

1  KREINDLER & KREINDLER LLP
   GRETCHEN M. NELSON (#112566)
2  MARK LABATON (#159555)
   707 Wilshire Boulevard, Suite 4100
3  Los Angeles, California 90017
   Telephone: (213) 622-6469
4  Facsimile: (213) 622-6019
   gnelson@kreindler.com
5  mlabaton@kreindler.com

6  *Liaison Counsel for Lead Plaintiffs*

   LABATON SUCHAROW LLP
7  JOEL H. BERNSTEIN
   JONATHAN M. PLASSE
8  IRA A. SCHOCHET
   DAVID J. GOLDSMITH
9  ETHAN D. WOHL
   ANN E. GITTLEMAN
10 140 Broadway
   New York, New York 10005
11 Telephone: (212) 907-0700
   Facsimile: (212) 818-0477
12 jbernstein@labaton.com
   jplasse@labaton.com
13 ischochet@labaton.com
   dgoldsmith@labaton.com
14 ewohl@labaton.com
   agittleman@labaton.com

15 *Lead Counsel for Lead Plaintiff Thomas*
   *P. DiNapoli, Comptroller of the State of*
16 *New York, as Administrative Head of the*
   *New York State and Local Retirement*
17 *Systems and as Trustee of the New York*
   *State Common Retirement Fund, and Lead*
18 *Plaintiff New York City Pension Funds*

19 [Additional counsel on signature page]

20                UNITED STATES DISTRICT COURT
21                CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
22
   IN RE COUNTRYWIDE FINANCIAL        Lead Case No.
23 CORPORATION SECURITIES             CV 07-05295 MRP (MANx)
   LITIGATION
24                                    **CONSOLIDATED AMENDED**
   This Document Applies to: All Actions   **CLASS ACTION COMPLAINT**
25                                    **FOR VIOLATIONS OF THE**
                                      **FEDERAL SECURITIES LAWS**
26
                                      [Exhibits filed under separate cover]
27
                                      Jury Trial Demanded
28

COPY

FILED

08 APR 11 PM 3: 58

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY:_____

1

## <u>__TABLE OF CONTENTS__</u>

2   GLOSSARY ............................................................................................................. xi

3   I.      NATURE AND SUMMARY OF THE ACTION ..................................... 2

4   II.     JURISDICTION AND VENUE ............................................................... 8

5   III.    THE PARTIES .......................................................................................... 9

6           A.   Plaintiffs ........................................................................................ 9

7           B.   Countrywide Defendants ............................................................. 11

8                1.   Countrywide and CCV ...................................................... 11

9                2.   The Officer Defendants ..................................................... 11

10               3.   Additional Individual Defendants .................................... 15

11          C.   Underwriter Defendants .............................................................. 18

12          D.   Auditor Defendants ..................................................................... 23

13  IV.     FACTUAL BACKGROUND AND SUBSTANTIVE
14          ALLEGATIONS ...................................................................................... 24

15          A.   Countrywide and its Interrelated Businesses ............................. 24

16          B.   Countrywide Shifts Away From Traditional Mortgages Toward
                 Producing Nontraditional, and Far Riskier, Loan Products ........ 27

17               1.   In an Effort to Achieve "Market Dominance," Mozilo and
18                    Sambol Spearhead a Dramatic "Culture Change" Starting in
                      or About May 2003 ........................................................... 27

19               2.   Countrywide's Nontraditional and Risky Loan Products ............ 30

20               3.   Countrywide's Significant Increases in Nontraditional Loan
21                    Originations Vastly Increase the Company's Credit Risk and
                      Liquidity Exposure ........................................................... 35

22          C.   Countrywide, Contrary to its Assurances of Strong and Superior
23               Underwriting Standards, Loosens and Abandons Them in Order
                 to Boost Loan Volume and Earnings ........................................... 39

24               1.   Countrywide, and Mozilo in Particular, Regularly Hyped the
                      Company's Underwriting Standards .................................. 39
25
                 2.   In an Effort to Meet Mozilo's 30% Market Share Goal,
26                    Countrywide Loosens its Underwriting Standards to Sweep
                      in Unqualified Borrowers ................................................. 42
27
                      (a)   The Underwriting Matrices Reveal a Steady Loosening
28                          of Loan Origination Standards............................... 44

(b)  Other Former Employees Company-Wide Witnessed the Loosening of Underwriting Standards .............................. 51

3.  Countrywide Ignores and Abandons its Underwriting Standards to Pump Up Loan Volume and Boost Earnings .......... 54

(a)  Countrywide Had a Company-Wide Practice of Originating and Funding Loans Without Regard to Loan Quality ..................................................................... 54

(b)  The Exception Processing System ..................................... 60

(c)  Countrywide's Inflated Appraisals and Other Fraudulent Loan Origination Practices ............................... 67

(d)  Countrywide Belatedly Begins to Tighten Up its Lax Lending Standards ............................................................. 72

D.  Countrywide Reported Minimal Origination of Subprime Loans By Classifying Subprime Loans as "Prime" ......................... 73

E.  Countrywide Misled the Class About the Creditworthiness of Pay Option ARM Borrowers ................................................... 81

F.  Countrywide Engaged in Widespread Predatory Lending Practices, Generating Short-Term Profit at Long-Term, Undisclosed Risk to the Class ................................................ 83

G.  Countrywide's Financial Statements Were Materially Misstated in Violation of GAAP ................................................................ 90

1.  Countrywide Inflated Earnings By Taking Inadequate Allowances for Loan Losses ..................................... 91

2.  Countrywide Inflated Earnings By Overvaluing its Retained Interests from Securitizations ..................................... 103

3.  Countrywide Inflated Earnings By Overvaluing its Mortgage Servicing Rights ..................................... 113

4.  Countrywide Inflated Earnings By Failing to Properly Reserve for Representations and Warranties ..................... 121

5.  Countrywide's Internal Controls Over Financial Reporting Were Ineffective ..................................... 128

H.  Defendants Materially Misrepresented Countrywide's Access to Liquidity And the Value of the Company's Excess Capital ............. 133

1.  Countrywide Did Not Have Access to Liquidity During the Class Period ..................................... 134

2.  The Company's Capital Was Overstated During the Class Period ..................................... 135

V.  ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER ................................................................. 138

   A.  Mortgage Banking Was Countrywide's "Core Business," and the Officer Defendants Closely Monitored the Company's Lending Practices and Credit Risk Exposure ..................................................... 138

   B.  The Officer Defendants Were Aware of, or Recklessly Disregarded, the Company's Relaxation and Abandonment of its Loan Underwriting Standards ............................................................. 142

   C.  The Officer Defendants Were Aware of, or Recklessly Disregarded, the Company's Violations of GAAP and Reporting of False Financial Statements.................................................................. 155

   D.  Insider Stock Sales By Mozilo and Other Officer Defendants During the Class Period Were Highly Unusual and Suspicious ........ 158

      1.  The Amount and Percentage of Shares Sold During the Class Period Was Extraordinary .................................................. 161

      2.  Stock Sales Increased Tremendously During the Class Period ........................................................................................ 161

      3.  Officer Defendants Generated Enormous Abnormal Profits on their Sales of Countrywide Stock ........................................ 165

      4.  Mozilo's Repeated and Highly Unusual Modifications of His 10b5-1 Trading Plans—Now Under Investigation By the SEC—Further Demonstrate the Suspicious Nature of His Selling .................................................................................... 167

      5.  The Increase in Stock Sales at the Same Time as Countrywide Initiated Major Stock Buybacks Further Demonstrates Their Suspicious Nature ................................. 172

VI.  THE AUDITOR DEFENDANTS ACTED WITH DELIBERATE RECKLESSNESS IN CONDUCTING THEIR AUDITS OF COUNTRYWIDE'S FINANCIAL STATEMENTS AND FAILED TO CONDUCT THOSE AUDITS IN ACCORDANCE WITH GAAS ............................................................................................... 173

   A.  Auditor Defendants Were Required to Comply With GAAS ........... 174

      1.  The Auditor Defendants' Expertise............................................ 174

      2.  The Standards of GAAS ............................................................ 176

   B.  The Auditor Defendants Failed To Exercise Due Professional Care and Professional Skepticism ..................................................... 177

   C.  The Auditor Defendants Failed To Properly Plan Their Audits of Countrywide ..................................................................................... 179

1          1.   The Auditor Defendants Failed to Obtain Knowledge of
2               Countrywide's Business ..................................................... 179

           2.   The Auditor Defendants Failed to Consider  Countrywide's
3               Lack of Internal Controls ................................................. 182

4          3.   The Auditor Defendants Failed to Obtain Sufficient
5               Competent Evidential Matter ........................................... 185

           4.   The Auditor Defendants Failed to Properly Evaluate
6               Management's Accounting Estimates ............................... 187

7     D.   The Auditor Defendants Recklessly, or in the Alternative
          Negligently, Expressed an Unqualified Opinion on
8         Countrywide's Financial Statements ...................................... 189

9   VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
          STATEMENTS ................................................................................. 190
10
      A.   The Company's False Statements Regarding 2003 Results ............... 190
11
      B.   The Company's False Statements Regarding 2004 Results ............... 195
12
           1.   First Quarter 2004 Form 8-K ........................................ 195
13
           2.   First Quarter 2004 Conference Call ............................ 196
14
           3.   First Quarter 2004 Form 10-Q ...................................... 198
15
           4.   Second Quarter 2004 Form 8-K .................................... 201
16
           5.   Second Quarter 2004 Conference Call ......................... 201
17
           6.   Second Quarter 2004 Form 10-Q .................................. 203
18
           7.   Third Quarter 2004 Form 8-K ...................................... 205
19
           8.   Third Quarter 2004 Conference Call ........................... 206
20
           9.   Third Quarter 2004 Form 10-Q ..................................... 208
21
           10.  Year End 2004 Form 8-K ................................................ 210
22
           11.  Year End 2004 Conference Call ...................................... 211
23
           12.  2004 Form 10-K ............................................................ 213
24
      C.   The Company's False Statements Regarding 2005 Results ............... 217
25
           1.   March 15, 2005 Piper Jaffray Conference ................... 217
26
           2.   First Quarter 2004 Amended Form 10-Q/A ................. 220
27
           3.   First Quarter 2005 Form 8-K ........................................ 221
28

4.  First Quarter 2005 Conference Call ...........................................222

5.  First Quarter 2005 Form 10-Q......................................................224

6.  Second Quarter 2004 Amended Form 10-Q/A ...........................226

7.  Third Quarter 2004 Amended Form 10-Q/A .............................226

8.  May 24, 2005 Countrywide Analyst Meeting............................227

9.  June 2, 2005 Sanford Bernstein & Co. Strategic Decisions
    Conference..................................................................................229

10. Second Quarter 2005 Form 8-K ................................................231

11. Second Quarter 2005 Conference Call......................................232

12. Second Quarter 2005 Form 10-Q ..............................................236

13. September 13, 2005 Lehman Brothers Financial Services
    Conference..................................................................................238

14. Third Quarter 2005 Form 8-K ...................................................239

15. Third Quarter 2005 Conference Call.........................................240

16. Third Quarter 2005 Form 10-Q .................................................241

17. Year End 2005 Form 8-K ...........................................................244

18. Year End 2005 Conference Call.................................................245

19. 2005 Form 10-K ..........................................................................246

20. March 6, 2007 Raymond James Institutional Investor
    Conference..................................................................................251

21. March 30, 2006 Countrywide Equity Investors Forum..............252

D.  The Company's False Statements Regarding 2006 Results...............255

1.  First Quarter 2006 Form 8-K......................................................255

2.  First Quarter 2006 Conference Call ..........................................255

3.  First Quarter 2006 Form 10-Q....................................................257

4.  May 17, 2006 American Financial Services Association
    Finance Industry Conference for Fixed Income Investors..........260

5.  Second Quarter 2006 Form 8-K .................................................262

6.  Second Quarter 2006 Conference Call.......................................262

7.  Second Quarter 2006 Form 10-Q ...............................................263

8.   September 12, 2006 Equity Investors Forum ..............................266

9.   September 13, 2006 Fixed Income Investor Forum ...................267

10.  Third Quarter 2006 Form 8-K ......................................................271

11.  Third Quarter 2006 Conference Call ...........................................272

12.  Third Quarter 2006 Form 10-Q....................................................273

13.  Year End 2006 Form 8-K ..............................................................276

14.  Year End 2006 Conference Call....................................................277

15.  2006 Form 10-K ..............................................................................279

E.   The Company's False Statements Regarding 2007 Results
     Before the Truth Begins to Emerge.................................................284

     1.   March 13, 2007 CNBC Interview and March 22, 2007 "Mad
          Money" Interview......................................................................284

     2.   First Quarter 2007 Form 8-K....................................................287

     3.   First Quarter 2007 Conference Call .........................................287

     4.   April 26, 2007 AFSA 7th Finance Industry Conference............290

     5.   First Quarter 2007 Form 10-Q..................................................293

F.   False and Misleading Registration Statements and Prospectuses
     for Countrywide's Offerings of Debt and Preferred Securities .........296

     1.   Series A Medium-Term Notes.....................................................296

     2.   Floating Rate Subordinated Notes Due April 1, 2011 ...............299

     3.   Series B Medium-Term Notes.....................................................300

     4.   6.25% Subordinated Notes Due May 15, 2016...........................302

     5.   7% Capital Securities .................................................................304

     6.   Series A and Series B Floating Rate Convertible Senior
          Debentures .................................................................................305

VIII.  INVESTORS BEGIN TO LEARN THE TRUTH ABOUT
       COUNTRYWIDE, CAUSING ITS SECURITIES TO PLUMMET
       IN VALUE, BUT THE COMPANY CONTINUES TO LULL THE
       INVESTING PUBLIC WITH  ADDITIONAL FALSE AND
       MISLEADING STATEMENTS ...................................................307

IX.    LOSS CAUSATION .....................................................................347

X.     POST-CLASS PERIOD EVENTS ..............................................350

XI.    CLASS ACTION ALLEGATIONS ...........................................................351

XII.   PRESUMPTION OF RELIANCE .............................................................354

XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ....................356

XIV.  CLAIMS FOR RELIEF .............................................................................357

COUNT I
For Violations of Section 11 of the Securities Act, on Behalf
of Purchasers of Series A Medium-Term Notes, Asserted
Against Defendants Countrywide, Mozilo, Kurland,
McLaughlin, Cisneros, Cunningham, Donato, Dougherty,
Enis, Garcia, Heller, King, Melone, Robertson, Russell, and
Snyder; Grant Thornton; and ABN AMRO, Banc of America
Securities, Barclays Capital, BNP Paribas, Citigroup Global
Markets, Countrywide Securities, Deutsche Bank, Dresdner
Kleinwort Wasserstein, Greenwich Capital, Goldman Sachs,
HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan
Stanley, RBC Capital, RBC Dominion, SG Americas
Securities, Wachovia Capital, and Wachovia Securities...................357

COUNT II
For Violations of Section 12(a)(2) of the Securities Act on
Behalf of Purchasers of Series A Medium-Term Notes,
Asserted Against Defendants Countrywide, ABN AMRO,
Banc of America Securities, Barclays Capital, BNP Paribas,
Citigroup Global Markets, Countrywide Securities, Deutsche
Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital,
Goldman Sachs, HSBC, J.P. Morgan Securities, Lehman
Brothers, Morgan Stanley, RBC Capital, RBC Dominion, SG
Americas Securities, Wachovia Capital, and Wachovia
Securities ..............................................................................................361

COUNT III
For Violations of Section 15 of the Securities Act on Behalf of
Purchasers of Series A Medium-Term Notes, Asserted Against
Defendants Mozilo, Kurland, and McLaughlin ..................................364

COUNT IV
For Violations of Section 11 of the Securities Act On Behalf of
Purchasers of Floating Rate Subordinated Notes Due April 1,
2011, Asserted Against Defendants Countrywide; Mozilo,
Kurland, McLaughlin, Cisneros, Cunningham, Donato,
Dougherty, Enis, Garcia, Heller, King, Melone, Robertson,
Russell, and Snyder; Grant Thornton and KPMG; and J.P.
Morgan Securities and Countrywide Securities...................................366

COUNT V
For Violations of Section 12(a)(2) of the Securities Act on
Behalf of Purchasers of Floating Rate Subordinated Notes Due
April 1, 2011, Asserted Against Defendants Countrywide, J.P.
Morgan Securities, and Countrywide Securities................................370

COUNT VI
For Violations of Section 15 of the Securities Act on Behalf of
Purchasers of Floating Rate Subordinated Notes Due April 1,
2011, Asserted Against Defendants Mozilo, Kurland, and
McLaughlin ...................................................................................... 372

COUNT VII
For Violations of Section 11 of the Securities Act on Behalf of
Purchasers of Series B Medium-Term Notes, Asserted Against
Defendants Countrywide,  Mozilo, Sambol, Kurland, Sieracki,
Brown, Cisneros, Cunningham, Donato, Dougherty, Enis,
Garcia, Heller, Melone, Parry, Robertson, Russell, and Snyder;
Grant Thornton and KPMG; and ABN AMRO, Banc of
America Securities, Barclays Capital, BNP Paribas, BNY
Capital, Citigroup Global Markets, Countrywide Securities,
Deutsche Bank, Dresdner Kleinwort Wasserstein, Goldman
Sachs, Greenwich Capital, HSBC, J.P. Morgan Securities,
Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC
Capital, RBC Dominion, Scotia Capital, SG Americas
Securities, TD Securities, UBS Securities, and Wachovia
Capital ................................................................................................. 374

COUNT VIII
For Violations of Section 12(a)(2) on Behalf of Purchasers of
Series B Medium-Term Notes, Asserted Against Defendants
Countrywide, ABN AMRO, Banc of America Securities,
Barclays Capital, BNP Paribas, BNY Capital, Citigroup
Global Markets, Countrywide Securities, Deutsche Bank,
Dresdner Kleinwort Wasserstein, Goldman Sachs, Greenwich
Capital, HSBC, J.P. Morgan Securities, Lehman Brothers,
Merrill Lynch, Morgan Stanley, RBC Capital, RBC Dominion,
Scotia Capital, SG Americas Securities, TD Securities, UBS
Securities, and Wachovia Capital ...................................................... 379

COUNT IX
For Violations of Section 15 of the Securities Act on Behalf of
Purchasers of Series B Medium-Term Notes, Asserted Against
Defendants Mozilo, Sambol, and Kurland ......................................... 382

COUNT X
For Violations of Section 11 of the Securities Act on Behalf of
Purchasers of 6.25% Subordinated Notes Due May 15, 2016,
Asserted Against Defendants Countrywide, Mozilo, Sambol,
Kurland, Sieracki, Brown, Cisneros, Cunningham, Donato,
Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson,
Russell, and Snyder; Grant Thornton and KPMG; and Banc of
America Securities, J.P. Morgan Securities, Countrywide
Securities, Barclays Capital, Deutsche Bank, HSBC, and
Wachovia Capital ............................................................................... 384

COUNT XI
    For Violations of Section 12(a)(2) of the Securities Act on
    Behalf of Purchasers of 6.25% Subordinated Notes Due May
    15, 2016, Asserted Against Defendants Countrywide, Banc of
    America Securities, J.P. Morgan Securities, Countrywide
    Securities, Barclays Capital, Deutsche Bank, HSBC, and
    Wachovia Capital ................................................................................388

COUNT XII
    For Violations of Section 15 of the Securities Act on Behalf of
    Purchasers of 6.25% Subordinated Notes Due May 15, 2016,
    Asserted Against Defendants Mozilo, Sambol, Sieracki, and
    Kurland ...............................................................................................391

COUNT XIII
    For Violations of Section 11 of the Securities Act on Behalf of
    Purchasers of 7% Capital Securities, Asserted Against
    Defendants Countrywide and CCV; Mozilo, Kurland, Sambol,
    Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty,
    Garcia, Gissinger, Melone, Parry, Robertson, Russell, and
    Snyder; Grant Thornton and KPMG; and Citigroup Global
    Markets, J.P. Morgan Securities, Merrill Lynch, UBS
    Securities, Wachovia Capital, Countrywide Securities, A.G.
    Edwards, Banc of America Securities, RBC Dain Rauscher,
    Barclays Capital, Deutsche Bank, Goldman Sachs, HSBC, and
    Lehman Brothers ................................................................................393

COUNT XIV
    For Violations of Section 12(a)(2) of the Securities Act on
    Behalf of Purchasers of 7% Capital Securities, Asserted
    Against Defendants Countrywide and CCV; and Defendants
    Citigroup Global Markets, J.P. Morgan Securities, Merrill
    Lynch, UBS Securities, Wachovia Capital, Countrywide
    Securities, A.G. Edwards, Banc of America Securities, RBC
    Dain Rauscher, Barclays Capital, Deutsche Bank, Goldman
    Sachs, HSBC, and Lehman Brothers..................................................398

COUNT XV
    For Violations of Section 15 of the Securities Act on Behalf of
    Purchasers of 7% Capital Securities, Asserted Against
    Defendants Mozilo, Sambol, and Sieracki .........................................401

COUNT XVI
    For Violations of Section 10(b) of the Exchange Act and SEC
    Rule 10b-5 on Behalf of Plaintiffs, Asserted Against
    Countrywide and the Officer Defendants............................................403

COUNT XVII
    For Violations of Section 20(a) of the Exchange Act, on
    Behalf of Plaintiffs, Asserted Against the Officer Defendants..........405

COUNT XVIII
    For Violations of Section 10(b) of the Exchange Act and SEC
    Rule 10b-5 on Behalf of Plaintiffs, Asserted Against KPMG
    and Grant Thornton ............................................................................406

COUNT XIX
 For Violations of Section 10(b) of the Exchange Act and SEC
 Rule 10b-5 on Behalf of Purchasers of Series A Debentures
 and Series B Debentures, Asserted Against Defendants
 Countrywide, Mozilo, Sambol, Sieracki, and KPMG.......................408

COUNT XX
 For Violations of Section 20(a) of the Exchange Act, on
 Behalf of Purchasers of Series A Debentures and Series B
 Debentures, Asserted Against Defendants Mozilo, Sambol and
 Sieracki ...............................................................................................411

COUNT XXI
 For Violations of Section 20A of the Exchange Act, on Behalf
 of Lead Plaintiffs, Asserted Against Defendants Mozilo,
 Sambol and Kurland ..........................................................................413

XV. PRAYER FOR RELIEF ...........................................................................414

XVI. DEMAND FOR JURY TRIAL.................................................................415

1

# **GLOSSARY**

2

3   2011 Notes...................................................................................299
        Floating Rate Subordinated Notes due April 1, 2011

4

5   2/28 loans......................................................................................30
        Loans with a teaser rate that would last for only 2 years before
        "resetting" to higher rates

6

7   2-Year Notes..................................................................................19
        2-Year Floating Rate Notes due 2007

8   3-Year Notes.................................................................................298
        3-Year Floating Rate Notes due 2008

9

10  6.25% Notes.................................................................................302
        6.25% Subordinated Floating Rate Notes due May 15, 2016

11  A&A.............................................................................................177
        AICPA Audit & Accounting Guide for lending institutions

12      providing guidance for independent accountants for high-risk
        areas of material misstatements

13

14  ALCO...........................................................................................104
        Asset/Liability Committee is comprised of several of the

15      Company's senior financial executives who determined the
        valuation of retained interests

16  Allowance for loan losses................................................................91
        Reserve for potential credit losses if underlying borrowers

17      defaulted on their obligations to make monthly mortgage
        payments

18

19  AMPS..........................................................................................149
        Report that summarized all of the Company's approved exception

20      loans and the overrides to the Company's underwriting guidelines
        made on those loans

21  ARMs............................................................................................2
        Adjustable rate mortgages

22

23  AS No. 2......................................................................................182
        PCAOB Auditing Standards, An Audit of Internal Control Over
        Financial Reporting Performed in Conjunction with an Audit of

24      the Financial Statements

25  Auditor Defendants.........................................................................23
        Grant Thornton and KPMG

26

27  Brown, Kathleen.............................................................................15
        Member of Countrywide's Board of Directors from March 2005
        until March 29, 2007.

28

CCV ...........................................................................................................11
    Countrywide Capital V is a Delaware Statutory Trust created by
    Countrywide

CHL ...........................................................................................................12
    Countrywide Home Loans, Inc.

Cisneros, Henry G. .....................................................................................15
    Member of Countrywide's Board of Directors from 2001 until
    October 24, 2007

Class Period ................................................................................................2
    Between March 12, 2004 and March 7, 2008

CLD ...........................................................................................................43
    Correspondent Lending Division

CLTV .........................................................................................................45
    Combined loan-to-value

CMD ..........................................................................................................50
    Division is Countrywide's loan origination and loan purchasing
    division.

CORAD .....................................................................................................150
    Countrywide Organizational Risk Assessment Database

COSO .......................................................................................................184
    Committee of Sponsoring Organizations of the Treadway
    Commission that issued Internal Control-Integrated Framework

Critical Accounting Policies .....................................................................155
    Accounting policies that governed the application of GAAP in the
    preparation of its financial statements

Cunningham, Jeffrey...................................................................................16
    Member of Countrywide's Board of Directors since 1998

DLO Matrix ...............................................................................................67
    Divides borrowers into three main categories based on credit
    scores: "620 or greater," "500 to 619," and "Less than 500." No
    distinction is drawn at the 660 (or 659) FICO level.

Donato, Robert J. .......................................................................................16
    Member of Countrywide's Board of Directors since 1993.

Dougherty, Michael E..................................................................................16
    Member of Countrywide's Board of Directors from 1998 until
    March 28, 2007.

DSCR .......................................................................................................123
    Debt service coverage ratios

**EITF 92-2** ...................................................................................................123
Emerging Issues Task Force, Measuring Loss Accruals by Transferors for Transfers of Receivables with Recourse, states that the reserve should be estimated based upon certain factors, including the Company's historical repurchase experience, industry repurchase experience, expected future volume of repurchases, and expected value of underlying collateral

**Enis, Ben M.** .................................................................................................16
Member of Countrywide's Board of Directors from 1984 until June 2006.

**EPS** ................................................................................................................4
Exception Processing System, proprietary computer system that was used to identify and route highly risky loans out of the regular loan approval process

**FASB** .............................................................................................................90
Financial Accounting Standards Board

**FHA** ..............................................................................................................87
Federal Housing Administration

**FICO** .............................................................................................................40
Fair Isaac Credit Organization

**First Buyback** ...............................................................................................172
Countrywide's first stock buyback for up to $2.5 billion in Countrywide stock announced on October 24, 2006

**FSL** ...............................................................................................................34
Full Spectrum Lending Division is Countrywide's loan origination and loan purchasing division.

**GAAP** ............................................................................................................90
Generally Accepted Accounting Principles

**GAAS** ...........................................................................................................173
Generally Accepted Auditing Standards

**Garcia, Carlos M.** .........................................................................................16
Countrywide's Executive Managing Director for Banking and Insurance and member of CHL's Board of Directors throughout the Class Period

**Gissinger III, Andrew** ....................................................................................16
Member of CHL's Board of Directors throughout the Class Period and Senior Managing Director and Chief Production Officer of CHL since 2006

**GSEs** .............................................................................................................27
Government sponsored entities providing liquidity to the home mortgage market

Heller, Edwin ................................................................................. 16
    Member of Countrywide's Board of Directors from 1993 until
    June 2006

HELOCs ........................................................................................ 33
    Home Equity Lines of Credit, second mortgage loans secured
    only by the difference between the value of the home and the
    amount due on a first mortgage

Individual Defendants .................................................................. 15
    Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros,
    Cunningham, Donato, Dougherty, Enis, Garcia, Gissinger, Heller,
    King, McLaughlin, Melone, Parry, Robertson, Russell, and
    Snyder

Interest-only mortgages ................................................................ 33
    Allowed the borrower to pay only the interest accruing on the
    loan each month for a predetermined time period.

King, Gwendolyn Stewart ............................................................. 17
    Member of Countrywide's Board of Directors from 2001 until
    November 15, 2004.

Kurland, Stanford L. ...................................................................... 7
    President and COO of Countrywide from before the Class Period
    until he resigned on September 7, 2006; joined Countrywide in
    1979, became COO in 1988.  President in January 2004, served in
    a number of other executive positions at the Company including
    Executive Managing Director from 2000 to 2003, Senior
    Managing Director from 1989 to 2000, from 2003 through 2005
    CEO and a director of CHL, and Chairman of CHL during 2006.

LIBOR ......................................................................................... 116
    London Inter Bank Offering Rate

LTV ............................................................................................. 124
    Loan-to-value

MBS .............................................................................................. 24
    Mortgage-backed securities

McLaughlin, Thomas K. ................................................................ 17
    Countrywide's Executive Managing Director and Chief Financial
    Officer from 2004 until his resignation effective April 1, 2005

Melone, Martin R. ......................................................................... 17
    Member of Countrywide's Board of Directors since 2003.

Mozilo, Angelo R. .......................................................................... 7
    Officer Defendant, Individual Defendant, the Company's co-
    founder, Chairman and CEO

MSRs ............................................................................................ 90
    Mortgage servicing rights

No doc loans .................................................................................32
    Loans based on a borrower's bare representations about his or her
    ability to repay, with little or no documentation to substantiate
    those representations

Officer Defendants...........................................................................11
    Mozilo, Sambol, Sieracki and Kurland

PAL ...............................................................................................65
    Price Any Loan, a proprietary computer system, or "pricing
    engine"

Parry, Robert T. ..............................................................................17
    Member of Countrywide's Board of Directors since 2004

Pay Option ARMs............................................................................3
    Pay-option adjustable-rate mortgages

PCAOB .........................................................................................131
    Public Company Accounting Oversight Board established by the
    Sarbanes-Oxley Act of 2002

PMI ...............................................................................................34
    Private Mortgage Insurance

PSLRA ............................................................................................9
    Private Securities Litigation Reform Act

QSPE............................................................................................103
    Qualifying Special Purpose Entity

Robertson, Oscar P. ........................................................................17
    Member of Countrywide's Board of Directors since 2000

Russell, Keith P. .............................................................................17
    Member of Countrywide's Board of Directors since 2003

SAB...............................................................................................92
    SEC Staff Accounting Bulletin

Sambol, David ................................................................................7
    Officer Defendant, Individual Defendant, joined Countrywide in
    1985 and became the Company's President and COO in
    September 2006.  He served as Executive Managing Director for
    Business Segment Operations from 2004 to 2006, Chairman and
    CEO of CHL since 2007, and President and COO of CHL from
    2004 through 2006.

Securities Act...................................................................................8
    Securities Act of 1933

SFAS.............................................................................................90
    Statement of Financial Accounting Standards

Sieracki, Eric P. ............................................................................. 12
    Officer Defendant, Individual Defendant, served as the
    Company's Executive Managing Director and CFO and CFO of
    Countrywide Bank Since April 2005 and is a member of the
    Executive Strategy Committee

SISA loans ..................................................................................... 55
    Stated Income/Stated Asset loans

Snyder, Harley W. ........................................................................... 17
    Member of Countrywide's Board of Directors since 1991

SOX ............................................................................................... 12
    Sarbanes-Oxley Act of 2002

Stated income loans ....................................................................... 32
    Loans based on a borrower's bare representations about his or her
    ability to repay, with little or no documentation to substantiate
    those representations

Underwriter Defendants ................................................................. 18
    ABN AMRO Incorporated, A.G. Edwards & Sons, Inc., Banc of
    America Securities LLC, Barclays Capital Inc., BNP Paribas
    Securities Corp., BNY Capital Markets, Inc., Citigroup Global
    Markets Inc., Countrywide Securities Corporation, Deutsche
    Bank Securities Inc., Dresdner Kleinwort Wasserstein Securities
    Inc., Goldman, Sachs & Co., Greenwich Capital Markets, Inc.,
    HSBC Securities (USA) Inc., J.P. Morgan Securities Inc.,
    Lehman Brothers Inc., Merrill, Lynch, Pierce, Fenner & Smith
    Incorporated, Morgan Stanley & Co. Incorporated, RBC Capital
    Markets Corp., RBC Dominion Securities Inc., RBC Dain
    Rauscher Inc., Scotia Capital Inc., SG Americas Securities, LLC,
    TD Securities Inc., UBS Securities LLC, Wachovia Capital
    Markets, LLC, and Wachovia Securities, Inc.

USAP ............................................................................................ 175
    Uniform Single Attestation Program

VLF ............................................................................................... 152
    A Countrywide proprietary database called Virtual Loan File

VOE ............................................................................................... 58
    Verification of employment

WLD .............................................................................................. 50
    Wholesale Lending Division, Countrywide's loan origination and
    loan purchasing division

1    Court-appointed Lead Plaintiff Thomas P. DiNapoli, Comptroller of the
2    State of New York, as Administrative Head of the New York State and Local
3    Retirement Systems and as Trustee of the New York State Common Retirement
4    Fund ("NYSCRF"), Court-appointed Lead Plaintiffs New York City Employees'
5    Retirement System, New York City Police Pension Fund, New York City Fire
6    Department Pension Fund, New York City Board of Education Retirement
7    System, and Teachers' Retirement System of the City of New York (collectively,
8    the "New York City Pension Funds" and, together with NYSCRF, the "New York
9    Funds"), and Plaintiffs Barry Brahn and Shelley B. Katzeff (together with the
10   "New York Funds," "Plaintiffs"), individually and on behalf of a class of
11   similarly situated persons and entities, by their undersigned counsel, for their
12   Consolidated Amended Class Action Complaint for Violations of the Federal
13   Securities Laws asserting claims against Countrywide Financial Corporation
14   ("Countrywide" or the "Company") and the other Defendants named herein,
15   allege the following upon personal knowledge as to themselves and their own
16   acts, and upon information and belief as to all other matters.[1]

17        Plaintiffs' information and belief as to allegations concerning matters other
18   than themselves and their own acts is based upon, among other things, (i) review
19   and analysis of documents filed publicly by Countrywide with the Securities and
20   Exchange Commission (the "SEC"); (ii) review and analysis of press releases,
21   news articles, and other public statements issued by or concerning Countrywide
22   and other Defendants named herein; (iii) review and analysis of research reports
23   issued by financial analysts concerning Countrywide's securities and business;
24   (iv) discussions with consulting experts; (v) other publicly available information
25   and data concerning Countrywide and its securities, including information

26   _____
27   [1] A glossary of certain defined terms in this Complaint and terms that are
     specific to Countrywide's business and the mortgage banking industry appears
28   after the table of contents.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
MASTER FILE NO. CV 07-05295 MRP (MANx)

1    concerning investigations of Countrywide being pursued by, among others, the

2    Federal Bureau of Investigation ("the FBI"), the SEC, the United States Trustee,

3    the United States Congress, and the California, Florida, Illinois and North

4    Carolina Attorneys General; (vi) an investigation conducted by and through Lead

5    Plaintiffs' attorneys, which included interviews of numerous former Countrywide

6    executives and employees and review and analysis of certain nonpublic

7    documents concerning Countrywide's business; (vii) review and analysis of news

8    articles, media reports and other publications concerning the mortgage banking

9    and lending industries; and (viii) review and analysis of certain pleadings filed in

10   other pending litigations naming Countrywide as a defendant or nominal

11   defendant.  Plaintiffs believe that substantial additional evidentiary support for the

12   allegations herein exists and will continue to be revealed after Plaintiffs have a

13   reasonable opportunity for discovery.

14

15   **I.     NATURE AND SUMMARY OF THE ACTION**

16        1.     Plaintiffs bring this federal securities class action on behalf of

17   themselves and all similarly situated persons and entities that, between March 12,

18   2004 and March 7, 2008, inclusive (the "Class Period"), purchased or otherwise

19   acquired the publicly traded common stock or other equity securities, debt

20   securities, or call options of or guaranteed by Countrywide, or sold Countrywide

21   put options, either in the open market or pursuant or traceable to a registration

22   statement, and were damaged thereby (the "Class").

23        2.     Countrywide has long been among the nation's largest mortgage

24   lenders, and became, to use its own tagline, "America's #1 Home Loan Lender"

25   during the Class Period.   The Company's singular effort to overtake its

26   competitors and capture a dominant share of the nation's residential loan market,

27   however, was the impetus for one of the largest corporate frauds in recent years,

28

1    one that led *The New York Times* to suggest that Countrywide may be "Enron's

2    Second Coming."

3       3.    In or about mid-2003, as described by a former high-ranking

4    executive, Countrywide embarked on a "culture change" that, during the Class

5    Period, involved a dramatic shift away from making traditional, fixed-rate

6    mortgages toward offering an array of new and far riskier loan products such as

7    pay-option adjustable-rate mortgages ("Pay Option ARMs"), which encouraged

8    borrowers to make "minimum" payments of a fraction of the interest due,

9    resulting in ballooning principal balances many borrowers could not repay; and

10    home equity lines of credit ("HELOCS"), which were second-lien mortgages that

11    faced substantial increased risk of becoming worthless in a default.  These loans

12    were not only risky by their terms, but were increasingly made to borrowers with

13    poor credit and were made on a "stated document" or "low documentation" basis,

14    meaning that the borrowers were not required (or even asked) to submit proof of

15    income or assets.

16       4.    All the while, Countrywide's senior management, including Angelo

17    R. Mozilo ("Mozilo"), the Company's co-founder, Chairman and CEO, falsely

18    assured the market that the Company's policies and procedures for underwriting

19    loans—in essence, determining whether the borrower was likely to pay in full and

20    on time—were tightly controlled and supervised and "designed to produce high

21    quality loans."  During the Class Period, Countrywide repeatedly represented that

22    its loan origination and underwriting practices were careful and "disciplined," and

23    also repeatedly described its practices as far superior to those of competing

24    lenders.  The consistent and essential message to the public was that

25    Countrywide, with Mozilo and his team at the helm, was "a very different focused

26    company" and that other lenders were fly-by-night outfits that did not know the

27    mortgage business and should be avoided by investors.

28

---

5.     During this time, however, and contrary to these public assurances, Countrywide was steadily loosening its underwriting standards to sweep in borrowers with poor credit, and was significantly deviating from these weakening standards in order to generate huge volumes of loans and quickly sell them off to the secondary mortgage market, the Company's chief source of financing.  Senior management, particularly David Sambol ("Sambol"), who ran the Company's loan production machine as President and COO of Countrywide Home Loans, Inc., sent a clear message to loan origination and underwriting employees that issuing loans was far more important than determining whether or not the loans should be made because of borrower creditworthiness.  Careful underwriting essentially went by the boards in favor of  cavalier loan origination and booking earnings.  "Exception loans"—loans that did not satisfy even the Company's weakened underwriting criteria—were routinely approved every day in high volume through a computer system called the Exception Processing System ("EPS"), but only after the Company charged these high risk borrowers extra points and fees.  An internal document described a principal objective of EPS as "[a]pprov[ing] virtually every borrower and loan profile with pricing add on when necessary."

6.     Further, to conceal its greatly increased production of subprime loans, Countrywide employed an internal, undisclosed definition of prime versus subprime, and thus, in its public reports, classified loans as "prime" that clearly were subprime.  Additionally, while the Company repeatedly represented that its Pay Option ARMs, which carried an especially high degree of risk, went only to the most sophisticated and creditworthy borrowers, many of these loans were made to borrowers with very weak credit.  In fact, it was revealed late in the Class Period, when the truth began to emerge, that the vast majority of Pay Option ARMs were made on a "low doc" or "no doc" basis.  In sum, Countrywide sacrificed loan ***quality*** for loan ***quantity*** in order to pump up loan production,

1  charge extra fees and higher interest rates, and boost its revenues.  At the same

2  time, as a result of its sacrifice of loan quality, the risk of borrower defaults

3  consistently increased during the Class Period, yet Countrywide never disclosed

4  this increased risk to the Class.

5      7.     Despite all of these risky lending practices, Countrywide's

6  management failed, in violation of generally accepted accounting principles

7  ("GAAP"), to set aside sufficient reserves for the massive loan losses that would

8  inevitably occur.  As the level of risk in Countrywide's loan portfolio drastically

9  increased, the Company kept the level of loan loss reserves relatively constant or

10  even allowed it to decrease, knowing that to increase loan loss reserves would

11  have a direct, dollar-for-dollar impact on the amount of earnings the Company

12  could report in its financial statements.  In addition to the failure to increase loan

13  loss reserves, Countrywide also reported inflated earnings, in violation of GAAP,

14  by overvaluing its "retained interests" and mortgage servicing rights from loans

15  securitized and sold to the secondary market, and by failing to properly reserve

16  for representations and warranties it made to purchasers of such securitized loans.

17      8.     The Auditor Defendants (defined below) negligently or recklessly

18  failed to comply with generally accepted auditing standards ("GAAS") in

19  auditing Countrywide's financial statements, and thus participated in conveying

20  materially false and misleading statements to the investing public.  As described

21  more fully below, the Underwriter Defendants (defined below) are responsible by

22  statute for materially false and misleading statements included in registration

23  statements and prospectuses for offerings of Countrywide debt and preferred

24  securities during the Class Period.

25      9.     Countrywide's risky scheme to artificially inflate earnings in the

26  short term initially resulted in remarkable growth for the Company, with a

27  seemingly booming business, a dominant market share, and a stock price that,

28  after trading under $20 for most of 2003, traded in the mid-$30s early in the Class

1  Period and climbed to a high of $45 by early 2007.  However, this growth has
2  been wiped out by a devastating collapse, with the stock price losing **87%** of its
3  value between July 2007 and March 2008, from approximately $34 to $4 per
4  share, as a result of a series of revelations of the truth concerning Countrywide.
5  The collapse in Countrywide's stock price from its Class Period high represents a
6  loss of market capitalization exceeding $25 billion.

7        10.    These revelations included disclosures on July 24, 2007, in
8  connection with disappointing second quarter results, that delinquency rates in the
9  Company's loan portfolios had jumped sharply, that its allowances for loan losses
10  were inadequate, and that the Company wrote down, by $388 million, the value
11  of retained interests on securitizations of HELOCs.  The Company also revealed,
12  in remarks during its quarterly conference call, that it had been classifying loans
13  as "prime" that the industry would have viewed as subprime, and that the
14  Company had "recalibrated" its proprietary underwriting system and made
15  numerous changes to its underwriting guidelines and processes.  In response, one
16  analyst stated that Countrywide "made serious miscalculations (and possibly
17  misrepresentations) about the quality of [its] loans" and observed that its
18  supposedly prime loans were "performing roughly in line with [a competing
19  lender's] subprime deals."

20        11.    Numerous additional partially corrective disclosures relating to
21  Countrywide's lending practices and financial reporting (including an enormous
22  and unprecedented $1.2 billion loss for the third quarter of 2007) followed,
23  culminating on March 8, 2008 with the stunning news that the FBI is
24  investigating Countrywide for securities fraud.  According to *The Wall Street*
25  *Journal*, the inquiry involves "whether senior officials made misrepresentations
26  about the Company's financial position and the quality of its mortgage loans in
27  securities filings."

28

---

12.    As the truth about Countrywide began to emerge in and after July 2007, Countrywide lost its ability to sell debt securities and accordingly suffered a serious cash crisis.  Countrywide systematically burned through its backup sources of liquidity, including pulling down its entire $11.5 billion credit facility, all the while misleading investors as to the true depth of its liquidity problems. By the Fall of 2007, the prospect of bankruptcy loomed.

13.    Countrywide's swift and stunning collapse—and the massive losses that unsuspecting investors have suffered as a result—were not caused by ordinary, or even extraordinary, market forces or business cycles.  Rather, as a former Countrywide risk management executive explained, the Company's downfall was largely caused by "lax underwriting guidelines" and its rapidly increasing origination of inherently risky loans to borrowers with poor credit. Notably, in September 2007, after the truth about Countrywide's fraud began to emerge, Secretary of the Treasury Henry M. Paulson told a group of mortgage industry executives: "Unlike periods of financial turbulence I've witnessed over many years, this turbulence wasn't precipitated by problems in the real economy. *This came about as a result of some bad lending practices.*"[2]

14.    Countrywide, its credibility shattered and its stock price crippled, is now preparing to be acquired by Bank of America Corporation, a former competitor, for the bargain-basement price of $4 billion in stock.  This sales price represents only 23% of the Company's $17.3 billion market capitalization at the beginning of the Class Period.

15.    Defendants Mozilo and Sambol, and Stanford L. Kurland, Countrywide's former President and COO, who were principally responsible for the Company's "culture change" and concerted foray into leveraged and high-risk lending practices, became enormously—almost indescribably—rich from insider

---

[2]    Throughout this Complaint, emphasis is added unless otherwise stated.

1    sales of Countrywide stock at artificially inflated prices, together reaping more

2    than **$735 million**.    The amount and timing of these stock sales present

3    compelling evidence against these Defendants, and the SEC has commenced an

4    inquiry into Mozilo's sales based in part on his frequent, and "fortuitous,"

5    amendments of his Rule 10b5-1 trading plans.    Moreover, these stock sales

6    occurred, and Mozilo's sales accelerated, just as the Company initiated the first of

7    two billion-dollar stock repurchase programs.    These buyback programs

8    supported Countrywide's stock price, securing massive profits for Mozilo's

9    personal sales, while the Company, and through it, the Class, suffered massive

10   losses on the shares it repurchased.

11

12   **II.    JURISDICTION AND VENUE**

13       16.    The claims asserted herein arise under Sections 11, 12(a)(2) and 15

14   of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l* and

15   77*o*, Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the

16   "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5

17   promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18       17.    This Court has jurisdiction over the subject matter of this action

19   pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the

20   Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

21       18.    Venue is proper in this District pursuant to Section 22 of the

22   Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), (c) and

23   (d).    Many of the acts and omissions charged herein, including the preparation

24   and dissemination to the public of materially false and misleading information,

25   occurred in substantial part in the Central District of California.    Countrywide

26   maintains its corporate headquarters and principal executive offices in this

27   District and did so throughout the Class Period.

28

19.   In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## III.   THE PARTIES

### A.   Plaintiffs

20.   On November 28, 2007, this Court appointed Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund ("NYSCRF"), to serve as a Lead Plaintiff in this consolidated securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").   As established by Article 9 of the New York Retirement and Social Security Law, NYSCRF holds and invests the assets of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System, and provides pension, death and disability benefits for state and local government employees and employees of certain other participating employers.   NYSCRF is the third-largest public pension fund in the nation, with assets under management exceeding $154 billion as of March 31, 2007 and serves more than one million active and retired members and their beneficiaries.   Thomas P. DiNapoli, Comptroller of the State of New York, is the sole trustee of NYSCRF.   As set forth in the amended certification annexed hereto as Exhibit A, Lead Plaintiff NYSCRF purchased Countrywide common stock on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

21.   On November 28, 2007, this Court also appointed the New York City Pension Funds, comprised of the actuarial pension systems of the New York

City Employees' Retirement System ("NYCERS"), the New York City Police Pension Fund, the New York City Fire Department Pension Fund, the New York City Board of Education Retirement System, and the Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds"), to serve as Lead Plaintiffs in this consolidated securities class action pursuant to the PSLRA.  The New York City Pension Funds provide pension benefits to employees of the City of New York, including full-time uniformed employees of the New York City Police and Fire Departments and the pedagogical staff and non-pedagogical employees of the Board of Education. NYCERS provides benefits to all New York City employees who are not eligible to participate in separate Police Department, Fire Department, Board of Education or Teachers pension funds.  Pursuant to Title 13 of the Administrative Code of the City of New York, the Boards of Trustees of the New York City Pension Funds have delegated to the Comptroller of the City of New York investment responsibility for management of the pension funds' assets. Collectively, the New York City Pension Funds have assets under management exceeding $110 billion and serve more than 370,000 active members and 262,000 retirees and beneficiaries.  As set forth in the amended certifications annexed collectively hereto as Exhibit B, Lead Plaintiffs New York City Pension Funds purchased Countrywide common stock on the open market during the Class Period and purchased or acquired other publicly traded securities of Countrywide pursuant or traceable to the Countrywide Registration Statements complained of below, and were damaged thereby as a result of the misconduct alleged herein.

22.    Plaintiff Barry Brahn ("Brahn"), as set forth in the amended certification annexed hereto as Exhibit C, acquired 7% Capital Securities issued by Countrywide Capital V ("CCV"), a Delaware Statutory Trust created by Countrywide, pursuant or traceable to the Registration Statement for such securities and was damaged as a result of the misconduct alleged herein.

1      23.    Plaintiff Shelley B. Katzeff ("Katzeff"), as set forth in the

2  certification annexed hereto as Exhibit D, acquired 7% Capital Securities issued

3  by CCV pursuant or traceable to the Registration Statement for such securities

4  and was damaged as a result of the misconduct alleged herein.

5      **B.**    **Countrywide Defendants**

6      **1.**    **Countrywide and CCV**

7      24.    Defendant Countrywide Financial Corporation ("Countrywide" or

8  the "Company") is a corporation organized and existing under the laws of the

9  State of Delaware, with its principal executive offices located at 4500 Park

10  Granada, Calabasas, California 91302.  Countrywide was founded in March 1969

11  and engages in mortgage lending and other finance-related businesses, including

12  mortgage banking, retail banking and mortgage warehouse lending, securities

13  dealing, insurance underwriting and international mortgage loan processing and

14  servicing.  Countrywide common stock has traded actively on the New York

15  Stock Exchange (the "NYSE") since October 1985.

16      25.    Defendant Countrywide Capital V ("CCV") is a Delaware Statutory

17  Trust and wholly owned subsidiary of Countrywide, created by Countrywide

18  solely for the purpose of issuing preferred securities.  Countrywide guarantees all

19  of CCV's offerings.

20      **2.**    **The Officer Defendants**

21      26.    Defendant Angelo R. Mozilo ("Mozilo") is a co-founder of

22  Countrywide and has been Chairman of the Board of Directors since March 1999

23  and Chief Executive Officer ("CEO") since February 1998.  He has been a

24  member of the Board since 1969.  Mozilo was also President of the Company

25  from March 2000 through December 2003 and has served in other executive

26  capacities since the Company's formation in 1969.  Mozilo signed the Company's

27  materially false and misleading Form 10-K Annual Reports for 2003 through

28  2006 filed with the SEC and accompanying certifications made pursuant to the

1   Sarbanes-Oxley Act of 2002 ("SOX"); SOX certifications accompanying the

2   Company's Form 10-Q Quarterly Reports filed with the SEC between the first

3   quarter of 2004 and the third quarter of 2007; and the Company's Registration

4   Statements dated April 7, 2004, February 9, 2006, October 27, 2006, and

5   November 15, 2007.

6        27.    Defendant David Sambol ("Sambol") joined Countrywide in 1985

7   and became the Company's President and Chief Operating Officer ("COO") in

8   September 2006.  Sambol served from 2004 to 2006 as Executive Managing

9   Director for Business Segment Operations, heading all revenue-generating

10  operations of the Company, as well as the corporate operational and support units

11  comprised of Administration, Marketing and Corporate Communications, and

12  Enterprise Operations and Technology.  Sambol has served as Chairman and

13  CEO of the Company's principal operating subsidiary, Countrywide Home

14  Loans, Inc. ("CHL") since 2007, and from 2004 through 2006 Sambol was

15  President and COO of CHL.    According to his executive profile on

16  Countrywide's website, Sambol "lead[s] all operations of the Company" and has

17  "oversight responsibility" for CHL, as well as Countrywide Bank, Countrywide

18  Insurance Group, Countrywide Capital Markets and the Company's Global

19  Operations.  Sambol was also a Managing Director from July 1994 to 2003, and

20  has served as Senior Managing Director and Chief of Production for the

21  Company's loan sector.  Sambol became a director of Countrywide in September

22  2007.  Sambol signed the Company's materially false and misleading Form 10-Q

23  Quarterly Reports filed with the SEC on November 7, 2006, May 9, 2007, August

24  9, 2007, and November 9, 2007; and Registration Statements dated February 9,

25  2006, October 27, 2006, and November 15, 2007.

26        28.    Defendant Eric P. Sieracki ("Sieracki") has served as the Company's

27  Executive Managing Director and Chief Financial Officer ("CFO") and as CFO

28  of Countrywide Bank since April 2005, and is a member of the Executive

1 Strategy Committee.   Sieracki was and is responsible for oversight of
2 Countrywide's major financial departments, including corporate accounting,
3 treasury, financial planning, strategic planning and taxation.   He also served as
4 the Company's senior manager in the areas of investor relations, corporate
5 development, and equity capital activities.  Sieracki joined the Company in 1988
6 as Senior Vice President of Countrywide Asset Management Corporation and has
7 held a number of executive positions.   In 1989, he was promoted to Executive
8 Vice President of Corporate Finance, in charge of finance and accounting
9 responsibilities for Countrywide and its subsidiaries.   He also served as Senior
10 Vice President and CFO of Countrywide Mortgage Investments, Inc., a publicly
11 traded affiliate of the Company.  Defendant Sieracki became a Managing Director
12 in 1996, a Senior Managing Director in 2002, and Executive Managing Director
13 in 2005.  Sieracki signed the Company's Form 10-K Annual Reports for 2005 and
14 2006 filed with the SEC and accompanying SOX certifications; Form 10-Q
15 Quarterly Reports between the first quarter of 2005 and the third quarter of 2007
16 and accompanying SOX certifications; Form 10-Q/A Amended Quarterly Reports
17 for the first three quarters of 2004; and Registration Statements dated February 9,
18 2006, October 27, 2006, and November 15, 2007.

19       29.   Defendant Stanford L. Kurland ("Kurland") was President and COO
20 of Countrywide from before the Class Period until he resigned on September 7,
21 2006.   Kurland joined Countrywide in 1979, and became COO in 1988 and
22 President in January 2004.   Kurland has served in a number of other executive
23 positions at the Company, including Executive Managing Director from 2000 to
24 2003 and Senior Managing Director from 1989 to 2000.   From 2003 through
25 2005, Kurland was CEO and a director of CHL, and during 2006 also served as
26 Chairman of CHL.  Kurland signed the Company's Form 10-K Annual Reports
27 filed with the SEC for 2003, 2004 and 2005; Form 10-Q Quarterly Reports filed
28 with the SEC between the first quarter of 2004 and the second quarter of 2006;

1    Form 10-Q/A Amended Quarterly Reports for the first three quarters of 2004;

2    Form 8-K Current Reports filed with the SEC on April 21, 2004 and July 26,

3    2004; and Registration Statements dated April 7, 2004 and February 9, 2006.

4        30.    Defendants Mozilo, Sambol, Sieracki and Kurland are referred to

5    herein collectively as the "Officer Defendants."  Each of these Defendants, by

6    virtue of their high-level positions with Countrywide, directly participated in the

7    management of the Company, was directly involved in the day-to-day operations

8    of the Company at the highest levels and was privy to confidential proprietary

9    information concerning the Company and its business, operations, growth,

10   financial statements, and financial condition during his tenure with the Company,

11   as alleged herein.  As set forth below, the materially misstated information

12   conveyed in the Company's SEC filings, press releases, and other public

13   statements was the result of the collective actions of these individuals.  Each of

14   these individuals, during his tenure with the Company, was involved in drafting,

15   producing, reviewing and/or disseminating the statements at issue in this case,

16   approved or ratified these statements, or was aware or recklessly disregarded that

17   these statements were being issued regarding the Company.  Accordingly, it is

18   appropriate to treat the Officer Defendants as a group for pleading purposes.

19       31.    As officers and directors of a publicly held company whose common

20   stock and other securities were, and are, registered with the SEC pursuant to the

21   Exchange Act, and whose common stock was, and is, traded on the NYSE, and

22   governed by the federal securities laws, the Officer Defendants each had a duty to

23   disseminate prompt, accurate, and truthful information with respect to the

24   Company's business, operations, financial statements and internal controls, and to

25   correct any previously issued statements that had become materially misleading

26   or untrue, so that the market prices of the Company's publicly traded securities

27   would be based on accurate information.  The Officer Defendants each violated

28   these requirements and obligations during the Class Period.

32.    The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, were able to and did control the content of the SEC filings, press releases and other public statements issued by Countrywide during the Class Period.  Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected.  Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed herein.

33.    The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, had access to the adverse undisclosed information about Countrywide's business, operations, financial statements and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Countrywide materially false and misleading.

### 3.    Additional Individual Defendants

34.    Defendant Kathleen Brown ("Brown") was a member of Countrywide's Board of Directors from March 2005 until March 29, 2007. Brown signed the Company's Registration Statements filed with the SEC dated February 9, 2006 and October 27, 2006.

35.    Defendant Henry G. Cisneros ("Cisneros") was a member of Countrywide's Board of Directors from 2001 until October 24, 2007.  Cisneros signed the Company's Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006 and October 27, 2006.

1       36.    Defendant Jeffrey M. Cunningham ("Cunningham") has been a

2 member of Countrywide's Board of Directors since 1998. Cunningham signed

3 the Company's Registration Statements filed with the SEC dated April 7, 2004,

4 February 9, 2006, October 27, 2006, and November 15, 2007.

5       37.    Defendant Robert J. Donato ("Donato") has been a member of

6 Countrywide's Board of Directors since 1993. Donato signed the Company's

7 Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,

8 October 27, 2006, and November 15, 2007.

9       38.    Defendant Michael E. Dougherty ("Dougherty") was a member of

10 Countrywide's Board of Directors from 1998 until March 28, 2007. Dougherty

11 signed the Company's Registration Statements filed with the SEC dated April 7,

12 2004, February 9, 2006 and October 27, 2006.

13      39.    Defendant Ben M. Enis ("Enis") was a member of Countrywide's

14 Board of Directors from 1984 until June 2006. Enis signed the Company's

15 Registration Statements  filed with the SEC dated April 7, 2004, February 9, 2006

16 and October 27, 2006.

17      40.    Defendant Carlos M. Garcia ("Garcia") is Countrywide's Executive

18 Managing Director for Banking and Insurance and has been a member of CHL's

19 Board of Directors throughout the Class Period. Garcia signed the Company's

20 Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006

21 and October 27, 2006.

22      41.    Defendant Andrew Gissinger III ("Gissinger") has been a member of

23 CHL's Board of Directors throughout the Class Period and a Senior Managing

24 Director and Chief Production Officer of CHL since 2006. Gissinger signed the

25 Company's Registration Statements filed with the SEC dated October 27, 2006

26 and November 15, 2007.

27      42.    Defendant Edwin Heller ("Heller") was a member of Countrywide's

28 Board of Directors from 1993 until June 2006. Heller signed the Company's

1   Registration Statements filed with the SEC dated April 7, 2004 and February 9,
2   2006.

3       43.     Defendant Gwendolyn Stewart King ("King") was a member of
4   Countrywide's Board of Directors from 2001 until November 15, 2004.  King
5   signed the Company's Registration Statement filed with the SEC dated April 7,
6   2004.

7       44.     Defendant   Thomas   K.   McLaughlin   ("McLaughlin")   was
8   Countrywide's Executive Managing Director and Chief Financial Officer from
9   2004 until his resignation effective April 1, 2005.  McLaughlin  signed the
10  Company's Registration Statement dated April 7, 2004.

11      45.     Defendant Martin R. Melone ("Melone") has been a member of
12  Countrywide's Board of Directors since 2003.  Melone signed the Company's
13  Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,
14  October 27, 2006, and November 15, 2007.

15      46.     Defendant Robert T. Parry ("Parry") has been a member of
16  Countrywide's Board of Directors since 2004.  Parry signed the Company's
17  Registration Statements filed with the SEC dated February 9, 2006, October 27,
18  2006, and November 15, 2007.

19      47.     Defendant Oscar P. Robertson ("Robertson") has been a member of
20  Countrywide's Board of Directors since 2000.  Robertson signed the Company's
21  Registration Statements filed with the SEC  dated April 7, 2004, February 9,
22  2006, October 27, 2006, and November 15, 2007.

23      48.     Defendant Keith P. Russell ("Russell") has been a member of
24  Countrywide's Board of Directors since 2003.  Russell signed the Company's
25  Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,
26  October 27, 2006, and November 15, 2007.

27      49.     Defendant Harley W. Snyder ("Snyder") has been a member of
28  Countrywide's Board of Directors since 1991.  Snyder signed the Company's

1  Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,
2  October 27, 2006, and November 15, 2007.

3      50.   Defendants Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros,
4  Cunningham, Donato, Dougherty, Enis, Garcia, Gissinger, Heller, King,
5  McLaughlin, Melone, Parry, Robertson, Russell, and Snyder are collectively
6  referred to herein as the "Individual Defendants."

7      **C.    Underwriter Defendants**

8      51.   Defendant ABN AMRO Incorporated ("ABN AMRO") is an
9  investment bank and acted as an underwriter with respect to Countrywide's
10  offerings of Series A Medium-Term Notes and Series B Medium-Term Notes.
11  ABN AMRO's U.S. headquarters are located at 55 East 52nd Street, New York,
12  New York 10055.

13      52.   Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is an
14  investment bank and acted as an underwriter with respect to CCV's offering of
15  7% Capital Securities.   A.G. Edwards' headquarters are located at 1 North
16  Jefferson Avenue, St. Louis, Missouri 63103.

17      53.   Defendant Banc of America Securities LLC ("Banc of America
18  Securities") is an investment bank and acted as an underwriter with respect to
19  Countrywide's offerings of Series A Medium-Term Notes (including the 3-Year
20  Floating Rate Notes Due 2008 ("3-Year Notes")), Series B Medium-Term Notes,
21  and 6.25% Subordinated Floating Rate Notes Due May 15, 2016 ("6.25%
22  Notes"), and with respect to CCV's offering of 7% Capital Securities.  Banc of
23  America Securities' headquarters are located at 9 West 57th Street, New York,
24  New York 10019.

25      54.   Defendant Barclays Capital Inc. ("Barclays Capital") is an
26  investment bank and acted as an underwriter with respect to Countrywide's
27  offerings of Series A Medium-Term Notes, Series B Medium-Term Notes, and
28  6.25% Notes, and with respect to CCV's offering of 7% Capital Securities.

1   Barclays Capital's U.S. headquarters are located at 200 Park Avenue, New York,
2   New York 10166.

3        55.    Defendant BNP Paribas Securities Corp. ("BNP Paribas") is an
4   investment bank and acted as an underwriter with respect to Countrywide's
5   offerings of Series A Medium-Term Notes and Series B Medium-Term Notes.
6   BNP Paribas' U.S. headquarters are located at 999 Bishop Street, Honolulu,
7   Hawaii 96813.

8        56.    Defendant BNY Capital Markets, Inc. ("BNY Capital") is an
9   investment bank and acted as an underwriter with respect to Countrywide's
10  offering of Series B Medium-Term Notes.   BNY Capital's headquarters are
11  located at 44 Wall Street, New York, New York 10005.

12       57.    Defendant Citigroup Global Markets Inc. ("Citigroup Global
13  Markets") is an investment bank and acted as an underwriter with respect to
14  Countrywide's offerings of Series A Medium-Term Notes and Series B Medium-
15  Term Notes, and with respect to CCV's offering of 7% Capital Securities.
16  Citigroup Global Markets' headquarters are located at 399 Park Avenue, New
17  York, New York 10043.

18       58.    Defendant Countrywide Securities Corporation ("Countrywide
19  Securities"), a wholly owned subsidiary of Countrywide, is a registered broker-
20  dealer primarily known for trading mortgage bonds.   Countrywide Securities
21  acted as an underwriter with respect to Countrywide's offerings of Series A
22  Medium-Term Notes (including the 2-Year Floating Rate Notes Due 2007 ("2-
23  Year Notes") and 3-Year Notes), Floating Rate Subordinated Notes due April 1,
24  2011 ("2011 Notes"), Series B Medium-Term Notes, and 6.25% Notes, and with
25  respect to CCV's offering of 7% Capital Securities.   Countrywide Securities'
26  headquarters are located at 4500 Park Granada, Calabasas, California 91302.

27       59.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an
28  investment bank and acted as an underwriter with respect to Countrywide's

1    offerings of Series A Medium-Term Notes (including the 2-Year Notes and 3-

2    Year Notes), Series B Medium-Term Notes, and 6.25% Notes, and with respect to

3    CCV's offering of 7% Capital Securities.  Deutsche Bank's U.S. headquarters are

4    located at One Fawcett Place, Greenwich, Connecticut 06830.

5            60.    Defendant  Dresdner  Kleinwort  Wasserstein  Securities  Inc.

6    ("Dresdner Kleinwort Wasserstein") is an investment bank and acted as an

7    underwriter with respect to Countrywide's offerings of Series A Medium-Term

8    Notes (including the 2-Year Notes and 3-Year Notes) and Series B Medium-Term

9    Notes.  Dresdner Kleinwort Wasserstein's U.S. headquarters are located at 1301

10   Avenue of the Americas, New York, New York 10019.

11           61.    Defendant  Goldman,  Sachs & Co. ("Goldman  Sachs")  is  an

12   investment bank and acted as an underwriter with respect to Countrywide's

13   offerings of Series A Medium-Term Notes and Series B Medium-Term Notes,

14   and with respect to CCV's offering of 7% Capital Securities.  Goldman Sachs'

15   headquarters are located at 85 Broad Street, New York, New York 10004.

16           62.    Defendant Greenwich Capital Markets, Inc. ("Greenwich Capital") is

17   an investment bank and acted as an underwriter with respect to Countrywide's

18   offerings of Series A Medium-Term Notes (including the 2-Year Notes and 3-

19   Year Notes) and Series B Medium-Term Notes.   Greenwich Capital's

20   headquarters are located at 600 Steamboat Road, Greenwich, Connecticut 06830.

21           63.    Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment

22   bank and acted as an underwriter with respect to Countrywide's offerings of

23   Series A Medium-Term Notes, Series B Medium-Term Notes, and 6.25% Notes,

24   and with respect to CCV's offering of 7% Capital Securities.  HSBC's U.S.

25   headquarters are located at 2700 Sanders Road, Prospect Heights, Illinois 60070.

26           64.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is

27   an investment bank and acted as an underwriter with respect to Countrywide's

28   offerings of Series A Medium-Term Notes, 2011 Notes, Series B Medium-Term

1   Notes, and 6.25% Notes, and with respect to CCV's offering of 7% Capital

2   Securities.  J.P. Morgan Securities' headquarters are located at 270 Park Avenue,

3   New York, New York 10017.

4         65.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is an

5   investment bank and acted as an underwriter with respect to Countrywide's

6   offerings of Series A Medium-Term Notes (including the 2-Year Notes and 3-

7   Year Notes) and Series B Medium-Term Notes, and with respect to CCV's

8   offering of 7% Capital Securities.  Lehman Brothers' headquarters are located at

9   745 Seventh Avenue, New York, New York 10019.

10         66.    Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated

11   ("Merrill Lynch") is an investment bank and acted as an underwriter with respect

12   to Countrywide's offering of Series B Medium-Term Notes and CCV's offering

13   of 7% Capital Securities.  Merrill Lynch's headquarters are located at 4 World

14   Financial Center, New York, New York 10080.

15         67.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley")

16   is an investment bank and acted as an underwriter with respect to Countrywide's

17   offerings of Series A Medium-Term Notes (including the 2-Year Notes and 3-

18   Year Notes) and Series B  Medium-Term Notes, and with respect to CCV's

19   offering of 7% Capital Securities.  Morgan Stanley's headquarters are located at

20   1595 Broadway, New York, New York 10036.

21         68.    Defendant RBC Capital Markets Corp. ("RBC Capital") is an

22   investment bank and acted as an underwriter with respect to Countrywide's

23   offerings of Series A Medium-Term Notes and Series B Medium-Term Notes.

24   RBC Capital's U.S. headquarters are located at 1211 Avenue of the Americas,

25   New York, New York 10036.

26         69.    Defendant RBC Dominion Securities Inc. ("RBC Dominion") is an

27   investment bank and acted as an underwriter with respect to Countrywide's

28   offerings of Series A Medium-Term Notes and Series B Medium-Term Notes.

1    RBC Dominion's U.S. headquarters are located at 1211 Avenue of the Americas,

2    New York, New York 10036.

3       70.    Defendant RBC Dain Rauscher Inc. ("RBC Dain Rauscher") is an

4    investment bank and acted as an underwriter with respect to CCV's offering of

5    7% Capital Securities.  RBC Dain Rauscher's U.S. headquarters are located at 60

6    South 6th Street, Minneapolis, Minnesota 55402.

7       71.    Defendant Scotia Capital Inc. ("Scotia Capital") is an investment

8    bank and acted as an underwriter with respect to Countrywide's offering of Series

9    B Medium-Term Notes.  Scotia Capital's U.S. headquarters are located at One

10   Liberty Plaza, New York, New York 10006.

11      72.    Defendant SG Americas Securities, LLC ("SG Americas Securities")

12   is an investment bank and acted as an underwriter with respect to Countrywide's

13   offerings of Series A Medium-Term Notes (including the 2-Year Notes) and

14   Series B Medium-Term Notes.  SG Americas Securities' U.S. headquarters are

15   located at 1221 Avenue of the Americas, New York, New York 10020.

16      73.    Defendant TD Securities Inc. ("TD Securities") is an investment

17   bank and acted as an underwriter with respect to Countrywide's offering of Series

18   B Medium-Term Notes.  TD Securities' U.S. headquarters are located at 31 West

19   52nd Street, New York, New York 10019.

20      74.    Defendant UBS Securities LLC ("UBS Securities") is an investment

21   bank and acted as an underwriter with respect to Countrywide's offering of Series

22   B Medium-Term Notes and CCV's offering of 7% Capital Securities.   UBS

23   Securities' U.S. headquarters are located at 1285 Avenue of the Americas, New

24   York, New York 10019.

25      75.    Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is

26   an investment bank and acted as an underwriter with respect to Countrywide's

27   offerings of Series A Medium-Term Notes (including the 2-Year Notes and 3-

28   Year Notes), Series B Medium-Term Notes, and 6.25% Notes, and with respect to

1   CCV's offering of 7% Capital Securities.  Wachovia Capital's headquarters are

2   located at One Wachovia Center, Charlotte, North Carolina 28288.

3     76. Defendant Wachovia Securities, Inc. ("Wachovia Securities") is an

4   investment bank and acted as an underwriter with respect to Countrywide's

5   offering of Series A Medium-Term Notes.  Wachovia Securities' headquarters are

6   located at One Wachovia Center, Charlotte, North Carolina 28288.

7     77. The Defendants named in this Section III.C are referred to

8   collectively herein as the "Underwriter Defendants."

9     **D. Auditor Defendants**

10     78. Defendant Grant Thornton LLP ("Grant Thornton") served as

11   Countrywide's outside auditor until January 5, 2004.  Grant Thornton provided

12   audit, audit-related, tax and other services to the Company during this period,

13   which included the issuance of an unqualified opinion on the Company's

14   financial statements for the year ended December 31, 2003.  Grant Thornton

15   consented to the incorporation by reference of its unqualified opinions on the

16   Company's financial statements for the year ended December 31, 2003 in

17   Countrywide's Registration Statement dated April 7, 2004, Prospectus

18   Supplement dated September 27, 2005, Registration Statement dated February 9,

19   2006, Prospectus Supplement dated May 11, 2006, and Amended Registration

20   Statement dated October 27, 2006.  Grant Thornton maintains its national

21   headquarters at 175 West Jackson Boulevard, Chicago, Illinois 60604.

22     79. Defendant KPMG LLP ("KPMG") has served as Countrywide's

23   outside auditor since January 5, 2004.  KPMG provided audit, audit-related, tax

24   and other services to Countrywide during the Class Period, which included the

25   issuance of unqualified opinions on the Company's financial statements for the

26   years ended December 31, 2004, 2005 and 2006 and management's assessments

27   of internal controls for the years ended December 31, 2005 and 2006.  KPMG

28   consented to the incorporation by reference of its unqualified opinions on the

1  Company's financial statements and management's assessment of internal

2  controls for the years ended December 31, 2006, 2005 and/or 2004 in

3  Countrywide's Prospectus Supplement dated September 27, 2005, Registration

4  Statement dated February 9, 2006, Prospectus Supplement dated May 11, 2006,

5  Amended Registration Statement dated October 27, 2006, and Registration

6  Statement dated November 15, 2007.  KPMG maintains its national headquarters

7  at 345 Park Avenue, New York, New York 10154.

8        80.   Defendants Grant Thornton and KPMG are referred to together

9  herein as the "Auditor Defendants."

10

11  **IV.   FACTUAL BACKGROUND AND**

           **SUBSTANTIVE ALLEGATIONS**

12

        **A.   Countrywide and its**

13           **Interrelated Businesses**

14        81.   Countrywide, which bills itself as "America's #1 Home Loan

15  Lender," is the largest mortgage lender and home loan servicer in the United

16  States.  During 2006, Countrywide originated or serviced approximately 17% of

17  all residential mortgages nationwide.

18        82.   Countrywide manages its business through five business segments:

19  (1) Mortgage Banking, which originates, purchases, sells and services non-

20  commercial mortgage loans nationwide; (2) Banking, in which Countrywide

21  Bank, N.A., a federally chartered banking institution, takes deposits and invests in

22  mortgage loans and home equity lines of credit ("HELOCs"), principally those

23  originating from the Mortgage Banking segment but also through mortgages

24  issued by third parties; (3) Capital Markets, which operated an institutional

25  broker-dealer that primarily specializes in trading and underwriting mortgage-

26  backed securities ("MBS"); (4) Insurance, which provides property, casualty, life

27  and disability insurance as well as reinsurance coverage to primary mortgage

28  insurers; and (5) Global Operations, which licenses proprietary software to

1   mortgage lenders in the United Kingdom and performs certain overseas
2   administrative and loan servicing functions.

3       83.   The Mortgage Banking, Banking and Capital Markets business
4   segments provided a full 93% of the Company's pre-tax earnings for 2006, with
5   48% coming from Mortgage Banking, 32% from Banking, and 13% from Capital
6   Markets.  The operations of these three divisions are interrelated, with the loan
7   origination process feeding the rest of the business.  The Company originates
8   home loans in the Mortgage Banking division, retains a portion of those loans on
9   the Company's balance sheet as investments, mostly in the Banking division, and,
10   during the Class Period, securitized and sold off the remainder of the mortgages
11   or mortgage-related rights and obligations to third parties through the Capital
12   Markets division.

13       84.   During most of the Class Period, until the truth about Defendants'
14   misconduct began to emerge, nearly all of the mortgage loans Countrywide
15   originated were sold into the secondary market, primarily in the form of securities
16   backed by pools of mortgages and, to a far lesser extent, as whole loans.
17   Countrywide also performed the ongoing servicing functions related to most of
18   the residential mortgage loans it originated.  Loans held for investment by the
19   Banking division appeared as assets on the Company's balance sheet.

20       85.   During the Class Period, Countrywide had significant financing
21   needs in order to run its operations.  According to Countrywide's Form 10-K
22   filings, the Company's short-term financing needs arose primarily from
23   warehousing of mortgage loans pending sale to the secondary market, trading
24   activities of its broker-dealer, and providing mortgage warehouse credit to others.
25   Long-term financing needs arose primarily from investments in mortgage loans,
26   investments in mortgage-servicing rights and interests that the Company retains
27   when it securitizes mortgage loans, and financial instruments acquired to manage
28   interest rate risk.  The Company met its financing needs primarily through

1   unsecured commercial paper and medium-term notes, asset-backed commercial

2   paper, revolving lines of credit, short-term repurchase agreements, deposit-

3   gathering, advances from Federal Home Loan Banks, unsecured subordinated

4   debt and junior subordinated debt, and retained earnings.   The debt securities

5   referred to below and issued by Countrywide during the Class Period provided

6   much of the Company's financing needs during the Class Period.

7       86.    Countrywide relied substantially on the secondary mortgage market

8   as a source of long-term capital to support its mortgage banking operations.   The

9   Company's strategy, according to Form 10-K reports filed during the Class

10  Period, was to ensure "***ongoing access*** to the secondary mortgage market by

11  ***consistently producing quality mortgages*** and servicing those mortgages at levels

12  that meet or exceed secondary market mortgage standards."   The Company

13  claimed that it made significant investments in personnel and technology to

14  ensure the quality of its mortgage loan production.

15      87.    The credit quality of the mortgage loans Countrywide originated was

16  of paramount importance to investors purchasing Countrywide's securitized loans

17  on the secondary mortgage market.   Thus, the Company's ability to securitize and

18  sell its mortgage loans (and maintain its principal source of liquidity) was heavily

19  dependent upon the financial community's belief that the Company maintained

20  appropriate controls commensurate with sound and disciplined loan underwriting

21  procedures designed to produce "quality mortgages."   Moreover, Countrywide

22  made representations and warranties to purchasers of its securitized mortgage

23  loans concerning their quality and the underwriting standards that were followed

24  in originating them.   If such a purchaser determined that Countrywide breached

25  its representations and warranties, or if a borrower defaulted early in the term of

26  the loan, the purchaser could require Countrywide to repurchase the mortgage

27  loans.

28

1

### B. Countrywide Shifts Away From Traditional Mortgages Toward Producing Nontraditional, and Far Riskier, Loan Products

2

3

#### 1. In an Effort to Achieve "Market Dominance," Mozilo and Sambol Spearhead a Dramatic "Culture Change" Starting in or About May 2003

4

5      88.    Until 2003, Countrywide primarily made traditional first-lien home

6    loans to individuals with strong credit.  Such "conforming" loans are generally

7    safer for lenders, and are regularly sold to Fannie Mae and Freddie Mac, the

8    government-sponsored entities ("GSEs") that provide liquidity to the home

9    mortgage market.[3]

10      89.    According to Confidential Witness 1 ("CW1"), in or about May

11   2003, a significant "culture change" began at the Company.  CW1, who worked

12   at Countrywide during the Class Period until early 2006, was a high-ranking

13   executive in Company headquarters who worked, on a day-to-day basis with

14   Defendants Mozilo, Sambol, Kurland and Sieracki.[4]  CW1 had senior-level

15   responsibilities with respect to, among other things, the Company's secondary

16   marketing operations and the pricing and risk of loans held for investment and for

17   sale.

18      90.    According to CW1, in May 2003, conflicts began to materialize

19   among members of the Company's Executive Committee—which included the

20   six or seven most senior executives of the Company, including all of the Officer

21   Defendants—as to the best strategy to grow Countrywide's business.  Around this

22

23   [3] A "conforming" loan is one which conforms to GSE guidelines, which include maximum loan amounts, debt-to-income ratio limits, and documentation requirements.  "Nonconforming" loans are all loans that do not conform to GSE guidelines, because they are too large, have debt-to-income ratios that are too high, or do not satisfy GSE documentation requirements.

24

25   [4] In an effort to protect the identities of knowledgeable witnesses who have come forward on a confidential basis, Plaintiffs have not pleaded all available information concerning job titles, locations, and starting and ending dates of employment when providing such information would be tantamount to revealing the witness' identity.  Plaintiffs will provide such information to the Court *in camera* if the Court so requests.

26

27

28

time, according to CW1, Sambol became particularly close to Mozilo and emerged as a major force within the Company, and took complete charge of loan production in 2004.  The conflicts regarding how to grow the business were resolved as Sambol succeeded in imposing a new Company-wide "mandate" that CW1 described as ***"more loans, more loans, more loans"*** across the board.

91.    The result, according to CW1, was a "culture change" that included a movement by Countrywide to originate more nonconforming loans, which are generally riskier and, because they cannot be sold to GSEs, must be marketed to private investors.   By increasing the origination of nonconforming loans, Countrywide was able to originate many more loans each year and, because nonconforming loans were riskier than conforming loans, Countrywide was able to charge borrowers higher fees when extending such loans.   In 2002, approximately 25% of the total loans originated by Countrywide were nonconforming.  In 2004, nearly 40% of loan originations were nonconforming, and by 2006 this figure was 45.2%.

92.    The "culture change" also involved a major shift in strategic direction away from extending traditional fixed-rate mortgages to borrowers with "prime" credit scores, toward issuing a wide range of nontraditional, higher-risk loans designed to allow borrowers, often those with blemished credit, to borrow more money than would be available under the Company's pre-2003 business model.  Employees who underwrote loans were paid in part based on the volume of loans they approved.  Mortgage brokers and other employees were paid based on the volume of loans they originated and, because of the higher origination fees charged with respect to such loans, were paid more when originating these nontraditional loan products than when they originated standard loans. Countrywide's employees and independent mortgage brokers, accordingly, targeted more and more borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay off the loans.

1    93.    According to CW1, the enhanced focus on nontraditional loans like
2    subprime and low documentation loans ultimately increased Countrywide's risk
3    of loss to unacceptable levels.  CW1 further reported that Sambol took a contrary
4    position, maintaining that by originating and procuring large volumes of loans,
5    regardless of their relative risk, any losses incurred by the riskier loans would be
6    covered by the profits generated on other loans.  Sambol's flawed strategy, which
7    was adopted by the Company and endorsed by the other Officer Defendants, was
8    nothing more than a variation on a classic Ponzi scheme, whereby profits on loans
9    higher on the pyramid are used to prop up a large volume of high-risk loans lower
10   on the pyramid, with the goal of constantly attracting more borrowers, and
11   especially high-risk borrowers whom Countrywide could charge higher fees.

12   94.    As part of the "culture change" in 2003, when Countrywide's market
13   share was about 13%, Mozilo announced a goal for Countrywide to capture an
14   enormous, and unprecedented, **30%** of the national residential loan market.
15   During a conference call with analysts on July 22, 2003, Mozilo stated that his
16   goal for the Company was "to **dominate** the purchase market and to get our
17   overall market share to the ultimate 30% by 2006, 2007[.]"  Mozilo reiterated
18   during a January 27, 2004 conference call that "[o]ur goal is **market dominance**,
19   and we are talking 30% origination market share by 2008 to support our macro
20   hedge strategy."  When challenged about the ramifications such massive growth
21   might have on loan quality, Mozilo assured the market: "Going for 30% mortgage
22   share here is **totally unrelated to quality of loans we go after. . . .**  There will be
23   **no compromise in that** as we grow market share.  Nor is there a necessity to do
24   that."  In fact, as reported in *The Wall Street Journal* in February 2008, Mozilo
25   dismissed suggestions at that time that such a push for growth might be risky:
26   "I'm fairly confident that we're not going to do anything stupid.  We have a
27   history of not doing anything stupid."

28

95.     According to CW1, Mozilo's plan to capture 30% of the mortgage market was put into action, in a Company-wide mandate, by Sambol.  In 2003, CW1 believed it would be difficult to achieve this goal in such a "fragmented market," that the goal was unrealistic and would result in "very low profit," and that there was no real reason to pursue it given that Countrywide was already a huge player in the industry.  But, under the direction of Mozilo and Sambol, the Company embarked on an effort to shift its focus away from fixed-rate loans to nontraditional and more lucrative loan products, and to put its loan production machine into overdrive.  As a central part of this effort, undisclosed to the Class, Countrywide loosened and abandoned its purportedly sound loan underwriting standards that had been designed to produce "high quality loans," in order to sweep in borrowers who previously would not have qualified for a loan.

## 2.     Countrywide's Nontraditional and Risky Loan Products

96.     Countrywide's nontraditional loan products included <u>adjustable rate mortgages</u>, or "<u>ARMs</u>," which typically provided a low "teaser" interest rate for a predetermined introductory time period, ranging between 2 and 10 years.  A significant portion of the ARMs the Company issued were called "2/28 loans," meaning that the teaser rate would last for only 2 years before "resetting" to higher rates, tied to whatever criteria was set forth in the loan documentation, for the next 28 years.  "Resetting" after the teaser period usually resulted in a significant increase in the borrower's monthly payments.  ARMs are inherently riskier loans and will generally result in higher delinquency rates than fixed-rate loans unless the lender is careful to sell these loans only to those borrowers whose financial condition and credit history demonstrate that they are likely to be able to pay the higher principal and interest payments when the rates "reset."

97.     "<u>Pay Option ARMs</u>" gave the borrower the "option" to pay down loan principal, to make the monthly interest payment, or to make a "minimum"

1   payment that in fact was less than the monthly interest which would normally be

2   paid in an "interest only" loan.  Thus, if the borrower made only the "minimum"

3   required payment, which was insufficient to pay accruing monthly interest, the

4   difference between that minimum required payment and the normal monthly

5   interest would be added to the remaining principal balance.  As a result, each

6   month the principle mortgage balance would grow.  As in the case of a gangland

7   loan shark, the borrower would owe Countrywide more and more money.  And,

8   as in the case of the victim of a loan shark, as the debt to Countrywide increased,

9   the monthly interest charges would grow with the new mortgage balance.

10  Accordingly, while a standard mortgage amortizes as principal is paid down, and

11  an "interest only" mortgage is non-amortizing, Pay Option ARMs were subject to

12  "negative amortization," meaning that the principal balance actually increased.

13  Countrywide booked this negative amortization as deferred interest earnings on

14  its income statement, reporting non-cash income created solely from a borrower's

15  failure to pay full interest.

16      98.    As Countrywide's management was aware, Pay Option ARMs were

17  fraught with significant risk because the option to make minimum payments

18  would, more often than not, be driven by necessity (the inability of the borrower

19  to even pay down interest as it accrued) which, coupled with increases to the loan

20  balance, exacerbated the risk of default.  Only if these loans were made to highly

21  creditworthy borrowers (who presumably would have no need to make such

22  minimal payments and incur negative amortization), or by assuming that real

23  estate values would simply increase indefinitely, could the Company reasonably

24  have expected that the deferred interest would ultimately be repaid.

25      99.    Countrywide's Pay Option ARMs came with negative amortization

26  "caps," which limited the amount of missed interest that could be rolled into the

27  principal balance.  Because a borrower who hit the cap (typically set at 110-125%

28  of the original loan amount) was subject to a reset interest rate coupled with

1   required principal paydown, the likelihood of default on a negatively amortizing

2   loan also increased materially as these caps were reached.

3       100.   During the Class Period, as alleged below, the Company represented

4   that borrowers receiving Pay Option ARMs were relatively wealthy and

5   sophisticated, minimizing the risk of default and loss.  However, Countrywide has

6   now conceded that the Company extended Pay Option ARMs during the Class

7   Period that were far too risky because the borrowers did not fit the descriptions

8   the Company had previously given.  According to the Company, and as reported

9   in *The Los Angeles Times* on December 28, 2007, 89% of the Pay Option ARMs

10  Countrywide issued during 2006 (amounting to $64 billion), and 83% of the Pay

11  Option ARMs it issued during 2005 (amounting to $74 billion), would no longer

12  pass muster under the Company's "new," more conservative lending practices

13  adopted in 2007.  However, these more conservative practices were hardly "new."

14  They were nothing more than the traditional underwriting policies the Company

15  abandoned during the Class Period in its aggressive push to pump up its earnings

16  and stock price by selling massive amounts of loans with little consideration

17  given to the borrowers' ability to pay.

18      101.   "Stated income" or "no doc" loans were based on a borrower's bare

19  representations about his or her ability to repay, with little or no documentation to

20  substantiate those representations.  In these loans, the lender typically agreed not

21  to inquire behind the borrower's represented income or assets, or simply loaned

22  the money without making such an inquiry.  Low-documentation mortgages were

23  originally designed for professional and business owners with high credit scores,

24  who preferred not to disclose their confidential financial information every time

25  they applied for a mortgage.  These loans generally required the highest level

26  credit scores and low loan-to-value ratios.  Countrywide, however, routinely

27  extended these loans to borrowers with weak credit, and knew that such "low

28  doc" or "no doc" loans, particularly when coupled with nontraditional products

1   like ARMs, were highly likely to contain misinformation from the borrower, such
2   as overstated incomes, that would result in increased defaults.  Because borrowers
3   would be told that there would be no inquiry into the veracity of their
4   representations in loan applications, Company employees referred to these
5   products as ***liar loans."***

6   102.  "Interest-only" mortgages allowed the borrower to pay only the
7   interest accruing on the loan each month for a predetermined time period.  The
8   loan's principal balance remained constant.  At the end of the initial time period,
9   borrowers were required to pay interest plus principal, with the interest adjusting
10  depending on whether the loan was an ARM or had a fixed rate.

11  103.  Home Equity Lines of Credit ("HELOCs") were second mortgage
12  loans secured only by the difference between the value of the home and the
13  amount due on a first mortgage.  HELOCs sat in the "first loss" position, meaning
14  that if there is a default and foreclosure, the HELOC lender receives proceeds
15  from the sale of the underlying property only after the first lien holder is paid in
16  full.  As noted by *The Wall Street Journal* in December 2007, HELOCs are
17  "high-risk" loans that are "potentially worthless in a default because the first-lien
18  holder gets first dibs on the home."  Thus, even a relatively modest decline in
19  home prices can have a devastating effect on the collateral securing HELOCs,
20  resulting in the entire amount of the HELOC becoming unsecured.

21  104.  Countrywide management knew that if home prices declined, the
22  value of the collateral purportedly supporting the Company's HELOCs would
23  disappear before the first-lien holder's collateral—leaving Countrywide with
24  nothing to support its loans.  The risk of issuing HELOCs was even greater when
25  the first mortgage loan was granted with 100% financing.  In such situations, even
26  if there was no decline in real estate values, there was still no collateral backing
27  the HELOC.  The entire collateral, *i.e.* the mortgaged property, was tied up for the
28  benefit of the first lien holder.  Because Countrywide's position in HELOCs was

1  subservient to the first lien holder, Countrywide management knew than in selling

2  these loans it was required to focus carefully on the creditworthiness of the

3  borrower and have in place enhanced and careful underwriting policies to ensure

4  than only the most creditworthy were offered this loan product.

5      105. An internal 2005 marketing document from Countrywide's Full

6  Spectrum Lending division ("FSL"), obtained by Lead Plaintiffs in the course of

7  their investigation and titled "Your FULL SERVICE LENDING Partners," lists

8  the Company's "General Subprime Lending Programs":

9           • 100% Financing

10           • 80/20 Programs

11           • Stated Income Programs

12           • 2/28 and 3/27 [ARMs]

13      106. "100% Financing" refers to loans that borrowers could obtain

14  without making a down payment, *i.e.* loans equal to the full purchase price of the

15  home. "80/20 Programs" were also no-money-down loans, and sidestepped the

16  need for borrowers to purchase private mortgage insurance (which was usually

17  required when the loan was for more than 80% of the home price). The home

18  buyer took out *two* loans, one for 80% of the purchase price, and a second,

19  "piggyback" loan for the remaining 20% of the purchase price.[5] Indeed, the same

20  document boasts that "FSL does NOT require Private Mortgage Insurance (PMI)

21  on any loan – ever!" These loan programs, particularly when combined with the

22  nontraditional types of loans Countrywide was offering, and, most significantly,

23  the undisclosed material deterioration of loan origination and underwriting

24

25

26      [5] A borrower who takes out a "piggyback" loan essentially borrows the down payment in addition to the mortgage. Piggyback loans only have a second

27  lien on the house, and therefore lenders are less likely to obtain any recovery upon a foreclosure than on a first lien loan. Moreover, such borrowers are more

28  likely to default because they have not put down any of their own money.

1  standards detailed below, carried a high degree of risk to the Company and the

2  Class.

3         **3.    Countrywide's Significant Increases in**
              **Nontraditional Loan Originations Vastly Increase**
4             **the Company's Credit Risk and Liquidity Exposure**

5         107.  Beginning in 2003, Countrywide substantially increased its

6  origination of nontraditional and subprime loans.  The chart below illustrates how

7  Countrywide's  origination  of  HELOCs,  subprime  mortgages  (using  the

8  Company's  internal  definition  of  that  term)  and  ARMs  increased  in  absolute

9  numbers and also as a percentage of the Company's total mortgage origination

10 before and during the Class Period:

11                         **Mortgage Loan Production**
                           **Years Ended December 31**
12                              **($ in millions)**

|  | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** |
|---|---|---|---|---|---|---|
| **Total mortgage loans originated** | $251,901 | $434,864 | $363,364 | $499,301 | $468,172 | $415,634 |
| **Nonprime mortgage loans** | $9,421 | $19,827 | $39,441 | $44,637 | $40,596 | $16,993 |
| **Nonprime mortgage loans as % of total loans** | 3.74% | 4.56% | 10.85% | 8.94% | 8.67% | 4.09% |
| **ARM loans** | N/A | N/A | $189,931 | $261,577 | $212,085 | N/A |
| **ARMs as % of total loans** | 14% | 21% | 52.27% | 52.39% | 45.30% | 27% |
| **Pay Option ARMs as % of total loans** | N/A | N/A | 6% | 19% | 14% | N/A |
| **HELOCs** | $11,650 | $18,103 | $30,893 | $44,850 | $47,876 | $34,399 |
| **HELOCs as % of total loans** | 4.62% | 4.16% | 8.50% | 8.98% | 10.23% | 8.28% |

25        108.  These figures substantially understated the risk to the Company and

26 the  Class  resulting  from,  among  other  things,  Countrywide's  loosened  and

27 deteriorating loan origination and underwriting standards and the explosion of

28 "exceptions" permitted to even those standards.  Further, Countrywide concealed

1  the fact that it was classifying many loans as "prime" that failed to meet the
2  requisite industry definitions for that term.

3       109.   Countrywide began offering Pay Option ARMs in 2003 and quickly
4  became a leader in what *The Wall Street Journal* called a "profitable and growing
5  part of the mortgage market."   According to an October 27, 2007 article
6  describing another example of undisclosed enhanced risk, the Company secretly
7  encouraged employees to sell Pay Option ARMs and sold them to borrowers who
8  did not fully understand their terms:

9         In one California branch office, employees could win prizes, such as a
10         trip to Hawaii, for selling the most option ARMs, says Cindy Lau,
11         who worked for the company for more than six years.  Only a small
12         portion of borrowers "understood the loan and knew what they were
13         getting themselves into," Ms. Lau adds.

14       110.   Pay Option ARMs, according to a November 2007 article in *The*
15  *New York Times*, "were especially lucrative.  Internal company documents from
16  March [2007] show that Countrywide made gross profit margins of more than 4
17  percent on such loans, compared with 2 percent margins earned on loans backed
18  by the Federal Housing Administration."   However, by providing a material
19  number of such loans to those with inappropriate credit histories and/or financial
20  histories, the Company, undisclosed to the Class, exposed its securities to a
21  significant risk of loss.

22       111.   By 2005, Countrywide had originated approximately $93 billion of
23  Pay Option ARMs.  According to an analysis conducted by UBS AG for *The Wall*
24  *Street Journal*, published on October 24, 2007, the Company rapidly increased its
25  production of Pay Option ARMs by "giving these loans to riskier and riskier
26  borrowers."   Indeed, an internal Countrywide sales document indicated that Pay
27  Option ARMs would benefit "[a]nyone who wants the lowest possible payment!"

28

112.   Moreover, despite the risky nature of Pay Option ARMs, Countrywide increased its production of these loans by offering them to persons who could not or would not document their income or assets.  By issuing these loans without analyzing the creditworthiness of borrowers, Countrywide increased its risk and that of Class members.  Pay Option ARMs are high-risk loans on their own.  Lending without checking on the creditworthiness of a borrower is a high-risk activity.  The combination of granting a high-risk loan to a borrower whose creditworthiness is unknown is deadly to a lender.  The investing public was kept in the dark about this risk.  According to *The Wall Street Journal*'s October 2007 analysis of Countrywide's lending practices, 78% of the Pay Option ARMs originated by Countrywide in 2004 "were 'low-doc' mortgages in which the borrower didn't fully document income or assets."  By the end of 2006, according to the Company's Form 10-Q report filed on November 9, 2007, *81%* of the Pay Option ARMs that the Company was holding for investment were loans with low or no income documentation.

113.   Countrywide also increased its origination of Pay Option ARMs by allowing borrowers to obtain them without making substantial down payments.  According to the UBS survey reported in *The Wall Street Journal*:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance.  By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

114.   At the same time Countrywide was increasing its origination of risky loans, it was also increasing the amount of Pay Option ARMs held by the Company for investment.  As of December 31, 2006, Pay Option ARMs

1   represented 46% of the Company's mortgage loans held for investment.  The
2   amount of Pay Option ARMs held for investment grew rapidly from
3   approximately $4.7 billion in 2004, to more than $26 billion in 2005, to more than
4   $32.7 billion in 2006.

5        115.   In addition to originating more risky loans, Countrywide exposed
6   itself and the Class to even greater risk in connection with these "nontraditional"
7   loans by keeping a retained interest in its securitized loans.   Countrywide
8   typically maintained retained interests in the mortgage pools it securitized for
9   non-prime mortgages and HELOCs.   Retained interest holders receive interest
10  payments from the securitized loan pools after all required regular interest has
11  been paid to other investors in the higher priority securities tranches.  This was
12  done as a form of credit enhancement, because Countrywide's retained interests
13  would take the first losses if any mortgage pool underperformed, giving the
14  securitization investors limited default protection.

15        116.   Countrywide's explosive origination of nontraditional loans during
16  the Class Period was highly lucrative for the Company in the short term but, as
17  Defendants knew or should have known, vastly increased the long-term risk to the
18  Company's business.  To whatever extent investors deemed those risks tolerable,
19  they were kept in the dark about facts and practices that vastly increased even
20  those risks.   That is, at the same time Countrywide loosened and abandoned its
21  loan origination and underwriting standards, sacrificing loan *quality* for loan
22  *quantity* (and its associated higher earnings and higher stock price), it falsely
23  assured investors and analysts that the Company's underwriting policies and
24  procedures, particularly in subprime loans, were sound and indeed superior to
25  those of competing lenders.

26

27

28

### C. Countrywide, Contrary to its Assurances of Strong and Superior Underwriting Standards, Loosens and Abandons Them in Order to Boost Loan Volume and Earnings

#### 1. Countrywide, and Mozilo in Particular, Regularly Hyped the Company's Underwriting Standards

117.   Countrywide consistently assured investors during the Class Period that the Company managed mortgage credit risk through rigorous standards for origination, underwriting, and ongoing surveillance of outstanding loans. Countrywide also represented in SEC filings that the Company had a credit policy that established standards for the determination of acceptable credit risks. Countrywide portrayed its underwriting process as tightly controlled and supervised, and ***"designed to produce high quality loans"*** through careful pre-loan screening and post-loan auditing, appraisal and underwriting reviews.

118.   In particular, Countrywide's Form 10-K annual reports touted the Company's "proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity."  In these public filings, the Company also described an "extensive post-funding quality control process" involving "comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation."  This post-funding quality control process further involved a "pre- and post-funding proprietary loan performance evaluation system" that "identifies fraud and poor performance of individuals and business entities associated with the origination of our loans."  According to Countrywide, "[t]he combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines with laws and regulations."

119. While Countrywide was rapidly developing its portfolio of HELOCs, Pay Option ARMs and other high-risk loans, Mozilo repeatedly emphasized Countrywide's purportedly superior underwriting skills to the market. When asked, for example, about the inherent risks of originating alternative mortgage products (like subprime loans) during an April 21, 2004 conference call, Mozilo responded:

> Sub-prime cannot be looked at generically. There is very, very good solid subprime business and there is this frothy business that you [refer] to. . . . [Y]ou can get so deep into this marginal credit that you can have serious problems where you are taking 400 FICOs with no documentation; that is dangerous stuff. ***So [I] think it is very important that you understand the disciplines that the Company had, particularly that Countrywide has, which are very strong disciplines in the origination of sub-prime loans. And maintaining that discipline is critically important to us. . . . [W]hen you look at sub-prime, you have to look at it in various tranches, and we are at the high end of that tranche.***

120. During the same conference call, an analyst asked whether management was "comfortable" that subprime lending was a "long-term, profitable business" given a number of large lenders' recent exits from the industry. Mozilo responded:

> [W]e have successfully managed this product for years. ***And so I think using what our competitors do as a barometer will put you down the wrong path. We are a very different focused company that understands this product very well, how to originate it, how to manage it, how to underwrite, how to service it.*** And so we look at . . . this sub-prime business as . . . one that has to be carefully

1    manage[d], but one that has a tremendous opportunity for us long into

2    the future, certainly through the balance of this decade and beyond.

3        121.   Similarly, Mozilo compared Countrywide with the rest of the

4    industry during a March 15, 2005 conference call, stating:

5        . . . I'm deeply concerned about credit quality in the overall industry.

6        I think that the amount of capacity that's been developed for subprime

7        is much greater than the quality of subprime loans available.  **And so**

8        **they're pushing further down – as I observe it, they're pushing**

9        **further down the credit chain into the 500 FICOs and below 550,**

10       **540, 530.**   And as you get down to those levels, **it becomes very**

11       **problematic and I don't think there's any amount of money you can**

12       **charge upfront to cover your losses on those type of loans**.

13

14       So I'm deeply concerned about everybody going into subprime.  As I

15       have said very often, there's an old Yiddish expression that says when

16       everybody goes to the same side of the boat, the boat tends to tip over.

17       And we are—a lot of people are going to the same side of the boat.

18       **So we've had to remain very disciplined in our subprime efforts. . . .**

19

20       So I have to separate it.   The overall industry I am troubled;

21       Countrywide I'm not, because we have remained very disciplined in

22       our origination of subprime loans.

23       122.   During the same call, Mozilo was asked how confident he was that

24   his goal of attaining a 30% market share was achievable.  Mozilo reaffirmed that

25   "our objective is to dominate our industry" but assured the market: **"I will say**

26   **this to you, that under no circumstances will Countrywide ever sacrifice sound**

27   **lending and margins for the sake of getting to that 30 percent market share."**

28

---

123.   Moreover, during a conference call on July 26, 2005, Mozilo and Kurland were asked to comment on a *Wall Street Journal* article apparently reporting that Countrywide and other lenders were loosening underwriting standards.   Mozilo stated: ***"I'm not aware of any loosening of underwriting standards that creates a less of a quality loan than we did in the past."***

124.   To further convince investors that Countrywide's concerted shift toward riskier mortgage products would remain a relatively safe proposition, the Company stated publicly that it minimized credit risk by selling most of the loans it originated ***"and by retaining high credit quality mortgages in our loan portfolio."***

125.   Each of these statements was diametrically opposed to what was actually happening within the Company at the time.   For example, as Mozilo and the Officer Defendants were well aware, Countrywide had in fact abandoned any "discipline" in the Company's "subprime efforts" and was "pushing further down the credit chain."   Thus, contrary to Mozilo's ringing assurance, Countrywide was indeed "sacrific[ing] sound lending and margins for the sake of getting to that 30 percent market share."   Further, Mozilo and the Officer Defendants, contrary to Mozilo's statements, were indeed "fully aware" of the Company's "loosening of underwriting standards" that created dramatically lesser quality loans than in the past.

### 2.   In an Effort to Meet Mozilo's 30% Market Share Goal, Countrywide Loosens its Underwriting Standards to Sweep in Unqualified Borrowers

126.   While Countrywide repeatedly hyped its strong underwriting standards during the Class Period, the Company, driven by Mozilo's goal of capturing 30% of the mortgage market, was progressively loosening them.   This undisclosed effort, which was part of the "culture change" described by CW1, was a critical element of the Company's concerted foray away from traditional lending to much riskier but more lucrative products, with the goal—also

1   undisclosed to the public but no secret within the Company—to generate huge
2   volumes of loans (and accompanying revenue) and sell them off to the secondary
3   markets as quickly as possible, regardless of the credit quality of the loans or the
4   magnitude of "exceptions" from the underwriting standards that would need to be
5   granted in order to fund the loans.

6        127.   An internal e-mail obtained by Lead Plaintiffs in the course of their
7   investigation discusses new guidelines then adopted by Countrywide's
8   Correspondent Lending Division ("CLD") for the origination of subprime loans.
9   The core business of CLD was to purchase subprime loans from independent,
10   outside mortgage brokers who originated the loans.  The e-mail, dated December
11   4, 2003, was sent by David Farrell ("Farrell"), CLD's Senior Vice President, to
12   "SubprimeSales@Countrywide" and "SubPrimeDept@Countrywide" regarding
13   the "Exception philosophy under the New Guidelines."

14        128.   "Exceptions" or "exception loans" are loans whose criteria fall
15   outside the Company's underwriting standards but are approved nonetheless.  The
16   December 4, 2003 e-mail purports to reiterate the Company's philosophy with
17   respect to allowing such "exceptions," and explains that the "recently released
18   new guidelines were designed to incorporate a wider range of credit scores for
19   each grade so that the need for such exceptions would be eliminated."  The new
20   guidelines also include, or were meant to accommodate, "increased loan amount
21   limits."  Farrell explains in the e-mail that "the bottom line is that we expanded
22   our guidelines in order to allow more loans to be approved without requiring an
23   exception approval."  The rationale in adopting these new loosened guidelines, in
24   other words, which was never disclosed to the market, was to capture a
25   population of borrowers with weak credit who previously would not have
26   qualified for a loan.

27        129.   Confidential Witness 2 ("CW2") worked in CLD as a supervising
28   underwriter during the Class Period until mid-2005.  CW2 oversaw between six

1  and ten underwriters who underwrote subprime loans. CW2 also supervised

2  CLD's underwriting operations in several states. Because CLD underwriters

3  could consult with any of the CLD underwriting supervisors, including CW2, and

4  brokers doing business with CLD similarly could approach CLD underwriting

5  managers irrespective of where the broker was located, CW2 became familiar

6  with CLD's underwriting practices with respect to all other regions of the country

7  in addition to CW2's region.

8      **(a)    The Underwriting Matrices Reveal a Steady
           Loosening of Loan Origination Standards**

9

10     130. Unbeknownst to the Class, underwriting guidelines at CLD were

11  progressively loosened throughout CW2's tenure. A review of the CLD

12  Underwriting Matrices for 2003 through 2006, which Lead Plaintiffs obtained in

13  the course of their investigation and which, according to CW2, were the key

14  documents CLD underwriters and managers relied upon in performing their

15  duties, reveals that underwriting standards were steadily loosened during the

16  Class Period.

17     131. For example, the level of documentation the Company required to

18  obtain a subprime mortgage was reduced considerably between February and

19  December 2003. The February 27, 2003 subprime underwriting matrix included

20  three loan documentation programs: full, simple and stated. The

21  December 22, 2003 subprime underwriting matrix includes only two such

22  programs: full and stated. The requirements for "Stated Doc" mortgages were

23  also relaxed. As of February 27, 2003, the Stated Doc program specified that

24  "verification [of income] may be requested on a case-by-case basis." As of

25  December 22, 2003, Stated Doc "income must be reasonable for the borrower's

26  professional [sic] and level of experience." The statement that income

27  verification could be requested was removed. In addition, the February 27, 2003

28  underwriting matrix specified that under Stated Doc, the "AA and A- risk grades

1   with LTVs greater than 75% require verification of a minimum 2 year continuous

2   employment (salaries must be in the same industry)."   The December 22, 2003

3   underwriting guidelines do not require verification of employment.

4          132.   As of February 27, 2003, the Underwriting Matrix for first lien

5   subprime loans showed a minimum FICO score[6] of 580 for a borrower with an

6   AA risk grade where the loan-to-value ratio was no greater than 85%.   Such a

7   borrower could get a loan for as much as $500,000.   As of December 22, 2003,

8   the minimum FICO score for a $500,000 loan had been lowered to 540, and

9   borrowers with 500 FICO scores could borrow $400,000.   This was true for both

10  full doc and stated doc loans.

11         133.   Further, as of December 6, 2003, the mortgage credit history

12  required for a borrower with a AA risk grade under the subprime loan program

13  was "1 x 30 late payment in the last 12 months; no rolling 30s allowed."   In other

14  words, the prospective borrower could be 30 days late on one mortgage payment

15  during the last twelve months, but could not have "rolling" delinquencies.   As of

16  December 22, 2003, this condition was changed to "Rolling–6x30=1," meaning

17  that the borrower could have up to six months of rolling 30-day delinquencies and

18  still qualify for the loan.

19         134.   According to the CLD Underwriting Matrix for subprime first

20  mortgages dated December 22, 2003, a "Stated Doc, Self-Employed" borrower

21  (meaning a borrower who is self-employed and does not provide any

22  documentation supporting income or assets) with a FICO score of 620 could

23  obtain a mortgage with a 70 percent combined loan-to-value ("CLTV") ratio[7] in

24

25     ───────────────────
       [6]   The Fair Isaac Credit Organization, or "FICO," score is a standard and
26  indeed the most widely accepted measure of the creditworthiness of a borrower.
    FICO scores range from 300-850.   The U.S. median is approximately 720.
27     [7]   This means that the loan could be as much as 70% of the value of the
    property.   The higher the maximum CLTV of the mortgage, the lower the
28  borrower's down-payment and the less borrower equity in the home.   A 70%
                                                        *(continued . . .)*

1   an amount up to $400,000, even if the borrower had had a Chapter 7 or 13
2   bankruptcy, provided that the bankruptcy had been discharged at least two years
3   before the loan application. The description of documentation programs confirms
4   that for "Stated" loan applicants, both salaried and self-employed, ***"[i]ncome on***
5   ***1003 application is not generally verified,"*** with the subjective caveat that the
6   stated income is "reasonable for the borrower's professional [sic] and level of
7   experience."

8      135. One year later, according to the CLD Underwriting Matrix for
9   subprime first mortgages dated December 20, 2004, standards were lowered. The
10  same "Stated Doc, Self-Employed" borrower could get a loan of up to $500,000.
11  Such a borrower with a FICO score as low as 500 could borrow $400,000.

12     136. The next year, standards were substantially lowered again.
13  According to the CLD Underwriting Matrix for subprime first mortgages dated
14  December 19, 2005, the same "Stated Doc, Self-Employed" borrower could get a
15  loan of up to $650,000, even if he or she had had a Chapter 7 or 13 bankruptcy
16  that had been discharged only ***one day*** (rather than two years) before the loan
17  application. Such a borrower with a FICO score as low as 520 could borrow
18  $500,000.

19     137. Only three months later, according to the CLD Underwriting Matrix
20  for subprime first mortgages dated March 21, 2006, the same "Stated Doc, Self-
21  Employed" borrower could get a loan of up to ***$1,000,000***, even if he or she had
22  discharged a bankruptcy only one day before the loan application. Such a
23  borrower with a FICO score as low as 500, the lowest FICO score on the matrix,
24  could borrow as much as $700,000.

25

26

   _____

27  *( . . . continued)*
   maximum CLTV implies a down-payment of 30% of the price of the property.
28  Generally, the higher the CLTV, the riskier the loan to Countrywide.

138.   The Underwriting Matrices reflect that standards for "Full Doc" subprime borrowers (where the borrower provides proof of income and 12-months of bank statements) and "Stated W-2" subprime borrowers (where the borrower provides a W-2 form showing wages but no other proof of assets) were relaxed in the same or comparable fashion.

139.   Countrywide's Underwriting Matrices also designated internal risk grades between AA+ and C- for both "Full Doc" and "Stated Doc" subprime borrowers.  Prior to 2005, in order for a subprime first mortgage borrower to be classified as a B risk grade, 18 months had to have elapsed since the discharge or dismissal of a personal bankruptcy.  As of 2005, this requirement was relaxed so that the same borrower could qualify for a B risk grade only one day after bankruptcy discharge and 12 months after dismissal of the bankruptcy proceeding.   By shortening the waiting period in this fashion, Countrywide enabled itself to make loans to borrowers who had not yet demonstrated creditworthiness.

140.   Countrywide was also willing to grant increasingly larger loans to low-quality borrowers.  Under the CLD Underwriting Matrices, as of November 19, 2003 and January 26, 2004, the maximum loan amount for Stated Doc subprime borrowers internally rated AA+, with a minimum FICO of 680 and 95% CLTV, was $400,000.   The maximum loan was increased to $500,000 as of December 20, 2004 and $700,000 as of March 21, 2006.  For borrowers with a C- (lowest) risk grade, for example, a minimum FICO of 500 (the lowest), and a CLTV of 70%, the Company would lend a maximum of $300,000 until March 21, 2006, when this maximum amount was increased to $500,000.  For an AA rated subprime borrower with a minimum FICO of 500 and a CLTV of 65%, the maximum loan amount that could be borrowed was $400,000 until it was raised to $700,000 as of March 21, 2006.  A B-grade borrower with a minimum FICO of 500 and an LTV of 80% could only borrow $400,000 between 2003 and 2005,

1    but could borrow up to $550,000 as of March 21, 2006.   These increases in
2    maximum loan amounts occurred at many risk grades during the Class Period,
3    exposing Countrywide to increasingly greater risk in its loan portfolio.

4        141.   Subprime underwriting standards also weakened with respect to
5    increased CLTV limitations between 2004 and 2006.  For example, in the A- risk
6    grade, the maximum CLTV for borrowers with a minimum 540 FICO was 85%
7    as of January 26, 2004, with a maximum loan amount of $500,000.   As of
8    December 20, 2004, the CLTV for these borrowers was increased to 95%, and as
9    of March 21, 2006, the maximum loan amount was increased to $600,000.
10   Borrowers rated AA+ with a minimum FICO of 540 had a maximum CLTV of
11   85% until December 20, 2004, when it was increased to 90%.

12       142.   Borrowers rated AA+ with a minimum FICO of 640 were
13   consistently able to borrow up to 100% CLTV.  Prior to 2005, however, these
14   loans were limited in amount to $500,000 and carried conditions that further
15   limited first-time home buyers to a maximum "payment shock"—the difference
16   in monthly housing costs in the new home versus the previous home—of 100%.
17   As of December 19, 2005, these conditions were eliminated and the maximum
18   loan size was increased to $575,000.  As of March 21, 2006, the maximum loan
19   size for such borrowers was increased further to $650,000.

20       143.   Countrywide's special underwriting standards for jumbo subprime
21   mortgages (those exceeding $500,000) were also loosened over time.   As of
22   December 2004, under the CLD Underwriting Matrices, a Full Doc subprime
23   borrower could not obtain a $1 million first mortgage unless the borrower was (1)
24   rated AA+ with a FICO score above 580 and had a maximum CLTV of 65%, or
25   (2) rated AA with a FICO score greater than 600 and had a maximum CLTV of
26   65%.

27       144.   In 2006, these conditions were relaxed so that a Full Doc subprime
28   borrower could obtain a $1 million first mortgage with no cash-out restrictions if

1   the borrower was: (1) rated AA+ with a minimum FICO of 600 and had a

2   maximum CLTV of 75% (compared to 65%), or (2) rated AA with a minimum

3   FICO of 600 and had a maximum CLTV of 70% (compared to 65%).  Thus,

4   Countrywide was willing to make riskier, higher CLTV jumbo loans to less

5   creditworthy subprime borrowers in 2006 as compared to 2004.

6       145.  Further, in 2004 the Underwriting Matrices for jumbo mortgages to

7   subprime borrowers provided that CLTV, even for borrowers rated AA+, could

8   never exceed 95%.  By March 2006, however, Countrywide was making jumbo

9   subprime first mortgage loans with 100% CLTV to AA+ rated borrowers with

10  FICO scores above 640.

11      146.  The Company's underwriting guidelines for its B risk grade

12  deteriorated during the Class Period for subprime second mortgages.  The B risk

13  grade was relaxed in 2005 to apply to borrowers with bankruptcy dismissals

14  within one year, as opposed to 18 months, and immediately following bankruptcy

15  discharges.  Moreover, as of December 20, 2004, a maximum 75% CLTV was

16  permitted for B risk grade borrowers with minimum FICO scores of 560 for

17  subprime second mortgages on family residences.  As of December 19, 2005, this

18  maximum CLTV increased to 80%.

19      147.  According to CW2, the Company's loosening of its Underwriting

20  Matrices and guidelines was necessary in order for CLD to achieve its goal of

21  *doubling* the aggregate volume of loans it purchased each year.  For 2002, CLD

22  had a stated goal of purchasing at least $2 billion in loans.  To CW2's best

23  recollection, CLD exceeded that goal.  For 2003, CLD's goal was to purchase at

24  least $4 billion in loans.  To CW2's best recollection, CLD purchased more than

25  $5 billion in loans in 2003.  For 2004, CLD's goal was to purchase at least $8

26  billion in loans.  To CW2's best recollection, CLD purchased more than $9

27  billion in loans that year.  For 2005, CLD's goal was to purchase at least $16

28  billion in loans.

1    148.   Indeed, according to CW2, it would have been impossible for CLD

2    to grow its business in the way Countrywide headquarters wanted had

3    Countrywide continued to use the Underwriting Matrices and guidelines in place

4    in 2003.  The loosening of the Underwriting Matrices and guidelines dramatically

5    increased CLD's ability to purchase more loans and meet its aggressive internal

6    goals.  However, it also dramatically increased the riskiness of the loans CLD was

7    purchasing.  According to CW2, the underwriting guidelines overall were "very

8    loose and lax" and designed to help CLD make loans.  CW2 reported that even

9    though the CLD underwriting goal doubled each year, the size of CLD

10   underwriting staff increased only minimally, making it difficult to adhere to any

11   standards or guidelines.  In fact, CW2 confirmed that the guidelines themselves

12   were not strictly adhered to.  As Farrell, who wrote the December 4, 2003 e-mail,

13   used to say according to CW2, "they are guidelines, not Gospel."

14   149.   Moreover, these CLD Underwriting Matrices, according to CW2

15   (and CW4 and CW5 as alleged below), were not written or developed by CLD

16   employees.  Rather, all CLD Underwriting Matrices were written by a central

17   office at the Countrywide corporate level.  This central office wrote the

18   Underwriting Matrices and guidelines not just for CLD, but for all Countrywide

19   divisions that originated and purchased loans.  CLD made loans to borrowers that

20   were originated by mortgage brokers and other intermediaries.  Based on CW2's

21   experience with the Company, CW2 believes that as the CLD Underwriting

22   Matrices and guidelines were loosened, those used in Countrywide's other loan

23   origination and loan purchasing divisions—including the Full Spectrum Lending

24   Division ("FSL"), the Wholesale Lending Division ("WLD"), and the Consumer

25   Markets Division ("CMD")—were loosened in the same fashion.

26

27

28

1

2

### (b)    Other Former Employees Company-Wide Witnessed the Loosening of Underwriting Standards

3        150.   Confidential Witness 3 ("CW3") was a corporate-level Senior Vice

4    President involved in financial reporting and analysis during most of the Class

5    Period until 2007.   CW3 was part of a group in Company headquarters that was

6    responsible for developing new loan products, tracking profitability and

7    performance, creating productivity models, and troubleshooting any problems.

8    According to CW3, the initiative to create new and innovative loan products

9    "came from high-up," and specifically David Sambol.   CW3's group was

10    expected to create "new, exotic products" that were similar to those that

11    Countrywide's competitors were offering.   CW3 characterized Countrywide as

12    "fast followers."   CW3's group engaged in a form of corporate espionage.

13    Specifically, the group would "receive intelligence" from an insider at Bank of

14    America, which included Bank of America's "exact guidelines" for an "exact new

15    product," which would then be introduced by Countrywide.   Each new product

16    was reviewed personally by Sambol and required his approval in order to be

17    marketed.   CW3 met regularly with Sambol regarding new product offerings.

18        151.   CW3 recalled a change in loan products as lending standards

19    gradually became more lax beginning as early as 2003.   CW3 described

20    Countrywide's newer products as "worthless," referring in particular to "no

21    income, no asset" loans that led to "easy money" for the Company but allowed

22    borrowers to simply state their income and assets without submitting any proof.

23    According to CW3, it was generally known at Countrywide that "there was a lot

24    of lying going on" by borrowers with respect to such loans.   CW3 also noted that

25    FICO scores became less important, with potential borrowers able to obtain a

26    mortgage with very low FICO scores (in the 500s), and that many of the loans

27    being issued by Countrywide had a 100% loan-to-value ratio, which were very

28    risky.

1      152.   Confidential Witness 4 ("CW4") was a Product Analyst in

2  Countrywide's corporate-level Risk Management division during the Class Period

3  until the fall of 2007.   As a Product Analyst in Company headquarters, CW4

4  assisted with distributing the Company's loan program guidelines, and was

5  specifically responsible for Company-wide distribution of management's

6  adjustments to FICO credit scores for all Countrywide products.   CW4 also

7  proofread the underwriting guidelines and matrices.   CW4 attended weekly

8  Fannie Mae and Freddie Mac meetings with Countrywide Senior Vice Presidents

9  and Executive Vice Presidents in attendance, where Countrywide representatives

10  would "request or negotiate guideline changes to keep up with another company."

11  Management negotiated for variances requested by branches in the field, which

12  sought to amend the underwriting guidelines to get "other loans through."

13      153.   According to CW4, Countrywide had "little spies" informing the

14  Company of competitors' practices, which Countrywide rapidly copied; if other

15  lenders were "being lenient and making money, we had to do it too."   Employees

16  often referred to Countrywide as "swift followers," such that if other lenders

17  lowered their FICO score requirements for particular types of loans, Countrywide

18  would always follow suit.

19      154.   CW4 further characterized the weakening underwriting standards at

20  Countrywide as "a feeding frenzy."   According to CW4, during the Class Period

21  Countrywide kept relaxing the guidelines and dropping the minimum FICO

22  scores borrowers needed to qualify for loans.   Requests were uniformly made to

23  loosen guidelines and never to tighten them.

24      155.   Confidential Witness 5 ("CW5") was a Technical Writer in the

25  Company's Calabasas headquarters from before the Class Period until late 2004

26  and during 2005 and 2006.   CW5 typed weekly revisions to Countrywide's

27  corporate credit policies and guidelines, and revised the "online documentation"

28  according to new guidelines CW5 was given.   Edits included updating loan-to-

1 value ratios and FICO credit scores for all loans.   CW5 explained that

2 Countrywide's underwriting guidelines were accessible using Lotus Notes

3 computer software, and that anybody in corporate headquarters, including upper

4 management, could access the software.   Employees who traveled could also

5 access the guidelines through a corresponding web application.   No later than

6 2005, CW5 became aware through the editing of guideline revisions and

7 interaction with other employees that guidelines had been loosened to allow

8 riskier lending.  By October 2005, risky lending was "definitely accelerated."

9      156.   Confidential Witness 6 ("CW6") was a subprime underwriter in a

10 California loan origination branch during the Class Period through the fall of

11 2007.   CW6 exclusively handled subprime loans and typically received

12 applications for "stated income, no-document" loans made by "self-employed"

13 individuals.   CW6 recalled becoming aware in 2005 that Countrywide was

14 loosening underwriting guidelines to allow additional and riskier borrowers to

15 satisfy loan criteria.   According to CW6, beginning at least in 2005, the

16 underwriting matrices were frequently updated to lower minimum FICO score

17 requirements.  According to CW6, lending restrictions were never tightened until

18 2007 when New Century, a Countrywide competitor and a large subprime lender

19 itself, filed for bankruptcy.

20      157.   Confidential Witness 7 ("CW7") is a former independent mortgage

21 broker and Senior Loan Officer with Family First Mortgage Corp. in Florida.

22 CW7 regularly ran loans through the Tampa, Florida office of Countrywide's

23 Wholesale Lending Division ("WLD").   While at Family First Mortgage, CW7

24 had occasion to originate loans that were funded not only by Countrywide, but

25 also other lenders including Fremont, New Century, and Citibank.   According to

26 CW7, Countrywide's lending standards were the loosest in the entire industry.

27 CW7 recalled that although many mortgage lenders began to tighten credit and

28

appraisal standards in or about 2005, Countrywide's standards remained lax and the Company "let things slide."

### 3. Countrywide Ignores and Abandons its Underwriting Standards to Pump Up Loan Volume and Boost Earnings

#### (a) Countrywide Had a Company-Wide Practice of Originating and Funding Loans Without Regard to Loan Quality

158. According to CW2, management turned CLD into a sweatshop where underwriters were under constant pressure to approve increasing quantities of loans without regard to quality. Loans were routinely approved for borrowers who, even based on Countrywide's loosened underwriting standards, did not actually qualify for the loan. According to CW2, the general rule at Countrywide was that loan applications were not to be scrutinized and underwriters were not to exercise professional judgment. Rather, loans were to be approved automatically unless there was a "blatant" problem on the face of the loan application. In fact, in contrast to loans that were approved, all loans that a CLD underwriter denied were automatically given to an underwriting manager for further review. According to CW2, no loan, regardless of whether it was within the underwriter's threshold authority (often $350,000 for a junior underwriter and $450,000 or $500,000 for a senior underwriter), could be denied without a second signature from an underwriting manager.

159. The culture of CLD, according to CW2, was that you could make any loan work, and "if you don't make loans, you don't have a job." CW2 would make this statement, in words or substance, to subordinates and this principle was reinforced by Countrywide management, including CW2's immediate supervisor (the First Vice President and second-in-charge to Farrell), at meetings of CLD managers that CW2 attended. The mantra was: "We gotta get more loans." "Close more loans." "Find the good in the loans." "We need to make the loans work."

1    160.   According to CW2, CLD underwriters and underwriting managers

2    were required to create a "paper trail" in loan files to support their loan approvals.

3    They were fully aware that in many cases—for example, in connection with

4    SISA, or Stated Income/Stated Asset, loans—borrowers were making false

5    statements about their income and assets.  Nevertheless, CLD underwriters had to

6    "paper the file" and "build a case" that a loan was appropriate.  CW2 was told

7    that underwriters had to create this paper trail because Countrywide needed to be

8    able to sell its loans on the secondary market.  To do so, the loan files had to

9    include sufficient documentation regarding borrower creditworthiness and loan

10   quality.

11   161.   According to CW2, in order to create a paper trail, CW2 and

12   colleagues would look for documentation, such as printouts from a website called

13   salary.com, to support the borrower's claims about his or her stated income.  The

14   salary.com website did not provide specific salary information for any particular

15   borrower.   Rather, this website purported to provide a range of salaries for

16   particular job titles based upon the borrower's zip code.   Countrywide

17   underwriters used salary.com to obtain this information because they knew the

18   borrower file had to have some type of documentation to support or substantiate

19   the borrower's income in order for the loan to be sold on the secondary market.

20   This was done in many cases in which CLD underwriters knew that the

21   borrower's income could not reasonably be what was represented on the loan

22   application.

23   162.   Indeed, according to CW2, if a borrower applying for a SISA loan

24   provided a bank name, address and account number, it was the practice in CLD

25   that bank balances would not be verified.  CLD underwriters would simply accept

26   whatever bank balance the borrower put on the application.  According to CW2,

27   all CLD underwriters knew that many of these bank balances were inflated.  For

28   this reason, CW2 and other underwriters would call SISA loans "***liar loans***."

163.   According to CW2, CLD underwriters had powerful incentives to approve loans regardless of their quality.   Underwriters were paid a monthly bonus, and, because they received relatively low salaries, depended on these bonuses to make ends meet.   Bonuses were based on the volume of the underwriter's loan production, and calculated using a points system.   Points were assigned to each loan depending on a variety of factors including the type of loan that was underwritten.   The more points the underwriter accumulated, the larger the bonus.   If an underwriter denied a loan, he or she received a lower number of points toward his or her monthly bonus than if the underwriter approved the loan. Indeed, according to a February 2008 article in *The Wall Street Journal*, Countrywide was so focused on growing loan origination that in at least one building, oversized replicas of monthly bonus checks were hung above employees' cubicles so everyone could see which employees were most successful in originating new mortgages.

164.   Confidential Witness 8 ("CW8") worked for Countrywide through the Class Period until after the Summer of 2007.   CW8 initially was involved in overseeing loan origination as an employee with FSL.   As an FSL manager, CW8 was required to be familiar with Countrywide corporate policies and procedures, and to travel to FSL offices across the nation.   To carry out these responsibilities, CW8 was required to have an in-depth knowledge not only of FSL's business and operations, but also the other Countrywide divisions and units engaged in loan origination.

165.   According to CW8, between mid-2004 and mid-2007 a substantial percentage of all loans originated by Countrywide were low-doc or no-doc loans, offered as both prime and subprime programs.   Underwriting practices for such loans were exceptionally weak.

166.   According to CW8, the prime no-doc loan program was called "No Income, No Assets," or "NINA."   Borrowers did not provide any meaningful

1  documentation to support NINA loan applications.   Meaningful underwriting,

2  therefore, was virtually impossible to perform.   "Fast & Easy" was a prime low-

3  doc loan program and an extremely important Company product during CW8's

4  tenure.   Like NINA borrowers, Fast & Easy borrowers did not have to provide

5  any significant documentation to support their loan applications, and meaningful

6  underwriting, *i.e.* a real assessment of the borrower's capacity to pay, was

7  virtually impossible to perform.

8       167.   CW8 related that the two basic subprime no-doc loan programs were

9  "Stated Self-Employed" and "Stated Wage Earner."   Subprime borrowers who

10  applied through the Stated Self-Employed program were not required to provide

11  any supporting income or asset documentation and were not subject to any

12  meaningful underwriting.   The Stated Wage Earner program was designed for

13  wage earners who received W-2 income but who also earned additional income

14  "off the books."   Borrowers were required to provide W-2s to verify their on-the-

15  books income, but were not required to provide any documents to verify their

16  additional income.   Meaningful underwriting, according to CW8, was therefore

17  impossible with respect to the "off the books" component of Stated Wage Earner

18  loan applications.

19       168.   According to CW8, loan origination standards and procedures were

20  not designed to produce high quality loans.   Rather, the rule at Countrywide, as

21  stated in its Sales Training Facilitator Guide, was that ***"we always look for ways***

22  ***to make the loan rather than turn it down."***   Countrywide's loan origination

23  standards and procedures, according to CW8, were focused on enabling the

24  Company to generate revenue growth and capture an increased share of the

25  mortgage loan market.

26       169.   An internal FSL presentation from 2005 obtained by Lead Plaintiffs

27  in the course of their investigation, titled "Your FULL SERVICE LENDING

28  Partners," notes that "Subprime lenders sell payment, not rate" and lists the

following "Full Spectrum Lending Success Stories" that highlight the extremely risky loans Countrywide routinely made to borrowers with the weakest credit:

- Borrower with a 530 FICO claimed three reporting collections had been paid in full. FSLD AE [account executive] collected proof of payment and submitted documents to LandSafe credit [Countrywide's in-house appraisal firm]. FICO was adjusted to a 587, and borrower was qualified for 100% LTV.

- Borrower with a 608 FICO was qualified for 100% LTV, using qualifying income from a non-occupying co-borrower with a 570 FICO!!!

- Borrower with a 515 FICO was qualified for 95% LTV, using offer letter and VOE [verification of employment] to qualify income from brand new job.

- Borrower whose application was received on October 28 closed in 7 days on November 4!!!

- Borrower with a 535 FICO was qualified for 100%, no PMI [private mortgage insurance] (ever!), waiving $800 in collection payoffs.

- Borrowers with 521 & 526 FICO were qualified for 100% LTV on cash out refinances.

170. Confidential Witness 9 ("CW9") was a loan underwriter in the Consumer Markets Division ("CMD"), sometimes referred to as the "retail division," from before the Class Period until the summer of 2007. CW9's West Coast branch was the "top grossing" branch in the nation, closing more than $2 billion in loans during its highest-producing year. CW9's branch only originated "prime loans," and CMD's loan programs included "no doc," or "NINA," reduced doc, SISA, and "Fast & Easy." Most loans originated in CW9's branch

1  were "hybrid" ARM loans such as 3/1 or 5/1 ARMs, as to which the respective

2  interest rate was fixed for three or five years and resets annually thereafter.  Most

3  other loans issued in CW9's branch were Pay Option ARMs and second-lien

4  HELOCs.  Additionally, according to CW9, "80/20" loans, which provided 100%

5  financing, were actively pushed by the Company.  According to CW9, senior

6  management insisted that 100% financing be "marketed like crazy."

7       171.  According to CW9, CMD's loan programs were "very consumer

8  friendly" and information on loan applications was "basically stated."  Every

9  Countrywide loan, however, according to CW9, gave the lender the right to verify

10  the income stated on the application, and it could be checked with the Internal

11  Revenue Service (the "IRS").  In fact, as reported in an April 6, 2008 article in

12  *The New York Times* called "A Road Not Taken By Lenders," at least 90% of

13  borrowers, including stated income borrowers, were required to provide IRS

14  Form 4506T with the application, authorizing the lender to verify income

15  information with the IRS.  According to the article, before 2006 it took one

16  business day to receive a response from the IRS, and in 2006 the IRS set up an

17  automated system, reducing the response time considerably.  However, according

18  to this article, income was verified with the IRS on only 3-5% of all loans funded

19  in 2006.  Just as Countrywide had a practice, as described by CW2, of not

20  verifying a "stated" bank balance, the Company turned a blind eye to "stated"

21  incomes despite its ability to determine easily whether that information was

22  accurate.

23       172.  According to Brian Koss, who spent four years as a regional Senior

24  Vice President at Countrywide where he ran 54 branches in New England and

25  upstate New York, Countrywide became a victim of "public company panic."

26  According to Mr. Koss, management was "reacting to each quarter's earnings and

27  making short term decisions.  They approached making loans like making

28  widgets, focusing on cost to produce and not risk or compliance."  According to

1   Mr. Koss, consistent with CW8, "[p]rograms like "Fast and Easy" where the

2   income and assets were stated, not verified, were open to abuse and misuse. ***The***

3   ***fiduciary responsibility of making sure whether the loan should truly be done***

4   ***was not as important as getting the deal done.*** As long as people had jobs and

5   values were on the rise, life was good."

**(b)     The Exception Processing System**

7       173.   Confidential Witness 10 ("CW10") was a loan officer in a CMD

8   branch from before the Class Period until the Summer of 2007, and was one of

9   the top sales representatives of "A paper" loans, which were prime loans.

10       174.   CW10 stated that Countrywide Bank was an "investor" in many of

11   the Company's loans, and that many of these were "risky" ARM loans and

12   HELOCs originated in CW10's branch.  Certain of these loans were $1 million,

13   $2 million, and $3 million second-lien "stated income" HELOCs, which CW10

14   labeled "atrocious" and many of which are presently being recalled by

15   Countrywide.  According to CW10, exceptions got "out of hand" and accelerated

16   quickly in 2004 and 2005, leading to the creation of more "flexible," or loosened

17   guidelines.

18       175.   In fact, according to CW10 and other witnesses, Countrywide had an

19   internal, proprietary computer system that was used to identify and route highly

20   risky loans out of the regular loan approval process and to the Company's central

21   "corporate underwriting" offices (called "Structured Loan Desks") in Plano,

22   Texas or Pasadena, California for evaluation.   The software was called the

23   Exception Processing System, or EPS.  The Exception Processing System was not

24   used to reject loans that were outside the Company's underwriting guidelines.

25   Rather, CW10 and other loan officers used EPS to obtain approval authority from

26   "corporate" to *close* and *fund* such loans.  CW10 explained that the EPS software

27   had entry tabs by which loan officers could enter a customer's FICO score, loan

28   amount, property value used as collateral, and a description of the client's

1   situation.  According to CW10, "highly risky loans" were entered into EPS, hence
2   the need for higher-up approvals outside of the normal approval process.   The
3   "corporate underwriters" at the Structured Loan Desks, headed by Eugene Soda,
4   responded to all requests for exceptions made through EPS.  CW10 stated 15% to
5   20% of the loans generated each day in CW10's office were run through EPS, and
6   very few were rejected.

7         176.   A presentation document titled "Countrywide CMD Structured Loan
8   Desk," filed publicly in *United States v. Partow*, No. 06-CR-00104 HRH (D.
9   Alaska), a criminal proceeding against a former Countrywide loan officer,
10  summarizes the "objectives" of the Exception Processing System:

11                                    Objectives
12        •  ***Approve virtually every borrower and loan profile with***
13           ***pricing add on when necessary.***
14        •  Identify alternative program to meet borrower needs.
15        •  Leverage FSLI [Full Spectrum Lending] for all subprime
16           opportunities.
17        •  Not intended to match any competitor's price.
18
19                                Objectives (cont.)
20        •  ***Process and price exceptions on standard products for***
21           ***high risk borrowers.***
22        •  Process exceptions for:
23           – Credit Scores
24           – LTV and loan amounts
25           – Cash out amounts
26           – Property types

27        177.   As an example of an exception loan, CW10 referred to a "stated
28  income" loan for more than $300,000 involving a high-rise condominium being

1   used as an investment property.  The borrower's FICO score was 618, lower than

2   the minimum 640 FICO prescribed in the guidelines, and the loan had a 75%

3   loan-to-value ratio.  CW10 considered this loan to be risky given the low FICO

4   score, stated income, and fact that the property was a high-rise condominium

5   (which, CW10, explained, are difficult to sell if repossessed) and was being used

6   for investment purposes.  For most loans at Countrywide, 620 was the general

7   demarcation line between prime and subprime loans.[8]  CW10 viewed the loan as

8   a "borderline Alt-A/subprime" loan, which ordinarily would have been referred to

9   FSL.  CW10, however, ran the loan data through EPS to see what would happen,

10  and it was approved and closed "fast."

11      178.   Confidential Witness 11 ("CW11") was a senior officer in Business

12  Re-Engineering, working in the Corporate Accounting department at Company

13  headquarters, during the Class Period.  CW11 reported to David Collette, the

14  Executive Vice President of Strategic Planning, who reported to Laurie Milleman,

15  the Chief Accounting Officer.  CW11 was responsible for managing internal

16  business systems between Corporate Accounting and IT.  Sambol asked CW11 to

17  create the Exception Processing System in 2004.  According to CW11, EPS is a

18  web-based system that interfaces among all of Countrywide's proprietary

19  computer systems, and was used by Company management in order to approve

20  loans that "violated the rules" or to overrule parameters set by Countrywide's

21  loan origination system.  EPS gave management the opportunity to approve loans

22  that, on their surface, should be rejected.  In particular, according to CW11, EPS

23  permitted management to override low credit scores and in turn add "additional

24  pricing" or discount points.  EPS, in other words, allowed central underwriting to

25

26      [8]  As further alleged in Section IV.D below, although Countrywide,
    unbeknownst to the Class, used a FICO score of 620 as a demarcation line
27  between prime and subprime loans, the mortgage banking industry generally
    considered that line of demarcation to be 660.
28

1   review loans that violated the Company's underwriting standards to evaluate
2   whether such loans should require higher pricing or other terms in view of those
3   violations.  According to CW10, as alleged above, such loans were approved and
4   funded as a matter of routine.

5   179.   CW9 described EPS as a "unique system" that referred loans that fell
6   outside Countrywide's underwriting guidelines to SLD.  According to CW9, if
7   anything on a loan application fell outside the underwriting standards, the loans
8   would go to SLD for exception processing.  According to CW9, approximately
9   *80%* of the loans that went through CW9's branch went to SLD, which was "very
10  liberal" in approving loans.  In CW9's view, "that's why CFC has issues today."
11  SLD approved loans with low FICO scores (500 range with compensation
12  factors) and loans with "580 FICO scores and 75/80% LTV ratios."  Such loans,
13  according to CW9, would be approved by SLD as "prime loans."

14  180.   According to CW9, SLD approved exceptions to loans based on
15  what could be sold to the secondary markets, and if SLD approved the exception
16  loan, the branch manager's hands would be tied and the loan was approved except
17  in the rarest of cases.  In sum, loans that did not meet the underwriting guidelines
18  went to SLD via the EPS, and if SLD didn't approve the loans, they were referred
19  to FSL.  In other words, loan applications that should never have been approved
20  were constantly kicked further up the corporate ladder until they reached a level
21  where they would be approved by those driven solely by corporate profits and
22  greed.

23  181.   Confidential Witness 12 ("CW12") was employed by Countrywide
24  for approximately fifteen years and held various Assistant Vice President-level
25  positions in underwriting, compliance, and risk management during the Class
26  Period.  Among other assignments, CW12 was an underwriter with SLD during a
27  portion of the Class Period.  According to CW12, SLD had about 40 employees

28

1   in Plano; about 20 employees in Pasadena, California, and about 20 employees in
2   Chandler, Arizona.

3       182.   According to CW12, Countrywide granted more and more
4   exceptions over time to borrowers who would not otherwise qualify for loans.
5   Although mortgage lenders generally had some process for approving loans that
6   fell outside underwriting guidelines, according to CW12, EPS was **"unique"** in
7   its "electronic" nature and its having been designed to electronically capture and
8   manage the "sheer volume of loans" being excepted at Countrywide on a daily
9   basis. According to CW12, the final, "non-beta" version of the system was rolled
10  out in late 2004 or early 2005, and during 2006 the Company processed
11  approximately 15,000-20,000 loans a month through EPS. CW12 learned from
12  supervisors in SLD that the number of loans going through SLD was increasing
13  greatly from year to year. According to CW12, loans processed under EPS were
14  "very lucrative" because the Company was receiving "higher fees" on such loans,
15  which were "higher risk loans."

16      183.   In joining SLD, CW12 believed at first that the role of someone in
17  CW12's position was to help mitigate risk by "not making every loan" and seeing
18  where the "line was to be drawn." However, the directives from Senior Vice
19  President Kathy Tinsley, CW12's immediate supervisor, and Eugene Soda, the
20  Executive Vice President who headed SLD, were to "do every loan."

21      184.   CW12 described Tinsley and Soda as major driving forces of risky
22  lending. According to CW12, these managers were "bonus-driven" and wanted
23  to please management by "making every deal" they could. Tinsley and Soda
24  even made an internal video featuring themselves in which they explained to the
25  sales force that SLD would approve almost every loan presented to it.

26      185.   CW12 described the use of a "T graph" listing the positive aspects of
27  a loan on one side and the negative aspects on the other. CW12 recalled showing
28  Tinsley and Lynette Thomas a "T graph" with 12 reasons why Countrywide

1  should not fund a particular loan and one reason why the loan might be an

2  acceptable risk.  According to CW12, all Tinsley and Thomas cared about was

3  who the loan officer was and "how much are we going to make on the loan," and

4  would consistently override CW12's concerns and approve the loan.  According

5  to CW12, Tinsley wanted to know who the loan officer was because she often

6  charged the borrower fewer "points" when approving a loan originated by a loan

7  officer she liked as compared to one she didn't like.  According to CW12, Tinsley

8  and Thomas expected CW12 to "keep quiet" regarding the nature of such risky

9  loans, so as not to jeopardize their stated policy to have SLD's decline rate stay

10  below 1%.  CW12 could "count on one finger" the number of such risky loans

11  CW12 was permitted to reject.

12      186.  CW12 further recalled that a "Multi-Million Dollar," or MMD,

13  group within the SLD handled jumbo loans which exceeded $1 million.  CW12

14  recalled that this group, with Tinsley's encouragement and approval, approved

15  such jumbo loans under the "Fast & Easy" program.  According to CW12, the

16  more loans Tinsley could push through, the larger her bonus would be, so she was

17  always pushing for more.

18      187.  CW12 reflected that "the things they [SLD] did with multi-million

19  dollar loans is just frightening."  For example, while CW12 was in training, a

20  borrower applied for a jumbo loan for his primary residence.  According to

21  CW12, however, this "primary" residence was the borrower's fourth residence,

22  and Countrywide had previously funded the loans on the borrower's other three

23  homes.  When CW12 pointed this out to a supervisor, CW12 was told: "We only

24  consider the information presented on this particular loan.  We don't try to

25  investigate."  CW12 was reprimanded later that day.

26      188.  CW12 described a second proprietary computer system, or "pricing

27  engine," called Price Any Loan, or PAL.  With PAL, only selective information

28  from a loan application was inputted in order to ensure that ***"no loan was out of***

1   ***the question."***  The existence of PAL confirmed that the purpose of the SLD was,

2   as stated by CW12, to find a way to make every loan possible.

3        189.   According to CW12, the difference between PAL and EPS was that

4   EPS kept track of the number and type of exceptions and generated a multitude of

5   reports regarding exception loans.  PAL was used to "price" exception loans,

6   based on their "risk" and Countrywide Bank's ability to "sell that risk" to the

7   secondary market.  According to CW12, the detailed information on pricing and

8   loan exceptions contained in PAL was available to employees in Secondary

9   Marketing and senior executives such as Sambol.

10       190.   Based on CW12's experience within SLD and many years as a

11  Countrywide employee, CW12 also explained that CLD did not use EPS itself but

12  rather a "slightly different variation," one that was part of CLD's "GEMS"

13  computer system.  According to CW12, CLD purchased as much as 50 million

14  dollars worth of loans per day from such subprime lenders as Aegis, New

15  Century, DIH Homebuilders, American Home, Silver States and Quicken, many

16  of which are now defunct owing to the poor quality of loans they issued.  CLD

17  only audited between 1% and 10% of these bulk purchases of loans.  According

18  to underwriters CW12 knew in CLD, if an audit revealed that loans were not

19  meeting  Countrywide's  underwriting  guidelines,  the  guidelines  would  be

20  "tweaked" midstream in order to get the package to conform by processing the

21  loans as exceptions through the GEMS exceptions module.  According to CW12,

22  Countrywide would find a way to "fit the loan in somewhere" in order to

23  purchase the package.

24       191.  CW3 also referenced the Exception Processing System and

25  commented that ***"so long as we could sell it, we'd do it,"*** and that every loan "has

26  a price."

27       192.   An internal October 2005 "Branch Presentation" obtained by Lead

28  Plaintiffs in the course of their investigation, titled "The Underwriting Process"

1    used by "Central Services-UW" (central underwriting) to train FSL branch

2    managers, confirms the widespread use of EPS and the prevalence of exceptions

3    in approved loans.  Branch managers were trained to use a computer-generated

4    grid called the "DLO Matrix," which assisted loan officers in "Developing Loan

5    Options" for customers.  Dividing borrowers in three main groups, one with

6    credit scores of 620 or above, another with scores between 500 and 619, and a

7    third with scores below 500, the DLO Matrix yields three basic decisions on

8    potential borrowers: "ACCEPT/APPROVE"; "REFER"; and "REFER (Next

9    Steps)."  For borrowers with scores of 500 or above for whom the specific

10   "REFER" decision is "Loan is outside of SubPrime Core guidelines," the DLO

11   Matrix did not reject the loan.  Rather, the "REFER (Next Steps)" field directed

12   the loan officer to submit that loan for ***"Manual underwriting or exception***

13   ***consideration."***  According to CW8, this meant that such loans were to be

14   submitted to SLD for exception approval.

15       193.  The same Branch Presentation indicates that for each month between

16   March and August 2005, between 15% and 19% of all subprime loans originated

17   or purchased by FSL were exception loans; between 30% and 40% of all

18   subprime loans purchased by FSL from CMD were exception loans; and between

19   17% and 23% of all subprime loans purchased by FSL from divisions other than

20   CMD were exception loans.

### (c)    Countrywide's Inflated Appraisals and Other Fraudulent Loan Origination Practices

23       194.  According to Mark Zachary, a former Regional Vice President of

24   Countrywide's joint venture with KB Home, Countrywide Mortgage Ventures,

25   LLC, the Company blatantly ignored its underwriting policies and procedures.  In

26   September 2006, Mr. Zachary informed Countrywide executives that there was a

27   problem with appraisals performed on KB Home properties being purchased with

28   Countrywide's loans.  According to Mr. Zachary, Countrywide executives knew

1   that appraisers were strongly encouraged to inflate appraisal values by as much as
2   6% to allow homeowners to "roll up" all closing costs.   According to Mr.
3   Zachary, this practice resulted in borrowers being "duped" as to the values of
4   their homes.  This also made loans more risky because when values were falsely
5   increased, loan-to-value ratios calculated with these phony numbers were
6   necessarily incorrect.

7       195.   Mr. Zachary also believed this practice misled investors who later
8   purchased these loans through securitizations because these investors were not
9   made aware that the actual home values were less than the inflated appraised
10  values.   According to Mr. Zachary, the inflated appraised values put buyers
11  "upside down" on their homes immediately after purchasing them; that is, the
12  borrowers immediately owed more than their homes were worth.   Thus, the
13  buyers were set up to be more susceptible to defaulting on their loans.   This
14  practice also put Countrywide at risk because it was unaware of the true value of
15  the assets on which the Company was loaning money.

16      196. Mr.   Zachary   brought   his   concerns   to   executives   of   the
17  Countrywide/KB Homes joint venture, as well as Countrywide executives in
18  Houston, the Company's Employee Relations Department and the Company's
19  Senior Risk Management Executives.

20      197.   According to Mr. Zachary, the Company performed an audit
21  investigating these matters in January 2007, and the findings of the audit
22  corroborated his story.  According to Mr. Zachary, the findings of this audit were
23  brought to the attention of Countrywide executives.

24      198.   According to Mr. Zachary, the Company also regularly approved no-
25  doc loans, even to applicants who had been refused loans under the Company's
26  full-documentation loan program.  In such instances, according to Mr. Zachary,
27  the Company's loan officers would "assist" applicants in switching to no-doc
28

1    loans.   Mr. Zachary brought this information to the attention of Countrywide

2    Employee Relations and Risk Management officials in 2006 and early 2007.

3         199.  CW8 also observed several instances where Countrywide's

4    underwriting policies were ignored with the approval of supervisors.   In early

5    2004—around the time Mozilo publicly touted the Company's "very strong

6    disciplines in the origination of sub-prime loans"—CW8 discovered that a very

7    productive loan officer in Massachusetts, Nick Markopoulos, was engaged in

8    cutting and pasting documents from the internet to create a fraudulent verification

9    of employment in support of a loan application.   CW8 referred the situation to

10   Countrywide's Human Resources Department but no investigation was started.

11   Markopoulos then left the Company of his own accord, but was rehired by

12   Countrywide about a year later as a branch manager.   CW8 contacted the

13   supervising Regional Vice President and objected to Markopoulos's rehiring,

14   citing his prior participation in fraud.   The Regional Vice President overruled

15   CW8's objection, citing Markopoulos's high level of productivity.

16        200.  Confidential Witness 13 ("CW13") was a senior officer in New

17   Customer Acquisition in Company headquarters during the Class Period.  CW13

18   oversaw television, radio and print advertisements for the entire Company, but

19   formally worked in the FSL division.  According to CW13, the "edict" regarding

20   subprime mortgages at Countrywide was to "sell as much subprime as possible."

21   CW13 corroborates CW8's account concerning Nick Markopoulos.  According to

22   CW13, it was known to senior management that Markopoulos, a Divisional

23   Executive Vice President, and other branch-level managers committed "a lot of

24   fraud" in originating loans but were kept on at the Company because they were

25   "good producers."

26        201.  CW8 additionally recalled a situation where multiple mortgage loans

27   were being originated to support the conversion of a series of apartment units

28   from rentals to condominiums.   CW8 and others suspected that these loans were

1   being originated in connection with sham "loan flipping" transactions involving

2   CMD employees.   Loan flipping is a scam whereby a lender convinces the

3   borrower to refinance multiple times, charging higher points, fees, and after

4   interest rates upon each refinancing.   Flipping ultimately leaves the borrower with

5   a little more cash and a lot more debt; the debt service quickly overwhelms any

6   benefit bought by the short-term cash.   According to CW8, the issue was raised

7   with Gregory A. Lumsden, President of the FSL division and Senior Managing

8   Director for loan origination.   CW8 vividly recalled Mr. Lumsden's "short and

9   sweet" response: ***"Fund the loans."***

10      202.   CW12 recalled a "predatory" loan refinancing in which a broker was

11   paid approximately $50,000 in fees, ultimately stripping all of the borrower's

12   equity in exchange for a "lower monthly payment."   According to CW12, the

13   borrower was a "woman in her 70s from New York" who was barely able to

14   make the payments on her existing loan.   The broker submitted a "conflict of

15   interest loan" for approval and refinancing, pulling out close to $60,000

16   representing the total equity in the home, with $50,000 to the broker and the

17   remaining cash going to the borrower.   According to CW12, the borrower

18   obtained a lower monthly payment only because the loan was an ARM, the

19   interest rate of which would eventually reset higher.   However, the borrower, like

20   many uneducated borrowers, did not understand this important detail.   CW12

21   believed that this loan was "not a responsible loan" and that the broker's fees

22   (which consisted of "front-end" and "back-end" fees in "discount points,"

23   appraisal fees, title insurance fees, credit report fees, points for using an

24   "alternative" loan program, a "commission," and a "yield spread premium" on the

25   pricing "differential") to be more like "robbery."

26      203.   After CW12 made a lot of "noise" complaining about this broker,

27   CW12's manager finally declined one of that broker's loans.   According to

28

1    CW12, their Managing Director then called the manager, "really chewed [him]

2    out" and told him that all such loans were to be approved going forward.

3         204.  Like Mark Zachary, CW8 also observed serious problems related to

4    Countrywide's system of obtaining appraisals on properties.  According to CW8,

5    Countrywide's appraisal system, referenced in the Company's Form 10-K filings

6    during the Class Period as careful and detailed and providing an assurance of

7    collateral quality, was a sham.

8         205.  According to CW8, until at least mid-2005, loan officers at all of

9    Countrywide's origination divisions were permitted to hire appraisers of their

10   own choosing.  They were permitted to discard appraisals that did not support

11   loan transactions, and substitute more favorable appraisals by replacement

12   appraisers when necessary to obtain a more favorable loan to value ratio so that

13   the loan would "qualify" for approval.  Loan officers were also able to lobby

14   appraisers to assign particular values to a property in order to support the closing

15   of the loans.

16        206.  Thus, Countrywide loosened and abandoned its supposedly sound

17   underwriting policies and procedures in order to pump up loan volume and boost

18   earnings, creating a significant long-term risk for investors.  In contrast to the

19   Company's public hyping of its underwriting standards, quantity, not quality, was

20   what mattered in loan origination because Countrywide made its money through

21   the rapid bundling and re-selling of loans on the secondary market.  Any

22   incentive the Company may have had to ensure that borrowers could repay the

23   loans was outweighed by the incentive to bundle and sell as many loans as

24   possible; accordingly, almost anyone could get a loan from Countrywide, even if

25   he or she had very little ability to pay it back.

26        207.  Countrywide's "culture change" from traditional lending to a "pump

27   and dump" operation was further fueled by a compensation structure, devised and

28   approved by management, that was closely linked to loan volume and not tied to

the quality of loans originated.  According to a former sales representative quoted in *The New York Times* on the August 26, 2007, "[t]he whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market."

### (d)   Countrywide Belatedly Begins to Tighten Up its Lax Lending Standards

208.   Only in March 2007, after the secondary mortgage market began to dry up, did Countrywide eliminate "piggyback" loans that allowed borrowers to purchase a home with no money down.  According to *Reuters*, an internal e-mail advised loan officers: "Please get in any deals over 95 LTV (loan-to-value) today! . . . Countrywide BC [subprime] will no longer be offering any 100 LTV products as of Monday, March 12."

209.   Further, according to published reports, Countrywide waited until February 23, 2007 to stop originating no-doc loans with more than 95% LTV.

210.   On July 24, 2007, the Company revealed for the first time that in actuality its underwriting guidelines had been inadequate throughout the Class Period, stating that the Company had "made many changes" to its "underwriting guidelines and processes, in order to improve the quality and secondary market execution of our production."  The Company also disclosed that its proprietary underwriting system needed to be "recalibrated."

211.   In mid-August 2007, after the price of Countrywide stock had dropped precipitously, the Company announced that it would make further significant changes to its underwriting operations by largely limiting itself to mortgages that could be bought by government-sponsored agencies Freddie Mac and Fannie Mae.  These changes, however, came far too late for Plaintiffs and the Class, who suffered massive losses on purchases of the Company's securities. Additional revelations would cripple the Company's stock price even further.

### D. Countrywide Reported Minimal Origination of Subprime Loans By Classifying Subprime Loans as "Prime"

212. During the Class Period, Countrywide made regular public disclosures distinguishing between its "prime" and "subprime" (sometimes referred to as "nonprime") loan originations and securitizations. As alleged in detail below, the Company periodically reported its volumes of prime and subprime mortgage loans produced and sold, the volumes of prime and subprime loans held for investment, and the value of the Company's credit-sensitive retained (or "residual") interests in securitized prime and subprime loans.

213. These statements classifying and distinguishing between "prime" and "subprime" loans were false and misleading because Countrywide, during the Class Period, employed a private, internal standard to distinguish between "prime" and "subprime" loans that, as the Officer Defendants knew, differed materially from the standard used by government agencies and generally accepted in the mortgage banking industry. Thus, while Countrywide repeatedly assured the market that it adhered to a conservative approach to loan origination and underwriting that set it apart from other, inferior mortgage lenders known to be heavily engaged in subprime lending, Countrywide actually conducted the same risky type of business but hid that fact from the Class by operating under a private benchmark for classifying loans as "prime" that was substantially below the benchmark accepted in the industry and understood by investors and analysts.

214. The most widely accepted measure of the creditworthiness of a borrower used in the mortgage and consumer lending industry, and which Countrywide used and relied upon heavily throughout the Class Period, is the borrower's Fair Isaac Credit Organization ("FICO") credit score. Fair Isaac describes the FICO score, which ranges from 300 to 850, as "the standard measure of US consumer credit risk" and "the recognized industry standard in consumer credit risk assessment." FICO scores are developed from a variety of

1   data in a prospective borrower's credit reports, including payment history,

2   amounts owed to creditors, length of credit history, new credit sources, and the

3   types of credit used.   Generally, the higher the FICO score, the better the

4   borrower's credit and the lower the risk of default.

5     215.   According to Fair Isaac, the U.S. median FICO score is in the 720

6   range.   Approximately 27% of the U.S. population has a FICO score between 750

7   and 799, 15% has a score below 600, and 27% has a score below 650.

8     216.   The FICO score is a key determinant of whether a given borrower

9   will be classified as "prime" or "subprime."   During the Class Period, Fitch

10   Ratings termed FICO scores the "best single indicator" of mortgage default risk.

11   Countrywide itself described FICO scores in its 2006 Form 10-K as "[a]

12   commonly used measure of consumer creditworthiness" used "to assess a

13   prospective borrower's credit history and the impact of the prospect's current

14   borrowing arrangements on their ability to repay a loan."

15     217.   There is a strong presumption in the mortgage lending industry that a

16   FICO score of 660 divides prime and subprime borrowers.   The principal

17   definition of "subprime" is found in the *Expanded Guidance for Subprime*

18   *Lending Programs*, issued jointly on January 31, 2001 by the U.S. Office of the

19   Comptroller of the Currency, the Board of Governors of the Federal Reserve

20   System, the Federal Deposit Insurance Corporation, and the Office of Thrift

21   Supervision ("OTS").   The *Expanded Guidance* was sent by the Deputy Director

22   of OTS to Defendant Mozilo and other banking CEOs on or about February 2,

23   2001, and Countrywide management was required to be familiar with it.   The

24   guidance advises financial institutions that the elevated levels of credit and other

25   risks arising from subprime lending tend to require heightened risk management

26   and additional capital reserves.   As explained in the *Expanded Guidance*, "[t]he

27   term 'subprime' refers to the credit characteristics of individual borrowers.

28   Subprime borrowers typically have weakened credit histories that include

1  payment delinquencies, and possibly more severe problems such as charge-offs,

2  judgments and bankruptcies.  They may also display reduced repayment capacity

3  as measured by credit scores, debt-to-income ratios, or other criteria that may

4  encompass borrowers with incomplete credit histories."

5      218.  OTS's February 2001 transmittal letter advises that the *Expanded*

6  *Guidance* was intended to provide, among other things, "a more specific

7  definition of the term subprime."  Among the credit risk characteristics listed in

8  the *Expanded Guidance* that label a borrower as "subprime" is a "[r]elatively high

9  default probability as evidenced by, for example, a credit bureau risk score

10  (FICO) of 660 or below (depending on the product/collateral), or other bureau or

11  proprietary scores with an equivalent default probability likelihood[.]"

12      219.  Standard & Poor's, one of the principal securities rating agencies,

13  similarly states: "Standard & Poor's considers subprime borrowers to have a

14  FICO credit score of 659 or below."  Conversely, "Standard & Poor's considers

15  prime borrowers to have a FICO credit score of 660 or above."

16      220.  Freddie Mac, one of the government sponsored entities that

17  purchased loans from Countrywide during the Class Period, stated in its February

18  2003 public guidelines that "FICO scores objectively evaluate all the information

19  in the Borrower's repository credit file at the time the FICO score was created.

20  Freddie Mac has identified a strong correlation between Mortgage performance

21  and FICO scores."  For loans on single-family properties, Freddie Mac views a

22  borrower with a FICO score above 660 as "likely to have an acceptable credit

23  reputation."  Further, FICO scores between 620 and 660 "should be viewed as an

24  indication that the Borrower's willingness to repay and ability to manage

25  obligations as agreed are uncertain."  A FICO score below 620, according to

26  Freddie Mac, "should be viewed as a strong indication" that the borrower's credit

27  profile is "not acceptable."

28

221.   According to CW8, however, during the Class Period, Countrywide had a company-wide practice of classifying loans to borrowers with FICO scores lower than 660, and indeed **_as low as 500_**, as "prime."

222.   In particular, according to CW8, loans to borrowers with FICO scores of 620 or higher were consistently classified by the Company as "prime" loans in its internal reporting systems.  This is corroborated by CW10, according to whom Countrywide generally viewed "subprime" borrowers as those with a FICO score below 620 (and, in any event, there were always "exceptions" to this rule which were submitted to "corporate underwriting").  Similarly, according to CW9, "620" was the demarcation line between prime and subprime loans at Countrywide, and there were "definitely" many prime loans originated in CMD with FICO scores of 620, 630 and 640.  CW9 saw prime loans with FICO scores in the 500 range that went through EPS.  Overall, according to CW8, a substantial percentage of the loans claimed by Countrywide to be "prime" loans in its public disclosures during the Class Period were loans to borrowers with FICO scores between 500 and 659.

223.   The October 2005 "DLO Matrix," referenced above, supports these witness accounts.  The DLO Matrix divides borrowers into three main categories based on credit scores: "620 or greater," "500 to 619," and "Less than 500."  No distinction is drawn at the 660 (or 659) FICO level.  Within the "620 or greater" FICO band, borrowers are further categorized based on whether they are first time home buyers or otherwise have a history of making existing mortgage payments on time.  For such borrowers, their starting product group is "Prime-Conforming" or "Prime-Non-Conforming" depending on the loan amount.  If the borrower falls within the guidelines in the automated underwriting system, the loan is approved as "Prime-Conforming" or "Prime-Non-Conforming."   If the automatic underwriting system rejects the conforming loan, the DLO Matrix instructs the loan officer to "re-commit" under the prime non-conforming program and re-run

1   the underwriting system.  If the underwriting system rejects the non-conforming

2   (large) loan as outside the non-conforming guidelines, the loan officer must

3   "[r]eview loan with Prime Underwriting Support Desk for exception

4   consideration."  According to CW8, if SLD then signed off on the exception, the

5   loan would be treated as prime.  CW9 also recalled that exception loans approved

6   by SLD, including loans in the 500 FICO range, would be approved as "prime

7   loans."

8       224.   For borrowers with FICO scores of 620 or better who were regularly

9   30-days late on mortgage payments, the Starting Product Group for a conforming-

10  size loan was "SubPrime—Expanded Approval (EA) Levels," which was then

11  treated as "Prime-Conforming" if the automated underwriting system approves

12  the loan.   Non-conforming loans were initially labeled subprime, but loans

13  outside the subprime guidelines were referred for "Manual Underwriting or

14  exception consideration."

15      225.   Under the DLO Matrix, for borrowers in the 500-619 FICO band

16  who were first-time home buyers or who had never been 60 days late making a

17  mortgage payment, a conforming-size loan similarly qualified as "Prime-

18  Conforming" if the automated underwriting system approved the loan.   Other

19  loans in this FICO band would be submitted for "Manual underwriting or

20  exception consideration."

21      226.   Another internal document indicates that Countrywide classified as

22  "prime" numerous loans made to borrowers with FICO scores below 660, and

23  indeed below 620.   Countrywide held top-level monthly "Business Review"

24  meetings at its Calabasas headquarters, during which the Company's and each

25  mortgage lending segment's performance and results were discussed and

26  evaluated in detail.  Each division supplied detailed documents in advance of the

27  meeting.  The FSL binder for the February 2007 "Business Review" meeting in

28  Calabasas included a "Prime Pricing Comparison" for January 2007 that

1   compared "prime" loans by FSL that were "Non-NCA" (*i.e.*, not to new

2   customers) with refinancing transactions within CMD.  Among the "prime" loans

3   by FSL, listed by loan program group, were 2,004 fixed-rate loans with an

4   average FICO score of 648; 16 interest-only ARM loans with an average FICO of

5   643; 11 3/1 ARM loans with an average FICO of 634; 12 7/1 ARM loans with an

6   average FICO of 627; 94 5/1 ARM loans with an average FICO of 614; and 11

7   5/1 ARM loans with an average FICO of 612.   These 2,148 loans constitute

8   approximately 23% of the 9,458 "prime" loans produced by FSL (Non-NCA) in

9   January 2007.

10       227.  Further, the Business Review binder's January 2007 "Prime

11  Production Profile" for FSL (Non-NCA) listed 1,794 first mortgages in the 620-

12  659 FICO band (average FICO 639); 720 first mortgages in the 580-619 FICO

13  band (average FICO 602); and 78 first mortgages in the "Less than 580" FICO

14  band (average FICO 556).  The "Prime Production Profile" also listed 820 second

15  mortgages in the 620-659 FICO band (average FICO 640); and two second

16  mortgages with loans to borrowers below 620 (average FICO 606).  These 3,414

17  loans constitute 36% of the 9,458 "prime" loans produced by FSL (Non-NCA) in

18  January 2007.  "Prime" CMD refinancings in January 2007 included 2,038 first

19  lien mortgages in the 620-659 FICO band (average FICO 642); 381 first lien

20  mortgages in the 580-619 FICO band (average FICO 604); and 138 first

21  mortgages in the less than 580 FICO band (average FICO 548), constituting

22  approximately 15% of the total 17,483 CMD refinance loans that month.

23       228.  Finally, the "Prime Production Profile" for FSL-NCA (*i.e.*, new

24  customers) listed 298 first mortgages in the 620-659 FICO band (average FICO

25  640), 68 first mortgages in the 580-619 FICO band (average FICO 605), and six

26  first mortgages with FICO scores below 580 (average FICO 562).  The same

27  "Prime Production Profile" also listed 169 second mortgages in the 620-659

28

1   FICO band (average FICO 640).  These 541 loans constitute more than 23% of

2   the 2,293 "prime" loans produced by FSL-NCA in January 2007.

3       229.  This data was drawn from a "Monthly Revenue Book" prepared each

4   month by FSL's Pricing and Secondary Marketing Department and sent to

5   corporate headquarters.  According to CW8, the Monthly Revenue Books were

6   prepared under a group headed by David Swain, FSL's Executive Vice President

7   for Products and Pricing, and sent directly to David Sambol's office for his

8   review.

9       230.  The FSL Monthly Revenue Book for May 2007, which Lead

10  Plaintiffs obtained in the course of their investigation, similarly shows that

11  Countrywide routinely extended "prime" loans to low-FICO borrowers.  The May

12  2007 "Prime Production Profile" for FSL "Non-NCA" loans lists 2,419 first

13  mortgages in the 620-659 FICO band (average FICO 639), 986 first mortgages in

14  the 580-619 FICO band (average FICO 602), and 112 first mortgages in the less

15  than 580 FICO band (average FICO 552).  This "Prime Production Profile" also

16  lists 1,071 second mortgages in the 620-659 FICO band (average FICO 639), one

17  second mortgage with a FICO of 617, and one second mortgage with a FICO of

18  579.  These 4,590 loans constitute more than 33% of the 13,859 "prime" loans

19  produced by FSL Non-NCA in May 2007.  "Prime" CMD refinancings in May

20  2007 included 2,128 first lien mortgages in the 620-659 FICO band (average

21  FICO 641), 506 first lien mortgages in the 580-619 FICO band (average FICO

22  604), and 178 first lien mortgages in the less than 580 FICO band (average FICO

23  550), constituting 15% of the total 18,294 CMD refinance loans that month.

24      231.  Countrywide's internal classification of subprime loans as "prime"

25  was undisclosed during the Class Period.  Countrywide routinely referred to

26  "prime" loans in SEC filings and other public statements without clarifying that

27  its unique definition of "prime" was inconsistent with the public's and industry's

28  understanding of that term, thereby rendering those statements misleading.

Countrywide's unique, internal standard remained concealed until the Company's July 24, 2007 conference call discussing its catastrophic second quarter 2007 results.    During the call, John McMurray, the Company's Chief Risk Officer stated in his opening presentation that "[a] prime FICO loan—*a prime loan with FICOs in the low 500s* is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO, holding all other variables constant."    Later during the call, in response to a question about delinquencies among the Company's "prime mortgages," McMurray stated: "There is a belief by many that prime FICOs stop at 620.    *That is not the case.*    There are affordability programs and Fannie Mae, expanded approval, as an example, *that go far below 620, yet those are considered prime."*

232.    Based on this explanation and other statements made during the conference call, an analyst from HSBC Securities stated that "[w]e do believe in some color given by management, *that the definition of 'prime' (or Alt-A for that matter) was loosened in the recent boom.*    Management referred to certain affordability programs where FICO scores *went 'far below' 620 (which already is well below the bank regulator's definition of subprime, which has a 660 cutoff)."*    The same analyst noted that "management acknowledged that the higher combined loan to value (CLTV) and reduced documentation higher CLTV products—classic speculator products—are accounting for a disproportionate share of credit costs."

233.    This analyst was plainly observing for the first time that Countrywide categorized as "prime" borrowers who should have been categorized as subprime, while lowering income documentation standards below prudent levels and increasing loan-to-value ratios above prudent levels.

234.    Similarly, a July 27, 2007 analyst report by Stifel, Nicolaus & Co. ("Stifel") discussing the disappointing second quarter results questioned the analyst's own "sanguine views" on the Company's credit exposure, stating:

1   . . . given the magnitude of the credit problems in the bank, we think

2   ***mgmt made serious miscalculations (and possibly***

3   ***misrepresentations) about the quality of the loans*** added to the bank.

4   In the analysis we present later in this note, we find that ***CFC's home***

5   ***equity securitizations are performing roughly inline with LEND's*** [a

6   competing subprime lender's] ***suprime deals***.   We also find that

7   underwriting standards deteriorated through 2006 and have only

8   improved slightly in 2007.

9   235.   With respect to Countrywide's underwriting criteria for HELOCs,

10   the Stifel report confirmed that the Company's underwriting standards declined

11   from no later than 2005 through late 2006, with only minimal improvement in

12   2007.

13   236.   The Stifel report further examined the gravity of Countrywide's

14   loose lending practices and expanded definition of "prime" by disclosing that

15   almost 20% of Countrywide's prime HELOCs in the first two quarters of 2007

16   were given to ***subprime borrowers with FICO scores of less than 660***.

17   Moreover, almost 23% of the prime HELOCs in those quarters had a CLTV

18   ***greater than 100%***.   In the analyst's view, "the increasing share of sub-660

19   FICO, 100%+ CLTV, and second home/non-owner occupied loans [was]

20   ***disturbing***."   The Stifel report also noted that in the first half of 2007, ***78%*** of

21   Countrywide's HELOCs were reduced documentation loans.

22   **E.   Countrywide Misled the Class**
     **About the Creditworthiness**

23   **of Pay Option ARM Borrowers**

24   237.   During the Class Period, Countrywide falsely maintained that its Pay

25   Option ARMs were prudently underwritten and that borrowers holding these

26   loans were of the highest credit quality and had relatively strong FICO scores.

27   During conference calls held in April and July 2005, Kurland represented to the

28   market that Pay Option ARMs are "all high FICO," and Mozilo declared that this

1   "product has a FICO score exceeding 700" and is limited to borrowers "of much

2   higher quality."

3       238.   According to CW8, at the time these statements were made,

4   Countrywide routinely funded Pay Option ARMs to thousands of borrowers with

5   FICO scores as low as 620 and sometimes lower, and this was communicated to

6   Kurland and Mozilo (and other executives) in multiple internal reports detailing

7   the Company's Pay Option ARMs.  An internal Countrywide document obtained

8   by Lead Plaintiffs in the course of their investigation, titled "PayOption ARM

9   101: 'Learning the Basics'" and dated April 2005, indicates that Pay Option

10  ARMs were often funded to borrowers with credit scores as low as 620.

11      239.   Further, according to CW8, not only were Pay Option ARMs

12  routinely made to borrowers with credit scores as low as 620 (or lower), but these

13  loans also were often underwritten through "low doc" programs that did not

14  involve any meaningful verification of income or assessment of the borrower's

15  capacity to repay the loan.  "PayOption ARM 101" indicates, in fact, that these

16  loans were offered through reduced documentation and SISA applications.

17      240.   Countrywide sought to reassure the market as to the safety of the Pay

18  Option ARMs held for investment in the Company's portfolio by disclosing the

19  average original FICO scores of the borrowers holding such loans.   The

20  Company's 2005 Form 10-K stated that the "pay-option loan portfolio" had a

21  "relatively high initial loan quality," and that the average original FICO score for

22  Pay Option ARMs held for investment as of December 31, 2005 and 2004 was

23  720 and 730, respectively.   In its 2006 Form 10-K, Countrywide dropped its

24  claim that Pay Option ARMs had "relatively high initial loan quality," but stated

25  that the average original FICO score for such loans as of December 31, 2006 was

26  718.

27      241.   Countrywide's statement in its 2005 Form 10-K that Pay Option

28  ARMs had a "relatively high initial loan quality" was false, and the "averages" in

1   the 2005 and 2006 Form 10-Ks were at best misleading, because Countrywide

2   was regularly funding Pay Option ARMs to borrowers with FICO scores as low

3   as 620 and sometimes lower.   Borrowers with FICO scores below 660 were

4   considered subprime by the financial community, including banking regulators

5   and mortgage industry participants, and securities analysts.   Countrywide's

6   representations of the "average" FICO score were misleading to a reasonable

7   investor because they omitted any reference to the applicable FICO score bands,

8   or at least the top and bottom of the range of FICO scores, which was necessary

9   in order to properly assess risk.   Such information would have been material and

10   indeed critical to the Class given Countrywide's routine practice of providing a

11   substantial number of Pay Option ARMs to subprime borrowers, many on a low-

12   doc or no-doc basis.

13       **F.    Countrywide Engaged in Widespread Predatory Lending Practices, Generating Short-Term**

14              **Profit at Long-Term, Undisclosed Risk to the Class**

15       242.   A further example of Countrywide's conscious abandonment of its

16   underwriting standards is its widespread use of deceptive lending practices during

17   the Class Period.   These practices garnered Countrywide huge fees from

18   borrowers who were extended loans they could not repay, resulting in the risk of

19   increased defaults and foreclosures to the detriment of the Company and the

20   Class.

21       243.   Predatory lending is a practice whereby a lender deceptively

22   convinces a borrower to agree to unfair and abusive loan terms, including interest

23   rates and fees that are unreasonably high.

24       244.   Countrywide and its management knew from the start of the Class

25   Period that the Company operated within specific statutory and regulatory

26   parameters that limited the interest rates and other fees Countrywide was

27   permitted to charge borrowers and the types of sales practices the Company could

28   employ.   Countrywide consistently assured investors during the Class Period that

1   it was in compliance with these laws and regulations.  Countrywide's Form 10-Ks
2   for 2003 and 2004 stated, for example:

3       Currently, there are a number of proposed and recently enacted
4       federal, state and local laws and regulations addressing responsible
5       banking practices with respect to borrowers with blemished credit.  In
6       general, these laws and regulations will impose new loan disclosure
7       requirements, restrict or prohibit certain loan terms, fees and charges
8       such as prepayment penalties and will increase penalties for non-
9       compliance.  Due to our lending practices, we do not believe that the
10      existence of, or compliance with, these laws and regulations will have
11      a material adverse impact on our business.

12      245.   On February 4, 2003, Defendant Mozilo gave a lecture at Harvard
13  University's Joint Center for Housing Studies which included the following
14  remarks:

15      These [predatory lending] laws were allegedly enacted to protect
16      borrowers from lenders who abuse the unsophisticated, low-income,
17      elderly and minority communities by charging high interest rates and
18      fees and fraudulently imposing unfair terms.  ***These lenders deserve***
19      ***unwavering scrutiny and, when found guilty, an unforgiving***
20      ***punishment.***

21      246.   Despite Countrywide's assurances and Mozilo's pointed remarks,
22  Countrywide did not comply with applicable regulatory and statutory restrictions
23  on predatory lending.  These abusive activities by the Company, while increasing
24  Countrywide's revenues in the short-term, posed a significantly increased risk to
25  investors from borrower defaults that was not disclosed to the public.  Simply put,
26  as Countrywide harmed borrowers, Countrywide put itself and therefore the Class
27  at increased risk, and ultimately harmed the Class.

28

247.   On August 26, 2007, *The New York Times* ran a major exposé titled *Inside the Countrywide Lending Spree*, revealing that Countrywide, as a matter of company practice, regularly steered borrowers to risky loan programs with unfavorable terms in order to generate maximum profits for the Company:

On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied.  "I want to be sure you are getting the best loan possible," the sales representatives would say.

But providing "the best loan possible" to customers wasn't always the bank's main goal, say some former employees.  Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.

***Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers,*** according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided.  One document, for instance, shows that until last September ***the computer system in the company's subprime unit excluded borrower's cash reserves,*** which had the effect of steering them away from lower-cost loans to those

1   that were more expensive to homeowners and more profitable to

2   Countrywide.

3   248.   A borrower who has more assets generally poses less risk to a lender,

4   and will typically get a better interest rate and/or few up-front fees or points on a

5   loan as a result.  However, as indicated above, Countrywide's software prevented

6   the input of borrowers' cash reserves so that loan officers would have to pitch

7   higher-cost loans to borrowers.

8   249.  Further, according to the *Times* exposé, "documents from the

9   subprime unit also show that Countrywide was willing to underwrite loans ***that***

10   ***left little disposable income for borrowers' food, clothing and other living***

11   ***expenses.***"  For example, one Countrywide manual stated that a borrower with a

12   family of four could obtain a loan even if the monthly mortgage payment left the

13   family with only $1,000 to live on for the month.  A single borrower could obtain

14   a loan whose payment left him or her only $550 for food, clothing or other

15   expenses for the month.   This was corroborated by the CLD Underwriting

16   Matrices obtained by Lead Plaintiffs.

17   250.   Countrywide also encouraged brokers to add prepayment penalty

18   terms to loans.  A broker's sales commission would be increased by 1% if he or

19   she added a three-year prepayment penalty to a loan.  Additionally, if a broker

20   convinced a borrower to take out a HELOC in addition to a mortgage loan—

21   which was commonplace in the Company's sales of so-called 80/20 loans—the

22   broker received an extra 0.25% commission.

23   251.   Brokers who induced borrowers to take out subprime loans were

24   even rewarded in some instances by prizes such as all-expense-paid trips to Las

25   Vegas.   Similarly, as reported in October 2007 by *The Wall Street Journal*,

26   employees in at least one California branch received prizes, including trips to

27   Hawaii, for selling the most Pay Option ARMs.

28

252.  Further, Countrywide's subprime unit also avoided offering borrowers Federal Housing Administration ("FHA") loans, which were backed by the U.S. government and carried less risk to borrowers.  FHA loans tended to be well-suited to low-income or first time buyers, but were not offered because they did not generate the high fees generated by non-government-backed loans.

253.  Countrywide's prioritizing of fees and commissions over borrower creditworthiness resulted in massive delinquencies in subprime loans.  As reported in the Company's Form 10-Q for the second quarter of 2007, 20.15% of Countrywide's subprime loans were delinquent as of June 30, 2007, sharply up from 14.41% the prior year.  Moreover, as noted in the *Times* exposé, nearly 10% of subprime mortgages were delinquent by 90 days or more, compared with only 5.35% the prior year.  At the end of 2006, according to Countrywide's 2006 Form 10-K, delinquencies for Countrywide's subprime loans had increased to 19.03%, more than 25% higher than the prior year's rate (15.20%) and more than 68% higher than the delinquency rate in 2004 (11.29%).  As of the end of 2007, fully 27.29% of Countrywide's subprime mortgage loans were delinquent, and 5.54% were pending foreclosure.

254.  Further, delinquencies on Pay Option ARMs, publicly touted as a "prime" program as alleged above, increased significantly during the Class Period.  As of the end of 2004, 0.1% of the Company's Pay Option ARM loans were delinquent.  By the end of 2007, 5.36% of all Pay Option ARM loans were delinquent.

255.  A complaint filed in this Court against Countrywide on December 21, 2007 illustrates the Company's predatory lending practices with respect to Pay Option ARMs.  As alleged in that complaint, Edward Marini lives in Little Egg Harbor Township, New Jersey.  In or around February 2005, Mr. Marini entered into a subprime loan with another lender that was soon sold to Countrywide.  Within a few months, Countrywide contacted Mr. Marini by

1    telephone and convinced him to refinance his mortgage with Countrywide Home

2    Loans in the form of a Pay Option ARM on his primary residence.  At the time of

3    the loan, Countrywide did not disclose to Mr. Marini that his monthly payments

4    would increase soon after taking out the loan, or that if he made the "minimum

5    payment" the principal amount of the loan would actually increase each month.

6        256.   Since this refinancing, the amount of principal Mr. Marini owes has

7    increased by approximately $17,000.  Mr. Marini has also received a "Significant

8    Payment Increase Alert" letter from Countrywide dated August 6, 2007,

9    indicating that the minimum payment on his mortgage will soon increase to more

10   than double what he is currently paying, based on negative amortization.  Mr.

11   Marini anticipates that, as a result, he will need to file for bankruptcy, because he

12   cannot make his monthly payments and has been unable to refinance his loan with

13   Countrywide.

14       257.   Similarly, on July 25, 2007, Audrey Sweet of Maple Heights, Ohio,

15   testified before Congress that Countrywide approved a mortgage that she and her

16   husband could not afford.  When she and her husband "were finally told the

17   amount of the monthly mortgage payment, [they] were shocked!"  Although they

18   expressed concern about the amount of the mortgage, they "were told not to

19   worry about it, as long as [they] paid the mortgage on time for a year [they]

20   would be able to refinance to a better rate."  Additionally, she testified that loan

21   documents were falsified.  In this regard, Ms. Sweet stated that in subsequently

22   reviewing her loan application, she:

23           discovered several things [she] had apparently overlooked until then.

24           The first was that my gross monthly income was recorded as $726

25           dollars more than it actually was.  Secondly, I have two sets of loan

26           documents, one that was created 10 days before we closed and one

27           that was created the day of closing.  The closing day documents list

28           my assets as $9400.00 in my Charter One Bank account.  I have never

1    had $9400 in the bank.  Indeed, coming up on payday, I am fortunate

2    to have $94 left!  The final item I noticed was that the tax amount

3    listed on the appraisal report was $1981.34, which comes to about

4    $165.00 a month but Countrywide listed $100.00 a month as the tax

5    amount.

6        258.   Because Ms. Sweet and her husband could not afford their mortgage

7    payments, they face default and foreclosure.  Countrywide's increased risk of not

8    being able to collect on the Sweets' mortgage puts the Class at increased risk.

9        259.   The Company's predatory lending practices are presently the subject

10   of an investigation by a panel of the United States Senate.  During an August 29,

11   2007 press conference reported in *The Wall Street Journal*, the panel's chairman,

12   Senator Charles Schumer, stated:

13       Countrywide's most lucrative brokers are those that make bad loans

14       that are ***largely designed to fail the borrower***. . . .  The company's

15       brokers can earn an extra 1 percent of the loan value in commission

16       by adding a three-year prepayment penalty to loans.

17       260.   The Attorneys General of California, Florida and Illinois have all

18   also launched investigations of Countrywide for deceptive business practices

19   relating to its mortgage lending.

20       261.   Simply put, Countrywide's whole business was designed with the

21   goal of originating loans and selling them to the secondary markets as quickly as

22   possible, regardless of the quality of the loans, the suitability of the products for

23   the borrower, or the number and magnitude of exceptions to Countrywide's

24   supposedly sound underwriting standards.  But, Countrywide's ability to sell

25   these loans quickly depended upon convincing investors in the secondary market

26   that the loans being sold were of high quality.  Among other things, this required

27   Countrywide to make various representations and warranties to the secondary

28   market, giving secondary market participants recourse if the representations and

warranties proved to be untrue.  These facts and the risks associated with them were not disclosed to investors, and Plaintiffs and the Class were damaged as a result.

### G.    Countrywide's Financial Statements Were Materially Misstated in Violation of GAAP

262.    Countrywide, in reporting its financial results during the Class Period, made numerous untrue statements of material fact and omitted to state material facts necessary to make its reported financial results not misleading. Countrywide violated generally accepted accounting principles ("GAAP") in connection with its allowances for loan losses on loans held for investment, valuation of retained interests and mortgage servicing rights ("MSRs"), and accruals for breaches in representations and warranties in connection with loan securitizations.

263.    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

264.    Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5") was issued in March 1975 by the FASB.  The principles described in SFAS 5 set forth the standards of financial accounting and reporting for loss contingencies.  SFAS 5 sets forth the standards to properly accrue liabilities for allowances for loan losses and breaches in representations and warranties.

265. Statement of Financial Accounting Standards No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities*, ("SFAS 140") was issued in September 2000 by the FASB, and later amended by Statement of Financial Accounting Standards No. 156, Accounting for Servicing of Financial Assets ("SFAS 156"). The principles described in SFAS 140 set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral." In particular, SFAS 140 sets forth the standards to properly assess the fair value for retained interests and MSRs. Both retained interest and MSRs are components of the revenue line item gain-on-sale.

266. As set forth below, Countrywide violated GAAP, principally SFAS 5, 140, and 156 in its Class Period financial statements.

### 1. Countrywide Inflated Earnings By Taking Inadequate Allowances for Loan Losses

267. According to its Form 10-K reports, Countrywide classified loans as held-for-investment based on management's intent and ability to hold the loans for the foreseeable future or to maturity. Countrywide represented that loans held for investment were stated on its balance sheet at amortized cost, which includes the loan's unpaid principal balance, reduced by a valuation allowance for credit losses inherent in the portfolio.

268. With respect to the Company's portfolio of loans held for investment, GAAP required the Company to establish a reserve for potential credit losses if underlying borrowers defaulted on their obligations to make monthly mortgage payments. Countrywide referred to this reserve as an allowance for loan losses.

269. In particular, SFAS 5 provides in paragraph 8:

An estimated loss for loss contingency . . .shall be accrued by a charge to income if *both* of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of loss can be reasonably estimated.  [Emphasis in original.]

270.   The SEC provided explicit guidance on the proper accounting for loan losses that Countrywide should have followed, but did not.   SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"), states in pertinent part: ***"It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process . . . .*** A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectibility . . . [and] be based on current and reliable data[.]"

271.   SAB 102 also provides: "Factors that should be considered in developing loss measurements include . . . ***levels of and trends in delinquencies and impaired loans . . . [and] effects of any changes in risk selection and underwriting standards***, and other changes in lending policies, procedures, and practices . . . ."  The SEC further stated in SAB 102 that "[f]or many entities engaged in lending activities, ***the allowance and provision for loan losses are significant elements of the financial statements.***  Therefore, the staff believes ***it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses."***

272.  During the Class Period, Countrywide did not establish adequate allowances for loan losses, violating GAAP and inflating its reported net income.

273.  Consistent with the purpose of SAB 102, Countrywide's allowance for loan losses was a critical metric for investors because it indicated the expected level of loss the Company was reasonably likely to incur on loans held for investment on its balance sheet.  Further, Countrywide's reported allowance for loan losses was directly linked to net income, which also was a critical metric for investors.  To increase its allowance for loan losses, Countrywide would have to take provisions for loan losses.  Under GAAP, taking a provision for loan losses reduces pre-tax earnings on a dollar-for-dollar basis.

274. According to its Form 10-K filings, Countrywide generally established the allowance for loan losses based on historical default rates and loss percentages for similar loans originated by the Company.   Countrywide represented that it generally considered loans to be impaired when it was probable that the Company would be unable to collect the scheduled principal or interest payments.  The Company's mortgage loan portfolios were comprised primarily of large groups of homogenous residential mortgage loans.  During the Class Period, Countrywide generally identified these groups of loans as impaired when they became 90 days delinquent and placed such loans on "non-accrual" status. Countrywide evaluated loans in its warehouse lending and commercial real estate lending portfolios individually for impairment using an internal rating system based on borrower-provided financial information and an assessment of the collateral.

275.  The allowance for loan losses was purportedly evaluated "on a periodic basis by management" and any adjustments were purportedly reflected in the Company's earnings.  In particular, Countrywide stated in its 2006 Form 10-K that "we *continually assess* the credit quality of our portfolios for loans held for investment to identify and provide for losses incurred."   The Form 10-K stated

further that "[o]ur allowance estimation process benefits from the extensive history and experience we have developed in our mortgage loan servicing activities," and that while "this process is subject to risk and uncertainties," ***"we address this risk by actively monitoring the delinquency and default experience of our homogenous pools by considering current economic and market conditions.*** Based on our assessments of current conditions, we make appropriate adjustments to our historically developed assumptions when necessary to adjust historical factors to account for present conditions. ***Our senior management is actively involved in the review and approval of our allowance for loan losses."***

276. "Senior management" included the highest-ranking officers of the Company. According to CW1, allowances for loan losses were ultimately set by a Financial Asset/Liability Committee whose members included Defendants Mozilo, Kurland (replaced by Sambol when Kurland left the Company) and Sieracki, and Jeffrey K. Speakes, the Company's Chief Economist.

277. The Company also assured investors during the Class Period that its allowances for loan losses were sufficient, stating, for example, that "loan losses were far below what you would expect to experience," and "the allowance for loan losses is adequate to absorb losses." During the second and third quarters of 2006, as reported delinquencies were increasing, Company representatives stated that "our performance in the delinquency area is still better than our models are projecting," that allowances for loan losses are "well within our model assumptions," and that "management . . . feel[s] very comfortable that we are as well reserved for all sorts of economic cycles that we can be."

278. Countrywide violated GAAP by not recording sufficient or reasonable allowances for loan losses in view of the fact that the Company had (a) loosened and substantially deviated from its underwriting standards beginning in 2003, (b) engaged in increasingly risky lending practices by making loans to borrowers with inferior credit quality and without proper documentation, and

1    (c) retained more risky loans on its balance sheet. The Company thereby

2    manipulated and artificially increased its reported earnings substantially.

3         279.    Because the Officer Defendants substantially loosened the

4    Company's underwriting guidelines and caused the Company's employees to

5    significantly deviate from them when originating loans, the Officer Defendants

6    should have increased Countrywide's allowances for loan losses as the Class

7    Period progressed. In violation of SFAS 5 and SAB 102 (which specifically ties

8    underwriting standards to the setting of loan loss reserves), the Company did not

9    do so, but, rather, kept allowances for loan losses relatively constant during the

10   Class Period before management finally began to institute some changes in 2007.

11        280.    A review of the Company's allowances for loan losses demonstrates

12   that during the Class Period—when the Company's exposure to and volume of

13   non-traditional, riskier loans were increasing dramatically—allowances for loan

14   losses ("ALL") increased steadily in dollar amount but remained relatively

15   constant (and in fact *decreased* from 1Q05 to 3Q06) as a percentage of the

16   Company's portfolio of loans held for investment ("LHI"):

| Quarter | LHI ($000s) | ALL ($000s) | ALL as % of LHI |
|---------|-------------|-------------|------------------|
| 4Q02 | $6,112,475 | $42,049 | 0.69% |
| 4Q03 | $26,446,504 | $78,449 | **0.30%** |
| 1Q04 | $30,033,754 | $93,054 | **0.31%** |
| 2Q04 | $34,001,291 | $105,839 | **0.31%** |
| 3Q04 | $35,035,980 | $107,765 | **0.31%** |
| 4Q04 | $39,785,132 | $125,046 | **0.31%** |
| 1Q05 | $47,833,388 | $134,916 | **0.28%** |
| 2Q05 | $62,684,289 | $155,962 | **0.25%** |
| 3Q05 | $67,960,558 | $184,784 | **0.27%** |
| 4Q05 | $70,260,353 | $189,201 | **0.27%** |
| 1Q06 | $74,279,882 | $172,271 | **0.23%** |
| 2Q06 | $79,991,180 | $183,581 | **0.23%** |
| 3Q06 | $81,004,695 | $207,987 | **0.26%** |
| 4Q06 | $78,346,811 | $261,054 | **0.33%** |
| 1Q07 | $75,551,461 | $374,367 | 0.50% |
| 2Q07 | $74,569,443 | $512,094 | 0.69% |
| 3Q07 | $84,778,139 | $1,219,963 | 1.44% |
| 4Q07 | $100,400,204 | $1,843,688 | 1.84% |

281.   A review of allowances for loan losses compared with delinquent loans in the Company's Banking Operations—which, during the Class Period, held more than 90% on average of the Company's total loans held for investment—reveals an even starker picture.  While 90-day delinquencies in loans within the Banking segment were steadily increasing, both in actual terms and as a percentage of total loans held for investment, allowances for loan losses were actually decreasing rapidly as a percentage of such delinquent, or "non-accrual," loans:

| Qtr | LHI ($000s) | ALL ($000s) | 90-day+ delinquent loans, Banking ($000s) | 90-day+ delinquent loans, Banking, as % of LHI | ALL as % of 90-day+ delinquent loans, Banking |
|---|---|---|---|---|---|
| 4Q03 | $26,446,504 | $78,449 | $3,700 | 0.01% | 2,120.24% |
| 1Q04 | $30,033,754 | $93,054 | $7,800 | 0.03% | 1,193.00% |
| 2Q04 | $34,001,291 | $105,839 | $11,100 | 0.03% | 953.50% |
| 3Q04 | $35,035,980 | $107,765 | $16,100 | 0.05% | 669.35% |
| 4Q04 | $39,785,132 | $125,046 | $21,800 | 0.05% | 573.61% |
| 1Q05 | $47,833,388 | $134,916 | $33,300 | 0.07% | 405.15% |
| 2Q05 | $62,684,289 | $155,962 | $41,100 | 0.07% | 379.47% |
| 3Q05 | $67,960,558 | $184,784 | $68,800 | 0.10% | 268.58% |
| 4Q05 | $70,260,353 | $189,201 | $151,300 | 0.22% | 125.05% |
| 1Q06 | $74,279,882 | $172,271 | $187,800 | 0.25% | 91.73% |
| 2Q06 | $79,991,180 | $183,581 | $233,000 | 0.29% | 78.79% |
| 3Q06 | $81,004,695 | $207,987 | $337,000 | 0.42% | 61.72% |
| 4Q06 | $78,346,811 | $261,054 | $519,083 | 0.66% | 50.29% |
| 1Q07 | $75,551,461 | $374,367 | $693,850 | 0.92% | 53.96% |
| 2Q07 | $74,569,443 | $512,094 | $940,782 | 1.26% | 54.52% |
| 3Q07 | $84,778,139 | $1,219,963 | $1,432,501 | 1.69% | 85.16% |
| 4Q07 | $100,400,204 | $1,843,688 | $2,884,067 | 2.87% | 63.93% |

282.   Countrywide, like other lenders, considered the level of 90-day-plus delinquent, or "non-accrual," loans in establishing its allowances for loan losses. Non-accrual loans are already impaired and not generating interest income. Moreover, the credit quality of the remainder of the portfolio was deteriorating because of the Company's loosened underwriting standards and increased usage of risky loans like HELOCs and Pay Option ARMs.  Thus, as the level of non-

1   accrual loans in Countrywide's portfolio increased, the allowance for loan losses

2   should have been substantially increased to keep pace.

3      283.   As reflected in the above chart, however, as the amount of non-

4   accrual (delinquent) loans in Banking Operations increased dramatically (from

5   $7.8 million as of the first quarter of 2004 to $940 million as of the second

6   quarter of 2007), allowances for loan losses, measured as a percentage of such

7   non-accrual loans, decreased dramatically in nearly every quarter from the first

8   quarter of 2004 (1,193%) through the second quarter of 2007 (54.52%).

9   Although this percentage increased from the second quarter to the third quarter of

10  2007, when Countrywide made its initial correction to the allowance (to 85.16%),

11  it sharply decreased again in the fourth quarter of 2007, to 63.93%.  This decrease

12  falsely suggested to the market that the July 2007 increase in loan loss provisions

13  was simply a one-time occurrence that was not indicative of the long-term health

14  of the portfolio.

15     284.   Prior to July 2007, this trend, reflecting the insufficient loan loss

16  reserves, helped the Company maintain the fiction, supported by Countrywide's

17  public statements, that the Company was a responsible, disciplined lender with a

18  conservative and stable loan portfolio and sound underwriting guidelines.

19  However, as the Officer Defendants knew, the Company was engaging in

20  increasingly risky lending practices and was making loans far more likely to

21  default and to be undercollaterized in the event of a default.   The Officer

22  Defendants therefore understood, as the market did not, the material significance

23  of the Company's undisclosed loosening of underwriting standards in terms of the

24  sufficiency of Countrywide's reserves.   Given these internally known but not

25  publicly disclosed facts and circumstances, the Officer Defendants had no basis

26  for maintaining the Company's allowance for loan losses at such historic low

27  levels and knew these reserves were inadequate.

28

1    285.   The insufficiency of Countrywide's loan loss reserves are reflected
2    in the belated spike in the Company's provisions for loan losses.  It was not until
3    July 2007, when the true facts regarding the Company's misconduct began to
4    emerge, that Countrywide increased its allowance for loan losses to 0.69% of the
5    total loans held for investment.  This reserve was more than twice as large as it
6    had been at year end 2003 (0.30%), 2004 (0.31%), 2005 (0.27%), and 2006
7    (0.33%), but was the same as the Company's reserve at the end of 2002, prior to
8    the Company's "culture change" and strategic shift toward non-traditional, risky
9    loans.

10    286.   In September 2007, at the end of the third quarter, the Company
11    again doubled its allowance for loan losses, to 1.44% of loans held for
12    investment.  By the end of 2007, Countrywide increased its allowance for loan
13    losses to $1.84 billion—more than seven times the $261 million allowance the
14    Company had at the end of 2006, and more than fourteen times the $125 million
15    allowance the Company had at the end of 2004.

16    287.   Growing delinquencies in the riskiest loans, combined with their
17    knowledge of the lowering of origination and underwriting standards for those
18    loans, also signaled to the Officer Defendants that allowances for loan losses
19    should have been substantially increased during the Class Period prior to 2007.
20    Delinquencies in Pay Option ARMs and HELOCs, the loans that presented the
21    greatest risk of default, increased substantially during the Class Period:

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| 90 day+ delinquent Pay Option ARMs as % of all Pay Option ARMs | N/A | 0.1% | 0.22% | 0.63% | 1.02% | 1.84% | 3.17% |
| Delinquent HELOCs as % of all loans serviced | 0.73% | 0.79% | 1.57% | 2.93% | 2.96% | 3.70% | 4.62% |

26    288.   In December 2007, Merrill Lynch economists referred to Pay Option
27    ARMs as **"ticking time bombs"** that would start **"ticking louder"** in 2008.
28    However, the Officer Defendants knew far earlier that Pay Option ARMs were a

1   problem because they knew that borrowers of such loans were not repaying
2   accrued interest at an increasing and alarming rate.

3      289.   During the Class Period, as the Officer Defendants knew, many
4   borrowers were only making the minimum payments on Pay Option ARMs,
5   meaning that they were not even paying down the currently due interest.  Thus,
6   during the Class Period, Countrywide recorded massive amounts of negative
7   amortization from Pay Option ARMs as deferred revenue.  While booking this
8   deferred revenue presented a current impression that the Company's results were
9   becoming better, in fact, the accumulated negative amortization signaled that
10  these loans were ticking time-bombs of delinquencies and defaults.  As soon as
11  borrowers reached the specified, pre-set negative amortization caps, which forced
12  them to start repaying the loan, such borrowers would be delinquent.

13     290.   The amount of accumulated negative amortization on Countrywide's
14  Pay Option ARMs grew dramatically during the Class Period while, as alleged
15  above, allowances for loan losses remained relatively flat until the 2007 third
16  quarter:

17 

| | 2003 | 2004 | 2005 | 2006 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| **Accumulated negative amortization from original loan balance, in $ millions** | N/A | 0.029 | 74.7 | 654 | 815.8 | 942 | 1,068 |

20     291.   Indeed, a November 7, 2007 report by Gradient Analytics, Inc.
21  ("Gradient") analyzing the quality of earnings at Countrywide and certain other
22  large mortgage lenders, while specifically noting the relative lack of detail in
23  Countrywide's disclosures concerning negative amortization, estimates that the
24  Company had $288 million in interest income from negative amortization during
25  the first half of 2007.  This equates to at least 31.3% of the Company's
26  consolidated income for that six-month period.  Gradient opines in its report that
27  the "income from negative amortization recorded by CFC is unsustainable and,
28  therefore, of lower quality."

292.   In 2006, Defendant Mozilo publicly acknowledged that the vast majority of borrowers of Pay Option ARMs were only making the minimum payments and that this posed a significant risk of defaults if the housing market declined—which, based on his experience in the industry, he knew would likely occur eventually.  As *The Wall Street Journal* reported in October 2007:

> It now appears that many borrowers who moved into option ARMs were attracted by the low payments and many have been staving off other financial problems.   More than 80% of borrowers who are current on these loans make only the minimum payment, according to UBS.

> Mr. Mozilo told investors in September 2006 that he was "shocked" so many people were making the minimum payment.  He called a sampling of borrowers to find out why.  The "general answer . . . was that the value of my home is going up at a faster rate than the negative amortization," he said.  "I realized I was talking to a group . . . that had never seen in their adult life real-estate values go down."

293.   Not only did the Officer Defendants know that many borrowers of Pay Option ARMs were making only the minimum payments, resulting in a massive accumulation of negative amortization, but the majority of such borrowers, as known to the Officer Defendants, were not even making the minimum payments on Pay Option ARMs.  According to Countrywide's third quarter 2007 Form 10-Q report, during the nine months ended September 30, 2006, 66% of borrowers elected to make less than full payments on Pay Option ARMs.   During the nine months ended September 30, 2007, a full 76% of borrowers elected to make less than full payments on Countrywide Pay Option ARM loans.

294.   Countrywide's allowances for loan losses were materially lower than those of its competitors, further confirming for the market the Company's misrepresentations that its loan portfolio was more sound and less risky than the portfolios of peer companies.   Countrywide's allowances for loan losses were between 0.27% and 0.34% from 2003 through the end of 2006.   Washington Mutual's allowances for loan losses during the same period, however, ranged between 0.63% and 0.72% of its loan portfolio; Wachovia's allowances ranged between 0.80% and 1.23%, and FirstFed Financial's allowances ranged between 1.00% and 1.70% of its loan portfolio.

295.   Nonetheless, Countrywide assured investors during this period that material increases in allowances for loan losses were unnecessary owing to the purported high quality of the Company's loans and careful process for setting loan loss reserves.   As alleged above, the Company stated in its 2006 Form 10-K that it "actively monitor[s] the delinquency and default experience of our homogenous pools by considering current economic and market conditions," and that "senior management is actively involved in the review and approval of our allowance for loan losses."

296.   On July 24, 2007, Countrywide's volume-driven, exception-ridden underwriting standards and lending practices manifested themselves in a sharp but belated increase in loan loss provisions of $293 million for the second quarter of 2007, driven primarily by loan loss provisions of $181 million on HELOCs. This increase in loan loss provisions nearly doubled the allowance for loan losses as of December 31, 2006, and created an allowance more than six times larger than the allowance as of the end of 2003.

297.   This increase, however, remained insufficient to cover the deterioration in the Company's loans held for investment.   The Company's third quarter 2007 results, announced on October 27, 2007, included a further massive provision for loan losses of $934 million, more than triple any provision

1    previously recorded by the Company.   Nearly 24% of the Company's subprime
2    loans were delinquent, up from 20.15% in the second quarter of 2006 and 16.93%
3    in the third quarter of 2006.   As stated in the Company's press release, the
4    increase in loan loss provisions was "primarily relate[d] to additional reserves
5    provided for the Company's junior lien home equity [HELOCs] and pay option
6    loans in the Banking Operations HFI [held for investment] portfolio."

7        298.   This $934 million provision represented 43%, 37%, and 35% of
8    Countrywide's net earnings for 2004, 2005 and 2006, respectively, and was the
9    single largest contributor to the Company's $1.2 billion loss for the third quarter
10   of 2007.

11       299.   Countrywide's massive $934 million increase in loan loss provision
12   shows that, during the Class Period, the Company's provisions for loan losses
13   were inadequate by at least 39.26% between the fourth quarter of 2003 and the
14   second quarter of 2007.   This percentage is derived from the assumption that for
15   the third quarter of 2007, Countrywide's provision for loan losses, at a minimum,
16   should have been proportionate to the provision that should have been recorded
17   for the second quarter of 2007.   In other words, had Countrywide recorded
18   39.26% higher provisions for loan losses throughout the Class Period, its
19   provision for loan losses taken in the third quarter of 2007 would have been
20   proportionately comparable to the provision in the second quarter of 2007 rather
21   than the massive $934 million provision that was recorded.   This estimate is
22   conservative because the charge for increased loan loss provisions Countrywide
23   took in the second quarter of 2007 was itself unexpected and significant, and
24   nonetheless insufficient.

25       300.   Because provisions for loan losses have a dollar-for-dollar impact on
26   pre-tax income under GAAP, Countrywide's materially understated allowances
27   for loan losses caused its pre-tax income to be materially overstated by
28   approximately $359 million for the years 2003-2006 and the first half of 2007.

301.   Accordingly, during the Class Period, Countrywide's allowances for loan losses were materially understated in violation of GAAP.  The Company's allowance for loan losses failed to sufficiently take into account the adverse performance of Countrywide's loans due to the deteriorating underwriting standards for those loans.  Rather than increase the Company's allowances for loan losses in a manner sufficient to account for these adverse facts and circumstances, Countrywide permitted its allowance for loan losses to steadily decrease when compared to loans held for investment that were delinquent according to the Company's own standards.

### 2.   Countrywide Inflated Earnings By Overvaluing its Retained Interests from Securitizations

302.   As a result of the Company's failure to adhere to its own underwriting guidelines, Countrywide overstated the fair value of its retained interests from securitizations.   Accordingly, Countrywide also falsely and materially inflated its assets, stockholders' equity, gain-on-sale, revenues and net income.

303.   According to its Form 10-K reports, Countrywide "sells substantially all of the mortgage loans it produces in the secondary mortgage market, primarily in the form of securities. . . ."  Countrywide transfers mortgage loans to a qualifying special purpose entity ("QSPE") which then converts those assets into cash.  The QSPE combines mortgage loans into one large pool, divides the pool of mortgage loans into smaller pieces (known as tiers or tranches) based upon default risk or other loan specific characteristics, and then sells the smaller pieces of the pool to the secondary market.  This process is known as a securitization.

304.  As the issuer of many securitizations, Countrywide generally maintained the riskiest tranche (the one in the first loss position) on its books as retained interests, also known as a residual security.  Retained interests provided

1    Countrywide with an opportunity to receive additional cash flows over the life of

2    the loans if specific loan performance criteria was met.

3    305. According to the Company's regulatory filings, the Company's

4    Asset/Liability Committee ("ALCO"), chaired by Chief Investment Officer Kevin

5    Bartlett and Defendant Sieracki, was "comprised of several of [the Company's]

6    senior financial executives [who] . . . determine[d] the valuation of . . . retained

7    interests."    Consequently, by virtue of the Officer Defendants' high level

8    positions at Countrywide, they supervised and had final determination of the

9    values assigned to the Company's retained interests.    As described below, the

10   values of the Company's retained interests were based in large part upon the

11   quality of the underlying loans collateralizing the securities.  Consequently, given

12   that a substantial portion of the underlying loans in the securitization were not

13   originated in accordance with the Company's underwriting guidelines, senior

14   management knew that the underlying loans that it securitized would not perform

15   in accordance with their respective mortgage requirements and, as a result, the

16   risk of default on those loans would increase.    Consequently, the Officer

17   Defendants also knew that the risk of default on the already high risk retained

18   interests would be even greater.  That increased risk should have been reflected in

19   the values placed on the retained interests, but was not.

20   306.  If the underlying loans defaulted, no income would be generated

21   from the retained interests and the fair value of the retained interests would be

22   materially overstated.  Once initially recorded, Countrywide was required to

23   determine the fair value of the retained interests in each subsequent quarter.[9]  As a

24   result, in every quarter during the Class Period, Countrywide did not properly

25   assess the fair value of its retained interests to reflect the increasingly risky nature

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [9] According to Countrywide's regulatory filings, the Company refers to
     decreases in fair value of retained interests as impairments, and increases in fair
28   value of retained interests as recoveries.

1    and poor performance of the underlying loans collateralizing the retained

2    interests.

3        307.   As stated in Countrywide's Form 10-K filings, when the Company

4    securitized mortgage loans, it valued its retained interests based upon Statement

5    of Financial Accounting Standards ("SFAS") No. 140, *Accounting for Transfers*

6    *and Servicing of Financial Assets and Extinguishments of Liabilities* ("SFAS

7    140").   SFAS 140 sets forth the standards for accounting for securitizations and

8    other transfers of financial assets and collateral.  In particular, SFAS 140 required

9    Countrywide to record its retained interests on the date of sale at fair value on its

10   balance sheet.  As stated in paragraph 58:

11           Other interests in transferred assets—those that are not part of the

12           proceeds of the transfer—are retained interests over which the

13           transferor has ***not relinquished control***.  They shall be measured at

14           the date of the transfer by allocating the previous carrying amount

15           between the assets sold, if any, and the retained interests, based on

16           their relative fair values.

17       308.   When determining the fair value of these retained interests,

18   Countrywide was required by GAAP to consider a number of factors, including

19   changes in the rate of prepayment speeds, discount rate and net lifetime credit

20   loss inherent in the underlying loans.  Paragraphs 68-70 of SFAS 140 provided

21   guidance on how to determine the fair value of retained interests:

22           The fair value of an asset (or liability) is the amount at which that

23           asset (or liability) could be bought (or incurred) or sold (or settled) in

24           a current transaction between willing parties, that is, other than in a

25           forced or liquidation sale . . . .

26

27           If quoted market prices ***are not available***, the estimate of fair value

28           shall be based on the best information available in the circumstances.

1   The estimate of fair value shall **consider prices for similar assets** and
2   liabilities and the results of valuation techniques to the extent
3   available in the circumstances.   Examples of valuation techniques
4   include the present value of estimated future cash flows, option-
5   pricing models, matrix pricing, option-adjusted spread models, and
6   fundamental analysis.   Valuation techniques for measuring financial
7   assets and liabilities and servicing assets and liabilities shall be
8   consistent with the objective of measuring fair value.   **_Those_**
9   **_techniques shall incorporate assumptions that market participants_**
10  **_would use in their estimates of values, future revenues, and future_**
11  **_expenses, including assumptions about interest rates, default,_**
12  **_prepayment, and volatility._**   In measuring financial liabilities and
13  servicing liabilities at fair value, the objective is to estimate the value
14  of the assets required currently to (a) settle the liability with the holder
15  or (b) transfer a liability to an entity of comparable credit standing.

16

17  Estimates of expected future cash flows, if used to estimate fair value,
18  shall be based on **_reasonable and supportable assumptions and_**
19  **_projections.  All available evidence shall be considered in developing_**
20  **_estimates of expected future cash flows._**   The weight given to the
21  evidence shall be commensurate with the extent to which the evidence
22  can be verified objectively.   If a range is estimated for either the
23  amount or timing of possible cash flows, the likelihood of possible
24  outcomes shall be considered either directly, if applying an expected
25  cash flow approach, or indirectly through the risk-adjusted discount
26  rate, if determining the best estimate of future cash flows.

27  FAS 140, ¶¶ 68-70.

28

309. In accordance with GAAP, retained interests are considered securities, which are governed by SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities* ("SFAS 115"). According to SFAS 115, the Company was required to classify its retained interests as "trading," "available-for-sale" or "held to maturity." Paragraphs 6-12 of SFAS 115 indicate that a security is classified as "held to maturity" if the Company has the positive intent and ability to hold the security to maturity; a security is classified as "trading" if the company holds the securities with the intent of selling them in the near term; and all other retained interests are classified as "available-for-sale."

310. Countrywide reported in its third quarter 2007 Form 10-Q that 83% of Countrywide's retained interests (valued at more than $2 billion) were classified as trading securities. The remainder of Countrywide's retained interests were classified as available-for-sale. Subsequent valuation of the retained interests, governed by SFAS 115, is based on these classifications. According to paragraph 13 of SFAS 115, changes in the fair value of available-for-sale securities are included in Other Comprehensive Income (in stockholders equity) and changes in the fair value of trading securities are recorded in the Income Statement. Specifically SFAS 115 states:

> ***Unrealized holding gains and losses for trading securities shall be included in earnings.*** Unrealized holding gains and losses for available-for-sale securities (including those classified as current assets) shall be excluded from earnings and reported in other comprehensive income until realized . . . .

311. Subsequent changes in the fair value of the Company's retained interests from securitizations were purportedly evaluated by senior management on a continuous basis and any adjustments increasing or reducing the value of trading retained interests were supposedly reflected in the Company's earnings. As indicated in Countrywide's Form 10-K reports,

1　　　Subsequent changes in the value of retained interests classified as
2　　trading securities are included in current-period earnings as a
3　　component of impairment of retained interests.

4

5　　　Unrealized gains and losses of retained interests classified as
6　　available-for-sale . . . are excluded from earnings and reported as a
7　　component of accumulated other comprehensive income, which is
8　　included in shareholders' equity.

9　　　312.  As a result of the foregoing, any fluctuations in the fair value of
10  Countrywide's retained interests classified as trading securities directly affected
11  the income statement dollar for dollar.  As management acknowledged in its
12  regulatory filings, "small changes in management's assumptions used to estimate
13  the value of retained interests would have a significant effect on its estimates of
14  the value.  Similarly, relatively small changes in value of these assets can have a
15  material effect on earnings for a particular period."  Similarly, as explained
16  above, improper valuation of retained interests that were classified as available-
17  for-sale directly affected and inflated stockholder's equity.

18　　　313.  Management stated in the Company's Form 10-K filings that it
19  "estimated fair value through the use of discounted cash flow models." The
20  Company further said  that "[t]he key assumptions used in the valuation of [our]
21  retained interests [in the cash flow model] include mortgage prepayment speeds,
22  discount rates, and for retained interests containing credit risk, the net lifetime
23  credit losses."[10]  Moreover, Countrywide "develop[s] cash flow, prepayment and
24  net lifetime credit loss assumptions based on the historical performance of the

25

26

27　　　　[10] Net lifetime credit losses are developed by estimating when and how many
loans will default and multiplying that amount by how much of the loan will be
28  uncollectible ("loss severity").

loans underlying our retained interests adjusted for the current economic environment as appropriate."

314.   One assumption that is critical to Countrywide's assessment of the fair value of its retained interests is the "default rate," the concept of which is encompassed in "net lifetime credit losses."   Default rate is the speed that the underlying mortgage loans become delinquent or default.   The chart below demonstrates that as Countrywide's underwriting guidelines continued to loosen over the Class Period, delinquencies and pending foreclosures from loan defaults rose significantly.   Notwithstanding that fact, Countrywide's assessment of fair value for its retained interests, except in 2007 when the truth began to emerge, continued to increase.

| Year ending December 31 | | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| Total Delinquencies[11] | 3.91% | 3.83% | 4.61% | 5.02% | 6.96% |
| Nonprime[9] | 12.46% | 11.29% | 15.20% | 19.03% | 27.29% |
| Prime Home Equity[9] | 0.73% | 0.79% | 1.57% | 2.93% | 5.92% |
| Pay Option ARMs delinquent 90 days or more[12] | N/A | <0.08% | 0.10% | 0.65% | 5.71% |
| Net Lifetime Credit Losses | 1.9% | 2.0% | 1.7% | 2.6% | 10.9% |
| Fair Value of Retained Interests ($000s) | $1,457,905 | $1,908,504 | $2,675,461 | $3,040,575 | $2,450,397 |

315.   Also, the chart above illustrates that Countrywide did not properly assess the rate of net lifetime credit loss when valuing its retained interests.   The Company failed to appropriately include the likelihood that there had been and would continue to be an increase in defaults as a result of the Company's undisclosed, severely deteriorating underwriting practices.   Had Countrywide

---

[11] Expressed as a percentage of the total number of loans serviced, excluding subserviced loans and loans purchased at a discount due to collection status.
[12] Expressed as a percentage of the unpaid principle balance of total pay option ARM loans in the Held for Investment portfolio.

1    properly assessed the fair value of its retained interests, factoring in the increased

2    default rate, investors would have been alerted to the poor credit quality of the

3    Company's loan portfolio and failing financial health.   As a result, the

4    Company's retained interests and net income were overstated.

5          316.   Other evidence that Countrywide improperly valued its retained

6    interests is illustrated by the chart in ¶ 337 below.   The chart shows that

7    Countrywide's loan sales peaked in the fourth quarter of 2005 and continued to

8    decrease through the remainder of the Class Period.   As a result, the Company

9    was not recording a substantial amount of additional retained interests from

10   securitizations.   Nonetheless, management continued to improperly increase its

11   assessment of fair value for its retained interests at the same time loan sales

12   continued to decrease.

13         317.   CW1 stated that while he was employed at Countrywide, in a

14   substantial number of instances, retained interests from securitizations should

15   have been valued at zero because the underlying mortgages in the securitizations

16   would likely default within 18 months.  CW1 further stated that the difference in

17   value between the underlying mortgage loans rate and the guaranteed coupon rate

18   should have been zero because Countrywide's significantly loosened origination

19   and underwriting standards required estimating far more delinquencies and

20   defaults, thereby materially reducing the return on the pooled mortgage loans.

21   According to CW1, by overvaluing the retained interests at inflated values,

22   Countrywide also manipulated its gain-on-sale figure.   Gain-on-sale is the

23   difference between the value of the securities sold (which includes the value of

24   the retained interests) and the carrying value of the underlying mortgage loans.

25   Thus, in a hypothetical example provided by CW1, in which the Company valued

26   its retained interests at 2.5%, with all other factors consistent, its gain-on-sale

27   would be 1.5%.   However, if the Company had properly valued its retained

28   interests at, for example, a lower figure of 1.0%, (rather than the value of zero

that CW1 believed proper in many instances), then the gain-on-sale would be zero, as demonstrated by the following chart:

| Inflated Retained Interest Valuation | | Proper Retained Interest Valuation | |
|---|---|---|---|
| Valuation of Pool of Loans at par | 100 | Valuation of Pool of Loans at par | 100 |
| **Retained Interest** | **+ 2.5** | **Retained Interest** | **+ 1.0** |
| Value of Pool of Loans | =102.5 | Value of Pool of Loans | =101.0 |
| | | | |
| Cost to originate Mortgage Loan | 1.0 | Cost to originate Mortgage Loan | 1.0 |
| Originated Mortgage Loan | +100 | Originated Mortgage Loan | +100 |
| Cost of Mortgage Loan | =101.0 | Cost of Mortgage Loan | =101.0 |
| | | | |
| **Gain-on-sale** (102.5 – 101.0) = | **1.5** | **Gain-on-sale** (101.5 – 101.5) = | **ZERO** |

318.    The impact of Countrywide's improper accounting not only affected the initial valuation of its retained interests, but also resulted in a very significant, and materially delayed, write-down of $2.38 billion in 2007 as illustrated in the chart below.    The increased level of impairments in 2007, based on Countrywide's regulatory filings with the Securities and Exchange Commission ("SEC"), make evident that the fair value of the Company's retained interests were severely inflated during the Class Period.    As of year end 2006, Countrywide held retained interests averaging $2.8 billion and recorded impairments totaling $284 million, only 10.12% of the total retained interests held.  However, at the end of 2007, Countrywide held retained interests averaging approximately $2.64 billion in value and it recorded cumulative impairment for 2007 totaling over ***$2.38 billion, or 89.99% of the total retained interests held.*** As further illustrated by the chart below, net lifetime credit losses were improperly assessed by management and improperly integrated into their determination of impairment of retained interests.  From the end of 2006 to end of

2007 net lifetime credit losses increased a mere 7.9%, while the total annual impairment of retained interests increased from $284 million at the end of 2006 to $2.38 billion at the end of 2007.

| Quarter | Fair Value of RI ($000s) | Impairment/ Recovery of Retained Interest ($000s) | Total Annual Impairment ($000s) | Annual Average FV of RI ($000s) | Yearly Impairment as a % of RI | Rate of Prepayment Speed | Discount Rate | Net Lifetime Credit Losses |
|---|---|---|---|---|---|---|---|---|
| 4Q07 | 2,450,397 | (966,500) | (2,380,876) | 2,645,719 | 89.99% | 21.0% | 17.3% | 10.9% |
| 3Q07 | 2,463,528 | (716,658) | | | | 20.1% | 20.4% | 9.4% |
| 2Q07 | 2,735,513 | (268,117) | | | | 23.4% | 18.4% | 5.1% |
| 1Q07 | 2,933,437 | (429,601) | | | | | | |
| 4Q06 | 3,040,575 | (73,677) | (284,690) | 2,813,049 | 10.12% | 32.2% | 17.3% | 2.6% |
| 3Q06 | 2,979,955 | (141,857) | | | | | | |
| 2Q06 | 2,751,018 | 51,498 | | | | | | |
| 1Q06 | 2,480,648 | (120,654) | | | | | | |
| 4Q05 | 2,675,461 | (68,110) | (364,506) | 2,323,523 | 15.69% | 38.3% | 17.9% | 1.7% |
| 3Q05 | 2,322,116 | (61,697) | | | | | | |
| 2Q05 | 2,157,263 | (97,629) | | | | | | |
| 1Q05 | 2,139,251 | (137,070) | | | | | | |
| 4Q04 | 1,908,504 | (96,618) | (368,295) | 1,606,941 | 22.92% | 34.8% | 18.1% | 2.0% |
| 3Q04 | 1,562,853 | 162 | | | | | | |
| 2Q04 | 1,432,717 | (178,424) | | | | | | |
| 1Q04 | 1,523,688 | (93,415) | | | | | | |

319.   The massive write-down in 2007 corroborates the statements by CW1, that the retained interests should have been valued at or close to zero due to the poor quality of the underlying loans, a view that CW1 states was regularly communicated by employees involved in valuing retained interests to the Officer Defendants throughout the Class Period.

320.   The Officer Defendants' statements concerning the write-down of Countrywide's retained interests during the Class Period were materially false and misleading when made because the Company's valuation model intentionally ignored: (i) the Company's change in lending practices beginning in 2003 to offer non-traditional, high risk loans; (ii) the Company's significant increasing production of subprime loans (iii) the Company's continued exception processing from its underwriting guidelines and (iv) the drastic increase in loan

delinquencies and defaults.   While the consequences of these undisclosed policies and practices became fully transparent and unavoidable when the housing market declined, ignoring the substantial deterioration in loan origination and underwriting standards and practices on the assumption that housing prices would only increase was, at the least, reckless in the extreme and constituted an enormous gamble that was never disclosed to the public.   If ordinary risk assumptions that investors had every right to expect were being utilized had been applied, the "change in culture" and the resulting increased delinquencies, would have resulted in proportionally reduced valuations of retained interests throughout the Class Period.  As a result, the fair market value of its retained interests was materially overstated throughout the Class Period as Countrywide failed to properly write down such retained interests to reflect the increased risk from the underlying loans it originated.

321.   Countrywide's valuation of its retained interests from securitizations was a critical metric for investors because it indicated the financial health of the Company, given that the valuation of its retained interests was directly linked to gain-on-sale and, ultimately, net income.   During the Class Period, as alleged herein, Countrywide did not properly value its retained interests from securitizations in accordance with SFAS 140 and SFAS 115, violating GAAP and inflating its reported net income.

322.   Given these internally known but not publicly disclosed facts and circumstances, the Officer Defendants had no basis for valuing the retained interests at the overstated value as they did.

### 3.   Countrywide Inflated Earnings By Overvaluing its Mortgage Servicing Rights

323.   As a result of its failure to adhere to its own underwriting standards, Countrywide overstated the fair value of mortgage servicing rights ("MSRs") throughout the Class Period.   Accordingly, the Officer Defendants also falsely

1    and materially inflated Countrywide's assets, gain-on-sale and reported net

2    income.

3        324.   Countrywide typically retains the right to service mortgage loans

4    after it sells them in the secondary market.  To a lesser extent, Countrywide also

5    purchases similar servicing rights from other loan originators and records them at

6    fair value at the time of their purchase.

7        325.   According to Countrywide's 2007 Form 10-K filing, the Company

8    described its MSRs as follows:

9            The value we assign to servicing rights is referred to as mortgage

10           servicing rights . . . .  Our MSRs arise from contractual agreements

11           between us and investors (or their agents) in MBS [mortgage backed

12           securities] and mortgage loans . . . . The Loan Servicing Sector

13           statement of operations includes the changes in value related to our

14           MSRs . . . as well as the revenues and expenses arising from servicing

15           the mortgage loans.  Although **MSRs generally arise from the sale or**

16           **securitization of mortgage loans that we originate**, we also

17           **occasionally** purchase MSRs from others.

18       326.  The initial value that Countrywide assigned its MSRs was

19   determined by a discounted cash flow model.  According to Countrywide's third

20   quarter 2007 Form 10-Q, "[t]he discounted cash flow models incorporate **cash**

21   **flow** and **prepayment projections** based on data drawn from the historical

22   performance of the loans underlying the Company's MSRs . . . in determining the

23   assets' fair value."[13]

24

25

---

26        [13] Prepayment projections or prepayment speed relates to the rate of payment
     of  debt obligations prior to the respective due dates on those instruments based
27   upon changes in interest rates, given that borrowers tend to refinance their loans
     when interest rates fall.
28

327.   Moreover, Countrywide's 2007 Form 10-K filing stated that any calculated change in the fair value of MSRs was based upon two primary components—a reduction in fair value due to the realization of expected cash flows and a change in fair value resulting from changes in interest rates and other market factors, otherwise referred to as a change in fair value due to management's assumptions.  The fair value of the Company's MSRs decreased when the Company received principal and interest payments from borrowers on the underlying loans.   Changes in management's assumptions could either increase or decrease the fair value of the Company's MSRs.

328.   According to the Company's third quarter 2007 Form 10-Q, the key assumptions used to assess changes in fair value of MSRs include weighted average life of loans, weighted average rate of mortgage prepayment speeds and weighted average discount rates.

329.   Until January 1, 2006, Countrywide's fair valuation of MSRs was governed by SFAS 140.  According to Countrywide's 2007 10-K filing, MSRs were initially recorded at fair value and then "[w]ere carried at the lower of amortized cost or estimated fair value . . . .  The adjusted cost basis value of the MSR was then assessed for impairment.  If MSRs were impaired, the impairment was recognized in current period earnings and the carrying value of the MSRs was adjusted through a valuation allowance."

330.  The Company elected to follow the Statement of Financial Accounting Standards No. 156, *Accounting for Servicing of Financial Assets* ("SFAS 156"), which amended SFAS 140, as of January 1, 2006.  In accordance with this election, the Company identified MSRs relating to all existing residential mortgage loans as a class of servicing rights and elected to apply fair value accounting to these MSRs.  SFAS 156 changed the accounting for, and reporting of, the recognition and measurement of separately recognized servicing assets and liabilities.  Like SFAS 140, SFAS 156 requires MSRs to be initially

1    recorded at fair value.    However, SFAS 156 allows MSRs to be ***carried on the***
2    ***books at fair value in subsequent periods*** (without the need to subsequently
3    value them at amortized cost).

4        331.    SFAS 156 provides entities with two choices of how to measure
5    servicing assets and liabilities in subsequent periods.    Countrywide chose to
6    record its MSRs at fair value in subsequent quarters and began doing so on
7    January 1, 2006.

8        332.    Countrywide used cash flow models to initially value its MSRs. In
9    Countrywide's 10-K filings, management disclosed that it used "discounted cash
10   flow models that incorporate cash flow and prepayment projections based on data
11   drawn from the historical performance of the loans underlying the Company's
12   MSRs" to determine changes in fair value due to management's assumption.  The
13   Company further disclosed that "[t]he key assumptions used in the valuation of
14   MSRs [in the cash flow model] include mortgage prepayment speeds, [ ] the
15   discount rate (projected London Inter Bank Offering Rate ("LIBOR") plus
16   option-adjusted spread)" and the weighted average life of the loans.

17       333.    Default rate was a critical assumption to Countrywide's assessment
18   of fair value for its MSRs, but without explanation was not mentioned in the list
19   of such assumptions published in the Company's Form 10-K filings.    The chart
20   below demonstrates that as Countrywide's underwriting guidelines continued to
21   loosen over the Class Period, delinquencies and pending foreclosures from loan
22   defaults rose significantly.    Notwithstanding that fact, Countrywide's assessment
23   of fair value for its MSRs continued to increase.

24
25
26
27
28

| Year ending December 31 | | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| Total Delinquencies[14] | 3.91% | 3.83% | 4.61% | 5.02% | 6.96% |
| Nonprime[14] | 12.46% | 11.29% | 15.20% | 19.03% | 27.29% |
| Prime Home Equity[14] | 0.73% | 0.79% | 1.57% | 2.93% | 5.92% |
| Pay Option ARMs delinquent 90 days or more[15] | N/A | <0.08% | 0.10% | 0.65% | 5.71% |
| Fair Value of MSRs ($000s) | $6,909,167 | $8,882,917 | $12,720,755 | $16,172,064 | $18,958,180 |

334.   By not appropriately using the default rate as a key assumption in the valuation of MSRs, the Company's MSRs were not properly valued when initially recorded and subsequently valued at the end of each quarter, and the Company's net income was overstated.  In the event Countrywide claims it did consider default rate as an assumption in its cash flow models, despite its failure to list them as such in the 10-Ks, the values of Countrywide's MSRs were still overstated because Countrywide did not properly assess the default risk of its underlying loans over the Class Period.  Management either failed, or was unable to properly assess, the high risk of the poor quality loans the Company originated as a result of its weakened lending practices and underwriting standards. Consequently, the fair value estimates for Countrywide's MSRs were materially overstated throughout the Class Period.

335.   In fact, CW12 confirmed that the loans Countrywide sold to the secondary market were extremely high risk loans and that this fact was concealed from the public.  CW12 stated further that the Company would purchase as much

---

[14] Expressed as a percentage of the total number of loans serviced, excluding subserviced loans and loans purchased at a discount due to collection status.
[15] Expressed as a percentage of the unpaid principle balance of total pay option ARM loans in the Held for Investment portfolio.

1    as $50 million dollars of loans per day from very risky underwriters, such as New

2    Century, American Home Loans and Quicken Loans, but only audit between 1%

3    and 10% of these loans on a spot check basis.  According to CW12, if, during one

4    of these audits, the loans were not meeting Countrywide's already loosened

5    guidelines, those guidelines would be "tweaked" in order to get the loan to

6    conform.  Countrywide would then sell this pool of loans to investors through

7    securitizations.  CW12 stated that investors thought they were getting a package

8    of 30 year fixed rate loans from Countrywide, but in reality that type of loan only

9    accounted for 10% of the pool, while the other loans included in the pool were

10    approved by exception or were being massaged in some way to conform to the

11    stated quality of the pool.

12    336.  Therefore, as CW12 confirmed, the underlying loans that

13    Countrywide securitized were extremely risky and such risk was concealed from

14    the public.   Because Countrywide serviced the majority of loans that it

15    securitized, those servicing assets were improperly valued when initially and

16    subsequently valued, because management failed to perform the due diligence

17    necessary to assess the increased risk of default of the underlying loans.

18    337.  Other evidence that Countrywide improperly valued its MSRs is

19    illustrated by the chart below.  The chart shows that Countrywide overstated the

20    initial fair value for its MSRs during the Class Period and improperly increased

21    the value of its MSRs after adopting SFAS 156.  On January 1, 2006, when the

22    Company adopted SFAS 156, the value for its MSRs materially increased while

23    the Company's loan sales peaked and began to decrease.   The trend below

24    indicates that the Officer Defendants were inflating the value of its MSRs.  The

25    majority of the Company's MSRs were obtained from loans that it originated and

26    sold in securitizations.  Therefore, the value of the Company's MSRs should have

27    decreased as the number of loans sold decreased.  However, this was not the case.

28    Instead, as loan sales decreased, the value of Countrywide's MSRs continued to

increase.  Had the Officer Defendants properly written-down the fair value of the Company's MSRs, investors would have been alerted to the poor credit quality of the Company's loan portfolio and failing financial health.

|  | Fair Value of MSRs ($000s) | Loan Sales ($000s) |
|---|---|---|
| Q4'07 | $ 18,958,180 | $ 66,564,474 |
| Q3'07 | $ 20,068,153 | $ 89,752,631 |
| Q2'07 | $ 20,087,368 | $ 125,478,893 |
| Q1'07 | $ 17,441,860 | $ 116,017,932 |
| Q4'06 | $ 16,172,064 | $ 123,266,310 |
| Q3'06 | $ 15,018,415 | $ 122,155,249 |
| Q2'06 | $ 15,320,575 | $ 112,986,892 |
| Q1'06 | $ 14,171,804 | $ 107,796,475 |
| Q4'05 | $ 12,720,755 | $ 126,300,525 |
| Q3'05 | $ 11,500,000 | $ 138,646,925 |
| Q2'05 | $ 9,400,000 | $ 115,329,462 |
| Q1'05 | $ 10,000,000 | $ 84,900,622 |
| Q4'04 | $ 8,882,917 | $ 96,923,245 |
| Q3'04 | $ 8,200,000 | $ 94,900,577 |
| Q2'04 | $ 9,100,000 | $ 99,993,870 |
| Q1'04 | $ 6,400,000 | $ 79,836,549 |
| Q4'03 | $ 6,909,167 | $ 71,640,410 |

Countrywide adopts SFAS 156 which allows it to estimate the fair value for its MSR each subsequent period.

**Countrywide's Loan Sales peaked but the fair value of its MSRs continue to increase at a rapid pace.**

338.   Countrywide's failing financial health came to the public's eye when it finally took a large write-down in 2007, which included a massive write-down of its MSRs in the 2007 Form 10-K.  The Company stated therein:

> We recorded **a decrease in the fair value of the MSRs in 2007 of $1,085.4 million**, primarily as a result of decreasing mortgage rates during the last half of the year which increased expected future prepayment speeds of our agency servicing portfolio. The impact of decreasing interest rates on expected future prepayments in other products was moderated by lower levels of housing turnover and lesser refinance activity due to weakening housing market conditions, reduced secondary market liquidity and significant tightening of available credit. Mortgage rates increased **during 2006, and as a result we recorded an increase in the fair value of the MSRs of $171.2 million.**

1    339. Consequently, the Company's valuation of its MSRs during the
2    Class Period was materially overstated because its cash flow model intentionally
3    ignored: (i) the Company's change in lending practices beginning in 2003 to offer
4    non-traditional, high risk loans; (ii) the Company's significant increasing
5    production of subprime loans (iii) the Company's continued exception processing
6    from its underwriting guidelines and (iv) the drastic increase in loan
7    delinquencies and defaults.  While the consequences of these undisclosed policies
8    and practices became publicly identifiable and unavoidable when the housing
9    market declined, ignoring the substantial deterioration in loan origination and
10   underwriting standards and practices based on the erroneous assumption that
11   housing prices would only go up was, at the least, reckless in the extreme and
12   constituted an enormous gamble that was never disclosed to the public.   If
13   ordinary risk assumptions that investors had every right to expect were being
14   utilized had been applied, the "change in culture," and resulting increased
15   delinquencies, would have resulted in proportionally reduced valuations of MSRs
16   throughout the Class Period.  As a result of these factors, the fair market value of
17   its MSRs was materially overstated because Countrywide failed to properly write
18   down its servicing assets to reflect increased risk from the underlying loans it
19   originated.

20   340. The valuation of Countrywide's MSRs was a critical metric for
21   investors because it indicated the financial health of the Company, given that the
22   valuation of MSRs was directly linked to gain-on-sale and, ultimately, net
23   income.  However, during the Class Period, Countrywide did not properly assign
24   an appropriate fair value when it initially recorded its MSRs, nor did it do so
25   when it subsequently valued MSRs in accordance with SFAS 140 and SFAS 156.
26   This practice was in violation of GAAP and caused Countrywide to inflate its
27   reported gain-on-sale and net income.   Rather than decrease the Company's

28

1  MSRs in a manner sufficient to account for these adverse facts and circumstances,

2  Countrywide used its MSRs to manage earnings during the Class Period.

3          **4.**        **Countrywide Inflated Earnings**
                  **By Failing to Properly Reserve for**

4                    **Representations and Warranties**

5        341.   As a result of its failure to adhere to its own underwriting standards,

6  Countrywide did not properly accrue liabilities for breaches of representations

7  and warranties throughout the Class Period.  Accordingly, the Officer Defendants

8  also materially understated Countrywide's liabilities and overstated its gain-on-

9  sale revenues, and net income.

10        342.   During the Class Period, Countrywide made representations and

11  warranties in connection with the sale of its mortgage loans to the secondary

12  market through securitizations.   The accrual of loss contingencies for

13  representations and warranties is based upon the rate of expected future claims

14  from investors resulting from breaches of the Company's corporate guarantees

15  and mortgage loan representations and warranties.  Countrywide's representations

16  and warranties with respect to the mortgage loans it sold included guarantees

17  concerning the loan's compliance with applicable loan criteria, such as loan to

18  value ratio limits, level of origination documentation required, credit scores, debt

19  to income ratios, delinquency rates, and compliance with applicable laws.

20        343.   According to Countrywide's regulatory filings, the Company

21  retained credit risk for all representations and warranties offered in a

22  securitization.  Countrywide defined "credit risk" in its 2007 10-K as follows:

23  "credit risk . . . is the risk that a borrower ***will not repay*** the [underlying] loans'

24  balance as agreed and the risk that the proceeds from liquidation of the collateral

25  securing the loan will not be adequate to repay the loan's balance."

26        344.   If Countrywide breached its corporate guarantees and mortgage loan

27  representations and warranties to secondary market purchasers, it would be

28  required to either repurchase the underlying mortgage loan with the identified

1    defects or compensate the purchaser.  In such cases, the Company would bear

2    subsequent credit loss on the mortgage loans.  "Credit loss" is a loss that arises

3    from the retention of credit risk.

4          345.  For instance, if a borrower of an underlying loan defaults, and as a

5    result of such default the Company breached its representations and warranties to

6    secondary market purchasers, the Company must repurchase the defective

7    underlying loan.  In cases in which Countrywide repurchased defective loans

8    from secondary market purchasers, it generally classified those loans as "held-for-

9    sale" because it typically remedied the loans' defects and then resold the loans to

10   other secondary market purchasers.  In those cases, Countrywide did not have the

11   intent or the ability to hold the repurchased loans until maturity.  Sales of

12   repurchased loans were normally at a loss since repurchased loans were, by their

13   nature, considered defective and therefore less valuable.  Therefore, Countrywide

14   suffered a credit loss whenever it resold repurchased loans to the market.

15        346.  Countrywide understated its loss accrual for its representations and

16   warranties because it failed to take into account the high risk and poor quality of

17   its underlying loans and its deteriorated underwriting practices.  Consequently,

18   the Officer Defendants violated GAAP.  Specifically, SFAS No. 5, *Accounting*

19   *for Contingencies*, required that Countrywide record a reserve for a future loss

20   associated with a breach of its representations and warranties that was probable

21   and estimable:

22          An estimated loss from a loss contingency . . . shall be accrued by a

23          charge to income if both of the following conditions are met:  (a.)

24          Information available prior to issuance of the financial statements

25          indicates that it is ***probable*** [(future event or events are likely to

26          occur)] that . . . a liability had been incurred at the date of the financial

27          statements. . . . [and] (b.) [t]he amount of loss can be ***reasonably***

28          ***estimated.***

347.   Further, SFAS 140 and Emerging Issues Task Force No. 92-2, *Measuring Loss Accruals by Transferors for Transfers of Receivables with Recourse*, ("EITF 92-2")  states that the reserve should be estimated based upon certain factors, including the Company's historical repurchase experience, industry repurchase experience, ***expected future volume of repurchases, and expected value of underlying collateral.***

348.   SFAS 140 and EITF 92-2 required the reserve to be estimated and recorded as a liability on Countrywide's balance sheet in the period in which the loans were sold, with a corresponding reduction of Countrywide's gain-on-sale in its income statement.  Specifically, SFAS 140 provides:

> Upon completion of a transfer of assets that satisfies the conditions to be accounted for as a sale (paragraph 9), the transferor (seller) shall:
>
> > a.  Derecognize all assets sold[;]
> >
> > b.  Recognize all assets obtained and ***liabilities incurred*** in consideration as proceeds of the sale, including cash, put or call options held or written (for example, guarantee or ***recourse obligations***), forward commitments . . . swaps . . . and servicing liabilities, if applicable[;]
> >
> > c.  ***Initially measure at fair value*** assets obtained and ***liabilities incurred in a sale*** or, if it is not practicable to estimate the fair value of an asset or a liability, apply alternative measures[; and]
> >
> > d.  Recognize in earnings any gain or loss on the sale. (Footnotes omitted)  (Certain emphasis in original).

349.   According to CW8, Countrywide made representations and warranties in the offering documents for its securitizations to investors in those securitizations and to insurers.   The representations involved material characteristics of the loan pools sold, including, among other things, the level of

1   origination documentation required, standardized credit scores of obligors and
2   other information regarding obligor credit quality, loan-to-value ("LTV") ratios
3   and debt service coverage ratios ("DSCR").   Further, according to CW8,
4   Countrwide's representations and warranties were false and misleading because
5   the Company loosened its underwriting guidelines during the Class Period and
6   repeatedly included loans in the loan pools that did not conform to the stated
7   description of such loan pools.  Additionally, CW8 noted that Countrywide failed
8   to disclose that it repeatedly permitted numerous exceptions to its underwriting
9   guidelines.

10      350.   The Officer Defendants, nonetheless, represented in the Company's
11   2006 Form 10-K that they "attempt to limit [Countrywide's] risk of incurring
12   these [representations and warranties] losses by structuring [its] operations to
13   ensure **consistent production of quality mortgages** and servicing those mortgages
14   at levels that meet or exceed secondary mortgage market standards."

15      351.   According to CW8, this representation was false and misleading
16   when made because Countrywide did not attempt to limit its "risk of incurring . . .
17   losses," or even "structure operations to ensure consistent production of quality
18   mortgages," but, rather, exposed Countrywide to material losses as a result of its
19   breaches of representations and warranties.  CW8 further stated that Countrywide
20   did not consistently produce quality mortgages because it classified as "prime"
21   numerous loans made to borrowers with FICO scores ranging between 500 and
22   659.   This type of loan represented a substantial amount of the loans that
23   Countrywide claimed were "prime" in its public disclosures during the Class
24   Period.  This was further evidence of Countrywide's poor underwriting practices.

25      352.   It was not until the third quarter of 2007 that Countrywide was
26   forced to admit the poor quality of its mortgage loans.  The Officer Defendants
27   finally increased the Company's allowance for representations and warranties by
28   a shocking $291.5 million to account for the Company's breaches of its

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                           124
MASTER FILE NO. CV 07-05295 MRP (MANX)

representations and warranties. The $291.5 million increase was *a 611.0% increase* from the $41.0 million reported in the third quarter of 2006. Notably, of the $291.5 million provision, *the Company reported that $177.3 million or 60% related to prime loans* and $67.1 million related to the nonprime loans, demonstrating the true extent of the Company's exposure to losses in its purported "prime" loan portfolio as a result of the improper lending practices.

353. Tellingly, this admission by Countrywide corroborated the statements made by CW8 because when Countrywide was forced to repurchase nonprime, lower quality loans due to breaches of its representations and warranties, the majority of loans that it repurchased were loans that Countrywide had deceptively defined as "prime" or allegedly higher quality. The Company's intentional misclassification of nonprime, more high risk loans as "prime" loans demonstrated that Countrywide's underwriting guidelines were severely loosened and had deteriorated over the Class Period. Importantly, Countrywide did not disclose this material omission to the market place, nor did it take this important fact into consideration when it accrued the loss contingencies for the Company's breaches of representations and warranties.

354. Moreover, in the Company's 2007 Form 10-K filing, Countrywide disclosed, for the very first time, that it reclassified the loans that it repurchased as a result of its breach of representations and warranties as held-for-investment. The 10-K stated:

> We may determine that a portion of the loans that we originate or purchase for sale will not be sold because of a defect, which may include . . . *deterioration of the credit status of the loan* while it was held for sale. Such loans are transferred to our portfolio of loans held for investment at the lower of cost or estimated fair value on an individual loan basis and *any loss is recorded as a component of gain-on-sale of loans or securities in current period earnings.*

355.   In other words, as the truth became known, Countrywide was no longer capable of "repairing" the repurchased loans as described above, to the satisfaction of the secondary market.   Thus, Countrywide had no choice but to reclassify them on its balance sheet as "held-for-investment."[16]   This reclassification was required because of the exceedingly poor quality of Countrywide's loans from its undisclosed deteriorated underwriting standards. The chart below, included in the Company's 2007 Form 10-K filing, illustrates the materially significant increase in the amount of loans Countrywide repurchased.   Based upon the year end balance in "other mortgage loans held for investment,"[17] the Company was holding at least **ten times the amount** of repurchased loans in its portfolio as of December 31, 2007 then it had held the prior year, indicating that the Company had repurchased **at least $3.82 billion** of loans that it originated.   Consequently, Countrywide's reserves were inadequate to account for the increased breaches of its representations and warranties due to the high risk loans that the Company had originated:

|  | **Other Mortgage Loans Held for Investment**<br><br>**December 31, 2006 ($000s)** | **Other Mortgage Loans Held for Investment**<br><br>**December 31, 2007 ($000s)** | **Minimum Amount of Loans Countrywide Repurchased**<br><br>**($000s)** |
|---|---|---|---|
| Nonprime Loans | 115,054 | 2,045,875 | 1,930,821 |
| Prime Loans | 252,731 | 1,768,448 | 1,515,717 |
| Prime Home Equity Loans | 57,518 | 435,695 | 378,177 |
| **Total** | **425,303** | **4,250,018** | **3,824,715** |

356.   While the consequences of Countrywide's insufficient reserves for breaches in representation and warranties became fully transparent and

---

[16] Loans are classified as held-for-investment if the Company has the positive intent and ability to hold the security to maturity.

[17]   Other loans held for investment predominantly included loans that Countrywide repurchased to remedy a violation of a representation and warranty.

1   unavoidable when the housing market declined, ignoring the substantial

2   deterioration in loan origination and underwriting standards and practices on the

3   assumption that housing prices would only increase was, at the least, reckless in

4   the extreme and constituted an enormous gamble that was never disclosed to the

5   public.  If ordinary risk assumptions that investors had every right to expect were

6   being utilized had been applied, the "change in culture" and the resulting

7   increased delinquencies would have resulted in proportionally increased reserves

8   for breaches of representations and warranties throughout the Class Period.

9       357.   The Officer Defendants knew of at least the following facts that

10  revealed its reserves for representations and warranties were materially

11  understated and in violation of GAAP during the Class Period: (i) the Company's

12  change in lending practices beginning in 2003 to offer non-traditional, high risk

13  loans to all borrowers, even those incapable of repaying the loans; (ii) the

14  increased origination of high risk loans to unqualified borrowers with little to no

15  supporting documentation (iii) the Company's continued origination of loan

16  through exception processing from its underwriting guidelines and (iv) the

17  increased likelihood that borrowers would default.

18      358.   As a result of these factors, Countrywide's liability for its

19  representations and warranties were materially understated throughout the Class

20  Period, which, in turn, overstated its net income.

21      359.   The accrual of loss contingencies from the Company's breach of its

22  representations and warranties was a critical metric for investors because it

23  indicated the financial health of the Company, given that the loss accrual was

24  based upon the quality and performance of the underlying loans.  During the

25  Class Period, Countrywide did not properly accrue loss contingencies that were

26  probable and estimable in accordance with SFAS 5, SFAS 140 and EITF 92-2.

27  Thus, the Officer Defendants violated GAAP and ultimately caused the Company

28  to understate its liabilities and overstate its reported net income.

### 5. Countrywide's Internal Controls Over Financial Reporting Were Ineffective

360. The Officer Defendants concealed the deterioration of Countrywide's internal controls throughout the Class Period by falsely representing in the Company's management's report on "internal control over financial reporting" that such controls were effective.[18]   The lack of effective internal controls enabled the Company to lower its underwriting standards to such a point that it issued inherently risky loans, such as Pay Option ARMs, 100% financing loans, and SISA and NINA loans to non-creditworthy borrowers, notwithstanding representations by the Officer Defendants that they carefully managed those risks.   Such lending practices caused the default rate of Countrywide's loans to increase at an accelerated pace throughout the Class Period. Additionally, the ineffectiveness of Countrywide's internal controls allowed the Officer Defendants to inappropriately classify sub-prime loans as prime loans (because, among other things, the benchmark FICO score they used for prime loans was lower than mortgage industry standards and the Company's

---

[18] SEC Release No. 33-8238 defines the term "internal control over financial reporting" as follows:

The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persona performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

    1.   Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

    2.   Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company, and;

    3.   Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material affect on the financial statements.

---

1    exception processing system further reduced standards), further masking the
2    failing financial health of the Company.

3        361.   As a result of Countrywide's failure to maintain effective internal
4    control over its financial reporting, the Officer Defendants were also able to
5    manipulate the timing of when they recorded reserves for contingent liabilities
6    and write-down the fair value of the Company's servicing and other
7    securitization-related assets. Countrywide's poor internal controls allowed the
8    Officer Defendants to materially misstate the financial statements throughout the
9    Class Period.

10       362. Countrywide's 2007 Form 10-K filing asserts management's
11   responsibility over internal controls:

12          Management is responsible for establishing and maintaining ***adequate***
13          ***internal control over financial reporting for the Company***. . . . In
14          making its assessment of internal control over financial reporting,
15          management [claimed to] use[ ] the criteria established in 'Internal
16          Control-Integrated Framework' issued by the Committee of
17          Sponsoring Organizations of the Treadway Commission (COSO).

18       363.   COSO defines "internal controls" in Ch.1 of its Framework as
19   follows:

20          Internal control is a process, effected by an entity's board of directors,
21          management and other personnel, designed to provide ***reasonable***
22          ***assurance*** regarding the achievement of objectives in the following
23          categories:   (i) Effectiveness and efficiency of operations; (ii)
24          ***Reliability of financial reporting***; (iii) Compliance with applicable
25          laws and regulations.

26       364.   Moreover, COSO emphasizes the importance of a strong control
27   environment, which sets a positive "tone at the top" and then flows down through
28

1    the Company.   The COSO Framework Executive Summary identifies the
2    pervasive influence that the control environment has on the Company, as follows:

3            The control environment sets the tone of an organization, influencing
4            the control consciousness of its people. It is the **foundation for all**
5            **other components of internal control**, providing discipline and
6            structure. Control environment factors include the integrity, ethical
7            values and competence of the entity's people; management's
8            philosophy and operating style; the way management assigns
9            authority and responsibility, and organizes and develops its people;
10           and the attention and direction provided by the board of directors.

11           365. In addition, the COSO Framework, Ch. 2, establishes that
12    management's philosophy and operating style directly affects the manner in
13    which the company is managed, the amount of risk that the company accepts and
14    ultimately the success of the company.   Chapter 2 of the COSO Framework
15    states:

16           Management's philosophy and operating style affect the way the
17           enterprise is managed, including the **kinds of business risks accepted**.
18           … Other elements of management's philosophy and operating style
19           include   attitudes   toward   financial   reporting,   conservative   or
20           aggressive selection from available alternative accounting principles,
21           **conscientiousness   and   conservatism   with   which   accounting**
22           **estimates are developed**, and attitudes toward data processing and
23           accounting functions and personnel. . . . **The impact of an ineffective**
24           **control environment could be far reaching, possibly resulting in a**
25           **financial loss, a tarnished public image or a business failure**.

26           366.   Specifically, Chapter 8 of the COSO Framework establishes the
27    Chief Executive Officer's responsibility over internal control.  Chapter 8 states as
28    follows:

[The chief executive] has ultimate ownership responsibility for the internal control system. One of the most important aspects of carrying out this responsibility is to ensure the existence of a ***positive control environment***. More than any other individual or function, the chief executive sets the "tone at the top" that affects control environment factors and other components of internal control.

367.   Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures.   Management is responsible for performing this assessment in the context of a top-down risk assessment,[19] which requires management to base both the scope of its assessment and the evidence gathered on risk.   Management's conclusion, as a result of that assessment, about whether the Company's internal control is effective must be included in the Company's annual report.

368.   Further, SEC Release No. 33-8238 requires management to report publicly all material weaknesses[20] in the Company's internal controls.

369.   Beginning in 2002, the Officer Defendants were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting."   Rule 302 states as follows:

[E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for ***establishing and maintaining an adequate internal control structure***

---

[19]   The top-down risk assessment approach describes the sequential thought process in identifying risks and controls based upon the tone at the top.   The tone at the top is created by management through maintaining a culture of honesty and high ethical standards; and establishing appropriate controls to prevent, deter, and detect fraud.

[20]   "A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."   PCAOB Auditing Standards No. 2, ¶ 10.

*and procedures for financial reporting*; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, *of the effectiveness of the internal control structure* and procedures of the issuer for financial reporting.

370.   As explained above and in the Company's regulatory filings, the Officer Defendants represented to the marketplace that their assessment of internal controls over financial reporting was based upon the framework established by COSO.    Also, the Officer Defendants represented in the Company's Form 10-K filings that "management concluded that the Company's internal control over financial reporting *was effective as of" the years ended December 31, 2003, December 31, 2004,[21] December 31, 2005, and December 31, 2006*.   These statements were false because Countrywide concealed its lax underwriting standards and increased approval of exception loans.   As a result, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading because Countrywide's internal controls were ineffective.   The Officer Defendants' statements were false and misleading because Countrywide's internal controls were significantly deficient and ineffective to prevent or detect errors or misstatements in its operations, underwriting practices or financial reporting.

371.   Consequently, the Company's purported control environment failed to provide assurance that the financial statements issued during the Class Period were reliable or in compliance with applicable laws.    Rather, the Officer Defendants focused on increasing loan volume origination without regard to the

---

[21] In the Company's 2004 Form 10-K, management noted a material weakness regarding recognizing gains on sale of mortgage backed securities with embedded derivatives.   Importantly, management did not recognize a material weakness with regard to its lax underwriting practices over the Class Period.

1    quality of such loans in an effort to reach the aggressive 30% market share goal.

2    The control environment shaped by the Officer Defendants resulted in ineffective

3    controls with respect to the Company's financial reporting process and allowed

4    the Officer Defendants to materially misstate the Company's financial statements.

5    As a result, the Officer Defendants manipulated the timing of when the Company

6    recorded reserves for contingent liabilities and when it wrote down the fair value

7    of its servicing and other securitization-related assets in violation of GAAP.

8        372.    The material weaknesses in Countrywide's internal controls arose

9    from, among other things, the Officer Defendants' tone at the top, a tone that

10   condoned lax underwriting practices and resulted in material misstatements in the

11   Company's financial reporting.  It was not until 2007 that the Company's lax

12   lending practices were revealed to the market place because, at that time, the

13   Company was forced to record billions of dollars of losses from its increased

14   delinquencies and defaulting loans.

15       373.    Management's assessment of internal control over financial

16   reporting was a critical metric for investors because it provided assurance that the

17   Company's financial statements were reliable and in compliance with applicable

18   laws.  However, during the Class Period, as alleged herein, Countrywide did not

19   properly assess its internal controls over financial reporting, thus it violated the

20   "Internal Control-Integrated Framework" issued by COSO and various other

21   requirements found in the SEC regulations and SOX Act.

22   **H.    Defendants Materially Misrepresented Countrywide's Access
         to Liquidity And the Value of the Company's Excess Capital**

23

24       374.    Access to liquidity—in plain English, access to cash to fund the

25   loans it was issuing, was vital to Countrywide.  Without liquidity, the Company's

26   core business would necessarily fail.  Similarly, in general terms, capital,

27   otherwise known as stockholders' equity, was the amount of financial resources

28

---

1    Countrywide had available to continue its operations over time.  Both liquidity
2    and capital are essential to the survival of a company.

3                    **1.     Countrywide Misrepresented its Access to Liquidity**

4           375.   Historically, Countrywide needed access to a staggering amount of
5    cash each month.  In 2006, for example, Countrywide originated approximately
6    $468 billion in loans—or roughly $39 billion per month.  To fund those loans,
7    Countrywide required the equivalent amount of cash.  It also required additional
8    cash to fund its other, incidental operations.

9           376.   Further, Countrywide's "change of culture" to issue higher risk loans
10   to higher risk borrowers posed a profound threat to the Company's sources of
11   liquidity.   By corroding the quality of the loans that formed the heart of
12   Countrywide's business, and consequently causing the Company's financial
13   statements to misrepresent multiple aspects of its business and finances—
14   including, but not limited to, its loan loss reserves and the assets on its balance
15   sheet—Defendants' misconduct created a ticking time bomb that was poised to
16   destroy Countrywide's reputation and creditworthiness, and thus its ability to
17   obtain the liquidity it needed, whether by selling debt instruments, selling
18   mortgages that it originated, borrowing, or otherwise.

19          377.   On July 24, 2007, the financial community began to learn that the
20   loans Countrywide was selling through securitizations and otherwise, as well as
21   the loans Countrywide held in its portfolio, were not as valuable as had been
22   represented because they were higher risk loans made to higher risk borrowers
23   than Defendants represented.  Moreover, those poor quality loans began to default
24   at an alarming and accelerating rate that forced Countrywide to begin to take very
25   large write-downs.

26          378.   The financial community further began to learn that these
27   misrepresentations were a consequence of Countrywide's misrepresenting itself
28   as being different and unique as compared to other residential mortgage lenders.

In short, the financial community learned it could not trust Countrywide. Consequently, Countrywide's sources of liquidity dried up. Countrywide lost its ability to sell debt securities—a key method by which it traditionally had obtained liquidity—because few investors had faith in the integrity of its business or financial statements, or the quality of the securities it sold, and thus few would purchase those securities. As Countrywide ran through its backup sources of liquidity—including an $11.5 billion credit facility, which it tapped in full on August 16, 2007, and its ability to borrow from the Federal Home Loan Bank of Atlanta, which Countrywide had come close to exhausting by November 26, 2007—Countrywide faced the prospect of bankruptcy. See ¶¶ 972-975 below.

### 2. The Company's Capital Was Overstated During the Class Period

379. Defendants' misconduct also materially eroded the amount of financial resources Countrywide had available to continue its operations over time. As a result of the Company's failure to properly record adequate allowances for loan losses, liabilities for breaches in representations and warranties, and failure to properly assess the fair value for its retained interests and MSRs, its net income was overstated. See Section IV.G. Since net income positively affects retained earnings, a component of stockholders' equity, the company's stockholders' equity was overstated as well.

380. Capital is synonymous to a company's stockholders' equity. A Company's stockholders' equity is derived from two main sources. The first and original source is the money that was originally invested in the company, along with any additional investments made thereafter (invested capital). The second comes from income and earnings from operations that a company is able to accumulate over time (retained earnings). Stockholders' equity equals total assets less total liabilities. Therefore, if a company's assets are overstated and its liabilities remain constant, its stockholders' equity will be overstated. Similarly,

1  if a company's liabilities are understated and assets remain constant, its
2  stockholders' equity will be overstated.

3      381.   As alleged in Section IV.G above, the Company's assets were
4  materially overstated and its liabilities were materially understated during the
5  Class Period, both of which resulted in a material overstatement of Countrywide's
6  capital.   As a result, all of Countrywide's statements relating to adequate or
7  excess capital were false and misleading.

8      382.   Defendants' false statements regarding Countrywide's excess capital
9  are further evidenced from the sudden changes in Countrywide's statements
10  relating to its capital during the summer of 2007.   At the June 5, 2007 investor
11  conference, the Company reported that it had between $2.8 and $5.4 billion in
12  excess capital.   Shortly thereafter, on August 23, 2007, Bank of America
13  announced a $2 billion investment in Countrywide.   In return for its investment,
14  Bank of America received very favorable terms, including obtaining non-voting
15  convertible Countrywide preferred securities yielding 7.25% annually and
16  convertible to common stock at $18 per share.

17      383.   However, not even five months later, on October 26, 2007, at the
18  third quarter earning conference call, Countrywide represented that its excess
19  capital had fallen to a range of between $1.1 and $4.7 billion, despite the Bank of
20  America cash infusion of $2.0 billion.   Countrywide's capital decreased swiftly
21  and severely from the massive write-downs that the Company was forced to take
22  as a result of its failure to properly reserve for losses and its failure to properly
23  value its assets.   These steps were required to be taken because of Countrywide's
24  previously undisclosed policy of taking on an exponentially greater amount of
25  risk.

26      384.   Specifically, due to the Company's inability to sell some of its loan
27  portfolio, and escalating credit losses, Countrywide was forced to take a $3
28  billion write-down in the third quarter of 2007.       The very next quarter,

1   Countrywide took another $2.2 billion in write-downs for the same reasons stated

2   herein and in Section IV.G.  Thus, in the second half of 2007 alone, Countrywide

3   took $5.2 billion in write-downs, which would have virtually wiped out

4   Countrywide's purported excess capital at the end of the second quarter of 2007,

5   before the Bank of America cash infusion.[22]

6        385.   The process by which the revelation of Defendants' misconduct

7   caused Countrywide to lose access to liquidity and deplete its capital also helped

8   to doom the Company's ability to survive independently.  Thus, on January 11,

9   2008, Bank of America announced that it was purchasing Countrywide for only

10  approximately $4 billion—representing approximately 26% of Countrywide's

11  most recently reported book value of approximately $15.3 billion, as set forth in

12  Countrywide's quarterly report for the third quarter of 2007.

13       386.   Bank of America's decision to purchase Countrywide for only

14  approximately 26% of Countrywide's book value following the completion of

15  comprehensive due diligence corroborates the fact that Countrywide's

16  stockholders' equity was inflated, the Company was in financial distress, and

17  Countrywide's statements regarding excess capital—directly relating to the

18  Company's ability to maintain a stable basis for long-term financing of its

19  operations—were false and misleading.

20       387.   The overstatement of stockholders' equity from the Company's

21  failure to properly assess its allowance for loan losses, liabilities for breaches of

22  its representations and warranties and improper valuation of its retained interests

23  and MSRs, was a critical metric for investors because it indicated the financial

24  health of the Company and its ability to continue its operations independently

25  over time.

26

27       [22] In comparison, in 2006, Countrywide took $800 million in write-downs,

28  while in 2007, write-downs equaled $6.5 billion.

388.   As detailed in Section VIII below, Countrywide continued to try to reassure the investing public about the soundness of its access to liquidity and adequate capital through ongoing false and misleading statements, even as the truth gradually came to light.   This caused, among other things, Countrywide's credibility to plummet, its creditworthiness to decline, its access to liquidity to be steadily choked off, and its overstated capital to be reduced by inevitable write-downs, far below what Countrywide represented to the marketplace.

## V.   ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER

389.   At all relevant times, Defendants Mozilo, Sambol, Sieracki, and Kurland acted with scienter in making materially false and misleading statements during the Class Period.   Each of these Officer Defendants had actual knowledge that the statements made by him were false and misleading, or acted with deliberately reckless disregard for the truth or falsity of those statements.   Each of the Officer Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial facts and evidence supporting a strong inference of scienter.

### A.   Mortgage Banking Was Countrywide's "Core Business," and the Officer Defendants Closely Monitored the Company's Lending Practices and Credit Risk Exposure

390.   During the Class Period, Countrywide consistently described its Mortgage Banking segment, which originated, purchased and serviced residential mortgage loans, as its "core business."   For the years 2004 through 2007, Mortgage Banking generated 65%, 59%, 48%, and 50% of the Company's pre-tax earnings, respectively.   The Mortgage Banking, Banking, and Capital Markets segments, taken collectively, consistently generated more than 90% of the Company's pre-tax earnings during the Class Period.

391.   The Officer Defendants were "hands-on," detail-oriented, and deeply involved in the daily management of all aspects of Countrywide's core operations, including the Company's policies, procedures and standards for underwriting loans and the assessment and management of credit risk.  Notably, as alleged below, Mozilo "participate[d] every day in loan originations [him]self."   The Officer Defendants were the executive officers directly responsible for these core operations, including Countrywide's lending practices and credit risk management.

392.   Overall, Countrywide's day-to-day management was overseen by an Executive Strategy Committee whose members, according to CW1, included all of the Officer Defendants as well as the Company's Chief Risk Officer, Chief Economist, Chief Legal Officer, and head of the Banking segment (Countrywide Bank), all of whom were executive officers of the Company.

393.   As stated in Form 10-K filings, management also maintained a Credit Committee during the Class Period, "comprised of our Chief Risk Officer and other senior executives," which "ha[d] primary responsibility for setting strategies to achieve our credit risk goals and objectives."   According to CW1, Defendants Mozilo, Kurland (replaced by Sambol after Kurland left the Company), and Sieracki, as well as the Chief Risk Officer and Chief Economist, sat on the Credit Committee during the Class Period.

394.   The Credit Committee was mandated under its charter to "review, assess and monitor the Company's policies and activities" with respect to "(1) credit risk management activities, including the credit risk management strategies, policies, controls, systems and methodology of the Company and its subsidiaries; (2) methodology of loan loss reserves and adequacy of loan loss reserve levels; and (3) actual and projected credit losses in all of the Company's activities and across all of its portfolios."   With respect to loan loss reserves in particular, Countrywide made clear in its Form 10-K reports that **"[o]ur senior management**

1    *is actively involved in the review and approval of our allowance for loan*

2    *losses."*

3    395.  Countrywide also maintained an Asset/Liability Committee

4    ("ALCO") during the Class Period that was comprised of "several of [the

5    Company's] senior financial executives" including the Chief Risk Officer and co-

6    chaired by Defendant Sieracki.   ALCO, according to the Company's 10-K

7    reports, "ultimately" determined the Company's valuation of retained interests

8    and MSRs.   These filings made clear that ***"[s]enior financial management***

9    ***exercises extensive and active oversight"*** of valuation of retained interests and

10   MSRs.

11   396.  As explained during a September 13, 2006 conference call, ALCO

12   maintained two subcommittees: the Pipeline and Portfolio Risk Management

13   Subcommittee and the Earnings Forecasting Subcommittee.   The Pipeline and

14   Portfolio Risk Management Subcommittee met "daily" and made "day-to-day,

15   tactical hedging decisions" concerning credit risk.   The Earnings Forecasting

16   Subcommittee met weekly to examine the Company's financial forecasts for the

17   current quarter, future quarters and entire fiscal year.   By updating forecasts

18   weekly, as stated during the conference call, the Subcommittee would "get a

19   sense of how production is performing, how the total company is going to

20   perform in different environments."

21   397.  With respect to liquidity, as stated in the Company's Form 10-K,

22   executive management reviewed the Company's compliance with liquidity

23   requirements on a monthly basis beginning in 2006: "To ensure compliance with

24   the LMP [Liquidity Management Plan], CHL, CSC and Countrywide Bank are

25   required to maintain adequate contingent liquidity regardless of conditions and to

26   diversify funding sources.   Each business unit has detailed metrics which are

27   appropriate to its business line.   The metrics are compared with actual

28   performance positions and ***reported to executive management monthly***."

398.   Further, Countrywide maintained a Board-level Finance Committee and Audit and Ethics Committee that reported directly to the Board of Directors. Mozilo has been Chairman of the Board throughout the Class Period, and Sambol joined the Board in 2007.  These Defendants, accordingly, were aware of these committees' activities and findings that were presented to the Board, as were The Officer Defendants who were asked to attend Board meetings.

399.   The Finance Committee, according to its charter, was charged with reviewing, assessing and monitoring the Company's activities with respect to a number of finance and market risk-related matters, including liquidity, capital adequacy, and reserves; projected levels of short- and long-term borrowing and credit line requirements; the charter, policies and activities of ALCO; policies and strategy relating to MSRs and retained interests; and the Company's mortgage loan sales and securitizations and secondary marketing objectives.  The Finance Committee was also charged with reviewing matters related to equity (stock) purchases, "taking into account the quantity and quality of consolidated assets, earnings, potential earnings, availability of retained earnings, projected growth rates, [and] liquidity and capital requirements[.]"  The Finance Committee met frequently during the Class Period, and ten times during 2006 in particular.

400.   The Audit and Ethics Committee was charged with assisting the Board in overseeing the integrity of the Company's financial statements and the financial and other information reporting processes of the Company, the Company's internal audit function and the performance thereof, the Company's system of internal controls, and the Company's Code of Business Ethics.  More specifically, the Audit and Ethics Committee was required under its charter to, among other things, "discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures and liabilities, including the Company's risk management policies," and to discuss "the systems management utilizes to assess, monitor and control

1  such exposures through the enterprise, including the Company's risk assessment

2  policies."   The Audit and Ethics Committee met frequently during the Class

3  Period, and 14 times during 2006 in particular.

4        401.   Owing to these standing Board Committees' regular and ongoing

5  activities, Defendants Mozilo and Sambol, at a minimum, were made aware of

6  developing issues involving the Company's liquidity, reserves, internal controls,

7  risk management and risk assessment policies as they arose during the Class

8  Period.

9        **B.   The Officer Defendants Were Aware of, or**
          **Recklessly Disregarded, the Company's Relaxation**

10        **and Abandonment of its Loan Underwriting Standards**

11        402.   During the Class Period, the Officer Defendants publicly described

12  Countrywide's loan underwriting in SEC filings and during conference calls as

13  tightly controlled and supervised, and "designed to produce high quality loans."

14  Moreover, Mozilo and the other Officer Defendants repeatedly described the

15  Company's underwriting practices, particularly its "strong disciplines in the

16  origination of sub-prime loans," as markedly superior to those of competing

17  lenders.   Countrywide's consistent and essential message to investors and

18  analysts, as Mozilo stated early in the Class Period, was that the Company is "a

19  very different focused company that understands this product very well, how to

20  originate it, how to manage it, how to underwrite, how to service it," and that

21  other lenders are fly-by-night outfits that don't know the mortgage business and

22  are best avoided.

23        403.   Mozilo held himself out as a unique type of CEO.   He claimed he

24  was personally involved "every day" in loan originations and, as such, kept close

25  tabs on credit quality.   When asked during the Company's July 26, 2005

26  conference call with analysts whether "credit quality in the nonprime mortgage

27  sector" was stable or worsening, Mozilo confidently replied:

28

1    I think it's stable.  . . . ***I do participate every day in originations***

2    ***myself, and it keeps me apprised of what's happening.***  I think that

3    that situation has stabilized.  ***I don't see any deterioration in the***

4    ***quality of those loans being originated.***

5    404.  Consistent with his purported hands-on approach, Mozilo was

6    similarly well-aware of the Company's underwriting policies and procedures and

7    changes made in them.  When asked during the same conference call whether

8    Countrywide was loosening underwriting standards, Mozilo said "I'm not aware

9    of any change of substance in underwriting policies" and, focusing on Pay Option

10   ARMs and interest-only loans, stated that "I'm not aware of any loosening of

11   underwriting standards that creates less of a quality loan than we did in the past."

12   In response to a follow-up question, Mozilo added: "We don't view that we have

13   taken ***any steps*** to reduce the quality of our underwriting regimen ***at all***."

14   405.  However, at and prior to this point in time, Countrywide—in a

15   headlong quest to meet Mozilo's goal of 30% market share—was steadily

16   loosening and abandoning its underwriting guidelines in order to capture less

17   creditworthy borrowers and was ramping up production of what one former

18   employee described as "new, exotic" products that led to "easy money" for the

19   Company but carried a high degree of risk.  As alleged herein, the Officer

20   Defendants were intentionally misstating the facts, or acting in a deliberately

21   reckless manner in making their repeated public statements regarding purportedly

22   strong and superior underwriting practices, in view of what was actually

23   happening at the Company, which, at the very least, provided no basis for and in

24   fact contradicted their repeated statements.

25   406.  According to CW1, the Company increased origination of risky

26   loans in an effort to meet Mozilo's demand to achieve 30% market share, and also

27   to keep up with perceived competition by other lenders.  Countrywide's near-

28   collapse was not caused simply by market forces.  Rather, according to CW1,

1    "lax underwriting guidelines" and increasing origination of subprime loans with
2    reduced documentation, lower credit scores and higher loan-to-value ratios were
3    key contributors to the Company's downfall.

4        407.   According to CW1, based on CW1's regular, day-to-day discussions
5    with them, all Company executives, and Mozilo and Sambol in particular, were
6    aware of the declining credit quality of loans being originated.   According to
7    CW1, this decline in loan quality occurred contemporaneously with the
8    Company's widening of its loan origination guidelines, which began in 2003.

9        408.   According to a *Wall Street Journal* article published on February 23,
10   2008, in late 2003, there was a meeting at Countrywide's headquarters of dozens
11   of executives.  At that meeting, tensions between Sambol and the Company's risk
12   managers "boiled over."   According to the article—which directly criticized
13   Sambol for his role in spearheading Countrywide's "lunge for growth" in the
14   subprime area—the Company's Chief Investment Officer, who was responsible
15   for pricing loans to be sold on the secondary mortgage market and managing risk,
16   ***"uttered a loud profanity and walked out of the meeting to protest what we saw***
17   ***as imprudent lending."***

18       409.   According to the article, however, Sambol, brushed aside warnings
19   from risk-control managers that underwriting standards were too lax, stating that
20   being too cautious would turn Countrywide into a ***"nice, little boutique."***  Sambol
21   pushed a policy of offering nearly the entire range of mortgage products available
22   in the market, including 100% financing, 80/20 loans, and low-doc and no-doc
23   loans to borrowers with weak credit.  Confidential Witness 14 ("CW14"), who
24   served as a high-level risk management officer with Countrywide Bank in
25   Company headquarters during the Class Period, confirmed the accuracy of this
26   report.  Indeed, no later than 2005, CW14, together with the Company's Chief
27   Risk Officer and Chief Credit Officer, all repeatedly warned Sambol about
28   aggressive production, and the dangers of lax underwriting standards and placing

risky loans on the Company's balance sheet.  According to CW14, however, the three of them ultimately were "in the wilderness alone" and were put under enormous pressure to "go with production," *i.e.* to accede to Sambol's plan to keep production in overdrive.   "Production and market share," according to CW14, were Countrywide's "front and center" objectives.

410.   CW1 personally observed Sambol, on a regular basis, put pressure on employees to price risky loans in a way that would not take into account the extent of the risk the loans presented and, accordingly, would overstate the value the loans on the Company's books.  CW1 also observed Sambol pressuring employees to widen underwriting guidelines that would have the effect of enabling increased production of risky loans.  According to CW1, Sambol had trouble balancing Countrywide's corporate mandate with his own "personal ambitions" and could not be controlled.

411.   During 2004 and 2005, CW1 repeatedly told Kurland and others that **"this isn't going to last forever."**  By this, CW1 meant that the mortgage market was saturated and that the bubble would eventually burst, with severe consequences for Countrywide given the significant undisclosed risk the Company was taking on.

412.   Regarding the "tone at the top" of the Company, CW1 stated, referring to Mozilo, Kurland and Sambol, that **"when you have three executives with 31% of the options, it kind of speaks for itself."**  According to CW1, these Defendants sought to ride out the problems in the mortgage industry as long as they could profit from them.

413.   Countrywide's senior executives took a keen interest in, and were aware of, how the Company's underwriting guidelines compared with those of competing lenders.  Countrywide held monthly "Business Review" meetings at its Calabasas headquarters, run by Sambol and other top executives, during which the operations and performance of each Company division was evaluated and

1   discussed in great detail.   According to CW8, binders of documents were

2   circulated prior to each Business Review that included highly detailed reports for

3   all Countrywide divisions concerning all aspects of the division's business and

4   lending activity, including loan production, loan classifications (such as prime

5   and subprime), and revenue and expenses.   The binders contained a wealth of

6   information in the aggregate and broken down to an almost molecular degree of

7   detail.

8        414.   According to CW8, each division forwarded its respective report to

9   Countrywide headquarters in Calabasas and the information was collected and

10   compiled within Sambol's office.  High-ranking Countrywide officials, including

11   Sambol, studied these monthly reports in detail.

12        415.   CW8 personally attended portions of two Business Review meetings

13   at which Sambol and other officials questioned managers about sections of the

14   monthly reports their divisions submitted.   During CW8's employment with

15   Countrywide, CW8 regularly spoke with other senior officials about these

16   Business Review meetings.   These officials described how Sambol and other

17   executives questioned them aggressively and in great detail regarding specific

18   aspects of the monthly reports they submitted.

19        416.   The binder circulated for a Business Review concerning the FSL

20   division, which Lead Plaintiffs obtained in the course of their investigation,

21   includes a "Non-Prime Competitor Comparison Matrix" which closely compares

22   Countrywide's underwriting standards for subprime loans, including "80/20

23   Combo," 100% loan-to-value, and interest-only loans, and at various

24   documentation levels, with the guidelines of subprime lenders New Century

25   Financial, Fremont, Option One Mortgage, First Franklin Financial,

26   Ameriquest/Argent, WMC Mortgage, and Decision One.   This Comparison

27   Matrix, which could not have been compiled without some degree of "industrial

28

1    espionage" into competitors' practices, was updated every month and e-mailed to

2    the entire FSL sales force.

3        417.   The FSL binder also shows, as alleged in detail in Section IV.D

4    above, that Countrywide consistently categorized as "prime" hundreds of loans to

5    borrowers with FICO scores below 660.   Moreover, the FSL binder contradicts

6    Mozilo's statement that Pay Option ARMs "ha[ve] a FICO score exceeding 700"

7    and were limited to borrowers "of much higher quality."   In January 2007 alone,

8    the FSL division made Pay Option ARM loans to at least 57 borrowers.   The

9    average FICO score of all of these borrowers was below 700.

10       418.   Sambol, with the support of the other Officer Defendants, who had

11   access to the same information, clearly knew about—and endorsed—

12   Countrywide's rampant deviations from its underwriting policies and procedures.

13   Sambol directed the creation in 2004 of Countrywide's proprietary Exception

14   Processing System to *approve* and fund "highly risky loans" (after tacking on

15   additional fees) that violated the Company's ever-loosening underwriting

16   guidelines.  As noted above, CMD's EPS, in particular, was intended to "approve

17   virtually every borrower and loan profile with pricing add on when necessary."

18       419.   According to CW12, the push toward risky lending ultimately came

19   from "high-up," and specifically from David Sambol.   According to CW12,

20   "things went south" when Sambol became more powerful within the Company in

21   2003.   "Late in 2003," according to CW12, risky lending through exceptions

22   became "more and more profitable," and the Company started making "wild

23   crazy loans" and "any exception was allowed."   Sambol, according to CW12, was

24   "completely for sales all the time," and had a philosophy that sales—that is,

25   originating loans and selling them to the secondary mortgage market—ruled the

26   Company.  Indeed, Sambol's mantra, according to CW12, was that "Countrywide

27   will make every loan possible."   Consistent with this practice, account executives

28   (loan officers) were told, "don't take no from underwriting, don't take no from

1  your branch manager, escalate as high as you have to.  If it has to go to Sambol,

2  just get the deal done."

3      420.   According to CW10, exceptions to loan guidelines were set forth in

4  "Executive Summary Reports" and monthly "Production Reports" at the branch,

5  area, and regional levels.   The Production Reports identified how many loans

6  were closed and funded, the types of loans originated, and exceptions to loan

7  guidelines.   The Production Reports were distributed to and discussed monthly

8  among Sambol (whom CW10 described as a "big numbers guy") and department

9  managers, and sometimes with Branch and Area Managers by means of

10 conference calls.   Eugene Soda, the "head of underwriting," was aware of

11 exception rates and regularly presented them at these meetings.

12     421.   According to CW12, there were an "endless" number of reports

13 "pulled" from EPS on all topics on a "daily, weekly, and monthly" basis.   EPS

14 was so detailed, according to CW12, that it was often "drilled down" to report on

15 the amount of loans with "100% LTV" ratios, the debt-to-value ratios or,

16 separately, on the loan processing "turn-times" (i.e., how long it took to close and

17 fund loans) for some or all regions of the Company.

18     422.   CW12's job description included furnishing "Exceptions Reporting"

19 to department supervisors, who in turn provided such reports to executives in

20 Secondary Marketing.   Exceptions reporting was also made available to other

21 executives, including Mozilo and Sambol.   CW12 saw both Mozilo's and

22 Sambol's names on the distribution lists for Exceptions Reporting, and CW12's

23 supervisors informed CW12 that Sambol would regularly give them specific

24 instructions based upon information in the exception reports he reviewed.   The

25 decisions coming down from Calabasas regarding "exception risk" (such as "no

26 more stated exception deals above a certain LTV") made clear to CW12 that

27 high-level executives were examining the data contained in exception reports and

28 making adjustments to the types of exceptions that would be allowed.

1    423.   Moreover, CW12 recalled that Kathy Tinsley, an EPS supervisor,
2  told CW12 and other underwriters that her supervisor, Jess Lederman, had been
3  told by Sambol at one point that he was unhappy (based on his review of EPS
4  statistics) with loan production, which at the time was not meeting goals he had
5  set.  Therefore, underwriting guidelines would need to be loosened, certain loan
6  programs would need to be pushed, and, he instructed, the Company would take
7  more risk on certain loans.

8    424.   According to CW12, exception reports were 30-40 pages long and
9  contained a multitude of data, including the "up-charge" (the amount of money
10  Countrywide stood to earn on each loan) and other different data and metrics.

11    425.   CW12 also described a report called "AMPS" that reported and
12  summarized all of the exception loans approved company-wide through all of
13  Countrywide's business channels.   "AMPS" showed all of the overrides to
14  Countrywide's underwriting guidelines made on exception loans.  These reports,
15  according to CW12, went out in special brown envelopes to preserve
16  confidentiality, and were circulated to all Countrywide executives and managers
17  of the First Vice President rank and higher.

18    426.   Additionally, according to CW12, increases in the rate of exceptions
19  were closely tracked and documented in "Trend Analysis" reports, which were
20  provided to David Sambol and other senior executives.   According to CW12,
21  Trend Analysis reports were "interoffied" in special confidential red and white
22  envelopes and kept in locked drawers.   As a result of receiving these reports,
23  Sambol and senior executives were aware of the massive statistical increases in
24  the volume of exceptions being granted as well as other key business trends for
25  the Company.  According to CW12, Trend Analysis reports showed "where loans
26  were headed," that is, whether various categories of loans were trending toward
27  being paid on time, or default.   Overall, according to CW12, Countrywide was

28

1   "very good about reporting" and having loan-by-loan and aggregate information

2   available to be "dissected in whatever format" needed by senior executives.

3        427.   From discussions held with SLD supervisors during 2004, CW12

4   also learned that Sambol received "executive level reporting" from SLD when

5   Sambol attended the meetings of Countrywide's committee on "CORAD," which

6   was an acronym for Countrywide Organizational Risk Assessment Database.

7   According to CW12, CORAD meetings were held at least once a month in

8   Calabasas or Plano to assess the Company's ongoing exposure to risk, and were

9   attended by 30 to 40 employees from all divisions of Secondary Marketing.

10  CW12 attended many CORAD meetings and recalled that Sambol attended as

11  well.

12       428.   Essential and detailed data on exceptions generated from EPS was

13  included in the materials circulated among senior executives at the monthly

14  Business Reviews.  The binders for these meetings contained extensive data on

15  Price Exceptions, or "PEs."  "Price Exceptions" was one of six topics in FSL's

16  revenue report for the February 2007 Business Review meeting.  This report

17  included a spreadsheet titled "Concession Trend Summary – BC 1sts."  BC 1sts

18  are essentially subprime first mortgages.  The "Concession Trend" chart provides,

19  for each month between January 2006 and January 2007, for the entire division,

20  various division branches and by region, the number of exception loans; the total

21  and average loan amounts; the WAC, or weighted average coupon of the

22  mortgages as pooled for securitization; the points added on, and the added

23  revenue.  In May 2006, for example, more than 7,000 FSL loans, totaling more

24  than $1.4 billion, contained price exceptions; Countrywide's revenue per loan

25  was more than $10,000.

26       429.   No later than early 2006, Mozilo and the Officer Defendants knew

27  that real estate values were poised to decline as interest rates increased.  In an

28  interview with CNBC's Maria Bartiromo in late February or early March 2006,

1   Mozilo stated that housing prices would decline significantly in the next 12 to 18
2   months:

3   ***I would expect a general decline of 5% to 10% throughout the***
4   ***country, some areas 20%.  And in areas where you have had heavy***
5   ***speculation, you could have 30%.***  We will see . . . sellers back off
6   from the prices they have been demanding.  A year or a year and a
7   half from now, you will have seen a slow deterioration of home values
8   and ***a substantial deterioration in those areas where there has been***
9   ***speculative excess***.

10   430.   Several months later, during the Company's Fixed Income Investor
11   and Creditor conference on September 13, 2006, Mozilo boasted that a looming
12   drop in home prices and an increase in mortgage interest rates would usher in a
13   period of remarkable prosperity for Countrywide.  In fact, Mozilo downplayed the
14   effect of rising rates, saying that "I have over 53 years of experience navigating
15   through all kinds of scenarios and this is nothing compared to 25% prime and
16   17.5% mortgage rates and 10% unemployment."  Mozilo assured investors and
17   analysts that Countrywide's ***"comprehensive methodologies . . . that include***
18   ***proprietary technology and surveillance systems"*** would successfully manage
19   any issues caused by the "proliferation of non-traditional mortgage products" and
20   potentially increased delinquencies.  Mozilo insisted that "[t]his is when we
21   shine," and even claimed that "10 years from now . . . most of the players today
22   will be gone, except for Countrywide."

23   431.   According to CW8, Countrywide had many proprietary systems in
24   place to ensure that its most senior executives had continuous knowledge of all
25   aspects of Countrywide's loan origination operations and finances.   Indeed,
26   according to CW10, Countrywide had "great" internal computer and information
27   systems, "the best in the industry," which allowed management to see
28   "everything" at "the touch of a button."

432.   A centralized, Internet-based system called "Turquoise" or "TQ-Web" provided detailed, virtually real-time data and information regarding every individual loan originated by Countrywide.  According to CW8, and a document titled "Overview of Production Reporting" obtained by Lead Plaintiffs in the course of their investigation, which includes multiple screen-shots of Turquoise, this system reported an "extraordinary range" of data by division, region and branch, including the loan program type and amount, document type, FICO score range, interest rates, fees imposed and collected, total revenue, and associated "drilldown reports" that could be sorted and filtered in innumerable ways. According to CW8, Turquoise included current and historical data going back years, and all senior officials and executives had open access to Turquoise.  In fact, according to CW8, the Company's most senior executives, including Sambol, regularly used Turquoise.  During CW8's tenure with the Company, CW8 participated in a number of meetings with senior officials who, during these meetings, made comments and asked questions that they only could have formulated after reviewing data gathered from the Turquoise system.

433.   According to CW8, and the Overview of Production Reporting document, an additional Internet-based database called "Status Mart" provided detailed information concerning Countrywide's loan production pipeline, tracking by division, region and branch, the total pipeline, new loan applications, pending and approved applications, and loan fundings.   The Overview of Production Reporting includes several screen-shots of Status Mart from July 2005.  Status Mart reports provided details on each loan, including loan-to-value ratios, risk grades, and document types (e.g., full, reduced, or stated).

434.   According to CW8, Countrywide also maintained a proprietary database during the Class Period called Virtual Loan File, or VLF, which includes an electronic image of virtually all application documents for Countrywide loans. Accordingly, executives accessing VLF could review Countrywide's loan

1  applications, including reduced documentation, low-doc and no-doc loans, at any

2  time.

3       435.   On October 4, 2006, federal banking regulators jointly released

4  extensive guidance regarding nontraditional loans titled the *Interagency Guidance*

5  *on Nontraditional Mortgage Product Risks*.   Countrywide provided detailed

6  written comments to the regulators on the proposed guidance on March 27, 2006,

7  and the Office of Thrift Supervision sent a copy of the *Interagency Guidance* and

8  supplemental information (which all The Officer Defendants were required to be

9  familiar with in any event) to Mozilo as CEO on October 10, 2006.

10       436.   The *Interagency Guidance*, among other things, specifically

11  criticized the sale of low-doc or "stated-income" Pay Option ARMs and other

12  nontraditional mortgage loans.  The *Interagency Guidance* observed that a lender

13  that does not extensively inquire into the ability of borrowers to repay these loans

14  is more likely to grant them to borrowers who will default.

15       437.   Moreover, as reported by *The Wall Street Journal* in February 2008,

16  internal Company documents show that as of mid-2006, as a result of

17  Countrywide's loose lending practices, defaults of subprime loans were starting to

18  run far higher than the rate projected by the Company's computer model.

19  Countrywide used highly sophisticated computer models to project delinquencies

20  and other critical measures of loan performance.   Subprime loan production did

21  not slow, however, and when risk analysts brought the rising defaults to Sambol's

22  attention, he brushed aside their concerns.

23       438.   At this point in time, the proportion of nontraditional loans in

24  Countrywide's loan portfolio, and those based on reduced documentation, had

25  been steadily increasing together with delinquencies.  CW14, in fact, recalled that

26  towards the end of 2006 the Company began to see loans go bad, and that

27  subprime delinquencies accelerated beginning in 2007, as house prices fell from

28  their peak in the middle of 2006.   CW9 recalled receiving a report from

1  "corporate" in late 2006 or early 2007 that listed nonperforming loans. Many of
2  these defaults were, in CW9's estimation, caused by ARMs resetting to higher
3  interest rates and dropping home values.

4  439. Indeed, notwithstanding Mozilo's statement at the July 24, 2007
5  conference call that "nobody saw this coming," the storm that was gathering in
6  mid to late 2006 was discussed at the highest levels of the Company. CW13
7  attended about a dozen of the Company's monthly Business Review meetings that
8  the Officer Defendants routinely attended. CW13 recalled that starting in late
9  2006, there were discussions in these meetings about the emerging mortgage
10 crisis and its effects on Countrywide's business. Although CW13 noted that the
11 "mortgage meltdown" did not severely impact Countrywide until the second
12 quarter of 2007, "it was on their radars from the beginning," and there were
13 "definitely issues in the industry that everyone at Countrywide had their eyes on"
14 before the summer of 2007. The Officer Defendants, however, took no
15 significant steps to tighten or improve the Company's underwriting standards
16 before the bottom fell out. According to CW4, who assisted with preparing and
17 distributing the underwriting guidelines, before July 2007, requests from
18 management were uniformly made to loosen the guidelines and never to tighten
19 them, **"no way."**

20 440. It was in July 2007, in fact, that Countrywide's Chief Credit Officer
21 candidly acknowledged that the Company should never have extended no-
22 documentation loans, and particularly not to subprime borrowers: "***The takeaway***
23 ***is . . . documentation matters***. The less documentation, the higher the serious
24 delinquency, all else equal." He also acknowledged that the Company's high
25 "concentration of piggyback financing that we did" during the Class Period had a
26 devastating effect, because ***"leverage at origination matters. More leverage***
27 ***means more serious delinquencies."***

28

### C.   The Officer Defendants Were Aware of, or Recklessly Disregarded, the Company's Violations of GAAP and Reporting of False Financial Statements

441.   The Officer Defendants repeatedly signed the Company's filings with the SEC that described, correctly, the controlling GAAP requirements for setting allowance for loan losses, valuing and accounting for retained interests and mortgage servicing rights in securitized loans, and setting an appropriate reserve for representations and warranties made to the secondary market. Countrywide's SEC filings stated that the Company had established accounting policies that governed the application of GAAP in the preparation of its financial statements and labeled its accounting policies involving, among other areas, allowance for loan losses and valuation and accounting for mortgage servicing rights and other retained interests as "Critical Accounting Policies."  At the same time, the Officer Defendants repeatedly failed to follow these GAAP requirements and the Company's own Critical Accounting Policies.  Each of these Defendants has substantial educational, financial and industry experience, including the application of these specific GAAP requirements.

442.   Countrywide's "senior management," as alleged above, was "actively involved in the review and approval" of the Company's allowances for loan losses, and, according to CW1, the loan loss allowances were set by a committee of top executives, including Mozilo, Kurland, Sambol, and Sieracki. These Defendants knew that delinquencies in Pay Option ARMs and HELOCs, the loans that presented the greatest risk of default, and accumulated negative amortization from unpaid debt on Pay Option ARMs, were all increasing substantially during the Class Period.  Moreover, in 2006, Mozilo specifically ordered the Company to look into why negative amortization was growing so quickly.  Mozilo told investors in September 2006 that he was "shocked" to find that so many people were making the minimum payment.  When Mozilo called

1   borrowers to ask why, he learned that he "was talking to a group . . . that had
2   never seen in their adult life real-estate values go down."

3       443.   The Officer Defendants knew at this point, however, that real-estate
4   values were poised to go down as interest rates increased.  As alleged above,
5   Mozilo stated in an interview on CNBC in late February or early March 2006 that
6   housing prices would decline significantly in the next 12 to 18 months.

7       444.   Despite the Officer Defendants' belief that home prices would
8   decline in the near term, their knowledge that a decline in housing prices and an
9   increase in interest rates could substantially and detrimentally impact the
10  Company's loan portfolio (which, in fact, was made clear in the Company's SEC
11  filings), and their knowledge that the Company's loan underwriting standards had
12  been loosened and abandoned, the Officer Defendants did not increase the
13  Company's allowance for loan losses to a sufficient level.

14      445.   Moreover, as noted above, the federal banking regulators issued the
15  extensive *Interagency Guidance* in October 2006.  This was just after Mozilo
16  learned, at the latest, that Pay Option ARM borrowers were making the minimum
17  payments allowed and negative amortization was skyrocketing. The guidance
18  expressed serious concerns about the increased use of reduced-documentation Pay
19  Option ARMs and other nontraditional loans, and urged lenders to take a hard
20  look at the sufficiency of their loan loss reserves, observing that a lender that does
21  not extensively inquire into borrowers' ability to repay is more likely to provide
22  them to borrowers who cannot keep up with the interest payments.  Again, despite
23  this knowledge, the Officer Defendants took no steps to substantially increase
24  Countrywide's allowance for loan losses, tighten or improve loan underwriting
25  standards, or otherwise position the Company to avoid this identified (and
26  obviously serious) pitfall.

27      446.   The Officer Defendants similarly failed, despite this knowledge, to
28  properly ascertain the reasonableness of the assumptions underlying the

1   Company's valuations of retained interests and mortgage servicing rights, or to

2   increase the Company's reserve for representations and warranties made to the

3   secondary market.  Among large-capitalization financial companies, Countrywide

4   has historically been one of the most aggressive in its use of gain-on-sale

5   accounting for loan securitizations.  Because the gain-on-sale method front-loads

6   both earnings and cash flows into the current period, relies on assumptions that

7   are relatively easy to manipulate, shifts liabilities off the balance sheet and is

8   relatively opaque, it is particularly subject to materially misleading earnings

9   management.  Further, the amount of gain-on-sale revenue recorded has a direct

10  relationship with the valuation of retained interests, which formed the "piece" of

11  the loan securitizations that Countrywide kept on its books.

12      447.   During the Class Period, the Officer Defendants were on notice that

13  the Company's internal controls regarding the proper accounting for gain-on-sale

14  revenue and the valuation of retained interests from loan securitizations were at

15  risk of having significant deficiencies. In its 2004 Form 10-K, Countrywide

16  admitted that its accounting for gain-on-sale revenue had been incorrect in 2003

17  and 2004 by recognizing certain revenue too early, and acknowledged that the

18  Company's internal controls over financial reporting had material weaknesses as

19  of the end of 2004.  Accordingly, Countrywide restated its financial results for the

20  second and third quarters of 2003 and the first three quarters of 2004, reversing

21  the gain-on-sale income recorded and eliminating the retained interests taken at

22  the time of the securitizations.

23      448.   The sworn certifications made by Defendants Mozilo, Sieracki, and

24  Kurland during the Class Period pursuant to the Sarbanes-Oxley Act of 2002, as

25  set forth below, also support a strong inference of scienter.  These Defendants

26  repeatedly signed certifications attesting to the Company's compliance with

27  GAAP and the adequacy of Countrywide's internal controls, and reaffirming that

28  they had designed sufficient disclosure controls and procedures to ensure that

1    "material information" concerning the Company was made known to them.  The

2    facts set forth herein, as well as Countrywide's admissions on and after July 24,

3    2007, reveal the falsity of these repeated certifications.  The undisclosed facts

4    concerning Countrywide's deteriorating underwriting standards and increasingly

5    risky lending practices constituted "material information," the disclosure of which

6    would have affected, and did affect, the fair presentation of Countrywide's

7    financial statements in compliance with GAAP and which was contrary to certain

8    disclosures in Countrywide's annual and quarterly reports.  These Defendants

9    acted intentionally or in a deliberately reckless manner in repeatedly issuing

10   sworn certifications attesting to the Company's compliance with GAAP, when

11   Countrywide's financial results were not presented in accordance with GAAP,

12   and as to the adequacy of Countrywide's internal controls, when the Company

13   suffered from material weaknesses in its internal controls.

14        **D.    Insider Stock Sales By Mozilo and
              Other Officer Defendants During the Class
15            Period Were Highly Unusual and Suspicious**

16        449.   The Class Period sales of Countrywide stock by Defendants Mozilo,

17   Sambol and Kurland were highly unusual, and therefore suspicious, as measured

18   by (1) the amount and percentage of shares sold, (2) comparison with the Officer

19   Defendants' own prior trading history and that of other insiders, and (3) the

20   timing of the sales.  Such sales therefore provide strong evidence of scienter.

21        450.   To evaluate the Officer Defendants' selling activity, Plaintiffs used

22   publicly available trading data required to be reported to the SEC on Form 4.

23   Plaintiffs analyzed the trading by insiders that occurred during the Class Period

24   and during the equal-length period immediately preceding the Class Period,

25   beginning March 16, 2000 and ending March 11, 2004 (the "Control Period").

26   The Countrywide Form 4s filed during the Class Period and Control Period are

27   hereby incorporated herein by reference, and the transactions reported therein are

28   set forth in Exhibit F, annexed hereto.

451.   The following methodologies were used to analyze the Officer Defendants' sales:

(a)   First, Plaintiffs calculated total sales by each of the Officer Defendants, together with the cash proceeds from such sales, during the Control and Class Periods.  All share calculations were made on a split-adjusted basis, *i.e.*, transactions preceding stock splits were multiplied by the split ratio to render them economically equivalent to post-split transactions.

(b)   To calculate the amounts and percentages of shares sold, Plaintiffs then calculated holdings at the end of the Class Period by referencing Countrywide's 2007 annual proxy statement on Schedule 14A, which sets forth shares owned and stock options exercisable by the Officer Defendants as of April 4, 2007.  Such data were then adjusted to the Class Period end date using the purchase and sale data set forth in the Countrywide Form 4s.  "Holdings" were deemed to include both shares held and stock options that were vested but not yet exercised.  Class Period sales were then calculated as a percentage of total shares available for sale during the Class Period, *i.e.*, the sum of Class Period sales plus end-of-Class-Period holdings.

(c)   To compare Class Period sales with prior trading history, Plaintiffs compared sales by the Officer Defendants during the Class Period with their sales during the Control Period.  Plaintiffs also compared the Officer Defendants' sales across the Control and Class Periods with those of lower-level (non-Defendant) reporting persons.

(d)   Plaintiffs then determined whether the Officer Defendants' sales of Countrywide stock during the Class Period generated abnormal (above-normal) profits.  Abnormal profits were evaluated using an event study methodology called the "market-adjusted method," which computes

cumulative shareholder returns not explained by market factors.  Under this approach, if an insider buys a share of stock which then increases in price from $100 to $120 (20%), and the benchmark index increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would be 19%. Under the same analysis, if a company's stock price declines subsequent to a sale by a greater amount than the relevant benchmark index, then the sale enabled the insider to generate an abnormal profit by avoiding the decline. For example, if an insider sells a share of stock which then declines from $100 to $80 (20%) while the relevant benchmark decreases from 1000 to 990 (1%), then the abnormal profit would again be 19%.    This methodology has been used extensively in the academic literature studying the profitability of insider trading.  Abnormal profits were calculated using a 250 trading day period following the day of trade, measured against a value-weighted index of NYSE, AMEX and NASDAQ stocks for 2000-2008.

(e)    After calculating abnormal profits for the Officer Defendants' Class Period sales, Plaintiffs then calculated the probability that such abnormal profits resulted from random chance.   This probability was calculated by computing the trade-dollar-weighted residuals from the market-adjusted model for the 250 trading days before and 250 trading days after the day of trade, and averaging these residuals across event days for each insider.   This data was then used to compute a "t-statistic" (a statistical tool) to infer the probability that the observed cumulative abnormal profits were due to random chance.

452.   By each analysis, the Officer Defendants' Class Period sales were extremely large and highly unusual.

### 1.   The Amount and Percentage of Shares Sold During the Class Period Was Extraordinary

453.   As reflected in the following table, the amount and percentage of shares sold during the Class Period by Defendants Mozilo, Kurland and Sambol were extraordinarily large:

| | Class Period Sales (Dollars) | Class Period Sales (Shares) | Holdings at End of Class Period | Sales as % of Total Shares Available for Sale |
|---|---|---|---|---|
| Angelo R. Mozilo | $478,348,129 | 13,397,335 | 5,307,817 | 71.6% |
| Stanford L. Kurland | $192,460,034 | 5,375,163 | 443,168 | 92.4% |
| David Sambol | $64,725,623 | 1,683,600 | 2,501,705 | 40.2% |
| Eric P. Sieracki | $0 | 0 | 572,521 | 0.0% |
| TOTAL | $735,533,786 | 20,456,098 | 8,825,211 | 69.9% |

454.   Thus, Mozilo's sales—totaling nearly a half-billion dollars—represented almost 75% of the total shares he had available for sale during the Class Period.

455.   Kurland's sales totaled nearly $200 million and represented more than 90% of his total holdings.

456.   Sambol sold close to half of his total holdings, for proceeds of more than $64 million.

### 2.   Stock Sales Increased Tremendously During the Class Period

457.   In addition to being massive in absolute and percentage terms, sales by Mozilo, Kurland and Sambol during the Class Period were extraordinary when compared to their own prior selling activity, and when compared to the selling activity of other, less well-placed and knowledgeable insiders.

458.   A comparison of the sales by the Officer Defendants as a group, and by Mozilo, Kurland and Sambol individually, during the Control and Class Periods are set forth in the following chart:



459.  As set forth in this chart, the Officer Defendants' sales as a group increased more than 400% during the Class Period, from approximately $138 million during the Control Period to more than $735 million during the Class Period.

460.  Mozilo's individual sales increased even more sharply.  During the Control Period, he sold shares worth approximately $63 million.  During the Class Period, his sales increased 656%, to more than $478 million.

461.  Kurland's individual sales also increased sharply.  During the Control Period, he sold shares worth nearly $45 million.  His sales during the Class Period more than quadrupled, to more than $192 million.

462.  Sambol's sales also increased substantially, nearly tripling from $22 million to almost $65 million.

463.  The contrast between the Officer Defendants' sales during the Control Period and the Class Period is also striking when measured in shares, rather than dollars, as set forth in the following chart:

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15

464.   By this measure, the Officer Defendants collectively increased their sales by 144%.  Mozilo more then tripled his sales, from nearly four million to nearly 13.4 million.  Kurland nearly doubled his sales, and Sambol's sales also increased significantly.

16
17
18
19
20
21
22
23

465.   The increase in the Officer Defendants' selling is even more striking when compared to the sales pattern of more junior Countrywide employees, who lacked the Officer Defendants' knowledge of the Company's true finances and operational condition.   As a group, non-Defendants sold shares worth $71.3 million during the Class Period, an increase of only 28% over the Control Period.[23]   By contrast, as noted above, the Officer Defendants increased their selling more than five-fold, to more than $735 million:

24
25
26

_____

27
28

[23]  Sales by David Loeb, a senior insider who left the Company in early 2000, are excluded.  If his sales are included, the contrast between Control Period and Class Period sales is even greater.



466.   The contrast between the Officer Defendants and more junior insiders is equally acute when calculated on the basis of the number of shares sold.   While the Officer Defendants' sales increased 144%, non-Defendants' sales, collectively, actually *decreased by more than a third*:



### 3. Officer Defendants Generated Enormous Abnormal Profits on their Sales of Countrywide Stock

467.   Using the methodology described above, Mozilo, Kurland, and Sambol each generated extremely large abnormal profits on their transactions in Countrywide stock during the Class Period, as reflected in the following chart:

| | Average One-Year Abnormal Profits on Class Period Trades | Probability that Abnormal Profits Resulted from Random Chance |
|---|---|---|
| Angelo R. Mozilo | 60.5% | <0.01% |
| Stanford L. Kurland | 54.5% | 0.01% |
| David Sambol | 35.0% | <0.01% |
| CUMULATIVE | 58.25% | <0.01% |

468.   As reflected in this chart, based on the timing of their Class Period trades, Mozilo generated average annual returns that exceeded the benchmark index by more than 60%, Kurland's profits exceeded the benchmark by more than 54%, and Kurland's trades delivered abnormal annual profits of 35%.

469.   The possibility that these abnormal profits resulted from random chance is extremely remote: as indicated in the table above, Plaintiffs calculated the probability of these profits occurring randomly at less than one hundredth of one percent, and the results are therefore strongly statistically significant.

470.   The timing and extent of the abnormal profits—and the contrast between Control Period and Class Period trades—are also reflected graphically in the charts set forth below.  These charts compare trades for the Control and Class Periods for each of Mozilo, Kurland and Sambol, and depict cumulative abnormal profit (or loss) on all trades occurring during each period, calculated daily for one to 250 days following the day of trade.  As reflected in the charts below, trades during the Control Period reflect negative abnormal profits (abnormal losses) for most periods in the 250 trading days following the day of trade.  By contrast, trades during the Class Period immediately generated abnormal profits, demonstrating them to be extraordinarily well-timed.

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



4.     **Mozilo's Repeated and Highly Unusual Modifications of His 10b5-1 Trading Plans—Now Under Investigation By the SEC—Further Demonstrate the Suspicious Nature of His Selling**

471.  Mozilo's repeated modifications to trading plans established pursuant to SEC Rule 10b5-1 during the latter part of the Class Period further demonstrate the suspicious nature of his sales during the Class Period.  These sales are now the subject of an SEC investigation.

472.  In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.  Previously, courts had split on whether simple possession of material, nonpublic information at the time of the trade was a sufficient basis for imposing liability, and some courts had held that liability attached to a trade only if the insider "used" inside information in making the trade.  *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51,727 (Aug. 24, 2000).

1    473.   To provide a safe harbor under the "aware of" standard, the SEC

2   created an affirmative defense to insider trading claims for trades made pursuant

3   to a binding agreement or plan ("10b5-1 Plans").  *See id.* at 51,727-28.

4    474.   Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to

5   insider trading liability only if it is entered into by an insider "before becoming

6   aware" of inside information, and was established "in good faith and not as part

7   of a plan or scheme to evade the prohibitions" against insider trading.

8    475.   Because of this, insiders are counseled to "design a trading plan with

9   the intention that it will not be modified or amended frequently, since changes to

10   the plan will raise issues as to a person's good faith."  Thomson West, *Corporate*

11   *Counsel's Guide to Insider Trading and Reporting* § 12:26 (2006).

12    476.   Mozilo, however, repeatedly modified his 10b5-1 Plans during the

13   latter part of the Class Period.  Mozilo initially established a 10b5-1 Plan early in

14   the Class Period, on April 26, 2004, which provided for sale of 210,000 shares

15   (on a split-adjusted basis) each month.  On October 27, 2006, Mozilo adopted a

16   new 10b5-1 Plan that provided for him to increase his sales by 67% to 350,000

17   shares a month – 140,000 more than authorized under the earlier plan.

18    477.   Less than seven weeks later, on December 12, 2006, Mozilo

19   implemented a new 10b5-1 Plan that increased his sales by 115,000 shares per

20   month, or nearly one-third, to 465,000 shares per month.

21    478.   Less than eight weeks later, on February 2, 2007, Mozilo modified

22   his 10b5-1 Plans for the third time in less than four months, again increasing his

23   sales by 115,000 shares per month, to 580,000 shares per month.

24    479.   Commenting on Mozilo's 10b5-1 Plans, experts interviewed by *The*

25   *Los Angeles Times* noted the highly suspicious nature of the plan changes in an

26   article dated September 29, 2007.  As reported in *The Los Angeles Times*, one

27   securities attorney commented, "***This raises a slew of red flags. . . .***  Anytime you

28   have revisions or modified plans . . . it is extremely suspicious."  A financial

1   planner commented, "There are circumstances where the plans could be amended,

2   but you better have a good reason because it's defeating the basis of the rule . . . .

3   ***If a guy is changing his plan around, I would think that would send up a red***

4   ***flag. I wouldn't allow my clients to do it."*** Another attorney whose practice

5   involves executive compensation also observed to *The Los Angeles Times* that

6   "the more that you modify or add to your plan over a short period of time, the

7   more risk that someone will call it into question."

8       480.   Adding to the "red flags" raised by the 10b5-1 Plan changes,

9   Mozilo's stated reasons for the changes are demonstrably false, inconsistent, and

10  incoherent.

11      481.   In the September 29, 2007 *Los Angeles Times* article cited above,

12  Mozilo stated through Countrywide's Chief Legal Officer, Sandy Samuels, that

13  the 10b5-1 plan revision on February 2, 2007 was "made in response to the new

14  terms of Mozilo's employment agreement, struck Dec. 22."

15      482.   Samuels' statement, made on behalf of Mozilo, was obviously false.

16  As set forth in the Company's own SEC filings, the terms of Mozilo's new

17  employment agreement (the "2006 Employment Agreement") were established

18  no later than October 20, 2006 – *before* Mozilo entered into the first of his three

19  10b5-1 Plan changes.   *See* Form 8-K, filed October 23, 2006.   The 2006

20  Employment Agreement therefore provided no basis for the December 2006 or

21  February 2007 changes and the resulting increase from monthly sales of 350,000

22  shares to 580,000 shares.

23      483.   In Countrywide's third quarter 2007 earnings call, held on October

24  26, 2007 (approximately a month after the *Los Angeles Times* article), Mozilo

25  changed his story.   Referring to the 2006 Employment Agreement, he stated,

26  "[t]hat new contract, and my decision to defer retirement, in turn . . . led to my

27  adopting new trading plans in 2006."

28

484.   This revised explanation, however, also does not stand up to scrutiny.  On the earnings call, Mozilo explained that he accelerated selling in 2004 "[i]n view of my expected retirement in 2006" and that "[c]learly it would not have been in the best interests of anyone, the shareholders or mine, to be in the position of having to unload all or a substantial portion of my holdings into the market at the same time of my retirement."  This stated reason for increasing sales is fundamentally inconsistent with Mozilo's actions in late 2006 and early 2007.

485.   First, by delaying his retirement and continuing to receive substantial current cash income, Mozilo extended the time period available to liquidate his holdings before retirement, *reducing* the size of the monthly sales needed to achieve that objective.

486.   Second, the additional equity grants Mozilo was to receive under the 2006 Employment Agreement in no way justify the increase in sales authorized under the October 2006, December 2006, and February 2007 10b5-1 Plans.

487.   In addition to paying cash compensation of up to $12.9 million each year, the 2006 Employment Agreement provided for equity-based compensation of $10 million annually, plus another $10 million "[i]n exchange for Mr. Mozilo agreeing to extend his term as the Company's Chief Executive Officer beyond December 31, 2006."   Under the terms of the 2006 Employment Agreement, these grants, totaling $40 million, were to vest over five years.

488.   At an assumed share price of $40 (the level at which Countrywide shares traded between December 2006 and February 2007), all of the equity grants under 2006 Employment Agreement would have thus provided Mozilo 1,000,000 new shares vesting over five years—an average rate of 16,666 new shares per month.

489.   Thus, far from justifying an increase from 210,000 shares per month in 2004 to 580,000 shares per month in early 2007, the additional equity grants in

1   the 2006 Employment Agreement warranted an increase, if any, of less than *one-*
2   *twentieth* that amount.

3       490.   Mozilo also misrepresented the circumstances of his Class Period
4   sales in other public statements.  During Countrywide's earnings call on July 24,
5   2007 for the second quarter of 2007, Mozilo responded sharply to a question
6   about his stock sales, asserting that they were made pursuant to a 10b5-1 Plan
7   established "well over a year ago."  In fact, the 10b5-1 Plans pursuant to which
8   Mozilo was then selling his holdings were entered into just five, seven and nine
9   months prior to the earnings call.

10      491.   Later on the same call, Mozilo returned to the question about his
11  insider sales and asserted:

12          [T]he shares that I have, actual stock that I have, I have retained for 39
13          1/2 years, not sold a share of the initial stock that I got when David
14          and I started this company – and I got that I purchased.  ***And the only***
15          ***thing that's being sold in 10b5-1 are options with expiration dates.***

16      492.   This assertion was false.   Countrywide's 2007 annual proxy
17  statement on Schedule 14A reflects outright ownership by Mozilo of 1,021,546
18  shares as of April 4, 2007.  His holdings a year earlier, on April 5, 2006, as set
19  forth in Countrywide's 2006 annual proxy statement on Schedule 14A, were
20  1,286,617 shares – *26% higher*.

21      493.   In light of Mozilo's false, inconsistent, and incoherent explanations
22  of his sharply increased selling activity during the Class Period, it is unsurprising
23  that the SEC has commenced an investigation of his sales, as reported by both
24  *The New York Times* and *The Wall Street Journal* on October 18, 2007.
25  According to *The Wall Street Journal*, "[a]t least one area of the inquiry, [people
26  familiar with the matter] say, involves stock sales by [Mozilo] through
27  prearranged executive sales plans."

28

---

**5.     The Increase in Stock Sales at the Same Time as Countrywide Initiated Major Stock Buybacks Further Demonstrates Their Suspicious Nature**

494.   The Officer Defendants' high rate of selling during the Class Period is particularly suspicious because it occurred just as Countrywide initiated its first-ever stock repurchase program.

495.   Countrywide's first stock buyback (the "First Buyback") – for up to $2.5 billion in Countrywide stock – was announced on October 24, 2006.  As the Daily News of Los Angeles noted in reporting on the First Buyback, "[c]ompanies typically buy back stock when they think it is undervalued." Gregory J. Wilcox, *Housing Slowdown Costs Jobs*, Daily News of L.A., Oct. 25, 2006.  However, insiders usually sell their personal stock when they believe it is overvalued.

496.   Mozilo made the first of his three 2006-07 10b5-1 Trading Plan changes just three days later, on October 27, 2006.  Mozilo then made two subsequent changes to his 10b5-1 Trading Plans while the First Buyback was occurring.

497.   Stock buybacks are widely recognized as boosting a company's share price, and the First Buyback was seen as having this effect for Countrywide. As reported in the *National Mortgage News* on October 30, 2006, "[a]nalysts at [Friedman Billings Ramsey] said Countrywide's share buyback will help to support the stock."

498.   On May 16, 2007, Countrywide announced a second buyback (the "Second Buyback") of approximately $1 billion in stock.  Mozilo's sales under his 10b5-1 Trading Plans were continuing during this period at the pace of 580,000 shares per month.

499.   Thus, at exactly the time Mozilo was sharply increasing his personal sales of Countrywide stock, he was causing the Company to engage in its first-ever repurchases of its own stock.  The immediate consequence of the buybacks

was to support the Company's share price, and the ultimate effect was to secure large profits on Mozilo's own sales during this period, while the Company, and through it, the Class, suffered massive losses on the shares it repurchased.

## VI. THE AUDITOR DEFENDANTS ACTED WITH DELIBERATE RECKLESSNESS IN CONDUCTING THEIR AUDITS OF COUNTRYWIDE'S FINANCIAL STATEMENTS AND FAILED TO CONDUCT THOSE AUDITS IN ACCORDANCE WITH GAAS

500. The Auditor Defendants violated Generally Accepted Auditing Standards ("GAAS") and acted with deliberate recklessness, or, in the alternative, with negligence, in conducting their audits, thus leading to the filing of false and misleading statements and documents with the SEC. These statements and documents were materially false and misleading, and in violation of GAAP, in that, among other things, they misrepresented, and failed to disclose, Countrywide's improper assessment of fair value for its retained interests and MSRs, its improper accruals for its breaches in representations and warranties, and its materially understated allowance for loan losses.

501. In accordance with GAAS, as independent auditors, the Auditor Defendants were required to plan, conduct, and report on the results of their audits.[24] In doing so, they were required to comply with auditing standards that provide principles for audit quality and the objectives to be achieved in an audit. Investors rely on the independent auditor's opinion with respect to a company's financial statements and the independent auditor's assessment of the effectiveness of the company's internal controls when deciding whether or not to invest in that company.

---

[24] GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

502.   The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms.  On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date.  Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003.  For simplicity, all references to GAAS hereinafter include the standards of the PCAOB.

A.     **Auditor Defendants Were Required to Comply With GAAS**

1.     **The Auditor Defendants' Expertise**

503.   As national accounting and auditing firms, both Grant Thornton and KPMG[25] held themselves out to their clients and the public as multi-disciplined specialists in numerous industries including Finance, Mortgage Banking and Retail Banking.  For example, on Grant Thornton's website, Grant Thornton claims, with respect to its Mortgage Banking services:

> Grant Thornton can help maximize your potential as a financial institution. We offer products and services designed for institutions like yours.
>
> **Assurance services**
> - Evaluate financial reporting internal controls

---

[25] Grant Thornton issued an audit opinion on Countrywide's 2003 financial statements.  KPMG issued audit opinions on Countrywide's financial statements for 2004, 2005, 2006 and 2007.

1      •   Audit financial statements in accordance with generally
2          accepted auditing standards and government auditing
3          standards
4      •   Test and report on internal controls in accordance with HUD
5          rules
6      •   Perform agreed-upon procedures on compliance with HUD
7          programs including HUD's Lender Assessment Subsystem
8      •   Perform Uniform Single Attestation Program (USAP)
9          engagements
10     •   Recommend internal control and process improvements
11     •   Consult on emerging issues including current
12         pronouncements and disclosure requirements
13     •   Assist with accounting questions for non-recurring items
14     •   Perform agreed-upon procedures related to securitizations
15     504.   Similarly, on its website, KPMG claims with respect to its Financial
16 Services practice:
17     Why select KPMG's Financial Services practice?
18     KPMG's Financial Services practice has a network of highly
19     experienced professionals dedicated to the financial sector. The scale
20     and power of the network helps to ensure our firms can deliver
21     projects locally or globally, according to client requirements.
22
23     Our Focus
24     KPMG's Financial Services practice focuses on providing Audit, Tax
25     and Advisory Services to the Retail Banking, Investment Banking,
26     Insurance, and Investment Management and Funds segments.  This
27     industry focus gives our professionals an in-depth understanding of
28

1   the key issues facing financial institutions, helping them to provide

2   practical services of real benefit to member firms' clients.

3   505.   As Countrywide's auditors, the Auditor Defendants had access to the

4   Company's books and records throughout the Class Period.   Further, as national

5   accounting and auditing firms with practice specialties that include mortgage

6   banking, retail banking and all other financial industry sectors, the Auditor

7   Defendants were required to be keenly aware of matters relating to, among other

8   things, Countrywide's business and the banking industry in which it operated;

9   Countrywide's accounting policies and procedures; Countrywide's financial risks;

10   audit risks in the mortgage banking industry and at Countrywide in particular; and

11   Countrywide's financial statement items likely to require adjustment.

12               **2.       The Standards of GAAS**

13   506.   GAAS is comprised of ten basic standards that establish the quality

14   of an auditor's performance and the overall objectives to be achieved in a

15   financial statement audit.   Auditors are required to follow those standards in each

16   and every audit they conduct.

17   507.   The GAAS standards fall into three basic categories:   (i) General

18   Standards; (ii) Fieldwork Standards; and (iii) Reporting Standards.   The General

19   Standards provide guidance to the auditor on the exercise of due professional care

20   in the performance of the audit.  The Standards of Fieldwork provide guidance on

21   audit planning, proper evaluation of internal control, and the collection of

22   evidential matter in order to be able to form a reasonable basis for the auditor's

23   opinion regarding the financial statements under audit.   The Standards of

24   Reporting provide guidance to the auditor on the content of the audit report and

25   the auditor's responsibility contained therein.   AU §150.02 (§150.02)[26]

26   _____

27   [26] Certain standards within GAAS were modified for audits of financial statements for periods beginning on or after December 15, 2006.  The concepts

28   within those standards are essentially similar.  For ease of reference during the
   *(continued . . . )*

508.   In order to obtain their licenses as Certified Public Accountants and in order to qualify to perform audits on financial statements of public companies in the United States, the Auditor Defendants and the individual members of the engagement teams conducting audits of Countrywide were required to have in-depth knowledge and understanding of those auditing standards, as well as an in-depth knowledge of the provisions of GAAP applicable to Countrywide's business.

**B.     The Auditor Defendants Failed To Exercise Due Professional Care and Professional Skepticism**

509.   General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report. AU §230.07 (§230.07) states that "[d]ue professional care requires the auditor to exercise professional skepticism.   Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."   In addition, the auditor should use "the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective valuation of evidence."   AU §230.07 (§230.07).

510.   Also, the AICPA *Audit & Accounting Guide* ("A&A") for lending institutions provides guidance for independent accountants for high-risk areas of material misstatements.   "The following factors relating to loans may be indicative of material misstatement . . . [h]igh rate of growth in loan portfolio."

511.   An example of the Auditor Defendants' deliberately reckless, or, in the alternative, negligent violation of General Standard No. 3 relates to Countrywide's failure to establish adequate allowances for loan losses as set forth

*(. . . continued)*
Class Period, the first reference relates to the standards before 2006; the parenthetical reference relates to the standards after 2006.

1   in Section IV.G.1 above.  Specifically, Countrywide did not take into account the

2   fact that the Company had (a) loosened its underwriting standards beginning in

3   2003; (b) engaged in increasingly risky lending practices by making increasingly

4   risky loans to borrowers with inferior credit quality and without proper

5   documentation; and (c) retained more risky loans on its balance sheet.

6          512.  The Auditor Defendants were required to know that the risk of

7   borrower default is a traditionally high risk area for mortgage banking companies,

8   especially Countrywide as a result of its overly aggressive goal to obtain 30%

9   market share loan originations by 2008.  With that knowledge, it was required

10  that, in conducting their audits, the Auditor Defendants exercise due professional

11  care, including the basic step of analyzing the correlations and interactions among

12  the allowance for loans, loans held for investment, non-accrual loans, and the

13  types of loans comprising the mortgage loans held on the balance sheet, and have

14  heightened awareness about the increased pressure on loan originations.

15         513.  GAAS required that the Auditor Defendants critically assess this

16  publicly available evidence and make an independent judgment regarding the

17  adequacy of the allowance for loan losses.  This would have included, among

18  other procedures, reviewing the reserving models of the Company, assessing the

19  assumptions underlying such models, obtaining sufficient documentation to

20  support management assumptions and comparing the Company's allowance to

21  that of other companies with similar origination characteristics within the

22  mortgage banking industry.  When necessary, the Auditor Defendants were

23  required to utilize the services of experts within their respective firms to perform

24  this analysis with an appropriate degree of professional skepticism.

25         514.  If the Auditor Defendants had performed the procedures described

26  above (which are basic to any mortgage company audit), the only reasonable

27  professional conclusion they could have drawn would have been that

28  Countrywide's allowance for loan losses was insufficient throughout the Class

Period and that the Company had violated GAAP.  Based on the allegations in Section IV.G above, it is evident that the Auditor Defendants did not exercise the due professional care necessary to perform their audits and, therefore, recklessly, or in the alternative, negligently, violated GAAS.

515. Similarly, with respect to Countrywide's inadequate liability for breaches of representations and warranties, valuation of MSRs, and valuation of retained interests, the Auditor Defendants should have exercised due professional care and professional skepticism.  Had they done so, the only reasonable professional conclusion they could have drawn would have been that Countrywide had violated GAAP with respect to each of those portions of its financial statements.

## C. The Auditor Defendants Failed To Properly Plan Their Audits of Countrywide

516. The second category of GAAS is the Standards of Fieldwork.  Those standards require an auditor to properly plan and supervise his staff.  Specifically, Standard of Fieldwork No. 1 requires the auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit." AU §311.03 (§311.02).  Further, "the auditor should consider, among other things: (a) Matters relating to the entity's business and the industry in which it operates; (b) The entity's accounting policies and procedures; . . . (d) Planned assessed level of control risk; (e) Preliminary judgment about materiality levels for audit purposes;  (f) Financial statement items likely to require adjustment." AU §311.03 (§314.02).

### 1. The Auditor Defendants Failed to Obtain Knowledge of Countrywide's Business

517. In order to properly plan an audit in accordance with GAAS, an auditor must obtain a sufficient understanding of the entity's business and operating environment.  In accordance with AU §311.06 (§314.03), an auditor must understand the entity's business sufficiently to identify areas of risks in

1  order to perform the audit in accordance with GAAS.  Specifically, AU §311.07

2  (§314.21) states:

> The auditor should obtain a knowledge of matters that relate to the
> nature of the entity's business, its organization, and its operating
> characteristics … The auditor should also consider matters affecting
> the industry in which the entity operates, such as economic conditions,
> government regulations, and changes in technology, as they relate to
> his audit.  Other matters, such as ***accounting practices common to the***
> ***industry***, competitive conditions, and, if available, financial trends
> and ratios should also be considered by the auditor.

518.  An example of the Auditor Defendants' reckless, or, in the alternative, negligent, violation of Standard of Fieldwork No. 1 relates to Countrywide's overstatement of the fair value of MSRs as set forth in Section IV.G.3 above.  Specifically, Countrywide did not take into account certain key assumptions, servicing portfolio composition data, and portfolio performance trends when assessing the fair value of its MSRs, such as default rate, delinquencies, the types of loans in the servicing portfolio, and the loosening of Countrywide's underwriting standards.

519.  As specialists in the financial services and mortgage banking industries, the Auditor Defendants and individual members of the engagement team were required to know that the fair valuation of MSRs is a high risk area for a company like Countrywide whose net income is so heavily dependant on the quality of its servicing portfolio for servicing fee income.  Since MSRs are not traditionally valued by reference to quoted market prices, the Auditor Defendants were required to assess the Company's process for determining the fair value of MSRs by reviewing the methodology employed, the assumptions used (not just the key assumptions as set forth in the Company's Form 10-K, but all of the necessary assumptions), and the relevance of such methodology to other

companies within the mortgage banking industry, including prime and sub-prime lenders.

520.   GAAS required that the Auditor Defendants understand the accounting practices common to the industry, as well as the influence of general economic and industry specific conditions on the valuation of MSRs.   It was required that the Auditor Defendants understand the inter-relationship among management's assumptions used in the Company's methodology and then assess whether the Company had properly integrated such assumptions into the models used.   Due to the common nature of this valuation process in any mortgage banking company, the Auditor Defendants were required to identify the deficiencies in Countrywide's process.

521.   If the Auditor Defendants had fulfilled their responsibilities under GAAS as identified in Standard of Fieldwork No. 1 (which are basic to any mortgage company audit), the only reasonable professional conclusion they could have drawn would have been that the Company's process for valuing MSRs was flawed to the point that it materially overstated the fair value of its MSRs. Based on the allegations in Section IV.G above,   it is evident that the Auditor Defendants did not obtain a sufficient understanding of Countrywide's business and the industry in which it operated necessary to perform their audits, and therefore recklessly, or in the alternative, negligently, violated GAAS.

522.   Similarly, with respect to Countrywide's allowances for loan losses, inadequate liability for breaches of representations and warranties, and valuation of retained interests, the Auditor Defendants should have properly planned their audits.   Had they done so, the only reasonable professional conclusion they could have drawn would have been that Countrywide had violated GAAP with respect to each of those portions of its financial statements.

## 2. The Auditor Defendants Failed to Consider Countrywide's Lack of Internal Controls

523. The Standard of Fieldwork No. 2 requires that an auditor have a sufficient understanding of the company's internal controls to properly plan the audit, assess audit risk, and to determine the nature, timing and extent of the tests performed. According to AU §319.34 (§319.34) and as illustrated above in Section IV.G.5, "[t]he control environment sets the tone of the organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure."

524. GAAS distinguishes between the responsibilities of an auditor and the company's management in an audit of an entity's financial statements. As illustrated in Section IV.G.5 above, it is management's responsibility for establishing and maintaining internal controls. AU §110.03 (§110.03). However, the independent auditor is responsible for rendering an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting.

525. According to PCAOB Auditing Standards ("AS") No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements*, ¶ 4 (¶2)[27]  "[m]aintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain ***reasonable assurance that no material weaknesses exist*** as of the date specified in management's assessment."

---

[27] On July 25, 2007, the PCAOB approved AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, which was effective for audits of fiscal years ending on or after November 15, 2007. The concepts in AS No. 5 are similar to those in AS No. 2. For ease of reference during the Class Period, the first reference relates to AS No. 2 and the parenthetical reference relates to AS No. 5.

526.  AS No. 2, ¶ 27 (No. 5, ¶7; No. 5, ¶62) describes components of internal controls and explains how an independent auditor should obtain a sufficient understanding of the internal controls for the purpose of assessing the risk of material misstatement and identifying deficiencies in internal control. Paragraph 27 (No. 5, ¶7; No. 5, ¶62) states as follows:

> In an audit of internal control over financial reporting, the auditor must obtain sufficient competent evidence about the design and operating effectiveness of controls over all relevant financial statement assertions related to all significant accounts and disclosures in the financial statements.  ***The auditor must plan and perform the audit to obtain reasonable assurance that deficiencies that, individually or in the aggregate, would represent material weaknesses are identified.***

527.  Also, the AICPA Audit and Accounting ("A&A") Guide for Depository and Lending Institutions provides guidance for independent accountants when testing internal controls.  Chapter 8, ¶ 139 states that:

> Effective internal control over financial reporting . . . should provide reasonable assurance that errors or fraud in management's financial statement assertions about the loan portfolio – ***including those due to the failure to execute lending transactions in accordance with management's written lending policies – are prevented or detected***."

528.  Based upon the foregoing, it was incumbent upon the Auditor Defendants to assess whether Countrywide's loan originations were in compliance with its underwriting guidelines as part of their due diligence, planning, assessment, and testing of internal controls.  It is evident from the allegations above that management's non-compliance with the Company's underwriting standards was one of the major reasons why Countrywide's loan portfolio experienced material losses.

529.   An example of the Auditor Defendants' reckless, or, in the alternative, negligent, violation of Standard of Fieldwork No. 2 and the requirements of AS No. 2 (No. 5) relates to Countrywide's loosening of underwriting standards, which resulted in the deterioration of the Company's internal controls, as set forth in Section IV.G.5 above.  Specifically, Countrywide consistently lowered its underwriting standards through exception processing and management overrides to enable it to originate loans to less creditworthy individuals in increasingly risky loan products.  This breakdown in internal controls resulted in a significant rise in delinquencies and an increased risk profile in the Company's portfolio. It also enabled Countrywide to inappropriately classify sub-prime loans as prime loans, further masking the failing financial health of the Company.

530.   GAAS required the Auditor Defendants to test Countrywide's internal controls in order perform their audits of the Company's financial statements and for KPMG to render its opinions on the effectiveness of the internal controls over financial reporting based on the criteria established in *Internal Control – Integrated Framework*, issued by COSO.  As stated in the AICPA A&A Guide for Depository and Lending Institutions, such tests would include the review of specific loan origination files to determine whether the loans were underwritten to the Company's guidelines.

531.   Given the pervasive nature of the loosening of the Company's underwriting standards, if the Auditor Defendants had performed these tests in accordance with GAAS (which are basic to any mortgage company audit), the only reasonable professional conclusion they could have drawn would have been that Countrywide's internal controls were so ineffective that the financial statements were not fairly presented in accordance with GAAP.  In addition, Grant Thornton and KPMG would have concluded that internal controls over financial reporting were not effective.  Based on the allegations in Section IV.G.5

1  above, it is evident that the Auditor Defendants did not sufficiently test internal

2  controls necessary to perform their audits, and recklessly, or in the alternative,

3  negligently, violated GAAS.

4      **3.      The Auditor Defendants Failed to Obtain
                Sufficient Competent Evidential Matter**

5

6  532.   Standards of Fieldwork Nos. 2 and 3 require that an independent

   auditor obtain, through inspection, observation, inquiries and confirmations,

7  competent, ***sufficient evidential matter to afford a reasonable basis for its

8  opinion***.   AU § 150.02 (§150.02).   The amount of evidence an auditor collects

9  from a company is dependent on the auditor's evaluation of audit risk.   This

10 determines the nature, timing and extent of the auditor's testing.   Mortgage loan

11 originations are the most important component of Countrywide's business.[28]

12

13 533.   As a result of the material weaknesses in Countrywide's internal

   control over financial reporting stemming from its non-compliance with its

14 underwriting policies, Grant Thornton and KPMG were obligated in accordance

15 with GAAS to increase the nature, timing and extent of their testing to obtain

16 reasonable assurance that Countrywide's financial statements were not materially

17 misstated.

18

19 534.   An example of the Auditor Defendants' reckless, or, in the

   alternative negligent, violation of Standards of Fieldwork Nos. 2 and 3 relates to

20 Countrywide's failure to adequately reserve for liabilities that could arise from

21 breaches of its representations and warranties throughout the Class Period, as set

22 forth in Section IV.G.4 above.   Specifically, Countrywide did not take into

23 account the fact that the Company had (a) changed its lending practices beginning

24

---

25 [28] The AICPA A&A Guide for Depository and Lending Institutions states that
   loans are the most important asset of a mortgage lender.   Paragraph 1 of Chapter
26 8 states that "[l]oans are usually the most significant assets of financial
   institutions and generate the largest portion of revenue.   Like investments, an
27 institution's management of its loans is an integral part of its asset/liability
   management strategy."

28

1   in 2003 to offer substantially increasing amounts of non-traditional, high risk
2   loans; (b) increased origination of high risk loans to unqualified borrowers with
3   little to no supporting documentation; (c) continued to originate loans through
4   exception processing and management overrides; (d) increased the likelihood that
5   the Company's loans would default as a result of the actions in (a) through (c)
6   above; and (e) misclassified sub-prime loans as prime loans, thereby not
7   appropriately disclosing the true extent of the Company's exposure to credit
8   related losses.

9       535.  GAAS required the Auditor Defendants to obtain sufficient
10  competent evidential matter in order to provide a reasonable basis for their
11  opinions on the financial statements.  With respect to the liability for breaches of
12  representations and warranties, this would have included obtaining and reviewing
13  trends in repurchase claims, delinquency statistics for loans that have been
14  securitized or sold, and information received from investors regarding repurchase
15  claims.  As specialists in the financial services and mortgage banking industries,
16  the Auditor Defendants and individual members of the engagement team should
17  have known to obtain such information in order to properly fulfill their
18  obligations with respect to Standards of Fieldwork No. 2 and 3.

19      536.  If the Auditor Defendants had performed these tests in accordance
20  with GAAS (which are basic to any mortgage company audit), the only
21  reasonable professional conclusion they could have drawn would have been that
22  Countrywide's reported liability for breaches of representations and warranties
23  was insufficient throughout the Class Period and that the Company had violated
24  GAAP.  Based on the allegations in Section IV.G above, it is evident that the
25  Auditor Defendants did not obtain sufficient competent evidential matter
26  necessary to perform their audits and therefore recklessly, or in the alternative,
27  negligently, violated GAAS.

28

537.   Similarly, with respect to Countrywide's allowances for loan losses, valuation of MSRs, and valuation of retained interests, the Auditor Defendants should have obtained sufficient, competent evidential matter.  Had they done so, the only reasonable professional conclusion they could have drawn would have been that Countrywide had violated GAAP with respect to each of those portions of its financial statements.

#### 4.   The Auditor Defendants Failed to Properly Evaluate Management's Accounting Estimates

538.   GAAS also requires an auditor to evaluate "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole." AU § 342.04 (§342.04).  GAAS acknowledges that the subjective factors present in developing accounting estimates make it difficult for management to establish effective internal controls over that process.  As such, according to AU § 342.04 (§342.04), "when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors." When an auditor evaluates reasonableness of those accounting estimates in accordance with AU § 342.09 (§342.09), the auditor should concentrate on "key factors and assumptions that are -- (a) Significant to the accounting estimate, (b) Sensitive to variations, (c) Deviations from historical patterns,  (d) Subjective and susceptible to misstatement and bias."

539.   Accounting estimates are inherent in the valuation of assets and the determination of reserves that are fundamental to the mortgage banking industry.  Such estimates are generally found in the assumptions underlying the business models used to determine the adequacy of reserves and the projected future health of the loan portfolio.  These estimates typically represent a targeted area of risk for the auditor of a mortgage banking entity.

540. An example of the Auditor Defendants' violation of their responsibilities with respect to auditing management's estimates with respect to the financial statements, taken as a whole, relates to Countrywide's overstatement of the fair value of retained interests as set forth in Section IV.G.2 above. Specifically, Countrywide did not appropriately take into account the effect of its loosening of its underwriting standards as evidenced by the changing composition of its originations, the resultant increase in default risk and current delinquencies, and fluctuations in prepayments of the underlying collateral when assessing the fair value of its retained interests.

541. GAAS required the Auditor Defendants to review the assumptions and estimates which materially affected the reported amounts of assets, liabilities, revenues and expenses in the financial statements. This was especially true for assets such as retained interests, which are usually valued through cash flow models, given that quoted market prices are generally not available. As a common practice in auditing retained interests for clients in the mortgage banking industry, such as Countrywide, the Auditor Defendants were required to identify the assumptions on which the estimates were based, evaluate the reasonableness of such assumptions, and understand the inter-relationship among management's assumptions used in the Company's valuation methodology. The Auditor Defendants were further required to assess whether the Company had properly integrated such assumptions into the models used.

542. If the Auditor Defendants had performed these procedures in accordance with GAAS (procedures which are basic to any mortgage company audit), the only reasonable professional conclusion they could have drawn would have been that the estimates underlying Countrywide's methodology for developing a fair value for its retained interests were deficient, and therefore that the Company violated GAAP. Based on the allegations in Section IV.G above, it is evident that the Auditor Defendants did not audit management's estimates

1 appropriately to perform their audits and therefore recklessly, or in the alternative

2 negligently, violated GAAS.

3         **D.    The Auditor Defendants Recklessly, or in the**
                    **Alternative Negligently, Expressed an Unqualified**

4                     **Opinion on Countrywide's Financial Statements**

5     543.   Standard of Reporting No. 4 requires an auditor to express an

6 opinion on the financial statements of a company taken as a whole, or an assertion

7 to the extent that an opinion cannot be expressed.  AU §150.02 (§150.02).

8     544.   When the Defendant Auditors violated GAAS with respect to the

9 General Standards, the Standards of Fieldwork and the Standards of Reporting

10 No. 1-3 as demonstrated above, they would have also violated the Standard of

11 Reporting No. 4 because they had an insufficient basis for expressing an

12 unqualified opinion on their audits for the years ended 2003, 2004, 2005 and

13 2006.

14     545.   If the Auditor Defendants had evaluated Countrywide's financial

15 statements as a whole as they were required to do, the only reasonable

16 professional conclusion they could have drawn was that the financial statements

17 violated GAAP.   Such a conclusion would have prevented the Auditor

18 Defendants from issuing unqualified opinions as to Countrywide's financial

19 statements.

20     546.   The Auditor Defendants' opinions of the Company's financial

21 statements were critical metrics for investors because they provided assurance

22 that the Company's financial statements could be relied upon and were in

23 compliance with applicable laws.   During the Class Period, as alleged herein,

24 Grant Thornton and KPMG violated GAAS when performing their audits of

25 Countrywide because they did not: properly plan the audit; properly assess the

26 Company's internal controls; identify areas of material weakness; sufficiently

27 understand Countrywide's business or the mortgage industry; exercise due

28 diligence or professional skepticism; examine sufficient competent evidential

matter; or properly assess management's estimates that the Company used in preparing its financial statements. This violation resulted in the overstatement of Countrywide's net income throughout the Class Period.

547. The Auditor Defendants, in reckless disregard of the true nature of their audits, or, in the alternative, negligently, caused their public statements to contain misstatements and omission of material facts. The Auditor Defendants' audits of Countrywide's financial statements for the years ended 2003, 2004, 2005 and 2006 were not performed in accordance with GAAS, and therefore, in fact, the Auditor Defendants knew or were reckless in not knowing, or in the alternative, were negligent in not knowing, that they had no basis for their unqualified opinions.

## VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.  The Company's False Statements Regarding 2003 Results

548. The Class Period begins on March 12, 2004. That day, Countrywide filed its Annual Report for 2003 with the SEC on Form 10-K (the "2003 Form 10-K"). The report was signed by Defendants Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, King, Melone, Russell, Robertson, and Snyder. The Company reported revenues of $8,026,846,000 and diluted earnings per share of $12.47.

549. In a section of the 2003 Form 10-K titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the retained interests on the Company's balance sheet as of December 31, 2003 was $1,355,535,000. The reported recovery of retained interests at year end equaled $27,786,000.

550. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2003 Form 10-K, Countrywide described the representations and warranties

exposure associated with the securitization of its loans as follows: "Management does not believe that any of its off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

551.   In a section of the 2003 Form 10-K titled "Securitization," the Company also stated the liabilities associated with the risk of representation and warranties "total[ed] $90.7 million."

552.   The Company reported in a section of the 2003 Form 10-K titled "Securitizations" that the fair value of its MSRs as of December 31, 2003 was $6,909,167,000.

553.   The Company reported allowance for loan losses of $78,449,000 at the end of 2003, having increased its provision for loan losses by $48,107,000 during the year.  The Company also had net charge-offs of $14,860,000.

554.   The Company also reported consolidated loan production by loan type.  Specifically, prime first mortgage loans equaled $396,934,000,000, prime home equity loans equaled $18,103,000,000, and subprime mortgage loans equaled $19,827,000,000.  Subprime mortgages produced equaled 4.6% of the total dollar amount of loans produced at year end.

555.   The 2003 Form 10-K also reported Mortgage Banking loan production by loan type.  Mortgage Banking prime home equity loans produced equaled $12,268,000,000, and Mortgage Banking subprime loans produced equaled $15,525,000,000 at year end.  Prime home equity loans and subprime loans produced equaled 7.0% of the total Mortgage Banking loans originated at year end.

556.   Furthermore, the Company reported that prime and prime home equity loans held for investment equaled $22.0 billion at year end.

557.   In a section of the 2003 Form 10-K titled "Secondary Mortgage Market," the Company stated that "[w]e ensure our ongoing access to the secondary mortgage market by ***consistently producing quality mortgages*** . . . As described elsewhere in this document, we have a ***major focus on ensuring the quality of our mortgage loan production . . . .***"

558.   In a section of the 2003 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

Mortgage Credit Risk

Overview

In our mortgage lending activities, ***we manage our credit risk by producing high quality loans*** . . . .

\* \* \*

Loan Quality

Our Credit Policy establishes standards for the determination of acceptable credit risks.  Those standards encompass borrower and collateral quality, underwriting guidelines, and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay.  We assess credit and capacity to pay through . . . manual or automated underwriting of additional credit characteristics.

\* \* \*

***Our loan origination standards and procedures are designed to produce high quality loans.***  These standards and procedures encompass underwriter qualifications and authority levels, appraisal

1  review requirements, fraud prevention, funds disbursement controls,
2  training of our employees and on-going review of their work . . . .  In
3  addition, we employ proprietary underwriting systems in our loan
4  origination process that improve the consistency of underwriting
5  standards, assess collateral adequacy, and help to prevent fraud, while
6  at the same time increasing productivity.

7

8  In addition to our pre-funding controls and procedures, we employ an
9  extensive post funding quality control process.  Our quality control
10  department, under the direction of the Chief Credit Officer, is
11  responsible for completing comprehensive loan audits that consist of a
12  re-verification of loan documentation, an in depth underwriting and
13  appraisal review, and if necessary, a fraud investigation.

14  559.  Defendant Grant Thornton included its unqualified audit opinion in
15  the 2003 Form 10-K, stating:

16  We conducted our audits in accordance with auditing standards
17  generally accepted in the United States of America . . . In our opinion,
18  the financial statements referred to above present fairly, in all material
19  respects, the consolidated financial position of Countrywide Financial
20  Corporation and Subsidiaries as of December 31, 2003 . . . and the
21  consolidated results of their operations and their consolidated cash
22  flows for the years ended December 31, 2003 . . . in conformity with
23  accounting principles generally accepted in the United States of
24  America. . . .

25  560.  Further assuring investors of the veracity of the information
26  contained in the 2003 Form 10-K, the report included SOX certifications signed
27  by Defendants Mozilo and McLaughlin, representing that the "report does not
28  contain any untrue statement of a material fact" and "the financial statements, and

1   other financial information included in this report, fairly present in all material

2   respects the financial condition" of Countrywide and that the Company employed

3   internal disclosure controls and procedures that detect "[a]ll significant

4   deficiencies and material weaknesses in the design or operation of internal control

5   over financial reporting" and "[a]ny fraud, whether or not material, that involves

6   management."

7       561.   During the Class Period, Defendants Mozilo, McLaughlin and

8   Sieracki signed multiple SOX certifications annexed to Countrywide's Form

9   10-Ks and Form 10-Qs filed with the SEC during the Class Period and attesting to

10   the accuracy of Countrywide's financial statements and the adequacy of the

11   Company's internal controls.   These SOX certifications were substantially

12   identical.  Representative SOX certifications signed by these Defendants and filed

13   during the Class Period are annexed hereto collectively as Exhibit E.

14       562.   The statements referenced above in the 2003 Form 10-K were

15   materially false and misleading when made.  As set forth in greater detail above,

16   the Company's reported values for revenue and diluted earnings per share were

17   false and misleading because the Company's allowance for loan losses and

18   accruals for representations and warranties were understated, and its assessments

19   of fair values for retained interests and MSRs were overstated.  See Section IV.G

20   above.   Statements related to loan loss reserves, retained interests, MSRs and

21   liabilities related to representations and warranties were false and misleading for

22   the same reasons set forth in Section IV.G above.  Furthermore, management's

23   statements relating to the volume of loans produced, the amount of revenues from

24   the sale of prime loans, and the value of prime loans held for investment were

25   false and misleading because Countrywide misclassified subprime loans as prime

26   loans.   See IV.D.   Countrywide's statements that it "consistently produce[d]

27   quality mortgages" and that its "loan origination standards and procedures are

28   designed to produce high quality loans" were false and misleading because

1    Countrywide loosened its underwriting guidelines over the Class Period to

2    increase loan volume without regard to loan quality, and also for the reasons set

3    forth in Section IV.C above.  Defendant Grant Thornton's 2003 unqualified audit

4    opinion report was false and misleading for the same reasons stated in Section VI

5    above.   Moreover, the SOX certifications signed by Defendants Mozilo and

6    McLaughlin were false and misleading because the financial statements issued

7    during the Class Period were materially misstated and violated GAAP.   See

8    Section IV.G.

9        563.   Analysts reacted positively to the materially false and misleading

10   statements made in the 2003 Form 10-K.  For example, on March 26, 2004,

11   Lehman Brothers issued a report in which it reiterated an overweight rating for

12   Countrywide.  "Despite the unlikel[i]hood of any net MSR recovery during the

13   quarter, we expect CFC to earn MORE, which again demonstrates the resiliency

14   of its business model.  We reiterate our 1-Overweight rating."

15       564.   On March 26, 2004, Piper Jaffray reiterated its "[o]utperform rating

16   and [stated that they] are raising . . . [the] target price to $135 from $134. . . . We

17   believe CFC is fundamentally well positioned to deliver double-digit long-term

18   earnings growth."

19       **B.     The Company's False Statements Regarding 2004 Results**

20           **1.     First Quarter 2004 Form 8-K**

21       565.   On April 21, 2004, Countrywide filed a Form 8-K, signed by

22   Defendant Kurland, attaching a press release that announced the Company's

23   financial results for the first quarter of 2004.  In the press release, Defendant

24   Mozilo touted the Company's "outstanding operational and financial results" and

25   risk management in an environment made more difficult by rising interest rates.

26       566.   In the April 21, 2004 press release, Countrywide reported gain-on-

27   sale of loans and securities in the amount of $1,358,667,000 for the quarter.

28

567.    Defendant Mozilo's statement in the April 21, 2004 press release that Countrywide had "outstanding operational and financial results" for the first quarter of 2004 was materially false and misleading when made because Countrywide's net income was overstated during the Class Period.  See Section IV.G.  Moreover, the Company's reported gain-on-sale of loans and securities was false and misleading because the Company overstated the fair value of its retained interests and MSRs, and also for the same reasons set forth in Sections IV.G.2 and IV.G.3 above.

## 2.    First Quarter 2004 Conference Call

568.    On a conference call held later that day to discuss the Company's first quarter 2004 financial results (the "April 21, 2004 Conference Call"), an analyst from Basswood Partners asked Defendant Mozilo if he could explain the functionalities of an adjustable rate mortgage ("ARM").  Mozilo responded that an ARM product "*is a great product, a prime product for the bank*, as long as it fits within the regulatory bounds that are set for the bank."

569.    On the same conference call, Defendant Mozilo addressed an analyst's concern about the Company's subprime loans by representing that the Company understood the subprime business better than its competitors:

I think using what our competitors do as a barometer will put you down the wrong path.  *We are a very different focused company that understands this [subprime] product very well, how to originate it, how to manage it, how to underwrite, how to service it.  And so we look at -- the short answer to your question is -- we look at this subprime business as a -- one that has to be carefully manage[d] . . . .*

570.    On the April 21, 2004 Conference Call, Mozilo also responded to an analyst's question regarding the potential risks from originating non-traditional, riskier loans, such as subprime loans.  Mozilo stated that Countrywide had taken a

1  more disciplined approach than its competitors, it was not involved in the "frothy

2  business" that others engaged in, and was properly monitoring subprime risks:

3  There is very, very good solid sub-prime business and there is this

4  frothy business that you relate to.  And you have to -- when you're

5  doing your analysis, what is the average FICO score of these.

6  Because you can get so deep into this marginal credit that you can

7  have serious problems where you are taking 400 FICOs with no

8  documentation; that is dangerous st[u]ff.  ***So [I] think it is very***

9  ***important that you understand the disciplines that the Company***

10  ***had, particularly that Countrywide has, which are very strong***

11  ***disciplines in the origination of sub-prime loans.  And maintaining***

12  ***that discipline is critically important to us. . . . [W]hen you look at***

13  ***sub-prime, you have to look at it in various tranches, and we are at***

14  ***the high end of that tranche.***

15  571.  Later on the same call, an analyst asked if subprime mortgages

16  would ever be held for investment on Countrywide's books.  Defendant Kurland

17  responded that Countrywide did not plan to ever hold subprime mortgages as an

18  investment on its books.  Specifically, Kurland stated that: "***[w]e don't intend to***

19  ***maintain as an investment sub-prime mortgages on our balance sheet. . . .***

20  [T]here is no intention at all to ha[ve] a permanent investment in a pool of sub-

21  prime loans."

22  572.  The statements made by Defendants Mozilo and Kurland on the

23  April 21, 2004 Conference Call were materially false and misleading when made.

24  Specifically, Defendant Mozilo's statement that ARM loans were "prime

25  product[s]" was false and misleading for the same reasons set forth in Section

26  IV.B above.  Furthermore, Mozilo's statements "that the Company had . . . very

27  strong disciplines in the origination of sub-prime loans"; "we are a very different

28  company that understands this [subprime] product"; and Countrywide's subprime

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                                    197
MASTER FILE NO. CV 07-05295 MRP (MANX)

originations were "at the high end" of the subprime tranche; were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality.  See Section IV.C.  Further, Mozilo knew that the Company's underwriting policies treated as prime many loans that should have been classified as subprime, by mortgage industry standards.  See Section IV.D.  Moreover, Defendant Kurland's statement that "[w]e don't intend to maintain as an investment subprime mortgages on our balance sheet" was misleading because Countrywide assumed subprime risk both on and off its balance sheet since a large part of its asset residuals were derived from subprime loans.  Countrywide also maintained off-balance sheet subprime risk through its representations and warranties of subprime loans.  See Section IV.B.

573.  Several analysts raised their recommendations and earnings estimates for Countrywide as a result of these misrepresentations:

- Raymond James reported on April 22, 2004 that, "[w]e continue to rate the shares Strong Buy based on their modest valuation. . . ."

- Piper Jaffray reported on April 22, 2004 that, "[w]e reiterate our Outperform rating and are raising our price target to $96 from $90."  In addition, analysts describe Countrywide as a company that produces "loans [that] are primarily prime credit quality first-lien mortgage loans secured by single-family residences."

### 3.    First Quarter 2004 Form 10-Q

574.  On May 7, 2004, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2004, ended March 31, 2004, signed by Defendants Kurland and McLaughlin.  The Company reported revenue for the quarter of $2,214,903,000 and diluted earnings per share of $2.22.

575.   In the first quarter 2004 Form 10-Q, the Company stated that its impairment of the fair value of its retained interests equaled $93,415,000.

576.   In the "Off-Balance Sheet Arrangements and Guarantees" section of its first quarter 2004 Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[m]anagement does not believe that any of its off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

577.   In a section of the Form 10-Q titled "Mortgage Servicing Rights," the Company reported that the fair value of its MSRs for the first quarter of 2004 was $6,406,491,000.

578.   The Company reported allowance for loan losses of $93,054,000 at the end of the first quarter of 2004.

579.   In the first quarter 2004 Form 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced). Specifically, Mortgage Banking prime home equity loans produced during the quarter equaled $3,729,000,000.   Mortgage Banking subprime loans produced during the quarter equaled $6,048,000,000, and was 8.9% of total Mortgage Banking loan production for the quarter.

580.   In the Form 10-Q, Defendants Kurland and McLaughlin described the Company's management of credit risk in the following terms: "[w]e manage mortgage credit risk principally by . . . ***only retaining high credit quality mortgages in our loan portfolio.***"

581.   Also, in the section entitled "Controls and Procedures," Countrywide described the adequacy of its internal controls: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2004

1    that has materially affected, or is reasonably likely to materially affect, our

2    internal control over financial reporting."

3        582.  Further assuring investors of the veracity of the information

4    contained in the Form 10-Q, the report included SOX certifications signed by

5    Defendants Mozilo and McLaughlin, representing that the "report does not

6    contain any untrue statement of a material fact" and "the financial statements, and

7    other financial information included in this report, fairly present in all material

8    respects the financial condition" of Countrywide.

9        583.  The statements referenced above in Countrywide's first quarter 2004

10   Form 10-Q were materially false and misleading when made.  As set forth in

11   greater detail above, the Company's reported values for its revenue and diluted

12   earning per share were false because the Company's allowance for loan losses

13   and accruals for representations and warranties were understated, and its

14   assessments of fair values for retained interests and MSRs were overstated.  See

15   Section IV.G above.  Statements related to loan loss reserves, retained interests,

16   MSRs and liabilities related to representations and warranties were false and

17   misleading for the same reasons set forth in Section IV.G above.   Also,

18   management's statements regarding the quality and volume of prime home equity

19   and subprime loans originated during the quarter were false and misleading

20   because Countrywide misclassified subprime loans as prime loans.  See Section

21   IV.D above.  Moreover, management's representation that Countrywide "only

22   retain[ed] high credit quality mortgages in our loan portfolio" was false because

23   Countrywide loosened its underwriting guidelines to increase loan volume

24   without regard to loan quality.  See Sections IV.B and IV.C.  Defendants Kurland

25   and McLaughlin's statements relating to internal controls were false and

26   misleading for the same reasons set forth in Section IV.G.5.  Moreover, the SOX

27   certifications signed by Defendants Mozilo and McLaughlin were false and

28

1   misleading because the financial statements issued during the Class Period were

2   materially misstated and violated GAAP.  See Section IV.G above.

3   **4.   Second Quarter 2004 Form 8-K**

4   584.   On July 26, 2004, Countrywide filed a Form 8-K signed by

5   Defendants Kurland, attaching a press release that announced the Company's

6   financial results for the second quarter of 2004.  In the press release, Defendants

7   Mozilo noted that these results were achieved in a tough environment and that

8   Countrywide's impressive performance demonstrated its ability to "prudently

9   manage risk."

10   585.   In this Form 8-K, Countrywide reported gain-on-sale of loans and

11   securities in the amount of $1,277,331,000 for the quarter.

12   586.   The statements made by Defendants Mozilo and Kurland in the July

13   22, 2004 press release were false and misleading.  Defendant Mozilo's statements

14   regarding management's ability to "prudently manage risk" were false and

15   misleading for the same reasons set forth in Sections IV.B and IV.C.  Moreover,

16   the Company's reported value for gain-on-sale of loans and securities was false

17   and misleading because the Company overstated the fair value of its retained

18   interests and MSRs.  See Sections IV.G.2 and IV.G.3.

19   **5.   Second Quarter 2004 Conference Call**

20   587.   On a conference call held later that day to discuss the Company's

21   second quarter 2004 results (the "July 22, 2004 Conference Call"), Defendant

22   Mozilo answered a question from an analyst at Lehman Brothers regarding

23   Countrywide's provision for loan loss reserves.  Mozilo responded with certainty

24   that the Company's reserves were adequate based upon its high credit quality

25   loans:

26   First of all in terms of loan losses, loan losses were far below what

27   you would expect to experience in a--this type of a bank . . .[however]

28   ***we have focused on FICOs well above the 700.  The average in the***

1      *portfolio is around 740. . . . [T]he quality of that portfolio and the*

2      *type of loans that are in there*, which are mortgage loans, assets that

3      we understand very well and know how to service, that--*that we can*

4      *expect the performance that we're seeing today to continue at a very*

5      *high level.*

6      588.   On the July 22, 2004 Conference Call, Defendant Mozilo discussed

7 the type of controls that Countrywide had in place at its bank and described them

8 as "very significant" and "extraordinary compliance and controls in place:"

9      There's *very significant controls in place . . .* this is a very deep area

10     of the [Fed's] concern as it is ours, so we *have extraordinary*

11     *compliance and controls in place there.*

12    589.   Defendant Mozilo's statements made during the July 22, 2004

13 Conference Call were materially false and misleading when made.  Specifically,

14 Mozilo's statement that the company's loan loss reserves were adequate because

15 the Company's portfolio purportedly contained high credit quality loans was false

16 and misleading because Defendants failed to account for the increased risk of its

17 mortgage loans.   See Sections IV.G.1 and IV.B.2.   Additionally, Mozilo's

18 statements touting Countrywide's very significant and extraordinary compliance

19 and internal controls were false and misleading because Countrywide

20 substantially deviated from its underwriting guidelines.  See Section IV.G.5.

21    590.   These materially false and misleading statements by Countrywide

22 and the Officer Defendants prompted positive reactions from analysts:

23        &bull;  Raymond James reported on July 23, 2004 that "[w]e

24          continue to rate the shares Strong Buy based on their modest

25          valuation. . . ."

26        &bull;  Piper Jaffray reported on July 23, 2004 that "we continue to

27          recommend that investors purchase shares of Countrywide,

28

1     which we view as the strongest player in the country's

2     largest consumer market."

3          **6.     Second Quarter 2004 Form 10-Q**

4     591.   On August 6, 2004, Countrywide filed its quarterly report on Form

5  10-Q for the second quarter of 2004, ended June 30, 2004, signed by Defendants

6  Kurland and McLaughlin.   The Company reported revenues for the quarter of

7  $2,333,104,000 and diluted earnings per share of $2.24.

8     592.   The Company stated in the Form 10-Q that the impairment of the fair

9  value of its retained interests equaled $178,424,000.

10     593.   In the "Off-Balance Sheet Arrangements and Guarantees" section of

11  the second quarter 2004 Form 10-Q, Countrywide described the representations

12  and warranties exposure associated with the securitization of its loans as follows:

13  "Management does not believe that any of its off-balance sheet arrangements

14  have had or are reasonably likely to have a current or future material effect on our

15  financial condition, changes in financial condition, revenues or expenses, results

16  of operations, liquidity, capital expenditures or capital resources."

17     594.   In a section titled "Mortgage Servicing Rights," the Company

18  reported that the estimated fair value of the MSRs as of June 30, 2004 was

19  $9,200,000,000.

20     595.   The Company reported allowance for loan losses of $105,839,000 as

21  of the end of the second quarter of 2004.   Net charge-offs equaled $13,138,000.

22     596.   In the second quarter 2004 Form 10-Q, the Company reported the

23  volume of Mortgage Banking prime home equity and subprime loans produced

24  (which was included in Countrywide's total volume of loans produced).

25  Specifically, Mortgage Banking prime home equity loans originated during the

26  quarter equaled $5,239,000,000.   Mortgage Banking subprime loans originated

27  during the quarter equaled $8,132,000,000, and was 9.2% of total Mortgage

28  Banking loan production.

597.   Countrywide reported consolidated prime mortgage loans, prime home equity loans and subprime loans held for investment in the amount of $14,015,330,000, $14,818,056,000, and $137,679,000, respectively.   Subprime mortgages equaled less than 1% of total mortgage loans held for investment.

598.   In the Form 10-Q, the Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk . . . ***by only retaining high credit quality mortgages in our loan portfolio.***"

599.   The Company concluded that there was no change in its internal controls that would affect its financial reporting: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

600.   Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and McLaughlin, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

601.   The statements referenced above in Countrywide's second quarter 2004 Form 10-Q were materially false and misleading when made.   As set forth in greater detail, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated.   See Section IV.G above.   Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.   Also, the statements in the Form 10-Q regarding the volume of prime home equity and subprime loans

1   originated during the quarter and the quality of loans held for investment were

2   false and misleading because Countrywide misclassified subprime loans as prime

3   loans, and also for the reasons set forth in Section IV.D above.  Moreover, the

4   representation that Countrywide "only retain[ed] high credit quality mortgages in

5   our loan portfolio" was false because Countrywide loosened its underwriting

6   guidelines to increase the volume of loans produced without regard to loan

7   quality.  See Sections IV.B and IV.C above.  The statements in the Form 10-Q

8   relating to internal controls were false and misleading for the same reasons set

9   forth in Section IV.G.5.  Moreover, the SOX certifications signed by Defendants

10  Mozilo and McLaughlin were false and misleading for the same reasons stated in

11  Section IV.G above.

### 7.   Third Quarter 2004 Form 8-K

12

13  602.  On October 20, 2004, Countrywide filed a Form 8-K, signed by

14  Laura Milleman, Managing Director and Chief Accounting Officer, which

15  attached a press release that announced the Company's financial results for the

16  third quarter of 2004, ended September 30, 2004.  In the press release, Defendant

17  Mozilo again highlighted Countrywide's ability to deliver strong results in a

18  tough environment in which interest rates rose by 50 basis points:

19       Countrywide's financial results for the quarter -- highlighted by

20       diluted earnings per share of $0.94 -- once again **demonstrate the**

21       **strength and resilience of our business model.**

22  603.  In the Form 8-K, Countrywide reported gain-on-sale of loans and

23  securities in the amount of $1,188,812,000 for the quarter.

24  604.  These statements contained in the October 20, 2004 Form 8-K and

25  press release were materially false and misleading when made.  Specifically,

26  Defendant Mozilo's statement that the third quarter financial results "demonstrate

27  the strength and resilience of our business model" was false and misleading

28  because Countrywide loosened its underwriting policies and substantially

1   increased its exception processing.  See Sections IV.C and IV.G.  The Company's

2   reported gain-on-sale of $1,188,812,000 was false and misleading because the

3   Company overstated its assessment of fair value for its retained interests and

4   MSRs, and also for the same reasons set forth in Sections IV.G.2 and IV.G.3

5   above.

6   **8.    Third Quarter 2004 Conference Call**

7   605.  On a conference call held later that same day to discuss the third

8   quarter financial results ("October 20, 2004 Conference Call") in which

9   Defendants Mozilo and Kurland participated, the Company's senior management

10  discussed the third quarter 2004 financial results and fourth quarter 2004 financial

11  outlook.   Mozilo touted the high quality loans held in Countrywide's Bank

12  portfolio: "The bank *continues to focus on portfolio quality as the average*

13  *FICO is now . . . 732 and the weighted average LTV stands at 80%.*"

14  606.  On the conference call, Jaime Weiss, an analyst with the Bank of

15  Montreal, asked Mozilo to comment on "insider tradings" of Countrywide's

16  stock.  Mozilo responded that all of his sales were performed in conformity with a

17  10b5-1 trading plan:

18      My decision has been that *since I'm 65-years-old to exercise and*

19      *[sell] on a schedule, irrespective of the market, stock up or down [in*

20      *accordance with a 10b5-1 plan].*  So, I would attach no meaning to it

21      whatsoever, those in the past that attached a meaning to it, is a big

22      loser. . . . The sell by myself, I think I can speak for Stan, is one of a

23      personal nature and has nothing to do with the Company.

24  607.  Defendant Mozilo's statements on the October 20, 2004 Conference

25  Call were materially false and misleading when made.  Specifically, his statement

26  regarding the Company's purported high credit quality loans with an average

27  "FICO [of] . . . 732, and . . . [a] weighted average of LTV . . . at 80%" was false

28  and misleading for the same reasons set forth in Sections IV.B and IV.C.

1   Mozilo's statement that he traded his shares of Countrywide stock "irrespective of
2   the market, stock up or down" was false and misleading for the same reasons set
3   forth in Section V.D discussing his insider sales of Countrywide stock.

4       608.   Analysts, nonetheless, reacted positively to Defendant Mozilo's
5   materially false and misleading statements above.  For example, on October 21,
6   2004, Credit Suisse First Boston issued a report that reiterated its "Outperform"
7   rating.  ABN AMRO analysts reiterated on October 21, 2004 their "Overweight"
8   rating with good credit quality.  In fact, the analysts rated CFC, SLM Corp. and
9   CIT Group Inc. an "A" for credit quality, with Countrywide ranking first.
10  Moreover, ABN AMRO pointed out that Countrywide originated more loans
11  during the quarter than any of the top three mortgage originators.  Specifically,
12  Countrywide's mortgage production volume was $92 billion, Wells Fargo Home
13  Mortgage was $68 billion, and Washington Mutual was $61 billion for the
14  quarter.

15      609.   Further, several other analysts either raised or maintained their stellar
16  recommendations and earnings estimates for Countrywide as a result of
17  Defendants' false and misleading misrepresentations:

18          •   Prudential Equity Group LLC maintained an "Overweight"
19              rating for Countrywide's stock.
20          •   Dresdner Kleinwort Wasserstein Research reported on
21              October 21, 2004 that "Countrywide display[ed] solid credit
22              and interest rate risk management due to its business model.
23              This is largely illustrated in the low credit-risk and high
24              liquidity of its loan production."
25          •   Raymond James issued a report on October 21, 2004 that
26              "[w]e are increasing our 2005 estimate, though, to $4.00.
27              We believe the downside in the stock Wednesday was

28

understandable but overdone, and we rate shares Strong
Buy."

### 9.   Third Quarter 2004 Form 10-Q

610.   On November 8, 2004, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2004, ended September 30, 2004, signed by Defendants Kurland and McLaughlin.   The Company reported revenues of $2,245,607,000 and diluted earnings per share of $0.94 for the quarter.

611.   The Company reported in the Form 10-Q that the recovery of the fair value of its retained interests equaled $162,000.

612.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described its representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

613.   In a section of the Form 10-Q titled "Mortgage Servicing Rights," the Company reported that the fair value of the MSRs as of September 30, 2004 was $8,200,000,000.

614.   The Company reported allowance for loan losses of $107,765,000 as of the end of the quarter, having increased its provision for loan losses by $48,888,000 and taken net charge-offs of $19,572,000 during the quarter.

615.   In the Form 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the quarter purportedly equaled $6,421,000,000.   Mortgage Banking subprime loans produced during the quarter

1   equaled $9,591,000,000, and was 12.45% of total Mortgage Banking loans

2   originated during the quarter.

3       616.   Further, Countrywide's portfolio of mortgage loans held for

4   investment as of September 30, 2004 consisted of prime mortgages, prime home

5   equity loans and subprime loans, and were reported in the Form 10-Q to amount

6   to $18,821,053,000, $11,113,845,000 and $124,768,000, respectively.   Subprime

7   mortgage loans equaled less than 1% of total mortgage loans held for investment.

8       617.   The Company described its management of credit risk in the

9   following terms: "[w]e manage mortgage credit risk principally . . . by ***only***

10  ***retaining high credit quality mortgages in our loan portfolio***."

11      618.   The Company also reported in its third quarter 2004 Form 10-Q that

12  management's review of the Company's disclosure controls and internal controls

13  was "effective:" "There has been no change in our internal control over financial

14  reporting during the quarter ended September 30, 2004 that has materially

15  affected, or is reasonably likely to materially affect, our internal control over

16  financial reporting."

17      619.   Further assuring investors of the veracity of the information

18  contained in the Form 10-Q, the report included SOX certifications signed by

19  Defendants Mozilo and McLaughlin, representing that the "report does not

20  contain any untrue statement of a material fact" and "the financial statements, and

21  other financial information included in this report, fairly present in all material

22  respects the financial condition" of Countrywide.

23      620.   The statements contained in the third quarter 2004 Form 10-Q above

24  were materially false and misleading when made.   As set forth in greater detail

25  above, the Company's reported values for its revenue and diluted earnings per

26  share were false because the Company's allowance for loan losses and accruals

27  for representations and warranties were understated, and its assessments of fair

28  values for retained interests and MSRs were overstated.   See Section IV.G above.

1    Statements related to loan loss reserves, retained interests, MSRs and liabilities

2    related to representations and warranties were false and misleading for the same

3    reasons set forth in Section IV.G above.   Also, the statements regarding the

4    quality and volume of prime home equity and subprime loans originated during

5    the quarter and the quality of loans held for investment were false because the

6    Company misclassified subprime loans as prime loans, and also for the reasons

7    set forth in Section IV.D above.   Moreover, the representation that Countrywide

8    "only retain[ed] high credit quality mortgages in our loan portfolio" was false

9    because Countrywide loosened its underwriting guidelines to increase loan

10   volume without regard to loan quality.   See Section IV.C above.   The statements

11   relating to internal controls were false and misleading for the same reasons set

12   forth in Section IV.G.5.   Moreover, the SOX certifications signed by Defendants

13   Mozilo and McLaughlin were false and misleading for the same reasons stated in

14   Section IV.G above.

15             **10.    Year End 2004 Form 8-K**

16        621.   On February 2, 2005, Countrywide filed a Form 8-K, signed by

17   Laura Milleman, attaching a press release announcing the Company's financial

18   results for the fourth quarter and year ended December 31, 2004.   In the press

19   release, Defendant Mozilo characterized the 2004 results as "strong" and "the

20   second best in our 35-year history," noting that the Company had regained its top

21   spot for loan origination in the United States and that the year was outstanding.

22        622.   Moreover, in the February 2, 2005 press release, Countrywide

23   reported gain-on-sale of loans and securities in the amount of $1,243,964,000 for

24   the fourth quarter of 2004.

25        623.   Defendants Countrywide's and Mozilo's statements contained in the

26   February 2, 2005 press release were false and misleading.   Mozilo's statements

27   that the fourth quarter's financial results were "strong" and the "financial results

28   were the second best in our 35-year history" were false and misleading for the

1  same reasons set forth in Sections IV.C and IV.G.  The Company's reported gain-
2  on-sale was false and misleading because the Company fraudulently overstated its
3  retained interests and MSRs, and also for the same reasons set forth in Sections
4  IV.G.2 and IV.G.3 above.

5           **11.    Year End 2004 Conference Call**

6           624.   On the conference call held the same day (the "February 2, 2005
7  Conference Call"), in which Defendants Mozilo, Kurland and McLaughlin
8  participated, the Company's senior management discussed the fourth quarter and
9  year end 2004 financial results and first quarter 2005 outlook.  Defendant Kurland
10 responded to a question from a Piper Jaffray analyst by emphasizing that
11 Countrywide's strategy had not changed to take on more risk:

12          Stan Kurland:  ***Our strategy is pretty much the same*** as we have been
13          operating it for. . . .

14

15          Bob Napoli - Piper Jaffray – Analyst:  The answer is no.  There has
16          been no real change to take more risk[?]

17

18          Stan Kurland - Countrywide Financial Corporation – President and
19          Chief Operating Officer:  ***No, no, no.***

20          625.   On the same conference call, Defendant McLaughlin responded to a
21 question from a Sanford Bernstein analyst and broke out the "volume of subprime
22 loans actually sold" in comparison to the volume of mortgages sold.  McLaughlin
23 stated, "[i]n terms of the volume of sales in the fourth quarter, there was 67
24 billion in prime mortgages sold, roughly 9.4 billion of subprime mortgages sold,
25 and between HELOC and fixed rates, looks like about 7.1 billion was sold."

26          626.   Defendants Kurland's and McLaughlin's statements on the February
27 2, 2005 Conference Call were materially false and misleading when made.
28 Defendants Kurland's statement that there was no change to Countrywide's

1   strategy to take on more risk was false and misleading because Countrywide

2   loosened its underwriting guidelines to increase loan volume without regard to

3   loan quality.  See Sections IV.B and IV.C.  Defendant McLaughlin's statement

4   that there "was 67 billion in prime mortgages sold" was false and misleading

5   because Countrywide misclassified its subprime loans as prime loans, and also for

6   the same reasons set forth in Section IV.D.

7       627.  Analysts reacted positively to these materially false and misleading

8   statements.  For example, on February 2, 2005, Piper Jaffray analysts issued a

9   report that reiterated its "Outperform" rating and top pick for 2005 in mortgage

10  finance.  An analyst stated:

11          [Even though] CFC's stock declined 5.5% following its 4Q04

12          earnings miss, which was caused by an unexpected net hedging

13          loss. . . .  [W]e believe CFC's . . . management **uses consistent low**

14          **risk strategies.**  We feel the fundamental strength to the quarter was

15          very strong as CFC exceeded our expectations on production income,

16          bank income and capital markets, and the company continued to gain

17          market share.

18      628.  Further, several other analysts either raised or maintained their stellar

19  recommendations and earnings estimates for Countrywide as a result of

20  Defendants' fraudulent misrepresentations:

21          •   Morgan Stanley reported on February 2, 2005 that they

22              "[r]emain Overweight [on Countrywide] with a new price

23              target of $44[.]"

24          •   Bernstein Research reported on February 3, 2005 that,

25              "[w]hile reported EPS were far below expectations, the

26              shortfall was due to volatility of its servicing hedge, **rather**

27              **than any serious operating weakness**, such as weakness in

28

loan pricing, or a swollen G&A ratio . . . "We rate CFC outperform."

- Merrill Lynch reported on February 3, 2005 that "[w]e remain comfortable with CFC's credit profile . . . and reiterate our Overweight investment recommendation and mid-A credit assessment."

### 12.    2004 Form 10-K

629.   On March 15, 2005, Countrywide filed its Annual Report for 2004 with the SEC on Form 10-K (the "2004 Form 10-K").  The report was signed by Defendants Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Russell, Robertson and Snyder.  In it, the Company reported revenues for 2004 of $8,566,627,000 and diluted earnings per share of $3.63.

630.   The Company reported in its 2004 Form 10-K, in a section entitled "Valuation of MSRs and Other Retained Interests," that the fair value of the retained interests on the Company's balance sheet as of December 31, 2004 was $1,908,504,000.  In addition, the reported impairment of retained interests as of year end 2004 equaled $368,295,000.

631.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

632.   In a section of the 2004 Form 10-K titled "Securitization," the Company also stated the liabilities associated with the risk of representations and warranties "total[ed] $139.9 million."

633.   In a section titled "Securitizations," the Company reported that the fair value of its MSRs as of December 31, 2004 was $8,882,917,000, in comparison to December 31, 2003, when fair value of MSRs was reported as $6,909,167,000.

634.   The Company reported allowance for loan losses of $125,046,000 as of the end of 2004, having increased its provision for loan losses by $71,775,000 during the year.  The Company also claimed net charge-offs of $25,178,000.

635.   The Company also reported in its 2004 Form 10-K the volume of loans it originated at year end: prime mortgage loans equaled $292,672,000,000, prime home equity loans equaled $30,893,000,000, and nonprime mortgage loans equaled $39,441,000,000.

636.   In the 2004 Form 10-K, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced during the year (which was included in Countrywide's total volume of Mortgage Banking Loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the year equaled $23,351,000,000.   Mortgage Banking nonprime mortgage loans originated during the year equaled $33,481,000,000, and was 10.5% of total Mortgage Banking loans originated for the year end.

637.   Countrywide also reported that prime mortgage loans held for investment equaled $22,587,246,000, prime home equity loans held for investment equaled $11,435,792,000, and nonprime loans held for investment equaled $171,592,000, or less than 1% of the total value of prime loans held for investment.

638.   The 2004 Form 10-K stated that "[t]he majority of our loan production consists of Prime Mortgage Loans."   Specifically, the Company highlighted the quality mortgages that it securitizes and sells to the secondary market:

1    We ensure our ongoing access to the secondary mortgage market by
2    ***consistently producing quality mortgages*** . . . .   As described
3    elsewhere in this document, ***we have a major focus on ensuring the***
4    ***quality of our mortgage loan production*** . . . .

5    639.   In a section of the Form 10-K titled "Mortgage Credit Risk," the
6    Company described its Credit Policy, portraying it as a tightly controlled and
7    supervised process "designed to produce high quality loans" through a rigorous
8    pre-loan screening procedure and post-loan auditing and appraisal and
9    underwriting reviews:

10   Loan Quality

11   Our Credit Policy establishes standards for the determination of
12   acceptable credit risks.   Those standards encompass borrower and
13   collateral quality, underwriting guidelines and loan origination
14   standards and procedures.

15

16   Borrower quality includes consideration of the borrower's credit and
17   capacity to pay.   We assess credit and capacity to pay through . . .
18   manual or automated underwriting of additional credit characteristics.

19                                    * * *

20   ***Our loan origination standards and procedures are designed to***
21   ***produce high quality loans.***   These standards and procedures
22   encompass underwriter qualifications and authority levels, appraisal
23   review requirements, fraud prevention, funds disbursement controls,
24   training of our employees and ongoing review of their work. . . . In
25   addition, we employ proprietary underwriting systems in our loan
26   origination process that improve the consistency of underwriting
27   standards, assess collateral adequacy and help to prevent fraud, while
28   at the same time increasing productivity.

1

2    In addition to our pre-funding controls and procedures, we employ an

3    extensive post-funding quality control process.  Our Quality Control

4    Department, under the direction of the Chief Credit Officer, is

5    responsible for completing comprehensive loan audits that consist of a

6    re-verification of loan documentation, an in-depth underwriting and

7    appraisal review, and if necessary, a fraud investigation.

8    640.   KPMG issued an audit report on management's assessment of the

9    Company's internal control over financial reporting, in accordance with the

10   standards of the Public Company Accounting Oversight Board.  In a report dated

11   March 11, 2005, KPMG stated:

12   . . . [T]he consolidated financial statements referred to above present

13   fairly, in all material respects, the financial position of Countrywide

14   Financial Corporation and subsidiaries as of December 31, 2004, and

15   the results of their operations and their cash flows for the year ended

16   December 31, 2004, in conformity with U.S. generally accepted

17   accounting principles.   Also in our opinion, the related financial

18   statement schedules, when considered in relation to the basic

19   consolidated financial statements taken as a whole, present fairly, in

20   all material respects, the information set forth therein.

21   641.   Further assuring investors of the veracity of the information

22   contained in the Form 10-K, the report included SOX certifications signed by

23   Defendants Mozilo and McLaughlin, representing that the "report does not

24   contain any untrue statement of a material fact" and "the financial statements, and

25   other financial information included in this report, fairly present in all material

26   respects the financial condition" of Countrywide and that the Company employed

27   internal disclosure controls and procedures that detect "[a]ll significant

28   deficiencies and material weaknesses in the design or operation of internal control

1  over financial reporting" and "[a]ny fraud, whether or not material, that involves

2  management."

3      642.  The statements referenced above in Countrywide's 2004 Form 10-K

4  were materially false and misleading when made.  As set forth in greater detail

5  above, the Company's reported revenue and diluted earnings per share were false

6  and misleading because the Company's allowance for loan losses and accruals for

7  representations and warranties were understated, and its assessments of fair

8  values for retained interests and MSRs were overstated.  See Section IV.G above.

9  Statements related to loan loss reserves, retained interests, MSRs and liabilities

10  related to representations and warranties were false and misleading for the same

11  reasons set forth in Section IV.G above.  Furthermore, statements relating to the

12  volume of prime and nonprime loans originated and the value of prime loans held

13  for investment were false and misleading because Countrywide misclassified its

14  subprime loans as prime loans and also for the same reasons set forth in Section

15  IV.D above.    Moreover, Countrywide's statements that it "consistently

16  produce[d] quality mortgages" and that its "loan origination standards and

17  procedures are designed to produce high quality loans" were false and misleading

18  because Countrywide loosened its underwriting guidelines to increase loan

19  volumes without regard to loan quality.  See Section IV.C above.  KPMG's

20  unqualified audit opinion was false and misleading for the same reasons stated in

21  Sections VI. and IV.G.5 above.  Moreover, the SOX certifications signed by

22  Defendants Mozilo and McLaughlin were false and misleading for the same

23  reasons stated in Section IV.G above.

24     **C.    The Company's False Statements Regarding 2005 Results**

25          **1.    March 15, 2005 Piper Jaffray Conference**

26      643.  On March 15, 2005, Defendant Mozilo spoke at a financial

27  conference sponsored by Piper Jaffray (the "March 15, 2005 Conference").  On

28  the issue of the credit quality of Countrywide's loans, Mozilo made a statement

emphasizing his concern about credit quality in the mortgage industry, generally, but then falsely distinguished Countrywide from the many lenders whose credit practices were beginning to make analysts and investors uneasy:

> The general statement is that I'm deeply concerned about credit quality in the overall industry.  I think that the amount of capacity that's been developed for subprime is much greater than the quality of subprime loans available.  ***And so they're pushing further down -- as I observe it, they're pushing further down the credit chain into the 500 FICOs and below 550, 540, 530.  And as you get down to those levels, it becomes very problematic and I don't think there's any amount of money you can charge upfront to cover your losses on those type of loans.***
>
> ***So I'm deeply concerned about everybody going into subprime. . . .***
>
> ***So we've had to remain very disciplined in our subprime efforts. And that's why you don't see massive growth for Countrywide on subprime.  We're trying to stay within a category of subprime loans that we know how to manage and manage effectively.***
>
> So I have to separate it.  ***The overall industry I am troubled; Countrywide I'm not, because we have remained very disciplined in our origination of subprime loans.***

644.   Also, during the March 15, 2005 Conference, Mozilo touted the Company's performance results for 2004 and 2005 as having been accomplished with minimal risk: "Countrywide Bank has grown substantially since its acquisition in May of 2001, leveraging off synergies with the production and

1   servicing sectors to generate assets and liabilities at a very low-cost, ***while***
2   ***producing competitive financial returns at a minimal risk***."

3   645.   Moreover, during the March 15, 2005 Conference, Mozilo responded
4   to an analyst's question regarding the 30% market growth goal that was set by
5   management to be achieved by 2008.   Mozilo highlighted that this goal was
6   realistic and Countrywide would not sacrifice its "sound lending" practices to
7   achieve it:

8       Your question is 30 percent, is that realistic, the 30 percent goal that
9       we set for ourselves 2008?  . . .  Is it achievable?  ***Absolutely. . . .***

10

11      But I will say this to you, ***that under no circumstances will***
12      ***Countrywide ever sacrifice sound lending and margins for the sake***
13      ***of getting to that 30 percent market share.***

14   646.   Further, Mozilo again emphasized the Company's management of its
15   subprime business, stating that management was very "concerned about the loan-
16   to-value ratio" because those type of loans would be affected first if there is a
17   downturn in the economy and, therefore, the Company must manage them
18   properly:

19      ***Obviously, when you're dealing in subprime, you have got to be***
20      ***concerned about the loan-to-value ratio because that's the bottom***
21      ***end of the strata and in the event of a bump in the economy or a***
22      ***burp in the economy, they are affected first. . . .***  Subprime is a
23      business we have been in for over 10 years.  We have been through
24      various cycles in those 10 years, and ***I think we have got it properly***
25      ***managed and surrounded.***

26   647.  Defendant Mozilo's statements made at the March 15, 2005
27   Conference above were materially false and misleading when made.  Specifically,
28   Mozilo's statement that "we've had to remain very disciplined in our subprime

1   efforts[,] [a]nd that's why you don't see massive growth for Countrywide on

2   subprime" was false and misleading because Countrywide misclassified its

3   subprime loans as prime loans.  See Section IV.D.  Also, Mozilo's statements

4   criticizing the Company's peers for "pushing further down . . . the credit chain

5   into the 500 FICOs and below 550, 540, 530" to originate loans, but claiming that

6   Countrywide's practices were different, more conservative and relatively safe as

7   opposed to high risk, were also misleading because Countrywide loosened its

8   underwriting practices to increase its loan volume without regard to loan quality.

9   See Section IV.C above.  Moreover, Mozilo's statement that Countrywide was

10  "generat[ing] assets and liabilities at a very low-cost, while producing

11  competitive financial returns at a minimal risk" was false and misleading for the

12  same reasons set forth in Section IV.C above.  Mozilo's statement that "under no

13  circumstances will Countrywide ever sacrifice sound lending and margins for the

14  sake of getting to that 30 percent market share," was also false and misleading

15  because Countrywide loosened and abandoned its underwriting guidelines to

16  boost loan volumes to reach the 30% market share goal.  See Sections IV.B and

17  IV.C.   Last, Mozilo's statement regarding the prudent management of

18  Countrywide's subprime loan-to-value ratio was false and misleading for the

19  same reasons set forth in Sections IV.B and IV.C above.

20           **2.      First Quarter 2004 Amended Form 10-Q/A**

21           648.   On April 25, 2005, Countrywide filed an amended quarterly report

22  on Form 10-Q/A for the first fiscal quarter of 2004, ended March 31, 2004, signed

23  by Defendants Kurland and Sieracki.  In the Form 10-Q/A, the Company restated

24  reported revenue for the quarter to $1,973,626,000 compared to $2,214,903,000

25  as previously reported.   Diluted earnings per share for the quarter ended

26  March 31, 2004 were restated to $1.75 from $2.22.  Gain-on-sale revenues were

27  restated to $1,117,390,000 from $1,358,667,000.

28

649.   These restated results in the Form 10-Q/A above were materially false and misleading when made.   As set forth in greater detail above, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated.   The Company's reported gain-on-sale was false and misleading because the Company overstated its assessment of fair value for its retained interests and MSRs, and also for the same reasons set forth in Section IV.G above.

### 3.     First Quarter 2005 Form 8-K

650.   On April 26, 2005, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release that announced the Company's financial results for the first quarter of 2005, ended March 31, 2005.   In the press release, Mozilo stated: "Countrywide opened 2005 with a ***solid*** first quarter. . . . The Company achieved diluted earnings per share of $1.13, an increase from both the first quarter of 2004 and last quarter."

651.   Moreover, in the April 26, 2005 press release, Countrywide reported gain-on-sale of loans and securities in the amount of $1,361,788,000 for the quarter.

652.   The statements made by Countrywide and Mozilo in the Form 8-K and April 26, 2005 press release above were materially false and misleading when made.   Mozilo's statement that the first quarter's financial results were "solid" was false and misleading because Countrywide's net income was materially overstated.   See Sections IV.G and IV.C above.   Moreover, the Company's reported value for its gain-on-sale of loans and securities was false and misleading because the Company fraudulently overstated the fair value of its retained interests and MSRs, and also for the same reasons set forth in Sections IV.G.2 and IV.G.3 above.

1

### 4. First Quarter 2005 Conference Call

2      653.  Later the same day, Countrywide held a conference call (the "April

3  26, 2005 Conference Call") in which Defendants Mozilo, Sieracki and Kurland

4  discussed the Company's financial results for the first quarter of 2005.  Defendant

5  Sieracki responded to a question from an analyst at NWQ Investment

6  Management regarding changes in underwriting policies at Countrywide:

7         Mark Patterson - NWQ Investment Management – Analyst: But has

8         there been any changes in the underwriting metrics with the current

9         origination levels or you're expected origination during 2005?   In

10        terms of FICO or combined loan-to-value or debt-to-income or any of

11        those kind of underwriting metrics?

12

13        Eric Sieracki - Countrywide Financial Corporation - Chief Financial

14        Officer:  I think they will remain . . . consistent with the first quarter

15        and most of what we did in 2004.  *We don't see any change in our*

16        *protocol relative to the volume [of] loans that we're originating.*

17     654.  Further, during the April 26, 2005 Conference Call, Defendants

18  Kurland and Sieracki both responded to a question from a KBW analyst

19  indicating that Countrywide and its Bank originated only high quality pay option

20  ARMs:

21        Fred Cannon - KBW – Analyst: . . . are you originating a lot of the

22        pay options ARMs or [is] the bank portfolio at this point in time?

23

24        Eric Sieracki - Countrywide Financial Corporation - Chief Financial

25        Officer:  A combination.  Most of it is not going into the bank, but we

26        are trying to develop protocol and a process for *delivering greater*

27        *levels* to meet the banks growth need.

28

---

1       Stanford Kurland - Countrywide Financial Corporation - President &

2       Chief Operating Officer:   ***These*** [pay option ARMS] ***are all high***

3       ***FICO.***

4       655.   Defendants Kurland's and Sieracki's statements made on the April

5 26, 2005 Conference Call above were materially false and misleading when

6 made.   Specifically, Defendant Kurland's statement that Countrywide's pay-

7 option ARMs were "all high FICO" was false and misleading for the same

8 reasons set forth in Sections IV.B.2 and IV.E above.   Additionally, Sieracki's

9 statement that Countrywide's "protocol" or "underwriting metric" relative to the

10 volume of loans originated "will remain . . .consistent" was false and misleading

11 because Countrywide loosened its underwriting guidelines to increase the volume

12 of loans originated without regard to loan quality.   See Sections IV.B and IV.C

13 above.

14       656.   Several analysts raised or maintained their stellar recommendations

15 and earnings estimates for Countrywide based upon Countrywide's false and

16 misleading statements.   For example, on April 27, 2005, analysts at Piper Jaffray

17 maintained their "Outperform" rating and described Countrywide as a mortgage

18 corporation with loans that "are primarily prime credit quality first-lien mortgage

19 loans secured by single-family residences."

20       657.   In addition, several other analysts raised or maintained their stellar

21 recommendations and earnings estimates for Countrywide as follows:

22           •   Merrill Lynch reported on April 26, 2005 that "[w]e reiterate

23                our Buy rating and our $43.00 12-month Price Objective."

24           •   Deutsche Bank reported on April 26, 2005 that, "[w]e are

25                reiterating our Buy rating and our $43 target price."

26           •   Morgan Stanley reported on April 27, 2005 that we

27                "[r]eiterate Overweight on [s]trong 1Q05 [r]esults."

28

1          **5.    First Quarter 2005 Form 10-Q**

2          658.   On May 9, 2005, Countrywide filed its Form 10-Q for the first

3    quarter of 2005, ended March 31, 2005, signed by Defendants Kurland and

4    Sieracki.  The Company reported revenues for the quarter of $2,404,885,000 and

5    diluted earnings per share of $1.13.

6          659.   The Company reported in the Form 10-Q that the impairment of the

7    fair value of its retained interests equaled $137,070,000.

8          660.   In the "Off-Balance Sheet Arrangements and Guarantees" section of

9    the  Form  10-Q,  Countrywide  described  the  representations  and  warranties

10   exposure associated with the securitization of its loans as follows: "[w]e do not

11   believe that any of our off-balance sheet arrangements have had or are reasonably

12   likely to have a current or future material effect on our financial condition,

13   changes in financial condition, revenues or expenses, results of operations,

14   liquidity, capital expenditures or capital resources."

15         661.   The Company reported in the Form 10-Q that the value of its MSRs

16   equaled $9,746,957,000 for the quarter end.

17         662.   The Company reported in the Form 10-Q that allowance for loan

18   losses as of the end of the first quarter equaled $134,916,000.

19         663.   The Company also reported the volume of Mortgage Banking prime

20   home  equity  and  subprime  loans  produced  (which  was  included  in  the  total

21   volume of loans produced).  Specifically, Mortgage Banking prime home equity

22   loans originated during the quarter equaled $6,619,000,000.  Mortgage Banking

23   nonprime mortgage loans originated during the quarter equaled $8,187,000,000,

24   and was 10.4% of total Mortgage Banking loans originated during the quarter.

25         664.   Countrywide also reported that prime mortgage loans held for

26   investment  equaled  $28,621,141,000,  prime  home  equity  loans  held  for

27   investment  equaled  $13,425,446,000,  and  nonprime  loans  held  for  investment

28   equaled $179,293,000.

665. The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk principally . . . *by retaining high credit quality mortgages in our loan portfolio.*"

666. The Company also reported in its first quarter 2005 Form 10-Q management's review of the Company's disclosure controls and internal controls:

> There has been no change in our internal control over financial reporting during the quarter ended March 31, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting . . . .

667. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

668. These statements contained in the first quarter 2005 Form 10-Q above were materially false and misleading when made. As set forth in greater detail above, the Company's reported values for its revenue and diluted earnings per share were false because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above. Also, the statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above. Moreover, the representation that Countrywide "only retain[ed] high credit quality

1   mortgages in our loan portfolio" was false and misleading because Countrywide

2   loosened its underwriting guidelines to increase loan volume without regard to

3   loan quality.  See Section IV.C.  The statements relating to internal controls were

4   false and misleading for the same reasons set forth in Section IV.G.5.  Moreover,

5   the SOX certifications signed by Defendants Mozilo and Sieracki were false and

6   misleading for the same reasons stated in Section IV.G above.

### 6.     Second Quarter 2004 Amended Form 10-Q/A

8          669.   On May 17, 2005, Countrywide filed an amended quarterly report on

9   Form 10-Q/A for the second quarter of 2004, ended June 30, 2004, signed by

10  Defendants Kurland and Sieracki.  The Company restated reported revenues for

11  the quarter as $2,474,746,000, compared with $2,333,104,000 as was previously

12  reported.  Diluted earnings per share for the quarter was restated to $2.52 from

13  $2.24, and gain-on-sale revenue was restated to $1,418,973,000 from

14  $1,277,331,000.

15         670.   These restated results were materially false and misleading when

16  made.  As set forth in greater detail above, the Company's reported revenue and

17  diluted earnings per share were false and misleading because the Company's

18  allowance for loan losses and accruals for representations and warranties were

19  understated.  The Company's reported gain-on-sale was false and misleading

20  because the Company overstated its assessment of fair value for its retained

21  interests and MSRs, and also for the same reasons set forth in Sections IV.G and

22  IV.C above.

### 7.     Third Quarter 2004 Amended Form 10-Q/A

24         671.   On May 17, 2005, Countrywide also filed an amended quarterly

25  report on Form 10-Q/A for the third quarter of 2004, ended September 30, 2004,

26  signed by Defendants Kurland and Sieracki.  Diluted earnings per share for the

27  quarter was restated to $0.80 from $0.94, and gain-on-sale revenue was restated

28  to $1,017,697,000 from $1,188,812,000.   The Company restated reported

1   revenues for the quarter as $2,711,618,000, compared with $2,245,607,000 as
2   was previously reported.

3       672.   These restated results were materially false and misleading when
4   made.  As set forth in greater detail above, the Company's reported revenue and
5   diluted earnings per share were false and misleading because the Company's
6   allowance for loan losses and accruals for representations and warranties were
7   understated.   The Company's reported gain-on-sale was false and misleading
8   because the Company overstated its assessment of fair value for its retained
9   interests and MSRs, and also for the same reasons set forth in Sections IV.G and
10  IV.C above.

11          **8.      May 24, 2005 Countrywide Analyst Meeting**

12      673.   On May 24, 2005, Defendants Mozilo, Sambol and Kurland and
13  John McMurray, the Company's Chief Credit Officer, participated in the
14  Countrywide Financial Corporation Analyst Meeting (the "May 24, 2005
15  Meeting").  At the meeting, McMurray stated, without correction or explanation
16  by Defendants Mozilo, Sambol or Kurland, that the Company originated loans
17  that met its credit standards: "[q]uality control . . . is a series of controls that we
18  have post-closing.  So what we are looking for there, is to ensure that the loans
19  that we originate have ***both met our credit standards and we[re] underwritten***
20  ***according to those standards.***"

21      674.   During the May 24, 2005 Meeting, an unidentified Countrywide
22  representative touted that Countrywide's loans held for investment are "first rate
23  mortgages" and "high quality loans" and, accordingly, the Company's allowance
24  for loan losses were adequate:

25        Well, you know, first of all the bank is investing in . . . ***prime***
26        ***mortgages, primarily HELOCs and some first rate mortgages*** . . . .
27        So, not much on the interest rate risk side.  But again, ***very high***
28        ***quality loans*** that have performed historically and we have you know,

1   default models that provide conservative reserves against that book of
2   business.

3   675.   Likewise, during the May 24, 2005 Meeting, Defendant Sambol
4   remarked that credit risks associated with ARM loans were mitigated:

> These risks [associated with ARM loans] are ***mitigated or addressed***
> ***in part by the different underwriting criteria*** which are applied to
> these loans relative to those used for traditional fixed-rate agency
> product such as maybe higher credit scores or lower loan to value
> ratios, and also importantly, the paradigm in the mortgage market
> today and with Countrywide in particular, is that the increased risk is
> priced for in a very granular way.

12   676.   Further, at the May 24, 2005 Meeting, an unidentified Countrywide
13   representative stated that Countrywide had an efficient control environment that
14   allowed the Company to distinguish itself from its peers by having the lowest cost
15   and most effective governance program:

> And I think it's the hallmark for Countrywide [that] . . . we have ***a***
> ***culture of concern about our operations*** and the enterprise that
> produces and [has an] ***efficient . . . control environment*** and we are
> going to continue to build on that and look at the environment that we
> are in today as one that we can produce a value of proposition.  We
> can distinguish ourselves as having the lowest cost and most effective
> governance program and that's what we are working to.

23   677.   During the May 24, 2005 Meeting, Defendant Sambol remarked that
24   credit risks associated with ARMs were mitigated:

> These risks are mitigated or addressed in part by the different
> underwriting criteria which are applied to these loans relative to those
> used for traditional fixed-rate agency product ***such as maybe higher***
> ***credit scores or lower loan to value ratios . . . .***

678.   Countrywide's statements at the May 24, 2005 Meeting above were materially false and misleading when made.  Specifically, McMurray's statement that Countrywide "ensure[s] that the loans . . . originate[d] have both met our credit standards and we[re] underwritten according to those standards" was false because Countrywide materially loosened its underwriting standards to increase loan volume without regard to loan quality.   See Sections IV.B and IV.C. Moreover, the Countrywide representative's statements relating to "conservative" loan loss reserves were false and misleading for the same reasons set forth in Section IV.G.1 above.  Further, in an effort to distinguish Countrywide from its peers in the mortgage industry, the statement made by a Countrywide representative that "we have a culture of concern about our operations and the enterprise that produces and [has an] efficient . . . control environment" was false and misleading because the Officer Defendants' assessment of internal controls over financial reporting was ineffective for the reasons set forth in Section IV.G.5.   Moreover, Defendant Sambol's statement that credit risks associated with ARMs were mitigated because underwriting guidelines were tightened was false and misleading for the same reasons set forth in Section IV.B above.

### 9.      June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference

679.   On June 2, 2005, Defendant Mozilo appeared on behalf of Countrywide at the Sanford Bernstein & Co. Strategic Decisions Conference (the "June 2, 2005 Conference").   At the conference, Mozilo touted the Company's operational results for 2005 and acknowledged that Countrywide had some high-risk mortgage products. Mozilo claimed, however, that Countrywide had elevated credit requirements for these high risk loans:

> We acknowledge that some of the products offered today carry higher credit risks than traditional GSE 30-year fixed-rate loans.  However, it is important [to] note that ***Countrywide mitigates these risks or***

1    ***addresses them in part by utilizing different underwriting criteria***
2    ***than that is used for traditional fixed-rate product, such as the***
3    ***requirement for higher credit scores*** . . . .

4    680.   Further, at the same conference, Mozilo once again touted the quality
5    of loans held for investment at Countrywide:

6    Credit quality of the portfolio remains outstanding with a weighted
7    average ***FICO score that exceeded 730 and a weighted average***
8    ***CLTV loan to value of 80%.***

9    681.   Also, at the June 2, 2005 Conference, Mozilo revised his aggressive
10   goal of 30% market share origination by 2008 and extended it to 2010.  However,
11   once again he told investors that Countrywide's profitability would not suffer as a
12   result of the Company's overly aggressive goal: "Questions always asked by you
13   people -- are you going to sacrifice profitability to gain market share?  ***The***
14   ***answer you can see for our plans is absolutely not.***"

15   682.   Moreover, at that same conference, Mozilo responded to a question
16   from an unidentified speaker regarding the extent of the exposure that a mortgage
17   lender would have should there be a correction in the appreciation of housing
18   prices:

19   Angelo Mozilo - Countrywide Financial - Chairman, CEO: And I can
20   tell you -- ***values going down do not force people out of their homes***
21   ***and does not force people into -- never has forced them into***
22   ***delinquency ever.  It's the loss of jobs.***

23   683.   Defendant Mozilo's statements made during the June 2, 2005
24   Conference Call above were materially false and misleading when made.
25   Specifically, Mozilo's statement that "Countrywide mitigates … risks or
26   addresses them in part by utilizing different underwriting criteria [for ARM loans]
27   than that is used for traditional fixed-rate product, such as the requirement for
28   higher credit scores" was false and misleading for the same reasons set forth in

1   Sections IV.B and IV.C above.  Mozilo's statement that the "credit quality of the

2   portfolio remains outstanding with a weighted average FICO score that exceeded

3   703 and a weighted average CLTV loan to value of 80%," was false and

4   misleading for the reasons set forth in Sections IV.B and IV.C.   Mozilo's

5   statement that Countrywide's profitability would not suffer as a result of its

6   aggressive goal to reach 30% market share by 2010 was false and misleading

7   because Countrywide loosened its underwriting guidelines to increase loan

8   volume without regard to loan quality.  See Sections IV.B and IV.C.

9                    **10.    Second Quarter 2005 Form 8-K**

10      684.   On July 26, 2005, the Company filed a Form 8-K, signed by Laura

11  Milleman, attaching a press release that announced the Company's financial

12  results for the second quarter of 2005, ended June 30, 2005.  Mozilo stated in the

13  press release: "Countrywide closed the first half of 2005 with *solid* operational

14  and financial results. . . .   The Company achieved diluted earnings per share of

15  $0.92 for the quarter, driving earnings per share for the first six months to $2.05"

16      685.   Moreover, in the July 26, 2005 press release, Countrywide reported

17  gain-on-sale of loans and securities in the amount of $1,145,409,000 for the

18  quarter.

19      686.   Countrywide's and Mozilo's statements contained in the July 26,

20  2005 Form 8-K and press release above were materially false and misleading

21  when made.  Mozilo's statement that the second quarter financial results were

22  "solid" was false and misleading because the Company's net income was

23  materially overstated.   See Sections IV.G and IV.C.   Consequently, the

24  Company's reported gain-on-sale for loans and securities was also false and

25  misleading because Countrywide materially overstated the fair value of its

26  residual interests and MSRs, and also for the same reasons stated in Sections

27  IV.G.2 and IV.G.3.

28

**11.    Second Quarter 2005 Conference Call**

687.    On a conference call held later that day (the "July 26, 2005 Conference Call"), in which Defendants Mozilo, Kurland and Sieracki participated, the Company's senior management discussed the second quarter 2005 financial results and the third quarter 2005 financial outlook.  Defendant Kurland commented on the quality of loans with prepayment penalties, such as Pay Option ARMs.  Kurland stated, "[o]f loans with prepayment penalties, I think another important point was our pay option portfolio . . . ***it is a very high-quality product.***"

688.    Similarly, during the July 26, 2005 Conference Call, Defendant Mozilo echoed Kurland's claims, touting the purported high quality of Countrywide's Pay Option ARMs:

> Ken Posner - Morgan Stanley Dean Witter – Analyst:  . . . there's a concern and there's been survey data that has documented that, to some extent, less-educated folks, lower-income folks tend to be more trusting of ARM products without necessarily understanding how they actually work.  Are there other controls or structures in place to make sure that people aren't [inappropriately marketing the new products]?
>
> Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO: . . . That product has a FICO score exceeding 700.  You don't see the lower end of the economic spectrum with an unsophisticated people with that kind of FICO score.  ***So the people that Countrywide is accepting under this program, generally speaking, are of much higher quality and they are not of the ilk that you may be seeing someplace else in the country or for some other lender.***

689.    Further, on the same call, Defendants Kurland and Mozilo both responded to a question from a Fox-Pitt Kelton analyst about whether

1    Countrywide's lending practices were loosening given that Countywide was

2    originating hybrid ARMs and Pay Option ARMs:

3         Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO: . . . I

4         am not aware of any change of substance in underwriting policies. . . .

5         *I'm not aware of any loosening of underwriting standards that*

6         *creates a less of a quality of loan than we did in the past.*  Stan?

7

8         Stanford Kurland - Countrywide Financial Corp. - President,

9         COO: . . . [We] *have not loosened our standards* relative to what the

10        bank acquires to the extent that we have standards that reflect and

11        pricing that reflects where we are able to deliver loans into the

12        secondary market.

13        690. Also, when asked whether Countrywide was loosening its

14   underwriting standards, Defendant Mozilo said, "I'm not *aware of any change of*

15   *substance in underwriting policies*."  In response to a follow-up question, Mozilo

16   added: "*[w]e don't view that we have taken any steps to reduce the quality of*

17   *our underwriting regimen at all.*"

18        691.   On the same conference call, Defendant Kurland reiterated the high

19   quality of the pay-option adjustable-rate mortgages, *"[t]he product itself tends to*

20   *be highest FICO, very good LTV product . . . ."*  Also, Defendant Sieracki touted

21   the credit quality of the home equity mortgages that Countrywide originates: "The

22   credit quality of our home equities should be emphasized here as well.  We are

23   730 FICO on these home equities, and that's extraordinary throughout the

24   industry."

25        692.   Similarly, Defendants Mozilo and Sieracki stated at the July 26,

26   2005 Conference Call that the Company retains only high credit quality loans and

27   there had been no deterioration of the quality of loans that were originated at

28   Countrywide:

1    Barry Cohen - Glenview Capital – Analyst:  . . . [C]an you give us a

2    sense of the credit quality in the nonprime mortgage sector and if you

3    have a view of whether the credit quality is stable or potentially -- not

4    potentially -- or worsening?

5

6    Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO:  I

7    think it's stable. . . .  I do participate every day in originations myself,

8    and it keeps me apprised of what's happening.  I think that that

9    situation has stabilized.  ***I don't see any deterioration in the quality***

10   ***of those loans being originated.***

11

12   Eric Sieracki - Countrywide Financial Corp. - CFO, Treasurer: I

13   would echo those sentiments.  We are running over ***80% premier in***

14   ***A.  We operate at the very top end of the nonprime credit spectrum.***

15   ***The FICO scores have remained very steady, just over 600.***

16        693.   The statements by Defendants Kurland, Mozilo and Sieracki during

17   the July 26, 2005 Conference Call were materially false and misleading when

18   made.  Specifically, Defendant Kurland's statements that Pay Option ARMs are

19   "a very high-quality product" and "highest FICO, very good LTV product" were

20   false and misleading for the same reasons set forh in Sections IV.E and IV.B

21   above.   Defendant Mozilo's statement that "the people that Countrywide is

22   accepting under this program [for Pay Option ARMs] . . . are of much higher

23   quality" was false and misleading for the same reasons stated in Sections IV.E

24   and IV.B above.  Defendant Sieracki's statements that Countrywide "operate[s] at

25   the very top end of the nonprime credit spectrum and that the FICO scores have

26   remained very steady, just over 600" were false and misleading for the same

27   reasons set forth above and in Sections IV.B and IV.C.  Mozilo's statement that

28   he was "not aware of any loosening of underwriting standards that creates a less .

1   . . quality . . . loan than we did in the past" was also false and misleading because

2   Mozilo knew or was reckless in not knowing that Countrywide severely loosened

3   its underwriting guidelines to originate high risk, poor quality loans.  See Section

4   IV.C.  Mozilo's statements that he was "not aware of any change of substance in

5   underwriting policies" and that he did not view that the Company had "taken any

6   steps to reduce the quality of our underwriting regimen at all," and Kurland's

7   statement that "we have not loosened our standards," were all false and

8   misleading for the same reasons set forth above and in Sections IV.B and IV.C.

9       694.  Analysts reacted positively to these materially false and misleading

10  statements.   For example, on July 26, 2005, analysts at Deutsche Bank

11  "continue[d] to believe that prospects for CFC are bright over the next 12-18

12  months.  We are reiterating our **Buy** rating[s] and $43 target price."  Deutsche

13  Bank based its views on the representations of the management that "[t]he

14  company has no intention of keeping subprime production on CFC's balance

15  sheet or holding it at Countrywide Bank."

16      695.  Further, several other analysts either raised or maintained their

17  recommendations and earnings estimates for Countrywide as a result of

18  defendants' fraudulent misrepresentations:

19          •   Piper Jaffray reported on July 27, 2005 that "[w]e are

20              maintaining our 2005 and 2006 EPS estimates at $4.15 and

21              $4.50, respectively."  "Reiterate Outperform."  Also, the

22              analysts described Countrywide as a mortgage lender with

23              loans that are "primarily prime credit quality first-lien

24              mortgage loans secured by single-family residences."

25          •   Lehman Brothers reiterated its Overweight rating for

26              Countywide on July 27, 2005.

27          •   Merrill Lynch reported on July 27, 2005 "**Overweight**

28              investment recommendation."

## 12.   Second Quarter 2005 Form 10-Q

696.   On August 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2005, ended June 30, 2005, signed by Defendants Kurland and Sieracki.   The Company reported revenues for the quarter of $2,307,943,000 and diluted earnings per share of $0.92.

697.   The Company also reported that the impairment of the fair value of its retained interests equaled $97,629,000.

698.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

699.   In a section titled "Securitizations," the Company reported that the fair value of is MSRs as of June 30, 2005 was $9,367,666,000.

700.   The Company reported allowance for loan losses of $155,962,000 as of the end of the quarter, having increased its provision for loan losses by only $36,723,000 during the quarter.   Net charge-offs equaled $5,807,000.

701.   Countrywide reported consolidated mortgage loans held for investment for the quarter ended June 30, 2005, as follows: prime mortgage loans equaled $40,071,009,000, prime home equity loans equaled $15,890,115,000, and subprime loans equaled $235,838,000 or less than 1% of total mortgage loans held for investment.

702.   In the Form 10-Q, the Company also reported the volume of Mortgage Banking nonprime mortgage and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced).   Specifically, Mortgage Banking prime home equity loans originated

1   during the quarter equaled $6,875,000,000.  Mortgage Banking nonprime

2   mortgage loans originated during the quarter equaled $9,670,000,000, and was

3   9.5% of the total Mortgage Banking loans produced for the quarter.

4       703.  The Company described its management of credit risk in the

5   following terms:  "[w]e manage mortgage credit risk . . . *by retaining high credit*

6   *quality mortgages in our loan portfolio.*"

7       704.  The Company also reported in the Form 10-Q management's review

8   of the Company's disclosure controls and internal controls:

9       There has been no change in our internal control over financial

10      reporting during the quarter ended June 30, 2005 that has materially

11      affected, or is reasonably likely to materially affect, our internal

12      control over financial reporting. . . .

13      705.  Further assuring investors of the veracity of the information

14   contained in the Form 10-Q, the report included SOX certifications signed by

15   Defendants Mozilo and Sieracki, representing that the "report does not contain

16   any untrue statement of a material fact" and "the financial statements, and other

17   financial information included in this report, fairly present in all material respects

18   the financial condition" of Countrywide.

19      706.  The statements contained in the Form 10-Q above were materially

20   false and misleading when made.  As set forth in greater detail above, the

21   Company's reported revenue and diluted earnings per share were false and

22   misleading because the Company's allowance for loan losses and accruals for

23   representations and warranties were understated, and its assessments of fair

24   values for retained interests and MSRs were overstated.  See Section IV.G above.

25   Statements related to loan loss reserves, retained interests, MSRs and liabilities

26   related to representations and warranties were false and misleading for the same

27   reasons set forth in Section IV.G above.  Also, the statements regarding the

28   quality of the volume of loans produced and loans held for investment were false

1 and misleading because Countrywide misclassified its subprime loans as prime
2 loans, and also for the reasons set forth in Section IV.D above.  Moreover, the
3 representation that Countrywide "only retain[ed] high credit quality mortgages in
4 our loan portfolio" was false and misleading because Countrywide severely
5 loosened its underwriting guidelines during the Class Period to increase loan
6 volume without regard to loan quality.  See Section IV.C above.  The statements
7 relating to internal controls were false and misleading for the same reasons set
8 forth in Section IV.G.5.  Moreover, the SOX certifications signed by Defendants
9 Mozilo and McLaughlin were false and misleading for the same reasons stated in
10 Section IV.G above.

### 13. September 13, 2005 Lehman Brothers Financial Services Conference

707.  Defendant Mozilo participated in a conference call with analysts held at Lehman Brothers Financial Services on September 13, 2005 (the "September 13, 2005 Conference Call").  Mozilo praised the Company's ongoing success and accounted for it by claiming that Countrywide properly managed credit risk:

> [A]ll business activities are managed with ongoing safety and soundness of Countrywide as our primary concern.  . . . With all business lines the majority of credit risk is sold or transferred to third parties with exposure primarily limited to three areas -- number one, the bank loan portfolio, while sizable at 56 billion, is ***limited to prime quality residential mortgage loans only*** . . . . ***Conservative underwriting standards are evidenced by the quality of the portfolio*** . . . ."

> Credit risk is also retained primarily from the securitization of prime home equity and nonprime loans. . . . [T]his exposure . . . adds 1.4

billion [and] accounts for less than 1% of total company assets . . . is only 2% of the total amount of loans that have been originated and securitized by Countrywide and are still outstanding.   Last is our exposure to rep[resentations] and warranties and all loans originated and sold **which are primarily prime quality.**

708.   Similarly, during the September 13, 2005 Conference Call, Mozilo again touted the high quality of its loans and the conservative underwriting guidelines at the Company:

From a risk management perspective **loan underwriting guidelines are conservative and under constant review . . .   In regard to pay option loans and interest only loans, each comprise 27% of the portfolio and have an average FICO score above 700.**

709.   Defendant Mozilo's statements on the September 13, 2005 Conference Call were materially false and misleading when made.   Specifically, Mozilo's statement that Countrywide's "[c]onservative underwriting standards are evidenced by the quality of the portfolio" was false and misleading because Countrywide classified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.   Mozilo's statement that Pay Option ARMs have an "average FICO score above 700" was false and misleading for the reasons set forth in Sections IV.E and IV.B.2 above.

**14.   Third Quarter 2005 Form 8-K**

710.   On October 27, 2005, Countrywide filed a Form 8-K, signed by Laura Milleman, that attached a press release announcing strong growth in the Company's financial results for the third quarter of 2005, ended September 30, 2005.   In the press release, Defendant Mozilo again touted Countrywide's ability to grow in a challenging environment: "Countrywide delivered **strong** results for the third quarter . . . . Diluted earnings per share were $1.03."

711.   Moreover, in the October 27, 2005 press release, Countrywide reported gain-on-sale of loans and securities $1,284,992,000 for the quarter.

712.   Countrywide's and Mozilo's statements contained in the October 27, 2005 Form 8-K and press release were materially false and misleading when made.   Specifically, Defendant Mozilo's statement that "Countrywide delivered strong results" was false and misleading for the reasons set forth in Sections IV.G and IV.C above.   Also, the Company's reported value of gain-on-sale of loans and securities was false and misleading because Countrywide materially overstated the fair value of its retained interests and MSRs, and also for the same reasons set forth in Sections IV.G.2 and IV.G.3 above.

### 15.   Third Quarter 2005 Conference Call

713.   During a conference call held later the same day (the "October 27, 2005 Conference Call") in which Defendants Mozilo, Kurland and Sieracki participated, the Company's senior management discussed the third quarter 2005 financial results.   Mozilo discussed the "high quality" of Countrywide's Pay Option ARMs which purportedly allowed the Company to serve its customers better:

> Pay option ARMs have recently been portrayed negatively.   ***But we view this product as enabling us to better serve qualified customers*** looking for a more efficient and flexible way to manage their obligations.   It is also an excellent asset for our portfolio, given our mortgage loan origination, servicing and ***risk management competencies.   And the prime quality of our pay option borrowers.***
>
> ***. . . Our pay option portfolios have very high credit quality, characterized by high FICO scores, solid loan-to-value ratios, and a low debt-to-income ratios.***

714.   Defendant Mozilo's statements that Pay Option ARMs are "prime quality;" "have very high credit quality characterized by high FICO scores, solid loan-to-value ratios;" and "enabl[e] us to better serve qualified customers" were materially false and misleading when made because Pay Option ARMs were very risky products that were not used to serve "qualified" customers, but rather high-risk borrowers.  See Sections IV.E and IV.B.2.

715.   Analysts reacted positively to these materially false and misleading statements.  For example, on October 27, 2005, analysts at Piper Jaffray stated in a report that "[w]e could be in for a few more challenging quarters in the mortgage industry, but to us, after the smoke clears, CFC is an obvious winner. CFC's current valuation is near trough valuation levels, setting up an excellent risk/reward opportunity for investors."  Piper Jaffray reiterated its "Outperform" rating for Countrywide's stock.

716.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of defendants' fraudulent misrepresentations:

- Merrill Lynch analysts reported on October 28, 2005 that they "remain[s] Overweight" on Countrywide's stock.
- Credit Suisse First Boston reported on November 8, 2005 "Outperform" for Countrywide.
- Morgan Stanley reported on October 27, 2005 "Overweight" for Countrywide.

**16.   Third Quarter 2005 Form 10-Q**

717.   On November 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the third fiscal quarter of 2005, ended September 30, 2005, signed by Defendants Kurland and Sieracki.  The Company reported revenues for the quarter of $2,711,618,000 and diluted earnings per share of $1.03.

718.   The Company also reported that the impairment of fair value for its retained interests equaled $61,697,000.

719.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the third quarter 2005 Form 10-Q, Countrywide described its representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

720.   In a section titled "Securitizations," the Company reported that the fair value of the MSRs as of September 30, 2005 was $11,428,404,000.

721.   The Company reported allowance for loan losses for the nine months ended September 30, 2005 of $184,784,000.

722.   Countrywide represented in its third quarter 2005 Form 10-Q that it had "a portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans, which totaled $62.2 billion at September 30, 2005." Specifically, Countrywide reported prime mortgage and prime home equity loans held for investment that equaled $45,664,924,000 and $15,314,508,000, respectively, and nonprime mortgage loans held for investment were reported at $263,973,000, or less than 1% of total mortgage loans held for investment.

723.   In the Form 10-Q, Countrywide also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $10,344,000,000. Mortgage Banking nonprime loans originated during the quarter equaled $11,399,000,000, and was 8.7% of total Mortgage Banking loans originated during the quarter.

724.   Moreover, the Company boasted in the Form 10-Q as to the high quality of its loans: The Company "retain[s] high credit quality mortgages in [its] loan portfolio[ ]" and "[o]ur pay-option loan portfolio has [a] very high initial loan quality, with original average credit rating . . . of 720 and original loan-to-value and combined loan-to-values of 74% and 78%, respectively."

725.   The Company also reported in the Form 10-Q management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. . . ."

726.   Further assuring investors of the veracity of the information contained in the third quarter 2005 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

727.   The statements contained in the third quarter 2005 Form 10-Q above were materially false and misleading when made.  Specifically, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated.  See Section IV.G above.  Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Also, the statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.  Moreover, the

1   representations that Countrywide "retain[s] high credit quality mortgages in [its]

2   loan portfolio[]" and "[o]ur pay-option loan portfolio has [a] very high initial loan

3   quality, with original average credit rating . . . of 720" were false and misleading

4   because Countrywide severely loosened its underwriting guidelines to increase

5   loan volume without regard to loan quality.  See Sections IV.C and IV.E above.

6   The statements relating to internal controls were false and misleading for the

7   same reasons set forth in Section IV.G.5.   Moreover, the SOX certifications

8   signed by Defendants Mozilo and Sieracki were false and misleading for the same

9   reasons stated in Section IV.G above.

10                    **17.    Year End 2005 Form 8-K**

11          728.   On January 31, 2006, Countrywide filed a Form 8-K, signed by

12   Laura Milleman, attaching a press release that announced the Company's

13   financial results for the fourth quarter and year ended December 31, 2005.  In the

14   press release, Mozilo commented on Company's "impressive" results as follows:

15                  For the fourth quarter and full year 2005, Countrywide achieved

16                  impressive earnings growth from the comparable prior year periods,

17                  despite a challenging transitional operating environment . . . .

18          729.   Moreover, in the January 31, 2006 press release, Countrywide

19   recorded gain-on-sale of loans and securities of $4,861,780,000 for the year

20   ended December 31, 2005.

21          730.   Mozilo's and Countrywide's statements contained in the January 31,

22   2006 Form 8-K and press release were materially false and misleading when

23   made.  Mozilo's statement that the fourth quarter and year end financial results

24   were "impressive" was false and misleading for the same reasons set forth in

25   Section IV.G.  As a result, the Company's reported value for its gain-on-sale was

26   also false and misleading because Countrywide materially overstated the fair

27   value of its retained interests and MSRs, and also for the same reasons stated in

28   Sections IV.G.2 and IV.G.3 above.

1

### 18.   Year End 2005 Conference Call

2   731.   Defendants Mozilo and Sieracki participated on a conference call
3   held later that same day to discuss the Company's 2005 financial results (the
4   "January 31, 2006 Conference Call").  In that call, Defendant Mozilo emphasized
5   the Company's purported "high quality" assets that continued to generate
6   substantial earnings growth:

7   The amount of pay option loans in the Bank's portfolio now stands at
8   26 billion, up from 22 billion last quarter. . . . It's important to note
9   that our **loan quality remains extremely high.**

10   732.   Mozilo's statement on the January 31, 2006 Conference Call above
11   was materially false and misleading when made because Countrywide loosened
12   and abandoned its underwriting standards to increase the volume of loans
13   originated without regard to quality.  See Sections IV.B and IV.C.

14   733.   Analysts reacted positively to Mozilo's materially false and
15   misleading statements above.  For example, on February 1, 2006, analysts at
16   Stifel Nicolaus stated in a report:

17   [W]e are reiterating our Buy rating on the shares and $48 target price,
18   which represents 9x our 2007 estimate of $5.30.  In addition, we are
19   placing the shares of Countrywide Financial Corp. on the Stifel
20   Nicolaus Select List as our Compelling Idea . . . .  we favor CFC at
21   current levels as a **higher quality, lower risk** way to play our
22   investment thesis.

23   734.   Further, several other analysts either raised or maintained their stellar
24   recommendations and earnings estimates for Countrywide as a result of
25   defendants' fraudulent misrepresentations:

26   •   AG Edwards reported on February 1, 2006 that "[w]e are
27   maintaining our 2006 EPS estimate of $4.15 and reiterating
28   our Buy rating and $41 price objective."

- On February 3, 2006, Citigroup reported that "[w]e continue to view CFC as a cheap growth company which is well positioned during the current 'inflection period' in mortgage finance." In part, Citigroup decision was based upon Countrywide's representations that "the company has experienced immaterial credit losses over its 35 years in the mortgage banking business."
- Credit Suisse reported on February 8, 2006 that it rated Countrywide as "Outperform."

### 19.    2005 Form 10-K

735.   On March 1, 2006, Countrywide filed its Annual Report for 2005 with the SEC on Form 10-K.  The report was signed by Defendants Mozilo, Kurland, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Robertson, Russell and Snyder.  In the 2005 Form 10-K, the Company reported revenues of $10,016,708,000 and diluted earnings per share of $4.11.

736.   In a section of the 2005 Form 10-K titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the retained interests on the Company's balance sheet as of December 31, 2005 was $2,675,461,000.  Further, the Company reported an impairment in the fair value of its retained interests that equaled $364,506,000.

737.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2005 Form 10-K, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

738.   In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of representations and warranties "total[ed] $169.8 million."

739.   In a section titled "Securitizations," the Company reported that the fair value of its MSRs as of December 31, 2005 was $12,720,755,000, in comparison to $8,882,917,000 as of December 31, 2004.

740.   The Company reported allowance for loan losses of $189,201,000 in its 2005 Form 10-K, having increased its provision for loan losses by $115,685,000 during the year.   The Company also had net charge-offs of $25,173,000.

741.   Countrywide reported in its 2005 Form 10-K that prime mortgages and prime home equity loans held for investment equaled $48,619,590,000 and $14,991,351,000, respectively, and nonprime mortgage loans held for investment equaled $255,677,000, or less than 1% of total mortgage loans held for investment.

742.   In the 2005 Form 10-K, the Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in the total volume of loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the year equaled $33,334,000,000. Mortgage Banking nonprime mortgage loans originating during the year equaled $40,089,000,000, and was 9.3% of the total Mortgage Banking loans originated for the year ended.

743.   Moreover, the Company stated the following in the 2005 Form 10-K as to the purported high quality of its loans:

> The majority of our loan production consists of Prime Mortgage loans[;] . . . [o]ur pay-option loan portfolio has a relatively high initial loan quality, with original average FICO scores . . . of 720 and

1    original loan-to-value and combined loan-to-values of 75% and 78%,
2    respectively.

3    744.  In a section of the 2005 Form 10-K titled "Mortgage Credit Risk,"
4    the Company described its Credit Policy, portraying it as a tightly controlled and
5    supervised process designed to produce "loans [that] are salable in the secondary
6    mortgage market" through a rigorous pre-loan screening procedure and post-loan
7    auditing and appraisal and underwriting reviews:

8    **Loan Quality**

9    Our credit policy establishes standards for the determination of
10   acceptable credit risks.  Those standards encompass borrower and
11   collateral quality, underwriting guidelines and loan origination
12   standards and procedures.

13

14   Borrower quality includes consideration of the borrower's credit and
15   capacity to pay.  We assess credit and capacity to pay through . . .
16   manual or automated underwriting. . . .  Our underwriting guidelines
17   for non-conforming mortgage loans, Prime Home Equity Loans, and
18   Nonprime Mortgage Loans have been designed so that these loans are
19   salable in the secondary mortgage market.  We developed these
20   guidelines to meet the requirements of private investors, rating
21   agencies and third-party credit enhancement providers.

22

23   These standards and procedures encompass underwriter qualifications
24   and authority levels, appraisal review requirements, fraud controls,
25   funds disbursement controls, training of our employees and ongoing
26   review of their work. . . .  We also employ proprietary underwriting
27   systems in our loan origination process that improve the consistency

28

1   of underwriting standards, assess collateral adequacy and help to
2   prevent fraud, while at the same time increasing productivity.

3

4   We supplement our loan origination standards and procedures with a
5   post-funding quality control process. Our Quality Control
6   Department, under the direction of the Chief Credit Officer, is
7   responsible for completing loan audits that may consist of a re-
8   verification of loan documentation, an underwriting and appraisal
9   review, and if necessary, a fraud investigation.

10   745.   Further, Countrywide represented in its 2005 Form 10-K that it
11   managed its credit risk by retaining high credit quality mortgages: "[w]e manage
12   mortgage credit risk . . . by **retaining high credit quality mortgages in our loan**
13   **portfolio.**"

14   746.   KPMG issued an audit report on management's assessment of the
15   Company's internal control over financial reporting, in accordance with the
16   standards of the Public Company Accounting Oversight Board. In a report dated
17   February 27, 2006, KPMG stated:

18   We conducted our audit in accordance with the standards of the Public
19   Company Accounting Oversight Board (United States). In our
20   opinion, management's assessment that the Company maintained
21   effective internal control over financial reporting as of December 31,
22   2005, is fairly stated, in all material respects, based on criteria
23   established in Internal Control—Integrated Framework issued by the
24   Committee of Sponsoring Organizations of the Treadway
25   Commission (COSO). . . . We also have audited, in accordance with
26   the standards of the Public Company Accounting Oversight Board
27   (United States), the consolidated balance sheets of Countrywide
28   Financial Corporation and subsidiaries as of December 31, 2005 and

1    2004, and . . . expressed an unqualified opinion on those consolidated

2    financial statements.

3    747. Further assuring investors of the veracity of the information

4    contained in the Form 10-K, the report included SOX certifications signed by

5    Defendants Mozilo and Sieracki, representing that the "report does not contain

6    any untrue statement of a material fact" and "the financial statements, and other

7    financial information included in this report, fairly present in all material respects

8    the financial condition" of Countrywide and that the Company employed internal

9    disclosure controls and procedures that detect "[a]ll significant deficiencies and

10    material weaknesses in the design or operation of internal control over financial

11    reporting" and "[a]ny fraud, whether or not material, that involves management."

12    748. The statements referenced above in Countrywide's 2005 Form 10-K

13    were materially false and misleading when made. As set forth in greater detail

14    above, the Company's reported revenue and diluted earnings per share were false

15    and misleading because the Company's allowance for loan losses and accruals for

16    representations and warranties were understated, and its assessments of fair

17    values for retained interests and MSRs were overstated. See Section IV.G above.

18    Statements related to loan loss reserves, retained interests, MSRs and liabilities

19    related to representations and warranties were false and misleading for the same

20    reasons set forth in Section IV.G above. Further, the statements relating to the

21    volume of prime home equity and nonprime loans produced and the value of

22    prime loans held for investment were false and misleading because Countrywide

23    misclassified subprime loans as prime loans to inflate volumes of prime loans,

24    and for the same reasons set forth in Section IV.D. Moreover, the statements that

25    Countrywide "retain[ed] high credit quality mortgages in our loan portfolio" and

26    that its loan origination standards and procedures were designed to produce

27    "loans [that] are salable in the secondary mortgage market" and "[o]ur pay-option

28    loan portfolio has a relatively high initial loan quality, with original average FICO

1   scores . . . of 720" were false and misleading because Countrywide severely

2   loosened and abandoned its underwriting practices to boost loan volume without

3   regard for loan quality.  See Sections IV.C and IV.E above.  Defendant KPMG's

4   2005 unqualified audit opinion report and assessment of management's internal

5   controls was false and misleading for the same reasons stated in Sections IV.G.5

6   and VI above.  Moreover, the SOX certifications signed by Defendants Mozilo

7   and Sieracki were false and misleading for the same reasons stated in Section

8   IV.G above.

9         **20.    March 6, 2007 Raymond James Institutional Investor**
              **Conference**

10

11         749.   On March 6, 2007, after some of Countrywide's competitors began

12   having problems because of their lending practices, Defendant Sieracki, speaking

13   at a Raymond James Institutional Investor Conference, made further false and

14   misleading statements about Countrywide's access to liquidity.   Sieracki

15   acknowledged the critical importance of liquidity in his remarks.  In particular, he

16   noted that: "Liquidity is a huge issue.  Not all of these models [a reference to the

17   business models of various Countrywide competitors in the lending industry] are

18   going to be able to fund themselves and you are going to see some of these

19   companies go out of business."

20         750.   Later during the same conference, Sieracki stated that: "***We're very***

21   ***well positioned at Countrywide due to*** experience in these cycles, expertise,

22   operating controls and ***our liquidity position***.  Let's fact it this is a pain phase of a

23   healthy process.  ***We're a top conditioned athlete*** and I would suggest that the

24   futures present value of this outcome, of this pain felt today is greater than

25   stumbling along at the status quo here."

26         751.   The statements referenced above were materially false and

27   misleading.  Specifically, Sieracki's statements that "We're very well positioned

28   at Countrywide due to . . . our liquidity position" and "[w]e're a top conditioned

1   athlete" were false and misleading because Countrywide did not have access to

2   the liquidity.  See Sections IV.H.1 and IV.B.

3   **21.   March 30, 2006 Countrywide Equity Investors Forum**

4   752.  On March 30, 2006, Countrywide hosted a Financial Equity

5   Investors Forum (the "March 30, 2006 Conference") in which Defendants

6   Mozilo, Kurland, Sambol, Sieracki, and Garcia participated.  Defendant Sambol

7   commented on the Company's culture.  He stated that while the Company focuses

8   on competition offensively, at the same time it was "supplemented by a strong

9   defense" or otherwise strong internal control:

10   We're extremely competitive in terms of our desire to win, and we

11   have a particular focus on offense, which at the same time is

12   supplemented by a strong defense as well, meaning that we have an

13   intense and ongoing focus on share growth while at the same time

14   ***maintaining a very strong internal control environment and what we***

15   ***believe is best-of-class governance. . . .  [O]ur culture is also***

16   ***characterized by a very high degree of ethics and integrity in***

17   ***everything that we do.***

18   753.  At the March 30, 2006 Conference, Garcia responded to a question

19   from an audience member inquiring whether or not the Company properly

20   reserved for loan losses.  Garcia responded that Countrywide properly reserved

21   for loan losses because of the very high quality of the loans that Countrywide

22   originated:

23   Unidentified Audience Member:  Carlos, can you talk a little bit about

24   your credit expectations and your bank portfolio and also your reserve

25   methodology and how would you answer critics who feel that you're

26   under-reserving in that portfolio, given the amount of pay option

27   ARMs and I[nterest] O[nly] [mortgage loans]?

28

1    Carlos Garcia - Countrywide Financial - EMD and Chief of Banking: .
2    . . the pay options that we're originating are very **high-quality pay**
3    **options**, both in terms of FICO and LTV, as well as other credit
4    attributes that we look at. . . . Also, our pay option reduction is
5    originated through the Countrywide['s] channels and is a **beneficiary**
6    **of strong underwriting** . . . . So we think we understand the risk very
7    well. . . .

8                              * * *

9    In terms of our reserves and charge-offs, I would have you look at our
10    charge-off experience and relate it to our reserves.  Our reserves are
11    around 18 basis points and our charge-off experience is something
12    like in the neighborhood of two to three basis points.  And so there's a
13    multiples of the charge-off experience in the reserve, we have
14    reserved not based on our historical experience, because we've been
15    growing a new book, so we've looked at all of these different
16    scenarios and **made many conservative assumptions and based our**
17    **[loan loss] reserves on that.**

18    754.  Defendant Mozilo also spoke during the Conference about his
19   ownership and sales of Countrywide's stock.  Mozilo claimed that he sold his
20   Countrywide stock pursuant to a 10b5-1 plan and "had no control over it":

21    Lisa Riordan – Countrywide Financial - EVP Investor Relations:
22    Great.  Some people feel that insider ownership is a little low.  Can
23    you comment on this?

24

25    Angelo Mozilo – Countrywide Financial - Chairman and CEO: . . .
26    Now, in my case, I own about a quarter of a [billion] [shares].  I don't
27    know what the scope of what you think is wealthy, but I own about
28    250 some-odd [m]illion, 260 [m]illion, if I can read that right,

1     between the stock and options that I hold and small amount of

2     incentive stock, which I just think has just vested.  And the only thing

3     -- I've not sold any shares for years. . . .  ***But in recent years I've sold***

4     ***no stock and I have no intention of selling any stock***.

5

6     The only thing I've sold are options that are expiring.  And I have a

7     group that you've seen, those of you that follow, have seen me sell a

8     certain amount of shares every week that's under a [10b5-1 plan] ***so I***

9     ***have no control over it***.  And I think the last exploration is either May

10     or June of this year and I have options in the outer years.  So ***I've only***

11     ***sold those that I've been compelled to sell because I really believe in***

12     ***this company***, I believe we're just at the threshold of our greatness.

13     755.  The statements made during the March 30, 2006 Conference above

14 were materially false and misleading when made.    Defendant Sambol's

15 statements that the Company had "a very strong internal control environment"

16 and that management had a "very high degree of ethics and integrity" were false

17 and misleading because Countrywide's internal controls over financial reporting

18 were ineffective.  See Section IV.G.5.  Defendant Garcia's statement that the

19 Company's loan loss reserves were proper because its Bank pay-option ARM

20 loans were "very high-quality pay options both in terms of FICO and LTV" was

21 false for the reasons set forth in Sections IV.G.1 and IV.E above.  Defendant

22 Mozilo's statement that he sold his Countrywide stock pursuant to a 10b5-1 plan

23 and "had no control over it" was false for the reasons set forth in Section V

24 above.

25     756.  Analysts reacted positively to Countrywide's materially false and

26 misleading statements.  For example, on March 31, 2006, Citigroup analysts

27 reiterated a "Buy" rating for Countrywide's shares based in part on

28

1    management's false "upbeat assessment of CFC's positioning & growth prospects

2    during the current mortgage downturn [at the investor forum]."

3        **D.    The Company's False Statements Regarding 2006 Results**

4            **1.    First Quarter 2006 Form 8-K**

5        757.   On April 27, 2006, Countrywide filed a Form 8-K, signed by Laura

6    Milleman, attaching a press release that announced the Company's financial

7    results for the first quarter of 2006, ended March 31, 2006.   The Company

8    reported a slight decrease in year-over-year earnings.  In the press release, Mozilo

9    attributed the decrease to an increasingly challenging environment.

10       758.   Countrywide reported gain-on-sale of loans and securities of

11   $1,361,178,000 for the quarter.

12       759.   Countrywide's statements contained in the April 27, 2006 Form 8-K

13   and press release were false and misleading.  Mozilo's statement that the decrease

14   in the Company's earnings was due to a "challenging environment" was false and

15   misleading for the reasons set forth in Sections IV.B and IV.C.  Specifically, the

16   Company's reported gain-on-sale was false because the Company materially

17   overstated the fair value of its retained interests and MSRs.  See Sections IV.G.2

18   and IV.G.3.

19           **2.    First Quarter 2006 Conference Call**

20       760.   On a conference call held later that same day ("April 27, 2006

21   Conference Call"), in which Defendant Mozilo, Sieracki, Kurland and Garcia

22   participated, the Company's senior management discussed the first quarter 2006

23   financial results and the financial outlook for the second quarter of 2006.

24   Specifically, Defendant Mozilo emphasized that even with challenges in the

25   mortgage industry, the Company still increased profitability while also increasing

26   its loan loss provision by $44 million:

27       For the first quarter of 2006, the Company also experienced a $44

28       million increase in the consolidated provision for loan losses.  ***This***

1    *increase was primarily a result of growth and seasoning of the*
2    *investment loan portfolio*.

3    761.   During the April 27, 2006 Conference Call, Mozilo highlighted the
4    purported quality of the Company's Pay Option ARM loans:

5    It's important to note that **our pay option loan quality remains**
6    **extremely high.**   Original CLTVs and original loan to values are 78%
7    and 75% respectively.   Average FICO scores on the pay option
8    portfolio are over 720.

9    762.   The statements made during the April 27, 2006 Conference Call
10   above were materially false and misleading when made.   Specifically, Defendant
11   Mozilo's statement regarding the reasons why Countrywide increased its loan
12   loss provision by $44 million was false and misleading for the reasons set forth in
13   Section IV.G.1 above.   Mozilo's statements that Countrywide's "pay option loan
14   quality remains extremely high" and its "[a]verage FICO scores on the pay option
15   portfolio are over 720" were false and misleading for the same reasons set forth in
16   Sections IV.E and IV.B.2 above.

17   763.   Analysts reacted positively to these materially false and misleading
18   statements.   For example, on May 1, 2006, Merrill Lynch analysts reiterated a
19   "Buy" rating for Countrywide stock.   Their opinion was based in part on
20   Countrywide's credit reserves in the first quarter.   Specifically, Merrill Lynch
21   analysts reported that, "CFC provisioned for $63M in credit losses in Q1'06,
22   meaningfully higher than the $24M in Q4'05, though **credit appears quite**
23   **strong.**"

24   764.   Further, several other analysts either raised or maintained their stellar
25   recommendations and earnings estimates for Countrywide as a result of
26   Countrywide's misrepresentations:

27   •   AG Edwards reported on April 27, 2006 that "[w]e are
28   raising our 2006 and 2007 EPS estimates by $0.20 each to

1    $4.50 and $4.90, respectively. We remain bullish on

2    CFC. . . ."

3    • Credit Suisse First Boston rated Countrywide "Outperform"

4    on May 3, 2006.

5    • Morgan Stanley rated Countrywide as "Overweight" on May

6    10, 2006.

7    **3.    First Quarter 2006 Form 10-Q**

8    765.    On May 10, 2006, Countrywide filed its quarterly report on Form

9    10-Q for the first fiscal quarter of 2006, ended March 31, 2006, signed by

10   Defendants Kurland and Sieracki.    The Company reported revenues for the

11   quarter of $2,835,948,000, and diluted earnings per share of $1.10.

12   766.    The Company reported that the impairment of the fair value of its

13   retained interest for the quarter equaled $120,654,000.

14   767.    In the "Off-Balance Sheet Arrangements and Guarantees" section of

15   the Form 10-Q, Countrywide described the representations and warranties

16   exposure associated with the securitization of its loans, as follows: "We do not

17   believe that any of our off-balance sheet arrangements have, or are reasonably

18   likely to have, a current or future material effect on our financial condition,

19   results of operations, liquidity, capital expenditures or capital resources."

20   768.    In a section titled "Credit Risk Management," the Company reported

21   the liabilities associated with the risk of representations and warranties that

22   "totaled $271.9 million at March 31, 2006 . . . ."

23   769.    In a section titled "Securitizations," the Company reported that the

24   fair value of its MSRs was $14,171,804,000 as of March 31, 2006.

25   770.    The Company reported allowance for loan losses of $172,271,000 as

26   of March 31, 2006.  The Company also allocated $37,927,000 from the quarter's

27   beginning balance to other assets.  Also, net charges-offs equaled $28,494,000.

28

771. Countrywide also reported loans held for investment, as follows: prime mortgages and prime home equity loans held for investment equaled $53,463,593,000 and $14,963,131,000, respectively. Nonprime mortgage loans held for investment equaled $324,040,000, or less than 1% of total mortgage loans held for investment.

772. In the Form 10-Q, the Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in the total Mortgage Banking volume of loans produced for the quarter-ended). Mortgage Banking prime home equity loans originated during the quarter equaled $9,528,000,000. Mortgage Banking nonprime mortgage loans originated during the quarter equaled $8,099,000,000, and was 8.7% of the total Mortgage Banking loans originated.

773. Moreover, in the Form 10-Q, the Company touted the high quality of its loans:

> "[W]e have a portfolio of mortgage loans held for investment, consisting **primarily of Prime Mortgage and Prime Home Equity Loans . . .**" and "[w]e view [pay option adjustable rate] loans as a profitable product that does not create disproportionate credit risk. Our pay-option loan portfolio has **very high initial loan quality, with original average FICO scores (a measure of credit rating) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.**"

774. With respect to management's review of the Company's disclosure controls and internal controls, it reported: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

775. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

776. The statements contained in the first quarter 2006 Form 10-Q above were materially false and misleading when made. Specifically, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above. Also, management's statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section IV.D above. Moreover, the representations that Countrywide "view[s] [Pay Option ARM] loans as a profitable product [with] very high initial loan quality" and "portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality. See Sections IV.E, IV.D and IV.C. The statements relating to internal controls were false and misleading because Countrywide's internal controls over financial reporting were ineffective. See Section IV.G.5. Moreover, the SOX certifications signed by Defendants Mozilo

1   and Sieracki were false and misleading for the same reasons stated in Section

2   IV.G above.

3           **4.**     **May 17, 2006 American Financial Services Association**
                         **Finance Industry Conference for Fixed Income Investors**

4

5   777.   On May 17, 2006, Countrywide participated in the American

6   Financial Services Association's Finance Industry Conference for Fixed Income

7   Investors ("May 17, 2006 Conference").  At the conference, Vincent Breitenbach,

8   Countrywide's Managing Director of Treasury Finance, discussed the Company's

9   credit risk management and emphasized that Countrywide limited its credit risk

10   by underwriting loans with "strong FICO scores":

11       [W]e do have a very healthy conservative approach to credit. . . .  We

12       talked about some of the metrics that we look at while underwriting

13       credit.  ***We want strong FICO scores, we want high down payments***

14       ***or low LT[V]s.***

15   778.   At the May 17, 2006 Conference, Breitenbach described the type of

16   borrowers that Countrywide targeted for ARM loans in order to maintain high

17   credit quality:

18       In our view the most important risk associated with th[e] [pay-option

19       ARM] product . . . is to ensure that the borrower is not using that

20       optionality just get in the house. . . .   The type of customer we're

21       looking for is someone who is a salesperson who may have some

22       variability in their monthly pay, an investment banker who has 11

23       months of reasonably good pay and then hopefully has one really

24       good month when he gets a bonus.  We have a lot of ***fairly rich people***

25       in there who are looking at this product as an arbitrage opportunity.  If

26       you can borrow money against a $2 or $3 million house at 3, 4, 5%,

27       then you can go out and invest in the market at a significantly greater

28       rate.  People we use -- ***some rich people at least*** -- will use this as an

1    arbitrage type of a vehicle. So these are the type of customers that
2    we're looking for.

3    779. At the May 17, 2006 Conference, Breitenbach also stated that
4    Countrywide guarded against having subprime loans in its portfolio at the Bank:

5        The way that we guard against not having sub-prime people in our
6        portfolio is a couple of different things. First of all the FICO scores
7        would indicate to us that from a historical perspective, this guy is
8        showing the ability and the propensity to pay on time with *a 727*
9        *average FICO score.* And by the way, *the dispersion around that*
10       *mean is pretty tight.* Again, *we're not trying to fool you* and we're
11       certainly not going to fool ourselves by putting in a bunch of lower
12       quality borrowers into the portfolio.

13   780. The statements referenced above during the May 17, 2006
14   Conference Call were materially false and misleading when made. Importantly,
15   after the call, the Officer Defendants did not issue corrections to any of
16   Breitenbach's statements. Specifically, Breitenbach's statements that the
17   Company has "a very healthy conservative approach to credit" and that the
18   Company "want[s] strong FICO scores" and "low LT[V]s" were false and
19   misleading because Countrywide severely loosened and eventually abandoned its
20   underwriting standards to increase loan volume without regard to loan quality.
21   See Sections IV.B and IV.C. In addition, Breitenbach's statements relating to
22   borrowers who are "fairly rich" and sophisticated for the Company's Pay Option
23   ARMs were misleading for the same reasons set forth in Sections IV.E and
24   IV.B.2 above. Lastly, Breitenbach's statement that Countrywide "guards against
25   not having sub-prime people in our portfolio" at the Bank was false and
26   misleading for the same reasons set forth in Sections IV.C and IV.B above.

27

28

### 5. Second Quarter 2006 Form 8-K

781.   On July 25, 2006, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release that announced the Company's financial results for the second quarter of 2006, ended June 30, 2006.  In the press release, Mozilo touted the Company's "strong results."

782.   Moreover, in the press release, Countrywide reported gain-on-sale of loans and securities in the amount of $1,527,450,000 for the quarter.

783.   Countrywide's and Mozilo's statements contained in the July 25, 2006 press release were materially false and misleading when made for the reasons set forth in Sections IV.G and IV.C.  The Company's reported gain-on-sale revenue was false and misleading because the Company overstated its retained interests and MSRs.  See Sections IV.G.2 and IV.G.3.

### 6. Second Quarter 2006 Conference Call

784.   There was a conference call held later the same day ("July 25, 2006 Conference Call") in which Defendants Mozilo, Sieracki, Kurland and Garcia participated, during which the Company's senior management discussed the second quarter 2006 financial results.   An analyst from Bear Stearns asked Defendant Mozilo about real estate appraisal values and whether Countrywide used internal or external appraisers.  In response, Mozilo touted the quality of the Company's appraisers, stating that Countrywide has very high quality internal and external appraisers:

> Well, we have a panel of appraisers, approved appraisers, that work through LandSafe.  . . . We do have internal appraisers to review the work of outside appraisers, so the answer to both is yes.  ***Again, we'll only use our own approved appraisers, and that panel is screened very carefully from time to time to make sure that we're getting rid of the bad ones and we're only putting in good ones.***

785.   Defendant Mozilo's statement that Countrywide "get[s] rid of the bad [appraisers] and we're only putting in good ones" was materially false and misleading when made for the reasons set forth in Section IV.C above.

786.   Analysts reacted positively to the Company's materially false and misleading statements.  For example, on July 25, 2006, analysts at Citigroup rated Countrywide's stock a "Buy" with "Medium risk."

787.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of its misrepresentations:

- Morgan Stanley reported on July 25, 2006 that they "[m]aintain buy rating and $45 price target."

- Stifel Nicolaus reported on July 26, 2006 that "we continue to believe CFC is well positioned to grow through the more challenging mortgage environment ahead."

- On July 26, 2006, Piper Jaffray reported that "[we are] still very comfortable with CFC's credit quality . . . [w]e reiterate our Outperform rating and our $62 target."

**7.    Second Quarter 2006 Form 10-Q**

788.   On August 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the second fiscal quarter of 2006, ended June 30, 2006, signed by Defendants Kurland and Sieracki.   The Company reported revenues for the quarter of $3,000,216,000 and diluted earnings per share of $1.15.

789.   The Company reported that the recovery of fair value for its retained interests equaled $51,498,000.

790.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are

1  reasonably likely to have, a current or future material effect on our financial
2  condition, results of operations, liquidity, capital expenditures or capital
3  resources."

4   791.  Countrywide also represented that it assumed risk with its
5  representations and warranties when it underwrote loans to the secondary market.
6  Management stated that: "[t]he liability associated with this risk totaled $307.6
7  million at June 30, 2006 and $169.8 million at December 31, 2005."

8   792.  In a section titled "Securitizations," the Company reported that the
9  fair value of the MSRs at June 30, 2006 was $15,320,575,000.

10   793.  The Company's reported allowance for loan losses for the six
11  months ended June 30, 2006 of $183,581,000.

12   794.  Countrywide reported mortgages held for investment in the second
13  quarter 2006 Form 10-Q.  Prime mortgage loans and prime home equity loans
14  equaled  $55,433,612,000  and  $19,081,303,000,  respectively.  Nonprime
15  mortgage loans held for investment equaled $9,290,000, or less than 1% of total
16  mortgage loans held for investment.

17   795.  The volume of Mortgage Banking loans originated for the quarter by
18  mortgage loan type, was reported as follows:  prime, prime home equity, and
19  nonprime  loans  amounted  to  $82,229,000,000,  $10,171,000,000,  and
20  $11,235,000,000, respectively.

21   796.  Moreover, the Company made a representation in the Form 10-Q as
22  to the purported high quality of its loans:

23   "[W]e have a portfolio of mortgage loans held for investment,
24   ***consisting primarily of Prime Mortgage and Prime Home Equity***
25   ***Loans . . .***" and "[o]ur pay-option investment loan portfolio borrowers
26   had, at the time the loans were originated, average FICO scores (a
27   measure of borrower creditworthiness) of 721 and original loan-to-
28   value and combined loan-to-values of 75% and 78%, respectively."

797.   The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

798.   Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

799.   The statements contained in the second quarter 2006 Form 10-Q were materially false and misleading when made.  Specifically, the Company's reported values for its revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated.  See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.   Also, management's statements regarding the quality of the volume of loans produced and loans held for investment were also false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.   Moreover, the representations that "[o]ur pay-option investment loan portfolio borrowers [had] . . . average FICO scores . . . of  721" and "[our] portfolio of mortgage loans held for investment, consist[ed] primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because the Company loosened and abandoned its underwriting practices to increase loan

1   volume without regard to loan quality.  See Sections IV.E, IV.B.2, IV.D and

2   IV.C.  The statements relating to internal controls were false and misleading

3   because the Company's internal controls over financial reporting were

4   ineffective.  See Section IV.G.5.  Moreover, the SOX certifications signed by

5   Defendants Mozilo and Sieracki were false and misleading for the same reasons

6   stated in Section IV.G above.

7   **8.      September 12, 2006 Equity Investors Forum**

8   800.   On September 12, 2006, Countrywide held an Equity Investor Forum

9   (the "September 12, 2006 Conference") in which Defendants Mozilo, Sambol and

10  Sieracki participated.  Jim Furash, Countrywide's Senior Managing Director and

11  President of Countrywide Bank, emphasized numerous times during the

12  conference, without correction or explanation by Mozilo, Sambol or Sieracki, the

13  "high quality" of loans that are held by Countrywide's Bank:

14      [W]e have built a very large, fast growing, and very efficient deposit

15      franchise that has enabled Countrywide to invest in a ***top quality***

16      ***mortgage origination***. . . .  But essentially our model is investing in

17      ***very low-risk assets today***, and a very low net interest margin.

18                          * * *

19      ***[I]incredibly strong asset quality at the bank.***  I'd like to emphasize

20      again the large, tangible, high quality balance sheet that we build. . . .

21      ***A very strong portfolio. . . .***  So we're very pleased with the credit

22      decisions that we're making and the returns that we are receiving as a

23      result of those decisions.

24      801.   Furash also discussed the Company's loan loss reserves, touting that

25  the Company "continue[s] to build . . . reserves in anticipation of any potential

26  threats":

27      Obviously the bank's total footings and earnings have been growing

28      substantially over the last years, ***but we've been able to match that***

1                 ***growth with our growth and our loan loss reserve.*** So even though

2                 we are growing our balance sheet very quickly, ***we continue to build***

3                 ***our reserves in anticipation of any potential threats that we see in***

4                 ***the portfolio. And again I'm very proud of that ability to maintain***

5                 ***this loan loss reserve growth while maintaining our earnings***

6                 ***productivity*** that I mentioned earlier. Again today our loan loss

7                 reserve's about $163 million dollars, 21 basis points on assets and

8                 that's up three basis points over the last quarter alone I believe.

9       802. The statements referenced above during the September 12, 2006

10 Conference Call were materially false and misleading when made. Specifically,

11 Furash's statement that "Countrywide invests in [ ] top quality mortgage

12 origination . . . in low risk assets" was false and misleading because Countrywide

13 loosened and abandoned its underwriting guidelines during the Class Period. See

14 Sections IV.B.2 and IV.C. Further, Furash's statement that "we continue to build

15 our [loan loss] reserves in anticipation of any potential threats" was false and

16 misleading for the reasons stated in Section IV.G.1 above.

17           **9. September 13, 2006 Fixed Income Investor Forum**

18       803. On September 13, 2006, Countrywide Financial hosted a Fixed

19 Income Investor Forum ("September 13, 2006 Conference") in which Defendants

20 Mozilo, Sambol and Sieracki participated. At the conference, Mozilo touted the

21 Company's prudent lending practices as an industry role model:

22                 Not only did we drive efficiency in the marketplace, but as an industry

23                 leader ***we served as a role model to others in terms of responsible***

24                 ***lending.***

25

26                 We take seriously the role of a responsible lender for all of our

27                 constituencies. . . . ***To help protect our bond holder customers, we***

28                 ***engage in prudent underwriting guidelines*** . . . .

1      804.   Mozilo also emphasized Countrywide's minor position in non-prime
2  loans:

> Similarly if the pricing gets tough in a particular product category, we
> can back off just as we did with non-prime.  ***It's only 9% of our
> production today***, at one point 30%, whereas for monoline non-prime
> lenders irrational pricing limits their options.

7      805.   At the same conference, an AIG analyst asked Mozilo about a recent
8  *Wall Street Journal* article that compared securitized mortgage-backed security
9  delinquency rates at Countrywide to Washington Mutual ("WaMu").   Mozilo
10  responded by praising Countrywide and its underwriting practices:

> One . . . theory that is held by most debt holders is that we
> continuously have . . . the contingent liability on anything we shoot to
> securitize, ***irrespective of the fact that it's clear in the documents
> that we do not.***   But that we would maintain responsibility and
> maintain our integrity and reputation is a theory that has not held
> together and it's not real.  ***There's no way that that's going to happen
> because the most important thing to us is the integrity of our
> company, the financial integrity.***

19      806. At the September 13, 2006 Conference, Defendant Sambol
20  responded to a question regarding the growth of prime and subprime mortgage
21  loans at Countrywide by claiming that the Company did not heavily participate in
22  subprime loans:

> ***Our profile in the subprime market has been one where we have, for
> the most part, been on the sidelines. . . .***   And subprime however,
> particularly in the third-party channels, the wholesale channel we are
> in the bottom half of the top 10.  And the reason for that is that -- is
> that that market we view to have been subject to some irrational
> conduct.

1

2  So, we view the pricing to be somewhat irrational.  We view what's

3  happened on the credit front to be very liberal.  ***And so, we opted not***

4  ***to fully participate, and it's for that reason you haven't seen growth***

5  ***in subprime volume*** as maybe the subprime industry has grown.

6  807.   At the same conference, an audience member asked if Countrywide

7  should consider reducing its capital base because the Company grew so fast, and

8  such high growth rates are likely unsustainable.  Defendant Sieracki responded

9  by emphasizing that the growth rate at Countrywide was not synonymous with its

10  risk appetite and that Countrywide's risk appetite has not changed to assume high

11  risk assets:

12  ***We're the last ones to think that we should be aggressive and take***

13  ***high risk, there's no change in our risk appetite here***, we're simply

14  perfecting and refining our capital structure and making sure the

15  excess capital doesn't get out of line.  We're talking about equity

16  neutral transactions with hybrid securities, so it's really a matter of

17  refining, perfecting and optimizing our capital structure. . . .  ***So I***

18  ***don't want anybody to get the impression that there's been a change***

19  ***in our risk appetite or that we're going to do anything aggressive***

20  ***here.***

21  808.  At the same conference, Furash discussed the adequacy of

22  Countrywide's loan loss reserves:

23  Despite the significant asset growth we've been able to outpace that

24  growth in our loan portfolio with the growth in our reserve.  So again

25  I want to emphasize that ***we reserve a very conservative amount***

26  ***based on our expected losses***, and we've been able to outpace our

27  asset growth with our growth in our loan loss reserve provision.  ***So***

28

1    *management and myself feel very comfortable that we are well*
2    *reserved for all sorts of economic cycles that we can be*.

3    809.   The statements referenced above, made during the September 13,
4    2006 Conference Call, were materially false and misleading when made.
5    Defendant Mozilo's statements that "we served as a role model to others in terms
6    of responsible lending," and that "we engage in prudent underwriting guidelines,"
7    were false and misleading because Countrywide loosened and abandoned its
8    underwriting guidelines during the Class Period.   See Sections IV.B and IV.C.
9    Further, Mozilo's statement that subprime loans only consist of "9% of
10   [Countrywide's] production today" was false and misleading for the reasons set
11   forth in Section IV.C above.   Specifically, subprime loans were being classified
12   as prime loans due to a combination of weakening underwriting standards,
13   exception processing of its loans and managerial policies that encourage quantity
14   of loans, not quality.   This resulted in a deterioration in the creditworthiness of
15   Countrywide's portfolio over the Class Period and an increase in subprime loans.
16   Defendant Sambol's statement that "[o]ur profile in the subprime market has been
17   one where . . . [we are] on the sidelines" and we "opted not to fully participate . . .
18   in subprime" were false and misleading for the reasons set forth in Section IV.C.
19   Additionally, Defendant Mozilo's statement that the "most important thing to
20   [management] is the [financial] integrity of the company" was false and
21   misleading for the reasons stated herein and set forth in Sections IV.G.5 and
22   IV.C.   Defendant Sieracki's statements that there has been no "change in our risk
23   appetite" and "that we're [not] going to do anything aggressive here" were false
24   for the same reasons set forth in Sections IV.B and IV.C above.   Likewise,
25   Furash's statement that "we reserve a very conservative amount [for loan losses]
26   based upon our expected loss" was false and misleading because the Company
27   manipulated its earning by taking inadequate allowances for loan losses.   See
28   Section IV.G.1.

810.   Analysts reacted positively to Countrywide's materially false and misleading statements above.  For example, on September 13, 2006, analysts at Credit Suisse rated Countrywide's stock "Outperform."  Analysts at Credit Suisse based their opinion upon management's false assurances and concluded that "[c]redit quality remains sound at Countrywide, generally better than management's initial expectations.  CLTVs, FICOs and delinquency trends of its $34.2 billion Option ARM portfolio have remained stable over the past three years.  Countrywide has been selling subprime residuals to further reduce credit risk."

811.   In addition, Fox-Pitt Kelton analysts retained a positive outlook on Countrywide's stock.  Fox-Pitt analysts reported on September 13, 2006 that "[w]e [r]emain [p]ositive [o]n CFC [d]espite [t]he [c]hallenging [e]nvironment[.]"

### 10.   Third Quarter 2006 Form 8-K

812.   On October 24, 2006, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release which announced the Company's financial results for the third quarter of 2006, ended September 20, 2006.In the press release, Mozilo reported as follows:

> Countrywide achieved **strong results** in the Banking, Capital Markets and Insurance segments, while the Mortgage Banking segment continued to experience the effects of a transitional market . . . .

813.   Moreover, in the press release, Countrywide reported a gain-on-sale of loans and securities of $1,166,000,000 for the quarter.

814.   The statements contained in the Form 8-K and October 24, 2006 press release were materially false and misleading when made.  Defendant Mozilo's statement that the third quarter 2006 financial results were "strong" was false and misleading for the reasons set forth in Sections IV.G and IV.C. Moreover, the Company's reported gain-on-sale was false and misleading

because Countrywide overstated the fair value for its retained interests and MSRs. See Sections IV.G.2 and IV.G.3 above.

### 11.   Third Quarter 2006 Conference Call

815.   Later the same day, Countrywide's senior management held a conference call (the "October 24, 2006 Conference Call") in which Defendants Mozilo, Sambol, Sieracki and Garcia participated and discussed the Company's financial results for the third quarter of 2006 and the fourth quarter and year end outlook.  Specifically, Mozilo emphasized that the Company's asset valuation reserves and loan loss reserves were appropriate for the increase in delinquencies that occurred:

> The year-over-year ***increase in delinquencies and foreclosures are primarily the result of portfolio seasoning, product mix, and changing economic and housing market conditions. . . .*** The Company believes its asset valuation reserves credit losses are appropriate for the increases in delinquencies.
>
> * * *
>
> The loan loss provision was $28 million in the third quarter of 2006, a decrease of $45 million in the third quarter of 2005. . . .   The allowance for loan losses was $180 million at September 30, 2006, as compared to $107 million at September 30, 2005. . . . ***The increase in delinquencies was in line with manager's expectations*** and primarily reflects the seasoning of the bank's loan portfolio.

816.   Defendant Mozilo's statements that "the Company's asset valuation reserves [for] credit losses are appropriate" and Mozilo's statement that "the increase in delinquencies was in line with management's expectations" were false and misleading for the reasons set forth in Section IV.G above.

817.   Analysts reacted positively to these materially false and misleading statements above.  For example, on October 24, 2006, analysts at Piper Jaffray

rated Countrywide's stock "Outperform" with low volatility.  Their opinion was based, in part, on Countrywide's "credit quality [being] . . . in line with expectations. . . ."

818.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations above:

- Fox-Pitt, Kelton reported on October 24, 2006 that, "[w]e rate CFC at Outperform and expect this company to be one of the best equipped to weather the housing storm of competition, shrinking market and regulatory scrutiny."
- Morgan Stanley rated Countrywide "Overweight" on October 24, 2006.
- Citigroup rated Countrywide as a "Buy" and stated on October 25, 2006 that "[c]redit was fine – in-line w/mgmt exp[ectations] as the portfolio seasons."

### 12.   Third Quarter 2006 Form 10-Q

819.   On November 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2006, ended September 30, 2006, signed by Defendants Sambol and Sieracki.  The Company reported revenues for the quarter of $2,822,495,000, and diluted earnings per share of $1.03.

820.   The Company reported in the Form 10-Q that the impairment of its retained interests equaled $141,857,000.

821.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the third quarter 2006 Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial

1  condition, results of operations, liquidity, capital expenditures or capital
2  resources."

3      822.   The Company also reported the amount of credit risk it assumed as a
4  result of its representations and warranties of its mortgage loans: "The liability
5  associated with this risk totaled $303.5 million at September 30, 2006. . . ."

6      823.   In a section of the Form 10-Q titled "Securitizations," the Company
7  reported that the fair value of the MSRs at September 30, 2006 was
8  $15,018,415,000.

9      824.   The Company reported allowance for loan losses of $207,987,000,
10  having increased its provision for loan losses by $37,996,000 during the quarter.

11      825.   Countrywide reported prime mortgage and prime home equity loans
12  held for investment that amounted to $55,486,886,000 and $19,625,354,000,
13  respectively.  In addition, nonprime mortgage loans held for investment equaled
14  $25,823,000, or less than 1% of total mortgage loans held for investment.

15      826.   The volume of Mortgage Banking prime, prime home equity and
16  nonprime loans originated during the quarter equaled $87,713,000,000,
17  $9,203,000,000, and $9,336,000,000, respectively.

18      827.   Moreover, the Company represented as to the high quality of its
19  loans, "we have a portfolio of mortgage loans held for investment, consisting
20  **primarily of Prime Mortgage and Prime Home Equity Loans. . . .**" and "[o]ur
21  pay-option investment loan portfolio borrowers had, at the time the loans were
22  originated, **average FICO scores (a measure of borrower creditworthiness) of**
23  **721 and original loan-to-value and combined loan-to-values of 75% and 78%,**
24  **respectively.**"

25      828.   The Company described its management of credit risk in the
26  following terms:

27      We manage mortgage credit risk by underwriting our mortgage loan
28      production to secondary market standards and by limiting credit

1     recourse to Countrywide in our loan sales and securitization

2     transactions. ***We also manage credit risk in our investment loan***

3     ***portfolio by retaining high credit quality loans***, through pricing

4     strategies designed to compensate for the risk. . . .

5     829.   The Company also reported management's review of the Company's

6 disclosure controls and internal controls: "There has been no change in our

7 internal control over financial reporting during the quarter ended September 30,

8 2006 that has materially affected, or is reasonably likely to materially affect, our

9 internal control over financial reporting. . . ."

10     830.   Further assuring investors of the veracity of the information

11 contained in the Form 10-Q, the report included SOX certifications signed by

12 Defendants Mozilo and Sieracki, which represented that the "report does not

13 contain any untrue statement of a material fact" and "the financial statements, and

14 other financial information included in this report, fairly present in all material

15 respects the financial condition" of Countrywide.

16     831.   The statements contained in the third quarter 2006 Form 10-Q were

17 materially false and misleading when made.   Specifically, the Company's

18 reported revenue and diluted earnings per share were false and misleading

19 because the Company's allowance for loan losses and accruals for representations

20 and warranties were understated, and its assessments of fair values for retained

21 interests and MSRs were overstated.  See Section IV.G above.  Statements related

22 to loan loss reserves, retained interests, MSRs and liabilities related to

23 representations and warranties were false and misleading for the same reasons set

24 forth in Section IV.G above.  Also, the statements regarding the quality of the

25 volume of loans originated and loans held for investment were false and

26 misleading because Countrywide misclassified subprime loans as prime loans,

27 and also for the reasons set forth in Section IV.D above.   Moreover, the

28 representations that "[o]ur pay-option investment loan portfolio [had an] . . .

1  average FICO score[] . . . of  721"; "[the Company's] portfolio of mortgage loans

2  held for investment consist[s]   primarily of Prime Mortgage and Prime Home

3  Equity Loans" and "[w]e also manage credit risk in our investment loan portfolio

4  by retaining high credit quality loans" were false and misleading because

5  Countrywide loosened its underwriting standards to increase loan volume without

6  regard to loan quality.   See Sections IV.E, IV.B.2, IV.D and IV.C.   The

7  statements relating to internal controls were false and misleading because the

8  Company's internal controls over financial reporting were ineffective.   See

9  Section IV.G.5.  Moreover, the SOX certifications signed by Defendants Mozilo

10  and Sieracki were false and misleading for the same reasons stated in Section

11  IV.G above.

### 13.     Year End 2006 Form 8-K

12

13       832.   On January 30, 2007, Countrywide filed a Form 8-K, signed by

14  Laura Milleman, attaching a press release that announced "record" earnings for

15  2006, driven by strong fourth quarter results.  The press release stated:

16       "Countrywide delivered **strong results** again in 2006," said Angelo R.

17       Mozilo, Chairman and Chief Executive Officer. . . .While our total

18       loan production declined six percent, **our performance outpaced the**

19       **industry.**

20       833.   Moreover, in the January 30, 2007 press release, Countrywide

21  reported gain-on-sale of loans and securities that equaled $1,419,318,000 for the

22  quarter ended December 31, 2006, and $5,681,847,000 for the year.

23       834.   The statements contained above in the January 30, 2007 Form 8-K

24  and press release were materially false and misleading when made.   Mozilo's

25  statement that the fourth quarter and year-end 2006 financial results were

26  "strong" was false and misleading for the reasons set forth in Sections IV.G and

27  IV.C above.  As a result, the Company's reported value for its gain-on-sale was

28

1  false and misleading because the Company overstated the fair value of its retained

2  interests and MSRs.  See Sections IV.G.1 and IV.G.2 above.

3  **14.    Year End 2006 Conference Call**

4  835.  Later that same day, Countrywide held a conference call discussing

5  the fourth quarter and year-end 2006 financial and operational results ("January

6  30, 2007 Conference Call") in which Defendants Mozilo, Sambol, Sieracki and

7  Garcia participated.  A Merrill Lynch analyst asked Mozilo why Countrywide

8  was adding so many credit enhancements to the Bank's portfolio.  Mozilo

9  responded that the Company was doing its best to expand its loan loss reserves to

10  the "maximum" in one form or another above what GAAP required:

11      Ken Bruce - Merrill Lynch – Analyst:  Okay.  And I noticed you were

12      adding quite a bit of credit enhancement to the bank portfolio.  Is that

13      just a reflection of that same cautious approach to what credit is doing

14      today?

15

16      Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO:

17      ***Yes, GAAP has its limitations on that issue and we are doing our***

18      ***best to expand our reserves in one form or another.***  And obviously

19      you have cash reserves and the other is that you discount the assets

20      and the third is that you can get pool insurance or MI insurance on the

21      assets.  ***We've I think exercised ourselves to the maximum in that***

22      ***regard and will continue to do so, by the way, throughout 2007*** . . . .

23  836.  At the January 30, 2007 Conference Call, Mozilo responded to a

24  question from an analyst at Piper Jaffray regarding current trends in the subprime

25  market by stating that the subprime industry was going to be severely hit because

26  of the decreased quality of borrowers.   Nonetheless, Mozilo represented that this

27  would not have a material impact on Countrywide because the Company had

28  backed away from the subprime area due to its concerns over credit quality:

1    You notice that in both the wholesale channel as well as our consumer

2    channel that our volumes were lower on a market share basis.   We

3    picked it up on the correspondent.   ***And it was because we backed***

4    ***away from the sub prime area because of our concern over credit***

5    ***quality.   And I think you're seeing the results of that with those***

6    ***competitors who took that product when we backed away.***

7

8    So I think there's a couple -- one is you're seeing two or three a day,

9    there's probably 40 or 50 a day throughout the country going down in

10   one form or another.   And I expect that to continue throughout the

11   year.   I think that sub prime is going to be severely hit primarily

12   because the sub prime business was a business of you take inferior

13   credit but you'd have, you'd require superior equity.   And so people

14   had to make a substantial down payment or if they had marginal

15   credit.

16

17   Well, that all disappeared in the last couple of years and you get a

18   100% loan with marginal credit and that doesn't work and so --

19   particularly if they have any kind of bumps like we have now in the

20   deterioration of real estate values because people can't get out.

21   837.   The statements referenced above during the January 30, 2007

22   Conference Call were materially false and misleading when made.   Defendant

23   Mozilo's statement that the Company was adding additional insurance to protect

24   against loan default to "exercise[ ] ourselves to the maximum"; and that "GAAP

25   has its limitations . . . [reserving for loan losses] and we are doing our best to

26   expand our reserves in one form or another" above what GAAP requires were

27   false and misleading for the same reasons set forth in Section IV.G.1 above.

28   Also, Mozilo's statement that Countrywide "backed away from the sub prime

area because of our concern over credit quality" was false and misleading because Countrywide was misclassifying subprime loans as prime loans, and also for the reasons set forth in Sections IV.D and IV.C above.

838.   Analysts reacted positively to the Company's materially false and misleading statements above.   For example, on February 2, 2007, analysts at Citigroup rated Countrywide's shares a "Buy" with "Medium Risk."

839.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of the Company's fraudulent misrepresentations:

- On January 31, 2007, Piper Jaffray maintained its "Outperform" rating for Countrywide.  Analysts stated that "[c]redit quality, while weakening, is still very respectable. . . ."

- On January 31, 2007, Merrill Lynch reiterated "Buy" for Countrywide stock and raised its price target to $50.  "Q4'06 results were generally viewed as a positive by the market . . . and the GOS margins were stronger than expected."

- Rapid Rating reported on January 31, 2007 that Countrywide's credit outlook is positive.  "[T]he company is a moderate to low risk and somewhat subject to fluctuations in market conditions, and that its assets are of very good quality."

### 15.   2006 Form 10-K

840.   On March 1, 2007, Countrywide filed its Annual Report for 2006 with the SEC on Form 10-K.  The report was signed by Defendants Mozilo, Sieracki, Milleman, Brown, Cisneros, Cunningham, Donato, Dougherty, Melone, Parry, Russell, Robertson and Snyder.   The Company reported revenues of $11,417,128,000, and diluted earnings per share of $4.30 for 2006.

841.   In a section titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the retained interests on its balance sheet as of December 31, 2006 was $3,040,575,000.   Further, the Company reported that the impairment in the fair value of its retained interests equaled $73,677,000 for the fourth quarter and $284.7 million for the year.

842.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2006 Form 10-K, Countrywide described the representations and warranties exposure associated with the securitization of its loans, as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

843.   In a section titled "Credit Risk Management", the Company also reported the liabilities associated with the risk of representation and warranties "total[ed] $390.2 million."

844.   Moreover, the 2006 Form 10-K stated that "contractual liability arises only when . . . representations and warranties are breached."  Countrywide also stated that it "attempt[s] to limit our risk of incurring these losses by structuring our operations to *ensure consistent production of quality mortgages* . . . ."

845.   The Company further reported in a section titled "Securitizations," that the fair value of its MSRs as of December 31, 2006 was $16,172,064,000.

846.   The Company reported allowance for loan losses of $261,054,000 as of the end of 2006.  The Company also had net charge-offs of $156,841,000.  The Company stated that "allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles."

847.   Countrywide also made representations concerning the purported high quality of its portfolio and the purportedly sufficient allowances and provision for loan losses in its 2006 Form 10-K:

"The increase in [the Company's] . . . allowance for loan losses reflects prevailing real estate market and economic conditions and the seasoning of the Bank's investment loan portfolio.  We expect the allowance for loan losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio continues to season and as current market conditions develop.  However, **we believe that our investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels.  We also believe our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles.**"

848.   Countrywide reported prime mortgages and prime home equity loans held for investment in the amounts of $230,139,000 and $56,029,000, respectively.   Nonprime mortgage loans held for investment amounted to $55,262,000, or less than 1% of total mortgage loans held for investment.

849.   In the 2006 Form 10-K, the Company reported that the volume of Mortgage Banking nonprime, prime home equity and prime loans originated during the year equaled $36,752,000,000, $39,962,000,000, and $344,370,000,000, respectively.

850.   Countrywide reported in its 2006 Form 10-K its high credit rating and strategy to continue to produce high quality mortgages to the secondary market:

Our strategy is to ensure our ongoing access to the secondary mortgage market by **consistently producing quality mortgages** and

1   servicing those mortgages at levels that meet or exceed secondary

2   mortgage market standards.

3

4   Moreover, the Company represented in its 10-K as to the purported

5   high quality of its loans: "[t]he ***majority of our loan production***

6   ***consists of Prime Mortgage loans.***"

7   851.  In a section of the Form 10-K titled "Mortgage Credit Risk," the

8   Company described its Credit Policy, portraying it as a tightly controlled and

9   supervised process with a rigorous pre-loan screening procedure, post-loan

10  auditing, appraisal, and underwriting reviews:

11  **Loan Quality**

12  Our credit policy establishes standards for the determination of

13  acceptable credit risks.  Those standards encompass borrower and

14  collateral quality, underwriting guidelines and loan origination

15  standards and procedures.

16

17  Borrower quality includes consideration of the borrower's credit and

18  capacity to pay.  We assess credit and capacity to pay through . . .

19  manual or automated underwriting. . . .  Our underwriting guidelines

20  for non-conforming mortgage loans, Prime Home Equity Loans, and

21  Nonprime Mortgage Loans have been designed so that these loans are

22  salable in the secondary mortgage market.  We developed these

23  guidelines to meet the requirements of private investors, rating

24  agencies and third-party credit enhancement providers.

25

26  These standards and procedures encompass underwriter qualifications

27  and authority levels, appraisal review requirements, fraud controls,

28  funds disbursement controls, training of our employees and ongoing

1   review of their work. . . .   We supplement our loan origination
2   standards and procedures with a post-funding quality control process.
3   Our Quality Control Department is responsible for completing loan
4   audits that may consist of a re-verification of loan documentation, an
5   underwriting and appraisal review, and, if necessary, a fraud
6   investigation.

7   852.   KPMG included in the 2006 Form 10-K an audit report on
8   management's assessment of the Company's internal control over financial
9   reporting, in accordance with the standards of the Public Company Accounting
10  Oversight Board.  In its report dated February 28, 2007, KPMG stated:

11  In our opinion, management's assessment that the Company
12  maintained effective internal control over financial reporting as of
13  December 31, 2006, is fairly stated, in all material respects, based on
14  criteria established in Internal Control—Integrated Framework issued
15  by the Committee of Sponsoring Organizations of the Treadway
16  Commission (COSO). . . . and our report dated February 28, 2007,
17  expressed an unqualified opinion on those consolidated financial
18  statements.

19  853.   Further assuring investors of the veracity of the information
20  contained in the Form 10-K, the report included SOX certifications signed by
21  Defendants Mozilo and Sieracki, representing that the "report does not contain
22  any untrue statement of a material fact" and "the financial statements, and other
23  financial information included in this report, fairly present in all material respects
24  the financial condition" of Countrywide and that the Company employed internal
25  disclosure controls and procedures that detect "[a]ll significant deficiencies and
26  material weaknesses in the design or operation of internal control over financial
27  reporting" and "[a]ny fraud, whether or not material, that involves management."

28

854.   The statements referenced above in Countrywide's 2006 Form 10-K were materially false and misleading when made.  As set forth in greater detail above, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated.  See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Furthermore, the statements relating to the volume of prime loans produced and the value of prime loans held for investment were all false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the same reasons stated in Section IV.D above.    Moreover, Countrywide's statements that it "consistently produc[ed] quality mortgages" and that its loan origination standards and procedures are designed to produce "loans [that] are salable in the secondary mortgage market" and "[t]he majority of our loan production consists of Prime Mortgage loans" were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality.   See Sections IV.C and IV.D above.   KPMG's 2006 unqualified audit opinion report and assessment of managements' internal controls was false and misleading for the same reasons stated in Sections VI.I and IV.G.5 above. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

E.   **The Company's False Statements Regarding 2007 Results Before the Truth Begins to Emerge**

1.   **March 13, 2007 CNBC Interview and March 22, 2007 "Mad Money" Interview**

855.   On March 13, 2007, Defendant Mozilo was interviewed by CNBC reporter Maria Bartiromo.   Mozilo falsely told the marketplace that the

Company's exposure to risky loans was not significant because purportedly only 7% of loans originated by Countrywide were subprime:

> MOZILO: . . . [T]he [loans] . . . that you see exposed [from the subprime market] at the moment would be the New Centuries, the NovaStars, and the Accredited Home Loans, and, those are monoline companies, subprime companies, that did well in the housing boom, in the bubble, but once the tide went out, you can see what's happened. *I think it's a mistake to apply what's happening to them to the more diversified financial services companies such as Countrywide*, Wells Fargo and others. Certainly, a percentage of our business is subprime. *We had 7 percent of our* [loan originations in subprime] . . .
>
> BARTIROMO: Seven percent?  Angelo, so you've got seven percent of originations coming from the subprime area?
>
> MOZILO: That's correct.  And about .2 percent of our assets are in subprime.  So I think it's very important that this be kept in perspective.  So, for us, what our concern is, Maria, is not so much for Countrywide *because we'll be fine.  In fact, this will be great for Countrywide at the end of the day because all the irrational competitors will be gone.*  So, you have to look over this valley you know to the horizon and it looks very positive for us.

856.   On March 22, 2007, Mozilo appeared on the popular CNBC program "Mad Money," hosted by Jim Cramer. Mozilo, once again, was very positive regarding the Company's prospects. He falsely assured investors that Countrywide was essentially a prime lender, and that subprime loans represented only 7-9% of the Company's business. He again differentiated Countrywide from

1   subprime lenders, asserting their business model was fundamentally flawed in a

2   way Countrywide's was not.

3       857.   Thereafter, on August 26, 2007 in an article titled, "Inside the

4   Countrywide Lending Spree," *The New York Times* reported that Mozilo's

5   statements during the CNBC interview on March 13, 2007 were materially false

6   and misleading for the following reasons:

7       Countrywide documents show that it, too, was a lax lender.   For

8       example, it wasn't until March 16 that Countrywide eliminated so-

9       called piggyback loans from its product list, loans that permitted

10      borrowers to buy a house without putting down any of their own

11      money.   And Countrywide waited until Feb. 23 to stop peddling

12      another risky product, loans that were worth more than 95 percent of a

13      home's  appraised  value  and  required  no  documentation  of  a

14      borrower's income.

15

16      [In addition] . . . Countrywide's product list showed that it would lend

17      $500,000 to a borrower rated C-minus, the second-riskiest grade.   As

18      long as the loan represented no more than 70 percent of the underlying

19      property's value, Countrywide would lend to a borrower even if the

20      person had a credit score as low as 500.

21      858.   In addition to the reasons set forth in the August 26, 2007 *New York

22  Times* article, Mozilo's statements above that "[w]e had 7 percent of [our business

23  in subprime]" and that "Countrywide was essentially a prime lender" were false

24  and misleading because Countrywide misclassified subprime loans as prime

25  loans, and also for the same reasons set forth in Sections IV.D and IV.C above.

26

27

28

### 2.   First Quarter 2007 Form 8-K

859.   On April 26, 2007, Countrywide filed a Form 8-K attaching a press release that announced its financial results for the first quarter of 2007.   In the press release, Mozilo stated the following:

> "Countrywide's earnings for the first quarter of 2007 were $434 million, despite adverse subprime and housing market conditions," said Angelo R. Mozilo, Chairman and Chief Executive Officer. While the Company's **_core operations delivered what was otherwise a strong quarter_**, earnings were impacted by charges relating to our subprime activities as well as increases to our loss reserves and related asset valuation adjustments stemming from higher delinquencies and softer housing markets.

860.   Moreover, in the April 26, 2007 press release, Countrywide reported gain-on-sale of loans and securities of $1,234,104,000 for the quarter.

861.   The Company's and Mozilo's statements contained in the April 26, 2007 press release were false and misleading.   Specifically, Mozilo's statement that the first quarter 2007 financial results were "strong" was misleading.   In truth, the first quarter results reflected the same material undisclosed conduct described in Sections IV.G and IV.C above.   As a result, the Company's net income was significantly overstated. In addition, gain-on-sale was false and misleading because the Company materially overstated its assessment of fair value for its retained interests and MSRs, and also for the reasons stated in Sections IV.G.2 and IV.G.3 above.

### 3.   First Quarter 2007 Conference Call

862.   On a conference call held later that day (the "April 26, 2007 Conference Call") in which Defendant Mozilo, Sambol, Sieracki, and Garcia participated, Mozilo touted the Company's growing pipeline of "prime" loans,

1   noting that Countrywide was poised to capitalize on the implosion of

2   irresponsible lenders that had populated the industry in the last five years:

3       As a result [of business consolidation], you have less competition and

4       as Dave pointed out, rational competition.  So when you have that,

5       one is your margins are going to improve.  There is no question that

6       there are many players who have entered the business over the last

7       five years that had to some degree or another irresponsible behavior,

8       conducted themselves irresponsibly, and that impacted everybody,

9       Gresham's Law.[29]

10       863.   Defendant Sambol reiterated that Countrywide's prime business

11   would continue to grow and that Countrywide had gained a competitive

12   advantage in the subprime area now that other lenders had exited that business:

13       And as it relates to top-line pricing margins, there was the absence of

14       competitive worsening in pricing.  ***So the outlook is very good for our***

15       ***prime business and prime margins.***   As it relates to subprimes, as I

16       mentioned in my presentation, we are now pricing our rate sheets to

17       provide for profitability in each of our channels, where I would tell

18       you that in '06, for much of '06 and part of '05, ***competitive***

19       ***conditions were such that in certain of our segments, we were***

20       ***pricing to breakeven.***

21       864.   Moreover, on the same call, Defendant Mozilo emphasized that there

22   was no spillover from the subprime debacle to prime mortgages:

23       [T]here has been a lot of talk about contagion or spillover from

24       subprime to Alt-A and so we thought we would comment a little bit

25       on that market and Countrywide's views and exposure to Alt-A.  First

26

27       [29]   "Observation that 'bad money drives out good.'"

28   http://www.britannica.com/ebc/article-93666139.

of all, by way of description, ***Alt-A generally consists of loans to prime credit borrowers unlike subprime . . .*** who don't qualify for traditional prime programs due to a variety of things; reduced documentation most notably and/or other layering of risk factors, maybe higher LTVs and higher loan amounts.

\* \* \*

***As it relates to Alt-A, the conclusion there is that, at least for Countrywide, there has not been any material impact or spillover into Alt-A or for that matter into our prime business.***

865.   During the April 26, 2007 Conference Call, Sambol declared that "***of course, Countrywide has the liquidity and the capital*** and the infrastructure to take advantage of the structural changes that are taking place in this market."

866.   The statements referenced above during the April 27, 2006 Conference Call were materially false and misleading when made.   Defendant Mozilo's statement that Countrywide would benefit from other mortgage companies' irresponsible conduct was false and misleading.   In truth, Countrywide was not different from the companies heavily involved in irresponsible lending.   See Sections IV.B and IV.C.   Moreover, Defendant Sambol's statement that "the outlook is very good for our prime business and prime margins" was false and misleading because Countrywide classified its subprime loans as prime loans, and also for the same reasons set forth in Section IV.D above.   In addition, Defendant Sambol's statement that management was pricing the loans to the secondary market "to breakeven" was false and misleading for the reasons set forth in Section IV.G.2 above.   Further, Defendant Mozilo's statement that "there has not been any material impact or spillover [from the subprime fallout] into Alt-A or . . . prime business" was false and misleading for the same reasons set forth above and in Section IV.D.   Sambol's statement that "Countrywide has the liquidity and the capital and the

infrastructure to take advantage of the structural changes that are taking place in this market" was false and misleading because Countrywide did not have access to the liquidity and the Company overstated its capital.  See Section IV.H.

### 4. April 26, 2007 AFSA 7th Finance Industry Conference

867.  On April 26, 2007, Countrywide participated at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors (the "April 26, 2007 Fixed Income Conference").  At that conference, Jennifer Sandefur, Senior Managing Director and Treasurer, attempted to distinguish Countrywide from its peer mortgage lenders by stating that the Company was not heavily involved in the subprime mortgage industry.  Specifically, Sandefur said that Countrywide's portfolio is of "very high quality" and primarily consisted of prime mortgages:

> There's been a significant amount of turmoil in the market recently as a result of the nonprime mortgage sector.  We strategically manage that.  ***We're essentially a prime mortgage originator.***  We have $400 million in residual investments on our balance sheet.  We have a very conservative liquidity profile which insulates us from market events like the subprime origination market events.
>
> * * *
>
> [D]uring the time that we acquired the bank in 2006, we originated over $2 trillion in mortgages in the United States, prime ***and a small amount of subprime*** and we put about ***$73 billion of very prime mortgages on our own balance sheet.***

868.  Repetitiously, at the same conference, Sandefur again emphasized Countrywide's high quality mortgages:

> Again, ***over 90% of Countrywide loan origination volume is prime quality.  Less than 9% of our production is subprime***. . . . ***The nonprime loans are all held for investment and sold into***

1       *securitizations with none of those going on our bank's balance*

2       *sheet.*

3                           \* \* \*

4       A little bit more about the bank.  Again, and the ***high credit quality of***

5       ***that portfolio that we selected.  Very low interest rate risk.***

6          869.   At the April 26, 2007 Fixed Income Conference, Sandefur discussed

7  the increased rate of delinquencies in the subprime mortgage industry and the

8  loosened underwriting standards for subprime loans.  However, she emphasized

9  that Countrywide was different and better than its competition:

10       [M]any of the players that originated . . . [subprime] loans and

11       loosened these standards as they were kind of gasping for breath at the

12       very end of the run in the refi boom, I think lowered a lot of the

13       underwriting standards which caused a lot of these delinquency

14       problems.  A lot of these smaller players are exiting the business

15       willingly in many cases and unwillingly in some cases.

16

17       ***. . . I'd like to differentiate Countrywide here.***  And from a lot of

18       competitors we've seen come and go in the past, you're talking about

19       a kind of one-trick pony, if you will, some of these subprime lenders

20       who all they did was originate subprime loans, enjoyed the wide

21       margins, they weren't properly capitalized.  They weren't properly

22       balanced.  They didn't have diversified businesses.  They didn't have

23       38 years of technology.  They didn't have the intellectual capital, the

24       hedging capabilities, the ability to price.  They did one thing.  They

25       originated subprime loans.

26

27       Versus a Countrywide ***who originates a very small component of***

28       ***subprime loans*** so that they have a full menu of products to offer

1  through the various diversified channels, retail, correspondent,

2  wholesale, through brokers. . . .  They underestimated the impact of

3  early payment defaults through the whole loan type of risk

4  transference that they were using *unlike the Countrywide who uses a*

5  *securitization, who has a reputation for high quality originations.*

6  870.  At the same conference, Sandefur commented on the adequacy of

7  Countrywide's allowance account for loan losses due to the pristine nature of its

8  portfolio:

9  . . . Allowances for loan losses which are really a 12 month

10  perspective look at potential losses, we've booked at $229 million for

11  '06.  Actual net charge-offs for the bank portfolio were only $34

12  million.  *So very conservative allowances for loan losses at very*

13  *small actual charge offs given the very pristine nature of this*

14  *portfolio. . . .*  So, again, the point here, *not subprime.  Very, very*

15  *prime.*  Kind of the opposite of subprime.

16  871.  The statements referenced above and made at the April 26, 2007

17  Fixed Income Conference were materially false and misleading when made.

18  Moreover, the Officer Defendants did not correct any of Sandefur's statements

19  after the conference call.  Specifically, Sandefur's statements that "[w]e're

20  essentially a prime mortgage originator," emphasizing the point with phrases such

21  as "very, very prime," were false and misleading for the same reasons set forth in

22  Section IV.D above.  Moreover, Sandefur's statements that "over 90% of

23  Countrywide['s] loan origination volume is prime quality" and "[l]ess than 9% of

24  our production is subprime" were false and misleading because Countrywide

25  improperly classified subprime mortgage loans as prime loans, and also for the

26  same reasons set forth in Section IV.D above.  In an attempt to distinguish

27  Countrywide from its peers, Sandefur's statements that Countrywide "originate[d]

28  a very small component of subprime loans" and "has a reputation for high quality

1   loans" were also materially false and misleading for the same reasons set forth in
2   Section IV.C above.  Moreover, Sandefur's statement that Countrywide had "very
3   conservative allowances for loan losses . . . given the very pristine nature of this
4   portfolio" was false and misleading for the reasons set forth above in Section
5   IV.G.1.

6       872.   Analysts continued to be deceived by management's false and
7   misleading statements as set forth above.  For example, on April 26, 2007,
8   Citigroup analysts rated Countrywide's shares a "Buy" with "Medium Risk."
9   Citigroup analysts based their opinion in part on Countrywide's senior
10   management's false assurances that after industry consolidation the Company
11   would be well positioned to grow market share and earnings and that
12   Countrywide's "core business" of prime loans was "solid."

13       873.   Further, several other analysts either raised or maintained their stellar
14   recommendations and earnings estimates for Countrywide as a result of the
15   Company's fraudulent misrepresentations:

16         •   On April 27, 2007, Piper Jaffray maintained its
17           "Outperform" rating for Countrywide.

18         •   On April 29, 2007, Morgan Stanley reiterated "Overweight"
19           for Countrywide's stock.

20         •   Rapid Rating reported on April 26, 2007 that Countrywide's
21           credit outlook is positive.  "[T]he company is a moderate to
22           low risk and somewhat subject to fluctuations in market
23           conditions, and *that its assets are of very good quality.*"

24       **5.**   **First Quarter 2007 Form 10-Q**

25       874.   On May 9, 2007, Countrywide filed its quarterly report on Form 10-
26   Q for the first quarter of 2007, ended March 31, 2007, signed by Defendant
27   Sambol and Sieracki.   The Company reported revenues for the quarter of
28   $2,405,776,000, and diluted earnings per share of $0.72.

875.   In the section titled "Impairment of Retained Interests," the Company noted that "we recognized impairment of retained interests of $429.6 million.   Impairment charges of $231.0 million were related to nonprime and related residual interests and $135.3 million were related to subordinated interests on prime home equity lines of credit securitizations."

876.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

877.   The Company described its management of credit risk in the following terms: "We attempt to limit our risk of incurring . . . [representation and warranty] losses by structuring our operations to ***ensure consistent production of quality mortgages*** . . . ."

878.   In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of representation and warranties ". . . total[ed] $365,300,000."

879.   In a section titled "Securitizations," the Company reported that the fair value of its MSRs at March 31, 2007 was $17,441,860,000.

880.   The Company reported allowance for loan losses of $374,367,000, having increased its provision for loan losses by $151,962,000 during the quarter. The Company also had net charge-offs of $38,649,000.

881.   Countrywide reported in its first quarter 2007 Form 10-Q that prime mortgage and prime home equity loans held for investment equaled $68,908,462,000, and nonprime mortgage loans held for investment equaled $1,144,184,000.

882.   The volume of Mortgage Banking nonprime, prime home equity and prime loans produced during the quarter equaled $7,500,000,000, $9,234,000,000 and $93,833,000,000, respectively.

883.   With respect to Countrywide's liquidity and capital resources, the Form 10-Q stated that:

> . . . nonprime loans and related securities became much less liquid. However, such assets represent **only a small portion** of our total assets.   The substantial majority of our assets continue to experience ample liquidity in the marketplace.  **As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements.**
>
> * * *
>
> . . . We establish reliable sources of liquidity sized to meet a range of potential future funding requirements. We currently have $94.4 billion in available sources of short-term liquidity, which represents a decrease of $2.0 billion from December 31, 2006.  **We believe we have adequate financing capacity to meet our currently foreseeable needs.**

884.   The Company also reported in the Form 10-Q management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

885.  Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other

1   financial information included in this report, fairly present in all material respects

2   the financial condition" of Countrywide.

3          886.   The statements contained in the first quarter 2007 Form 10-Q above

4   were materially false and misleading when made.   Specifically, the Company's

5   reported values for its revenue and diluted earning per share were false and

6   misleading because the Company's allowance for loan losses and accruals for

7   representations and warranties were understated, and its assessments of fair

8   values for retained interests and MSRs were overstated.  See Section IV.G above.

9   The statements related to loan loss reserves, retained interests, MSRs and

10  liabilities related to representations and warranties were false and misleading for

11  the same reasons stated in Section IV.G above.   Also, the statements regarding

12  the quality of the volume of loans produced and loans held for investment were

13  false and misleading because Countrywide improperly classified subprime loans

14  as prime loans, and also for the reasons set forth in Section IV.D above.

15  Moreover, the representation that we "ensure consistent production of quality

16  mortgages" was false and misleading because Countrywide loosened and

17  abandoned its underwriting guidelines when originating loans.  See Section IV.C.

18  Moreover, Countrywide's statements regarding liquidity were false and

19  misleading for the same reasons stated in Section IV.H.1 above.  The statements

20  relating to internal controls were false and misleading because the Company's

21  internal controls over financial reporting were ineffective.   See Section IV.G.5.

22  Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were

23  false and misleading for the same reasons stated in Section IV.G above.

24          **F.      False and Misleading Registration
               Statements and Prospectuses for Countrywide's**
25             **Offerings of Debt and Preferred Securities**

26              **1.      Series A Medium-Term Notes**

27          887.   On or about February 7, 2005, Countrywide commenced a public

28  offering of approximately $8.627 billion of Series A Medium-Term Notes to be

1   offered on a continuous basis.  Net proceeds from this offering to Countrywide,

2   after deducting expenses, exceeded $8 billion.

3       888.   The Series A Medium-Term Notes were offered and sold pursuant to

4   a shelf registration statement on Form S-3 and prospectus, dated April 7, 2004

5   and April 21, 2004, signed by Mozilo, Kurland, McLaughlin, Cisneros,

6   Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson,

7   Russell, and Snyder; a prospectus supplement dated February 7, 2005; a

8   prospectus supplement dated December 14, 2005 (increasing the size of the

9   offering from $8 billion to $8.627 billion); a series of pricing supplements

10  numbered 1-18 and 20-24 dated between March 16, 2005 and February 1, 2006;

11  and a Free Writing Prospectus dated December 14, 2005 (collectively, the "Series

12  A Medium-Term Notes Prospectus"), all of which Countrywide filed with the

13  SEC (collectively, the "Series A Medium-Term Notes Registration Statement").

14      889.   The Series A Medium-Term Notes Registration Statement expressly

15  incorporated by reference Countrywide's Form 10-K Annual Report for the year

16  ended December 31, 2003 and Countrywide's consolidated financial statements

17  for 2003 as audited by Grant Thornton, and also presented selected Countrywide

18  consolidated financial data for the year ended December 31, 2003.  This selected

19  consolidated financial data for 2003 reported, among other metrics, gain-on-sale

20  of loans and securities of $5,890,325,000; total revenues of $8,026,846,000; net

21  earnings of $2,372,950,000; and diluted earnings per share of $12.47.

22      890.   Defendants ABN AMRO, Banc of America Securities, Barclays

23  Capital, BNP Paribas, Citigroup Global Markets, Countrywide Securities,

24  Deutsche Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital, Goldman

25  Sachs, HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan Stanley, RBC

26  Capital, RBC Dominion, SG Americas Securities, Wachovia Capital, and

27  Wachovia Securities acted as underwriters with respect to the offering of Series A

28  Medium-Term Notes.

891.   Grant Thornton consented to being named in the Series A Medium-Term Notes Registration Statement as a party that certified the Company's financial statements for the year ended December 31, 2003.

892.   On or about December 19, 2005, as part of the continuous offering of Series A Medium-Term Notes, Countrywide publicly issued $500,000,000 of 2-Year Floating Rate Notes Due 2007 ("2-Year Notes") pursuant to Pricing Supplement No. 20 dated December 14, 2005 (to the Prospectus dated April 21, 2004 and Prospectus Supplements dated February 7, 2005 and December 14, 2005) and the Free Writing Prospectus dated December 14, 2005, both of which were filed with the SEC.

893.   Defendants Deutsche Bank, Lehman Brothers, Wachovia Capital, Countrywide Securities, Dresdner Kleinwort Wasserstein, Greenwich Capital, Morgan Stanley, and SG Americas Securities acted as underwriters with respect to the issuance of 2-Year Notes.

894.   On or about December 19, 2005, as part of the continuous offering of Series A Medium-Term Notes, Countrywide publicly issued $500,000,000 of 3-Year Floating Rate Notes Due 2008 ("3-Year Notes") pursuant to Pricing Supplement No. 21 dated December 14, 2005 (to the Prospectus dated April 21, 2004 and Prospectus Supplements dated February 7, 2005 and December 14, 2005) and the Free Writing Prospectus dated December 14, 2005, both of which were filed with the SEC.

895.   Defendants Banc of America Securities, Deutsche Bank, Lehman Brothers, Countrywide Securities, Dresdner Kleinwort Wasserstein, Greenwich Capital, Morgan Stanley, and Wachovia Capital acted as underwriters with respect to the issuance of 3-Year Notes.

896.   As alleged in detail above, Countrywide's Form 10-K and financial statements for the year ended December 31, 2003 were materially false and misleading.   Accordingly, the Series A Medium-Term Notes Registration

1  Statement and the Form 10-K incorporated therein by reference, pursuant to

2  which Lead Plaintiffs New York City Pension Funds and other members of the

3  Class were induced to purchase Series A Medium-Term Notes, contained untrue

4  statements of material fact and omitted to state material facts required to be stated

5  therein or necessary to make the statements contained therein not misleading.

6  **2.  Floating Rate Subordinated Notes Due April 1, 2011**

7  897.  On or about September 29, 2005, Countrywide publicly issued

8  $500,000,000 of Floating Rate Subordinated Notes due April 1, 2011 (the "2011

9  Notes").  Net proceeds to the Company from the offering of 2011 Notes, after

10  deducting offering expenses, were approximately $497,765,000.

11  898.  The 2011 Notes were offered and sold pursuant to the shelf

12  registration statement on Form S-3 and prospectus, dated April 7, 2004 and April

13  21, 2004, signed by Defendants Mozilo, Kurland, McLaughlin, Cisneros,

14  Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson,

15  Russell and Snyder; and a prospectus supplement dated September 27, 2005

16  (collectively, the "2011 Notes Prospectus"), all of which Countrywide filed with

17  the SEC (collectively, the "2011 Notes Registration Statement").

18  899.  The 2011 Notes Registration Statement expressly incorporated by

19  reference Countrywide's Form 10-K Annual Report for the year ended December

20  31, 2003 and the consolidated financial statements from Countrywide's Form 10-

21  K Annual Report for the year ended December 31, 2004 as audited by KPMG,

22  and Countrywide's consolidated financial statements for the year ended

23  December 31, 2003 as audited by Grant Thornton, and also presented selected

24  Countrywide consolidated financial data for the year ended December 31, 2003.

25  This selected consolidated financial data for 2003 reported, among other metrics,

26  gain-on-sale of loans and securities of $5,890,325,000; total revenues of

27  $8,026,846,000; net earnings of $2,372,950,000; and diluted earnings per share of

28  $12.47.

1     900.   Defendants J.P. Morgan Securities and Countrywide Securities acted

2  as underwriters with respect to the offering of 2011 Notes.

3     901.  Grant Thornton consented to being named in the 2011 Notes

4  Registration Statement as a party that certified the Company's financial

5  statements for the year ended December 31, 2003.

6     902.  KPMG consented to being named in the 2011 Notes Registration

7  Statement as a party that certified the Company's financial statements and

8  management's assessment of the effectiveness of internal controls for the year

9  ended December 31, 2004.

10     903.  As alleged in detail above, Countrywide's Form 10-K reports and

11  financial statements for the years ending December 31, 2003 and 2004 were

12  materially false and misleading.  According, the 2011 Notes Registration

13  Statement and the Form 10-K and audited financial statements incorporated

14  therein by reference, pursuant to which Lead Plaintiffs New York City Pension

15  Funds and other members of the Class were induced to purchase 2011 Notes,

16  contained untrue statements of material fact and omitted to state material facts

17  required to be stated therein or necessary to make the statements contained

18  therein not misleading.

19          **3.     Series B Medium-Term Notes**

20     904.  On or about February 13, 2006, Countrywide commenced a public

21  offering of Series B Medium-Term Notes to be offered on a continuous basis.

22  Net proceeds from this offering to Countrywide, after deducting offering

23  expenses, were approximately $10,700,000,000.

24     905.  The Series B Medium-Term Notes were offered and sold pursuant to

25  a shelf registration statement on Form S-3ASR and prospectus dated February 9,

26  2006, signed by Defendants Mozilo, Sambol, Kurland, Sieracki, Brown, Cisneros,

27  Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson,

28  Russell and Snyder; a prospectus supplement dated February 13, 2006; and 153

1   successive pricing supplements and Free Writing Prospectuses dated between
2   February 22, 2006 and August 6, 2007 (collectively, the "Series B Medium-Term
3   Notes Prospectus"), all of which Countrywide filed with the SEC (collectively,
4   the "Series B Medium-Term Notes Registration Statement").

5       906.   The Series B Medium-Term Notes Registration Statement expressly
6   incorporated by reference documents filed by Countrywide with the SEC,
7   including its Annual Report on Form 10-K for the year ended December 31,
8   2004; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005,
9   June 30, 2005 and September 30, 2005; and Current Reports on Form 8-K dated
10  September 30, 2005 and October 27, 2005.  The Series B Registration Statement
11  also expressly incorporated by reference Countrywide's consolidated financial
12  statements as audited by Grant Thornton and KPMG.

13      907.   Defendants ABN AMRO, Banc of America Securities, Barclays
14  Capital, BNP Paribas, BNY Capital, Citigroup Global Markets, Countrywide
15  Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Goldman Sachs,
16  Greenwich Capital, HSBC, J.P. Morgan Securities, Lehman Brothers, Merrill
17  Lynch, Morgan Stanley, RBC Capital, RBC Dominion, Scotia Capital, SG
18  Americas Securities, TD Securities, UBS Securities, and Wachovia Capital
19  Markets acted as underwriters with respect to the offering of Series B Medium-
20  Term Notes.

21      908.   Grant Thornton consented to being named in the Series B Medium-
22  Term Notes Registration Statement as a party that certified the Company's
23  financial statements for the year ended December 31, 2003.

24      909.   KPMG consented to being named in the Series B Medium-Term
25  Notes Registration Statement as a party that certified the Company's financial
26  statements ended December 31, 2004.

27      910.   As alleged in detail above, Countrywide's Form 10-K for the year
28  ended December 31, 2004, Countrywide's consolidated financial statements for

1    the years ended December 31, 2003 and 2004, and other SEC filings noted above
2    as incorporated by reference in the Series B Medium-Term Notes Registration
3    Statement were materially false and misleading.    Accordingly, the Series B
4    Medium-Term Notes Registration Statement and documents incorporated therein
5    by reference, pursuant to which Lead Plaintiffs New York City Pension Funds
6    and other members of the Class were induced to purchase Series B Medium-Term
7    Notes, contained untrue statements of material fact and omitted to state material
8    facts required therein to be stated or necessary to make the statements contained
9    therein not misleading.

10                   **4.        6.25% Subordinated Notes Due May 15, 2016**

11        911.   On  or  about  May  11,  2006,  Countrywide  publicly  issued
12    $1,000,000,000 of 6.25% Subordinated Notes Due May 15, 2016 ("6.25%
13    Notes").  Net proceeds to the Company from the offering of 6.25% Notes, after
14    deducting offering expenses, were approximately $992,790,000.

15        912.   The 6.25% Notes were offered and sold pursuant to the shelf
16    registration statement on Form S-3ASR and prospectus dated February 9, 2006,
17    signed by Defendants Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros,
18    Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson,
19    Russell and Snyder; a prospectus supplement dated May 11, 2006; and a Free
20    Writing  Prospectus  dated  May  11,  2006  (collectively,  the  "6.25%  Notes
21    Prospectus"); all of which Countrywide filed with the SEC (collectively, the
22    "6.25% Notes Registration Statement").

23        913.   The 6.25% Notes Registration Statement expressly incorporated by
24    reference the documents filed by Countrywide with the SEC, including its Annual
25    Report on Form 10-K for the year ended December 31, 2004; Quarterly Reports
26    on Form 10-Q for the quarters ended March 31, 2005, June 30, 2005 and
27    September 30, 2005; and Current Reports on Form 8-K dated September 30, 2005
28    and October 27, 2005.  The 6.25% Notes Registration Statement also expressly

1  incorporated by reference Countrywide's consolidated financial statements as
2  audited by Grant Thornton and KPMG for the years 2003, 2004 and 2005.

3       914.   Defendants Banc of America Securities and J.P. Morgan Securities
4  (as Joint Book-Running Managers), Countrywide Securities (as Joint Lead
5  Manager), and Barclays Capital, Deutsche Bank, HSBC, and Wachovia Capital
6  (as Co-Managers) acted as underwriters with respect to the offering of 6.25%
7  Notes.

8       915.  Grant Thornton consented to being named in the 6.25% Notes
9  Registration Statement as a party that certified the Company's financial
10 statements for the year ended December 31, 2003.

11      916.  KPMG consented to being named in the 6.25% Notes Registration
12 Statement as a party that certified the Company's financial statements for the
13 years ended December 31, 2004 and 2005 and management's assessment of the
14 effectiveness of  internal controls for the years ended December 31, 2004 and
15 2005.

16      917.  As alleged in detail above, Countrywide's Form 10-K for the year
17 ended December 31, 2004, Countrywide's consolidated financial statements for
18 the years ended December 31, 2003, 2004, and 2005, and other SEC filings noted
19 above as incorporated by reference in the 6.25% Notes Registration Statement
20 were materially false and misleading.  Accordingly, the 6.25% Notes Registration
21 Statement and documents incorporated therein by reference, pursuant to which
22 Lead Plaintiffs New York City Pension Funds and other members of the Class
23 were induced to purchase 6.25% Notes, contained untrue statements of material
24 fact and omitted to state material facts required therein to be stated or necessary
25 to make the statements contained therein not misleading.

26

27

28

### 5.   7% Capital Securities

918.   On or about November 3, 2006, CCV commenced a public offering of 52,000,000 7% Capital Securities at $25 per share, with a total value of $1.3 billion.

919.   The 7% Capital Securities were offered and sold pursuant to a Post-Effective Amendment, dated October 27, 2006, to the registration statement on Form S-3 dated February 9, 2006, signed by Defendants Mozilo, Sambol, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Garcia, Gissinger, Melone, Parry, Robertson, Russell, and Snyder; and a prospectus supplement dated November 1, 2006 (collectively, the "7% Capital Securities Prospectus"); all filed by Countrywide and CCV with the SEC (collectively, the "7% Capital Securities Registration Statement").

920.   The 7% Capital Securities Registration Statement expressly incorporated by reference documents filed by Countrywide with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2005; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006 and June 30, 2006; and Current Report on Form 8-K filed October 24, 2006.  The 7% Capital Securities Registration Statement also expressly incorporated by reference Countrywide's consolidated financial statements for the year ended December 31, 2003 as audited by Grant Thornton, and consolidated financial statements for the years 2004 and 2005 as audited by KPMG.

921.   Defendants Citigroup Global Markets, J.P. Morgan Securities, Merrill Lynch, Morgan Stanley, UBS Securities, and Wachovia Capital (as Joint Book-Runners); Countrywide Securities (as Senior Co-Manager); A.G. Edwards, Banc of America Securities, and RBC Dain Rauscher (as Co-Managers); and Barclays Capital, Deutsche Bank, Goldman Sachs, HSBC, and Lehman Brothers (as Junior Co-Managers) acted as underwriters with respect to the offering of 7% Capital Securities.

922.   Grant Thornton consented to being named in the 7% Capital Securities Registration Statement as a party that certified the Company's financial statements for the year ended December 31, 2003.

923.   KPMG consented to being named in the 7% Capital Securities Registration Statement as a party that certified the Company's financial statements for the years ended December 31, 2004 and 2005 and management's assessment of the effectiveness of internal controls for the year ended December 31, 2005.

924.   As alleged in detail above, Countrywide's Form 10-K for the year ended December 31, 2005, Countrywide's consolidated financial statements for the years ended December 31, 2003, 2004, and 2005, and other SEC filings noted above as incorporated by reference in the 7% Capital Securities Registration Statement were materially false and misleading.  Accordingly, the 7% Capital Securities Registration Statement and documents incorporated therein by reference, pursuant to which Plaintiffs Brahn and Katzeff and other members of the Class were induced to purchase 7% Capital Securities, contained untrue statements of material fact and omitted to state material facts required therein to be stated or necessary to make the statements contained therein not misleading.

### 6.   Series A and Series B Floating Rate Convertible Senior Debentures

925.   On May 16, 2007, Countrywide issued a press release announcing that it had priced a private placement of Series A Floating Rate Convertible Senior Debentures Due 2037 ("Series A Debentures") and Series B Floating Rate Convertible Senior Debentures Due 2037 ("Series B Debentures") for sale to Lehman Brothers, Citigroup, and Banc of America Securities as initial purchasers ("the Initial Purchasers").

926.   The private placement commenced on or about May 16, 2007 and closed on May 22, 2007.   During that period, Countrywide sold $2 billion of

Series A Debentures and $2 billion of Series B Debentures to the Initial Purchasers.  These debentures were sold to the Initial Purchasers  through an exemption from registrations claimed under Section 4(2) of the Securities Act.

927.   The Initial Purchasers sold the Debentures to qualified institutional buyers pursuant to the terms of an Offering Memorandum dated May 16, 2007 prepared by Countrywide.

928.   The Debentures are convertible into cash and Countrywide common stock according to an adjustable conversion rate.  The Series A Debentures have an initial conversion rate representing a 30% premium over Countrywide's closing common stock price on May 16, 2007 of $40.33 per share.  The Series B Debentures have an initial conversion rate representing a 40% premium over the same Countrywide's closing common stock price.

929. On or about November 15, 2007, Countrywide filed a shelf registration statement on Form S-3ASR for the purpose of registering for offer and resale the Series A  and Series B Debentures ("the Series A and B Debenture Registration Statement").

930.   The Series A and B Debenture Registration Statement was signed by Defendants Mozilo, Sieracki, Cunningham, Donato, Gissinger, Melone, Parry, Robertson, Russell, Sambol and Snyder.

931.   The Series A and B Debenture Registration Statement incorporated by reference the following documents: Countrywide's Form 10-K Annual Report for the year ended December 31, 2006; and Countrywide's quarterly reports on Form 10-Q for the quarters ended March 31, 2007, June 30, 2007 and September 30, 2007; the consolidated financial statements and financial statement schedules of Countrywide and its subsidiaries as of December 31, 2006 and 2005, and for each of the years in the 3-year period ended December 31, 2006, management's assessment of the effectiveness of internal control over financial reporting and the

1  effectiveness of internal control over financial reporting as of December 31, 2006
2  in reliance upon the reports of KPMG.

3      932.   On or about December 11, 2007, Countrywide filed a Prospectus
4  Supplement ("Prospectus Supplement No. 1") on Form 424(b)(7) relating to the
5  offer and resale of $4,000,000,000 aggregate principal amount of Series A and
6  Series B Debentures. Prospectus Supplement No. 1 identified the selling
7  securityholders who used this prospectus to resell their Debentures and any shares
8  of Countrywide common stock issuable upon conversion of their Debentures.

9      933.   As alleged above in detail, Countrywide's 2006 Form 10-K and
10 financial statements for the years ended December 31, 2006 and 2005 as well as
11 the Company's quarterly reports on Form 10-Q for the first three quarters of fiscal
12 2007 were materially false and misleading.   Accordingly, the Series A and B
13 Debenture Registration Statement and the Form 10-K and the Forms 10-Q
14 incorporated therein by reference, pursuant to which Lead Plaintiffs New York
15 City Pension Funds and other members of the Class were induced to purchase
16 Series A Debentures and Series B Debentures, contained untrue statements of
17 material fact and omitted to state material facts required to be stated therein or
18 necessary to make the statements contained therein not misleading.

19

20 **VIII.  INVESTORS BEGIN TO LEARN THE TRUTH**
21 **ABOUT COUNTRYWIDE, CAUSING ITS SECURITIES**
   **TO PLUMMET IN VALUE, BUT THE COMPANY**
   **CONTINUES TO LULL THE INVESTING PUBLIC WITH**
22 **ADDITIONAL FALSE AND MISLEADING STATEMENTS**

23     934.   No later than July 24, 2007, Countrywide and various individual
24 defendants finally began to partially reveal the truth about matters concerning
25 which Countrywide, individual defendants and the Underwriter and Auditor
26 Defendants previously had made materially false and misleading statements.
27 Those matters included Countrywide's lending practices, underwriting standards,
28 financial reporting and accounting practices, lack of financial stability, lack of

1    access to liquidity, and lack of business ethics and integrity.  Additional public

2    revelations of the truth concerning these and other matters critical to

3    Countrywide's business were issued by government agencies, including the FBI,

4    the SEC, various United States Trustees, and a series of state Attorneys General;

5    the business media; and participants in the financial markets, including analysts

6    and rating agencies.

7         935.   These revelations related to matters highly material to buyers of

8    Countrywide's publicly traded securities.  Between July 24, 2007 and March 10,

9    2008, the revelation of the truth concerning such material facts caused Plaintiffs

10   and the Class to suffer substantial losses.   Each new revelation caused an

11   additional drop in the value of Countrywide's securities and additional losses to

12   Class members.  Those losses were a direct result of the revelation of the truth

13   about the materially false and misleading statements alleged herein and were

14   dramatically larger, to a statistically significant degree, than any losses Class

15   members would have sustained due to ordinary market forces.

16        936.   **Partial Corrective Disclosures and Continued Misrepresenta-**

17   **tions on July 24, 2007**.  On July 24, 2007, Countrywide filed a Form 8-K and

18   issued a press release announcing its financial results for the second quarter of

19   2007.   Countrywide's quarterly release surprised the market with a series of

20   revelations that partially corrected Defendants' earlier false and misleading

21   statements, and that caused a sharp decline in Countrywide's stock price.

22   However, Countrywide and certain Individual Defendants, notably Mozilo,

23   dampened the effect of Countrywide's July 24, 2007 partial corrective disclosures

24   by making additional fraudulent statements that day in an effort to bolster the

25   Company's stock price and blunt the impact of the corrective disclosures on the

26   market.

27        937.   Important revelations in Countrywide's second quarter release

28   included the disclosure that delinquency rates had jumped sharply in a series of

1   loan categories.   Countrywide disclosed, for example, that for subprime loans

2   serviced by the Company, the delinquency rate in the second quarter had more

3   than doubled to an extraordinary 23.71%, from just 9.45% as of March 31, 2007

4   (the end of the previous quarter).  Similarly, Countrywide disclosed that for prime

5   home equity loans (HELOCs) serviced by the Company, the delinquency rate had

6   also more than doubled in the second quarter to 4.56%, from 2.15% as of March

7   31, 2007.

8          938.   This report also included dramatic new charges and loan loss

9   provisions, an additional revelation that the quality of Countrywide's loans,

10  especially its prime loans, was weaker than had previously been represented.  The

11  report disclosed, for example, that Countrywide had reserved $293 million for

12  loan losses, compared to just $61.9 million in comparable loan loss reserves the

13  prior year.  Countrywide attributed $181 million of the increased loan loss reserve

14  to HELOCs in the Company's held-for-investment portfolio.    In addition,

15  Countrywide wrote down the value of "residual securities collateralized by prime

16  home equity loans" by $388 million.  These "residual securities" were retained by

17  Countrywide after other securities relating to the prime home equity loans at issue

18  were sold.  As a result of these charges and adjustments, Countrywide reported

19  reduced second quarter earnings of 81 cents per share, down from $1.15 per share

20  one year earlier.

21         939.   In addition to affording the market some indication concerning the

22  poor quality of the loans originated by Countrywide, the Company's lax

23  underwriting standards, its inadequate loan loss reserves, and the inflated values

24  at which it carried loan-based assets on its balance sheet, in a related disclosure

25  during a conference call that day, July 24, 2007, Countrywide suggested for the

26  first time that it had classified loans to borrowers with FICO scores as low as 500

27  as "prime" – far below the industry norm of requiring a borrower to have a

28

1  minimum FICO score of 660 in order for a loan to the borrower to be classified as

2  "prime."

3       940.   In particular, during the conference call, Chief Risk Officer John

4  McMurray claimed that the term "prime" is one that "covers a very vast

5  spectrum," and referred to "a prime loan with FICOs in the low 500s," thereby

6  disclosing that, contrary to industry norms, Countrywide might classify such a

7  loan as a prime loan for purposes of its SEC filings and other financial reporting.

8       941.   Later in the same conference call, McMurray declared that, "[t]here

9  is a belief by many that prime FICOs stop at 620.  That is not the case."  This

10  second, more explicit, remark by McMurray is striking because it demonstrates

11  that senior Countrywide officials – including McMurray, the Company's Chief

12  Risk Officer – were fully aware that it is a common understanding in the lending

13  industry that loans to borrowers with FICO scores below a certain threshold

14  cannot be classified as "prime" loans.   Nevertheless, Countrywide chose to

15  secretly classify loans made to borrowers with dramatically lower FICO scores as

16  "prime" without disclosing to the investing public that it was the Company's

17  practice to do so.

18       942.  In addition, with respect to Countrywide's origination and

19  underwriting standards, and its internal controls, the following was disclosed at

20  the July 24, 2007 conference call:

21           (a)   As of the end of the second quarter of 2007, 80% of

22         Countrywide's pay-option ARM loans, which Defendants persisted during

23         the Class Period in referring to as a "prime" product offered mainly to high

24         net worth borrowers, were actually low documentation loans (as Piper

25         Jaffray reported on July 25); as McMurray noted at the same conference,

26         ***"documentation matters.  The less documentation, the higher the serious***

27         ***delinquency, all else equal"***;

28

---

1       (b)    Many of the charge-offs and delinquencies "stem from the

2    higher concentration of piggyback financing that we did and that we have

3    in the port[folio]. . ." (according to McMurray); as McMurray also stated at

4    the conference, *"leverage at origination matters.  More leverage means*

5    *more serious delinquencies";* and

6       (c)    Countrywide *"made many changes to [its] product offerings,*

7    *pricing, underwriting guidelines and processes in order to improve the*

8    *quality and secondary market execution of our production"* (according to

9    Chief Investment Officer Kevin Bartlett), notwithstanding repeated

10    statements during the Class Period as to the conservative and careful

11    manner in which the Company handled these matters, in contrast to its

12    competitors, and McMurray said the Company's automated underwriting

13    system needed to be *"recalibrated."*

14    943.  Countrywide's second quarter 2007 results served as a partial

15 corrective disclosure with respect to (a) the stringency of Countrywide's loan

16 origination and underwriting standards; (b) the accuracy of Countrywide's

17 financial reporting, especially the accuracy of defendants' representations

18 concerning Countrywide's loan loss reserves and concerning the value of loan-

19 related assets reflected on Countrywide's balance sheet, such as loans held-for-

20 investment and retained residual assets; and (c) Countrywide's practice of

21 classifying loans made to borrowers with FICO scores ranging down to the low

22 500s as "prime."  Indeed, as alleged in detail in Section IV.D above, one analyst

23 concluded from this conference call that Countrywide management *"made*

24 *serious miscalculations (and possibly misrepresentations) about the quality of*

25 *the loans added to the bank."*

26    944.  Countrywide's stock price declined on July 24, 2007 by

27 approximately 10.5%, from $34.06 to $30.50, on volume of 51,249,500 shares, as

28 compared to volume of 12,730,800 shares the prior trading day.  This loss, which

1    was caused by the July 24, 2007 partial corrective disclosure, was materially

2    larger, to a statistically significant extent, than any losses Class members would

3    have sustained as a result of ordinary market forces.   Countrywide's other

4    securities also experienced material and statistically significant drops in their

5    trading prices as a result of the July 24, 2007 partial disclosures, including the

6    trading price of the CCV 7% Capital Security, which fell by 3.84%.

7        945.   Nonetheless, these losses were tempered by additional

8    misrepresentations made by Defendants the same day.   On the July 24, 2007

9    conference call, in which Defendants Mozilo, Sambol, Sieracki and Garcia

10   participated, Mozilo stated that the growing mortgage crisis would allow

11   Countrywide to leverage its strong liquidity position.   Mozilo stated in his

12   prepared remarks:

13       [W]e believe that the Company is well positioned to capitalize on

14       opportunities during this transitional period in the mortgage business,

15       which we believe will enhance the Company's long-term earnings

16       growth prospects.   We expect to leverage the strength of

17       Countrywide's capital liquidity positions . . . to emerge ***in a superior***

18       ***competitive position*** coming out of the current housing downcycle.

19       946.   Similarly, on the July 24, 2007 conference call, Mozilo again

20   commented on Countrywide's strong liquidity position.   Specifically, Mozilo

21   stated that Countrywide had excess capital in terms of equity and plenty of

22   sources to get through its current situation:

23       [W]e're certainly not going to have any issues funding the

24       Company. . . . we have adequate diversified and reliable sources of

25       liquidity available . . . we still have plenty of liquidity cushion. . . .

26       So, we have abundant excess capital in terms of equity and we have

27       tremendous[ ] liquidity sources to fund ourselves through this

28

1   situation.   And we feel very, very comfortable about our liquidity
2   scenario overall.

3   947.   Also on the July 24, 2007 Conference Call, Mozilo responded
4   sharply to a question about his stock sales, asserting that they were made pursuant
5   to a 10b5-1 Plan established "well over a year ago."   Later on the same call,
6   Mozilo returned to the question about his Countrywide stock sales and asserted:

7   [T]he shares that I have, actual stock I have, I have retained for 39 and
8   a half years.   Not sold a share of the initial stock that I got when
9   David and I started this Company – that I got, that I purchased.   The
10   only thing that is being sold under the 10b5-1 are options with
11   expiration dates.

12   948.   The statements referenced above during the July 24, 2007 conference
13   call were materially false and misleading when made.   Specifically, Mozilo's
14   reassuring statements that: "we have abundant excess capital in terms of equity";
15   "[we] have tremendous liquidity sources to fund ourselves through this situation";
16   and "[w]e believe we have adequate funding liquidity to accommodate these
17   marketplace changes"; were false and misleading for the same reasons set forth in
18   Section IV.H.   Moreover, Mozilo's statements regarding his stock sales were
19   false for the same reasons set forth in Section V.D.

20   949.   **Misrepresentations on August 2, 2007.**   On August 2, 2007,
21   Countrywide and Defendant Sieracki, Countrywide's Chief Financial Officer,
22   made a series of additional fraudulent statements in a further effort to deceive the
23   investing public about Countrywide's liquidity and its net worth.   A Countrywide
24   press release that day entitled "Countrywide Comments on Its Strong Funding
25   Liquidity and Financial Condition" asserted that:

26   "Countrywide has longstanding and time-tested funding liquidity
27   contingency planning," said Eric P. Sieracki, Chief Financial Officer.
28   "These planning protocols were designed to encompass a wide variety

of conditions, including recent secondary market volatility. Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today. We place major emphasis on the adequacy, reliability and diversity of our funding sources. . . ."

Sieracki continued, "Our mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank."

This statement was false and misleading for the reasons alleged in Section IV.H.

950. In addition, the August 2 press release contained a false and misleading statement about Countrywide's net worth. Specifically, quoting Sieracki, the press release stated that "Countrywide's financial condition remains strong, as evidenced by over $14 billion of net worth . . . ." However, this "$14 billion" net worth figure was materially inflated. *See* Section IV.H above.

951. **Corrective Disclosures and Continued Misrepresentations on August 9, 2007.** After the stock market closed on August 9, 2007, Countrywide filed with the SEC the Company's Form 10-Q quarterly report for the quarter ended June 30, 2007. The Form 10-Q surprised the investing public by noting the existence of "unprecedented market conditions" bearing on Countrywide's liquidity, and by further noting that "[w]hile we believe we have adequate funding liquidity, the situation is rapidly evolving and the impact on the Company is unknown." These statements were a partial corrective disclosure with respect to Countrywide's boasts – made as recently as one week earlier in the Company's August 2, 2007 press release – about the Company's supposedly "highly effective" liquidity planning and about the "reliability" of its sources of liquidity. The Company also stated that its impairment of the fair value of its retained interests equaled $268,117,000.

952.  As a result of this partial corrective disclosure, Countrywide common stock declined on August 10, 2007 by approximately 2.8%, from $28.66 to $27.86 on a volume of 48,657,500 shares, as compared to a volume of 24,502,100 shares the prior trading day.  This loss, which was caused by the August 9, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

953.  Nonetheless, these losses were tempered by additional misrepresentations by Defendants made on the same day.  In the "Off-Balance Sheet Arrangements and Guarantees" section of the second quarter 2007 Form 10-Q, which was signed by Defendants Sambol and Sieracki, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

954.  In a section titled "Financial Statements," the Company reported that the fair value of its MSRs for the quarter was $20,087,368,000.

955.  The Company also reported an allowance for loan losses of $512,904,000 as of the end of the quarter, having increased its provision for loan losses by $292,924,000 during the quarter, with net charge-offs of $154,387,000.

956.  The Company also claimed, again, in the Form 10-Q that it had adequate funding liquidity to accommodate marketplace changes:

> **We believe we have adequate funding liquidity to accommodate these marketplace changes in the near term . . .** We also believe that the challenges facing the industry should ultimately benefit Countrywide as the mortgage lending industry continues to consolidate.

957.   Also, in the section titled "Controls and Procedures," Countrywide described the adequacy of its internal controls:

> There has been no change in our internal control over financial reporting during the quarter ended June 30, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

958.   Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a SOX certification signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

959.   The statements referenced above from Countrywide's second quarter 2007 Form 10-Q were materially false and misleading when made.  As set forth in greater detail above, the Company's values for its revenue and diluted earnings per share were false because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessment of fair value for retained interests and MSRs were overstated.  See Section IV.G above.  Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Countrywide's statement that "[w]e believe we have adequate funding liquidity to accommodate these marketplace changes in the near term" was false and misleading for the same reasons set forth in Section IV.H above.  The statements relating to internal controls were false and misleading for the same reasons set forth in Section IV.G.5.  Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

1        960.    Analysts and investors continued to rely on Defendant's false
2    statements set forth above.  For example, on July 25, 2007, Piper Jaffray analysts
3    rated Countrywide's shares as "Outperform" and "believe[d] CFC has ample
4    liquidity to work through the housing/mortgage recession."

5        961.    Further, several other analysts either raised or maintained their stellar
6    recommendations and earnings estimates for Countrywide as a result of
7    Defendants' lulling misrepresentations.  For example, on August 2, 2007, Morgan
8    Stanley maintained an "Overweight" rating on Countrywide stock.    Analysts
9    reported "[w]ith capital markets volatility raising questions about the liquidity of
10    securitization markets, the key issue in the short term for Countrywide is
11    liquidity.  ***We don't see any near-term liquidity challenges for the company . . .***"

12        962.    **Corrective Disclosure on August 13, 2007.**   On August 13, 2007,
13    Merrill Lynch issued an analyst report that indicated that, because of liquidity
14    problems, "it is possible for CFC to go bankrupt."    In particular, under the
15    heading "Liquidity[,] the most pressing concern . . .," the Merrill Lynch report
16    stated:

17            The market is concerned that CFC could have difficulty with its credit
18            facilities, which are critical to it operating in the near-term.  CFC
19            currently has about $185B in available credit facilities, though the
20            concern is that these facilities could be terminated or the terms
21            changed meaningfully, thus impacting CFC's ability to operate
22            normally.  ***We cannot understate the importance of liquidity for a***
23            ***specialty finance company like CFC.***  If enough financial pressure is
24            placed on CFC or if the market loses confidence in its ability to
25            function properly then the model can break, leading to an effective
26            insolvency.  If liquidations occur in a weak market, ***then it is possible***
27            ***for CFC to go bankrupt.***

28

963.   The Merrill Lynch report served as a partial corrective disclosure with regard to a number of Defendants' false and misleading statements.  Among other matters, the report partially corrected Defendants' false statements that Countrywide was financially sound; that Countrywide was well-positioned to weather the downturn in the housing market; that Countrywide was poised to grow during the downturn and to capture marketshare from weaker competitors; and that Countrywide had secure access to ample sources of liquidity.

964.   As a result of the disclosures contained in the Merrill Lynch report, Countrywide common stock declined on August 13 by approximately 4.5%, on high volume exceeding 29 million shares.  This loss, which was caused by the August 13 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

965.   **Corrective Disclosure on August 14, 2007.**  On August 14, 2007, before the market opened, Countrywide issued a press release and filed a Form 8-K releasing its monthly operational data for July 2007.   In this report, Countrywide disclosed that by the end of July 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by approximately 35% to 4.89%, compared to a 3.61% rate as of July 31, 2006.   Countrywide also disclosed that, similarly, by the end of July 2007, its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.04%, compared to 0.46% as of July 31, 2006.

966.   An August 15, 2007, *Los Angeles Times* article about the July operating report commented: "[i]n a grim report that helped send mortgage stocks reeling, No. 1 home lender Countrywide Financial Corp. said Tuesday that foreclosures and delinquencies jumped in July to the highest levels in more than five years."  The article also noted that "Countrywide didn't file detailed monthly reports before 2002."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
MASTER FILE NO. CV 07-05295 MRP (MANx)

318

967.  Countrywide's August 14, 2007 disclosure of unexpectedly high rates of delinquencies and foreclosures partially corrected Countrywide's prior misrepresentations about the quality of its loan origination and underwriting standards and served as a partial corrective disclosure with respect to aspects of Countrywide's financial reporting, including Countrywide's loan loss reserves and its reported assets.  It was also a partial corrective disclosure with regard to Countrywide's prior misstatements that Countrywide's business was sound; that Countrywide was well-positioned to withstand the downturn in the housing market; and that Countrywide was poised to capture market share from weaker competitors.

968.  Countrywide's stock closed down on August 14, 2007 by approximately 8.1%, from $26.61 to $24.46, on high volume of almost 36 million shares.   This loss, which was caused by the August 14 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

969.  **Corrective Disclosure on August 15, 2007.**  On August 15, 2007, Merrill Lynch surprised the markets by following up on its August 13, 2007 analyst report expressing liquidity concerns about Countrywide with a further research report that downgraded Countrywide from "buy" to "sell" based on even more serious perceived liquidity problems.  An August 17, 2007 *Wall Street Journal* article summarized the impact of the August 15 Merrill Lynch analyst report on Countrywide's stock:

> When Merrill Lynch & Co. analyst Kenneth Bruce put a surprise "sell" rating on Countrywide Financial Corp. this week, the stock fell 13%. Many on Wall Street clearly felt he knew what he was talking about: He used to work at the troubled mortgage lender.

1      Mr. Bruce, 40, follows mortgage companies in Merrill's San

2      Francisco office.  But for 13 years before his arrival on Wall Street, he

3      worked in the mortgage business in different capacities.  One of them

4      was a two-year stint working for Countrywide's home-loans division

5      in Pasadena, California.  His boss there was David Sambol, who is

6      now the firm's president and heir apparent to its embattled chief

7      executive, Angelo Mozilo.

8

9      Mr. Bruce's Wednesday report, entitled "Liquidity is the Achilles

10     Heel" came just two days after he had reiterated his longstanding

11     "buy" rating on the company.  Pointing out that "funding markets are

12     deteriorating quickly," he suggested that Countrywide may even face

13     bankruptcy. "Our view has changed, materially," he wrote on the first

14     page of the report.

15     970.   The August 15, 2007 Merrill Lynch analyst report further partially

16 corrected Defendants' false statements that Countrywide was financially sound;

17 that Countrywide was well-positioned to weather the downturn in the housing

18 market; that Countrywide was poised to grow during the downturn and to capture

19 marketshare from weaker competitors; and that Countrywide had secure access to

20 ample sources of liquidity.

21     971.  As a consequence of those partial corrective disclosures,

22 Countrywide common stock fell by approximately 13% that day, from $24.46 to

23 $21.29, on volume of 118,552,500 shares, as compared to volume of 35,846,800

24 shares the prior trading day.  This loss, which was caused by the August 15 partial

25 corrective disclosure, was dramatically larger, to a statistically significant extent,

26 than any losses Class members would have sustained as a result of ordinary

27 market forces.

28

972. **Corrective Disclosures on August 16, 2007.** Two significant events that occurred on Thursday, August 16, 2007, served as partial corrective disclosures.

973. First, Countrywide announced that it drew its ***entire $11.5 billion*** credit facility to "supplement" its cash position. The credit facility that Countrywide drew on, in its entirety, was perceived by the market to be in the nature of a emergency fund to be used only as a last resort, or a close to last resort, source of liquidity. Second, and as a result, all three major credit rating agencies – Standard & Poor's, Moody's Investors Service, and Fitch Ratings – issued downgrades with regard to Countrywide securities. Moody's sharply downgraded Countrywide and CHL's senior debt rating to Baa3 from A3, just one notch above junk grade. Fitch sharply downgraded Countrywide's long-term issuer default rating two notches to BBB+ from A, just two notches above junk grade, and also downgraded Countrywide's CCIV and CCV preferred securities to BBB- from A-. S&P downgraded Countrywide to A- from A.

974. Countrywide's decision to access its $11.5 billion credit facility and the rating agency downgrades both constituted partial corrective disclosures to the investing public concerning a series of prior false and misleading statements by defendants, including with respect to: the soundness and stability of Countrywide's business and finances; Countrywide's ability to weather the downturn in the housing market; Countrywide's ability to thrive and gain market share from weaker competitors during the housing market downturn; Countrywide's access to liquidity; and the poor inherent quality of the loan portfolio that formed the core of Countrywide's business.

975. Countrywide's stock declined by approximately 11% on August 16, 2007, from $21.29 to $18.95, on extraordinary volume of 201,476,900 shares. This loss, which was caused by the August 16 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class

1 members would have sustained as a result of ordinary market forces.

2 Countrywide's other securities also experienced material and statistically

3 significant drops in their trading prices as a result of the August 16, 2007 partial

4 disclosures, including the trading price of the 6.25% Subordinated Notes due May

5 15, 2016, which fell by 10.53%; the trading price of the 3-Year Floating Rate

6 Notes Due 2008, which fell by 17.6%; the trading price of the 6% Notes due

7 November 2035, which fell by 13.01%; and the trading price of the 2-Year

8 Floating Rate Notes Due December 2007, which fell by 7.18%.

9     976.  **Positive News and Misrepresentations on August 23, 2007.**  On

10 August 23, 2007, before the stock market opened, the media reported that Bank of

11 America had announced a $2 billion investment in Countrywide.  In return for its

12 investment, Bank of America received a non-voting convertible Countrywide

13 preferred security yielding 7.25% annually and convertible to common stock at

14 $18 per share.  On January 11, 2008, as further discussed below, Bank of

15 America announced that it was acquiring Countrywide for a total of $4 billion.

16 Largely in response to the $2 billion Bank of America preferred security purchase

17 announced that day, as well as the misrepresentations by Defendant Mozilo

18 alleged below concerning the transaction and other material matters,

19 Countrywide's stock price rose approximately 1% on August 23, 2007.

20     977.  In an August 23, 2007 article in *The Wall Street Journal*, Defendant

21 Mozilo was quoted saying that "Countrywide would have survived without help

22 from Bank of America . . . ."

23     978.  The same day, August 23, 2007, Mozilo was again interviewed on

24 CNBC by Maria Bartiromo. During the interview, Mozilo falsely assured the

25 market place that the Company was not at risk of suffering a bankruptcy:

26         Well, first of all let me comment [on a] couple things.  One is the, just

27         the irresponsible behavior on part of that analyst from Merrill Lynch

28         to, yell fire in a very crowded theater in [an] environment where you

had panic already setting in the overall markets unrelated to Countrywide. Was *totally irresponsible and baseless. . . .* Has no basis whatsoever.

* * *

*. . . I can tell you there is no more chance for bankruptcy today for Countrywide than it was six months ago*, two years ago, when the stock was $45 a share. [We] are a very solid company.

979. Moreover, Mozilo stated during the CNBC interview that his stock sales were out of his hands and in line with investors' interests:

The upcoming sales are driven by rules within the 10b5-1 plan that were established long ago, and should in no way be viewed as any indication of my future outlook for Countrywide. . . . As one of Countrywide's largest individual shareholders, *my interests are firmly aligned with those of our other investors.*

980. Also on August 23, 2007, Mozilo was interviewed by Neil Cavuto of Fox News. Mozilo responded to a question regarding Countrywide's lending practices:

We're lending the money. It would be foolhardy for us to lend money to someone, A, by duping them, and, secondly, to think that we wouldn't be paid back. *We never make a loan where we think that we're creating a situation where we couldn't be paid back. We try to underwrite these loans prudently.*

981. Defendant Mozilo's statements referenced above were materially false and misleading when made. Specifically, Mozilo's reassuring statements that "Countrywide would have survived without help from Bank of America" and that the Company had "no more chance for bankruptcy today . . . than it was six months ago" were false and misleading for the reasons set forth in Section IV.H above. Additionally, Mozilo's statement that his "interest[s] are firmly aligned

1   with those of our other investors" was false and misleading for the reasons set

2   forth above in Section V.D.5.

3       982.   Analysts still maintained their faith in the Company in reliance on

4   management's false and misleading statements.  For example, on August 23,

5   2007, analysts at Piper Jaffray rated Countrywide's shares "Outperform."  Several

6   other analysts also raised or maintained their stellar recommendations and

7   earnings estimates for Countrywide as a result of Countrywide's fraudulent

8   misrepresentations:

9          •  On August 23, 2007, Citigroup rated Countrywide's stock a

10             "Buy."  Analysts stated that the Bank of America $2 billion

11             infusion "should enable CFC to continue to play a leadership

12             role during the U.S. mortgage market's return of normalcy."

13          •  On August 23, 2007, Credit Suisse rated Countrywide's

14             shares "Outperform."

15       983.  **Corrective Disclosure on August 24, 2007.**  On August 24, 2007,

16   Fitch Ratings downgraded Countrywide Home Loans, Inc.'s servicer ratings with

17   respect to a series of loan categories and placed the ratings on "Rating Watch

18   Evolving" status – a signal that the ratings could be cut again.  In its press release

19   announcing the downgrades, Fitch noted "the continued pressure on CHL's

20   liquidity position and financial flexibility" as well as "delinquency" challenges.

21       984.  Fitch's downgrade constituted an additional partial corrective

22   disclosure concerning prior false and misleading statements by defendants with

23   respect to Countrywide's access to liquidity, Countrywide's lax loan origination

24   and underwriting standards, the soundness and stability of Countrywide's

25   business and finances, Countrywide's ability to weather the downturn in the

26   housing market, and Countrywide's ability to thrive and gain marketshare from

27   weaker competitors during the housing market downturn.

28

985.   Countrywide's stock declined by approximately 4.6% on August 24, 2007, from $22.02 to $21.00, on high volume of 66,189,400 shares.  This loss, which was caused by the August 24 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

986.   **Corrective Disclosure on August 27, 2007.**  On August 27, 2007, Lehman Brothers issued a report that lowered earnings projections for Countrywide based in large part on the analysts' assessment that Countrywide would have to mark down to market (i.e. mark down to their actual, and now reduced, market value) the value of "non-conforming" loans that Countrywide reflected on its balance sheet.  The Lehman Brothers report was an additional indication to the investing public that Countrywide's financial statements and related SEC filings included false and misleading information, including with respect to the inflated asset values for loans incorporated into Countrywide's balance sheet that should have been significantly marked down to their true worth in the marketplace pursuant to GAAP.  The Lehman Brothers report was a further partial disclosure that Countrywide's claims that it was a well-managed lender that had adhered to conservative underwriting and loan origination standards were false.

987.   Countrywide's stock price fell on August 27, 2007 by 4.8%, from $21.00 to $20.00, on high volume of 46,671,300 shares.  This loss, which was caused by the August 27 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

988.   **Corrective Disclosure on September 10, 2007.**  After the market closed on Friday, September 7, 2007, Countrywide announced a plan to lay off between "10,000 to 12,000 [employees] over the next three months representing up to 20 percent of its current workforce."  This announcement of massive layoffs

1   constituted a further partial correction of multiple prior false statements by

2   Countrywide officials, including statements that Countrywide was well positioned

3   to weather the credit crisis, that its financial condition was sound, and that

4   Countrywide would strengthen its position within the lending industry during the

5   crisis by capturing market share from weaker competitors.

6        989.   The market reacted to Countrywide's announcement on Monday,

7   September 10, 2007 – the next business day.  Countrywide's stock fell 5.5% on

8   September 10, from $18.21 to $17.21, on high volume.  This loss, which was

9   caused by the September 7 partial corrective disclosure, was dramatically larger,

10  to a statistically significant extent, than any losses Class members would have

11  sustained as a result of ordinary market forces.

12       990.   **Corrective Disclosure on October 24, 2007.**  Before the markets

13  opened on Wednesday, October 24, 2007, *The Wall Street Journal* published a

14  major article that constituted a further partial revelation to the investing public of

15  the truth regarding Countrywide's loan origination and underwriting practices.

16       991.   The October 24 *Journal* story revealed a series of important pieces

17  of information to the investing public, much of which related to Countrywide's

18  Pay Option ARMs.

19       992.   The *Journal*'s October 24 story began by explaining that:

20       Subprime mortgages aren't the only challenge facing Countrywide

21       Financial Corp., the nation's biggest home-mortgage lender.  Some

22       loans classified as prime when they were originated are now going

23       bad at a rapid pace.

24  The *Journal* further revealed:

25       An analysis prepared for *The Wall Street Journal* by UBS AG shows

26       that 3.55% of option ARMs originated by Countrywide in 2006 and

27       packaged into securities sold to investors are at least 60 days past due.

28       That compares with an average option-ARM delinquency rate of

1    2.56% for the industry as a whole and is the highest of six companies

2    analyzed by UBS.

3    993.   The *Journal* also noted that:

4    "Among option ARMs held in its own portfolio, 5.7% were at least 30

5    days past due as of June 30, the measure Countrywide uses. That's up

6    from 1.6% a year earlier. Countrywide held $27.8 billion of option

7    ARMs as of June 30, accounting for about 41% of the loans held as

8    investments by its savings bank. An additional $122 billion have been

9    packaged into securities sold to investors, according to UBS.

10    994.   The *Journal* declared that "the deteriorating performance of option

11    ARMs is evidence that lax underwriting that led to problems in subprime loans is

12    showing up in the prime market, where defaults typically are minimal."   In

13    addition, the *Journal* quoted UBS analyst Shumin Li, who stated that "at

14    Countrywide 'they were giving these loans to riskier and riskier borrowers.'"

15    995.   This article partially corrected prior material false and misleading

16    statements, including Countrywide's and Mozilo's repeated representations that

17    Countrywide maintained conservative loan origination and underwriting

18    standards, that Countrywide was well-positioned to endure the housing industry

19    downturn, and that Countrywide would thrive during the downturn by capturing

20    marketshare from weaker competitors.

21    996.   On October 24, Countrywide's stock price fell by 8.1%, from $15.05

22    to $13.83 on volume of 66,182,900 shares, as compared to 29,945,200 shares the

23    prior trading day.   This loss, which was caused by the October 24 partial

24    corrective disclosure, was dramatically larger, to a statistically significant extent,

25    than any losses Class members would have sustained as a result of ordinary

26    market forces.   Countrywide's other securities also experienced material and

27    statistically significant drops in their trading prices as a result of the October 24,

28    2007 partial disclosures, including the trading price of the CCV 7% Capital

1    Securities (preferred stock), which fell by 9.05%; the trading price of the

2    Countrywide Capital IV 6.75% Capital Securities (preferred stock), which fell by

3    10.82%; the trading price of the 6% Notes due April 2035, which fell by 9.53%;

4    and the trading price of the 6.3% Notes due April 2036, which fell by 9.44%.

5        997.  **Corrective Disclosure and Continued Misrepresentations on**

6    **October 26, 2007.**   On October 26, 2007, before the stock market opened,

7    Countrywide issued a press release and filed a Form 8-K reporting its financial

8    results for the third quarter of 2007, including an enormous quarterly loss of $1.2

9    billion, or $2.85 per share, *the Company's first quarterly loss in 25 years.*

10   Among other disclosures related to the third quarter were a $1 billion write-down

11   of the Company's loans and mortgage-backed securities; an increase in loan loss

12   provisions to $934 million, compared to $293 million in the prior quarter and $38

13   million in the third quarter of 2006; and an increase in the provisions for

14   representations and warranties to $291 million, compared to $79 million in the

15   prior quarter and $41 million in the third quarter of 2006.

16       998.  Countrywide and various individual defendants – led by Defendant

17   Mozilo – managed, however, to temporarily swamp the poor performance that

18   Countrywide reported on October 26 with a series of false statements, in both the

19   press release and during an earnings conference call that day, that reassured the

20   investing public and sent Countrywide's stock price up that day by an

21   extraordinary 32.4% to close at $17.30.

22       999.  These statements included the following:

23           (a)   Defendant Mozilo's statement in the  press release that

24   "during the period [the third quarter] we . . . laid the foundation for a return

25   to profitability in the fourth quarter," and in the earnings call that "we

26   expect to return to profitability in the fourth quarter and we anticipate that

27   2008 will also be profitable;" Similarly, the press release quoted Defendant

28

1    Sambol as saying that "[w]e . . . anticipate that the Company will be
2    profitable in the fourth quarter and in 2008";

3          (b)    Defendant Mozilo's denial in the earnings call that he had
4    engaged in insider trading.  Mozilo declared that "I would like to state
5    *categorically* that at *no* time did I make *any* trading decisions based on any
6    material non-public information and I fully complied with all . . .
7    applicable securities laws in connection with my trading plans";

8          (c)    Defendant Sambol's statement in the earnings call that "we
9    see long-term prospects for . . . Countrywide to remain very attractive.  The
10   company has sufficient capital, liquidity and financing capacity for its
11   operating needs and its growth needs.   And coming through this
12   environment, CFC continues to possess all of its key historical competitive
13   advantages . . . "; Mozilo's similar statement in the press release that "[t]he
14   Company has sufficient capital, liquidity and financing capacity for its
15   operating needs and its growth needs"; and Sieracki's similar statement
16   during the earnings call that "[w]e now have ample and growing funding
17   liquidity. . . .   The mortgage company has adequate liquidity to fund all
18   debt maturities through 2008, without raising any new debt. . . .   So you
19   can see the liquidity situation is very strong at Countrywide at September
20   30, 2007"; and

21         (d)    The statements by Sambol on the earnings call that seconded
22   the views of an analyst who touted the Company's loan loss reserve
23   methodology, claiming that it is better than its peers:

24               But one other aspect of our reserves that is worth
25               mentioning is we have a reserve methodology, at least we
26               have had to date . . . that we think is somewhat conservative
27               relative to what most of our peers do.  And what we do it is
28               where maybe some of our peers book in their reserve what

1     they believe to be one year's worth of forward charge-offs,

2     maybe five quarters in the case I think as we have looked at

3     the landscape, the most conservative guide, we have a

4     reserve methodology that books more than five quarters of

5     expected losses.  And it is because what we do is we book

6     kind of a reserve for the lifetime losses on loans that are

7     delinquent today, 90+ delinquent, as well as the lifetime

8     expected losses on loans that will go delinquent within the

9     next 12 months.

10  1000. Defendants Mozilo's and Sambol's statements referenced above

11 were materially false and misleading when made.  Specifically, the reassuring

12 statements made by Mozilo and Sambol that, for example, "we expect to return to

13 profitability in the fourth quarter" and "[t]he Company has sufficient capital,

14 liquidity and financing capacity," and the similar statements by Mozilo, Sambol

15 and Sieracki that "[t]he Company's liquidity is stable and improving" and "[w]e

16 now have ample and growing funding liquidity" were false and misleading for the

17 reasons set forth in Section IV.H above.  Also, Mozilo's denial of insider trading

18 was false for the reasons detailed in Section V.D above.  Further, Sambol's

19 statements that Countrywide "ha[s] a reserve methodology that books more than

20 five quarters of expected losses" and "is somewhat conservative relative to what

21 most of our peers do" were false and misleading.  See Section IV.G.1 above.

22  1001. Several analysts either raised or maintained their stellar

23 recommendations for Countrywide in reliance on Defendants' fraudulent

24 misrepresentations:

25    • On October 26, 2007, Morgan Stanley analysts rated

26     Countrywide's stock as "Equal-weight" and stated that

27     "[w]e feel substantially more confident in the company's

28     liquidity."

1             • On October 29, 2007, Credit Suisse analysts rated
2                  Countrywide's stock as "Outperform" and stated that "we do
3                  believe that its credit and reserve position is solid and will
4                  likely prove conservative relative to many market
5                  participants."

6             • On October 29, 2007, Fox-Pitt Kelton analysts rated
7                  Countrywide's stock "Outperform" and stated "we are
8                  optimistic that Q3 represents a trough for the company."

9      1002. **Corrective Disclosure on October 30, 2007.** Before the markets

10 opened on Tuesday, October 30, *The Wall Street Journal* published a further

11 article that partially corrected prior material false and misleading statements by

12 defendants.

13      1003. Most notably, the *Journal* reported that "some analysts warn that

14 [Countrywide] . . . hasn't gone far enough in marking down the value of mortgage

15 securities it holds." The *Journal* noted that in addition to "question[ing] whether

16 Countrywide has gone far enough in marking down assets," two specific analysts

17 that it cited – Frederick Cannon of Keefe, Bruyette & Woods, and Paul J. Miller

18 Jr. of Friedman, Billings, Ramsey & Co. – also questioned whether Countrywide

19 had adequately "provid[ed] for future loan losses." The *Journal* article

20 represented a further partial corrective disclosure with regard to the veracity of

21 Countrywide's accounting, in particular with respect to the value of the assets that

22 Countrywide reported based on mortgages that it held, and with respect to

23 Countrywide's loan loss reserves.

24      1004. The *Journal* also asserted that Countrywide "may have trouble

25 delivering on" what the *Journal* termed its "profit vow" the prior Friday, October

26 26 – that it would return to profitability in the fourth quarter of 2007 and through

27 2008 – thereby partially correcting Countrywide's and Mozilo's false October 26

28 profit representations.

1005. The *Journal*'s October 30 article also partially corrected prior false statements by Countrywide about its access to liquidity, its institutional stability, and its ability to thrive during the housing downturn.  The *Journal* noted in that regard that "lenders like Countrywide can no longer fund themselves with short-term borrowings in the capital markets, such as by issuing commercial paper."  Quoting analyst Cannon, the *Journal* further noted, among other matters, that "Countrywide has yet to show that it can 'earn above its cost of capital,'" and that it appeared that Countrywide "can raise funds 'only at very high prices.'"

1006. Countrywide's stock declined on October 30 by approximately 5.3%, from $16.83 to $15.94, on high volume.  This loss, which was caused by the October 30 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1007. **Corrective Disclosure on November 7, 2007.**  On November 7, 2007, Gradient Analytics, Inc. ("Gradient"), an independent equity research firm, issued a 27-page report detailing six techniques "for misstating the earnings and net assets at firms that are heavily invested in mortgages and related securities."  The Gradient report analyzed five major U.S. mortgage businesses, including Countrywide.  The report concluded, *inter alia*, that Countrywide "appears to be at risk from virtually all of the mortgage accounting games highlighted in this report."  The Gradient report then elaborated at some length about dubious features of Countrywide's financial reporting.

1008. For example, Gradient indicated that:

> – "[W]e expect to see more losses reported down the road" from write-downs of "CFC's retained interests."
>
> – "Gradient believes that the company's MSRs [mortgage servicing rights] may be materially overstated."

1             – "CFC's loans held for investment – and particularly its

2                Option ARMs – may be subject to a high risk of

3                misstatement at the present time."

4             – "[W]e would expect negative amortization to be a

5                significant problem."

6             – "[T]here may be a substantially larger impairment that has

7                been avoided by [Countrywide] changing the classification

8                of . . . loans to the held for investment category."

9    1009. Countrywide's stock declined on November 7, 2007 by

10  approximately 9.3%, from $15.02 to $13.63, on high volume.  This loss, which

11  was caused by the November 7 partial corrective disclosure, was dramatically

12  larger, to a statistically significant extent, than any losses Class members would

13  have sustained as a result of ordinary market forces.   Countrywide's other

14  securities also experienced material and statistically significant drops in their

15  trading prices as a result of the November 7, 2007 partial disclosures, including

16  the trading price of the 7% Capital preferred stock, which fell by 4.02%; and the

17  trading price of the 6.75% Capital IV preferred stock, which fell by 5.41%.

18    1010. **Misrepresentations on November 9, 2007.**  On November 9, 2007,

19  Countrywide filed its Form 10-Q report for the third quarter of 2007, ended

20  September 30, 2007.  In the Form 10-Q, which Defendants Sambol and Sieracki

21  signed, Countrywide once again stated that during the industry downturn, "[w]e

22  also believe that many opportunities will present themselves to the Company as a

23  result of the market transition taking place, and that Countrywide is well

24  positioned to capitalize on these opportunities."

25    1011. In a section titled "Valuation of MSRs and Other Retained Interests,"

26  the Company reported that the fair value of the retained interests on its balance

27  sheet as of September 30, 2007 was $2,463,528,000.  The impairment taken on

28  the fair value of its retained interests equaled $716,658,000.

1012. In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

1013. In a section titled "Credit Risk Management," the Company also stated the liabilities associated with the risk of representation and warranties as "totaling $639,647,000."

1014. In a section titled "Securitizations," the Company reported that the fair value of MSRs as of September 30, 2007 was $20,068,153,000.

1015. Also, in the section entitled "Controls and Procedures," Countrywide described the adequacy of its internal controls:

> There has been no change in our internal control over financial reporting, other than discussed above, during the quarter ended September 30, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

1016. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a SOX certification signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

1017. The statements referenced above in the third quarter 2007 Form 10-Q were materially false and misleading when made. Countrywide's statement that it "is well positioned to capitalize on . . . opportunities" was false and misleading for the same reasons set forth in Section IV.H above. The Company's

1  statement in the Form 10-Q relating to the value of its retained interests, MSRs

2  and statements relating to its representations and warranties were false and

3  misleading for the reasons stated in Section IV.G above.  The statements relating

4  to internal controls were false and misleading for the same reasons set forth in

5  Section IV.G.5.  The SOX certifications signed by Defendants Mozilo and

6  Sieracki were false and misleading for the same reasons stated in Section IV.G

7  above.

8      1018. **<u>Corrective Disclosure on November 26, 2007.</u>**  On November 26,

9  2007, before the securities markets opened, *The Wall Street Journal* published an

10  article that detailed Countrywide's heavy dependence on the Federal Home Loan

11  Bank of Atlanta ("FHLB") as a source of liquidity that had, since mid-August

12  2007, been important to allowing Countrywide to remain in business.  The article

13  also reported that Countrywide's ability to use the FHLB as a source of liquidity

14  was near an end.

15      1019. Specifically, the *Journal* reported that:

16  "When Countrywide Financial Corp. Chief Executive Angelo Mozilo

17  needs cash to fund home loans these days, he doesn't look to

18  investment banks in New York or London.

19

20  He relies mainly on the quasigovernmental Federal Home Loan Bank

21  in Atlanta.

22                                          * * *

23  The Atlanta home loan bank has helped to keep Countrywide in

24  business since mid-August, when investors' fears over default risk

25  shut off mortgage lenders' ability to raise money through commercial

26  paper or other short-term borrowings. Countrywide has replaced that

27  funding mainly by tapping the Atlanta bank, where its borrowings

28

1  totaled $51.1 billion as of Sept. 30, up 77% from three months

2  earlier."

3  1020. The *Journal* also reported that "the home loan bank . . . limit[s] any

4  member's total advances to 50% of that member's assets."   The *Journal*

5  explained that "Countrywide's savings bank had assets of $106 billion at the end

6  of October, which suggests that its advances are near that ceiling."

7  1021. The FHLB's limitation of member banks to borrowing 50% of their

8  assets necessarily implied that Countrywide was very close to its borrowing

9  ceiling because, as noted, Countrywide's bank "had assets of $106 billion." Fifty

10  percent of $106 billion equals $53 billion.   Because, as the *Journal* reported,

11  Countrywide had already borrowed $51.1 billion from the FHLB, by implication

12  it could borrow only about $1.9 billion more without violating the FHLB's 50%

13  of assets borrowing limitation ($53 billion - $51.1 billion = $1.9 billion).   $1.9

14  billion represents only a small fraction of the total liquidity Countrywide had to

15  have access to each month to remain in business.

16  1022. The *Journal*'s article about Countrywide's dependence on the FHLB

17  as a source of liquidity and of the likely exhaustion of Countrywide's ability to

18  turn to the FHLB was a partial correction of a number of prior false and

19  misleading statements by Defendants.   In particular, it corrected recent false

20  statements about Countrywide's institutional stability, its ability to weather the

21  downturn in the housing market, its ability to gain market share from competitors,

22  and its access to liquidity.

23  1023. Following the publication of the *Journal*'s November 26 article,

24  Countrywide's stock declined by approximately 10.5%, from $9.65 to $8.64, on a

25  volume of 54,940,000 shares, as compared to a volume of 21,627,700 shares on

26  the prior trading day.   This loss, which was caused by the November 26 partial

27  corrective disclosure, was dramatically larger, to a statistically significant extent,

28

1   than any losses Class members would have sustained as a result of ordinary
2   market forces.

3       1024. **<u>Corrective Disclosures on December 13, 2007.</u>**  On December 13,
4   2007, there were three partial corrective disclosures.

5       1025. First, before the market opened, Countrywide issued a press release
6   and filed a Form 8-K releasing its November 2007 operational data.   In this
7   monthly operating report, Countrywide disclosed a further deterioration in its
8   delinquency and foreclosure rates.   Among other matters, for example,
9   Countrywide disclosed that, as of November 30, 2007, its rate of delinquency as a
10   percentage of loans serviced had increased to 6.34%.

11       1026. Countrywide's December 13 disclosure of continued high rates of
12   delinquencies and foreclosures was a further partial corrective disclosure with
13   regard to Countrywide's false and misleading representations about the quality of
14   its loan origination and underwriting standards.  In addition, the report served as a
15   partial corrective disclosure with respect to aspects of Countrywide's financial
16   reporting, including Countrywide's loan loss reserves and its reported assets.  The
17   report was also a partial corrective disclosure with regard to Countrywide's false
18   and misleading statements that its business was sound, that Countrywide was
19   well-positioned to withstand the downturn in the housing market, and that
20   Countrywide was poised to capture marketshare from competitors whose
21   condition was weaker.

22       1027. In addition, a second significant partial corrective disclosure on
23   December 13 was a *New York Times* article that reported that "[t]he Illinois
24   attorney general is investigating the home loan unit of Countrywide Financial as
25   part of the state's expanding inquiry into dubious lending practices that have
26   trapped borrowers in high-cost mortgages they can no longer afford."  The *Times*
27   further noted that "Lisa Madigan, the attorney general, has subpoenaed
28   documents from Countrywide relating to its loan origination practices."   In

addition, among other matters, the *Times* quoted Illinois Attorney General Madigan as saying about "a Chicago mortgage broker" for which Countrywide was the "primary lender" that "[t]his company's conduct is a prime example of unscrupulous mortgage brokers that has led to a foreclosure crisis for many Illinois homeowners."

1028. The *Times* article represented a further disclosure that partially corrected defendants' prior material false and misleading statements regarding, among other matters, Countrywide's loan origination and underwriting practices; the accuracy and integrity of its accounting including, in particular, the adequacy of its loan loss reserves and the valuation of loans that it reflected as assets on its balance sheet; its business ethics; its institutional strength and stability; its ability to thrive during the housing downturn; and its ability to sustain itself as a viable independent business.

1029. A third partial corrective disclosure on December 13, 2007 was an announcement by Fitch Investment Research that it was downgrading 110 classes of residential mortgage backed securities from 28 Countrywide transactions. Fitch's downgrade constituted a further partial corrective disclosure with respect to the quality of Countrywide's loan origination and underwriting standards.

1030. Countrywide's stock declined on December 13, 2007 by approximately 4.3%, from $10.53 to $10.08 on high volume. This loss, which was caused by the December 13 partial corrective disclosures, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1031. **Corrective Disclosure and Continued Misrepresentations on January 8, 2008.** On January 8, 2008, before the markets opened, *The New York Times* published an article that reported that "Countrywide Financial Corporation fabricated documents related to the bankruptcy case of a Pennsylvania homeowner, court records show, raising new questions about the business

1  practices of the giant mortgage lender at the center of the subprime mess."  The
2  *Times* noted that the fabricated documents, which it described as "three letters
3  from Countrywide addressed to . . . [a] homeowner," were written in connection
4  with "one of 300 bankruptcy cases in which Countrywide's practices have come
5  under scrutiny in western Pennsylvania."  The *Times* quoted U.S. Bankruptcy
6  Judge Thomas P. Agresti, who presides over the case in connection with which
7  the letters were written, as saying that "[t]hese letters are a smoking gun that
8  something is not right in Denmark."

9       1032. The January 8, 2008 *Times* article served as a partial corrective
10  disclosure with respect to a series of false representations by Countrywide.  Those
11  representations included statements about Countrywide's business ethics, and
12  about the competence and accuracy of both Countrywide's management and its
13  information and financial reporting systems.

14       1033. In response, Countrywide stock plummeted by approximately 28.4%
15  that day, from $7.64 to $5.47, on extraordinary volume of 178,828,900 shares
16  compared to 38,088,800 shares the prior trading day.  This loss, which was
17  caused by the January 8 partial corrective disclosure, was dramatically larger, to a
18  statistically significant extent, than any losses Class members would have
19  sustained as a result of ordinary market forces.  Countrywide's other securities
20  also experienced material and statistically significant drops in their trading prices
21  as a result of the January 8, 2008 partial disclosures, including the trading price of
22  the 7% Capital V preferred stock, which fell by 22.61%; the trading price of the
23  6.75% Capital IV preferred stock, which fell by 21.96%; the trading price of the
24  6.25% Subordinated Notes due May 15, 2016, which fell by 13.74%; the trading
25  price of the 6% Notes due November 2035, which fell by 7.04%; and the trading
26  price of the 6.3% Notes due April 2036, which fell by 6.99%.

27       1034. Nonetheless, these losses were tempered by additional
28  misrepresentations by Defendants made on the same day.  On January 8, 2008,

1  Reuters reported in an article titled "Countrywide Rejects Bankruptcy Rumor"
2  that Countrywide had stated that "[t]here is no substance to the rumor that
3  Countrywide is planning to file for bankruptcy, and we are not aware of any basis
4  for the rumor that any of the major rating agencies are contemplating negative
5  action relative to the company."

6      1035. The Company's statement alleged in the prior paragraph was false
7  and misleading for the same reasons set forth in Section IV.H above.

8      1036. **Corrective Disclosure on January 9, 2008**.   On January 9, 2008,
9  before the market opened, Countrywide issued a press release and filed a Form
10  8-K releasing its operational data for December 2007.  In this monthly operating
11  report, Countrywide disclosed that by December 31, 2007, its rate of pending
12  foreclosures as a percentage of unpaid principal balance had more than doubled to
13  1.44%, compared to 0.70% as of December 31, 2006.  Similarly, Countrywide
14  also disclosed that by December 31, 2007, its rate of delinquency as a percentage
15  of unpaid principal balance had increased by more than 50% to 7.20%, compared
16  to 4.6% as of December 31, 2006.

17      1037. As a Reuters article published after the markets closed on January 9
18  explained, the rates of foreclosures and delinquencies that Countrywide disclosed
19  in its December monthly operating report were "the highest on record, sending its
20  shares tumbling . . . to their lowest in nearly 13 years."  As Reuters noted,
21  "[a]nalysts attributed Wednesday's drop to deteriorating credit quality reflected in
22  Countrywide's monthly operating report, and renewed concern the lender might
23  not survive the housing crunch and could seek bankruptcy protection."  Reuters
24  quoted Lehman Brothers analyst Bruce Harting's statement that "[t]he extent of
25  the deterioration is a surprise and does not bode well for the fourth-quarter results
26  of companies with mortgage credit exposure that may have to further add to
27  reserves."

28

1038. Countrywide's January 9 revelation of its unexpectedly high rates of foreclosures and delinquencies was a partial corrective disclosure with respect to a number of defendants' prior false and misleading statements.  In particular, it was a further partial corrective disclosure with regard to Countrywide's representations about the quality of its loan origination and underwriting standards.  In addition, it served as a partial corrective disclosure with respect to the accuracy of Countrywide's financial reporting, including its loan loss reserves and its reported assets.  It was also understood by the market to be a partial corrective disclosure with regard to Countrywide's false statements on October 26, 2007 about the likelihood that Countrywide would return to profitability in the fourth quarter of 2007 and in 2008.

1039. Countrywide's stock closed down on January 9, 2008 by approximately 6.4%, from $5.47 to $5.12, on heavy volume of 164,027,600 shares.   This loss, which was caused by the January 9 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces. Countrywide's other securities also experienced material and statistically significant drops in their trading prices as a result of the January 9, 2008 partial disclosures, including the trading price of the 7% Capital V preferred stock, which fell by 3.9%; the trading price of the 6.75% Capital  IV preferred stock, which fell by 6.6%; the trading price of the 6.25% Subordinated Notes Due May 15, 2016, which fell by 9.17%; the trading price of the 3-Year Floating Rate Notes Due 2008, which fell by 4.36%; and the trading price of the 6% Notes due November 2035, which also fell by 4.36%.

1040. **Announcement of Merger Agreement on January 11, 2008.** Before the securities markets opened on Friday, January 11, 2008, "Bank of America Corporation . . . announced a definitive agreement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4

1  billion." Specifically, Bank of America agreed to offer 0.1822 shares of its stock

2  to Countrywide shareholders for every Countrywide share they held.

3  1041. The previous day, Thursday, January 10, Countrywide stock had

4  soared in value by approximately 51.4% to close at $7.75 after *The Wall Street*

5  *Journal* first reported at 2:15 p.m. that Bank of America was "in advanced talks

6  to acquire . . . Countrywide."

7  1042. After Bank of America disclosed the terms of the purchase on

8  Friday, January 11, however, Countrywide's stock price slumped back down to

9  close at $6.33, giving up the majority of its gain the day before.

10  1043. The approximately $4 billion that Bank of America announced on

11  January 11 that it was paying for Countrywide represented only about 27% of

12  Countrywide's most recently reported book value of approximately $15.3 billion,

13  which was reported as of September 30, 2007.

14  1044. Bank of America's decision to purchase Countrywide for only

15  approximately 26% of Countrywide's book value following the completion of

16  comprehensive due diligence represented a partial corrective disclosure with

17  respect to a series of false and misleading statements that had been made by

18  Defendants.

19  1045. Among other matters, the low purchase price of Countrywide

20  relative to book value represented a disclosure that Countrywide's financial

21  statements continued to falsely overvalue Countrywide's assets (including, in

22  particular, residual securities, loans held for investment, and loans held for sale),

23  and continued to understate Countrywide's loan loss reserves.

24  1046. A January 11, 2008 report by Wachovia Capital Markets

25  commented:

26  The purchase price of roughly $4B is well below the most recently

27  reported equity capital base of $15B. We believe that BAC [Bank of

28  America Corporation] will use the difference (negative goodwill) to

1    write down a large percentage of CFC's assets. Candidates include
2    residual securities, the $84B held for investment portfolio (mostly
3    option ARMs and high LTV prime home equity loans) and the $31B
4    held for sale portfolio, which includes a large portfolio of subprime
5    loans.

6    1047. Countrywide's stock price declined on January 11, 2008 by
7    approximately 18.3%, from $7.75 to $6.33, on heavy volume of 234,155,300
8    shares.   This loss, which was caused by the January 11 partial corrective
9    disclosure, was dramatically larger, to a statistically significant extent, than any
10   losses Class members would have sustained as a result of ordinary market forces.

11   1048. **Misrepresentation on January 29, 2008.**   *Bloomberg* reported on
12   January 29, 2008, in an article titled "Countrywide KB Home Loans Accused of
13   Fraud by Whistleblower," that Mark Zachary, a former regional vice president of
14   a Countrywide Financial Corp. and KB Homes joint venture, claimed he had been
15   fired for rejecting unqualified borrowers and reporting illegal and unethical
16   lending practices to management. Countrywide said in an e-mailed statement that
17   it "has policies and procedures in place that aim to prevent the type of activities
18   Mr. Zachary is alleging."   Countrywide's statement was false and misleading for
19   the reasons set forth in Section IV.C.3.

20   1049. **Corrective Disclosure on February 5, 2008.**   On Monday,
21   February 4, 2008, very shortly before the stock market closed, Standard & Poor's
22   Ratings Services placed certain "residential loan, subprime, subordinate-lien, and
23   special servicer rankings" relating to Countrywide Home Loans "on creditwatch
24   with negative implications."

25   1050. Standard & Poor's explained that "[t]he creditwatch placements
26   reflect increased scrutiny of Countrywide's servicing practices by various federal
27   and state enforcement agencies, including the office of the U.S. Trustee and the
28   office of the Florida Attorney General."

1051. Standard & Poor's February 4, 2008 placement of Countrywide Home Loans on creditwatch with negative implications served as a partial corrective disclosure with respect to a series of false representations by Countrywide. Those representations included statements about Countrywide's business ethics, and about the competence and accuracy of Countrywide's management, and information and financial reporting systems.

1052. As noted above, Standard & Poor's creditwatch action was reported by the media very shortly prior to the close of the stock market on Monday, February 4. The following day, Countrywide's stock declined by approximately 8.6%, from $7.22 to $6.60, on high volume. This loss, which was caused by the February 4 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1053. **Corrective Disclosure on March 6, 2008.** On March 6, 2008, the *Chicago Sun-Times* reported that "Illinois Attorney General Lisa Madigan issued subpoenas to Countrywide Home Loans Inc. and Wells Fargo Financial Illinois to determine if they unfairly steered African American and Latino borrowers into higher cost or otherwise inappropriate home loans in violation of fair lending and civil rights laws." The Illinois Attorney General was quoted as saying that "[t]he difference in cost between the home loans sold to white borrowers and those sold to African-American and Latino borrowers is alarming." In addition, her office said in a statement that "[i]ncome level does not appear to account for the difference in pricing." Reportedly, "[t]he wealthiest African-American homeowners were still more likely than the poorest white borrowers to get placed in high-cost loans."

1054. Media coverage of the Illinois Attorney General's investigation served as a partial corrective disclosure with regard to a series of defendants' false and misleading statements, including statements denying that Countrywide

1   engaged in predatory lending; statements affirming that Countrywide maintained
2   appropriate loan origination and underwriting standards; and statements regarding
3   Countrywide's ethical standards and the quality of its management.

4       1055. Countrywide's stock price declined on March 6, 2008 by
5   approximately 8.8%, from $5.70 to $5.20, on volume exceeding 32 million
6   shares.  This loss, which was caused by the March 6 partial corrective disclosure,
7   was dramatically larger, to a statistically significant extent, than any losses Class
8   members would have sustained as a result of ordinary market forces.

9       1056. **Corrective Disclosure on March 8, 2008.**  On Saturday, March 8,
10  2008, *The Wall Street Journal* reported that "[t]he Federal Bureau of
11  Investigation is probing . . . Countrywide Financial Corp. for possible securities
12  fraud."   The *Journal* further reported that "***[t]he inquiry involves whether***
13  ***company officials made misrepresentations about the Company's financial***
14  ***position and the quality of its mortgage loans in securities filings***, four people
15  with knowledge of the matter said."   The *Journal* also noted that "Countrywide
16  issued more than $100 billion in mortgage-backed securities between 2004 and
17  2007" and that "[m]ore than two dozen Wall Street firms helped construct those
18  deals, making it possible that some of them will also face law-enforcement
19  scrutiny."   The *Journal* also reported that:

20      Federal investigators are looking at evidence that may indicate
21      widespread fraud in the origination of Countrywide mortgages, said
22      one person with knowledge of the inquiry.  If borne out, that could
23      raise questions about whether company executives knew about the
24      prospect that Countrywide's mortgage securities would suffer many
25      more defaults than predicted in offering documents.

26

27      Another potential issue facing the company is whether it has been
28      candid in its accounting for losses. People familiar with the matter

1    said that Countrywide's losses may be several times greater than it has

2    disclosed.

3        1057. The *Journal*'s March 8, 2008 story was a further partial corrective

4    disclosure with regard to a series of prior false and misleading statements by

5    defendants.  Among other matters, the March 8 *Journal* story constituted a partial

6    corrective disclosure with regard to false and misleading representations made by

7    defendants in Countrywide's financial statements and related SEC filings,

8    including, but not limited to, representations concerning Countrywide's loan loss

9    reserves, earnings, and assets.  The story also constituted a partial corrective

10   disclosure with regard to Countrywide's prior false and misleading

11   representations about its business ethics and the quality of its management.  In

12   addition, the March 8 *Journal* story partially corrected Defendants' prior false

13   and misleading statements about Countrywide's institutional stability and its

14   ability to weather the housing crisis and to capture market share at the expense of

15   purportedly weaker competitors.  The story further partially corrected, among

16   other matters, Defendants' prior false and misleading statements about the quality

17   of Countrywide's loan origination and underwriting standards.

18       1058. On Monday, March 10, 2008, the first day that the securities markets

19   were open following the publication of the *Journal*'s March 8 story, Countrywide

20   stock declined by approximately 14%, from $5.07 to close at $4.36 — its lowest

21   level since April 1995 — on volume exceeding 35 million shares.  This loss,

22   which was caused by the March 8, partial corrective disclosure, was dramatically

23   larger,  to a statistically significant extent, than any losses Class members would

24   have sustained as a result of ordinary market forces.  Countrywide's other

25   securities also experienced material and statistically significant drops in their

26   trading prices as a result of the March 8, 2008 partial disclosures, including the

27   trading price of the 7% Capital V preferred stock, which fell by 17.56%; and the

28   trading price of the 6.75% Capital  IV preferred stock, which fell by 16.98%.

1

## IX.   LOSS CAUSATION

2    1059.  Throughout the Class Period, the prices of Countrywide common

3  stock, the Countrywide Capital V 7% Capital Securities, Countrywide debt

4  securities listed in Section VII.F above, and Countrywide call options were

5  artificially inflated (and the price of Countrywide put options were artificially

6  reduced) as a direct result of Defendants' materially false and misleading

7  statements and omissions. When the truth became known, the prices of

8  Countrywide securities declined precipitously as the artificial inflation was

9  removed from the prices of these securities, causing substantial damage to

10  Plaintiffs and members of the Class. The chart below shows the fluctuation of the

11  price of Countrywide common stock during the Class Period:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Historical Price and Trading Volume of Countrywide Common Stock
From March 12, 2004 Through March 10, 2008

7/24/07, 30.50.

3/10/08, 4.36

1060. During the Class Period, Countrywide common stock traded as high as $45.03 per share as recently as February 2, 2007, and closed at $34.06 per share just prior to the July 24, 2007 conference call.  Over the next five and a half months, as the truth continued to emerge, Countrywide's common stock price plummeted to $5.12 per share on January 9, 2008, just prior to the announcement of the Bank of America merger.  While this announcement was viewed as a positive event, causing Countrywide's stock price to partially recover, additional revelations soon came to light causing the stock to fall, from a high (after the announcement) of $7.75 per share, by another 44% to the end of the Class Period, to $4.36 per share.

1061. In all, as a consequence of the revelation of the truth concerning Countrywide during the Class Period, ***Countrywide common stock lost in excess of $25 billion in market capitalization, or more than 90% of its value.***

1062. Specific dates of adverse disclosure, and corresponding declines in the price of Countrywide common and preferred stock, and representative debt securities, are set forth in Section VIII above.

1063. Moreover, the adverse consequences of Countrywide's partial disclosures beginning on July 24, 2007 through the end of Class Period, and the adverse impact of those circumstances on the Company's business going forward, were entirely foreseeable to Defendants at all relevant times.  Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.

1064. As set forth above, the Company's failure to maintain effective internal controls, its substantially loosened loan origination and underwriting standards, and its failure to report its 2003-2006 financial statements in accordance with GAAP not only were material, but also triggered foreseeable and grave consequences for the Company.  The prices of the Company's securities during the Class Period were based upon its public position that Countrywide was

1  different and unique in its business model as opposed to its competitors.  The
2  materially false and misleading statements relating to Countrywide's uniqueness
3  bore a direct impact on the Company's financial reporting and required such
4  reporting to violate GAAP.  In turn, the financial reporting that was presented in
5  violation of GAAP conveyed the impression that the Company was more
6  profitable, better capitalized, and would have better access to liquidity than was
7  actually the case.  Thus, the precipitous declines in value of the securities
8  purchased by the Class were a direct, foreseeable, and proximate result of the
9  corrective disclosures of the truth with respect to Defendants' materially false and
10  misleading statements.

11      1065. Similarly, the fact that the Company's end-of-Class-Period adverse
12  disclosures triggered governmental investigations into the Company's Class
13  Period statements, reported financial results and insider selling, was an entirely
14  foreseeable consequence of the misconduct complained of herein.

15

16  **X.      POST-CLASS PERIOD EVENTS**

17      1066. On March 12, 2008, Fitch Ratings further downgraded
18  Countrywide's long-term issuer default rating from BBB+ to BBB-, its lowest
19  investment-grade rating, citing rapidly rising delinquency rates in the Company's
20  home equity loan portfolio.

21      1067. On March 23, 2008, *Bloomberg News* reported that *Barron's*
22  magazine published its annual list of the thirty best CEOs worldwide, chosen
23  among CEOs who have been on the job for at least three years and have
24  "delivered for shareholders" while building their reputations as executives.  After
25  including Defendant Mozilo on last year's list, *Barron's* removed him this year,
26  calling him ***"the biggest embarrassment"*** owing to Countrywide's collapse.

27      1068. On March 27, 2008, CNN reported that Assured Guaranty Ltd., an
28  insurance company that provided credit enhancement products to Countrywide

1   during the Class Period, was re-examining the Company's lending documents for

2   some of the $2.1 billion in guarantees Assured wrote for Countrywide's

3   securitized HELOCs.  This $2.1 billion in mortgage-backed securities "has run

4   into trouble as defaults on the loans rose above expectations in the last few

5   quarters."  Assured is investigating whether Countrywide's representations and

6   warranties meet the terms of the loans; if they do not, Assured will require

7   Countrywide to repurchase them or replace them with better loans.

8        1069. On April 2, 2008, as reported in *The Wall Street Journal*, the United

9   States Bankruptcy Court for the Western District of Pennsylvania authorized an

10  in-depth probe of Countrywide's mortgage processing systems by bankruptcy

11  investigators hunting for evidence that the Company systematically abuses

12  borrowers. The Bankruptcy Court is presiding over 293 cases alleging widespread

13  misconduct involving Countrywide, including claims that the Company imposed

14  improper fees on bankrupt homeowners, refused to cash mortgage payments from

15  court officials, violated court orders while pursuing troubled customers and, in

16  one case, fabricated documents.  The Bankruptcy Court gave a green light to an

17  inquiry by the United States Trustee into "the impact of Countrywide's

18  bankruptcy procedures on the integrity of the bankruptcy process," based on a

19  showing by the Trustee that several bankruptcy cases involving Countrywide had

20  "a common thread of potential wrongdoing."

21       1070. On April 4, 2008, Moody's downgraded Countrywide Bank's

22  financial strength rating to D, or default, from C-, citing Countrywide's severe

23  liquidity woes.  A Moody's Vice President stated that these liquidity issues could

24  threaten Countrywide Bank's current ability to continue its "franchise."

25

26  **XI.   CLASS ACTION ALLEGATIONS**

27       1071. Plaintiffs bring this action on their own behalf and as a class action

28  pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on

behalf of a class consisting of all persons and entities which, between March 12, 2004 and March 7, 2008, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock or other equity securities, debt securities, or call options of or guaranteed by Countrywide, or sold Countrywide put options, either in the open market or pursuant or traceable to a registration statement, and were damaged thereby (the "Class").  Excluded from the Class are the Defendants; the members of the immediate families of the Individual Defendants; the subsidiaries and affiliates of Defendants; any person who is an officer, director, partner or controlling person of Countrywide (including any of its subsidiaries or affiliates, which include but are not limited to Countrywide Home Loans, Inc., Countrywide Capital V and Countrywide Capital IV) or any other Defendant; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

1072. The members of the Class are so numerous that joinder of all members is impracticable.  As of February 24, 2006, Countrywide had 602,995,163 shares of common stock outstanding and actively trading on the NYSE with the ticker symbol "CFC."  Additionally, during the Class Period, Countrywide and CCV issued billions of dollars worth of debt and preferred securities through the Underwriter Defendants.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by Countrywide or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

1073. Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly

1    wrongful conduct in violation of the Securities Act and Exchange Act as
2    complained of herein.

3        1074. Plaintiffs will fairly and adequately protect the interests of the
4    members of the Class.   Plaintiffs have retained counsel competent and
5    experienced in class and securities litigation.

6        1075. Common questions of law and fact exist as to all members of the
7    Class and predominate over any questions solely affecting individual members of
8    the Class.  The questions of law and fact common to the Class include:

9            (a)     whether the federal securities laws were violated by
10       Defendants' acts and omissions as alleged herein;

11           (b)     whether the registration statements and prospectuses for the
12       Company's Offerings contained material misstatements or omitted to state
13       material information;

14           (c)     whether the SEC filings, press releases and other public
15       statements made to the investing public during the Class Period contained
16       material misstatements or omitted to state material information;

17           (d)     whether and to what extent the Company's financial
18       statements were not presented in conformity with GAAP during the Class
19       Period;

20           (e)     whether and to what extent the Auditor Defendants' audits of
21       the Company's financial statements and management's assessments of
22       internal controls during the Class Period were not conducted in accordance
23       with the standards of the Public Company Accounting Oversight Board;

24           (f)     whether and to what extent the market prices of Countrywide
25       common stock and other publicly traded securities were artificially inflated
26       during the Class Period because of the material misrepresentations and/or
27       omissions complained of herein;

28

(g)     whether, with respect to Plaintiffs' claims for violations of the Securities Act, the Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

(h)     whether, with respect to Plaintiffs' claims for violations of the Exchange Act, the Defendants named in those claims acted with the requisite level of scienter;

(i)     whether, with respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, the Defendants named in those claims were controlling persons of Countrywide;

(j)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(k)     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

1076. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   PRESUMPTION OF RELIANCE

1077. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims

1  asserted herein against Defendants are predicated in part upon omissions of
2  material fact which there was a duty to disclose.

3     1078. In the alternative, Plaintiffs are entitled to a presumption of reliance
4  on Defendants' material misrepresentations and omissions pursuant to the fraud-
5  on-the-market doctrine because:

6        (a)    Countrywide's common stock was actively traded in an
7     efficient market on the NYSE during the Class Period;

8        (b)    Countrywide's common stock traded at high weekly volumes
9     during the Class Period;

10        (c)    As a regulated issuer, Countrywide filed periodic public
11     reports with the SEC;

12        (d)    During the Class Period, Countrywide was eligible to file, and
13     did file, registration statements with the SEC on Form S-3;

14        (e)    Countrywide regularly communicated with public investors by
15     means of established market communication mechanisms, including
16     through regular dissemination of press releases on the major news wire
17     services and through other wide-ranging public disclosures, such as
18     communications with the financial press, securities analysts and other
19     similar reporting services;

20        (f)    The market reacted promptly to public information
21     disseminated by Countrywide;

22        (g)    Countrywide securities were covered by numerous securities
23     analysts employed by major brokerage firms who wrote reports that were
24     distributed to the sales force and certain customers of their respective firms.
25     Each of these reports was publicly available and entered the public
26     marketplace;

27

28

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Countrywide's securities; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased Countrywide securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

1079. In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Countrywide's business, financial results and business prospects throughout the Class Period.

## XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

1080. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint.  The statements alleged to be false and misleading all relate to historical facts or existing conditions and were not identified as forward-looking statements.  To the extent any of the false statements alleged herein may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly "forward-looking" statements.  Alternatively, to the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those materially false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker knew the

statement was false or the statement was authorized or approved by an executive officer of Countrywide who knew that those statements were false.

## XIV.  CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 11 of the Securities Act, on Behalf of Purchasers of Series A Medium-Term Notes, Asserted Against Defendants Countrywide, Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson, Russell, and Snyder; Grant Thornton; and ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital, Goldman Sachs, HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan Stanley, RBC Capital, RBC Dominion, SG Americas Securities, Wachovia Capital, and Wachovia Securities**

1081. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1082. This Count is brought pursuant to Section 11 of the Securities Act against Defendant Countrywide; Individual Defendants Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson, Russell, and Snyder; Auditor Defendant Grant Thornton; and Underwriter Defendants ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital, Goldman Sachs, HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan Stanley, RBC Capital, RBC Dominion, SG Americas Securities, Wachovia Capital, and Wachovia Securities.

1083. This claim is brought on behalf of Lead Plaintiff New York City Pension Funds and other members of the Class who, during the Class Period, purchased or otherwise acquired Countrywide Series A Medium-Term Notes

1  issued pursuant or traceable to the Series A Medium-Term Notes Registration
2  Statement.

3    1084. Countrywide was the registrant for the Series A Medium-Term
4  Notes Registration Statement and issued Series A Medium-Term Notes pursuant
5  to that registration statement.

6    1085. Defendants Mozilo, McLaughlin, Kurland, Cisneros, Cunningham,
7  Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson, Russell and
8  Snyder each signed the Series A Medium-Term Notes Registration Statement.

9    1086. At the time the Series A Medium-Term Notes Registration Statement
10  and prospectus supplements were filed, Defendants Mozilo, Cisneros,
11  Cunningham, Donato, Dougherty, Enis, Heller, King, Melone, Robertson, Russell
12  and Snyder were each directors of Countrywide.

13    1087. Defendant Grant Thornton audited certain of Countrywide's
14  financial statements issued during the Class Period and consented to being named
15  in the Series A Medium-Term Notes Registration Statement as a party that
16  certified the audited financial statements contained or incorporated by reference
17  therein.  Grant Thornton's audit report incorrectly stated that its audits were
18  performed in accordance with GAAS and that the Company's financial
19  statements were fairly presented in accordance with GAAP.

20    1088. Defendants ABN AMRO, Banc of America Securities, Barclays
21  Capital, BNP Paribas, Citigroup Global Markets, Countrywide Securities,
22  Deutsche Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital, Goldman
23  Sachs, HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan Stanley, RBC
24  Capital, RBC Dominion, SG Americas Securities, Wachovia Capital, and
25  Wachovia Securities acted as underwriters with respect to the offering of Series A
26  Medium-Term Notes.

27    1089. As set forth above, the Series A Medium-Term Notes Registration
28  Statement contained untrue statements of material fact, including the financial

1   statements of Countrywide.  In addition, the Series A Medium-Term Notes
2   Registration Statement omitted to state other facts required to be stated therein or
3   necessary to make the statements therein not misleading, including
4   Countrywide's violations of GAAP.  The facts misstated and omitted would have
5   been material to a reasonable person reviewing the Series A Medium-Term Notes
6   Registration Statement.

7       1090. Countrywide, as issuer of the Series A Medium-Term Notes, is
8   strictly liable for the material misstatements and omissions contained in the Series
9   A Medium-Term Notes Registration Statement.

10      1091. The other Defendants named in this Count owed to Lead Plaintiff
11  New York City Pension Funds and the Class the duty to make a reasonable and
12  diligent investigation of the statements contained in the Series A Medium-Term
13  Notes Registration Statement, to ensure that the statements contained or
14  incorporated by reference therein were true and that there was no omission to
15  state a material fact required to be stated therein in order to make the statements
16  contained therein not misleading.

17      1092. These Defendants did not make a reasonable and diligent
18  investigation of the statements contained or incorporated by reference in the
19  Series A Medium-Term Notes Registration Statement, and did not possess
20  reasonable grounds for believing that the Series A Medium-Term Notes
21  Registration Statement did not contain an untrue statement or omit to state a
22  material fact required to be stated therein or necessary to make the statements
23  therein not misleading.

24      1093. The Underwriter Defendants named in this Count did not conduct a
25  reasonable investigation of the statements contained in and incorporated by
26  reference in the Series A Medium-Term Notes Registration Statement and did not
27  possess reasonable grounds for believing that the statements contained therein
28  were true and not materially misstated.   In particular, these Underwriter

1    Defendants did not conduct a reasonable investigation into the accuracy of the

2    statements regarding Countrywide's reported financial performance, internal

3    controls, underwriting standards and lending practices.   These Underwriter

4    Defendants could not simply rely on the work of Countrywide's auditors because

5    the investing public relies on the underwriters to obtain and verify relevant

6    information and then make sure that important facts are accurately disclosed.

7    Thus, the Underwriter Defendants must conduct their own, independent and

8    reasonable investigation into the accuracy of the Company's financial statements

9    and assessments of internal controls, and they were negligent in failing to do so

10   sufficiently in connection with the offering.

11   1094. Similarly, the Individual Defendants named in this Count were

12   negligent in failing to conduct a reasonable investigation of the statements

13   contained in the Series A Medium-Term Notes Registration Statement regarding

14   Countrywide's financial performance, internal controls, underwriting standards

15   and lending practices and did not possess reasonable grounds for believing that

16   the statements contained therein were true and not materially misstated.

17   1095. Defendant Grant Thornton, which consented to the inclusion of its

18   opinions in the Series A Medium-Term Notes Registration Statement, negligently

19   failed to perform its audits of Countrywide in a reasonable manner and, thus, its

20   audits did not constitute a reasonable investigation of whether the Company's

21   financial statements were presented in compliance with GAAP and whether

22   management's assessment of internal controls was properly and accurately

23   presented.

24   1096. Lead Plaintiff New York City Pension Funds and members of the

25   Class purchased Series A Medium-Term Notes issued pursuant or traceable to the

26   Series A Medium-Term Notes Registration Statement and were damaged thereby.

27   1097. Lead Plaintiff New York City Pension Funds and the Class did not

28   know, nor in the exercise of reasonable diligence could have known, of the untrue

statements of material fact or omissions of material facts in the Series A Medium-Term Notes Registration Statement when they purchased or acquired their securities.  Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

1098. By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 11 of the Securities Act.

## COUNT II

**For Violations of Section 12(a)(2) of the Securities Act on Behalf of Purchasers of Series A Medium-Term Notes, Asserted Against Defendants Countrywide, ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital, Goldman Sachs, HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan Stanley, RBC Capital, RBC Dominion, SG Americas Securities, Wachovia Capital, and Wachovia Securities**

1099. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1100. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendant Countrywide and Underwriter Defendants ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Greenwich Capital, Goldman Sachs, HSBC, J.P. Morgan Securities, Lehman Brothers, Morgan Stanley, RBC Capital, RBC Dominion, SG Americas Securities, Wachovia Capital, and Wachovia Securities.

1    1101. This claim is brought on behalf of Lead Plaintiff New York City
2    Pension Funds and other members of the Class who, during the Class Period,
3    purchased or otherwise acquired Countrywide Series A Medium-Term Notes
4    issued pursuant to the Series A Medium-Term Notes Prospectus.

5    1102. Countrywide solicited the purchase of its Series A Medium-Term
6    Notes by the use of means or instruments of transportation or communication in
7    interstate commerce or of the mails and by means of the Series A Medium-Term
8    Notes Prospectus.

9    1103. The Underwriter Defendants named in this Count are sellers within
10   the meaning of the Securities Act because they (a) transferred title to Lead
11   Plaintiff New York City Pension Funds and other purchasers of the Series A
12   Medium-Term Notes; (b) transferred title to the Series A Medium-Term Notes to
13   other purchasers and/or broker-dealers that sold the Series A Medium-Term
14   Notes as their agents; and/or (c) solicited the purchase of Series A Medium-Term
15   Notes by Lead Plaintiff New York City Pension Funds and other members of the
16   Class, motivated at least in part by a desire to serve their own financial interests
17   and the interests of Countrywide, including but not limited to commissions on
18   their own sales of the Series A Medium-Term Notes and separate commissions on
19   the sale of the Series A Medium-Term Notes by non-underwriter broker-dealers.

20   1104. As alleged herein, the Series A Medium-Term Notes Prospectus
21   contained untrue statements of material fact, including the financial statements of
22   Countrywide.  In addition, the Series A Medium-Term Notes Prospectus omitted
23   to state material facts required to be stated therein or necessary to make the
24   statements therein not misleading, including Countrywide's violations of GAAP.
25   The facts misstated and omitted would have been material to a reasonable person
26   reviewing the Series A Medium-Term Notes Prospectus.

27   1105. Countrywide and the Underwriter Defendants named in this Count
28   owed to Lead Plaintiff New York City Pension Funds and the Class the duty to

1  make a reasonable and diligent investigation of the statements contained in the

2  Series A Medium-Term Notes Prospectus, to ensure that the statements contained

3  or incorporated by reference therein were true and that there was no omission to

4  state a material fact required to be stated therein in order to make the statements

5  contained therein not misleading.

6      1106. Countrywide and the Underwriter Defendants named in this Count

7  did not make a reasonable and diligent investigation of the statements contained

8  or incorporated by reference in the Series A Medium-Term Notes Prospectus and

9  did not possess reasonable grounds for believing that the Series A Medium-Term

10  Notes Prospectus did not contain an untrue statement of material fact or omit to

11  state a material fact required to be stated therein or necessary to make the

12  statements therein not misleading.

13      1107. Lead Plaintiff New York City Pension Funds and members of the

14  Class purchased Series A Medium-Term Notes pursuant to the Series A Medium-

15  Term Notes Prospectus and were damaged thereby.

16      1108. Lead Plaintiff New York City Pension Funds and the Class did not

17  know, nor in the exercise of reasonable diligence could have known, of the untrue

18  statements of material fact or omissions of material facts in the Series A Medium-

19  Term Notes Prospectus when they purchased or acquired the securities.  Less than

20  one year has elapsed between the time they discovered or reasonably could have

21  discovered the facts upon which this Count is based and the time this claim was

22  brought.  Less than three years have elapsed between the time that the securities

23  upon which this Count is brought were *bona fide* offered to the public and the

24  time this action was commenced.

25      1109. By reason of the foregoing, Countrywide and the Underwriter

26  Defendants named in this Count are liable to Lead Plaintiff New York City

27  Pension Funds and members of the Class for violations of Section 12(a)(2) of the

28  Securities Act.  Lead Plaintiff New York City Pension Funds and Class members

1   hereby tender their securities to their respective sellers and seek rescission of their

2   purchases to the extent that they continue to own such securities.

3

4                                    **COUNT III**

5       **For Violations of Section 15 of the Securities Act on Behalf**
        **of Purchasers of Series A Medium-Term Notes, Asserted**
6       **Against Defendants Mozilo, Kurland, and McLaughlin**

7       1110. Lead Plaintiff New York City Pension Funds repeats and realleges

8   each and every allegation above as if fully set forth herein.  For purposes of this

9   Count, Plaintiffs assert only strict liability and negligence claims and expressly

10  disclaim any claim of fraud or intentional misconduct.

11      1111. This Count is brought pursuant to Section 15 of the Securities Act

12  against Defendants Mozilo, Kurland, and McLaughlin, on behalf of Lead Plaintiff

13  New York City Pension Funds and members of the Class who purchased or

14  acquired Countrywide Series A Medium-Term Notes pursuant or traceable to the

15  Series A Medium-Term Notes Registration Statement or pursuant to the Series A

16  Medium-Term Notes Prospectus.

17      1112. Countrywide violated Section 11 of the Securities Act by issuing the

18  Series A Medium-Term Notes Registration Statement which contained untrue

19  statements of material fact and omitted to state material facts required to be stated

20  therein or necessary in order to make the statements therein not misleading.  The

21  facts misstated and omitted would have been material to a reasonable person

22  reviewing the Series A Medium-Term Notes Registration Statement.

23      1113. Countrywide violated Section 12(a)(2) of the Securities Act by

24  soliciting the purchase of Series A Medium-Term Notes by means of the Series A

25  Medium-Term Notes Prospectus which contained untrue statements of material

26  fact and omitted to state material facts required to be stated therein or necessary

27  in order to make the statements therein not misleading.  The facts misstated and

28

1    omitted would have been material to a reasonable person reviewing the Series A

2    Medium-Term Notes Prospectus.

3        1114. Defendants Mozilo, Kurland, and McLaughlin were controlling

4    persons of Countrywide when each of the Series A Medium-Term Notes

5    Registration Statement and Series A Medium Term Notes Prospectus was filed

6    and became effective, because of their senior executive positions with

7    Countrywide; their direct involvement in the Company's day-to-day operations,

8    including its mortgage banking and lending practices and financial reporting and

9    accounting functions; and their signatures on and participation in the preparation

10   and dissemination of this Registration Statement and Prospectus.

11       1115. By virtue of the foregoing, Defendants Mozilo, Kurland, and

12   McLaughlin each had the power to influence and control, and did influence and

13   control, directly or indirectly, the decision-making of Countrywide, including the

14   content of its financial statements and this Registration Statement and Prospectus.

15       1116. Defendants Mozilo, Kurland, and McLaughlin acted negligently and

16   without reasonable care regarding the accuracy of the information contained and

17   incorporated by reference in this Registration Statement and Prospectus and

18   lacked reasonable grounds to believe that such information was accurate and

19   complete in all material respects.

20       1117. Lead Plaintiff New York City Pension Funds and members of the

21   Class purchased Countrywide Series A Medium-Term Notes pursuant or

22   traceable to the Registration Statement for this offering, or pursuant to the

23   Prospectus for this offering, and were damaged thereby.

24       1118. Lead Plaintiff New York City Pension Funds and the Class did not

25   know, nor in the exercise of reasonable diligence could have known, of the untrue

26   statements of material fact or omissions of material facts in the Series A Medium-

27   Term Notes Registration Statement and Prospectus when they purchased or

28   acquired the securities.

1119. By reason of the foregoing, Defendants Mozilo, Kurland and McLaughlin are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 15 of the Securities Act.

## COUNT IV

**For Violations of Section 11 of the Securities Act On Behalf of Purchasers of Floating Rate Subordinated Notes Due April 1, 2011, Asserted Against Defendants Countrywide; Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson, Russell, and Snyder; Grant Thornton and KPMG; and J.P. Morgan Securities and Countrywide Securities**

1120. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1121. This Count is brought pursuant to Section 11 of the Securities Act against Defendant Countrywide; Individual Defendants Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson, Russell, and Snyder; Auditor Defendants Grant Thornton and KPMG; and Underwriter Defendants J.P. Morgan Securities and Countrywide Securities.

1122. This claim is brought on behalf of Lead Plaintiff New York City Pension Funds and other members of the Class who, during the Class Period, purchased or otherwise acquired Countrywide 2011 Notes pursuant or traceable to the 2011 Notes Registration Statement.

1123. Countrywide was the registrant for the 2011 Notes Registration Statement and issued 2011 Notes pursuant to that registration statement.

1124. Defendants Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson, Russell and Snyder each signed the 2011 Notes Registration Statement.

1    1125. At the time the 2011 Notes Registration Statement and prospectus

2    supplement were filed, Defendants Mozilo, Cisneros, Cunningham, Donato,

3    Dougherty, Enis, Heller, King, Melone, Robertson, Russell and Snyder were each

4    directors of Countrywide.

5    1126. Defendant Grant Thornton audited certain of Countrywide's

6    financial statements issued during the Class Period and consented to being named

7    in the 2011 Notes Registration Statement as a party that certified audited financial

8    statements contained or incorporated by reference therein. Grant Thornton's

9    audit report incorrectly stated that its audits were performed in accordance with

10   GAAS and that the Company's financial statements were fairly presented in

11   accordance with GAAP.

12   1127. Defendant KPMG was the auditor for Countrywide during the Class

13   Period and consented to being named in the 2011 Notes Registration Statement as

14   a party that certified audited financial statements contained or incorporated by

15   reference therein. KPMG's audit report incorrectly stated that its audits were

16   performed in accordance with GAAS and that the Company's financial

17   statements were fairly presented in accordance with GAAP.

18   1128. Defendants J.P. Morgan Securities and Countrywide Securities acted

19   as underwriters with respect to the offering of 2011 Notes.

20   1129. As set forth above, the 2011 Notes Registration Statement contained

21   untrue statements of material fact, including the financial statements of

22   Countrywide. In addition, the 2011 Notes Registration Statement omitted to state

23   other facts required to be stated therein or necessary to make the statements

24   therein not misleading, including Countrywide's violations of GAAP. The facts

25   misstated and omitted would have been material to a reasonable person reviewing

26   the 2011 Notes Registration Statement.

27

28

1    1130. Countrywide, as issuer of the 2011 Notes, is strictly liable for the

2    material misstatements and omissions contained in the 2011 Notes Registration

3    Statement.

4    1131. The other Defendants named in this Count owed to Lead Plaintiff

5    New York City Pension Funds and the Class the duty to make a reasonable and

6    diligent investigation of the statements contained in the 2011 Notes Registration

7    Statement, to ensure that the statements contained or incorporated by reference

8    therein were true and that there was no omission to state a material fact required

9    to be stated therein in order to make the statements contained therein not

10   misleading.

11   1132. These Defendants did not make a reasonable and diligent

12   investigation of the statements contained or incorporated by reference in the 2011

13   Notes Registration Statement, and did not possess reasonable grounds for

14   believing that the 2011 Notes Registration Statement did not contain an untrue

15   statement or omit to state a material fact required to be stated therein or necessary

16   to make the statements therein not misleading.

17   1133. The Underwriter Defendants named in this Count did not conduct a

18   reasonable investigation of the statements contained in and incorporated by

19   reference in the 2011 Notes Registration Statement and did not possess

20   reasonable grounds for believing that the statements contained therein were true

21   and not materially misstated.  In particular, these Underwriter Defendants did not

22   conduct a reasonable investigation into the accuracy of the statements regarding

23   Countrywide's reported financial performance, internal controls, underwriting

24   standards and lending practices.  These Underwriter Defendants could not simply

25   rely on the work of Countrywide's auditors because the investing public relies on

26   the underwriters to obtain and verify relevant information and then make sure that

27   important facts are accurately disclosed.  Thus, the Underwriter Defendants must

28   conduct their own, independent and reasonable investigation into the accuracy of

1  the Company's financial statements and assessments of internal controls, and they

2  were negligent in failing to do so sufficiently in connection with the offering.

3      1134. Similarly, the Individual Defendants named in this Count were

4  negligent in failing to conduct a reasonable investigation of the statements

5  contained in the 2011 Notes Registration Statement regarding Countrywide's

6  financial performance, internal controls, underwriting standards and lending

7  practices and did not possess reasonable grounds for believing that the statements

8  contained therein were true and not materially misstated.

9      1135. Defendant Grant Thornton, which consented to the inclusion of its

10  opinions in the 2011 Notes Registration Statement, negligently failed to perform

11  its audits of Countrywide in a reasonable manner and, thus, its audits did not

12  constitute a reasonable investigation of whether the Company's financial

13  statements were presented in compliance with GAAP and whether management's

14  assessment of internal controls was properly and accurately presented.

15      1136. Defendant KPMG, which consented to the inclusion of its opinions

16  in the 2011 Notes Registration Statement, negligently failed to perform its audits

17  of Countrywide in a reasonable manner and, thus, its audits did not constitute a

18  reasonable investigation of whether the Company's financial statements were

19  presented in compliance with GAAP and whether management's assessment of

20  internal controls was properly and accurately presented.

21      1137. Lead Plaintiff New York City Pension Funds and members of the

22  Class purchased 2011 Notes issued pursuant or traceable to the 2011 Notes

23  Registration Statement and were damaged thereby.

24      1138. Lead Plaintiff New York City Pension Funds and the Class did not

25  know, nor in the exercise of reasonable diligence could have known, of the untrue

26  statements of material fact or omissions of material facts in the 2011 Notes

27  Registration Statement when they purchased or acquired their securities.  Less

28  than one year has elapsed between the time they discovered or reasonably could

have discovered the facts upon which this Count is based and the time this claim was brought.   Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

1139. By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 11 of the Securities Act.

### COUNT V

**For Violations of Section 12(a)(2) of the
Securities Act on Behalf of Purchasers of Floating Rate
Subordinated Notes Due April 1, 2011, Asserted Against Defendants
Countrywide, J.P. Morgan Securities, and Countrywide Securities**

1140. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.   For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1141. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendant Countrywide and Underwriter Defendants J.P. Morgan Securities and Countrywide Securities.

1142. This claim is brought on behalf of Lead Plaintiff New York City Pension Funds and other members of the Class who, during the Class Period, purchased or otherwise acquired Countrywide 2011 Notes issued pursuant to the 2011 Notes Prospectus.

1143. Countrywide solicited the purchase of its 2011 Notes by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the 2011 Notes Prospectus.

1144. J.P. Morgan Securities and Countrywide Securities are sellers within the meaning of the Securities Act because they (a) transferred title to Lead

1   Plaintiff New York City Pension Funds and other purchasers of the 2011 Notes;

2   (b) transferred title to the 2011 Notes to other purchasers and/or broker-dealers

3   that sold the 2011 Notes as their agents; and/or (c) solicited the purchase of 2011

4   Notes by Lead Plaintiff New York City Pension Funds and other members of the

5   Class, motivated at least in part by a desire to serve their own financial interests

6   and the interests of Countrywide, including but not limited to commissions on

7   their own sales of the 2011 Notes and separate commissions on the sale of the

8   2011 Notes by non-underwriter broker-dealers.

9        1145. As alleged herein, the 2011 Notes Prospectus contained untrue

10  statements of material fact, including the financial statements of Countrywide.  In

11  addition, the 2011 Notes Prospectus omitted to state material facts required to be

12  stated therein or necessary to make the statements therein not misleading,

13  including Countrywide's violations of GAAP.  The facts misstated and omitted

14  would have been material to a reasonable person reviewing the 2011 Notes

15  Prospectus.

16       1146. Countrywide, J.P. Morgan Securities and Countrywide Securities

17  owed to Lead Plaintiff New York City Pension Funds and the Class the duty to

18  make a reasonable and diligent investigation of the statements contained in the

19  2011 Notes Prospectus, to ensure that the statements contained or incorporated by

20  reference therein were true and that there was no omission to state a material fact

21  required to be stated therein in order to make the statements contained therein not

22  misleading.

23       1147. Countrywide, J.P. Morgan Securities and Countrywide Securities did

24  not make a reasonable and diligent investigation of the statements contained or

25  incorporated by reference in the 2011 Notes Prospectus and did not possess

26  reasonable grounds for believing that the 2011 Notes Prospectus did not contain

27  an untrue statement of material fact or omit to state a material fact required to be

28  stated therein or necessary to make the statements therein not misleading.

1148. Lead Plaintiff New York City Pension Funds and members of the Class purchased 2011 Notes pursuant to the 2011 Notes Prospectus and were damaged thereby.

1149. Lead Plaintiff New York City Pension Funds and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 2011 Notes Prospectus when they purchased or acquired the securities.  Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

1150. By reason of the foregoing, Countrywide, J.P. Morgan Securities and Countrywide Securities are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 12(a)(2) of the Securities Act. Lead Plaintiff New York City Pension Funds and Class members hereby tender their securities to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.


### COUNT VI

**For Violations of Section 15 of the Securities Act on Behalf of
Purchasers of Floating Rate Subordinated Notes Due April 1, 2011,
Asserted Against Defendants Mozilo, Kurland, and McLaughlin**

1151. Lead Plaintiff New York City Pension Funds repeats and realleges each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1152. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Mozilo, Kurland, and McLaughlin, on behalf of Lead Plaintiff

New York City Pension Funds and members of the Class who purchased or acquired Countrywide 2011 Notes pursuant or traceable to the 2011 Notes Registration Statement or pursuant to the 2011 Notes Prospectus.

1153. Countrywide violated Section 11 of the Securities Act by issuing the 2011 Notes Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the 2011 Notes Registration Statement.

1154. Countrywide violated Section 12(a)(2) of the Securities Act by soliciting the purchase of 2011 Notes by means of the 2011 Notes Prospectus which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the 2011 Notes Prospectus.

1155. Defendants Mozilo, Kurland, and McLaughlin were controlling persons of Countrywide when each of the 2011 Notes Registration Statement and 2011 Notes Prospectus was filed and became effective, because of their senior executive positions with Countrywide; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of this Registration Statement and Prospectus.

1156. By virtue of the foregoing, Defendants Mozilo, Kurland, and McLaughlin each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide, including the content of its financial statements and this Registration Statement and Prospectus.

1157. Defendants Mozilo, Kurland, and McLaughlin acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in this Registration Statement and Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

1158. Lead Plaintiff New York City Pension Funds and members of the Class purchased Countrywide 2011 Notes pursuant or traceable to the Registration Statement for this offering, or pursuant to the Prospectus for this offering, and were damaged thereby.

1159. Lead Plaintiff New York City Pension Funds and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 2011 Notes Registration Statement and Prospectus when they purchased or acquired the securities.

1160. By reason of the foregoing, Defendants Mozilo, Kurland and McLaughlin are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 15 of the Securities Act.

**COUNT VII**

**For Violations of Section 11 of the Securities Act on Behalf of Purchasers of Series B Medium-Term Notes, Asserted Against Defendants Countrywide, Mozilo, Sambol, Kurland, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson, Russell, and Snyder; Grant Thornton and KPMG; and ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, BNY Capital, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Goldman Sachs, Greenwich Capital, HSBC, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Capital, RBC Dominion, Scotia Capital, SG Americas Securities, TD Securities, UBS Securities, and Wachovia Capital**

1161. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.   For purposes of this Count, Plaintiffs assert only strict

1  liability and negligence claims and expressly disclaim any claim of fraud or
2  intentional misconduct.

3      1162. This Count is brought pursuant to Section 11 of the Securities Act
4  against Defendant Countrywide; Individual Defendants Mozilo, Sambol, Kurland,
5  Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia,
6  Heller, Melone, Parry, Robertson, Russell, and Snyder; Auditor Defendants Grant
7  Thornton and KPMG; and Underwriter Defendants ABN AMRO, Banc of
8  America Securities, Barclays Capital, BNP Paribas, BNY Capital, Citigroup
9  Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort
10  Wasserstein, Goldman Sachs, Greenwich Capital, HSBC, J.P. Morgan Securities,
11  Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Capital, RBC Dominion,
12  Scotia Capital, SG Americas Securities, TD Securities, UBS Securities, and
13  Wachovia Capital.

14      1163. This claim is brought on behalf of Lead Plaintiff New York City
15  Pension Funds and other members of the Class who, during the Class Period,
16  purchased or otherwise acquired Countrywide Series B Medium-Term Notes
17  issued pursuant or traceable to the Series B Medium-Term Notes Registration
18  Statement.

19      1164. Countrywide was the registrant for the Series B Medium-Term Notes
20  Registration Statement and issued Series B Medium-Term Notes pursuant to that
21  registration statement.

22      1165. Defendants Mozilo, Sambol, Kurland, Sieracki, Brown, Cisneros,
23  Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson,
24  Russell, and Snyder each signed the Series B Medium-Term Notes Registration
25  Statement.

26      1166. At the time the Series B Medium-Term Notes Registration Statement
27  and prospectus supplements were filed, Defendants Mozilo, Brown, Cisneros,

28

1   Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Robertson,

2   Russell, and Snyder were each directors of Countrywide.

3       1167. Defendant Grant Thornton audited certain of Countrywide's

4   financial statements issued during the Class Period and consented to being named

5   in the Series B Medium-Term Notes Registration Statement as a party that

6   certified the audited financial statements contained or incorporated by reference

7   therein.  Grant Thornton's audit report incorrectly stated that its audits were

8   performed in accordance with GAAS and that the Company's financial

9   statements were fairly presented in accordance with GAAP.

10      1168. Defendant KPMG was the auditor for Countrywide during the Class

11  Period and consented to being named in the Series B Medium-Term Notes

12  Registration Statement as a party that certified the audited financial statements

13  contained or incorporated by reference therein.  KPMG's audit report incorrectly

14  stated that its audits were performed in accordance with GAAS and that the

15  Company's financial statements were fairly presented in accordance with GAAP.

16      1169. Defendants ABN AMRO, Banc of America Securities, Barclays

17  Capital, BNP Paribas, BNY Capital, Citigroup Global Markets, Countrywide

18  Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Goldman Sachs,

19  Greenwich Capital, HSBC, J.P. Morgan Securities, Lehman Brothers, Merrill

20  Lynch, Morgan Stanley, RBC Capital, RBC Dominion, Scotia Capital, SG

21  Americas Securities, TD Securities, UBS Securities, and Wachovia Capital acted

22  as underwriters with respect to the offering of Series B Medium-Term Notes.

23      1170. As set forth above, the Series B Medium-Term Notes Registration

24  Statement contained untrue statements of material fact, including the financial

25  statements of Countrywide.  In addition, the Series B Medium-Term Notes

26  Registration Statement omitted to state other facts required to be stated therein or

27  necessary to make the statements therein not misleading, including

28  Countrywide's violations of GAAP.  The facts misstated and omitted would have

1   been material to a reasonable person reviewing the Series B Medium-Term Notes

2   Registration Statement.

3        1171. Countrywide, as issuer of the Series B Medium-Term Notes, is

4   strictly liable for the material misstatements and omissions contained in the Series

5   B Medium-Term Notes Registration Statement.

6        1172. The other Defendants named in this Count owed to Lead Plaintiff

7   New York City Pension Funds and the Class the duty to make a reasonable and

8   diligent investigation of the statements contained in the Series B Medium-Term

9   Notes Registration Statement, to ensure that the statements contained or

10  incorporated by reference therein were true and that there was no omission to

11  state a material fact required to be stated therein in order to make the statements

12  contained therein not misleading.

13       1173. These Defendants did not make a reasonable and diligent

14  investigation of the statements contained or incorporated by reference in the

15  Series B Medium-Term Notes Registration Statement, and did not possess

16  reasonable grounds for believing that the Series B Medium-Term Notes

17  Registration Statement did not contain an untrue statement or omit to state a

18  material fact required to be stated therein or necessary to make the statements

19  therein not misleading.

20       1174. The Underwriter Defendants named in this Count did not conduct a

21  reasonable investigation of the statements contained in and incorporated by

22  reference in the Series B Medium-Term Notes Registration Statement and did not

23  possess reasonable grounds for believing that the statements contained therein

24  were true and not materially misstated.   In particular, these Underwriter

25  Defendants did not conduct a reasonable investigation into the accuracy of the

26  statements regarding Countrywide's reported financial performance, internal

27  controls, underwriting standards and lending practices.   These Underwriter

28  Defendants could not simply rely on the work of Countrywide's auditors because

1    the investing public relies on the underwriters to obtain and verify relevant
2    information and then make sure that important facts are accurately disclosed.
3    Thus, the Underwriter Defendants must conduct their own, independent and
4    reasonable investigation into the accuracy of the Company's financial statements
5    and assessments of internal controls, and they were negligent in failing to do so
6    sufficiently in connection with the offering.

7        1175. Similarly, the Individual Defendants named in this Count were
8    negligent in failing to conduct a reasonable investigation of the statements
9    contained in the Series B Medium-Term Notes Registration Statement regarding
10   Countrywide's financial performance, internal controls, underwriting standards
11   and lending practices and did not possess reasonable grounds for believing that
12   the statements contained therein were true and not materially misstated.

13       1176. Defendant Grant Thornton, which consented to the inclusion of its
14   opinions in the Series B Medium-Term Notes Registration Statement, negligently
15   failed to perform its audits of Countrywide in a reasonable manner and, thus, its
16   audits did not constitute a reasonable investigation of whether the Company's
17   financial statements were presented in compliance with GAAP and whether
18   management's assessment of internal controls was properly and accurately
19   presented.

20       1177. Defendant KPMG, which consented to the inclusion of its opinions
21   in the Series B Medium-Term Notes Registration Statement, negligently failed to
22   perform its audits of Countrywide in a reasonable manner and, thus, its audits did
23   not constitute a reasonable investigation of whether the Company's financial
24   statements were presented in compliance with GAAP and whether management's
25   assessment of internal controls was properly and accurately presented.

26       1178. Lead Plaintiff New York City Pension Funds and members of the
27   Class purchased Series B Medium-Term Notes issued pursuant or traceable to the
28   Series B Medium-Term Notes Registration Statement and were damaged thereby.

1179. Lead Plaintiff New York City Pension Funds and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Series B Medium-Term Notes Registration Statement when they purchased or acquired their securities.  Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

1180. By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 11 of the Securities Act.

## COUNT VIII

**For Violations of Section 12(a)(2) on Behalf of Purchasers of Series B Medium-Term Notes, Asserted Against Defendants Countrywide, ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, BNY Capital, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Goldman Sachs, Greenwich Capital, HSBC, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Capital, RBC Dominion, Scotia Capital, SG Americas Securities, TD Securities, UBS Securities, and Wachovia Capital**

1181. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1182. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendant Countrywide and Underwriter Defendants ABN AMRO, Banc of America Securities, Barclays Capital, BNP Paribas, BNY Capital, Citigroup Global Markets, Countrywide Securities, Deutsche Bank, Dresdner Kleinwort Wasserstein, Goldman Sachs, Greenwich Capital, HSBC, J.P. Morgan

1    Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Capital, RBC

2    Dominion, Scotia Capital, SG Americas Securities, TD Securities, UBS

3    Securities, and Wachovia Capital.

4        1183. This claim is brought on behalf of Lead Plaintiff New York City

5    Pension Funds and other members of the Class who, during the Class Period,

6    purchased or otherwise acquired Countrywide Series B Medium-Term Notes

7    issued pursuant to the Series B Medium-Term Notes Prospectus.

8        1184. Countrywide solicited the purchase of its Series B Medium-Term

9    Notes by the use of means or instruments of transportation or communication in

10   interstate commerce or of the mails and by means of the Series B Medium-Term

11   Notes Prospectus.  Additionally, the Series B Medium-Term Notes Registration

12   Statement, of which Countrywide is the registrant, states that "[f]or the purpose of

13   determining liability of a registrant under the Securities Act of 1933 to any

14   purchaser in the initial distribution of the securities, each undersigned registrant

15   undertakes that in a primary offering of securities . . . regardless of the

16   underwriting method used to sell the securities to the purchaser . . . the

17   undersigned registrant will be a seller to the purchaser and will be considered to

18   offer or sell such securities to such purchaser."

19       1185. The Underwriter Defendants named in this Count are sellers within

20   the meaning of the Securities Act because they (a) transferred title to Lead

21   Plaintiff New York City Pension Funds and other purchasers of the Series B

22   Medium-Term Notes; (b) transferred title to the Series B Medium-Term Notes to

23   other purchasers and/or broker-dealers that sold the Series B Medium-Term Notes

24   as their agents; and/or (c) solicited the purchase of Series B Medium-Term Notes

25   by Lead Plaintiff New York City Pension Funds and other members of the Class,

26   motivated at least in part by a desire to serve their own financial interests and the

27   interests of Countrywide, including but not limited to commissions on their own

28

1   sales of the Series B Medium-Term Notes and separate commissions on the sale
2   of the Series B Medium-Term Notes by non-underwriter broker-dealers.

3       1186. As alleged herein, the Series B Medium-Term Notes Prospectus
4   contained untrue statements of material fact, including the financial statements of
5   Countrywide.  In addition, the Series B Medium-Term Notes Prospectus omitted
6   to state material facts required to be stated therein or necessary to make the
7   statements therein not misleading, including Countrywide's violations of GAAP.
8   The facts misstated and omitted would have been material to a reasonable person
9   reviewing the Series B Medium-Term Notes Prospectus.

10      1187. Countrywide and the Underwriter Defendants named in this Count
11  owed to Lead Plaintiff New York City Pension Funds and the Class the duty to
12  make a reasonable and diligent investigation of the statements contained in the
13  Series B Medium-Term Notes Prospectus, to ensure that the statements contained
14  or incorporated by reference therein were true and that there was no omission to
15  state a material fact required to be stated therein in order to make the statements
16  contained therein not misleading.

17      1188. Countrywide and the Underwriter Defendants named in this Count
18  did not make a reasonable and diligent investigation of the statements contained
19  or incorporated by reference in the Series B Medium-Term Notes Prospectus and
20  did not possess reasonable grounds for believing that the Series B Medium-Term
21  Notes Prospectus did not contain an untrue statement of material fact or omit to
22  state a material fact required to be stated therein or necessary to make the
23  statements therein not misleading.

24      1189. Lead Plaintiff New York City Pension Funds and members of the
25  Class purchased Series B Medium-Term Notes pursuant to the Series B Medium-
26  Term Notes Prospectus and were damaged thereby.

27      1190. Lead Plaintiff New York City Pension Funds and the Class did not
28  know, nor in the exercise of reasonable diligence could have known, of the untrue

1    statements of material fact or omissions of material facts in the Series B Medium-

2    Term Notes Prospectus when they purchased or acquired the securities.  Less than

3    one year has elapsed between the time they discovered or reasonably could have

4    discovered the facts upon which this Count is based and the time this claim was

5    brought.  Less than three years have elapsed between the time that the securities

6    upon which this Count is brought were *bona fide* offered to the public and the

7    time this action was commenced.

8         1191. By reason of the foregoing, Countrywide and the Underwriter

9    Defendants named in this Count are liable to Lead Plaintiff New York City

10   Pension Funds and members of the Class for violations of Section 12(a)(2) of the

11   Securities Act.  Lead Plaintiff New York City Pension Funds and Class members

12   hereby tender their securities to their respective sellers and seek rescission of their

13   purchases to the extent that they continue to own such securities.

14

15                              **COUNT IX**

16        **For Violations of Section 15 of the Securities Act on
         Behalf of Purchasers of Series B Medium-Term Notes,**
17       **Asserted Against Defendants Mozilo, Sambol, and Kurland**

18        1192. Lead Plaintiff New York City Pension Funds repeats and realleges

19   each and every allegation above as if fully set forth herein.  For purposes of this

20   Count, Plaintiffs assert only strict liability and negligence claims and expressly

21   disclaim any claim of fraud or intentional misconduct.

22        1193. This Count is brought pursuant to Section 15 of the Securities Act

23   against Defendants Mozilo, Sambol, Kurland, on behalf of Lead Plaintiff New

24   York City Pension Funds and members of the Class who purchased or acquired

25   Countrywide Series B Medium-Term Notes pursuant or traceable to the Series B

26   Medium-Term Notes Registration Statement or pursuant to the Series B Medium-

27   Term Notes Prospectus.

28

1194. Countrywide violated Section 11 of the Securities Act by issuing the Series B Medium-Term Notes Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Series B Medium-Term Notes Registration Statement.

1195. Countrywide violated Section 12(a)(2) of the Securities Act by soliciting the purchase of Series B Medium-Term Notes by means of the Series B Medium-Term Notes Prospectus which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Series B Medium-Term Notes Prospectus.

1196. Defendants Mozilo, Sambol, and Kurland were controlling persons of Countrywide when each of the Series B Medium-Term Notes Registration Statement and Series B Medium Term Notes Prospectus was filed and became effective, because of their senior executive positions with Countrywide; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of this Registration Statement and Prospectus.

1197. By virtue of the foregoing, Defendants Mozilo, Sambol, and Kurland each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide, including the content of its financial statements and this Registration Statement and Prospectus.

1198. Defendants Mozilo, Sambol, and Kurland acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in this Registration Statement and Prospectus and

1   lacked reasonable grounds to believe that such information was accurate and

2   complete in all material respects.

3          1199. Lead Plaintiff New York City Pension Funds and members of the

4   Class purchased Countrywide Series B Medium-Term Notes pursuant or traceable

5   to the Registration Statement for this offering, or pursuant to the Prospectus for

6   this offering, and were damaged thereby.

7          1200. Lead Plaintiff New York City Pension Funds and the Class did not

8   know, nor in the exercise of reasonable diligence could have known, of the untrue

9   statements of material fact or omissions of material facts in the Series B Medium-

10  Term Notes Registration Statement and Prospectus when they purchased or

11  acquired the securities.

12         1201. By reason of the foregoing, Defendants Mozilo, Sambol, and

13  Kurland are liable to Lead Plaintiff New York City Pension Funds and members

14  of the Class for violations of Section 15 of the Securities Act.

15

16                              **COUNT X**

17  **For Violations of Section 11 of the Securities Act on Behalf of Purchasers of
    6.25% Subordinated Notes Due May 15, 2016, Asserted Against Defendants**
18  **Countrywide, Mozilo, Sambol, Kurland, Sieracki, Brown, Cisneros,
    Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry,**
19  **Robertson, Russell, and Snyder; Grant Thornton and KPMG; and Banc of
    America Securities, J.P. Morgan Securities, Countrywide Securities,**
20  **Barclays Capital, Deutsche Bank, HSBC, and Wachovia Capital**

21         1202. Plaintiffs repeat and reallege each and every allegation above as if

22  fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict

23  liability and negligence claims and expressly disclaim any claim of fraud or

24  intentional misconduct.

25         1203. This Count is brought pursuant to Section 11 of the Securities Act

26  against Defendant Countrywide; Individual Defendants Mozilo, Sambol, Kurland,

27  Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia,

28  Heller, Melone, Parry, Robertson, Russell, and Snyder; Auditor Defendants Grant

1  Thornton and KPMG; and Underwriter Defendants Banc of America Securities,

2  J.P. Morgan Securities, Countrywide Securities, Barclays Capital, Deutsche

3  Bank, HSBC, and Wachovia Capital.

4      1204. This claim is brought on behalf of Lead Plaintiff New York City

5  Pension Funds and other members of the Class who, during the Class Period,

6  purchased or otherwise acquired Countrywide 6.25% Notes pursuant or traceable

7  to the 6.25% Notes Registration Statement.

8      1205. Countrywide was the registrant for the 6.25% Notes Registration

9  Statement and issued 6.25% Notes pursuant to that registration statement.

10      1206. Defendants Mozilo, Sambol, Kurland, Sieracki, Brown, Cisneros,

11  Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson,

12  Russell, and Snyder each signed the 6.25% Notes Registration Statement.

13      1207. At the time the 6.25% Notes Registration Statement and prospectus

14  supplements were filed, Defendants Mozilo, Brown, Cisneros, Cunningham,

15  Donato, Dougherty, Enis, Heller, Melone, Parry, Robertson, Russell, and Snyder

16  were each directors of Countrywide.

17      1208. Defendant Grant Thornton audited certain of Countrywide's

18  financial statements issued during the Class Period and consented to being named

19  in the 6.25% Notes Registration Statement as a party that certified audited

20  financial statements contained or incorporated by reference therein.   Grant

21  Thornton's audit report incorrectly stated that its audits were performed in

22  accordance with GAAS and that the Company's financial statements were fairly

23  presented in accordance with GAAP.

24      1209. Defendant KPMG was the auditor for Countrywide during the Class

25  Period and consented to being named in the 6.25% Notes Registration Statement

26  as a party that certified audited financial statements contained or incorporated by

27  reference therein.   KPMG's audit report incorrectly stated that its audits were

28

1   performed in accordance with GAAS and that the Company's financial

2   statements were fairly presented in accordance with GAAP.

3       1210. Defendants Banc of America Securities, J.P. Morgan Securities,

4   Countrywide Securities, Barclays Capital, Deutsche Bank, HSBC, and Wachovia

5   Capital acted as underwriters with respect to the offering of 6.25% Notes.

6       1211. As set forth above, the 6.25% Notes Registration Statement

7   contained untrue statements of material fact, including the financial statements of

8   Countrywide.  In addition, the 6.25% Notes Registration Statement omitted to

9   state other facts required to be stated therein or necessary to make the statements

10  therein not misleading, including Countrywide's violations of GAAP.  The facts

11  misstated and omitted would have been material to a reasonable person reviewing

12  the 6.25% Notes Registration Statement.

13      1212. Countrywide, as issuer of the 6.25% Notes, is strictly liable for the

14  material misstatements and omissions contained in the 6.25% Notes Registration

15  Statement.

16      1213. The other Defendants named in this Count owed to Lead Plaintiff

17  New York City Pension Funds and the Class the duty to make a reasonable and

18  diligent investigation of the statements contained in the 6.25% Notes Registration

19  Statement, to ensure that the statements contained or incorporated by reference

20  therein were true and that there was no omission to state a material fact required

21  to be stated therein in order to make the statements contained therein not

22  misleading.

23      1214. These Defendants did not make a reasonable and diligent

24  investigation of the statements contained or incorporated by reference in the

25  6.25% Notes Registration Statement, and did not possess reasonable grounds for

26  believing that the 6.25% Notes Registration Statement did not contain an untrue

27  statement or omit to state a material fact required to be stated therein or necessary

28  to make the statements therein not misleading.

1215. The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 6.25% Notes Registration Statement and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.  In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding Countrywide's reported financial performance, internal controls, underwriting standards and lending practices.  These Underwriter Defendants could not simply rely on the work of Countrywide's auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed.  Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the offering.

1216. Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 6.25% Notes Registration Statement regarding Countrywide's financial performance, internal controls, underwriting standards and lending practices and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

1217. Defendant Grant Thornton, which consented to the inclusion of its opinions in the 6.25% Notes Registration Statement, negligently failed to perform its audits of Countrywide in a reasonable manner and, thus, its audits did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and whether management's assessment of internal controls was properly and accurately presented.

1218. Defendant KPMG, which consented to the inclusion of its opinions in the 6.25% Notes Registration Statement, negligently failed to perform its audits

1  of Countrywide in a reasonable manner and, thus, its audits did not constitute a
2  reasonable investigation of whether the Company's financial statements were
3  presented in compliance with GAAP and whether management's assessment of
4  internal controls was properly and accurately presented.

5  1219. Lead Plaintiff New York City Pension Funds and members of the
6  Class purchased 6.25% Notes issued pursuant or traceable to the 6.25% Notes
7  Registration Statement and were damaged thereby.

8  1220. Lead Plaintiff New York City Pension Funds and the Class did not
9  know, nor in the exercise of reasonable diligence could have known, of the untrue
10  statements of material fact or omissions of material facts in the 6.25% Notes
11  Registration Statement when they purchased or acquired their securities.  Less
12  than one year has elapsed between the time they discovered or reasonably could
13  have discovered the facts upon which this Count is based and the time this claim
14  was brought.  Less than three years have elapsed between the time that the
15  securities upon which this Count is brought were *bona fide* offered to the public
16  and the time this action was commenced.

17  1221. By reason of the foregoing, the Defendants named in this Count are
18  liable to Lead Plaintiff New York City Pension Funds and members of the Class
19  for violations of Section 11 of the Securities Act.

20

21  **COUNT XI**

22  **For Violations of Section 12(a)(2) of the Securities Act on Behalf of
Purchasers of 6.25% Subordinated Notes Due May 15, 2016, Asserted
23  Against Defendants Countrywide, Banc of America Securities, J.P. Morgan
Securities, Countrywide Securities, Barclays Capital, Deutsche Bank, HSBC,
24  and Wachovia Capital**

25  1222. Plaintiffs repeat and reallege each and every allegation above as if
26  fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict
27  liability and negligence claims and expressly disclaim any claim of fraud or
28  intentional misconduct.

1223. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendant Countrywide and Underwriter Defendants Banc of America Securities, J.P. Morgan Securities, Countrywide Securities, Barclays Capital, Deutsche Bank, HSBC, and Wachovia Capital.

1224. This claim is brought on behalf of Lead Plaintiff New York City Pension Funds and other members of the Class who, during the Class Period, purchased or otherwise acquired Countrywide 6.25% Notes issued pursuant to the 6.25% Notes Prospectus.

1225. Countrywide solicited the purchase of its 6.25% Notes by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the 6.25% Notes Prospectus.  Additionally, the 6.25% Notes Registration Statement, of which Countrywide is the registrant, states that "[f]or the purpose of determining liability of a registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, each undersigned registrant undertakes that in a primary offering of securities . . . regardless of the underwriting method used to sell the securities to the purchaser . . . the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser."

1226. The Underwriter Defendants named in this Count are sellers within the meaning of the Securities Act because they (a) transferred title to Lead Plaintiff New York City Pension Funds and other purchasers of the 6.25% Notes; (b) transferred title to the 6.25% Notes to other purchasers and/or broker-dealers that sold the 6.25% Notes as their agents; and/or (c) solicited the purchase of 6.25% Notes by Lead Plaintiff New York City Pension Funds and other members of the Class, motivated at least in part by a desire to serve their own financial interests and the interests of Countrywide, including but not limited to commissions on their own sales of the 6.25% Notes and separate commissions on the sale of the 6.25% Notes by non-underwriter broker-dealers.

1227. As alleged herein, the 6.25% Notes Prospectus contained untrue statements of material fact, including the financial statements of Countrywide. In addition, the 6.25% Notes Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the 6.25% Notes Prospectus.

1228. Countrywide and the Underwriter Defendants named in this Count owed to Lead Plaintiff New York City Pension Funds and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Notes Prospectus, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1229. Countrywide and the Underwriter Defendants named in this Count did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 6.25% Notes Prospectus and did not possess reasonable grounds for believing that the 6.25% Notes Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

1230. Lead Plaintiff New York City Pension Funds and members of the Class purchased 6.25% Notes pursuant to the 6.25% Notes Prospectus and were damaged thereby.

1231. Lead Plaintiff New York City Pension Funds and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Notes Prospectus when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have

discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

1232. By reason of the foregoing, Countrywide and the Underwriter Defendants named in this Count are liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 12(a)(2) of the Securities Act.  Lead Plaintiff New York City Pension Funds and Class members hereby tender their securities to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT XII

**For Violations of Section 15 of the Securities Act on
Behalf of Purchasers of 6.25% Subordinated Notes Due May 15, 2016,
Asserted Against Defendants Mozilo, Sambol, Sieracki, and Kurland**

1233. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1234. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Mozilo, Sambol, Sieracki, and Kurland on behalf of Lead Plaintiff New York City Pension Funds and members of the Class who purchased or acquired Countrywide 6.25% Notes pursuant or traceable to the 6.25% Notes Registration Statement or pursuant to the 6.25% Notes Prospectus.

1235. Countrywide violated Section 11 of the Securities Act by issuing the 6.25% Notes Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts

1  misstated and omitted would have been material to a reasonable person reviewing
2  the 6.25% Notes Registration Statement.

3      1236. Countrywide violated Section 12(a)(2) of the Securities Act by
4  soliciting the purchase of 6.25% Notes by means of the 6.25% Notes Prospectus
5  and 6.25% Notes Prospectus which contained untrue statements of material fact
6  and omitted to state material facts required to be stated therein or necessary in
7  order to make the statements therein not misleading.  The facts misstated and
8  omitted would have been material to a reasonable person reviewing the 6.25%
9  Notes Prospectus.

10     1237. Defendants Mozilo, Sambol, Sieracki, and Kurland were controlling
11  persons of Countrywide when each of the 6.25% Notes Registration Statement
12  and 6.25% Notes Prospectus was filed and became effective, because of their
13  senior executive positions with Countrywide; their direct involvement in the
14  Company's day-to-day operations, including its mortgage banking and lending
15  practices and financial reporting and accounting functions; and their signatures on
16  and participation in the preparation and dissemination of each of this Registration
17  Statement and Prospectus.

18     1238. By virtue of the foregoing, Defendants Mozilo, Sambol, Sieracki,
19  and Kurland each had the power to influence and control, and did influence and
20  control, directly or indirectly, the decision-making of Countrywide, including the
21  content of its financial statements and this Registration Statement and Prospectus.

22     1239. Defendants Mozilo, Sambol, Sieracki, and Kurland acted negligently
23  and  without reasonable care regarding the accuracy of the information contained
24  and incorporated by reference in this Registration Statement and Prospectus and
25  lacked reasonable grounds to believe that such information was accurate and
26  complete in all material respects.

27     1240. Lead Plaintiff New York City Pension Funds and members of the
28  Class purchased Countrywide 6.25% Notes pursuant or traceable to the 6.25%

1  Notes Registration Statement, or pursuant to the 6.25% Notes Prospectus, and

2  were damaged thereby.

3        1241. Lead Plaintiff New York City Pension Funds and the Class did not

4  know, nor in the exercise of reasonable diligence could have known, of the untrue

5  statements of material fact or omissions of material facts in the 6.25% Notes

6  Registration Statement and 6.25% Notes Prospectus when they purchased or

7  acquired the respective securities.

8        1242. By reason of the foregoing, Defendants Mozilo, Sambol, Sieracki,

9  and Kurland are liable to Lead Plaintiff New York City Pension Funds and

10  members of the Class for violations of Section 15 of the Securities Act.

11

12                              **COUNT XIII**

13  **For Violations of Section 11 of the Securities Act on Behalf of Purchasers of
    7% Capital Securities, Asserted Against Defendants Countrywide and CCV;**
14  **Mozilo, Kurland, Sambol, Sieracki, Brown, Cisneros, Cunningham, Donato,
    Dougherty, Garcia, Gissinger, Melone, Parry, Robertson, Russell, and**
15  **Snyder; Grant Thornton and KPMG; and Citigroup Global Markets, J.P.
    Morgan Securities, Merrill Lynch, UBS Securities, Wachovia Capital,**
16  **Countrywide Securities, A.G. Edwards, Banc of America Securities, RBC
    Dain Rauscher, Barclays Capital, Deutsche Bank, Goldman Sachs, HSBC,**
17                          **and Lehman Brothers**

18        1243. Plaintiffs repeat and reallege each and every allegation above as if

19  fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict

20  liability and negligence claims and expressly disclaim any claim of fraud or

21  intentional misconduct.

22        1244. This Count is brought pursuant to Section 11 of the Securities Act

23  against Defendants Countrywide and CCV; Individual Defendants Mozilo,

24  Kurland, Sambol, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty,

25  Garcia, Gissinger, Melone, Parry, Robertson, Russell, and Snyder; Auditor

26  Defendants Grant Thornton and KPMG; and Underwriter Defendants Citigroup

27  Global Markets, J.P. Morgan Securities, Merrill Lynch, UBS Securities,

28  Wachovia Capital, Countrywide Securities, A.G. Edwards, Banc of America

1  Securities, RBC Dain Rauscher, Barclays Capital, Deutsche Bank, Goldman
2  Sachs, HSBC, and Lehman Brothers.

3      1245. This claim is brought on behalf of Plaintiffs Barry Brahn and Shelley
4  B. Katzeff and other members of the Class who, during the Class Period,
5  purchased or otherwise acquired CCV 7% Capital Securities pursuant or traceable
6  to the 7% Capital Securities Registration Statement.

7      1246. Countrywide and CCV were the registrants for the 7% Capital
8  Securities Registration Statement, and CCV issued the 7% Capital Securities
9  pursuant to that registration statement.

10      1247. Defendants Mozilo, Kurland, Sambol, Sieracki, Brown, Cisneros,
11  Cunningham, Donato, Dougherty, Garcia, Gissinger, Melone, Parry, Robertson,
12  Russell, and Snyder each signed the 7% Capital Securities Registration
13  Statement.

14      1248. At the time the 7% Capital Securities Registration Statement and
15  prospectus supplement were filed, Defendants Mozilo, Brown, Cisneros,
16  Cunningham, Donato, Dougherty, Melone, Parry, Robertson, Russell, and Snyder
17  were each directors of Countrywide.

18      1249. Defendant Grant Thornton audited certain of Countrywide's
19  financial statements issued during the Class Period and consented to being named
20  in the 7% Capital Securities Registration Statement as a party that certified
21  audited financial statements contained or incorporated by reference therein.
22  Grant Thornton's audit report incorrectly stated that its audits were performed in
23  accordance with GAAS and that the Company's financial statements were fairly
24  presented in accordance with GAAP.

25      1250. Defendant KPMG was the auditor for Countrywide during the Class
26  Period and consented to being named in the 7% Capital Securities Registration
27  Statement as a party that certified audited financial statements contained or
28  incorporated by reference therein.  KPMG's audit report incorrectly stated that its

1   audits were performed in accordance with GAAS and that the Company's
2   financial statements were fairly presented in accordance with GAAP.

3       1251. Defendants Citigroup Global Markets, J.P. Morgan Securities,
4   Merrill Lynch, UBS Securities, Wachovia Capital, Countrywide Securities, A.G.
5   Edwards, Banc of America Securities, RBC Dain Rauscher, Barclays Capital,
6   Deutsche Bank, Goldman Sachs, HSBC, and Lehman Brothers acted as
7   underwriters with respect to the offering of 7% Capital Securities.

8       1252. As set forth above, the 7% Capital Securities Registration Statement
9   contained untrue statements of material fact, including the financial statements of
10  Countrywide.   In addition, the 7% Capital Securities Registration Statement
11  omitted to state other facts required to be stated therein or necessary to make the
12  statements therein not misleading, including Countrywide's violations of GAAP.
13  The facts misstated and omitted would have been material to a reasonable person
14  reviewing the 7% Capital Securities Registration Statement.

15      1253. CCV, as issuer of the 7% Capital Securities, is strictly liable for the
16  material misstatements and omissions contained in the 7% Capital Securities
17  Registration Statement.

18      1254. The other Defendants named in this Count owed to Plaintiffs Brahn
19  and Katzeff and the Class the duty to make a reasonable and diligent investigation
20  of the statements contained in the 7% Capital Securities Registration Statement,
21  to ensure that the statements contained or incorporated by reference therein were
22  true and that there was no omission to state a material fact required to be stated
23  therein in order to make the statements contained therein not misleading.

24      1255. These Defendants did not make a reasonable and diligent
25  investigation of the statements contained or incorporated by reference in the 7%
26  Capital Securities Registration Statement, and did not possess reasonable grounds
27  for believing that the 7% Capital Securities Registration Statement did not contain

28

1   an untrue statement or omit to state a material fact required to be stated therein or

2   necessary to make the statements therein not misleading.

3       1256. The Underwriter Defendants named in this Count did not conduct a

4   reasonable investigation of the statements contained in and incorporated by

5   reference in the 7% Capital Securities Registration Statement and did not possess

6   reasonable grounds for believing that the statements contained therein were true

7   and not materially misstated.  In particular, these Underwriter Defendants did not

8   conduct a reasonable investigation into the accuracy of the statements regarding

9   Countrywide's reported financial performance, internal controls, underwriting

10  standards and lending practices.  These Underwriter Defendants could not simply

11  rely on the work of Countrywide's auditors because the investing public relies on

12  the underwriters to obtain and verify relevant information and then make sure that

13  important facts are accurately disclosed.  Thus, the Underwriter Defendants must

14  conduct their own, independent and reasonable investigation into the accuracy of

15  the Company's financial statements and assessments of internal controls, and they

16  were negligent in failing to do so sufficiently in connection with the offering.

17      1257. Similarly, the Individual Defendants named in this Count were

18  negligent in failing to conduct a reasonable investigation of the statements

19  contained in the 7% Capital Securities Registration Statement regarding

20  Countrywide's financial performance, internal controls, underwriting standards

21  and lending practices and did not possess reasonable grounds for believing that

22  the statements contained therein were true and not materially misstated.

23      1258. Defendant Grant Thornton, which consented to the inclusion of its

24  opinions in the 7% Capital Securities Registration Statement, negligently failed to

25  perform its audits of Countrywide in a reasonable manner and, thus, its audits did

26  not constitute a reasonable investigation of whether the Company's financial

27  statements were presented in compliance with GAAP and whether management's

28  assessment of internal controls was properly and accurately presented.

1259. Defendant KPMG, which consented to the inclusion of its opinions in the 7% Capital Securities Registration Statement, negligently failed to perform its audits of Countrywide in a reasonable manner and, thus, its audits did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and whether management's assessment of internal controls was properly and accurately presented.

1260. Plaintiffs Brahn and Katzeff and members of the Class purchased 7% Capital Securities issued pursuant or traceable to the 7% Capital Securities Registration Statement and were damaged thereby.

1261. Plaintiffs Brahn and Katzeff and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 7% Capital Securities Registration Statement when they purchased or acquired their securities.  Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

1262. By reason of the foregoing, the Defendants named in this Count are liable to Plaintiffs Brahn and Katzeff and members of the Class for violations of Section 11 of the Securities Act.

## COUNT XIV

**For Violations of Section 12(a)(2) of the Securities Act on Behalf of Purchasers of 7% Capital Securities, Asserted Against Defendants Countrywide and CCV; and Defendants Citigroup Global Markets, J.P. Morgan Securities, Merrill Lynch, UBS Securities, Wachovia Capital, Countrywide Securities, A.G. Edwards, Banc of America Securities, RBC Dain Rauscher, Barclays Capital, Deutsche Bank, Goldman Sachs, HSBC, and Lehman Brothers**

1263. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1264. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendants Countrywide and CCV and Underwriter Defendants Citigroup Global Markets, J.P. Morgan Securities, Merrill Lynch, UBS Securities, Wachovia Capital, Countrywide Securities, A.G. Edwards, Banc of America Securities, RBC Dain Rauscher, Barclays Capital, Deutsche Bank, Goldman Sachs, HSBC, and Lehman Brothers.

1265. This claim is brought on behalf of Plaintiff Shelley B. Katzeff and other members of the Class who, during the Class Period, purchased or otherwise acquired CCV 7% Capital Securities issued pursuant to the 7% Capital Securities Prospectus.

1266. Countrywide and CCV solicited the purchase of its 7% Capital Securities by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the 7% Capital Securities Prospectus.  Additionally, the 7% Capital Securities Registration Statement, of which Countrywide and CCV are registrants, states that "[f]or the purpose of determining liability of a registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, each undersigned registrant undertakes that in a primary offering of securities . . . regardless of the underwriting method used to sell the securities to the purchaser . . . the

1  undersigned registrant will be a seller to the purchaser and will be considered to

2  offer or sell such securities to such purchaser."

3       1267. The Underwriter Defendants named in this Count are sellers within

4  the meaning of the Securities Act because they (a) transferred title to Lead

5  Plaintiff New York City Pension Funds and other purchasers of the 7% Capital

6  Securities; (b) transferred title to the 7% Capital Securities to other purchasers

7  and/or broker-dealers that sold the 7% Capital Securities as their agents; and/or

8  (c) solicited the purchase of 7% Capital Securities by Plaintiff Katzeff and other

9  members of the Class, motivated at least in part by a desire to serve their own

10  financial interests and the interests of Countrywide, including but not limited to

11  commissions on their own sales of the 7% Capital Securities and separate

12  commissions on the sale of the 7% Capital Securities by non-underwriter broker-

13  dealers.

14       1268. As alleged herein, the 7% Capital Securities Prospectus contained

15  untrue statements of material fact, including the financial statements of

16  Countrywide.  In addition, the 7% Capital Securities Prospectus omitted to state

17  material facts required to be stated therein or necessary to make the statements

18  therein not misleading, including Countrywide's violations of GAAP.  The facts

19  misstated and omitted would have been material to a reasonable person reviewing

20  the 7% Capital Securities Prospectus.

21       1269. Countrywide and the Underwriter Defendants named in this Count

22  owed to Plaintiff Katzeff and the Class the duty to make a reasonable and diligent

23  investigation of the statements contained in the 7% Capital Securities Prospectus,

24  to ensure that the statements contained or incorporated by reference therein were

25  true and that there was no omission to state a material fact required to be stated

26  therein in order to make the statements contained therein not misleading.

27       1270. Countrywide and the Underwriter Defendants named in this Count

28  did not make a reasonable and diligent investigation of the statements contained

1   or incorporated by reference in the 7% Capital Securities Prospectus and did not

2   possess reasonable grounds for believing that the 7% Capital Securities

3   Prospectus did not contain an untrue statement of material fact or omit to state a

4   material fact required to be stated therein or necessary to make the statements

5   therein not misleading.

6       1271. Plaintiff Katzeff and members of the Class purchased 7% Capital

7   Securities pursuant to the 7% Capital Securities Prospectus and were damaged

8   thereby.

9       1272. Plaintiff Katzeff and the Class did not know, nor in the exercise of

10  reasonable diligence could have known, of the untrue statements of material fact

11  or omissions of material facts in the 7% Capital Securities Prospectus when she

12  purchased or acquired the securities.  Less than one year has elapsed between the

13  time she discovered or reasonably could have discovered the facts upon which

14  this Count is based and the time this claim was brought.  Less than three years

15  have elapsed between the time that the securities upon which this Count is

16  brought were *bona fide* offered to the public and the time this action was

17  commenced.

18      1273. By reason of the foregoing, Countrywide and the Underwriter

19  Defendants named in this Count are liable to Plaintiff Katzeff and members of the

20  Class for violations of Section 12(a)(2) of the Securities Act.  Plaintiff Katzeff

21  and Class members hereby tender their securities to  their respective sellers and

22  seek rescission of their purchases to the extent that they continue to own such

23  securities.

24

25

26

27

28

**COUNT XV**

**For Violations of Section 15 of the Securities Act
on Behalf of Purchasers of 7% Capital Securities,
Asserted Against Defendants Mozilo, Sambol, and Sieracki**

1274. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1275. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Mozilo, Sambol, and Sieracki on behalf of Plaintiffs Brahn and Katzeff and members of the Class who purchased or acquired CCV 7% Capital Securities pursuant or traceable to the 7% Capital Securities Registration Statement, or pursuant to the 7% Capital Securities Prospectus.

1276. Countrywide and CCV violated Section 11 of the Securities Act by issuing the 7% Capital Securities Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the 7% Capital Securities Registration Statement.

1277. Countrywide and CCV violated Section 12(a)(2) of the Securities Act by soliciting the purchase of 7% Capital Securities by means of the 7% Capital Securities Prospectus which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the 7% Capital Securities Prospectus.

1278. Defendants Mozilo, Sambol, and Sieracki were controlling persons of Countrywide and CCV when the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus were filed and became effective, because of

their senior executive positions with Countrywide; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus.

1279. By virtue of the foregoing, Defendants Mozilo, Sambol, and Sieracki each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide and CCV, including the content of Countrywide's financial statements and the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus.

1280. Defendants Mozilo, Sambol, and Sieracki acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

1281. Plaintiffs Brahn and Katzeff and members of the Class purchased CCV 7% Capital Securities pursuant or traceable to the 7% Capital Securities Registration Statement, or pursuant to the 7% Capital Securities Prospectus, and were damaged thereby.

1282. Plaintiffs Brahn and Katzeff and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus when they purchased or acquired the securities.

1283. By reason of the foregoing, Defendants Mozilo, Sambol, and Sieracki are liable to Plaintiffs Brahn and Katzeff and members of the Class for violations of Section 15 of the Securities Act.

**COUNT XVI**

**For Violations of Section 10(b) of the Exchange
Act and SEC Rule 10b-5 on Behalf of Plaintiffs,
Asserted Against Countrywide and the Officer Defendants**

1284. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

1285. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiffs and members of the Class against Countrywide and the Officer Defendants Mozilo, Sambol, Sieracki, and Kurland.

1286. As alleged herein, throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Countrywide common stock and other publicly traded securities, including but not limited to public debt and preferred securities specifically alleged herein; and (iii) cause Plaintiffs and members of the Class to purchase Countrywide securities at artificially inflated prices.

1287. The Officer Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having prepared, approved, signed and/or disseminated documents (other than the Registration Statement and Prospectuses complained of herein, which are not subjects of this

1  Count) which contained untrue statements of material fact and/or omitted facts

2  necessary to make the statements therein not misleading.

3      1288. As set forth above, Defendants made their false and misleading

4  statements and omissions and engaged in the fraudulent activity described herein

5  knowingly and intentionally, or in such a deliberately reckless manner as to

6  constitute willful deceit and fraud upon Plaintiffs and the other members of the

7  Class who purchased Countrywide common stock and/or other Countrywide

8  public securities, including but not limited to the securities specifically alleged

9  herein, during the Class Period.

10     1289. In ignorance of the false and misleading nature of these Defendants'

11  statements and omissions, and relying directly or indirectly on those statements or

12  upon the integrity of the market prices for Countrywide common stock and other

13  publicly traded securities, Plaintiffs and other members of the Class purchased

14  Countrywide securities at artificially inflated prices during the Class Period.  But

15  for the fraud, Plaintiffs and members of the Class would not have purchased

16  Countrywide securities at artificially inflated prices.  As set forth herein, when the

17  true facts were subsequently disclosed, the prices of Countrywide common stock

18  and other publicly traded securities declined precipitously and Plaintiffs and

19  members of the Class were harmed and damaged as a direct and proximate result

20  of their purchases of Countrywide securities at artificially inflated prices and the

21  subsequent decline in the prices of those securities when the truth began to be

22  disclosed.

23     1290. By virtue of the foregoing, Defendant Countrywide and the Officer

24  Defendants Mozilo, Sambol, Sieracki and Kurland are liable to Plaintiffs and

25  members of the Class for violations of Section 10(b) of the Exchange Act and

26  Rule 10b-5 promulgated thereunder.

27

28

# COUNT XVII

### For Violations of Section 20(a) of the Exchange Act, on Behalf of Plaintiffs, Asserted Against the Officer Defendants

1291. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

1292. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Officer Defendants Mozilo, Sambol, Sieracki, and Kurland, on behalf of Plaintiffs and members of the Class.

1293. As alleged above, Countrywide violated Section 10(b) and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of Defendants Mozilo, Sambol, Sieracki, and Kurland and others who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

1294. The Officer Defendants were controlling persons of Countrywide during the Class Period, due to their senior executive positions with the Company; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the Company's public filings.

1295. By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide, including the content of its financial statements and other public statements.

1296. As set forth above, these Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased Countrywide securities during the Class Period.

1297. In ignorance of the false and misleading nature of these Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Countrywide common stock and other publicly traded securities, Plaintiffs and other members of the Class purchased Countrywide securities at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased Countrywide securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the prices of Countrywide common stock and other public securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Countrywide securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth began to be disclosed.

1298. By reason of the foregoing, the Officer Defendants are liable to Plaintiffs and the members of the Class for violations of Section 20(a) of the Exchange Act.

## COUNT XVIII

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 on Behalf of Plaintiffs, Asserted Against KPMG and Grant Thornton

1299. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

1   1300. This Count is asserted pursuant to Section 10(b) of the Exchange Act

2   and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiffs and

3   members of the Class against KPMG and Grant Thornton.

4   1301. As alleged herein, throughout the Class Period, KPMG and Grant

5   Thornton, directly and indirectly, by the use of the means or instrumentalities of

6   interstate commerce, the mails and/or the facilities of national securities

7   exchanges, made untrue statements of material fact and/or omitted to state

8   material facts necessary to make their statements not misleading and carried out a

9   plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange

10  Act and Rule 10b-5 promulgated thereunder.   KPMG and Grant Thornton

11  intended to and did, as alleged herein, (i) deceive the investing public, including

12  Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices

13  of Countrywide common stock and other publicly traded securities, including but

14  not limited to public debt and preferred securities specifically alleged herein; and

15  (iii) cause Plaintiffs and members of the Class to purchase Countrywide securities

16  at artificially inflated prices.

17  1302. KPMG and Grant Thornton were responsible for issuing their

18  respective false and misleading audit reports and opinions alleged herein and

19  having engaged in a plan, scheme and course of conduct designed to deceive

20  Plaintiffs and members of the Class, by virtue of having prepared, approved,

21  signed and/or disseminated documents (other than the Registration Statements

22  and Prospectuses complained of herein, which are not subjects of this Count)

23  which contained untrue statements of material fact and/or omitted facts necessary

24  to make the statements therein not misleading.

25  1303. As set forth above, KPMG and Grant Thornton made their false and

26  misleading statements and omissions and engaged in the fraudulent activity

27  described herein knowingly and intentionally, or in such a deliberately reckless

28  manner as to constitute willful deceit and fraud upon Plaintiffs and the other

1  members of the Class who purchased Countrywide common stock and/or other

2  Countrywide public securities, including but not limited to the securities

3  specifically alleged herein, during the Class Period.

4      1304. In ignorance of the false and misleading nature of KPMG's and

5  Grant Thornton's statements and omissions, and relying directly or indirectly on

6  those statements or upon the integrity of the market prices for Countrywide

7  common stock and other publicly traded securities, Plaintiffs and other members

8  of the Class purchased Countrywide securities at artificially inflated prices during

9  the Class Period.  But for the fraud, Plaintiffs and members of the Class would

10 not have purchased Countrywide securities at artificially inflated prices.  As set

11 forth herein, when the true facts were subsequently disclosed, the prices of

12 Countrywide common stock and other publicly traded securities declined

13 precipitously and Plaintiffs and members of the Class were harmed and damaged

14 as a direct and proximate result of their purchases of Countrywide securities at

15 artificially inflated prices and the subsequent decline in the prices of those

16 securities when the truth began to be disclosed.

17     1305. By virtue of the foregoing, Defendants KPMG and Grant Thornton

18 are liable to Plaintiffs and members of the Class for violations of Section 10(b) of

19 the Exchange Act and Rule 10b-5 promulgated thereunder.

20

21 **COUNT XIX**

22 **For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 on Behalf of Purchasers of Series
A Debentures and Series B Debentures, Asserted Against
Defendants Countrywide, Mozilo, Sambol, Sieracki, and KPMG**

23

24     1306. Plaintiffs repeat and reallege each and every allegation set forth

25 above as if fully set forth herein.

26

27     1307. This Count is asserted pursuant to Section 10(b) of the Exchange Act

28 and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiff

New York City Pension Funds and other members of the Class who, during the Class Period, purchased publicly traded Series A Debentures or Series B Debentures, against Defendant Countrywide, Mozilo, Sambol, Sieracki, and KPMG.

1308. As alleged herein, throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   These Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff New York City Pension Funds and members of the Class; (ii) artificially inflate and maintain the prices of publicly traded Series A Debentures and Series B Debentures; and (iii) cause Lead Plaintiff New York City Pension Funds and members of the Class to purchase publicly traded Series A Debentures or Series B Debentures at artificially inflated prices.

1309. Defendants Countrywide, Mozilo, Sambol, and Sieracki were individually and collectively responsible for making the false and misleading statements and omissions in the Series A and Series B Debenture Registration Statement as alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff New York City Pension Funds and members of the Class, by virtue of having prepared, approved, signed and/or disseminated the Series A and Series B Debenture Registration Statement which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

1310. Defendant KPMG was the auditor for Countrywide during the Class Period and consented to being named in the Series A and Series B Debenture

1    Registration Statement as a party that certified the audited financial statements
2    contained or incorporated by reference therein.   KPMG's audit report falsely
3    stated that its audits were performed in accordance with GAAS and that the
4    Company's financial statements were fairly presented in accordance with GAAP.

5    1311. As set forth above, the Defendants named in this Count made their
6    false and misleading statements and omissions and engaged in the fraudulent
7    activity described herein knowingly and intentionally, or in such a deliberately
8    reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff New
9    York City Pension Funds and the other members of the Class who purchased
10   publicly traded Series A Debentures or Series B Debentures during the Class
11   Period.

12   1312. In ignorance of the false and misleading nature of these Defendants'
13   statements and omissions, and relying directly or indirectly on those statements or
14   upon the integrity of the market prices for publicly traded Series A Debentures or
15   Series B Debentures, Lead Plaintiff New York City Pension Funds and other
16   members of the Class purchased publicly traded Series A Debentures or Series B
17   Debentures at artificially inflated prices during the Class Period.   But for the
18   fraud, Lead Plaintiff New York City Pension Funds and members of the Class
19   would not have purchased such securities at artificially inflated prices.   As set
20   forth herein, when the true facts were subsequently disclosed, the prices of
21   publicly traded Series A Debentures and Series B Debentures declined
22   precipitously and Lead Plaintiff New York City Pension Funds and members of
23   the Class were harmed and damaged as a direct and proximate result of their
24   purchases of these securities at artificially inflated prices and the subsequent
25   decline in the prices of those securities when the truth began to be disclosed.

26   1313. By virtue of the foregoing, Defendants Countrywide, Mozilo,
27   Sambol, Sieracki, and KPMG are liable to Lead Plaintiff New York City Pension

28

1   Funds and members of the Class for violations of Section 10(b) of the Exchange

2   Act and Rule 10b-5 promulgated thereunder.

3

4                                    **COUNT XX**

5   **For Violations of Section 20(a) of the Exchange Act,**
    **on Behalf of Purchasers of Series A Debentures and Series B**
6   **Debentures, Asserted Against Defendants Mozilo, Sambol and Sieracki**

7        1314. Plaintiffs repeat and reallege each of the allegations set forth above

8   as if fully set forth herein.

9        1315. This Count is asserted pursuant to Section 20(a) of the Exchange Act

10  against Defendants Mozilo, Sambol, and Sieracki, on behalf of Lead Plaintiff

11  New York City Pension Funds and members of the Class who, during the Class

12  Period, purchased publicly traded Series A Debentures or Series B Debentures.

13       1316. As alleged above, Countrywide violated Section 10(b) and Rule 10b-

14  5 promulgated thereunder by making false and misleading statements in

15  connection with the purchase and sale of securities and by participating in a

16  fraudulent scheme and course of business or conduct throughout the Class Period.

17  This fraudulent conduct was undertaken with scienter and the Company is

18  charged with the knowledge and scienter of Defendants Mozilo, Sambol, and

19  Sieracki and others who knew of or acted with deliberate reckless disregard of the

20  falsity of the Company's statements and the fraudulent nature of its scheme

21  during the Class Period.

22       1317. Defendants Mozilo, Sambol, and Sieracki were controlling persons

23  of Countrywide during the Class Period, due to their senior executive positions

24  with the Company; their direct involvement in the Company's day-to-day

25  operations, including its mortgage banking and lending practices and financial

26  reporting and accounting functions; and their signatures on and participation in

27  the preparation and dissemination of the Series A and Series B Debenture

28  Registration Statement.

1318. By virtue of the foregoing, Defendants Mozilo, Sambol, and Sieracki each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide, including the content of the Series A and Series B Debenture Registration Statement.

1319. As set forth above, these Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased publicly traded Series A Debentures or Series B Debentures during the Class Period.

1320. In ignorance of the false and misleading nature of these Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Countrywide common stock and other publicly traded securities, Lead Plaintiff New York City Pension Funds and other members of the Class purchased publicly traded Series A Debentures or Series B Debentures at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff New York City Pension Funds and members of the Class would not have purchased these securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the prices of these securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of these securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth began to be disclosed.

1321. By reason of the foregoing, Defendants Mozilo, Sambol, and Sieracki are liable to Lead Plaintiff New York City Pension Funds and the members of the Class for violations of Section 20(a) of the Exchange Act.

## COUNT XXI

### For Violations of Section 20A of the Exchange Act,
### on Behalf of Lead Plaintiffs, Asserted Against
### Defendants Mozilo, Sambol and Kurland

1322. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

1323. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Mozilo, Sambol, and Kurland, on behalf of Lead Plaintiffs and all members of the Class who purchased Countrywide common stock contemporaneously with any of these Defendants' sales of Countrywide common stock during the Class Period.

1324. Each of these Defendants sold substantial numbers of shares of Countrywide common stock during the Class Period while in possession of material, adverse, nonpublic information.  This conduct violated Section 20A of the Exchange Act.

1325. As set forth in the annexed certifications of Lead Plaintiffs and the annexed Exhibit G, Lead Plaintiffs purchased shares of Countrywide common stock on the same day as or close in time to sales of Countrywide common stock made by the Defendants named in this Count while these Defendants were in possession of material, adverse, nonpublic information.   These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

1326. Numerous other Class members also purchased Countrywide common stock contemporaneously with these Defendants' sales of stock during the Class Period based on material, adverse, nonpublic information.

1327. Accordingly, under Section 20A of the Exchange Act, the Defendants named in this Count are each liable to Lead Plaintiffs and the Class for all profits gained and losses avoided by them as a result of their stock sales.

1328. The Defendants named in this Count are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.   Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B.   Declaring and determining that Defendants violated the Securities Act and Exchange Act by reason of the acts and omissions alleged herein;

C.   Awarding preliminary and permanent injunctive relief in favor of Plaintiffs and Class against Defendants and their counsel, agents and all persons acting under, in concert with, or for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze on Defendants' insider trading proceeds;

D.   Ordering an accounting of Defendants' insider trading proceeds;

E.   Disgorgement of Defendants' insider trading proceeds;

F.   Restitution of investors' monies of which they were defrauded;

G.   Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

H.   Awarding Plaintiffs and the Class the right to rescind their Countrywide securities to the extent they continue to hold such securities;

I.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and fees and costs incurred by consulting and testifying expert witnesses; and

1     J.     Granting such other and further relief as the Court deems just and

2  proper.

3

4  **XVI. DEMAND FOR JURY TRIAL**

5     Plaintiffs demand a trial by jury of all issues so triable.

6

Dated: April 11, 2008         LABATON SUCHAROW LLP

7

8                  By:

9                       JOEL H. BERNSTEIN
                        JONATHAN M. PLASSE

10                    IRA A. SCHOCHET
                    DAVID J. GOLDSMITH

11                    ETHAN D. WOHL
                    ANN E. GITTLEMAN

12                    140 Broadway
                    New York, New York  10005

13                    Telephone:  (212) 907-0700
                    Facsimile:  (212) 818-0477

14                    jbernstein@labaton.com
                    jplasse@labaton.com

15                    ischochet@labaton.com
                    dgoldsmith@labaton.com

16                    ewohl@labaton.com
                    agittleman@labaton.com

17                    *Lead Counsel for Lead Plaintiff*

18                    *Thomas P. DiNapoli, Comptroller*
                    *of the State of New York, as*

19                    *Administrative Head of the New York*
                    *State and Local Retirement Systems*

20                    *and as Trustee of the New York State*
                    *Common Retirement Fund, and Lead*

21                    *Plaintiff New York City Pension Funds*

22                    KREINDLER & KREINDLER LLP
                    GRETCHEN M. NELSON (#112566)

23                    MARK LABATON (#159555)
                    707 Wilshire Boulevard, Suite 4100

24                    Los Angeles, California  90017
                    Telephone:  (213) 622-6469

25                    Facsimile:  (213) 622-6019
                    gnelson@kreindler.com

26                    mlabaton@kreindler.com

27                    *Liaison Counsel for Lead*
                    *Plaintiffs New York Funds*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAPLAN FOX & KILSHEIMER LLP
FREDERIC S. FOX
JOEL B. STRAUSS
JEFFREY P. CAMPISI
850 Third Avenue
New York, New York  10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714
jstrauss@kaplanfox.com
jcampisi@kaplanfox.com

*Attorneys for Plaintiffs Barry
Brahn and Shelley B. Katzeff*