ERIC S. WAXMAN (SBN 106649)
eric.waxman@skadden.com
PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

Attorneys for Defendants
Michael E. Dougherty and
Kathleen Brown

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies To:  All Actions | LEAD CASE NO.: CV 07-05295 MRP (MANX)<br><br>(1) NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; and<br><br>(2) [PROPOSED] ORDER GRANTING MOTION TO DISMISS (lodged separately under separate cover).<br><br>Date:  October 20, 2008<br>Time:  10:00 a.m.<br>Judge:  Hon. Mariana R. Pfaelzer<br>Ctrm:  12 |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on October 20, 2008 at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Mariana R. Pfaelzer, located at 312 North Spring Street, Los Angeles, California, Defendants Michael E. Dougherty and Kathleen Brown shall, and hereby do, move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").

The grounds for this motion are that the Complaint does not state a claim on which relief can be granted against Mr. Dougherty or Ms. Brown.  This motion is based upon this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the Joint Request for Judicial Notice, the pleadings and papers filed in this action, and such oral argument as the Court may entertain.  Further, Mr. Dougherty and Ms. Brown hereby join in the motions to dismiss of the Countrywide Defendants, KPMG LLP, and Grant Thornton LLP, as well as Parts III.A, III.C, and III.D of the motion to dismiss of the Underwriter Defendants, all filed contemporaneously with this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on June 3-4, 2008.

DATED: June 10, 2008

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP


By: _____/s/Eric S. Waxman_____
Eric S. Waxman
Attorneys for Defendants
Michael E. Dougherty and Kathleen Brown

i

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................... iii

I.     PRELIMINARY STATEMENT .......................................................1

II.    FACTUAL BACKGROUND ............................................................2

III.   THIS COURT SHOULD DISMISS COUNTS I, IV, VII, X, AND XIII ASSERTED UNDER SECTION 11 BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM .............................................5

    A.   The Court Should Dismiss Plaintiffs' Section 11 Claims Because Plaintiffs Have Failed to Plead Loss Under Section 11(e) ..........................................................................................5

       1.   2011 Notes (Count IV).................................................5

       2.   6.25% Notes (Count X)................................................7

       3.   Series A Medium-Term Notes (Count I) .........................8

       4.   Series B Medium-Term Notes (Count VII) .................11

       5.   7% Capital Securities (Count XIII) ...............................13

    B.   Plaintiffs Have Failed To Allege False or Misleading Statements With The Requisite Particularity ...........................13

       1.   Plaintiffs' Claims Sound In Fraud, And As Such, Must Be Pleaded With Particularity ..............................13

       2.   Plaintiffs Have Failed To Plead That The Registration Statements Were False Or Misleading With Particularity ......................................................................16

          (a)   Plaintiffs' Allegations Concerning The Company's Allowance For Loan Losses Are Insufficient....................................................16

          (b)   Plaintiffs' Allegations Concerning Retained Interests Are Insufficient......................20

          (c)   Plaintiffs' Allegations Concerning Countrywide's Mortgage Servicing Rights Are Insufficient....................................................23

          (d)   Plaintiffs' Allegations Concerning Countrywide's Representations And Warranties Are Insufficient................................24

IV.   CONCLUSION ...........................................................................25

**TABLE OF AUTHORITIES**

**CASES**

**PAGE**

In re 2007 Novastar Financial Inc., Securities Litigation,
  Case No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166
  (W.D. Mo. June 4, 2008) ............................................................... 16, 18

In re Aegon N.V. Securities Litigation,
  No. 03 Civ. 0603(RMS), 2004 WL 1415973
  (S.D.N.Y. June 23, 2004) ................................................... 17, 19, 20, 24

AIG Global Securities Lending Corp. v. Bank of America Securities LLC,
  254 F. Supp. 2d 373 (S.D.N.Y. 2003) .............................................. 20

In re Alamosa Holdings, Inc. Securities Litigation,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................................. 6

Alaska Electrical Pension Fund v. Adecco S.A.,
  434 F. Supp. 2d 815 (S.D. Cal. 2006) .............................................. 19

In re Anchor Gaming Securities Litigation,
  33 F. Supp. 2d 889 (D. Nev. 1999) .................................................. 15

In re Broderbund/Learning Co. Securities Litigation,
  294 F.3d 1201 (9th Cir. 2002) ............................................ 1, 5, 7, 8, 9

Brody v. Homestore, Inc.,
  No. CV02-08068 FMC (JWJx),
  2003 WL 22127108 (C.D. Cal. Aug. 8, 2003) ................................. 16

In re Capstead Mortgage Corp. Securities Litigation,
  258 F. Supp. 2d 533 (N.D. Tex. 2003) ........................................ 21, 23

Central Laborers Pension Fund v. Merix Corp.,
  No. CV04-826-MO, 2005 WL 2244072 (D. Or. Sept. 15, 2005)............ 14

In re Countrywide Financial Corp. Derivative Litigation,
  __ F. Supp. 2d __, Lead Case No. CV-07-06923-MRP (MANx),
  2008 WL 2064977 (C.D. Cal. May 14, 2008) ............... 17, 18, 19, 21, 24

Davidco Investors, LLC v. Anchor Glass Container Corp.,
  No. 8:04CV2561T-24EAJ, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ........ 6

DiLeo v. Ernst & Young,
  901 F.2d 624 (7th Cir. 1990) .......................................................... 18

Dura Pharmaceuticals Inc. v. Broudo,
  544 U.S. 336 (2005)....................................................................................7

Financial Acquisition Partners LP v. Blackwell,
  No. Civ.A.3:02-CV-1586-K, 2004 WL 2203253
  (N.D. Tex. Sept. 29, 2004)........................................................................21

In re Gemstar-TV Guide, International Securities Litigation,
  Case No. CV 02-02775 MRP (PLAx),
  2003 U.S. Dist. LEXIS 25884 (C.D. Cal. Aug. 15, 2003) ..........................2, 15, 16

In re GlenFed, Inc. Securities Litigation,
  42 F.3d 1541 (9th Cir. 1994) (en banc) ........................................................16, 19

In re ICN Pharmaceuticals, Inc. Securities Litigation,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........................................................22

In re Infonet Services Corp. Securities Litigation,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) ........................................................14, 15

Kane v. Madge Networks N.V.,
  No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000).........19, 23

In re Lantronix, Inc. Securities Litigation,
  No. CV02-03899PA (JTLX), 2003 WL 23198818
  (C.D. Cal. Dec. 31, 2003) ...........................................................................14

Lindner Dividend Fund, Inc. Securities Litigation,
  880 F. Supp. 49 (D. Mass. 1995)................................................................18, 19, 24

Madison Partnership Liquidity Investors 31, LLC v. USAA Properties III, Inc.,
  No. Civ.SA-98-CA-324-EP, 1999 WL 33292714
  (W.D. Tex. July 16, 1999) ...........................................................................8

In re McKesson HBOC, Inc. Securities Litigation,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000)........................................................1, 2, 5, 6, 7, 8

Metz v. United Counties Bancorp,
  61 F. Supp. 2d 364 (D. N.J. 1999)..............................................................1, 8, 11, 13

In re Mutual Funds Investment Litigation,
  384 F. Supp. 2d 845 (D. Md. 2005)...............................................................8, 9

Pierce v. Morris,
  No. 4:03-CV-026-Y, 2006 WL 2370343 (N.D. Tex. Aug. 16, 2006) ...............5, 6, 9

Rombach v. Chang,
 355 F.3d 164 (2d Cir. 2004)..................................................................................14

Rubke v. Capitol Bancorp Ltd.,
 460 F. Supp. 2d 1124 (N.D. Cal. 2006)..........................................................14, 15

In re Salomon Smith Barney Mutual Fund Fees Litigation,
 441 F. Supp. 2d 579 (S.D.N.Y. 2006) ............................................................11, 13

In re Seracare Life Sciences, Inc.,
 No. 05-CV-2335-H (CAB), 2007 WL 935583 (S.D. Cal. Mar. 19, 2007) .............14

In re Silicon Image, Inc. Securities Litigation,
 No. C-05-456 MMC, 2007 WL 607804 (N.D. Cal. Feb. 23, 2007) ......................22

In re Silicon Storage Technology Inc. Securities Litigation,
 No. C 05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006)......................22

In re Stac Electronics Securities Litigation,
 89 F.3d 1399 (9th Cir. 1996)..............................................................................2, 14

In re Stratosphere Corp. Securities Litigation,
 1 F. Supp. 2d 1096 (D. Nev. 1998) ......................................................................16

In re Tibco Software, Inc. Securities Litigation,
 No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ....................22

In re Van Wagoner Funds, Inc. Securities Litigation,
 382 F. Supp. 2d 1173 (N.D. Cal. 2004)..................................................................8

Wenger v. Lumisys, Inc.,
 2 F. Supp. 2d 1231 (N.D. Cal. 1998)................................................................22, 24

In re Wet Seal, Inc. Securities Litigation,
 518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................23

In re White Electric Designs Corp. Securities Litigation,
 416 F. Supp. 2d 754 (D. Ariz. 2006) ................................................................14, 15

Yourish v. California Amplifier,
 191 F.3d 983 (9th Cir. 1999)................................................................................16

# **STATUTES**

15 U.S.C. § 77k ................................................................................................1, 5

15 U.S.C. § 77z-1 ..................................................................................................6

# **OTHER**

SEC Release No. 6862, Release No. 27928, Release No. 33-6862,
    Release No. 34-27928, Release No. IC-17452, Release No. IS -121,
    46 S.E.C. Docket 26, 1990 WL 311657 (Apr. 23, 1990) ......................................10

# I.    PRELIMINARY STATEMENT

Despite the unprecedented length and scope of the 415-page Consolidated Amended Class Action Complaint for Violations of the Securities Laws ("Complaint" or "Compl."), Plaintiffs have failed to state a claim upon which relief may be granted against former directors of Countrywide Financial Corporation ("Countrywide" or "the Company") Michael E. Dougherty and Kathleen Brown.  Against Mr. Dougherty and Ms. Brown, Plaintiffs exclusively assert claims arising under Section 11 of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. 77k, based on Mr. Dougherty's and Ms. Brown's signature on allegedly false or misleading registration statements filed in connection with five offerings of various Countrywide debt securities ("the Registration Statements").  Each of Plaintiffs' claims fails.

First, each of Plaintiffs' claims is deficient because Plaintiffs have failed to plead that they suffered loss under § 11.  See In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1203 (9th Cir. 2002).  To recover under § 11, a plaintiff must demonstrate that he or she suffered a certain type of damages caused by a misrepresentation.  Id. at 1204.  Specifically, "damages must be 'measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the Section 11 claim was filed." Id. (quoting Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1421 (9th Cir. 1994)).  It is not enough for a plaintiff to plead damages generally; he or she must plead loss as defined by the statute.  See Metz v. United Counties Bancorp, 61 F. Supp. 2d 364 (D. N.J. 1999).

Here, Plaintiffs fail to plead that they suffered the requisite loss.  With regard to two of the five securities offerings at issue, Plaintiffs sold their securities before Countrywide made any alleged "corrective disclosure" concerning the Registration Statements that purportedly caused a price decline.  Because Courts have concluded that selling prior to a corrective disclosure conclusively forecloses Plaintiffs' showing loss caused by a misstatement, the Court should dismiss the Section 11 claims concerning the initial two registration statements.  See In re McKesson HBOC, Inc. Securities Litigation,

1

1 | 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000).

2 |      With regard to the remaining three securities that Plaintiffs continue to own,
3 | Plaintiffs fail to plead that the value of their securities at the time they filed suit was less
4 | than the price they paid.  While Plaintiffs plead generally that the market price of certain
5 | securities declined on certain isolated days (in several instances, not even the securities
6 | Plaintiffs own), the Complaint simply does not plead, as it must, that the value of the
7 | securities at the time Plaintiffs filed suit was less than the price paid.  Absent such
8 | allegations, Plaintiffs have not pleaded that they suffered damages as a matter of law.

9 |      <u>Second</u>, even if the Court concludes Plaintiffs have pleaded loss, Plaintiffs have
10 | failed to plead with particularity that the Registration Statements were false or
11 | misleading.  Although there is no general requirement that § 11 claims be pleaded with
12 | particularity, such claims do have to be pleaded with particularity when they "sound in
13 | fraud."  <u>See</u> <u>In re Stac Elecs. Sec. Litig.</u>, 89 F.3d 1399, 1404-05 (9th Cir. 1996).  Here,
14 | Plaintiffs allege a "unified course of conduct" with respect to their § 11 claims and fraud
15 | claims arising under § 10(b) of the Securities Exchange Act ("Exchange Act"), which
16 | Plaintiffs' characterize as "one of the largest corporate frauds in recent years."  (Compl.
17 | ¶ 2.)  Therefore, Plaintiffs' § 11 claims must be pleaded with particularity.  <u>See</u> <u>Gemstar-</u>
18 | <u>TV Guide, International Securities Litigation</u>, Case No. CV 02-02775 MRP (PLAx),
19 | 2003 U.S. Dist. LEXIS 25884, at *28 (C.D. Cal. Aug. 15, 2003) (Pfaelzer, J.) (claim
20 | sounds in fraud when "the gravamen of the Complaint" is that Defendants have
21 | "deliberately . . . withheld unfavorable information").  Because, for the reasons below,
22 | the Complaint fails to plead false and misleading statements in the Registration
23 | Statements with the necessary particularity, the Court should dismiss the Complaint for
24 | this reason as well.

25 | **II.   FACTUAL BACKGROUND**

26 |      Out of the twenty-one counts asserted in the Complaint, only five are asserted
27 | against Mr. Dougherty (Counts I, IV, VII, X, XIII), and only three are asserted against
28 | Ms. Brown (Counts VII, X, XIII).  Each count arises exclusively from § 11.  In each

1  count, Mr. Dougherty and Ms. Brown are alleged to have signed a purportedly

2  misleading registration statement and prospectus that offered a certain type of debt

3  security to the public ("the Registration Statements"). (Compl. ¶¶ 34, 38.)

4        Count I arises from an offering of "**Series A Medium-Term Notes**." (Compl.

5  ¶ 1083.) The Series A Medium-Term Notes were registered under a shelf-registration on

6  Form S-3 dated April 7, 2004 and April 21, 2004. (Compl. ¶ 888.) Between March 16,

7  2005 and February 1, 2006, offerings of different types of the Series A Medium-Term

8  Notes were made to the public pursuant to various "pricing supplements." (Id.) The

9  pricing supplements offered different notes on terms that varied in price, coupon,

10 maturity date, and other terms. (See Compl. ¶¶ 888, 892, 894.) Plaintiffs New York City

11 Pension Funds purchased certain Series A Medium-Term Notes on June 8, 2005,

12 pursuant to a pricing supplement dated the same day. (Compl. Ex. B at 24, 31, 39, 50

13 ("Security Number" 22238HAG5); Request for Judicial Notice ("RJN") Ex. 2 (pricing

14 supplement dated June 8, 2005).) Plaintiffs allege that the registration statement and

15 prospectuses were misleading because they incorporated by reference Countrywide's

16 fiscal year 2003 Form 10-K and consolidated financial data, which Plaintiffs allege was

17 misleading. (Compl. ¶¶ 548-562, 896.)

18       Count IV arises from an offering of Floating Rate Notes due April 1, 2011 ("**the

19 2011 Notes**"). (Compl. ¶ 1122.) The 2011 Notes were registered pursuant to the same

20 Form S-3 as the Series A Medium-Term Notes. (Compl. ¶ 898.) Thereafter, they were

21 sold pursuant to a prospectus supplement dated September 27, 2005. (Id.) Plaintiffs New

22 York City Pension Funds allegedly purchased these notes on September 27, 2005 and

23 March 21, 2006. (Compl. Ex. B at 23, 30, 39, 44, 49 ("Security Number" 222372AH7).)

24 Plaintiffs sold them on July 3, 2006. (Id.) Plaintiffs allege that the registration statement

25 and prospectuses were misleading because they incorporated by reference Countrywide's

26 fiscal years 2003 and 2004 Form 10-Ks and consolidated financial data, which Plaintiffs

27 allege were misleading. (Compl. ¶¶ 629-642, 903.)

28       Count VII arises from an offering of "**Series B Medium-Term Notes**." (Compl.

¶ 1163.)  The Series B Medium-Term Notes were offered and sold pursuant to a shelf registration statement on Form S-3ASR and prospectus dated February 9, 2006.  (Compl. ¶ 905.)  Thereafter, different Series B Medium-Term Notes were sold pursuant to different pricing supplements, with, among other things, different prices, coupons, and maturity dates.  (Compl. ¶ 905.)  Plaintiffs New York City Pension Funds purchased two types of Series B Medium-Term Notes on June 4, 2007.  (Compl. Ex. B at 24, 31, 39 ("Security Number" 22238HGQ7); Compl. Ex. B at 24, 31, 39, 44, 50 ("Security Number" 2238HGR5).)  Plaintiffs allege that the registration statement and prospectuses were misleading because they incorporated by reference Countrywide's fiscal year 2004 Form 10-K, first, second and third quarter 2005 Form 10-Qs, Form 8-Ks dated September 30, 2005 and October 27, 2005, and consolidated financial data, which Plaintiffs allege were misleading.  (Compl. ¶¶ 629-642, 658-668, 696-706, 710-712, 717-727, 910.)

Count X arises from an offering of 6.25% Subordinated Notes Due May 15, 2016 ("**6.25% Notes**").  (Compl. ¶ 1204.)  The 6.25% Notes were offered and sold pursuant to the same Form S-3ASR and prospectus as the Series B Medium-Term Notes, and a prospectus supplement dated May 11, 2006.  (Compl. ¶ 912.)  Plaintiffs New York City Pension Funds allegedly purchased these notes on the same day.  (Compl. Ex. B at 23-24, 30, 39, 49 ("Security Number" 222372AJ3).)  They sold them all by July 16, 2007.  (Id.)  Plaintiffs allege that the registration statement and prospectuses were misleading because they incorporated by reference Countrywide's fiscal year 2004 Form 10-K, first, second and third quarter 2005 Form 10-Qs, Form 8-Ks dated September 30, 2005 and October 27, 2005, and consolidated financial data, which Plaintiffs allege were misleading.  (Compl. ¶¶ 629-642, 658-668, 696-706, 710-12, 717-727, 917.)

Count XIII arises from a public offering of "**7% Capital Securities**."  (Compl. ¶ 1245.)  Those securities were offered and sold pursuant to a Post-Effective Amendment, dated October 27, 2006, to the registration statement on Form S-3 dated February 9, 2006.  (Compl. ¶ 919.)  Plaintiff Barry Brahn allegedly purchased these securities on January 22, 2007 (Compl. Ex. C), and Shelley Katzeff allegedly purchased

these securities on November 1, 2006.  (Compl. Ex. D.)  Plaintiffs allege that the registration statements were misleading because they incorporated by reference Countrywide's fiscal year 2005 Form 10-K, as well as its first, second, and third quarter 2006 Form 10-Qs, a Form 8-K, and consolidated financial data, which Plaintiffs allege were misleading.  (Compl. ¶¶ 735-748, 765-776, 819-831, 920, 924.)

### III.   THIS COURT SHOULD DISMISS COUNTS I, IV, VII, X, AND XIII ASSERTED UNDER SECTION 11 BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM

#### A.   The Court Should Dismiss Plaintiffs' Section 11 Claims Because Plaintiffs Have Failed to Plead Loss Under Section 11(e)

Section 11 of the Securities Act, 77 U.S.C. § 77k, provides that "a person who acquires a security may sue when a registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein necessary to make the statements not misleading.'"  In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1203 (9th Cir. 2002) (quoting 15 U.S.C. § 77k).  Section 11(e), which sets out the measure of damages under § 11, allows a person to sue for "**losses caused by the misstatement or omission**."  Id. (citation omitted) (emphasis added).  It is firmly established that absent a cognizable loss as defined under § 11(e), there can be no recovery under § 11.  See id. at 1204; see also Pierce v. Morris, Civil Action No. 4:03-CV-026-Y, 2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006) ("Where a plaintiff fails to allege any conceivable damages for violation of the Securities Act, his claims must be dismissed.")  Here, for each of the securities Plaintiffs allegedly purchased pursuant to the Registration Statements, Plaintiffs have failed to plead the required loss.

#### 1.   2011 Notes (Count IV)

To begin with, the Complaint conclusively forecloses Plaintiffs' showing loss with regard to the 2011 Notes.  (See Compl. ¶¶ 897-903.)  In In re McKesson HBOC, Inc. Securities Litigation, the court dismissed a § 11 claim for failure to show loss when there was "no allegation in the complaint that any corrective disclosures reached the market prior" to the plaintiff's sale of the securities.  McKesson, 126 F. Supp. 2d at 1262.  Thus, as in McKesson, when a plaintiff sells a security prior to any corrective disclosure that

1  decreases the value of the security, such plaintiff could not have been injured by a decline

2  in value because the disclosure was not made until <u>after</u> the plaintiff had sold the security.

3  <u>See id.</u>  It is for this reason that the <u>McKesson</u> court found that the complaint in that case

4  revealed "that the Section 11 defendants have an absolute 'negative causation' defense

5  pursuant to Section 11(e) for any HBOC shareholders who disposed of their shares prior

6  to the corrective disclosure."  <u>Id.</u>; <u>see also</u> <u>DavidCo Investors, LLC v. Anchor Glass</u>

7  <u>Container Corp.</u>, No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *25 (M.D. Fla. Mar. 6,

8  2006) (dismissing claim and concluding, "[plaintiffs] sold all of their stock prior to this

9  corrective disclosure.  As such, Defendants have met their burden or proving negative

10  causation based on the allegations in the complaint.").

11        As Exhibit B to the Complaint decisively demonstrates, Plaintiffs sold all of their

12  2011 Notes by July 3, 2006.  (Compl. Ex. B at 23, 30, 39, 44, 49 ("Security Number"

13  222372AH7 (reflecting equal quantity of notes purchased as sold)).)[1]  However, the first

14  corrective disclosure alleged in the Complaint – which Plaintiffs explicitly allege was the

15  first indication of any alleged misstatement by the Company – did not occur until July 24,

16  2007, more than a year after Plaintiffs sold their 2011 Notes.  (Compl. ¶¶ 934, 936

17  (alleging that July 24, 2007 press release "surprised the market"); ¶¶ 937, 938 (alleging

18  that July 24, 2007 release included "revelations"); ¶ 939 (alleging that July 24, 2007

19  conference call made disclosures "for the first time" regarding Countrywide's loan

20  classifications).)  Because Plaintiffs sold their 2011 Notes prior to the first alleged

21  corrective disclosure, like the plaintiffs in <u>McKesson</u> and <u>DavidCo</u>, by definition they

22  suffered no loss caused by any correction of the purported misrepresentation.[2]

23  ─────────────────
[1]  Exhibit B constitutes Plaintiffs' sworn certifications pursuant to Section 27 of the
24  Securities Act, 15 U.S.C. § 77z-1.  (<u>See</u> Compl. ¶ 21.)  "[I]t is clear that in evaluating
     whether a plaintiff has stated a claim for which he could be entitled to relief, a court must
25  review the damages alleged by looking to plaintiff's § 27 certification."  <u>Pierce</u>, 2006 WL
     2370343, at *4 n.11 (citing cases).  Although not explained in the Complaint, the
26  "Security Number" provided in Exhibit B evidently refers to the CUSIP number of the
     security.  The Former Directors used the CUSIP numbers to match the securities listed in
27  Exhibit B to the registration statements at issue through publicly-accessible websites that
     provide securities and financial information.
28  [2]  <u>See also</u> <u>In re Alamosa Holdings, Inc. Sec. Litig.</u>, 382 F. Supp. 2d 832, 865-66 (N.D.
     Tex. 2005) (because plaintiffs alleged that stock declined in response to particular

(cont'd)

1       Furthermore, it is plain that Plaintiffs cannot recover under § 11 if they sell their

2   securities for a profit.  See Broderbund, 294 F.3d at 1204 (dismissing § 11 claims when

3   plaintiff sold at a profit); McKesson, 126 F. Supp. at 1262 ("Shareholders who sell their

4   stock at a price higher than their purchase price are entitled to no relief under Section 11,

5   because all measures of damages under Section 11 are limited to differences in trading

6   price").  A review of Exhibit B, however, seems to indicate that Plaintiffs did just that.

7   With regard to each of the New York Funds, Exhibit B shows that the "principal" the

8   funds received upon sale was greater than the amount they invested upon purchase.[3]

9   Because Plaintiffs received greater "principal" than they paid, they sold at a profit.  This

10  also forecloses any claim under § 11.  See Broderbund, 294 F.3d at 1204.

## 2.  6.25% Notes (Count X)

12      Plaintiffs' claim based on the 6.25% Notes fails for precisely the same reason as

13  the claim based on the 2011 Notes.  (Compl. ¶¶ 911-917.)  Exhibit B reflects that

14  Plaintiffs sold all their 6.25% Notes by July 19, 2007.  (Compl. Ex. B at 23-24, 30, 39, 49

15  ("Security Number" 222372AJ3 (reflecting equal quantity of purchases as sales)).)  Again,

16  however, the first corrective disclosure alleged in the Complaint was made on July 24,

17  2007, five days after Plaintiffs disposed of all their 6.25% Notes.  Thus, because

18  Plaintiffs sold the 6.25% Notes, just like the 2011 Notes, before any alleged corrective

19  disclosures reached the market, Plaintiffs could not have suffered loss from the correction

20  _____

*(cont'd from previous page)*
disclosure, court concluded that "Plaintiffs' own pleadings demonstrate that any loss
experienced by Plaintiffs could not be attributable to an alleged misrepresentation or

21  omission from the Registration Statement"); cf. Dura Pharmaceuticals v. Broudo, 544
U.S. 336, 343 (2005) ("if . . . the purchaser sells the shares quickly before the relevant

22  truth begins to leak out, the misrepresentation will not have led to any loss").

23  [3] The total "principal" the NYC Retirement System paid for the 2011 Notes was
$19,984,950, while the total "principal" they received in return was $20,000,000.00.

24  (Compl. Ex. B at 23.)  The total "principal" the NYC Police Department Pension Fund
paid for the 2011 Notes was $1,998,060.00, but the total "principal" upon sale was

25  $2,000,000.00 (Compl. Ex. B at 30.)  Likewise, the total "principal" the NYC Fire
Department Pension Fund paid for the 2011 Notes was $4,995,150.00, while the

26  "principal" upon sale was $5,000,000.00.  (Compl. Ex. B at 39.)  Similarly, the total
"principal" that NYC Board of Education paid for the 2011 Notes was $2,497,575.00, but

27  the total "principal" upon sale was $2,500,000.00.  (Compl. Ex. B at 44.)  Finally, the
total "principal" paid by the NYC Teachers' Retirement System was $17,487,375, but the

28  total "principal" received was $17,500,000.  (Compl. Ex. B at 49.)

1  of any misstatements.  Plaintiffs' claim therefore conclusively fails under § 11(e).  <u>See</u>,
2  <u>e.g.</u>, <u>McKesson</u>, 126 F. Supp. 2d at 1262.

### 3.    Series A Medium-Term Notes (Count I)

4        Plaintiffs' allegations about the Series A Medium-Term Notes are equally lacking.
5  (Compl. ¶¶ 887-903.)  In determining loss under § 11(e), "damages must be 'measured by
6  the difference between the amount paid for the security and its price at either the time it
7  was sold or the date the Section 11 claim was filed.'"  <u>Broderbund</u>, 294 F.3d at 1204
8  (quoting <u>Miller v. Pezzani</u>, 35 F.3d 1407, 1421 (9th Cir. 1994)).  Given this specific and
9  exclusive measure of damages, "it is not enough to merely plead injuries, the plaintiffs
10  must plead a certain kind of injury."  <u>See</u> <u>Metz</u>, 61 F. Supp. 2d at 378; <u>see also</u> <u>In re</u>
11  <u>Mutual Funds Investment Litig.</u>, 384 F. Supp. 2d 845, 866 (D. Md. 2005) ("Because the
12  existence of recoverable damages is an element of a Section 11 claim, **a plaintiff must**
13  **plead facts** demonstrating that he suffered the particular type of injury contemplated by
14  the statute.") (emphasis added).[4]  Here, Plaintiffs have failed to plead that they suffered
15  damages of the sort allowed under § 11(e).

16        The Series A Medium-Term Notes identified in Exhibit B to the Complaint as
17  "Security Number 22238HAG5" were purchased pursuant to a June 8, 2005 pricing
18  supplement that offered Series A Medium-Term fixed-rate notes at a price of 99.805%,
19  an interest rate of 4.5%, and a maturity date of June 15, 2010 ("**2010 4.5% Notes**").  (<u>See</u>
20  Compl. Ex. B at 24, 31, 39, 50 ("Security Number" 22238HAG5); RJN Ex. 2 (June 8,
21  2005 pricing supplement).)  Because, according to Exhibit B, Plaintiffs have not sold the
22  2010 4.5% Notes, Plaintiffs cannot demonstrate damages based on the difference
23  between the amount they paid and the "'price at . . . the time it was sold.'"  <u>Broderbund</u>,
24

---

25  [4] <u>See also</u> <u>In re Van Wagoner Funds, Inc. Sec. Litig.</u>, 382 F. Supp. 2d 1173, 1183 (N.D.
   Cal. 2004) (dismissing § 11 claim because "[f]or loss causation to be properly pled, a
26  plaintiff must plead that the misrepresentation touches upon the reason for the
   investments['] decline in value.  Here the Court finds there is no decline in value and thus
27  no loss causation pled"); <u>Madison P'ship Liquidity Investors 31, LLC v. USAA</u>
   <u>Properties III, Inc.</u>, No. Civ.SA-98-CA-324-EP, 1999 WL 33292714, at *2 (W.D. Tex.
28  July 16, 1999) (dismissing § 11 claim because plaintiffs did not suffer any damages as
   defined by § 11(e)).

1  294 F.3d at 1204 (citation omitted).  Therefore, they may **only** state a claim by alleging

2  that the value of the securities **at the time suit was filed** was lower than the price they

3  paid.  See Pierce, 2006 WL 2370343, at *3 (dismissing claim because value of securities

4  on day complaint was filed was higher than price plaintiff paid); see also Mutual Funds,

5  384 F. Supp. 2d at 867 (finding it "fatal" to plaintiffs' claim that they "have not alleged

6  facts demonstrating that they (or the other members of the putative class) have sold their

7  shares (or could have sold their shares at the time suit was filed) for an amount less than

8  they paid for the shares").  Plaintiffs, however, have not alleged that the value of their

9  2010 4.5% Notes when they filed suit was less than what they paid.  Absent such

10  allegations, Plaintiffs have not pleaded that they suffered recoverable loss under § 11.

11     Rather than plead damages, Plaintiffs merely allege that Countrywide's securities

12  "experienced material and statistically significant drops in their trading prices."  (Compl.

13  ¶¶ 944, 975, 996, 1009, 1033, 1039, 1058.)  To support this conclusion, Plaintiffs allege

14  drops in the prices of "3-Year Floating Rate Notes Due 2008" ("3-Year Notes") (Compl.

15  ¶¶ 975, 1039), "2-Year Floating Rate Notes Due December 2007" ("2-Year Notes")

16  (Compl. ¶ 975), and "6% Notes due November 2035" ("6% Notes").  (Compl. ¶¶ 975,

17  1033, 1039.)  However, while each of these three securities are in fact Series A Medium-

18  Term Notes (Compl. ¶¶ 892, 894; RJN Ex. 3 (pricing supplement dated November 10,

19  2005)) and issued pursuant to the same registration statement as the 2010 4.5% Notes, the

20  three securities on which Plaintiffs rely to show loss are completely different securities

21  from the 2010 4.5% Notes that Plaintiffs actually purchased, and therefore have no

22  bearing on any loss concerning the 2010 4.5% Notes.

23     Specifically, the 2-Year Notes were issued pursuant to a prospectus and pricing

24  supplement dated December 14, 2005.  (Compl. ¶ 892.)  The CUSIP number for the

25  floating rate 2-Year Notes was 22238HAV2; the offering price was 100% with an initial

26  interest rate of 4.666888%; and the maturity date was December 19, 2007.  (RJN Ex. 4

27  (pricing supplement No. 20 dated December 14, 2005).)  The 3-Year Notes were also

28  issued pursuant to a prospectus and pricing supplement dated December 14, 2005.

9

1  (Compl. ¶ 894.)  The CUSIP number for the floating rate 3-Year Notes was 22238HAW0,

2  and the notes were offered at a 100% purchase price, an initial interest rate of 4.76688%,

3  and a maturity date of December 19, 2008.  (RJN Ex. 5 (pricing supplement No. 21 dated

4  December 14, 2005).)  The 6% Notes were issued pursuant to a pricing supplement dated

5  November 10, 2005, with an issue price of 95.996276%, a fixed interest rate of 6%, and a

6  maturity date of November 14, 2035.  (RJN Ex. 3 (pricing supplement No. 16 dated

7  November 10, 2005).)

8       As is evident, these securities have entirely different terms from the 2010 4.5%

9  Notes that Plaintiffs actually bought.  Even if they are all "Series A Medium-Term

10 Notes" (Compl. ¶ 888), they are nevertheless entirely different securities.[5]  Therefore,

11 even if the trading price of the 2-Year Notes, 3-Year Notes, and 6% Notes did decline, it

12 does not mean that the price of the 2010 4.5% Notes also declined.  The trading price of

13 2-Year Notes, 3-Year Notes and 6% Notes due 2035 is thus irrelevant to Plaintiffs'

14 obligation to plead that they suffered damages under § 11(e).

15      In addition, even if the value of the 3-Year Notes, 2-Year Notes and 6% Notes

16 were somehow relevant to Plaintiffs' claim (and it is not), Plaintiffs' allegations are

17 insufficient to establish the requisite loss in any event.  At most, Plaintiffs allege that the

18 trading price of the notes declined by a certain percentage.  (Compl. ¶¶ 975, 996, 1033,

19 1039.)  That the trading price of the notes declined on certain dates in the class period,

20 however, does not ipso facto mean that their value the day Plaintiffs filed suit was less

21 than the price Plaintiffs paid.  For example, the securities could have risen in value after

22 the offering and then declined by the percentage Plaintiffs claim, but still have traded, at

23 the time the lawsuit was filed, above Plaintiffs' purchase price.  Likewise, the price of the

24 notes could have risen again between the dates of the alleged declines in the Complaint

25

26 _____

   [5] See, e.g., SEC Release No. 6862, Release No. 27928, Release No. 33-6862, Release No.
27 34-27928, Release No. IC-17452, Release No. IS -121, 46 S.E.C. Docket 26, 1990 WL
   311657, at *5 (Apr. 23, 1990) (explaining that "Debt securities will be deemed to be of
28 the same class if their terms relating to interest rate, maturity, subordination, security,
   convertibility, call, redemption and similar material matters are substantially identical").

1  and Plaintiffs' filing suit.[6]  Accordingly, absent express allegations that the value of the

2  2010 4.5% Notes at the time the lawsuit was filed was less than the value of the notes at

3  the time of purchase, Plaintiffs have failed to plead injury under § 11(e).

4      Plaintiffs' only remaining attempt to allege loss based on the Series A Medium-

5  Term Notes is to claim that they purchased Series A Medium-Term Notes "and were

6  damaged thereby."  (Compl. ¶ 1096; see also ¶ 1059 (conclusory allegations of price

7  decline).)  This general allegation, however, is insufficient to demonstrate loss under

8  § 11(e).  See Metz, 61 F. Supp. 2d at 378 (general allegation that plaintiffs suffered

9  damages insufficient to state a claim).  The Complaint contains **no allegations at all** that

10 the 2010 4.5% Notes have lost any value, let alone that their value was lower than their

11 purchase price on the day the Complaint was filed.  (See Compl. ¶¶ 934-1070 (describing

12 trading prices of Countrywide stock and securities, not including 2010 4.5% Notes).)

13 Accordingly, the Court should dismiss this claim.  See In re Salomon Smith Barney

14 Mutual Fund Fees Litig., 441 F. Supp. 2d 579, 591 (S.D.N.Y. 2006) (dismissing claim

15 under § 11 when plaintiffs "have not alleged even that they in fact lost money on their

16 purchase of mutual fund stock").[7]

17          **4.    Series B Medium-Term Notes (Count VII)**

18      Plaintiffs have also failed to allege the requisite loss arising from their purchase of

19 the Series B Medium-Term Notes.  (Compl. ¶¶ 904-910.)  Like the Series A Medium-

20 Term Notes, Plaintiffs continue to hold Series B Medium-Term Notes.  As Exhibit B to

21 the Complaint demonstrates, Plaintiffs purchased Series B Medium-Term notes pursuant

22

23 [6] Given that the 2-Year Notes reached maturity on December 19, 2007, months before the
   Complaint was filed, it is difficult to imagine how Plaintiffs could possibly demonstrate
24 loss in connection with these notes.

   [7] Plaintiffs' claims regarding the 6.25% Notes and 2011 Notes suffer from similar defects.
25 As regards the 6.25% Notes, Plaintiffs plead certain, isolated declines in market price, but
   fail to describe the value of the notes at the time they filed suit.  (See Compl. ¶¶ 975,
26 1033, 1039 (alleging only percent decline on certain dates).)  As regards the 2011 Notes,
   Plaintiffs make no allegation at all that the notes have declined in value.  (See Compl. ¶¶
27 934-1070 (describing trading price of Countrywide stock and securities, not including
   2011 Notes).  Therefore, even if the Court rejects the argument that Plaintiffs' early sale
28 of those notes precludes their claim, Plaintiffs have nevertheless failed to demonstrate
   any loss.

1  to a pricing supplement dated June 4, 2007.  (Compl. Ex. B at 24, 31, 39 ("Security

2  Number" 22238HGQ7).)  Those notes were issued at an offering price of 99.807%, with

3  a fixed interest rate of 5.8%, and a maturity date of June 7, 2012 ("2012 5.8% Notes").

4  (RJN Ex. 8 (pricing supplement No. 134 dated June 4, 2007).)  Plaintiffs also purchased

5  additional Series B Medium-Term Notes pursuant to a separate pricing supplement also

6  dated June 4, 2007.  (Compl. Ex. B at 24, 31, 39, 44, 50 ("Security Number"

7  2238HGR5).)  Those notes were issued at an offering price of 100%, with a floating rate

8  of 3-month LIBOR plus 0.44%, and a maturity date of May 7, 2012 ("5-Year Notes")

9  (RJN Ex. 9 (pricing supplement No. 135 dated June 4, 2007).)  Plaintiffs fail to allege

10  loss arising from these Notes.

11      Once again, Plaintiffs' allegations that Countrywide's securities "experienced

12  material and statistically significant drops in their trading prices" is insufficient to show

13  Plaintiffs' loss.  (Compl. ¶¶ 944, 975, 996, 1009, 1033, 1039, 1058.)  Plaintiffs again only

14  plead declines in the trading price of **different** Series B Medium-Term Notes from what

15  Plaintiffs purchased.  (Compl. ¶¶ 996, 1033.)  Specifically, Plaintiffs allege that the

16  trading price of the 6.3% Notes due April 2036 declined.  (Id.)  These notes were issued

17  pursuant to a pricing supplement dated April 24, 2006.  (RJN Ex. 7 (pricing supplement

18  No. 7 dated April 24, 2006).)  They were issued at an offering price of 100%, with a fixed

19  rate of 6.3%, and a maturity date of April 28, 2036.  (Id.)  The 6.3% Notes due April

20  2036 thus plainly have different terms from the 2012 5.8% Notes and the 5-Year Notes

21  that Plaintiffs allegedly purchased.  Plaintiffs provide no basis for the Court to conclude

22  that a decline in the price of the 6.3% Notes due April 2036 indicates a decline in the

23  price of the 5.8% Notes and the 5-Year Notes.[8]

24      As for the notes they actually purchased, Plaintiffs have failed to allege any decline

25  ───────────────────────

[8] Even if the Court concluded that the securities are the same (and it should not),

26  Plaintiffs have failed to allege facts demonstrating that the value of the notes when they
    filed suit was less than the price they paid.  As with the Series A Medium-Term Notes,

27  Plaintiffs have merely pleaded a decline in purchase price by a certain percentage on
    certain isolated days.  (Compl. ¶¶ 996, 1033.)  This, however, as explained above, is

28  insufficient to show that the value was lower on the day Plaintiffs filed suit than the price
    they paid.  (See supra Part III.A.3.)

1  in the value.  No allegations in the Complaint describe the value of 5.8% Notes and 5-

2  Year Notes at the time Plaintiffs filed suit, let alone that the value was less than

3  Plaintiffs' purchase price.  Plaintiffs have thus failed to allege the required loss.  See

4  Metz, 61 F. Supp. 2d at 378 (general allegation that plaintiffs suffered damages

5  insufficient); Salomon Smith Barney, 441 F. Supp. 2d at 591 (dismissing claim under §

6  11 when plaintiffs "have not alleged even that they in fact lost money on their purchase

7  of mutual fund stock").

8              **5.    7% Capital Securities (Count XIII)**

9         Plaintiffs' claim based on the 7% Capital Securities suffers from the same defect.

10  Plaintiffs fail to identify or describe the value of the securities at the time they filed suit

11  or otherwise allege that the value was less than what they paid.  Instead, Plaintiffs attempt

12  to show loss merely by alleging a percentage decline in market price following certain

13  disclosures on isolated days.  (Compl. ¶¶ 944, 996, 975, 1009, 1033, 1039, 1058.)  This is

14  insufficient.  As explained, supra, Parts III.A.3 and III.A.4, Plaintiffs fail to allege that the

15  declines in market price by certain percentages rendered the value of the security on the

16  day they filed suit less than what they paid.  Plaintiffs fail to allege that the prices did not

17  recover after their declines, or that the declines were greater than the amount of

18  appreciation the securities had previously enjoyed.  Plaintiffs have therefore failed to

19  state a claim for this security as well.  See Mutual Funds, 384 F. Supp. 2d at 867.

20  **B.    Plaintiffs Have Failed To Allege False or Misleading Statements With**
       **The Requisite Particularity**
21

22              **1.    Plaintiffs' Claims Sound In Fraud, And As Such, Must Be**
                    **Pleaded With Particularity**

23         Even if this Court concludes that Plaintiffs have properly established loss (and it

24  should not), the Court should nevertheless dismiss Plaintiffs' claims for failure to plead

25  with particularity.

26         In cases where fraud is not a necessary element of a claim, but a plaintiff
           chooses to allege a unified course of fraudulent conduct and rely entirely
27         on that course of conduct as the basis of the claim, the claim is said to be
           "grounded in fraud" or to "sound in fraud," and the pleading of that
28         claim as a whole must satisfy the particularity requirement of Rule 9(b).

1  In re Seracare Life Scis., Inc., No. 05-CV-2335-H (CAB), 2007 WL 935583, at *11 (S.D.

2  Cal. Mar. 19, 2007) (citing Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103 (9th Cir.

3  2003)).  Accordingly, even though fraud is not an element of a § 11 claim, when a § 11

4  claim nevertheless "sound[s] in fraud," a plaintiff must plead it with particularity.  See

5  Stac Elecs., 89 F.3d at 1404-05.

6         Courts in the Ninth Circuit have concluded that where a plaintiff uses the same

7  facts to support both an Exchange Act claim and a Securities Act claim, the complaint

8  sounds in fraud.  See, e.g., In re Infonet Servs. Corp. Sec. Litig., 310 F. Supp. 2d 1080,

9  1094 (C.D. Cal. 2003); Rubke v. Capitol Bancorp Ltd., 460 F. Supp. 2d 1124, 1145 (N.D.

10 Cal. 2006).  In Central Laborers Pension Fund v. Merix Corp., No. CV04-826-MO, 2005

11 WL 2244072 (D. Or. Sept. 15, 2005), for example, the court concluded that a § 11 claim

12 sounded in fraud when "[t]he substance of the alleged misrepresentations and omissions

13 that form the basis of Plaintiff's Securities Act claims is virtually identical to that of the

14 statements underlying its Exchange Act claims." Id. at *6.[9]

15        In the present case, Plaintiffs' Complaint alleges the same "unified course of

16 conduct" to support both their Exchange Act and § 11 claims.[10]  This alone is sufficient to

17 conclude that Plaintiffs' § 11 claims sound in fraud.[11]  Moreover, Plaintiffs' § 11 claims

18 [9] See also In re Lantronix, Inc. Sec. Litig., No. CV02-03899PA(JTLX), 2003 WL
19 23198818, at *8 (C.D. Cal. Dec. 31, 2003) ("The basis for all of the claims in the
   Complaint is that Defendants made material misstatements concerning Lantronix's
20 finances throughout the class period in order to inflate the offering price of the IPO . . .
   and the stock price . . . . Put simply, the allegations in the Complaint describe a 'unified
21 course of fraudulent conduct' and Rule 9(b) applies.")

   [10] For example, Plaintiffs' introductory paragraphs, which outline their entire theory of
22 liability for both sets of claims, characterize Plaintiffs' claims as arising from "one of the
   largest corporate frauds in recent years." (Compl. ¶ 2; see also id. ¶ 13 (allegations
23 concerning "Countrywide's fraud").)  See In re White Elec. Designs Corp. Sec. Litig.,
   416 F. Supp. 2d 754, 778 (D. Ariz. 2006) (complaint sounds in fraud when "first sentence
24 of the complaint said that the action was brought" based on a "fraudulent scheme")
   (citation omitted).  The Complaint then goes on for more than one thousand paragraphs
25 describing the nature of this alleged "fraud," while repeatedly referring to said fraud as
   "**Defendants'** misconduct" (Compl. ¶¶ 84, 376, 379, 385.)

26 [11] See Gemstar-TV Guide, 2003 U.S. Dist. LEXIS 25884, at *28 (claim sounds in fraud
   when "the gravamen of the Complaint" is that Defendants have "'deliberately . . .
27 withheld unfavorable information'"); In re Anchor Gaming Sec. Litig., 33 F. Supp. 2d
   889, 893 (D. Nev. 1999) ("the Complaint is rife with insinuations . . . that defendants
28 purposefully omitted and misstated material information . . . . These allegations of
   purposeful concealment and intentional misconduct amount, if true, amount to fraud").

                                          14

are based on the same allegedly misleading statements as their Exchange Act claims (Compl. ¶¶ 896, 903, 910, 917, 924), which they repeatedly refer to as "fraudulent misrepresentations." (Compl. ¶¶ 628, 695, 716, 734, 818, 839, 873, 982, 1001.)  See Rombach v. Chang, 355 F.3d 164, 171-72 (2d Cir. 2004) (noting use of language "classically associated with fraud" and highlighting allegations that statements were "'inaccurate *and* misleading,'" "'*untrue*,'" and "'materially *false* and *misleading*'" as allegations of fraud).  Plaintiffs' characterization of the purported misstatements in the Registration Statements as "fraudulent" as opposed to merely "inaccurate" plainly points to the conclusion that the Complaint sounds in fraud.  See id.

Plaintiffs also incorporate by reference the entirety of the fraud allegations into their § 11 claims (Compl. ¶¶ 1081, 1120, 1161, 1202, 1243), which courts consistently conclude demonstrates that a § 11 claim sounds in fraud.  See Infonet, 310 F. Supp. 2d at 1094 ("Plaintiffs' assertion that their Securities Action claims are based only on negligence or strict liability 'is untenable in light of the complaint's wholesale adoption of the allegations under the [Securities Exchange Act] fraud claims for purposes of the Securities Act claims.'").[12]

That Plaintiffs disclaim an intent to plead fraud has no legal effect.  (See, e.g., Compl. ¶ 1081, 1120, 1161, 1202, 1243.)  Courts consistently reject such disclaimers when the "gravamen of the complaint is plainly fraud."  Stac Elecs., 89 F.3d at 1405 n.2 (noting with regard to disclaimer of fraud, "[t]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus").[13]

---

[12] See also Rubke, 460 F. Supp. 2d at 1145 (same); White Elec. Designs, 416 F. Supp. 2d at 778 (complaint sounds in fraud where "[e]ach 1933 Act claim 'repeats and realleges each and every allegation' [of fraud].")

[13] See, e.g., Gemstar-TV Guide, 2003 U.S. Dist. LEXIS 25884, at *29 ("This requirement cannot be avoided by plaintiffs who merely recite that there are no allegations of fraud in the Section 11 claims"); Brody v. Homestore, Inc., No. CV02-08068 FMC (JWJx), 2003 WL 22127108, at *4 (C.D. Cal. Aug. 8, 2003) (concluding that § 11 claims sound in fraud despite plaintiffs' express disavowal of fraud claims).  Similarly ,it makes no difference that Plaintiffs allege that Mr. Dougherty and Ms. Brown "did not make a reasonable and diligent investigation."  (See, e.g., Compl. ¶ 1092.)  Such boilerplate allegations of negligence are insufficient when a complaint plainly sounds in fraud.  See
*(cont'd)*

## 2. **Plaintiffs Have Failed To Plead With Particularity That The Registration Statements Were False Or Misleading**

Here, despite the Complaint's unparalleled length, Plaintiffs have failed to plead misstatements with the requisite particularity.[14]  Thus, Plaintiffs' novel manages to violate not only Rule 9(b), but also the requirement of Rule 8(a)(2) that Plaintiffs make a "short plain statement" showing their entitlement to relief.[15]  Specifically, Plaintiffs allege that the Form 10-Ks, 10-Qs and financial data incorporated into the Registration Statements were misleading because they, inter alia, (1) misreported revenues and earnings per share because "the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated" (Compl. ¶¶ 562, 583, 601, 620, 642, 668, 706, 727, 748, 776, 799, 831); and (2) misreported loan loss reserves, retained interests, MSRs and liabilities related to misrepresentations and warranties.  (Id.)  To the extent Plaintiffs allege falsity of the Registration Statements based on these purported GAAP violations, Plaintiffs' allegations fail.

### (a) **Plaintiffs' Allegations Concerning The Company's Allowance For Loan Losses Are Insufficient**

Plaintiffs have failed to plead sufficiently that the Company's allowance for loan

---

*(cont'd from previous page)*
In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1104 (D. Nev. 1998) (holding that disclaimer of fraud-based liability was insufficient even where plaintiffs alleged that "Defendants in some instances failed to use due diligence" or 'should have known' statements were inaccurate").

[14] As one court recently observed, "One might be tempted to think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific.  The temptation is dangerous and must be resisted."  In re 2007 Novastar Financial Inc., Sec. Litig., Case No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *7 (W.D. Mo. June 4, 2008).

[15] Under Rule 9(b), to plead with "particularity," a plaintiff must allege, at a minimum, the time, place, and content of the misstatements as well as the "circumstances indicating falseness." In re GlenFed, Inc., Sec. Litig. 42 F.3d 1541, 1547-48 (9th Cir. 1994) (en banc) superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1309 (C.D. Cal. 1996).  To plead the "circumstances indicating falseness," a plaintiff "must set forth an explanation as to why the statement or omission complained of was false or misleading."  Id. at 1548; see also id. at 1549-53; Yourish v. Cal. Amplifier, 191 F.3d 983, 994 (9th Cir. 1999) (holding that broad ranging allegations that do not allege specific facts to support them do not meet the standards of Rule 9(b)) (citing GlenFed, 42 F.3d at 1547).

1    losses was understated in violation of GAAP.  (Compl. ¶¶ 267-301.)  To plead a violation

2    of GAAP with sufficient particularity, a plaintiff "'must show with particularity how the

3    [improper accounting] adjustments affected the company's financial statements and

4    whether they were material in light of the company's overall financial position.'"  In re

5    Countrywide Fin. Corp. Derivative Litig., Lead Case No. CV-07-06923-MRP (MANx),

6    2008 WL 2064977, at *20 (C.D. Cal. May 14, 2008) (Pfaelzer, J.) (quoting In re Daou

7    Sys. Inc., 411 F.3d 1006, 1018 (9th Cir. 2005)).  As this Court has previously noted, to

8    demonstrate that loan loss reserves violated GAAP, a plaintiff must plead that "the losses

9    were 'probable' at the time of reporting, [and] that the magnitude of the loss could

10   reasonably be estimated."  Countrywide, 2008 WL 2064977, at *21 n.31.[16]  Plaintiffs'

11   allegations fall far short of this burden.

12       First, this Court should reject the contention that Countrywide's loan loss reserves

13   were insufficient.  (Compl. ¶¶ 278-283.)  In the derivative action related to this case, the

14   plaintiffs also alleged that "loan loss reserves, as a percentage of loans held for

15   investment, decreased by more than half from 2002 to 2003 and remained at this level

16   until 2007 even though Countrywide added riskier loans to its portfolio during this time."

17   Countrywide, 2008 WL 2064977, at *20.  The Court rejected this argument.  "[T]he

18   setting of loan loss reserves involves a great deal of discretion."  Id. at *21 (citing In re

19   Aegon N.V. Sec. Litig., No. 03 Civ. 0603, 2004 WL 1415973, at *17 (S.D.N.Y. June 23,

20   2004)).  Further, "even if Countrywide's reserves were on the low side of normal during

21   the 2003-2006 period, they were not sufficiently troublesome as to raise problems with

22   the Company's independent auditors."  Id. at *21.  Based on these facts, the Court

23   concluded that "Plaintiffs have not adequately pled particularized facts that show that the

24   loan loss levels were, in fact, so low that they were false and misleading."  Id. at *21.

25   Here, Plaintiffs rely on essentially the same data as the plaintiffs in the derivative action.

26

27   _____

     [16] (See also Compl. ¶ 268 (quoting Statement of Financial Accounting Standards No. 5,
     which requires that estimated losses for loss contingencies be accrued when information

28   indicates that it is "probable than an asset had been impaired or a liability had been
     incurred" and that the "amount of loss can be reasonably estimated").)

1  (Compl. ¶¶ 280, 281.)  Their allegations, too, are therefore deficient.[17]

2      Second, Plaintiffs allege that the "insufficiency of Countrywide's loan loss

3  reserves are reflected in the belated spike in the Company's provisions for loan losses."

4  (Compl. ¶ 285.)  Again, however, this Court rejected this very argument in the related

5  derivative action, based on precisely the same facts.  The Court reasoned that a

6  "substantial increase in loan loss reserves due to market conditions is not evidence that

7  the reserves stated in earlier statements were inadequate."  Countrywide, 2008 WL

8  2064977, at *21 n.28 (citing Lindner Dividend Fund, Inc. v. Ernst & Young, 880 F. Supp.

9  49, 58 (D. Mass. 1995)).[18]  This Court should reach the same conclusion here.

10      Third, Plaintiffs allege that the increase in negative amortization on Countrywide's

11  balance sheets should have led to an increase in reserves.  (Compl. ¶¶ 289-293.)  This is

12  not so.  Plaintiffs have not explained why an increase in negative amortization necessarily

13  calls for an increase in reserves under GAAP.  Implicit in Plaintiffs' contention is the

14  premise that, should a borrower of a PayOption ARM make only the minimum payment,

15  it becomes "probable" that the loan will be impaired and that the "amount of loss will be

16  reasonably estimated."  (Compl. ¶ 269.)  Plaintiffs, however, plead nothing to support

17  that assumption, or their interpretation of the relevant accounting rules.

18      At most, Plaintiffs allege that the PayOption ARMs were "ticking time-bombs"

19

20  [17] While Plaintiffs here, unlike the derivative plaintiffs, do challenge Countrywide's independent auditors, their allegations are based on nothing more than the conclusion that

21  because loan loss reserves were not increased, the auditors must have acted unreasonably. (Compl. ¶¶ 514-515.)  These allegations simply beg the question, and therefore, fail to

22  distinguish this case from the derivative action.

    [18] See also GlenFed, 42 F.3d at 1549 ("The fact that an allegedly fraudulent statement and

23  a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false. For example, both the valuation of assets and the setting of

24  loan loss reserves are based on flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure."); DiLeo v. Ernst & Young, 901

25  F.2d 624, 627 (7th Cir. 1990) (rejecting claim that increase in reserves indicated the falsity of prior financial statements and noting:  "For any bad loan the time comes when

26  the debtor's failure is so plain that the loan is written down or written off.  No matter when a bank does this, someone may say that it should have acted sooner."); Novastar

27  Financial, 2008 U.S. Dist. LEXIS 44166, at *12) (rejecting claim that loan loss reserves violated GAAP and concluding, "Novastar made provisions, but those provisions turned

28  out to be inadequate.  This does not mean the initial provisions were 'false;' it just means management did not do a good job").

1  (Compl. ¶ 289) or that they posed a "significant risk of defaults." (Compl. ¶ 292.) This

2  is a far cry from pleading that Countrywide had reason to know that it was "probable"

3  that any particular group of loans would be impaired.  (Compl. ¶ 274); see Countrywide,

4  2008 WL 2064977, at *4, 12, 21 n.31 (noting that plaintiffs had failed to plead that losses

5  were probable and capable of estimation).[19]  Nor do Plaintiffs attempt to explain how

6  such negative amortization should have been viewed in light of the accounting rules at

7  issue.  See Lindner Dividend Fund, 880 F. Supp. at 49, 58 (noting plaintiffs failure to

8  "indicate the manner in which [accounting] principles were allegedly disregarded")

9  (citing In re the One Bancorp Sec. Litig., 135 F.R.D. 9, 12-13 nn. 8 & 9 (D. Me. 1991)).

10  Fourth, Plaintiffs allege that "Countrywide's allowances for loan losses were

11  materially lower than those of its competitors." (Compl. ¶ 294.)  As this Court observed

12  in the derivative action, "any comparison of loan loss reserves held by industry

13  competitors is useless without information about the composition of their loan

14  portfolios." Countrywide, 2008 WL 2064977, at *21.  Here, as in the derivative action,

15  Plaintiffs provide no information about the loan portfolios of Countrywide's competitors.

16  Therefore, Plaintiffs' allegations are insufficient.

17  Fifth, the Court should reject Plaintiffs' attempt to quantify the amount by which

18  loss reserves were restated by alleging that the "provisions for loan losses were

19  inadequate by at least 39.26% between the fourth quarter of 2003 and the second quarter

20  of 2007." (Compl. ¶ 299.)  Plaintiffs are right to recognize their obligation to plead the

21  "amount by which revenues and earnings were overstated." Alaska Elec. Pension Fund v.

22  Adecco S.A., 434 F. Supp. 2d 815, 822 (S.D. Cal. 2006); see also Aegon, 2004 WL

23  1415973, at *8 (recognizing plaintiffs' obligation to plead what loss reserves "'should

24  have been'").  Plaintiffs' allegations, however, are insufficient to meet this burden.  For

25  one thing, Plaintiffs' estimate of what reserves should have been, which groups all

26  financial statements together for the class period, fails to identify the amount by which a

---

27  [19] See also Kane v. Madge Networks N.V., No. C-96-20652 RMW, 2000 WL 33208116,

28  at *5 (N.D. Cal. May 26, 2000) ("predictions about the collectability of debt are forward-
looking, and they are based on 'flexible accounting principles'").

single earnings statement was supposedly inflated.

Further, Plaintiffs acknowledge that their estimate of what reserves should have been is based on an "assumption" that loss provisions for the third quarter of 2007 "should have been proportionate to the provision that should have been recorded for the second quarter of 2007." (Compl. ¶ 299.) Plaintiffs plead no facts in support of this "assumption." In any event, Plaintiffs' conclusion does not follow from their premise. Even if it is true that loss provisions for the third and second quarter should have been "proportionate," it does not follow that the disparity between the two quarters should have been spread out over the Class Period. Rather, loss reserves throughout the Class Period were required to be set based on the conditions that existed at the time. (Compl. ¶¶ 269-270.) Because Plaintiffs have failed to quantify properly the amount by which loss reserves were understated, Plaintiffs' claim fails. See Aegon, 2004 WL 1415973, at *8 ("'[a]lthough the plaintiffs have claimed in conclusory terms that the loss figures were materially false, they have provided no indication of the amount by which the figures were supposedly under or overstated'") (quoting AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003)).

### (b) Plaintiffs' Allegations Concerning Retained Interests Are Insufficient

Plaintiffs' claim that the Company's valuation of its retained interests violated GAAP is equally deficient. First, Plaintiffs allege that the retained interests were overvalued because the Company failed to consider properly default rate and net lifetime credit loss. (Compl. ¶¶ 314-315.) Plaintiffs offer no facts to demonstrate that the Company did not consider default rate and net lifetime credit loss in valuing its retained interests. Instead, they merely allege that while delinquencies generally increased, so did the value of Countrywide's retained interests. (Compl. ¶ 314.) On this basis, Plaintiffs assume default rate and net lifetime credit loss were not considered. Plaintiffs plead nothing, however, to show that GAAP necessarily required the level of delinquencies and value of retained interests to be inversely proportional.

Indeed, "[t]he GAAP requirements upon which Plaintiffs rely 'require the

20

1  substantial application of judgment to the totality of the circumstances.'"  In re Capstead

2  Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533, 522 (N.D. Tex. 2003).  Plaintiffs

3  themselves admit that the Company was required to consider, value, and weigh a number

4  of factors and make a number of sensitive assumptions in determining the fair value of its

5  retained interests.  (Compl. ¶¶ 308, 312, 313.)  That being the case, the mere fact that the

6  value of the Company's retained interests increased despite rising defaults does not

7  inevitably indicate that the Company failed to consider the default rates.  Instead, it

8  reflects at most that, when considered in totality with other factors, the default rates did

9  not require a decrease in the value of retained interests.  Plaintiffs have failed to

10  demonstrate how such a result violated GAAP.  See Fin. Acquisition Partners LP v.

11  Blackwell, No. Civ.A.3:02-CV-1586-K, 2004 WL 2203253, at *19 (N.D. Tex. Sept. 29,

12  2004) (rejecting allegations that retained interests violated GAAP when plaintiffs did not

13  "allege any facts which would demonstrate that the assumptions used . . . were not the

14  'best estimate based on reasonable and supportable assumptions and projections'").[20]

15       Second, Plaintiffs allege that retained interests were overvalued because while the

16  number of loans Countrywide sold during the Class Period decreased, the Company

17  continued to "increase its assessment of fair value for its retained interests."  (Compl. ¶

18  316.)  Again, however, Plaintiffs fail to explain why, under GAAP, these two values must

19  be directly correlated.  Absent facts to the contrary, the increase in the value of retained

20  interests vis-à-vis the volume of loans sold simply reflects perfectly permissible

21  judgments by management.  See Capstead, 258 F. Supp. 2d at 552 (noting substantial

22  judgment required by accounting principles use for valuing retained interests).

23       Third, Plaintiffs rely on the statement of CW1 to allege that "retained interests

24  from securitizations should have been valued at zero."  (Compl. ¶ 317.)  To justify

25

---

26  [20]See also Capstead, 258 F. Supp. 2d at 553 (rejecting contention that "because of
    Capstead's high leverage, it was required to recognize losses with respect to its interest-
27  only securities in accordance with GAAP," and concluding, "Plaintiffs do not specify the
    accounting principle which they contend was violated"); cf. Countrywide, 2008 WL
28  2064977, at *21 (increase in riskier loans did not necessarily require greater reserves in
    light of discretionary nature of accounting rules).

1  reliance on CW1, Plaintiffs must offer specifics in support of his opinion.  See In re

2  Tibco Software, Inc. Sec. Litig., No. C 05-2146 SBA, 2006 WL 1469654, at *22 (N.D.

3  Cal. May 25, 2006) (holding plaintiffs' allegations as to confidential witnesses

4  insufficient where a complaint failed to identify "numerous *documentary sources* which

5  provided *specific* facts concerning the company's significant write-off of inventory").[21]

6        Here, Plaintiffs plead only that in a vague "substantial number of instances,"

7  retained interests should have been valued at zero.  Plaintiffs give no specific examples of

8  the purported "underlying mortgages" that would "likely default within 18 months," nor

9  do they allege that the number of said mortgages was sufficient to have an impact on the

10  Company's ultimate determination of fair value for their retained interests.  (Compl.

11  ¶ 317.)  Absent such facts, Plaintiffs have given no reason to give CW1 any credence.

12  See In re Silicon Image, Inc. Sec. Litig., No. C-05-456 MMC, 2007 WL 607804, at *3

13  (N.D. Cal. Feb. 23, 2007) (rejecting statements of confidential witnesses when plaintiffs

14  "fail to allege facts suggesting the basis for said sources' respective opinions").[22]

15        Finally, Plaintiffs allege that the Company's increased impairment of retained

16  interest in 2007 supports the conclusion that the retained interests were previously

17  overvalued.  (Compl. ¶¶ 318-319.)  However, the mere fact that Countrywide increased

18  impairments in 2007 does not mean that its prior valuation was false.  See In re ICN

19  Pharms., Inc. Sec. Litig., 299 F. Supp.2d 1055, 1065 (C.D. Cal. 2004) ("even a

20  delinquent write-down of the impaired assets . . .  does not state a claim of securities

21  fraud").[23]

22

23

---

24  [21] See also In re Silicon Storage Tech. Inc. Sec. Litig., No. C 05-0295 PJH, 2006 WL
648683, at *10 (N.D. Cal. Mar. 10, 2006) (plaintiffs must "plead 'corroborating details
when allegations are based on non-public information'").

25  [22] Absent CW1's conclusory opinion, Plaintiffs plead nothing to demonstrate what the
26  value of the retained interests should have been.  See Adecco S.A., 434 F. Supp. 2d at
822 (plaintiffs must plead amount by which income was overstated).

27  [23] See also Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998)
("'[d]isclosure of accurate historical data does not become misleading even if less
28  favorable results might be predictable by the company in the future'"); In re Wet Seal, Inc.
Sec. Litig., 518 F. Supp. 2d 1148, 1162 (C.D. Cal. 2007) (same).

22

**(c)   Plaintiffs' Allegations Concerning Countrywide's
Mortgage Servicing Rights Are Insufficient**

This Court should reject Plaintiffs' claim that the value of Countrywide's mortgage
servicing rights ("MSRs") was overstated.  Plaintiffs offer no specific facts to show, as
they must, how the mortgage servicing rights were overvalued, or by what amount.  See
Capstead, 258 F. Supp. 2d at 554 (finding GAAP violations insufficiently pleaded when
"Plaintiffs allege no facts to show the fair value of the mortgage-servicing rights, the
price paid for these assets, the principal balance of the underlying loans serviced, the
interest rates of the underlying loans, the estimated net-servicing income, servicing
revenues, servicing costs, servicing losses, and the run-off rate of the mortgage loans").[24]

Instead, Plaintiffs allege that the MSRs must have been overvalued because
Countrywide's default rate was increasing.  (Compl. ¶¶ 333-334.)  Plaintiffs' position is
baseless.  First, Plaintiffs plead nothing to warrant the proposition that "[d]efault rate was
a critical assumption to Countrywide's assessment of fair value for its MSRs."  (Compl. ¶
333.)  Second, even assuming that Countrywide was required to consider default rates in
order to comply with GAAP, Plaintiffs have failed to demonstrate how a mere increase in
the value of MSRs indicates that default rate was not considered.  As with Plaintiffs'
allegations concerning retained interests, Plaintiffs' allegations disregard that, in light of
all other relevant factors, default rate could be considered and the value of MSRs
nevertheless rise.  (See, supra, Part III.B.2.b.)

Next, Plaintiffs allege that because the number of loans Countrywide sold
decreased while the value of MSRs increased, the value of the MSRs must have been
overstated.  (Compl. ¶ 337.)  As with their allegations pertaining to retained interests,
Plaintiffs fail to explain why, under GAAP, the volume of loans and value of MSRs must
be directly correlated, especially considering the varied assumptions that may affect the
value of the MSRs.  (Compl. ¶ 327, 332.)  Plaintiffs' allegations therefore fail to

---

[24] See also Kane, 2000 WL 33208116, at *6 (holding that "alleged inventory valuation
fraud is pleaded with insufficient particularity" where "[p]laintiffs largely avoid pleading
specific figures").

1   demonstrate that the disparity between the volume of loans and value of MSRs was not

2   the result of permissible judgments by management.

3          Finally, Plaintiffs allege that the fact that the Company "took a large write-down in

4   2007" indicates that previous valuations had been false.  (Compl. ¶ 338.)  Not so.

5   Plaintiffs fail to allege that the write-down had anything to do with increased defaults.

6   Instead, the Complaint itself makes clear that the write-down was related to interest rates.

7   (Id.); see Countrywide, 2008 WL 2064977, at *21 ("Interest rate risk, however, is present

8   regardless of the underwriting quality of the underlying loans.").[25]

9                  **(d)    Plaintiffs' Allegations Concerning Countrywide's
                           Representations And Warranties Are Insufficient**

10         Plaintiffs' claim that Countrywide understated its reserves for representations and

11  warranties likewise fails.  To demonstrate that reserves were understated, Plaintiffs must

12  plead facts to demonstrate that the Company failed to take appropriate reserves when it

13  was "probable" that the loss would occur and would be reasonably estimated.  (Compl.

14  ¶ 346); Countrywide, 2008 WL 2064977, at *21 n.31 (rejecting allegations of insufficient

15  reserves when plaintiffs failed to plead "that the losses were 'probable' at the time of

16  report, or that the magnitude of the loss could reasonably be estimated").  Plaintiffs plead

17  no such facts here.  Nor have Plaintiffs described, as they must, what the appropriate

18  amount of reserves should have been.  See Aegon, 2004 WL 1415973, at *8 (recognizing

19  plaintiffs' obligation to plead what loss reserves "'should have been'").[26]

20         Plaintiffs' attempt to demonstrate instead that reserves were inadequate because

21  Countrywide maintained a large portion of the loans it repurchased as loans held for

22  investment in 2007 is also unavailing.  (Compl. ¶¶ 353-355.)  Plaintiffs fail to plead facts

23

24  [25] Further, as demonstrated, supra Part III.B.2.b and c, the mere fact that the MSRs were
    later written down does not mean that the were falsely valued in the first place.  See

25  Wenger, 2 F. Supp. 2d at 1245 ("[d]isclosure of accurate historical data does not become
    misleading even if less favorable results might be predictable by the company in the

26  future").

    [26] Plaintiffs again rely on the fact that Countrywide increased its reserves for

27  representations and warranties in 2007.  As has been repeatedly stated, however, the mere
    fact that Countrywide increased its reserves does not indicate that its prior reserves

28  violated GAAP.  See, e.g., Countrywide, 2008 WL 2064977, at *21 n.28; Lindner
    Dividend Fund, 880 F. Supp. at 58.

                                        24

1  to demonstrate that the increase in repurchased loans held for investment indicates that

2  Company's prior reserves were inadequate.  Indeed, it is difficult to imagine how

3  conditions that developed <u>after</u> a statement was made, could render that prior statement

4  false.  Plaintiffs' claim should be dismissed.[27]

5  **IV.   CONCLUSION**

6         For the foregoing reasons, the Court should dismiss Plaintiffs' § 11 claims asserted

7  against Mr. Dougherty and Ms. Brown.

8  DATED:  June 10, 2008

9                                            SKADDEN, ARPS, SLATE, MEAGHER &
                                             FLOM, LLP

10

11                                    By: _____
                                                 /s/Eric S. Waxman
12                                               Eric S. Waxman
                                              Attorneys for Defendants
13                                   Michael E. Dougherty & Kathleen Brown

14

15

16

17

18

19

20

21

22

23

24

25

26  _____
    [27] Because Plaintiffs have failed to plead adequately that Countrywide's financial
27  statements were false, they have by extension failed to demonstrate that Countrywide's
    internal controls over financial reporting were ineffective, (<u>see</u> Compl. ¶¶ 360-373
28  (allegations concerning internal controls assuming false financial statements)), that the
    auditors' unqualified opinions were false (Compl. ¶ 500), or that the SOX certifications
    were false.  (Compl. ¶ 370.)