DEAN J. KITCHENS, SBN 82096
DKitchens@gibsondunn.com
MICHAEL DORE, SBN 227442
MDore@gibsondunn.com
LINDSAY PENNINGTON, SBN 249879
LPennington@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

JONATHAN DICKEY, SBN 88226
JDickey@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 48th Floor
New York, New York 10166-0193
Telephone:  (212) 351-2399
Facsimile:  (212) 351-6399

Attorneys for Underwriter Defendants

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re Countrywide Financial Corp. Securities Litigation<br><br>This Document Applies to:<br>All Actions | Lead Case No.<br>07-CV-05295-MRP(MANx)<br><br>**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Joint Request for Judicial Notice Filed Concurrently]<br>Hon. Mariana R. Pfaelzer, Court Room 12<br>Hearing Date: October 20, 2008 at 10:00 a.m. |

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that, on October 20, 2008 at 10:00 a.m, or as soon

3    thereafter as the matter may be heard, before the Honorable Mariana R. Pfaelzer,

4    United States District Judge, located at 312 North Spring Street, Courtroom 12,

5    Los Angeles, California  90012, ABN AMRO Incorporated, A.G. Edwards & Sons,

6    Inc., Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas Securities

7    Corp., BNY Capital Markets, Inc., Citigroup Global Markets Inc., Deutsche Bank

8    Securities Inc., Dresdner Kleinwort Wasserstein Securities Inc., Goldman, Sachs &

9    Co., Greenwich Capital Markets, Inc., HSBC Securities (USA) Inc., J.P. Morgan

10   Securities Inc., Lehman Brothers Inc., Merrill, Lynch, Pierce, Fenner & Smith

11   Incorporated, Morgan Stanley & Co. Incorporated, RBC Capital Markets Corp., RBC

12   Dominion Securities Inc., RBC Dain Rauscher Inc., Scotia Capital Inc., SG Americas

13   Securities, LLC, TD Securities Inc., UBS Securities LLC, Wachovia Capital Markets,

14   LLC, and Wachovia Securities, Inc. (the "Underwriter Defendants") will and hereby

15   do move for an order dismissing Plaintiffs' Consolidated Amended Class Action

16   Complaint ("CAC") pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), 8(a)(2), the provisions

17   of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.

18   §§ 77m, 77k, 77l, 77m, 77z-2, and Article III to the U.S. Constitution.

19       The grounds for this motion are that the CAC fails to state a claim against the

20   Underwriter Defendants upon which relief can be granted.  Specifically, the CAC fails

21   to allege facts sufficient to demonstrate that the Underwriter Defendants are liable for

22   any specific statements of fact that were materially false when made, as required by

23   Federal Rule of Civil Procedure 9(b), which applies to this action because the CAC

24   "sounds in fraud."  Moreover, almost all of Plaintiffs' claims for violation of Sections

25   11 and 12(a)(2) of the Securities Act are time-barred by the one-year statute of

26   limitations applicable to such claims.  The Lead Plaintiffs also lack standing to sue on

27   many of the securities on which their Section 11 claims are based and fail to allege

28

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1   standing for their Section 12(a)(2) claims.  The Underwriter Defendants also are

2   protected by the "safe harbor" provision of the PSLRA because the CAC fails to allege

3   with the particularity required by the PSLRA that the Underwriter Defendants knew

4   that any of the forward-looking statements upon which the Section 11 and 12(a)(2)

5   claims are partially based were false when made.

6           This motion is made based on this Notice of Motion, the Memorandum of Points

7   and Authorities in support thereof, the Defendants' Joint Request for Judicial Notice

8   and exhibits thereto filed herewith, and all papers, pleadings, documents, arguments of

9   counsel, and other materials presented before or during the hearing on this motion, and

10  any other evidence and argument the Court may consider.  The Underwriter

11  Defendants also join in the arguments set forth in the Countrywide Defendants' and

12  Defendant KPMG's Motions to Dismiss filed in this Court on June 10, 2008 to the

13  extent those arguments support the Underwriter Defendants' argument that the CAC

14  fails to state a claim under Sections 11 or 12(a)(2) of the Securities Act of 1933.

15          Pursuant to Local Rule 7-3, the issues regarding this motion were discussed

16  telephonically with counsel for Plaintiffs on June 4, 2008.

17  DATED:  June 10, 2008

18                                      DEAN J. KITCHENS
19                                      JONATHAN DICKEY
20                                      MICHAEL DORE
                                        LINDSAY PENNINGTON
21                                      GIBSON, DUNN & CRUTCHER LLP

22

23                          By:  _Dean Kitchens_
24                                        Dean J. Kitchens

25                          Attorneys for Underwriter Defendants

26

27

28

3

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

DEAN J. KITCHENS, SBN 82096
DKitchens@gibsondunn.com
MICHAEL DORE, SBN 227442
MDore@gibsondunn.com
LINDSAY PENNINGTON, SBN 249879
LPennington@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520

JONATHAN DICKEY, SBN 088226
JDickey@gibsondunn.com
200 Park Avenue, 48th Floor
New York, New York 10166-0193
Telephone:  (212) 351-2399
Facsimile:  (212) 351-6399


Attorneys for Underwriter Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to: All Actions | Lead Case No.<br>CV 07-05295 MPR (MANx)<br><br>**UNDERWRITER DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Gibson, Dunn &
Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................. 1

II.   STATEMENT OF FACTS ...................................................... 4

III.  ARGUMENT ........................................................................ 7

    A.   THE CAC FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 12(a)(2) AGAINST THE UNDERWRITER DEFENDANTS ................................................................. 7

        1.   Plaintiffs Must Meet Heightened Pleading Requirements For Their Section 11 and 12(a)(2) Claims ..................................... 7

            a)   Plaintiffs' Section 11 and 12(a)(2) Claims Are "Grounded In Fraud" And Therefore Must Satisfy Rule 9(b) ...................................... 7

            b)   Plaintiffs' "Puzzle Pleading" Fails To Satisfy Rule 9(b) ...................................... 8

        2.   Plaintiffs' Section 11 and 12(a)(2) Claims Fail to Allege Statements That Were Materially False When Made ................. 10

    B.   THE SECTION 11 AND 12(a)(2) CLAIMS ARE BARRED IN PART BY THE ONE-YEAR STATUTE OF LIMITATIONS. ............ 20

    C.   THE SECTION 11 CLAIMS SET FORTH IN COUNTS IV, V, X, XI, AND XIII MUST BE DISMISSED FOR LACK OF STANDING .............................................................................. 24

        1.   NY Funds Did Not Purchase Any of the Capital V 7% Securities. .............................................................. 24

        2.   NY Funds Were Not Holders of Floating Rate Notes or 6.25% Subordinated Notes at the Time of the First Alleged Curative Disclosure in July 2007. .................................. 25

        3.   Lead Plaintiffs Fail to Allege That They Purchased Any of the 2-Year Notes or 3-Year Notes .......................................... 27

i

Gibson, Dunn & Crutcher LLP

D.   THE SECTION 11 AND SECTION 12(a)(2) CLAIMS
     PREMISED ON COUNTRYWIDE DEBT SECURITIES
     THAT HAVE MATURED FAIL TO ALLEGE LOSS
     CAUSATION OR AN ACTIONABLE LOSS AND SHOULD
     BE DISMISSED ................................................................................ 27

E.   THE SECTION 12(a)(2) CLAIMS MUST BE DISMISSED
     FOR LACK OF STANDING ............................................................. 29

IV.   CONCLUSION .......................................................................................... 30

ii

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page

## CASES

*Atlas v. Accredited Home Lenders Holding Co.*,
  2008 U.S. Dist. LEXIS 3863 (S.D. Cal. Jan. 4, 2008)...........................................8, 11

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ................................................................................8

*Betz v. Trainer Wortham & Co.*,
  504 F.3d 1017 (9th Cir. 2007), amended, 519 F.3d 863 (9th Cir. 2008)..................21

*Bond Opportunity Fund v. Unilab Corp.*,
  2003 WL 21058251 (S.D.N.Y. May 9, 2003).........................................................17

*Brody v. Homestore*,
  2003 U.S. Dist. LEXIS 17267 (C.D. Cal. Aug. 11, 2003) ........................................10

*D.E. & J. Ltd. P'ship v. Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 2005 U.S. App. LEXIS 11267
  (6th Cir. June 10, 2005)................................................................................16

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
  2006 WL 547989 (M.D. Fla. Mar. 6, 2006).........................................................26

*Domenikos v. Roth*,
  2008 U.S. App. LEXIS 12079 (2d Cir. June 5, 2008) (summary order) ..................23

*Heliotrope Gen, Inc. v. Ford Motor Co.*,
  189 F.3d 971 (9th Cir. 1999)..........................................................................20

*In re Alamosa Holdings, Inc. Sec. Litig.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005)...........................................................24, 25

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000)...........................................................8, 10

*In re Cavanaugh*,
  306 F.3d 726 (9th Cir. 2002)..........................................................................25

iii

Gibson, Dunn &
Crutcher LLP

*In re Comverse Tech., Inc. Sec. Litig.*,
  2007 U.S. Dist. LEXIS 14878 (E.D.N.Y. Mar. 2, 2007) ............................................25

*In re Countrywide Fin. Corp. Derivative Litig.*,
  2008 U.S. Dist. LEXIS 40754 ........................................................................................7

*In re Exodus Comm'ns, Inc. Sec. Litig.*,
  2006 WL 3050829 (N.D. Cal. Oct. 26, 2006) ..............................................................24

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) .........................................................................................10

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
  2008 WL 2104208 (C.D. Cal. May 19, 2008) ..............................................................17

*In re Impax Laboratories, Inc. Sec. Litig.*,
  2008 WL 1766943  (N.D. Cal. April 17, 2008) ......................................................25, 26

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) ...........................................................7, 21, 22

*In re Lason, Inc. Sec. Litig.*,
  143 F. Supp. 2d 855 (E.D. Mich. 2001) .......................................................................16

*In re Kindred Healthcare, Inc. Sec. Litig.*,
  299 F. Supp. 2d 724 (W.D. Ky. 2004) ..........................................................................14

*In re Livent, Inc. Sec. Litig.*,
  148 F. Supp. 2d 331 (S.D.N.Y. 2001) ..........................................................................22

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................10, 25, 26, 28

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..........................................................................28

*In re Metro. Sec. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) ...........................................................8, 21, 23

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..................................................8, 10, 14, 15

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) .................................................................................7, 21

iv

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

*In re Stratosphere Corp. Sec. Litig.,*
   1 F. Supp. 2d 1096 (D. Nev. 1998) ..................................................................16

*In re Van Wagoner Funds, Inc. Sec. Litig.,*
   382 F. Supp. 2d 1173 (N.D. Cal. 2004)...........................................................20

*In re Wells Fargo Sec. Litig.,*
   12 F.3d 922 (9th Cir. 1993) ...........................................................................14

*In re Wet Seal Sec. Litig.,*
   518 F. Supp. 2d 1148 (C.D. Cal. 2007).........................................................16

*In re Williston Basin Interstate Pipeline Co.,*
   2008 U.S. App. LEXIS 10047 (9th Cir. May 9, 2008) ...................................8

*In re World of Wonders Sec. Litig.,*
   35 F.3d 1407 (9th Cir. 1994) .........................................................................13

*In re WorldCom, Inc. Sec. Litig.,*
   2005 WL 375314 (S.D.N.Y. Feb. 17, 2005) .............................................24, 26

*Joseph v. Wiles,*
   223 F.3d 1155 (10th Cir. 2000) .....................................................................24

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .......................................................................................25

*Ong v. Sears, Roebuck & Co.,*
   388 F. Supp. 2d 871  (N.D. Ill. 2004)............................................................27

*Pew v. Cardarelli,*
   2005 U.S. Dist. LEXIS 40018 (N.D.N.Y. Mar. 17, 2005)............................13

*Pinter v. Dahl,*
   486 U.S. 622 (1988) .......................................................................................29

*Rosenzweig v. Azurix Corp.,*
   332 F.3d 854 (5th Cir. 2003)..........................................................................29

*Shapiro v. UJB Fin. Corp.,*
   964 F.2d 272 (3d Cir. 1992) ..........................................................................14

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
   2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)..............................................29

v

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

*Tripp v. IndyMac Bancorp, Inc.*,
    2007 U.S. Dist. LEXIS 95445 (C.D. Cal. Nov. 29, 2007) ........................10

*Wenger v. Lumysis, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998).......................................................16

*West Palm Beach Firefighters Pension Fund v. Startek, Inc.*,
    2008 WL 879023 (D. Colo. March 28, 2008) ..........................................24

**STATUTES**

15 U.S.C. § 77m..............................................................................................20

15 U.S.C. § 77z-2(c)(1)(A)(i) .........................................................................13

**RULES**

Fed. R. Civ. P. 8(a)(2) ......................................................................................7

Fed. R. Civ. P. 9(b). ..........................................................................................8

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

# I. INTRODUCTION

In this action, putative class plaintiffs contend that Countrywide, along with its underwriters, auditors, and others, engaged in a fraudulent course of conduct over several years, by which Countrywide allegedly misled the market into believing that all was well with the U.S. mortgage industry in general, and with Countrywide's lending activities in particular. In classic "fraud by hindsight" fashion, Plaintiffs further contend that the adverse disclosures Countrywide made in 2007 concerning the impact of the collapsing housing market on its business and operations were admissions that Countrywide "knew it all along," and that all of the company's statements in its 10-K's and 10-Q's over a period of several years were false and misleading.

As the Countrywide Defendants' motion to dismiss filed concurrently herewith makes clear, however, the market was well aware of the risks associated with purchases of Countrywide securities. Investors received, for example, ongoing disclosures from Countrywide concerning the growth in its subprime lending, the increasing delinquency rates associated with that segment of its business, and the deteriorating performance of its "pay-option ARM" mortgage products in particular. Indeed, Countrywide investors were informed of many of the facts that plaintiffs now contend were not disclosed. The Consolidated Amended Complaint ("CAC" or "Complaint") and other judicially noticeable facts demonstrate that although Countrywide, like many other mortgage lenders, was adversely affected by the onset of deteriorating market conditions in 2007, the losses it has experienced are not the product of fraud, whether in the form of accounting misstatements, misleading disclosure about underwriting practices, or otherwise.

The Section 11 claims against the Underwriter Defendants seek to hold them responsible for alleged misstatements and omissions in the Registration Statements by

1

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1    which certain debt offerings were made.[1]  The flaw in the Complaint is that the claims

2    are not limited to statements made in the Registration Statements (and those specific

3    1934 Act filings which they incorporate by reference).  Rather, through the device of

4    repetitive and undifferentiated pleading, the Underwriter Defendants are simply

5    lumped together with all of the other defendants, each of whom is alleged to have

6    made a variety of statements the Plaintiffs claim are false and misleading.  As a result,

7    each of the Underwriter Defendants is effectively charged with all of the alleged

8    misstatements, including many for which they have no responsibility as a matter of

9    law.  This is classic, impermissible "puzzle-style" pleading.  The Underwriter

10   Defendants' objections are not simply technical in nature—their objections go to the

11   heart of the legal obligations of the various parties involved in this matter.  That is

12   because the Underwriter Defendants' purported liability must be limited to the

13   Registration Statements (and the documents incorporated by reference), and may *not*

14   be based upon the numerous conference calls, press releases, investor conferences and

15   the like, which the Underwriter Defendants are not alleged to have participated in,

16   reviewed, approved, or endorsed.  For this reason alone, this Complaint, which

17   canvasses years of such conferences, releases and oral statements, and then

18   incorporates all of them in every count against every defendant, does not pass the

---

[1]  The Underwriter Defendants understand that Defendants Countrywide, KPMG
LLP, and Grant Thornton LLP will file concurrently with this Motion their own
motions to dismiss the CAC.  Those motions address a number of claims, including
claims under Sections 11 and 12(a)(2) of the 1933 Act.  Plaintiffs allege that the
Underwriter Defendants have violated only these two sections of the 1933 Act.
Accordingly, the Underwriter Defendants join in those motions to dismiss to the
extent they address Plaintiffs' failure to properly state their causes of action under
Sections 11 and 12(a)(2).

2

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1   pleading standard applicable to this case.[2]

2       While it requires significant effort to strip down the allegations in the 416-page

3 Complaint to those for which the Underwriter Defendants could theoretically have any

4 legal responsibility, it is necessary to do so in order to evaluate the sufficiency of these

5 allegations.  When the Complaint is reduced to just those statements, it is readily

6 apparent that although the allegations of the Complaint are far-reaching, the specific

7 claims against the Underwriter Defendants are narrow in scope, and thinly pled.

8       As will be demonstrated below, the CAC fails to state a claim against the

9 Underwriter Defendants for at least the following reasons:

10     &bull; Under Rule 9(b), which applies here because the CAC "sounds in fraud,"
11       Plaintiffs have failed to allege facts sufficient to demonstrate that the
      Underwriter Defendants are liable for any specific statements of fact that
12       were *materially false when made*.

13     &bull; All claims under Sections 11 and 12(a)(2) against all Underwriter
      Defendants except Counts XIII and XIV are barred by the applicable one-
14       year statute of limitations under Section 15 of the 1933 Act.

15     &bull; All claims under Sections 11 and 12(a)(2) against certain of the
      Underwriter Defendants named in Counts I, II, IV, V, VII, VIII, X and XI
16       are barred by the applicable one-year statute of limitations, since such
      claims were not brought against these Underwriter Defendants until
17       January 2008.

18     &bull; The Lead Plaintiffs lack standing to sue on many of the securities on
      which their Section 11 claims are based.

19

20

21 [2]  The Underwriter Defendants are aware of the Court's May 14, 2008 Order Granting
in Part and Denying in Part the Motions to Dismiss of the Defendants in the
22 Derivative Litigation.  In that Order, the Court found that certain public statements
of Countrywide and its executives were material misstatements, and that the
23 directors who served on certain committees were uniquely positioned to understand
the significance of certain information which was disclosed to the public.  The
24 Underwriter Defendants in this case are in a completely different capacity, and they
have potential responsibility for a far narrower set of public statements.  Thus the
25 Underwriter Defendants are not seeking to relitigate matters already determined in
the May 14 Order; rather they are asking this Court to review a much more limited
26 set of statements for which the Underwriters may have responsibility.

27

28

Gibson, Dunn &
Crutcher LLP

- The Lead Plaintiffs fail to allege standing for their Section 12(a)(2) claims against the Underwriter Defendants, since they fail to allege that they purchased their Countrywide securities directly from any of the Underwriter Defendants.

In sum, the Underwriter Defendants respectfully submit that despite Plaintiffs' thinly-veiled attempt to bring additional "deep pocket" defendants into this proceeding, the securities fraud claims against the Underwriter Defendants are meritless and no different than the 1933 Act claims that Courts in this District repeatedly have dismissed under Rules 9(b) and 8(a). Those same pleading standards warrant dismissal of the claims asserted against the Underwriter Defendants here.

## II.   STATEMENT OF FACTS

As alleged in the CAC, Countrywide is one of the leading mortgage lenders in the United States. Much as Countrywide's competitors in the mortgage origination business did, it accessed the capital markets frequently in order to finance its mortgage lending activities, and issued various classes of debt securities to sophisticated investors.

***The Offerings.*** Although Countrywide's public offerings of securities date back many years, the CAC alleges that the public offerings that form the basis for Plaintiffs' 1933 Act claims against the Underwriter Defendants began in April 2004.

The CAC alleges that only two registration statements are involved in this action: (a) a "shelf" registration statement filed on Form S-3 in April 2004, pursuant to which the Series A Medium Term Notes and Floating Rate Subordinated Notes were offered to the public (CAC ¶¶ 887-903); and (b) a "shelf" registration statement filed on Form S-3ASR in February 2006 (subsequently amended in October 2006), pursuant to which the remaining Countrywide securities were offered to the public (CAC ¶¶ 904-924). The CAC alleges that each of the Underwriter Defendants participated in

4

1    one or more of these offerings, or in the offering of various "tranches" of debt

2    securities issued pursuant to a single registration statement. [3]

3       With respect to Plaintiffs' Section 12(a)(2) claims, the CAC alleges that each of

4    the five public offerings at issue was made pursuant to different prospectuses,

5    prospectus supplements, and "free writing prospectuses" ("FRP's") (*see* CAC ¶¶ 888,

6    892, 894, 898, 905, 912, and 919).

7       Appendix A to this Motion sets forth a chart of each of the offerings at issue,

8    together with (a) each of the related registration statements, (b) the 10-K's and 10-Q's

9    that were incorporated by reference into each registration statement, (c) the

10   "base prospectus" involved, and (d) the supplemental prospectuses involved, if any.

11   As Appendix A clearly shows, the offering documents that form the basis of Plaintiffs'

12   Section 11 and 12(a)(2) claims vary considerably from offering to offering, involve

13   different SEC filings that were incorporated by reference, and also involve different

14   prospectuses. The CAC does not allege, however, *which* statements in *which* offering

15   documents are alleged to be materially false and misleading, or *why*.

16       ***Lead Plaintiffs' Purchases and Sales of Countrywide Securities***. Appendix B

17   to this motion contains a chart of all the purchases and sales of Countrywide securities

18   by Lead Plaintiffs at issue herein, based upon their lead plaintiff certifications filed

19   with this Court. As the chart shows, Lead Plaintiffs purchased and sold certain

20   Countrywide securities at issue herein over a period of years. It is clear from the data

21   that Lead Plaintiffs sold their total holdings of Floating Rate Notes and 6.25%

22

23    [3]   The CAC refers to various "pricing supplements" issued in connection with each

24      such "tranche" of debt (*e.g.*, CAC ¶¶ 888, 892, 894). In the example of the Series B

25      Medium Term Notes, the Series B offering actually comprised over 150 separate
       tranches, each with different groups of investment banks that participated in those

26      issuances. *See, e.g.,* Defendants' Joint Request for Judicial Notice ("RJN"), Exhs. 6,
       8; *see also* CAC ¶ 905 ("The Series B Medium Term-Notes were offered and sold

27      pursuant to . . . 153 successive pricing supplements . . . .").

28

5

---

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1  Subordinated Notes before Countrywide's first alleged curative disclosure in

2  July 2007.  In other instances, Lead Plaintiffs continued to purchase Countrywide

3  securities well after the first alleged "curative" disclosure, and after this lawsuit was

4  first filed.  As discussed below, these and other facts demonstrate that many of

5  Lead Plaintiffs' claims therefore must be dismissed on standing grounds.

6       ***The Alleged Misleading Disclosures in the Offering Documents.***  The heart of

7  the case against the Underwriter Defendants is confined to certain paragraphs in the

8  CAC.  Specifically, paragraphs 1081 through 1273 contain the key allegations under

9  Sections 11 and 12(a)(2) against the Underwriter Defendants.  Plaintiffs' formulaic

10  pleading approach involves boilerplate allegations to the effect that (a) a particular

11  offering took place; (b) certain investment banks served as underwriters of that

12  particular offering; (c) "as set forth above" (where, they do not say), the offering

13  documents contained untrue statements of material fact, or omitted to state other facts

14  required to be stated therein; and (d) the Underwriter Defendants failed to conduct a

15  reasonable investigation.  The only allegation relating directly to the Underwriter

16  Defendants is generically pled: "in particular, these Underwriter Defendants did not

17  conduct a reasonable investigation into the *accuracy of the statements regarding*

18  *Countrywide's reported financial performance, internal controls, underwriting*

19  *standards and lending practices*" (*e.g.*, CAC ¶ 1093) (emphasis added).  This catch-

20  phrase is then repeated in the remaining Section 11 Counts (CAC ¶¶ 1133, 1174, 1215

21  and 1256).  Each of these generic allegations also purports to say—but does not say

22  *why*—the Underwriter Defendants could not rely upon Countrywide's SEC filings,

23  notwithstanding Section 11's explicit statutory provision allowing underwriters to rely

24  upon expertised reports contained therein.  *Id.*  Other than these boilerplate allegations,

25  there are no facts pled concerning the alleged actions of the Underwriter Defendants.

26

27

28

Gibson, Dunn & Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

### III.   ARGUMENT

**A.    THE CAC FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 12(a)(2) AGAINST THE UNDERWRITER DEFENDANTS**

Plaintiffs' 416-page Complaint is the very type of "puzzle-style" pleading that courts frequently have rejected under Rules 9(b) and 8(a) of the Federal Rules of Civil Procedure, and which should be rejected here.  Moreover, to the extent that the Underwriter Defendants can identify the alleged misrepresentations upon which the Section 11 and 12(a)(2) claims are based, the conclusion is inescapable that such alleged misrepresentations were *not materially false when made.*  Accordingly, Plaintiffs' claims against the Underwriter Defendants should be dismissed.

**1.    Plaintiffs Must Meet Heightened Pleading Requirements For Their Section 11 and 12(a)(2) Claims**

**a)    Plaintiffs' Section 11 and 12(a)(2) Claims Are "Grounded In Fraud" And Therefore Must Satisfy Rule 9(b)**

It is well-settled in this Circuit that Rule 9(b) applies when claims are "grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996) ("[T]he particularity requirements of Rule 9(b) apply to claims brought under Section 11 when . . . they are grounded in fraud."); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1094 (C.D. Cal. 2003).  Like the Section 14 proxy statement claims in the related derivative action in these consolidated proceedings, which this Court held were subject to the pleading requirements of Rule 9(b),[4] the Section 11 and 12(a)(2) claims here are grounded in fraud and subject to Rule 9(b).[5]

---

[4]   *In re Countrywide Fin. Corp. Derivative Litig.*, 2008 U.S. Dist. LEXIS 40754, at *86 & n.36 (noting that "the complaint clearly sounds in fraud," and that the "tone of the allegations leaves no doubt that fraud, not negligence is at issue").

[5]   If and to the extent the Court concludes that Rule 9(b) is inapplicable to the 1933 Act claims, Federal Rule of Civil Procedure 8(a)(2) still requires heightened

[Footnote continued on next page]

7

**b)**     **Plaintiffs' "Puzzle Pleading" Fails To Satisfy Rule 9(b)**

1

2          Plaintiffs' lengthy "puzzle-style" pleading utterly fails to comply with Rule 9(b).

3   As one district court recently noted, "puzzle pleadings are those that require the

4   defendant and the court to 'match the statements up with the reasons they are false or

5   misleading.'" *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007)

6   (quoting *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000)).

7   "In the context of securities class action complaints, courts have repeatedly lamented

8   plaintiffs' counsels' tendency to place the burden on the reader to sort out the

9   statements and match them with the corresponding adverse facts to solve the puzzle of

10  interpreting Plaintiffs' claims." *In re Splash Tech. Holdings, Inc. Sec. Litig.*,

11  160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (quotations omitted).

12         Here, Plaintiffs impose just this sort of complex "puzzle" on the Underwriter

13  Defendants and the Court, due in part to their almost total reliance on "incorporation

14  by reference" principles to plead their Section 11 and 12(a)(2) claims.  As Plaintiffs'

15  allegations make clear, the two registration statements at issue, the April 2004 "shelf"

16  registration statement filed on Form S-3 (*e.g.*, CAC ¶¶ 888, 898) and the February

17  2006 "shelf" registration statement filed on Form S-3 ASR (*e.g.*, CAC ¶¶ 905, 912,

18  919) themselves say very little.  Instead, the alleged actionable misstatements in the

19  two registration statements arise entirely via documents that are incorporated by

20

21  _____

[Footnote continued from previous page]

22     pleading of the alleged false statements.  Under the pleading standards recently
       enunciated by the U.S. Supreme Court in *Bell Atl. Corp. v. Twombly*, 127 S. Ct.
23     1955 (2007), the Court held that to survive a Rule 12(b)(6) motion to dismiss the
       plaintiff must allege "enough facts to state a claim to relief that is *plausible on its*
24     *face*." *Id.* at 1974 (emphasis added).  *Twombly* recently has been applied and
       followed by the Ninth Circuit. *In re Williston Basin Interstate Pipeline Co.*, 2008
25     U.S. App. LEXIS 10047, at *14 (9th Cir. May 9, 2008); *see also  Atlas v.*
26     *Accredited Home Lenders Holding Co.*, 2008 U.S. Dist. LEXIS 3863, at *23 (S.D.
       Cal. Jan. 4, 2008) (applying "plausibility" standard in securities class action).
27

28

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

reference.[6]  But Plaintiffs do not specifically or accurately describe the documents that are purportedly incorporated by reference into the registration statements at issue,[7] and they do not describe what specific statements within each incorporated document is materially misleading.[8]

This is a classic example of "puzzle pleading."  The CAC's structural flaws force Defendants and the Court to pore through the "prolix and sprawling" document searching for the alleged false statements, and the reasons for their falsity.  As the Ninth Circuit explained, "[a] complaint is not a puzzle . . . and we are loathe to allow plaintiffs to tax defendants, against whom they have levelled very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer

---

[6]  *See, e.g.*, CAC ¶¶ 896, 903, 910, 917, 924 (listing several public filings that allegedly were materially false and misleading and were incorporated into respective registration statements, and then alleging that "[a]ccordingly," the registration statement contained alleged misstatements).

[7]  *Compare* CAC ¶ 913 (listing several filings incorporated by reference into the 6.25% Notes Registration Statement *with* RJN Ex. 10 at 2 (listing additional Current Reports not listed in the CAC that are incorporated by reference into the Registration Statement) (RJN page cites refer to original page number of respective filing and not to page of RJN generally).

[8]  Plaintiffs vaguely allege, for example, in Count XIII that "*as set forth above*, the 7% Capital Securities Registration Statement contained untrue statements of material fact, including the financial statements of Countrywide." (emphasis added).  CAC ¶ 1252. From this allegation, one must guess that the untrue statements "as set forth above" derive from the allegation found at page 304 of the CAC that "[t]he 7% Capital Securities Registration Statement expressly incorporated by reference documents filed by Countrywide with the SEC, *including* its Annual Report on Form 10-K for the year ended December 31, 2005; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006 and June 30, 2006; and Current Report on Form 8-K filed October 24, 2006." CAC ¶ 920 (emphasis added).  One then must surmise what statements within each of those SEC filings is "alleged in detail above," by a process of "backward" analysis of the hundreds of pages preceding that allegation.

9

1    to their complaint." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1554 (9th Cir.

2    1994); *see also In re Metro.*, 532 F. Supp. 2d at 1279. In *Metro,* the court dismissed

3    the complaint for failing to satisfy Rule 9(b), noting that "[w]here a complaint contains

4    puzzle pleading, the Ninth Circuit has recommended that the plaintiff should be

5    required to 'streamline and reorganize the complaint before allowing it to serve as the

6    document controlling discovery." 532 F. Supp. 2d at 1280 (quoting *GlenFed*, 42 F.3d

7    at 1554).[9]

8          **2.     Plaintiffs' Section 11 and 12(a)(2) Claims Fail to Allege**

9                 **Statements That Were Materially False When Made**

10       Even if one can overcome the challenge of Plaintiffs' "puzzle style" pleading

11    and actually divine the allegedly false statements put at issue by Plaintiffs, the CAC

12    fails to allege how such statements were *materially false when made.*[10]

13

---

14    9    *See also, e.g., In re Splash Tech.*, 160 F. Supp. 2d at 1075 (dismissing complaint

15       where plaintiffs "failed to craft a complaint in such a way that a reader can, without
undue effort, divine precisely which statements (or portions of statements) are

16       alleged to be false or misleading, and the reason or reasons why each statement is

17       false or misleading"); *In re Autodesk*, 132 F. Supp. 2d at 842 ("The court is
unwilling . . . to search through the 51-page CAC as plaintiffs' counsel suggested,

18       and also finds that it would be unfair to compel defendants to do so."); *Tripp v.*

19       *IndyMac Bancorp, Inc.*, 2007 U.S. Dist. LEXIS 95445, at *17-18 (C.D. Cal. Nov.
29, 2007) ("[I]f Plaintiffs choose to amend, the Court will require that any further

20       amendment greatly simplify the operative pleading by clearly identifying only those

21       statements that are alleged to be false or misleading and (briefly, but specifically),
stating why.").

22

23    10    *See Brody v. Homestore*, 2003 U.S. Dist. LEXIS 17267, at *15 (C.D. Cal. Aug. 11,
2003) ("Because a plaintiff must 'set forth what is false or misleading about a

24       statement, he must also 'set forth, as part of the circumstances constituting fraud, an

25       explanation as to why the disputed statement was untrue or misleading
*when made.*'") (quoting *In re GlenFed*, 42 F.3d at 1548-49) (emphasis in *GlenFed*);

26       *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal.
2000) ("Like all provisions of the 1933 and 1934 Acts, Section 11 penalizes only

27       statements that are materially false."). Section 11 can only be violated "when any

28                                 [Footnote continued on next page]

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1    ***What Plaintiffs Allege the Underwriter Defendants Failed to Address in Their***

2    ***Due Diligence.*** Each of the Section 11 claims alleges that the Underwriter Defendants

3    "did not conduct a diligent investigation into the accuracy of the statements regarding

4    Countrywide's *reported financial performance, internal controls, underwriting*

5    *standards and lending practices.*" *See, e.g.,* CAC ¶¶ 1093, 1133, 1174, 1215, and

6    1256 (emphasis added).  These four elements of the Section 11 claims against the

7    Underwriter Defendants therefore create the framework for determining what

8    statements in the documents that are incorporated by reference into either of the

9    Registration Statements are actionable against the Underwriter Defendants.  The first

10   two elements are accounting related, while the second two relate to underwriting

11   practices.

12        ***2005 10-K Example.***  An example of the failings of the CAC to plead that the

13   Underwriter Defendants should be held responsible for alleged misstatements made in

14   documents incorporated by reference is found in Countrywide's 2005 10-K, which is

15   alleged to have been incorporated by reference into the October 2006 amended

16   registration statement upon which Plaintiffs' Section 11 claim on the 7% Capital

17   Securities is based (CAC ¶¶ 919-920).  This example is representative of other

18   documents incorporated by reference, and is used for illustrative purposes.

19             ***What Plaintiffs Contend Was Misstated in the 2005 10-K.***

20        The alleged misstatements in the 2005 10-K are set forth at CAC ¶¶ 735 through

21   748.  Each of the four elements of the Section 11 claim are addressed in turn below.

22   In sum, these alleged misstatements cannot form the basis of a claim against the

23   Underwriter Defendants because (a) they are inadequately pled claims of accounting

-------

24   [Footnote continued from previous page]

25        part of a registration statement, when it became effective, contains an untrue
         statement of a *material* fact or omitted to state a *material* fact required to be stated

26       therein or necessary to make the statements therein not misleading." *Atlas*, 2008

27       U.S. Dist. LEXIS 3863, at *40-41 (emphasis added).

28

11

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1  violations where the accounting matters reflect the application of judgment to complex

2  rules, (b) they are non-actionable statements of opinion that are not "false," (c) they are

3  included within extensive, explicit and correct disclosures regarding Countrywide's

4  business that are all part of the "total mix" of information providing investors with

5  knowledge of all material facts and (d) they are in many instances "forward looking

6  statements" that are protected in the absence of knowing falsity, and there are no such

7  allegations as to the Underwriter Defendants.

8        *"Reported Financial Performance."* Plaintiffs allege that

9  Countrywide's SEC filings materially misstated the company's financial performance

10  for four separate reasons: (1) that the loan loss reserves for retained mortgages were

11  inadequate (CAC ¶¶ 267 to 301), (2) that the residual value of retained interests from

12  securitizations was overstated (¶¶ 302 to 322), (3) that the value of Countrywide's

13  retained mortgage servicing rights was also overstated (¶¶ 323 to 340), and (4) that

14  Countrywide's reserves for breaches of representations and warranties regarding

15  mortgages sold into the secondary market were not adequate (¶¶ 341 to 359).

16      The Underwriter Defendants submit that these alleged accounting misstatements

17  are not properly pleaded and cannot form the basis for a claim under any provision of

18  the securities laws. The Court already has addressed these same essential allegations

19  regarding Countrywide's accounting practices and its alleged failure to follow GAAP

20  in the related derivative action, and found them insufficient. That conclusion is

21  similarly appropriate here, where the allegations are both general and conclusory and

22  relate to matters inherently the product of judgment. These arguments are made in the

23  concurrently filed motions to dismiss of Countrywide, KPMG, and Grant Thornton.[11]

24  The Underwriter Defendants join in those core arguments and incorporate them by

25

26

27

[11] For example, as KPMG states in its motion, Countrywide has not made a restatement, nor suggested one is forthcoming, of any alleged false statements.

28

12

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1 | reference rather than repeating them here.  In addition, the Underwriter Defendants
2 | submit that Countrywide's public statements regarding reserves and future values are
3 | inherently "forward looking" statements, and that the Underwriters cannot be liable in
4 | the absence of allegations of actual knowledge of falsity, which are wholly absent from
5 | the CAC.

6 |       Under the PSLRA's safe harbor provision, "forward-looking statements," that is,
7 | statements regarding future events or contingencies, are protected if they are
8 | "accompanied by meaningful cautionary statements identifying important factors that
9 | could cause actual results to differ materially from those in the forward-looking
10 | statement."  15 U.S.C. § 77z-2(c)(1)(A)(i).  *See also In re World of Wonders Sec.*
11 | *Litig.*, 35 F.3d 1407, 1415 n. 3 (9th Cir. 1994) (the "bespeaks caution" doctrine applies
12 | to Section 11 claims).  Here, the alleged accounting violations all relate to statements
13 | of future expectations, and given the "meaningful cautionary statements" that
14 | accompanied them, they cannot be the basis for liability absent actual knowledge of
15 | falsity, which is not alleged as to the Underwriters.[12]

---

[12] Section 27A of the 1933 Act excludes from the safe harbor provision a forward-
looking statement that is "included in a financial statement prepared in accordance
with generally accepted accounting principles."  15 U.S.C. § 77z-2(b)(2)(A).
The "financial statements" included in an SEC filing like the 2005 10-K, however,
are a distinct and separate part of the Form.  *See* RJN Ex. 12 at 108 ("Item 8.
*Financial Statements and Supplementary Data*"); *see also, e.g., Pew v. Cardarelli*,
2005 U.S. Dist. LEXIS 40018, at *37 & n.2 (N.D.N.Y. Mar. 17, 2005) (noting that
the "PSLRA does not apply to disclosures contained within financial statements,"
and then applying safe-harbor analysis to statements contained elsewhere in a 2001
10-K and a 2002 10-K).  Plaintiffs' allegations regarding these matters do not
specify where the alleged misstatements come from, and in most cases they only
characterize (and do not quote) the alleged misstatements, so the Underwriter
Defendants and the Court are left to guess their origin and content.

To the extent the Underwriter Defendants can discern what the alleged
misstatements are, the forward-looking statements alleged by Plaintiffs to be
[Footnote continued on next page]

13

Gibson, Dunn &
Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

The statements concerning financial performance at issue here all qualify as "forward looking statements."  Two of them involve the setting of reserves for future contingencies (potential losses on retained mortgages and repurchase obligations) which, *at best*, can only be estimated at the time they are disclosed.[13]  The other two statements are predictions of future values (retained mortgage servicing rights and residual values of securitizations) and similarly cannot be known until the occurrence of future events.[14]

In fact, Countrywide's public filings contained exactly the type of cautionary language regarding its forward-looking statements that the courts have upheld in other cases construing the "safe harbor."  For example, the 2005 10-K disclosed:

---

[Footnote continued from previous page]

misleading in the 2006 10-K, for example, appear to be taken variously from the body and text of the Form 10-K (and not only in the accompanying financial statements) and, in some cases, not even in the 10-K at all.  *See, e.g.*, CAC ¶ 277 (Countrywide representatives were making alleged misstatements in unidentified places in Q2 and Q3 2006 regarding loan loss adequacy); ¶ 292 (Defendant Mozilo "publicly acknowledged" a majority of borrowers of pay-option ARMs were making the minimum payments).  Because different legal standards may apply to statements made in the financial statements as opposed to the balance of the 10-K (and as further opposed to statements made in neither place), the Plaintiffs must be required to plead with specificity the source of the alleged misstatements, which they have failed to do.

[13] *See, e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("No matter what method is used, the economic judgments made in setting loan loss reserves can be validated only at some future date."); *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993) ("setting of loan loss reserves is, by all accounts, an 'art and not a science'"); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 733-34 (W.D. Ky. 2004) ("By their very nature, reserve levels are projections of future events and results.").

[14] *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067 (N.D. Cal. 2001) ( "A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." )

14

Gibson, Dunn & Crutcher LLP

*Our accounting policies and methods are fundamental to how we report our financial condition and results of operations, and they may require management to make estimates about matters that are inherently uncertain*

We have identified several accounting policies as being "critical" to the presentation of our financial condition and results of operations because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be recorded under different conditions or using different assumptions.  These critical accounting policies relate to our gain from sale of loans and securities, valuation of retained interests and interest rate management activities. Because of the inherent uncertainty of the estimates associated with these critical accounting policies, we cannot provide any assurance that we will not make significant subsequent adjustments to the related amounts recorded.

RJN, Ex 12 at 33.

Since the statements concerning financial performance identified by the Plaintiffs are "forward-looking statements," the PSLRA protects those statements (made outside the context of GAAP financial statements) provided they are either accompanied by "meaningful cautionary language" or are not made with *actual knowledge* of falsity.  *See Splash Tech.*, 160 F. Supp. 2d at 1069 ("To the extent a plaintiff relies upon allegations of false forward-looking statements, he must plead 'in great detail,' 'all the facts' forming the basis for the belief that the defendant made the statements with actual knowledge that they were false.").  Regardless of whether Plaintiffs have pled the knowledge of other parties sufficiently, the Plaintiffs in 416 pages have not alleged a single fact to suggest that the *Underwriters* knew any of these statements was false when made, nor have they alleged with clarity where those statements were made.  Therefore, no claim can be stated against them.  *See, e.g., In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 860 (E.D. Mich. 2001) (rejecting safe harbor defense of issuer defendants but reaching "a different conclusion as to the Underwriters' liability" because "[t]he plaintiff failed to allege that the underwriters

15

1  had actual knowledge that statements in the 1998 prospectus were false"); *cf. In re*

2  *Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1121 (D. Nev. 1998) ("While the

3  documents Plaintiffs cite may be relevant to the Director Defendants and Grand

4  Casinos' scienter, there is no factual basis to conclude that the Underwriters . . . knew

5  of the falsity or misleading nature of the statements at issue.").[15]

6       *"Internal Controls."*  The Complaint does not contain any

7  statement from the 2005 10-K relating to Countrywide's internal controls, other than

8  (a) statements set forth in the audit report issued by KPMG (CAC ¶ 746), which

9  clearly is an "expertised" statement for purposes of Section 11; and (b) a statement

10  ascribed to the "SOX certifications" of Countrywide's CEO and CFO (CAC ¶ 747).

11  Putting aside the question whether underwriters can be held legally responsible for an

12  allegedly false "SOX certification" by Countrywide's CEO or CFO, the Complaint

13  simply does not describe why any of these statements regarding internal controls were

14  false when made.  Moreover, statements regarding internal controls—whether

15  KPMG's opinion on the SEC filings or the CEO's and CFO's opinion on the adequacy

16  of Countrywide's internal controls—are simply those parties' statements of their own

17  opinions, and cannot form the basis for a claim against the Underwriters in this case.

18  *See, e.g., D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 736 (E.D. Mich.

19  2003), *aff'd*, 2005 U.S. App. LEXIS 11267 (6th Cir. June 10, 2005) (dismissing

20

21  [15]  The Underwriter Defendants also join in the arguments of the Countrywide

22  Defendants and KPMG describing how many of these statements concerning
    financial performance also constitute inactionable statements of opinion.

23  For example, CAC ¶ 737 quotes from the 2005 10-K on the subject of off-balance

24  sheet arrangements, and Countrywide's statement that "we do not believe that any
    of our off-balance sheet arrangements have or are reasonably likely to have a

25  current or future material effect on our financial condition…"  This statement, and

26  many similar statements quoted in the CAC, is a non-actionable statement of
    opinion.  *See, e.g., In re Wet Seal Sec. Litig.*, 518 F. Supp. 2d 1148, 1168-69 (C.D.

27  Cal. 2007); *Wenger v. Lumysis, Inc.*, 2 F. Supp. 2d 1231, 1245-46 (N.D. Cal. 1998).

28

Gibson, Dunn &
Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1    allegation that defendant misrepresented adequacy of internal controls because

2    complaint lacked allegation that speaker did not actually believe opinion).[16]  For a

3    plaintiff to plead that opinions constitute actionable misrepresentations, a plaintiff

4    "must allege 'with particularity' 'provable facts' to demonstrate that the statement of

5    opinion is both objectively and subjectively false. . . . Thus, the plaintiff must show

6    that the [defendant] did not actually hold the belief or opinion stated, and that the

7    opinion was in fact incorrect."  *Bond Opp. Fund v. Unilab Corp.*, 2003 WL 21058251,

8    at *5 (S.D.N.Y. May 9, 2003).

9             ***"Underwriting Standards."***  The CAC refers to only a single

10   statement in the 2005 10-K specifically discussing "underwriting standards," which is

11   quoted in CAC ¶ 744:  "Our underwriting guidelines… have been designed so that

12   these loans *are salable in the secondary mortgage market*." On its face, this statement

13   is not false or misleading.  *Cf. In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 2008

14   WL 2104208, at *10 (C.D. Cal. May 19, 2008) (finding company statements of its

15   "solid" loan production not false or misleading, despite alleged improper monitoring of

16   loan quality, because, "[a]s the Splash court recognized [160 F. Supp. 2d 1059, 1076

17   (N.D. Cal. 2001)], the word 'solid,' like the words 'robust' and 'strong,' is such a

18   vague expression of optimism that it would not have conveyed a misleading

19   impression of the future on which a reasonable investor would rely").

20

21   _____

22   [16] In fact, Countrywide's 2004 Form 10-K disclosed management's assessment of
     material weaknesses in the company's internal controls, and KPMG's 2004 audit
23   report stated: "In our opinion, management's assessment that the Company did **not**
     maintain effective internal control over financial reporting as of December 31,
24   2004, is fairly stated, in all material respects . . . .  Also, in our opinion, because of
     the effect of the material weakness described above on the achievement of the
25   objectives of the control criteria, the Company has ***not*** maintained effective internal
26   control over financial reporting as of December 31, 2004 . . . ."  *See* RJN, Ex. 11 at
     93-94) (emphasis added); *see also* KPMG Mot. to Dismiss CAC at 16-17.
27

28

                                              17

1    Indeed, the statement suggests that Countrywide's underwriting standards were

2    flexible, and were sensitive to market conditions.  It also is not disputed that

3    Countrywide was successful in selling the vast majority of loans it originated into the

4    secondary market, which likewise implies that whatever the underwriting guidelines

5    were, they were acceptable to participants in the secondary market who actually

6    bought the loans.  Far from suggesting fraudulent lending practices, this statement

7    indicates that Countrywide's underwriting standards were acceptable to third parties

8    who purchased billions of dollars of loans based on those standards.

9         ***"Lending Practices."***  CAC ¶¶ 743 and 744 contain two quotes

10   from the 2005 10-K regarding loan practices; each is addressed in turn.

11        Paragraph 743 quotes a sentence stating that "our pay-option loan portfolio has a

12   relatively high *initial* loan quality, with *original* average FICO scores … of 720 and

13   *original* loan-to-value and combined loan-to-values of 75% and 78% respectively"

14   (emphasis added).  Plaintiffs do not allege any facts, however, that Countrywide's

15   pay-option ARMs did not, in fact, have the initial characteristics described in this

16   sentence.  Moreover, Plaintiffs omit the rest of the paragraph from which this sentence

17   is found: "This high credit quality notwithstanding, lower initial payment requirements

18   of pay-option loans *may increase the credit risk inherent in our loans held for*

19   *investment...* Our exposure to this higher credit risk is increased by the negative

20   amortization that has been added to the principal balance" (emphasis added).

21        The 2005 10-K elsewhere makes explicit disclosure about the huge growth in

22   Countrywide's pay-option ARMs, and the dramatic increase in the negative

23   amortization about which Countrywide already was warning (RJN Ex. 12 at 41, 56,

24   F-36, F-37).  For example, the 10-K disclosed that Countrywide increased its total pay-

25   option loan portfolio from $4.7 billion at the end of 2004 to $26.1 billion at year-end

26   2005; and that the amount of "negative amortization" Countrywide already had

27   experienced had grown from $29,000 in 2004 to $142 million in 2005.  The 2005 10-K

28

18

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

also contained explicit disclosure of the significant growth in Countrywide's total
amount of its retained residual interests in, its interests in securitizations of, and its
owned services portfolio of, non-prime loans (RJN Ex. 12 at 95, 98, and F-38).  The
10-K also disclosed the significant growth in Countrywide's loans held for investment
(RJN Ex. 12 at 40, F-4, and F-58).  These disclosures in the aggregate made clear that
Countrywide faced significant risks with regard to its owned loan portfolio and pay-
option ARM portfolio, notwithstanding what it described as the high *initial* loan
quality of its pay-option ARMs.

   Paragraph 745 contains a statement that arguably relates to lending practices:
"we manage mortgage credit risk… *by retaining high credit quality mortgages in our
loan portfolio*" (emphasis added).  This is a statement not about all of Countrywide's
lending practices, but about the loans it held for investment.  The ellipsis Plaintiffs
employ is highly misleading—the full sentence in the 10-K makes clear that
"we manage mortgage credit risk *by selling most of the mortgage loans we produce,
and by retaining high credit quality mortgages in our portfolio.*"  RJN Ex. 12 at 42
(emphasis added).  In any event, Plaintiffs do not set forth any specific facts
demonstrating that the loans the company retained were not "high credit quality."
To the extent Plaintiffs seek to prove that the loans retained by Countrywide were *not*
"high credit quality" because of the company's concealment of its actual and potential
loss experience on these loans, other disclosures in the same 10-K undermine this
theory.  For example, the 2005 10-K disclosed the significant increase in actual
delinquencies and default rates that Countrywide was experiencing in its loans held for
investment, and in Countrywide's non-prime mortgage loans generally (RJN Ex. 12 at
8, 98, F-23, F-78), as well as the growth in loan losses and loss reserves for both prime
and non-prime loans (RJN Ex. 12 at 63, 75, F-5, F-20).  The 10-K further disclosed
that delinquencies on subprime loans of all types increased significantly from 11.29%
in 2004 to 15.20% in 2005, and 90-day delinquency rates in particular were up sharply.

Gibson, Dunn &
Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1  Foreclosure rates for subprime loans also increased.  Loan losses on loans held for

2  investment jumped from $71 million in 2004 to $115 million in 2005.  In light of these

3  and other disclosures, any reasonable investor should have had a sober view as to the

4  credit risks Countrywide faced on the loans it retained.

5       ***Additional Relevant Disclosures in the 2005 10-K That Rendered the***

6  ***Alleged Misstatements Immaterial.***  Countrywide made explicit risk factor disclosures

7  concerning the deterioration of the U.S. housing market  (*e.g.*, RJN Ex. 12 at 104-106).

8  These issues are discussed in detail in the motion to dismiss filed by Countrywide.

9  The combination of these and similar disclosures should have placed a reasonable

10  investor on notice of the significant increase in credit risk and Countrywide's exposure

11  to future subprime-related losses and write downs in the event of a downturn in the

12  housing market.[17]

13       **B.    THE SECTION 11 AND 12(a)(2) CLAIMS ARE BARRED IN PART**

14            **BY THE ONE-YEAR STATUTE OF LIMITATIONS.**

15       Plaintiffs' claims for relief under Sections 11 and 12(a)(2) are governed by—

16  and squarely barred by—a one-year statute of limitations.  Section 15 of the 1933 Act

17  sets forth a one-year statute of limitations for such claims from the date of the

18  discovery of the untrue statement or omission, or after such discovery should have

19  been made by the exercise of reasonable diligence.  15 U.S.C. § 77m.  The Complaint,

20

21

22  [17] *See, e.g., In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1182
23  (N.D. Cal. 2004) ("Because Van Wagoner's valuation policies were public, as well
     as all adverse information about the restricted securities in which Van Wagoner
24  funds had invested, the Casolaris have not alleged that Allied concealed any facts
     from its investors.").  *Cf. Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971,
25  976 (9th Cir. 1999) ("Because Ford's tax strategy was part of the total mix of
26  market information reflected in the price of FHI Preferred Stock at the time
     Heliotrope purchased its shares, Heliotrope cannot prove that Ford's failure to
27  disclose its tax strategy caused Heliotrope any loss.") (citations omitted).

28

20

Gibson, Dunn &
Crutcher LLP

1    together with other judicially noticeable facts, compels the conclusion that, under

2    Plaintiffs' theory of the case, investors had inquiry notice of potentially misleading

3    statements or omissions related to Countrywide's mortgage lending standards and

4    actions on or before September 18, 2006 – one year prior to the filing of this action.

5    Further, since Plaintiffs have not alleged that they engaged in any reasonable diligence

6    to investigate the true nature of the facts underlying any allegedly misleading

7    statements or omissions, all their Section 11 and 12(a)(2) claims other than Counts

8    XIII and XIV are time-barred.

9         In the Ninth Circuit, this statute of limitations is triggered by "inquiry notice" of

10   an untrue or misleading statement. *Betz v. Trainer Wortham & Co.*, 504 F.3d 1017,

11   1024 (9th Cir. 2007), amended, 519 F.3d 863 (9th Cir. 2008). A plaintiff is put on

12   inquiry notice when there exists sufficient suspicion of an "untrue or misleading

13   statement" to cause a reasonable investor to investigate the matter more fully. *In re*

14   *Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1411 (9th Cir. 1996); *Betz*, 504 F.3d at 1024.

15   Once a plaintiff is placed on inquiry notice, the court must examine "when the

16   investor, in the exercise of reasonable diligence, should have discovered the facts

17   constituting the alleged[ly]" fraudulent or misleading statement. *Betz*, 504 F.3d at

18   1024. The time at which a reasonably diligent investor should have uncovered these

19   facts indicates when the statute of limitations began to run. *Id.* at 1024.[18]

20   ─────────────────

21   [18] District courts in this Circuit have applied this "'inquiry-plus-reasonable-diligence

22   test' to determine when inquiry notice triggers the statute of limitations in a
     securities action." *In re Metro. Sec. Lit.*, 532 F. Supp. 2d 1260, 1286 (E.D. Wash.

23   2006); *In re Infonet Servs. Corp Sec. Lit.*, 310 F. Supp. 2d 1106, 1113 (C.D. Cal.
     2003) (barring Sections 11 and 12(a)(2) claims on inquiry notice grounds).

24   "Inquiry notice may be triggered by 'any financial, legal, or other data, such as

25   public disclosures in the media about the financial condition of the corporation . . .

26   that provide the plaintiff with sufficient storm warnings to alert a reasonable person
     to the probability that there were either misleading statements or significant

27   omissions involved in the sale of securities." *Infonet*, 310 F. Supp. 2d at 1113-14

28                                                    [Footnote continued on next page]

                                          21

Gibson, Dunn &
Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

On its face, the CAC reveals that class members were on inquiry notice concerning claims based on alleged undisclosed risks relating to Countrywide's subprime and nonprime mortgage lending practices well prior to September 18, 2006, one year prior to the filing date of this litigation.  The Complaint is replete with allegations regarding Countrywide's lending practices and their associated risks, and these allegations demonstrate that these practices and risks were publicly disclosed and known no later than the third quarter of 2006.  In addition to all the disclosure cited above from the 2005 10-K (filed with the SEC on May 1, 2006), other examples taken from the CAC that would have put a reasonable investor on inquiry notice include:

- "*In 2006*, Defendant Mozilo *publicly acknowledged* that the vast majority of borrowers of Pay Option ARMs were only making the minimum payments and that this posed a significant risk of defaults if the housing market declined." Compl. ¶ 292 (emphasis added).[19]

- "Freddie Mac, one of the government sponsored entities that purchased loans from Countrywide during the Class Period, stated in its *February 2003* public guidelines that 'FICO scores objectively evaluate all the information in the Borrower's repository credit file at the time the FICO score was created.  Freddie Mac has identified a strong correlation between Mortgage performance and FICO scores." Compl. ¶ 220.

- The Company's subprime loans carried a delinquency rate of "16.93% *in the third quarter of 2006*." Compl. ¶ 297 (emphasis added).[20]

- "*In the Company's 2004 Form 10-K,* management noted a material weakness regarding recognizing gains on sale of mortgage backed securities with embedded derivatives." Compl. ¶ 370 n.21 (emphasis added).

---

[Footnote continued from previous page]
(quoting *In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 364-65 (S.D.N.Y. 2001)).

[19]  It appears that Mozilo's statements occurred on September 13, 2006. *See* CAC ¶¶ 292 and 430.

[20]  The delinquency rate for Countrywide subprime loans noted for Q3 2006 is higher than the reported delinquency rate of 15.20% for 2005, and exceedingly higher than the 2004 rate of 11.29%.

22

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

- The Company was questioned by investors about "credit quality in the nonprime mortgage sector" on "July 26, 2005." Compl. ¶ 403.

- "In an interview with CNBC's Maria Bartiromo *in late February or early March 2006*, Mozilo stated that housing prices would decline significantly in the next 12 to 18 months." Compl. ¶ 429, 443 (emphasis added).

- Wall Street analysts questioned the Company about "the functionalities of an adjustable rate mortgage" in an "*April 21, 2004* Conference Call." Compl. ¶ 568 (emphasis added).

In their motion to dismiss filed concurrently herewith, the Countrywide Defendants cite many other public disclosures that in the aggregate reflect that investors were provided with "sufficient storm warnings" regarding the facts giving rise to their claims years ago. A summary of additional public disclosures relevant to the Underwriter Defendants' statute of limitations argument is attached as Appendix C.

Despite the disclosure of these warnings by March 2006, when Countrywide filed its 2005 10-K, Plaintiffs do not allege that they conducted *any* investigation into the possibility of misstatements or misrepresentations in the Company's public filings and statements. The failure to allege any facts establishing diligent inquiry is itself a ground for dismissal. *See Domenikos v. Roth*, 2008 U.S. App. LEXIS 12079, at *3 (2d Cir. June 5, 2008) (non-precedential summary order) ("If inquiry notice is established and the investor fails to conduct an inquiry, knowledge of the fraud is imputed as of the date he received inquiry notice."). Although Plaintiffs "could have discovered the facts underlying their claims at an earlier date in the exercise of reasonable diligence," *In re Metro. Sec. Litig.*, 532 F. Supp. 2d at 1289, no facts in the Complaint establish that they attempted to do so. Accordingly, all Section 11 and 12(a)(2) claims other than Counts XIII and XIV are time-barred.[21]

---

[21] If the Court does not grant the motion to dismiss on these grounds, then in the alternative the Underwriter Defendants move to dismiss all claims other than Counts XIII and XIV against those underwriters first named in any complaint in January 2008, on the grounds that at a minimum the claims against those defendants are time-barred under the relevant one-year statute of limitations, given

[Footnote continued on next page]

23

Gibson, Dunn &
Crutcher LLP

## C.   THE SECTION 11 CLAIMS SET FORTH IN COUNTS IV, V, X, XI, AND XIII MUST BE DISMISSED FOR LACK OF STANDING

As discussed below, Lead Plaintiffs lack standing to sue the Underwriter Defendants under Section 11 for certain of the classes of securities on which the Section 11 claims are based because Lead Plaintiffs did not purchase or hold certain of the CW securities.

### 1.   NY Funds Did Not Purchase Any of the Capital V 7% Securities.

To have standing to bring an action under Section 11, Plaintiffs must demonstrate that the securities they purchased were issued in or are traceable to the deficient registration statement. *In re Exodus Comm'ns, Inc. Sec. Litig.*, 2006 WL 3050829, at *1 (N.D. Cal. Oct. 26, 2006); *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 864 (N.D. Tex. 2005). "[T]he burden is on the plaintiff to 'prove the securities he bought were those sold in an offering covered by the false registration statement.'" *West Palm Beach Firefighters Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *7 (D. Colo. March 28, 2008) (quoting *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)). Lead Plaintiffs do not allege in their Amended Certification that they ever purchased any of the Capital V 7% Securities. Therefore, they lack standing to sue on these securities.[22]

---

[Footnote continued from previous page]
the additional adverse disclosures made by Countrywide through January 2007. Under relevant case law, there is no basis for Plaintiffs to rely upon the "relation back" doctrine to add these new defendants, whose identities were known at the time of the filing of the original suits. *See In re WorldCom, Inc. Sec. Litig.,* 2004 WL 540450, at *3-6 (S.D.N.Y. Mar. 19, 2004).

[22] Class representatives Brahn and Katzeff appear to have been added as plaintiffs in the CAC to cure the obvious lack of standing on NY Funds with regard to the 7% Capital Securities. These new plaintiffs were quietly inserted into this litigation without notice to the court or to the Defendants, and without having taken any steps
[Footnote continued on next page]

24

Gibson, Dunn &
Crutcher LLP

## 2. NY Funds Were Not Holders of Floating Rate Notes or 6.25% Subordinated Notes at the Time of the First Alleged Curative Disclosure in July 2007.

"Constitutional standing requires that a plaintiff show (1) an injury in fact (2) that is fairly traceable to the defendant's actions and (3) that will likely be redressed by a favorable decision." *In re Impax Labs., Inc. Sec. Litig.*, 2008 WL 1766943, at *6 (N.D. Cal. April 17, 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "In a class action, a lead plaintiff must show that it personally has been injured, 'not that injury has been suffered by other, unidentified members of the class to which [it] belong[s] and which [it] purport[s] to represent.'" *Id.*; *see also In re Comverse Tech., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 14878, at *16 (E.D.N.Y. Mar. 2, 2007) (refusing to grant lead plaintiff motion of shareholder who had sold all holdings of Comverse securities prior to curative disclosures, and therefore could not establish loss causation as a matter of law).[23]

---

[Footnote continued from previous page]
to comply with the lead plaintiff provisions of the PSLRA.  Although, in light of this Court's prior rulings, the Underwriter Defendants do not seek dismissal of these plaintiffs' claims on this basis, the practice is questionable at best.  *See, e.g., In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) (purpose of lead plaintiff provisions of PSLRA is, *inter alia*, to "discourage opportunistic lawsuits" and "diminish the risk of lawyer-driven lawsuits").

[23] Some courts have referred to this as "negative causation," when an affirmative defense is made out on the face of the pleadings.  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (dismissing Section 11 claim on "negative causation" grounds where plaintiffs had exchanged their shares prior to any corrective disclosure); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375314 at *6 (S.D.N.Y. Feb. 17, 2005); *see also, e.g., In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 865 (N.D. Tex. 2005) ("If the negative causation defense is apparent on the face of a complaint, dismissal under Rule 12(b)(6) of the Section 11 claim is proper.").

Gibson, Dunn & Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1    Lead Plaintiffs here allege that the curative disclosures began on July 24, 2007.

2    Complaint ¶ 210.  However, their amended certification makes clear that none of the

3    NY Funds was a holder of any of the Floating Rate Notes due 2011 or the 6.25%

4    Subordinated Notes due 2016 as of the date of the first curative disclosure.

5    Where, as here, the Lead Plaintiff sells all of its shares of stock in the

6    corporation prior to the corrective disclosure of truthful information, such plaintiff

7    "will not have suffered any loss based on a misrepresentation related to that

8    information" and thus, lacks standing to bring suit.  *In re Impax Labs., Inc. Sec. Litig.*,

9    2008 WL 1766943, at *7; *accord In re McKesson HBOC Sec. Litig.*, 126 F. Supp. 2d

10   1248, 1262 (N.D. Cal. 2000); *Davidco Investors, LLC v. Anchor Glass Container*

11   *Corp.*, 2006 WL 547989, at *24 (M.D. Fla. Mar. 6, 2006).[24]  Even if Lead Plaintiffs

12   attempt to argue that the fact that all their holdings were disposed of prior to any

13   curative disclosure does not establish "negative causation" *per se*, here, Appendix B

14   reflects that in the case of NY Funds' purchases and sales of Floating Rate Notes,

15   Lead Plaintiffs contend they actually had a net *gain*.  And as to the 6.25%

16   Subordinated Notes, although Appendix B shows a very small loss (according to Lead

17   Plaintiffs' own estimates), it is equally plausible that any such loss was due to the

18   general decline in the securities prices of mortgage originators during the time period

19   of NY Funds' last wave of sales of these securities in June and July 2007,

20

21   [24]  Other facts concerning NY Funds' trading also call into question these plaintiffs'
22   ability to prove loss causation with regard to their purchases of other classes of
     Countrywide securities.  For example, all NY Funds' purchases of Series B
23   Medium Term Notes occurred on June 4, 2007, after Countrywide had made
     significant adverse disclosures, and the marketplace was saturated with other
24   adverse information about the subprime mortgage market.  Indeed, in that same
     month, NY Funds itself began *divesting* itself of other Countrywide securities.
25   Similarly, NY Funds Variable A purchases and sales started in October 2007, after
26   this litigation was first commenced.  Finally, at least one of the NY Funds
     purchased Series B Notes in February 2008, long after this lawsuit had commenced.
27

28

Gibson, Dunn &
Crutcher LLP

as demonstrated in the Countrywide Defendants' motion to dismiss.  In short, this Court should find that in light of this showing of negative causation, NY Funds lack standing to sue on these two classes of securities.

### 3.   Lead Plaintiffs Fail to Allege That They Purchased Any of the 2-Year Notes or 3-Year Notes

Lead Plaintiffs allege in CAC ¶¶ 892 and 894 that they purport to sue the Underwriter Defendants for over $1 billion worth of "2-Year Notes" and "3-Year Notes."[25]  However, the Lead Plaintiffs' trading information set forth in Appendix B shows that none of the Lead Plaintiffs purchased any of the 2-Year Notes or 3-Year Notes.  Accordingly, none of the Lead Plaintiffs has standing to sue on these securities. *See, e.g., Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004) (dismissing Sections 11 and 12(a)(2) claims where named plaintiffs lacked standing to sue on their own with respect to two of the securities offerings at issue).

### D.   THE SECTION 11 AND SECTION 12(a)(2) CLAIMS PREMISED ON COUNTRYWIDE DEBT SECURITIES THAT HAVE MATURED FAIL TO ALLEGE LOSS CAUSATION OR AN ACTIONABLE LOSS AND SHOULD BE DISMISSED

Under Sections 11 and 12 there can be no recovery for alleged losses that are not attributable to the alleged misstatements or omissions in a prospectus, oral communication, or registration statement. *See* 15 U.S.C. §§ 77k(e), l(b).  Any alleged decrease in the value of a security before the disclosure of an alleged misstatement or

---

[25]  In those same paragraphs, Lead Plaintiffs make clear that those Notes were sold pursuant to certain specified "Pricing Supplements" identified therein. *See also* CAC ¶ 888.  Each such Pricing Supplement is representative of a different "tranche" of Series A debt securities sold pursuant to the February 2004 registration statement, and involved different configurations of underwriters for each such tranche. *See, e.g.*, RJN Exhs. 1, 2, and 4.

27

Gibson, Dunn & Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

1 omission cannot be attributed to the alleged misstatement or omission and such a loss

2 is not actionable under the 1933 Act. *See, e.g., In re McKesson HBOC Inc., Sec. Litig.,*

3 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (defendant has "absolute" negative

4 causation defense against plaintiffs who dispose of security prior to the date of curative

5 disclosure); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F. Supp.

6 2d 243, 255 (S.D.N.Y. 2003) (granting motion to dismiss where alleged losses

7 occurred before public disclosure of the allegedly concealed information).

8       Many of the Countrywide debt securities at issue in this litigation had specified

9 maturity dates, and a number of the Series A and Series B Securities matured prior to

10 the curative disclosures that began on July 24, 2007. *See* Appendix D.  To the extent

11 Plaintiffs' 1933 Act claims are based on Countrywide debt securities that matured

12 *prior* to the curative disclosures that began on July 24, 2007, Plaintiffs cannot establish

13 loss causation.  To the extent any purchasers sold or disposed of their debt securities

14 before maturity, any decline in the value of those securities occurred before the alleged

15 misstatements or omissions and necessarily cannot be attributed to the misstatements

16 or omissions as a matter of law.  *In re McKesson,* 126 F. Supp. 2d at 1262; *In re*

17 *Merrill Lynch,* 272 F. Supp. 2d at 254.

18       With respect to purchasers who held Countrywide debt securities to maturity,

19 regardless of whether the securities matured before or after the curative disclosures,

20 there can be no recovery because such purchasers did not suffer any loss recoverable

21 under the statute.  The CAC makes no allegation that Countrywide ever defaulted in

22 the payment of any interest or principal due on the debt securities while they were

23 outstanding, or caused any loss to purchasers of these securities who held them to

24 maturity.  Accordingly, this Court may properly infer that as to debt securities that

25 have reached maturity, Countrywide continued to pay interest to investors without

26 default, and all principal was repaid to holders of these securities upon maturity.

27 Accordingly, at a minimum, the Court should rule that (a) if the Countrywide debt

28

28

1  securities at issue matured prior to the first curative disclosure, no claim can be stated

2  as to such securities, and (b) no claim can be stated as to those Countrywide securities

3  that class members purchased and held to maturity.

4      **E.**    **THE SECTION 12(a)(2) CLAIMS MUST BE DISMISSED FOR**

5              **LACK OF STANDING**

6        Under Section 12(a)(2), unlike Section 11, plaintiffs may not simply rely upon

7  "tracing" doctrine to have standing to sue.  Rather, they must plead with particularity

8  that they purchased their securities from the defendant they are suing.

9  This "purchaser-seller" rule was established by the U.S. Supreme Court in *Pinter v.*

10  *Dahl,* 486 U.S. 622 (1988), in which the Court noted that the language of Section 12

11  "contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.*

12  at 642.  Subsequent decisions have made clear that the purchaser-seller rule applies to

13  Section 12(a)(2) claims in particular.  *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 871

14  (5th Cir. 2003).[26]

15        Here, Plaintiffs have paid lip service to the purchaser-seller requirement, and

16  have alleged in boilerplate fashion in their Section 12(a)(2) claim relating to the Series

17  A Notes that each of the Underwriter Defendants are "sellers" because they

18  "(a) transferred title to Lead Plaintiff… *and other purchasers* of the Series A Medium

19  Term Notes, (b) transferred title… to *other purchasers and/or broker dealers* that sold

20  the Series A Medium Term Notes as their agents, *and/or* (c) solicited the purchase of

21  Series A Medium Term Notes by Lead Plaintiff…and *other members of the class…*"

22  CAC ¶ 1103 (emphasis added).  This litany of alternative possibilities is repeated in

23

24

25  [26]  The purchaser-seller rule has been interpreted by some courts to permit standing if the defendant actively solicited the plaintiffs' purchases of the involved securities. *See, e.g., Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,* 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001).  But no such allegations of active solicitation by any Underwriter Defendant is made in the CAC.

26

27

28

29

Gibson, Dunn & Crutcher LLP

**UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1  each of the remaining Section 12(a)(2) claims relating to the other classes of

2  Countrywide securities (CAC ¶¶ 1144, 1185, 1226 and 1267).  Based on this generic

3  type of allegation, this Court must conclude that Lead Plaintiffs have not pled that they

4  *actually purchased* from any of the Underwriter Defendants, and therefore they lack

5  standing to sue.  Indeed, a large number of the Series A and B offerings were

6  "self underwritten" by Countrywide Securities, and no third party underwriter

7  participated in those offerings.  *See, e.g.*, Appendix D and RJN Exhs. 1, 3, 6, and 7.

8  At a minimum, this Court should dismiss all Section 12(a)(2) claims relating to

9  offerings sold exclusively by Countrywide.

## IV.   CONCLUSION

11       For all the reasons stated herein, the Underwriter Defendants respectfully

12  request that the Court dismiss the Consolidated Amended Complaint.

14

DATED:  June 10, 2008

15                              DEAN KITCHENS
16                              JONATHAN DICKEY
                               MICHAEL DORE
17                              LINDSAY PENNINGTON
                               GIBSON, DUNN & CRUTCHER LLP
18
19                   By:  *Dean Kitchens*
20                              Dean J. Kitchens

21                         Attorneys for Underwriters Defendants

28

30

Gibson, Dunn &
Crutcher LLP

UNDERWRITER DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

# APPENDIX A

## APPENDIX A

| OFFERING | REGISTRATION STATEMENT | SEC FILING | "BASE PROSPECTUS" | PROSPECTUS SUPPS. AND/OR FRPs |
|---|---|---|---|---|
| Series A Medium Term Notes (includes 2-yr and 3-yr notes) | April 2004 | 2003 10-K | April 2004 | Feb. 2005 & Dec. 2005 |
| Floating Rate Subordinated Notes | April 2004 | 2003 10-K | April 2004 | Sept. 2005 |
| Series B Medium Term Notes | Feb. 2006 | 2004 10-K; 2005 10-Qs | Feb. 2006 | Feb. 2006-Aug. 2007 |
| 6.25% Subordinated Notes | Feb. 2006 | 2004 10-K; 2005 10-Qs | Feb. 2006 | May 2006 |
| 7% Capital Securities | Feb. & Oct. 2006 | 2005 10-K; 2006 10-Qs | Oct. 2006 | n/a |

100456550_2.DOC

# APPENDIX B

APPENDIX B

| Name of Person who the Amended Complaint was Filed on Behalf of: | Trans | Trade Date | Settle Date | Quantity | Price | Principal* |
|---|---|---|---|---|---|---|
| **Floating Rate Subordinated Notes Due April 1, 2001** | | | | | | |
| NYCERS | Buy | 9/27/2005 | 9/30/2005 | 15,000,000.00 | $99.90 | ($14,985,450.00) |
| NYCERS | Buy | 3/21/2006 | 3/24/2006 | 5,000,000.00 | $99.99 | ($4,999,500.00) |
| NYCERS | Sell | 7/3/2006 | 7/3/2006 | -20,000,000.00 | $ - | $20,000,000.00 |
| NYC Police | Buy | 9/27/2005 | 9/30/2005 | 2,000,000.00 | $99.90 | ($1,998,060.00) |
| NYC Police | Sell | 7/3/2006 | 7/3/2006 | -2,000,000.00 | $ - | $2,000,000.00 |
| NYC Fire | Buy | 9/27/2005 | 9/30/2005 | 5,000,000.00 | $99.90 | ($4,995,150.00) |
| NYC Fire | Sell | 7/3/2006 | 7/3/2006 | -5,000,000.00 | $ - | $5,000,000.00 |
| NYC BOE | Buy | 9/27/2005 | 9/30/2005 | 2,500,000.00 | $99.90 | ($2,497,575.00) |
| NYC BOE | Sell | 7/3/2006 | 7/3/2006 | -2,500,000.00 | $ - | $2,500,000.00 |
| NYC Teachers | Buy | 9/27/2005 | 9/30/2005 | 12,500,000.00 | $99.90 | ($12,487,875.00) |
| NYC Teachers | Buy | 3/21/2006 | 3/24/2006 | 5,000,000.00 | $99.99 | ($4,999,500.00) |
| NYC Teachers | Sell | 7/3/2006 | 7/3/2006 | -17,500,000.00 | $ - | $17,500,000.00 |
| | | | TOTAL | 0.00 | | $36,890.00 |
| | | | | | | |
| **6.25 Subordinated Notes Due May 15, 2016** | | | | | | |
| NYCERS | Buy | 5/11/2006 | 5/16/2006 | 2,950,000.00 | $99.73 | ($2,942,005.50) |
| NYCERS | Sell | 5/11/2006 | 5/16/2006 | -625,000.00 | $99.80 | $623,762.50 |
| NYCERS | Buy | 5/11/2006 | 5/16/2006 | 1,250,000.00 | $99.73 | ($1,246,612.50) |
| NYCERS | Sell | 5/11/2006 | 5/16/2006 | -625,000.00 | $99.88 | $624,218.75 |
| NYCERS | Sell | 5/11/2006 | 5/16/2006 | -625,000.00 | $99.80 | $623,762.50 |
| NYCERS | Buy | 5/11/2006 | 5/16/2006 | 1,250,000.00 | $99.73 | ($1,246,612.50) |
| NYCERS | Sell | 5/11/2006 | 5/16/2006 | -625,000.00 | $99.88 | $624,218.75 |
| NYCERS | Sell | 1/26/2007 | 1/31/2007 | -869,000.00 | $101.98 | $886,249.65 |
| NYCERS | Sell | 6/26/2007 | 6/29/2007 | -1,182,000.00 | $98.04 | $1,158,844.62 |
| NYCERS | Sell | 7/16/2007 | 7/19/2007 | -899,000.00 | $97.68 | $878,161.18 |
| NYC Police | Buy | 5/11/2006 | 5/16/2006 | 2,750,000.00 | $99.73 | ($2,742,547.50) |
| NYC Police | Sell | 1/26/2007 | 1/31/2007 | -810,000.00 | $101.98 | $826,078.50 |
| NYC Police | Sell | 6/26/2007 | 6/29/2007 | -1,102,000.00 | $98.04 | $1,080,411.82 |
| NYC Police | Sell | 7/16/2007 | 7/19/2007 | -838,000.00 | $97.68 | $818,575.16 |
| NYC Fire | Buy | 5/11/2006 | 5/16/2006 | 720,000.00 | $99.73 | ($718,048.80) |
| NYC Fire | Sell | 1/26/2007 | 1/31/2007 | -212,000.00 | $101.98 | $216,208.20 |
| NYC Fire | Sell | 6/26/2007 | 6/29/2007 | -288,000.00 | $98.04 | $282,358.08 |
| NYC Fire | Sell | 7/16/2007 | 7/19/2007 | -220,000.00 | $97.68 | $214,900.40 |
| NYC Teachers | Buy | 5/11/2006 | 5/16/2006 | 3,000,000.00 | $99.73 | ($2,991,870.00) |
| NYC Teachers | Sell | 1/26/2007 | 1/31/2007 | -884,000.00 | $101.98 | $901,547.40 |
| NYC Teachers | Sell | 6/26/2007 | 6/29/2007 | -1,202,000.00 | $98.04 | $1,178,452.82 |
| NYC Teachers | Sell | 7/16/2007 | 7/19/2007 | -914,000.00 | $97.68 | $892,813.48 |
| | | | TOTAL | 0.00 | | ($57,132.99) |
| | | | | | | |
| **Medium-Term Notes, Series A, Pricing Supplement No. 7 dated June 8, 2005** | | | | | | |
| NYCERS | Buy | 6/8/2005 | 6/13/2005 | 4,800,000.00 | $ - | ($4,790,640.00) |
| NYC Police | Buy | 6/8/2005 | 6/13/2005 | 4,145,000.00 | $ - | ($4,136,917.25) |
| NYC Fire | Buy | 6/8/2005 | 6/13/2005 | 1,170,000.00 | $99.80 | ($1,167,718.50) |
| NYC Teachers | Buy | 6/8/2005 | 6/13/2005 | 4,715,000.00 | $ - | ($4,705,805.75) |
| | | | TOTAL | 14,830,000.00 | | ($14,801,081.50) |
| | | | | | | |
| **Medium-Term Notes, Series B, Pricing Supplement No. 134 dated June 4, 2007** | | | | | | |
| NYCERS | Buy | 6/4/2007 | 6/7/2007 | 2,000,000.00 | $ - | ($1,996,140.00) |
| NYCERS | Buy | 6/4/2007 | 6/7/2007 | 1,425,000.00 | $ - | ($1,422,249.75) |
| NYCERS | Buy | 2/12/2008 | 2/15/2008 | 400,000.00 | $90.50 | ($362,000.00) |
| NYC Police | Buy | 6/4/2007 | 6/7/2007 | 725,000.00 | $ - | ($723,600.75) |
| NYC Fire | Buy | 6/4/2007 | 6/7/2007 | 250,000.00 | $99.81 | ($249,517.50) |
| | | | TOTAL | 3,375,000.00 | | ($4,753,508.00) |
| | | | | | | |
| **Medium-Term Notes, Series B, Pricing Supplement No. 135 dated June 4, 2007** | | | | | | |
| NYCERS | Buy | 6/4/2007 | 6/7/2007 | 7,500,000.00 | $100.00 | ($7,500,000.00) |
| NYC Police | Buy | 6/4/2007 | 6/7/2007 | 1,500,000.00 | $100.00 | ($1,500,000.00) |
| NYC Fire | Buy | 6/4/2007 | 6/7/2007 | 2,500,000.00 | $100.00 | ($2,500,000.00) |
| NYC BOE | Buy | 6/4/2007 | 6/7/2007 | 1,500,000.00 | $100.00 | ($1,500,000.00) |
| NYC Teachers | Buy | 6/4/2007 | 6/7/2007 | 7,500,000.00 | $100.00 | ($7,500,000.00) |
| | | | TOTAL | 20,500,000.00 | | ($20,500,000.00) |
| * Plaintiffs' estimates -- subject to verification | | | | | | |

| Name of Person who the Amended Complaint was Filed on Behalf of: | Trans | Trade Date | Settle Date | Quantity | Price | Principal* |
|---|---|---|---|---|---|---|
| INFORMATION FOR DEALS LISTED IN THE AMENDED CERTIFICATION (EXHIBIT B) THAT DO NOT MATCH UP WITH DEALS NAMED IN THE COMPLAINT | | | | | | |
| **Offering date 10/11/2007, maturity date 4/15/2037** | | | | | | |
| NYC Teachers' Variable A | FREE DELIVERY | 12/12/2007 | | 1,850,000.00 | | |
| NYC Teachers' Variable A | PURCHASES | 12/12/2007 | | 913,000.00 | | |
| NYC Teachers' Variable A | PURCHASES | 12119/07 | | 908,000.00 | | |
| NYC Teachers' Variable A | SALES | 1/9/2008 | | 610,000.00 | | |
| NYC Teachers' Variable A | SALES | 1/10/2008 | | 604,000.00 | | |
| NYC Teachers' Variable A | PURCHASES | 1/25/2008 | | 100,000.00 | | |
| NYC Teachers' Variable A | SALES | 2/20/2008 | | 21,000.00 | | |
| NYC Teachers' Variable A | SALES | 3/10/2008 | | 256,000.00 | | |
| NYC Teachers' Variable A | SALES | 3/10/2008 | | 122,000.00 | | |
| **Medium-Term Notes, Series K, Pricing Supplement No. 5 dated January 24, 2002** | | | | | | |
| NYCERS | Sell | 10/14/2004 | 10/19/2004 | -3,455,000.00 | $105.13 | $3,632,206.95 |
| NYC Police | Sell | 10/14/2004 | 10/19/2004 | -2,560,000.00 | $105.13 | $2,691,302.40 |
| NYC Fire | Sell | 10/14/2004 | 10/19/2004 | -785,000.00 | $105.13 | $825,262.65 |
| NYC Teachers | Sell | 10/14/2004 | 10/19/2004 | -3,130,000.00 | $105.13 | $3,290,537.70 |
| | | | TOTAL | -9,930,000.00 | | $10,439,309.70 |
| **Medium-Term Notes, Series M, dated August 23, 2004** | | | | | | |
| NYCERS | Buy | 10/26/2004 | 10/29/2002 | 3,580,000.00 | $99.84 | ($3,574,200.40) |
| NYCERS | Sell | 6/8/2005 | 6/13/2002 | -3,580,000.00 | $100.05 | $3,581,897.40 |
| NYC Police | Buy | 10/26/2004 | 10/29/2004 | 2,970,000.00 | $99.84 | ($2,965,188.60) |
| NYC Police | Sell | 6/8/2005 | 6/13/2005 | -2,970,000.00 | $100.05 | $2,971,574.10 |
| NYC Fire | Buy | 10/26/2004 | 10/29/2004 | 835,000.00 | $99.84 | ($833,647.30) |
| NYC Fire | Sell | 6/8/2005 | 6/13/2004 | -835,000.00 | $100.05 | $835,442.55 |
| NYC Teachers | Buy | 10/26/2004 | 10/29/2004 | 3,475,000.00 | $99.84 | ($3,469,370.50) |
| NYC Teachers | Sell | 6/8/2005 | 6/13/2005 | -3,475,000.00 | $100.05 | $3,476,841.75 |
| | | | TOTAL | 0.00 | | $23,349.00 |
| **Medium-Term Notes, Series M, Pricing Supplement No. 8 dated September 13, 2004** | | | | | | |
| NYCERS | Buy | 10/14/2004 | 10/19/2004 | 3,630,000.00 | $100.43 | ($3,645,754.20) |
| NYCERS | Sell | 5/11/2006 | 5/16/2006 | -3,630,000.00 | $95.38 | $3,462,330.30 |
| NYC Police | Buy | 10/14/2004 | 10/19/2004 | 2,690,000.00 | $100.43 | ($2,701,674.60) |
| NYC Police | Buy | 8/12/2005 | 8/17/2005 | 540,000.00 | $9,732 | ($525,501.00) |
| NYC Police | Sell | 5/11/2006 | 5/16/2006 | -3,230,000.00 | $95.38 | $3,080,806.30 |
| NYC Fire | Buy | 10/14/2004 | 10/19/2004 | 830,000.00 | $100.43 | ($833,602.20) |
| NYC Fire | Buy | 8/12/2005 | 8/17/2005 | 60,000.00 | $97.32 | ($58,389.00) |
| NYC Fire | Sell | 5/11/2006 | 5/16/2006 | -890,000.00 | $95.38 | $848,890.90 |
| NYC Teachers | Buy | 10/14/2004 | 10/19/2004 | 3,290,000.00 | $100.43 | ($3,304,278.60) |
| NYC Teachers | Buy | 8/12/2005 | 8/17/2005 | 400,000.00 | $97.32 | ($389,260.00) |
| NYC Teachers | Sell | 5/11/2006 | 5/16/2006 | -3,690,000.00 | $9,538.00 | $3,519,558.90 |
| | | | TOTAL | 0.00 | | ($546,873.20) |
| **Medium-Term Notes, Series K, Pricing Supplement No. 29 dated December 12, 2002** | | | | | | |
| NYC Teachers | Buy | 9/10/2007 | 9/13/2007 | 650,000.00 | $97.75 | ($635,375.00) |
| NYC Teachers | Buy | 9/11/2007 | 9/14/2007 | 200,000.00 | $97.75 | ($195,500.00) |
| NYC Teachers | Sell | 12/19/2007 | 12/19/2007 | -850,000.00 | $100.00 | $850,000.00 |
| | | | TOTAL | 0.00 | | $19,125.00 |
| **Series A Floating Rate Convertible Senior Debenture Due 2037** | | | | | | |
| NYC Teachers' Variable A | PURCHASES | 8/7/2007 | | 1,850,000.00 | | |

# APPENDIX C

| Appendix C | |
|---|---|
| **REPRESENTATIVE COMPLAINT ALLEGATIONS** | **REPRESENTATIVE COUNTRYWIDE PUBLIC DISCLOSURES PRIOR TO SEPTEMBER 18, 2006** |
| **FICO SCORES AND PAY-OPTION ARMS**<br><br>"Countrywide sought to reassure the market as to the safety of the Pay Option ARMS held for investment in the Company's portfolio by disclosing the average original FICO scores of the borrowers holding such loans. The Company's 2005 Form 10-K stated that the 'pay-option loan portfolio' had a "relatively high initial loan quality,' and that the average original FICO score for Pay Option ARMS held for investment as of December 31, 2005 and 2004 was 720 and 730, respectively." (CAC ¶ 240) | **FY 2005 Form 10-K at 42:**  The quoted language from the 10-K continues by disclosing the following: "This high credit quality notwithstanding, lower initial payment requirements of pay-option loans *may increase the credit risk inherent in our loans held for investment*... Our exposure to this higher credit risk is increased by the negative amortization that has been added to the principal balance" (emphasis added).<br><br>**FY 2005 Form 10-K at 41:**  "Pay-option loans have increased from approximately 6% of our loan production during the year ended December 31, 2004, to approximately 19% of our production during the year ended December 31, 2005."<br><br>**FY 2005 10-K at F-36:**  "The Company's investment in 'pay-option' loans comprised 41% and 14% of the Company's investment in mortgage loans held for investment at December 31, 2005 and 2004, respectively."<br><br>**FY 2005 Form 10-K, at 57:**  Accumulated negative amortization for pay-option loans held for investment increased from $29,000 in 2004 to $13.9 million in 2005.<br><br>**1Q 2006 Form 10-Q at 35**:  "This high credit quality notwithstanding, lower initial payment requirements of pay-option loans may increase the credit risk inherent in our loans held for investment.  This is because when the required monthly payments for pay-option loans eventually increase (in a period not to exceed 10 years), borrowers may be less able to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a more traditional monthly-amortizing loan." |

|  | **2Q 2006 Form 10-Q at 37:** "Furthermore, substantially all of the pay-option loans we originate are underwritten based on 'reduced documentation' standards whereby the loan applicant's income is not fully documented." |
|---|---|
| **LOAN LOSS RESERVES**<br><br>The complaint alleges that unbeknownst to plaintiffs, the loan loss reserves were inadequate.<br><br>"As the level of risk in Countrywide's loan portfolio drastically increased, the Company kept the level of loan loss reserves relatively constant or even allowed it decrease, knowing that to increase loan loss reserves would have a direct, dollar-for-dollar impact on the amount of earnings the Company could report in its financial statements." (CAC ¶ 7) | **FY 2005 Form 10-K at F-5:** The provision for all loan losses in Countrywide's consolidated financial statements grew from $48,204,000 in 2003 to $115,685,000 in 2005.<br><br>**FY 2005 Form 10-K at 74-76.** The provision for loan losses for the banking segment which "hold[s] loans in portfolio that historically would have been immediately securitized and sole into the secondary market" grew from $9,782,000 in 2003 to $37,438,000 in 2004. Likewise, the allowance for loan losses in this segment grew from $6,651,000 in 2003 to $29,008,000 in 2004."<br><br>**1Q 2006 Form 10-Q at 47:** "The Banking Operation's provision for loan losses increased by $21.2 million during the quarter ended March 31, 2006 compared to the quarter ended March 31, 2005. . . . We expect our provision for loan losses and the related allowance for loan losses to increase as a percentage of our portfolio of loans held for investment as our portfolio continues to season."<br><br>**1Q 2006 Form 10-Q at 53:** "The increase in the provision of loan losses is due to the continuing growth and seasoning of the Banking Segment's loan portfolio, along with deteriorating credit performance of loans held for investment in our Mortgage Banking Segment."<br><br>**1Q 2006 Form 10-Q at 15 n.1:** "Loans held for investment at December 31, 2005, included loans that had been liquidated through foreclosure as of that date. Accordingly, the allowance for loan losses totaling $37.9 million related to $54.2 million in loans has been charged off in connection with the transfer of such loans to real estate acquired in settlement of loans." |

| | |
|---|---|
| | **2Q 2006 Form 10-Q at 50**: "The Banking Operations provision for loan losses increased by $15.5 million during the quarter ended June 30, 2006 compared to the quarter ended June 30, 2005. This increase reflects current portfolio growth, along with seasoning of loans acquired during the past years of rapid portfolio growth." |
| | **2Q 2006 Form 10-Q at 56**: "The increase in the provision for loan losses is due to the continuing growth and seasoning of the Banking Segment's loan portfolio, along with deteriorating credit performance of loans held for investment in our Mortgage Banking Segment." |
| | **FY 2005 Form 10-K at F-4.** Loans held for investment, net of allowance for loan losses grew from $39,661,191,000 in 2004 to $70,071,152,000 in 2005. |
| **INCREASED LEVELS OF NONPRIME LENDING**<br><br>"Beginning in 2003, Countrywide substantially increased its origination of nontraditional and subprime loans." (CAC ¶ 107).<br><br>"Countrywide loosened and abandoned its supposedly sound underwriting policies and procedures in order to pump up loan volume and boost earnings..." (CAC ¶ 206). | **FY 2005 Form 10-K at 8.** Nonprime mortgages in Countrywide's loan servicing portfolio increased from 11.29% of Countrywide's portfolio in 2004 to 15.20% of Countrywide's portfolio in 2005.<br><br>**FY 2005 Form 10-K at 25.** The total number of nonprime mortgage loans made by Countrywide's Mortgage Banking Loan Production increased from 95,062,000 in 2003 to 218,821,000 in 2004 to 254,172,000 in 2005. Likewise the % of total dollar volume of Countrywide's Mortgage Banking Loan Production consisting of nonprime mortgage loans went from 3.9% in 2003 to 10.5% in 2004 to 9.3% in 2005.<br><br>**FY 2005 Form 10-K at 28.** The total number of nonprime mortgage loans made by Countrywide's Wholesale Lending Division Loan Production increased from 29,094,000 in 2003 to 77,985,000 in 2004 to 94,646,000 in 2005. Likewise the % of total dollar volume of Countrywide's Wholesale Lending Division Loan Production consisting of nonprime mortgage loans went from 5.5% in 2003 to 16.2% in 2004 to 18.8% in 2005. |

| | |
|---|---|
| **GROWTH IN PAY-OPTION LOANS**<br><br>"Countrywide's explosive origination of nontraditional loans during the Class Period . . . vastly increased the long-term risk to the Company's business. To whatever extent investors deemed those risks tolerable, they were kept in the dark about facts and practices that vastly increased even those risks." (CAC ¶ 116)<br><br>"Despite the risky nature of Pay Option ARMs, Countrywide increased its production of these loans by offering them to persons who could not or would not document their income or assets" (CAC ¶ 112) | **FY 2005 Form 10-K at 50.** Countrywide's Mortgage Banking Nonprime Mortgage Loans increased from $33,481 in 2004 to $40,089 in 2005.<br><br>**1Q 2006 Form 10-Q at 52:** "Gain on sale of Nonprime Mortgage Loans decreased in the quarter ended March 31, 2006 as compared to 2005 due primarily to lower margins resulting from *increased pricing competition.*"<br><br>**FY 2005 Form 10-K at 61.** Nonprime Mortgage Loans sold grew from $30,649,607,000 in 2004 to $43,774,272,000.<br><br>**FY 2005 Form 10-K at 98.** The dollar amount of Countrywide's servicing portfolio in Nonprime mortgages grew from $84,608,000 in 2004 to $116,101 in 2005.<br><br>**FY 2005 Form 10-K at 41.** "Pay-option loans have increased from approximately 6% of our loan production during the year ended December 31, 2004, to approximately 19% of our production during the year ended December 31, 2005.... Approximately 82% of the pay-option loans produced in 2005 was originated for sale *without recourse.* The remainder of these loans, which amount to $17.2 billion, were retained in the Bank's portfolio of loans held for investment." (emphasis added).<br><br>**FY 2005 Form 10-K at 56; 1Q 2006 Form 10-Q at 46:** "Countrywide Bank increased its investment in pay-option loans during 2005.... Our underwriting standards conform to those required to make the pay-option loans salable into the secondary market at the date of funding..."<br><br>**1Q 2006 Form 10-Q at 35:** "While adjustable rate production has decreased as a percentage of total production, pay option loans have continued to increase their representation in adjustable-rate production, from approximately 17% of our loan production during the quarter ended March 31, 2005, to approximately 19% of our production during the quarter ended March 31, 2006." |

**1Q 2006 Form 10-Q at 35; 2Q 2006 Form 10-Q at 37**: "Pay-option loans differ from 'traditional' monthly-amortizing loans by providing borrowers with the option to make fully amortizing, interest-only, or 'negative-amortizing' payments. . . . [L]ower initial payment requirements of pay-option loans may increase the credit risk inherent in our loans held for investment.  This is because when the required monthly payments for pay-option loans eventually increase (in a period not to exceed 10 years), borrowers may be less able to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a more traditional monthly-amortizing loan."

**2Q 2006 Form 10-Q at 37**: "The trend [in decreased loan production] is also reflected in our pay-option loan production, which has decreased from approximately 21% of our loan production during the quarter ended June 30, 2005, to approximately 17% of our production during the quarter ended June 30, 2006.  Approximately 72% of the pay-option arms originated in the quarter ended June 30, 2006 were retained in our Bank's investment loan portfolio."

**2Q 2006 Form 10-Q at 49**: "Banking Operations increased its investment in pay-option loans during the quarter ended June 30, 2006.  These loans have interest rates that adjust monthly and minimum required payments that adjust annually, resulting in the potential for negative amortization. . . . Assuming today's interest rates remain unchanged, borrowers who consistently make the minimum required payment will have the ability to make less than the full interest payment for three to four years, at which time the negative amortization cap will be reached and a new monthly payment amount will be required.  The resulting payment adjustment could be substantial.  Our underwriting standards conform to those required to make the pay-option loans salable into the secondary market at the date of funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment assuming the loan's interest rate is fully indexed."

**2Q 2006 Form 10-Q at 50**:  The total pay-option portfolio held for investment by Banking Operations as of June 30, 2006 was $34,226,440 (in thousands), compared to $26,101,306 (in thousands) as of December 31, 2005.  The loans delinquent were up 0.19%, compared to 0.10 %, respectively.

**FY 2005 Form 10-K at F-36.**  "Beginning in 2004, one of the adjustable-rate loan products offered by the Company increased in prominence, from approximately 6% of loan originations during the year ended December 31, 2004 to approximately 19% during the year ended December 31,2005.  This product is commonly referred to as a 'pay-option' loan.  The Company has retained a significant portion of its pay-option loan production in its investment portfolio during the to-year period ended December 31, 2005.  The Company's investment in 'pay-option' loans comprised 41% and 14% of the Company's investment in mortgage loans held for investment at December 31, 2005 and 2004, respectively.

Pay-option loans have interest rates that adjust monthly and contain features that allow the borrower to defer making the full interest payment for at least the first year of the loan.  After this 'option' period, minimum monthly payments increase by no more than 7 ½% per year unless the unpaid balance increases to a specified limit, which is no more than 115% of the original loan amount, at which time a new monthly payment amount adequate to repay the loan over its remaining contractual life is established….  Due to the lack of significant historical experience at Countrywide, the credit performance of these loans has not been established for the Company.

Due to pay option loans' amortization characteristics, the loss that the Company would realize in the event of default may be higher than that realized on a 'traditional' loan that does not provide for deferral of a portion of the fully amortizing loan payment."

| | **FY 2005 Form 10-K at F-37.**  Accumulated negative amortization (from original loan balance) for pay-option loans held for investment grew from $29,000 in 2004 to $142,034,000 in 2005. |
|---|---|
| **UNDERWRITING STANDARDS**<br><br>"Countrywide consistently assured investors during the Class Period that the Company managed mortgage credit risk through rigorous standards for . . underwriting[.]" (CAC ¶ 117) | **FY 2005 Form 10-K at 93:**  "Our underwriting guidelines for non-conforming mortgage loans … have been designed so that these loans are salable in the secondary mortgage market.  We developed these guidelines to meet the requirements of private investors, rating agencies  and third-party credit enhancement providers.<br><br>**2Q06 Form 10-Q at 37:**  "[S]ubstantially all of the pay-option loans we originate are underwritten based on 'reduced documentation' standards whereby the loan applicant's income is not fully documented.  Our pay-option investment loan portfolio borrowers had, at the time the loans were originated, average FICO scores (a measure of borrower creditworthiness) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.  We believe this product is an attractive portfolio investment as the higher credit risk inherent in pay-option loans is balanced by higher expected returns relative to other first mortgage loan products." |
| **DELINQUENCY**<br><br>Countrywide's sub-prime delinquency rates were as high as 17% in the third quarter of 2006. (CAC ¶ 297)<br><br>Non-prime delinquencies increased dramatically between 2004 and 2006, as did "net lifetime credit losses." | **FY 2005 Form 10-K at 8:**  Table reflecting that of CW's loan servicing portfolio, 15.20% of non-prime mortgages were delinquent<br><br>**FY 2005 Form 10-K at 24-32:**  Tables reflecting CW loan production percentages by division, with non-prime production ranging from 0.1% to 57.2%<br><br>**FY 2005 Form 10-K at 99:**  "We attribute the overall increase in delinquencies in our servicing portfolio primarily to the relative increase in the number of loans in the non-prime portfolio, as well as an increase in average seasoning of these portfolios, which carry higher delinquency rates |

| | than conventional and Prime Home Equity mortgage loans." |
|---|---|
| | **FY 2005 Form 10-K at F-23**: prime home equity and non-prime delinquencies at $1.639 billion for 2005, and the "Company incurred credit losses of $124 million, $99.4 million and $95.5 million related to the mortgage loans above during the years ended December 31, 2005, 2004 and 2003 respectively." |
| | **FY 2005 Form 10-K at F-78.** The percentage of delinquent mortgage loans in Countrywide's servicing portfolio that were nonprime mortgages grew from 11.29% in 2004 to 15.20% in 2005. The percentage of loans pending foreclosure in Countrywide's servicing portfolio that were nonprime mortgages grew from 1.74% in 2004 to 2.03% in 2005. |
| **PERFORMANCE OF SECURITIES**<br><br>In 2004, the company publicly disclosed material weaknesses in revenue recognition for certain mortgage backed securities. (CAC ¶ 370 n.21) | **1Q06 Form 10-Q at 61**: "The total credit losses incurred for the quarters ended March 31, 2006 and 2005 related to all of our mortgage loan sales activities are summarized as follows: Non-prime securitizations with retained residual interest -- $24.005 million [1Q06 and] $19.792 million [2005]."<br><br>**1Q06 Form 10-Q at 65**: "During the quarter ended March 31, 2006, we securitized $8.5 billion in Non-prime mortgage and Prime home equity loans with limited recourse for credit losses." |
| **CREDIT QUALITY**<br><br>Investors were questioning management regarding credit quality as early as July 2005. (CAC ¶ 403) | **FY 2005 Form 10-K at 100**: "Issues of concern to one or more credit rating agencies in the past have included our significant investment in MSRs and other retained interests, our involvement in non-prime lending, as well as our liquidity and capital structure. We maintain an active dialogue with all three rating agencies, meeting throughout the year to review operational and financial performance and areas of focus." |
| **HOUSING MARKET TRENDS**<br><br>In early 2006, the Company stated its belief that housing | **FY 2005 Form 10-K at 41; 1Q 2006 Form 10-Q at 34-35**: "Third party forecasters predict total U.S. mortgage production for 2006 to be between $2.2 trillion and $2.4 trillion, compared to $2.8 trillion in 2005. Due to |

| | |
|---|---|
| prices were going to decline significantly in the next 12-18 months. (CAC ¶¶ 429, 443) | differences in products represented and model estimation logic, mortgage market estimates vary.  We estimate the mortgage market for 2006 to be $2.6 trillion compared to our estimate of $3.3 trillion for 2005."<br><br>**2Q06 Form 10-Q at 36**: "Third party forecasters predict total U.S. mortgage production for 2006 to be between $2.38 trillion and $2.41 trillion, compared to $2.9 trillion in 2005.  Due to differences in products represented and estimation methods, mortgage market estimates vary.  We estimate the mortgage market for 2006 to be $2.6 trillion compared to $3.3 trillion in 2005."<br><br>**FY 2005 Form 10-K at 105**: "We expect housing values to increase at a slower rate in the coming years than in the past several years."<br><br>**1Q06 Form 10-Q at 67**: "Over the last several years, the housing price index has significantly outpaced the consumer price index and growth in personal income.  Consequently, we expect housing values to increase at a slower rate in the coming years than in the past several years."<br><br>**2Q Form 10-Q at 88**: "[W]e expect housing values to increase at a slower rate in the coming years than in the past several years." |
| **NEGATIVE AMORTIZATION**<br><br>"[D]uring the Class Period, Countrywide recorded massive amounts of negative amortization from Pay Option ARMs[.]" (CAC ¶ 289) | **FY 2005 Form 10-K:**  Accumulated negative amortization (from original loan balance) in the Total Pay-option loan portfolio grew from 29,000 in 2004 to $26,101,306 in 2005.<br><br>**1Q 2006 Form 10-Q at 47:**  Accumulated negative amortization (from original loan balance) in the Total Pay-option loan portfolio grew from $26,101,306 in 2005 to $30,965,164 in the first quarter of 2006. |
| **SECURITIZATION OF NON-PRIME MORTGAGES** | **FY 2005 Form 10-K at 89:** "We have identified several accounting polcies as being critical to the presentation of our financial condition….because they require management to make particularly subjective and complex judgments about matters that are inherently |

| | |
|---|---|
| "Countrywide overstated the fair value of its retained interests from securitizations." (CAC ¶ 302) | uncertain…  These critical accounting policies relate to our… valuation of retained interests…"<br><br>**FY 2005 Form 10-K at 95:**  Nonprime securitizations with retained residual interests grew from $43,021,000 in 2004 to $69,269,000 in 2005.<br><br>**FY 2005 Form 10-K at F-20:**  "[T]he Company generally has limited recourse on the … Nonprime Mortgage Loans it securitizes, through retention of a subordinated interest or through its issuance of a corporate guarantee of losses up to a negotiated maximum amount."<br><br>**2Q 2006 Form 10-Q at 86:**  "Nonprime Loans generally are secured with limited recourse for credit losses." |
| **RISK FACTORS**<br><br>"As the truth began to emerge about Countrywide  in and after July 2007, Countrywide lost its ability to sell debt securities and accordingly suffered a serious cash crisis."  (CAC ¶ 12) | **FY 2005 Form 10-K at 35; 1Q 2006 Form 10-Q at 41; 2Q 2006 Form 10-Q at 91:**  Additional factors that "could cause actual results to differ materially from historical results or those anticipated include, but are not limited to:<br><br>• A general decline in U.S. housing prices or in activity in the U.S. housing market<br><br>• A loss of investment-grade credit ratings, which may result in increased cost of debt or loss of access to corporate debt markets<br><br>• A reduction in the availability of secondary markets for our mortgage loan products…." |

# APPENDIX D

**APPENDIX D**
**MATURITY DATES**

Bold = Underwriter Defendants Involved
Non-Bold =Underwritten by Countrywide Securities Only
Shaded= Maturity Date Prior to Curative Disclosure

|  | Stated Maturity Date |
|---|---|
| **Series A Medium-Term Notes** | |
| → PS No. 1 Dated 3/16/05 | 3/21/06 |
| → PS No. 2 Dated 4/6/05 | 4/11/07 |
| → **PS No. 3 Dated 5/2/05** | **5/5/08** |
| → PS No. 4 Dated 5/10/05 | 5/11/15 |
| → PS No. 5 Dated 5/10/05 | 5/11/20 |
| → PS No. 6 Dated 5/20/05 | 5/27/20 |
| → **PS No. 7 Dated 6/8/05** | **6/15/10** |
| → PS No. 9 Dated 6/20/05 | 6/24/15 |
| → PS No. 10 Dated 7/22/05 | 7/28/15 |
| → PS No. 11 Dated 1/26/05 | 1/31/06 |
| → PS No. 12 Dated 8/18/05 | 8/25/20 |
| → PS No. 13 Dated 8/22/05 | 8/26/20 |
| → PS No. 14 Dated 9/8/05 | 9/13/06 |
| → PS No. 15 Dated 10/28/05 | 11/3/06 |
| → PS No. 16 Dated 11/10/05 | 11/14/35 |
| → PS No. 17 Dated 11/15/05 | 11/22/30 |
| → PS No. 18 Dated 12/2/05 | 12/5/06 |
| → **PS No. 20 Dated 12/14/05 (2-Yr Floating Rate Subordinated Notes Due 2007)** | **12/19/07** |
| → **PS No. 21 Dated 12/14/05 (3-Year Floating Rate Subordinated Notes Due 2008)** | **12/19/08** |
| → PS No. 22 Dated 1/19/06 | 1/24/31 |
| → PS No. 23 1/25/06 | 1/27/31 |
| → PS No. 24 Dated 2/1/06 | 2/8/36 |
| **Floating Rate Subordinated Notes Due April 1, 2011** | **4/1/11** |
| **Series B Medium-Term Notes** | |
| → **PS No. 1 Dated 2/22/06** | **2/27/08** |
| → PS No. 2 Dated 3/1/06 | 3/16/26 |
| → **FWP Dated 2/13/06** | **3/24/09** |
| → PS No. 3 Dated 3/16/06 | 3/23/21 |
| → **PS No. 4 Dated 3/21/06** | **3/24/09** |
| → PS No. 5 Dated 3/31/06 | 4/6/21 |
| → PS No. 6 Dated 4/7/06 | 4/13/21 |
| → PS No. 7 Dated 4/24/06 | 4/28/36 |
| → PS No. 8 Dated 4/24/06 | 4/26/21 |
| → PS No. 9 Dated 4/24/06 | 4/15/11 |
| → PS No. 10 dated 4/24/06 | 4/15/09 |
| → PS No. 11 Dated 4/28/-6 | 5/15/07 |
| → PS No. 12 Dated 4/28/06 | 5/15/09 |
| → PS No. 13 Dated 5/15/06 | 5/15/07 |
| → PS No. 14 Dated 5/15/06 | 5/15/09 |
| → **FWP Dated 5/24/06** | **3/24/09** |
| → PS No. 15 Dated 5/22/06 | 5/15/07 |
| → PS No. 16 Dated 5/22/06 | 5/15/09 |
| → **PS No. 17 Dated 5/24/06** | **6/1/09** |
| → PS No. 18 Dated 5/26/06 | 5/15/07 |
| → PS No. 19 Dated 5/26/06 | 5/15/09 |
| → PS No. 20 Dated 6.5.06 | 6/15/07 |
| → PS No. 21 Dated 6/9/06 | 6/15/09 |
| → PS No. 22 Dated 6/12/06 | 6/15/07 |

APPENDIX D
MATURITY DATES

Bold = Underwriter Defendants Involved
Non-Bold =Underwritten by Countrywide Securities Only
Shaded= Maturity Date Prior to Curative Disclosure

|  | Stated Maturity Date |
|---|---|
| → PS No. 23 Dated 6/12/06 | 6/15/09 |
| → PS No. 24 Dated 6/19/06 | 6/15/07 |
| → PS No. 25 Dated 6/19/06 | 6/15/09 |
| → **PS No. 26 Dated 6/22/06** | **6/27/07** |
| → PS No. 27 Dated 6/26/06 | 6/15/07 |
| → PS No. 28 Dated 7/3/06 | 7/16/07 |
| → PS No. 29 Dated 7/3/06 | 7/15/09 |
| → PS No. 30 Dated 7/10/06 | 7/16/07 |
| → PS No. 31 Dated 7/10/06 | 7/15/09 |
| → PS No. 32 Dated 7/17/06 | 7/16/07 |
| → PS No. 33 Dated 7/17/06 | 7/15/09 |
| → PS No. 34 Dated 7/24/06 | 7/16/07 |
| → PS No. 35 Dated 7/24/06 | 7/15/09 |
| → PS No. 36 Dated 7/31/06 | 8/15/07 |
| → PS No. 37 Dated 7/31/06 | 8/17/09 |
| → PS No. 38 Dated 8/7/06 | 8/15/07 |
| → PS No. 39 Dated 8/7/06 | 8/17/09 |
| → PS No. 40 Dated 8/14/06 | 8/15/07 |
| → PS No. 41 Dated 8/14/06 | 8/17/09 |
| → PS No. 42 Dated 8/21/06 | 8/15/07 |
| → PS No. 43 Dated 8/21/06 | 8/17/09 |
| → **PS No. 44 Dated 8/23/06** | **9/2/08** |
| → PS No. 45 Dated 8/28/06 | 9/17/07 |
| → PS No. 46 Dated 9/5/06 | 9/17/07 |
| → PS No. 47 Dated 9/5/06 | 9/15/08 |
| → PS No. 48 Dated 9/5/06 | 9/15/09 |
| → PS No. 49 Dated 9/11/06 | 9/17/07 |
| → PS No. 50 Dated 9/11/06 | 9/15/08 |
| → PS No. 51 Dated 9/11/06 | 9/15/09 |
| → PS No. 52 Dated 9/18/06 | 9/17/07 |
| → PS No. 53 Dated 9/18/06 | 9/15/08 |
| → PS No. 54 Dated 9/18/06 | 9/15/09 |
| → PS No. 55 Dated 9/21/06 | 9/17/07 |
| → PS No. 56 Dated 9/21/07 | 9/15/08 |
| → PS No. 57 Dated 9/21/06 | 9/15/09 |
| → PS No. 58 Dated 10/2/06 | 10/15/08 |
| → PS No. 59 Dated 10/2/06 | 10/15/09 |
| → PS No. 60 Dated 10/2/06 | 10/15/07 |
| → PS No. 61 Dated 10/10/06 | 10/15/07 |
| → PS No. 62 Dated 10/10/06 | 10/15/09 |
| → PS No. 63 Dated 10/16/06 | 10/15/07 |
| → PS No. 64 Dated 10/16/06 | 10/15/08 |
| → PS No. 65 Dated 10/16/06 | 10/15/09 |
| → PS No. 66 Dated 10/23/06 | 10/15/07 |
| → PS No. 67 Dated 10/23/06 | 10/15/09 |
| → PS No. 68 Dated 10/30/06 | 11/15/07 |
| → PS No. 69 Dated 10/30/06 | 11/16/09 |
| → **PS No. 70 Dated 11/1/06** | **10/31/07** |
| → PS No. 71 Dated 11/6/06 | 11/15/07 |
| → PS No. 72 Dated 11/6/06 | 11/16/09 |
| → PS No. 73 Dated 11/13/06 | 11/15/07 |

APPENDIX D
MATURITY DATES

Bold = Underwriter Defendants Involved
Non-Bold =Underwritten by Countrywide Securities Only
Shaded= Maturity Date Prior to Curative Disclosure

|  | Stated Maturity Date |
|---|---|
| → PS No. 74 Dated 11/13/06 | 11/16/09 |
| → PS No. 75 Dated 11/20/06 | 11/15/07 |
| → PS No. 76 Dated 11/20/06 | 11/16/09 |
| → PS No. 77 Dated 12/1/06 | 12/17/07 |
| → PS No. 78 Dated 12/1/06 | 12/15/09 |
| → PS No. 79 Dated 12/11/06 | 12/17/07 |
| → PS No. 80 Dated 12/11/06 | 12/15/09 |
| → **PS No. 81 Dated 12/13/06** | **6/18/08** |
| → PS No. 83 Dated 12/18/06 | 12/17/07 |
| → PS No. 84 Dated 12/18/06 | 12/15/09 |
| → PS No. 85 Dated 12/26/06 | 12/17/07 |
| → PS No. 86 Dated 12/26/06 | 12/15/09 |
| → PS No. 87 Dated 1/2/07 | 1/15/08 |
| → PS No. 88 Dated 1/2/07 | 1/15/10 |
| → PS No. 89 Dated 1/8/07 | 1/15/08 |
| → PS No. 90 Dated 1/8/07 | 1/15/10 |
| → PS No. 91 Dated 1/16/07 | 1/15/08 |
| → PS No. 92 Dated 1/16/07 | 1/15/10 |
| → PS No. 93 Dated 1/22/07 | 1/15/08 |
| → PS No. 94 Dated 1/22/07 | 1/15/10 |
| → PS No. 95 Dated 1/29/07 | 2/15/08 |
| → PS No. 96 Dated 1/29/07 | 2/15/10 |
| → PS No. 97 Dated 2/12/07 | 2/15/08 |
| → PS No. 98 Dated 2/12/07 | 2/16/10 |
| → PS No. 99 Dated 2/20/07 | 2/15/08 |
| → PS No. 100 Dated 2/20/07 | 2/16/10 |
| → **PS No. 101 Dated 2/23/07** | **2/28/08** |
| → PS No. 102 Dated 2/26/07 | 3/17/08 |
| → PS No. 103 Dated 2/26/07 | 3/16/09 |
| → PS No. 104 Dated 3/5/07 | 3/17/08 |
| → PS No. 105 Dated 3/5/07 | 3/16/09 |
| → PS No. 106 Dated 3/12/07 | 3/17/08 |
| → PS No. 107 Dated 3/12/07 | 3/16/09 |
| → PS No. 108 Dated 3/19/07 | 3/17/08 |
| → PS No. 109 Dated 3/19/07 | 3/16/09 |
| → PS No. 110 Dated 3/26/07 | 3/17/08 |
| → PS No. 111 Dated 3/26/07 | 3/15/10 |
| → PS No. 112 Dated 4/2/07 | 4/15/08 |
| → PS No. 113 Dated 4/2/07 | 4/15/10 |
| → PS No. 114 Dated 4/9/07 | 4/15/08 |
| → PS No. 115 Dated 4/9/07 | 4/15/10 |
| → PS No. 116 Dated 4/16/07 | 4/15/08 |
| → PS No. 117 Dated 4/16/07 | 4/15/10 |
| → PS No. 118 Dated 4/23/07 | 4/15/08 |
| → PS No. 119 Dated 4/23/07 | 4/15/10 |
| → PS No. 120 Dated 4/30/07 | 5/15/08 |
| → PS No. 121 Dated 4/30/07 | 5/17/10 |
| → PS No. 122 Dated 5/7/07 | 5/15/08 |
| → PS No. 123 Dated 5/7/07 | 5/17/10 |
| → **PS No. 124 Dated 5/8/07** | **4/30/08** |
| → PS No. 125 Dated 5/14/07 | 5/15/08 |

**APPENDIX D**
**MATURITY DATES**

Bold = Underwriter Defendants Involved
Non-Bold =Underwritten by Countrywide Securities Only
Shaded= Maturity Date Prior to Curative Disclosure

|  | Stated Maturity Date |
|---|---|
| → PS No. 126 Dated 5/14/07 | 5/17/10 |
| → PS No. 127 Dated 5/15/07 | 5/15/08 |
| → PS No. 128 Dated 5/21/07 | 5/15/08 |
| → PS No. 129 Dated 5/21/07 | 5/17/10 |
| → PS No. 130 Dated 5/29/07 | 6/16/08 |
| → PS No. 131 Dated 5/29/07 | 6/15/10 |
| → PS No. 132 Dated 6/4/07 | 6/16/08 |
| → PS No.133 Dated 6/4/07 | 6/15/10 |
| → **PS No. 134 Dated 6/4/07** | **6/7/12** |
| → **PS No. 135 Dated 6/4/07** | **5/7/12** |
| → PS No. 136 Dated 6/11/07 | 6/16/08 |
| → PS No. 137 Dated 6/11/07 | 6/15/10 |
| → PS No. 138 Dated 6/18/07 | 6/16/08 |
| → PS No. 139 Dated 6/18/07 | 6/15/10 |
| → PS No. 140 Dated 6/25/2007 | 6/16/08 |
| → PS No. 141 Dated 6/25/07 | 6/15/10 |
| → PS No. 142 Dated 7/2/07 | 7/15/08 |
| → PS No. 143 Dated 7/2/07 | 7/15/10 |
| → PS No. 144 Dated 7/9/07 | 7/15/08 |
| → PS No. 145 Dated 7/9/07 | 7/15/10 |
| → PS No. 146 Dated 7/16/07 | 7/15/08 |
| → PS No. 147 Dated 7/16/07 | 7/15/10 |
| → PS No. 148 Dated 7/23/07 | 7/15/08 |
| → PS No. 149 Dated 7/23/07 | 7/15/10 |
| → PS No. 150 Dated 7/26/07 | 8/15/08 |
| → PS No. 151 Dated 7/26/07 | 8/16/10 |
| → PS No. 152 Dated 8/6/07 | 8/15/08 |

**APPENDIX D**
**MATURITY DATES**

Bold = Underwriter Defendants Involved
Non-Bold =Underwritten by Countrywide Securities Only
Shaded= Maturity Date Prior to Curative Disclosure

|  | Stated Maturity Date |
|---|---|
| → PS No. 153 Dated 8/6/07 | 8/16/10 |
| **6.25% Subordinated Notes Due May 15, 2016** | 5/15/2016 |
| **7% Capital Securities\*** | 11/1/36 |
|  |  |