## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

———————————————————— x
In re: COUNTRYWIDE FINANCIAL  :
CORPORATION SECURITIES        : Lead Case No. CV 07-05295 MRP (MANx)
LITIGATION                    :
———————————————————— x

### AFFIDAVIT OF GREGG A. JARRELL

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF MONROE     )

GREGG. A. JARRELL, being duly sworn, deposes and says:

### I. INTRODUCTION

1. I have been retained by Lead Counsel on behalf of Plaintiffs in this Action. I have been asked by Counsel to research and analyze economically appropriate industry indexes in response to the Defendants' assertion that the decline in Countrywide's stock price tracked the overall decline in the S&P Supercomposite Thrifts and Mortgage Finance Index. Defendants assert that the "decline in CFC's stock price from early 2007 through the end of the proposed Class Period (March 12, 2004 through March 7, 2008) reflects broad industry-wide disruptions as opposed to the impact of CFC-specific, corrective disclosures."[1]

2. I find that the S&P Supercomposite Thrifts and Mortgage Finance Index, as represented by Exhibit 29 of the Defendants' Notice of Motion and Motion to Dismiss the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws

---

[1] Countrywide Defendants' Notice of Motion and Motion to Dismiss the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws, pg. 53.

("Exhibit 29"), is not an appropriate proxy for the industry against which to compare Countrywide's stock-price movements over the proposed Class Period. There are at least three problems with Defendant's index. First, according to the Defendants own exhibit, Countrywide itself comprises over 11% of the value of the index, causing spurious correlation that is misleading. Second, over 60% of the mortgage finance firms in Defendants' index have been the subject of litigation for allegations of fraud similar to Countrywide. Third, there is evidence that Countrywide's corrective disclosures caused declines in general industry indexes as investors anticipated industry-wide fallout.

3. In addition, I show that correcting industry indexes to exclude Countrywide and 118 litigation-tainted firms makes a big difference. Indeed, Countrywide's stock-price decline is much greater than the decline of the fraud-tainted indexes, which undermines the flawed analysis provided by Defendants.

## II. QUALIFICATIONS AND COMPENSATION

4. I am currently a tenured Professor of Economics and Finance at the University of Rochester's William E. Simon Graduate School of Business Administration, where I have been a member of the faculty since 1988. I hold a Ph.D. in Business Economics from the University of Chicago (1978), with major concentrations in Industrial Organization and Finance, as well as an MBA (1976) from the University of Chicago.

5. From 1977 to 1981, I was an Assistant Professor of Economics at the Graduate School of Management at the University of Rochester. From 1981 to 1983, I was a Post-Doctoral Research Fellow at the University of Chicago's Center for the Study of the Economy

000006

and the State.  Thereafter, from 1983 to 1984, I was a Senior Economist with Lexecon, Inc., a Chicago-based economics consulting firm specializing in antitrust and securities litigation.  I served as an expert in mergers and acquisitions on the 1983 United States Securities and Exchange Commission (the "SEC") Advisory Committee on Tender Offer Policy.  From 1984 through 1987, I was the Chief Economist for the SEC in Washington, D.C.  I also served as an Adjunct Professor at the Georgetown University Law School in Washington, D.C. during 1985 and 1986, where I co-taught a course on securities regulation.  From 1987 to 1988, I was the Senior Vice President and Director of Research at the Alcar Group, Inc., a Chicago-based management consulting and software firm specializing in financial valuations of businesses and securities.

6.      Since joining the Simon School faculty at the University of Rochester, I have served (from 1988 to 1990) as director of the school's Managerial Economics Research Center.  I also served as director of the Bradley Policy Research Center at the Simon School from 1988 to 1994.  In addition, I teach a course titled "Cases in Finance" to second-year MBA students that covers, among other subjects, the operation of financial markets and the market for corporate control, the economics of mergers and acquisitions, valuation analysis for businesses and securities, the response of stock prices to public information, and financial regulation of securities markets.  I also teach a price theory course called Managerial Economics that includes applications of intra-company pricing of transfers of products and services.  I have received ten Superior Teaching Awards, and I was the School's AT&T Foundation Resident Management Fellow in 1987.

000007

7. I have authored or co-authored more than two dozen articles and studies in scholarly journals generally on the topics of mergers and acquisitions, the regulation of financial markets, and the response of stock prices to the release of information, among other things. My academic and practical experience relating to mergers and acquisitions includes the valuation and aggregations of businesses, and their ability to operate under various debt and expense scenarios. My curriculum vitae, with a list of publications and of recent cases in which I have testified as an expert at deposition or trial, is attached as Exhibit 1.

8. My compensation, which is not contingent upon the outcome of this matter, is based on the number of hours worked on this assignment, as well as out-of-pocket expenses. My hourly rate is $550. To assist me in this assignment, I have worked with Forensic Economics, Inc., whose employees acted under my supervision and direction for this assignment. Forensic Economics, Inc., located in Rochester, New York, was founded in 1989. The hourly rates of the employees of Forensic Economics who worked on this assignment range from $75 to $425.

### III. MATERIALS REVIEWED

9. In the course of my assignment in this Action, I have reviewed several documents, including the Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws (the "Amended Complaint"), Countrywide Defendants' Notice of Motion and Motion to Dismiss the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("Motion to Dismiss"), stock price data related to Countrywide's common stock as well as various general market and industry-specific indexes, certain filings with the SEC by Countrywide, and news stories and press releases relating to Countrywide.

000008

Attached as Exhibit 2 is a comprehensive list of materials reviewed in connection with this Declaration. I cite in the text and exhibits of this Affidavit the specific documents and information on which I have relied in reaching my opinions.

## IV.  BACKGROUND

**Countrywide Financial Corporation**

10. Countrywide Financial Corporation ("Countrywide or the "Company" ) was publicly traded on the New York Stock Exchange ("NYSE") from September 1, 1969 (the date of its initial public offering) until July 1, 2008, at which time Countrywide was purchased by Bank of America.[2] Countrywide reported having 583,344,439 shares of common stock issued and outstanding as of May 9, 2008.[3] Attached as Exhibit 3 is a chart depicting Countrywide's daily closing stock price and reported trading volume during the Class Period. Exhibit 4 is a chart showing the value of $100.00 invested on March 12, 2004 in Countrywide's common stock and the Standard and Poor's Supercomposite Index through March 10, 2008.

## V. ANALYSIS

**A. The Defendants' Claim that Countrywide's Stock Price is the Result of Industry-wide Price Declines**

11. In their Motion to Dismiss, the Defendants' claim that: "*Dura* and its progeny also make clear that loss causation does not exist where an alleged loss could be the result of

---

[2] Source: Bloomberg.

[3] Countrywide's Form 10-Q for the period ending March 31, 2008, filed with the SEC on May 12, 2008.

000009

'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price.'"[4] "Here, the decline in CFC's stock price tracked the overall decline in the mortgage lending industry, as reflected in the S&P Supercomposite Thrifts and Mortgage Finance Index. The movement of that index demonstrates that the share prices of CFC's competitors have also dropped significantly during the same period. *See* Ex 29. The Court may take judicial notice of these parallel stock price movements, which support the inference that the decline in CFC's stock price from early 2007 through the end of the proposed class period reflects broad industry-wide disruptions as opposed to the impact of CFC-specific, corrective disclosures."[5]

12. The Defendants' Exhibit 29 doesn't appear to support their conclusions that "the decline in CFC's stock price from early 2007 through the end of the proposed class period reflects broad industry-wide disruptions as opposed to the impact of CFC-specific, corrective disclosures." In Exhibit 29, it seems clear that Countrywide's returns tracked the S&P Supercomposite Thrifts and Mortgage Finance Index (ticker S15THMF) closely until approximately mid-July 2007 when the difference between the two lines sharply diverge, and Countrywide's stock price declines at a much faster rate than the flawed index.

13. In my view, the Defendants' conclusion is misleading and unsupported by their own exhibit.

---

[4] Countrywide Defendants' Notice of Motion and Motion to Dismiss the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws, pg. 52.

[5] Ibid, pg. 52-53.

000010

**B. How Indexes are Used**

14.     Economists use event studies to detect the presence of a cause and effect relationship between company disclosures and resulting movements in the stock price. As a general proposition, modern finance theory holds that the market price of a common stock reflects the discounted value of expected future cash flows to the stockholder. Thus, new information that causes the market to significantly alter its expectation of future cash flows will cause a prompt repricing of the security to reflect the new expectations.[6]

15.     An event study is an empirical technique that measures the effect of new information on the market prices of a company's publicly traded securities. This is done by comparing the percentage change in the market price of a company's common stock (known as a "return") over a selected time period to the return predicted by a market model that uses a market index, such as the S&P 500 Index or the Nasdaq Composite Index, and possibly an industry index.[7] The market model describes the normal relation between the return on the company's common stock and the return on the market and industry indexes. This relationship is used to predict the return of a company's security over time. When significant new information about the company (*e.g.*, corrective disclosures, earnings reports, dividend changes, stock-splits, regulatory rulings, acquisition bids, asset sales, or tax legislation) is disclosed to the market, the

---

[6] *See* Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46, 1575-1617 (December 1991); Robert Jennings, and Laura Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23, 336-350 (Spring 1985); James M. Patell and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, 243-252 (June 1984); and Catherine S. Woodruff and A. J. Senchack, Jr., "Intradaily Price-Volume Adjustments of NYSE Stocks to Unexpected Earnings," *Journal of Finance* 43, 467-491 (June 1988).

[7] J. Campbell, A. Lo, & A. Craig MacKinlay, **The Econometrics of Financial Markets**, Princeton University Press (1997), p. 156.

000011

market model is used to determine the component of the stock return that would be expected based on the return of the overall market and industry. The remaining component of the stock return (that which cannot be explained by the return on the market and industry) is attributed to the new company-specific information or to "random noise." If the disclosure of the new information is accompanied by a stock return that is outside of the stock's normal volatility range (as measured by the market model), then the return is said to be "statistically significant."[8]

16. Event studies also assess the probability that a stock's return was due to news disclosed about a particular event, and not due to chance. Thus, the event study can objectively quantify the market price movements associated with the disclosure of new information to assess the materiality of that information to investors.

**C. Importance of Appropriate Indexes**

17. It is normal that the market and industry indexes selected for a market model contain the returns of the company being studied. For the general market, the company is not a significant component of the index returns, but for the industry indexes, this can be an issue. If the subject company accounts for a non-trivial fraction of the index, then the analyst should adjust the industry index by mathematically excluding the return of the subject company.

18. The Defendants assert, based on the S&P Supercomposite Thrifts and Mortgage Finance Index,[9] that the decline in Countrywide's stock price is the result of industry-wide price

---

[8] The determination of a statistically significant return must account for the individual stock's normal volatility. Accordingly, event studies start by computing "excess returns" (the percentage change in the company's stock price including dividends, net of market-wide and/or industry-wide influences) and the volatility of these excess returns.

[9] Countrywide Defendants' Notice of Motion and Motion to Dismiss the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws, Exhibit 29.

000012

declines. But, Countrywide represents 11.6% of the Defendants' index (as of January 3, 2007, according to Exhibit 29), and the Defendants make no adjustment to exclude this important source of spurious correlation.[10] This high percentage is clearly economically material and contaminates the predicted return, rendering it unsuitable and unreliable as a predictor of Countrywide's stock returns due to market and industry effects (and not Countrywide's specific movements) during the proposed Class Period.

19. For example, Exhibit 9 shows the market model results of using the S&P Supercomposite Thrifts and Mortgage Finance Index (unadjusted) and adjusting out Countrywide's returns. The key results of the market models change when Countrywide is adjusted out of the index returns. Comparing the market model results from the unadjusted to the adjusted index, the Market Beta is different by 0.026, the net-of-market industry beta is changed by 0.241, the standard error increased and the adjusted R squared and F-statistic each declined. *See* Exhibit 9.

**D. Countrywide May Have Caused Industry-wide Declines**

20. Another cause of spurious correlation occurs when the industry index reacts to news regarding the subject company. If the index is moving in sympathy with the subject company, then it is inappropriate and misleading to use the index as an "explanatory" variable in a market model. In this case, many news stories indicate that there was widespread speculation that the problems disclosed at Countrywide were present in other peer companies, which are included in many industry indexes like the Defendants' S&P Supercomposite Thrifts and

---

[10] *Ibid*. Preferably, the company of interest should not be in an index, or should be a negligible percentage of the index, to yield a statistically valid market model. As a practical matter, some indexes are so large that they may indeed include the company of interest.

000013

Mortgage Finance Index. *See* Exhibit 5. Consequently, the stock prices of Countrywide's industry peers may well have declined on key disclosure dates because of Countrywide's disclosures. If Countrywide's disclosures resulted in significant industry-wide declines, then it would be inappropriate to use this index to statistically explain Countrywide's stock-price movements.

21. I reviewed certain news stories on some of the partially corrective disclosure dates as alleged in the Amended Complaint. I found several instances where a market index or other mortgage finance peer company stock price declines were attributed, at least in part, to negative news about Countrywide. For example, on July 24, 2007, a date alleged to be a partially corrective disclosure in the Amended Complaint, the Associate Press Newswires published a story titled "Countrywide Financial warning drags down S&P 500,"[11] stated that:

> The broadly monitored Standard & Poor's 500 fell Tuesday, hurt by a warning from Countrywide Financial Corp. The S&P 500 lost 30.53 points to 1,511.04.

22. On another date alleged to be a partially corrective disclosure, August 15, 2007, a news headline read: "LOANS; Lender reports rising defaults; Countrywide home foreclosures and delinquencies surge to five-year highs in July. Mortgage stocks tumble"[12] that stated:

> In a grim report that helped send mortgage stocks reeling, No. 1 home lender Countrywide Financial Corp. said Tuesday that foreclosures and delinquencies jumped in July to the highest levels in more than five years...Countrywide shares fell $2.15, or 8.1%, to $24.46, bringing their loss this year to 42%. Other mortgage stocks

---

[11] "Countrywide Financial warning drags down S&P 500," Associated Press Newswires, July 24, 2007, 5:07pm.

[12] "LOANS; Lender reports rising defaults; Countrywide home foreclosures and delinquencies surge to five-year highs in July. Mortgage stocks tumble," Los Angeles Times, August 15, 2007.

> also tumbled Tuesday on bad news of their own and in reaction to
> Countrywide's difficulties...

23.     Further, in my review of news stories on six other alleged partially corrective disclosure dates, I found news reports that mention that the declines in Countrywide's stock price helped, at least in part, to "drag down" or "weigh down" Standard & Poor's 500, Dow Jones industrial average or other mortgage stocks.[13]

**E. Other Industry Indexes and Index Adjustments**

24.     Finally, any valid industry index should be free of negative effects of public fraud allegations against the companies in the index.  To the extent that co-movement between Countrywide and an index reflect simultaneous fraud-related corrective disclosures, then it would be improper to use the index without an adjustment to "net-out" the fraud-tainted index returns from Countrywide's returns in evaluating loss causation.

25.     I identified ten industry indexes that are a proxy for the mortgage finance industry for which I can obtain the weighting for members: Financial Sector Index (IXM Index), KBW Mortgage Finance Index (MFX Index), New York Stock Exchange Financial Index (NYK Index), S&P Supercomposite Banks Index (S15BANXX Index), S&P Supercomposite Financials Index (S15FINL Index), S&P Supercomposite Thrift and Mortgage Finance Index (S15THMF

---

[13] "S&P 500 weighed down by Countrywide Financial, Pulte Homes and E-Trade Financial," Associated Press Newswires, August 14, 2007, 5:29pm; "S&P 500 weighed down by Countrywide Financial, Agilent Technologies and Ambac Financial," Associated Press Newswires, August 15, 2007, 5:22pm; "Countrywide, Unisys, Big Lots drag S&P 500 Index in midday trading Monday," Associated Press Newswires, August 27, 2007, 12:25pm; "CIT Group, E-Trade help pull S&P 500 lower in Monday trading," Associated Press Newswires, November 26, 2007, 5:12pm; "Wall Street jumps down on worries about Countrywide," Comtex News Network, January 8, 2008, 8:51pm; and "Mortgage stocks slammed by delinquency concerns; PMI, IndyMac slump after Countrywide reports jump in late payments in Dec.," MarketWatch, January 9, 2008, 4:17pm.

000015

Index), S&P 500 Banks Index (S5BANKX Index), S&P 500 Financials Index (S5FINL Index), S&P 500 Thrift and Mortgage Finance Index (S5THMF Index), and the Merrill Lynch Basic Four Interest Rate Sensitive Index (XI Index).[14]  *See* Exhibit 7.

26.     Next, I identified all the companies that were members of each of the ten indexes, as well as their weights, for the following dates: March 12, 2004, March 31, 2006, July 15, 2007, March 7, 2008 and March 10, 2008.  There are a total of 583 different companies that are in at least one of these 10 indexes.  *See* Exhibit 7.

27.     I then identified every company that has been the subject of litigation related to mortgage finance (including sub-prime) as of August 1, 2008.[15]  My analysis shows that there are at least 118 other companies that are alleged to have violated securities laws or are otherwise tainted by mortgage fraud allegations ("Mortgage Fraud Tainted").[16]

28.     To the extent that these Mortgage Fraud Tainted companies comprise an economically material percentage of an index, then this index would be disqualified as a legitimate proxy for mortgage finance industry without adjusting out the Mortgage Fraud Tainted returns.  As exhibit 7 shows, the Mortgage Fraud Tainted companies average between 55% and 68% of the indexes over the five dates, which is clearly significant!  *See* Exhibit 7.

29.     I then re-created equally weighted versions of the 10 indexes ("EWI") that remove the returns of all Mortgage Fraud Tainted firms from the date of each firm's first

---

[14] Source: Bloomberg. These are the only indexes for which the index components and weightings are available to me.

[15] Sources: The Bloomberg Subprime Litigation Tracker from Bloomberg; the Subprime-Related Securities Class Action Lawsuits from The D & O Diary (http://69.177.1.186/clients/blog/subprimelawsuitslist.doc); and the Stanford law School Securities Class Action Clearinghouse (http://securities.stanford.edu).  *See* Exhibit 6.

[16] Exhibit 5.

000016

mortgage-related lawsuit (*see* Exhibit 5). Next, I charted the relative values of Countrywide and each of the 10 mortgage finance EWI's from January 3, 2007 through March 10, 2008, which shows visually that the value of Countrywide common stock declines suddenly, and to a much greater degree, than the indexes adjusted for the Mortgage Fraud Tainted companies. *See* Exhibit 8. The value of Countrywide common stock begins to diverge from the value of the 10 EWI's starting in mid-July, and the divergence generally increases through the first quarter of 2008.[17]

30.   From my analysis, I conclude that the Defendants' unadjusted S&P Supercomposite Thrift and Mortgage Finance Index cannot appropriately be used to infer that "the decline in CFC's stock price from early 2007 through the end of the proposed class period reflects broad industry-wide disruptions as opposed to the impact of CFC-specific, corrective disclosures." To the contrary, Countrywide's stock price fell far greater than did the general price level of the non-fraud tainted companies in the industry.

_____
Gregg A. Jarrell

Sworn to before me this
11th day of August, 2008.

_____
Notary Public

MICHAEL D. BEDWORTH
Notary Public, State of New York
Qualified in Monroe County
Reg. #01BE6027256
My Commission Expires June 28, 2011

---

[17] I do not offer an opinion of the best industry index to use in this action, which would be the product of further analysis.

000017