1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION | **Lead Case No. CV-07-05295-MRP (MANx)** **OMNIBUS ORDER ON DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT AND ALL PENDING REQUESTS FOR JUDICIAL NOTICE** |

**INTRODUCTION**

This Court has consolidated numerous securities actions related to Countrywide Financial Corporation ("Countrywide")[1] into three cases pending

---

[1] On July 1, 2008, Countrywide completed a forward triangular merger into a subsidiary of Bank of America ("BofA") called Red Oak Merger Corporation ("Red Oak"). To effect the merger, Countrywide shareholders received shares of BofA in exchange for their Countrywide shares. Red Oak was then renamed Countrywide Financial Corporation. Countrywide Fin. Corp., Form 10-Q (Aug. 11, 2008). The merger postdates the class period and the allegations in the complaint. Therefore, "Countrywide" as used in this Order refers to the entity as constituted before the merger (and, where applicable, its subsidiaries or affiliates).

-1-

1  before it.[2] The present case involves publicly traded equity securities and publicly

2  traded, unsecured debt instruments that Countrywide used to raise capital from

3  investors.

4      On August 14, 2007, George Pappas, on behalf of himself and all others

5  similarly situated, filed suit against Countrywide and several individuals alleging

6  securities law violations. On November 28, 2007, this Court consolidated the

7  *Pappas* action with several other cases involving publicly traded Countrywide

8  securities. The Court designated New York Funds ("NY Funds")[3] as lead plaintiffs.

9  In this Order, "Plaintiffs" refers to all the named plaintiffs in this consolidated

10  case; "NY Funds" is used when referring to the lead plaintiffs in particular.

11      Plaintiffs filed a 416-page Consolidated Amended Class Action Complaint

12  ("CAC") on April 14, 2008. The CAC's proposed class period spans the nearly 4

13  years between March 12, 2004 and March 7, 2008. The CAC contains 21 claims

14  and names 50 defendants. Defendants now move to dismiss.

15      The Court feels obliged to issue this comprehensive—and regrettably long—

16  Order to establish much of the law of the case, narrow the issues, and discourage

17

18  ─────────────

19  [2] The other two cases are *In re Countrywide Fin. Corp. Deriv. Litig.*, 2:07-CV-06923-MRP, and *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, 2:07-CV-07097-MRP.

20  
21      The *Derivative Litigation* case comprises derivative claims by Countrywide shareholders before the BofA merger. *Argent* involves nonpublicly traded debt

22  instruments that Countrywide used to raise capital from qualified institutional buyers. The Court kept *Argent* a separate case because it anticipated that reliance

23  issues in the private placement market—the fraud on the market presumption and

24  actual reliance—would raise unique issues. Consol. Order 12-13  (Nov. 28, 2007).

25      Judge John F. Walter of this District is presiding over the ERISA claims against Countrywide. *Alvidres v. Countrywide*, 2:07-CV-5810-JFW (C.D. Cal.).

26  [3] "New York Funds" refers to Thomas P. DiNapoli, Comptroller of the State of

27  New York, as Administrative Head of the New York State and Local Retirement

28  Systems, as Trustee of the New York State Common Retirement Fund, and as Trustee of the New York City Pension Funds.

1   some of the parties' more tenuous arguments.[4] This document shall guide the

2   parties and save the Court detailed expositions in future orders.

3          For reasons explained below, the motions are granted in part and denied in

4   part. The Conclusion section of this Order summarizes which claims are dismissed.

5   ///

6   ///

7   ///

8   ///

9   ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   _____

28   [4] To "discourage" is not to "preclude." The Court does not intend to tell the parties how to litigate their case; it only intends to manage and streamline this litigation.

1

## TABLE OF CONTENTS

OVERVIEW OF ALLEGATIONS AND CLAIMS........................................................................ 5
   A. Overview of allegations about Countrywide's core business ................................................. 6
      i. Countrywide changes strategy ..................................................................... 7
      ii. How Countrywide's core mortgage-related operations affect investment value    17
      iii. Examples of allegedly false statements ................................................. 20
   B. Overview of claims and defendants ..................................................................... 23

LEGAL ANALYSIS...................................................................................................... 26
   A. Rule 8(a)................................................................................................. 26
   B. Issues common to the '33 and '34 Act claims ...................................................... 27
      i. Standing ................................................................................. 27
      ii. Statute of limitations ................................................................. 31
      iii. Truth on the market ................................................................. 32
      iv. Grant Thornton's involvement ...................................................... 34
   C. '33 Act Claims ......................................................................................... 36
      i. Section 11 ................................................................................. 36
         1. "Sounds in fraud"............................................................. 37
         2. Section 11 standing ......................................................... 39
         3. Loss.......................................................................... 45
         4. Loss causation ................................................................. 51
         5. Market forces and causation ................................................. 56
         6. Falsity....................................................................... 58
      ii. Section 12(a)(2) ........................................................................ 72
      iii. Section 15 ............................................................................. 73
   D. '34 Act Claims ......................................................................................... 74
      i. Section 10(b) ............................................................................ 74
         1. Standing ..................................................................... 75
         2. Materiality................................................................... 75
         3. Falsity & scienter .......................................................... 76
            a. Countrywide........................................................... 88
            b. Angelo Mozilo ....................................................... 88
            c. David Sambol.......................................................... 91
            d. Stanford Kurland...................................................... 93
            e. Eric Sieracki.......................................................... 95
            f. KPMG................................................................. 96
         4. Reliance....................................................................... 99
         5. Loss.......................................................................... 101
         6. Loss causation ................................................................. 101
      ii. Section 20(a) ............................................................................ 104
      iii. Section 20A ............................................................................ 105

CONCLUSION.......................................................................................................... 111

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.

## OVERVIEW OF ALLEGATIONS AND CLAIMS

The Court first summarizes Plaintiffs' basic allegations and states the general nature of their legal claims. Specific additional allegations are discussed as relevant in the legal analysis section (Section II).

While the facts of this case are inextricably intertwined with the mortgage-backed securities ("MBS") that Countrywide sold to investment banks and other sophisticated investors, none of the actions before this Court are based on MBS purchases. Rather, the present case is brought on behalf of those who invested in Countrywide's business. The investments' values depend in great part on the soundness of Countrywide's core mortgage-related operations. These operations include originating mortgages, purchasing mortgages from other originators, servicing mortgages, investing in mortgages, and packaging mortgages into MBS for resale.[5] Core mortgage-related operations accounted for the vast majority of Countrywide's earnings during the class period—93% of fiscal year ("FY") 2006 pretax earnings. *See* ¶¶ 82-83.[6]

As explained in the legal analysis, the federal securities laws deal with false or misleading statements in connection with investments. The federal securities laws do not create liability for poor business judgment or failed operations. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977). Nor do the laws require public companies to disclose every change in operations. But the CAC's allegations present the extraordinary case where a company's essential operations were so at odds with the company's public statements that many statements that would not be actionable in the vast majority of cases are rendered cognizable to the

---

[5] Approximately 96% of Countrywide's mortgages were packaged into MBS. Hearing Tr. at 22:11 (statement of counsel for Countrywide); Countrywide, Form 10-K at 2 (2004); Form 10-K at 93 (2005); Form 10-K at 101 (2006).
[6] All paragraph citations refer to the CAC.

securities laws.

For example, descriptions such as "high quality" are generally not actionable; they are vague and subjective puffery not capable of being material as a matter of law. On an individual level, this is because a reasonable person would not rely on such descriptions; on a macro scale, the statements will have little price effect because the market will discount them. *See Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Svc. Inc.*, 911 F.2d 242, 245-46 (9th Cir. 1990) (collecting and discussing puffery cases, including securities cases). However, the CAC adequately alleges that Countrywide's practices so departed from its public statements that even "high quality" became materially false or misleading; and that to apply the puffery rule to such allegations would deny that "high quality" has any meaning.[7]

Thus, to understand Plaintiffs' claims, one must first understand the facts Plaintiffs allege about Countrywide's core operations.

**A. Overview of allegations about Countrywide's core business**

Legal standard. A motion to dismiss tests whether the allegations in a complaint, if true, amount to an actionable claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept as true all allegations of material fact in the complaint and read the complaint in the light most favorable to the nonmoving party.

---

[7] *Cf. In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (because "the facts alleged . . . lead to a strong inference there was no reasonable basis for believing such statements to be true . . . the puffery rule does not insulate Defendants from liability" under the securities laws); *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' For example, if a defendant represents that its lending practices are 'conservative' . . . the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.").

1  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Parks Sch.*
2  *of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  However, a court
3  need not accept as true unreasonable inferences; nor need it accept legal
4  conclusions cast in the form of factual allegations. *Sprewell*, 266 F.3d at 988. A
5  court reads the complaint as a whole, together with matters appropriate for judicial
6  notice, rather than isolating allegations and taking them out of context. *Tellabs,*
7  *Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).  Dismissal is
8  appropriate only where a complaint fails to allege "enough facts to state a claim to
9  relief that is plausible on its face." *Bell Atlantic. Corp. v. Twombly*, 127 S. Ct.
10  1955, 1974 (2007).

11  Accordingly, the discussion below provides an overview of some key facts
12  that Plaintiffs allege, stated in the light most favorable to the Plaintiffs.[8]

13  **i. Countrywide changes strategy**

14  "In or about mid-2003," the CAC alleges, Countrywide began a systematic
15  shift from its traditional mortgage business. ¶ 3.

16  Underwriting practices. From mid-2003 onward, Countrywide continually
17  loosened its underwriting guidelines to the point of nearly abandoning them by
18  2006. Countrywide's highest-level managers authored official documents—
19  underwriting matrices and guidelines—such as those for Countrywide's
20  Corresponding Lending Division ("CLD") that memorialized Countrywide's
21  systematically lowered lending standards. ¶¶ 127, 149-52, 154. Numerous
22  Confidential Witnesses ("CWs") from different levels and involved in different

23

24

_____

25  [8] The Public Securities Litigation Reform Act ("PSLRA") heightens the standard
26  for pleading fraud claims. For fraud, a court must balance competing inferences in
    evaluating the facts underlying falsity and scienter. *Tellabs, Inc.*, 127 S. Ct. 2499.
27  That balancing takes place in Section II.D, which addresses fraud. The present
28  Section recites the allegations according to the ordinary motion to dismiss
    standard.

1  aspects of the company corroborate the nature of Countrywide's strategy shift.[9]

2  *See, e.g.*, ¶¶ 155-57. The CAC and CWs identify specific documents and their

3  dates. ¶¶ 130-47 (alleging underwriting matrix updates from January 2004 to

4  March 2006), 155-57 (CWs alleging dramatic changes in practices during 2005

5  and 2006).

6         Chairman and CEO Angelo Mozilo's stated goal was to gain 30% market

7  share. ¶ 405. To do so, he and other high-ranking executives at Countrywide

8  ordered many of the lowered standards. *See, e.g.*, ¶¶ 405, 419.

9         Nothing alleged thus far amounts to a securities violation. The claims arise

10  because, throughout the class period, Countrywide officers publicly denied that

11  underwriting standards had deteriorated. Countrywide officers expressly said they

12  would not lower underwriting standards in service of the market share goal. *See,*

13  *e.g.*, ¶¶ 122, 237, 253, 403, 690, 731, 803-05.

14         Underwriting standards changed so much during the class period that, in

15  December 2007, Countrywide told reporters that billions of dollars of loans in

16  2005 and 2006 could not have been made under "new" guidelines. Those "new"

17  guidelines actually represented Countrywide's pre-class period guidelines. ¶ 32.

18  Countrywide revealed that 89% ($64 bn.) of its 2006 pay-option ARMs would not

19  have been approved under the new-old guidelines; nor would 83% ($74 bn.) of its

20  2005 pay-option ARMs. *Id.* Pay-option ARMs, explained below, are one of the

21  riskiest classes of loans.[10]

22  _____

23  [9] "Where plaintiffs rely on both confidential witnesses and on other facts, they
    need not name their sources as long as the latter facts provide an adequate basis for
24  believing that the defendants' statements were false." *In re Daou Sys.*, 411 F.3d
25  1006, 1015 (9th Cir. 2005) (internal quotations and citation omitted).
26  [10] Countrywide Defendants quibble with some portions of the CAC's narrative,
    especially the underwriting matrices' relevance. First, Countrywide Defendants
27  note that the matrices only apply to the Correspondent Lending Division ("CLD"),
28  which purchases loans originated by third parties and does not originate its own
    loans. Therefore, Countrywide Defendants argue, the matrices merely "address the

-8-

1    "Subprime." Countrywide also employed a misleading definition of

2    "subprime." ¶¶ 5-6. The definition was known internally but not disclosed to the

3    public until 2007. ¶ 10. Thus, the CAC alleges, Countrywide's public statements

4    about its "subprime" operations were inherently misleading to investors.

5    Countrywide, and most lenders, use a credit score system called "FICO."

6    Named for the system's creator, Fair Isaac Credit Organization, FICO refers to a

7    method for calculating a borrower's credit worthiness. FICO's workings are

8    largely proprietary, but based on the information in a credit bureau's files—e.g.,

9    credit card usage and payment history, other revolving loan history, installment

10   loan history, previous bankruptcy, judgments, and liens—FICO returns a score

11   between 300 and 800. CAC at 45 n.6. The higher the score, the more creditworthy

12

13

14   loan origination practices of . . . third parties" that have nothing to do with
     Countrywide's underwriting standards. Countrywide Defs.' Mot. at 21. But

15   Plaintiffs label this a distinction without a difference, and the Court agrees: it

16   would make little sense for Countrywide to maintain looser standards for loans that
     it paid for than for loans originated in-house. What is more, Plaintiffs' detailed

17   account of weakened underwriting standards in one division, CLD, is also (1)

18   strongly corroborated by the other confidential witnesses positioned throughout the
     company and (2) allegedly originated from a central corporate office that wrote

19   matrices and guidelines "for all Countrywide divisions that originated and

20   purchased loans." ¶ 149.

21   Under *Tellabs*, the Court reads the entire complaint as a whole, but

22   Countrywide Defendants would have the Court evaluate the matrices outside the
     context of other, non-CLD-related allegations. Such a reading violates clear

23   Supreme Court case law.

24   Countrywide Defendants also state that the matrices only apply to first-lien
     subprime loans and therefore the matrices "do not reflect overall CLD guidelines."

25   Countrywide Defs.' Mot. to Dismiss at 21. Plaintiffs protest that this raises facts

26   outside their Complaint. Even if Defendants' assertion were considered, however,
     it is unclear why the probative value of those documents would be diminished. *See*

27   Pls.' Opp'n at 17 n.12 ("Defendants do not, and cannot, assert that lending

28   guidelines were not loosened in corresponding fashion for these unspecified other
     loans CLD purchased.").

the borrower; the more creditworthy the borrower, the less likely the borrower is to default.

Though "subprime" has no universal definition, the CAC adequately alleges that industry custom regarded 660 as the prime-subprime dividing line. ¶¶ 217-20, 232. Further, the US median score is 720. ¶ 215. The dispersion is such that only 27% of the population has a score below 650 and 15% of the population scores below 600. *Id.*

Countrywide internally used 620 to mark the subprime line.[11] *See, e.g.*, ¶¶ 177, 192, 223, 226. According to two CWs—one a manager in Full Spectrum Lending ("FSL"), Countrywide's loan origination and purchasing division, and the other a loan originator who worked in a branch that only underwrote "prime" loans—some loans to borrowers with scores as low as 500 were classified as "prime." ¶ 164, 170, 221, 223, 226. Countrywide revealed its internal deviation from the industry norm to the public in a July 24, 2007 conference call. ¶ 231 (Countrywide's Chief Risk Officer disclosing and defending Countrywide's classification system and suggesting that Countrywide classified borrowers "with FICOs in the low 500s" as "prime"). Some analysts expressed shock. ¶¶ 232-34. Countrywide's stock price fell that day. ¶ 944.

---

[11] Again, only 27% of the population has a score below 650 and 15% of the population scores below 600. ¶ 215. Where "prime" and "subprime" refer to the borrowers—that is, where they define relative creditworthiness of a buyer as revealed by his credit history—then it becomes difficult to believe that a fraction of the population *significantly smaller* than the bottom 1/3 would not be "subprime."
However, both CAC and Countrywide use "prime" and "subprime" to describe the overall quality of a loan as well as a borrower's personal credit history. Where "subprime" describes the overall loan, rather than just the borrower's credit worthiness, additional factors may be able to outweigh a low FICO score to make "prime" not misleading, at least assuming reasonable investors and the market would have this understanding. On this motion to dismiss, Plaintiffs have the benefit of the inference that "subprime" applies to borrowers' creditworthiness.

As Countrywide lowered standards, borrowers with lower FICO scores could take out larger loans (in absolute-dollar terms) with higher loan-to-value ratios. ¶¶ 141-46. The loan-to-value ratio measures the amount owed on the loan against the appraised value of the home. A higher ratio indicates higher risk because the more owed relative to the home's value, the less likely a borrower can (or has strong enough incentives to) pay off the loan. More to the point from a lienholder's perspective: in the event of foreclosure, it becomes less likely the lienholder can recover the loan net of foreclosure expenses.

Exception loans. Countrywide often waived even its weakened standards, routinely approving loans that fell well outside its guidelines. ¶ 5. Its goal was to "[a]pprove virtually every borrower and loan profile with pricing add on [sic] when necessary." ¶¶ 5, 176. These exceptions made Countrywide's public disclosures even more misleading insofar as they stated information regarding loan types and its customers' credit quality.

One common practice for loans that Countrywide originated in-house involved a computer system called the Exception Processing System ("EPS"). ¶ 175. EPS was created and overseen by one of Countrywide's longest-serving officers and directors, David Sambol. ¶ 178.

High-risk loans that did not meet the stated underwriting matrices could be originated using the EPS. A loan officer would "enter a customer's FICO score, loan amount, property value used as collateral, and a description of the client's situation" into the EPS. *Id.* CW9, a retail underwriter in the branch that was "the 'top grossing' branch in the nation, closing more than $2 billion in loans during its highest-producing year," alleges that exception loans "including loans in the 500 FICO range, would be approved as 'prime loans.'" ¶¶ 170, 223.

CW9 further alleges that "approximately 80%" of loans at his branch went into the EPS. ¶ 179. In the office of CW10, a loan originator, 15-20% of each day's originations were processed by the EPS. *Id.*; ¶ 173. During parts of the class

period, CW12 reports that Countrywide processed between 15,000 and 20,000
loans per month through EPS. *Id.* Whatever the absolute numbers, exception loans
made up significant portions of Countrywide's loan originations even early in the
class period. *See, e.g.,* ¶ 193 (internal document reporting that exception loans
made up 15-40% of loans coming into FSL from various Countrywide divisions).

Loans put into EPS were sent to Countrywide's central corporate
underwriting offices, known as the "Structured Loan Desks") ("SLDs").
Countrywide set up an incentive system that encouraged the SLDs to approve as
many loans as possible.[12] ¶¶ 183-85. One SLD allegedly had a stated policy of
keeping its decline rate at 1%. ¶ 185. Low decline rates were allegedly imposed on
the SLD managers by the highest level officers and directors. *See, e.g.,* ¶ 410, 423.

Rather than a risk management system, EPS was a tool for generating higher
fees for Countrywide and enabling the company to gain market share. ¶ 182. Loans
processed through EPS were priced with risk-based "add-ons" (additional fees and
mark-ups meant to compensate for risk) using a system called "Price Any Loan."
¶¶ 182-83. Countrywide's internal philosophy, the CAC alleges, was that no loan
was too risky to be out of the question. *See, e.g.,* ¶¶ 183 and 192. David Sambol's
"mantra . . . was that 'Countrywide will make every loan possible.'" ¶ 419.

The highest-placed people in the company, including Mozilo and Sambol,
monitored the EPS exceptions closely and acted on EPS reports. These and other
top executives knew the exception rates and revised underwriting guidelines

---

[12] There is absolutely nothing improper about a strong incentive structure on its
own. Rather, it is to be expected and perhaps encouraged in most industries.
However, extraordinary incentives may corroborate sound allegations that are
based on independent allegations. For example, the CAC's incentive-related
allegations bolster inferences that (1) there was a widespread push from the top to
abandon sound risk management; (2) a high volume of exception loans were
processed; and (3) even raw data entered by loan officers into Countrywide's
computer systems was falsified more than the market would expect.

downward in response to EPS reports. ¶¶ 405, 412-29.[13] Reports to the executives, including EPS reports, were detailed and broke down exceptions by, for example, branch and region. ¶¶ 420-27.

Countrywide did not originate all the loans it serviced or packaged into MBS. It also bought loans from other subprime lenders. ¶ 190. Approximately 1-10% of these purchased loans were audited. ¶¶ 190, 335. If the audit showed that the loans failed Countrywide's "underwriting guidelines, the guidelines would be 'tweaked' midstream in order to get the package to conform by processing the loans as exceptions through" a computer system similar to EPS, called the "GEMS exception module." ¶ 190.

Appraisals. One Countrywide insider, Mark Zachary, states that in September 2006 he "informed Countrywide executives that there was a problem with appraisals" on one of Countrywide's joint ventures. ¶ 194. He alleges specific dates when he reported to Countrywide's board and states that the board "knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to 'roll up' [into their mortgage] all closing costs." *Id.*

Rolling-up makes it easier to sell a home, but can result in the borrower owing more than the home is worth—even before a housing market shift or negative amortization. ¶ 195. If not limited to the joint venture—the CAC does not say how substantial the venture was—more widespread, and accounting for a higher percentage of stated values than perhaps known to the market, then faulty appraisal practices make assessing the value and quality of Countrywide's loans and MBS more difficult.

---

[13] David Farrell, Senior Vice President of CLD sent an email on December 4, 2003 to two distribution lists within the company. ¶ 127. The email explained that Countrywide had lowered its underwriting guidelines to "incorporate a wider range of credit scores" while "increasing loan amounts." ¶¶ 127-28. The "bottom line," Farrell wrote, was that "we expanded our guidelines in order to allow more loans to be approved without requiring an exception approval." ¶ 128.

1       Further, CW8 (an FSL manager) alleges that, "until at least mid-2005 . . . all

2   of Countrywide's origination divisions" allowed loan officers to "hire appraisers of

3   their own choosing" and then "discard appraisals that did not support loan

4   transactions, and substitute more favorable appraisals . . . to obtain a more

5   favorable loan to value ratio so that the loan would 'qualify' for approval." ¶ 205.

6       <u>Documentation practices.</u> In "stated-income," "stated-asset," or "no-doc"

7   loans, the borrower simply asserts his income (or assets) on a form. ¶ 101.

8   Countrywide told borrowers there would be no income verification. *Id. See also*

9   ¶ 131 (stating that Countrywide removed from its guidelines a statement that

10  "income verification could be requested"); ¶ 134 (Countrywide internal document

11  states that "income on [a no doc] application is generally not verified" so long as

12  "the stated income is 'reasonable for the borrower's professional [sic] and level of

13  experience'"); ¶ 161 (discussing low verification rates).

14       CW2, a supervising underwriter, describes a process by which loans were

15  approved based on the borrowers' stated income and then rationalized post hoc.

16  CW2 states that CLD underwriters had to "paper the file" and "build the case" that

17  stated-income, stated-asset loans had been appropriately approved, "because

18  [underwriters] knew the borrower file had to have some type of documentation to

19  support or substantiate the borrower's income in order for the loan to be sold on

20  the secondary market." *Id.* ¶¶ 129, 160-162 (describing how CW2 and other

21  underwriters would use printouts from a website, salary.com, which provided

22  generic salary ranges based on a borrower's particular job title and zip code). This

23  was done even when "CLD underwriters knew that the borrower's income could

24  not reasonably be what was represented on the loan application." *Id.* ¶161. Thus,

25  many loans that did not meet the matrices may have been approved without having

26  to process an exception.

27       The incentive system at the CLD was set up so that <u>denying</u> loans required

28  more work by an underwriter than approving loans within his threshold authority:

denying loans of any value required additional review and a second signature.
¶ 158. For example, a junior officer with the discretionary authority to approve a loan up to $350,000 could not decline that same loan without additional review and work. *Id.* Combined with the other allegations, the incentive system contributes an inference that Countrywide policies were designed from top to bottom to encourage increased risk. *But see supra* n.12 (emphasizing the limits of incentive-based inferences).

During the class period, official underwriting matrices progressively lowered the metrics required for no-doc loans. ¶¶ 135-37. By the end of the period, a borrower with a FICO score of 500 <u>and</u> whose bankruptcy had been discharged a single day before origination could get a loan up to $700,000—without providing income documentation. ¶ 137.

<u>New products.</u> The above practices were combined with a shift to new, inherently more risky loan products.

One example is the adjustable-rate mortgage ("ARM"). ARMs give homeowners a low "teaser" interest rate for an introductory period, typically between 2-10 years. ¶ 96. After the teaser period expires, ARMs "reset" to higher interest rates for the remainder of the mortgage period. *Id.* After the reset, buyers have higher minimum payments. *Id.*

Pay-option ARMs are a type of ARM designed to give buyers flexibility in paying back their mortgage. The buyer may, in a given month, choose (1) to pay down the principal; (2) make an interest-only payment; or (3) make a minimum payment lower than the interest for the period. ¶ 97. If a buyer chooses option 3, the remaining interest will be capitalized. *Id.* This is known as "negative amortization." *Id.* Countrywide's pay-option ARMs have amortization caps (usually 110-125% of the original loan amount). ¶ 99. When a buyer hits the cap, the interest rates typically reset and buyers must begin paying down the principal. *Id.* Thus, the risk of default increases as the principal reaches the amortization cap.

1  Further, the "vast majority" of pay-option ARMs were made on a low-doc or no-
2  doc basis. ¶ 6.

3       Interest-only mortgages allow the borrower to make only interest payments
4  for an introductory period. ¶ 102. After the introductory period, minimum payment
5  requirements increase, making these loans inherently riskier as well. *Id.* Interest-
6  only loans could be fixed rate or ARM loans. *Id.*

7       A Home Equity Line of Credit ("HELOC") is a second mortgage secured by
8  the difference between the value of the home and amount due on the first
9  mortgage. ¶ 103. The smaller that delta, the more likely that even a slight decrease
10  in property value will render the HELOC's collateral worthless.

11       Traditionally, a buyer financing more than 80% of a home's value had to
12  purchase Private Mortgage Insurance ("PMI") to protect the lender from default on
13  the mortgage. ¶ 106. Countrywide internal documents state that Countrywide's
14  loan origination and purchasing division "does NOT require Private Mortgage
15  Insurance (PMI) on any loan – ever!" *Id.* Instead, a buyer could finance 100% of
16  the purchase price by simultaneously taking out (1) a mortgage for 80% of the
17  home's value and (2) a "piggyback" loan for remaining 20%. *Id.* The piggyback
18  loan is a second lien. Therefore, it is subject to the same risks as a HELOC. *Id.* n.5.

19       <u>Loan-to-value ratios</u>. Both HELOCs with slim margins between the home's
20  value and the amount due on the first mortgage and piggyback loans that allow
21  100% financing increase risk. *See* ¶ 942 (Countrywide representative on
22  conference call explaining that "leverage [here, the loan-to-value ratio] at
23  origination matters. More leverage means more serious delinquencies.").

24       Relatively high loan-to-value ratios at origination were exacerbated by
25  negative amortization on pay-option ARMs and the riskiness of Countrywide's
26  other new products. Pay-option ARMs and 100% financing plans increased
27  dramatically during the class period. In 2004, 15% of the pay-option ARMs
28  packaged into MBS had loan-to-value ratios of greater than 90%. ¶ 113. By 2006,

1   the percentage of securitized pay-option ARMs had almost doubled to 29% of

2   securitized loans. *Id.*

3   **ii. How Countrywide's core mortgage-related operations affect**

4   **investment value**

5   Again, Countrywide's core mortgage-related operations accounted for the

6   vast majority of Countrywide's earnings during the class period—93% of pretax

7   earnings for 2006. *See* ¶¶ 82-83. Therefore, virtually all the value of an investment

8   in Countrywide derived from its ability to carry on mortgage-related businesses.

9   *Cf. Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155

10  (S.D. Cal. 2008) ("[A]s a mortgage lender . . . underwriting practices would be

11  among the most important information looked to by investors.").

12  <u>Origination fees.</u> A substantial portion of Countrywide's income came from

13  loan origination fees. Writing more mortgages generates more fees, as explained

14  above. Countrywide's continued ability to originate loans apace would therefore

15  increase the value of investments in the company.

16  However, Countrywide could only keep originating loans at a high rate if (1)

17  the housing market remained healthy; (2) people continued to invest capital in

18  Countrywide as a going concern; (3) Countrywide's own investments in loans rose

19  in value; and (4) Countrywide could continue to sell the mortgages it originated to

20  third parties so that it could use the proceeds to originate more mortgages. Steps 2-

21  4 could only continue if Countrywide's underwriting practices were basically

22  sound and the mortgages performed adequately. If Countrywide's loans began

23  systematically to perform below expectations, Countrywide's value as a going

24  concern would rapidly diminish.

25  <u>Servicing fees.</u> Countrywide also earns fees from servicing mortgages.

26  "Servicing" refers to processing payments and dealing with customers. Therefore,

27  the longer the loan exists, the more servicing fees the servicer can collect.

28  Countrywide valued these assets on its balance sheet as mortgage-servicing rights

-17-

1   ("MSRs"). MSRs' value is a function of the likelihood Countrywide will continue
2   to service the mortgage, discounted by interest rate risk and other market risks
3   extrinsic to the mortgages. ¶ 327. Controlling for extrinsic risks, the value of MSRs
4   increases with mortgages' expected life spans. The life of a mortgage ends (1)
5   upon payment in full (either payment over the mortgage's stated period or pre-
6   payment before the mortgage's stated period runs); or (2) default and foreclosure.
7   Risky loans increase the risk of default, thereby decreasing the value of MSRs.

8       <u>Loans packaged into MBS for resale.</u> Countrywide's Capital Markets
9   division created collections of mortgages for sale to relatively sophisticated
10  investors such as investment banks.

11      MBS separate the operational risk of the mortgage originator from mortgage
12  risk. As such, investors in Countrywide could expect decreased exposure to low-
13  performing mortgages. Likewise, those who invested in MBS could expect
14  decreased exposure to Countrywide's ongoing operations.

15      MBS also pool loan risk. By gathering mortgages into MBS, the risk of
16  individual mortgage defaults is mitigated by other mortgages: some high-risk,
17  high-yield mortgages are made more attractive by being offset by lower-risk,
18  lower-yield mortgages.[14]

19      MBS investors buy the right to receive an income stream from a pool of
20  underlying mortgages. Countrywide would put the mortgages into an entity created
21  to issue the MBS (commonly known as a Special Investment Vehicle ["SIV"]).

22  _____

23  [14] According to the CAC, Sambol's strategy was to take the risk-offsetting logic of
    MBS to an illogical extreme. The CAC compares his strategy to a pyramid
24  scheme: to keep generating a high volume of even the riskiest (and hence highest-
    fee generating) loans, assuming that relatively few higher quality loans at the top
25  would offset defaults lower on the pyramid. ¶ 93. This could work only for so long
26  as the value of the collateral backing up those risky loans would continue to rise;
    that is, if home values kept rising at the pace of the early 2000s, many foreclosed
27  mortgages could still break even or turn a profit (and then new people would buy
28  the homes and new origination fees could be generated).

-18-

The SIV are trusts with no assets except the right to receive mortgage payments. Countrywide would then collect mortgage payments (that is, service the mortgages) and pass the payments (net of its servicing fees) on to the SIV.[15].

The SIVs would issues debt instruments to investors. Those instruments are the MBS. They are sold in income tiers known as "tranches." The tranches are paid in descending order—with each subsequent tranche yielding higher interest to compensate for the increased risk that the last dollar will be taken by a higher tranche. Thus, the lowest tranche (the "residual interest") takes the first loss, the next level takes the next loss, and so on until the highest tranche (the "supersenior tranche") takes the last loss.

To attract investors, Countrywide would often hold the residual interest (as well as some higher tranches). Countrywide thereby bore additional risk to further reduce MBS investors' risk. Countrywide booked these assets as "retained interests" ("RIs"). ¶ 115.

Further, Countrywide made representations and warranties ("R&Ws") to MBS purchasers. The R&Ws obligated Countrywide to replace some securitized loans if they failed to perform at a certain level. ¶ 87. Both RIs and R&Ws increased Countrywide's own financial exposure in the event that the loans it originated began systematically failing.

Investors in an MBS receive a prospectus with statistics regarding the loans underlying the MBS. The prospectuses contain tables of statistics about the loans behind the MBS. The tables break down the loans into ranges by such criteria as FICO, loan-to-value ratio, documentation level, and sometimes a credit quality classification such as "prime" or "nonprime." *See, e.g.*, Countrywide Defs.' Supp. Req. for Jud. Notice, Exs. 77-79; *infra* Section II.B.iii (discussing the truth on the market defense).

---

[15] *See, e.g.*, Countrywide Defs.' Supp. Req. for Judicial Notice, Exs. 77-79.

1        To the extent that the loans underlying MBS fail to perform, the ability of

2   Countrywide to continue to sell MBS to investors (known as selling into the

3   "secondary market") would be impaired. The secondary market's appetite for

4   Countrywide's MBS was a primary source of liquidity (i.e., cash to continue the

5   business of loaning money for mortgages). *See, e.g.*, ¶ 376. To the extent the data

6   about the mortgages entered into Countrywide's computer system was misleading,

7   the MBS may not perform as well as the MBS prospectus' disclosures would

8   suggest. Such poor performance could lead to an increase in Countrywide's R&Ws

9   liability as well as an inability to continue selling mortgages to investors in MBS.

10   ¶¶ 85-87.

11        <u>Loans held by Countrywide.</u> The value of the loans held for investment

12   ("LHIs") by Countrywide's banking division depended on the quality of the

13   underlying mortgages as well as interest rate and other market risks extrinsic to the

14   mortgages. LHIs are kept on the balance sheet at amortized cost—the loan's

15   unpaid principal balance less an allowance for projected loan losses. ¶¶ 267, 278-

16   79; Fair Accounting Statement No. 115 ("FAS 115"). If the LHIs had losses

17   greater than the assumptions used to establish the allowance amount, the

18   inadequate allowance would inflate Countrywide's book value.

19        Countrywide also held loans for sale. If the loans could not be sold, they

20   would eventually have to be discounted and moved to the LHI balance sheet item.

21   ¶¶ 354-55. Thus, if the credit quality of the loans Countrywide intended to sell

22   deteriorated while held for sale, it would be more difficult to sell the loans and they

23   could eventually be reclassified and discounted, lowering Countrywide's net book

24   value.

25        **iii. Examples of allegedly false statements**

26        The CAC contains myriad statements that occur throughout the 4-year class

27   period. The following are illustrative examples of the statements the CAC alleges

28   were materially false or misleading.

-20-

1      Directors and officers. Specific misrepresentations by the Officer
2  Defendants are discussed below in connection with the CAC's fraud allegations.
3  Section II.D.3.

4      Countrywide. Countrywide's SEC Forms 10-K during the class period
5  "touted the Company's 'proprietary underwriting systems . . . that improve the
6  consistency of underwriting standards, assess collateral adequacy and help to
7  prevent fraud.'" ¶ 118. Countrywide's SEC disclosures "also described an
8  'extensive post-funding quality control process.'" *Id. See also, e.g.*, ¶¶ 350-51. The
9  CAC's allegations raise the inference that Countrywide's computer systems, such
10  as EPS, could not reasonably be said to "improve consistency," "assess collateral
11  adequacy," or "prevent fraud." References to "underwriting standards" or a
12  "quality control process" may also be actionable in these circumstances. *See also*
13  ¶ 673. As explained above, the CAC sufficiently alleges that Countrywide
14  systematically departed so far from any reasonable interpretation of "quality" and
15  "standards" that such statements could be materially false or misleading.

16      It cannot be emphasized enough that in the vast majority of cases such
17  statements would be nonactionable puffery. Given the gravity of the CAC's
18  allegations about Countrywide's operations—as well as the market's subsequent
19  realizations regarding Countrywide's business and mortgages—the Court cannot
20  dismiss such claims at the pleading stage.

21      The CAC also alleges that Countrywide did not disclose to its own investors
22  how many of Countrywide's riskiest loans were originated on a reduced
23  documentation basis. *See* Pls.' Opp. at 29-30 (noting 80% of Countrywide's pay-
24  option ARMs originated in 2004 were low-doc mortgages; and roughly 80% of its
25  HELOCs and pay option ARMs held in the Countrywide Bank portfolio as of July
26  2007 were low doc).[16]

27  _____

28  [16] However, it may have been possible to piece together a rough picture of
Countrywide's practices if one were willing and able to analyze a vast amount of

1    Moreover, the CAC sufficiently alleges that statements attributable to
2  Countrywide that speak in terms of "prime" versus "subprime" (or "nonprime")
3  were also misleading before Countrywide's June 2007 disclosure of its internal
4  definition of prime. ¶ 232, 625; *supra* Section I.A.1. These misrepresentations
5  continued throughout the class period and until at least April 2007. ¶ 867-70
6  (Countrywide representative stating to finance industry conference that "over 90%
7  of Countrywide loan origination volume is prime quality" and that Countrywide's
8  loan were "[k]ind of the opposite of subprime").

9    Some Defendants argue that the CAC itself bars any allegation of falsity
10  after Countrywide released its financials for 3Q07, as it states that the company
11  was "forced to admit the poor quality of its mortgage loans" at that time. *See* CAC
12  ¶ 353. This argument, which strips the CAC's allegation from its context, borders
13  on the frivolous. Plaintiffs allege that the 3Q07 disclosures failed to correct all
14  misrepresentations; rather, the truth only gradually leaked out and was often
15  coupled with further misrepresentations to blunt the disclosures' impact on the
16  value of Countrywide securities. ¶¶ 997-1058. It is possible that a complaint could
17  allow only the inference that corrective disclosure was complete by a certain point
18

19  data released by Countrywide's SIVs. *See infra* Section II.B.iii (discussing truth on
20  the market); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) (to
21  use a truth on the market defense, defendant must show that the information was
    "transmitted to the public with a degree of intensity and credibility sufficient to
22  effectively counterbalance any misleading impression created by the insiders' one-
23  sided representations" (quotations and citation omitted)). Defendants also claim
    that the company disclosed "as early as January 2005" that nearly all its pay-option
24  ARMs were originated in this way, and therefore did not mislead investors. *See*
25  Countrywide Defs.' Mot. to Dismiss at 20. Though evaluating the adequacy of the
    Company's disclosures of adverse information is generally not appropriate on a
26  motion to dismiss, Plaintiffs note in any case that any disclosure that loans were
27  made on a reduced-documentation basis did <u>not</u> reveal the fact that Countrywide
    had performed little or no meaningful borrower verification, even for certain
28  "prime" loans. Pls.' Opp. at 14.

-22-

1   and thus all statements thereafter could not be false (or material or causally related
2   to a loss, see *infra* Sections II.C.i.4, II.D.i.6). The CAC is no such complaint.

3       The CAC alleges actionable statements by Countrywide from at least 2004
4   and continuing throughout the class period.

5       <u>Auditors and accounting-related statements.</u> Plaintiffs allege that
6   Countrywide's practices made virtually every accounting-related statement
7   actionable. The basic theory is that various balance sheet items—including the
8   LHIs, RIs, R&Ws, and MSRs explained above—should have changed much more
9   dramatically than they did during the class period, given the changes underway in
10  Countrywide's operations. The inferences one can draw from the accounting-
11  related statements are analyzed in *infra* Section II.C.i.6.

12  **B. Overview of claims and defendants**

13      The Complaint names fifty Defendants: Countrywide, Countrywide Capital
14  V, Countrywide Securities Corp., four "Officer Defendants,"[17] sixteen additional
15  "Individual Defendants,"[18] twenty-five "Underwriter Defendants,"[19] and two

---

[17] <u>"Officer Defendants"</u> refers to Angelo R. Mozilo, David Sambol, Eric P. Sieracki, and Stanford L. Kurland.

[18] <u>"Individual Defendants"</u> refers to the Officer Defendants, as well as Kathleen Brown, Henry G. Cisneros, Jeffrey M. Cunningham, Robert J. Donato, Michael E. Dougherty, Ben M. Enis, Carlos M Garcia, Andrew Gissinger III, Edwin Heller, Gwendolyn Stewart King, Thomas K McLaughlin, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Harley W. Snyder.

[19] <u>"Underwriter Defendants"</u> refers to ABN AMRO Inc., A.G. Edwards & Sons, Inc., Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas Securities Corp., BNY Capital Markets, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Dresdner Kleinwort Wasserstein Securities Inc., Goldman, Sachs & Co., Greenwich Capital Markets, Inc., HSBC Securities (USA) Inc., J.P. Morgan Securities Inc., Lehman Brothers Inc., Merrill, Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. Inc., RBC Capital Markets Corp., RBC Dominion Securities Inc., RBC Dain Rauscher Inc., Scotia Capital Inc., SG Americas Securities LLC, TD Securities Inc., UBS Securities LLC, Wachovia Capital Markets LLC, and Wachovia Securities, Inc.

1   "Auditor Defendants."[20] At the time of briefing, Individual Defendants Michael E.

2   Dougherty and Kathleen Brown  had their own counsel. Dougherty and Brown's

3   ("D&B's") arguments are therefore identified separately where appropriate.

4   KPMG submitted separate briefing. GT also submitted separate briefing. All other

5   Defendants (Countrywide, its affiliated entities,[21] and Individual Defendants

6   besides D&B) submitted consolidated briefing; collectively, they are "Countrywide

7   Defendants" for the purposes of referring to their arguments and papers.

8        The first group of claims—Counts 1-15[22]—are brought under the Securities

9   Act of 1933 ("'33 Act"). These claims are based on five Countrywide-related

10   securities. Six classes of securities are unsecured debt instruments: Series A

11   Medium-Term Notes ("Series A Notes"), Floating Rate Subordinated Notes Due

12   April 1, 2011 ("2011 Notes"), Series B Medium-Term Notes ("Series B Notes"),

13   Series A Floating Rate Senior Convertible Debentures Due 2037 ("Series A

14   Debentures"), Series B Floating Rate Senior Convertible Debentures Due 2037

15   ("Series B Debentures"),[23]  and 6.25% Subordinated Notes Due May 15, 2016

16   ("6.25% Notes"). The last security is an equity security "7% Capital Securities" in

17   Countrywide Capital V, a Delaware Statutory Trust, the sole assets of which are

18   Countrywide subordinated debt. For each of these five securities, Plaintiffs allege

19   three Counts. Each Count alleges violations of §§ 11, 12(a)(2), and 15,

20

21   _____

22   [20] "Auditor Defendants" refers to Grant Thornton LLP ("Grant Thornton") and
     KPMG LLP ("KPMG").

23   [21] Countrywide Securities Corporation is a Countrywide affiliate that acted as an
     underwriter. The CAC treats it as an "Underwriter Defendants." However, the
24   Corporation shares counsel with Countrywide, so this Order includes it as a

25   "Countrywide Defendant." Many of the Underwriter Defendants' arguments apply
     to the Corporation.
26   [22] The CAC's headings use Roman numerals, but the Court uses Arabic numerals

27   for clarity in prose.
     [23] Series A and B Debentures were also sold in the private placement market.
28   Privately traded Debentures are part of the *Argent* case. *See supra* n.2.

respectively.

Plaintiffs bring § 11 claims against: (1) those Individual Defendants who signed the relevant registration statements; (2) the Auditor Defendants that certified the audited financial statements contained or incorporated in the registration statements; (3) the Underwriter Defendants that acted as underwriters in the securities' offerings; and (4) other Defendants who "owed a duty to make a reasonable and diligent investigation of the statements" in connection with public offerings. The § 12(a)(2) claims are brought against the Underwriter Defendants that allegedly served as "sellers" within the meaning of the '33 Act for the relevant security. Finally, § 15 claims are brought against the Individual Defendants who allegedly served as "control persons" of Countrywide when the registration statements were filed and became effective.

The remaining claims (Counts 16-21) allege violations of the Securities Exchange Act of 1934 ('34 Act).

Count 16 alleges violations of § 10(b) and SEC Rule 10b-5 against Countrywide and the Officer Defendants with respect to common stock and "other publicly traded securities, including but not limited to, public debt and preferred securities specifically alleged." Count 18 alleges the same against Auditor Defendants.

Count 17 alleges § 20(a) violations against the Officer Defendants with respect to common stock and "other publicly traded securities, including but not limited to, public debt and preferred securities specifically alleged." Count 21 alleges § 20A violations against Mozilo, Sambol, and Kurland for the same securities.

Count 19 alleges § 10(b) and SEC Rule 10b-5 against Countrywide and the Officer Defendants with respect to publicly traded Series A and B Debentures. Count 20 alleges § 20(a) violations against Mozilo, Sambol, and Sieracki as to the same Debentures.

1

## II.

2

## LEGAL ANALYSIS

3   Six separate motions to dismiss are before the Court: (1) Underwriter

4   Defendants' Motion to Dismiss; (2) KPMG's Motion to Dismiss; (3) Countrywide

5   and Certain Individual Defendants' Motion to Dismiss; (4) Grant Thornton's

6   Motion to Dismiss; (5) Dougherty and Brown's Motion to Dismiss; and (6)

7   KPMG's Motion under Fed. R. Civ. Proc. 8, 12(e), and 41(b).

8   The motions and opposition raise dozens of arguments. Most Defendants'

9   motions expressly adopt portions of other Defendants' motions. The Court

10   addresses the arguments deemed important in turn, without necessarily identifying

11   which Defendants made which arguments.

12   **A. Rule 8(a)**

13   KPMG filed a motion asking the Court to dismiss Plaintiffs' CAC under

14   Rule 41(b) for failure to comply with Rule 8, which requires that pleadings include

15   "a short and plain statement of the claim showing that the pleader is entitled to

16   relief." Fed. R. Civ. Proc. 8(a)(2).[24]

17   Today's securities plaintiffs must meet three separate pleading standards—

18   Rule 8(a)'s short and plain statement rule, Rule 9(b)'s particularity requirement

19   ("In all averments of fraud or mistake, the circumstances constituting fraud or

20   mistake shall be stated with particularity"), and the Private Securities Litigation

21   Act ("PSLRA")'s requirement that the facts underlying falsity and scienter be pled

22   with particularity sufficient to create a cogent and compelling inference of falsity

23   and scienter. *Tellabs*, 127 S. Ct. 2499. In a case such as this, navigating and

24

―――――――――――――――

25   [24] The motion's caption also states that KPMG moves under Rule 12(e) for a more

26   definite statement, but KPMG does not identify any indefinite statements or "point
out the details desired." Fed. R. Civ. Proc. 12(e). Indeed, the motion's supporting

27   memorandum does not discuss Rule 12(e). At any rate, the CAC is far from "so

28   vague or ambiguous that [KPMG] cannot reasonably prepare a response." *Id.* This
should be apparent from *supra* Section I.A's narrative taken from the CAC.

1  reconciling these standards can be an onerous task.

2      Plaintiffs' 416-page CAC is neither "short" nor "plain."  However, the Court

3  declines to dismiss it on these grounds. *Stephenson v. Deustche Bank AG* is

4  instructive. 282 F. Supp. 2d 1032, 1075 (D. Minn. 2003). *Stephenson* recognized

5  that, where a complaint includes a '34 Act claim, "Rule 8(a) must be read in

6  harmony with Rule 9(b)." *Id.* Given that case's complicated facts, in *Stephenson* it

7  was "appropriate that Plaintiffs present their allegations in detail to comply with

8  Rule 9(b)['s requirement that fraud be plead with particularity] and the heightened

9  pleading standards of the [PSLRA]." *Id.* That is, *Stephenson* heeded the second

10  part of Rule 8(a): the short and plain statement must still be sufficient to "show[]

11  that the pleader is entitled to relief" according to whatever other rules and laws

12  govern the action. Fed. R. Civ. Proc. 8(a)(2).

13      The Court (and Defendants) would have appreciated a complaint that is

14  more concise, less redundant, and better organized. This Court has little patience

15  for excess—and 416 pages is excessive. But, given the extraordinary complexity of

16  this case's factual allegations, the lengthy class period, and the wide swath of

17  defendants, focusing on the CAC's rhetorical and structural flaws would be a

18  pointless enterprise.

19      Plaintiffs have, as a general matter, successfully navigated the pleading

20  standards. In so doing, Plaintiffs provided KPMG a complaint that fairly puts

21  KPMG on notice of the claims against it.

22      KPMG's motion is DENIED.

23  **B. Issues common to the '33 and '34 Act claims**

24      **i. Standing**

25      Various Defendants attack Plaintiffs' standing as to several claims. The

26  Court does not find these arguments persuasive and rejects them all. However,

27  D&B correctly point out a formal pleading requirement that Plaintiffs failed to

28  meet with respect to the 2011 Notes. Plaintiffs state that they are prepared to

1   remedy the error. Plaintiffs have leave to amend for this purpose.

2       <u>7% Securities.</u> Underwriter Defendants argue that no one in this case has

3   standing to sue on the 7% Securities because NY Funds did not purchase those

4   particular securities. NY Funds do not have standing for the 7% Securities, but

5   other named plaintiffs do.

6       Underwriter Defendants would have this Court interpret the PSLRA's lead

7   plaintiff provision as working a sea change in the law of standing and,

8   paradoxically, inhibiting this Court's discretion to appoint lead plaintiffs. As lead

9   plaintiffs, NY Funds may bring claims on behalf of other named parties, and

10  "nothing in the PSLRA requires that the lead plaintiffs have standing to assert all

11  of the claims" so long as lead plaintiffs "identify and include named plaintiffs who

12  have standing." *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205

13  (S.D.N.Y. 2003).

14      Underwriter Defendants' interpretation of the lead plaintiff provision, utterly

15  unsupported by its text, 15 U.S.C. § 78u-4(a)(3)(B), would require this Court to

16  appoint even more lead plaintiffs. By so doing, Underwriter Defendants' proposed

17  rule would require courts either (1) to increase lawyer-driven litigation and

18  conflicts of interest by elevating more lawyers to lead counsel status;[25] or (2) to

19  waste judicial resources by litigating securities cases in separate actions rather than

20  by allowing the Court to exercise its discretion in consolidating several named

21  plaintiffs' actions into a single case, led by a single plaintiff. It is therefore no

22  surprise that "Judges presiding over complex securities class actions under the

23  PSLRA have repeatedly rejected arguments . . . that seek to confuse the role of

24

25

26  [25] Indeed, "The purpose of the lead plaintiff section of the PSLRA was never to do
    away with the notion of class representatives or named plaintiffs in securities class

27  actions. Rather, the purpose was to ensure that securities litigation was investor-
    driven, as opposed to lawyer-driven." *In re Initial Public Offering Securities*

28  *Litigation*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002).

1  lead plaintiffs under the PSLRA with that of named plaintiffs . . . ." *Global*
2  *Crossing*, 313 F. Supp. 2d at 205.

3      In this case, it is undisputed that named Plaintiff Brahn holds the relevant
4  security. Underwriter Defendants make the meritless assertion, buried in a
5  footnote, that NY Funds "quietly inserted [Brahn] into this litigation without notice
6  to the court or the Defendants" to cure an "obvious" lack of standing.
7  Underwriters' Mot. at 24 n.22. Brahn filed his own case on November 5, 2007 and
8  the Court consolidated it on November 28, 2007 with a written order describing the
9  case—after a hearing with all the parties where Brahn's case was discussed. *See*
10 Nov. 28 Order Consolidating Cases and Appointing Lead Plaintiff and Lead
11 Counsel, at 5-6; Nov. 19, 2007 Hearing Tr. at 46:31-47.

12     The 7% Securities remain in this litigation.

13     2011 Notes. D&B correctly point out that the CAC fails to include the 2011
14 Notes in the same counts as a security for which any named Plaintiff has standing.
15 D&B's Reply at 9-10. Thus, Plaintiffs cannot state a claim in Counts 4-6 because
16 those counts rely solely on the 2011 Notes. Plaintiffs agreed on this point at the
17 hearing. Oct. 20, 2008 Hearing Tr. at 135:5-16.[26] *See also infra* Section II.C.i.2
18 (discussing § 11 standing for the 2011 Notes).

19     Accordingly, Counts 4-6 are DISMISSED WITHOUT PREJUDICE.
20 Plaintiffs have LEAVE TO AMEND.

21     Matured debt. At the hearing, the parties inexplicably continued to debate
22 debt instruments that have already matured.

23     Plaintiffs cannot recover—and do not seek recovery—on debt instruments
24 held to maturity because Countrywide paid on the agreed terms. *See* CAC Ex. B;
25 Pls.' Opp. Appx. A; Hearing Tr. at 132:2-10. More debt will come due during the
26 litigation. This will, of course, defeat standing for and recovery on the matured

27  _____

28 [26] All further "Hearing" cites refer to the October 20, 2008 hearing on the present
    motions.

1  instruments if Countrywide pays in full. But no company's future is certain. It also
2  is possible that, as the law contemplates, Plaintiffs will sell the instruments at a
3  loss caused by the alleged securities law violations between now and maturity. *See,*
4  *e.g.*, 15 U.S.C. § 77k(e) (defining § 11 damages).

5  Plaintiffs allege the type of economic injury the securities laws require. *See*
6  *infra* Section II.C.i.3. Matured debt will raise damages issues. If all securities in
7  one category of debt matures, then standing as to that category will be defeated.[27]
8  The Court defers further consideration of matured debt until the summary
9  judgment or damages stage; or until Plaintiffs lose standing because all debt of one
10 category has matured.[28]

11 Counsel for Underwriter Defendants at the hearing indicated that some
12 Underwriter Defendants should be dismissed because all the particular instruments
13 they underwrote have matured. Hearing Tr. 52:11-17 ("I have . . . underwriter
14 clients whose only involvement in this case is to have underwritten those short-
15 term notes which are now fully paid . . . . and my clients are wondering why
16 they're still involved, because these things are gone.").

17 Counsel did not bring this to the Court's attention in the papers.[29] If the
18 Court correctly understands Underwriter Defendants' assertion at the hearing, then
19 counsel for Underwriter Defendants should have pointed this out earlier.

20

21 [27] This does not appear likely given the stated maturity dates of the securities in
22 issue. Pls.' Opp. Appx. A.
23 [28] The Court takes notice that BofA recently agreed to guarantee many
     Countrywide debt obligations. BofA, Form 8-K (Nov. 7, 2008). This does not
24 change the above analysis. BofA's guarantee may well cause the debt securities'
25 value to increase, but there is still the fact question whether Plaintiffs suffered a
     loss.
26 [29] Appendix D to Underwriter Defendants' motion discloses whether unnamed
27 "Underwriter Defendants [were] Involved" in a particular offering. The appendix
     does not explain which of the 25 Underwriter Defendants should be dismissed
28 because all the notes they underwrote matured and were paid in full.

1    Counsel for both sides are INSTRUCTED to meet and confer as to any
2    necessary amendment on this matter.

3    **ii. Statute of limitations**

4    Underwriter Defendants also argue that the statute of limitations bars
5    Plaintiffs' '33 Act claims.

6    The '33 Act provides that "[n]o action shall be maintained to enforce any
7    liability created under section 11 or section 12(a)(2) . . . unless brought within one
8    year after the discovery of the untrue statement or the omission, or after such
9    discovery should have been made by the exercise of reasonable diligence." 15
10   U.S.C. § 77m.

11   In this case, the statute of limitations would bar Plaintiffs' claims if they
12   discovered or should have discovered the actionable statements by mid-2006.

13   The Ninth Circuit presently applies a two-prong "inquiry-plus-reasonable-
14   diligence" standard to determine the applicability of this provision. *Betz v. Trainer*
15   *Wortham & Co., Inc.*, 519 F.3d 863, 871 (9th Cir. 2008), *subseq. hist. at* 77
16   U.S.L.W. 3196 (U.S. Oct. 6, 2008) (inviting Solicitor General's comment on cert.
17   petition). First, a court identifies when, if at all, an investor had inquiry notice
18   ("when there exists sufficient suspicion of fraud to cause a reasonable investor to
19   investigate the matter further.") *Id*. Second, a court determines when a reasonably
20   diligent investor making such an investigation would have discovered the facts
21   underlying the alleged fraud. *Id*.

22   The Court finds it unnecessary to address *Betz*'s reasonable diligence prong.
23   Countrywide's alleged systematic shift from sound underwriting could not have
24   been maintained through the class period if reasonable investors had inquiry
25   notice.

26   Countrywide was a huge, closely watched company. Even so, analysts were
27   still said to have been shocked by Countrywide's 2007 revelations. ¶¶ 233-34.
28   Countrywide allegedly continued its misrepresentations even while it began issuing

1  corrective disclosures. ¶¶ 997-1058. The ratings agencies have testified to

2  Congress that they failed to get sound analysis on the market.[30] Countrywide's

3  mortgage-related operations and mortgage securitizations were complex financial

4  transactions that were relatively difficult to value.[31]

5      Where a market appears to have all the ordinary hallmarks of efficiency but

6  a complaint still plausibly alleges the market was fooled, it is preposterous to argue

7  at the pleadings stage that a "reasonable investor" should have been on inquiry

8  notice. *See Betz*, 519 F.3d at 865 (Kozinski, C.J., dissenting from denial of

9  rehearing *en banc*) (observing that statute of limitations arguments are difficult for

10 defendants in "those byzantine securities cases involving risk-indexed convertible

11 debentures or rupee-denominated strip bonds [and] Gibbon-length, fine-print

12 prospectus[es] artfully concealing liabilities").

13     **iii. Truth on the market**

14     Shortly before the hearing, Countrywide Defendants began propounding a

15 new argument in a request for judicial notice. Countrywide Defendants point out

16 that the majority of Countrywide's mortgages were securitized into MBS and sold

17 into the private secondary market. The prospectuses from these MBS contain some

18 statistics of varying specificity about the underlying mortgages. *See, e.g.*,

19 Countrywide Defs.' Supp. Req. for Judicial Notice, Exs. 77-79. The prospectuses

20 are on file with the SEC and available to the public. Countrywide Defendants

21

22 [30] For example, see the prepared statements of Stephen W. Joynt, President and

23 CEO of Fitch, Inc., Raymond W. McDaniel, Chairman and CEO of Moody's
   Corp., and Deven Sharma, President of Standard & Poor's, to the House Comm. on

24 Oversight and Gov't Reform, Hearing on Credit Rating Agencies and the Financial

25 Crisis (Oct. 22, 2008), *available at* http://oversight.house.gov/story.asp?ID=2250
   (last accessed Nov. 7, 2008).

26 [31] The Court doubts that the extent and effect of Countrywide's alleged practices

27 has been revealed. Countrywide originated and securitized a huge volume of loans
   during the class period. The CAC alleges that the documentation underlying the

28 loans is untrustworthy.

1  assert that these documents put the truth on the market, thereby foreclosing the
2  possibility that Plaintiffs "relied" on the misrepresentations in paying a market
3  price for the securities. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th
4  Cir. 1992). The Court takes notice of these prospectuses, but not for the truth of the
5  matters asserted therein.

6         The Court also notes SEC Regulation AB, which governs many of the
7  disclosures in MBS prospectuses. 17 C.F.R. 229.1100 *et seq.*  Regulation AB relies
8  heavily on disclosing historical loan performance data. Countrywide's historical
9  loan performance data should have become increasingly false or misleading as
10 Countrywide's loan underwriting standards declined. Failing to disclose the
11 evaporation of the most fundamental assumption that makes historical performance
12 data useful—that the current loans materially resemble the previous loans—could
13 be independently false or misleading. *Cf.* 17 C.F.R. 229.1110(b); *id.* 229.1111(c)
14 (always requiring historical data on the current asset pool); SEC DIV. OF CORP.
15 FINANCE, MANUAL OF PUBLICLY AVAILABLE TELEPHONE INTERPRETATIONS,
16 REGULATION AB AND RELATED RULES (SEC interpretation emphasizing that
17 general principles of materiality guide any additional disclosures necessary to
18 prevent the historical data provided under Regulation AB from being materially
19 false or misleading), *available at*
20 http://www.sec.gov/interps/telephone/cftelinterps_regab.pdf (last accessed Nov.
21 13, 2008).

22        Countrywide Defendants argue that these approximately 250,000 pages of
23 prospectuses, issued by SIVs and not Countrywide itself, put the truth on the
24 market and thereby negate the reliance element. For substantially the same reasons
25 elaborated above in discussing the statute of limitations, the Court rejects a truth-
26 on-the-market defense at the pleading stage.[32] *Hanon*, 976 F.2d at 503 (to use a

27 ───────────────

28 [32] Of course, it is possible that a hedge fund somewhere had a computer analyzing
   the loan detail tables in all these prospectuses. That hypothetical fund may have

1   truth on the market defense, defendant must show that the information was

2   "transmitted to the public with a degree of intensity and credibility sufficient to

3   effectively counterbalance any misleading impression created by the insiders' one-

4   sided representations" (quotations and citation omitted)).

5        Countrywide's MBS were complex instruments and the prospectuses are

6   very large documents; it is perfectly reasonable to infer that this complexity,

7   coupled with Countrywide's alleged public misrepresentations, would blunt the

8   effect of any disclosures in MBS' prospectuses.

9        **iv. Grant Thornton's involvement**

10       Auditor Defendant Grant Thornton ("GT") conducted Countrywide's 2003

11  audit. The audit was completed in February 2004. GT performed no other

12  Countrywide audits during the class period. GT's 2003 audit conclusions were

13  incorporated, with GT's consent, into subsequent SEC filings during the class

14  period.

15       The CAC's allegations about Countrywide's core operations depict dramatic

16  underwriting changes that began in mid-2003 and continued throughout the class

17  period. *See supra* Section I.A.i. However, Plaintiffs do not allege sufficient facts to

18  allow the inference that Countrywide's new practices had gone on long enough, or

19  had yet dramatically enough departed from previous practices, to have resulted in

20  any accounting-related material misstatement or omission for the 2003 fiscal year.

21       Instead, the most egregious departures from sound underwriting are not

22  alleged to have occurred until after GT completed its work in February 2004.

23

24  pieced together that Countrywide's origination practices had deteriorated to some

25  degree. Even then, the CAC adequately alleges that the data Countrywide used to

26  generate those tables was faultier than a market participant would realize. The
    argument requires a further inference that such a hypothetical fund had any

27  substantial effect in remedying the mispricing through its trading. Contrary to their

28  suggestions at the hearing, Countrywide Defendants are not entitled to such
    speculation.

Countrywide's departure from previous underwriting practices did not allegedly peak until about 2005. ¶¶ 130-47 (alleging underwriting matrix updates from January 2004 to March 2006), 155-57 (CWs alleging dramatic changes in practices during 2005 and 2006). Further, it is reasonable to infer that buyers who intended to refinance their ARMs or interest-only loans near the reset date would not cause much trouble until approximately two years after origination (and even then likely if underwriting practices had changed or the housing market cooled). *See, e.g.*, ¶ 96 (ARMs generally set within 2 years ["2/28" loans]); ¶ 99 (pay-option ARMs have negative amortization caps, at which point they reset). *See also* ¶ 317 (CW1 alleging that loose underwriting standards made default likely within 18 months of origination); Countrywide, Form 10-K at 42 (2006) ("[W]hen the required monthly payments for pay-option loans eventually increase . . . borrowers may be less able to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower with an amortizing loan. Our exposure to this higher credit risk is increased by any negative amortization that has been added to the principal balance.").

Even if the 2003 changes were serious enough to make balance sheet items based on 2003 mortgages materially false or misleading further down the road, significant mortgage default rates would take longer to manifest than the short time between the mid-2003 shifts[33] and the end of 2003. It is reasonable to infer that delinquency probability rises at some point after origination before declining over the loan's life. *See* ¶ 317 (CW1 alleging that loose underwriting standards made default likely within 18 months of origination); Countrywide, Form 10-K at 42

---

[33] It is not even clear that "mid-2003" is the best starting point, though that is what the CAC alleges. ¶ 3. Many of the CAC's particularized allegations cannot be placed earlier than December 2003. *See, e.g.*, ¶ 128 (Farrell email announcing reduced guidelines on December 3, 2003); ¶ 131 (December 2003 underwriting matrix compared with February 2003 underwriting matrix).

1   (2006) ("[W]hen the required monthly payments for pay-option loans eventually
2   increase . . . borrowers may be less able to pay the increased amounts and,
3   therefore, more likely to default on the loan, than a borrower with an amortizing
4   loan. Our exposure to this higher credit risk is increased by any negative
5   amortization that has been added to the principal balance."). The Court cannot
6   infer that this default probability curve on the mid-2003 mortgages—based on
7   underwriting practices that had only recently begun to deteriorate—would deviate
8   enough by the end of 2003 for GT's audit to be materially false or misleading.

9        By the time of GT's audit, Countrywide's loan performance would not have
10  borne out—and, based on all reasonable inferences from the CAC, did not yet bear
11  out—the alleged changes in Countrywide's mortgage-related operations.

12       Plaintiffs in the eight months between the first *Pappas* complaint and the
13  CAC had sufficient opportunity to investigate GT's involvement and make
14  allegations sufficient to state a claim. They have not. Given the timeline of the
15  CAC's allegations, Plaintiffs cannot state a claim against GT. *Lopez v. Smith*, 203
16  F.3d 1122, 1129 (9th Cir. 2000) (dismissing with prejudice is appropriate where
17  plaintiff cannot cure by amendment).

18       Accordingly, all claims against GT are DISMISSED WITH PREJUDICE.
19  **C. '33 Act Claims**
20       **i. Section 11**
21       Section 11 provides a remedy for plaintiffs that purchased a security they
22  can trace to a defective registration statement.

23       To state a claim under § 11, a plaintiff "must demonstrate (1) that the
24  registration statement contained an omission or misrepresentation, and (2) that the
25  omission or misrepresentation was material, that is, it would have misled a
26  reasonable investor about the nature of his or her investment." *In re Stac Elecs.*
27  *Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) (quotations and citation
28  omitted), *cert. denied sub. nom. Anderson v. Clow*, 520 U.S. 1103 (1997).

1  Defendants are liable for innocent or negligent material misstatements or

2  omissions, subject to a few affirmative defenses. The most notable affirmative

3  defense is due diligence. 15 U.S.C. § 77k(b)(3); *In re Stac*, 89 F.3d at 1404.

4  Reliance is not an element.[34]

5  ### 1. "Sounds in fraud"

6  '33 Act claims are subject to Rule 8(a)'s ordinary notice pleading

7  requirements unless the allegations "sound in fraud." *In re Daou Sys., Inc.*, 411

8  F.3d 1006, 1027 (9th Cir. 2005), *cert. denied sub. nom. Daou Sys., Inc. v. Sparling*,

9  546 U.S. 1172 (2006). *Id.* In evaluating a '33 Act claim, a court must strip away

10  the allegations that sound in fraud and see if the remaining allegations state a

11  claim. *Id.* at 1028.

12  The CAC's '33 Act allegations do not sound in fraud. The CAC does the

13  work of "stripping" the allegations that sound in fraud. It levies fraud allegations

14  against a select few defendants. Those allegations are addressed in the '34 Act

15  discussion. *Infra* Section II.D.

16  Several defendants take a contrary view. KPMG argues, for example, that

17  the law provides that "[w]hen a misrepresentation forming the basis of a Section 11

18  claims is also alleged to support a claim for fraud under Section 10(b), the Section

19  11 claim is 'grounded in fraud' and the plaintiff must plead that claim with

20  particularity." KPMG's 12(b)(6) Mot. to Dismiss at 7.

21

---

22  [34] There are two possible exceptions. One arises where the issuer released an

23  earnings statement that covers a twelve-month (or greater) period that began after

24  the effective date. In that case, aftermarket purchasers who acquired the security after the earnings statement must also prove reliance on the registration statement.

25  15 U.S.C. § 77k(a). There is some authority for another exception in the unusual

26  case where it appears from the face of the complaint that a plaintiff cannot have actually relied on the registration statement. *APA Excelsior III L.P. v. Premiere*

27  *Techs., Inc.*, 476 F.3d 1261, 1271 (11th Cir. 2007); *In re Levi Strauss Sec. Litig.*,

28  527 F. Supp. 2d 965, 974-78 (N.D. Cal. 2007) (locating *APA Excelsior*'s reliance analysis in the materiality element). Otherwise, reliance is presumed.

1    The Court rejects this statement of the law. *In re Daou* endorses a bright line
2    only where plaintiffs allege "a unified course of fraudulent conduct and rely
3    <u>entirely</u> on that course of conduct as the basis of a claim." *In re Daou*, 411 F.3d at
4    1027 (emphasis added) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,
5    1103-04 (9th Cir. 2003)). Similarly, *In re Stac* held only that the particularity
6    requirements of Rule 9(b) are applicable to § 11 claims "where the gravamen of
7    the Complaint is plainly fraud" and a plaintiff makes only "nominal efforts" to
8    disclaim fraud as to some defendants. 89 F.3d at 1405 n.2. *See also In re Suprema*
9    *Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272-73 (3d Cir. 2006) (interpreting the
10   sounds in fraud doctrine of *In re Daou* and *In re Stac* more narrowly than this
11   Court does and holding, "where the plaintiff has exercised care in differentiating
12   asserted negligence claims from fraud claims and in delineating the allegations that
13   support the negligence cause of action as distinct from the fraud . . ." the complaint
14   does not sound in fraud).

15   Plaintiffs here do not rely on a unified course of fraudulent conduct against
16   all Defendants. Rather, as explained in *supra* Section I.A.i, Plaintiffs describe a
17   unified course of abandoning sound underwriting practices. No fraud lies in
18   changed practices alone. The alleged fraudulent conduct, not yet fully explained in
19   this Order, is distinct from this conduct. The fraud consists in intentionally
20   misrepresenting Countrywide's underwriting practices.

21   Not all Defendants are alleged to have participated in the fraud. The CAC
22   clearly specifies which defendants participated in which allegedly fraudulent
23   conduct. For example, Underwriter Defendants are nowhere implicated in
24   fraudulent conduct. Neither are the vast majority of the Individual Defendants. As
25   to those Defendants who are implicated in fraud, the CAC provides additional,
26   particularized allegations. *See, e.g.*, ¶¶ 8, 500 (expressly alleging mental states less
27   than fraud against some Defendants and specifying the nonfraudulent course of
28   conduct giving rise to the violations). *See also infra* Section II.D.i.3 (discussing

1    scienter).

2         The CAC's carefully circumscribed fraud allegations recognize important

3    truths where § 11 and §10(b) claims are pled together: § 11 liability arises against a

4    vast array of participants in an offering. It is unlikely that so many individuals and

5    entities could all act fraudulently together. At some point, repeated

6    misrepresentations, as well as additional corroborating facts, may allow an

7    inference of fraud as to some participants. Heightened pleading standards properly

8    force plaintiffs to limit their fraud allegations to those participants who are likely to

9    have acted fraudulently. Heightened pleading gives those participants the deserved

10   protection of Rule 9(b); and frees the rest from defending against unreasonable and

11   unfounded fraud claims.

12        But it eviscerates § 11 to give all defendants Rule 9(b) protection when (1)

13   only certain defendants are expressly alleged to act fraudulently; (2) a complaint

14   specifies unique, particularized facts as to those defendants; and (3) the

15   particularized facts raise a scienter inference as to those defendants, but not all.

16   *Accord In re McKesson HBOC, Inc. Sec. Litig*, 126 F. Supp. 2d 1248, 1266 (N.D.

17   Cal. 2000) (holding that a '33 Act § 14(a) claim sounded in fraud only as to some

18   defendants, as to whom particularized fraud allegations were specifically made).[35]

19                    **2. Section 11 standing**

20        NY Funds purchased the 2011 Notes but sold them at a profit. Plaintiffs

21   therefore concede their purchase of the 2011 Notes does not give them standing.

22   Pls.' Opp. at 122 n.99. No other named plaintiff purchased the 2011 Notes. Nor did

23

---

24   [35] This Court previously determined, in assessing derivative claims under § 14(a)

25   of the Exchange Act, 15 U.S.C. § 78j(b), brought by a different lead plaintiff, "the

26   Complaint clearly sounds in fraud, and thus both Rule 9(b) and the PSLRA apply."
     *In re Countrywide Deriv. Litig.*, 554 F. Supp. 2d at 1076. However, the present

27   CAC asserts different claims, based on different allegations, and names different

28   defendants. The CAC also better articulates those allegations that are substantially
     the same.

                              -39-

1   any named plaintiff purchase either the 2- or 3-Year Notes. However, NY Funds
2   did purchase debt instruments issued under the same shelf registration as these
3   Notes: the CAC alleges that the 2011, 2- and 3-Year Notes were part of the Series
4   A Notes issuances originally registered on the same Form S-3 with the same base
5   prospectus. ¶¶ 888, 898.

6      Under § 11, if "any part of the registration statement, when such part became
7   effective, contained an untrue statement of a material fact or omitted to state a
8   material fact," then any person acquiring "such security" pursuant to the
9   registration statement has standing to sue a variety of participants in the security's
10   issuance. 15 U.S.C. § 77k(a) (emphasis added). A § 11 violation occurs in the
11   registration statement; but the security's purchase date and value are needed to
12   determine whether and to what extent the violation injured the purchaser. Though
13   initial and aftermarket buyers alike have standing, aftermarket buyers face the
14   additional task of tracing their purchase to the registration statement. *Hertzberg v.*
15   *Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999). Thus, standing is satisfied so
16   long as the purchase can be traced to a registration statement containing, in any
17   part, a false or misleading statement as of that part's effective date.

18      Standing is straightforward in a traditional issuance case, where all the
19   securities are issued under identical documentation and share a single effective
20   date. But in a shelf registration, the issuer files a registration with the SEC and then
21   either (1) keeps this registration "on the shelf" by waiting until a later date to go
22   effective; or (2) completes one offering of less than the authorized securities on the
23   effective date and puts the registration statement on the shelf for further issuances
24   at later dates. The delayed, continuous, or serial offerings may continue until they
25   reach the total issuance authorized by the shelf registration. Thus, the registration
26   may be "pulled down" from the shelf to issue securities as needed. *See Finkel v.*
27   *Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992) (outlining shelf registration
28   mechanics).

-40-