1    Again, as insiders were selling, Countrywide was buying—with newly

2  raised capital rather than existing cash reserves. The CAC therefore creates a

3  strong inference that Countrywide's explanation for its stock repurchase plan was

4  economically suspect.[68] As the Court observed in the *Derivative Litigation*, "How

5  could the [Countrywide] Board members approve a repurchase of $ 2.4 billion

6  dollars worth of stock, and nearly contemporaneously liquidate $ 148 million of

7  their personal holdings just months before the stock dropped some 80-90%?" 554

8  F. Supp. 2d at 1067.[69]

9    Chairman and CEO Mozilo's increase in selling during the repurchase and

10  disclosures was the most pronounced. Even if the repurchase was entirely

11  unobjectionable, Mozilo's increased sales—as disclosures snowballed—

12  contributes independently to an inference of scienter. Though Mozilo used 10b5-1

13  plans to sell based on predetermined events, he amended these plans so frequently

14

---

15  [68] Open market repurchases have also received some attention from academics and
16  the SEC. The Court expresses no opinion about the propriety of open market
   repurchases generally; as with any transaction, there are surely many legitimate
17  reasons for a repurchase. For example, repurchasing shares reduces the number of
18  shares outstanding, thereby increasing earnings per share and allowing enhanced
   dividend distribution.
19    However, the following alleged facts contribute to a strong inference of
20  scienter—(1) two large open market repurchases while disclosures mounted and
21  (2) raising money from outside investors while (3) insiders increased their selling.
    These allegations do not fit neatly into the *Silicon Graphics* factors, but they do
22  find some basis in the literature. *See* JESSE M. FRIED, INFORMED TRADING AND
23  FALSE SIGNALING WITH OPEN MARKET REPURCHASES, 93 CAL. L. REV. 1323
   (2005) (discussing some economics of and incentives for repurchases). *See also* 17
24  C.F.R. § 240.10b-18(b) (providing issuers and affiliated purchasers, but not inside
25  sellers, a limited safe harbor for open market repurchases).
26  [69] The *Derivative Litigation* named different defendants, of course, so the absolute
   numbers involved here are not as great. But the observation at the core of this
27  inference remains valid for the CAC: it is suspect for those in a position to
28  understand Countrywide's true state to initiate a huge repurchase while liquidating
   their holdings shortly before a precipitous drop.

1    during this period that he "appear[ed] to defeat the very purpose of the 10b5-1

2    plans." *In re Countrywide Deriv. Litig.*, 554 F. Supp. 2d at 1069; ¶¶ 471-93; 17

3    C.F.R. § 240.10b5-1 (providing a safe harbor for plans in good faith).[70] Indeed,

4    Mozilo made a 10b5-1 amendment three days after announcing the first

5    repurchase; and he then made two more amendments during the first repurchase.

6    ¶ 496.

7       The CAC, as explained above, only gives aggregate sales data for Sambol,

8    Kurland, and Sieracki.[71] The Court will not draw any inference based on that

9    dataset and assumes, for purposes of the present motions only, that these three

10   defendants sold no stock.

11       Kurland left Countrywide in September 2006—before the first repurchase

12   plan. ¶ 29. There are no other allegations about Kurland's trading behavior. The

13   repurchase allegations therefore do not contribute to a scienter inference for

14   Kurland.

15       The weak support for scienter that the CAC provides as to Sambol and

16   Sieracki derives only from (1) the suspicious structure of the repurchase plans and

17

18

---

19   [70] The Court declines Defendants' invitation to reconsider its conclusion in the
*Derivative Litigation* that the timing of Defendant Mozilo's stock plans are

20   probative of scienter. Defendants dispute the timing of Mozilo's new employment

21   agreement, which they argue is dated December 22, 2006, not October 20, 2006, as
Plaintiffs allege. Countrywide Defs.' Mot. at 45-46. Thus, they argue, Mozilo's

22   public explanation for amending his December 2006 plan is consistent with the

23   date of his employment agreement. *Id.*; ¶ 484. The Court found in its previous
order that the very fact that Mozilo was so actively amending his 10b5-1 plans,

24   which were designed to be passive, was relevant to scienter. *See* 554 F. Supp.2d at

25   1069.

26   [71] The allegations discussed in the *Derivative Litigation* order did include absolute-
dollar values of Sambol's sales during the repurchase periods. Even if the Court

27   were inclined to take judicial notice of those figures, they give no comparison with
any earlier period and therefore no reason to infer that Sambol's behavior changed

28   during the repurchases. *See* 554 F. Supp. 2d at 1067.

1  (2) the CAC's allegations that Mozilo's insider trading was brought to the Officer

2  Defendants' attention. *See, e.g.*, ¶¶ 491, 752, 753.[72]

3      Position-based inferences. In some circumstances it is appropriate to use a

4  defendant's position and responsibilities within the company to support a strong

5  inference of scienter. This is especially appropriate when the alleged

6  misrepresentations relate to a company's "core operations."

7      The Court analyzes position-based inferences after a flurry of recent Ninth

8  Circuit opinions on the issue. This Court recently discussed such inferences in the

9  *Derivative Litigation*. 554 F. Supp. 2d at 1057-71 (finding that it was "absurd to

10  suggest" some key insiders lacked knowledge about Countrywide's core mortgage-

11  related operations). Because the Court did not then have the benefit of *Metzler Inv.*

12  *GMBH v. Corinthian Colleges, Inc.*, 534 F.3d 1068, *as amended by* 540 F.3d 1049

13  (9th Cir. 2008), *Berson v. Applied Signal Tech.*, 527 F.3d 982 (9th Cir. 2008)

14  (Kozinski, C.J.), and *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008),

15  the Court now undertakes a more thorough discussion of the law.

16      *Metzler* rejected a complaint alleging fraud at Corinthian Colleges

17  ("Corinthian"), a trade school operator with campuses nationwide. 527 F.3d at

18  1055. *See also supra* Section II.C.i.4 (discussing *Metzler*'s loss causation analysis).

19  Corinthian's core business depended on enrolling students and receiving tuition

20  payments. The *Metzler* complaint alleged that Corinthian's colleges were

21  "pervaded by fraudulent practices" because some campus administrators falsified

22  reports. 540 F.3d at 1055-56, 1059-60. The *Metzler* confidential witnesses had only

23  campus-level knowledge and represented just a few Corinthian campuses. *Id.*

24      To monitor its core operations, Corinthian "had in place a management

---

[72] *Accord No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America
West Holing Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established
even if the officers who made the misleading statements did not sell stock during
the class period . . . the lack of stock sales by a defendant is not dispositive . . . .").

1  information system that monitored enrollment and other data company-wide." *Id.*
2  at 1067-68. That information system apparently reported fairly high-level
3  enrollment data: just "enrollment and placement figures." *Id.* at 1068. The
4  complaint alleged that management had a "general awareness" of the company's
5  day-to-day workings." *Id.*

6  The *Metzler* panel, facing such a deficient complaint, rejected a strong
7  inference of scienter. It has been long established in this Circuit that "general
8  awareness of the day-to-day workings of the company's business does not establish
9  scienter." *Id.* Further, even if the *Metzler* defendants had actual knowledge of the
10  data reported by the system, there was apparently no basis for inferring that the
11  data would reveal the alleged pervasive fraud. First, the alleged fraud was a plan to
12  systematically falsify enrollment data throughout the company. But the allegations
13  came only from a few scattered campuses and nothing suggested that the
14  individual defendants orchestrated a plan from the top rather than supervisory
15  failures. *See id.* at 1056. Second, even if administrators were falsifying data on a
16  significant scale, nothing about the enrollment data gave rise to a strong inference
17  that the data's recipients must have known of the fraud: even if the data the campus
18  administrators entered was systematically fraudulent, administrators would have
19  had strong incentives to make the data look legitimate.

20  By contrast, the present CAC persuasively alleges that systematic changes in
21  Countrywide came from the top down and pervaded virtually every office. *See*
22  *supra* Section II.A.i (explaining allegations about Countrywide's core mortgage-
23  related operations). Countrywide directors and officers were allegedly not just
24  generally aware of EPS and other exception-tracking systems, they were,
25  according to many corroborating CWs, regularly provided detailed exception
26  statistics. *See, e.g.*, ¶¶ 405, 412-29. As discussed *infra*, each Officer Defendant
27  against whom scienter is alleged publicly professed knowledge of Countrywide's
28

-84-

1   underwriting practices at the time in question.[73]

2   Moreover, the exception figures that Countrywide's systems tracked were

3   not high-level data that would not clearly point up Countrywide's true position.

4   Rather, the figures track exactly the business practices in issue—systematically

5   lowering, avoiding, and undermining guidelines while approving low-quality

6   mortgages as "prime." The analog for *Metzler* would be a system that tracked

7   when Corinthian or Department of Education guidelines were disregarded, not a

8   system that tracked enrollment data.[74]

9   *Berson* is most instructive for evaluating the present CAC. 527 F.3d 982. In

10  *Berson*, defendant corporation Applied Signal received 80% of its revenue from

11  contracts with two government agencies. *Id.* at 984. Countrywide, similarly,

12  received over 90% of its revenue from its core mortgage-related operations for at

13  least part of the class period. ¶¶ 82-83. Therefore, Applied Signal's business

14  revolved around a few major government contracts, just as sound mortgage

15  underwriting practices were undeniably central to Countrywide's ongoing vitality.

16  The government agencies could order work on the contracts stopped at any

17  time. 527 F.3d at 984. Once stopped, Applied Signal stopped earning money. *Id.*

18

19  [73] *Accord In re Daou*, 411 F.3d 1006, 1022 ("[S]pecific admissions from top

20  executives that they are involved in every detail of the company and that they

21  monitored portions of the company's database are factors in favor of inferring

    scienter . . . ." (discussing the inference in the context of accounting fraud));

22  *Metzler*, 540 F.3d at 1066 (scienter requires "specific contemporaneous statements

23  or conditions that demonstrate the intentional or deliberately reckless false or

    misleading nature of the statements when made" (quoting *Ronconi v. Larkin*, 253

24  F.3d 423, 243 (9th Cir. 2001) (emphasis added)).

25  [74] This is not to discourage effective management information systems. In fact, as

26  with effective internal controls over financial accounting, strong information

    systems and involved management may often contribute to an inference of good

27  faith by demonstrating a commitment to sound practices. But when there are both

28  strong systems and allegations of long-running misconduct of the type those

    systems aim to prevent, a strong inference of scienter may be more likely.

-85-

1   Just as important, once work was stopped there was a high probability that the
2   agency would unilaterally cancel the contract. *Id.*

3     Applied Signal received four stop-work orders—one of which was on a
4   project worth approximately $12mn. *Id.* at 986-87. Applied Signal allegedly misled
5   the market by not properly accounting for the greatly increased risk it would lose
6   the stopped contracts, thereby making it look like the $12mn was still coming in
7   (or was likely to come in). *See id.* at 987, 990.

8     *Berson* held that these facts gave rise to a strong inference of scienter for
9   Applied Signal's CEO and CFO. *Id.* at 987-88. The *Berson* complaint, unlike the
10  present CAC, did not refer to confidential witnesses who could allege first-hand
11  knowledge of the CEO and CFO's practices. Rather, *Berson* approved the
12  inference that the CEO and CFO knew of the stop-work orders because the
13  suggestion that these corporate insiders—the top executive and the top financial
14  officer—would be unaware of a development so crucial to the business was
15  "absurd." *Id.* at 987-88.

16    Prior to *Berson* there was some confusion in the Circuit as to whether core
17  operations inferences were appropriate. *Berson* explained that the Circuit had
18  rejected only two inappropriately lax pre-*Tellabs* standards: (1) a bald statement
19  that core operations and important transactions "may be attributed to the company
20  and its officers" without any elaboration on how high the hurdles to such an
21  inference are; and (2) a standard that would contravene the text of the PSLRA by
22  testing core operations inferences for a "reasonable inference" of scienter. *Id.* at
23  988-89 (explicating *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003)
24  and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
25  Corp.*, 320 F.3d 920 (9th Cir. 2003)).

26    Finally, *South Ferry* resolved any misinterpretations of *Berson* and clarified
27  the position-based inference analysis. 542 F.3d 776. *South Ferry* recognized that
28  complaints must rely on circumstantial evidence of scienter. In some cases it is

-86-

1    "absurd to suggest" that management's position is not a highly probative

2    circumstance. *Tellabs* does not allow courts to create "separate[] rules of thumb for

3    each type of scienter allegation"; instead, the circumstances must always be

4    viewed as a whole. *Id.* at 784. For position-based allegations to satisfy the PSLRA,

5    plaintiffs must "bridge the gap" between a defendant's mere access to information

6    and an inference of knowledge. *Id.* at 783. In most cases, this will require

7    additional particularized facts about the defendants—perhaps, as in the present

8    CAC, a defendant's own public statements or confidential witness reports about a

9    defendant's specific activities.

10       In "exceedingly rare" circumstances, *South Ferry* explained, a "bare core

11   operations inference" may suffice. *Id.* at 785 n.3 (citing and discussing *Berson*, 527

12   F.3d 982). The complaint must show that it is "absurd to suggest" the defendants,

13   by virtue of their positions, would not have knowledge of developments in core

14   operations or important transactions. *Id.* at 786 (quoting *Berson*, 527 F.3d at 988).

15       From these cases, the Court derives the following principles: (1) a

16   defendant's position within the company is a relevant circumstance to consider in

17   the *Tellabs* analysis; (2) all particularized allegations about a defendant's activities

18   and statements should be considered before making a position-based inference, just

19   as in any *Tellabs* analysis; and (3) position alone creates a strong inference of

20   scienter only in the extraordinary case where it is "absurd to suggest" that a

21   defendant did not know. These principles inform the following discussion.[75]

22

23

24

25

26   [75] *Berson* and *South Ferry* renounce any language in *Metzler* or pre-*Tellabs* cases
     could be interpreted to require more. *See South Ferry*, 542 F.3d at 784-85

27   (discounting the approach of several pre-*Tellabs* cases and only citing *Metzler* for
     the proposition that a "bare core operations inference" based solely on

28   "management's general awareness" is insufficient).

### a. Countrywide

The alleged falsity of statements made by the company has already been discussed above in Sections I.A.iii and II.C.i.6. Even revising the core business allegations to further discount confidential witnesses, see *In re Daou*, 411 F.3d at 1015, and otherwise reflect the PSLRA's heightened pleading standards, the CAC still adequately alleges fraud against Countrywide. If the highly particularized allegations about Countrywide's core business operations give even a rough sketch of what Countrywide's business practices looked like during the class period, then many statements the Court has already discussed—and others raised in the CAC—may well have been fraudulent.

### b. Angelo Mozilo

Chairman and CEO Mozilo made numerous public statements about Countrywide and its practices during the class period. Some of his public statements appear to demonstrate that he knew others of his statements were false when made. Thus, the Court need not impute knowledge to Mozilo from his position alone.

2004. In April 2004, Mozilo distinguished Countrywide's "very, very good solid subprime business" from the "frothy business [where lenders] are taking 400 FICOs with no documentation." ¶ 119. Mozilo declared Countrywide's "very strong disciplines in the origination of sub-prime loans" and assured the market that "maintaining that discipline is critically important to" Countrywide. *Id.* Mozilo concluded, "[W]hen you look at sub-prime, you have to look at it in tranches, and we are at the high end of that tranche." *Id. See also* ¶ 120 (discussing further statements on the same conference call). *Cf.* ¶¶ 132-34 (discussing official underwriting matrices from 2003 that contradict Mozilo's 2004 representations).

The CAC's timeline of continually deteriorating underwriting standards—especially when coupled with exception processing and reckless documentation practices—gives rise to a strong inference that, by April 2004 Countrywide was

1  already in the "frothy" subprime business that Mozilo derided.

2  <u>2005.</u> In March 2005, Mozilo continued to distinguish Countrywide from its

3  would-be peers. He chastised his competition for "pushing further down the credit

4  chain into the 500 FICOs, and below 550 . . . as you get down to those levels, it

5  becomes very problematic and I don't think there's any amount of money you can

6  charge upfront to cover your losses on those types of loans." ¶ 121.

7  Mozilo represented that Countrywide, by contrast, "had to remain very

8  disciplined" and therefore Mozilo said he had "to separate it" from the

9  competition. *Id.* Through  2006 and into 2007 Mozilo continued to differentiate

10  Countrywide and even said that Countrywide's "profile in the subprime market has

11  been one where we have, for the most part, been on the sidelines." ¶ 806, 836. *Cf.*

12  ¶ 135 (discussing 2004 Countrywide official underwriting matrix that contradicts

13  Mozilo's 2005 representations). *See also* ¶ 156 (discussing continued deterioration

14  in 2005 underwriting standards); ¶ 169 (quoting Countrywide internal documents

15  touting loan approvals where borrowers had FICOs in the low 500s); ¶¶ 152, 153

16  (CW4 alleging Countrywide monitored its competitors and revised practices

17  downward in response to its peers).

18  Further, it is alleged that Mozilo understood the risks that Countrywide was

19  taking. On a March 2005 conference call, he said, "I don't think there's any

20  amount of money you can charge upfront to cover your losses on" loans with "500

21  FICOs and below 550, 540, 530." ¶ 121. This directly contradicts the "Price Any

22  Loan" system discussed above and Countrywide's internal documents that

23  systematically encouraged approving virtually any loan with additional "add-on"

24  fees. ¶¶ 182-83.

25  Mozilo in a July 2005 conference call also assured his investors, "I do

26  participate in originations myself, and it keeps me apprised of what's happening. I

27  think that the situation has stabilized. I don't see any deterioration in the quality of

28  those loans being originated." ¶ 403. Mozilo, in the same call, added that he was

"not aware of any change of substance in underwriting policies" and that "[w]e don't view that we have taken any steps to reduce the quality of our underwriting regimen at all." ¶ 690. In a September 2005 call, Mozilo added that Countrywide's "loan underwriting guidelines are conservative and under constant review." ¶ 708. Throughout 2006, Mozilo still represented that Countrywide's "loan quality remains extremely high." ¶¶ 731, 803-05.

Mozilo made similar statements about Countrywide's 30% market share goal. Mozilo repeatedly assured the market that Countrywide's 30% market share target was "totally unrelated to quality [sic] of loans we go after . . . there will be no compromise in that as we grow market share." ¶ 94. Mozilo in 2005 also said that "under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share." ¶ 122.

2006. Mozilo explained in 2006 that his customers allowed their principal balances to increase through negative amortization on Pay-Option ARMs because they "had never seen in their adult life real-estate values go down." ¶ 292. The same year, Mozilo himself predicted in the housing market "a general decline of 5% to 10% throughout the country, some areas 20%. And in areas where you have had heavy speculation, you could have 30%." ¶ 429.

Notwithstanding the foregoing statements, Mozilo in a 2007 conference call told analysts, as Countrywide's business entered crisis, that "nobody saw this coming." ¶ 439.

2007. In early 2007, Mozilo represented that "7%" of Countrywide's originations were "subprime" and that "0.2%" of Countrywide's assets were "subprime." ¶ 855, 856.

Accepting the CAC's extensive allegations regarding Mozilo's understanding of Countrywide's day-to-day operations—his self-proclaimed "hands on" approach, his long career with Countrywide, and the detailed loan and exception statistics—the CAC supports the inference that Mozilo intended his

-90-

1    statements to mislead the market during the entire class period.[76]

2         There does not appear to be a plausible competing inference against which

3    to balance an inference of scienter.

4                              **c. David Sambol**

5         Sambol joined Countrywide in 1985 and has occupied many prominent

6    leadership positions at Countrywide, including "Executive Managing Director for

7    Business Segment Operations, heading all revenue-generating operations of the

8    Company," becoming Chief Operating Officer ("COO") in September 2006 and

9    joining the board of directors in September 2007. ¶ 27. He served on the Executive

10   Strategy Committee, composed of a handful of the company's top executives and

11   charged with day-to-day management. ¶ 392. Sambol was also part of the Credit

12   Committee, which reviewed and monitored credit risk and the actual and projected

13   credit losses for all of the company's portfolios, and also evaluated loan loss

14   reserves and the methodology for calculating them. ¶¶ 392-94 (noting that the

15

16

---

17   [76] Defendants make no serious claim to the PSLRA safe harbor for forward-
18   looking statements. They argue that Mozilo's March and July 2005 representations
     that CFC would never "sacrifice sound lending" for 30% market share are forward-
19   looking. Countrywide Defs.' Mot. to Dismiss at 28. It is not clear this is the kind of
     statement protected by the safe harbor provision. *See* 15 U.S.C. § 78u-5(i)(1)
20   (defining forward-looking statement as, among other things, a projection of
21   revenues or other financial data; a statement of future economic performance; or
     plans and objectives relating to products or services of the issuer). Plaintiffs argue,
22   "Promising investors that an unsound business practice will never be
23   undertaken. . . is entirely different than attempting to predict future earnings." Pls.'
     Opp'n at 36-37. That may be, but "sound lending" is still a subjective phrase that
24   may be subject to the puffery rule in the ordinary case. The Court finds this
25   statement not protected by the safe harbor because there are particularized
     allegations that the unsound business practices had already been undertaken,
26   making Mozilo's statement false when made. *See generally No. 84 Employer-*
27   *Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320
28   F.3d 920, 936-37 (9th Cir. 2003) (discussing the PSLRA's safe harbor provision).

1   Credit Committee was composed of the Chief Risk Officer and other senior
2   executives).

3   Sambol created and oversaw the EPS. ¶ 178. In addition, the CAC alleges
4   that Sambol received numerous reports detailing the company's approval of
5   exceptions. *See* ¶¶ 422, 425 (describing "AMPS" reports, which summarized all
6   exception loans); ¶ 426 (characterizing confidential "Trend Analysis" reports that
7   documented increases in the rate of exceptions granted); ¶¶ 431-34 (describing
8   proprietary systems, including "Turquoise," which provided real-time data on
9   every individual loan; "Status Mart," which provided detailed information about
10  the company-wide loan production pipeline; and "Virtual Loan File," containing
11  "an electronic image of virtually all application documents for Countrywide
12  loans").

13  Sambol made statements in 2006 about Countrywide's "maintaining a very
14  strong internal control environment and what we believe is best-of-class
15  governance [together with a] culture . . . characterized by a very high degree of
16  ethics and integrity in everything that we do." ¶ 752. Meanwhile, CW12 alleges
17  that Countrywide loan officers "were told, 'don't take no from underwriting, don't
18  take no from your branch manager, escalate as high as you have to. If it has to go
19  to Sambol, just get the deal done.'"

20  Taken together, Sambol's job positions, duties, and access to corporate
21  reports and information systems give rise to a strong inference of scienter. Though
22  the core business knowledge that is imputed to the Defendants is not in the form of
23  discrete events as in *Berson*, the alleged underwriting quality and credit risk
24  management issues were so fundamental to Countrywide, and on such a broad
25  scale, should have been so apparent that "it would be difficult to conclude that
26  those Defendants at the top levels of Countrywide management did not know what
27  was going on." *In re Countrywide Deriv. Litig.,* 554 F. Supp. 2d at 1066.

28  This is not a case like *Metzler*, where the plaintiffs had not demonstrated that

1  any enrollment fraud was widespread, and had inadequately pled why the

2  company's information systems would have informed defendants of this fraud. *See*

3  540 F.3d at 1049. The CAC gives rise to the inference that Sambol was aware not

4  only of the culture change and the loosening of underwriting guidelines, but the

5  concomitant effect on loan quality and credit risk.[77]

6      The Court finds that the CAC raises a strong inference of scienter as to

7  Sambol for the entire class period. The scienter inference is of actual knowledge or

8  intent, not deliberate recklessness. The plausible alternative inference is willful

9  ignorance.

10              **d. Stanford Kurland**

11      Kurland was President and COO until resigning on September 7, 2006. ¶ 29.

12  Like Defendants Mozilo and Sambol, he was also on the Executive Strategy

13  Committee and the Credit Committee, and was also on "the Asset/Liability

14  Committee."

15

16  _____

17  [77] Again, for Defendants Mozilo and Sambol, Plaintiffs go beyond alleging scienter
    based on job positions alone; the CAC avers that Mozilo and Sambol in fact led the

18  charge to abandon sound underwriting. *See* ¶¶ 93, 419 ("CW1 further reported that
    Sambol took a contrary position, maintaining that by originating and procuring

19  large volumes of loans, regardless of their relative risk, any losses incurred by the
    riskier loans would be covered by the profits generated on other loans"); ¶ 409-10

20  (relating CW1's allegation that Sambol put pressure on employees on a regular

21  basis "to price risky loans in a way that would not take into account the extent of

22  the risk the loans presented"; ¶¶ 178, 418 (alleging that Sambol directed the
    creation of the Exception Processing System); ¶ 423 (relating CW12's allegation

23  that Sambol was unhappy with EPS/SLD loan production); ¶¶ 413-15 (describing

24  Sambol as highly engaged in the operation and performance of each Company
    division). *See also* ¶ 403 (relating Mozilo's 2005 statement that he was involved

25  "every day" in loan originations and his opinion, based on personal experience, on

26  whether there had been a decline in credit quality of loans). Thus, *Corinthian* is

27  distinguishable for the further reason that the plaintiffs there did not allege, as here,

28  that the executives named as defendants actively contributed to the underlying
    situation in that case.

-93-

On a February 2005 conference call, Kurland engaged in the following exchange:

> Stan Kurland: *Our strategy is pretty much the same* as we have been operating it for. . . .
> Bob Napoli - Piper Jaffray - Analyst: The answer is no. There has been no real change to take more risk[?]
> Stan Kurland - Countrywide Financial Corporation - President and Chief Operating Officer: *No, no, no.*

¶ 624 (emphasis in original).

Kurland also stated on both April and July 2005 conference calls that Countrywide's pay-option ARM loans were "all high FICO." ¶ 237. He said on the July 2005 conference call that "[we at Countrywide] have not loosened our standards relative to what the bank acquires to the extent that we have standards that reflect and pricing that reflects where [sic] we are able to deliver loans into the secondary market." ¶ 689. This latter statement has less force than the others because it refers only to LHIs and not general underwriting standards; it also appears to suggest that the standards are relative to what Countrywide was able to sell into the secondary market. But it is still materially misleading because the CAC alleges that even what Countrywide was selling into the secondary market had profoundly changed in risk character by July 2005; and, if and when the market became aware of the risk, many loans would not have been saleable.

As explained *supra*, the CAC raises a strong inference that, by the time of these statements, Countrywide's strategy shift was complete. Section II.C.i.6 (discussing primarily accounting-related falsity inferences and finding that by FY05 the changes were undeniably reflected in Countrywide's loan performance, as evidenced by rapidly rising negative amortization). Kurland's primary job as COO was to oversee Countrywide's operations. The only plausible alternative inference to a strong inference of scienter as to Kurland by February 2005 is gross recklessness. That inference is less compelling than one of actual knowledge or intent.

In sum, the Court finds that the CAC raises a strong inference of scienter as

to Kurland from February 2005 until the time he left Countrywide in September
2006. The inference is of actual knowledge or intent, not deliberate recklessness.
The CAC raises no strong inference as to Kurland before February 2005.[78]

### e. Eric Sieracki

Defendant Sieracki became Executive Managing Director and Chief
Financial Officer ("CFO") in 2005. ¶ 28. During the class period, he was a member
of several management committees: the Executive Strategy Committee; the Credit
Committee; and the Asset/Liability Committee, of which he was chairman. *Id.*
¶¶ 28, 393, 395. He is also alleged to have received the same internal reports
described above, and to have had the same access to the company's proprietary
information systems as Mozilo and Sambol.

Defendants object that Sieracki's job had nothing to do with loan
underwriting. However, a strong inference of scienter is warranted for two reasons.
First, as CFO, Sieracki was directly responsible for Countrywide's financials.
Those financials, as explained in *supra* Section II.C.i.6, depended on
Countrywide's operations. *See also In re Countrywide Deriv. Litig.*, 554 F.
Supp.2d at 1066 (finding scienter with respect to Sieracki based on similar
allegations). Second, scienter is appropriate for the same reasons that this Court
found scienter with respect to the <u>outside directors</u> in the derivative case. In
addition to his role as CFO, Sieracki served on the board as a member of the Credit
Committee—which had "primary responsibility for setting strategies to

---

[78] For example, the only other particularized allegation that Kurland himself made
a false or misleading statement is from an April 2004 conference call. On that call,
Kurland said Countrywide did not <u>intend</u> to hold "sub-prime" loans for investment.
*See* ¶ 572. The CAC lacks an adequately particularized factual basis to infer that
this statement—a statement of <u>future intent</u>—was false when made in April 2004.
The Court cannot say that this statement, so soon after Countrywide's alleged mid-
2003 shift, was materially false or misleading under the PSLRA's standards. *But
see supra* n.59 (finding such statements actionable in FY04 under more deferential
§ 11 review).

achieve [Countrywide's] credit risk goals and objectives," ¶ 393—and chairman of "the Asset/Liability Committee," which maintained a Pipeline and Portfolio Risk Management Subcommittee that met daily regarding credit risk issues. ¶ 396.

Sieracki said in an April 2005 conference call, "We don't see any change in our protocol relative to the volume [of] loans that we're originating." ¶ 253. In July 2005, he said that Countrywide "operate[s] at the very top of the nonprime credit spectrum." ¶ 692.

One alternative inference for Sieracki, as with Kurland, is gross recklessness—that he had reviewed Countrywide's operations and analyzed its extensive internal reports for his new role as CFO, but did not recognize the alleged practices his statements contradict. This inference is especially weak because Sieracki had been in various executive positions since joining Countrywide in 1988 and, indeed, was Executive Vice President of Corporate Finance since 1989. ¶ 28. The second alternative inference as to Sieracki is deliberate recklessness—that he gave the market strong, false assurances without having looked at Countrywide's operations and their history, despite his long service in Countrywide's financial department.

Therefore, the Court finds that the CAC raises a strong inference of scienter as to Sieracki from his statement on the April 2005 conference call onward. This inference is of actual knowledge or intent, not deliberate recklessness.

### f. KPMG

Plaintiffs allege that KPMG made false or misleading statements in its audit certifications and accounting reports attributable to KPMG.

To establish auditor scienter, courts look primarily to the alleged GAAP and Generally Accepted Auditing Standard ("GAAS") violations, as well as any other allegations about KPMG's representations or conduct. The "red flag" doctrine guides the GAAP and GAAS inquiries: the more facts alleged that should have caused a reasonable auditor to investigate further before making a representation,

1   the more cogent and compelling a scienter inference becomes. *See DSAM Global*
2   *Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002); *In re*
3   *Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279-80 (3d Cir. 2006); *In re*
4   *Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004). As
5   with all scienter standards under the PSLRA, the Court balances competing
6   inferences and takes the complaint as a whole. *Tellabs*, 127 S. Ct. at 2504-05;
7   *South Ferry*, 542 F.3d at 784 (cautioning against "separate[] rules of thumb for
8   each type of scienter allegation").

9       KPMG is an outside auditor, making a position-based inference rather more
10  difficult because outsider auditors have more limited information than, for
11  example, the committee members who oversee the audit. Further, an auditor's job
12  requires complex and subjective professional judgments that courts are not ideally
13  positioned to second guess.[79]

14      GAAP. As with any alleged misrepresentation, GAAP violations should
15  generally be more than "minor or technical in nature" and "constitute[] widespread
16  and significant inflation" to contribute to a strong inference of scienter. *In re Daou*
17  *Systems, Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005). Applying a much more

18

---

19  [79] Some courts have given outside auditors as a class remarkable deference, in part
20  because some courts think outside auditors lack "any rational economic incentive
21  to participate in its client's fraud." *Reiger v. PricewaterhouseCoopers, LLP*, 117 F.
    Supp. 2d 1003 (S.D. Cal. 2000), *aff'd sub. nom. DSAM Global Value Fund v.*
22  *Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002). The Court finds this
23  supposition suspect, at best. Auditors are hired and retained by insiders. A few top
    auditing firms compete for high-profile clients such as Countrywide. Therefore,
24  they have strong structural incentives to yield to management on close questions.
25  More to the point, *Tellabs* and *South Ferry* put to rest the misguided idea that
    courts should create categorical rules and presumptions for different kinds of actors
26  and statements. An outside auditor's lack of information relative to management,
27  and the subjective professional judgments that auditors must make, do weigh in
28  outside auditors' favor under a *Tellabs* analysis; outside auditors' economic
    incentives weigh, if at all, somewhat against auditors.

-97-

1   deferential standard of review—Rule 8(a)(2) rather than the PSLRA standard that

2   applies here—the Court has already found actionable representations by KPMG

3   beginning with FY06-related accounting statements. *Supra* Section II.C.i.6 & n.63

4   (noting that even nonauditor outsiders were beginning to see red flags by early

5   2006). The Court found no actionable GAAP violations before FY06. *Id.*

6        Adjusting for the PSLRA's heightened particularity inquiry, the CAC

7   alleges few FY06 accounting-related GAAP violations with particularity. The

8   $570.3mn increase in negative amortization between FY05 and FY06 is a

9   significant red flag. ¶ 290. So are the increased delinquencies on HELOCs and

10   pay-option ARMs in FY06. ¶¶ 292-93. The Court therefore draws only a modest

11   inference from the alleged FY06 accounting-related violations.

12        GAAS. Where GAAP refers to how financials are reported, GAAS refers to

13   how an audit is conducted. Of course, "[a]lleging a poor audit is not equivalent to

14   alleging an intent to deceive." *Ezra Charitable Trust v. Tyco Int'l Ltd.*, 466 F.3d 1,

15   12 n.10 (1st Cir. 2006). Rather, just as with GAAP, the more likely it is that a

16   reasonable auditor, having conducted a reasonable audit, would have discovered

17   the truth, the stronger the scienter inference.

18        The CAC recites GAAS' basic general, fieldwork, and reporting standards.

19   But it makes little effort to apply the standards. The Court discerns, however, a

20   couple of potentially significant red flags.

21        First, a high rate of growth in a loan portfolio is a red flag under GAAS'

22   fieldwork standards that the CAC pleads specifically enough. ¶¶ 510-11.

23        Second, GAAS' fieldwork standards require that auditors obtain sufficient

24   "evidential matter" to support their conclusions. ¶ 532. The CAC alleges that

25   insufficient evidential matter was collected, but does not explain what that matter

26   should have been. Were the auditors supposed to go back to Countrywide's loan

27   origination files where they could see the poor level of documentation? *See* ¶¶ 532-

28   34. And if KPMG should have gone back to the underlying files, what should

-98-

1    KPMG's sampling or testing practices have looked like? The CAC is frustratingly
2    vague on these points. *Cf. DSAM Global*, 288 F.3d at 390 (alleging poor
3    documentation practices at the audited company, with little more, is more likely to
4    generate an inference of a "negligent audit rather than scienter").

5         The CAC does allege that KPMG was required under GAAS to evaluate the
6    models that Countrywide used to value its MSRs. ¶ 519. As discussed above, to the
7    extent those models used historical loan data, they may have been misleading. But
8    the CAC does not provide a particularized basis for the Court to infer that KPMG
9    was more than negligent or reckless if it failed to discover that Countrywide's
10   practices had changed so dramatically that historical data was of limited use.

11        The Court therefore draws only the weakest of inferences from the GAAS
12   allegations.

13        Other KPMG statements and actions. The CAC offers nothing more about
14   KPMG.

15        Conclusion. The CAC does not "bridge the gap" between gross recklessness
16   and "some degree of intentional or conscious misconduct" to satisfy the deliberate
17   recklessness standard. *See South Ferry*, 542 F.3d at 783. The Court is not even
18   satisfied that the KPMG scienter allegations allow much more than a negligence
19   inference.

20        Counts 18 and 19 are DISMISSED as to KPMG WITHOUT PREJUDICE.
21   Plaintiffs have LEAVE TO AMEND.

22            **4. Reliance**

23        The reliance element is subject to the pleading requirements of Rule 9(b)
24   because it is one of the "circumstances constituting fraud" not subject to PSLRA
25   standards. Fed. R. Civ. Proc. 9(b); 15 U.S.C. § 78u-4(b). Therefore, reliance must
26   be pled with particularity to state a claim. Fed. R. Civ. Proc. 9(b). *See Concha v.*
27   *London*, 62 F.3d 1493, 1503 (9th Cir. 1995), *cert. denied*, 517 U.S. 1183 (1995)
28   ("Fraud arises from the plaintiff's reliance . . . .").

1    　　　The Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988),

2    validated the rebuttable presumption of reliance in sufficiently efficient markets.

3    An efficient market gives plaintiffs a shortcut for pleading reliance because an

4    efficient market is presumed to impound new information—including fraudulent

5    information—quickly into asset prices.

6    　　　Defendants have not yet disputed in this case that there was an efficient

7    market for Countrywide's publicly traded securities. The Court takes notice that at

8    least some types of Countrywide securities were traded in large volume and that

9    Countrywide was a large company closely watched by analysts. The CAC also

10   alleges specific correlations between Countrywide common stock—quite heavily

11   traded—and some of the debt instruments in this case, suggesting that the market

12   for some debt was relatively efficient. *See, e.g.*, ¶¶ 996, 1039. The present CAC

13   thus establishes reliance through the fraud-on-the-market presumption.[80] *See also*

14

15

16   [80] As previously discussed by this Court in the related *Argent* case, the fraud on the

17   market presumption usually makes a plaintiff's job—even with the particularity requirement—quite straightforward. Plaintiffs can frequently point to an archetypal

18   efficient market (e.g., the market for an actively traded stock on the New York

19   Stock Exchange). However, the first consolidated *Argent* complaint was dismissed for insufficient particularity as to reliance. This was in part because Argent

20   conclusorily pled reliance on an efficient market for the price of a private-

21   placement security, but it was not at all clear from that complaint that there was a sufficiently efficient market to rely on. *Argent Classic Convertible Arbitrage Fund*

22   *v. Countrywide Fin. Corp.*, No. 2:07-CV-07097-MRP, slip. op. (C.D. Cal. Nov. 13,

23   2008). *See also Boyle v. Merrimack Bancorp, Inc.*, 756 F. Supp. 55, 61 (D. Mass.

24   1991) (requiring reliance be pled with particularity where the face of the complaint suggests that plaintiff may not have relied on the market at all).

25   　　The Series A and B Debentures in this case are substantively the same bonds in

26   *Argent*. The Series A and B Debentures were originally put in the private placement market in May 2007. ¶¶ 925-27. Those privately traded bonds are the

27   subject of *Argent*. Countrywide registered the bonds for public trading on

28   November 15, 2007. ¶ 929. The Plaintiffs in this case bring § 10(b) claims on those publicly traded Debentures.

-100-

1 | *supra* Section II.B.iii (rejecting Defendants' truth-on-the-market defense at this
2 | stage of litigation).

3 |     Having before it no reasonable arguments against reliance, the Court
4 | DENIES the motions to dismiss on reliance grounds as to all securities.

5 | **5. Loss**

6 |     Neither the Ninth Circuit nor the Supreme Court has decided whether Rule
7 | 8(a)(2)'s notice pleading standard or Rule 9(b)'s particularity requirement governs
8 | loss and loss causation. *Berson*, 527 F.3d at 989 (citing *Dura*, 544 U.S. at 346).

9 |     The lack of clarity in the law presents no problem in this case. The CAC
10 | satisfies the particularity requirement for loss.

11 |     Plaintiffs need not plead their exact damages. Contrary to some Defendants'
12 | suggestions, nothing requires that Plaintiffs allege their exact damages or the price
13 | dollar value of declines.

14 |     Without holding that a plaintiff must always do so, the Court observes that
15 | Plaintiffs here quantify their economic losses on the securities in numerous ways—
16 | and with particularity. *See, e.g.*, CAC at 348 (historical common stock prices);
17 | CAC Ex. B (transaction schedule).

18 | **6. Loss causation**

19 |     Loss causation is simply "a causal connection between the material

20 |

21 |     The parties have not disputed the Debentures in this case. However, the Court
22 | anticipates some potential reliance issues: (1) what impact, if any, the late
23 | registration and trading of these securities has; (2) whether the market for these
24 | securities was efficient; and (3) whether NY Funds is an appropriate class
    representative because they bring only '34 Act, and not '33 Act, claims on the
25 | Debentures. *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261,
26 | 1271 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 Fed. Appx. 800
    (2007); *In re Levi Strauss Sec. Litig.*, 527 F. Supp. 2d 965, 974-78 (N.D. Cal.
27 | 2007) (suggesting a reliance-related reason why NY Funds may not have brought
28 | '33 Act claims). The Court expects these issues to be addressed at class
    certification.

misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Plaintiffs have the burden to plead loss causation on § 10(b). *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 346 n.39 (S.D.N.Y. 2005) (observing that the loss causation element of § 10(b) is the "mirror image" of the defendants' burden on loss causation on § 11).

However, loss causation generally "[s]hould not prove burdensome for a plaintiff" that actually suffered economic harm in connection with the purchase or sale of a security. *Dura*, 544 U.S. at 346. *Dura* requires a plaintiff to allege more than just an "inflated" stock price. *Id.* Instead, a plaintiff must allege a mispricing caused by the securities violation, followed by a subsequent price correction caused when the market appreciated (or began to appreciate) the truth. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056-57 (9th Cir. 2008). Otherwise, the alleged violations cannot have proximately caused whatever loss the plaintiff suffered.

Loss causation is ordinarily shown by alleging a corrective disclosure and a price correction shortly thereafter. Of course, the more efficient the market, the more quickly a court should expect the price drop to occur. However, corrective information sometimes comes to the market slowly, making it likely other variables will confound loss causation.

For example, management could "leak" information slowly into the market, either innocently (they were only gradually discovering the extent of the misrepresentation themselves) or with an eye to spreading out the losses over time (either to reduce price volatility or, perhaps, even to make ascertaining loss causation more difficult). *See id.* at 1058 (partial disclosures may "not contain enough information to significantly undermine" a misrepresentation, but that does not render them nonactionable *per se*). Further, corrective information often comes at the same time as good news (again, either innocently or in order to minimize volatility or confound loss causation).

-102-

1    And sometimes the market is not perfectly efficient, even as to companies
2  that are closely watched and traded in relatively high volume. *See America West*,
3  320 F.3d at 933-34 (rejecting a bright-line rule that stock price changes must be
4  occur "immediately" upon a disclosure because markets are sometimes "subject to
5  distortions that prevent the ideal of a free and open public market" (internal
6  quotation and citation omitted)). For example, in some specialized industries an
7  audience other than financial professionals may appreciate a partial corrective
8  disclosure's true significance. Thus, the Ninth Circuit has approved an inference
9  that a pharmaceutical company's stock price decline was caused by a partial
10  corrective disclosure from three months prior. *Gilead*, 536 F.3d at 1058. The panel
11  reasoned that the disclosure's gravity was better understood by physicians than the
12  market, and therefore found actionable that a price decline that did not occur until
13  the company's next financial statements showed the effect on sales. *Id.*

14    The point is that showing loss causation is not precluded by a series of
15  disclosures; serial disclosures just make it more difficult for plaintiffs as a practical
16  matter. *See In re Gilead*, 536 F.3d at 1055 ("The [disclosure of the]
17  misrepresentation need not be the sole reason for the decline in value of the
18  securities, but it must be a substantial cause." (internal quotations and citation
19  omitted)); *In re Daou*, 411 F.3d at 1026 (analyzing a series of partial disclosures).

20    Defendants here attack Plaintiffs' loss causation theories because
21  Countrywide's corrective disclosures were made over an extended period of time
22  and often in combination with alleged further misrepresentations that dampened
23  the disclosures' price effects. The point, however, is that the price of Countrywide
24  securities dropped as the disclosures accumulated. By the end, Countrywide stock,
25  at least, had plummeted. Most corrective disclosures correlate tightly with declines,
26  as is expected in an efficient market. Plaintiffs identify these disclosures with
27  particularity. ¶¶ 934-1059.

28    For the Court's related rejection of Defendants' truth on the market defense,

-103-

1   see *supra* Section I.B.iii.

2      There is, however, a serious loss causation defect in the CAC. Plaintiffs have

3   not adequately alleged loss causation for Kurland. The Court found in *supra*

4   Section II.D.i.3.d that the CAC only adequately alleges scienter for Kurland

5   between February 2005 and his September 2006 resignation. The first alleged

6   disclosure and decline is on July 24, 2007. ¶¶ 936-44. While § 11's lesser

7   requirements keep Defendants from defeating those claims on loss causation

8   grounds, *supra* Section II.D.i.6, it is too far a stretch—even assuming Rule 8(a)(2)

9   applies—to state a claim that Kurland's 2005-2006 statements could have

10  proximately caused losses almost a year later.

11     The motions to dismiss on Counts 16 and 18 are DENIED as to all Officer

12  Defendants except Kurland. Counts 16 and 18 and DISMISSED WITHOUT

13  PREJUDICE as to Kurland. Plaintiffs have LEAVE TO AMEND.

14     **ii. Section 20(a)**

15     Count 17 alleges a § 20(a) violation against the Officer Defendants on

16  Countrywide "common stock and other publicly traded securities." ¶ 1297. Count

17  20 alleges the same for the Series A and B Debentures.

18     Section 20(a) creates joint and several liability for control persons who aid

19  and abet '34 Act violations. *America West*, 320 F.3d at 945. The elements of

20  § 20(a) are "(1) a primary violation of federal securities law and (2) that the

21  defendant exercised actual power or control over the primary violator." *Id.*

22  (internal citation and quotations omitted). There is "a good faith defense if [a

23  defendant] can show no scienter and an effective lack of participation." *Id.*

24  Whether a defendant is a control person is "an intensely factual question." *Id.*

25     "Although the circumstances of the primary violators' fraud must be pled

26  with particularity under Rule 9(b) [and the PSLRA], the control element is not a

27  circumstance that constitutes fraud and therefore need not be pled with

28  particularity." *In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at *12, 2008 U.S.

-104-

1  Dist. LEXIS 80717, at *38 (N.D. Cal. Sept. 24, 2008).

2  The CAC adequately alleges primary violations for Mozilo, Sambol, and

3  Sieracki, as discussed in *supra* Section II.D.

4  These three Officer Defendants are plausible control persons who allegedly

5  aided and abetted Countrywide's violations. *See supra* Section II.D.i.3 (explaining

6  the Defendants' positions and responsibilities at Countrywide).

7  The CAC does not, however, adequately allege a primary violation by

8  Kurland. *Supra* Section II.D.i.6. Counts 17 and 20 are therefore DISMISSED

9  WITHOUT PREJUDICE as to Kurland. Plaintiffs have LEAVE TO AMEND.

10  **iii. Section 20A**

11  Count 21 arises under § 20A(a) against Mozilo, Sambol, and Kurland (i.e.,

12  all Officer Defendants except Sieracki) (collectively, "§ 20A Defendants").

13  Section 20A(a), part of the 1988 Insider Trading and Securities Fraud

14  Enforcement Act amendments to the '34 Act, creates an express private right of

15  action against insiders who commit a '34 Act violation by trading while in

16  possession of material, nonpublic information. 15 U.S.C. § 78t-1(a); *Johnson v.*

17  *Aljian*, 490 F.3d 778 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1650 (2008). *See also*

18  *U.S. v. O'Hagan*, U.S. 642, 666 n.11 (1997)

19  A § 20A(a) plaintiff must plead (1) that defendant committed a '34 Act

20  violation "by purchasing or selling a security while in possession of material,

21  nonpublic information"; and (2) facts showing that the defendant's trade occurred

22  "contemporaneously" with a complementary trade by the plaintiff (i.e., if

23  defendant sold that class of security, plaintiff must have purchased that class of

24  security, and vice-versa). 15 U.S.C. § 78t-1(a); *Johnson*, 490 F.3d 778. If

25  successful, plaintiffs may be able to recover up to the insider's profit gained or loss

26  avoided, offset by any disgorgements to the SEC. *See* 15 U.S.C. § 78t-1(b)(1)-(2).

27  It bears emphasis that the predicate violation must be made "<u>by</u> purchasing

28  or selling." Though there is some dicta suggesting the contrary in cases not binding

-105-

on this Court, this language means that the predicate violation must be an act of insider trading, not just trading while simultaneously committing a free-floating '34 Act violation. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 308-11 (S.D.N.Y. 2008) (squarely taking this position). This is consistent with the legislative history as well as the plain text of Section 20A.[81] Thus, the Court must determine whether the Section 20A Defendants engaged in insider trading that is actionable under the '34 Act.

Insider trading is actionable under the '34 Act on two theories: (1) "the 'traditional' or 'classical theory' [that insiders have] a duty to disclose or abstain from trading because of the necessity of preventing a corporate insider from taking unfair advantage of uninformed stockholders"; and (2) a "'misappropriation' theory . . . that a person commits fraud . . . when he misappropriates confidential information" in breach of a duty of confidence. *O'Hagan*, 521 U.S. at 651-52 (internal quotations, citations, and modifications omitted).

The significant differences between the '34 Act claims properly stated against Mozilo and Sambol (the only § 20A Defendants that the CAC properly states a '34 Act claim against) and a '34 Act insider trading claim theory involve the scienter, loss causation, and loss elements. Scienter and loss causation for

---

[81] To be clear, the Court has found no case that actually applies § 20A to a non-insider trading claim. The Committee Report on the 1988 amendments makes explicit that Section 20A requires that a '34 Act insider trading violation be the predicate. H.R. Rep. No. 100-910, 100th Cong., 2d Sess. 26-28 (1988) ("[T]his section would codify an express right of action against insider traders and tippers" and was created to make the misappropriation theory of insider trading—which the courts had been somewhat reluctant to accept—actionable). The leading commentators concur. 3 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 12.16[7][B] at 536 (5th ed. 2005) (calling § 20A "the express insider trading private remedy"); LOUIS LOSS, ET AL. FUNDAMENTALS OF SECURITIES REGULATION 1018 (5th ed. 2003) (explaining the conduct § 20A targets).

insider trading requires that the insider <u>actually use</u> (scienter) the inside information in deciding to make the trade (loss causation). *U.S. v. Smith*, 155 F.3d 1051, 1067-69 (9th Cir. 1998). *See also America West*, 320 F.3d at 937 (trading based on material nonpublic information is a deceptive device that can create a § 10(b) violation).[82] Loss, on the other hand, is the insider's profit gained or loss avoided. 15 U.S.C. § 78t-1(b)(1)-(2).

Contemporaneous trading must be pled with specificity under Rule 9(b). *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993). The predicate insider trading violation is subject to the PSLRA.

<u>Trading on material, nonpublic information.</u> The CAC alleges with particularity—and at great length—what material, nonpublic information

---

[82] *Smith* was a criminal case. The panel used the prodefendant presumptions that apply in the criminal context to support its conclusion that only "actual use" allows a scienter finding; it also used the case's criminal nature to renounce a presumption, used in at least one other Circuit, that possession of knowledge allows an inference of use. *Id.* at 1068-69.

The *Smith* Court expressly held open that a lesser standard could apply to a civil enforcement action. *Id.* at 1069 n.27. It may be that a less stringent standard now applies to SEC civil enforcement actions. *See U.S. v. Nacchio*, 519 F.3d 1140, 1167-68 (10th Cir. 2008) (discussing developments after *Smith*).

However, the present case is a private securities action to which the PSLRA applies. Only *Smith*'s "actual use" standard satisfies the PSLRA and the Ninth Circuit's demanding deliberate recklessness or actual knowledge or intent standards. The Court therefore adopts actual use, subject to *Tellabs* balancing. The Court also rejects the presumption that knowledge triggers an actual-use inference. The Court recognizes that it parts ways with another District Court in its jurisdiction, see *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1197-99 (C.D. Cal. 2004) (adopting the presumption), *aff'd in part*, 490 F.3d 778 (9th Cir. 2007) (not addressing the presumption), on this point, but *Aljian* was pre-*Tellabs*. The Court cannot reconcile *Aljian*'s presumption with *Tellabs* balancing and *South Ferry*'s astute observation that, after *Tellabs*, courts cannot establish categorical presumptions in PSLRA analyses. *See supra* Section II.D.i.3; *Tellabs* 127 S. Ct. 2499; *S. Ferry*, 542 F.3d at 784 (cautioning against "separate[] rules of thumb for each type of scienter allegation").

Defendants possessed. The material inside information is the true state of
Countrywide's operations, about which Defendants intentionally misled the
markets. This is a classic insider trading theory, not a misappropriation theory. For
much of the class period, § 20A Defendants must have known that Countrywide's
true operations would eventually be revealed; but how long the alleged practices
could persist, they could not have known. The practices could presumably go
undetected until a change in the housing market or the loans in new MBS loans
were seasoned enough to infer that their performance deviated significantly from
prior securitized loans. However, the PSLRA requires the Court determine when
§ 20A Defendants knew <u>with sufficient certainty</u> that truth would be revealed <u>soon
enough</u> for this knowledge to create a strong inference that they actually used it in
deciding to make their trades. The initial July 2007 corrective disclosure that the
CAC identifies is a very significant disclosure that gives rise to a strong inference
of scienter. The Court finds that § 20A Defendant transactions shortly before this
disclosure (and for the remainder of the class period) suffice to state a claim—even
against Kurland, who did have transactions during this actionable period. CAC Ex.
G. Therefore, unlike the § 10(b) claim discussed above, plaintiffs adequately allege
loss causation against Kurland (in addition to the other § 20A Defendants).

   Contemporaneous trading. There is no law binding on this Court as to what
constitutes "contemporaneous" trading. The Ninth Circuit has said that the
timeframe required for an insider's trade to be "contemporaneous" with a
plaintiff's trade is "not fixed." *Neubronner*, 6 F.3d at 670. The Ninth Circuit more
recently declined to elaborate on the period's "exact contours." *Brody v.
Transitional Hosps. Corp.*, 280 F.3d 997, 1004 (9th Cir. 2002). *See also In re
Countrywide Deriv. Litig*, 554 F. Supp. 2d at 1074-75 (collecting various district

1   court approaches to contemporaneousness). Nevertheless, "contemporaneous
2   trading must be pleaded with particularity." *Neubronner*, 6 F.3d at 670.[83]

3       The Court must therefore adopt a contemporaneousness rule suitable for the
4   current fact pattern and decide whether the CAC states a claim. The Court adopts a
5   modified version of the contemporaneousness rule from *In re Fed. Nat'l Mortgage*
6   *Ass'n Sec., Deriv, and ERISA Litig.*, 503 F. Supp. 2d 25, 46-48 (D.D.C. 2007).

7       The *In re Fed. Nat'l* Court relied on opinions from the Ninth Circuit and
8   District Courts in California, among others around the country, to find an emerging
9   consensus that contemporaneous purchases—at least in actively traded markets—
10  are those that occur (1) on the same day (2) after the insider sold.[84] *Id.* Section 20A
11  is designed to force an insider to recompense the trader on the transaction's other
12  end. *Id.* The contemporaneousness requirement roughly approximates privity while
13  sparing a plaintiff the task—nearly impossible in modern markets—of establishing
14  that he traded directly with the insider. *Id.*

15      On this "privity-substitute" view, the insider must have offered his security
16  for sale before the outsider purchased in order for there to be a possibility that the
17  trade was between them. *Id.* In markets for actively traded securities there is a
18  much lower probability that the insider actually traded with someone who bought a
19  day later. Therefore, on a motion to dismiss, the same-day rule appears, at first, a

20
21
22

---

23  [83] In the *Derivative Litigation*, this Court declined to adopt a specific formulation
    of the contemporaneousness requirement. 554 F. Supp. 2d at 1074-75. Instead, it
24  held that the repurchase plan was enough to make sales during November 2006 and
    May 2007 "contemporaneous." *Id.* at 1075. On further consideration, the Court
25  retracts that conclusion as a matter of law. Section 20A creates liability for those
26  who traded <u>with a § 20A defendant</u>. Countrywide, not the named Officer
27  Defendants, performed the repurchase transactions.
28  [84] Of course, where an insider buys, the outsider's offer must come before the
    insider's bid, but the CAC alleges insider sales while outsiders bought. ¶ 1324.

1   judicially manageable rule that balances market realities with a strong deterrent

2   effect by reasonably limiting the universe of potential plaintiffs.[85] *See id.*

3       However, a literal "same-day" rule invites a stratagem: if it means by the

4   close of the trading day, then insiders could trade near the close and greatly reduce

5   the universe of potential successful plaintiffs. On the other hand, interpreting

6   "same day" to mean the 24-hour period after the insider's transaction presents a

7   problem on motions to dismiss: most plaintiffs will only be able to determine the

8   date—not the time—of the insider's transactions. *See Concha v. London*, 62 F.3d

9   1493, 1503 (9th Cir. 1995) ("Rule 9(b) . . . requires that plaintiffs specifically plead

10  those facts surrounding alleged acts of fraud to which they can reasonably be

11  expected to have access.").

12      The contemporaneousness rule adopted here is: (1) on a motion to dismiss

13  (2) related to an actively traded security (3) plaintiffs must allege that they traded

14  on the other side of an insider's transaction (4) and plead facts showing they traded

15  the same class of security on the same trading day, or one trading day after, the

16  insider's transaction.

17      The Court leaves open the possibility for later proof on the mixed question

18  of law and fact whether, in this case, a period other than 24 hours should be

19  adopted for determining liability.

20      The CAC states a § 20A(a) claim against the § 20A Defendants based on

21  their common stock transactions. CAC Ex. G (listing § 20A Defendants' sales next

22  to contemporaneous NY Funds purchases).

23      Defendants' motions to dismiss on Count 21 are DENIED.

24  _____

25  [85] Even if one rejects the "privity-substitute" view and prefers the theory that

26  insider's trade altered the market price, the insider's transaction still must occur
    first (to have an effect on the market price) and, at least in markets for actively

27  traded securities, "contemporaneous"—for purposes of a motion to dismiss—

28  should still be limited to a 24-hour period (because supervening causes will almost
    certainly overpower any trade-related price effect after a day).

-110-

### III.

### CONCLUSION

Plaintiffs are GRANTED LEAVE TO AMEND within 20 days of this Order.

Due to the complexity of this case and the length of the CAC, if Plaintiffs amend by submitting a Second Consolidated Amended Complaint ("SCAC"), Plaintiffs are REQUESTED (1) to provide the Court and all Defendants a redline indicating all changes to between the CAC and the SCAC; and (2) to provide the Court and all Defendants a conversion table indicating which CAC paragraphs have been renumbered in the SCAC. Plaintiffs are admonished not to make unnecessary changes, as unnecessary changes will only further delay the proceedings and may add to the already overlong CAC.

All pending Requests for Judicial Notice not granted in this Order are DENIED.

Underwriter Defendants and Plaintiffs are INSTRUCTED to meet and confer as to which underwriters should be removed from any SCAC because all the particular securities they underwrote have matured.

All parties are advised that the Court will schedule a status conference shortly to discuss discovery on the claims that survive this Order.

To summarize:

- All claims against GT are DISMISSED **WITH PREJUDICE**.
- Counts 2, 4, 5, 8, 11, and 14 against those Underwriter Defendant(s) (including Countrywide Securities Corporation) as to whom they are asserted are DISMISSED WITHOUT PREJUDICE.
- Counts 4, 18, and 19 against KPMG are DISMISSED WITHOUT PREJUDICE.
- Counts 4 and 6 against Mozilo are DISMISSED WITHOUT PREJUDICE.
- Counts 4, 6, 16, and 17 against Kurland are DISMISSED WITHOUT

-111-

1    PREJUDICE.

2    • Counts 4, 5, 6, 8, 11, and 14 against those Countrywide Defendant(s) as to

3    whom they are asserted are DISMISSED WITHOUT PREJUDICE.

4    As to the remaining Counts, theories based on:

5    • Retained interest-related statements are DISMISSED WITHOUT

6    PREJUDICE.

7    • FY03 accounting-related statements are DISMISSED **WITH PREJUDICE**.

8    • FY04 and FY05 accounting-related statements are DISMISSED WITHOUT

9    PREJUDICE.

10   • FY06 accounting-related statements are DISMISSED WITHOUT

11   PREJUDICE as against Underwriter Defendants <u>only</u>.

12   • All theories based on language such as "solid quarter" (and other language

13   which describes present financial performance as evidenced in

14   documentation accompanying the statements) from Forms 8-K are

15   DISMISSED **WITH PREJUDICE**.

16   Plaintiffs have LEAVE TO AMEND all claims and theories that are dismissed

17   without prejudice.

18   Plaintiffs have LEAVE TO AMEND their accounting-related theories for all

19   years, even as to those theories not dismissed.

20   IT IS SO ORDERED.

21

22   DATED: *December 1, 2008*        *Mariana R. Pfaelzer*

23                                    Hon. Mariana R. Pfaelzer
                                      United States District Judge
24

25

26

27

28

-112-