ORIGINAL

1  KREINDLER & KREINDLER LLP
   GRETCHEN M. NELSON (#112566)
2  MARK LABATON (#159555)
   707 Wilshire Boulevard, Suite 4100
3  Los Angeles, California  90017
   Telephone:  (213) 622-6469
4  Facsimile:  (213) 622-6019
   gnelson@kreindler.com
5  mlabaton@kreindler.com

6  *Liaison Counsel for Lead Plaintiffs*

   LABATON SUCHAROW LLP
7  JOEL H. BERNSTEIN
   JONATHAN M. PLASSE
8  IRA A. SCHOCHET
   DAVID J. GOLDSMITH
9  ETHAN D. WOHL
   ANN E. WALIER
10 140 Broadway
   New York, New York  10005
11 Telephone:  (212) 907-0700
   Facsimile:  (212) 818-0477
12 jbernstein@labaton.com
   jplasse@labaton.com
13 ischochet@labaton.com
   dgoldsmith@labaton.com
14 ewohl@labaton.com
   awalier@labaton.com

15 *Lead Counsel for Lead Plaintiff Thomas*
   *P. DiNapoli, Comptroller of the State of*
16 *New York, as Administrative Head of the*
   *New York State and Local Retirement*
17 *Systems and as Trustee of the New York*
   *State Common Retirement Fund, and Lead*
18 *Plaintiff New York City Pension Funds*

19 [Additional counsel on signature page]

FILED
CLERK, U.S. DISTRICT COURT

JAN – 7 2009
10:11

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

20               UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
21                    WESTERN DIVISION

22 | IN RE COUNTRYWIDE FINANCIAL | Lead Case No. |
   | CORPORATION SECURITIES | CV 07-05295 MRP (MANx) |
23 | LITIGATION | |
   | | **SECOND CONSOLIDATED** |
24 | This Document Applies to:  All Actions | **AMENDED CLASS ACTION** |
   | | **COMPLAINT FOR** |
25 | | **VIOLATIONS OF THE** |
   | | **FEDERAL SECURITIES LAWS** |
26 | | |
   | | [Exhibits filed under separate cover] |
27 | | |
   | | Jury Trial Demanded |
28

# **TABLE OF CONTENTS**

GLOSSARY ..................................................................................................... xi

I.   NATURE AND SUMMARY OF THE ACTION ...................................... 2

II.  JURISDICTION AND VENUE ............................................................... 8

III. THE PARTIES ......................................................................................... 9

    A.  Plaintiffs .......................................................................................... 9

    B.  Countrywide Defendants ............................................................... 11

        1.  Countrywide and CCV ........................................................ 11

        2.  The Officer Defendants ....................................................... 11

        3.  Additional Individual Defendants ....................................... 15

    C.  Underwriter Defendants ................................................................ 18

    D.  Non-Party Underwriter.................................................................. 22

    E.  KPMG............................................................................................ 22

IV.  FACTUAL BACKGROUND AND SUBSTANTIVE
     ALLEGATIONS ................................................................................... 23

    A.  Countrywide and its Interrelated Businesses ............................... 23

    B.  Countrywide Shifts Away From Traditional Mortgages Toward
        Producing Nontraditional, and Far Riskier, Loan Products ......... 26

        1.  In an Effort to Achieve "Market Dominance," Mozilo and
            Sambol Spearhead a Dramatic "Culture Change" Starting in
            or About May 2003 ............................................................. 26

        2.  Countrywide's Nontraditional and Risky Loan Products ............. 29

        3.  Countrywide's Significant Increases in Nontraditional Loan
            Originations Vastly Increase the Company's Credit Risk and
            Liquidity Exposure ............................................................. 34

        4.  Countrywide's Securitized Loans Reveal Consistent, High-
            Volume Lending to Borrowers With Blemished Credit........... 38

C.  Countrywide, Contrary to its Assurances of Strong and Superior Underwriting Standards, Loosens and Abandons Them in Order to Boost Loan Volume and Earnings .......................................... 42

    1.  Countrywide, and Mozilo in Particular, Regularly Hyped the Company's Underwriting Standards .............................................. 42

    2.  In an Effort to Meet Mozilo's 30% Market Share Goal, Countrywide Loosens its Underwriting Standards to Sweep in Unqualified Borrowers .............................................................. 46

        (a)  The Underwriting Matrices Reveal a Steady Loosening of Loan Origination Standards.............................................. 47

        (b)  Other Former Employees Company-Wide Witnessed the Loosening of Underwriting Standards............................ 54

    3.  Countrywide Ignores and Abandons its Underwriting Standards to Pump Up Loan Volume and Boost Earnings ........... 57

        (a)  Countrywide Had a Company-Wide Practice of Originating and Funding Loans Without Regard to Loan Quality .................................................................... 57

        (b)  The Exception Processing System ........................................ 63

        (c)  Countrywide's Inflated Appraisals and Other Fraudulent Loan Origination Practices ................................ 71

        (d)  Countrywide Belatedly Begins to Tighten Up its Lax Lending Standards ............................................................... 77

D.  Countrywide Reported Minimal Origination of Subprime Loans By Classifying Subprime Loans as "Prime" ......................................... 78

E.  Countrywide Misled the Class About the Creditworthiness of Pay Option ARM Borrowers.................................................................. 87

F.  Countrywide Engaged in Widespread Predatory Lending Practices, Generating Short-Term Profit at Long-Term, Undisclosed Risk to the Class ............................................................. 88

G.  Countrywide's Financial Statements Were Materially Misstated in Violation of GAAP.......................................................................... 95

1.    Background................................................................95

2.    Risk Factors .............................................................97

    (a)    Risk Factors in 2004 ...............................................97

    (b)    Risk Factors in 2005 ..............................................98

    (c)    Risk Factors in 2006 ..........................................100

    (d)    Risk Factors in 2007 ..........................................101

3.    Countrywide Inflated Earnings By Taking Inadequate Allowances for Loan Losses .........................................101

4.    Countrywide Inflated Earnings By Overvaluing its Retained Interests from Securitizations.......................................117

5.    Countrywide Inflated Earnings By Overvaluing its Mortgage Servicing Rights.........................................126

6.    Countrywide Inflated Earnings By Failing to Properly Reserve for Representations and Warranties...............................136

7.    Countrywide's Internal Controls Over Financial Reporting Were Ineffective ........................................................144

H.    Defendants Materially Misrepresented Countrywide's Access to Liquidity And the Value of the Company's Excess Capital..............149

    1.    Countrywide Misrepresented its Access to Liquidity .................150

    2.    The Company's Capital Was Overstated During the Class Period...........................................................151

V.    ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER ....................................................154

A.    Mortgage Banking Was Countrywide's "Core Business," and the Officer Defendants Closely Monitored the Company's Lending Practices and Credit Risk Exposure .....................................154

B.    The Officer Defendants Were Aware of, or Recklessly Disregarded, the Company's Relaxation and Abandonment of its Loan Underwriting Standards .........................................158

C.  The Officer Defendants Were Aware of, or Recklessly
    Disregarded, the Company's Violations of GAAP and Reporting
    of False Financial Statements ............................................................. 171

D.  Insider Stock Sales By Mozilo and Other Officer Defendants
    During the Class Period Were Highly Unusual and Suspicious ........ 174

    1.  The Amount and Percentage of Shares Sold During the
        Class Period Was Extraordinary ............................................. 177

    2.  Stock Sales Increased Tremendously During the Class
        Period ....................................................................................... 177

    3.  Officer Defendants Generated Enormous Abnormal Profits
        on their Sales of Countrywide Stock ....................................... 181

    4.  Mozilo's Repeated and Highly Unusual Modifications of
        His 10b5-1 Trading Plans—Now Under Investigation By the
        SEC—Further Demonstrate the Suspicious Nature of His
        Selling ..................................................................................... 183

    5.  The Increase in Stock Sales at the Same Time as
        Countrywide Initiated Major Stock Buybacks Further
        Demonstrates Their Suspicious Nature ................................... 188

VI.  KPMG ACTED WITH DELIBERATE RECKLESSNESS, OR, IN
     THE ALTERNATIVE, WITH NEGLIGENCE, IN CONDUCTING
     ITS AUDITS OF COUNTRYWIDE'S FINANCIAL
     STATEMENTS AND FAILED TO CONDUCT THOSE AUDITS
     IN ACCORDANCE WITH GAAS ............................................................. 189

     A.  The Standards of GAAS and the AICPA Audit & Accounting
         Guide ............................................................................................... 190

     B.  KPMG Failed to Perform Procedures in Accordance With
         GAAS And Ignored Numerous Red Flags That Indicated a High
         Risk of Material Misstatement ........................................................ 192

         1.  Pertinent GAAS Requirements .................................................. 192

         2.  Audit Risk Factors in 2004 ........................................................ 196

         3.  Audit of Countrywide's 2004 Financial Statements ................... 196

4.  Audit Risk Factors in 2005 ........................................................... 204

5.  Audit of Countrywide's 2005 Financial Statements ................... 205

6.  Audit Risk Factors in 2006 ........................................................... 211

7.  Audit of Countrywide's 2006 Financial Statements ................... 212

VII.  ADDITIONAL FACTS REGARDING THE FAILURE OF THE
UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE
DUE DILIGENCE ...................................................................................... 217

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS ............................................................................................ 222

A.  The Company's False Statements Regarding 2003 ........................... 222

B.  The Company's False Statements Regarding 2004 Results ............... 225

1.  First Quarter 2004 Form 8-K ....................................................... 225

2.  First Quarter 2004 Conference Call ............................................. 226

3.  First Quarter 2004 Form 10-Q ...................................................... 228

4.  Second Quarter 2004 Form 8-K .................................................... 230

5.  Second Quarter 2004 Conference Call .......................................... 231

6.  Second Quarter 2004 Form 10-Q .................................................. 232

7.  Third Quarter 2004 Form 8-K ...................................................... 235

8.  Third Quarter 2004 Conference Call ............................................. 236

9.  Third Quarter 2004 Form 10-Q ..................................................... 238

10. Year End 2004 Form 8-K .............................................................. 240

11. Year End 2004 Conference Call .................................................... 240

12. 2004 Form 10-K ............................................................................. 242

C.  The Company's False Statements Regarding 2005 Results ............... 247

1.  March 15, 2005 Piper Jaffray Conference .................................... 247

2. First Quarter 2004 Amended Form 10-Q/A ................................. 250

3. First Quarter 2005 Form 8-K ....................................................... 250

4. First Quarter 2005 Conference Call ............................................. 251

5. First Quarter 2005 Form 10-Q ..................................................... 253

6. Second Quarter 2004 Amended Form 10-Q/A ........................... 255

7. Third Quarter 2004 Amended Form 10-Q/A .............................. 256

8. May 24, 2005 Countrywide Analyst Meeting .............................. 256

9. June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference ..................................................................................... 259

10. Second Quarter 2005 Form 8-K ................................................... 260

11. Second Quarter 2005 Conference Call ......................................... 261

12. Second Quarter 2005 Form 10-Q ................................................. 265

13. September 13, 2005 Lehman Brothers Financial Services Conference ..................................................................................... 267

14. Third Quarter 2005 Form 8-K ...................................................... 268

15. Third Quarter 2005 Conference Call ............................................ 269

16. Third Quarter 2005 Form 10-Q .................................................... 270

17. Year End 2005 Form 8-K .............................................................. 273

18. Year End 2005 Conference Call .................................................... 273

19. 2005 Form 10-K ............................................................................ 274

20. March 30, 2006 Countrywide Equity Investors Forum ............... 279

D. The Company's False Statements Regarding 2006 Results ............... 282

1. First Quarter 2006 Form 8-K ....................................................... 282

2. First Quarter 2006 Conference Call ............................................. 283

3. First Quarter 2006 Form 10-Q ..................................................... 285

4.  May 17, 2006 American Financial Services Association Finance Industry Conference for Fixed Income Investors ..........287

5.  Second Quarter 2006 Form 8-K ....................................................289

6.  Second Quarter 2006 Conference Call .........................................290

7.  Second Quarter 2006 Form 10-Q .................................................291

8.  September 12, 2006 Equity Investors Forum ...............................293

9.  September 13, 2006 Fixed Income Investor Forum .....................295

10. Third Quarter 2006 Form 8-K .......................................................299

11. Third Quarter 2006 Conference Call .............................................299

12. Third Quarter 2006 Form 10-Q .....................................................300

13. Year End 2006 Form 8-K ...............................................................303

14. Year End 2006 Conference Call .....................................................304

15. 2006 Form 10-K ............................................................................306

E.  The Company's False Statements Regarding 2007 Results Before the Truth Begins to Emerge .......................................................311

1.  March 6, 2007 Raymond James Institutional Investor Conference ........................................................................................311

2.  March 13, 2007 CNBC Interview and March 22, 2007 "Mad Money" Interview .......................................................................312

3.  First Quarter 2007 Form 8-K .........................................................314

4.  First Quarter 2007 Conference Call ..............................................315

5.  April 26, 2007 AFSA 7th Finance Industry Conference .............317

6.  First Quarter 2007 Form 10-Q .......................................................321

F.  False and Misleading Registration Statements and Prospectuses for Countrywide's Offerings of Debt and Preferred Securities .........324

1.  Series A Medium-Term Notes .......................................................324

2. Series B Medium-Term Notes ........................................................ 325

3. 6.25% Subordinated Notes Due May 15, 2016 ............................ 326

4. 7% Capital Securities ................................................................. 328

IX. INVESTORS BEGIN TO LEARN THE TRUTH ABOUT
COUNTRYWIDE, CAUSING ITS SECURITIES TO PLUMMET
IN VALUE, BUT THE COMPANY CONTINUES TO LULL THE
INVESTING PUBLIC WITH ADDITIONAL FALSE AND
MISLEADING STATEMENTS ................................................................ 329

X. LOSS CAUSATION ...................................................................... 369

XI. POST-CLASS PERIOD EVENTS .......................................... 373

XII. CLASS ACTION ALLEGATIONS ........................................... 374

XIII. PRESUMPTION OF RELIANCE ............................................ 377

XIV. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................... 379

XV. CLAIMS FOR RELIEF ................................................................ 380

COUNT I For Violations of Section 11 of the Securities Act, on
Behalf of Purchasers of Series A Medium-Term Notes,
Asserted Against Defendants Countrywide, Mozilo, Kurland,
McLaughlin, Cisneros, Cunningham, Donato, Dougherty,
Enis, Garcia, Heller, King, Melone, Robertson, Russell, and
Snyder; and Banc of America Securities, Barclays Capital,
Citigroup Global Markets, Countrywide Securities, Deutsche
Bank, Greenwich Capital, HSBC, J.P. Morgan Securities,
Morgan Stanley, RBC Dominion, and Wachovia Capital ................ 380

COUNT II For Violations of Section 12(a)(2) of the Securities Act
on Behalf of Purchasers of Series A Medium-Term Notes,
Asserted Against Defendants Countrywide and J.P. Morgan
Securities ..................................................................................... 383

COUNT III For Violations of Section 15 of the Securities Act on
Behalf of Purchasers of Series A Medium-Term Notes,
Asserted Against Defendants Mozilo, Kurland, and
McLaughlin .................................................................................. 386

COUNT IV For Violations of Section 11 of the Securities Act on
Behalf of Purchasers of Series B Medium-Term Notes and
6.25% Subordinated Notes Due May 15, 2016, Asserted
Against Defendants Countrywide,  Mozilo, Sambol, Kurland,
Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty,
Enis, Garcia, Heller, Melone, Parry, Robertson, Russell, and
Snyder; KPMG; and ABN AMRO, Banc of America
Securities, Barclays Capital, BNP Paribas, BNY Capital,
Citigroup Global Markets, Countrywide Securities, Deutsche
Bank, Goldman Sachs, Greenwich Capital, HSBC, J.P.
Morgan Securities, Merrill Lynch, Morgan Stanley, RBC
Dominion, Scotia Capital, TD Securities, UBS Securities, and
Wachovia Capital ............................................................................388

COUNT V For Violations of Section 12(a)(2) on Behalf of
Purchasers of Series B Medium-Term Notes, Asserted Against
Defendants Countrywide and Goldman Sachs....................................393

COUNT VI For Violations of Section 15 of the Securities Act on
Behalf of Purchasers of Series B Medium-Term Notes and
6.25% Subordinated Notes Due May 15, 2016, Asserted
Against Defendants Mozilo, Sambol, Sieracki, and Kurland ...........395

COUNT VII For Violations of Section 11 of the Securities Act on
Behalf of Purchasers of 7% Capital Securities, Asserted
Against Defendants Countrywide and CCV; Mozilo, Kurland,
Sambol, Sieracki, Brown, Cisneros, Cunningham, Donato,
Dougherty, Garcia, Gissinger, Melone, Parry, Robertson,
Russell, and Snyder; KPMG; and Citigroup Global Markets,
J.P. Morgan Securities, Merrill Lynch, UBS Securities,
Wachovia Capital, Countrywide Securities, A.G. Edwards,
Banc of America Securities, RBC Dain Rauscher, Barclays
Capital, Deutsche Bank, Goldman Sachs, and HSBC .......................398

COUNT VIII For Violations of Section 12(a)(2) of the Securities
Act on Behalf of Purchasers of 7% Capital Securities, Asserted
Against Defendants Countrywide and CCV; and Defendant
Citigroup Global Markets..................................................................402

COUNT IX For Violations of Section 15 of the Securities Act on
Behalf of Purchasers of 7% Capital Securities, Asserted
Against Defendants Mozilo, Sambol, and Sieracki............................404

COUNT X For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 on Behalf of Plaintiffs, Asserted Against Countrywide and the Officer Defendants............................................406

COUNT XI For Violations of Section 20(a) of the Exchange Act, on Behalf of Plaintiffs, Asserted Against the Officer Defendants ............................................................................408

COUNT XII For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 on Behalf of Plaintiffs, Asserted Against Defendant KPMG ...............................................................410

COUNT XIII For Violations of Section 20A of the Exchange Act, on Behalf of Lead Plaintiffs, Asserted Against Defendants Mozilo, Sambol and Kurland ...............................................412

XVI.  PRAYER FOR RELIEF ...........................................................413

XVII. DEMAND FOR JURY TRIAL.................................................414

1

## GLOSSARY

2

3    6.25% Notes............................................................................................326
     6.25% Subordinated Floating Rate Notes due May 15, 2016.

4

5    AAG.........................................................................................................97
     AICPA Audit and Accounting Guide.  Provides industry-specific
6    guidance to preparers of financial statements and their auditors,
     specifically for high risk areas of material misstatement.

7    AAG Chapter 5 ........................................................................................101
     Audit Considerations and Certain Financial Reporting Matters.
8    Provides guidance on general financial reporting and auditing
     considerations, including: knowledge of the business, industry
9    risk factors, internal controls, analytical procedures, and fraud
     risk considerations.

10

11   AAG Chapter 7 ........................................................................................197
     Investments in Debt and Equity Securities.  Provides guidance on
12   accounting and auditing issues associated with investments
     including MBS, RIs, and MSRs.

13   AAG Chapter 8 ........................................................................................114
     Loans.  Provides guidance on accounting and auditing issues that
14   arise from loans made by financial institutions, including the
     lending process and related internal controls.

15

16   AAG Chapter 9 ........................................................................................104
     Credit Losses.  Provides guidance on accounting and auditing
17   issues that arise in estimating the ALL including assessing credit
     losses inherent in the loan portfolio.

18   AAG Chapter 10 .......................................................................................118
     Transfers of Loans and Mortgage Banking Activities.  Provides
19   guidance on accounting and auditing related issues that arise in
     connection with sales and securitizations of loans, including for
20   MSRs and RIs.

21   AAM .........................................................................................................97
     AICPA Audit and Accounting Manual.  The AAM includes the
22   ARAs (defined below).

23   AICPA ......................................................................................................190
     American Institute of Certified Public Accountants.

24

25   ALCO........................................................................................................156
     Asset/Liability Committee; comprised of several of the
     Company's senior financial executives who determined the
26   valuation of retained interests.

27   ALL...........................................................................................................95
     Allowance for loan losses related to LHI.

28

AMPS..................................................................................................................165
   Report that summarized all of the Company's approved exception
   loans and the overrides to the Company's underwriting guidelines
   made on those loans.

ARA......................................................................................................................97
   Audit Risk Alert.  On an annual basis, the AICPA issues both
   general economic and industry specific ARAs.

ARMs.......................................................................................................................3
   Adjustable rate mortgages.

AS .......................................................................................................................147
   Auditing Standards.  ASs are issued by the PCAOB to establish
   GAAS.

AU...........................................................................................................................191
   Abbreviation by which SASs (defined below) are codified.

AU 150....................................................................................................................191
   Generally Accepted Auditing Standards.  Sets forth the ten
   general auditing standards that are categorized as general, field
   work, and reporting standards.

AU 230....................................................................................................................195
   Due Professional Care in the Performance of Work.  Requires the
   auditor to exercise a questionable mind and a critical assessment
   of audit evidence.

AU 311....................................................................................................................192
   Planning and Supervision.  Requires the auditor to obtain
   knowledge of the entity's business and industry including its
   types of products and services, production and distribution
   methods.

AU 312....................................................................................................................207
   Audit Risk and Materiality in Conducting an Audit.  Requires the
   auditor to consider risk and materiality in determining the nature,
   timing, and extent of auditing procedures.

AU 316....................................................................................................................195
   Consideration of Fraud in a Financial Statement Audit.  Requires
   the auditor to consider fraud risk factors to assess the risk of
   material misstatement due to fraud and respond to identified risks
   by changing the nature, timing, and extent of auditing procedures.

AU 319....................................................................................................................193
   Consideration of Internal Control in a Financial Statement Audit.
   Requires the auditor to obtain a sufficient understanding of
   internal controls to plan the audit and determine the extent of tests
   to be performed.

AU 328..................................................................................................194
  Auditing Fair Value Measurements and Disclosures. Requires
  the auditor to test management's significant assumptions,
  valuation model, and data underlying fair value measurements as
  well as relevant controls.

AU 329..................................................................................................193
  Analytical Procedures. Requires the auditor to apply analytical
  procedures to plan the nature, timing, and extent of auditing
  procedures as well as to perform an overall review of the
  financial information.

AU 333..................................................................................................195
  Management Representations. Requires the auditor to obtain
  written representations but clarifies that the representations are
  not a substitute for the application of auditing procedures.

AU 342..................................................................................................194
  Auditing Accounting Estimates. Requires the auditor to obtain
  evidential matter to provide reasonable assurance that accounting
  estimates are reasonable and in conformity with GAAP.

Auditing Standard No. 2 .......................................................................147
  An Audit of Internal Control Over Financial Reporting Performed
  in Conjunction With an Audit of Financial Statements.
  Establishes requirements when an auditor is engaged to audit both
  a company's financial statements and management's assessment
  of the effectiveness of internal control over financial reporting.

Brown, Kathleen.....................................................................................15
  Member of Countrywide's Board of Directors from March 2005
  until March 29, 2007.

CCV ........................................................................................................11
  Countrywide Capital V, a Delaware Statutory Trust created by
  Countrywide.

CHL ........................................................................................................12
  Countrywide Home Loans, Inc.

Cisneros, Henry G. .................................................................................15
  Member of Countrywide's Board of Directors from 2001 until
  October 24, 2007.

Class Period .............................................................................................2
  March 12, 2004 through March 7, 2008.

CLD .......................................................................................................46
  Correspondent Lending Division; Countrywide's loan purchasing
  division.

CLTV......................................................................................................49
  Consolidated (or combined) loan-to-value ratio.

CMD ...........................................................................................................54
    Consumer Markets Division; one of Countrywide's loan
    origination divisions.

CORAD ......................................................................................................166
    Countrywide Organizational Risk Assessment Database.

COSO...........................................................................................................145
    Committee on Sponsoring Organizations of the Treadway
    Commission. Established the criteria used to assess internal
    controls over financial reporting.

Critical Accounting Policies.................................................................171
    Accounting policies that governed the application of GAAP in the
    preparation of its financial statements.

Cunningham, Jeffrey..............................................................................16
    Member of Countrywide's Board of Directors since 1998.

DLO Matrix ................................................................................................70
    Divides borrowers into three main categories based on credit
    scores: "620 or greater," "500 to 619," and "Less than 500." No
    distinction is drawn at the 660 (or 659) FICO level.

Donato, Robert J. ....................................................................................16
    Member of Countrywide's Board of Directors since 1993.

Dougherty, Michael E................................................................................16
    Member of Countrywide's Board of Directors from 1998 until
    March 28, 2007.

EITF 92-2...................................................................................................137
    Emerging Issues Task Force No. 92-2, Measuring Loss Accruals
    by Transferors of Receivables with Recourse. Sets forth the
    standards to measure credit losses expected to be incurred to
    compensate transferees for the failure of the debtors to pay when
    due.

Enis, Ben M. ..............................................................................................16
    Member of Countrywide's Board of Directors from 1984 until
    June 2006.

EPS.................................................................................................................4
    Exception Processing System, proprietary computer system that
    was used to identify and route highly risky loans out of the
    regular loan approval process.

FASB ...........................................................................................................95
    Financial Accounting Standards Board. Issues GAAP in the
    United States generally in the form of SFASs.

FFIEC.........................................................................................................112
    Federal Financial Institutions Examination Council.

FHA ........................................................................................................92
    Federal Housing Administration.

FICO ......................................................................................................38
    Fair Isaac Credit Organization.

First Buyback..........................................................................................188
    Countrywide's first stock buyback for up to $2.5 billion in
    Countrywide stock announced on October 24, 2006.

FSL.........................................................................................................33
    Full Spectrum Lending Division; Countrywide's subprime loan
    origination division.

GAAP........................................................................................................5
    Generally Accepted Accounting Principles.  The set of standards,
    conventions, and rules followed by accountants in the preparation
    of financial statements.

GAAS.........................................................................................................5
    Generally Accepted Auditing Standards.  The standards by which
    an auditor plans, conducts, and reports the results of an audit.

Garcia, Carlos M.........................................................................................16
    Countrywide's Executive Managing Director for Banking and
    Insurance and member of CHL's Board of Directors throughout
    the Class Period.

Gissinger III, Andrew ...................................................................................16
    Member of CHL's Board of Directors throughout the Class
    Period and Senior Managing Director and Chief Production
    Officer of CHL since 2006.

GSEs .......................................................................................................26
    Government-sponsored entities; provide liquidity to the home
    mortgage market.

Heller, Edwin.............................................................................................17
    Member of Countrywide's Board of Directors from 1993 until
    June 2006.

HELOCs.....................................................................................................3
    Home Equity Lines of Credit; second mortgage loans secured
    only by the difference between the value of the home and the
    amount due on a first mortgage.

Individual Defendants....................................................................................18
    Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros,
    Cunningham, Donato, Dougherty, Enis, Garcia, Gissinger, Heller,
    King, McLaughlin, Melone, Parry, Robertson, Russell, and
    Snyder.

Interest-only mortgages ................................................................................30
    Allowed the borrower to pay only the interest accruing on the
    loan each month for a predetermined time period.

King, Gwendolyn Stewart ................................................................................ 17
    Member of Countrywide's Board of Directors from 2001 until
    November 15, 2004.

Kurland, Stanford L. .................................................................................... 13
    President and COO of Countrywide from before the Class Period
    until September 7, 2006; joined Countrywide in 1979, became
    COO in 1988.  President in January 2004, served in a number of
    other executive positions at the Company including Executive
    Managing Director from 2000 to 2003, Senior Managing Director
    from 1989 to 2000, from 2003 through 2005 CEO and a director
    of CHL, and Chairman of CHL during 2006.

LHI ................................................................................................................ 95
    Loans Held for Investment.

LIBOR ......................................................................................................... 129
    London Inter Bank Offering Rate.

LTV ............................................................................................................... 49
    Loan-to-value ratio.

MBS .............................................................................................................. 23
    Mortgage-backed securities.

McLaughlin, Thomas K. ............................................................................... 17
    Countrywide's Executive Managing Director and Chief Financial
    Officer from 2004 until his resignation effective April 1, 2005.

Melone, Martin R. ........................................................................................ 17
    Member of Countrywide's Board of Directors since 2003.

Mozilo, Angelo R. ........................................................................................ 11
    Officer Defendant, Individual Defendant, the Company's co-
    founder, Chairman and CEO.

MSRs ............................................................................................................ 95
    Mortgage servicing rights.

Net Lifetime Credit Losses ......................................................................... 120
    Estimation of loan default and multiplying that amount by the
    percentage of the loan balance that will be uncollectible.

No doc loans ................................................................................................. 31
    Loans based on a borrower's bare representations about his or her
    ability to repay, with little or no documentation to substantiate
    those representations.

Officer Defendants ...................................................................................... 14
    Mozilo, Sambol, Sieracki and Kurland.

QSPE ........................................................................................................... 118
    Qualifying Special Purpose Entity.

1
2

PAL ................................................................................................ 69
   Price Any Loan, a proprietary computer system, or "pricing engine."

3
4

Parry, Robert T. ............................................................................ 17
   Member of Countrywide's Board of Directors since 2004.

Pay Option ARMs .......................................................................... 29
   Pay-option adjustable-rate mortgages.

5
6

PCAOB ........................................................................................ 190
   Public Company Accounting Oversight Board. Authorized by SOX to establish auditing and related standards to be used by registered public accounting firms in the preparation and issuance of audit reports.

7
8

PMI ................................................................................................ 33
   Private Mortgage Insurance.

9
10

Prepayment Speed ........................................................................ 119
   The rate at which a borrower will prepay its mortgage loan.

11
12

PSLRA ............................................................................................ 9
   Private Securities Litigation Reform Act of 1995.

13
14

R&Ws ............................................................................................ 96
   Representations and warranties provided to the transferee in connection with loan securitizations.

15
16

RIs ................................................................................................ 95
   Retained interests.

17
18

Robertson, Oscar P. ...................................................................... 17
   Member of Countrywide's Board of Directors since 2000.

Russell, Keith P. .......................................................................... 17
   Member of Countrywide's Board of Directors since 2003.

19
20

SAB ............................................................................................ 100
   Staff Accounting Bulletin. Issued to express the SEC's views on specific matters that are relevant to accounting and auditing.

21
22

SAB 99 ........................................................................................ 111
   Staff Accounting Bulletin No. 99, Materiality. Expresses the views of the SEC staff that exclusive reliance on quantitative measures of materiality is inappropriate.

23
24

SAB 102 ................................................................................. 99-100
   Staff Accounting Bulletin No. 102, Selected Loan Loss Allowance Methodology and Documentation Issues. Expresses the views of the SEC staff on the determination of loan losses in accordance with GAAP.

25
26
27
28

Sambol, David ................................................................................................ 12
    Officer Defendant, Individual Defendant, joined Countrywide in
    1985 and became the Company's President and COO in
    September 2006. He served as Executive Managing Director for
    Business Segment Operations from 2004 to 2006, Chairman and
    CEO of CHL since 2007, and President and COO of CHL from
    2004 through 2006.

SAS ................................................................................................................ 190
    Statement on Auditing Standards. SASs are issued by the ASB to
    establish GAAS.

Securities Act ................................................................................................. 8
    Securities Act of 1933.

SFAS .............................................................................................................. 96
    Statement of Financial Accounting Standards. SFASs are issued
    by the FASB to establish GAAP.

SFAS 5 ........................................................................................................... 96
    Statement of Financial Accounting Standards No. 5, Accounting
    for Contingencies. Sets forth the standards to which Countrywide
    was required to adhere to properly account for reserves for ALL
    and breaches in R&Ws.

SFAS 115 ....................................................................................................... 118
    Statement of Financial Accounting Standards No. 115,
    Accounting for Certain Investments in Debt and Equity
    Securities. Sets forth the standards for accounting and reporting
    for investments in certain equity and all debt securities.

SFAS 140 ....................................................................................................... 96
    Statement of Financial Accounting Standards No. 140,
    Accounting for Transfers and Servicing of Financial Assets and
    Extinguishment of Liabilities. Sets forth the standards for
    accounting for securitizations and other transfers of financial
    assets and collateral, including RIs and MSRs.

SFAS 156 ....................................................................................................... 96-97
    Statement of Financial Accounting Standards No. 156,
    Accounting for Servicing of Financial Assets. Amended SFAS
    140 to provide entities a choice of methods to use when valuing
    MSRs.

Sieracki, Eric P. ............................................................................................ 12
    Officer Defendant, Individual Defendant, served as the
    Company's Executive Managing Director and CFO and CFO of
    Countrywide Bank Since April 2005 and is a member of the
    Executive Strategy Committee.

SISA loans ..................................................................................................... 58
    Stated Income/Stated Asset loans.

Snyder, Harley W. .......................................................................................... 18
    Member of Countrywide's Board of Directors since 1991.

SOX ............................................................................................. 12
    Sarbanes-Oxley Act of 2002.

Stated income loans ................................................................... 31
    Loans based on a borrower's bare representations about his or her
    ability to repay, with little or no documentation to substantiate
    those representations.

Underwriter Defendants ............................................................. 22
    ABN AMRO Incorporated, A.G. Edwards & Sons, Inc., Banc of
    America Securities LLC, Barclays Capital Inc., BNP Paribas
    Securities Corp., BNY Capital Markets, Inc., Citigroup Global
    Markets Inc., Countrywide Securities Corporation, Deutsche
    Bank Securities Inc., Goldman, Sachs & Co., Greenwich Capital
    Markets, Inc., HSBC Securities (USA) Inc., J.P. Morgan
    Securities Inc., Merrill, Lynch, Pierce, Fenner & Smith
    Incorporated, Morgan Stanley & Co. Incorporated, RBC Dain
    Rauscher Inc., RBC Dominion Securities Inc., Scotia Capital Inc.,
    TD Securities Inc., UBS Securities LLC, and Wachovia Capital
    Markets, LLC.

Valuation Allowance .................................................................. 127
    Reduces the value of impaired MSRs.

VLF ............................................................................................. 168
    A Countrywide proprietary database called Virtual Loan File.

VOE ............................................................................................ 61
    Verification of employment.

Weighted-Average Life .............................................................. 120
    Reference to the time period over which the economic benefit of
    an asset is expected to be received, if any.

WLD ........................................................................................... 54
    Wholesale Lending Division; Countrywide's loan origination and
    loan purchasing division.

Court-appointed Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund ("NYSCRF"), Court-appointed Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds" and, together with NYSCRF, the "New York Funds"), and Plaintiffs Barry Brahn and Shelley B. Katzeff (together with the "New York Funds," "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned counsel, for their Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws asserting claims against Countrywide Financial Corporation ("Countrywide" or the "Company") and the other Defendants named herein, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things, (i) review and analysis of documents filed publicly by Countrywide and certain affiliates thereof with the Securities and Exchange Commission (the "SEC"); (ii) review and analysis of press releases, news articles, and other public statements issued by or concerning Countrywide and other Defendants named herein; (iii) review and analysis of research reports issued by financial analysts concerning Countrywide's securities and business; (iv) discussions with consulting experts; (v) other publicly available information and data concerning Countrywide and its

---

[1] A glossary of certain defined terms in this Complaint and terms that are specific to Countrywide's business and the mortgage banking industry appears after the table of contents.

securities, including information concerning investigations of Countrywide being pursued by, among others, the Federal Bureau of Investigation ("the FBI"), the SEC, the United States Trustee, the United States Congress, and the California, Florida, Illinois and North Carolina Attorneys General; (vi) an investigation conducted by and through Lead Plaintiffs' attorneys, which included interviews of numerous former Countrywide executives and employees and review and analysis of certain nonpublic documents concerning Countrywide's business; (vii) review and analysis of news articles, media reports and other publications concerning the mortgage banking and lending industries; and (viii) review and analysis of certain pleadings filed in other pending litigations naming Countrywide or certain subsidiaries or affiliates as a defendant or nominal defendant. Plaintiffs believe that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Plaintiffs bring this federal securities class action on behalf of themselves and all similarly situated persons and entities that, between March 12, 2004 and March 7, 2008, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock or other equity securities, debt securities, or call options of or guaranteed by Countrywide, or sold Countrywide put options, either in the open market or pursuant or traceable to a registration statement, and were damaged thereby (the "Class").

2.    Countrywide has long been among the nation's largest mortgage lenders, and became, to use its own tagline, "America's #1 Home Loan Lender" during the Class Period.  The Company's singular effort to overtake its competitors and capture a dominant share of the nation's residential loan market, however, was the impetus for one of the largest corporate frauds in recent years,

1   one that led *The New York Times* to suggest that Countrywide may be "Enron's

2   Second Coming."

3       3.    In or about mid-2003, as described by a former high-ranking

4   executive, Countrywide embarked on a "culture change" that, during the Class

5   Period, involved a dramatic shift away from making traditional, fixed-rate

6   mortgages toward offering an array of new and far riskier loan products such as

7   pay-option adjustable-rate mortgages ("Pay Option ARMs"), which encouraged

8   borrowers to make "minimum" payments of a fraction of the interest due,

9   resulting in ballooning principal balances many borrowers could not repay; and

10   home equity lines of credit ("HELOCs"), which were second-lien mortgages that

11   faced substantial increased risk of becoming worthless in a default.  These loans

12   were not only risky by their terms, but were increasingly made to borrowers with

13   poor credit and were made on a "stated document" or "low documentation" basis,

14   meaning that the borrowers were not required (or even asked) to submit proof of

15   income or assets.

16       4.    All the while, Countrywide's senior management, including Angelo

17   R. Mozilo ("Mozilo"), the Company's co-founder, Chairman and CEO, falsely

18   assured the market that the Company's policies and procedures for underwriting

19   loans—in essence, determining whether the borrower was likely to pay in full and

20   on time—were tightly controlled and supervised and "designed to produce high

21   quality loans."  During the Class Period, Countrywide repeatedly represented that

22   its loan origination and underwriting practices were careful and "disciplined," and

23   also repeatedly described its practices as far superior to those of competing

24   lenders.    The consistent and essential message to the public was that

25   Countrywide, with Mozilo and his team at the helm, was "a very different focused

26   company" and that other lenders were fly-by-night outfits that did not know the

27   mortgage business and should be avoided by investors.

28

5.     During this time, however, and contrary to these public assurances, Countrywide was steadily loosening its underwriting standards to sweep in borrowers with poor credit, and was significantly deviating from these weakening standards in order to generate huge volumes of loans and quickly sell them off to the secondary mortgage market, the Company's chief source of financing. Senior management, particularly David Sambol ("Sambol"), who ran the Company's loan production machine as President and COO of Countrywide Home Loans, Inc., sent a clear message to loan origination and underwriting employees that issuing loans was far more important than determining whether or not the loans should be made because of borrower creditworthiness.   Careful underwriting essentially went by the boards in favor of cavalier loan origination and booking earnings.   "Exception loans"—loans that did not satisfy even the Company's weakened underwriting criteria—were routinely approved every day in high volume through a computer system called the Exception Processing System ("EPS"), but only after the Company charged these high risk borrowers extra points and fees.  An internal document described a principal objective of EPS as "[a]pprov[ing] virtually every borrower and loan profile with pricing add on when necessary."

6.     Further, to conceal its greatly increased production of subprime loans, Countrywide employed an internal, undisclosed definition of prime versus subprime, and thus, in its public reports, classified loans as "prime" that clearly were subprime.  Additionally, while the Company repeatedly represented that its Pay Option ARMs, which carried an especially high degree of risk, went only to the most sophisticated and creditworthy borrowers, many of these loans were made to borrowers with very weak credit.  In fact, it was revealed late in the Class Period, when the truth began to emerge, that the vast majority of Pay Option ARMs were made on a "low doc" or "no doc" basis.  In sum, Countrywide sacrificed loan *quality* for loan *quantity* in order to pump up loan production,

charge extra fees and higher interest rates, and boost its revenues.  At the same time, as a result of its sacrifice of loan quality, the risk of borrower defaults consistently increased during the Class Period, yet Countrywide never disclosed this increased risk to the Class.

7.      Despite all of these risky lending practices, Countrywide's management failed, in violation of generally accepted accounting principles ("GAAP"), to set aside sufficient reserves for the massive loan losses that would inevitably occur.  As the level of risk in Countrywide's loan portfolio drastically increased, the Company kept the level of loan loss reserves relatively constant or even allowed it to decrease, knowing that to increase loan loss reserves would have a direct, dollar-for-dollar impact on the amount of earnings the Company could report in its financial statements.  In addition to the failure to increase loan loss reserves, Countrywide also reported inflated earnings, in violation of GAAP, by overvaluing its "retained interests" and mortgage servicing rights from loans securitized and sold to the secondary market, and by failing to properly reserve for representations and warranties it made to purchasers of such securitized loans.

8.      KPMG LLP ("KPMG") negligently or recklessly failed to comply with generally accepted auditing standards ("GAAS") in auditing Countrywide's financial statements for its fiscal years 2004 through 2006, and thus participated in conveying materially false and misleading statements to the investing public.  As described more fully below, the Underwriter Defendants (defined below) are responsible by statute for materially false and misleading statements included in registration statements and prospectuses for offerings of Countrywide debt and preferred securities during the Class Period.

9.      Countrywide's risky scheme to artificially inflate earnings in the short term initially resulted in remarkable growth for the Company, with a seemingly booming business, a dominant market share, and a stock price that, after trading under $20 for most of 2003, traded in the mid-$30s early in the Class

Period and climbed to a high of $45 by early 2007.  However, this growth has been wiped out by a devastating collapse, with the stock price losing *87%* of its value between July 2007 and March 2008, from approximately $34 to $4 per share, as a result of a series of revelations of the truth concerning Countrywide. The collapse in Countrywide's stock price from its Class Period high represents a loss of market capitalization exceeding $25 billion.

10.   These revelations included disclosures on July 24, 2007, in connection with disappointing second quarter results, that delinquency rates in the Company's loan portfolios had jumped sharply, that its allowances for loan losses were inadequate, and that the Company wrote down, by $388 million, the value of retained interests on securitizations of HELOCs.  The Company also revealed, in remarks during its quarterly conference call, that it had been classifying loans as "prime" that the industry would have viewed as subprime, and that the Company had "recalibrated" its proprietary underwriting system and made numerous changes to its underwriting guidelines and processes.  In response, one analyst stated that Countrywide "made serious miscalculations (and possibly misrepresentations) about the quality of [its] loans" and observed that its supposedly prime loans were "performing roughly in line with [a competing lender's] subprime deals."

11.   Numerous additional partially corrective disclosures relating to Countrywide's lending practices and financial reporting (including an enormous and unprecedented $1.2 billion loss for the third quarter of 2007) followed, culminating on March 8, 2008 with the stunning news that the FBI is investigating Countrywide for securities fraud.  According to *The Wall Street Journal*, the inquiry involves "whether senior officials made misrepresentations about the Company's financial position and the quality of its mortgage loans in securities filings."

12.     As the truth about Countrywide began to emerge in and after July 2007, Countrywide lost its ability to sell debt securities and accordingly suffered a serious cash crisis.  Countrywide systematically burned through its backup sources of liquidity, including pulling down its entire $11.5 billion credit facility, all the while misleading investors as to the true depth of its liquidity problems. By the Fall of 2007, the prospect of bankruptcy loomed.

13.     Countrywide's swift and stunning collapse—and the massive losses that unsuspecting investors have suffered as a result—were not caused by ordinary, or even extraordinary, market forces or business cycles.  Rather, as a former Countrywide risk management executive explained, the Company's downfall was largely caused by "lax underwriting guidelines" and its rapidly increasing origination of inherently risky loans to borrowers with poor credit. Notably, in September 2007, after the truth about Countrywide's fraud began to emerge, Secretary of the Treasury Henry M. Paulson told a group of mortgage industry executives: "Unlike periods of financial turbulence I've witnessed over many years, this turbulence wasn't precipitated by problems in the real economy. *This came about as a result of some bad lending practices.*"[2]

14.     Countrywide, its credibility shattered and its stock price crippled, was acquired on July 1, 2008 by Bank of America Corporation, a former competitor, for the bargain-basement price of $4 billion in stock.  This sales price represented only 23% of the Company's $17.3 billion market capitalization at the beginning of the Class Period.

15.     Defendants Mozilo and Sambol, and Stanford L. Kurland, Countrywide's former President and COO, who were principally responsible for the Company's "culture change" and concerted foray into leveraged and high-risk lending practices, became enormously—almost indescribably—rich from insider

---

[2]   Throughout this Complaint, emphasis is added unless otherwise stated.

sales of Countrywide stock at artificially inflated prices, together reaping more than *$735 million*.   The amount and timing of these stock sales present compelling evidence against these Defendants, and the SEC has commenced an inquiry into Mozilo's sales based in part on his frequent, and "fortuitous," amendments of his Rule 10b5-1 trading plans.   Moreover, these stock sales occurred, and Mozilo's sales accelerated, just as the Company initiated the first of two billion-dollar stock repurchase programs.   These buyback programs supported Countrywide's stock price, securing massive profits for Mozilo's personal sales, while the Company, and through it, the Class, suffered massive losses on the shares it repurchased.

## II.   JURISDICTION AND VENUE

16.   The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l* and 77*o*, Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17.   This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

18.   Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), (c) and (d).   Many of the acts and omissions charged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in substantial part in the Central District of California.   Countrywide maintains its corporate headquarters and principal executive offices in this District and did so throughout the Class Period.

19.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## III.    THE PARTIES

### A.    Plaintiffs

20.    On November 28, 2007, this Court appointed Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund ("NYSCRF"), to serve as a Lead Plaintiff in this consolidated securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").   As established by Article 9 of the New York Retirement and Social Security Law, NYSCRF holds and invests the assets of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System, and provides pension, death and disability benefits for state and local government employees and employees of certain other participating employers.  NYSCRF is the third-largest public pension fund in the nation, with assets under management exceeding $154 billion as of March 31, 2007 and serves more than one million active and retired members and their beneficiaries.  Thomas P. DiNapoli, Comptroller of the State of New York, is the sole trustee of NYSCRF.  As set forth in the amended certification annexed hereto as Exhibit A, Lead Plaintiff NYSCRF purchased Countrywide common stock on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

21.    On November 28, 2007, this Court also appointed the New York City Pension Funds, comprised of the actuarial pension systems of the New York

City Employees' Retirement System ("NYCERS"), the New York City Police Pension Fund, the New York City Fire Department Pension Fund, the New York City Board of Education Retirement System, and the Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds"), to serve as Lead Plaintiffs in this consolidated securities class action pursuant to the PSLRA. The New York City Pension Funds provide pension benefits to employees of the City of New York, including full-time uniformed employees of the New York City Police and Fire Departments and the pedagogical staff and non-pedagogical employees of the Board of Education. NYCERS provides benefits to all New York City employees who are not eligible to participate in separate Police Department, Fire Department, Board of Education or Teachers pension funds. Pursuant to Title 13 of the Administrative Code of the City of New York, the Boards of Trustees of the New York City Pension Funds have delegated to the Comptroller of the City of New York investment responsibility for management of the pension funds' assets. Collectively, the New York City Pension Funds have assets under management exceeding $110 billion and serve more than 370,000 active members and 262,000 retirees and beneficiaries. As set forth in the amended certifications annexed collectively hereto as Exhibit B, Lead Plaintiffs New York City Pension Funds purchased Countrywide common stock on the open market during the Class Period and purchased or acquired other publicly traded securities of Countrywide pursuant or traceable to the Countrywide Registration Statements complained of below, and were damaged thereby as a result of the misconduct alleged herein.

22. Plaintiff Barry Brahn ("Brahn"), as set forth in the amended certification annexed hereto as Exhibit C, acquired 7% Capital Securities issued by Countrywide Capital V ("CCV"), a Delaware Statutory Trust created by Countrywide, pursuant or traceable to the Registration Statement for such securities and was damaged as a result of the misconduct alleged herein.

23.     Plaintiff Shelley B. Katzeff ("Katzeff"), as set forth in the certification annexed hereto as Exhibit D, acquired 7% Capital Securities issued by CCV pursuant or traceable to the Registration Statement for such securities and was damaged as a result of the misconduct alleged herein.

### B.     Countrywide Defendants

#### 1.     Countrywide and CCV

24.     Defendant Countrywide Financial Corporation ("Countrywide" or the "Company") is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located at 4500 Park Granada, Calabasas, California 91302.  Countrywide was founded in March 1969 and engages in mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan processing and servicing.  Countrywide common stock has traded actively on the New York Stock Exchange (the "NYSE") since October 1985.

25.     Defendant Countrywide Capital V ("CCV") is a Delaware Statutory Trust and wholly owned subsidiary of Countrywide, created by Countrywide solely for the purpose of issuing preferred securities.  Countrywide guarantees all of CCV's offerings.

#### 2.     The Officer Defendants

26.     Defendant Angelo R. Mozilo ("Mozilo") is a co-founder of Countrywide and has been Chairman of the Board of Directors since March 1999 and Chief Executive Officer ("CEO") since February 1998.  He has been a member of the Board since 1969.  Mozilo was also President of the Company from March 2000 through December 2003 and has served in other executive capacities since the Company's formation in 1969. Mozilo signed the Company's materially false and misleading Form 10-K Annual Reports for 2003 through 2006 filed with the SEC and accompanying certifications made pursuant to the

1   Sarbanes-Oxley Act of 2002 ("SOX"); SOX certifications accompanying the
2   Company's Form 10-Q Quarterly Reports filed with the SEC between the first
3   quarter of 2004 and the third quarter of 2007; and the Company's Registration
4   Statements dated April 7, 2004, February 9, 2006, October 27, 2006, and
5   November 15, 2007.

6       27.   Defendant David Sambol ("Sambol") joined Countrywide in 1985
7   and became the Company's President and Chief Operating Officer ("COO") in
8   September 2006.  Sambol served from 2004 to 2006 as Executive Managing
9   Director for Business Segment Operations, heading all revenue-generating
10  operations of the Company, as well as the corporate operational and support units
11  comprised of Administration, Marketing and Corporate Communications, and
12  Enterprise Operations and Technology.  Sambol has served as Chairman and
13  CEO of the Company's principal operating subsidiary, Countrywide Home
14  Loans, Inc. ("CHL") since 2007, and from 2004 through 2006 Sambol was
15  President and COO of CHL.  According to his executive profile on
16  Countrywide's website, Sambol "lead[s] all operations of the Company" and has
17  "oversight responsibility" for CHL, as well as Countrywide Bank, Countrywide
18  Insurance Group, Countrywide Capital Markets and the Company's Global
19  Operations.  Sambol was also a Managing Director from July 1994 to 2003, and
20  has served as Senior Managing Director and Chief of Production for the
21  Company's loan sector.  Sambol became a director of Countrywide in September
22  2007.  Sambol signed the Company's materially false and misleading Form 10-Q
23  Quarterly Reports filed with the SEC on November 7, 2006, May 9, 2007, August
24  9, 2007, and November 9, 2007; and Registration Statements dated February 9,
25  2006, October 27, 2006, and November 15, 2007.

26      28.   Defendant Eric P. Sieracki ("Sieracki") has served as the Company's
27  Executive Managing Director and Chief Financial Officer ("CFO") and as CFO
28  of Countrywide Bank since April 2005, and is a member of the Executive

Strategy Committee.   Sieracki was and is responsible for oversight of Countrywide's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation.   He also served as the Company's senior manager in the areas of investor relations, corporate development, and equity capital activities.   Sieracki joined the Company in 1988 as Senior Vice President of Countrywide Asset Management Corporation and has held a number of executive positions.   In 1989, he was promoted to Executive Vice President of Corporate Finance, in charge of finance and accounting responsibilities for Countrywide and its subsidiaries.   He also served as Senior Vice President and CFO of Countrywide Mortgage Investments, Inc., a publicly traded affiliate of the Company.   Defendant Sieracki became a Managing Director in 1996, a Senior Managing Director in 2002, and Executive Managing Director in 2005.   Sieracki signed the Company's Form 10-K Annual Reports for 2005 and 2006 filed with the SEC and accompanying SOX certifications; Form 10-Q Quarterly Reports between the first quarter of 2005 and the third quarter of 2007 and accompanying SOX certifications; Form 10-Q/A Amended Quarterly Reports for the first three quarters of 2004; and Registration Statements dated February 9, 2006, October 27, 2006, and November 15, 2007.

29.   Defendant Stanford L. Kurland ("Kurland") was President and COO of Countrywide from before the Class Period until he ceased working for the Company on September 7, 2006.   Kurland joined Countrywide in 1979, and became COO in 1988 and President in January 2004.   Kurland has served in a number of other executive positions at the Company, including Executive Managing Director from 2000 to 2003 and Senior Managing Director from 1989 to 2000.   From 2003 through 2005, Kurland was CEO and a director of CHL, and during 2006 also served as Chairman of CHL.   Kurland signed the Company's Form 10-K Annual Reports filed with the SEC for 2003, 2004 and 2005; Form 10-Q Quarterly Reports filed with the SEC between the first quarter of 2004 and

the second quarter of 2006; Form 10-Q/A Amended Quarterly Reports for the first three quarters of 2004; Form 8-K Current Reports filed with the SEC on April 21, 2004 and July 26, 2004; and Registration Statements dated April 7, 2004 and February 9, 2006.

30.   Defendants Mozilo, Sambol, Sieracki and Kurland are referred to herein collectively as the "Officer Defendants." Each of these Defendants, by virtue of their high-level positions with Countrywide, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his tenure with the Company, as alleged herein.  As set forth below, the materially misstated information conveyed in the Company's SEC filings, press releases, and other public statements was the result of the collective actions of these individuals.  Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case, approved or ratified these statements, or was aware or recklessly disregarded that these statements were being issued regarding the Company.  Accordingly, it is appropriate to treat the Officer Defendants as a group for pleading purposes.

31.   As officers and directors of a publicly held company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws, the Officer Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities

1    would be based on accurate information.  The Officer Defendants each violated

2    these requirements and obligations during the Class Period.

3        32.    The Officer Defendants, because of their positions of control and

4    authority as senior executive officers and/or directors of Countrywide, were able

5    to and did control the content of the SEC filings, press releases and other public

6    statements issued by Countrywide during the Class Period.   Each of these

7    individuals was provided with copies of the statements at issue in this action

8    before they were issued to the public and had the ability to prevent their issuance

9    or cause them to be corrected.   Accordingly, each of these individuals is

10   responsible for the accuracy of the public statements detailed herein.

11       33.    The Officer Defendants, because of their positions of control and

12   authority as senior executive officers and/or directors of Countrywide, had access

13   to the adverse undisclosed information about Countrywide's business, operations,

14   financial statements and internal controls through access to internal corporate

15   documents, conversations with other corporate officers and employees,

16   attendance at management and Board of Directors meetings and committees

17   thereof and via reports and other information provided to them in connection

18   therewith, and knew or recklessly disregarded that these adverse undisclosed facts

19   rendered the positive representations made by or about Countrywide materially

20   false and misleading.

21                    **3.    Additional Individual Defendants**

22       34.    Defendant Kathleen Brown ("Brown") was   a   member   of

23   Countrywide's Board of Directors from March 2005 until March 29, 2007.

24   Brown signed the Company's Registration Statements filed with the SEC dated

25   February 9, 2006 and October 27, 2006.

26       35.    Defendant Henry G. Cisneros ("Cisneros") was a member of

27   Countrywide's Board of Directors from 2001 until October 24, 2007.  Cisneros

28

1   signed the Company's Registration Statements filed with the SEC dated April 7,

2   2004, February 9, 2006 and October 27, 2006.

3       36.   Defendant Jeffrey M. Cunningham ("Cunningham") has been a

4   member of Countrywide's Board of Directors since 1998. Cunningham signed

5   the Company's Registration Statements filed with the SEC dated April 7, 2004,

6   February 9, 2006, October 27, 2006, and November 15, 2007.

7       37.   Defendant Robert J. Donato ("Donato") has been a member of

8   Countrywide's Board of Directors since 1993. Donato signed the Company's

9   Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,

10   October 27, 2006, and November 15, 2007.

11      38.   Defendant Michael E. Dougherty ("Dougherty") was a member of

12   Countrywide's Board of Directors from 1998 until March 28, 2007. Dougherty

13   signed the Company's Registration Statements filed with the SEC dated April 7,

14   2004, February 9, 2006 and October 27, 2006.

15      39.   Defendant Ben M. Enis ("Enis") was a member of Countrywide's

16   Board of Directors from 1984 until June 2006. Enis signed the Company's

17   Registration Statements  filed with the SEC dated April 7, 2004, February 9, 2006

18   and October 27, 2006.

19      40.   Defendant Carlos M. Garcia ("Garcia") is Countrywide's Executive

20   Managing Director for Banking and Insurance and has been a member of CHL's

21   Board of Directors throughout the Class Period. Garcia signed the Company's

22   Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006

23   and October 27, 2006.

24      41.   Defendant Andrew Gissinger III ("Gissinger") has been a member of

25   CHL's Board of Directors throughout the Class Period and a Senior Managing

26   Director and Chief Production Officer of CHL since 2006. Gissinger signed the

27   Company's Registration Statements filed with the SEC dated October 27, 2006

28   and November 15, 2007.

1     42.   Defendant Edwin Heller ("Heller") was a member of Countrywide's

2  Board of Directors from 1993 until June 2006.  Heller signed the Company's

3  Registration Statements filed with the SEC dated April 7, 2004 and February 9,

4  2006.

5     43.   Defendant Gwendolyn Stewart King ("King") was a member of

6  Countrywide's Board of Directors from 2001 until November 15, 2004.  King

7  signed the Company's Registration Statement filed with the SEC dated April 7,

8  2004.

9     44.   Defendant Thomas K. McLaughlin ("McLaughlin") was

10  Countrywide's Executive Managing Director and Chief Financial Officer from

11  2004 until his resignation effective April 1, 2005.  McLaughlin signed the

12  Company's Registration Statement dated April 7, 2004.

13     45.   Defendant Martin R. Melone ("Melone") has been a member of

14  Countrywide's Board of Directors since 2003.  Melone signed the Company's

15  Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,

16  October 27, 2006, and November 15, 2007.

17     46.   Defendant Robert T. Parry ("Parry") has been a member of

18  Countrywide's Board of Directors since 2004.  Parry signed the Company's

19  Registration Statements filed with the SEC dated February 9, 2006, October 27,

20  2006, and November 15, 2007.

21     47.   Defendant Oscar P. Robertson ("Robertson") has been a member of

22  Countrywide's Board of Directors since 2000.  Robertson signed the Company's

23  Registration Statements filed with the SEC  dated April 7, 2004, February 9,

24  2006, October 27, 2006, and November 15, 2007.

25     48.   Defendant Keith P. Russell ("Russell") has been a member of

26  Countrywide's Board of Directors since 2003.  Russell signed the Company's

27  Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006,

28  October 27, 2006, and November 15, 2007.

49.   Defendant Harley W. Snyder ("Snyder") has been a member of Countrywide's Board of Directors since 1991.   Snyder signed the Company's Registration Statements filed with the SEC dated April 7, 2004, February 9, 2006, October 27, 2006, and November 15, 2007.

50.   Defendants Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Gissinger, Heller, King, McLaughlin, Melone, Parry, Robertson, Russell, and Snyder are collectively referred to herein as the "Individual Defendants."

C.   **Underwriter Defendants**

51.   Defendant ABN AMRO Incorporated ("ABN AMRO") is an investment bank and acted as an underwriter with respect to Countrywide's offering of Series B Medium-Term Notes.  ABN AMRO's U.S. headquarters are located at 55 East 52nd Street, New York, New York 10055.

52.   Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is an investment bank and acted as an underwriter with respect to CCV's offering of 7% Capital Securities.   A.G. Edwards' headquarters are located at 1 North Jefferson Avenue, St. Louis, Missouri 63103.

53.   Defendant Banc of America Securities LLC ("Banc of America Securities") is an investment bank and acted as an underwriter with respect to Countrywide's offerings of Series A Medium-Term Notes, Series B Medium-Term Notes, and 6.25% Subordinated Floating Rate Notes Due May 15, 2016 ("6.25% Notes"), and with respect to CCV's offering of 7% Capital Securities. Banc of America Securities' headquarters are located at 9 West 57th Street, New York, New York 10019.

54.   Defendant Barclays Capital Inc. ("Barclays Capital") is an investment bank and acted as an underwriter with respect to Countrywide's offerings of Series A Medium-Term Notes, Series B Medium-Term Notes, and 6.25% Notes, and with respect to CCV's offering of 7% Capital Securities.

1  Barclays Capital's U.S. headquarters are located at 200 Park Avenue, New York,
2  New York 10166.

3      55.    Defendant BNP Paribas Securities Corp. ("BNP Paribas") is an
4  investment bank and acted as an underwriter with respect to Countrywide's
5  offering of Series B Medium-Term Notes. BNP Paribas' U.S. headquarters are
6  located at 999 Bishop Street, Honolulu, Hawaii 96813.

7      56.    Defendant BNY Capital Markets, Inc. ("BNY Capital") is an
8  investment bank and acted as an underwriter with respect to Countrywide's
9  offering of Series B Medium-Term Notes. BNY Capital's headquarters are
10 located at 44 Wall Street, New York, New York 10005.

11     57.    Defendant Citigroup Global Markets Inc. ("Citigroup Global
12 Markets") is an investment bank and acted as an underwriter with respect to
13 Countrywide's offerings of Series A Medium-Term Notes and Series B Medium-
14 Term Notes, and with respect to CCV's offering of 7% Capital Securities.
15 Citigroup Global Markets' headquarters are located at 399 Park Avenue, New
16 York, New York 10043.

17     58.    Defendant Countrywide Securities Corporation ("Countrywide
18 Securities"), a wholly owned subsidiary of Countrywide, is a registered broker-
19 dealer primarily known for trading mortgage bonds. Countrywide Securities
20 acted as an underwriter with respect to Countrywide's offerings of Series A
21 Medium-Term Notes, Series B Medium-Term Notes, and 6.25% Notes, and with
22 respect to CCV's offering of 7% Capital Securities. Countrywide Securities'
23 headquarters are located at 4500 Park Granada, Calabasas, California 91302.

24     59.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an
25 investment bank and acted as an underwriter with respect to Countrywide's
26 offerings of Series A Medium-Term Notes, Series B Medium-Term Notes, and
27 6.25% Notes, and with respect to CCV's offering of 7% Capital Securities.

28

1   Deutsche Bank's U.S. headquarters are located at One Fawcett Place, Greenwich,
2   Connecticut 06830.

3       60.   Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an
4   investment bank and acted as an underwriter with respect to Countrywide's
5   offering of Series B Medium-Term Notes, and with respect to CCV's offering of
6   7% Capital Securities.  Goldman Sachs' headquarters are located at 85 Broad
7   Street, New York, New York 10004.

8       61.   Defendant Greenwich Capital Markets, Inc. ("Greenwich Capital") is
9   an investment bank and acted as an underwriter with respect to Countrywide's
10  offerings of Series A Medium-Term Notes and Series B Medium-Term Notes.
11  Greenwich Capital's headquarters are located at 600 Steamboat Road, Greenwich,
12  Connecticut 06830.

13      62.   Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment
14  bank and acted as an underwriter with respect to Countrywide's offerings of
15  Series A Medium-Term Notes, Series B Medium-Term Notes, and 6.25% Notes,
16  and with respect to CCV's offering of 7% Capital Securities.  HSBC's U.S.
17  headquarters are located at 2700 Sanders Road, Prospect Heights, Illinois 60070.

18      63.   Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is
19  an investment bank and acted as an underwriter with respect to Countrywide's
20  offerings of Series A Medium-Term Notes, Series B Medium-Term Notes, and
21  6.25% Notes, and with respect to CCV's offering of 7% Capital Securities.  J.P.
22  Morgan Securities' headquarters are located at 270 Park Avenue, New York, New
23  York 10017.

24      64.   Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated
25  ("Merrill Lynch") is an investment bank and acted as an underwriter with respect
26  to Countrywide's offering of Series B Medium-Term Notes and CCV's offering
27  of 7% Capital Securities.  Merrill Lynch's headquarters are located at 4 World
28  Financial Center, New York, New York 10080.

65.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is an investment bank and acted as an underwriter with respect to Countrywide's offerings of Series A Medium-Term Notes and Series B Medium-Term Notes, and with respect to CCV's offering of 7% Capital Securities.  Morgan Stanley's headquarters are located at 1595 Broadway, New York, New York 10036.

66.    Defendant RBC Dain Rauscher Inc. ("RBC Dain Rauscher") is an investment bank and acted as an underwriter with respect to CCV's offering of 7% Capital Securities.  RBC Dain Rauscher's U.S. headquarters are located at 60 South 6th Street, Minneapolis, Minnesota 55402.

67.    Defendant RBC Dominion Securities Inc. ("RBC Dominion") is an investment bank and acted as an underwriter with respect to Countrywide's offerings of Series A Medium-Term Notes and Series B Medium-Term Notes. RBC Dominion's U.S. headquarters are located at 1211 Avenue of the Americas, New York, New York 10036.

68.    Defendant Scotia Capital Inc. ("Scotia Capital") is an investment bank and acted as an underwriter with respect to Countrywide's offering of Series B Medium-Term Notes.  Scotia Capital's U.S. headquarters are located at One Liberty Plaza, New York, New York 10006.

69.    Defendant TD Securities Inc. ("TD Securities") is an investment bank and acted as an underwriter with respect to Countrywide's offering of Series B Medium-Term Notes.  TD Securities' U.S. headquarters are located at 31 West 52nd Street, New York, New York 10019.

70.    Defendant UBS Securities LLC ("UBS Securities") is an investment bank and acted as an underwriter with respect to Countrywide's offering of Series B Medium-Term Notes and CCV's offering of 7% Capital Securities.   UBS Securities' U.S. headquarters are located at 1285 Avenue of the Americas, New York, New York 10019.

71.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is an investment bank and acted as an underwriter with respect to Countrywide's offerings of Series A Medium-Term Notes, Series B Medium-Term Notes, and 6.25% Notes, and with respect to CCV's offering of 7% Capital Securities. Wachovia Capital's headquarters are located at One Wachovia Center, Charlotte, North Carolina 28288.

72.     The Defendants named in this Section III.C are referred to collectively herein as the "Underwriter Defendants."

### D.     Non-Party Underwriter

73.     Lehman Brothers Inc. ("Lehman Brothers") is an investment bank and acted as an underwriter with respect to Countrywide's offerings of Series A Medium-Term Notes and Series B Medium-Term Notes, and with respect to CCV's offering of 7% Capital Securities. Lehman Brothers' headquarters are located at 745 Seventh Avenue, New York, New York 10019. Lehman Brothers is not named as a Defendant in this Second Amended Complaint due to the petition for bankruptcy protection under Section 11 of the Bankruptcy Code filed by Lehman Brothers Holdings Inc. on September 15, 2008, and the Order Commencing Liquidation entered on September 19, 2008 in *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, No. 08 Civ. 8119 (GEL) (S.D.N.Y.). But for this bankruptcy petition and Order Commencing Litigation, Lehman Brothers would continue to be a named Defendant in this action.

### E.     KPMG

74.     Defendant KPMG LLP ("KPMG") has served as Countrywide's outside auditor since January 5, 2004. KPMG provided audit, audit-related, tax and other services to Countrywide during the Class Period, which included the issuance of unqualified opinions on the Company's financial statements for the years ended December 31, 2004, 2005 and 2006 and management's assessments of internal controls for the years ended December 31, 2005 and 2006. KPMG

1   consented to the incorporation by reference of its unqualified opinions on the
2   Company's financial statements and management's assessment of internal
3   controls for the years ended December 31, 2006, 2005 and/or 2004 in
4   Countrywide's Prospectus Supplement dated September 27, 2005, Registration
5   Statement dated February 9, 2006, Prospectus Supplement dated May 11, 2006,
6   Amended Registration Statement dated October 27, 2006, and Registration
7   Statement dated November 15, 2007. KPMG maintains its national headquarters
8   at 345 Park Avenue, New York, New York 10154.

9

10  **IV.   FACTUAL BACKGROUND AND
        SUBSTANTIVE ALLEGATIONS**

11        **A.   Countrywide and its
                 Interrelated Businesses**

12

13        75.   Countrywide, which bills itself as "America's #1 Home Loan
14  Lender," is the largest mortgage lender and home loan servicer in the United
15  States. During 2006, Countrywide originated or serviced approximately 17% of
16  all residential mortgages nationwide.

17        76.   Countrywide manages its business through five business segments:
18  (1) Mortgage Banking, which originates, purchases, sells and services non-
19  commercial mortgage loans nationwide; (2) Banking, in which Countrywide
20  Bank, N.A., a federally chartered banking institution, takes deposits and invests in
21  mortgage loans and home equity lines of credit ("HELOCs"), principally those
22  originating from the Mortgage Banking segment but also through mortgages
23  issued by third parties; (3) Capital Markets, which operated an institutional
24  broker-dealer that primarily specializes in trading and underwriting mortgage-
25  backed securities ("MBS"); (4) Insurance, which provides property, casualty, life
26  and disability insurance as well as reinsurance coverage to primary mortgage
27  insurers; and (5) Global Operations, which licenses proprietary software to

28

1  mortgage lenders in the United Kingdom and performs certain overseas
2  administrative and loan servicing functions.

3      77.    The Mortgage Banking, Banking and Capital Markets business
4  segments provided a full 93% of the Company's pre-tax earnings for 2006, with
5  48% coming from Mortgage Banking, 32% from Banking, and 13% from Capital
6  Markets.  The operations of these three divisions are interrelated, with the loan
7  origination process feeding the rest of the business.  The Company originates
8  home loans in the Mortgage Banking division, retains a portion of those loans on
9  the Company's balance sheet as investments, mostly in the Banking division, and,
10 during the Class Period, securitized and sold off the remainder of the mortgages
11 or mortgage-related rights and obligations to third parties through the Capital
12 Markets division.

13     78.    During most of the Class Period, until the truth about Defendants'
14 misconduct began to emerge, nearly all of the mortgage loans Countrywide
15 originated were sold into the secondary market, primarily in the form of securities
16 backed by pools of mortgages and, to a far lesser extent, as whole loans.
17 Countrywide also performed the ongoing servicing functions related to most of
18 the residential mortgage loans it originated.  Loans held for investment by the
19 Banking division appeared as assets on the Company's balance sheet.

20     79.    During the Class Period, Countrywide had significant financing
21 needs in order to run its operations.  According to Countrywide's Form 10-K
22 filings, the Company's short-term financing needs arose primarily from
23 warehousing of mortgage loans pending sale to the secondary market, trading
24 activities of its broker-dealer, and providing mortgage warehouse credit to others.
25 Long-term financing needs arose primarily from investments in mortgage loans,
26 investments in mortgage-servicing rights and interests that the Company retains
27 when it securitizes mortgage loans, and financial instruments acquired to manage
28 interest rate risk.  The Company met its financing needs primarily through

1  unsecured commercial paper and medium-term notes, asset-backed commercial
2  paper, revolving lines of credit, short-term repurchase agreements, deposit-
3  gathering, advances from Federal Home Loan Banks, unsecured subordinated
4  debt and junior subordinated debt, and retained earnings.  The debt securities
5  referred to below and issued by Countrywide during the Class Period provided
6  much of the Company's financing needs during the Class Period.

7        80.    Countrywide relied substantially on the secondary mortgage market
8  as a source of long-term capital to support its mortgage banking operations.  The
9  Company's strategy, according to Form 10-K reports filed during the Class
10 Period, was to ensure "*ongoing access* to the secondary mortgage market by
11 *consistently producing quality mortgages* and servicing those mortgages at levels
12 that meet or exceed secondary market mortgage standards."   The Company
13 claimed that it made significant investments in personnel and technology to
14 ensure the quality of its mortgage loan production.

15       81.    The credit quality of the mortgage loans Countrywide originated was
16 of paramount importance to investors purchasing Countrywide's securitized loans
17 on the secondary mortgage market.  Thus, the Company's ability to securitize and
18 sell its mortgage loans (and maintain its principal source of liquidity) was heavily
19 dependent upon the financial community's belief that the Company maintained
20 appropriate controls commensurate with sound and disciplined loan underwriting
21 procedures designed to produce "quality mortgages."   Moreover, Countrywide
22 made representations and warranties to purchasers of its securitized mortgage
23 loans concerning their quality and the underwriting standards that were followed
24 in originating them.  If such a purchaser determined that Countrywide breached
25 its representations and warranties, or if a borrower defaulted early in the term of
26 the loan, the purchaser could require Countrywide to repurchase the mortgage
27 loans.

28

**B.   Countrywide Shifts Away From Traditional Mortgages Toward Producing Nontraditional, and Far Riskier, Loan Products**

     **1.   In an Effort to Achieve "Market Dominance," Mozilo and Sambol Spearhead a Dramatic "Culture Change" Starting in or About May 2003**

82.   Until 2003, Countrywide primarily made traditional first-lien home loans to individuals with strong credit. Such "conforming" loans are generally safer for lenders, and are regularly sold to Fannie Mae and Freddie Mac, the government-sponsored entities ("GSEs") that provide liquidity to the home mortgage market.[3]

83.   According to Confidential Witness 1 ("CW1"), in or about May 2003, a significant "culture change" began at the Company. CW1, who worked at Countrywide during the Class Period until early 2006, was a high-ranking executive in Company headquarters who worked, on a day-to-day basis with Defendants Mozilo, Sambol, Kurland and Sieracki.[4] CW1 had senior-level responsibilities with respect to, among other things, the Company's secondary marketing operations and the pricing and risk of loans held for investment and for sale.

84.   According to CW1, in May 2003, conflicts began to materialize among members of the Company's Executive Committee—which included the six or seven most senior executives of the Company, including all of the Officer Defendants—as to the best strategy to grow Countrywide's business. Around this

---

[3]   A "conforming" loan is one which conforms to GSE guidelines, which include maximum loan amounts, debt-to-income ratio limits, and documentation requirements. "Nonconforming" loans are all loans that do not conform to GSE guidelines, because they are too large, have debt-to-income ratios that are too high, or do not satisfy GSE documentation requirements.

[4]   In an effort to protect the identities of knowledgeable witnesses who have come forward on a confidential basis, Plaintiffs have not pleaded all available information concerning job titles, locations, and starting and ending dates of employment when providing such information would be tantamount to revealing the witness' identity. Plaintiffs will provide such information to the Court *in camera* if the Court so requests.

time, according to CW1, Sambol became particularly close to Mozilo and emerged as a major force within the Company, and took complete charge of loan production in 2004. The conflicts regarding how to grow the business were resolved as Sambol succeeded in imposing a new Company-wide "mandate" that CW1 described as *"more loans, more loans, more loans"* across the board.

85. The result, according to CW1, was a "culture change" that included a movement by Countrywide to originate more nonconforming loans, which are generally riskier and, because they cannot be sold to GSEs, must be marketed to private investors. By increasing the origination of nonconforming loans, Countrywide was able to originate many more loans each year and, because nonconforming loans were riskier than conforming loans, Countrywide was able to charge borrowers higher fees when extending such loans. In 2002, approximately 25% of the total loans originated by Countrywide were nonconforming. In 2004, nearly 40% of loan originations were nonconforming, and by 2006 this figure was 45.2%.

86. The "culture change" also involved a major shift in strategic direction away from extending traditional fixed-rate mortgages to borrowers with "prime" credit scores, toward issuing a wide range of nontraditional, higher-risk loans designed to allow borrowers, often those with blemished credit, to borrow more money than would be available under the Company's pre-2003 business model. Employees who underwrote loans were paid in part based on the volume of loans they approved. Mortgage brokers and other employees were paid based on the volume of loans they originated and, because of the higher origination fees charged with respect to such loans, were paid more when originating these nontraditional loan products than when they originated standard loans. Countrywide's employees and independent mortgage brokers, accordingly, targeted more and more borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay off the loans.

87.     According to CW1, the enhanced focus on nontraditional loans like subprime and low documentation loans ultimately increased Countrywide's risk of loss to unacceptable levels. CW1 further reported that Sambol took a contrary position, maintaining that by originating and procuring large volumes of loans, regardless of their relative risk, any losses incurred by the riskier loans would be covered by the profits generated on other loans. Sambol's flawed strategy, which was adopted by the Company and endorsed by the other Officer Defendants, was nothing more than a variation on a classic Ponzi scheme, whereby profits on loans higher on the pyramid are used to prop up a large volume of high-risk loans lower on the pyramid, with the goal of constantly attracting more borrowers, and especially high-risk borrowers whom Countrywide could charge higher fees.

88.     As part of the "culture change" in 2003, when Countrywide's market share was about 13%, Mozilo announced a goal for Countrywide to capture an enormous, and unprecedented, *30%* of the national residential loan market. During a conference call with analysts on July 22, 2003, Mozilo stated that his goal for the Company was "to *dominate* the purchase market and to get our overall market share to the ultimate 30% by 2006, 2007[.]" Mozilo reiterated during a January 27, 2004 conference call that "[o]ur goal is *market dominance*, and we are talking 30% origination market share by 2008 to support our macro hedge strategy." When challenged about the ramifications such massive growth might have on loan quality, Mozilo assured the market: "Going for 30% mortgage share here is *totally unrelated to quality of loans we go after. . . .* There will be *no compromise in that* as we grow market share. Nor is there a necessity to do that." In fact, as reported in *The Wall Street Journal* in February 2008, Mozilo dismissed suggestions at that time that such a push for growth might be risky: "I'm fairly confident that we're not going to do anything stupid. We have a history of not doing anything stupid."

89.    According to CW1, Mozilo's plan to capture 30% of the mortgage market was put into action, in a Company-wide mandate, by Sambol. In 2003, CW1 believed it would be difficult to achieve this goal in such a "fragmented market," that the goal was unrealistic and would result in "very low profit," and that there was no real reason to pursue it given that Countrywide was already a huge player in the industry. But, under the direction of Mozilo and Sambol, the Company embarked on an effort to shift its focus away from fixed-rate loans to nontraditional and more lucrative loan products, and to put its loan production machine into overdrive. As a central part of this effort, undisclosed to the Class, Countrywide loosened and abandoned its purportedly sound loan underwriting standards that had been designed to produce "high quality loans," in order to sweep in borrowers who previously would not have qualified for a loan.

### 2.    Countrywide's Nontraditional and Risky Loan Products

90.    Countrywide's nontraditional loan products included <u>adjustable rate mortgages</u>, or "<u>ARMs</u>," which typically provided a low "teaser" interest rate for a predetermined introductory time period, ranging between 2 and 10 years. A significant portion of the ARMs the Company issued were called "2/28 loans," meaning that the teaser rate would last for only 2 years before "resetting" to higher rates, tied to whatever criteria was set forth in the loan documentation, for the next 28 years. "Resetting" after the teaser period usually resulted in a significant increase in the borrower's monthly payments. ARMs are inherently riskier loans and will generally result in higher delinquency rates than fixed-rate loans unless the lender is careful to sell these loans only to those borrowers whose financial condition and credit history demonstrate that they are likely to be able to pay the higher principal and interest payments when the rates "reset."

91.    "<u>Pay Option ARMs</u>" gave the borrower the "option" to pay down loan principal, to make the monthly interest payment, or to make a "minimum"

payment that in fact was less than the monthly interest which would normally be paid in an "interest only" loan. Thus, if the borrower made only the "minimum" required payment, which was insufficient to pay accruing monthly interest, the difference between that minimum required payment and the normal monthly interest would be added to the remaining principal balance. As a result, each month the principal mortgage balance would grow. As in the case of a gangland loan shark, the borrower would owe Countrywide more and more money. And, as in the case of the victim of a loan shark, as the debt to Countrywide increased, the monthly interest charges would grow with the new mortgage balance. Accordingly, while a standard mortgage amortizes as principal is paid down, and an "interest only" mortgage is non-amortizing, Pay Option ARMs were subject to "negative amortization," meaning that the principal balance actually increased. Countrywide booked this negative amortization as deferred interest earnings on its income statement, reporting non-cash income created solely from a borrower's failure to pay full interest.

92.     As Countrywide's management was aware, Pay Option ARMs were fraught with significant risk because the option to make minimum payments would, more often than not, be driven by necessity (the inability of the borrower to even pay down interest as it accrued) which, coupled with increases to the loan balance, exacerbated the risk of default. Only if these loans were made to highly creditworthy borrowers (who presumably would have no need to make such minimal payments and incur negative amortization), or by assuming that real estate values would simply increase indefinitely, could the Company reasonably have expected that the deferred interest would ultimately be repaid.

93.     Countrywide's Pay Option ARMs came with negative amortization "caps," which limited the amount of missed interest that could be rolled into the principal balance. Because a borrower who hit the cap (typically set at 110-125% of the original loan amount) was subject to a reset interest rate coupled with

1 required principal paydown, the likelihood of default on a negatively amortizing
2 loan also increased materially as these caps were reached.

3     94.    During the Class Period, as alleged below, the Company represented
4 that borrowers receiving Pay Option ARMs were relatively wealthy and
5 sophisticated, minimizing the risk of default and loss. However, Countrywide has
6 now conceded that the Company extended Pay Option ARMs during the Class
7 Period that were far too risky because the borrowers did not fit the descriptions
8 the Company had previously given. According to the Company, and as reported
9 in *The Los Angeles Times* on December 28, 2007, 89% of the Pay Option ARMs
10 Countrywide issued during 2006 (amounting to $64 billion), and 83% of the Pay
11 Option ARMs it issued during 2005 (amounting to $74 billion), would no longer
12 pass muster under the Company's "new," more conservative lending practices
13 adopted in 2007. However, these more conservative practices were hardly "new."
14 They were nothing more than the traditional underwriting policies the Company
15 abandoned during the Class Period in its aggressive push to pump up its earnings
16 and stock price by selling massive amounts of loans with little consideration
17 given to the borrowers' ability to pay.

18     95.    "Stated income" or "no doc" loans were based on a borrower's bare
19 representations about his or her ability to repay, with little or no documentation to
20 substantiate those representations. In these loans, the lender typically agreed not
21 to inquire behind the borrower's represented income or assets, or simply loaned
22 the money without making such an inquiry. Low-documentation mortgages were
23 originally designed for professionals and business owners with high credit scores,
24 who preferred not to disclose their confidential financial information every time
25 they applied for a mortgage. These loans generally required the highest level
26 credit scores and low loan-to-value ratios. Countrywide, however, routinely
27 extended these loans to borrowers with weak credit, and knew that such "low
28 doc" or "no doc" loans, particularly when coupled with nontraditional products

1  like ARMs, were highly likely to contain misinformation from the borrower, such
2  as overstated incomes, that would result in increased defaults. Because borrowers
3  would be told that there would be no inquiry into the veracity of their
4  representations in loan applications, Company employees referred to these
5  products as *"liar loans."*

6      96.    "Interest-only" mortgages allowed the borrower to pay only the
7  interest accruing on the loan each month for a predetermined time period. The
8  loan's principal balance remained constant. At the end of the initial time period,
9  borrowers were required to pay interest plus principal, with the interest adjusting
10 depending on whether the loan was an ARM or had a fixed rate.

11     97.    Home Equity Lines of Credit ("HELOCs") were second mortgage
12 loans secured only by the difference between the value of the home and the
13 amount due on a first mortgage. HELOCs sat in the "first loss" position, meaning
14 that if there is a default and foreclosure, the HELOC lender receives proceeds
15 from the sale of the underlying property only after the first lien holder is paid in
16 full. As noted by *The Wall Street Journal* in December 2007, HELOCs are
17 "high-risk" loans that are "potentially worthless in a default because the first-lien
18 holder gets first dibs on the home." Thus, even a relatively modest decline in
19 home prices can have a devastating effect on the collateral securing HELOCs,
20 resulting in the entire amount of the HELOC becoming unsecured.

21     98.    Countrywide management knew that if home prices declined, the
22 value of the collateral purportedly supporting the Company's HELOCs would
23 disappear before the first-lien holder's collateral—leaving Countrywide with
24 nothing to support its loans. The risk of issuing HELOCs was even greater when
25 the first mortgage loan was granted with 100% financing. In such situations, even
26 if there was no decline in real estate values, there was still no collateral backing
27 the HELOC. The entire collateral, *i.e.* the mortgaged property, was tied up for the
28 benefit of the first lien holder. Because Countrywide's position in HELOCs was

1    subservient to the first lien holder, Countrywide management knew that in selling
2    these loans it was required to focus carefully on the creditworthiness of the
3    borrower and have in place enhanced and careful underwriting policies to ensure
4    that only the most creditworthy were offered this loan product.

5        99.    An internal 2005 marketing document from Countrywide's Full
6    Spectrum Lending division ("FSL"), obtained by Lead Plaintiffs in the course of
7    their investigation and titled "Your FULL SERVICE LENDING Partners," lists
8    the Company's "General Subprime Lending Programs":

9        • 100% Financing
10       • 80/20 Programs
11       • Stated Income Programs
12       • 2/28 and 3/27 [ARMs]

13       100.    "100% Financing" refers to loans that borrowers could obtain
14   without making a down payment, *i.e.* loans equal to the full purchase price of the
15   home. "80/20 Programs" were also no-money-down loans, and sidestepped the
16   need for borrowers to purchase private mortgage insurance (which was usually
17   required when the loan was for more than 80% of the home price). The home
18   buyer took out *two* loans, one for 80% of the purchase price, and a second,
19   "piggyback" loan for the remaining 20% of the purchase price.[5] Indeed, the same
20   document boasts that "FSL does NOT require Private Mortgage Insurance (PMI)
21   on any loan – ever!" These loan programs, particularly when combined with the
22   nontraditional types of loans Countrywide was offering, and, most significantly,
23   the undisclosed material deterioration of loan origination and underwriting

24
25

---

26   [5]  A borrower who takes out a "piggyback" loan essentially borrows the
     down payment in addition to the mortgage. Piggyback loans only have a second
27   lien on the house, and therefore lenders are less likely to obtain any recovery
     upon a foreclosure than on a first lien loan. Moreover, such borrowers are more
28   likely to default because they have not put down any of their own money.

1   standards detailed below, carried a high degree of risk to the Company and the

2   Class.

3       **3.    Countrywide's Significant Increases in**
        **Nontraditional Loan Originations Vastly Increase**
4       **the Company's Credit Risk and Liquidity Exposure**

5       101.  Beginning in 2003, Countrywide substantially increased its

6   origination of nontraditional and subprime loans. The chart below illustrates how

7   Countrywide's origination of HELOCs, subprime mortgages (using the

8   Company's internal definition of that term) and ARMs increased in absolute

9   numbers and also as a percentage of the Company's total mortgage origination

10  before and during the Class Period:

**Mortgage Loan Production**
**Years Ended December 31**
**($ in millions)**

|                                               | 2002      | 2003      | 2004      | 2005      | 2006      | 2007      |
|-----------------------------------------------|-----------|-----------|-----------|-----------|-----------|-----------|
| **Total mortgage loans originated**           | $251,901  | $434,864  | $363,364  | $499,301  | $468,172  | $415,634  |
| **Nonprime mortgage loans**                   | $9,421    | $19,827   | $39,441   | $44,637   | $40,596   | $16,993   |
| **Nonprime mortgage loans as % of total loans** | 3.74%   | 4.56%     | 10.85%    | 8.94%     | 8.67%     | 4.09%     |
| **ARM loans**                                 | N/A       | N/A       | $189,931  | $261,577  | $212,085  | N/A       |
| **ARMs as % of total loans**                  | 14%       | 21%       | 52.27%    | 52.39%    | 45.30%    | 27%       |
| **Pay Option ARMs as % of total loans**       | N/A       | N/A       | 6%        | 19%       | 14%       | N/A       |
| **HELOCs**                                    | $11,650   | $18,103   | $30,893   | $44,850   | $47,876   | $34,399   |
| **HELOCs as % of total loans**                | 4.62%     | 4.16%     | 8.50%     | 8.98%     | 10.23%    | 8.28%     |

25      102.  These figures substantially understated the risk to the Company and

26  the Class resulting from, among other things, Countrywide's loosened and

27  deteriorating loan origination and underwriting standards and the explosion of

28  "exceptions" permitted to even those standards. Further, Countrywide concealed

1  the fact that it was classifying many loans as "prime" that failed to meet the
2  requisite industry definitions for that term.

3       103.   Countrywide began offering Pay Option ARMs in 2003 and quickly
4  became a leader in what *The Wall Street Journal* called a "profitable and growing
5  part of the mortgage market."   According to an October 27, 2007 article
6  describing another example of undisclosed enhanced risk, the Company secretly
7  encouraged employees to sell Pay Option ARMs and sold them to borrowers who
8  did not fully understand their terms:

9       In one California branch office, employees could win prizes, such as a
10      trip to Hawaii, for selling the most option ARMs, says Cindy Lau,
11      who worked for the company for more than six years.  Only a small
12      portion of borrowers "understood the loan and knew what they were
13      getting themselves into," Ms. Lau adds.

14      104.   Pay Option ARMs, according to a November 2007 article in *The*
15  *New York Times*, "were especially lucrative.  Internal company documents from
16  March [2007] show that Countrywide made gross profit margins of more than 4
17  percent on such loans, compared with 2 percent margins earned on loans backed
18  by the Federal Housing Administration."   However, by providing a material
19  number of such loans to those with inappropriate credit histories and/or financial
20  histories, the Company, undisclosed to the Class, exposed its securities to a
21  significant risk of loss.

22      105.   By 2005, Countrywide had originated approximately $93 billion of
23  Pay Option ARMs. According to an analysis conducted by UBS AG for *The Wall*
24  *Street Journal*, published on October 24, 2007, the Company rapidly increased its
25  production of Pay Option ARMs by "giving these loans to riskier and riskier
26  borrowers."   Indeed, an internal Countrywide sales document indicated that Pay
27  Option ARMs would benefit "[a]nyone who wants the lowest possible payment!"

28

106. Moreover, despite the risky nature of Pay Option ARMs, Countrywide increased its production of these loans by offering them to persons who could not or would not document their income or assets. By issuing these loans without analyzing the creditworthiness of borrowers, Countrywide increased its risk and that of Class members. Pay Option ARMs are high-risk loans on their own. Lending without checking on the creditworthiness of a borrower is a high-risk activity. The combination of granting a high-risk loan to a borrower whose creditworthiness is unknown is deadly to a lender. The investing public was kept in the dark about this risk. According to *The Wall Street Journal*'s October 2007 analysis of Countrywide's lending practices, 78% of the Pay Option ARMs originated by Countrywide in 2004 "were 'low-doc' mortgages in which the borrower didn't fully document income or assets." By the end of 2006, according to the Company's Form 10-Q report filed on November 9, 2007, *81%* of the Pay Option ARMs that the Company was holding for investment were loans with low or no income documentation.

107. Countrywide also increased its origination of Pay Option ARMs by allowing borrowers to obtain them without making substantial down payments. According to the UBS survey reported in *The Wall Street Journal*:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

108. At the same time Countrywide was increasing its origination of risky loans, it was also increasing the amount of Pay Option ARMs held by the Company for investment. As of December 31, 2006, Pay Option ARMs

1    represented 46% of the Company's mortgage loans held for investment.   The
2    amount of Pay Option ARMs held for investment grew rapidly from
3    approximately $4.7 billion in 2004, to more than $26 billion in 2005, to more than
4    $32.7 billion in 2006.

5        109.   In addition to originating more risky loans, Countrywide exposed
6    itself and the Class to even greater risk in connection with these "nontraditional"
7    loans by keeping a retained interest in its securitized loans.   Countrywide
8    typically maintained retained interests in the mortgage pools it securitized for
9    non-prime mortgages and HELOCs.   Retained interest holders receive interest
10   payments from the securitized loan pools after all required regular interest has
11   been paid to other investors in the higher priority securities tranches.   This was
12   done as a form of credit enhancement, because Countrywide's retained interests
13   would take the first losses if any mortgage pool underperformed, giving the
14   securitization investors limited default protection.

15       110.   Countrywide's explosive origination of nontraditional loans during
16   the Class Period was highly lucrative for the Company in the short term but, as
17   Defendants knew or should have known, vastly increased the long-term risk to the
18   Company's business.   To whatever extent investors deemed those risks tolerable,
19   they were kept in the dark about facts and practices that vastly increased even
20   those risks.   That is, at the same time Countrywide loosened and abandoned its
21   loan origination and underwriting standards, sacrificing loan *quality* for loan
22   *quantity* (and its associated higher earnings and higher stock price), it falsely
23   assured investors and analysts that the Company's underwriting policies and
24   procedures, particularly in subprime loans, were sound and indeed superior to
25   those of competing lenders.

26
27
28