1
2

### 4. Countrywide's Securitized Loans Reveal Consistent, High-Volume Lending to Borrowers With Blemished Credit

3      111. Countrywide, as alleged above, relied heavily on the secondary
4  mortgage market during the Class Period to operate its mortgage lending
5  business. Countrywide generally sold about 95% of its mortgage loans on the
6  secondary market in the form of mortgage-backed securities.

7      112. Countrywide securitized and sold its loans to the secondary market
8  during the Class Period through its affiliates CWALT, Inc. (Pay Option ARMs),
9  CWMBS, Inc. (fixed-rate and ARM loans), CWABS, Inc. (subprime loans), and
10 CWHEQ, Inc. (HELOCs). These entities acquired loans originated by
11 Countrywide pursuant to pooling and servicing agreements, and then issued
12 securities backed by those loans, with Countrywide acting as the "sponsor" of the
13 offerings. During the Class Period, CWALT, CWMBS, CWABS, and CWHEQ
14 and their affiliates disseminated more than 1,000 prospectus supplements for
15 offerings of mortgage-backed securities.

16     113. Each of these prospectus supplements made various disclosures with
17 respect to the overall credit quality of the pools of mortgage loans underlying the
18 securities issued in that particular offering, including the ranges of "FICO" scores
19 of the borrowers for the loans. The Fair Isaac Credit Organization, or "FICO,"
20 score is a standard and indeed the most widely accepted measure of the
21 creditworthiness of a borrower, and was used by Countrywide throughout the
22 Class Period. FICO scores range from 300-850, with the U.S. median
23 approximately 720.

24     114. Lead Plaintiffs, with the assistance of a qualified professional
25 services firm, have reviewed the 1,000-plus prospectus supplements issued by
26 CWALT, CWMBS, CWABS, and CWHEQ and calculated the aggregate
27 distribution of FICO scores for all Countrywide mortgage loan securitizations
28

1   during the Class Period. The methodology for this analysis and calculation is
2   explained in Exhibit E hereto.

3       115. As alleged in greater detail in Section IV.D below, the FICO score is
4   a key determinant of whether a given borrower will be classified as "prime" or
5   "subprime," and there is a strong presumption in the mortgage lending industry
6   that a FICO score of 660 divides prime and subprime borrowers. Lead Plaintiffs'
7   analysis reveals that Countrywide consistently made loans to borrowers with
8   FICO scores below 660, and even below 620, *i.e.*, subprime loans, in proportions
9   and amounts far greater than those suggested by the Company's top executives,
10  and contrary to Countrywide's public assurances that it was a conservative and
11  cautious lender in subprime and in general.

12      116. On September 13, 2006, for example, Countrywide hosted an
13  investor conference during which Mozilo emphasized the Company's minor
14  position in subprime, stating that subprime loans are "only 9% of our production
15  today." During the same conference, Sambol claimed that "[o]ur profile in the
16  subprime market has been one where we have, for the most part, been on the
17  sidelines." One year earlier, during a September 13, 2005 conference call with
18  analysts, Mozilo, referring to securitized loans, stated that "all loans originated
19  and sold" were "primarily prime quality."

20      117. As shown below, Lead Plaintiffs' analysis of Countrywide's loan
21  securitizations reveals otherwise. As early as the first quarter of 2004, 58% of the
22  total dollar balance outstanding on Countrywide's securitized loans were on loans
23  made to borrowers with FICO scores below 660, and more than 37% were on
24  loans to borrowers with FICO scores below 620. During the same quarter, nearly
25  37% of all securitized loans were made to borrowers with FICO scores below
26  660, and more than 20% were made to borrowers with FICO scores below 620:

27
28

**% of Total Loans Securitized By Quarter**

| Quarter | Range of FICO Credit Scores | | |
|---|---|---|---|
| | Less than 620 | 620-660 | Less than 660 |
| 2004Q1 | 20.62% | 15.92% | 36.74% |
| 2004Q2 | 27.61% | 17.51% | 45.40% |
| 2004Q3 | 11.52% | 14.44% | 26.17% |
| 2004Q4 | 16.84% | 15.53% | 32.64% |
| 2005Q1 | 14.11% | 14.37% | 28.72% |
| 2005Q2 | 24.64% | 16.40% | 41.69% |
| 2005Q3 | 10.56% | 12.58% | 23.30% |
| 2005Q4 | 23.91% | 19.05% | 43.31% |
| 2006Q1 | 15.32% | 17.40% | 32.88% |
| 2006Q2 | 3.86% | 16.57% | 20.59% |
| 2006Q3 | 18.12% | 21.59% | 39.97% |
| 2006Q4 | 15.96% | 18.12% | 34.37% |
| 2007Q1 | 12.13% | 14.43% | 27.13% |
| 2007Q2 | 22.19% | 16.75% | 39.32% |
| 2007Q3 | 12.39% | 9.60% | 24.83% |
| 2007Q4 | 16.24% | 13.36% | 31.04% |
| 2008Q1 | 1.02% | 12.61% | 13.71% |

**% of Dollar Balance Outstanding ($) By Quarter**

| Quarter | Range of FICO Credit Scores | | |
|---|---|---|---|
| | Less than 620 | 620-660 | Less than 660 |
| 2004Q1 | 37.15% | 20.52% | 58.07% |
| 2004Q2 | 28.38% | 16.41% | 45.07% |
| 2004Q3 | 17.62% | 14.52% | 32.45% |
| 2004Q4 | 20.12% | 16.71% | 37.16% |
| 2005Q1 | 15.30% | 14.34% | 29.89% |
| 2005Q2 | 22.66% | 16.60% | 39.77% |
| 2005Q3 | 14.58% | 14.18% | 28.95% |
| 2005Q4 | 22.51% | 19.64% | 42.41% |
| 2006Q1 | 15.83% | 17.41% | 33.39% |
| 2006Q2 | 3.33% | 14.23% | 17.75% |
| 2006Q3 | 19.63% | 19.65% | 39.55% |
| 2006Q4 | 19.70% | 16.61% | 36.86% |
| 2007Q1 | 15.72% | 14.07% | 31.22% |
| 2007Q2 | 22.40% | 14.09% | 37.37% |
| 2007Q3 | 8.51% | 8.62% | 20.87% |
| 2007Q4 | 10.43% | 10.76% | 23.19% |
| 2008Q1 | 0.70% | 12.07% | 12.81% |

1    118.  By the third quarter of 2005, close in time to Mozilo's representation
2  that all securitized loans were "primarily prime quality," nearly 29% of total
3  balances outstanding were on loans made to borrowers with FICOs below 660,
4  and 14% were on loans to borrowers with FICOs below 620.  The proportions of
5  total loans to borrowers with these low FICO scores are approximately 23% and
6  10%, respectively.

7    119.  And by the third quarter of 2006, near the time of the September 13,
8  2006 investor conference, loans to borrowers with FICOs below 660 comprised
9  more than 39%, and loans to borrowers with FICOs below 620 comprised more
10  than 19%, of Countrywide's total loan balances outstanding.  Nearly 40% of all
11  securitized loans at this point had been made to borrowers with FICOs below 660,
12  and 18% were below 620.

13    120.  The aggregated data above and in the tables below for each year
14  from 2004 through 2007 and the first quarter of 2008, and for the Class Period,
15  reveal that Countrywide's loan originations, contrary to Mozilo's and Sambol's
16  statements, were heavily weighted toward low-FICO, subprime borrowers as
17  early as the first quarter of 2004 and until Countrywide was forced to drastically
18  tighten its lending standards and largely cease subprime lending in early 2008.

19

20

21

22

23

24

25

26

27

28

**Totals by Year**

|  |  | Range of FICO Credit Scores | | |
|---|---|---|---|---|
|  |  | Less than 620 | 620-660 | Less than 660 |
| 2004 | % of Loans Securitized (of 1,416,160 Total) | 16.57% | 15.38% | 32.18% |
|  | % of Dollar Balance Outstanding (of $166,347,006,186 Total) | 22.87% | 16.40% | 39.59% |
| 2005 | % of Loans Securitized (of 1,338,523 Total) | 17.55% | 15.52% | 33.38% |
|  | % of Dollar Balance Outstanding (of $221,156,962,042 Total) | 18.90% | 16.53% | 35.72% |

|  |  | Range of FICO Credit Scores | | |
|---|---|---|---|---|
|  |  | Less than 620 | 620-660 | Less than 660 |
| 2006 | % of Loans Securitized (of 888,277 Total) | 14.26% | 18.57% | 33.06% |
|  | % of Dollar Balance Outstanding (of $140,510,239,905 Total) | 15.38% | 17.10% | 32.77% |
| 2007 | % of Loans Securitized (of 629,166 Total) | 15.68% | 14.30% | 30.93% |
|  | % of Dollar Balance Outstanding (of $123,082,577,560 Total) | 15.09% | 12.31% | 29.27% |
| 1Q08 | % of Loans Securitized (of 16,523 Total) | 1.02% | 12.61% | 13.71% |
|  | % of Dollar Balance Outstanding (of $7,324,809,979 Total) | 0.70% | 12.07% | 12.81% |

### Total for the Class Period

|  | Range of FICO Credit Scores | | |
|---|---|---|---|
|  | Less than 620 | 620-660 | Less than 660 |
| % of Loans Securitized (of 4,289,717 Total) | 16.22% | 15.92% | 32.50% |
| % of Dollar Balance Outstanding (of $658,625,946,379 Total) | 18.25% | 15.79% | 34.62% |

C.    **Countrywide, Contrary to its Assurances of Strong and Superior Underwriting Standards, Loosens and Abandons Them in Order to Boost Loan Volume and Earnings**

      1.    **Countrywide, and Mozilo in Particular, Regularly Hyped the Company's Underwriting Standards**

121.    Countrywide consistently assured investors during the Class Period that the Company managed mortgage credit risk through rigorous standards for origination, underwriting, and ongoing surveillance of outstanding loans. Countrywide also represented in SEC filings that the Company had a credit policy that established standards for the determination of acceptable credit risks. Countrywide portrayed its underwriting process as tightly controlled and

1  supervised, and *"designed to produce high quality loans"* through careful pre-
2  loan screening and post-loan auditing, appraisal and underwriting reviews.

3      122.  In particular, Countrywide's Form 10-K annual reports touted the
4  Company's "proprietary underwriting systems in our loan origination process that
5  improve the consistency of underwriting standards, assess collateral adequacy and
6  help to prevent fraud, while at the same time increasing productivity."  In these
7  public filings, the Company also described an "extensive post-funding quality
8  control process" involving "comprehensive loan audits that consist of a re-
9  verification of loan documentation, an in-depth underwriting and appraisal
10  review, and if necessary, a fraud investigation."  This post-funding quality control
11  process further involved a "pre- and post-funding proprietary loan performance
12  evaluation system" that "identifies fraud and poor performance of individuals and
13  business entities associated with the origination of our loans."   According to
14  Countrywide, "[t]he combination of this system and our audit results allows us to
15  evaluate and measure adherence to prescribed underwriting guidelines with laws
16  and regulations."

17      123.  While Countrywide was rapidly developing its portfolio of HELOCs,
18  Pay Option ARMs and other high-risk loans, Mozilo repeatedly emphasized
19  Countrywide's purportedly superior underwriting skills to the market.   When
20  asked, for example, about the inherent risks of originating alternative mortgage
21  products (like subprime loans) during an April 21, 2004 conference call, Mozilo
22  responded:

23      Sub-prime cannot be looked at generically.  There is very, very good
24      solid subprime business and there is this frothy business that you
25      [refer] to. . . . [Y]ou can get so deep into this marginal credit that you
26      can have serious problems where you are taking 400 FICOs with no
27      documentation; that is dangerous stuff.  *So [I] think it is very*
28      *important that you understand the disciplines that the Company*

1 | *had, particularly that Countrywide has, which are very strong*
2 | *disciplines in the origination of sub-prime loans. And maintaining*
3 | *that discipline is critically important to us. . . . [W]hen you look at*
4 | *sub-prime, you have to look at it in various tranches, and we are at*
5 | *the high end of that tranche.*

6 | 124. During the same conference call, an analyst asked whether
7 | management was "comfortable" that subprime lending was a "long-term,
8 | profitable business" given a number of large lenders' recent exits from the
9 | industry. Mozilo responded:

10 | [W]e have successfully managed this product for years. *And so I*
11 | *think using what our competitors do as a barometer will put you*
12 | *down the wrong path. We are a very different focused company that*
13 | *understands this product very well, how to originate it, how to*
14 | *manage it, how to underwrite, how to service it.* And so we look at
15 | . . . this sub-prime business as . . . one that has to be carefully
16 | manage[d], but one that has a tremendous opportunity for us long into
17 | the future, certainly through the balance of this decade and beyond.

18 | 125. Similarly, Mozilo compared Countrywide with the rest of the
19 | industry during a March 15, 2005 conference call, stating:

20 | . . . I'm deeply concerned about credit quality in the overall industry.
21 | I think that the amount of capacity that's been developed for subprime
22 | is much greater than the quality of subprime loans available. *And so*
23 | *they're pushing further down – as I observe it, they're pushing*
24 | *further down the credit chain into the 500 FICOs and below 550,*
25 | *540, 530.* And as you get down to those levels, *it becomes very*
26 | *problematic and I don't think there's any amount of money you can*
27 | *charge upfront to cover your losses on those type of loans.*

28 |

1    So I'm deeply concerned about everybody going into subprime.  As I

2    have said very often, there's an old Yiddish expression that says when

3    everybody goes to the same side of the boat, the boat tends to tip over.

4    And we are—a lot of people are going to the same side of the boat.

5    *So we've had to remain very disciplined in our subprime efforts. . . .*

6

7    So I have to separate it.   The overall industry I am troubled;

8    Countrywide I'm not, because we have remained very disciplined in

9    our origination of subprime loans.

10       126.   During the same call, Mozilo was asked how confident he was that

11   his goal of attaining a 30% market share was achievable.  Mozilo reaffirmed that

12   "our objective is to dominate our industry" but assured the market: *"I will say*

13   *this to you, that under no circumstances will Countrywide ever sacrifice sound*

14   *lending and margins for the sake of getting to that 30 percent market share."*

15       127.   Moreover, during a conference call on July 26, 2005, Mozilo and

16   Kurland were asked to comment on a *Wall Street Journal* article apparently

17   reporting that Countrywide and other lenders were loosening underwriting

18   standards.   Mozilo stated: *"I'm not aware of any loosening of underwriting*

19   *standards that creates a less of a quality loan than we did in the past."*

20       128.   To further convince investors that Countrywide's concerted shift

21   toward riskier mortgage products would remain a relatively safe proposition, the

22   Company stated publicly that it minimized credit risk by selling most of the loans

23   it originated *"and by retaining high credit quality mortgages in our loan*

24   *portfolio."*

25       129.   Each of these statements was diametrically opposed to what was

26   actually happening within the Company at the time.  For example, as Mozilo and

27   the Officer Defendants were well aware, Countrywide had in fact abandoned any

28   "discipline" in the Company's "subprime efforts" and was "pushing further down

1  the credit chain." Thus, contrary to Mozilo's ringing assurance, Countrywide was
2  indeed "sacrific[ing] sound lending and margins for the sake of getting to that 30
3  percent market share." Further, Mozilo and the Officer Defendants, contrary to
4  Mozilo's statements, were indeed "fully aware" of the Company's "loosening of
5  underwriting standards" that created dramatically lesser quality loans than in the
6  past.

7      **2. In an Effort to Meet Mozilo's 30% Market Share**
      **Goal, Countrywide Loosens its Underwriting**
8        **Standards to Sweep in Unqualified Borrowers**

9    130. While Countrywide repeatedly hyped its strong underwriting
10  standards during the Class Period, the Company, driven by Mozilo's goal of
11  capturing 30% of the mortgage market, was progressively loosening them. This
12  undisclosed effort, which was part of the "culture change" described by CW1,
13  was a critical element of the Company's concerted foray away from traditional
14  lending to much riskier but more lucrative products, with the goal—also
15  undisclosed to the public but no secret within the Company—to generate huge
16  volumes of loans (and accompanying revenue) and sell them off to the secondary
17  markets as quickly as possible, regardless of the credit quality of the loans or the
18  magnitude of "exceptions" from the underwriting standards that would need to be
19  granted in order to fund the loans.

20    131. An internal e-mail obtained by Lead Plaintiffs in the course of their
21  investigation discusses new guidelines then adopted by Countrywide's
22  Correspondent Lending Division ("CLD") for the origination of subprime loans.
23  The core business of CLD was to purchase subprime loans from independent,
24  outside mortgage brokers who originated the loans. The e-mail, dated December
25  4, 2003, was sent by David Farrell ("Farrell"), CLD's Senior Vice President, to
26  "SubprimeSales@Countrywide" and "SubPrimeDept@Countrywide" regarding
27  the "Exception philosophy under the New Guidelines."

28

1    132. "Exceptions" or "exception loans" are loans whose criteria fall

2   outside the Company's underwriting standards but are approved nonetheless. The

3   December 4, 2003 e-mail purports to reiterate the Company's philosophy with

4   respect to allowing such "exceptions," and explains that the "recently released

5   new guidelines were designed to incorporate a wider range of credit scores for

6   each grade so that the need for such exceptions would be eliminated." The new

7   guidelines also include, or were meant to accommodate, "increased loan amount

8   limits." Farrell explains in the e-mail that "the bottom line is that we expanded

9   our guidelines in order to allow more loans to be approved without requiring an

10   exception approval." The rationale in adopting these new loosened guidelines, in

11   other words, which was never disclosed to the market, was to capture a

12   population of borrowers with weak credit who previously would not have

13   qualified for a loan.

14    133. Confidential Witness 2 ("CW2") worked in CLD as a supervising

15   underwriter during the Class Period until mid-2005. CW2 oversaw between six

16   and ten underwriters who underwrote subprime loans. CW2 also supervised

17   CLD's underwriting operations in several states. Because CLD underwriters

18   could consult with any of the CLD underwriting supervisors, including CW2, and

19   brokers doing business with CLD similarly could approach CLD underwriting

20   managers irrespective of where the broker was located, CW2 became familiar

21   with CLD's underwriting practices with respect to all other regions of the country

22   in addition to CW2's region.

23                    (a)    **The Underwriting Matrices Reveal a Steady**
                            **Loosening of Loan Origination Standards**
24

25    134. Unbeknownst to the Class, underwriting guidelines at CLD were

26   progressively loosened throughout CW2's tenure. A review of the CLD

27   Underwriting Matrices for 2003 through 2006, which Lead Plaintiffs obtained in

28   the course of their investigation and which, according to CW2, were the key

---

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    47
LEAD CASE NO. CV 07-05295 MRP (MANx)

1 documents CLD underwriters and managers relied upon in performing their
2 duties, reveals that underwriting standards were steadily loosened during the
3 Class Period.

4     135. For example, the level of documentation the Company required to
5 obtain a subprime mortgage was reduced considerably between February and
6 December 2003. The February 27, 2003 subprime underwriting matrix included
7 three loan documentation programs: full, simple and stated. The
8 December 22, 2003 subprime underwriting matrix includes only two such
9 programs: full and stated. The requirements for "Stated Doc" mortgages were
10 also relaxed. As of February 27, 2003, the Stated Doc program specified that
11 "verification [of income] may be requested on a case-by-case basis." As of
12 December 22, 2003, Stated Doc "income must be reasonable for the borrower's
13 professional [sic] and level of experience." The statement that income
14 verification could be requested was removed. In addition, the February 27, 2003
15 underwriting matrix specified that under Stated Doc, the "AA and A- risk grades
16 with LTVs greater than 75% require verification of a minimum 2 year continuous
17 employment (salaries must be in the same industry)." The December 22, 2003
18 underwriting guidelines do not require verification of employment.

19     136. As of February 27, 2003, the Underwriting Matrix for first lien
20 subprime loans showed a minimum FICO score of 580 for a borrower with an AA
21 risk grade where the loan-to-value ratio was no greater than 85%. Such a
22 borrower could get a loan for as much as $500,000. As of December 22, 2003,
23 the minimum FICO score for a $500,000 loan had been lowered to 540, and
24 borrowers with 500 FICO scores could borrow $400,000. This was true for both
25 full doc and stated doc loans.

26     137. Further, as of December 6, 2003, the mortgage credit history
27 required for a borrower with a AA risk grade under the subprime loan program
28 was "1 x 30 late payment in the last 12 months; no rolling 30s allowed." In other

1   words, the prospective borrower could be 30 days late on one mortgage payment
2   during the last twelve months, but could not have "rolling" delinquencies. As of
3   December 22, 2003, this condition was changed to "Rolling–6x30=1," meaning
4   that the borrower could have up to six months of rolling 30-day delinquencies and
5   still qualify for the loan.

6       138. According to the CLD Underwriting Matrix for subprime first
7   mortgages dated December 22, 2003, a "Stated Doc, Self-Employed" borrower
8   (meaning a borrower who is self-employed and does not provide any
9   documentation supporting income or assets) with a FICO score of 620 could
10  obtain a mortgage with a 70 percent combined loan-to-value ("CLTV") ratio[6] in
11  an amount up to $400,000, even if the borrower had had a Chapter 7 or 13
12  bankruptcy, provided that the bankruptcy had been discharged at least two years
13  before the loan application. The description of documentation programs confirms
14  that for "Stated" loan applicants, both salaried and self-employed, *"[i]ncome on*
15  *1003 application is not generally verified,"* with the subjective caveat that the
16  stated income is "reasonable for the borrower's professional [sic] and level of
17  experience."

18      139. One year later, according to the CLD Underwriting Matrix for
19  subprime first mortgages dated December 20, 2004, standards were lowered. The
20  same "Stated Doc, Self-Employed" borrower could get a loan of up to $500,000.
21  Such a borrower with a FICO score as low as 500 could borrow $400,000.

22      140. The next year, standards were substantially lowered again.
23  According to the CLD Underwriting Matrix for subprime first mortgages dated
24  December 19, 2005, the same "Stated Doc, Self-Employed" borrower could get a

---

25  [6]  This means that the loan could be as much as 70% of the value of the
26  property. The higher the maximum CLTV of the mortgage, the lower the
     borrower's down-payment and the less borrower equity in the home. A 70%
27  maximum CLTV implies a down-payment of 30% of the price of the property.
     Generally, the higher the CLTV, the riskier the loan to Countrywide.
28

1    loan of up to $650,000, even if he or she had had a Chapter 7 or 13 bankruptcy
2    that had been discharged only *one day* (rather than two years) before the loan
3    application.   Such a borrower with a FICO score as low as 520 could borrow
4    $500,000.

5        141.   Only three months later, according to the CLD Underwriting Matrix
6    for subprime first mortgages dated March 21, 2006, the same "Stated Doc, Self-
7    Employed" borrower could get a loan of up to *$1,000,000*, even if he or she had
8    discharged a bankruptcy only one day before the loan application.   Such a
9    borrower with a FICO score as low as 500, the lowest FICO score on the matrix,
10    could borrow as much as $700,000.

11        142.   The Underwriting Matrices reflect that standards for "Full Doc"
12    subprime borrowers (where the borrower provides proof of income and 12-
13    months of bank statements) and "Stated W-2" subprime borrowers (where the
14    borrower provides a W-2 form showing wages but no other proof of assets) were
15    relaxed in the same or comparable fashion.

16        143.   Countrywide's Underwriting Matrices also designated internal risk
17    grades between AA+ and C- for both "Full Doc" and "Stated Doc" subprime
18    borrowers.   Prior to 2005, in order for a subprime first mortgage borrower to be
19    classified as a B risk grade, 18 months had to have elapsed since the discharge or
20    dismissal of a personal bankruptcy.  As of 2005, this requirement was relaxed so
21    that the same borrower could qualify for a B risk grade only one day after
22    bankruptcy discharge and 12 months after dismissal of the bankruptcy
23    proceeding.   By shortening the waiting period in this fashion, Countrywide
24    enabled itself to make loans to borrowers who had not yet demonstrated
25    creditworthiness.

26        144.   Countrywide was also willing to grant increasingly larger loans to
27    low-quality borrowers.   Under the CLD Underwriting Matrices, as of November
28    19, 2003 and January 26, 2004, the maximum loan amount for Stated Doc

1   subprime borrowers internally rated AA+, with a minimum FICO of 680 and 95%
2   CLTV, was $400,000.   The maximum loan was increased to $500,000 as of
3   December 20, 2004 and $700,000 as of March 21, 2006. For borrowers with a C-
4   (lowest) risk grade, for example, a minimum FICO of 500 (the lowest), and a
5   CLTV of 70%, the Company would lend a maximum of $300,000 until March 21,
6   2006, when this maximum amount was increased to $500,000. For an AA rated
7   subprime borrower with a minimum FICO of 500 and a CLTV of 65%, the
8   maximum loan amount that could be borrowed was $400,000 until it was raised
9   to $700,000 as of March 21, 2006. A B- risk grade borrower with a minimum
10  FICO of 500 and an LTV of 80% could only borrow $400,000 between 2003 and
11  2005, but could borrow up to $550,000 as of March 21, 2006. These increases in
12  maximum loan amounts occurred at many risk grades during the Class Period,
13  exposing Countrywide to increasingly greater risk in its loan portfolio.

14      145. Subprime underwriting standards also weakened with respect to
15  increased CLTV limitations between 2004 and 2006. For example, in the A- risk
16  grade, the maximum CLTV for borrowers with a minimum 540 FICO was 85%
17  as of January 26, 2004, with a maximum loan amount of $500,000.   As of
18  December 20, 2004, the CLTV for these borrowers was increased to 95%, and as
19  of March 21, 2006, the maximum loan amount was increased to $600,000.
20  Borrowers rated AA+ with a minimum FICO of 540 had a maximum CLTV of
21  85% until December 20, 2004, when it was increased to 90%.

22      146. Borrowers rated AA+ with a minimum FICO of 640 were
23  consistently able to borrow up to 100% CLTV. Prior to 2005, however, these
24  loans were limited in amount to $500,000 and carried conditions that further
25  limited first-time home buyers to a maximum "payment shock"—the difference
26  in monthly housing costs in the new home versus the previous home—of 100%.
27  As of December 19, 2005, these conditions were eliminated and the maximum

28

1  loan size was increased to $575,000. As of March 21, 2006, the maximum loan

2  size for such borrowers was increased further to $650,000.

3      147. Countrywide's special underwriting standards for jumbo subprime

4  mortgages (those exceeding $500,000) were also loosened over time. As of

5  December 2004, under the CLD Underwriting Matrices, a Full Doc subprime

6  borrower could not obtain a $1 million first mortgage unless the borrower was (1)

7  rated AA+ with a FICO score above 580 and had a maximum CLTV of 65%, or

8  (2) rated AA with a FICO score greater than 600 and had a maximum CLTV of

9  65%.

10      148. In 2006, these conditions were relaxed so that a Full Doc subprime

11  borrower could obtain a $1 million first mortgage with no cash-out restrictions if

12  the borrower was: (1) rated AA+ with a minimum FICO of 600 and had a

13  maximum CLTV of 75% (compared to 65%), or (2) rated AA with a minimum

14  FICO of 600 and had a maximum CLTV of 70% (compared to 65%). Thus,

15  Countrywide was willing to make riskier, higher CLTV jumbo loans to less

16  creditworthy subprime borrowers in 2006 as compared to 2004.

17      149. Further, in 2004 the Underwriting Matrices for jumbo mortgages to

18  subprime borrowers provided that CLTV, even for borrowers rated AA+, could

19  never exceed 95%. By March 2006, however, Countrywide was making jumbo

20  subprime first mortgage loans with 100% CLTV to AA+ rated borrowers with

21  FICO scores above 640.

22      150. The Company's underwriting guidelines for its B risk grade

23  deteriorated during the Class Period for subprime second mortgages. The B risk

24  grade was relaxed in 2005 to apply to borrowers with bankruptcy dismissals

25  within one year, as opposed to 18 months, and immediately following bankruptcy

26  discharges. Moreover, as of December 20, 2004, a maximum 75% CLTV was

27  permitted for B risk grade borrowers with minimum FICO scores of 560 for

28

1  subprime second mortgages on family residences.  As of December 19, 2005, this
2  maximum CLTV increased to 80%.

3      151.  According to CW2, the Company's loosening of its Underwriting
4  Matrices and guidelines was necessary in order for CLD to achieve its goal of
5  *doubling* the aggregate volume of loans it purchased each year.  For 2002, CLD
6  had a stated goal of purchasing at least $2 billion in loans.  To CW2's best
7  recollection, CLD exceeded that goal.  For 2003, CLD's goal was to purchase at
8  least $4 billion in loans.  To CW2's best recollection, CLD purchased more than
9  $5 billion in loans in 2003.  For 2004, CLD's goal was to purchase at least $8
10 billion in loans.  To CW2's best recollection, CLD purchased more than $9
11 billion in loans that year.  For 2005, CLD's goal was to purchase at least $16
12 billion in loans.

13     152.  Indeed, according to CW2, it would have been impossible for CLD
14 to grow its business in the way Countrywide headquarters wanted had
15 Countrywide continued to use the Underwriting Matrices and guidelines in place
16 in 2003. The loosening of the Underwriting Matrices and guidelines dramatically
17 increased CLD's ability to purchase more loans and meet its aggressive internal
18 goals.  However, it also dramatically increased the riskiness of the loans CLD was
19 purchasing.  According to CW2, the underwriting guidelines overall were "very
20 loose and lax" and designed to help CLD make loans.  CW2 reported that even
21 though the CLD underwriting goal doubled each year, the size of CLD
22 underwriting staff increased only minimally, making it difficult to adhere to any
23 standards or guidelines.  In fact, CW2 confirmed that the guidelines themselves
24 were not strictly adhered to.  As Farrell, who wrote the December 4, 2003 e-mail,
25 used to say according to CW2, "they are guidelines, not Gospel."

26     153.  Moreover, these CLD Underwriting Matrices, according to CW2
27 (and CW4 and CW5 as alleged below), were not written or developed by CLD
28 employees.  Rather, all CLD Underwriting Matrices were written by a central

1   office at the Countrywide corporate level.   This central office wrote the
2   Underwriting Matrices and guidelines not just for CLD, but for all Countrywide
3   divisions that originated and purchased loans.  CLD made loans to borrowers that
4   were originated by mortgage brokers and other intermediaries.  Based on CW2's
5   experience with the Company, CW2 believes that as the CLD Underwriting
6   Matrices and guidelines were loosened, those used in Countrywide's other loan
7   origination and loan purchasing divisions—including the Full Spectrum Lending
8   Division ("FSL"), the Wholesale Lending Division ("WLD"), and the Consumer
9   Markets Division ("CMD")—were loosened in the same fashion.

10 **(b)   Other Former Employees**
11 **Company-Wide Witnessed the**
   **Loosening of Underwriting Standards**

12      154.   Confidential Witness 3 ("CW3") was a corporate-level Senior Vice
13  President involved in financial reporting and analysis during most of the Class
14  Period until 2007.  CW3 was part of a group in Company headquarters that was
15  responsible for developing new loan products, tracking profitability and
16  performance, creating productivity models, and troubleshooting any problems.
17  According to CW3, the initiative to create new and innovative loan products
18  "came from high-up," and specifically David Sambol.   CW3's group was
19  expected to create "new, exotic products" that were similar to those that
20  Countrywide's competitors were offering.  CW3 characterized Countrywide as
21  "fast followers."   CW3's group engaged in a form of corporate espionage.
22  Specifically, the group would "receive intelligence" from an insider at Bank of
23  America, which included Bank of America's "exact guidelines" for an "exact new
24  product," which would then be introduced by Countrywide.  Each new product
25  was reviewed personally by Sambol and required his approval in order to be
26  marketed.  CW3 met regularly with Sambol regarding new product offerings.

27      155.   CW3 recalled a change in loan products as lending standards
28  gradually became more lax beginning as early as 2003.   CW3 described

1    Countrywide's newer products as "worthless," referring in particular to "no
2    income, no asset" loans that led to "easy money" for the Company but allowed
3    borrowers to simply state their income and assets without submitting any proof.
4    According to CW3, it was generally known at Countrywide that "there was a lot
5    of lying going on" by borrowers with respect to such loans. CW3 also noted that
6    FICO scores became less important, with potential borrowers able to obtain a
7    mortgage with very low FICO scores (in the 500s), and that many of the loans
8    being issued by Countrywide had a 100% loan-to-value ratio, which were very
9    risky.

10        156. Confidential Witness 4 ("CW4") was a Product Analyst in
11    Countrywide's corporate-level Risk Management division during the Class Period
12    until the fall of 2007. As a Product Analyst in Company headquarters, CW4
13    assisted with distributing the Company's loan program guidelines, and was
14    specifically responsible for Company-wide distribution of management's
15    adjustments to FICO credit scores for all Countrywide products. CW4 also
16    proofread the underwriting guidelines and matrices. CW4 attended weekly
17    Fannie Mae and Freddie Mac meetings with Countrywide Senior Vice Presidents
18    and Executive Vice Presidents in attendance, where Countrywide representatives
19    would "request or negotiate guideline changes to keep up with another company."
20    Management negotiated for variances requested by branches in the field, which
21    sought to amend the underwriting guidelines to get "other loans through."

22        157. According to CW4, Countrywide had "little spies" informing the
23    Company of competitors' practices, which Countrywide rapidly copied; if other
24    lenders were "being lenient and making money, we had to do it too." Employees
25    often referred to Countrywide as "swift followers," such that if other lenders
26    lowered their FICO score requirements for particular types of loans, Countrywide
27    would always follow suit.

28

1    158.  CW4 further characterized the weakening underwriting standards at
2  Countrywide as "a feeding frenzy." According to CW4, during the Class Period
3  Countrywide kept relaxing the guidelines and dropping the minimum FICO
4  scores borrowers needed to qualify for loans. Requests were uniformly made to
5  loosen guidelines and never to tighten them.

6    159.  Confidential Witness 5 ("CW5") was a Technical Writer in the
7  Company's Calabasas headquarters from before the Class Period until late 2004
8  and during 2005 and 2006. CW5 typed weekly revisions to Countrywide's
9  corporate credit policies and guidelines, and revised the "online documentation"
10  according to new guidelines CW5 was given. Edits included updating loan-to-
11  value ratios and FICO credit scores for all loans.   CW5 explained that
12  Countrywide's underwriting guidelines were accessible using Lotus Notes
13  computer software, and that anybody in corporate headquarters, including upper
14  management, could access the software. Employees who traveled could also
15  access the guidelines through a corresponding web application. No later than
16  2005, CW5 became aware through the editing of guideline revisions and
17  interaction with other employees that guidelines had been loosened to allow
18  riskier lending. By October 2005, risky lending was "definitely accelerated."

19    160.  Confidential Witness 6 ("CW6") was a subprime underwriter in a
20  California loan origination branch during the Class Period through the fall of
21  2007.   CW6 exclusively handled subprime loans and typically received
22  applications for "stated income, no-document" loans made by "self-employed"
23  individuals.   CW6 recalled becoming aware in 2005 that Countrywide was
24  loosening underwriting guidelines to allow additional and riskier borrowers to
25  satisfy loan criteria.  According to CW6, beginning at least in 2005, the
26  underwriting matrices were frequently updated to lower minimum FICO score
27  requirements. According to CW6, lending restrictions were never tightened until
28

1  2007 when New Century, a Countrywide competitor and a large subprime lender

2  itself, filed for bankruptcy.

3     161.  Confidential Witness 7 ("CW7") is a former independent mortgage

4  broker and Senior Loan Officer with Family First Mortgage Corp. in Florida.

5  CW7 regularly ran loans through the Tampa, Florida office of Countrywide's

6  Wholesale Lending Division ("WLD").  While at Family First Mortgage, CW7

7  had occasion to originate loans that were funded not only by Countrywide, but

8  also other lenders including Fremont, New Century, and Citibank.  According to

9  CW7, Countrywide's lending standards were the loosest in the entire industry.

10  CW7 recalled that although many mortgage lenders began to tighten credit and

11  appraisal standards in or about 2005, Countrywide's standards remained lax and

12  the Company "let things slide."

13        **3.    Countrywide Ignores and Abandons**
              **its Underwriting Standards to Pump**
14            **Up Loan Volume and Boost Earnings**

15            **(a)    Countrywide Had a Company-Wide**
                   **Practice of Originating and Funding**
16                **Loans Without Regard to Loan Quality**

17     162.  According to CW2, management turned CLD into a sweatshop

18  where underwriters were under constant pressure to approve increasing quantities

19  of loans without regard to quality.  Loans were routinely approved for borrowers

20  who, even based on Countrywide's loosened underwriting standards, did not

21  actually qualify for the loan.  According to CW2, the general rule at Countrywide

22  was that loan applications were not to be scrutinized and underwriters were not to

23  exercise professional judgment.  Rather, loans were to be approved automatically

24  unless there was a "blatant" problem on the face of the loan application.  In fact,

25  in contrast to loans that were approved, all loans that a CLD underwriter denied

26  were automatically given to an underwriting manager for further review.

27  According to CW2, no loan, regardless of whether it was within the underwriter's

28  threshold authority (often $350,000 for a junior underwriter and $450,000 or

1    $500,000 for a senior underwriter), could be denied without a second signature

2    from an underwriting manager.

3       163. The culture of CLD, according to CW2, was that you could make

4    any loan work, and "if you don't make loans, you don't have a job." CW2 would

5    make this statement, in words or substance, to subordinates and this principle was

6    reinforced by Countrywide management, including CW2's immediate supervisor

7    (the First Vice President and second-in-charge to Farrell), at meetings of CLD

8    managers that CW2 attended. The mantra was: "We gotta get more loans."

9    "Close more loans." "Find the good in the loans." "We need to make the loans

10    work."

11       164. According to CW2, CLD underwriters and underwriting managers

12    were required to create a "paper trail" in loan files to support their loan approvals.

13    They were fully aware that in many cases—for example, in connection with

14    SISA, or Stated Income/Stated Asset, loans—borrowers were making false

15    statements about their income and assets. Nevertheless, CLD underwriters had to

16    "paper the file" and "build a case" that a loan was appropriate. CW2 was told

17    that underwriters had to create this paper trail because Countrywide needed to be

18    able to sell its loans on the secondary market. To do so, the loan files had to

19    include sufficient documentation regarding borrower creditworthiness and loan

20    quality.

21       165. According to CW2, in order to create a paper trail, CW2 and

22    colleagues would look for documentation, such as printouts from a website called

23    salary.com, to support the borrower's claims about his or her stated income. The

24    salary.com website did not provide specific salary information for any particular

25    borrower. Rather, this website purported to provide a range of salaries for

26    particular job titles based upon the borrower's zip code. Countrywide

27    underwriters used salary.com to obtain this information because they knew the

28    borrower file had to have some type of documentation to support or substantiate

1    the borrower's income in order for the loan to be sold on the secondary market.
2    This was done in many cases in which CLD underwriters knew that the
3    borrower's income could not reasonably be what was represented on the loan
4    application.

5        166.    Indeed, according to CW2, if a borrower applying for a SISA loan
6    provided a bank name, address and account number, it was the practice in CLD
7    that bank balances would not be verified. CLD underwriters would simply accept
8    whatever bank balance the borrower put on the application. According to CW2,
9    all CLD underwriters knew that many of these bank balances were inflated. For
10    this reason, CW2 and other underwriters would call SISA loans "*liar loans.*"

11        167.    According to CW2, CLD underwriters had powerful incentives to
12    approve loans regardless of their quality. Underwriters were paid a monthly
13    bonus, and, because they received relatively low salaries, depended on these
14    bonuses to make ends meet. Bonuses were based on the volume of the
15    underwriter's loan production, and calculated using a points system. Points were
16    assigned to each loan depending on a variety of factors including the type of loan
17    that was underwritten. The more points the underwriter accumulated, the larger
18    the bonus. If an underwriter denied a loan, he or she received a lower number of
19    points toward his or her monthly bonus than if the underwriter approved the loan.
20    Indeed, according to a February 2008 article in *The Wall Street Journal*,
21    Countrywide was so focused on growing loan origination that in at least one
22    building, oversized replicas of monthly bonus checks were hung above
23    employees' cubicles so everyone could see which employees were most
24    successful in originating new mortgages.

25        168.    Confidential Witness 8 ("CW8") worked for Countrywide through
26    the Class Period until after the Summer of 2007. CW8 initially was involved in
27    overseeing loan origination as an employee with FSL. As an FSL manager, CW8
28    was required to be familiar with Countrywide corporate policies and procedures,

1  and to travel to FSL offices across the nation.  To carry out these responsibilities,
2  CW8 was required to have an in-depth knowledge not only of FSL's business and
3  operations, but also the other Countrywide divisions and units engaged in loan
4  origination.

5      169.  According to CW8, between mid-2004 and mid-2007 a substantial
6  percentage of all loans originated by Countrywide were low-doc or no-doc loans,
7  offered as both prime and subprime programs.  Underwriting practices for such
8  loans were exceptionally weak.

9      170.  According to CW8, the prime no-doc loan program was called "No
10  Income, No Assets," or "NINA."  Borrowers did not provide any meaningful
11  documentation to support NINA loan applications.  Meaningful underwriting,
12  therefore, was virtually impossible to perform.  "Fast & Easy" was a prime low-
13  doc loan program and an extremely important Company product during CW8's
14  tenure.  Like NINA borrowers, Fast & Easy borrowers did not have to provide
15  any significant documentation to support their loan applications, and meaningful
16  underwriting, *i.e.* a real assessment of the borrower's capacity to pay, was
17  virtually impossible to perform.

18      171.  CW8 related that the two basic subprime no-doc loan programs were
19  "Stated Self-Employed" and "Stated Wage Earner."  Subprime borrowers who
20  applied through the Stated Self-Employed program were not required to provide
21  any supporting income or asset documentation and were not subject to any
22  meaningful underwriting.  The Stated Wage Earner program was designed for
23  wage earners who received W-2 income but who also earned additional income
24  "off the books."  Borrowers were required to provide W-2s to verify their on-the-
25  books income, but were not required to provide any documents to verify their
26  additional income.  Meaningful underwriting, according to CW8, was therefore
27  impossible with respect to the "off the books" component of Stated Wage Earner
28  loan applications.

172. According to CW8, loan origination standards and procedures were not designed to produce high quality loans. Rather, the rule at Countrywide, as stated in its Sales Training Facilitator Guide, was that *"we always look for ways to make the loan rather than turn it down."* Countrywide's loan origination standards and procedures, according to CW8, were focused on enabling the Company to generate revenue growth and capture an increased share of the mortgage loan market.

173. An internal FSL presentation from 2005 obtained by Lead Plaintiffs in the course of their investigation, titled "Your FULL SERVICE LENDING Partners," notes that "Subprime lenders sell payment, not rate" and lists the following "Full Spectrum Lending Success Stories" that highlight the extremely risky loans Countrywide routinely made to borrowers with the weakest credit:

- Borrower with a 530 FICO claimed three reporting collections had been paid in full. FSLD AE [account executive] collected proof of payment and submitted documents to LandSafe credit [Countrywide's in-house appraisal firm]. FICO was adjusted to a 587, and borrower was qualified for 100% LTV.

- Borrower with a 608 FICO was qualified for 100% LTV, using qualifying income from a non-occupying co-borrower with a 570 FICO!!!

- Borrower with a 515 FICO was qualified for 95% LTV, using offer letter and VOE [verification of employment] to qualify income from brand new job.

- Borrower whose application was received on October 28 closed in 7 days on November 4!!!

- Borrower with a 535 FICO was qualified for 100%, no PMI [private mortgage insurance] (ever!), waiving $800 in collection payoffs.
- Borrowers with 521 & 526 FICO were qualified for 100% LTV on cash out refinances.

174. Confidential Witness 9 ("CW9") was a loan underwriter in the Consumer Markets Division ("CMD"), sometimes referred to as the "retail division," from before the Class Period until the summer of 2007. CW9's West Coast branch was the "top grossing" branch in the nation, closing more than $2 billion in loans during its highest-producing year. CW9's branch only originated "prime loans," and CMD's loan programs included "no doc," or "NINA," reduced doc, SISA, and "Fast & Easy." Most loans originated in CW9's branch were "hybrid" ARM loans such as 3/1 or 5/1 ARMs, as to which the respective interest rate was fixed for three or five years and resets annually thereafter. Most other loans issued in CW9's branch were Pay Option ARMs and second-lien HELOCs. Additionally, according to CW9, "80/20" loans, which provided 100% financing, were actively pushed by the Company. According to CW9, senior management insisted that 100% financing be "marketed like crazy."

175. According to CW9, CMD's loan programs were "very consumer friendly" and information on loan applications was "basically stated." Every Countrywide loan, however, according to CW9, gave the lender the right to verify the income stated on the application, and it could be checked with the Internal Revenue Service (the "IRS"). In fact, as reported in an April 6, 2008 article in *The New York Times* called "A Road Not Taken By Lenders," at least 90% of borrowers, including stated income borrowers, were required to provide IRS Form 4506T with the application, authorizing the lender to verify income information with the IRS. According to the article, before 2006 it took one business day to receive a response from the IRS, and in 2006 the IRS set up an

1  automated system, reducing the response time considerably. However, according
2  to this article, income was verified with the IRS on only 3-5% of all loans funded
3  in 2006. Just as Countrywide had a practice, as described by CW2, of not
4  verifying a "stated" bank balance, the Company turned a blind eye to "stated"
5  incomes despite its ability to determine easily whether that information was
6  accurate.

7      176.  According to Brian Koss, who spent four years as a regional Senior
8  Vice President at Countrywide where he ran 54 branches in New England and
9  upstate New York, Countrywide became a victim of "public company panic."
10 According to Mr. Koss, management was "reacting to each quarter's earnings and
11 making short term decisions. They approached making loans like making
12 widgets, focusing on cost to produce and not risk or compliance." According to
13 Mr. Koss, consistent with CW8, "[p]rograms like "Fast and Easy" where the
14 income and assets were stated, not verified, were open to abuse and misuse. *The
15 fiduciary responsibility of making sure whether the loan should truly be done
16 was not as important as getting the deal done.* As long as people had jobs and
17 values were on the rise, life was good."

### (b)    The Exception Processing System

19     177.  Confidential Witness 10 ("CW10") was a loan officer in a CMD
20 branch from before the Class Period until the Summer of 2007, and was one of
21 the top sales representatives of "A paper" loans, which were prime loans.

22     178.  CW10 stated that Countrywide Bank was an "investor" in many of
23 the Company's loans, and that many of these were "risky" ARM loans and
24 HELOCs originated in CW10's branch. Certain of these loans were $1 million,
25 $2 million, and $3 million second-lien "stated income" HELOCs, which CW10
26 labeled "atrocious" and many of which are presently being recalled by
27 Countrywide. According to CW10, exceptions got "out of hand" and accelerated

28

1    quickly in 2004 and 2005, leading to the creation of more "flexible," or loosened

2    guidelines.

3         179.  In fact, according to CW10 and other witnesses, Countrywide had an

4    internal, proprietary computer system that was used to identify and route highly

5    risky loans out of the regular loan approval process and to the Company's central

6    "corporate underwriting" offices (called "Structured Loan Desks") in Plano,

7    Texas or Pasadena, California for evaluation.    The software was called the

8    Exception Processing System, or EPS. The Exception Processing System was not

9    used to reject loans that were outside the Company's underwriting guidelines.

10   Rather, CW10 and other loan officers used EPS to obtain approval authority from

11   "corporate" to *close* and *fund* such loans.  CW10 explained that the EPS software

12   had entry tabs by which loan officers could enter a customer's FICO score, loan

13   amount, property value used as collateral, and a description of the client's

14   situation. According to CW10, "highly risky loans" were entered into EPS, hence

15   the need for higher-up approvals outside of the normal approval process.   The

16   "corporate underwriters" at the Structured Loan Desks, headed by Eugene Soda,

17   responded to all requests for exceptions made through EPS.  CW10 stated 15% to

18   20% of the loans generated each day in CW10's office were run through EPS, and

19   very few were rejected.

20        180.  A presentation document titled "Countrywide CMD Structured Loan

21   Desk," filed publicly in *United States v. Partow*, No. 06-CR-00104 HRH (D.

22   Alaska), a criminal proceeding against a former Countrywide loan officer,

23   summarizes the "objectives" of the Exception Processing System:

                              Objectives

24

25        •  ***Approve virtually every borrower and loan profile with***

26           ***pricing add on when necessary.***

27        •  Identify alternative program to meet borrower needs.

28

- Leverage FSLI [Full Spectrum Lending] for all subprime opportunities.

- Not intended to match any competitor's price.

Objectives (cont.)

- ***Process and price exceptions on standard products for high risk borrowers.***

- Process exceptions for:

    – Credit Scores

    – LTV and loan amounts

    – Cash out amounts

    – Property types

181. As an example of an exception loan, CW10 referred to a "stated income" loan for more than $300,000 involving a high-rise condominium being used as an investment property. The borrower's FICO score was 618, lower than the minimum 640 FICO prescribed in the guidelines, and the loan had a 75% loan-to-value ratio. CW10 considered this loan to be risky given the low FICO score, stated income, and fact that the property was a high-rise condominium (which, CW10, explained, are difficult to sell if repossessed) and was being used for investment purposes. For most loans at Countrywide, 620 was the general demarcation line between prime and subprime loans.[7] CW10 viewed the loan as a "borderline Alt-A/subprime" loan, which ordinarily would have been referred to FSL. CW10, however, ran the loan data through EPS to see what would happen, and it was approved and closed "fast."

---

[7] As further alleged in Section IV.D below, although Countrywide, unbeknownst to the Class, used a FICO score of 620 as a demarcation line between prime and subprime loans, the mortgage banking industry generally considered that line of demarcation to be 660.

1    182.  Confidential Witness 11 ("CW11") was a senior officer in Business
2    Re-Engineering, working in the Corporate Accounting department at Company
3    headquarters, during the Class Period.  CW11 reported to David Collette, the
4    Executive Vice President of Strategic Planning, who reported to Laurie Milleman,
5    the Chief Accounting Officer.  CW11 was responsible for managing internal
6    business systems between Corporate Accounting and IT.  Sambol asked CW11 to
7    create the Exception Processing System in 2004.  According to CW11, EPS is a
8    web-based system that interfaces among all of Countrywide's proprietary
9    computer systems, and was used by Company management in order to approve
10    loans that "violated the rules" or to overrule parameters set by Countrywide's
11    loan origination system.  EPS gave management the opportunity to approve loans
12    that, on their surface, should be rejected.  In particular, according to CW11, EPS
13    permitted management to override low credit scores and in turn add "additional
14    pricing" or discount points.  EPS, in other words, allowed central underwriting to
15    review loans that violated the Company's underwriting standards to evaluate
16    whether such loans should require higher pricing or other terms in view of those
17    violations.  According to CW10, as alleged above, such loans were approved and
18    funded as a matter of routine.

19    183.  CW9 described EPS as a "unique system" that referred loans that fell
20    outside Countrywide's underwriting guidelines to SLD.  According to CW9, if
21    anything on a loan application fell outside the underwriting standards, the loans
22    would go to SLD for exception processing.  According to CW9, approximately
23    *80%* of the loans that went through CW9's branch went to SLD, which was "very
24    liberal" in approving loans.  In CW9's view, "that's why CFC has issues today."
25    SLD approved loans with low FICO scores (500 range with compensation
26    factors) and loans with "580 FICO scores and 75/80% LTV ratios."  Such loans,
27    according to CW9, would be approved by SLD as "prime loans."

28

1    184.  According to CW9, SLD approved exceptions to loans based on
2    what could be sold to the secondary markets, and if SLD approved the exception
3    loan, the branch manager's hands would be tied and the loan was approved except
4    in the rarest of cases.  In sum, loans that did not meet the underwriting guidelines
5    went to SLD via the EPS, and if SLD didn't approve the loans, they were referred
6    to FSL.  In other words, loan applications that should never have been approved
7    were constantly kicked further up the corporate ladder until they reached a level
8    where they would be approved by those driven solely by corporate profits and
9    greed.

10    185.  Confidential Witness 12 ("CW12") was employed by Countrywide
11    for approximately fifteen years and held various Assistant Vice President-level
12    positions in underwriting, compliance, and risk management during the Class
13    Period.  Among other assignments, CW12 was an underwriter with SLD during a
14    portion of the Class Period.  According to CW12, SLD had about 40 employees
15    in Plano; about 20 employees in Pasadena, California, and about 20 employees in
16    Chandler, Arizona.

17    186.  According    to    CW12,    Countrywide    granted    more    and    more
18    exceptions over time to borrowers who would not otherwise qualify for loans.
19    Although mortgage lenders generally had some process for approving loans that
20    fell outside underwriting guidelines, according to CW12, EPS was *"unique"* in
21    its "electronic" nature and its having been designed to electronically capture and
22    manage the "sheer volume of loans" being excepted at Countrywide on a daily
23    basis.  According to CW12, the final, "non-beta" version of the system was rolled
24    out in late 2004 or early 2005, and during 2006 the Company processed
25    approximately 15,000-20,000 loans a month through EPS.  CW12 learned from
26    supervisors in SLD that the number of loans going through SLD was increasing
27    greatly from year to year.  According to CW12, loans processed under EPS were
28

1   "very lucrative" because the Company was receiving "higher fees" on such loans,

2   which were "higher risk loans."

3       187.  In joining SLD, CW12 believed at first that the role of someone in

4   CW12's position was to help mitigate risk by "not making every loan" and seeing

5   where the "line was to be drawn." However, the directives from Senior Vice

6   President Kathy Tinsley, CW12's immediate supervisor, and Eugene Soda, the

7   Executive Vice President who headed SLD, were to "do every loan."

8       188.  CW12 described Tinsley and Soda as major driving forces of risky

9   lending. According to CW12, these managers were "bonus-driven" and wanted

10  to please management by "making every deal" they could. Tinsley and Soda

11  even made an internal video featuring themselves in which they explained to the

12  sales force that SLD would approve almost every loan presented to it.

13      189.  CW12 described the use of a "T graph" listing the positive aspects of

14  a loan on one side and the negative aspects on the other. CW12 recalled showing

15  Tinsley and Lynette Thomas a "T graph" with 12 reasons why Countrywide

16  should not fund a particular loan and one reason why the loan might be an

17  acceptable risk. According to CW12, all Tinsley and Thomas cared about was

18  who the loan officer was and "how much are we going to make on the loan," and

19  would consistently override CW12's concerns and approve the loan. According

20  to CW12, Tinsley wanted to know who the loan officer was because she often

21  charged the borrower fewer "points" when approving a loan originated by a loan

22  officer she liked as compared to one she didn't like. According to CW12, Tinsley

23  and Thomas expected CW12 to "keep quiet" regarding the nature of such risky

24  loans, so as not to jeopardize their stated policy to have SLD's decline rate stay

25  below 1%. CW12 could "count on one finger" the number of such risky loans

26  CW12 was permitted to reject.

27      190.  CW12 further recalled that a "Multi-Million Dollar," or MMD,

28  group within the SLD handled jumbo loans which exceeded $1 million. CW12

1  recalled that this group, with Tinsley's encouragement and approval, approved
2  such jumbo loans under the "Fast & Easy" program. According to CW12, the
3  more loans Tinsley could push through, the larger her bonus would be, so she was
4  always pushing for more.

5      191. CW12 reflected that "the things they [SLD] did with multi-million
6  dollar loans is just frightening." For example, while CW12 was in training, a
7  borrower applied for a jumbo loan for his primary residence. According to
8  CW12, however, this "primary" residence was the borrower's fourth residence,
9  and Countrywide had previously funded the loans on the borrower's other three
10 homes. When CW12 pointed this out to a supervisor, CW12 was told: "We only
11 consider the information presented on this particular loan. We don't try to
12 investigate." CW12 was reprimanded later that day.

13     192. CW12 described a second proprietary computer system, or "pricing
14 engine," called Price Any Loan, or PAL. With PAL, only selective information
15 from a loan application was inputted in order to ensure that *"no loan was out of*
16 *the question."* The existence of PAL confirmed that the purpose of the SLD was,
17 as stated by CW12, to find a way to make every loan possible.

18     193. According to CW12, the difference between PAL and EPS was that
19 EPS kept track of the number and type of exceptions and generated a multitude of
20 reports regarding exception loans. PAL was used to "price" exception loans,
21 based on their "risk" and Countrywide Bank's ability to "sell that risk" to the
22 secondary market. According to CW12, the detailed information on pricing and
23 loan exceptions contained in PAL was available to employees in Secondary
24 Marketing and senior executives such as Sambol.

25     194. Based on CW12's experience within SLD and many years as a
26 Countrywide employee, CW12 also explained that CLD did not use EPS itself but
27 rather a "slightly different variation," one that was part of CLD's "GEMS"
28 computer system. According to CW12, CLD purchased as much as 50 million

1    dollars worth of loans per day from such subprime lenders as Aegis, New
2    Century, DIH Homebuilders, American Home, Silver States and Quicken, many
3    of which are now defunct owing to the poor quality of loans they issued. CLD
4    only audited between 1% and 10% of these bulk purchases of loans. According
5    to underwriters CW12 knew in CLD, if an audit revealed that loans were not
6    meeting Countrywide's underwriting guidelines, the guidelines would be
7    "tweaked" midstream in order to get the package to conform by processing the
8    loans as exceptions through the GEMS exceptions module. According to CW12,
9    Countrywide would find a way to "fit the loan in somewhere" in order to
10   purchase the package.

11       195. CW3 also referenced the Exception Processing System and
12   commented that *"so long as we could sell it, we'd do it,"* and that every loan "has
13   a price."

14       196. An internal October 2005 "Branch Presentation" obtained by Lead
15   Plaintiffs in the course of their investigation, titled "The Underwriting Process"
16   used by "Central Services-UW" (central underwriting) to train FSL branch
17   managers, confirms the widespread use of EPS and the prevalence of exceptions
18   in approved loans. Branch managers were trained to use a computer-generated
19   grid called the "DLO Matrix," which assisted loan officers in "Developing Loan
20   Options" for customers. Dividing borrowers in three main groups, one with
21   credit scores of 620 or above, another with scores between 500 and 619, and a
22   third with scores below 500, the DLO Matrix yields three basic decisions on
23   potential borrowers: "ACCEPT/APPROVE"; "REFER"; and "REFER (Next
24   Steps)." For borrowers with scores of 500 or above for whom the specific
25   "REFER" decision is "Loan is outside of SubPrime Core guidelines," the DLO
26   Matrix did not reject the loan. Rather, the "REFER (Next Steps)" field directed
27   the loan officer to submit that loan for *"Manual underwriting or exception*

28

1   *consideration."*   According to CW8, this meant that such loans were to be

2   submitted to SLD for exception approval.

3   197.  The same Branch Presentation indicates that for each month between

4   March and August 2005, between 15% and 19% of all subprime loans originated

5   or purchased by FSL were exception loans; between 30% and 40% of all

6   subprime loans purchased by FSL from CMD were exception loans; and between

7   17% and 23% of all subprime loans purchased by FSL from divisions other than

8   CMD were exception loans.

### (c) Countrywide's Inflated Appraisals and Other Fraudulent Loan Origination Practices

10   198.  According to Mark Zachary, a former Regional Vice President of

11   Countrywide's joint venture with KB Home, Countrywide Mortgage Ventures,

12   LLC, the Company blatantly ignored its underwriting policies and procedures.  In

13   September 2006, Mr. Zachary informed Countrywide executives that there was a

14   problem with appraisals performed on KB Home properties being purchased with

15   Countrywide's loans.  According to Mr. Zachary, Countrywide executives knew

16   that appraisers were strongly encouraged to inflate appraisal values by as much as

17   6% to allow homeowners to "roll up" all closing costs.  According to Mr.

18   Zachary, this practice resulted in borrowers being "duped" as to the values of

19   their homes.  This also made loans more risky because when values were falsely

20   increased, loan-to-value ratios calculated with these phony numbers were

21   necessarily incorrect.

22   199.  Mr. Zachary also believed this practice misled investors who later

23   purchased these loans through securitizations because these investors were not

24   made aware that the actual home values were less than the inflated appraised

25   values.  According to Mr. Zachary, the inflated appraised values put buyers

26   "upside down" on their homes immediately after purchasing them; that is, the

27   borrowers immediately owed more than their homes were worth.  Thus, the

28

1   buyers were set up to be more susceptible to defaulting on their loans. This
2   practice also put Countrywide at risk because it was unaware of the true value of
3   the assets on which the Company was loaning money.

4       200. Mr. Zachary brought his concerns to executives of the
5   Countrywide/KB Homes joint venture, as well as Countrywide executives in
6   Houston, the Company's Employee Relations Department and the Company's
7   Senior Risk Management Executives.

8       201. According to Mr. Zachary, the Company performed an audit
9   investigating these matters in January 2007, and the findings of the audit
10  corroborated his story. According to Mr. Zachary, the findings of this audit were
11  brought to the attention of Countrywide executives.

12      202. According to Mr. Zachary, the Company also regularly approved no-
13  doc loans, even to applicants who had been refused loans under the Company's
14  full-documentation loan program. In such instances, according to Mr. Zachary,
15  the Company's loan officers would "assist" applicants in switching to no-doc
16  loans. Mr. Zachary brought this information to the attention of Countrywide
17  Employee Relations and Risk Management officials in 2006 and early 2007.

18      203. Further, according to Capitol West Appraisals, LLC ("Capitol
19  West"), a company that has provided real estate appraisals to mortgage brokers
20  and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington
21  Mutual and other lenders, Countrywide engaged in a pattern and practice of
22  pressuring real estate appraisers to artificially increase appraisal values for
23  properties underlying mortgages Countrywide originated and/or underwrote.
24  Capitol West stated that Countrywide loan officers sought to pressure Capitol
25  West to increase appraisal values for three separate loan transactions. When
26  Capitol West refused to vary the appraisal values from what it independently
27  determined was appropriate, Countrywide retaliated in a manner that, according
28  to Capitol West, is consistent with its course of conduct with respect to all

1  independent appraisers, one designed to undermine that independence and cause
2  appraisers to act in conformity with Countrywide's improper scheme to inflate
3  real estate values.

4      204.  In particular, according to Capitol West, from at least 2004, and
5  likely before, and continuing through at least the end of the Class Period,
6  Countrywide maintained a database titled the "Field Review List" containing the
7  names of appraisers whose reports Countrywide would not accept unless the
8  mortgage broker also submitted a report from a second appraiser.  Capitol West
9  was placed on the Field Review List after refusing to buckle under to pressure to
10  inflate real estate values.  The practical effect of being placed on the Field Review
11  List was to be blacklisted as no mortgage broker would hire an appraiser
12  appearing on the Field Review List to appraise real estate for which Countrywide
13  would be the lender because neither the broker nor the borrower would pay to
14  have two appraisals done.   Instead, the broker would simply retain another
15  appraiser who was not on the Field Review List.

16      205.  According to Capitol West, Countrywide created certain procedures
17  to further enforce its blacklisting of uncooperative appraisers.  Specifically, if a
18  mortgage broker were to hire an appraiser that happened to be on the Field
19  Review List, Countrywide's computer systems automatically flagged the
20  underlying property for a "field review" of the appraisal by LandSafe, Inc., a
21  wholly owned subsidiary of Countrywide.  LandSafe would then issue another
22  appraisal for the subject property that, without exception, would be designed to
23  "shoot holes" in the appraisal performed by the blacklisted appraiser such that the
24  mortgage transaction could not close based on that appraisal.  Indeed, in every
25  instance, LandSafe would find defects in the appraisal from the blacklisted
26  appraiser, even if another, non-blacklisted appraiser arrived at the same value for
27  the underlying property and the said non-blacklisted appraiser's appraisal was
28

1    accepted.    According to Capitol West, this exact set of facts happened with
2    respect to an appraisal it submitted after it was placed on the Field Review List.

3        206.  Because Countrywide was one of the nation's largest mortgage
4    lenders, a substantial portion of any mortgage broker's loans may have been
5    submitted to Countrywide. Because a broker could not rule out that Countrywide
6    would be the ultimate lender, and because mortgage brokers knew from the
7    blacklist that a field review would be required if a blacklisted appraiser were
8    chosen, with the likely result that a mortgage would not be issued with that
9    appraisal, and, in any event, its mortgage applicant would have to incur the cost
10   of retaining another appraiser, such a broker had a strong incentive to refrain from
11   using a blacklisted appraiser.    By these means, Countrywide systematically
12   enlisted appraisers in its scheme to inflate appraisals.

13       207. CW8 also observed several instances where Countrywide's
14   underwriting policies were ignored with the approval of supervisors.  In early
15   2004—around the time Mozilo publicly touted the Company's "very strong
16   disciplines in the origination of sub-prime loans"—CW8 discovered that a very
17   productive loan officer in Massachusetts, Nick Markopoulos, was engaged in
18   cutting and pasting documents from the internet to create a fraudulent verification
19   of employment in support of a loan application.  CW8 referred the situation to
20   Countrywide's Human Resources Department but no investigation was started.
21   Markopoulos then left the Company of his own accord, but was rehired by
22   Countrywide about a year later as a branch manager.    CW8 contacted the
23   supervising Regional Vice President and objected to Markopoulos's rehiring,
24   citing his prior participation in fraud.  The Regional Vice President overruled
25   CW8's objection, citing Markopoulos's high level of productivity.

26       208.  Confidential Witness 13 ("CW13") was a senior officer in New
27   Customer Acquisition in Company headquarters during the Class Period. CW13
28   oversaw television, radio and print advertisements for the entire Company, but

1   formally worked in the FSL division. According to CW13, the "edict" regarding

2   subprime mortgages at Countrywide was to "sell as much subprime as possible."

3   CW13 corroborates CW8's account concerning Nick Markopoulos. According to

4   CW13, it was known to senior management that Markopoulos, a Divisional

5   Executive Vice President, and other branch-level managers committed "a lot of

6   fraud" in originating loans but were kept on at the Company because they were

7   "good producers."

8       209.   CW8 additionally recalled a situation where multiple mortgage loans

9   were being originated to support the conversion of a series of apartment units

10  from rentals to condominiums. CW8 and others suspected that these loans were

11  being originated in connection with sham "loan flipping" transactions involving

12  CMD employees.   Loan flipping is a scam whereby a lender convinces the

13  borrower to refinance multiple times, charging higher points, fees, and after

14  interest rates upon each refinancing. Flipping ultimately leaves the borrower with

15  a little more cash and a lot more debt; the debt service quickly overwhelms any

16  benefit bought by the short-term cash. According to CW8, the issue was raised

17  with Gregory A. Lumsden, President of the FSL division and Senior Managing

18  Director for loan origination. CW8 vividly recalled Mr. Lumsden's "short and

19  sweet" response: ***Fund the loans.***"

20      210.   CW12 recalled a "predatory" loan refinancing in which a broker was

21  paid approximately $50,000 in fees, ultimately stripping all of the borrower's

22  equity in exchange for a "lower monthly payment."  According to CW12, the

23  borrower was a "woman in her 70s from New York" who was barely able to

24  make the payments on her existing loan. The broker submitted a "conflict of

25  interest loan" for approval and refinancing, pulling out close to $60,000

26  representing the total equity in the home, with $50,000 to the broker and the

27  remaining cash going to the borrower.  According to CW12, the borrower

28  obtained a lower monthly payment only because the loan was an ARM, the

1  interest rate of which would eventually reset higher. However, the borrower, like

2  many uneducated borrowers, did not understand this important detail. CW12

3  believed that this loan was "not a responsible loan" and that the broker's fees

4  (which consisted of "front-end" and "back-end" fees in "discount points,"

5  appraisal fees, title insurance fees, credit report fees, points for using an

6  "alternative" loan program, a "commission," and a "yield spread premium" on the

7  pricing "differential") to be more like "robbery."

8      211. After CW12 made a lot of "noise" complaining about this broker,

9  CW12's manager finally declined one of that broker's loans. According to

10  CW12, their Managing Director then called the manager, "really chewed [him]

11  out" and told him that all such loans were to be approved going forward.

12      212. Like Mark Zachary, CW8 also observed serious problems related to

13  Countrywide's system of obtaining appraisals on properties. According to CW8,

14  Countrywide's appraisal system, referenced in the Company's Form 10-K filings

15  during the Class Period as careful and detailed and providing an assurance of

16  collateral quality, was a sham.

17      213. According to CW8, until at least mid-2005, loan officers at all of

18  Countrywide's origination divisions were permitted to hire appraisers of their

19  own choosing. They were permitted to discard appraisals that did not support

20  loan transactions, and substitute more favorable appraisals by replacement

21  appraisers when necessary to obtain a more favorable loan to value ratio so that

22  the loan would "qualify" for approval. Loan officers were also able to lobby

23  appraisers to assign particular values to a property in order to support the closing

24  of the loans.

25      214. Thus, Countrywide loosened and abandoned its supposedly sound

26  underwriting policies and procedures in order to pump up loan volume and boost

27  earnings, creating a significant long-term risk for investors. In contrast to the

28  Company's public hyping of its underwriting standards, quantity, not quality, was

1    what mattered in loan origination because Countrywide made its money through

2    the rapid bundling and re-selling of loans on the secondary market.    Any

3    incentive the Company may have had to ensure that borrowers could repay the

4    loans was outweighed by the incentive to bundle and sell as many loans as

5    possible; accordingly, almost anyone could get a loan from Countrywide, even if

6    he or she had very little ability to pay it back.

7        215.    Countrywide's "culture change" from traditional lending to a "pump

8    and dump" operation was further fueled by a compensation structure, devised and

9    approved by management, that was closely linked to loan volume and not tied to

10   the quality of loans originated.    According to a former sales representative quoted

11   in *The New York Times* on the August 26, 2007, "[t]he whole commission

12   structure in both prime and subprime was designed to reward salespeople for

13   pushing whatever programs Countrywide made the most money on in the

14   secondary market."

15              **(d)    Countrywide Belatedly Begins to
                         Tighten Up its Lax Lending Standards**

16

17       216.    Only in March 2007, after the secondary mortgage market began to

18   dry up, did Countrywide eliminate "piggyback" loans that allowed borrowers to

     purchase a home with no money down.    According to *Reuters*, an internal e-mail

19   advised loan officers: "Please get in any deals over 95 LTV (loan-to-value) today!

20   . . . Countrywide BC [subprime] will no longer be offering any 100 LTV products

21   as of Monday, March 12."

22       217.    Further, according to published reports, Countrywide waited until

23   February 23, 2007 to stop originating no-doc loans with more than 95% LTV.

24

25       218.    On July 24, 2007, the Company revealed for the first time that in

26   actuality its underwriting guidelines had been inadequate throughout the Class

     Period, stating that the Company had "made many changes" to its "underwriting

27   guidelines and processes, in order to improve the quality and secondary market

28

---

1    execution of our production." The Company also disclosed that its proprietary

2    underwriting system needed to be "recalibrated."

3        219. In mid-August 2007, after the price of Countrywide stock had

4    dropped precipitously, the Company announced that it would make further

5    significant changes to its underwriting operations by largely limiting itself to

6    mortgages that could be bought by government-sponsored agencies Freddie Mac

7    and Fannie Mae. These changes, however, came far too late for Plaintiffs and the

8    Class, who suffered massive losses on purchases of the Company's securities.

9    Additional revelations would cripple the Company's stock price even further.

10    **D.    Countrywide Reported Minimal Origination of Subprime**
      **Loans By Classifying Subprime Loans as "Prime"**

11

12        220. During the Class Period, Countrywide made regular public

13    disclosures distinguishing between its "prime" and "subprime" (sometimes

      referred to as "nonprime") loan originations and securitizations. As alleged in
14
      detail below, the Company periodically reported its volumes of prime and
15
      subprime mortgage loans produced and sold, the volumes of prime and subprime
16
      loans held for investment, and the value of the Company's credit-sensitive
17
      retained (or "residual") interests in securitized prime and subprime loans.
18

19        221. These statements classifying and distinguishing between "prime"

20    and "subprime" loans were false and misleading because Countrywide, during the

      Class Period, employed a private, internal standard to distinguish between
21
      "prime" and "subprime" loans that, as the Officer Defendants knew, differed
22
      materially from the standard used by government agencies and generally accepted
23
      in the mortgage banking industry. Thus, while Countrywide repeatedly assured
24
      the market that it adhered to a conservative approach to loan origination and
25
      underwriting that set it apart from other, inferior mortgage lenders known to be
26
      heavily engaged in subprime lending, Countrywide actually conducted the same
27
      risky type of business but hid that fact from the Class by operating under a private
28

1    benchmark for classifying loans as "prime" that was substantially below the
2    benchmark accepted in the industry and understood by investors and analysts.

3        222.    The most widely accepted measure of the creditworthiness of a
4    borrower used in the mortgage and consumer lending industry, and which
5    Countrywide used and relied upon heavily throughout the Class Period, is the
6    borrower's Fair Isaac Credit Organization ("FICO") credit score.    Fair Isaac
7    describes the FICO score, which ranges from 300 to 850, as "the standard
8    measure of US consumer credit risk" and "the recognized industry standard in
9    consumer credit risk assessment." FICO scores are developed from a variety of
10    data in a prospective borrower's credit reports, including payment history,
11    amounts owed to creditors, length of credit history, new credit sources, and the
12    types of credit used.    Generally, the higher the FICO score, the better the
13    borrower's credit and the lower the risk of default.

14        223.    According to Fair Isaac, the U.S. median FICO score is in the 720
15    range.  Approximately 27% of the U.S. population has a FICO score between 750
16    and 799, 15% has a score below 600, and 27% has a score below 650.

17        224.    The FICO score is a key determinant of whether a given borrower
18    will be classified as "prime" or "subprime."  During the Class Period, Fitch
19    Ratings termed FICO scores the "best single indicator" of mortgage default risk.
20    Countrywide itself described FICO scores in its 2006 Form 10-K as "[a]
21    commonly used measure of consumer creditworthiness" used "to assess a
22    prospective borrower's credit history and the impact of the prospect's current
23    borrowing arrangements on their ability to repay a loan."

24        225.    There is a strong presumption in the mortgage lending industry that a
25    FICO score of 660 divides prime and subprime borrowers.    The principal
26    definition of "subprime" is found in the *Expanded Guidance for Subprime*
27    *Lending Programs*, issued jointly on January 31, 2001 by the U.S. Office of the
28    Comptroller of the Currency, the Board of Governors of the Federal Reserve

1   System, the Federal Deposit Insurance Corporation, and the Office of Thrift
2   Supervision ("OTS"). The *Expanded Guidance* was sent by the Deputy Director
3   of OTS to Defendant Mozilo and other banking CEOs on or about February 2,
4   2001, and Countrywide management was required to be familiar with it. The
5   guidance advises financial institutions that the elevated levels of credit and other
6   risks arising from subprime lending tend to require heightened risk management
7   and additional capital reserves. As explained in the *Expanded Guidance*, "[t]he
8   term 'subprime' refers to the credit characteristics of individual borrowers.
9   Subprime borrowers typically have weakened credit histories that include
10  payment delinquencies, and possibly more severe problems such as charge-offs,
11  judgments and bankruptcies. They may also display reduced repayment capacity
12  as measured by credit scores, debt-to-income ratios, or other criteria that may
13  encompass borrowers with incomplete credit histories."

14      226. OTS's February 2001 transmittal letter advises that the *Expanded*
15  *Guidance* was intended to provide, among other things, "a more specific
16  definition of the term subprime." Among the credit risk characteristics listed in
17  the *Expanded Guidance* that label a borrower as "subprime" is a "[r]elatively high
18  default probability as evidenced by, for example, a credit bureau risk score
19  (FICO) of 660 or below (depending on the product/collateral), or other bureau or
20  proprietary scores with an equivalent default probability likelihood[.]"

21      227. Standard & Poor's, one of the principal securities rating agencies,
22  similarly states: "Standard & Poor's considers subprime borrowers to have a
23  FICO credit score of 659 or below." Conversely, "Standard & Poor's considers
24  prime borrowers to have a FICO credit score of 660 or above."

25      228. Freddie Mac, one of the government sponsored entities that
26  purchased loans from Countrywide during the Class Period, stated in its February
27  2003 public guidelines that "FICO scores objectively evaluate all the information
28  in the Borrower's repository credit file at the time the FICO score was created.

1  Freddie Mac has identified a strong correlation between Mortgage performance
2  and FICO scores." For loans on single-family properties, Freddie Mac views a
3  borrower with a FICO score above 660 as "likely to have an acceptable credit
4  reputation." Further, FICO scores between 620 and 660 "should be viewed as an
5  indication that the Borrower's willingness to repay and ability to manage
6  obligations as agreed are uncertain." A FICO score below 620, according to
7  Freddie Mac, "should be viewed as a strong indication" that the borrower's credit
8  profile is "not acceptable."

9      229. According to CW8, however, during the Class Period, Countrywide
10  had a company-wide practice of classifying loans to borrowers with FICO scores
11  lower than 660, and indeed *as low as 500*, as "prime."

12      230. In particular, according to CW8, loans to borrowers with FICO
13  scores of 620 or higher were consistently classified by the Company as "prime"
14  loans in its internal reporting systems. This is corroborated by CW10, according
15  to whom Countrywide generally viewed "subprime" borrowers as those with a
16  FICO score below 620 (and, in any event, there were always "exceptions" to this
17  rule which were submitted to "corporate underwriting"). Similarly, according to
18  CW9, "620" was the demarcation line between prime and subprime loans at
19  Countrywide, and there were "definitely" many prime loans originated in CMD
20  with FICO scores of 620, 630 and 640. CW9 saw prime loans with FICO scores
21  in the 500 range that went through EPS. Overall, according to CW8, a substantial
22  percentage of the loans claimed by Countrywide to be "prime" loans in its public
23  disclosures during the Class Period were loans to borrowers with FICO scores
24  between 500 and 659.

25      231. The October 2005 "DLO Matrix," referenced above, supports these
26  witness accounts. The DLO Matrix divides borrowers into three main categories
27  based on credit scores: "620 or greater," "500 to 619," and "Less than 500." No
28  distinction is drawn at the 660 (or 659) FICO level. Within the "620 or greater"

1    FICO band, borrowers are further categorized based on whether they are first time
2    home buyers or otherwise have a history of making existing mortgage payments
3    on time.  For such borrowers, their starting product group is "Prime-Conforming"
4    or "Prime-Non-Conforming" depending on the loan amount.  If the borrower falls
5    within the guidelines in the automated underwriting system, the loan is approved
6    as "Prime-Conforming" or "Prime-Non-Conforming."    If the automatic
7    underwriting system rejects the conforming loan, the DLO Matrix instructs the
8    loan officer to "re-commit" under the prime non-conforming program and re-run
9    the underwriting system.  If the underwriting system rejects the non-conforming
10   (large) loan as outside the non-conforming guidelines, the loan officer must
11   "[r]eview loan with Prime Underwriting Support Desk for exception
12   consideration."  According to CW8, if SLD then signed off on the exception, the
13   loan would be treated as prime.  CW9 also recalled that exception loans approved
14   by SLD, including loans in the 500 FICO range, would be approved as "prime
15   loans."

16        232.  For borrowers with FICO scores of 620 or better who were regularly
17   30-days late on mortgage payments, the Starting Product Group for a conforming-
18   size loan was "SubPrime—Expanded Approval (EA) Levels," which was then
19   treated as "Prime-Conforming" if the automated underwriting system approves
20   the loan.    Non-conforming loans were initially labeled subprime, but loans
21   outside the subprime guidelines were referred for "Manual Underwriting or
22   exception consideration."

23        233.  Under the DLO Matrix, for borrowers in the 500-619 FICO band
24   who were first-time home buyers or who had never been 60 days late making a
25   mortgage payment, a conforming-size loan similarly qualified as "Prime-
26   Conforming" if the automated underwriting system approved the loan.  Other
27   loans in this FICO band would be submitted for "Manual underwriting or
28   exception consideration."

1          234.  Another internal document indicates that Countrywide classified as
2     "prime" numerous loans made to borrowers with FICO scores below 660, and
3     indeed below 620.   Countrywide held top-level monthly "Business Review"
4     meetings at its Calabasas headquarters, during which the Company's and each
5     mortgage lending segment's performance and results were discussed and
6     evaluated in detail.  Each division supplied detailed documents in advance of the
7     meeting.  The FSL binder for the February 2007 "Business Review" meeting in
8     Calabasas included a "Prime Pricing Comparison" for January 2007 that
9     compared "prime" loans by FSL that were "Non-NCA" (*i.e.*, not to new
10    customers) with refinancing transactions within CMD.  Among the "prime" loans
11    by FSL, listed by loan program group, were 2,004 fixed-rate loans with an
12    average FICO score of 648; 16 interest-only ARM loans with an average FICO of
13    643; 11 3/1 ARM loans with an average FICO of 634; 12 7/1 ARM loans with an
14    average FICO of 627; 94 5/1 ARM loans with an average FICO of 614; and 11
15    5/1 ARM loans with an average FICO of 612.   These 2,148 loans constitute
16    approximately 23% of the 9,458 "prime" loans produced by FSL (Non-NCA) in
17    January 2007.

18          235.  Further, the Business Review binder's January 2007 "Prime
19    Production Profile" for FSL (Non-NCA) listed 1,794 first mortgages in the 620-
20    659 FICO band (average FICO 639); 720 first mortgages in the 580-619 FICO
21    band (average FICO 602); and 78 first mortgages in the "Less than 580" FICO
22    band (average FICO 556).  The "Prime Production Profile" also listed 820 second
23    mortgages in the 620-659 FICO band (average FICO 640); and two second
24    mortgages with loans to borrowers below 620 (average FICO 606).  These 3,414
25    loans constitute 36% of the 9,458 "prime" loans produced by FSL (Non-NCA) in
26    January 2007.  "Prime" CMD refinancings in January 2007 included 2,038 first
27    lien mortgages in the 620-659 FICO band (average FICO 642); 381 first lien
28    mortgages in the 580-619 FICO band (average FICO 604); and 138 first

1   mortgages in the less than 580 FICO band (average FICO 548), constituting
2   approximately 15% of the total 17,483 CMD refinance loans that month.

3   236.  Finally, the "Prime Production Profile" for FSL-NCA (*i.e.*, new
4   customers) listed 298 first mortgages in the 620-659 FICO band (average FICO
5   640), 68 first mortgages in the 580-619 FICO band (average FICO 605), and six
6   first mortgages with FICO scores below 580 (average FICO 562).  The same
7   "Prime Production Profile" also listed 169 second mortgages in the 620-659
8   FICO band (average FICO 640).  These 541 loans constitute more than 23% of
9   the 2,293 "prime" loans produced by FSL-NCA in January 2007.

10   237.  This data was drawn from a "Monthly Revenue Book" prepared each
11   month by FSL's Pricing and Secondary Marketing Department and sent to
12   corporate headquarters.  According to CW8, the Monthly Revenue Books were
13   prepared under a group headed by David Swain, FSL's Executive Vice President
14   for Products and Pricing, and sent directly to David Sambol's office for his
15   review.

16   238.  The FSL Monthly Revenue Book for May 2007, which Lead
17   Plaintiffs obtained in the course of their investigation, similarly shows that
18   Countrywide routinely extended "prime" loans to low-FICO borrowers.  The May
19   2007 "Prime Production Profile" for FSL "Non-NCA" loans lists 2,419 first
20   mortgages in the 620-659 FICO band (average FICO 639), 986 first mortgages in
21   the 580-619 FICO band (average FICO 602), and 112 first mortgages in the less
22   than 580 FICO band (average FICO 552).  This "Prime Production Profile" also
23   lists 1,071 second mortgages in the 620-659 FICO band (average FICO 639), one
24   second mortgage with a FICO of 617, and one second mortgage with a FICO of
25   579.  These 4,590 loans constitute more than 33% of the 13,859 "prime" loans
26   produced by FSL Non-NCA in May 2007.  "Prime" CMD refinancings in May
27   2007 included 2,128 first lien mortgages in the 620-659 FICO band (average
28   FICO 641), 506 first lien mortgages in the 580-619 FICO band (average FICO

1    604), and 178 first lien mortgages in the less than 580 FICO band (average FICO
2    550), constituting 15% of the total 18,294 CMD refinance loans that month.

3       239.  Countrywide's internal classification of subprime loans as "prime"
4    was undisclosed during the Class Period.  Countrywide routinely referred to
5    "prime" loans in SEC filings and other public statements without clarifying that
6    its unique definition of "prime" was inconsistent with the public's and industry's
7    understanding of that term, thereby rendering those statements misleading.
8    Countrywide's unique, internal standard remained concealed until the Company's
9    July 24, 2007 conference call discussing its catastrophic second quarter 2007
10   results.  During the call, John McMurray, the Company's Chief Risk Officer
11   stated in his opening presentation that "[a] prime FICO loan—*a prime loan with*
12   *FICOs in the low 500s* is going to be over 30 times more likely to be seriously
13   delinquent than a prime loan with an 800 FICO, holding all other variables
14   constant."  Later during the call, in response to a question about delinquencies
15   among the Company's "prime mortgages," McMurray stated: "There is a belief
16   by many that prime FICOs stop at 620.  *That is not the case.*  There are
17   affordability programs and Fannie Mae, expanded approval, as an example, *that*
18   *go far below 620, yet those are considered prime."*

19      240.  Based on this explanation and other statements made during the
20   conference call, an analyst from HSBC Securities stated that "[w]e do believe in
21   some color given by management, *that the definition of 'prime' (or Alt-A for*
22   *that matter) was loosened in the recent boom.*  Management referred to certain
23   affordability programs where FICO scores *went 'far below' 620 (which already*
24   *is well below the bank regulator's definition of subprime, which has a 660*
25   *cutoff)."*  The same analyst noted that "management acknowledged that the
26   higher combined loan to value (CLTV) and reduced documentation higher CLTV
27   products—classic speculator products—are accounting for a disproportionate
28   share of credit costs."

1    241.  This analyst was plainly observing for the first time that
2  Countrywide categorized as "prime" borrowers who should have been
3  categorized as subprime, while lowering income documentation standards below
4  prudent levels and increasing loan-to-value ratios above prudent levels.

5    242.  Similarly, a July 27, 2007 analyst report by Stifel, Nicolaus & Co.
6  ("Stifel") discussing the disappointing second quarter results questioned the
7  analyst's own "sanguine views" on the Company's credit exposure, stating:

8      . . . given the magnitude of the credit problems in the bank, we think
9      ***mgmt made serious miscalculations (and possibly***
10     ***misrepresentations) about the quality of the loans*** added to the bank.
11     In the analysis we present later in this note, we find that ***CFC's home***
12     ***equity securitizations are performing roughly inline with LEND's*** [a
13     competing subprime lender's] ***subprime deals.***  We also find that
14     underwriting standards deteriorated through 2006 and have only
15     improved slightly in 2007.

16    243.  With respect to Countrywide's underwriting criteria for HELOCs,
17  the Stifel report confirmed that the Company's underwriting standards declined
18  from no later than 2005 through late 2006, with only minimal improvement in
19  2007.

20    244.  The Stifel report further examined the gravity of Countrywide's
21  loose lending practices and expanded definition of "prime" by disclosing that
22  almost 20% of Countrywide's prime HELOCs in the first two quarters of 2007
23  were given to ***subprime borrowers with FICO scores of less than 660.***
24  Moreover, almost 23% of the prime HELOCs in those quarters had a CLTV
25  ***greater than 100%.***  In the analyst's view, "the increasing share of sub-660
26  FICO, 100%+ CLTV, and second home/non-owner occupied loans [was]
27  ***disturbing.***"  The Stifel report also noted that in the first half of 2007, ***78% of***
28  Countrywide's HELOCs were reduced documentation loans.