### E.    Countrywide Misled the Class About the Creditworthiness of Pay Option ARM Borrowers

245.    During the Class Period, Countrywide falsely maintained that its Pay Option ARMs were prudently underwritten and that borrowers holding these loans were of the highest credit quality and had relatively strong FICO scores. During conference calls held in April and July 2005, Kurland represented to the market that Pay Option ARMs are "all high FICO," and Mozilo declared that this "product has a FICO score exceeding 700" and is limited to borrowers "of much higher quality."

246.    According to CW8, at the time these statements were made, Countrywide routinely funded Pay Option ARMs to thousands of borrowers with FICO scores as low as 620 and sometimes lower, and this was communicated to Kurland and Mozilo (and other executives) in multiple internal reports detailing the Company's Pay Option ARMs. An internal Countrywide document obtained by Lead Plaintiffs in the course of their investigation, titled "PayOption ARM 101: 'Learning the Basics'" and dated April 2005, indicates that Pay Option ARMs were often funded to borrowers with credit scores as low as 620.

247.    Further, according to CW8, not only were Pay Option ARMs routinely made to borrowers with credit scores as low as 620 (or lower), but these loans also were often underwritten through "low doc" programs that did not involve any meaningful verification of income or assessment of the borrower's capacity to repay the loan. "PayOption ARM 101" indicates, in fact, that these loans were offered through reduced documentation and SISA applications.

248.    Countrywide sought to reassure the market as to the safety of the Pay Option ARMs held for investment in the Company's portfolio by disclosing the average original FICO scores of the borrowers holding such loans. The Company's 2005 Form 10-K stated that the "pay-option loan portfolio" had a "relatively high initial loan quality," and that the average original FICO score for

1  Pay Option ARMs held for investment as of December 31, 2005 and 2004 was
2  720 and 730, respectively.  In its 2006 Form 10-K, Countrywide dropped its
3  claim that Pay Option ARMs had "relatively high initial loan quality," but stated
4  that the average original FICO score for such loans as of December 31, 2006 was
5  718.

6      249.  Countrywide's statement in its 2005 Form 10-K that Pay Option
7  ARMs had a "relatively high initial loan quality" was false, and the "averages" in
8  the 2005 and 2006 Form 10-Ks were at best misleading, because Countrywide
9  was regularly funding Pay Option ARMs to borrowers with FICO scores as low
10  as 620 and sometimes lower.  Borrowers with FICO scores below 660 were
11  considered subprime by the financial community, including banking regulators
12  and mortgage industry participants, and securities analysts.  Countrywide's
13  representations of the "average" FICO score were misleading to a reasonable
14  investor because they omitted any reference to the applicable FICO score bands,
15  or at least the top and bottom of the range of FICO scores, which was necessary
16  in order to properly assess risk.  Such information would have been material and
17  indeed critical to the Class given Countrywide's routine practice of providing a
18  substantial number of Pay Option ARMs to subprime borrowers, many on a low-
19  doc or no-doc basis.

20  **F.    Countrywide Engaged in Widespread Predatory**
     **Lending Practices, Generating Short-Term**
21     **Profit at Long-Term, Undisclosed Risk to the Class**

22      250.  A further example of Countrywide's conscious abandonment of its
23  underwriting standards is its widespread use of deceptive lending practices during
24  the Class Period.  These practices garnered Countrywide huge fees from
25  borrowers who were extended loans they could not repay, resulting in the risk of
26  increased defaults and foreclosures to the detriment of the Company and the
27  Class.

28

1    251. Predatory lending is a practice whereby a lender deceptively
2    convinces a borrower to agree to unfair and abusive loan terms, including interest
3    rates and fees that are unreasonably high.

4    252. Countrywide and its management knew from the start of the Class
5    Period that the Company operated within specific statutory and regulatory
6    parameters that limited the interest rates and other fees Countrywide was
7    permitted to charge borrowers and the types of sales practices the Company could
8    employ. Countrywide consistently assured investors during the Class Period that
9    it was in compliance with these laws and regulations. Countrywide's Form 10-Ks
10   for 2003 and 2004 stated, for example:

11        Currently, there are a number of proposed and recently enacted
12        federal, state and local laws and regulations addressing responsible
13        banking practices with respect to borrowers with blemished credit. In
14        general, these laws and regulations will impose new loan disclosure
15        requirements, restrict or prohibit certain loan terms, fees and charges
16        such as prepayment penalties and will increase penalties for non-
17        compliance. Due to our lending practices, we do not believe that the
18        existence of, or compliance with, these laws and regulations will have
19        a material adverse impact on our business.

20   253. On February 4, 2003, Defendant Mozilo gave a lecture at Harvard
21   University's Joint Center for Housing Studies which included the following
22   remarks:

23        These [predatory lending] laws were allegedly enacted to protect
24        borrowers from lenders who abuse the unsophisticated, low-income,
25        elderly and minority communities by charging high interest rates and
26        fees and fraudulently imposing unfair terms. *These lenders deserve*
27        *unwavering scrutiny and, when found guilty, an unforgiving*
28        *punishment.*

1    254.  Despite Countrywide's assurances and Mozilo's pointed remarks,
2  Countrywide did not comply with applicable regulatory and statutory restrictions
3  on predatory lending.  These abusive activities by the Company, while increasing
4  Countrywide's revenues in the short-term, posed a significantly increased risk to
5  investors from borrower defaults that was not disclosed to the public.  Simply put,
6  as Countrywide harmed borrowers, Countrywide put itself and therefore the Class
7  at increased risk, and ultimately harmed the Class.

8    255.  On August 26, 2007, *The New York Times* ran a major exposé titled
9  *Inside the Countrywide Lending Spree*, revealing that Countrywide, as a matter of
10 company practice, regularly steered borrowers to risky loan programs with
11 unfavorable terms in order to generate maximum profits for the Company:

12    On its way to becoming the nation's largest mortgage lender, the
13    Countrywide Financial Corporation encouraged its sales force to court
14    customers over the telephone with a seductive pitch that seldom
15    varied.  "I want to be sure you are getting the best loan possible," the
16    sales representatives would say.

18    But providing "the best loan possible" to customers wasn't always the
19    bank's main goal, say some former employees.  Instead, potential
20    borrowers were often led to high-cost and sometimes unfavorable
21    loans that resulted in richer commissions for Countrywide's smooth-
22    talking sales force, outsize fees to company affiliates providing
23    services on the loans, and a roaring stock price that made
24    Countrywide executives among the highest paid in America.

26    *Countrywide's entire operation, from its computer system to its*
27    *incentive pay structure and financing arrangements, is intended to*
28    *wring maximum profits out of the mortgage lending boom no matter*

*what it costs borrowers,* according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September *the computer system in the company's subprime unit excluded borrower's cash reserves,* which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

256. A borrower who has more assets generally poses less risk to a lender, and will typically get a better interest rate and/or few up-front fees or points on a loan as a result. However, as indicated above, Countrywide's software prevented the input of borrowers' cash reserves so that loan officers would have to pitch higher-cost loans to borrowers.

257. Further, according to the *Times* exposé, "documents from the subprime unit also show that Countrywide was willing to underwrite loans *that left little disposable income for borrowers' food, clothing and other living expenses."* For example, one Countrywide manual stated that a borrower with a family of four could obtain a loan even if the monthly mortgage payment left the family with only $1,000 to live on for the month. A single borrower could obtain a loan whose payment left him or her only $550 for food, clothing or other expenses for the month. This was corroborated by the CLD Underwriting Matrices obtained by Lead Plaintiffs.

258. Countrywide also encouraged brokers to add prepayment penalty terms to loans. A broker's sales commission would be increased by 1% if he or she added a three-year prepayment penalty to a loan. Additionally, if a broker convinced a borrower to take out a HELOC in addition to a mortgage loan— which was commonplace in the Company's sales of so-called 80/20 loans—the broker received an extra 0.25% commission.

259. Brokers who induced borrowers to take out subprime loans were even rewarded in some instances by prizes such as all-expense-paid trips to Las Vegas. Similarly, as reported in October 2007 by *The Wall Street Journal*, employees in at least one California branch received prizes, including trips to Hawaii, for selling the most Pay Option ARMs.

260. Further, Countrywide's subprime unit also avoided offering borrowers Federal Housing Administration ("FHA") loans, which were backed by the U.S. government and carried less risk to borrowers. FHA loans tended to be well-suited to low-income or first time buyers, but were not offered because they did not generate the high fees generated by non-government-backed loans.

261. Countrywide's prioritizing of fees and commissions over borrower creditworthiness resulted in massive delinquencies in subprime loans. As reported in the Company's Form 10-Q for the second quarter of 2007, 20.15% of Countrywide's subprime loans were delinquent as of June 30, 2007, sharply up from 14.41% the prior year. Moreover, as noted in the *Times* exposé, nearly 10% of subprime mortgages were delinquent by 90 days or more, compared with only 5.35% the prior year. At the end of 2006, according to Countrywide's 2006 Form 10-K, delinquencies for Countrywide's subprime loans had increased to 19.03%, more than 25% higher than the prior year's rate (15.20%) and more than 68% higher than the delinquency rate in 2004 (11.29%). As of the end of 2007, fully 27.29% of Countrywide's subprime mortgage loans were delinquent, and 5.54% were pending foreclosure.

262. Further, delinquencies on Pay Option ARMs, publicly touted as a "prime" program as alleged above, increased significantly during the Class Period. As of the end of 2004, 0.1% of the Company's Pay Option ARM loans were delinquent. By the end of 2007, 5.36% of all Pay Option ARM loans were delinquent.

263.   A complaint filed in this Court against Countrywide on December 21, 2007 illustrates the Company's predatory lending practices with respect to Pay Option ARMs.  As alleged in that complaint, Edward Marini lives in Little Egg Harbor Township, New Jersey.   In or around February 2005, Mr. Marini entered into a subprime loan with another lender that was soon sold to Countrywide.    Within a few months, Countrywide contacted Mr. Marini by telephone and convinced him to refinance his mortgage with Countrywide Home Loans in the form of a Pay Option ARM on his primary residence.  At the time of the loan, Countrywide did not disclose to Mr. Marini that his monthly payments would increase soon after taking out the loan, or that if he made the "minimum payment" the principal amount of the loan would actually increase each month.

264.   Since this refinancing, the amount of principal Mr. Marini owes has increased by approximately $17,000.  Mr. Marini has also received a "Significant Payment Increase Alert" letter from Countrywide dated August 6, 2007, indicating that the minimum payment on his mortgage will soon increase to more than double what he is currently paying, based on negative amortization.  Mr. Marini anticipates that, as a result, he will need to file for bankruptcy, because he cannot make his monthly payments and has been unable to refinance his loan with Countrywide.

265.   Similarly, on July 25, 2007, Audrey Sweet of Maple Heights, Ohio, testified before Congress that Countrywide approved a mortgage that she and her husband could not afford.   When she and her husband "were finally told the amount of the monthly mortgage payment, [they] were shocked!"  Although they expressed concern about the amount of the mortgage, they "were told not to worry about it, as long as [they] paid the mortgage on time for a year [they] would be able to refinance to a better rate."  Additionally, she testified that loan documents were falsified.  In this regard, Ms. Sweet stated that in subsequently reviewing her loan application, she:

1  discovered several things [she] had apparently overlooked until then.
2  The first was that my gross monthly income was recorded as $726
3  dollars more than it actually was.  Secondly, I have two sets of loan
4  documents, one that was created 10 days before we closed and one
5  that was created the day of closing.  The closing day documents list
6  my assets as $9400.00 in my Charter One Bank account.  I have never
7  had $9400 in the bank.  Indeed, coming up on payday, I am fortunate
8  to have $94 left!  The final item I noticed was that the tax amount
9  listed on the appraisal report was $1981.34, which comes to about
10  $165.00 a month but Countrywide listed $100.00 a month as the tax
11  amount.

12  266.  Because Ms. Sweet and her husband could not afford their mortgage
13  payments, they face default and foreclosure.  Countrywide's increased risk of not
14  being able to collect on the Sweets' mortgage puts the Class at increased risk.

15  267.  The Company's predatory lending practices are presently the subject
16  of an investigation by a panel of the United States Senate.  During an August 29,
17  2007 press conference reported in *The Wall Street Journal*, the panel's chairman,
18  Senator Charles Schumer, stated:

19  Countrywide's most lucrative brokers are those that make bad loans
20  that are ***largely designed to fail the borrower***. . . . The company's
21  brokers can earn an extra 1 percent of the loan value in commission
22  by adding a three-year prepayment penalty to loans.

23  268.  The Attorneys General of California, Florida and Illinois have all
24  also launched investigations of Countrywide for deceptive business practices
25  relating to its mortgage lending.

26  269.  Simply put, Countrywide's whole business was designed with the
27  goal of originating loans and selling them to the secondary markets as quickly as
28  possible, regardless of the quality of the loans, the suitability of the products for

1  the borrower, or the number and magnitude of exceptions to Countrywide's
2  supposedly sound underwriting standards.    But, Countrywide's ability to sell
3  these loans quickly depended upon convincing investors in the secondary market
4  that the loans being sold were of high quality.  Among other things, this required
5  Countrywide to make various representations and warranties to the secondary
6  market, giving secondary market participants recourse if the representations and
7  warranties proved to be untrue.  These facts and the risks associated with them
8  were not disclosed to investors, and Plaintiffs and the Class were damaged as a
9  result.

10    **G.    Countrywide's Financial Statements Were
          Materially Misstated in Violation of GAAP**

11        **1.    Background**

12    270.  Generally Accepted Accounting Principles ("GAAP") constitutes
13  those standards recognized by the accounting profession as the conventions, rules
14  and procedures necessary to define accepted accounting practices at a particular
15  time.  The SEC has the statutory authority for the promulgation of GAAP for
16  public companies and has delegated that authority to the Financial Accounting
17  Standards  Board  (the  "FASB").    SEC  Regulation  S-X,  17  C.F.R.
18  § 210.4-01(a)(1), provides that financial statements filed with the SEC that are
19  not presented in conformity with GAAP will be presumed to be misleading,
20  despite footnotes or other disclosures.

21    271.  Countrywide, in reporting its financial results during the Class
22  Period, made numerous untrue statements of material fact and omitted to state
23  material facts necessary to make its reported financial results not misleading.
24  Countrywide violated GAAP in connection with its allowances for loan losses
25  ("ALL") on loans held for investment ("LHI"), valuation of retained interests
26  ("RIs"), valuation of mortgage servicing rights ("MSRs"), and accruals for

27
28

1    breaches of representations and warranties ("R&Ws") in connection with loan
2    securitizations.

3        272.   Two related terms—delinquency and nonaccrual—were important
4    concepts that Countrywide was required to consider in preparing its financial
5    statements in accordance with GAAP.  Delinquent loans and nonaccrual loans aid
6    management in determining whether a loan default is probable.  Countrywide's
7    regulatory filings reported delinquencies beginning when a loan was past due for
8    at least 30 days.   Countrywide also reported in its regulatory filings that it
9    characterized nonaccrual loans as those delinquent for at least 90 days.  Once a
10   loan was placed in nonaccrual status, Countrywide recorded interest income as
11   payments were collected, as opposed to when the payments became due.  In many
12   cases, a borrower that is considered to be in default will have its mortgage
13   foreclosed.  Therefore, for Countrywide, the number and trend of delinquencies
14   and nonaccrual loans should have been key metrics to use in determining default
15   rates for loans, and, as explained below, for the determination of ALL, valuation
16   of MSRs, accruals for breaches in R&Ws, and valuation of RIs.

17       273.   Statement of Financial Accounting Standards No. 5, *Accounting for*
18   *Contingencies* ("SFAS 5") was issued in March 1975 by the FASB.   The
19   principles described in SFAS 5 set forth the standards of financial accounting and
20   reporting for loss contingencies.  SFAS 5 sets forth the standards Countrywide
21   was required to adhere to in order to properly account for reserves for ALL and
22   breaches in R&Ws.

23       274.   Statement of Financial Accounting Standards No. 140, *Accounting*
24   *for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities*,
25   ("SFAS 140") was issued in September 2000 by the FASB, and later amended by
26   Statement of Financial Accounting Standards No. 156, *Accounting for Servicing*
27   *of Financial Assets* ("SFAS 156").   The principles described in SFAS 140 set
28   forth "the standards for accounting for securitizations and other transfers of

1   financial assets and collateral." In particular, SFAS 140 sets forth the standards
2   to properly assess the fair value for RIs and MSRs. Both RIs and MSRs are
3   components of the revenue line item gain-on-sale. SFAS 140, ¶ 11.

4        275. The AICPA issues industry-specific Audit & Accounting Guides
5   ("AAG") to provide guidance in preparing financial statements in accordance
6   with GAAP. The AAG for Depository and Lending Institutions was applicable to
7   Countrywide and interpreted GAAP pronouncements on the proper methods to
8   assess fair value for RIs and MSRs and accrue liabilities for ALL and R&Ws.

9        276. The AICPA also issues Audit Risk Alerts ("ARA"). The ARAs are
10  particularized by industry, including for financial institutions such as
11  Countrywide. The ARAs are used by industry participants, such as Countrywide
12  and its auditor, KPMG, to address areas of concern and identify the significant
13  business risks that may result in the material misstatement of the financial
14  statements. As evidence of their broad application, each year, representatives of
15  each industry participate in the development of the ARAs. The 2007 ARA states
16  in its inside cover, in fact, that Lawrence R. Gee, Countrywide's "Technical
17  Accountant" since 2006, made "essential contributions" to the development of the
18  ARA for lending institutions. It was also typical practice for the audit quality
19  departments of major accounting firms such as KPMG to integrate the ARAs into
20  firm memoranda for purposes of disseminating that information to applicable
21  clients and firm professionals. The ARAs are included in the AICPA's annual
22  Audit and Accounting Manual ("AAM").

23       **2.    Risk Factors**

24       277. Set forth below are the risk factors set forth in the Class Period
25  ARAs relating to lending institutions.

26           **(a)    Risk Factors in 2004**

27       278. The 2004 ARA stated that financial institutions that emphasized
28  subprime lending were beginning to show credit quality weakness. AAM

1   8050.07.  An assumption of credit risk is relevant to management's assumption in

2   estimating ALL and R&Ws, and is also relevant for valuing RIs and MSRs.

3   SFAS 5, SAB 102, SFAS 140, AAG Chs. 9 & 10.

4      279.  The ARA also warned that "[h]ome equity lending has tapered off

5   and delinquencies are increasing.  The federal banking agencies noted that

6   possibly half of U.S. family mortgages may be subprime, and delinquencies on

7   subprime loans continue to rise." AAM 8050.33.

8             **(b)**   **Risk Factors in 2005**

9      280.  The 2005 ARA elaborated on the 2004 ARA and focused on several

10  significant risks confronting lending institutions.  The first area of emphasis was

11  the valuation of mortgage-backed securities ("MBS") and related assets such as

12  MSRs and RIs derived from ARMs (adjustable-rate mortgages).  The 2005 ARA

13  noted that the combination of continued interest rate increases and a market that

14  was "flooded" with MBSs "may be impairing these assets." AAM 8050.10.  In

15  other words, as the MBS (secondary loan) market became flooded, there was less

16  demand and more supply of MBSs.  This created a liquidity risk because there

17  was an increasing risk that a seller would not be able to find a buyer for such

18  securities at a desirable price.  Thus, the flooding of the relevant market and

19  resultant increased risk of illiquidity should have been incorporated in

20  Countrywide's valuation models and related accounting estimates.

21     281.  The 2005 ARA cautioned that when the valuation of MBSs or MSRs

22  represents a material component of an entity's financial statements, as they did on

23  Countrywide's financial statements, that entity must have a robust methodology

24  in place to evaluate all of the critical variables in the pricing model.  AAM

25  8050.11.  This caution was augmented by a rising fear among analysts that a

26  reversal in credit quality could occur if interest rates continued to rise.  That is,

27  under those conditions, payments would become more difficult for borrowers

28  who would ultimately experience problems refinancing their mortgages if their

1    ARM loans reset at higher interest rates. AAM 8050.17. These risks were
2    particularly attributable to borrowers who "met only the threshold debt service
3    coverage ratios." AAM 8050.19. In other words, as higher interest rates took
4    effect, ARM borrowers who had low FICO scores, high debt-to-income ratios, or
5    high loan-to-value ratios would present significantly greater risk to mortgage
6    lenders. As a result, Countrywide should have adjusted its assumptions to include
7    these increased risks from such loans.

8    282.    The 2005 ARA also cited to the findings of the Office of the
9    Comptroller of the Currency ("OCC"), which warned that financial institutions
10   with significant holdings of financial instruments such as MBSs "need to focus on
11   the economic value of their equity." For Countrywide, this would have included
12   RIs. AAM 8050.14.

13   283.    Another important risk factor articulated in the 2005 ARA was "The
14   Housing Bubble's Overstated Collateral Values." This section of the ARA noted
15   the following issues that were increasingly present at Countrywide (AAM
16   8050.22):

17       [I]t is possible that financial institutions may have extended credit to
18       customers based upon inflated collateral values, perhaps subjecting
19       themselves to additional credit risk. In particular, many consumers
20       took out jumbo residential mortgages which may have been
21       collateralized by inflated property values. Customers holding
22       adjustable rate mortgages may not be able to make payments if
23       interest rates rise significantly. Upon foreclosure, these financial
24       institutions may not be able to liquidate underlying assets without
25       absorbing significant losses and may be stuck with the asset if the
26       economy lessens housing demand in the marketplace.

27   284.    Due at least in part to the continued rise in interest rates, this risk
28   directly impacted Countrywide. SEC Staff Accounting Bulletin No. 102, *Selected*

1  *Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"),
2  notes that "[i]t is critical that loan loss allowance methodologies incorporate
3  management's current judgments about the credit quality of the loan portfolio
4  through a disciplined and consistently applied process. . . . A registrant's loan
5  loss allowance methodology generally should . . . [c]onsider the particular risks
6  inherent in different kinds of lending . . . [and] *[c]onsider current collateral*
7  *values*." As a result, Countrywide's increasing exposure to ARMs, in
8  combination with its borrowers' exhibiting a growing tendency to make less than
9  full payments on "pay option" loans with decreased collateral values, constituted
10  a risk to Countrywide that the ALL would be under-reserved.

11  **(c)   Risk Factors in 2006**

12  285. The 2006 ARA focused on many of the same significant risks that
13  confronted mortgage lenders in 2005. Such relevant risk areas included the
14  increase in originations of risky loan products, such as ARMs and Pay Option
15  ARMs, which posed particular risks for entities that had not "developed
16  appropriate risk management policies (such as avoidance of negative
17  amortization)." AAM 8050.35. The 2006 ARA raised the specific concern that
18  the value of these products were often predicated on an assumption that home
19  prices would continue to rise, which it observed was an assumption unlikely to be
20  sustainable: "[S]ome of these [ARM] products assume a continued rise in home
21  prices that may not continue." AAM 8050.35. As a result, Countrywide should
22  have ensured that it was reflecting the increased credit risk of such products in its
23  valuation model and assumptions used to prepare the financial statements.

24  286. The 2006 ARA noted increased concerns regarding home equity
25  lending and related mortgages in terms of the easing of underwriting standards.
26  AAM 8050.36. In particular, the ARA continued to emphasize that if an
27  institution elected to change its underwriting standards to issue riskier loans, the

28

1  effect of such riskier loans must be considered in evaluating the ALL.  AAM

2  8050.36.

3              **(d)    Risk Factors in 2007**

4      287.  During 2007, the AAG listed fraud risk factors applicable to

5  mortgage lenders.  Each of these factors should have been considered by

6  management in assessing whether the Company's reserves and fair value

7  assumptions were appropriate (AAG Chs. 9 and 10).  These risk factors included

8  (AAG Ch. 5, Ex. 5-1):

9              (a)    Significant volatility in financial markets where the institution

10      is exposed to loss of revenue,

11              (b)    Deteriorating economic conditions (for example, real estate

12      prices) within industries or geographic regions in which the institution has

13      significant credit concentrations, and

14              (c)    Decline in asset quality due to borrowers affected by

15      recessionary declines.

16          **3.    Countrywide Inflated Earnings By Taking**
           **Inadequate Allowances for Loan Losses**

17

18      288.  According to its Form 10-K reports, Countrywide classified loans as

19  held for investment when management intended to hold the loans for the

20  foreseeable future or to maturity.  Countrywide represented that loans held for

21  investment were stated on its balance sheet at amortized cost, which included the

22  loans' unpaid principal balance, reduced by a valuation allowance for credit

23  losses inherent in the portfolio.

24      289.  With respect to the Company's portfolio of loans held for

25  investment, GAAP required the Company to establish a reserve for potential

26  credit losses related to borrowers who were expected to default on their

27  obligations to make monthly mortgage payments.  Countrywide referred to this

28  reserve as the allowance for loan losses, or "ALL."

290. Countrywide's ALL was a critical metric for investors because it indicated the expected level of loss the Company was reasonably likely to incur on loans held for investment on its balance sheet. Further, Countrywide's reported ALL was directly linked to net income, which also was a critical metric for investors. To increase its ALL, Countrywide would have to take additional provisions for loan losses. Under GAAP, taking a provision for loan losses reduces pre-tax earnings on a dollar-for-dollar basis.

291. With respect to the relevant GAAP requirements, SFAS 5 provides in paragraph 8:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> > a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
> >
> > b. The amount of loss can be reasonably estimated.

[Emphasis in original.]

292. The SEC also provided explicit guidance on the proper accounting for loan losses that Countrywide should have followed, but did not. SAB 102 states in pertinent part: ***"It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process. . . .*** A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectibility . . . [and] [b]e based on current and reliable data[.]"

1    293.  SAB 102 also provides: "Factors that should be considered in

2  developing loss measurements include . . . *[l]evels of and trends in delinquencies*

3  *and impaired loans . . . [and] [e]ffects of any changes in risk selection and*

4  *underwriting standards*, and other changes in lending policies, procedures, and

5  practices . . . ."  The SEC further stated in SAB 102 that "[f]or many entities

6  engaged in lending activities, *the allowance and provision for loan losses are*

7  *significant elements of the financial statements*.  Therefore, the staff believes *it*

8  *is appropriate for an entity's management to review, on a periodic basis, its*

9  *methodology for determining its allowance for loan losses*."

10    294.  Countrywide claimed it was determining ALL consistent with SAB

11  102.  It stated that the ALL was evaluated "on a periodic basis by management"

12  and any adjustments were purportedly reflected in the Company's earnings.  For

13  example, Countrywide stated in its 2006 Form 10-K that "we continually assess

14  the credit quality of our portfolios for loans held for investment to identify and

15  provide for losses incurred."  This Form 10-K also stated that "[o]ur allowance

16  estimation process benefits from the extensive history and experience we have

17  developed in our mortgage loan servicing activities," and that while "this process

18  is subject to risks and uncertainties":

19       *[W]e address this risk by actively monitoring the delinquency and*

20       *default experience of our homogenous pools by considering current*

21       *economic and market conditions.*  Based on our assessments of

22       current conditions, we make appropriate adjustments to our

23       historically developed assumptions when necessary to adjust historical

24       factors to account for present conditions.  *Our senior management is*

25       *actively involved in the review and approval of our allowance for*

26       *loan losses.*

27    295.  "Senior management" included the highest-ranking officers of the

28  Company.    According  to  CW1,  ALL  was  ultimately  set  by  a  Financial

1 | Asset/Liability Committee whose members included Defendants Mozilo, Kurland
2 | (replaced by Sambol when Kurland left the Company) and Sieracki, and Jeffrey
3 | K. Speakes, the Company's Chief Economist.

4 |     296.  The AAG also provided specific guidance on estimating ALL.
5 | Chapter 9 stated that management should generally consider historical rates of
6 | default when evaluating ALL reserves but "[c]hanges in facts, circumstances or
7 | institution's procedures may cause *factors different from those considered in the*
8 | *past to become significant* to the estimate of the allowance at the balance sheet
9 | date." AAG Ch. 9, "Credit Losses."

10 |     297.  As is evidenced in Countrywide's Form 10-K filings, the Company
11 | generally established the ALL based on historical default rates and loss
12 | percentages for similar loans originated by the Company. As a result,
13 | Countrywide failed to include in its estimated rate of default significant increases
14 | in risky loan products and loosened underwriting standards.

15 |     298.  The AAG also provided guidance on when loans could be considered
16 | impaired. In particular, Chapter 9 states that under SFAS 5 "a loan would be
17 | impaired at origination . . . if a faulty credit granting decision has been made or
18 | loan credit review procedures are inadequate or overly aggressive, in which case,
19 | the *loss should be recognized at the date of the loan origination*."

20 |     299.  As alleged in detail in Sections IV.B and IV.C above, Countrywide's
21 | credit-granting decisions were made without regard to borrower credit quality and
22 | minimal due diligence, if any, was performed on the loans. GAAP, including
23 | SFAS 5 and SAB 102, as emphasized in AAG Ch. 9, these practices required
24 | Countrywide to adjust historical trends and increase ALL for each year based on
25 | both the increased probability of impairment and actual impairment at origination.
26 | The Company did not do so, in violation of SFAS 5 and SAB 102, which
27 | specifically ties loan underwriting standards and changes in risk to the setting of
28 |

1    loan loss reserves. Rather, the Company kept ALL relatively constant during the

2    Class Period before management finally began to institute some changes in 2007.

3       300.   The comparison of ALL as a percent of LHI measures portfolio

4    credit risk coverage. If loan products are increasing in risk, the ALL as a percent

5    of LHI should increase as well. A review of the Company's ALL demonstrates

6    that during the Class Period—when the Company's exposure to and volume of

7    non-traditional, riskier loans were increasing dramatically—ALL increased

8    steadily in dollar amount but remained relatively constant (and in fact *decreased*

9    from 1Q05 to 3Q06) as a percentage of the Company's portfolio of LHI. Indeed,

10   LHI increased from only 10% of Countrywide's total assets in 2002 to 27%, 31%,

11   and 40% in 2003, 2004, and 2005, respectively. Thus, while Countrywide

12   assumed increasing amounts of credit risk as the Class Period progressed, it also

13   was unable to securitize many of the loans carrying that risk, holding them

14   instead on its financial statements but failing to appropriately account for that risk

15   in its ALL. The following table illustrates these trends:

16

17

18

19

20

21

22

23

24

25

26

27

28

| Quarter | LHI ($000s) | ALL ($000s) | ALL as % of LHI |
|---------|-------------|-------------|-----------------|
| 4Q02 | $6,112,475 | $42,049 | 0.69% |
| 4Q03 | $26,446,504 | $78,449 | 0.30% |
| 1Q04 | $30,033,754 | $93,054 | 0.31% |
| 2Q04 | $34,001,291 | $105,839 | 0.31% |
| 3Q04 | $35,035,980 | $107,765 | 0.31% |
| 4Q04 | $39,785,132 | $125,046 | 0.31% |
| 1Q05 | $47,833,388 | $134,916 | 0.28% |
| 2Q05 | $62,684,289 | $155,962 | 0.25% |
| 3Q05 | $67,960,558 | $184,784 | 0.27% |
| 4Q05 | $70,260,353 | $189,201 | 0.27% |
| 1Q06 | $74,279,882 | $172,271 | 0.23% |
| 2Q06 | $79,991,180 | $183,581 | 0.23% |
| 3Q06 | $81,004,695 | $207,987 | 0.26% |
| 4Q06 | $78,346,811 | $261,054 | 0.33% |
| 1Q07 | $75,551,461 | $374,367 | 0.50% |
| 2Q07 | $74,569,443 | $512,094 | 0.69% |
| 3Q07 | $84,778,139 | $1,219,963 | 1.44% |
| 4Q07 | $100,400,204 | $1,843,688 | 1.84% |

301. Beginning in 2003, Countrywide systematically increased its origination of nontraditional and nonprime loans. In accordance with the AAG (Ch. 9), the AAMs (8050.07, 8050.33) and SAB 102, estimates for ALL should have included "effects of any changes in risk selections and underwriting standards."

302. For example, in 2003, Countrywide produced approximately $20 billion in nonprime loans (based on the concealed, internal definition of "prime" that it employed), which was 4.6% of the total mortgage loans produced. In 2004, Countrywide increased its production of nonprime loans to more than $39 billion, which was 10.9% of total mortgage loans produced. Thus, production of nonprime loans increased almost 99% during 2004 alone, illustrating that Countrywide was assuming more credit risk. Also during 2004, Countrywide

1  increased the dollar value of ARM loans that it produced by 108%, and increased
2  HELOC loans by 70.7%. By 2004, it was clear that Countrywide was incurring
3  substantially more risk, even as the Company wrote fewer mortgages. According
4  to the 2004 ARA, federal banking agencies noted that possibly half of U.S. family
5  mortgages were subprime, and that delinquencies on subprime mortgages
6  continued to rise. AAM 8050.33.

7      303.  The table below depicts the increase in nonprime and nontraditional
8  mortgage loans at Countrywide:

| ($ millions of loans originated) | 2003 | % of 2003 | 2004 | % of 2004 | % Change |
|---|---|---|---|---|---|
| Total Mortgages | $ 434,864 | | $ 363,364 | | (16.4)% |
| Nonprime Mortgages | $ 19,827 | 4.6% | $ 39,441 | 10.9% | 98.9% |
| ARMs | $ 91,321 | 21% | $ 189,931 | 52.3% | 108.0% |
| Pay Option ARMs | n/a | | $ 21,802 | 6% | n/a |
| HELOCs | $ 18,103 | 4.2% | $ 30,893 | 8.5% | 70.7% |

17      304.  The data in the table in paragraph 303 above should have created a
18  presumption within management that the changing mix of Countrywide's loans
19  held for investment warranted increasingly conservative accounting estimates.
20  But Countrywide did not properly account for the increased production of
21  nonprime and nontraditional loans in 2004. This is evidenced by the fact that,
22  among other indicators, the ALL as a percent of LHI stayed constant from 0.30%
23  to 0.31% as noted in paragraph 300 above. This static reserve reflected
24  Countrywide's failure to properly adjust its historical rate of default in light of the
25  increased risk it was facing. Indeed, as alleged above as to Countrywide's
26  pervasive improper lending practices, loans to borrowers with high loan-to-value
27  ratios, high debt-to-income ratios, and low FICO scores (which included
28  approximately $173,071,802 of loans to borrowers with FICO scores of 500 and

1  below that were securitized during 2004), and which were based on decreased due
2  diligence leading to increased risk of false appraisals and other frauds in loan
3  applications, were impaired at origination as contemplated in AAG Ch. 9.  As a
4  result, the key assumption, historical default rate, that Countrywide used to
5  calculate its ALL, was flawed, and the reported net aggregate value of the
6  Company's LHIs was overstated.

7      305.  This trend continued throughout the Class Period.  For example, in
8  2005, Countrywide originated $45 billion in nonprime loans,[8] which comprised
9  8.9% of total mortgage loans produced.  Countrywide's production of nonprime
10 loans increased 13.2% during 2005 as compared to 2004, reflecting
11 Countrywide's continued assumption of increased credit risk.  Notably, during
12 2005, Countrywide increased originations of Pay Option ARM loans by 335%.
13 Originations of ARMs increased 37.7% and HELOC originations increased
14 45.2%.  The increase in nonprime and nontraditional mortgages is depicted in the
15 table below:

| ($ millions of loans originated) | 2004 | % of 2004 | 2005 | % of 2005 | % Change |
|---|---|---|---|---|---|
| Total Mortgage | $ 363,364 | | $ 499,301 | | 37.4% |
| Nonprime Mortgage | $ 39,441 | 10.9% | $ 44,637 | 8.9% | 13.2% |
| ARMs | $ 189,931 | 52.3% | $ 261,577 | 52.3% | 37.7% |
| Pay Option ARMs | $ 21,802 | 6% | $ 94,867 | 19% | 335.1% |
| HELOCs | $ 30,893 | 8.5% | $ 44,850 | 9.0% | 45.2% |

24 Such loans were subject to the same pervasive improper practices that infected all
25 levels of the Company's loan origination and underwriting functions.  Loans that

---

27 [8]  Again, using Countrywide's improper definition of "prime" versus
28 "nonprime."

1   were made to borrowers with high loan-to-value ratios, high debt-to-income

2   ratios, and low FICO scores (which included approximately $236,733,720 of

3   loans made to borrowers with a FICO score of 500 and below that were

4   securitized during 2005), and were based on decreased due diligence leading to

5   increased risk of false appraisals, were impaired at origination as contemplated by

6   AAG Ch. 9.

7       306. The table in paragraph 300 above once again illustrates

8   Countrywide's failure to properly account for increased risk in accordance with

9   SAB 102 during 2005, as the ALL as a percent of LHI inexplicably ***decreased***

10   from 0.31% to 0.27%. This shows, again, Countrywide's failure to adjust its

11   historical rate of default to include the known increased risk from nontraditional

12   loan products, nonprime loans and faulty credit-granting decisions resulting from

13   its changed business practices and model. Countrywide's historical "default rate"

14   was an incorrect measure for use in calculating ALL, especially given that a

15   material number of loans were impaired at origination. As a result,

16   Countrywide's financial statements failed to comply with GAAP.

17       307. In 2006, Countrywide once again understated its ALL. As illustrated

18   in the table below, in 2006 Countrywide produced approximately $41 billion in

19   nonprime loans, which was 8.7% of total mortgage loans produced.[9]  Although

20   there was a decrease in mortgage loans produced by Countrywide in 2006,

21   resulting in a concomitant decrease in nonprime and nontraditional mortgage

22   loans, the origination of such loans as a percentage of the total dollar value of

23   mortgage loans originated during 2006 remained strong and continued to be a

24   central focus of Countrywide's business. Thus, as shown below, 45.3% of the

25

26

27      [9]  Again, utilizing Countrywide's improper definition of "prime" and

28   "nonprime."

total dollar value of mortgage loans produced during 2006 were ARM loans, 14% were Pay Option ARMs, 10.2% were HELOCs, and 8.7% were nonprime loans.

| ($ millions of loans originated) | 2005 | % of 2005 | 2006 | % of 2006 | % Change |
|---|---|---|---|---|---|
| Total Mortgage | $ 499,301 | | $ 468,172 | | (6.2)% |
| Nonprime Mortgage | $ 44,637 | 8.9% | $ 40,596 | 8.7% | (9.1)% |
| ARMs | $ 261,577 | 52.3% | $ 212,085 | 45.3% | (18.9)% |
| Pay Option ARMs | $ 94,867 | 19% | $ 65,544 | 14% | (30.9)% |
| HELOCs | $ 44,850 | 9.0% | $ 47,876 | 10.2% | 6.8% |

The implication for Countrywide's financial statements of continued production of these high-risk loans was that its current and preexisting exposure to these investments warranted higher reserve rates and more conservative assumptions underlying associated accounting estimates and fair value measurements. AAG Chs. 9 and 10. Such loans were subject to the same pervasive improper practices that infected all levels of the Company's loan origination and underwriting functions. Loans that were made to borrowers with high loan-to-value ratios, high debt-to-income ratios, and low FICO scores (which included approximately $109,531,508 of loans made to borrowers with FICO scores of 500 and below that were securitized during 2006), and were based on decreased due diligence leading to increased risk of false appraisals, were impaired at origination as contemplated by AAG Ch. 9.

308. Once again, as illustrated in the table in paragraph 300 above, Countrywide failed to properly accrue ALL due to the increased risk assumed by the Company in 2006. The 2006 ALL as a percentage of LHI, in fact, stayed essentially flat as compared to 2005, at a rate of 0.33%. This lack of change once again illustrates Countrywide's failure to adjust its historical rate of default to

1  include the Company's increased risk, not just from 2006, but also from 2003 to
2  2006.

3      309.  Countrywide also failed to adjust its ALL based upon the increased
4  risk caused by material underlying qualitative considerations.    SAB 99,
5  "Materiality," notes that qualitative materiality involves, among other
6  considerations, "the surrounding circumstances that inform an investor's
7  evaluation of financial statement entries." Countrywide's financial statements
8  were materially false and misleading because the Company improperly
9  characterized a substantial number of its subprime loans as prime loans.  This
10  misrepresentation further demonstrates that the static levels of Countrywide's
11  ALL clearly failed to accommodate increasing nonprime risk.

12      310.  As set forth in Section IV.B.4 above, an analysis of aggregate FICO
13  scores associated with securitized loans show a substantial discrepancy between
14  the percentage of loans Countrywide claimed were nonprime and its actual
15  lending practices.   Given that Countrywide's concealed flexible definition of
16  "prime" was applied without distinction to whether loans were securitized and
17  sold or held in the LHI portfolio, there is a strong inference that there was a lower
18  percentage of prime loans in the LHI portfolio as well.

19      311.  In order to properly account for risk when estimating ALL,
20  Countrywide had to utilize estimates based on a correct determination of which
21  loans were prime and which were nonprime.  Wrongly minimizing the percentage
22  of nonprime loans would have materially worsened the understatement of ALL.
23  For example, at the end of 2006, Nonprime Mortgages had a delinquency rate of
24  19.03%, whereas Conventional Mortgages had a delinquency rate of 2.76%.
25  Accordingly, the Nonprime Mortgages that were improperly classified as Prime
26  or Conventional Mortgages would be under-reserved as of the balance sheet date.

27      312.  Other evidence of Countrywide's underaccrual for its ALL involved
28  Countrywide's loans that were 30-89 days past due.  An important component of

1   data that was reported by Countrywide was the information on its call reports for
2   30-89 Days Past Due on first mortgages.  A call report is a quarterly financial
3   report that banks must file with bank regulators, collected by the Federal
4   Financial Institutions Examination Council ("FFIEC").  Any rise in loans that
5   were 30-89 days overdue provided an early warning signal to Countrywide of
6   both rising credit risks and the inaccuracy of its ALL assumptions.  Data
7   concerning loans 30-89 days past due are important because they provide a signal
8   to the financial institution of the volume of loans that is likely to enter non-
9   accrual status and ultimately default, and accordingly provide an important
10  indicator of probability of impairment in the determination of ALL.

11       313.  As illustrated in the chart below, Countrywide experienced a
12  significant increasing trend of delinquencies as early as the second quarter of
13  2004, one that continued throughout 2005.  For example, the call reports indicate
14  that for the second quarter of 2004, loans that were 30 to 89 days past due
15  represented approximately 0.25% of the median value of mortgages.  By the end
16  of 2005, however, this rate had quadrupled to 1.00%.