

**30-89 Days Past Due 1st Lien Median Values
Percent of Total 1st Lien 1-4 Family Mortgages
2003-2008**

314.  This chart compares Countrywide's reported data with data relative to the industry as a whole, and for banks having more than $1 billion of real estate loans.  The chart demonstrates that while delinquencies of 30 to 89 days remained relatively constant for both the industry as a whole and those large banks between the first quarter of 2003 and the fourth quarter of 2005, Countrywide's delinquencies grew.

315.  This growth trend, which began in the first quarter of 2004, should have resulted in modifications to Countrywide's historical loss assumptions.  By the second quarter of 2005, when Countrywide's delinquency rate for 30-89 day loans surpassed the banking industry median for such loans, there should have been no doubt that the application of historical assumptions would have resulted in inadequate provisions to ALL.  Throughout the remainder of 2005 and through

1  the second quarter of 2006, the industry remained steady with rates between of

2  0.63% and 0.71%, while the rate of Countrywide loans that were 30-89 days past

3  due shot up from 0.77% to 1.25%.   Again, this evolution of the delinquency trend

4  provided a clear signal that Countrywide's ALL should have been increasing as a

5  percentage of total loans held for investment.

6      316.   In accordance with the ARA described in paragraph 285 above,

7  increases in originations of risky loans, particularly ARMs and Pay Option

8  ARMs, posed particular risks for lenders that had not "developed appropriate risk

9  management   policies   (such   as   avoidance   of   negative   amortization)."

10  Accordingly, Countrywide's ALL should have been increased to reflect such

11  increased credit risk. AAM 8050.35. As shown in the table below, delinquencies

12  in Pay Option ARMs and HELOCs, the loans that presented the greatest risk of

13  default, increased substantially during the Class Period:

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| 90 day+ delinquent Pay Option ARMs as % of all Pay Option ARMs | N/A | 0.1% | 0.22% | 0.63% | 1.02% | 1.84% | 3.17% |
| Delinquent HELOCs as % of all loans serviced | 0.73% | 0.79% | 1.57% | 2.93% | 2.96% | 3.70% | 4.62% |

19      317.   During the Class Period, many borrowers only made the minimum

20  payments on Pay Option ARMs, meaning that they were not even paying then

21  currently due interest.   Thus, during the Class Period, Countrywide recorded

22  massive amounts of negative amortization from Pay Option ARMs as deferred

23  revenue.   While booking this deferred revenue presented a current impression that

24  the Company's results were becoming better, in fact, the accumulated negative

25  amortization signaled that these loans were ticking time-bombs of delinquencies

26  and defaults, as mentioned in AAG Ch. 8, "Loans," and in paragraph 285 above.

27  As soon as borrowers reached the specified, pre-set negative amortization caps,

28  which forced them to start repaying the loan, not only would such borrowers be

1  delinquent, but their loans would also have experienced meaningful deterioration
2  in the applicable loan-to-value ratios, given that unpaid interest, according to the
3  terms of the mortgages, was added to principal.  That deterioration would have
4  also decreased the borrower's motivation to make further payments.  2005 AAM
5  8050.17.

6      318.  As shown in the table below, the amount of accumulated negative
7  amortization on Countrywide's Pay Option ARMs held for investment grew
8  dramatically during the Class Period.  During 2005, accumulated negative
9  amortization ballooned by more than 250,000%, and grew another 775% during
10  2006 and another 86% during 2007.  Despite the increasing risk from
11  accumulating negative amortization, ALL remained relatively flat as a percentage
12  of LHI until the third quarter of 2007:

|  | 2004 | 2005 | 2006 | 2007[10] |
|---|---|---|---|---|
| **Accumulated negative amortization from original loan balance, in $ millions** | 0.029 | 74.7 | 654 | 1,216 |
| **Current period negative amortization** | 0.029 | 74.7 | 579.2 | 562 |
| **Annual Growth Rate** | N/A | 257,652% | 775% | 86% |
| **ALL as % of LHI** | 0.31% | 0.27% | 0.33% | 1.84% |

19      319.  On July 24, 2007, Countrywide's volume-driven, exception-ridden
20  underwriting standards and lending practices manifested themselves in a sharp
21  but belated increase in loan loss provisions of $293 million for the second quarter
22  of 2007.  Approximately 62% of this increase was derived from an increase in
23  loan loss provisions of HELOCs of $181 million.

24
25

---

26      [10] For 1Q07, 2Q07, and 3Q07, Countrywide's accumulative negative
amortization from its original loan balance was $815.8 million; $942 million; and
27  $1,068 million, respectively.  During the same quarters, ALL as a percentage of
LHI was 0.50%, 0.69%, and 1.44% respectively.
28

320.    The July 24, 2007 increase in loan loss provisions was insufficient to cover the deterioration in the Company's loans held for investment.    The Company's third quarter 2007 results, announced on October 27, 2007, included a further massive provision for loan losses of $934 million, more than triple any provision previously recorded by the Company.    Nearly 24% of the Company's subprime loans were delinquent, up from 20.15% in the second quarter of 2007 and 16.93% in the third quarter of 2006.    As stated in the Company's press release, the increase in loan loss provisions was "primarily relate[d] to additional reserves provided for the Company's junior lien home equity [HELOCs] and pay option loans in the Banking Operations HFI [held for investment] portfolio."

321.    This $934 million provision represented 43%, 37%, and 35% of Countrywide's net earnings for 2004, 2005 and 2006, respectively, and was the single largest contributor to the Company's $1.2 billion loss for the third quarter of 2007.

322.    Because provisions for loan losses have a dollar-for-dollar impact on pre-tax income under GAAP, Countrywide's materially understated ALL caused its pre-tax income to be materially overstated by approximately $349 million cumulatively for the years 2004-2006 and the first half of 2007.

323.    In sum, Countrywide did not take into consideration the following risk factors when estimating its ALL:

(a)    The percent of loans that Countrywide held for investment increased year over year, demonstrating that Countrywide's loans were growing riskier and the secondary market was growing less willing to purchase the loans;

(b)    The reported amount of nonprime loans increased through 2005 and remained a central focus of Countrywide's loan production;

(c)     The actual amount of nonprime loans produced by Countrywide was much higher than the reported amount of nonprime loans through the Class Period;

(d)     The nonaccrual ARM delinquencies continued to rise at a significant rate during the Class Period;

(e)     Delinquent HELOCs increased during the Class Period;

(f)     Countrywide's delinquent loans that were 30-89 days past due increased substantially during the Class Period;

(g)     Countrywide's delinquent loans that were 30-89 days past due were increasing at a rapid pace and surpassed the median value for all banks loans that were 30-89 days overdue in the mortgage industry; and

(h)     Countrywide's underwriting practices deteriorated during the Class Period.

324.    Accordingly, during the Class Period, Countrywide's ALL was materially understated in violation of GAAP.   The Company's ALL failed to sufficiently take into account the adverse performance of Countrywide's loans due to the deteriorating underwriting standards for those loans.   Rather than increase the Company's ALL in a manner sufficient to account for these adverse factors, Countrywide misleadingly reduced and thus materially understated ALL.

### 4.     Countrywide Inflated Earnings By Overvaluing its Retained Interests from Securitizations

325.    As a result of the Company's increased credit risk and failure to adhere to its own underwriting guidelines, Countrywide overstated the fair value of its RIs from securitizations.    Accordingly, Countrywide also falsely and materially inflated its assets, stockholders' equity, gain-on-sale, revenues and net income.

326.    According to its Form 10-K reports, Countrywide "sells substantially all of the mortgage loans it produces in the secondary mortgage market, primarily

1   in the form of securities." Countrywide transferred mortgage loans to a
2   qualifying special purpose entity ("QSPE") which then converted those assets
3   into cash. The QSPE combined mortgage loans into one large pool, divided the
4   pool of mortgage loans into smaller pieces (known as tiers or tranches) based
5   upon default risk or other loan specific characteristics, and then sold the smaller
6   pieces of the pool to the secondary market. This process is known as
7   securitization.

8       327. As the issuer of many securitizations, Countrywide generally
9   maintained the riskiest tranches (the one in the first loss position) on its books as
10  RIs, also known as residual securities. RIs provided Countrywide with an
11  opportunity to receive additional cash flows over the life of the loans if specific
12  loan performance criteria were met.

13      328. Countrywide's valuation of RI from securitizations was a critical
14  metric for investors because it indicated the financial health of the Company.
15  This is because the valuation of RI was directly linked to gain-on-sale and,
16  ultimately, net income. During the Class Period, as alleged herein, Countrywide
17  did not properly value RI from securitizations in accordance with SFAS 140 and
18  SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities*,
19  violating GAAP and inflating its reported net income.

20      329. Countrywide's values for RI were materially overstated because of
21  its deteriorating underwriting standards. SFAS 140, paragraph 59 notes: "If the
22  retained interests are subordinated to more senior interests held by others, that
23  subordination may concentrate into the retained interests most of the risks
24  inherent in the transferred assets and shall be taken into consideration in
25  estimating the fair value of the retained interests." AAG Ch. 10, "Transfers of
26  Loans and Mortgage Banking Activities"; 2005 AAM 8050.14.

27      330. Management stated in the Company's Form 10-K filings that it
28  "estimate[s] fair value [of RI] through the use of discounted cash flow models."

1   The Company further said that "[t]he key assumptions used in the valuation of
2   [our] RI [in the cash flow model] include mortgage prepayment speeds, discount
3   rates, and . . . the net lifetime credit losses." Moreover, Countrywide "develop[s]
4   cash flow, prepayment and net lifetime credit loss assumptions based on *the*
5   *historical performance of the loans underlying our retained interests* . . . ."

6   331.  As described below, the values of the Company's RI were based in
7   large part upon the quality of the underlying loans.  Given that a substantial
8   portion of the underlying loans in the securitizations beginning in 2003 were not
9   originated in accordance with the Company's underwriting standards, there was
10   an increased risk that those loans would not perform in accordance with their
11   terms and, consequently, the securitizations would not perform as expected.
12   Because the RIs were the riskiest tranches of the securitizations, the failure to
13   comply with Countrywide's underwriting standards significantly impacted the
14   value of RI.  Thus, to properly value RI, Countrywide was required to adjust
15   assumptions that had been based upon the historical rate of default (i.e., net
16   lifetime credit losses) to include the increased credit risk of the underlying loans
17   included in its securitizations.

18   332.  Once RI was initially recorded, Countrywide was required to
19   determine the fair value of RI in each subsequent quarter.[11]  Paragraphs 68-70 of
20   SFAS 140 provided guidance on how to determine the fair value of RI:

21      Valuation techniques for measuring financial assets and liabilities and
22      servicing assets and liabilities shall be consistent with the objective of
23      measuring fair value.  ***Those techniques shall incorporate***
24      ***assumptions that market participants would use in their estimates of***

---

[11] According to Countrywide's SEC filings, the Company referred to
decreases in fair value of RI as "impairments," and increases in fair value of RI as
"recoveries."

> *values, future revenues, and future expenses, including assumptions*
> *about interest rates, default, prepayment, and volatility.*
>
> * * *
>
> Estimates of expected future cash flows, if used to estimate fair value,
> shall be based on *reasonable and supportable assumptions and*
> *projections. All available evidence shall be considered in developing*
> *estimates of expected future cash flows.*

SFAS 140, ¶¶ 68-70.

333. A key assumption Countrywide used to assess the fair value of RI was the "default rate," the concept of which is encompassed in "net lifetime credit loss" as referenced in Company Form 10-Ks. Net lifetime credit loss is determined by estimating when and how many loans will default and multiplying that amount by the percentage of the loan balance that will be uncollectible. Default rate is the speed at which the underlying mortgage loans become delinquent or default.

334. A second important assumption used to estimate the fair value of RI is "weighted average life." This assumption refers to the period of time during which the benefit of RI is expected to be received; in other words, the length of time that Countrywide will get paid on its RI, if any. This is influenced by prepayment rates and credit risk. SFAS 140, ¶ 17. Countrywide's shift toward nonprime and nontraditional lending beginning in 2003 should have decreased the weighted average life of RI, instead of allowing weighted average life to remain constant or increase. This is because the "life" of a loan ends when the borrower defaults, resulting in a lower weighted average life. As Countrywide increased the number of loans it made to less creditworthy borrowers under loosened underwriting standards and weak (if any) due diligence, defaults would be expected to increase and the weighted average life of such loans would be expected to decrease.

335.    The table below illustrates that Countrywide did not sufficiently adjust its historical default assumptions to encompass the new riskier loans that the Company was producing at a rapid pace; and nor did they include the increased credit risk from Countrywide's loosened underwriting practices. Countrywide failed to take these steps even though financial institutions with significant holdings of financial instruments like MBSs "need[ed] to focus on the economic value of their equity," which, for Countrywide, would have included RI.  2005 AAM 8050.14.   The Company failed to appropriately include in its assumptions for both weighted average life and net credit losses the likelihood that there had been, and would continue to be, an increase in defaults.

| Year ending December 31 | | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| **Nonprime Loans Originated ($ millions)** | $19,827 | $39,441 | $44,637 | $40,596 | $16,993 |
| **Total Delinquencies[12]** | 3.91% | 3.83% | 4.61% | 5.02% | 6.96% |
| **Nonprime Delinquencies** | 12.46% | 11.29% | 15.20% | 19.03% | 27.29% |
| **Prime Home Equity Delinquencies** | 0.73% | 0.79% | 1.57% | 2.93% | 5.92% |
| **Weighted Average Life** | 2.0 | 2.5 | 2.4 | 2.8 | 6.4 |
| **Net Lifetime Credit Losses** | 1.9% | 2.0% | 1.7% | 2.6% | 10.9% |
| **Weighted Average Prepayment Speed** | 30.6% | 34.8% | 38.3% | 32.2% | 21.0% |
| **Fair Value of Retained Interests ($000s)** | $1,355,535 | $1,908,504 | $2,675,461 | $3,040,575 | $2,450,397 |

336.    For example, at the end of 2003, Countrywide assumed that the net lifetime credit losses on RI was 1.9%.  But despite the increasing originations of nonprime loans, reported net lifetime credit losses for 2004 was only 2.0%.

---

[12] Expressed as a percentage of the total number of loans serviced, excluding subserviced loans and loans purchased at a discount due to collection status.

Moreover, the fair value of RI was significantly increased by the assumption that the weighted-average life rose from 2.0 years to 2.5 years. Accordingly, the fair value of Countrywide's RI was overstated at least beginning in 2004 because the changes in credit risk strategy and loosened underwriting practices were not appropriately included in the assumptions for weighted average life and net lifetime credit losses that were used to value RI.

337. In 2005, Countrywide again modified one of the key assumptions involved in its pricing model and, as a result, increased the fair value of RI. Specifically, whereas Countrywide's net lifetime credit losses in 2004 were assumed to be 2.0%, this rate was *lowered* in 2005 *by 15%*, to 1.7%. A lower rate of net lifetime credit losses should occur where delinquencies are decreasing and fewer borrowers will ultimately default on their mortgages. However, as shown in the table above, delinquencies increased markedly in 2005. In fact, the net lifetime credit loss rate that Countrywide claimed in 2005 was even lower than the rate that Countrywide reported in 2003, and so did not reflect the full impact of Countrywide's decision to increase its origination of high-risk mortgages.

338. In addition, Countrywide's assumptions regarding weighted average life in 2005 were overly aggressive. In consideration of the increased risk of default driven by Countrywide's new strategy, it would have been unreasonable to have presumed that the weighted average life of RI in 2005 would have been greater than in 2003. Yet, Countrywide assumed that weighted average life would, indeed, increase.

339. While Countrywide did increase its expectation of lifetime credit loss from 1.7% in 2005 to 2.6% in 2006, this increase still did not reasonably capture total credit-related losses expected as of that time due to the continuing increase in riskier loans. This rate instead continued to be based upon Countrywide's historical performance, one that reflected less risky loans. Additionally, Countrywide inappropriately offset the negative fair value impact of

higher estimated credit losses by simultaneously extending its assumed weighted average life of the RI. While weighted average life generally increases as interest rates rise (as they did in 2006), that presumption was unlikely to be realized by Countrywide's loans as its borrowers were increasingly unlikely to meet their interest-rate adjusted obligations. In other words, as higher interest rates took effect, ARM borrowers who had low FICO scores, high debt-to-income ratios, or high loan-to-value ratios would present significantly greater risk because this environment was a perfect storm leading to increased probabilities of default, particularly given that housing prices were decreasing since late 2005 (2005 AAM 8050.22) and negative amortization on Pay Option ARMs was increasing since 2004 (2005 AAM 8050.19, 2006 AAM 8050.35-38). And, given the subordinated position of many of Countrywide's RI, even a minor uptick in defaults was likely to have a significant impact on its losses. That is, if a borrower of a loan that was held for investment with either negative amortization or diminished collateral value had defaulted, Countrywide would record a loss to LHI in the amount of the difference between the loan carrying value and the collateral value.[13] However, such a default would have a much more drastic impact on Countrywide's RI, because the difference between the loan carrying value and the collateral value would first be apportioned to Countrywide's RI, until the loss allocation to RI was exhausted.

340.    The impact of Countrywide's improper accounting was evidenced by Countrywide's recorded write-downs to RI of $2.4 billion during 2007. Despite those write-downs, the reported fair value of Countrywide's RI remained at $2.5 billion as of the conclusion of 2007. Countrywide's RI should have suffered significantly greater impairment. Countrywide, however, distorted its results by

---

[13] Loan carrying value is the net dollar value at which an asset is carried on a firm's balance sheet. For example, a loan that was originated at $500,000 but that has been paid down $100,000 has a book value of $400,000.

1   reducing management's fair value assumption for prepayment speed to 21.0% in
2   December 2007 from 32.2% in December 2006, and more than doubling the
3   weighted average life assumption to 6.4 years in December 2007 from 2.8 years
4   in December 2006. These misleading fair value inputs prevented Countrywide
5   from reporting significantly greater impairment charges related to its RI, which
6   were clearly warranted at that time.

7       341. Countrywide's continued valuation of RI at $2.5 billion by
8   increasing the weighted average life to 6.4 years was unsupportable. With rising
9   defaults (i.e., net credit losses increased to 10.9%), Countrywide should have
10   decreased the weighted average life assumption rather than aggressively increase
11   it, because it was highly unlikely that if the underlying loans were defaulting, the
12   average life of a loan would grow. It was not logical that Countrywide would
13   benefit from RI for a period exceeding 6 years in 2007, when that period had been
14   less than 3 years in 2006. Moreover, interest rates were falling at the end of 2007
15   (the prime rate had declined from 8.25% as of December 2006 to 7.33% as of
16   December 2007), which suggested an accelerating rate of prepayment and a
17   shorter weighted average life for the RI. In its 2007 Form 10-K, however,
18   Countrywide *reported the very opposite* as to the effect of declining interest rates
19   on prepayment speeds for MSRs. Countrywide stated that "[w]e recorded a
20   decrease in the fair value of the MSRs in 2007 of $1,085.4 million, primarily as a
21   result of decreasing mortgage rates during the last half of the year which
22   *increased expected future prepayment speeds* of our agency servicing portfolio."
23   As illustrated in the table in paragraph 335 above, Countrywide decreased the
24   future prepayment speed for RI, and by doing so evaded recording greater
25   impairment charges related to RI in 2007.

26       342. The increased amount of nonprime, low-FICO loans that were
27   included in Countrywide's securitizations also shows that RI was overstated
28   during the Class Period (see tables in Section IV.B.4 above). The wide

1  discrepancy between (i) the high number of nonprime, low-FICO loans as a
2  percentage of securitized loans, and (ii) the falsely lower number of nonprime
3  loans reported as a percentage of total loan originations, further illustrates that
4  Countrywide was not properly considering the amount of increased risk in its
5  assumptions when valuing RI during the Class Period.

6      343.  CW1 also provided evidence of the overstatement of RI. According
7  to CW1, in a substantial number of instances during his tenure with the Company,
8  RI should have been valued at zero because the underlying mortgages in the
9  securitizations would likely default within 18 months. CW1 further stated that
10 the difference in value between the underlying mortgage loans rate and the
11 guaranteed coupon rate should have been zero because Countrywide's
12 significantly loosened origination and underwriting standards should have
13 required the Company to estimate far more delinquencies and defaults, thereby
14 materially reducing the return on the pooled mortgage loans. According to CW1,
15 by reporting the RI at inflated values, Countrywide also manipulated its gain-on-
16 sale income. Thus, in a hypothetical example provided by CW1, if the Company
17 valued RI at 2.5%, its gain-on-sale with all other factors consistent would be
18 1.5%. However, if the Company had properly valued RI at, for example, a lower
19 rate of 1.0% (rather than the value of zero that CW1 believed proper in many
20 instances), then gain-on-sale would be zero.

21     344.  Countrywide's massive write-down in 2007 corroborates CW1's
22 averment that RI should have been valued at or close to zero due to the poor
23 quality of the underlying loans, many of which should have been considered
24 impaired at origination.

25     345.  The statements set forth in paragraphs 340-341 concerning the write-
26 down of Countrywide's RI during the Class Period were materially false and
27 misleading when made because the Company's valuation model and key
28 assumptions ignored: (i) the Company's change in lending practices beginning in

1   2003 to offer non-traditional, high-risk loans; (ii) the Company's significant

2   increasing production of subprime loans; (iii) the Company's continued

3   exceptions from its underwriting guidelines; and (iv) the drastic increase in loan

4   delinquencies and defaults. Under legitimate risk assumptions, Countrywide's

5   intentional lowering of lending standards and the resulting increased

6   delinquencies would have resulted in proportionally reduced valuations of RI

7   throughout the Class Period. As a result, the fair market value of Countrywide's

8   RI was materially overstated in each of the years from 2004 through the first half

9   of 2007, as Countrywide failed to employ fair value assumptions to RI to reflect

10  the increased risk from the underlying loans it originated in violation of SFAS

11  140 and SFAS 115.

### 5.    Countrywide Inflated Earnings By Overvaluing its Mortgage Servicing Rights

346.   As a result of its loosened underwriting standards and its failure to adhere to even those standards, Countrywide overstated the fair value of its MSRs throughout the Class Period. Accordingly, the Officer Defendants also falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income.

347.   Countrywide typically retained the right to service mortgage loans after it sells them in the secondary market. To a lesser extent, Countrywide also purchased similar servicing rights from other loan originators and recorded them at fair value at the time of their purchase.

348.   According to Countrywide's Form 10-K filings during the Class Period, the Company described its MSRs as follows:

> The value we assign to servicing rights is referred to as mortgage
> servicing rights . . . . Our MSRs arise from contractual agreements
> between us and investors (or their agents) in MBS [mortgage backed
> securities] and mortgage loans.

349. The valuation of Countrywide's MSRs was a critical metric for investors because it indicated the financial health of the Company, given that the valuation of MSRs was directly linked to gain-on-sale and, ultimately, net income. However, during the Class Period, Countrywide did not properly assign an appropriate fair value when it initially recorded MSRs, nor did it do so when it subsequently valued MSRs in accordance with SFAS 140 and SFAS 156. This practice was in violation of GAAP and also caused Countrywide to improperly inflate its reported gain-on-sale and net income.

350. Until January 1, 2006, Countrywide's valuation of MSRs was governed by SFAS 140. According to Countrywide's Form 10-K filings, MSRs were initially recorded at fair value and then "were carried at the lower of amortized cost or estimated fair value. . . . The adjusted cost basis value of the MSR was then assessed for impairment. If MSRs were impaired, the impairment was recognized in current period earnings and the carrying value of the MSRs was adjusted through a valuation allowance." A valuation allowance serves a purpose similar to ALL relative to LHI. The valuation allowance account reduces the value of MSRs (*i.e.*, amortized cost) when impaired.

351. Countrywide maintained a pricing model to estimate the fair value of its MSRs. According to Countrywide's 2005 Form 10-K, in periods prior to 2006, this pricing model was used to gauge the adequacy of the valuation allowance: "Our MSR valuation process combines the use of a sophisticated discounted cash flow model . . . The cash flow assumptions and prepayment assumptions used in our discounted cash flow model are based on our empirical data drawn from the historical performance of our MSRs, which we believe are consistent with assumptions used by market participants valuing similar MSRs."

352. Statement of Financial Accounting Standards No. 156, *Accounting for Servicing of Financial Assets* ("SFAS 156"), amended SFAS 140 as of January 1, 2006 and provided reporting entities a choice of methods to use when

1  valuing MSRs. Countrywide elected to follow SFAS 156 as of January 1, 2006,
2  and chose to record MSRs at fair value (as opposed to amortized cost) in
3  subsequent quarters. In accordance with this election, the Company identified
4  MSRs relating to all existing residential mortgage loans as a class of servicing
5  rights and elected to apply fair value accounting to these MSRs. SFAS 156
6  changed the accounting for, and reporting of, the recognition and measurement of
7  separately recognized servicing assets and liabilities. Like SFAS 140, SFAS 156
8  requires MSRs to be initially recorded at fair value. However, SFAS 156 allows
9  MSRs to be *carried on the books at fair value in subsequent periods* (without
10  the need to subsequently value them at amortized cost).

11      353. In 2006 and thereafter, the fair values that Countrywide assigned its
12  MSRs were determined by a discounted cash flow model. According to
13  Countrywide's third quarter 2007 Form 10-Q, "[t]he discounted cash flow models
14  incorporate cash flow and prepayment projections based on data drawn from the
15  *historical performance of the loans underlying the Company's MSRs* . . . in
16  determining the assets' fair value."[14]

17      354. Moreover, Countrywide's 2007 Form 10-K stated that any calculated
18  change in the fair value of its MSRs was based upon two primary components—a
19  reduction in fair value due to the realization of expected cash flows, and a change
20  in fair value resulting from changes in interest rates and other market factors,
21  otherwise referred to as a change in fair value due to management's assumptions.
22  The fair value of the Company's MSRs decreased when the Company received
23  principal and interest payments from borrowers on any of the underlying loans
24  because the receipt of such payments (which include servicing fees) reduces the
25

26  ――――――――――
   [14] Prepayment projections or prepayment speed relates to the rate of payment
27  of debt obligations prior to the respective due dates on those instruments based
   upon changes in interest rates, given that borrowers tend to refinance their loans
28  when interest rates fall.

1   total amount receivable for the life of the loan. Changes in management's
2   assumptions could either increase or decrease the fair value of the Company's
3   MSRs.

4        355.  As noted above, management stated in Countrywide's Form 10-Ks
5   that it used "discounted cash flow models that incorporate cash flow and
6   prepayment projections based on data drawn from the historical performance of
7   the loans underlying the Company's MSRs" to determine changes in fair value
8   due to management's assumptions. The Company further stated that "[t]he key
9   assumptions used in the valuation of MSRs [in the cash flow model] include
10  mortgage prepayment speeds, the discount rate (projected London Inter Bank
11  Offering Rate ("LIBOR") plus option-adjusted spread)" and the weighted average
12  life of the loans.

13       356.  Throughout the Class Period, the default rate should have been a
14  critical assumption to Countrywide's assessment of fair value for its MSRs.
15  Default rate is not mentioned, however, in the list of such assumptions disclosed
16  in the Company's Form 10-Ks, and there is no explanation for the omission. The
17  table below demonstrates that as Countrywide's underwriting guidelines
18  continued to loosen over the Class Period, delinquencies and pending foreclosures
19  from loan defaults rose significantly. Notwithstanding this fact, Countrywide's
20  assumptions underlying its assessment of fair value for its MSRs continued to
21  increase in 2006 and 2007 when the Company reported MSRs at fair value
22  pursuant to SFAS 156:

23
24
25
26
27
28

| Year ending December 31 | | | |
|---|---|---|---|
| | 2005 | 2006 | 2007 |
| Total Delinquencies[15] | 4.61% | 5.02% | 6.96% |
| Nonprime[15] | 15.20% | 19.03% | 27.29% |
| Prime Home Equity[15] | 1.57% | 2.93% | 5.92% |
| Prepayment Speed | 22.8% | 21.0% | 17.9% |
| Weighted Average Life | 5.6 | 5.8 | 6.4 |
| Fair Value of MSRs ($000s) | $12,720,755 | $16,172,064 | $18,958,180 |

357.   By failing to appropriately use the default rate as a key assumption in the valuation of MSRs, the Company did not properly value its MSRs when initially recorded or when subsequently valued at the end of each quarter, and the Company's net income was accordingly overstated.   Even if Countrywide did somehow consider default rates as an assumption in its cash flow models, despite its failure to list them as assumptions in its Form 10-Ks, the values of Countrywide's MSRs were still overstated because the Company failed to adjust its assumptions of default rate to reflect the dramatic loosening in the Company's lending practices.   As higher interest rates took effect, ARM borrowers that had low FICO scores, high debt-to-income ratios or high loan-to-value ratios present significantly greater risk.   AAM 8050.19.   Consequently, Countrywide materially overstated the fair value estimates for its MSR throughout the Class Period.

358.   For instance, as Countrywide increased originations of mortgages overall, and also increased the percentage of mortgages granted to less creditworthy borrowers using loosened underwriting standards and without prudent due diligence, the gross value of Countrywide's MSRs as reported rose from $8.1 billion as of December 31, 2003 to $9.8 billion as of December 31,

---

[15] Expressed as a percentage of the total number of loans serviced, excluding subserviced loans and loans purchased at a discount due to collection status.

1   2004.  Yet, despite the consequent significant increase in the gross value and risk

2   of these assets, Countrywide actually decreased its valuation allowance for

3   impairment of MSRs from $1.2 billion to $1.1 billion.  Thus, although the gross

4   value of MSRs increased by 22% in 2004, the related valuation allowance

5   decreased by more than 9%.  This movement in the valuation allowance was

6   illogical in light of the increased credit risk associated with loosening

7   underwriting standards and failures to exercise prudent due diligence, as well as

8   the effect of that risk on the value of MSRs.  If credit risk increased,

9   management's valuation allowance account should have also increased, thus

10  providing a negative effect on the value of net MSRs.  Instead, the valuation

11  allowance *decreased* during 2004, thus conveniently—and misleadingly—

12  providing a positive effect on the value of net MSRs.  The table below

13  summarizes these changes:

|  | 2003 | 2004 | Increase/(Decrease) |
|---|---|---|---|
| **MSRs, gross** | $8,065,174 | $9,820,511 | 22% |
| **Valuation Allowance** | (1,201,549) | (1,090,582) | (9)% |
| **MSRs, net (as reported)** | $6,863,625 | $8,729,929 | 27% |
| **Valuation Allowance as a % of Gross MSRs** | 14.9% | 11.1% | (26)% |

359.  GAAP prescribes that MSRs should be continually evaluated to
determine whether their valuation should change, including whether or not costs
expected to be incurred cause MSRs to become a servicing liability rather than an
asset.  SFAS 140, ¶ 62.  If the costs of servicing poor quality loans increase (due
to, for example, the costs of sending delinquency notices, hiring collection agents,
etc.) to a high enough level, they will offset the expected income to be derived
from those MSRs.  Thus, when loans became troubled (for example, as loans
became 30 to 89 days delinquent), Countrywide should have anticipated those
incrementally higher costs and factored them into the valuation of MSRs.

1 Instead, while making riskier loans upon which it retained MSRs, Countrywide

2 inappropriately maintained its historical approach to establishing the value of

3 these assets.

4      360.   The reported gross balance of MSRs rose again from $9.8 billion as

5 of December 31, 2004 to $13.0 billion as of December 31, 2005. Yet, despite the

6 continued significant increase in credit risk assumed by Countrywide during that

7 year, the valuation allowance for impairment of MSRs actually decreased from

8 $1.1 billion to only $0.4 billion. Thus, although gross MSRs increased 33% in

9 2005, the related valuation allowance decreased over 60%. It was illogical that

10 the valuation allowance would drop in relative terms from 11% to only 3% of

11 gross MSRs given known exposure to increased default risk due to the loosening

12 in underwriting standards and failures to exercise prudent due diligence, and the

13 effect of that risk on the value of MSRs. In particular, it is unlikely that the net

14 reported value of MSRs accounted for the increase in expected operating costs to

15 service these loans. The table below summarizes these changes:

| | 2004 | 2005 | Increase/(Decrease) |
|---|---|---|---|
| MSR, gross | $9,820,511 | $13,031,359 | 33% |
| Valuation Allowance | (1,090,582) | (420,520) | (61)% |
| MSR, net (as reported) | $8,729,929 | $12,610,839 | 44% |
| Valuation Allowance as a % of Gross MSR | 11.1% | 3.2% | (71)% |

21      361.   As noted above, in 2006, Countrywide adopted SFAS 156 and began

22 to report its MSRs at purported "fair value." Accordingly, the reported MSRs

23 were now exclusively dependent upon the fair value assumptions employed by

24 management. During 2006, despite the significant increase in the level of credit

25 risk that by then had been accumulated by Countrywide, the Company's reported

26 balance of MSRs reflected a $432 million increase in fair value solely derived

27 from modified assumptions applied in its pricing model relating to SFAS 156.

1   However, as illustrated in the table below, there were no significant modified

2   assumptions that would warrant such an increase in fair value.   While 2006

3   represented the first year that Countrywide reported its MSRs at fair value, the

4   Company had provided disclosure about the inputs to its model used to assess the

5   fair value of its MSRs (*i.e.*, weighted average life and prepayment rates) since at

6   least 2002.  The table below indicates that from 2002 to 2006, Countrywide did

7   not significantly modify the fair value assumptions used in its model.   The

8   Company thus failed to incorporate the increased credit risk of its lending

9   strategies implemented in 2003 and the steady loosening of underwriting

10  standards and due diligence practices thereafter, or failed to do so appropriately.

11  At a minimum, to address the rising risk of default, Countrywide should have

12  decreased the weighted average life of its MSRs, instead of increasing it from 5.6

13  to 5.8 between 2005 and 2006:

|                            | 2002  | 2003  | 2004  | 2005  | 2006  |
|----------------------------|-------|-------|-------|-------|-------|
| **Weighted Average Life**  | 5.6   | 6.0   | 6.1   | 5.6   | 5.8   |
| **Prepayment Speed**       | 21.7% | 20.8% | 22.0% | 22.8% | 21.0% |
| **Option-Adjusted Spread** | 3.6%  | 4.3%  | 6.0%  | 6.4%  | 6.2%  |

19      362.   These credit risk factors had implications beyond simply the revenue

20  element of the MSRs. Countrywide's pricing models also failed to appropriately

21  consider the probable increase in operating costs (i.e., costs to restructure

22  mortgages in default and costs to collect late payments) that were inherent in the

23  MSRs generated in 2003 and thereafter.  As these increases in operating costs

24  became more likely over time, they should have caused changes to the pricing

25  model-based fair value assumptions, or, in the alternative, introduction of new

26  factors, that resulted in lower proportionate MSRs fair values than in prior

27  periods.

28

1    363.  Countrywide first wrote-down the fair value of its MSRs in its third

2  quarter 2007 Form 10-Q.  In that quarter, Countrywide recorded a reduction of

3  $1.1 billion in the fair value of the MSRs due solely to a change in model

4  assumptions.  Nevertheless, there does not appear to have been any meaningful

5  change to the key fair value assumptions in the model disclosed by Countrywide

6  to explain this change, strongly indicating an understanding that its model was

7  inadequate but a refusal to acknowledge its prior improper valuations.  In fact, the

8  increased weighted average life and the decreased prepayment speed both implied

9  that the modified fair value assumptions would have resulted in an increase to the

10  reported value of its MSRs as of September 30, 2007, rather than the decrease

11  which was reported.    The table below compares the key assumptions to

12  determining fair value disclosed by Countrywide's 3Q07 Form 10-Q with the key

13  assumptions used at the end of 2006, as disclosed in its 2006 Form 10-K:

|  | 12/31/06 | 9/30/07 |
|---|---|---|
| **Fair Value of MSRs** | $16.2B | $20.1B |
| **Weighted Average Life (in years)** | 5.8 | 6.4 |
| **Annual Prepayment Speed** | 21.0% | 18.1% |
| **Option-Adjusted Spread** | 6.2% | 6.1% |

19    364.  As illustrated above, there was no significant change in

20  management's key assumptions to warrant such a massive write-down of

21  Countrywide's MSRs.  Nonetheless, Countrywide continued to write down its

22  MSRs in the fourth quarter of 2007 as reported in its 2007 Form 10-K.  These

23  facts lead to the inference that Countrywide's assumptions used to value its MSRs

24  were incorrect and that some other undisclosed assumption such as default risk or

25  increasing servicing costs had been introduced, which resulted in the write-down.

26  This hidden introduction of "new" assumptions, ones that Countrywide did not

27  seem to consider with respect to prior valuations, provides evidence that there

28

1  was a failure to appropriately value its MSRs during the Class Period to reflect

2  the true credit risk of the underlying loans that Countrywide serviced.

3      365.  Additional evidence of management's hidden assumptions arises

4  from the Company's own SEC filings.  Countrywide disclosed in its 2007 Form

5  10-K that "[w]e recorded a decrease in the fair value of the MSRs in 2007 of

6  $1,085.4 million, primarily as a result of decreasing mortgage rates during the last

7  half of the year which *increased expected future prepayment speeds* of our

8  agency servicing portfolio."  However, as mentioned in the RI section above, the

9  weighted average prepayment speed for both MSRs and RIs decreased in the

10  Company's disclosed fair value assumptions as of December 31, 2007.

11  Countrywide does provide some disclosure that the market deterioration

12  moderated the impact of prepayments, but there is no disclosure reconciling these

13  conflicting conclusions.

14      366.  Consequently, the Company's valuation of its MSRs during the

15  Class Period was materially overstated because its cash flow model ignored: (i)

16  the Company's change in lending practices beginning in 2003 to offer non-

17  traditional, high-risk loans; (ii) the Company's significant increasing production

18  of subprime loans; (iii) the Company's continued exceptions from its

19  underwriting guidelines; (iv) the drastic increase in loan delinquencies and

20  defaults; and (v) the increased expected costs associated with servicing delinquent

21  loans.  Under proper risk assumptions, the "change in culture" and resulting

22  increased delinquencies would have resulted in proportionally reduced valuations

23  of its MSRs throughout the Class Period.  Rather than decrease the Company's

24  MSRs in a manner sufficient to account for these adverse facts and circumstances,

25  Countrywide used its MSRs to inflate earnings during the Class Period.

26

27

28