### 6. Countrywide Inflated Earnings By Failing to Properly Reserve for Representations and Warranties

367. As a result of its failure to adhere to its own underwriting standards, Countrywide did not properly accrue liabilities for breaches of representations and warranties throughout the Class Period. Accordingly, Countrywide and the Officer Defendants also materially understated Countrywide's liabilities and overstated its gain-on-sale revenues, and net income.

368. During the Class Period, Countrywide made representations and warranties in connection with the sale of its mortgage loans to the secondary market through securitizations. The accrual of loss contingencies for representations and warranties is based upon the rate of expected future claims from investors resulting from breaches of the Company's corporate guarantees and mortgage loan representations and warranties. Countrywide's representations and warranties with respect to the mortgage loans it sold included guarantees concerning the loans' compliance with applicable loan criteria, such as loan to value ratio limits, level of origination documentation required, credit scores, debt to income ratios, delinquency rates, the Company's written underwriting policies, and compliance with applicable laws.

369. According to Countrywide's regulatory filings, the Company retained credit risk for all representations and warranties offered in a securitization. Countrywide defined "credit risk" in its 2007 10-K as follows: "credit risk . . . is the risk that a borrower *will not repay* the [underlying] loans' balance as agreed and the risk that the proceeds from liquidation of the collateral securing the loan will not be adequate to repay the loan's balance."

370. "Credit loss" is a loss that arises from the retention of credit risk. If Countrywide breached its corporate guarantees and mortgage loan representations and warranties to secondary market purchasers, it would be required to either repurchase the underlying mortgage loan with the identified defects or

1  compensate the purchaser. In such cases, the Company would bear subsequent
2  credit losses on the mortgage loans.

3      371. Countrywide understated its loss accrual for R&Ws because it
4  ignored the high risk and poor quality of its underlying loans and its deteriorated
5  underwriting practices. Consequently, the Officer Defendants violated GAAP.
6  Specifically, SFAS No. 5, Accounting for Contingencies, required that
7  Countrywide record a reserve for a future loss associated with a breach of its
8  representations and warranties that was probable and estimable:

9      An estimated loss from a loss contingency . . . shall be accrued by a
10     charge to income if both of the following conditions are met: (a.)
11     Information available prior to issuance of the financial statements
12     indicates that it is *probable* [future event or events are likely to occur]
13     that . . . a liability had been incurred at the date of the financial
14     statements. . . . [and] (b.) [t]he amount of loss can be *reasonably*
15     *estimated*.

16     372. Further, SFAS 140 and Emerging Issues Task Force No. 92-2,
17  *Measuring Loss Accruals by Transferors for Transfers of Receivables with*
18  *Recourse* ("EITF 92-2"), states that the reserve should be estimated based upon
19  certain factors, including the Company's historical repurchase experience,
20  industry repurchase experience, *expected future volume of repurchases, and*
21  *expected value of underlying collateral*.

22     373. SFAS 140 and EITF 92-2 required the reserve to be estimated and
23  recorded as a liability on Countrywide's balance sheet in the period in which the
24  loans were sold, with a corresponding reduction of Countrywide's gain-on-sale in
25  its income statement. Specifically, SFAS 140 provides:

26     Upon completion of a transfer of assets that satisfies the conditions to
27     be accounted for as a sale (paragraph 9), the transferor (seller) shall
28     (paragraph 11):

a. Derecognize all assets sold[;]

b. Recognize all assets obtained and ***liabilities incurred*** in consideration as proceeds of the sale, including cash, put or call options held or written (for example, guarantee or ***recourse obligations***), forward commitments . . . swaps . . . and servicing liabilities, if applicable[;]

c. ***Initially measure at fair value*** assets obtained and ***liabilities incurred in a sale*** or, if it is not practicable to estimate the fair value of an asset or a liability, apply alternative measures[; and]

d. Recognize in earnings any gain or loss on the sale.

[Certain emphasis in original.]

374. According to CW8, Countrywide's representations and warranties were false and misleading because the Company loosened its underwriting guidelines during the Class Period and repeatedly included loans in the loan pools that did not conform to the stated description of such loan pools. Additionally, CW8 noted that the numerous exceptions to Countrywide's underwriting guidelines constituted breaches of representations and warranties in and of themselves.

375. Consistent with CW8's statements above, according to MBIA Insurance Company ("MBIA"), a monoline insurer for Countrywide's securitizations, Countrywide's loan files were incomplete. The files were missing appraisals, were not originated in accordance with the Company's underwriting standards, and borrower information was not verified by the Company. MBIA is one of the nation's oldest and largest monoline insurers, and provides financial guarantee insurance and other forms of credit protection, generally on financial obligations sold in the secondary market. MBIA states that Countrywide induced it to provide billions of dollars of credit enhancements during 2005 through 2007

1   in the form of guarantees on particular classes of residential mortgage backed
2   securities ("RMBS"). In doing so, Countrywide falsely represented to MBIA that
3   it had originated the underlying mortgages in strict compliance with its
4   underwriting standards and guidelines. MBIA states that it has already paid out
5   more than $459 million on its guarantees and is exposed to claims in excess of
6   several hundred million dollars more. MBIA further states that after reviewing
7   Countrywide's loan files, its loan applications lacked key documentation, such as
8   verification of borrower assets or income; included invalid or incomplete
9   appraisals; demonstrated fraud by borrowers on the face of applications; and
10  reflected that any of the borrower income, FICO score, or debt or DTI (debt-to-
11  income) or consolidated loan-to-value ("CLTV") information it was able to
12  obtain failed to meet stated Countrywide guidelines (without any permissible
13  exception).

14      376.   Similarly, Amalgamated Bank ("Amalgamated") has stated that it
15  purchased four portfolios of HELOCs from Countrywide between 2006 and 2007.
16  Amalgamated is a New York State chartered bank that was founded in 1923.
17  Amalgamated has been providing trust, investment advisory, custodial and benefit
18  remittance services for public sector employee benefit plans since 1973.
19  Amalgamated states that in selling the portfolios, Countrywide represented that
20  all of the loans in the portfolios had been originated in accordance with
21  Countrywide's underwriting guidelines, which included specific FICO scores,
22  loan-to-value ratios, debt-to-income ratios and due diligence performed on such
23  loans. Amalgamated states that it discovered deficiencies in the portfolios barely
24  six months after purchasing them. For example, Amalgamated states that the
25  loans in the portfolios were not originated and underwritten in accordance with
26  Countrywide's lending policies. There was no due diligence performed on the
27  underlying loans. Borrowers' FICO scores were less than what was required by
28  Countrywide's underwriting guidelines for such loans. CLTV ratios and debt-to-

income ratios exceeded agreed-upon limits.  Property appraisals were missing from the files.  One loan file, according to Amalgamated, revealed that a borrower claimed "to be a 13 year dental hygienist earning $26,200 per month (or $314,000 per year), when the borrower's employer estimated annual sales for the entire dental business was only $220,000."

377.  Further, CW12 confirmed that the loans Countrywide sold to the secondary market were extremely high risk loans.  CW12 stated further that the Company would purchase as much as $50 million dollars of loans per day from very risky lenders, such as New Century, American Home Loans and Quicken Loans, but only audit between 1% and 10% of these loans on a spot-check basis. According to CW12, if, during one of these audits, the loans were not meeting Countrywide's already loosened guidelines, those guidelines would be "tweaked" so that loans would conform.  Countrywide would then sell pools of these loans to investors through securitizations.

378.  The Company's 2006 Form 10-K represented that Countrywide attempted to limit the risk of incurring losses from breaches of representations and warranties by structuring its operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that met or exceeded secondary mortgage market standards.

379.  According to CW8, this representation was false and misleading when made because Countrywide did not attempt to limit its "risk of incurring . . . losses," or even "structure operations to ensure consistent production of quality mortgages."  Rather, Countrywide exposed itself to material losses as a result of its breaches of representations and warranties.

380.  The table below compares securitizations and the provision of new R&W reserves in 2005 to those in 2004:

| ($ in millions) | 2004 | 2005 | % Change |
|---|---|---|---|
| Estimated Total Securitizations | $166,347 | $221,157 | 33% |
| Provisions for New R&W | $85.4 | $66.4 | (22)% |
| New R&W as % of Total Securitizations | 0.05% | 0.03% | (41)% |
| Prime Home Equity and Nonprime Securitizations | $57,800 | $61,400 | 6% |
| R&W as % of Home Equity and Nonprime | 0.15% | 0.11% | (27)% |

381.   In 2004, Countrywide was originating high risk mortgages to the weakest borrowers.  For example, Countrywide securitized approximately $166 billion of loans during 2004, of which 40% were to borrowers with FICO scores of 660 or below, as mentioned in paragraph 120 above.  In addition, as alleged above, Countrywide further increased its risk exposure by loosening its underwriting criteria and failing to follow prudent due diligence practices. Therefore, Countrywide should have increased its accruals for R&Ws further than it did to account for such heightened risk.

382.   In 2005, Countrywide again failed to adequately provide sufficient R&W reserves.   This can be seen by comparing R&W reserves with securitizations of HELOCs and nonprime loans.  Countrywide's Form 10-Ks represented that only securitizations of HELOCs and nonprime loans were subject to recourse, meaning, for example, that Countrywide would be required to repurchase a loan if the borrower defaulted within a certain time after the securitization, regardless of whether there was a breach of its R&Ws. Countrywide increased securitizations of those types of loans from $57.8 billion to $61.4 billion in 2004 and 2005, respectively, a growth rate of 6%. However, in 2005, Countrywide actually decreased its provisions for new R&W reserves by 22% from approximately $85 million in 2004 to $66 million in 2005.  This year-over-year change in 2005 represented an inexplicable 27% drop in new R&W provisions as a percentage of relevant securitizations.

1    383.   The 22% decrease in new R&W provisions is also indefensible when
2    one compares 2004 to 2005 securitizations.  The dollar value of loans securitized
3    in 2005, as shown in the securitization prospectuses referred to in paragraph 120
4    above, were approximately $221 billion, approximately 33% greater than the
5    value of loans securitized during 2004, as shown in the same prospectuses.  In
6    other words, as a percentage of total loans securitized in 2005, Countrywide
7    recorded new reserves in the ratio of approximately 0.03% of new loans
8    securitized versus the 2004 reserve rate of 0.05% of loans securitized; a decrease
9    of approximately 41%.  In consideration of the increasing credit risk associated
10   with the 2005 loans securitized, including the risk related to loans originated
11   through the EPS system, it was illogical that the rate of new R&W provisions in
12   2005 would have been reduced by nearly 41% as compared to 2004.

13   384.   Moreover, in 2006, the Company assumed more risky loans and the
14   delinquency rate on the loans that the Company held for investment was
15   skyrocketing.  Given that Countrywide used the same underwriting criteria for
16   loans held for investment as it did for loans it planned to sell or securitize, and
17   Countrywide represented that it placed loans of higher quality in its LHI portfolio,
18   the Company should have acknowledged the probability that the loans the
19   Company sold to the secondary market would experience at least the same rate of
20   delinquencies.  While Countrywide increased its R&W reserve for 2006, that
21   increase was insufficient in view of the Company's continued origination and
22   securitization of substantial numbers of loans to less creditworthy borrowers with
23   loosened underwriting guidelines and lax or non-existent due diligence.

24   385.   Under proper risk assumptions, Countrywide's loosened lending
25   standards and the resulting increased delinquencies would have resulted in
26   proportionally increased reserves for breaches of representations and warranties
27   throughout the Class Period.

28

386.   It was not until the third quarter of 2007 that Countrywide was forced to admit that the amount of its reserves for R&W had been wrong.  At that time, the Company increased its allowance for representations and warranties by a shocking $291.5 million, or 611% from the $41.0 million reported twelve months earlier in the third quarter of 2006.  Notably, the Company reported that $177.3 million or 60% of this increased allowance related to prime loans and $67.1 million related to the nonprime loans, demonstrating the true extent of the Company's exposure to losses in its purported "prime" loan portfolio as a result of (a) its improper lending practices, and (b) its improper internal definition of "prime."

387.   Countrywide's reserves for R&W were materially understated and in violation of GAAP during the Class Period for at least the following reasons: (i) the Company changed its lending practices beginning in 2003 to offer non-traditional, high risk loans to all borrowers, even those incapable of repaying the loans; (ii) the increased origination of high-risk loans to unqualified borrowers with little to no supporting documentation; (iii) the Company's continued origination of loans through exceptions from its underwriting guidelines; and (iv) the increased probability that borrowers would default.

388.   As a result of these factors, Countrywide's liability for its breaches in R&W was materially understated throughout the Class Period, which, in turn, overstated its net income.  The accrual of loss contingencies from the Company's breach of its representations and warranties was a critical metric for investors because it indicated the financial health of the Company, given that the loss accrual was based upon the quality and performance of the underlying loans.  During the Class Period, Countrywide did not properly accrue loss contingencies that were probable and estimable in accordance with SFAS 5, SFAS 140 and EITF 92-2.

389. Thus, GAAP was violated and the Company understated its liabilities and overstated its reported net income.

### 7. Countrywide's Internal Controls Over Financial Reporting Were Ineffective

390. The Officer Defendants concealed the deterioration of Countrywide's internal controls during the Class Period by falsely representing in the Company's management's report on "internal control over financial reporting" that such controls were effective.[16] The lack of effective internal controls enabled the Company to lower its underwriting standards to such a point that it issued inherently risky loans, such as Pay Option ARMs, 100% financing loans, and SISA and NINA loans to non-creditworthy borrowers, notwithstanding representations by the Officer Defendants that they carefully managed those risks. Such lending practices caused the default rate of Countrywide's loans to increase at an accelerated pace throughout the Class Period. Additionally, the ineffectiveness of Countrywide's internal controls allowed the Officer Defendants to inappropriately classify sub-prime loans as prime loans (because, among other

---

[16] SEC Release No. 33-8238 defines the term "internal control over financial reporting" as follows:

The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persona performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

1. Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company, and;

3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material affect on the financial company's assets that could have a material affect on the financial statements.

1  things, the benchmark FICO score they used for prime loans was lower than
2  mortgage industry standards and the Company's exception processing system
3  further reduced standards), further masking the failing financial health of the
4  Company.

5       391.   As a result of Countrywide's failure to maintain effective internal
6  control over its financial reporting, the Officer Defendants were also able to
7  manipulate the timing of when they recorded reserves for contingent liabilities
8  and write-down the fair value of the Company's servicing and other
9  securitization-related assets. Countrywide's poor internal controls allowed the
10 Officer Defendants to materially misstate the financial statements during the
11 Class Period.

12      392.   Countrywide's 2007 Form 10-K filing asserts management's
13 responsibility over internal controls:

14      Management is responsible for establishing and maintaining *adequate*
15      *internal control over financial reporting for the Company*. . . . In
16      making its assessment of internal control over financial reporting,
17      management [claimed to] use[ ] the criteria established in 'Internal
18      Control-Integrated Framework' issued by the Committee of
19      Sponsoring Organizations of the Treadway Commission (COSO).

20      393.   COSO defines "internal controls" in Ch. 1 of its Framework as
21 follows:

22      Internal control is a process, effected by an entity's board of directors,
23      management and other personnel, designed to provide *reasonable*
24      *assurance* regarding the achievement of objectives in the following
25      categories:   (i) Effectiveness and efficiency of operations; (ii)
26      *Reliability of financial reporting*; (iii) Compliance with applicable
27      laws and regulations.

28

394. Moreover, COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company. The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the Company, as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the *foundation for all other components of internal control*, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

395. In addition, the COSO Framework, Ch. 2, establishes that management's philosophy and operating style directly affects the manner in which the company is managed, the amount of risk that the company accepts and ultimately the success of the company. Chapter 2 of the COSO Framework states:

> Management's philosophy and operating style affect the way the enterprise is managed, including the *kinds of business risks accepted*. ... Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, *conscientiousness and conservatism with which accounting estimates are developed*, and attitudes toward data processing and accounting functions and personnel. .... *The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure.*

1  396. Specifically, Chapter 8 of the COSO Framework establishes the

2  Chief Executive Officer's responsibility over internal control. Chapter 8 states as

3  follows:

4   [The chief executive] has ultimate ownership responsibility for the

5   internal control system. One of the most important aspects of carrying

6   out this responsibility is to ensure the existence of a *positive control*

7   *environment*. More than any other individual or function, the chief

8   executive sets the "tone at the top" that affects control environment

9   factors and other components of internal control.

10  397. Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-

11  Oxley Act") requires management to assess the effectiveness of the internal

12  control structure and the financial reporting for procedures.  Management is

13  responsible for performing this assessment in the context of a top-down risk

14  assessment,[17] which requires management to base both the scope of its assessment

15  and the evidence gathered on risk.  Management's conclusion, as a result of that

16  assessment, about whether the Company's internal control is effective must be

17  included in the Company's annual report.

18  398. Further, SEC Release No. 33-8238 requires management to report

19  publicly all material weaknesses[18] in the Company's internal controls.

20  399. Beginning in 2002, the Officer Defendants were required under Rule

21  302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's

22  "internal control over financial reporting."  Rule 302 states as follows:

23

24  [17] The top-down risk assessment approach describes the sequential thought
process in identifying risks and controls based upon the tone at the top.  The tone
at the top is created by management through maintaining a culture of honesty and

25  high ethical standards; and establishing appropriate controls to prevent, deter, and
detect fraud.

26  [18] "A material weakness is a significant deficiency, or combination of
significant deficiencies, that results in more than a remote likelihood that a

27  material misstatement of the annual or interim financial statements will not be
prevented or detected." PCAOB Auditing Standards No. 2, ¶ 10.

28

[E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for *establishing and maintaining an adequate internal control structure and procedures for financial reporting*; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, *of the effectiveness of the internal control structure* and procedures of the issuer for financial reporting.

400.  As explained above and in the Company's regulatory filings, the Officer Defendants represented to the marketplace that their assessment of internal controls over financial reporting was based upon the framework established by COSO.  Also, the Officer Defendants represented in the Company's Form 10-K filings that "management concluded that the Company's internal control over financial reporting *was effective as of" the years ended December 31, 2004,[19] December 31, 2005, and December 31, 2006*.  These statements were false because Countrywide concealed its lax underwriting standards and increased approval of exception loans.  As a result, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading because Countrywide's internal controls were ineffective.  The Officer Defendants' statements were false and misleading because Countrywide's internal controls were significantly deficient and ineffective to prevent or detect errors or misstatements in its operations, underwriting practices or financial reporting.

401.  Consequently, the Company's purported control environment failed to provide assurance that the financial statements issued during the Class Period

---

[19] In the Company's 2004 Form 10-K, management noted a material weakness regarding recognizing gains on sale of mortgage backed securities with embedded derivatives.   Importantly, management did not recognize a material weakness with regard to its lax underwriting practices over the Class Period.

1   were reliable or in compliance with applicable laws.   Rather, the Officer

2   Defendants focused on increasing loan volume origination without regard to the

3   quality of such loans in an effort to reach the aggressive 30% market share goal.

4   The control environment shaped by the Officer Defendants resulted in ineffective

5   controls with respect to the Company's financial reporting process and allowed

6   the Officer Defendants to materially misstate the Company's financial statements.

7   As a result, the Officer Defendants manipulated the timing of when the Company

8   recorded reserves for contingent liabilities and when it wrote down the fair value

9   of its servicing and other securitization-related assets in violation of GAAP.

10      402.  The material weaknesses in Countrywide's internal controls arose

11  from, among other things, the Officer Defendants' tone at the top, a tone that

12  condoned lax underwriting practices and resulted in material misstatements in the

13  Company's financial reporting.  It was not until 2007 that the Company's lax

14  lending practices were revealed to the market place because, at that time, the

15  Company was forced to record billions of dollars of losses from its increased

16  delinquencies and defaulting loans.

17      403.  Management's assessment of internal control over financial

18  reporting was a critical metric for investors because it provided assurance that the

19  Company's financial statements were reliable and in compliance with applicable

20  laws.  However, during the Class Period, as alleged herein, Countrywide did not

21  properly assess its internal controls over financial reporting, thus it violated the

22  "Internal Control-Integrated Framework" issued by COSO and various other

23  requirements found in the SEC regulations and SOX Act.

24      **H.    Defendants Materially Misrepresented Countrywide's Access
            to Liquidity And the Value of the Company's Excess Capital**

25

26      404.  Access to liquidity—in plain English, access to cash to fund the

27  loans it was issuing, was vital to Countrywide.  Without liquidity, the Company's

28  core business would necessarily fail.   Similarly, in general terms, capital,

1   otherwise known as stockholders' equity, was the amount of financial resources

2   Countrywide had available to continue its operations over time.  Both liquidity

3   and capital are essential to the survival of a company.

4              **1.       Countrywide Misrepresented its Access to Liquidity**

5        405.  Historically, Countrywide needed access to a staggering amount of

6   cash each month.  In 2006, for example, Countrywide originated approximately

7   $468 billion in loans—or roughly $39 billion per month.  To fund those loans,

8   Countrywide required the equivalent amount of cash.  It also required additional

9   cash to fund its other, incidental operations.

10       406.  Further, Countrywide's "change of culture" to issue higher risk loans

11  to higher risk borrowers posed a profound threat to the Company's sources of

12  liquidity.   By corroding the quality of the loans that formed the heart of

13  Countrywide's business, and consequently causing the Company's financial

14  statements to misrepresent multiple aspects of its business and finances—

15  including, but not limited to, its loan loss reserves and the assets on its balance

16  sheet—Defendants' misconduct created a ticking time bomb that was poised to

17  destroy Countrywide's reputation and creditworthiness, and thus its ability to

18  obtain the liquidity it needed, whether by selling debt instruments, selling

19  mortgages that it originated, borrowing, or otherwise.

20       407.  On July 24, 2007, the financial community began to learn that the

21  loans Countrywide was selling through securitizations and otherwise, as well as

22  the loans Countrywide held in its portfolio, were not as valuable as had been

23  represented because they were higher risk loans made to higher risk borrowers

24  than Defendants represented.  Moreover, those poor quality loans began to default

25  at an alarming and accelerating rate that forced Countrywide to begin to take very

26  large write-downs.

27       408.  The financial community further began to learn that these

28  misrepresentations were a consequence of Countrywide's misrepresenting itself

as being different and unique as compared to other residential mortgage lenders. In short, the financial community learned it could not trust Countrywide. Consequently, Countrywide's sources of liquidity dried up. Countrywide lost its ability to sell debt securities—a key method by which it traditionally had obtained liquidity—because few investors had faith in the integrity of its business or financial statements, or the quality of the securities it sold, and thus few would purchase those securities. As Countrywide ran through its backup sources of liquidity—including an $11.5 billion credit facility, which it tapped in full on August 16, 2007, and its ability to borrow from the Federal Home Loan Bank of Atlanta, which Countrywide had come close to exhausting by November 26, 2007—Countrywide faced the prospect of bankruptcy. See ¶¶ 990-993 below.

### 2. The Company's Capital Was Overstated During the Class Period

409. Defendants' misconduct also materially eroded the amount of financial resources Countrywide had available to continue its operations over time. As a result of the Company's failure to properly record adequate allowances for loan losses, liabilities for breaches in representations and warranties, and failure to properly assess the fair value for its retained interests and MSRs, its net income was overstated. See Section IV.G. Since net income positively affects retained earnings, a component of stockholders' equity, the company's stockholders' equity was overstated as well.

410. Capital is synonymous to a company's stockholders' equity. A Company's stockholders' equity is derived from two main sources. The first and original source is the money that was originally invested in the company, along with any additional investments made thereafter (invested capital). The second comes from income and earnings from operations that a company is able to accumulate over time (retained earnings). Stockholders' equity equals total assets less total liabilities. Therefore, if a company's assets are overstated and its

1 │ liabilities remain constant, its stockholders' equity will be overstated. Similarly,

2 │ if a company's liabilities are understated and assets remain constant, its

3 │ stockholders' equity will be overstated.

4 │      411. As alleged in Section IV.G above, the Company's assets were

5 │ materially overstated and its liabilities were materially understated during the

6 │ Class Period, both of which resulted in a material overstatement of Countrywide's

7 │ capital. As a result, all of Countrywide's statements relating to adequate or

8 │ excess capital were false and misleading.

9 │      412. Defendants' false statements regarding Countrywide's excess capital

10 │ are further evidenced from the sudden changes in Countrywide's statements

11 │ relating to its capital during the summer of 2007. At the June 5, 2007 investor

12 │ conference, the Company reported that it had between $2.8 and $5.4 billion in

13 │ excess capital. Shortly thereafter, on August 23, 2007, Bank of America

14 │ announced a $2 billion investment in Countrywide. In return for its investment,

15 │ Bank of America received very favorable terms, including obtaining non-voting

16 │ convertible Countrywide preferred securities yielding 7.25% annually and

17 │ convertible to common stock at $18 per share.

18 │      413. However, not even five months later, on October 26, 2007, at the

19 │ third quarter earning conference call, Countrywide represented that its excess

20 │ capital had fallen to a range of between $1.1 and $4.7 billion, despite the Bank of

21 │ America cash infusion of $2.0 billion. Countrywide's capital decreased swiftly

22 │ and severely from the massive write-downs that the Company was forced to take

23 │ as a result of its failure to properly reserve for losses and its failure to properly

24 │ value its assets. These steps were required to be taken because of Countrywide's

25 │ previously undisclosed policy of taking on an exponentially greater amount of

26 │ risk.

27 │      414. Specifically, due to the Company's inability to sell some of its loan

28 │ portfolio, and escalating credit losses, Countrywide was forced to take a $3

billion write-down in the third quarter of 2007. The very next quarter, Countrywide took another $2.2 billion in write-downs for the same reasons stated herein and in Section IV.G. Thus, in the second half of 2007 alone, Countrywide took $5.2 billion in write-downs, which would have virtually wiped out Countrywide's purported excess capital at the end of the second quarter of 2007, before the Bank of America cash infusion.[20]

415. The process by which the revelation of Defendants' misconduct caused Countrywide to lose access to liquidity and deplete its capital also helped to doom the Company's ability to survive independently. Thus, on January 11, 2008, Bank of America announced that it was purchasing Countrywide for only approximately $4 billion—representing approximately 26% of Countrywide's most recently reported book value of approximately $15.3 billion, as set forth in Countrywide's quarterly report for the third quarter of 2007.

416. Bank of America's decision to purchase Countrywide for only approximately 26% of Countrywide's book value following the completion of comprehensive due diligence corroborates the fact that Countrywide's stockholders' equity was inflated, the Company was in financial distress, and Countrywide's statements regarding excess capital—directly relating to the Company's ability to maintain a stable basis for long-term financing of its operations—were false and misleading.

417. The overstatement of stockholders' equity from the Company's failure to properly assess its allowance for loan losses, liabilities for breaches of its representations and warranties and improper valuation of its retained interests and MSRs, was a critical metric for investors because it indicated the financial

---

[20] In comparison, in 2006, Countrywide took $800 million in write-downs, while in 2007, write-downs equaled $6.5 billion.

1  health of the Company and its ability to continue its operations independently
2  over time.

3      418.  As detailed in Section IX below, Countrywide continued to try to
4  reassure the investing public about the soundness of its access to liquidity and
5  adequate capital through ongoing false and misleading statements, even as the
6  truth gradually came to light.   This caused, among other things, Countrywide's
7  credibility to plummet, its creditworthiness to decline, its access to liquidity to be
8  steadily choked off, and its overstated capital to be reduced by inevitable write-
9  downs, far below what Countrywide represented to the marketplace.

10

11  **V.    ADDITIONAL ALLEGATIONS SUPPORTING
       THE OFFICER DEFENDANTS' SCIENTER**

12
13      419.  At all relevant times, Defendants Mozilo, Sambol, Sieracki, and
14  Kurland acted with scienter in making materially false and misleading statements
15  during the Class Period.  Each of these Officer Defendants had actual knowledge
16  that the statements made by him were false and misleading, or acted with
17  deliberately reckless disregard for the truth or falsity of those statements.  Each of
18  the Officer Defendants' intent to deceive, or deliberately reckless disregard for
19  the truth, is demonstrated by substantial direct and circumstantial facts and
20  evidence supporting a strong inference of scienter.

21      **A.    Mortgage Banking Was Countrywide's "Core
             Business," and the Officer Defendants Closely Monitored
             the Company's Lending Practices and Credit Risk Exposure**

22
23      420.  During the Class Period, Countrywide consistently described its
24  Mortgage Banking segment, which originated, purchased and serviced residential
25  mortgage loans, as its "core business."   For the years 2004 through 2007,
26  Mortgage Banking generated 65%, 59%, 48%, and 50% of the Company's pre-
27  tax earnings, respectively.  The Mortgage Banking, Banking, and Capital Markets

28

1   segments, taken collectively, consistently generated more than 90% of the
2   Company's pre-tax earnings during the Class Period.

3       421.   The Officer Defendants were "hands-on," detail-oriented, and deeply
4   involved in the daily management of all aspects of Countrywide's core
5   operations, including the Company's policies, procedures and standards for
6   underwriting loans and the assessment and management of credit risk. Notably,
7   as alleged below, Mozilo "participate[d] every day in loan originations
8   [him]self."   The Officer Defendants were the executive officers directly
9   responsible for these core operations, including Countrywide's lending practices
10  and credit risk management.

11      422.   Overall, Countrywide's day-to-day management was overseen by an
12  Executive Strategy Committee whose members, according to CW1, included all
13  of the Officer Defendants as well as the Company's Chief Risk Officer, Chief
14  Economist, Chief Legal Officer, and head of the Banking segment (Countrywide
15  Bank), all of whom were executive officers of the Company.

16      423.   As stated in Form 10-K filings, management also maintained a
17  Credit Committee during the Class Period, "comprised of our Chief Risk Officer
18  and other senior executives," which "ha[d] primary responsibility for setting
19  strategies to achieve our credit risk goals and objectives." According to CW1,
20  Defendants Mozilo, Kurland (replaced by Sambol after Kurland left the
21  Company), and Sieracki, as well as the Chief Risk Officer and Chief Economist,
22  sat on the Credit Committee during the Class Period.

23      424.   The Credit Committee was mandated under its charter to "review,
24  assess and monitor the Company's policies and activities" with respect to "(1)
25  credit risk management activities, including the credit risk management strategies,
26  policies, controls, systems and methodology of the Company and its subsidiaries;
27  (2) methodology of loan loss reserves and adequacy of loan loss reserve levels;
28  and (3) actual and projected credit losses in all of the Company's activities and

1   across all of its portfolios."   With respect to loan loss reserves in particular,

2   Countrywide made clear in its Form 10-K reports that *"[o]ur senior management*

3   *is actively involved in the review and approval of our allowance for loan*

4   *losses."*

5       425.   Countrywide   also   maintained   an   Asset/Liability   Committee

6   ("ALCO") during the Class Period that was comprised of "several of [the

7   Company's] senior financial executives" including the Chief Risk Officer and co-

8   chaired by Defendant Sieracki.   ALCO, according to the Company's 10-K

9   reports, "ultimately" determined the Company's valuation of retained interests

10  and MSRs.   These filings made clear that *"[s]enior financial management*

11  *exercises extensive and active oversight"* of valuation of retained interests and

12  MSRs.

13      426.   As explained during a September 13, 2006 conference call, ALCO

14  maintained two subcommittees: the Pipeline and Portfolio Risk Management

15  Subcommittee and the Earnings Forecasting Subcommittee.   The Pipeline and

16  Portfolio Risk Management Subcommittee met "daily" and made "day-to-day,

17  tactical hedging decisions" concerning credit risk.   The Earnings Forecasting

18  Subcommittee met weekly to examine the Company's financial forecasts for the

19  current quarter, future quarters and entire fiscal year.   By updating forecasts

20  weekly, as stated during the conference call, the Subcommittee would "get a

21  sense of how production is performing, how the total company is going to

22  perform in different environments."

23      427.   With respect to liquidity, as stated in the Company's Form 10-K,

24  executive management reviewed the Company's compliance with liquidity

25  requirements on a monthly basis beginning in 2006: "To ensure compliance with

26  the LMP [Liquidity Management Plan], CHL, CSC and Countrywide Bank are

27  required to maintain adequate contingent liquidity regardless of conditions and to

28  diversify funding sources.   Each business unit has detailed metrics which are

appropriate to its business line.   The metrics are compared with actual performance positions and ***reported to executive management monthly***."

428.   Further, Countrywide maintained a Board-level Finance Committee and Audit and Ethics Committee that reported directly to the Board of Directors. Mozilo has been Chairman of the Board throughout the Class Period, and Sambol joined the Board in 2007.   These Defendants, accordingly, were aware of these committees' activities and findings that were presented to the Board, as were The Officer Defendants who were asked to attend Board meetings.

429.   The Finance Committee, according to its charter, was charged with reviewing, assessing and monitoring the Company's activities with respect to a number of finance and market risk-related matters, including liquidity, capital adequacy, and reserves; projected levels of short- and long-term borrowing and credit line requirements; the charter, policies and activities of ALCO; policies and strategy relating to MSRs and retained interests; and the Company's mortgage loan sales and securitizations and secondary marketing objectives.   The Finance Committee was also charged with reviewing matters related to equity (stock) purchases, "taking into account the quantity and quality of consolidated assets, earnings, potential earnings, availability of retained earnings, projected growth rates, [and] liquidity and capital requirements[.]"   The Finance Committee met frequently during the Class Period, and ten times during 2006 in particular.

430.   The Audit and Ethics Committee was charged with assisting the Board in overseeing the integrity of the Company's financial statements and the financial and other information reporting processes of the Company, the Company's internal audit function and the performance thereof, the Company's system of internal controls, and the Company's Code of Business Ethics.   More specifically, the Audit and Ethics Committee was required under its charter to, among other things, "discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such

1   exposures and liabilities, including the Company's risk management policies,"
2   and to discuss "the systems management utilizes to assess, monitor and control
3   such exposures through the enterprise, including the Company's risk assessment
4   policies."   The Audit and Ethics Committee met frequently during the Class
5   Period, and 14 times during 2006 in particular.

6       431.   Owing to these standing Board Committees' regular and ongoing
7   activities, Defendants Mozilo and Sambol, at a minimum, were made aware of
8   developing issues involving the Company's liquidity, reserves, internal controls,
9   risk management and risk assessment policies as they arose during the Class
10   Period.

11   **B.    The Officer Defendants Were Aware of, or
         Recklessly Disregarded, the Company's Relaxation
12        and Abandonment of its Loan Underwriting Standards**

13      432.   During the Class Period, the Officer Defendants publicly described
14   Countrywide's loan underwriting in SEC filings and during conference calls as
15   tightly controlled and supervised, and "designed to produce high quality loans."
16   Moreover, Mozilo and the other Officer Defendants repeatedly described the
17   Company's underwriting practices, particularly its "strong disciplines in the
18   origination of sub-prime loans," as markedly superior to those of competing
19   lenders.   Countrywide's consistent and essential message to investors and
20   analysts, as Mozilo stated early in the Class Period, was that the Company is "a
21   very different focused company that understands this product very well, how to
22   originate it, how to manage it, how to underwrite, how to service it," and that
23   other lenders are fly-by-night outfits that don't know the mortgage business and
24   are best avoided.

25      433.   Mozilo held himself out as a unique type of CEO.   He claimed he
26   was personally involved "every day" in loan originations and, as such, kept close
27   tabs on credit quality.   When asked during the Company's July 26, 2005

28

conference call with analysts whether "credit quality in the nonprime mortgage sector" was stable or worsening, Mozilo confidently replied:

> I think it's stable. ... *I do participate every day in originations myself, and it keeps me apprised of what's happening.* I think that that situation has stabilized. *I don't see any deterioration in the quality of those loans being originated.*

434. Consistent with his purported hands-on approach, Mozilo was similarly well-aware of the Company's underwriting policies and procedures and changes made in them. When asked during the same conference call whether Countrywide was loosening underwriting standards, Mozilo said "I'm not aware of any change of substance in underwriting policies" and, focusing on Pay Option ARMs and interest-only loans, stated that "I'm not aware of any loosening of underwriting standards that creates less of a quality loan than we did in the past." In response to a follow-up question, Mozilo added: "We don't view that we have taken *any steps* to reduce the quality of our underwriting regimen *at all*."

435. However, at and prior to this point in time, Countrywide—in a headlong quest to meet Mozilo's goal of 30% market share—was steadily loosening and abandoning its underwriting guidelines in order to capture less creditworthy borrowers and was ramping up production of what one former employee described as "new, exotic" products that led to "easy money" for the Company but carried a high degree of risk. As alleged herein, the Officer Defendants were intentionally misstating the facts, or acting in a deliberately reckless manner in making their repeated public statements regarding purportedly strong and superior underwriting practices, in view of what was actually happening at the Company, which, at the very least, provided no basis for and in fact contradicted their repeated statements.

436. According to CW1, the Company increased origination of risky loans in an effort to meet Mozilo's demand to achieve 30% market share, and also

to keep up with perceived competition by other lenders. Countrywide's near-collapse was not caused simply by market forces. Rather, according to CW1, "lax underwriting guidelines" and increasing origination of subprime loans with reduced documentation, lower credit scores and higher loan-to-value ratios were key contributors to the Company's downfall.

437. According to CW1, based on CW1's regular, day-to-day discussions with them, all Company executives, and Mozilo and Sambol in particular, were aware of the declining credit quality of loans being originated. According to CW1, this decline in loan quality occurred contemporaneously with the Company's widening of its loan origination guidelines, which began in 2003.

438. According to a *Wall Street Journal* article published on February 23, 2008, in late 2003, there was a meeting at Countrywide's headquarters of dozens of executives. At that meeting, tensions between Sambol and the Company's risk managers "boiled over." According to the article—which directly criticized Sambol for his role in spearheading Countrywide's "lunge for growth" in the subprime area—the Company's Chief Investment Officer, who was responsible for pricing loans to be sold on the secondary mortgage market and managing risk, *"uttered a loud profanity and walked out of the meeting to protest what we saw as imprudent lending."*

439. According to the article, however, Sambol, brushed aside warnings from risk-control managers that underwriting standards were too lax, stating that being too cautious would turn Countrywide into a *"nice, little boutique."* Sambol pushed a policy of offering nearly the entire range of mortgage products available in the market, including 100% financing, 80/20 loans, and low-doc and no-doc loans to borrowers with weak credit. Confidential Witness 14 ("CW14"), who served as a high-level risk management officer with Countrywide Bank in Company headquarters during the Class Period, confirmed the accuracy of this report. Indeed, no later than 2005, CW14, together with the Company's Chief

1  Risk Officer and Chief Credit Officer, all repeatedly warned Sambol about
2  aggressive production, and the dangers of lax underwriting standards and placing
3  risky loans on the Company's balance sheet. According to CW14, however, the
4  three of them ultimately were "in the wilderness alone" and were put under
5  enormous pressure to "go with production," *i.e.* to accede to Sambol's plan to
6  keep production in overdrive.  "Production and market share," according to
7  CW14, were Countrywide's "front and center" objectives.

8       440.  CW1 personally observed Sambol, on a regular basis, put pressure
9  on employees to price risky loans in a way that would not take into account the
10  extent of the risk the loans presented and, accordingly, would overstate the value
11  of the loans on the Company's books.  CW1 also observed Sambol pressuring
12  employees to widen underwriting guidelines that would have the effect of
13  enabling increased production of risky loans.  According to CW1, Sambol had
14  trouble balancing Countrywide's corporate mandate with his own "personal
15  ambitions" and could not be controlled.

16      441.  During 2004 and 2005, CW1 repeatedly told Kurland and others that
17  *"this isn't going to last forever."*  By this, CW1 meant that the mortgage market
18  was saturated and that the bubble would eventually burst, with severe
19  consequences for Countrywide given the significant undisclosed risk the
20  Company was taking on.

21      442.  Regarding the "tone at the top" of the Company, CW1 stated,
22  referring to Mozilo, Kurland and Sambol, that *"when you have three executives*
23  *with 31% of the options, it kind of speaks for itself."*  According to CW1, these
24  Defendants sought to ride out the problems in the mortgage industry as long as
25  they could profit from them.

26      443.  Countrywide's senior executives took a keen interest in, and were
27  aware of, how the Company's underwriting guidelines compared with those of
28  competing lenders. Countrywide held monthly "Business Review" meetings at its

1 Calabasas headquarters, run by Sambol and other top executives, during which
2 the operations and performance of each Company division was evaluated and
3 discussed in great detail.   According to CW8, binders of documents were
4 circulated prior to each Business Review that included highly detailed reports for
5 all Countrywide divisions concerning all aspects of the division's business and
6 lending activity, including loan production, loan classifications (such as prime
7 and subprime), and revenue and expenses.   The binders contained a wealth of
8 information in the aggregate and broken down to an almost molecular degree of
9 detail.

10    444.   According to CW8, each division forwarded its respective report to
11 Countrywide headquarters in Calabasas and the information was collected and
12 compiled within Sambol's office.  High-ranking Countrywide officials, including
13 Sambol, studied these monthly reports in detail.

14    445.   CW8 personally attended portions of two Business Review meetings
15 at which Sambol and other officials questioned managers about sections of the
16 monthly reports their divisions submitted.   During CW8's employment with
17 Countrywide, CW8 regularly spoke with other senior officials about these
18 Business Review meetings.   These officials described how Sambol and other
19 executives questioned them aggressively and in great detail regarding specific
20 aspects of the monthly reports they submitted.

21    446.   The binder circulated for a Business Review concerning the FSL
22 division, which Lead Plaintiffs obtained in the course of their investigation,
23 includes a "Non-Prime Competitor Comparison Matrix" which closely compares
24 Countrywide's underwriting standards for subprime loans, including "80/20
25 Combo," 100% loan-to-value, and interest-only loans, and at various
26 documentation levels, with the guidelines of subprime lenders New Century
27 Financial, Fremont, Option One Mortgage, First Franklin Financial,
28 Ameriquest/Argent, WMC Mortgage, and Decision One.   This Comparison

Matrix, which could not have been compiled without some degree of "industrial espionage" into competitors' practices, was updated every month and e-mailed to the entire FSL sales force.

447. The FSL binder also shows, as alleged in detail in Section IV.D above, that Countrywide consistently categorized as "prime" hundreds of loans to borrowers with FICO scores below 660. Moreover, the FSL binder contradicts Mozilo's statement that Pay Option ARMs "ha[ve] a FICO score exceeding 700" and were limited to borrowers "of much higher quality." In January 2007 alone, the FSL division made Pay Option ARM loans to at least 57 borrowers. The average FICO score of all of these borrowers was below 700.

448. Sambol, with the support of the other Officer Defendants, who had access to the same information, clearly knew about—and endorsed—Countrywide's rampant deviations from its underwriting policies and procedures. Sambol directed the creation in 2004 of Countrywide's proprietary Exception Processing System to *approve* and fund "highly risky loans" (after tacking on additional fees) that violated the Company's ever-loosening underwriting guidelines. As noted above, CMD's EPS, in particular, was intended to "approve virtually every borrower and loan profile with pricing add on when necessary."

449. According to CW12, the push toward risky lending ultimately came from "high-up," and specifically from David Sambol. According to CW12, "things went south" when Sambol became more powerful within the Company in 2003. "Late in 2003," according to CW12, risky lending through exceptions became "more and more profitable," and the Company started making "wild crazy loans" and "any exception was allowed." Sambol, according to CW12, was "completely for sales all the time," and had a philosophy that sales—that is, originating loans and selling them to the secondary mortgage market—ruled the Company. Indeed, Sambol's mantra, according to CW12, was that "Countrywide will make every loan possible." Consistent with this practice, account executives

1  (loan officers) were told, "don't take no from underwriting, don't take no from
2  your branch manager, escalate as high as you have to.  If it has to go to Sambol,
3  just get the deal done."

4      450.  According to CW10, exceptions to loan guidelines were set forth in
5  "Executive Summary Reports" and monthly "Production Reports" at the branch,
6  area, and regional levels.  The Production Reports identified how many loans
7  were closed and funded, the types of loans originated, and exceptions to loan
8  guidelines.  The Production Reports were distributed to and discussed monthly
9  among Sambol (whom CW10 described as a "big numbers guy") and department
10  managers, and sometimes with Branch and Area Managers by means of
11  conference calls.  Eugene Soda, the "head of underwriting," was aware of
12  exception rates and regularly presented them at these meetings.

13      451.  According to CW12, there were an "endless" number of reports
14  "pulled" from EPS on all topics on a "daily, weekly, and monthly" basis.  EPS
15  was so detailed, according to CW12, that it was often "drilled down" to report on
16  the amount of loans with "100% LTV" ratios, the debt-to-value ratios or,
17  separately, on the loan processing "turn-times" (i.e., how long it took to close and
18  fund loans) for some or all regions of the Company.

19      452.  CW12's job description included furnishing "Exceptions Reporting"
20  to department supervisors, who in turn provided such reports to executives in
21  Secondary Marketing.  Exceptions reporting was also made available to other
22  executives, including Mozilo and Sambol.  CW12 saw both Mozilo's and
23  Sambol's names on the distribution lists for Exceptions Reporting, and CW12's
24  supervisors informed CW12 that Sambol would regularly give them specific
25  instructions based upon information in the exception reports he reviewed.  The
26  decisions coming down from Calabasas regarding "exception risk" (such as "no
27  more stated exception deals above a certain LTV") made clear to CW12 that

28

1   high-level executives were examining the data contained in exception reports and
2   making adjustments to the types of exceptions that would be allowed.

3        453.   Moreover, CW12 recalled that Kathy Tinsley, an EPS supervisor,
4   told CW12 and other underwriters that her supervisor, Jess Lederman, had been
5   told by Sambol at one point that he was unhappy (based on his review of EPS
6   statistics) with loan production, which at the time was not meeting goals he had
7   set.  Therefore, underwriting guidelines would need to be loosened, certain loan
8   programs would need to be pushed, and, he instructed, the Company would take
9   more risk on certain loans.

10       454.   According to CW12, exception reports were 30-40 pages long and
11  contained a multitude of data, including the "up-charge" (the amount of money
12  Countrywide stood to earn on each loan) and other different data and metrics.

13       455.   CW12 also described a report called "AMPS" that reported and
14  summarized all of the exception loans approved company-wide through all of
15  Countrywide's business channels.    "AMPS" showed all of the overrides to
16  Countrywide's underwriting guidelines made on exception loans.  These reports,
17  according to CW12, went out in special brown envelopes to preserve
18  confidentiality, and were circulated to all Countrywide executives and managers
19  of the First Vice President rank and higher.

20       456.   Additionally, according to CW12, increases in the rate of exceptions
21  were closely tracked and documented in "Trend Analysis" reports, which were
22  provided to David Sambol and other senior executives.  According to CW12,
23  Trend Analysis reports were "interofficed" in special confidential red and white
24  envelopes and kept in locked drawers.  As a result of receiving these reports,
25  Sambol and senior executives were aware of the massive statistical increases in
26  the volume of exceptions being granted as well as other key business trends for
27  the Company.  According to CW12, Trend Analysis reports showed "where loans
28  were headed," that is, whether various categories of loans were trending toward

1   being paid on time, or default.  Overall, according to CW12, Countrywide was
2   "very good about reporting" and having loan-by-loan and aggregate information
3   available to be "dissected in whatever format" needed by senior executives.

4       457.  From discussions held with SLD supervisors during 2004, CW12
5   also learned that Sambol received "executive level reporting" from SLD when
6   Sambol attended the meetings of Countrywide's committee on "CORAD," which
7   was an acronym for Countrywide Organizational Risk Assessment Database.
8   According to CW12, CORAD meetings were held at least once a month in
9   Calabasas or Plano to assess the Company's ongoing exposure to risk, and were
10  attended by 30 to 40 employees from all divisions of Secondary Marketing.
11  CW12 attended many CORAD meetings and recalled that Sambol attended as
12  well.

13      458.  Essential and detailed data on exceptions generated from EPS was
14  included in the materials circulated among senior executives at the monthly
15  Business Reviews.  The binders for these meetings contained extensive data on
16  Price Exceptions, or "PEs."  "Price Exceptions" was one of six topics in FSL's
17  revenue report for the February 2007 Business Review meeting.  This report
18  included a spreadsheet titled "Concession Trend Summary – BC 1sts."  BC 1sts
19  are essentially subprime first mortgages. The "Concession Trend" chart provides,
20  for each month between January 2006 and January 2007, for the entire division,
21  various division branches and by region, the number of exception loans; the total
22  and average loan amounts;  the WAC, or weighted average coupon of the
23  mortgages as pooled for securitization;  the points added on, and the added
24  revenue.  In May 2006, for example, more than 7,000 FSL loans, totaling more
25  than $1.4 billion, contained price exceptions; Countrywide's revenue per loan
26  was more than $10,000.

27      459.  No later than early 2006, Mozilo and the Officer Defendants knew
28  that real estate values were poised to decline as interest rates increased.  In an

1   interview with CNBC's Maria Bartiromo in late February or early March 2006,
2   Mozilo stated that housing prices would decline significantly in the next 12 to 18
3   months:

4        *I would expect a general decline of 5% to 10% throughout the*
5        *country, some areas 20%. And in areas where you have had heavy*
6        *speculation, you could have 30%.* We will see . . . sellers back off
7        from the prices they have been demanding. A year or a year and a
8        half from now, you will have seen a slow deterioration of home values
9        and *a substantial deterioration in those areas where there has been*
10       *speculative excess*.

11       460.   Several months later, during the Company's Fixed Income Investor
12  and Creditor conference on September 13, 2006, Mozilo boasted that a looming
13  drop in home prices and an increase in mortgage interest rates would usher in a
14  period of remarkable prosperity for Countrywide. In fact, Mozilo downplayed the
15  effect of rising rates, saying that "I have over 53 years of experience navigating
16  through all kinds of scenarios and this is nothing compared to 25% prime and
17  17.5% mortgage rates and 10% unemployment." Mozilo assured investors and
18  analysts that Countrywide's *"comprehensive methodologies . . . that include*
19  *proprietary technology and surveillance systems"* would successfully manage
20  any issues caused by the "proliferation of non-traditional mortgage products" and
21  potentially increased delinquencies. Mozilo insisted that "[t]his is when we
22  shine," and even claimed that "10 years from now . . . most of the players today
23  will be gone, except for Countrywide."

24       461.   According to CW8, Countrywide had many proprietary systems in
25  place to ensure that its most senior executives had continuous knowledge of all
26  aspects of Countrywide's loan origination operations and finances. Indeed,
27  according to CW10, Countrywide had "great" internal computer and information
28

1  systems, "the best in the industry," which allowed management to see
2  "everything" at "the touch of a button."

3     462.  A centralized, Internet-based system called "Turquoise" or "TQ-
4  Web" provided detailed, virtually real-time data and information regarding every
5  individual loan originated by Countrywide.  According to CW8, and a document
6  titled "Overview of Production Reporting" obtained by Lead Plaintiffs in the
7  course of their investigation, which includes multiple screen-shots of Turquoise,
8  this system reported an "extraordinary range" of data by division, region and
9  branch, including the loan program type and amount, document type, FICO score
10  range, interest rates, fees imposed and collected, total revenue, and associated
11  "drilldown reports" that could be sorted and filtered in innumerable ways.
12  According to CW8, Turquoise included current and historical data going back
13  years, and all senior officials and executives had open access to Turquoise.  In
14  fact, according to CW8, the Company's most senior executives, including
15  Sambol, regularly used Turquoise.  During CW8's tenure with the Company,
16  CW8 participated in a number of meetings with senior officials who, during these
17  meetings, made comments and asked questions that they only could have
18  formulated after reviewing data gathered from the Turquoise system.

19     463.  According to CW8, and the Overview of Production Reporting
20  document, an additional Internet-based database called "Status Mart" provided
21  detailed information concerning Countrywide's loan production pipeline, tracking
22  by division, region and branch, the total pipeline, new loan applications, pending
23  and approved applications, and loan fundings.  The Overview of Production
24  Reporting includes several screen-shots of Status Mart from July 2005.  Status
25  Mart reports provided details on each loan, including loan-to-value ratios, risk
26  grades, and document types (e.g., full, reduced, or stated).

27     464.  According to CW8, Countrywide also maintained a proprietary
28  database during the Class Period called Virtual Loan File, or VLF, which includes

1  an electronic image of virtually all application documents for Countrywide loans.
2  Accordingly, executives accessing VLF could review Countrywide's loan
3  applications, including reduced documentation, low-doc and no-doc loans, at any
4  time.

5      465.  On October 4, 2006, federal banking regulators jointly released
6  extensive guidance regarding nontraditional loans titled the *Interagency Guidance*
7  *on Nontraditional Mortgage Product Risks*.  Countrywide provided detailed
8  written comments to the regulators on the proposed guidance on March 27, 2006,
9  and the Office of Thrift Supervision sent a copy of the *Interagency Guidance* and
10 supplemental information (which all The Officer Defendants were required to be
11 familiar with in any event) to Mozilo as CEO on October 10, 2006.

12     466.  The *Interagency Guidance*, among other things, specifically
13 criticized the sale of low-doc or "stated-income" Pay Option ARMs and other
14 nontraditional mortgage loans.  The *Interagency Guidance* observed that a lender
15 that does not extensively inquire into the ability of borrowers to repay these loans
16 is more likely to grant them to borrowers who will default.

17     467.  Moreover, as reported by *The Wall Street Journal* in February 2008,
18 internal Company documents show that as of mid-2006, as a result of
19 Countrywide's loose lending practices, defaults of subprime loans were starting to
20 run far higher than the rate projected by the Company's computer model.
21 Countrywide used highly sophisticated computer models to project delinquencies
22 and other critical measures of loan performance.  Subprime loan production did
23 not slow, however, and when risk analysts brought the rising defaults to Sambol's
24 attention, he brushed aside their concerns.

25     468.  At this point in time, the proportion of nontraditional loans in
26 Countrywide's loan portfolio, and those based on reduced documentation, had
27 been steadily increasing together with delinquencies.  CW14, in fact, recalled that
28 towards the end of 2006 the Company began to see loans go bad, and that

subprime delinquencies accelerated beginning in 2007, as house prices fell from their peak in the middle of 2006. CW9 recalled receiving a report from "corporate" in late 2006 or early 2007 that listed nonperforming loans. Many of these defaults were, in CW9's estimation, caused by ARMs resetting to higher interest rates and dropping home values.

469. Indeed, notwithstanding Mozilo's statement at the July 24, 2007 conference call that "nobody saw this coming," the storm that was gathering in mid to late 2006 was discussed at the highest levels of the Company. CW13 attended about a dozen of the Company's monthly Business Review meetings that the Officer Defendants routinely attended. CW13 recalled that starting in late 2006, there were discussions in these meetings about the emerging mortgage crisis and its effects on Countrywide's business. Although CW13 noted that the "mortgage meltdown" did not severely impact Countrywide until the second quarter of 2007, "it was on their radars from the beginning," and there were "definitely issues in the industry that everyone at Countrywide had their eyes on" before the summer of 2007. The Officer Defendants, however, took no significant steps to tighten or improve the Company's underwriting standards before the bottom fell out. According to CW4, who assisted with preparing and distributing the underwriting guidelines, before July 2007, requests from management were uniformly made to loosen the guidelines and never to tighten them, *"no way."*

470. It was in July 2007, in fact, that Countrywide's Chief Credit Officer candidly acknowledged that the Company should never have extended no-documentation loans, and particularly not to subprime borrowers: "*The takeaway is ... documentation matters*. The less documentation, the higher the serious delinquency, all else equal." He also acknowledged that the Company's high "concentration of piggyback financing that we did" during the Class Period had a