1   devastating effect, because *"leverage at origination matters. More leverage*
2   *means more serious delinquencies."*

   C.   **The Officer Defendants Were Aware of, or Recklessly**
3        **Disregarded, the Company's Violations of GAAP and**
4        **Reporting of False Financial Statements**

5        471.   The Officer Defendants repeatedly signed the Company's filings
6   with the SEC that described, correctly, the controlling GAAP requirements for
7   setting allowance for loan losses, valuing and accounting for retained interests
8   and mortgage servicing rights in securitized loans, and setting an appropriate
9   reserve for representations and warranties made to the secondary market.
10  Countrywide's SEC filings stated that the Company had established accounting
11  policies that governed the application of GAAP in the preparation of its financial
12  statements and labeled its accounting policies involving, among other areas,
13  allowance for loan losses and valuation and accounting for mortgage servicing
14  rights and other retained interests as "Critical Accounting Policies." At the same
15  time, the Officer Defendants repeatedly failed to follow these GAAP
16  requirements and the Company's own Critical Accounting Policies. Each of
17  these Defendants has substantial educational, financial and industry experience,
18  including the application of these specific GAAP requirements.

19       472.   Countrywide's "senior management," as alleged above, was
20  "actively involved in the review and approval" of the Company's allowances for
21  loan losses, and, according to CW1, the loan loss allowances were set by a
22  committee of top executives, including Mozilo, Kurland, Sambol, and Sieracki.
23  These Defendants knew that delinquencies in Pay Option ARMs and HELOCs,
24  the loans that presented the greatest risk of default, and accumulated negative
25  amortization from unpaid debt on Pay Option ARMs, were all increasing
26  substantially during the Class Period. Moreover, in 2006, Mozilo specifically
27  ordered the Company to look into why negative amortization was growing so
28  quickly. Mozilo told investors in September 2006 that he was "shocked" to find

1   that so many people were making the minimum payment.  When Mozilo called
2   borrowers to ask why, he learned that he "was talking to a group . . . that had
3   never seen in their adult life real-estate values go down."

4      473.   The Officer Defendants knew at this point, however, that real-estate
5   values were poised to go down as interest rates increased.  As alleged above,
6   Mozilo stated in an interview on CNBC in late February or early March 2006 that
7   housing prices would decline significantly in the next 12 to 18 months.

8      474.  Despite the Officer Defendants' belief that home prices would
9   decline in the near term, their knowledge that a decline in housing prices and an
10  increase in interest rates could substantially and detrimentally impact the
11  Company's loan portfolio (which, in fact, was made clear in the Company's SEC
12  filings), and their knowledge that the Company's loan underwriting standards had
13  been loosened and abandoned, the Officer Defendants did not increase the
14  Company's allowance for loan losses to a sufficient level.

15     475.   Moreover, as noted above, the federal banking regulators issued the
16  extensive *Interagency Guidance* in October 2006.  This was just after Mozilo
17  learned, at the latest, that Pay Option ARM borrowers were making the minimum
18  payments allowed and negative amortization was skyrocketing. The guidance
19  expressed serious concerns about the increased use of reduced-documentation Pay
20  Option ARMs and other nontraditional loans, and urged lenders to take a hard
21  look at the sufficiency of their loan loss reserves, observing that a lender that does
22  not extensively inquire into borrowers' ability to repay is more likely to provide
23  them to borrowers who cannot keep up with the interest payments.  Again, despite
24  this knowledge, the Officer Defendants took no steps to substantially increase
25  Countrywide's allowance for loan losses, tighten or improve loan underwriting
26  standards, or otherwise position the Company to avoid this identified (and
27  obviously serious) pitfall.

28

476.   The Officer Defendants similarly failed, despite this knowledge, to properly ascertain the reasonableness of the assumptions underlying the Company's valuations of retained interests and mortgage servicing rights, or to increase the Company's reserve for representations and warranties made to the secondary market.  Among large-capitalization financial companies, Countrywide has historically been one of the most aggressive in its use of gain-on-sale accounting for loan securitizations.  Because the gain-on-sale method front-loads both earnings and cash flows into the current period, relies on assumptions that are relatively easy to manipulate, shifts liabilities off the balance sheet and is relatively opaque, it is particularly subject to materially misleading earnings management.  Further, the amount of gain-on-sale revenue recorded has a direct relationship with the valuation of retained interests, which formed the "piece" of the loan securitizations that Countrywide kept on its books.

477.   During the Class Period, the Officer Defendants were on notice that the Company's internal controls regarding the proper accounting for gain-on-sale revenue and the valuation of retained interests from loan securitizations were at risk of having significant deficiencies. In its 2004 Form 10-K, Countrywide admitted that its accounting for gain-on-sale revenue had been incorrect in 2003 and 2004 by recognizing certain revenue too early, and acknowledged that the Company's internal controls over financial reporting had material weaknesses as of the end of 2004.  Accordingly, Countrywide restated its financial results for the second and third quarters of 2003 and the first three quarters of 2004, reversing the gain-on-sale income recorded and eliminating the retained interests taken at the time of the securitizations.

478.   The sworn certifications made by Defendants Mozilo, Sieracki, and Kurland during the Class Period pursuant to the Sarbanes-Oxley Act of 2002, as set forth below, also support a strong inference of scienter.  These Defendants repeatedly signed certifications attesting to the Company's compliance with

1  GAAP and the adequacy of Countrywide's internal controls, and reaffirming that
2  they had designed sufficient disclosure controls and procedures to ensure that
3  "material information" concerning the Company was made known to them. The
4  facts set forth herein, as well as Countrywide's admissions on and after July 24,
5  2007, reveal the falsity of these repeated certifications. The undisclosed facts
6  concerning Countrywide's deteriorating underwriting standards and increasingly
7  risky lending practices constituted "material information," the disclosure of which
8  would have affected, and did affect, the fair presentation of Countrywide's
9  financial statements in compliance with GAAP and which was contrary to certain
10 disclosures in Countrywide's annual and quarterly reports. These Defendants
11 acted intentionally or in a deliberately reckless manner in repeatedly issuing
12 sworn certifications attesting to the Company's compliance with GAAP, when
13 Countrywide's financial results were not presented in accordance with GAAP,
14 and as to the adequacy of Countrywide's internal controls, when the Company
15 suffered from material weaknesses in its internal controls.

16 **D.   Insider Stock Sales By Mozilo and
       Other Officer Defendants During the Class
17     Period Were Highly Unusual and Suspicious**

18     479.  The Class Period sales of Countrywide stock by Defendants Mozilo,
19 Sambol and Kurland were highly unusual, and therefore suspicious, as measured
20 by (1) the amount and percentage of shares sold, (2) comparison with the Officer
21 Defendants' own prior trading history and that of other insiders, and (3) the
22 timing of the sales. Such sales therefore provide strong evidence of scienter.

23     480.  To evaluate the Officer Defendants' selling activity, Plaintiffs used
24 publicly available trading data required to be reported to the SEC on Form 4.
25 Plaintiffs analyzed the trading by insiders that occurred during the Class Period
26 and during the equal-length period immediately preceding the Class Period,
27 beginning March 16, 2000 and ending March 11, 2004 (the "Control Period").
28 The Countrywide Form 4s filed during the Class Period and Control Period are

1    hereby incorporated herein by reference, and the transactions reported therein are

2    set forth in Exhibit G, annexed hereto.

3       481. The following methodologies were used to analyze the Officer

4    Defendants' sales:

5        (a) First, Plaintiffs calculated total sales by each of the Officer

6    Defendants, together with the cash proceeds from such sales, during the

7    Control and Class Periods. All share calculations were made on a split-

8    adjusted basis, *i.e.*, transactions preceding stock splits were multiplied by

9    the split ratio to render them economically equivalent to post-split

10   transactions.

11       (b) To calculate the amounts and percentages of shares sold,

12   Plaintiffs then calculated holdings at the end of the Class Period by

13   referencing Countrywide's 2007 annual proxy statement on Schedule 14A,

14   which sets forth shares owned and stock options exercisable by the Officer

15   Defendants as of April 4, 2007. Such data were then adjusted to the Class

16   Period end date using the purchase and sale data set forth in the

17   Countrywide Form 4s. "Holdings" were deemed to include both shares

18   held and stock options that were vested but not yet exercised. Class Period

19   sales were then calculated as a percentage of total shares available for sale

20   during the Class Period, *i.e.*, the sum of Class Period sales plus end-of-

21   Class-Period holdings.

22       (c) To compare Class Period sales with prior trading history,

23   Plaintiffs compared sales by the Officer Defendants during the Class Period

24   with their sales during the Control Period. Plaintiffs also compared the

25   Officer Defendants' sales across the Control and Class Periods with those

26   of lower-level (non-Defendant) reporting persons.

27       (d) Plaintiffs then determined whether the Officer Defendants'

28   sales of Countrywide stock during the Class Period generated abnormal

(above-normal) profits. Abnormal profits were evaluated using an event study methodology called the "market-adjusted method," which computes cumulative shareholder returns not explained by market factors. Under this approach, if an insider buys a share of stock which then increases in price from $100 to $120 (20%), and the benchmark index increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would be 19%. Under the same analysis, if a company's stock price declines subsequent to a sale by a greater amount than the relevant benchmark index, then the sale enabled the insider to generate an abnormal profit by avoiding the decline. For example, if an insider sells a share of stock which then declines from $100 to $80 (20%) while the relevant benchmark decreases from 1000 to 990 (1%), then the abnormal profit would again be 19%. This methodology has been used extensively in the academic literature studying the profitability of insider trading. Abnormal profits were calculated using a 250 trading day period following the day of trade, measured against a value-weighted index of NYSE, AMEX and NASDAQ stocks for 2000-2008.

(e)     After calculating abnormal profits for the Officer Defendants' Class Period sales, Plaintiffs then calculated the probability that such abnormal profits resulted from random chance. This probability was calculated by computing the trade-dollar-weighted residuals from the market-adjusted model for the 250 trading days before and 250 trading days after the day of trade, and averaging these residuals across event days for each insider. This data was then used to compute a "t-statistic" (a statistical tool) to infer the probability that the observed cumulative abnormal profits were due to random chance.

482.   By each analysis, the Officer Defendants' Class Period sales were extremely large and highly unusual.

### 1.   The Amount and Percentage of Shares Sold During the Class Period Was Extraordinary

483.   As reflected in the following table, the amount and percentage of shares sold during the Class Period by Defendants Mozilo, Kurland and Sambol were extraordinarily large:

| | Class Period Sales (Dollars) | Class Period Sales (Shares) | Holdings at End of Class Period | Sales as % of Total Shares Available for Sale |
|---|---|---|---|---|
| Angelo R. Mozilo | $478,348,129 | 13,397,335 | 5,307,817 | 71.6% |
| Stanford L. Kurland | $192,460,034 | 5,375,163 | 443,168 | 92.4% |
| David Sambol | $64,725,623 | 1,683,600 | 2,501,705 | 40.2% |
| Eric P. Sieracki | $0 | 0 | 572,521 | 0.0% |
| TOTAL | $735,533,786 | 20,456,098 | 8,825,211 | 69.9% |

484.   Thus, Mozilo's sales—totaling nearly a half-billion dollars—represented almost 75% of the total shares he had available for sale during the Class Period.

485.   Kurland's sales totaled nearly $200 million and represented more than 90% of his total holdings.

486.   Sambol sold close to half of his total holdings, for proceeds of more than $64 million.

### 2.   Stock Sales Increased Tremendously During the Class Period

487.   In addition to being massive in absolute and percentage terms, sales by Mozilo, Kurland and Sambol during the Class Period were extraordinary when compared to their own prior selling activity, and when compared to the selling activity of other, less well-placed and knowledgeable insiders.

488.   A comparison of the sales by the Officer Defendants as a group, and by Mozilo, Kurland and Sambol individually, during the Control and Class Periods are set forth in the following chart:



489. As set forth in this chart, the Officer Defendants' sales as a group increased more than 400% during the Class Period, from approximately $138 million during the Control Period to more than $735 million during the Class Period.

490. Mozilo's individual sales increased even more sharply. During the Control Period, he sold shares worth approximately $63 million. During the Class Period, his sales increased 656%, to more than $478 million.

491. Kurland's individual sales also increased sharply. During the Control Period, he sold shares worth nearly $45 million. His sales during the Class Period more than quadrupled, to more than $192 million.

492. Sambol's sales also increased substantially, nearly tripling from $22 million to almost $65 million.

493. The contrast between the Officer Defendants' sales during the Control Period and the Class Period is also striking when measured in shares, rather than dollars, as set forth in the following chart:



494.   By this measure, the Officer Defendants collectively increased their sales by 144%.   Mozilo more then tripled his sales, from nearly four million to nearly 13.4 million.   Kurland nearly doubled his sales, and Sambol's sales also increased significantly.

495.   The increase in the Officer Defendants' selling is even more striking when compared to the sales pattern of more junior Countrywide employees, who lacked the Officer Defendants' knowledge of the Company's true finances and operational condition.   As a group, non-Defendants sold shares worth $71.3 million during the Class Period, an increase of only 28% over the Control Period.[21]   By contrast, as noted above, the Officer Defendants increased their selling more than five-fold, to more than $735 million:

---

[21]   Sales by David Loeb, a senior insider who left the Company in early 2000, are excluded.   If his sales are included, the contrast between Control Period and Class Period sales is even greater.



496.    The contrast between the Officer Defendants and more junior insiders is equally acute when calculated on the basis of the number of shares sold.    While the Officer Defendants' sales increased 144%, non-Defendants' sales, collectively, actually *decreased by more than a third*:



### 3. Officer Defendants Generated Enormous Abnormal Profits on their Sales of Countrywide Stock

497. Using the methodology described above, Mozilo, Kurland, and Sambol each generated extremely large abnormal profits on their transactions in Countrywide stock during the Class Period, as reflected in the following chart:

|  | Average One-Year Abnormal Profits on Class Period Trades | Probability that Abnormal Profits Resulted from Random Chance |
|---|---|---|
| Angelo R. Mozilo | 60.5% | <0.01% |
| Stanford L. Kurland | 54.5% | 0.01% |
| David Sambol | 35.0% | <0.01% |
| CUMULATIVE | 58.25% | <0.01% |

498. As reflected in this chart, based on the timing of their Class Period trades, Mozilo generated average annual returns that exceeded the benchmark index by more than 60%, Kurland's profits exceeded the benchmark by more than 54%, and Sambol's trades delivered abnormal annual profits of 35%.

499. The possibility that these abnormal profits resulted from random chance is extremely remote: as indicated in the table above, Plaintiffs calculated the probability of these profits occurring randomly at less than one hundredth of one percent, and the results are therefore strongly statistically significant.

500. The timing and extent of the abnormal profits—and the contrast between Control Period and Class Period trades—are also reflected graphically in the charts set forth below. These charts compare trades for the Control and Class Periods for each of Mozilo, Kurland and Sambol, and depict cumulative abnormal profit (or loss) on all trades occurring during each period, calculated daily for one to 250 days following the day of trade. As reflected in the charts below, trades during the Control Period reflect negative abnormal profits (abnormal losses) for most periods in the 250 trading days following the day of trade. By contrast, trades during the Class Period immediately generated abnormal profits, demonstrating them to be extraordinarily well-timed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







### 4. Mozilo's Repeated and Highly Unusual Modifications of His 10b5-1 Trading Plans—Now Under Investigation By the SEC—Further Demonstrate the Suspicious Nature of His Selling

501. Mozilo's repeated modifications to trading plans established pursuant to SEC Rule 10b5-1 during the latter part of the Class Period further demonstrate the suspicious nature of his sales during the Class Period. These sales are now the subject of an SEC investigation.

502. In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. Previously, courts had split on whether simple possession of material, nonpublic information at the time of the trade was a sufficient basis for imposing liability, and some courts had held that liability attached to a trade only if the insider "used" inside information in making the trade. *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51,727 (Aug. 24, 2000).

1    503.  To provide a safe harbor under the "aware of" standard, the SEC
2  created an affirmative defense to insider trading claims for trades made pursuant
3  to a binding agreement or plan ("10b5-1 Plans"). *See id.* at 51,727-28.

4    504.  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to
5  insider trading liability only if it is entered into by an insider "before becoming
6  aware" of inside information, and was established "in good faith and not as part
7  of a plan or scheme to evade the prohibitions" against insider trading.

8    505.  Because of this, insiders are counseled to "design a trading plan with
9  the intention that it will not be modified or amended frequently, since changes to
10  the plan will raise issues as to a person's good faith." Thomson West, *Corporate*
11  *Counsel's Guide to Insider Trading and Reporting* § 12:26 (2006).

12    506.  Mozilo, however, repeatedly modified his 10b5-1 Plans during the
13  latter part of the Class Period. Mozilo initially established a 10b5-1 Plan early in
14  the Class Period, on April 26, 2004, which provided for sale of 210,000 shares
15  (on a split-adjusted basis) each month. On October 27, 2006, Mozilo adopted a
16  new 10b5-1 Plan that provided for him to increase his sales by 67% to 350,000
17  shares a month – 140,000 more than authorized under the earlier plan.

18    507.  Less than seven weeks later, on December 12, 2006, Mozilo
19  implemented a new 10b5-1 Plan that increased his sales by 115,000 shares per
20  month, or nearly one-third, to 465,000 shares per month.

21    508.  Less than eight weeks later, on February 2, 2007, Mozilo modified
22  his 10b5-1 Plans for the third time in less than four months, again increasing his
23  sales by 115,000 shares per month, to 580,000 shares per month.

24    509.  Commenting on Mozilo's 10b5-1 Plans, experts interviewed by *The*
25  *Los Angeles Times* noted the highly suspicious nature of the plan changes in an
26  article dated September 29, 2007. As reported in *The Los Angeles Times*, one
27  securities attorney commented, "***This raises a slew of red flags. . . .*** Anytime you
28  have revisions or modified plans . . . it is extremely suspicious." A financial

1  planner commented, "There are circumstances where the plans could be amended,
2  but you better have a good reason because it's defeating the basis of the rule . . . .
3  *If a guy is changing his plan around, I would think that would send up a red*
4  *flag. I wouldn't allow my clients to do it.*" Another attorney whose practice
5  involves executive compensation also observed to *The Los Angeles Times* that
6  "the more that you modify or add to your plan over a short period of time, the
7  more risk that someone will call it into question."

8  510.  Adding to the "red flags" raised by the 10b5-1 Plan changes,
9  Mozilo's stated reasons for the changes are demonstrably false, inconsistent, and
10  incoherent.

11  511.  In the September 29, 2007 *Los Angeles Times* article cited above,
12  Mozilo stated through Countrywide's Chief Legal Officer, Sandy Samuels, that
13  the 10b5-1 plan revision on February 2, 2007 was "made in response to the new
14  terms of Mozilo's employment agreement, struck Dec. 22."

15  512.  Samuels' statement, made on behalf of Mozilo, was obviously false.
16  As set forth in the Company's own SEC filings, the terms of Mozilo's new
17  employment agreement (the "2006 Employment Agreement") were established
18  no later than October 20, 2006 – *before* Mozilo entered into the first of his three
19  10b5-1 Plan changes. *See* Form 8-K, filed October 23, 2006.  The 2006
20  Employment Agreement therefore provided no basis for the December 2006 or
21  February 2007 changes and the resulting increase from monthly sales of 350,000
22  shares to 580,000 shares.

23  513.  In Countrywide's third quarter 2007 earnings call, held on October
24  26, 2007 (approximately a month after the *Los Angeles Times* article), Mozilo
25  changed his story.  Referring to the 2006 Employment Agreement, he stated,
26  "[t]hat new contract, and my decision to defer retirement, in turn . . . led to my
27  adopting new trading plans in 2006."

28

514. This revised explanation, however, also does not stand up to scrutiny. On the earnings call, Mozilo explained that he accelerated selling in 2004 "[i]n view of my expected retirement in 2006" and that "[c]learly it would not have been in the best interests of anyone, the shareholders or mine, to be in the position of having to unload all or a substantial portion of my holdings into the market at the same time of my retirement." This stated reason for increasing sales is fundamentally inconsistent with Mozilo's actions in late 2006 and early 2007.

515. First, by delaying his retirement and continuing to receive substantial current cash income, Mozilo extended the time period available to liquidate his holdings before retirement, *reducing* the size of the monthly sales needed to achieve that objective.

516. Second, the additional equity grants Mozilo was to receive under the 2006 Employment Agreement in no way justify the increase in sales authorized under the October 2006, December 2006, and February 2007 10b5-1 Plans.

517. In addition to paying cash compensation of up to $12.9 million each year, the 2006 Employment Agreement provided for equity-based compensation of $10 million annually, plus another $10 million "[i]n exchange for Mr. Mozilo agreeing to extend his term as the Company's Chief Executive Officer beyond December 31, 2006." Under the terms of the 2006 Employment Agreement, these grants, totaling $40 million, were to vest over five years.

518. At an assumed share price of $40 (the level at which Countrywide shares traded between December 2006 and February 2007), all of the equity grants under 2006 Employment Agreement would have thus provided Mozilo 1,000,000 new shares vesting over five years—an average rate of 16,666 new shares per month.

519. Thus, far from justifying an increase from 210,000 shares per month in 2004 to 580,000 shares per month in early 2007, the additional equity grants in

1  the 2006 Employment Agreement warranted an increase, if any, of less than *one-*
2  *twentieth* that amount.

3  520. Mozilo also misrepresented the circumstances of his Class Period
4  sales in other public statements. During Countrywide's earnings call on July 24,
5  2007 for the second quarter of 2007, Mozilo responded sharply to a question
6  about his stock sales, asserting that they were made pursuant to a 10b5-1 Plan
7  established "well over a year ago." In fact, the 10b5-1 Plans pursuant to which
8  Mozilo was then selling his holdings were entered into just five, seven and nine
9  months prior to the earnings call.

10 521. Later on the same call, Mozilo returned to the question about his
11 insider sales and asserted:

12    [T]he shares that I have, actual stock that I have, I have retained for 39
13    1/2 years, not sold a share of the initial stock that I got when David
14    and I started this company – and I got that I purchased. *And the only*
15    *thing that's being sold in 10b5-1 are options with expiration dates.*

16 522. This assertion was false. Countrywide's 2007 annual proxy
17 statement on Schedule 14A reflects outright ownership by Mozilo of 1,021,546
18 shares as of April 4, 2007. His holdings a year earlier, on April 5, 2006, as set
19 forth in Countrywide's 2006 annual proxy statement on Schedule 14A, were
20 1,286,617 shares – *26% higher*.

21 523. In light of Mozilo's false, inconsistent, and incoherent explanations
22 of his sharply increased selling activity during the Class Period, it is unsurprising
23 that the SEC has commenced an investigation of his sales, as reported by both
24 *The New York Times* and *The Wall Street Journal* on October 18, 2007.
25 According to *The Wall Street Journal*, "[a]t least one area of the inquiry, [people
26 familiar with the matter] say, involves stock sales by [Mozilo] through
27 prearranged executive sales plans."

28

1
2

**5.   The Increase in Stock Sales at the Same Time as Countrywide Initiated Major Stock Buybacks Further Demonstrates Their Suspicious Nature**

3      524.   The Officer Defendants' high rate of selling during the Class Period
4   is particularly suspicious because it occurred just as Countrywide initiated its
5   first-ever stock repurchase program.

6      525.   Countrywide's first stock buyback (the "First Buyback") – for up to
7   $2.5 billion in Countrywide stock – was announced on October 24, 2006.  As the
8   Daily News of Los Angeles noted in reporting on the First Buyback,
9   "[c]ompanies typically buy back stock when they think it is undervalued."
10   Gregory J. Wilcox, *Housing Slowdown Costs Jobs*, Daily News of L.A., Oct. 25,
11   2006.  However, insiders usually sell their personal stock when they believe it is
12   overvalued.

13      526.   Mozilo made the first of his three 2006-07 10b5-1 Trading Plan
14   changes just three days later, on October 27, 2006.  Mozilo then made two
15   subsequent changes to his 10b5-1 Trading Plans while the First Buyback was
16   occurring.

17      527.   Stock buybacks are widely recognized as boosting a company's
18   share price, and the First Buyback was seen as having this effect for Countrywide.
19   As reported in the *National Mortgage News* on October 30, 2006, "[a]nalysts at
20   [Friedman Billings Ramsey] said Countrywide's share buyback will help to
21   support the stock."

22      528.   On May 16, 2007, Countrywide announced a second buyback (the
23   "Second Buyback") of approximately $1 billion in stock.  Mozilo's sales under
24   his 10b5-1 Trading Plans were continuing during this period at the pace of
25   580,000 shares per month.

26      529.   Thus, at exactly the time Mozilo was sharply increasing his personal
27   sales of Countrywide stock, he was causing the Company to engage in its first-
28   ever repurchases of its own stock.  The immediate consequence of the buybacks

1   was to support the Company's share price, and the ultimate effect was to secure

2   large profits on Mozilo's own sales during this period, while the Company, and

3   through it, the Class, suffered massive losses on the shares it repurchased.

4

5   **VI.  KPMG ACTED WITH DELIBERATE RECKLESSNESS,**

6   **OR, IN THE ALTERNATIVE, WITH NEGLIGENCE, IN CONDUCTING ITS AUDITS OF COUNTRYWIDE'S**

7   **FINANCIAL STATEMENTS AND FAILED TO CONDUCT THOSE AUDITS IN ACCORDANCE WITH GAAS**

8   530.   KPMG violated Generally Accepted Auditing Standards ("GAAS")

9   and acted with deliberate recklessness, or, in the alternative, with negligence, in

10   conducting its audits of Countrywide's financial statements and issuing

11   unqualified, "clean" audit opinions thereon.   Countrywide's audited financial

12   statements for 2004, 2005 and 2006, as alleged in Section IV.G above, violated

13   GAAP because they misrepresented and failed to disclose that the Company had

14   improperly assessed fair value for its RI and MSRs, had improperly accrued for

15   its breaches in R&W, and had materially understated its ALL.   Through its audits,

16   KPMG readily should have uncovered evidence of the Company's failures to

17   comply with GAAP.  KPMG's failure to do so constituted an extreme departure

18   from accepted and binding standards of care as defined by GAAS, or, in the

19   alternative, negligence.     Absent deliberate recklessness or, alternatively,

20   negligence, KPMG could not have issued Countrywide clean audit opinions.

21   531.   KPMG, in particular, was required to be familiar with the many risk

22   factors that faced Countrywide and other lenders in the proper presentation of

23   their financial statements.  Risk factors identify areas of an audit that have an

24   increased level of risk, and may present areas of the audit that require additional

25   testing.  The auditor should especially be attuned to these areas of increased risk

26   when performing its duties in accordance with GAAS. During the Class Period,

27   KPMG failed to appropriately consider or simply ignored relevant risk factors,

28

1  including those related to deficiencies in the Company's internal controls, in
2  auditing Countrywide's financial statements.

3      532.  "Red flags" are fraud risk factors that indicate a high risk of material
4  misstatement.  Red flags come to the attention of the auditor through its testing
5  required under GAAS, and place a reasonable auditor on notice that the audited
6  company could potentially be engaged in wrongdoing.  During the Class Period,
7  various red flags were apparent to KPMG, but, as alleged in detail below, KPMG
8  either failed to properly inquire further into such red flags or ignored them
9  outright.  Either way, KPMG violated GAAS and allowed the Company to
10  materially overstate its earnings for the fiscal years 2004, 2005, and 2006 in
11  violation of GAAP.

12      **A.  The Standards of GAAS and the AICPA Audit & Accounting Guide**

13
14      533.  The Public Company Accounting Oversight Board ("PCAOB"),
15  established by the Sarbanes-Oxley Act of 2002, is responsible for the
16  development of auditing and related professional practice standards that must be
17  followed by registered public accounting firms.  On April 16, 2003, the PCAOB
18  adopted as its interim standards GAAS as described by the AICPA Auditing
19  Standards Board's SAS No. 95, *Generally Accepted Auditing Standards*, and
20  related interpretations in existence on that date.  Accordingly, an auditor's
21  reference to "the standards of the Public Company Accounting Oversight Board
22  (United States)" includes a reference to GAAS in existence as of April 16, 2003.
23  For clarity, all references to GAAS herein include the standards of the PCAOB.

24      534.  GAAS is comprised of ten basic standards that establish the quality
25  of an auditor's performance and the overall objectives to be achieved in a
26  financial statement audit.  Auditors are required to follow these standards in each
27  and every audit they conduct.  GAAS also includes Statements on Auditing
28  Standards ("SAS") issued by the Auditing Standards Board of the American

1  Institute of Certified Public Accountants ("AICPA"), which are codified in
2  *AICPA Professional Standards* under the prefix "AU."

3      535.  The GAAS standards fall into three basic categories: General
4  Standards, Fieldwork Standards, and Reporting Standards.   The General
5  Standards provide guidance to the auditor on the exercise of due professional care
6  in the performance of the audit.  The Standards of Fieldwork provide guidance on
7  audit planning, proper evaluation of internal control, and the collection of
8  evidential matter in order to be able to form a reasonable basis for the auditor's
9  opinion regarding the financial statements under audit.   The Standards of
10  Reporting provide guidance to the auditor on the content of the audit report and
11  the auditor's responsibility contained therein.  AU 150.02.

12      536.  The AICPA Audit & Accounting Guide ("AAG") for lending
13  institutions is designed to provide guidance for independent accountants primarily
14  on the application of the standards of fieldwork.   Specifically, it provides
15  guidance on the risk assessment process and the design of audit procedures, as
16  well as general audit considerations for deposit and lending institutions like
17  Countrywide.  The AAG is approved by both the Financial Accounting Standards
18  Board ("FASB"), which promulgates SFASs, as well as the Auditing Standards
19  Board ("ASB"), which issues SASs.

20      537.  The AICPA, as noted above, also issues Audit Risk Alerts ("ARA").
21  The ARAs are particularized by industry, including for financial institutions such
22  as Countrywide. The ARAs provide auditors with an overview of recent
23  economic, industry, regulatory, and professional development and, in particular,
24  those that may affect audit engagements.  These ARAs should have focused the
25  KPMG audit team on those specific aspects of Countrywide's financial
26  statements where an increased level of risk of material misstatement was present
27  and additional considerations were warranted.

28

**B.      KPMG Failed to Perform Procedures in Accordance With GAAS And Ignored Numerous Red Flags That Indicated a High Risk of Material Misstatement**

**1.      Pertinent GAAS Requirements**

538.   KPMG was required to plan, conduct, and report on the results of its audit of Countrywide in accordance with GAAS.  In doing so, it was required to comply with auditing standards that provided principles for audit quality and the objectives to be achieved in an audit.  KPMG knew that investors, when making an investment decision, would rely on its opinions as an independent auditor with respect to the Company's financial statements and on its assessment of the effectiveness of the Company's internal controls.

539.   For purposes of its audits of Countrywide for 2004, 2005 and 2006, KPMG had a professional obligation in accordance with GAAS to perform the following procedures, among others, to:

(a)      Understand Countrywide's business (AU 311, "Planning and Supervision"), which included the following:

(i)      AU 311 required KPMG to adequately plan the work and properly supervise its assistants.  In accordance with AU 311, KPMG was required to perform specific audit procedures to obtain an understanding of Countrywide and its environment, including internal controls, and to be able to assess the risks of material misstatement in the financial statements (AU 311.06-09).

(ii)      GAAS required KPMG's understanding of Countrywide's business to be developed through (1) its experience with Countrywide and its industry, (2) inquiries with Countrywide personnel, and (3) review of AICPA AAGs and other materials such as ARAs (AU 311.07-08).   GAAS further required KPMG's planning to assess the extent to which Countrywide employed computer processing in its accounting processes.   Specifically,

KPMG was obligated to understand the organizational structure of the computer processing activities and the availability of data underlying the computer systems (AU 311.09). Ultimately, the KPMG auditors should have had specific knowledge as to Countrywide's risk management strategies, organizational structure, product lines and services, strategies for lending and investing, and other characteristics (AAG Ch. 5).

(b)    Test the internal control processes through which transactions were originated through to their inclusion in the financial statements (AU 319, "Consideration of Internal Control in a Financial Statement Audit"). This testing would include the following:

(i)    Developing knowledge about Countrywide's accounting systems as they related to the pricing models supporting the accounting estimates used to determine ALL and R&W, as well as the fair value inputs for MSR and RI (AU 319, AAG Chs. 5, 9 and 10).

(ii)    Considering the operating effectiveness of controls for loans, including: "inspect[ion of] loan documents to determine whether the institutions lending policies [were] being followed" (AAG Ch. 8).

(c)    Perform analytical procedures, in accordance with AU 329, "Analytical Procedures," to substantiate that the financial information produced by the Company's information systems was free of material misstatement. KPMG should have performed analytical review procedures to identify risks of material misstatement and applied particular scrutiny to the accounts that were vulnerable as a result of Countrywide's acceptance of increasing credit risk (AU 329.06). Such analytical procedures should have included, in conjunction with its internal control testing pursuant to

AU 319,  obtaining a sufficient understanding of the Company's valuation models related to the ALL, MSR, and RI.  KPMG should have ensured that the assumptions applied in Countrywide's valuation models were, among other considerations, based upon (a) all known relevant internal and external factors that might have affected collectibility, (b) current and reliable data, and (c) consistent inputs.

(d)     Apply auditing procedures to those accounts with a high risk of misstatement such as the accounting estimates related to ALL and R&W,  as well as the fair value measurements reflected in MSR and RI (GAAS including AU 328, "Auditing Fair Value Measurements and Disclosures," and AU 342, "Auditing Accounting Estimates").    These procedures should have included:

(i)     In accordance with AU 328, "Auditing Fair Value Measurements and Disclosures," assessing whether Countrywide's assumptions were reasonable and reflected market-based information (AAG Ch. 9).

(ii)     In accordance with AU 342, "Auditing Accounting Estimates," assessing the Company's calculations of ALL and R&W,  GAAS  required   concentration   on  "key   factors   and assumptions that [we]re (a) significant to the accounting estimate, (b) sensitive to variations, (c) deviations from historical patterns, [and] (d) subjective and susceptible to misstatement and bias" (AU 342.09).  With regard to MSR and RI, GAAS required KPMG to evaluate "(a) whether management's assumptions are reasonable and reflect . . . market information . . . , (b) the fair value measurement was determined using an appropriate model . . . , [and] (c) management used relevant information that was reasonably available at the time" (AU 328.26).

1        (iii)    Obtaining competent evidence supporting the existence,

2        value, and rights to collateral (AU 328.25, AAG Ch. 9, in a

3        subsection titled "Management's Methodology").

4        (iv)    Performing tests to establish the reliability of

5        management's representations. (AU 333, "Management

6        Representations," ¶ 2, AU 319.95).

7        (e)    Increasing the nature, timing, and extent of auditing

8        procedures applied when a high risk of fraud or error was present (AU 316,

9        "Consideration of Fraud in a Financial Statement Audit"; AAG Ch. 5,

10        including Exhibit 5-1).

11        540.  GAAS sets forth factors that present a higher degree of risk of

12 material misstatement, and of which auditors such as KPMG are required to be

13 aware.  For example, GAAS states that there is a presumption that improper

14 revenue recognition is a fraud risk (i.e., gain-on-sale recognition)[22] (AU 316.41).

15 GAAS specifies that there is a high degree of risk related to the estimation of the

16 fair value of investments (i.e., proper valuation of MSRs and RIs) (AU 316.39),

17 and reiterates that there is always a risk of management overriding internal

18 controls (AU 316.08, 42, and 57-65).  That risk would apply, for example, to

19 Countrywide's establishment of EPS to approve loans that would not have been

20 approved under the Company's written underwriting policies, as alleged in

21 Section IV.C.3.b above.

22        541.  Further, at every step of its audits, KPMG was required to exercise

23 professional skepticism.  GAAS requires that an auditor exercise professional

24 skepticism (AU 230, "Due Professional Care in the Performance of Work") when

25

26

[22] As explained in Section IV.G above, misstatements of ALL, MSRs, RI, and R&W impact the correct accounting for "gain-on-sale" revenue and revenue recognition generally.

1  performing its audits.   Professional skepticism is an attitude that includes a
2  questioning mind and a critical assessment of the evidence (AU 230.07).

3  ### 2.   Audit Risk Factors in 2004

4      542.   Contemporary GAAS pronouncements highlighted the relaxation of
5  credit standards and deviations from policy as fraud risk factors (AAG Ex. 5-1).
6  The ARA for 2004 also cautioned auditors that competition to increase loan
7  origination volume had contributed to the softening of credit criteria, which
8  increased credit risk (AAM 8050.12).   In conjunction with AU 316,
9  "Consideration of Fraud in a Financial Statement Audit," the AAG also provided
10 KPMG with specific environmental factors that were likely to increase the
11 potential for fraud in a mortgage lender, which included the following (AAG
12 Ch. 5):

13          (i)    Relaxation of credit standards,

14          (ii)   Excessive extension of credit standards with approved
15      deviation from policy,

16          (iii)  Excessive concentration of lending (particularly new
17      lending),

18          (iv)   Excessive lending in new products, and

19          (v)    Frequent or unusual exceptions to credit policy.

20 ### 3.   Audit of Countrywide's 2004 Financial Statements

21     543.   During its audit of Countrywide in 2004, had KPMG in fact
22 complied with the GAAS provisions set forth above, KPMG would have
23 uncovered various red flags that should have prompted the auditors to either test
24 further or require management to adjust the Company's financial statements so
25 they would be presented free of material misstatements.

26     544.   In 2004, compliance with AU 311 (noted in paragraph 539(a) above)
27 would have led KPMG to learn that Countrywide had publicly announced and
28

1    implemented a very aggressive firm-wide goal of capturing 30% residential
2    mortgage market share by 2008. This stated objective not only increased the
3    degree of credit risk that Countrywide was likely to assume as a whole, but it also
4    increased the risk that Countrywide would compromise its lending standards in
5    the face of increased competition to reach this position (AAM 8050.12).

6        545. The AAG, in combination with AU 311, also required KPMG to
7    review the Company's securitization prospectuses noted in Section IV.B.4 above.
8    KPMG's objective in doing so would have been to obtain the necessary
9    "[u]nderstanding [of] the risks associated with a particular tranche of a MBS
10   [mortgage backed security] . . . [which] often requires an understanding of the
11   security structure, as documented in the offering document and related literature."
12   AAG Ch. 7. KPMG would have been required to review a sampling of the more
13   than 200 securitization prospectuses that were filed with the SEC during 2004.
14   Had KPMG reviewed such a sample, KPMG would have learned that the
15   aggregate dollar value of loans with FICO scores of 660 and below was
16   approximately 40% of the total dollar value of loans securitized during 2004, as
17   discussed in Section IV.B.4 above. Similarly, KPMG would have learned that the
18   aggregate dollar value of loans with FICO scores of 620 and below was
19   approximately 23% of the total dollar value of loans securitized during 2004.

20       546. KPMG would also have seen that Countrywide's 2004 Form 10-K
21   represented that only 11% of the loans it originated in 2004 were nonprime. The
22   discrepancy between the Company's reported percentage of nonprime loans
23   originated (11%) and the actual number of nonprime loans included in
24   Countrywide's prospectuses (approximately 40%) was a glaring red flag that
25   required further inquiry, especially because Countrywide represented that it
26   securitized and sold substantially all of the mortgage loans it produced. This red
27   flag required KPMG to perform additional analytical and substantive testing on
28   the Company's loan quality and risk level, which is described in detail below.

1   Accordingly, KPMG should have addressed this discrepancy with management,
2   and if it did not receive an appropriate response, should have considered
3   modifying its opinion (AU 550, "Other Information in Documents Containing
4   Audited Financial Statements").

5       547.   In accordance with AU 319 (noted in paragraph 539(b) above),
6   KPMG's testing of Countrywide's internal controls should have included a
7   review of Countrywide's underwriting guidelines, such as those set forth in its
8   underwriting matrices, and the trending of underwriting practices as shown in
9   those matrices.   KPMG should have also tested the operating effectiveness of
10  internal controls over financial information; in other words, whether management
11  was approving and granting loans in accordance with its written underwriting
12  standards.   These routine tests would have enabled KPMG to understand the
13  procedures by which transactions were processed, if the transactions were being
14  processed in accordance with the Company's policies, and if there was any
15  change from the prior year.   This analysis would have alerted KPMG to another
16  red flag, that Countrywide was systematically loosening its underwriting
17  practices, as described in Section IV.C.2.a, beginning at the end of 2003 and
18  continuing throughout 2004, and that Company was granting loans to borrowers
19  who did not qualify even under the Company's loosened underwriting standards.
20  Specifically, AAG Ch. 5 observes that "[e]xcessive extension of credit standards"
21  is a fraud risk factor.

22      548.   Testing of Countrywide's internal controls, in accordance with AU
23  319 and AU 316, also required a detailed testing of the Company's loan files. For
24  example, KPMG should have tested whether Countrywide's loans were being
25  approved in accordance with the Company's written lending policies, whether
26  credit investigations were being performed, whether credit limits were adhered to,
27  whether Countrywide's procedure for capturing all required loan documentation
28  was functioning, and whether the information recorded in Countrywide's data

1  processing system and used for management reporting was being tested by
2  personnel independent of the preparer and was accurate.

3      549.  Had KPMG properly reviewed Countrywide's loan files, KPMG
4  would have discovered that Countrywide routinely originated high-risk loans to
5  borrowers with the weakest credit.  Additionally, KPMG would have discovered
6  that Countrywide was not performing appropriate levels of due diligence on such
7  loans.   Through its testing of Countrywide's loan files, KPMG would have
8  learned that Countrywide classified loans that were subprime loans as "prime"
9  loans.   KPMG also would have seen that loans were being granted without
10  verification of borrower income, employment or net worth, and that loans were
11  being granted with appraisals and other important documents missing from the
12  loan files.  These facts should have raised a red flag for KPMG in conjunction
13  with the ARA described in paragraph 542 above, given that they revealed a
14  pattern of management's override of its own internal controls, which, as noted
15  above, was a pervasive fraud risk (AU 316.08, AU 319.22).  Moreover, the failure
16  to appropriately document these loans should have raised serious concerns about
17  whether borrowers could re-pay their loans and whether the value of the
18  underlying collateral was sufficient (AU 328; AAG Ch. 9).

19      550.  In conducting analytical testing to determine whether Countrywide
20  was aggressively originating high-risk loans and, if so, whether the additional
21  risks of those loans were appropriately reflected in its financial statements,
22  KPMG, pursuant to 2004 AAM 8050.12 and AU 329, should have examined the
23  percentage of each loan type produced in comparison to the total loans produced.
24  This determination should have been made with respect to the number of each
25  type of loan produced compared to the total number of loans produced, as well as
26  the total dollar amount of each type of loan produced compared to the total dollar
27  amount of loans produced.  These ratios measure the composition of the loan
28  portfolio, lending strategy and corresponding level of risk (AAG Ch. 5).

551.   To perform these analytical procedures, KPMG should have used data similar to that presented in the table in paragraph 303 above.  Through its observations, KPMG would then have determined that: (a) approximately 50% of loans originated by Countrywide in 2004 were nonconforming loans, up from approximately 36% in 2003; (b) Nonprime Mortgage Loans increased approximately 99%; (c) ARM loan origination increased approximately 108%; and (d) HELOC origination increased approximately 71%.   These statistics presented a major red flag that indicated that Countrywide had become a very high risk lender.

552.   In response to this red flag, in accordance with AU 316 and 2004 AAM 8050.12, KPMG should then have undertaken further procedures to understand Countrywide's methods of classifying its loan portfolio (prime versus nonprime loans) and to verify that Countrywide applied and disclosed these methods appropriately and consistently.  Had KPMG properly performed such procedures, KPMG would have determined that Countrywide was classifying a substantial number of loans with FICO scores below 660, below 620, and, indeed, sometimes as low as 500, as prime loans.  This presented yet another glaring red flag.

553.   Based on all of the risk factors highlighted above in paragraphs 278-279 and 542, and in combination with the red flags mentioned in paragraphs 544-551, KPMG should have approached its audit of Countrywide with increased professional skepticism (AU 230).  In particular, KPMG should have expanded its audit testing of Countrywide's accounts that had a high risk of misstatement, such as those requiring fair value measurements in accordance with AU 328, "Auditing Fair Value Measurements and Disclosures," and AU 342, "Auditing Accounting Estimates," to ensure that the increased risk of defaults that could have been identified were adequately incorporated into Countrywide's accounting estimates. KPMG should have conducted procedures such as those described below, to

ensure that Countrywide's accounts for ALL and R&W reflected an appropriately increased accrual rate commensurate with the increased credit risk referred to above, and that, for the same reason, the valuations of MSRs and RI had been adjusted by means of sufficiently decreased fair value assumptions.

554.   Also, as part of KPMG's procedures in accordance with AU 329 and AU 342, KPMG should have compared ALL with the total value of loans held for investment to measure portfolio credit risk coverage.   Had KPMG properly performed this testing, it would have discovered that Countrywide's ALL as a percentage of loans held for investment stayed flat from 0.30% to 0.31%, despite the fact that the Company was rapidly producing higher risk loans.   In this regard, KPMG failed to exercise an appropriate degree of skepticism by failing to challenge the assumptions employed by management in its accounting estimate (AU 230, 316 and 342.09).

555.   Further, GAAS states that, with respect to accounting estimates, "methods that rely solely on mathematical calculations, such as a percentage of total loans based on historical experience . . . generally fail to contain the essential elements because they do not involve a detailed analysis of an institution's particular transactions or consider the current economic environment." AAG Ch. 9.   Similarly, GAAS requires accounting estimates to include "effects of any changes in lending policies and procedures" and that management should avoid "old, incomplete, or inconsistent data to assess operating performance or financial capacity." AAG Ch. 9.   These provisions of GAAS are entirely consistent with applicable GAAP such as SAB 102, mentioned in paragraph 284 above. Specifically, KPMG should have tested management's key assumptions for calculating ALL.   Had KPMG performed such a test, KPMG would have determined that Countrywide was using an unreliable model for calculating ALL based upon historical results, one that failed to account for the changes Countrywide had implemented as to its lending practices.

556.   Had KPMG properly assessed the red flags above in paragraphs 544-551, KPMG would have determined that Countrywide was in fact originating loans based on faulty credit granting decisions and that the Company's lack of loan credit review procedures were widespread.   Therefore, many of its loans should have been considered impaired at origination pursuant to AAG Ch. 9 (see paragraph 298 above) and, as a result, ALL was materially understated (see Section IV.G.3 above).

557.   KPMG showed a similar failure to exercise professional skepticism related to Countrywide's reported valuation of MSR and RI. The historical rate of default was a key assumption Countrywide used to calculate MSR and RI. Had KPMG properly assessed Countrywide's accounting estimates, it would have made a determination that management did not adjust the historical rate to factor in the increased risk that the company was assuming through its aggressive production of nonconforming loans, loosening underwriting practices, and increased credit risk.

558.   GAAS, including AU 328 and AU 342, required KPMG to compare the value of Countrywide's MSRs from year to year to identify changes in the assumptions underlying fair value determinations.   KPMG would have determined that the value of MSRs increased by 22% from 2003 to 2004.   A valuation allowance is established to track and account for the impairment risk related to MSRs, and as such is recorded as an offset to the gross balance of MSRs (SFAS 140). Yet, despite this significant increase in the balance of MSRs, Countrywide *decreased* its valuation allowance for impairment of MSRs from approximately 15% of MSRs in 2003 to only 11% in 2004. The decrease in the valuation allowance was illogical and presented yet another red flag because as a lender assumes more credit risk, its valuation allowance for impairment has a negative effect on MSR, not a positive effect. In the absence of evidence that Countrywide's loan portfolio was becoming less risky rather than more risky, AU

316, 326 and 329 required KPMG to seek evidence to determine why Countrywide was decreasing its valuation allowance and thereby increasing the value of its MSRs. AU 329.02 ("A basic premise underlying the application of analytical procedures is that plausible relationships among data may reasonably be expected to exist and continue in the absence of known conditions to the contrary."). Moreover, KPMG knew that the value of MSRs as a servicing asset was established by the excess of expected revenue over expected costs. But, Countrywide failed to appropriately incorporate an expectation of the higher expected costs associated with the MSRs it generated, beginning in 2003 and thereafter (see Section IV.G.5 above). Additionally, Countrywide was using an old model to calculate the fair value of its MSRs, which focused in historical trends, as illustrated in Section IV.G.5 above. In this regard, KPMG failed to appropriately consider GAAS, which stated that "historical information may not be representative of future conditions . . . if management intends to engage in new activities or circumstances change" (AU 328.37).

559. Pursuant to AU 328, KPMG was also required to assess management's key assumptions used to value its RI. For example, KPMG should have reviewed management's assumptions used to calculate Countrywide's net lifetime credit losses. Despite the increasing origination of nonprime loans, the assumption for net lifetime credit losses in 2003 was 1.9% and was only raised to 2.0% in 2004, as alleged in Section IV.G.4 above. The fair value of RI was increased from 2003 to 2004 because the assumption was made that the weighted-average life of securitized loans increased from 2.0 years to 2.5 years. However, when credit risk increases, net lifetime credit losses are expected to increase accordingly and the weighted average life of the underlying loans is expected to decrease. This red flag should have prompted KPMG to inquire further into management's assumptions or perform its own testing of RI. In doing so, KPMG would have determined that Countrywide's RI was overstated because changes in

1   the Company's credit risk strategy and loosened underwriting practices were not
2   appropriately included in the assumptions for weighted average life and net
3   lifetime credit losses that were used to value RI.

4   560.  If, in 2004, the procedures set forth above had been properly
5   performed, KPMG would have determined that a "clean" audit opinion on
6   Countrywide's financial statements would have been false and misleading.  Thus,
7   KPMG acted with deliberate recklessness, or, in the alternative, with negligence,
8   in conducting its 2004 audit of Countrywide's financial statements and failed to
9   conduct its audit in accordance with GAAS.

10   **4.   Audit Risk Factors in 2005**

11   561.  The risk factors present in 2004 were equally relevant for 2005.
12   Additionally, the AAG (Chs. 5, 8 and 9) and the ARA highlighted the following
13   risk factors, present at Countrywide, which KPMG should have considered:

14   (a)   Aggressive measures undertaken to increase market share in
15   non-prime markets,

16   (b)   Inadequate   documentation   supporting   loan   origination
17   decisions,

18   (c)   Inappropriate classification of non-prime transactions as prime
19   transactions,

20   (d)   Unusual or inadequate review of the valuation of underlying
21   collateral and associated appraisals,

22   (e)   Increasing interest rates (AAM 8050.10), and

23   (f)   "Housing bubble effects."   This was a caution that the
24   calculation of risk should include consideration of the possibility that the
25   "housing bubble" would burst.  AAM 8050.22.  For Countrywide, the
26   appropriate considerations would have been the potential effects of such a
27   housing bubble burst on valuations of its LHI, MSRs, and RIs, as well as
28   the proper reserves for breaches of R&W.