## 5.   Audit of Countrywide's 2005 Financial Statements

562.   In 2005, KPMG would have seen the same red flags that were apparent in 2004, and would have been required, in the face of those red flags, to perform the same procedures it was required to perform in 2004.

563.   In addition, as in 2004, in accordance with AU 311, KPMG should have reviewed the Company's securitization prospectuses for 2005.   Because Countrywide offered more than 200 securitization prospectuses during 2005, KPMG would have been required to review a sample of those prospectuses.   Had KPMG properly performed such tests, KPMG would have found, among other things, that the aggregate dollar value of loans with FICO scores of 660 and below was approximately 36% of the total dollar value of loans securitized during 2005, as alleged in Section IV.B.4 above.   Similarly, KPMG would have learned that the aggregate dollar value of loans with FICO scores of 620 and below was approximately 19% of the total dollar value of loans securitized in 2005.

564.   KPMG would have also been aware that management had represented to investors in the 2005 Form 10-K that only 9% of loans originated were nonprime.   The discrepancy between the higher amount of subprime loans included in Countrywide's prospectuses (36%) and the amount of nonprime loans that the Defendants disclosed in its Form 10-K (9%) was, as in 2004, a glaring red flag that required substantial further inquiry from KPMG.   These results should have alerted KPMG to perform additional analytical and substantive testing on the Company's loan quality and risk level.

565.   As in 2004, KPMG's review of Countrywide's underwriting matrices pursuant to AU 319 would have alerted KPMG to another red flag, that loosening of underwriting guidelines continued in 2005, so that even less creditworthy borrowers were obtaining loans.

566.   AU 319 and AAG Ch. 5, referenced in paragraphs 539(b) and 561 above, required KPMG to test the adequacy of internal controls, and the operating effectiveness of internal controls over financial information.  KPMG should have had continuing discussions with management and IT personnel to determine the types of IT systems used at Countrywide in 2005 (AU 319.59).  Accordingly, KPMG should have been aware of the implementation of EPS in 2005.

567.  Being aware of EPS, KPMG should have performed audit procedures to test the types of transactions processed by EPS because those transactions had a greater risk of misstatement (AU 319.30).[23]  GAAS recognizes that risks related to the processing and recording of financial data increase when "new or revamped information systems" are introduced (AU 319.38).  Additionally, KPMG's procedures to test EPS should have included the assessment of how EPS differed from Countrywide's routine loan processing system.

568.   The existence of EPS by itself should have been a signal to KPMG of the continued rising risk of fraud at Countrywide. Specifically, the AAG observed that "frequent or unusual exceptions to credit policy" is a fraud risk factor.  AAG Ch. 5.  Here, the very name of the system "Exception Processing System" explicitly coincided with the fraud risk factors highlighted by GAAS.

569.   In accordance with AU 319 and AU 316, and the red flags in paragraphs 563-566 above, KPMG was required to inquire further with Countrywide's employees and expand the nature, timing and extent of its testing on EPS.   KPMG should have determined that EPS had been set up by management to override the Company's underwriting standards rather than

---

[23] AU 319.30 ("As an entity's operations and systems become more complex and sophisticated, it becomes more likely that the auditor would need to increase his or her understanding of the internal control components to obtain the understanding necessary to design tests of controls, when applicable, and substantive tests.").

adhere to them.  An effective control environment includes a well-defined lending approval and review system that includes *established credit limits*, as well as limits and controls over the types of loans made (AAG Ch. 8).  Moreover, applicable GAAS instructs that "[e]ffective internal control over financial reporting . . . should provide reasonable assurance that errors or fraud in management's financial statement assertions about the loan portfolio – *including those due to the failure to execute lending transactions in accordance with management's written lending policies – are prevented or detected*."  AAG Ch. 8.

570.  KPMG should have also discovered that the transactions authorized by EPS created a high degree of risk of material misstatement because numerous loans were granted to borrowers that did not qualify under Countrywide's already loosened written underwriting standards.  AU 312, "Audit Risk and Materiality in Conducting an Audit," ¶ 16 ("The auditor's understanding of internal control may heighten or mitigate the auditor's concern about the risk of misstatement.").  Moreover, the implementation of this system demonstrated the Officer Defendants' commitment to achieving financial objectives at any cost and without regard to preexisting internal controls.

571.  In 2005, KPMG's detailed testing of the Company's loan files would have provided evidence similar to the evidence that would have been found in 2004.  In addition, such testing would have provided evidence that Countrywide was issuing increasing numbers of Pay Option ARMs to less creditworthy borrowers, without proper documentation of income or assets or adequate appraisals.

572.  Through its detailed loan testing in accordance with AU 319, KPMG also should have determined whether appraisals were included in Countrywide's files and were supportive of a reasonable collateral value.  This analysis should have been conducted on an ongoing basis (AU 328).  Specifically, "an inspection

1  of loan documentation should include tests of the adequacy of both the current
2  value of collateral in relation to the outstanding loan balance and, if needed,
3  insurance coverage on the loan collateral." AAG Ch. 8. This red flag should
4  have alerted KPMG that Countrywide might be exposed to increased credit risk
5  and as a result, the financial statements were at a high risk of material
6  misstatement.

7      573. In testing the composition of the loan portfolio in 2005, KPMG
8  would have encountered evidence similar to that presented in the table in
9  paragraph 305 above, which compared loans originated in 2004 to 2005. In
10 making this comparison, the auditors would have determined that approximately
11 56% of loans originated by Countrywide in 2005 were nonconforming loans, up
12 from 50% in 2004. This was a red flag to KPMG that Countrywide was
13 increasing its rate of origination of high-risk loans at a rapid pace. Also, KPMG
14 would have detected that origination of Pay Option ARMs had increased at the
15 alarming rate of 335% over the prior year. This was also a red flag.

16     574. In response to these red flags, and in accordance with AU 316 and
17 2004 AAM 8050.12, KPMG should have once again reviewed methods of
18 classifying its loan portfolio (prime versus nonprime loans) and to verify that
19 Countrywide applied and disclosed these methods appropriately and consistently.
20 Had KPMG properly performed such procedures, it would have determined that
21 Countrywide was classifying a substantial number of loans with FICO scores
22 below 660, below 620 and indeed sometimes as low as 500 as prime loans.

23     575. As a result of the red flags listed above, KPMG was required to
24 perform additional testing of its loans to determine if delinquencies were rising in
25 high risk loans. AU 316, 326, 329; AAG Chs. 5 and 9. For example, KPMG
26 would have seen, as the chart below illustrates, that delinquencies at Countrywide
27 were increasing at a rapid pace. In particular, HELOC delinquencies nearly
28 doubled in 2005, and nonprime delinquencies rose substantially to 15.20%:

| | 2004 | 2005 | % Change |
|---|---|---|---|
| Total Delinquencies | 3.83% | 4.61% | 20.4% |
| Nonprime Loan Delinquencies | 11.29% | 15.20% | 34.6% |
| HELOC Delinquencies | 0.79% | 1.57% | 98.7 |

576.   KPMG was required to perform additional testing to determine the reasons for increasing delinquencies, including whether the rise in delinquencies was a function of external economic conditions or whether the nature of Countrywide's lending policies were also implicated.  GAAS observes that it is useful for the auditor to review publicly available information in an institution's FFIEC call reports because financial and lending institutions disclose detailed data on loans. AAG Ch. 5. As set forth in paragraph 312 above, Countrywide's call reports provided details on the number of loans that were 30-89 days overdue.  As set forth in paragraph 313 above, by the end of 2005 this rate had quadrupled.

577.   As in 2004, the risk factors highlighted above, in conjunction with the red flags that should have become apparent, required KPMG to approach its audit of Countrywide with increased skepticism.  Accordingly, KPMG should have performed tests similar to those it should have performed in 2004.  Among other things, KPMG would have learned that Countrywide's ALL as a percentage of loans held for investment continued to decrease from 0.31% in 2004 to 0.27% in 2005, as illustrated in paragraph 300 above.  KPMG should have deemed illogical the decrease in the reserve rate applied in 2005 as compared to 2004, especially because KPMG, had it properly conducted the various testing set forth above, would have been aware of the increased credit risks.

578.   By the end of 2005, the prime rate of interest increased to 7.15% from 5.15% at the end of 2004.  This external economic factor posed a risk that KPMG should have considered as to the difficulty that borrowers would face in refinancing their ARM loans, which would raise the potential for increasing the

rate of default, thus affecting the accounting estimates necessarily underlying Countrywide's ALL and R&W and its valuation of MSRs and RI.

579. Despite the significant increase in credit risk assumed by Countrywide, the valuation allowance for impairment of Countrywide's MSR *dropped* from 11% to only 3% of gross MSR. KPMG should have determined that the valuation allowance was inadequate in light of the rising credit risk and that the Officer Defendants failed to incorporate expected increasing operating costs to service these loans (AU 230, 316, 328, and 342; and AAG Chs. 9 and 10).

580. With respect to the valuation of RIs, by performing tests such as it had been required to perform in 2004, KPMG would have learned that the net lifetime credit losses rate dropped 15%, from 2.0% in 2004 to 1.7% in 2005. Once again, this was a red flag to KPMG that management's assumptions were incorrect because as delinquencies and credit risk increased, net credit losses should have also increased accordingly.

581. In addition to the above, KPMG should have also examined Countrywide's weighted average life assumption. Had KPMG done so, KPMG would have determined that Countrywide continued to maintain a highly aggressive position with respect to the expected weighted average life of the RIs that it had initially raised in 2004. KPMG should have determined that, in consideration of the expected rise in defaults driven by Countrywide's new strategy, it would have been unreasonable to presume that the weighted average life of RI of 2.4 years in 2005 would have been greater than the weighted average life of RI of 2.0 years in 2003 when there was substantially less credit risk. As such, KPMG failed to adhere to applicable GAAS, including AU 230, 316 and 328, and AAG Chs. 5 and 10.

582. In view of Countrywide's marketing strategy, one that significantly increased credit risk, AU 342 required KPMG to test the adequacy of

Countrywide's reserves for breaches in R&W. KPMG would have determined through its testing of management's key assumptions in 2005 that even though Countrywide substantially increased the nature and extent of the credit risk associated with the loans it originated, it did not appropriately increase its accruals for breaches in R&Ws. Among other things, KPMG should have analyzed R&W reserves as a percentage of subprime loan and HELOC securitizations. KPMG should have been aware that Countrywide's Form 10-Ks disclosed that only those categories of securitizations were subject to recourse as set forth in paragraph 382 above. Countrywide increased securitizations of Prime Home Equity and Nonprime loans from $57.8 billion in 2004 to $61.4 billion in 2005, a growth rate of 6%. However, in 2005, Countrywide actually decreased its provisions for new R&W by 22%, from $85 million in 2004 to $66 million in 2005. This year-over-year change in 2005 represented an inexplicable 27% drop in new R&W provisions as a percentage of relevant securitizations. This should have been a red flag to KPMG to further inquire into management's assumptions for accruing reserves for breaches in R&W.

583. If, in 2005, KPMG had properly performed the procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2005 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

### 6.   Audit Risk Factors in 2006

584. In 2006, all of the risk factors that were present in 2004 and 2005 were equally relevant. In 2006, the risk of the "Housing bubble effects" was noted in AAM 8050.37.

585. In 2006, KPMG should have been aware of the same fraud risk factors and risks of material misstatements that were relevant in 2004 and 2005,

1   as set forth in paragraphs 278-284, 542 and 561 above.  AAG Ex. 5-1, Chs. 8 and
2   9.  However, because there was a substantial increase in the production of Pay
3   Option ARMs (an increase of 335%) and HELOCs (an increase of 45%) in 2005,
4   KPMG should have been aware as well of a risk factor that was raised in the 2006
5   AAG.  This AAG stated that a risk of material misstatement can arise from
6   "[s]ignificant concentrations of loan products with terms that give rise to credit
7   risk, *such as negative amortization loans*, loans with high loan-to-value ratios,
8   *multiple loans on the same collateral* that when combined result in a high loan-
9   to-value ratio, and interest-only loans."  AAG Ch. 8.

### 7.   Audit of Countrywide's 2006 Financial Statements

10
11      586.   In 2006, KPMG should have seen the same red flags as were present
12   in 2005, and would have been required, in the face of those red flags, to perform
13   the same procedures it was required to perform in 2005.
14
15      587.   In addition, in accordance with AU 311 and AAG Ch. 7, KPMG
16   should have reviewed the Company's loan securitization prospectuses for 2006.
17   Because Countrywide offered more than 170 securitizations in 2006, KPMG
18   would have been required to review a sampling of the prospectuses from those
19   securitizations.  Had KPMG properly reviewed that sample, KPMG would have
20   learned that the aggregate dollar value of loans with FICO scores of 660 and
21   below was 33% of the total dollar value of the loans securitized as alleged in
22   Section IV.B.4 above.  Similarly, KPMG would have learned that the aggregate
23   dollar value of loans with FICO scores of 620 and below was 15% of the total
24   dollar value of loans securitized during 2006.   These results reflected
25   Countrywide's continued origination of substantial numbers of loans to less
26   creditworthy borrowers.
27      588.   KPMG would have also been aware that management had publicly
28   represented in the 2006 Form 10-K that only 8.7% of loans originated were

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    212
~~LEAD CASE NO. CV 07-05295 MRP (MANx)~~

1  nonprime in nature.  The discrepancy between the higher amount of subprime
2  loans included in Countrywide's securitization prospectuses (33%) and the
3  amount of nonprime loans that the Defendants disclosed in its Form 10-K (8.7%)
4  was again, as in 2005 and 2004, a glaring red flag that necessitated further inquiry
5  from KPMG.  These results should have alerted KPMG to perform additional
6  analytical and substantive testing on the Company's loan quality and risk level.

7       589.  As in 2004 and 2005, KPMG's review of Countrywide's
8  underwriting matrices pursuant to AU 319 would have alerted KPMG to another
9  red flag, that Countrywide's loosening of underwriting guidelines continued in
10  2006 so that even less creditworthy borrowers were obtaining loans.

11      590.  In accordance with AU 319 and AU 316, KPMG should have tested
12  the Company's loan files.  This testing would have further corroborated, among
13  many other facts, that Countrywide was continuing to issue Pay Option ARMs
14  and other higher risk loan products to less creditworthy borrowers without proper
15  documentation of income or assets, as negative amortization amounts were
16  growing.  In accordance with AAG Ch. 9 and AAM 8050.17, and after reviewing
17  Countrywide's loan files, KPMG should have found that Countrywide's loans
18  were once again not being approved in accordance with its underwriting practices
19  and that evidence supporting collateral such as appraisals was inadequate, as
20  illustrated in Section IV.C.3.c above.

21      591.  In performing its 2006 analytical review procedures, KPMG again
22  should have examined the volume of loans produced by type as a percentage of
23  all loans produced to measure the composition of the loan portfolio relative to the
24  lending strategy (AAG Ch. 5).  In doing so, KPMG would have learned that
25  approximately 54% of loans originated by Countrywide in 2006 were
26  nonconforming loans.  This was a continued red flag to KPMG that Countrywide
27  was aggressively originating high-risk loans (AU 328 and 342; AAG Chs. 9 and
28  10).

592. Accumulated negative amortization on Pay Option ARMs grew nearly eight-fold during 2006, from $74.7 million in 2005 to $654 million in 2006. This 775% increase was a glaring red flag which provided further evidence of the increasingly poor quality of such loans and an increase in the risk of material misstatement in Countrywide's financial statements. AAG Ch. 5 specifically observed that a risk of material misstatement can arise from "negative amortization loans."

593. Based upon the continued increase in the origination of Pay Option ARMs and 2006 AAM 8050.35 (see paragraph 285 above), KPMG should have determined whether Countrywide had developed an appropriate risk management policy to avoid negative amortization.

594. In accordance with the red flags listed above and AU 329, KPMG was required to perform additional testing of Countrywide's loans to determine if delinquency rates on such risky loans were increasing. The table below shows the accelerating delinquency rates in 2006. Given the sheer volume of Countrywide's loan portfolio, even small increases in the delinquency rates indicated significant absolute dollar value changes in the amounts at risk:

|  | 2005 | 2006 | % Change |
|---|---|---|---|
| Total Delinquencies | 4.61% | 5.02% | 8.9% |
| Nonprime Loan delinquencies | 15.20% | 19.03% | 25.2% |
| HELOC delinquencies | 1.57% | 2.93% | 86.6% |
| Pay Option ARMs delinquent 90 days or more | 0.10% | 0.63% | 530% |

595. These rapidly increasing delinquency rates should have prompted KPMG to perform additional testing. KPMG should have reviewed the loans in 2006 that were considered 30-89 days overdue because these loans were about to become non-accruing. As shown by the chart in paragraph 313 above, the volume of loans that were 30-89 days past due rose sharply during 2006. Specifically, the delinquency rate of loans that were 30-89 day loans past due in

1  each quarter rose significantly, and by the end of 2006, the delinquency rate for
2  these loans now exceeded 2%, which was more than double the rate at the end of
3  2005. Moreover, the percentage of Countrywide's loans that were 30-89 days
4  past due demonstrated a clear divergence from the trends of other industry
5  participants, as illustrated in paragraph 315 above. These facts strongly indicate
6  that the strategy of targeting less creditworthy borrowers with high-risk mortgage
7  products and loosened underwriting practices all played a critical role in
8  destabilizing the credit quality of the Company's loan portfolio.

9      596. As in 2005, the risk factors highlighted above in conjunction with
10  the red flags required KPMG to approach its audit of Countrywide with increased
11  skepticism in the same manner as it was required to do so in 2005 and 2004.
12  KPMG should thus have performed tests similar to those it should have
13  performed in 2005. Among other things, KPMG would then have learned that
14  Countrywide's ALL as a percentage of loans held for investment stayed
15  essentially flat as compared to 2005, at a rate of 0.33%, as illustrated in paragraph
16  300 above. This static reserve rate was one of a multitude of fraud risks exhibited
17  by Countrywide throughout the years 2004, 2005 and 2006. AAG Ch. 5, Ex. 5-1
18  ("Rapid growth or unusual profitability, especially compared to that of other peer
19  financial institutions; for example unusually large growth in the loan portfolio
20  without a commensurate increase in the size of the [ALL].").

21      597. Similarly, KPMG failed to exercise professional skepticism in
22  evaluating MSRs. Despite the significant increase in the level of credit risk that
23  by then had been accumulated by Countrywide, the Company's reported balance
24  of MSRs reflected a $432 million increase in fair value solely derived from
25  modified assumptions applied in its pricing model relating to SFAS 156.
26  However, as illustrated in the table in paragraph 363 above, Countrywide did not
27  significantly modify the fair value assumptions used in its model, which is
28  corroborative of the fact that the Company failed to incorporate the increased

1  credit risk of its lending strategies in its value determinations (including those
2  used in evaluating the expected costs of servicing those loans) or failed to do so
3  appropriately. As a result, KPMG failed to exercise professional skepticism when
4  auditing management's assumptions to calculate the fair value of its MSRs.

5      598. In addition to these failures, KPMG failed to exercise professional
6  skepticism when evaluating management's assumptions for purposes of its fair
7  value measurements related to RI. While Countrywide did increase its
8  expectation of net lifetime credit loss from 1.7% in 2005 to 2.6% in 2006, this
9  increase did not reasonably capture total credit-related losses expected as of that
10 time due to the continuing increase in riskier loans, given that this rate continued
11 to be based upon the historical performance of Countrywide's loans. KPMG
12 should have been aware that management was using an incorrect assumption to
13 calculate its RI, because the historical performance of Countrywide's loans was
14 not a reliable indicator of future performance. Indeed, as alleged above, KPMG
15 knew that in 2006 many relevant delinquency trends indicated that credit risk was
16 increasing and Countrywide was unlikely to be able to avoid significant credit
17 losses, particularly on the most subordinated of equity interests in its
18 securitizations.

19     599. Moreover, KPMG should have examined Countrywide's weighted
20 average life assumption. Had KPMG done so, KPMG would have determined
21 that Countrywide continued to maintain a highly aggressive position with respect
22 to the expected weighted average life of the RI. KPMG should have determined,
23 in consideration of the expected rise in defaults driven by Countrywide's new
24 strategy, that it would have been unreasonable to have presumed that the
25 weighted average life of RI of 2.8 years in 2006 would have been greater than the
26 weighted average life of RI of 2.4 years in 2005. As such, KPMG failed to
27 adhere to applicable GAAS, including AU 230, 316 and 328, and AAG Chs. 5
28 and 10.

600.   In combination with KPMG's knowledge that the Company had embarked on a marketing strategy that significantly increased credit risk, KPMG should have concluded that Countrywide's liability for R&W continued to increase commensurately.   In accordance with AU 342, KPMG was required to test management's assumptions used to reserve for breaches in R&W.   Default rate is an important assumption.   Had KPMG properly tested management's assumptions, KPMG would have determined that in 2006, the Company had assumed more risky loans and the delinquency rate on such loans was skyrocketing, as illustrated in paragraph 313 above.   KPMG should have concluded, based upon this red flag, that while Countrywide increased its R&W reserve for 2006, that increase was insufficient in view of the Company's continued origination and securitization of substantial numbers of loans to less creditworthy borrowers with loosened underwriting guidelines, lax or non-existent due diligence and rising delinquencies in such high risk loans.

601.   If, in 2006, KPMG had properly performed the procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading.   Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2006 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

## VII.   ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE

602.   In connection with the registration process and initial sale of the debt and preferred securities alleged in Section VIII.F below, the Underwriter Defendants were obligated to perform reasonable investigations into Countrywide's business and operations to ensure that the statements in the subject registration statements and prospectuses were not materially false and misleading.

In the process of conducting their "due diligence" investigations, the Underwriter Defendants should have exercised a high degree of care and sought to independently verify the Company's representations. This demanding standard governed all of the representations contained in the subject registration statements, including those accounting-related representations in the unaudited interim financial statements incorporated in the registration statements.

603. The Underwriter Defendants did not properly conduct their due diligence reviews, and did not properly disclose risk, despite having full access to Countrywide's records (unlike the public investors in Countrywide securities), and thus falsely and misleadingly presented the subject registration statements and the sale of the subject debt and preferred securities offered to the Plaintiffs and the public.

604. As to the portions of the registration statements involving accounting-related representations in the audited financial statements incorporated therein, the Underwriter Defendants were generally entitled to rely on KPMG's certifications. Such reliance, however, was governed by a standard of reasonableness required of a prudent person, in the respective positions of the Underwriter Defendants, in the management of that person's own property. The mere existence of an audit does not excuse the failure to investigate information obtained in conducting due diligence that would prompt a reasonably prudent underwriter to question the accuracy of the audited financial statements.

605. In performing their due diligence procedures and investigations, the Underwriter Defendants ignored the following "red flags" that required further investigation of the audited financial statements:

> (a) Starting in 2003, Countrywide's public announcement that it had implemented a very aggressive firm-wide goal of obtaining 30% market share by 2006-2007 (and the 2004 announced revision of that goal end date to 2008), given that there was a risk that the means designed to

achieve that goal would include deterioration of underwriting standards, with implications as to the accuracy of loan loss reserves, MSRs, retained interests, representations and warranties, and the effectiveness of internal controls;

(b)   Confirmation of the substantial deterioration of loan origination and underwriting standards as reflected in the underwriting matrices, beginning in 2004;

(c)   The substantial number of subprime loans included in securitizations, beginning in 2004, as reflected in the aggregate mean FICO score bands contained in the securitization prospectuses, which the Underwriter Defendants would otherwise be obligated to review, and which a majority of the Underwriter Defendants necessarily reviewed because they acted as underwriters during 2005 and 2006 for certain of Countrywide's Class Period offerings of mortgage-backed securities; in particular, Banc of America Securities, Barclays Capital, Citigroup Global Markets, Countrywide Securities (which underwrote nearly all of the Company's loan securitizations), Deutsche Bank, Greenwich Capital, HSBC, J.P. Morgan Securities, and Morgan Stanley underwrote certain securitizations during 2005 and also acted as underwriters for Countrywide's Series A Medium-Term Notes offered in 2005; these nine Underwriter Defendants, together with BNP Paribas, Goldman Sachs, Merrill Lynch, and UBS Securities, underwrote certain securitizations during 2006 and also acted as underwriters for the Series B Medium-Term Notes (including the 6.25% Notes) offered in 2006; Citigroup Global Markets, J.P. Morgan, Merrill Lynch, UBS Securities, Countrywide Securities, Banc of America Securities; Barclays Capital, Deutsche Bank, Goldman Sachs, and HSBC underwrote certain securitizations during 2006 and also acted as underwriters for the 7% Capital Securities offered in

2006; such review of the securitization prospectuses would have alerted these Underwriter Defendants as to both the materially increased substantial risk that the Company was taking on and its inappropriate classification of high-risk loans as "prime" (a classification that did not vary depending on where the loans were placed by the Company), which also called into question, among other things, the quality of loans held for investment, and therefore the accuracy of the loan loss reserves, as well as the quality of the securitized loans and the financial valuations associated therewith;

(d)     The sample loan documentation that the Underwriter Defendants would be required to inspect, which would have revealed that Countrywide was both originating loans to very high-risk borrowers and not performing appropriate levels of due diligence on such loans;

(e)     An examination in each year until the end of 2005 of Countrywide's loan composition, which would have shown, beginning in 2003, yearly increases in Nonprime Mortgage Loans, ARMs, and HELOCs (and Pay Option ARMs beginning no later than 2004) by very substantial percentages, revealing (along with other items listed here) that the level of risk that characterized that portfolio was changing by such material amounts that the use of historical information in calculating financial reporting valuations was inappropriate;

(f)     An examination of Countrywide's allowance for loan loss reserves as a percentage of loans held for investment, which would have shown it to be fairly static across the Class Period until 2007, during a time when the Company was rapidly producing higher risk loans;

(g)     An examination of Countrywide's collateral appraisal procedures, which would have raised serious questions as to their adequacy, including, at least until mid-2005, permitting loan officers at all

of Countrywide's origination divisions to hire appraisers of their own choosing, to discard appraisals that did not support loan transactions and to substitute more favorable appraisals by replacement appraisers, thereby raising questions as to the value of collateral used to calculate the adequacy of loan loss reserves, as well as the use of a database, the Field Review List, to blacklist appraisers who did not comply with Countrywide's requests to inflate appraisal values (including failing to engage in due diligence communications with appraisers appearing on the Field Review List);

(h)    An examination of the amount of loans that were 90 days or more delinquent, which would have shown that they began to sharply increase as early as 2005, including very substantial increases in defaults of HELOCs and Pay Option ARMs, and that there were, during the equivalent period, increases in loans 30-89 days delinquent that far exceeded the increases reported by all other mortgage lenders, which should also have raised questions as to the static ratio of allowance for loan losses as a percentage of loans held for investment;

(i)    An examination of Countrywide's internal controls, which would have led to the discovery of its Exception Processing System, begun in 2005 and used to identify and route highly risky loans out of the regular loan approval process so that they could be approved, notwithstanding the fact that they failed to meet Countrywide's already deteriorating loan origination and underwriting standards, which should have raised questions as to the accuracy of all valuation financial reporting items; and

(j)    An examination of Countrywide's accumulated negative amortization on Pay Option ARMs, which would have shown that it grew dramatically from 2004 to 2005, another red flag indicating the increasingly poor quality and extremely high risk of such loans and the

1   need to question the assumptions used in calculating financial reporting

2   valuations.

3

4   **VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

5

6   **A.   The Company's False Statements Regarding 2003**

7   606.   The Class Period begins on March 12, 2004.  That day, Countrywide

8   filed its Annual Report for 2003 with the SEC on Form 10-K (the "2003 Form

9   10-K").   The report was signed by Defendants Mozilo, Kurland, McLaughlin,

10  Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, King, Melone, Russell,

11  Robertson, and Snyder.

12  607.   The 2003 Form 10-K reported consolidated loan production by loan

13  type.  Specifically, prime first mortgage loans equaled $396,934,000,000, prime

14  home equity loans equaled $18,103,000,000, and subprime mortgage loans

15  equaled $19,827,000,000.  Subprime mortgages produced equaled 4.6% of the

16  total dollar amount of loans produced at year end.

17  608.   The Company also reported Mortgage Banking loan production by

18  loan type.   Mortgage Banking prime home equity loans produced equaled

19  $12,268,000,000, and Mortgage Banking subprime loans produced equaled

20  $15,525,000,000 at year end.   Prime home equity loans and subprime loans

21  produced equaled 7.0% of the total Mortgage Banking loans originated at year

22  end.

23  609.   Furthermore, the Company reported that prime and prime home

24  equity loans held for investment equaled $22.0 billion at year end.

25  610.   In a section of the 2003 Form 10-K titled "Secondary Mortgage

26  Market," the Company stated that "[w]e ensure our ongoing access to the

27  secondary mortgage market by *consistently producing quality mortgages*. . . As

28

1   described elsewhere in this document, we have a ***major focus on ensuring the***
2   ***quality of our mortgage loan production . . . .***"

3       611.   In a section of the 2003 Form 10-K titled "Mortgage Credit Risk,"
4   the Company described its Credit Policy, portraying it as a tightly controlled and
5   supervised process "designed to produce high quality loans" through a rigorous
6   pre-loan screening procedure and post-loan auditing and appraisal and
7   underwriting reviews:

8       Mortgage Credit Risk
9       Overview
10      In our mortgage lending activities, ***we manage our credit risk by***
11      ***producing high quality loans . . . .***
12                       * * *

13      Loan Quality
14      Our Credit Policy establishes standards for the determination of
15      acceptable credit risks.   Those standards encompass borrower and
16      collateral quality, underwriting guidelines, and loan origination
17      standards and procedures.

18

19      Borrower quality includes consideration of the borrower's credit and
20      capacity to pay.   We assess credit and capacity to pay through . . .
21      manual or automated underwriting of additional credit characteristics.
22                       * * *

23      ***Our loan origination standards and procedures are designed to***
24      ***produce high quality loans.***   These standards and procedures
25      encompass underwriter qualifications and authority levels, appraisal
26      review requirements, fraud prevention, funds disbursement controls,
27      training of our employees and on-going review of their work . . . .   In
28      addition, we employ proprietary underwriting systems in our loan

origination process that improve the consistency of underwriting standards, assess collateral adequacy, and help to prevent fraud, while at the same time increasing productivity.

In addition to our pre-funding controls and procedures, we employ an extensive post funding quality control process. Our quality control department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in depth underwriting and appraisal review, and if necessary, a fraud investigation.

612. Further assuring investors of the veracity of the information contained in the 2003 Form 10-K, the report included SOX certifications signed by Defendants Mozilo and McLaughlin, representing that the "report does not contain any untrue statement of a material fact."

613. During the Class Period, Defendants Mozilo, McLaughlin and Sieracki signed multiple SOX certifications annexed to Countrywide's Form 10-Ks and Form 10-Qs filed with the SEC during the Class Period and attesting to the accuracy of Countrywide's financial statements and the adequacy of the Company's internal controls. These SOX certifications were substantially identical. Representative SOX certifications signed by these Defendants and filed during the Class Period are annexed hereto collectively as Exhibit F.

614. The statements referenced above in the 2003 Form 10-K were materially false and misleading when made. As set forth in greater detail above, management's statements relating to the volume of loans produced, the amount of revenues from the sale of prime loans, and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans. See Section IV.D above. Countrywide's statements that it "consistently produce[d] quality mortgages" and that its "loan

1  origination standards and procedures are designed to produce high quality loans"
2  were false and misleading because Countrywide loosened its underwriting
3  guidelines over the Class Period to increase loan volume without regard to loan
4  quality, and also for the reasons set forth in Section IV.C above.  Moreover, the
5  SOX certifications signed by Defendants Mozilo and McLaughlin were false and
6  misleading because the 2003 Form 10-K contained untrue statements of material
7  fact or omits to state material facts necessary to make the statements made not
8  misleading.  See Section IV.C and D.

9      615.  Analysts reacted positively to the materially false and misleading
10  statements made in the 2003 Form 10-K.  For example, on March 26, 2004,
11  Lehman Brothers issued a report in which it reiterated an overweight rating for
12  Countrywide.  "Despite the unlikel[i]hood of any net MSR recovery during the
13  quarter, we expect CFC to earn MORE, which again demonstrates the resiliency
14  of its business model.  We reiterate our 1-Overweight rating."

15      616.  On March 26, 2004, Piper Jaffray reiterated its "[o]utperform rating
16  and [stated that they] are raising . . . [the] target price to $135 from $134. . . . We
17  believe CFC is fundamentally well positioned to deliver double-digit long-term
18  earnings growth."

19  **B.    The Company's False Statements Regarding 2004 Results**

20      **1.    First Quarter 2004 Form 8-K**

21      617.  On April 21, 2004, Countrywide filed a Form 8-K, signed by
22  Defendant Kurland, attaching a press release that announced the Company's
23  financial results for the first quarter of 2004.  In the press release, Countrywide
24  reported gain-on-sale of loans and securities in the amount of $1,358,667,000 for
25  the quarter.

26      618.  The Company's reported gain-on-sale of loans and securities in the
27  April 21, 2004 press release was materially false and misleading when made

28

1   because the Company overstated the fair value of its retained interests and MSRs,

2   and also for the same reasons set forth in Sections IV.G.4 and IV.G.5 above.

3           **2.    First Quarter 2004 Conference Call**

4           619.  On a conference call held later that day to discuss the Company's

5   first quarter 2004 financial results (the "April 21, 2004 Conference Call"), an

6   analyst from Basswood Partners asked Defendant Mozilo if he could explain the

7   functionalities of an adjustable rate mortgage ("ARM").  Mozilo responded that

8   an ARM product "***is a great product, a prime product for the bank***, as long as it

9   fits within the regulatory bounds that are set for the bank."

10          620.  On the same conference call, Defendant Mozilo addressed an

11  analyst's concern about the Company's subprime loans by representing that the

12  Company understood the subprime business better than its competitors:

13          I think using what our competitors do as a barometer will put you

14          down the wrong path. ***We are a very different focused company that***

15          ***understands this [subprime] product very well, how to originate it,***

16          ***how to manage it, how to underwrite, how to service it.  And so we***

17          ***look at -- the short answer to your question is -- we look at this sub-***

18          ***prime business as a -- one that has to be carefully manage[d] . . . .***

19          621.  On the April 21, 2004 Conference Call, Mozilo also responded to an

20  analyst's question regarding the potential risks from originating non-traditional,

21  riskier loans, such as subprime loans. Mozilo stated that Countrywide had taken a

22  more disciplined approach than its competitors, it was not involved in the "frothy

23  business" that others engaged in, and was properly monitoring subprime risks:

24          There is very, very good solid sub-prime business and there is this

25          frothy business that you relate to.  And you have to -- when you're

26          doing your analysis, what is the average FICO score of these.

27          Because you can get so deep into this marginal credit that you can

28          have serious problems where you are taking 400 FICOs with no

documentation; that is dangerous st[u]ff. *So [I] think it is very important that you understand the disciplines that the Company had, particularly that Countrywide has, which are very strong disciplines in the origination of sub-prime loans. And maintaining that discipline is critically important to us. . . . [W]hen you look at sub-prime, you have to look at it in various tranches, and we are at the high end of that tranche.*

622.   Later on the same call, an analyst asked if subprime mortgages would ever be held for investment on Countrywide's books. Defendant Kurland responded that Countrywide did not plan to ever hold subprime mortgages as an investment on its books. Specifically, Kurland stated that: *"[w]e don't intend to maintain as an investment sub-prime mortgages on our balance sheet. . . .* [T]here is no intention at all to ha[ve] a permanent investment in a pool of sub-prime loans."

623.   The statements made by Defendants Mozilo and Kurland on the April 21, 2004 Conference Call were materially false and misleading when made. Specifically, Defendant Mozilo's statement that ARM loans were "prime product[s]" was false and misleading for the same reasons set forth in Section IV.B above. Furthermore, Mozilo's statements "that the Company had . . . very strong disciplines in the origination of sub-prime loans"; "we are a very different company that understands this [subprime] product"; and Countrywide's subprime originations were "at the high end" of the subprime tranche; were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality. See Section IV.C. Further, Mozilo knew that the Company's underwriting policies treated as prime many loans that should have been classified as subprime, by mortgage industry standards. See Section IV.D. Moreover, Defendant Kurland's statement that "[w]e don't intend to maintain as an investment subprime mortgages on our

balance sheet" was misleading because Countrywide assumed subprime risk both on and off its balance sheet since a large part of its asset residuals were derived from subprime loans. Countrywide also maintained off-balance sheet subprime risk through its representations and warranties of subprime loans. See Section IV.B.

624. Several analysts raised their recommendations and earnings estimates for Countrywide as a result of these misrepresentations:

- Raymond James reported on April 22, 2004 that, "[w]e continue to rate the shares Strong Buy based on their modest valuation. . . ."

- Piper Jaffray reported on April 22, 2004 that, "[w]e reiterate our Outperform rating and are raising our price target to $96 from $90." In addition, analysts describe Countrywide as a company that produces "loans [that] are primarily prime credit quality first-lien mortgage loans secured by single-family residences."

### 3.   First Quarter 2004 Form 10-Q

625. On May 7, 2004, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2004, ended March 31, 2004, signed by Defendants Kurland and McLaughlin. The Company reported revenue for the quarter of $2,214,903,000 and diluted earnings per share of $2.22.

626. In the first quarter 2004 Form 10-Q, the Company stated that its impairment of the fair value of its retained interests equaled $93,415,000.

627. In the "Off-Balance Sheet Arrangements and Guarantees" section of its first quarter 2004 Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[m]anagement does not believe that any of its off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our

1  financial condition, changes in financial condition, revenues or expenses, results
2  of operations, liquidity, capital expenditures or capital resources."

3      628.  In a section of the Form 10-Q titled "Mortgage Servicing Rights,"
4  the Company reported that the fair value of its MSRs for the first quarter of 2004
5  was $6,406,491,000.

6      629.  The Company reported allowance for loan losses of $93,054,000 at
7  the end of the first quarter of 2004.

8      630.  In the first quarter 2004 Form 10-Q, the Company reported the
9  volume of Mortgage Banking prime home equity and subprime loans produced
10 (which was included in Countrywide's total volume of loans produced).
11 Specifically, Mortgage Banking prime home equity loans produced during the
12 quarter equaled $3,729,000,000.  Mortgage Banking subprime loans produced
13 during the quarter equaled $6,048,000,000, and was 8.9% of total Mortgage
14 Banking loan production for the quarter.

15     631.  In the Form 10-Q, Defendants Kurland and McLaughlin described
16 the Company's management of credit risk in the following terms: "[w]e manage
17 mortgage credit risk principally by . . . *only retaining high credit quality*
18 *mortgages in our loan portfolio.*"

19     632.  Also, in the section entitled "Controls and Procedures," Countrywide
20 described the adequacy of its internal controls: "There has been no change in our
21 internal control over financial reporting during the quarter ended March 31, 2004
22 that has materially affected, or is reasonably likely to materially affect, our
23 internal control over financial reporting."

24     633.  Further assuring investors of the veracity of the information
25 contained in the Form 10-Q, the report included SOX certifications signed by
26 Defendants Mozilo and McLaughlin, representing that the "report does not
27 contain any untrue statement of a material fact" and "the financial statements, and

28

1 | other financial information included in this report, fairly present in all material
2 | respects the financial condition" of Countrywide.

3 |     634.   The statements referenced above in Countrywide's first quarter 2004
4 | Form 10-Q were materially false and misleading when made.  As set forth in
5 | greater detail above, the Company's reported values for its revenue and diluted
6 | earning per share were false because the Company's allowance for loan losses
7 | and accruals for representations and warranties were understated, and its
8 | assessments of fair values for retained interests and MSRs were overstated.  See
9 | Section IV.G above.  Statements related to loan loss reserves, retained interests,
10 | MSRs and liabilities related to representations and warranties were false and
11 | misleading for the same reasons set forth in Section IV.G above.  Also,
12 | management's statements regarding the quality and volume of prime home equity
13 | and subprime loans originated during the quarter were false and misleading
14 | because Countrywide misclassified subprime loans as prime loans.  See Section
15 | IV.D above.  Moreover, management's representation that Countrywide "only
16 | retain[ed] high credit quality mortgages in our loan portfolio" was false because
17 | Countrywide loosened its underwriting guidelines to increase loan volume
18 | without regard to loan quality.  See Sections IV.B and IV.C.  Defendants Kurland
19 | and McLaughlin's statements relating to internal controls were false and
20 | misleading for the same reasons set forth in Section IV.G.7.  Moreover, the SOX
21 | certifications signed by Defendants Mozilo and McLaughlin were false and
22 | misleading because the financial statements issued during the Class Period were
23 | materially misstated and violated GAAP.  See Section IV.G above.

24 |     **4.    Second Quarter 2004 Form 8-K**

25 |     635.   On July 26, 2004, Countrywide filed a Form 8-K signed by
26 | Defendant Kurland, attaching a press release that announced the Company's
27 | financial results for the second quarter of 2004.  In the press release, Defendants
28 | Mozilo noted that these results were achieved in a tough environment and that

1  Countrywide's impressive performance demonstrated its ability to "prudently
2  manage risk."

3      636.   In this Form 8-K, Countrywide reported gain-on-sale of loans and
4  securities in the amount of $1,277,331,000 for the quarter.

5      637.   The statements made by Defendants Mozilo and Kurland in the July
6  22, 2004 press release were false and misleading.  Defendant Mozilo's statements
7  regarding management's ability to "prudently manage risk" were false and
8  misleading for the same reasons set forth in Sections IV.B and IV.C.  Moreover,
9  the Company's reported value for gain-on-sale of loans and securities was false
10 and misleading because the Company overstated the fair value of its retained
11 interests and MSRs.  See Sections IV.G.4 and IV.G.5.

12          **5.    Second Quarter 2004 Conference Call**

13     638.   On a conference call held later that day to discuss the Company's
14 second quarter 2004 results (the "July 22, 2004 Conference Call"), Defendant
15 Mozilo answered a question from an analyst at Lehman Brothers regarding
16 Countrywide's provision for loan loss reserves.  Mozilo responded with certainty
17 that the Company's reserves were adequate based upon its high credit quality
18 loans:

19     First of all in terms of loan losses, loan losses were far below what
20     you would expect to experience in a--this type of a bank . . .[however]
21     *we have focused on FICOs well above the 700.  The average in the*
22     *portfolio is around 740. . . . [T]he quality of that portfolio and the*
23     *type of loans that are in there,* which are mortgage loans, assets that
24     we understand very well and know how to service, that--*that we can*
25     *expect the performance that we're seeing today to continue at a very*
26     *high level.*

27
28

1   639.   On the July 22, 2004 Conference Call, Defendant Mozilo discussed
2   the type of controls that Countrywide had in place at its bank and described them
3   as "very significant" and "extraordinary compliance and controls in place:"

4   There's ***very significant controls in place . . .*** this is a very deep area
5   of the [Fed's] concern as it is ours, so we ***have extraordinary***
6   ***compliance and controls in place there.***

7   640.   Defendant Mozilo's statements made during the July 22, 2004
8   Conference Call were materially false and misleading when made.   Specifically,
9   Mozilo's statement that the company's loan loss reserves were adequate because
10  the Company's portfolio purportedly contained high credit quality loans was false
11  and misleading because Defendants failed to account for the increased risk of its
12  mortgage loans.     See Sections IV.G.3 and IV.B.2.     Additionally, Mozilo's
13  statements touting Countrywide's very significant and extraordinary compliance
14  and  internal  controls  were  false  and  misleading  because  Countrywide
15  substantially deviated from its underwriting guidelines. See Section IV.G.7.

16  641.   These materially false and misleading statements by Countrywide
17  and the Officer Defendants prompted positive reactions from analysts:

18  •   Raymond James reported on July 23, 2004 that "[w]e
19      continue to rate the shares Strong Buy based on their modest
20      valuation. . . ."

21  •   Piper Jaffray reported on July 23, 2004 that "we continue to
22      recommend that investors purchase shares of Countrywide,
23      which we view as the strongest player in the country's
24      largest consumer market."

25  **6.   Second Quarter 2004 Form 10-Q**

26  642.   On August 6, 2004, Countrywide filed its quarterly report on Form
27  10-Q for the second quarter of 2004, ended June 30, 2004, signed by Defendants

28

Kurland and McLaughlin. The Company reported revenues for the quarter of $2,333,104,000 and diluted earnings per share of $2.24.

643. The Company stated in the Form 10-Q that the impairment of the fair value of its retained interests equaled $178,424,000.

644. In the "Off-Balance Sheet Arrangements and Guarantees" section of the second quarter 2004 Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "Management does not believe that any of its off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

645. In a section titled "Mortgage Servicing Rights," the Company reported that the estimated fair value of the MSRs as of June 30, 2004 was $9,200,000,000.

646. The Company reported allowance for loan losses of $105,839,000 as of the end of the second quarter of 2004. Net charge-offs equaled $13,138,000.

647. In the second quarter 2004 Form 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $5,239,000,000. Mortgage Banking subprime loans originated during the quarter equaled $8,132,000,000, and was 9.2% of total Mortgage Banking loan production.

648. Countrywide reported consolidated prime mortgage loans, prime home equity loans and subprime loans held for investment in the amount of $14,015,330,000, $14,818,056,000, and $137,679,000, respectively. Subprime mortgages equaled less than 1% of total mortgage loans held for investment.

649.   In the Form 10-Q, the Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk . . . *by only retaining high credit quality mortgages in our loan portfolio.*"

650.   The Company concluded that there was no change in its internal controls that would affect its financial reporting: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

651.   Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and McLaughlin, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

652.   The statements referenced above in Countrywide's second quarter 2004 Form 10-Q were materially false and misleading when made.  As set forth in greater detail, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above.   Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Also, the statements in the Form 10-Q regarding the volume of prime home equity and subprime loans originated during the quarter and the quality of loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.  Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in

our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase the volume of loans produced without regard to loan quality. See Sections IV.B and IV.C above. The statements in the Form 10-Q relating to internal controls were false and misleading for the same reasons set forth in Section IV.G.7. Moreover, the SOX certifications signed by Defendants Mozilo and McLaughlin were false and misleading for the same reasons stated in Section IV.G above.

### 7.    Third Quarter 2004 Form 8-K

653.  On October 20, 2004, Countrywide filed a Form 8-K, signed by Laura Milleman, Managing Director and Chief Accounting Officer, which attached a press release that announced the Company's financial results for the third quarter of 2004, ended September 30, 2004. In the press release, Defendant Mozilo again highlighted Countrywide's ability to deliver strong results in a tough environment in which interest rates rose by 50 basis points:

> Countrywide's financial results for the quarter -- highlighted by diluted earnings per share of $0.94 -- once again *demonstrate the strength and resilience of our business model.*

654.  In the Form 8-K, Countrywide reported gain-on-sale of loans and securities in the amount of $1,188,812,000 for the quarter.

655.  These statements contained in the October 20, 2004 Form 8-K and press release were materially false and misleading when made. Specifically, Defendant Mozilo's statement that the third quarter financial results "demonstrate the strength and resilience of our business model" was false and misleading because Countrywide loosened its underwriting policies and substantially increased its exception processing. See Sections IV.C and IV.G. The Company's reported gain-on-sale of $1,188,812,000 was false and misleading because the Company overstated its assessment of fair value for its retained interests and

1 MSRs, and also for the same reasons set forth in Sections IV.G.4 and IV.G.5
2 above.

### 8.   Third Quarter 2004 Conference Call

656.   On a conference call held later that same day to discuss the third quarter financial results ("October 20, 2004 Conference Call") in which Defendants Mozilo and Kurland participated, the Company's senior management discussed the third quarter 2004 financial results and fourth quarter 2004 financial outlook.   Mozilo touted the high quality loans held in Countrywide's Bank portfolio: "The bank *continues to focus on portfolio quality as the average FICO is now . . . 732 and the weighted average LTV stands at 80%.*"

657.   On the conference call, Jaime Weiss, an analyst with the Bank of Montreal, asked Mozilo to comment on "insider tradings" of Countrywide's stock. Mozilo responded that all of his sales were performed in conformity with a 10b5-1 trading plan:

> My decision has been that *since I'm 65-years-old to exercise and [sell] on a schedule, irrespective of the market, stock up or down [in accordance with a 10b5-1 plan].*  So, I would attach no meaning to it whatsoever, those in the past that attached a meaning to it, is a big loser. . . . The sell by myself, I think I can speak for Stan, is one of a personal nature and has nothing to do with the Company.

658.   Defendant Mozilo's statements on the October 20, 2004 Conference Call were materially false and misleading when made.   Specifically, his statement regarding the Company's purported high credit quality loans with an average "FICO [of] . . . 732, and . . . [a] weighted average of LTV . . . at 80%" was false and misleading for the same reasons set forth in Sections IV.B and IV.C. Mozilo's statement that he traded his shares of Countrywide stock "irrespective of the market, stock up or down" was false and misleading for the same reasons set forth in Section V.D discussing his insider sales of Countrywide stock.

659.   Analysts, nonetheless, reacted positively to Defendant Mozilo's materially false and misleading statements above.  For example, on October 21, 2004, Credit Suisse First Boston issued a report that reiterated its "Outperform" rating.  ABN AMRO analysts reiterated on October 21, 2004 their "Overweight" rating with good credit quality.  In fact, the analysts rated CFC, SLM Corp. and CIT Group Inc. an "A" for credit quality, with Countrywide ranking first. Moreover, ABN AMRO pointed out that Countrywide originated more loans during the quarter than any of the top three mortgage originators.  Specifically, Countrywide's mortgage production volume was $92 billion, Wells Fargo Home Mortgage was $68 billion, and Washington Mutual was $61 billion for the quarter.

660.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' false and misleading misrepresentations:

- Prudential Equity Group LLC maintained an "Overweight" rating for Countrywide's stock.

- Dresdner Kleinwort Wasserstein Research reported on October 21, 2004 that "Countrywide display[ed] solid credit and interest rate risk management due to its business model. This is largely illustrated in the low credit-risk and high liquidity of its loan production."

- Raymond James issued a report on October 21, 2004 that "[w]e are increasing our 2005 estimate, though, to $4.00. We believe the downside in the stock Wednesday was understandable but overdone, and we rate shares Strong Buy."