### 9.    Third Quarter 2004 Form 10-Q

661.   On November 8, 2004, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2004, ended September 30, 2004, signed by Defendants Kurland and McLaughlin.   The Company reported revenues of $2,245,607,000 and diluted earnings per share of $0.94 for the quarter.

662.   The Company reported in the Form 10-Q that the recovery of the fair value of its retained interests equaled $162,000.

663.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described its representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

664.   In a section of the Form 10-Q titled "Mortgage Servicing Rights," the Company reported that the fair value of the MSRs as of September 30, 2004 was $8,200,000,000.

665.   The Company reported allowance for loan losses of $107,765,000 as of the end of the quarter, having increased its provision for loan losses by $48,888,000 and taken net charge-offs of $19,572,000 during the quarter.

666.   In the Form 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the quarter purportedly equaled $6,421,000,000.   Mortgage Banking subprime loans produced during the quarter equaled $9,591,000,000, and was 12.45% of total Mortgage Banking loans originated during the quarter.

667. Further, Countrywide's portfolio of mortgage loans held for investment as of September 30, 2004 consisted of prime mortgages, prime home equity loans and subprime loans, and were reported in the Form 10-Q to amount to $18,821,053,000, $11,113,845,000 and $124,768,000, respectively. Subprime mortgage loans equaled less than 1% of total mortgage loans held for investment.

668. The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk principally . . . by *only retaining high credit quality mortgages in our loan portfolio*."

669. The Company also reported in its third quarter 2004 Form 10-Q that management's review of the Company's disclosure controls and internal controls was "effective:" "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

670. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and McLaughlin, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

671. The statements contained in the third quarter 2004 Form 10-Q above were materially false and misleading when made. As set forth in greater detail above, the Company's reported values for its revenue and diluted earnings per share were false because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same

reasons set forth in Section IV.G above. Also, the statements regarding the quality and volume of prime home equity and subprime loans originated during the quarter and the quality of loans held for investment were false because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section IV.D above. Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Section IV.C above. The statements relating to internal controls were false and misleading for the same reasons set forth in Section IV.G.7. Moreover, the SOX certifications signed by Defendants Mozilo and McLaughlin were false and misleading for the same reasons stated in Section IV.G above.

### 10.    Year End 2004 Form 8-K

672.   On February 2, 2005, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2004. In the press release, Countrywide reported gain-on-sale of loans and securities in the amount of $1,243,964,000 for the fourth quarter of 2004.

673.   The Company's reported gain-on-sale was materially false and misleading when made because the Company fraudulently overstated its retained interests and MSRs, and also for the same reasons set forth in Sections IV.G.4 and IV.G.5 above.

### 11.    Year End 2004 Conference Call

674.   On the conference call held the same day (the "February 2, 2005 Conference Call"), in which Defendants Mozilo, Kurland and McLaughlin participated, the Company's senior management discussed the fourth quarter and year end 2004 financial results and first quarter 2005 outlook. Defendant Kurland

responded to a question from a Piper Jaffray analyst by emphasizing that Countrywide's strategy had not changed to take on more risk:

> Stan Kurland: ***Our strategy is pretty much the same*** as we have been operating it for. . . .

> Bob Napoli - Piper Jaffray – Analyst: The answer is no. There has been no real change to take more risk[?]

> Stan Kurland - Countrywide Financial Corporation – President and Chief Operating Officer: ***No, no, no.***

675. On the same conference call, Defendant McLaughlin responded to a question from a Sanford Bernstein analyst and broke out the "volume of subprime loans actually sold" in comparison to the volume of mortgages sold. McLaughlin stated, "[i]n terms of the volume of sales in the fourth quarter, there was 67 billion in prime mortgages sold, roughly 9.4 billion of subprime mortgages sold, and between HELOC and fixed rates, looks like about 7.1 billion was sold."

676. Defendants Kurland's and McLaughlin's statements on the February 2, 2005 Conference Call were materially false and misleading when made. Defendants Kurland's statement that there was no change to Countrywide's strategy to take on more risk was false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections IV.B and IV.C. Defendant McLaughlin's statement that there "was 67 billion in prime mortgages sold" was false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the same reasons set forth in Section IV.D.

677. Analysts reacted positively to these materially false and misleading statements. For example, on February 2, 2005, Piper Jaffray analysts issued a

report that reiterated its "Outperform" rating and top pick for 2005 in mortgage finance. An analyst stated:

> [Even though] CFC's stock declined 5.5% following its 4Q04 earnings miss, which was caused by an unexpected net hedging loss. . . . [W]e believe CFC's . . . management **uses consistent low risk strategies.** We feel the fundamental strength to the quarter was very strong as CFC exceeded our expectations on production income, bank income and capital markets, and the company continued to gain market share.

678. Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations:

- Morgan Stanley reported on February 2, 2005 that they "[r]emain Overweight [on Countrywide] with a new price target of $44[.]"
- Bernstein Research reported on February 3, 2005 that, "[w]hile reported EPS were far below expectations, the shortfall was due to volatility of its servicing hedge, *rather than any serious operating weakness*, such as weakness in loan pricing, or a swollen G&A ratio . . . "We rate CFC outperform."
- Merrill Lynch reported on February 3, 2005 that "[w]e remain comfortable with CFC's credit profile . . . and reiterate our Overweight investment recommendation and mid-A credit assessment."

### 12.    2004 Form 10-K

679. On March 15, 2005, Countrywide filed its Annual Report for 2004 with the SEC on Form 10-K (the "2004 Form 10-K"). The report was signed by

Defendants Mozilo, Kurland, McLaughlin, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Russell, Robertson and Snyder. In it, the Company reported revenues for 2004 of $8,566,627,000 and diluted earnings per share of $3.63.

680. The Company reported in its 2004 Form 10-K, in a section entitled "Valuation of MSRs and Other Retained Interests," that the fair value of the retained interests on the Company's balance sheet as of December 31, 2004 was $1,908,504,000. In addition, the reported impairment of retained interests as of year end 2004 equaled $368,295,000.

681. In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

682. In a section of the 2004 Form 10-K titled "Securitization," the Company also stated the liabilities associated with the risk of representations and warranties "total[ed] $139.9 million."

683. In a section titled "Securitizations," the Company reported that the fair value of its MSRs as of December 31, 2004 was $8,882,917,000, in comparison to December 31, 2003, when fair value of MSRs was reported as $6,909,167,000.

684. The Company reported allowance for loan losses of $125,046,000 as of the end of 2004, having increased its provision for loan losses by $71,775,000 during the year. The Company also claimed net charge-offs of $25,178,000.

685. The Company also reported in its 2004 Form 10-K the volume of loans it originated at year end: prime mortgage loans equaled $292,672,000,000,

prime home equity loans equaled $30,893,000,000, and nonprime mortgage loans equaled $39,441,000,000.

686.   In the 2004 Form 10-K, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced during the year (which was included in Countrywide's total volume of Mortgage Banking Loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the year equaled $23,351,000,000.   Mortgage Banking nonprime mortgage loans originated during the year equaled $33,481,000,000, and was 10.5% of total Mortgage Banking loans originated for the year end.

687.   Countrywide also reported that prime mortgage loans held for investment equaled $22,587,246,000, prime home equity loans held for investment equaled $11,435,792,000, and nonprime loans held for investment equaled $171,592,000, or less than 1% of the total value of prime loans held for investment.

688.   The 2004 Form 10-K stated that "[t]he majority of our loan production consists of Prime Mortgage Loans."   Specifically, the Company highlighted the quality mortgages that it securitizes and sells to the secondary market:

> We ensure our ongoing access to the secondary mortgage market by *consistently producing quality mortgages* . . . .   As described elsewhere in this document, *we have a major focus on ensuring the quality of our mortgage loan production* . . . .

689.   In a section of the Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

1    Loan Quality

2    Our Credit Policy establishes standards for the determination of

3    acceptable credit risks.  Those standards encompass borrower and

4    collateral quality, underwriting guidelines and loan origination

5    standards and procedures.

6

7    Borrower quality includes consideration of the borrower's credit and

8    capacity to pay.  We assess credit and capacity to pay through . . .

9    manual or automated underwriting of additional credit characteristics.

10                                    * * *

11   ***Our loan origination standards and procedures are designed to***

12   ***produce high quality loans.***   These standards and procedures

13   encompass underwriter qualifications and authority levels, appraisal

14   review requirements, fraud prevention, funds disbursement controls,

15   training of our employees and ongoing review of their work. . . . In

16   addition, we employ proprietary underwriting systems in our loan

17   origination process that improve the consistency of underwriting

18   standards, assess collateral adequacy and help to prevent fraud, while

19   at the same time increasing productivity.

20

21   In addition to our pre-funding controls and procedures, we employ an

22   extensive post-funding quality control process.  Our Quality Control

23   Department, under the direction of the Chief Credit Officer, is

24   responsible for completing comprehensive loan audits that consist of a

25   re-verification of loan documentation, an in-depth underwriting and

26   appraisal review, and if necessary, a fraud investigation.

27   690.  KPMG issued an audit report on management's assessment of the

28   Company's internal control over financial reporting, in accordance with the

1  standards of the Public Company Accounting Oversight Board.  In a report dated

2  March 11, 2005, KPMG stated:

> . . . [T]he consolidated financial statements referred to above present
> fairly, in all material respects, the financial position of Countrywide
> Financial Corporation and subsidiaries as of December 31, 2004, and
> the results of their operations and their cash flows for the year ended
> December 31, 2004, in conformity with U.S. generally accepted
> accounting principles.  Also in our opinion, the related financial
> statement schedules, when considered in relation to the basic
> consolidated financial statements taken as a whole, present fairly, in
> all material respects, the information set forth therein.

12  691.  Further assuring investors of the veracity of the information

13  contained in the Form 10-K, the report included SOX certifications signed by

14  Defendants Mozilo and McLaughlin, representing that the "report does not

15  contain any untrue statement of a material fact" and "the financial statements, and

16  other financial information included in this report, fairly present in all material

17  respects the financial condition" of Countrywide and that the Company employed

18  internal disclosure controls and procedures that detect "[a]ll significant

19  deficiencies and material weaknesses in the design or operation of internal control

20  over financial reporting" and "[a]ny fraud, whether or not material, that involves

21  management."

22  692.  The statements referenced above in Countrywide's 2004 Form 10-K

23  were materially false and misleading when made.  As set forth in greater detail

24  above, the Company's reported revenue and diluted earnings per share were false

25  and misleading because the Company's allowance for loan losses and accruals for

26  representations and warranties were understated, and its assessments of fair

27  values for retained interests and MSRs were overstated.  See Section IV.G above.

28  Statements related to loan loss reserves, retained interests, MSRs and liabilities

related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above. Furthermore, statements relating to the volume of prime and nonprime loans originated and the value of prime loans held for investment were false and misleading because Countrywide misclassified its subprime loans as prime loans and also for the same reasons set forth in Section IV.D above. Moreover, Countrywide's statements that it "consistently produce[d] quality mortgages" and that its "loan origination standards and procedures are designed to produce high quality loans" were false and misleading because Countrywide loosened its underwriting guidelines to increase loan volumes without regard to loan quality. See Section IV.C above. KPMG's unqualified audit opinion was false and misleading for the same reasons stated in Sections IV.G.7 and VI above. Moreover, the SOX certifications signed by Defendants Mozilo and McLaughlin were false and misleading for the same reasons stated in Section IV.G above.

### C.   The Company's False Statements Regarding 2005 Results

#### 1.   March 15, 2005 Piper Jaffray Conference

693.   On March 15, 2005, Defendant Mozilo spoke at a financial conference sponsored by Piper Jaffray (the "March 15, 2005 Conference"). On the issue of the credit quality of Countrywide's loans, Mozilo made a statement emphasizing his concern about credit quality in the mortgage industry, generally, but then falsely distinguished Countrywide from the many lenders whose credit practices were beginning to make analysts and investors uneasy:

> The general statement is that I'm deeply concerned about credit quality in the overall industry. I think that the amount of capacity that's been developed for subprime is much greater than the quality of subprime loans available. *And so they're pushing further down -- as I observe it, they're pushing further down the credit chain into the 500 FICOs and below 550, 540, 530. And as you get down to those*

*levels, it becomes very problematic and I don't think there's any amount of money you can charge upfront to cover your losses on those type of loans.*

*So I'm deeply concerned about everybody going into subprime. . . .*

*So we've had to remain very disciplined in our subprime efforts. And that's why you don't see massive growth for Countrywide on subprime. We're trying to stay within a category of subprime loans that we know how to manage and manage effectively.*

So I have to separate it. *The overall industry I am troubled; Countrywide I'm not, because we have remained very disciplined in our origination of subprime loans.*

694. Also, during the March 15, 2005 Conference, Mozilo touted the Company's performance results for 2004 and 2005 as having been accomplished with minimal risk: "Countrywide Bank has grown substantially since its acquisition in May of 2001, leveraging off synergies with the production and servicing sectors to generate assets and liabilities at a very low-cost, *while producing competitive financial returns at a minimal risk.*"

695. Moreover, during the March 15, 2005 Conference, Mozilo responded to an analyst's question regarding the 30% market growth goal that was set by management to be achieved by 2008. Mozilo highlighted that this goal was realistic and Countrywide would not sacrifice its "sound lending" practices to achieve it:

Your question is 30 percent, is that realistic, the 30 percent goal that we set for ourselves 2008? . . . Is it achievable? *Absolutely. . . .*

1    But I will say this to you, *that under no circumstances will*
2    *Countrywide ever sacrifice sound lending and margins for the sake*
3    *of getting to that 30 percent market share.*

4    696.  Further, Mozilo again emphasized the Company's management of its
5    subprime business, stating that management was very "concerned about the loan-
6    to-value ratio" because those type of loans would be affected first if there is a
7    downturn in the economy and, therefore, the Company must manage them
8    properly:

9    *Obviously, when you're dealing in subprime, you have got to be*
10   *concerned about the loan-to-value ratio because that's the bottom*
11   *end of the strata and in the event of a bump in the economy or a*
12   *burp in the economy, they are affected first. . . .* Subprime is a
13   business we have been in for over 10 years.  We have been through
14   various cycles in those 10 years, and *I think we have got it properly*
15   *managed and surrounded.*

16   697.  Defendant Mozilo's statements made at the March 15, 2005
17   Conference above were materially false and misleading when made.  Specifically,
18   Mozilo's statement that "we've had to remain very disciplined in our subprime
19   efforts[,] [a]nd that's why you don't see massive growth for Countrywide on
20   subprime" was false and misleading because Countrywide misclassified its
21   subprime loans as prime loans.  See Section IV.D.  Also, Mozilo's statements
22   criticizing the Company's peers for "pushing further down . . . the credit chain
23   into the 500 FICOs and below 550, 540, 530" to originate loans, but claiming that
24   Countrywide's practices were different, more conservative and relatively safe as
25   opposed to high risk, were also misleading because Countrywide loosened its
26   underwriting practices to increase its loan volume without regard to loan quality.
27   See Section IV.C above.  Moreover, Mozilo's statement that Countrywide was
28   "generat[ing] assets and liabilities at a very low-cost, while producing

1 competitive financial returns at a minimal risk" was false and misleading for the
2 same reasons set forth in Section IV.C above.  Mozilo's statement that "under no
3 circumstances will Countrywide ever sacrifice sound lending and margins for the
4 sake of getting to that 30 percent market share," was also false and misleading
5 because Countrywide loosened and abandoned its underwriting guidelines to
6 boost loan volumes to reach the 30% market share goal.  See Sections IV.B and
7 IV.C.   Last, Mozilo's statement regarding the prudent management of
8 Countrywide's subprime loan-to-value ratio was false and misleading for the
9 same reasons set forth in Sections IV.B and IV.C above.

10 ## 2.    First Quarter 2004 Amended Form 10-Q/A

11 698.  On April 25, 2005, Countrywide filed an amended quarterly report
12 on Form 10-Q/A for the first fiscal quarter of 2004, ended March 31, 2004, signed
13 by Defendants Kurland and Sieracki.  In the Form 10-Q/A, the Company restated
14 reported revenue for the quarter to $1,973,626,000 compared to $2,214,903,000
15 as previously reported.   Diluted earnings per share for the quarter ended
16 March 31, 2004 were restated to $1.75 from $2.22.  Gain-on-sale revenues were
17 restated to $1,117,390,000 from $1,358,667,000.

18 699.  These restated results in the Form 10-Q/A above were materially
19 false and misleading when made.  As set forth in greater detail above, the
20 Company's reported revenue and diluted earnings per share were false and
21 misleading because the Company's allowance for loan losses and accruals for
22 representations and warranties were understated.  The Company's reported gain-
23 on-sale was false and misleading because the Company overstated its assessment
24 of fair value for its retained interests and MSRs, and also for the same reasons set
25 forth in Section IV.G above.

26 ## 3.    First Quarter 2005 Form 8-K

27 700.  On April 26, 2005, Countrywide filed a Form 8-K, signed by Laura
28 Milleman, attaching a press release that announced the Company's financial

results for the first quarter of 2005, ended March 31, 2005. In the press release, Countrywide reported gain-on-sale of loans and securities in the amount of $1,361,788,000 for the quarter.

701. The Company's reported value for its gain-on-sale of loans and securities was materially false and misleading when made because the Company fraudulently overstated the fair value of its retained interests and MSRs, and also for the same reasons set forth in Sections IV.G.4 and IV.G.5 above.

### 4. First Quarter 2005 Conference Call

702. Later the same day, Countrywide held a conference call (the "April 26, 2005 Conference Call") in which Defendants Mozilo, Sieracki and Kurland discussed the Company's financial results for the first quarter of 2005. Defendant Sieracki responded to a question from an analyst at NWQ Investment Management regarding changes in underwriting policies at Countrywide:

> Mark Patterson - NWQ Investment Management – Analyst: But has there been any changes in the underwriting metrics with the current origination levels or you're expected origination during 2005? In terms of FICO or combined loan-to-value or debt-to-income or any of those kind of underwriting metrics?
>
> Eric Sieracki - Countrywide Financial Corporation - Chief Financial Officer: I think they will remain . . . consistent with the first quarter and most of what we did in 2004. *We don't see any change in our protocol relative to the volume [of] loans that we're originating.*

703. Further, during the April 26, 2005 Conference Call, Defendants Kurland and Sieracki both responded to a question from a KBW analyst indicating that Countrywide and its Bank originated only high quality pay option ARMs:

Fred Cannon - KBW – Analyst: . . . are you originating a lot of the pay options ARMs or [is] the bank portfolio at this point in time?

Eric Sieracki - Countrywide Financial Corporation - Chief Financial Officer: A combination. Most of it is not going into the bank, but we are trying to develop protocol and a process for *delivering greater levels* to meet the banks growth need.

Stanford Kurland - Countrywide Financial Corporation - President & Chief Operating Officer: *These* [pay option ARMS] *are all high FICO.*

704. Defendants Kurland's and Sieracki's statements made on the April 26, 2005 Conference Call above were materially false and misleading when made. Specifically, Defendant Kurland's statement that Countrywide's pay-option ARMs were "all high FICO" was false and misleading for the same reasons set forth in Sections IV.B.2 and IV.E above. Additionally, Sieracki's statement that Countrywide's "protocol" or "underwriting metric" relative to the volume of loans originated "will remain . . .consistent" was false and misleading because Countrywide loosened its underwriting guidelines to increase the volume of loans originated without regard to loan quality. See Sections IV.B and IV.C above.

705. Several analysts raised or maintained their stellar recommendations and earnings estimates for Countrywide based upon Countrywide's false and misleading statements. For example, on April 27, 2005, analysts at Piper Jaffray maintained their "Outperform" rating and described Countrywide as a mortgage corporation with loans that "are primarily prime credit quality first-lien mortgage loans secured by single-family residences."

706.   In addition, several other analysts raised or maintained their stellar recommendations and earnings estimates for Countrywide as follows:

- Merrill Lynch reported on April 26, 2005 that "[w]e reiterate our Buy rating and our $43.00 12-month Price Objective."
- Deutsche Bank reported on April 26, 2005 that, "[w]e are reiterating our Buy rating and our $43 target price."
- Morgan Stanley reported on April 27, 2005 that we "[r]eiterate Overweight on [s]trong 1Q05 [r]esults."

### 5.   First Quarter 2005 Form 10-Q

707.   On May 9, 2005, Countrywide filed its Form 10-Q for the first quarter of 2005, ended March 31, 2005, signed by Defendants Kurland and Sieracki. The Company reported revenues for the quarter of $2,404,885,000 and diluted earnings per share of $1.13.

708.   The Company reported in the Form 10-Q that the impairment of the fair value of its retained interests equaled $137,070,000.

709.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

710.   The Company reported in the Form 10-Q that the value of its MSRs equaled $9,746,957,000 for the quarter end.

711.   The Company reported in the Form 10-Q that allowance for loan losses as of the end of the first quarter equaled $134,916,000.

712.   The Company also reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in the total

1  volume of loans produced). Specifically, Mortgage Banking prime home equity
2  loans originated during the quarter equaled $6,619,000,000. Mortgage Banking
3  nonprime mortgage loans originated during the quarter equaled $8,187,000,000,
4  and was 10.4% of total Mortgage Banking loans originated during the quarter.

5  713. Countrywide also reported that prime mortgage loans held for
6  investment equaled $28,621,141,000, prime home equity loans held for
7  investment equaled $13,425,446,000, and nonprime loans held for investment
8  equaled $179,293,000.

9  714. The Company described its management of credit risk in the
10 following terms: "[w]e manage mortgage credit risk principally . . . *by retaining*
11 *high credit quality mortgages in our loan portfolio.*"

12 715. The Company also reported in its first quarter 2005 Form 10-Q
13 management's review of the Company's disclosure controls and internal controls:

14 There has been no change in our internal control over financial
15 reporting during the quarter ended March 31, 2005 that has materially
16 affected, or is reasonably likely to materially affect, our internal
17 control over financial reporting . . . .

18 716. Further assuring investors of the veracity of the information
19 contained in the Form 10-Q, the report included SOX certifications signed by
20 Defendants Mozilo and Sieracki, representing that the "report does not contain
21 any untrue statement of a material fact" and "the financial statements, and other
22 financial information included in this report, fairly present in all material respects
23 the financial condition" of Countrywide.

24 717. These statements contained in the first quarter 2005 Form 10-Q
25 above were materially false and misleading when made. As set forth in greater
26 detail above, the Company's reported values for its revenue and diluted earnings
27 per share were false because the Company's allowance for loan losses and
28 accruals for representations and warranties were understated, and its assessments

of fair values for retained interests and MSRs were overstated. See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above. Also, the statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above. Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Section IV.C. The statements relating to internal controls were false and misleading for the same reasons set forth in Section IV.G.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

### 6.    Second Quarter 2004 Amended Form 10-Q/A

718.    On May 17, 2005, Countrywide filed an amended quarterly report on Form 10-Q/A for the second quarter of 2004, ended June 30, 2004, signed by Defendants Kurland and Sieracki. The Company restated reported revenues for the quarter as $2,474,746,000, compared with $2,333,104,000 as was previously reported. Diluted earnings per share for the quarter was restated to $2.52 from $2.24, and gain-on-sale revenue was restated to $1,418,973,000 from $1,277,331,000.

719.    These restated results were materially false and misleading when made. As set forth in greater detail above, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated. The Company's reported gain-on-sale was false and misleading because the Company overstated its assessment of fair value for its retained

1  interests and MSRs, and also for the same reasons set forth in Sections IV.G and
2  IV.C above.

3  ### 7.   Third Quarter 2004 Amended Form 10-Q/A

4  720.  On May 17, 2005, Countrywide also filed an amended quarterly
5  report on Form 10-Q/A for the third quarter of 2004, ended September 30, 2004,
6  signed by Defendants Kurland and Sieracki.  Diluted earnings per share for the
7  quarter was restated to $0.80 from $0.94, and gain-on-sale revenue was restated
8  to $1,017,697,000 from $1,188,812,000.   The Company restated reported
9  revenues for the quarter as $2,711,618,000, compared with $2,245,607,000 as
10  was previously reported.

11  721.  These restated results were materially false and misleading when
12  made.  As set forth in greater detail above, the Company's reported revenue and
13  diluted earnings per share were false and misleading because the Company's
14  allowance for loan losses and accruals for representations and warranties were
15  understated.   The Company's reported gain-on-sale was false and misleading
16  because the Company overstated its assessment of fair value for its retained
17  interests and MSRs, and also for the same reasons set forth in Sections IV.G and
18  IV.C above.

19  ### 8.   May 24, 2005 Countrywide Analyst Meeting

20  722.  On May 24, 2005, Defendants Mozilo, Sambol and Kurland and
21  John McMurray, the Company's Chief Credit Officer, participated in the
22  Countrywide Financial Corporation Analyst Meeting (the "May 24, 2005
23  Meeting").  At the meeting, McMurray stated, without correction or explanation
24  by Defendants Mozilo, Sambol or Kurland, that the Company originated loans
25  that met its credit standards: "[q]uality control . . . is a series of controls that we
26  have post-closing.  So what we are looking for there, is to ensure that the loans
27  that we originate have ***both met our credit standards and we[re] underwritten***
28  ***according to those standards.***"

723.   During the May 24, 2005 Meeting, an unidentified Countrywide representative touted that Countrywide's loans held for investment are "first rate mortgages" and "high quality loans" and, accordingly, the Company's allowance for loan losses were adequate:

> Well, you know, first of all the bank is investing in . . . *prime mortgages, primarily HELOCs and some first rate mortgages* . . . . So, not much on the interest rate risk side. But again, *very high quality loans* that have performed historically and we have you know, default models that provide conservative reserves against that book of business.

724.   Likewise, during the May 24, 2005 Meeting, Defendant Sambol remarked that credit risks associated with ARM loans were mitigated:

> These risks [associated with ARM loans] are *mitigated or addressed in part by the different underwriting criteria* which are applied to these loans relative to those used for traditional fixed-rate agency product such as maybe higher credit scores or lower loan to value ratios, and also importantly, the paradigm in the mortgage market today and with Countrywide in particular, is that the increased risk is priced for in a very granular way.

725.   Further, at the May 24, 2005 Meeting, an unidentified Countrywide representative stated that Countrywide had an efficient control environment that allowed the Company to distinguish itself from its peers by having the lowest cost and most effective governance program:

> And I think it's the hallmark for Countrywide [that] . . . we have *a culture of concern about our operations* and the enterprise that produces and [has an] *efficient . . . control environment* and we are going to continue to build on that and look at the environment that we are in today as one that we can produce a value of proposition.  We

1    can distinguish ourselves as having the lowest cost and most effective

2    governance program and that's what we are working to.

3    726.  During the May 24, 2005 Meeting, Defendant Sambol remarked that

4    credit risks associated with ARMs were mitigated:

5    These risks are mitigated or addressed in part by the different

6    underwriting criteria which are applied to these loans relative to those

7    used for traditional fixed-rate agency product *such as maybe higher*

8    *credit scores or lower loan to value ratios . . . .*

9    727.  Countrywide's statements at the May 24, 2005 Meeting above were

10   materially false and misleading when made.  Specifically, McMurray's statement

11   that Countrywide "ensure[s] that the loans . . . originate[d] have both met our

12   credit standards and we[re] underwritten according to those standards" was false

13   because Countrywide materially loosened its underwriting standards to increase

14   loan volume without regard to loan quality.   See Sections IV.B and IV.C.

15   Moreover, the Countrywide representative's statements relating to "conservative"

16   loan loss reserves were false and misleading for the same reasons set forth in

17   Section IV.G.3 above.  Further, in an effort to distinguish Countrywide from its

18   peers in the mortgage industry, the statement made by a Countrywide

19   representative that "we have a culture of concern about our operations and the

20   enterprise that produces and [has an] efficient . . . control environment" was false

21   and misleading because the Officer Defendants' assessment of internal controls

22   over financial reporting was ineffective for the reasons set forth in Section

23   IV.G.7.  Moreover, Defendant Sambol's statement that credit risks associated

24   with ARMs were mitigated because underwriting guidelines were tightened was

25   false and misleading for the same reasons set forth in Section IV.B above.

26

27

28

### 9.   June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference

728.   On June 2, 2005, Defendant Mozilo appeared on behalf of Countrywide at the Sanford Bernstein & Co. Strategic Decisions Conference (the "June 2, 2005 Conference").   At the conference, Mozilo touted the Company's operational results for 2005 and acknowledged that Countrywide had some high-risk mortgage products. Mozilo claimed, however, that Countrywide had elevated credit requirements for these high risk loans:

> We acknowledge that some of the products offered today carry higher credit risks than traditional GSE 30-year fixed-rate loans.  However, it is important [to] note that *Countrywide mitigates these risks or addresses them in part by utilizing different underwriting criteria than that is used for traditional fixed-rate product, such as the requirement for higher credit scores* . . . .

729.   Further, at the same conference, Mozilo once again touted the quality of loans held for investment at Countrywide:

> Credit quality of the portfolio remains outstanding with a weighted average *FICO score that exceeded 730 and a weighted average CLTV loan to value of 80%.*

730.   Also, at the June 2, 2005 Conference, Mozilo revised his aggressive goal of 30% market share origination by 2008 and extended it to 2010.  However, once again he told investors that Countrywide's profitability would not suffer as a result of the Company's overly aggressive goal: "Questions always asked by you people -- are you going to sacrifice profitability to gain market share? *The answer you can see for our plans is absolutely not.*"

731.   Moreover, at that same conference, Mozilo responded to a question from an unidentified speaker regarding the extent of the exposure that a mortgage

1   lender would have should there be a correction in the appreciation of housing
2   prices:

> Angelo Mozilo - Countrywide Financial - Chairman, CEO: And I can
> tell you -- *values going down do not force people out of their homes*
> *and does not force people into -- never has forced them into*
> *delinquency ever. It's the loss of jobs.*

7   732.   Defendant Mozilo's statements made during the June 2, 2005
8   Conference Call above were materially false and misleading when made.
9   Specifically, Mozilo's statement that "Countrywide mitigates … risks or
10   addresses them in part by utilizing different underwriting criteria [for ARM loans]
11   than that is used for traditional fixed-rate product, such as the requirement for
12   higher credit scores" was false and misleading for the same reasons set forth in
13   Sections IV.B and IV.C above. Mozilo's statement that the "credit quality of the
14   portfolio remains outstanding with a weighted average FICO score that exceeded
15   703 and a weighted average CLTV loan to value of 80%," was false and
16   misleading for the reasons set forth in Sections IV.B and IV.C.   Mozilo's
17   statement that Countrywide's profitability would not suffer as a result of its
18   aggressive goal to reach 30% market share by 2010 was false and misleading
19   because Countrywide loosened its underwriting guidelines to increase loan
20   volume without regard to loan quality.  See Sections IV.B and IV.C.

21              **10.   Second Quarter 2005 Form 8-K**

22   733.   On July 26, 2005, the Company filed a Form 8-K, signed by Laura
23   Milleman, attaching a press release that announced the Company's financial
24   results for the second quarter of 2005, ended June 30, 2005.  In the July 26, 2005
25   press release, Countrywide reported gain-on-sale of loans and securities in the
26   amount of $1,145,409,000 for the quarter.

27   734.   Countrywide's statements contained in the July 26, 2005 Form 8-K
28   and press release above were materially false and misleading when made.  The

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                               260
LEAD CASE NO. CV 07-05295 MRP (MANX)

1  Company's reported gain-on-sale for loans and securities was false and
2  misleading because Countrywide materially overstated the fair value of its
3  residual interests and MSRs, and also for the same reasons stated in Sections
4  IV.G.4 and IV.G.5.

### 11.  Second Quarter 2005 Conference Call

6  735.  On a conference call held later that day (the "July 26, 2005
7  Conference Call"), in which Defendants Mozilo, Kurland and Sieracki
8  participated, the Company's senior management discussed the second quarter
9  2005 financial results and the third quarter 2005 financial outlook. Defendant
10  Kurland commented on the quality of loans with prepayment penalties, such as
11  Pay Option ARMs. Kurland stated, "[o]f loans with prepayment penalties, I think
12  another important point was our pay option portfolio . . . *it is a very high-quality*
13  *product.*"

14  736.  Similarly, during the July 26, 2005 Conference Call, Defendant
15  Mozilo echoed Kurland's claims, touting the purported high quality of
16  Countrywide's Pay Option ARMs:

17  Ken Posner - Morgan Stanley Dean Witter – Analyst:  . . . there's a
18  concern and there's been survey data that has documented that, to
19  some extent, less-educated folks, lower-income folks tend to be more
20  trusting of ARM products without necessarily understanding how they
21  actually work.  Are there other controls or structures in place to make
22  sure that people aren't [inappropriately marketing the new products]?

23

24  Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO: . . .
25  That product has a FICO score exceeding 700.  You don't see the
26  lower end of the economic spectrum with an unsophisticated people
27  with that kind of FICO score.  *So the people that Countrywide is*
28  *accepting under this program, generally speaking, are of much*

*higher quality and they are not of the ilk that you may be seeing someplace else in the country or for some other lender.*

737.   Further, on the same call, Defendants Kurland and Mozilo both responded to a question from a Fox-Pitt Kelton analyst about whether Countrywide's lending practices were loosening given that Countywide was originating hybrid ARMs and Pay Option ARMs:

> Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO: . . . I am not aware of any change of substance in underwriting policies. . . . *I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan than we did in the past.* Stan?
>
> Stanford Kurland - Countrywide Financial Corp. - President, COO: . . . [We] *have not loosened our standards* relative to what the bank acquires to the extent that we have standards that reflect and pricing that reflects where we are able to deliver loans into the secondary market.

738.   Also, when asked whether Countrywide was loosening its underwriting standards, Defendant Mozilo said, "I'm not *aware of any change of substance in underwriting policies*." In response to a follow-up question, Mozilo added: "*[w]e don't view that we have taken any steps to reduce the quality of our underwriting regimen at all.*"

739.   On the same conference call, Defendant Kurland reiterated the high quality of the pay-option adjustable-rate mortgages, *"[t]he product itself tends to be highest FICO, very good LTV product . . . ."* Also, Defendant Sieracki touted the credit quality of the home equity mortgages that Countrywide originates: "The credit quality of our home equities should be emphasized here as well. We are 730 FICO on these home equities, and that's extraordinary throughout the industry."

740.   Similarly, Defendants Mozilo and Sieracki stated at the July 26, 2005 Conference Call that the Company retains only high credit quality loans and there had been no deterioration of the quality of loans that were originated at Countrywide:

> Barry Cohen - Glenview Capital – Analyst:  . . . [C]an you give us a sense of the credit quality in the nonprime mortgage sector and if you have a view of whether the credit quality is stable or potentially -- not potentially -- or worsening?

> Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO:  I think it's stable. . . . I do participate every day in originations myself, and it keeps me apprised of what's happening.  I think that that situation has stabilized.  *I don't see any deterioration in the quality of those loans being originated.*

> Eric Sieracki - Countrywide Financial Corp. - CFO, Treasurer: I would echo those sentiments.  We are running over *80% premier in A.  We operate at the very top end of the nonprime credit spectrum.  The FICO scores have remained very steady, just over 600.*

741.   The statements by Defendants Kurland, Mozilo and Sieracki during the July 26, 2005 Conference Call were materially false and misleading when made.  Specifically, Defendant Kurland's statements that Pay Option ARMs are "a very high-quality product" and "highest FICO, very good LTV product" were false and misleading for the same reasons set forth in Sections IV.E and IV.B above.   Defendant Mozilo's statement that "the people that Countrywide is accepting under this program [for Pay Option ARMs] . . . are of much higher quality" was false and misleading for the same reasons stated in Sections IV.E and IV.B above. Defendant Sieracki's statements that Countrywide "operate[s] at

1 the very top end of the nonprime credit spectrum and that the FICO scores have
2 remained very steady, just over 600" were false and misleading for the same
3 reasons set forth above and in Sections IV.B and IV.C. Mozilo's statement that
4 he was "not aware of any loosening of underwriting standards that creates a less .
5 . . quality . . . loan than we did in the past" was also false and misleading because
6 Mozilo knew or was reckless in not knowing that Countrywide severely loosened
7 its underwriting guidelines to originate high risk, poor quality loans. See Section
8 IV.C. Mozilo's statements that he was "not aware of any change of substance in
9 underwriting policies" and that he did not view that the Company had "taken any
10 steps to reduce the quality of our underwriting regimen at all," and Kurland's
11 statement that "we have not loosened our standards," were all false and
12 misleading for the same reasons set forth above and in Sections IV.B and IV.C.

13    742. Analysts reacted positively to these materially false and misleading
14 statements. For example, on July 26, 2005, analysts at Deutsche Bank
15 "continue[d] to believe that prospects for CFC are bright over the next 12-18
16 months. We are reiterating our *Buy* rating[s] and $43 target price." Deutsche
17 Bank based its views on the representations of the management that "[t]he
18 company has no intention of keeping subprime production on CFC's balance
19 sheet or holding it at Countrywide Bank."

20    743. Further, several other analysts either raised or maintained their
21 recommendations and earnings estimates for Countrywide as a result of
22 defendants' fraudulent misrepresentations:

23         • Piper Jaffray reported on July 27, 2005 that "[w]e are
24             maintaining our 2005 and 2006 EPS estimates at $4.15 and
25             $4.50, respectively." "Reiterate Outperform." Also, the
26             analysts described Countrywide as a mortgage lender with
27             loans that are "primarily prime credit quality first-lien
28             mortgage loans secured by single-family residences."

- Lehman Brothers reiterated its Overweight rating for Countywide on July 27, 2005.
- Merrill Lynch reported on July 27, 2005 "*Overweight* investment recommendation."

### 12.   Second Quarter 2005 Form 10-Q

744.   On August 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2005, ended June 30, 2005, signed by Defendants Kurland and Sieracki.   The Company reported revenues for the quarter of $2,307,943,000 and diluted earnings per share of $0.92.

745.   The Company also reported that the impairment of the fair value of its retained interests equaled $97,629,000.

746.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

747.   In a section titled "Securitizations," the Company reported that the fair value of is MSRs as of June 30, 2005 was $9,367,666,000.

748.   The Company reported allowance for loan losses of $155,962,000 as of the end of the quarter, having increased its provision for loan losses by only $36,723,000 during the quarter.  Net charge-offs equaled $5,807,000.

749.   Countrywide reported consolidated mortgage loans held for investment for the quarter ended June 30, 2005, as follows: prime mortgage loans equaled $40,071,009,000, prime home equity loans equaled $15,890,115,000, and subprime loans equaled $235,838,000 or less than 1% of total mortgage loans held for investment.

750. In the Form 10-Q, the Company also reported the volume of Mortgage Banking nonprime mortgage and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $6,875,000,000. Mortgage Banking nonprime mortgage loans originated during the quarter equaled $9,670,000,000, and was 9.5% of the total Mortgage Banking loans produced for the quarter.

751. The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk . . . *by retaining high credit quality mortgages in our loan portfolio.*"

752. The Company also reported in the Form 10-Q management's review of the Company's disclosure controls and internal controls:

> There has been no change in our internal control over financial reporting during the quarter ended June 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. . . .

753. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

754. The statements contained in the Form 10-Q above were materially false and misleading when made. As set forth in greater detail above, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above.

Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.   Also, the statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.   Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false and misleading because Countrywide severely loosened its underwriting guidelines during the Class Period to increase loan volume without regard to loan quality.   See Section IV.C above.   The statements relating to internal controls were false and misleading for the same reasons set forth in Section IV.G.7.   Moreover, the SOX certifications signed by Defendants Mozilo and McLaughlin were false and misleading for the same reasons stated in Section IV.G above.

### 13.   September 13, 2005 Lehman Brothers Financial Services Conference

755.   Defendant Mozilo participated in a conference call with analysts held at Lehman Brothers Financial Services on September 13, 2005 (the "September 13, 2005 Conference Call").   Mozilo praised the Company's ongoing success and accounted for it by claiming that Countrywide properly managed credit risk:

> [A]ll business activities are managed with ongoing safety and soundness of Countrywide as our primary concern.  . . . With all business lines the majority of credit risk is sold or transferred to third parties with exposure primarily limited to three areas -- number one, the bank loan portfolio, while sizable at 56 billion, is **limited to prime quality residential mortgage loans only** . . . . **Conservative**

1       *underwriting standards are evidenced by the quality of the*
2       *portfolio. . . .*"

3

4       Credit risk is also retained primarily from the securitization of prime
5       home equity and nonprime loans. . . . [T]his exposure . . . adds 1.4
6       billion [and] accounts for less than 1% of total company assets . . . is
7       only 2% of the total amount of loans that have been originated and
8       securitized by Countrywide and are still outstanding.  Last is our
9       exposure to rep[resentations] and warranties and all loans originated
10      and sold *which are primarily prime quality.*

11      756.  Similarly, during the September 13, 2005 Conference Call, Mozilo
12      again touted the high quality of its loans and the conservative underwriting
13      guidelines at the Company:

14      From a risk management perspective *loan underwriting guidelines*
15      *are conservative and under constant review . . . In regard to pay*
16      *option loans and interest only loans, each comprise 27% of the*
17      *portfolio and have an average FICO score above 700.*

18      757.  Defendant Mozilo's statements on the September 13, 2005
19      Conference Call were materially false and misleading when made.  Specifically,
20      Mozilo's statement that Countrywide's "[c]onservative underwriting standards
21      are evidenced by the quality of the portfolio" was false and misleading because
22      Countrywide classified its subprime loans as prime loans, and also for the reasons
23      set forth in Section IV.D above.  Mozilo's statement that Pay Option ARMs have
24      an "average FICO score above 700" was false and misleading for the reasons set
25      forth in Sections IV.E and IV.B.2 above.

26      **14.   Third Quarter 2005 Form 8-K**

27      758.  On October 27, 2005, Countrywide filed a Form 8-K, signed by
28      Laura Milleman, that attached a press release announcing strong growth in the

1   Company's financial results for the third quarter of 2005, ended September 30,
2   2005.  In the October 27, 2005 press release, Countrywide reported gain-on-sale
3   of loans and securities $1,284,992,000 for the quarter.

4       759.  The Company's reported value of gain-on-sale of loans and
5   securities was materially false and misleading when made because Countrywide
6   materially overstated the fair value of its retained interests and MSRs, and also
7   for the same reasons set forth in Sections IV.G.4 and IV.G.5 above.

8              **15.    Third Quarter 2005 Conference Call**

9       760.  During a conference call held later the same day (the "October 27,
10  2005 Conference Call") in which Defendants Mozilo, Kurland and Sieracki
11  participated, the Company's senior management discussed the third quarter 2005
12  financial results.  Mozilo discussed the "high quality" of Countrywide's Pay
13  Option ARMs which purportedly allowed the Company to serve its customers
14  better:

15          Pay option ARMs have recently been portrayed negatively.  *But we*
16          *view this product as enabling us to better serve qualified customers*
17          looking for a more efficient and flexible way to manage their
18          obligations.  It is also an excellent asset for our portfolio, given our
19          mortgage loan origination, servicing and *risk management*
20          *competencies.  And the prime quality of our pay option borrowers.*

21
22          *. . . Our pay option portfolios have very high credit quality,*
23          *characterized by high FICO scores, solid loan-to-value ratios, and a*
24          *low debt-to-income ratios.*

25      761.  Defendant Mozilo's statements that Pay Option ARMs are "prime
26  quality;" "have very high credit quality characterized by high FICO scores, solid
27  loan-to-value ratios;" and "enabl[e] us to better serve qualified customers" were
28  materially false and misleading when made because Pay Option ARMs were very

risky products that were not used to serve "qualified" customers, but rather high-risk borrowers.  See Sections IV.E and IV.B.2.

762.   Analysts reacted positively to these materially false and misleading statements.  For example, on October 27, 2005, analysts at Piper Jaffray stated in a report that "[w]e could be in for a few more challenging quarters in the mortgage industry, but to us, after the smoke clears, CFC is an obvious winner. CFC's current valuation is near trough valuation levels, setting up an excellent risk/reward opportunity for investors."  Piper Jaffray reiterated its "Outperform" rating for Countrywide's stock.

763.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of defendants' fraudulent misrepresentations:

- Merrill Lynch analysts reported on October 28, 2005 that they "remain[s] Overweight" on Countrywide's stock.
- Credit Suisse First Boston reported on November 8, 2005 "Outperform" for Countrywide.
- Morgan Stanley reported on October 27, 2005 "Overweight" for Countrywide.

## 16.   Third Quarter 2005 Form 10-Q

764.   On November 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the third fiscal quarter of 2005, ended September 30, 2005, signed by Defendants Kurland and Sieracki.  The Company reported revenues for the quarter of $2,711,618,000 and diluted earnings per share of $1.03.

765.   The Company also reported that the impairment of fair value for its retained interests equaled $61,697,000.

766.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the third quarter 2005 Form 10-Q, Countrywide described its representations and warranties exposure associated with the securitization of its loans as follows:

1  "[w]e do not believe that any of our off-balance sheet arrangements have or are
2  reasonably likely to have a current or future material effect on our financial
3  condition, results of operations, liquidity, capital expenditures or capital
4  resources."

5      767.  In a section titled "Securitizations," the Company reported that the
6  fair value of the MSRs as of September 30, 2005 was $11,428,404,000.

7      768.  The Company reported allowance for loan losses for the nine months
8  ended September 30, 2005 of $184,784,000.

9      769.  Countrywide represented in its third quarter 2005 Form 10-Q that it
10  had "a portfolio of mortgage loans held for investment, consisting primarily of
11  Prime Mortgage and Prime Home Equity Loans, which totaled $62.2 billion at
12  September 30, 2005."  Specifically, Countrywide reported prime mortgage and
13  prime home equity loans held for investment that equaled $45,664,924,000 and
14  $15,314,508,000, respectively, and nonprime mortgage loans held for investment
15  were reported at $263,973,000, or less than 1% of total mortgage loans held for
16  investment.

17      770.  In the Form 10-Q, Countrywide also reported the volume of
18  Mortgage Banking nonprime and prime home equity loans produced (which was
19  included in Countrywide's total volume of Mortgage Banking loans produced).
20  Specifically, Mortgage Banking prime home equity loans originated during the
21  quarter equaled $10,344,000,000.  Mortgage Banking nonprime loans originated
22  during the quarter equaled $11,399,000,000, and was 8.7% of total Mortgage
23  Banking loans originated during the quarter.

24      771.  Moreover, the Company boasted in the Form 10-Q as to the high
25  quality of its loans: The Company "retain[s] high credit quality mortgages in [its]
26  loan portfolio[ ]" and "[o]ur pay-option loan portfolio has [a] very high initial
27  loan quality, with original average credit rating . . . of 720 and original loan-to-
28  value and combined loan-to-values of 74% and 78%, respectively."

772.   The Company also reported in the Form 10-Q management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. . . ."

773.   Further assuring investors of the veracity of the information contained in the third quarter 2005 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

774.   The statements contained in the third quarter 2005 Form 10-Q above were materially false and misleading when made.  Specifically, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above.  Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Also, the statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.  Moreover, the representations that Countrywide "retain[s] high credit quality mortgages in [its] loan portfolio[]" and "[o]ur pay-option loan portfolio has [a] very high initial loan quality, with original average credit rating . . . of 720" were false and misleading because Countrywide severely loosened its underwriting guidelines to increase loan volume without regard to loan quality.  See Sections IV.C and IV.E above.

The statements relating to internal controls were false and misleading for the same reasons set forth in Section IV.G.7.  Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

### 17.   Year End 2005 Form 8-K

775.   On January 31, 2006, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release that announced the Company's financial results for the fourth quarter and year ended December 31, 2005. Countrywide recorded gain-on-sale of loans and securities of $4,861,780,000 for the year ended December 31, 2005.

776.   The Company's reported value for its gain-on-sale was materially false and misleading when made because Countrywide materially overstated the fair value of its retained interests and MSRs, and also for the same reasons stated in Sections IV.G.4 and IV.G.5 above.

### 18.   Year End 2005 Conference Call

777.   Defendants Mozilo and Sieracki participated on a conference call held later that same day to discuss the Company's 2005 financial results (the "January 31, 2006 Conference Call").  In that call, Defendant Mozilo emphasized the Company's purported "high quality" assets that continued to generate substantial earnings growth:

> The amount of pay option loans in the Bank's portfolio now stands at 26 billion, up from 22 billion last quarter. . . . It's important to note that our *loan quality remains extremely high.*

778.   Mozilo's statement on the January 31, 2006 Conference Call above was materially false and misleading when made because Countrywide loosened and abandoned its underwriting standards to increase the volume of loans originated without regard to quality.  See Sections IV.B and IV.C.

779.  Analysts reacted positively to Mozilo's materially false and misleading statements above.  For example, on February 1, 2006, analysts at Stifel Nicolaus stated in a report:

> [W]e are reiterating our Buy rating on the shares and $48 target price, which represents 9x our 2007 estimate of $5.30.  In addition, we are placing the shares of Countrywide Financial Corp. on the Stifel Nicolaus Select List as our Compelling Idea . . . . we favor CFC at current levels as a *higher quality, lower risk* way to play our investment thesis.

780.  Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of defendants' fraudulent misrepresentations:

- AG Edwards reported on February 1, 2006 that "[w]e are maintaining our 2006 EPS estimate of $4.15 and reiterating our Buy rating and $41 price objective."
- On February 3, 2006, Citigroup reported that "[w]e continue to view CFC as a cheap growth company which is well positioned during the current 'inflection period' in mortgage finance."  In part, Citigroup decision was based upon Countrywide's representations that "the company has experienced immaterial credit losses over its 35 years in the mortgage banking business."
- Credit Suisse reported on February 8, 2006 that it rated Countrywide as "Outperform."

### 19.    2005 Form 10-K

781.  On March 1, 2006, Countrywide filed its Annual Report for 2005 with the SEC on Form 10-K.  The report was signed by Defendants Mozilo, Kurland, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis,

Heller, Melone, Parry, Robertson, Russell and Snyder. In the 2005 Form 10-K, the Company reported revenues of $10,016,708,000 and diluted earnings per share of $4.11.

782. In a section of the 2005 Form 10-K titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the retained interests on the Company's balance sheet as of December 31, 2005 was $2,675,461,000. Further, the Company reported an impairment in the fair value of its retained interests that equaled $364,506,000.

783. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2005 Form 10-K, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

784. In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of representations and warranties "total[ed] $169.8 million."

785. In a section titled "Securitizations," the Company reported that the fair value of its MSRs as of December 31, 2005 was $12,720,755,000, in comparison to $8,882,917,000 as of December 31, 2004.

786. The Company reported allowance for loan losses of $189,201,000 in its 2005 Form 10-K, having increased its provision for loan losses by $115,685,000 during the year. The Company also had net charge-offs of $25,173,000.

787. Countrywide reported in its 2005 Form 10-K that prime mortgages and prime home equity loans held for investment equaled $48,619,590,000 and $14,991,351,000, respectively, and nonprime mortgage loans held for investment

1    equaled $255,677,000, or less than 1% of total mortgage loans held for
2    investment.

3        788.  In the 2005 Form 10-K, the Company also reported the volume of
4    Mortgage Banking nonprime and prime home equity loans produced (which was
5    included in the total volume of loans produced).  Specifically, Mortgage Banking
6    prime home equity loans originated during the year equaled $33,334,000,000.
7    Mortgage Banking nonprime mortgage loans originating during the year equaled
8    $40,089,000,000, and was 9.3% of the total Mortgage Banking loans originated
9    for the year ended.

10       789.  Moreover, the Company stated the following in the 2005 Form 10-K
11   as to the purported high quality of its loans:

12       The majority of our loan production consists of Prime Mortgage
13       loans[;] . . . [o]ur pay-option loan portfolio has a relatively high initial
14       loan quality, with original average FICO scores . . . of 720 and
15       original loan-to-value and combined loan-to-values of 75% and 78%,
16       respectively.

17       790.  In a section of the 2005 Form 10-K titled "Mortgage Credit Risk,"
18   the Company described its Credit Policy, portraying it as a tightly controlled and
19   supervised process designed to produce "loans [that] are salable in the secondary
20   mortgage market" through a rigorous pre-loan screening procedure and post-loan
21   auditing and appraisal and underwriting reviews:

22       **Loan Quality**

23       Our credit policy establishes standards for the determination of
24       acceptable credit risks.  Those standards encompass borrower and
25       collateral quality, underwriting guidelines and loan origination
26       standards and procedures.

27
28

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through . . . manual or automated underwriting. . . . Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work. . . . We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

We supplement our loan origination standards and procedures with a post-funding quality control process. Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and if necessary, a fraud investigation.

791. Further, Countrywide represented in its 2005 Form 10-K that it managed its credit risk by retaining high credit quality mortgages: "[w]e manage mortgage credit risk . . . by *retaining high credit quality mortgages in our loan portfolio.*"

1   792. KPMG issued an audit report on management's assessment of the
2   Company's internal control over financial reporting, in accordance with the
3   standards of the Public Company Accounting Oversight Board. In a report dated
4   February 27, 2006, KPMG stated:

5       We conducted our audit in accordance with the standards of the Public
6       Company Accounting Oversight Board (United States).   In our
7       opinion, management's assessment that the Company maintained
8       effective internal control over financial reporting as of December 31,
9       2005, is fairly stated, in all material respects, based on criteria
10      established in Internal Control—Integrated Framework issued by the
11      Committee of Sponsoring Organizations of the Treadway
12      Commission (COSO). . . . We also have audited, in accordance with
13      the standards of the Public Company Accounting Oversight Board
14      (United States), the consolidated balance sheets of Countrywide
15      Financial Corporation and subsidiaries as of December 31, 2005 and
16      2004, and . . . expressed an unqualified opinion on those consolidated
17      financial statements.

18  793. Further assuring investors of the veracity of the information
19  contained in the Form 10-K, the report included SOX certifications signed by
20  Defendants Mozilo and Sieracki, representing that the "report does not contain
21  any untrue statement of a material fact" and "the financial statements, and other
22  financial information included in this report, fairly present in all material respects
23  the financial condition" of Countrywide and that the Company employed internal
24  disclosure controls and procedures that detect "[a]ll significant deficiencies and
25  material weaknesses in the design or operation of internal control over financial
26  reporting" and "[a]ny fraud, whether or not material, that involves management."

27  794. The statements referenced above in Countrywide's 2005 Form 10-K
28  were materially false and misleading when made. As set forth in greater detail

above, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above. Further, the statements relating to the volume of prime home equity and nonprime loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans to inflate volumes of prime loans, and for the same reasons set forth in Section IV.D. Moreover, the statements that Countrywide "retain[ed] high credit quality mortgages in our loan portfolio" and that its loan origination standards and procedures were designed to produce "loans [that] are salable in the secondary mortgage market" and "[o]ur pay-option loan portfolio has a relatively high initial loan quality, with original average FICO scores . . . of 720" were false and misleading because Countrywide severely loosened and abandoned its underwriting practices to boost loan volume without regard for loan quality. See Sections IV.C and IV.E above. Defendant KPMG's 2005 unqualified audit opinion report and assessment of management's internal controls was false and misleading for the same reasons stated in Sections IV.G.7 and VI above. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

## 20.   March 30, 2006 Countrywide Equity Investors Forum

795. On March 30, 2006, Countrywide hosted a Financial Equity Investors Forum (the "March 30, 2006 Conference") in which Defendants Mozilo, Kurland, Sambol, Sieracki, and Garcia participated. Defendant Sambol commented on the Company's culture. He stated that while the Company focuses

on competition offensively, at the same time it was "supplemented by a strong
defense" or otherwise strong internal control:

> We're extremely competitive in terms of our desire to win, and we
> have a particular focus on offense, which at the same time is
> supplemented by a strong defense as well, meaning that we have an
> intense and ongoing focus on share growth while at the same time
> *maintaining a very strong internal control environment and what we*
> *believe is best-of-class governance. . . .   [O]ur culture is also*
> *characterized by a very high degree of ethics and integrity in*
> *everything that we do.*

796.   At the March 30, 2006 Conference, Garcia responded to a question
from an audience member inquiring whether or not the Company properly
reserved for loan losses.  Garcia responded that Countrywide properly reserved
for loan losses because of the very high quality of the loans that Countrywide
originated:

> Unidentified Audience Member:  Carlos, can you talk a little bit about
> your credit expectations and your bank portfolio and also your reserve
> methodology and how would you answer critics who feel that you're
> under-reserving in that portfolio, given the amount of pay option
> ARMs and I[nterest] O[nly] [mortgage loans]?
>
> Carlos Garcia - Countrywide Financial - EMD and Chief of Banking: .
> . . the pay options that we're originating are very *high-quality pay*
> *options*, both in terms of FICO and LTV, as well as other credit
> attributes that we look at. . . .  Also, our pay option reduction is
> originated through the Countrywide['s] channels and is a *beneficiary*
> *of strong underwriting* . . . .  So we think we understand the risk very
> well. . . .

\* \* \*

In terms of our reserves and charge-offs, I would have you look at our charge-off experience and relate it to our reserves. Our reserves are around 18 basis points and our charge-off experience is something like in the neighborhood of two to three basis points. And so there's a multiples of the charge-off experience in the reserve, we have reserved not based on our historical experience, because we've been growing a new book, so we've looked at all of these different scenarios and *made many conservative assumptions and based our [loan loss] reserves on that.*

797. Defendant Mozilo also spoke during the Conference about his ownership and sales of Countrywide's stock. Mozilo claimed that he sold his Countrywide stock pursuant to a 10b5-1 plan and "had no control over it":

Lisa Riordan – Countrywide Financial - EVP Investor Relations: Great. Some people feel that insider ownership is a little low. Can you comment on this?

Angelo Mozilo – Countrywide Financial - Chairman and CEO: . . . Now, in my case, I own about a quarter of a [billion] [shares]. I don't know what the scope of what you think is wealthy, but I own about 250 some-odd [m]illion, 260 [m]illion, if I can read that right, between the stock and options that I hold and small amount of incentive stock, which I just think has just vested. And the only thing -- I've not sold any shares for years. . . . *But in recent years I've sold no stock and I have no intention of selling any stock.*

The only thing I've sold are options that are expiring. And I have a group that you've seen, those of you that follow, have seen me sell a

1    certain amount of shares every week that's under a [10b5-1 plan] *so I*
2    *have no control over it.* And I think the last exploration is either May
3    or June of this year and I have options in the outer years. So *I've only*
4    *sold those that I've been compelled to sell because I really believe in*
5    *this company*, I believe we're just at the threshold of our greatness.

6    798.  The statements made during the March 30, 2006 Conference above
7    were materially false and misleading when made. Defendant Sambol's
8    statements that the Company had "a very strong internal control environment"
9    and that management had a "very high degree of ethics and integrity" were false
10   and misleading because Countrywide's internal controls over financial reporting
11   were ineffective.  See Section IV.G.7.  Defendant Garcia's statement that the
12   Company's loan loss reserves were proper because its Bank pay-option ARM
13   loans were "very high-quality pay options both in terms of FICO and LTV" was
14   false for the reasons set forth in Sections IV.G.1 and IV.E above.  Defendant
15   Mozilo's statement that he sold his Countrywide stock pursuant to a 10b5-1 plan
16   and "had no control over it" was false for the reasons set forth in Section V
17   above.

18   799.  Analysts reacted positively to Countrywide's materially false and
19   misleading statements.  For example, on March 31, 2006, Citigroup analysts
20   reiterated a "Buy" rating for Countrywide's shares based in part on
21   management's false "upbeat assessment of CFC's positioning & growth prospects
22   during the current mortgage downturn [at the investor forum]."

23   **D.    The Company's False Statements Regarding 2006 Results**

24   **1.    First Quarter 2006 Form 8-K**

25   800.  On April 27, 2006, Countrywide filed a Form 8-K, signed by Laura
26   Milleman, attaching a press release that announced the Company's financial
27   results for the first quarter of 2006, ended March 31, 2006.  The Company

28

1    reported a slight decrease in year-over-year earnings. In the press release, Mozilo
2    attributed the decrease to an increasingly challenging environment.

3    801. Countrywide reported gain-on-sale of loans and securities of
4    $1,361,178,000 for the quarter.

5    802. Countrywide's statements contained in the April 27, 2006 Form 8-K
6    and press release were false and misleading. Mozilo's statement that the decrease
7    in the Company's earnings was due to a "challenging environment" was false and
8    misleading for the reasons set forth in Sections IV.B and IV.C. Specifically, the
9    Company's reported gain-on-sale was false because the Company materially
10   overstated the fair value of its retained interests and MSRs. See Sections IV.G.4
11   and IV.G.5.

12                    **2.    First Quarter 2006 Conference Call**

13   803. On a conference call held later that same day ("April 27, 2006
14   Conference Call"), in which Defendant Mozilo, Sieracki, Kurland and Garcia
15   participated, the Company's senior management discussed the first quarter 2006
16   financial results and the financial outlook for the second quarter of 2006.
17   Specifically, Defendant Mozilo emphasized that even with challenges in the
18   mortgage industry, the Company still increased profitability while also increasing
19   its loan loss provision by $44 million:

20        For the first quarter of 2006, the Company also experienced a $44
21        million increase in the consolidated provision for loan losses. ***This***
22        ***increase was primarily a result of growth and seasoning of the***
23        ***investment loan portfolio***.

24   804. During the April 27, 2006 Conference Call, Mozilo highlighted the
25   purported quality of the Company's Pay Option ARM loans:

26        It's important to note that ***our pay option loan quality remains***
27        ***extremely high.*** Original CLTVs and original loan to values are 78%

28

---

and 75% respectively.   Average FICO scores on the pay option portfolio are over 720.

805.   The statements made during the April 27, 2006 Conference Call above were materially false and misleading when made.  Specifically, Defendant Mozilo's statement regarding the reasons why Countrywide increased its loan loss provision by $44 million was false and misleading for the reasons set forth in Section IV.G.1 above.  Mozilo's statements that Countrywide's "pay option loan quality remains extremely high" and its "[a]verage FICO scores on the pay option portfolio are over 720" were false and misleading for the same reasons set forth in Sections IV.E and IV.B.2 above.

806.   Analysts reacted positively to these materially false and misleading statements.  For example, on May 1, 2006, Merrill Lynch analysts reiterated a "Buy" rating for Countrywide stock.   Their opinion was based in part on Countrywide's credit reserves in the first quarter.  Specifically, Merrill Lynch analysts reported that, "CFC provisioned for $63M in credit losses in Q1'06, meaningfully higher than the $24M in Q4'05, though *credit appears quite strong.*"

807.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Countrywide's misrepresentations:

- AG Edwards reported on April 27, 2006 that "[w]e are raising our 2006 and 2007 EPS estimates by $0.20 each to $4.50 and $4.90, respectively.   We remain bullish on CFC. . . ."
- Credit Suisse First Boston rated Countrywide "Outperform" on May 3, 2006.
- Morgan Stanley rated Countrywide as "Overweight" on May 10, 2006.

### 3.   First Quarter 2006 Form 10-Q

808.   On May 10, 2006, Countrywide filed its quarterly report on Form 10-Q for the first fiscal quarter of 2006, ended March 31, 2006, signed by Defendants Kurland and Sieracki.   The Company reported revenues for the quarter of $2,835,948,000, and diluted earnings per share of $1.10.

809.   The Company reported that the impairment of the fair value of its retained interest for the quarter equaled $120,654,000.

810.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

811.   In a section titled "Credit Risk Management," the Company reported the liabilities associated with the risk of representations and warranties that "totaled $271.9 million at March 31, 2006 . . . ."

812.   In a section titled "Securitizations," the Company reported that the fair value of its MSRs was $14,171,804,000 as of March 31, 2006.

813.   The Company reported allowance for loan losses of $172,271,000 as of March 31, 2006.   The Company also allocated $37,927,000 from the quarter's beginning balance to other assets.   Also, net charges-offs equaled $28,494,000.

814.   Countrywide also reported loans held for investment, as follows: prime mortgages and prime home equity loans held for investment equaled $53,463,593,000 and $14,963,131,000, respectively.   Nonprime mortgage loans held for investment equaled $324,040,000, or less than 1% of total mortgage loans held for investment.

815.   In the Form 10-Q, the Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was

1 || included in the total Mortgage Banking volume of loans produced for the quarter-

2 || ended). Mortgage Banking prime home equity loans originated during the quarter

3 || equaled $9,528,000,000. Mortgage Banking nonprime mortgage loans originated

4 || during the quarter equaled $8,099,000,000, and was 8.7% of the total Mortgage

5 || Banking loans originated.

6     816. Moreover, in the Form 10-Q, the Company touted the high quality of

7 || its loans:

8     "[W]e have a portfolio of mortgage loans held for investment,

9     consisting *primarily of Prime Mortgage and Prime Home Equity*

10     *Loans . . .*" and "[w]e view [pay option adjustable rate] loans as a

11     profitable product that does not create disproportionate credit risk.

12     Our pay-option loan portfolio has *very high initial loan quality, with*

13     *original average FICO scores (a measure of credit rating) of 721*

14     *and original loan-to-value and combined loan-to-values of 75% and*

15     *78%, respectively.*"

16     817. With respect to management's review of the Company's disclosure

17 || controls and internal controls, it reported: "There has been no change in our

18 || internal control over financial reporting during the quarter ended March 31, 2006

19 || that has materially affected, or is reasonably likely to materially affect, our

20 || internal control over financial reporting."

21     818. Further assuring investors of the veracity of the information

22 || contained in the Form 10-Q, the report included SOX certifications signed by

23 || Defendants Mozilo and Sieracki, representing that the "report does not contain

24 || any untrue statement of a material fact" and "the financial statements, and other

25 || financial information included in this report, fairly present in all material respects

26 || the financial condition" of Countrywide.

27     819. The statements contained in the first quarter 2006 Form 10-Q above

28 || were materially false and misleading when made. Specifically, the Company's

reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated.  See Section IV.G above.  Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Also, management's statements regarding the quality of the volume of loans produced and loans held for investment were false and misleading because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.  Moreover, the representations that Countrywide "view[s] [Pay Option ARM] loans as a profitable product [with] very high initial loan quality" and "portfolio of mortgage loans held for investment, consisting  primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality.  See Sections IV.E, IV.D and IV.C.  The statements relating to internal controls were false and misleading because Countrywide's internal controls over financial reporting were ineffective.  See Section IV.G.7.  Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

### 4.    May 17, 2006 American Financial Services Association Finance Industry Conference for Fixed Income Investors

820.   On May 17, 2006, Countrywide participated in the American Financial Services Association's Finance Industry Conference for Fixed Income Investors ("May 17, 2006 Conference").  At the conference, Vincent Breitenbach, Countrywide's Managing Director of Treasury Finance, discussed the Company's