1  credit risk management and emphasized that Countrywide limited its credit risk
2  by underwriting loans with "strong FICO scores":

3      [W]e do have a very healthy conservative approach to credit. . . . We
4      talked about some of the metrics that we look at while underwriting
5      credit. ***We want strong FICO scores, we want high down payments***
6      ***or low LT[V]s.***

7      821.  At the May 17, 2006 Conference, Breitenbach described the type of
8  borrowers that Countrywide targeted for ARM loans in order to maintain high
9  credit quality:

10      In our view the most important risk associated with th[e] [pay-option
11      ARM] product . . . is to ensure that the borrower is not using that
12      optionality just get in the house. . . . The type of customer we're
13      looking for is someone who is a salesperson who may have some
14      variability in their monthly pay, an investment banker who has 11
15      months of reasonably good pay and then hopefully has one really
16      good month when he gets a bonus. We have a lot of ***fairly rich people***
17      in there who are looking at this product as an arbitrage opportunity. If
18      you can borrow money against a $2 or $3 million house at 3, 4, 5%,
19      then you can go out and invest in the market at a significantly greater
20      rate. People we use -- ***some rich people at least*** -- will use this as an
21      arbitrage type of a vehicle. So these are the type of customers that
22      we're looking for.

23      822.  At the May 17, 2006 Conference, Breitenbach also stated that
24  Countrywide guarded against having subprime loans in its portfolio at the Bank:

25      The way that we guard against not having sub-prime people in our
26      portfolio is a couple of different things. First of all the FICO scores
27      would indicate to us that from a historical perspective, this guy is
28      showing the ability and the propensity to pay on time with ***a 727***

*average FICO score.* And by the way, *the dispersion around that mean is pretty tight.* Again, *we're not trying to fool you* and we're certainly not going to fool ourselves by putting in a bunch of lower quality borrowers into the portfolio.

823. The statements referenced above during the May 17, 2006 Conference Call were materially false and misleading when made. Importantly, after the call, the Officer Defendants did not issue corrections to any of Breitenbach's statements. Specifically, Breitenbach's statements that the Company has "a very healthy conservative approach to credit" and that the Company "want[s] strong FICO scores" and "low LT[V]s" were false and misleading because Countrywide severely loosened and eventually abandoned its underwriting standards to increase loan volume without regard to loan quality. See Sections IV.B and IV.C. In addition, Breitenbach's statements relating to borrowers who are "fairly rich" and sophisticated for the Company's Pay Option ARMs were misleading for the same reasons set forth in Sections IV.E and IV.B.2 above. Lastly, Breitenbach's statement that Countrywide "guards against not having sub-prime people in our portfolio" at the Bank was false and misleading for the same reasons set forth in Sections IV.C and IV.B above.

### 5.    Second Quarter 2006 Form 8-K

824. On July 25, 2006, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release that announced the Company's financial results for the second quarter of 2006, ended June 30, 2006. In the press release, Countrywide reported gain-on-sale of loans and securities in the amount of $1,527,450,000 for the quarter.

825. The Company's reported gain-on-sale revenue was materially false and misleading when made because the Company overstated its retained interests and MSRs. See Sections IV.G.4 and IV.G.5.

1

### 6.    Second Quarter 2006 Conference Call

2    826.   There was a conference call held later the same day ("July 25, 2006

3    Conference Call") in which Defendants Mozilo, Sieracki, Kurland and Garcia

4    participated, during which the Company's senior management discussed the

5    second quarter 2006 financial results.   An analyst from Bear Stearns asked

6    Defendant Mozilo about real estate appraisal values and whether Countrywide

7    used internal or external appraisers.  In response, Mozilo touted the quality of the

8    Company's appraisers, stating that Countrywide has very high quality internal

9    and external appraisers:

10           Well, we have a panel of appraisers, approved appraisers, that work

11           through LandSafe. . . . We do have internal appraisers to review the

12           work of outside appraisers, so the answer to both is yes. *Again, we'll*

13           *only use our own approved appraisers, and that panel is screened*

14           *very carefully from time to time to make sure that we're getting rid*

15           *of the bad ones and we're only putting in good ones.*

16    827.   Defendant Mozilo's statement that Countrywide "get[s] rid of the

17    bad [appraisers] and we're only putting in good ones" was materially false and

18    misleading when made for the reasons set forth in Section IV.C above.

19    828.   Analysts reacted positively to the Company's materially false and

20    misleading statements. For example, on July 25, 2006, analysts at Citigroup rated

21    Countrywide's stock a "Buy" with "Medium risk."

22    829.   Further, several other analysts either raised or maintained their stellar

23    recommendations and earnings estimates for Countrywide as a result of its

24    misrepresentations:

25           •    Morgan Stanley reported on July 25, 2006 that they

26                "[m]aintain buy rating and $45 price target."

27

28

- Stifel Nicolaus reported on July 26, 2006 that "we continue to believe CFC is well positioned to grow through the more challenging mortgage environment ahead."
- On July 26, 2006, Piper Jaffray reported that "[we are] still very comfortable with CFC's credit quality . . . [w]e reiterate our Outperform rating and our $62 target."

### 7.    Second Quarter 2006 Form 10-Q

830.   On August 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the second fiscal quarter of 2006, ended June 30, 2006, signed by Defendants Kurland and Sieracki.   The Company reported revenues for the quarter of $3,000,216,000 and diluted earnings per share of $1.15.

831.   The Company reported that the recovery of fair value for its retained interests equaled $51,498,000.

832.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

833.   Countrywide also represented that it assumed risk with its representations and warranties when it underwrote loans to the secondary market. Management stated that: "[t]he liability associated with this risk totaled $307.6 million at June 30, 2006 and $169.8 million at December 31, 2005."

834.   In a section titled "Securitizations," the Company reported that the fair value of the MSRs at June 30, 2006 was $15,320,575,000.

835.   The Company's reported allowance for loan losses for the six months ended June 30, 2006 of $183,581,000.

836.   Countrywide reported mortgages held for investment in the second quarter 2006 Form 10-Q.  Prime mortgage loans and prime home equity loans equaled  $55,433,612,000  and  $19,081,303,000,  respectively.   Nonprime mortgage loans held for investment equaled $9,290,000, or less than 1% of total mortgage loans held for investment.

837.   The volume of Mortgage Banking loans originated for the quarter by mortgage loan type, was reported as follows:  prime, prime home equity, and nonprime  loans  amounted  to  $82,229,000,000,  $10,171,000,000,  and $11,235,000,000, respectively.

838.   Moreover, the Company made a representation in the Form 10-Q as to the purported high quality of its loans:

> "[W]e have a portfolio of mortgage loans held for investment, *consisting primarily of Prime Mortgage and Prime Home Equity Loans . . .*" and "[o]ur pay-option investment loan portfolio borrowers had, at the time the loans were originated, average FICO scores (a measure of borrower creditworthiness) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively."

839.   The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

840.   Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

841.   The statements contained in the second quarter 2006 Form 10-Q were materially false and misleading when made.   Specifically, the Company's reported values for its revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated. See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.   Also, management's statements regarding the quality of the volume of loans produced and loans held for investment were also false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section IV.D above.   Moreover, the representations that "[o]ur pay-option investment loan portfolio borrowers [had] . . . average FICO scores . . . of  721" and "[our] portfolio of mortgage loans held for investment, consist[ed] primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because the Company loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality.   See Sections IV.E, IV.B.2, IV.D and IV.C.   The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective.   See Section IV.G.7.   Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

## 8.   September 12, 2006 Equity Investors Forum

842.   On September 12, 2006, Countrywide held an Equity Investor Forum (the "September 12, 2006 Conference") in which Defendants Mozilo, Sambol and Sieracki participated.   Jim Furash, Countrywide's Senior Managing Director and President of Countrywide Bank, emphasized numerous times during the

conference, without correction or explanation by Mozilo, Sambol or Sieracki, the "high quality" of loans that are held by Countrywide's Bank:

> [W]e have built a very large, fast growing, and very efficient deposit franchise that has enabled Countrywide to invest in a ***top quality mortgage origination***. . . . But essentially our model is investing in ***very low-risk assets today***, and a very low net interest margin.
>
> * * *
>
> ***[I]incredibly strong asset quality at the bank.*** I'd like to emphasize again the large, tangible, high quality balance sheet that we build. . . . ***A very strong portfolio.*** . . . So we're very pleased with the credit decisions that we're making and the returns that we are receiving as a result of those decisions.

843.   Furash also discussed the Company's loan loss reserves, touting that the Company "continue[s] to build . . . reserves in anticipation of any potential threats":

> Obviously the bank's total footings and earnings have been growing substantially over the last years, ***but we've been able to match that growth with our growth and our loan loss reserve.*** So even though we are growing our balance sheet very quickly, ***we continue to build our reserves in anticipation of any potential threats that we see in the portfolio. And again I'm very proud of that ability to maintain this loan loss reserve growth while maintaining our earnings productivity*** that I mentioned earlier.   Again today our loan loss reserve's about $163 million dollars, 21 basis points on assets and that's up three basis points over the last quarter alone I believe.

844.   The statements referenced above during the September 12, 2006 Conference Call were materially false and misleading when made. Specifically, Furash's statement that "Countrywide invests in [ ] top quality mortgage

origination . . . in low risk assets" was false and misleading because Countrywide loosened and abandoned its underwriting guidelines during the Class Period.  See Sections IV.B.2 and IV.C.  Further, Furash's statement that "we continue to build our [loan loss] reserves in anticipation of any potential threats" was false and misleading for the reasons stated in Section IV.G.3 above.

### 9.    September 13, 2006 Fixed Income Investor Forum

845.  On September 13, 2006, Countrywide Financial hosted a Fixed Income Investor Forum ("September 13, 2006 Conference") in which Defendants Mozilo, Sambol and Sieracki participated.  At the conference, Mozilo touted the Company's prudent lending practices as an industry role model:

> Not only did we drive efficiency in the marketplace, but as an industry leader *we served as a role model to others in terms of responsible lending.*

> We take seriously the role of a responsible lender for all of our constituencies. . . . *To help protect our bond holder customers, we engage in prudent underwriting guidelines* . . . .

846.  Mozilo also emphasized Countrywide's minor position in non-prime loans:

> Similarly if the pricing gets tough in a particular product category, we can back off just as we did with non-prime.  *It's only 9% of our production today*, at one point 30%, whereas for monoline non-prime lenders irrational pricing limits their options.

847.  At the same conference, an AIG analyst asked Mozilo about a recent *Wall Street Journal* article that compared securitized mortgage-backed security delinquency rates at Countrywide to Washington Mutual ("WaMu").  Mozilo responded by praising Countrywide and its underwriting practices:

1     One . . . theory that is held by most debt holders is that we

2     continuously have . . . the contingent liability on anything we shoot to

3     securitize, ***irrespective of the fact that it's clear in the documents***

4     ***that we do not.***  But that we would maintain responsibility and

5     maintain our integrity and reputation is a theory that has not held

6     together and it's not real. ***There's no way that that's going to happen***

7     ***because the most important thing to us is the integrity of our***

8     ***company, the financial integrity.***

9     848.   At the September 13, 2006 Conference, Defendant Sambol

10  responded to a question regarding the growth of prime and subprime mortgage

11  loans at Countrywide by claiming that the Company did not heavily participate in

12  subprime loans:

13     ***Our profile in the subprime market has been one where we have, for***

14     ***the most part, been on the sidelines. . . .***  And subprime however,

15     particularly in the third-party channels, the wholesale channel we are

16     in the bottom half of the top 10.  And the reason for that is that -- is

17     that that market we view to have been subject to some irrational

18     conduct.

19

20     So, we view the pricing to be somewhat irrational.  We view what's

21     happened on the credit front to be very liberal. ***And so, we opted not***

22     ***to fully participate, and it's for that reason you haven't seen growth***

23     ***in subprime volume*** as maybe the subprime industry has grown.

24     849.   At the same conference, an audience member asked if Countrywide

25  should consider reducing its capital base because the Company grew so fast, and

26  such high growth rates are likely unsustainable.  Defendant Sieracki responded

27  by emphasizing that the growth rate at Countrywide was not synonymous with its

28

risk appetite and that Countrywide's risk appetite has not changed to assume high risk assets:

> *We're the last ones to think that we should be aggressive and take high risk, there's no change in our risk appetite here*, we're simply perfecting and refining our capital structure and making sure the excess capital doesn't get out of line.  We're talking about equity neutral transactions with hybrid securities, so it's really a matter of refining, perfecting and optimizing our capital structure. . . .  *So I don't want anybody to get the impression that there's been a change in our risk appetite or that we're going to do anything aggressive here.*

850.  At the same conference, Furash discussed the adequacy of Countrywide's loan loss reserves:

> Despite the significant asset growth we've been able to outpace that growth in our loan portfolio with the growth in our reserve.  So again I want to emphasize that *we reserve a very conservative amount based on our expected losses*, and we've been able to outpace our asset growth with our growth in our loan loss reserve provision.  *So management and myself feel very comfortable that we are well reserved for all sorts of economic cycles that we can be.*

851.  The statements referenced above, made during the September 13, 2006 Conference Call, were materially false and misleading when made. Defendant Mozilo's statements that "we served as a role model to others in terms of responsible lending," and that "we engage in prudent underwriting guidelines," were false and misleading because Countrywide loosened and abandoned its underwriting guidelines during the Class Period.  See Sections IV.B and IV.C. Further, Mozilo's statement that subprime loans only consist of "9% of [Countrywide's] production today" was false and misleading for the reasons set

forth in Section IV.C above.  Specifically, subprime loans were being classified as prime loans due to a combination of weakening underwriting standards, exception processing of its loans and managerial policies that encourage quantity of loans, not quality.  This resulted in a deterioration in the creditworthiness of Countrywide's portfolio over the Class Period and an increase in subprime loans. Defendant Sambol's statement that "[o]ur profile in the subprime market has been one where . . . [we are] on the sidelines" and we "opted not to fully participate . . . in subprime" were false and misleading for the reasons set forth in Section IV.C. Additionally, Defendant Mozilo's statement that the "most important thing to [management] is the [financial] integrity of the company" was false and misleading for the reasons stated herein and set forth in Sections IV.G.7 and IV.C.  Defendant Sieracki's statements that there has been no "change in our risk appetite" and "that we're [not] going to do anything aggressive here" were false for the same reasons set forth in Sections IV.B and IV.C above.    Likewise, Furash's statement that "we reserve a very conservative amount [for loan losses] based upon our expected loss" was false and misleading because the Company manipulated its earning by taking inadequate allowances for loan losses.    See Section IV.G.1.

852.  Analysts reacted positively to Countrywide's materially false and misleading statements above.  For example, on September 13, 2006, analysts at Credit Suisse rated Countrywide's stock "Outperform."  Analysts at Credit Suisse based their opinion upon management's false assurances and concluded that "[c]redit quality remains sound at Countrywide, generally better than management's initial expectations.  CLTVs, FICOs and delinquency trends of its $34.2 billion Option ARM portfolio have remained stable over the past three years.  Countrywide has been selling subprime residuals to further reduce credit risk."

853.   In addition, Fox-Pitt Kelton analysts retained a positive outlook on Countrywide's stock.   Fox-Pitt analysts reported on September 13, 2006 that "[w]e [r]emain [p]ositive [o]n CFC [d]espite [t]he [c]hallenging [e]nvironment[.]"

### 10.   Third Quarter 2006 Form 8-K

854.   On October 24, 2006, Countrywide filed a Form 8-K, signed by Laura Milleman, attaching a press release which announced the Company's financial results for the third quarter of 2006, ended September 20, 2006.   In the press release, Countrywide reported gain-on-sale of loans and securities of $1,166,000,000 for the quarter.

855.   The Company's reported gain-on-sale was materially false and misleading when made because Countrywide overstated the fair value for its retained interests and MSRs.   See Sections IV.G.4 and IV.G.5 above.

### 11.   Third Quarter 2006 Conference Call

856.   Later the same day, Countrywide's senior management held a conference call (the "October 24, 2006 Conference Call") in which Defendants Mozilo, Sambol, Sieracki and Garcia participated and discussed the Company's financial results for the third quarter of 2006 and the fourth quarter and year end outlook.   Specifically, Mozilo emphasized that the Company's asset valuation reserves and loan loss reserves were appropriate for the increase in delinquencies that occurred:

> The year-over-year *increase in delinquencies and foreclosures are primarily the result of portfolio seasoning, product mix, and changing economic and housing market conditions. . . .*   The Company believes its asset valuation reserves credit losses are appropriate for the increases in delinquencies.
>
> * * *
>
> The loan loss provision was $28 million in the third quarter of 2006, a decrease of $45 million in the third quarter of 2005. . . .   The

allowance for loan losses was $180 million at September 30, 2006, as compared to $107 million at September 30, 2005. . . . *The increase in delinquencies was in line with manager's expectations* and primarily reflects the seasoning of the bank's loan portfolio.

857.   Defendant Mozilo's statements that "the Company's asset valuation reserves [for] credit losses are appropriate" and Mozilo's statement that "the increase in delinquencies was in line with management's expectations" were false and misleading for the reasons set forth in Section IV.G above.

858.   Analysts reacted positively to these materially false and misleading statements above.  For example, on October 24, 2006, analysts at Piper Jaffray rated Countrywide's stock "Outperform" with low volatility.  Their opinion was based, in part, on Countrywide's "credit quality [being] . . . in line with expectations. . . ."

859.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations above:

- Fox-Pitt, Kelton reported on October 24, 2006 that, "[w]e rate CFC at Outperform and expect this company to be one of the best equipped to weather the housing storm of competition, shrinking market and regulatory scrutiny."

- Morgan Stanley rated Countrywide "Overweight" on October 24, 2006.

- Citigroup rated Countrywide as a "Buy" and stated on October 25, 2006 that "[c]redit was fine – in-line w/mgmt exp[ectations] as the portfolio seasons."

### 12.   Third Quarter 2006 Form 10-Q

860.   On November 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2006, ended September 30, 2006, signed by

Defendants Sambol and Sieracki.  The Company reported revenues for the quarter of $2,822,495,000, and diluted earnings per share of $1.03.

861.  The Company reported in the Form 10-Q that the impairment of its retained interests equaled $141,857,000.

862.  In the "Off-Balance Sheet Arrangements and Guarantees" section of the third quarter 2006 Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

863.  The Company also reported the amount of credit risk it assumed as a result of its representations and warranties of its mortgage loans: "The liability associated with this risk totaled $303.5 million at September 30, 2006. . . ."

864.  In a section of the Form 10-Q titled "Securitizations," the Company reported that the fair value of the MSRs at September 30, 2006 was $15,018,415,000.

865.  The Company reported allowance for loan losses of $207,987,000, having increased its provision for loan losses by $37,996,000 during the quarter.

866.  Countrywide reported prime mortgage and prime home equity loans held for investment that amounted to $55,486,886,000 and $19,625,354,000, respectively.  In addition, nonprime mortgage loans held for investment equaled $25,823,000, or less than 1% of total mortgage loans held for investment.

867.  The volume of Mortgage Banking prime, prime home equity and nonprime loans originated during the quarter equaled $87,713,000,000, $9,203,000,000, and $9,336,000,000, respectively.

868.  Moreover, the Company represented as to the high quality of its loans, "we have a portfolio of mortgage loans held for investment, consisting

1  *primarily of Prime Mortgage and Prime Home Equity Loans. . . .*" and "[o]ur

2  pay-option investment loan portfolio borrowers had, at the time the loans were

3  originated, *average FICO scores (a measure of borrower creditworthiness) of*

4  *721 and original loan-to-value and combined loan-to-values of 75% and 78%,*

5  *respectively.*"

6      869. The Company described its management of credit risk in the

7  following terms:

> We manage mortgage credit risk by underwriting our mortgage loan
> production to secondary market standards and by limiting credit
> recourse to Countrywide in our loan sales and securitization
> transactions. *We also manage credit risk in our investment loan*
> *portfolio by retaining high credit quality loans*, through pricing
> strategies designed to compensate for the risk. . . .

14      870. The Company also reported management's review of the Company's

15  disclosure controls and internal controls: "There has been no change in our

16  internal control over financial reporting during the quarter ended September 30,

17  2006 that has materially affected, or is reasonably likely to materially affect, our

18  internal control over financial reporting. . . ."

19      871. Further assuring investors of the veracity of the information

20  contained in the Form 10-Q, the report included SOX certifications signed by

21  Defendants Mozilo and Sieracki, which represented that the "report does not

22  contain any untrue statement of a material fact" and "the financial statements, and

23  other financial information included in this report, fairly present in all material

24  respects the financial condition" of Countrywide.

25      872. The statements contained in the third quarter 2006 Form 10-Q were

26  materially false and misleading when made. Specifically, the Company's

27  reported revenue and diluted earnings per share were false and misleading

28  because the Company's allowance for loan losses and accruals for representations

1    and warranties were understated, and its assessments of fair values for retained
2    interests and MSRs were overstated.  See Section IV.G above.  Statements related
3    to loan loss reserves, retained interests, MSRs and liabilities related to
4    representations and warranties were false and misleading for the same reasons set
5    forth in Section IV.G above.  Also, the statements regarding the quality of the
6    volume of loans originated and loans held for investment were false and
7    misleading because Countrywide misclassified subprime loans as prime loans,
8    and also for the reasons set forth in Section IV.D above.  Moreover, the
9    representations that "[o]ur pay-option investment loan portfolio [had an] . . .
10   average FICO score[] . . . of 721"; "[the Company's] portfolio of mortgage loans
11   held for investment consist[s]  primarily of Prime Mortgage and Prime Home
12   Equity Loans" and "[w]e also manage credit risk in our investment loan portfolio
13   by retaining high credit quality loans" were false and misleading because
14   Countrywide loosened its underwriting standards to increase loan volume without
15   regard to loan quality.   See Sections IV.E, IV.B.2, IV.D and IV.C.   The
16   statements relating to internal controls were false and misleading because the
17   Company's internal controls over financial reporting were ineffective.   See
18   Section IV.G.7.  Moreover, the SOX certifications signed by Defendants Mozilo
19   and Sieracki were false and misleading for the same reasons stated in Section
20   IV.G above.

21              **13.    Year End 2006 Form 8-K**

22        873.  On January 30, 2007, Countrywide filed a Form 8-K, signed by
23   Laura Milleman, attaching a press release that announced "record" earnings for
24   2006, driven by strong fourth quarter results.  Countrywide reported gain-on-sale
25   of loans and securities that equaled $1,419,318,000 for the quarter ended
26   December 31, 2006, and $5,681,847,000 for the year.

27

28

874.   The Company's reported value for its gain-on-sale was materially false and misleading when made because the Company overstated the fair value of its retained interests and MSRs.  See Sections IV.G.4 and IV.G.5 above.

### 14.   Year End 2006 Conference Call

875.   Later that same day, Countrywide held a conference call discussing the fourth quarter and year-end 2006 financial and operational results ("January 30, 2007 Conference Call") in which Defendants Mozilo, Sambol, Sieracki and Garcia participated.   A Merrill Lynch analyst asked Mozilo why Countrywide was adding so many credit enhancements to the Bank's portfolio.   Mozilo responded that the Company was doing its best to expand its loan loss reserves to the "maximum" in one form or another above what GAAP required:

> Ken Bruce - Merrill Lynch – Analyst:  Okay.  And I noticed you were adding quite a bit of credit enhancement to the bank portfolio.  Is that just a reflection of that same cautious approach to what credit is doing today?
>
> Angelo Mozilo - Countrywide Financial Corp. - Chairman, CEO:  ***Yes, GAAP has its limitations on that issue and we are doing our best to expand our reserves in one form or another.***  And obviously you have cash reserves and the other is that you discount the assets and the third is that you can get pool insurance or MI insurance on the assets.  ***We've I think exercised ourselves to the maximum in that regard and will continue to do so, by the way, throughout 2007.* . . .**

876.   At the January 30, 2007 Conference Call, Mozilo responded to a question from an analyst at Piper Jaffray regarding current trends in the subprime market by stating that the subprime industry was going to be severely hit because of the decreased quality of borrowers.   Nonetheless, Mozilo represented that this

1   would not have a material impact on Countrywide because the Company had
2   backed away from the subprime area due to its concerns over credit quality:

3       You notice that in both the wholesale channel as well as our consumer
4       channel that our volumes were lower on a market share basis.  We
5       picked it up on the correspondent.  *And it was because we backed*
6       *away from the sub prime area because of our concern over credit*
7       *quality.  And I think you're seeing the results of that with those*
8       *competitors who took that product when we backed away.*

10      So I think there's a couple -- one is you're seeing two or three a day,
11      there's probably 40 or 50 a day throughout the country going down in
12      one form or another.  And I expect that to continue throughout the
13      year.  I think that sub prime is going to be severely hit primarily
14      because the sub prime business was a business of you take inferior
15      credit but you'd have, you'd require superior equity.  And so people
16      had to make a substantial down payment or if they had marginal
17      credit.

19      Well, that all disappeared in the last couple of years and you get a
20      100% loan with marginal credit and that doesn't work and so --
21      particularly if they have any kind of bumps like we have now in the
22      deterioration of real estate values because people can't get out.

23      877.   The statements referenced above during the January 30, 2007
24   Conference Call were materially false and misleading when made.  Defendant
25   Mozilo's statement that the Company was adding additional insurance to protect
26   against loan default to "exercise[ ] ourselves to the maximum"; and that "GAAP
27   has its limitations . . . [reserving for loan losses] and we are doing our best to
28   expand our reserves in one form or another" above what GAAP requires were

false and misleading for the same reasons set forth in Section IV.G.3 above. Also, Mozilo's statement that Countrywide "backed away from the sub prime area because of our concern over credit quality" was false and misleading because Countrywide was misclassifying subprime loans as prime loans, and also for the reasons set forth in Sections IV.D and IV.C above.

878. Analysts reacted positively to the Company's materially false and misleading statements above. For example, on February 2, 2007, analysts at Citigroup rated Countrywide's shares a "Buy" with "Medium Risk."

879. Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of the Company's fraudulent misrepresentations:

- On January 31, 2007, Piper Jaffray maintained its "Outperform" rating for Countrywide. Analysts stated that "[c]redit quality, while weakening, is still very respectable. . . ."

- On January 31, 2007, Merrill Lynch reiterated "Buy" for Countrywide stock and raised its price target to $50. "Q4'06 results were generally viewed as a positive by the market . . . and the GOS margins were stronger than expected."

- Rapid Rating reported on January 31, 2007 that Countrywide's credit outlook is positive. "[T]he company is a moderate to low risk and somewhat subject to fluctuations in market conditions, and that its assets are of very good quality."

### 15.    2006 Form 10-K

880. On March 1, 2007, Countrywide filed its Annual Report for 2006 with the SEC on Form 10-K. The report was signed by Defendants Mozilo, Sieracki, Milleman, Brown, Cisneros, Cunningham, Donato, Dougherty, Melone,

1   Parry, Russell, Robertson and Snyder.   The Company reported revenues of
2   $11,417,128,000, and diluted earnings per share of $4.30 for 2006.

3       881.   In a section titled "Valuation of MSRs and Other Retained Interests,"
4   the Company reported that the fair value of the retained interests on its balance
5   sheet as of December 31, 2006 was $3,040,575,000.   Further, the Company
6   reported that the impairment in the fair value of its retained interests equaled
7   $73,677,000 for the fourth quarter and $284.7 million for the year.

8       882.   In the "Off-Balance Sheet Arrangements and Guarantees" section of
9   the 2006 Form 10-K, Countrywide described the representations and warranties
10   exposure associated with the securitization of its loans, as follows: "[w]e do not
11   believe that any of our off-balance sheet arrangements have had, or are
12   reasonably likely to have, a current or future material effect on our financial
13   condition, results of operations, liquidity, capital expenditures or capital
14   resources."

15       883.   In a section titled "Credit Risk Management", the Company also
16   reported the liabilities associated with the risk of representation and warranties
17   "total[ed] $390.2 million."

18       884.   Moreover, the 2006 Form 10-K stated that "contractual liability
19   arises only when . . . representations and warranties are breached."   Countrywide
20   also stated that it "attempt[s] to limit our risk of incurring these losses by
21   structuring our operations to **ensure consistent production of quality**
22   **mortgages** . . . ."

23       885.   The Company further reported in a section titled "Securitizations,"
24   that the fair value of its MSRs as of December 31, 2006 was $16,172,064,000.

25       886.   The Company reported allowance for loan losses of $261,054,000 as
26   of the end of 2006.   The Company also had net charge-offs of $156,841,000.   The
27   Company stated that "allowances and provisions for credit losses are adequate
28   pursuant to generally accepted accounting principles."

887. Countrywide also made representations concerning the purported high quality of its portfolio and the purportedly sufficient allowances and provision for loan losses in its 2006 Form 10-K:

> "The increase in [the Company's] . . . allowance for loan losses reflects prevailing real estate market and economic conditions and the seasoning of the Bank's investment loan portfolio.  We expect the allowance for loan losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio continues to season and as current market conditions develop.  However, *we believe that our investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels.  We also believe our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles.*"

888. Countrywide reported prime mortgages and prime home equity loans held for investment in the amounts of $230,139,000 and $56,029,000, respectively.  Nonprime mortgage loans held for investment amounted to $55,262,000, or less than 1% of total mortgage loans held for investment.

889. In the 2006 Form 10-K, the Company reported that the volume of Mortgage Banking nonprime, prime home equity and prime loans originated during the year equaled $36,752,000,000, $39,962,000,000, and $344,370,000,000, respectively.

890. Countrywide reported in its 2006 Form 10-K its high credit rating and strategy to continue to produce high quality mortgages to the secondary market:

> Our strategy is to ensure our ongoing access to the secondary mortgage market by *consistently producing quality mortgages* and

1    servicing those mortgages at levels that meet or exceed secondary
2    mortgage market standards.

3

4    Moreover, the Company represented in its 10-K as to the purported
5    high quality of its loans: "[t]he *majority of our loan production*
6    *consists of Prime Mortgage loans.*"

7    891. In a section of the Form 10-K titled "Mortgage Credit Risk," the
8    Company described its Credit Policy, portraying it as a tightly controlled and
9    supervised process with a rigorous pre-loan screening procedure, post-loan
10   auditing, appraisal, and underwriting reviews:

11       **Loan Quality**

12       Our credit policy establishes standards for the determination of
13       acceptable credit risks. Those standards encompass borrower and
14       collateral quality, underwriting guidelines and loan origination
15       standards and procedures.

16

17       Borrower quality includes consideration of the borrower's credit and
18       capacity to pay. We assess credit and capacity to pay through . . .
19       manual or automated underwriting. . . . Our underwriting guidelines
20       for non-conforming mortgage loans, Prime Home Equity Loans, and
21       Nonprime Mortgage Loans have been designed so that these loans are
22       salable in the secondary mortgage market. We developed these
23       guidelines to meet the requirements of private investors, rating
24       agencies and third-party credit enhancement providers.

25

26       These standards and procedures encompass underwriter qualifications
27       and authority levels, appraisal review requirements, fraud controls,
28       funds disbursement controls, training of our employees and ongoing

1  review of their work. . . .  We supplement our loan origination
2  standards and procedures with a post-funding quality control process.
3  Our Quality Control Department is responsible for completing loan
4  audits that may consist of a re-verification of loan documentation, an
5  underwriting and appraisal review, and, if necessary, a fraud
6  investigation.

7  892.  KPMG included in the 2006 Form 10-K an audit report on
8  management's assessment of the Company's internal control over financial
9  reporting, in accordance with the standards of the Public Company Accounting
10  Oversight Board.  In its report dated February 28, 2007, KPMG stated:

11  In our opinion, management's assessment that the Company
12  maintained effective internal control over financial reporting as of
13  December 31, 2006, is fairly stated, in all material respects, based on
14  criteria established in Internal Control—Integrated Framework issued
15  by the Committee of Sponsoring Organizations of the Treadway
16  Commission (COSO). . . . and our report dated February 28, 2007,
17  expressed an unqualified opinion on those consolidated financial
18  statements.

19  893.  Further assuring investors of the veracity of the information
20  contained in the Form 10-K, the report included SOX certifications signed by
21  Defendants Mozilo and Sieracki, representing that the "report does not contain
22  any untrue statement of a material fact" and "the financial statements, and other
23  financial information included in this report, fairly present in all material respects
24  the financial condition" of Countrywide and that the Company employed internal
25  disclosure controls and procedures that detect "[a]ll significant deficiencies and
26  material weaknesses in the design or operation of internal control over financial
27  reporting" and "[a]ny fraud, whether or not material, that involves management."

28

894.   The statements referenced above in Countrywide's 2006 Form 10-K were materially false and misleading when made.  As set forth in greater detail above, the Company's reported revenue and diluted earnings per share were false and misleading because the Company's allowance for loan losses and accruals for representations and warranties were understated, and its assessments of fair values for retained interests and MSRs were overstated.  See Section IV.G above. Statements related to loan loss reserves, retained interests, MSRs and liabilities related to representations and warranties were false and misleading for the same reasons set forth in Section IV.G above.  Furthermore, the statements relating to the volume of prime loans produced and the value of prime loans held for investment were all false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the same reasons stated in Section IV.D above.   Moreover, Countrywide's statements that it "consistently produc[ed] quality mortgages" and that its loan origination standards and procedures are designed to produce "loans [that] are salable in the secondary mortgage market" and "[t]he majority of our loan production consists of Prime Mortgage loans" were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality.   See Sections IV.C and IV.D above.   KPMG's 2006 unqualified audit opinion report and assessment of management's internal controls was false and misleading for the same reasons stated in Sections VI and IV.G.7 above. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

### E.   The Company's False Statements Regarding 2007 Results Before the Truth Begins to Emerge

#### 1.   March 6, 2007 Raymond James Institutional Investor Conference

895.   On March 6, 2007, after some of Countrywide's competitors began having problems because of their lending practices, Defendant Sieracki, speaking

at a Raymond James Institutional Investor Conference, made further false and misleading statements about Countrywide's access to liquidity. Sieracki acknowledged the critical importance of liquidity in his remarks. In particular, he noted that: "Liquidity is a huge issue. Not all of these models [a reference to the business models of various Countrywide competitors in the lending industry] are going to be able to fund themselves and you are going to see some of these companies go out of business."

896. Later during the same conference, Sieracki stated that: "*We're very well positioned at Countrywide due to* experience in these cycles, expertise, operating controls and *our liquidity position*. Let's fact it this is a pain phase of a healthy process. *We're a top conditioned athlete* and I would suggest that the future present value of this outcome, of this pain felt today is greater than stumbling along at the status quo here."

897. The statements referenced above were materially false and misleading. Specifically, Sieracki's statements that "We're very well positioned at Countrywide due to . . . our liquidity position" and "[w]e're a top conditioned athlete" were false and misleading because Countrywide did not have access to the liquidity. See Sections IV.H.1 and IV.B.

### 2.   March 13, 2007 CNBC Interview and March 22, 2007 "Mad Money" Interview

898. On March 13, 2007, Defendant Mozilo was interviewed by CNBC reporter Maria Bartiromo. Mozilo falsely told the marketplace that the Company's exposure to risky loans was not significant because purportedly only 7% of loans originated by Countrywide were subprime:

> MOZILO: . . . [T]he [loans] . . . that you see exposed [from the subprime market] at the moment would be the New Centuries, the NovaStars, and the Accredited Home Loans, and, those are monoline companies, subprime companies, that did well in the housing boom, in

1    the bubble, but once the tide went out, you can see what's happened.

2    *I think it's a mistake to apply what's happening to them to the more*

3    *diversified financial services companies such as Countrywide*, Wells

4    Fargo and others. Certainly, a percentage of our business is subprime.

5    *We had 7 percent of our* [loan originations in subprime] . . .

6

7    BARTIROMO: Seven percent?  Angelo, so you've got seven percent

8    of originations coming from the subprime area?

9

10    MOZILO: That's correct.  And about .2 percent of our assets are in

11    subprime.  So I think it's very important that this be kept in

12    perspective. So, for us, what our concern is, Maria, is not so much for

13    Countrywide *because we'll be fine.  In fact, this will be great for*

14    *Countrywide at the end of the day because all the irrational*

15    *competitors will be gone.*  So, you have to look over this valley you

16    know to the horizon and it looks very positive for us.

17        899.   On March 22, 2007, Mozilo appeared on the popular CNBC program

18    "Mad Money," hosted by Jim Cramer. Mozilo, once again, was very positive

19    regarding the Company's prospects. He falsely assured investors that

20    Countrywide was essentially a prime lender, and that subprime loans represented

21    only 7-9% of the Company's business. He again differentiated Countrywide from

22    subprime lenders, asserting their business model was fundamentally flawed in a

23    way Countrywide's was not.

24        900.   Thereafter, on August 26, 2007 in an article titled, "Inside the

25    Countrywide Lending Spree," *The New York Times* reported that Mozilo's

26    statements during the CNBC interview on March 13, 2007 were materially false

27    and misleading for the following reasons:

28

Countrywide documents show that it, too, was a lax lender. For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a house without putting down any of their own money. And Countrywide waited until Feb. 23 to stop peddling another risky product, loans that were worth more than 95 percent of a home's appraised value and required no documentation of a borrower's income.

[In addition] . . . Countrywide's product list showed that it would lend $500,000 to a borrower rated C-minus, the second-riskiest grade. As long as the loan represented no more than 70 percent of the underlying property's value, Countrywide would lend to a borrower even if the person had a credit score as low as 500.

901.   In addition to the reasons set forth in the August 26, 2007 *New York Times* article, Mozilo's statements above that "[w]e had 7 percent of [our business in subprime]" and that "Countrywide was essentially a prime lender" were false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the same reasons set forth in Sections IV.D and IV.C above.

### 3.   First Quarter 2007 Form 8-K

902.   On April 26, 2007, Countrywide filed a Form 8-K attaching a press release that announced its financial results for the first quarter of 2007. Countrywide reported gain-on-sale of loans and securities of $1,234,104,000 for the quarter.

903.   Countrywide's reported gain-on-sale was materially false and misleading when made because the Company materially overstated its assessment of fair value for its retained interests and MSRs, and also for the reasons stated in Sections IV.G.4 and IV.G.5 above.

### 4.   First Quarter 2007 Conference Call

904.   On a conference call held later that day (the "April 26, 2007 Conference Call") in which Defendant Mozilo, Sambol, Sieracki, and Garcia participated, Mozilo touted the Company's growing pipeline of "prime" loans, noting that Countrywide was poised to capitalize on the implosion of irresponsible lenders that had populated the industry in the last five years:

> As a result [of business consolidation], you have less competition and as Dave pointed out, rational competition. So when you have that, one is your margins are going to improve. There is no question that there are many players who have entered the business over the last five years that had to some degree or another irresponsible behavior, conducted themselves irresponsibly, and that impacted everybody, Gresham's Law.[24]

905.   Defendant Sambol reiterated that Countrywide's prime business would continue to grow and that Countrywide had gained a competitive advantage in the subprime area now that other lenders had exited that business:

> And as it relates to top-line pricing margins, there was the absence of competitive worsening in pricing. *So the outlook is very good for our prime business and prime margins.* As it relates to subprimes, as I mentioned in my presentation, we are now pricing our rate sheets to provide for profitability in each of our channels, where I would tell you that in '06, for much of '06 and part of '05, *competitive conditions were such that in certain of our segments, we were pricing to breakeven.*

---

[24] "Observation    that    'bad    money    drives    out    good.'"
http://www.britannica.com/ebc/article-93666139.

906.   Moreover, on the same call, Defendant Mozilo emphasized that there was no spillover from the subprime debacle to prime mortgages:

> [T]here has been a lot of talk about contagion or spillover from subprime to Alt-A and so we thought we would comment a little bit on that market and Countrywide's views and exposure to Alt-A. First of all, by way of description, ***Alt-A generally consists of loans to prime credit borrowers unlike subprime . . .*** who don't qualify for traditional prime programs due to a variety of things; reduced documentation most notably and/or other layering of risk factors, maybe higher LTVs and higher loan amounts.
>
> * * *
>
> ***As it relates to Alt-A, the conclusion there is that, at least for Countrywide, there has not been any material impact or spillover into Alt-A or for that matter into our prime business.***

907.   During the April 26, 2007 Conference Call, Sambol declared that "***of course, Countrywide has the liquidity and the capital*** and the infrastructure to take advantage of the structural changes that are taking place in this market."

908.   The statements referenced above during the April 27, 2006 Conference Call were materially false and misleading when made.  Defendant Mozilo's statement that Countrywide would benefit from other mortgage companies' irresponsible conduct was false and misleading.   In truth, Countrywide was not different from the companies heavily involved in irresponsible lending.   See Sections IV.B and IV.C.   Moreover, Defendant Sambol's statement that "the outlook is very good for our prime business and prime margins" was false and misleading because Countrywide classified its subprime loans as prime loans, and also for the same reasons set forth in Section IV.D above.  In addition, Defendant Sambol's statement that management was pricing the loans to the secondary market "to breakeven" was false and

misleading for the reasons set forth in Section IV.G.4 above.  Further, Defendant Mozilo's statement that "there has not been any material impact or spillover [from the subprime fallout] into Alt-A or . . . prime business" was false and misleading for the same reasons set forth above and in Section IV.D.  Sambol's statement that "Countrywide has the liquidity and the capital and the infrastructure to take advantage of the structural changes that are taking place in this market" was false and misleading because Countrywide did not have access to the liquidity and the Company overstated its capital.  See Section IV.H.

### 5.   April 26, 2007 AFSA 7th Finance Industry Conference

909.  On April 26, 2007, Countrywide participated at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors (the "April 26, 2007 Fixed Income Conference").  At that conference, Jennifer Sandefur, Senior Managing Director and Treasurer, attempted to distinguish Countrywide from its peer mortgage lenders by stating that the Company was not heavily involved in the subprime mortgage industry.  Specifically, Sandefur said that Countrywide's portfolio is of "very high quality" and primarily consisted of prime mortgages:

> There's been a significant amount of turmoil in the market recently as a result of the nonprime mortgage sector.  We strategically manage that. *We're essentially a prime mortgage originator.*  We have $400 million in residual investments on our balance sheet.  We have a very conservative liquidity profile which insulates us from market events like the subprime origination market events.

> * * *

> [D]uring the time that we acquired the bank in 2006, we originated over $2 trillion in mortgages in the United States, prime *and a small amount of subprime* and we put about *$73 billion of very prime mortgages on our own balance sheet.*

910. Repetitiously, at the same conference, Sandefur again emphasized Countrywide's high quality mortgages:

> Again, **over 90% of Countrywide loan origination volume is prime quality. Less than 9% of our production is subprime. . . . The nonprime loans are all held for investment and sold into securitizations with none of those going on our bank's balance sheet.**
>
> * * *
>
> A little bit more about the bank. Again, and the **high credit quality of that portfolio that we selected. Very low interest rate risk.**

911. At the April 26, 2007 Fixed Income Conference, Sandefur discussed the increased rate of delinquencies in the subprime mortgage industry and the loosened underwriting standards for subprime loans. However, she emphasized that Countrywide was different and better than its competition:

> [M]any of the players that originated . . . [subprime] loans and loosened these standards as they were kind of gasping for breath at the very end of the run in the refi boom, I think lowered a lot of the underwriting standards which caused a lot of these delinquency problems. A lot of these smaller players are exiting the business willingly in many cases and unwillingly in some cases.
>
> **. . . I'd like to differentiate Countrywide here.** And from a lot of competitors we've seen come and go in the past, you're talking about a kind of one-trick pony, if you will, some of these subprime lenders who all they did was originate subprime loans, enjoyed the wide margins, they weren't properly capitalized. They weren't properly balanced. They didn't have diversified businesses. They didn't have 38 years of technology. They didn't have the intellectual capital, the

hedging capabilities, the ability to price. They did one thing. They originated subprime loans.

Versus a Countrywide *who originates a very small component of subprime loans* so that they have a full menu of products to offer through the various diversified channels, retail, correspondent, wholesale, through brokers. . . . They underestimated the impact of early payment defaults through the whole loan type of risk transference that they were using *unlike the Countrywide who uses a securitization, who has a reputation for high quality originations.*

912.   At the same conference, Sandefur commented on the adequacy of Countrywide's allowance account for loan losses due to the pristine nature of its portfolio:

. . . Allowances for loan losses which are really a 12 month perspective look at potential losses, we've booked at $229 million for '06.   Actual net charge-offs for the bank portfolio were only $34 million. *So very conservative allowances for loan losses at very small actual charge offs given the very pristine nature of this portfolio. . . .* So, again, the point here, *not subprime.   Very, very prime.* Kind of the opposite of subprime.

913.   The statements referenced above and made at the April 26, 2007 Fixed Income Conference were materially false and misleading when made. Moreover, the Officer Defendants did not correct any of Sandefur's statements after the conference call.   Specifically, Sandefur's statements that "[w]e're essentially a prime mortgage originator," emphasizing the point with phrases such as "very, very prime," were false and misleading for the same reasons set forth in Section IV.D above.   Moreover, Sandefur's statements that "over 90% of Countrywide['s] loan origination volume is prime quality" and "[l]ess than 9% of

our production is subprime" were false and misleading because Countrywide improperly classified subprime mortgage loans as prime loans, and also for the same reasons set forth in Section IV.D above.   In an attempt to distinguish Countrywide from its peers, Sandefur's statements that Countrywide "originate[d] a very small component of subprime loans" and "has a reputation for high quality loans" were also materially false and misleading for the same reasons set forth in Section IV.C above.  Moreover, Sandefur's statement that Countrywide had "very conservative allowances for loan losses . . . given the very pristine nature of this portfolio" was false and misleading for the reasons set forth above in Section IV.G.3.

914.   Analysts continued to be deceived by management's false and misleading statements as set forth above.  For example, on April 26, 2007, Citigroup analysts rated Countrywide's shares a "Buy" with "Medium Risk." Citigroup analysts based their opinion in part on Countrywide's senior management's false assurances that after industry consolidation the Company would be well positioned to grow market share and earnings and that Countrywide's "core business" of prime loans was "solid."

915.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of the Company's fraudulent misrepresentations:

- On April 27, 2007, Piper Jaffray maintained its "Outperform" rating for Countrywide.
- On April 29, 2007, Morgan Stanley reiterated "Overweight" for Countrywide's stock.
- Rapid Rating reported on April 26, 2007 that Countrywide's credit outlook is positive.  "[T]he company is a moderate to low risk and somewhat subject to fluctuations in market conditions, and *that its assets are of very good quality.*"

### 6.    First Quarter 2007 Form 10-Q

916.   On May 9, 2007, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2007, ended March 31, 2007, signed by Defendant Sambol and Sieracki.    The Company reported revenues for the quarter of $2,405,776,000, and diluted earnings per share of $0.72.

917.   In the section titled "Impairment of Retained Interests," the Company noted that "we recognized impairment of retained interests of $429.6 million.   Impairment charges of $231.0 million were related to nonprime and related residual interests and $135.3 million were related to subordinated interests on prime home equity lines of credit securitizations."

918.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the Form 10-Q, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

919.   The Company described its management of credit risk in the following terms: "We attempt to limit our risk of incurring . . . [representation and warranty] losses by structuring our operations to *ensure consistent production of quality mortgages* . . . ."

920.   In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of representation and warranties ". . . total[ed] $365,300,000."

921.   In a section titled "Securitizations," the Company reported that the fair value of its MSRs at March 31, 2007 was $17,441,860,000.

922.   The Company reported allowance for loan losses of $374,367,000, having increased its provision for loan losses by $151,962,000 during the quarter. The Company also had net charge-offs of $38,649,000.

923.   Countrywide reported in its first quarter 2007 Form 10-Q that prime mortgage and prime home equity loans held for investment equaled $68,908,462,000, and nonprime mortgage loans held for investment equaled $1,144,184,000.

924.   The volume of Mortgage Banking nonprime, prime home equity and prime loans produced during the quarter equaled $7,500,000,000, $9,234,000,000 and $93,833,000,000, respectively.

925.   With respect to Countrywide's liquidity and capital resources, the Form 10-Q stated that:

> . . . nonprime loans and related securities became much less liquid. However, such assets represent *only a small portion* of our total assets.   The substantial majority of our assets continue to experience ample liquidity in the marketplace.   *As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements.*
>
> \* \* \*
>
> . . . We establish reliable sources of liquidity sized to meet a range of potential future funding requirements. We currently have $94.4 billion in available sources of short-term liquidity, which represents a decrease of $2.0 billion from December 31, 2006.   *We believe we have adequate financing capacity to meet our currently foreseeable needs.*

926.   The Company also reported in the Form 10-Q management's review of the Company's disclosure controls and internal controls: "There has been no

1   change in our internal control over financial reporting during the quarter ended
2   March 31, 2007 that has materially affected, or is reasonably likely to materially
3   affect, our internal control over financial reporting."

4       927.  Further assuring investors of the veracity of the information
5   contained in the Form 10-Q, the report included SOX certifications signed by
6   Defendants Mozilo and Sieracki, representing that the "report does not contain
7   any untrue statement of a material fact" and "the financial statements, and other
8   financial information included in this report, fairly present in all material respects
9   the financial condition" of Countrywide.

10      928.  The statements contained in the first quarter 2007 Form 10-Q above
11  were materially false and misleading when made.  Specifically, the Company's
12  reported values for its revenue and diluted earning per share were false and
13  misleading because the Company's allowance for loan losses and accruals for
14  representations and warranties were understated, and its assessments of fair
15  values for retained interests and MSRs were overstated. See Section IV.G above.
16  The statements related to loan loss reserves, retained interests, MSRs and
17  liabilities related to representations and warranties were false and misleading for
18  the same reasons stated in Section IV.G above.) Also, the statements regarding
19  the quality of the volume of loans produced and loans held for investment were
20  false and misleading because Countrywide improperly classified subprime loans
21  as prime loans, and also for the reasons set forth in Section IV.D above.
22  Moreover, the representation that we "ensure consistent production of quality
23  mortgages" was false and misleading because Countrywide loosened and
24  abandoned its underwriting guidelines when originating loans. See Section IV.C.
25  Moreover, Countrywide's statements regarding liquidity were false and
26  misleading for the same reasons stated in Section IV.H.1 above. The statements
27  relating to internal controls were false and misleading because the Company's
28  internal controls over financial reporting were ineffective.  See Section IV.G.7.

1   Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were

2   false and misleading for the same reasons stated in Section IV.G above.

3       **F.    False and Misleading Registration
            Statements and Prospectuses for Countrywide's**

4       **Offerings of Debt and Preferred Securities**

5           **1.    Series A Medium-Term Notes**

6           929.   On or about February 7, 2005, Countrywide commenced a public

7   offering of approximately $8.627 billion of Series A Medium-Term Notes to be

8   offered on a continuous basis.  Net proceeds from this offering to Countrywide,

9   after deducting expenses, exceeded $8 billion.

10          930.   The Series A Medium-Term Notes were offered and sold pursuant to

11  a shelf registration statement on Form S-3 and prospectus, dated April 7, 2004

12  and April 21, 2004, signed by Mozilo, Kurland, McLaughlin, Cisneros,

13  Cunningham, Donato, Dougherty, Enis, Garcia, Heller, King, Melone, Robertson,

14  Russell, and Snyder; a prospectus supplement dated February 7, 2005; a

15  prospectus supplement dated December 14, 2005 (increasing the size of the

16  offering from $8 billion to $8.627 billion); a series of pricing supplements

17  numbered 1-18 and 20-24 dated between March 16, 2005 and February 1, 2006;

18  and a Free Writing Prospectus dated December 14, 2005 (collectively, the "Series

19  A Medium-Term Notes Prospectus"), all of which Countrywide filed with the

20  SEC (collectively, the "Series A Medium-Term Notes Registration Statement").

21          931.   The Series A Medium-Term Notes Registration Statement expressly

22  incorporated by reference Countrywide's Form 10-K Annual Report for the year

23  ended December 31, 2003.

24          932.   Defendants Banc of America Securities, Barclays Capital, Citigroup

25  Global Markets, Countrywide Securities, Deutsche Bank, Greenwich Capital,

26  HSBC, J.P. Morgan Securities, Morgan Stanley, RBC Dominion, and Wachovia

27  Capital acted as underwriters with respect to the offering of Series A Medium-

28  Term Notes.

1    933.   As alleged in detail above, Countrywide's Form 10-K for the year

2    ended December 31, 2003 was materially false and misleading.  Accordingly, the

3    Series A Medium-Term Notes Registration Statement and the Form 10-K

4    incorporated therein by reference, pursuant to which Lead Plaintiffs New York

5    City Pension Funds and other members of the Class were induced to purchase

6    Series A Medium-Term Notes, contained untrue statements of material fact and

7    omitted to state material facts required to be stated therein or necessary to make

8    the statements contained therein not misleading.

9                    **2.    Series B Medium-Term Notes**

10    934.   On or about February 13, 2006, Countrywide commenced a public

11    offering of Series B Medium-Term Notes to be offered on a continuous basis.

12    Net proceeds from this offering to Countrywide, after deducting offering

13    expenses, were approximately $10,700,000,000.

14    935.   The Series B Medium-Term Notes were offered and sold pursuant to

15    a shelf registration statement on Form S-3ASR and prospectus dated February 9,

16    2006, signed by Defendants Mozilo, Sambol, Kurland, Sieracki, Brown, Cisneros,

17    Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson,

18    Russell and Snyder; a prospectus supplement dated February 13, 2006; and 153

19    successive pricing supplements and Free Writing Prospectuses dated between

20    February 22, 2006 and August 6, 2007 (collectively, the "Series B Medium-Term

21    Notes Prospectus"), all of which Countrywide filed with the SEC (collectively,

22    the "Series B Medium-Term Notes Registration Statement").

23    936.   The Series B Medium-Term Notes Registration Statement expressly

24    incorporated by reference documents filed by Countrywide with the SEC,

25    including its Annual Report on Form 10-K for the year ended December 31,

26    2004; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005,

27    June 30, 2005 and September 30, 2005; and Current Reports on Form 8-K dated

28    September 30, 2005 and October 27, 2005. The Series B Registration Statement

1  also expressly incorporated by reference Countrywide's consolidated financial
2  statements as audited by KPMG.

3      937.  Defendants ABN AMRO, Banc of America Securities, Barclays
4  Capital, BNP Paribas, BNY Capital, Citigroup Global Markets, Countrywide
5  Securities, Deutsche Bank, Goldman Sachs, Greenwich Capital, HSBC, J.P.
6  Morgan Securities, Merrill Lynch, Morgan Stanley, RBC Dominion, Scotia
7  Capital, TD Securities, UBS Securities, and Wachovia Capital acted as
8  underwriters with respect to the offering of Series B Medium-Term Notes.

9      938.  KPMG consented to being named in the Series B Medium-Term
10  Notes Registration Statement as a party that certified the Company's financial
11  statements ended December 31, 2004.

12      939.  As alleged in detail above, Countrywide's Form 10-K for the year
13  ended December 31, 2004, Countrywide's consolidated financial statements for
14  the year ended December 31, 2004, and other SEC filings noted above as
15  incorporated by reference in the Series B Medium-Term Notes Registration
16  Statement were materially false and misleading.  Accordingly, the Series B
17  Medium-Term Notes Registration Statement and documents incorporated therein
18  by reference, pursuant to which Lead Plaintiffs New York City Pension Funds
19  and other members of the Class were induced to purchase Series B Medium-Term
20  Notes, contained untrue statements of material fact and omitted to state material
21  facts required therein to be stated or necessary to make the statements contained
22  therein not misleading.

23          **3.    6.25% Subordinated Notes Due May 15, 2016**

24      940.  On or about May 11, 2006, Countrywide publicly issued
25  $1,000,000,000 of 6.25% Subordinated Notes Due May 15, 2016 ("6.25%
26  Notes").  Net proceeds to the Company from the offering of 6.25% Notes, after
27  deducting offering expenses, were approximately $992,790,000.

28

---

941.   The 6.25% Notes were offered and sold pursuant to the shelf registration statement on Form S-3ASR and prospectus dated February 9, 2006, signed by Defendants Mozilo, Sambol, Sieracki, Kurland, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Garcia, Heller, Melone, Parry, Robertson, Russell and Snyder; a prospectus supplement dated May 11, 2006; and a Free Writing Prospectus dated May 11, 2006 (collectively, the "6.25% Notes Prospectus"); all of which Countrywide filed with the SEC (collectively, the "6.25% Notes Registration Statement").

942.   The 6.25% Notes Registration Statement expressly incorporated by reference the documents filed by Countrywide with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2004; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005, June 30, 2005 and September 30, 2005; and Current Reports on Form 8-K dated September 30, 2005 and October 27, 2005.   The 6.25% Notes Registration Statement also expressly incorporated by reference Countrywide's consolidated financial statements as audited by KPMG for the years 2004 and 2005.

943.   Defendants Banc of America Securities and J.P. Morgan Securities (as Joint Book-Running Managers), Countrywide Securities (as Joint Lead Manager), and Barclays Capital, Deutsche Bank, HSBC, and Wachovia Capital (as Co-Managers) acted as underwriters with respect to the offering of 6.25% Notes.

944.   KPMG consented to being named in the 6.25% Notes Registration Statement as a party that certified the Company's financial statements for the years ended December 31, 2004 and 2005 and management's assessment of the effectiveness of internal controls for the years ended December 31, 2004 and 2005.

945.   As alleged in detail above, Countrywide's Form 10-K for the year ended December 31, 2004, Countrywide's consolidated financial statements for

the years ended December 31, 2004 and 2005, and other SEC filings noted above as incorporated by reference in the 6.25% Notes Registration Statement were materially false and misleading. Accordingly, the 6.25% Notes Registration Statement and documents incorporated therein by reference, pursuant to which Lead Plaintiffs New York City Pension Funds and other members of the Class were induced to purchase 6.25% Notes, contained untrue statements of material fact and omitted to state material facts required therein to be stated or necessary to make the statements contained therein not misleading.

### 4.    7% Capital Securities

946.   On or about November 3, 2006, CCV commenced a public offering of 52,000,000 7% Capital Securities at $25 per share, with a total value of $1.3 billion.

947.   The 7% Capital Securities were offered and sold pursuant to a Post-Effective Amendment, dated October 27, 2006, to the registration statement on Form S-3 dated February 9, 2006, signed by Defendants Mozilo, Sambol, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Garcia, Gissinger, Melone, Parry, Robertson, Russell, and Snyder; and a prospectus supplement dated November 1, 2006 (collectively, the "7% Capital Securities Prospectus"); all filed by Countrywide and CCV with the SEC (collectively, the "7% Capital Securities Registration Statement").

948.   The 7% Capital Securities Registration Statement expressly incorporated by reference documents filed by Countrywide with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2005; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006 and June 30, 2006; and Current Report on Form 8-K filed October 24, 2006. The 7% Capital Securities Registration Statement also expressly incorporated by reference Countrywide's consolidated financial statements for the years 2004 and 2005 as audited by KPMG.

949. Defendants Citigroup Global Markets, J.P. Morgan Securities, Merrill Lynch, Morgan Stanley, UBS Securities, and Wachovia Capital (as Joint Book-Runners); Countrywide Securities (as Senior Co-Manager); A.G. Edwards, Banc of America Securities, and RBC Dain Rauscher (as Co-Managers); and Barclays Capital, Deutsche Bank, Goldman Sachs, and HSBC (as Junior Co-Managers) acted as underwriters with respect to the offering of 7% Capital Securities.

950. KPMG consented to being named in the 7% Capital Securities Registration Statement as a party that certified the Company's financial statements for the years ended December 31, 2004 and 2005 and management's assessment of the effectiveness of internal controls for the year ended December 31, 2005.

951. As alleged in detail above, Countrywide's Form 10-K for the year ended December 31, 2005, Countrywide's consolidated financial statements for the years ended December 31, 2004 and 2005, and other SEC filings noted above as incorporated by reference in the 7% Capital Securities Registration Statement were materially false and misleading. Accordingly, the 7% Capital Securities Registration Statement and documents incorporated therein by reference, pursuant to which Plaintiffs Brahn and Katzeff and other members of the Class were induced to purchase 7% Capital Securities, contained untrue statements of material fact and omitted to state material facts required therein to be stated or necessary to make the statements contained therein not misleading.

## IX.   INVESTORS BEGIN TO LEARN THE TRUTH ABOUT COUNTRYWIDE, CAUSING ITS SECURITIES TO PLUMMET IN VALUE, BUT THE COMPANY CONTINUES TO LULL THE INVESTING PUBLIC WITH ADDITIONAL FALSE AND MISLEADING STATEMENTS

952. No later than July 24, 2007, Countrywide and various individual defendants finally began to partially reveal the truth about matters concerning