which Countrywide, individual defendants, Underwriter Defendants and KPMG previously had made materially false and misleading statements. Those matters included Countrywide's lending practices, underwriting standards, financial reporting and accounting practices, lack of financial stability, lack of access to liquidity, and lack of business ethics and integrity. Additional public revelations of the truth concerning these and other matters critical to Countrywide's business were issued by government agencies, including the FBI, the SEC, various United States Trustees, and a series of state Attorneys General; the business media; and participants in the financial markets, including analysts and rating agencies.

953. These revelations related to matters highly material to buyers of Countrywide's publicly traded securities. Between July 24, 2007 and March 10, 2008, the revelation of the truth concerning such material facts caused Plaintiffs and the Class to suffer substantial losses. Each new revelation caused an additional drop in the value of Countrywide's securities and additional losses to Class members. Those losses were a direct result of the revelation of the truth about the materially false and misleading statements alleged herein and were dramatically larger, to a statistically significant degree, than any losses Class members would have sustained due to ordinary market forces.

954. **Partial Corrective Disclosures and Continued Misrepresentations on July 24, 2007**. On July 24, 2007, Countrywide filed a Form 8-K and issued a press release announcing its financial results for the second quarter of 2007. Countrywide's quarterly release surprised the market with a series of revelations that partially corrected Defendants' earlier false and misleading statements, and that caused a sharp decline in Countrywide's stock price. However, Countrywide and certain Individual Defendants, notably Mozilo, dampened the effect of Countrywide's July 24, 2007 partial corrective disclosures by making additional fraudulent statements that day in an effort to bolster the

1 Company's stock price and blunt the impact of the corrective disclosures on the
2 market.

3     955. Important revelations in Countrywide's second quarter release
4 included the disclosure that delinquency rates had jumped sharply in a series of
5 loan categories. Countrywide disclosed, for example, that for subprime loans
6 serviced by the Company, the delinquency rate in the second quarter had more
7 than doubled to an extraordinary 23.71%, from just 9.45% as of March 31, 2007
8 (the end of the previous quarter). Similarly, Countrywide disclosed that for prime
9 home equity loans (HELOCs) serviced by the Company, the delinquency rate had
10 also more than doubled in the second quarter to 4.56%, from 2.15% as of March
11 31, 2007.

12     956. This report also included dramatic new charges and loan loss
13 provisions, an additional revelation that the quality of Countrywide's loans,
14 especially its prime loans, was weaker than had previously been represented. The
15 report disclosed, for example, that Countrywide had reserved $293 million for
16 loan losses, compared to just $61.9 million in comparable loan loss reserves the
17 prior year. Countrywide attributed $181 million of the increased loan loss reserve
18 to HELOCs in the Company's held-for-investment portfolio. In addition,
19 Countrywide wrote down the value of "residual securities collateralized by prime
20 home equity loans" by $388 million. These "residual securities" were retained by
21 Countrywide after other securities relating to the prime home equity loans at issue
22 were sold. As a result of these charges and adjustments, Countrywide reported
23 reduced second quarter earnings of 81 cents per share, down from $1.15 per share
24 one year earlier.

25     957. In addition to affording the market some indication concerning the
26 poor quality of the loans originated by Countrywide, the Company's lax
27 underwriting standards, its inadequate loan loss reserves, and the inflated values
28 at which it carried loan-based assets on its balance sheet, in a related disclosure

during a conference call that day, July 24, 2007, Countrywide suggested for the first time that it had classified loans to borrowers with FICO scores as low as 500 as "prime" – far below the industry norm of requiring a borrower to have a minimum FICO score of 660 in order for a loan to the borrower to be classified as "prime."

958.   In particular, during the conference call, Chief Risk Officer John McMurray claimed that the term "prime" is one that "covers a very vast spectrum," and referred to "a prime loan with FICOs in the low 500s," thereby disclosing that, contrary to industry norms, Countrywide might classify such a loan as a prime loan for purposes of its SEC filings and other financial reporting.

959.   Later in the same conference call, McMurray declared that, "[t]here is a belief by many that prime FICOs stop at 620. That is not the case." This second, more explicit, remark by McMurray is striking because it demonstrates that senior Countrywide officials – including McMurray, the Company's Chief Risk Officer – were fully aware that it is a common understanding in the lending industry that loans to borrowers with FICO scores below a certain threshold cannot be classified as "prime" loans.  Nevertheless, Countrywide chose to secretly classify loans made to borrowers with dramatically lower FICO scores as "prime" without disclosing to the investing public that it was the Company's practice to do so.

960.   In addition, with respect to Countrywide's origination and underwriting standards, and its internal controls, the following was disclosed at the July 24, 2007 conference call:

> (a)   As of the end of the second quarter of 2007, 80% of Countrywide's pay-option ARM loans, which Defendants persisted during the Class Period in referring to as a "prime" product offered mainly to high net worth borrowers, were actually low documentation loans (as Piper Jaffray reported on July 25); as McMurray noted at the same conference,

1    *"documentation matters.  The less documentation, the higher the serious*
2    *delinquency, all else equal";*

3           (b)    Many of the charge-offs and delinquencies "stem from the
4    higher concentration of piggyback financing that we did and that we have
5    in the port[folio]. . ." (according to McMurray); as McMurray also stated at
6    the conference, *"leverage at origination matters.  More leverage means*
7    *more serious delinquencies";* and

8           (c)    Countrywide *"made many changes to [its] product offerings,*
9    *pricing, underwriting guidelines and processes in order to improve the*
10   *quality and secondary market execution of our production"* (according to
11   Chief Investment Officer Kevin Bartlett), notwithstanding repeated
12   statements during the Class Period as to the conservative and careful
13   manner in which the Company handled these matters, in contrast to its
14   competitors, and McMurray said the Company's automated underwriting
15   system needed to be *"recalibrated."*

16   961.  Countrywide's second quarter 2007 results served as a partial
17   corrective disclosure with respect to (a) the stringency of Countrywide's loan
18   origination and underwriting standards; (b) the accuracy of Countrywide's
19   financial reporting, especially the accuracy of defendants' representations
20   concerning Countrywide's loan loss reserves and concerning the value of loan-
21   related assets reflected on Countrywide's balance sheet, such as loans held-for-
22   investment and retained residual assets; and (c) Countrywide's practice of
23   classifying loans made to borrowers with FICO scores ranging down to the low
24   500s as "prime."  Indeed, as alleged in detail in Section IV.D above, one analyst
25   concluded from this conference call that Countrywide management *"made*
26   *serious miscalculations (and possibly misrepresentations) about the quality of*
27   *the loans added to the bank."*

28

962.   Countrywide's stock price declined on July 24, 2007 by approximately 10.5%, from $34.06 to $30.50, on volume of 51,249,500 shares, as compared to volume of 12,730,800 shares the prior trading day.  This loss, which was caused by the July 24, 2007 partial corrective disclosure, was materially larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.   Countrywide's other securities also experienced material and statistically significant drops in their trading prices as a result of the July 24, 2007 partial disclosures, including the trading price of the CCV 7% Capital Security, which fell by 3.84%.

963.   Nonetheless, these losses were tempered by additional misrepresentations made by Defendants the same day.  On the July 24, 2007 conference call, in which Defendants Mozilo, Sambol, Sieracki and Garcia participated, Mozilo stated that the growing mortgage crisis would allow Countrywide to leverage its strong liquidity position.   Mozilo stated in his prepared remarks:

> [W]e believe that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects.   We expect to leverage the strength of Countrywide's capital liquidity positions . . . to emerge *in a superior competitive position* coming out of the current housing downcycle.

964.   Similarly, on the July 24, 2007 conference call, Mozilo again commented on Countrywide's strong liquidity position.   Specifically, Mozilo stated that Countrywide had excess capital in terms of equity and plenty of sources to get through its current situation:

> [W]e're certainly not going to have any issues funding the Company. . . . we have adequate diversified and reliable sources of liquidity available . . . we still have plenty of liquidity cushion. . . .

1
2
3
4

> So, we have abundant excess capital in terms of equity and we have tremendous[ ] liquidity sources to fund ourselves through this situation. And we feel very, very comfortable about our liquidity scenario overall.

5
6
7
8

965. Also on the July 24, 2007 Conference Call, Mozilo responded sharply to a question about his stock sales, asserting that they were made pursuant to a 10b5-1 Plan established "well over a year ago." Later on the same call, Mozilo returned to the question about his Countrywide stock sales and asserted:

9
10
11
12
13

> [T]he shares that I have, actual stock I have, I have retained for 39 and a half years. Not sold a share of the initial stock that I got when David and I started this Company – that I got, that I purchased. The only thing that is being sold under the 10b5-1 are options with expiration dates.

14
15
16
17
18
19
20
21

966. The statements referenced above during the July 24, 2007 conference call were materially false and misleading when made. Specifically, Mozilo's reassuring statements that: "we have abundant excess capital in terms of equity"; "[we] have tremendous liquidity sources to fund ourselves through this situation"; and "[w]e believe we have adequate funding liquidity to accommodate these marketplace changes"; were false and misleading for the same reasons set forth in Section IV.H. Moreover, Mozilo's statements regarding his stock sales were false for the same reasons set forth in Section V.D.

22
23
24
25
26
27

967. **Misrepresentations on August 2, 2007.** On August 2, 2007, Countrywide and Defendant Sieracki, Countrywide's Chief Financial Officer, made a series of additional fraudulent statements in a further effort to deceive the investing public about Countrywide's liquidity and its net worth. A Countrywide press release that day entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition" asserted that:

28

1    "Countrywide has longstanding and time-tested funding liquidity
2    contingency planning," said Eric P. Sieracki, Chief Financial Officer.
3    "These planning protocols were designed to encompass a wide variety
4    of conditions, including recent secondary market volatility. Our
5    liquidity planning proved highly effective earlier during 2007 when
6    market concerns first arose about subprime lending, and remains so
7    today.  We place major emphasis on the adequacy, reliability and
8    diversity of our funding sources. . . ."

9

10    Sieracki continued, "Our mortgage company has significant short-
11    term funding liquidity cushions and is supplemented by the ample
12    liquidity sources of our bank."

13    This statement was false and misleading for the reasons alleged in Section IV.H.

14    968.  In addition, the August 2 press release contained a false and
15    misleading statement about Countrywide's net worth.   Specifically, quoting
16    Sieracki, the press release stated that "Countrywide's financial condition remains
17    strong, as evidenced by over $14 billion of net worth . . . ." However, this "$14
18    billion" net worth figure was materially inflated. See Section IV.H above.

19    969.  **Corrective Disclosures and Continued Misrepresentations on**
20    **August 9, 2007.**  After the stock market closed on August 9, 2007, Countrywide
21    filed with the SEC the Company's Form 10-Q quarterly report for the quarter
22    ended June 30, 2007. The Form 10-Q surprised the investing public by noting the
23    existence of "unprecedented market conditions" bearing on Countrywide's
24    liquidity, and by further noting that "[w]hile we believe we have adequate
25    funding liquidity, the situation is rapidly evolving and the impact on the Company
26    is unknown." These statements were a partial corrective disclosure with respect
27    to Countrywide's boasts – made as recently as one week earlier in the Company's
28    August 2, 2007 press release – about the Company's supposedly "highly

1  effective" liquidity planning and about the "reliability" of its sources of liquidity.
2  The Company also stated that its impairment of the fair value of its retained
3  interests equaled $268,117,000.

4     970.   As a result of this partial corrective disclosure, Countrywide
5  common stock declined on August 10, 2007 by approximately 2.8%, from $28.66
6  to $27.86 on a volume of 48,657,500 shares, as compared to a volume of
7  24,502,100 shares the prior trading day.  This loss, which was caused by the
8  August 9, 2007 partial corrective disclosure, was dramatically larger, to a
9  statistically significant extent, than any losses Class members would have
10  sustained as a result of ordinary market forces.

11     971.   Nonetheless,   these   losses   were   tempered   by   additional
12  misrepresentations by Defendants made on the same day.  In the "Off-Balance
13  Sheet Arrangements and Guarantees" section of the second quarter 2007 Form
14  10-Q, which was signed by Defendants Sambol and Sieracki, Countrywide
15  described the representations and warranties exposure associated with the
16  securitization of its loans as follows: "We do not believe that any of our off-
17  balance sheet arrangements have had, or are reasonably likely to have, a current
18  or future material effect on our financial condition, results of operations, liquidity,
19  capital expenditures or capital resources."

20     972.   In a section titled "Financial Statements," the Company reported that
21  the fair value of its MSRs for the quarter was $20,087,368,000.

22     973.   The Company also reported an allowance for loan losses of
23  $512,904,000 as of the end of the quarter, having increased its provision for loan
24  losses by $292,924,000 during the quarter, with net charge-offs of $154,387,000.

25     974.   The Company also claimed, again, in the Form 10-Q that it had
26  adequate funding liquidity to accommodate marketplace changes:

27     *We believe we have adequate funding liquidity to accommodate*
28     *these marketplace changes in the near term ...* We also believe that

1    the challenges facing the industry should ultimately benefit
2    Countrywide as the mortgage lending industry continues to
3    consolidate.

4    975.   Also, in the section titled "Controls and Procedures," Countrywide
5    described the adequacy of its internal controls:

6    There has been no change in our internal control over financial
7    reporting during the quarter ended June 30, 2007 that has materially
8    affected, or is reasonably likely to materially affect, our internal
9    control over financial reporting.

10   976.   Further assuring investors of the veracity of the information
11   contained in the Form 10-Q, the report included a SOX certification signed by
12   Defendants Mozilo and Sieracki representing that the "report does not contain any
13   untrue statement of a material fact" and "the financial statements, and other
14   financial information included in this report, fairly present in all material respects
15   the financial condition" of Countrywide.

16   977.   The statements referenced above from Countrywide's second quarter
17   2007 Form 10-Q were materially false and misleading when made. As set forth
18   in greater detail above, the Company's values for its revenue and diluted earnings
19   per share were false because the Company's allowance for loan losses and
20   accruals for representations and warranties were understated, and its assessment
21   of fair value for retained interests and MSRs were overstated. See Section IV.G
22   above.   Statements related to loan loss reserves, retained interests, MSRs and
23   liabilities related to representations and warranties were false and misleading for
24   the same reasons set forth in Section IV.G above. Countrywide's statement that
25   "[w]e believe we have adequate funding liquidity to accommodate these
26   marketplace changes in the near term" was false and misleading for the same
27   reasons set forth in Section IV.H above.   The statements relating to internal
28   controls were false and misleading for the same reasons set forth in Section

IV.G.7.   Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section IV.G above.

978.   Analysts and investors continued to rely on Defendant's false statements set forth above.  For example, on July 25, 2007, Piper Jaffray analysts rated Countrywide's shares as "Outperform" and "believe[d] CFC has ample liquidity to work through the housing/mortgage recession."

979.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' lulling misrepresentations.  For example, on August 2, 2007, Morgan Stanley maintained an "Overweight" rating on Countrywide stock.   Analysts reported "[w]ith capital markets volatility raising questions about the liquidity of securitization markets, the key issue in the short term for Countrywide is liquidity. *We don't see any near-term liquidity challenges for the company . . .*"

980.   **Corrective Disclosure on August 13, 2007.**  On August 13, 2007, Merrill Lynch issued an analyst report that indicated that, because of liquidity problems, "it is possible for CFC to go bankrupt."   In particular, under the heading "Liquidity[,] the most pressing concern . . .," the Merrill Lynch report stated:

> The market is concerned that CFC could have difficulty with its credit facilities, which are critical to it operating in the near-term. CFC currently has about $185B in available credit facilities, though the concern is that these facilities could be terminated or the terms changed meaningfully, thus impacting CFC's ability to operate normally. *We cannot understate the importance of liquidity for a specialty finance company like CFC.* If enough financial pressure is placed on CFC or if the market loses confidence in its ability to function properly then the model can break, leading to an effective

insolency.  If liquidations occur in a weak market, ***then it is possible for CFC to go bankrupt.***

981.   The Merrill Lynch report served as a partial corrective disclosure with regard to a number of Defendants' false and misleading statements.  Among other matters, the report partially corrected Defendants' false statements that Countrywide was financially sound; that Countrywide was well-positioned to weather the downturn in the housing market; that Countrywide was poised to grow during the downturn and to capture marketshare from weaker competitors; and that Countrywide had secure access to ample sources of liquidity.

982.   As a result of the disclosures contained in the Merrill Lynch report, Countrywide common stock declined on August 13 by approximately 4.5%, on high volume exceeding 29 million shares.  This loss, which was caused by the August 13 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

983.   **Corrective Disclosure on August 14, 2007.**  On August 14, 2007, before the market opened, Countrywide issued a press release and filed a Form 8-K releasing its monthly operational data for July 2007.   In this report, Countrywide disclosed that by the end of July 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by approximately 35% to 4.89%, compared to a 3.61% rate as of July 31, 2006.   Countrywide also disclosed that, similarly, by the end of July 2007, its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.04%, compared to 0.46% as of July 31, 2006.

984.   An August 15, 2007, *Los Angeles Times* article about the July operating report commented: "[i]n a grim report that helped send mortgage stocks reeling, No. 1 home lender Countrywide Financial Corp. said Tuesday that foreclosures and delinquencies jumped in July to the highest levels in more than

1   five years." The article also noted that "Countrywide didn't file detailed monthly

2   reports before 2002."

3       985. Countrywide's August 14, 2007 disclosure of unexpectedly high

4   rates of delinquencies and foreclosures partially corrected Countrywide's prior

5   misrepresentations about the quality of its loan origination and underwriting

6   standards and served as a partial corrective disclosure with respect to aspects of

7   Countrywide's financial reporting, including Countrywide's loan loss reserves

8   and its reported assets. It was also a partial corrective disclosure with regard to

9   Countrywide's prior misstatements that Countrywide's business was sound; that

10  Countrywide was well-positioned to withstand the downturn in the housing

11  market; and that Countrywide was poised to capture market share from weaker

12  competitors.

13      986. Countrywide's stock closed down on August 14, 2007 by

14  approximately 8.1%, from $26.61 to $24.46, on high volume of almost 36 million

15  shares. This loss, which was caused by the August 14 partial corrective

16  disclosure, was dramatically larger, to a statistically significant extent, than any

17  losses Class members would have sustained as a result of ordinary market forces.

18      987. **Corrective Disclosure on August 15, 2007.** On August 15, 2007,

19  Merrill Lynch surprised the markets by following up on its August 13, 2007

20  analyst report expressing liquidity concerns about Countrywide with a further

21  research report that downgraded Countrywide from "buy" to "sell" based on even

22  more serious perceived liquidity problems. An August 17, 2007 *Wall Street*

23  *Journal* article summarized the impact of the August 15 Merrill Lynch analyst

24  report on Countrywide's stock:

25      When Merrill Lynch & Co. analyst Kenneth Bruce put a surprise

26      "sell" rating on Countrywide Financial Corp. this week, the stock fell

27      13%. Many on Wall Street clearly felt he knew what he was talking

28      about: He used to work at the troubled mortgage lender.

1

2      Mr. Bruce, 40, follows mortgage companies in Merrill's San

3      Francisco office. But for 13 years before his arrival on Wall Street, he

4      worked in the mortgage business in different capacities. One of them

5      was a two-year stint working for Countrywide's home-loans division

6      in Pasadena, California. His boss there was David Sambol, who is

7      now the firm's president and heir apparent to its embattled chief

8      executive, Angelo Mozilo.

9

10     Mr. Bruce's Wednesday report, entitled "Liquidity is the Achilles

11     Heel" came just two days after he had reiterated his longstanding

12     "buy" rating on the company. Pointing out that "funding markets are

13     deteriorating quickly," he suggested that Countrywide may even face

14     bankruptcy. "Our view has changed, materially," he wrote on the first

15     page of the report.

16     ·988.   The August 15, 2007 Merrill Lynch analyst report further partially

17  corrected Defendants' false statements that Countrywide was financially sound;

18  that Countrywide was well-positioned to weather the downturn in the housing

19  market; that Countrywide was poised to grow during the downturn and to capture

20  marketshare from weaker competitors; and that Countrywide had secure access to

21  ample sources of liquidity.

22     989.   As a consequence of those partial corrective disclosures,

23  Countrywide common stock fell by approximately 13% that day, from $24.46 to

24  $21.29, on volume of 118,552,500 shares, as compared to volume of 35,846,800

25  shares the prior trading day. This loss, which was caused by the August 15 partial

26  corrective disclosure, was dramatically larger, to a statistically significant extent,

27  than any losses Class members would have sustained as a result of ordinary

28  market forces.

990. **Corrective Disclosures on August 16, 2007.**   Two significant events that occurred on Thursday, August 16, 2007, served as partial corrective disclosures.

991.  First, Countrywide announced that it drew its *entire $11.5 billion* credit facility to "supplement" its cash position.   The credit facility that Countrywide drew on, in its entirety, was perceived by the market to be in the nature of a emergency fund to be used only as a last resort, or a close to last resort, source of liquidity.  Second, and as a result, all three major credit rating agencies – Standard & Poor's, Moody's Investors Service, and Fitch Ratings – issued downgrades with regard to Countrywide securities.  Moody's sharply downgraded Countrywide and CHL's senior debt rating to Baa3 from A3, just one notch above junk grade.  Fitch sharply downgraded Countrywide's long-term issuer default rating two notches to BBB+ from A, just two notches above junk grade, and also downgraded Countrywide's CCIV and CCV preferred securities to BBB- from A-.  S&P downgraded Countrywide to A- from A.

992.  Countrywide's decision to access its $11.5 billion credit facility  and the rating agency downgrades both constituted partial corrective disclosures to the investing public concerning a series of prior false and misleading statements by defendants,  including with respect to:  the  soundness  and  stability  of Countrywide's business and finances;  Countrywide's ability to weather the downturn in the housing market; Countrywide's ability to thrive and gain market share  from  weaker  competitors  during  the  housing  market  downturn; Countrywide's access to liquidity; and the poor inherent quality of the loan portfolio that formed the core of Countrywide's business.

993.  Countrywide's stock declined by approximately 11% on August 16, 2007, from $21.29 to $18.95, on extraordinary volume of 201,476,900 shares. This loss, which was caused by the August 16 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class

1  members would have sustained as a result of ordinary market forces.
2  Countrywide's other securities also experienced material and statistically
3  significant drops in their trading prices as a result of the August 16, 2007 partial
4  disclosures, including the trading price of the 6.25% Subordinated Notes due May
5  15, 2016, which fell by 10.53%; the trading price of the 3-Year Floating Rate
6  Notes Due 2008, which fell by 17.6%; the trading price of the 6% Notes due
7  November 2035, which fell by 13.01%; and the trading price of the 2-Year
8  Floating Rate Notes Due December 2007, which fell by 7.18%.

9      994.  **Positive News and Misrepresentations on August 23, 2007.**  On
10  August 23, 2007, before the stock market opened, the media reported that Bank of
11  America had announced a $2 billion investment in Countrywide.  In return for its
12  investment, Bank of America received a non-voting convertible Countrywide
13  preferred security yielding 7.25% annually and convertible to common stock at
14  $18 per share.  On January 11, 2008, as further discussed below, Bank of
15  America announced that it was acquiring Countrywide for a total of $4 billion.
16  Largely in response to the $2 billion Bank of America preferred security purchase
17  announced that day, as well as the misrepresentations by Defendant Mozilo
18  alleged below concerning the transaction and other material matters,
19  Countrywide's stock price rose approximately 1% on August 23, 2007.

20      995.  In an August 23, 2007 article in *The Wall Street Journal*, Defendant
21  Mozilo was quoted saying that "Countrywide would have survived without help
22  from Bank of America . . . ."

23      996.  The same day, August 23, 2007, Mozilo was again interviewed on
24  CNBC by Maria Bartiromo. During the interview, Mozilo falsely assured the
25  market place that the Company was not at risk of suffering a bankruptcy:

26      Well, first of all let me comment [on a] couple things.  One is the, just
27      the irresponsible behavior on part of that analyst from Merrill Lynch
28      to, yell fire in a very crowded theater in [an] environment where you

had panic already setting in the overall markets unrelated to Countrywide. Was *totally irresponsible and baseless. . . .* Has no basis whatsoever.

* * *

*. . . I can tell you there is no more chance for bankruptcy today for Countrywide than it was six months ago,* two years ago, when the stock was $45 a share. [We] are a very solid company.

997.   Moreover, Mozilo stated during the CNBC interview that his stock sales were out of his hands and in line with investors' interests:

The upcoming sales are driven by rules within the 10b5-1 plan that were established long ago, and should in no way be viewed as any indication of my future outlook for Countrywide. . . .   As one of Countrywide's largest individual shareholders, *my interests are firmly aligned with those of our other investors.*

998.   Also on August 23, 2007, Mozilo was interviewed by Neil Cavuto of Fox News.   Mozilo responded to a question regarding Countrywide's lending practices:

We're lending the money.   It would be foolhardy for us to lend money to someone, A, by duping them, and, secondly, to think that we wouldn't be paid back. *We never make a loan where we think that we're creating a situation where we couldn't be paid back. We try to underwrite these loans prudently.*

999.   Defendant Mozilo's statements referenced above were materially false and misleading when made.   Specifically, Mozilo's reassuring statements that "Countrywide would have survived without help from Bank of America" and that the Company had "no more chance for bankruptcy today . . . than it was six months ago" were false and misleading for the reasons set forth in Section IV.H above.   Additionally, Mozilo's statement that his "interest[s] are firmly aligned

1   with those of our other investors" was false and misleading for the reasons set
2   forth above in Section V.D.5.

3       1000. Analysts still maintained their faith in the Company in reliance on
4   management's false and misleading statements.  For example, on August 23,
5   2007, analysts at Piper Jaffray rated Countrywide's shares "Outperform."  Several
6   other analysts also raised or maintained their stellar recommendations and
7   earnings estimates for Countrywide as a result of Countrywide's fraudulent
8   misrepresentations:

9       • On August 23, 2007, Citigroup rated Countrywide's stock a
10          "Buy."  Analysts stated that the Bank of America $2 billion
11          infusion "should enable CFC to continue to play a leadership
12          role during the U.S. mortgage market's return of normalcy."

13      • On August 23, 2007, Credit Suisse rated Countrywide's
14          shares "Outperform."

15      1001. **Corrective Disclosure on August 24, 2007.**  On August 24, 2007,
16   Fitch Ratings downgraded Countrywide Home Loans, Inc.'s servicer ratings with
17   respect to a series of loan categories and placed the ratings on "Rating Watch
18   Evolving" status – a signal that the ratings could be cut again.  In its press release
19   announcing the downgrades, Fitch noted "the continued pressure on CHL's
20   liquidity position and financial flexibility" as well as "delinquency" challenges.

21      1002. Fitch's downgrade constituted an additional partial corrective
22   disclosure concerning prior false and misleading statements by defendants with
23   respect to Countrywide's access to liquidity, Countrywide's lax loan origination
24   and underwriting standards, the soundness and stability of Countrywide's
25   business and finances, Countrywide's ability to weather the downturn in the
26   housing market, and Countrywide's ability to thrive and gain marketshare from
27   weaker competitors during the housing market downturn.

28

1003. Countrywide's stock declined by approximately 4.6% on August 24, 2007, from $22.02 to $21.00, on high volume of 66,189,400 shares. This loss, which was caused by the August 24 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1004. **Corrective Disclosure on August 27, 2007.**  On August 27, 2007, Lehman Brothers issued a report that lowered earnings projections for Countrywide based in large part on the analysts' assessment that Countrywide would have to mark down to market (i.e. mark down to their actual, and now reduced, market value) the value of "non-conforming" loans that Countrywide reflected on its balance sheet.  The Lehman Brothers report was an additional indication to the investing public that Countrywide's financial statements and related SEC filings included false and misleading information, including with respect to the inflated asset values for loans incorporated into Countrywide's balance sheet that should have been significantly marked down to their true worth in the marketplace pursuant to GAAP.  The Lehman Brothers report was a further partial disclosure that Countrywide's claims that it was a well-managed lender that had adhered to conservative underwriting and loan origination standards were false.

1005. Countrywide's stock price fell on August 27, 2007 by 4.8%, from $21.00 to $20.00, on high volume of 46,671,300 shares.  This loss, which was caused by the August 27 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1006. **Corrective Disclosure on September 10, 2007.**  After the market closed on Friday, September 7, 2007, Countrywide announced a plan to lay off between "10,000 to 12,000 [employees] over the next three months representing up to 20 percent of its current workforce."  This announcement of massive layoffs

constituted a further partial correction of multiple prior false statements by Countrywide officials, including statements that Countrywide was well positioned to weather the credit crisis, that its financial condition was sound, and that Countrywide would strengthen its position within the lending industry during the crisis by capturing market share from weaker competitors.

1007. The market reacted to Countrywide's announcement on Monday, September 10, 2007 – the next business day.  Countrywide's stock fell 5.5% on September 10, from $18.21 to $17.21, on high volume.  This loss, which was caused by the September 7 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1008. **Corrective Disclosure on October 24, 2007.**  Before the markets opened on Wednesday, October 24, 2007, *The Wall Street Journal* published a major article that constituted a further partial revelation to the investing public of the truth regarding Countrywide's loan origination and underwriting practices.

1009. The October 24 *Journal* story revealed a series of important pieces of information to the investing public, much of which related to Countrywide's Pay Option ARMs.

1010. The *Journal*'s October 24 story began by explaining that:

> Subprime mortgages aren't the only challenge facing Countrywide Financial Corp., the nation's biggest home-mortgage lender.  Some loans classified as prime when they were originated are now going bad at a rapid pace.

The *Journal* further revealed:

> An analysis prepared for *The Wall Street Journal* by UBS AG shows that 3.55% of option ARMs originated by Countrywide in 2006 and packaged into securities sold to investors are at least 60 days past due.  That compares with an average option-ARM delinquency rate of

2.56% for the industry as a whole and is the highest of six companies analyzed by UBS.

1011. The *Journal* also noted that:

"Among option ARMs held in its own portfolio, 5.7% were at least 30 days past due as of June 30, the measure Countrywide uses. That's up from 1.6% a year earlier. Countrywide held $27.8 billion of option ARMs as of June 30, accounting for about 41% of the loans held as investments by its savings bank. An additional $122 billion have been packaged into securities sold to investors, according to UBS.

1012. The *Journal* declared that "the deteriorating performance of option ARMs is evidence that lax underwriting that led to problems in subprime loans is showing up in the prime market, where defaults typically are minimal." In addition, the *Journal* quoted UBS analyst Shumin Li, who stated that "at Countrywide 'they were giving these loans to riskier and riskier borrowers.'"

1013. This article partially corrected prior material false and misleading statements, including Countrywide's and Mozilo's repeated representations that Countrywide maintained conservative loan origination and underwriting standards, that Countrywide was well-positioned to endure the housing industry downturn, and that Countrywide would thrive during the downturn by capturing marketshare from weaker competitors.

1014. On October 24, Countrywide's stock price fell by 8.1%, from $15.05 to $13.83 on volume of 66,182,900 shares, as compared to 29,945,200 shares the prior trading day. This loss, which was caused by the October 24 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces. Countrywide's other securities also experienced material and statistically significant drops in their trading prices as a result of the October 24, 2007 partial disclosures, including the trading price of the CCV 7% Capital

1   Securities (preferred stock), which fell by 9.05%; the trading price of the
2   Countrywide Capital IV 6.75% Capital Securities (preferred stock), which fell by
3   10.82%; the trading price of the 6% Notes due April 2035, which fell by 9.53%;
4   and the trading price of the 6.3% Notes due April 2036, which fell by 9.44%.

5   1015. **Corrective Disclosure and Continued Misrepresentations on**
6   **October 26, 2007.**   On October 26, 2007, before the stock market opened,
7   Countrywide issued a press release and filed a Form 8-K reporting its financial
8   results for the third quarter of 2007, including an enormous quarterly loss of $1.2
9   billion, or $2.85 per share, *the Company's first quarterly loss in 25 years.*
10  Among other disclosures related to the third quarter were a $1 billion write-down
11  of the Company's loans and mortgage-backed securities; an increase in loan loss
12  provisions to $934 million, compared to $293 million in the prior quarter and $38
13  million in the third quarter of 2006; and an increase in the provisions for
14  representations and warranties to $291 million, compared to $79 million in the
15  prior quarter and $41 million in the third quarter of 2006.

16  1016. Countrywide and various individual defendants – led by Defendant
17  Mozilo – managed, however, to temporarily swamp the poor performance that
18  Countrywide reported on October 26 with a series of false statements, in both the
19  press release and during an earnings conference call that day, that reassured the
20  investing public and sent Countrywide's stock price up that day by an
21  extraordinary 32.4% to close at $17.30.

22  1017. These statements included the following:

23  (a)   Defendant Mozilo's statement in the   press release that
24  "during the period [the third quarter] we . . . laid the foundation for a return
25  to profitability in the fourth quarter," and in the earnings call that "we
26  expect to return to profitability in the fourth quarter and we anticipate that
27  2008 will also be profitable;" Similarly, the press release quoted Defendant

28

1    Sambol as saying that "[w]e . . . anticipate that the Company will be

2    profitable in the fourth quarter and in 2008";

3         (b)    Defendant Mozilo's denial in the earnings call that he had

4    engaged in insider trading.  Mozilo declared that "I would like to state

5    *categorically* that at *no* time did I make *any* trading decisions based on any

6    material non-public information and I fully complied with all . . .

7    applicable securities laws in connection with my trading plans";

8         (c)    Defendant Sambol's statement in the earnings call that "we

9    see long-term prospects for . . . Countrywide to remain very attractive.  The

10   company has sufficient capital, liquidity and financing capacity for its

11   operating needs and its growth needs.   And coming through this

12   environment, CFC continues to possess all of its key historical competitive

13   advantages . . . "; Mozilo's similar statement in the press release that "[t]he

14   Company has sufficient capital, liquidity and financing capacity for its

15   operating needs and its growth needs"; and Sieracki's similar statement

16   during the earnings call that "[w]e now have ample and growing funding

17   liquidity. . . .   The mortgage company has adequate liquidity to fund all

18   debt maturities through 2008, without raising any new debt. . . .   So you

19   can see the liquidity situation is very strong at Countrywide at September

20   30, 2007"; and

21        (d)    The statements by Sambol on the earnings call that seconded

22   the views of an analyst who touted the Company's loan loss reserve

23   methodology, claiming that it is better than its peers:

24              But one other aspect of our reserves that is worth

25              mentioning is we have a reserve methodology, at least we

26              have had to date . . . that we think is somewhat conservative

27              relative to what most of our peers do.  And what we do it is

28              where maybe some of our peers book in their reserve what

they believe to be one year's worth of forward charge-offs, maybe five quarters in the case I think as we have looked at the landscape, the most conservative guide, we have a reserve methodology that books more than five quarters of expected losses. And it is because what we do is we book kind of a reserve for the lifetime losses on loans that are delinquent today, 90+ delinquent, as well as the lifetime expected losses on loans that will go delinquent within the next 12 months.

1018. Defendants Mozilo's and Sambol's statements referenced above were materially false and misleading when made. Specifically, the reassuring statements made by Mozilo and Sambol that, for example, "we expect to return to profitability in the fourth quarter" and "[t]he Company has sufficient capital, liquidity and financing capacity," and the similar statements by Mozilo, Sambol and Sieracki that "[t]he Company's liquidity is stable and improving" and "[w]e now have ample and growing funding liquidity" were false and misleading for the reasons set forth in Section IV.H above. Also, Mozilo's denial of insider trading was false for the reasons detailed in Section V.D above. Further, Sambol's statements that Countrywide "ha[s] a reserve methodology that books more than five quarters of expected losses" and "is somewhat conservative relative to what most of our peers do" were false and misleading. See Section IV.G.3 above.

1019. Several analysts either raised or maintained their stellar recommendations for Countrywide in reliance on Defendants' fraudulent misrepresentations:

- On October 26, 2007, Morgan Stanley analysts rated Countrywide's stock as "Equal-weight" and stated that "[w]e feel substantially more confident in the company's liquidity."

- On October 29, 2007, Credit Suisse analysts rated Countrywide's stock as "Outperform" and stated that "we do believe that its credit and reserve position is solid and will likely prove conservative relative to many market participants."

- On October 29, 2007, Fox-Pitt Kelton analysts rated Countrywide's stock "Outperform" and stated "we are optimistic that Q3 represents a trough for the company."

1020. **Corrective Disclosure on October 30, 2007.**  Before the markets opened on Tuesday, October 30, *The Wall Street Journal* published a further article that partially corrected prior material false and misleading statements by defendants.

1021. Most notably, the *Journal* reported that "some analysts warn that [Countrywide] . . . hasn't gone far enough in marking down the value of mortgage securities it holds."  The *Journal* noted that in addition to "question[ing] whether Countrywide has gone far enough in marking down assets," two specific analysts that it cited – Frederick Cannon of Keefe, Bruyette & Woods, and Paul J. Miller Jr. of Friedman, Billings, Ramsey & Co. – also questioned whether Countrywide had adequately "provid[ed] for future loan losses."  The *Journal* article represented a further partial corrective disclosure with regard to the veracity of Countrywide's accounting, in particular with respect to the value of the assets that Countrywide reported based on mortgages that it held, and with respect to Countrywide's loan loss reserves.

1022. The *Journal* also asserted that Countrywide "may have trouble delivering on" what the *Journal* termed its "profit vow" the prior Friday, October 26 – that it would return to profitability in the fourth quarter of 2007 and through 2008 – thereby partially correcting Countrywide's and Mozilo's false October 26 profit representations.

1023. The *Journal*'s October 30 article also partially corrected prior false statements by Countrywide about its access to liquidity, its institutional stability, and its ability to thrive during the housing downturn.  The *Journal* noted in that regard that "lenders like Countrywide can no longer fund themselves with short-term borrowings in the capital markets, such as by issuing commercial paper."  Quoting analyst Cannon, the *Journal* further noted, among other matters, that "Countrywide has yet to show that it can 'earn above its cost of capital,'" and that it appeared that Countrywide "can raise funds 'only at very high prices.'"

1024. Countrywide's stock declined on October 30 by approximately 5.3%, from $16.83 to $15.94, on high volume.  This loss, which was caused by the October 30 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1025. **Corrective Disclosure on November 7, 2007.**  On November 7, 2007, Gradient Analytics, Inc. ("Gradient"), an independent equity research firm, issued a 27-page report detailing six techniques "for misstating the earnings and net assets at firms that are heavily invested in mortgages and related securities."  The Gradient report analyzed five major U.S. mortgage businesses, including Countrywide.  The report concluded, *inter alia*, that Countrywide "appears to be at risk from virtually all of the mortgage accounting games highlighted in this report."  The Gradient report then elaborated at some length about dubious features of Countrywide's financial reporting.

1026. For example, Gradient indicated that:

- "[W]e expect to see more losses reported down the road" from write-downs of "CFC's retained interests."
- "Gradient believes that the company's MSRs [mortgage servicing rights] may be materially overstated."

- "CFC's loans held for investment – and particularly its Option ARMs – may be subject to a high risk of misstatement at the present time."

- "[W]e would expect negative amortization to be a significant problem."

- "[T]here may be a substantially larger impairment that has been avoided by [Countrywide] changing the classification of . . . loans to the held for investment category."

1027. Countrywide's stock declined on November 7, 2007 by approximately 9.3%, from $15.02 to $13.63, on high volume. This loss, which was caused by the November 7 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.   Countrywide's other securities also experienced material and statistically significant drops in their trading prices as a result of the November 7, 2007 partial disclosures, including the trading price of the 7% Capital preferred stock, which fell by 4.02%; and the trading price of the 6.75% Capital IV preferred stock, which fell by 5.41%.

1028. **Misrepresentations on November 9, 2007.**  On November 9, 2007, Countrywide filed its Form 10-Q report for the third quarter of 2007, ended September 30, 2007.  In the Form 10-Q, which Defendants Sambol and Sieracki signed, Countrywide once again stated that during the industry downturn, "[w]e also believe that many opportunities will present themselves to the Company as a result of the market transition taking place, and that Countrywide is well positioned to capitalize on these opportunities."

1029. In a section titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the retained interests on its balance sheet as of September 30, 2007 was $2,463,528,000.  The impairment taken on the fair value of its retained interests equaled $716,658,000.

1030. In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

1031. In a section titled "Credit Risk Management," the Company also stated the liabilities associated with the risk of representation and warranties as "totaling $639,647,000."

1032. In a section titled "Securitizations," the Company reported that the fair value of MSRs as of September 30, 2007 was $20,068,153,000.

1033. Also, in the section entitled "Controls and Procedures," Countrywide described the adequacy of its internal controls:

> There has been no change in our internal control over financial reporting, other than discussed above, during the quarter ended September 30, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

1034. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a SOX certification signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

1035. The statements referenced above in the third quarter 2007 Form 10-Q were materially false and misleading when made. Countrywide's statement that it "is well positioned to capitalize on . . . opportunities" was false and misleading for the same reasons set forth in Section IV.H above. The Company's

1  statement in the Form 10-Q relating to the value of its retained interests, MSRs
2  and statements relating to its representations and warranties were false and
3  misleading for the reasons stated in Section IV.G above.  The statements relating
4  to internal controls were false and misleading for the same reasons set forth in
5  Section IV.G.5.   The SOX certifications signed by Defendants Mozilo and
6  Sieracki were false and misleading for the same reasons stated in Section IV.G
7  above.

8      1036. **Corrective Disclosure on November 26, 2007.**  On November 26,
9  2007, before the securities markets opened, *The Wall Street Journal* published an
10 article that detailed Countrywide's heavy dependence on the Federal Home Loan
11 Bank of Atlanta ("FHLB") as a source of liquidity that had, since mid-August
12 2007, been important to allowing Countrywide to remain in business.  The article
13 also reported that Countrywide's ability to use the FHLB as a source of liquidity
14 was near an end.

15     1037. Specifically, the *Journal* reported that:

16     "When Countrywide Financial Corp. Chief Executive Angelo Mozilo
17     needs cash to fund home loans these days, he doesn't look to
18     investment banks in New York or London.

19

20     He relies mainly on the quasigovernmental Federal Home Loan Bank
21     in Atlanta.

22                                    * * *

23     The Atlanta home loan bank has helped to keep Countrywide in
24     business since mid-August, when investors' fears over default risk
25     shut off mortgage lenders' ability to raise money through commercial
26     paper or other short-term borrowings. Countrywide has replaced that
27     funding mainly by tapping the Atlanta bank, where its borrowings

28

1   totaled $51.1 billion as of Sept. 30, up 77% from three months

2   earlier."

3   1038. The *Journal* also reported that "the home loan bank . . . limit[s] any

4   member's total advances to 50% of that member's assets."   The *Journal*

5   explained that "Countrywide's savings bank had assets of $106 billion at the end

6   of October, which suggests that its advances are near that ceiling."

7   1039. The FHLB's limitation of member banks to borrowing 50% of their

8   assets necessarily implied that Countrywide was very close to its borrowing

9   ceiling because, as noted, Countrywide's bank "had assets of $106 billion." Fifty

10   percent of $106 billion equals $53 billion.  Because, as the *Journal* reported,

11   Countrywide had already borrowed $51.1 billion from the FHLB, by implication

12   it could borrow only about $1.9 billion more without violating the FHLB's 50%

13   of assets borrowing limitation ($53 billion - $51.1 billion = $1.9 billion).  $1.9

14   billion represents only a small fraction of the total liquidity Countrywide had to

15   have access to each month to remain in business.

16   1040. The *Journal*'s article about Countrywide's dependence on the FHLB

17   as a source of liquidity and of the likely exhaustion of Countrywide's ability to

18   turn to the FHLB was a partial correction of a number of prior false and

19   misleading statements by Defendants.   In particular, it corrected recent false

20   statements about Countrywide's institutional stability, its ability to weather the

21   downturn in the housing market, its ability to gain market share from competitors,

22   and its access to liquidity.

23   1041. Following the publication of the *Journal*'s November 26 article,

24   Countrywide's stock declined by approximately 10.5%, from $9.65 to $8.64, on a

25   volume of 54,940,000 shares, as compared to a volume of 21,627,700 shares on

26   the prior trading day.  This loss, which was caused by the November 26 partial

27   corrective disclosure, was dramatically larger, to a statistically significant extent,

28

than any losses Class members would have sustained as a result of ordinary market forces.

1042. **Corrective Disclosures on December 13, 2007.** On December 13, 2007, there were three partial corrective disclosures.

1043. First, before the market opened, Countrywide issued a press release and filed a Form 8-K releasing its November 2007 operational data. In this monthly operating report, Countrywide disclosed a further deterioration in its delinquency and foreclosure rates. Among other matters, for example, Countrywide disclosed that, as of November 30, 2007, its rate of delinquency as a percentage of loans serviced had increased to 6.34%.

1044. Countrywide's December 13 disclosure of continued high rates of delinquencies and foreclosures was a further partial corrective disclosure with regard to Countrywide's false and misleading representations about the quality of its loan origination and underwriting standards. In addition, the report served as a partial corrective disclosure with respect to aspects of Countrywide's financial reporting, including Countrywide's loan loss reserves and its reported assets. The report was also a partial corrective disclosure with regard to Countrywide's false and misleading statements that its business was sound, that Countrywide was well-positioned to withstand the downturn in the housing market, and that Countrywide was poised to capture marketshare from competitors whose condition was weaker.

1045. In addition, a second significant partial corrective disclosure on December 13 was a *New York Times* article that reported that "[t]he Illinois attorney general is investigating the home loan unit of Countrywide Financial as part of the state's expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford." The *Times* further noted that "Lisa Madigan, the attorney general, has subpoenaed documents from Countrywide relating to its loan origination practices." In

addition, among other matters, the *Times* quoted Illinois Attorney General Madigan as saying about "a Chicago mortgage broker" for which Countrywide was the "primary lender" that "[t]his company's conduct is a prime example of unscrupulous mortgage brokers that has led to a foreclosure crisis for many Illinois homeowners."

1046. The *Times* article represented a further disclosure that partially corrected defendants' prior material false and misleading statements regarding, among other matters, Countrywide's loan origination and underwriting practices; the accuracy and integrity of its accounting including, in particular, the adequacy of its loan loss reserves and the valuation of loans that it reflected as assets on its balance sheet; its business ethics; its institutional strength and stability; its ability to thrive during the housing downturn; and its ability to sustain itself as a viable independent business.

1047. A third partial corrective disclosure on December 13, 2007 was an announcement by Fitch Investment Research that it was downgrading 110 classes of residential mortgage backed securities from 28 Countrywide transactions. Fitch's downgrade constituted a further partial corrective disclosure with respect to the quality of Countrywide's loan origination and underwriting standards.

1048. Countrywide's stock declined on December 13, 2007 by approximately 4.3%, from $10.53 to $10.08 on high volume. This loss, which was caused by the December 13 partial corrective disclosures, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1049. **Corrective Disclosure and Continued Misrepresentations on January 8, 2008.** On January 8, 2008, before the markets opened, *The New York Times* published an article that reported that "Countrywide Financial Corporation fabricated documents related to the bankruptcy case of a Pennsylvania homeowner, court records show, raising new questions about the business

1    practices of the giant mortgage lender at the center of the subprime mess." The

2    *Times* noted that the fabricated documents, which it described as "three letters

3    from Countrywide addressed to . . . [a] homeowner," were written in connection

4    with "one of 300 bankruptcy cases in which Countrywide's practices have come

5    under scrutiny in western Pennsylvania." The *Times* quoted U.S. Bankruptcy

6    Judge Thomas P. Agresti, who presides over the case in connection with which

7    the letters were written, as saying that "[t]hese letters are a smoking gun that

8    something is not right in Denmark."

9    1050. The January 8, 2008 *Times* article served as a partial corrective

10    disclosure with respect to a series of false representations by Countrywide. Those

11    representations included statements about Countrywide's business ethics, and

12    about the competence and accuracy of both Countrywide's management and its

13    information and financial reporting systems.

14    1051. In response, Countrywide stock plummeted by approximately 28.4%

15    that day, from $7.64 to $5.47, on extraordinary volume of 178,828,900 shares

16    compared to 38,088,800 shares the prior trading day.   This loss, which was

17    caused by the January 8 partial corrective disclosure, was dramatically larger, to a

18    statistically significant extent, than any losses Class members would have

19    sustained as a result of ordinary market forces.  Countrywide's other securities

20    also experienced material and statistically significant drops in their trading prices

21    as a result of the January 8, 2008 partial disclosures, including the trading price of

22    the 7% Capital V preferred stock, which fell by 22.61%; the trading price of the

23    6.75% Capital IV preferred stock, which fell by 21.96%; the trading price of the

24    6.25% Subordinated Notes due May 15, 2016, which fell by 13.74%; the trading

25    price of the 6% Notes due November 2035, which fell by 7.04%; and the trading

26    price of the 6.3% Notes due April 2036, which fell by 6.99%.

27    1052. Nonetheless,    these    losses    were    tempered    by    additional

28    misrepresentations by Defendants made on the same day. On January 8, 2008,

1   Reuters reported in an article titled "Countrywide Rejects Bankruptcy Rumor"
2   that Countrywide had stated that "[t]here is no substance to the rumor that
3   Countrywide is planning to file for bankruptcy, and we are not aware of any basis
4   for the rumor that any of the major rating agencies are contemplating negative
5   action relative to the company."

6       1053.  The Company's statement alleged in the prior paragraph was false
7   and misleading for the same reasons set forth in Section IV.H above.

8       1054.  **Corrective Disclosure on January 9, 2008.**  On January 9, 2008,
9   before the market opened, Countrywide issued a press release and filed a Form
10  8-K releasing its operational data for December 2007.  In this monthly operating
11  report, Countrywide disclosed that by December 31, 2007, its rate of pending
12  foreclosures as a percentage of unpaid principal balance had more than doubled to
13  1.44%, compared to 0.70% as of December 31, 2006.  Similarly, Countrywide
14  also disclosed that by December 31, 2007, its rate of delinquency as a percentage
15  of unpaid principal balance had increased by more than 50% to 7.20%, compared
16  to 4.6% as of December 31, 2006.

17      1055.  As a Reuters article published after the markets closed on January 9
18  explained, the rates of foreclosures and delinquencies that Countrywide disclosed
19  in its December monthly operating report were "the highest on record, sending its
20  shares tumbling . . . to their lowest in nearly 13 years."  As Reuters noted,
21  "[a]nalysts attributed Wednesday's drop to deteriorating credit quality reflected in
22  Countrywide's monthly operating report, and renewed concern the lender might
23  not survive the housing crunch and could seek bankruptcy protection."  Reuters
24  quoted Lehman Brothers analyst Bruce Harting's statement that "[t]he extent of
25  the deterioration is a surprise and does not bode well for the fourth-quarter results
26  of companies with mortgage credit exposure that may have to further add to
27  reserves."

28

1056. Countrywide's January 9 revelation of its unexpectedly high rates of foreclosures and delinquencies was a partial corrective disclosure with respect to a number of defendants' prior false and misleading statements. In particular, it was a further partial corrective disclosure with regard to Countrywide's representations about the quality of its loan origination and underwriting standards. In addition, it served as a partial corrective disclosure with respect to the accuracy of Countrywide's financial reporting, including its loan loss reserves and its reported assets. It was also understood by the market to be a partial corrective disclosure with regard to Countrywide's false statements on October 26, 2007 about the likelihood that Countrywide would return to profitability in the fourth quarter of 2007 and in 2008.

1057. Countrywide's stock closed down on January 9, 2008 by approximately 6.4%, from $5.47 to $5.12, on heavy volume of 164,027,600 shares. This loss, which was caused by the January 9 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces. Countrywide's other securities also experienced material and statistically significant drops in their trading prices as a result of the January 9, 2008 partial disclosures, including the trading price of the 7% Capital V preferred stock, which fell by 3.9%; the trading price of the 6.75% Capital IV preferred stock, which fell by 6.6%; the trading price of the 6.25% Subordinated Notes Due May 15, 2016, which fell by 9.17%; the trading price of the 3-Year Floating Rate Notes Due 2008, which fell by 4.36%; and the trading price of the 6% Notes due November 2035, which also fell by 4.36%.

1058. **Announcement of Merger Agreement on January 11, 2008.** Before the securities markets opened on Friday, January 11, 2008, "Bank of America Corporation . . . announced a definitive agreement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4

1  billion." Specifically, Bank of America agreed to offer 0.1822 shares of its stock
2  to Countrywide shareholders for every Countrywide share they held.

3      1059. The previous day, Thursday, January 10, Countrywide stock had
4  soared in value by approximately 51.4% to close at $7.75 after *The Wall Street*
5  *Journal* first reported at 2:15 p.m. that Bank of America was "in advanced talks
6  to acquire . . . Countrywide."

7      1060. After Bank of America disclosed the terms of the purchase on
8  Friday, January 11, however, Countrywide's stock price slumped back down to
9  close at $6.33, giving up the majority of its gain the day before.

10     1061. The approximately $4 billion that Bank of America announced on
11 January 11 that it was paying for Countrywide represented only about 27% of
12 Countrywide's most recently reported book value of approximately $15.3 billion,
13 which was reported as of September 30, 2007.

14     1062. Bank of America's decision to purchase Countrywide for only
15 approximately 26% of Countrywide's book value following the completion of
16 comprehensive due diligence represented a partial corrective disclosure with
17 respect to a series of false and misleading statements that had been made by
18 Defendants.

19     1063. Among other matters, the low purchase price of Countrywide
20 relative to book value represented a disclosure that Countrywide's financial
21 statements continued to falsely overvalue Countrywide's assets (including, in
22 particular, residual securities, loans held for investment, and loans held for sale),
23 and continued to understate Countrywide's loan loss reserves.

24     1064. A January 11, 2008 report by Wachovia Capital Markets
25 commented:

26     The purchase price of roughly $4B is well below the most recently
27     reported equity capital base of $15B. We believe that BAC [Bank of
28     America Corporation] will use the difference (negative goodwill) to

write down a large percentage of CFC's assets. Candidates include residual securities, the $84B held for investment portfolio (mostly option ARMs and high LTV prime home equity loans) and the $31B held for sale portfolio, which includes a large portfolio of subprime loans.

1065. Countrywide's stock price declined on January 11, 2008 by approximately 18.3%, from $7.75 to $6.33, on heavy volume of 234,155,300 shares.   This loss, which was caused by the January 11 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1066. **Misrepresentation on January 29, 2008.**   *Bloomberg* reported on January 29, 2008, in an article titled "Countrywide KB Home Loans Accused of Fraud by Whistleblower," that Mark Zachary, a former regional vice president of a Countrywide Financial Corp. and KB Homes joint venture, claimed he had been fired for rejecting unqualified borrowers and reporting illegal and unethical lending practices to management. Countrywide said in an e-mailed statement that it "has policies and procedures in place that aim to prevent the type of activities Mr. Zachary is alleging."   Countrywide's statement was false and misleading for the reasons set forth in Section IV.C.3.

1067. **Corrective Disclosure on February 5, 2008.**   On Monday, February 4, 2008, very shortly before the stock market closed, Standard & Poor's Ratings Services placed certain "residential loan, subprime, subordinate-lien, and special servicer rankings" relating to Countrywide Home Loans "on creditwatch with negative implications."

1068. Standard & Poor's explained that "[t]he creditwatch placements reflect increased scrutiny of Countrywide's servicing practices by various federal and state enforcement agencies, including the office of the U.S. Trustee and the office of the Florida Attorney General."

1069. Standard & Poor's February 4, 2008 placement of Countrywide Home Loans on creditwatch with negative implications served as a partial corrective disclosure with respect to a series of false representations by Countrywide. Those representations included statements about Countrywide's business ethics, and about the competence and accuracy of Countrywide's management, and information and financial reporting systems.

1070. As noted above, Standard & Poor's creditwatch action was reported by the media very shortly prior to the close of the stock market on Monday, February 4. The following day, Countrywide's stock declined by approximately 8.6%, from $7.22 to $6.60, on high volume. This loss, which was caused by the February 4 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces.

1071. **Corrective Disclosure on March 6, 2008.** On March 6, 2008, the *Chicago Sun-Times* reported that "Illinois Attorney General Lisa Madigan issued subpoenas to Countrywide Home Loans Inc. and Wells Fargo Financial Illinois to determine if they unfairly steered African American and Latino borrowers into higher cost or otherwise inappropriate home loans in violation of fair lending and civil rights laws." The Illinois Attorney General was quoted as saying that "[t]he difference in cost between the home loans sold to white borrowers and those sold to African-American and Latino borrowers is alarming." In addition, her office said in a statement that "[i]ncome level does not appear to account for the difference in pricing." Reportedly, "[t]he wealthiest African-American homeowners were still more likely than the poorest white borrowers to get placed in high-cost loans."

1072. Media coverage of the Illinois Attorney General's investigation served as a partial corrective disclosure with regard to a series of defendants' false and misleading statements, including statements denying that Countrywide

1   engaged in predatory lending; statements affirming that Countrywide maintained
2   appropriate loan origination and underwriting standards; and statements regarding
3   Countrywide's ethical standards and the quality of its management.

4       1073. Countrywide's stock price declined on March 6, 2008 by
5   approximately 8.8%, from $5.70 to $5.20, on volume exceeding 32 million
6   shares. This loss, which was caused by the March 6 partial corrective disclosure,
7   was dramatically larger, to a statistically significant extent, than any losses Class
8   members would have sustained as a result of ordinary market forces.

9       1074. **Corrective Disclosure on March 8, 2008.** On Saturday, March 8,
10  2008, *The Wall Street Journal* reported that "[t]he Federal Bureau of
11  Investigation is probing . . . Countrywide Financial Corp. for possible securities
12  fraud." The *Journal* further reported that "*[t]he inquiry involves whether*
13  *company officials made misrepresentations about the Company's financial*
14  *position and the quality of its mortgage loans in securities filings*, four people
15  with knowledge of the matter said." The *Journal* also noted that "Countrywide
16  issued more than $100 billion in mortgage-backed securities between 2004 and
17  2007" and that "[m]ore than two dozen Wall Street firms helped construct those
18  deals, making it possible that some of them will also face law-enforcement
19  scrutiny." The *Journal* also reported that:

20      Federal investigators are looking at evidence that may indicate
21      widespread fraud in the origination of Countrywide mortgages, said
22      one person with knowledge of the inquiry. If borne out, that could
23      raise questions about whether company executives knew about the
24      prospect that Countrywide's mortgage securities would suffer many
25      more defaults than predicted in offering documents.

26

27      Another potential issue facing the company is whether it has been
28      candid in its accounting for losses. People familiar with the matter

said that Countrywide's losses may be several times greater than it has disclosed.

1075. The *Journal*'s March 8, 2008 story was a further partial corrective disclosure with regard to a series of prior false and misleading statements by defendants. Among other matters, the March 8 *Journal* story constituted a partial corrective disclosure with regard to false and misleading representations made by defendants in Countrywide's financial statements and related SEC filings, including, but not limited to, representations concerning Countrywide's loan loss reserves, earnings, and assets. The story also constituted a partial corrective disclosure with regard to Countrywide's prior false and misleading representations about its business ethics and the quality of its management. In addition, the March 8 *Journal* story partially corrected Defendants' prior false and misleading statements about Countrywide's institutional stability and its ability to weather the housing crisis and to capture market share at the expense of purportedly weaker competitors. The story further partially corrected, among other matters, Defendants' prior false and misleading statements about the quality of Countrywide's loan origination and underwriting standards.

1076. On Monday, March 10, 2008, the first day that the securities markets were open following the publication of the *Journal*'s March 8 story, Countrywide stock declined by approximately 14%, from $5.07 to close at $4.36 — its lowest level since April 1995 — on volume exceeding 35 million shares. This loss, which was caused by the March 8, partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Class members would have sustained as a result of ordinary market forces. Countrywide's other securities also experienced material and statistically significant drops in their trading prices as a result of the March 8, 2008 partial disclosures, including the trading price of the 7% Capital V preferred stock, which fell by 17.56%; and the trading price of the 6.75% Capital IV preferred stock, which fell by 16.98%.

1  **X.    LOSS CAUSATION**

2       1077. Throughout the Class Period, the prices of Countrywide common

3  stock, the Countrywide Capital V 7% Capital Securities, Countrywide debt

4  securities listed in Section VIII.F above, and Countrywide call options were

5  artificially inflated (and the price of Countrywide put options were artificially

6  reduced) as a direct result of Defendants' materially false and misleading

7  statements and omissions. When the truth became known, the prices of

8  Countrywide securities declined precipitously as the artificial inflation was

9  removed from the prices of these securities, causing substantial damage to

10  Plaintiffs and members of the Class. The chart below shows the fluctuation of the

11  price of Countrywide common stock during the Class Period:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28