Bingham McCutchen LLP
GWYN QUILLEN (SBN 138428)
SCOTT VICK (SBN 171944)
The Water Garden
Fourth Floor, North Tower
1620 26th Street
Santa Monica, CA  90404-4060
Telephone:  310.907.1000
Facsimile:  310.907.2000
Email:   gwyn.quillen@bingham.com
          scott.vick@bingham.com

Bingham McCutchen LLP
TODD E. GORDINIER (SBN 82200)
EDWARD S. KIM (SBN 192856)
600 Anton Boulevard
18th Floor
Costa Mesa, CA  92626-1924
Telephone:  714.830.0600
Facsimile:  714.830.0700
Email:    todd.gordinier@bingham.com
          edward.kim@bingham.com

Attorneys for Defendant
KPMG LLP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions, | Lead Case No.<br>CV07-05295 MRP(MANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT KPMG LLP'S MOTION TO DISMISS SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Date:         April 13, 2009<br>Time:         10:00 a.m.<br>Courtroom:  12<br>Judge:        Hon. Mariana R. Pfaelzer |

A/72826441.6/3314001-0000328518

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................1

II.    ALLEGATIONS AND PROCEDURAL BACKGROUND ........................2

       A.    KPMG's Engagements........................................2

       B.    The Court's Order on Defendants' Motion to Dismiss the CAC ........3

       C.    Plaintiffs' Claims Against KPMG in SAC .........................3

III.   THE SAC DOES NOT ADEQUATELY PLEAD THE FALSITY OF
       KPMG'S STATEMENTS ..............................................4

       A.    Plaintiffs Fail to Satisfy the Pleading Requirements of the
             Reform Act, Rule 9 and Rule 8...............................4

             1.    The Reform Act Sets a High Pleading Standard ......................4

             2.    Rule 9(b) Applies to the Section 11 Claims .............................5

             3.    Plaintiffs Do Not Satisfy Rule 8 ...............................6

       B.    Plaintiffs Fail to Allege That KPMG's Statements of Opinion
             on Countrywide's Financial Statements Were False When
             Made ......................................................6

       C.    Plaintiffs Fail to Allege Facts Demonstrating that the Financial
             Statements Were Not Fairly Presented in Accordance with
             GAAP .....................................................7

             1.    Allowances for Loan Losses.....................................7

                   a.    Countrywide Considered the Appropriate Factors..........8

                   b.    FAS 5 Did Not Permit Higher ALL Estimates
                         Based on Abstract Notions of Increased Risk................9

                   c.    Countrywide's Charge Offs Suggest that the ALL
                         Estimates were Reasonable ...........................10

1

## TABLE OF CONTENTS
(continued)

2                                                                          **Page**

3              d.     Plaintiffs' "Impaired at Origination Theory"

4                     Would Have Resulted in Excessive Reserves in

5                     Violation of GAAP .........................................................12

6         2.    Reserves for Representations and Warranties .........................13

7         3.    Valuation of Retained Interests from Securitizations..............14

8         4.    Valuation of Mortgage Servicing Rights .................................16

9     D.    Plaintiffs' Conclusory GAAS Allegations Do Not State a Claim .....17

10  IV.   PLAINTIFFS FAIL TO ALLEGE SCIENTER ........................................17

11  V.    PLAINTIFFS HAVE FAILED TO PLEAD LOSS CAUSATION .............24

12  VI.   CONCLUSION ...........................................................................25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

FEDERAL CASES

4

5

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ...................................................6

6

7

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982) ...............................................................18

8

9

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) .........................................................23

10

11

*In re Acterna Corp. Sec. Litig.*,
    378 F. Supp. 2d 561 (D. Md. 2005)....................................................23

12

13

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007) ..........................................24, 25

14

*In re Bally Total Fitness Sec. Litig.*,
    No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006)......................20, 23

15

16

*In re Countrywide Financial Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...............................................8

17

18

*In re Daou Systems, Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ...................................................4, 6, 25

19

20

*In re Dell Sec. Litig.*,
    No. A-06-CA-726-SS, --- F.Supp.2d ----, 2008 WL 5068856 (W.D. Tex.
    Oct. 7, 2008) .........................................................................3, 19, 20

21

22

*In re Glenfed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) .............................................................15

23

24

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000).............................................5, 7

25

26

*In re Ramp Corp. Sec. Litig.*,
    No. 05 CIV. 6521(DLC), 2006 WL 2037913 (S.D.N.Y. July 21, 2006)...........17

27

28

*In re Real Estate Assoc. L.P. Litig.*,
    223 F. Supp. 2d 1142 (C.D. Cal. 2002)................................................6

*In re Recoton Corp. Sec. Litig.*,
    358 F. Supp. 2d 1130 (M.D. Fla. 2005) ...................................................5, 20, 22

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ...............................................................................4

*In re Spiegel, Inc., Sec. Litig.*,
    No. 02 C 8946, 2005 WL 1838449 (N.D. Ill. July 29, 2005)...........................23

*In re Stone & Webster, Inc. Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003)................................................................23

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).............................................................................22

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ............................................................22

*In re Surebeam Corp. Sec. Litig.*,
    No. 03 CV 1721JM(POR), 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005).............5

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) .................................................................................6

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ......................................................................18, 24

*Lindner Dividend Fund, Inc. v. Ernst & Young*,
    880 F. Supp. 49 (D. Mass. 1995)........................................................................11

*Metzler Inv. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .....................................................................24, 25

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ......................................................................18, 20

*Reiger v. PricewaterhouseCoopers, LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000) ...................................................6, 18, 20

*Rubke v. Capitol Bancorp LTD*,
    No. 07-15083, 551 F.3d 1156, 2009 WL 69278 (9th Cir. Jan. 13, 2009)........5, 7

*SEC v. PriceWaterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992) ..................................................................23

*South Ferry LP, No. 2 v. Killinger,*
   542 F.3d 776 (9th Cir. 2008) .................................................................5

*Tripp v. IndyMac Financial, Inc.,*
   No. CV07-1635-GW-(VBKx), 2007 WL 4591930 (C.D. Cal. Nov. 29,
   2007) .......................................................................................................23

**STATE CASES**

*Bily v. Arthur Young & Co.,*
   3 Cal. 4th 370 (1992) ...........................................................................7

**FEDERAL STATUTES**

15 U.S.C. § 77k...............................................................................passim

15 U.S.C. § 78j(b) .....................................................................3, 4, 5

15 U.S.C. § 78u-4(b)(1)(B)...................................................................4

1  **I.     INTRODUCTION**

2          In its Order on Defendants' Motion to Dismiss the Consolidated Amended

3  Class Action Complaint ("CAC"), the Court held that plaintiffs failed to plead any

4  actionable GAAP violations pertaining to Countrywide's 2004 and 2005 financial

5  statements and dismissed all accounting-related claims for those years' financial

6  statements.  The Court also held that plaintiffs failed to plead scienter against

7  KPMG, because they failed to allege facts establishing "some degree of intentional

8  or conscious misconduct to satisfy the deliberate recklessness standard."

9          Plaintiffs have not cured any of the deficiencies that resulted in the dismissal

10 of their claims against KPMG.  As before, the only statements at issue by KPMG

11 in the Second Consolidated Amended Class Action Complaint ("SAC") are its

12 audit reports on Countrywide's 2004-2006 financial statements.  Rather than

13 curing the pleading deficiencies identified by the Court, plaintiffs have merely

14 added generalized risk factors, labeled them as "red flags," and asserted conclusory

15 allegations of what KPMG supposedly should have done and must have known.

16         The SAC alleges no facts at all about KPMG's audits, and is more revealing

17 for the allegations that are still missing than for those that have been added.  There

18 has been no restatement, and plaintiffs fail to identify the amount by which any

19 financial statement in any year was misstated.  There are still no confidential

20 witness statements regarding any aspect of KPMG's audits, and there are no facts

21 regarding any purported "tips," letters, memos, conversations, or internal

22 communications even showing any GAAP violations, let alone KPMG's purported

23 knowledge of them.  Nor are there any facts regarding who at KPMG supposedly

24 participated in the purported fraud, or why anyone from KPMG would do so.

25         Because plaintiffs do not have any facts regarding the actual audit work that

26 was performed, plaintiffs instead use hindsight and conjecture to form a

27 speculative and circular chain of inferences of what KPMG should have done,

28 what it must have known and what accounting judgments it would have and should

1  have reached.  And as before, plaintiffs attempt to use the charges taken in 2007 to

2  argue that mortgage assets were overstated and liabilities understated in prior

3  years.  However, plaintiffs fail to consider that in 2007, housing prices suffered the

4  first sustained nationwide decline in over 30 years and this decline triggered a

5  wave of defaults that led to declines in the value of mortgage related assets

6  throughout the industry.  This required Countrywide to change the estimated value

7  of its mortgage assets during 2007 and does not support the conclusion that

8  accounting in 2006 or earlier was incorrect.

9      In the oral argument on Defendants' Motion to Dismiss the CAC, the Court

10  asked plaintiffs' counsel whether they knew what testing was actually performed

11  and whether that testing was adequate.  Plaintiffs' counsel conceded that, "*I don't

12  know today precisely what KPMG did when they were doing their audits.  I'm not

13  going to know until I have the work papers*."  It is clear that plaintiffs do not have

14  any facts to support their claims against KPMG, but filed their complaint hoping

15  that the discovery process may eventually provide some facts to validate their

16  claim, a practice the Reform Act was enacted specifically to preclude.

17      It is equally clear that this is not an accounting case.  There has been no

18  restatement, and no corrective disclosure purporting to reveal the falsity of

19  Countrywide's financial statements or KMPG's opinions.  And despite multiple

20  attempts, plaintiffs have been unable to allege any facts regarding KPMG's audits.

21  The facts pled by plaintiffs do not raise the right to relief against KPMG beyond a

22  speculative level and thus do not meet the applicable pleading standards.

23  **II.    ALLEGATIONS AND PROCEDURAL BACKGROUND**

24      **A.    KPMG's Engagements**

25      As Countrywide's outside auditor, KPMG audited Countrywide's annual

26  financial statements for the years ended December 31, 2004, 2005 and 2006 (also

27  2007 but that is not at issue here).  KPMG issued audit reports for those years'

28  financial statements, which were included in Countrywide's 2004, 2005 and 2006

1  Annual Reports on Form 10-K filed with the Securities and Exchange Commission

2  ("SEC").  KPMG consented to the incorporation by reference of its opinions in

3  certain registration statements and prospectus supplements identified below.

4      **B.      The Court's Order on Defendants' Motion to Dismiss the CAC**

5       Plaintiffs' CAC asserted claims against KPMG under Section 11 of the

6  Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.

7  Plaintiffs asserted that KPMG's audit reports, which were included in

8  Countrywide's 2004-2006 10-K filings and incorporated by reference into certain

9  registration statements, falsely stated that KPMG's audits were performed in

10  accordance with GAAS and that, in KPMG's opinion, the Company's financial

11  statements were fairly presented in accordance with GAAP.

12      All Defendants, including KPMG, filed motions to dismiss the CAC.  The

13  Court determined that the allegations concerning the valuation of retained interests

14  failed to state a claim for any year, and that plaintiffs failed to plead any actionable

15  GAAP violations related to the 2004 and 2005 financial statements.  *In re*

16  *Countrywide Financial Corp. Sec. Litig.*, No. CV-07-05295-MRP (MANx) ---

17  F.Supp.2d ----, 2008 WL 5100124, at *29 (C.D. Cal. Dec. 1, 2008).  The Court

18  also dismissed both Section 10 claims against KPMG finding that Defendants

19  failed to plead scienter against KPMG.  *Id.* at *50.

20      **C.      Plaintiffs' Claims Against KPMG in SAC**

21      Plaintiffs again claim in the SAC that KPMG's audit reports on

22  Countrywide's 2004-2006 financial statements falsely stated that KPMG's audits

23  were performed in accordance with GAAS and that, in KPMG's opinion, the

24  Company's financial statements were fairly presented in accordance with GAAP.

25  (SAC, ¶¶ 1143, 1185.)  As before, plaintiffs allege that Countrywide's financial

26  statements were not fairly presented in accordance with GAAP because

27  Countrywide purportedly: (i) established inadequate reserves for its loan loss

28  allowances ("ALL") and for its representations and warranties ("R&W"), and (ii)

overstated the value of its residual interests ("RI") and mortgage servicing rights ("MSRs").  (SAC, ¶¶ 288, 325, 346, 367, 390.)

Plaintiffs' SAC asserts two Section 11 claims and one Section 10(b) claim against KPMG.  Count IV is based on the Registration Statements filed in connection with the issuance of the Series B Medium Term Notes (incorporating KPMG's opinion on Countrywide's 2004 audit opinion) and the 6.25% Subordinated Notes due May 15, 2016 (incorporating KPMG's opinions on Countrywide's 2004 and 2005 financial statements).  (SAC, ¶¶ 936, 942, 1137.) Count VII is based on the Registration Statements filed in connection with the 7% Capital Securities, which incorporated KPMG's opinion on Countrywide's 2004 and 2005 financial statements.  (SAC, ¶¶ 948, 1181.)  Plaintiffs' Section 10(b) claim asserted in Count XII alleges generally that KPMG issued false and misleading audit reports and opinions, and is based on the same alleged false statements that are the subject of the Section 11 claims.  (SAC, ¶¶ 1233-39.)

## III.   THE SAC DOES NOT ADEQUATELY PLEAD THE FALSITY OF KPMG'S STATEMENTS

### A.   Plaintiffs Fail to Satisfy the Pleading Requirements of the Reform Act, Rule 9 and Rule 8

#### 1.   The Reform Act Sets a High Pleading Standard

"Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'''  *In re Daou Systems, Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (citation omitted); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).  A securities fraud complaint must specify each statement alleged to have been misleading and the reason(s) why the statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B).  Pleading with particularity means that a "plaintiff must provide a list of all relevant circumstances in great detail."  *Silicon Graphics*, 183 F.3d at 984.  "It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that

1  will validate her claim." *South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 783

2  (9th Cir. 2008) (citation omitted).  Where plaintiffs contend defendants had access

3  to contrary facts, they must specifically identify the reports or statements

4  containing this information.  "Conclusory allegations that do no more than state

5  that [the auditor] 'would have known,' 'knew and ignored,' or 'recklessly failed to

6  know' are insufficient to state a claim under PSLRA and Rule 9(b)."  *In re Recoton*

7  *Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1147 (M.D. Fla. 2005)

8            **2.**      **Rule 9(b) Applies to the Section 11 Claims**

9        Plaintiffs must allege Section 11 claims with increased particularity under

10  Rule 9(b) if their complaint 'sounds in fraud.'"  *Rubke v. Capitol Bancorp LTD*,

11  No. 07-15083, 551 F.3d 1156, 2009 WL 69278, at *3 (9th Cir. Jan. 13, 2009).  As

12  the Ninth Circuit recently observed, "Where . . . a complaint employs ***the exact***

13  ***same factual allegations*** to allege violations of section 11 as it uses to allege

14  fraudulent conduct under section 10(b) of the Exchange Act, ***we can assume that it***

15  ***sounds in fraud*** ."  *Id.* at *3 (emphasis added).

16        Here, plaintiffs' entire theory of liability against KPMG for both its Section

17  10 and 11 claims is premised on the same allegations that KPMG's audit opinions

18  on Countrywide's financial statements were false at the time they were made.  (*See*

19  SAC, ¶¶ 530-601).[1]  Because KPMG's alleged false statements consist entirely of

20  audit ***opinions***, plaintiffs must establish that the statements of opinion were

21  objectively and ***subjectively false***.  *See Rubke*, 551 F.3d 1156, 2009 WL 69278, at

22  *4 (statements of opinion "can give rise to a claim under section 11 only if the

23  complaint alleges with particularity that the statements were both objectively and

_____

25       [1] The test is specific to each individual and turns on whether the claims
against each individual defendant allege a unified course of fraudulent conduct that
26  forms the basis of the fraud and non-fraud claims against that defendant.  *See In re*
*McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266 (N.D. Cal. 2000); *In*
27  *re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2005 WL 5036360, at
*7 (S.D. Cal. Jan. 3, 2005).

28

1  subjectively false or misleading."). "'Where a statement of opinion is claimed to

2  be false, the speaker's 'state of mind' is implicated, and the plaintiff is required to

3  plead the evidentiary facts showing the speaker knew the opinion to be false' at the

4  time it was made") (quotation omitted).  *In re Real Estate Assoc. L.P. Litig.*, 223 F.

5  Supp. 2d 1142, 1148-49 (C.D. Cal. 2002).  Since this requires a showing that

6  KPMG knew the opinion was false, both the Section 11 and 10 claims sound in

7  fraud and the heightened pleading standard under Rule 9(b) applies.

8       Furthermore, plaintiffs incorporate "each and every allegation," including

9  the intertwined fraud and scienter allegations against KPMG, into each of their

10 Section 11 claims.  (*See* SAC, ¶¶ 1137, 1179); *see also Daou*, 411 F.3d at 1028

11 (plaintiffs' claims sounded in fraud where "[t]he complaint fully incorporates all

12 allegations previously averred in the complaint for purposes of all their claims.").

13                    **3.       Plaintiffs Do Not Satisfy Rule 8**

14      Apart from Rule 9(b)'s particularity requirements, Rule 8 requires factual

15 allegations, and does not permit mere conclusions and unsupported inferences.  *See*

16 *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007)

17 (complaint "requires more than labels and conclusions, and a formulaic recitation

18 of the elements of a cause of action will not do . . . .   Factual allegations must be

19 enough to raise a right to relief above the speculative level . . . .") (citations

20 omitted); *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)

21 ("[C]onclusory allegations of law and unwarranted  inferences are insufficient to

22 defeat a motion to dismiss . . . .").

23      **B.    Plaintiffs Fail to Allege That KPMG's Statements of Opinion on**

24            **Countrywide's Financial Statements Were False When Made**

25      The only KPMG statements at issue are set forth in its audit reports, which

26 are statements of **opinion** on Countrywide's financial statements.  *See Reiger v.*

27 *PricewaterhouseCoopers, LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000) ("the

28 report generated by an independent accountant often represents a professional

1  opinion based on numerous and complex factors") (citation omitted); *Bily v. Arthur*

2  *Young & Co.*, 3 Cal. 4th 370, 400 (1992) ("[A]n audit report is a professional

3  opinion based on numerous and complex factors . . . .  Although ultimately

4  expressed in shorthand form, the report is the final product of a complex process

5  involving discretion and judgment on the part of the auditor at every stage.")

6      As discussed above, a statement of opinion is false under the securities laws

7  only if it is both objectively and subjectively false.  *Rubke*, 551 F.3d 1156, 2009

8  WL 69278, at *4; *see also McKesson*, 126 F. Supp. 2d at 1265.  Plaintiffs fail to

9  event attempt to allege that KPMG did not, in fact, genuinely hold the opinions

10  expressed in its audit reports at the time they were issued.  Plaintiffs' complete

11  failure to allege these basic facts renders all of their claims against KPMG

12  insufficient as a matter of law.

13    **C.**    **Plaintiffs Fail to Allege Facts Demonstrating that the Financial**

14          **Statements Were Not Fairly Presented in Accordance with GAAP**

15          **1.**    **Allowances for Loan Losses**

16      In dismissing the accounting related claims for the 2004 and 2005 financial

17  statements, this Court found that plaintiffs failed to allege enough corroborating

18  facts, apart from the substantial growth in Countrywide's business, to support the

19  allegation that the 2004 and 2005 ALL estimates were falsely overstated at the

20  time the financial statements were issued.  *Countrywide Sec. Litig.*, 2008 WL

21  5100124, at *33-34.  Despite three attempts, plaintiffs are still unable to allege any

22  additional facts showing that the ALL estimates were falsely overstated at the time

23  those estimates were made or that KPMG was aware of any misstatements.

24  Plaintiffs instead rely on inaccurate and incomplete recitations of the applicable

25  GAAP provisions and advance a new "impaired at origination" theory that they

26  failed to plead in the CAC, but attempted to argue at oral argument.  (SAC, ¶¶ 298-

27  307, 344, 556.)  As shown below, plaintiffs have still failed to plead sufficient facts

28  showing that the ALL estimates were false when made.

a.   Countrywide Considered the Appropriate Factors

This Court previously observed that it is "apparent that the setting of loan loss reserves involves a great deal of discretion." *In re Countrywide Financial Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008).  "The Court emphasizes that the balance sheet items addressed here are based on projections. These projections are subjective and give management and auditors a fair amount of leeway to make reasonable judgments." *Countrywide Financial Corp. Sec. Litig.*, 2008 WL 5100124, at *30 n. 56.

Plaintiffs allege that: "As is evidenced in Countrywide's Form 10-K filings, the Company generally established the ALL based on historical default rates and loss percentages . . . .  As a result, Countrywide failed to include in its estimated rate of default significant increases in risky loan products and loosened underwriting standards."  (SAC, ¶ 297.)  But in fact, Countrywide's 10-Ks expressly disclosed that the ALL estimation process

> **is subject to risks and uncertainties, including reliance on historical loss information that may not represent current conditions** and the proper identification of factors giving rise to credit losses. For example, **new products may have default rates and loss severities which differ from those products we have historically offered and upon which our estimates are based**. . . we make appropriate adjustments to our historically developed assumptions when necessary to adjust historical factors to account for present conditions.

(2006 10-K at 52; RJN, Ex. 3) (emphasis added).

Plaintiffs also fail to allege any facts to support their conclusory assertion that Countrywide failed to consider the increased origination of nonprime and nontraditional loans in estimating the ALL.  The conclusion that Countrywide failed to consider the proper factors is not only conclusory but illogical.  Indeed, plaintiffs allege that Countrywide's head of technical accounting, Larry Gee, provided "essential contributions" to the very literature they cite.  (SAC, ¶ 276.)

1
2

        b.     FAS 5 Did Not Permit Higher ALL Estimates Based on
Abstract Notions of Increased Risk

3       Plaintiffs allege that Countywide should have increased its ALL for potential
4 future credit losses because it began originating nontraditional and nonprime
5 mortgages beginning in 2003.  (SAC, ¶ 289.)  However, this is directly opposite to
6 fundamental GAAP requirements.  As the Court observed in its Order, GAAP
7 actually prohibits establishing loss reserves based on abstract notions of risk.
8 *Countrywide Financial Corp. Sec. Litig.*, 2008 WL 5100124, at *32.  Financial
9 Accounting Standards No. 5 ("FAS 5") guides accounting for loss contingencies
10 (for ALL and R&W reserve estimates) and allows reserves only if (1) it is probable
11 that an asset has been impaired at the date of the financial statement, and (2) the
12 loss amount can be reasonably estimated.  *See id.*

13       As the Court recognized in its Order, FAS 5 permits an accrual for losses
14 only for losses already incurred, not for the risk of future losses that have not
15 occurred as of the reporting date.  *Countrywide Financial Corp. Sec. Litig.*, 2008
16 WL 5100124, at *32.  The application of FAS Statements 5 and 114 to a Loan
17 Portfolio (the "Implementation Guide") states that "losses should **not** be
18 recognized before it is probable that they have been incurred, even though it may
19 be probable based on past experience that losses will be incurred in the future.
20 (*See* Implementation Guide; RJN Ex. 11.)  Plaintiffs fail to allege any facts
21 showing that any additional loans were impaired for which the ALL was
22 insufficient as of the respective reporting dates or that KPMG possessed
23 information of any such shortfall.

24       Plaintiffs rely heavily on their analysis that ALL as a percentage of LHI
25 remained relatively constant even though Countrywide increased its origination of
26 nonprime and nontraditional loans.  Plaintiffs assert the conclusion that, "[i]f loan
27 products are increasing in risk, the ALL as a percent of LHI should increase as
28 well."  (SAC, ¶ 300.)  Plaintiffs' constant references to loans originated are beside

1    the point because the ALL applies only to LHI.  Plaintiffs admit that Countrywide

2    "*placed loans of higher quality in its LHI portfolio*" and sold or securitized the

3    lower quality loans.  (SAC, ¶ 384.)

4         Plaintiffs fail to identify any loan held for investment that had underwriting

5    flaws.  Nor do they allege what percentage, if any, of nonprime loans were held in

6    the LHI portfolio during the Class Period, and they do not consider this in their

7    analysis comparing ALL as a percentage of LHI.  In fact, nearly all of the LHI was

8    held at Countrywide Bank, an FDIC insured, federally chartered bank.  (*See* 2006

9    10-K at 104; RJN, Ex. 3.)  Countrywide Bank performed its own analysis to select

10   which loans the bank would hold for investment.  (*See* 2006 10-K at 105; RJN, Ex.

11   3.)   Indeed, the loans held by Countrywide Bank in 2006, for example, had an

12   **average FICO score of 726** and approximately **95% of the LHI had FICO**

13   **scores above 660**.  (*Id.*)  Countrywide's 10-Ks showed that Countrywide Bank

14   held some loans with FICO scores below 620, but the dollar amount of these loans

15   was a miniscule 0.2% of LHI in 2006.  (*Id.*)

16        Plaintiffs also fail to consider the numerous other factors that could affect

17   the estimate of ALL as a percentage of LHI, such as actual and forecasted interest

18   rates and housing prices.  If Countrywide had calculated the allowance in the

19   manner plaintiffs suggest, it would have been reckless and a violation of GAAP.

20              c.    Countrywide's Charge Offs Suggest that the ALL

21                    Estimates were Reasonable

22        SAB 102 states that, "a registrant's loan loss allowance methodology is

23   considered valid when it accurately estimates the amount of loss contained in the

24   portfolio."  (RJN, Ex. 18.)  Also, AAG Section 9.55 states that the auditor can

25   assess the reasonableness of management's allowance estimates by comparing

26   "current-year charge offs with prior-period estimated losses to determine the

27   historic reliability of prior-period estimates."  (RJN, Ex. 16) (emphasis added).

28

1  Thus, one way to validate whether an allowance for loan losses is adequate is by

2  comparing the ALL to actual charge-offs in the subsequent year.

3      In Countrywide's FY04 annual statement, the ALL was estimated at

4  $125,046,000.  (2004 10-K at F-44; RJN, Ex. 1.)  The subsequent charge off in

5  2005 was only $25,173,000, which represented only 20.1% of the 2004 ALL

6  estimate. (2005 10-K at F-35; RJN, Ex. 2.)  In the FY05 financial statements, the

7  ALL estimate was increased to $189,201,000.  (*Id*.)  The subsequent charge off in

8  2006 was $156,841,000, which represented 83% of the 2005 ALL estimate.  (*Id*.)

9  In both cases, the subsequent year charge-offs were lower than the prior year-end

10  estimate, suggesting that the estimates were reasonable and indeed conservative.

11      In 2006, the ALL estimate was increased again to $261,054,000.  (*Id*.)

12  Despite the increase in the 2006 ALL estimate, the subsequent 2007 charge-offs of

13  $703,380,000 turned out to be greater than the previous years' estimate.  (2007 10-

14  K at F-42; RJN, Ex. 4.)  However, this is not surprising given the industry wide

15  events occurring in 2007 that led to increased delinquencies.  In fact, for the first

16  two quarters of 2007, the charge-offs were in line with the prior year estimate, and

17  it was only the remarkable events of August 2007 that triggered significant

18  changes during the third and fourth quarters of 2007.  (*See* 2007 Q1 10-Q at 13,

19  2007 Q2 10-Q at 15, and 2007 Q3 1Q at 18; RJN, Exs. 6, 7, 8.)

20      Plaintiffs' assertion that Countrywide's decision to increase its reserves

21  beginning in July 2007 somehow suggests that they had been fraudulently

22  understated in prior periods is simply pleading fraud by hindsight.  *Countrywide*

23  *Sec. Litig.*, 2008 WL 5100124, at *30 ("[T]he fact that the balance sheet items, in

24  hindsight, were inaccurately estimated is not enough on its own to state a claim.").

25  Estimates are not false at the time they are made if those estimates are later

26  revised.  *See Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 58-

27  59 (D. Mass. 1995) (substantial increase in loan loss reserves due to market

28

1 | conditions is not evidence that the reserves stated in earlier statements were

2 | inadequate).[2]  It goes without saying that values change over time.

3 |        d.    <u>Plaintiffs' "Impaired at Origination Theory" Would Have</u>

4 |              <u>Resulted in Excessive Reserves in Violation of GAAP</u>

5 |       Plaintiffs allege a new "impaired at origination" theory based on an AICPA

6 | interpretation of FAS 5.  (SAC, ¶ 298, citing AAG, Ch. 9.)[3]  Plaintiffs now allege

7 | that a loan should be considered "impaired at origination" if it resulted from a

8 | faulty credit decision or inadequate loan credit review.  (SAC, ¶ 298.)  Notably,

9 | plaintiffs fail to disclose that Section 9.35 states that: "FASB Statement No. 5

10 | prohibits recognizing losses if the events causing the losses have not yet occurred.

11 | *The act of lending money generally is not the event that cause asset impairment.*

12 | *Though some credit losses can be predicted, future losses should not be provided*

13 | *for at the time loans are made, because the events that cause the losses or loan*

14 | *impairment (for example, loss of employment, disability, or bankruptcy) have not*

15 | *yet occurred.*"  (RJN, Ex. 16) (emphasis added).

16 |       Plaintiffs allege no facts regarding what faulty credit granting decisions were

17 | made for the loans held by Countrywide Bank, or if there were inadequate or

18 | overly aggressive loan credit review procedures, or which loans should have been

19 | recognized as being impaired at origination.  In fact, the analysis of the subsequent

20 |

---

[2] GAAP expressly recognizes a distinction between a change in accounting estimates versus a correction of an error in a previously issued financial statement. Under SFAS 154, a change in accounting estimates "shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods" (SFAS 154, ¶ 19; RJN, Ex. 10), while an error in a previously issued financial statement must be reported as a prior-period adjustment in a restatement (SFAS, 154, ¶ 25; RJN, Ex. 10.)   In 2007, Countrywide only changed its estimates.

[3] In its Order, the Court declined plaintiffs' request to take judicial notice of the AICPA's interpretation of FAS 5, stating that, "the Court cannot say, based on the CAC, that the AICPA's possible interpretation of FAS 5 is inevitable or even apparent." *Countrywide Sec. Litig.*, 2008 WL 5100124, at *32 (citing *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 100-01 (1995) (discussing potential for conflicting GAAP interpretations.").

1  years' charge-offs suggest that the ALL estimates were reasonable, and the

2  application of plaintiffs' impaired at origination theory would have resulted in

3  wildly excessive reserves.  While it is true that many of Countrywide's loans

4  would reset in future years at higher rates, and it was likely that delinquencies

5  would occur on some of those loans at some time in the future, as noted above,

6  FAS 5 prohibited Countrywide from increasing its reserves until the events causing

7  the losses occurred.  The SEC and GAAP forbid not only under reserving, but also

8  over reserving.  Plaintiffs' impaired at origination theory would have resulted in

9  excessive reserves that would have run afoul of rules prohibiting over reserving.

10                    **2.      Reserves for Representations and Warranties**

11          As before, plaintiffs allege that Countrywide understated its loss reserves for

12  its R&W because it allegedly failed to take into account its deteriorating

13  underwriting practices.  (SAC, ¶¶ 367-89.)  However, plaintiffs fail to allege any

14  facts supporting its conclusory allegations that the attributes of the actual loans

15  originated were not taken into account.  As with ALL, the R&W reserves are

16  estimates involving the exercise of discretion.  The Company's 10-Ks contained

17  extensive disclosures revealing the risks that the estimates could change based on

18  changing market conditions.  (*See* Appendix A.)  As with the ALL, SFAS 5 allows

19  a reserve for future losses associated with a breach of the Company's R&W only if

20  it is probable that a liability has been incurred as of the reporting date and the

21  amount of loss can be reasonably estimated.  Plaintiffs fail to allege facts showing

22  the reserves were not properly estimated for such losses.  Instead, plaintiffs merely

23  attempt to allege fraud by hindsight by pointing to the subsequent increase in

24  reserves for representations and warranties in 2007, after the industry-wide decline

25  in home values.

26          Plaintiffs also allege that Countrywide should have increased its R&W

27  reserve in 2005 because it increased securitizations of home equity and nonprime

28  loans between 2004 and 2005.  (SAC, ¶ 382.)  However, plaintiffs fail to allege

1  facts showing that additional liabilities had been incurred and that such liabilities

2  could be reasonably estimated as of the financial statement date.  FAS 5 prohibits

3  reserving for impairments or liabilities based on abstract notions of risk.

4         **3.**      **Valuation of Retained Interests from Securitizations**

5        Plaintiffs have failed to cure the principal defect identified by the Court in

6  dismissing the claim for valuation of retained interests ("RI").  In its Order, the

7  Court held that the allegations regarding the valuation of retained interests (for all

8  years) failed to state a claim because "*[i]t is entirely possible that RI values*

9  *increased, even as delinquencies increased (on a percentage basis), because*

10  *Countrywide was adding more RI to its portfolio (on an absolute basis) while*

11  *properly marking down the old RIs*." *Countrywide Sec. Litig.*, 2008 WL 5100124,

12  at *31 (emphasis added).  The Court further observed that, "*RI value depends on*

13  *the number of interests retained, discounted by their projected losses.  The CAC*

14  *does not allege anything about other variables that could affect RI value*." *Id*. at

15  *31 n. 60 (emphasis added).

16        As before, plaintiffs allege that the RI values should have decreased (rather

17  than increased) during the Class Period due to the reduced quality of loans

18  originated by Countrywide.  (SAC, ¶ 334.)  However, plaintiffs fail to consider that

19  RI values increased, even as delinquencies increased, because Countrywide was

20  adding more RI to its portfolio while properly marking down the existing RIs.

21  Without addressing this defect identified by the Court, plaintiffs' SAC makes the

22  same allegations as before that the values for RI were overstated because it relied

23  on historical default rates, and they allege that Countrywide failed to include in its

24  assumption for both weighted average life and net credit losses the likelihood that

25  there would be an increase in defaults.  (SAC, ¶ 335.)  Although plaintiffs allege

26  what factors should have been considered to determine the fair value of the RIs,

27  plaintiffs do not allege facts showing that Countrywide did not, in fact, consider

28  those factors.

1    The valuation of retained interests from securitizations are estimates

2    involving the exercise of discretion.  *See In re Glenfed, Inc. Sec. Litig.*, 42 F.3d

3    1541, 1549 (9th Cir. 1994) ("[B]oth the valuation of assets and the setting of loan

4    loss reserves are based on flexible accounting concepts, which, when applied, do

5    not always (or perhaps ever) yield a single correct figure.").  Such estimates are not

6    false at the time they are made just because they are later revised.

7    Countrywide's 10-Ks describe the fact that the valuation of RIs "require[s]

8    management to make judgments about matters that are inherently uncertain" and

9    that the Company's management "cannot provide any assurance that we will not

10    make significant adjustments to the related amounts recorded."  (2006 10-K at 37;

11    RJN, Ex. 3.)  The 10-Ks also provide additional extensive disclosures regarding the

12    valuation of retained interests.  (*See* Appendix A.)

13    Plaintiffs cite to Confidential Witness No. 1 who allegedly provided

14    unspecified evidence allegedly showing that "in a substantial number of instances

15    during his tenure with the Company, RI should have been valued at zero . . . ."

16    (SAC, ¶ 343.)  This unsupported exaggeration and overgeneralization is far from

17    sufficient to allege that there was any material misstatement in Countrywide's

18    financial statements due to its estimates of valuation for its portfolio of RIs.

19    Indeed, the comparison of RI values to subsequent write downs shows modest

20    write downs in the 2004 and 2005 RIs.  (*See* 2005 10-K at F-35, 2006 10-K at F-

21    37; RJN, Exs. 2, 3.)  In 2004, the value of RIs were recorded as $1,908,504,000.

22    (2005 10-K at F-23; RJN, Ex. 2.)  In 2005, Countrywide recognized an impairment

23    of $364,506,000, representing a 19% write down.  (2005 10-K at F-65; RJN, Ex.

24    2.)  In 2005, the value of RIs were recorded as $2,675,461,000.  (2005 10-K at F-

25    23; RJN, Ex. 2.)  In 2006, Countrywide recognized an impairment of

26    $284,690,000, representing a 10% write down.  (2006 10-K at F-4; RJN, Ex. 3.)

27    Plaintiffs allege that the substantial write-down in RIs in 2007 corroborates CW1's

28    assertion that RI should have been valued at or close to zero.  (SAC, ¶ 344.)  This

1   is improper use of hindsight and fails to take into account the effect of industry-

2   wide market forces affecting the housing and credit markets in 2007.  In fact, as

3   Countrywide explained: "[T]hese impairment charges were the result of the effect

4   of increased estimates for future losses on the loans underlying these securities

5   driven by weakening housing market conditions and significant tightening of

6   available credit."  (2007 10-K at 81; RJN, Ex. 4.)

7                   **4.    Valuation of Mortgage Servicing Rights**

8           As before, plaintiffs allege that Countrywide failed to appropriately use the

9   default rate as a key assumption in the valuation of its MSRs, and that the MSRs

10  were not valued properly because Countrywide did not adjust its assumptions of

11  default rates to reflect the credit risks of the nonprime and nontraditional loans it

12  began originating in 2003.  (SAC, ¶ 357.)  Plaintiffs again fail to allege any facts

13  supporting its conclusion that the appropriate factors were not considered.

14          Plaintiffs also allege that the valuation allowance should have increased,

15  rather than decreased, as the value of the MSRs increased, due to the alleged

16  increased credit risks.  (SAC, ¶ 358.)  But this fails to take into account that MSRs

17  are cumulative, or any of the other variables that could affect the value of MSRs

18  and the estimation of the valuation allowance, including interest rates, prepayment

19  estimates and the strength of the housing markets, as well as market data regarding

20  MSR trades, MSR broker valuations, prices of interest-only securities, and peer

21  group MSR valuation surveys.  (*See* 2006 10-K at 48; RJN, Ex. 3.)

22          Plaintiffs also allege that the write downs in MSR values in 2007 support the

23  conclusion that the assumptions used to value MSRs in prior years were incorrect,

24  again improperly using hindsight.  (SAC, ¶ 364.)   The 10-Ks explained that the

25  write downs in 2007 were primarily the result of decreasing mortgage interest rates

26  during the last half of the year which increased expected future prepayment speeds.

27  (*See* 2007 10-K at 81; RJN, Ex. 4.)

28

### D.   Plaintiffs' Conclusory GAAS Allegations Do Not State a Claim

Plaintiffs make conclusory assertions that KPMG failed to conduct its audits in accordance with GAAS.  However, plaintiffs do not support these conclusions with facts.  Plaintiffs fail to allege what procedures or audit work KPMG performed, how those procedures were deficient, or how any such deficiencies resulted in a violation of any professional standards.

Instead, as discussed in the scienter section below, plaintiffs attempt to form an unsupported and speculative chain of inferences by alleging what KPMG should have done, what "red flags" KPMG supposedly would have discovered if it had performed those procedures, and what judgments it would have reached.  (SAC, ¶¶ 538-601.)  Such unsupported conclusions do not meet the heightened pleading requirements for pleading securities fraud claims.  *See SmarTalk*, 124 F. Supp. 2d at 517 ("The GAAS violations set forth in this case show nothing more than hindsight.  At best, the Plaintiffs speculate that had [the auditor] followed GAAS, [the auditor] would have been aware of the GAAP violations.  Again, absent from the allegations is any particular fact or document that would have come to light to show that a GAAP violation existed or at least to make the existence of a GAAP violation so obvious that any reasonable person would have known of it.")  Moreover, since Plaintiffs do not plead a GAAP violation, they could not state a claim against KPMG even if they had properly pled a GAAS violation.  *In re Ramp Corp. Sec. Litig.*, No. 05 CIV. 6521(DLC), 2006 WL 2037913, at *8 (S.D.N.Y. July 21, 2006) ("Having failed to identify a misstatement in the financial statements . . . plaintiffs have not adequately pleaded that [the auditor's] representation that its audit complied with GAAS was false.")

## IV.   PLAINTIFFS FAIL TO ALLEGE SCIENTER

Deliberate recklessness on the part of an independent auditor requires far more than carelessness or even gross negligence.  It entails a mental state so culpable that it approximates an "actual intent to aid in the fraud being perpetrated

1   by the audited company." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121

2   (2d Cir. 1982); *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693-94 (6th

3   Cir. 2004); *Reiger*, 117 F. Supp. 2d at 1006-07.  To meet the exacting standard of

4   "deliberate recklessness," a plaintiff must allege facts raising a strong inference

5   that "the accounting practices were so deficient that the audit amounted to no audit

6   at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or

7   that the accounting judgments which were made were such that no reasonable

8   accountant would have made the same decisions if confronted with the same

9   facts." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)

10  (citations omitted).

11          In dismissing the Section 10 claims in the CAC for failure to plead scienter,

12  the Court held that it would draw "only the weakest of inferences from the GAAS

13  allegations." *Countrywide Sec. Litig.*, 2008 WL 5100124, at *50.  "The CAC does

14  not 'bridge the gap' between gross recklessness and 'some degree of intentional or

15  conscious misconduct' to satisfy the deliberate recklessness standard.  The Court is

16  not even satisfied that the KPMG scienter allegations allow much more than a

17  negligence inference." *Id.* (citation omitted).

18          As before, plaintiffs' SAC fails to allege any facts at all regarding the actual

19  audit work that was performed by KPMG.  Plaintiffs fail to allege a single fact

20  about what procedures were actually performed, what information or documents

21  were actually reviewed, who was involved in the audits, what communications

22  were exchanged, what accounting judgments were made or what information and

23  factors were considered in reaching any such judgments.  Instead, as before,

24  plaintiffs allege various general procedures purportedly required by GAAS and

25  allege that KPMG would have discovered various purported "red flags" if KPMG

26  had performed those procedures.

27          Section VI.B. of the SAC alleges that KPMG was required by GAAS to

28  perform the following procedures: (i) understand Countrywide's business, (ii) test

1    the internal control processes, (iii) perform analytical procedures, and (iv) apply

2    auditing procedures to accounts with a high risk of misstatement.  (SAC, ¶ 539.)

3    Plaintiffs speculate that "had KPMG in fact complied with the GAAS provisions

4    set forth above, KPMG would have uncovered red flags that should have prompted

5    the auditors to either test further or require management to adjust the Company's

6    financial statements so they would be presented free of material misstatements."

7    (SAC, ¶ 543.)  But plaintiffs fail to allege that KPMG did not perform those

8    procedures, nor could they since they have admitted that they do not know what

9    KPMG's audits actually entailed.[4]  Conclusory allegations of GAAS violations are

10   not sufficient to raise a strong inference of scienter.  *See In re Dell Sec. Litig.*, No.

11   A-06-CA-726-SS, --- F.Supp.2d ----, 2008 WL 5068856, at *18 (W.D. Tex. Oct. 7,

12   2008) (holding that the alleged GAAS violations were insufficient to establish

13   scienter where plaintiffs "allege[d] no facts about PwC's audit, what it entailed, or

14   how it was deficient.  Plaintiffs simply make the bare assertion PwC violated

15   GAAS rules, but without a shred of evidence about what PwC's procedures or

16   audits actually entailed, how the procedures specifically violated the standards, or

17   that the alleged violations were purposeful or negligent.").

18        Unable to plead any particularized *facts* regarding KPMG's audits,

19   plaintiffs' SAC has instead added generalized mortgage industry risk factors for

20   each years' audit, labeled them as "red flags," and have asserted conclusory

21   allegations of what KPMG would have discovered and what it "must have known"

---

22        [4]  Plaintiffs often misstate what the referenced sections require. Frequently,

23   the procedures that plaintiffs say are required by the referenced section are not
     even mentioned in the standards.  In other cases, the literature says that an auditor

24   "may consider" certain factors without requiring any specific consideration or
     procedure.  For example, in  paragraph 539(a)(ii), plaintiffs imply that AU 311.07-

25   08 required KPMG to review the AICPA Audit and Accounting Guide to develop
     it's understanding of Countrywide's business.  The literature does not require

26   review of the guide, but merely states that "other sources an auditor may consult
     include AICPA accounting and audit guides . . . ."  (RJN, Ex. 17.)  Similarly, in

27   paragraph 563, plaintiffs state that "in accordance with AU 311, KPMG should
     have reviewed the Company's securitization prospectuses for 2005."  (*Id.*)  AU

28   311 does not require review of securitization prospectuses, or even mention them.

1   if it had followed GAAS. (SAC, ¶ 542.)  However, generalized risk factors

2   pertaining to the mortgage industry as a whole do not rise to the level of red flags.

3   *In re Dell*, 2008 WL 5068856, at *19 ("the litany of risk factors provided by the

4   Plaintiffs, which is neither particularized nor supported by any specific details,

5   does not meet the particularity requirements of the PSLRA . . . ."); *In re Bally*

6   *Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *13 (N.D. Ill. July

7   12, 2006) (dismissing complaint where plaintiffs "attempted to 'cherry-pick a

8   handful of very generalized risk factors, label them as red flags, and stitch them

9   together to show scienter.'").

10          Instead, "'[r]ed flags' are facts that come to the attention of an auditor that

11   would place a reasonable auditor on notice that the audited company was engaged

12   in wrongdoing to the detriment of its investors." *Recoton*, 358 F. Supp. 2d at 1147

13   (citation omitted).  "A red flag creating a strong inference of scienter consists of an

14   egregious refusal to see the obvious, or to investigate the doubtful." *PR Diamonds*,

15   364 F.3d at 695 (citations omitted).  "'[S]o called red flags, which should be

16   deemed to have put a defendant on notice of alleged improprieties, must be closer

17   to smoking guns than mere warning signs.'"  *In re Bally*, 2006 WL 3714708, at

18   *13 (citation omitted); *see also Reiger*, 117 F. Supp. 2d at 1012 ("The warning

19   signs in these cases more closely resembled 'smoking guns' than 'red flags.'  Each

20   case included specific facts suggesting the independent accountant consciously

21   entertained doubts about the veracity of its client's financial disclosures . . . .").

22          Here, the purported red flags alleged in the SAC would not place an auditor

23   on notice that Countrywide was engaged in wrongdoing.  Many merely reflect

24   business decisions and judgments by Countrywide and its management.  For

25   example, plaintiffs allege that, "In 2004, compliance with AU 311 . . . would have

26   led KPMG to learn that Countrywide had publicly announced and implemented a

27   very aggressive firm-wide goal of capturing 30% residential mortgage market

28   share by 2008."  (SAC, ¶ 544.)  This purported red flag merely reflects a business

1    decision by Countrywide.  Similarly, originating more subprime loans or more

2    pay-option ARMS is a business decision, not an indication of wrongdoing.

3         Plaintiffs also allege that KPMG should have reviewed a sampling of the

4    Company's more than 200 securitization prospectuses in accordance with AU 311.

5    (SAC, ¶ 545.)  However, Section AU 311 and the AAG do not require review of

6    securitization prospectuses, or even mention them.  Nonetheless, plaintiffs allege

7    that had KPMG reviewed the prospectuses, it would have supposedly discovered a

8    discrepancy between the percentage of nonprime loans reported in the prospectuses

9    versus those reported in the 10-Ks.  (SAC, ¶ 545-46).  Although plaintiffs label this

10   alleged discrepancy as a "glaring red flag," this is a false and misleading

11   distinction since plaintiffs are comparing the reported value of **loans securitized** in

12   the prospectuses with the reported value of **loans originated** in the 10-Ks.

13   Moreover, Countrywide <u>retained</u> rather than <u>securitized</u> the higher quality loans.[5]

14        Plaintiffs also allege that KPMG should have reviewed Countrywide's

15   underwriting guidelines and that such a review would have shown that

16   Countrywide was loosening its underwriting practices.  (SAC, ¶ 547.)  Plaintiffs

17   also allege that KPMG should have been aware of the implementation of EPS in

18   2005, and that KPMG should have performed detailed testing of Countrywide's

19   loan files to determine if Countrywide originated high risk loans to borrowers with

20   weak credit.  (SAC, ¶¶ 566, 548-49.)  However, plaintiffs never support these

21   conclusory assertions with any facts regarding whether KPMG actually reviewed

22   such documents or performed such tests, and what information KPMG actually

23   learned and what it did with that information.  Plaintiffs cannot do so because there

24   are no facts to support the conclusion that Countrywide did not properly consider

25   the attributes of the loans it actually originated in making its accounting estimates.

26

27   ─────────────────

28   [5] Plaintiffs also incorrectly assume that a loan whose borrower had a FICO score
     lower than 660 cannot be a prime loan.  (SAC, ¶ 225.)

A/72826441.6/3314001-0000328518                              -21-

1    Conclusory allegations of what the auditors "must have known" or "should

2    have known" are too speculative to support a strong inference of scienter.  *See,*

3    *e.g.*, *Recoton*, 358 F. Supp. 2d at 1147 ("Conclusory allegations that do no more

4    than state that D & T 'would have known,' 'knew and ignored,' or 'recklessly

5    failed to know' are insufficient under PSLRA and Rule 9(b)."); *In re Sunterra*

6    *Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1324 (M.D. Fla. 2002) (allegations of

7    "must have known" fail to pass muster under the PSLRA); *In re Stone & Webster,*

8    *Inc. Sec. Litig.*, 414 F.3d 187, 214 (1st Cir. 2005) ("Complaint assert[ed] . . . that

9    PwC missed various 'red flag' warning signs but lack[ed] concreteness as to how

10   the conduct of the audit related to the missed warning signs").

11   Plaintiffs also allege that if KPMG reviewed the loan files, they would have

12   discovered that Countrywide classified loans that were subprime loans as prime

13   loans.  (SAC, ¶ 549.)  Plaintiffs allege that "a FICO score of 660 divides prime

14   from subprime borrowers" (SAC, ¶ 225), and plaintiffs allege that Countrywide

15   "employed a private, internal standard" that its management "knew [] differed

16   from the standard used by government agencies and generally accepted in the

17   mortgage banking industry."  (SAC, ¶ 221.)  However, there is no bright line rule

18   based on FICO scores for classifying loans as prime or subprime.[6]

19   Plaintiffs also raise as additional red flags the purported GAAP violations

20   regarding the setting of ALL and R&W reserves and the valuation of RI and MSRs

21   that form the basis of their Section 11 claims.  (*See, e.g.*, SAC, ¶¶ 554-56, 582.)

---

22   [6] Indeed, in September 2007, the FDIC, along with the U.S. Department of
     Treasury's Office of the Comptroller of the Currency and Office of Thrift
23   Supervision, the National Credit Union Administration and the Federal Reserve
     System, issued the *Statement on Subprime Mortgage Lending* to provide "final
24   interagency" guidance on the "emerging risks associated with certain subprime
     mortgage products" recognizing that "the term **'subprime' is not consistently**
25   **defined in the marketplace or among individual institutions.**" (*Statement on*
     *Subprime Mortgage Lending*, June 2007, at 2, 5; RJN, Ex. 19); *see also* Federal
26   Reserve Bank of San Francisco, *Economic Letter: House Price and Subprime*
     *Mortgage Delinquencies*, June 8, 2007, at 1 (RJN, Ex. 20) ("**there is no readily**
27   **agreed upon definition of 'subprime'** … **'subprime' is not rigorously and**
     **consistently defined in the mortgage industry.**") (emphasis added).

28

1    However, as discussed above, these estimates for reserves and valuations were

2    subject to discretion and judgment and were not false at the time they were made.

3    *See SEC v. PriceWaterhouse*, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992) ("no

4    finding of fraud or recklessness can rationally be made" where accounting items

5    "involved complex issues of accounting as to which reasonable accountants could

6    reach different conclusions"); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561,

7    583 (D. Md. 2005) (no scienter where there was no restatement and alleged GAAP

8    violation involved complicated accounting principles).  Moreover, the increased

9    write offs in 2007 do not support a strong inference of scienter.  *See Tripp v.*

10   *IndyMac Financial, Inc*., No. CV07-1635-GW-(VBKx), 2007 WL 4591930 at *4

11   (C.D. Cal. Nov. 29, 2007) (holding that charge offs in 2007 did not support a

12   strong inference of scienter and instead supported the inference that the defendant

13   increased its charge offs in response to the drastic changes in the housing and

14   mortgage markets).

15        Moreover, a red flag raising a strong inference of scienter cannot consist of

16   the alleged accounting violations themselves.  *See, e.g*., *In re  Stone & Webster,*

17   *Inc. Sec. Litig*., 253 F. Supp. 2d 102, 133 (D. Mass. 2003) ("'red flags . . . must be

18   something more than the accounting violation itself") (citation omitted); *Garfield*

19   *v. NDC Health Corp.,* 466 F.3d 1255, 1268 (11th Cir. 2006) ("It is established . . .

20   that the purported red flags cannot simply rehash the alleged GAAP violations.")

21   (citations omitted); *In re Spiegel, Inc., Sec. Litig*., No. 02 C 8946, 2005 WL

22   1838449, at *9 (N.D. Ill. July 29, 2005) ("[s]everal of the 'red flags' . . . appear to

23   be merely the accounting violations themselves and, as such, cannot give rise to a

24   strong inference of scienter"); *In re Bally*, 2006 WL 3714708, at *12 ("Plaintiffs'

25   'red flags' [were] largely reconstituted versions of their allegations couched in the

26   context of the [AICPA]").

27        Because plaintiffs have not alleged any facts at all about the actual audit

28   work performed by KPMG and instead rely on conclusory and speculative

1  assertions, plaintiffs fail to meet the exacting standard of "deliberate recklessness,"

2  and fail to raise a strong inference that the accounting practices were so deficient

3  that the audit amounted to "no audit at all."  *Worlds of Wonder*, 35 F.3d at 1426.

4  **V.    PLAINTIFFS HAVE FAILED TO PLEAD LOSS CAUSATION**

5        To plead loss causation against KPMG in this action, plaintiffs must allege

6  facts demonstrating that KPMG's audit opinions on Countrywide's 2004-2006

7  financial statements were false at the time they were made, and that the public

8  disclosure of such facts caused a decline in Countrywide's stock price.  *Metzler*

9  *Inv. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th

10  Cir. 2008).  The sufficiency of the loss causation allegations against KPMG must

11  be considered separately from those of the other defendants.  *See In re AOL Time*

12  *Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 676-77 (S.D.N.Y. 2007).

13        Plaintiffs still fail to identify any corrective disclosures that allegedly reveal

14  that KPMG's statements in its 2004-2006 audit reports were false at the time they

15  were made.  None of the corrective disclosures alleged in the SAC even mention

16  KPMG or its audit opinions or Countrywide's prior financial statements, let alone

17  purport to disclose the alleged falsity of KPMG's audit opinions at the time they

18  were issued.  *See AOL Time Warner*, 503 F. Supp. 2d at 679-80 (rejecting

19  corrective disclosure allegations against auditor finding that "none of them

20  'amount to a corrective disclosure . . . because they do not reveal to the market the

21  falsity of the prior' E&Y audit opinions.").

22        Unable to allege the existence of any such corrective disclosures, plaintiffs

23  instead refer to various SEC filings, press releases, analyst reports and press

24  reports and make conclusory and attenuated arguments that such information

25  constitute "partial corrective disclosures" of numerous alleged misstatements and

26  omissions by the various defendants to the SAC.  (*See* SAC, § IX.)  Plaintiffs'

27  indistinct and intertwined allegations are not sufficient to satisfy the loss causation

28  requirement against KPMG because those allegations do not establish that

1    KPMG's alleged statements were the cause of plaintiffs' alleged loss, and do not

2    provide a basis to ascribe some proportion of the loss to KPMG's statements.  *See*

3    *AOL Time Warner*, 503 F. Supp. 2d at 680 (plaintiffs failed to distinguish losses

4    allegedly caused by the auditor's statements versus other defendants, and failed to

5    allege facts ascribing some portion of the loss to the auditor's statements).

6         Moreover, plaintiffs' numerous allegations of corrective disclosures that

7    purported to reveal the risk of fraud are unavailing.  "Neither *Daou* nor *Dura*

8    support the notion that loss causation is pled where a defendant's disclosure

9    reveals a 'risk' or 'potential' for widespread fraudulent conduct."  *Metzler Inv.*

10   *GMBH*, 540 F.3d at 1064.  Although plaintiffs allege or infer what the market

11   purportedly "understood" various disclosures to mean, the Ninth Circuit Court of

12   Appeals recently held that such allegations are not "facts" but are unwarranted

13   inferences that are insufficient to withstand a motion to dismiss.  *Id.* at 1065.

14        Since plaintiffs have not alleged facts showing that Countrywide's stock

15   price declined as a result of any purported corrective disclosure revealing the

16   falsity of any of KPMG's prior audit opinions, plaintiffs have not sufficiently

17   alleged loss causation.

18   **VI.   CONCLUSION**

19        For all of the foregoing reasons, and for the reasons explained in the motion

20   to dismiss by Countrywide, defendant KPMG respectfully requests that the Court

21   dismiss the claims alleged against KPMG in plaintiffs' SAC, with prejudice.

22   DATED:  February 6, 2009          Bingham McCutchen LLP

23

24

25                                     By: /s/ _____
                                            Gwyn Quillen
26                                          Attorneys for Defendant
                                            KPMG LLP
27

28

A/72826441.6/3314001-0000328518                    -25-