DEAN J. KITCHENS, SBN 82096
DKitchens@gibsondunn.com
LINDSAY PENNINGTON, SBN 249879
LPennington@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

JONATHAN DICKEY, SBN 88226
JDickey@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 48th Floor
New York, New York 10166-0193
Telephone:  (212) 351-2399
Facsimile:  (212) 351-6399

Attorneys for Underwriter Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| In re Countrywide Financial Corp. Securities Litigation<br><br>This Document Applies to:<br>All Actions | Lead Case No.<br>07-CV-05295-MRP(MANx)<br><br>**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>Hon. Mariana R. Pfaelzer<br>Hearing Date:  April 13, 2009<br>Hearing Time:  10:00 a.m.<br>Courtroom:  12 |

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that, on April 13, 2009, at 10:00 a.m. or as soon

3 thereafter as the matter may be heard, before the Honorable Mariana R. Pfaelzer,

4 United States District Judge, located at 312 N. Spring Street, Courtroom 12, Los

5 Angeles, California, 90012, Defendants ABN AMRO Incorporated, A.G. Edwards &

6 Sons, Inc., Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas

7 Securities Corp., BNY Capital Markets, Inc., Citigroup Global Markets Inc., Deutsche

8 Bank Securities Inc., Goldman, Sachs & Co., Greenwich Capital Markets, Inc., HSBC

9 Securities (USA) Inc., J.P. Morgan Securities Inc., Merrill, Lynch, Pierce, Fenner &

10 Smith Incorporated, Morgan Stanley & Co. Incorporated, RBC Dominion Securities

11 Inc., RBC Dain Rauscher Inc., Scotia Capital Inc., TD Securities Inc., UBS Securities

12 LLC, and Wachovia Capital Markets, LLC (the "Underwriter Defendants") will and

13 hereby do move for an order dismissing portions of Plaintiffs' Second Consolidated

14 Amended Class Action Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6).

15    The Underwriter Defendants move to dismiss with prejudice all claims based on

16 accounting-related misstatements through and including 2006.  The grounds for this

17 motion are that SAC fails to allege facts sufficient to demonstrate that the Underwriter

18 Defendants are not entitled to a due diligence defense as a matter of law with respect to

19 alleged accounting-related misstatements in 2006.

20    This motion is made based on this Notice of Motion, the Memorandum of Points

21 and Authorities in support thereof, and all papers, pleadings, documents, arguments of

22 counsel, and other materials presented before or during the hearing on this motion, and

23 any other evidence and argument the Court may consider.  The Underwriter

24 Defendants also join in the arguments respecting claims under Securities Act of 1933

25 set forth in the Countrywide Defendants' and Defendant KPMG's Motions to Dismiss

26 filed in this Court on February 6, 2009.

27

28

Gibson, Dunn &
Crutcher LLP

1       Pursuant to Local Rule 7-3, counsel for the Underwriter Defendants conferred

2   telephonically with counsel for plaintiffs regarding this motion on February 2, 2009,

3   but were not able to reach agreement regarding these issues.

4

5   DATED:  February 6, 2009

6                         DEAN J. KITCHENS

7                         JONATHAN DICKEY

8                         LINDSAY PENNINGTON
                      GIBSON, DUNN & CRUTCHER LLP

9

10               By:  _Dean Kitchens_

11                        Dean J. Kitchens

12               Attorneys for Underwriter Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND OF THE COURT'S PRIOR RULINGS ............................. 2

III.  THE NEWLY ALLEGED FACTS DO NOT SUPPORT THE CLAIM
      UNDERWRITERS WERE UNREASONABLE IN RELYING ON THE
      EXPERTISED PORTIONS OF THE REGISTRATION STATEMENTS ...... 3

      A.    Virtually All Of The "Additional Facts" Were Before The
            Court Previously And Found Insufficient To Constitute "Red
            Flags" Prior To 2007 ................................................................. 5

      B.    The Other "New Facts" Are Not Alleged to Have Been Known
            by the Underwriters and Are Therefore Not "Red Flags" ...... 8

      C.    Taken As A Whole, The Alleged Red Flags Do Not Support
            The Claim It Was Imprudent For The Underwriters To Rely On
            The Expertised Portions Of The Registration Statements ..... 10

IV.   CONCLUSION ................................................................................. 11

i

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page

## CASES

*Escott v. BarChris Const. Corp.,*
   283 F. Supp. 643 (S.D.N.Y. 1968) .................................................................4

*In re Software Toolworks Sec. Litig.,*
   50 F. 3rd 615 (9th Cir. 1994) ..............................................................4, 10

*In re Van Wagoner Funds, Inc., Secs. Litig.,*
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ......................................................8

*In re Worlds of Wonder Sec. Litig.,*
   35 F.3d 1407 (9th Cir. 1994) ..............................................................4, 10

*Io Group, Inc. v. Veoh Networks, Inc.,*
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) ......................................................8

*Reiger v. PricewaterhouseCoopers LLP,*
   117 F. Supp. 2d 1003 (S.D. Cal. 2000) ......................................................8

## STATUTES

15 U.S.C. § 77k(b)(3)(C) .................................................................................3

15 U.S.C. § 77k(c) ..........................................................................................4

Gibson, Dunn &
Crutcher LLP

**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF
SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

## MEMORANDUM OF POINTS AND AUTHORITIES

The Underwriter Defendants[1] submit the following Memorandum of Points and Authorities in support of their Motion to Dismiss Portions of the Second Amended Complaint ("SAC"):

## I.    INTRODUCTION

In its Omnibus Order of December 1, 2008, the Court held the Underwriter Defendants' due diligence defense is established on the face of the Consolidated Amended Complaint ("CAC") as a matter of law with respect to alleged accounting-related misstatements in 2006. (Order at page 58.) The Court gave Plaintiffs an opportunity to replead their allegations respecting the due diligence defense, and they have attempted to do so in the SAC. (*See* paragraphs 602-605.) Because these newly alleged facts do not negate the defense this Court already held was apparent on the face of the pleading, the Underwriter Defendants now move to dismiss with prejudice all claims based on accounting-related misstatements through and including 2006.[2]

---

[1]The Underwriter Defendants (or "Underwriters") include ABN AMRO Incorporated, A.G. Edwards & Sons, Inc., Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas Securities Corp., BNY Capital Markets, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co., Greenwich Capital Markets, Inc., HSBC Securities (USA) Inc., J.P. Morgan Securities Inc., Merrill, Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, RBC Dominion Securities Inc., RBC Dain Rauscher Inc., Scotia Capital Inc., TD Securities Inc., UBS Securities LLC, and Wachovia Capital Markets, LLC.

[2]While the Court determined the Underwriters had the due diligence defense for one year in 2006, we assume that the defense would relate equally to years prior to 2006. In its Order the Court did not mention the earlier years, presumably because no claim was stated even as to the auditor defendants (Grant Thorton and KPMG) with respect to accounting-related statements prior to 2006.

Gibson, Dunn & Crutcher LLP

1    Given the clarity and thoroughness of the Court's Omnibus Order, this Motion

2  narrowly addresses only the question of the adequacy of the newly alleged facts to

3  overcome the due diligence defense apparent from the face of the CAC.  In the prior

4  Order the Court generally granted Motions to Dismiss all accounting-related

5  statements up through 2005, and then additionally granted the Underwriter

6  Defendants' Motion regarding the "due diligence" defense as to 2006.  The Plaintiffs

7  have now re-pleaded both as to the accounting-related statements generally and the

8  Underwriters' due diligence defense specifically.  Accordingly, this Motion to Dismiss

9  necessarily involves (a) the Underwriters Joinder to the Motions to Dismiss

10  accounting-related statements filed by Countrywide and KPMG for the periods

11  2004-2006, and (b) an analysis of the newly pleaded facts purporting to overcome the

12  Underwriters' "due diligence" defense.  The Underwriter Defendants do not separately

13  address (a) above, but join in the Motions of Countrywide and KPMG.  In the balance

14  of this Motion, the Underwriter Defendants address (b) above, and seek an Order

15  dismissing all accounting-related misstatements alleged against the Underwriter

16  Defendants from 2006 and prior.

## II.    BACKGROUND OF THE COURT'S PRIOR RULINGS

18    In the Omnibus Order, the Court held that the CAC did not allege sufficient "red

19  flags" to establish that the Underwriter Defendants' reliance on statements by the

20  auditors was unreasonable in 2006.  (Order at 58.)  The Court's Order notes that

21  negative trends and troubling information regarding Countrywide's performance in

22  2006 and prior were alleged in the CAC, including its aggressive business plan, its

23  deteriorating loan underwriting standards, its increasing reliance on "risky products"

24  and the increasing number of its delinquent loans.  And while the Court decided that a

25  claim as to certain of these *non*-accounting statements had been pleaded, it also

26  concluded these allegations were insufficient to plead a claim against the Underwriters

27  regarding accounting-related misstatements, because the complaint alleged no facts

28

NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF
SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

suggesting that it was unreasonable for the Underwriters to rely on expertised portions of the Registration Statements in that period.

In attempting to replead their claim of "red flags" which would have caused the Underwriters, as reasonably prudent persons, to question the validity of accounting-related statements made by the experts, all Plaintiffs have effectively done is to reiterate allegations already before the Court, portraying them this time as "Additional Facts Regarding the Failure of the Underwriter Defendants to Conduct Adequate Due Diligence."  (SAC at ¶ 602)  Because there is nothing materially new or different, the Court's previous conclusion as to the CAC likewise applies to the SAC.

## III.   THE NEWLY ALLEGED FACTS DO NOT SUPPORT THE CLAIM UNDERWRITERS WERE UNREASONABLE IN RELYING ON THE EXPERTISED PORTIONS OF THE REGISTRATION STATEMENTS

As the Court earlier noted, while Section 11 of the 1933 Act imposes responsibility for misstatements or omissions in the registration statements by which the securities at issue were sold, it also establishes a due diligence defense to such claims.  As relevant here, Section 11(b)(3)(C) provides that a potentially liable defendant is entitled to rely on an expert:  "[a]s regards any part of the registration statement purporting to be made on the authority of an expert," a defendant other than that expert will not be liable if he demonstrates that

> he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(C).

As the Court recognized in its prior decision, it is well settled that accountants are "experts" for purposes of this reliance defense and that audited financial statements

**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1  are considered "expertised" portions of a registration statement. *In re Worlds of*
2  *Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994); *In re Software Toolworks Sec.*
3  *Litig.*, 50 F. 3rd 615, 623 (9th Cir. 1994). The standard for what constitutes a
4  "reasonable ground" to believe (or disbelieve) a statement is "that required of a
5  prudent man in the management of his own property. " 15 U.S.C. § 77k(c). *See also*
6  *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968). In its Order, the
7  Court held that the CAC "does not adequately allege that Underwriter Defendants'
8  reliance on KPMG and Countrywide management's accounting-related misstatements
9  during this period [2006] was unreasonable. " (Omnibus Order at 70) This decision is
10 clearly based on the Court's assessment of the conduct of a reasonably prudent person
11 in relying on accounting experts for accounting-related statements even where some
12 negative information might suggest problems in the business.

13     Plaintiffs' burden, then, was to proffer allegations in the SAC sufficient to
14 establish the unreasonableness of the Underwriter Defendants' reliance on the
15 expertised portions. The "newly pleaded" facts germane to this Motion are found in
16 paragraphs 602-605 of the SAC.[3] While these new allegations seek to identify "red
17 flags" that purportedly would put the Underwriter Defendants on notice of
18 accounting-related misstatements prior to 2007, they add nothing new to the factual
19 allegations this Court previously held demonstrate a "due diligence" defense on the
20 face of the pleading.

21     In fact, nothing about the "red flags" alleged in the SAC changes the prior
22 conclusion that it was reasonable for the Underwriter Defendants to rely on KPMG
23 with regard to accounting-related misstatements. Although there are ten supposed "red
24 flags" (*see* Exhibit A; SAC at ¶ 605(a)-(j)) in fact, there are far fewer because several

25
26
27  [3]For the Court's convenience in reviewing the sufficiency of the allegations, the
    relevant paragraphs of the SAC are attached as Exhibit A.
28

NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF
SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

Gibson, Dunn &
Crutcher LLP

1   are just slightly different ways of saying the same thing.  Virtually all of the "red flags"

2   were already included in the prior CAC and the Court found them inadequate.

3   Moreover, many of these "red flags" are in fact *non*-accounting-related statements

4   which the Court already addressed in denying the Defendants' motion to dismiss with

5   regard to *non*-accounting related statements.  Still other "red flags" are not even

6   alleged to have been known to the Underwriters.  And most importantly, none of the

7   "red flags" constitutes notice to the "prudent person" that it is "imprudent" to rely on

8   the expertised portions of the registration statements or calling into question the

9   expertised portions of the registration statements.

10   **A.      Virtually All Of The "Additional Facts" Were Before The Court Previously**

11   **          And Found Insufficient To Constitute "Red Flags" Prior To 2007**

12   As a comparison of the prior Order and the "newly" alleged facts in paragraph

13   605 of the SAC reveals, virtually all of those allegations were contained in the prior

14   CAC and were found insufficient to overcome the defense.  These include at least

15   subparagraphs (a) through (e), (h) and (j) of paragraph 605, and arguably all of them.

16   (*See* Exhibit A.)  While it is not clear from the SAC whether the underwriters are

17   alleged to have been aware of all of them or any of them, for purposes of this Motion it

18   does not matter.  If they are alleged to have been aware of them, the Court already

19   found essentially identical allegations did not constitute sufficient "red flags" to the

20   Underwriters.  (Order at 58.)  If, on the other hand, Plaintiffs allege that the

21   Underwriters should have discovered the supposed "red flags," then that argument fails

22   as well because they have no duty to investigate expertised statements and they cannot

23   be said to be placed on notice by a "red flag" they are not alleged to have known about.

24   (*See* discussion in Section III.B. *infra*.)

25   By way of example showing these "new" allegations were in fact included in the

26   CAC, in subparagraph 605(a) of the SAC it is alleged that starting prior to 2004,

27   Countrywide publicly announced that "it had implemented a very aggressive firm-wide

28

NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF
SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

Gibson, Dunn &
Crutcher LLP

1   goal of obtaining 30% market share by 2006-2007 (and [in] 2004 announced revision

2   of that goal end date to 2008). . . .."  Those same facts were explicitly stated in

3   paragraph 94 of the CAC which alleges, among other things, that "[d]uring a

4   conference call with analysts on July 22, 2003, Mozilo stated that his goal for the

5   Company was 'to dominate the purchase market and to get our overall market share to

6   the ultimate 30% by 2006-2007.'  Mozilo reiterated during a January 27, 2004

7   conference call that our goal is market dominance and we are talking 30% origination

8   market share by 2008 to support our macro hedge strategy."  Quite obviously, the

9   Court already has concluded that allegations about aggressive growth are not "red

10  flags" to the Underwriters.

11          The new allegations also contain numerous additional references to

12  **non**-accounting statements which are just repackaged from the prior CAC.

13  Subparagraph (b) alleges that loan origination and underwriting standards had

14  deteriorated, subparagraph (c) alleges that the number of subprime loans included in

15  the securitizations was increasing, and subparagraph (d) alleges that Countrywide was

16  originating loans to high-risk borrowers and not performing proper diligence on those

17  loans.  These types of alleged misstatements were a centerpiece of the CAC and were

18  discussed at length in the Omnibus Order.  The Court found that many of them

19  adequately pled a claim as to **non**-accounting-related misstatements:  At page 64 of the

20  Omnibus Order, statements about mortgage quality were held to be properly pled as

21  **non**-accounting-related misstatements; at page 68 statements in 2004 about loan

22  quality and underwriting standards, as well as prime-subprime classifications, were

23  held to be properly pled; at page 69 statements in 2005 about prime-subprime

24  classification and the quality of the LHI portfolio were found to be properly pled

25  claims, and at page 70 omissions in 2006 about the "complete transformation of the

26  loan underwriting process" and the increasing delinquencies on loans was found to be

27  properly pled.  Thus, with respect to subparagraphs (b), (c) and (d), the Court plainly

28

Gibson, Dunn &
Crutcher LLP

**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF
SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

had before it at the time of the prior Motions to Dismiss these same essential allegations, and found them inadequate as to the issue of the Underwriter Defendants' entitlement to rely on the expertised portion of the offering materials -- that is, the accounting-related statements. The "new" allegations simply re-package the core of what already has been alleged and found lacking with regard to accounting-related misstatements.

Similarly, subparagraph (e) alleges that the change in Countrywide's "loan composition" would have shown an increased level of risk that constitutes a "red flag." The Order also addressed that claim, finding the relevant statistics "ambiguous" and was unable to infer anything about the alleged falsity of the financial statements based thereon. (Order at 67.) The CAC also contained allegations that the delinquency rates generally, as well as the HELOCs and Pay Option ARMs specifically, were increasing (compare CAC paragraphs 293-97 with SAC paragraph 605(h)) as well as allegations that accumulated negative amortization on Pay Option ARMs grew dramatically from 2004 to 2005 (Compare CAC at paragraph 290 to SAC paragraph 605(j)). (*See also* Order at 67 and 69 re 2004 and 2005.)

With respect to all these supposedly "new facts," it is apparent that they were included in the CAC, this Court previously considered virtually all of them, and the Court found them insufficient "red flags" to put Underwriters on notice of alleged accounting-related misstatements in 2006 (and, presumably in years prior as well). Despite this determination, the Court gave Plaintiffs leave to allege ***additional*** facts showing why the Underwriter Defendants' reliance on statements by the auditors was imprudent. None of these allegations constitute such "new facts," and thus none changes the result.

Gibson, Dunn & Crutcher LLP

NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)

**B.     The Other "New Facts" Are Not Alleged to Have Been Known by the Underwriters and Are Therefore Not "Red Flags"**

The balance of the supposedly "new facts" constituting "red flags" were all allegedly concealed by Countywide, or are not alleged in any event to have been known to the Underwriters.  Implicit in the concept of a "red flag" triggering a duty to inquire is that the information was *actually* known to the defendant.  In other words, a fact does not become a "red flag" until the defendant actually sees it.  *In re Van Wagoner Funds, Inc., Secs. Litig.,* 382 F. Supp. 2d 1173, 1185–86 (N.D. Cal. 2004) ("[W]here a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the [defendant]'s awareness of those details or 'red flags.'"); *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000) ("Plaintiffs leave a critical gap unbridged by failing to allege any facts suggesting Price Waterhouse knew" of red flags indicating a suspicious transaction); *cf. Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148–49 (N.D. Cal. 2008) (trademark that appeared several minutes into video clip did not constitute "red flag" of infringement, where no evidence showed that defendant "was aware of, but chose to ignore" the trademark).

It is obvious that a fact not known to a person cannot be a "red flag" alerting that person to make further inquiry.  Yet here the Plaintiffs allege that certain facts they do not even claim were known by the Underwriters, and still other facts which would have been known *if* a "proper inquiry" had been made, are nonetheless "red flags" putting the Underwriters on notice as to accounting-related misstatements.  In that regard, the Plaintiffs are confusing the "due diligence" defense under Section 11(b)(3)(A) (which provides a defense if an affirmative investigation into the accuracy of the misstatements has been made) with the defense at issue here, Section 11(b)(3)(C) (which provides a defense where reliance is placed on an expertised

**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

1   portion of the registration statement, unless the defendant is aware of a reason to

2   disbelieve it, and which does not impose an affirmative duty to investigate).  The

3   Section 11(b)(3)(C) reliance defense imposes no affirmative duty to investigate; it only

4   asks whether a defendant had a reason to disbelieve the statements of the experts so as

5   to render its entitlement to rely on the experts otherwise unreasonable.  Therefore, any

6   allegation that the Underwriters in fact were aware of those supposed "red flags" is a

7   prerequisite to pleading the unreasonableness of reliance on the expertised portions of

8   the registration statements.

9          As relevant to this pleading Motion, the Underwriters contend that the Section

10   11(b)(3)(C) defense is applicable to the entirely of paragraph 605, and by way of

11   example note the following specific subparagraphs:  subparagraph (b) (alleging that

12   Countrywide's internal underwriting matrices disclosed deteriorating loan practices but

13   making no allegation that the Underwriters had seen the matrices); subparagraph (g)

14   (alleging that the appraisal processes at Countrywide were inadequate but not alleging

15   the Underwriters knew of that alleged inadequacy); subparagraph (i) (alleging that an

16   examination of Countrywide's internal controls would have led to the uncovering of

17   the "Exceptions Processing System," which allegedly would in turn have led to an

18   inquiry of loan quality and, in turn, raised accounting questions, but making no

19   allegation that the Underwriters made an examination of internal controls or knew of

20   the Exceptions Processing System); and subparagraph (j) (alleging that the

21   examination of the increase in negative amortization would have revealed problems

22   with the loans, but making no allegation that the Underwriters conducted such an

23   examination).  The missing link in all of these alleged "red flags" is the allegation that

24   the Underwriters were aware of them and, as a result of that awareness, lacked a

25   reasonable ground to believe the accounting-related statements made by the experts.

26

27

28

Gibson, Dunn &
Crutcher LLP

**C.**    **Taken As A Whole, The Alleged Red Flags Do Not Support The Claim It Was Imprudent For The Underwriters To Rely On The Expertised Portions Of The Registration Statements**

Beyond the shortcomings in each of the ten separate subparagraphs of new Paragraph 605, it is also clear that taken as a whole they do not create a basis for a reasonably prudent person to question the accuracy of the audited financial statements and other expertised portions of the registration statements. These "newly added" allegations describe aggressive business goals (subparagraph (a)); allegedly inadequate loan applications and underwriting processes (subparagraphs (b) and (d)); awareness of the deterioration of performance of various loans (subparagraphs (h) and (j)); increasing reliance on higher risk loans (subparagraphs (c), (d), (e), and (f)) and problems in Countrywide's appraisal process and its internal controls (subparagraphs (g) and (i)). Beyond the fact that these same core themes were discussed at length in the Omnibus Order and found insufficient to overcome the "reliance" defense in the CAC, even taken as a whole (again) in the SAC they do not reasonably call into question the accuracy of the historical financial statements or other accounting-related statements, and certainly do not make it unreasonable for the Underwriters to rely thereon.

The mortgage lending business is an extremely complex one, and it is entirely appropriate for the Underwriters to rely on the expert's statement unless grounds were known to them that rendered such reliance unreasonable. Section 11(b)(3)(C) of the 1933 Act. This is not a case, such as *In re Software Toolworks,* 50 F.3d 615 (9th Cir. 1994), in which a backdated contract was found in the diligence process. Nor does it involve awareness of some blatant misapplication of GAAP, or the erroneous recognition of phantom revenue. To the contrary, this case involves complex accounting rules and the application of factual material to those rules in a setting requiring a high degree of professional judgment. *In re Worlds of Wonder Sec. Litig.,*

Gibson, Dunn & Crutcher LLP

**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PORTIONS OF SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; CASE No. CV 07-05295-MRP (MANx)**

35 F.3d 1407, 1421 (9th Cir. 1994) (auditor's accounting decisions on complex issues of revenue recognition are "precisely the type of 'certified' information on which Section 11 permits non-experts to rely.")  It is very significant that *to this day* there has been no restatement of Countrywide's financial statements, which means that there has been no determination even with the full benefit of hindsight that there were any prior material misstatements.  For these and other reasons, it was entirely appropriate for the Underwriters to rely on experts regarding the accounting-related statements in the registration statements from 2003 through 2006.  The SAC does not introduce any new allegations that establish otherwise.

## IV.   CONCLUSION

For the foregoing reasons, the Underwriter Defendants request that the Court dismiss with prejudice all claims against them based on accounting-related statements from 2003 through 2006.


DATED:  February 6, 2009

GIBSON, DUNN & CRUTCHER LLP


By:  _Dean Kitchens_____

Dean J. Kitchens

Attorneys for Underwriter Defendants

100590120_5.DOC

11

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

1  KREINDLER & KREINDLER LLP
   GRETCHEN M. NELSON (#112566)
2  MARK LABATON (#159555)
   707 Wilshire Boulevard, Suite 4100
3  Los Angeles, California  90017
   Telephone:  (213) 622-6469
4  Facsimile:  (213) 622-6019
   gnelson@kreindler.com
5  mlabaton@kreindler.com

6  *Liaison Counsel for Lead Plaintiffs*

7  LABATON SUCHAROW LLP
   JOEL H. BERNSTEIN
   JONATHAN M. PLASSE
8  IRA A. SCHOCHET
   DAVID J. GOLDSMITH
9  ETHAN D. WOHL
   ANN E. WALIER
10 140 Broadway
   New York, New York  10005
11 Telephone:  (212) 907-0700
   Facsimile:  (212) 818-0477
12 jbernstein@labaton.com
   jplasse@labaton.com
13 ischochet@labaton.com
   dgoldsmith@labaton.com
14 ewohl@labaton.com
   awalier@labaton.com

15 *Lead Counsel for Lead Plaintiff Thomas*
   *P. DiNapoli, Comptroller of the State of*
16 *New York, as Administrative Head of the*
   *New York State and Local Retirement*
17 *Systems and as Trustee of the New York*
   *State Common Retirement Fund, and Lead*
18 *Plaintiff New York City Pension Funds*

19 [Additional counsel on signature page]

20            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
21                 WESTERN DIVISION

| | |
|---|---|
| 22 IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>24 This Document Applies to:  All Actions | Lead Case No. CV 07-05295 MRP (MANx)<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>[Exhibits filed under separate cover]<br><br>Jury Trial Demanded |

600.   In combination with KPMG's knowledge that the Company had embarked on a marketing strategy that significantly increased credit risk, KPMG should have concluded that Countrywide's liability for R&W continued to increase commensurately.   In accordance with AU 342, KPMG was required to test management's assumptions used to reserve for breaches in R&W.   Default rate is an important assumption.   Had KPMG properly tested management's assumptions, KPMG would have determined that in 2006, the Company had assumed more risky loans and the delinquency rate on such loans was skyrocketing, as illustrated in paragraph 313 above.   KPMG should have concluded, based upon this red flag, that while Countrywide increased its R&W reserve for 2006, that increase was insufficient in view of the Company's continued origination and securitization of substantial numbers of loans to less creditworthy borrowers with loosened underwriting guidelines, lax or non-existent due diligence and rising delinquencies in such high risk loans.

601.   If, in 2006, KPMG had properly performed the procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading.   Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2006 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

## VII.   ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE

602.   In connection with the registration process and initial sale of the debt and preferred securities alleged in Section VIII.F below, the Underwriter Defendants were obligated to perform reasonable investigations into Countrywide's business and operations to ensure that the statements in the subject registration statements and prospectuses were not materially false and misleading.

1   In the process of conducting their "due diligence" investigations, the Underwriter
2   Defendants should have exercised a high degree of care and sought to
3   independently verify the Company's representations.  This demanding standard
4   governed all of the representations contained in the subject registration
5   statements, including those accounting-related representations in the unaudited
6   interim financial statements incorporated in the registration statements.

7       603.  The Underwriter Defendants did not properly conduct their due
8   diligence reviews, and did not properly disclose risk, despite having full access to
9   Countrywide's records (unlike the public investors in Countrywide securities),
10  and thus falsely and misleadingly presented the subject registration statements
11  and the sale of the subject debt and preferred securities offered to the Plaintiffs
12  and the public.

13      604.  As to the portions of the registration statements involving
14  accounting-related representations in the audited financial statements
15  incorporated therein, the Underwriter Defendants were generally entitled to rely
16  on KPMG's certifications.  Such reliance, however, was governed by a standard
17  of reasonableness required of a prudent person, in the respective positions of the
18  Underwriter Defendants, in the  management of that person's own property.  The
19  mere existence of an audit does not excuse the failure to investigate information
20  obtained in conducting due diligence that would prompt a reasonably prudent
21  underwriter to question the accuracy of the audited financial statements.

22      605.  In performing their due diligence procedures and investigations, the
23  Underwriter Defendants ignored the following "red flags" that required further
24  investigation of the audited financial statements:

25              (a)    Starting in 2003, Countrywide's public announcement that it
26          had implemented a very aggressive firm-wide goal of obtaining 30%
27          market share by 2006-2007 (and the 2004 announced revision of that goal
28          end date to 2008), given that there was a risk that the means designed to

1    achieve that goal would include deterioration of underwriting standards,

2    with implications as to the accuracy of loan loss reserves, MSRs, retained

3    interests, representations and warranties, and the effectiveness of internal

4    controls;

5        (b)    Confirmation of the substantial deterioration of loan

6    origination and underwriting standards as reflected in the underwriting

7    matrices, beginning in 2004;

8        (c)    The substantial number of subprime loans included in

9    securitizations, beginning in 2004, as reflected in the aggregate mean FICO

10   score bands contained in the securitization prospectuses, which the

11   Underwriter Defendants would otherwise be obligated to review, and

12   which a majority of the Underwriter Defendants necessarily reviewed

13   because they acted as underwriters during 2005 and 2006 for certain of

14   Countrywide's Class Period offerings of mortgage-backed securities; in

15   particular, Banc of America Securities, Barclays Capital, Citigroup Global

16   Markets, Countrywide Securities (which underwrote nearly all of the

17   Company's loan securitizations), Deutsche Bank, Greenwich Capital,

18   HSBC, J.P. Morgan Securities, and Morgan Stanley underwrote certain

19   securitizations during 2005 and also acted as underwriters for

20   Countrywide's Series A Medium-Term Notes offered in 2005; these nine

21   Underwriter Defendants, together with BNP Paribas, Goldman Sachs,

22   Merrill Lynch, and UBS Securities, underwrote certain securitizations

23   during 2006 and also acted as underwriters for the Series B Medium-Term

24   Notes (including the 6.25% Notes) offered in 2006; Citigroup Global

25   Markets, J.P. Morgan, Merrill Lynch, UBS Securities, Countrywide

26   Securities, Banc of America Securities; Barclays Capital, Deutsche Bank,

27   Goldman Sachs, and HSBC underwrote certain securitizations during 2006

28   and also acted as underwriters for the 7% Capital Securities offered in

2006; such review of the securitization prospectuses would have alerted these Underwriter Defendants as to both the materially increased substantial risk that the Company was taking on and its inappropriate classification of high-risk loans as "prime" (a classification that did not vary depending on where the loans were placed by the Company), which also called into question, among other things, the quality of loans held for investment, and therefore the accuracy of the loan loss reserves, as well as the quality of the securitized loans and the financial valuations associated therewith;

(d)     The sample loan documentation that the Underwriter Defendants would be required to inspect, which would have revealed that Countrywide was both originating loans to very high-risk borrowers and not performing appropriate levels of due diligence on such loans;

(e)     An examination in each year until the end of 2005 of Countrywide's loan composition, which would have shown, beginning in 2003, yearly increases in Nonprime Mortgage Loans, ARMs, and HELOCs (and Pay Option ARMs beginning no later than 2004) by very substantial percentages, revealing (along with other items listed here) that the level of risk that characterized that portfolio was changing by such material amounts that the use of historical information in calculating financial reporting valuations was inappropriate;

(f)     An examination of Countrywide's allowance for loan loss reserves as a percentage of loans held for investment, which would have shown it to be fairly static across the Class Period until 2007, during a time when the Company was rapidly producing higher risk loans;

(g)     An examination of Countrywide's collateral appraisal procedures, which would have raised serious questions as to their adequacy, including, at least until mid-2005, permitting loan officers at all

1    of Countrywide's origination divisions to hire appraisers of their own

2    choosing, to discard appraisals that did not support loan transactions and to

3    substitute more favorable appraisals by replacement appraisers, thereby

4    raising questions as to the value of collateral used to calculate the adequacy

5    of loan loss reserves, as well as the use of a database, the Field Review

6    List, to blacklist appraisers who did not comply with Countrywide's

7    requests to inflate appraisal values (including failing to engage in due

8    diligence communications with appraisers appearing on the Field Review

9    List);

10           (h)    An examination of the amount of loans that were 90 days or

11   more delinquent, which would have shown that they began to sharply

12   increase as early as 2005, including very substantial increases in defaults of

13   HELOCs and Pay Option ARMs, and that there were, during the equivalent

14   period, increases in loans 30-89 days delinquent that far exceeded the

15   increases reported by all other mortgage lenders, which should also have

16   raised questions as to the static ratio of allowance for loan losses as a

17   percentage of loans held for investment;

18           (i)    An examination of Countrywide's internal controls, which

19   would have led to the discovery of its Exception Processing System, begun

20   in 2005 and used to identify and route highly risky loans out of the regular

21   loan approval process so that they could be approved,  notwithstanding the

22   fact that they failed to meet Countrywide's already deteriorating loan

23   origination and underwriting standards, which should have raised questions

24   as to the accuracy of all valuation financial reporting items; and

25           (j)    An examination of Countrywide's accumulated negative

26   amortization on Pay Option ARMs, which would have shown that it grew

27   dramatically from 2004 to 2005, another red flag indicating the

28   increasingly poor quality and extremely high risk of such loans and the

---

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                                221
LEAD CASE NO. CV 07-05295 MRP (MANx)

**EXHIBIT A**
17

1    need to question the assumptions used in calculating financial reporting

2    valuations.

3

4    **VIII. DEFENDANTS' MATERIALLY FALSE
     AND MISLEADING STATEMENTS**

5    **A.     The Company's False Statements Regarding 2003**

6    606.   The Class Period begins on March 12, 2004.  That day, Countrywide

7    filed its Annual Report for 2003 with the SEC on Form 10-K (the "2003 Form

8    10-K").  The report was signed by Defendants Mozilo, Kurland, McLaughlin,

9    Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, King, Melone, Russell,

10   Robertson, and Snyder.

11   607.   The 2003 Form 10-K reported consolidated loan production by loan

12   type.  Specifically, prime first mortgage loans equaled $396,934,000,000, prime

13   home equity loans equaled $18,103,000,000, and subprime mortgage loans

14   equaled $19,827,000,000.  Subprime mortgages produced equaled 4.6% of the

15   total dollar amount of loans produced at year end.

16   608.   The Company also reported Mortgage Banking loan production by

17   loan type.  Mortgage Banking prime home equity loans produced equaled

18   $12,268,000,000, and Mortgage Banking subprime loans produced equaled

19   $15,525,000,000 at year end.  Prime home equity loans and subprime loans

20   produced equaled 7.0% of the total Mortgage Banking loans originated at year

21   end.

22   609.   Furthermore, the Company reported that prime and prime home

23   equity loans held for investment equaled $22.0 billion at year end.

24   610.   In a section of the 2003 Form 10-K titled "Secondary Mortgage

25   Market," the Company stated that "[w]e ensure our ongoing access to the

26   secondary mortgage market by ***consistently producing quality mortgages***. . . As

27

28

---