**DLA PIPER LLP (US)**
SHIRLI FABBRI WEISS (Bar No. 079225)
shirli.weiss@dlapiper.com
401 B Street, Suite 1700
San Diego, CA  92101-4297
Tel:  (619) 699-2700  |  Fax:  (619) 699-2701

NICOLAS MORGAN (Bar No. 166441)
nicolas.morgan@dlapiper.com
1999 Avenue of the Stars, Suite 400
Los Angeles, CA  90067-6022
Tel:  (310) 595-3000  |  Fax:  (310) 595-3300

DAVID PRIEBE (Bar No. 148679)
david.priebe@dlapiper.com
JEFFREY B. COOPERSMITH (Bar No. 252819)
jeff.coopersmith@dlapiper.com
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel:  (650) 833-2000  |  Fax:  (650) 833-2001

Attorneys for Defendant ERIC P. SIERACKI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies To All Actions. | Lead Case No. CV 07-05295-MRP (MANx)<br><br>**DEFENDANT ERIC P. SIERACKI'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:          April 13, 2009<br>Time:         10:00 a.m.<br>Courtroom:  12<br>Judge:        The Hon. Mariana R. Pfaelzer |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on April 13, 2009, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Mariana R. Pfaelzer, United States District Judge, 312 North Spring Street, Los Angeles, California, Defendant Eric P. Sieracki will and hereby does move for an order dismissing certain claims against him alleged in Plaintiff's Second Amended Class Action Complaint (the "Complaint" or "SAC"). The principal ground for this Motion is that the Complaint fails to plead the strong inference of scienter required by the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4(b)(2) for claims asserted against Mr. Sieracki  Mr. Sieracki also joins in and incorporates by reference the grounds for dismissal in the separate Motion to Dismiss filed by Countrywide Financial Corporation.

This motion is made based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, Request For Judicial Notice, and Declaration of David Priebe; all papers, pleadings, documents, arguments of counsel, and other materials presented before or during the hearing on this motion, and any other evidence and argument the Court may consider.

Pursuant to Local Rule 7-3, counsel for Countrywide, Mr. Sieracki, and the other defendants discussed the scheduling of motions to dismiss with counsel for Plaintiffs, resulting in the stipulated schedule then entered (with modification) by the Court. Countrywide also discussed the contemplated motions to dismiss with Plaintiffs, prior to the filing of its motion.

Respectfully submitted,

February 6, 2009                     DLA PIPER LLP (US)


By:   /s/ David Priebe
Attorneys for Defendant ERIC SIERACKI

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................... 3

      A.    The Complaint Erroneously Attributes April 26, 2005
            Statements To Mr. Sieracki ........................................................ 3

      B.    The Complaint Does Not Allege The Falsity Of The Other
            Statements Attributed To Mr. Sieracki ...................................... 4

            1.    July 26, 2005 Statements Regarding FICO Scores Are Not
                  Shown To Be False ............................................................. 4

            2.    September 13, 2006 Statements Regarding A Plan To Sell
                  And Purchase Securities Are Not Shown To Be False ......... 5

            3.    2007 Statements Regarding Liquidity Planning And
                  Sources Are Not Shown To Be False .................................. 6

      C.    Allegations Regarding Loan Underwriting Standards .................... 6

      D.    Allegations Regarding Financial Statements ................................ 9

      E.    Mr. Sieracki's Stock Purchases Throughout His Tenure As CFO
            Support A Strong Anti-Scienter Inference ................................. 12

III.  THE COMPLAINT DOES NOT PLEAD A STRONG INFERENCE
      OF SCIENTER AS TO MR. SIERACKI ............................................ 14

      A.    Standards For Pleading Scienter ............................................... 14

      B.    The Complaint Relies On Fact-Free Second-Guessing Of
            Subjective Accounting Judgments ............................................ 16

      C.    Mr. Sieracki's Stock Purchases Negate Any Inference Of
            Scienter .................................................................................. 20

IV.   THE COMPLAINT DOES NOT PLEAD A CONTROL PERSON
      CLAIM AGAINST MR. SIERACKI ................................................... 23

V.    CONCLUSION .................................................................................. 24

      APPENDIX OF STOCK CALCULATIONS ........................................ 25

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3

4  *Bell Atlantic Corp. v. Twombly,*
       127 S. Ct. 1955 (2007) ..................................................................... 23

5
   *DiLeo v. Ernst & Young*,
6       901 F.2d 624 (7th Cir. 1990)............................................ 17, 18, 19

7  *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase & Co.*,
8       — F.3d —, 2009 WL 129911 (2d Cir. Jan. 21, 2009) ................................ 21

9  *Glazer Capital Management, LP v. Magistri*,
       549 F.3d 736 (9th Cir. Nov. 26, 2008)..................................... 14, 23
10
   *Howard v. Everex Sys.*,
11      228 F.3d 1057 (9th Cir. 2000)...................................................... 23

12
   *In re Bristol-Myers Squibb Sec. Litig.*,
13      312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................... 22

14
   *In re Ceridian Corp. Sec. Litig.*,
15      542 F.3d 240 (8th Cir. 2008)....................................................... 17

16  *In re Federal National Mortgage Ass'n Sec., Derivative, & "ERISA" Litig.*,
17      503 F. Supp. 2d 25 (D.D.C. 2007) .............................................. 23

18  *In re Foundry Networks, Inc. Sec. Litig.*,
       No. C-00-4823-MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ...... 20

19
   *In re Hutchinson Tech., Inc. Sec. Litig.*,
20      536 F.3d 952 (8th Cir. 2008)....................................................... 19

21  *In re K-tel Int'l, Inc. Sec. Litig.*,
22      300 F.3d 881 (8th Cir. 2002)....................................................... 19

23  *In re Silicon Graphics, Inc. Sec. Litig.*,
       183 F.3d 970 (9th Cir. 1999)................................................. 14, 18
24
   *In re Vantive Corp. Sec. Litig.*,
25      283 F.3d 1079  (9th Cir. 2002)............................................ 20, 22

26
   *Malin v. XL Capital Ltd.*,
27      499 F. Supp. 2d 117 (D. Conn. 2007) .............................. 19, 20, 22

28

-ii-

*McCasland v. FormFactor Inc.*,
   No. C 07-5545 SI, 2008 WL 2951275 (N.D. Cal. July 25, 2008) ............... 20

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008)........................................................ 22

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ............................................................ 22

*Rubke v. Capital Bancorp Ltd.*,
   – F.3d –, No. 07-15083, 2009 WL 69278 (9th Cir. Jan. 13, 2009)..... 1, 14, 22

*South Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008)....................................................... 2, 14, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499 (2007) ................................. 14, 15, 16, 22, 23

*Zucco Partners, LLC v. Digimarc Corp.*,
   — F.3d —, No. 06-35758, 2009 WL 57081 (9th Cir. Jan. 12, 2009)..............
   ....................................................................................... 1, 15, 18, 19

## STATUTES

15 U.S.C. § 78j(b) .............................................................................*passim*

15 U.S.C. § 78t(a) ................................................................................ 23

15 U.S.C. § 78u-4(b)(2) ....................................................................... 14

## MISCELLANEOUS

141 Cong. R. S17965, S17982 (Dec. 5, 1995)......................................... 3

1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.     **INTRODUCTION**

3          Eric P. Sieracki ("Mr. Sieracki") joins in Countrywide Financial

4   Corporation's ("Countrywide") Motion to Dismiss portions of Plaintiffs' Second

5   Amended Complaint (the "Complaint" or "SAC").  Mr. Sieracki, who served as

6   Countrywide's Chief Financial Officer from May 2005 until its acquisition by Bank

7   Of America in July 2008, also writes separately to address the insufficiency of the

8   allegations against him.

9          Mr. Sieracki is mindful that on December 1, 2008, the Court issued a lengthy

10  Order regarding the prior complaint.  The Court, however, should re-examine the

11  scienter allegations against Mr. Sieracki in light of the following:

12         First, a new Ninth Circuit opinion, issued subsequent to the Order, has

13  provided important guidance regarding the high pleading standards for accusations

14  of accounting fraud in the specific context of claims alleged against a Chief

15  Financial Officer.  In *Zucco Partners, LLC v. Digimarc Corp.*, ___ F.3d ___, No.

16  06-35758, 2009 WL 57081 (9th Cir. Jan. 12, 2009), the court affirmed the dismissal

17  of accounting fraud claims against an issuer's CFO, although the issuer had restated

18  its financials and the complaint alleged that six anonymous sources had asserted

19  that the CFO had personally directed the incorrect practices leading to the restated

20  numbers.  *Zucco Partners* helps demonstrate that the allegations against Mr.

21  Sieracki do not state a claim.

22         Second, other new and relevant cases have issued since the Court's prior

23  Order, including another Ninth Circuit opinion, *Rubke v. Capital Bancorp Ltd.,* ___

24  F.3d ___, No. 07-15083, 2009 WL 69278 (9th Cir. Jan. 13, 2009), which provide

25  further guidance and emphasis on the strict requirement that to state a claim for

26  securities fraud, scienter allegations must be particularized as to each individual

27  defendant.  The Complaint is inadequate as to Mr. Sieracki under the standards of

28

1   these cases.

2        <u>Third</u>, and related to the second point, defendant has discovered through the

3   retrieval of judicially noticeable documents that certain statements attributed to Mr.

4   Sieracki in an analyst conference call quoted in the Complaint and upon which the

5   Court relied in its Order, were not in fact made by him.  The record of this

6   judicially noticeable error of the Complaint is supplied in Section II(A), *infra*.

7        <u>Fourth</u>, Mr. Sieracki also submits judicially noticeable documents showing

8   that he not only refrained from selling stock during the relevant period, as was

9   acknowledged by the Court in its prior Order, but that he *purchased* stock and held

10  it, forgoing nearly $20 million in profit and paying tax on non-existent profits.

11  Such facts strongly giving rise to the anti-scienter inference that Mr. Sieracki did

12  not believe Countrywide's statements were false, concealing undisclosed risks, but

13  rather believed that Countrywide had disclosed its risks and had a bright future.  In

14  other words, it is inconceivable that Mr. Sieracki would have taken this course had

15  he believed that Countrywide's public statements were false.  Indeed, one court

16  held that such conduct is "wholly inconsistent with fraudulent intent."  Under the

17  holistic approach to scienter adopted by *South Ferry LP, #2 v. Killinger*, 542 F.3d

18  776 (9th Cir. 2008), the only reasonable inference that can be drawn from this

19  information is that Mr. Sieracki believed that Countrywide's public statements

20  (including its financial statements) were accurate and that its prospects were bright.

21       <u>Finally</u>, numerous other factors strongly support dismissal as against Mr.

22  Sieracki.  The Complaint does not allege any facts showing that Mr. Sieracki

23  deliberately or consciously caused Countrywide to issue false or misleading

24  financial statements.  There are no allegations about any specific piece of

25  undisclosed adverse information or document known to Mr. Sieracki, any improper

26  accounting judgment or departure from GAAP made by Mr. Sieracki, any internal

27  statement by Mr. Sieracki that contradicted anything Countrywide said publicly, or

28  indeed about how the financial statements were prepared at all.  Nor does any

former employee source allege facts showing that Mr. Sieracki consciously misrepresented the financial statements.  It is also undisputed that Countrywide's financial statements never were restated, even after the company was acquired. Moreover, a lack of scienter is a particularly appropriate conclusion here because Plaintiffs challenge inherently subjective judgments regarding the timing of loss reserves and asset revaluations.  Even before the Reform Act, such claims were recognized as nothing more than claims of "fraud by hindsight."  The Complaint does nothing to dispel that characterization, and indeed its allegations do not show the malfeasance touted by Plaintiffs.

In suing Mr. Sieracki, Plaintiffs have demonstrated the classic and long discredited "sue them all" mentality.  However as one Senator explained in urging adopton of the Private Securities Litigation Reform Act of 1995, the "sue them all and let the judge sort it out mentality" is exactly the approach Congress sought to eliminate.  141 CONG. R. S17965, S17982 (Dec. 5, 1995) (Sen. Burns).  A reexamination of the allegations against Mr. Sieracki in the light of new authority and judicially noticeable facts show that Plaintiffs have pled no basis to accuse him of securities fraud, and the claims against him should be dismissed.

## II.   STATEMENT OF FACTS

Mr. Sieracki focuses on those allegations of the Complaint that address him, and that pertain to the preparation of Countrywide's financial statements.

### A.   The Complaint Erroneously Attributes April 26, 2005 Statements To Mr. Sieracki

Plaintiffs allege that Mr. Sieracki served as Countrywide's Executive Managing Director and CFO since April 2005.  SAC ¶ 28.  Plaintiffs allege that as the CFO, Mr. Sieracki signed SEC filings and Sarbanes-Oxley Act certifications, and alleges in conclusory fashion that these contained false or misleading financial statements and disclosures regarding loan underwriting practices.  *Id*. ¶¶ 717, 754, 774, 794, 819, 841, 872, 894, 928, 977.

1   The Complaint also avers to other statements allegedly made by Mr.
2   Sieracki.  The first two statements purportedly occurred on an April 26, 2005
3   conference call, and refer to loan origination protocols.  SAC ¶¶ 702-703.  The
4   Court explicitly focused on this allegation in its discussion of Mr. Sieracki's alleged
5   scienter.  Order at 95.  But Mr. Sieracki did not make the statements.  The Court is
6   requested to take judicial notice of a transcript of the call, which is publicly
7   available and is attached as Exhibit A to the Declaration of David Priebe.  The
8   passages from the transcript that are cited in the Complaint are highlighted in the
9   Exhibit, at pages 8 and 16.  They show that the statements were made by Angelo
10  Mozilo and Stanford Kurland, not Mr. Sieracki.

11      **B.      The Complaint Does Not Allege The Falsity Of The Other**
12              **Statements Attributed To Mr. Sieracki**

13  The Complaint does not allege that the other statements alleged to have been
14  made by Mr. Sieracki were false, inasmuch as the falsity allegations simply do not
15  contradict the contents of the statements.

16      **1.      July 26, 2005 Statements Regarding FICO Scores Are Not**
17              **Shown To Be False**

18  The Complaint alleges that in a July 26, 2005 conference call, Mr. Sieracki
19  stated that customers for home equity loans had good credit qualities, with an
20  average 730 FICO score.  SAC ¶ 739.  In response to a question regarding the
21  stability of the nonprime mortgage sector, Mr. Sieracki stated that Countrywide "is
22  running over 80% premier in A *minus*.  We operate at the very top end of the
23  nonprime credit spectrum.  The FICO scores have remained very steady, just over
24  600."  *Id*. ¶ 740 (emphasis added to word omitted by Plaintiffs).

25  Plaintiffs allege that these statements were false and misleading, referring to
26  generalized allegations that Countrywide produced riskier loan products and had
27  lax underwriting standards.  *Id*. ¶ 741.  But Mr. Sieracki did not speak to
28  underwriting standards as a whole.  He presented *specific FICO numbers* regarding

*specific sectors*:  the nonprime mortgage sector and HELOCs.  The Complaint does not allege that Mr. Sieracki misrepresented the FICO statistics, or that FICO scores just over 600 would not fall within the "very top end of the nonprime credit spectrum," or that Countrywide was not running over 80% premier in A minus.[1]  Moreover, as explained below, the Complaint's allegations regarding "Countrywide's" underwriting practices frequently do not refer to Countrywide as a whole at all.  *See* Section II(C), *infra*.

> ### 2.  September 13, 2006 Statements Regarding A Plan To Sell And Purchase Securities Are Not Shown To Be False

The Complaint next alleges that Mr. Sieracki answered a question at a Fixed Income Forum on September 13, 2006.  He was asked whether the recently announced plan to sell convertible hybrid securities and repurchase common stock signified that Countrywide had changed its position on growth rates and risk.  Mr. Sieracki allegedly stated that it did not:  "We're talking about equity neutral transactions with hybrid securities, so it's really a matter of refining, perfecting and optimizing our capital structure…. so I don't want anybody to get the impression that there's been a change in our risk appetite or that we're going to do anything aggressive here."  SAC ¶ 849.  The Complaint does not allege any facts showing that Mr. Sieracki's description of the transactions was false, or that the plan announced at this time was accompanied by a change in risk preferences, or that the "risk" referenced in the question and answer refer to the topic of loan underwriting at all.

---

[1]  Indeed, as Plaintiffs assert that the definition of "subprime" is based solely on a FICO score under 620 (SAC ¶¶ 239-240)—although defectively so, as the sources they cite do not actually say this, when read carefully—they presumably agree with an assessment that FICO scores just over 600 would fall within the very top end of the nonprime credit spectrum.

1
2

     **3.**     <u>**2007 Statements Regarding Liquidity Planning And Sources**</u>
<u>**Are Not Shown To Be False**</u>

3     Finally, Plaintiffs challenge three statements allegedly made by Mr. Sieracki

4 regarding liquidity.  At a Raymond James conference on March 6, 2007, Mr.

5 Sieracki allegedly commented that liquidity "was a huge issue" and that while

6 monoline subprime lenders (companies that, unlike Countrywide, engaged solely in

7 subprime lending) would suffer, Countrywide was "very well positioned" "due to

8 experience in these cycles, expertise, operating controls and our liquidity position."

9 SAC ¶¶ 895-896.  Mr. Sieracki also allegedly made statements regarding liquidity

10 plans and liquidity sources, and Countrywide's $14 billion net worth (which

11 Plaintiffs contend was inflated), in an August 2, 2007 press release.  *Id.* ¶ 967.

12 Plaintiffs also challenge an October 26, 2007, statement that "the liquidity situation

13 is very strong at Countrywide."  *Id.* ¶ 1017.

14     The Complaint alleges that these statements were false due to the reasons set

15 forth in Section IV.H of the Complaint   SAC ¶¶ 897, 968, 1017.  But Plaintiffs fail

16 to make any allegations specifically against Mr. Sieracki in that Section.  Moreover,

17 the Complaint does not (and cannot) allege facts showing that Countrywide had *not*

18 engaged in liquidity planning or did *not* have several liquidity sources at the time of

19 each statement.  To the contrary, the Complaint acknowledges that Countrywide

20 was able to draw upon a $11.5 billion credit facility on August 16, and that Bank Of

21 America invested $2 billion on August 23.  *Id.* ¶¶ 408, 412.

22     **C.**     <u>**Allegations Regarding Loan Underwriting Standards**</u>

23     The lynchpin of the Complaint is its assertion that the "Officer Defendants"

24 as a generic group received internal reports regarding Countrywide's loan

25 underwriting standards or practices, which supposedly varied from what was

26 disclosed.  A close analysis of these allegations shows that they do not constitute

27 factually-based allegations that loan underwriting standards varied from what was

28 disclosed, much less that the financial statements were flawed as a consequence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>First</u>, while Plaintiffs allege that Countrywide would make any loan regardless of the borrower's credit risk (SAC ¶¶ 5, 84, 87, 449), the Complaint does ***not*** allege that Countrywide failed to take the credit risk presented by each borrower into account in pricing the loans.  To the contrary, the Complaint alleges that David Sambol directed that Countrywide would charge additional fees for riskier loans.  *Id.* ¶¶ 5, 180, 448 (there would be "pricing add on when necessary"), *see also id.* ¶ 193 (PAL used to price "exception" loans, based on risk).[2]  It goes without saying that a lender making loans to borrowers with credit risk, but even high credit risk is not securities fraud.  Plaintiffs allege that Countrywide's loan standards were not "prudent" as they were represented.  But this conclusory allegation is not factually supported by allegations that Countrywide lent to borrowers with high credit risk.  Underwriting prudence, a subjective evaluation, does not depend solely on the riskiness of the borrower; it also depends on the price charged for the risk.  Plaintiffs presented an incomplete picture in eliciting the Court's opinion on this topic.

<u>Second</u>, Plaintiffs assert that a high percentage of loans was made as exceptions to "normal" underwriting criteria, yet most of their allegations simply do not pertain to Countrywide's underwriting criteria.  Rather, much of Plaintiffs' argument is based on documents and anonymous sources relating to a division called Full Spectrum Lending ("FSL").  SAC ¶¶ 196-197, 231-233 (citing presentation and DLO Matrix for FSL); *see also id.* ¶¶ 168-173 (citing former FSL employee CW8); *id.* ¶ 208 (citing former FSL employee CW13), *id* ¶ 216 (referring to alleged practice of "Countrywide subprime"); *id.* ¶¶ 234-235 (referring to FSL business reviews).  Thus, Plaintiffs' allegations about exceptions to "normal" underwriting compare apples to oranges and demonstrate nothing.  Plaintiffs admit that FSL was the subprime division of Countrywide.  SAC at xv.  FSL would be

---

[2]  To similar effect, the Complaint also acknowledges that the margins on allegedly riskier loan types was higher.  SAC ¶ 104.

1   expected to have employed different underwriting standards than the principal

2   direct lending divisions within the Company.  Likewise irrelevant are the

3   Complaint's references to "CLD," the Correspondent Lending Division.  SAC

4   ¶¶ 133-153, 162-167, *citing* CW2 and alleged documents.  Correspondent Lending

5   refers to loans underwritten and closed by external sources and then acquired by

6   Countrywide, *not* to loans made by Countrywide.  *Id.* at xiii.[3]

7          Thus, Plaintiffs use the complexity of Countrywide's business as a

8   camouflage to make unsubstantiated leaps of logic, which, upon examination, fail

9   the strict pleading standards of the Reform Act.  Similar flaws plague Plaintiffs'

10  allegations regarding pay option ARMS.  Plaintiffs assert that investors suddenly

11  learned after the Third Quarter 2007 that 81% of the pay option ARMS in

12  Countrywide Bank's portfolio had been made with low or no documentation,

13  implying that this signaled a new fact about declining loan underwriting standards

14  hitherto unknown to investors.  SAC ¶ 106.  In fact, Countrywide explicitly

15  disclosed more than one year earlier that "*substantially all* of the pay-option loans

16  we originate are underwritten based on 'reduced documentation' standards whereby

17  the loan applicant's income is based on representations provided by the borrower."

18  Form 10-Q for Second Quarter 2006 filed Aug. 8, 2006 at 37 (emphasis added)

19  (Priebe Decl. Ex. H).  In addition, while Plaintiffs do not contest the accuracy of the

20  average FICO score for pay option ARMS disclosed by Countrywide throughout

21  the class period, they nevertheless assert that the number was misleading because a

22  band of loans were made below the average.  SAC ¶ 249.  All this demonstrates is a

23  lack of understanding of a basic concept of mathematics (the meaning of "average")

24  on the part of Plaintiffs.

25

26  [3]  The Court relied on the FSL document cited in paragraph 197 as support for the
    proposition that exception loan percentages were high from the start of the class
27  period.  Order at 12; *see also id.* at 14 (referencing an FSL manager source).  The
    Court also cited CLD in several places in its opinion.
28

1        <u>Third</u>, Plaintiffs assert that Countrywide first disclosed in a July 24, 2007

2   conference call that it had relaxed underwriting standards by including loans with

3   FICO scores in the low 500s within the category "prime."  *Cf.* SAC ¶¶ 239, 240,

4   244 (attributing statements to John McMurray, and citing two analysts'

5   interpretation of the call).  The transcript of the call shows that Mr. McMurray

6   spoke on theoretical models of risk.  *See* Priebe Decl. Exhibit B.  Mr. McMurray

7   explained that due to several factors (such as the availability of Fannie Mae and

8   affordability programs), assigning loans to the categories "prime" and "subprime"

9   for purposes of the model was not a straight function of FICO scores.  *Id.* at 4-5, 11.

10  Significantly, neither the Complaint nor the analysts' remarks cited therein alleges

11  that Mr. McMurray was incorrect in his assessment.  Moreover, Mr. McMurray

12  explained that in the application of the multifactor analysis of loan categories, loans

13  with *high* FICO scores could nevertheless fail to qualify for prime loan status, but

14  would instead be classified as subprime.  *Id.* at 34.  Plaintiffs ignore this

15  explanation, because it refutes their assertion that Mr. McMurray attested to a

16  leftward (towards lower FICO scores) shift in the overall distribution of loans into

17  the prime vs. subprime categories.  Hence, Plaintiffs' "spin" to that effect distorts

18  what was actually disclosed.  Moreover, the Complaint does not allege the

19  magnitude of any seepage of prime loans into the low-500s FICO range.

20       **D.**    <u>**Allegations Regarding Financial Statements**</u>

21       As Countrywide's CFO, Mr. Sieracki pays particular attention to the

22  Complaint's allegations regarding Countrywide's financial statements.  Those

23  allegations, too, come up short in premise and specifics.

24       The backdrop of Plaintiffs' story about the financial statements is a portrayal

25  of Countrywide as having enjoyed unqualified success, unaffected by housing

26  market declines or valuation adjustments, until the announcement of Second

27  Quarter 2007 results on July 24, 2007.  SAC ¶¶ 952-954 (asserting this was the first

28  instance in which "truth" was revealed); *id.* ¶ 363 (alleging that "Countrywide first

1   wrote-down the fair value of its MSRs in its third quarter 2007 Form 10-Q."). The

2   Court cited some of these allegations which were asserted in the prior complaint.

3   See Order at 61-62 (finding unusual a $1 billion decline in the value of MSRs

4   during Fiscal Year 2007); *id.* at 63 (referring to $177.3M increase in R & W

5   reserves in Q307).

6          In fact, the Second Quarter 2007 was not the first time Countrywide had

7   reported higher reserves, decreasing MSR valuations, and/or negative effects of the

8   mortgage market.  For example:

9   •       For the First Quarter 2007, Countrywide reported that mortgage banking

10          revenues from subprime operations had declined by approximately $400

11          million; that revenues from subprime investments had declined by $155

12          million, "largely as a result of impairment charges against retained interests

13          from subprime and related securities, net of credit hedge gains"; that other

14          net credit costs had increased by $132 million "as a result of rising

15          delinquencies, deteriorating housing market conditions, and resulting

16          increased loss reserves"; and that Loan Servicing sector pre-tax earnings

17          "were adversely impacted by $429 million in impairment charges against

18          retained interests," including $231 million related to subprime and similar

19          interests and $135 million related to HELOCs.  *See* press release dated April

20          26, 2007.[4]

21   •       For the Fourth Quarter 2006, Countrywide recorded a $70.8 million

22          provision for loan losses.  For the year as a whole, the $233.8 loan loss

23          provision was more than twice the provision taken in the prior year (2005).

24          Countrywide also took a $73 million charge for the impairment of retained

25          interests in the MSR portfolio.  *See* press release dated Jan. 30, 2007 at 7, 14.

26

27   ───────────────────────

28   [4]  Copies of this press releases and the other quarterly earnings releases cited herein
     are attached as Exhibits C through G to the Priebe Declaration.

SIERACKI MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. CV 07-07097-MRP (MANx)

1 • The value of MSRs declined by over $1 billion in the Third Quarter 2006

2 alone.  *See* press release dated Oct. 24, 2006 at 7.[5]  Countrywide also took a

3 $140 million charge for the impairment of retained interests in the MSR

4 portfolio.  *Id.*

5 Hence, the context created by Plaintiffs for their accounting fraud allegations

6 is flawed from the outset, once the judicially noticeable public record is consulted.

7 Equally flawed are the substance of the financial fraud allegations.  The Complaint

8 alleges that Countrywide's financial statements violated GAAP because the value

9 of mortgage servicing rights and retained interests were not written down as timely

10 as Plaintiffs would like, and because loan-related loss reserves were not taken as

11 timely as Plaintiffs now say they should have been taken.  SAC at 101-144.

12 Countrywide and KPMG are addressing the GAAP provisions at issue in their

13 respective motions to dismiss, and hence Mr. Sieracki will not address those

14 provisions in any detail.  However, two points must be made regarding the

15 application of GAAP as it pertains to Mr. Sieracki's alleged scienter:

16 First, the Complaint cites no anonymous source who avers to the preparation

17 of Countrywide's financial statements or SEC filings, nor any alleged documents

18 discussing these topics.  As a result, no source, be it documentary or testimonial,

19 alleges facts showing that Mr. Sieracki (or anyone else) consciously violated any

20 applicable GAAP standard, or directed anyone else to violate GAAP.  One of the

21 anonymous sources, CW1, claims to have worked with Mr. Sieracki on a daily

22 basis (SAC ¶ 83), yet does not allege that he did anything improper.[6]  The other

23 sources relied upon by Plaintiffs do not even claim to have had any contact with

24 Mr. Sieracki.

25 _____

26 [5] Countrywide also had taken a charge in excess of $1 billion for the impairment of MSRs in the Second Quarter 2005.  *See* press release dated July 25, 2006 at 5

27 (reporting $1.281 billion impairment for quarter ended June 30, 2005).

28 [6] CW1 speaks almost exclusively of the alleged actions of officers other than Mr. Sieracki.  *See* SAC ¶ 442.

Second, the Complaint does not allege that the defendant recipients of any information regarding loan underwriting standards, including Mr. Sieracki, failed to incorporate that information into Countrywide's financial statements or qualitative disclosures.  For example, CW1 asserts that Defendants "knew that delinquencies in Pay Option ARMs and HELOCs, the loans that presented the greatest risk of default, and accumulated negative amortization from unpaid debt on Pay Option ARMS, were all increasing substantially during the Class Period."  SAC at 472. But this cannot constitute material nonpublic information known only to Mr. Sieracki and not incorporated into the financials.  Countrywide publicly disclosed information on these topics when reporting its quarterly results on various occasions throughout the class period, and Plaintiffs do not allege that the published numbers were false.[7]  Equally as significant, CW1 does **not** allege that Mr. Sieracki failed to take this information, or any other information, into account in managing the preparation of Countrywide's financial statements.  Neither does any other source, some of whom claim to have been involved in financial reporting.

### E.    Mr. Sieracki's Stock Purchases Thoughout His Tenure As CFO Support a Strong Anti-Scienter Inference

Mr. Sieracki's stock transactions support a strong inference *against* scienter. In its Order, the Court referenced Mr. Sieracki's stock transactions, noting correctly

---

[7]  For example, the press release announcing Third Quarter 2005 results stated that Countrywide Bank's portfolio included $22 billion in pay option loans and $14 billion of interest-only loans, versus $4 billion and $8 billion, respectively, for the Third Quarter 2004.  It also disclosed the principal amount of pay option loans with negative amortization ($7.9 billion) and the amount of the accumulated negative amortization ($25.5 million), versus lower figures for the Third Quarter 2004 ($2.7 million and $3,000).  Press release dated Oct. 27, 2005 at 9.  The same information was disclosed in the July 25, 2006 press release announcing Second Quarter 2006 results; the January 30, 2007 press release announcing Fourth Quarter 2006 results; and the April 26, 2007 press release announcing First Quarter 2007 results. Delinquency rates for Countrywide Bank's portfolio were disclosed in the press releases announcing results for the Fourth Quarter 2005, First Quarter 2006, Third Quarter 2006, and Fourth Quarter 2006.  As noted, press releases are attached as Exhibits C through G to the Priebe Declaration.

1   that Mr. Sieracki "had no <u>net</u> sales during the class period."  Order at 80 (emphasis
2   in original), *id.* at 82 (assuming no sales).

3          The public record, cognizable on a motion to dismiss, [8] shows that Mr.
4   Sieracki did not just have "no <u>net</u> sales":  he did not sell a single share of stock
5   during his tenure as CFO.  Most importantly, Mr. Sieracki *purchased* stock
6   throughout his tenure at CFO by the exercise of options, *without selling the*
7   *acquired shares in the open market* or otherwise, forgoing a significant profit.  On
8   May 26, 2005, Mr. Sieracki acquired 31,062 shares by exercise of options, which
9   he did not sell at the then-current closing market price of $36.65 per share.  *See*
10  Appendix Of Stock Calculations, *infra*.  By retaining rather than selling these
11  shares, Mr. Sieracki chose not to take a profit of $1,139,751.  On July 11, 2006, Mr.
12  Sieracki paid cash to exercise options and acquire 60,000 shares, which he did not
13  sell at the then-current closing market price of $38.08 per share.  By retaining rather
14  than selling these shares, Mr. Sieracki chose not to take a profit of $1,936,800.  *Id.*
15  On May 31, 2007, Mr. Sieracki acquired 13,806 shares by the exercise of options,
16  which he did not sell at the then-current closing market price of $38.94 per share.
17  By retaining rather than selling these shares, Mr. Sieracki chose not to take a profit
18  of $441,139.  *Id.*

19         This information, combined with Mr. Sieracki's holdings reported in the
20  proxy statement filed April 27, 2007, shows that Mr. Sieracki experienced a loss in
21  value of between $18.3 million and $19.9 million by not selling his holdings on
22  May 31, 2007, the date of his last stock purchase.[9]  Moreover, it is a matter of
23  common knowledge that Mr. Sieracki, like any person exercising options but not

24

25  [8]  Paragraphs 9 through 14 of the Priebe Declaration attach SEC filings and Internet
    site references documenting the stock information set forth in this brief.
26
27  [9]  Some of the holdings were in the form of vested options, for which Mr. Sieracki
    would have paid an exercise price.  However, as the Forms 4 show, the exercise
28  prices for the options he exercised in 2005 through 2007 were much lower than the
    $38 per share open market price at which he could have sold in late May 2007.

selling the acquired shares, would have paid thousands of dollars in Alternative
Minimum Tax on the paper profit in the transactions.

## III.   THE COMPLAINT DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER AS TO MR. SIERACKI

### A.   Standards For Pleading Scienter

The scienter element for a federal securities fraud claim requires particular facts demonstrating a deliberate and conscious act on the part of the defendant, via either recklessness or knowing misrepresentation.  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999).  The Reform Act requires Plaintiffs to plead particular facts showing a strong inference of scienter.  15 U.S.C. § 78u-4(b)(2).  This entails the pleading of specific facts which give rise to an inference that is "powerful or cogent" and "cogent and compelling."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007).  The judicial inquiry as to whether a securities complaint meets this standard is guided by key tenets:

*Holistic inquiry.*  Even if the affirmative allegations of a complaint suggest a powerful, cogent and compelling inference of scienter, if there are also anti-scienter inferences that may be derived from the complaint and from matters of judicial notice, the inference of scienter must be at least as compelling as the competing anti-scienter inference.  *Tellabs*, 127 S.Ct. at 2510.  This requires a holistic analysis of all the allegations from a complaint and matters of judicial notice.  *South Ferry*, 542 F.3d at 782.

*Quantity does not imply quality*.  The Complaint cites fourteen anonymous sources and one disclosed former employee source (who complains about a joint venture, not Countrywide itself).  Courts must carefully examine the allegations from sources such as these from two standpoints—for content and for the alleged basis of knowledge—and cannot assume that the sheer quantity of allegations makes up for a lack of substance.  To the contrary, courts have recognized that quantity may be a device intended to camouflage poor quality of allegations.

1   Hence, in affirming dismissal in *Zucco Partners* notwithstanding a "voluminous"

2   number of allegations (including allegations from six anonymous sources), the

3   Ninth Circuit chastised plaintiffs for assuming that "compiling a large quantity of

4   otherwise questionable allegations will create a strong inference of scienter through

5   the complaint's emergent properties."  2009 WL 57081 at *22.

6       *Individualized inquiry*.  Facts showing each defendant's scienter must be

7   pleaded, *see Tellabs*, 127 S.Ct. at 2511 n.6, and they must be pleaded on an

8   individualized basis; that is, upon what that person, not someone else, knew.  The

9   Ninth Circuit has emphasized the significance of these rules in two recent decisions.

10   In *Rubke v. Capital Bancorp Ltd.,* ___ F.3d ___, No. 07-15083, 2009 WL 69278

11   (9th Cir. Jan. 13, 2009), the court reasoned that allegations about a non-employee

12   director who allegedly made false statements to shareholders did not plead that "*the*

13   *defendants* in this case had the requisite mental state." *Id.* at *9 (emphasis in

14   original).  In *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736 (9th Cir.

15   Nov. 26, 2008), where a CEO's scienter was the key to attributing liability to his

16   corporation, the court focused on what the CEO knew about the alleged undisclosed

17   misconduct, not on what other employees knew.  *Id.* at 745.

18       **Internal disagreement in accounting practices does not evidence scienter.**

19   In *Zucco Partners*, the complaint alleged that the defendant company's

20   management openly questioned the formulae used by the company's internal

21   accounting system to account for software development costs, and complained

22   about the system to its vendor (Microsoft).  The Ninth Circuit reasoned that this

23   established at best disagreement and questioning within the company about the

24   system, not that the auditors had counseled against using the system or that

25   management admitted that its use of the system was wrong.  Such disagreement

26   was "far from the deliberate, conscious recklessness required for a strong inference

27   of scienter under the PSLRA."  2009 WL 57081 at *12.  Thus, the Complaint's

28   reliance on the personal opinions regarding the prudence of loan underwriting

1   standards of anonymous sources (such as CW10, *see* SAC ¶ 178) or the valuation

2   of retained interests (such as CW1, *see* SAC ¶ 343) signify nothing.

3       ***The absence of allegations one would expect counts against scienter***.  The

4   absence of allegations one would expect to see if there was scienter is a factor

5   counted against plaintiffs.  *Tellabs*, 127 S.Ct. at 2511 ("We agree that omissions

6   and ambiguities count against inferring scienter....").

7       Under these standards, the Complaint does not plead scienter on the part of

8   Mr. Sieracki.  It does not aver to any information Mr. Sieracki received that

9   contradicted any SEC filing he signed (including any number in any financial

10  statement), or any oral statement he made.  It does not contain any allegation, from

11  any source, that Mr. Sieracki committed or directed any malfeasance.  Indeed, the

12  Complaint's challenge to Countrywide's financial statements constitutes a classic

13  attempt to plead accounting fraud by hindsight that courts have found objectionable

14  even before the Reform Act.  Set against the lack of adverse information against

15  Mr. Sieracki is the judicially noticeable fact that he *purchased* Countrywide stock

16  throughout the class period, and held onto those shares and his other holdings at a

17  considerable loss.  No person who believed that Countrywide's public statements

18  were false or that its prospects were bleak would have engaged in this behavior.

19      **B.    The Complaint Relies On Fact-Free Second-Guessing Of**

20              **Subjective Accounting Judgments**

21      The Complaint apparently objects to Countrywide's purported loan

22  underwriting standards.  Plaintiffs, however, do not (and cannot) allege that those

23  standards were improper.  Rather, Plaintiffs claim to be ignorant of the standards.

24  More importantly for purposes of assessing the purported claim against Mr.

25  Sieracki, Plaintiffs assert that Countrywide's financial statements were false

26  because certain assets were not timely written down and loan loss reserves were not

27  timely increased, allegedly in violation of GAAP.  *See* Section II(D), *supra*.

28      As explained in Countrywide's Motion to Dismiss, the Complaint

1    misapprehends the relevant GAAP standards.  Apart from this error, Plaintiffs'

2    GAAP claims are predicated on second-guessing of subjective judgments.  GAAP

3    is not a canonical set of rules, but rather is a set of pronouncements that allow

4    judgment and difference of opinion.  *See*, *e.g*., *In re Ceridian Corp. Sec. Litig.,* 542

5    F.3d 240, 246 (8th Cir. 2008) (citations omitted; affirming dismissal of securities

6    fraud claims involving company that issued five restatements over two year period).

7    The GAAP principles at issue in this case are no different, for they involve

8    subjective matters of judgment and timing.  For example, the Complaint

9    acknowledges that SAB 102, which supposedly governs methodology for loan loss

10   reserves, should "incorporate management's *current judgments* about the credit

11   quality of the loan portfolio through a disciplined and consistently applied process."

12   SAC ¶ 292 (emphasis added).

13        All the Complaint does is second-guess these subjective judgments after the

14   fact.  Even before the Reform Act, courts recognized the fraud-by-hindsight essence

15   of this type of claim.  In the classic case of *DiLeo v. Ernst & Young*, 901 F.2d 624

16   (7th Cir. 1990), the Seventh Circuit considered securities fraud claims asserted

17   against the auditors of a bank that had experienced a precipitous decline in fortune

18   when "risky loans did not pay off."  *Id.* at 626.  Plaintiffs alleged, as do Plaintiffs

19   here, that although the bank had increased its loan reserves, it "did not do so fast

20   enough," and indeed was under-reserved by $4 billion.  *Id*. at 626-27.  The court

21   characterized plaintiffs' theory as second-guessing the timing of inherently

22   subjective judgments, and held that it did not amount to fraud:

23            For any bad loan the time comes when the debtor's failure is so plain

24            that the loan is written down or written off.  No matter when a bank

25            does this, someone may say that it should have acted sooner.  If all

26            that is involved is a dispute about the timing of the writeoff, based on

27            estimates of the probability that a particular debtor will pay, we do not

28            have fraud; we may not even have negligence.  Recklessness or fraud

1        in making loans is not the same as fraud in discovering and revealing

2        that the portfolio has turned sour.

3    The court thus affirmed dismissal, even though scienter at the time could be averred

4    generally.  The court reasoned that "[b]ecause only a fraction of financial

5    deteriorations reflects fraud, plaintiffs may not proffer the different financial

6    statements and rest," and it quoted Judge Friendly to the effect that all plaintiffs had

7    offered is forbidden "fraud by hindsight…"  *Id.* at 627, 628.

8          The Reform Act codified that the type of accounting second-guessing decried

9    by *DiLeo v. Ernst & Young* no longer suffices.  *Silicon Graphics,* 183 F.3d at 988

10   (Congress enacted the Reform Act to "put an end to the practice of pleading fraud

11   by hindsight.").  Recently, the Ninth Circuit implemented the Reform Act in

12   considering accounting fraud claims against a corporation and its CFO.  In *Zucco*

13   *Partners*, six anonymous sources accused the CFO of approving and ordering

14   incorrect practices to monitor and then account for the costs of software

15   development, and/or not writing down obsolete inventory on a timely basis.  One

16   source, CW1, credibly alleged that he or she had been ordered by the CFO not to

17   write down obsolete inventory because that would result in the company missing

18   market expectations.  2009 WL 57081 at *13.  The complaint further alleged that

19   management had complained about the software system used to record and account

20   for software development expenses.  *Id.* at *12.  The CFO proved to be wrong, as

21   the company restated the manner in which it accounted for the expenses.  The CFO

22   resigned, as did two corporate controllers and the company's outside auditors.  *Id.*

23   at *16.  Before his resignation, the CFO sold 48% of his stock holdings, including

24   vested options.  *Id.* at *19.  The Ninth Circuit nevertheless affirmed dismissal for

25   failure to plead scienter.  It explained that the accounting decisions regarding

26   software development expenses were subjective; the complaint disclosed at most a

27   disagreement over those decisions, not a consciously reckless or intentional desire

28   to make wrong accounting decisions on the part of the CFO; and that other

1   allegations of the complaint outweighed CW1's assertions against the CFO.[10]

2        The allegations of the Complaint against Mr. Sieracki cannot suffice under

3   these standards.  The allegations that Countrywide recorded additional reserves and

4   devalued assets later than Plaintiffs assert it should have acted are analogous to the

5   allegations in *DiLeo* and (as to the obsolete inventory writedown claim) *Zucco*

6   *Partners*.  *Zucco Partners* found a complaint lacking even when the defendant

7   company issued a restatement; here, as was the case in a dismissal recently affirmed

8   by the Eighth Circuit, Countywide "has never restated its financials, and there are

9   no people, documents, or sources that say [its] numbers were false."  *In re*

10   *Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952, 960 (8th Cir. 2008) (affirming

11   dismissal of alleged accounting fraud under such circumstances).  *Zucco Partners*

12   found a complaint lacking even when anonymous sources asserted that the CFO

13   had engaged in wrongdoing.  But no one here even accuses Eric Sieracki of

14   wrongdoing—not even CW1, who claims to have worked with him on a daily

15   basis—other than Plaintiffs themselves.  Indeed, none of the anonymous sources

16   claims to have been involved in the accounting decisions at all.  *See Malin v. XL*

17   *Capital Ltd.,* 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (dismissing lawsuit

18   alleging that insurer failed to take reserves on timely basis, where none of the

19   anonymous sources relied upon by plaintiffs "are alleged to have been involved in

20   or to have any familiarity with the process of setting or estimating loss reserves.").

21        Likewise, there are no allegations that Mr. Sieracki possessed information

22   contrary to or undermining the financial statements (including reserves and

23   valuations) issued by Countrywide.  The Complaint contains no allegations of

24   "meetings, conversations, and internal memoranda and reports–to support the

25   inference that any of the individual defendants actually believed [the company's]

26

---

27   [10]  *See also In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 891-93 (8th Cir. 2002)
(claims of violations of FAS 121 and FAS 5 based on allegations that company
28   should have written off earlier the assets it wrote off later were fraud by hindsight).

SIERACKI MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. CV 07-07097-MRP (MANx)

1  public statements might be false or misleading at the time they were made," or

2  believed that its financial statements were not compliant with GAAP.  *See*

3  *McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL 2951275, *8, *10

4  (N.D. Cal. July 25, 2008).  The Complaint alleges that Mr. Sieracki and other

5  officers knew about loan delinquency statistics, but (1) those statistics were

6  publicly reported throughout the class period, and Plaintiffs do not allege that the

7  reported numbers were false; and (2) the Complaint does not plead that

8  Countrywide and Mr. Sieracki consciously failed to take the effect of these

9  statistics, or of the loan underwriting standards alleged in the Complaint, into

10  account in preparing and issuing the financial statements.  *See* Section II(D), *supra*.

11  Plaintiffs' mere *assumption* that the financial statements did not take whatever

12  information that was known to Mr. Sieracki into account is fatal to their purported

13  claim.  The law does not allow a mere assumption that because financial statements

14  are based on the results of operations—which is true in every business—the

15  financial statements do not *properly reflect* the results of operations.[11]

16      In sum, no person or document alleges that Mr. Sieracki engaged in a

17  conscious attempt to lie to investors, either by deliberate recklessness or knowing

18  desire to defraud.   It also bears noting that Plaintiffs' foundational allegations that

19  loan underwriting standards were lax, and that the effects of those standards and

20  declining market conditions were undisclosed and not accounted for until the

21  market was "shocked" in the Second Quarter 2007, do not withstand careful

22
[11]  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1089 (9th Cir. 2002) (falsity
23  and scienter not pleaded where complaint merely assumed that revenue had been
    recognized on challenged contract); *In re Foundry Networks, Inc. Sec. Litig.*, No.
24  C-00-4823-MMC, 2003 WL 22077729, *11 (N.D. Cal. Aug. 29, 2003) (public
    forecast not rendered false by allegations of decrease in internal forecasts and
25  indications of weak demand, where complaint did not allege that public forecast
    had not already taken these factors into account); *Malin,* 499 F. Supp. 2d at 146
26  (dismissing lawsuit challenging company's statements about reserves where
    "Plaintiffs simply list the statements and assert that because large reserve increases
27  were necessary, the accounting practices described must not have been followed.").

28

1   analysis.  *See* Sections II(C), (D), *supra*.  There is a fundamental problem in

2   Plaintiffs' assertion that Mr. Sieracki consciously failed to account for alleged

3   underlying poor conditions in Countrywide's financial statements, when their

4   allegations of contemporaneous underlying poor conditions are so full of holes.

5           **C.**      **Mr. Sieracki's Stock Purchases Negate Any Inference Of Scienter**

6           The previous section demonstrates that the Complaint fails to plead

7   affirmative facts, through sources or documents, giving rise to a strong inference

8   that Mr. Sieracki consciously made or caused to be made public statements, and in

9   particular financial statements, that were false or misleading.

10          Set against the lack of affirmative allegation showing scienter is Mr.

11  Sieracki's stock transaction information, which strongly counsels against any

12  inference of scienter.  Section II(E), *supra*.  Mr. Sieracki did not sell stock, and

13  hence is not within the set of officers whose sales conceivably could contribute to

14  scienter (although the Court properly discounted most of the insider sales

15  allegations against those defendants who did sell).  Mr. Sieracki also is not among

16  those persons who sold stock at the time the Company was repurchasing its

17  common stock.  *Cf.* SAC at 188-189.[12]

18          Nor is this all.  The Ninth Circuit has recognized that even when an officer

19  sells stock, his retention of the majority of his or her shares renders non-suspicious

20

21  ─────────────────

    [12]  The Court noted that the repurchase was financed by the sale of debt securities.

22  Order at 80-81.  There is nothing unusual or suspicious about capital restructuring.
    Indeed, if an attractive restructuring plan (like any transaction that benefits

23  shareholders) presents itself, corporations are at risk if they do *not* take advantage
    of it, lest they engender the wrath of institutional shareholders such as Plaintiffs.

24  *See ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase & Co.*, —
    F.3d —, 2009 WL 129911, *8 (2d Cir. Jan. 21, 2009) ("Earning profits for the

25  shareholders is the essence of the duty of loyalty, and therefore it would be an
    unusual case where the accomplishment of this objective constitutes the requisite

26  motive to defraud the shareholders.").  Moreover, the effect of the capital
    restructuring on reported EPS was negligible.  *See* Jan. 30, 2007 press release

27  announcing Fourth Quarter 2006 results (Priebe Decl. Ex. F) (effect on 2006 EPS

28  of the first and larger repurchase was $0.02, or less than 0.5% of annual EPS).

the sales that were made.  *See*, *e.g.*, *Vantive*, 283 F.3d at 1094 (no suspicion where CEO sold 13% of shares and vested options during a fifteen-month class period). Here, Mr. Sieracki not only did not sell stock:  he purchased and held stock.  In so doing, he gave up millions of dollars in immediately realizable profits for the shares he purchased; gave up tens of millions of dollars in immediately realizable profits for all the shares he held but did not sell; and paid tax on paper gains to boot.

As an appellate court recently recognized, on a motion to dismiss, *Tellabs* requires courts to draw inferences that *reasonably would be drawn*, not ones that *possibly could be drawn*.  *Mizzaro v. Home Depot, Inc*., 544 F.3d 1230, 1239 (11th Cir. 2008).  The only inference that reasonably would be drawn from Mr. Sieracki's stock-related behavior is one of a belief in the truth of Countrywide's statements and the strength of its prospects.  Plaintiffs' wishful notions that Mr. Sieracki knew that Countrywide's financial statements failed to disclose a ticking bomb are completely at odds with his constant and repeated investment in the Company.  As one court reasoned in finding that a complaint did not plead scienter (even under looser Second Circuit standards), where an individual defendant increases his or her holdings during the class period, this is "a fact wholly inconsistent with fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *see also Malin,* 499 F. Supp. 2d at 152 (dismissing lawsuit alleging inadequate loss reserves, where plaintiffs failed to account for stock acquired by the defendants and fact that CFO had bought rather than sold stock); *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (scienter not pleaded where complaint alleged that individual defendants purchased stock after the price collapsed and did not allege that they sold stock during the relevant period; hence, "defendants were among [the company's] largest shareholders and shared the pain when the company failed.").

It would be unreasonable, in contrast, to draw an inference of scienter, let alone a strong inference thereof, given this information and under the holistic

1   approach to assessing scienter required under *Tellabs* and *South Ferry*.  Mr.

2   Sieracki recognizes that the Court referred to the fact that fellow officers sold stock

3   as somehow contributing to Mr. Sieracki's scienter.  However, under the

4   individualized approach to scienter newly reemphasized by the Ninth Circuit in

5   *Rubke* and *Glazer Capital Management*, it is Mr. Sieracki's assessment of

6   Countrywide's statements and prospects, not others' assessments, that matters in

7   pleading Mr. Sieracki's scienter.  Mr. Sieracki's choice to buy stock even as others

8   were selling stock even further demonstrates his good faith.

9   **IV.   THE COMPLAINT DOES NOT PLEAD A CONTROL PERSON**

10           **CLAIM AGAINST MR. SIERACKI**

11          The Complaint's failure to allege sufficient particularized facts to support a

12   securities fraud claim under Section 10(b) of the Exchange Act requires dismissal

13   of the control person claim under Section 20(a) as well.  To establish that Mr.

14   Sieracki is a control person, Plaintiffs must show that he "exercised actual power or

15   control over the primary violator."  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065

16   (9th Cir. 2000).  The pleading of control person status is subject to Rule 12(b)(6) at

17   a minimum, and hence to a plausibility standard that may be reached on a motion to

18   dismiss.  *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007).[13]

19          The Complaint does not plausibly allege that Mr. Sieracki was a control

20   person with respect to the securities violations purportedly alleged here.  All the

21   other individual defendants—Messrs. Mozilo, Sambol, and Kurland—were *above*

22   Mr. Sieracki in the management hierarchy at Countrywide, serving as Chief

_____

23   [13]  It should also be the case that a complaint must plead an individual's culpable
24   participation in the alleged fraud in order to state a § 20(a) claim, lest the
     protections of the Reform Act be eviscerated as to corporate officials against whom
25   a § 10(b) claim cannot be stated.  This is the position of several courts, including a
     decision the Court previously has found reliable, *In re Federal National Mortgage*
26   *Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 44-45 (D.D.C.
     2007).  To Mr. Sieracki's knowledge, the Ninth Circuit has not ruled on this topic,
27   in substantial part because its § 20(a) jurisprudence remains grounded in cases that
28   predate the Reform Act.

Executive Officers and/or Chief Operating Officers.  Logically, any control relationship would have been in the opposite direction, with Mr. Sieracki as a controlled person rather than a controller (although to be certain Mr. Sieracki does not imply in any way that he was controlled by any other person to engage in fraud).  Nor does the Complaint allege that Mr. Sieracki was a control person with respect to any malfeasance by Countrywide.  The Complaint does not allege that Mr. Sieracki possessed the power to cause or direct the management of Countrywide via share ownership, a position on the Board of Directors, or contract. Apart from this, with respect to the financial statements, the Complaint does not allege a violation, for the reasons explained in Countrywide's motion and the instant motion.  With respect to underlying loan underwriting practices, assuming contrary to fact that a claim is stated (*see* Section II(C), *supra*), the Complaint attributes policy leadership entirely to individuals other than Mr. Sieracki.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the securities fraud claim against Eric Sieracki must be dismissed.  Dismissal should be with prejudice, as Plaintiffs have had ample opportunity to bring to the Court's attention facts showing that Mr. Sieracki engaged in fraud.

Respectfully submitted,

February 6, 2009                          DLA PIPER LLP (US)

By:   /s/ David Priebe

Attorneys for Defendant ERIC SIERACKI

# APPENDIX OF STOCK CALCULATIONS

**5/26/05 exercise and hold**

| | |
|---:|---|
| 31,062 | Number of shares exercised and held (after paying for shares) |
| $36.65 | 5/26/05 closing price minus strike price |
| $1,139,751 | Profit lost as a result of holding |

**7/16/06 exercise and hold**

| | |
|---:|---|
| 60,000 | Number of shares exercised and held |
| $32.28 | 7/16/06 closing price minus strike price |
| $1,936,800 | Profit lost as a result of holding |

**5/31/07 exercise and hold**

| | |
|---:|---|
| 13,806 | Number of shares exercised and held (after paying for shares) |
| $32.17 | 5/31/07 closing price minus strike price |
| $444,139 | Profit lost as a result of holding |

**4/27/07 proxy statement**

| | |
|---:|---|
| 422,721 | Number of shares (including vested options) as of 4/7/07 |
| 406,013 | Minus the number of option shares exercised on 5/31/07 |
| 166,508 | Other shares owned as of 4/7/07 per the proxy statement |
| 154,652 | Minus the 401(k) shares per the proxy statement |
| 560,665 | Total shares owned as of 4/7/07 |

**Value of holdings, 5/31/07**

| | |
|---:|---|
| 560,665 | Total shares owned as of 4/7/07 |
| 574,471 | Plus shares acquired and held on 5/31/07 |
| $38.94 | Price on 5/31/07 |
| $22,369,901 | Value of holdings on 5/31/07 |

**Loss upon Bank Of America acquisition**

| | |
|---:|---|
| $7.00 | Sale price at time of announcement |
| $4,021,297 | Value of holdings at time of announcement |
| $18,348,604 | Lost profit at time of announcement (as compared to 5/31/07 price) |
| $4.25 | Eventual sale price (last closing price) |
| $2,441,502 | Value of holdings at time of closing |
| $19,928,399 | Lost profit at time of closing (as compared to 5/31/07 price) |