MICHAEL D. TORPEY (SBN 79424)
*mtorpey@orrick.com*
PENELOPE A. GRABOYS BLAIR (SBN 214742)
*pgraboysblair@orrick.com*
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California  94105-2669
Telephone:    415-773-5700
Facsimile:    415-773-5759

MICHAEL C. TU (SBN 186793)
*mtu@orrick.com*
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 S. Figueroa Street, Suite 3200
Los Angeles, California  90017
Telephone:    213-629-2020
Facsimile:    213-612-2499

Attorneys for Defendant
David Sambol

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DISTRICT

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>    ALL ACTIONS. | Lead Case No. CV 07-5295 MRP (MANx)<br><br>**DEFENDANT DAVID SAMBOL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Date:    April 13, 2009<br>Time:    10:00 a.m.<br>Judge:    Hon. Mariana R. Pfaelzer<br>          Courtroom 12<br>          Spring Street Courthouse |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................... 1

II. STATEMENT OF FACTS ........................................................ 3

    A. The SAC's Allegations Against David Sambol .................................... 3

    B. Mr. Sambol's Career At Countrywide ................................................ 4

        1. From 2004 To Mid-2006, Mr. Sambol Was Focused On Countrywide's Loan Production Business ............................... 4

        2. Mr. Sambol Was Named President And Chief Operating Officer As Countrywide Adjusted To The Deteriorating Housing Market ........................................................................ 5

III. ARGUMENT ............................................................................. 6

    A. The Allegations Directed Specifically Against Mr. Sambol Do Not Establish A Strong Inference Of Scienter ...................................... 6

        1. The SAC's Insider Trading Allegations Actually Negate Any Inference Of Scienter Against Mr. Sambol ...................... 8

        2. Under *Zucco*, The SAC's Confidential Witness Allegations Are Insufficient To Create A Strong Inference Of Scienter Against Mr. Sambol ................................................. 9

        3. Under *Zucco*, The SAC's Core Business Allegations Cannot Sustain A Strong Inference Of Scienter Against Mr. Sambol ..................................................................... 12

            a. The SAC Does Not Assert That Mr. Sambol Had Oversight Of The Credit Risk Management And Disclosure Processes ..................................................... 13

            b. The SAC Does Not Allege That The Information Allegedly Omitted Would Have Been Readily Apparent To Somebody In Mr. Sambol's Position ........ 14

    B. The SAC Does Not Establish Control Person Liability Against Mr. Sambol ............................................................................ 20

    C. The SAC Does Not Adequately Plead A Section 20A Claim Against Mr. Sambol ............................................................................ 20

IV. CONCLUSION .......................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Batwin v. Occam Networks, Inc.*,
No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365
(C.D. Cal. July 1, 2008)........................................................................21

*Berson v. Applied Signal Tech. Inc.*,
527 F.3d 982 (9th Cir. 2008).............................................................12

*Durham v. Kelly*,
810 F.2d 1500 (9th Cir. 1987)...........................................................20

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000)............................................................20

*In re Connetics Corp. Sec. Litig.*,
No. C 07-02940 SI, 2008 WL 3842938
(N.D. Cal. Aug. 14, 2008)..................................................................21

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................8

*In re Daou Sys. Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005).......................................................9, 11

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)................................................9

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008)..............................................12

*In re InfoSonics Corp. Sec. Litig.*,
No. 06cv1231 BTM (WMc), 2007 WL 2301757
(S.D. Cal. Aug. 7, 2007)....................................................................22

*In re Metawave Comnc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003)..........................................12

*In re Petco Animal Supplies Inc. Sec. Litig.*,
No. 05-CV-0823-H (RBB),
2005 WL 5957816 (S.D. Cal. Aug. 1, 2005) ......................................21

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)..............................................................11

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002)..............................................................9

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)..............................................................8

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Middlesex Retirement Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007)..........................................................20

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
551 U.S. 308 (2007) ......................................................................................9

*U.S. v. Smith*,
155 F.3d 1051 (9th Cir. 1998).......................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
No. 06-35758, ___ F.3d ___, 2009 WL 57081
(9th Cir. Jan. 12, 2009)...........................................................................*passim*

## STATUTES

15 U.S.C. § 78t-1(a)................................................................................................20

## I.   __INTRODUCTION__

Plaintiffs' Second Consolidated Amended Class Action Complaint (the "SAC") does not add a single new allegation regarding David Sambol. Instead, the SAC pleads precisely the same insider trading allegations that this Court previously found did not create an inference of scienter with respect to Mr. Sambol. Recent Ninth Circuit law is instructive as to the rest of Plaintiffs' scienter allegations against an individual officer. Taken together, Plaintiffs' SAC fails to establish the requisite showing. Distilling the 435 page SAC down to the allegations specifically asserted against Mr. Sambol demonstrates three marked gaps in the theory of scienter against him.

First, Plaintiffs' allegations of insider trading serve only to undermine any inference of scienter. This Court has found that the timing and nature of Mr. Sambol's trades fail to support any such inference. In fact, Mr. Sambol's class period sales were made pursuant to a registered 10b5-1 plan which, combined with the substantial volume of personal holdings which Mr. Sambol chose not to sell (amounting to a decline in the value of holdings of over $90 million) actually conflicts with any inference of scienter. Such economically irrational behavior refutes any inference, let alone a strong inference, that Mr. Sambol acted to capitalize on any alleged artificially inflated price. Despite this Court's rejection of Plaintiffs' theory, the SAC again relies on precisely the same allegations of trading in support of their claim of scienter against Mr. Sambol. Such allegations not only fail to support, but negate Plaintiffs' theory of scienter.

Second, the confidential witness allegations on which Plaintiffs rely fail to meet the standard for particularity recently articulated by the Ninth Circuit in *Zucco Partners, LLC v. Digimarc Corp.*, No. 06-35758, __ F.3d __, 2009 WL 57081 (9th Cir. Jan. 12, 2009). Under *Zucco*, vague anecdotes and unreliable hearsay recounted by unnamed, unidentified witnesses are insufficient to demonstrate that Mr. Sambol intended to deceive shareholders as to the risks involved with Countrywide's

1  extension of credit to a broader range of potential homebuyers.  Further, the

2  reliability and particularity of each confidential witness and each statement the

3  witness makes must be closely examined as to each individual defendant.  However

4  voluminous all of the confidential witnesses' claims may be when taken together

5  against all defendants, only four witnesses make any direct reference to Mr. Sambol.

6  Each of those four witnesses, and their statements, plainly lack the reliability and

7  sufficient particularity required to establish scienter.

8       Third, Plaintiffs' attempt to support their scienter allegations with arguments

9  based on Mr. Sambol's positions within the Company also fails to meet the rigorous

10 standard under *Tellabs* as applied by the Ninth Circuit in *Zucco*.  The SAC does not

11 demonstrate that Mr. Sambol's leadership role within Countrywide's loan

12 production operation establishes that any alleged inadequacy of Countrywide's

13 disclosures would have been apparent to Mr. Sambol.  This is underscored by the

14 robust nature of the Company's disclosures and the ubiquitous, contemporaneous

15 public knowledge of the very same loan products that form the basis for the SAC.

16 The expansion of credit to a greater range of potential homeowners through new

17 loan products and broadened underwriting guidelines was an industry-wide

18 phenomenon that was reported widely, praised by many, and readily observable

19 throughout the class period by investors, bondholders, homebuyers, homebuilders,

20 and anyone with even a curious interest in the value of homes in their own

21 community.  Plaintiffs have not specifically demonstrated that the alleged

22 misstatements would have been readily apparent to Mr. Sambol based upon his

23 position at the Company of overseeing loan production.

24       Mr. Sambol joins in the Motion to Dismiss the Second Consolidated Amended

25 Class Action Complaint filed by Countrywide in this matter.  Further, as a result of

26 the SAC's failure to allege a compelling theory specifically establishing that Mr.

27

28

1   Sambol engaged in or directed misrepresentations about the risks of Countrywide's

2   business practices, Mr. Sambol brings this motion on his own behalf.[1]

3   **II.   STATEMENT OF FACTS**

4       **A.   The SAC's Allegations Against David Sambol**

5           Plaintiffs' allegations regarding Mr. Sambol amount to little more than the

6   assertion that he pursued a policy of offering a broad range of mortgage products

7   already available in the market, encouraged Countrywide's employees to extend

8   credit to a wider range of potential homebuyers, and oversaw the creation of a

9   formal, automated system intended to manage and regulate the consideration of

10  certain loans that were otherwise outside of Countrywide's underwriting guidelines.

11  (SAC ¶¶ 439, 440, 448.)  Plaintiffs dedicate a substantial portion of their allegations

12  against Mr. Sambol to his role in Countrywide's production of home loans, as the

13  SAC itself acknowledges that for much of the Class Period, Mr. Sambol was not a

14  member of the senior executive team and was primarily charged with overseeing the

15  Company's loan production segment in addition to certain operational and support

16  units.  (*Id*. ¶¶ 5, 27, 295, 423.)

17          Plaintiffs devote far fewer pages to explaining those functions of the Company

18  for which Mr. Sambol was *not* responsible during key portions of the Class Period.

19  For example, Plaintiffs allege that Countrywide's Credit Committee had primary

20  responsibility for the Company's credit risk goals and objectives and was mandated

21  to assess and monitor (1) the Company's credit risk management policies, (2) the

22  adequacy of its loan loss reserves, and (3) actual and projected credit losses.  (SAC

23  ¶¶ 423-424.)  Mr. Sambol, Plaintiffs concede, had no role on this committee until

24  September of 2006.  (*Id.* ¶¶ 29, 423.).  Moreover, Mr. Sambol is not alleged to have

25  joined Countrywide's Board until 2007, nor is he alleged to have maintained any

26  _____

27      [1] Although Mr. Sambol was a named party to this lawsuit prior to Plaintiffs'
    filing of the SAC and a defendant in previous joint motions with Countrywide, he
    recently obtained his own individual counsel.  This motion thus represents Mr.

28  Sambol's first opportunity to file a separate individual brief in this case.

1    prior involvement in or oversight of the Company's Board-level committees. (*Id.* ¶

2    428.) Indeed, despite an overall suggestion to the contrary, nowhere in the SAC do

3    Plaintiffs assert that prior to September of 2006 Mr. Sambol had responsibility for

4    Countrywide's risk management, accounting, asset valuation, financial reporting,

5    internal controls, or any other corporate function that might give rise to a claim

6    under the securities laws. Plaintiffs fail to make this allegation because, as detailed

7    below, Mr. Sambol had no such responsibility during the majority of the Class

8    Period.

9         **B.**     **Mr. Sambol's Career At Countrywide**

10       Mr. Sambol joined Countrywide in 1985 as director of the Company's internal

11   audit function. (*Id.* ¶ 27; RJN Ex. A.) At that time, Plaintiffs allege Countrywide's

12   business model was relatively uncomplicated. The Company issued loans to

13   homebuyers and sold those loans to investors, primarily the government-sponsored

14   Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan

15   Mortgage Corporation ("Freddie Mac"). (SAC ¶ 82.) Over the next fifteen years,

16   Mr. Sambol oversaw or was involved in a variety of divisions in the loan production

17   and capital markets area. (RJN Ex. B at 7.) In 2000, Mr. Sambol was promoted to

18   Senior Managing Director, Chief of Production, a position principally responsible

19   for Countrywide's mortgage loan production operation. (SAC ¶¶ 27, 76; RJN Ex. C

20   at 9.)

21         **1.**     **From 2004 To Mid-2006, Mr. Sambol Was Focused On**

22              **Countrywide's Loan Production Business**

23       From the beginning of the Class Period alleged in the SAC, Mr. Sambol's role

24   remained focused on ensuring that the Company offered loan products that were

25   competitive with those offered by its peers and that met the criteria of purchasers in

26   the secondary market. In 2004, Mr. Sambol's title changed to Executive Managing

27   Director and Chief of Mortgage Banking and Capital Markets. (RJN Ex. D at 14.)

28

1   This new title, however, did not materially alter Mr. Sambol's responsibilities for the

2   production side of Countrywide's business.  Plaintiffs allege that Mr. Sambol's

3   responsibility during much of the Class Period was to supervise Countrywide's

4   production of mortgage loans.  (SAC ¶ 84.)  During this time period, Mr. Sambol did

5   not oversee such functions as accounting, finance, legal, internal audit, risk

6   management, or the disclosures.  (RJN Ex. A).  Plaintiffs concede that Mr. Sambol

7   did not sign any SEC filings during this time period, and they do not make any

8   allegations seeking to attribute these disclosures to him.  (SAC ¶ 27).  As Plaintiffs

9   acknowledge, such responsibilities fell to Countrywide's more senior executives or

10   were delegated to peers of Mr. Sambol over whom he exercised no formal influence

11   or supervision. (*Id.* ¶¶ 28, 239, 959.)

### 2.   Mr. Sambol Was Named President And Chief Operating Officer As Countrywide Adjusted To The Deteriorating Housing Market

15   The months spanning the middle of 2006 through the middle of 2007 marked

16   a significant period of transition for Mr. Sambol, Countrywide and the industry in

17   which it operated.  In September of 2006, Mr. Sambol was named President and

18   COO of Countrywide following the resignation of Stanford Kurland.  (*Id.* ¶ 27; RJN

19   Ex. A.)  With this promotion Mr. Sambol gained responsibility for operating units

20   over which he previously had no oversight or little involvement, such as risk

21   management, financial accounting, and investor disclosures.  (*Id.*; *see also* RJN

22   Ex. E at 7.)  The pace of change was rapid and the learning curve steep throughout

23   this time.  While Mr. Sambol had limited personal experience in many of the

24   departments that he now managed, his transition was eased by the ability to rely

25   upon a team of highly regarded finance and risk-management professionals.  (RJN

26   Ex. F (announcing Countrywide as the most shareholder-friendly mortgage finance

27   company of 2006 by *Institutional Investor* magazine).)

28

1    Mr. Sambol's career at Countrywide had before this time coincided with

2    industry-wide growth and a broadening of credit available to potential homebuyers.

3    In contrast, his promotion to President immediately preceded a time of retraction in

4    the industry and for Countrywide itself.  (RJN Ex. E at 9.)  The Company began a

5    series of adjustments to its underwriting guidelines within months of Mr. Sambol's

6    promotion, including restrictions on many of the very loan products that are the

7    focus of Plaintiffs' SAC.  (SAC ¶¶ 94, 216-219, 900, 960.)  Countrywide also

8    increased its accounting reserves as the housing market began to show signs of

9    weakness.  (*Id.* ¶¶ 300, 319, 320, 363, 386, 956.)

10    The national decline in home prices began in 2007, accompanied by a notable

11    increase in mortgage delinquencies.  (*Id.* ¶ 468; RJN Ex. G at 67 & Ex. H at 97.)

12    The underlying cause of the greater-than-expected rate of delinquencies is now the

13    subject of numerous works of scholarship and journalism that Mr. Sambol does not

14    presume to summarize here.  However catastrophic for the national economy, neither

15    the decline in home prices nor the accompanying rise in delinquencies was the

16    primary contributor to Countrywide's rapid loss of value during this time.  (RJN

17    Ex. I at 48; Ex. J.)  Rather, the Company was severely damaged by the credit crisis

18    that gripped the global economy in August of 2007.  (*Id.*)  The Company's stock

19    continued to fall through the end of the year, culminating with Bank of America's

20    January 11, 2008 announcement of its intent to purchase Countrywide in an all-stock

21    transaction.  (SAC ¶¶ 1005, 1007, 1024, 1027, 1041, 1048, 1058.)

22  **III.  ARGUMENT**

23      **A.  The Allegations Directed Specifically Against Mr. Sambol Do Not**
24          **Establish A Strong Inference Of Scienter**

25    Plaintiffs' allegations of securities fraud are not based on the identification of

26    an explicit misstatement, but rather on the contention that Countrywide failed to

27    provide enough information about the Company's underwriting guidelines and credit

28    risk in its disclosures to shareholders.  (*See, e.g.*, *Id.* ¶¶ 102-104, 110, 130, 132, 239,

1  269, 478, 1096, 1098.)  Plaintiffs' theory rests on the contention that Mr. Sambol

2  should be held liable for these alleged omissions because (1) his stock sales,

3  (2) confidential witnesses, and (3) his position in the Company combine to create a

4  strong inference that he knew about or was deliberately reckless in not knowing

5  about the omissions.[2]  Under this Court's finding of an absence of scienter on insider

6  trading and further evolved analysis of scienter in the Ninth Circuit after *Tellabs*, the

7  allegations against Mr. Sambol do not amount to the requisite showing of scienter.

8        As an initial matter, this Court has already firmly rejected most of Plaintiffs'

9  stock sale allegations and found the allegations regarding Mr. Sambol's trading

10 inadequate.  (Omnibus Order on Defendants' Motions to Dismiss the Consolidated

11 Amended Complaint and All Pending Requests for Judicial Notice ("Omnibus

12 Order") at 79:25-26; 82:7-10.)  Despite the Court's ruling, the SAC alleges the exact

13 same allegations against Mr. Sambol to establish scienter.  (SAC ¶¶ 479-500.)  Even

14 if the Court had not already dismissed these allegations, Plaintiffs' reliance is

15 misplaced since Mr. Sambol's stock sales during the relevant period plainly ***negate***

16 any inference of scienter against him.

17       Further, on January 12, 2009, the Ninth Circuit issued its opinion in *Zucco*,

18 which provides additional insight into the analysis of scienter allegations as to an

19 individual when based on confidential witnesses and a core operations theory.  In

20 this case, both types of factual allegations are insufficient to sustain a strong

21 inference of scienter against Mr. Sambol.  The hearsay and conclusory allegations of

22 Plaintiffs' confidential witnesses fail to establish any basis for their personal

23 knowledge of Mr. Sambol's mental state regarding the sufficiency of Countrywide's

24 underwriting disclosures.  *See Zucco*, 2009 WL 57081, at *12 ("[t]hese generalized

25

---

26   [2]While Plaintiffs also heavily rely on Countrywide's alleged accounting failures, the SAC makes only passing reference to Mr. Sambol as participating in

27 any accounting fraud.  Whatever limited weight these vague and unsupported claims carry as against Mr. Sambol, they are addressed by Countrywide's Motion to

28 Dismiss all accounting-related claims.

claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state").  Similarly, the SAC's core operation allegations do not persuasively demonstrate that any alleged deficiencies in Countrywide's disclosures would have been apparent to Mr. Sambol given his limited role with respect to the disclosure process.  *Zucco*, 2009 WL 57081, at *15 (holding that "[t]here is no indication" that definitions applicable to various stages of software development would be obvious to executives not intimately connected with the development process or the relevant provisions of GAAP).

1.   **The SAC's Insider Trading Allegations Actually Negate Any Inference Of Scienter Against Mr. Sambol**

As this Court has previously recognized, the timing and nature of Mr. Sambol's trades do not support a strong inference of scienter.  In its order in *In re Countrywide Derivative Litigation*, the Court held that Plaintiffs had failed to tie the insider sales to (1) the stock repurchase, (2) each insider's history of stock sales, or (3) the public statements at issue.  *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1067-68 (C.D. Cal. 2008);  *see also* Omnibus Order at 82:25-28 (asserting that, even if the Court were to take judicial notice of the absolute-dollar values of Mr. Sambol's sales during the repurchase periods, "they give . . . no reason to infer that Sambol's behavior changed during the repurchases" and thus no reason to draw any inference of scienter).

The SAC contains precisely the same allegations regarding Mr. Sambol's trading.  Judicially noticeable SEC filings demonstrate that all of Mr. Sambol's trades during the class period were made pursuant to Rule 10b5-1 plans, the terms of which belie any inference of scienter.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) ("Sales according to pre-determined plans may 'rebut an inference of scienter.'").  Pre-ordained, regular trading plans are

1    effectively the opposite of insider trading in that there is no contemplation of timing

2    the trading based on good or bad news.  Moreover, at the end of the putative class

3    period, Mr. Sambol retained nearly 2.5 million shares of Countrywide stock, causing

4    the value of his holdings to decline by over $90 million.  (RJN Ex. K; Ex. L at 17,

5    41-42; Ex. M.)  Such irrational economic behavior strongly negates any inference

6    that Mr. Sambol acted to capitalize on an artificially inflated price.  *See In re Hansen*

7    *Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("[A]ny

8    inference of scienter is defeated when an insider sells only a portion of his stock

9    holdings and 'end[s] up reaping the same large losses as did Plaintiff when the stock

10   price dropped.'") (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th

11   Cir. 2002)).  *Accord Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir.

12   2002) (finding no inference of scienter where insider retained majority of stock and

13   experienced large losses as stock price declined).

14

15        **2.    Under *Zucco*, The SAC's Confidential Witness Allegations
             Are Insufficient To Create A Strong Inference Of Scienter
16           Against Mr. Sambol**

17        The Ninth Circuit in *Zucco* unequivocally observed that no case had yet "fully

18   explain[ed]" how the Supreme Court's *Tellabs* decision is reconciled with the

19   pleading standards of the Ninth Circuit under the PSLRA particularly with respect to

20   scienter.  *Zucco*, 2009 WL 57081, at *1 (applying *Tellabs, Inc. v. Makor Issues &*

21   *Rights Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2510 (2007)).  In the first such decision,

22   the Ninth Circuit went through a detailed analysis of the sufficiency of scienter

23   allegations including the confidential witness statements under *Tellabs* and *In re*

24   *Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005).  *Zucco*, 2009 WL

25   57081, at *1.

26        The Ninth Circuit's opinion in *Zucco* establishes that even where confidential

27   witness allegations may be voluminous, they are not sufficient to state a claim

28   against an individual when the witnesses making such claims are demonstrably

1    unreliable.  *Zucco*, 2009 WL 57081, at *9-13.  In *Zucco*, the court reviewed the

2    plaintiffs' confidential witness allegations with a deeply critical eye, meticulously

3    examining the information provided about each witness.  *Id.* at *7-13.  The court

4    concluded that, although the Plaintiffs described the confidential witnesses with a

5    great degree of specificity, they did not provide the requisite particularity to establish

6    that the statements were reliably based on the witnesses' personal knowledge.  *Id.* at

7    *10-11.  In reaching this conclusion, the court found it relevant that a majority of the

8    confidential witnesses based their knowledge on vague hearsay.  *Id.* at *11-12 & n.4.

9    The court also discounted confidential witnesses whose employment positions

10   suggested a lack of personal knowledge about the information alleged and

11   confidential witnesses who made conclusory assertions of scienter.  *Id.* at *11.

12          The allegations as to Mr. Sambol have similar deficiencies with respect to

13   their reliability and personal knowledge.  Plaintiffs' SAC identifies a total of

14   fourteen confidential witnesses, yet only four of those fourteen witnesses make any

15   direct reference to Mr. Sambol.  Not one of those four witnesses allege that Mr.

16   Sambol did anything more than responsibly execute his duties by analyzing the

17   secondary market demand for competitors' products and assessing whether

18   Countrywide could properly offer such products, consistent with the Company's

19   business model.  (*See* SAC ¶¶ 84, 87, 89, 193, 237, 295, 422-423, 437, 439-440,

20   442-445, 449, 452-456, 461-462.)  Applying *Zucco*'s exhaustive analysis of witness

21   allegations, the SAC offers an inadequate basis by which to conclude that Mr.

22   Sambol was responsible for either managing credit risk or determining the extent of

23   disclosures related to such risk.  (*Id.*)

24          Further, two of the four witnesses, CW8 and CW12, base their allegations of

25   scienter entirely on unreliable hearsay.[3]  *See Zucco,* 2009 WL 57081, at *11

26   ───────────────
        [3] For example, CW12 alleges that, at some undisclosed time, CW12 was told by
27   CW12's boss that CW12's boss's boss had been told by Mr. Sambol that he was
     unhappy with loan production and that, as a result, underwriting guidelines would
28   need to be loosened so that the Company could take more risk on certain loans.
     (SAC ¶ 453.)  This **double hearsay**, unaccompanied by any details, is precisely the

1   ("[V]ague hearsay . . . is not enough to satisfy *Daou's* reliability standard.").  In fact,

2   CW8 and CW12 never claim to have had any direct interaction with Mr. Sambol

3   and, tellingly, the SAC fails to identify how either witness—one "an employee with

4   FSL" and one an Assistant Vice President in various "underwriting, compliance, and

5   risk management" positions – occupied a position that would provide him or her

6   with information regarding Mr. Sambol's state of mind at the time he made allegedly

7   false statements.  (SAC ¶¶ 168, 185.)

8       The remaining two confidential witnesses, CW1 and CW14, are also

9   unreliable because they provide no basis for the claims made about Mr. Sambol.  For

10  example, CW14 alleges that he and others repeatedly warned Mr. Sambol about the

11  dangers of relaxed underwriting standards and placing risky loans on the Company's

12  balance sheet.  (*Id.* ¶ 439.)  Yet CW14 does not relay any information about any of

13  the occasions on which these warnings supposedly took place.  (*Id.*)  Nor does

14  CW14 report on the actual warnings provided or the context in which such warnings

15  were purportedly given.  (*Id.*)  Without such information, the allegations of CW1

16  and CW14 are not sufficiently particular to establish their reliability and personal

17  knowledge.

18      Finally, none of the four confidential witnesses making allegations against Mr.

19  Sambol have identified with particularity any statement, internal report,

20  memorandum, email, meeting, or other communication that suggests Mr. Sambol

21  believed that any public statements were false or misleading when made.  *In re*

22  *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (plaintiff must

23  detail "the sources of her information with respect to the reports, how she learned of

24  the reports, who drafted them, [and] which officers received them," and provide "an

25  adequate description of their contents," which are expected to include "countless

26

27  kind of allegation the *Zucco* court found so lacking in reliability.  *Zucco*, 2009 WL
    57081, at *11 (finding knowledge based on vague hearsay insufficient to satisfy
28  *Daou's* reliability standard).

specifics"); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1100 (C.D. Cal. 2008); *In re Metawave Comnc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("Plaintiffs must plead 'with substantial specificity' how confidential witnesses 'came to learn of the information they provide in the complaint.'") (citation omitted)).  The lack of supporting documentation, when combined with the witnesses' reliance on untrustworthy hearsay, lack of interaction with Mr. Sambol, and unsubstantiated allegations, is not adequate to raise a strong inference of scienter against Mr. Sambol.  *Zucco,* 2009 WL 57081, at *11-12.

### 3. Under *Zucco*, The SAC's Core Business Allegations Cannot Sustain A Strong Inference Of Scienter Against Mr. Sambol

Without insider trading or confidential witness allegations to turn to, Plaintiffs are left to contend that scienter can be inferred against Mr. Sambol based strictly upon the position he held at the Company.  (SAC ¶¶ 420-431.)  Plaintiffs' core business allegations, however, fail to meet the rigorous standard upheld by *Zucco* for recognizing an exception to the general rule that such allegations are not enough to create a strong inference of scienter.  *Zucco,* 2009 WL 57081, at *14.

In *Zucco*, the Ninth Circuit carefully analyzed the narrow exception, first identified in *Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008), which permits an inference of scienter for core business allegations where the information misrepresented is readily apparent to the defendant corporation's senior management.  *Zucco*, 2009 WL 57081, at *15 (citing *Berson*, 527 F.3d at 987-89).  The court thoroughly considered the core business allegations in the context of the roles played by the individuals whom the plaintiff sought an inference of scienter against.  *Zucco*, 2009 WL 57081, at *15.  The court concluded that the *Berson* exception was inapplicable because there was no reason to believe that the falsity of the original representations would have been immediately obvious to corporate management.  *Zucco,* 2009 WL 57081, at *15.

Here, as in *Zucco*, Plaintiffs' core business allegations do not support an inference of scienter because Plaintiffs have not presented any evidence that Mr. Sambol, who played a limited role in the credit risk management and disclosure processes complained of by Plaintiffs, would have or should have known that the disclosures omitted important information.

a.   **The SAC Does Not Assert That Mr. Sambol Had Oversight Of The Credit Risk Management And Disclosure Processes**

Plaintiffs theory rests on the contention that during most of the class period Mr. Sambol's oversight of loan production is sufficient to demonstrate his knowledge of omissions in the disclosures regarding the expansion of credit risk. (SAC ¶ 27.)  As delineated by *Zucco*, there is a gap in Plaintiffs' theory.  Plaintiffs have not alleged that Mr. Sambol had any experience in or responsibility for the disclosure processes or the credit risk division, nor do they allege that he had reason not to rely on these processes.  *See Zucco*, 2009 WL 57081, at *15 (holding that "[t]here is no indication" that definitions applicable to various stages of software development would be obvious to executives not intimately connected with the development process or the relevant provisions of GAAP).

For over half of the class period, prior to assuming the position of President, Plaintiffs could not and do not allege that Mr. Sambol actively participated in deciding what information should be included in those disclosures.  Even after September 2006, when Mr. Sambol was thrust into the role of President and COO of Countrywide, Plaintiffs do not bother to make any such distinction in their allegations.  (SAC ¶ 27; RJN Ex. A.)  Plaintiffs have not alleged that Mr. Sambol was wrong to rely upon the competent professionals in the legal, finance and credit risk departments to create comprehensive disclosures.  Nor have Plaintiffs suggested that anyone at Countrywide or outside of Countrywide gave Mr. Sambol reason to

believe that he could not reasonably rely on the reporting process.  In fact, the SAC itself confirms that while Mr. Sambol was President, contrary to Plaintiffs' unfounded assertions that Mr. Sambol sought to hide information from the investing public, Countrywide's credit risk management and disclosure processes worked to amend the Company's disclosures to reflect the unanticipated market events that were affecting the Company.  (*See, e.g.*, SAC ¶ 925 ("[N]onprime loans and related securities became much less liquid."), ¶ 969 (noting "unprecedented market conditions" and stating that "[w]hile we believe we have adequate funding liquidity, the situation is rapidly evolving and the impact on the Company is unknown").)[4]

### b.   The SAC Does Not Allege That The Information Allegedly Omitted Would Have Been Readily Apparent To Somebody In Mr. Sambol's Position

Given the limited role that Plaintiffs concede Mr. Sambol played in the credit risk management and disclosure processes, *Zucco* next instructs us to consider whether the alleged misrepresentations identified by Plaintiffs would have been readily apparent to somebody like Mr. Sambol.  *Zucco,* 2009 WL 57081, at *15.

### (1)   The Disclosures Are Comprehensive

A review of the quarterly and annual SEC filings identified in the SAC establishes that Countrywide disclosed detailed information on all aspects of the Company's business, including FICO and LTV data for Countrywide Bank's held for investment ("HFI") portfolio, FICO and LTV data for Pay Option ARMs and other loan products, production and performance data, the business model, the risks associated with the business model, and liquidity needs.  (*See, e.g.,* RJN Ex. O at 64, 85, 105-08, F-38.)  In addition, the filings clearly emphasized that the Company's underwriting guidelines were "designed so that [Countrywide's] loans [would be]

---

[4] A review of the disclosures themselves reveals that Countrywide actually said a great deal more about the market problems it was facing than is contained in the SAC.  (*See, e.g.,* RJN Ex. E at 9; Ex. N at 19.)

1   saleable in the secondary mortgage market" and that the guidelines were developed

2   "to meet the requirements of private investors, rating agencies and third-party credit

3   enhancement providers."  (SAC ¶ 790 (quoting Countrywide's 10-K for 2005).)

4   Plaintiffs have not alleged that this immense amount of data was inaccurate on its

5   face.  Nor have Plaintiffs claimed that Countrywide's disclosures were any less

6   fulsome than those of its peers.  Thus, Plaintiffs have not demonstrated that there

7   was anything in the disclosures themselves that would have readily appeared to Mr.

8   Sambol to be in need of additional explanation.

9                        **(2)    The Alleged Omissions Were Not Evident To**

10                               **Professionals Trained In Finance And**

11                               **Accounting**

12         Plaintiffs' claims that Mr. Sambol must have known that Countrywide's

13   disclosures contained misrepresentations is further refuted by the fact that Plaintiffs

14   have not alleged that any of the countless professionals who reviewed the

15   Company's disclosures ever suggested, to Mr. Sambol or anybody else, that they

16   were inaccurate.  (SAC ¶¶ 28, 74, 428-431.)  Plaintiffs do not allege that

17   Countrywide's employees who were responsible for preparing the Company's

18   disclosures raised any concern about the adequacy of such disclosures to Mr.

19   Sambol.  Plaintiffs do not allege that the accountants who conducted a detailed

20   review of the disclosures before approving them found any misstatements.  They do

21   not allege that the regulators charged with overseeing Countrywide ever suggested

22   that the Company was falsely or incompletely disclosing information.  Lastly,

23   Plaintiffs do not contend that the analysts, industry experts, ratings agencies, or

24   Fannie Mae and Freddie Mac raised any concerns with Mr. Sambol, all of whom had

25   not just quarterly and annual disclosures of Countrywide at their disposal but also

26   disclosures including details of the unique loan characteristics prior to the rating of

27   each securitization.  Plaintiffs have not provided any reason to believe that Mr.

28

1   Sambol would have known the disclosures contained omissions when, apparently,

2   none of these trained professionals recognized a problem.

3           **(3)     The Market Was Aware Of The Allegedly**
                        **Omitted Information**

4

5           Plaintiffs' argument that Countrywide's disclosures contained omissions that

6   would be evident to someone in Mr. Sambol's position must also be considered in

7   the context of the (1) broad public knowledge of Countrywide's expanded loan

8   standards, and (2) comprehensive disclosures made to investors, analysts, and those

9   who purchased the Company's loans in the secondary market.  *See Zucco*, 2009 WL

10  57081, at *15 ("[R]eporting false information will only be indicative of scienter

11  where the falsity is patently obvious.").

12          **(a)     The Expansion Of Credit Availability Was**
                       **Widely Recognized And The Subject Of**
                       **Contemporaneous Media Coverage**

13

14

15          The general liberalization of the mortgage market during the class period was

16  an industry-wide phenomenon, and Countrywide's role in the expansion of loan

17  products and credit opportunities for homebuyers was well documented by some of

18  the most widely-read periodicals in the world.  An April 27, 2005 article featured in

19  the *Los Angeles Times* discussing Countrywide's first quarter, 2005 results noted

20  that:

21          Countrywide said its production of adjustable-rate

22          mortgages rose 45% in the first quarter compared with a

23          year earlier and constituted 53% of all loans. Among the

24          company's more popular loans is the "pay-option"

25          adjustable-rate mortgage, which represented 18% of all

26          Countrywide loans produced in the first quarter. With

27          such a loan, the borrower has several payment options

28

1          every month, including paying interest only; paying less

2          than the interest due, which causes the loan to be

3          negatively amortized over its term; or paying principal

4          and interest.

5    (RJN Ex. P.)

6          Similarly, a *New York Times* article from October 16, 2005 detailed both the

7    volume and potential risks of Countrywide's adjustable rate business:

8

9          Adjustable-rate loans accounted for 51 percent of

10          Countrywide's mortgages last year, up from 14 percent in

11          2002. In this year's second quarter, pay-option loans, the

12          ones that allow negative amortization, were 21 percent of

13          Countrywide's total, versus just 3 percent a year earlier.

14          That volume of such loans has never been tested in a

15          sharply rising interest-rate environment, a situation feared

16          by some though not yet on the horizon. While

17          Countrywide sells most of its loans, passing the credit risk

18          to others, it had $15 billion worth of pay-option adjustable

19          rate mortgages on its own books at the end of June, and

20          almost one in five of them had experienced negative

21          amortization.

22    (RJN Ex. Q.)  In that same time frame, the *Chicago Tribune* detailed "a sharp rise"

23    in the issuance of low-documentation and no-documentation loans, which "allow

24    borrowers to skip some or all of the traditional requirements for verifying income

25    and assets."  The *Tribune* article specifically noted that Countrywide had such a loan

26    program that "eliminates much of the paperwork normally required."  (RJN Ex. R.)

27          The extension of credit to potential homebuyers through new loan products

28    and more flexible underwriting guidelines was not simply observed by the media, it

1    was often praised as a necessary and valuable step in fulfilling the societal goal of

2    increased home ownership.  As but one of myriad examples, a May 27, 2005 *Los*

3    *Angeles Times* article detailed Countrywide's outreach to Latino borrowers in Los

4    Angeles in response to criticism that it had not adequately served that fast growing

5    community.  The article observed that "[a]mong the types of loans available is one

6    that uses 'flexible' underwriting guidelines. That will help prospective borrowers

7    who may be creditworthy but have nontraditional credit histories or income sources

8    and little money for a down payment."  (RJN Ex. S.)  Plaintiffs have not alleged *any*

9    *facts* that demonstrate how Mr. Sambol's limited role with respect to the disclosures,

10   his well-founded reliance on the credit risk department and the massive amounts of

11   information about the risk profile of its loan practices disclosed by Countrywide to

12   the industry and the media, would have somehow combined to give Mr. Sambol

13   pause as to the disclosures.

14                         **(b)**     **Countrywide's Disclosures To Investors,**
                                        **Analysts, And Loan Purchasers Were**
15                                      **Detailed And Robust**

16

17          While the popular media publicized the general broadening of credit available

18   to potential homebuyers, Countrywide articulated its own underwriting and

19   production trends in overwhelming detail to investors, analysts, and those who

20   purchased the Company's securitized loans.  Countrywide disclosed granular

21   operations data to the market through 13-Month Operational Reports.  (*E.g.*, RJN

22   Ex. T; Ex. U.)  These reports, which were filed with the SEC, contained loan

23   funding data for the past months broken down by division and product type, while

24   also providing Countrywide's delinquency and pending foreclosure data.  (*Id.*)

25          Countrywide also held regular meetings with analysts and investors, during

26   which Countrywide provided charts and graphs showing the delinquency rate of

27   products over time and the percentage of delinquencies for the Pay Option ARM

28   component of Countrywide Bank's HFI portfolio.  (*E.g.*, RJN Ex. V.)

Countrywide's openness with analysts and investors is evidenced by the comments and opinions included in publicly-available reports during the class period.  For example, a February 1, 2006 report by Keefe, Bruyette and Woods explained "[i]n our view, CFC was able to achieve its high level of production through the sale of a wide array of non-traditional mortgages, including the Option ARM, the interest-only loan, and piggy-back structured loans allowing for 90% and 100% loan-to-value ratios.  Option ARMs and interest only loans were nearly 40% of production in the second half of 2005."  (RJN Ex. W at 3.)  Similarly, a July 15, 2005 BNP Paribas analyst report stated that "[m]uch of the recent mortgage growth at Countrywide, in line with the industry, reflects higher subprime originations as well as greater use of alternative loan structures such as interest-only loans and pay- option ARMs."  (RJN Ex. X at 2.)  In addition, the prospectus supplements issued in connection with the Company's loan securitizations fulsomely disclosed credit attributes such as loan balance, LTV, occupancy type, borrower FICO score and volume of supporting documentation for all assets included in the securitized pool.  (*E.g.*, RJN Ex. Y at S-21-47; RJN Ex. Z at A-1-7; RJN Ex. AA at S-30-62.)  For example, the prospectus supplement dated May 2, 2006 for a securitized pool of pay option ARM and other prime loans disclosed that only 167 of the 1,722 loans in the pool had been underwritten on the basis of full documentation.  (RJN Ex. BB at S-39.)  These prospectus supplements also explicitly stated that Countrywide made a "significant number" of loans as "underwriting exceptions" outside of the Company's standard underwriting guidelines.  (*E.g.*, RJN Ex. CC at S-35 ("On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.  It is expected that a significant number of the Mortgage Loans will have been originated based on these

types of underwriting exceptions.").)  Thus, those who would bear the actual risk that such loans would default were provided all data necessary to weigh the risk of such default against the reward of a yield higher than that of other investments.

## B.   The SAC Does Not Establish Control Person Liability Against Mr. Sambol

The Section 20(a) and Section 15 claims should be dismissed because the SAC does not plead facts sufficient to establish control person liability against Mr. Sambol for the entire class period.  To establish that Mr. Sambol is a control person, Plaintiffs must show that he "exercised actual power or control over the primary violator."  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[5]  The SAC demonstrates that Mr. Sambol did not exercise power or control over either the other Officer Defendants, who were his supervisors or peers, or Countrywide itself, particularly in the time period prior to September 2006.  *See Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194-95 (C.D. Cal. 2007) (dismissing a Section 20(a) claim against a defendant whose Section 10(b) co-defendants were either his peers or supervisors).  Plaintiffs have therefore not adequately pled how Mr. Sambol could have exercised power or control over a primary violator and, for that reason, the control person claims against him should be dismissed.  Plaintiffs' Section 20(a) claim also fails because Plaintiffs do not adequately allege a claim for primary liability under Section 10(b).

## C.   The SAC Does Not Adequately Plead A Section 20A Claim Against Mr. Sambol

A plaintiff cannot sustain a Section 20A claim unless he sufficiently pleads that (1) a person purchased or sold a security on the basis of material, nonpublic information; and (2) he traded contemporaneously with the purchase or sale of

---

[5] The Ninth Circuit applies the same test for control person liability for purposes of Section 20(a) of the Exchange Act that it applies for purposes of Section 15 of the Securities Act.  *See Durham v. Kelly*, 810 F.2d 1500, 1500 (9th Cir. 1987).

1   securities *that is the subject of such violation*.  15 U.S.C. § 78t-1(a); *see also In re*

2   *Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823-H (RBB), 2005 WL

3   5957816 (S.D. Cal. Aug. 1, 2005) (finding that Section 20A claims were only stated

4   as to the insider trades made at the time plaintiffs had adequately pleaded scienter).

5          The Court's Omnibus Order analyzed Plaintiffs' claims in the context of the

6   above requirements and set out the following guidelines:  First, this Court held that

7   only those trades made shortly before "[t]he initial July 2007 corrective disclosure"

8   and those trades made for the remainder of the class period suffice to create a strong

9   inference that any defendant actually used inside information in deciding to make his

10  trades.  (Omnibus Order at 108:12-16.)  Next, this Court held that Plaintiffs could

11  not satisfy the contemporaneous requirement without adequately alleging "that they

12  traded on the other side of an insider's transaction" and that "they traded the same

13  class of security on the same trading day, or one trading day after, the insider's

14  transaction."  (Omnibus Order at 110:12-16.)

15         In light of the Court's guidance, it is clear that Plaintiffs have not met the

16  requirements for pleading a Section 20A claim with regard to Mr. Sambol.  As an

17  initial matter, although the SAC alleges that Plaintiffs traded stock "on the same day

18  as or close in time to sales . . . made by the Defendants," it does not allege that

19  Plaintiffs traded "on the other side of" any of Mr. Sambol's transactions.  For this

20  reason alone, Plaintiffs' Section 20A claim must be dismissed as to Mr. Sambol.  *See*

21  *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 U.S. Dist.

22  LEXIS 52365, at *82 (C.D. Cal. July 1, 2008) (citing *Alfus v. Pyramid Tech. Corp.*,

23  745 F. Supp. 1511, 1522 (N.D. Cal. 1990) (for a plaintiff's trade to have been

24  contemporaneous, it must have occurred after the wrongful insider transaction)); *In*

25  *re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *13 (N.D.

26  Cal. Aug. 14, 2008) (citing *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1489 (N.D.

27  Cal. 1992) ("No liability can attach for trades made by plaintiffs before the insider

28  engages in trading activity.")).

1    In addition, although Plaintiffs have identified a number of Countrywide stock

2    sales made by Mr. Sambol from 2004 through 2007, they have identified only one

3    such sale that satisfies the rules outlined in the Court's Omnibus Order.  That is,

4    from July 2007 until the end of the class period—the only time during which this

5    Court determined a claim for insider trading could be made—Mr. Sambol sold stock

6    just once on the same trading day or one trading day after Plaintiffs.  That sale took

7    place on July 19, 2007.  (SAC Ex. H.)

8    This sale, however, was made pursuant to the terms of a 10b5-1 plan entered

9    into by Mr. Sambol on May 20, 2007.  (RJN Ex. K.)  The July 19, 2007 trade

10   therefore does not satisfy the requirement that Mr. Sambol make actual use of the

11   inside information since he instituted the sales plan long before July 2007, the first

12   date on which this Court held Plaintiffs could sufficiently plead a claim for insider

13   trading against defendants.  *See U.S. v. Smith*, 155 F.3d 1051, 1068 (9th Cir. 1998)

14   ("[A]n investor who has a preexisting plan to trade, and who carries through with

15   that plan after coming into possession of material nonpublic information, does not

16   intend to defraud or deceive; he simply intends to implement his pre-possession

17   financial strategy."); *In re InfoSonics Corp. Sec. Litig.*, No. 06cv1231 BTM (WMc),

18   2007 WL 2301757, at *5 (S.D. Cal. Aug. 7, 2007) ("[Defendants'] June sales were

19   pre-scheduled under Rule 10b-5 trading plans that were already in place.  In order to

20   prevent the sales, [Defendants] would have had to terminate the trading plans and

21   then would be vulnerable to accusations that they terminated the plans to avoid

22   selling shares at lower prices after the restatement.  [One Defendant] continued to

23   sell shares in accordance with the 10b-5 plan even after [the Company's]

24   announcement of its financial results for the second quarter of 2006.").[6]  Plaintiffs

25   thus cannot state a Section 20A claim against Mr. Sambol.

26

27   _____

     [6] This conclusion is further bolstered by the fact that the July 19, 2007 trade,
     which took place almost a week ***before*** the first alleged "corrective disclosure," was
28   the last trade Mr. Sambol made during the class period.  (SAC Ex. H.)

DEFENDANT DAVID SAMBOL'S MP&A
ISO MOTION TO DISMISS THE SAC
LEAD CASE NO. CV 07-5295 MRP (MANx)

1

## IV.    <u>CONCLUSION</u>

2

For the foregoing reasons, Mr. David Sambol respectfully requests that this

3

Court dismiss with prejudice the claims under Sections 10(b), 20(a) and 20A of the

4

Securities Exchange Act of 1934 and Section 15 of the Securities Act of 1933 made

5

against him in the Second Consolidated Amended Class Action Complaint.

6

Dated:  February 6, 2009              Respectfully submitted,

7
                                      MICHAEL D. TORPEY
                                      PENELOPE A. GRABOYS BLAIR
8                                     MICHAEL C. TU
                                      ORRICK, HERRINGTON & SUTCLIFFE LLP
9

10
                                      By:_____/s/ Michael D. Torpey_____
11                                             Michael D. Torpey

12
                                      Attorneys for Defendant
13                                    David Sambol

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28