1

**DLA PIPER LLP (US)**
SHIRLI FABBRI WEISS (Bar No. 079225)
shirli.weiss@dlapiper.com
401 B Street, Suite 1700
San Diego, CA  92101-4297
Tel:  (619) 699-2700  |  Fax:  (619) 699-2701

NICOLAS MORGAN (Bar No. 166441)
nicolas.morgan@dlapiper.com
1999 Avenue of the Stars, Suite 400
Los Angeles, CA  90067-6022
Tel:  (310) 595-3000  |  Fax:  (310) 595-3300

DAVID PRIEBE (Bar No. 148679)
david.priebe@dlapiper.com
JEFFREY B. COOPERSMITH (Bar No. 252819)
jeff.coopersmith@dlapiper.com
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel:  (650) 833-2000  |  Fax:  (650) 833-2001

Attorneys for Defendant ERIC P. SIERACKI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>———————————————<br><br>This Document Applies To All Actions. | Lead Case No. CV 07-05295-MRP (MANx)<br><br>**DEFENDANT ERIC P. SIERACKI'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:        April 13, 2009<br>Time:       10:00 a.m.<br>Courtroom:  12<br>Judge:      The Hon. Mariana R. Pfaelzer |

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................... 1

II.  THE COMPLAINT DOES NOT ALLEGE THE FALSITY OF
CERTAIN STATEMENTS ATTRIBUTED TO MR. SIERACKI ............... 2

    A.  July 26, 2005 Statements Regarding FICO Scores .............................. 2

    B.  September 13, 2006 Statements Regarding A Plan To Sell And
Purchase Securities ............................................................... 3

    C.  2007 Statements Regarding Liquidity Planning And Sources ............. 4

III.  THE COMPLAINT DOES NOT PLEAD A STRONG INFERENCE
OF SCIENTER AS TO MR. SIERACKI ........................................ 6

    A.  Plaintiffs Do Not Explain How A Claim Can Be Stated Against
Mr. Sieracki When It Was Not Stated Against The CFO In
*Zucco Partners* ..................................................................... 6

    B.  There Are No Allegations That Mr. Sieracki Consciously Failed
To Take Countrywide's Performance Into Account In Its
Financial Statements ................................................................ 8

    C.  Mr. Sieracki's Stock Purchases Throughout His Tenure As CFO
Constitute A "Fact Wholly Inconsistent With Fraudulent Intent" ..... 13

    D.  The Complaint Does Not Allege The Fundamental Premise That
Loan Underwriting Standards Varied From What Was
Represented ......................................................................... 16

IV.  THE COMPLAINT DOES NOT PLEAD A CONTROL PERSON
CLAIM AGAINST MR. SIERACKI .......................................... 20

V.  CONCLUSION ......................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

*Argent Classic Convertible Arbitrage Fund v. Countrywide Fin. Corp.*,
    No. CV 07-07097-MRP (MANx) (C.D. Cal. Mar. 19, 2009)..............................5

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) .........................................................9, 10

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................................4

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
    549 F.3d 618 (4th Cir. 2008) ................................................................................4

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ..............................................................................11

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...........................................................13, 14

*In re Cardinal Health Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006)...............................................................15

*In re Countrywide Financial Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008)..............................................................12

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008)..............................................................20

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008)..............................................................15

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)...............................................................................10

*In re Unumprovident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ..............................................................14

*Ley v. Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008).................................................................................4

*McCasland v. FormFactor Inc.*,
    No. C 07-5545 SI, 2008 WL 2951275 (N.D. Cal. July 25, 2008) ........................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ........................................................................... 14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)........................................... 15

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ........................................................................................... 11

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ................................................................................. 12

*South Ferry LP, No. 2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005), *rev'd*, 542 F.3d 776 (9th Cir. 2008)..................................................................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499 (2007) ............................................................... 14

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)........................................................ 1, 6, 7, 8, 10

**RULES**

Fed. R. Civ. P. 9(b) ........................................................................................... 9, 19

1    Eric P. Sieracki respectfully submits this reply memorandum in further

2  support of his motion to dismiss (the "Motion") Plaintiffs' Second Amended

3  Consolidated Class Action Complaint (the "Complaint" or "SAC").

4  **I.      INTRODUCTION**

5    The Motion asks the Court to assess the scienter allegations against Mr.

6  Sieracki in light of *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir.

7  2009), and to address whether falsity is pleaded as to a subset of statements that

8  have been attributed to Mr. Sieracki but not explicitly addressed in the Court's

9  December 1, 2008 Order in this case (the "Order"). Plaintiffs' opposition brief

10 ("Opposition" or "Opp") sidesteps many of Mr. Sieracki's contentions. Indeed, the

11 Opposition demonstrates that Plaintiffs are attempting to pursue a claim against Mr.

12 Sieracki that does not make sense or comply with the law, in light of:

13 •     The actual text of certain statements allegedly made by Mr. Sieracki (and

14       others), which Plaintiffs have taken out of context in order to manufacture

15       statements that were not made and contradictions that do not exist;

16 •     The absence of *any* person or document that even so much as indicates that

17       Mr. Sieracki failed to take Countrywide's condition or operations into

18       account in preparing its financial statements;

19 •     Mr. Sieracki's *multi-year* practice of purchasing Countrywide's stock and not

20       selling it; and

21 •     The weakness of the underlying allegations that Countrywide's loan

22       underwriting practices varied from what was represented about them.

23    Mr. Sieracki's contentions as to these points stand unrefuted. It follows that

24 the Complaint does not plead a securities fraud claim against Mr. Sieracki.

25

26

27

28

-1-                                      REPLY ISO SIERACKI MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                                               Case No. CV 07-07097-MRP (MANx)

1    **II.    THE COMPLAINT DOES NOT ALLEGE THE FALSITY OF**
2         **CERTAIN STATEMENTS ATTRIBUTED TO MR. SIERACKI**

3         As a threshold matter, Mr. Sieracki showed that the Complaint does not
4    allege that three sets of statements he allegedly made were false, because the falsity
5    allegations simply do not contradict the actual contents of the statements.  *See*
6    Motion § II(B).  Contrary to Plaintiffs' Opposition, the Court has not already
7    considered these arguments, and Plaintiffs cannot plead falsity by continuing to rely
8    on a "spin" on the statements that does not comport with their actual contents.

9              **A.    July 26, 2005 Statements Regarding FICO Scores**

10        The Complaint alleges that on July 26, 2005, Mr. Sieracki stated that
11   customers for home equity loans had an average 730 FICO score and that
12   Countrywide "is running over 80% premier in A minus.  We operate at the very top
13   end of the nonprime credit spectrum.  The FICO scores have remained very steady,
14   just over 600."  The Complaint asserts that these statements were contradicted by
15   generalized allegations that Countrywide had lax loan underwriting standards, but
16   as Mr. Sieracki explained, the July 26 statements did not speak to loan underwriting
17   standards as a whole; they presented *specific FICO numbers* regarding *specific*
18   *sectors*.  The Complaint does not allege that these actual statements were false; *e.g.*,
19   that Mr. Sieracki misrepresented the FICO statistics for home equity loans, or that
20   FICO scores just over 600 would not fall within the very top end of the nonprime
21   credit spectrum.  *See* Motion § II(B)(1).

22        In response, Plaintiffs assert that the Order already found the July 26
23   statements actionable.  *See* Opp 117.  It did not.  The portion of the Order cited by
24   Plaintiffs refers to the July 26 statements in discussing scienter.  The Order did not
25   analyze the actual contents of the July 26 statements and assess whether they were
26   contradicted by the allegations regarding loan underwriting standards in general
27   (which they are not).

28

-2-

1    Hence, whether the Complaint pleads the falsity of these statements remains

2    an open issue, and it is one that must be resolved against Plaintiffs.  Plaintiffs'

3    reliance on allegations that some borrowers in the Correspondent Lending Division

4    had low FICO scores (Opp at 118) merely underscores the Complaint's failure to

5    plead the falsity of the actual alleged statements.  To reiterate, the alleged

6    statements regarding FICO scores were made about specific subcategories of

7    borrowers—home equity loans and the A minus-rated sector.  The Complaint does

8    not draw a connection between home equity loans or the A minus sector on the one

9    hand and the Correspondent Lending Division on the other.   Nor does the

10   Complaint allege that Mr. Sieracki made a statement about loan underwriting

11   standards in general.  Hence, the Complaint does not plead a contradiction between

12   what was allegedly represented and the supposed "true" state of affairs.

13   **B.    September 13, 2006 Statements Regarding A Plan To Sell And**

14   **Purchase Securities**

15   The Complaint alleges that on September 13, 2006, Mr. Sieracki was asked

16   whether the recently announced plan to sell convertible hybrid securities and

17   repurchase common stock signified that Countrywide had changed its position on

18   growth rates and risk, and that he replied that it did not.  As Mr. Sieracki explained,

19   the Complaint does not allege any facts showing that his description of the

20   transactions was false, or that the plan announced at this time was accompanied by

21   a change in risk preferences, or indeed that the "risk" referenced in the question and

22   answer refer to the topic of loan underwriting at all.  *See* Motion § II(B)(2).

23   In response, Plaintiffs concede by silence that Mr. Sieracki's alleged

24   statement was made in response to a question about the plan to sell convertible

25   hybrid securities and repurchase common stock.  Hence, Plaintiffs' assertion that

26   the phrase "growth rates and risk" may "plausibly" be linked to issues regarding

27   loan lending standards (Opp at 118) wrenches the September 13 statement out of its

28   context.  Plaintiffs cannot take a statement out of the context in which it was made,

in order to manufacture a statement that was not made and a contradiction that does not exist. *See Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (plaintiffs could not misrepresent that CEO had made statement about liquidity, when the context showed that he was talking about earnings).[1]  Moreover, under Plaintiffs' view, *any* statement regarding Countrywide's prospects, operations, or future arguably could be construed as a statement about a specific aspect of its business (its loan underwriting standards), and hence require disclosure of the supposed "true" facts regarding loan underwriting standards.  That is not the law of this Circuit.  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002).[2]  Furthermore, the Opposition fails to address Mr. Sieracki's point that even if the September 13 statement could be misconstrued to pertain to loan underwriting standards, the Complaint does not allege that those standards had changed *at the time of* the statement, and in connection with the repurchase.

## C.    2007 Statements Regarding Liquidity Planning And Sources

Plaintiffs also challenge three statements allegedly made by Mr. Sieracki (on March 6, August 9, and October 26, 2007) regarding Countrywide's liquidity planning and sources.  Mr. Sieracki explained that while the Complaint alleges that these statements were false for the reasons set forth in Section IV.H of the Complaint, there are no allegations specifically directed against Mr. Sieracki in that

---

[1]  *See also Cozzarelli v. Inspire Pharmaceuticals Inc.,* 549 F.3d 618, 624-25 (4th Cir. 2008) (plaintiffs could not manufacture scienter by taking alleged statements out of the context of the analyst reports in which the statements were found).

[2]  Plaintiffs also assert that the Court found the Company's plan to sell convertible hybrid securities and repurchase common stock economically suspect.  Opp at 88 n.72, *id.* at 118.  Plaintiffs misconstrue the Court's order, which merely stated that the fact that the stock repurchase was accompanied by a sale of other securities rendered the anti-scienter impact of the repurchase less powerful than it otherwise would have been.  Plaintiffs fail to address Mr. Sieracki's explanation that:  (1) in reality, there is nothing suspicious about a beneficial capital restructuring; and (2) the repurchase had no material effect on reported EPS.  *See Motion at 21 n.12; cf.* Opp at 88 n.72 (mistakenly contending that Mr. Sieracki had offered no previously unconsidered arguments regarding the repurchase).

1   Section.  Mr. Sieracki also noted that the Complaint does not (and cannot) allege

2   facts showing that Countrywide had *not* engaged in liquidity planning or did *not*

3   have several liquidity sources at the time of each statement.  To the contrary, the

4   Complaint acknowledges that Countrywide was able to draw upon a $11.5 billion

5   credit facility on August 16, and that Bank Of America invested $2 billion on

6   August 23.  *See* Motion § II(B)(3).[3]

7          In response, Plaintiffs assert—significantly, without citation to the

8   Complaint—that Mr. Sieracki "well understood" that disclosure of the "poor

9   quality" of Countrywide's lending practices would damage the Company's liquidity

10   position.  Opp at 119.  Putting aside the fact that there are no specifics alleged in

11   support of this assertion and that Plaintiffs would require Mr. Sieracki to have been

12   able to predict the future, Plaintiffs again ignore the actual contents of the

13   statements in question.  The statements refer to liquidity planning and sources,

14   which Plaintiffs nowhere allege did not exist as represented.   Indeed, the

15   Opposition itself refers to the August 16 credit facility draw-down (*id.*) and a

16   November 26, 2007 statement that the Federal Home Loan Bank in Atlanta was

17   also providing cash to the Company.  In so doing, Plaintiffs affirm Mr. Sieracki's

18   point that there were liquidity sources for Countrywide at the times of his

19   statements.

20

21

22

23

24

---

25   [3]  The Court recently confirmed that it has not considered these contentions.  *See*

26   *Argent Classic Arbitrage Fund v. Countrywide Fin. Corp.*, No. CV 07-07097-MRP
     (MANx), slip op. at 10 n.7 (C.D. Cal. Mar. 19, 2009) ("This Court has never

27   analyzed liquidity-related allegations in a Countrywide case, except in *Pappas* …
     (2) to reject the *Pappas*' Defendants' fact-intensive arguments about

28   macroeconomic forces, which were inappropriate on a motion to dismiss.").

III.   **THE COMPLAINT DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER AS TO MR. SIERACKI**

The remainder of the Complaint alleges that Mr. Sieracki signed SEC filings that contained false financial statements and false statements that Countrywide had prudent loan underwriting standards.  Mr. Sieracki demonstrated that the Complaint does not plead a strong inference of his scienter, especially in light of *Zucco Partners*, 552 F.3d 981.  Indeed, when closely examined, the Complaint's allegations that Countrywide issued false financial statements and false representations of prudent loan standards are tenuous at best, which means that the case for scienter rests on an infirm foundation.  Nothing in the Opposition refutes Mr. Sieracki's contentions.

A.   **Plaintiffs Do Not Explain How A Claim Can Be Stated Against Mr. Sieracki When It Was Not Stated Against The CFO In *Zucco Partners***

The Motion discusses in *Zucco Partners* at length.  Mr. Sieracki did not claim that *Zucco Partners* fundamentally changed the standards for pleading scienter.  Rather, Mr. Sieracki relied on *Zucco Partners* for its <u>application</u> of pleading standards to the purported securities claim alleged against him.  He explained that *Zucco Partners* had "implemented the Reform Act in considering accounting fraud claims against a corporation and its CFO," and in so doing had "provided important guidance regarding the high pleading standards for accusations of accounting fraud in the specific context of claims alleged against a Chief Financial Officer."  *See* Motion at 1:13-15, 18:11-12.  Mr. Sieracki then applied *Zucco Partners* by comparative analysis.  Numerous allegations that seemed to be probative of the company's and CFO's scienter were present in *Zucco Partners*, but are not present in the Complaint.

The Opposition does not refute this comparative analysis of *Zucco Partners*.  It barely mentions *Zucco Partners* at all, citing it only for the proposition that

1   anonymous sources may be used.  *See* Opp at 46 n.44 (contrasting *Zucco Partners*

2   in arguing that anonymous source regarding MSR valuations was a high-ranking

3   executive who was directly involved in valuing residual interests), *id.* at 75 (*Zucco*

4   *Partners* is consistent with *In re Daou Systems* in allowing anonymous source

5   allegations under certain circumstances), *id.* at 81 (*Zucco*'s standards are consistent

6   with prior cases).  Hence, nowhere does the Opposition deny the following:

7   •       In *Zucco Partners*, a company restated its financials due to the admitted

8           accounting errors of its CFO.  Here, Countrywide did not restate its

9           financials, and they never will be restated.  *See* Motion at 18:20-23, 19:6-11.

10  •       In *Zucco Partners*, six purported sources—one of whom was credibly

11          alleged—accused the company and its CFO of engaging in financial fraud.

12          Here, no anonymous sources or documents accuse Countrywide, or Mr.

13          Sieracki, of having misrepresented the Company's financials.  *See* Motion at

14          19:8-13.

15  •       In *Zucco Partners*, an anonymous source credibly alleged that he or she had

16          been ordered by the CFO not to write down obsolete inventory because that

17          would result in the company missing market expectations.  Here, no

18          anonymous source accuses Mr. Sieracki, the CFO of Countrywide, of

19          ordering anything improper.  *See* Motion at 11:18-24, 12:12-15, 18:15-18,

20          19:11-15.  This includes an anonymous source whom Plaintiffs assert was

21          involved in residual interest valuation, and a source whom Plaintiffs assert

22          interacted on a daily basis with Mr. Sieracki.  *Accord*, Opp at 86 n.69

23          (acknowledging that this source, CW1, does not accuse Mr. Sieracki of

24          anything improper).

25  •       In *Zucco Partners*, senior management openly questioned the company's

26          systems for recording software development expenses.  The systems proved

27          inadequate, and the company restated the expenses.  Here, the Complaint

28          does not allege that Mr. Sieracki questioned any aspect of Countrywide's

1  accounting or that there is any document, conversation, or meeting to that

2  effect.  *See* Motion at 15:19-27, 18:18-20, 19:23-20:4.

3  •  In *Zucco Partners*, the CFO sold 48% of his stock during the period covered

4  by his accounting errors.  Here, Mr. Sieracki purchased and held stock, rather

5  than selling stock.   *See* Motion at 18:23-24, *id.* Section III(C).

6  •  In *Zucco Partners*, several internal sources opined that the company had

7  adopted improper accounting policies.  Thus, it is irrelevant that some

8  sources in this case anonymously and after the fact opined to Plaintiffs that

9  Countrywide had wrong loan underwriting or valuation of retained interest

10  policies.  *See* Motion at 15:18-16:2.

11  If the complaint in *Zucco Partners* did not state a securities fraud claim

12  against a CFO despite the presence of stronger allegations than asserted here

13  against Mr. Sieracki, then the Complaint here cannot state a claim against Mr.

14  Sieracki.  Plaintiffs do not refute this argument despite the fact that it was clearly

15  presented by Mr. Sieracki.  Hence, the Court should apply *Zucco Partners* to grant

16  the Motion.

17  **B.  There Are No Allegations That Mr. Sieracki Consciously Failed**

18  **To Take Countrywide's Performance Into Account In Its**

19  **Financial Statements**

20  Mr. Sieracki also explained that the Complaint does not allege that he

21  received any information regarding loan underwriting standards that he consciously

22  failed to properly incorporate into Countrywide's financial statements or qualitative

23  disclosures.  To this end, the Complaint contains no allegations of "meetings,

24  conversations, and internal memoranda and reports–to support the inference that

25  any of the individual defendants actually believed [the company's] public

26  statements might be false or misleading at the time they were made," or believed

27  that its financial statements were not compliant with GAAP.  *See* Motion at 19:23-

28  20:3, *quoting McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL

-8-

1   2951275, *8, *10 (N.D. Cal. July 25, 2008).  Likewise, while the Complaint alleges

2   that Mr. Sieracki and other officers knew about loan delinquency and pay option

3   ARM statistics, (1) those statistics were publicly reported throughout the class

4   period, and (2) the Complaint does not plead that Countrywide and Mr. Sieracki

5   consciously failed to take the effect of these statistics, or of the loan underwriting

6   standards alleged in the Complaint, into account in preparing and issuing the

7   financial statements.  *See* Motion at 12:1-12 & n.7, 20:4-10.[4]  The law does not

8   allow Plaintiffs to merely *assume,* as they have done, that the financial statements

9   did not take into account whatever information that was known to Mr. Sieracki.  *Id.*

10   at 20:11-15 & n.11 (citing cases).

11      Plaintiffs do not respond with specificity.  The Opposition does not point to

12   any sources, documents, or communications that are alleged in the Complaint, and

13   that indicate that Mr. Sieracki failed to properly account for Countrywide's

14   financial performance.  Instead, Plaintiffs continue to rely on phantom internal

15   reports.  They assert that Mr. Sieracki's memberships in the Credit Committee,

16   Executive Strategy Committee, and Asset/Liability Committee gave him access to

17   internal reports that refuted his public statements.  Opp at 85.  But the Complaint

18   does not plead even a *single* internal report sent to Mr. Sieracki or any of these

19   committees, nor explain how what was in any report contradicted any public

20   statement made by Mr. Sieracki (as is required by Fed. R. Civ. P. 9(b)).  Instead,

21   Plaintiffs claim they do not need not be specific, asserting that "an inference of

22   scienter is not dependent upon internal projections directly contradicting the

23   Company's reported financial results."  Opp at 85-86, *citing Atlas v. Accredited*

---

[4]  Mr. Sieracki is not referring to only two instances of disclosure, contrary to
Plaintiffs' assertion.  Opp at 87.  Every month, Countrywide disclosed, by a press
release attached to a Form 8-K, a panoply of operational statistics, including the
amount of pay option ARM loans originated, delinquency rates, and foreclosure
rates.  Each quarter, Countrywide disclosed, by a press release attached to a Form
8-K, the amount of pay option ARMs with negative amortization, and the amount
of that negative amortization.

1 *Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008).

2      The principal problem with Plaintiffs' argument is that the Ninth Circuit

3 rejected it.  In *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999),

4 the Court held that unspecified adverse internal reports do not count when it comes

5 to pleading scienter.  Apart from this problem, the Complaint in this case is not like

6 the complaint assessed in *Atlas,* which alleged "with specificity" that the

7 management defendants in that case "actually directed…deviations from company

8 policy."  Here, Plaintiffs do not even claim that Mr. Sieracki directed any deviation

9 from any company policy regarding financial statements or loan underwriting

10 standards.  Unlike, for example, *Zucco Partners*, the Complaint does not cite any

11 source or document to the effect that Mr. Sieracki directed anyone to do anything,

12 let alone anything improper.  Indeed, the Complaint alleges that other officers, not

13 Mr. Sieracki, directed loan underwriting practices.[5]

14      In addition to these deficiencies, the Complaint does not allege that any

15 internal loan performance information known to Mr. Sieracki was different from

16 the detailed financial and operational data (such as the amount of pay option

17 ARMS, the amount of pay option ARMs with negative amortization, loan

18 delinquency rates, and loan foreclosure rates) that Countrywide public disclosed

19 after every quarter—indeed, after every *month*.  While Plaintiffs quibble about the

20 impact of those numbers, they do not and cannot allege that they were false or

21 unknown to investors, that they were different than whatever internal numbers were

22 known to Mr. Sieracki, or that they were not taken into account in Countrywide's

23 public financial statements.  Hence, Plaintiffs' assertion that the financial

24 statements "concealed" risk (Opp at 87) is devoid of factual or logical support.

25      Plaintiffs also argue that "the allegations and arguments relating to KPMG's

26 scienter apply equally, if not more so, to Sieracki," because the CFO is principally

27

28   [5] The Complaint also fails to allege that loan underwriting standards varied from
what was publicly represented.  *See* Section III(D), *infra*.

1  responsible for the accuracy of a company's financial statements and has an "even

2  greater obligation to engage in the type of testing and analysis that KPMG failed to

3  perform."  Opp at 88 n.71, *citing Reves v. Ernst & Young*, 507 U.S. 170, 190-191

4  (1993).  But the citation to *Reves* states that management and auditors fulfill

5  different roles, which cannot be filled simultaneously by the same person or entity.

6  Hence, *Reves* rejects Plaintiffs' attempt to analogize KPMG to Mr. Sieracki.

7         In sum, Mr. Sieracki's contention that there are no specific factual allegations

8  in the Complaint from which an inference of conscious wrongdoing on his part may

9  be drawn remains unrefuted.  Mr. Sieracki also explained that Plaintiffs rely on the

10  mistaken premise that they have alleged the falsity of Countrywide's financial

11  statements.  As in his opening brief, Mr. Sieracki will not repeat the more detailed

12  contentions regarding the financial statements presented by Countrywide in its

13  companion motion to dismiss.  Rather, he addresses again the macro-level problems

14  with Plaintiffs' theory.

15         First, nothing in the Opposition refutes Mr. Sieracki's point that Plaintiffs'

16  financial fraud claims are predicated on the second-guessing of subjective reserve

17  and valuation judgments made after the fact, as forbidden by *DiLeo v. Ernst &*

18  *Young*, 901 F.2d 624 (7th Cir. 1990) and the Reform Act.  To the contrary,

19  Plaintiffs argue that the increase between the 2006 and 2007 levels of the provision

20  for loan loss reserves ("ALL") shows that the earlier reserve numbers must have

21  been false.  Opp at 25 n.22.  However, as Mr. Sieracki showed (and Plaintiffs do

22  not refute), Countrywide had taken large loan loss reserves prior to the Second

23  Quarter 2007.  Indeed, the ALL had doubled from 2005 to 2006.  *See* Motion at

24  10:22-23.[6]  Hence, this case does not present the type of change in reserve alleged

25  _____

[6] Plaintiffs allege that this doubling of reserves is suspicious, asserting that ALL
26  stayed constant as a percentage of loans held for investment from 2005 to 2006
even as delinquencies and negative amortization supposedly increased.  Opp at 18-
27  19, 87-88.  As explained in this section of the brief, however, delinquency rates and
negative amortization data were publicly disclosed throughout 2006.  Hence, the
28  circumstances that Plaintiffs criticize in hindsight were clear to investors in real

1    in *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) (cited by Plaintiffs), in which a

2    company went from no write-off at all for a particular asset (uncollectible

3    capitalized royalty advances) to a write off of 84% of the balance. *Id*. at 92.

4    Rather, Plaintiffs complain about the timing of the reserves taken over a period of

5    time, where such reserves had always existed (and had in fact been augmented).[7]

6          Second, the Opposition does not refute Mr. Sieracki's contention that the

7    Second Quarter 2007 was not the first time Countrywide had reported higher

8    reserves, decreasing MSR valuations, and/or negative effects of the mortgage

9    market, contrary to Plaintiffs' story to that effect. *See* Motion at 9:24-11:4 (citing

10   numerous examples of adverse data disclosed throughout 2005-2007, not just

11   "isolated" examples as asserted in the Opposition).  Plaintiffs' response that the

12   Court rejected the argument that rising loan delinquency rates were "publicly

13   reported throughout the Class Period" misses the point.  Opp at 87, *citing In re*

14   *Countrywide Financial Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1060, 1062

15   (C.D. Cal. 2008).  Judging from the opinion, the apparent context of the Court's

16

17   ───────────────

18   time, and cannot constitute the type of material nonpublic information known only
     to Mr. Sieracki but not reflected in the financial statements.  Moreover, the
19   Complaint does not allege that Countrywide's loan underwriting practices
     deteriorated *during 2006*, which is the time frame for which Plaintiffs challenge this
20   reserve.  Rather, to the extent the Complaint alleges that Countrywide engaged in
     undisclosed imprudent lending practices (which it does not, *see* Section III(D),
21   *infra*), it presents the matter as a practice that had been in place *since 2004*.  *See*,
     *e.g.*, Opp at 26.  Indeed, in arguing that the Complaint now alleges that "loans
22   written under Countrywide's new practices were impaired at the time of the FY04
     and FY05 filings" (*id.* at 10), Plaintiffs reinforce the point that there is nothing
23   special alleged about the 2006 loans or loan underwriting standards that would have
     required the Company to take a higher ALL as a percentage of loans held for
24   investment in that year.

25   [7]  To similar effect, Plaintiffs admit that Countrywide wrote down the value of
     retained interests in 2006 and in the First Quarter 2007, and argue that the
26   magnitude of these devaluations was smaller than what occurred later.  Opp at 39
     n.34.  Likewise, Plaintiffs assert that the write-down of MSRs in the Third Quarter
27   2007 was larger than the write-downs in previous periods, and that there had been
     increases in the value of this assert in the first half of 2007.  *Id.* at 46 & n.45.
28

-12-                                    REPLY ISO SIERACKI MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                        Case No. CV 07-07097-MRP (MANx)

1   discussion was a truth on the market defense, which may raise issues about the

2   intensity of corrective disclosures.  That is not Mr. Sieracki's contention in this

3   Motion.  Rather, his contention is that the underlying statistics on which Plaintiffs

4   base their argument that Countrywide needed large loan loss reserves or asset

5   devaluations were publicly and accurately disclosed.  Hence, these statistics cannot

6   constitute the type of internal, nonpublic information that was known only to Mr.

7   Sieracki, but not reflected in the financial statements.

8        **C.    Mr. Sieracki's Stock Purchases Throughout His Tenure As CFO**

9             **Constitute A "Fact Wholly Inconsistent With Fraudulent Intent"**

10        Mr. Sieracki also showed that his stock transactions support a strong

11   inference *against* scienter.  Mr. Sieracki never sold a share of stock during his

12   multi-year tenure as CFO.  Rather, he *purchased* stock throughout that tenure by

13   the exercise of options, *without selling the acquired shares in the open market* or

14   otherwise.  In so doing, he gave up a significant profit (while paying Alternative

15   Minimum Tax on nonexistent paper "profit"), and lost up to $20 million when

16   Countrywide was acquired by Bank Of America.  *See* Motion Sections II(E), III(C).

17   As one court reasoned in finding that a complaint did not plead scienter, where an

18   individual defendant increases his or her holdings during the class period, this is "a

19   fact wholly inconsistent with fraudulent intent."  *Id.* at 22:14-19, *quoting In re

20   Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

21        The Opposition fails to refute these contentions.  Instead, Plaintiffs'

22   speculative arguments serve to reinforce Mr. Sieracki's assessment.

23        First, Plaintiffs speculate that Mr. Sieracki mistakenly held onto his stock

24   because he "may not have known precisely when the bottom would fall out" given

25   Countrywide's "relatively gradual" demise.  Opp at 90.  As a threshold matter,

26   Plaintiffs' assertion that Countrywide's decline was "gradual" fundamentally

27   undermines their argument that it was evident from the outset of the class period

28   that purportedly lax loan underwriting standards inevitably would destroy the

1  Company.  In any event, Plaintiffs fail the reasonability test required under the

2  Reform Act.  While Plaintiffs cite *Tellabs*, as Mr. Sieracki explained, that case

3  requires courts to draw inferences that *reasonably would be drawn*, not ones that

4  possibly could be drawn.  *See* Motion at 22:7-11, *citing Mizzaro v. Home Depot,*

5  *Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008).[8]  Applying this principle, the time span

6  encompassed by Mr. Sieracki's stock purchases-without-sales is not fleeting or

7  trivial:  it is at least three years.  As *Bristol-Myers Squibb* reasoned, the only

8  inference that reasonably would be drawn from Mr. Sieracki's stock purchases, and

9  decisions not to sell, over such a long period of time is one of good faith.

10      Second, Plaintiffs argue (based on a district court decision that was vacated)

11  that the imminent expiration of Mr. Sieracki's stock options spurred his stock

12  purchases.  Opp at 90 & n.73, citing *South Ferry LP, No. 2 v. Killinger*, 399 F.

13  Supp. 2d 1121, 1145 (W.D. Wash. 2005), *rev'd*, 542 F.3d 776 (9th Cir. 2008).  If

14  correct, this *increases* the inference of good faith that Mr. Sieracki asks the Court to

15  draw, and the implausibility of Plaintiffs' "mistaken decision to hold onto shares"

16  theory.  If the options were about to expire, this meant that Mr. Sieracki had not

17  exercised them in the years and years in which they were vested and in the money.

18  For example, the options exercised on May 31, 2007 had been exercisable since

19  June 2, *1998*, according to the Form 4 for the transaction on which Plaintiffs

20  themselves rely, and Countrywide's stock price had been above the $6.77 strike

21  price at virtually all subsequent times.  Hence, Mr. Sieracki did not abstain from

22  taking profit for just the final three years of the options' vesting period:  he did so

23  for an even longer period.

24

25  [8]  To similar effect, Plaintiffs' argument that "[t]he common sense proposition that
26  fraud does not constitute good business cannot be turned on its head so as to
    suggest any inference of fraud is unreasonable because no sane person would
27  conduct his or her business that way" is inapposite.  Opp at 90-91, *citing In re
    Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 894 (E.D. Tenn. 2005)).
28  There is no form of "business" or question of sanity at issue here.

1         Third, Plaintiffs claim that *No. 84 Employer-Teamster Joint Council Pension*

2    *Trust Fund v. America West Holding Corp.* 320 F.3d 920, 944 (9th Cir. 2003),

3    vitiates the absence of stock sales.  It does not.  In that case, insider trading on

4    misleading statements tending to inflate the stock price was alleged, and the issue

5    was whether other defendants who did not sell stock on that information could

6    nonetheless possess scienter.  The Ninth Circuit speculated that such persons would

7    be motivated to inflate the stock price because their eligibility for stock options and

8    bonuses was based primarily on financial performance.  *Id.* at 944.  Here, Mr.

9    Sieracki held and continued to hold millions of dollars worth of stock and options,

10   even as Countrywide reported what Plaintiffs assert was false strong financial

11   performance.  Neither *America West* nor Plaintiffs' other cases support their

12   argument.[9]

13        In sum, Mr. Sieracki's contentions stand unrefuted, and his stock-related

14   conduct renders "wholly inconsistent" with scienter.  The Opposition makes one

15   other reference to stock transactions and Mr. Sieracki.  It asserts that he knew that

16   Mr. Mozilo was selling stock during the time that Countrywide commenced its

17   modest stock repurchase in late 2006.  Opp at 118.  This is unavailing for at least

18   two reasons.  First, scienter is an individualized inquiry.  Mr. Sieracki cannot be

19   held liable for what Mr. Mozilo did or did not do, or knew or did not know.  For his

20   part, Mr. Sieracki was not selling stock at this time.  Second, *everyone* knew these

21   facts.  Mr. Mozilo reported his sales on Forms 4 in close to real time.  If Plaintiffs

22   
23   [9]  In *In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008), the fact that
     defendants had sold some stock, but not a tremendous amount, supported a weak
24   inference of scienter.  *Id.* at 1232.  Here Mr. Sieracki sold no stock, and suffered
     substantial losses as a result.  *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d
25   688, 735 (S.D. Ohio 2006), opines that the holding of stock does not conclusively
     negate an inference of scienter.  Mr. Sieracki need not conclusively negate any
26   inference of scienter in order to prevail in this Motion.  Rather, it is Plaintiffs'
     burden to plead a strong inference of scienter, which they cannot do in light of Mr.
27   Sieracki's stock purchases.  That being said, no reasonable person would draw any
     inference from Mr. Sieracki's stock-related conduct other than one of good faith.
28

1   suggest that the combination of the sales and repurchases in late 2006 was

2   suspicious, it raises further questions regarding the extent to which investors were

3   supposedly "shocked" to learn after the Second Quarter 2007 that Countrywide's

4   prospects were waning, when the sales and repurchases had been a matter of public

5   knowledge for more than nine months.

6   **D.    The Complaint Does Not Allege The Fundamental Premise That**

7   **Loan Underwriting Standards Varied From What Was**

8   **<u>Represented</u>**

9       As a further challenge to Plaintiffs' assertion that the Complaint alleges a

10  strong inference of scienter, Mr. Sieracki questioned Plaintiffs' premise that the

11  Complaint alleges that the "Officer Defendants" received internal reports regarding

12  Countrywide's loan underwriting standards or practices, which supposedly varied

13  from what was disclosed.  A close analysis of these allegations shows that they do

14  not constitute factually-based allegations that loan underwriting standards varied

15  from what was disclosed, much less that the financial statements were flawed as a

16  consequence.  The Opposition does not refute Mr. Sieracki's contentions.

17      <u>First</u>, Mr. Sieracki explained that the Complaint does not allege that

18  Countrywide failed to take the credit risk presented by each borrower into account

19  in pricing its loans.  To the contrary, it alleges that Countrywide charged additional

20  fees for riskier loans, so as to price risk into its products and maintain underwriting

21  prudence.  Motion at 7:1-15.  In response, Plaintiffs argue that this lawsuit is about

22  Countrywide's "misrepresentation and concealment of the level of credit risk," not

23  its "business judgment in conducting loan underwriting."  Opp at 120.  But the

24  "misrepresentations" alleged in the Complaint—the statements about loan

25  underwriting standards supposedly at odds with the internal evidence—were

26  statements made primarily by Countrywide's CEO, Angelo Mozilo, that subprime

27  loan underwriting standards were *prudent*; that is, based on standards and

28  disciplines designed to assess and account for risk.  *See, e.g.*, Complaint ¶¶ 121-

-16-

1   128, 620-621; *accord*, Opp at 25 n.23 (contending that problem at Countrywide

2   was making of loans without considering risk).[10]  By failing to acknowledge that

3   pricing for risk is a means to address risk, Plaintiffs continue to present what Mr.

4   Sieracki claimed they presented to the Court:  an incomplete picture.  *See* Motion

5   at 7:14-15.

6        Second, Mr. Sieracki demonstrated that while Plaintiffs assert that a high

7   percentage of loans was made as exceptions to "normal" underwriting criteria, most

8   of their allegations simply do not pertain to Countrywide's normal underwriting

9   criteria at all.  Rather, much of Plaintiffs' argument is based on documents and

10  anonymous sources relating to a division called Full Spectrum Lending ("FSL"),

11  which Plaintiffs admit was the subprime division of Countrywide and which would

12  have been expected to use different criteria than other portions of the Company.

13  Motion at 7:16-8:2.  Other allegations pertain to the Correspondent Lending

14  Division ("CLD").  These allegations lack probative value because these were loans

15  purchased by Countrywide, not made by Countrywide.  *Id.* at 8:2-6.

16       Significantly, the Opposition ignores Mr. Sieracki's contentions regarding

17  the inadequacy of the FSL allegations; rather, Plaintiffs discuss only the CLD

18  allegations.  Given that the Court relied heavily on the FSL allegations in its prior

19  Order (*see* Motion at 8 n.3), Plaintiffs' silence is telling and should give the Court

20  pause.  As to CLD, Plaintiffs argue that the underwriting matrices for that division

21  are probative of Countrywide's loan standards as a whole because they originated

22  from a central corporate office.  Opp at 120-121, *citing* Order at 9 n.10.  But the

23  fact that these underwriting guidelines "originated" at a central corporate office

24  does not speak to Countrywide's standard or prime underwriting guidelines.  Many

---

[10]  To somewhat similar effect, the Complaint alleges that Countrywide's SEC
filings represented that high credit quality loans were maintained in the Company's
portfolio.  *See*, *e.g.*, Complaint ¶¶ 631, 649.  But the characteristics of loans
retained in the portfolio are not the same as those of all loans made by
Countrywide.  *See* Countrywide Motion To Dismiss§ I(A)(1).

1   corporate initiatives specific to certain departments come from central corporate

2   offices, but do not pertain to the entire company.[11]  In the end, we are left with a

3   Complaint that purports to indict Countrywide's loan underwriting standards, yet

4   lacks a single allegation about the underwriting standards employed by the

5   Company's mainstream, bread-and-butter mortgage lending divisions.  That

6   Plaintiffs are forced to resort to allegations regarding ancillary divisions (FSL and

7   CLD) speaks volumes about the inadequacy of their Complaint.

8        Third, Mr. Sieracki demonstrated that Plaintiffs could not assert that

9   investors learned only after the Third Quarter 2007 that pay option ARMS in

10   Countrywide Bank's portfolio had been made with low or no documentation, since

11   Countrywide had disclosed more than one year earlier (in August 2006) that

12   "*substantially all* of the pay-option loans we originate are underwritten based on

13   'reduced documentation' standards whereby the loan applicant's income is based

14   on representations provided by the borrower," and where Countrywide had

15   disclosed the average FICO score for pay option ARMS by Countrywide

16   throughout the class period.  Motion at 8:9-24.  In response, Plaintiffs argue that the

17   August 2006 disclosure was misleading because it failed to also disclose the lack of

18   due diligence of the loan applicants.  Opp at 120.  But these are the same things.

19   That Countrywide did not require documentation from these borrowers is the same

20   as saying that due diligence was limited, and the Complaint does not allege that

21   Countrywide had represented that it had conducted due diligence despite not

22   requiring documentation from borrowers.  Plaintiffs also argue that the disclosure

23   of an average FICO score for pay option ARM borrowers "could be misleading

24

25   _____

     [11]  Plaintiffs also assert that it would "it would make little sense" for the loans
26   Countrywide purchases to have a looser standard than those originating in
     Countrywide.  Opp at 121.  Plaintiffs present no authority or factual allegation in
27   support of this proposition.  The proposition is far from self-evident.  For instance,
     in purchasing rather than making these loans, Countrywide could have acquired
28   them at a discount that would reflect any greater underwriting risk in the loans.

1   without providing the dispersion of those scores around a mean." *Id.* at 122 &

2   n.106 (presenting hypothetical wherein Bill Gates' FICO and net worth are

3   included in average calculations).  But the Complaint does not allege that a few

4   high-value prime borrowers (the "Bill Gates" of the world) offset the low FICO

5   scores of the vast majority of borrowers such that the factually accurate mean FICO

6   score was somehow misleading.

7       <u>Fourth</u>, Mr. Sieracki refuted Plaintiffs' assertion that Countrywide did not

8   disclose any lower underwriting standards until a July 24, 2007 conference call, in

9   which Mr. McMurray supposedly stated that the Company had relaxed its standards

10  by including loans with FICO scores in the low 500s within the category "prime."

11  *See* Motion at 9:5-19.  Plaintiffs assert that the Order found that "industry custom

12  regarded 660 as the prime-subprime dividing line," and hence that two analysts

13  were stunned after the July 24 conference call.  Opp at 122-123.  Plaintiffs again

14  miss the point, because they do not consider the substance of the actual statements.

15  As Mr. Sieracki explained, and Plaintiffs do not refute, under Mr. McMurray's

16  hypothetical taxonomy of loan categories, loans with a *high* FICO score could

17  nevertheless be classified as "subprime."  Thus, regardless of whether two analysts

18  were "stunned" (whatever that means) at Mr. McMurray taxonomy (Opp at 122),[12]

19  he did not attest to a leftward migration of the loan portfolio towards lower FICO

20  scores.  *See* Motion at 9:11-18.

21

22

---

23  [12]  The relevant paragraphs of the Complaint quoting the two analysts reports cited
     by Plaintiffs are ambiguous at best in setting forth exactly what the analysts were
24  "stunned" about, and why.  In any event, Plaintiffs' premise that two analysts'
     *opinions* about Countrywide's disclosures plead falsity or scienter is inconsistent
25  with the Reform Act and Fed. R. Civ. P. 9(b).  A securities plaintiff must identify
     statements that are false or misleading, and show an *objective* contradiction
26  between those statements and the actual state of affairs.  This is a separate inquiry
     from an analyst's *subjective* assessments, especially where (as here) those opinions
27  are untethered to actual statements.  Analysts may be biased, inattentive, or
     incompetent.  Their utterances do not become the truth about the world.
28

IV.   **THE COMPLAINT DOES NOT PLEAD A CONTROL PERSON CLAIM AGAINST MR. SIERACKI**

The Complaint's failure to allege sufficient particularized facts to support a securities fraud claim under Section 10(b) of the Exchange Act requires dismissal of the control person claim under Section 20(a) as well.

Apart from this, the Complaint does not plead that Mr. Sieracki was a control person with respect to the violation purportedly alleged here. Plaintiffs assert that the Order found control person status to be a "fact question rarely appropriate for motion practice," and they allege that Mr. Sieracki is a "plausible control person." Opp at 134, *citing* Order at 73-74.  While Mr. Sieracki pointed out that the other individual Defendants in this case outranked him, Plaintiffs counter that the "distribution of power . . . is itself an intensely factual question not appropriate for resolution on these motions," and that a CEO and CFO can both be control persons *Id.* at 135, *citing In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1053-54 (N.D. Cal. 2008)).  These are generic arguments, when an individualized inquiry is required as to whether control person liability is pleaded here against Mr. Sieracki.  It is unremarkable that a CFO *can* be considered a control person.  Here, the primary violation purportedly alleged in the Complaint is the purported abandonment of loan underwriting standards.  The Complaint does not allege that Mr. Sieracki controlled this aspect of Countrywide's business, or the person who allegedly directed those practices (Mr. Sambol).  The distribution of power may be a factual issue, but here Plaintiffs had alleged that Mr. Sieracki was not the person with the power.

1

## V.    **CONCLUSION**

2          For the reasons set forth above and in the Motion, the securities fraud claim

3 against Eric Sieracki should be dismissed with prejudice.

4                                    Respectfully submitted,

5 March 26, 2009                     DLA PIPER LLP (US)

6                                    By:   /s/ David Priebe

7                                    Attorneys for Defendant ERIC SIERACKI

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28