Bingham McCutchen LLP
GWYN QUILLEN (SBN 138428)
SCOTT VICK (SBN 171944)
The Water Garden
Fourth Floor, North Tower
1620 26th Street
Santa Monica, CA  90404-4060
Telephone:  310.907.1000
Facsimile:  310.907.2000
Email:   gwyn.quillen@bingham.com
         scott.vick@bingham.com

Bingham McCutchen LLP
TODD E. GORDINIER (SBN 82200)
EDWARD S. KIM (SBN 192856)
600 Anton Boulevard
18th Floor
Costa Mesa, CA  92626-1924
Telephone:  714.830.0600
Facsimile:  714.830.0700
Email:   todd.gordinier@bingham.com
         edward.kim@bingham.com

Attorneys for Defendant
KPMG LLP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:<br><br>All Actions | Lead Case No.:<br><br>CV07-05295 MRP(MANx)<br><br>**DEFENDANT KPMG LLP'S REPLY IN SUPPORT OF MOTION TO DISMISS LEAD PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Date:          April 13, 2009<br>Time:          10:00 a.m.<br>Courtroom:  12<br>Judge:         Hon. Mariana R. Pfaelzer |

A/72917005.1/3314001-0000328518

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................1

II.   THE FACTS ALLEGED DO NOT DEMONSTRATE THAT THE
      FINANCIAL STATEMENTS VIOLATED GAAP ......................................3

      A.    Rule 9(b) Applies to Plaintiffs' Section 11 Claim Against
            KPMG ........................................................................3

      B.    Allowances for Loan Losses ................................................4

            1.    The "New" Facts Alleged in the SAC Are Insufficient to
                  Support Plaintiffs' Claims ........................................4

            2.    Plaintiffs' Opposition Misapplies FAS 5.................................6

            3.    Plaintiffs' Assertion that Countrywide Relied Exclusively
                  on Historical Default Rates in Estimating the ALL is
                  Unsupported by Facts ........................................7

            4.    Plaintiffs' Opposition to the Analysis of Countrywide's
                  Charge Offs Relies on a Flawed Factual Premise and
                  Relies on Allegations Not Pleaded in the SAC ........................9

            5.    Plaintiffs' "Impaired at Origination Theory" Fails.................10

      C.    Reserves for Representations and Warranties....................................11

      D.    Valuation of Retained Interests from Securitizations ........................12

      E.    Valuation of Mortgage Servicing Rights ...........................................15

III.  PLAINTIFFS FAIL TO ALLEGE FACTS TO SUPPORT THE
      CONCLUSION THAT KPMG'S AUDITS VIOLATED GAAS ..............17

IV.   PLAINTIFFS FAIL TO ALLEGE SCIENTER.......................................17

V.    LOSS CAUSATION IS ABSENT AS TO KPMG....................................22

VI.   CONCLUSION ..........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Huberman v. Tag-It Pac. Inc.*,
No. 07-55648, 2009 WL 485053 (9th Cir. Feb. 11, 2009)................................27

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007) ....................................................24, 25, 27

*In re Countrywide Financial Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................11

*In re Countrywide Financial Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................................................6

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005). .....................................................................5, 25

*In re Dell, Inc. Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ......................................................20, 26

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .................................................................26, 27

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................................................26

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000)................................................................5

*In re Metropolitan Sec. Litig.*,
532 F. Supp. 2d 1260 (E.D. Wash. 2007)............................................................5

*In re Philip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004) ...............................................................21

*In re Ramp Corp. Sec. Litig.*,
No. 05 CIV. 6521(DLC), 2006 WL 2037913 (S.D.N.Y. July 21, 2006)...........18

*In re Recoton Corp. Sec. Litig.*,
358 F. Supp. 2d 1130 (M.D. Fla. 2005) .............................................................20

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)..............................................................................20

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998)......................................................................6

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ............................................................20

*In re Surebeam Corp. Sec. Litig.*,
    No. 03 CV 1721JM(POR), 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005)............5

*Kelley v. Rambus, Inc.*,
    No. C 07-1238 JF (HRL), 2008 WL 5170598 (N.D. Cal. Dec. 9, 2008)............5

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ..............................................................24, 25, 26

*Reiger v. PricewaterhouseCoopers, LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000) ..............................................................20

1  **I.      INTRODUCTION**

2         Plaintiffs' arguments expose the fatal defects inherent in their failed efforts

3  to convert what is, if anything at all, a disclosure case, into an accounting case.

4  Plaintiffs' accounting claims are based on the presumption that Countrywide failed

5  to consider the increased credit risk of its "nontraditional" and "nonprime" loans in

6  estimating its allowance for loan loss reserves ("ALL") and its reserves for

7  breaches of its representations and warranties ("R&W") and in its valuation of its

8  retained interests ("RIs") and mortgage servicing rights ("MSRs.")  They further

9  presume that the Company's financial reporting was wrong and, therefore, the

10 auditing of those financial statements must have been wrong as well.  This is sheer

11 speculation and is unsupported by facts.  Plaintiffs' opposition fails to identify a

12 single particularized fact, witness or document showing that the attributes of

13 Countrywide's current loans, and current economic conditions, were not properly

14 taken into consideration for financial reporting purposes.  Rather than stating facts,

15 plaintiffs use hindsight and speculation to support their assumptions.  Accordingly,

16 and as more fully discussed herein, the SAC is fatally flawed.

17        Plaintiffs misapply GAAP principles.  Plaintiffs' claim based on the ALL

18 relies on the credit profiles and percentages of the loans originated and sold by

19 Countrywide in securitizations.  However, the ALL establishes a reserve for losses

20 for the small subset of loans that Countrywide chose to hold in its portfolio of

21 loans held for investment ("LHI") with Countrywide Bank.  Plaintiffs fail to allege

22 any facts at all about the attributes or credit profile of the loans held by

23 Countrywide.  Moreover, under Financial Accounting Standards Board Statement

24 No. 5 ("FAS 5"), a reserve cannot be recorded unless it is probable that an asset is

25 impaired at the financial statement date, and it is contemplated that a future event

26 will occur confirming the fact of the prior loss (which should then result in a

27 charge-off).  Plaintiffs confuse these concepts by arguing that a reserve should be

28 recorded if it is probable that a loan may be impaired in the future.

1      Similarly, FAS 5 allows a reserve for losses associated with a breach of the

2   Company's R&W only if it is probable that a liability has been incurred as of the

3   reporting date and the amount of loss can be reasonably estimated.  Contrary to

4   plaintiffs' misapplication of FAS 5, the fact that Countrywide increased its

5   securitization of nonprime and nontraditional loans in 2004 and 2005 does not *ipso*

6   *facto* mean that Countrywide incurred additional liabilities for breaches of its

7   R&W as of the financial statement dates, or that Countrywide failed to properly

8   reserve for any such liabilities that may have been incurred as of those dates.

9      Plaintiffs' RI and MSR claims fail to cure the deficiencies previously

10   identified by the Court.  Plaintiffs fail to identify any facts in the SAC regarding

11   whether Countrywide was adding more RI to its portfolio while marking down

12   existing RIs.  Similarly, plaintiffs focus exclusively on the year-to-year changes of

13   the MSR values, but they fail to account for the fact that MSR values are

14   cumulative and that the total value of MSRs can increase even as delinquencies in

15   a given year increase.  Plaintiffs also fail to consider the impact of the other

16   variables that affect RI and MSR values.

17      Having failed to plead a GAAP violation, it is impossible for plaintiffs to

18   plead the falsity of KPMG's audit opinions.  Even if they had pled a GAAP

19   violation, they have not stated a claim because they have utterly failed to allege

20   facts showing that KPMG did not perform its audits in accordance with GAAS.

21   Instead, plaintiffs attempt to support their auditing claims against KPMG with

22   hindsight and speculation.  Plaintiffs' opposition does not identify a single fact,

23   witness or document showing what procedures were actually performed, what

24   information or documents were actually reviewed, who was involved in the audits,

25   what communications were exchanged, what accounting judgments were made or

26   what information and factors were considered in reaching any such judgments.

27   Instead, plaintiffs rely on unwarranted inferences to speculate about what KPMG

28   should have done, what it must have known and what accounting judgments it

1   would have and should have reached if it had performed various procedures. If
2   this were sufficient, anyone could state a claim against any auditor at any time
3   without any factual basis.

4         Despite three attempts, plaintiffs have not pleaded the facts necessary to
5   sustain their claims against KPMG. Plaintiffs' claims against KPMG should be
6   dismissed with prejudice.

7   **II.    THE FACTS ALLEGED DO NOT DEMONSTRATE THAT**
8   **         THE FINANCIAL STATEMENTS VIOLATED GAAP**

9         **A.    Rule 9(b) Applies to Plaintiffs' Section 11 Claim Against KPMG**

10        Plaintiffs acknowledge that a complaint sounds in fraud when it alleges a
11  unified course of conduct and relies entirely on that course of conduct as the basis
12  of a claim under Section 10 and 11. (Opp. 7-8, n.5.) Plaintiffs argue that the SAC
13  does not rely on a uniform course of fraudulent conduct against all defendants.
14  However, the "sounds in fraud" inquiry is specific to each defendant and turns on
15  whether the claims against that defendant allege a unified course of fraudulent
16  conduct that forms the basis of the fraud and non-fraud claims against that
17  defendant. *See In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Supp. 2d 1248,
18  1266 (N.D. Cal. 2000); *In re Surebeam Corp. Sec. Litig.,* No. 03 CV
19  1721JM(POR), 2005 WL 5036360, at *7 (S.D. Cal. Jan. 3, 2005).

20        Plaintiffs' Section 10 and Section 11 claims alleged against KPMG are
21  based on the same conduct, and plaintiffs fail to identify any differences in the
22  factual allegations underlying those claims. Indeed, plaintiffs' Section 11 claims
23  expressly incorporate every previous allegation in the SAC, including the fraud
24  and scienter allegations against KPMG. If that is not a "unified course of conduct"
25  then nothing is. *See In re Daou Sys., Inc*., 411 F.3d 1006, 1028 (9th Cir. 2005)
26  ("Rule 9(b) may prove fatal to 1933 Securities Act claims grounded in fraud when
27  the complaint makes a wholesale adoption of the securities fraud allegations for
28  purposes of the Securities Act claims.") (citations and internal quotations

omitted).[1]  Thus, plaintiffs' Section 11 claims should be subject to Rule 9(b).  Even under Rule 8 the claims fail because they do not rise above the level of speculation.

**B.**     **Allowances for Loan Losses**

    **1.**     **The "New" Facts Alleged in the SAC Are Insufficient to Support Plaintiffs' Claims**

In its Omnibus Order, the Court found that plaintiffs failed to allege enough facts to support the allegation that the 2004 and 2005 ALL estimates were overstated.  *In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1180-81 (C.D. Cal. 2008) (hereinafter, "Omnibus Order").  Plaintiffs attempt to cure this deficiency by pleading additional facts regarding the profile of the loans originated by Countrywide and sold and securitized.  Plaintiffs argue that the increased credit risk of those loans should have resulted in an increase to the ALL.  However, the ALL does not pertain to the loans originated or securitized by Countrywide, but instead establishes a reserve for the losses resulting from the small subset of loans that Countrywide chose to retain in its LHI portfolio.

Beginning on page 10 of the Opposition, plaintiffs identify new allegations that supposedly support their ALL claims, including allegations that overall the LHI portfolio was growing, and that there were also increases in nonprime mortgages, ARMs, and HELOCs that were originated by Countrywide. (Opp. 10:20-11:7 (citing SAC ¶¶ 303, 305).)  However, plaintiffs fail to allege what the attributes were of the loans held in the LHI portfolio at Countrywide Bank (rather than sold), nor do they allege facts demonstrating that the LHI portfolio was impaired, or that Countrywide failed to accrue a loss reserve for any such loans

---

[1] Plaintiffs' disavowal of allegations of fraud in the Section 11 claims are insufficient to avoid Rule 9(b).  (SAC ¶ 1137.)  *See Kelley v. Rambus, Inc.*, No. C 07-1238 JF (HRL), 2008 WL 5170598, at *2 (N.D. Cal. Dec. 9, 2008) ("[T]he Court must determine the applicability of Rule 9(b) by examining the actual substance of the pleadings, notwithstanding Plaintiffs' purported disavowal of any allegations of fraud.") (citations omitted); *In re Metropolitan Sec. Litig.,* 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007) (same); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1104 (D. Nev. 1998) (same).

1   that were impaired.  In fact, as demonstrated in KPMG's and Countrywide's

2   moving papers, the loans held by Countrywide Bank in 2006, for example, had an

3   average FICO score of 726 and approximately 95% of the LHI had FICO scores

4   above 660 (which plaintiffs contend is the dividing line for prime loans).  (*See*

5   2006 10-K at 105: Joint Request for Judicial Notice "RJN"), Ex. 3.)  Thus,

6   according to plaintiffs' own assertions, 95% of the LHI were prime loans.

7        Plaintiffs also argue that the percentage of loans that were 30-89 days past

8   due increased significantly from the second quarter of 2004 to the end of 2005

9   (from one half of one percent to one percent, according to plaintiffs' chart in

10  paragraph 313), and they assert that this increase in delinquencies should have

11  resulted in modifications to Countrywide's loss assumptions.  (Opp. 11:9-17.)

12  Plaintiffs fail to identify any facts showing whether these increased delinquencies

13  were attributable to the nonprime and nontraditional loans originated during the

14  class period under the purportedly loosened underwriting guidelines, or to other

15  loans originated in earlier periods.  Moreover, plaintiffs ignore the fact that

16  Countrywide increased its loan loss allowances during this period.  For example, in

17  2003, the loan loss allowance was established as $78.5 million.  (2004 10-K at F-

18  44, RJN, Ex. 1.)  By the end of 2004, the ALL was raised to $125 million, and by

19  the end of 2005, the ALL was increased to $189 million.  (2005 10-K at F-35:

20  RJN, Ex. 2.)  As KPMG has demonstrated, the ALL in each of those years was

21  more than sufficient to cover the subsequent year charge-offs.

22        Plaintiffs also point to allegations that many borrowers only made minimum

23  payments on Pay Option ARMs.  But, plaintiffs fail to explain why this required

24  Countrywide to accrue a loss reserve for these loans during Countrywide's 2004

25  and 2005 fiscal years in excess of the amount it actually accrued.  The average

26  FICO score of the ARM loans held in Countrywide's LHI portfolio was 730 in

27  2004 and 720 in 2005.  (*See* 2005 10-K at 57; RJN, Ex. 2; *and* 2006 10-K at F-38;

28  RJN, Ex. 3.)  Making minimum payments is a feature of the loan and doesn't mean

the loans were impaired as of the reporting dates.  Indeed, delinquencies on Pay
Option ARMS were lower than on other loans serviced by Countrywide during
2004 through 2006. (See 2005 10-K at pages 57 and 98; 2006 10-K at pages 9 and
F-38.)

### 2.    Plaintiffs' Opposition Misapplies FAS 5

Plaintiffs' opposition reveals a fundamental misunderstanding and
misapplication of FAS 5.  As recognized by the Court in its Omnibus Order:

> FAS 5 requires that two conditions be met before adding to an
> estimated loss contingency: (1) an asset **is impaired** or liability
> incurred **at the date of the financial statements** (further, "[i]t is
> implicit in this condition that it must be probable that one or more
> future events will occur confirming the fact of the loss"); and (2) the
> loss amount "can be reasonably estimated."

Omnibus Order at 1179 (emphasis added).

Nonetheless, plaintiffs argue that "it was not sufficient for Countrywide to
increase its reserves only for existing losses or those certain to occur."  (Opp. 14:8-
15:1.)  Plaintiffs argue that the use of the terms "probable" and "contingent" in
FAS 5 and in the Overview to the FASB Implementation Guidance, Application of
FASB Statements 5 and 144 to a Loan Portfolio (the "Implementation Guide"),
"clearly require a determination that something will happen in the future."  (Opp.
15:1-15.)  Plaintiffs confuse two different concepts under FAS 5.  A reserve for
ALL may be recorded only when it is probable that a loss **has been incurred** as of
the financial statement date, and FAS 5 contemplates that one or more future
events will occur confirming the fact of this loss that was incurred as of the
financial statement date.  Plaintiffs conflate the concepts that the loss must be
incurred as of the reporting date and a future event will occur confirming that loss.

The Implementation Guide explains that "the concept of GAAP is that
impairment of receivables should be recognized when, based on all available
information, it is ***probable that a loss has been incurred*** based on past events and
conditions existing at the date of the financial statements."  (Implementation

Guide, pg. 2; RJN, Ex. 11.)  Such events are explained in the AAG to include "loss of employment, disability, or bankruptcy" of the borrower. (See AAG paragraph 9.35).  The Guide goes on to explain that, "Losses should not be recognized before it is probable that they have been incurred, even though it may be probable based on past experience that losses will be incurred in the future." (*Id.* at pg. 2; RJN, Ex. 11.)  The Guide also states that, "[i]t is inappropriate to recognize a loss today for possible or expected future trends that may lead to a loss in the future." (*Id.* pg. 6; RJN, Ex. 11.)  Thus, the only "future event" discussed in FAS 5 is that it must be probable that one or more future events will occur ***confirming the fact of the loss*** that was incurred as of the reporting date.

Revealing a further misunderstanding of the purpose of the ALL and the application of FAS 5, plaintiffs argue that "[i]t defies common sense to set up a reserve only for ***existing*** losses.  If Countrywide already knows with certainty the amount of the loss that has occurred at the balance sheet date, the Company, in accordance with its SEC disclosures, should record a *charge-off* rather than take a reserve for a contingency that is 'likely to occur'." (Opp. 16:3-7 (emphasis in original).)  But FAS 5 does not require that the company know for certain that a loss has been incurred as of the reporting date.  Rather, FAS 5 requires a reserve if company information shows it is probable that an asset has been impaired as of the financial statement date.  FAS 5 states that "[i]t is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss." (FAS 5 ¶ 8(a); RJN, Ex. 9.)  When the loss that was incurred is later confirmed, the Company must then charge-off that loss.

### 3. Plaintiffs' Assertion that Countrywide Relied Exclusively on Historical Default Rates in Estimating the ALL is Unsupported by Facts

Plaintiffs assert that Countrywide established the ALL based on historical default rates, and they claim that Countrywide failed to consider the change in

1   credit quality of its loan portfolio.  (Opp. 17:4-5.)  Plaintiffs also rely heavily on

2   their argument that ALL as a percentage of LHI stayed relatively constant while

3   Countrywide increased its origination of nonprime and nontraditional loans.  (Opp.

4   18:13-19.)  But plaintiffs fail to allege any facts showing the composition or credit

5   quality of the loans in the LHI portfolio, nor do they allege facts showing how the

6   credit quality of the LHI portfolio changed during the class period from prior

7   years. They also ignore other variables that affect the ALL.

8        Plaintiffs cite to the portion of the Court's Omnibus Order stating that "[i]n

9   the present unusual circumstances, relying on historical data could be misleading,

10  at least absent a disclaimer that a significant change in circumstances foreseeably

11  renders historical data a misleading predictor, unless the model factors . . .

12  change." (Opp.17:11-14, citing Omnibus Order at 62.)  However, Countrywide's

13  10-Ks expressly disclosed that the ALL estimation process

14  **is subject to risks and uncertainties, including reliance on**
    **historical loss information that may not represent current**
15  **conditions** and the proper identification of factors giving rise to credit
    losses. For example, **new products may have default rates and loss**
16  **severities which differ from those products we have historically**
    **offered and upon which our estimates are based**. . .
17
    (2006 10-K at 52; RJN, Ex. 3 (emphasis added).)  Countrywide also expressly
18
    disclosed that it "**make[s] appropriate adjustments to our historically**
19
    **developed assumptions when necessary to adjust historical factors to account**
20
    **for present conditions**." *Id.*  Neither the SAC nor plaintiffs' opposition alleges any
21
    facts to suggest that these historical assumptions were not in fact adjusted as
22
    circumstances changed, let alone that the assumptions used resulted in a GAAP
23
    violation.  Countrywide's moving papers also demonstrated that Countrywide
24
    adjusted its historical models and default rates by back-testing and validating them.
25

26

27

28

1
2
3

### 4. Plaintiffs' Opposition to the Analysis of Countrywide's Charge Offs Relies on a Flawed Factual Premise and Relies on Allegations Not Pleaded in the SAC

4      Section 9.55 of the AICPA's Audit and Accounting Guide ("AAG") states

5   that the auditor can assess the reasonableness of management's allowance

6   estimates by comparing "current-year chargeoffs with prior-period estimated losses

7   to determine the historic reliability of prior-period estimates." (AICPA Audit &

8   Accounting Guide ("AAG") § 9.55; RJN, Ex. 16 (emphasis added).)  Thus, one

9   way to validate whether the ALL is adequate is by comparing the ALL to actual

10  charge-offs in the subsequent year.  As demonstrated in KPMG's moving papers,

11  the ALL reserves established in 2004 and 2005 were more than sufficient to cover

12  the charge-offs in subsequent years.

13      Plaintiffs argue that "[t]his comparison, however, is only useful in the

14  absence of the progressively dramatic changes in the risk profile of the Company's

15  loans year after year." (Opp. 24:15-17.)  Plaintiffs miss the point.  With the benefit

16  of hindsight, looking back, we can all see that the ALL was sufficient at a point in

17  time, say December 31, 2005, to cover all the losses that had been incurred in that

18  portfolio as of that date because the ultimate resolution of those losses through

19  charge-offs in the subsequent year total less than the amount of the ALL.

20      Plaintiffs also fail to consider that charge-offs taken in 2007 are attributable

21  not only to loans that were originated in 2004-2006 under the allegedly looser

22  underwriting guidelines, but also to loans originated in prior years.  Plaintiffs fail

23  to allege any facts showing what percentage of the charge-offs taken in 2007 were

24  attributable to loans originated during the class period versus prior years.

25      Plaintiffs also make the curious argument that "unlike determinations with

26  respect to ALL, Countrywide's decision to take charge-offs was subject to

27  substantial discretion." (Opp. 24:22-24.)  As this Court previously observed, it is

28  "apparent that the setting of loan loss reserves involves a great deal of discretion."

*In re Countrywide Financial Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008). "The Court emphasizes that the balance sheet items addressed here are based on projections. These projections are subjective and give management and auditors a fair amount of leeway to make reasonable judgments." Omnibus Order at 1176 n.56. Plaintiffs argue in the opposition that the Court should not consider the charge-off analysis and they assert that Countrywide minimized its charge-offs in the 2004-2006 periods to conceal the insufficiency of the ALL estimates during the prior years. (Opp. 25:7-8.) This argument is not supported by any allegations in the SAC and should be disregarded in its entirety.

### 5. Plaintiffs' "Impaired at Origination Theory" Fails

Plaintiffs' "impaired at origination" theory is based on the misapplication of FAS 5. (*See* SAC ¶ 298.) Based on plaintiffs' truncated recitation of an AICPA interpretation of FAS 5, plaintiffs argue that "the SAC alleges the precise circumstances listed in Chapter 9 that would require loans to be considered impaired at origination. Specifically, loans that were originated to borrowers with low FICO scores, high debt to income ('DTI') ratios, high loan-to-value ('LTV') ratios, and no-doc, low-doc, or stated documentation loans." (Opp. 21:14-18 (citing SAC ¶¶ 304-05, 307).) Notably, plaintiffs' opposition fails to acknowledge the SAC's failure to quote the full text of the passage from paragraph 9.35 of the AAG, nor do they consider the implications of the omitted text (in bold below) which undermines plaintiffs' argument:

> FASB Statement No. 5 **prohibits** recognizing losses **if the events causing the losses have not yet occurred. The act of lending money generally is not the event that causes asset impairment.** Though some credit losses can be predicted, **future losses should not be provided for at the time loans are made, because the events that cause the losses or loan impairment (for example, loss of employment, disability, or bankruptcy) have not yet occurred.** Generally, a loan would be impaired at origination **only** if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive, in which case, the loss should be recognized at the date of loan origination.

1  (AAG § 9.35; RJN, Ex. 16 (emphasis added).)

2  The language that plaintiffs omitted in the SAC makes clear that the AAG

3  does not alter the FAS 5 requirement that a loss reserve can only be recorded

4  where it is probable that a loss has been incurred as of the financial statement date.

5  Moreover, plaintiffs fail to allege any facts regarding the risk or credit profile of

6  the loans held in the LHI portfolio, nor do they allege any facts showing that any

7  losses had been incurred as of the date of origination of any loans that

8  Countrywide Bank retained in its LHI portfolio.  Indeed, as discussed above, 95%

9  of the loans in the LHI portfolio had FICO scores at origination that satisfy

10  plaintiffs' own definition of prime.  Plaintiffs also fail to consider the impact of

11  collateral values, which also affect whether a loan is considered impaired under

12  FAS 5, as demonstrated in Countrywide's moving papers.

13  **C.    Reserves for Representations and Warranties**

14  Plaintiffs' argument regarding the R&W reserves is similarly based on a

15  misapplication of FAS 5.  In dismissing the R&W claims pertaining to the 2004

16  and 2005 financial statements, the Court stated that:

17  For its R&W and LHI theories, the CAC barely attempts to apply the
relevant accounting principles.  Defendants, on the other hand,
18  convincingly argue that the general accounting principles that are
alleged in the CAC could in fact be read to preclude Countrywide
19  from making the estimates Plaintiffs propound.

20  Omnibus Order at 1179.  Plaintiffs argue that the SAC alleges new facts regarding

21  Countrywide's loosened underwriting standards and the increased securitization of

22  nonprime and nontraditional loans in 2004 and 2005.  (Opp. 26:13-19.)  But

23  plaintiffs fail to plead any facts showing that Countrywide incurred additional

24  liabilities as of the financial statement dates that were not otherwise included in the

25  R&W reserves.  Any such potential liability would result solely from the breach of

26  representations and warranties Countrywide made in connection with the sale of its

27  loans.  Yet, plaintiffs fail to allege any facts regarding what contractual

28

A/72917005.1/3314001-0000328518                -11-

representations and warranties Countrywide made in the relevant documents, how Countrywide incurred any liabilities as a result of any breach, and whether or not Countrywide reserved for any such liabilities incurred from such breaches.

Plaintiffs point to the allegations in the complaint made by MBIA Insurance Company in a different lawsuit alleging that Countrywide purportedly breached its representations and warranties made on loans securitized in 2005. (Opp. 27:19-23.) However, plaintiffs fail to allege any facts at all about whether Countrywide's 2005 R&W reserve included a reserve for such alleged liabilities.

Plaintiffs also argue that Countrywide erroneously decreased its R&W reserves from 2004 to 2005 by 22% even though it increased its securitizations by 33%. (Opp. 32:20-21.) However, this argument ignores the impact collateral values and other variables have on R&W reserves. This argument also focuses exclusively on the amount of increases to the R&W reserve year over year, and ignores the aggregate yearly balance of the reserves which must be considered since R&W reserves are cumulative. Indeed, the R&W reserves were increased to $169.8 million at December 31, 2005 from $139.9 million at December 31, 2004. (See 2005 10-K, page F-20.)

In fact, Countrywide's R&W reserves for years 2004-2007 were more than adequate to cover the amount of reserves subsequently charged off due to the payment of R&W liabilities in each of those years. Plaintiffs also argue that the increases in R&W reserves in the third quarter of 2007 shows that the amount of its R&W reserves in prior years had been understated. However, the increase of reserves in response to the then current market conditions does not mean that the amount of the reserves previously recorded based on the conditions existing at those times were falsely stated. Rather, it is simply pleading fraud by hindsight.

### D.   Valuation of Retained Interests from Securitizations

Plaintiffs' RI claim is based on the assertion that the RI values should have decreased (rather than increased) during the Class Period as the quality of loans

originated by Countrywide decreased.  (SAC ¶ 334.)  In dismissing the RI claims (for all years), the Court identified the deficiencies in the allegations by observing that "*[i]t is entirely possible that RI values increased, even as delinquencies increased (on a percentage basis), because Countrywide was adding more RI to its portfolio (on an absolute basis) while properly marking down the old RIs.*"  Omnibus Order at 1178 (emphasis added).  The Court also noted that, "*RI value depends on the number of interests retained, discounted by their projected losses.  The CAC does not allege anything about other variables that could affect RI value.*"  *Id.* at 1178 n.60 (emphasis added).

Plaintiffs identify the new facts alleged in support of the RI claims on page 35 of the opposition.  However, plaintiffs fail to identify any new allegations curing the deficiencies identified by the Court in dismissing the prior RI claims.  Plaintiffs fail to identify any facts in the SAC regarding whether Countrywide was adding more RI to its portfolio (on an absolute basis) while marking down existing RIs.  Plaintiffs also fail to identify any facts regarding the impact of the other variables that affect RI values, such as the effect of collateral values and interest rates, or the level of prepayments and refinancing activities, or the state of the housing markets, loan-to-value ratios, or the aging of the loans.

Instead, plaintiffs point to their new allegations reciting the values of mortgages originated and securitized in 2006, and the percentages of ARMs, HELOCs, and the percentages of FICO scores above and below 620.  (Opp. 35:7-17.)  However, plaintiffs fail to explain how those statistics, in and of themselves, show that Countrywide overvalued its RI in 2006.  Even if one assumed that nonprime and nontraditional loans had an increased risk of default, plaintiffs fail to allege any facts regarding whether Countrywide considered such factors in valuing its RI, nor do they allege any facts regarding the other variables affecting RI.

Plaintiffs also point to their allegations regarding the Weighted Average Life ("WAL") and Net Lifetime Credit Loss ("NLCL") that are considered in valuing

1    RI.  (Opp. 35:18-20.)  WAL refers to the length of time during which cash flows

2    from the RI are expected to be received.  Plaintiffs argue that Countrywide should

3    have lowered its assumptions used for WAL as the credit risk of the nontraditional

4    loans securitized during the class period increased.  (Opp. 38:2-4.)  This argument

5    presumes that as the rate of loan defaults increase, the WAL must necessarily

6    decrease.  However, the rate of default is not the only factor affecting the WAL.

7    Plaintiffs fail to consider the other factors impacting WAL, such as the impact of

8    collateral values, and the rate of mortgage prepayments and refinancings, which

9    can decrease when interest rates rise.  Rising interest rates make refinancing less

10   desirable, resulting in fewer prepayments, which causes the WAL to increase.

11   Thus, the WAL may increase even as default rates rise if other factors such as

12   prepayment speeds decrease as a result of a rise in interest rates.

13        Plaintiffs argue that this "ignores the fact that as interest rates on ARMs and

14   Pay Option ARMs 'reset' to much higher rates in an environment of rising interest

15   rates (like 2004 through 2006), a borrower would either be unable to pay his

16   mortgage and default, or be forced to refinance his mortgage at the higher interest

17   rate, which in most instances would be lower than the loan's reset rate . . . .  Both

18   events result in a shorter WAL and increased prepayment rate."  (Opp. 38:10-18.)

19   However, plaintiffs do not consider the fact that interest rates on the majority of

20   ARMs originated in 2004-2006 would likely not reset within the same year or

21   within the next one or two years.  Nor do they allege any facts showing the

22   percentage, number or amounts of ARMs that reset during the class period.

23   Moreover, plaintiffs' argument would not apply to fixed rate mortgages at all.

24        Plaintiffs also assert that Countrywide should have increased the NLCL

25   assumptions as the credit risk of its securitized loans increased.  (Opp. 38:19-20.)

26   Plaintiffs argue in their opposition that, "[a]s credit risk increases, the number of

27   securitized loans that default increases, and the assumptions of NLCL should also

28   increase."  (Opp. 38:20-22.)  Plaintiffs acknowledge that the NLCL is determined

1   by estimating the rate at which mortgage loans are expected to default, *multiplied*

2   *by the percentage of the loan balance that will be uncollectible*.  (*See* Opp. 35,

3   n.30.)  Yet, plaintiffs fail to identify any facts in the SAC regarding the impact of

4   collateral values on the NLCL or the fact that a default will not result in a loss if

5   the collateral value is sufficient.  Although plaintiffs argue that collateral values

6   did not provide a sufficient cushion for credit losses because Countrywide

7   purportedly increased LTV ratios and falsified appraisals and borrower information

8   (Opp. 39:1-4), the paragraphs referenced in the opposition do not support this

9   assertion.  Plaintiffs cite to paragraphs 203-205 and 375 of the SAC.  However,

10  none of those paragraphs allege any facts regarding the actual collateral cushion or

11  LTV ratio of the securitized loans for which Countrywide held retained interests.

12       Plaintiffs also argue that the substantial write-down in RIs in 2007 shows

13  that the RI was overvalued in prior years.  This is alleging fraud by hindsight and

14  does not factor in the impact of industry-wide market forces affecting the housing

15  and credit markets in 2007.  Moreover, plaintiffs fail to identify which portion of

16  the write downs resulted from RIs acquired during the class period, and which ones

17  resulted from those acquired in prior years.  It also ignores the modest write downs

18  in the 2004 through 2006, as demonstrated in KPMG's moving papers.  (KPMG

19  Mot. to Dismiss the SAC ("KPMG Mot.") 15:19-27.)

20       **E.    <u>Valuation of Mortgage Servicing Rights</u>**

21       In dismissing the MSR claims for 2004 and 2005, the Court stated that

22  plaintiffs had failed to allege that Countrywide's underwriting practices had

23  changed enough for the Court to draw a reasonable inference that MSR values

24  were overstated, and that plaintiffs had failed to allege corroborating facts in

25  addition to the dramatic growth in Countrywide's business to allow the inference

26  that the MSR valuations were false.  Omnibus Order at 1179-80.  Plaintiffs argue

27  that the SAC "alleges new facts that corroborate that as credit risk increased,

28  Countrywide incurred increased costs to service its poor quality loans."  (Opp.

41:9-11.)  Plaintiffs argue that such costs should have decreased the value of its MSRs.  (Opp. 41:11.)  However, plaintiffs fail to allege facts showing that Countrywide failed to consider changes in servicing costs in valuing the MSRs. Nor do they allege any facts regarding the amount (either per loan or in the aggregate) of the incrementally higher costs of servicing "poor quality loans" or the amount by which the MSRs should have been decreased as a result.

Plaintiffs also argue that the WAL (which is one of the factors considered in valuing MSRs) stayed constant while credit risk increased.  (Opp. 41:13-15.) Again, plaintiffs fail to allege any facts to support their conclusory assertion that Countrywide failed to consider the credit risk of the loans in its MSR portfolio in valuing the MSR.  As discussed above, the increase in credit risk is not the only factor affecting the WAL.  Other factors such as interest rates affect the rate of mortgage refinancings and prepayments.  Thus, the WAL may increase even if credit risk increases if prepayment speeds decrease as interest rates rise.  Plaintiffs argue that the valuation allowance for the MSRs should have increased as the credit risk of the loans serviced increased.  (Opp. 41:12-13; 43:8-12.)  But they fail to consider the cumulative nature of the MSRs.  And this argument, too, ignores the other variables such as interest rates, prepayment estimates and the strength of the housing markets, as well as market data regarding MSR trades, MSR broker valuations, prices of interest-only securities, and peer group MSR valuation surveys.  (*See* 2006 10-K at 48-49; RJN, Ex. 3.)

Plaintiffs also argue that the write downs in MSR values in 2007 support the conclusion that the assumptions used to value MSRs in prior years were incorrect. (SAC ¶ 364.)  Again, this is alleging fraud by hindsight.  Moreover, the write downs in 2007 were primarily the result of decreasing mortgage interest rates during the last half of the year which increased expected future prepayment speeds. (*See* 2007 10-K at 81; RJN, Ex. 4.)

1   Because the facts alleged by Plaintiffs do not support their claim of GAAP

2   violations, all claims against KPMG should be dismissed.  *See In re Ramp Corp.*

3   *Sec. Litig.*, No. 05 CIV. 6521(DLC), 2006 WL 2037913, at *8 (S.D.N.Y. July 21,

4   2006) ("Having failed to identify a misstatement in the financial statements . . .

5   plaintiffs have not adequately pleaded that [the auditor's] representation that its

6   audit complied with GAAS was false.").

7   **III.   PLAINTIFFS FAIL TO ALLEGE FACTS TO SUPPORT THE**

8   **CONCLUSION THAT KPMG'S AUDITS VIOLATED GAAS**

9   To state a claim against KPMG, Plaintiffs must plead facts showing a GAAP

10   violation in Countrywide's annual financial statements, but they must also show

11   that KPMG's audit report was both objectively and subjectively false.  KPMG's

12   responsibility is limited to its own statements, i.e., that based on its audits in

13   accordance with GAAS, in KPMG's opinion the financial statements of the

14   company were fairly presented in accordance with GAAP.  Plaintiffs fail to point

15   to any facts that support their conclusory assertions that KPMG's opinion was

16   either objectively or subjectively false.  They allege not a single fact learned by

17   KPMG during its audits that shows that Countrywide's accounting failed to

18   comply with GAAP, or if it did, in what regard, by how much and in what period.

19   As a result, all claims against KPMG must fail.

20   **IV.   PLAINTIFFS FAIL TO ALLEGE SCIENTER**

21   Nothing in the SAC or plaintiffs' brief point to the required particularized

22   facts raising a strong inference that KPMG acted with scienter -- a mental state

23   approaching intent to deceive -- in connection with KPMG's audits of the financial

24   statements prepared by Countrywide.  Therefore, plaintiffs' Section 10(b) claim

25   against KPMG must be dismissed.

26   As to their purported Section 10(b) claim against KPMG, plaintiffs have

27   done nothing more than engage in a disapproved form of "pleading opposites" and

28   pleading factually unsupported conclusions rather than the required particularized

facts raising a strong inference of scienter.  Specifically, plaintiffs quote from certain accounting literature (often inaccurately or out-of-context), then abruptly conclude -- without any particularized factual support -- that, if KPMG had performed audit procedures A, B, or C, then KPMG would certainly have discovered the alleged falsity of Countrywide's financial statements, and further, plaintiffs *speculate* that KPMG's failure to perform these (or other) procedures went beyond gross negligence (which will not support a Section 10(b) claim) and rose to the level of deliberate recklessness approaching the intent to deceive.  But plaintiffs' "pleading of opposites" and pleading of unsupported conclusions do not satisfy the Reform Act's express and stringent requirements that plaintiffs plead particularized facts raising a strong inference of scienter.

Courts have routinely recognized that there is no single recipe or checklist of procedures that auditors must perform when auditing financial statements -- the audit procedures auditors perform is a matter of professional judgment, and plaintiffs have not identified ***any*** of the procedures that KPMG performed, much less allege with the required particularized facts showing why or how those unidentified audit procedures were so deficient that KPMG's conduct rises to the level of deliberate recklessness supporting a Section 10(b) claim.[2]

Courts have soundly rejected attempts by securities plaintiffs to plead the required particularized facts raising a strong inference of scienter with generalized allegations of what the auditors supposedly should have done and what they supposedly should have known.[3]  Likewise, courts have rejected generalized

---

[2]  *Reiger v. PricewaterhouseCoopers, LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000) (dismissing Section 10(b) claim against auditor and noting that a chain of factually unsupported inferences, built on other factually unsupported inferences, will not support a Section 10(b) claim).

[3]  *See, e.g.*, *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1147 (M.D. Fla. 2005) ("Conclusory allegations that do no more than state that D & T 'would have known,' 'knew and ignored,' or 'recklessly failed to know' are insufficient under PSLRA and Rule 9(b)."); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1324 (M.D. Fla. 2002) (allegations of "must have known" fail to pass muster under the Reform Act); *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 214 (1st

1    allegations of GAAP and GAAS violations unsupported by the required

2    particularized facts regarding the actual audit work that was performed.[4]

3         Plaintiffs argue that they should be relieved of their obligation to plead the

4    specific audit procedures or field work KPMG actually conducted and why those

5    procedures were deficient because such facts "are peculiarly within [the auditor's]

6    knowledge, and thus are not required at the pleading stage." (Opp. 57:17-20.)

7    Certainly plaintiffs need not identify *all* audit procedures KPMG performed, but

8    plaintiffs are required to state particularized facts supporting their assertion that

9    KPMG acted with deliberate recklessness approaching intent to deceive. The

10   SAC's speculation is insufficient to plead scienter.

11        Plaintiffs cite *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476

12   (S.D.N.Y. 2004) for the proposition that they are not required to plead what audit

13   procedures KPMG performed to plead a strong inference of scienter. (Opp. 58:6-

14   11.) Plaintiffs misconstrue both the argument and holding of that case, which

15   alleged specific instances showing the auditor's actual knowledge of the

16   company's accounting fraud. *Philip*, 383 F. Supp. 2d at 471.[5]

17   Cir. 2005) ("Complaint assert[ed] . . . that PwC missed various 'red flag' warning
     signs but lack[ed] concreteness as to how the conduct of the audit related to the
18   missed warning signs").

19   [4] *See, e.g., In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 903 (W.D. Tex. 2008)
     ("The Plaintiffs, however, do not allege any specific facts to support their
20   assertions. They allege no facts about [the] audit, what it entailed, or how it was
     deficient. Plaintiffs simply make the bare assertion [the auditor] violated GAAS
21   rules, but without a shred of evidence about what [the auditor's] procedures or
     audits actually entailed, how the procedures specifically violated the standards, or
22   that the alleged violations were purposeful or negligent.").

23   [5] For example, the complaint alleged that a specific audit partner advised the
     company's Executive Vice-President and Vice President of Operations that if the
24   company characterized losses as "training expenses," the losses could be
     capitalized in accordance with GAAP, that the officers agreed to this suggestion,
25   and the audit partner agreed to sign off on the audit. *Id.* at 471-72. The complaint
     also alleged that the auditor was aware that the losses were actual losses and that
26   the company had not undertaken any training activities, and alleged that the auditor
     had no documentation supporting the characterization of the losses as training
27   expenses. *Id.* at 472. The complaint alleged that the auditor's managing partner
     "expressed concern about certain 'corporate adjustments' made by [the company's]
28   accounting office." *Id.* The complaint further alleged that the managing partner
     told the company's officers that "just because they tell you to make an entry does

1    Plaintiffs also argue that various generalized risk factors pertaining to the

2    mortgage industry "put KPMG on notice of areas to watch out for in planning and

3    conducting its audit, and obligated KPMG to approach its audits with increased

4    professional skepticism." (Opp. 51:10-52:3.)  But every audit requires auditors to

5    make professional judgments about which areas present the greatest risks of

6    misstatement in order to plan their audit.  (SAC ¶ 539).  There is a significant

7    difference between generalized risk factors and red flags.  As plaintiffs

8    acknowledge, "a red flag is a fact that 'would place a reasonable auditor on notice

9    that the audited company was engaged in wrongdoing to the detriment of its

10   investors.'" (Opp. 51:3-5).  Facts such as increases in loan originations, relaxation

11   of credit guidelines, and a system in which review by more experienced personnel

12   was required before the company would make a loan that did not fit the standard

13   guidelines, are business decisions made by the company, not facts that would tell

14   an auditor the client was engaged in wrongdoing.  Plaintiffs allege no facts

15   regarding how and to what extent KPMG considered their accounting implications

16   and what conclusions KPMG reached after performing its audit procedures.

17   Plaintiffs also incorrectly argue that KPMG was required to review a sample

18   of Countrywide's numerous securitization prospectuses filed with the SEC for its

19   loan securitization transactions that would have supposedly revealed a discrepancy

20   between the percentage of nonprime loans reported in the prospectuses versus

21   those reported in the 10-Ks.  (Opp. 52:17-53:9.)  GAAS contains no such

22   requirement – the documents the auditor chooses to look at are a matter of

23   professional judgment.[6]  (*See* footnotes 3-5, *supra*.)  Plaintiffs' argument also

24

25   not mean you have to make it." *Id.*  The complaint alleged that the auditor became
     aware of the company's "practice of recording the revenue of companies it was in

26   the process of acquiring as of the date [the company] agreed to the acquisition
     rather than the closing date," in violation of GAAP. *Id.*

27   [6] Plaintiffs argue that KPMG was required to review the securitization
     prospectuses in accordance with AU Section 311 and Ch. 7 of the Audit and

28   Accounting Guide ("AAG").  (SAC ¶ 545.)  However, AU 311 does not mention
     prospectus nor does it require the review of securitization prospectuses as part of a

1   assumes that all loans to borrowers with FICO scores below 660 are subprime.  As

2   KPMG demonstrated in its opening brief, this is not so, as there can be other

3   compensating factors and there is no generally agreed upon definition of a

4   subprime loan.  (KPMG Mot. 22, n.6.)  In addition, plaintiffs are comparing the

5   reported value of **loans securitized** in the prospectuses with the reported value of

6   **loans originated** in the 10-Ks.  Countrywide ***held for investment*** rather than

7   ***securitized*** the higher quality loans.  Plaintiffs have not and cannot show any red

8   flags that came to KPMG's attention related to the securitization prospectuses.

9        Plaintiffs also argue that KPMG should have reviewed Countrywide's

10  underwriting guidelines and, contrary to accounting literature, that KPMG should

11  have performed testing of ***individual*** loan files to determine if Countrywide was

12  following its underwriting guidelines.  (Opp. 55:13-26.)  Then, based on their false

13  premise, plaintiffs argue -- again without particularized factual support -- that had

14  KPMG reviewed a sample of individual loan files of a company that wrote one of

15  every six mortgages in the country, that KPMG would necessarily have learned

16  that Countrywide was allegedly improperly classifying loans to borrowers with

17  FICO scores as low as 620 as "prime."  (Opp. 56:2-4.)  But there is no bright-line

18  rule based on FICO scores for classifying loans as prime or subprime.  Moreover,

19  plaintiffs cannot identify any allegations in the SAC showing whether KPMG

20  actually reviewed such documents or performed such tests, and what information

21  KPMG actually learned and what it did with that information.

22       Plaintiffs also argue that KPMG should have considered the increasing

23  percentage of Pay Option ARMs in Countrywide's LHI portfolio and the increased

24

25  financial statement audit.  (*See* AICPA: AU Section 311; RJN, Ex. 17.)  Moreover,
    AAG Ch. 7 titled "Investments in Debt and Equity Securities" pertains to the
26  accounting for securities acquired by the audited company.  It does not require
    auditors to review prospectuses pertaining to securitizations originated or
27  performed by the audited entity as part of a financial statement audit.  (AAG Ch. 7;
    Defendants Countrywide & KPMG Supplemental RJN ("Supplemental RJN"), Ex.
28  34.)

1  credit risk of such borrowers.  (Opp. 56:24-57:2.)  However, plaintiffs fail to allege

2  any particularized facts showing that KPMG did not consider such facts.  Plaintiffs

3  also fail to consider that the average FICO score of the Pay Option ARM loans

4  held in Countrywide's LHI portfolio was 730 in 2004, 720 in 2005, and 718 in

5  2006, more than meeting even plaintiffs' own definition of "prime."  (*See* 2005 10-

6  K at 57; RJN, Ex. 2; *and* 2006 10-K at F-38; RJN Ex. 3.)

7          Plaintiffs also variously label other items as "red flags" in the SAC.  But

8  calling something a "red flag" does not make it so.  Because plaintiffs have not

9  alleged the particularized facts raising a strong inference that KPMG acted with a

10  state of mind approaching intent to deceive, plaintiffs' Section 10(b) claim against

11  KPMG must be dismissed.

12  **V.     LOSS CAUSATION IS ABSENT AS TO KPMG**

13          The fact that there has never been a restatement or any other corrective

14  disclosure regarding Countrywide's financial statements that were issued during

15  the class period also means that the investors' losses were not caused by the

16  correction of any accounting misstatements.  Loss causation must exist as to each

17  statement by each defendant.  It is absent as to any statement made by KPMG.

18  The corrective disclosures to which plaintiffs attribute their losses do not mention

19  KPMG or its audit opinions -- let alone any fact that reveals the alleged falsity of

20  KPMG's audit reports regarding Countrywide's financial statements.  Loss

21  causation requires a corrective disclosure containing factual information that

22  reveals the falsity of a prior misrepresentation to the market.  *Metzler Inv. GMBH*

23  *v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062-65 (9th Cir. 2008).  Where the

24  alleged misrepresentations are an auditor's statements in an audit opinion, the

25  corrective disclosure must contain facts that reveal to the market that the audit

26  opinion was false at the time it was issued.[7]  This would require facts

27  _____

28  [7]  *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 680 (S.D.N.Y. 2007) (rejecting corrective disclosure allegations against auditor finding that "none

1  demonstrating that KPMG's audit opinions on Countrywide's 2004-2006 financial

2  statements were false when  made and that the public disclosure of such facts

3  caused a decline in Countrywide's stock price.  *Metzler*, 540 F.3d at 1062 ("the

4  complaint must allege that the defendant's 'share price fell significantly after the

5  truth [of a misrepresentation] became known.'") (citation omitted).

6       Unable to identify any corrective disclosures that mention KPMG or reveal

7  the falsity of *KPMG's* statements, plaintiffs point to three alleged corrective

8  disclosures they assert are "related to the accuracy of Countrywide's financial

9  statements."  (Opp. 106:3-4).  But none of these supposed corrective disclosures

10  mention KPMG, or its audit opinions, and none purport to disclose the alleged

11  falsity of KPMG's audit reports at the time they were issued.[8]  Nor do the supposed

12  corrective disclosures contain any factual information showing that Countrywide's

13  2004-2006 financial statements were false, or, more importantly, that *KPMG's*

14  audits were not conducted in accordance with GAAS.[9]

15       The Ninth Circuit has held that disclosures like these are insufficient to

16  constitute a corrective disclosure for purposes of loss causation.  *See Metzler*, 540

17  F.3d at 1064.[10]  Each of the alleged corrective disclosures suggest, at most, a "risk"

18  of them 'amount to a corrective disclosure because they do not reveal to the market
   the falsity of the prior' E&Y audit opinions") (citation omitted).

19

20  [8]  *AOL*, 503 F. Supp. 2d at 679-80 (holding that none of the alleged disclosures
   "amount to a corrective disclosure because they do not reveal to the market the
   falsity of the prior' E&Y audit opinions.") (citation omitted).

21  [9]  Notably, Plaintiffs mischaracterize the October 30, 2007 Wall Street Journal
   article.  The article does not, as Plaintiffs claim, challenge "Countrywide's

22  application of GAAP in several financial items . . . ."  (*See* Opp. 106:7-13.)
   Indeed, among other things, the article cites to an analyst that "raised his estimate

23  for Countrywide earnings in 2008 . . . ."  (Oct. 30, 2007 *Wall Street Journal*
   Article; Supplemental RJN, Ex. 36.)

24
   [10]  Specifically, in holding that the alleged corrective disclosures in *Metzler* were

25  insufficient, the Court explained: "[T]he TAC itself discredits the notion that the
   June 24 disclosure revealed company-wide manipulation of student enrollment, by

26  describing the June 24 disclosure as revealing to investors 'the ***potential*** but real
   ***risk*** of all 88 colleges being placed on reimbursement status . . . .  But neither

27  *Daou* nor *Dura* support the notion that loss causation is pled where a defendant's
   disclosure reveals a **'risk'** or **'potential'** for widespread fraudulent conduct."  540

28  F.3d at 1064 (emphasis in original).

1  or "potential" for fraudulent conduct.  (*See* Opp., 106:7-107:13; *see also* Oct. 30,

2  2007 *Wall Street Journal* Article; Supplemental RJN, Ex. 36; Nov. 7, 2007

3  *Gradient Analytics, Inc.* Report; Supplemental RJN, Ex. 35; March 8, 2008 *Wall*

4  *Street Journal* Article; Supplemental RJN, Ex. 37.)  For example, the November 7,

5  2007 Gradient Analytics, Inc. report stated that Countrywide "***appears*** to be at ***risk***

6  from virtually all of the mortgage accounting games highlighted in this report . . .

7  ."  (Nov. 7, 2007 *Gradient Analytics, Inc.* Report; Supplemental RJN, Ex. 35.)

8  Furthermore, the March 8, 2008 *Wall Street Journal* article reported that the FBI

9  was investigating "***possible*** securities fraud."  (March 8, 2008 *Wall Street Journal*

10  Article; Supplemental RJN, Ex. 37.)  The article then speculates that "[a]nother

11  ***potential*** issue is whether it has been candid in its accounting for losses."  (*Id.*

12  (emphasis added).)[11]

13       Moreover, similar to the plaintiffs in *Metzler*, plaintiffs repeatedly allege

14  what the market somehow "understood" various disclosures to mean.  However, as

15  the Ninth Circuit recently observed in rejecting similar loss causation allegations,

16  plaintiffs' allegations are not "facts" but are unwarranted inferences that are

17  insufficient to withstand a motion to dismiss.  *Metzler*, 540 F.3d at 1064-65.

18       Plaintiffs also mischaracterize *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

19  1058 (9th Cir. 2008) by claiming it holds that "the linkage between the alleged

20  misstatement and the alleged corrective disclosure need be only facially plausible."

21  (Opp. 110:3-4.)  That is not what *Gilead* held.  *Gilead* does not address the linkage

22  between the alleged misstatement and the alleged corrective disclosure, but instead

23  focuses on the linkage between the alleged corrective disclosure and the decline in

---

[11] Furthermore, "the disclosure of an investigation, whether conducted internally or by the SEC, absent a revelation of prior misrepresentations, [does not] constitute a corrective disclosure for purposes of loss causation." *Dell*, 591 F. Supp. 2d at 910; *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (holding that public disclosures of SEC and internal investigation did not constitute corrective disclosures because they did not disclose any wrongdoing).

the stock price. 536 F. 3d at 1057-58. Unlike the present case, there was no dispute in *Gilead* that the alleged corrective disclosure (*i.e.*, the FDA's Warning Letter) constituted a corrective disclosure. *Id.* Rather, the defendant argued that the decline in the stock price was not linked to the corrective disclosure because the stock price drop did not occur until three months after the corrective disclosure. *Id.* at 1057. And, for the same reasons, Plaintiffs cannot rely on *Huberman v. Tag-It Pac. Inc.*, No. 07-55648, 2009 WL 485053, at *2 (9th Cir. Feb. 11, 2009).

Plaintiffs' attempt to distinguish *AOL* also fails. KPMG cited the *AOL* case for the proposition that a corrective disclosure of an auditor's audit report must reveal the falsity of the audit report. That propositions stands unchallenged. The *AOL* court did not base its decision on the fact that the accounting and non-accounting allegations were unrelated as plaintiffs assert, but on the fact that the auditor defendant could only be held liable "for false audit opinions certifying AOL and AOLTW's financial results . . . ." 503 F. Supp. 2d at 677. Here, as in the *AOL* case, no disclosures revealed any alleged falsity of any KPMG statements. Thus, Plaintiffs' Section 10 and 11 claims should be dismissed for lack of loss causation.

## VI.   CONCLUSION

For all of the foregoing reasons, KPMG respectfully requests that the Court dismiss the claims alleged against KPMG in plaintiffs' SAC, with prejudice.

DATED: March 26, 2009               Bingham McCutchen LLP


By: /s/
   Gwyn Quillen
   Attorneys for Defendant
   KPMG LLP