JORDAN ETH (SBN 121617)
JEth@mofo.com
JUDSON E. LOBDELL (SBN 146041)
JLobdell@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone: 415-268-7000
Facsimile: 415-268-7522

Attorneys for Defendants
HENRY CISNEROS, JEFF CUNNINGHAM, ROBERT DONATO, BEN M. ENIS, EDWIN HELLER, GWENDOLYN S. KING, MARTIN MELONE, ROBERT PARRY, OSCAR ROBERTSON, KEITH RUSSELL and HARLEY SNYDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION

This Document Relates To: All Actions

Case No. CV 07-05295-MRP (MANx)

**OUTSIDE DIRECTORS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Hearing: April 13, 2009
Time: 10:00 a.m.
Court: Courtroom 12
Judge: Mariana R. Pfaelzer

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 1

I. COUNT I SHOULD BE DISMISSED .......... 1

A. The SAC Does Not Allege Facts Showing that Countrywide's 2003 Form 10-K Contained Any Actionable Misrepresentation. .......... 1

1. Plaintiffs fail to allege contemporaneous facts inconsistent with descriptions of loans as "prime" or "high quality." .......... 1

2. The terms "high quality" and "prime," as used in the 2003 Form 10-K, are not actionable. .......... 5

B. Count I is Also Barred by the Statute of Repose. .......... 6

II. ALL ACCOUNTING-RELATED CLAIMS AGAINST THE OUTSIDE DIRECTORS SHOULD BE DISMISSED. .......... 7

CONCLUSION .......... 13

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)....................12

*Buzayan v. City of Davis*, No. 06-cv-1576-MCE-DAD, 2009 U.S. Dist. LEXIS 15217 (E.D. Cal. Feb. 25, 2009)....................6

*Chilicky v. Schweiker*, 796 F.2d 1131 (9th Cir. 1986)....................6

*Escott v. BarChris*, 283 F. Supp. 643 (S.D.N.Y. 1968)....................10

*Hicks v. Small*, 842 F. Supp. 407 (D. Nev. 1993)....................6

*In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005)....................3

*In re Citigroup Inc. S'holders Litig.*, No. 19827, 2003 Del. Ch. LEXIS 61 (Del. Ch. June 5, 2003)....................9

*In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008)....................8

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008)....................*passim*

*In re Downey Sec. Litig.*, Case No. CV 08-3261-JFW (RZx), 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009)....................5

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002)....................9

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576 (S.D. Tex. 2003)....................9

*In re Harmonic, Inc., Sec. Litig.*,
No. C 00-2287 PJH, 2006 U.S. Dist. LEXIS 90450 (N.D. Cal. Dec. 11, 2006) .......... 6

*In re Software Toolworks, Inc. Sec. Litig.*,
50 F.3d 615 (9th Cir. 1994) .......... 10

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......... 8

*In re WorldCom Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004) .......... 7, 11

*In re WorldCom Inc. Sec. Litig.*,
Master File 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 4193 (S.D.N.Y. Mar. 21, 2005) .......... 10

*Nurmi v. Peterson*,
No. 88-5436-WMB, 1989 U.S. Dist. LEXIS 9765 (C.D. Cal. Mar. 31, 1989) .......... 6

*Sharma v. Skaarup Ship Mgmt. Corp.*,
699 F. Supp. 440 (S.D.N.Y. 1988) .......... 6

*Siemers v. Wells Fargo & Co.*,
No. C 05-04518 WHA, 2006 WL 3041090 (N.D. Cal. Oct. 24, 2006) .......... 6

*Sprint Telephony PCS, L.P. v. County of San Diego*,
311 F. Supp. 2d 898 (S.D. Cal. 2004) .......... 6

**STATUTES**

15 U.S.C. § 77k(b)(3)(C) .......... 7, 11

**RULES**

Federal Rule of Civil Procedure 12(g) .......... 5

## INTRODUCTION

The Outside Directors' Opening Memorandum demonstrated that Count I of the SAC should be dismissed for three independent reasons: (1) the SAC does not allege facts showing that statements in Countrywide's 2003 Form 10-K describing loans as "high quality" and "prime" were false; (2) these vague and undefined terms are not actionable; and (3) claims based on statements in the 2003 10-K are time-barred. The Opening Memorandum also demonstrated that the accounting claims against the Outside Directors in Counts IV and VII should be dismissed for two reasons: (1) the SAC does not plead violations of GAAP; and (2) the SAC does not plead that the Outside Directors' reliance on the expert accountants who prepared, certified, and audited Countrywide's financial statements was unreasonable. Plaintiffs' Opposition is based on mischaracterizations of their own SAC and the Court's Omnibus Order, as well as a misreading of relevant legal authority. As discussed below, and for the reasons stated in the Opening Memorandum, the Outside Directors' motion should be granted.

## ARGUMENT

### I. COUNT I SHOULD BE DISMISSED.

#### A. The SAC Does Not Allege Facts Showing that Countrywide's 2003 Form 10-K Contained Any Actionable Misrepresentation.

##### 1. Plaintiffs fail to allege contemporaneous facts inconsistent with descriptions of loans as "prime" or "high quality."

Plaintiffs do not dispute that the only statements alleged to be false in Countrywide's 2003 10-K are descriptions of loans as "prime" and "high quality." (*See* Outside Dirs.' Mem. at 3-4.)[1] The Opening Memorandum demonstrated that the SAC does not allege facts inconsistent with these statements as required to

[1] Plaintiffs also do not dispute that the Outside Directors are not responsible for the Sarbanes-Oxley certifications accompanying Countrywide's SEC filings. (*See* Outside Dirs.' Mem. at 3 n.3.)

plead falsity. (Outside Dirs.' Mem. at 4-6.) Plaintiffs' Opposition confirms the absence of such allegations.

First, with respect to classification of loans as "prime," the record is clear: The ***earliest*** factual allegation in the SAC that Plaintiffs offer to support their contention that Countrywide had its own "internal definition" of prime is from ***October 2005***. (*Id.* at 5.) The "internal definition" allegation cannot, therefore, support a claim of falsity with respect to the 2003 10-K. Plaintiffs offer no response to this argument in their Opposition.

Second, with respect to the description of loans as "high quality," the ***only*** factual allegation concerning 2003 that Plaintiffs cite in their Opposition is a December 4, 2003 email. (Opp'n at 124.) This email, however, does not even purport to describe overall loan quality or underwriting guidelines for Countrywide in 2003 (or any other period); instead, it describes a subset of subprime loans that Countrywide bought from independent mortgage brokers. (SAC ¶¶ 131-32.) Furthermore, the email describes only "recently released," "new" guidelines, with no indication as to when, or even whether, those guidelines were in place earlier in 2003. The email also does not call into question, much less contradict, statements in the 2003 10-K that Countrywide's loans were, in the aggregate, "high quality." Rather than confront these points, Plaintiffs ignore them in their Opposition.

Plaintiffs do not dispute that the only confidential witness who is definitive about the timing of Countrywide's lending practices ***contradicts*** Plaintiffs' claim that the "quality" statements in the 2003 10-K were false. CW2 describes Countrywide's 2003 lending practices as prudent and restrained in comparison to later practices, explaining: ***"[I]t would have been impossible for CLD to grow its business in the way Countrywide headquarters wanted had Countrywide continued to use the Underwriting Matrices and guidelines in place in 2003."*** (SAC ¶ 152 (emphasis added); *see also* SAC ¶ 1084 (Countrywide's underwriting practices were "materially more conservative" in 2003 than in later years.).)

Plaintiffs assert that a "culture change" began in 2003 (Opp'n at 123 (citing SAC ¶ 3)), but cite no facts from the SAC to support this vague allegation, because there are none. (*See* Omnibus Order at 35 n.33.) In a footnote to their Opposition, Plaintiffs cite several paragraphs of the SAC that, they suggest, are inconsistent with "high quality." These paragraphs, however, offer Plaintiffs no support. Plaintiffs cite a statement by CW3 recalling that loan products and lending standards "gradually became more lax beginning as early as 2003." (SAC ¶ 155.) The qualification "as early as" denotes conduct beginning no earlier than 2003; but CW3 does not say when it actually began, so this statement is meaningless with respect to 2003. And the vague allegation of laxity is not supported by any 2003 facts.

Plaintiffs also cite a statement from CW4 that Countrywide relaxed lending guidelines "during the Class Period." (SAC ¶ 158.) The Class Period, however, did not even begin until March 12, 2004, so changes "during the Class Period" are irrelevant to Count I. *See In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) (dismissing Section 11 claim under Rule 8, holding that events after filing of registration statement could not retrospectively make the registration statement false).

Plaintiffs point to CW8's allegations about appraisal practices; here again, however, the allegations do not concern 2003. (Opp'n at 124.) CW8 speaks instead about appraisal practices that allegedly were occurring "until at least mid-2005," without stating when the practice began. (SAC ¶ 213.) Furthermore, CW8, unlike other CWs, is not even alleged to have worked at Countrywide in 2003. (*Compare id.* ¶ 168 (CW8) *to* ¶¶ 159, 174, 177 (CWs 5, 9, 10 alleged to have been at Countrywide "from before the Class Period").)

It is not surprising that the SAC does not attack 2003 loan quality; indeed it is entirely consistent with Plaintiffs' theory that underwriting deteriorated at Countrywide, and loans were misclassified, during a Class Period that began in

March 2004. The SAC routinely describes such activity as occurring ***"during the Class Period."*** (*Id.* ¶¶ 1, 5, 6, 78, 94, 114, 130, 158, 221, 229, 230, 239, 245, 250, 252, 262, 271, 305, 317, 318, 328, 346, 348, 349, 368, 374, 390, 403, 420, 432, 754, 844, 851 (emphasis added).) And when the SAC is more specific, it identifies dates in 2004 and later. For example, Plaintiffs allege:

- The "trend of delinquencies" began ***"as early as the second quarter of 2004"*** (*Id.* ¶ 313 (emphasis added));
- Lending standards lowered repeatedly ***from December 20, 2004, onward*** (*Id.* ¶¶ 139-150 (emphasis added));
- "Subprime underwriting standards . . . weakened with respect to increased CLTV limitations ***between 2004 and 2006"*** (*Id.* ¶ 145 (emphasis added));
- **"[B]etween *mid-2004 and mid-2007*** a substantial percentage of all loans originated by Countrywide were low-doc or no-doc loans" (*Id.* ¶ 169 (emphasis added));
- "[S]ubstantial deterioration of loan origination and underwriting standards as reflected in the underwriting matrices [was] ***beginning in 2004"*** (*Id.* ¶ 605(b) (emphasis added));
- ***"No later than 2005,*** CW5 became aware . . . that guidelines had been loosened to allow riskier lending. *By October 2005*, risky lending was 'definitely accelerated.'" (*Id.* ¶ 159 (emphasis added));
- CW6 became aware ***"in 2005*** that Countrywide was loosening underwriting guidelines" (*Id.* ¶ 160 (emphasis added));
- Increase in loan amounts to "low-quality borrowers" became significant only ***in March 2006*** (*Id.* ¶ 144 (emphasis added));
- "[S]pecial underwriting standards for jumbo subprime mortgages . . . relaxed . . . ***in 2006"*** (*Id.* ¶¶ 147-48 (emphasis added));
- The Exception Processing System was ***"rolled out in late 2004 or early 2005"*** (*Id.* ¶ 186 (emphasis added)).

Plaintiffs' Opposition cannot escape the simple truth that the facts pled in the SAC do not show the labels "prime" or "high quality" in the 2003 10-K to be false. On this ground alone, Count I should be dismissed.

### 2. The terms "high quality" and "prime," as used in the 2003 Form 10-K, are not actionable.

Additionally, as demonstrated in the Opening Memorandum, the "prime" and "high quality" labels, as used in the 2003 10-K, are too vague, generalized, and undefined to support a claim of falsity. (Outside Dirs.' Mem. at 7.) The rule in the Ninth Circuit has long been that vague, generalized statements presenting the corporation, its operations, or its products in a favorable light are not actionable. *See, e.g., In re Downey Sec. Litig.*, Case No. CV 08-3261-JFW (RZx), 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (dismissing claims and citing cases). While the Court held that an exception to that rule was appropriate because Plaintiffs alleged that "Countrywide's practices so departed from its public statements that even 'high quality' became materially false or misleading" (Omnibus Order at 6), no such exception is warranted with regard to these statements in the 2003 10-K. As discussed above, the SAC does not allege a departure at all with respect to 2003, much less an extreme one justifying an exception to established precedent. Even Plaintiffs offer no support for such a position in their Opposition. (Opp'n at 125.)

Finally, Plaintiffs' contention that the above arguments cannot be considered on their merits because Countrywide made them in the last round of motions to dismiss (Opp'n at 125) is incorrect. Countrywide did not make an argument directed at 2003, as the Outside Directors are making now. Instead, Countrywide attacked the overall reliability of Plaintiffs' CWs and argued that their statements did not support a finding of falsity or scienter with respect to any of the challenged statements made at any time. Even if Countrywide had made this argument, however, that would not prevent the Court from considering the merits of the Outside Directors' motion. Contrary to Plaintiffs' assertion based on Rule 12(g) (Opp'n at 9 n.7), the Outside Directors' right to present their arguments at this stage

is well recognized.[2] *See Nurmi v. Peterson*, No. 88-5436-WMB, 1989 U.S. Dist. LEXIS 9765, at *2 (C.D. Cal. Mar. 31, 1989) ("a motion to dismiss for failure to state a claim . . . is not subject to the consolidation of defenses requirements . . . ."); *In re Harmonic, Inc., Sec. Litig.*, No. C 00-2287 PJH, 2006 U.S. Dist. LEXIS 90450, at *39-40 (N.D. Cal. Dec. 11, 2006) (same); *Hicks v. Small*, 842 F. Supp. 407, 408 (D. Nev. 1993) (same), *aff'd*, 69 F.3d 967, 969 (9th Cir. 1995). Granting the motion will dispose of all claims against Outside Director Gwendolyn King[3] and will reduce the scope of the action for all the Outside Directors.[4]

**B. Count I is Also Barred by the Statute of Repose.**

The Outside Directors join in the arguments set forth in Thomas McLaughlin's opening and reply memoranda in support of his motion to dismiss

---

[2] The Outside Directors were represented by counsel for Countrywide in the last round of motions to dismiss. Contrary to Plaintiffs' arguments, the Outside Directors do not contend that the Court should address their motion because of any change in representation, or that dismissal is required by the Court's ruling in favor of Grant Thornton. (*See* Opp'n at 124-25; Outside Dirs.' Mem. at 4, 5-6.)

[3] Plaintiffs point to no alleged misstatement or omission that links Ms. King to this case aside from the quality-related statements in the 2003 10-K. For reasons set forth here, those allegations do not state a claim that the 2003 10-K was false. There is no basis, therefore, for keeping Ms. King in this case.

[4] There are well-recognized grounds for this Court to consider a motion that would narrow the case and remove a defendant, particularly in light of the multi-party, multi-year, broad subject matter scope of this case. *See, e.g.*, *Buzayan v. City of Davis*, No. 06-cv-1576-MCE-DAD, 2009 U.S. Dist. LEXIS 15217, at *3 (E.D. Cal. Feb. 26, 2009) (considering a second, partially "duplicative" motion to dismiss "because resolution of Defendants' most recent contentions may help clarify the remaining issues in the present action"); *Sharma v. Skaarup Ship Mgmt. Corp.*, 699 F. Supp. 440, 444 (S.D.N.Y. 1988) (considering "renewed" motion to dismiss because the "motions have narrowed the issues before the court, and should lead to a shorter discovery period and trial").

Plaintiffs' cases do not hold otherwise. *See Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 3041090, at *4-5 (N.D. Cal. Oct. 24, 2006) (deciding second motion to dismiss); *Sprint Telephony PCS, L.P. v. County of San Diego*, 311 F. Supp. 2d 898, 904-905 (S.D. Cal. 2004) (same); *see also Chilicky v. Schweiker*, 796 F.2d 1131 (9th Cir. 1986) (discussing the mandatory waiver of certain jurisdictional defenses, which is inapplicable here).

Count I on the ground it is time-barred. For this additional reason, the claims against the Outside Directors asserted in Count I should be dismissed.

## II. ALL ACCOUNTING-RELATED CLAIMS AGAINST THE OUTSIDE DIRECTORS SHOULD BE DISMISSED.

In the Opening Memorandum, the Outside Directors demonstrated that all accounting-related claims asserted against them in Counts IV and VII should be dismissed on two grounds: (1) the SAC does not allege a GAAP violation for the reasons stated in Countrywide's and KPMG's motions; and (2) "reasonable reliance" pursuant to Section 11(b)(3)(C) of the Securities Act of 1933. (Outside Dirs.' Mem. at 8-12.) The Outside Directors adopt the arguments made in Countrywide's and KPMG's reply memoranda concerning GAAP.

As for reasonable reliance, the SAC does not plead any facts showing that the Outside Directors acted unreasonably in relying on experts who prepared, certified, and audited the financial statements incorporated into the relevant registration statements. (*Id.*) Plaintiffs' Opposition, which is principally directed at the Underwriters, fails to identify any grounds for denying the Outside Directors' motion.

Plaintiffs argue that so-called "red flags" ought to have put the Underwriters and Outside Directors on notice that Countrywide's financial statements were false. As Plaintiffs acknowledge, a red flag is not merely something that draws a director's attention; it is "information that strips a defendant of his confidence in the accuracy of those portions of a registration statement premised on audited financial statements." (Opp'n at 95, quoting *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 673 (S.D.N.Y. 2004).) The SAC does not allege that any Outside Director ever saw such a red flag.

The SAC fails to allege that any Outside Director was ever informed of any information that ought to have raised an eyebrow, let alone of information that

should have stripped them of their confidence in any of the accounting experts who prepared, certified, and audited the Company's financial statements. Indeed, the *only* factual allegations in the SAC against the Outside Directors are that they served on the Board and certain Board committees and that they signed registration statements and Forms 10-K.[5] (SAC ¶¶ 34-50, 428-31, 606, 679, 781, 880, 930, 935, 941, 947, 1104, 1141-42, 1183-84; *see* Unopposed Motion to Correct at 1-2.)[6] Plaintiffs do not describe any documents shown to the Board or any presentations made to the Board by management. While the Omnibus Order indicated that communications regarding Countrywide's Exception Processing System and

---

[5] In a footnote, Plaintiffs argue that they have met their pleading burden by alleging that some Outside Directors were members of committees that "met frequently and were charged with substantial responsibilities such that the members of those committees 'were made aware of developing issues involving the Company's liquidity, reserves, internal controls, risk management and risk assessment policies as they arose during the Class Period.'" (Opp'n at 99 n.81.) Plaintiffs have not, however, pled a single fact raised at any meeting that alerted or should have alerted any Outside Director that anything was amiss with Countrywide's financial accounting. Plaintiffs cite allegations in the Derivative Action that certain committee members among the Outside Directors were aware of rising delinquencies and negative amortization. (Opp'n at 98-99 n.81.) But Plaintiffs fail to acknowledge that, in this action, the Court has found that these factors were not red flags *until 2007*. (Omnibus Order at 70-71.) All the registration statements at issue in the Counts against the Outside Directors, however, became effective no later than 2006, making red flags in 2007 irrelevant to the claims against the Outside Directors. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 418 (S.D.N.Y. 2003) (rejecting four red flags because "[e]ach of the events occurred after the last misrepresentation any of the Audit Committee Defendants is alleged to have made"). Indeed, Outside Directors Heller, Enis, and King left the Board before 2007.

In any event, Plaintiffs' argument is irrelevant to Mr. Snyder and Ms. King, who were not on the Finance or Audit and Ethics committees. This Court dismissed Mr. Snyder from the Derivative Action because he was not a member of these two committees, a rationale that presumably would have applied to Ms. King had she been a defendant in the Derivative Action. *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1065 n.23 (C.D. Cal. 2008).

[6] As explained in the Opening Memorandum, the legal conclusion asserted in the SAC that the Outside Directors were "negligent" does not state a claim. (Outside Dirs.' Mem. at 12.)

appraisal fraud were communicated to the Board, even Plaintiffs now acknowledge, through their non-opposition to the Motion to Correct, that ***no such allegations were ever made*** in the CAC (*id.*), and that the SAC does not add any such allegations.

Moreover, as established in the Unopposed Motion to Correct, ***none of the CWs claim to have had any contact with the Board.*** The alleged red flags simply did not appear in the Board room. *See In re Citigroup Inc. S'holders Litig.*, No. 19827, 2003 Del. Ch. LEXIS 61, at *8 (Del. Ch. June 5, 2003) (rejecting "red flags" in derivative suit that were only known to management, because "'[r]ed flags' are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer").

Plaintiffs' heavy reliance on *Enron* and *WorldCom* is revealing. These cases arose from two of the largest financial accounting restatements in history ($1.3 billion and $9 billion, respectively). This case, by contrast, does not involve a restatement at all – to this day, Countrywide's internal accountants and external auditors stand behind Countrywide's financial statements.

The red flags seen in *Enron* and *WorldCom* are absent here. *Enron*, for example, involved accounting practices that Enron's auditors had advised outside directors were "high risk" practices that "push limits," concerns held by outside directors about a conflict of interest involving Enron's CFO, and "substantial negative coverage" of Enron's auditors (the doomed Arthur Andersen) in the media. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 640 (S.D. Tex. 2003). The Enron directors were alleged to have been notified of ongoing fraud at the company, and even to have played a role in concealing that fraud. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 635-

636 (S.D. Tex. 2002). Plaintiffs have not alleged anything close to the red flags in *Enron*.[7]

Plaintiffs downplay Delaware decisions holding that outside directors may rely on representations by management, contending that Section 11 cases have "not permitted [directors] simply to accept at face value the representations of management and auditors." (Opp'n at 103.) But this is precisely what the "reasonable reliance" defense permits with respect to financial statements if, as here, the Board directs that they be prepared, certified, and audited by financial accounting experts – absent facts that put the directors on notice that the accountants were untrustworthy. As discussed above, the SAC does not plead any such facts.

Plaintiffs' argument that Outside Directors must "verify" representations made to them by management and outside auditors is not supported by the law. Indeed, a case Plaintiffs cite several times, *Escott v. BarChris Construction Corp.*, held that an outside director was entitled to rely on expertised portions of a financial statement even though he had "*made no investigation of the accuracy of the prospectus*." 283 F. Supp. 643, 688 (S.D.N.Y. 1968) (emphasis added). Similarly, the Ninth Circuit has held defendants "need not conduct due diligence into the 'expertised' parts of a prospectus." *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 623 (9th Cir. 1994).

Plaintiffs' discourse on how red flags can arise during the course of due diligence regarding other matters is irrelevant because Plaintiffs do not allege this ever happened. Plaintiffs insist that the Outside Directors would have come across

---

[7] In *WorldCom*, the defendant was a 30-year veteran employee and former CEO of MCI who failed to act in the face of extraordinarily low reported line costs (the company's largest expense), which ultimately resulted in the $9 billion restatement. *See In re WorldCom Inc. Sec. Litig.*, Master File 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 4193, at *34-35 & n.10 (S.D.N.Y. Mar. 21, 2005).

various things in the due diligence process (Opp'n at 96-98), but none of this is pled in the SAC. Furthermore, none of these things raise any question about whether Countrywide's accountants and auditors were following GAAP in preparing and auditing the Company's books.

Plaintiffs' suggestion that the Outside Directors should have chosen to "consult with accounting experts to confirm that the accounting treatment is appropriate and that additional disclosure is unnecessary" misses the point: That is exactly what the Outside Directors did. (Opp'n at 96, quoting *WorldCom*, 346 F. Supp. 2d at 684.) The Outside Directors were not required to retain yet more experts to check up on the work done by internal and external accounting experts, including KPMG, who all agreed that GAAP had been followed. Indeed, by making this argument, Plaintiffs tacitly concede that the Outside Directors were in no position to reach independent judgments concerning whether the Company's complex financial statements were prepared in accordance with GAAP without relying on experts.

Plaintiffs' assertion that Outside Directors cannot rely on Countrywide's internal accounting experts is likewise incorrect. (Opp'n at 94-95.) Plaintiffs cite no appellate authority for this point and no authority at all from within this Circuit, relying on two district court opinions from Texas and one from New York. While no court within this Circuit has analyzed the issue, the plain language of Section 11 permits reliance on any part of the registration statement "purporting to be made on the authority of an expert." The text of the statute provides no support for the notion that a CPA employed by Countrywide is not an expert on accounting, while an otherwise identical CPA employed by KPMG is an expert. Plaintiffs seek to draw a distinction between the two based on independence, but the statute does not limit reliance to *independent* experts.

Plaintiffs argue that the Outside Directors and the Underwriters have not cited a case where claims were dismissed on the reasonable reliance defense. That

is incorrect; this Court dismissed on precisely that basis in the Omnibus Order. (Omnibus Order at 58, 71.) As Plaintiffs know, few cases have been decided in this area, and even fewer after the Supreme Court set out the standard of review in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The fact that defendants have not discovered another case (besides this one) applying the *Twombly* standard to a motion to dismiss a claim pursuant to Section 11(b)(3)(C) is hardly surprising.

Plaintiffs' suggestion that the Court has already ruled on the Outside Directors' reasonable reliance defense is also incorrect. (Opp'n at 100.) The Omnibus Order did not discuss the application of the defense to the Outside Directors, much less conclude that it was not applicable to them. Moreover, the Omnibus Order states that the Outside Directors are alleged to have had knowledge of two facts that Plaintiffs now call red flags in their Opposition – alleged manipulations of the appraisal system and the Exception Processing System. (*See* Omnibus Order at 13:11-16, 84:23-26; Opp'n at 97-98.) Even Plaintiffs now agree, however, that they have never made any such allegation. (Unopposed Motion to Correct at 1-2.) The Omnibus Order does not, therefore, bar consideration of this motion on its merits.

**CONCLUSION**

For the foregoing reasons, and the reasons stated in the other defendants' opening and reply papers, the Outside Directors respectfully request that the Court dismiss Count I and dismiss the accounting-related claims against them in Counts IV and VII, all with prejudice.

Dated: March 26, 2009

MORRISON & FOERSTER LLP

By:/s/ Jordan Eth
Jordan Eth

Attorneys for Defendants HENRY CISNEROS, JEFF CUNNINGHAM, ROBERT DONATO, BEN M. ENIS, EDWIN HELLER, GWENDOLYN S. KING, MARTIN MELONE, ROBERT PARRY, OSCAR ROBERTSON, KEITH RUSSELL and HARLEY SNYDER