Lloyd Winawer (State Bar No. 157823)
*lwinawer@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067
Telephone: 310-788-5177
Facsimile: 310-286-0992

Brian E. Pastuszenski (*Pro Hac Vice*)
*bpastuszenski@goodwinprocter.com*
Inez Friedman-Boyce (*Pro Hac Vice*)
*ifriedmanboyce@goodwinprocter.com*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, Massachusetts 02109
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Attorneys for Defendants*
Countrywide Financial Corporation,
Countrywide Securities Corporation, and
Countrywide Capital V

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. SECURITIES LITIGATION | Lead Case No. 07-CV-005295-MRP (MANx)<br><br>**COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Date: April 13, 2009<br>Time: 10:00 a.m.<br>Courtroom: 12<br>Judge: Mariana R. Pfaelzer |

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California 90067

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT ...........................................................................................3

I.  THE SAC DOES NOT ALLEGE A GAAP VIOLATION.............................3

    A.  The SAC Does Not Allege Facts Showing That Countrywide Under-reserved For Loan Losses ........................................................3

        1.  Plaintiffs' Loan Loss Reserve Allegations Ignore FASB's Specific Instructions As To How FAS 5 Must Be Implemented ...................3

        2.  The SAC Does Not Support An Inference That CFC Failed To Take Credit Risk Into Account When Setting Reserves............................4

        3.  The Undisputed High Quality Of Countrywide's LHI Portfolio Contradicts The Inference Plaintiffs Ask This Court To Draw........8

    B.  The SAC Does Not Allege Facts Showing That Countrywide Under-reserved For Potential R&W Liability ......................................9

    C.  The SAC Fails To Allege Facts To Support An Inference That Countrywide Materially Overstated Its MSRs And RIs.......................11

        1.  Plaintiffs Fail To Consider The Impact Of Key Valuation Assumptions Besides Credit Risk...................................................12

        2.  The SAC Does Not Support Any Inference That It Was Inappropriate For Countrywide To Consider "Historical Performance," Or That Its Models Were Not Updated As Performance Changed.........................................................17

        3.  The 2007 Writedowns Of MSRs And RIs Do Not Support An Inference of Fraud........................................................................18

II.  THE SECTION 12(A)(2) CLAIMS FAIL AGAINST COUNTRYWIDE AND CCV ..........................................................................................20

CONCLUSION.......................................................................................22

i

COUNTRYWIDE DEFS.' REPLY MEMO. ISO MOTION TO DISMISS Lead Case No. 07-CV-05295-MRP (MANx)
SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF AUTHORITIES

**CASES**

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006) ........................................................5, 11

*Broam v. Bogan*,
  320 F.3d 1023 (9th Cir. 2003) ..............................................................8

*Caifa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007) ................................................11

*California Pub. Employees' Ret. Sys. v. Chubb*,
  394 F.3d 126 (3d Cir. 2004) ...........................................................5, 11

*Cecena v. Allstate Ins. Co.*,
  No. C 05-3178 JF, 2007 WL 134245 (N.D. Cal. Jan. 16, 2007)....................16

*In re Credit Acceptance Corp. Sec. Litig.*,
  50 F. Supp. 2d 662 (E.D. Mich. 1999) ..........................................7-8

*D.E. & J. Ltd. P'ship v. Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003) ........................................19

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001) ........................................19

*In re Downey Sec. Litig.*,
  No. CV 08-3261-JFW, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009)........ 5-6, 18

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).............................................................22

*Fouad v. Isilon Sys., Inc.*,
  No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)..............21

*Geinko v. Padda*,
  No. 00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ..............................11

*In re Harmonic Inc. Sec. Litig.*,
  No. C 00-2287 PJH, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006)...................21

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

*In re Infonet Servs. Corp. Sec. Litig.*,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......................................................21, 22

*Lawrence v. City of San Bernardino*,
    No. CV04-00336 FMC, 2005 WL 5950105 (C.D. Cal. July 27, 2005) .............21

*Loan v. FDIC*,
    717 F. Supp. 964 (D. Mass. 1989) ......................................................................6

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...........................................................5, 11

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ...............................................................19

*In re Novastar Fin., Inc. Sec. Litig.*,
    No. 07-0139-CV, 2008 WL 2354367 (W.D. Mo. Jun. 4, 2008) ........................7

*Pinter v. Dahl*,
    486 U.S. 622 (1988)............................................................................ 20-21, 22

*Pittleman v. Impac Mortgage Holdings Inc.*,
    No. SACV 07-0970 AG, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009)..........7, 19

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ............................................................................21

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..........................................................................................19

*Schneider v. California Dep't of Corr.*,
    151 F.3d 1194 (9th Cir. 1998) ............................................................................8

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)..............................................................................21

*In re Silicon Graphics, Inc. Sec. Litig.*,
    970 F. Supp. 746 (N.D. Cal. 1997)....................................................................18

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1998) ..............................................................................6

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

iii

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007)................................................................7

*Tripp v. IndyMac Fin. Corp.*,
   No. CV07-1635GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007)..................7

*In re Turretto*,
   255 B.R. 884 (Bankr. N.D. Cal. 2000) ...........................................16

**STATUTES**

Securities Act of 1933, § 12 (a)(2) .......................................................20

**REGULATIONS**

Securities Offering Reform, Exchange Act Release No. 8591, 2005 WL
   1692642 (Aug. 3, 2005).........................................................22

17 C.F.R. § 230.159A (2009) .......................................................... 21-22

17 C.F.R. § 229.512 (2009) ...............................................................22

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California 90067

COUNTRYWIDE DEFS.' REPLY MEMO. ISO MOTION TO DISMISS Lead Case No. 07-CV-05295-MRP (MANx)
SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**PRELIMINARY STATEMENT**

The accounting-related claims in the Second Amended Complaint ("SAC") – regarding Countrywide's loan loss reserves, representations and warranties ("R&W") reserves, and the valuation of residual interests ("RI") and mortgage servicing rights ("MSR") – are all based on the same faulty premise that Countrywide's alleged business decision to "loosen" its ***underwriting*** standards and originate riskier loans during the putative class period must mean that Countrywide's ***accounting*** for these reserves, rights, and interests was flawed. One does not follow from the other. Just because Countrywide's loan production personnel allegedly originated loans having greater credit risk does not mean that Countrywide's finance department did not appropriately take that risk into account when making the accounting judgments that are reflected in its audited financial statements. The Opposition does not point to a single confidential witness (let alone witnesses who corroborate each other), a single document, or any particularized factual allegation in the SAC that would support an inference that Countrywide's accounting judgments failed to take the credit quality of its loan originations into account, or did so incorrectly. Plaintiffs' only basis for questioning Countrywide's accounting judgments is the charges that Countrywide began to take in late 2007. But, those charges were recorded at a time when collateral values were plummeting and the economy was collapsing – external events that GAAP required Countrywide to consider. Plaintiffs ignore the direct impact these external events necessarily had on the charges Countrywide recorded at the time, and instead attribute those charges in impermissible "fraud by hindsight" fashion to improper accounting and fraud.

Plaintiffs' accounting allegations fail for the following separate and independent reasons as well:

- ***Loan Loss Reserve Allegations*** – Plaintiffs' loan loss reserve allegations depend on applying FAS 5, the governing standard, in precisely the manner the Financial Accounting Standards Board ("FASB") has said FAS 5 should ***not*** be

1

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California 90067

applied.  Contrary to explicit guidance from FASB, the source of GAAP itself, Plaintiffs' allegations assert that Countrywide should have recorded larger reserves than it did because of the alleged probability of greater losses in the future due to its loosened lending standards.  As FASB explicitly instructs, however, FAS 5 requires an issuer to consider only whether it is probable that losses already exist in the loan portfolio as of the date the financial statements are prepared.  Plaintiffs nowhere address this explicit GAAP guidance in their 150-page Opposition because they cannot square their arguments with FASB's directive.  Plaintiffs' loan loss reserve allegations are also inconsistent with the high quality of Countrywide's loan portfolio and the low delinquency and default rates and minimal chargeoffs in that portfolio until late 2007.  In fact, for most of the putative class period, delinquency and default rates were *lower* than they had been in 1999-2003, before Countrywide allegedly began making risky loans.

- ***R&W Reserve Allegations*** – The Opposition concedes that the SAC does not identify a single representation or warranty that was ever breached, and the SAC nowhere alleges that Countrywide ever incurred a dollar of R&W-related liability for which Countrywide had not adequately reserved.  Plaintiffs' implicit assumption that Countrywide's representations and warranties ceased to be accurate as credit risk levels allegedly rose is not supported by a single fact alleged in the SAC, and is also inconsistent with the extensive disclosures purchasers of Countrywide's loans received about the credit quality and credit risk attributes of those loans prior to buying them.

- ***MSR and RI Allegations*** – As it disclosed in its SEC filings, Countrywide's methodology for valuing its MSRs and RIs took into account a wide range of variables, including interest rates, prepayment speeds, housing market conditions, and collateral values.  Plaintiffs ignore these factors, and focus in both the SAC and the Opposition only on the allegedly increased credit risk associated with the loans Countrywide originated.  Plaintiffs, however, cannot turn these deeply nuanced

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

2

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

accounting judgments into a one dimensional inquiry concerning credit risk only.  As such, the SAC suffers from the same flaw that led the Court to dismiss in their entirety the predecessor complaint's RI allegations – namely, Plaintiffs' failure to address the range of variables relevant to the valuation of these mortgage servicing rights and residual interests.

## ARGUMENT

## I.    THE SAC DOES NOT ALLEGE A GAAP VIOLATION.

### A.    The SAC Does Not Allege Facts Showing That Countrywide Under-reserved For Loan Losses.

#### 1.    Plaintiffs' Loan Loss Reserve Allegations Ignore FASB's Specific Instructions As To How FAS 5 Must Be Implemented.

FAS 5 provides the GAAP standard for determining loss contingencies, including loan loss reserves.  Under FAS 5, a reserve may be recorded only when it is probable that a loss *already* has been incurred as of the date of the financial statements and the amount of loss is reasonably estimable.[1]  Thus, the question that FAS 5 required Countrywide to answer was whether at the time it prepared its financial statements it was probable that Countrywide already had losses in its portfolio at the date of the financial statements.  The question was not whether – as a result of its allegedly risky lending practices – its loans held for investment ("LHI") portfolio might incur losses at some point in the future.[2]  FASB, which promulgated this GAAP standard, has published official guidance for issuers of financial statements on how FAS 5 is to be implemented, which

---

[1] "Date of the financial statements" means the end of the most recent accounting period for which financial statements are being presented.  Ex. 9 (FAS 5, ¶ 8, n.4).

[2] Plaintiffs' argument about loan loss reserves in the Opposition principally addresses how the word "probable" should be interpreted.  *See* Plaintiffs' Opposition to Motions to Dismiss ("Opp." or "Opposition" at 10-18).  Although the meaning of "probable" (as opposed to another concept used in FAS 5, "reasonably possible") is not unimportant, the central issue that Plaintiffs avoid addressing is *what is it that must be probable?*  FAS 5 and FASB's own guidance on FAS 5 make clear that what must be probable is the existence of actual, current losses in the portfolio at the date of the financial statements, not future losses that may arise as a result of allegedly risky loan origination practices.

3

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

confirms this. More specifically, the Overview to the FASB Staff Implementation Guidance, *Application of FASB Statements 5 and 114 to a Loan Portfolio* (the "FASB Guidance") instructs that "it is **inappropriate** to consider possible or expected future trends that **may lead** to additional losses." Ex. 11 at 2 (emphasis added).[3] Rather, "[l]osses should not be recognized before it is probable that they **have been incurred**, even though it may be probable based on past experience that losses **will be incurred** in the future." *Id.* (emphasis added).

The Opposition ignores entirely this FASB Guidance, and makes no attempt to address how the FASB Guidance applies in this case. Through the FASB Guidance, the very same body that promulgated GAAP explicitly rejected Plaintiffs' arguments here – that Countrywide should have recorded larger reserves because the increased riskiness of Countrywide's lending practices allegedly created a greater risk of default and loss in the future. Only by ignoring what FASB itself has said about the correct application of FAS 5 could Plaintiffs make the following remarkable statements that appear in their Opposition: "[i]t defies common sense to set up a reserve only for existing losses" (Opp. at 16) and "GAAP requires companies to maintain reserves for **potential losses**" (Opp. at 13). Whether or not Plaintiffs think GAAP is "logical," FAS 5 and the FASB Guidance are unambiguous, and Plaintiffs' GAAP arguments cannot survive because they depend on ignoring GAAP and how the promulgator of GAAP has said GAAP should be implemented.

### 2.  The SAC Does Not Support An Inference That CFC Failed To Take Credit Risk Into Account When Setting Reserves.

The Opposition does not point to any facts in the SAC that support the inference that Countrywide did not take credit risk into account when setting loan loss

---

[3] Exhibits ("Ex.") 1-24 are to Countrywide's request for judicial notice (Dkt. No. 365-2). Exs. 25-33 are to Joint Supplemental Request for Judicial Notice filed herewith.

4

reserves.[4]  Even assuming for argument's sake that Countrywide "loosened" its underwriting standards during the putative class period and did not adequately disclose that fact to the investing public, that does not mean that CFC failed to take credit risk into account when setting reserves.  Plaintiffs' mantra that Countrywide made very risky loans during 2004-2007 has nothing to do with how Countrywide accounted for the risk associated with those loans.[5]

Indeed, as explained in Countrywide's opening brief, the Company's public disclosures explained that its methodology for setting loan loss reserves took into account the credit quality of the mortgage loans in its LHI portfolio.  *See* Countrywide Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("CFC Br.") at 13.  As part of that methodology, the Company "assessed loan credit quality" including key credit risk attributes such as "original loan-to-value, borrower credit score, documentation type, etc."  Ex. 3 at F-13 (2006 10-K).  What this means is that Countrywide factored into its reserve determinations the extent of the information it obtained from borrowers, the amount of collateral protection, the borrower's creditworthiness, and so on – the very things Plaintiffs assert Countrywide did not do.  Plaintiffs nowhere point to a single confidential witness, a single document, or a single other fact calling the accuracy of those disclosures into question.[6]  See CFC Br. at 12-13.  *In re Downey Sec. Litig.*, No. CV 08-3261-JFW,

---

[4] To survive a motion to dismiss, Plaintiffs must show "when and to what level [an] allowance should have been changed," and "why the allowance made by the corporation was unreasonable in light of the [conditions] experienced." *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006) (emphasis added), *aff'd*, 256 Fed. Appx. 74 (9th Cir. 2007) (dismissing securities fraud claim for inadequate reserves); *California Pub. Employees' Ret. Sys. v. Chubb*, 394 F.3d 126 (3d Cir. 2004) (dismissing securities claim when plaintiffs failed "[to] provide any particulars regarding the amount by which [loss] reserves were distorted, or how much revenue was improperly recognized").

[5] *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (accounting allegations dismissed where plaintiffs only alleged internal misconduct regarding business practices and not allegations regarding accounting practices).

[6] Moreover, CFC disclosed – and Plaintiffs allege no facts to dispute – that CFC revised its loan loss models to the extent that the actual performance of its loans

5

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1  2009 WL 736802, at *8 (C.D. Cal. Mar. 18, 2009) (dismissing GAAP claims where

2  plaintiff "simply assumes that Downey ignored the financial metrics in setting its

3  reserves without alleging any particularized facts that Downey did, in fact, ignore its

4  own publicly-disclosed information when setting reserves.")

5      The delinquency rate in Countrywide's LHI portfolio during the putative class

6  period also does not support any inference that Countrywide failed to consider credit

7  risk in its loan originations when setting reserves.  Plaintiffs assert that loans 30-89

8  days delinquent in Countrywide's LHI portfolio "increased dramatically" between

9  2004 and the end of 2005.  SAC ¶ 313.  In fact, however, the SAC itself shows that

10  the percentage of LHI loans 30-89 days delinquent was just over one half of one

11  percent (0.50%) in Q1 2003 and still only one percent in Q4 2005 – an increase of less

12  than one-half of one percent in two years.  *See also infra* at 14 and Appendix A for a

13  comparison of delinquency and default rates as between 1999-2003 and 2004-2007).[7]

14  Plaintiffs' allegation that the loans in Countrywide's LHI portfolio originated during

15  this period were "impaired at origination" is simply not tenable given the undisputed

16  delinquency rates above, which would have been materially higher had those loans

17  _____

18  required revision of "expected loss factors."  In that regard, CFC disclosed that
   reserves were "determined by applying expected loss factors to outstanding loans" and

19  that "[t]his evaluation is inherently subjective as it requires estimates that are
   susceptible to significant revision as factors change or more information becomes

20  available."  Ex. 1 at F-13 (2004 10-K).  Plaintiffs rely on this and other CFC SEC
   filings throughout the SAC, and Plaintiffs cannot attack these disclosures without

21  some facts – particularized facts – that support an inference that these disclosures
   were materially false.  *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986

22  (9th Cir. 1998) ("Although [plaintiff] questions the veracity of the SEC forms, her
   ongoing and substantial reliance on the forms as a basis for her allegations

23  substantially weakens her position"); *Loan v. FDIC*, 717 F. Supp. 964, 967 (D. Mass.
   1989) (dismissing 1933 Act claim because a plaintiff must "explain what is untrue

24  about each of the challenged statements and cannot merely quote a statement and
   assert that it is untrue").

25  [7] Indeed, Judge Walter recently dismissed similar allegations where "Plaintiff ha[d]
   alleged that Downey's loan loss reserves were falsely understated, because, in part,

26  Downey's financial metrics (e.g., such as negative amortization balances, non-
   performing assets, defaults rates, anticipated recasts, etc.) suggested the reserves

27  should have been greater.  However, Plaintiff then simply assumes that Downey
   ignored the financial metrics in setting its reserves without alleging any particularized

28  facts that Downey did."  *In re Downey Sec. Litig.*, 2009 WL 736802, at *8.

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1  been impaired when made (*i.e.*, had losses already existed in those loans on the date of

2  origination).  Indeed, even at the end of 2007, when delinquencies markedly spiked as

3  the housing market and the economy began to collapse, over 95% of the LHI portfolio

4  was still not delinquent.  SAC ¶ 313.  And, in late 2007, Countrywide found itself in

5  what Judge Guilford recently characterized as "a volatile industry at the onset of a

6  long, destructive economic downturn."  *Pittleman v. Impac Mortgage Holdings Inc.*,

7  No. SACV 07-0970 AG, 2009 WL 648983, at *6 (C.D. Cal. Mar. 9, 2009).[8]  As

8  required by FAS 5, Countrywide at that time took external economic conditions into

9  account when setting reserves, including the first national decline in home prices since

10  the Great Depression and the most devastating economic downturn in 70 years.  *See*

11  Ex. 18 (SEC Staff Accounting Bulletin 102, §§ 2, 4).

12          Notably, Plaintiffs do not allege that Countrywide has restated its loan loss

13  reserves, because Countrywide has not.  Nor do they allege that Countrywide hid any

14  information from its auditors, or that its auditors ever withdrew or modified any of

15  their audit opinions (as to loan loss reserves or anything else).  To the contrary,

16  Countrywide's auditors reported each year that in the auditors' opinion, the financial

17  statements were fairly presented in all material respects in accordance with GAAP.

18  Countrywide's charge-offs also were well below its loan loss reserves for each year

19  from 2004-2006, demonstrating that the Company was well-reserved.  *See In re*

20  *Novastar Fin., Inc. Sec. Litig.*, No. 07-01389-cv, 2008 WL 2354367, at *3 (W.D. Mo.

21  Jun. 4, 2008) ("it is noteworthy that nobody – the SEC, Novastar's auditors, or anyone

22  else – has suggested Novastar should or must restate its financial reports"); *In re*

23  *Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 680 (E.D. Mich. 1999)

24

25  [8] *See, e.g., Tripp v. IndyMac Fin. Corp.*, No. CV07-1635GW, 2007 WL 4591930, at
26  *4 (C.D. Cal. Nov. 29, 2007) ("an even stronger inference is that Defendants were
    simply unable to shield themselves as effectively as they anticipated from the drastic
27  change in the housing and mortgage markets and, once that inability became evident,
    IndyMac's financials were changed accordingly"); *Tellabs, Inc. v. Makor Issues &*
28  *Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007) (requiring court to consider all plausible
    inferences including those favoring defendants).

7

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1    ("[n]one of the financial statements issued during the class period had to be restated,

2    as GAAP policies would require if the [loan loss] reserve was found later to have been

3    materially misstated").

4            **3.**    **The Undisputed High Quality Of Countrywide's LHI Portfolio Contradicts The Inference Plaintiffs Ask This Court To Draw.**

5

6          There is an additional critical disconnect between Plaintiffs' allegations about

7    loosened underwriting standards and increased risk in Countrywide's LHI portfolio –

8    the high credit quality of Countrywide's LHI portfolio.  As Countrywide showed in its

9    opening brief, that portfolio was comprised primarily of high FICO score, moderate

10   LTV pay option ARM loans and HELOCs.  CFC Br. at 6-7.  Indeed, the Opposition

11   does not dispute that 95% of the loans in that portfolio were "prime" loans under

12   Plaintiffs' own definition of "prime" – effectively undermining Plaintiffs' argument

13   that these loans were all "impaired at origination."  Opp. at 20-22.  Rather,

14   contradicting the overarching importance Plaintiffs place on FICO scores in the SAC

15   and its predecessor, Plaintiffs now assert that FICO scores are not a particularly good

16   indicator of credit quality.[9]  Opp. at 22 n.21.  Plaintiffs cannot have it both ways.  *See*

17   *Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (disregarding allegations

18   made for first time in plaintiff's opposition to motion to dismiss.); *Schneider v. Calif.*

19   *Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (same).  This contradiction in

20   Plaintiff's own arguments further supports dismissal of their loan loss reserve claim.

21

22

23   _____

24   [9] In the Opposition, Plaintiffs say "Countrywide held onto high-risk loans because those loans had the greatest return for the Company."  Opp. at 12.  The Opposition
25   cites as support a *New York Times* article noting that pay option ARM loans "were especially lucrative" and that "Countrywide made gross profit margins of more than 4
26   percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration."  *Id.*, SAC ¶ 104.  This shows that Countrywide
27   stood to gain more by ***not*** holding pay option ARMs for investment, because of the high profit to be gained by selling them in the secondary market.  It also does nothing
28   to demonstrate how Countrywide determined which pay option ARMs (or HELOCs) to hold for investment.

COUNTRYWIDE DEFS' REPLY MEMO ISO MOTION TO DISMISS    LEAD CASE NO. 07-CV-05295 MRP(MANx)
SECOND CONSOLIDATED AMENDED COMPLAINT

**B.   The SAC Does Not Allege Facts Showing That Countrywide Under-reserved For Potential R&W Liability.**

Plaintiffs' arguments about R&W reserves fare no better for many of the same reasons discussed above.  Plaintiffs ask this Court to simply *assume* that if Countrywide sold riskier loans during the putative class period then its representations and warranties to loan purchasers must have been false and Countrywide's R&W reserves must have been inadequate.  But Plaintiffs do not identify a single instance where Countrywide breached any specific representation or warranty, not to mention any instance where Countrywide failed to account properly for potential liability arising from such a breach.  In other words, Plaintiffs have not pleaded any connection whatsoever between the supposed increased credit risk associated with the loans that Countrywide securitized or otherwise sold and any possible liability flowing from any representations made about the credit quality of those loans.

The issue here is whether the R&W reserves recorded in Countrywide's financial statements were sufficient to cover liability for likely breaches of representations and warranties associated with the loans it had securitized or otherwise sold.  The process of setting reserves required Countrywide to make an estimate (to be adjusted over time as new information became available) of the dollar amount of losses Countrywide likely would be required to incur as a result of loans not complying with the particular representations and warranties it had made about those loans.  FAS 140 ¶ 11; FAS 5 ¶ 8.  The SAC seems to assume that Countrywide had a static set of representations and warranties that were narrowly tailored to fit traditional 30-year fixed interest rate loans involving full documentation from borrowers that Countrywide fully verified, which became inaccurate as the nature and credit risk attributes of Countrywide's loans changed.  But no facts are alleged anywhere in the SAC to support such an assumption.  Indeed, the SAC does not describe the content of any representation or warranty whatsoever that Countrywide made to a buyer of its

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

9

1    loans during the putative class period or at any other time for that matter.[10]

2         Moreover, the inference that buyers were misled as to the credit risk associated

3    with the loans they bought is further undercut by the undisputed fact that purchasers of

4    loans from Countrywide received extensive information about the credit risk attributes

5    of what they were buying.  Buyers of securitized loans from Countrywide received

6    that information through the prospectus supplements issued with those deals, and

7    buyers of whole loans had the right to do diligence on the quality of the loans before

8    buying.  *See* CFC. Br. at 16.

9         In short, as with each of the SAC's accounting allegations, Plaintiffs' R&W-

10   related allegations do nothing more than intone that Countrywide "loosened" its

11   underwriting practices and then ask this Court to leap to the conclusion that

12   Countrywide's accounting must have been improper.  But, just like the prior

13   complaint, the SAC does not allege a single fact suggesting that the R&W reserve

14   methodology Countrywide followed deviated from GAAP,[11] much less identify even a

15   single representation or warranty that was breached, the dollar amount of any R&W-

16   related loss that Countrywide incurred, or any such loss that Countrywide had not

17   reserved for adequately.  To the contrary, Plaintiffs do not dispute that the charge-offs

18   Countrywide recorded in respect of R&W-related liability were well below its R&W

19   reserves for each year from 2004 through 2007, undermining any inference Plaintiffs

20   seek to have this Court draw.  CFC Br. at 17-18.  The SAC thus contains nothing but

21   factually unsupported speculation, which is not enough to survive a motion to dismiss.

22

23   [10] Plaintiffs' argument that there need not be an actual breach of a representation or
     warranty to have R&W liability thus makes no sense.  Opp. at 30-31.  The R&W
24   reserve – by definition – is an estimate of ***probable*** loss resulting from any
     representations and warranties that ***may have been*** breached when made (*i.e.*, when
25   the loans were sold or securitized).  There can be no loss unless there is a breach.

26   [11] Countrywide disclosed that it set its R&W reserves based on "assessments of
     current conditions," making "appropriate adjustments to . . . historically developed
27   assumptions when necessary to adjust historical factors to account for present
     conditions."  *See* Ex. 4 at 56-57 (2007 10K).  Plaintiffs have alleged no particularized
28   facts to suggest Countrywide did otherwise.

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1   *See, e.g., Marsh*, 501 F. Supp. 2d 452 (dismissing claims for misstated financial

2   statements where accounting allegations were merely "a carbon copy" of the

3   allegations regarding misstatements with respect to business practices).[12]

**C.   The SAC Fails to Allege Facts To Support An Inference That
Countrywide Materially Overstated Its MSRs and RIs.**

With respect to Countrywide's valuation of mortgage servicing rights ("MSRs")

and retained interests ("RIs"), Plaintiffs' Opposition fails for the same reason its

allegations as to the R&W reserves fail:  even if the Court assumes that Countrywide

"loosened" its underwriting practices, the SAC alleges no particularized facts to

support an inference that those practices were not considered and properly accounted

for in the valuation of MSRs and RIs.  As with the loan loss reserve and R&W

allegations, the SAC – whatever it may allege about underwriting or loan quality –

fails to allege any particularized facts relevant to ***improper accounting or GAAP***

***violations***.  It does not identify a single confidential witness who participated in the

valuation process for MSRs and RIs; it does not identify a single confidential witness

who had knowledge of the valuation models, their assumptions, or projections; in fact,

it does not identify a single confidential witness with any accounting expertise

whatsoever.  Nor does it reference any documents to show that the process was

flawed, key variables were ignored, or that the ultimate MSR and RI valuations were

overstated.  Plaintiffs have pleaded none of the facts – let alone facts pleaded with

particularity – that would be required to state a claim for securities fraud based on

misstated MSR and RI valuations.  *See Alaska*, 434 F. Supp. 2d at 823; *Chubb*, 394

F.3d at 15; *Marsh*, 501 F. Supp. 2d at 477.

---

[12] In the absence of any factual basis for arguing that the R&W reserves did not
comply with GAAP, Plaintiffs rely on allegations supposedly made by non-parties in
other lawsuits that Countrywide loans were not originated in compliance with
Countrywide's underwriting standards.  *See* Opp. at 29-30.  Such statements are not
"facts," are inherently self-serving, and cannot form the basis of any reasonable
inference in this case.  *See Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6
n.8 (N.D. Ill. Feb. 27, 2002); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411
(S.D.N.Y. 2007).

**Goodwin Procter LLP**
**10250 Constellation Blvd., 21st Floor**
**Los Angeles, California 90067**

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1     Plaintiffs' Opposition does not – and cannot – dispute any of this.[13]  Instead, it

2  relies on three sets of allegations concerning:  (1) certain assumptions utilized in the

3  MSR and RI valuation models; (2) the use of "historical performance" data to project

4  future cash flows; and (3) the writedowns of MSR and RI valuations in 2007.  None of

5  these allegations supports an inference that Countrywide's accounting was improper.

6     **1.     Plaintiffs Fail To Consider The Impact Of Key Valuation Assumptions Besides Credit Risk.**

7

8     In its prior order, the Court dismissed Plaintiffs' claims concerning RI

9  valuations in part because "the CAC did not allege enough facts regarding 'other

10  variables' [besides delinquencies] that could affect RI value."  Opp. at 34; Order at

11  63-64 n.60.  The SAC suffers from this same fatal flaw, with respect to both MSRs

12  and RIs (just as it does with respect to loan loss and R&W reserves).  Plaintiffs

13  repeatedly focus on one variable, and one variable only – "increased credit risk" from

14  "loosened" underwriting practices – then argue that it should have necessarily

15  translated into lower MSR and RI valuations during the putative class period.  *See*

16  Opp. at 37-38, 43-46.  But that statement – in addition to being factually unsupported

17  – is overly simplistic:  these valuations are derived from consideration of a multitude

18  of internal and external factors (many of which have offsetting effects), which are

19  analyzed by highly sophisticated models and involve a series of subjective

20  judgments.[14]  Because the SAC – like the CAC – disregards all of these other factors

21  except credit risk, it fails to support any inference that the MSRs and RIs were

22  overvalued.  The three arguments Plaintiffs make in the Opposition about RIs and

23  MSRs only highlight the flaws in their allegations and make clear why dismissal is

24  appropriate.

---

25  [13] Plaintiffs argue that CW1 is somehow qualified to opine on RI valuations because

26  he was involved in "secondary marketing operations and the pricing and risk of loans held for investment and for sale."  Opp. at 39 n.33.  Plaintiffs fail to allege, however,

27  that CW1 had any role or expertise in accounting or GAAP.

28  [14] *See* Ex. 3 at 37 (2006 Form 10K) (noting inherent subjectivity and uncertainty in valuation of MSRs and RIs).

COUNTRYWIDE DEFS' REPLY MEMO ISO MOTION TO DISMISS          LEAD CASE NO. 07-CV-05295 MRP(MANx)
SECOND CONSOLIDATED AMENDED COMPLAINT

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

<u>First</u>, Plaintiffs contend that the "weighted average life" (WAL) assumption used for both MSRs and RIs should have decreased during the putative class period, because increased defaults meant shorter loan lives.  Since (Plaintiffs argue) Countrywide kept WAL relatively constant (or even higher) instead, Plaintiffs ask the Court to infer that WAL – and in turn, MSR and RI valuations – were overstated.  *See* Opp. at 37-38, 45.  As Countrywide showed in its opening brief, however, this argument ignores other significant factors that affect WAL, such as changes in interest rates.  Even if one assumed an increased risk of default, it is possible that WAL – and MSR and RI valuations – would nevertheless increase if higher interest rates led to less refinancing, which would result in fewer prepayments and longer loan lives.  *See* CFC Br. at 21-22.  Indeed, as Plaintiffs admit, there was "an environment of rising interest rates" between 2004 and 2006, Opp. at 38, which would have counterbalanced the effects of any increased credit risk on WAL.

Plaintiffs have no answer for this.  Rather, they try to dismiss the connection between WAL and interest rates in this context, asserting that Defendants are making an "assumption" premised "misleadingly on a generic reference to GAAP."  Opp. at 38.  But, Plaintiffs themselves acknowledge in the SAC that "weighted average life generally increases as interest rates rise."  ¶ 339.[15]  Plaintiffs then argue that higher interest rates could also cause many ARMs and Pay Option ARMs to "reset" to higher rates, potentially triggering more defaults and thereby decreasing WAL.  *See* Opp. at 38.  The SAC, however, alleges no facts to suggest that any increase in defaults would necessarily offset the WAL increase normally caused by higher interest rates as a result of reduced prepayments; nor does it allege any facts showing that any supposed

---

[15] Moreover, the "generic reference to GAAP" was a direct quotation from the Financial Accounting Standards Board:  "Decreases in interest rates generally increase prepayment speed estimates on the underlying loans…. Increases in interest rates have the opposite effect."  Ex. 12 at 16 (Staff Implementation Issue No. F8); *see also* Ex. 25 at F-36 (2004 10-K) ("Declining mortgage interest rates generally precipitate increased mortgage refinancing activity, which decreases the expected life of the underlying loans").

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

rate "resets" were not fully accounted for in Countrywide's MSR and RI valuation models.[16]

The information disclosed in Countrywide's public filings – information that Plaintiffs do not dispute – also shows that only a tiny fraction of the Company's pay-option loans were scheduled to recast before 2009. Ex. 28 (2007 10K) at 127. This information is inconsistent with and undermines any inference the Plaintiffs would have this Court draw about possible interest rate resets. Moreover, the levels of defaults in Countrywide-originated loans were generally within historical (pre-2004) norms throughout 2004, 2005, and 2006, and it was not until 2007 that defaults began to spike as the economy and the real estate market collapsed. *See* Appx. A. Similarly, until mid 2007, Countrywide's delinquency rate throughout the putative class period (2004-07) was typically ***lower*** than the delinquency rate during the four years preceding the putative class period (2000-03) when Countrywide supposedly was not making risky loans. *See id.* Again, the inferences Plaintiffs ask this Court to draw cannot be reconciled with this undisputed data.

<u>Second</u>, Plaintiffs argue that the "prepayment rate" assumption used for MSRs should have increased during the class period (again due to increased credit risk), but like WAL, it "stayed constant." Opp. at 41. This argument fails for the same reason Plaintiffs' argument regarding WAL fails. Like WAL, the prepayment rate is affected by many variables besides credit risk: interest rates, housing market conditions, housing prices, turnover (how frequently homes are being bought and sold), refinancing activity, LTV ratio, and seasonality, to name a few. *See* CFC Br. at 22. In fact, FASB itself has noted that "MSR fair values are ***most significantly impacted by changes in interest rates*** and the corresponding effect of those changes on prepayment speed estimates." Ex. 12 at 16 (FASB Staff Implementation Issue No.

---

[16] In addition, delinquencies actually did not begin to markedly rise until very late 2006/early 2007, as even the SAC itself acknowledges. *See* SAC ¶ 335; Appx. A.

F8) (emphasis added).[17]   This impact is entirely independent of credit risk; as this Court noted in the derivative litigation, "[i]nterest rate risk . . . is present regardless of the underwriting quality of the underlying loans."   *In re Countrywide Fin. Corp. Deriv. Litig.*, May 14, 2008 Order at 35.   Yet Plaintiffs ignore the impact of interest rates completely – interest rates that the Opposition (at 38) acknowledges were increasing during the putative class period.   Thus, because Plaintiffs again fail to consider any relevant variables besides credit risk, there is no factual basis to infer that Countrywide's prepayment speed assumption was inaccurate and hence its valuation of MSRs was overstated.

Third, Plaintiffs argue that the "net lifetime credit loss" (NLCL) assumption used for RIs should have increased during the putative class period (allegedly because of increased delinquencies), but Countrywide instead "kept NLCL constant or even decreased it."   Opp. at 38.   As an initial matter, the data in the SAC does not support this argument.   Indeed, in one year (2004) Countrywide *increased* its net credit loss assumption even though the delinquency rate *went down*.   Moreover, in three of the other four years of the putative class period, the percentage increase in Countrywide's net credit loss assumption *was larger than* the percentage increase in delinquencies:

|  | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Total Delinquencies (change) | 3.91% (N/A) | 3.83% (-0.08) | 4.61% (+0.78) | 5.02% (+0.41) | 6.96% (+1.94) |
| *(% change from prior year)* | | *-2.0%* | *+20.4%* | *+8.9%* | *+38.6* |
| NLCL (change) | 1.9% (N/A) | 2.0% (+0.1) | 1.7% (-0.3) | 2.6% (+0.9) | 10.9% (+8.3) |
| *(% change from prior year)* | | *+5.3%* | *-15.0%* | *+52.9%* | *+319.2%* |

SAC ¶ 335.

Equally important, as they did in the prior complaint, Plaintiffs again ignore a

---

[17] *See also* Ex. 30 at 47 (3Q 2006 10Q) ("[t]he long-term performance of [Loan Servicing] sector is affected primarily by the level of interest rates, the corresponding effect on the level of projected and actual prepayments . . . and our ability to manage interest rate risk"); *id.* at 20 (MSR fair value "reflects changes in discount rates and prepayment speed assumptions, primarily due to changes in interest rates"); Ex. 27 at F-44 (2006 10K) (same).

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

COUNTRYWIDE DEFS' REPLY MEMO ISO MOTION TO DISMISS   LEAD CASE NO. 07-CV-05295 MRP(MANx)
SECOND CONSOLIDATED AMENDED COMPLAINT

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

critical variable that affects NLCL:  collateral values.  As with loan loss reserves, a default will not result in an actual credit loss if the collateral value is sufficient to pay off the unpaid principal balance of the loan at the time of default.  Thus, stable or rising collateral values may cause NLCL to remain constant, even in the face of increasing delinquencies from allegedly "loosened" underwriting practices.  Plaintiffs ignore the fact that housing prices *continued to appreciate until 2007*, when they began to decline nationally for the first time since the Great Depression.[18]  The NLCL assumptions that Countrywide used are consistent with this continuing appreciation in home prices:  after a long period of appreciating collateral values from 2003-06 (with their offsetting effect on delinquencies), NLCL assumption quadrupled in 2007 when collateral values precipitously dropped.  SAC ¶ 335.[19]  Without addressing this important variable, the SAC cannot support an inference that the NLCL assumption was incorrect and MSRs and RIs were overvalued.[20]

---

[18] The Court may take judicial notice of housing prices.  *See, e.g., Cecena v. Allstate Ins. Co.*, No. C 05-3178 JF, 2007 WL 134245, at *6 (N.D. Cal. Jan. 16, 2007) (taking judicial notice of housing market); *In re Turretto*, 255 B.R. 884, 892 (Bankr. N.D. Cal. 2000) (same).

[19] Plaintiffs also make a conclusory allegation that, as credit risk increased, Countrywide "incurred increased costs to service its poor quality loans," which should have adversely impacted MSR values.  Opp. at 41.  Plaintiffs, however, allege no facts regarding the magnitude of these supposed costs, their relationship to other variables affecting MSR valuations, or whether they were already accounted for in the models.

[20] Plaintiffs argue that collateral values "did not provide a sufficient cushion for credit losses because Countrywide increased LTV ratios and also falsified appraisals and borrower information."  Opp. at 39.  Whether or not LTV ratios increased goes to how the loans were underwritten, not how they were accounted for.  Any alleged increase in LTV ratios does not mean that Countrywide failed to account properly for credit losses in light of whatever the collateral values and LTV ratios actually were.  Plaintiffs' accusation that Countrywide "falsified appraisals and borrower information" is largely based on allegations that appear in other lawsuits, which are not a reliable foundation for any inferences in this case and one confidential witness who is not alleged to have had any appraisal-related responsibilities, any responsibilities at all outside of the FSL (subprime) division, or any supposed information regarding appraisal practices past mid-2005.  *See* SAC ¶¶ 198-206, 212-213.

16

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California 90067

2. **The SAC Does Not Support Any Inference That It Was Inappropriate For Countrywide To Consider "Historical Performance," Or That Its Models Were Not Updated As Performance Changed.**

Plaintiffs also criticize Countrywide's consideration of the "historical performance" of the loans underlying the MSRs and RIs.  Opp. at 35-36, 41-42, 45.  Plaintiffs argue (*see* SAC ¶¶ 330, 353) that such "historical performance" data would not have reflected the increased credit risk from its allegedly new underwriting practices, thus warranting an inference of improper accounting.

This argument is misplaced, however, and if taken to its logical conclusion would itself violate GAAP.  Countrywide MSRs related to almost one trillion dollars in underlying loans at every point during the putative class period.  Ex. 28 at 9 (2007 10K).  In other words, in 2004, before Countrywide had even begun to originate pay option ARM loans, and in 2003, before its allegedly risky lending practices began, Countrywide had roughly a trillion dollars in loans that it was servicing.  To have not considered "historical data" would have ignored years of performance of the very loans Countrywide would be servicing for years to come.  Moreover, Countrywide disclosed that in valuing its MSRs it did take into account the composition and changing performance characteristics of the loans it was servicing in then current economic and market conditions.  Again, Plaintiffs do not identify a single confidential witness, document, or other fact (let alone any facts alleged with the required particularity) that calls the accuracy of these disclosures into question – disclosures that undermine the inferences Plaintiffs seek to have this Court draw:

- "The assumptions underlying the [MSR valuation] ***will be affected as market conditions and portfolio composition and behavior change***, causing both actual and projected amortization levels to vary over time." Ex. 25 at F-24 (2004 10K) (emphasis added); *see also* Ex. 26 at F-43 (2005 10K).

17

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California 90067

- "We develop cash flow, prepayment and net lifetime credit loss assumptions based on the historical performance of the loans underlying our retained interests *adjusted for the current economic environment as appropriate*."  Ex. 4 at 55 (2007 10K) (emphasis added).

- "The long-term performance of [the Loan Servicing] sector is affected primarily by the level and direction of interest rates, the level of projected and actual prepayments in our servicing portfolio, projected and *actual credit losses* . . ."  Ex. 29 at 56-58 (3Q 2007 10Q) (emphasis added).[21]

In sum, GAAP required Countrywide to estimate the fair value of its MSRs and RIs using "[a]ll available evidence," including "assumptions about interest rates, default, prepayment, and volatility."  Ex. 32 (FAS 140, ¶¶ 69-70); *see also* Ex. 33 (FAS 157 ¶ 28); SAC ¶ 332.  That is precisely what Countrywide disclosed it did, and Plaintiff's Opposition points to not a single fact alleged in the SAC that suggests that Countrywide's multi-variable valuation models did anything other than exactly that.[22] *See In re Downey Sec. Litig.*, 2009 WL 736802, at *8 (dismissing GAAP claims in the absence of particularized facts showing that issuer failed to consider relevant information).

### 3.   The 2007 Writedowns of MSRs And RIs Do Not Support An Inference Of Fraud.

Plaintiffs' assertion that the writedown of MSR and RI valuations in 2007 supports an inference that their values were overstated in prior years due allegedly to increased origination of risky loans suffers from the same problem as their valuation

---

[21] *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 759 (N.D. Cal. 1997) ("Having . . . based their allegations on defendants' SEC filings . . . plaintiffs can hardly complain when defendants refer to the same information in their defense").

[22] Plaintiffs' only response to Countrywide's disclosure concerning "model validation policies," "ongoing performance monitoring," and "back testing of actual results to model predictions," Ex. 3 at F-22 (2006 10K), is to protest that "Countrywide does not explain the nature of the so-called back-testing." Opp. at 43.  Again, this misses the point.  It is *Plaintiffs'* burden to allege facts establishing a GAAP violation, and in the face of undisputed disclosures like this one, they have plainly failed to do so.

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1  arguments.  Opp. at 39-40, 46-47.  As with their valuation arguments, Plaintiffs focus

2  entirely on one variable – "loosened" underwriting practices – and ignore the

3  economic crisis that began in late 2007, which started "the onset of a long, destructive

4  economic downturn."  *Pittleman*, 2009 WL 648983, at *6.  Countrywide's opening

5  brief detailed these unprecedented events:  housing prices (and collateral values)

6  collapsed, the credit and capital markets seized up, and, as jobs were lost in the

7  declining economy, even normally reliable borrowers struggled to pay their

8  mortgages.  *See* CFC Br. at 3-4.[23]  This crisis had substantial adverse impacts on

9  Countrywide's financial results as well as the financial results of thousands of other

10  businesses in this country, yet Plaintiffs fail to address it.  To the extent that large

11  financial charges ever support an inference of earlier financial misstatements, when

12  those charges occur at a time – as here – of great economic upheaval, any such

13  inference ceases to be reasonable, particularly where the plaintiffs simply ignore the

14  effect of economic events on the timing and necessity of the charges that were taken.

15  Such "fraud by hindsight" allegations are insufficient to withstand a motion to

16  dismiss.  *See, e.g.*, *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1223-24 (S.D.

17  Cal. 2001); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).  In fact, in its

18  earlier order, this Court held that the 2007 writedown of MSRs, without more, "is not

19  enough on its own to state a claim."  Order at 61-62.[24]

20

21  [23] The Court may take judicial notice of these economic conditions.  *See D.E. & J Ltd.
    P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003) (taking judicial
22  notice of market trends and conditions); *In re Merrill Lynch & Co., Research Reports
    Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (taking judicial notice of
23  market bubble and later crash).

24  [24] Plaintiffs incorrectly argue that there was an "astounding" $1.1 billion writedown of
    MSRs "in the third quarter of 2007." Opp. at 46; SAC ¶ 363.  Plaintiffs appear to be
25  referring to *2007 overall*, for which Countrywide recorded a $1.09 billion reduction in
    MSR fair value due to changes in its valuation assumptions.  According to
26  Countrywide's Form 10-K, this was primarily caused by "decreasing mortgage rates
    during the last half of the year . . . . moderated by lower levels of housing turnover and
27  lesser refinance activity due to weakening housing market conditions, reduced
    secondary market liquidity and significant tightening of available credit."  Ex. 4 at 81
28  (2007 10K).  Plaintiffs do not address these factors, but simply presume fraud.  In
    addition, although Countrywide incurred a charge of $1.09 billion, MSR valuation

19

Plaintiffs also point to the $2.4 billion impairment of RIs in 2007, claiming it represented 90% of their total value. *See* Opp. at 39-40.  They say that unless there was fraud, "[a] 90% loss in one year is otherwise inexplicable." *Id*.  Plaintiffs try to rule out the economic crisis as a possible cause, arguing that "[r]eal estate values in the U.S. simply did not drop by 90% in 2007." *Id*.  As Plaintiffs know, however, prices need not drop by 90% for the riskiest tranches of securitizations (which is what Countrywide retained in its RIs, *see* Ex. 2 at 94 (2005 10K)) to absorb heavy losses. The Opposition itself notes that "even a slight decrease in collateral value would have a significant impact on the value of RIs." Opp. at 39.  In any event, Plaintiffs' alleged "90% loss in one year" is just not true.  Even according to the SAC, the total fair value of Countrywide's RIs at the end of 2006 was $3.04 billion, and at the end of 2007 it was still $2.45 billion.  SAC ¶ 335.[25]

In the end, Plaintiffs allege no facts to support an inference that these writedowns demonstrate a GAAP violation.  As with the loan loss and R&W reserves, absent any confidential witnesses or even a single document suggesting that Countrywide violated GAAP in accounting for its RIs and MSRs, a far more likely inference is that they were the result of the dramatic changes in economic conditions.

## II.   THE SECTION 12(A)(2) CLAIMS FAIL AGAINST COUNTRYWIDE AND CCV.

Plaintiffs' Section 12(a)(2) claims should be dismissed against Countrywide (Counts II, V and VIII) and CCV (Count VIII) because such defendants (i) did not

---

actually ***increased*** on a net basis in 2007 by $2.8 billion.  As the Court has previously noted, "MSRs are cumulative – older MSRs remain and new MSRs are added."  Order at 61 n.57.  For 2007, the starting fair value was $16.2 billion; there were $6.9 billion in MSR additions, a $1.09 billion reduction from valuation assumption changes, and a $3.0 billion reduction from realization of expected cash flows, resulting in a final fair value of $19.0 billion.  *See* Ex. 28 at F-52 (2007 10K).

[25] *See also* Ex. 4 at 81 (2007 10K).  Like MSRs, RIs are cumulative, and the 2007 impairment was partially offset by newly acquired RIs.  This is not to suggest that the $2.4 billion impairment was not significant; clearly it was.  Rather, it only underscores the fact that Plaintiffs are presenting a very narrow – and misleading – view of Countrywide's financial results.

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1  pass title to Countrywide securities to Plaintiffs (*i.e.*, they were not in privity with

2  Plaintiffs), and (ii) were not active solicitors motivated by personal financial gain.  *See*

3  *Pinter v. Dahl*, 486 U.S. 622 (1988); CFC Br. at 24-25.  Plaintiffs do not allege that

4  Countrywide and CCV passed title to Plaintiffs, *see* SAC ¶¶ 1120, 1160, 1201

5  (alleging shares purchased directly from underwriters), and the SAC's allegation that

6  Countrywide and CSC "solicited purchasers" (*see* Opp. at 133) is not an allegation of

7  fact but simply a conclusory assertion of the sort that courts routinely reject at the

8  pleading stage.  *See, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir.

9  2003); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996); *In re Infonet*

10  *Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003); *Fouad v. Isilon*

11  *Systems, Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at * 7 (W.D. Wash. Dec. 29,

12  2008).  Plaintiffs also argue that Countrywide sold the 7% Capital Securities at issue

13  in Count VIII "to raise money to buy back millions of dollars of its own stock." Opp.

14  at 133.  The purpose for which an issuer effects an offering, however, has nothing to

15  do with whether it qualifies as a "seller" for Section 12(a)(2) purposes, and Plaintiffs

16  do not cite a single case suggesting otherwise.[26]

17      Plaintiffs argue that the Supreme Court's limitation of Section 12(a)(2) liability

18  in *Pinter* should be rejected here because two of the registration statements at issue (in

19  Counts V and VIII) state that the registrant would be a seller for purposes of the

20  Securities Act regardless of the form of the underwriting transaction.  Opp. at 132-33.

21  The inclusion of this language, however, was required by an amendment to Item 512

---

23  [26] Plaintiffs argue (Opp. at 9 n.7) that the Court should not consider Defendants'
   Section 12(a)(2) argument for dismissal of the SAC because it supposedly was not

24  raised with regard to the CAC.  This is incorrect – the Countrywide Defendants
   incorporated by reference these very same arguments as articulated in the motion to

25  dismiss the CAC filed by the Underwriter Defendants.  *See* Countrywide Defendants'
   Notice of Motion to Dismiss at 1 (Dkt. No. 212).  In any event, an amended complaint

26  "supersedes" its predecessor, *Lawrence v. City of San Bernardino*, No. CV04-00336
   FMC, 2005 WL 5950105, at *4 (C.D. Cal. July 27, 2005), and "a party does not waive

27  a ground for moving to dismiss for failure to state a claim by not including that
   ground in an earlier motion to dismiss."  *In re Harmonic, Inc., Sec. Litig.*, NO. C 00-

28  2287 PJH, 2006 WL 3591148, at *12 (N.D. Cal. Dec. 11, 2006).

COUNTRYWIDE DEFS' REPLY MEMO ISO MOTION TO DISMISS            LEAD CASE NO. 07-CV-05295 MRP(MANx)
SECOND CONSOLIDATED AMENDED COMPLAINT

1  of Regulation S-K, which took effect on December 1, 2005.  *See* Securities Offering

2  Reform, Exchange Act Release No. 8591, 2005 WL 1692642 at 136-137 (Aug. 3,

3  2005); 17 C.F.R. § 229.512.  The amendment to Item 512 resulted from the SEC's

4  adoption, on the same day, of SEC Rule 159A, which provides that an issuer will be

5  treated as a seller in firm commitment underwritings, in which an issuer sells all of the

6  securities in an offering to one or more underwriters who in turn sell to investors.  *See*

7  17 C.F.R. § 230.159A.  Rule 159 ostensibly seeks to invalidate the Supreme Court's

8  holding in *Pinter* that Section 12 imposes liability only on those in privity with, or

9  who directly solicited, the purchaser.  *See, e.g., Pinter*, 486 U.S. at 641-42, 647;

10 *accord In re Infonet Servs. Corp.*, 310 F. Supp. 2d at 1100.  The SEC, however,

11 cannot through rulemaking expand liability beyond that created by Congress in the

12 underlying statute.  Indeed, in rejecting the SEC's attempt to interpret SEC Rule 10b-5

13 in a manner inconsistent with Section 10(b) of the Securities Exchange Act of 1934,

14 the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976), held

15 that "[t]he rulemaking power granted to an administrative agency charged with the

16 administration of a federal statute is not the power to make law."  The Supreme Court

17 in *Pinter* already has articulated the limits of the liability Congress created in Section

18 12 of the Securities Act of 1933.  Because the ostensible abrogation of *Pinter* in SEC

19 Rule 159A is invalid, the language in the registration statements Plaintiffs mention

20 likewise cannot affect the Supreme Court's interpretation of Section 12(a)(2).[27]

## CONCLUSION

22 For the foregoing reasons and those set forth in the Countrywide Defendants'

23 opening brief, the Court should dismiss all of the financial-accounting related

24 allegations in the SAC.

---

28 [27] Moreover, SEC Rule 159A does not apply to the registration statement at issue in Count II, which took effect in 2004.  Ex. 31.

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California  90067

COUNTRYWIDE DEFS' REPLY MEMO ISO MOTION TO DISMISS   LEAD CASE No. 07-CV-05295 MRP(MANx)
SECOND CONSOLIDATED AMENDED COMPLAINT

1    Dated:  March 26, 2009                GOODWIN PROCTER LLP

2                                          By: /s/ Brian E. Pastuszenski

3                                             Brian E. Pastuszenski (*Pro Hac Vice*)
                                              Lloyd Winawer
                                              Inez Friedman-Boyce (*Pro Hac Vice*)
4                                          *Attorneys for the Countrywide Defendants*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Goodwin Procter LLP**
**10250 Constellation Blvd., 21ˢᵗ Floor**
**Los Angeles, California 90067**

23

**APPENDIX A**

**Countrywide Financial Corporation**
**Quarterly Delinquency Rates**
**February 28, 1999 - December 31, 2007**



**Notes and Sources:**
Data are as reported and obtained from Countrywide's SEC Forms 10-Q and 10-K. Revised figures for 2/29/00 and 2/28/01 were obtained from the 2002 10K filed March 28, 2003.

**Countrywide Financial Corporation**
**Quarterly Foreclosure Rates**
**February 28, 1999 - December 31, 2007**



**Notes and Sources:**
Data are as reported and obtained from Countrywide's SEC Forms 10-Q and 10-K. Revised figures for 2/29/00 and 2/28/01 were obtained from the 2002 10K filed March 28, 2003.

**Countrywide Financial Corporation**
**Annual and Quarterly Delinquency and Foreclosure Rates**
**February 28, 1999 to December 31, 2007**

| Reporting Period Ending | Rates | | Source: | |
| | Delinquency | Foreclosure | SEC Form | Page Number(s) |
| (1) | (2) | (3) | (4) | (5) |
| 2/28/99 | 3.55 % | 0.31 % | 10K | 11 |
| 5/31/99 | 3.00 | 0.27 | 10Q | 21 |
| 8/31/99 | 3.36 | 0.28 | 10Q | 24 |
| 11/30/99 | 3.97 | 0.33 | 10Q | 27 |
| 2/29/00 | 4.01 | 0.58 | 10K | 13,14 |
| 5/31/00 | 4.12 | 0.35 | 10Q | 25 |
| 8/31/00 | 4.11 | 0.42 | 10Q | 33, 34 |
| 11/30/00 | 4.58 | 0.43 | 10Q | 35, 36 |
| 2/28/01 | 4.90 | 0.64 | 10K | 13,14 |
| 5/31/01 | 4.39 | 0.45 | 10Q | 16 |
| 8/31/01 | 4.44 | 0.48 | 10Q | 22 |
| 11/30/01 | 4.92 | 0.56 | 10Q | 20 |
| 3/31/02 | 4.43 | 0.66 | 10Q | 22 |
| 6/30/02 | 4.63 | 0.54 | 10Q | 29 |
| 9/30/02 | 4.64 | 0.54 | 10Q | 31, 32 |
| 12/31/02 | 4.62 | 0.55 | 10K | 14 |
| 3/31/03 | 3.77 | 0.53 | 10Q | 27 |
| 6/30/03 | 3.79 | 0.47 | 10Q | 37 |
| 9/30/03 | 3.81 | 0.45 | 10Q | 60 |
| 12/31/03 | 3.91 | 0.43 | 10K | 7 |
| 3/31/04 | 3.20 | 0.42 | 10Q | 48 |
| 6/30/04 | 3.48 | 0.37 | 10Q | 66 |
| 9/30/04 | 3.73 | 0.35 | 10Q | 63 |
| 12/31/04 | 3.83 | 0.42 | 10K | 7,8 |
| 3/31/05 | 3.31 | 0.43 | 10Q | 52, 53 |
| 6/30/05 | 3.51 | 0.39 | 10Q | 68 |
| 9/30/05 | 4.03 | 0.42 | 10Q | 77 |
| 12/31/05 | 4.61 | 0.44 | 10K | 8 |
| 3/31/06 | 3.68 | 0.47 | 10Q | 63 |
| 6/30/06 | 3.92 | 0.47 | 10Q | 84 |
| 9/30/06 | 4.50 | 0.52 | 10Q | 87 |
| 12/31/06 | 5.02 | 0.65 | 10K | 9 |
| 3/31/07 | 4.29 | 0.69 | 10Q | 62 |
| 6/30/07 | 4.98 | 0.74 | 10Q | 92 |
| 9/30/07 | 5.87 | 0.92 | 10Q | 107 |
| 12/31/07 | 6.96 | 1.04 | 10K | 10 |

**Notes and Sources:**
    Revised figures for 2/29/00 and 2/28/01 were obtained from the 2002 10K filed March 28, 2003.