## I.  Qualifications and Assignment

1.      My qualifications are contained in my previous Report in this matter dated June

22, 2009 ("Kleidon Report").

2.      I have been asked by counsel for KPMG to review and comment on the Affidavit

in this matter by Gregg A. Jarrell dated June 22, 2009 ("Jarrell Affidavit" or "Jarrell").

Additional materials I have relied on in this current Rebuttal Report, beyond those listed in

Exhibit 2 of the Kleidon Report, comprise:

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997, pp. 13–39;

- Mitchell, Mark, and Jeffry Netter, "The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, February 1994, pp. 545–590;

- Ball, Ray, and Philip Brown, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, Vol. 6, No. 2, Autumn 1968, pp. 159–78;

- 6.75% Preferred Securities Prospectus Supplement;

- 222372AE4 Liquid Yield Option Note Prospectus Supplement; and

- Documents cited in the Second Consolidated Amended Class Action Complaint dated January 6, 2009 ("Complaint") and referenced herein.

## II.    Summary of Opinions

3.    After reviewing the Jarrell Affidavit and accompanying exhibits, I provide below a brief summary of my findings in this matter.  The bases for each finding are detailed in the sections that follow.

- The opinions contained in my initial Report in this matter are unchanged given my review of the Jarrell Affidavit.  Jarrell's Affidavit in no way addresses the evidence against market efficiency documented in the Kleidon Report.

- Jarrell's application of the event study methodology in an attempt to demonstrate a cause-and-effect relationship between information and price changes in Countrywide securities is flawed and inconsistent with relevant academic literature, and therefore provides no evidence concerning market efficiency.

  - Rather than starting with information and then looking to whether there is security price reaction, Jarrell starts with days on which there is a large security price change and then looks to see if he can identify information released at that time.  Jarrell's analysis cannot establish that, when there is information, there will always be a rapid and accurate reflection of that information in the price as is required to support a finding of market efficiency throughout the putative class period.

  - Jarrell's analysis of earnings announcements does not systematically apply the necessary step of predicting the price change based on the earnings surprise, which renders his analysis devoid of content.  Jarrell's analysis does not provide any evidence concerning market efficiency, because no matter what result he finds, he explains it away by assumption.

- Jarrell's application of the event study methodology to Countrywide common stock does not support his conclusion of market efficiency.  Jarrell opines and concludes that "generally" the market for Countrywide stock impounded new information released on earnings announcement days, but Jarrell does not conclude that it always impounded information, as is required for a finding of market efficiency throughout the putative class period.

- Jarrell's application of the event study methodology to Countrywide debt securities does not support his conclusion of market efficiency.

  - Jarrell's presumption of market efficiency for Countrywide debt securities is unsubstantiated.  An analysis of the markets for Countrywide debt securities does not support his presumption of market efficiency.

Page 5

- Jarrell's analysis of market efficiency for Countrywide debt securities is incomplete. Jarrell analyzes only a subset of Countrywide debt securities. Jarrell's earnings surprise test does not support his presumption of market efficiency for Countrywide debt securities. Extending Jarrell's analysis to alleged corrective disclosures does not support his presumption of market efficiency for Countrywide debt securities.

- Jarrell's attempt to infer market efficiency of Countrywide debt securities based on the presumed efficiency of his "representative bond" is flawed and does not support his presumption of market efficiency for Countrywide debt securities. Price changes in Countrywide debt securities were frequently inconsistent with those of his "representative bond" during the putative class period.

## III.   Analysis of the Jarrell Affidavit

4.      The Jarrell Affidavit concludes that Countrywide common stock, preferred securities, exchange-traded call and put options on Countrywide common stock, and certain bonds traded in efficient markets (Jarrell Affidavit, ¶3). My analysis of the Jarrell Affidavit proceeds as follows. Section A affirms the opinions contained in my initial Report in this matter, which are unchanged given my review of the Jarrell Affidavit. Section B describes the flaws in Jarrell's event study methodology. Section C establishes that Jarrell's application of his event study methodology to Countrywide common stock does not support his conclusion of market efficiency for Countrywide common stock. Section D establishes that Jarrell's application of his event study methodology to Countrywide debt securities does not support his conclusion of market efficiency for Countrywide debt securities. Section E establishes that Jarrell's "representative bond" is not representative of other Countrywide debt securities, and his attempt to infer market efficiency of Countrywide debt securities based on his "representative bond" does not support his presumption of market efficiency for Countrywide debt securities.

Page 6

A.    *Jarrell's Analysis Does Not Address the Issues Raised in My Initial Report*

5.      The opinions contained in my initial Report in this matter are unchanged given my review of the Jarrell Affidavit.  In particular, the analysis in the Jarrell Affidavit does not establish that the markets for the relevant Countrywide securities in this matter were efficient throughout the putative class period.

6.      As just one example, the Kleidon Report (¶68) demonstrates that, for Countrywide debt securities with sufficient data to run the test, percent changes in prices (i.e., returns) are predictable based on past changes in Countrywide common stock prices (i.e., past stock returns).  This finding of predictability based on stale information is simply inconsistent with Countrywide debt securities trading in efficient markets which rapidly incorporate all information.  Jarrell's Affidavit in no way addresses the evidence against market efficiency documented in the Kleidon Report.

B.    *Jarrell's Application of the Event Study Methodology Is Flawed and Inconsistent with Relevant Academic Literature and, Therefore, Provides No Evidence Concerning Market Efficiency*

7.      The importance of market efficiency in the current context is that, if the price always fully reflects public information, then individual investors cannot expect to gain from individually reviewing the public information, that is, they can reasonably rely on the security price.  Thus, the essence of the issue is whether public information is rapidly and accurately incorporated in the security price—an issue which *starts* with public information, and then moves to a security price reaction.

Page 7

8.      However, the primary event study analysis undertaken by Jarrell does not follow this logic.  Rather than starting with information and then looking to whether there is security price reaction, Jarrell starts with days on which there is a large security price change[1] and then looks to see if he can identify information released at that time.  This analysis cannot achieve what is necessary in this context, namely whether it is reasonable for an investor to always rely on the price rather than examine the underlying information individually.  The most that Jarrell's analysis could establish is that on some days, when there is a big price change, there is information—but it cannot establish that, when there is information, there will always be a rapid and accurate reflection of that information in the price.  For example, Jarrell's study of large price changes does not attempt to examine whether information that should cause a price change did cause a change, and as rapidly as would be expected in an efficient market.[2]

9.      The logic that, in order to establish evidence of market efficiency, an event study must start with information and then look to associated price changes is consistent with the academic literature on event studies.  For example:

---

[1] Jarrell conducts four event studies (Jarrell Affidavit, Appendices A–D), one each for Countrywide common stock, the two preferred securities (6.75% Preferred Securities and 7% Capital Securities), and his "representative bond" (CUSIP 22237LNR9, which I refer to as the "Series L Note").  Jarrell examines 47 statistically significant days for Countrywide common stock (Jarrell Affidavit, ¶46); 45 statistically significant days for the 7% Capital Securities (Jarrell Affidavit, ¶72); 34 statistically significant days for the 6.75% Preferred Securities (Jarrell Affidavit, ¶72); and 10 statistically significant days for the Series L Note (Jarrell Affidavit, ¶122).

[2] Jarrell's event study methodology suffers from several other flaws.  For example, for his event study for Countrywide common stock, Jarrell excludes from his industry control 15 companies representing 47% of the index that "were tainted by allegations of mortgage-related fraud" (Jarrell Affidavit, ¶21).  In my opinion, this exclusion is inappropriate in this matter, and causes Jarrell to reach inaccurate conclusions regarding the size of residual price declines, which Jarrell (Jarrell Affidavit, ¶13) states are "attributed to the new company-specific information…."  Removal of nearly 50% of the index reduces Jarrell's ability to distinguish between industry-wide effects and Countrywide-specific effects and may result in erroneous conclusions.  Further, Jarrell uses standard errors from his common stock regression and applies those to his event studies for the preferred securities (Jarrell Affidavit, fn. 69) "to be conservative…on the assumption that the standard error of the preferred's cannot logically exceed that for the common stock."  This explanation for his assumed standard error for the preferred securities is unreasonable and unsubstantiated.

> The execution of an event study is quite simple. It involves the identification of an event that causes investors to change their expectations about the value of a firm.[3]

> The initial task of conducting an event study is to define the event of interest and identify the period over which the security prices of the firms involved in this event will be examined - the event window. For example, if one is looking at the information content of an earnings [announcement] with daily data, the event will be the earnings announcement and the event window will include the one day of the announcement.[4]

10.     Jarrell himself recognizes that this is the standard way of proceeding, that is, starting with a value-relevant day followed by analysis of the return on that day. Jarrell (¶13) states:

> When significant new information about the company (*e.g.*, corrective disclosures, earnings reports, dividend changes, stock splits, regulatory rulings, acquisition bids, asset sales, or tax legislation) is disclosed to the market, the market model is used to determine the component of the stock return that would be expected based on the return of the overall market and industry.

11.     Jarrell does attempt one exercise that is more consistent with an appropriate application of the event study methodology to examine market efficiency, but it is so flawed that it amounts to no evidence on the subject. He examines the returns of Countrywide common stock on 16 quarterly earnings announcement dates during the putative class period (Jarrell Affidavit, ¶¶48–9). Jarrell calls this a test of "reaction to earnings surprises" (Jarrell Affidavit, ¶48 and Exhibit 5).

---

[3] Mark Mitchell and Jeffry Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, February 1994, pp. 545–590 at 557.
[4] MacKinlay, A. Craig "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997, pp. 13–39 at 14.

12.     Such an investigation could, in principle, shed light on whether Countrywide security prices reacted as expected in an efficient market.  For example, there is an academic literature that examines "earnings surprises," which are defined as, for example, earnings announcements that differ from the market's expectations, and then looks to see whether there is a rapid price change consistent with the earnings surprise (for example, a price increase if the surprise is positive).[5]  However, this exercise requires a preliminary investigation as to whether the earnings announcement contains a surprise, and if so, in what direction.

13.     Jarrell's analysis of earnings announcements does not systematically apply this necessary step of predicting the price change based on the earnings surprise, which renders his analysis devoid of content.  In particular, Jarrell's analysis does not provide any evidence concerning market efficiency, because no matter what result he finds, he explains it away by assumption.  There are numerous examples in Jarrell's Exhibit 5 (where he reports the results of his "earnings surprise" test) where the direction of the price change is inconsistent with the direction of the "surprise," and Jarrell makes no attempt to explain such inconsistencies except by assumption.  One assumption he makes is that other information simultaneously announced is sufficient to explain the inconsistent price change.  Jarrell (¶49) states: "Because announcements of quarterly financial performance will also contain material information not captured in the earnings numbers, financial economists do not expect a one-to-one mapping of earnings surprises and stock price responses."  Thus, if Jarrell finds no price change, he presumes there

---

[5] Jarrell himself cites one such academic article:  "See the seminal article by R. Ball and P. Brown, 'An empirical evaluation of accounting income numbers,' Journal of Accounting Research, 6 (1968), pp. 159-77" (Jarrell Affidavit, fn. 43).

Page 10

was either no information or if there was, say, a negative earnings surprise, he assumes it was offset by some other positive news; if there is a significant price rise, he presumes there was a positive earnings surprise or some other positive information, and vice versa. But without any systematic analysis of whether those presumptions are correct—and Jarrell undertakes no such analysis—there is no content to his earnings surprise "test" regarding efficiency, because no matter what he finds he assumes it is consistent with efficiency. If by assumption there is no possible way to fail a test, there is no test.

14.     Thus, Jarrell's application of the event study methodology in an attempt to demonstrate a cause-and-effect relationship between information and price changes is flawed and inconsistent with relevant academic literature, and provides no evidence concerning market efficiency.

C.      *Jarrell's Application of the Event Study Methodology to Countrywide Common Stock Does Not Support His Conclusion of Market Efficiency*

15.     Jarrell applies his primary event study analysis, as discussed above, to Countrywide common stock "to detect the presence of a cause-and-effect relationship between relevant news events and resulting movements in the price of Countrywide's common stock" (Jarrell Affidavit, ¶43). This analysis suffers from the flaw described above, namely, rather than starting with information and then looking to whether there is a stock price reaction, Jarrell starts with 47 days on which there is a statistically significant change in Countrywide common stock price and then looks to see if he can identify information released on those days. The results of this analysis cannot discern whether there is always a rapid and accurate reflection of new

information in the stock price, thus, it is of no value for the purpose of establishing market efficiency of Countrywide common stock.

16.     Jarrell also applies his "reaction to earnings surprises" test to Countrywide common stock.  As described above, this analysis does not provide any evidence concerning market efficiency, because no matter what result he finds, he explains it away by assumption.

17.     Given these flaws in his analysis, Jarrell can state only a very weak conclusion— one that does not provide evidence that Countrywide common stock traded in an efficient market throughout the putative class period.  Namely, Jarrell opines and concludes that "generally" the market for Countrywide common stock impounded new information released on earnings announcement days, but Jarrell does not conclude that it *always* impounded information, as is required for a finding that the market was efficient throughout the putative class period.  Jarrell states (Jarrell Affidavit, ¶49, emphasis added, internal citation omitted):

> In this case, I examined 16 separate quarterly earnings announcements made by Countrywide during the Class Period (*see* Exhibit 5).  Six of those earnings announcements resulted in stock price reactions that were statistically significant and moved as expected with the news contained in each earnings announcement (*i.e.*, earnings, guidance, stock buyback and/or financings). On the other ten dates when the Company announced earnings, the stock prices *generally* moved as expected in reaction to the news (*see* Exhibit 5).  Consistent with an informationally efficient market, this analysis shows a positive correlation between new earnings information and one-day stock price responses.

18.     An efficient market is not one that "generally" impounds information rapidly, but rather one that *always* impounds information rapidly (Kleidon Report, ¶32).  Thus, on its face, Jarrell's conclusion, that Countrywide stock price "generally" reacted as expected to news

released in earnings announcements, is not consistent with the existence of an efficient market

for Countrywide stock throughout the putative class period.

D.   *Jarrell's Application of the Event Study Methodology to Countrywide Debt Securities Does Not Support His Conclusion of Market Efficiency*

   1)   Jarrell's Presumption of Market Efficiency for Countrywide Debt Securities Is Unsubstantiated

19.   Jarrell begins his analysis of market efficiency for Countrywide debt securities

with a "presumption" of market efficiency.  He states (Jarrell Affidavit, ¶97, emphasis added):

> Given the strong evidence supporting market efficiency for the trading markets in Countrywide's equity and option securities, as an economist, I **begin with a presumption** that the market for Countrywide's bonds also is informationally efficient.  This presumption is based on the fact that it is generally more difficult for investors to efficiently price equity securities for a company than its debt securities.

20.   Thus, his "presumption" of market efficiency for Countrywide debt securities is

based on his assertion of "strong evidence supporting market efficiency" of Countrywide

common stock.  As discussed in the previous section, Jarrell's analysis of a cause-and-effect

relationship with regard to Countrywide common stock is flawed.  To the extent that his finding

of market efficiency of Countrywide common stock depends on his cause-and-effect analysis, his

conclusion of market efficiency of Countrywide common stock throughout the putative class

period is unsubstantiated.  Further, a finding of market efficiency for common stock does not

imply market efficiency for debt securities, because, among other reasons, there are structural

differences in the markets for common stock and debt securities.  As discussed in the Kleidon

Report, an analysis of the markets for Countrywide debt securities does not support a finding of market efficiency.

2)      Jarrell's Analysis of Market Efficiency for Countrywide Debt Securities Is Incomplete

21.      Jarrell's opinions related to market efficiency are specific to only a subset of the securities at issue in this matter and are qualified such that they do not support the conclusion that the markets for even his subset of securities were efficient throughout the putative class. This is discussed in detail in Section (a) below.

22.      As discussed above, the scientific approach to conducting an event study begins by specifying a set of value-relevant information followed by an examination of the price reaction of securities to that information.  Jarrell admits that this is the standard approach and also performs a test of earnings surprises for Countrywide common stock.  However, Jarrell does not apply the test of earnings surprises to Countrywide debt securities.  Moreover, Jarrell (¶13) lists "corrective disclosures" as an example of significant new information about a company, the impact of which could be examined using an event study.  However, Jarrell does not examine the price reaction of Countrywide securities on the alleged corrective disclosures mentioned in the Complaint.  Jarrell's cause-and-effect analysis can be extended by examining the price reaction of Countrywide debt securities on the earnings announcement days identified by Jarrell as well as on the alleged corrective disclosure days.  The results of these analyses fail to support Jarrell's presumption of market efficiency for Countrywide debt securities, as discussed in Sections (b) and (c) below.

Page 14

### a)    Jarrell Analyzes Only a Subset of Countrywide Debt Securities

23.    Not only does Jarrell begin his analysis of market efficiency of Countrywide debt securities with a "presumption" of market efficiency, he assumes his conclusions and then sets out to examine a limited set of evidence in an attempt to "confirm" his assumption (Jarrell Affidavit, ¶123).[6]

24.    Jarrell identifies a total of 197 Countrywide debt securities[7] (Jarrell Affidavit, Exhibit 12 and fn. 3), but he analyzes selected indicators of market efficiency only for "certain bonds for which [he has] sufficient data" (Jarrell Affidavit, ¶3). Specifically, he examines the market efficiency of only 26 Countrywide debt securities, including two preferred debt securities, one "representative bond" or the Series L Note (Jarrell Affidavit, ¶106), and 23 additional debt securities for which he has trading data (Jarrell Affidavit, ¶131). Jarrell (¶3) concludes that the preferred debt securities and certain Countrywide bonds "for which [he has] sufficient data" traded in efficient markets with regard to publicly disclosed information.

---

[6] Moreover, Jarrell (¶97) states: "This presumption is based on the fact that it is generally more difficult for investors to efficiently price equity securities for a company than its debt securities." However, this argument simply does not apply to the current Countrywide debt securities for several reasons. First, Jarrell does not explain what he means by "generally." While it is true that default-free, government bonds do not require an analysis of a company's cash flows, it is not true of corporate bonds which could possibly default. In fact, analytically, a corporate bond is equivalent to a default-free bond less the value of a put on the firm's assets, while equity is equivalent to a call on the firm's assets, and there is no reason to expect the valuation of a put to be "less difficult" than the valuation of a call on the same assets. More fundamentally, the question of whether a bond is priced efficiently depends on whether there are arbitrageurs who monitor the price of the bond and trade if it is not efficiently priced, but for many of the bonds at issue in this case there was very little trading interest, let alone any incentive for an arbitrageur to actively monitor the pricing. Indeed, the direct evidence that Countrywide debt securities returns were predictable based on past equity returns (as discussed in the Kleidon Report and in ¶6 above) indicates that no such presumption of efficiency for debt securities is warranted.

[7] This includes the 195 securities identified in Exhibit 12 to the Jarrell Affidavit and two preferred securities analyzed by Jarrell (Jarrell Affidavit, fn. 3)—the 6.75% Preferred Securities and the 7% Capital Securities. As discussed in the Kleidon Report (¶38), the 7% Capital Securities are non-convertible, straight-debt securities. The 6.75% Preferred Securities are also non-convertible, straight-debt securities (6.75% Preferred Securities Prospectus Supplement, pp. S-2 through S-6).

25.     Thus, as demonstrated in Exhibit 1, Jarrell opines that the markets for only 13 Countrywide debt securities were efficient, representing only 6.6% out of the 197 Countrywide debt securities that he considers.  As discussed below, Jarrell's opinions with respect to market efficiency of the 13 Countrywide debt securities are limited such that they do not support a finding that the markets for even this subset of securities were efficient throughout the putative class period.

26.     As a preliminary matter, the 197 debt securities considered by Jarrell include certain securities for which I understand that plaintiffs only recently asserted were at issue in this case, including the "representative bond" analyzed by Jarrell to investigate the market efficiency of Countrywide debt securities.  Exhibit 4 to the Kleidon Report identifies the 176 Countrywide debt securities analyzed in that Report, which I understand have been previously identified by plaintiffs as the securities at issue in this case.  Of the 197 securities identified by Jarrell, 39 were not analyzed in my prior Report.  Should the Court permit these additional securities to be included in this matter, I reserve the right to supplement my analysis.

27.     Exhibit 2 lists the Countrywide debt securities analyzed in the Kleidon Report and the additional debt securities considered by Jarrell (including preferred securities).  For the securities listed in Exhibit 2, the column titled "Jarrell Analyzes for Market Efficiency" indicates whether Jarrell analyzes market efficiency of a particular debt security and, if he does, whether he asserts support for market efficiency for that security.  Out of a total of 215 debt securities listed in Exhibit 2, Jarrell opines on market efficiency for only 26 securities.

28.     Having "presumed" the market efficiency of Countrywide debt securities, Jarrell then sets out to examine the market efficiency of 26 Countrywide debt securities and concludes that 13 of those traded in efficient markets (Jarrell Affidavit, ¶¶73, 123, 132).  However, Jarrell's opinion on market efficiency of ten of the 13 debt securities (i.e., excluding the two preferred securities and the Series L Note) is qualified.  For example, Jarrell finds that, "for the most part," ten of the debt securities "tended to move" in a "reasonably similar" manner to the eleventh, or the Series L Note, on the days on which the Series L Note experienced its ten largest returns during the putative class period.  Jarrell states (Jarrell Affidavit, ¶134, emphasis added):

> Exhibit 16 shows the returns for all ten bonds and the representative bond for the ten days for which the representative bond had the largest returns over the Class Period.  *For the most part*, the ten bonds *tended to move* in the same direction and in a *reasonably similar* amount to that of the representative bond for each of the ten days.  Although the bonds have many differences in coupon rates, maturities, asset protection, and seniority, many economic factors will still cause the bonds of a given company to move in rough tandem, and the data in this case for these 11 bonds (including the representative bond) are consistent with all 11 being traded in informationally efficient markets.

29.     Thus, on its face, the Jarrell Affidavit concludes that, "for the most part," Countrywide debt securities "tended to move" in the same direction and in a "reasonably similar" amount to that of the Series L Note, *but not always*.  Jarrell's finding that these debt securities "tended to move" together "for the most part," *but not always*, contradicts his presumption of market efficiency of those debt securities.  Moreover, this finding provides direct evidence that these debt securities did not trade in efficient markets throughout the putative class period given his assertion that the Series L Note was in fact representative and given his

Page 17

112

conclusion that Series L Note traded in an efficient market.  Either the Series L Note is representative as Jarrell claims and the markets for the remaining ten debt securities were not efficient, or the Series L Note is not representative and the ten debt securities cannot be presumed to have traded in efficient markets on the basis of their co-movement alone with the Series L Note.

30.     In either case, Jarrell has not provided evidence that the set of 13 Countrywide debt securities traded in efficient markets throughout the putative class period.  As noted in Section III.C above, an efficient market is not one that "for the most part" "tends to" impound information rapidly,[8] but rather one that *always* impounds information rapidly.

31.     For the remaining 13 out 26 debt securities that Jarrell examines,  Jarrell (¶135) states that he cannot conclude that the markets for those were efficient throughout the putative class period:

> With respect to the remaining 13 bonds for which I analyzed TRACE data, the TRACE data alone was not sufficient to confirm the presumption of market efficiency.

32.     As demonstrated in Exhibit 1, Jarrell opines that the markets for only 13 Countrywide debt securities were efficient, that is, only 6.6% out of the 197 Countrywide debt securities that he considers.  Thus, while Jarrell's analysis attempts to establish market efficiency for some of Countrywide debt securities—namely, the two preferred securities and those for

---

[8] I note that Jarrell does not explicitly state that his test of the co-movement of the ten debt securities with the Series L Note is a test of whether or not the prices of the ten debt securities impounded information quickly.  However, given his assertions that the Series L Note is representative of this set of debt securities and that the Series L Note impounded information rapidly (Jarrell Affidavit, ¶¶122, 123), if the markets for the ten debt securities were efficient, then the set of 11 debt securities must move together on days associated with value-relevant news.

which he has "sufficient data"—his analysis ignores whether or not a substantial number of other debt securities at issue in this matter traded in efficient markets.  Moreover, even for the 13 debt securities he opines on, he *does not* establish market efficiency, as discussed below.

33.     In sum, Jarrell's opinions related to market efficiency are specific to only a subset of the securities at issue in this matter and are limited such that they do not demonstrate or establish that the markets for even this subset of securities were efficient throughout the putative class period.

### b)     Jarrell's Earnings Surprise Test Does Not Support His Presumption of Market Efficiency for Countrywide Debt Securities

34.     As noted above, while Jarrell at least attempts a more appropriate analysis for a cause-and-effect relationship for Countrywide common stock, namely the earnings surprise test, he simply fails to extend the same analysis to Countrywide debt securities.  Jarrell's only apparent explanation for this inconsistency is that value-relevant days for debt securities may not be the same as those for common stock.  For example, Jarrell (¶71) states:

> Moreover, just because news materially impacts Countrywide's common stock does not necessarily mean that it will also have a statistically significant impact on the preferred securities.

35.     To the extent that the news contained in earnings releases reveals information about the average value of a firm's assets, that information is expected to be value-relevant for not only common stock, but also corporate debt securities with some possibility of default.  Thus, Jarrell's test of earnings surprises can be extended to Countrywide debt securities.

Page 19

**114**

36.     The results of such a test for Countrywide debt securities do not support a finding of market efficiency.  Jarrell performs event studies for three Countrywide debt securities—the 6.75% Preferred Securities, the 7% Capital Securities, and the Series L Note.  Exhibit 3 shows the results of Jarrell's event studies for these three debt securities on the set of earnings announcement days considered by Jarrell.[9]  Jarrell's own event studies show that the residual returns of these three debt securities were not statistically significant on most of the 16 earnings announcement days.  In fact, all three debt securities experienced statistically significant price movements on only two out of the 16 earnings announcement days—that is, on October 26, 2007 and on January 29, 2008 (Exhibit 3).

37.     Jarrell's methodology of examining securities price changes on earnings announcement days can also be extended to the 26 Countrywide debt securities he analyzes, but for which he fails to conduct an earnings announcement test.  Exhibit 4 shows the results of this analysis.  Since Jarrell does not provide event studies for the other debt securities, the analysis in Exhibit 4 examines their raw returns (i.e., percent price changes) on earnings announcement days.  Exhibit 4 shows that many of the 26 Countrywide debt securities did not trade on earnings announcement days.  On average, approximately 30.6% of the debt securities did not trade on earnings announcement days.  Moreover, Exhibit 4 shows that when some securities did trade on earnings announcement days and had one-day returns, the prices of those debt securities often moved in opposite directions.

---

[9] Notwithstanding the flaws in Jarrell's event study methodology discussed above, for my analysis in this Rebuttal Report, I take the results of Jarrell's event studies as given.

38.     Jarrell's methodology of examining securities price changes on earnings announcement days can be further extended to a broader set of Countrywide securities.[10] Exhibit 5 shows that, on average, approximately 78.2% of the debt securities examined did not trade on earnings announcement days.  Moreover, Exhibit 5 shows that when some securities did trade on earnings announcement days and had one-day returns available, the prices of those debt securities often moved in opposite directions.  For example, on April 26, 2007, when Countrywide reported its 1Q2007 results and according to Jarrell, "EPS of 72 cents missed analyst estimates of 77 cents" (Jarrell Affidavit, Exhibit 5), of the 15 securities that traded and had one-day returns, six increased in price, seven decreased in price, and two did not observe a change in price.  On only one out of the 16 earnings announcement days did all securities move in the same direction.

39.     Thus, Jarrell's own earnings surprise test fails to support his presumption of market efficiency for Countrywide debt securities.  Countrywide debt securities often did not trade on earnings announcement days, or when they did trade, their prices often moved in opposite directions.

> **c)     Extending Jarrell's Analysis to Alleged Corrective Disclosures Does Not Support His Presumption of Market Efficiency for Countrywide Debt Securities**

40.     As discussed above, Jarrell himself states (Jarrell Affidavit, ¶13) that one set of "significant new information" about a company comprises the days on which plaintiffs allege

---

[10] This analysis includes 176 Countrywide debt securities included in Kleidon Report Exhibit 4 and the additional 11 debt securities analyzed by Jarrell, including the 6.75% Preferred Securities.

that material, adverse information is disclosed to the market, that is, alleged corrective disclosure days. In this matter, plaintiffs allege that the alleged truth was disclosed to the market between July 24, 2007 and March 10, 2008, causing plaintiffs to suffer substantial losses that "were dramatically larger, to a statistically significant degree, than any losses Class members would have sustained due to ordinary market forces" (Complaint, ¶953). Taking as given plaintiffs' allegations that alleged corrective disclosures did reveal value-relevant information, the following paragraphs examine the price reaction of Countrywide debt securities on the corrective disclosure days alleged by plaintiffs during the period July 24, 2007 to March 10, 2008.

41.     My analysis first examines the residual returns provided by Jarrell for three Countrywide debt securities on the alleged disclosure days. Exhibit 6 shows that in many cases, inconsistent with plaintiffs' allegations, the three debt securities did not experience statistically significant residual returns. For example, on July 24, 2007, when Countrywide filed a Form 8-K and issued a press release announcing its financial results for 2Q2007 (Complaint, ¶954), none of the three debt securities experienced a statistically significant residual return. Similarly, on October 30, 2007, when, according to the Complaint (¶¶1020, 1021), *The Wall Street Journal* published an article stating that "some analysts warn[ed] that [Countrywide]…[hadn't] gone far enough in marking down the value of mortgage securities it holds," none of these three securities had significant residuals.

42.     Moreover, Exhibit 6 also demonstrates that the three Countrywide securities traded in opposite directions on many alleged corrective disclosure days. For example, on August 16, 2007, according to the Complaint (¶991), Countrywide announced its decision to

Page 22

**117**

draw down its entire credit facility to supplement its cash position and three rating agencies—Standard and Poor's, Moody's, and Fitch—announced downgrades of Countrywide securities. On this date, the 6.75% Preferred Securities and the Series L Note experienced statistically significant price changes. However, the 6.75% Preferred Securities experienced a significant price *increase* and the Series L Note experienced a significant price *decrease*. Similarly, on October 24, 2007, the 6.75% Preferred Securities experienced a significant price *increase* and the 7% Capital Securities and the Series L Note experienced significant price *decreases*.

43.     Exhibit 7 shows the results of a similar analysis for the 26 debt securities analyzed by Jarrell. Since Jarrell does not provide event studies for all 26 debt securities, the analysis in Exhibit 7 examines their raw returns. Exhibit 7 shows that, on average, approximately 38.1% of the outstanding debt securities did not trade on alleged corrective disclosure days. Moreover, Exhibit 7 shows that when some securities did trade on alleged corrective disclosure days and had one-day returns, the prices of those debt securities often moved in opposite directions. For example, on August 24, 2007, when, according to the Complaint (¶1001), Fitch announced a downgrade of Countrywide Home Loans, Inc.'s servicer ratings and placed it on "Ratings Watch Evolving" status. Of the 12 securities that traded and had one-day returns on this date, five increased in price and seven decreased in price.

44.     My analysis also examines price changes on alleged corrective disclosures of a broader set of Countrywide debt securities.[11] Exhibit 8 shows that, on average, approximately 80.2% of the debt securities examined did not trade on alleged corrective disclosure days.

---

[11] This analysis includes 176 Countrywide debt securities included in Kleidon Report Exhibit 4 and the additional 11 debt securities analyzed by Jarrell, including the 6.75% Preferred Securities.

Moreover, Exhibit 8 shows that when some securities did trade on earnings announcement days and had one-day returns available, the prices of those debt securities often moved in opposite directions.

45.     Thus, the results found by extending Jarrell's cause-and-effect analysis to alleged corrective disclosures do not support his presumption of market efficiency for Countrywide debt securities. Countrywide debt securities often did not trade on alleged corrective disclosure days, or when they did trade, their prices often moved in opposite directions.

46.     Overall, Jarrell's analysis of a cause-and-effect relationship between value-relevant information and price changes in Countrywide debt securities does not demonstrate that the markets for Countrywide debt were efficient throughout the putative class period.

E.     *Jarrell's Attempt to Infer Market Efficiency of Countrywide Debt Securities Based on the Presumed Efficiency of His "Representative Bond" Is Flawed and Does Not Support His Presumption of Market Efficiency for Countrywide Debt Securities*

47.     As noted above, Jarrell opines that 13 Countrywide debt securities traded in efficient markets. Jarrell's conclusion with respect to the efficiency of ten of these debt securities is based, in part, on his finding that, "for the most part," these debt securities "tended to move" in a "reasonably similar" manner to the "representative" Series L Note (Jarrell Affidavit, ¶134).

48.     The logic underlying Jarrell's analysis appears to be as follows. Suppose one selects a representative security for a set of securities. Further, if the representative security trades in an efficient market, then one would expect the set of securities to move in tandem with the representative security if the set of securities traded in efficient markets. Jarrell applies this

Page 24

119

logic to his analysis of market efficiency of Countrywide debt securities.  He chooses the Series L Note as "representative," concludes that the Series L Note traded in an efficient market, and then asserts that other debt securities traded in efficient markets, in part, because they "tended to move" together with the Series L Note (Jarrell Affidavit, ¶134).

49.     If one finds evidence that the set of securities does not move in tandem with the representative security, then the logical conclusion would be that either the set of securities does not trade in efficient markets, or alternatively, the representative security is in fact not "representative," in which case there would be no reason to expect them to move together.  An analysis of the co-movement of Countrywide debt securities with the Series L Note shows that price changes in Countrywide debt securities were frequently inconsistent with those of the Series L Note during the putative class period.  Thus, it must be that either the set of Countrywide debt securities did not trade in efficient markets, or alternatively, the Series L Note is in fact not "representative," in which case one simply cannot infer from the trading behavior of the Series L Note that all other debt securities traded in efficient markets.

1)     Jarrell's Own Analysis Indicates that Countrywide Debt Securities Moved in Opposite Directions to His "Representative Bond"

50.     Jarrell examines the price behavior of ten Countrywide debt securities on the ten largest statistically significant days for the Series L Note (Jarrell Affidavit, Exhibit 16) and concludes (Jarrell Affidavit, ¶134) that, "for the most part," the ten securities "tended to move" together with the Series L Note.  Thus, Jarrell concedes that Countrywide debt securities "tended to move" in tandem with the "representative" Series L Note "for the most part," but not always.

Page 25

I examine the consistency of price reaction of a set of Countrywide debt securities (comprising 176 debt securities included in Kleidon Report Exhibit 4 and the additional 10 debt securities analyzed by Jarrell) with that of Jarrell's Series L Note and find that they frequently did not move in tandem with the Series L Note.  The following sections discuss the results of this analysis for a) the set of earnings announcement days identified by Jarrell; b) plaintiffs' alleged corrective disclosure days; c) days on which, according to Jarrell, the Series L Note had statistically significant price changes; and d) all days in the putative class period.

> **a)   Price Changes in Countrywide Debt Securities Were Frequently Inconsistent with Those of His "Representative Bond" on Earnings Announcement Days**

51.      Exhibit 9 shows that Countrywide debt securities often moved in opposite directions with respect to the Series L Note on the 16 earnings announcement days identified by Jarrell.  Among the 1,046 eligible paired trading days, there exist 212 paired trades of Countrywide debt securities (20.3%).[12]  Among the 212 paired trades of Countrywide debt securities, there exist 151 paired consecutive trades allowing the calculation of 151 paired one-day returns (71.2%).  Of the 151 paired returns, 34.4% of the pairs trade in an opposite direction to the Series L Note, a fact that demonstrates that the prices of other debt securities do not move consistently in tandem with those of the Series L Note on earnings announcement days.

---

[12] Eligible paired trading days are days on which two Countrywide debt securities both experienced an eligible trading day.  Paired trading days with trades are days on which two Countrywide debt securities traded.  Paired returns are the one-day returns for a pair of Countrywide debt securities.

      **b)**     **Price Changes in Countrywide Debt Securities Were Frequently Inconsistent with Those of His "Representative Bond" on Alleged Corrective Disclosure Days**

52.     Exhibit 10 shows the results of this analysis for the alleged corrective disclosure days. Among the 3,851 eligible paired trading days, there exist 740 paired trades of Countrywide debt securities (19.2%). Among the 740 paired trades of Countrywide debt securities, there exist 484 paired returns (65.4%). Of the 484 paired returns, 45.5% of the pairs trade in an opposite direction to the Series L Note, a fact that demonstrates that the prices of other debt securities do not move consistently in tandem with those of the Series L Note on alleged corrective disclosure days.

      **c)**     **Price Changes in Countrywide Debt Securities Were Frequently Inconsistent with Those of His "Representative Bond" on Days on Which Price Changes in His "Representative Bond" Were Statistically Significant**

53.     This section examines co-movement of Countrywide debt securities with the Series L Note on days on which, according to Jarrell, the Series L Note experienced a statistically significant price movement. Exhibit 11 shows the results of this analysis. Among the 15,671 eligible paired trading days, there exist 2,863 paired trades of Countrywide debt securities (18.3%). Among the 2,863 paired trades of Countrywide debt securities, there exist 1,975 paired returns (69.0%). Of the 1,975 paired returns, 41.0% of the pairs trade in an opposite direction to the Series L Note, a fact that demonstrates that the prices of other debt securities do not move consistently in tandem with those of the Series L Note, even on days on

which the Series L Note experienced a statistically significant price movement, according to Jarrell.

### d) Price Changes in Countrywide Debt Securities Were Frequently Inconsistent with Those of His "Representative Bond" During the Putative Class Period

54.     Exhibit 12 shows the results of this analysis for all eligible trading days during the putative class period.  Of the 9,362 paired consecutive trades, 44.7% of the pairs trade in an opposite direction to the Series L Note.  Thus, these results demonstrate that the prices of all other debt securities do not move consistently in tandem with those of the Series L Note throughout the putative class period.

55.     As discussed above, even assuming that the Series L Note is representative and taking as given Jarrell's conclusion that it traded in an efficient market, the other Countrywide debt securities frequently traded in opposite directions.  This is contrary to what would be expected in an efficient market.  Alternatively, the Series L Note is not representative in which case Jarrell does not have a basis to assert market efficiency of other debt securities based on a finding of market efficiency of the Series L Note.

### 2) Jarrell's Own Analysis Shows That His "Representative Bond" Is Not Representative of Other Debt Securities

56.     Jarrell (¶132) asserts that the indicators of market efficiency for the ten other debt securities were "sufficiently similar" to those of the Series L Note.  In fact, Jarrell's assertion is incorrect.  For example, as Jarrell's Exhibit 15 shows, while the Series L Note was the most actively traded bond—with trading on 99% of days during the putative class period—other debt

Page 28

123

securities that Jarrell deems similar to this bond did not trade as frequently.  For example,

Jarrell's Exhibit 15 shows that 22238HAC4 and 22238HAW0 traded on less than 25% of trading

days.  Moreover, while the Series L Note had 203 institutional holders, 22238HAC4,

22238HAW0, and 22238HBD1 had fewer than 60 institutional holders each during the putative

class period.  Thus, the Series L Note selected by Jarrell does not appear to "represent" the set of

ten debt securities he compares it to, much less the remaining 13 debt securities that Jarrell

considers but for which he does not have sufficient data, and even less for the remaining 171

debt securities listed in his Exhibit 12 that Jarrell does not even analyze.


Executed on this _29th_ day of _June_ in 2009 in _Menlo Park, CA_ .

Allan W. Kleidon

Page 29

124

1



**Exhibit 1**
**Countrywide Financial Corp.**
**Countrywide Debt Securities Considered by Jarrell**
Source: Jarrell Affidavit

**197 Debt Securities Considered by Jarrell[1]**

171 Securities (86.8%)

26 Securities (13.2%)

**26 Debt Securities Analyzed by Jarrell for Market Efficiency[2]**

13 Securities (50.0%)

3 Securities (11.5%)

10 Securities (38.5%)

**Finds Data Insufficient to Support Presumption of Market Efficiency (¶135)**

**Ostensibly Finds Support For Market Efficiency (¶¶73, 108)[4]**

**Ostensibly Finds Support For Market Efficiency Based In Part On Price Co-Movement With Series L Note (¶¶108, 134)[3]**

Note:
[1] Jarrell lists 195 Countrywide debt securities in Exhibit 12 to Jarrell Affidavit, and also considers the 7% Capital Securities and the 6.75% Preferred Securities (Appendices B and C to Jarrell Affidavit).
[2] Jarrell analyzes the 7% Capital Securities, the 6.75% Preferred Securities, and 24 other Countrywide debt securities for which he has TRACE data (Jarrell Affidavit, ¶¶63, 106-7, 131).
[3] Jarrell deems the Series L Note (CUSIP 22237LNR9) to be the "representative bond" (Jarrell Affidavit, ¶106).
[4] Jarrell ostensibly finds support for market efficiency for the 7% Capital Securities, the 6.75% Preferred Securities, and the Series L Note (CUSIP 22237LNR9).

126

2

**Exhibit 2**

**Countrywide Financial Corp.**

**Summary of Jarrell's Market Efficiency Analysis for Countrywide Debt Securities**

Source: Jarrell Affidavit, Kleidon Report, Bloomberg; 2223372/E4 Liquid Yield Option Note Prospectus Supplement

| CUSIP | Issue[1] | Issuance Date[2] | Maturity Date[3] | Principal Amount[4] | Security At Issue[5] | Jarrell Analyzes for Market Efficiency[6] | Jarrell Has FINRA TRACE Data[7] | Weekly Trading Volume[8] | Analyst Coverage[9] | Market Makers[10] | Form S-3 Eligibility[11] | Cause and Effect Analysis[12] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 222388209 | 7% Capital Securities | 11/8/06 | 11/1/36 | $1,495,000,000 | ✓ | Jarrell Finds Support | N/A | ✓ | ✓ | ✓ | ✓ | Event Study |
| 22238E206 | 6.75% Preferred Securities | | | | | | | | | | | |
| 22237LN89 | Series L Note | 4/11/03 | 4/1/33 | $1,000,000,000 | ✓ | Jarrell Finds Support | ✓ | ✓ | ✓ | ✓ | ✓ | Event Study |
| 22237Z4J3 | 6.25% Subordinated Notes | 5/21/03 | 5/21/08 | $1,000,000,000 | ✓ | Jarrell Finds Support | ✓ | ✓ | ✓ | ✓ | ✓ | Price Co-Movement |
| | | 5/16/06 | 5/15/16 | $1,000,000,000 | | | | | | | | |
| 22238HAA8 | Series A | 3/21/05 | 3/21/06 | $575,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAB6 | Series A | 4/11/05 | 4/11/07 | $545,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAC4 | Series A | 5/5/05 | 5/5/08 | $500,000,000 | ✓ | X | X | X | ✓ | X | ✓ | Price Co-Movement |
| 22238HAD2 | Series A | 5/11/05 | 5/11/15 | $991,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAE0 | Series A | 5/11/05 | 5/11/25 | $1,284,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAF7 | Series A | 5/27/05 | 5/27/20 | $20,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAG5 | Series A | 6/13/05 | 6/15/10 | $500,000,000 | ✓ | Jarrell Finds Support | X | X | ✓ | X | ✓ | Price Co-Movement |
| 22238HAH3 | Series A | 6/24/05 | 6/24/15 | $19,185,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAK6 | Series A | 7/28/05 | 7/28/15 | $8,362,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAM2 | Series A | 8/25/05 | 8/25/20 | $5,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAN0 | Series A | 8/26/05 | 8/26/20 | $10,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAP5 | Series A | 9/13/05 | 9/13/05 | $1,000,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAQ3 | Series A | 11/3/05 | 11/3/06 | $1,000,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAR1 | Series A | 11/14/05 | 11/14/35 | $546,748,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAS9 | Series A | 11/22/05 | 11/22/30 | $30,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAT7 | Series A | 12/2/05 | 12/5/08 | $840,000,000 | ✓ | Jarrell Finds Support | X | X | ✓ | X | ✓ | Price Co-Movement |
| 22238HAV0 | Series A | 12/19/05 | 12/19/08 | $500,000,000 | ✓ | Data Insufficient Per Jarrell | X | X | ✓ | X | ✓ | X |
| 22238HAU4 | Series A | 12/15/05 | 12/14/35 | $500,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAW8 | Series A | 12/19/05 | 12/21/35 | $40,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAX6 | Series A | 12/19/05 | 12/19/07 | $500,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HAY4 | Series A | 1/24/06 | 1/24/31 | $12,230,000 | ✓ | Data Insufficient Per Jarrell | X | X | ✓ | X | ✓ | X |
| 22238HAZ1 | Series A | 1/27/06 | 1/27/21 | $10,140,000 | ✓ | Data Insufficient Per Jarrell | X | X | ✓ | X | ✓ | X |
| 22238HA23 | Series A | 2/8/06 | 2/8/06 | $53,026,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22237U4F9 | Series B | 6/1/06 | 6/1/09 | $CONQ975,000,000 | ✓ | Jarrell Finds Support | X | X | ✓ | X | ✓ | Price Co-Movement |
| 22238HBA7 | Series B | 2/27/06 | 2/27/08 | $500,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBB5 | Series B | 3/16/06 | 3/16/26 | $50,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBC3 | Series B | 3/23/06 | 3/23/21 | $4,425,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBD1 | Series B | 3/24/06 | 3/24/09 | $800,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBE9 | Series B | 4/6/05 | 4/6/21 | $998,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBF6 | Series B | 4/13/06 | 4/13/21 | $4,643,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBG4 | Series B | 4/26/06 | 4/15/09 | $1,946,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBH2 | Series B | 4/26/06 | 4/15/11 | $1,456,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBJ8 | Series B | 4/26/06 | 4/26/21 | $4,548,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBK5 | Series B | 4/26/06 | 4/26/26 | $118,205,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBL3 | Series B | 5/5/06 | 5/15/09 | $284,000,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBM1 | Series B | 5/9/06 | 5/15/09 | $731,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBN9 | Series B | 5/19/06 | 5/15/07 | $6,830,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBP4 | Series B | 5/19/06 | 5/15/09 | $565,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBQ2 | Series B | 5/26/06 | 5/15/07 | $2,042,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBR0 | Series B | 5/26/06 | 5/15/09 | $1,855,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBS8 | Series B | 6/2/06 | 5/15/07 | $1,769,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBT6 | Series B | 6/2/06 | 5/15/09 | $515,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBU3 | Series B | 6/9/06 | 6/15/07 | $2,173,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBV1 | Series B | 6/9/06 | 6/15/09 | $384,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBW9 | Series B | 6/16/06 | 6/15/07 | $1,759,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBX7 | Series B | 6/16/06 | 6/15/09 | $318,000 | ✓ | X | X | X | ✓ | X | ✓ | X |
| 22238HBY5 | Series B | 6/23/06 | 6/15/07 | $3,107,000 | ✓ | X | X | X | ✓ | X | ✓ | X |



## Exhibit 2 (Cont'd)
### Countrywide Financial Corp.
### Summary of Jarrell's Market Efficiency Analysis for Countrywide Debt Securities

Source: Jarrell Affidavit; Kimberton Report; Bloomberg; 2223724E4 Liquid Yield Option Note Prospectus Supplement

Exhibit 2 (Cont'd)

Countrywide Financial Corp.

Summary of Jarrell's Market Efficiency Analysis for Countrywide Debt Securities

Source: Jarrell Affidavit; Kleidon Report; Bloomberg; 2223724E4 Liquid Yield Option Note Prospectus Supplement



Page 315

**Exhibit 2 (Cont'd)**
**Countrywide Financial Corp.**
**Summary of Jarrell's Market Efficiency Analysis for Countrywide Debt Securities**

Source: Jarrell Affidavit; Kleidon Report; Bloomberg; 222372AE4 Liquid Yield Option Note Prospectus Supplement



| CUSIP | Issue[1] | Issuance Date[2] | Maturity Date[3] | Principal Amount[4] | Security At Issue[5] | Jarrell Analyzes for Market Efficiency[6] | Jarrell Has FINRA TRACE Data[7] | Weekly Trading Volume[8] | Analyst Coverage[9] | Market Makers[10] | Form S-3 Eligibility[11] | Cause and Effect Analysis[12] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22238HGL9 | Series B | 6/8/07 | 6/16/08 | $1,840,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGM6 | Series B | 6/8/07 | 6/15/10 | $644,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGN4 | Series B | 6/15/07 | 6/16/08 | $1,673,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGP9 | Series B | 6/15/07 | 6/15/10 | $301,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGR5 | Series B | 6/7/07 | 6/7/12 | $2,000,000 | ✓ | Jarrell Finds Support | ✓ | X | ✓ | X | ✓ | Price Co-Movement |
| 22238HGS3 | Series B | 6/22/07 | 6/16/08 | $3,538,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGT1 | Series B | 6/22/07 | 6/15/10 | $2,085,000 | ✓ | Data Insufficient Per Jarrell | ✓ | X | ✓ | X | ✓ | X |
| 22238HGU8 | Series B | 6/29/07 | 6/16/08 | $2,190,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGV6 | Series B | 6/29/07 | 6/15/10 | $1,690,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGW4 | Series B | 7/6/07 | 7/15/08 | $1,723,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGX2 | Series B | 7/6/07 | 7/15/10 | $1,377,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGY0 | Series B | 7/13/07 | 7/15/08 | $1,061,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HGZ7 | Series B | 7/13/07 | 7/15/10 | $212,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHA1 | Series B | 7/20/07 | 7/15/08 | $3,459,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHB9 | Series B | 7/20/07 | 7/15/10 | $2,911,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHC7 | Series B | 8/3/07 | 8/15/08 | $512,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHD5 | Series B | 8/3/07 | 8/16/10 | $290,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHE3 | Series B | 8/10/07 | 8/15/08 | $95,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHF0 | Series B | 8/10/07 | 8/16/10 | $140,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHG8 | Series B | 7/27/07 | 7/15/08 | $2,392,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 22238HHH6 | Series B | 7/27/07 | 7/15/10 | $2,272,000 | ✓ | X | ✓ | X | ✓ | X | ✓ | X |
| 222372AE4 [13] | LYON | 8/16/01 | 2/8/31 | $675,000,000 | ✓ | Data Insufficient Per Jarrell | ✓ | X | ✓ | X | X | X |
| 22237AX08 [13] | LYON | 9/17/04 | 2/8/31 | $31,177,000 | ✓ | Data Insufficient Per Jarrell | ✓ | X | ✓ | X | X | X |
| 22238HEL0 | Series B | 12/18/06 | 1/5/09 | $600,000,000 | ✓ | Jarrell Finds Support | ✓ | X | ✓ | X | ✓ | Price Co-Movement |
| 22237LHE5 | Series H | 4/13/09 | 4/15/09 | $600,000,000 | ✓ | Jarrell Finds Support | ✓ | X | ✓ | X | X | Price Co-Movement |
| 22237LMY5 | Series K | 7/22/02 | 7/15/09 | $750,000,000 | ✓ | Data Insufficient Per Jarrell | ✓ | X | ✓ | X | X | X |
| 22237LPA4 | Series L | 3/22/04 | 12/19/07 | $750,000,000 | ✓ | Jarrell Finds Support | ✓ | X | ✓ | X | ✓ | X |
| 22237LPA4 | Series L | 3/22/11 | 3/22/11 | $1,350,000,000 | ✓ | Jarrell Finds Support | ✓ | X | ✓ | X | ✓ | X |
| 22237LPM8 | Series M | 9/15/04 | 9/15/09 | $1,250,000,000 | ✓ | Jarrell Finds Support | ✓ | X | ✓ | X | ✓ | X |
| 22237LPN6 | Series M | 11/16/04 | 11/16/07 | $650,000,000 | ✓ | Data Insufficient Per Jarrell | ✓ | X | ✓ | X | ✓ | X |
| 222372AN4 | Series A | 7/16/07 | 4/15/37 | $2,000,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| X501192300765 [13] | Not Found | 5/24/04 | 11/24/08 | EUR 1,000,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| X502043822060 [13] | Not Found | 9/15/05 | 9/15/09 | $324,033,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| X501825G567 [13] | Not Found | 11/23/05 | 11/23/10 | EUR 500,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B0TRLX | Not Found | 12/16/05 | 12/16/10 | $325,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| X502438202060 [13] | Series 53 | 2/17/06 | 2/17/11 | GBP 300,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| X501825G567 [13] | Series 41 | 2/17/04 | 12/16/10 | GBP 275,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B0TRLX | Not Found | 12/16/05 | 12/16/10 | $250,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| CH0024762853 [13] | Not Found | 3/15/06 | 3/16/09 | CHF 200,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B9OKPX | Not Found | 7/7/05 | 7/7/08 | $175,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B9OO9N | Not Found | 7/7/05 | 7/7/08 | $150,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B9OO9R | Not Found | 9/7/04 | 9/7/07 | $150,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B9Y8YH | Not Found | 2/3/05 | 8/3/07 | $100,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B1D7KCV | Not Found | 12/27/07 | 12/27/07 | $75,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| 22237LFN7 | Series F | 4/24/98 | 4/24/13 | $50,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| B1D7H58 | Not Found | 4/7/05 | 4/7/09 | $40,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| 223237LN63 | Series K | 12/24/01 | 12/24/18 | $25,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| 22237LPH9 | Series M | 7/16/04 | 7/16/29 | $25,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| 22237LEF5 | Series M | 10/17/06 | 10/17/08 | $25,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| 22237AXA8 | Series A | 11/21/06 | 11/15/26 | $24,031,000 | ✓ | X | ✓ | X | ✓ | X | X | X |
| 22237LFG0 | Series F | 4/17/98 | 4/17/13 | $15,000,000 | ✓ | X | ✓ | X | ✓ | X | X | X |

## Exhibit 2 (Cont'd)
## Countrywide Financial Corp.
## Summary of Jarrell's Market Efficiency Analysis for Countrywide Debt Securities

Source: Jarrell Affidavit; Abiddon Report; Bloomberg; 223372444 Liquid Yield Option Note Prospectus Supplement

| CUSIP | Issue[1] | Issuance Date[10] | Maturity Date[1] | Principal Amount[2] | Security At Issue[3] | Jarrell Analyzes for Market Efficiency[4] | Jarrell Has FINRA TRACE Data[5] | Weekly Trading Volume[6] | Analyst Coverage[7] | Market Makers[8] | Form S-3 Eligibility[9] | Cause and Effect Analysis[10] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22237LFR8 | Series F | 4/17/09 | 4/16/10 | $15,000,000 | X | X | X | X | ✓ | X | ✓ | X |
| 22237LPJ5 | Series M | 7/23/04 | 7/23/29 | $15,000,000 | X | X | X | X | ✓ | X | ✓ | X |
| 22237LPF3 | Series M | 7/23/04 | 6/25/29 | $12,500,000 | X | X | X | X | ✓ | X | ✓ | X |
| 22237LNH1 | Series L | 5/16/03 | 5/16/23 | $10,000,000 | X | X | X | X | ✓ | X | ✓ | X |
| 22237LNJ7 | Series L | 5/16/03 | 5/16/13 | $10,000,000 | X | X | X | X | ✓ | X | ✓ | X |
| 22237LNE8 | Series K | 1/24/03 | 1/24/18 | $5,000,000 | X | X | X | X | ✓ | X | ✓ | X |
| 22237LNK4 | Series L | 5/16/03 | 5/16/18 | $5,000,000 | X | X | X | X | ✓ | X | ✓ | X |
| **Total** | | | | 176 | 26 | 24 | 13 | 215 | 3 | 215 | 13 |

*Jarrell's Analysis of Cammer Factors*

132