1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION** | Lead Case No. CV-07-05295-MRP (MANx)<br><br>**MEMORANDUM OF DECISION Resolving All Class Certification Issues and Related Objections** |

## INTRODUCTION

This is a putative securities class action involving Countrywide Financial Corporation ("Countrywide Financial") and some of its affiliated companies (collectively, "Countrywide").[1] Plaintiffs assert claims against Countrywide, individuals associated with Countrywide, Countrywide's auditor during the proposed class period, and underwriters of some Countrywide securities. Collectively, these individuals and entities are "Defendants."[2]

---

[1]      Bank of America acquired Countrywide Financial after the proposed class period. "Countrywide Financial," as used in this order, refers to the entity as constituted before the transaction. *See* Countrywide Fin. Corp., Form 10-Q (Aug. 11, 2008).

[2]      Many Defendants have retained separate counsel, either individually or together with similarly situated Defendants. Counsel refer to these Defendants (or

*(footnote continues . . .)*

One of several Countrywide-related matters before this Court, this case is the largest.[3] It consolidates several private actions involving publicly traded investments in Countrywide. These investments in Countrywide must be distinguished from the mortgage-backed securities ("MBS") that Countrywide produced. This suit does not seek recovery for MBS investors.

The proposed class period spans the nearly four years from March 12, 2004 through March 7, 2008.

After two rounds of motions to dismiss, some voluntarily dropped claims, and some stipulated dismissals, the case has been narrowed to claims against 43 defendants across 13 counts. The case implicates four broad categories of securities (common stock; put and call options on the common; "straight debt" securities; and hybrid debt-equity securities. The straight debt and hybrid categories comprise several distinct securities.

Plaintiffs move to certify a relatively undifferentiated class of Countrywide investors who "were damaged." Plaintiffs have met their burden to show that this

---

*(. . . footnote continued)*

groups of Defendants) with self-descriptive names, such as "Underwriter Defendants." These self-descriptive names are used when referring to arguments made only by specific Defendants.

[3]     Other Countrywide-related cases before this Court include: a derivative case, presently stayed in favor of proceedings in Delaware, *see In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008); a case involving a narrow set of privately traded Countrywide securities, *see Argent Classic Convertible Arbitrage Fund v. Countrywide Fin. Corp.*, 2008 U.S. Dist. LEXIS 103148 (C.D. Cal. Nov. 13, 2008), and a suit principally between Countrywide and a mortgage insurance company. *See United Guaranty Mortgage Indemn. Co. v. Countrywide Fin. Corp.*, --- F. Supp. 2d ----, 2009 WL 3199844, 2009 U.S. Dist. LEXIS 96283 (C.D. Cal. 2009). *See also Luther v. Countrywide Fin. Corp.*, 2009 WL 3271368, 2009 U.S. Dist. LEXIS 100138 (C.D. Cal. Oct. 9, 2009) (discussing the procedural history of a Countrywide suit related to mortgage-backed securities that has generated two cases in this Court).

1    case may be maintained as a class action, but not on behalf of the undifferentiated

2    class they seek to represent.[4] As explained below, the class certification motion is

3    GRANTED IN PART. This order certifies three subclasses. It declines to include

4    several debt securities and one hybrid security. This order also resolves some

5    evidentiary objections related to the class certification proceedings.

6    / / /

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    _____

[4]      By reason of this case's unique factual circumstances, the Court, after

23    careful consideration, respectfully parts way with authorities that have approved

24    relatively undifferentiated classes of securities purchasers. *See, e.g.*, *In re Enron*

      *Sec. Deriv. & ERISA Litig.*, 529 F. Supp. 2d 644, 650 n.4 (S.D. Tex. 2006)

25    (collecting and discussing cases that approve undifferentiated classes of securities

26    purchasers). *Accord Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir.

27    2005) (per curiam) ("[C]lass actions typically involve complex facts that are

      unlikely to be on all fours with existing precedent.").

28

-3-

# TABLE OF CONTENTS

I. PROCEDURAL HISTORY ............................................................................................ 5
   A. Consolidation, lead plaintiff, and lead counsel ................................................... 5
   B. Motions to dismiss ............................................................................................... 6
   C. Class certification-related events ......................................................................... 6

II. BACKGROUND ........................................................................................................... 9
   A. Summary of allegations ....................................................................................... 9
   B. Notable features of the case ............................................................................... 11
   C. Securities implicated .......................................................................................... 11

III. LEGAL DISCUSSION ............................................................................................. 15
   A. Rule 23 overview. .............................................................................................. 16
   B. Rule 23(a) prerequisites .................................................................................... 18
      1. Numerosity.................................................................................................... 18
      2. Commonality................................................................................................. 18
      3. Typicality ...................................................................................................... 21
         a. City Funds is typical of debt purchasers ............................................... 22
         b. State Fund is typical of common stock purchasers ................................ 28
         c. New York Funds' index and disclosure-period purchases are typical .......... 30
         d. The Capital Securities: Katzeff is not typical ....................................... 32
      4. Adequacy ...................................................................................................... 33
         a. Pay-to-play allegations .......................................................................... 33
         b. New York Funds' monitoring of counsel and Rule 23(g) ..................... 36
         c. The Capital Securities: Brahn is adequate ............................................ 38
   C. Rule 23(b)(3) requirements ............................................................................... 43
      1. Predominance................................................................................................ 43
         a. Fraud-on-the-market theory .................................................................. 44
            i. The theory ....................................................................................... 45
            ii. Market efficiency............................................................................ 47
            iii. The relevant type of efficiency ....................................................... 48
            iv. The Cammer factors ....................................................................... 52
            v. Debt considerations......................................................................... 57
         b. Procedure: establishing and rebutting the presumption ........................ 59
         c. Expert overview ..................................................................................... 60
         d. Common stock (and options on the common) ....................................... 63
         e. Capital Securities .................................................................................. 66
         f. Debt securities ....................................................................................... 67
         g. Section 11 reliance burden..................................................................... 71
         h. Class and disclosure periods .................................................................. 74
      2. Superiority (manageability) .......................................................................... 76

IV. CONCLUSION........................................................................................................... 78

# I.

## PROCEDURAL HISTORY

This section recounts the procedural history useful for understanding this order.

**A. Consolidation, lead plaintiff, and lead counsel**

In November 2007 and March 2008, this Court consolidated several cases involving publicly traded Countrywide securities into this case number. Docket Nos. 67, 178. The first consolidation order appointed a group of New York pension funds as the "lead plaintiff" under the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u-4(a)(2)(A). The lead plaintiff group consists of: (1) the New York State Common Retirement Fund and (2) the New York City Pension Funds (itself a group of related funds).[5]

For reasons that will become clear, some entities in the lead plaintiff group must be distinguished: "State Fund" and "City Funds" refer, respectively, to the different funds. "New York Funds" refers to both the State Fund and City Funds, collectively.

The lead plaintiff group was selected by applying the PSLRA. The PSLRA first presumes that the lead plaintiff will be that with "the largest financial interest in the relief sought by the class." *In re Cavanaugh*, 306 F.3d 726, 729 n.2, 730 (9th

---

[5]    "[T]here is one lead plaintiff under the [PSLRA]: an individual, an institution or a properly-constituted group." *In re Cendant Corp. Litig.*, 264 F.3d 201, 223 n.3 (3d Cir. 2001) (internal quotations and modifications omitted); *In re Cohen*, --- F.3d ----, 2009 WL 3681701, at *5 n.4, 2009 U.S. App. LEXIS 24330, at *16 n.4 (citing *Cendant*). The lead plaintiff in this case is a group constituted of these New York entities. These New York entities had relationships prior to litigation and are a self-constituted group, not one artificially created by the Court. *See Cohen*, --- F.3d ----, 2009 WL 3681701, 2009 U.S. App. LEXIS 24330; Order Consolidating Cases and Appointing Lead Plaintiff and Lead Counsel (Nov. 28, 2007), Docket No. 67 at 9 & n.1, 17-18.

1  Cir. 2002). After the other contending plaintiffs failed to rebut the PSLRA's

2  presumption, the Court approved New York Funds. It also approved New York

3  Funds' choice of lead counsel, Labaton Sucharow LLP, based on that firm's

4  experience in prior securities class actions.[6]

5       There are additional named plaintiffs in this consolidated case. Important for

6  this motion—because they are proposed class representatives for one type of

7  security—are named plaintiffs Shelley Katzeff and Barry Brahn. Both are

8  individual investors. Katzeff and Brahn are not affiliated, except that they are

9  represented by the same counsel, Kaplan Fox & Kilsheimer, LLP.

10       "Plaintiffs" refers to New York Funds, Katzeff, and Brahn, collectively.

11  **B. Motions to dismiss**

12       Plaintiffs filed their Consolidated Amended Complaint ("the CAC") in April

13  2008. On December 1, 2008, the Court ruled on motions to dismiss the CAC. The

14  CAC's basic theory was approved, though some aspects of the CAC were

15  dismissed. Leave to amend was granted in most respects. 588 F. Supp. 2d 1132

16  (hereinafter "CAC Order").

17       Plaintiffs filed their Second Consolidated Amended Complaint in February

18  2009. Most of this complaint survived dismissal; the remainder was dismissed with

19  prejudice. 2009 WL 943271, 2009 U.S. Dist. LEXIS 32951 (Apr. 6, 2009). The

20  Second Amended Complaint is the operative complaint ("the complaint" in text;

21  cited as "Compl.").

22  **C. Class certification-related events**

23       Class certification schedule. After the motions to dismiss were resolved, the

24  Court held a status conference at which Plaintiffs were pointedly asked which

25  securities remained at issue in this case. Plaintiffs unequivocally stated that only

26  _____

27  [6]    Order Consolidating Cases and Appointing Lead Plaintiff and Lead Counsel (Nov. 28, 2007), Docket No. 67 at 18.

28

1   six securities were at issue: the common stock, options on the common stock, and
2   four debt or debt-like securities. The four debt offerings were specifically
3   identified.

4          MR. GOLDSMITH:  Well, Your Honor, in terms of the offerings,
5          principally, there is the Series A medium-term notes, the Series B
6          medium-term notes, the 6.25 percent notes that are due in 2016, and
7          then the 7 percent capital security, which is actually a preferred stock.

8                 Those are the – the offerings that we allege in our complaint,
9          Judge, are those four, those four offerings.

10                And then, of course, Your Honor, we have the common stocks,
11         and we have options, the call options and put options, purchases of
12         calls and sales of puts.

13  (Transcr. of April 30, 2009 Proceedings at 26:17-27:01.) Defendants agreed that
14  only these six securities remained at issue. Defendants noted the "four remaining
15  debt or debt-like" securities advanced by Plaintiffs presented market efficiency
16  issues that would be the subject of class certification discovery and briefing. *Id.* at
17  27:10-16. No other securities were identified by Plaintiffs.

18         In reliance on Plaintiffs' representations, the Court filed class certification
19  and trial schedules. Docket Nos. 438 (May 1, 2009), 439 (May 4, 2009). The
20  schedules were expeditious, bearing in mind (1) that the first of the consolidated
21  cases had been filed nearly two years prior; (2) that Defendants had notice, at least
22  by the December 2008 CAC Order, that many claims in the CAC were actionable;
23  (3) that most Defendants had already prepared substantial document productions
24  for government investigations into factually related matters; (4) an understanding
25  that this litigation—and, hence, expert preparation for class certification—was
26  limited to a defined set of securities, an understanding which Plaintiffs later
27  undermined; and (5) that uncertainty and unresolved litigation do not serve the
28  interests of the parties or justice.

1       Later, during the course of discovery, Plaintiffs requested information from

2  Defendants regarding seventeen additional debt securities. Plaintiffs disclosed for

3  the first time that they intend to pursue their '34 Act Section 10(b) claims, set forth

4  in Count X, on the basis of these securities. The securities were not identified in

5  the Complaint and were therefore not addressed in the motions to dismiss. A

6  dispute arose over whether Count X encompasses these unidentified securities.

7  Count X sets forth allegations pertaining to "Countrywide common stock and/or

8  other Countrywide public securities, including but not limited to the securities

9  specifically alleged herein." Compl. ¶1222.[7] Defendants filed a motion for

10  judgment on the pleadings, arguing Plaintiffs' claims should be dismissed to the

11  extent they are based on any securities other than the six previously identified. The

12  Court resolves Defendants' motion concurrently with Plaintiffs' motion for class

13  certification, albeit in a separate order.

14       <u>Class certification papers and hearing.</u> Plaintiffs moved for class

15  certification. Countrywide Defendants filed a comprehensive opposition. The other

16  Defendants largely joined Countrywide Defendants' arguments. Some Defendants

17  made additional points or amplifications. KPMG—Countrywide's auditor during

18  the proposed class period—filed its own opposition, together with evidentiary

19  objections to Plaintiffs' proffered expert. A class certification hearing was held on

20  September 22, 2009.

21       In adjudicating the class certification motion, the Court has considered the

22  seventeen additional debt securities advanced by Plaintiffs in connection with their

23  '34 Act claims. These debt securities present a serious question about reliance. As

24

25    [7]    *See also* ¶¶ 1220 ("Countrywide common stock and other publicly traded

26  securities, including but not limited to public debt and preferred securities

27  specifically alleged herein"), 1223 ("Countrywide common stock and other

    publicly traded securities").

28

1  discussed in detail *infra*, Plaintiffs seek to employ the *Basic* presumption of
2  reliance by establishing the market for each security is efficient. Most of the
3  controversy over class certification, and the bulk of the expert's attention, is
4  focused on the predominance inquiry into these seventeen additional debt
5  securities. Put simply, the question is whether these newly added securities qualify
6  for the *Basic* presumption of reliance, or whether individualized issues of reliance
7  predominate and, thus, defeat certification.

8                                    **II.**

9                              **BACKGROUND**

10        This section briefly summarizes some allegations and facts that provide
11  necessary background.

12  **A. Summary of allegations**

13        This case's basic theory is discussed at length in the order on the first round
14  of motions to dismiss. CAC Order, 588 F. Supp. 2d at 1144-54, 1185-97, *as*
15  *corrected by* 2009 WL 943271, at *3, 2009 U.S. Dist. LEXIS 32951, at *14
16  (correcting some distinctions between management and the board that were
17  immaterial to the CAC Order's legal analysis and conclusions).

18        The central allegations are unchanged in the operative complaint. To briefly
19  summarize the allegations, assumed true and stated favorably to Plaintiffs:

20        During the class period, Countrywide's core operations involved originating
21  mortgages, purchasing mortgages from other originators, servicing mortgages,
22  investing in mortgages, and packaging mortgages into MBS for sale to investors.[8]

23  _____

24  [8]     MBS are generally structured as follows: One of several Countrywide-
25  affiliated vehicles conveys a pool of mortgages to a special-purpose vehicle (often
    a trust, statutory or otherwise). Debt securities that represent an interest in a
26  particular trust's mortgage pool are distributed to investors. The debt instruments
27  contain a right to income from the trust's underlying mortgages. CAC Order, 588
    F. Supp. 2d at 1151-52 (elaborating the structure).
28

Countrywide's value hinged on its ability to keep originating (or purchasing) mortgages, obtaining fees for servicing those mortgages, maintaining or earning value by holding interests in those mortgages, and selling MBS to investors. These operations could continue only if the mortgages performed reasonably as expected; mortgage performance, in turn, is closely related to underwriting quality. CAC Order, 588 F. Supp. 2d at 1151-53 (explaining "[h]ow Countrywide's core mortgage-related operations affect investment value").

In 2004, Countrywide began significantly lowering its underwriting standards for the mortgages it originated and purchased. By 2007, underwriting standards had deteriorated profoundly. Despite these changes, Countrywide held itself out as different from competitors that made loans deep into the "subprime" spectrum. For example, some Defendants repeatedly denied throughout the class period that Countrywide's underwriting standards had significantly changed; and Countrywide may have employed a peculiar definition of "subprime" that it did not disclose to the market until July 2007. *Id.* at 1145-50, 1153-54, 1174, 1192-96.

Of course, the alleged securities violations arise because Countrywide (and certain individual Defendants) denied the changes and otherwise materially misrepresented Countrywide's operations to Countrywide investors during the proposed class period. *Id.* at 1144 ("The federal securities laws do not create liability for poor judgment or failed operations . . . [n]or do the laws require public companies to disclose every change in operations.").

Eventually, the market learned the true state of Countrywide's operations. The alleged corrective disclosures occurred between July 2007 and March 2008. During those months, the value of investments in Countrywide—which had been inflated by misrepresentations about Countrywide's operations—dropped. Further, the disclosures coincided with (or contributed to or were caused by) significant market events. Though Countrywide was one of the biggest mortgage-related

companies, those events involved both Countrywide specifically and the mortgage industry more generally. *See generally* CAC Order at 1159-60.

**B. Notable features of the case**

For present purposes, the key observations are that (1) the changes at Countrywide occurred over the course of several years; and (2) the corrective disclosures occurred over nearly eight months.

In securities cases, the most important questions involve who knew what when—essentially, an inquiry into whether a representation was false when made. In this case, the timeline is crucial: by some point in the class period, statements that, in many cases, would not be actionable as a matter of law could give rise to liability. The CAC Order is detailed because—as it repeatedly emphasizes—it is the rare case indeed that can successfully plead so many actionable statements, by so many parties, over so long a time.[9] And it may be the rare case, after recent securities law developments, that can adequately plead scienter for so many Defendants.

Thus understood, this case's basic theory is not novel; though perhaps its scope is. This scope creates significant class certification issues. *Cf. In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 274 (S.D.N.Y. 2003) ("Although the litigation . . . is mammoth, the securities law claims are not unusual.").

**C. Securities implicated**

---

[9]     For example, Countrywide may have changed so greatly that even representations that its loans were "high quality" could have become actionable by some point in the class period. *See* CAC Order, 588 F. Supp. 2d at 1144, 1153-54 (giving illustrative examples of alleged misrepresentations "throughout the 4-year class period"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) (discussing the pre-PSLRA standard for actionable opinions and beliefs and citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) and *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1093 (1991)).

1    The number of securities on which Plaintiffs seek to recover contributes
2    importantly to the case's scope. This order avoids discussing the particular
3    securities in detail, except to the extent required by the legal analysis.

4    The categories of securities implicated are:

5    1.  common stock;

6    2.  options on the common (sellers of puts and buyers of calls);

7    3.  straight debt securities;

8    4.  and a particular kind of hybrid debt-equity security (a "trust-preferred
9        security").

10   Common stock & options on the common. The first and second categories—
11   common stock and options on the common (referenced collectively as "the
12   common," unless a distinction is necessary)—do not require detailed analysis. No
13   Defendant raises a serious or meritorious challenge to certification of some class
14   on the common. However, it is important to note that State Fund purchased only
15   Countrywide Financial's common stock; State Fund purchased no Countrywide
16   debt or hybrid securities. State Fund has demonstrated that it is an appropriate class
17   representative on the common. Accordingly, common stock (and options on the
18   common) require somewhat less discussion than the debt and the hybrid debt-
19   equity securities.[10]

20   Straight debt. The third category—straight debt—requires more extensive
21   analysis.[11] Plaintiffs seek to represent purchasers of a number of the debt

22

23

---

24   [11]    As explained in Section I.C. *supra*, there is a dispute over what debt
25   securities are included in this category because of the way in which the Section
     10(b) claims were pleaded. With respect to the Section 10(b) claims only, Plaintiffs
26   seek to include seventeen additional securities as the "public securities" referred to
27   in Count X, including Series H, K, L, and M instruments, and other bonds that
     Plaintiffs did not purchase.
28

-12-

1  securities.[12] City Funds purchased a variety of Countrywide debt securities, but not
2  all the particular securities for which City Funds seeks to represent a class.[13]

3      The straight debt offerings differed in size and timing; and the particular
4  debt instruments differ in their repayment terms. Further, many debt securities
5  were distributed in "shelf offerings" over the course of the long class period. The
6  shelf offerings resulted in securities that share a base registration statement but
7  entered the market at different times and, accordingly, incorporate slightly
8  different materials into their offering documents.[14]

9      Hybrid debt-equity securities. The fourth category—the hybrid debt-equity
10 securities, also known as the Capital Securities—requires more careful analysis.
11 The securities at issue are not ordinary "preferred shares," as sometimes suggested
12 by the parties.[15] They are more commonly referred to as "trust-preferred

13

14

15 [12]    For purposes of this order, "purchasers" may include those who "otherwise
16 acquired" the securities. This language comes from one of the statutes implicated
   in this case. 15 U.S.C. § 78c(a)(13). It also forms part of Plaintiffs' proposed class
17 definition.
   [13]    Compl. Ex. B.
18 [14]    See CAC Order, 588 F. Supp. 2d at 1164-67 (discussing shelf offerings at
19 length), as elaborated by 2009 WL 943271, at *4-7, 2009 U.S. Dist. LEXIS 32951,
   at *19-31 (addressing additional nuances); HAROLD S. BLOOMENTHAL & SAMUEL
20 WOLFF, 3C SECURITIES AND FEDERAL CORPORATE LAW §§ 16:3.65-70 (West Sept.
21 2009) (discussing the CAC Order and mentioning its subsequent elaboration of
22 some shelf offering-related issues).
   [15]    The experts in this case refer to these securities as "preferred" or "trust-
23 preferred" securities. The first three paragraphs of Brahn's original complaint
24 correctly outline the transaction's general structure. Brahn v. Countrywide Fin.
   Corp., CV-07-7259-MRP. With these exceptions, the parties have generally
25 avoided acknowledging the Capital Securities' features.
26     There is literature discussing unique aspects of some trust-preferred
27 securities. See, e.g., Jennifer Salutric, et al., "Emerging Issues Regarding Trust
   Preferred Securities," FEDERAL RESERVE BANK OF PHILADELPHIA, 13 SRC
28

                                                        (footnote continues . . .)

-13-

securities." This order refers to the particular securities at issue as the "Capital Securities," a name used in the securities' prospectuses and by the parties.

The Capital Securities were issued by an entity known as "Countrywide Capital V," a statutory trust that served only as a funding vehicle for Countrywide; it is a nonoperating entity. All other securities in this case were issued by Countrywide Financial.

Countrywide Capital V's "only assets [at the time the Capital Securities were issued] were junior subordinated deferrable interest debentures issued by Countrywide Financial Corporation."[16] Thus, the Capital Securities are an equity interest in a statutory trust, the sole assets of which are Countrywide Financial debt securities. Further notable features of the Capital Securities include a contractual right to distribution of interest payments from the trust's underlying Countrywide Financial debt (subject to some deferral provisions) and an "unconditional guarantee" by Countrywide Financial (though that guarantee appears highly subordinated). The guarantee is now backed by Bank of America.[17] Further, Bank of America has the right to call the Capital Securities for redemption—"at a redemption price equal to 100% of their principal amount plus accrued but unpaid interest thereon"—on or after November 1, 2011.[18]

---

*(. . . footnote continued)*

INSIGHTS 3 (2009), *available at* http://www.philadelphiafed.org/bank-resources/publications/src-insights/2009/first-quarter/Insights1_09.pdf.

[16] Countrywide Capital V, Prospectus Supp. (Rule 424(b)(5)), at S-1, S-10-11, 1-3 (Nov. 3, 2006) [hereinafter "Capital Securities Prospectus"].

[17] Countrywide Capital V, 3d Supp. Indenture (Form 8-A12B) (Nov. 6, 2008); *see also supra* n.1 (noting that Bank of America acquired Countrywide Financial); CAC Order at 1158 n.28 (noting that a guarantee by Bank of America does not eliminate fact questions regarding loss).

[18] Capital Securities Prospectus at S-1, S-7.

To summarize: the Capital Securities are equity, but they are equity in a trust that holds only the debt of another entity. Further, they are equity with certain contractual rights to payment. Payments are "unconditionally guaranteed" by another entity (now Bank of America). And the Capital Securities can be redeemed in the future. It should be self-evident that such a security has unique economic and legal features.[19]

Most relevant for class certification, the Capital Securities (1) are issued by a different entity than the other securities; and (2) their price and, hence, the economic interests of their purchasers foreseeably differ from the other securities in this case.

New York Funds did not purchase the Capital Securities. Perhaps recognizing that the features discussed above would pose substantial problems of standing, typicality, and adequacy, Plaintiffs propose individual Plaintiffs Katzeff and Brahn to represent Capital Securities purchasers.

### III.

### LEGAL DISCUSSION

A court exercises "broad discretion to certify a class" within Federal Rule of Civil Procedure 23's framework. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *as amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

An initial class certification requires "some degree of speculation" due to the "uncertain state of the record" before the record's development at summary judgment or trial. *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). Accordingly, the certification order may be altered or amended before final

---

[19]   *See, e.g., id.* at S-5-6, S-18 (discussing payment deferrals), S-36, 13-14 (discussing a guarantee); S-6-7, S-11-12 (discussing principal repayment); S-17 (discussing regulatory consequences); S-37-39 (discussing tax treatment).

judgment. Fed. R. Civ. P. 23(c)(1)(C).

**A. Rule 23 overview.**

The certification proponent "bears the burden of demonstrating" that all Rule 23 requirements are satisfied. *Zinser*, 253 F.3d at 1186.

Certification proceeds in two steps. First, the action must meet all four prerequisites of Rule 23(a). The prerequisites are (1) numerosity (that "the class is so numerous that joinder of all members is impracticable"); (2) commonality (that "there are questions of law or fact common to the class"); (3) typicality (that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy (that "the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a)(1)-(4).

Next, the action must fall into one of Rule 23(b)'s categories. Plaintiffs here seek certification under Rule 23(b)(3), which requires a court to "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These two Rule 23(b)(3) requirements are "predominance"[20] and "superiority."

Approving a party to represent (and, upon final judgment, bind) absent class members ought not be taken lightly. Nor should subjecting defendants to the enhanced potential liability that comes with a certified class. Indeed, "[t]he class action device was designed as an exception to the usual rule." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982).

Therefore, to protect due process, the Court is empowered to undertake an analysis as "rigorous" as necessary under the circumstances, such that the Court is

---

[20]    The predominance requirement is similar to the commonality prerequisite, only "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).

"satisfied" that a class action may be properly maintained. *Id.* at 161 (discussing the Rule 23(a) prerequisites); *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997) (explaining that Rule 23(b)'s requirements likewise demand a "close look"); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (per curiam) (observing that some kinds of cases "require[] deeper probing" at class certification); *Zinser*, 253 F.3d at 1186 (recognizing the same).[21]

Rule 23 does not permit undue inquiry into the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003). It follows that the complaint's substantive allegations—as opposed to conclusory assertions that the action meets Rule 23's requirements—are generally presumed true. *Blackie*, 524 F.2d at 897, 900-01 & n.17; *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 575-76 (N.D. Cal. 2009) ("[A]lthough the Court may not require preliminary proof of the claim, it 'need not blindly rely on conclusory allegations which parrot Rule 23 requirements.'") (quoting 2 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 7.26 (4th ed. 2005)).

Even so, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12 (1978) (quoting 15 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3911, p. 485 n. 45 (1976)). Thus, a court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509

---

[21]   A securities class is often composed of numerous individual plaintiffs, each of whom engaged in relatively small transactions involving only common stock. Such a case may require relatively little scrutiny, leading courts sometimes to suggest that securities classes will be certified as a matter of course. Not so—at least not in a modern securities case involving more than common stock purchasers.

1  (9th Cir. 1992) (quoting *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal.
2  1985) (Rymer, J.)). However, this refusal to avoid class certification issues that
3  overlap with the merits must be balanced against the possibility of effectively
4  converting class certification into a substitute for summary judgment analysis.

5       Therefore, the complaint's allegations are generally accepted as true, though
6  viewed in light of the evidence thus far adduced.

7  **B. Rule 23(a) prerequisites**

8       **1. Numerosity**

9       Rule 23(a)(1) requires only that the class be so numerous that joinder is
10 "impracticable." Common stock (and puts and calls on the common) numbered in
11 the millions and were frequently traded, with billions of trades during the proposed
12 class period.

13      The debt securities (and the Capital Securities) involved in this case had
14 relatively fewer buyers and sellers, but still readily satisfy numerosity. *WorldCom*,
15 219 F.R.D. at 280 (concluding that "billions of dollars of debt securities" in a large
16 and active issuer satisfied the numerosity requirement, but not identifying a
17 particular number of securities or their trading volume).

18      Defendants do not dispute numerosity.

19      The numerosity prerequisite is met.

20      **2. Commonality**

21      Commonality requires "questions of law or fact common to the class." Fed.
22 R. Civ. P. 23(a)(2). Commonality is not identity. Indeed, "shared legal issues with
23 divergent factual predicates is sufficient, as is a common core of salient facts [even
24 if that core is] coupled with disparate legal remedies within the class." *Hanlon v.
25 Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). This standard is somewhat
26 "permissive[]." *Id.*

27      Further, when seeking certification under Rule 23(b)(3), the commonality
28 requirement will generally be "subsumed under, or superseded by, the more

1   stringent Rule 23(b)(3)" predominance inquiry. *Amchem*, 521 U.S. at 609.

2   Accordingly, Defendants do not dispute that Rule 23(a)(2) is satisfied. However, a

3   brief discussion of the common issues will provide background for the remaining

4   class certification analysis.

5          The complaint asserts claims under the Securities Act of 1933 ("the '33

6   Act") and the Securities Exchange Act of 1934 ("the '34 Act"). These claims arise

7   under three different sections of each act: '33 Act §§ 11 (registration statement

8   liability), 12(a)(2) (prospectus liability), and 15 (control person liability); and '34

9   Act §§ 10(b) (fraud), 20(a) (insider trading), and 20A (control person liability).

10         '33 Act claims. Claims under § 11 of the '33 Act require proof of material

11  misrepresentations or omissions in securities registration statements. Those

12  registration statements—and, for example, the accounting statements they

13  incorporate by reference—are shared by many securities. 588 F. Supp. 2d at 1162,

14  1167. Likewise for the claims under § 12(a)(2) of the '33 Act, which will require

15  evaluation of statements in prospectuses. *Id.* at 1183. Some Defendants will

16  presumably assert, for example, that Plaintiffs should have exercised due diligence

17  in ascertaining the truth with respect to certain alleged misstatements and

18  omissions for part (or all) of the class period. Such defenses will generally turn on

19  the same core of facts. *See id.* at 1162. And the claims under § 15 of the '33 Act

20  ask whether particular Defendants are "control persons" liable for another's

21  primary violation of § 11 or § 12(a)(2), which hinges on the primary violation and

22  facts regarding the particular Defendants. All these issues are common to those

23  class members with '33 Act claims.

24         '34 Act claims. As for the '34 Act—specifically the implied private right of

25  action for securities fraud under § 10(b) and SEC Rule 10b-5—there are likewise

26  common courses of conduct and statements that will be in dispute. In fact, most of

27  the conduct and many of the statements relevant to the '33 Act claims are also

28  relevant to the '34 Act claims. *See* 588 F. Supp. 2d at 1185-97. The § 20A insider

1  trading claim—which now stands only against Individual Defendant Mozilo—
2  involves a course of conduct that must be proven by those class members that
3  traded "contemporaneously" with Mozilo. *Id.* at 1202. And the § 20(a) claim asks
4  whether certain Defendants qualify as "control persons" liable for another's
5  primary '34 Act violations. *Id.* at 1201. These issues, too, are common to those
6  class members with '34 Act claims.

7      <u>Distinctions among the claims.</u> The asserted '33 and '34 Act claims—though
8  they have slightly different legal standards (and burdens) and name different
9  Defendants—are best tried in a single class. *See In re Flag Telecom Holdings, Ltd.*
10  *Sec. Litig.*, 574 F.3d 29, 35-37 (2d Cir. 2009) (approving this commonsense result,
11  though recognizing that distinctions between the '33 and '34 Acts could be cause
12  for concern under some circumstances).

13      Most notably, the loss (and loss causation) standards (and burdens) differ
14  among the various claims. *See id.* Still, loss and loss causation will be triable by
15  classwide proof. *Id.* Meanwhile, Defendants' position appears to be that all or most
16  of the class' loss either (1) cannot have been caused by any of the alleged
17  violations because the truth was already on the market or (2) was caused by
18  supervening forces. *See* 588 F. Supp. 2d at 1159, 1173; *see also In re Cendant*
19  *Corp. Litig.*, 264 F.3d 201, 227, 249-50 (3d Cir. 2001) (explaining one way that
20  loss and loss causation might be handled on a classwide basis where an alleged
21  fraud occurs over a period of time rather than in a single "surprising
22  announcement"; recognizing that a trial on the appropriate methodology will
23  require complex expert testimony); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 148-49
24  (N.D. Tex. 1980) (conceptualizing these determinations as a "damages ribbon" for
25  classwide determination, assuming an out-of-pocket damages measure).[22]

26
27  [22]     There is some evidence of reduced market efficiency during the disclosure
28  period. *See infra* III.C.1 (discussing fraud-on-the-market and the class period

*(footnote continues . . .)*

<u>Damages & tracing.</u> Damages, as always, will be an individualized issue. That is no impediment to a securities class action—even one involving a long class period. *Blackie*, 524 F.2d at 905, 908, 909-1 & n.25. Finally, some "tracing" under the '33 Act might also require individualized proceedings. *See* 588 F. Supp. 2d at 1162. These proceedings may begin after determining the classwide loss and when it was caused. *See In re Enron*, 529 F. Supp. 2d at 700-01, 713-14; *In re WorldCom*, 219 F.R.D. at 302-03.

These common issues of law and fact more than satisfy the commonality prerequisite.

**3. Typicality**

The typicality and adequacy prerequisites, together, are "[t]he due process touchstone." *Blackie*, 524 F.2d at 910. Typicality must be judged in light of the circumstances. *Id.* "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.

Typicality is not identity. Rather, the class' claims need be only "fairly encompassed by" or "reasonably co-extensive with" the proposed representative's

---

*(. . . footnote continued)*

length). This may complicate proving how much of the class' loss can be apportioned to any fraud. The market's possibly reduced efficiency could have been caused by, for example, either—or some combination of—(1) shifts in trading patterns as the extent of Countrywide's practices became known to the market; or (2) market-wide and macroeconomic events that coincided with, contributed to, or to some extent were caused by Countrywide's disclosures. *See* CAC Order, 588 F. Supp. 2d at 1173-74 (rejecting Defendants' attempt to reduce these loss causation issues into a reason for dismissal as a matter of law).

The Ninth Circuit recognizes that "causation difficulties [do not] necessarily render class certification impossible." *Zinser, amendment on denial of reh'g*, 273 F.3d at 1266. That is especially true here, where loss causation—though perhaps unusually difficult—still raises classwide issues about the market.

1  claim. *Falcon*, 457 U.S. at 156 ("fairly encompassed by"); *Hanlon*, 150 F.3d at
2  1020 ("reasonably coextensive with"). And the class' injuries must be "similar to
3  those of the named plaintiffs and . . . [must] result from the same, injurious course
4  of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).

5      However, typicality is defeated where "there is a danger that absent class
6  members will suffer [because] their representative is preoccupied with defenses
7  unique to it." *Hanon*, 976 F.2d at 508 (internal quotations omitted).

8                    **a. City Funds is typical of debt purchasers**

9      City Funds purchased both straight debt and common stock in Countrywide
10  Financial. Compl. Ex. B. In addition, a few outside investment managers for City
11  Funds purchased some Countrywide MBS. Defendants raise some arguments
12  regarding the import of City Funds' MBS purchases; namely, that City Funds
13  suffers from unique defenses due to its fairly limited MBS purchases. The
14  discussion that follows refers to several distinct (but closely related) arguments
15  regarding these purchases as "the MBS defenses."

16      Again, the issue at class certification is not whether a defense is meritorious.
17  The issue is whether the defense threatens to "preoccupy" City Funds. *Hanon*, 976
18  F.2d at 509. Still, the defense must be evaluated to some extent; that such defense
19  exists is not sufficient to determine whether it will "preoccupy" City Funds.
20  Because the MBS defenses go both to the merits and to class certification, the
21  Court cannot avoid the MBS defenses at class certification—though, of course,
22  nothing that follows shall be construed to imply any determination on the merits.

23      City Funds will not be "preoccupied" with the MBS defenses. However,
24  issues raised by the MBS defenses do suggest a useful mechanism for managing
25  this case: creating a debt subclass.

26      Background. The MBS defenses illustrate an important way in which this
27  case is distinguishable from other large securities litigations: part of Countrywide's
28  operations—the MBS it sold—involved the securities markets.

Again, MBS were securitized in a process that involved several legally separate entities. *Supra* n.8. Certain entities involved in MBS issuance filed reports or prospectuses with the Securities and Exchange Commission. Those entities were not Countrywide Financial or any other entity that is a party to this litigation. *See id.* at 1153 n.16, 1159-60. That is because the securities at issue in this case constitute investments in Countrywide, not in Countrywide MBS.

The MBS defenses rest on the following facts: City Funds held some Countrywide MBS over the course of the class period. Each MBS prospectus contains some general statements about Countrywide's underwriting practices for the type of mortgages pooled in that MBS. Each MBS prospectus also contains high-level statistics regarding the pooled loans and low-level statistics for each loan in the pool.[23]

---

[23]    Defendants suggest that City Funds could, as a matter of law, be charged with knowledge of the entire prospectus for each Countrywide MBS that City Funds ever held (or that were held on City Funds' behalf in accounts with outside investment agents). That is, at the very least, a gross oversimplification—particularly where (1) there were aftermarket transactions in which no actual prospectus delivery may have been required; and (2) where the prospectus relates to a different security by a legally distinct issuer. *See generally* 3B BLOOMENTHAL & WOLFF, SECURITIES AND FEDERAL CORP. LAW § 12:58 (West Sept. 2009) (discussing some circumstances where statements in a prospectus may override nonprospectus representations); 4 BROMBERG & LOWENFELS ON SECURITIES AND COMMODITIES FRAUD § 7:446 (West May 2009) (collecting cases and discussing reliance when a party has "[a]ccess to relevant information").

Relatedly, New York Funds' guidelines generally bind investment managers to review MBS' credit ratings rather than comb through SEC filings. *See* Barrett Dep. at 366:6-371:11, 414:18-24, 420:4-9; Jeter Dep. at 120:7-121:6, 269:23-271:2. Grave typicality concerns would be raised if the Funds compelled their investment managers to read and actually rely upon every line of each MBS prospectus before a transaction. Further, there is evidence in the record that credit rating agencies are important to MBS purchasers and that not all relevant characteristics of the underlying mortgages were disclosed in the prospectus'

*(footnote continues . . .)*

1    This order has already adverted to some issues relevant to the MBS

2    defenses: (1) this case is brought on behalf of investors in Countrywide, not MBS

3    investors, *supra* n.8 & associated text; (2) not all of Countrywide's value derived

4    from its MBS sales, *supra* Section II.A (explaining Countrywide's various

5    mortgage-related operations); and (3) legally separate vehicles (not Countrywide

6    itself) filed MBS prospectuses with the SEC. *See supra* n.8.

7    In addition, it bears emphasis that each MBS prospectus discloses some

8    information regarding the loans underlying that particular MBS. The MBS

9    prospectuses also disclose some information about Countrywide's lending

10   programs—but the degree of disclosure (and even whether certain programs were

11   disclosed) appears to be uneven across the class period.[24]

12   Small sample size. City Funds made relatively few MBS purchases.

13   Defendants emphasize the securitizations' overall face value, but the MBS

14   purchases amount to a small sample of Countrywide's securitizations during the

15   class period. As noted in the CAC Order, it would take a massive effort to piece

16   together a picture of Countrywide's operations (and how they changed over the

17

18   _(. . . footnote continued)_

19   statistical breakdowns. *See generally* Nelson Decl. Ex. EE (emails to Defendant

20   Gissinger and Chief Risk Officer McMurray stating, "2006 production is
     substantially underperforming compared to prior years . . . . The Secondary Market

21   (Rating Agencies and Investors) is struggling to understand why performance

22   models have not properly predicted this phenomenon. . . . We believe that both
     measurable and immeasurable loan attributes are contributing to this

23   deterioration." (emphases added)).

24   [24]    *See* Pls.' Class Cert. Reply at 2 nn.1-2 (discussing some prospectuses
     proffered by Countrywide Defendants). Additional complications include: Some

25   MBS include mortgages that Countrywide purchased from other originators. And

26   some MBS contain loans of various "vintages"—that is, loans that Countrywide

27   originated at different times and therefore with allegedly different standards. *See*
     *id.* at 2 n.1.

28

1   class period) by aggregating the data in the MBS prospectuses that may have been
2   filed with the SEC during the class period. CAC Order, 588 F. Supp. 2d 1159-60 &
3   n.32 ("Of course, it is possible that a hedge fund somewhere had a computer
4   analyzing the loan detail tables in all these prospectuses [and] may have pieced
5   together that Countrywide's origination practices had deteriorated to some degree
6   [and] that such a hypothetical fund had [a] substantial effect [on the market price,
7   but] Countrywide Defendants are not entitled to such speculation." (emphasis in
8   original)).[25] The Court is puzzled as to how City Funds could be "preoccupied"
9   with an argument that City Funds could piece together such a picture from its
10  holdings, which constitute a very small, and not necessarily representative, sample
11  of the MBS Countrywide issued during the class period.[26]

12

13

_____

14  [25]     Undertaking such an effort would only be possible if one actually could
15  locate the prospectuses. Securities law treatise-writers have had some difficulty in
    the endeavor. 3C BLOOMENTHAL & WOLFF, SECURITIES AND FEDERAL CORPORATE
16  LAW § 16:3.50 (West Sept. 2009) (noting such difficulties in a discussion of the
17  CAC Order's treatment of Defendants' truth-on-the-market version of the MBS
    defense). At least one other court has had a similar problem. SEC v. Mozilo, 2009
18  WL 3807124, at *10 n.5, 2009 U.S. Dist. LEXIS 104689, at *30 n.5, (C.D. Cal.
19  Nov. 3, 2009) (Walter, J.) (evaluating similar arguments made by certain
    Individual Defendants in a factually related suit brought by the SEC and noting,
20  "The Court tested [one species of the MBS defenses] by typing 'Countrywide' into
21  EDGAR [the SEC's online database] . . . the search result only identified the name
22  of one of these [prospectus-filing vehicles.]").
    [26]     There are closely related conceptual and fact issues regarding materiality. To
23  the extent each MBS prospectus is taken individually, the disclosures in it
24  primarily relate to the mortgages underlying that particular MBS. If taken
    individually, each MBS may contain a small sample of loans originated or
25  purchased by Countrywide and therefore may not be material to investors in the
26  proposed class. Many MBS prospectus disclosures may be immaterial to investors
    in Countrywide unless the data in them is aggregated. Cf. Basic, Inc. v. Levinson,
27  485 U.S. 232, 231 (1988) (observing, in discussing the appropriate materiality
28

(footnote continues . . .)

_Classwide defenses._ Second, some of Defendants' principal defenses appear to revolve around the theory that a substantial amount (if not all) of the truth about Countrywide was disclosed to the market through these prospectuses. This theory could relate to inquiry notice (for a statute of limitations defense) or form a truth-on-the-market defense. _See Hanon_, 976 F.3d at 503 (explaining that a complete truth-on-the-market defense requires showing that technically "available" truth was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations").

Indeed, Defendants argued in motions to dismiss that the MBS' disclosures create a truth-on-the-market defense that could resolve this case as a matter of law. CAC Order, 588 F. Supp. 2d at 1159-60 (rejecting the argument that the judicially noticeable filing of the MBS prospectuses with the SEC rendered the complaint's allegations implausible as a matter of law). Thus, the prospectuses and their disclosures will presumably be analyzed at trial as part of classwide defenses—not as something particularly unique to City Funds.

_Debt subclass._ However, Defendants' arguments that City Funds is atypical have clarified an important point. In rebutting the arguments, Plaintiffs' counsel recognized that Countrywide debt investors may be qualitatively different from common stock investors in three important respects.[27]

First, debt investors may, as a general matter, be more sophisticated than common stock purchasers. It is indisputable that more people are comfortable purchasing common stock, covered in the popular media, than they are buying debt

---

_( . . . footnote continued)_

standard, that "an avalanche of trivial information" is "hardly conducive to informed decisionmaking").

[27]     _See_ Class Cert. Hearing Tr. at 15:13-15:25.

instruments. The experts in this case for both sides agree. *Infra* Section III.C.1.f (discussing the debt markets in the context of the fraud-on-the-market theory). Indeed, both State Fund and City Funds internally distinguish their debt ("fixed income") investment groups from their equities groups.[28]

Second, debt instruments respond to different information and trade in a different type of market than the other securities at issue in this case. Therefore, they raise different (and more complex) issues than the other securities in this case.[29]

Third, MBS are themselves a type of debt security. Those who invested in Countrywide debt would be more likely to be investors in Countrywide MBS than those who purchased only Countrywide common stock. Thus, an investor in Countrywide debt should be more likely to have knowledge of the Countrywide MBS prospectuses.

Therefore, City Funds is deemed typical of a class composed of Countrywide bond purchasers. Fed. R. Civ. P. 23(c)(5). If subsequent developments warrant, the debt class may require a separate trial phase. *See, e.g.*, Rule 23(d)(1)(A). City Funds may not represent purchasers of Countrywide common stock (or options on the common).[30]

---

[28]   *See, e.g.*, Jeter Dep. at 30:6-32:10; Barrett Dep. at 201:12-202:2.

[29]   This is discussed in some depth in *infra* Section III.C.1.a (discussing fraud-on-the-market and the debt securities markets).

[30]   Defendants also make typicality arguments based on statements by some people in the City Comptroller's office. In particular, the Comptroller and a staffer in the Comptroller's office publicly made some political statements and gave testimony to the New York State legislature regarding "predatory lending" and a "housing bubble." But there is no evidence that such involvement or testimony was based on any nonpublic information—or even much independent investigation. Indeed, other government-affiliated entities and individuals presumably made similar public statements regarding "predatory lending" and a "housing bubble"

*(footnote continues . . .)*

### b. State Fund is typical of common stock purchasers

Defendants raise MBS defenses to challenge State Fund's typicality too. State Fund has a longstanding securities lending agreement with JPMorgan Chase & Co. ("JPMorgan"). Under the lending agreement, State Fund earns additional money by making some of its holdings available for others to borrow. JPMorgan serves as the intermediary. If a preapproved third-party borrower posts cash or noncash collateral to JPMorgan, then JPMorgan will allow that party to borrow certain State Fund holdings. These collateral accounts on a few—it appears to be two—occasions held a Countrywide MBS. These legal interests in MBS are more attenuated and far fewer in number than City Funds' MBS holdings. Therefore, MBS defenses are even less likely to "preoccupy" State Fund.[31]

Defendants also discuss some other State Fund mortgage-investment programs. For example, State Fund is involved with some mortgage lending with "Community Preservation Program," a nonprofit lender. The Program writes "construction" and "rehabilitation" loans for commercial property and multifamily residences, such as apartments. By contrast, Countrywide's mortgage operations principally involved single-family residential mortgages.[32] Gellman Aff.

---

*(. . . footnote continued)*

during the class period, which was marked by increased interest in mortgage lending.

[31]     To the extent such formalism matters, it appears that JPMorgan holds certain collateral accounts "in [JPMorgan's] name and under [JPMorgan's] sole dominion and control." Other collateral accounts are held in JP Morgan Chase's name and designated to the borrower (not the lender, State Fund). As a result, it appears that no interest (or title) in the collateral is ever held directly by State Fund. Jones Decl. Ex. 21 at ¶¶ 1(g)-(h).

[32]     Similarly, State Fund and City Funds worked with the Government-Sponsored Enterprises ("GSEs"), such as "Fannie Mae" and "Freddie Mac," to invest indirectly in loans backed by the GSEs. Such mortgages must "conform" to certain guidelines; they are known as "conforming" loans. The mortgages in those

*(footnote continues . . .)*

Of course, any institutional plaintiff would have had some exposure to mortgages or MBS during the class period. Mortgages and MBS have pervaded the capital markets in recent years. It may be the atypical institutional investor that avoided mortgage-market exposure during the class period. Thus, State Fund's mortgage-related investments could merely make State Fund typical of institutional investors.[33] As the largest claimants, institutional investors are favored by the PSLRA's structure. *See In re Cavanaugh*, 306 F.3d 726, 738 (9th Cir. 2002). Further, as a sophisticated participant in modern markets, State Fund's operations may provide both sides an opportunity to illustrate the market concepts involved in this case. In this way, State Fund's limited involvement in relevant markets may well assist both sides in elucidating their theories.[34]

---

*(. . . footnote continued)*

programs do not appear to be "subprime" within the meaning of the complaint; to the contrary, they appear to be conventional fixed rate mortgages to borrowers with fairly high credit scores. Nelson Decl. Ex. KK.

Distinctions between conforming and nonconforming loans are also part of the complaint's theory: it distinguishes Countrywide's "shift" at the beginning of the class period from originating traditional conforming loans to focusing on new types of nonconforming loans. Compl. ¶ 83. *See also* Nelson Decl. Ex. X (email from Chief Risk Officer McMurray to Defendant Kurland and former Defendant McLaughlin stating, "While our conforming guidelines have become more aggressive over time, the GSEs bear the brunt of this incremental risk.").

[33]   *Cf. In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 WL 1357509, at *7, 2000 U.S. Dist. LEXIS 13469, at *20 (S.D.N.Y. Sept. 20, 2000) (concluding a proposed class representative was typical even though, early in the class period, she read a newspaper article somewhat relevant to the alleged misrepresentations because many other class members "presumably read newspapers").

[34]   For example, a State Fund representative testified that the JPMorgan collateral account still held a Countrywide MBS on July 10, 2009 "[b]ecause [that MBS] hasn't matured and no one wanted to buy it." Barrett Dep. at 378:5-379:7. State Fund's continued holding of a single Countrywide MBS, and the stated reasons for that holding, could evidence the market's reaction to Countrywide's disclosures and the effects of Countrywide's alleged change in operations during

*(footnote continues . . .)*

1   State Funds is typical and may represent a class of investors in common

2   stock and options on the common. Fed. R. Civ. P. 23(c)(5).

3   **c. New York Funds' index and disclosure-period purchases are**

4   **typical**

5   Defendants make typicality arguments about New York Funds' index

6   purchases and purchases of additional Countrywide securities during the alleged

7   disclosure period. The notion behind both arguments is that index and disclosure-

8   period purchases create unique defenses on the element of reliance. The Court

9   joins the great weight of authority and concludes (1) that index purchases are

10  typical, and (2) it is not inherently atypical (or necessarily unreasonable) to make

11  some purchases during the disclosure period.

12  Index purchases. Defendants argue that because index purchases seek to

13  match a predetermined index of securities, such purchases are not made in reliance

14  on any misrepresentation. To the contrary: because index purchases seek only to

15  match the index and exclude other considerations (such as, for example, reliance

16  on nonpublic information or other idiosyncratic motivations), index purchases rely

17  exclusively upon the market to impound any representations (including

18  misrepresentations) into securities' prices.[35] This is close to perfect reliance on

19  market price-setting, which is a well established kind of reliance in securities

20  cases. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988); *infra* Section III.C.1.a

21  (discussing the fraud-on-the-market theory). Accordingly, index purchases pose no

22

23                                                  *( . . . footnote continued)*

24  the class period. On the other hand, the stated reasons for continuing to hold the

25  MBS could be symptomatic of market-wide liquidity problems that Countrywide
    Defendants asserted as a complete defense at the pleading stage. *See* CAC Order at

26  588 F. Supp. 2d at 1173-74. Either way, such evidence illustrates both sides'

27  arguments; it threatens no unique defense.
    [35]      Barrett Dep. at 181:16-1822:20, 192:20-193:2; Jeter Dep. at 121:25-124:22.

28

typicality concern. *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D. Cal. 2009); *In re WorldCom*, 219 F.R.D. at 281-82 ("swiftly reject[ing]" a number of arguments, including the proposition that index purchases are atypical).

<u>Disclosure-period purchases.</u> As for purchases during the disclosure period—often referred to as "post-disclosure purchases" because they come after one or more corrective disclosures—such purchases could be made: (1) as index purchases; (2) in reliance on the issuer's representations that it has corrected prior misrepresentations; (3) on the theory that corrective disclosures are, in fact, corrective;[36] or (4) as an attempt to "average-down" the price paid for an issuer's securities.[37] Further, there may be fact issues whether some alleged disclosures were material or corrective.[38] And other class members also presumably purchased after Countrywide's first corrective disclosure and during the disclosure period. *See generally In re Connetics*, 257 F.R.D. at 576-77 (discussing post-disclosure purchases at length and collecting cases). Of course, <u>unusual</u> post-disclosure trading patterns present typicality problems.[39] But no evidence of any unusual

---

[36]     *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 203-04 (E.D. Pa. 2008). *Cf.* Barrett Dep. at 208:13-20, 340:3-11 (State Fund investment supervisor speculating that "once there is sunshine on these [prior misrepresentations], stock prices have been driven down, that perhaps . . . is an opportunity to go back in and invest . . . .").

[37]     "In fact, purchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot be used to defeat a proposed class representative's typicality." *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 n.12 (D. Minn. 2001) (collecting cases); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 298 (D. Del. 2003) (the same).

[38]     *See Unioil*, 107 F.R.D. at 621 (Rymer, J.).

[39]     *See, e.g., DVI*, 249 F.R.D. at 204 n.12 (noting a hypothetical post-disclosure purchase scenario that could present typicality problems); *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *5, 1996 U.S. Dist. LEXIS 21774, at *18 (N.D. Cal.

*(footnote continues . . .)*

1   post-disclosure pattern has been presented here.

2   ### d. The Capital Securities: Katzeff is not typical

3   As explained above, separate class representatives, Katzeff and Brahn, are

4   proposed for the unique Capital Securities. *Supra* Section I.A. Katzeff is not

5   typical; concerns about Brahn's typicality are noted in the adequacy analysis

6   below.

7   Katzeff testified that she believes her former broker misled her regarding the

8   nature of the Capital Securities.[40] In fact, she suspects broker "fraud."[41] She has

9   even spoken with an attorney about suing her former broker.[42]

10   Reliance on a broker will not generally make a plaintiff atypical. *See, e.g.,*

11   *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 261 (D. Mass. 2005); *In re*

12   *Terayon Comm'ns Sys., Inc.* 2003 WL 21383824, at *4 (N.D. Cal. Feb. 24, 2003)

13   (Patel, J.); *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196,

14   1213-14 (S.D.N.Y. 1992).

15   But Katzeff's testimony establishes a unique defense: that Katzeff believes

16   she relied on her broker's supervening misrepresentations—and that those

17   misrepresentations caused (or at least confounded) any loss. In view of Katzeff's

18   testimony, this defense threatens to become the focus of the Capital Securities'

19   litigation to the putative class' detriment. *Accord In re Safeguard Scientifics*, 216

20   F.R.D. 577, 583 (E.D. Pa. 2003) (rejecting as atypical and inadequate a proposed

21   class representative who brought arbitration proceedings against his broker).

22

23   *(. . . footnote continued)*

24   Mar. 14, 1996) (rejecting as atypical a proposed class representative who tripled

25   his holdings after the first of two disclosures and after his complaint was filed).
    [40]   Katzeff Dep. at 27:3-9, 37:20-24, 45:23-47:7, 56:15-60:3, 61:1-63:18, 97:8-

26   98:25, 126:8-24, 129:10-15, 203:7-15.

27   [41]   *Id.* at 61:1-62:2.
    [42]   *Id.* at 63:5-23.

28

1    Plaintiffs fail to show that Katzeff is typical.

2    **4. Adequacy**

3    Adequacy asks whether "the representative parties will fairly and adequately

4    protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The two key inquiries

5    are (1) whether there are conflicts within the class; and (2) whether plaintiffs and

6    counsel will vigorously fulfill their duties to the class. *Staton v. Boeing Co.*, 327

7    F.3d 938, 957 (9th Cir. 2003).

8    The adequacy inquiry also "factors in competency and conflicts of class

9    counsel." *Amchem*, 521 U.S. at 626 n.20; *Local Joint Exec. Bd. of*

10   *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th

11   Cir. 2001). Adequacy is a due process "touchstone" and must be judged in light of

12   the circumstances. *Blackie*, 524 F.2d at 910.

13   **a. Pay-to-play allegations**

14   Defendants devote a great deal of attention to "pay-to-play" allegations

15   against New York Funds.

16   Investment pay-to-play. Persons formerly affiliated with State Fund

17   allegedly accepted improper payments from some of State Fund's investment

18   "placement agents" or "investment managers"—not securities litigators. The

19   implicated placement agents or investment managers appear not to have handled

20   Countrywide investments. Therefore, the scandal would seem largely irrelevant to

21   any issues regarding why State Fund invested in Countrywide.[43]

22   Further, all or most persons implicated in the conduct are no longer affiliated

23   with State Fund. To the extent any such persons may still be affiliated with State

24   Fund, the allegations may have some relevance to the Fund's "integrity" or

25

26

---

27   [43]   There may be an investigation into similar conduct involving City Funds'
     placement agents.

28

1   "character"[44]— to whatever extent those concepts sensibly apply to an
2   organization, as distinct from persons who run or constitute the organization.[45]

3       At any rate, the Court has reviewed the submitted deposition transcripts of
4   New York Funds' designated witnesses. *See* Fed. R. Civ. P. 30(b)(6). These
5   witnesses—staff who oversee New York Funds' day-to-day operations, including
6   investments and this litigation—appear to perform their organizational
7   responsibilities with integrity.

8       <u>Attorney pay-to-play.</u> More serious, and independent of the foregoing pay-
9   to-play allegations, are allegations of attorney pay-to-play in <u>this</u> case. Attorneys
10  from lead counsel Labaton Sucharow LLP made a series of campaign contributions
11  to the State Comptroller, sole trustee of State Fund, after counsel were retained for,
12  and appointed lead counsel in, this case. The contributions were made in amounts
13  such $6,200 or $9,600. Different attorneys made contributions within four days'
14  time. These contributions total precisely $50,000.[46]

15      Any suspicion of lawyer pay-to-play derived from this conduct may be
16  somewhat speculative—though any suspicion would be relevant to attorney-class
17  conflicts and the willingness of State Fund to monitor its attorneys and make
18  decisions for the benefit of the class rather than its attorneys. *Accord Rodriguez v.*
19  *West Publ'g Corp.*, 563 F.3d 98, 959 (9th Cir. 2009) (disapproving certain

20

21  [44]    *See In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 682-83 (N.D. Cal.
22  1986) (recognizing that "questions of personal integrity" may be relevant to
    adequacy).
23  [45]    Organizations are "less amenable to a generalization about [their]
24  'character'" than natural persons. *In re Leapfrog Enters., Inc. Sec. Litig.*, 2005 WL
25  3801587, at *4, 2005 U.S. Dist. LEXIS 40994, at *15-16 (making this observation
    while evaluating adequacy under the PSLRA's lead plaintiff inquiry).
26  [46]    Separately, attorneys from Kaplan Fox, counsel for Brahn and Katzeff, have
27  made donations to the New York City Comptroller, a trustee for most of the funds
    comprising City Funds.
28

1   incentive agreements between named plaintiffs and counsel and stating, "An

2   absence of material conflicts of interest between the named plaintiffs and their

3   counsel with other class members is central to adequacy and, in turn, to due

4   process for absent members of the class.").

5       Perhaps more important, attorneys are free to exercise their right to donate to

6   politicians who support their views. Defendants do not allege that the donations

7   violated any law. Plaintiffs' counsel note that their policy preferences align with

8   the Comptroller's policy stance on securities litigation. Though not exactly

9   correlative, because Defendants do not seek to represent absent parties, similar

10  political-donation freedom exists for lawyers and parties on the defense side.[47]

11

12  [47]     Courts have long been less enamored of securities litigation pay-to-play

13  arguments than litigants and the press, who might consider such conduct quite

    distasteful. *Compare In re Cendant Corp. Litig.*, 182 F.R.D. 144, 148-49 (D.N.J.

14  1998) (dismissing, in the PSLRA lead plaintiff context, such conduct as legal and

15  the requested inference as "speculative"), *disapproved on other grounds*, 264 F.3d

    201 (3d Cir. 2001), *with, e.g.*, Raymond, Nate, "New Suit by Former Labaton

16  Sucharow Lawyer Offers Glimpse at Plaintiffs' Bar Business Tactics,"

17  AMERICANLAWYER.COM (May 1, 2009), *available at*

18  http://www.law.com/jsp/tal/digestTAL.jsp?id=1202430371619 (providing an

    example of press coverage of pay-to-play allegations unrelated to this case).

19       On the other hand, distinguished jurists and commentators have recently

20  signaled increased concern about securities litigation pay-to-play. *See Iron

    Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and

21  Securitization, LLC*, 616 F. Supp. 2d 461, 467 n.3 (S.D.N.Y. 2009) (Rakoff, J.)

22  (expressing concern about the possibility of lawyer pay-to-play and citing Coffee,

    Jr., John C., *"Pay-to-Play" Reform: What, How, and Why?*, N.Y.L.J., May 21,

23  2009, p.5.).

24       However, some literature suggests that pay-to-play concerns may be

25  exaggerated—at least for public pension funds with certain governance structures.

    *See generally* David H. Webber, *Is "Pay-to-Play" Driving Public Pension Fund

26  Activism in Securities Class Actions? An Empirical Study*, N.Y.U. L. & Econ.

27  Working Paper No. 09-28, *available at*

    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1432497. State Fund does not

28

                                                              *(footnote continues . . .)*

1    The most pertinent facts are: Labaton Sucharow was retained for this matter
2  after career staff recommended Labaton. State Fund staff followed what appear to
3  be reasonable ethics protocols in making the recommendation. The staff
4  recommended Labaton based on Labaton's independent investigation of this case,
5  Labaton's written proposal for handling this case, and because Labaton had already
6  filed a complaint against Countrywide for another plaintiff.[48]

7              **b. New York Funds' monitoring of counsel and Rule 23(g)**

8    Closely related to the adequacy inquiry, Rule 23(g) governs how class
9  counsel is appointed. A class certification order must address Rule 23(g). Fed. R.
10  Civ. P. 23(c)(1)(B). Rule 23(g) requires a court to consider four factors regarding
11  counsel and allows consideration of "any other matter pertinent to counsel's ability
12  to fairly and adequately represent the interests of the class." *Id.* 23(g)(1)(A)-(B).
13  The Court has considered all Rule 23(g)(1) and Rule 23(a)(3) factors. Only the
14  following observations are appropriate:

15    On at least two significant occasions, certain attorneys for the New York
16  Funds have retracted oral representations made, on the record, to the Court.[49] The

17  _____

*(. . . footnote continued)*

18  appear to have one of these governance structures, but no inference can properly be
19  drawn from the Fund's structure.

[48]    New York Funds' Resp. to Countrywide Defs.' Second Interrogs., Interrog.
20  No. 4 (describing "the circumstances giving rise to [New York Funds']
21  participation in this suit"). *See also* Peaslee Dep. at 41:20-60:51, 124:1-133:8,
22  350:14-353:22, 358:11-362:14 (testifying regarding State Fund's selection of
   counsel for this matter); Seemen Dep. at 70:2-74:22, 77:4-22, 81:2-88:4 (testifying
23  regarding City Funds' selection of counsel for this matter).

[49]    The first incident involved factually incorrect assertions about the nature of
24  the City Funds' investment activity and appeared to modify the content of the class
25  from that proposed in the complaint. *See* Class Cert. Hearing Tr. at 11:6-15:25.
   (Sept. 22, 2009). These later-retracted representations were made at a hearing on a
26  motion to dismiss. The representations later provided Defendants with arguments
27  against class certification.

28
*(footnote continues . . .)*

Court expects to rely on counsel's position after express assurances of a position —oral assurances, but on the record and made at some length.[50] The Court's expectations of counsel are particularly high when counsel engages in litigation of this magnitude and proposes to represent absent parties.[51]

The PSLRA presumes that the plaintiff with the most money at stake will be the plaintiff most likely to monitor counsel; therefore, that plaintiff is generally entitled to choose its counsel. *In re Cavanaugh*, 306 F.3d 726, 738-39 (9th Cir. 2002) (addressing the PSLRA's lead plaintiff provisions); *Cohen*, --- F.3d ----, 2009 WL 3681701, 2009 U.S. App. LEXIS 24330 (the same).

The PSLRA does not alter class certification standards. *In re Cavanaugh*, 306 F.3d at 738-39. Nor does the PSLRA alter other mechanisms at the Court's disposal. Accordingly, appointment under the PSLRA does not cement counsel's participation in a suit. *Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231

---

*(. . . footnote continued)*

The second gave rise to a motion for judgment on the pleadings. *See* Docket No. 483 (July 10, 2009) (detailed minutes and order taking under submission motion for judgment on the pleadings); Status Conf. Tr. (July 7, 2009) (lengthy discussion about the effect of certain oral representations on the Court and Defendants); Order Denying Judgment on the Pleadings (filed concurrently with this initial class certification order). This incident interrupted class certification-related discovery and created the possibility of prejudice to Defendants.

[50] When appropriate, the Court is willing to engage in tentative or hypothetical discussions without binding counsel to a position. But on both occasions the Court (and Defendants) understood counsel to expressly commit to a position or represent a fact.

[51] There are also indications in the record that Plaintiffs' counsel performed their discovery duties somewhat less diligently than the Court requires in sophisticated litigation. *See, e.g.*, Order, Docket No. 505 (Aug. 25, 2009) (extending class certification schedule due to discovery conduct); Peaslee Dep. at 177:17-178:14, 211:15-215:11, 348:18-20. *Cf. In re DVI Sec. Litig.*, 249 F.R.D. 196, 205-06 (discussing discovery conduct in the adequacy inquiry); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 137 (S.D.N.Y. 2007) (the same).

1   F.3d 1215, 1218-19 (9th Cir. 2000) (refusing to appoint PSLRA lead counsel as

2   class counsel "would be consistent with the district court's <u>continuing</u> duty to see

3   that a class is adequately represented by counsel" (emphasis in original)).

4   After careful review of the depositions and responses to interrogatories, the

5   Court concludes that New York Funds are sufficiently monitoring this litigation.[52]

6   Indeed, State Fund staff in particular testified that they devote substantial attention

7   to the litigation. *Accord In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 636-37

8   (C.D. Cal. 2009) (approving an institutional class representative that made a

9   slightly lesser showing of involvement).

10   The Court concludes that proposed class counsel are adequate and will fairly

11   represent the class' interests. Indeed, counsel could be viewed on occasion as

12   zealous. And counsel's written submissions have been satisfactory.

13   ### c. The Capital Securities: Brahn is adequate

14   Again, separate class representatives are proposed for the unique Capital

15   Securities. Katzeff being atypical, Brahn is the only remaining proposed

16   representative for the Capital Securities.[53]

17   Brahn does not have a very sophisticated appreciation of the Capital

18   Securities' unique features. Further, though he has suffered a cognizable loss in a

19   legal sense, his loss is, as yet, unrealized. Because of the Capital Securities'

20   features and post-class period events, his unrealized loss may be reversed. These

21   loss concerns do not involve unnecessary inquiry into the merits. Rather, they go to

22   class certification issues: Brahn's understanding of the Capital Securities' value,

23   and hence the value of his claims, is relevant to his ability to serve as a check on

24   counsel's interests—which may diverge from the class' interests.

25

26   [52]   The Court presumes that counsel promptly informed their clients of the

27   possible ramifications of the events discussed in *supra* n.49.

[53]   *Supra* Section III.B.3.d.

28

1    There is more. Brahn's health has already interfered with the schedule in this
2    case and raises some doubts for the future.

3    However, Brahn's deposition transcript demonstrates his general intellectual
4    competence, good faith, willingness and desire to serve as a class representative.

5    It is a close question, but the Court concludes that Brahn may represent a
6    class of Capital Securities purchasers.[54]

7    <u>Adequacy of individual investors.</u> The law leans somewhat against
8    disqualifying individual investors on adequacy grounds. The cases generally
9    reason that individual investors may appropriately delegate most tasks in a
10   complex case to qualified counsel. The Court does not question the thrust of this
11   reasoning. *See, e.g., Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d
12   52, 61-62 (2d Cir. 2000) (explaining this reasoning at some length). Likewise, a
13   class representative's ability to participate in further discovery or at trial is often,
14   and perhaps not always inappropriately, a marginal consideration. *See Edgington v.
15   R.G. Dickinson and Co.*, 139 F.R.D. 183, 195 (D. Kan. 1991) ("Often times, courts
16   have written off challenges to the representatives' health and age by minimizing
17   the role of the representative at trial or by assessing only the adequacy of the
18   representative's attorney.").

19   Still, the adequacy requirement must make some demand of the
20   representative party—not just the party's counsel—even if that representative is an
21   individual. Indeed, adequacy is one of the Rule 23 due process "touchstone[s]."
22   *Blackie*, 524 F.2d at 910. The Rule's text speaks only of the "parties." Fed. R. Civ.
23   P. 23(a)(4). Likewise, the Ninth Circuit's formulation of the adequacy inquiry
24   recognizes that both party and counsel play a role. *Staton*, 327 F.3d at 957.
25   Accordingly, the cases recognize that a class representative must himself have

26
27   [54]    Class certification orders are inherently tentative and may be revisited before
     judgment. *Blackie*, 524 F.2d at 901; Fed. R. Civ. P. 23(c)(1)(C).
28

independent significance and cannot entirely abdicate his responsibilities to counsel. *Baffa*, 222 F.3d at 61 (concluding class representatives are inadequate if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys"); *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100-01 (D. Conn. 2006) (collecting authority).

<u>Health concerns.</u> Brahn suffers from several chronic health problems.[55] Due to an episode that included a medically induced coma, Brahn's deposition in this matter was delayed until well after the close of class certification discovery—in fact, the day <u>after</u> the motion for class certification was originally due. It appears from the deposition transcript that Brahn was in pain during the deposition.[56] However, Brahn endured a full day of questioning, during which he demonstrated a strong willingness to serve as a class representative and the intellectual capacity to do so. Still, there is some question regarding his ability to travel from his home in the northeastern United States to Los Angeles to testify in this case, if necessary.[57]

The concerns about Brahn's health are not speculative: Brahn's health has already hampered the parties' ability to comply with the class certification schedule. It may have contributed to discovery problems by delaying document production and interrogatories.[58] Some ramifications of his health problems have rendered him more reliant than usual on counsel.[59] If Brahn suffers another acute

---

[55]     Brahn Dep. at 10:1-11:7, 13:1-5, 14:7, 15:20-18:13, 24:11-18, 25:12-27:7, 154:19-155:8.
[56]     *See id.* at 59:3-18, 61:23-62:3, 129:2-8, 249:4-15.
[57]     *See id.* at 276:7-277:21.
[58]     *Id.* at 79:22-81:10 (production), 96:2-23 (production), 97:13-98:19 (production), 189:11-193:12 (interrogatories).
[59]     *Id.* at 193:25-194:9; 227:4-229:2.

1   health problem, Brahn may be unable to discharge his duties as class

2   representative.[60]

3       <u>Nature of the Capital Securities & Brahn's knowledge.</u> As explained above,

4   the Capital Securities are unique securities. *Supra* Section II.C. Due to the Capital

5   Securities' complexity, Capital Securities purchasers would undeniably benefit

6   from a representative with more than the level of knowledge and involvement that

7   courts sometimes suggest is required to represent a securities class. Brahn does not

8   understand the complexity of the Capital Securities.[61] Nor has he paid a great deal

9   of attention to this case thus far.[62]

10       The foregoing adequacy concerns—about Brahn's health and the importance

11   of a representative who understands the Capital Securities well—combine with

12   typicality concerns.[63] Brahn has suffered only as yet unrealized losses which may

13

---

14   [60]    It is rare, but not entirely unknown, for courts to discuss issues about class

15   representatives' health. For example, one court expressed reluctance to approve as
     class representative a plaintiff that had recently "suffered a heart attack . . .

16   render[ing] him incapable of being deposed in the foreseeable future." *Moskowitz*

17   *v. Lopp*, 128 F.R.D. 624, 635-36 (E.D. Pa. 1989). That court approved the
     proposed representative, but it did so on the legally incorrect basis "that it is

18   defendants' burden to prove inadequacy." *Id.* at 636. The burden, in fact, is on

19   Plaintiffs. *Zinser*, 253 F.3d at 1186.

20       Other cases have rejected proposed class representatives as inadequate for
     their poor health and resulting inability to travel. *Sloan v. BorgWarner, Inc.*, ---

21   F.R.D. ----, 2009 WL 2876897, at *4, 2009 U.S. Dist. LEXIS 79039, at *10 (E.D.

22   Mich. Sept. 3, 2009) (rejecting class representative with a history of poor health
     and who had difficulty "traveling long distances"). *But see Steiner v. Ideal Basic*

23   *Indus., Inc.*, 127 F.R.D. 192, 195 (D. Colo. 1987) (holding a securities class

24   representative adequate though the representative could not travel to trial).

25   [61]    *See, e.g.*, Brahn Dep. at 45:1-49:12, 56:4-56:19.
     [62]    *See, e.g., id.* at 166:22-167:24, 185:14-24, 212:3-8, 213:4-9.

26   [63]    It is difficult to entirely separate typicality from adequacy; as the Supreme

27   Court recognizes, the two prerequisites "tend to merge." *Amchem*, 521 U.S. at 626
     n.20.

28

<u>never</u> be realized because of the Capital Securities' features and Bank of
America's assumption of the limited sort of "unconditional guaranty." Of course,
the securities laws do not require a realized loss. *See* 588 F. Supp. 2d at 1170, 1183
(discussing the '33 Act); 4 BROMBERG & LOWENFELS ON SECURITIES FRAUD
§ 7:526 (West May 2009) (regarding the '34 Act, "Certainly a defrauded purchaser
can recover without realizing his losses by selling the security."); *id.* §§ 8:1-10
(collecting and discussing cases).[64] Because Brahn has no realized loss, and may
never realize a loss, his deposition highlights some confusion about his loss and
loss causation.[65]

On the other hand, Brahn does understand markets and this case well enough
to surpass the standards set for individual securities plaintiffs.[66] Brahn was not
stymied by counsel's repeated attempts to point to a "guarantee." He observed that
there is no such thing as completely guaranteed investment—there is always some
degree of risk.[67] Nor was Brahn led too far astray by his loss being unrealized.
Further, many other Capital Securities purchasers presumably understood the
Capital Securities in a way comparable to Brahn.[68] Many Capital Securities
purchasers may have a loss situation similar to Brahn's as well.

---

[64]    Of course, damages will be a matter for individualized proceedings. *Supra*
Section III.B.2 (addressing commonality). But proposed class representatives may
be rejected as atypical and inadequate when they pose unique economic loss or loss
causation issues. *Accord In re Safeguard Scientifics*, 216 F.R.D. 577, 583 (E.D. Pa.
2003).
[65]    Brahn Dep. at 131:11-137:18. *But see id.* at 85:10-15.
[66]    *Id.* at 132:22-133; 180:5-186:16, 221:8-222:21.
[67]    *Id.* at 132:12-22, 133:24-134:21.
[68]    The Capital Securities traded on the New York Stock Exchange for part of
the class period. *See* Kleidon Rep. ¶ 40. It is therefore reasonable to presume that
some portion of the class purchased the Capital Securities on the Exchange without
fully appreciating their features.

Plaintiffs have met their burden to show that Brahn may represent Capital Securities purchasers, at least for the present.[69] Capital Securities purchasers shall constitute their own class because of the Capital Securities' unique features. Fed. R. Civ. P. 23(c)(5). A separate phase of the classwide trial may be required for the Capital Securities subclass. *See, e.g.*, Fed. R. Civ. P. 23(d)(1)(A).

## C. Rule 23(b)(3) requirements

### 1. Predominance

Rule 23(b)(3)'s predominance inquiry asks "whether proposed classes are sufficiently cohesive" by focusing on "the relationship between the common and the individual issues." *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (internal citations and quotations omitted). This is similar to, but more "stringent" than Rule 23(a)(2)'s commonality inquiry. *Amchem*, 521 U.S. at 609. Here, the factor that threatens Plaintiffs' ability to survive the predominance inquiry is reliance.

Plaintiffs' Section 10(b) claims, which are brought under the '34 Act,

---

[69]   Plaintiffs also propose that Brahn represent a class of those who purchased Capital Securities from Countrywide Capital IV, an entity similar to (but distinct from) Countrywide Capital V. No named plaintiff purchased securities from Capital IV and Capital IV is not a party to this case.

Because no named plaintiff purchased the Capital IV securities, there is no possibility of '33 Act standing; but Brahn may have '34 Act standing. *See* CAC Order 588 F. Supp. 2d at 1164 (discussing '33 Act standing); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 959-63 (N.D. Cal. 2005) (discussing '34 Act standing). Even so, the foregoing concerns about Brahn's adequacy and typicality combine with typicality concerns raised by: (1) Brahn's lack of '33 Act standing, therefore limiting him to '34 Act recovery on behalf of the Capital IV securities' class; and (2) Brahn's adequacy showing for those securities that he did purchase. Plaintiffs' counsel exceeds what may be the law's indulgence of individual investors by proposing Brahn as a representative for securities he did not purchase, for which he cannot recover under the '33 Act for the class, and about which he knows even less.

1   require a showing of reliance. Absent a theory for presuming that the entire class

2   relied on Defendants' alleged misrepresentations, individual issues of reliance

3   (also known as "transaction causation") will predominate. *Desai v. Deutsche Bank*

4   *Sec. Ltd.*, 573 F.3d 931, 937 (9th Cir. 2009); *Blackie*, 524 F.2d at 905-08; *see also*

5   *Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988) ("Requiring proof of

6   individualized reliance from each member of the proposed plaintiff class

7   effectively would have prevented respondents from proceeding with a class action .

8   . . ."). Thus, before the Court can certify a class with respect to a particular

9   security, the Court must be persuaded that Plaintiffs are entitled to a presumption

10   of classwide reliance.[70]

11   **a. Fraud-on-the-market theory**

12   Here, the theory invoked for classwide reliance is "fraud-on-the-market."

13   Plaintiffs argue that Defendants' material misrepresentations affected the price of

14   the securities, which Plaintiffs relied on to be an accurate indication of the

15   securities' value. Establishing fraud-on-the-market requires evidence of market

16   efficiency.

17   This case requires closely evaluating market efficiency. Here, the parties

18   have proffered four experts on market efficiency. Plaintiffs proffer one expert, Dr.

19   Jarrell.[71] Defendants' experts are Dr. Das[72], Dr. Carron[73], and Dr. Kleidon.[74]

20   Countrywide Defendants, in particular, have offered expert evidence with some

21

---

22   [70]   On this record, no claims besides the 10(b) claims involve reliance issues
that threaten predominance. *See supra* Section III.B.2 (providing an overview of

23   the claims); Section III.C.1.g. (discussing some §11 reliance issues).

24   [71]   Gregg A. Jarrell, Ph.D., Professor of Finance and Economics, University of
Rochester.

25   [72]   Sanjiv R. Das, Ph.D., Professor of Finance and Chair of the Finance

26   Department, Santa Clara University.

27   [73]   Andrew S. Carron, Ph.D., President of NERA Economic Consulting.
[74]   Allan W. Kleidon, Ph.D., Senior Vice President, Cornerstone Research.

28

rather unique analysis in support of its conclusions. Neither any party to this case, nor the Court, is aware of a securities case where this sort of expert evidence has been offered. Further, experts on both sides agree that the debt securities' presence in this litigation raises reliance concerns not frequently addressed by the courts.

Countrywide Defendants' expert evidence on reliance is both interesting and useful, and has persuaded the Court that it is necessary to reduce the size of the class from that sought by Plaintiffs. The Court explains below the reliance issues raised by this class certification motion and some considerations which have informed the Court's decision to amend Plaintiffs' proposed class definition.[75]

### i. The theory

A Supreme Court plurality in *Basic* approved a rebuttable presumption of classwide reliance under some circumstances. 485 U.S. 224. *See also Blackie*, 524 F.2d at 905-08 (establishing the presumption in the Ninth Circuit before *Basic*).

The *Basic* theory holds that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . ." 485 U.S. at 241. Thus, misrepresentations are presumed to be impounded into a security's market price. *Id.* at 242. As a matter of "common sense and probability," the *Basic* theory

---

[75]   "There is no requirement for expert testimony on the issue of market efficiency, but many courts have considered it when addressing [the *Basic* presumption], which may often benefit from statistical, economic, and mathematical analysis." *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005). Indeed, "[i]n many cases, where heavily-traded or well known stocks are the target of suits, market efficiency will not even be an issue." *Id.* at 322. Here, efficiency is very nearly a nonissue for Countrywide common stock and options. If not for the debt securities' presence in this case, the Court would have no trouble analyzing the issue with brevity. *Accord* 4 BROMBERG & LOWENFELS § 7:484 (cautioning against excessive use of "[e]xpensive experts with complex equations and long computer printouts . . ." in some types of cases).

presumes that market participants rely on the market price, which, in turn, impounds the misrepresentations. *Id.* at 246-47.

The theory can be conceived as amounting to three sequential presumptions: (1) the market price impounds the misrepresentations, (2) the plaintiff relies on that market price, and (3) the reliance was reasonable. *See Semerenko v. Cendant Corp.*, 222 F.3d 165, 178-79 (3d Cir. 2000) (decomposing *Basic* into essentially these three presumptions); *accord Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996).[76]

---

[76] Of course, as explained above in discussing Defendants' arguments that New York Funds' index purchases and post-disclosure purchases render the Funds atypical, reliance on price does not mean <u>exclusive</u> reliance on price. *Supra* Section III.B.3.c. *See also Basic*, 485 U.S. at 244 ("Thus the market is performing a <u>substantial part of the valuation</u> process performed by the investor in a face-to-face transaction." (quoting with approval *In re LTV Sec. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980) (emphasis added)).

Few people really treat all securities as nothing more than a price, with each security at a given price point identical to any other. Whether rationally or irrationally, market participants work with price in addition to some combination of other information or beliefs. *Accord Semerenko*, 222 F.3d at 179 (recognizing that *Basic* treats price "as <u>an</u> indicator of [a security's] value" (emphasis added)); *In re PolyMedica Sec. Litig.*, 432 F.3d 1, 8 n.12 & 10 n.15 (1st Cir. 2005) (discussing literature recognizing that extreme views of price reliance are untenable for *Basic*'s pragmatic presumption).

*Basic* merely presumes actual reliance on the market price as a substantial factor; and it does so for reasons of "fairness, public policy, and probability, as well as judicial economy"—not for theoretical perfection. *Basic*, 485 U.S. at 990. *See generally* Donald C. Langevoort, *Theories, Assumptions and Securities Regulations: Market Efficiency Revisited*, 140 U. Pa. L. Rev. 851 (1992) (discussing efficient market theory's role in securities law and concluding, "For many reasons, we have gambled on a simplifying theory that allows us not to worry too much about [certain questions] in making judgments about securities law. But at some point, the dice will stop rolling, and intellectually, it will be time to settle up.").

For the market to impound price information (and for a plaintiff to rely reasonably on a market price), the market must be "efficient." *Basic*, 485 U.S. at 248; *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). *Basic* refused to "conclusively adopt any particular theory of how quickly and completely publicly available information is reflected in market price"—that is, of how efficient a market must be to apply the presumption. *Id.* at 248 n.28. Indeed, today market "efficiency" has different meanings to theoreticians of various stripes.[77] However, in this Circuit, informational efficiency, such that prices will "reflect all relevant information", is the type of efficiency relevant to the *Basic* presumption. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114-15 (9th Cir. 1989).

### ii. Market efficiency

A working model of informational efficiency is necessary to implement *Basic. Cf. In re DVI Sec. Litig.*, 249 F.R.D. 196, 212 (E.D. Pa. 2008) ("[A]s a court, we cannot make a determination purely on theory, but must make a determination in the context of the real world."). Almost every court to consider the issue has adopted the efficiency factors used in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). The *Cammer* factors are a nonexclusive guide to structure the inquiry into whether a market is efficient.

The Ninth Circuit has employed the *Cammer* analysis. *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999), but has offered relatively little additional

---

[77]*See In re PolyMedica Sec. Litig.*, 432 F.3d 1, 10 n.16 (1st Cir. 2005) (discussing different academic versions of "informational" efficiency—the type of efficiency invoked by *Basic*); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508-11 (1st Cir. 2005) (discussing an academic view of "fundamental value" efficiency—fundamental value referring to a security's "correct" value on some metric besides the market price; explaining fundamental value efficiency's extremely limited relevance to informational efficiency). *Accord In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1478 n.7 (N.D. Cal. 1992) (Walker, J.) (rejecting "fundamental value" efficiency).

1 guidance on how to apply the *Basic* presumption at class certification.

2 Here, the *Cammer* factors (and some other factors generally approved by

3 courts following *Cammer*) inform the parties' efficiency arguments. However, the

4 debt securities and expert testimony in this case push the limits of *Cammer*'s

5 analysis. All four experts involved in this case agree on the relevant formulation of

6 "efficiency" adopted in this order. *Infra* n.81 (explaining that each of the four

7 experts adopt an identical version of efficiency and that the Ninth Circuit, in an

8 unpublished disposition, appears to have applied the same version). The experts

9 disagree only as to the degree of efficiency that is demonstrated by the record.

10 <u>iii. The relevant type of efficiency</u>

11 The First Circuit recently addressed, in depth, the type of informational

12 efficiency that *Cammer* probes. In two cases, decided on the same day and treated

13 as "companion" cases, that Circuit reviewed the weight of judicial authority and

14 concluded that the courts have reached consensus on at least the contours of an

15 "efficient market" for applying *Basic*. *PolyMedica*, 432 F.3d 1; *Xcelera.com*, 430

16 F.3d 503. Indeed, the First Circuit explained that *Cammer*'s language and factors

17 "track[] . . . the definition" of efficiency it adopted. *Xcelera.com*, 430 F.3d at 508.

18 More important in this jurisdiction, the First Circuit quoted and cited a Ninth

19 Circuit case in reaching its conclusions. *PolyMedica*, 432 F.3d at 12-13 (quoting

20 *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding*

21 *Corp.*, 320 F.3d 920, 947 (9th Cir. 2003), *cert. denied*, 540 U.S. 966 (2003)).

22 These two First Circuit cases distill *Cammer* and Ninth Circuit authority into

23 a coherent statement of informational efficiency for fraud-on-the-market purposes.

24 This distillation is useful for reviewing the proffered expert evidence and

25 determining whether Plaintiffs have met their burden to show market efficiency for

26 the securities at issue.

27 <u>The degree of impoundment.</u> *PolyMedica*, after a scholarly discussion of the

28 theoretical issues, concludes that an efficient market is one where the market price

1   of a security <u>fully</u> reflects all publicly available, material information. 432 F.3d at

2   12-14. Though no Ninth Circuit authority exists directly on the point, the

3   *PolyMedica* standard is compatible with Ninth Circuit authority. In *Apple*, the

4   Ninth Circuit explained that "it is a basic assumption of the securities laws that the

5   partially-informed investors will cancel each other out, and that [a] stock price [in

6   an efficient market] will <u>accurately</u> reflect <u>all</u> relevant information." 886 F.2d at

7   1114. A few years later, a different panel stated, "[I]n a modern and efficient

8   securities market, the price of a stock incorporates <u>all available</u> public

9   information." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

10  *West Holding Corp.*, 320 F.3d 920, 947 (9th Cir. 2003) (emphasis added), *cert.*

11  *denied*, 540 U.S. 966 (2003)). However, "accurately" and "all available" do not

12  mean that the information is impounded in some objectively "correct" way, as

13  suggested by the "fundamental value" version of efficiency that has been rejected

14  by the cases. Rather, *Apple* explains that, if a market is efficient, then the market

15  will reflect misrepresentations until they are driven out with new information of

16  sufficient "intensity and credibility" to counter the misrepresentations. *Apple*, 886

17  F.2d at 1116. *Accord VeriFone*, 784 F. Supp. at 1479-80 (explaining that *Basic*

18  presumes that there is a difference between a "market price" altered by a

19  misrepresentation and an "efficient price" that would exist in the market but for the

20  misrepresentation).

21      The foregoing implies an important consequence of the term "fully" as

22  incorporated in *PolyMedica*'s definition of an efficient market. As *Apple* observes,

23  the opinions of "noise traders"—the relatively uninformed—cancel each other out

24  or are overpowered by the better informed. The result is a market consensus price

25  that reflects the market's best judgment about a security's value. 886 F.2d at 1114

26  ("[I]t is a basic assumption of the securities laws that partially-informed investors

27  will cancel each other out . . . ."). That consensus price is the relevant price. The

28  more difficult it is to determine a consensus price, the less evidence there is that

the market is efficient. Thus, efficiency is somewhat harder to establish for non-exchange markets ("over-the-counter" markets) where trades are less centralized. *Cammer*, 711 F. Supp. at 1281; *In re Livent Sec. Litig.*, 222 F.R.D. 219, 222 (S.D.N.Y. 2002).

In an efficient market, the consensus price should not change significantly unless there is <u>new</u> information that is material to the security's value. *PolyMedica* 432 F.3d at 18. Thus, "stale" information—that is, information already known to the market—should be incorporated into the market price. The result is what is sometimes referred to as a "random walk"—a situation in which information about the past or present should not be able to predict future price movements ("returns") because prices respond only to new information. *LTV*, 88 F.R.D. at 143.[78]

This Court adopts the *PolyMedica* standard for the degree to which publicly available, material information is impounded in an efficient market. That degree is "fully."

<u>Speed of information impoundment.</u> To some extent, the notion that an issuer files a press release and "the market" instantaneously and entirely adjusts its price to reflect the "value" of the information in the press release is theoretical. However, certain market actors that trade quickly to make small, incremental profits make it possible for information to be quickly impounded. For example, information entrepreneurs "obtain and analyze information about stocks from a variety of sources, including from the issuer, market analysts, and the financial press" and increase market efficiency through their trades. *PolyMedica*, 432 F.3d at 9. Similarly, the presence of "arbitrageurs"—those who quickly exploit (usually small) price differences among <u>different</u> markets—help bring prices across markets quickly into line with one another, enabling different markets to reflect the same

---

[78]     *See also* Das Rep. ¶¶ 12-13 (quoting two textbooks).

information.[79] As a result, an ordinary investor should not be able to systematically outperform the market based on public information.

Still, even an efficient market may not impound all material information immediately. For example, efficient markets may take relatively longer to fully appreciate some types of information, such as the effect of an FDA Warning Letter on future drug sales. *See, e.g., In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008).[80] As the Ninth Circuit in *America West* explained:

> The market is subject to distortions that prevent the ideal
> of a free and open public market from occurring. . . . As
> recognized by the Supreme Court, these distortions may
> not be corrected immediately. Because of these
> distortions, adoption of a bright-line rule assuming that
> the stock price will instantly react would fail to address
> the realities of the market.

320 F.3d at 934 (internal quotations and citations omitted). Accordingly, "[e]fficiency is not an all-or-nothing phenomenon." *PolyMedica*, 432 F.3d at 15.

Market efficiency is a "fact-specific" inquiry. *America West*, 320 F.3d at

---

[79]     Of course, an arbitrage opportunity cannot be exploited if there are other impediments to transactions. These impediments suggest inefficiency and may include, for example, the situation where costs to make the transaction (the "transaction costs") are higher than the theoretical profit opportunity. Das Dep. at 148:18-149:6. *See also PolyMedica*, 453 F. Supp. 2d 260, 273-74 (D. Mass. 2006) (district court on remand from the First Circuit, using increased transaction costs for short selling as probative of market efficiency because short sellers can help prices rapidly impound negative information).

[80]     *See also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *6 n.74, 2006 U.S. Dist. LEXIS 52991, at *28 n.74 (S.D.N.Y. Aug. 1, 2006) (Scheindlin, J.) ("Some economists have termed th[e] time variable the Efficiency Paradox." (internal citation and quotations omitted) (discussing authority on this point)).

935. Determining if information is rapidly impounded involves analyzing the "structure of the market" and other evidence to determine "whether a market processes information in such a way as to justify investor reliance" on the price to impound all publicly available information—including misrepresentations. *PolyMedica*, 432 F.3d at 14-15, 18. *PolyMedica*—in keeping with the long line of courts that have relied on the *Cammer* factors—approved giving courts "wide latitude in deciding what factors to apply in a given case, and what weight should be given those factors." *Id.* at 18. And *PolyMedica* recognizes that district courts must draw lines and "must draw these lines sensibly." 432 F.3d at 17.

In short, an efficient market for purposes of *Basic* is one that rapidly and fully impounds all material, publicly available information.[81] The cases agree that finance theory's hypothesis referred to as "semi-strong efficiency" is the closest equivalent to the efficient market relied on by *Basic* that can be tested. *PolyMedica*, 432 F.3d at 10 n.16. Indeed, semi-strong efficiency is the hypothesis tested by Plaintiffs' expert and all three Defense experts.

### iv. The *Cammer* factors

The five *Cammer* factors are nonexclusive; courts regularly consider other factors that are reasonable under the circumstances as well. *PolyMedica*, 432 F.3d at 18; *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (reciting the

---

[81]    A recent unpublished disposition from a Ninth Circuit panel adopts substantially the same standard: "[A]n efficient market is one that rapidly reflects new information in prices, such that security prices fully reflect all available information." *Huberman v. Tag-It Pac. Inc.*, 314 Fed. Appx. 59, 63 (9th Cir. Feb. 11, 2009) (emphases added) (citing *Binder*, 184 F.3d at 1065). Although the case does not refer to "materiality," materiality may sometimes be "subsume[d]" in a fraud-on-the-market case because markets should only respond to material new information. *VeriFone*, 784 F. Supp. at 1479. *See also* 4 BROMBERG & LOWENFELS § 7:484 (stating that an "efficient market" for *Basic* is "reasonably definable" as "one which rapidly reflects new information in price" (emphases added)).

1  *Cammer* factors, as well as some additional factors, and explaining that "this does
2  not represent an exhaustive list, and in some cases one of the above factors may be
3  unnecessary"). The factors "are an analytic tool, not a checklist." *Enron*, 529 F.
4  Supp. 2d at 770.

5     The first four *Cammer* factors indirectly assess market efficiency by
6  evaluating whether the attributes of the market for that security are conducive to
7  informational efficiency. *See PolyMedica*, 432 F.3d at 18; *Xcelera.com*, 430 F.3d
8  at 511.[82] The factors are:

9     • Trading volume of the security during the relevant period. The higher
10         the trading volume, the stronger the showing of "significant investor
11         interest in the company" and, therefore, "likelihood that many
12         investors are executing trades on the basis of newly available or
13         disseminated corporate information." *Cammer*, 711 F. Supp. at 1286.
14         Courts often use the "average weekly trading volume." *Xcelera.com*,
15         430 F.3d at 514; *Cammer*, 711 F. Supp. at 1293.

16     • Analysts following the issuer. The more the investment community
17         follows an issuer, the more likely that investors will rapidly and fully
18         impound information into the issuer's securities prices. *Cammer*, 711
19         F. Supp. at 1286; *Xcelera.com*, 430 F.3d at 514. Courts sometimes

20

21  [82]  Each security trades in its own "market" for purposes of the fraud-on-the-
22  market theory. 4 BROMBERG & LOWENFELS § 7:484; *see also Teamsters*, 2006 WL
23  2161887, at *12, 2006 U.S. Dist. LEXIS 52991, at *56-57 (noting that each
    security's "market must independently satisfy" some efficiency factors (emphasis
24  in original)). That is not to say that evidence regarding similar securities from the
25  same issuer, or evidence regarding the issuer itself, cannot also be probative of
    efficiency. Indeed, many of the *Cammer* factors evaluate attributes of the issuer to
26  indirectly determine whether the market for the securities of that issuer is efficient.
27  The key point is that information about the specific security is more probative than
    information about similar securities or the issuer.
28

count the number of analysts, *see Teamsters*, 2006 WL 2161887, at *6
& n.82, 2006 U.S. Dist. LEXIS 52991, at *31 & n.82 (collecting
authority), but it may be helpful to focus on the type of analysts when
counting. For example, in evaluating a specific debt security, the
following hierarchy of analysts —as measured by the value of their
analysis—may be useful: analysts following that specific security,
analysts who follow an issuer's debt in general, and analysts who
follow the issuer's common stock. *See Enron*, 529 F. Supp. 2d at 748
(recognizing that information regarding "the specific security at issue"
is more probative than general information about an issuer).

- Issuer's eligibility to file SEC Form S-3. The SEC Form S-3 is an
abbreviated disclosure form. The SEC allows some issuers to use this
form based on the assumption that the market has sufficient
information about an issuer. An issuer may use Form S-3 when (1) the
public market values the issuer's securities at a high price (that is, the
"public float" is sufficiently large); and (2) the issuer has been
publicly disclosing information by making periodic reports to the SEC
for at least twelve consecutive months. *Cammer*, 711 F. Supp. at
1284; *Xcelera.com*, 430 F.3d at 511. Eligibility to file a Form S-3 is
therefore some evidence of these factors, which, in turn, are relevant
to informational efficiency about the issuer.[83]

- Arbitrageurs and market-makers. Arbitrageurs, discussed above,

---

[83] This factor's prominence may be due more to tradition than its value. Still,
S-3 eligibility does indirectly measure an issuer's public float and indicate a
minimum amount of publicly available information, both of which correlate with
market efficiency. Courts sometimes consider public float as a separate factor as
well. *See Unger*, 401 F.3d at 323.

exploit price differences among markets. "A market-maker is one who
helps establish a market for securities by reporting bid-and-asked
quotations (the price a buyer will pay for a security and the price a
seller will sell a security) and who stands ready to buy or sell at these
publicly quoted prices." *Xcelera.com*, 430 F.3d at 515 (alterations and
internal quotations and citations omitted). Market-makers enhance
"liquidity"—the ability to execute a trade quickly and efficiently—
because they distribute price information; trades are less likely to
happen when price discovery is difficult. Market-makers stand by as
available counterparties to a trade, thereby enhancing the possibility
that a trade can occur at a price that reflects information rather than a
party's urgent need to buy or sell.[84] Market-makers thereby help
trades—and, hence, the price information trades report—execute more
smoothly. The more market-makers for a particular security (and,
relatedly, the greater the volume of the security the market-makers are
prepared to handle), the more reasonable it is to infer that the security
is liquid, and, therefore, more likely the market for that security is
efficient. Similarly, the presence of large institutional investors may
be similar to the presence of market-makers and arbitrageurs: large
investors, with more money at stake, may be more likely to inform

---

[84]     A related factor is the bid-ask spread, or the difference between the price at
which investors are willing to buy the stock and the price at which current
stockholders are willing to sell. *Krogman v. Sterrit*, 202 F.R.D. 467, 478 (N.D.
Tex. 2001). A greater bid-ask spread may suggest decreased efficiency because it
indicates high transaction costs (thereby discouraging trades, including arbitrage),
or perhaps because the spread represents a risk premium, which is correlated with
liquidity problems.

themselves well before trading. *See Xcelera.com*, 430 F.3d at 515.[85]

The final *Cammer* factor differs from the others. Rather than relying on circumstantial evidence that a security's market is <u>conducive</u> to efficiency, the final factor explores whether an important <u>result</u> of an efficient market exists:

- <u>Empirical evidence suggesting a causal connection between new information and price movement</u>. A causal connection between new information and price movement is "the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer*, 711 F. Supp. at 1287. It is therefore the "most important" *Cammer* factor. *Polymedica*, 453 F. Supp. 2d at 268; *Xcelera.com*, 430 F.3d at 512.

Event studies are by far the most common test for a causal connection. An event study attempts to determine whether new information correlates with a price movement—including the price movement's direction and, perhaps, magnitude. Causation may be inferred from this correlation. Naturally, the inference that the new information has caused the price movement is stronger under some circumstances. For example, the inference will be stronger: (1) the more statistically significant the correlation; (2) the more objectively defined the event is; (3) the better the study controls for nonfraud factors; and (4) the larger and more representative the sample. Some reasons these circumstances enhance the reasonableness of inferring a causal connection are discussed below in the analysis

---

[85]     As with some of the other foregoing propositions, there may be academic debate about this. *See, e.g., Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 315 & n.16 (5th Cir. 2005) (citing 1994 article that found market-makers were not useful in determining efficiency). However, in this case, experts on both sides agree that institutional investors tend to increase market efficiency. Carron Dep. at 124:16-126:19; Kleidon Rep. ¶ 25. Further, as discussed in the analysis of the expert evidence, institutional investor interest in the debt securities at issue in this case does appear to be correlated with other indicators of efficiency.

1 of the proffered expert evidence.

2    Other empirical studies include testing for price correlation with certain
3 variables. For example, experts often perform one or more tests for serial
4 correlation—the ability of a security's prior movement to predict its future
5 movement. "In an efficient market, there should be no trends because the market
6 should be reacting quickly to new information, and new prices are being set
7 quickly based upon the new information." *Lehocky*, 220 F.R.D. at 506. In other
8 words, if the security is efficient enough, its past movements will not predict its
9 future movements. This was previously referred to as a "random walk" because
10 price changes are being driven by new, unpredictable information. *See supra*
11 discussion at p.48. Thus, the presence of serial correlation suggests inefficiency.[86]
12 However, the absence of serial correlation could also indicate that the security's
13 market is so inefficient that new information is barely, or not at all, related to past
14 information. Thus, the presence of serial correlation is not itself determinative of
15 inefficiency.

16    As stated, event studies are often used to determine how a security reacted to
17 news. *Xcelera.com*, 430 F.3d at 512-14. The event study in this case, presented by
18 Plaintiffs, is discussed below.

19                          v. Debt considerations

20    Debt and equity respond differently to some types of news. *Accord Enron*,
21 529 F. Supp. 2d at 747 ("There seems to be little, if any, dispute that the nature of
22 news that would affect the markets for stock can be quite different [from] what
23 would affect the markets for bonds."). Each of the following qualifications or
24 elaborations of the *Cammer* factors, as applied to debt securities, is generally
25 assented to—to a greater or lesser extent—by experts on both sides of this case.

26

27 ────────────────
[86]    *See, e.g., Lehocky*, 220 F.R.D. at 506 & n.20.
28

1    Debt reacts to the risk of a change in interest rates; generally increasing
2  interest rates will increase bond yields. It also reacts to default risk, which is the
3  risk that the issuer will not pay as agreed. Equities and debt may react to similar
4  news, but their responses may diverge in degree. For example, there may an
5  "equity cushion" or "equity buffer" that will be wiped out before debt value is
6  affected. This is because, in bankruptcy, the debt securities will be paid off before
7  the equity. Hence, there is a "cushion" for bad news about the issuer. Until the
8  financial situation becomes severe enough that the issuer is likely to default, there
9  is relatively little effect on debt price. Another reason for a different response is
10  that equity takes any additional profit, but debt's upside is limited by the debt's
11  terms. *See id. at* 762 & n.141.
12    In addition, some *Cammer* factors are less applicable to debt securities. As
13  noted above, coverage by equities analysts, such as analysts who cover common
14  stock of the issuer, differs from debt analyst coverage. While equity analyst
15  coverage is relevant to the efficiency of an issuer's debt, it is not as probative as
16  debt analyst coverage—particularly debt analyst coverage of the particular debt
17  security in issue.
18    Coverage by the major credit rating agencies also provides information to
19  the market and is relevant to a determination of a debt security's efficiency.
20  Ratings agency coverage includes bottom-line ratings as well as other statements,
21  such as that the agency may reconsider a rating. There are important limits to the
22  rating agencies, however. The ratings agencies' reports appear to provide less
23  nuanced information than analysts' reports, appear to issue less often than analysts'
24  reports, and may lag behind the market's knowledge. *See Teamsters Local 445*
25  *Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 206 n.12 (2d Cir.
26  2008). *See also* Carron Dep. at 41:5-44:23 (defense expert reviewing and
27  discussing the report and opinions of plaintiff's expert on credit ratings).
28    All the foregoing is to illustrate some types of relevant evidence and to

1  elaborate on *PolyMedica*'s caution that there are no bright lines; rather, lines must

2  be drawn, and factors weighed, sensibly and in the circumstances of the case. *Am.*

3  *West*, 320 F.3d at 934; *PolyMedica*, 432 F.3d at 17; *Unger*, 401 F.3d at 323.

### b. Procedure: establishing and rebutting the presumption

5  The "threshold facts" underlying market efficiency must be shown at class

6  certification for the *Basic* presumption to apply. *Basic*, 485 U.S. at 248 & nn.27,

7  28 (quoting "threshold facts" from the class certification holding of the appellate

8  court below); *PolyMedica,* 432 F.3d at 17 ("As the notes of the Advisory

9  Committee on Rule 301 of the Federal Rules of Evidence, cited in *Basic*, make

10  clear, a party need only establish 'basic facts' in order to invoke the presumption of

11  reliance." (citing *Basic*, 485 U.S. at 245 and *Cammer*, 711 F. Supp. at 1291 n.48

12  (reasoning to the same conclusion for the same reasons))). This evidentiary

13  showing is "one of degree." *PolyMedica*, 432 F.3d at 17.[87]

14  After the *Basic* presumption has been raised, it can be rebutted at a merits

15  stage. *Id.* at 7 n.10; *see also Basic*, 485 U.S. at 245, 249 n.29. The Supreme Court

16  recognizes that the presumption may be rebutted by "[a]ny showing that severs the

17  link between the alleged misrepresentation and either the price received (or paid)

18  by the plaintiff, or his decision to trade at the market price." *Basic*, 485 U.S. at

19  248. One way to sever the link is to show that the "truth was on the market"—i.e.,

20  that the market knew the truth and therefore the market price did not change in

21  reliance on the misrepresentations. *Provenz*, 102 F.3d at 1492-93 & n.4; *Apple*

---

23  [87]   The level of factual showing on the Rule 23 prerequisites and requirements

24  may be affected by a pending Ninth Circuit *en banc* case. *See Dukes v. Wal-Mart,*

25  *Inc.*, 556 F.3d 919 (9th Cir. 2009) (order taking case *en banc*). Here, the Court

follows binding authority, *supra* Section III.A (explaining the Rule 23 standard),

26  and *PolyMedica* by treating "[t]he question of how much evidence of efficiency is

27  necessary for a court to accept the fraud-on-the-market presumption of reliance at

the class-certification stage [as] one of degree." *PolyMedica*, 432 F.3d at 17.

28

*Computer*, 886 F.2d at 1114-15 (explaining *Basic* and concluding "that in a fraud
on the market case, the defendant's failure to disclose material information may be
excused where that information has been made credibly available to the market by
other sources."). Defendants could also rebut the presumption by showing that a
plaintiff actually knew of the concealed information "but nevertheless" still
transacted to his detriment because of other forces. *Basic*, 485 U.S. at 249.

### c. Expert overview

Again, there are four experts in this case. Plaintiffs proffer one expert, Dr.
Jarrell. Defendants' experts are Dr. Das, Dr. Carron, and Dr. Kleidon. The experts
have performed different tests and come to varying conclusions. However, the
facts and data offered by the experts, as opposed to the reports' ultimate
conclusions, can be reconciled by the Court—at least for the legally relevant issues
at class certification. At the class certification stage, therefore, all experts'
testimony has been considered and given their appropriate weight.[88]

Dr. Jarrell, Plaintiffs' expert, applied the *Cammer* and other factors that
courts have considered. He also conducted some correlation tests. He opines that
the markets for common stock, options on the common, the Capital Securities, and
eleven debt securities are efficient. He declined to opine on the efficiency of the
markets for the thirteen other debt securities at issue in this case.

Dr. Das, Countrywide Defendants' expert, was not asked to examine the
common stock or options. He performed correlation tests with respect to the debt
securities and Capital Securities. Dr. Das' precise type of test appears never to

---

[88]      As with the factual showing required to establish the Rule 23 prerequisites
and requirements, the standards for evaluating expert evidence may be affected by
a pending *en banc* case. *Supra* n.87. However, the experts in this case do not
present inherently conflicting evidence. There is no "battle of the experts" in that
sense. But there is a battle over relatively unique expert evidence in this large case.

1   have been presented to a court before, but the framework underlying his model has

2   been published in a peer-reviewed journal. Sanjiv R. Das and Rangarajan K.

3   Sundaram, *An Integrated Model for Hybrid Securities*, 53 MGMT. SCI. 1439 (2007).

4   Dr. Jarrell agrees that Dr. Das' inputs to his correlation tests are relevant and he

5   offers no critique of Dr. Das' methodology.[89] Notably, Dr. Jarrell's event studies,

6   *Cammer* analyses, correlation tests and results are compatible with Dr. Das' tests.

7        Dr. Das' model tests for correlations between the debt securities' returns and

8   four variables: (1) Countrywide's common stock price; (2) Countrywide's credit

9   risk (as reflected in the market for Countrywide credit-default swaps);[90]

10  (3) Countrywide's volatility as reflected in option prices;[91] and (4) interest rate

11  changes.[92] As Dr. Das explained, these factors are used by market participants to

12  price bonds every day and also are accepted within the academic community as the

13  appropriate inputs for pricing bonds. *See* Das Dep. at 204:5-206:5. These variables

---

15  [89]      Jarrell Reb. Rep. ¶ 98 (stating that debt "value can be affected by, for
16  example, a change in interest rates; the default risk of a bond; particular restrictions
17  on a corporate bond such as seniority, call feature and/or convertibility features.
18  Changes in one or more of these factors can explain, for the most part, why a
    bond's value varies in prices from one day to the next.").

19  [90]      The credit-default swap spread measures the market's perception of an
20  issuer's risk. *See* Das Rep. p.11 n.10. Credit default swaps are contracts that refer
    to a "credit event" such as a bankruptcy or default. A credit-default swap "buyer"
21  will make a series of payments to the "seller." If the referenced credit event occurs,
22  the seller will pay out to the buyer. For example, a credit-default swap on
    Countrywide might pay out if Countrywide debt had its rating downgraded. The
23  "spread" is a measure of the contract's price. The bigger the spread, the more
24  likely the market thinks the event will occur.

25  [91]      A calculation that uses options prices, it is included to account for debt with
    "option-like" features, such as a right of conversion into common stock. Das Dep.
26  at 41:3-4; *see also* Jarrell Aff. at n.9.

27  [92]      Such changes are measured by the change in yield of a one-year U.S.
    Treasury bill.

28

1  can reasonably be presumed to affect the value of Countrywide debt. Indeed, Dr.
2  Jarrell expresses no opposition to the theoretical underpinning of Dr. Das' test.

3  Dr. Das tested for both a same-day correlation between the debt securities'
4  returns and the four variables, i.e., whether the debt security responds to new
5  information relevant to the debt's value. Das Rep. ¶ 23. Same-day correlation is
6  consistent with market efficiency. Dr. Das also tested for a correlation between the
7  debt securities' returns and the four variables as of the prior day, i.e., whether old
8  information predicts changes in the debt securities' value. Correlation between
9  prior-day variables and the security's return is evidence of inefficiency. As
10  explained above, old information should not help explain a security's future
11  movements. Das Reb. Rep. ¶ 6.

12  Dr. Das used three datasets for his price information. Two were based on
13  actual trade data from the Financial Industry Regulatory Authority ("FINRA"),
14  which requires that all trade data be reported. FINRA data is available to market
15  participants in real-time, which enhances price discovery, and therefore liquidity.
16  This availability of information has therefore been weighed as a factor in favor of
17  market efficiency for all the debt securities at issue. The third is a set of "matrix"
18  prices from Bloomberg, which use actual trade data as one input into a model.[93]
19  The matrix prices are further removed from actual trade data and are therefore less
20  probative than the actual trade data. *See Teamsters*, 546 F.3d at 208-09 & n.16;
21  *Enron*, 529 F. Supp. 2d at 760-61; *DVI*, 249 F.R.D. at 214 n.32.

22  Dr. Carron, Countrywide Defendants' other expert, performed some
23  statistical calculations, opined on the nature of the market for debt securities,
24  provided other background information, and criticized Dr. Jarrell's work.

25

---

26  [93]   Das Rep. ¶¶ 17-19 & n.12 (explaining matrix sources); *see also* Das Reb.
27  Rep. ¶ 3 (matrix prices "based" on actual trade data); *id.* ¶9 (FINRA data contains
       intra-day trading and reports the volume of trades).
28

Dr. Kleidon, proffered by KPMG, opined on the general structure of the debt markets and Countrywide's debt. His exhibits principally contain aggregate statistics about numerous Countrywide debt securities, including many for which Plaintiffs do not seek to certify a class. Accordingly, his report is useful for general background.

The experts have devoted extensive analysis to the debt securities at issue here. The Court discusses only the most important aspects of the reports in its analysis.

### d. Common stock (and options on the common)

Dr. Jarrell applied the *Cammer* factors (and additional factors approved by courts) to the common stock, as well as certain exchange-traded options on the common (puts and calls).[94] When applied to a company as large as Countrywide, each factor obviously favors efficiency.

For the fifth "causation" factor, Dr. Jarrell performed an event study on the common. He then ran two tests to determine whether exchange-traded options on the common traded consistently with market efficiency: whether Countrywide's common stock and options' prices correlated as predicted by the Black-Scholes pricing model, a widely accepted option pricing model; and whether the exchange-traded options on the Countrywide common violated put-call parity on any day in the class period.[95]

---

[94] *See In re Fed. Nat'l Mortgage Assoc. Sec. Litig.*, 247 F.R.D. 32, 42 (D.D.C. 2008) (collecting authority that applies *Basic* to option trading).

[95] Put-call parity is a theoretical relation between call option prices, put option prices, and stock prices that should hold because a portfolio of put and call options plus risk-free bonds can be constructed to replicate the payoff from purchasing the underlying stock. *PolyMedica*, 453 F. Supp. 2d at 274-75 (district court on remand from the First Circuit, providing greatly simplified illustrations of options theory and noting only a few assumptions on which the examples rely); *Seinfeld v.*

*(footnote continues . . .)*

Dr. Jarrell defined the events for study as every quarterly earnings release dated during the class period where earnings differed from analysts' consensus estimates. This is a fairly objective criterion. None of the three defense experts has any objection to the methodology used in Dr. Jarrell's event study on the common, at least "in principle."[96]

It should be obvious, even to those without a background in statistics or econometrics, that the events for study should be selected using criteria that are as objective as possible. Further, those criteria should be determined before looking at the result to be studied (here, stock returns). Relatedly, unless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility. Of course, many decision points in designing an event study require some subjectivity: identifying news, categorizing which news is "material," and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations.[97] But such subjectivity should be

---

*(. . . footnote continued)*

*Becherer*, 461 F.3d 365, 373 n.4 (3d Cir. 2006) (discussing the Black-Scholes pricing model).

[96]    The defense experts provide little criticism of Jarrell's "earnings surprise" event study on the common stock in their reports. *See* Carron Rebuttal at ¶ 30 (containing the only reference to Jarrell's event study on the common and stating that it "could in principle" be correctly designed); Carron Dep. at 37:12-38:6, 39:13-41:25 (stating that he has no opinion on efficiency of the market on the common stock or puts and calls on the common and does not disagree with Dr. Jarrell on those securities). *But see* Kleidon Rep. at ¶¶ 12-13 (agreeing with the methodology in general principle but taking issue with some specific aspects of Dr. Jarrell's methodology).

[97]    *DVI* observes that any event study has some degree of ambiguity as to materiality: one cannot say with certainty whether a lack of response is due to "investor indifference to that particular news event." 249 F.R.D. at 211. That is true—indeed, it is why the Supreme Court recognizes in *Basic* that fraud-on-the-

*(footnote continues . . .)*

minimized.[98]

Dr. Jarrell's earning surprise event study must be given due consideration on this motion. He has a reasonable number of observations (due to the long class period) and has defined his "new" information relatively objectively—as a significant deviation from the analyst consensus.[99] Further, Dr. Jarrell took his

---

*(. . . footnote continued)*

market may "collapse" materiality to some extent, *see Basic*, 485 U.S. at 248 n.27—but this ambiguity can be reduced by increasing the sample size (number of "observations"), ensuring the sample is representative (e.g., by studying a random sample of days with both large and small returns), and objectively defining "new" information. At the same time, *DVI* appears to approve almost any event study methodology simply because *DVI* notes (1) that experts on both sides of that case happened to perform equally flawed event studies, and (2) that almost any event study involves some subjectivity—another correct observation, but not one that excuses poor design. 249 F.R.D. at 211.

By contrast, the district court in *PolyMedica*, after remand from the First Circuit, declared that an event study must compare "all news days with all non-news days" in order to "approach usefulness." 453 F. Supp. 2d at 270. The *PolyMedica* district court was critiquing an expert report that analyzed the days with the 10 largest price movements from a pool of 160. This seeming overstatement appears to be a paraphrase of expert testimony to the effect that the sample size was too small and likely not representative. 453 F. Supp. 2d at 269-70.

[98] One way to minimize subjectivity is to define the event *ex ante* by criteria that are as objective as possible under the circumstances. *See, e.g.*, Craig A. MacKinlay, *Event Studies in Economics and Finance*, J. ECON. LIT., vol. 25 at p.14 (March 1997); Robert G. Bowman, *Understanding and Conducting Event Studies*, J. BUS. FIN. & ACCOUNTING at p.563 (1983); *see also* Jarrell Dep. at 50:13-22, 51:18-52:6. Another important component in designing an event study is minimizing confounding information—that is, an event study should isolate the variable to be studied, as much as possible. To that end, securities event study methodology attempts to reduce, for example, the effect of marketwide factors and industry-specific factors.

[99] That is not to say that Dr. Jarrell's methodology is the only methodology with probative value; nor is it to say that Dr. Jarrell's methodology is the best—there may be some events that simply are incapable of reasonable dispute as to

*(footnote continues . . .)*

observations from the class period. Observations during the class period should be more probative of efficiency than from another period.[100] No defense expert performed a test that shows evidence of inefficiency in these securities.

Plaintiffs are entitled to the *Basic* presumption with respect to the common stock and certain exchange-traded options on the common (sellers of puts and buyers of calls).

### e. Capital Securities

Dr. Jarrell applied the *Cammer* factors to the Capital Securities. The Capital Securities had a market capitalization between $385 million and 1.3 billion during the class period. Jarrell Aff. ¶ 75. They traded on the New York Stock Exchange for much of the class period, where their average bid-ask spread was 0.51%. *Id.* ¶ 76. The high trading volume and low bid-ask spread on these securities are indicative of an efficient market.

Dr. Jarrell ran a relatively subjective "news reaction" event study of the Capital Securities and found some results consistent with efficiency. This study sampled only 45 days with some of the largest returns during the class period. Dr. Jarrell also ran two serial correlation tests. One test generated an estimate of the degree of correlation—a "coefficient"—between the security's returns and returns from the prior day. The second test calculated a Durbin-Watson statistic, another generally accepted method of estimating serial correlation. Neither test indicated

---

*(. . . footnote continued)*

whether they are relevant news that should move a security's value in one direction or another. And there are potentially techniques to reduce subjectivity in news analysis, such as using computers to compile the amount of news coverage a certain issuer received on a given day or to algorithmically extract the general "positivity" or "negativity" from text of news coverage.

[100]   That is not to say that other time periods may not be probative; or that they may not be relevant to establishing a baseline if an event study is attempting to compare periods. *See, e.g.,* Jarrell Rep. ¶ 22.

1    statistically significant serial correlation. Further, none of Dr. Das' tests found

2    statistically significant evidence of inefficiency in the Capital Securities.

3          The Capital Securities subclass is entitled to the *Basic* presumption.

4                    **f. Debt securities**

5          Dr. Jarrell's methodology on the debt securities yields results of little

6    probative value. He ran a "news reaction" event study on one of Countrywide's

7    "L Series" bonds, which was the most actively traded bond in the class period. He

8    termed that bond a "representative bond." For this study, Dr. Jarrell took <u>ten</u> days

9    during the entire class period as his sample. Those days were some of the highest-

10   return days during the period. Dr. Jarrell then compared the representative bond to

11   other bonds at issue and concluded that "[f]or the most part [they] tended to move

12   in the same direction and in a reasonably similar amount to that of the

13   representative bond" for the ten days he studied. Jerrell Aff. ¶ 134. Of the twenty-

14   three bonds that Dr. Jarrell compared to the representative bond, he opined that ten

15   are relatively efficient. *Id.* ¶ 135.

16         Dr. Jarrell's news reaction event study is too subjective to be very helpful to

17   the Court. First, the event study used a very small sample of only ten days within

18   the class period. Second, those days may not be a representative sample because

19   they were some of the biggest return days. Third, the representative bond had the

20   highest trading volume of any debt security Dr. Jarrell tested. Further, Dr. Jarrell

21   compared the other bonds to the representative bond and made quite subjective

22   determinations about whether the bonds "tended to move" in a manner "reasonably

23   similar" to the representative bond. *Id.* Dr. Jarrell did recognize that the other

24   bonds have economic terms that could affect their response to new information,

25   such as "differences in coupon rates, maturities, asset protection, and seniority . . .

26   .", but he appears to give them minimal, if any, weight. *Id.*

27         While the Court recognizes that the *Enron* court approved a similar analysis,

28   the Court finds that decision unpersuasive precedent because the bond market at

1   the time was not transparent. 529 F. Supp. 2d at 748 & n.125. In fact, that court

2   and its experts expressed a frustration at the lack of data on the bond market. *Id.*

3   There is more data available now because of recent changes in FINRA rules and

4   reporting requirements.

5        The representative bond traded on 997 days of the class period. Some other

6   bonds traded on fewer than 200 days during the class period. Three bonds had

7   remarkably few (less than 50) institutional holders, while others had hundreds of

8   institutional holders. The bonds also differ widely in average daily volume—from

9   about $800,000 for a bond that traded a mere 112 days and was held by 58

10  institutions to almost $6 billion for a bond held by 236 institutions. The bonds'

11  price dispersions do not appear tightly correlated with the other efficiency-related

12  factors. Further, the bonds were, in general, correlated with the representative bond

13  to a greater extent the <u>fewer</u> days they traded. This negative relationship is

14  troubling because the two factors, increased trading and correlation with the

15  representative bond, should move in the same direction. Indeed, the weight of

16  judicial and economic authority suggests that more trades and more price

17  information should enhance liquidity. It is reasonable, therefore, to suspect that the

18  stronger correlations may be due to the small sample size.[101]

19       When Dr. Das applied two of his three price datasets to the group of twenty-

20  three bonds, he found no evidence of inefficiency on two of them, one of which

21  was Dr. Jarrell's representative bond, CUSIP No. 22237LNR9.[102] The other bond

22  was also in the L Series, meaning that its economic features are similar to the

23

24  [101]   This and the remaining discussion of the bonds is based on Jarrell Aff. Ex.
       15 and Das Reb. Rep. Exs. 2A-C.

25  [102]   CUSIP is an acronym for the Committee on Uniform Securities

26  Identification Procedures.  The committee supplies a unique nine-character

27  identification number, the CUSIP number, for each class of security traded in the
       United States.

28

representative bond. This second L Series bond also made a strong showing on Dr. Jarrell's *Cammer*-like circumstantial metrics: it had the highest number of institutional holders (284) and a relatively high number of trading days (970—second only to the representative bond's 997). Thus, this second L series bond, CUSIP No. 22237LPA4, qualifies for the *Basic* presumption.[103]

Three bonds, CUSIP Nos. 22238HAC4, 22238HAW0, and 22238HBD1, have very low numbers of institutional holders—17, 49, and 58. Those three bonds also traded on the fewest days—170, 112, and 221. These bonds also had the smallest issue sizes. Two bonds were $500 million issues, and one was an $800 million issue.[104] Accordingly, under *Cammer*, Plaintiffs have made an extremely weak showing of efficiency on these bonds.

On one of these three bonds, CUSIP No. 22238HAW0, Dr. Das found no evidence of inefficiency under any of his three price datasets. However, that bond had the least active trading by far (20% of available days). That bond also had few institutional holders (58) and a small number of trading days in absolute terms (a mere 112). On this basis, a reasonable inference is that Dr. Das could not find statistically significant evidence of inefficiency because too few observations were available. Plaintiffs have not met their burden to show efficiency on these three bonds. No *Basic* presumption is warranted as to them.

Of the remaining bonds, Dr. Das found some evidence of inefficiency on all tests. However, the Court recognizes that three of the remaining bonds are distinguishable largely on (1) indicators of their trading activity; (2) their terms;

---

[103] To underscore the weakness of Dr. Jarrell's "representative bond test", the Court notes this second L bond was one of the <u>least</u> correlated with the representative bond.

[104] Presumably because of this small sample size, these two also happen to be the most correlated with the representative bond.

and (3) and their number of institutional holders.[105] All were issues over $1 billion, had between 236 and 284 institutional holders, and experienced active trading in both absolute number of trading days available and days on which trading occurred (98-99% of available days). These bonds, CUSIP Nos. 22238HGQ7 from Series B Medium-Term Notes, 222372AJ3 from the 6.25% Subordinated Notes Due May 15, 2016, and 22237LPM8 from Series M Medium-Term Notes, have made a strong showing of efficiency under the *Cammer* factors. The evidence consists of (1) Dr. Das' evidence of some inefficiency in these bonds; and (2) a strong showing under the *Cammer* factors. Therefore, at present, the Court concludes these three bonds qualify for the *Basic* presumption.

In sum, five of the ten debt securities on which Plaintiffs seek class certification qualify for the presumption: CUSIP Nos. 22237LNR9, 22237LPA4, 22238HGQ7, 222372AJ3, and 22237LPM8. Because Plaintiffs did not purchase Series L or Series M Medium-Term Notes, they do not have standing to bring '33 Act claims on those Notes. Plaintiffs' '34 Act claims depend on their ability to qualify for the *Basic* presumption of reliance. Since the Court concludes only two Series L (CUSIP Nos. 22237LNR9 and 22237LPA4) and one Series M (CUSIP No. 22237LPM8) Notes qualify for the presumption, the Court limits the debt securities subclass to purchasers of those specific instruments as well as purchasers of the Series A and Series B Medium-Term Notes and the 6.25% Subordinated Notes Due May 15, 2016.[106]

---

[105]   Dr. Jarrell includes some other factors, such as price dispersion, but his representative bond has some of the greatest price dispersions. This evidence is either ambiguous or somewhat disfavors Plaintiffs.

[106]   Due to differences between the '33 and '34 Acts, the claims upon which Plaintiffs can seek classwide recovery differ according to individual securities. At this stage, Plaintiffs successfully showed *Basic* market efficiency for five specific straight debt instruments. Two of these instruments are types on which Plaintiffs

*(footnote continues . . .)*

### g. Section 11 reliance burden

Because § 11 of the '33 Act imposes nearly strict liability for misrepresentations or omissions in a registration statement, Plaintiffs do not need to rely on a fraud-on-the-market theory to establish class-wide reliance. Section 11 creates a cause of action for a person who acquires a security against those who play a "direct role in a registered offering," *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983), if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . " 15 U.S.C. § 77k(a). Under § 11, purchasers are not required to prove reliance <u>unless</u> "such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement . . . ." 15 U.S.C. § 77k(a). If an earnings statement was "made generally available," this exception to strict liability applies and a plaintiff must prove he "acquired the security relying upon such untrue statement in the

---

*(. . . footnote continued)*

can recover on certain '33 Act claims and some '34 Act claims--one Series B Note [CUSIP No. 22238HGQ7] and one 6.25% Subordinated Note [CUSIP No. 222372AJ3]. Plaintiffs can seek classwide recovery for the remaining three instruments only on certain '34 Act claims [CUSIP Nos. 22237LNR9, 22237LPA4, and 22237LPM8]. Recognizing this, Plaintiffs' proposed class definition, and the Court's adopted class definition, define the class by either type of instrument or only CUSIP. Where the class is defined by type of instrument, classwide recovery is not necessarily limited to specific CUSIPs. Where the class is defined with reference to specific CUSIPs, any classwide recovery on that type of instrument is limited to certain CUSIPs. This class definition shall not be read to expand or contract other legal limitations on classwide recovery. The proposed class notice shall carefully and accurately reflect these distinctions in plain language. Fed. R. Civ. P. 23(c)(2)(B).

1   registration statement or relying upon the registration statement and not knowing
2   of such omission, but such reliance may be established without proof of the
3   reading of the registration statement by such person." *Id.*

4          Underwriter Defendants argue the exception applies here because many
5   members of the purported class purchased securities after Countrywide issued
6   qualifying earning statements. Each of those putative class members will be
7   required to prove individual reliance upon the registration statement. Such
8   individual reliance issues would predominate at a trial on the §11 claims and could
9   prevent the Court from certifying a class. *See supra* Section III.C.1.a (explaining
10  the rationale for a fraud-on-the-market or other classwide reliance theory).

11         Plaintiffs insist that the exception does not apply here because the
12  accounting statements that Countrywide issued do not qualify as earning
13  statements under § 11(a) or SEC rules. Specifically, Plaintiffs contend that an
14  earning statement will not satisfy Section 11(a) unless it meets SEC regulatory
15  requirements, including that it not contain any material misstatements and that the
16  information be complete enough so as to not be misleading. At least two district
17  courts, both of which addressed cases primarily based on large accounting frauds,
18  agree. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 293-94 (S.D.N.Y.
19  2003); *In re Enron Sec. Deriv. & ERISA Litig.*, 529 F. Supp. 2d 644, 696-97 (S.D.
20  Tex. 2006) (adopting *WorldCom*'s analysis).

21         *WorldCom* cites SEC Rule 158, which defines "earning statement" for
22  §11(a)'s reliance provision and establishes specific circumstances under which a
23  statement will be deemed "sufficient." *WorldCom*, 219 F.R.D. at 289 (citing 17
24  C.F.R. § 230.158(a) (defining terms in §11)). For example, reporting companies
25  may satisfy §11(a)'s earning statement provision with information contained in any
26  of several SEC Forms, including "(i) In Item 8 of Form 10-K . . . , Item 1 of Form

27

28

1   10-Q . . . ; (ii) In Item 17 of Form 20-F . . . ; or (iii) In Form 40-F."[107] 17 C.F.R.

2   § 230.158(a).[108] *WorldCom* reasons that because other SEC regulations require that

3   SEC filings do not contain material omissions, a filing cannot constitute an

4   "earning statement" for purposes of § 11(a) if it does not contain the requisite

5   material disclosures. *WorldCom*, 219 F.R.D. at 289, 293 (relying on 17 C.F.R.

6   §210.4-01(a) ("The information required with respect to any statement shall be

7   furnished as a minimum requirement to which shall be added such further material

8   information as is necessary to make the required statements, in light of the

9   circumstances under which they are made, not misleading")). *WorldCom*

10  concludes:

11              An earning statement that violates the SEC filing

12              requirements should not be considered an "earning

13              statement" for purposes of Section 11, and should not

14              function in a Section 11 claim to shift to the plaintiff the

15              burden of proving reliance. It would be illogical indeed if

16              any filing—no matter how inaccurate or misleading, and

17              despite its perpetuation of the very misrepresentations at

18              stake in the Section 11 claim—were sufficient to shift the

19              burden to the plaintiffs to establish reliance on the

20              Registration Statement. Whether a filing is sufficient to

21              shift the burden must depend on whether it meets the

22

23  [107] Such periodic reports on SEC Forms are mandatory for "reporting" companies.
24  [108] "Permitting one or any combination of Exchange Act reports containing the
25  required information for statements of income to satisfy the 'earning statement'
    requirement of paragraph (a) means that the information in the 'earning statement'
26  may be contained in multiple documents." Definition of Terms, SEC Release No.
    6485, File No. S7-972, 1983 WL 33530, at *2, 1983 SEC LEXIS 717, at *7
27  (September 23, 1983).
28

1    requirement for earning statements imposed by the SEC
2    rules and regulations.

3  *Id.* at 293-94. *Accord Enron*, 529 F. Supp. 2d at 697 (quoting *WorldCom*).

4        The Court agrees with the essence of this reasoning. The present matter can
5  be resolved with a narrow holding: Section 11(a) and the SEC rulemaking do not
6  allow defendants to shift the reliance burden to plaintiffs where, as in this case,
7  both the financial statements incorporated in the registration statements and
8  subsequent earning statements are alleged to contain material accounting-related
9  misstatements or omissions.[109]

10       So long as Plaintiffs prove accounting violations in Countrywide's relevant
11 periodic reports, those reports will not qualify as earning statements within the
12 meaning of §11(a)'s reliance provision. As the record now stands, individualized
13 reliance issues do not predominate on any § 11 claim.

14                **h. Class and disclosure periods**

15       Plaintiffs propose a class period from between March 12, 2004 and March 7,
16 2008 (inclusive). Although the class period is adequately pleaded, and the March
17 2004 start date is plausible under the complaint's allegations, there are substantial
18 issues surrounding the appropriate end date for the class period.

19       Plaintiffs contend that material information continued to come to light as late
20 as March 8, 2008, the date on which the complaint alleges the last corrective
21 disclosure occurred. On that date, the Wall Street Journal reported that the FBI was
22 investigating Countrywide for possible securities fraud. *See* Compl. ¶1074. The
23 Court notes, however, that by late 2007 or early 2008, the plausibility of some of
24 the alleged disclosures' corrective effect is strained. *Compare* Compl. ¶ 1049-55
25 (alleging a New York Times exposé on January 8 and that Countrywide filed a

26 ───────────

27 [109] The complaint in this case pleads material misstatements or omissions on Forms
28 8-K and 10-Q.

-74-

negative SEC Form 8-K on January 9), *with* ¶¶ 1066-76 (alleging unfavorable media coverage sporadically between February 2008 and the proposed class period end date of March 7, 2008).

As an example, experts on both sides recognize that on January 10, 2008 there were two relevant "competing rumors" in the market: (1) Countrywide was facing imminent bankruptcy; and (2) Bank of America was prepared to acquire Countrywide. On January 11, Bank of America announced the merger. As all the experts recognize, these events coincided with unique market events—indeed, parts of Dr. Jarrell's analysis divided the class period into two subperiods because some efficiency indicators changed substantially over the period's course. All of the foregoing may have implications for reliance on the market (both as to market efficiency and as to what the class may have been reasonably relying upon).

Courts have cut short proposed class periods where plaintiffs overreach by alleging progressively more tenuous and less plausible disclosures. Some courts terminate the class period in a fraud-on-the-market case at the point where there is "no substantial question of fact" whether additional disclosures could correct alleged misrepresentations. *Fed. Nat'l*, 247 F.R.D. at 38-41 (collecting cases and discussing the legal considerations). However, this approach may come close to exceeding the bounds of appropriate class certification inquiry. It may also blur the distinctions between class certification and summary judgment. On the other hand, there are sound policy considerations and case law to support requiring that plaintiffs justify the requested class period. Such a requirement may be especially reasonable after plaintiffs have had the benefit of discovery. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 528 (N.D. Cal. 2009) (Alsup, J.) (analyzing recent authority on point and observing that *Fed. Nat'l* can be interpreted as a sensible application of *Basic*).

To the extent the foregoing concerns relate to loss or loss causation, they raise merits issues that must be reserved for a later time. To the extent these also

implicate the fraud-on-the-market presumption, the Court observes only that—at least for some debt securities—Plaintiffs' fraud-on-the-market showing is weak and may grow weaker late in the class period. For now, it is sufficient.

### 2. Superiority (manageability)

Rule 23(b)(3) sets out four "non-exhaustive" factors to consider in the superiority inquiry. *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). These factors weigh in favor of class certification. The only factor warranting discussion is "manageability," an evaluation of "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).

In addition, the Advisory Committee Notes to Rule 23's 2003 Amendments—and some Ninth Circuit authority—suggest that considering a "trial plan" may be a useful exercise at this stage. *See Zinser*, 253 F.3d at 1190 (upholding denial of class certification where "there was no manageable trial plan adequate to deal with individualized issues and variances in state law"). Nothing in the Rule requires a trial plan, *Chamberlan*, 402 F.3d at 961 n.4, but one party has argued manageability. On this point, a brief discussion will suffice.

Some manageability concerns have already been reduced by other holdings in this order. For example, the Court's *sua sponte* decision to create three subclasses will help divide the issues and keep the arguments focused. Fed. R. Civ. P. 23(c)(5), 23(d)(1)(A); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 244 n.25 (2d Cir. 2001) (encouraging district courts to consider subclassing and noting that it is "not inconsistent" with the PSLRA to create subclasses). As noted in connection with creating the Capital Securities and debt subclasses, the subclasses may need to be tried in separate phases in order to avoid confusion or prejudice to the class on the common stock (and options). *See, e.g.*, Fed. R. Civ. P. 23(d)(1)(A). This may be advisable in light of the class certification hearing, where the Court repeatedly asked defense counsel to confirm that his strongest assertions were

1  directed solely at the <u>debt</u> subclass.[110] Indeed, the vast majority of Defendants'
2  affirmative evidence on market efficiency is directed to the debt subclass; likewise
3  for Defendants' strongest criticisms of Plaintiffs' expert evidence. At the class
4  certification hearing, defense counsel said very little against efficiency on the
5  common stock (and options) subclass. It will enhance manageability and avoid
6  confusion to focus on discrete subclasses of the various securities at issue.

7      Moreover, the Court reiterates some observations noted above in
8  summarizing the allegations. *Supra* Section II.B. For the most part, the parties need
9  only establish what happened within Countrywide, when, and who knew (or should
10  have known)—including when and how any changes should have manifested
11  themselves in, for example, Countrywide's accounting. Armed with a timeline of
12  evidence and alleged violations of the securities laws, a jury could, in a reasonable
13  time, determine whether representations when made amounted to violations.

14      The basic theory of this case is not unusual, and neither is its management
15  problem, although large. *See also In re Visa Check/MasterMoney Antitrust Litig.*,
16  280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (collecting authority to the effect
17  that manageability is not generally a dispositive concern on class certification).
18  Indeed, the federal courts handle large and complex cases every day. The evidence
19  will be comprehensible, and its volume digestible, if presented by capable counsel.

20
21
22
23
24
25
26

27  [110]   *See also* Carron Rep., *passim* (rarely distinguishing criticisms of Plaintiffs'
28  expert analysis on the common from Plaintiffs' expert analysis on the debt).

1    **IV.**

2    **CONCLUSION**

3        KPMG's evidentiary objection to the Marotto declaration is SUSTAINED.

4    Docket No. 559. All KPMG's other evidentiary objections are OVERRULED.[111]

5    Docket No. 577.

6        Plaintiffs' motion for class certification is GRANTED IN PART. Docket

7    No. 509.

8        The following class shall be certified:

9            All persons and entities that, between March 12, 2004 and March 7,

10           2008 (inclusive), either in the open market or pursuant or traceable to

11           a registration statement:

12           • Purchased or otherwise acquired Countrywide Financial

13               Corporation publicly traded common stock or call options ("the

14               common stock subclass"); or

15           • Sold Countrywide Financial Corporation publicly traded put

16               options (included as part of the common stock subclass); or

17           • Purchased or otherwise acquired Countrywide Capital V 7%

18               Securities ("the Capital Securities subclass"); or

19

20

21

22

23

24

25    [111]    The objections were made under a "lower [i.e., less demanding of expert

26    evidence] *Daubert* standard" that may apply to class certification proceedings. This

27    ruling is without prejudice to a motion under the *Daubert* standard. *Daubert v.*

      *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

28

-78-

1               • Purchased or otherwise acquired Countrywide Financial

2                  Corporation Series A Medium-Term Notes,[112] Series B Medium-

3                  Term Notes, 6.25% Subordinated Notes Due May 15, 2016, Series

4                  L Medium-Term Notes (limited to CUSIP nos. 22237LNR9 and

5                  22237LPA4), and Series M Medium-Term Notes (limited to

6                  CUSIP no. 22237LPM8) ("the debt securities subclass").

7         Excluded from the class are:

8               • Defendants;

9               • Members of the Individual Defendants' immediate families;

10             • Defendants' subsidiaries and affiliates;

11             • Any person who was an officer, director, partner or controlling

12               person of Countrywide (including any of its subsidiaries or

13               affiliates) or any other Defendant during the class period;

14             • Any entity in which any Defendant has a controlling interest; and

15             • The legal representatives, heirs, successors and assigns of any such

16               excluded person or entity.

17         All issues except damages and, to the extent necessary, '33 Act tracing, shall

18  be determined on a class-wide basis. Fed. R. Civ. P. 23(c)(1)(B).

19         Labaton Sucharow LLP is appointed class counsel. Fed. R. Civ. P. 23(g).

20         State Fund is appointed class representative for the common stock subclass.

21         The City Funds group is appointed class representative for the debt subclass.

22

23

24   [112]    The Court notes that because no Series A instrument was found to have

25  traded in an efficient market, Plaintiffs may not assert '34 Act claims with respect
to the Series A Medium-Term Notes. Moreover, Plaintiffs' '34 Act claims with

26  respect to the Series B Medium-Term Notes are limited to CUSIP No.
22238HGQ7, and with respect to the 6.25% Subordinated Notes are limited to

27  CUSIP No. 222372AJ3. *See supra* Section III.C.1.f.

28

1    Barry Brahn is appointed class representative for the Capital Securities
2  subclass.

3    The parties shall jointly file a proposed class certification order and a
4  proposed class notice on or before Tuesday, January 5, 2010. The notice should
5  use plain language. The filing shall include supporting affidavits to help the Court
6  determine the best notice practicable under the circumstances. Fed. R. Civ. P.
7  23(c)(2)(B).

8

9  IT IS SO ORDERED.

10

11  DATED: December 9, 2009

12                                      Hon. Mariana R. Pfaelzer
                                        United States District Judge