# Exhibit B

1 | KREINDLER & KREINDLER LLP
GRETCHEN M. NELSON (#112566)
2 | *gnelson@kreindler.com*
MARK LABATON (#159555)
3 | *mlabaton@kreindler.com*
707 Wilshire Boulevard, Suite 4100
4 | Los Angeles, California  90017
Telephone:  (213) 622-6469
5 | Facsimile:  (213) 622-6019

6 | *Liaison Counsel for Lead*
*Plaintiffs New York Funds*

7 |
LABATON SUCHAROW LLP
8 | JOEL H. BERNSTEIN
*jbernstein@labaton.com*
9 | JONATHAN M. PLASSE
*jplasse@labaton.com*
10 | IRA A. SCHOCHET
*ischochet@labaton.com*
11 | DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
12 | MICHAEL H. ROGERS
*mrogers@labaton.com*
13 | JOSHUA L. CROWELL
*jcrowell@labaton.com*
14 | 140 Broadway
New York, New York  10005
15 | Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
16 |
*Lead Counsel for Lead*
17 | *Plaintiffs New York Funds*

18 |
UNITED STATES DISTRICT COURT
19 |
CENTRAL DISTRICT OF CALIFORNIA
20 |
WESTERN DIVISION
21 |

| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION | Lead Case No. CV-07-05295 MRP (MANx) |
|---|---|
| This Document Applies to:  All Actions | **LEAD PLAINTIFF NEW YORK STATE COMMON RETIREMENT FUND'S VERIFIED SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANT ANGELO R. MOZILO'S INTERROGATORIES NO. 11, 12, 13 AND 22** |

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Lead

2    Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as

3    Administrative Head of the New York State and Local Retirement Systems and as

4    Trustee of the New York State Common Retirement Fund ("NYSCRF"), hereby

5    serves supplemental answers and objection to Defendant Angelo R. Mozilo's

6    Interrogatories No. 11, 12, 13 and 22 to New York State Common Retirement

7    Fund (the "Interrogatories"), as follows:

8

9    **<u>INTRODUCTION</u>**

10    NYSCRF's supplemental answers and objections to these Interrogatories

11    are made for the sole purpose of this action.  No incidental or implied admissions

12    are intended in these answers.  NYSCRF's answers to all or any part of the

13    Interrogatories should not be taken as an admission that:  (a) NYSCRF accepts or

14    admits the existence of any fact(s) set forth or assumed by that interrogatory; (b)

15    NYSCRF has in its possession, custody or control any information or documents

16    responsive to that interrogatory; (c) information or documents responsive to that

17    interrogatory exist; or (d) NYSCRF's answers constitute admissible evidence.

18    NYSCRF's answers to all or any part of an interrogatory are not intended to be

19    and shall not be a waiver by NYSCRF of all or any part of their objection(s) to

20    that interrogatory.

21    While NYSCRF's prefiling and subsequent investigative efforts have been

22    substantial, they have not completed (a) their investigation of the facts relating to

23    this case, (b) discovery in this action, or (c) preparation for trial.  The following

24    answers are based upon information known at this time.  NYSCRF reserves the

25    right to make use of, or to introduce at any deposition, hearing and/or trial,

26    information or documents responsive to the Interrogatories but discovered

27

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)

097

1   subsequent to the date of service of these Responses and Objections, including,

2   but not limited to, any information or documents obtained in discovery herein.

3

4   **GENERAL OBJECTIONS**

5        NYSCRF generally objects to the Interrogatories on the following grounds,

6   each of which is expressly incorporated by reference in the responses to the

7   individual interrogatories below.  All responses set forth herein are subject to and

8   without waiver of any of these General Objections:

9        1.    NYSCRF objects to the Interrogatories to the extent that they

10   purport to impose any obligations on plaintiffs that are not imposed by law, or

11   are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil

12   Procedure.

13        2.    NYSCRF objects to the Interrogatories as facially overbroad and

14   unduly burdensome.  *See Advocare Int'l, L.P. v. Scheckenbach*, No. C08-5332

15   RBL, 2009 WL 3064867, at *1 (W.D. Wash. Sept. 24, 2009) ("Numerous federal

16   courts have held that contention interrogatories which 'systematically track all of

17   the allegations in an opposing party's pleadings, and that ask for 'each and every

18   fact' and application of law to fact that supports the party's allegations are an

19   abuse of the discovery process because they are overly broad and unduly

20   burdensome.'").  NYSCRF is not required to provide every fact in support of its

21   contentions.  *See Tubbs v. Sacramento County Jail*, No. CIV S-06-0280 LKK

22   GGH P, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("[P]laintiff is not

23   required to present his entire case in discovery responses.").

24        3.    NYSCRF objects to the Interrogatories to the extent they

25   prematurely seek information related to particular types of expert(s), expert

26   testimony, or opinion at a time when certain expert reports have not been

27   submitted.

28

1  4.  NYSCRF objects to the Interrogatories to the extent that they seek

2 information or documents that are beyond the scope of permissible discovery.

3  5.  NYSCRF objects to the Interrogatories to the extent that they seek

4 or require the disclosure of information or documents that are protected from

5 discovery by the attorney-client privilege, the attorney work product doctrine, the

6 joint prosecution or common interest privilege, or any other applicable privilege

7 or immunity.

8  6.  NYSCRF objects to the Interrogatories to the extent that they seek

9 information based on documents that are not within NYSCRF's possession,

10 custody or control.

11  7.  NYSCRF objects to the Interrogatories to the extent they seek

12 information or documents that can be found in the pleadings.

13  8.  NYSCRF objects to the Interrogatories as unduly burdensome to the

14 extent such Interrogatories seek (a) information or documents in the public

15 domain, as such information or documents are equally available to Defendant

16 Mozilo, or (b) information or documents to which Defendant Mozilo has equal or

17 greater access.

18  9.  NYSCRF objects to the Interrogatories insofar as they are vague,

19 ambiguous, harassing, overly broad or burdensome and to the extent that the

20 discovery sought is unreasonably cumulative, duplicative, or disproportionate.

21  10.  NYSCRF objects to the Interrogatories to the extent they

22 prematurely seek information related to particular types of expert(s), expert

23 testimony, or opinion at a time when certain expert reports have not been

24 submitted.

25  11.  NYSCRF objects to the Interrogatories insofar as they seek

26 information or documents that are irrelevant to any claim, defense, or subject

27

28

LEAD PL. NYSCRF'S SUPPL. ANS. & OBJ. TO MOZILO'S INTERROGS. NO. 11, 12, 13 & 22
LEAD CASE NO. CV 07-05295 MRP (MANx)  3

099

1   matter of the litigation, or are not reasonably calculated to lead to the discovery

2   of admissible evidence.

3         12.    NYSCRF objects to the Interrogatories to the extent that they call

4   for a legal conclusion, a legal argument, or constitute a discovery request that is

5   premature at this stage of the litigation and is invasive of the attorney work

6   product doctrine.

7         13.    NYSCRF objects to the Interrogatories as unduly burdensome to the

8   extent they are duplicative of documents and information produced in response

9   to Interrogatories and Requests for Production previously propounded to

10  NYSCRF or disclosed in Lead Plaintiffs' Initial Disclosures pursuant to Fed. R.

11  Civ. P. 26(a).

12        14.    NYSCRF objects to the Interrogatories to the extent they are

13  contention interrogatories, which are premature at this early stage of discovery,

14  particularly if they are broad interrogatories that will not clarify the issues or

15  narrow the scope of the litigation.

16        15.    NYSCRF objects to the Interrogatories on the grounds that

17  Defendants have not yet completed discovery.  After the Securities and Exchange

18  Commission commenced its civil action against Defendants Sambol, Angelo

19  Mozilo, and Eric Sieracki, No. CV 09-03994 JFW (C.D. Cal.), it provided or

20  otherwise made available to these Defendants all transcripts of the depositions it

21  conducted during its pre-filing investigation styled *In re Countrywide Financial*

22  *Corporation*, File No. LA-3370, along with all documents marked as exhibits

23  during such depositions, any sound or video recordings of such depositions, and

24  all signed court reporter certifications of such depositions.  Defendants Sambol,

25  Mozilo, and Sieracki have not supplemented their document productions by

26  producing these materials, as required by Rule 26(e) of the Federal Rules of Civil

27  Procedure.

28

1     16.    In providing information in response to the Interrogatories,

2    NYSCRF does not in any way waive, or intend to waive, but rather intend to

3    preserve and are preserving:

4        a.    all objections as to competency, relevancy, materiality or

5    admissibility of any Interrogatory, the responses or their subject matter;

6        b.    all objections as to vagueness, ambiguity or other infirmity in

7    the form of the Interrogatories, any objections based on the undue burden

8    imposed by the Interrogatories and each individual request contained therein;

9        c.    all rights to object on any ground to the use of any of the

10    information or its subject matter in any subsequent proceedings, including the

11    trial of this or any other action;

12        d.    all rights to object on any ground to any further

13    interrogatories or other discovery requests involving or related to the subject

14    matter of any Interrogatory;

15        e.    the right to supplement responses to the Interrogatories; and

16        f.    any and all privileges and rights under the applicable Federal

17    Rules of Civil Procedure, the Local Rules of this Court, other statutes, guidelines

18    or common law.

19     17.    NYSCRF objects to each Definition and Instruction to the extent

20    each imposes on NYSCRF any obligation beyond what is required by the Federal

21    Rules of Civil Procedure.

22     18.    NYSCRF objects to the Definitions and Instructions sections of the

23    Interrogatories to the extent that the definitions are overly broad or call for

24    information or documents that are protected from discovery by the attorney-

25    client privilege, the attorney work product doctrine, the joint prosecution or

26    common interest privilege, or any other applicable privilege or immunity.

27

28

19.     NYSCRF objects to Definition 6 of Defendant Mozilo's First and Second Sets of Interrogatories to the New York State Common Retirement Fund, purporting to define "NYSCRF."  Although New York State Comptroller Thomas P. DiNapoli is the Trustee of NYSCRF, the Office of the New York State Comptroller is neither a part of NYSCRF nor a party to this action.

20.     NYSCRF objects to Definition 9 of Defendant Mozilo's Second Set of Interrogatories to the New York State Common Retirement Fund dated December 16, 2009, purporting to define "identify," when referring to a written communication, as stating (1) the generic nature of the written communication; (2) the date on which the written communication was prepared; (3) the name and address of each person who wrote, signed, initialed, dictated or otherwise participated in the preparation of the written communication and each person to whom the written communication was sent or addressed; (4) the name of each custodian of the written communication; (5) a brief description of the contents of the written communication; and (6) the present location of the original and each non-identical copy of the communication.  With respect to written communications that have already been produced to all of the parties through discovery in this action, Definition 9 is unnecessary and unduly burdensome. Where NYSCRF answers an Interrogatory by identifying written communications that have been produced in this action, NYSCRF will list only the applicable bates number(s), which provides sufficient identification of documents already in Defendant Mozilo's possession.

21.     NYSCRF objects to Instruction 3 of Defendant Mozilo's First and Second Sets of Interrogatories to the New York State Common Retirement Fund, which provides that when responding to an Interrogatory by reference to a document, NYSCRF must list the date the document was "prepared, sent and/or received" and attach the document as an exhibit.  With respect to documents that

have already been produced to all of the parties through discovery in this action, Instruction 3 is unnecessary and unduly burdensome.  Where NYSCRF answers to an Interrogatory by reference to documents that have been produced in this action, NYSCRF will list only the applicable bates number(s), which provides sufficient identification of documents already in Defendant Mozilo's possession.

22.    The following specific objections and answers are subject to the General Objections.  By setting forth specific objections, NYSCRF does not intend to limit or restrict the General Objections.  NYSCRF incorporates the above General Objections into its answers to each of the Interrogatories.  To the extent that NYSCRF answers the Interrogatories, any stated objections are not waived by providing answers.

## SPECIFIC ANSWERS AND OBJECTIONS

## INTERROGATORY NO. 11:

For each statement identified in response to Interrogatory No. 10, describe in detail the basis for your allegation that the statement is false and/or misleading.

## ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 11:

NYSCRF incorporates by reference its General Objections.  NYSCRF further objects that because this contention interrogatory seeks "all facts," it is overly broad and unduly burdensome on its face.  *See Advocare Int'l*, 2009 WL 3064867, at *1; *Tubbs*, 2008 WL 863974, at *1.   NYSCRF further objects to this Interrogatory to the extent that it seeks information equally available to Defendant Mozilo, or information to which Defendant Mozilo has equal or greater access. NYSCRF further objects to this Interrogatory to the extent that it seeks information not in NYSCRF's possession, custody, or control.  NYSCRF further objects to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the

1   joint prosecution privilege, or any other applicable privilege, protection, or

2   immunity.  NYSCRF's Answer does not necessarily provide every supporting or

3   otherwise relevant fact that is in the evidentiary record as it currently stands, nor

4   does this Answer necessarily provide every supporting or otherwise relevant fact

5   that NYSCRF may present in opposition to or in favor of a summary judgment

6   motion, or at the trial of this action.

7          Subject to and without waiving the foregoing general and specific

8   objections, NYSCRF answers as follows:

9   **I.     LOAN QUALITY**

10         As reflected in the response to Interrogatory No. 10, Defendant Mozilo

11  made numerous public statements throughout the Class Period, either orally or in

12  writing, attesting to the high quality of the loans both originated by Countrywide

13  and retained in the bank's portfolio.  For example, the Form 10-K Annual Reports

14  for the years 2003, 2004, and 2006 all contain statements about how

15  Countrywide's underwriting guidelines are "designed to produce high quality

16  loans."  Also, Mozilo stated that "[t]he bank continues to focus on portfolio

17  quality as the average FICO is now . . . 732 and the weighted average LTV stands

18  at 80%" during the third quarter 2004 earnings call.  On several occasions, he also

19  stated publicly that Countrywide would not sacrifice loan quality in its attempts to

20  achieve 30% market share.  For example, at the March 15, 2005 Piper Jaffray

21  Conference, Mozilo stated that "under no circumstances will Countrywide ever

22  sacrifice sound lending and margins for the sake of getting to that 30 percent

23  market share."  During the July 26, 2005 earnings call, Mozilo stated "I don't see

24  any deterioration in the quality of those loans being originated."  These

25  statements were false and misleading because Countrywide drastically expanded

26  its loan origination guidelines over the course of the Class Period, giving it the

27  broadest product menu in the mortgage lending industry.  Further, Countrywide

28

granted significantly increased exceptions to those already expanded guidelines, and originated a substantial amount of loans with layered risk characteristics. The result of Countrywide's expanded loan origination guidelines and exceptions was a substantial increase in the credit risk of loans originated and a deterioration of the quality of those loans. These facts, and the extent to which the probabilities of default and loss were increased as a result, were never disclosed to investors.

### A.    Expansion of Underwriting Guidelines and the Matching Strategy

In a presentation to the Midwinter 2004 Housing Conference on February 27, 2004, Mozilo outlined the growth of Countrywide: "We have publicly stated our intent to reach 30% origination market share within 5 years." February 27, 2004 Presentation at MOZ-015928. In an e-mail dated September 1, 2004, Mozilo wrote that "[a]s I look at production trends, not only at Countrywide, but also with other lenders, there is a clear deterioration in credit quality of loans being originated over the past several years." Ex. 274 at CFCP000916353. When confronted with this e-mail, Mozilo testified that "to me the word 'deterioration' was comparable to expansion of guidelines. Guidelines had been substantially expanded throughout the industry from the time I started 55 years ago, and there was some substantial changes in guidelines." Mozilo Dep. at 99:8-13; Ex. 810 at CFCP005887980. Mozilo also stated that "I fully understand that our residuals have been modeled on a conservative basis but it is only conservative based upon historical performances. But the type of loans currently being originated combined with the unprecedented stretching of all aspects of credit standards could cause a bump in the road that could bring with it catastrophic consequences." Ex. 274 at CFCP000916353.

In June 2005, Defendant Gissinger emphasized the need for "VELOCITY" and for Countrywide to have the broadest guidelines in the industry, declaring:

The waterfall for proprietary products is as follows:

105

1
2
3

> Our Correspondent channel should have everything available to other legitimate Correspondent lenders in the marketplace plus a little more

4
5
6

> Our Wholesale channel should have everything available to CLD and other legitimate Wholesale lenders in the marketplace plus a little more

7
8
9

> Our Retail channels should have everything available to WLD and other legitimate Retail lenders in the marketplace plus a little more.

June 13, 2005 e-mail at CFCP006629535.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Despite the significance of "legitimate" lenders in Gissinger's "Guiding Principles," Countrywide had no "hard and firm" definition of a "legitimate" lender or competitor for purposes of implementing the matching strategy. Gissinger Dep. at 59:21-23. Mark Elbaum, CFO of Mortgage Banking, who reported to Gissinger, initially testified that Wells Fargo, Chase, Citibank and Washington Mutual were the companies that Countrywide "followed." Elbaum Dep. at 34:20-22. However, when shown a chart of competitors whose guidelines Countrywide matched, which was included in a February 13, 2007 document titled "Product Leadership Business Review" (Ex. 402 at CFCP004436674), Elbaum admitted that Countrywide's matched the guidelines of much less established companies in the subprime market, such as New Century, Argent and Fremont. Elbaum Dep. at 75:3-20. In addition, Frank Aguilera, Managing Director of Portfolio Credit Risk Management, testified that Countrywide's "primary" competitors in the subprime market were Ames, New Century, Ameriquest and Long Beach. Aguilera Dep. at 95:15-22.

26
27
28

The willingness of Countrywide to match "any" lender, not just "legitimate" ones, was pervasive throughout the Company. McMurray expressed his concern that Countrywide was willing to match "any" lender, not just

"legitimate" ones, to Christian Ingerslev, Executive Vice President of Product management.  McMurray stated that in a strategic planning meeting, production heads stated that they believed the competitor match was without limitation.  "In other words, it was not qualified or constrained by such competitor being legitimate." Ex. 483 at CFC2007I313734.  Furthermore, McMurray expressed his concern at matching less than legitimate lenders to Countrywide management at the highest levels.  In an e-mail to Sambol, McMurray wrote that he was concerned that there was not a "consistent definition of primary competitor[s]" submitted in a matching request.  McMurray cited competitors such as Aames (23d in volume), Fieldstone (26th), and Sebring (46th).  Ex. 675 at CFC2007I088611.  When asked in deposition if he believed that the lenders cited by McMurray were "legitimate," Sambol testified that he did not recognize these competitors as "very legitimate competitors in the market," but that he would not have had "any aversion" if the production people sought to match these fringe players in the market.  Sambol Dep. at 209:3-14.

The strategy set forth in the above June 13, 2005 e-mail by Gissinger was sometimes known as the "matching strategy," or "supermarket strategy."  It was the key driver of this aggressive expansion of guidelines.  The execution of the matching strategy began with the Product Leadership group, which was tasked with identifying "gaps" in the marketplace between Countrywide's products, pricing, or guidelines, and those of its competitors.  Kuelbs Dep. at 28:3-29:9.

Because of the matching strategy, the Company was continuously making product adjustments to keep up with the market.  With respect to underwriting guidelines, the adjustments were almost always expansions rather than contractions.  Kuelbs Dep. at 144:14-145:19.  Mindy Levine, a product analyst, testified that Countrywide kept relaxing underwriting guidelines over the course of the Class Period, specifically by lowering the minimum FICO score required

1   for approval of certain loan programs.  Levine Dep. at 163:11-20.  According to

2   Nick Krsnich, Countrywide's Chief Investment Officer from 2004 to 2006, the

3   quality of the Company's subprime loans deteriorated because of lower FICO

4   scores, higher loan-to-value (LTV) ratios, and less borrower income/asset

5   documentation.  Krsnich Dep. at 231:6-232:8.  Brian Kuelbs, Managing Director

6   of Products and Pricing from April 2005 to mid-2006, could recall only one

7   instance in which his group supported contracting the guidelines of any loan

8   program—and, as explained below, that proposed change was rejected by

9   Sambol.  Kuelbs Dep. at 173:6-174:2.

10         In June 2005, McMurray told Sambol: "Because the matching process

11   includes comparisons to a variety of lenders, our match will be a composite of the

12   outer boundaries offered across multiple lenders.  For example, First Franklin is

13   used as a comparison for some guidelines where they are more aggressive (e.g.,

14   high LTV/CLTV) and not used where they are less aggressive (e.g., stated doc

15   loans).  As a result, our composite guidelines are likely among the most

16   aggressive in the industry."  Ex. 718 at CFC2007I088607; McMurray Dep. at

17   247:3-23.  Sambol agreed with this statement.  Sambol Dep. at 179:13-180:24.

18         On June 24, 2005, McMurray, criticized and expressed concerns to

19   Gissinger and Sambol regarding Countrywide's matching strategy.  McMurray

20   warned Gissinger and Sambol that (1) because of Countrywide's "strategy to have

21   the widest product line in the industry, we are clearly out on the 'frontier' in

22   many areas" and that there would be "high expected default rates and losses;" (2)

23   it was difficult to verify mitigants and stipulations required by competitors in

24   their subprime programs and that in some cases Countrywide was simply unable

25   to match those mitigants; (3) as part of its matching strategy, Countrywide was

26   lowering its guidelines to match "lesser players" in the marketplace; and (4) as a

27   result of the above, Countrywide would have a "composite match" across

28

1  multiple lenders which would make Countrywide the most aggressive lender in

2  the marketplace.  Ex. 1721 at CFC2007I088597-98.  McMurray went on to note

3  that the frontier had "high expected default rates and losses."  *Id.*

4      To demonstrate his point that Countrywide was "on the frontier,"

5  McMurray wrote to Gissinger and Sambol that 35% of Countrywide's CMD and

6  WLD purchase business had CLTVs of 100% and Countrywide had a risk

7  position in the 70% of those 100% CLTV loans that were either subprime or

8  HELOCs.  *Id.* at CFC2007I088597.

9      McMurray reiterated his concern to Sambol in a February 2007 e-mail:

10  "Since we match numerous competitors over an extended time frame, our menu

11  ends up being a composite of the most aggressive offerings in the market."  Ex.

12  808 at CFC2007B062763.

13      In a February 2005 e-mail, Sambol stated that Countrywide was "willing to

14  price virtually any loan that we reasonably believe we could sell/ securitize

15  without losing money, even if other lenders can't or won't do the deal."  Ex. 1538

16  at CFCP006172202.  This was known as "risk-based pricing," meaning that as

17  risk increased, a higher price (interest rate) would be collected or charged in order

18  to compensate for the risk, thus justifying the expansion of guidelines.  However,

19  this so-called strategy could not work because some risk could not be priced to

20  receive proper compensation.  And, a higher interest rate would never provide

21  compensation for loans that were pre-paid or defaulted since in those cases, the

22  payment of interest stopped.  McMurray SEC Dep. at 380:25-384:15.

23      McMurray testified that successfully executing the matching strategy

24  required "understand[ing] what the other lenders were truly offering, including

25  some of the nuances associated with their offerings."  He stated that Countrywide

26  was not doing this adequately.  McMurray Dep. at 248:3-19.  In a January 2007

27  e-mail, McMurray told Gissinger that it was "absolutely crucial that the

28

competitor guideline evaluations be thorough and accurate given our 'matching' strategy."  However, McMurray said, it was a "struggle . . . getting accurate and complete" evaluations.  Ex. 1548 at CFC2007I167630.  One month later, McMurray told Sambol "[o]ur ability to thoroughly understand and/or precisely match what competitors are offering has been less than perfect."  Ex. 808 at CFC2007B062763.  In addition, McMurray explains that although Sambol stated that Countrywide would only match programs by "primary" players, there was not a consistent definition of "primary" player.  Ex. 675 at CFC2007I088611.

An April 2006 presentation to the Corporate Credit Risk Committee indicated that "Countrywide Subprime has followed the market's product expansion without adoption of the more cautious credit fundamentals."  Ex. 1547 at CFCP006028122.

McMurray's concerns about Countrywide's fundamental business model and philosophy (which included the matching strategy) were so profound that he "couldn't imagine" that the end of the ongoing industry expansion of guidelines would have anything but an unhappy ending for Countrywide, and that there could be a "sudden, abrupt, and severe" down cycle.  McMurray Dep. at 400:3-401:8.

At a November 1, 2006 high-level "Product Summit" that Gissinger attended, McMurray expressed his doubts about Countrywide's matching strategy, arguing that it would lead to Countrywide having the broadest composite guidelines in the industry, which would effectively cede control of the Company's credit policy to competitors and secondary market purchasers.  Nov. 2, 2006 McMurray e-mail at CFC2007B012332-33.

On November 2, 2006, McMurray sent an e-mail to Chief Investment Officer Kevin Bartlett, which Bartlett forwarded to Sambol, stating that the matching strategy had caused Countrywide to cede its underwriting standards to

110

1  the most aggressive lenders in the market.  In the e-mail, McMurray asked: "Do

2  we want to effectively cede our policy and is this approach 'saleable' from a risk

3  perspective to those constituents who may worry about our risk profile?"  Nov. 2,

4  2006 e-mail at CFC2007B012333.

5      In a January 2007 e-mail, McMurray advised Gissinger that "[i]f we're

6  truly looking to match what other lenders are doing, we should also match (or at

7  least address) the risk offsets."  Ex. 1548 at CFC2007I167630.

8      In a February 11, 2007 e-mail to Sambol, McMurray noted that the

9  production divisions continued to advocate for, and operated pursuant to, an

10  approach based upon the matching strategy alone, and repeated his concern that

11  the strategy would cause Countrywide's guidelines to be a composite of the

12  riskiest offerings in the market.  Additionally, McMurray warned: "I doubt this

13  approach would play well with regulators, investors, rating agencies etc.  To

14  some, this approach might seem like we've simply ceded our risk standards and

15  balance sheet to whoever has the most liberal guidelines."  Ex. 808 at

16  CFC2007B062765.

17      **B.  Exception Loans Magnified Countrywide's Credit Risk**

18      Mozilo consistently touted the high quality of the loans that Countrywide

19  originated.  However, he failed to disclose the extent to which loans were being

20  originated with exceptions to underwriting guidelines and the extent to which

21  those exceptions magnified the risk of default by borrowers and loss to

22  Countrywide, even as early as 2004.  In May 2004, McMurray expressed his

23  concerns regarding the excessive approval of exceptions, particularly for high-

24  risk loans.  He reported to Sambol and others about the high exception levels for

25  high-balance loans.  May 1, 2004 McMurray e-mail at CFCP000130447.  For

26  loans greater than $1 million, the exception rate was about 32%; for loans greater

27  than $3 million, the exception rate was 75%.  *Id.*  McMurray was particularly

28

111

1   concerned about a "pocket" of these high-balance loans that combined both loan-

2   to-value and FICO exceptions.  *Id.*

3        One year later, in May 2005, McMurray informed Sambol that developing

4   economic conditions required Countrywide to revise its exception loan policies:

5   "Given the expansion in guidelines and growing likelihood that the real estate

6   market will cool, this seems like an appropriate juncture to revisit our approach to

7   exceptions . . . ."  Ex. 1543 at CFC2007I081829.  He also warned that

8   Countrywide's rampant exceptions would undermine its strategy of selling off

9   credit risk in the secondary market: "[W]e will see higher rates of default on the

10  riskier transactions and third parties coming back to us seeking a repurchase or

11  indemnification based on an alleged [representations & warranties] breach as the

12  rationale."  *Id.* at CFC2007I081830.  He questioned whether the various parts of

13  the Company (Production Divisions, Bank, Credit, etc.) were aligned on key

14  SLD/exception issues.  *Id.*  Finally, McMurray told Sambol that Countrywide's

15  pricing models had some "inherent limitations" that were amplified when used to

16  price exceptions.  He explained that their pricing generally reflected the mean

17  average outcome.  However, in instances where the outcomes were worse than

18  the mean, Countrywide's pricing would be inadequate.  Further, McMurray

19  pointed out that their data was limited because it did not include high-stress

20  economic environments, and the estimated models used to price transactions were

21  beyond the scope of the data.  *Id.*

22       In June 2005, the exception rate for subprime loans at Countrywide was

23  37% for purchase loans[1] and 21% for stated income loans.  August 2006 B/C

24  Exceptions Report at CFC2007C503827.  By August 2006, the exception rate for

25  purchase loans remained 37%, while the exception rate for stated income loans

---

[1] "Purchase loans" were loans made to purchase residences rather than to refinance.

1    increased to 27%.  *Id.*  During the same period, the exception rate for high LTV

2    subprime loans was 29%.  *Id.*  Also in June 2005, in the Consumer Marketing

3    Division ("CMD"), the retail channel, 15% of all loans were originated with

4    underwriting exceptions, including 70% of those of over $1 million.  Ex. 505 at

5    CFC2007G583523.  Companywide, for loans greater than $650,000, those

6    underwritten with exceptions were performing at a rate that was 2.8 times worse

7    overall.  Ex. 505 at CFC2007G583524.

8        While Countrywide published underwriting guidelines for its various

9    branches, which were significantly expanded during the Class Period (Sambol

10   Dep. at 462:9-24), it also established far more expanded "shadow" guidelines that

11   were unpublished, which the divisional Structured Loan Desks (SLDs) used to

12   grant exceptions to the published guidelines.  Feb. 23, 2005 Rossi e-mail at

13   CFCP000123153.

14       Further, even if a requested exception did not fit within the shadow

15   guidelines, the SLD provided exception loans based solely on the criteria of

16   "salability" – whether the loan could be sold on the secondary mortgage market –

17   without reference to credit risk criteria.  Ex. 1539 at CFCP002905199.  When

18   asked about this, Sambol answered: "Yes, that was generally my view of . . . the

19   SLD . . . throughout my . . . tenure."  Sambol Dep. at 79:23-80:16.

20       In an e-mail dated June 1, 2006, the Secondary Marketing department

21   noted that 60% of Countrywide's Expanded Criteria programs were exceptions to

22   guidelines and 33% of "Core" nonconforming programs were exceptions.  June 7,

23   2006 e-mail at CFCP006002404.  Kevin Bartlett's response was: "I'm stunned."

24   *Id.*  McMurray seconded this position, confirming he knew exceptions were high,

25   but that was much higher then he expected.  *Id.*

26       A year later, McMurray was still concerned about exceptions being granted

27   to "prime" loans.  In an e-mail to Gissinger, dated June 25, 2007, McMurray

28

113

wrote: "Based upon really poor, and what appears to be worsening performance, I'm recommending that we severely curtail or eliminate loan exceptions in the following categories: 1st and 2nd Liens with CLTV's of 95% and higher; and 1st Liens with balances of $1 million or more." June 25, 2007 McMurray e-mail at CFCP000851192.

By 2007, Countrywide's exception loan production had grown to alarming levels, particularly with respect to high-risk loans.  In February, Credit Risk Management reported that there were "significant levels of exceptions (solely based on fico scores) under all high risk programs"—the high loan-to-value ("LTV") single loans program and the combo loan program (e.g., 80/20 loans). Ex. 319 at CFCP000623519.  The subprime exception levels at Full Spectrum Lending (FSL)[2] *"exceed[ed] any imaginable comfort level." Id.* (emphasis added).  Across all divisions, exceptions accounted for 25% of loans with 95% LTV, 37% of loans with 100% LTV, and 13% of "combo loans."  *Id.*

An e-mail dated May 25, 2007 stated: "The exception capacity of SLD has created loans that simply do not exist elsewhere in the marketplace and provide the ultimate control for our originators."  Ex. 1540 at CFC2007A912519.

### C. The Layered Risk Characteristics of the Loans Magnified the Credit Risk to Countrywide

As shown below, Countrywide drastically increased the number of loans originated with layered risk attributes[3] over the course of the Class Period.  This fact was never disclosed to investors.

---

[2] FSL was Countrywide's retail sub-prime division although sub-prime loans could also be granted through outside brokers and others.

[3] McMurray explained "layered risk": " So an example would be the combination of a lot of – I shouldn't say a lot – of multiple risk factors in one loan.  So in this last cycle across the industry one – one of the striking things at least to me was the amount of high-leverage loans that were done, including hundred percent loan-to-value or combined loan-to-value loans, and so – so one of the phenomena that we observed was the combination of a high-leverage transaction [with] other risk factors, such as low documentation, perhaps borrowers with a weaker credit history, that was – that was beyond combinations

1       Countrywide policy required layered risk loan products to have mitigating

2  factors in order to offset the increased credit risk and ensure repayment.

3  However, it became clear as early as 2004 that layered risk loans were often being

4  funded without those mitigating factors.  In a February 5, 2004 e-mail, McMurray

5  stated with respect to a very high-risk No Income, No Asset (NINA) loan,[4] "most

6  of the exceptions we're seeing didn't have offsets – they were simply going to

7  higher LTVs and/or lower FICOs."  Ex. 257 at CFCP001395354.  McMurray

8  noted this trend in connection with all of Countrywide's loans to Keith

9  McLaughlin, then the Chief Financial Officer, on September 9, 2004, stating

10  "[w]e're seeing more loans with layered risk factors (e.g., high CLTV + low

11  documentation + weak FICO + ...)."  Ex. 810 at CFCP005887985.

12       This concern was shared by the highest levels of management at

13  Countrywide.  For example, eight days earlier on September 1, 2004, Angelo

14  Mozilo e-mailed Stan Kurland, stating "I fully understand that our residuals have

15  been modeled on a conservative basis but it is only conservative based upon

16  historical performances.  ***But the type of loans currently being originated***

17  ***combined with the unprecedented stretching of all aspects of credit standards***

18  ***could cause a bump in the road that could bring with it catastrophic***

19  ***consequences."***  Ex. 274 at CFCP000916353 (emphasis added).

20       The dangers of risk layering compounded as Countrywide significantly

21  loosened its underwriting practices over the course of the Class Period.  A

22  September 2005 Countrywide FSL Credit Risk Presentation stated that "[t]he

23  number of BC loans with multiple exceptions represents 24% of total BC loans

24  with exceptions."  Sept. 2005 presentation at CFCP005893805.  A September 26,

---

that had been offered historically.  So that . . . would be [an] important example."
McMurray Dep. at 88:6-89:8.

   [4] A NINA loan is one in which a borrower provides no income or asset
information.

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)          19

115

1    2006 document outlining the proposed effects of the *Interagency Guidance on*

2    *Nontraditional Mortgage Products* on Countrywide's business states that "[r]isk

3    layering should demonstrate mitigating factors supporting repayment capacity.

4    Higher pricing does not replace the need for sound underwriting."  The potential

5    impact of following such guidance reads as follows: ***"Needs further review,***

6    ***however recent guideline expansions and exception practices have nearly***

7    ***maxed out all risk layers.  Could likely result in guideline tightening and***

8    ***resulting decrease of eligible borrowers."***  Sept. 26, 2006 chart at

9    CFCP005877730 (emphasis added).

10       In an October 11, 2005 e-mail, Christian Ingerslev detailed comparative

11   statistics regarding risk layering within the Fast & Easy program, a reduced

12   documentation program offered by Countrywide.  He stated "Risk layering

13   compounds the F & E hazard ratios to a much greater degree than Full Doc, thus

14   further expansion would very likely lead to additional deterioration . . . 2004 F&E

15   Loans seasoned 9 months are performing about 75% worse than 2003 (ever-60

16   day rates)."  Oct. 11, 2005 e-mail at CFCP004512907.  This effect was not

17   limited to loans within the Fast & Easy program.

18       A December 11, 2006 Corporate Credit Risk Committee presentation set

19   out the effects of layered risk on HELOC performance.  It showed the

20   delinquency rate for HELOC loans with 100% LTV and reduced documentation

21   which had seasoned for 12 months and had ever been 90 days or more delinquent

22   as 4.10%, compared to 2.85% for comparable HELOCs with 95% LTV, and

23   0.83% for all HELOCs.  Ex. 827 at CFCP006242696.

24       In a January 12, 2007 memorandum entitled "Subprime Products

25   Recommended Product Offering Changes—2007," Frank Aguilera, Senior VP

26   and Product Manager of Sub-Prime Mortgages, stated "2006 Production is

27   substantially underperforming compared to prior years.  ***Much of this***

28

1    *deterioration can be attributed to High LTV layered risk product."*  Ex. 258 at

2    CFC2007I167121 (emphasis added).  The March 12, 2007 CFC Corporate Credit

3    Risk committee Presentation showed HELOC layered risk default performance

4    almost 3 times higher than what models predicted.  Ex. 658 at CFC2007E748520.

5    A June 11, 2007 presentation entitled "Proposed HELOC Default Risk Model"

6    explained that "[p]erformance multiple of loans with layered risk may tend to

7    compress over time . . . [r]ecent vintages (2004+) include loans with significant

8    layered risk . . . *[w]ithin the model, risk attributes are multiplicative."*  Ex. 286

9    at CFCP000852477 (emphasis added).  A June 14, 2007 "Manufacturing Quality"

10   presentation e-mailed from John McMurray to Jack Schakett charted the

11   exponential increase in delinquencies when risks are layered, and stated: "[t]he

12   delinquency rates are astoundingly high so early out of the gate."  June 14, 2007

13   Presentation at CFC2007I248687-88.

14        In July 2007, Vijay LaLa, Managing Director, Product Development and

15   Support, stated that Countrywide had become the "sole player" offering loans

16   with 90% LTV and stated documentation with FICO scores as low as 580 FICO.

17   July 23, 2007 LaLa e-mail at CFCP001511860.

18        Ingerslev testified that "during my tenure at Countrywide, the amount of

19   that layered risk from 2002 to 2008 grew" and "there was more layered risk done

20   every year between 2004 and 2008."  Ingerslev Dep. at 111:1-20.

21        **D.    Loans Held for Investment**

22        During the Class Period there were increasingly risky loans being held for

23   investment as assets on the balance sheet of the Bank.  In March 2005, Garcia

24   complained to Mozilo about Sambol's quest to gain more influence over use of

25   the bank's balance sheet, "which he seeks to use to fund products with risks or

26   pricing not supported by the secondary market . . . even at . . . potentially negative

27   returns to the Bank."  Ex. 1643 at CFC2007H067579.

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                             21

117

E.    **Increased Credit Risk**

In a September 8, 2004 e-mail to Keith McLaughlin, Mozilo expressed concern about the credit risk of subprime residuals on Countrywide's balance sheet and noted a deterioration in credit quality of loans generally.  Ex. 1285 at CFC2007H253574.

The same day, McMurray sent an e-mail to McLaughlin setting forth a litany of risks Countrywide would face as a result of its aggressive strategies over the coming years and the reasons why.  Ex. 810 at CFCP0058877980.

F.    **100% Financing (80/20 Loans) and HSBC**

In November 2005, Josh Adler, Countrywide's Executive Vice President of Structured Finance, forwarded to Gissinger and others a report stating that the secondary market for subprime, fixed-rate seconds

> has continued to decline . . . .  The majority of the Street[5] has made it clear that they do not want this collateral . . . .  Because this market is limited to essentially 1 investor [HSBC], there are loans we are originating that are unsaleable.

Ex. 1725 at CFCP001671315-16.  In the first quarter of 2006, HSBC began to contractually "put back" these loans to Countrywide, contending they were defective.  July 6, 2006 McMurray e-mail at CFC2007I147272.  Countrywide had agreed to a contract granting HSBC the right to put back loans based upon post-closing due diligence.  McMurray Dep. at 380:21-382:5.  Essentially, because as noted by Adler in Exhibit 1725 (cited above) there were no other purchasers for these loans, Countrywide had no choice but to agree to a sale allowing HSBC the right to see if the loans would perform well, and if not, to seek grounds for a refund.  For HSBC, this was a no-risk sale.  For Countrywide, it was very high risk.

_____

[5] The "Street" referred to Wall Street.  Gissinger Dep. at 239:20-21.

118

1   In an April 2006 e-mail to Sambol, Mozilo, while referring to the loans

2 which had been sold to HSBC stated: "In all of my years in the business I have

3 never seen a more toxic pr[o]duct.  It's not only subordinated [sic] to the first but

4 the first is sub-prime.  In addition the fico's are below 600, below 500 and some

5 below 400 compounded by the fact these are 100% loans which must always be

6 written off in the event of foreclosure. . . .  No margin, no matter how high, could

7 ever cover the inevitable losses on loans with ficos un[d]er 600.  Whether you

8 consider this business milk or not I am prepared to go without milk irrespective of

9 the consequences to our production."  Ex. 1295 at CFC2007B125324.  Sambol

10 pushed back, stating that "these loans are pervasively offered in the marketplace

11 by virtually every relevant competitor of ours."  *Id.*  Mozilo responded: "There

12 was a time when Savings and Loans [w]ere doing things because their

13 competitors were doing it.  They all went broke.  We should not be involved in

14 programs or products simply because our competitors have them. . . ."  *Id.*  When

15 asked about these e-mails, Mozilo testified: "If the only reason why you offered a

16 product . . . is because somebody else was doing it, that's a dangerous game to

17 play."  Mozilo SEC Dep. at 545:23-546:17.

18   In an April 13, 2006 e-mail, Mozilo recognized the validity of HSBC's

19 claims that representations and warranties concerning the underwriting of these

20 loans by Countrywide were breached, stating: "The loans were originated through

21 our channels with serious disregard for process, compliance with guidelines and

22 irresponsible behavior relative to meeting timelines.  As a result we delivered

23 loans with deficient documentation, did not respond timely in correcting those

24 deficiencies which resulted in extreme time delays thereby permitting loans to

25 have a greater chance for early payment default."  Ex. 1121 at CFC2007B00890.

26 "I have personally observed a serious lack of compliance within our origination

27

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)    23

119

1   system as it relates to documentation and generally a deteriation [sic] in the

2   quality of loans originated versus the pricing of those loan [sic]."

3       Mozilo testified that "in this kind of a product, if you vary from the

4   guidelines, whether it be relative to analyzing these – the ability of these people to

5   pay or in documentation, it becomes very toxic."  Mozilo Dep. at 173:22-174:22.

6   He also testified that there were good reasons for his concerns about the HSBC

7   transaction.  *Id.* at 174:23-175:2.

8   **II.   PAY OPTION ARMS**

9       Throughout the Class Period, Countrywide and its executives in

10  Countrywide's periodic filings made statements that Pay Option loans were a

11  high quality product, marketed to high quality, sophisticated borrowers with high

12  FICO scores.  Mozilo also made public statements about the quality of the Pay

13  Option loans.  For example, at an April 27, 2006 conference call, he stated that

14  "[p]ay option loan quality remains extremely high" and that "[a]verage FICO

15  scores on the pay option portfolio are over 720."  These statements were false and

16  misleading because Countrywide originated the Pay Option ARM to borrowers

17  with blemished credit histories in order to achieve its 30% market share goal.

18      **A.   Mozilo's Concerns About Pay Option ARMs**

19      Contrary to Countrywide's public statements, pay option loans were not

20  being marketed to sophisticated borrowers who understood the risk of making the

21  minimum payment.  In a July 6, 2005 e-mail, Mozilo stated to Sambol that he was

22  "becoming increasingly concerned about the neg am [negative amortization]

23  component of the Pay Option loan."  Ex. 1287 at CFC2007I060858.  Mozilo

24  testified that he had concerns about the negative amortization aspect of the Pay

25  Option loans through 2007 and that he expressed those concerns.  Mozilo Dep. at

26  112:25-113:7.

27

28

In August 2005, Mozilo advised Dan Tarman, Managing Director, Corporate Communications and Brand Marketing, that Countrywide Bank was implementing policy changes regarding Pay Option ARM origination, stating that ***"In my opinion there is nothing intrinsically wrong with pay option loans however there is something very wrong as to whom the product is being sold.*** Third party originators such as mortgage brokers are utilizing the loan to squeeze borrowers into homes without regard to the future consequences to that borrower, and speculators are using it as an arbitrage product.  These events could lead to catastrophic consequences which would be exacerbated if real estate values begin to decline." Aug. 3, 2005 e-mail at CFCP001929490.

Also in February 2006, an analysis of borrower behavior revealed that minimum payment selection, and thus negative amortization, was "highly correlated" to FICO and CLTV.  Ex. 1560 at CFC2007I309740.  Specifically, 72% of borrowers with FICOs less than 660 made the minimum payment, as did 70% of those with CLTVs greater than 80%.  *Id.* at CFC2007I309742.  Further, in May 2006, Rossi reported that a "very large percentage" of reduced documentation Pay Option borrowers misstated their incomes by 10% or more.  Ex. 1562 at CFCP000001353.  Countrywide continued to issue Pay Option loans to borrowers with FICO scores less than 660 and/or combined loan-to-value ratios ("CLTV") greater than 80%.  *E.g.,* JPM-ARG 00000805.  For this reason, throughout 2006 and 2007, the delinquency rate for Pay Option loans continued to rise.  *E.g.,* JPM-ARG 00000813.

In an April 3, 2006 e-mail, Mozilo wrote: "This is important data that could portend serious problems with this product.  Since over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies.  We

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                        25

121

1   must limit this product to high ficos otherwise we could face both financial and

2   regulatory consequences."  Ex. 1290 at CFC2007B008722.

3          Countrywide conducted a pilot program in 2006 that raised the starting

4   interest rate ("start rate") for these loans to 1.25% for 30-year loans and 1.8% for

5   40-year loans.  Ex. 1560 at CFC2007I309740.  Later that year, the start rate was

6   restored to 1% as to certain of the Pay Option ARMs, including all full

7   documentation loans with CLTVs of 90% and certain reduced documentation

8   loans with CLTVs over 80%.  Ex. 1561 at CFCP002372326.  McMurray was not

9   consulted prior to restoring the minimum rate on those loans, and when he

10  learned about it, he told senior executives that it was a "really bad idea."  Ex. 807

11  at CFC2007I149244.  Bartlett testified that Sambol and Gissinger argued for

12  restoring the start rate because Countrywide was purportedly losing business, so it

13  "couldn't sustain the increase."  Bartlett SEC Dep. at 200:15-201:18.  When

14  asked about the decision to restore the start rate, Sambol testified that "I would

15  have been consulted and would have been okay with it."  Sambol Dep. at 393:24-

16  394:17.  Once again, loan production prevailed over sound credit risk

17  management.

18         At a Question and Answer session following a Sanford C. Bernstein

19  Strategic Decisions' Conference on May 31, 2006, Mozilo was asked about what

20  would happen to borrowers when higher interest rates on Pay Options caused

21  payments to increase.  In answering the question, Mozilo did not mention his

22  concerns that it was a possibility that certain borrowers would not be able to make

23  their payments if Pay Options reset or readjusted.

24              Q: To your knowledge, to your recollection, why didn't
                you mention that possibility when you were answering
25              the question in a Q and A . . . on May 31st, '06?

26

27              A: It just didn't come to my mind. . . . It wasn't
                paramount on my mind.
28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                          26

122

1   Mozilo SEC Dep. at 360:25-361:18.

2   However, in an internal e-mail the very next day, June 1, 2006, Mozilo

3   expressed concern that the timing of rate resets was going to accelerate and that

4   payments would be substantially higher than the borrowers expected.  Ex. 1297 at

5   CFC2007C583091.  Mozilo stated in the same e-mail that "[w]e have at least

6   20% or more of the Bank's pay option loans at a fico of 700 or less.  It is clear

7   that the lower fico borrowers are going to experience a payment shock which is

8   going to be difficult if not impossible for them to manage."  *Id.*  Sambol testified

9   that he had no reason to believe Mozilo was incorrect regarding the numbers he

10  quoted.  Sambol Dep. at 408:1-4.

11  Moreover, Mozilo stated that: "In a discussion with both Stan and Dave it

12  came to my attention that the majority of pay options being originated by us, both

13  wholesale and retail, are based upon stated income.  There is also some evidence

14  that the information that the borrower is providing us relative to their income does

15  not match up with IRS records."  Ex. 1297 at CFC2007C583091.  Mozilo also

16  stated that it was evident that certain things would happen relative to the Bank's

17  balance sheet: that the time of the reset was going to accelerate and that the reset

18  payments would be higher than the borrower expected.  *Id.  **"Since we know or

19  can reliably predict** what's going to happen in the next couple of years it is

20  imperative that we address the issue now."  *Id.* (emphasis added).  Mozilo

21  testified that he was concerned about the fact that a majority of the Pay Options at

22  the Bank were being originated upon stated income, because there is a greater risk

23  of default in that case.  Mozilo SEC Dep. at 341:5-342:4.

24  In an e-mail with the subject "PayOption Data requested by Angelo—

25  URGENT," Clifford Rossi, the Bank's Chief Credit Risk Officer, reported "the

26  ***fact*** that a very large percentage of reduced doc [Pay Option borrowers] overstate

27  their incomes by 10% or more is of some concern."  Ex. 1562 at CFCP000001353

28

(emphasis added).  Sambol testified that Countrywide performed after-the-fact spot-checking of borrower information against IRS records and that at one committee meeting he attended sometime in 2006, he learned that spot-checks revealed a significant rate of disparity between stated income and income reported to the IRS, perhaps around 30%.  Sambol SEC Dep. at 81:14-82:13.

Ninety-seven percent (97%) of Countrywide's Suspicious Activity Report ("SAR") filings were attributed to stated income by borrowers, and IRS income tax information differed substantially from borrower's listed income in 78% of all mortgage-related SARs.  Jan. 31, 2007 Audit Committee Presentation at KPMG-XXMAB-000-028696.

By May 2006, the Bank had eliminated the requirement that the minimum FICO score for PayOptions in its portfolio be set at 660.  Ex. 1654 at CFC2007D806766.  In response to Rossi's concerns about purchasing a pool of whole loan PayOptions, of which 85% of the below-660 FICO loans were at a loss rate of greater than 120 basis points, Garcia stated that "[w]e already make and buy these type of loans at chl" and that the Bank "can't cherrie pick acquisitions at fr[o]nt end like we do [with] chl production."  *Id.* at CFC2007D806765-66.  Rossi stated that he knew "we have decided to take PayOptions down to 620 [FICO] now on whole loan acquisitions," but cautioned that "buying concentrations of lower FICO assets that we produce today could eventually cause securities pricing problems."  *Id.* at CFC2007D806765.  A March 24, 2005 e-mail from Garcia indicated that the reduction in minimum FICO scores for Pay Option ARMS to below 660 may have occurred as early as Fall 2004.  Mar. 24, 2005 Garcia e-mail at CFC2007I102877-78.

On July 10, 2006, Mozilo received an internal monthly "flash report" that tracked the delinquencies in the Pay Option portfolio, as well as the percentage of borrowers electing to make the minimum payment and the amount of

1  accumulated negative amortization on each loan.  After seeing the reported data,

2  he stated: "If I am reading these numbers correctly it appears to me that the loans

3  (payoptions) with neg am have a higher delinquency than our standard book of

4  business.  If this is the case, this is quite alarming, because of the very low

5  payment requirements of a neg am loan."  July 10, 2006 e-mail at

6  CFC2007A814896.

7  **B.      Mozilo Urges Selling the Pay Option Loan Portfolio**

8  Contrary to what was being publicly disclosed, Mozilo wanted the Bank to

9  begin reducing its Pay Option portfolio.  McMurray SEC Dep. at 647:5-15.  At

10  the May 31, 2006 Stanford C. Bernstein Annual Strategic Decisions Conference,

11  Mozilo discussed the Pay Option as a "sound investment for the Bank and a

12  sound financial investment tool for consumers."  He also stated that "[t]he

13  performance profile of this product is well-understood because of its 20-year

14  history, which includes stress tests in difficult environments."  May 31, 2006

15  Stanford C. Bernstein conference at CFC2007826796.

16  However, in an August 2006 internal memorandum to Countrywide's

17  Board of Directors, Mozilo took the opposite position, stating: "Although we

18  believe that the Pay Option should not present credit risks that are significantly

19  higher than credit risks presented by ARM loans in general, ***we do not have long***

20  ***term data to validate this assumption.***"  Aug. 26, 2006 Mozilo memorandum at

21  CFCP000231898 (emphasis added).

22  Further, Mozilo sent an e-mail to Sambol and Sieracki expressing even

23  greater concern about the portfolio and stating that they were "flying blind" with

24  respect to Pay Option performance.  In that e-mail, Mozilo wrote:

25  [w]e have no way, with any reasonable certainty, to

26  assess the real risk of holding these loans on our balance

27  sheet.  The only history we can look to is that of World

28

Savings[6] however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico.  In my judgment, as a long time lender, I would always trade off fico for equity.  ***The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales.***

Ex. 1125 at CFC2007C526149 (emphasis added).  In the same e-mail, Mozilo stated that "pay options are currently mispriced in the secondary market, and that spread could disappear quickly if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]."  *Id.*  He urged that the "timing [wa]s right" to sell Countrywide Bank's portfolio of loans.  *Id.*  To mitigate these anticipated losses, Mozilo proposed that the Bank "sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port[folio]."  *Id.*  Mozilo testified that as of September 26, 2006, he had concerns with both Pay Options and HELOCs that Countrywide was "flying blind" with regard to their performance.  Mozilo SEC Dep. at 376:16-379:5.

McMurray responded to Mozilo's September 26, 2006 e-mail, agreeing that Countrywide "should be shedding rather than adding Pay Option credit risk to the portfolio."  Ex. 1125 at CFC2007C526148.  In the fall of 2006, Kevin Bartlett went further, and recommended to Mozilo and others that all Pay Option ARMs be sold from Countrywide Bank because Countrywide was not receiving sufficient compensation on these loans to offset the risk of retaining them on its balance sheet.  Bartlett Dep. at 150:22-151:9.

---

[6] World Savings was a bank that had originated Pay Options for about twenty years before Countrywide entered the market.  Garcia Dep. at 142:15-143:14.

On January 29, 2007, Mozilo directed Carlos Garcia to meet with others to explore a one-time transaction where KPMG, owing to the tarred reputation of Pay Options, would sell the bulk of the Pay Options out of the Bank and replace them with HELOCs.  Jan. 29, 2007 e-mail at CFC2007B668918.  Mozilo explained the "tarred reputation of Pay Options" by saying that there were a lot of issues with Pay Options and he was continuously concerned with Countrywide's reputation with it.  Mozilo SEC Dep. at 596:5-12.

Garcia testified that there was a time that the Bank stopped accumulating Pay Options at the direction of Mozilo, but that this was only temporary.

> [T]hen there was a point in time where he said, you know, "Stop."  And then we stopped temporarily until we did more analysis and then got everybody basically comfortable to go back to Angelo and say, "You know, we should continue to do this."  And then it was baked into the strategic plan, meaning it was approved by the board of directors, it was, you know, talked about in the earnings call for the first quarter for the year end of '06. So that would have been like in January of '07, you know.  So the stopping of pay options is like a very temporary thing, reaction to Angelo had asked us to stop and keep adding.

Garcia Dep. at 156:6-21.

However, in an e-mail exchange on March 9, 2007, Mozilo inquired as to why the production of Pay Options was increasing:

> Our production of Pay Options is increasing.  How is this happening when the underwriting guidelines have been so severely restricted?  I also see that we continue to have a substantial inflow of subprime.  In light of the fact that we are taking substantial losses on subprime and it's attendant residuals how do we justify the continuing intake of such substantial volumes?  I do not want to continue to have to hold subprime for

investments on our balance sheet because of the lack of liquidity and the adverse pricing environment. Have we sold the Pay options in the Bank as we had discussed about a month ago?

Ex. 1650 at CFC2007G095894.

Garcia responded by explaining that the Bank had "credit enhance[d]" the Pay Option ARMs portfolio instead of selling it. *Id.* at CFC2007G095893. Mozilo continued to express his frustration that the Pay Option portfolio had not been sold, stating: "More importantly all of the decisions that were made relative to the retention, instead of sale of the pay options were made without my knowledge and my participation in the process and I don't appreciate it since I am the one ultimately responsible for the overall performance of the company." *Id.* He continued: "It is my belief that our original strategy was where we should have gone and ***the unilateral reversal of those decisions will prove harmful to the Company from a variety of perspectives.***" *Id.* (emphasis added).

As late as November 2007, Mozilo stated internally that he questioned "whether we should touch this product going forward because of our inability to properly underwrite these combined with the fact that these loans are inherently unsound unless they are full doc, no more than 75% LTV and no piggys." Nov. 3, 2007 Mozilo e-mail at CFCP003063616.

Finally, on November 4, 2007, Mozilo stated that "Pay options have hurt the Company and the Bank badly despite your belief that it is a viable product . . . I do not like this product because they are not fixable in the event of serious default and also because they promote the worst behavior from the mortgagors who opt for this product irrespective of the fact that they are prime and super prime borrowers." Ex. 1302 at CFCP003867934.

Again, none of the above was disclosed to the shareholders.

128

## III.   PRIME/SUBPRIME DISTINCTION

Countrywide's Forms 10-K and 10-Q filed during the Class Period all contained data regarding the number of prime and nonprime loans originated during their relevant time periods.  (The 2003 Form 10-K and the Form 10-Qs for 1Q, 2Q and 3Q 2004 used the term "subprime".)  At the September 13, 2006 Fixed Income Investor Forum, Mozilo stated that subprime loans were "only 9% of [Countrywide's] production today."  On March 22, 2007, Mozilo also stated that subprime loans were only 7-9% of Countrywide's business when he appeared on CNBC's "Mad Money" program.  These statements were all false and misleading because Countrywide knew that investors and analysts would think that the terms prime and subprime related to borrower creditworthiness when, in fact, Countrywide used those terms to distinguish the origination channel of the loans that were issued.  Countrywide's definition of prime and subprime was never disclosed to investors.

The principal definition of "subprime" is found in the *Expanded Guidance for Subprime Lending Programs,* issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision.  It states that "[t]he term "subprime" refers to the credit characteristics of individual borrowers.  Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies.  They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories.  Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase."  Ex. 287 at p. 2.

129

1    Among the credit risk characteristics listed in the *Expanded Guidance* that

2  label a borrower as "subprime" is a "[r]elatively high default probability as

3  evidenced by, for example, a credit bureau risk score (FICO) of 660 or below

4  (depending on the product/collateral), or other bureau or proprietary scores with

5  an equivalent default probability likelihood[.]"  Ex. 287 at p. 3.

6    Mozilo testified that when he referred to the term "prime," he generally

7  meant loans with FICO scores of 620 and greater.  Mozilo Dep. at 102:2-18.  He

8  also testified that the distinction between a prime and subprime loan was

9  primarily FICO.  Mozilo SEC Dep. at 710:9-19.  Russell testified that the main

10  driver of a loan's designation as prime or subprime at Countrywide Bank was

11  FICO score, and that a score of 660 was the cutoff.  Russell SEC Dep. at 37:18-

12  39:9.

13    However, Countrywide's internal designation of loans as prime or

14  subprime hinged not on borrower characteristics, but the channel from which the

15  loans were originated.  McMurray testified that "at Countrywide, the difference

16  was simply by product.  So if something – if something was a prime product, then

17  any loan originated under those guidelines was prime, and anything originated

18  under subprime guidelines was subprime."  McMurray SEC Dep. at 35:8-16.

19    Early on, in October 2004, Mozilo suggested changing the term "subprime"

20  to "emerging markets" for minority initiatives, citing to WLD's use of the term

21  Specialty Lending in place of "subprime."  Oct. 3, 2004 Mozilo e-mail at

22  CFC2007H155152.  In March 2006, Weintraub e-mailed Bielanski about the

23  initiative to lead Countrywide away from the use of the term "sub-prime" and

24  mentioned how two years earlier they had e-branded the Wholesale B/C lending

25  group as SLG [Specialty Lending Group], and stopped using the term "subprime"

26  in favor of the term "nonprime."  This e-mail was forwarded to Mozilo, who

27

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                                          34

130

1   responded that "We must continue to be innovative to maintain our leadership

2   position."  Mar. 21, 2006 Mozilo e-mail at CFC2007A369941.

3       On the July 24, 2007 earnings call, McMurray stated: "So the way I think

4   about prime is that it covers a very vast spectrum, so I don't thank you can paint it

5   with a single brush. . . .  So in the prime sector, recall how I showed you the line

6   that covered FICO.  There is a belief by many that prime FICOs stop at 620.  That

7   is not the case.  There are affordability programs and Fannie Mae, expanded

8   approval, as an example, that go far below 620, yet those are still considered

9   prime."  An analyst report by Van Hesser of HSBC Securities, issued

10  immediately after this presentation, stated, "Management referred to certain

11  affordability programs where FICO scores went 'far below' 620 (which already is

12  well below the bank regulator's definition of subprime, which has a 660 cutoff)."

13  Ex. 281 at NYF-UW017963.

14      Throughout the Class Period, Countrywide granted loans whose qualities

15  would fit squarely into any reasonable investor's definition of "subprime."  In

16  2003, relating to underwriting standards relevant to information presented in the

17  2004 Form 10-K, a Countrywide borrower could obtain a $400,000 loan based

18  upon Stated Income, with an LTV of 90% and a FICO of 580, and this loan

19  would be classified as prime for reporting purposes.   March 2003 CHL

20  presentation at CFCNYF00271853.  A November 2006 e-mail from David Swain,

21  EVP of Products and Pricing, FSL, to Vijay LaLa showed that 1.3% of Prime 1st

22  lien fundings over the preceding three months went to borrowers with FICO

23  scores between 500 and 580, and 10.4% of prime first lien loans went to

24  borrowers with FICO scores between 580 and 620.  Nov. 8, 2006 Swain e-mail at

25  CFCP004403827.

26      Further, Countrywide classified its Alt-A and Extreme Alt-A loans as

27  prime in its periodic filings (McMurray Dep. at 361:3-20, Mozilo SEC Dep. at

28

709:25-710:8), but never made the disclosure that Countrywide included such loans in its statistics concerning prime loans.  McMurray testified that "[t]he key difference between Alt A and the prime world is, the way we thought about it was documentation.  So in Alt A, most or virtually all of those would have some type of a low or no doc feature, and in the conventional – the typical conventional prime world, those would have either a – they would be full doc or alt doc or preferred doc . . . ."  McMurray Dep. at 364:11-18.  Gissinger also testified that documentation level was a difference between prime and Alt-A loans.  Gissinger Dep. at 625:21-626:1.  He further testified that "[i]f you were looking at it in terms of a general 30,000-foot standpoint, it would end up going between subprime, the higher end of subprime, and Alt-A."  Gissinger Dep. at 287:18-288:11.  Gissinger classified Extreme Alt-A as "another classification, if you will, between prime, Alt-A, extreme Alt-A, what would be called – there's a grading scale in subprime.  There'd be the upper tier subprime, normal subprime, lower subprime.  There's one additional column, if you will, in terms of the gradation."  Gissinger Dep. at 285:25-286:6.

  As far as Plaintiffs are able to discern, neither Countrywide nor any of its employees disclosed, either publicly or in writing, that Alt-A and Extreme Alt-A loans were classified as prime in Countrywide's periodic filings.  The change in terminology in Countrywide's periodic filings exacerbated this omission.  As McMurray and Gissinger testified, Alt-A and Extreme Alt-A loans fall between prime and subprime.  Beginning in the first quarter of 2005, Countrywide publicly classified its loans as either "prime" or "nonprime" in its periodic filings.  A reasonable investor would conclude that those loans that bore distinct differences from prime loans would be reported as nonprime.

  Executives in Countrywide's credit risk group noted that officials at Countrywide Bank were attempting to misclassify loans as prime.  An e-mail

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)   36

132

exchange dated April 20, 2005 discussed a pool of loans featuring "Alt-B 2/28" loans that Countrywide was considering purchasing.  During the exchange, McMurray stated that "Alt-B" was just a euphemism for subprime and that he did not "know any 2/28 that's not a subprime loan."  Additionally, McMurray pointed out that Countrywide did not have authorization from the Office of the Comptroller of the Currency ("OCC") to purchase subprime loans and should not move forward on this pool without regulatory approval.  In response, Mike Muir stated that, by asking the OCC's permission to purchase the pools, Countrywide "implicitly [is] stating that [it thinks] these are loans that [it] shouldn't be doing." Jim Furash echoed Muir's sentiments, stating that, while Countrywide was not authorized to purchase subprime loans, "we do not think these loans are sub prime."  He went on to state that "sellers of subprime assets often have prime loans for sale and that is what we are purchasing."  McMurray responded by stating, "Based on everything I read and heard so far, it would be hard to argue that these are prime loans."  Apr. 20, 2005 e-mail from McMurray to Rossi at CFCP001101395.

Executives at Countrywide took pains to conceal their internal definition of prime from those outside the company.  In a September 8, 2005 e-mail, an Executive Vice President at Countrywide Securities Corporation, Kevin Doyle, said that when Fannie Mae refused to purchase subprime loans from Countrywide, those loans were renamed "credit blemished."  CFC2007A024416. Also, Greg Lumsden, CEO of FSL, gave a presentation to a group of Consumer Markets Division (CMD) employees, admitting "[w]e are at this moment, sort of tied for first as the largest subprime lender," and "[w]e put a lot of subprime borrowers actually in prime loans."  2005 Presentation at CFC2007143076.

After the July 24, 2007 earnings call, Mozilo e-mailed Sambol and recommended internally changing the term "subprime" to "standard," "so that we

---

1  can say without reservation that we do not participate in 'subprime' lending."

2  Aug. 26, 2007 Mozilo e-mail at CFC2007A367426.  This request was forwarded

3  on to Gissinger who stated "Dave shared this with me and I had already changed

4  sub prime to near prime as a proxy until there was something better.  Today, we

5  are selling this product to the agencies and am open to a new name."  Aug. 29,

6  2007 Gissinger e-mail at CFCNYF04233983.

7          Countrywide's obfuscation of the distinction between prime and subprime

8  loans was so pronounced that even its auditors were fooled.  In August 2007,

9  John Klinge, engagement partner at KPMG, sent an e-mail to John Taylor,

10  Raymond Munoz, and Nicole Carillo concerning "CFC - Charge-off Policy and

11  HFS LOCOM," in which he said in part: "I am reading McMurray's comments

12  on the quality of the prime portfolio, and he stated that a portion of the prime

13  portfolio has FICOs below 620.  Not sure why that is prime, but clearly those

14  loans should not receive the same price as other prime loans for purposes of

15  LOCOM analysis."  Aug. 7, 2007 Klinge e-mail at KPMG-XXOTH-005-097578.

16          A month later, Mozilo told investors that "[w]e are out of the subprime

17  business."  September 18, 2007 Bank of America Investment Conference at

18  CFC2007769328.  Gissinger reacted to an article in *USA Today* quoting Mozilo's

19  statement by e-mailing Bielanski and Sambol, stating "[t]his article is killing me

20  in CHL.  I need your help crafting a response or clarification that states: We're

21  not out of the subprime business . . . ."  Sept. 22, 2007 Gissinger e-mail at

22  CFCP007872926.  Three days later, Gissinger sent an e-mail to approximately

23  150 members of his "team" at CHL, stating that despite Mozilo's statement,

24  Countrywide was still originating subprime product.  Sept. 25, 2007 Gissinger

25  e-mail at CFCNYF04234820.

26

27

28

## IV.    THE "WALL OF WORRIES"

McMurray presented a summary outline titled "Wall of Worries" to the Board of Directors Credit Risk Committee on February 13, 2007.  This presentation was designed to inform committee members of the reasons why and how Countrywide's credit exposure increased as it transitioned away from being a mortgage banker.  McMurray attributed the increase in "delinquencies and reserves . . . [to] transitioning economic environment, seasoning and the guideline expansion that occurred in the industry over the last several years."  Ex. 805 at CFCP007103440.  McMurray testified that the idea behind the "Wall of Worries" slide was to assemble on one page the principal concerns that members of management should be thinking about.  McMurray Dep. at 51:25-52:5. McMurray voiced these concerns to Countrywide's senior management throughout the Class Period.  *See, e.g.,* Ex. 810 at CFCP005887980.

McMurray testified that he began to worry about the sustainability of the trajectory of housing prices even before he joined Countrywide.  McMurray Dep. at 57:19-24.  This concern increased the longer the pattern continued, which he testified was conveyed to whoever was "willing to listen."  *Id.* at 61:11-62:12. McMurray characterized exception underwriting as a "more complex" concern in his outline.  He stated that an exception loan represented "a riskier potential transaction, and in my view more difficult to underwrite."  *Id.* at 73:6-11.  He clarified that the guideline expansions into new products that had not been offered historically before were essentially a shift into "untested waters" where you "don't have the benefit of history to inform your judgments or on which to build models."  *Id.* at 86:13-22.

McMurray also reiterated to senior management his consistent and growing concern that as credit guidelines loosened, in combination with the normally cyclical nature of the credit cycle (i.e., what goes up must eventually come

135

1   down), investor and insurers would begin to seek ways of putting loans back to

2   Countrywide by looking for breaches in representations and warranties.

3   McMurray Dep. at 137-41.  McMurray had also expressed concern about

4   Countrywide's ability to measure this risk, given the lack of uniformity as to the

5   nature and extent of representations and warranties provided to each of the

6   investors in Countrywide's loans.  McMurray Dep. at 129:3-19.

7        In terms of products, McMurray focused on Pay Options because the

8   product (i) tended to be "relatively controversial out in the market," due to its

9   negative amortization feature, (ii) was relatively complicated due to its very

10  nature as an adjustable rate mortgage and, (iii) for risk  management reasons.

11  McMurray Dep. at 209:6-212:20.  McMurray characterized the PayOption ARM

12  as the riskiest prime first lien from a credit risk perspective.  *Id.* at 214:17-23.

13       McMurray had explained there were several levels of concern regarding

14  HELOCs.  These risks included the fact that HELOCS, as second liens were

15  subordinate to first liens.  Since borrowers did not draw down all funding at one

16  time, it was often impossible to know what the total amount the borrower would

17  eventually owe would be.  Most HELOCs were granted with reduced

18  documentation.  And, the residual Countrywide would end up owning after

19  HELOCs were securitized and sold into the secondary market were highly risky.

20  *Id.* at 221-223.

21       McMurray had further stated that given two identical loans—one with full

22  documentation and one with reduced documentation—the likelihood of the

23  reduced documentation loan becoming seriously delinquent was between two and

24  four times more likely than the full-documentation loan.  *Id.* at 223:24-224:7.

25       McMurray disfavored the matching strategy because "it was matched

26  across various lenders and on specific product features, and so by virtue of taking

27  that approach, you ended up with a set of guidelines that would actually be more

28

1   aggressive than any single lender had by virtue of taking this matching approach,

2   so that was one of the concerns I had." McMurray Dep. at 245:11-19. McMurray

3   in fact agreed that as compared to those lenders matched, Countrywide would be

4   the most aggressive lender. McMurray Dep. at 247:15-23.

5         On several occasions, McMurray communicated the need to "follow

6   established risk guidance and policies[;] a product cannot be rolled out or

7   transactions closed without the required approvals." Ex. 1549 at

8   CFC2007B243316. In November 2006, he told Sambol that this was a

9   "fundamental deficienc[y]," pointing specifically to Countrywide's offering of

10  Extreme Alt-A without McMurray's approval. *Id.* He added that there were

11  "several recent examples where products or transactions proceeded without the

12  required risk approvals or in contradiction of established policy." *Id.* Although

13  he "previously created a set of guiding principles" in 2004 (Ex. 811 at

14  CFCP000004374), there had not been "acceptance from some of the key business

15  units." Ex. 1549 at CFC2007B243316. In January 2007, the problem persisted,

16  and McMurray told Gissinger, "[t]here have been occasions where PL [Product

17  Leadership] has been unable and/or unwilling to comprehend key risk issues,"

18  such as "two particular aspects on the recent (unapproved) subprime loan amount

19  changes." Ex. 1548 at CFC2007I167630. As efforts to curtail production in

20  favor of risk management failed, there were repeated requests by McMurray to

21  increase disclosure.

22        Credit Risk Management's judgment was often overruled. McMurray

23  wrote to Chief Investment Officer Nick Krsnich in early 2005, telling him that

24  "Drew [Gissinger] wanted us to consider giving Production a portion of the

25  balance sheet which would allow them to fund 'makes sense' transactions without

26  having to follow the normal corporate policies and processes." Feb. 14, 2005

27  McMurray e-mail at CFC2007I087711. Indeed, according to Kuelbs, it was

28

1   standard practice for production executives under Gissinger to ignore standards

2   and directives from the Company's credit department, dismissing them as

3   "aspirational," instead following only Gissinger's instructions.  Kuelbs SEC Dep.

4   at 66:7-69:10, 70:19-71:19.

5        In response to Gissinger's suggestion that production be placed in charge

6   of any variances it determined were in the market, effectively cutting credit risk

7   management out of the decision-making process, McMurray responded by

8   warning Gissinger:

9           I'm all for streamlining the process as long as it stays a

10          process.  A lot of what happens now is outside of any

11          semblance of a process so efficiency is terrible, people

        are frustrated and the quality of decisions is suboptimal

12          or worse.  We should discuss what constitutes a sound

13          business decision—we tend to cede our risk and

        investing decisions by matching whatever is in the

14          market.

15  Ex. 1723 at CFCP007147701-02.

16       For example, in a March 7, 2005 e-mail, Christian Ingerslev, an employee

17  in Product Leadership, stated: "I spoke to Desautels and he was called in by

18  Spector and Drew [Gissinger] under $1.5 million exception thing.  Sounds like

19  they got in on the line with the traders, and long story short, they now think they

20  can sell them but not with the pricing they were previously providing. . . .  it's

21  frustrating to try and hold the line and then just be overridden with whining and

22  escalations, just reinforces that sales can have anything they want if they yell loud

23  enough to drew."  Ex. 486 at CFC2007I087902.  Vijay LaLa, Managing Director,

24  Product Development and Support, answered someone's question about the

25  chances of Countrywide rolling out a new product: "We are likely going to do

26  it—Drew will likely override John [McMurray].  Stay tuned . . . ."  Oct. 27, 2005

27  LaLa e-mail at CFCP004835387.

28

In his testimony to the SEC, Ingerslev elaborated on the conflict between the sales and credit risk groups at Countrywide:

> So there was a strong sales culture. So . . . ultimately . . . disagreements or ties were broken . . . to the side of erring on, well, we don't want to lose volume, we want to keep up the volume and keep up our market share. That was a strategy that the company had. . . .

> [I]n that environment, there was conflict. Some of it you'd expect, and some of it went beyond what you would expect and was tough. . . .[A]ny question asked by the sales area that wasn't answered with a yes . . . was not considered final. That just means we need to ask you again or ask somebody else, or there must be something broken with our process, because if the process were working, you would clearly say yes. . . . [Y]ou can say that was a bad business strategy in the end, but that's what it was.

Ingerslev SEC Dep. at 132:14-133:23.

According to a memorandum dated June 17, 2005 and e-mailed by Steven Trentacosta to McMurray, Gissinger as Chief Production Officer had the clear authority to override any decisions made by the credit risk department. "If the resolution can not be made between the MD's (McMurray and Kuelbs) and the requesting production divisions, Drew Gissinger will be brought in to make final resolution based on the fact provided and the need of the production divisions." June 17, 2005 Trentacosta e-mail at CFCP001099322-23; June 17, 2005 memorandum at CFCP001099331.

In a February 10, 2006 e-mail to Lumsden, head of FSL, McMurray insisted that Countrywide needed to stay with the "no exceptions policy" for the

1   subprime 80/20 loans[7] because "[t]he company is not willing to take credit risk on

2   these seconds and we must therefore have a clearly identified execution consistent

3   with this."  Lumsden responded: "It just doesn't work . . . We cannot shutdown

4   while waiting for who knows when."  Feb. 10, 2007 McMurray e-mail at

5   CFCP004541746.

6         Again, in a March 23, 2006 e-mail, McMurray outlined Countrywide's

7   "Policy on High Risk Products," stating "[w]e revised the CFC Credit Policy to

8   include more specific requirements on high risk products.  While much of this is

9   already in effect, we want to be sure there is no ambiguity with respect to high

10   risk products and the retention of credit risk.  This policy is effective

11   immediately."  Ex. 491 at CFC2007I315086.  In September 2007, in reference to

12   the above, "McMurray stated 'I was never supported on this and Secondary,

13   Production and CCM basically continued to operate as though they never

14   received this policy.  In addition to this e-mail, there were many meetings and

15   other conversations where these issues were discussed."  Ex. 491 at

16   CFC2007I315086.  Among other things, this policy sought to severely restrict the

17   Company's retention of credit risk on high risk products.  *Id.*

18         In his testimony to the SEC, McMurray stated that Eric Sieracki told him

19   that Sambol had "slashed" credit disclosure language out of the 2006 Form 10-K,

20   "especially around widened guidelines for affordability."  McMurray SEC Dep.

21   846:15-850:15.

22         Gissinger refused to deploy new, more stringent credit guidelines, instead

23   claiming that he lacked input from the Production Division, when in fact his own

24   direct report, Kuelbs, provided input into those guidelines.  Gissinger SEC Dep.

25   at 135:4-8; Mar. 1, 2006 McMurray e-mail at CFC2007I099846.  McMurray

26

27       [7] An 80/20 loan is actually two loans granted at the same time.  The first

28   mortgage has an LTV of 80%.  The second mortgage has an LTV of 20%.  The CLTV is 100%.

understood that Gissinger disagreed with guidelines because they were conservative compared to the market, hence his refusal to deploy them. McMurray SEC Dep. at 666:24-667:3.

A Countrywide internal audit report from October 2006 observed:

> In June 2006, a product change was considered to increase the Subprime Loan and Loan to Value (LTV) amounts across all credit grades and most Fair Isaac Corporation (FICO) scores and LTV combinations within each grade.  On the PCPF reviewed, it was noted that the Chief Credit Officer clearly disapproved of the change.  Following existing guidelines, the change was implemented as the EMD–Chief Production Officer for CHL approved the product change . . . it would be a potential conflict of interests for the Chief Production Officer to override the position of the Chief Credit Officer . . .  This finding is rated Moderate Risk as the current approval structure could lead to an acceptance of credit risk in excess of CFC's tolerance levels.

Oct. 11, 2006 Internal Audit Report at CFC2007B992826.

In an April 20, 2006 e-mail regarding the 10-Q Unit Discussion and Analysis for the Quarter Ended March 31, 2006, McMurray described the business and environmental changes at Countrywide from a Credit Risk perspective from the previous quarter.  Ex. 813 at CFC2007I153312.  The changes McMurray highlighted in part include the following facts: 1) "We are still seeing lenders offering increasingly aggressive product offerings despite signs of less favorable conditions;" 2) Home price appreciation now appears to be slowing after years of very favorable results, aspects of the business many of the changes to how the business; 3) The extremely favorable economic conditions . . . we've experienced over the past several years is unlikely to continue resulting in higher defaults.  McMurray also noted that loan quality deteriorated for the

141

quarter ending March 31, 2006.  Ex. 813 at CFC2007I153312.  On April 20, 2006, in a fax from McMurray to Jie Ling, a manager of SEC Reporting responsible for collecting the MD&A disclosures, McMurray noted that, based on conversations he had had with Greg Hendry, managing director of financial reporting and accounting governance, and others about keeping language in the 10-Q, "[t]here had been a recommendation from an officer at Countrywide Bank to remove or 'soften' some of the language on credit."  McMurray wrote that it was his belief that the language should remain in and was told that it would.  Ex. 814 at JPM-ARG 00001282.

McMurray expressed his concerns and the need for CFC to expand its credit risk disclosures in the Form 10-Q for 2Q 2006 as well.  In a July 17, 2006 e-mail, McMurray listed major factors that were likely to result in Countrywide's experiencing an increase in "delinquencies, defaults, and credit losses going forward," such as:

> Credit Guidelines - The industry has expanded credit guidelines very aggressively over the past several years.  Some transaction combine risk factors or risk levels that were not seen in previous cycles.  The delinquencies and defaults from these transactions will be higher.
> Loan Manufacturing - There are many steps in the loan manufacturing processes.  To the extent any of these is not performed correctly, we will be exposed to unexpected losses

Ex. 342 at CFCP000697743.  These disclosures were not included in the Form 10-Q for 2Q 2006.  *See* Ex. 344.

McMurray again expressed his concerns relating to risk disclosures when the Form 10-Q for 3Q 2006 was being prepared.  In an October 17, 2006 e-mail to Jie Ling and Greg Hendry, McMurray reiterated similar concerns that he expressed in his July 17, 2006 e-mail.  Specifically, he noted:

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                            46

142

> As I've communicated to you previously, underwriting guidelines have widened dramatically over the past five or so years.  Loan quality has deteriorated as consequence of this guideline widening.  The transition from extremely favorable conditions, which prevailed over the past several years, to a more difficult environment will also adversely affect loan quality and loan performance.  The allowance is addressed in a dedicated meeting between Corporate Credit and Corporate Accounting.

Ex. 346 at CFCP001444911-12.  These disclosures were not included in the Form 10-Q for 3Q 2006.  Hendry Dep. at 149:22-151:13; *see* Ex. 236.

In a November 16, 2006 e-mail to Sambol, McMurray complained about guidelines and products being introduced in contravention of credit policy.  As an example, McMurray cited the fact that Extreme Alt-A loans were being offered by the loan production divisions even though that program had not been officially approved in the guideline review process.  Ex. 484 at CFC2007B012537.  The guidelines for this unapproved program permitted 100% financing, layered with additional credit risk factors such as stated income, lower than average FICO scores, or non-owner occupied investment properties.  Ex. 632 at CFCNYF0019452.

Even when funneled through the proper reporting channels, suggested disclosures regarding the deteriorating quality of Countrywide's loan originations made by internal Countrywide employees would not end up in Countrywide's periodic filings.  In January, 2007, Countrywide's servicing division completed an MD&A template for the 2006 Form 10-K.  Ex. 676 at CFCP002234184.  The template requested year over year delinquency rates and a detailed explanation for any change in those rates.  In response, the servicing division attributed the increase in delinquencies in both the HELOC and subprime portfolio to

143

"[i]nferior quality and performance of loans originated in 2005 and YTD 2006 compared with quality and performance of the 2002-2004 vintages." *Id.* at CFCP002234195. Servicing attributed the increase in delinquencies across the entire CHL portfolio to "[e]xpansion of guidelines in 2005 - YTD in response to the more competitive environment." *Id.* at CFCP002234196. Sambol testified that he believed this statement was true. Sambol Dep. at 464:10-20. The causes identified by servicing were not disclosed in Countrywide's 2006 Form 10-K. *See* Ex. 261. Nor were they disclosed in any subsequent periodic filing or by any Countrywide employee, either orally or in writing.

There were several instances when McMurray refused to approve loan product programs that he argued would increase risk beyond tolerable levels, but were nevertheless implemented by Countrywide. In a November 2, 2006 e-mail from Bartlett to Sambol regarding sign-off on Extreme Alt-A, Bartlett stated, "I'm a little worried about John. He's been withholding sign offs on certain issues that should be priced for. The latest was on extreme alt a where Drew and crowd needed me to sign off when John was out after John dragged his feet for over 30 days. Of course they pick the day he's out to tell me they need a decision." Nov. 2, 2006 Bartlett e-mail at CFC2007B012332. McMurray testified that he never signed off on the product and so stated to Sambol. McMurray SEC Dep. at 691:12-24.

McMurray testified regarding a conversation he had with Bartlett, which prompted him to jot down some handwritten notes describing reasons he wanted to resign from Countrywide. Ex. 816 at JPM-ARG 00001217; McMurray Dep. at 394:20-395:2. McMurray wrote, "1. Concern about personal risk. Do not want to be blamed for products, guidelines, etc. that I never advocated and often recommended against; concerns about inadequate controls, infrastructure, etc." *Id.* McMurray testified that he was concerned that with "the guideline expansion

144

1    that had occurred and the self-reinforcing effects that we'd already talked about

2    on home prices, there . . . wasn't any way for me to imagine that ending happily."

3    McMurray Dep. at 399:3-7.  McMurray then spoke with Dave Sambol regarding

4    his intention to resign.  McMurray voiced his concerns about Countrywide's

5    matching strategy, how Countrywide managed credit risk, and his concern about

6    personal risk discussed in his handwritten notes.  McMurray Dep. at 406:20-

7    418:23.  Sambol convinced McMurray not to resign, however, by saying that he

8    was committed to "very strong controls and . . . a very strong risk management

9    organization and . . . strong checks and balances," and by giving him a substantial

10   pay raise.  Sambol Dep. at 223:4-225:6.

11          Notwithstanding such promises, McMurray was compelled to continue his

12   efforts to curtail Countrywide's matching strategy – e.g., communicating to

13   Sambol "fundamental deficiencies that need to be remedied," as reflected in

14   unapproved Extreme Alt-A originations.  Ex. 1549 at CFC2007B243316.

15   Moreover, Sambol and Bartlett did not devote much time to addressing

16   McMurray's concerns.  Two of these concerns were: (i) Countrywide's

17   "composite set of guidelines will be the most aggressive in the credit market,"

18   and (ii) the Company was ceding credit policy "to the most aggressive lenders in

19   the market."  Nov. 2, 2006 Sambol e-mail at CFC2007B062313.  Bartlett testified

20   that other than one conversation that he and Sambol had with McMurray, Bartlett

21   did not "remember talking about . . . these two issues with [Sambol]."  Bartlett

22   SEC Dep. at 318:18-319:12.

23          Shortly before McMurray's final resignation from Countrywide in

24   September 2007, in reference to his "policy on high risk products," he stated: "I

25   was never supported on this and Secondary, Production and CCM basically

26   continued to operate as though they never received this policy.  In addition to this

27

28

145

1  email, there were many meetings and other conversations where these issues were

2  discussed." Ex. 491 at CFC2007I315086.

3      In a fax dated January 25, 2007 regarding McMurray's 10-K certification,

4  McMurray continued to voice similar concerns about the risks of a worsening

5  credit environment and increased delinquencies. Ex. 1306 at JPM-ARG

6  00001309. Specifically, regarding changes in loan quality, McMurray stated that

7  "As noted in other communications, guidelines have widened making the loans

8  riskier." *Id.* at JPM-ARG 00001310. Again, McMurray referred members of the

9  Financial Reporting Group to the "relevant discussion, meetings presentations

10 and e-mails on this topic." *Id.* McMurray specifically pointed to a January 2,

11 2007 e-mail he sent to Sieracki, which explained why "delinquencies will

12 increase" and why the "R&I (repurchase and indemnification) provision expense

13 will increase." Ex. 1127 at CFC2007G567590. McMurray stated:

14      •   higher defaults = higher repurchases because investors and credit
          enhancers tend to put back only defaulted loans

15

16      •   investors and credit enhancers will attempt to mitigate their
          delinquency challenges through increased repurchase requests (i.e.

17           being more aggressive with their requests)

18      •   investors and credit enhancers will attempt to mitigate their
          delinquency challenges by more aggressively resisting our rebuttals"

19 *Id.*

20     None of these statements were included in the 2007 Form 10-K.

21     In an e-mail string dated April 10, 2007, McMurray commented to Erika

22 Joseph, the manager of SEC reporting, and Jie Ling that "not all of my comments

23 have made it into your previous filings." Apr. 10, 2007 McMurray e-mail at

24 CFC2007H030371. In an earlier e-mail within the string dated April 4, 2007,

25 McMurray provided his electronic responses to the questionnaire from the

26 financial reporting group. In his response, McMurray mentions "[a]s discussed

27 previously and on several separate occasions with Corporate Accounting, market

28

1     fundamentals (especially home prices) and liquidity have deteriorated materially.

2     Furthermore, regulatory and reputational conditions are increasingly adverse." In

3     addition, McMurray pointed out that "[a]s noted previously and repeatedly,

4     industry guidelines have widened significantly over the past several years. The

5     industry and CW were originating loans with more aggressive credit guidelines

6     than was the case historically." *Id.* These statements were not included in

7     Countrywide's 1Q 2007 Form 10-Q. *See* Ex. 348.

8         On April 25, 2007, Jie Ling received John McMurray's MD&A

9     questionnaire for the period ending March 31, 2007, in which he repeated his

10    calls for additional disclosure. He stated "[a]s discussed previously and on

11    several occasions with Corporate Accounting, market fundamentals (especially

12    home prices) and liquidity have deteriorated materially." He further stated that

13    "[a]s noted previously and repeatedly, industry guidelines have widened

14    significantly over the past several years. The industry and CW were originating

15    loans with more aggressive credit guidelines than was the case historically.

16    Guidelines have been recently trimmed back though are still very aggressive in a

17    historical context." Ex. 1307 at JPM-ARG 00001292. These statements were not

18    included in Countrywide's 1Q 2007 Form 10-Q. *See* Ex. 348.

19         In a July 21, 2007 e-mail, McMurray outlined the issues warranting

20    disclosure in the 2Q 2007 Form 10-Q. He described the deteriorating housing

21    market as "worse than anything we've seen in the last forty to fifty years." He

22    went on to state that "[m]any of the product innovations introduced into the

23    market over the past five years are untested in stress environments. These

24    innovations often incorporate features and/or combinations of attributes that tend

25    to make them more risky. Because of the company's matching and no brokering

26    principles and strategies, we have some type of exposure to all of these

27    innovations (e.g. in loans directly and/or residuals and/or R&W)." He then stated

28

147

1   that "the company has grown rapidly in both the volume and breadth of our risk

2   exposures," but "the infrastructure (people, processes and systems) to manage this

3   activity and exposure have not kept up with this growth."  Ex. 349 at

4   CFCP005862910.

5          McMurray submitted his MD&A questionnaire on August 8, 2007,

6   reiterating the concerns in his July 21, 2007 e-mail.  Ex. 1308 at JPM-ARG

7   00001323-24.  His statements were not included in Countrywide's 1Q 2007 Form

8   10-Q.  Hendry Dep. at 163:4-170:10, Ex. 348.

9   **V.      "LESSONS LEARNED"**

10         On August 31, 2007, Keith Russell, a member of the Board of Directors,

11  sent a memorandum to Angelo Mozilo and others requesting a comprehensive

12  "lessons learned" analysis of the series of events leading to the credit and

13  liquidity crisis, so as to avoid any future re-occurrences.  Ex. 850 at

14  CFCP007837478.  An investigation ensued and the following individuals were

15  interviewed:

| Name | Title |
|---|---|
| Sandy Samuels | Executive Vice President, Deputy General Counsel |
| Andrew Gissinger | Executive Managing Director, Residential Lending, CFC & President, COO CHL |
| Kevin Bartlett | Senior Managing Director Investment and Portfolio Management |
| Carlos Garcia | Executive Managing Director CFC Chief of Banking and Insurance Operations |
| Ron Kripalani | Senior Managing Director and President Capital Markets |
| Jack Schakett | Executive Managing Director and Chief Operations Officer (CHL) |
| Eric Sieracki | Executive Management Director and Chief Financial Officer |
| Walter Smeichewicz | Senior Managing Director of Enterprise Risk Assessment |
| Tim Wennnes | Managing Director and Chief Operating Officer (Bank Segment) |
| Brian Hale | Senior Managing Director and President Consumer Markets Division |

| Todd Dal Porto | Senior Managing Director and   President, (Wholesale Lending) Division |
|---|---|
| Doug Jones | Senior Managing Director and President IMSG |
| Greg Lumsden | Senior Managing Director and President, FSL Division |
| Mark E. Elbaum | Senior Managing Director and Chief Financial Officer (CHL) |
| Jennifer Sandefur | Senior Managing Director Treasury |
| Anne McCallion | Senior Managing Division and Chief of Financial Operations and Planning |

Ex. 400 at CFCP002927320.

On November 17, 2007, a summary of interview perspectives entitled "Key Observations and Lessons Learned From The Crisis" was created and sent to Anne McCallion and Eric Sieracki detailing the interviews with executive management.  Ex. 272 at CFCNYF00276842.  The summary provided clear admissions that the widening of guidelines and the drive to achieve the market share caused a huge increase in credit risk, all of which was evident at the time these events were occurring, and that the public statements regarding Countrywide's guidelines, loan quality and credit risk management had been false and misleading at the time they were made.  The summary included the following direct quote observations:

- Deteriorating credit conditions were clear . . . ;[8]
- We did not fully heed the warnings of our credits models. Delinquencies were rising, and models predicted worse to come;[9]
- Early indicators of credit risk exposure existed.  Internal control systems highlighted many of the risks that eventually transpired;[10]
- Risk indicators and internal control systems may not have gotten enough attention in the institutional risk and Board committees;[11]
- Our model of matching products put us at the mercy of irrational market behavior;[12]

---

[8] Elbaum, Ex. 401 at CFCNYF00276831.
[9] Kripalani, Interview Notes at CFCNYF00276838.
[10] Smiechewicz, Ex. 415 at CFCNYF00276825.
[11] Id.
[12] Lumsden, Ex. 419 at CFCNYF00276854.

1    • The focus of production was volume and margin, not credit risk.
2    There was also massive emphasis on share;[13]
3    • We were driven by market share, and wouldn't say "no" (to guideline expansion);[14]
4    • Our wide guidelines were not supported by the proper infrastructure
5    (credit, risk management); and
6    • Lots of experienced people were uncomfortable with the
7    underwriting guidelines.  Going forward, we need to rely on our
     experience and instinct when business practices don't make sense.[15]
8    Ex. 272 at CFCNYF00276842.

9         On November 26, 2007, Sambol made a presentation to the Board of
10   Directors that addressed the key events of the crisis, how CFC handled the crisis,
11   and the lessons learned from the crisis.  Nov. 2007 Presentation at
12   CFCNYF00276876.

13        Countrywide acknowledged in this presentation that it failed to heed
14   warning signs in 10 fundamental areas of its business before the crisis careened
15   out of control and operated in these areas in such a fundamentally flawed manner
16   that Countrywide's actions more likely than not would result in disaster.  These
17   areas include (1) Market Expectation & Anticipation, (2) Strategic Planning, (3)
18   Contingency Planning, (4) Business Model, (5) Risk Governance, (6)
19   Management, Culture and Organization, (7) Coordination, Teamwork &
20   Leadership, (8) Communication, (9) Financial Systems, (10) Board & Regulators.
21   *Id.*

22        Regarding market expectation and anticipation, Countrywide found that
23   before the crisis it did not fully heed the warnings of its credit models, however
24   flawed.  Delinquencies were rising and models predicted that the worse was to
25   come.  Deteriorating credit conditions were clear.  Countrywide largely ignored

---

26
27   [13] *Id.*
     [14] Schakett, Ex. 424 at CFCNYF00276863.
28   [15] Lumsden, Ex. 419 at CFCNYF00276854.

1    its own models and maintained that the problems were largely confined to

2    subprime. *Id.* at CFCNYF00276884.

3         Though Countrywide had backup liquidity structures that were in place as

4    part of the company's contingency planning, Countrywide did not have an

5    external communication plan to support the draw of its bank lines.  Countrywide

6    continued to grow aggressively through the second quarter of 2007, despite the

7    warnings of credit models and to focus on share growth and hiring.  Initiatives

8    regarding manufacturing quality did not turn into meaningful action until the

9    second quarter. *Id.* at CFCNYF00276886.

10        Countrywide found that its model of matching products put the company at

11   the mercy of irrational market behavior.  Countrywide was under significant

12   pressure from all its partners (builders, real-estate agents, brokers) to get deals

13   done.  That put further pressure on guidelines.  In Countrywide's own words:

14   "We gave-in to the market." *Id.* at CFCNYF00276888; *see also* McMurray

15   e-mail to Sambol in June 2005 stating that "Because the matching process

16   includes comparisons to a variety of lenders, our match will be the composite of

17   the outer boundaries offered across multiple lenders. . . .  As a result, our

18   composite guidelines are likely among the most aggressive in the industry."  Ex.

19   808 at CFC2007I088611; McMurray Dep. at 247:3-23.

20        Countrywide found that the company knew it was taking risks, but believed

21   it could price the products right and offset the risk, a strategy that had been

22   undisclosed to investors.  Countrywide acknowledged in its findings that "[w]ith

23   riskier products, you need to be exquisite in off-loading the risk"

24   (CFCNYF00276889), echoing a warning that McMurray stated he previously

25   voiced.  McMurray SEC Dep. at 380:25-384:15.  Countrywide was driven by

26   market share, and wouldn't say "no" (to guideline expansion). *Id.* at

27   CFCNYF00276889.  The company's wide guidelines were not supported by the

28

1   proper infrastructure (credit, risk management),  *id.,* echoing what McMurray had

2   wanted disclosed in the 2Q 2007 Form 10-Q.  Ex. 349 at CFCP005862910.

3          Countrywide also found that in the area of risk governance, early indicators

4   of credit risk exposure existed.  Internal control systems highlighted many of the

5   risks that eventually transpired.  Countrywide acknowledged that risk indicators

6   and internal control systems may not have received enough attention in the

7   institutional risk and Board committees.

8          Regarding the areas of management, culture and organization, Countrywide

9   found that lots of experienced people at the company were uncomfortable with

10  underwriting guidelines.  Countrywide had a tremendous zeal for dominance (as

11  measured by market share), which was a source of much of the company's

12  success.  However, it might have been taken too far as Countrywide, in its own

13  words, "remained pedal-to-the-medal as warning signs mounted."  *Id.* at

14  CFCNYF00276891.

15         As regards its Board of Directors, Countrywide determined that the Board

16  should have been more active and interested in risk issues presented to the Board

17  committees.  The Board should have taken a leadership role in management

18  transitions – the lack of which caused ambiguities in leadership.  Additionally,

19  Countrywide found a need to clarify the role of the Board and asked the question

20  of whether the company should expect greater oversight.  *Id.* at

21  CFCNYF00276895.

22  **VI.   HOUSING, LIQUIDITY AND CREDIT CRISIS**

23         Beginning in 2007, Mozilo made various statements, orally and in writing,

24  regarding Countrywide's access to liquidity.  For example, the Form 10-Q for the

25  first quarter of 2007 states that "[w]e believe we have adequate financing capacity

26  to meet our currently foreseeable needs" and the Forms 10-Q for the second and

27  third quarters of 2007 state that "[w]e do not believe that any of our off-balance

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)          56

152

sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."  During the July 24, 2007 Earnings Call, Mozilo stated: "[W]e believe that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects.  We expect to leverage the strength of Countrywide's capital liquidity positions . . . to emerge in a superior competitive position coming out of the current housing downcycle."  An August 2, 2007 Countrywide press release stated that the company had "ample liquidity."  On August 23, 2007, Mozilo stated that Countrywide would have survived without the $2 billion cash infusion it received from Bank of America.  These statements were false and misleading because Countrywide was in the midst of a liquidity crisis and had to scramble to acquire liquidity in order to stay afloat in mid to late 2007.

As early as October 26, 2004, Sieracki recounted to Mozilo a conversation he had with Jonathan Gray, a well-respected analyst, during which Gray advised "Since a credit crisis is inevitable, fortify [y]our credit risk policies now and disclose them to the Street."  Ex. 1286 at CFC2007I075139.

Mozilo testified that he believed in the fall of 2006 that housing prices would not go up forever.  Mozilo SEC Dep. at 470:1-6.  "Remember what I said almost six months ago.  'In my 53 years in the business I have never seen a soft landing.'  This one is going to be as hard as they come."  Feb. 27, 2007 Mozilo e-mail at CFC2007A373214; Mozilo SEC Dep. at 608:8-609:10.

As early as April 2007, McMurray stated that he had "discussed previously…on several separate occasions" that "liquidity [has] deteriorated materially" along with home prices and other market fundamentals.  Apr. 4, 2007 McMurray e-mail at CFCP001445626.

153

On July 5, 2007, Mozilo wrote to Sieracki and Sambol regarding liquidity, citing a "substantial number of unknowns" looming, including with respect to the subprime and HELOC issues facing Countrywide, and recommending Countrywide find an additional $4.5 billion in financing.  Ex. 1565 at CFC2007B659355.  Mozilo again voiced concerns about liquidity in a Board of Directors Special Telephonic Meeting.  July 17, 2007 Meeting Minutes at CFC2007B648589.

Mozilo testified that he was informed of the liquidity crisis on or about August 2, 2007 by David Sambol.  Mozilo SEC Dep. at 154:12-155:7.  Mozilo stated: "It was a global crisis within Countrywide and all areas of the company . . ."  Mozilo SEC Dep. at 155:8-9.

Countrywide prepared a timeline on its decision to draw down on its back up line of credit in response to a request for information by the SEC.  August 2007 Timeline at CFC2007-00657.

At an August 6, 2007 Board of Directors meeting, Mozilo stated that the ability of Countrywide to finance its inventory with commercial paper was being adversely impacted by the difficulty in marketing specific securitization transactions and tranches.  Aug. 6, 2007 Meeting Minutes at KPMG-07FYA-047-000272.  Mozilo informed the Board at this meeting that the Company may have to draw on its back-up facilities.  Aug. 2007 Timeline at CFC2007-00659; Mozilo SEC Dep. at 160:6-14.  At the August 10, 2007 Countrywide and Countrywide Bank Board of Directors Special Telephonic Meeting, Mozilo described Countrywide's liquidity issues  as "severe" and Sieracki stated that Countrywide had lost access to unsecured commercial paper.  Aug. 10, 2007 Meeting Minutes at KPMG-07FYA-047-000276.  Mozilo also informed the Board on August 10, 2007 that the Company may need to access its contingency liquidity plans and draw-down on its back-up facilities.  August 2007 Timeline at CFC2007-00662.

1    On August 16, 2007, Countrywide drew down its entire $11.5 billion back-

2    up bank credit line, an event that caused Countrywide's credit rating to be

3    downgraded by the ratings agencies.  Sept. 11, 2007 Finance Summit summary at

4    CFCNYF04547136.  Sieracki determined that the $2 billion infusion from Bank

5    of America was necessary because Countrywide would otherwise be forced into

6    disclosures that were "likely to kill any public deal."  Sieracki notes, EPS NYF

7    000624.  Later, he observed that Countrywide needed a private, insider deal for

8    term debt or "expanded disclosures about Q3 for public deal."  Sieracki notes,

9    EPS NYF 000628.  A CHL Cash Reconciliation shows that had this draw down

10   not occurred, Countrywide would have been roughly $5 billion short of meeting

11   its obligations.  CHL Cash Reconciliation, at EPS NYF 000688.

12   In an August 26, 2007 e-mail, Mozilo stated: "This is no longer about

13   current stock price but about securing the future of our Company so that we can

14   remove all threats from the regulators, analysts, rating agencies and the press.

15   We should pile on the equity and not worry at all about dilution.  The worst

16   dilution would be a stock price at zero."  Ex. 1300 at CFCP006575286.

17   In another August 26, 2007 e-mail, Mozilo stated, with regard to extending

18   the commercial paper issue by one of its off-balance sheet funding vehicles, that:

19   "I am deeply concerned that it will send us into another death spiral because it

20   will be perceived that we remain in deep trouble and our creditors and

21   shareholders will be wondering what's next."  Ex. 1312 at CFCP00305682.

22   Mozilo testified that, at that time, he believed that they had had a liquidity crisis

23   in the Company.  Mozilo Dep. at 290:5-12.  Sambol testified that Mozilo was

24   concerned about the perception such an extension would elicit.  He stated "our

25   having made that decision was a very . . . profound decision in terms of, you

26   know, implications thereafter, because it's something that one only does in a very

27   stressed situation . . ."  Sambol Dep. at 433:13-31.

28

1       In a September 28, 2007 e-mail, Mozilo stated that "[i]t is very possible,

2   and even probable, that the deterioration in real estate values will continue well

3   into 2008 thereby resulting in increasing delinquencies, foreclosures and severity

4   of losses."  Ex. 1301 at CFC2007C526420.

5       In a September 29, 2007 e-mail to Mozilo, Sieracki stated that "[w]e all

6   agree liquidity remains a critically important issue" and advised that contingent

7   liquidity be accumulated at the bank to prepare for further deteriorating market

8   conditions.  Ex. 1568 at CFC2007B848398.

9       Hoping to reverse an OTS CAMELS[16] rating downgrade, Countrywide

10  pursued a $5 billion credit line with Bank of America.  Mozilo requested that the

11  deal get closed as quickly as possible since the release of Countrywide's third

12  quarter results were going to "make it increasingly difficult to get additional

13  liquidity as rapidly as we need it."  Oct. 5, 2007 Mozilo e-mail at

14  CFC2007B788647.

15      In the November 2007 CFO report to the Board of Directors, Sieracki

16  asserted that "November continued to be a challenging period for securing

17  financing and maintaining liquidity."  Nov. 2007 CFO Report to Board of

18  Directors at CFC2007B824430.  A November 7, 2007 e-mail described liquidity

19  as "tight" with the only meaningful liquidity being "through CFC, FRBNY and

20  GCF-all else is overnight."  Nov. 5, 2007 Bockian e-mail, at CFCP005099378.  In

21  a December 12, 2007 e-mail, Dave Bigelow told Sieracki that since year-over-

22  year comparisons were unfavorable to Countrywide, such comparisons were

23  eliminated from the November Operations Press Release.  Dec. 12, 2007 Bigelow

24  e-mail, at CFC2007B187889.

25

26      [16] OTS CAMELS is the Office of Thrift Supervision's rating system for

27  federal thrifts and is based on Capital, Asset Quality, Management, Earnings, Liquidity and Sensitivity to Market Risk.  Mar. 5, 2007 Enterprise Risk

28  Management presentation at CFCP005295290.

In January 2008, Jennifer Sandefur, Senior Managing Director and Treasurer, asked Bank of America for a capital infusion of $3-4 billion, which was based upon "BofA's understanding of our risks." Jan. 23, 2008 Sandefur e-mail at CFC2007A587660. Sieracki stated at this time "[b]ottom line = we're one last straw away from BK [bankruptcy]." Sieracki notes at EPS NYF 000638.

## VII. STOCK SALES

During an interview with CNBC's Maria Bartiromo on August 23, 2007, Mozilo stated that his stock sales were out of his hands, and that his interests were firmly aligned with those of other investors. During the October 26, 2007 earnings call, Mozilo stated "I would like to state categorically that at no time did I make any trading decisions based on any material non-public information and I fully complied with all . . . applicable securities laws in connection with my trading plans."

## VIII. GAAP VIOLATIONS AND WEAKNESSES IN INTERNAL CONTROLS

Countrywide's consolidated financial statements contained in certain of the Company's Forms 10-K, 10-Q, and 8-K filed during the Class Period contained material misstatements and omissions in violation of Generally Accepted Accounting Principles ("GAAP"). These material misstatements and omissions concerned reporting over Internal Controls, and accounting and reporting of Countrywide's Allowances for Loan and Lease Losses ("ALLL"), Retained Interests ("RIs"), Mortgage Servicing Rights ("MSRs"), and Representations and Warranties ("R&Ws"). NYSCRF will explain their basis for the assertion of falsity of these material misstatements and omissions in violation of GAAP in Plaintiffs' expert report to be served shortly.

## INTERROGATORY NO. 12:

Identify all facts supporting your contention in paragraph 419 of the SAC that Mr. Mozilo "had actual knowledge that the statements made by him were false and misleading, or acted with deliberately reckless disregard for the true or false of those statements."

## ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 12:

NYSCRF incorporates by reference its General Objections.  NYSCRF further objects that because this contention interrogatory seeks "all facts," it is overly broad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.   NYSCRF further objects to this Interrogatory to the extent that it seeks information equally available to Defendant Mozilo, or information to which Defendant Mozilo has equal or greater access.  NYSCRF further objects to this Interrogatory to the extent that it seeks information not in NYSCRF's possession, custody, or control.  NYSCRF further objects to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  NYSCRF's Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact that NYSCRF may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, NYSCRF answers as follows:

**A.    Mozilo Knew or Was Deliberately Reckless in Not Knowing of the Deteriorating Quality of the Loans That Countrywide Was Originating**

Mozilo had actual knowledge (or was deliberately reckless to the extent that he did not have such knowledge) as to every important fact that occurred at

1    Countrywide.  Mozilo made public representations that he was a hands on CEO
2    who daily participated in mortgage originations to keep himself apprised of what
3    was going on in the Company.[17]  July 26, 2005 Conference Call at
4    CFC2007E830032.  Garcia confirmed that Mozilo was intricately involved in all
5    aspects of managing the company: ***"Nothing got done without everybody***
6    ***knowing, whether it be regulators, Mozilo, boards."***  Garcia SEC Dep. at
7    126:24-127:2 (emphasis added).

8         Throughout the Class Period, Mozilo knew or should have known that his
9    statements about the high quality of the loans being originated at Countrywide
10   were false and misleading because Mozilo knew or should have known that the
11   quality of the loans was deteriorating due to the massive expansion of the
12   underwriting guidelines and the increase in exceptions being granted.  Mozilo
13   was aware, as early as September 2004, of the effect that these changes in
14   guidelines would have on the credit risk assumed by Countrywide.  Mozilo knew
15   about all of these guideline expansions and the potential effects that this would
16   have on the quality of the loans originated by Countrywide as evidenced by the
17   various e-mails and other documents that he authored and received throughout the
18   Class Period, as detailed in Plaintiffs' answer to Interrogatory Number 11.

19        In his SEC testimony, Mozilo testified that he routinely received and
20   reviewed five separate monthly reports in his capacity as CEO, including a flash
21   delinquency and production report.  Mozilo SEC Dep. at 19:19-24:2.  "I'll get a
22   delinquency report, a flash report, once a month which tells me delinquency
23   trends, foreclosure trends.  These reports have been given to me over a series of a
24   long period of time.  So with the base part of our business in production and

25

26         [17] At his deposition, Mozilo testified to the contrary, claiming he had not
27   underwritten a mortgage loan in 30 years.  Mozilo Dep. at 183:14-17.  To the
     extent he was belatedly seeking to distance himself from extensive involvement
28   in Countrywide issues relevant here, the record belies such self-serving self-
     effacement.

1    servicing, those were important reports to me because it's the heart of the

2    business." Mozilo SEC Dep. at 20:11-17.  As a recipient of these reports, Mozilo

3    was or should have been aware of the effects of the massive underwriting

4    expansion on loan quality.

5            The flash delinquency reports contained overall key metrics that included,

6    but are not limited to the following executive highlights: Origination volume per

7    division, delinquency rates, and the percentage of negative amortization within a

8    specific portfolio.  The flash reports detailed the average balance, age, interest

9    rate, fico, delinquency and payment percentage by category, and payoff of the

10   loans.  It also provided a comparison which detailed the percentage of change

11   from previous months.  In addition to the flash reports, Mozilo was provided with

12   e-mail reports providing color for the trends and statistics specified within the

13   report.  *E.g.,* July 10, 2006 e-mails at CFCP002295607-611.

14           On February 13, 2007, McMurray made a presentation at the Credit Risk

15   Committee of the Board of Directors (Ex. 805 at CFCP007103461) as detailed

16   above in the answer to Interrogatory Number 11.  McMurray testified that he had

17   previously discussed all of the subject matters covered in that presentation all

18   throughout the Class Period, and that he "would discuss it with any human being

19   that was willing to listen to me" and that there were certainly occasions where he

20   was able to discuss it with Mozilo.  McMurray Dep. at 61:23-62:7.

21           Exhibit 810 contains an e-mail from McMurray to McLaughlin dated

22   September 9, 2004.  Many of the concerns expressed in that e-mail continued

23   through to the presentation set forth in Exhibit 805 on February 13, 2007.

24   McMurray Dep. at 327:1-22.  McMurray testified that he brought those concerns

25   to the attention of "upper management" of Countrywide (*id.* at 323:16-324),

26   which would have included Mozilo.  July 26, 2005 McMurray e-mail at

27   CFCP005882521.

28

### 1. Mozilo Knew of or Was Deliberately Reckless in Not Knowing of the Expansion of the Underwriting Guidelines and Countrywide's Matching Strategy

In response to a December 5, 2006 *Wall Street Journal* article criticizing subprime mortgages and the resultant delinquencies, Mozilo sent a memo to the Board of Directors in which he made reference to Countrywide's "Supermarket strategy," which was another name used to describe the matching strategy. He stated "we offer substantially all of the residential mortgage products available in the industry as part of our 'supermarket' strategy." Ex. 1554. In addition, on April 17, 2006, Mozilo received an e-mail from Sambol in which Sambol noted that subprime second mortgages were offered by nearly everyone else in the industry, an allusion to the matching strategy. Ex. 1295 at CFC2007B125324.

Moreover, Mozilo testified: "We never invented a product, we only took existing products that were out there and tried to tailor it to our underwriting system and to our . . . culture, the way we operate." Mozilo SEC Dep. at 305:4-14.

By no later than early in 2006, Mozilo knew that Countrywide's higher risk loan products, such as those put back to Countrywide by HSBC and referred to in response to the prior interrogatory, could not continue to be sold into the secondary market. In September 2006, Mozilo wrote an e-mail to Sambol warning that he believed that the Pay-Option loan was "mispriced" in the secondary market and that the pricing spread could disappear quickly if there were a negative event in the market. Ex. 1125 at CFC2007C526149 (Mozilo testified he thought that the entire secondary market was mispricing pay option arms. Mozilo SEC Dep. at 381:21-382:15.

Moreover, in his SEC deposition, Mozilo admitted that he was concerned about the guideline expansions and expressed those concerns to management. *Id.* at 551:12-20.

### 2. Mozilo Knew or Was Deliberately Reckless in Not Knowing of the Breakdown of Internal Procedures and Operations

Mozilo knew or should have known that there were increasing problems with Countrywide's internal procedures and operations.  In April 2006, Mozilo told Sambol and others that he "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deteri[or]ation in the quality of loans originated versus the pricing of those loan[s]."  Ex. 1550 at CFCP002618620.

In addition, throughout the Class Period, Mozilo received various reports generated by Countrywide's Internal Audit Department.  For example, a Countrywide Internal Audit report from October 2006 observed:

> In June 2006, a product change was considered to increase Subprime Loan and Loan to Value (LTV) amounts across all credit grades and most Fair Isaac Corporation (FICO) scores and LTV combinations within each credit grade.  On the PCPF reviewed, it was noted that the Chief Credit Officer disapproved of the change.  Following existing guidelines, the change was implemented as the EMD–Chief Production Officer for CHL approved the product change . . . it would be a conflict of interests for the Chief Production Officer to override the position of the Chief Credit Officer . . . This finding is rated Moderate Risk as the current approval structure could lead to an acceptance of credit risk in excess of CFC's tolerance levels.

This audit report was sent to Mozilo.  Oct. 11, 2006 Internal Audit Department Review at CFC2007B992821.  A June 29, 2007 report determined there were deficiencies in the HELOC loss model.  It stated:

> Atypical market conditions related to underlying collateral resulted in residual interest write-downs of $429 million in the first quarter of this year and $216

162

million in the prior two quarters . . . In addition to the deficiency noted above, Alt-A RI models did not accurately reflect deal structures, had not been independently validated and the Valuation and Analysis (VAN) group had not completely documented procedures related to supplying the Model Validation Group (MVG) with impact analyses for new model versions used in RI valuations.

This audit report was sent to Mozilo.  June 29, 2007 Internal Audit Department Review at CFC2007G817310.

### 3.   Mozilo Knew or Was Deliberately Reckless in Not Knowing That Countrywide Was Granting Large Amounts of Exceptions

In addition, Mozilo was aware that underwriting exceptions were being made outside of the normal process for a variety of reasons.  As set forth in more detail in response to the prior interrogatory, Mozilo knew and complained mightily about the exceptions to normal underwriting that led to the put back transaction from HSBC.  Additionally, Mozilo himself was personally responsible for making loans outside of underwriting guidelines.  For example, in March of 2006, a loan approval issued by Mozilo fell outside the normal underwriting process.  McMurray implored Gissinger to assist him in enforcing the established protocols.  "In order to follow an orderly governance process, exception needs to go through the established protocol.  If someone goes outside of policy/protocol, then it's likely that the required governance will not be adhered to."  Mar. 7, 2006 McMurray e-mail at CFCP004233452.

Mozilo was also alerted by Sambol in July 2006 over concerns he had about "accommodative guidelines" and "guideline exceptions" in construction lending.  Although the program is "extremely profitable" to Countrywide, Sambol said they had investigated complaints about a "minority" of the "riskiest loans

and the toughest to do" loans which were outside underwriting guidelines, with "very high loan balance . . . little borrower equity and with no documentation." July 20, 2006 Sambol e-mail at CFC2007B010196.

### 4. Mozilo Knew or Was Deliberately Reckless in Not Knowing That the Statements He Made Regarding Loan Quality Were False and Misleading Because of the Layered Risk Characteristics of the Loans

Mozilo knew that Countrywide was not originating high quality loans because he knew or should have known that Countrywide was originating loans with layered risk characteristics.

Mozilo e-mailed Stan Kurland on September 1, 2004, stating "I fully understand that our residuals have been modeled on a conservative basis but it is only conservative based upon historical performances. ***But the type of loans currently being originated combined with the unprecedented stretching of all aspects of credit standards could cause a bump in the road that could bring with it catastrophic consequences.***" Ex. 274 at CFCP000916353 (emphasis added).

### 5. Mozilo Knew or Was Deliberately Reckless in Not Knowing That the Loan Quality of Countrywide's Held For Investment Portfolio Was Deteriorating

In March 2005, Garcia complained to Mozilo about Sambol's quest to gain more influence over use of the bank's balance sheet, "which he seeks to use to fund products with risks or pricing not supported by the secondary market . . . even at potentially negative returns to the Bank. CHL is under pressure to "take risky products with no or poor secondary execution." Ex. 1643 at CFC2007H067578.

In August 2005, Mozilo expressed his concerns to Garcia about the environment surrounding the borrower's utilizing the pay option loan and suggested re-thinking the assets the Bank held. Ex. 1288 at CFC2007I061393.

1  Sambol suggested an analysis of the securitization implications of Mozilo's

2  suggestion and warned against "cherry picking" what remained in the Bank as it

3  could result in an over concentration of "higher risk loans." "The remaining

4  production then increasingly looks like an "adversely selected pool." *Id.* Mozilo

5  responded: "By placing [Pay Options], even at 50%, into the Bank we have no

6  idea what economic and reputational losses we will suffer, not to say anything

7  about restrictions placed upon us by regulators." Ex. 1288 at CFC2007I061392.

8  Garcia responded and agreed with Mozilo's concerns, "given the fact that credit

9  availability is going to tighten or at least get a lot more expensive due to the

10  growing concerns over payoption and io loans, rising rates, housing bubbles and

11  ensuing regulatory and lender actions." Ex. 1288 at CFC2007I061392. Further,

12  Mozilo wanted the Bank to begin reducing its Pay Option portfolio. McMurray

13  SEC Dep. at 647:5-15.

### 6. Mozilo Knew or Was Deliberately Reckless in Not Knowing of the Substantial Increased Credit Risk Throughout the Class Period

16  In a September 8, 2004 e-mail, Mozilo expressed concerns to McLaughlin

17  about the credit risk of subprime residuals on Countrywide's balance sheet. Ex.

18  1285 at CFC2007H253574. This led McLaughlin to ask McMurray to prepare a

19  report concerning credit risk facing Countrywide. July 26, 2005 McMurray e-

20  mail at CFCP005882521. The result was McMurray's detailed memorandum on

21  credit risk of September 9, 2004 (Ex. 810 at CFCP005887980), the content of

22  which was brought to Mozilo's attention. July 26, 2005 McMurray e-mail at

23  CFCP005882521.

24  Mozilo was aware as early as June 2006 that a significant percentage of

25  borrowers who were taking out stated income loans were engaged in mortgage

26  fraud. On June l, 2006, Mozilo advised Garcia and Furash he had become aware

27  that the Pay Option ARM portfolio was largely underwritten on a reduced

28

165

1   documentation basis and that there was evidence that borrowers were lying about

2   their income on their loan applications.  Ex. 1297 at CFC2007C583091.  In a May

3   2006 e-mail string regarding gathering information on Pay Options to be provided

4   to Mozilo, Rossi pointed out that "[t]he reason why that is important I think is

5   that if we believe DTI to be a factor of interest on [Pay Options] then the ***fact*** that

6   ***a very large percentage*** of reduced doc overstate their incomes by 10% or more

7   is of some concern."  Ex. 1562 at CFCP000001353 (emphasis added).  Indeed, in

8   early June, Rossi distributed a report summarizing recently conducted Form 4506

9   audits.  Rossi concluded from the information that the "findings level for the

10   Random audits would suggest that approximately 40% of the Bank's reduced

11   documentation loans in the portfolio could potentially have income overstated by

12   more than 10% and a significant percent of those loans would have income

13   overstated by 50% or more."  June 2, 2006 Rossi e-mail at CFC2007D814286.

14   **7.    Mozilo Knew or Was Deliberately Reckless
         in Not Knowing of the Extraordinarily
15         High Risk of 100% CLTV Financing**

16   Mozilo knew of the risks Countrywide incurred by originating subprime

17   80/20 loans and repeatedly questioned the wisdom of continuing to offer the

18   product.  Mozilo became concerned about the loans in at least as early as the first

19   quarter of 2006, when HSBC, the dominant purchaser of Countrywide's 80/20

20   loans, began to contractually force Countrywide to "buy back" a significant dollar

21   volume of these loans that HSBC contended were defective.  Mar. 28, 2006

22   Mozilo e-mail at CFC2007A370003.  Mozilo also knew this problem was not

23   limited to the loans Countrywide sold to HSBC.  *See* e-mails Mozilo authored and

24   received and related testimony, discussed in the "100% Financing (80/20 Loans)

25   and HSBC" subsection of the answer to Interrogatory No. 11 above.

26   In a March 24, 2006 e-mail, Sambol advised Mozilo that 60% of subprime

27   financing had CLTVs of 100%, the overwhelming majority of these high CLTV

28

1    deals were structured as "tandem financings" with a 75% to 80% first mortgage

2    and a 15% to 25% second mortgage, and implied that Mozilo should not have

3    been surprised to learn this information.  Ex. 1553 at CFC2007B004968.

4           On December 7, 2006, Mozilo circulated a memorandum drafted for him

5    by McMurray to the Board of Directors and all Countrywide managing directors,

6    which included the following statement: "From the low set by the 2002 vintage,

7    performance has deteriorated in each successive year as a result of guideline

8    expansions. . . .  Further, as economic conditions worsen (home price declines

9    and/or increased unemployment), we would expect to see the performance for all

10   vintages to deteriorate."  Ex. 1554 at CFC2007829059.  The memorandum also

11   included a chart showing that the percentage of 60 and 90 day delinquencies in

12   the 2006 vintage (at 8.11 % and 4.03% respectively), exceeded the percentages

13   from each of the previous six years, and the company expected these percentages

14   to rise.  Ex. 1554 at CFC2007829059.  The memorandum also stated: "Consistent

15   with the broader industry, we have expanded our subprime menu over recent

16   years.  Since 2003, the industry aggressively expanded product offerings and

17   guidelines to promote more purchase business.  Industry guidelines have

18   expanded in a variety of dimensions, including increased availability of reduced

19   documentation, higher leverage (i.e. lower down payment or equity

20   requirements), increased prevalence of "piggyback" (first + second lien) loans,

21   higher loan amounts, and interest-only.  More importantly, these products are

22   typically offered in combination with each other, creating 'layered' risk."  Ex.

23   1554 at CFC2007829060.  Mozilo agreed with the content of the memorandum at

24   the time that he distributed it.  Mozilo SEC Dep. at 620:16-21.

25

26

27

28

**B.     Mozilo Knew or Was Deliberately Reckless in Not Knowing That His Public Statements Concerning Pay Option Loans Were False and Misleading**

**1.     Mozilo's Concerns About Pay Option ARMs**

Mozilo knew that Pay Options were not being marketed to sophisticated borrowers who understood the risk of making the minimum payment. As a result, he had concerns about the negative amortization aspect of the Pay Option loans throughout the Class Period and he repeatedly expressed those concerns internally at Countrywide. Mozilo Dep. at 112:25-113:7. Additionally, in an August 1, 2005 e-mail, Mozilo indicated a concern that pay option borrowers included some real estate speculators, which he also viewed as high risk borrowers. Ex. 1288 at CFC2007I061393.

> For example you should never put a non-owner occupied pay option ARM on the balance sheet. I know you have already done this but it is unacceptable. Secondly only 660 fico's and above, owner occupied pay options should be accepted and only on a limited basis. The focus should be 700 and above (owner occupied) for this product. The simple reason is that when the loan resets in five years there will be an enormous payment shock and if the borrower is not sufficiently sophisticated to truly understand this consequence then the bank will be dealing with foreclosure in potentially a deflated real estate market.

Ex. 1288 at CFC2007I061393.

Mozilo also recounted a discussion with a mortgage broker who utilized the Pay Option ARM frequently because it was the only product he could use to qualify the borrowers within the economically depressed area he was serving. Mozilo then stated "I have heard this story many times over from mortgage brokers who utilize the pay option for very marginal borrowers for the sole purpose of creating volumes and commissions." *Id.* at CFC2007I061394.

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                                                  72

168

In August 2005, Mozilo advised Dan Tarman that the Bank was implementing policy changes regarding the Pay-Option ARMs origination, stating that "*In my opinion there is nothing intrinsically wrong with pay option loans however there is something very wrong as to whom the product is being sold.* Third party originators such as mortgage brokers are squeezing borrowers into homes without regard to the future consequences to that borrower, and speculators are using it as an arbitrage product.  These events could lead to catastrophic consequences which would be exacerbated if real estate values begin to decline."  Aug. 3, 2005 e-mail at CFCP001929490 (emphasis added).

Mozilo also knew that the effect of borrowers making the minimum payment would be an increase in delinquencies and a reduction in the credit quality of the Bank's portfolio.  In an April 3, 2006 e-mail, Mozilo stated: "This is important data that could portend serious problems with this product.  Since over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies.  We must limit this product to high ficos otherwise we could face both financial and regulatory consequences."  Ex. 1290 at CFC2007B008723.  Mozilo testified that one of the concerns he had in 2006 was that substantial amounts of resets and much higher delinquencies could occur.  Mozilo Dep. at 129:8-130:8.  Mozilo testified that, as of this date, he was concerned about the "trend in the amount of minimum payment that was being made" and "he didn't know what the consequence of that would be."  Mozilo SEC Dep. at 316:2-8.

Mozilo testified that starting interest rates on Pay Options ARM loans were raised to compensate for risk but when production dropped the rates were lowered back to original levels.  *Id.* at 328:19-329:7.

On August 19, 2006, Mozilo responded to a question about Pay Options from Director Robert Donato, stating: "These loans are going to reset much faster than the borrowers anticipated and at higher payments than anticipated. The only out is to refinance these loans before reset." Aug. 19, 2006 e-mail at CFC2007A362338. Mozilo went on to explain that refinancing would be difficult "because in all cases the loan could be above the current value." *Id.*

McMurray believed that others at Countrywide were aware of his views regarding the risks surrounding Pay Option ARMs because he "had communicated that on a number of occasions." McMurray SEC Dep. at 639:19-23. McMurray stated that he had a number of conversations with Sambol and Kurland and discussed the issue frequently with Kevin Bartlett. *Id.* at 640:10-641:16.

As further evidence of Mozilo's knowledge of the falsity of his public statements concerning Pay Option ARM loans, Plaintiffs incorporate a portion of their answer to Interrogatory No. 11 above in the section "Mozilo's Concerns About Pay-Option ARMs."

**2.     Mozilo Knew, or Was Deliberately Recklessness in Not Knowing, That His Statements About the Quality of Pay Option Loans Being Originated Were False and Misleading Because He Wanted the Bank to Shrink its Pay Option Portfolio**

*See* answer to Interrogatory No. 11 above in the section titled "Mozilo Urges Selling the Pay Option Portfolio."

**C.     Prime/Subprime Distinction**

Plaintiffs incorporate their answer to Interrogatory No. 11 above in the section titled "Prime/Subprime Distinction."

**D.     Housing, Liquidity, and Credit Crisis**

Mozilo knew or should have known that his statements regarding the housing market and Countrywide's liquidity position were false and misleading

1    as evidenced by the various e-mails and memoranda that he authored and

2    received throughout the Class Period.

3        In October 2006, Mozilo received an e-mail containing a draft presentation

4    by Mark Zandi, an economist with Moody's/Economy.com.  Oct. 19, 2006

5    Cousins e-mail at CFCP000477679.  The presentation explained that housing

6    fueled growth during the boom and would weigh on growth in the downturn.  The

7    presentation also explained that housing was overvalued in half the nation and

8    therefore, housing had lost its investment luster.  Zandi predicted that non-owner

9    occupied originations, which made up a substantial percentage of originations in

10   most metropolitan areas in 2005, would fall and that mortgage credit quality

11   would suffer as weak house prices and ARM resets combined to produce

12   heightened defaults and delinquencies.  Zandi also predicted that Home sales

13   would hit bottom in 3-6 months and that after a 3-4% median home price

14   contraction in 2007, modest price growth would occur in 2008.  Oct. 2006

15   Regional Housing Outlook presentation CFCP000477680.

16       Further, Plaintiffs incorporate the answer to Interrogatory No. 11 above in

17   the section titled "Housing, Liquidity and Credit Crisis."

18   **E.    Stock Sales**

19       During an interview with CNBC's Maria Bartiromo on August 23, 2007,

20   Mozilo stated that his stock sales were out of his hands, and that his interests were

21   firmly aligned with those of other investors.  At the October 26, 2007 Earnings

22   Call, Mozilo stated "I would like to state categorically that at no time did I make

23   any trading decisions based on any material non-public information and I fully

24   complied with all . . . applicable securities laws in connection with my trading

25   plans."  These statements were false and misleading because beginning in

26   October 2006, Mozilo circumvented the purpose of SEC Rule 10b5-1 by

27

28

1    engaging in new trading plans and amending his trading plans while he was in

2    possession of material nonpublic information.

3          Mozilo initially entered into a Rule 10b5-1 trading plan in 2002.  Mozilo

4    Dep. at 29:2-9.  Thereafter, during the Class Period, Mozilo entered into five

5    different Rule 10b5-1 trading plans and amended one plan.

6          Mozilo established a Rule 10b5-1 plan ("Plan 1") on December 29, 2004.

7    Dec. 29, 2004 Plan at CFC2007000001.

8          Mozilo established a second Rule 10b5-1 plan ("Plan 2") on October 27,

9    2006.  Oct. 27, 2006 Plan at CFC2007000016.  When entering into Plan 2,

10   Mozilo increased the number of shares to be sold daily from 52,500 to 70,000.

11   Oct. 27, 2006 e-mail at CFC2007000388.

12         Mozilo established a third Rule 10b5-1 Plan ("Plan 3") on October 27,

13   2006 in the name of his charitable foundation.  Oct. 27, 2006 Foundation Plan at

14   CFC2007000031.

15         Mozilo established a fourth Rule 10b5-1 Plan ("Plan 4") on November 13,

16   2006 in the name of the Mozilo living trust.  Nov. 13, 2006 Rule 10b5-1 Plan at

17   CFC2007000039.

18         Mozilo established a fifth Rule 10b5-1 Plan ("Plan 5") on December 12,

19   2006.  Dec. 12, 2006 Plan at CFC2007000047.  Plan 5 provided for the

20   disposition of shares that the Mozilo had the right to acquire through 647,000

21   options granted on February 12, 2002 and 742,000 options granted on March 19,

22   2002.  *Id.*  Mozilo amended Plan 5 on February 2, 2007 to add additional stock

23   options for sale under the plan.  Feb. 2, 2007 Amendment at CFC2007000062.

24   Mozilo testified that he was aware that he was negotiating the amendment to Plan

25   5 during a blackout period.  Mozilo SEC Dep. at 142:20-143:1.

26         During the Class Period, Mozilo knew his statements concerning his stock

27   sales were false and misleading because he had possession of material

28

1   information, unknown to the public, as otherwise set forth in this answer at the

2   time that he entered into new Rule 10b5-1 trading plans or amended existing

3   plans.

4   **F.      Internal Controls Over Financial Statements**

5          **1.      Mozilo's Responsibilities as Set
              Forth in His SOX Certifications**

6

7          As CEO, Mozilo was responsible for, and explicitly certified in periodic

8   Company reports filed with the SEC pursuant to SOX, that he had established and

9   maintained disclosure controls and procedures and internal controls over financial

10  reporting; that he had designed or caused the design of such disclosure controls to

11  ensure that material information relating to the Company was made known to

12  him; that he had designed or caused the design of internal controls over financial

13  reporting to provide reasonable assurance regarding the reliability of financial

14  reporting and the preparation of financial statements under Generally Accepted

15  Accounting Principles ("GAAP"); that he had evaluated the effectiveness of the

16  Company's disclosure controls and procedures; that he had disclosed any change

17  in the Company's internal controls over financial reporting that had occurred; and

18  that he had disclosed all significant deficiencies and material weaknesses in the

19  design or operation of internal controls over financial reporting reasonably likely

20  to adversely affect the Company's ability to report financial information.

21         Further, Mozilo, as CEO, and as part of his SOX certifications included in

22  the Company's periodic reports filed while he was CEO, specifically represented

23  that each of those reports *(i.e.,* the Form 10-Ks and 10-Qs referred to response to

24  Interrogatory No. 11 above) did not contain any untrue statement of material fact

25  or omit to state a material fact; and that the financial statements in those reports

26  fairly presented in all material respects the financial condition and results of

27  operations of the Company.

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                           77

173

1    Having undertaken all the significant responsibilities relating to disclosures

2    and internal controls set forth in his SOX certifications and having designed

3    systems to ensure that he himself was provided with all relevant material

4    information, Mozilo acquired sufficient information so that he either knew or

5    recklessly disregarded the false and misleading information referred to in

6    NYSCRF's answer to Interrogatory No. 11 above.

7    Mozilo knew that the Form 10-Ks and 10-Qs filed by Countrywide during

8    the Class Period contained false and misleading statements because of the facts

9    contained in NYSCRF's answer to Interrogatory No. 11.  In addition, Mozilo

10   knew or was deliberately reckless in not knowing that the rampant issuance of

11   exception loans and fraudulent activity on the part of borrowers and lending

12   officers caused a deterioration in the Company's internal controls over financial

13   reporting.

14   **2.    Fraud**

15   On June 1, 2006, Mozilo sent an e-mail to Garcia stating that in "a

16   discussion with both Stan [Kurland] and Dave [Sambol] it came to my attention"

17   that: (1) Countrywide originated a majority of its Pay Options under the stated

18   income program – i.e., no substantiation of borrowers' ability to repay; and (2)

19   there was evidence that the information borrowers were providing did not match

20   up with IRS records.  Ex. 255 at CFC2007A371364.  Less than a week before, in

21   an e-mail with the subject "PayOption Data requested by Angelo-URGENT,"

22   Clifford Rossi, the Bank's Chief Credit Risk Officer, reported "the *fact* that a

23   very large percentage of reduced doc [Pay Option borrowers] overstate their

24   incomes by 10% or more."  Ex. 1562 at CFCP000001353 (emphasis added).

25

26

27

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)    78

174

### 3. Mozilo Acted With Deliberately Reckless Disregard for the Truth by Taking a Hands-Off Approach to Certifying the Periodic Filings and Verifying the Accuracy of his Public Filings

Mozilo testified that as part of the process established for signing certifications with respect to Countrywide's SEC filings, he did not review any of the certifications or questionnaires and he did not speak to any of his "sub-certifiers." Mozilo Dep. at 238:10-239:3. However, as detailed above in the answer to this Interrogatory and in the answer to Interrogatory No. 11 above, Mozilo was aware of "red flags" that required him to take a much more active approach to ensuring that the periodic filings did not contain any false or misleading statements.

Before 2005 (Mozilo did not recall how long before), when he needed to certify to the accuracy of information in Form 10-Ks and 10-Qs, Mozilo would call a meeting of Countrywide officers and department heads from all over the world and would listen to their comments concerning the accuracy of these documents before certifying. Mozilo Dep. at 233:11-234:23. Mozilo testified that this process became too expensive so Countrywide came up with a process that he followed from at least 2005 onward, pursuant to which Countrywide Officers and Department heads would complete questionnaires that would be used for the drafting of Form 10-Ks and 10-Qs. These Officers and Department heads would then certify that the information in the questionnaires they completed was true. Mozilo Dep. at 230:16-233:10. Although Mozilo had actively participated in meetings of officers and department heads before certifying any filing, Mozilo testified that he never read the questionnaires nor looked at the certifications of officers and department heads. He did not question any of his managers and did not know if anyone questioned them. Mozilo Dep. at 238:4-240:1.

175

1    Thus, Mozilo knew or should have known that the process Mozilo

2    described could not possibly have provided him with the unfiltered concerns of

3    senior management, such as those evidenced by the testimony of John McMurray,

4    as outlined in the "Internal Procedures and Operations" subsection of the answer

5    to Interrogatory No. 11 above.

6    Further, Mozilo testified at length that he did not recall whether he had had

7    any conversations with anyone at Countrywide, prior to certifying documents

8    filed with the SEC, regarding whether there should be additional disclosure with

9    respect to credit risk, the percentage of loans being originated by the company on

10   a reduced documentation or stated income basis, the percentage of loans being

11   originated by Countrywide that were Alt-A, those loans being originated by

12   Countrywide that had a loan to value ratio or combined loan to value ratio greater

13   than 95 percent, the percentage of loans being originated that had piggyback

14   seconds and the percentage of loans being originated with layered risk

15   characteristics.  *See, e.g.,* Mozilo SEC Dep. at 795:10-797:15.

16   Similarly, with regard to his scripted presentations at investor forums,

17   Mozilo testified that his presentations would be reviewed by the relevant financial

18   and legal officers before they were presented to him and that he would provide

19   comments if he had any, but testified that his comments would be only

20   grammatical and "generally not of substance."  Mozilo Dep. at 247:11-18.  When

21   asked if he did anything to determine the accuracy of the statements contained in

22   the scripted presentations that he read from, Mozilo testified that he did nothing

23   but "relied on the process."  Mozilo Dep. at 247:20-248:1.

24

25   **INTERROGATORY NO. 13:**

26   Identify all facts supporting your contention in paragraph 623 of the SAC

27   that Mr. Mozilo "knew that the Company's underwriting policies treated as prime
     many loans that should have been classified as subprime, by mortgage industry
     standards."

28

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 13:**

NYSCRF incorporates by reference its General Objections. NYSCRF further objects that because this contention interrogatory seeks "all facts," it is overly broad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. NYSCRF further objects to this Interrogatory to the extent that it seeks information equally available to Defendant Mozilo, or information to which Defendant Mozilo has equal or greater access. NYSCRF further objects to this Interrogatory to the extent that it seeks information not in NYSCRF's possession, custody, or control. NYSCRF further objects to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity. NYSCRF's Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact that NYSCRF may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, NYSCRF answers as follows:

Plaintiffs incorporate their answers to Interrogatories No. 11 and 12 above to the extent they discuss the distinction between prime and subprime loans.

**INTERROGATORY NO. 22:**

State in detail all facts supporting your allegations in paragraph 1242 of the SAC that Angelo Mozilo "sold substantial numbers of shares of Countrywide common stock during the Class Period while in possession of material, adverse, nonpublic information."

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 22:**

NYSCRF incorporates by reference its General Objections.  NYSCRF further objects that because this contention interrogatory seeks "all facts," it is overly broad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.   NYSCRF further objects to this Interrogatory to the extent that it seeks information equally available to Defendant Mozilo, or information to which Defendant Mozilo has equal or greater access.  NYSCRF further objects to this Interrogatory to the extent that it seeks information not in NYSCRF's possession, custody, or control.  NYSCRF further objects to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  NYSCRF's Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact that NYSCRF may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, NYSCRF answers as follows:

For facts supporting our contention that Mozilo was in possession of material, adverse, nonpublic information, see NYSCRF's answers to Interrogatories No. 11 and 12 above.

Between November 1, 2006 and October 12, 2007, Mozilo sold 5,908,505 shares of Countrywide stock totaling $207,967,128, as evidenced by his Form 4s filed publicly with the SEC.

1    Dated:  February 22, 2010              LABATON SUCHAROW LLP

2                                    By:   */s/ Joel H. Bernstein*
                                          JOEL H. BERNSTEIN
3                                         JONATHAN M. PLASSE
                                          IRA A. SCHOCHET
4                                         DAVID J. GOLDSMITH
                                          MICHAEL H. ROGERS
5                                         JOSHUA L. CROWELL

6                                         *Lead Counsel for Lead*
                                          *Plaintiffs New York Funds*
7
                                          KREINDLER & KREINDLER LLP
8                                         GRETCHEN M. NELSON
                                          MARK LABATON
9
                                          *Liaison Counsel for Lead*
10                                        *Plaintiffs New York Funds*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

1

## **<u>VERIFICATION</u>**

2      Joel H. Bernstein declares as follows:

3      I am a member of the law firm of Labaton Sucharow LLP, Court-appointed

4  Lead Counsel for Lead Plaintiffs Thomas P. DiNapoli, Comptroller of the State of

5  New York, as Administrative Head of the New York State and Local Retirement

6  Systems and as Trustee of the New York State Common Retirement Fund, and

7  the New York City Employees' Retirement System, New York City Police

8  Pension Fund, New York City Fire Department Pension Fund, New York City

9  Board of Education Retirement System, and Teachers' Retirement System of the

10 City of New York.

11      I have reviewed Lead Plaintiff New York State Common Retirement

12 Fund's Verified Supplemental Answers and Objections to Defendant Angelo R.

13 Mozilo's Interrogatories No. 11, 12, 13 and 22, and state that the responses

14 therein are true and correct to the best of my knowledge, information and belief,

15 subject to the objections set forth therein.

16      Executed this 22d day of February, 2010.

17

18                          */s/ Joel H. Bernstein*
                            Joel H. Bernstein
19

20

21

22

23

24

25

26

27

28

Lead Pl. NYSCRF's Suppl. Ans. & Obj. to Mozilo's Interrogs. no. 11, 12, 13 & 22
Lead Case No. CV 07-05295 MRP (MANx)                                    84

180