# Exhibit C

KREINDLER & KREINDLER LLP
GRETCHEN M. NELSON (#112566)
*gnelson@kreindler.com*
MARK LABATON (#159555)
*mlabaton@kreindler.com*
707 Wilshire Boulevard, Suite 4100
Los Angeles, California  90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019

*Liaison Counsel for Lead
Plaintiffs New York Funds*

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
*jbernstein@labaton.com*
JONATHAN M. PLASSE
*jplasse@labaton.com*
IRA A. SCHOCHET
*ischochet@labaton.com*
DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
MICHAEL H. ROGERS
*mrogers@labaton.com*
JOSHUA L. CROWELL
*jcrowell@labaton.com*
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead
Plaintiffs New York Funds*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Relates to:  All Actions | Lead Case No.<br>CV-07-05295 MRP (MANx)<br><br>**PLAINTIFFS' SECOND SUPPLEMENTAL VERIFIED ANSWERS AND OBJECTIONS TO THE FIRST SET OF INTERROGATORIES PROPOUNDED TO PLAINTIFFS BY DEFENDANT DAVID SAMBOL** |

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)

182

1        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Lead

2    Plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as

3    Administrative Head of the New York State and Local Retirement Systems and as

4    Trustee of the New York State Common Retirement Fund, and the New York

5    City Employees' Retirement System, New York City Police Pension Fund, New

6    York City Fire Department Pension Fund, New York City Board of Education

7    Retirement System, and Teachers' Retirement System of the City of New York,

8    and Plaintiff Barry Brahn, on behalf of the Class (collectively, "Plaintiffs"),

9    hereby serve second supplemental answers and objections to Interrogatory Nos.

10    1-21 of the First Set of Interrogatories Propounded to Plaintiffs by Defendant

11    David Sambol, dated November 23, 2009 (the "Interrogatories"), as follows:

12

13                 **<u>INTRODUCTION</u>**

14        Plaintiffs' second supplemental answers and objections to Interrogatory

15    Nos. 1-21 are made for the sole purpose of this action.  No incidental or implied

16    admissions are intended in these answers.  Plaintiffs' answers to all or any part of

17    the Interrogatories should not be taken as an admission that: (a) Plaintiffs accept

18    or admit the existence of any fact(s) set forth or assumed by that interrogatory; (b)

19    Plaintiffs have in their possession, custody or control any information or

20    documents responsive to that interrogatory; (c) information or documents

21    responsive to that interrogatory exist; or (d) Plaintiffs' answers constitute

22    admissible evidence.  Plaintiffs' answers to all or any part of an interrogatory are

23    not intended to be and shall not be a waiver by Plaintiffs of all or any part of their

24    objection(s) to that interrogatory.

25        While Plaintiffs' prefiling and subsequent investigative efforts have been

26    substantial, they have not completed (a) their investigation of the facts relating to

27    this case, (b) discovery in this action, or (c) preparation for trial.  The following

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)

183

1   answers are based upon information known at this time.  Plaintiffs reserve the

2   right to make use of, or to introduce at any deposition, hearing and/or trial,

3   information or documents responsive to Interrogatory Nos. 1-21 but discovered

4   subsequent to the date of service of these Answers and Objections, including, but

5   not limited to, any information or documents obtained in discovery herein.

6

7                              **GENERAL OBJECTIONS**

8            Plaintiffs generally object to Interrogatory Nos. 1-21 on the following

9    grounds, each of which is expressly incorporated by reference in the answers and

10   objections to the individual interrogatories below.  All answers and objections set

11   forth herein are subject to and without waiver of any of these General Objections:

12           1.      Plaintiffs object to Interrogatory Nos. 1-21 to the extent they purport

13   to impose any obligations on Plaintiffs that are not imposed by law, or are

14   otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil

15   Procedure.

16           2.      Plaintiffs object to Interrogatory Nos. 1-21 to the extent they seek

17   information or documents that are beyond the scope of permissible discovery.

18           3.      Plaintiffs object to Interrogatory Nos. 1-21 to the extent they seek or

19   require the disclosure of information or documents that are protected from

20   discovery by the attorney-client privilege, the attorney work product doctrine, the

21   joint prosecution or common interest privilege, or any other applicable privilege

22   or immunity.

23           4.      Plaintiffs object to Interrogatory Nos. 1-21 to the extent they seek

24   information based on documents that are not within Plaintiffs' possession,

25   custody or control.

26           5.      Plaintiffs object to Interrogatory Nos. 1-21 to the extent they seek

27   information that can be found in the pleadings.

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    2

184

6.      Plaintiffs object to Interrogatory Nos. 1-21 as unduly burdensome to the extent such Interrogatories seek (a) information or documents in the public domain, as such information or documents are equally available to Defendant David Sambol ("Defendant Sambol"), or (b) information or documents to which Defendant Sambol has equal or greater access.

7.      Plaintiffs object to Interrogatory Nos. 1-21 insofar as they are vague, ambiguous, harassing, overly broad or burdensome and to the extent that the discovery sought is unreasonably cumulative, duplicative, or disproportionate.

8.      Plaintiffs object to Interrogatory Nos. 1-21 insofar as they seek information or documents that are irrelevant to any claim, defense, or subject matter of the litigation, or are not reasonably calculated to lead to the discovery of admissible evidence.

9.      Plaintiffs object to Interrogatory Nos. 1-21 to the extent they call for a legal conclusion, a legal argument, or constitute a discovery request that is premature at this stage of the litigation and is invasive of the attorney work product doctrine.

10.     Plaintiffs object to Interrogatory Nos. 1-21 as unduly burdensome to the extent they are duplicative of documents and information produced in response to Interrogatories and Requests for Production previously propounded to Plaintiffs or disclosed in Plaintiffs' Initial Disclosures pursuant to Fed. R. Civ. P. 26(a).

11.     Plaintiffs object to Interrogatory Nos. 1-21 as facially overbroad and unduly burdensome.  *See Advocare Int'l, L.P. v. Scheckenbach*, No. C08-5332 RBL, 2009 WL 3064867, at *1 (W.D. Wash. Sept. 24, 2009) ("Numerous federal courts have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                    3

185

1  fact' and application of law to fact that supports the party's allegations are an

2  abuse of the discovery process because they are overly broad and unduly

3  burdensome.'"").  Plaintiffs are not required to provide every fact in support of

4  their contentions.  *See Tubbs v. Sacramento County Jail*, No. CIV S-06-0280

5  LKK GGH P, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("[P]laintiff is

6  not required to present his entire case in discovery responses.").

7        12.    Plaintiffs object to the Interrogatories to the extent they prematurely

8  seek information related to particular types of expert(s), expert testimony, or

9  opinion at a time when certain expert reports have not been submitted.

10        13.    Plaintiffs reserve the right to further supplement their answers to

11  Interrogatory Nos. 1-21 pending rulings by the Court as to whether Plaintiffs will

12  have access to documents purportedly protected from disclosure by the bank

13  examination privilege.

14        14.    Plaintiffs object to Interrogatory Nos. 2-21 on the grounds that

15  Defendants have not yet completed discovery.  After the Securities and Exchange

16  Commission commenced its civil action against Defendants Sambol, Angelo

17  Mozilo, and Eric Sieracki, No. CV 09-03994 JFW (C.D. Cal.), it provided or

18  otherwise made available to these Defendants all transcripts of the depositions it

19  conducted during its pre-filing investigation styled *In re Countrywide Financial*

20  *Corporation*, File No. LA-3370, along with all documents marked as exhibits

21  during such depositions, any sound or video recordings of such depositions, and

22  all signed court reporter certifications of such depositions.  Defendants Sambol,

23  Mozilo, and Sieracki have not supplemented their document productions by

24  producing these materials, as required by Rule 26(e) of the Federal Rules of Civil

25  Procedure.

26

27

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)    4

186

15.     In providing answers to Interrogatory Nos. 1-21, Plaintiffs do not in any way waive, or intend to waive, but rather intend to preserve and are preserving:

  a.     all objections as to competency, relevancy, materiality or admissibility of Interrogatory Nos. 1-21, the answers or their subject matter;

  b.     all objections as to vagueness, ambiguity or other infirmity in the form of Interrogatory Nos. 1-21, any objections based on the undue burden imposed by the Interrogatories and each individual request contained therein;

  c.     all rights to object on any ground to the use of any of the information or its subject matter in any subsequent proceedings, including the trial of this or any other action;

  d.     all rights to object on any ground to any further interrogatories or other discovery requests involving or related to the subject matter of Interrogatory Nos. 1-21;

  e.     the right to supplement answers to Interrogatory Nos. 1-21; and

  f.     any and all privileges and rights under the applicable Federal Rules of Civil Procedure, the Local Rules of this Court, other statutes, guidelines or common law.

16.     Plaintiffs object to each Definition and Instruction to the extent each imposes on Plaintiffs any obligation beyond what is required by the Federal Rules of Civil Procedure.

17.     Plaintiffs object to the Definitions and Instructions section of the Interrogatories to the extent the definitions are overly broad or call for information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine, the joint prosecution or common interest privilege, or any other applicable privilege or immunity.

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)  5

187

18.     Plaintiffs object to Instruction No. 1 to the extent it requires Plaintiffs to provide information that is not in Plaintiffs' possession, custody or control and/or requires the production of information by individual and/or entities that are not a party to this action.

19.     Shelley B. Katzeff ("Katzeff") objects to Interrogatory Nos. 1-21 because the Court declined to appoint her a class representative.  *See Memorandum of Decision Resolving All Class Certification Issues and Related Objections*, dated December 9, 2009.  Katzeff adopts all objections to Interrogatory Nos. 1-21 asserted by Plaintiffs.

20.     The following specific objections and answers are subject to Plaintiffs' General Objections.  By setting forth specific objections, Plaintiffs do not intend to limit or restrict the General Objections.  Plaintiffs incorporate the above General Objections into their answers to Interrogatory Nos. 1-21.  To the extent that Plaintiffs answer Interrogatory Nos. 1-21, any stated objections are not waived by providing answers.

## SPECIFIC ANSWERS AND OBJECTIONS

### INTERROGATORY NO. 1:

Identify each statement made by Sambol that you allege in this Action to be false and/or misleading.

### SUPPLEMENTAL ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 1:

Plaintiffs incorporate by reference their General Objections.

Subject to and without waiving these objections, Plaintiffs answer by referring Defendant Sambol to the paragraphs of the Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws dated January 6, 2009 (the "Complaint") identifying statements made by him that Plaintiffs allege to be false and/or misleading.  *See* Complaint ¶¶ 27, 116, 722-

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                                        6

188

724, 726-727, 781-791, 795, 798, 800-801, 808-817, 824-825, 830-839, 842, 848, 851, 854-855, 860-870, 873-874, 880-892, 902-903, 905, 907-908, 916-926, 935-936, 941-942, 947-948, 971-975, 1017-1018, 1028-1033, 1141 and 1183.

The Series B Medium-Term Notes Registration Statement, which Sambol signed on or about February 9, 2006, incorporated by reference the Company's 2004 Form 10-K, the Form 10-Q reports for the first, second, and third quarters of 2005, and the September 30, 2005 and October 27, 2005 Form 8-K reports. The Registration Statement, as was standard for shelf registration statements issued by Countrywide, also incorporated by reference certain "future" Exchange Act filings the Company made with the SEC after February 9, 2006 up until August 6, 2007, the date of the last offering of Series B Medium-Term Notes to the public. These "future filings" included the Company's 2005 Form 10-K, the April 27, 2006 Form 8-K, the first quarter 2006 Form 10-Q, the July 25, 2006 Form 8-K, the second quarter 2006 Form 10-Q, the October 24, 2006 Form 8-K, the third quarter 2006 Form 10-Q (which Sambol signed in any event), the January 30, 2007 Form 8-K, the 2006 Form 10-K, the April 26, 2007 Form 8-K, and the first quarter 2007 Form 10-Q (which Sambol signed in any event).

The 6.25% Notes Registration Statement, which Sambol signed on or about February 9, 2006, similarly incorporated by reference the Company's 2004 Form 10-K, the Form 10-Q reports for the first, second, and third quarters of 2005, and the September 30, 2005 and October 27, 2005 Form 8-K reports. It also incorporated by reference Countrywide's consolidated financial statements as audited by KPMG for the years 2004 and 2005. The Registration Statement, as was standard for shelf registration statements issued by Countrywide, also incorporated by reference certain "future" Exchange Act filings the Company made with the SEC after February 9, 2006 up until May 11, 2006, the date of the offering of 6.25% Notes to the public. These "future filings" included the

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                                    7

189

1   Company's 2005 Form 10-K, the April 27, 2006 Form 8-K, and the first quarter

2   2006 Form 10-Q.

3        The 7% Capital Securities Registration Statement, which Sambol signed on

4   or about October 27, 2006, incorporated by reference the Company's 2005 Form

5   10-K, the Form 10-Q reports for the first and second quarters of 2006, the

6   October 24, 2006 Form 8-K, and Countrywide's audited consolidated financial

7   statements for 2004 and 2005.

8

9   **INTERROGATORY NO. 2:**

10       Describe in detail all facts that support your contention in paragraph 15 of
    the Complaint that Sambol was among those "principally responsible for the
11  Company's 'culture change' and concerted foray into leveraged and high-risk
    lending practices."

12
    **SUPPLEMENTAL ANSWER AND**
13  **OBJECTIONS TO INTERROGATORY NO. 2:**

14       Plaintiffs incorporate by reference their General Objections.  Plaintiffs

15  further object that because this contention interrogatory seeks "all facts," it is

16  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

17  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

18  Interrogatory to the extent that it seeks information equally available to Defendant

19  Sambol, or information to which he has equal or greater access.  Plaintiffs further

20  object to this Interrogatory to the extent that it seeks information not in their

21  possession, custody, or control.  Plaintiffs further object to this Interrogatory to

22  the extent it seeks disclosure of information protected by the attorney-client

23  privilege, the attorney work product doctrine, the joint prosecution privilege, or

24  any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

25  not necessarily provide every supporting or otherwise relevant fact that is in the

26  evidentiary record as it currently stands, nor does this Answer necessarily provide

27

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)       8

190

1  every supporting or otherwise relevant fact Plaintiffs may present in opposition to
2  or in favor of a summary judgment motion, or at the trial of this action.

3       Subject to and without waiving the foregoing general and specific
4  objections, Plaintiffs answer as follows:

5       During a July 22, 2003 conference call with analysts, Countrywide's Chief
6  Executive Officer and Chairman of the Board, Defendant Angelo R. Mozilo,
7  announced the Company's goal to attain a 30% market share.  Ex. 270 at
8  CFCNYF00018822.  Sambol shared this goal with equal zeal, and his ascendance
9  at Countrywide both signified and reinforced the fact that the pursuit of market
10 share drove almost everything the Company did.  By virtue of his various
11 positions at Countrywide, Sambol was one of the individuals "principally
12 responsible" for carrying out the Company's efforts to gain market share, which
13 entailed a "'culture change' and concerted foray into leveraged and high-risk
14 lending practices."

15      From July 2000 through January 2004, Sambol was Senior Managing
16 Director of Production.  While he was in this position, the heads of all of the loan
17 production divisions reported to him.  Sambol reported to Defendant Stanford R.
18 Kurland, who was President and Chief Operating Officer during this period.
19 From January 2004 through April 2006, Sambol was Executive Managing
20 Director of Mortgage Banking and Capital Markets, while continuing to report to
21 Kurland.  Defendant Andrew Gissinger, who became the new head of production,
22 reported directly to Sambol.  Gissinger testified that starting in 2004, he began
23 meeting with Sambol "often."  Gissinger Dep. at 30:17-21.  In September 2006,
24 Sambol replaced Kurland as President and Chief Operating Officer.  Sambol
25 claimed that in this position he was responsible for the operations of the entire
26 company (with the exception of the Legal Department), including Credit Risk
27 Management.  Sambol SEC Dep. at 19:4-26:10.

28

191

During product summits, a gathering of Countrywide's production and credit personnel, Sambol "would remind everybody that if it was a meaningful product in the market, we wanted to offer it on our menu."  Aguilera SEC Dep. at 86:20-87:9.  In a February 2005 e-mail, Sambol stated that "we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."  Ex. 1538 at CFCP006172202.  During his deposition, Sambol was asked whether he agreed with the comment from the Chief Investment Officer that "when credit was easily salable, the SLD [Structured Loan Desk] was a way to take advantage of the 'salability' and do loans outside guidelines and not let our views of risk get in the way."  Ex. 1539 at CFCP002905199.  Sambol answered: "Yes, that was generally my view of . . . the SLD . . . throughout my . . . tenure."  Sambol Dep. at 79:23-80:16.

These quotations aptly summarize the record evidence to date as to Sambol's governing philosophy during his tenure at Countrywide.  In every credit decision, there was a tension between loan production on one side and credit risk management on the other.  In carrying out Mozilo's edict to increase market share, Sambol consistently favored taking actions that increased loan production, while paying little attention to warnings from credit risk management.

Indeed, Kurland's testimony implies that Sambol did not have the requisite temperament to lead Countrywide's operations:

> [I]n mortgage banking, when you have a [ ] large origination operation, you have enormous pressure coming from the field, [] and from management, over these areas and it's hard . . . to maintain a balance when you have . . . basically 40, 50,000 people . . . screaming for [ ] product and then in the Secondary Marketing areas, you have the disciplines of creating product and selling product and . . . my view, at the time, is that he

192

1
2
        didn't have the maturity, or balance that I thought was
        necessary.

3   Kurland SEC Dep. at 282:21-283:21.  During his SEC deposition, Kurland was

4   asked whether it was his "experience that Mr. Sambol, during [his] tenure at the

5   company, was disinclined to listen to warnings from credit risk managers, or risk

6   control managers."  Kurland responded: "I agree with . . . your question; yes, . . .

7   he was aggressive."  Kurland SEC Dep. at 283:22-285:1.

8           Sambol was a zealous advocate of what was called the "matching strategy,"

9   in which the Company attempted to offer virtually any loan product that a

10  competitor offered.  The matching strategy was unique to Countrywide.  Kuelbs

11  Dep. at 59:8-17.  Countrywide's Chief Risk Officer, John McMurray, testified

12  that, based on his own observations, "that it was probably a strategy that Dave

13  Sambol came up with after he took over the production divisions, which predated

14  my arrival at Countrywide.  But, you know, he certainly talked about it

15  constantly."  McMurray SEC Dep. at 18:4-11.  The goal of the matching strategy

16  was rapid growth.  During an October 2005 Business Review meeting, which

17  Sambol attended, loan production's goal was to "Jumpstart our growth 30+% in

18  '06 and then low 20% thereafter."  Oct. 18-19, 2005 Business Review minutes, at

19  KPMG-05FYA-030-000298.

20          The execution of the matching strategy began with the Product Leadership

21  group, which was tasked with identifying "gaps" in the marketplace between

22  Countrywide's products, pricing, or guidelines, and those of its competitors.

23  Kuelbs Dep. at 28:3-29:9.  Representatives from the Loan Production, Credit Risk

24  Management, and Secondary Marketing groups met at least twice a week to

25  decide whether to match identified gaps, which numbered anywhere from 40 to

26  over 100.  Kuelbs Dep. at 66:7-68:18, 143:16-144:12.  Theoretically, all three

27  groups had to approve of a product change, but this did not happen in practice.

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                                 11

193

1    Frequently, Credit Risk Management would not approve a product change sought

2    by Loan Production.  When there was disagreement, the decision was escalated

3    either to Sambol or Gissinger, who reported directly to Sambol.  Kuelbs Dep. at

4    64:1-65:3.

5            Credit Risk Management's judgment was often overruled.  For example, in

6    a March 7, 2005 e-mail, Christian Ingerslev, an employee in Product Leadership,

7    stated: "I spoke to Desautels [and] he was called in by Spector and Drew

8    [Gissinger] under $1.5 mm exception thing.  Sounds like they got on the line with

9    the traders, and long story short, they now think they can sell them but not with

10   the pricing they were previously providing. . . .  It's frustrating to try and hold the

11   line and then just be overridden with whining and escalations, just reinforces that

12   sales can have anything they want if they yell loud enough."  Ex. 486 at

13   CFC2007I087902.

14           In his testimony to the SEC, Ingerslev elaborated on the conflict between

15   sales and credit:

16           So there was a strong sales culture.  So . . . ultimately . . .
             disagreements or ties were broken . . . to the side of erring on,
17           well, we don't want to lose volume, we want to keep up the
             volume and keep up our market share.  That was a strategy that
18           the company had. . . .
19
             [I]n that environment, there was conflict.  Some of it you'd
20           expect, and some of it went beyond what you would expect and
             was tough.  . . .[A]ny question asked by the sales area that
21           wasn't answered with a yes . . . was not considered final.  That
             just means we need to ask you again or ask somebody else, or
22           there must be something broken with our process, because if the
             process were working, you would clearly say yes. . . .[Y]ou can
23           say that was a bad business strategy in the end, but that's what
             it was.
24

25

26

27   Ingerslev SEC Dep. at 132:14-133:23.

28

194

1    Because of the matching strategy, the Company was continuously making

2  product adjustments to keep up with the market.  With respect to underwriting

3  guidelines, the adjustments were almost always expansions rather than

4  contractions.  Kuelbs Dep. at 144:14-145:19.  For example, according to Nick

5  Krsnich, Countrywide's Chief Investment Officer from 2004 to 2006, the quality

6  of the Company's subprime loans deteriorated due to lower FICO scores, higher

7  loan-to-value ratios, and less borrower income/asset documentation.  Krsnich

8  Dep. at 231:6-232:8.  Brian Kuelbs, Managing Director of Products and Pricing

9  from April 2005 to mid-2006, could recall only one instance in which his group

10  supported contracting the guidelines of any loan program – and, as explained

11  below, that proposed change was rejected by Sambol.  Kuelbs Dep. at 173:6-

12  174:2.  In concurrence, Aguilera testified that retractions of loan programs were

13  "very unusual . . . [t]he process really wasn't designed to work backwards."

14  Aguilera SEC Dep. at 98:9-22.

15    The matching strategy resulted in Countrywide's developing the most

16  aggressive underwriting guidelines among the many competitors that the

17  Company followed.  Sambol testified that lenders that were ranked 46th in the

18  industry in volume could be considered "primary" lenders for the purposes of the

19  matching program, thereby casting a very wide net with respect to the competitive

20  offerings that it matched.  Sambol Dep. at 206:24-209:14; Ex. 675 at

21  CFC2007I088611.  In June 2005, John McMurray, the Chief Risk Officer, told

22  Sambol: "Because the matching process includes comparisons to a variety of

23  lenders, our match will be the composite of outer boundaries offered across

24  multiple lenders. . . .  As a result, our composite guides are likely among the most

25  aggressive in the industry."  Ex. 675 at CFC2007I088611; McMurray Dep. at

26  247:3-23.  Sambol agreed with this statement.  Sambol Dep. at 180:17-24.

27  McMurray reiterated his concern to Sambol in a February 2007 e-mail: "Since we

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                        13

195

1    match numerous competitors over an extended time frame, our menu ends up

2    being a composite of the most aggressive offerings in the market."  Ex. 808 at

3    CFC2007B062765.

4           Also in June 2005, McMurray sent an e-mail to Sambol and others

5    regarding "subprime product requests."  Ex. 675 at CFC2007I088613.  In that e-

6    mail, McMurray made two points of note: (i) "Verifying what competitors are

7    truly offering continues to be challenging in the subprime sector.  Many of our

8    competitor's most aggressive offerings are often mitigated by other credit

9    requirements or stips" – implying that Countrywide's offerings are often not

10   mitigated; and (ii) "As a consequence of CW's strategy to have the widest

11   product line in the industry, we are clearly out on the 'frontier' in many areas.

12   While I'm sure you already know this, I think we should be very deliberate since

13   the outer boundaries are potentially controversial and have **high expected default**

14   **rates and losses**." *Id.* (emphasis added).  Rather than heed these credit risk

15   warnings, Sambol replied, "I am not of the impression that we are on the

16   'frontier' with respect to our product line, but that we only offer that which the

17   major players also offer, and our pending requests represent 'holes' in our

18   menu/guidelines. . . ." *Id.*  McMurray responded directly to Sambol, making him

19   aware that by saying "frontier," he meant "from a credit perspective," not a

20   product offering perspective. *Id.* at CFC2007I088611.

21          McMurray testified that successfully executing the matching strategy

22   required "understand[ing] what the other lenders were truly offering, including

23   some of the nuances associated with their offerings."  He stated that Countrywide

24   was not doing this adequately.  McMurray Dep. at 248:3-19.  In a January 2007 e-

25   mail, McMurray told Gissinger, who reported to Sambol, that it was "absolutely

26   crucial that the competitor guideline evaluations be thorough and accurate given

27   our 'matching' strategy."  However, McMurray said, it was a "struggle . . .

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    14

196

getting accurate and complete" evaluations.  Ex. 1548 at CFC2007I167630.  One month later, McMurray told Sambol the same thing – "Our ability to thoroughly understand and/or precisely match what competitors are offering has often been less than perfect."  Ex. 808 at CFC2007B062766.  In addition, there were inconsistencies regarding which competitors the Company would attempt to match.  Ex. 675 at CFC2007I088611.

Further, Countrywide's execution of the matching strategy entailed adopting the most aggressive aspects of competitors' guidelines without adopting the companion mitigants that offset risk.  In June 2005, McMurray informed Sambol that "[o]ur matches to what other lenders are offering cannot always incorporate some of the credit risk mitigants used by these lenders." *Id.* at CFC2007I088611.  Demonstrating to Sambol that this serious problem persisted without resolution, almost a year later, an April 2006 presentation to the Credit Risk Committee, a management committee, indicated that, unlike competitors, Countrywide's product expansion in "high risk" categories had not "generally been offset with more cautious credit fundamentals."  Ex. 1547 at CFCP006028122.  Rather, "Countrywide Subprime [ ] followed the market's product expansion without adoption of the more cautious credit fundamentals." *Id.*  Sambol was a member of this Committee at that time, and his practice was to review the presentations provided to the Committee.  Sambol Dep. at 60:13-17. Later, continuing to make the same point in a January 2007 e-mail, McMurray advised Gissinger that "[i]f we're truly looking to match what other lenders are doing, we should [ ] also match (or at least address) the risk offsets.  Ex. 1548 at CFC2007I167630.

More than once, Sambol claimed that there was minimal reason to be concerned about the allowance for loan and lease losses ("ALLL") or credit risk because Countrywide could sell off the risk.  Smiechewicz Dep. at 191:25-

192:23.  As detailed herein, various officers educated, trained, and charged with managing Countrywide's risk in some respect repeatedly warned Sambol that his view of limited risk was wrong.  These warnings were corroborated by events that came to his attention.

One risk of originating loans pursuant to guidelines that McMurray called "among the most aggressive in the industry" (Ex. 675 at CFC2007I088611) was that the secondary market would lose its appetite for such hazardous loans, forcing Countrywide to keep such loans on its own balance sheet.  Sambol knew that this risk was materializing as early as November 2005, as shown by an e-mail forwarded by Josh Adler to Sambol and others.  In that e-mail, a secondary marketing employee explained that the market for subprime fixed rate second mortgages "has continued to decline," and the majority of Wall Street purchasers "have made it clear that they do not want this collateral."  Ex. 1725 at CFCP001671316.  The secondary marketing employee further explained that certain subprime fixed rate second loans that Countrywide was originating were "unsalable," and therefore recommended that Countrywide stop making exceptions for loans with debt-to-income ratios below 55% and with FICO scores below 520.  *Id.*

Indeed, Sambol testified that, in early 2006, HSBC compelled Countrywide to repurchase a substantial dollar amount of 80/20 loans that had performed poorly.  Sambol Dep. at 256:12-19.  HSBC had decided that it no longer wanted to hold Countrywide's 80/20 loans, and exercised its contractual right, pursuant to representations and warranties ("R&Ws"), to kick out exception loans to break the transactions.  HSBC had been the "dominant investor" in that asset class, diminishing Countrywide's ability to sell this 80/20 credit risk in the secondary market.  Kuelbs Dep. at 113:18-117:15.

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                                16

198

1        In some instances, Countrywide began originating hazardous loans even

2    though it could not distribute the risk to the secondary market.  In November

3    2006, McMurray refused to sign off on the Extreme Alt-A product because he

4    "was very unsupportive of retaining this risk and no one convinced me that we

5    had an execution to successfully distribute the risk."  Ex. 1549 at

6    CFC2007B243316.  Nonetheless, the loan program "proceeded without the

7    required risk approvals or in contradiction of established policy."  *Id.*

8        Carlos Garcia, head of Countrywide Bank, stated in a May 2004 e-mail

9    that, during a Corporate Credit Committee meeting, Sambol asserted that the

10    Bank's process was "inefficient due to our inability or unwillingness to make

11    guideline exceptions, particularly without invoking an executive summit.  As a

12    result Dave was asking for balance sheet capacity at the parent."  May 3, 2004

13    Garcia e-mail at CFC2007I133508.  In March 2005, Garcia told Kurland and

14    Mozilo that Sambol "wants the Bank to provide balance sheet immediately at his

15    discretion to help deal with increasing competitive pressure. . . .  He is trying to

16    have me removed from the Bank at all cost so he can gain more influence over

17    the use of the Bank's balance sheet, which he seeks to use to fund products with

18    risks or pricing not supported by the secondary market, even at suboptimal or

19    potentially negative returns to the Bank or without first conducting due

20    diligence."  Ex. 1558 at CFC2007H067578-79.  Garcia testified that by

21    "competitive pressure," he meant "primarily pricing pressure."  For instance,

22    Sambol pushed Garcia to reduce prices on "ARM pricing programs," but Garcia

23    "couldn't make that math work out and make sense to us."  Garcia Dep. at 86:4-

24    87:10.  Sambol wanted to match competitors' prices that were so low that

25    Countrywide would not have been able to make a profit by selling them to the

26    secondary market.  *Id.* at 101:14-102:7.  Additionally, Sambol wanted Garcia to

27

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)        17

199

1   fund more subprime loans through the Bank, even though regulators had not

2   approved such a process.  *Id.* at 88:8-89:5.

3         Kurland testified that "if there were products that the market didn't . . .

4   have a . . . large liquid market for, [Sambol] would often push . . . [to] use the

5   balance sheet to fund these types of mortgages."  In other words, Sambol "would

6   argue to position loans on the balance sheet."  Kurland SEC Dep. at 277:3-20.

7   Kurland disagreed with Sambol's strategy because "the actual balance sheet

8   capacity of the company wasn't really there to . . . have any meaningful presence

9   in a particular product."  *Id.* at 277:21-278:11.  Consistent with Garcia's

10  testimony, Kurland testified that Sambol wanted to use the balance sheet when he

11  did not like the prices in the secondary market – *i.e.*, keep on the balance sheet

12  loans that could not be profitably sold.  *Id.*  This is why Kurland was opposed to

13  giving Sambol control over both loan production and secondary marketing.  *Id.* at

14  282:17-823:21.

15        As noted above, pursuant to procedures that Sambol deemed proper during

16  his tenure, Countrywide's Structured Loan Desk approved exceptions to

17  guidelines if a determination was made that the loan was "salable," without

18  "let[ting] our views of risk get in the way."  Ex. 1539 at CFCP002905199.

19  Ingerslev testified about the consequences of this standard:

20          [T]he performance . . . was just looking bad and there were all
21          sorts of potential ramifications of that.  One of which is . . .
            investors heading for the exits, which is exactly what happened
22          with the liquidity crisis.  If you keep taking advantage of an
            opportunity that exists and you load up on it and it turns out be
23          bad . . . it could potential[ly] go away . . . overnight, and that's
24          exactly what happened. . . .  [I]nvestors lost confidence in their
            ability to assess and risk and predict performance, and so they
25          stopped buying mortgages. . . .  [I]t's a result of the volatility
26          that I described. . . .  [W]hen you layer on these additional risks,
            you go further out . . . the risk spectrum, the volatility around
27
28

200

> the expected result grows, and we were witnessing that.  And so
> the confidence to assess that volatility . . . dropped precipitously
> particularly when combined with the economic environment
> that was occurring, specifically home prices declining.

Ingerslev SEC Dep. at 167:3-168:17.  Ingerslev expressly warned senior
management that Countrywide's expanding guidelines could cause disruptions to
the secondary market in this way.  He began making such warnings starting
sometime in 2006, and it was an "ongoing dialogue that we were having," which
included at least McMurray, Bartlett, and Gissinger.  *Id.* at 168:24-169:15.  Both
Bartlett and Gissinger reported directly to Sambol, and McMurray testified that
he often communicated his concerns to Sambol.  McMurray Dep. at 248:20-
249:9, 256:3-15, 409:20-410:16.

In attributing the liquidity crisis in part to "layer[ing] on these additional
risks," Ingerslev was referring to what was called "risk layering" – *i.e.*, the
practice of compounding multiple risk factors in a single loan.  McMurray warned
Sambol of this practice as early as June 2005, when McMurray cited risk layering
as an example of the fact that Countrywide's underwriting guidelines were on the
"frontier."  Ex. 675 at CFC2007I088611.  McMurray stated that "[a]pproximately
8% of our CMD[retail division]/WLD [wholesale division]/FSL [subprime
division] purchases now combine a CLTV above 90% + low doc feature + IO
[interest only]/Neg Am[ortization]."  *Id.*  Moreover, McMurray noted that "we
have a credit risk position in 95% of that population (10% subprime and 85% HE
piggy-back)."  *Id.*  Isolating subprime loans within this population, presumably a
riskier subset, the number is similar – "approximately 8% are 100% CLTV +
stated + IO."  *Id.*

In September 2006, Ingerslev informed Bartlett, McMurray, and many
others in senior management that "recent guideline expansions and exception
practices have nearly maxed out all risk layers" and "have eliminated many of the

201

1    differences between full and low doc guidelines."  Ex. 479 at CFCP005877730.

2    With respect to Interest Only and Pay Option loans specifically, Ingerslev stated

3    that recent guideline expansions have also "nearly maxed out all risk layers."  *Id.*

4    Ingerslev's analysis was related to changes in interagency guidance, a topic that

5    he addressed before the meeting of Credit Risk Management Committee in

6    December 2006, which Sambol attended.  Ex. 497 at KPMG-06FYA-069-

7    000165.

8           Worse, Countrywide routinely originated loans with layered risk but

9    without requiring the presence of compensating factors.  In January 2006,

10   Ingerslev stated that although Countrywide's automated underwriting system

11   "does account for layered risks, many Refers [*i.e.*, exception loans] are originated

12   at the extremes in all [underwriting] categories and pricing is used as an offset for

13   that."  Ex. 480 at CFCP000977204.  Similarly, Aguilera testified that with respect

14   to subprime mortgages, Countrywide executed its matching strategy on a loan-by-

15   loan basis "via exceptions" without evaluating compensating factors.  For this

16   reason, such exception loans "inherently ha[d] more risk" than loans originated

17   under a "typical exception policy" that required compensating factors.  (Aguilera

18   SEC Dep. at 53:4-55:9.)  Thus, Countrywide often relied solely on pricing to

19   offset the risk of exception loans, rather than compensating risk factors.

20          A presentation to the December 2006 meeting of the Corporate Credit Risk

21   Committee, which Sambol attended, reported that with respect to HELOC/FRS

22   loans, "[l]ayered risk segments identified in late March '06 represent[s] highest

23   degree of model uncertainty, and very closely approximat[es] 'Extreme Alt A'

24   definition."  Ex. 498 at CFCP006242697.  Thus, due to risk layering,

25   Countrywide's HELOC/FRS loans closely approximated the very loan product

26   that McMurray had previously rejected as an unsound credit risk.

27

28

202

1         Risk layering was a particular problem with respect to HELOCs.  A

2    presentation to the March 2007 meeting of the Corporate Credit Risk Committee,

3    which Sambol also attended (Ex. 1556 at CFC2007C007471), reported that "62%

4    of total 2006 HELOC fundings were Reduced Documentation," a concentration

5    that more than doubled from 2004.  Ex. 500 at CFC2007C007264.  In addition,

6    "52% of Countrywide Bank HELOCs were Reduced documentation in 2006, up

7    from 11% in 2004."  *Id.*  The concern was that "[l]ayered risk [was] driving poor

8    performance within Reduced Documentation."  *Id.* at CFC2007C007265.  The

9    presentation stated: "Reduced Doc performs 3-4X worse than Non-Reduced Doc

10   types," and "100% CLTV . . . performs poorly across all FICOs (represents 20%

11   of Reduced Doc volume)."  *Id.*

12        The HSBC repurchases in early 2006 also demonstrated to Sambol that if

13   exceptions were not kept under control, R&Ws could obligate Countrywide to

14   take back credit risk that it had sold in the secondary market.  In April 2006,

15   referring to the HSBC incident, Mozilo told Sambol and others that he

16   "personally observed a serious lack of compliance within our origination system

17   as it relates to documentation and generally a deteri[or]ation in the quality of

18   loans originated verses the pricing of those loan[s]."  Apr. 13, 2006 Mozilo e-mail

19   at CFCP002618620.  In 2006, Walter Smiechewicz, Senior Managing Director of

20   Enterprise Risk Management, began highlighting this risk in risk assessment

21   maps distributed to the Executive Risk Committee.  He testified: "[I]f you're

22   matching more aggressive products with your competitors and the secondary

23   market may not have an appetite to purchase that, or the secondary markets may

24   not want to purchase something because of the quality of the underwriting, those

25   loans could get kicked out of deals, and that was something very measurable that

26   we would have in the risk map."  Smiechewicz Dep. at 147:14-148:5.  As a

27

28

203

1    member of the Executive Risk Committee, Sambol received these maps.

2    Smiechewicz Dep. at 40:24-41:15; Sambol Dep. at 48:23-49:8.

3         Another major risk concerned the residual interests, especially those

4    associated with HELOC, Pay Option, and subprime loans.  When securitizing

5    pools of mortgages, several tranches were created.  The riskiest of those tranches,

6    referred to by McMurray during his deposition as "leftover food," was the

7    residual.  McMurray Dep. at 150:13-151:1.  Countrywide often retained the

8    residual interest, and it was not always possible to sell that interest.  Indeed, a

9    December 2006 Credit Risk Committee presentation stated: "HELOCs/FRS

10   (Home Equity Line of Credit/Fixed Rate Seconds) are retained on the Bank's

11   balance sheet and/or securitized with CW holding a residual security.  Unlike

12   subprime, we have never sold or 'NIMed' a residual where the underlying

13   collateral was comprised of seconds."[1]  Ex. 498 at CFCP006242693.

14        And with respect to subprime loans, McMurray explained that "if you

15   wanted to be in that business and if after determining that you wanted to be in that

16   business that you didn't want to hold the entire risk of the loan on the balance

17   sheet . . . one of the few credit enhancement vehicles available to you would have

18   been the securitization market, and so even going that route, [ ] you could transfer

19   much of the risk but not all of the risk.  ***You'd be left with a residual, and***

20   ***sometimes those could be sold and sometimes those could not be sold***."

21   McMurray Dep. at 158:10-21 (emphasis added).

22        Mozilo also recognized the risk of residual interests.  In a September 2004

23   e-mail to Kurland, Mozilo stated, "I fully understand that our residuals have been

24

25   ────────────────────

26   [1] "NIM" stands for net interest margin: "to split [the residual] into two parts,
     [ ] one of which could be sold into the market, and [ ] the reason to do that would
     be you're not selling all of the risk like you would with selling the residual, but
27   you're selling off a portion of the risk, and . . . that would be one way of
     reducing the risk position on a residual holding."  (McMurray Dep. at 494:13-
28   495:25.)

────────────────────────────────

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    22

204

1  modeled on a conservative basis but it is only conservative based upon historical

2  performances.  But the type of loans currently being originated combined with the

3  unprecedented stretching of all aspects of credit standards could cause a bump in

4  the road that could bring with it catastrophic consequences."  Ex. 274 at

5  CFCP00096353.  Almost two years later, in May 2006, Mozilo asked Sambol and

6  others to examine Countrywide's "risk profile, . . . including exposure on our

7  residuals," with special attention to HELOC and Pay Option loans.  Ex. 373

8  CFC2007B084228.

9       Frank Aguilera, the product manager of subprime mortgages, testified that

10  the matching strategy was particularly dangerous with respect to subprime loans.

11  From a "credit perspective," it was "not a tolerable process."  He explained that,

12  "[i]n the subprime environment, ultimately those products end up going into a

13  pool for which we retain the residual and have first loss."  Referring to the

14  matching strategy, he testified: "Without saying, 'Here's the way it would work,'

15  without getting a credit view, without credit giving some guardrails on how you

16  would do it or not do it, it seemed to me at that time that those kinds of processes

17  should have happened before they implemented a program like that in the

18  subprime environment where we actually retain risk."  The risk was exacerbated

19  by the fact that the matching strategy was executed "via exceptions" without

20  evaluating compensating factors.  Aguilera SEC Dep. at 51:8-53:6, 54:7-55:9.

21       A June 2005 presentation to the Corporate Credit Risk Committee, which

22  Sambol would have reviewed as part of his practice, reported that primary credit

23  risk had been retained on 14% of the portfolio, and "[f]irst loss [was] retained on

24  most whole loans and ABS residuals, each representing approximately 7% of the

25  portfolio ($1,129M LC)."  Ex. 505 at CFC2007G583512.  The same presentation

26  also showed that "[c]oinciding with [Countrywide's] growth of new products, we

27  now participate in the credit risk to a much greater degree . . . [n]early 50% of all

28

205

1  loans (up from 25% [in 2003]).”  *Id.* at CFC2007G583518.  This credit risk was

2  concentrated in three categories – “HE piggy backs, Subprime and Bank-Owned

3  1sts.”  *Id.*

4        The March 2007 presentation to the Corporate Credit Risk Committee

5  reported that “[r]esiduals may be CW’s most significant and most volatile credit

6  exposure.”  Ex. 500 at CFC2007C007249.  One concern was that Countrywide

7  “retains the risk on HELOCs behind PayOption.”  *Id.* at CFC2007C007261.

8  More specifically, “14% of HELOCs on servicing portfolio have a PayOption

9  Senior Lien.  CFC holds the residuals on HELOC securitizations.”  *Id.*  Further,

10  “10% of Countrywide Bank HELOCs have PayOption Senior Lien.  CFC holds

11  these on the balance sheet.”  *Id.*

12        Smiechewicz consistently highlighted the risk of residual interests in his

13  regularly distributed risk assessments, which Sambol received.  Smiechewicz

14  Dep. at 34:16-38:4; Sambol Dep. at 48:23-49:8.  Further, an Internal Audit report

15  in June 2007, which was distributed to Sambol, stated that residual interests “have

16  high inherent risk due to the large size of the portfolio (approximately $3 billion

17  as of March 31, 2007) that is extremely sensitive to changes in either prepayment

18  or default rates.  This risk exposure is increasing because default rates have been

19  trending upward in the past three quarters.”  June 29, 2007 Internal Audit Report

20  at CFC2007G855961.

21        Primarily due to the risk of residual interests, Krsnich frequently warned

22  Sambol and other senior executives that Countrywide was not being adequately

23  compensated for the risks it was assuming through its matching strategy.  Krsnich

24  testified that “the main component of risk [was] the residual interest, and my

25  opinion was . . . that we needed to get paid more for that risk and that we would

26  never accept a competitor’s price.”  Krsnich Dep. at 228:22-229:21.  For his part,

27  McMurray told Sambol in February 2007 that “[r]isk-based pricing works only if

28

206

1    . . . a sufficient number of borrowers [ ] pay without defaulting or prepaying

2    prematurely so that adequate risk compensation is collected.  Said differently,

3    there are transactions which cannot be risk-based priced successfully, especially if

4    the risk premium is collected in rate rather than price."  Ex. 808 at

5    CFC2007B062766.

6        Similarly, Kurland was opposed to originating and securitizing 80/20 loans

7    (*i.e.*, 80% LTV first loan with a 20% LTV second loan) because he did not want

8    Countrywide to bear the residual risk.  Kurland SEC Dep. at 278:21-279:4.  He

9    rejected the suggestion that such loans "could be put into securitizations without

10   affecting the company's risk profile."  That was "inaccurate because the . . .

11   losses . . . on Subprime Seconds would go to reduce the value of residuals. . . ."

12   Kurland SEC Dep. at 294:6-295:7.  In a March 2006 e-mail to Sambol, Gissinger

13   wrote that "[Kurland] opined that NO non prime seconds could go into securities,

14   as he does not want to hold any credit risk."  Ex. 315 at CFCP000776721.

15   Gissinger noted that this was "not consistent with your instructions and contrary

16   to market activity/execution."  *Id.*  Rather than note that the risk management

17   policy preference of Kurland—who was the superior of both them at the time—

18   should govern, Sambol replied to Gissinger, "I'll speak to him."[2]  *Id.*

19       McMurray testified that he was never in favor of the matching strategy and

20   sought to have it curtailed.  McMurray Dep. at 245:11-22.  In February 2007, he

21   sent an e-mail to Sambol to counter the view that "if a product, guideline, or

22   transaction is in the market, than [sic] we can (and most likely will) offer the

---

24   [2] Kurland testified that "I would [ ] give instructions in a meeting, or to
25   executives . . . and then, what I was told and this is after I left, [Sambol]
     would say, 'Don't worry about that.  I'll take care of that.  I'll go back to him and
26   deal with him,' and that he, in essence, . . . diminished many of the directions
     that I had given by . . . acting behind my back and that type of thing."  The
27   people who told Kurland about Sambol's behavior included Mark DeJesse,
     Countrywide's chief trader, and David Spector, head of secondary marketing.
28   Kurland SEC Dep. at 291:3-13.

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                          25

207

1   same thing." Ex. 808 at CFC2007B062763.  McMurray recommended tempering

2   the matching strategy "with a risk transfer and/or capital allocation governor,"

3   which implies that such a governor did not exist.  Ex. 808 at CFC2007B062765.

4   McMurray's chief concern about the matching strategy, which he expressed to

5   Sambol, was that "risk standards get ceded to other institutions."  McMurray SEC

6   Dep. at 195:20-196:2.

7       Indeed, on many occasions, McMurray sought to rein in Countrywide's

8   expanding guidelines but was often opposed by Sambol.  For example, as

9   explained in the answers to Interrogatory Nos. 8 and 16 below, Sambol rebuffed

10  McMurray's attempts to restrain the 80/20 and Pay Option loan programs.

11      McMurray developed a set of principles intended to limit the matching

12  strategy, the three R's: risk, return, and responsibility.  He testified that these

13  principles should be considered when contemplating whether to offer a loan

14  product.  (1) "[D]o we understand the risks?  So even though Countrywide sold

15  most of its production into the capital markets, . . . [t]here was no product or

16  execution that could be done shedding all the risk.  Countrywide was always

17  going to retain some portion of the risk."  (2) "Return is the idea that for a profit

18  seeking company, you should only . . . offer products that generate an expected

19  return."  (3) The third R refers to responsibilities to shareholders, mortgage-

20  backed security holders, employees, regulators, and customers.  McMurray SEC

21  Dep. at 20:25-23:1.  McMurray wanted the three R's to be "guiding" principles

22  for Countrywide.  Sambol refused to endorse them fully.  Based on subsequent

23  discussions, McMurray testified that Sambol considered the matching strategy

24  more important to Countrywide than the three R's.  McMurray testified that

25  Sambol was concerned that these principles would be an impediment to

26  McMurray's approval of new loan products or guidelines.  McMurray SEC Dep.

27  at 32:6-33:16.

28

208

1    Mozilo also tried to rein in Sambol's overzealous pursuit of the matching

2    strategy.  In an April 2006 e-mail to Sambol, Mozilo, while referring to 80/20

3    loans, stated: "In all of my years in the business I have never seen a more toxic

4    pr[o]duct.  It's not only suboordinated [sic] to the first but the first is sub-prime.

5    In addition the fico's are below 600, below 500 and some below 400 compounded

6    by the fact these are 100% loans which must always be written off in the event of

7    foreclosure. . . .  No margin, no matter how high, could ever cover the inevitable

8    losses on loans with ficos un[d]er 600.  Whether you consider this business milk

9    or not I am prepared to go without milk irrespective of the consequences to our

10   production."  Ex. 1295 at CFC2007B125324.  Sambol pushed back, but his

11   response simply ignored the characteristics that Mozilo detailed as to why this

12   loan product presented significant financial and reputational risks (though he

13   mechanically stated in general terms that he was mindful of such risks).  Rather,

14   he blindly returned to the principles of the matching strategy, notwithstanding

15   that Mozilo had expressly rejected its application in this instance: "[T]hese loans

16   are pervasively offered in the marketplace by virtually every relevant competitor

17   of ours."  *Id.*  Mozilo responded: "There was a time when Savings and Loans

18   [w]ere doing things because their competitors were doing it.  They all went broke.

19   We should not be involved in programs or products simply because our

20   competitors have them. . . ."  *Id.*  When about asked these e-mails, Mozilo

21   testified: "If the only reason why you offered a product . . . is because somebody

22   else was doing it, that's a dangerous game to play."  Mozilo SEC Dep. at 545:23-

23   546:17.

24   Frustrated in his efforts to reform Countrywide's credit risk management,

25   McMurray announced his resignation in November 2006 (he was convinced to

26   retract his resignation and continued to work at Countrywide until September

27   2007).  He testified that one reason for his resignation was that his debates with

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    27

209

1   Sambol over credit risk were sometimes "quite vigorous," thereby tarnishing his

2   relationship with the President of the Company.  McMurray Dep. at 409:9-

3   410:16.

4          Just before McMurray announced his November 2006 resignation, he

5   attended a "product summit" held by Gissinger, whom Sambol had appointed

6   head of production.  Nov. 2, 2006 McMurray e-mail at CFC2007B062313.

7   During this summit, McMurray attempted to fend off requests from the

8   production divisions for approvals of new products or expansions of existing

9   products.  As he later related in an e-mail to Bartlett, "[Gissinger] and others

10  reminded me that the company's policy is: 'we match whatever anyone else has

11  out in the market.'  I've obviously heard this many times before."  *Id.* at

12  CFC2007B062314.  Bartlett forwarded McMurray's e-mail to Sambol, stating:

13  "I'm a little worried about John.  He's been withholding sign offs on certain

14  issues that should be priced for.  The latest was on extreme alt a where

15  [Gissinger] and crowd needed me to sign off when John was out after John

16  dragged his feet for over 30 days.  Of course they pick a day he's out to tell me

17  they need a decision."  *Id.* at CFC2007B062313.  Thus, McMurray refused to

18  approve the Extreme Alt-A program, the production divisions went around him

19  while he was on vacation, and Bartlett provided the sign-off.  Unsurprisingly,

20  Bartlett was concerned that Countrywide might lose McMurray "because he feels

21  powerless."  *Id.*

22         In preparation for a meeting with Sambol regarding his announced

23  resignation in 2006, McMurray wrote down the following notes:

24        • "Concern about personal risk.  Do not want to be blamed for
25           products, guidelines, etc. that I never advocated and often
26           recommended against."

27        • "[C]oncerns about inadequate controls, infrastructure. etc."

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                                    28

210

- "Concerns about company's risk philosophy.  Discussed 'can't say no' culture, pressures from matching and no brokering policies."

Ex. 816 at JPM-ARG 00001217.

McMurray orally expressed these concerns to Sambol during this meeting. McMurray Dep. at 398:6-19.  Sambol convinced McMurray not to resign, however, by saying that he was committed to "very strong controls and . . . a very strong risk management organization and . . . strong checks and balances," and by giving him a substantial pay raise.  Sambol Dep. at 223:4-225:6.  Although Sambol nominally stated agreement with McMurray's risk philosophy, he also said that "the company's strategies (mortgage supermarket, no brokering, etc.) required a complete product line-up."  Ex. 817 at JPM-ARG 00001218. McMurray conveyed to Sambol that more needed to be done to "reconcile company strategy on products with this risk philosophy."  *Id.*

Notwithstanding such promises, McMurray was compelled to continue his efforts to curtail Countrywide's matching strategy – *e.g.*, communicating to Sambol "fundamental deficiencies that need to be remedied," as reflected in unapproved Extreme Alt-A originations.  Ex. 1549 at CFC2007B243316. Moreover, Sambol and Bartlett did not devote much time to addressing McMurray's concerns.  Two of these concerns were: (i) Countrywide's "composite set of guidelines will be the most aggressive credit in the market," and (ii) the Company was ceding credit policy "to the most aggressive lenders in the market."  Nov. 2, 2006 McMurray e-mail at CFC2007B062314.  Bartlett testified that other than one conversation that he and Sambol had with McMurray, Bartlett did not "remember talking about . . . these two issues with [Sambol]." Bartlett SEC Dep. at 318:18-319:12.

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs. Lead Case No. CV 07-05295 MRP (MANx)                                    29

211

1    Shortly before McMurray's final resignation from Countrywide in

2    September 2007, in reference to his "policy on high risk products," he stated: "I

3    was never supported on this and Secondary, Production and CCM basically

4    continued to operate as though they never received this policy.  In addition to this

5    email, there were many meetings and other conversations where these issues were

6    discussed."  Ex. 491 at CFC2007I315086.

7    After McMurray's departure, during a November 2007 meeting of the

8    Credit Risk Management Committee, Sambol requested that the committee

9    "provide the Company with a guiding philosophy around credit risk."  Nov. 1,

10    2007 Credit Risk Management Committee minutes at CFC2007A508752.  This

11    request implies that Countrywide did not have one as of November 2007, despite

12    McMurray's efforts.  Jess Lederman, McMurray's replacement as Chief Risk

13    Officer, "expressed a need to articulate what **compelling** reasons would cause the

14    Company to ***override*** the market based philosophy."  *Id.* (emphases added).  Jack

15    Schakett, Chief Operations Officer, testified that "market-based philosophy"

16    meant the matching strategy.  Schakett SEC Dep. at 359:25-360:19.

17    Despite the widening lending guidelines at Countrywide, Sambol made

18    efforts to prevent the disclosure of this fact to investors.  McMurray testified that

19    Sieracki told him that Sambol "had slashed some of the credit text especially

20    around widened guidelines for affordability."  McMurray further testified that the

21    "slashed" text was likely in connection with drafting Countrywide's 2006 Form

22    10-K.  McMurray SEC Dep. at 849:5-850:15.

23

24    **INTERROGATORY NO. 3:**

25    Describe in detail all facts that support your contention in paragraph 221
of the Complaint that Sambol was aware that "Countrywide, during the Class

26    Period, employed a private, internal standard to distinguish between 'prime' and
'subprime' loans that . . . differed materially from the standard used by

27    government agencies and generally accepted in the mortgage banking industry."

28

---

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                30

212

**SUPPLEMENTAL ANSWER AND
OBJECTIONS TO INTERROGATORY NO. 3:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer as follows:

Countrywide's Forms 10-K and 10-Q filed during the Class Period all contained data regarding the number of prime and nonprime loans originated during their relevant time periods (the Form 10-K for 2003 and the Forms 10-Q for 1Q, 2Q and 3Q 2004 used the term "subprime").  At the September 13, 2006 Fixed Income Investor Forum, Mozilo stated that subprime loans were "only 9% of [Countrywide's] production today."  Ex. 278 at CFC2007826820.  On March 22, 2007, he also stated that subprime loans were only 7-9% of Countrywide's business when he appeared on CNBC's "Mad Money" program.  These statements were all false and misleading because Countrywide knew that

213

1    investors and analysts would think that the terms prime and subprime related to

2    borrower creditworthiness when, in fact, Countrywide used those terms to

3    distinguish the origination channel of the loans that were issued.  Countrywide's

4    definition of prime and subprime was never disclosed to investors.

5        The principal definition of "subprime" is found in the *Expanded Guidance*

6    *for Subprime Lending Programs* ("*Expanded Guidance*"), issued jointly on

7    January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the

8    Board of Governors of the Federal Reserve System, the Federal Deposit

9    Insurance Corporation, and the Office of Thrift Supervision.  It states that "[t]he

10   term 'subprime' refers to the credit characteristics of individual borrowers.

11   Subprime borrowers typically have weakened credit histories that include

12   payment delinquencies, and possibly more severe problems such as charge-offs,

13   judgments, and bankruptcies.  They may also display reduced repayment capacity

14   as measured by credit scores, debt-to-income ratios, or other criteria that may

15   encompass borrowers with incomplete credit histories.  Subprime loans are loans

16   to borrowers displaying one or more of these characteristics at the time of

17   origination or purchase."  Ex. 287 at p. 2.

18       Among the credit risk characteristics listed in the *Expanded Guidance* that

19   label a borrower as "subprime" is a "[r]elatively high default probability as

20   evidenced by, for example, a credit bureau risk score (FICO) of 660 or below

21   (depending on the product/collateral), or other bureau or proprietary scores with

22   an equivalent default probability likelihood[.]"  Ex. 287 at 3.

23       Mozilo testified that when he referred to the term "prime," he generally

24   meant loans with FICO scores of 620 and greater.  Mozilo Dep. 102:2-18.  He

25   also testified that the distinction between a prime and subprime loan was

26   primarily FICO.  Mozilo SEC Dep. at 710:9-19.  Russell testified that the main

27   driver of a loan's designation as prime or subprime at Countrywide Bank was

28

214

1    FICO score, and that a score of 660 was the cutoff.  Russell SEC Dep. at 37:18-

2    39:9.

3         However, Countrywide's internal designation of loans as prime or

4    subprime hinged not on borrower characteristics, but the channel from which the

5    loans were originated.  McMurray testified that "at Countrywide, the difference

6    was simply by product.  So if something . . . was a prime product, then any loan

7    originated under those guidelines was prime, and anything originated under

8    subprime guidelines was subprime."  McMurray SEC Dep. at 35:8-16.  Sambol's

9    testimony was consistent with McMurray's characterization: "The underlying

10   loans, you know, generally had different characteristics, but so we kind of

11   identified these are loan programs, these are guidelines applicable to subprime

12   and these are applicable to prime."  Sambol SEC Dep. at 44:2-5.  Thus, Sambol

13   was aware of Countrywide's internal, undisclosed distinction between prime and

14   subprime.

15        On a July 24, 2007 earnings call, McMurray stated: "So the way I think

16   about prime is that it covers a very vast spectrum, so I don't thank you can paint it

17   with a single brush. . . .  So in the prime sector, recall how I showed you the line

18   that covered FICO.  There is a belief by many that prime FICOs stop at 620.  That

19   is not the case.  There are affordability programs and Fannie Mae, expanded

20   approval, as an example, that go far below 620, yet those are still considered

21   prime."  Ex. 285 at CFC20071285046.  A subsequent report by Van Hesser, an

22   analyst from HSBC Securities, stated, "Management referred to certain

23   affordability programs where FICO scores went 'far below' 620 (which already is

24   well below the bank regulator's definition of subprime, which has a 660 cutoff)."

25   Ex. 281 at NYF-UW017964.

26        Throughout the Class Period, Countrywide granted loans whose qualities

27   would fit squarely into any reasonable investor's definition of "subprime."  In

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                                    33

215

2003, relating to underwriting standards relevant to information presented in the 2004 Form 10-K, a Countrywide borrower could obtain a $400,000 loan based upon Stated Income, with an LTV of 90% and a FICO of 580, and this loan would be classified as prime for reporting purposes.  Mar. 2003 CHL presentation at CFCNYF00271853.  A November 2006 e-mail from David Swain, Executive Vice President of Products and Pricing at Full Spectrum Lending ("FSL"), to Vijay LaLa, Managing Director of Product Development and Support, showed that 1.3% of Prime 1st lien fundings over the preceding three months went to borrowers with FICO scores between 500 and 580, and 10.4% of prime first lien loans went to borrowers with FICO scores between 580 and 620.  Nov. 8, 2006 Swain e-mail at CFCP004403827.  As Senior Managing Director of Production and later Executive Managing Director of Mortgage Banking and Capital Markets, Sambol knew or should have known Countrywide's minimum underwriting guidelines.

Further, Countrywide classified its Alt-A and Extreme Alt-A loans as prime in its periodic filings (McMurray Dep. at 361:3-20; Mozilo SEC Dep. at 709:25-710:8), but never disclosed that Countrywide included such loans in its statistics concerning prime loans.  McMurray testified, "The key difference between Alt A and the prime world is, the way we thought about it was documentation.  So in Alt A, most or virtually all of those would have some type of a low or no doc feature, and in . . . the typical conventional prime world, . . . they would be full doc or alt doc or preferred doc. . . ."  McMurray Dep. at 364:11-18.  Gissinger classified Extreme Alt-A as "another classification, if you will, between prime, Alt-A, extreme Alt-A, what would be called – there's a grading scale in subprime."  Gissinger Dep. at 285:25-286:6.

Sambol also testified that most Alt-A loans were originated based on reduced documentation; indeed, he stated that reduced documentation was one of

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)

34

216

1   Alt-A's "primary characteristics."  Sambol SEC Dep. at 144:15-21; 533:8-19.  In

2   2006, Sambol discovered that "Alt-A had all the same issues as subprime."  Ex.

3   1555 at CFC2007B013899.  For this reason, in February 2007, Nancy DeLiban,

4   an executive in the Capital Markets group, sent an e-mail to Sambol

5   recommending that he "put the same guideline requirements through on Alt-A as

6   subprime ASAP."  *Id.*

7       As far as Plaintiffs are able to discern, neither Countrywide nor any of its

8   employees publicly disclosed that Alt-A and Extreme Alt-A loans were classified

9   as prime in Countrywide's periodic filings.  The change in terminology in

10  Countrywide's periodic filings exacerbated this omission.  As McMurray and

11  Gissinger testified, Alt-A and Extreme Alt-A loans fall between prime and

12  subprime.  From the first quarter of 2005 onward, Countrywide publicly classified

13  its loans as either "prime" or "nonprime" in its periodic filings.  A reasonable

14  investor would conclude that those loans that bore distinct differences from prime

15  loans would be reported as nonprime.

16      Executives at Countrywide took pains to conceal their internal definition of

17  prime from those outside the company.  In a September 2005 e-mail, Kevin

18  Doyle, an Executive Vice President at Countrywide Securities Corp., said that

19  when Fannie Mae refused to purchase subprime loans from Countrywide, those

20  loans were renamed "credit blemished."  Sept. 8, 2005 Doyle e-mail at

21  CFC2007A024416.  Also, Gregory Lumsden, head of FSL, gave a presentation to

22  a group of CMD (retail division) employees, admitting that "[w]e are at this

23  moment, sort of tied for first as the largest subprime lender," and "[w]e put a lot

24  of subprime borrowers actually in prime loans."  2005 audio presentation at

25  CFC2007143076.

26      After the July 24, 2007 earnings call, Mozilo sent an e-mail to Sambol

27  recommending that Countrywide internally change the term "subprime" to

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                35

217

1    "standard," "so that we can say without reservation that we do not participate in

2    'subprime' lending." Aug. 26, 2007 Mozilo e-mail at CFC2007A367426.

3    Mozilo's request was forwarded to Gissinger, who stated, "Dave [Sambol] shared

4    this with me and I had already changed sub prime to near prime as a proxy until

5    there was something better. Today, we are selling this product to the agencies

6    and I am open to a new name." Aug. 29, 2007 Gissinger e-mail at

7    CFCNYF04233983.

8        Countrywide's obfuscation of the distinction between prime and subprime

9    loans was so pronounced that even its auditors were fooled. In August 2007,

10    John Klinge, engagement partner at KPMG, sent an e-mail to John Taylor,

11    Raymond Munoz, and Nicole Carillo concerning "CFC - Charge-off Policy and

12    HFS LOCOM," in which he said in part: "I am reading McMurray's comments

13    on the quality of the prime portfolio, and he stated that a portion of the prime

14    portfolio has FICOs below 620. Not sure why that is prime, but clearly those

15    loans should not receive the same price as other prime loans for purposes of

16    LOCOM analysis." Aug. 7, 2007 Klinge e-mail at KPMG-XXOTH-005-097578.

17        A month later, Mozilo told investors that "[w]e are out of the subprime

18    business." Sept. 18, 2007 Bank of America Investment Conference at

19    CFC2007769328. Reacting to an article in *USA Today* quoting Mozilo's

20    statement, Gissinger sent an e-mail to Sambol stating that, "[t]his article is killing

21    me in CHL. I need your help crafting a response or clarification that states:

22    We're not out of the subprime business. . . ." Sept. 22, 2007 Gissinger e-mail at

23    CFCP00787926. Three days later, Gissinger sent an e-mail to approximately 150

24    members of his team at CHL, writing that despite Mozilo's statement,

25    Countrywide was still originating subprime product. Sept. 25, 2007 Gissinger e-

26    mail at CFCNYF04234820.

27

28

**INTERROGATORY NO. 4:**

Describe in detail all facts that support your contention in paragraph 346 of the Complaint that Sambol "falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income."

**SUPPLEMENTAL ANSWER AND OBJECTIONS TO INTERROGATORY NO. 4:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object that this Interrogatory distorts paragraph 346 of the Complaint, which states in full: "As a result of its loosened underwriting standards and its failure to adhere to even those standards, Countrywide overstated the fair value of its MSRs throughout the Class Period.  Accordingly, the Officer Defendants also falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income."  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs further object to this Interrogatory as premature because it calls for information dependent upon expert analysis and opinion testimony.  Plaintiffs further object to this Interrogatory on the ground that the information responsive to it is subject to ongoing discovery of KPMG.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs state that information responsive to this Interrogatory will be

set forth in one or more expert witness reports to be submitted at the appropriate time.

**INTERROGATORY NO. 5:**

Describe in detail all facts that support your contention in paragraph 367 of the Complaint that Sambol "materially understated Countrywide's liabilities and overstated its gain-on-sale revenues, and net income."

**SUPPLEMENTAL ANSWER AND
OBJECTIONS TO INTERROGATORY NO. 5:**

Plaintiffs incorporate by reference their General Objections. Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object that this Interrogatory distorts paragraph 367 of the Complaint, which states in full: "As a result of its failure to adhere to its own underwriting standards, Countrywide did not properly accrue liabilities for breaches of representations and warranties throughout the Class Period. Accordingly, Countrywide and the Officer Defendants also materially understated Countrywide's liabilities and overstated its gain-on-sale revenues, and net income." Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control. Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity. Plaintiffs further object to this Interrogatory as premature because it calls for information dependent upon expert analysis and opinion testimony. Plaintiffs further object to this Interrogatory on the ground that the information responsive to it is subject to ongoing discovery of KPMG.

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                    38

220

Subject to and without waiving the foregoing general and specific objections, Plaintiffs state that information responsive to this Interrogatory will be set forth in one or more expert witness reports to be submitted at the appropriate time.

**INTERROGATORY NO. 6:**

Describe in detail all facts that support your contention in paragraph 390 of the Complaint that Sambol, in particular, "concealed the deterioration of Countrywide's internal controls during the Class Period by falsely representing in the Company's management's report on 'internal control over financial reporting' that such controls were effective."

**SUPPLEMENTAL ANSWER AND OBJECTIONS TO INTERROGATORY NO. 6:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs further object to this Interrogatory as premature because it calls for information dependent upon expert analysis and opinion testimony.  Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

1    Subject to and without waiving the foregoing general and specific

2    objections, Plaintiffs answer as follows:

3        Fraud & Document Deficiencies

4        Sambol was aware of pervasive fraudulent activity as early as 2005.

5    During a Business Review meeting in October of that year, which Sambol

6    attended, it was noted that "[t]oo many STD [standard] Branches are blowing up

7    due to fraud/credit quality."  October 18-19, 2005 Business Review minutes,

8    KPMG-05FYA-030-000301.

9        A presentation to the December 2006 meeting of the Corporate Credit Risk

10   Committee, which Sambol attended, reported that an audit found that 25.1% of

11   Countrywide's loans were rated "Severe Unsat[isfactory]," "High Risk," or

12   "Document Deficiency."  Ex. 498 at CFCP006242718.

13       On June 1, 2006, Mozilo sent an e-mail to Garcia stating that in "a

14   discussion with both Stan [Kurland] and Dave [Sambol] it came to my attention"

15   that: (i) Countrywide originated a majority of its Pay Options under the stated

16   income program – *i.e.*, no substantiation of borrowers' ability to repay; and (ii)

17   there was evidence that the information borrowers were providing did not match

18   up with IRS records.  Ex. 255 at CFC2007A371364.  Less than a week before, in

19   an e-mail with the subject "PayOption Data requested by Angelo-URGENT,"

20   Clifford Rossi, the Bank's Chief Credit Risk Officer, reported "the ***fact*** that a

21   very large percentage of reduced doc [Pay Option borrowers] overstate their

22   incomes by 10% or more."  Ex. 1562 at CFCP000001353 (emphasis added).

23   Indeed, in early June, Rossi distributed a report summarizing recently conducted

24   Form 4506 audits.  Rossi concluded from the information that the "findings level

25   for the Random audits would suggest that approximately 40% of the Bank's

26   reduced documentation loans in the portfolio could potentially have income

27   overstated by more than 10% and a significant percent of those loans would have

28

222

income overstated by 50% or more." June 2, 2006 Rossi e-mail at CFC2007D814286. And Sambol confirmed to the SEC Staff that Countrywide performed after-the-fact spot-checking of borrower information against IRS records. Sambol SEC Dep. at 81:14-82:13. As further corroboration, during one committee meeting that Sambol attended sometime in 2006, it was revealed to him that spot-checks revealed a significant rate of disparity, perhaps around 30%. *Id.*

Sambol also knew that the head of Fraud Risk Management viewed fraud as a pervasive problem at Countrywide. On a monthly basis, Sambol received reports issued by the Corporate Office of the President ("COOP") that provided various Countrywide fraud statistics. Foster Decl., Ex. 476 at LS-CFC 005148. Eileen Foster, who worked in COOP from September 2005 through July 2008, rising to Executive Vice President of Fraud Risk Management, was in charge of monitoring and investigating fraud. *Id.* at LS-CFC 005147. Her affidavit states that in her position she became aware of "systemic fraudulent activity" on the part of both borrowers and lending officers, resulting in the origination of loans to borrowers who were either not creditworthy or straw-borrowers. She found evidence of fraudulent appraisals, manipulated property values, manipulated FICO scores, misstated or fabricated documents, and manipulation of the automatic underwriting system. *Id.* at LS-CFC 005149.

Indeed, on July 27, 2007, after reviewing data that showed increases in early payment defaults for 2006 vintage subprime loans originating in the Wholesale Lending Division, Sambol told Gissinger he did not know how long he could continue to support a wholesale subprime operation given Countrywide's "inability to weed out fraud and control quality." Ex. 1730 at CFC2007A934578-590.

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)

41

223

<u>Enterprise Risk & Quantitative Modeling</u>

Smiechewicz, the Senior Managing Director of Enterprise Risk Assessment, created the Enterprise Risk Assessment Map ("ERAM"), which he distributed to Countrywide senior management on a quarterly basis beginning in the fourth quarter of 2005 until he left the Company in December 2007. Smiechewicz distributed ERAM to, among others, the members of the Executive Risk Committee, of which Sambol was a member.  Thus, Sambol received ERAM.  Smiechewicz Dep. at 34:16-35:7, 40:20-41:15; Sambol Dep. at 48:23-49:8.

ERAM identified the top two or three market risks, credit risks, and operations risks to Countrywide.  One risk that ERAM consistently highlighted was the lack of adequate model validation.  Smiechewicz Dep. at 35:8-38:15. Smiechewicz testified that "the protocol around model validations were not where they should be, and that there were certain models that had not been validated that should have been validated.  And I believe that as time went by we began to increase the color on [ERAM] to bring more management attention on the issue." *Id.* at 39:11-19.  Smiechewicz testified that Sambol paid little attention to these risk assessments, however.  *Id.* at 204:22-206:14.

Following Countrywide's liquidity crisis, several of the Company's senior managers offered key observations.  Smiechewicz stated that "[e]arly indicators of credit risk exposure existed.  Internal control systems highlighted many of the risks that eventually transpired."  Ex. 415 at CFCNYF00276829.  He added that "[r]isk indicators and [internal] control systems may not have gotten enough attention in the institutional risk and Board committees."  *Id.*  Mark Elbaum, Chief Financial Officer of the Bank, stated that "[d]ecentralization and local decision making were another characteristic of our model," but the "downside was fewer risk controls and less focus on risk, as the local decision makers were

224

not directly measured on risk." Ex. 401 at CFCNYF00276832. Ron Kripalani, head of Capital Markets, stated, "We did not fully heed the warnings of our credit models. Delinquencies were rising, and models predicted worse to come." Ex. 417 at CFCNYF00276838. He added, "We continued to grow aggressively through Q2 [2007], despite warnings of credit models," and "[i]nitiatives regarding manufacturing quality did not turn into meaningful action until Q2 [2007]." *Id.*

Both internal and external analyses of Countrywide's models corroborate these risk assessments. For example, in April 2005, Internal Audit reported to the Audit and Ethics Committee regarding "Past Due Findings." Under the heading "Considerable Risk," one of these past due findings was a report dated December 8, 2003, that found: "The residual interest models do not model cash flows according to the structure disclosed in the transaction documents and may provide inaccurate valuations to Corporate Accounting." Apr. 19, 2005 Internal Audit Report at KPMG-XXOTH-005-237432. In June 2007, another Internal Audit report, which was distributed to Sambol, found that Countrywide's residual interest models were still deficient: "Alt-A RI models did not accurately reflect deal structures, had not been independently validated and the Valuation and Analysis (VAN) group had not completely documented procedures . . . for new model versions used in RI valuations." June 29, 2007 Internal Audit Report at CFC2007G855961.

External auditors also reviewed Countrywide's model validation. Ernst & Young was engaged to "assist[ ] Countrywide with the review and validation of a number of models used for prepayment and default forecasting, loss forecasting, and loan loss reserving." Ex. 1119 at KPMG-06FYA-136-000015. In January 2007, Ernst & Young presented the following findings:

- "The Bank and CFC are aware that some of the models reviewed (e.g., Scorecards, ALLL, Loss/Severity) exhibit

225

poor performance and are in the process of developing new models"

- "Limited or no model documentation around initial development, model adjustments/overrides, subsequent revisions, and/or the implementation process"

- "Limited or inconsistent ongoing monitoring of model performance"

*Id.* at KPMG-06FYA-136-000016. The following month, KPMG informed Eric Sieracki, Countrywide's Chief Financial Officer, of a "substantial deficiency" with respect to Countrywide's financial statements, saying that: "As a result of the validation process covering only certain high-risk and complex models in 2006, and the lack of a sufficient new or enhanced model population to ensure that the Quantitative Modeling and Model Validation Policy relating to model development was operating effectively at December 31, 2006, there is a more than remote likelihood that a misstatement of the Company's annual or interim financial statements that is more than inconsequential will not be prevented or detected." Ex. 1117 at KPMG-06FYA-002-000252.

Sambol would have seen all of these internal and external audit reports. Julie Scammahorn, Countrywide's General Auditor, testified that she met with Sambol "on a regular basis" to discuss "significant audit reports," "internal controls and results of the audits," and "all past due findings." Scammahorn Dep. at 176:11-177:20. She met with Sambol when he was head of production and continued to do so after he became President. *Id.*

<u>SEC Filings</u>

Sambol signed Countrywide's Form 10-Q filings for the quarters ending September 30, 2006; March 31, 2007; June 30, 2007; September 30, 2007; and March 31, 2008. He also signed the Company's Form 10-K filing for the year

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                    44

226

1   ended December 31, 2007.  In addition, he signed the internal Executive Officer's

2   Certifications attesting to the Company's internal controls throughout 2005 and

3   2006.  None of the internal control problems relating to exceptions, fraud, or

4   enterprise risk was disclosed in any filing he signed or certified.

5          The SEC requires that the financial statements of a public company be

6   prepared in conformity with generally accepted accounting principles ("GAAP")

7   and requires that a public company's annual financial statements be audited in

8   accordance with generally accepted auditing standards ("GAAS").  The primary

9   source of GAAS is the AICPA Codification of Statements on Auditing Standards,

10  which has sections with the prefix AU.  Because the independent auditor's role

11  includes expressing a professional opinion on whether financial statements are

12  presented fairly in conformity with GAAP, there are AU sections relevant to the

13  application of GAAP.  For example, AU 110 Responsibilities and Functions of

14  the Independent Auditor paragraph 3 states, "Management is responsible for

15  adopting sound accounting policies and for establishing and maintaining internal

16  control that will, among other things, initiate, authorize, record, process, and

17  report transactions (as well as events and conditions) consistent with

18  management's assertions embodied in the financial statements."

19         From 2003 onwards, Countrywide's controls over its loan origination

20  processes were relaxed, but executives such as Sambol failed to ensure that the

21  Company's internal control over financial reporting was prepared for this

22  evolution.  Specifically, the Company continuously failed to expand and enhance

23  its internal controls to enable accounting personnel to reflect the new credit risks

24  seasoning into its financial statements.  Paragraph 394 of the Complaint cited

25  Chapter 2 of the COSO Framework, stating, "The impact of an ineffective control

26  environment could be far reaching, possibly resulting in a financial loss, a

27

28

227

1  tarnished public image or a business failure."  This scenario accurately reflected
2  the ultimate outcome of Countrywide's internal control weaknesses.

3  Fully demonstrating this failure to ensure proper internal controls in light
4  of Countrywide's expanded underwriting guidelines and procedures, in April
5  2006, Mozilo told Sambol and others that he "personally observed a serious lack
6  of compliance within our origination system as it relates to documentation and
7  generally a deteri[or]ation in the quality of loans originated verses the pricing of
8  those loan[s]."  Ex. 1550 at CFCP002618620.  Sambol testified that, in response
9  to this comment from the CEO of the Company, he conducted no further inquiry,
10  not even asking Mozilo for further detail.  Sambol Dep. at 257:19-261:12.

11  A presentation to the March 2007 meeting of the Corporate Credit Risk
12  Committee, which Sambol attended, reported that "[b]usiness unit risk
13  management and controls may be inadequate for transitioning environment."  Ex.
14  500 at CFC2007C007249.

15

16  **INTERROGATORY NO. 7:**

17  Describe in detail all facts that support your contention in paragraph 431
   of the Complaint that Sambol was "aware of developing issues involving the
18  Company's liquidity, reserves, internal controls, risk management and risk
   assessment policies as they arose during the Class Period."
19
   **SUPPLEMENTAL ANSWER AND**
20  **OBJECTIONS TO INTERROGATORY NO. 7:**

21  Plaintiffs incorporate by reference their General Objections.  Plaintiffs
22  further object that because this contention interrogatory seeks "all facts," it is
23  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL
24  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object that this
25  Interrogatory distorts paragraph 431 of the Complaint, which states in full:
26  "Owing to these standing Board Committees' regular and ongoing activities,
27  Defendants Mozilo and Sambol, at a minimum, were made aware of developing

28

228

issues involving the Company's liquidity, reserves, internal controls, risk management and risk assessment policies as they arose during the Class Period." Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.   Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Plaintiffs reiterate and incorporate by reference their objections and answers in response to Interrogatory Nos. 2 and 6.

Sambol testified during his SEC deposition that as Executive Managing Director of Mortgage Banking and Capital Markets from January 2004-April 2006, he sat on the following governance committees: Executive Risk Committee, Executive Strategy Committee, Credit Risk Committee, and Compliance Committee.  In addition, he sometimes attended meetings of Asset Liability Committee ("ALCO") and the Operational Risk Committee.  (Sambol SEC Dep. at 26:11-27:5.)  Upon becoming President and Chief Operating Officer in September 2006, Sambol continued to attend the meetings of the Executive Risk, Executive Strategy, Credit Risk, and Compliance committees, and may have put himself on ALCO.  Sambol SEC Dep. at 34:25-35:16.

1    "The executive risk committee was the committee to which the other
2    governance committees of the company submitted their reports, and so it would
3    meet periodically, my recollection is quarterly, and . . . the members of that
4    committee would receive reports from the head of other committees, such as the
5    Countrywide credit committee, the asset liability committee, the operations
6    committee and so forth." Sambol Dep. at 42:18-43:3. The Executive Strategy
7    Committee "consist[ed] of the seniormost executives of the company, including
8    Angelo Mozilo, myself, Stan [Kurland] and – and the other executive managing
9    directors and perhaps one or two other individuals that convened periodically to
10   discuss matters of strategy affecting the company." *Id.* at 39:24-40:5. The Credit
11   Risk Committee "focused on risk issues related to products that should be offered,
12   the performance of those products, . . . which products should be retained or the
13   risks on which should be retained." Sambol SEC Dep. at 27:6-16. The
14   Compliance Committee was also the "Responsible Lending Committee" and was
15   involved in approving new products. *Id.* at 29:20-30:3. "ALCO is a supporting
16   corporate credit committee to the finance credit committee." McMurray SEC
17   Dep. at 108:3-12. "[T]he purview of the Operational Risk Committee really
18   related to our operating controls, technology, process, procedures relating to, you
19   know, the work flows and the operations of the company." Sambol SEC Dep. at
20   27:6-16.

21   From January 2004 through April 2006, Sambol received "reports on
22   volume trends and margin trends and expense trends and delinquency trends,"
23   adding that "there was a lot of transparency with respect to . . . activity reports on
24   the activities and metrics of the company." He also received the Accounting
25   Flash Report, the Pay Option ARM Flash Report, and the Servicing Portfolio
26   Flash Report. Sambol SEC Dep. at 31:16-33:16. Although Sambol did not
27   receive Matrix reports during this period, he did begin receiving them shortly

28

230

1   before becoming President of the Company.  *Id.* at 32:6-33:10.  "The matrix

2   report was a forecast of the company's earnings and . . . balance sheet that . . . the

3   financial reporting department . . . prepared regularly.  And we met as frequently

4   as weekly to review changes to that forecast."  Sambol Dep. at 63:3-14.

5     Sambol testified that from 2004 through 2007, he "[n]ot infrequently"

6   accessed the Turquoise production reporting database.  This database enabled him

7   to obtain information on the percentages of Countrywide loan fundings with

8   particular CLTVs or FICOs ranges as to particular types of loans, including

9   subprime, Pay Option ARM, HELOC, 80/20, and reduced document loans.  *Id.* at

10  308:25-312:13.

11    In addition, Sambol testified that he was aware in 2007 that Countrywide

12  was "seeking to update [its] models so that they would be more predictive . . .

13  because we determined that they weren't predictive of what was transpiring at the

14  time."  *Id.* at 280:11-281:5.  In discussions with Wei Wang, who was in charge of

15  credit default modeling in the Capital Markets group, Sambol learned that the

16  models were underpredicting the probability of default.  *Id.* at 281:17-282:14.

17    As President of Countrywide, Sambol was responsible for the operations of

18  the entire company (with the exception of the Legal Department), including

19  Credit Risk Management.  Sambol SEC Dep. at 19:4-26:10.

20

21  **INTERROGATORY NO. 8:**

22    Describe in detail all facts that support your contention in paragraph 439

23  of the Complaint that "CW14, together with the Company's Chief Risk Officer
    and Chief Credit Officer, all repeatedly warned Sambol about aggressive
    production, and the dangers of lax underwriting standards and placing risky loans

24  on the Company's balance sheet.  According to CW14, however, the three of
    them ultimately were 'in the wilderness alone' and were put under enormous

25  pressure to 'go with production,' i.e. to accede to Sambol's plan to keep
    production in overdrive."

26

27

28

231

**SUPPLEMENTAL ANSWER AND**
**OBJECTIONS TO INTERROGATORY NO. 8:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer as follows:

Plaintiffs reiterate and incorporate by reference their objections and answers in response to Interrogatory Nos. 2, 9, 10, 11, and 15.

"CW14" is Clifford Rossi, who was Countrywide Bank's Chief Credit Risk Officer.  Although he did not recall in his testimony that he personally warned Sambol "about aggressive production, dangers of lax underwriting standards and placing risky loans on the Company's balance sheet," he did not dispute that McMurray and Krsnich had done so.  Rossi Dep. at 157:23-162:7.  During his deposition, Rossi did agree with "the fact . . . that I certainly had a feeling that there was pressure to do more production."  *Id.* at 162:24-165:5.  Additionally, he

1  testified that "I can certainly say that there were instances where I believed that

2  additional pressure was being asserted from senior management. . . .  I did agree

3  or I do agree that there was aggressive behavior and evidence at various times,

4  not all the time, but at various times with certain senior managers about the

5  direction of both the bank and CFC growth in the portfolio." *Id.* at 163:22-165:5.

6      In fact, Rossi testified that on several occasions he felt pressure from

7  Gissinger, who worked directly under Sambol, to permit increased production:

8  "On more than one occasion, maybe not more than a handful, maybe fewer than

9  that, it would come up in such a way that, well, you know, the bank needs to,

10  paraphrasing here, grow up and effectively become a real bank and take a little of

11  the bad with a lot of the good.  That to me felt like pressure." *Id.* at 190:7-191:20.

12  More generally, Rossi felt that senior management "exerted a greater degree of

13  interest in micromanagement of those [credit risk] issues than I felt warranted for

14  the position that I held." *Id.* at 192:8-193:6.

15      A March 2005 e-mail from Garcia to Kurland and Mozilo demonstrates

16  that Sambol pressured even senior employees in order to boost production.  In

17  that e-mail, Garcia wrote that Sambol "wants the Bank to provide balance sheet

18  immediately at his discretion to help deal with increasing competitive pressure. . .

19  .  He is trying to have me removed from the Bank at all cost so he can gain more

20  influence over the use of the Bank's balance sheet, which he seeks to use to fund

21  products with risks or pricing not supported by the secondary market, even at

22  suboptimal or potentially negative returns to the Bank or without first conducting

23  due diligence." Ex. 1558 at CFC2007H067578.

24      Sambol's approach to the 80/20 loan program is a prime example of how

25  he ignored warnings about aggressive production and the dangers of lax

26  underwriting standards and placing risky loans on the Company's balance sheet.

27  Aguilera testified that originally the program's minimum FICO score was 640,

28

233

1    but had drifted down to 580, with exceptions permitting scores of 560.  Aguilera

2    SEC Dep. at 85:5-86:1.

3         Both the CEO and Chairman, Mozilo, and the Chief Credit Risk Officer,

4    McMurray, expressed serious doubts about the viability of the 80/20 loan

5    program.  Following the forced repurchase from HSBC, in an April 2006 e-mail

6    to Sambol and others, Mozilo stated: "In my conversations with Sambol he calls

7    the 100% sub prime seconds as the 'milk' of the business.  Frankly I consider that

8    product line to be the poison of ours."  Ex. 1550 at CFCP002618620.

9         In another April 2006 e-mail to Sambol, Mozilo, while referring to 80/20

10   loans, stated: "In all of my years in the business I have never seen a more toxic

11   pr[o]duct.  It's not only suboordinated [sic] to the first but the first is sub-prime.

12   In addition the fico's are below 600, below 500 and some below 400 compounded

13   by the fact these are 100% loans which must always be written off in the event of

14   foreclosure. . . .  No margin, no matter how high, could ever cover the inevitable

15   losses on loans with ficos un[d]er 600.  Whether you consider this business milk

16   or not I am prepared to go without milk irrespective of the consequences to our

17   production."  Ex. 1295 at CFC2007B125324.  Sambol pushed back, stating that

18   "these loans are pervasively offered in the marketplace by virtually every relevant

19   competitor of ours."  *Id.*  Mozilo responded: "There was a time when Savings and

20   Loans [w]ere doing things because their competitors were doing it.  They all went

21   broke.  We should not be involved in programs or products simply because our

22   competitors have them. . . ."  *Id.*

23        Kurland also disagreed with Sambol's support of the 80/20 program.

24   Specifically, Kurland was opposed to originating and securitizing such loans

25   because he did not want Countrywide to bear the residual risk.  Kurland SEC

26   Dep. at 278:21-279:4.  He rejected the suggestion that such loans "could be put

27   into securitizations without affecting the company's risk profile."  That was

28

234

"inaccurate because the . . . losses . . . on Subprime Seconds would go to reduce the value of residuals. . . ." *Id.* at 294:6-295:7.  In a March 2006 e-mail to Sambol, Gissinger wrote that "[Kurland] opined that NO non prime seconds could go into securities, as he does not want to hold any credit risk."  Ex. 315 at CFCP000776721.  Gissinger noted that this was "not consistent with your instructions and contrary to market activity/execution."  *Id.*  Kurland testified that Sambol diminished many of Kurland's directions to subordinates by acting behind his back.  *See supra* note 2 and accompanying text.

Similarly, McMurray was also concerned about the 80/20 loan program.  On February 1, 2006, McMurray sent an email to Kuelbs with the subject "Resistan[c]e to 80/20 Changes," in which he questioned the "basic existence" of the program: "Do you think that a 100% subprime loan is a viable program – does a loan with no equity, nonprime credit, and in some cases, undocumented income make sense?"  Ex. 312 at CFCP001628290.  Moreover, he questioned whether the Company had "reliable execution to shed this credit risk [in the secondary market], which we do not want to retain under any circumstances."  *Id.*  He even questioned whether the offering was profitable "after factoring in the HSBC put-backs and other costs."  *Id.*

For this reason, in the first half of 2006, McMurray attempted to implement changes to 80/20's exception, loan size, and loan balance policies.  Kuelbs Dep. at 99:25-100:13.  Aguilera testified that the performance characteristics of 80/20 loans were "deteriorating quite rapidly," and Credit Risk Management "thought it would be best to begin reducing [Countrywide's] production of those products."  Aguilera SEC Dep. at 96:12-18.

Sambol, however, fully supported an aggressive 80/20 loan program.  He testified that 80/20 loans were so pervasive in the marketplace that "if we didn't offer 100 percent financing or – or subprime 100 percent financing, that it would

235

1    be almost analogous to – to having a supermarket without milk." Sambol Dep. at

2    262:5-263:7. Sambol never refuted – or even attempted to counter – McMurray's

3    objections to the 80/20 program from a credit perspective. Sambol's defense of

4    the program was merely that the product is in the market, therefore Countrywide

5    should offer it. Aguilera SEC Dep. at 86:6-87:23.

6         Unsurprisingly, then, McMurray encountered "resistance" to his "efforts

7    and instructions to reign [sic] in [the 80/20] program." Ex. 312 at

8    CFCP001628290. In February 2006, despite McMurray's opposition,

9    Countrywide expanded the exception policies for subprime, large 80/20 loans in

10   order to match its competitors. Kuelbs Dep. at 103:2-105:12. Further, in March

11   2006, when McMurray promulgated his "policy on high risk products," which

12   included 80/20 loans, he stated that "Secondary, Production and CCM basically

13   continued to operate as though they never received [the] policy." Ex. 491 at

14   CFC2007I315086. Referring back to it in September 2007, McMurray said, "I

15   was never supported on this." *Id.*

16        In April 2006, McMurray again attempted to rein in 80/20 loans by

17   proposing to increase the minimum FICO score by 20 points for all such loans.

18   Apr. 27, 2006 Kuelbs e-mail at CFC2007B061553. Kuelbs supported the

19   proposal, the only instance that the Managing Director of Products and Pricing

20   could recall supporting a recommendation by Credit Risk Management to tighten

21   any loan program's guidelines. Kuelbs Dep. at 173:6-174:2. Sambol opposed the

22   proposal, stating, "I'm not sure this is advisable," and it was not fully

23   implemented. Apr. 28, 2006 Sambol e-mail at CFC2007B061553; Kuelbs Dep. at

24   168:19-170:20. Indeed, the minimum FICO score for full documentation 80/20

25   loans remained at 580. Ex. 412 at CFCP000620424. McMurray and Aguilera

26   agreed that "this [580] level coupled with [Countrywide's] underlying credit

27   standards remain aggressive to the market." *Id.* at CFCP000620423.

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                    54

236

**INTERROGATORY NO. 9:**

Describe in detail all facts that support your contention in paragraph 440 of the Complaint that Sambol "put pressure on employees to price risky loans in a way that would not take into account the extent of the risk the loans presented and, accordingly, would overstate the value of the loans on the Company's books . . . [and pressured employees] to widen underwriting guidelines that would have the effect of enabling increased production of risky loans."

**SUPPLEMENTAL ANSWER AND OBJECTIONS TO INTERROGATORY NO. 9:**

Plaintiffs incorporate by reference their General Objections. Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control. Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity. Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer as follows:

Plaintiffs reiterate and incorporate by reference their objections and answers in response to Interrogatory Nos. 2, 8, 10, and 11.

Though, as noted above, it is supported by responses to other interrogatories, Paragraph 440 of the Complaint is derived from statements by

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS. LEAD CASE NO. CV 07-05295 MRP (MANx)
55

237

1   Nick Krsnich, who was Countrywide's Chief Investment Officer during part of

2   the Class Period.  During his deposition, Krsnich testified that, "I thought that we

3   weren't getting paid enough for the risks that we were taking."  Krsnich Dep. at

4   228:22-229:12.  He added that "the main component of risk would have the

5   residual interest, and my opinion was, is that we needed to get paid more for that

6   risk and that we would never accept a competitor's price."  *Id.* at 229:13-21.  For

7   this reason, he expressly disagreed with the "dynamic" in which "the company

8   produced the market price based on either the execution or where they thought

9   value was, and I didn't believe we need to take . . . the competitor's current price

10  into that discussion."  In other words, he stated to Sambol, among others, that

11  production should not "have a say with regard to the final market price."  This

12  was a point of contention with Sambol, which led Krsnich to try "to fend off

13  Dave" during sometimes heated debates.  *Id.* at 210:17-212:17.  Smiechewicz

14  also testified that Countrywide's pricing policy under Sambol was to match those

15  of its competitors.  Smiechewicz Dep. at 143:5-11.

16       A March 2005 e-mail from Garcia to Kurland and Mozilo also supports

17  paragraph 440 of the Complaint.  In that e-mail, Garcia wrote that Sambol "wants

18  the Bank to provide balance sheet immediately at his discretion to help deal with

19  increasing competitive pressure. . . .  He is trying to have me removed from the

20  Bank at all cost so he can gain more influence over the use of the Bank's balance

21  sheet, which he seeks to use to fund products with risks or pricing not supported

22  by the secondary market, even at suboptimal or potentially negative returns to the

23  Bank or without first conducting due diligence."  Ex. 1558 at CFC2007H067578.

24       Further, Sambol pushed this aggressive matching strategy notwithstanding

25  questions that were raised as to its effect on Countrywide's financial results.  In

26  January 2007, McMurray sent an e-mail to Gissinger – who reported to Sambol –

27  that pushed back against the movement to establish "the most aggressive possible

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                                    56

238

guidelines." Ex. 1548 at CFC2007I167630.  He stated that whereas "the objective should be to maximize risk-adjusted returns for CW . . . [t]he current approach gives us the riskiest, but not the most profitable, guidelines." *Id.*

Countrywide's "no brokering" policy exacerbated the incentives to aggressively expand guidelines.  McMurray explained this concern to Sambol in November 2006:

> "[H]e [McMurray] pointed out that . . . in large part one of the reasons that . . . there was the pressure on . . . the infrastructure that there was a product leadership group and that there was a lot of sensitivity to the timing of changes and so forth from . . . the production side stemmed from the fact that we didn't allow brokering because, had we allowed brokering which was . . . allowed by other companies that[ ] would have represented a release valve . . . in lessening . . . the need for us to constantly . . . expand our product line . . . and the pressure on the systems and people and so forth that comes with that."

Sambol Dep. at 222:10-223:1.  Nonetheless, Sambol did not consider any relaxation of that policy.  *Id.* at 223:5-25.

**INTERROGATORY NO. 10:**

Describe in detail all facts that support your contention in paragraph 440 of the Complaint that Sambol "had trouble balancing Countrywide's corporate mandate with his own 'personal ambitions' and could not be controlled."

**SUPPLEMENTAL ANSWER AND
OBJECTIONS TO INTERROGATORY NO. 10:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further

239

1   object to this Interrogatory to the extent that it seeks information not in their

2   possession, custody, or control.  Plaintiffs further object to this Interrogatory to

3   the extent it seeks disclosure of information protected by the attorney-client

4   privilege, the attorney work product doctrine, the joint prosecution privilege, or

5   any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

6   not necessarily provide every supporting or otherwise relevant fact that is in the

7   evidentiary record as it currently stands, nor does this Answer necessarily provide

8   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

9   or in favor of a summary judgment motion, or at the trial of this action.

10          Subject to and without waiving the foregoing general and specific

11   objections, Plaintiffs answer as follows:

12          Plaintiffs reiterate and incorporate by reference their objections and

13   answers in response to Interrogatory No. 2.

14          In a March 2005 e-mail sent to Kurland and Mozilo, Garcia discussed

15   Sambol's ambitions: "Sambol is frustrated with the Bank because he wants the

16   Bank to provide balance sheet immediately at his discretion to help deal with

17   increasing competitive pressure. . . .  He is trying to have me removed from the

18   Bank at all cost so he can gain more influence over the use of the Bank's balance

19   sheet, which he seeks to use to fund products with risks or pricing not supported

20   by the secondary market, even at suboptimal or potentially negative returns to the

21   Bank or without first conducting due diligence."  Ex. 15548 at

22   CFC2007H067578.

23          Moreover, while Kurland was President of the Company, Sambol often

24   undermined his directions to subordinates.  Kurland testified that "I would [ ] give

25   instructions in a meeting, or to executives . . . and then, what I was told and this is

26   after I left, that [Sambol] would say, 'Don't worry about that.  I'll take care of

27   that.  I'll go back to him and deal with him,' and that he, in essence, . . .

28

240

1   diminished many of the directions that I had given by . . . acting behind my back

2   and that type of thing."  The people who told Kurland about Sambol's behavior

3   included Mark DeJesse, Countrywide's chief trader, and David Spector, head of

4   secondary marketing.  Kurland SEC Dep. at 291:3-13.

5

6   **INTERROGATORY NO. 11:**

7   Describe in detail all facts that support your contention in paragraph 448
    of the Complaint that "Sambol, with the support of the other Officer Defendants,

8   who had access to the same information, clearly knew about – and endorsed –
    Countrywide's rampant deviations from its underwriting policies and

9   procedures."

10  **SUPPLEMENTAL ANSWER AND
    OBJECTIONS TO INTERROGATORY NO. 11:**

11  Plaintiffs incorporate by reference their General Objections.  Plaintiffs

12  further object that because this contention interrogatory seeks "all facts," it is

13  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

14  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

15  Interrogatory to the extent that it seeks information equally available to Defendant

16  Sambol, or information to which he has equal or greater access.  Plaintiffs further

17  object to this Interrogatory to the extent that it seeks information not in their

18  possession, custody, or control.  Plaintiffs further object to this Interrogatory to

19  the extent it seeks disclosure of information protected by the attorney-client

20  privilege, the attorney work product doctrine, the joint prosecution privilege, or

21  any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

22  not necessarily provide every supporting or otherwise relevant fact that is in the

23  evidentiary record as it currently stands, nor does this Answer necessarily provide

24  every supporting or otherwise relevant fact Plaintiffs may present in opposition to

25  or in favor of a summary judgment motion, or at the trial of this action.

26  Subject to and without waiving the foregoing general and specific

27  objections, Plaintiffs answer as follows:

28

241

1    Plaintiffs reiterate and incorporate by reference their objections and

2    answers in response to Interrogatory No. 2.

3    In May 2004, McMurray expressed his concerns regarding the excessive

4    approval of exceptions, particularly for high-risk loans.  He reported to Sambol

5    and others about the high exception levels for high-balance loans.  May 1, 2004

6    McMurray e-mail at CFCP000130447.  For loans greater than $1 million, the

7    exception rate was about 32%; for loans greater than $3 million, the exception

8    rate was 75%.  *Id.*  McMurray was particularly concerned about a "pocket" of

9    these high-balance loans that combined both loan-to-value and FICO exceptions.

10   *Id.*

11   One year later, in May 2005, McMurray informed Sambol that developing

12   economic conditions required Countrywide to revise its exception loan policies:

13   "Given the expansion in guidelines and growing likelihood that the real estate

14   market will cool, this seems like an appropriate juncture to revisit our approach to

15   exceptions. . . ."  Ex. 1543 at CFC2007I081829.  McMurray also warned that

16   Countrywide's rampant exceptions would undermine its strategy of selling off

17   credit risk in the secondary market: "[W]e will see higher rates of default on the

18   riskier transactions and third parties coming back to us seeking a repurchase or

19   indemnification based on an alleged [representations & warranty] breach as the

20   rationale."  *Id.*  He questioned whether the various parts of the Company were

21   sufficiently aware of this risk.  *Id.*  Finally, McMurray told Sambol that

22   Countrywide's pricing models had some "inherent limitations" that were

23   amplified when used to price exceptions.  *Id.*

24   In June 2005, the month after McMurray sent the e-mail, the subprime

25   exception rates were 37% for purchase loans and 21% for stated income loans.

26   Aug. 2006 B/C Underwriter Exceptions Monthly Reporting Packet at

27   CFC2007C503824.  By August 2006, the exception rate for purchase loans

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                              60

242

1   remained at 37%, while the exception rate for stated income loans increased to

2   27%. *Id.* During the same period, the exception rate for high loan-to-value

3   subprime loans (>90% LTV/95% CLTV) dropped from 40%, but still remained at

4   a high level, 29%. *Id.*

5        Also in June 2005, a presentation to the Corporate Credit Risk Committee,

6   of which Sambol was a member, reported that in the Consumer Marketing

7   Division [retail mortgages], 15% of all loans were exceptions, including 70% of

8   those of over $1 million. Ex. 505 at CFC2007G583523. These exceptions were

9   concentrated "a) <$650k, O/O 95-100% CLTV purchases with low ficos; b) Non-

10  Owner 90% CLTV purchases; and c) >$1mm purchases 75-90% CLTV." *Id.*

11  Moreover, 70% of exception loans included "piggy-back" second mortgages. *Id.*

12  Company-wide exceptions were performing 2.8 times worse overall, as measured

13  by delinquency rates. *Id.* at CFC2007G583524. In the Consumer Marketing

14  Division exceptions were performing 3.5 times worse than loans within

15  guidelines. *Id.*

16       While Countrywide published underwriting guidelines for its various

17  branches, which were significantly expanded during the Class Period (Sambol

18  Dep. at 462:9-24), the Company also established far more expanded "shadow"

19  guidelines that were unpublished. The divisional Structured Loan Desks

20  ("SLDs") used these shadow guidelines to grant exceptions to the published

21  guidelines. Feb. 23, 2005 Rossi e-mail at CFCP000123153. Further, even if a

22  requested exception did not fit within the shadow guidelines, the SLD provided

23  exception loans based solely on the criteria of "salability" – whether the loan

24  could be sold on the secondary mortgage market – ***without reference to credit***

25  ***risk guideline criteria***. Ex. 1539 at CFCP002905199. When asked about this,

26  Sambol answered: "Yes, that was generally my view of . . . the SLD . . .

27  throughout my . . . tenure." Sambol Dep. at 79:23-80:16.

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)     61

243

1    Subsequent events demonstrate that Sambol disregarded McMurray's

2    warnings.  In December 2005, Sambol was informed by Credit Risk Management

3    that expanding the guidelines for Pay Option loans would have little effect on

4    volume because the rampant origination of exception loans had already expanded

5    the guidelines *de facto*.  Rossi Ex. 32 at CFCP004529640.  According to the e-

6    mail, "the guideline creep at CHL" had "unintentionally" caused the division to

7    match a competitor's looser underwriting guidelines.  *Id.*  Moreover, fully two-

8    thirds of the exceptions issued by Full Spectrum Lending ("FSL"), Countrywide's

9    subprime loan production division, were exceptions that no other competitor

10   offered.  Ex. 254 at CFCP004747585.  Also in December 2005, Sambol attended

11   a Business Review meeting, during which attendees discussed, "How do we keep

12   exceptions as an exception – not the rule?  Exceptions should have some

13   friction."  Dec. 12-14, 2005 Business Review minutes, KPMG-05FYA-030-

14   000312.  This issue was left for an unspecified future Business Review meeting,

15   with no indication it was ever resolved.  *Id.*

16   In February 2006, Gissinger, who reported to Sambol and met with him

17   often (Gissinger Dep. at 30:17-21.), was told that the Wholesale Lending Division

18   had "a high percentage of exceptions specifically on our pay options."  Ex. 1731

19   at CFCP004534825.  He stated that this "provides us with the broadest and most

20   liberal guidelines and is an answer for how we were able to grow so

21   disproportionally."  *Id.*  Rather than expressing concern about this fact, Gissinger

22   asked, "what is our strategy to leverage this?"  *Id.*  In fact, he stated that he

23   wanted to understand Pay Option exception policies, not to ameliorate the

24   problem of high exception rates, but to develop a "gameplan [to] jumpstart our

25   non pay option business."  *Id.*

26   In June 2006, the Secondary Marketing department reported that 60% of

27   Countrywide's Expanded Criteria programs and 33% of "Core" nonconforming

28

244

1    programs were exceptions to underwriting guidelines.  June 7, 2006 McMurray e-

2    mail at CFCP006002404.  Bartlett's response was: "I'm stunned."  *Id.*  McMurray

3    seconded Bartlett's surprise, stating that he "knew the exception activity was

4    high, [but] this is much higher then I expected."  *Id.*

5         A year later, McMurray was still concerned about exceptions being granted

6    to "prime" loans.  In a June 2007 e-mail to Gissinger, McMurray wrote: "Based

7    upon really poor, and what appears to be worsening performance, I'm

8    recommending that we severely curtail or eliminate loan exceptions in the

9    following categories: 1st and 2nd Liens with CLTV's of 95% and higher; and 1st

10   Liens with balances of $1 million or more."  June 25, 2007 McMurray e-mail at

11   CFCP000851192.

12        By 2007, Countrywide's exception loan production had grown to alarming

13   levels, particularly with respect to high-risk loans.  In February, Credit Risk

14   Management reported that there were "significant levels of exceptions (solely

15   based on fico scores) under all high risk programs"—the high loan-to-value

16   ("LTV") single loans program and the combo loan program (*e.g.*, 80/20 loans).

17   Ex. 319 at CFCP000623519.  The subprime exception levels at FSL "exceed[ed]

18   any imaginable comfort level."  *Id.*  Across all divisions, exceptions accounted for

19   25% of 95%-LTV loans, 37% of 100%-LTV loans, and 13% of combo loans.  *Id.*

20   Sambol acknowledged that one such loan program, the 80/20 loans, was a risky

21   product, and that the number of exceptions to those loans exacerbated the risk.

22   Sambol Dep. at 265:13-266:1.

23        Exceptions became so rampant at Countrywide that they were discussed

24   within the Company as common knowledge.  In the middle of 2007, the retail

25   loan division drafted a "value proposition memo" that was circulated to all of

26   Countrywide's Retail Sales Leaders.  Ex. 1540 at CFC2007A912518.  It stated:

27   "The exception capacity of SLD [the Structured Loan Desk, which processed

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)    63

245

1   exception loans] has created loans that simply do not exist elsewhere in the

2   marketplace and provide the ultimate control for our originators."  *Id.* at

3   CFC2007A912519.  Sambol was forwarded the "value proposition memo," and

4   he approved of it.  *Id.*

5        Worse, Countrywide routinely originated loans with layered risk but

6   without requiring the presence of compensating factors.  In January 2006,

7   Ingerslev stated that although Countrywide's automated underwriting system

8   "does account for layered risks, many Refers [*i.e.*, exception loans] are originated

9   at the extremes in all [underwriting] categories and pricing is used as an offset for

10  that."  Ex. 480 at CFCP000977204.  Similarly, Aguilera testified that with respect

11  to subprime mortgages, Countrywide executed its matching strategy on a loan-by-

12  loan basis "via exceptions" without evaluating compensating factors.  For this

13  reason, such exception loans "inherently ha[d] more risk" than loans originated

14  under a "typical exception policy," that required compensating factors.  Aguilera

15  SEC Dep. at 53:4-55:9.  Thus, Countrywide often relied solely on pricing to

16  offset the risk of exception loans, rather than compensating risk factors.

17        Additionally, in February 2008, Ingerslev noted that in prior years

18  Countrywide had produced "unfettered exception volume. . . , particularly low

19  doc helocs."  Ex. 485 at CFC2007C735826.  Despite the unchecked exception

20  volume of such loans, Ingerslev testified that the Bank "had a concentration of

21  HELOCs in its portfolio."  Ingerslev Dep. at 98:24-99:10.

22

23  **INTERROGATORY NO. 12:**

24        Describe in detail all facts that support your contention in paragraph 448
    of the Complaint that "Sambol directed the creation in 2004 of Countrywide's

25  proprietary Exception Processing System to approve and fund 'highly risky
    loans' (after tacking on additional fees) that violated the Company's ever-

26  loosening underwriting guidelines . . . EPS, in particular, was intended to
    'approve virtually every borrower and loan profile with pricing add on when

27  necessary.'"

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                    64

246

**SUPPLEMENTAL ANSWER AND
OBJECTIONS TO INTERROGATORY NO. 12:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs
further object that because this contention interrogatory seeks "all facts," it is
overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL
3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this
Interrogatory to the extent that it seeks information equally available to Defendant
Sambol, or information to which he has equal or greater access.  Plaintiffs further
object to this Interrogatory to the extent that it seeks information not in their
possession, custody, or control.  Plaintiffs further object to this Interrogatory to
the extent it seeks disclosure of information protected by the attorney-client
privilege, the attorney work product doctrine, the joint prosecution privilege, or
any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does
not necessarily provide every supporting or otherwise relevant fact that is in the
evidentiary record as it currently stands, nor does this Answer necessarily provide
every supporting or otherwise relevant fact Plaintiffs may present in opposition to
or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific
objections, Plaintiffs answer as follows:

Plaintiffs reiterate and incorporate by reference their objections and
answers in response to Interrogatory No. 11.

Paragraph 448 of the Complaint is derived from statements by Josephine
Chen, who from 2003 to 2007 worked under Bill Cobb, Countrywide's Chief
Accounting Officer.  Chen Dep. at 27:2-16.  Cobb reported directly to Sambol.
*Id.* at 30:9-13.  Chen played a significant role, and spent much of her time,
developing the Exception Processing System ("EPS").  *Id.* at 31:19-32:4.

Sambol sponsored the EPS project and had a central role in developing the
system.  He oversaw the design and implementation of EPS, and attended

monthly meetings concerning the project.  *Id.* at 100:3-102:18, 121:4-19.  Chen testified that she assumed Sambol asked Bill Cobb to create EPS.  *Id.* at 50:20-24.

EPS had two functions.  First, it tracked the variances between the points that are supposed to be charged on a given loan and what Countrywide actually charged on that loan.  Second, EPS allowed certain authorized personnel to override various other Company systems to permit a variance of the points charged or interest rate set for a particular loan.  *Id.* at 90:22-91:25, 51:2-52:1.  According to Tamara Wright, who was an Assistant Vice President ("AVP") at the divisional Structured Loan Desk ("SLD") within CMD (the retail division), "EPS was the system through which SLD received loan files for exception consideration, and it also contained a pricing engine that calculated final loans pricing with the exceptions that were approved."  Wright Decl. dated Nov. 30, 2009, ¶ 5, LS-CFC 005330.

A presentation document titled "Countrywide CMD Structured Loan Desk," filed publicly in *United States v. Partow*, No. 06-CR-00104 HRH (D. Alaska), a criminal proceeding against a former Countrywide loan officer, states that one of the objectives of EPS was to "[a]pprove virtually every borrower and loan profile with pricing add on when necessary."  LS-CFC 005053.


**INTERROGATORY NO. 13:**

Describe in detail all facts that support your contention in paragraph 449 of the Complaint that "the push toward risky lending ultimately came from 'high-up,' and specifically from David Sambol.  According to CW12, 'things went south' when Sambol became more powerful within the Company in 2003 . . . Sambol, according to CW12, was 'completely for sales all the time,' and had a philosophy that sales – that is, originating loans and selling them to the secondary mortgage market – ruled the Company.  Indeed, Sambol's mantra, according to CW12, was that 'Countrywide will make every loan possible.'"

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                    66

248

**SUPPLEMENTAL ANSWER AND
OBJECTIONS TO INTERROGATORY NO. 13:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs

further object that because this contention interrogatory seeks "all facts," it is

overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

Interrogatory to the extent that it seeks information equally available to Defendant

Sambol, or information to which he has equal or greater access.  Plaintiffs further

object to this Interrogatory to the extent that it seeks information not in their

possession, custody, or control.  Plaintiffs further object to this Interrogatory to

the extent it seeks disclosure of information protected by the attorney-client

privilege, the attorney work product doctrine, the joint prosecution privilege, or

any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

not necessarily provide every supporting or otherwise relevant fact that is in the

evidentiary record as it currently stands, nor does this Answer necessarily provide

every supporting or otherwise relevant fact Plaintiffs may present in opposition to

or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific

objections, Plaintiffs answer as follows:

Plaintiffs reiterate and incorporate by reference their objections and

answers in response to Interrogatory Nos. 2, 8, 10, 11, and 14.

Though supported by responses to other interrogatories, as noted above,

Paragraph 449 of the Complaint is derived from statements by Tamara Wright,

who worked at Countrywide from March 1993 through October 2006.  From

December 2004 through March 2006, she held the position of AVP of

Compliance in the product development group.  From March 2006 through

October 2006, she was an AVP at the divisional Structured Loan Desk ("SLD")

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                67

249

within CMD (the retail division), which handled exception loans.  Wright Decl. dated Nov. 30, 2009, ¶ 2, LS-CFC 005328-29.

From 2004 through 2006, Wright witnessed Countrywide use EPS "to underwrite and approve mortgage loans whose criteria fell outside of the Company's standard published origination and underwriting guidelines." Exception loans that could not be approved by branch-level underwriters were escalated to the divisional SLD for approval.  The divisional SLD had its own separate underwriting guidelines for granting exception loans.  Loans that failed to meet SLD's exception policies were escalated further to the Secondary Marketing Department corporate SLD.  In addition, Wright regularly witnessed SLD originating exception loans that involved layered risk – "[a]pproving exception on top of exception."  These loans frequently fell outside SLD's risk tolerance guidelines.  Wright Decl. dated Nov. 30, 2009, ¶¶ 3, 11, LS-CFC 005329-30, 005333.

**INTERROGATORY NO. 14:**

Describe in detail all facts that support your contention in paragraph 453 of the Complaint that Sambol "was unhappy (based on his review of EPS statistics) with loan production, which at the time was not meeting goals he had set.  Therefore, underwriting guidelines would need to be loosened, certain loan programs would need to be pushed, and, he instructed, the Company would take more risk on certain loans."

**SUPPLEMENTAL ANSWER AND OBJECTIONS TO INTERROGATORY NO. 14:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access.  Plaintiffs further

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                          68

250

1   object to this Interrogatory to the extent that it seeks information not in their

2   possession, custody, or control.  Plaintiffs further object to this Interrogatory to

3   the extent it seeks disclosure of information protected by the attorney-client

4   privilege, the attorney work product doctrine, the joint prosecution privilege, or

5   any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

6   not necessarily provide every supporting or otherwise relevant fact that is in the

7   evidentiary record as it currently stands, nor does this Answer necessarily provide

8   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

9   or in favor of a summary judgment motion, or at the trial of this action.

10        Subject to and without waiving the foregoing general and specific

11   objections, Plaintiffs answer as follows:

12        Plaintiffs reiterate and incorporate by reference their objections and

13   answers in response to Interrogatory Nos. 2, 8, 10, 11, and 13.

14        Though supported by responses to other interrogatories, as noted above,

15   Paragraph 449 of the Complaint is derived from statements by Tamara Wright

16   regarding comments made by Kathy Tinsley, an EPS supervisor.  Wright worked

17   at Countrywide from March 1993 through October 2006.  From March 2006

18   through October 2006, Wright was AVP at the divisional Structured Loan Desk

19   ("SLD") within CMD (the retail division), which handled exception loans.

20   Wright reported indirectly to Kathy Tinsley, a Senior Vice President at SLD.  As

21   soon as Wright started working at SLD, Tinsley and another of Wright's

22   supervisors made it clear to her that they were to "do every loan."  Wright Decl.

23   dated Nov. 30, 2009, ¶¶ 2, 8, LS-CFC 005329, 005331.

24

25   **INTERROGATORY NO. 15:**

26        Describe in detail all facts that support your contention in paragraph 467
     of the Complaint that Sambol "brushed aside" concerns from risk analysts
27   regarding "the rising defaults."

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                    69

251

**SUPPLEMENTAL ANSWER AND**
**OBJECTIONS TO INTERROGATORY NO. 15:**

Plaintiffs incorporate by reference their General Objections. Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Sambol, or information to which he has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information not in their possession, custody, or control. Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity. Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer as follows:

Plaintiffs reiterate and incorporate by reference their objections and answers in response to Interrogatory Nos. 2 and 8-11.

Though supported by responses to other interrogatories, as noted above, Paragraph 467 of the Complaint is derived from a *Wall Street Journal* article published on February 23, 2008, which reported that "Mr. Sambol brushed aside warnings from risk-control managers at Countrywide that the company's lending standards were too lax, according to four current and former executives at Countrywide." Ex. 716 at SKO00184.

252

1        During his SEC deposition, Kurland was shown the *Wall Street Journal*

2   article, specifically the passage stating that "Mr. Sambol brushed aside warnings

3   from risk control managers, that the company's lending standards were too lax."

4   Kurland was then asked whether it was his "experience that Mr. Sambol, during

5   [his] tenure at the company, was disinclined to listen to warnings from credit risk

6   managers, or risk control managers."  Kurland responded: "I agree with . . . your

7   question; yes, . . . he was aggressive."  Kurland SEC Dep. at 283:22-285:1.

8   Moreover, Kurland's testimony implies that Sambol did not have the requisite

9   temperament to lead Countrywide's operations:

10        [I]n mortgage banking, when you have a [ ] large origination

11        operation, you have enormous pressure coming from the field, [

12        ] and from management, over these areas and it's hard . . . to

13        maintain a balance when you have . . . basically 40, 50,000

14        people . . . screaming for [ ] product and then in the Secondary

15        Marketing areas, you have the disciplines of creating product

16        and selling product and . . . my view, at the time, is that he

17        didn't have the maturity, or balance that I thought was

          necessary.

    Kurland SEC Dep. at 282:21-283:21.

18       In June 2005, McMurray sent an e-mail to Sambol and others regarding

19  "subprime product requests."  Ex. 675 at CFC2007I088613.  In that e-mail,

20  McMurray made two points of note: (i) "Verifying what competitors are truly

21  offering continues to be challenging in the subprime sector.  Many of our

22  competitor's most aggressive offerings are often mitigated by other credit

23  requirements or stips" – implying that Countrywide's offerings are often not

24  mitigated; and (ii) "As a consequence of CW's strategy to have the widest

25  product line in the industry, we are clearly out on the 'frontier' in many areas.

26  While I'm sure you already know this, I think we should be very deliberate since

27  the outer boundaries are potentially controversial and have ***high expected default***

28

253

1   *rates and losses*." *Id.* (emphasis added).  Rather than heed these credit risk

2   warnings, Sambol replied, "I am not of the impression that we are on the

3   'frontier' with respect to our product line, but that we only offer that which the

4   major players also offer, and our pending requests represent 'holes' in our

5   menu/guidelines. . . ." *Id.*  McMurray responded to Sambol by informing him

6   that by "frontier," he meant "from a credit perspective," not a product offering

7   perspective. *Id.* at CFC2007I088611.

8       A June 2005 presentation to the Corporate Credit Risk Committee, which

9   Sambol would have reviewed as part of his practice, reported that in the

10  Consumer Marketing Division [retail mortgages], 15% of all loans were

11  exceptions, including 70% of those of over $1 million.  Ex. 505 at

12  CFC2007G583523.  These exceptions were concentrated "a) <$650k, O/O 95-

13  100% CLTV purchases with low ficos; b) Non-Owner 90% CLTV purchases; and

14  c) >$1mm purchases 75-90% CLTV." *Id.*  Moreover, 70% of exception loans

15  included "piggy-back" second mortgages. *Id.*  Company-wide exceptions were

16  performing 2.8 times worse overall, as measured by delinquency rates. *Id.* at

17  CFC2007G583524.  In the Consumer Marketing Division exceptions were

18  performing 3.5 times worse than loans within guidelines. *Id.*

19      Further, during his SEC deposition, Sambol testified that he routinely

20  received detailed reports on delinquency trends.  For example, he received flash

21  reports detailing the delinquency and default rates for Countrywide's loans,

22  including HELOCs, Pay Options, and subprime loans.  Sambol SEC Dep. at

23  31:16-33:16.

24      Sambol therefore knew, for example, that the delinquency rate in the

25  HELOC and subprime servicing portfolios increased 87% and 30%, respectively,

26  from December 2005 to December 2006.  Ex. 676 at CFCP002234195.  In a

27  Management Discussion and Analysis template for the 2006 Form 10-K, in words

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                        72

254

1 that never made into the actual Form 10-K that was filed with the SEC and sent to

2 investors, the dramatic increases in the delinquency rates for both portfolios were

3 attributed to "[i]nferior quality and performance of loans originated in 2005 and

4 YTD 2006 compared with the quality and performance of the 2002-2004

5 vintages." *Id.* Sambol testified that he agreed with this attribution, "where

6 'quality' is . . . synonymous with . . . 'guideline expansion.'" Sambol Dep. at

7 462:9-24. Moreover, the delinquency rate in the CHL servicing portfolio

8 increased 13% over the same period. This increase was attributed to "[e]xpansion

9 of guidelines in 2005 – YTD 2006 in response to the more competitive

10 environment." Ex. 676 at CFCP002234196.

11     A presentation to the December 2006 meeting of the Corporate Credit Risk

12 Committee, which Sambol attended, reported that with respect to subprime

13 mortgages, "[e]ach vintage since 2002 has underperformed the previous year,"

14 and "[t]o date the 2006 vintage is CHL's worst." Ex. 498 at CFCP006242707.

15 The presentation also stated that early payment defaults had increased for

16 subprime mortgages during 2006. *Id.* at 708.

17     Throughout 2006 and 2007, delinquency rates continued to rise for its Pay

18 Option, HELOC, and subprime loans. *E.g.*, Ex. 1564 at JPM-ARG 00000813.

19 Yet Sambol still pushed production aggressively while neglecting sound credit

20 risk management. An e-mail Sambol received from Nancy DeLiban in February

21 2007 laid out the consequences of his inattention to quality underwriting. The e-

22 mail stated that Alt-A loans had all the same issues as subprime – *e.g.*,

23 manipulating FICO scores and loose underwriting guidelines. Ex. 1555 at

24 CFC2007B013899. Moreover, Countrywide had discovered this fact during the

25 prior year. *Id.* As a result, the e-mail informed Sambol that the Company

26 expected a 30% default rate on Alt-A loans issued in 2006 and likely the first half

27 of 2007. *Id.*

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)

73

255

1    A presentation to the March 2007 meeting of the Corporate Credit Risk

2    Committee, which Sambol attended, reported: "Emerging delinquency patterns

3    indicate that the 2006 vintage (loans originated in 2006) will be one of the worse

4    performing books in recent history.  The 2005 vintage is also performing poorly

5    relative to other recent vintages."  Ex. 500 at CFC2007C007230.  Delinquency

6    rates were particularly alarming in subprime.  "2006 Subprime performance is the

7    worst since the inception of the program.  Ever 90s [delinquency rate] for BC

8    2nds at 9 months of age [is] 15%, approximately 4X greater than any vintage

9    prior to 2005.")  *Id.*  The presentation also stated that "ARM performance is

10   notably worse than fixed."  *Id.*

11   Sambol also received the Enterprise Risk Assessment Maps ("ERAM")

12   that were circulated by Smiechewicz.  Smiechewicz Dep. at 40:24-41:15; Sambol

13   Dep. at 48:23-49:8.  ERAM identified the top two or three market risks, credit

14   risks, and operations risks to Countrywide.  There were several risks that ERAM

15   consistently highlighted: (1) the risky HELOC portfolio held on the balance sheet,

16   which was heavily weighted in highly priced metropolitan areas; (2) the residuals

17   of securitized loans held on the balance sheet; (3) the lack of adequate model

18   validation; (4) lack of maturity to the economic capital program; and (5) lack of

19   diversity in funding sources.  Smiechewicz Dep. at 34:16-38:15.  According to

20   Smiechewicz, several of these risks that had been previously identified by ERAM

21   were causes of Countrywide's liquidity crisis.  *Id.* at 131:14-21.

22   Following Countrywide's liquidity crisis, Smiechewicz stated that "[e]arly

23   indicators of credit risk exposure existed.  Internal control systems highlighted

24   many of the risks that eventually transpired."  Ex. 415 at CFCNYF00276829.  He

25   added that "[r]isk indicators and [internal] control systems may not have gotten

26   enough attention in the institutional risk and Board committees."  *Id.*

27

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)    74

256

1    The Enterprise Risk Assessment group addressed Countrywide's credit and

2 operational risks during the regularly scheduled meetings of the Executive Risk

3 Committee.  When Sambol was elevated to President, however, he canceled most

4 or all of these meetings.  This reckless inattention to credit risk issues led

5 Smiechewicz to resign in December 2007.  Smiechewicz Dep. at 205:5-206:14,

6 216:15-217:25.

7

8 **INTERROGATORY NO. 16:**

9    Describe in detail all facts that support your contention in paragraph 727
of the Complaint that "Sambol's statement that credit risks associated with
10 ARMs were mitigated because underwriting guidelines were tightened was false
and misleading."

11 **SUPPLEMENTAL ANSWER AND**
**OBJECTIONS TO INTERROGATORY NO. 16:**
12

13    Plaintiffs incorporate by reference their General Objections.  Plaintiffs

14 further object that because this contention interrogatory seeks "all facts," it is

15 overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

16 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object that this

17 Interrogatory does not provide Sambol's actual statement, which is alleged in

18 paragraph 726 of the Complaint: "These risks are mitigated or addressed in part

19 by the different underwriting criteria which are applied to these loans relative to

20 those used for traditional fixed-rate agency product ***such as maybe higher credit***

21 ***scores or lower loan to value ratios***. . . ."  Plaintiffs further object to this

22 Interrogatory to the extent that it seeks information equally available to Defendant

23 Sambol, or information to which he has equal or greater access.  Plaintiffs further

24 object to this Interrogatory to the extent that it seeks information not in their

25 possession, custody, or control.  Plaintiffs further object to this Interrogatory to

26 the extent it seeks disclosure of information protected by the attorney-client

27 privilege, the attorney work product doctrine, the joint prosecution privilege, or

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                          75

257

1   any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

2   not necessarily provide every supporting or otherwise relevant fact that is in the

3   evidentiary record as it currently stands, nor does this Answer necessarily provide

4   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

5   or in favor of a summary judgment motion, or at the trial of this action.

6         Subject to and without waiving the foregoing general and specific

7   objections, Plaintiffs answer as follows:

8         Sambol made the challenged statement on May 24, 2005 during the

9   Countrywide Financial Corporation Analyst Meeting.  Thereafter, Countrywide

10  continued to issue Pay Option loans to borrowers with FICO scores less than 660

11  and/or combined loan-to-value ratios ("CLTV") greater than 80%.  *E.g.*, Ex. 1564

12  at JPM-ARG 00000811.  For this reason, throughout 2006 and 2007, the

13  delinquency rate for Pay Option loans continued to rise.  *E.g.*, *id.* at JPM-ARG

14  00000813.

15        A few months later, Mozilo admonished Sambol and others that

16  Countrywide was issuing Pay Option loans to the wrong types of borrowers.  In

17  an August 2005 e-mail that was forwarded to Sambol, Mozilo stated, "you should

18  never put a non owner occupied pay option ARM on the balance sheet.  I know

19  you have already done this but it is unacceptable.  Secondly only 660 fico's and

20  above, owner occupied pay options should be accepted and only on a limited

21  basis.  The focus should be 700 and above (owner occupied) for this product."

22  Ex. 1288 at CFC2007I061393.  Mozilo also relayed the following anecdotal

23  information: A mortgage broker in Michigan "said that the area he serves is

24  severely economically depressed and that the only way he can qualify his

25  borrowers is [ ] via [Countrywide's] pay option ARM.  I have heard this story

26  many times over from mortgage brokers who utilize the pay option for very

27

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                    76

258

1    marginal borrowers for the sole purpose of creating volumes and commissions."

2    *Id.* at CFC2007I061394.

3        In February 2006, Gissinger, who reported to Sambol and met with him

4    often (Gissinger Dep. at 30:17-21.), was told that Countrywide had "a high

5    percentage of exceptions specifically on our pay options."  Ex. 1731 at

6    CFCP004534825.  Gissinger stated that this "provides us with the broadest and

7    most liberal guidelines and is an answer for how we were able to grow so

8    disproportionally."  *Id.*  Rather than expressing concern about this fact, Gissinger

9    asked, "what is our strategy to leverage this?"  *Id.*  In fact, he stated that he

10   wanted to understand Pay Option exception policies, not to ameliorate the

11   problem of high exception rates, but to develop a "gameplan [to] jumpstart our

12   non pay option business."  *Id.*

13       Also in February 2006, an analysis of borrower behavior revealed that

14   minimum payment selection, and thus negative amortization, was "highly

15   correlated" to FICO and CLTV.  Ex. 1560 at CFC2007I309742.  Specifically,

16   72% of borrowers with FICOs less than 660 made the minimum payment, as did

17   70% of those with CLTVs greater than 80%.  *Id.*  Further, in May 2006, Credit

18   Risk Management reported that a "very large percentage" of reduced

19   documentation Pay Option borrowers misstated their incomes by 10% or more.

20   Ex. 1562 at CFCP000001353.

21       Later that year, in June 2006, Mozilo stated in an e-mail to Sambol and

22   others that "at least 20% or more of the Bank's pay option loans [are] at a fico of

23   700 or less."  Ex. 255 at CFC2007A371364.  Moreover, a supplemental

24   presentation at a July 27, 2007 analyst conference, entitled "Credit Summary,"

25   showed that almost 40% of the unpaid balance of Countrywide Bank's held-for-

26   investment ("HFI") portfolio was composed of loans to borrowers with FICO

27

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                                          77

259

1    scores of less than 700.  Ex. 1564 at JPM-ARG 00000811.  And 35% of the HFI

2    portfolio was composed of loans with CLTVs of over 80%.  *Id.*

3         In or around June 2006, Countrywide's marketing group organized focus

4    groups composed of actual Countrywide Pay Option borrowers.  The focus

5    groups revealed that "brokers were either coaching or doing it on behalf of

6    borrowers to . . . round up their income, basically, from what it really was, and

7    that was . . . concerning to see in here."  Ingerslev SEC Dep. at 98:16-99:2.  In

8    fact, the problem was worse than incomes being rounded up.  When the

9    "Consumer Focus Group Study" was presented to the Corporate Credit Risk

10   Committee on June 22, 2006, one finding was that "[s]ome borrowers can only

11   afford to make the minimum payment (and qualified with stated income)."  Ex.

12   494 at CFCP000809011.  Sambol attended the June 22 meeting.  Ex. 493 at

13   CFC2007E748710.  Besides enhancing borrower education efforts, Ingerslev

14   could not recall any changes that Countrywide made to the manner in which it

15   originated Pay Options as a result of the focus group results.  Ingerslev SEC Dep.

16   at 97:23-98:3.

17        In May 2006, Countrywide's senior management, including Sambol,

18   learned that (i) most Pay Options were originated under the stated income

19   program, and (ii) a very large percentage of reduced documentation Pay Option

20   borrowers overstated their incomes by 10% or more.  *See supra* Answer to

21   Interrogatory No. 16.

22        Throughout these developments, McMurray had been concerned about the

23   risks posed by the growing negative amortization of Pay Option loans.  *See* Ex.

24   320 at CFCP004850839.  As of February 2006, despite the fact that negative

25   amortization and delinquency rates had been rising substantially since the

26   introduction of the Pay Option product, the minimum pay rate remained at 1%.

27   To mitigate this risk, McMurray urged Countrywide to raise Pay Options'

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)     78

260

1    minimum pay rates to 1.25%, which would have reduced the rate of negative

2    amortization and thus the delinquency and default risk.  Kuelbs Dep. at 190:19-

3    193:15, Ex. 320 at CFC2007I309746.

4        In response, Countrywide conducted a pilot program in 2006 that raised the

5    start rate to 1.25% for 30-year loans and 1.8% for 40-year loans.  Ex. 320 at

6    CFC2007I309746.  Later that year, Countrywide management restored the start

7    rate to 1% as to certain of the Pay Option ARMs, including all full documentation

8    loans with CLTVs of 90% and certain reduced document loans with CLTVs over

9    80%.  Ex. 1561 at CFCP002372326.  McMurray was not consulted prior to

10   restoring the minimum rate on those loans, and when he learned about it, he

11   expressed to senior executives that it was a "really bad idea."  Ex. 807 at

12   CFC2007I149244.  Bartlett testified that Sambol and Gissinger argued for

13   restoring the start rate.  Bartlett SEC Dep. at 200:15-201:18.  At his deposition,

14   when asked about the decision to restore the start rate, Sambol testified that "I

15   would have been consulted and would have been okay with it."  Sambol Dep. at

16   393:24-394:17.  Once again, loan production prevailed over sound credit risk

17   management.

18       A presentation to the March 2007 meeting of the Corporate Credit Risk

19   Committee, which Sambol attended, reported that "ARM performance is notably

20   worse than fixed."  Ex. 500 at CFC2007C007230.  And 2006-vintage Pay Options

21   were "performing worse than previous vintages."  *Id.* at CFC2007C007254.

22   Specifically, at age 6 months, the 2006 was performing 1.7 times worse than

23   2005, as measured by delinquency rate.  *Id.*  In addition, FICO scores were

24   drifting lower while CLTV ratios were drifting higher.  *Id.*  The presentation also

25   stated that Countrywide's Pay Options were becoming concentrated in loans that

26   performed the worst.  *Id.* at CFC2007C007260.  "Although PayOption volume is

27   decreasing, the concentration of $1 Million is increasing."  *Id.*  "At age 12, the 90

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                                    79

261

1   Day Ever Delinquency on loans greater than $1million is 2X the overall average."

2   *Id.*

3

4   **INTERROGATORY NO. 17:**

5   Describe in detail all facts that support your contention in paragraph 1175 of the Complaint that Sambol "acted negligently and without reasonable care
6   regarding the accuracy of the information contained and incorporated by reference in these Registration Statements and Prospectuses and lacked
7   reasonable grounds to believe that such information was accurate and complete in all material respects."

8   **SUPPLEMENTAL ANSWER AND**
9   **OBJECTIONS TO INTERROGATORY NO. 17:**

10   Plaintiffs incorporate by reference their General Objections.  Plaintiffs

11   further object that because this contention interrogatory seeks "all facts," it is

12   overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

13   3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

14   Interrogatory to the extent that it seeks information equally available to Defendant

15   Sambol, or information to which he has equal or greater access.  Plaintiffs further

16   object to this Interrogatory to the extent that it seeks information not in their

17   possession, custody, or control.  Plaintiffs further object to this Interrogatory to

18   the extent it seeks disclosure of information protected by the attorney-client

19   privilege, the attorney work product doctrine, the joint prosecution privilege, or

20   any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

21   not necessarily provide every supporting or otherwise relevant fact that is in the

22   evidentiary record as it currently stands, nor does this Answer necessarily provide

23   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

24   or in favor of a summary judgment motion, or at the trial of this action.

25   Subject to and without waiving the foregoing general and specific

26   objections, Plaintiffs reiterate and incorporate by reference their objections and

27   answers to Interrogatory Nos. 1-17 and 21 as to what statements of Sambol

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    80

262

1  Plaintiffs contend were materially false and/or misleading, why they were false

2  and/or misleading, and Sambol's responsibility and involvement in relevant

3  issues such that allowing those statements to be made reflected, at the least, a

4  failure to conduct a reasonable and diligent investigation of the statements, and

5  should have led Sambol to at least not have a reasonable basis to believe those

6  statements were true and materially complete.

7

8  **INTERROGATORY NO. 18:**

9  Describe in detail all facts that support your contention in paragraph 1190
   of the Complaint that Sambol "did not make a reasonable and diligent

10  investigation of the statements contained or incorporated by reference in the 7%
    Capital Securities Registration Statement, and did not possess reasonable

11  grounds for believing that the 7% Capital Securities Registration Statement did
    not contain an untrue statement or omit to state a material fact required to be

12  stated therein or necessary to make the statements therein not misleading."

13  **SUPPLEMENTAL ANSWER AND**
    **OBJECTIONS TO INTERROGATORY NO. 18:**

14

15  Plaintiffs incorporate by reference their General Objections.  Plaintiffs

16  further object that because this contention interrogatory seeks "all facts," it is

17  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

18  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

19  Interrogatory to the extent that it seeks information equally available to Defendant

20  Sambol, or information to which he has equal or greater access.  Plaintiffs further

21  object to this Interrogatory to the extent that it seeks information not in their

22  possession, custody, or control.  Plaintiffs further object to this Interrogatory to

23  the extent it seeks disclosure of information protected by the attorney-client

24  privilege, the attorney work product doctrine, the joint prosecution privilege, or

25  any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

26  not necessarily provide every supporting or otherwise relevant fact that is in the

27  evidentiary record as it currently stands, nor does this Answer necessarily provide

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                                         81

263

1  every supporting or otherwise relevant fact Plaintiffs may present in opposition to

2  or in favor of a summary judgment motion, or at the trial of this action.

3        Subject to and without waiving the foregoing general and specific

4  objections, Plaintiffs reiterate and incorporate by reference their objections and

5  answers to Interrogatory Nos. 1-17 and 21 as to what statements of Sambol

6  Plaintiffs contend were materially false and/or misleading, why they were false

7  and/or misleading, and Sambol's responsibility and involvement in relevant

8  issues such that allowing those statements to be made reflected, at the least, a

9  failure to conduct a reasonable and diligent investigation of the statements, and

10  should have led Sambol to at least not have a reasonable basis to believe those

11  statements were true and materially complete.

12

13  **INTERROGATORY NO. 19:**

14        Describe in detail all facts that support your contention in paragraph 1214
of the Complaint that Sambol "acted negligently and without reasonable care

15  regarding the accuracy of the information contained and incorporated by
reference in the 7% Capital Securities Registration Statement and 7% Capital

16  Securities Prospectus and lacked reasonable grounds to believe that such
information was accurate and complete in all material respects."

17
**SUPPLEMENTAL ANSWER AND**

18  **OBJECTIONS TO INTERROGATORY NO. 19:**

19        Plaintiffs incorporate by reference their General Objections.  Plaintiffs

20  further object that because this contention interrogatory seeks "all facts," it is

21  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

22  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

23  Interrogatory to the extent that it seeks information equally available to Defendant

24  Sambol, or information to which he has equal or greater access.  Plaintiffs further

25  object to this Interrogatory to the extent that it seeks information not in their

26  possession, custody, or control.  Plaintiffs further object to this Interrogatory to

27  the extent it seeks disclosure of information protected by the attorney-client

28

1   privilege, the attorney work product doctrine, the joint prosecution privilege, or

2   any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

3   not necessarily provide every supporting or otherwise relevant fact that is in the

4   evidentiary record as it currently stands, nor does this Answer necessarily provide

5   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

6   or in favor of a summary judgment motion, or at the trial of this action.

7        Subject to and without waiving the foregoing general and specific

8   objections, Plaintiffs reiterate and incorporate by reference their objections and

9   answers in response to Interrogatory No. 18.

10

11  **INTERROGATORY NO. 20:**

12      Describe in detail all facts that support your contention in paragraph 1220
    of the Complaint that Sambol "directly and indirectly . . . made untrue statements
13  of material fact and/or omitted to state material facts necessary to make their
    statements not misleading and carried out a plan, scheme and course of conduct,
14  in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
    thereunder."
15
    **SUPPLEMENTAL ANSWER AND**
16  **OBJECTIONS TO INTERROGATORY NO. 20:**

17      Plaintiffs incorporate by reference their General Objections.  Plaintiffs

18  further object that because this contention interrogatory seeks "all facts," it is

19  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

20  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

21  Interrogatory to the extent that it seeks information equally available to Defendant

22  Sambol, or information to which he has equal or greater access.  Plaintiffs further

23  object to this Interrogatory to the extent that it seeks information not in their

24  possession, custody, or control.  Plaintiffs further object to this Interrogatory to

25  the extent it seeks disclosure of information protected by the attorney-client

26  privilege, the attorney work product doctrine, the joint prosecution privilege, or

27  any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                          83

265

1   not necessarily provide every supporting or otherwise relevant fact that is in the

2   evidentiary record as it currently stands, nor does this Answer necessarily provide

3   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

4   or in favor of a summary judgment motion, or at the trial of this action.

5       Subject to and without waiving the foregoing general and specific

6   objections, Plaintiffs answer as follows:

7       Plaintiffs reiterate and incorporate by reference their objections and

8   answers in response to Interrogatory Nos. 1-17 and 21.

9

10  **INTERROGATORY NO. 21:**

11      Describe in detail all facts that support your contention in paragraph 1228
    of the Complaint that Sambol was a controlling person of Countrywide during
12  the Class Period.

13  **SUPPLEMENTAL ANSWER AND
    OBJECTIONS TO INTERROGATORY NO. 21:**

14      Plaintiffs incorporate by reference their General Objections.  Plaintiffs

15  further object that because this contention interrogatory seeks "all facts," it is

16  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

17  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

18  Interrogatory to the extent that it seeks information equally available to Defendant

19  Sambol, or information to which he has equal or greater access.  Plaintiffs further

20  object to this Interrogatory to the extent that it seeks information not in their

21  possession, custody, or control.  Plaintiffs further object to this Interrogatory to

22  the extent it seeks disclosure of information protected by the attorney-client

23  privilege, the attorney work product doctrine, the joint prosecution privilege, or

24  any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does

25  not necessarily provide every supporting or otherwise relevant fact that is in the

26  evidentiary record as it currently stands, nor does this Answer necessarily provide

27

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                           84

266

1   every supporting or otherwise relevant fact Plaintiffs may present in opposition to

2   or in favor of a summary judgment motion, or at the trial of this action.

3          Subject to and without waiving the foregoing general and specific

4   objections, Plaintiffs answer as follows:

5          Plaintiffs reiterate and incorporate by reference their objections and

6   answers in response to Interrogatory Nos. 2-17.

7          From July 2000 through January 2004, Sambol was Senior Managing

8   Director of Production.  While he was in this position, the heads of all of the loan

9   production divisions reported to him.  Sambol reported to Defendant Stanford R.

10  Kurland, who was President and Chief Operating Officer during this period.

11  From January 2004 through April 2006, Sambol was Executive Managing

12  Director of Mortgage Banking and Capital Markets, while continuing to report to

13  Kurland.  Defendant Andrew Gissinger, who became the new head of production,

14  reported directly to Sambol.  In September 2006, Sambol replaced Kurland as

15  President and Chief Operating Officer.  Sambol claimed that in this position he

16  was responsible for the operations of the entire company (with the exception of

17  the Legal Department), including Credit Risk Management.  Sambol SEC Dep. at

18  19:4-26:10.

19         Sambol signed Countrywide's Form 10-Q filings for the quarters ending

20  September 30, 2006; March 31, 2007; June 30, 2007; September 30, 2007; and

21  March 31, 2008.  He also signed the Company's Form 10-K filing for the year

22  ended December 31, 2007.  In addition, Sambol signed the Senior Executive

23  Officer's subcertifications for the Company's Form 10-Q filings from 2004

24  through 2007.  *E.g.,* KPMG-04QR1-010-000061, CFCP002162725,

25  CFC2007E835324.  He also signed the Senior Executive Officer's

26  subcertifications for Countrywide's Form 10-Ks for 2004, 2005, and 2006.

27  KPMG-04FYA-003-000123, CFC2007E835080; Sambol Dep. at 453:1-457:18.

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                                    85

267

1    Laurie Milleman, Countrywide's chief accounting officer, testified that she

2  "had meetings with Dave [Sambol] to go over his comments on the SEC filings,

3  where he . . . walked me through his changes."  Milleman SEC Dep. at 445:1-14.

4  Anne McCallion, Senior Managing Director of Financial Planning and

5  Operations, and later Deputy Chief Financial Officer, testified that she "met with

6  [Sambol] every quarter to discuss the SEC filings, so we did meet with him on a

7  regular basis."  McCallion SEC Dep. at 441:17-24.

8    As additional evidence of Sambol as a controlling person of Countrywide,

9  he was involved in the decision not to disclose Countrywide's deteriorating

10  underwriting standards in the 2006 Form 10-K.  McMurray testified that Sieracki

11  told him that Sambol "had slashed some of the credit text especially around

12  widened guidelines for affordability."  McMurray further testified that the

13  "slashed" text was likely in connection with drafting Countrywide's 2006 Form

14  10-K.  McMurray SEC Dep. at 849:5-850:15.

15

16  Dated:  February 22, 2010          LABATON SUCHAROW LLP

17                          By:  */s/ Joel H. Bernstein*
                                JOEL H. BERNSTEIN
18                              JONATHAN M. PLASSE
                                IRA A. SCHOCHET
19                              DAVID J. GOLDSMITH
                                MICHAEL H. ROGERS
20                              JOSHUA L. CROWELL

21                              *Lead Counsel for Lead*
                                *Plaintiffs New York Funds*
22
                                KREINDLER & KREINDLER LLP
23                              GRETCHEN M. NELSON
                                MARK LABATON
24
                                *Liaison Counsel for Lead*
25                              *Plaintiffs New York Funds*

26

27

28

Plaintiffs' 2d Suppl. Ver. Ans. & Obj. to Def. David Sambol's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                              86

268

1    KAPLAN FOX & KILSHEIMER LLP
     JOEL B. STRAUSS
2    *jstrauss@kaplanfox.com*
     JEFFREY P. CAMPISI
3    *jcampisi@kaplanfox.com*
     850 Third Avenue
4    New York, New York 10022
     Telephone: (212) 687-1980
5    Facsimile:  (212) 687-7714

6    *Attorneys for Plaintiff*
     *Barry Brahn*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANX)                                          87

269

## **VERIFICATION**

Joel H. Bernstein declares as follows:

I am a member of the law firm of Labaton Sucharow LLP, Court-appointed Lead Counsel for Lead Plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund, and the New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York.

I have reviewed Plaintiffs' Second Supplemental Verified Answers and Objections to the First Set of Interrogatories Propounded to Plaintiffs by Defendant David Sambol and state that the responses therein are true and correct to the best of my knowledge, information and belief, subject to the objections set forth therein.

Executed this 22nd day of February, 2010.


*/s/ Joel H. Bernstein*
Joel H. Bernstein

PLAINTIFFS' 2D SUPPL. VER. ANS. & OBJ. TO DEF. DAVID SAMBOL'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)                    88

270