# Exhibit D

271

1  KREINDLER & KREINDLER LLP
   GRETCHEN M. NELSON (#112566)
2  *gnelson@kreindler.com*
   MARK LABATON (#159555)
3  *mlabaton@kreindler.com*
   707 Wilshire Boulevard, Suite 4100
4  Los Angeles, California  90017
   Telephone:  (213) 622-6469
5  Facsimile:  (213) 622-6019

6  *Liaison Counsel for Lead*
   *Plaintiffs New York Funds*
7
   LABATON SUCHAROW LLP
8  JOEL H. BERNSTEIN
   *jbernstein@labaton.com*
9  JONATHAN M. PLASSE
   *jplasse@labaton.com*
10 IRA A. SCHOCHET
   *ischochet@labaton.com*
11 DAVID J. GOLDSMITH
   *dgoldsmith@labaton.com*
12 MICHAEL H. ROGERS
   *mrogers@labaton.com*
13 JOSHUA L. CROWELL
   *jcrowell@labaton.com*
14 140 Broadway
   New York, New York  10005
15 Telephone:  (212) 907-0700
   Facsimile:  (212) 818-0477
16
   *Lead Counsel for Lead*
17 *Plaintiffs New York Funds*

18
19              UNITED STATES DISTRICT COURT
20              CENTRAL DISTRICT OF CALIFORNIA
                      WESTERN DIVISION
21

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION | Lead Case No. CV-07-05295 MRP (MANx) |
| This Document Applies to:  All Actions | **PLAINTIFFS' VERIFIED ANSWERS AND OBJECTIONS TO DEFENDANT ERIC SIERACKI'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS** |

22
23
24
25
26
27
28

# **INTRODUCTION**

Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund ("NYSCRF"), Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds" and together with NYSCRF, the "New York Funds"), and Plaintiff Barry Brahn (together with the New York Funds, "Plaintiffs"), hereby answer and object to Defendant Eric Sieracki's ("Sieracki") First Set of Interrogatories to Plaintiffs, dated December 29, 2009 (the "Interrogatories"), as follows:

# **GENERAL OBJECTIONS**

Plaintiffs generally object to the Interrogatories on the following grounds, each of which is expressly incorporated by reference in the answers to the individual interrogatories below.  All answers set forth herein are subject to and without waiver of any of these General Objections:

1.    Plaintiffs object to the Interrogatories to the extent that they purport to impose any obligations on Plaintiffs that are not imposed by law, or are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure.

2.    Plaintiffs object to the Interrogatories to the extent that they seek information or documents that are beyond the scope of permissible discovery.

3.    Plaintiffs object to the Interrogatories to the extent that they seek or require the disclosure of information or documents that are protected from

1  discovery by the attorney-client privilege, the attorney work product doctrine, or

2  any other applicable privilege or immunity.

3      4.    Plaintiffs object to the Interrogatories to the extent that they seek

4  information based on documents that are not within Plaintiffs' possession, custody

5  or control.

6      5.    Plaintiffs object to the Interrogatories to the extent they seek

7  information or documents that can be found in the pleadings.

8      6.    Plaintiffs object to the Interrogatories insofar as they are vague,

9  ambiguous, harassing, overly broad or burdensome and to the extent that the

10  discovery sought is unreasonably cumulative, duplicative, or disproportionate.

11      7.    Plaintiffs object to the Interrogatories insofar as they seek

12  information or documents that are irrelevant to any claim, defense, or subject

13  matter of the litigation, or are not reasonably calculated to lead to the discovery of

14  admissible evidence.

15      8.    Plaintiffs object to the Interrogatories to the extent that they call for a

16  legal conclusion, a legal argument, or constitute a discovery request that is

17  premature at this stage of the litigation and is invasive of the attorney work

18  product doctrine.

19      9.    Plaintiffs object to these Interrogatories as facially overbroad and

20  unduly burdensome.  *See Advocare Int'l, L.P. v. Scheckenbach*, No. C08-5332

21  RBL, 2009 WL 3064867, at *1 (W.D. Wash. Sept. 24, 2009) ("Numerous federal

22  courts have held that contention interrogatories which 'systematically track all of

23  the allegations in an opposing party's pleadings, and that ask for each and every

24  fact and application of law to fact that supports the party's allegations are an abuse

25  of the discovery process because they are overly broad and unduly burdensome'").

26  Plaintiffs are not required to provide every fact in support of their contentions.

27  *See Tubbs v. Sacramento County Jail*, No. CIV S-06-0280 LKK GGH P, 2008

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)    3

274

WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("[P]laintiff is not required to present his entire case in discovery responses.").  For this reason, although the Interrogatories seek "all facts" that support their claims, Plaintiffs' Answers below do not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands.  Nor do Plaintiffs' Answers below necessarily provide every supporting or otherwise relevant fact that Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

10.     Plaintiffs object to the Interrogatories to the extent they prematurely seek information related to particular types of expert(s), expert testimony, or opinion at a time when certain expert reports have not been submitted.

11.     Plaintiffs object to the Interrogatories on the grounds that Sieracki, in violation of Rule 33(a)(1) of the Federal Rules of Civil Procedure, has in effect propounded more than 25 interrogatories without leave of Court.  The majority of the Interrogatories propounded contain multiple and compound requests for information, *i.e.*, "State all facts and identify all persons and documents . . ." (emphasis supplied).  In essence, Sieracki has propounded more than 60 interrogatories without seeking leave of Court in violation of Rule 33(a)(1).

12.     Plaintiffs object to Interrogatory Nos. 2-21 on the grounds that Defendants have not yet completed discovery.  After the Securities and Exchange Commission commenced its civil action against Defendants Sambol, Angelo Mozilo, and Eric Sieracki, No. CV 09-03994 JFW (C.D. Cal.), it provided or otherwise made available to these Defendants all transcripts of the depositions it conducted during its pre-filing investigation styled *In re Countrywide Financial Corporation*, File No. LA-3370, along with all documents marked as exhibits during such depositions, any sound or video recordings of such depositions, and all signed court reporter certifications of such depositions.  Defendants Sambol,

1    Mozilo, and Sieracki have not supplemented their document productions by
2    producing these materials, as required by Rule 26(e) of the Federal Rules of Civil
3    Procedure.

4         13.    Plaintiffs reserve the right to further supplement their answers to the
5    Interrogatories pending rulings by the Court as to whether Plaintiffs will have
6    access to documents purportedly protected from disclosure by the bank
7    examination privilege.

8         14.    In providing answers to the Interrogatories, Plaintiffs do not in any
9    way waive, or intend to waive, but rather intend to preserve and are preserving:

10        a.    all objections as to competency, relevancy, materiality or
11   admissibility of any Interrogatory, the answers or their subject matter;

12        b.    all objections as to vagueness, ambiguity or other infirmity in
13   the form of the Interrogatories, any objections based on the undue burden imposed
14   by the Interrogatories and each individual request contained therein;

15        c.    all rights to object on any ground to the use of any of the
16   information or its subject matter in any subsequent proceedings, including the trial
17   of this or any other action;

18        d.    all rights to object on any ground to any further interrogatories
19   or other discovery requests involving or related to the subject matter of any
20   Interrogatory;

21        e.    the right to supplement answers to the Interrogatories; and

22        f.    any and all privileges and rights under the applicable Federal
23   Rules of Civil Procedure, the Local Rules of this Court, or other statutes.

24        15.    Plaintiffs object to the Definitions and Instructions section of the
25   Interrogatories to the extent that the definitions are overly broad or call for
26   information or documents that are protected from discovery by the attorney-client

27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                    5

276

1   privilege, the attorney work product doctrine, or any other applicable privilege or

2   immunity.

3        16.    Plaintiffs object to the definitions of "YOU" and "YOUR" to the

4   extent that they are defined to include individuals or entities that are not parties to

5   this action.

6        17.    Plaintiffs object to the Instructions to the extent they require Plaintiffs

7   to provide information that is not in Plaintiffs' possession, custody or control

8   and/or requires the production of information by individual and/or entities that are

9   not a party to this action.

10       18.    Shelley B. Katzeff ("Katzeff") objects to the Interrogatories because

11  the Court declined to appoint her a class representative.  *See Memorandum of*

12  *Decision Resolving All Class Certification Issues and Related Objections*, dated

13  December 9, 2009.  Katzeff adopts all general and specific objections to the

14  Interrogatories asserted by Plaintiff.

15  
16  <u>**SPECIFIC ANSWERS AND OBJECTIONS**</u>

17  <u>**INTERROGATORY NO. 1:**</u>

18       Identify each statement made by SIERACKI that you allege in this ACTION to be false and/or misleading.

19  <u>**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 1:**</u>

20       Plaintiffs incorporate by reference their General Objections to the

21  Interrogatories.  Moreover, Plaintiffs object to Interrogatory No. 1 on the grounds

22  that it is vague.  Notwithstanding these objections, Plaintiffs state that as described

23  in the Complaint, they allege that the following statements made or documents

24  issued and/or signed by Sieracki (with respect to statements particularized in the

25  Complaint) were false and misleading:

26       a.    Countrywide's Form 10-Q/A filed on April 25, 2005 for its first

27  quarter 2004 results, Complaint ¶¶ 698-699;

28  

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)      6

277

b.      Statements made by Sieracki during an April 26, 2005 conference call regarding Countrywide's first quarter 2005 results, *id.* ¶¶ 702-706;

c.      Countrywide's Form 10-Q filed on May 9, 2005 reporting results for its first quarter of 2005, *id.* ¶¶ 707-717;

d.      Countrywide's Form 10-Q/A filed on May 17, 2005 for its second quarter 2004 results, *id.* ¶¶ 718-719;

e.      Countrywide's Form 10-Q/A filed on May 17, 2005 for its third quarter 2004 results, *id.* ¶¶ 720-721;

f.      Statements made by Sieracki during a July 26, 2005 conference call regarding Countrywide's second quarter 2005 results, *id.* ¶ 740;

g.      Countrywide's Form 10-Q filed on August 8, 2005, reporting results for its second quarter 2005, *id.* ¶¶ 744-754;

h.      Countrywide's Form 10-Q filed on November 8, 2005 reporting results for its third quarter of 2005, *id.* ¶¶ 764-774;

i.      Countrywide's Shelf Registration Statement on Form S-3ASR and prospectus dated February 9, 2006 and subsequent prospectus supplements with respect to the sale of its Series B Medium Term Notes (including documents incorporated by reference therein and "future filings" with the SEC under the Exchange Act after February 9, 2006 up until August 6, 2007, the date of the last offering of Series B Medium-Term Notes, namely the Company's 2005 Form 10-K, the April 27, 2006 Form 8-K, the first quarter 2006 Form 10-Q, the July 25, 2006 Form 8-K, the second quarter 2006 Form 10-Q, the October 24, 2006 Form 8-K, the third quarter 2006 Form 10-Q, the January 30, 2007 Form 8-K, the 2006 Form 10-K, the April 26, 2007 Form 8-K, and the first quarter 2007 Form 10-Q), *id.* ¶¶ 934-939;

j.      Countrywide's Shelf Registration Statement on Form-3ASR and prospectus dated February 9, 2006, and prospectus supplements with respect to the

278

1   sale of its 6.25% Subordinated Notes due May 15, 2016 (including documents

2   incorporated by reference therein and "future filings" with the SEC under the

3   Exchange Act after February 9, 2006 up until May 11, 2006, the date of the

4   offering of 6.25% Notes, namely the Company's 2005 Form 10-K, the April 27,

5   2006 Form 8-K, and the first quarter 2006 Form 10-Q), *id.* ¶¶ 940-945;

6       k.      Countrywide's Registration Statement on Form S-3 dated February 9,

7   2006 and prospectus supplements with respect to its 7% Capital Securities

8   (including documents incorporated by reference therein), *id.* ¶¶ 946-951;

9       l.      Countrywide's Form 10-K filed on March 1, 2006 reporting its 2005

10  year-end results, *id.* ¶¶ 781-794;

11      m.      Countrywide's Form 10-Q filed on May 10, 2006, reporting results for

12  its first quarter of 2006, *id.* ¶¶ 808-819;

13      n.      Countrywide's Form 10-Q filed on August 7, 2006 reporting results

14  for its second quarter of 2006, *id.* ¶¶ 830-841;

15      o.      Statements made by Sieracki during a September 13, 2006 Fixed

16  Income Investor Forum, *id.* ¶ 849;

17      p.      Countrywide's Form 10-Q filed on November 7, 2006 reporting

18  results for its third quarter of 2006, *id.* ¶¶ 860-872;

19      q.      Countrywide's Form 10-K filed on March 1, 2007 reporting results

20  for its year-end 2006, *id.* ¶¶ 880-894;

21      r.      Statements made by Sieracki at a March 6, 2007 Raymond James

22  Investor Conference, *id.* ¶¶ 895-897;

23      s.      Countrywide's Form 10-Q filed on May 9, 2007, reporting results for

24  its first quarter of 2007, *id.* ¶¶ 916-928;

25      t.      Statements made by Sieracki in an August 2, 2007 press release, *id.* ¶¶

26  967-968;

27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                              8

279

1   u.   Countrywide's Form 10-Q filed on August 9, 2007 reporting results

2   for its second quarter of 2007, *id.* ¶¶ 969-977;

3   v.   Statements made by Sieracki during an October 26, 2007 conference

4   call regarding Countrywide's third quarter 2007 results, *id.* ¶¶ 1016-1017; and

5   w.   Countrywide's Form 10-Q filed on November 9, 2007, reporting

6   results with respect to its third quarter of 2007, *id.* ¶¶ 1028-1035.

7

8   **INTERROGATORY NO. 2:**

9   For each statement YOU identified in response to Interrogatory Number 1,
10  describe in detail the basis for YOUR allegation that the statement is false and/or
    misleading.

11  **ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 2:**

12  Plaintiffs incorporate by reference their General Objections.  Plaintiffs

13  further object that because this contention interrogatory seeks all facts, it is

14  overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

15  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

16  Interrogatory to the extent that it seeks information equally available to Defendant

17  Sambol, or information to which he has equal or greater access.  Plaintiffs further

18  object to this Interrogatory to the extent that it seeks information not in their

19  possession, custody, or control.  Plaintiffs further object to this Interrogatory to the

20  extent it seeks disclosure of information protected by the attorney-client privilege,

21  the attorney work product doctrine, the joint prosecution privilege, or any other

22  applicable privilege, protection, or immunity.  Plaintiffs' Answer does not

23  necessarily provide every supporting or otherwise relevant fact that is in the

24  evidentiary record as it currently stands, nor does this Answer necessarily provide

25  every supporting or otherwise relevant fact Plaintiffs may present in opposition to

26  or in favor of a summary judgment motion, or at the trial of this action.

27

28

1       Subject to and without waiving the foregoing general and specific

2  objections, Plaintiffs answer as follows:

3  **I.    LOAN QUALITY**

4       As reflected in the response to Interrogatory No. 1, Defendant Sieracki made

5  numerous public statements throughout the Class Period, either orally or in writing,

6  attesting to the high quality of the loans both originated by Countrywide and

7  retained in the bank's portfolio.  For example, the Form 10-K Annual Reports for

8  the years 2003, 2004, and 2006 all contain statements about how Countrywide's

9  underwriting guidelines are "designed to produce high quality loans."  Also, at the

10  September 13, 2006 Fixed Income Investor Forum, Sieracki maintained that the

11  protocols relative to assuring loan quality were not expected to change, despite

12  growing volumes, that Countrywide did not have an "aggressive risk appetite and

13  that the Company had no intention of changing that appetite.  These statements

14  were false and misleading because Countrywide drastically expanded its loan

15  origination guidelines over the course of the Class Period, giving it the broadest

16  product menu in the mortgage lending industry.  Further, Countrywide granted

17  significantly increased exceptions to those already expanded guidelines, and

18  originated a substantial amount of loans with layered risk characteristics.  The

19  result of Countrywide's expanded loan origination guidelines and exceptions was a

20  substantial increase in the credit risk of loans originated and a deterioration of the

21  quality of those loans.  These facts, and the extent to which the probabilities of

22  default and loss were increased as a result, were never disclosed to investors.

23      **A.    Expansion of Underwriting
         Guidelines and the Matching Strategy**

24

25       In June 2005, Defendant Gissinger emphasized the need for "VELOCITY"

    and for Countrywide to have the broadest guidelines in the industry, declaring:

26

27          The waterfall for proprietary products is as follows:

28

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.
Lead Case No. CV 07-05295 MRP (MANx)                                    10

281

> Our Correspondent channel should have everything
> available to other legitimate Correspondent lenders in the
> marketplace plus a little more
>
> Our Wholesale channel should have everything available
> to CLD and other legitimate Wholesale lenders in the
> marketplace plus a little more
>
> Our Retail channels should have everything available to
> WLD and other legitimate Retail lenders in the
> marketplace plus a little more.

June 13, 2005 e-mail at CFCP006629535.

Despite the significance of "legitimate" lenders in Gissinger's "Guiding Principles," Countrywide had no "hard and firm" definition of a "legitimate" lender or competitor for purposes of implementing the matching strategy. Gissinger Dep. at 59:21-23.  Mark Elbaum, CFO of Mortgage Banking, who reported to Gissinger, initially testified that Wells Fargo, Chase, Citibank and Washington Mutual were the companies that Countrywide "followed."  Elbaum Dep. at 34:20-22.  However, when shown a chart of competitors whose guidelines Countrywide matched, which was included in a February 13, 2007 document titled "Product Leadership Business Review" (Ex. 402 at CFCP004436674), Elbaum admitted that Countrywide's matched the guidelines of much less established companies in the subprime market, such as New Century, Argent and Fremont. Elbaum Dep. at 75:3-20.  In addition, Frank Aguilera, Managing Director of Portfolio Credit Risk Management, testified that Countrywide's "primary" competitors in the subprime market were Ames, New Century, Ameriquest and Long Beach.  Aguilera Dep. at 95:15-22.

The willingness of Countrywide to match "any" lender, not just "legitimate" ones, was pervasive throughout the Company.  McMurray expressed his concern that Countrywide was willing to match "any" lender, not just "legitimate" ones, to

1   Christian Ingerslev, Executive Vice President of Product management.  McMurray

2   stated that in a strategic planning meeting, production heads stated that they

3   believed the competitor match was without limitation.  "In other words, it was not

4   qualified or constrained by such competitor being legitimate."  Ex. 483 at

5   CFC2007I313734.  Furthermore, McMurray expressed his concern at matching

6   less than legitimate lenders to Countrywide management at the highest levels.  In

7   an e-mail to Sambol, McMurray wrote that he was concerned that there was not a

8   "consistent definition of primary competitor[s]" submitted in a matching request.

9   McMurray cited competitors such as Aames (23d in volume), Fieldstone (26th),

10  and Sebring (46th).  Ex. 675 at CFC2007I088611.  When asked in deposition if he

11  believed that the lenders cited by McMurray were "legitimate," Sambol testified

12  that he did not recognize these competitors as "very legitimate competitors in the

13  market," but that he would not have had "any aversion" if the production people

14  sought to match these fringe players in the market.  Sambol Dep. at 209:3-14.

15      The strategy set forth in the above June 13, 2005 e-mail by Gissinger was

16  sometimes known as the "matching strategy," or "supermarket strategy."  It was

17  the key driver of this aggressive expansion of guidelines.  The execution of the

18  matching strategy began with the Product Leadership group, which was tasked

19  with identifying "gaps" in the marketplace between Countrywide's products,

20  pricing, or guidelines, and those of its competitors.  Kuelbs Dep. at 28:3-29:9.

21      Because of the matching strategy, the Company was continuously making

22  product adjustments to keep up with the market.  With respect to underwriting

23  guidelines, the adjustments were almost always expansions rather than

24  contractions.  Kuelbs Dep. at 144:14-145:19.  Mindy Levine, a product analyst,

25  testified that Countrywide kept relaxing underwriting guidelines over the course of

26  the Class Period, specifically by lowering the minimum FICO score required for

27  approval of certain loan programs.  Levine Dep. at 163:11-20.  According to Nick

28

283

1   Krsnich, Countrywide's Chief Investment Officer from 2004 to 2006, the quality

2   of the Company's subprime loans deteriorated because of lower FICO scores,

3   higher loan-to-value (LTV) ratios, and less borrower income/asset documentation.

4   Krsnich Dep. at 231:6-232:8.  Brian Kuelbs, Managing Director of Products and

5   Pricing from April 2005 to mid-2006, could recall only one instance in which his

6   group supported contracting the guidelines of any loan program—and, as explained

7   below, that proposed change was rejected by Sambol.  Kuelbs Dep. at 173:6-174:2.

8       In June 2005, McMurray told Sambol: "Because the matching process

9   includes comparisons to a variety of lenders, our match will be a composite of the

10  outer boundaries offered across multiple lenders.  For example, First Franklin is

11  used as a comparison for some guidelines where they are more aggressive (e.g.,

12  high LTV/CLTV) and not used where they are less aggressive (e.g., stated doc

13  loans).  As a result, our composite guidelines are likely among the most aggressive

14  in the industry."  Ex. 718 at CFC2007I088607; McMurray Dep. at 247:3-23.

15  Sambol agreed with this statement.  Sambol Dep. at 179:13-180:24.

16      On June 24, 2005, McMurray, criticized and expressed concerns to

17  Gissinger and Sambol regarding Countrywide's matching strategy.  McMurray

18  warned Gissinger and Sambol that (1) because of Countrywide's "strategy to have

19  the widest product line in the industry, we are clearly out on the 'frontier' in many

20  areas" and that there would be "high expected default rates and losses;" (2) it was

21  difficult to verify mitigants and stipulations required by competitors in their

22  subprime programs and that in some cases Countrywide was simply unable to

23  match those mitigants; (3) as part of its matching strategy, Countrywide was

24  lowering its guidelines to match "lesser players" in the marketplace; and (4) as a

25  result of the above, Countrywide would have a "composite match" across multiple

26  lenders which would make Countrywide the most aggressive lender in the

27

28

1   marketplace.  Ex. 1721 at CFC2007I088597-98.  McMurray went on to note that

2   the frontier had "high expected default rates and losses."  *Id.*

3          To demonstrate his point that Countrywide was "on the frontier," McMurray

4   wrote to Gissinger and Sambol that 35% of Countrywide's CMD and WLD

5   purchase business had CLTVs of 100% and Countrywide had a risk position in the

6   70% of those 100% CLTV loans that were either subprime or HELOCs.  *Id.* at

7   CFC2007I088597.

8          McMurray reiterated his concern to Sambol in a February 2007 e-mail:

9   "Since we match numerous competitors over an extended time frame, our menu

10  ends up being a composite of the most aggressive offerings in the market."  Ex.

11  808 at CFC2007B062763.

12         In a February 2005 e-mail, Sambol stated that Countrywide was "willing to

13  price virtually any loan that we reasonably believe we could sell/securitize without

14  losing money, even if other lenders can't or won't do the deal."  Ex. 1538 at

15  CFCP006172202.  This was known as "risk-based pricing," meaning that as risk

16  increased, a higher price (interest rate) would be collected or charged in order to

17  compensate for the risk, thus justifying the expansion of guidelines.  However, this

18  so-called strategy could not work because some risk could not be priced to receive

19  proper compensation.  And, a higher interest rate would never provide

20  compensation for loans that were pre-paid or defaulted since in those cases, the

21  payment of interest stopped.  McMurray SEC Dep. at 380:25-384:15.

22         McMurray testified that successfully executing the matching strategy

23  required "understand[ing] what the other lenders were truly offering, including

24  some of the nuances associated with their offerings."  He stated that Countrywide

25  was not doing this adequately.  McMurray Dep. at 248:3-19.  In a January 2007

26  e-mail, McMurray told Gissinger that it was "absolutely crucial that the competitor

27  guideline evaluations be thorough and accurate given our 'matching' strategy."

28

1    However, McMurray said, it was a "struggle . . . getting accurate and complete"

2    evaluations.  Ex. 1548 at CFC2007I167630.  One month later, McMurray told

3    Sambol "[o]ur ability to thoroughly understand and/or precisely match what

4    competitors are offering has been less than perfect."  Ex. 808 at

5    CFC2007B062763.  In addition, McMurray explains that although Sambol stated

6    that Countrywide would only match programs by "primary" players, there was not

7    a consistent definition of "primary" player.  Ex. 675 at CFC2007I088611.

8         An April 2006 presentation to the Corporate Credit Risk Committee

9    indicated that "Countrywide Subprime has followed the market's product

10   expansion without adoption of the more cautious credit fundamentals."  Ex. 1547

11   at CFCP006028122.

12        McMurray's concerns about Countrywide's fundamental business model and

13   philosophy (which included the matching strategy) were so profound that he

14   "couldn't imagine" that the end of the ongoing industry expansion of guidelines

15   would have anything but an unhappy ending for Countrywide, and that there could

16   be a "sudden, abrupt, and severe" down cycle.  McMurray Dep. at 400:3-401:8.

17        At a November 1, 2006 high-level "Product Summit" that Gissinger

18   attended, McMurray expressed his doubts about Countrywide's matching strategy,

19   arguing that it would lead to Countrywide having the broadest composite

20   guidelines in the industry, which would effectively cede control of the Company's

21   credit policy to competitors and secondary market purchasers.  Nov. 2, 2006

22   McMurray e-mail at CFC2007B012332-33.

23        On November 2, 2006, McMurray sent an e-mail to Chief Investment

24   Officer Kevin Bartlett, which Bartlett forwarded to Sambol, stating that the

25   matching strategy had caused Countrywide to cede its underwriting standards to

26   the most aggressive lenders in the market.  In the e-mail, McMurray asked: "Do we

27   want to effectively cede our policy and is this approach 'saleable' from a risk

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    15

286

1   perspective to those constituents who may worry about our risk profile?"  Nov. 2,

2   2006 e-mail at CFC2007B012333.

3       In a January 2007 e-mail, McMurray advised Gissinger that "[i]f we're truly

4   looking to match what other lenders are doing, we should also match (or at least

5   address) the risk offsets."  Ex. 1548 at CFC2007I167630.

6       In a February 11, 2007 e-mail to Sambol, McMurray noted that the

7   production divisions continued to advocate for, and operated pursuant to, an

8   approach based upon the matching strategy alone, and repeated his concern that the

9   strategy would cause Countrywide's guidelines to be a composite of the riskiest

10   offerings in the market.  Additionally, McMurray warned: "I doubt this approach

11   would play well with regulators, investors, rating agencies etc.  To some, this

12   approach might seem like we've simply ceded our risk standards and balance sheet

13   to whoever has the most liberal guidelines."  Ex. 808 at CFC2007B062765.

14       **B.**    **Exception Loans Magnified Countrywide's Credit Risk**

15       Sieracki consistently touted the high quality of the loans that Countrywide

16   originated.  However, he failed to disclose the extent to which loans were being

17   originated with exceptions to underwriting guidelines and the extent to which those

18   exceptions magnified the risk of default by borrowers and loss to Countrywide.  In

19   May 2005, McMurray informed Sambol that developing economic conditions

20   required Countrywide to revise its exception loan policies: "Given the expansion in

21   guidelines and growing likelihood that the real estate market will cool, this seems

22   like an appropriate juncture to revisit our approach to exceptions . . . ."  Ex. 1543 at

23   CFC2007I081829.  He also warned that Countrywide's rampant exceptions would

24   undermine its strategy of selling off credit risk in the secondary market: "[W]e will

25   see higher rates of default on the riskier transactions and third parties coming back

26   to us seeking a repurchase or indemnification based on an alleged [representations

27   & warranties] breach as the rationale."  *Id.* at CFC2007I081830.  He questioned

28

1  whether the various parts of the Company (Production Divisions, Bank, Credit,
2  etc.) were are aligned on key SLD/exception issues.  *Id.*  Finally, McMurray told
3  Sambol that Countrywide's pricing models had some "inherent limitations" that
4  were amplified when used to price exceptions.  He explained that their pricing
5  generally reflected the mean average outcome.  However, in instances where the
6  outcomes were worse than the mean, Countrywide's pricing would be inadequate.
7  Further, McMurray pointed out that their data was limited because it did not
8  include high-stress economic environments, and the estimated models used to price
9  transactions were beyond the scope of the data.  *Id.*

10         In June 2005, the exception rate for subprime loans at Countrywide was 37%
11  for purchase loans[1] and 21% for stated income loans.  August 2006 B/C Exceptions
12  Report at CFC2007C503827.  By August 2006, the exception rate for purchase
13  loans remained 37%, while the exception rate for stated income loans increased to
14  27%.  *Id.*  During the same period, the exception rate for high LTV subprime loans
15  was 29%.  *Id.*  Also in June 2005, in the Consumer Marketing Division ("CMD"),
16  the retail channel, 15% of all loans were originated with underwriting exceptions,
17  including 70% of those of over $1 million.  Ex. 505 at CFC2007G583523.
18  Companywide, for loans greater than $650,000, those underwritten with exceptions
19  were performing at a rate that was 2.8 times worse overall.  Ex. 505 at
20  CFC2007G583524.

21         While Countrywide published underwriting guidelines for its various
22  branches, which were significantly expanded during the Class Period (Sambol
23  Dep. at 462:9-24), it also established far more expanded "shadow" guidelines that
24  were unpublished, which the divisional Structured Loan Desks (SLDs) used to

25
26
27  _____
   [1] "Purchase loans" were loans made to purchase residences rather than to
28  refinance.

grant exceptions to the published guidelines.  Feb. 23, 2005 Rossi e-mail at CFCP000123153.

Further, even if a requested exception did not fit within the shadow guidelines, the SLD provided exception loans based solely on the criteria of "salability" – whether the loan could be sold on the secondary mortgage market – without reference to credit risk criteria.  Ex. 1539 at CFCP002905199.  When asked about this, Sambol answered: "Yes, that was generally my view of . . . the SLD . . . throughout my . . . tenure."  Sambol Dep. at 79:23-80:16.

In an e-mail dated June 1, 2006, the Secondary Marketing department noted that 60% of Countrywide's Expanded Criteria programs were exceptions to guidelines and 33% of "Core" nonconforming programs were exceptions.  June 7, 2006 e-mail at CFCP006002404.  Kevin Bartlett's response was: "I'm stunned."  *Id.*  McMurray seconded this position, confirming he knew exceptions were high, but that was much higher then he expected.  *Id.*

A year later, McMurray was still concerned about exceptions being granted to "prime" loans.  In an e-mail to Gissinger, dated June 25, 2007, McMurray wrote: "Based upon really poor, and what appears to be worsening performance, I'm recommending that we severely curtail or eliminate loan exceptions in the following categories: 1st and 2nd Liens with CLTV's of 95% and higher; and 1st Liens with balances of $1 million or more."  June 25, 2007 McMurray e-mail at CFCP000851192.

By 2007, Countrywide's exception loan production had grown to alarming levels, particularly with respect to high-risk loans.  In February, Credit Risk Management reported that there were "significant levels of exceptions (solely based on fico scores) under all high risk programs"—the high loan-to-value ("LTV") single loans program and the combo loan program (e.g., 80/20 loans).  Ex. 319 at CFCP000623519.  The subprime exception levels at Full Spectrum

1  Lending (FSL)[2] ***"exceed[ed] any imaginable comfort level."*** *Id.* (emphasis

2  added).  Across all divisions, exceptions accounted for 25% of loans with 95%

3  LTV, 37% of loans with 100% LTV, and 13% of "combo loans." *Id.*

4      An e-mail dated May 25, 2007 stated: "The exception capacity of SLD has

5  created loans that simply do not exist elsewhere in the marketplace and provide the

6  ultimate control for our originators."  Ex. 1540 at CFC2007A912519.

## C.  The Layered Risk Characteristics of the Loans Magnified the Credit Risk to Countrywide

9      As shown below, Countrywide drastically increased the number of loans

10 originated with layered risk attributes[3] over the course of the Class Period.  This

11 fact was never disclosed to investors.

12     Countrywide policy required layered risk loan products to have mitigating

13 factors in order to offset the increased credit risk and ensure repayment.  However,

14 it became clear as early as 2004 that layered risk loans were often being funded

15 without those mitigating factors.  In a February 5, 2004 e-mail, McMurray stated

16 with respect a very high-risk No Income, No Asset (NINA) loan,[4] "most of the

17 exceptions we're seeing didn't have offsets – they were simply going to higher

18 LTVs and/or lower FICOs."  Ex. 257 at CFCP001395354.  McMurray noted this

19 trend in connection with all of Countrywide's loans to Keith McLaughlin, then the

---

21 [2] FSL was Countrywide's retail sub-prime division although sub-prime loans could also be granted through outside brokers and others.

22 [3] McMurray explained "layered risk": " So an example would be the combination of a lot of – I shouldn't say a lot – of multiple risk factors in one loan. So in this last cycle across the industry one – one of the striking things at least to me was the amount of high-leverage loans that were done, including  hundred percent loan-to-value or combined loan-to-value loans, and so – so one of the phenomena that we observed was the combination of a high-leverage transaction [with] other risk factors, such as low documentation, perhaps borrowers with a weaker credit history, that was – that was beyond combinations that had been offered historically.  So that . . . would be [an] important example."  McMurray Dep. at 88:6-89:8.

27 [4] A NINA loan is one in which a borrower provides no income or asset information.

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                    19

290

1    Chief Financial Officer, on September 9, 2004, stating "[w]e're seeing more loans

2    with layered risk factors (e.g., high CLTV + low documentation + weak FICO +

3    ...)." Ex. 810 at CFCP005887985.

4         This concern was shared by the highest levels of management at

5    Countrywide.  For example, eight days earlier on September 1, 2004, Angelo

6    Mozilo e-mailed Stan Kurland, stating "I fully understand that our residuals have

7    been modeled on a conservative basis but it is only conservative based upon

8    historical performances.  ***But the type of loans currently being originated***

9    ***combined with the unprecedented stretching of all aspects of credit standards***

10   ***could cause a bump in the road that could bring with it catastrophic***

11   ***consequences.***" Ex. 274 at CFCP000916353 (emphasis added).

12        The dangers of risk layering compounded as Countrywide significantly

13   loosened its underwriting practices over the course of the Class Period.  A

14   September 2005 Countrywide FSL Credit Risk Presentation stated that "[t]he

15   number of BC loans with multiple exceptions represents 24% of total BC loans

16   with exceptions." Sept. 2005 presentation at CFCP005893805.  A September 26,

17   2006 document outlining the proposed effects of the *Interagency Guidance on*

18   *Nontraditional Mortgage Products* on Countrywide's business states that "[r]isk

19   layering should demonstrate mitigating factors supporting repayment capacity.

20   Higher pricing does not replace the need for sound underwriting."  The potential

21   impact of following such guidance reads as follows: ***"Needs further review,***

22   ***however recent guideline expansions and exception practices have nearly maxed***

23   ***out all risk layers.  Could likely result in guideline tightening and resulting***

24   ***decrease of eligible borrowers."*** Sept. 26, 2006 chart at CFCP005877730

25   (emphasis added).

26        In an October 11, 2005 e-mail, Christian Ingerslev detailed comparative

27   statistics regarding risk layering within the Fast & Easy program, a reduced

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                          20

291

documentation program offered by Countrywide.  He stated "Risk layering compounds the F & E hazard ratios to a much greater degree than Full Doc, thus further expansion would very likely lead to additional deterioration . . . 2004 F&E Loans seasoned 9 months are performing about 75% worse than 2003 (ever-60 day rates)."  Oct. 11, 2005 e-mail at CFCP004512907.  This effect was not limited to loans within the Fast & Easy program.

A December 11, 2006 Corporate Credit Risk Committee presentation set out the effects of layered risk on HELOC performance.  It showed the delinquency rate for HELOC loans with 100% LTV and reduced documentation which had seasoned for 12 months and had ever been 90 days or more delinquent as 4.10%, compared to 2.85% for comparable HELOCs with 95% LTV, and 0.83% for all HELOCs.  Ex. 827 at CFCP006242696.

In a January 12, 2007 memorandum entitled "Subprime Products Recommended Product Offering Changes—2007," Frank Aguilera, Senior VP and Product Manager of Sub-Prime Mortgages, stated "2006 Production is substantially underperforming compared to prior years. ***Much of this deterioration can be attributed to High LTV layered risk product.***"  Ex. 258 at CFC2007I167121 (emphasis added).  The March 12, 2007 CFC Corporate Credit Risk committee Presentation showed HELOC layered risk default performance almost 3 times higher than what models predicted.  Ex. 658 at CFC2007E748520.  A June 11, 2007 presentation entitled "Proposed HELOC Default Risk Model" explained that "[p]erformance multiple of loans with layered risk may tend to compress over time . . . [r]ecent vintages (2004+) include loans with significant layered risk . . . ***[w]ithin the model, risk attributes are multiplicative.***"  Ex. 286 at CFCP000852477 (emphasis added).  A June 14, 2007 "Manufacturing Quality" presentation e-mailed from John McMurray to Jack Schakett charted the exponential increase in delinquencies when risks are layered, and stated: "[t]he

292

1    delinquency rates are astoundingly high so early out of the gate."  June 14, 2007

2    Presentation at CFC2007I248687-88.

3          In July 2007, Vijay LaLa, Managing Director, Product Development and

4    Support, stated that Countrywide had become the "sole player" offering loans with

5    90% LTV and stated documentation with FICO scores as low as 580 FICO.  July

6    23, 2007 LaLa e-mail at CFCP001511860.

7          Ingerslev testified that "during my tenure at Countrywide, the amount of that

8    layered risk from 2002 to 2008 grew" and "there was more layered risk done every

9    year between 2004 and 2008."  Ingerslev Dep. at 111:1-20.

10         **D.    Loans Held for Investment**

11         During the Class Period there were increasingly risky loans being held for

12   investment as assets on the balance sheet of the Bank.  In March 2005, Garcia

13   complained to Mozilo about Sambol's quest to gain more influence over use of the

14   bank's balance sheet, "which he seeks to use to fund products with risks or pricing

15   not supported by the secondary market . . . even at . . . potentially negative returns

16   to the Bank."  Ex. 1643 at CFC2007H067579.

17         **E.    100% Financing (80/20 Loans) and HSBC**

18         In November 2005, Josh Adler, Countrywide's Executive Vice President of

19   Structured Finance, forwarded to Gissinger and others a report stating that the

20   secondary market for subprime, fixed-rate seconds

21              has continued to decline . . . .  The majority of the Street[5]
22              has made it clear that they do not want this collateral . . . .
23              Because this market is limited to essentially 1 investor
24              [HSBC], there are loans we are originating that are
                unsaleable.

25

26

27   ───────────────
       [5] The "Street" referred to Wall Street.  Gissinger Dep. at 239:20-21.
28

1   Ex. 1725 at CFCP001671315-16.  In the first quarter of 2006, HSBC began to

2   contractually "put back" these loans to Countrywide, contending they were

3   defective.  July 6, 2006 McMurray e-mail at CFC2007I147272.  Countrywide had

4   agreed to a contract granting HSBC the right to put back loans based upon post-

5   closing due diligence.  McMurray Dep. at 380:21-382:5.  Essentially, because as

6   noted by Adler in Exhibit 1725 (cited above) there were no other purchasers for

7   these loans, Countrywide had no choice but to agree to a sale allowing HSBC the

8   right to see if the loans would perform well, and if not, to seek grounds for a

9   refund.  For HSBC, this was a no-risk sale.  For Countrywide, it was very high

10  risk.

11       In an April 2006 e-mail to Sambol, Mozilo, while referring to the loans

12  which had been sold to HSBC stated: "In all of my years in the business I have

13  never seen a more toxic pr[o]duct.  It's not only subordinated [sic] to the first but

14  the first is sub-prime.  In addition the fico's are below 600, below 500 and some

15  below 400 compounded by the fact these are 100% loans which must always be

16  written off in the event of foreclosure. . . .  No margin, no matter how high, could

17  ever cover the inevitable losses on loans with ficos un[d]er 600.  Whether you

18  consider this business milk or not I am prepared to go without milk irrespective of

19  the consequences to our production."  Ex. 1295 at CFC2007B125324.  Sambol

20  pushed back, stating that "these loans are pervasively offered in the marketplace by

21  virtually every relevant competitor of ours."  *Id.*  Mozilo responded: "There was a

22  time when Savings and Loans [w]ere doing things because their competitors were

23  doing it.  They all went broke.  We should not be involved in programs or products

24  simply because our competitors have them. . . ."  *Id.*  When asked about these

25  e-mails, Mozilo testified: "If the only reason why you offered a product . . . is

26  because somebody else was doing it, that's a dangerous game to play."  Mozilo

27  SEC Dep. at 545:23-546:17.

28

294

1    In an April 13, 2006 e-mail to Sieracki, Mozilo recognized the validity of

2  HSBC's claims that representations and warranties concerning the underwriting of

3  these loans by Countrywide were breached, stating: "The loans were originated

4  through our channels with serious disregard for process, compliance with

5  guidelines and irresponsible behavior relative to meeting timelines.  As a result we

6  delivered loans with deficient documentation, did not respond timely in correcting

7  those deficiencies which resulted in extreme time delays thereby permitting loans

8  to have a greater chance for early payment default."  Ex. 1121 at CFC2007B00890.

9  "I have personally observed a serious lack of compliance within our origination

10  system as it relates to documentation and generally a deteriation [sic] in the quality

11  of loans originated versus the pricing of those loan [sic]."

12    Mozilo testified that "in this kind of a product, if you vary from the

13  guidelines, whether it be relative to analyzing these – the ability of these people to

14  pay or in documentation, it becomes very toxic."  Mozilo Dep. at 173:22-174:22.

15  He also testified that there were good reasons for his concerns about the HSBC

16  transaction.  *Id.* at 174:23-175:2.

17  **II.    PAY OPTION ARMS**

18    Throughout the Class Period, Sieracki made statements in Countrywide's

19  periodic filings that Pay Option loans were a high quality product, marketed to

20  high quality, sophisticated borrowers with high FICO scores.  These statements

21  were false and misleading because Countrywide originated the Pay Option ARM to

22  borrowers with blemished credit histories in order to achieve its 30% market share

23  goal.

24    **A.    Internal Concerns About Pay Option ARMs**

25    Contrary to Countrywide's public statements, pay option loans were not

26  being marketed to sophisticated borrowers who understood the risk of making the

27  minimum payment.  In a July 6, 2005 e-mail, Mozilo stated to Sambol that he was

28

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                    24

295

"becoming increasingly concerned about the neg am [negative amortization] component of the Pay Option loan."  Ex. 1287 at CFC2007I060858.  Mozilo testified that he had concerns about the negative amortization aspect of the Pay Option loans through 2007 and that he expressed those concerns.  Mozilo Dep. at 112:25-113:7.

In August 2005, Mozilo advised Dan Tarman, Managing Director, Corporate Communications and Brand Marketing, that Countrywide Bank was implementing policy changes regarding Pay Option ARM origination, stating that *"In my opinion there is nothing intrinsically wrong with pay option loans however there is something very wrong as to whom the product is being sold.*  Third party originators such as mortgage brokers are utilizing the loan to squeeze borrowers into homes without regard to the future consequences to that borrower, and speculators are using it as an arbitrage product.  These events could lead to catastrophic consequences which would be exacerbated if real estate values begin to decline."  Aug. 3, 2005 e-mail at CFCP001929490.

Also in February 2006, an analysis of borrower behavior revealed that minimum payment selection, and thus negative amortization, was "highly correlated" to FICO and CLTV.  Ex. 1560 at CFC2007I309740.  Specifically, 72% of borrowers with FICOs less than 660 made the minimum payment, as did 70% of those with CLTVs greater than 80%.  *Id.* at CFC2007I309742.  Further, in May 2006, Rossi reported that a "very large percentage" of reduced documentation Pay Option borrowers misstated their incomes by 10% or more.  Ex. 1562 at CFCP000001353.  Countrywide continued to issue Pay Option loans to borrowers with FICO scores less than 660 and/or combined loan-to-value ratios ("CLTV") greater than 80%.  *E.g.,* JPM-ARG 00000805.  For this reason, throughout 2006 and 2007, the delinquency rate for Pay Option loans continued to rise.  *E.g.,* JPM-ARG 00000813.

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                      25

296

1    In an April 3, 2006 e-mail, Mozilo wrote: "This is important data that could
2    portend serious problems with this product.  Since over 70% have opted to make
3    the lower payment it appears that it is just a matter of time that we will be faced
4    with a substantial amount of resets and therefore much higher delinquencies.  We
5    must limit this product to high ficos otherwise we could face both financial and
6    regulatory consequences."  Ex. 1290 at CFC2007B008722.
7    Countrywide conducted a pilot program in 2006 that raised the starting
8    interest rate ("start rate") for these loans to 1.25% for 30-year loans and 1.8% for
9    40-year loans.  Ex. 1560 at CFC2007I309740.  Later that year, the start rate was
10   restored to 1% as to certain of the Pay Option ARMs, including all full
11   documentation loans with CLTVs of 90% and certain reduced documentation loans
12   with CLTVs over 80%.  Ex. 1561 at CFCP002372326.  McMurray was not
13   consulted prior to restoring the minimum rate on those loans, and when he learned
14   about it, he told senior executives that it was a "really bad idea."  Ex. 807 at
15   CFC2007I149244.  Bartlett testified that Sambol and Gissinger argued for
16   restoring the start rate because Countrywide was purportedly losing business, so it
17   "couldn't sustain the increase."  Bartlett SEC Dep. at 200:15-201:18.  When asked
18   about the decision to restore the start rate, Sambol testified that "I would have been
19   consulted and would have been okay with it."  Sambol Dep. at 393:24-394:17.
20   Once again, loan production prevailed over sound credit risk management.
21   In a June 1, 2006, Mozilo expressed concern that the timing of rate resets
22   was going to accelerate and that payments would be substantially higher than the
23   borrowers expected.  Ex. 1297 at CFC2007C583091.  Mozilo stated in the same
24   e-mail that "[w]e have at least 20% or more of the Bank's pay option loans at a
25   fico of 700 or less.  It is clear that the lower fico borrowers are going to experience
26   a payment shock which is going to be difficult if not impossible for them to
27
28

297

1    manage." *Id.* Sambol testified that he had no reason to believe Mozilo was

2    incorrect regarding the numbers he quoted. Sambol Dep. at 408:1-4.

3            Moreover, Mozilo stated that: "In a discussion with both Stan and Dave it

4    came to my attention that the majority of pay options being originated by us, both

5    wholesale and retail, are based upon stated income. There is also some evidence

6    that the information that the borrower is providing us relative to their income does

7    not match up with IRS records." Ex. 1297 at CFC2007C583091. Mozilo also

8    stated that it was evident that certain things would happen relative to the Bank's

9    balance sheet: that the time of the reset was going to accelerate and that the reset

10   payments would be higher than the borrower expected. *Id.* ***"Since we know or***

11   ***can reliably predict*** what's going to happen in the next couple of years it is

12   imperative that we address the issue now." *Id.* (emphasis added). Mozilo testified

13   that he was concerned about the fact that a majority of the Pay Options at the Bank

14   were being originated upon stated income, because there is a greater risk of default

15   in that case. Mozilo SEC Dep. at 341:5-342:4.

16           In an e-mail with the subject "PayOption Data requested by Angelo—

17   URGENT," Clifford Rossi, the Bank's Chief Credit Risk Officer, reported "the

18   ***fact that a very large percentage*** of reduced doc [Pay Option borrowers] overstate

19   their incomes by 10% or more is of some concern." Ex. 1562 at CFCP000001353

20   (emphasis added). Indeed, in early June, Rossi distributed a report summarizing

21   recently conducted Form 4506 audits. Rossi concluded from the information that

22   the "findings level for the Random audits would suggest that approximately 40%

23   of the Bank's reduced documentation loans in the portfolio could potentially have

24   income overstated by more than 10% and a significant percent of those loans

25   would have income overstated by 50% or more." June 2, 2006 Rossi e-mail at

26   CFC2007D814286. Sambol testified that Countrywide performed after-the-fact

27   spot-checking of borrower information against IRS records and that at one

28

1    committee meeting he attended sometime in 2006, he learned that spot-checks

2    revealed a significant rate of disparity between stated income and income reported

3    to the IRS, perhaps around 30%.  Sambol SEC Dep. at 81:14-82:13.

4         Ninety-seven percent (97%) of Countrywide's Suspicious Activity Report

5    ("SAR") filings were attributed to stated income by borrowers, and IRS income tax

6    information differed substantially from borrower's listed income in 78% of all

7    mortgage-related SARs.  Jan. 31, 2007 Audit Committee Presentation at KPMG-

8    XXMAB-000-028696.

9         By May 2006, the Bank had eliminated the requirement that the minimum

10   FICO score for PayOptions in its portfolio be set at 660.  Ex. 1654 at

11   CFC2007D806766.  In response to Rossi's concerns about purchasing a pool of

12   whole loan PayOptions, of which 85% of the below-660 FICO loans were at a loss

13   rate of greater than 120 basis points, Garcia stated that "[w]e already make and buy

14   these type of loans at chl" and that the Bank "can't cherrie pick acquisitions at

15   front end like we do [with] chl production."  *Id.* at CFC2007D806765-66.  Rossi

16   stated that he knew "we have decided to take PayOptions down to 620 [FICO] now

17   on whole loan acquisitions," but cautioned that "buying concentrations of lower

18   FICO assets that we produce today could eventually cause securities pricing

19   problems."  *Id.* at CFC2007D806765.  A March 24, 2005 e-mail from Garcia

20   indicated that the reduction in minimum FICO scores for Pay Option ARMS to

21   below 660 may have occurred as early as Fall 2004.  Mar. 24, 2005 Garcia e-mail

22   at CFC2007I102877-78.

23        **B.    Mozilo Urges Selling the Pay Option Loan Portfolio**

24        Contrary to what was being publicly disclosed publicly, Countrywide

25   wanted the Bank to begin reducing its Pay Option portfolio.  McMurray SEC Dep.

26   at 647:5-15.

27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                    28

299

In an August 2006 internal memorandum to Countrywide's Board of Directors, Mozilo took the opposite position, stating: "Although we believe that the Pay Option should not present credit risks that are significantly higher than credit risks presented by ARM loans in general, *we do not have long term data to validate this assumption*." Aug. 26, 2006 Mozilo memorandum at CFCP000231898 (emphasis added).

Further, Mozilo sent an e-mail to Sambol and Sieracki expressing even greater concern about the portfolio and stating that they were "flying blind" with respect to Pay Option performance. In that e-mail, Mozilo wrote:

> [w]e have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet. The only history we can look to is that of World Savings[6] however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico. In my judgment, as a long time lender, I would always trade off fico for equity. *The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales.*

Ex. 1125 at CFC2007C526149 (emphasis added). In the same e-mail, Mozilo stated that "pay options are currently mispriced in the secondary market, and that spread could disappear quickly if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]." *Id.* He urged that the "timing [wa]s right" to sell Countrywide Bank's portfolio of loans. *Id.* To mitigate these anticipated losses, Mozilo proposed that the Bank "sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in

---

[6] World Savings was a bank that had originated Pay Options for about twenty years before Countrywide entered the market. Garcia Dep. at 142:15-143:14.

300

1    their port[folio]."  *Id.*  Mozilo testified that as of September 26, 2006, he had

2    concerns with both Pay Options and HELOCs that Countrywide was "flying blind"

3    with regard to their performance.  Mozilo SEC Dep. at 376:16-379:5.

4         McMurray responded to Mozilo's September 26, 2006 e-mail, agreeing that

5    Countrywide "should be shedding rather than adding Pay Option credit risk to the

6    portfolio."  Ex. 1125 at CFC2007C526148.  In the fall of 2006, Kevin Bartlett

7    went further, and recommended to Mozilo and others that all Pay Option ARMs be

8    sold from Countrywide Bank because Countrywide was not receiving sufficient

9    compensation on these loans to offset the risk of retaining them on its balance

10   sheet.  Bartlett Dep. at 150:22-151:9.

11        On January 29, 2007, Mozilo directed Sieracki to meet with others to

12   explore a one-time transaction where KPMG, owing to the tarred reputation of Pay

13   Options, would sell the bulk of the Pay Options out of the Bank and replace them

14   with HELOCs.  Jan. 29, 2007 e-mail at CFC2007B668918.  Mozilo explained the

15   "tarred reputation of Pay Options" by saying that there were a lot of issues with

16   Pay Options and he was continuously concerned with Countrywide's reputation

17   with it.  Mozilo SEC Dep. at 596:5-12.

18        Garcia testified that there was a time that the Bank stopped accumulating

19   Pay Options at the direction of Mozilo, but that this was only temporary.

20              [T]hen there was a point in time where he said, you
21              know, "Stop."  And then we stopped temporarily until we
22              did more analysis and then got everybody basically
                comfortable to go back to Angelo and say, "You know,
23              we should continue to do this."  And then it was baked
24              into the strategic plan, meaning it was approved by the
                board of directors, it was, you know, talked about in the
25              earnings call for the first quarter for the year end of '06.
26              So that would have been like in January of '07, you
                know.  So the stopping of pay options is like a very
27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                      30

301

1            temporary thing, reaction to Angelo had asked us to stop

2            and keep adding.

3   Garcia Dep. at 156:6-21.

4

5         However, in an e-mail exchange on March 9, 2007, Mozilo inquired as to

6   why the production of Pay Options was increasing:

7            Our production of Pay Options is increasing.  How is this

           happening when the underwriting guidelines have been

8            so severely restricted?  I also see that we continue to have

9            a substantial inflow of subprime.  In light of the fact that

           we are taking substantial losses on subprime and it's

10           attendant residuals how do we justify the continuing

11           intake of such substantial volumes?  I do not want to

12           continue to have to hold subprime for investments on our

          balance sheet because of the lack of liquidity and the

13           adverse pricing environment.  Have we sold the Pay

14           options in the Bank as we had discussed about a month

15           ago?

16   Ex. 1650 at CFC2007G095894.

17         Garcia responded by explaining that the Bank had "credit enhance[d]" the

18   Pay Option ARMs portfolio instead of selling it.  *Id.* at CFC2007G095893.  Mozilo

19   continued to express his frustration that the Pay Option portfolio had not been sold,

20   stating: "More importantly all of the decisions that were made relative to the

21   retention, instead of sale of the payoptions were made without my knowledge and

22   my participation in the process and I don't appreciate it since I am the one

23   ultimately responsible for the overall performance of the Company."  *Id.* He

24   continued: "It is my belief that our original strategy was where we should have

25   gone and ***the unilateral reversal of those decisions will prove harmful to the***

26   ***Company from a variety of perspectives."***  *Id.* (emphasis added).

27

28

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)             31

302

1    As late as November 2007, Mozilo stated internally that he questioned

2  "whether we should touch this product going forward because of our inability to

3  properly underwrite these combined with the fact that these loans are inherently

4  unsound unless they are full doc, no more than 75% LTV and no piggys" and that

5  "pay option have hurt the company and the Bank badly."  Nov. 3, 2007 Mozilo

6  e-mail at CFCP003063616.

7    Finally, on November 4, 2007, Mozilo stated that "Pay options have hurt the

8  Company and the Bank badly despite your belief that it is a viable product . . . I do

9  not like this product because they are not fixable in the event of serious default and

10  also because they promote the worst behavior from the mortgagors who opt for this

11  product irrespective of the fact that they are prime and super prime borrowers."

12  Ex. 1302 at CFCP003867934.

13    Again, none of the above was disclosed to the shareholders.

14  **III.   PRIME/SUBPRIME DISTINCTION**

15    Countrywide's Forms 10-K and 10-Q signed by Sieracki all contained data

16  regarding the number of prime and nonprime loans originated during their relevant

17  time periods.  These statements were false and misleading because Countrywide

18  knew that investors and analysts would think that the terms prime and subprime

19  related to borrower creditworthiness when, in fact, Countrywide used those terms

20  to distinguish the origination channel of the loans that were issued.  Countrywide's

21  definition of prime and subprime was never disclosed to investors.

22    The principal definition of "subprime" is found in the *Expanded Guidance*

23  *for Subprime Lending Programs,* issued jointly on January 31, 2001 by the U.S.

24  Office of the Comptroller of the Currency, the Board of Governors of the Federal

25  Reserve System, the Federal Deposit Insurance Corporation, and the Office of

26  Thrift Supervision.  It states that "[t]he term "subprime" refers to the credit

27  characteristics of individual borrowers.  Subprime borrowers typically have

28

1   weakened credit histories that include payment delinquencies, and possibly more

2   severe problems such as charge-offs, judgments, and bankruptcies.  They may also

3   display reduced repayment capacity as measured by credit scores, debt-to-income

4   ratios, or other criteria that may encompass borrowers with incomplete credit

5   histories.  Subprime loans are loans to borrowers displaying one or more of these

6   characteristics at the time of origination or purchase."  Ex. 287 at p. 2.

7          Among the credit risk characteristics listed in the *Expanded Guidance* that

8   label a borrower as "subprime" is a "[r]elatively high default probability as

9   evidenced by, for example, a credit bureau risk score (FICO) of 660 or below

10  (depending on the product/collateral), or other bureau or proprietary scores with an

11  equivalent default probability likelihood[.]"  Ex. 287 at p. 3.

12         Mozilo testified that when he referred to the term "prime," he generally

13  meant loans with FICO scores of 620 and greater.  Mozilo Dep. at 102:2-18.  He

14  also testified that the distinction between a prime and subprime loan was primarily

15  FICO.  Mozilo SEC Dep. at 710:9-19.  Russell testified that the main driver of a

16  loan's designation as prime or subprime at Countrywide Bank was FICO score,

17  and that a score of 660 was the cutoff.  Russell SEC Dep. at 37:18-39:9.

18         However, Countrywide's internal designation of loans as prime or subprime

19  hinged not on borrower characteristics, but the channel from which the loans were

20  originated.  McMurray testified that "at Countrywide, the difference was simply by

21  product.  So if something – if something was a prime product, then any loan

22  originated under those guidelines was prime, and anything originated under

23  subprime guidelines was subprime."  McMurray SEC Dep. at 35:8-16.

24         Early on, in October 2004, Mozilo suggested changing the term "subprime"

25  to "emerging markets" for minority initiatives, citing to WLD's use of the term

26  Specialty Lending in place of "subprime."  Oct. 3, 2004 Mozilo e-mail at

27  CFC2007H155152.  In March 2006, Weintraub e-mailed Bielanski about the

28

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                    33

304

initiative to lead Countrywide away from the use of the term "sub-prime" and mentioned how two years earlier they had e-branded the Wholesale B/C lending group as SLG [Specialty Lending Group], and stopped using the term "subprime" in favor of the term "nonprime."  This e-mail was forwarded to Mozilo, who responded that "We must continue to be innovative to maintain our leadership position."  Mar. 21, 2006 Mozilo e-mail at CFC2007A369941.

On the July 24, 2007 earnings call, McMurray stated: "So the way I think about prime is that it covers a very vast spectrum, so I don't thank you can paint it with a single brush. . . .  So in the prime sector, recall how I showed you the line that covered FICO.  There is a belief by many that prime FICOs stop at 620.  That is not the case.  There are affordability programs and Fannie Mae, expanded approval, as an example, that go far below 620, yet those are still considered prime."  An analyst report by Van Hesser of HSBC Securities, issued immediately after this presentation, stated, "Management referred to certain affordability programs where FICO scores went 'far below' 620 (which already is well below the bank regulator's definition of subprime, which has a 660 cutoff)."  Ex. 281 at NYF-UW017963.

Throughout the Class Period, Countrywide granted loans whose qualities would fit squarely into any reasonable investor's definition of "subprime."  In 2003, relating to underwriting standards relevant to information presented in the 2004 Form 10-K, a Countrywide borrower could obtain a $400,000 loan based upon Stated Income, with an LTV of 90% and a FICO of 580, and this loan would be classified as prime for reporting purposes.   March 2003 CHL presentation at CFCNYF00271853.  A November 2006 e-mail from David Swain, EVP of Products and Pricing, FSL, to Vijay LaLa showed that 1.3% of Prime 1st lien fundings over the preceding three months went to borrowers with FICO scores between 500 and 580, and 10.4% of prime first lien loans went to borrowers with

305

1    FICO scores between 580 and 620.  November 8, 2006 Swain e-mail at

2    CFCP004403827.

3         Further, Countrywide classified its Alt-A and Extreme Alt-A loans as prime

4    in its periodic filings (McMurray Dep. at 361:3-20, Mozilo SEC Dep. at 709:25-

5    710:8), but never made the disclosure that Countrywide included such loans in its

6    statistics concerning prime loans.  McMurray testified that "[t]he key difference

7    between Alt A and the prime world is, the way we thought about it was

8    documentation.  So in Alt A, most or virtually all of those would have some type

9    of a low or no doc feature, and in the conventional – the typical conventional prime

10   world, those would have either a – they would be full doc or alt doc or preferred

11   doc . . . ."  McMurray Dep. at 364:11-18.  Gissinger also testified that

12   documentation level was a difference between prime and Alt-A loans.  Gissinger

13   Dep. at 625:21-626:1.  He further testified that "[i]f you were looking at it in terms

14   of a general 30,000-foot standpoint, it would end up going between subprime, the

15   higher end of subprime, and Alt-A."  Gissinger Dep. at 287:18-288:11.  Gissinger

16   classified Extreme Alt-A as "another classification, if you will, between prime,

17   Alt-A, extreme Alt-A, what would be called – there's a grading scale in subprime.

18   There'd be the upper tier subprime, normal subprime, lower subprime.  There's

19   one additional column, if you will, in terms of the gradation."  Gissinger Dep. at

20   285:25-286:6.

21        As far as Plaintiffs are able to discern, neither Countrywide nor any of its

22   employees disclosed, either publicly or in writing, that Alt-A and Extreme Alt-A

23   loans were classified as prime in Countrywide's periodic filings.  The change in

24   terminology in Countrywide's periodic filings exacerbated this omission.  As

25   McMurray and Gissinger testified, Alt-A and Extreme Alt-A loans fall between

26   prime and subprime.  Beginning in the first quarter of 2005, Countrywide publicly

27   classified its loans as either "prime" or "nonprime" in its periodic filings.  A

28

1    reasonable investor would conclude that those loans that bore distinct differences

2    from prime loans would be reported as nonprime.

3         Executives in Countrywide's credit risk group noted that officials at

4    Countrywide Bank were attempting to misclassify loans as prime.  An e-mail

5    exchange dated April 20, 2005 discussed a pool of loans featuring "Alt-B 2/28"

6    loans that Countrywide was considering purchasing.  During the exchange,

7    McMurray stated that "Alt-B" was just a euphemism for subprime and that he did

8    not "know any 2/28 that's not a subprime loan."  Additionally, McMurray pointed

9    out that Countrywide did not have authorization from the Office of the Comptroller

10   of the Currency ("OCC") to purchase subprime loans and should not move forward

11   on this pool without regulatory approval.  In response, Mike Muir stated that, by

12   asking the OCC's permission to purchase the pools, Countrywide "implicitly [is]

13   stating that [it thinks] these are loans that [it] shouldn't be doing."  Jim Furash

14   echoed Muir's sentiments, stating that, while Countrywide was not authorized to

15   purchase subprime loans, "we do not think these loans are sub prime."  He went on

16   to state that "sellers of subprime assets often have prime loans for sale and that is

17   what we are purchasing."  McMurray responded by stating, "Based on everything I

18   read and heard so far, it would be hard to argue that these are prime loans."  Apr.

19   20, 2005 e-mail from McMurray to Rossi at CFCP001101395.

20        Executives at Countrywide took pains to conceal their internal definition of

21   prime from those outside the company.  In a September 8, 2005 e-mail, an

22   Executive Vice President at Countrywide Securities Corporation, Kevin Doyle,

23   said that when Fannie Mae refused to purchase subprime loans from Countrywide,

24   those loans were renamed "credit blemished."  CFC2007A024416.  Also, Greg

25   Lumsden, CEO of FSL, gave a presentation to a group of Consumer Markets

26   Division (CMD) employees, admitting "[w]e are at this moment, sort of tied for

27

28

307

1   first as the largest subprime lender," and "[w]e put a lot of subprime borrowers

2   actually in prime loans."  2005 Presentation at CFC2007143076.

3        After the July 24, 2007 earnings call, Mozilo e-mailed Sambol and

4   recommended internally changing the term "subprime" to "standard," "so that we

5   can say without reservation that we do not participate in 'subprime' lending."

6   Aug. 26, 2007 Mozilo e-mail at CFC2007A367426.  This request was forwarded

7   on to Gissinger who stated "Dave shared this with me and I had already changed

8   sub prime to near prime as a proxy until there was something better.  Today, we

9   are selling this product to the agencies and am open to a new name."  Aug. 29,

10   2007 Gissinger e-mail at CFCNYF04233983.

11        Countrywide's obfuscation of the distinction between prime and subprime

12   loans was so pronounced that even its auditors were fooled.  In August 2007, John

13   Klinge, engagement partner at KPMG, sent an e-mail to John Taylor, Raymond

14   Munoz, and Nicole Carillo concerning "CFC - Charge-off Policy and HFS

15   LOCOM," in which he said in part: "I am reading McMurray's comments on the

16   quality of the prime portfolio, and he stated that a portion of the prime portfolio

17   has FICOs below 620.  Not sure why that is prime, but clearly those loans should

18   not receive the same price as other prime loans for purposes of LOCOM analysis."

19   Aug. 7, 2007 Klinge e-mail at KPMG-XXOTH-005-097578.

20        A month later, Mozilo told investors that "[w]e are out of the subprime

21   business."  September 18, 2007 Bank of America Investment Conference at

22   CFC2007769328.  Gissinger reacted to an article in *USA Today* quoting Mozilo's

23   statement by e-mailing Bielanski and Sambol, stating "[t]his article is killing me in

24   CHL.  I need your help crafting a response or clarification that states: We're not

25   out of the subprime business . . . ."  Sept. 22, 2007 Gissinger e-mail at

26   CFCP007872926.  Three days later, Gissinger sent an e-mail to approximately 150

27   members of his "team" at CHL, stating that despite Mozilo's statement,

28

1    Countrywide was still originating subprime product.  Sept. 25, 2007 Gissinger

2    e-mail at CFCNYF04234820.

3    **IV.    THE "WALL OF WORRIES"**

4            McMurray presented a summary outline titled "Wall of Worries" to the

5    Board of Directors Credit Risk Committee on February 13, 2007.  This

6    presentation was designed to inform committee members of the reasons why and

7    how Countrywide's credit exposure increased as it transitioned away from being a

8    mortgage banker.  McMurray attributed the increase in "delinquencies and reserves

9    . . . [to the] transitioning economic environment, seasoning and the guideline

10   expansion that occurred in the industry over the last several years."  Ex. 805 at

11   CFCP007103440.  McMurray testified that the idea behind the "Wall of Worries"

12   slide was to assemble on one page the principal concerns that members of

13   management should be thinking about.  McMurray Dep. at 51:25-52:5. McMurray

14   voiced these concerns to Countrywide's senior management throughout the Class

15   Period.  *See, e.g.,* Ex. 810 at CFCP005887980.

16           McMurray testified that he began to worry about the sustainability of the

17   trajectory of housing prices even before he joined Countrywide.  McMurray Dep.

18   at 57:19-24.  This concern increased the longer the pattern continued, which he

19   testified was conveyed to whoever was "willing to listen."  *Id.* at 61:11-62:12.

20   McMurray characterized exception underwriting as a "more complex" concern in

21   his outline.  He stated that an exception loan represented "a riskier potential

22   transaction, and in my view more difficult to underwrite."  *Id.* at 73:6-11.  He

23   clarified that the guideline expansions into new products that had not been offered

24   historically before were essentially a shift into "untested waters" where you "don't

25   have the benefit of history to inform your judgments or on which to build models."

26   *Id.* at 86:13-22.

27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                           38

309

1    McMurray also reiterated to senior management his consistent and growing

2    concern that as credit guidelines loosened, in combination with the normally

3    cyclical nature of the credit cycle (i.e., what goes up must eventually come down),

4    investor and insurers would begin to seek ways of putting loans back to

5    Countrywide by looking for breaches in representations and warranties.

6    McMurray Dep. at 137-41.  McMurray had also expressed concern about

7    Countrywide's ability to measure this risk, given the lack of uniformity as to the

8    nature and extent of representations and warranties provided to each of the

9    investors in Countrywide's loans.  McMurray Dep. at 129:3-19.

10    In terms of products, McMurray focused on Pay Options because the

11    product (i) tended to be "relatively controversial out in the market," due to its

12    negative amortization feature, (ii) was relatively complicated due to its very nature

13    as an adjustable rate mortgage and, (iii) for risk management reasons.  McMurray

14    Dep. at 209:6-212:20.  McMurray characterized the PayOption ARM as the riskiest

15    prime first lien from a credit risk perspective.  *Id.* at 214:17-23.

16    McMurray had explained there were several levels of concern regarding

17    HELOCs.  These risks included the fact that HELOCS, as second liens were

18    subordinate to first liens.  Since borrowers did not draw down all funding at one

19    time, it was often impossible to know what the total amount the borrower would

20    eventually owe would be.  Most HELOCs were granted with reduced

21    documentation.  And, the residual Countrywide would end up owning after

22    HELOCs were securitized and sold into the secondary market were highly risky.

23    *Id.* at 221-223.

24    McMurray had further stated that given two identical loans—one with full

25    documentation and one with reduced documentation—the likelihood of the

26    reduced documentation loan becoming seriously delinquent was between two and

27    four times more likely than the full-documentation loan.  *Id.* at 223:24-224:7.

28

1    McMurray disfavored the matching strategy because "it was matched across
2  various lenders and on specific product features, and so by virtue of taking that
3  approach, you ended up with a set of guidelines that would actually be more
4  aggressive than any single lender had by virtue of taking this matching approach,
5  so that was one of the concerns I had."  McMurray Dep. at 245:11-19.  McMurray
6  in fact agreed that as compared to those lenders matched, Countrywide would be
7  the most aggressive lender.  McMurray Dep. at 247:15-23.

8    On several occasions, McMurray communicated the need to "follow
9  established risk guidance and policies[;] a product cannot be rolled out or
10  transactions closed without the required approvals."  Ex. 1549 at
11  CFC2007B243316.  In November 2006, he told Sambol that this was a
12  "fundamental deficienc[y]," pointing specifically to Countrywide's offering of
13  Extreme Alt-A without McMurray's approval.  *Id.*  He added that there were
14  "several recent examples where products or transactions proceeded without the
15  required risk approvals or in contradiction of established policy."  *Id.*  Although he
16  "previously created a set of guiding principles" in 2004 (Ex. 811 at
17  CFCP000004374), there had not been "acceptance from some of the key business
18  units."  Ex. 1549 at CFC2007B243316.  In January 2007, the problem persisted,
19  and McMurray told Gissinger, "[t]here have been occasions where PL [Product
20  Leadership] has been unable and/or unwilling to comprehend key risk issues," such
21  as "two particular aspects on the recent (unapproved) subprime loan amount
22  changes."  Ex. 1548 at CFC2007I167630.  As efforts to curtail production in favor
23  of risk management failed, there were repeated requests by McMurray to increase
24  disclosure.

25    Credit Risk Management's judgment was often overruled.  McMurray wrote
26  to Chief Investment Officer Nick Krsnich in early 2005, telling him that that
27  "Drew [Gissinger] wanted us to consider giving Production a portion of the

28

balance sheet which would allow them to fund 'makes sense' transactions without having to follow the normal corporate policies and processes." Feb. 14, 2005 McMurray e-mail at CFC2007I087711.  Indeed, according to Kuelbs, it was standard practice for production executives under Gissinger to ignore standards and directives from the Company's credit department, dismissing them as "aspirational," instead following only Gissinger's instructions.  Kuelbs SEC Dep. at 66:7-69:10, 70:19-71:19.

In response to Gissinger's suggestion that production be placed in charge of any variances it determined were in the market, effectively cutting credit risk management out of the decision-making process, McMurray responded by warning Gissinger:

> I'm all for streamlining the process as long as it stays a process.  A lot of what happens now is outside of any semblance of a process so efficiency is terrible, people are frustrated and the quality of decisions is suboptimal or worse.  We should discuss what constitutes a sound business decision—we tend to cede our risk and investing decisions by matching whatever is in the market.

Ex. 1723 at CFCP007147701-02.

For example, in a March 7, 2005 e-mail, Christian Ingerslev, an employee in Product Leadership, stated: "I spoke to Desautels and he was called in by Spector and Drew [Gissinger] under $1.5 million exception thing.  Sounds like they got in on the line with the traders, and long story short, they now think they can sell them but not with the pricing they were previously providing. . . .  it's frustrating to try and hold the line and then just be overridden with whining and escalations, just reinforces that sales can have anything they want if they yell loud enough to Drew."  Ex. 486 at CFC2007I087902.  Vijay LaLa, Managing Director, Product Development and Support, answered someone's question about the chances of

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                                              41

312

1    Countrywide rolling out a new product: "We are likely going to do it—Drew will

2    likely override John [McMurray].  Stay tuned . . . ."  Oct. 27, 2005 LaLa e-mail at

3    CFCP004835387.

4           In his testimony to the SEC, Ingerslev elaborated on the conflict between the

5    sales and credit risk groups at Countrywide:

6               So there was a strong sales culture.  So . . . ultimately . . .
                disagreements or ties were broken . . . to the side of
7               erring on, well, we don't want to lose volume, we want to
                keep up the volume and keep up our market share.  That
8               was a strategy that the company had. . . .
9
10              [I]n that environment, there was conflict.  Some of it
                you'd expect, and some of it went beyond what you
11              would expect and was tough.  . . .[A]ny question asked
                by the sales area that wasn't answered with a yes . . . was
12              not considered final.  That just means we need to ask you
                again or ask somebody else, or there must be something
13              broken with our process, because if the process were
                working, you would clearly say yes. . . . [Y]ou can say
14              that was a bad business strategy in the end, but that's
15              what it was.
16
17
18   Ingerslev SEC Dep. at 132:14-133:23.

19          According to a memorandum dated June 17, 2005 and e-mailed by Steven

20   Trentacosta to McMurray, Gissinger as Chief Production Officer had the clear

21   authority to override any decisions made by the credit risk department.  "If the

22   resolution can not be made between the MD's (McMurray and Kuelbs) and the

23   requesting production divisions, Drew Gissinger will be brought in to make final

24   resolution based on the fact provided and the need of the production divisions."

25   June 17, 2005 Trentacosta e-mail at CFCP001099322-23; June 17, 2005

26   memorandum at CFCP001099331.

27

28

313

1    In a February 10, 2006 e-mail to Lumsden, head of FSL, McMurray insisted

2  that Countrywide needed to stay with the "no exceptions policy" for the subprime

3  80/20 loans[7] because "[t]he company is not willing to take credit risk on these

4  seconds and we must therefore have a clearly identified execution consistent with

5  this."  Lumsden responded: "It just doesn't work . . . We cannot shutdown while

6  waiting for who knows when."  Feb. 10, 2007 McMurray e-mail at

7  CFCP004541746.

8    Again, in a March 23, 2006 e-mail, McMurray outlined Countrywide's

9  "Policy on High Risk Products," stating "[w]e revised the CFC Credit Policy to

10  include more specific requirements on high risk products.  While much of this is

11  already in effect, we want to be sure there is no ambiguity with respect to high risk

12  products and the retention of credit risk.  This policy is effective immediately."

13  Ex. 491 at CFC2007I315086.  In September 2007, in reference to the above,

14  "McMurray stated 'I was never supported on this and Secondary, Production and

15  CCM basically continued to operate as though they never received this policy.  In

16  addition to this e-mail, there were many meetings and other conversations where

17  these issues were discussed."  Ex. 491 at CFC2007I315086.  Among other things,

18  this policy sought to severely restrict the Company's retention of credit risk on

19  high risk products.  *Id.*

20    In his testimony to the SEC, McMurray stated that Eric Sieracki told him

21  that Sambol had "slashed" credit disclosure language out of the 2006 Form 10-K,

22  "especially around widened guidelines for affordability."  McMurray SEC Dep.

23  846:15-850:15.

24    Gissinger refused to deploy new, more stringent credit guidelines, instead

25  claiming that he lacked input from the Production Division, when in fact his own

26

27  ───────────────
   [7] An 80/20 loan is actually two loans granted at the same time.  The first
   mortgage has an LTV of 80%.  The second mortgage has an LTV of 20%.  The
28  CLTV is 100%.

1   direct report, Kuelbs, provided input into those guidelines.  Gissinger SEC Dep. at

2   135:4-8; Mar. 1, 2006 McMurray e-mail at CFC2007I099846.  McMurray

3   understood that Gissinger disagreed with guidelines because they were

4   conservative compared to the market, hence his refusal to deploy them.  McMurray

5   SEC Dep. at 666:24-667:3.

6          A Countrywide internal audit report from October 2006 observed:

7               In June 2006, a product change was considered to
               increase the Subprime Loan and Loan to Value (LTV)
8               amounts across all credit grades and most Fair Isaac
               Corporation (FICO) scores and LTV combinations within
9               each grade.  On the PCPF reviewed, it was noted that the
10              Chief Credit Officer clearly disapproved of the change.
               Following existing guidelines, the change was
11              implemented as the EMD–Chief Production Officer for
12              CHL approved the product change . . . it would be a
               potential conflict of interests for the Chief Production
13              Officer to override the position of the Chief Credit
14              Officer . . .  This finding is rated Moderate Risk as the
               current approval structure could lead to an acceptance of
15              credit risk in excess of CFC's tolerance levels.
16

17

18  Oct. 11, 2006 Internal Audit Report at CFC2007B992826.

19         In an April 20, 2006 e-mail regarding the 10-Q Unit Discussion and

20  Analysis for the Quarter Ended March 31, 2006, McMurray described the business

21  and environmental changes at Countrywide from a Credit Risk perspective from

22  the previous quarter.  Ex. 813 at CFC2007I153312.  The changes McMurray

23  highlighted in part include the following facts: 1) "We are still seeing lenders

24  offering increasingly aggressive product offerings despite signs of less favorable

25  conditions;" 2) Home price appreciation now appears to be slowing after years of

26  very favorable results, aspects of the business many of the changes to how the

27  business; 3) The extremely favorable economic conditions . . . we've experienced

28

315

1   over the past several years is unlikely to continue resulting in higher defaults.

2   McMurray also noted that loan quality deteriorated for the quarter ending March

3   31, 2006.  Ex. 813 at CFC2007I153312.  On April 20, 2006, in a fax from

4   McMurray to Jie Ling, a manager of SEC Reporting responsible for collecting the

5   MD&A disclosures, McMurray noted that, based on conversations he had had with

6   Greg Hendry, managing director of financial reporting and accounting governance,

7   and others about keeping language in the 10-Q, "[t]here had been a

8   recommendation from an officer at Countrywide Bank to remove or 'soften' some

9   of the language on credit."  McMurray wrote that it was his belief that the language

10  should remain in and was told that it would.  Ex. 814 at JPM-ARG 00001282.

11          McMurray expressed his concerns and the need for CFC to expand its credit

12  risk disclosures in the Form 10-Q for 2Q 2006 as well.  In a July 17, 2006 e-mail,

13  McMurray listed major factors that were likely to result in Countrywide's

14  experiencing an increase in "delinquencies, defaults, and credit losses going

15  forward," such as:

16              Credit Guidelines - The industry has expanded credit
                guidelines very aggressively over the past several years.
17              Some transaction combine risk factors or risk levels that
18              were not seen in previous cycles.  The delinquencies and
                defaults from these transactions will be higher.
19

20              Loan Manufacturing - There are many steps in the loan
21              manufacturing processes.  To the extent any of these is
                not performed correctly, we will be exposed to
22              unexpected losses
23

24  Ex. 342 at CFCP000697743.  These disclosures were not included in the Form 10-

25  Q for 2Q 2006.  *See* Ex. 344.

26          McMurray again expressed his concerns relating to risk disclosures when the

27  Form 10-Q for 3Q 2006 was being prepared.  In an October 17, 2006 e-mail to Jie

28

316

1  Ling and Greg Hendry, McMurray reiterated similar concerns that he expressed in

2  his July 17, 2006 e-mail.  Specifically, he noted:

3              As I've communicated to you previously, underwriting
              guidelines have widened dramatically over the past five
4              or so years.  Loan quality has deteriorated as
              consequence of this guideline widening.  The transition
5              from extremely favorable conditions, which prevailed
6              over the past several years, to a more difficult
              environment will also adversely affect loan quality and
7              loan performance.  The allowance is addressed in a
8              dedicated meeting between Corporate Credit and
9              Corporate Accounting.

10

11  Ex. 346 at CFCP001444911-12.  These disclosures were not included in the Form

12  10-Q for 3Q 2006.  Hendry Dep. at 149:22-151:13; *see* Ex. 236.

13        In a November 16, 2006 e-mail to Sambol, McMurray complained about

14  guidelines and products being introduced in contravention of credit policy.  As an

15  example, McMurray cited the fact that Extreme Alt-A loans were being offered by

16  the loan production divisions even though that program had not been officially

17  approved in the guideline review process.  Ex. 484 at CFC2007B012537.  The

18  guidelines for this unapproved program permitted 100% financing, layered with

19  additional credit risk factors such as stated income, lower than average FICO

20  scores, or non-owner occupied investment properties.  Ex. 632 at

21  CFCNYF0019452.

22        Even when funneled through the proper reporting channels, suggested

23  disclosures regarding the deteriorating quality of Countrywide's loan originations

24  made by internal Countrywide employees would not end up in Countrywide's

25  periodic filings.  In January, 2007, Countrywide's servicing division completed an

26  MD&A template for the 2006 Form 10-K.  Ex. 676 at CFCP002234184.  The

27  template requested year over year delinquency rates and a detailed explanation for

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                    46

317

1    any change in those rates.  In response, the servicing division attributed the

2    increase in delinquencies in both the HELOC and subprime portfolio to "[i]nferior

3    quality and performance of loans originated in 2005 and YTD 2006 compared with

4    quality and performance of the 2002-2004 vintages."  *Id.* at CFCP002234195.

5    Servicing attributed the increase in delinquencies across the entire CHL portfolio

6    to "[e]xpansion of guidelines in 2005 - YTD in response to the more competitive

7    environment."  *Id.* at CFCP002234196.  Sambol testified that he believed this

8    statement was true.  Sambol Dep. at 464:10-20.  The causes identified by servicing

9    were not disclosed in Countrywide's 2006 Form 10-K.  *See* Ex. 261.  Nor were

10   they disclosed in any subsequent periodic filing or by any Countrywide employee,

11   either orally or in writing.

12         There were several instances when McMurray refused to approve loan

13   product programs that he argued would increase risk beyond tolerable levels, but

14   were nevertheless implemented by Countrywide.  In a November 2, 2006 e-mail

15   from Bartlett to Sambol regarding sign-off on Extreme Alt-A, Bartlett stated, "I'm

16   a little worried about John.  He's been withholding sign offs on certain issues that

17   should be priced for.  The latest was on extreme alt a where Drew and crowd

18   needed me to sign off when John was out after John dragged his feet for over 30

19   days.  Of course they pick the day he's out to tell me they need a decision."  Nov.

20   2, 2006 Bartlett e-mail at CFC2007B012332.  McMurray testified that he never

21   signed off on the product and so stated to Sambol. McMurray SEC Dep. at 691:12-

22   24.

23         McMurray testified regarding a conversation he had with Bartlett, which

24   prompted him to jot down some handwritten notes describing reasons he wanted to

25   resign from Countrywide.  Ex. 816 at JPM-ARG 00001217; McMurray Dep. at

26   394:20-395:2.  McMurray wrote, "1.  Concern about personal risk.  Do not want to

27   be blamed for products, guidelines, etc. that I never advocated and often

28

318

1   recommended against; concerns about inadequate controls, infrastructure, etc." *Id.*
2   McMurray testified that he was concerned that with "the guideline expansion that
3   had occurred and the self-reinforcing effects that we'd already talked about on
4   home prices, there . . . wasn't any way for me to imagine that ending happily."
5   McMurray Dep. at 399:3-7.  McMurray then spoke with Dave Sambol regarding
6   his intention to resign.  McMurray voiced his concerns about Countrywide's
7   matching strategy, how Countrywide managed credit risk, and his concern about
8   personal risk discussed in his handwritten notes.  McMurray Dep. at 406:20-
9   418:23.  Sambol convinced McMurray not to resign, however, by saying that he
10  was committed to "very strong controls and . . . a very strong risk management
11  organization and . . . strong checks and balances," and by giving him a substantial
12  pay raise.  Sambol Dep. at 223:4-225:6.

13       Notwithstanding such promises, McMurray was compelled to continue his
14  efforts to curtail Countrywide's matching strategy – e.g., communicating to
15  Sambol "fundamental deficiencies that need to be remedied," as reflected in
16  unapproved Extreme Alt-A originations.  Ex. 1549 at CFC2007B243316.
17  Moreover, Sambol and Bartlett did not devote much time to addressing
18  McMurray's concerns.  Two of these concerns were: (i) Countrywide's "composite
19  set of guidelines will be the most aggressive in the credit market," and (ii) the
20  Company was ceding credit policy "to the most aggressive lenders in the market."
21  Nov. 2, 2006 Sambol e-mail at CFC2007B062313.  Bartlett testified that other than
22  one conversation that he and Sambol had with McMurray, Bartlett did not
23  "remember talking about . . . these two issues with [Sambol]."  Bartlett SEC Dep.
24  at 318:18-319:12.

25       Shortly before McMurray's final resignation from Countrywide in
26  September 2007, in reference to his "policy on high risk products," he stated: "I
27  was never supported on this and Secondary, Production and CCM basically

28

319

1  continued to operate as though they never received this policy.  In addition to this

2  e-mail, there were many meetings and other conversations where these issues were

3  discussed."  Ex. 491 at CFC2007I315086.

4       In a fax dated January 25, 2007 regarding McMurray's 10-K certification,

5  McMurray continued to voice similar concerns about the risks of a worsening

6  credit environment and increased delinquencies.  Ex. 1306 at JPM-ARG 00001309.

7  Specifically, regarding changes in loan quality, McMurray stated that "As noted in

8  other communications, guidelines have widened making the loans riskier."  *Id.* at

9  JPM-ARG 00001310.  Again, McMurray referred members of the Financial

10  Reporting Group to the "relevant discussion, meetings presentations and e-mails on

11  this topic."  *Id.*  McMurray specifically pointed to a January 2, 2007 e-mail he sent

12  to Sieracki, which explained why "delinquencies will increase" and why the "R&I

13  (repurchase and indemnification) provision expense will increase."  Ex. 1127 at

14  CFC2007G567590.  McMurray stated:

15      •   higher defaults = higher repurchases because investors and credit

16             enhancers tend to put back only defaulted loans

    •   investors and credit enhancers will attempt to mitigate their

17             delinquency challenges through increased repurchase requests (i.e.

18             being more aggressive with their requests)

19      •   investors and credit enhancers will attempt to mitigate their

           delinquency challenges by more aggressively resisting our rebuttals"

20  *Id.*

21       None of these statements were included in the 2007 Form 10-K.

22       In an e-mail string dated April 10, 2007, McMurray commented to Erika

23  Joseph, the manager of SEC reporting, and Jie Ling that "not all of my comments

24  have made it into your previous filings."  Apr. 10, 2007 McMurray e-mail at

25  CFC2007H030371.  In an earlier e-mail within the string dated April 4, 2007,

26  McMurray provided his electronic responses to the questionnaire from the

27  financial reporting group.  In his response, McMurray mentions "[a]s discussed

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)          49

320

1  previously and on several separate occasions with Corporate Accounting, market

2  fundamentals (especially home prices) and liquidity have deteriorated materially.

3  Furthermore, regulatory and reputational conditions are increasingly adverse."  In

4  addition, McMurray pointed out that "[a]s noted previously and repeatedly,

5  industry guidelines have widened significantly over the past several years.  The

6  industry and CW were originating loans with more aggressive credit guidelines

7  than the case historically."  *Id.*  These statements were not included in

8  Countrywide's 1Q 2007 Form 10-Q.  *See* Ex. 348.

9      On April 25, 2007, Jie Ling received John McMurray's MD&A

10  questionnaire for the period ending March 31, 2007, in which he repeated his calls

11  for additional disclosure.  He stated "[a]s discussed previously and on several

12  occasions with Corporate Accounting, market fundamentals (especially home

13  prices) and liquidity have deteriorated materially."  He further stated that "[a]s

14  noted previously and repeatedly, industry guidelines have widened significantly

15  over the past several years.  The industry and CW were originating loans with

16  more aggressive credit guidelines than was the case historically.  Guidelines have

17  been recently trimmed back though are still very aggressive in a historical

18  context."  Ex. 1307 at JPM-ARG 00001292.  These statements were not included

19  in Countrywide's 1Q 2007 Form 10-Q.  *See* Ex. 348.

20      In a July 21, 2007 e-mail, McMurray outlined the issues warranting

21  disclosure in the 2Q 2007 Form 10-Q.  He described the deteriorating housing

22  market as "worse than anything we've seen in the last forty to fifty years."  He

23  went on to state that "[m]any of the product innovations introduced into the market

24  over the past five years are untested in stress environments.  These innovations

25  often incorporate features and/or combinations of attributes that tend to make them

26  more risky.  Because of the company's matching and no brokering principles and

27  strategies, we have some type of exposure to all of these innovations (e.g. in loans

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                                    50

321

directly and/or residuals and/or R&W)."  He then stated that "the company has grown rapidly in both the volume and breadth of our risk exposures," but "the infrastructure (people, processes and systems) to manage this activity and exposure have not kept up with this growth."  Ex. 349 at CFCP005862910.

McMurray submitted his MD&A questionnaire on August 8, 2007, reiterating the concerns in his July 21, 2007 e-mail.  Ex. 1308 at JPM-ARG 00001323-24.  His statements were not included in Countrywide's 1Q 2007 Form 10-Q.  Hendry Dep. at 163:4-170:10, Ex. 348.

## V.   "LESSONS LEARNED"

On August 31, 2007, Keith Russell, a member of the Board of Directors, sent a memorandum to Sieracki and others requesting a comprehensive "lessons learned" analysis of the series of events leading to the credit and liquidity crisis, so as to avoid any future re-occurrences.  Ex. 850 at CFCP007837478.  An investigation ensued and the following individuals were interviewed:

| Name | Title |
|---|---|
| Sandy Samuels | Executive Vice President, Deputy General Counsel |
| Andrew Gissinger | Executive Managing Director, Residential Lending, CFC & President, COO CHL |
| Kevin Bartlett | Senior Managing Director Investment and Portfolio Management |
| Carlos Garcia | Executive Managing Director CFC Chief of Banking and Insurance Operations |
| Ron Kripalani | Senior Managing Director and President Capital Markets |
| Jack Schakett | Executive Managing Director and Chief Operations Officer (CHL) |
| Eric Sieracki | Executive Management Director and Chief Financial Officer |
| Walter Smeichewicz | Senior Managing Director of Enterprise Risk Assessment |
| Tim Wennnes | Managing Director and Chief Operating Officer (Bank Segment) |
| Brian Hale | Senior Managing Director and President Consumer Markets Division |
| Todd Dal Porto | Senior Managing Director and   President, (Wholesale Lending) Division |

| Doug Jones | Senior Managing Director and President IMSG |
| Greg Lumsden | Senior Managing Director and President, FSL Division |
| Mark E. Elbaum | Senior Managing Director and Chief Financial Officer (CHL) |
| Jennifer Sandefur | Senior Managing Director Treasury |
| Anne McCallion | Senior Managing Division and Chief of Financial Operations and Planning |

Ex. 400 at CFCP002927320.

On November 17, 2007, a summary of interview perspectives entitled "Key Observations and Lessons Learned From The Crisis" was created and sent to Anne McCallion and Eric Sieracki detailing the interviews with executive management. Ex. 272 at CFCNYF00276842. The summary provided clear admissions that the widening of guidelines and the drive to achieve the market share caused a huge increase in credit risk, all of which was evident at the time these events were occurring, and that the public statements regarding Countrywide's guidelines, loan quality and credit risk management had been false and misleading at the time they were made. The summary included the following direct quote observations:

- Deteriorating credit conditions were clear . . . ;[8]
- We did not fully heed the warnings of our credits models. Delinquencies were rising, and models predicted worse to come;[9]
- Early indicators of credit risk exposure existed. Internal control systems highlighted many of the risks that eventually transpired;[10]
- Risk indicators and internal control systems may not have gotten enough attention in the institutional risk and Board committees;[11]
- Our model of matching products put us at the mercy of irrational market behavior;[12]
- The focus of production was volume and margin, not credit risk. There was also massive emphasis on share;[13]

---

[8] Elbaum, Ex. 401 at CFCNYF00276831.
[9] Kripalani, Interview Notes at CFCNYF00276838.
[10] Smiechewicz, Ex. 415 at CFCNYF00276825.
[11] Id.
[12] Lumsden, Ex. 419 at CFCNYF00276854.
[13] Id.

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                    52

323

- We were driven by market share, and wouldn't say "no" (to guideline expansion);[14]
- Our wide guidelines were not supported by the proper infrastructure (credit, risk management); and
- Lots of experienced people were uncomfortable with the underwriting guidelines.  Going forward, we need to rely on our experience and instinct when business practices don't make sense.[15]

Ex. 272 at CFCNYF00276842.

On November 26, 2007, Sambol made a presentation to the Board of Directors that addressed the key events of the crisis, how CFC handled the crisis, and the lessons learned from the crisis.  Nov. 2007 Presentation at CFCNYF00276876.

Countrywide acknowledged in this presentation that it failed to heed warning signs in 10 fundamental areas of its business before the crisis careened out of control and operated in these areas in such a fundamentally flawed manner that Countrywide's actions more likely than not would result in disaster.  These areas include (1) Market Expectation & Anticipation, (2) Strategic Planning, (3) Contingency Planning, (4) Business Model, (5) Risk Governance, (6) Management, Culture and Organization, (7) Coordination, Teamwork & Leadership, (8) Communication, (9) Financial Systems, (10) Board & Regulators. *Id.*

Regarding market expectation and anticipation, Countrywide found that before the crisis it did not fully heed the warnings of its credit models, however flawed.  Delinquencies were rising and models predicted that the worse was to come.  Deteriorating credit conditions were clear.  Countrywide largely ignored its own models and maintained that the problems were largely confined to subprime. *Id.* at CFCNYF00276884.

---

[14] Schakett, Ex. 424 at CFCNYF00276863.
[15] Lumsden, Ex. 419 at CFCNYF00276854.

1    Though Countrywide had backup liquidity structures that were in place as

2  part of the company's contingency planning, Countrywide did not have an external

3  communication plan to support the draw of its bank lines.  Countrywide continued

4  to grow aggressively through the second quarter of 2007, despite the warnings of

5  credit models and to focus on share growth and hiring.  Initiatives regarding

6  manufacturing quality did not turn into meaningful action until the second quarter.

7  *Id.* at CFCNYF00276886.

8    Countrywide found that its model of matching products put the company at

9  the mercy of irrational market behavior.  Countrywide was under significant

10  pressure from all its partners (builders, real-estate agents, brokers) to get deals

11  done.  That put further pressure on guidelines.  In Countrywide's own words:  "We

12  gave-in to the market."  *Id.* at CFCNYF00276888; *see also* McMurray e-mail to

13  Sambol in June 2005 stating that "Because the matching process includes

14  comparisons to a variety of lenders, our match will be the composite of the outer

15  boundaries offered across multiple lenders. . . .  As a result, our composite

16  guidelines are likely among the most aggressive in the industry."  Ex. 808 at

17  CFC2007I088611; McMurray Dep. at 247:3-23.

18    Countrywide found that the company knew it was taking risks, but believed

19  it could price the products right and offset the risk, a strategy that had been

20  undisclosed to investors.  Countrywide acknowledged in its findings that "[w]ith

21  riskier products, you need to be exquisite in off-loading the risk"

22  (CFCNYF00276889), echoing a warning that McMurray stated he previously

23  voiced.  McMurray SEC Dep. at 380:25-384:15.  Countrywide was driven by

24  market share, and wouldn't say "no" (to guideline expansion).  *Id.* at

25  CFCNYF00276889.  The company's wide guidelines were not supported by the

26  proper infrastructure (credit, risk management), *id.,* echoing what McMurray had

27  wanted disclosed in the 2Q 2007 Form 10-Q.  Ex. 349 at CFCP005862910.

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                                      54

325

1    Countrywide also found that in the area of risk governance, early indicators

2    of credit risk exposure existed.  Internal control systems highlighted many of the

3    risks that eventually transpired.  Countrywide acknowledged that risk indicators

4    and internal control systems may not have received enough attention in the

5    institutional risk and Board committees.

6    Regarding the areas of management, culture and organization, Countrywide

7    found that lots of experienced people at the company were uncomfortable with

8    underwriting guidelines.  Countrywide had a tremendous zeal for dominance (as

9    measured by market share), which was a source of much of the company's success.

10   However, it might have been taken too far as Countrywide, in its own words,

11   "remained pedal-to-the-medal as warning signs mounted."  *Id.* at

12   CFCNYF00276891.

13   As regards its Board of Directors, Countrywide determined that the Board

14   should have been more active and interested in risk issues presented to the Board

15   committees.  The Board should have taken a leadership role in management

16   transitions – the lack of which caused ambiguities in leadership.  Additionally,

17   Countrywide found a need to clarify the role of the Board and asked the question

18   of whether the company should expect greater oversight.  *Id.* at

19   CFCNYF00276895.

20   **VI.   MISSTATEMENTS AND OMISSIONS**
     **IN VIOLATION OF GAAP**
21

22   Sieracki knew that Countrywide's consolidated financial statements

23   contained in certain of the Company's Forms 10-K, 10-Q, and 8-K filed during the

24   Class Period, incorporated by reference therein, contained material misstatements

25   and omissions in violation of Generally Accepted Accounting Principles

26   ("GAAP").  These material misstatements and omissions concerned reporting over

27   Internal Controls, and accounting and reporting of Countrywide's Allowances for

28   Loan and Lease Losses, Retained Interests, Mortgage Servicing Rights, and

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                                55

326

Representations and Warranties.  Plaintiffs will explain their basis for the assertion of falsity of these material misstatements in violation of GAAP in one or more expert reports to be submitted shortly.

## VII.   HOUSING, LIQUIDITY AND CREDIT CRISIS

Beginning in 2007, Sieracki made various statements, orally and in writing, regarding Countrywide's access to liquidity.  For example, the Form 10-Q for the first quarter of 2007 states that "[w]e believe we have adequate financing capacity to meet our currently foreseeable needs" and the Forms 10-Q for the second and third quarters of 2007 state that "[w]e do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."  Also, an August 27 press release issued by Countrywide under Sieracki's name stated:

> Countrywide has longstanding and time-tested funding liquidity contingency planning," said Eric P. Sieracki, Chief Financial Officer.  "These planning protocols were designed to encompass a wide variety of conditions including secondary market volatility.  Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today.  We place major emphasis on the adequacy, reliability and diversity of our funding sources … Our mortgage company has significant short term funding liquidity cushions and is supplemented by the ample liquidity resources of our bank.

At the October 6, 2007 Earnings Call, Sieracki stated "[w]e now have ample and growing funding liquidity…. The mortgage company has adequate liquidity to fund all debt maturities through 2008, without raising any new debt… So you can see the liquidity situation is very strong at Countrywide at September 30, 2007."

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                                                56

327

1      These statements were false and misleading because Countrywide was in the

2  midst of a liquidity crisis and had to scramble to acquire liquidity in order to stay

3  afloat in mid to late 2007.

4      As early as October 26, 2004, Sieracki recounted to Mozilo a conversation

5  he had with Jonathan Gray, a well-respected analyst, during which Gray advised

6  "Since a credit crisis is inevitable, fortify [y]our credit risk policies now and

7  disclose them to the Street."  Ex. 1286 at CFC2007I075139.

8      Mozilo testified that he believed in the fall of 2006 that housing prices

9  would not go up forever.  Mozilo SEC Dep. at 470:1-6.  "Remember what I said

10  almost six months ago.  'In my 53 years in the business I have never seen a soft

11  landing.'  This one is going to be as hard as they come."  Feb. 27, 2007 Mozilo

12  e-mail at CFC2007A373214; Mozilo SEC Dep. at 608:8-609:10.

13      As early as April 2007, McMurray stated that he had "discussed

14  previously…on several separate occasions" that "liquidity [has] deteriorated

15  materially" along with home prices and other market fundamentals.  Apr. 4, 2007

16  McMurray e-mail at CFCP001445626.

17      On July 5, 2007, Mozilo wrote to Sieracki and Sambol regarding liquidity,

18  citing a "substantial number of unknowns" looming, including with respect to the

19  subprime and HELOC issues facing Countrywide, and recommending

20  Countrywide find an additional $4.5 billion in financing.  Ex. 1565 at

21  CFC2007B659355.  Mozilo again voiced concerns about liquidity in a Board of

22  Directors Special Telephonic Meeting.  July 17, 2007 Meeting Minutes at

23  CFC2007B648589.

24      Mozilo testified that he was informed of the liquidity crisis on or about

25  August 2, 2007 by David Sambol.  Mozilo SEC Dep. at 154:12-155:7.  Mozilo

26  stated: "It was a global crisis within Countrywide and all areas of the company . .

27  ."  Mozilo SEC Dep. at 155:8-9.

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)           57

328

1    Countrywide prepared a timeline on its decision to draw down on its back up

2    line of credit in response to a request for information by the SEC.  August 2007

3    Timeline at CFC2007-00657.

4    At an August 6, 2007 Board of Directors meeting, Mozilo stated that the

5    ability of Countrywide to finance its inventory with commercial paper was being

6    adversely impacted by the difficulty in marketing specific securitization

7    transactions and tranches.  Aug. 6, 2007 Meeting Minutes at KPMG-07FYA-047-

8    000272.  Mozilo informed the Board at this meeting that the Company may have to

9    draw on its back-up facilities (Aug. 2007 Timeline at CFC2007-00659; Mozilo

10   SEC Dep. at 160:6-14.  At the August 10, 2007 Countrywide and Countrywide

11   Bank Board of Directors Special Telephonic Meeting, Mozilo described

12   Countrywide's liquidity issues  as "severe" and Sieracki stated that Countrywide

13   had lost access to unsecured commercial paper.  Aug. 10, 2007 Meeting Minutes at

14   KPMG-07FYA-047-000276.  Mozilo also informed the Board on August 10, 2007

15   that the Company may need to access its contingency liquidity plans and draw-

16   down on its back-up facilities.  August 2007 Timeline at CFC2007-00662.

17   On August 16, 2007, Countrywide drew down its entire $11.5 billion back-

18   up bank credit line, an event that caused Countrywide's credit rating to be

19   downgraded by the ratings agencies.  Sept. 11, 2007 Finance Summit summary at

20   CFCNYF04547136.  Sieracki determined that the $2 billion infusion from Bank of

21   America was necessary because Countrywide would otherwise be forced into

22   disclosures that would "likely to kill any public deal."  Sieracki notes, EPS NYF

23   000624.  Later, he observed that Countrywide needed a private, insider deal for

24   term debt or "expanded disclosures about Q3 for public deal."  Sieracki notes, EPS

25   NYF 000628.  A CHL Cash Reconciliation shows that had this draw down not

26   occurred, Countrywide would have been roughly $5 billion short of meeting its

27   obligations.  CHL Cash Reconciliation, at EPS NYF 000688.

28

329

In an August 26, 2007 e-mail, Mozilo stated: "This is no longer about current stock price but about securing the future of our Company so that we can remove all threats from the regulators, analysts, rating agencies and the press. We should pile on the equity and not worry at all about dilution. The worst dilution would be a stock price at zero." Ex. 1300 at CFCP006575286.

In another August 26, 2007 e-mail, Mozilo told Sieracki, with regard to extending the commercial paper issue by one of its off-balance sheet funding vehicles, that: "I am deeply concerned that it will send us into another death spiral because it will be perceived that we remain in deep trouble and our creditors and shareholders will be wondering what's next." Ex. 1312 at CFCP00305682. Mozilo testified that, at that time, he believed that they had had a liquidity crisis in the Company. Mozilo Dep. at 290:5-12. Sambol testified that Mozilo was concerned about the perception such an extension would elicit. He stated "our having made that decision was a very . . . profound decision in terms of, you know, implications thereafter, because it's something that one only does in a very stressed situation . . ." Sambol Dep. at 433:13-31.

In a September 28, 2007 e-mail, Mozilo stated that "[i]t is very possible, and even probable, that the deterioration in real estate values will continue well into 2008 thereby resulting in increasing delinquencies, foreclosures and severity of losses." Ex. 1301 at CFC2007C526420.

In a September 29, 2007 e-mail to Mozilo, Sieracki stated that "[w]e all agree liquidity remains a critically important issue" and advised that contingent liquidity be accumulated at the bank to prepare for further deteriorating market conditions. Ex. 1568 at CFC2007B848398.

1    Hoping to reverse an OTS CAMELS[16] rating downgrade, Countrywide

2    pursued a $5 billion credit line with Bank of America.  Mozilo requested that the

3    deal get closed as quickly as possible since the release of Countrywide's third

4    quarter results were going to "make it increasingly difficult to get additional

5    liquidity as rapidly as we need it."  Oct. 5, 2007 Mozilo e-mail at

6    CFC2007B788647.

7    In the November 2007 CFO report to the Board of Directors, Sieracki

8    asserted that "November continued to be a challenging period for securing

9    financing and maintaining liquidity."  Nov. 2007 CFO Report to Board of

10   Directors at CFC2007B824430.  A November 7, 2007 e-mail described liquidity as

11   "tight" with the only meaningful liquidity being "through CFC, FRBNY and GCF-

12   all else is overnight."  Nov. 5, 2007 Bockian e-mail, at CFCP005099378.  In a

13   December 12, 2007 e-mail, Dave Bigelow told Sieracki that since year-over-year

14   comparisons were unfavorable to Countrywide, such comparisons were eliminated

15   from the November Operations Press Release.  Dec. 12, 2007 Bigelow e-mail, at

16   CFC2007B187889.

17   In January 2008, Jennifer Sandefur, Senior Managing Director and

18   Treasurer, asked Bank of America for a capital infusion of $3-4 billion, which was

19   based upon "BofA's understanding of our risks."  Jan. 23, 2008 Sandefur e-mail at

20   CFC2007A587660.  Sieracki stated at this time "[b]ottom line = we're one last

21   straw away from BK [bankruptcy]."  Sieracki notes at EPS NYF 000638.

22

23   **INTERROGATORY NO. 3:**

24   State all facts and identify all persons and documents with information

25   supporting YOUR contention in paragraph 31 of YOUR COMPLAINT that
SIERACKI violated his "duty to disseminate prompt, accurate and truthful

26   ───────────────
[16] OTS CAMELS is the Office of Thrift Supervision's rating system for federal

27   thrifts and is based on Capital, Asset Quality, Management, Earnings, Liquidity
and Sensitivity to Market Risk.  Mar. 5, 2007 Enterprise Risk Management
presentation at CFCP005295290.

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                          60

331

1  information with respect to the Company's business, operations, financial
statements and internal controls, and to correct any previously issued statements
2  that had become materially misleading and untrue."

3  **ANSWER AND OBJECTIONS TO INTERROGATORY NO. 3:**

4       Plaintiffs object to Interrogatory 3 on the grounds that it is vague, overly

5  broad, and burdensome.  Because this contention interrogatory seeks "all facts," it

6  is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

7  3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving

8  the foregoing objections, Plaintiffs state that Sieracki violated his duty to

9  disseminate prompt, accurate and truthful information with respect to the

10  Company's business, operations, financial statements and internal controls, and to

11  correct any previously issued statements that had become materially misleading

12  and untrue by disseminating, or causing to disseminate, the false and misleading

13  statements referred to in Plaintiffs' Answer to Interrogatory No. 1, which were

14  false and misleading for the reasons set forth in Plaintiffs' Answer to Interrogatory

15  No. 2.

16

17  **INTERROGATORY NO. 4:**

18       State all facts and identify all persons and documents with information
supporting Your contention in paragraph 33 of Your Complaint that SIERACKI
19  "knew or recklessly disregarded that these adverse undisclosed facts rendered the
positive representations made by or about Countrywide materially false and
20  misleading".

21  **ANSWER AND OBJECTIONS TO INTERROGATORY NO. 4:**

22       Plaintiffs object to this interrogatory on the grounds that it is vague, overly

23  broad, and unduly burdensome.  Because this contention interrogatory seeks "all

24  facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,*

25  2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without

26  waiving these objections, Plaintiffs state that the following supports the allegations

27  in paragraph 33 of the Complaint that Sieracki "knew or recklessly disregarded

28

332

that these adverse undisclosed facts rendered the positive representations made by or about Countrywide materially false and misleading:"

Leadership/Participation in Countrywide Committees

While serving as the Company's Chief Financial Officer ("CFO"), Sieracki either chaired, participated, and/or periodically attended the following Countrywide committees: Countrywide Executive Risk Committee ("CERC"), Asset Liability Committee ("ALCO"); Executive Strategy Committee ("ESC"); and the Countrywide Credit Risk Committee ("CCRC").

At these meetings, individuals such as John McMurray, Cliff Rossi, Jeff Speaks, Frank Aguilera, Andrew Gissinger and Christian Ingerslev presented information and raised questions and issues about the Company's performance, trends, products, events or concerns, that alerted Sieracki to the inaccuracy of statements made in the Company's filings with the SEC, including the certifications made by Sieracki pursuant to the Sarbanes-Oxley Act ("SOX") in many of those filings.  Ex. 1113 at CFCNYF0044793.

For example, at a June 28, 2005 Corporate Credit Risk Committee, Sieracki and others were informed by defendant Kurland that the Company was taking too much risk onto its balance sheet; that Kurland was concerned that the Company was increasing its marketing and sale of certain relatively risky products; and that subprime originations had increased.  Ex. 504 at CFC2007G583563-68.

At a June 22, 2006 Credit Risk Committee, Cliff Rossi advised Sieracki and others that credit exposure at Countrywide Bank had increased overall; and that the PD ALLL models "had not proven as predictive for the more recent vintages, and stated that the ALLL model had been underestimating the performance of both the first and second liens in the Bank."  Rossi Ex. 19 at KPMG-06FYA-069-000146.

In addition, since Sieracki was the co-chair of ALCO, he became aware of the shortcomings of the models that Countrywide used in its valuations of

333

1    mortgage servicing rights, retained interests, and allowance for loan loss reserves,

2    which valuations were included in SEC filings issued while Sieracki was CFO.

3    Sieracki testified that ALCO would approve the valuations for the MSRs and RIs

4    that would appear in a particular SEC filing.  Sieracki Dep. at 29:20-30:5.   He

5    specifically identified the Valuation and Analysis (VAN) group (a subcommittee

6    that reported to ALCO) was responsible for determining the value of MSRs and

7    RIs.  Sieracki explained that VAN managed the models and cash flows that came

8    up through the valuation process. Sieracki explained that after VAN made a

9    determination as to the valuation of the MSRs and RIs, VAN would then report it

10   findings to ALCO for approval.  The former CFO testified that "I managed

11   accounting and would have reviewed the financial statements with them in

12   connection with the closing of the books, and would have personally been involved

13   in the valuation of certain of assets, such as MSRs."  Sieracki Dep. at 37:9-13.

14   The ALCO charter lists "Monitor valuation of MSRs and Other Residuals" as one

15   of the committee's responsibilities.  2006 ALCO Charter at CFC2007E215268.

16   <u>Authoring and Receiving E-Mails and Other Communications</u>

17          Sieracki also became aware of facts undisclosed to the investing public

18   which rendered the Company's positive statements false and misleading by virtue

19   of his authoring and receiving letters and e-mails on a variety of important topics

20   during his tenure as CFO. These letters and e-mails include the following:

21          a.      February 27, 2006 letter from KPMG to Sieracki, Ex. 1116: this letter

22   advised Sieracki of numerous control deficiencies identified by KPMG during its

23   2005 audit of internal controls, including control deficiencies involving virtually

24   all phases of the Company's modeling process.

25          b.      February 28, 2007 letter from KPMG to Sieracki, Ex. 1117: KPMG

26   advised Sieracki of numerous control deficiencies it had identified in its 2006

27   audit, including those relating to the Company's modeling process;

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                        63

334

c.      Ernst & Young Model Validation Review dated January 16, 2007, Ex. 1119: Ernst & Young reported to Countrywide that models it had reviewed exhibited poor performance; there was limited or no model documentation around model development; and limited or inconsistent ongoing monitoring of model performance.

d.      April 13, 2006 e-mail from Mozilo to Sieracki and others, Ex. 1121. Mozilo stated that he has ". . . personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." Mozilo further states that with respect to the Company's "100% subprime seconds" product:

> Frankly I consider this product line to be the poison of ours.  Obviously as CEO I cannot continue the sanctioning of the origination of this product until such time [as] I can get concrete assurances that we are not facing a continuous catastrophe.

*Id.* at CFC2007B008980.

e.      April 16, 2006 e-mail from Carlos Garcia to Sieracki and others, Ex. 1122:

> The 2005 book has seen a slight decline in the weighted average FICO and equity of the collateral (increase in the LTV) coupled with significant expansion of reduced documentation underwriting.  As predicted, the aforementioned risk factors have resulted in the 2005 book experiencing faster development of defaults than the 2004 and 2003 vintages.

*Id.* at CFC2007C809712.

f.      May 18, 2006 e-mail from Mozilo to Sieracki and others, Ex. 373:

> We must pay special attention to helocs and pay options.  With interest rates continuing to rise unabated helocs will become increasingly toxic in that mortgagors will be and are facing substantially higher payments then when the

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                          64

335

loan was originated.  We should attempt to efficiently off
loan [sic] this product even if it means a much slower
growth for the bank."

*Id.* at CFC2007B084228.

g.      September 26, 2006 e-mail from Mozilo to Sieracki and others, Ex.
1125: Mozilo wanted Sieracki and others to consider that the Company had
" . . . no way, with any reasonable certainty, to assess the real risk of holding these
[pay option] loans on our balance sheet. . . .  The bottom line is that we are flying
blind on how these loans will perform in a stressed environment of higher
unemployment, reduced values and slowing home sales."  *Id.* at
CFC2007C526149.  As a result, Mozilo believed the "timing is right for us to sell
all newly originated pay options and begin rolling off the balance sheet, in an
orderly manner, pay options currently in their port."  *Id.*

h.      January 2, 2007 e-mail from John McMurray to Sieracki and others,
Ex. 1127: specifies in detail why delinquencies at the bank will increase, and how
that will affect Company's financial results (including impairments of residual
valuations, lowering of MSR valuations, and increased loan loss reserve
requirements).

i.      January 29, 2007 e-mail from McMurray to Sieracki and others,
subsequently forwarded to financial reporting staff on February 5, 2007,
CFC2007G458175: McMurray highlights disclosure issues as to delinquency,
credit reserve and expense related issues in anticipation of Countrywide's January
30, 2006 press release.

j.      July 5, 2007 e-mail from Mozilo to Sieracki and Sambol regarding
liquidity, citing a "substantial number of unknowns" relating to HELOCs and
subprime looming, and recommending Countrywide find an additional $4.5 billion
in financing.  July 5, 2007 Mozilo e-mail at CFC2007B659355.

k.      Countrywide timeline on its decision to draw down on its back up line of credit in response to a request for information by the SEC.  August 2007 Timeline at CFC2007-00657.

l.      August 6, 2007 Board of Directors meeting, attended by Sieracki. Mozilo stated that the ability of Countrywide to finance its inventory with commercial paper was being adversely impacted by the difficulty in marketing specific securitization transactions and tranches.  Aug. 6, 2007 Meeting Minutes at KPMG-07FYA-047-000272.  Mozilo informed the Board at this meeting that the Company may have to draw on its back-up facilities.

m.      August 10, 2007 Countrywide and Countrywide Bank Board of Directors Special Telephonic Meeting, Mozilo described Countrywide's liquidity issues  as "severe" and Sieracki stated that Countrywide had lost access to unsecured commercial paper.  Aug. 10, 2007 Meeting Minutes at KPMG-07FYA-047-000276.

n.      August 26, 2007 e-mail from Mozilo to Sieracki: "This is no longer about current stock price but about securing the future of our Company so that we can remove all threats from the regulators, analysts, rating agencies and the press. We should pile on the equity and not worry at all about dilution.  The worst dilution would be a stock price at zero."  Ex. 1300 at CFCP006575286.

o.      August 26, 2007 e-mail from Mozilo to Sieracki, which stated, with regard to extending the commercial paper issue by one of its off-balance sheet funding vehicles, that: "I am deeply concerned that it will send as into another death spiral because it will be perceived that we remain in deep trouble and our creditors and shareholders will be wondering what's next."  Ex. 1312 at CFCP00305682.

p.      September 11, 2007 Finance Summit Summary, presented by Sieracki.  Countrywide drew down its entire $11.5 billion back-up bank credit line,

337

1   an event which causes Countrywide's credit rating to be downgraded by the ratings

2   agencies.  Sept. 11, 2007 Finance Summit Summary at CFCNYF04547136.

3   Sieracki determined that $2 billion infusion from Bank of America was necessary

4   because Countrywide would otherwise be forced into disclosures that would

5   "likely to kill any public deal."  Sieracki notes at EPS NYF 000624.  Later, he

6   observed that Countrywide needed a private, insider deal for term debt or

7   "expanded disclosures about Q3 for public deal."  *Id.* at EPS NYF 000628.

8       q.    September 28, 2007 e-mail from Mozilo to Sambol and Sieracki,

9   which Mozilo stated that "[i]t is very possible, and even probable, that the

10   deterioration in real estate values will continue well into 2008 thereby resulting in

11   increasing delinquencies, foreclosures and severity of losses."  Ex. 1301 at

12   CFC2007C526420.

13       r.    September 29, 2007 e-mail from Sieracki to Mozilo, which stated that

14   "[w]e all agree liquidity remains a critically important issue" and advised that

15   contingent liquidity be accumulated at the bank to prepare for further deteriorating

16   market conditions.  Sept. 29, 2007 Sieracki e-mail at CFC2007B848398.

17       s.    November 2007 CFO report to the Board of Directors.  Sieracki put

18   forward that "November continued to be a challenging period for securing

19   financing and maintaining liquidity."  Nov. 2007 CFO Report to the Board of

20   Directors, at CFC2007B824430.

21       t.    December 12, 2007 e-mail from Dave Bigelow to Sieracki, which

22   stated that since year-over-year comparisons were unfavorable to Countrywide,

23   such comparisons were eliminated from the November Operations Press Release.

24   December 12, 2007 Bigelow e-mail, at CFC2007B187889.

25       Sieracki's Acknowledgements of Risks/Personal Responsibility

26       During the Class Period, Sieracki himself acknowledged the risks involved

27   in what he was doing (or not doing), and that it could result in his "[losing] his net

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                    67

338

worth" or "going to jail."  Ex. 1120 at CFC2007C678519, Ex. 1124 at CFC2007C678588.  In a March 22, 2006 e-mail to his father (Ex. 1120), Sieracki noted:

> As many bad things as I could say about Stan [Kurland], he helped me manage certain risky issues here. [Kurland's resignation] significantly increases the risk of my job.  ***As you know, I can lose my net worth or go to jail for things I don't even know.***

Ex. 1120 at CFC2007C678519 (emphasis added).

Two months later, in a May 26, 2006 e-mail to his father, Ex. 1124, Sieracki similarly noted:

> ***It's tempting to think about bailing based on the stock price,*** but I think I need to persevere and stick it out as long as I can.  They're finally forced to pay me good money and I will try to ride that train as long as I can.  ***The big issue is risk.  Sarbanes-Oxley can result in me going to jail or losing my net worth for things I don't even know.***  Guilty verdicts were handed down on Enron today.

Ex. 1124 at CFC2007C678588 (emphases added).

<u>Sieracki's Responsibilities as Set Forth in his SOX Certifications</u>

As CFO of the Company, Sieracki was responsible for, and explicitly certified in periodic Company reports filed with the SEC pursuant to SOX, that he had established and maintained disclosure controls and procedures and internal controls over financial reporting; that he had designed or caused the design of such disclosure controls to ensure that material information relating to the Company was made known to him; that he had designed or caused the design of internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements under Generally Accepted Accounting Principles ("GAAP"); that he had evaluated the effectiveness of the Company's disclosure controls and procedures; that he had disclosed any

change in the Company's internal controls over financial reporting that had occurred; and that he had disclosed all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting reasonably likely to adversely affect the Company's ability to report financial information.

Further, Sieracki, as CFO, and as part of his SOX certifications included in the Company's periodic reports filed while he was CFO, specifically represented that each of those reports (*i.e.* the 10-Ks and 10-Qs referred to in Answer No. 1, above) did not contain any untrue statement of material fact or omit to state a material fact; and that the financial statements in those reports fairly presented in all material respects the financial condition and results of operations of the Company.

Having undertaken all the significant responsibilities relating to disclosures and internal controls set forth in his SOX certifications and having designed systems to ensure that he himself was provided with all relevant material information, Sieracki acquired sufficient information so that he either knew or recklessly disregarded the false and misleading information referred to in Plaintiffs' Answer to Interrogatory 2 above.


**INTERROGATORY NO. 5:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 129 of YOUR Complaint that SIERACKI was "indeed 'fully aware' of the Company's 'loosening of underwriting standards' that created dramatically lesser quality loans than in the past."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 5:**

Plaintiffs object to this Interrogatory on the grounds that it is vague, overly broad, and burdensome. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)

69

340

3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving these objections, Plaintiffs state that documents that support the allegation in paragraph 129 of the Complaint that Sieracki was "indeed, 'fully aware' of the Company's 'loosening of underwriting standards' that created dramatically lesser quality loans than in the past" include the following:

    a.    April 13, 2006 e-mail from Mozilo to Sieracki and others, Ex. 1121. *See* Answer to Interrogatory No. 4.

    b.    April 16, 2006 e-mail from Garcia to Sieracki and others, Ex. 1122. *See* Answer to Interrogatory No. 4.

    c.    May 18, 2006 e-mail from Mozilo to Sieracki and others, Ex. 373. *See* Answer to Interrogatory No. 4.

    d.    September 26, 2006 e-mail from Mozilo to Sieracki and others, Ex. 1125.  *See* Answer to Interrogatory No. 4.

    e.    January 2, 2007 e-mail from McMurray to Sieracki and others, Ex. 1127.  *See* Answer to Interrogatory No. 4.

    f.    January 29, 2007 e-mail from Mozilo to Sieracki and others, Ex. 1162 at CFCP002904940.  Sieracki asked to investigate with KPMG the possibility of selling the bulk of Pay Options on the balance sheet, to be replaced with HELOCs, "a more traditional bank asset."

**INTERROGATORY NO. 6:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 221 of YOUR COMPLAINT that SIERACKI "knew[Countrywide's definitions of prime and subprime], differed materially from the standard used by the government agencies and generally accepted in the mortgage banking industry."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 6:**

Plaintiffs object to Interrogatory No. 6 on the grounds that it is vague, overly broad and burdensome.  Because this contention interrogatory seeks "all facts," it

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)

70

341

is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving these objections, Plaintiffs state as follows:

   The principal definition of "subprime" is found in the Expanded Guidance for Subprime Lending Programs (the "Expanded Guidance"), issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of the Thrift Supervision.  It states that

> The term "subprime" refers to the credit characteristics of individual borrowers.  Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies.  They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories.  Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase.

Ex. 287 at p. 2.

   Among the credit risk characteristics listed in the Expanded Guidance that label a borrower as "subprime" is a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood."  *Id.* at 3.

   Sieracki, as the CFO of a national mortgage company, with numerous years of experience in the mortgage lending industry, and considering his significant responsibilities at the Company, including chairing or participating in a number of committees that addressed subprime type issues, knew (or was reckless in not knowing) of the Expanded Guidelines criteria. *See also* Sieracki SEC Dep. at 38:5-11 ("hard and fast criteria…characterized by FICO scores below 620).

However, Sieracki testified that Countrywide in fact used a different standard or criteria for determining whether a loan was subprime or not.  As a result, Sieracki knew, or was reckless in not knowing, that the Company's definition of subprime differed from the criteria and definitions contained in the Expanded Guidance, a standard used by government agencies and accepted in the mortgage banking industry.

**INTERROGATORY NO. 7:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 346 of YOUR COMPLAINT that SIERACKI "falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 7:**

Plaintiffs object to Interrogatory No. 7 on the grounds that it is vague, overly broad and burdensome.  Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory on the grounds that the information responsive to it is subject to ongoing discovery of KPMG.  Subject to and without waving these objections, Plaintiffs state that information responsive to this Interrogatory will be set forth in one or more expert witness reports to be submitted at the appropriate time.

**INTERROGATORY NO.8:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 367 of YOUR COMPLAINT that SIERACKI "materially understated Countrywide's liabilities and overstated its gain-on-sale revenues, and net income,"

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 8:**

Plaintiffs object to Interrogatory No. 8 on the grounds that it is vague, overly broad and burdensome.  Because this contention interrogatory seeks "all facts," it

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)

72

343

is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory on the grounds the information responsive to it is subject to ongoing discovery of KPMG.  Subject to and without waving these objections, Plaintiffs state that information responsive to this Interrogatory will be set forth in one or more expert witness reports to be submitted at the appropriate time.


## INTERROGATORY NO. 9:

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 390 of YOUR COMPLAINT that SIERACKI "concealed the deterioration of Countrywide's internal controls during the Class Period by falsely representing in the Company's management's report on 'internal control over financial reporting' that such controls were effective."

## ANSWER AND OBJECTIONS TO INTERROGATORY NO. 9:

Plaintiffs object to Interrogatory 9 on the grounds that it is vague, overly broad and burdensome.  Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

By virtue of his own investigation and receipt of information from KPMG and Ernst and Young (*see* the documents referred to in Plaintiffs' Answer to Interrogatory No. 4, above), Sieracki was aware of the existence of material weaknesses with respect to the Company's internal controls, including, but not limited to material weaknesses with respect to internal controls designed to ensure the reasonableness of the fair value estimates of *inter alia*, MSRs, loan related loss reserves, and loans held for sale.  Nevertheless, Sieracki did not disclose these material weaknesses to the investing public, and instead signed SOX certifications for periodic reports filed with the SEC (and referred to in Plaintiffs' Answer to Interrogatory No. 1 above) which failed to disclose such material weaknesses, and

344

1   further falsely represented that any such material weaknesses likely to adversely

2   affect the Company's ability to summarize and report financial information would

3   have been disclosed.

4

5   **INTERROGATORY NO. 10:**

6       State all facts and identify all persons and documents with information
supporting YOUR contention in paragraph 390 of YOUR COMPLAINT that
7   SIERACKI "inappropriately classif[ied] sub-prime loans as prime loans."

8   **ANSWER AND OBJECTIONS TO INTERROGATORY NO. 10:**

9       Plaintiffs object to Interrogatory No. 10 on the grounds that it is vague,

10  overly broad, burdensome, and distorts the allegations of the Complaint referred to

11  (*i.e.* paragraph 390 of the Complaint).  Because this contention interrogatory seeks

12  "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,*

13  2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.

14      Subject to and without waiving the foregoing objections, Plaintiffs state that

15  Countrywide's Forms 10-K and 10-Q filed during the Class Period all contained

16  data regarding the number of prime and nonprime loans originated during their

17  relevant time periods.  These statements were all false and misleading because

18  Countrywide knew that investors and analysts would think that the terms prime

19  and subprime related to borrower creditworthiness when, in fact, Countrywide

20  used those terms to distinguish the origination channel of the loans that were

21  issued.  Countrywide's definition of prime and subprime was never disclosed to

22  investors.

23      As noted in Plaintiffs' Answer to Interrogatory 6, above, the principal

24  definition of "subprime" is found in the Expanded Guidance.  It states that:

25          The term "subprime" refers to the credit characteristics of
            individual borrowers.  Subprime borrowers typically
26          have weakened credit histories that include payment
            delinquencies, and possibly more severe problems such
27          as charge-offs, judgments, and bankruptcies.  They may

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)                                    74

345

> also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories.  Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase."

Ex. 287 at p. 2.

Among the credit risk characteristics listed in the Expanded Guidance that label a borrower as "subprime" is a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood[.]"  *Id.* at 3.

However, as Sieracki knew (*see* Plaintiffs' Answer to Interrogatory 6, above), Countrywide's internal designation of loans as prime or subprime hinged not on borrower characteristics, but the channel from which the loans were originated.  McMurray testified that "at Countrywide, the difference was simply by product.  So if something -- if something was a prime product, then any loan originated under those guidelines was prime, and anything originated under subprime guidelines was subprime."  McMurray SEC Dep. at 35:8-16.

Throughout the Class Period, Countrywide granted loans whose qualities would fit squarely into any reasonable investor's definition of "subprime," but would report the loan as prime.  For example, in 2003, relating to underwriting standards relevant to information presented in Countrywide's 2003 Form 10-K, a Countrywide borrower could obtain a $400,000 loan based upon Stated Income, with an LTV of 90% and a FICO of 580, and this loan would be classified as prime for reporting purposes.  March 2003 Countrywide Home Loans presentation at CFCNYF00271859.

Further, Countrywide classified its Alt-A and Extreme Alt-A loans as prime in its periodic filings. McMurray Dep. at 361:3-20, Mozilo SEC Dep. at 709:25-

710:8, but never made the disclosure that Countrywide included such loans in its statistics concerning prime loans.  As far as Plaintiffs are able to discern, neither Countrywide nor any of its employees, including Sieracki, disclosed, either verbally or in writing, that Alt-A and Extreme Alt-A loans were classified as prime in Countrywide's periodic filings.  A reasonable investor would conclude that those loans that bore distinct differences from prime loans would be reported as nonprime.

**INTERROGATORY NO. 11:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 391 of YOUR COMPLAINT that SIERACKI "materially misstate[d] the financial statements during the Class Period."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 11:**

Plaintiffs object to Interrogatory No. 11 on the grounds that it is vague, overly broad, burdensome, distorts the substance of the relevant allegation of the Complaint, and requests information sought by Sieracki in prior Interrogatories. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

Financial statements issued or caused to be issued by Sieracki during the Class Period contained false and misleading information as set forth in the Complaint and as referred to in Plaintiffs' Answer to Interrogatory No. 2 above.

**INTERROGATORY NO. 12:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 400 of YOUR COMPLAINT that SIERACKI's "statements were false and misleading because Countrywide's internal controls were significantly deficient and ineffective to prevent or detect errors or misstatements in its operations, underwriting practices or financial reporting."

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANx)

76

347

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 12:**

Plaintiffs object to Interrogatory No. 12 on the grounds that it is vague, overly broad, and burdensome, and is subject to further discovery of KPMG. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

Communications with Company employees as well as those with KPMG and Ernst and Young to the Company (including those referred to by Plaintiffs in their Answer to Interrogatory No. 4 above) indicated or should have indicated to Sieracki that the Company's internal controls over financial reporting were not effective, and that there were material weaknesses with respect to those controls (*See also* the report of Plaintiffs' expert on accounting issues for description regarding the material weaknesses that existed in the Company's internal controls). As a result, statements by Sieracki, including his SOX certifications which failed to disclose the material weaknesses in these internal controls, were false and misleading.

**INTERROGATORY NO. 13:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 402 of YOUR COMPLAINT that SIERACKI "condoned lax underwriting practices."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 13:**

Plaintiffs object to Interrogatory No. 13 on the grounds that it is vague, overly broad, burdensome, and distorts the allegations of paragraph 402 of the Complaint. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1;

*Tubbs,* 2008 WL 863974, at \*1.  Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

As noted in Plaintiffs' Answer to Interrogatory No. 4 above, by virtue of his position at the Company, attendance at numerous committee meetings, receipt of e-mails, communications with the Company's outside auditors, and obligations based upon his SOX certifications to design appropriate internal control procedures and to disclose all significant deficiencies and material weakness in the design or operation of internal control over financial reporting, Sieracki was intimately familiar with the relaxation of underwriting practices at the Company. Nevertheless, and despite his obligations under SOX and the federal securities laws, Sieracki failed to disclose the relaxation of underwriting practices or their impact upon the reported financial results of the Company.


**INTERROGATORY NO. 14:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 419 of YOUR COMPLAINT that SIERACKI "acted with scienter in making materially false and misleading statements during the Class Period."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 14:**

Plaintiffs object to Interrogatory No. 14 on the grounds that it is overly broad, burdensome, and duplicative.  Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at \*1; *Tubbs,* 2008 WL 863974, at \*1.  Subject to and without waiving the foregoing objections, Plaintiffs refer to and incorporate their Answer to Interrogatory No. 4, above.


**INTERROGATORY NO. 15:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 435 of YOUR COMPLAINT that SIERACKI was "intentionally misstating the facts, or acting in a deliberately reckless manner in making [his] repeated public statements regarding purportedly

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                                      78

349

1  strong underwriting practices, in view of what was actually happening at the Company, which, at the very least, provided no basis for and in fact
2  contradicted[his] repeated statements."

3  **ANSWER AND OBJECTIONS TO INTERROGATORY NO. 15:**

4      Plaintiffs object to Interrogatory No. 15 on the grounds that it is vague,

5  overly broad, burdensome and duplicative.  Because this contention interrogatory

6  seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare*

7  *Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and

8  without waiving the foregoing objections, Plaintiffs refer to and incorporate by

9  reference their Answers to Interrogatory No. 4.

10

11  **INTERROGATORY NO. 16:**

12  State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 435 of YOUR COMPLAINT that
13  SIERACKI "repeatedly failed to follow GAAP requirements and the Company's own Critical Accounting Policies."

14  **ANSWER AND OBJECTIONS TO INTERROGATORY NO. 16:**

15      Plaintiffs object to Interrogatory No. 16 on the grounds that it is vague,

16  overly broad, burdensome, and is subject to further discovery of KPMG.  Because

17  this contention interrogatory seeks "all facts," it is overbroad and unduly

18  burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,*

19  2008 WL 863974, at *1.  Subject to and without waiving the foregoing objections,

20  Plaintiffs state that a description of how Sieracki failed to follow GAAP

21  requirements and the Company's own Critical Accounting Policies will be set forth

22  in one or more expert witness reports to be submitted at the appropriate time.

23

24  **INTERROGATORY NO. 17:**

25  State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 1155 of YOUR COMPLAINT that
26  SIERACKI is liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 11 of the Securities Act."
27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                              79

350

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 17:**

Plaintiffs object to Interrogatory No. 17 on the grounds that it is vague, overly broad, burdensome, and seeks information relating to a legal conclusion. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

Lead Plaintiff New York City Pension Funds and members of the class purchased securities referred to in Count IV of the Complaint; those purchases are reflected in the certifications attached to the Complaint as well as documents and other electronic information which was provided to defendants and identified those purchases. As described in Plaintiffs' Answers to Interrogatories Nos. 1 and 2, the Registration Statements referred to in Count IV of the Complaint contained false and misleading statements, and Sieracki signed these Registration Statements. As a result, Sieracki is liable to the New York City Pension Funds and the Class for violations of Section 11 of the Securities Act.

**INTERROGATORY NO. 18:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 1178 of YOUR COMPLAINT that SIERACKI is liable to Lead Plaintiff New York City Pension Funds and members of the Class for violations of Section 15 of the Securities Act."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 18:**

Plaintiffs object to Interrogatory No. 18 on the grounds that it is vague, overly broad, burdensome, and seeks information relating to a legal conclusion. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

As set forth in their Answer to Interrogatory No. 17 and paragraphs 1169 and 1172 of the Complaint, the Series B Medium-Term Notes Registration Statement and the 6.25% Notes Registration Statement issued by Countrywide contained false and misleading statements.  Sieracki, as CFO, was responsible for the accuracy of the information contained in these statements.  Indeed, as set forth in his SOX certifications, Sieracki was responsible for the establishment and maintenance of disclosure controls and internal controls designed to insure the reliability of the Company's financial reporting.

Thus, Sieracki was directly involved in and supervised the reporting of the Company's financial results.  As such, he was in a position to, and did control the decision making process at Countrywide regarding the information that was disclosed in the Registration Statements referred to above and the documents incorporated by reference therein, and is therefore liable under Section 15 of the Securities Act.

**INTERROGATORY NO. 19:**

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 1196 of YOUR COMPLAINT that SIERACKI is liable to Plaintiffs Brahn and Katzeff and members of the Class for violations of Section 11 of the Securities Act."

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 19:**

Plaintiffs object to Interrogatory No. 19 on the grounds that it is vague, overly broad, burdensome, seeks information relating to a legal conclusion, and seeks information regarding Katzeff who has not been designated as a class representative.  Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

352

Plaintiff Brahn and other members of the Class purchased 7% Capital Securities referred to in Count VII of the Complaint; Brahn's purchases are reflected in the certification attached to the Complaint as well as documents produced to Defendants.  The Registration Statement filed in connection with the 7% Capital Securities contained false statements and was signed by, among others, Sieracki.  As a result, Sieracki is liable to Plaintiff Brahn and other members of the class for violations of Section 11 of the Securities Act.

## INTERROGATORY NO. 20:

State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 1217 of YOUR COMPLAINT that SIERACKI is liable to Plaintiffs Brahn and Katzeff as members of the Class for violations of Section 15 of the Securities Act."

## ANSWER AND OBJECTIONS TO INTERROGATORY NO. 20:

Plaintiffs object to Interrogatory No. 20 on the grounds that it is vague, overly broad, burdensome, seeks information relating to a legal conclusion, and seeks information regarding Katzeff who has not been designated as a class representative.  Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

As set forth in their Answer to Interrogatory No. 19 and paragraph 1210 of the Complaint, the 7% Capital Securities Registration Statement issued by Countrywide contained false and misleading statements.  Sieracki, as CFO, was responsible for the accuracy of the information contained in that document.  Indeed, as set forth in his SOX certifications, Sieracki was responsible for the establishment and maintenance of disclosure controls and internal controls designed to insure the reliability of the Company's financial reporting.

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                                           82

353

1    Thus, Sieracki was directly involved in and supervised the reporting of the

2    Company's financial results.  As such, he was in a position to, and did control the

3    decision making process at Countrywide regarding the information that was

4    disclosed in the 7% Capital Securities Registration Statement and the documents

5    incorporated by reference therein, and is therefore liable under Section 15 of the

6    Securities Act.

7

8    **INTERROGATORY NO. 21:**

9    State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 1224 of YOUR COMPLAINT that

10   SIERACKI is liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act."

11

12   **ANSWER AND OBJECTIONS TO INTERROGATORY NO. 21:**

13   Plaintiffs object to Interrogatory No. 21 on the grounds that it is vague,

14   overly broad, burdensome, and seeks information relating to a legal conclusion.

15   Because this contention interrogatory seeks "all facts," it is overbroad and unduly

16   burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,*

17   2008 WL 863974, at *1.  Subject to and without waiving the foregoing objections,

     Plaintiffs state as follows:

18   Sieracki issued or caused to be issued the statements referred to in Plaintiffs'

19   Answer to Interrogatory No. 1, which were false and misleading for the reasons set

20   forth in Plaintiffs' Answer to Interrogatory 2, and he did so intentionally or

21   recklessly, as described in Plaintiffs' Answer to Interrogatory No. 3.

22

23   **INTERROGATORY NO. 22:**

24   State all facts and identify all persons and documents with information supporting YOUR contention in paragraph 1232 of YOUR COMPLAINT that

25   SIERACKI is liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act."

26

27

28

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.

LEAD CASE NO. CV 07-05295 MRP (MANX)                                      83

354

**ANSWER AND OBJECTIONS TO INTERROGATORY NO. 22:**

Plaintiffs object to Interrogatory No. 22 on the grounds that it is vague, overly broad, burdensome and seeks information relating to a legal conclusion. Because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Subject to and without waiving the foregoing objections, Plaintiffs state as follows:

As set forth in their Answer to Interrogatory No. 21 and paragraph 1227 of the Complaint, Countrywide issued false and misleading statements during the Class Period. Sieracki, as CFO, was responsible for the accuracy of these statements. Indeed, as set forth in his SOX certifications, Sieracki, was responsible for the establishment and maintenance of disclosure controls and internal controls designed to insure the reliability of the Company's financial reporting.

Thus, Sieracki was directly involved in the reporting of the Company's financial results and the periodic reports alleged to have been false and misleading in Count X of the Complaint, and indeed controlled the disclosures contained in those reports. As such, he was in a position to, and did control the decision making at Countrywide regarding the information disclosed in its financial statements and other public reports, and therefore is liable under Section 20(a) of the Exchange Act.

Dated: February 22, 2010          LABATON SUCHAROW LLP

                                  By:   */s/ Joel H. Bernstein*
                                        JOEL H. BERNSTEIN
                                        JONATHAN M. PLASSE
                                        IRA A. SCHOCHET
                                        DAVID J. GOLDSMITH
                                        MICHAEL H. ROGERS
                                        JOSHUA L. CROWELL

                                        *Lead Counsel for Lead*
                                        *Plaintiffs New York Funds*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KREINDLER & KREINDLER LLP
GRETCHEN M. NELSON
MARK LABATON

*Liaison Counsel for Lead*
Plaintiffs New York Funds

KAPLAN FOX & KILSHEIMER LLP
JOEL B. STRAUSS
*jstrauss@kaplanfox.com*
JEFFREY P. CAMPISI
*jcampisi@kaplanfox.com*
850 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
Facsimile:  (212) 687-7714

*Attorneys for Plaintiff*
*Barry Brahn*

Plaintiffs' Ans. & Obj. to Def. Sieracki's 1st Set Of Interrogs.

Lead Case No. CV 07-05295 MRP (MANx)                                                    85

356

## **VERIFICATION**

Joel H. Bernstein declares as follows:

I am a member of the law firm of Labaton Sucharow LLP, Court-appointed Lead Counsel for Lead Plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund, and the New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York.

I have reviewed Lead Plaintiffs New York City Pension Funds' Verified Answers and Objections to Defendant Eric P. Sieracki's First Set of Interrogatories and state that the responses therein are true and correct to the best of my knowledge, information and belief, subject to the objections set forth therein.

Executed this 22nd day of February, 2010.


*/s/ Joel H. Bernstein*
Joel H. Bernstein

735065 v1
[2/20/2010 13:18]
016381-0001

PLAINTIFFS' ANS. & OBJ. TO DEF. SIERACKI'S 1ST SET OF INTERROGS.
LEAD CASE NO. CV 07-05295 MRP (MANx)

86

357