Exhibit A

KREINDLER & KREINDLER LLP
GRETCHEN M. NELSON (#112566)
gnelson@kreindler.com
MARK LABATON (#159555)
mlabaton@kreindler.com
707 Wilshire Boulevard, Suite 4100
Los Angeles, California  90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019

*Liaison Counsel for Lead
Plaintiffs New York Funds*

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
jbernstein@labaton.com
JONATHAN M. PLASSE
jplasse@labaton.com
IRA A. SCHOCHET
ischochet@labaton.com
DAVID J. GOLDSMITH
dgoldsmith@labaton.com
MICHAEL H. ROGERS
mrogers@labaton.com
JOSHUA L. CROWELL
jcrowell@labaton.com
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead
Plaintiffs New York Funds*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions | Lead Case No.<br>CV-07-05295 MRP (MANx)<br><br>**PLAINTIFFS' VERIFIED SUPPLEMENTAL ANSWERS AND OBJECTIONS TO INTERROGATORIES NO. 2-4 AND 6-15 PROPOUNDED BY DEFENDANT KEITH P. RUSSELL TO LEAD PLAINTIFFS AND PLAINTIFFS** |

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Lead

2    Plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as

3    Administrative Head of the New York State and Local Retirement Systems and as

4    Trustee of the New York State Common Retirement Fund, and the New York

5    City Employees' Retirement System, New York City Police Pension Fund, New

6    York City Fire Department Pension Fund, New York City Board of Education

7    Retirement System, and Teachers' Retirement System of the City of New York,

8    and Plaintiff Barry Brahn, on behalf of the Class (collectively, "Plaintiffs"), serve

9    supplemental answers and objections to Interrogatories No. 2-4 and 6-15 of the

10   First Set of Interrogatories Propounded by Defendant Keith P. Russell to Lead

11   Plaintiffs and Plaintiffs, dated November 3, 2009 (the "Interrogatories"), as

12   follows:

13

14                              **<u>INTRODUCTION</u>**

15   Plaintiffs' supplemental answers and objections to these Interrogatories are

16   made for the sole purpose of this action.  No incidental or implied admissions are

17   intended in these answers.  Plaintiffs' answers to all or any part of the

18   Interrogatories should not be taken as an admission that:  (a) Plaintiffs accept or

19   admit the existence of any fact(s) set forth or assumed by that interrogatory; (b)

20   Plaintiffs have in their possession, custody or control any information or

21   documents responsive to that interrogatory; (c) information or documents

22   responsive to that interrogatory exist; or (d) Plaintiffs' answers constitute

23   admissible evidence.  Plaintiffs' answers to all or any part of an interrogatory are

24   not intended to be and shall not be a waiver by Plaintiff of all or any part of their

25   objection(s) to that interrogatory.

26   While Plaintiffs' prefiling and subsequent investigative efforts have been

27   substantial, they have not completed (a) their investigation of the facts relating to

28

this case, (b) discovery in this action, or (c) preparation for trial.  The following answers are based upon information known at this time.  Plaintiffs reserve the right to make use of, or to introduce at any deposition, hearing and/or trial, information or documents responsive to the Interrogatories but discovered subsequent to the date of service of these answers and objections, including, but not limited to, any information or documents obtained in discovery herein.

## **GENERAL OBJECTIONS**

Plaintiffs generally object to the Interrogatories on the following grounds, each of which is expressly incorporated by reference in the responses to the individual interrogatories below.  All responses set forth herein are subject to and without waiver of any of these General Objections:

1.      Plaintiffs object to the Interrogatories to the extent that they purport to impose any obligations on Plaintiffs that are not imposed by law, or are otherwise inconsistent with Rules 26 and 33 of the Federal Rules of Civil Procedure.

2.      Plaintiffs object to the Interrogatories as facially overbroad and unduly burdensome.  *See Advocare Int'l, L.P. v. Scheckenbach,* No. C08-5332 RBL, 2009 WL 3064867, at *1 (W.D. Wash. Sept. 24, 2009) ("Numerous federal courts have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'").  Plaintiffs are not required to provide every fact in support of their contentions.  *See Tubbs v. Sacramento County Jail,* No. CIV S-06-0280 LKK GGH P, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("[P]laintiff is not required to present his entire case in discovery responses.").

1    3.    Plaintiffs object to the Interrogatories to the extent that they

2   prematurely seek information related to particular types of expert(s), expert

3   testimony, or opinion at a time when certain expert reports have not been

4   submitted.

5    4.    Plaintiffs object to the Interrogatories to the extent that they seek

6   information or documents that are beyond the scope of permissible discovery.

7    5.    Plaintiffs object to the Interrogatories to the extent that they seek or

8   require the disclosure of information or documents that are protected from

9   discovery by the attorney-client privilege, the attorney work product doctrine, the

10  joint prosecution or common interest privilege, or any other applicable privilege

11  or immunity.

12   6.    Plaintiffs object to the Interrogatories to the extent that they seek

13  information based on documents that are not within Plaintiffs' possession,

14  custody or control.

15   7.    Plaintiffs object to the Interrogatories to the extent they seek

16  information or documents that can be found in the pleadings.

17   8.    Plaintiffs object to the Interrogatories as unduly burdensome to the

18  extent such Interrogatories seek (a) information or documents in the public

19  domain, as such information or documents are equally available to Defendant

20  Keith P. Russell ("Defendant Russell"), or (b) information or documents to

21  which Defendant Russell has equal or greater access.

22   9.    Plaintiffs object to the Interrogatories insofar as they are vague,

23  ambiguous, harassing, overly broad or burdensome and to the extent that the

24  discovery sought is unreasonably cumulative, duplicative, or disproportionate.

25   10.   Plaintiffs object to the Interrogatories insofar as they seek

26  information or documents that are irrelevant to any claim, defense, or subject

27

28

---

matter of the litigation, or are not reasonably calculated to lead to the discovery of admissible evidence.

11.     Plaintiffs object to the Interrogatories to the extent that they call for a legal conclusion, a legal argument, or constitute a discovery request that is premature at this stage of the litigation and is invasive of the attorney work product doctrine.

12.     Plaintiffs object to the Interrogatories as unduly burdensome to the extent they are duplicative of documents and information produced in response to Interrogatories and Requests for Production previously propounded to Plaintiffs or disclosed in Plaintiffs' Initial Disclosures pursuant to Fed. R. Civ. P. 26(a).

13.     Plaintiffs object to the Interrogatories to the extent they are contention interrogatories, which are premature at this early stage of discovery, particularly if they are broad interrogatories that will not clarify the issues or narrow the scope of the litigation.

14.     In providing information in response to the Interrogatories, Plaintiffs do not in any way waive, or intend to waive, but rather intend to preserve and are preserving:

a.     all objections as to competency, relevancy, materiality or admissibility of any Interrogatory, the responses or their subject matter;

b.     all objections as to vagueness, ambiguity or other infirmity in the form of the Interrogatories, any objections based on the undue burden imposed by the Interrogatories and each individual request contained therein;

c.     all rights to object on any ground to the use of any of the information or its subject matter in any subsequent proceedings, including the trial of this or any other action;

1             d.     all rights to object on any ground to any further

2    interrogatories or other discovery requests involving or related to the subject

3    matter of any Interrogatory;

4             e.     the right to supplement answers to the Interrogatories; and

5             f.     any and all privileges and rights under the applicable Federal

6    Rules of Civil Procedure, the Local Rules of this Court, other statutes, guidelines

7    or common law.

8         15.    Plaintiffs object to each Definition and Instruction to the extent each

9    imposes on Plaintiffs any obligation beyond what is required by the Federal

10   Rules of Civil Procedure.

11        16.    Plaintiffs object to the Definitions and Instructions section of the

12   Interrogatories to the extent that the definitions are overly broad or call for

13   information or documents that are protected from discovery by the attorney-

14   client privilege, the attorney work product doctrine, the joint prosecution or

15   common interest privilege, or any other applicable privilege or immunity.

16        17.    Plaintiffs object to the definitions of "YOU" and "YOUR" to the

17   extent that they are defined to include individuals or entities that are not parties

18   to this action.

19        18.    Plaintiffs object to the definitions of "IDENTIFY" and

20   "IDENTIFIED" as vague, ambiguous, overly broad, and unduly burdensome,

21   and to the extent that they include information protected from discovery by the

22   attorney-client privilege, the attorney work product doctrine, the joint

23   prosecution or common interest privilege, or any other applicable privilege or

24   immunity.

25        19.    Plaintiffs object to the definition of "STATEMENT" as it is vague,

26   ambiguous and overly broad as to the meaning of "any communication

27   potentially actionable" and to the extent that it is defined to include information

28

protected from discovery by the attorney-client privilege, the attorney work product doctrine, the joint prosecution or common interest privilege, or any other applicable privilege or immunity.

20.     Shelley B. Katzeff ("Katzeff") objects to the Interrogatories because the Court declined to appoint her a class representative.  *See Memorandum of Decision Resolving All Class Certification Issues and Related Objections*, dated December 9, 2009 (Dkt. No. 661).  Katzeff adopts all general and specific objections to the Interrogatories asserted by Plaintiff.

21.     The following specific objections and answers are subject to Plaintiffs' General Objections.  By setting forth specific objections, Plaintiffs do not intend to limit or restrict the General Objections.  Plaintiffs incorporate the above General Objections into their answers to each of the Interrogatories.  To the extent that Plaintiffs answer the Interrogatories, any stated objections are not waived by providing answers.

## SPECIFIC ANSWERS AND OBJECTIONS

### INTERROGATORY NO. 2:

State all facts on which YOU base YOUR response to INTERROGATORY NO. 1 regarding each OUTSIDE DIRECTOR.

### ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 2:

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all facts," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information

1   not in Plaintiffs' possession, custody, or control.  Plaintiffs further object to this

2   Interrogatory to the extent it seeks disclosure of information protected by the

3   attorney-client privilege, the attorney work product doctrine, the joint prosecution

4   privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs'

5   Answer does not necessarily provide every supporting or otherwise relevant fact

6   that is in the evidentiary record as it currently stands, nor does this Answer

7   necessarily provide every supporting or otherwise relevant fact that Plaintiffs may

8   present in opposition to or in favor of a summary judgment motion, or at the trial

9   of this action.

10          Subject to and without waiving the foregoing general and specific

11   objections, Plaintiffs answer as follows:

12          The Board of Directors ("Board") of Countrywide Financial Corporation

13   ("Countrywide" or the "Company") was fully aware of and involved in the

14   Company's business practices and strategies, including the strategy to achieve

15   market dominance by expanding guidelines and originating riskier loan product

16   lines.  The Board additionally understood that as a result, Countrywide would be

17   exposed to credit risks far beyond those disclosed in the SEC filings that the

18   Board approved and which undermined the Company's representations that it

19   originated "high quality" loans.  The Board was further aware that because

20   Countrywide was continually originating new products, their models could not

21   accurately predict loan performance.  Aware of the issues and charged with the

22   task of approving Countrywide's public filings, the members of the Board of

23   Directors, from information learned in connection with Board meetings, meetings

24   of the Board of Directors of Countrywide Bank ("Bank Board"), and the various

25   Board and Bank Board Committees on which they served, had reasonable

26   grounds to believe that the Registration Statements they signed or documents

27

28

**Exhibit A
0011**

1    incorporated by reference, omitted material facts and/or contained misleading

2    information.

3         The Board of Directors was aware in 2003 that Countrywide had

4    implemented a new strategy of market dominance.  In fact, the intention and

5    emphasis at Countrywide was always to increase its share of residential mortgage

6    lending.  Heller Dep. at 103:13-105:17.  At the Strategic Planning Committee

7    Meeting of the Board of Directors on November 11, 2003, David Bigelow,

8    Managing Director for Investor Relations, reviewed Countrywide's new strategic

9    mission which included "dominating residential mortgage lending."  Ex. 1676 at

10   MRM NYF_0020074.  Director Defendants Henry G. Cisneros, Jeffrey M.

11   Cunningham, Edwin Heller, and Gwendolyn S. King were in attendance.

12        Members of the Board understood that in order to achieve market

13   dominance, Countrywide would expand its product line.  Alan Frelix, Managing

14   Director for Strategic Planning, stated at the January 23, 2004 Strategic Planning

15   Committee Meeting of the Board that the ability to "price any 'saleable' or

16   'bankable' loan is critical to success" in the mortgage product line.  Cisneros,

17   Cunningham, Heller, and King were in attendance.  *Id.* at MRM NYF_0020077.

18        Countrywide's strategy for market dominance included attaining a 30%

19   market share.  Defendant Stanford L. Kurland presented Countrywide's strategy

20   to dominate the mortgage lending market and attain this market share at the Board

21   meeting on February 10, 2004.  Ex. 1678 at CFCNYF00453001; Ex. 1679 at

22   CFCNYF00453082.  The presentation highlighted Countrywide's objective to

23   "[m]aintain the broadest rational U.S. mortgage product line available to meet

24   consumer demand and be able to competitively price any 'saleable' or 'bankable'

25   loan."  Ex. 1679 at CFCNYF00453087.  Countrywide had an objective to

26   increase its product mix and offer a product line substantially equivalent to what

27   was available in the market by its competition.  Heller Dep. at 124:05-19; 128:03-

28

1   18.  The standards that made a loan saleable or bankable were determined by the

2   purchasers of mortgage-backed securities and banks that bought them for resale.

3   *Id.* at 132:03-133:12.

4        King was aware that Countrywide had several different types of loan

5   products and was reaching out to a number of potential borrowers who had not

6   been in the housing market before.  King Dep. at 109:02-06.  She understood that

7   if a potential borrower could not qualify under certain loan standards, it was

8   possible that they could qualify for a different kind of product because

9   Countrywide had a number of them.  *Id.* at 72:11-19, 76:06-10.  Countrywide had

10  its ear to the ground about innovation in the mortgage industry and adopted those

11  products that were appropriate.  Parry SEC Dep. at 30:04-14.

12       Countrywide's strategic plan to achieve market dominance included

13  growing the Company's origination of subprime loans.  Heller Dep. at 108:23-

14  110:03.  Frelix described the potential for the Company to grow its subprime

15  business at the February 10, 2004 meeting of the Board's Strategic Planning

16  Committee.  He stated that Countrywide's subprime lending volume could grow

17  to as much as 15-20% of the total loan volume depending on interest rates.  The

18  plan was to grow the subprime segment organically, as opposed to growing

19  through acquisitions.  Ex. 1677 at KPMG-04FYA-042-000091.  Not only were

20  members of the Board aware of Countrywide's strategy to drastically grow

21  subprime business, but they also approved it.  *Id.* at 000092.

22       King also knew that Countrywide's plan for dominating the residential

23  lending mortgage market included subprime lending.  King Dep. at 110:03-07.

24  She understood that Countrywide would have to grow into markets that it had not

25  sold into yet.  *Id.* at 125:07-11.  For instance, Defendant Angelo R. Mozilo

26  informed the Board at its April 20, 2004 meeting that due to higher sales margins

27  on subprime and home equity production, pre-tax earnings from the quarter

28

**Exhibit A**
**0013**

1  experienced a "21% increase from the prior quarter and a 114% increase from the
2  first quarter of 2003."  Director Defendants Cisneros, Cunningham, Robert J.
3  Donato, Ben E. Enis, Heller, Martin R. Melone, Oscar P. Robertson, Keith P.
4  Russell, and Harley W. Snyder were in attendance.  Ex. 1181 at
5  CFCNYF00267421-22.

6       The Board failed to give the subprime expansion the close and careful
7  attention required.  Cisneros testified, for example, that Countrywide's higher
8  sales margins for subprime and home equity line (HELOC) production was not
9  something he focused on.  Cisneros Dep. at 57:21-58:21.

10       In addition to being discussed and approved at the February 2004 Board
11  Meeting, Countrywide's strategy for market dominance continued to be discussed
12  at Strategic Planning Committee meetings and reports of those meetings were
13  made to the Board.  For example, King, Enis, and Robertson attended the August
14  3, 2004 Regular Meeting of the Board of Directors, at which Chief Accounting
15  Officer Anne McCallion's presentation on Countrywide's market share-driven
16  strategy was discussed.  The goals listed in the presentation include being "#1 In
17  Originations" and having a "30 percent Market Share."  The presentation
18  reiterated Countrywide's goal to "Dominate Residual Mortgage Lending" during
19  the 2004-2008 period.  Ex. 1977 at CFCNYF00454624.  The presentation further
20  noted that, "Competition is increasing in both originations and servicing.  Thus,
21  there is an increased demand for competitive intelligence."  *Id.* at
22  CFCNYF00454628.  Countrywide would gain competitive intelligence by
23  tracking the specific number and types of loan products that its competitors
24  offered.  Enis Dep. at 101:14-102:6.

25       McCallion's August 3, 2004 presentation also noted that among
26  Countrywide's "Priority Objectives" during this period was to "[g]row originated
27  market share by at least 20 percent annually."  She reiterated the mission to

28

**Exhibit A
0014**

1  "[m]aintain the broadest rational U.S. mortgage product line available to meet

2  consumer demand and be able to competitively price any 'saleable' or 'bankable'

3  loan."  Ex. 1977 at CFCNYF00454630-31.  The presentation also stated that

4  Countrywide had nearly twice the number of loan products of its nearest

5  competitor and had introduced over 90 new or enhanced products in 2004.  *Id.* at

6  CFCNYF00454637.

7       The Board also knew that Mozilo planned to increase Countrywide's

8  market share in order to compensate for unfavorable market changes and offset

9  liquidity constraints.  On December 29, 2004, Mozilo e-mailed "Thoughts for

10  2005," his outlook for Countrywide in the upcoming year, to Cisneros,

11  Cunningham, Donato, Enis, Heller, Melone, Parry, Robertson, Russell, and

12  Snyder.  Mozilo stated, "Fannie's current problems, as well as the increased

13  capitalization requirements of both GSE's, could cause liquidity constraints on

14  the mortgage market for a protracted period.  If this situation comes to reality,

15  then it would be expected that spreads would widen between government paper

16  and mortgages, and that mortgage rates could rise at a faster pace than

17  government-backed securities. . . .  At the same time, we must work vigorously to

18  continue to gain market share in order to make up for the inevitable fall off of

19  volumes within the mortgage industry."  Ex. 1605 at CFC2007I320666-67.

20       Countrywide's fixation on gaining market share was a corporate objective

21  that was discussed frequently at Board meetings.  Heller Dep. at 104:08-109:04;

22  Cisneros Dep. at 68:24-69:08.  Countrywide's strategic mission was discussed

23  again in the presentation materials for the February 22, 2005 meeting of the

24  Board's Strategic Planning Committee.  Enis, Robertson, and Parry were in

25  attendance.  The presentation reiterated that Countrywide's goal was to

26  "[m]aintain the broadest rational U.S. mortgage product line available to meet

27  consumer demand and be able to competitively price any 'saleable' or 'bankable'

28

**Exhibit A
0015**

1   loan."  The presentation materials also expressed that although Countrywide had

2   almost twice the number of unique products available compared to its

3   competitors, it was continuing to expand its product line.  In fact, the plan for

4   2005 was to introduce "8 enhanced or new products per month."  The

5   presentation again showed that Countrywide already had more than twice the

6   number of loan products as the second-leading competitor.  Ex. 914 at MRM

7   NYF_0005194.

8        Melone knew that Countrywide's strategy was to maintain the broadest

9   product line in the U.S.  Melone Dep. at 107:10-24.  Melone also understood that

10   Countrywide's strategy was to gain market share by offering new products.  *Id.* at

11   109:07-17.  He acknowledged he was made aware of the various products

12   Countrywide was offering to customers.  Ex. 914 at MRM NYF_0005194;

13   Melone Dep. at 104:13-105:6; 106:23-107:24.  However, Melone was not

14   prepared to provide the requisite oversight as a Director because he did not

15   believe that a Director should know the differences between the loan products

16   offered by Countrywide.  Melone Dep. at 112:7-13.

17        The Director Defendants knew or should have known with the sheer

18   number of new products, fervor to increase market share, and Countrywide loan

19   originators compensated based on the volume of loans underwritten, that

20   Countrywide would not be able to consistently originate "high quality" loans as

21   quality would be sacrificed for market share.  They further knew or should have

22   known that the strategy to match competitors, who were lessening their

23   underwriting standards, and to originate every saleable or bankable loan as the

24   purchasers of mortgage-backed securities ("MBS") were willing to accept riskier

25   and riskier loans, that the credit quality of loans being originated by Countrywide

26   was deteriorating.  Indeed, Heller could not recall a time when the Board was

27   advised by management that Countrywide would not originate a type of loan that

28

**Exhibit A
0016**

1  could be packaged in an MBS because it was too risky.  Heller Dep. at 136:1-15.
2  In approving the Strategic Plan at the Board's February 10, 2004 meeting (Ex.
3  1677), the Director Defendants therefore knew or should have known that they
4  were approving a "race to the bottom" with regard to credit quality, driven by
5  origination of riskier and riskier loans by competitors and the willingness of
6  investors to accept riskier and riskier MBS.

7          The Board members knew or should have known that Countrywide's
8  market-driven strategic plan would compromise its underwriting guidelines.  The
9  Board had discussions about new products designed to expand the universe of
10 persons who could qualify for housing finance, a process which included
11 expanding the underwriting guidelines.  Cisneros Dep. at 80:07-81:04.  The
12 Board knew that underwriting guidelines were expanded to accomplish the goal
13 of maintaining the broadest product line.  For example, Cisneros knew that efforts
14 were under way to make more mortgages available by, among other things,
15 lowering FICO score requirements.  Cisneros SEC Dep. at 38:04:39-17.  He was
16 also aware that Countrywide sought to expand the universe of persons who could
17 qualify for housing finance by expanding underwriting standards.  Cisneros Dep.
18 at 80:13-81:04.

19         Melone testified that as time went on, he knew that underwriting guidelines
20 were being expanded to meet the competition in order to gain or keep market
21 share.  Melone Dep. at 209:13-210:08.  Melone knew that the underwriting
22 guidelines at Countrywide changed to meet the marketplace, and that the directors
23 were generally kept informed of these guidelines for various products.  In fact,
24 Melone suggested that guidelines were expanded in order to force people into
25 them.  *Id.* at 132:25-133:09.  He believed that Russell had a greater understanding
26 of the guideline changes.  *Id.* at 33:14-35:16.  As a result, Melone deferred to
27 Russell's experience and knowledge.  *Id.* at 36:24-37:6.

28

1   Snyder also knew that as demand in the marketplace increased,

2   Countrywide was developing alternative loans for borrowers who could not

3   initially qualify.  Snyder Dep. at 156:14-18.  Snyder was also aware that if

4   Countrywide's lenders were unable to accommodate a prospective borrower in

5   one loan program, they could look to other programs to accommodate the

6   borrower.  *Id.* at 142:21-144:16.

7   Additionally, the Board was aware that the expansion of underwriting

8   guidelines led to increased credit risk.  Snyder understood that Countrywide's

9   credit risk would increase for loans held by the company if guidelines such as

10  FICO or LTV were less restrictive.  *Id.* at 147:25-148:16.  Moreover, Parry was

11  aware in 2005 that Countrywide's underwriting guidelines had become more

12  aggressive, including lower FICO scores, high LTV, and reduced documentation.

13  Parry understood that expanded guidelines increased the likelihood of

14  delinquency or default.  Parry SEC Dep. at 57:17-58:09.

15  Countrywide's goal to maintain the broadest product line included the

16  "matching strategy."  Russell understood the matching strategy to be the same as

17  the supermarket strategy.  Russell Dep. at 226:05-227:19.  He was aware that

18  Countrywide's matching strategy was to offer a wide range of products that

19  would be competitive in the marketplace in terms of rate, down payment,

20  underwriting criteria and the customer's perception of the product.  That included

21  adding a product on the menu if a competitor was offering it.  *Id.* at 226:05-

22  229:09.  John McMurray, the Chief Risk Officer, expressed to the Credit

23  Committee of the Board that the chief concern with the matching strategy is that

24  Countrywide's risk standards would get ceded to other institutions.  McMurray

25  SEC Dep. at 195:20-196:11.

26  Russell and McMurray discussed the matching strategy extensively, while

27  also discussing the tension between production and credit in product standards,

28

1    criteria, and pricing.  Russell Dep. at 228:09-231:04.  However, Russell was not

2    anxious to be involved in the debate over underwriting guidelines.  McMurray

3    Dep. at 249:14-250:16.  He clearly did not want to be involved in the tension

4    between production and credit, feeling that decisions on production should be

5    made by management and that he did not have the knowledge, expertise, or

6    authority to decide company policy.  Russell Dep. at 231:09-236:06.  Russell did

7    have that knowledge, expertise, and authority, however.  For example, as Chief

8    Risk Officer at Mellon Financial Corporation, his responsibilities included

9    monitoring, managing, and overseeing risks, including interest rate risk, credit

10   risk, and servicing risk.  *Id.* at 17:25-21:21.  In contrast, Heller believed it was the

11   Board's responsibility to make sure that the credit risk systems that the Board set

12   up were implemented and monitored.  Heller Dep. at 69:24-71:15.

13          The Board failed to appreciate the risks associated with guideline

14   expansion and the deployment of a matching strategy.  Parry testified that the

15   Board did not need to be made aware of the risk issues associated with the

16   matching strategy as presented in an e-mail by McMurray regarding matching

17   strategy risk and aggressive guideline expansion.  Parry SEC Dep. at 32:19-35:02.

18   Although he should have known otherwise, Donato didn't believe that the

19   expansion of subprime underwriting standards created greater risk to

20   Countrywide.  Donato SEC Dep. at 151:17-22.

21          The expansion of guidelines led to the deterioration of the loans

22   Countrywide was originating and rendered the statement that Countrywide

23   originated "high quality loans" in its Form 10-Ks and 10-Qs materially false and

24   misleading.  The Board was informed of the clear deterioration in the credit

25   quality of loans being originated during several years prior to 2004.  Melone Dep.

26   at 163:24-165:15.  Melone confirmed that in 2004, Countrywide had originated

27   no-documentation or low-documentation loans, issued interest-only loans, and

28

1   had increased CLTVs from the previous benchmark.  *Id.* at 185:23-184:19.

2   Inconsistent with his duty as a Director, he testified that he didn't get into the

3   details of understanding underwriting guidelines.  *Id.* at 35:05-10.  As for King,

4   incredibly, she was not even sure whether the Board should have been informed

5   that there was a clear deterioration in credit quality over the several years leading

6   into 2004.  King Dep. at 139:20-147:23; 37:10-38:15.

7        As Countrywide expanded its underwriting guidelines, the Board received

8   reports and warnings relating to the increased credit risk associated with the

9   strategies that Countrywide had assumed.  Donato, Enis, and Snyder attended the

10  February 10, 2004 meeting of the Credit Committee during which Nick Krsnich,

11  the Chief Investment Officer, presented a report on the company's credit risks,

12  discussing "loan performance, delinquencies, and quality control across the

13  company's various mortgage loan products."  Krsnich also noted the Company's

14  increase in stated documentation loans as well as its execution on subprime fixed-

15  rate second loans.  Ex. 1976 at MRM NYF_0018630-31; Enis Dep. at 84:2-86:14.

16  This Credit Risk Report contained information that was generally received at a

17  Board committee meeting and involved a "fairly extensive discussion on the

18  credit risk associated with" such products.  Enis Dep. at 86:17-87:24.  Krsnich

19  also informed the Committee that the Company had begun originating **125%** LTV

20  loans.  Ex. 1976 at MRM NYF_0018631.

21       The Board's Credit Committee was also aware of the rise in delinquency

22  rates due to guideline expansion.  Donato, Enis, and Russell attended the June 15,

23  2004 Credit Committee meeting which included a presentation on Nonprime

24  Delinquency Trends.  The report stated that "2003 subprime first and seconds

25  may be marginally worse due to guideline expansions (e.g. LTV and stated doc

26  expansion)."  Ex. 1981 at CFCNYF00454123.  Enis could not confirm that this

27  information was important, stating only that it was "one bit of a great deal of

28

1    information" that the committee considered at each meeting.  Enis considered the

2    increased credit risk due to guideline expansion as an issue to be discussed, but

3    not as a concern.  Enis Dep. at 137:15-141:24.  In the normal course of business,

4    the Board received information on delinquency trends for various types of loans,

5    including subprime.  Additionally, trends of Loan-To-Value (LTV) origination

6    were also provided to the Board.  Heller Dep. at 172:04-174:22-25.

7        The report also indicated that a number of housing markets in California,

8    Florida and in the Northeast had already exhibited evidence of being overpriced.

9    Ex. 1981 at CFCNYF00454413-14.  The Board had discussed the overpricing of

10   certain California markets and the Florida markets.  Heller Dep. at 170:06-

11   171:19.  The Bank Board further discussed that the appreciating housing market

12   could not be sustained.  Garcia SEC Dep. at 244:04-11.  In fact, McMurray

13   frequently discussed his increasing concerns about the sustainability of the

14   trajectory of home pricing to the full Board.  McMurray Dep. at 61:14-62:12.

15       McMurray made presentations to the Board regarding the kinds of products

16   being offered by Countrywide and the methods of managing their credit risks.

17   Melone Dep. at 59:24-62:02.  McMurray also reported periodically to the Board

18   of Directors on credit risk concerns, including reports to the Audit, Credit, and

19   Finance Committees of the Board of Directors.  McMurray Dep. at 47:12-48:17;

20   Heller Dep. at 95:07-12.  On September 9, 2004, McMurray sent a

21   comprehensive credit risk e-mail that described in detail why Countrywide's

22   exposure to credit risk was increasing.  The e-mail provided a number of

23   undisclosed reasons for this trend, including deteriorating loan quality, aggressive

24   guideline expansion, risk layering, risk retention, and the unlikelihood that home

25   price appreciation would continue.  Ex. 838 at CFCP001134012.  McMurray also

26   discussed with the Board's Credit Committee that eliminating all risk in a

27

28

1   financial institution is a "distortion of reality."  Ex. 810 at CFCP005887982;

2   McMurray Dep. at 524:1-525:19.

3        McMurray further wrote in his September 2004 e-mail that loan quality

4   was deteriorating throughout the primary market due to competitive factors in the

5   areas of underwriting standards and riskier loan programs, such as ARMs, and

6   riskier loan features such as low or no-documentation, interest-only, and/or higher

7   CLTV/LTVs.  Ex. 838 at CFCP001134012.  Referring to loan quality, McMurray

8   added, "We are doing less and less mainstream product and more products with

9   one or more incremental risk features.  A significant portion of our recent

10  subprime production is now 80/20, IO, stated doc, etc.  Many of these loans have

11  layered risks (e.g., high CLTV + IO + stated)."  *Id.* at CFCP001134017.

12       McMurray shared his thoughts with "[a]lmost anyone who would listen" at

13  Countrywide, including Russell.  McMurray Dep. at 321:11-322:20; 323:16-

14  324:8.  He forwarded his credit risk e-mail to Russell on June 6, 2005.

15  McMurray informed Russell that the credit risks he outlined in 2004 had become

16  higher in 2005.  Russell responded that he would review the e-mail in detail but

17  that it seemed "very comprehensive at 'first look.'"  Ex. 839 at CFCP001130211.

18  In an e-mail to McMurray, Michael Burak, an employee in Secondary Marketing,

19  stated that most of the information in the e-mail was included in the various

20  product books, including the product executive summaries.  June 7, 2005 Burak

21  e-mail at CFCP001130310-20.  The Credit Committee received reports related to

22  the loss forecasting of particular products, such as pay option loans, along with

23  product books detailing loan performance.  Donato SEC Dep. at 93:03-97:15.

24       In June 2005, McMurray distributed his September 2004 credit risk e-mail

25  to Cunningham, Enis, Robertson, Kathleen Brown, and Russell.  Ex. 1780 at KB-

26  NYF 004313; Ex. 1781 at KB-NYF 004314.  In a cover memorandum

27  accompanying the September 2004 e-mail, McMurray wrote: "This e-mail

28

1   explains why I thought CFC's credit risk was increasing.  All of the factors

2   outlined in the e-mail are still present today.  In addition, CFC continues to

3   broaden its product line as well as retain more credit risk in the form of whole

4   loans, especially Treasury Bank . . . .  A central tenant [sic] of CFC's corporate

5   strategy . . . is to offer the industry's widest product line."  Ex. 1780 at KB-NYF

6   004313.

7          As noted above, McMurray reported periodically to Board Committees on

8   credit risk concerns.  McMurray Dep. at 47:12-48:17.  Russell would relay the

9   most important issues presented at the Credit Committee meetings to the full

10  Board.  Russell Dep. at 174:04-175:17.  If an issue was reported to the Credit

11  Committee, then it would have been reported to the Board of Directors.  Snyder

12  Dep. at 197:15-198:21.  In fact, due to the detail of the Committee reports at

13  Board Meetings, in February 2006, the Corporate Governance Committee

14  recommended that the reports be limited to the most important matters and that

15  the minutes from all committee meetings be distributed to all Directors of the full

16  Board for their review.  Heller Dep. at 79:21-80:23; Enis Dep. at 84:19-22; Ex.

17  2025 at KPMG-06FYA-014-000014.

18         Russell knew that in September 2004, both Countrywide and the market

19  was experiencing a decline in underwriting criteria rather than maintaining the

20  high quality standards represented in Countrywide's SEC filings.  Russell knew

21  that expanding underwriting guidelines could lead to higher risk.  Moreover, he

22  knew that wider guidelines could directly translate into higher expected

23  delinquencies and higher expected costs.  Russell Dep. at 110:07-114:20.  Russell

24  failed to take McMurray's September 2004 e-mail seriously, however.  Despite

25  the significant issues presented in the e-mail, Russell did not bring it to anyone

26  else's attention.  *Id.* at 89:03-10.  The Board expected Russell to distill

27  McMurray's significant credit risk issues for them.  Heller Dep. at 195:16-198:16.

28

1   In fact, nothing in McMurray's e-mail caused Russell to react strongly, panic, or
2   ask for clarification, or differed from what Russell understood to be the current
3   state of affairs.  Russell also believed that McMurray's views were already
4   incorporated and embedded in Credit Committee materials.  Russell Dep. at
5   60:03-07; 90:21-94:25.

6   The Board discussed CFC's increasing credit risk, and the deteriorating
7   loan quality stemming from more aggressive underwriting standards and riskier
8   loan programs.  Melone Dep. at 179:15-181:12.  Melone recalled discussing
9   certain issues in McMurray's e-mail, including deteriorating loan quality, with the
10  Board.  *Id.* at 182:17-184:13.  Snyder knew that as the market evolved,
11  Countrywide saw more loans with layered risk, higher loan-to-value ratios,
12  reduced documentation, and lower FICO scores and that information would have
13  been reported to the Board.  Snyder Dep. at 196:12-197:13.  Yet, the Board of
14  Directors failed to ensure that Countrywide disclosed that it was originating low-
15  documentation or no-documentation loans in the 2004 Form 10-K.

16  Donato believed that Countrywide changed the criteria of its loans based
17  on the standards of the ultimate investor and the marketplace.  Donato SEC Dep.
18  at 128:08-130:16.  Donato knew that Countrywide's business plan would change
19  based on investors' appetites.  *Id.* at 24:17-25:21.

20  McMurray provided extensive presentations to the Credit Committee on a
21  gamut of issues, including loan performance, delinquencies, foreclosures, and the
22  entire loan portfolio.  *Id.* at 37:06-24.  As a follow-up to his September 2004 e-
23  mail, McMurray produced a 2004 Q3 Report on increasing credit risk for the
24  Credit Risk Management & Finance Committee of the Board of Directors.  Ex.
25  1980 at CFCNYF00454409.  McMurray's report expanded on the issues
26  expressed in his e-mail.  The report contained detailed data on ARMs, credit
27  reserves, and delinquency trends for various loan products.  McMurray reported

28

**Exhibit A
0024**

1   increased HELOC and subprime production as well as executions where
2   Countrywide retained "most . . . or a substantive amount . . . of the underlying
3   credit risk." *Id.* The report also described ARM-specific concerns such as
4   "Combining ARMS with other risky features (IO and/or undocumented income)."
5   *Id.* at CFCNYF00454426. The report further stated that the composition of
6   Countrywide's subprime production is moving towards high LTV, 80/20, interest
7   only, and stated documentation. *Id.* at CFCNYF00454434. This layering of risks
8   was also not disclosed in the 2004 10-K.

9       The Board failed to take steps to disclose the credit risk warnings they were
10   receiving. Enis believed that McMurray's information regarding increasing credit
11   risk was "useful [but] not more or less useful than some other information." Enis
12   Dep. at 122:10-123:15. Enis did not testify that this information was important to
13   members of the Credit Committee, but only that it "provokes discussion." *Id.* at
14   126:19-128:4. Incredibly, Enis did not consider it his responsibility as a Board
15   member to raise concerns. *Id.* at 109:6-109:12. When asked whether
16   McMurray's report contradicted the statement in Countrywide's 2004 Form 10-K
17   that Countrywide's "loan origination standards and procedures are designed to
18   produce high-quality loans," Enis stated that he did not recall specifically
19   comparing the two. *Id.* at 130:24-132:10.

20       Members of the Board were aware in 2004 that there was such a significant
21   deficiency in Countrywide's loan origination process that adequate systems were
22   not in place to prevent the origination of unduly risky loans. In connection with
23   September 16, 2004 meeting of the Audit & Ethics Committee, in which Melone,
24   Cisneros, Heller and Russell participated, the Committee received a Sarbanes-
25   Oxley Section 404 Update that stated: "Limitations on system access and
26   segregation of duties are not inherent in the EDGE system. The EDGE system is
27   the loan origination system used by the Company's production units." As for

28

1   remediation efforts, it stated, "Long-term remediation options are being

2   developed.  Manual compensating controls are being identified and tested."  Ex.

3   1603 at CFCNYF00446603.  According to Heller, this supposed manual

4   compensating control was a "handwritten system."  Heller Dep. at 226:1-227:25.

5   Given the volume of loans originated by Countrywide, these Directors knew or

6   should have known that any handwritten system was wholly inadequate.  The

7   Directors knew that this was among the nine Significant Deficiencies that would

8   not be remediated by year end from the February 21-23, 2005 Board Meeting.

9   Ex. 1001 at CFCNYF00267713.  The Directors further knew from the report

10  presented by Eric Sieracki at the February 21-22, 2006 Board Meeting that this

11  significant deficiency had not been remediated as of February 2006.  Ex. 2024 at

12  MRM NYF_0009092.  That report indicated not only that the issue had not been

13  resolved but that the consequence is that "there are no systematic controls that

14  prevent an originator or underwriter to fund a loan."  *Id.*  Heller acknowledged

15  that this is the same issue raised at the September 16, 2004 Audit & Ethics

16  Committee meeting.  Heller Dep. at 242:3-243:2.

17          Moreover, Enis testified that information regarding Countrywide's credit

18  risk trends and levels would be "important" to a member of the Credit

19  Committee, but he denied having "concerns about these things."  He also stated

20  that investors reading Countrywide's public filings would find this information

21  "useful" but was not sure that "important" is the right word.  Enis Dep. at 114:8-

22  115:6.  Ironically, Donato believed there was too much detail for him in

23  McMurray's presentations, as he preferred to focus on trends.  Donato SEC Dep.

24  at 37:06-38:14.  Yet, the increasing credit risk to which Countrywide was

25  exposed was just such a trend.  A detailed report of the information before the

26  Credit Committee was made by Russell at the full Board meeting on September

27  27-28, 2005.  Among other things, Russell reported that Mr. McMurray had

28

1  discussed at the Credit Committee meeting "current credit trends, the real estate

2  market and risks associated with certain products, such as pay option arms and

3  reduced documentation loan programs." Ex. 1607 at CFCNYF00267774-75.

4        The additional credit risk Countrywide assumed was done with the

5  knowledge and approval of members of the Board.  The September 27, 2005

6  Credit Committee Meeting presentation materials included the "Guiding

7  Principles for Investing in Credit Risk."  One principle stated: "Oversight – CFC

8  will take credit risk only when the Credit Committee makes the decision with

9  proper deliberation." Ex. 1985 at CFCNYF00448267.  The materials noted

10 among its credit risk management issues that there were more sales and loans for

11 non-occupying buyers. *Id.* at CFCNYF00448276.  The materials also noted that

12 more loans were being done with higher LTVs or CLTVs, that LTV/CLTV was a

13 key driver of default probability, and Countrywide's exposure was growing due

14 to HELOCs and subprime loans. *Id.* at CFCNYF004482778.  An additional

15 concern was that fewer mortgages were being closed with traditional

16 documentation, while less documentation equals a higher rate of default. *Id.*

17 Cunningham, Enis, Robertson, and Russell were in attendance.  Evidencing the

18 Board's lack of proper attention to Countrywide's increasing credit risk, Melone

19 believed that credit risk could have been ranked higher on the Board's list of

20 priorities.  Melone Dep. at 81:19-84:25.

21       The Board knew or should have known that Countrywide employed a

22 hazardous and undisclosed underwriting exception system as part of its strategic

23 mission.  In McMurray's September 2004 credit risk e-mail, he warned that

24 Countrywide was "doing more exceptions than in the past."  Ex. 838 at

25 CFCP001134015.  In June 2005, McMurray maintained that this warning was still

26 justified in his memorandum to Russell, Brown, Enis and Robertson.  Ex. 1780 at

27 KB-NYF 004313; Ex. 839 at CFCP001130211-14.  In addition, the extent of

28

1   unauthorized exceptions was discussed at the February 10, 2004 meeting of the

2   Audit & Ethics Committee, attended by Cisneros, Donato, King, Melone, and

3   Russell.  The meeting materials expressed that "Pricing exceptions were not

4   authorized on 28 percent of the loans funded in October."  Ex. 1673 at

5   CFCNYF00451727.  Yet, there is no indication the Audit & Ethics Committee

6   ever addressed this significant issue.  It is therefore not surprising that three years

7   later, exception underwriting was still a major area of concern as it was listed on

8   McMurray's "Wall of Worries" in his February 13, 2007 presentation to the

9   Board Credit Committee.  Ex. 923 at CFCP007834447.

10      There was no pubic disclosure in any of the SEC filings incorporated by

11  reference in the Registration Statements signed by the Director Defendants of

12  Countrywide's exception system or the extent to which loans were being

13  originated without complying with the Company's then in-effect underwriting

14  guidelines, even though the prevalence of exceptions continued unabated

15  throughout 2005 and 2006.  All members of the Board save Michael Dougherty

16  attended the November 29, 2006 Board of Directors meeting, as Andy Bielanski

17  (a senior marketing and corporate communications officer) discussed in detail the

18  Company's *"Countrywide Can"* branding campaign.  Ex. 1613 at HGC

19  NYF_0011635.

20      Full Spectrum Lending's "Countrywide Can" presentation of subprime

21  credit risk described Countrywide's subprime underwriting exception trends.  The

22  BC overall exception trends in the Countrywide's Consumer Market Divisions

23  ("CMD") showed over a 30% exception rate ramp-up during 2005 and early

24  2006.  Countrywide Can Presentation at CFC2007C504982.  Additionally,

25  CMD's stated documentation exception rate had steadily exceeded 30% from

26  June 2005 to March 2006, while the exception rate for all 90% LTV and 95%

27  CLTV loans was 25%.  *Id.* at CFC2007C504983.  Moreover, loans with 95%

28

1   LTV and under 600 FICO had exceptions rates of 30% for CMD and 40% for

2   KB-JV (Countrywide's KB Homes Joint Venture).  Also, 80/20 loans with stated

3   documentation and sub-620 FICO had exception rates of 11% for CMD and 13%

4   for KB-JV.  *Id.* at CFC2007C504985.

5          The Board claimed to be concerned with the processes used to ensure that

6   guidelines were being followed.  Heller Dep. at 51:10-52:06.  Nevertheless, the

7   Board either failed to understand the exception system or ignored it.  For

8   example, Heller understood that underwriting exceptions were being made, but

9   did not recall an exception system.  Heller only hoped that people would use

10  judgment as to whether a loan should be made.  *Id.* at 58:02-17.  King could not

11  even recall what a pricing exception was.  King Dep. at 88:02-06.  Snyder could

12  not recall any exception processing system or receiving any reports identifying

13  underwriting exceptions.  Snyder Dep. at 145:10-21.  Even Melone could not

14  recall that Countrywide had an exception policy.  Melone Dep. at 203:05-15.

15  Snyder believed, in fact, that the process of setting and changing guidelines was

16  outside of the Board's role.  Snyder Dep. at 145:22-146:07.

17         Countrywide's Residential Mortgaging Lending presentation from August

18  2007 describes the circumstances by which Countrywide used the exception

19  system.  From 2005-2006, the presentation indicated that "Experiencing an

20  erosion of market share, Countrywide reluctantly followed the industry expansion

21  . . . .  In the Prime space, we elected to expand guidelines primarily via a

22  controlled exception process rather than introducing as standard guidelines; while

23  in Subprime, we expanded posted guidelines."  The presentation shows that from

24  pre 2005 to 2006, Countrywide reduced minimum FICO score for "prime" full

25  documentation loans with 100% CLTV from 660 to 620.  Additionally, the

26  minimum FICO score for low documentation loans with 100% CLTV was

27  reduced from 700 to 620.  Ex. 921 at CFC2007I286181.  This resulted in 26% of

28

1   Countrywide's loans with less that 620 FICO having 100% CLTV.  *Id.* at

2   CFC2007I286182.

3       On December 7, 2006, Mozilo sent a memorandum to the Board

4   concerning Countrywide's subprime mortgage business and guidelines expansion.

5   Mozilo stated that "[w]e offer substantially all of the residential mortgage

6   products available in the industry as part of our 'supermarket' strategy."  Mozilo

7   stated that the expansion of underwriting guidelines is the primary factor driving

8   the dramatic growth of subprime volume.  Mozilo added that subprime had

9   evolved "to a sector offering very high leverage and reduced documentation."

10   Ex. 1614 at CFCP006700248.  Mozilo also informed the Board that he agreed

11   that the 2006 loan vintage would be one of the worst in history and that "the poor

12   performance will be driven by the combination of wider guidelines and the

13   transitional economic environment."  Mozilo additionally stated that performance

14   has deteriorated in each successive year "as a result of guideline expansion."  *Id.*

15   Mozilo's memo further demonstrated that interest-only and 100% piggyback

16   loans were not offered in 2001, but were offered in 2006 with a minimum 560

17   and 580 FICO score, respectively.  Additionally, stated documentation loans

18   constituted 36% of subprime production in 2006, while interest-only loans were

19   23% and 100% CLTV were 24%.  *Id.* at CFCP006700249.  Mozilo noted that

20   Countrywide retained, "material credit and market risk on subprime

21   securitizations through creation of residual securities, which remain on CW's

22   balance sheet subsequent to settlement."  *Id.* at CFCP006700250.

23       The Board was already familiar with the issues presented by Mozilo,

24   including the rises in delinquencies.  Donato SEC Dep. at 147:22-148:05.  Russell

25   considered the memo very informative, but was probably aware and familiar with

26   most of the matters.  Russell Dep. at 217:01-221:06.  Parry was already familiar

27   with some of the issues in Mozilo's memo through reading and discussions.

28

1  However, the issue of piggyback loans occurred to Parry late as he did not realize

2  how prevalent piggy backs would be over time.  Parry SEC Dep. at 45:10-12.

3  Snyder could not recall whether he was surprised by the contents of Mozilo's

4  memo.  Snyder Dep. at 154:14-23.

5         Cisneros understood that layered risk involved the combination of risks that

6  occurred when products with different risk profiles are combined, yet none of the

7  SEC filings he approved disclosed the extent of this fact.  As a result of Mozilo's

8  memo, Cisneros became aware that "100% financing represented 62% of

9  Countrywide's 2006 second quarter subprime business."  Ex. 1614 at

10  CFCP006700249; Cisneros Dep. at 106:04, 109:12.  Referring to Mozilo's memo,

11  Melone testified that the expansion of Countrywide's subprime menu over recent

12  years was discussed at a number of meetings.  Melone Dep. at 204:13-205:01.

13  Despite the important issues enumerated in Mozilo's memorandum, the Board did

14  not discuss it at any meeting.  Cisneros SEC Dep. at 59:08-13.  Surprisingly,

15  Cisneros did not believe the contents of the memo should have been disclosed in

16  the Form 10-K.  *Id.* at 60:05-12.

17         Snyder also understood that credit quality may have been deteriorating.

18  Snyder Dep. at 153:04-15.  Snyder acknowledged that he knew that

19  Countrywide's subprime loan business had evolved from a sector largely

20  comprised of borrowers with impaired credit doing transactions at moderate to

21  low LTVs to a sector offering very high leverage and reduced documentation.  *Id.*

22  at 157:10-158:05.  Snyder was aware that Countrywide was offering 80/20 loans,

23  known as piggybacks, and pay option loans with lower introductory rates than

24  accrual rates that could result in negative amortization and payment shock.  *Id.* at

25  160:03-166:17.

26         The Board had knowledge of the expanding underwriting guidelines used

27  in originating loans.  For example, Heller saw and discussed Countrywide's

28

1   guidelines.  Heller Dep. at 50:05-51:03.  While Enis saw them also, he indicated

2   that the Board would not see all of the underwriting guidelines that Countrywide

3   applied for its various products because the guidelines "change[d] from day-to-

4   day."  Regardless, the Board was quite cognizant of the process by which the

5   guidelines were put together.  Enis Dep. at 44:01-14.

6        The undisclosed increases in credit risks to which Countrywide was

7   exposed continued unabated throughout the period of time of the offerings.  In

8   2007, the Board continued to be aware of Countrywide's loan deterioration and

9   increasing credit risk and model deficiency.  On February 20, 2007, Cisneros,

10  Cunningham, Donato, Melone, Parry, Robertson, and Snyder received a

11  confidential e-mail from Jennifer Pitcock attaching McMurray's February 13,

12  2007 Credit Report Presentation.  Ex. 922 at CFCP007834422.  This presentation

13  stated that, "Credit exposures have increased in volume, breadth, and complexity

14  as part of the Company's long-term transition away from being a mortgage

15  banker."  Ex. 923 at CFCP007834426.  McMurray reported that 2006 vintage will

16  be one of the worst performing books in recent history and that the 2005 vintage

17  is also performing poorly.  *Id.* at CFCP007834436.

18       The presentation also included McMurray's "Areas of Concerns – 'Wall of

19  Worries,'" a summary of the serious risks that Countrywide was taking including

20  loan quality and exception underwriting.  McMurray attributed loan deterioration

21  to increased layering.  *Id.* at CFCP007834446-47.  One concern was that most

22  borrowers were making payments resulting in negative amortization.  *Id.* at

23  CFCP007834454.  Cisneros believed, however, that offering negative

24  amortization loans was a reasonable business practice.  Cisneros Dep. at 73:11-

25  21.

26       Another concern expressed in the "Wall of Worries" was that the majority

27  of HELOCs were reduced documentation.  Ex. 923 at CFCP007834460.

28

**Exhibit A
0032**

1  Although McMurray considered the high levels of negative amortization and

2  HELOCs with reduced documentation to be concerns, Cunningham ignored his

3  concerns.  Cunningham Dep. at 98:21-100:13.  Another concern with HELOCs

4  was that layered risk was driving poor performance.  Ex. 923 at CFCP007834461.

5  As discussed below, McMurray's presentation also expressed that there were

6  "holes" in Countrywide's reserve models.

7        As a result of expanded guidelines and prevalence of authorized and

8  unauthorized exceptions to those guidelines, members of the Board of Directors

9  was further aware that the number of Suspicious Activity Reports ("SARs") had

10  increased during the Class Period, along with the percentage of SARs stemming

11  from mortgage fraud.  The reports presented to the Board or the Audit Committee

12  revealed that a significant number of the SAR filings was based on "income

13  misrepresentation," evidencing the growing credit risks of Countrywide's

14  growing use of no or low-documentation loans, particularly to subprime

15  borrowers.

16        The Fraud Prevention and Investigation Report within the Audit and Ethics

17  Committee presentation materials for November 11, 2003 indicated that CFC's

18  SAR filings had steadily increased, while 74.2% of SAR filings from July 16 to

19  September 30, 2003 were for mortgage fraud.  Ex. 1675 at KPR NYF_0012609-

20  10.  Moreover, the report indicated that a large percentage of SAR filings was

21  based on borrower misrepresentations, including income.  *Id.* at KPR

22  NYF_0012624-34.

23        Cisneros, Heller, Melone and Russell attended a June 15, 2004 Meeting of

24  the Board Audit & Ethics Committee that included a presentation on SARs

25  filings.  The presentation revealed that 88% of SARs filed dealt with mortgage

26  fraud and that SARs filed on appraisers rose to 26%.  Ex. 2022 at

27  CFCNYF00452052.  Many of the SARs filed were based on income

28

1   misrepresentation.  Heller Dep. at 147:22-148:06; Ex. 2022 at

2   CFCNYF00452054-62.  Heller believed that the volume of loans at Countrywide

3   became so enormous that more borrowers tried to engage in different schemes,

4   resulting in a higher volume of SARs.  Heller Dep. at 148:07-149:22.

5        Members of the Board were also aware that the SARs filings continued to

6   increase with the principal reason being due to Countrywide's origination of

7   stated-documentation loans.  Materials presented at a January 31, 2007 Audit

8   Committee meeting showed that 95% of SAR filings in 2006 were mortgage-

9   related.  KPMG-XXMAB-000-028695.  Even worse, 97% of Form 4506 SAR

10  filings were attributed to stated income by borrowers, and IRS income tax

11  information differed substantially from borrowers' listed incomes in 78% of all

12  mortgage-related Form 4506 SAR filings.  *Id.* at 028696.  Russell and the Audit

13  Committee discussed the increase in SARs, which was due to an increase in

14  stated-documentation and reduced-documentation loans.  Russell Dep. at 203:12-

15  19.  Russell knew that there was evidence that the borrower information provided

16  to Countrywide didn't match borrower IRS records.  *Id.* at 204:19-207:25.

17       The Pay Option ARM program and the decision to grow Countrywide

18  Bank's portfolio from pay option loans was a strategic plan supported, approved

19  and endorsed by the Board.  Garcia Dep. at 73:15-74:06, 125:5-128:22, 136:2-23;

20  Garcia SEC Dep. at 250:12-15.  Although the Bank ceased the accumulation of

21  pay option loans into the portfolio at one point because of credit risk, the Board

22  soon approved the resumption of pay option accumulation as a part of

23  Countrywide's strategic plan.  Garcia Dep. at 156:10-21.  The credit risks of pay

24  option loans were reported to the Board of Directors.  Snyder Dep. at 173:02-09.

25  According to Mozilo, "the board was continuously informed, relative to the steps

26  we were taking, concerning all of our products in the bank, including … my

27  thoughts relative to what potentially could happen on the negative side."  Mozilo

28

1  SEC Dep. at 462:10-17.  In fact, the Bank portfolio was discussed with the Credit

2  Committee and Rossi, White, or someone else from the bank was at every

3  committee meeting to supplement the information provided by McMurray.

4  McMurray Dep. at 546:15-547:18; Ex. 809 at CFC2007829000.  Also, as CEO of

5  Countrywide Bank, Garcia was accountable to the Bank's Board of Directors.

6  Garcia Dep. at 48:23-49:16.

7           Members of the Board knew that Countrywide placed subprime loans into

8  the Bank portfolio.  At the March 9, 2004 meeting of the Board's Strategic

9  Planning Committee, it was announced that the Bank was planning to expand its

10  product line for loans with FICO scores of less than 660.  Garcia informed the

11  Board that there might be a shift in loan products from hybrid ARMs to fully

12  adjustable ARMs which would need to be developed by Countrywide Home

13  Loans and the Bank.  Ex. 1601 at CFCNYF00267099.  Cisneros, Cunningham,

14  Heller and King were in attendance.  *Id.* at CFCNYF00267098.  Donato knew

15  that most of the Bank's Pay Option ARMs were held in the Bank for income

16  spread and not securitized.  Donato understood that the intent was to hold pay

17  options for investment.  Donato SEC Dep. at 62:13-63:09.  Parry knew the

18  Bank's portfolio changed as more pay options and subprime loans were moved to

19  the Bank because they could not be sold.  Parry SEC Dep. at 62:4-8.  Although

20  Snyder acknowledged that the role of the Board included assessing the risks faced

21  by the Bank, he either ignored or failed to assess these risks because he testified

22  he was comfortable with the credit risk information provided from Countrywide's

23  management on pay options with no documentation, loans held for investment

24  (HFI), and residual interests.  Snyder Dep. at 146:09-147:09, 203:06-204:21.

25           Members of the Board of Directors also knew in 2005 that Countrywide's

26  models could not accurately predict pay option performance.  The meeting

27  materials distributed at the February 22, 2005 Finance and Credit Committee

28

1   meeting contained a Credit Review presentation for the fourth quarter of 2004.

2   Ex. 1983 at CFCNYF00457237.  The section on Credit Risk Indices described

3   unresolved ARM issues.  For example, it stated that the "IO is new and increased

4   risk is not yet observed in empirical results and therefore not in empirical

5   models."  *Id.* at CFCNYF00457249.  Enis acknowledged that Countrywide's

6   failure to account for interest-only ARMs in its reserve models was presented to

7   the Credit Committee as far back as February 22, 2005.  Enis Dep. at 154:25-

8   155:11; 156:20-158:17.  The Board lacked oversight with respect to the product

9   modeling.  According to Enis, the Board of Directors "did not get into operations

10  of the models."  *Id.* at 56:9-57:13.  In his February 13, 2007 Credit Risk

11  presentation, McMurray warned of a "lack of key models, shortcomings."  Ex.

12  923 at CFCP007834447.  Melone acknowledged that Countrywide's models

13  "weren't up to speed, weren't doing what we wanted, and they had to make

14  manual adjustments."  Melone Dep. at 216:08-20.

15       Cunningham, Donato, and Enis attended the April 19, 2005 Credit

16  Committee meeting at which McMurray presented materials reporting that

17  interest-only ARMs were a new product and increased risk was "not yet observed

18  in empirical results and therefore not in empirical models."  Ex. 1982 at

19  CFCNYF00457375.  The April 19, 2005 report further indicated that

20  Countrywide had dramatically increased its origination of pay option ARMs

21  through the use of reduced documentation guidelines.  *Id.* at CFCNYF00457383.

22  The report also noted that stated-documentation products would experience more

23  losses where Countrywide retained some or all of the credit risk.  *Id.* at

24  CFCNYF00457386.  McMurray recommended that Countrywide should develop

25  a "straw man" to mitigate its exposure.  *Id.* at CFCNYF00457389.

26       Members of the Board knew of the heavy concentration of pay-option and

27  subprime loans in the Bank's portfolio, as well as the risks associated with their

28

1    retention.  At the Board Credit Committee meeting on November 29, 2005, for

2    example, McMurray discussed Countrywide's pay option product in detail,

3    describing key features, pros and cons, challenges and risks, and the control

4    systems utilized to manage the product.  Cunningham, Donato, Enis, Robertson

5    and Russell were in attendance.  Ex. 1185 at CFCNYF00267797.

6         However, the Board knew that Countrywide's existing control systems

7    were not adequately managing risk through the Enterprise Risk Assessment

8    Maps.  The Enterprise Risk Assessment Map (ERAM) was a communication

9    vehicle to the Board regarding the assessment of risks across the organization.

10   Smiechewicz Dep. at 101:1-4.  The ERAM was a "heat map," a detailed listing of

11   the various types of risks faced by Countrywide that was color-coded depending

12   on the areas that the Company was more or less concerned with.  Smiechewicz

13   would have typically provided the ERAMs to the Board's Audit Committee.

14   McMurray SEC Dep. at 90:12-21; 103:24-104:22.  The maps were generally

15   issued to coincide with Board meetings and would be refreshed right before so

16   that the Audit Committee would have an updated assessment.  For each risk

17   mentioned in the map, the idea was to give the Board an idea of what was going

18   on in a summary fashion.  *Id.* at 112:5-115:6.

19        For example, the August 2006 ERAM revealed that Countrywide was

20   exposed to various risks.  One credit portfolio risk was that the "failure to

21   adequately monitor credit metrics and appropriately respond to adverse

22   delinquency performance trends may result in losses exceeding expectations."

23   Another credit portfolio risk was that "lending decisions are based on faulty credit

24   evaluation systems."  The Board was also aware of the reserving methodology

25   risks, such as the risk that "factors considered and assumptions made to create the

26   ALLL model may not be documented and tested for validity or updated in a

27   timely fashion as necessary.  The reserving methodology may be theoretically

28

1  flawed or inconsistently applied."  Ex. 710 at KPMG-XXOTH-005-188625.

2  Additionally, the "data, parameters, or assumptions input into models may be

3  inaccurate or incorrectly entered, resulting in invalid output and financial or

4  operational losses to CFC."  *Id.* at 188621.  The Board was further aware that

5  Countrywide's liquidity "may be constrained due to a lack of diversification of

6  funding sources including Countrywide Bank's reliance upon non-traditional

7  deposit funding sources" and that "Growth may be hindered through a lack of

8  sufficient liquidity and equity capital."  *Id.* at 188624.

9       The presentation materials for the November 29, 2005 Credit Committee

10  Meeting discussed Countrywide's increasing credit risk trend.  Eighty percent of

11  August 2005 ARM fundings were Pay Options, "with PayOptions comprising

12  34% of the Bank's portfolio."  Additionally, "36% of PayOption loans have

13  negative amortization totaling ~$25 million."  Cunningham, Enis, Russell and

14  Robertson were present at the meeting.  Ex. 842 at CFC2007I303119.  The

15  presentation materials also contained detailed data of retained credit risks.  For

16  example, Countrywide retained 78% of subprime piggyback loans without

17  mortgage insurance and an average FICO of 626.  Ex. 842 at CFC2007I303110.

18  Furthermore, 63% of subprime first-lien loans were retained with CLTVs over

19  95% and an average FICO of 642.  *Id.* at CFC2007I303111.  By having one loan

20  with 80% LTV and another 20% piggyback loan, Snyder knew the borrower

21  could avoid mortgage insurance, which was required on loans with 90%-95%

22  LTV.  Without mortgage insurance, the risk might increase.  Snyder Dep. at

23  192:02-193:13.

24       Members of the Board of Directors also understood that types of

25  adjustable-rate mortgages held by the Bank significantly increased Countrywide's

26  retained credit risk.  McMurray provided another report on Countrywide's credit

27  risk at the February 21, 2006 Credit Committee Meeting of the Board of

28

1   Directors.  He informed the Committee that much of Countrywide's retained risk

2   was in the form of adjustable-rate mortgages held by the Bank.  Enis, Robertson

3   and Russell were in attendance.  Ex. 1003 at KPMG-06FYA-014-000275.

4   During that meeting, Cliff Rossi, the Bank's Chief Credit Officer, noted an

5   increase in delinquencies and nonperforming assets.  *Id.* at 000277.

6          The February 21, 2006 Credit Committee meeting materials contained a

7   credit risk analysis, including data depicting sold vs. retained credit risk by

8   product, with factors such as LTV and FICO score.  Enis, Cunningham, Russell,

9   and Robertson were present.  For example, Countrywide retained 64% of

10  subprime first-liens with an average FICO of 617 and only 4% mortgage

11  insurance.  Ex. 1987 at CFCNYF00460680.  The Board knew that the percentage

12  of mortgage insurance was not disclosed.  A discussion of the factors separating

13  prime and subprime was also included in McMurray's presentation.  The

14  presentation showed that Countrywide considered full documentation loans with

15  95% LTV and a 620 FICO as prime loans.  *Id.* at CFCNYF00460689.  Russell

16  saw statistics showing the documentation status of pay option loans and

17  participated in a series of discussions on that topic.  Russell Dep. at 198:06-

18  201:06.

19         McMurray's presentation at the February 21, 2006 Credit Committee

20  meeting included information on special topics, such as FICO and CLTV

21  distribution, neither of which were disclosed.  Ex. 1987 at CFCNYF00460690-91.

22  McMurray also reported that portfolio delinquencies had increased steadily

23  during 2005 and that in recent vintages, Countrywide's reserve model had been

24  underestimating delinquencies in the lower risk segments.  *Id.* at

25  CFCNYF00460721, 724.  When asked if he was apprised of any changes in how

26  the model predicted probability of default, Heller stated that he "was advised of

27

28

1    any material adjustments in a determination of events of default."  Heller Dep. at

2    206:9-207:13.

3          The growing concern over pay-option loans was known by members of the

4    Board.  During the February 21, 2006 Operations and Public Policy Committee

5    Meeting, Beverly Reynolds, the Chief Compliance Officer, discussed interest-

6    only loans and pay-option ARMs.  Reynolds informed the Committee members

7    that there was regulatory concern due to the "potential for negative amortization .

8    . . reduced documentation requirements, and the belief that these programs are

9    being offered to a wider range of consumers, some of which may not qualify for

10   other mortgage programs, and may not understand the risks."  Cisneros,

11   Cunningham, Parry and Robertson were in attendance.  Ex. 1005 at KPMG-

12   06FYA-014-000448.

13         Members of the Board received reports showing delinquency rates by

14   different types of loans.  Snyder Dep. at 190:03-06.  For example, the Bank's

15   Forecasted Delinquency 2007 presentation for the Board Credit Committee

16   meeting on March 27, 2006 showed that delinquencies had been steadily rising

17   and would continue to do so into 2007.  Ex. 845 at KPR NYF_0005409.  The

18   forecast represented a material increase in delinquencies.  Additionally, 72% of

19   the Bank's portfolio consisted of loans in states with projected Housing Price

20   Index (HPI) declines over the next two years.  *Id.*

21         Members of the Board were informed of Countrywide's retained credit

22   risk.  At the April 25, 2006 Credit Committee Meeting of the Board of Directors,

23   McMurray presented another credit risk report, containing a statistical breakdown

24   by credit risk retained by Countrywide through its various loan products.  The

25   data showed high percentages of pay options, subprime products, and high

26   LTV/CLTV loans being retained in Q1 2006.  Ex. 844 at CFC2007I303209-10.

27

28

1    Cunningham, Enis, Robertson and Russell were in attendance.  Ex. 1006 at

2    CFCNYF00267897.

3        The presentation materials for the April 25, 2006 Credit Committee

4    meeting showed that the riskiest segments of the Bank's portfolio were growing,

5    while the least risky segments were losing portfolio share.  Ex. 844 at

6    CFC2007I303265.  At the April 25, 2006, Board of Directors' Credit Committee

7    meeting, Rossi noted a rise in delinquencies and nonperforming assets,

8    attributable to the seasoning of the loans and the maturation of the loan portfolio.

9    Ex. 1187 at CFCNYF00267898.  Cunningham, Enis, Robertson, and Russell were

10   in attendance.  *Id.* at CFCNYF00267896.  Rossi also discussed the Bank's

11   nonperforming assets and their relationship to its allowance for loan and lease

12   loss (ALLL) reserves at the Board Credit Committee meeting on June 13, 2006.

13   Ex. 1190 at KPMG-06FYA-014-000294.  Cunningham, Parry, and Russell were

14   present.  *Id.* at 000292.

15       The August 2006 Credit Report to the Bank's Board of Directors indicated

16   that pay-option delinquency rates were expected to continue to rise in 2006 due to

17   "payment shock resulting from annual payment reset" and that "Approximately

18   $7 billion of PayOptions will reset in 3Q06 and 4Q06."  Ex. 841 at KPMG-

19   XXOTH-005-164624.  The report also showed that the primary audit found 39%

20   unsupported appraisal values and excessive debt-to-income ratios.  *Id.* at 164625.

21   The report further stated that "HELOC delinquencies exceeded tolerance levels

22   for the eleventh consecutive month" and "1st lien delinquencies exceeded

23   tolerance levels for the sixth consecutive month."  *Id.* at 164626.

24       The same report further stated that "[f]rom 2003-2006, each PayOption

25   vintage's delinquency is progressively higher than the previous vintage.  This

26   trend reflects the Bank's willingness to accept loan attributes similar to the

27   market, which include an increasing composition of reduced documentation

28

**Exhibit A
0041**

loans." *Id.* at 164629.  In August 2006, 13% of pay option loans in the Bank's portfolio had FICOs less than 660.  *Id.* at 164641.  Russell believed that the increased monitoring and focus on pay options was driven by the size of the portfolio.  Russell Dep. at 130:24-131:08.

On August 16, 2006, Mozilo sent the Board a detailed memorandum prepared by McMurray that addressed Pay Option ARM loans.  Mozilo wrote that the Pay Option ARM included "a minimum payment option that almost always results in negative amortization."  Ex. 1610 at HGC NYF_0000363.  Mozilo explained that "as the spread between minimum pay rate and the full accrual rate increases, the loan will negatively amortize faster when the borrower chooses the minimum payment option . . . .  There has never been a larger difference in the market between these two rates than there is now."  *Id.* at HGC NYF_0000363-64.  Mozilo continued: "Although we believe that the Pay Option should not present credit risks that are significantly higher than credit risks presented by ARM loans in general, we do not have long term data to validate this assumption."  *Id.* at HGC NYF_0000365.

The issues presented in Mozilo's August 2006 memo were already known to the Board.  Before receiving the memo, Parry was aware that there were certain risk characteristics associated with Pay Option ARMs and that there were increases in LTV.  Parry also knew that there was some concern over the difficulty in predicting interest rates and that a payment shock could ensue when interest rates increased.  Parry SEC Dep. at 63:23-66:16.  Snyder knew that Countrywide originated HELOCs to borrowers that had Pay Option loans as the first mortgage.  Snyder Dep. at 184:25-185:02.  Snyder had a prior understanding as to how Countrywide assessed the credit risks of holding pay-option loans and this information was reported to the Board.  *Id.* at 172:12-24.

1    In the fall of 2006, the Board knew that Countrywide's pay-option

2    modeling was insufficient.  On September 27, 2006, Mozilo discussed pay-option

3    loans at the Board of Directors' regular meeting.  Mozilo indicated that

4    "management was in the process of refining its analysis of the credit risk

5    associated with this loan product and the related models.  A discussion then

6    ensued concerning pay-option ARM loans and alternative strategies for managing

7    the credit risk, including borrower refinance activity and loan sales, etc."  Donato

8    SEC Ex. 607, at CFC2007B648418.  Donato knew that Countrywide was refining

9    its models, including those for pay-option ARMs, because models were not

10   performing as expected.  Donato SEC Dep. at 173:18-174:15.

11   The Audit Committee presentation materials from the September 26, 2006

12   meeting also demonstrated Countrywide's difficulty with its model performance.

13   The presentation explained that "[t]he accounting for credit risk is subject to

14   inaccuracies due to the certain risks inherent in the estimation process."  Melone

15   knew that a key risk was the "introduction of products with different default and

16   collateral risk than those used to develop loss approach *for which historical*

17   *performance information has not been developed at Countrywide.*"  Ex. 915 at

18   MRM NYF_0001249 (emphasis added).  Further risk came in the form of

19   "[c]hanges in the quality of loan production or in other loan attributes that *are not*

20   *evaluated by the valuation models.*"  *Id.* (emphasis added); Melone Dep. at

21   126:14-127:03.  Although Melone knew it was possible that inaccuracies in the

22   model could not easily be resolved because Countrywide was continually offering

23   new loan products, and that manual adjustments had to be made each quarter, this

24   information was not disclosed in Countrywide's public filings.  Melone Dep. at

25   132:19-136:25; 176:16-177:01.

26   The Board received continued warnings as to the Bank's deteriorating

27   portfolio.  The Countrywide Bank November 2006 Credit Summary Report to the

28

**Exhibit A
0043**

1   Board indicated that "[q]uality control audits of 2006 vintage production have

2   shown a significant increase in Severe Unsatisfactory (SUS) rates for 2006

3   fundings."  Ex. 659 at CFC2007H013928.  It revealed that "PayOptions

4   comprised 47% of the Bank's portfolio" and "Reduced documentation loans

5   comprise 68% of the Bank's portfolio."  It also showed that delinquencies had

6   steadily increased in the previous five quarters.  *Id.* at CFC2007H013931.

7        Melone also understood that Countrywide's ALLL needed to be monitored

8   because of delinquency and default.  On January 31, 2007, Melone was copied on

9   an Internal Audit Report assessing Countrywide's ALLL.  Feb. 24, 2007 Audit

10   Report at CFC2007G457193.  The report concluded that the inherent risk of loan

11   defaults was "high and increasing . . . .  An increase in loan defaults makes it

12   essential for Portfolio Management to monitor the ALLL calculation and ensure

13   that management is receiving accurate data so they can make appropriate

14   decisions."  *Id.* at CFC2007G457194.  The report also concluded that "The Credit

15   and Interest Rate Risk Management Risk Assessment, which includes the ALLL

16   risks and controls, was not adequately documented."  *Id.* at CFC2007G457199.

17        The Board was aware that the HELOCs in the Bank's portfolio were

18   continuing to experience high delinquency rates.  On July 25, 2007, the Board

19   received a presentation on HELOC delinquencies and reserves at Countrywide

20   Bank.  The presentation indicated that "[d]elinquencies started to increase

21   substantially when the Bank's HFI portfolio stopped growing (Portfolio

22   Seasoning) . . . However, over the last 12 months, delinquency seems to have

23   accelerated relative to the prior 12 months despite similar growth trends."  Ex.

24   931 at MRM NYF_0000160.  Melone knew that the Bank was holding HELOCs.

25   He also testified that The Board of Directors knew in 2006 that the housing

26   market was getting tougher and that there were accelerated delinquency trends for

27   HELOCs in the entire marketplace.  Melone Dep. at 258:06-260:04.  In July

28

1    2005, Rossi had informed the Board's Credit Committee that Countrywide was

2    taking on more HELOCs with reduced documentation.  Rossi Dep. at 336:22-25.

3         Stephen Thompson, CFO of Countrywide Bank, had discussions with the

4    Board of Directors concerning the trend of increasing delinquencies in the HFI

5    portfolio.  Thompson SEC Dep. at 41:17-42:10.  Thompson also discussed the

6    increasing delinquency rates in the Pay Option portfolio with the Board.  *Id.* at

7    80:10-80:20.  Thompson also advised the Bank Board of Directors of deficiencies

8    in Countrywide's modeling deficiencies.  On April 23, 2007, Thompson sent an

9    e-mail to the Bank Board attaching two memos relating to Countrywide's ALLL

10   methodology.  Thompson stated that the information would be helpful to all

11   members of the Bank's Board given the current economic environment, the pace

12   of change in delinquencies, and "the high degree of focus management is placing

13   on these issues."

14        The memoranda were also received by Melone, Parry, Russell and Snyder.

15   Apr. 23, 2007 Thompson e-mail at CFCP007835178.  The first memorandum,

16   dated April 10, 2007, described potential shortfalls in the Company's reserve

17   method results.  Apr. 10, 2007 Thompson memo at CFCP007835185.  The

18   second memo, dated April 13, 2007, addressed how PD factors used in reserve

19   models had been underpredicting the migration of loans into 90+ days

20   delinquency status.  Apr. 13, 2007 Thompson memo at CFCP007835198.  More

21   than a year prior, Russell had informed the Board during the February 21-22,

22   2006 Board meeting that the Company was reviewing a change in its reserve

23   methodology for reported loan delinquencies.  The rationale for the change was

24   described by Kurland and CFO Eric P. Sieracki.  Ex. 2025 at KPMG-06FYA-

25   014-000016.  Then, on April 24, 2006, McMurray sent the Credit Committee and

26   the Board of Directors a memo regarding a change in the definition of impaired

27   assets.  McMurray informed the Board that the definition of an impaired asset has

28

1    been changed from 60+ days past due to 90+ days past due.  McMurray wrote

2    that the financial impact will be a one-time $3.5 million reduction in reserve

3    balance for Countrywide.  Ex. 924 at CFCNYF00460766.

4           The Board continued to be aware of the decline of the housing market in

5    2007 and the possible calamity faced by Countrywide through increasing

6    delinquencies and defaults, as well as insufficient liquidity.  Based upon

7    information he received as a director, Cisneros knew of concerns about the

8    direction of the housing market and nonprime loans in early 2007, including a

9    "coming storm" for which Countrywide should prepare itself.  Cisneros Dep. at

10   114:08-15, 115:12-15.

11          The Board understood that Countrywide was facing challenges from within

12   and outside the Company.  On February 14, 2007, all members of the Board were

13   in attendance as Mozilo opened his report by reviewing the current industry

14   environment and the increase in the level of concern regarding subprime

15   mortgage loans.  Mozilo also reviewed Countrywide's potential exposure areas

16   due to subprime defaults, including increased servicing costs.  Ex. 1015 at HGC

17   NYF_0011650.  Defendant David Sambol discussed the environmental

18   challenges facing the Company during 2007, focusing on declining loan volumes,

19   softening home prices, continued margin pressure, increased delinquencies and

20   defaults, credit-related issues, and regulatory uncertainty.  "[Sambol] indicated

21   that there would likely be a decline in the total market, which may exacerbate

22   existing overcapacity in the short term.  He further indicated that this might

23   constrict the ability of the Bank to continue to grow until the market corrects."

24   *Id.* at HGC NYF_0011652.  At that meeting, the Board also approved an inter-

25   company line of credit of $5 billion from CFC to Countrywide Bank as an

26   additional funding source.  *Id.* at HGC NYF_0011661.

27

28

1    The Board was further informed that Countrywide's risky loan products
2 were unable to be sold.  In an April 6, 2007 memorandum to the Board discussing
3 challenges faced by the Company, Mozilo noted that the "subprime, Alt-A and
4 the CDO markets are far from robust and will negatively impact the volume and
5 efficiency of executions for various of the businesses of our securities
6 operations."  Mozilo explained that he wanted the Board to understand that the
7 secondary markets were beginning to show signs of weakness and that this would
8 affect the sale of such products.  Ex. 1309 at CFC2007C401073; Mozilo Dep. at
9 248:7-17; 254:9-255:4.

10    In April 2007, Cunningham knew that subprime credit performance was
11 deteriorating.  Cunningham Dep. at 103:21-105:15.  All directors other than
12 Dougherty attended the Board meeting on April 18, 2007.  During that meeting,
13 Mozilo reviewed subprime credit performance and noted that the deterioration of
14 that segment was accelerating, particularly due to secondary market impact and
15 modifications to underwriting guidelines.  Ex. 1016 at HGC NYF_0011696.
16 Sambol also reported that the subprime sector had been "deteriorating at an
17 accelerated pace, particularly with respect to 2006 originations."  Sambol also
18 noted that "there are currently no buyers for 'below investment grade' securities
19 (i.e. subprime residuals) at rational levels and that spreads on subprime bonds
20 below investment grade had widened considerably."  *Id.* at HGC NYF_0011697.

21    The Board was also aware that Countrywide was struggling with liquidity
22 issues in 2007.  On May 14, 2007, the meeting materials for an upcoming meeting
23 of the Board Finance Committee were sent to Cisneros, Cunningham, Donato,
24 Melone, Parry, Robertson, Russell and Snyder.  Ex. 1017 at CFCP006700302.
25 The materials indicated that Countrywide's management was seeking approval
26 from the Board for the issuance of $4 billion of convertible debt.  The materials
27 also explained that CFC had significant debt issuance needs for 2007, specifically

28

**Exhibit A
0047**

1   $8 billion for ongoing funding needs and $2 billion for potential stock repurchase.

2   Ex. 1017 at CFCP006700305-06.

3        All the directors, except for Dougherty and Melone, discussed the $4

4   billion of convertible debt issuance during the May 15, 2007 Board meeting.

5   Sieracki acknowledged that the objective of using the proceeds of a convertible

6   debt offering to repurchase stock seemed a little incongruent.  Ex. 1018 at HGC

7   NYF_0011720.  Nonetheless, Donato and the Finance Committee recommended

8   that the $4 billion of convertible debt issuance be approved by the full Board, *id.*

9   at HGC NYF_0011721, and it was approved.  Cisneros Dep. at 123:02-12.

10        Despite the issues with its liquidity, the Board of Directors was aware that

11   Countrywide issued a misleading press release on August 2, 2007 claiming the

12   adequacy of its funding liquidity and the strength of its financial condition.  Aug.

13   2, 2007 Press Release at CFCP003866694.  At Mozilo's request, Jennifer Pitcock

14   e-mailed the press release to Cisneros, Cunningham, Donato, Melone, Parry,

15   Robertson, Russell and Snyder.  Pitcock e-mail at CFCP003866692.  Parry knew

16   that credit risk was increased because more mortgages were being placed in the

17   Bank, as a result of the difficulty in selling in the market.  Parry Dep. at 147:22-

18   149:09.

19        The members of the Board failed to provide the necessary oversight

20   required of them during their tenures at Countrywide.  For example, Donato

21   testified that he and the Finance Committee provided oversight of Countrywide's

22   finances at about 10,000 feet.  Donato SEC Dep. at 33:1-6.  Donato indicated that

23   he wasn't involved in the loan origination process and that it was above his "pay-

24   grade."  *Id.* at 130:17-131:17.  Donato reviewed Form 10-Ks and 10-Qs before

25   they were filed, but he spent little to no time on the exhibits and financial tables.

26   *Id.* at 99:14-101:03.

27

28

---

**Exhibit A
0048**

1      Cisneros admitted his own lack of oversight in a candid October 19, 2008

2  article in *The New York Times*.  Cisneros agreed that Countrywide expanded

3  subprime lending while he served as a Director.  Cisneros Dep. at 150:16-151:15.

4  Cisneros explained that "[t]he irresistible temptation to engage in subprime was

5  Countrywide's ***fatal error*** . . . I fault myself for not having seen it and, since it

6  was not something I could change, having left."  Ex. 1633 at p. 5 (emphasis

7  added).  Cisneros testified that his quote in the article was accurate.  Cisneros

8  Dep. at 153:05-154:21; 155:06-08; Cisneros SEC Dep. at 83:18-84:02.  The

9  article continued, "Mr. Cisneros, 61, had a foot in a number of those worlds.

10  Despite his qualms, he encouraged the unprepared to buy homes – part of a broad

11  national trend with dire economic consequences."  The article quoted Cisneros:

12  "I've been waiting for someone to put all the blame at my doorstep."  Ex. 1633 at

13  p. 1-2.

14      Additionally, Cisneros knew that Countrywide was making a more

15  aggressive effort to expand access to home ownership from 2001 to 2007;

16  however, he was unaware of the technical aspects or mechanisms being used.

17  Cisneros SEC Dep. at 47:13-21.  Cisneros even testified that, "As an outside

18  director, I assumed that the technical people are aware of the things that they need

19  to be doing at the retail level."  *Id.* at 58:03-08.  Moreover, Cisneros never

20  questioned whether Countrywide should be making subprime loans at Board

21  meetings.  Cisneros Dep. at 39:18-20.

22      Furthermore, the Board of Directors did not provide sufficient oversight

23  over the large number of new Countrywide loan products.  For example, Enis was

24  not concerned over the large number of loan products the Company offered as

25  compared to its competitors, and how it would impact the modeling for

26  Countrywide's allowance for loan losses because he, "did not see it [as his] role

27  to express concerns."  Enis Dep. at 107:23-109:12.

28

1    Consistent with their lack of oversight, the Director Defendants failed to

2    compare the disclosures in the Registration Statements they signed, and

3    documents incorporated by reference, with the materials they had received as

4    members of the Board or Bank Board or Committees of each, which contained

5    numerous material facts regarding Countrywide's loan origination and credit risk

6    that were not disclosed in these documents.  It was the responsibility of the Board

7    members to be comfortable that the information supplied in the registration

8    statements was correct.  Snyder Dep. at 82:18-21.  However, the Board did not re-

9    review for consistency those documents incorporated by reference into the

10   Registration Statements.  For example, when Enis gave authorization for the

11   registration statements to be signed on his behalf, he did not go back and review

12   any of the Company's 10-Qs or 10-Ks.  Enis Dep. at 204:17-206:18.  Snyder also

13   testified that he did not go back and review again those documents incorporated

14   by reference when he signed the Registration Statements.  Snyder Dep. at 84:07-

15   17; 88:10-17; 206:05-08.  As part of his review of the Registration Statements,

16   Parry did not go back and re-review the Forms 10-K and 10-Q that were

17   incorporated by reference therein.  Instead, he would ask financial accounting and

18   the CFO if anything had changed since the original review that would make the

19   filings inappropriate.  Parry Dep. at 78:13-80:2.  King did not recall reading the

20   entire April 7, 2004 registration statement.  Instead, she relied on presentations by

21   Countrywide officers and approval from other directors.  King Dep. at 183:08-22.

22   Robertson never asked for any clarifications or changes in Countrywide's SEC

23   filings.  Robertson Dep. at 21:1-11.  Heller suggested that because he was not a

24   CPA, he was not able to review the financial statements for accuracy and

25   completeness.  Heller Dep. at 84:05-85:07.

26   Russell sought to identify these oversights after the fact.  On August 31,

27   2007, Russell authored a memorandum to Mozilo, Sambol and Snyder suggesting

28

1    the creation of a comprehensive "lessons learned" analysis regarding the credit

2    and liquidity crisis.  Russell wrote that he was "not interested in a 'blame and

3    shame' exercise (although where we have made mistakes – like all humans do –

4    we should recognize them and learn from them)."  Russell further requested that

5    "to ensure maximum reality and candor, they prepare the analysis under

6    Attorney-Client Privilege (but it should be <u>prepared</u> by the operational and

7    financial people, not by the lawyers)."  Ex. 850 at HWS NYF_0000240 (emphasis

8    in original).  Russell's memo and comments therein demonstrate his

9    acknowledgement that Countrywide's management and the Board made crucial

10   errors in their stewardship of the Company.

11         As stated in the Lessons Learned memorandum, the Committees of the

12   Board of Directors were not paying enough attention to Countrywide's risk

13   indicators and internal control systems.  Ex. 370 at CFCNYF00276845.

14   Additionally, the Board was not sufficiently active and interested in risk issues

15   presented to the Board committees.  The Board did not take a "leadership role in

16   management transitions – the lack of which caused ambiguities in leadership."

17   The memo also called into question the role of the Board and its oversight.  *Id.* at

18   CFCNYF00276849.  If the Board had paid more attention, more governance

19   could have been placed around those risks.  Smiechewicz Dep. at 131:09-21.

20   Smiechewicz testified that if the Board had been "more conservative in directing

21   the risk profile of the organization, that would have been an enhancement to

22   governance."  *Id.* at 136:08-21.

23         The Lessons Learned presentation to the Board further illustrates the

24   decision-making that led to Countrywide's credit and liquidity crisis.  The

25   presentation indicated that the Board's role was not always synchronized with

26   management.  Lessons Learned Presentation at CFCNYF00276881.  The

27   presentation reiterated the same themes from the Lesson Learned memo: The

28

1    Board Committees may not have given enough attention to risk indicators and

2    internal control systems, and should have been more active and interested in

3    issues presented to the Board Committees.  *Id.* at CFCNYF00276890, 95.

4            The Board ignored all the obvious warnings signs available to them.  The

5    published guide on "Detecting Red Flags in Board Reports," written for

6    independent directors of lending institutions, described methods for highlighting

7    ratios or trends that may signal existing or potential problems.  The guide stated:

8    "This booklet describes information generally found in board reports, and it

9    highlights 'red flags'—ratios or trends that may signal existing or potential

10   problems.  An effective board is alert for the appearance of red flags that give rise

11   to further inquiry.  By making further inquiry, the directors can determine if a

12   substantial problem exists or may be forming."  Ex. 912 at MRM NYF_0002948.

13           The manual identified many of the red flags experienced by Countrywide.

14   The asset securitization red flags included "[o]ver-reliance on securitization as a

15   funding source," "Significant growth or pressure for growth," and "Adverse

16   performance trends."  Unfortunately, Robertson was never concerned about the

17   rapid growth of the company.  Robertson Dep. at 27:16-20.  The mortgage

18   banking red flags included "[r]apid increases in mortgage loan production volume

19   relative to the bank's capital or asset size without corresponding increase in staff

20   or systems," "High or increasing level of policy exceptions," "High or increasing

21   delinquency or foreclosure rates on serviced loans," and "Unauthorized

22   exceptions to policy guidelines."  Ex. 912 at MRM NYF_0002979-0002982.

23           In addition to lack of oversight, the evidence also suggests that the

24   nonmanagement directors failed to act independently of Mozilo in their decision-

25   making.  On November 2, 2007, Robert Ferlauto, of the American Federation of

26   State, County, and Municipal Employees (AFSCME), wrote a letter to Parry

27   regarding the lack of oversight and internal controls by Countrywide's Board of

28

1    Directors.  Ferlauto wrote, "Last year Mozilo and I had a private meeting

2    arranged by Henry Cisneros to discuss our concerns."  Ex. 1632 at RTP

3    NYF_0001785.  This meeting only heightened our view that Mozilo was running

4    the board rather than the other way around."  *Id.* at RTP NYF_0001785.  Cisneros

5    attended the meeting.  Cisneros Dep. at 147:21-148:8.  Enis could not recall any

6    specific instance during his 22 years on the Board where he challenged

7    management.  Neither could he recall any specific instance where he questioned

8    management regarding the credit risk exposure Countrywide had between 2003

9    and the time he left the Board in June 2006.  Enis Dep. at 208:23-209:13.

10           Finally, board compensation was so excessive that the Directors were

11   unable to critically oversee the disclosures made in Countrywide's Registration

12   Statements and documents incorporated by reference.  The Board had a stake in

13   Countrywide's market domination as most of their compensation came from

14   stock.  Countrywide's April 28, 2006 Proxy Statement stated that pursuant to the

15   Company's 2003 Non-Employee Directors' Fee Plan, each Director annually

16   received shares of restricted stock with an aggregate value equal to $220,000

17   under Countrywide's director compensation program.  Furthermore, each

18   Director received an annual retainer fee of $70,000, which could include an

19   additional retained fee of $25,000 for the Lead Director.  Directors also received a

20   fee of $1,500 for each Board meeting attended and $750 for each telephonic

21   Board meeting attended.  Ex. 2020 at p. 21.  The value of Donato's restricted

22   shares was approximately $1.2 million in December 2005, while the value of

23   Heller's restricted shares grew from $474,135 in December 2005 to $864,289 in

24   December 2006.  April 2007 Proxy Statement at CFCP006483388; Ex. 2020 at p.

25   21.  The value of Cunningham's restricted shares was nearly $1.6 million on

26   December 31, 2006.  April 2007 Proxy Statement at CFCP006483388.

27

28

1    The Directors also benefited handsomely from exercising stock options.

2    Heller received more than $3.2 million from his sale of stock options from April

3    to August 2006.  Ex. 2021 at CFCP004959910-11; Heller Dep. at 26:21-27:04.

4    During the same time period, Snyder realized approximately $3.9 million from

5    his sales.  Ex. 2021 at CFCP004959910-11.  King, for her brief tenure on the

6    Board, had a total value of $507,891.22 in restricted stock as of December 31,

7    2004.  Ex. 1687 at GSK NYF_0000130.  King also received about $1 million in

8    proceeds from selling Countrywide stock in 2005-2006.  King Dep. at 192:03-07.

9    A November 8, 2007 letter from Gerald McEntee of AFSCME called for

10    the resignations of Snyder, Donato and Robertson due to excessive grants of stock

11    options.  The letter indicates that these Directors sold more than $15 million in

12    Countrywide stock during 2005-2007.  Robertson realized $9.25 million in sales

13    proceeds, while Snyder realized $6.63 million.  Even Cunningham and Donato

14    realized significant sale proceeds over that time period, gaining approximately

15    $2.35 and $1.7 million, respectively.  Ex. 944 at MRM NYF_0001904.

16    Hewitt Associates, Countrywide's Human Resources consultant, assessed

17    Countrywide's "overall director pay" in June 2006 as "significantly higher than

18    the median of similarly sized organizations . . . .  In particular, equity-based

19    compensation is substantially higher than the median."  Ex. 909 at MRM

20    NYF_0003070.  Hewitt concluded that "the non-retainer equity values [are] more

21    than double the median of the peer companies" and "[t]he relative pay mix of the

22    Board pay package is balanced much more heavily toward equity than is typical."

23    Ex. 909 at MRM NYF_0003076.  And Moody's Corporate Governance

24    Assessment for Countrywide in November 2006 explained that "Director pay at

25    Countrywide remains high compared to other large companies, and includes

26    benefits that are no longer common in U.S. companies."  Ex. 1204 at

27    CFCP006482600.

28

**INTERROGATORY NO. 3:**

IDENTIFY all DOCUMENTS supporting YOUR response to INTERROGATORY NO. 2.

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 3:**

Plaintiffs incorporate by reference their General Objections. Plaintiffs further object that because this contention interrogatory seeks "all documents," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity. Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant document that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant document that Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer by referring Defendant Russell to the documents referenced in the Answer to Interrogatory No. 2 above.

**INTERROGATORY NO. 4:**

IDENTIFY each PERSON with personal knowledge of the facts supporting YOUR response to INTERROGATORY NO. 2.

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 4:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "each person with personal knowledge," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in Plaintiffs' possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does not necessarily list every responsive person who is part of the evidentiary record as it currently stands, nor does this Answer necessarily list every supporting person who may be referenced in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs identify the following persons:

- Paul Abate, Executive Vice President ("EVP"), Internal Audit
- Art Agnos, Countrywide Bank ("CWB") Board Director
- Jeffrey Aiken, EVP, Countrywide Bank
- Raja Akram, Senior Manager, KPMG LLP
- Kevin Bartlett, Senior Managing Director ("SMD") and Chief Investment Officer ("CIO")
- Charles Benedict, Senior Vice President ("SVP"), IT Governance
- Andy Bielanski, SMD, Marketing and Corporate Communications

1  &bull;  David Bigelow, Managing Director ("MD"), Investor Relations

2  &bull;  Susan E. Bow, SMD, General Counsel, Corporate
      and Securities and Corporate Secretary

3  &bull;  Kathleen Brown, CFC Board Director

4  &bull;  Claire Bunnell, Executive Assistant
5      to the SMD/EMD, Executive Administration

6  &bull;  Michael Burak, Secondary Marketing

7  &bull;  Pat Cahalan, Senior Manager, KPMG

8  &bull;  Scott Carnahan, Partner, KPMG

9  &bull;  Henry G. Cisneros, CFC Board Director

10  &bull;  Bradley Coburn, MD, Treasury

11  &bull;  Jeffrey M. Cunningham, CFC Board Director

12  &bull;  Paul Deitch, MD, Bank Operations & Technology

13  &bull;  Roberto Del Angelo, Munger, Tolles & Olson LLP

14  &bull;  Sharon Deprano, First Vice President ("FVP"), Structured Finance

15  &bull;  Robert J. Donato, CFC Board Director

16  &bull;  Michael E. Dougherty, CFC Board Director

17  &bull;  Ben M. Enis, CFC Board Director

18  &bull;  Andrew Erskine, SVP and Assistant General Counsel, CHL

19  &bull;  Kaye Feller, EVP, Credit Risk Governance, Countrywide Bank

20  &bull;  Robert Ferlauto, Director, Corporate
      Governance and Investment Policy, AFSCME

21  &bull;  Michael E. Finn, Regional Director of the
22      Office of Thrift Supervision (OTS), West Region

23  &bull;  Teri Freas, Executive Assistant to the Board of Directors, Legal

24  &bull;  Alan Frelix, MD, Strategic Planning

25  &bull;  James Furash, SMD, President and Chief
      Executive Officer ("CEO") of Countrywide Bank

26  &bull;  Carlos Garcia, EMD, Banking and Insurance

27  &bull;  Lawrence Gee, MD, Technical Accounting

28

1    •    Kay Gerfen, Executive Assistant, Executive Administration

2    •    Gabrielle Ghio, FVP, Senior Legal Counsel

3    •    Andrew Gissinger, EMD and Chief Production Officer, CHL

4    •    Leora Goren, SMD and Chief Human Resources Officer

5    •    Jerry Hager, Attorney, Countrywide Bank

6    •    John Hankins, VP, Structured Finance

7    •    Edwin Heller, CFC Board Director

8    •    Greg Hendry, EVP, Financial Reporting

9    •    Shiva Iyer, MD, Financial Planning and Corporate Budgeting

10   •    Jane Jelenko, CWB Board Director

11   •    Richard Jones, SMD and Chief Information Officer

12   •    Robert Karchinski, EVP, Bank General Auditor

13   •    Gwendolyn S. King, CFC Board Director

14   •    Pat Kinsella, Audit Partner, KPMG

15   •    John G. Klinge, Engagement Partner, KPMG

16   •    Richard Kozlow, EVP, General Auditor, Countrywide Bank

17   •    Ron Kripalani, SMD &  President, Capital Markets

18   •    Nick Krsnich, SMD and CIO, CFC

19   •    Stanford L. Kurland, President and Chief Operating Officer ("COO")

20   •    Thomas Lehner, VP, Bonus Analysis, Full Spectrum Lending

21   •    Dean Lesiak, MD, Risk Management, Countrywide Bank

22   •    Jim Liddy, Partner, KPMG

23   •    Paul Liu, SVP, Assistant General Counsel

24   •    Greg Lumsden, SMD and President, Full Spectrum Lending

25   •    Anne McCallion, SMD, Chief of Financial Operations and Planning

26   •    Gregor MacDonald, EVP, Credit Risk Analytics

27   •    Mark McElroy, SVP, Contracts and Negotiations, CHL

28

1      •     Keith McLaughlin, EMD & Chief Financial Officer ("CFO")

2      •     John McMurray, SMD & Chief Credit Officer

3      •     Martin Melone, CFC & CWB Board Director

4      •     Laurie K. Milleman, SMD & Chief Accounting Officer

5      •     Angelo Mozilo, Chairman of the Board and CEO

6      •     Mike Muir, MD, Chief Financial Officer, Countrywide Bank

7      •     Michael O'Sullivan, Partner, Munger, Tolles & Olson LLP

8      •     Joe Pangrazio, Countrywide Bank

9      •     Robert T. Parry, CFC & CWB Board Director

10      •     Jennifer Pitcock, AVP, Board Governance, Legal

11      •     Phillip Pitts, SVP, Central Compliance

12      •     Richard Pohl, MD, Mortgage Bank Accounting

13      •     Scott M. Polakoff, Deputy Director and COO, OTS

14      •     Barry Pyle, MD, Corporate Development

15      •     Richard Rasiej, VP, Residual Interests Risk Management

16      •     Marci Reardon, Executive Assistant to the CEO

17      •     Beverly Reynolds, MD, Chief Compliance Officer, CHL

18      •     Katica Rich, Executive Assistant to
19            SMD, Secondary Marketing – CRM

20      •     Oscar P. Robertson, CFC Board Director

21      •     Clifford V. Rossi, MD, Chief Risk Officer, Countrywide Bank

22      •     Keith P. Russell, CFC & CWB Board Director

23      •     Rodolfo Saenz, EVP, Corporate Marketing

24      •     Thomas Saletta, SVP, Compliance and Technical Support

25      •     David Sambol, Chief of Mortgage
           Banking and Capital Markets, President and COO, CFC

26      •     Sandor E. Samuels, SMD and Chief Legal Officer

27      •     Jennifer Sandefur, SMD & Treasurer, CFC

28

1    •    Julie L. Scammahorn, MD & Chief Audit Officer

2    •    Jack W. Schakett, EMD, Chief Operations Officer

3    •    Kathy Schwartz, Treasury, CF/CCI

4    •    Mary Jane Seebach, MD, Countrywide Public Affairs

5    •    Tina Shenk, AVP, Board Governance

6    •    Sean Shockley, FVP, Finance, FSL

7    •    Eric P. Sieracki, EMD and CFO, CFC

8    •    Richard Silva, EVP, Chief Risk Oversight Officer

9    •    Walter Smiechewicz, SMD, Enterprise Risk Assessment, CFC

10   •    Cheryl Smith, CISSP, Chief Information
         Security Officer, SVP, IT Governance

11

12   •    Harley W. Snyder, CFC & CWB Board Director

13   •    David Spector, SMD, Secondary Marketing

14   •    Kent Sorey, SVP, Capital Markets, Internal Audit

15   •    Jeff Speakes, SMD and Chief Economist

16   •    Ronald Staake, FVP and CFO, Finance Department, FSL

17   •    Derek W. Stark, SVP, Assistant General
         Counsel, Countrywide Home Loans

18   •    Erik Stein, EVP & Director, Fraud Risk Management

19   •    Lori Stull, Executive Assistant, Countrywide Bank

20   •    Jaynie Studenmund, CWB Board Director

21   •    Kathy Schwartz, MD, Financial Planning & Corporate Budgeting

22   •    Steve Swatsek, Executive Vice President, Valuations and Analysis

23   •    Steve Sylvers, MD, Corporate Tax, CF, CCI

24   •    Cecilia Tan-Chavez, Legal, CF/CCI

25   •    Kathy Tanner, Credit, Countrywide Bank

26   •    John Taylor, Lead Audit Partner, KPMG

27   •    Stephen Thompson, Former CFO, Countrywide Bank

28

1

- • Carman Turner, MD, Chief Accounting Officer

2

- • Michael S. Udovic, Legal/CF/CCI, Senior Vice President, Chief Governance Officer and Assistant Secretary

3

4

- • Mark Upson, MD, Administration

5

- • David Walker, MD, Chief Credit Officer

6

- • Tim Wennes, MD & President, Countrywide Bank

7

- • Rick Wentz, SMD, General Secretary,

8

  Chief Ethics Officer and Assistant Secretary

9

- • Rod Williams, Managing Director, Credit Risk Management

10

- • Tom Williams, Managing Director, President of Countrywide Warehouse Lending

11

- • Don White, EVP, Portfolio Management

12

13

**INTERROGATORY NO. 6:**

14

State all facts on which YOU base YOUR response to INTERROGATORY NO. 5 regarding each OUTSIDE DIRECTOR.

15

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 6:**

16

17

Plaintiffs incorporate by reference their General Objections. Plaintiffs

18

further object that because this contention interrogatory seeks "all facts," it is

19

overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL

20

3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this

21

Interrogatory to the extent that it seeks information equally available to Defendant

22

Russell, or information to which Defendant Russell has equal or greater access.

23

Plaintiffs further object to this Interrogatory to the extent that it seeks information

24

not in Plaintiffs' possession, custody, or control. Plaintiffs further object to this

25

Interrogatory to the extent it seeks disclosure of information protected by the

26

attorney-client privilege, the attorney work product doctrine, the joint prosecution

27

privilege, or any other applicable privilege, protection, or immunity. Plaintiffs'

28

1   Answer does not necessarily provide every supporting or otherwise relevant fact
2   that is in the evidentiary record as it currently stands, nor does this Answer
3   necessarily provide every supporting or otherwise relevant fact that Plaintiffs may
4   present in opposition to or in favor of a summary judgment motion, or at the trial
5   of this action.

6       Subject to and without waiving the foregoing general and specific
7   objections, Plaintiffs answer as follows:

8       Countrywide's Board of Directors received a number of red flags warning
9   them of the deficiencies in modeling and internal controls that rendered
10  unreasonable any reliance on the Company's auditors with regard to "expertised"
11  portions of the Company's SEC filings incorporated by reference in the pertinent
12  Registration Statements.  The Directors knew or should have known that
13  Countrywide could not adequately manage its loan portfolio because the models
14  used did not accurately predict loan performance, and thus could not adequately
15  set reserves for Allowance for Loan and Lease Losses ("ALLL") or
16  representations and warranties on securitized loans ("R&W"), or properly value
17  residual interests ("RI") and mortgage servicing rights ("MSR") on loans sold to
18  the secondary market.  As a result, to the extent that the Company's auditors
19  provided opinions concerning the Company's publicly reported earnings and net
20  income, such opinions were unreliable.  The Directors should have taken greater
21  measures to ensure that the deficiencies were adequately disclosed.

22      As described in the Responses to Interrogatories No. 2-4 above, and
23  incorporated by reference herein, the Board knew that Countrywide's loan quality
24  was deteriorating beginning no later than 2004 due to Countrywide: (i) loosening
25  or disregarding/excepting its underwriting standards; and (ii) originating riskier
26  loan products, thereby increasing the risk of default and impacting Countrywide's
27  models for ALLL, R&W, RI and MSR.  In addition, as also discussed in

28

1    Responses to Interrogatories Nos. 2-4 above, and incorporated by reference

2    herein, the Board knew that in its effort to gain market share from its competitors,

3    Countrywide had greatly expanded the number of loan products it offered without

4    having any historical delinquency or default data.

5           The Board knew, or should have known, about the impact of these factors

6    on Countrywide's models for ALLL, R&W, RI, and MSR.  Knowledge of these

7    factors should have raised red flags with the Board about the accuracy of

8    Countrywide's models and caused them to doubt the assurances from the

9    Company's auditors about the accuracy and reliability of those models.

10          For example, presentations at the meetings of the Board's Strategic

11   Planning Committee on August 3, 2004 and February 22, 2005 reflect the huge

12   expansion in Countrywide's product line and expansion into emerging markets,

13   encompassing different risk measures and underwriting standards for which

14   Countrywide did not have historical data, all of which impacted the accuracy of

15   Countrywide's models.  Ex. 914 at MRM NYF_0005181-83, 0005191-94,

16   0005197, 0005203-06; Ex. 1977 at CFCNYF00454623-24, 4630-38; Melone

17   Dep. at 111:21-116:24.

18          Further demonstrating how Countrywide implemented its expansion

19   strategy to such a degree that it was, as Mozilo stated in a September 26, 2006 e-

20   mail, "flying blind on how these loans will perform in a stressed environment of

21   higher unemployment, reduced values and slowing home sales" (Ex. 1125 at

22   CFC2007C526149), is a December 7, 2006 memorandum from Mozilo to the

23   Board discussing a *Wall Street Journal* article titled "More Borrowers With Risky

24   Loans Falling Behind."  In the memo, Mozilo refers to Countrywide's

25   "supermarket strategy" and states:

26               Consistent with the broader industry, we expanded our
27               subprime menu over recent years.  Since 2003, the
                 industry aggressively expanded product offerings and
28

> guidelines to promote more purchase business.  Industry guidelines have expanded in a variety of dimensions, including increased availability of reduced documentation, higher leverage (i.e. lower down payment or equity requirements), increased prevalence of "piggyback" (first + plus second lien) loans, higher loan amounts, and interest only.  More importantly, these products are typically offered in combination with each other, creating "layered" risk.

Ex. 1614 at CFCP006700249.

The attendant increased default risk was not routinely incorporated in Countrywide's models because, as discussed further below, the Board of Directors knew or should have known that Countrywide lacked historical delinquency/default data for many of these new loan products that increasingly had "layered risk" features.  Ex. 838 at CFCP001134015; Melone Dep. at 111:21-116:24; Melone SEC Dep. at 53:12-24; Ex. 1982 at CFCNYF00457375-87; Ex. 1983 at CFCNYF00457249.  Melone did not even know what the term "layered risk" meant, nor did he recall any discussions at the Board level regarding layered risk.  Melone Dep. at 205:03-25; Melone SEC Dep. at 53:12-24.

Another example is a Countrywide presentation to the Board regarding Residential Mortgage Lending including a chart titled "How Did We Get Here? CFC Prime Guideline Expansion—2005/2006."  The presentation expressed that "Experiencing an erosion of market share, Countrywide reluctantly followed the industry expansion.  In the prime space, we elected to expand guidelines primarily via a controlled exception process rather than introducing as standard guidelines; while in subprime, we expanded posted guidelines."  Ex. 921 at CFC2007I286181.

The Directors ignored other red flags that bore directly on the reliability of Countrywide's models for ALLL, R&W, RI and MSR.  The published guide for

1   "Detecting Red Flags in Board Reports," which was specific to lending

2   institutions, discussed methods for identifying ratios or trends that could signal

3   existing or potential problems.  Ex. 912 at MRM NYF_0002949-64, 0002982-85.

4   The guide identified a litany of red flags relating to asset quality and credit risk

5   that could impact a bank's financial performance.  The guide also listed red flags

6   relating to audit and internal controls including "Significant internal control or

7   other deficiencies noted in audit reports that have not been corrected" and

8   "Internal or external auditors relying heavily on the other's conclusions."  *Id.* at

9   MRM NYF_0002984.

10        The Board knew or should have known that there were shortcomings in

11   Countrywide's models as members of the Board were informed that the output

12   from the models had to be manually adjusted or increased at least quarterly

13   because the models "weren't up to speed."  Melone Dep. at 117:19-121:9;

14   215:02-216:20; Ex. 923 at CFCP00783446-47, CFCP00783469.  Melone, the

15   Chairman of the Audit Committee, was concerned that Company had to make

16   manual adjustments to ALLL at the end of each quarter.  Melone Dep. at 194:08-

17   196:20.  In addition, issues with regard to the validity of Countrywide's financial

18   models were brought to the attention of either the Audit Committee or the

19   Finance Committee.  *Id.* at 75:16-76:9.  The Board also had discussions about the

20   fact that some models "were not picking up recent experience as well as was the

21   case in the past."  Parry Dep. 140:13-23.  Countrywide would have to then "apply

22   judgment to compensate for those misses between actual and predicted values."

23   *Id.*

24        The Board was further apprised of red flags in Countrywide's accounting

25   and modeling methods in other instances which should have caused them to

26   question the accuracy of Countrywide's models and any financial statements

27   opined on by the Company's auditors.  For example, in an August 16, 2006

28

1    memorandum to the Board, Mozilo discussed Pay Option ARMs including the

2    increasing use of "stated income" documentation – which Melone agreed had a

3    higher risk of default.  Ex. 916 at CFCP007834399; Melone Dep. at 140:17-

4    141:07.  Mozilo also stated in the memorandum: "Although we believe that the

5    Pay Option should not present credit risks that are significantly higher than credit

6    risks presented by ARM loans in general, *we do not have long-term data to*

7    *validate this assumption."*  Ex. 916 at CFCP007834401 (emphasis added).

8    Melone, who agreed that this lack of historical data presented a risk that the

9    ALLL models were inaccurate, "did not know" if this risk was material but would

10   want to know this fact as a director.  Melone Dep. at 143:14-146:03; 151:20-

11   152:21.

12         Members of the Board also knew of red flags concerning the Company's

13   auditing system through various reports.  For example, the Audit Report

14   Executive Summaries discussed at Audit Committee meetings listed a number of

15   auditing risks.  *See* Ex. 1671 at CFCNYF00451565.  One report revealed that

16   accounting treatment for the loan inventory fair value hedge effectiveness test did

17   not fully comply with SFAS 133.  Ex. 1673 at CFCNYF00451721.  The report

18   additionally showed that existing SFAS 133 proprietary model procedures were

19   not formally documented.  *Id.*  The report also indicated that the accounting

20   treatment for Countrywide MBS did not fully comply with SFAS 140, and was

21   classified as a high risk.  *Id.* at CFCNYF00451725.  Further, the report presented

22   a risk concerning pricing exceptions: "Pricing exceptions were not authorized on

23   28% of the loans funded in October . . . Management agrees with the

24   recommendation and will implement a system enhancement (Project SHIELD) to

25   prevent unauthorized pricing exceptions."  *Id.* at CFCNYF00451727.

26   Notwithstanding this high exception rate, there is no evidence in subsequent

27   Audit Committee minutes that it was addressed.

28

1       The report also delineated red flags associated with residual interests (RIs),

2    indicating that Countrywide's residual interest models did not model cash flows

3    "according to the structure disclosed in the transaction documents and may

4    provide inaccurate valuations to Corporate Accounting." *Id.* at

5    CFCNYF00451734.  The report also indicated that certain model validation

6    processes to support the valuation of the residual interest assets have not been

7    formally established or fully addressed.  Furthermore, the Committee members

8    were informed that "[t]he Secondary Marketing residual interest models do not

9    model cash flows according to the structure disclosed in the transaction

10    documents and may provide inaccurate initial valuations." *Id.*

11       The Board also received red flags concerning Countrywide's SOX 404

12    deficiencies, which were not only addressed by the Audit & Ethics Committee in

13    detail but also discussed with the full Board.  Ex. 1001 at CFCNYF00267713; Ex.

14    2024 at MRM NYF_0009092; Cisneros Dep. at 62:02-13.  The SOX 404

15    Compliance report discussed at a meeting of the Audit & Ethics Committee on

16    September 16, 2004 identified a number of "significant deficiencies."  Ex. 1603 at

17    CFCNYF00446585-614.  A "significant deficiency" is:

18            a control deficiency or combination of control

19            deficiencies, that adversely affects the company's

20            ability to initiate, authorize, record, process, or report
                external financial data reliably in accordance with

21            generally accepted accounting principles such that *there*

22            *is more than a remote likelihood that a misstatement of*
                *the company's annual or interim financial statements*

23            *that is more than inconsequential will not be prevented*

24            *or detected.*

25    KPMG Letter with Nov. 9, 2004 Audit & Ethics Committee Meeting Materials, at

26    CFCNYF00452699-700 (emphasis added).

27

28

**Exhibit A
0067**

1    One significant deficiency identified was that "[v]alidation of Company

2    models has not been consistently performed or documented.  This includes

3    documentation of change-control procedures and validation of the

4    appropriateness and accuracy of mathematical calculations and concepts used in

5    the models."  Ex. 1603 at CFCNYF00446602.  Cisneros, Heller, Melone, and

6    Russell received the presentation.  *Id.* at CFCNYF00446585.

7    Red flags concerning significant deficiencies within SOX 404 were also

8    reported at the November 9-10, 2004 Board of Directors Regular Meeting.  All

9    Directors attended.  Melone reported that although there were a number of

10   significant deficiencies related to the SOX 404 Project, Countrywide was only

11   required to report material weaknesses.  Ex. 1000 at CFCNYF00267364.

12   Regardless of whether they had to be specifically disclosed, the existence of the

13   significant deficiencies concerning the models undermined any reliance on the

14   Company's auditors regarding those models.  Moreover, it was Countrywide's

15   management and not the auditors who determined the differences between

16   significant deficiencies and material weaknesses.  The Audit Committee, a

17   committee mandated by the Sarbanes-Oxley Act, was presented with significant

18   deficiencies and material weaknesses before they went to the CFO and CEO.

19   McCallion Dep. at 120:20-121:15; 133:12-136:14.  McCallion, the Chief

20   Accounting Officer, discussed with the Board whether an issue should be

21   classified as a "material weakness" as opposed to a "significant deficiency."

22   McCallion Dep. at 140:18-141:2.  In any event, KPMG LLP ("KPMG")

23   identified numerous significant deficiencies in Countrywide's controls and

24   models and warned that "some or all of the aforementioned significant

25   deficiencies may rise to the level of a material weakness."  KPMG Letter with

26   Nov. 9, 2004 Audit & Ethics Committee Meeting Materials, at

27   CFCNYF00452700.

28

1    The Board also was aware that red flags signaling Countrywide's
2 "significant deficiencies" were not corrected as more arose.  Thomas Saletta, a
3 Senior Vice President for Compliance, described key SOX 404 items that needed
4 to be addressed by management and KPMG at the Special Telephonic Meeting of
5 the Audit Committee on January 7, 2005.  Saletta reported on the status of
6 significant deficiencies, noting that seven had not been remediated as of January
7 4, 2005 and that twelve new deficiencies had been identified by KPMG since the
8 last committee meeting.  Jan. 7, 2005 Audit Committee Minutes at KPMG-
9 05FYA-039-000195.

10    There were also red flags that should have caused the Board of the
11 Directors to question the accuracy of KPMG's opinions and advice.  On February
12 14, 2005, CFC held a Special Telephonic Meeting of the Audit and Ethics
13 Committee.  Melone discussed an accounting matter raised by KPMG with
14 respect to Countrywide's recently reported fourth quarter earnings, explaining the
15 issue involved the Company's gain on sale recognition pursuant to SAS 140 for
16 certain securitization transactions that contained embedded derivatives.  Cisneros,
17 Heller, Melone, and Russell were in attendance.  Feb. 14, 2005 Audit & Ethics
18 Committee Minutes at KPMG-05FYA-039-000197.

19    On or about February 19, 2005, Melone received notes written by Mozilo
20 summarizing a conference call among Mozilo, Kurland, and Gene O'Kelly—
21 KPMG's Chairman and CEO—regarding the factors leading to Countrywide's
22 restatement of its 2004 financial statements.  Ex. 910 at MRM NYF_0000445-49.
23 Mozilo's notes also reflected a separate conversation among him and Melone and
24 O'Kelly.  Ex. 910 at MRM NYF_0000446; Melone Dep. at 91:06-92:25.  After
25 receiving assurances from KPMG that were no issues or impediments with
26 Countrywide's earnings release, Countrywide was later informed that the release
27 was inaccurate.  Ex. 910 at MRM NYF_0000445.  Mozilo's notes stated: "This

28

1   has all come about because of your partners failing in their performance of the

2   audit from day one of the engagement and further exacerbating the problem by

3   advising us to release earnings . . . They never prompted us or raised an issue

4   about compliance with 140.  Bottom line KPMG caused the problem that we face

5   today." *Id.*  The restatement was discussed in detail with the Board.  Feb. 14,

6   2005 Audit & Ethics Committee Minutes at KPMG-05FYA-039-000197; Melone

7   Dep. at 94:03-13.

8        In preparation for a discussion with the Board on this issue, Melone wrote

9   that the "Audit Committee has determined that a change in auditors at this time is

10  not in the best interest of the company . . . We may need to manage relationships

11  in the future to ensure choices."  Ex. 911 at MRM NYF_0000443.

12       News of unremediated significant deficiencies continued to be presented to

13  the Board of Directors.  All members of the Board except Cunningham attended

14  the regular Board meeting on February 21-23, 2005.  McCallion reported to the

15  Board that KPMG's review had uncovered nine significant deficiencies related to

16  SOX 404, but that Countrywide determined not to remediate all of them prior to

17  year end.  Melone reiterated that Countrywide was not required to report

18  significant deficiencies.  Ex. 1001 at CFCNYF00267713.

19       The Directors also were aware of red flags concerning Countrywide's

20  financial reporting from KPMG.  On March 11, 2005, KPMG sent the Audit &

21  Ethics Committee a letter highlighting over 170 "significant deficiencies" and

22  weaknesses in Countrywide's internal control over financial reporting.  Ex. 926 at

23  MRM NYF_0000966-0001025.  These findings were based on Countrywide's

24  financial statements as of December 31, 2004.  Many of the "significant

25  deficiencies" related to Countrywide's models for ALLL, MSR and RI.  For

26  example, Countrywide's Secondary Marketing Unit reported that, "There is no

27  formal documentation to evidence the review and validation of the methodology

28

1   used to calculate the HELOC Residuals Valuation Adjustment.  It appears that

2   there is no formalized process or guidelines related to monitoring model

3   performance and adjustments." *Id.* at MRM NYF_0001004.

4         The SOX 404 Update from the February 21-22, 2006 Board of Directors

5   Presentation also highlighted red flags regarding significant deficiencies for

6   internal controls.  The presentation showed that the internal controls intended to

7   ensure the reasonableness of fair value estimates of the mortgage servicing rights

8   and loan related loss reserves were not properly designed.  These deficiencies

9   related to controls over the model development process, the monitoring of model

10  performance, and the independent valuation process.  Ex. 2024 at MRM

11  NYF_0009092.  Additionally, there were other significant deficiencies within the

12  EDGE system, such as: "Segregation of duties between loan originators,

13  underwriters and funders is not inherent in the EDGE system.  There are no

14  systematic controls that prevent an originator or underwriter to fund a loan."  Ex.

15  2024 at MRM NYF_0009092.

16        Cisneros, Donato, Melone, Parry, Russell attended the Audit Committee

17  meeting on June 13, 2006, during which additional red flags were reported

18  concerning Countrywide's loss tracking system.  Laurie Milleman claimed that

19  the policies and procedures for the allowance for loan losses were adequate and

20  applied correctly, yet noted that the system used to track loss data had not been

21  updated to reflect the Company's increased exposure to credit losses.  Parry Dep.

22  at 97:4-98:20; Ex. 1917 at CFCNYF00267942.  Despite the red flag, Parry

23  doubted that any adjustment was made at year end to the financial statements to

24  reflect this problem.  Parry Dep. at 100:18-22.

25        Melone also received Countrywide's September 25, 2006 SOX 404 Report

26  which highlighted a number of previous significant deficiencies that still had not

27  been addressed.  Ex. 927, at MRM NYF_0001210.  Indeed, Countrywide's

28

1    inability to fix those long-standing red flags itself constituted a red flag.  Issues

2    with the Countrywide's EDGE loan origination system still had not been

3    remedied.  *Id.* at MRM NYF_0001211, 0001220.  In addition, "Certain of the

4    Company's internal controls intended to ensure the reasonableness of the 1) the

5    fair value estimates of the mortgage servicing rights (MSRs) and the residual

6    assets, 2) certain loan related loss reserves, and 3) loans held-for sale, were not

7    properly designed as of December 31, 2005."  *Id.* at MRM NYF_0001212.

8    Melone testified that he was aware of this deficiency at the time.  Melone Dep. at

9    229:20-230:10.

10           In addition, the September 26, 2006 Audit Committee presentation

11   materials illustrated Countrywide's difficulty with accounting for credit risk.  The

12   presentation read: "The accounting for credit risk is subject to inaccuracies due to

13   the certain risks inherent in the estimation process."  Ex. 915 at MRM

14   NYF_0001249.  Additionally, Melone understood that a key risk was the

15   "introduction of products with different default and collateral risk than those used

16   to develop loss approach for which historical performance information has not

17   been developed at Countrywide."  *Id.*  Another risk concerned the "[c]hanges in

18   the quality of loan production or in other loan attributes that are not evaluated by

19   the valuation models."  *Id.*; Melone Dep. at 126:14-127:03.  Melone confirmed

20   the possibility that a reason inaccuracies in the model could not easily be resolved

21   was because Countrywide was continually offering new loan products.  Melone

22   Dep. at 132:19-136:25, 176:16-177:01.

23           The Board was apprised of further red flags when Saletta provided an

24   update on three significant deficiencies with respect to SOX 404 identified for

25   2005 at the November 27-28, 2006 meeting of the Audit Committee.  Parry Dep.

26   at 113:17-114:22; Ex. 1920 at CFC2007B647555.  Saletta indicated that he did

27   not believe that the expense reductions initiative was likely to increase the

28

1   likelihood of identifying a material weakness.  Ex. 1920 at CFC2007B647554-55.

2   Saletta and John Klinge, a KPMG engagement partner, confirmed that the

3   Company would have several significant deficiencies in relation to SOX 404.  *Id.*

4   at CFC2007B647555.  Cisneros, Melone, Parry, and Russell were in attendance.

5   *Id.*

6        The Board was aware that these red flags with regard to accounting and

7   modeling had not been resolved in 2006.  Cisneros, Melone, Parry, and Russell

8   attended the February 21, 2007 meeting of the Audit Committee during which

9   Saletta reported on unresolved significant deficiencies from 2006, which related

10  to modeling, calculations, and reports.  Ex. 1922 at CFC2007827770-71.

11       The Board continued to receive reports concerning SOX 404 and model

12  validations.  During the June 11-12, 2007 meeting of the Audit Committee,

13  attended by Cisneros, Melone, Parry, and Russell, Melone participated in a

14  discussion regarding the SOX 404 Project during which Pat Cahalan, a KPMG

15  Senior Manager, explained the rationale for including model validation as a

16  significant deficiency for the 2006 portion of the SOX 404 Project.  In addition,

17  Cahalan and John Taylor, another KPMG engagement partner, discussed

18  KPMG's testing approach under Auditing Standard No. 5 and the "consequential

19  reduction in the time to be spent on the SOX 404 Project."  Ex. 1924 at

20  CFC2007827780.

21       Melone also knew of continued red flags with Countrywide's ALLL.  On

22  September 12, 2007, Klinge e-mailed Patrick Kinsella and Anise Yi, two

23  members of the Countrywide audit team, and recounted a meeting he had with

24  Melone earlier that day.  Klinge noted that Melone "mentioned the ALLL a few

25  times, almost like the company wants to make it as large as possible under

26  GAAP."  Sept. 12, 2007 Klinge e-mail at KPMG-XXAJY-000-012649.

27

28

1    There were extensive discussions within the Credit Committee about the

2    ALLL level, methodology, model performance, and model adjustment.  Russell

3    Dep. at 138:12-139:21.  Melone was a designated audit financial expert, along

4    with two other Board Directors.  Melone Dep. at 38:12-16, 46:15-47:16, 63:11-

5    64:10; Ex. 908 at MRM NYF_0004263.  Melone did not understand the details of

6    how ALLL was calculated, however.  Instead, he relied on the external audit

7    function.  Melone Dep. at 193:23-194:02.  In fact, with Countrywide shareholders

8    dependent on Melone to provide the obligatory, independent oversight, he relied

9    on assurances from KPMG that the shortcomings in the ALLL modeling were

10   taken care of.  *Id.* at 124:07-21.  Furthermore, Melone didn't discuss or inquire

11   about the results of an Ernst & Young review after E&Y was brought in to

12   analyze Countrywide's ALLL models.  *Id.* at 200:05-201:17.

13       Enis made it a point to not "express concerns" about Countrywide's models

14   – despite the numerous red flags raised as discussed above.  When asked if he

15   ever expressed any concerns about modeling for ALLL given the large number of

16   loan products sold by Countrywide, Enis testified: "There were always a number

17   of discussions about various issues.  I do recall that *I tried carefully not to*

18   *express concerns.*  I would raise questions and I would ask about various kinds of

19   information, but *I did not see it my role to express concerns."*  Enis Dep. at

20   109:6-12 (emphases added).  Enis repeated his statement that he would not

21   express "concerns" in connection with, and in spite of, the credit risk reports

22   given by McMurray highlighting Countrywide's deteriorating loan quality and

23   problems with its models.  *Id.* at 114:1-10.

24

25   **INTERROGATORY NO. 7:**

26       IDENTIFY all DOCUMENTS supporting YOUR response to
     INTERROGATORY NO. 6.

27

28

1

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 7:**

2

3

Plaintiffs incorporate by reference their General Objections.  Plaintiffs

4

further object that because this contention interrogatory seeks "all documents," it

5

is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL

6

3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this

7

Interrogatory to the extent that it seeks information equally available to Defendant

8

Russell, or information to which Defendant Russell has equal or greater access.

9

Plaintiffs further object to this Interrogatory to the extent that it seeks information

10

not in Plaintiffs' possession, custody, or control.  Plaintiffs further object to this

11

Interrogatory to the extent it seeks disclosure of information protected by the

12

attorney-client privilege, the attorney work product doctrine, the joint prosecution

13

privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs'

14

Answer does not necessarily provide every supporting or otherwise relevant

15

document that is in the evidentiary record as it currently stands, nor does this

16

Answer necessarily provide every supporting or otherwise relevant document that

17

Plaintiffs may present in opposition to or in favor of a summary judgment motion,

or at the trial of this action.

18

Subject to and without waiving the foregoing general and specific

19

objections, Plaintiffs answer by referring Defendant Russell to the documents

20

referenced in the Answers to Interrogatories No. 2 and 6 above.

21

22

**INTERROGATORY NO. 8:**

23

IDENTIFY each PERSON with personal knowledge of the facts supporting

24

YOUR response to INTERROGATORY NO. 6.

25

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 8:**

26

Plaintiffs incorporate by reference their General Objections.  Plaintiffs

27

further object that because this contention interrogatory seeks "each person with

28

Plaintiffs' Supp. Ans. & Obj. to Def. Russell's Interrogs. No. 2-4 & 6-15
Lead Case No. CV 07-05295 MRP (MANx)

- 71 -

**Exhibit A
0075**

1  person," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,*

2  2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further

3  object to this Interrogatory to the extent that it seeks information equally available

4  to Defendant Russell, or information to which Defendant Russell has equal or

5  greater access.  Plaintiffs further object to this Interrogatory to the extent that it

6  seeks information not in Plaintiffs' possession, custody, or control.  Plaintiffs

7  further object to this Interrogatory to the extent it seeks disclosure of information

8  protected by the attorney-client privilege, the attorney work product doctrine, the

9  joint prosecution privilege, or any other applicable privilege, protection, or

10  immunity.  Plaintiffs' Answer does not necessarily list every responsive "Person"

11  who is part of the evidentiary record as it currently stands, nor does this Answer

12  necessarily list every supporting "Person" who may be referenced in opposition to

13  or in favor of a summary judgment motion, or at the trial of this action.

14         Subject to and without waiving the foregoing general and specific

15  objections, Plaintiffs identify the following persons:

16       •     Paul Abate, Executive Vice President ("EVP"), Internal Audit

17       •     Raja Akram, Senior Manager, KPMG

18       •     Kevin Bartlett, Senior Managing Director ("SMD") and Chief Investment Officer ("CIO")

19

20       •     David Bigelow, MD, Investor Relations

     •     Philip Bigge, CBCP, VP, Business Continuity, CFC

21       •     Susan E. Bow, SMD, General Counsel, Corporate and Securities and Corporate Secretary

22

23       •     Kathleen Brown, Board Director

24       •     Pat Cahalan, Senior Manager, KPMG

25       •     Scott Carnahan, Partner, KPMG

26       •     Henry G. Cisneros, CFC Board Director

27       •     Jeffrey M. Cunningham, CFC Board Director

28

1     •     Roberto Del Angelo, Munger, Tolles & Olson LLP.

2     •     Sharon Deprano, First Vice President ("FVP"), Structured Finance

3     •     Robert J. Donato, CFC Board Director

4     •     Michael E. Dougherty, CFC Board Director

5     •     Ben M. Enis, CFC Board Director

6     •     Andrew Erskine, SVP and Assistant General Counsel, CHL

7     •     Michael E. Finn, Regional Director of the Office of Thrift Supervision (OTS), West Region

8

9     •     Alan Frelix, Managing Director ("MD"), Strategic Planning

     •     James Furash, SMD, President and Chief

10    Executive Officer ("CEO") of Countrywide Bank

11     •     Carlos Garcia, EMD, Banking and Insurance

12     •     Lawrence Gee, MD, Technical Accounting

13     •     Gabrielle Ghio, FVP, Senior Legal Counsel

14     •     John Hankins, VP, Structured Finance

15     •     Edwin Heller, CFC Board Director

16     •     Greg Hendry, EVP, Financial Reporting

17     •     Mark Hutchins, Client Service Partner, KPMG

18     •     Shiva Iyer, MD, Financial Planning and Corporate Budgeting

19     •     Gwendolyn S. King, CFC Board Director

20     •     Pat Kinsella, Audit Partner, KPMG

21     •     John G. Klinge, Engagement Partner, KPMG

22     •     Richard Kozlow, EVP, General Auditor, Countrywide Bank

23     •     Nick Krsnich, SMD and CIO, CFC

24     •     Thomas Lehner, VP, Bonus Analysis, Full Spectrum Lending

25     •     Jim Liddy, Partner, KPMG

26     •     Paul Liu, SVP, Assistant General Counsel

27     •     Greg Lumsden, SMD and President, Full Spectrum Lending

28

1    •    Anne McCallion, SMD, Chief of Financial Operations and Planning

2    •    Mark McElroy, SVP, Contracts and Negotiations, CHL

3    •    Keith McLaughlin, EMD & Chief Financial Officer ("CFO")

4    •    John McMurray, SMD & Chief Credit Officer

5    •    Martin Melone, CFC & CWB Board Director

6    •    Laurie K. Milleman, SMD & Chief Accounting Officer

7    •    Nick Miller, EVP, Legal Division

8    •    Angelo Mozilo, Chairman of the Board and CEO

9    •    Gene O'Kelley, Chairman and CEO, KPMG

10   •    Michael O'Sullivan, Munger, Tolles & Olson LLP

11   •    Joe Pangrazio, Countrywide Bank

12   •    Robert T. Parry, CFC & CWB Board Director

13   •    Richard Pohl, MD, Mortgage Bank Accounting

14   •    Barry Pyle, MD, Corporate Development

15   •    Richard Rasiej, VP, Residual Interests Risk Management

16   •    Oscar P. Robertson, CFC Board Director

17   •    Keith P. Russell, CFC & CWB Board Director

18   •    Rodolfo Saenz, EVP, Corporate Marketing, CF/CCI

19   •    Thomas Saletta, SVP, Compliance and Technical Support

20   •    David Sambol, Chief of Mortgage Banking
          and Capital Markets, President and COO, CFC.

21   •    Sandor E. Samuels, SMD and Chief Legal Officer

22   •    Jennifer Sandefur, SMD & Treasurer, CFC

23   •    Julie L. Scammahorn, MD & Chief Audit Officer

24   •    Mary Jane Seebach, MD, Countrywide Public Affairs

25   •    Sean Shockley, FVP, Finance, FSL

26   •    Eric P. Sieracki, EMD and CFO, CFC

27   •    Walter Smiechewicz, SMD, Enterprise Risk Assessment, CFC

28

1      •      Harley W. Snyder, CFC & CWB Board Director

2      •      Kent Sorey, SVP, Capital Markets, Internal Audit

3      •      David Spector, SMD, Secondary Marketing

4      •      Ronald Staake, FVP and CFO, Finance Department, FSL

5      •      Derek W. Stark, SVP, Assistant General
              Counsel, Countrywide Home Loans
6
       •      Kathy Schwartz, MD, Financial Planning & Corporate Budgeting
7
       •      Steve Swatsek, Executive Vice President, Valuations and Analysis
8
       •      Steve Sylvers, MD, Corporate Tax, CF, CCI
9
       •      John Taylor, Lead Audit Partner, KPMG
10
       •      Michael S. Udovic, Legal/CF/CCI, Senior Vice President,
11            Chief Governance Officer and Assistant Secretary

12     •      Mark Upson, MD, Administration

13     •      Anise Yi, Senior Manager, KPMG

14

15     **INTERROGATORY NO. 9:**

16          IDENTIFY each STATEMENT by any DEFENDANT that YOU contend
violated the federal securities laws, including the precise language of each
17   STATEMENT, the date the STATEMENT was made, and the DOCUMENT,
place, or location in which the STATEMENT was made.
18
     **ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 9:**
19
20          Plaintiffs incorporate by reference their General Objections.  Plaintiffs

21   further object that because this contention interrogatory seeks identification of

22   each statement by "any Defendant," it is overbroad and unduly burdensome on its

23   face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at

24   *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks

25   information equally available to Defendant Russell, or information to which

26   Defendant Russell has equal or greater access.  Plaintiffs further object to this

27   Interrogatory to the extent that it seeks information not in Plaintiffs' possession,

28

1    custody, or control.  Plaintiffs further object to this Interrogatory to the extent it

2    seeks disclosure of information protected by the attorney-client privilege, the

3    attorney work product doctrine, the joint prosecution privilege, or any other

4    applicable privilege, protection, or immunity.

5           Subject to and without waiving the foregoing general and specific

6    objections, Plaintiffs answer by referring Defendant Russell to the paragraphs of

7    the Second Consolidated Amended Class Action Complaint for Violations of the

8    Federal Securities Laws (the "SAC") identifying Defendants' statements that

9    Plaintiffs allege to be materially false and/or misleading.  *See* SAC ¶¶ 606-951,

10   963-968, 971-979, 994-1000, 1016-1019, 1028-1035, 1052-1053, and 1066.

11          More specifically with respect to Defendant Russell and the Defendants

12   also represented by his counsel, the Series A Medium Term Notes Registration

13   Statement, which Defendants Cisneros, Cunningham, Donato, Enis, Heller, King,

14   Melone, Robertson, Russell and Snyder signed on or about April 7, 2004,

15   incorporated by reference Countrywide's Form 10-K for the year ended

16   December 31, 2003.  The Registration Statement, as was standard for shelf

17   registration statements issued by Countrywide, also incorporated by reference

18   certain "future" Exchange Act filings the Company made with the SEC after

19   April 6, 2004 up until February 1, 2006, the date the Series A Medium Term

20   Notes were offered to the public.  These "future filings" included the Company's

21   April 21, 2004 Form 8-K; first quarter 2004 Form 10-Q; July 26, 2004 Form 8-K;

22   second quarter 2004 Form 10-Q; October 20, 2004 Form 8-K; third quarter 2004

23   Form 10-Q; February 2, 2005 Form 8-K; 2004 Form 10-K; first quarter 2004

24   amended Form 10-Q/A; April 26, 2005 Form 8-K; first quarter 2005 Form 10-Q;

25   second quarter 2004 amended Form 10-Q/A; third quarter 2004 amended Form

26   10-Q/A; July 26, 2005 Form 8-K; second quarter 2005 Form 10-Q; October 27,

27   2005 Form 8-K; third quarter 2005 Form 10-Q; and January 31, 2006 Form 8-K.

28

1        The Series B Medium-Term Notes Registration Statement, which

2  Defendants Cisneros, Cunningham, Donato, Enis, Heller, Melone, Robertson,

3  Russell, Snyder, and Parry signed on or about February 9, 2006, incorporated by

4  reference the Company's 2004 Form 10-K, the Form 10-Q reports for the first,

5  second, and third quarters of 2005, and the September 30, 2005 and October 27,

6  2005 Form 8-K reports.  The Registration Statement, as was standard for shelf

7  registration statements issued by Countrywide, also incorporated by reference

8  certain "future" Exchange Act filings the Company made with the SEC after

9  February 9, 2006 up until August 6, 2007, the date of the last offering of Series B

10  Medium-Term Notes to the public.  These "future filings" included the

11  Company's 2005 Form 10-K, the April 27, 2006 Form 8-K, the first quarter 2006

12  Form 10-Q, the July 25, 2006 Form 8-K, the second quarter 2006 Form 10-Q, the

13  October 24, 2006 Form 8-K, the third quarter 2006 Form 10-Q, the January 30,

14  2007 Form 8-K, the 2006 Form 10-K, the April 26, 2007 Form 8-K, and the first

15  quarter 2007 Form 10-Q.

16        The 6.25% Notes Registration Statement, which Defendants Cisneros,

17  Cunningham, Donato, Enis, Heller, Melone, Robertson, Russell, Snyder, and

18  Parry signed on or about February 9, 2006, similarly incorporated by reference

19  the Company's 2004 Form 10-K, the Form 10-Q reports for the first, second, and

20  third quarters of 2005, and the September 30, 2005 and October 27, 2005 Form 8-

21  K reports.  It also incorporated by reference Countrywide's consolidated financial

22  statements as audited by KPMG for the years 2004 and 2005.  The Registration

23  Statement, as was standard for shelf registration statements issued by

24  Countrywide, also incorporated by reference certain "future" Exchange Act

25  filings the Company made with the SEC after February 9, 2006 up until May 11,

26  2006, the date of the  offering of 6.25% Notes to the public.  These "future

27

28

1    filings" included the Company's 2005 Form 10-K, the April 27, 2006 Form 8-K,

2    and the first quarter 2006 Form 10-Q.

3            The 7% Capital Securities Registration Statement, which Defendants

4    Cisneros, Cunningham, Donato, Melone, Robertson, Russell, Snyder, and Parry

5    signed on or about October 27, 2006, incorporated by reference the Company's

6    2005 Form 10-K, the Form 10-Q reports for the first and second quarters of 2006,

7    the October 24, 2006 Form 8-K, and Countrywide's audited consolidated

8    financial statements for 2004 and 2005.

9            Further, Plaintiffs refer Defendant Russell to the following sets of answers

10   to interrogatories, dated February 22, 2010, which Plaintiffs have previously

11   served in this action: (a) Lead Plaintiff New York State Common Retirement

12   Fund's Verified Supplemental Answers and Objections to Defendant Angelo R.

13   Mozilo's Interrogatories No. 11, 12, 13, and 22; (b) Plaintiffs' Second

14   Supplemental Verified Answers and Objections to the First Set of Interrogatories

15   Propounded to Plaintiffs by Defendant David Sambol; (c) Plaintiffs' Verified

16   Answers and Objections to Defendant Eric Sieracki's First Set of Interrogatories

17   to Plaintiffs; (d) Lead Plaintiff New York City Pension Funds' Verified

18   Supplemental Answers and Objections to Defendant Carlos Garcia's Second Set

19   of Interrogatories; (e) Second Supplemental Answers and Objections to the

20   Second Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B. Katzeff by

21   Defendant Carlos Garcia; (f) Supplemental Answers and Objections to Defendant

22   Andrew Gissinger III's First Set of Interrogatories to Plaintiffs Barry Brahn and

23   Shelley B. Katzeff; and (g) Plaintiffs' Verified Answers and Objections to

24   Defendant Banc of America Securities, LLC's First Set of Interrogatories.

25

26

27

28

**Exhibit A
0082**

**INTERROGATORY NO. 10:**

For each STATEMENT IDENTIFIED in YOUR response to INTERROGATORY NO. 9, STATE all facts supporting YOUR contention that the STATEMENT violated the federal securities laws.

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 10:**

Plaintiffs incorporate by reference their General Objections. Plaintiffs further object that because this contention interrogatory seeks "all facts" relating to statements by "any Defendant," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity. Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant fact that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant fact that Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer by referring Defendant Russell to the Answers to Interrogatories No. 2 and 6 above, and to the following sets of answers to interrogatories, dated February 22, 2010, which Plaintiffs have previously served in this action: (a) Lead Plaintiff New York State Common Retirement Fund's Verified Supplemental Answers and Objections to Defendant Angelo R. Mozilo's

Interrogatories No. 11, 12, 13, and 22; (b) Plaintiffs' Second Supplemental Verified Answers and Objections to the First Set of Interrogatories Propounded to Plaintiffs by Defendant David Sambol; (c) Plaintiffs' Verified Answers and Objections to Defendant Eric Sieracki's First Set of Interrogatories to Plaintiffs; (d) Lead Plaintiff New York City Pension Funds' Verified Supplemental Answers and Objections to Defendant Carlos Garcia's Second Set of Interrogatories; (e) Second Supplemental Answers and Objections to the Second Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B. Katzeff by Defendant Carlos Garcia; (f) Supplemental Answers and Objections to Defendant Andrew Gissinger III's First Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B. Katzeff; and (g) Plaintiffs' Verified Answers and Objections to Defendant Banc of America Securities, LLC's First Set of Interrogatories.

**INTERROGATORY NO. 11:**

For each STATEMENT IDENTIFIED in YOUR response to INTERROGATORY NO. 9, IDENTIFY each DEFENDANT that YOU contend made the STATEMENT.

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 11:**

Plaintiffs incorporate by reference their General Objections. Plaintiffs further object that because this contention interrogatory seeks identification of each statement by "each Defendant," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access. Plaintiffs further object to this Interrogatory to the extent that it seeks information not in Plaintiffs' possession, custody, or control. Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the

1   attorney work product doctrine, the joint prosecution privilege, or any other

2   applicable privilege, protection, or immunity.

3        Subject to and without waiving the foregoing general and specific

4   objections, Plaintiffs answer by referring Defendant Russell to the paragraphs of

5   the SAC identifying Defendants' statements that Plaintiffs allege to be materially

6   false and/or misleading.  *See* SAC ¶¶ 606-951, 963-968, 971-979, 994-1000,

7   1016-1019, 1028-1035, 1052-1053, and 1066.

8        Plaintiffs further refer Defendant Russell to their Answers to

9   Interrogatories No. 9 and 10 above, and to the following sets of answers to

10  interrogatories, dated February 22, 2010, which Plaintiffs have previously served

11  in this action: (a) Lead Plaintiff New York State Common Retirement Fund's

12  Verified Supplemental Answers and Objections to Defendant Angelo R. Mozilo's

13  Interrogatories No. 11, 12, 13, and 22; (b) Plaintiffs' Second Supplemental

14  Verified Answers and Objections to the First Set of Interrogatories Propounded to

15  Plaintiffs by Defendant David Sambol; (c) Plaintiffs' Verified Answers and

16  Objections to Defendant Eric Sieracki's First Set of Interrogatories to Plaintiffs;

17  (d) Lead Plaintiff New York City Pension Funds' Verified Supplemental Answers

18  and Objections to Defendant Carlos Garcia's Second Set of Interrogatories; (e)

19  Second Supplemental Answers and Objections to the Second Set of

20  Interrogatories to Plaintiffs Barry Brahn and Shelley B. Katzeff by Defendant

21  Carlos Garcia; (f) Supplemental Answers and Objections to Defendant Andrew

22  Gissinger III's First Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B.

23  Katzeff; and (g) Plaintiffs' Verified Answers and Objections to Defendant Banc

24  of America Securities, LLC's First Set of Interrogatories.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTERROGATORY NO. 12:**

For each STATEMENT IDENTIFIED in YOUR response to INTERROGATORY NO. 9, IDENTIFY each DEFENDANT that YOU contend is legally responsible for making the STATEMENT.

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 12:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks identification of each statement by "each Defendant," it is overbroad and unduly burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in Plaintiffs' possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer by referring Defendant Russell to the paragraphs of the SAC identifying Defendants' statements that Plaintiffs allege to be materially false and/or misleading.  *See* SAC ¶¶ 606-951, 963-968, 971-979, 994-1000, 1016-1019, 1028-1035, 1052-1053, and 1066.

Plaintiffs further refer Defendant Russell to their Answers to Interrogatories No. 9 and 10 above, and to the following sets of answers to interrogatories, dated February 22, 2010, which Plaintiffs have previously served in this action: (a) Lead Plaintiff New York State Common Retirement Fund's Verified Supplemental Answers and Objections to Defendant Angelo R. Mozilo's Interrogatories No. 11, 12, 13, and 22; (b) Plaintiffs' Second Supplemental

1  Verified Answers and Objections to the First Set of Interrogatories Propounded to

2  Plaintiffs by Defendant David Sambol; (c) Plaintiffs' Verified Answers and

3  Objections to Defendant Eric Sieracki's First Set of Interrogatories to Plaintiffs;

4  (d) Lead Plaintiff New York City Pension Funds' Verified Supplemental Answers

5  and Objections to Defendant Carlos Garcia's Second Set of Interrogatories; (e)

6  Second Supplemental Answers and Objections to the Second Set of

7  Interrogatories to Plaintiffs Barry Brahn and Shelley B. Katzeff by Defendant

8  Carlos Garcia; (f) Supplemental Answers and Objections to Defendant Andrew

9  Gissinger III's First Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B.

10  Katzeff; and (g) Plaintiffs' Verified Answers and Objections to Defendant Banc

11  of America Securities, LLC's First Set of Interrogatories.

12

13  **INTERROGATORY NO. 13:**

14      For each DEFENDANT IDENTIFIED in YOUR response to
15  INTERROGATORY NO. 12, state all facts supporting YOUR response to
   INTERROGATORY NO. 12.

16  **ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 13:**

17      Plaintiffs incorporate by reference their General Objections.  Plaintiffs

18  further object that because this contention interrogatory seeks "all facts" relating

19  to statements by "each Defendant," it is overbroad and unduly burdensome on its

20  face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at

21  *1.  Plaintiffs further object to this Interrogatory to the extent that it seeks

22  information equally available to Defendant Russell, or information to which

23  Defendant Russell has equal or greater access.  Plaintiffs further object to this

24  Interrogatory to the extent that it seeks information not in Plaintiffs' possession,

25  custody, or control.  Plaintiffs further object to this Interrogatory to the extent it

26  seeks disclosure of information protected by the attorney-client privilege, the

27  attorney work product doctrine, the joint prosecution privilege, or any other

28

1   applicable privilege, protection, or immunity.  Plaintiffs' Answer does not

2   necessarily provide every supporting or otherwise relevant fact that is in the

3   evidentiary record as it currently stands, nor does this Answer necessarily provide

4   every supporting or otherwise relevant fact that Plaintiffs may present in

5   opposition to or in favor of a summary judgment motion, or at the trial of this

6   action.

7          Subject to and without waiving the foregoing general and specific

8   objections, Plaintiffs answer by referring Defendant Russell to the Answers to

9   Interrogatories No. 2 and 6 above, and to the following sets of answers to

10  interrogatories, dated February 22, 2010, which Plaintiffs have previously served

11  in this action: (a) Lead Plaintiff New York State Common Retirement Fund's

12  Verified Supplemental Answers and Objections to Defendant Angelo R. Mozilo's

13  Interrogatories No. 11, 12, 13, and 22; (b) Plaintiffs' Second Supplemental

14  Verified Answers and Objections to the First Set of Interrogatories Propounded to

15  Plaintiffs by Defendant David Sambol; (c) Plaintiffs' Verified Answers and

16  Objections to Defendant Eric Sieracki's First Set of Interrogatories to Plaintiffs;

17  (d) Lead Plaintiff New York City Pension Funds' Verified Supplemental Answers

18  and Objections to Defendant Carlos Garcia's Second Set of Interrogatories; (e)

19  Second Supplemental Answers and Objections to the Second Set of

20  Interrogatories to Plaintiffs Barry Brahn and Shelley B. Katzeff by Defendant

21  Carlos Garcia; (f) Supplemental Answers and Objections to Defendant Andrew

22  Gissinger III's First Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B.

23  Katzeff; and (g) Plaintiffs' Verified Answers and Objections to Defendant Banc

24  of America Securities, LLC's First Set of Interrogatories.

25

26

27

28

**INTERROGATORY NO. 14:**

For each DEFENDANT IDENTIFIED in YOUR response to INTERROGATORY NO. 12, IDENTIFY all DOCUMENTS supporting YOUR response to INTERROGATORY NO. 13.

**ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 14:**

Plaintiffs incorporate by reference their General Objections.  Plaintiffs further object that because this contention interrogatory seeks "all documents" concerning "each Defendant," it is overbroad and unduly burdensome on its face. *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,* 2008 WL 863974, at *1. Plaintiffs further object to this Interrogatory to the extent that it seeks information equally available to Defendant Russell, or information to which Defendant Russell has equal or greater access.  Plaintiffs further object to this Interrogatory to the extent that it seeks information not in Plaintiffs' possession, custody, or control.  Plaintiffs further object to this Interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs' Answer does not necessarily provide every supporting or otherwise relevant document that is in the evidentiary record as it currently stands, nor does this Answer necessarily provide every supporting or otherwise relevant document that Plaintiffs may present in opposition to or in favor of a summary judgment motion, or at the trial of this action.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs answer by referring Defendant Russell to the Answers to Interrogatories No. 2, 3, 6 and 7 above, and to documents referenced in the following sets of answers to interrogatories, dated February 22, 2010, which Plaintiffs have previously served in this action: (a) Lead Plaintiff New York State Common Retirement Fund's Verified Supplemental Answers and Objections to

1  Defendant Angelo R. Mozilo's Interrogatories No. 11, 12, 13, and 22; (b)

2  Plaintiffs' Second Supplemental Verified Answers and Objections to the First Set

3  of Interrogatories Propounded to Plaintiffs by Defendant David Sambol; (c)

4  Plaintiffs' Verified Answers and Objections to Defendant Eric Sieracki's First Set

5  of Interrogatories to Plaintiffs; (d) Lead Plaintiff New York City Pension Funds'

6  Verified Supplemental Answers and Objections to Defendant Carlos Garcia's

7  Second Set of Interrogatories; (e) Second Supplemental Answers and Objections

8  to the Second Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B.

9  Katzeff by Defendant Carlos Garcia; (f) Supplemental Answers and Objections to

10  Defendant Andrew Gissinger III's First Set of Interrogatories to Plaintiffs Barry

11  Brahn and Shelley B. Katzeff; and (g) Plaintiffs' Verified Answers and

12  Objections to Defendant Banc of America Securities, LLC's First Set of

13  Interrogatories.

14

15  **INTERROGATORY NO. 15:**

16      For each DEFENDANT IDENTIFIED in YOUR response to
17  INTERROGATORY NO. 12, IDENTIFY all PERSONS with personal
    knowledge of the facts supporting YOUR response to INTERROGATORY NO.
18  13.

19  **ANSWERS AND OBJECTIONS TO INTERROGATORY NO. 15:**

20      Plaintiffs incorporate by reference their General Objections.  Plaintiffs

21  further object that because this contention interrogatory seeks "each person with

22  personal knowledge" concerning "each Defendant" it is overbroad and unduly

23  burdensome on its face.  *See Advocare Int'l,* 2009 WL 3064867, at *1; *Tubbs,*

24  2008 WL 863974, at *1.  Plaintiffs further object to this Interrogatory to the

25  extent that it seeks information equally available to Defendant Russell, or

26  information to which Defendant Russell has equal or greater access.  Plaintiffs

27  further object to this Interrogatory to the extent that it seeks information not in

28

1    Plaintiffs' possession, custody, or control.  Plaintiffs further object to this

2    Interrogatory to the extent it seeks disclosure of information protected by the

3    attorney-client privilege, the attorney work product doctrine, the joint prosecution

4    privilege, or any other applicable privilege, protection, or immunity.  Plaintiffs'

5    Answer does not necessarily list every responsive "Person" who is part of the

6    evidentiary record as it currently stands, nor does this Answer necessarily list

7    every supporting "Person" who may be referenced in opposition to or in favor of

8    a summary judgment motion, or at the trial of this action.

9           Subject to and without waiving the foregoing general and specific

10   objections, Plaintiffs answer by referring Defendant Russell to the Answers to

11   Interrogatories No. 4 and 8 above, and to persons referenced or listed in the

12   following sets of answers to interrogatories, dated February 22, 2010, which

13   Plaintiffs have previously served in this action: (a) Lead Plaintiff New York State

14   Common Retirement Fund's Verified Supplemental Answers and Objections to

15   Defendant Angelo R. Mozilo's Interrogatories No. 11, 12, 13, and 22; (b)

16   Plaintiffs' Second Supplemental Verified Answers and Objections to the First Set

17   of Interrogatories Propounded to Plaintiffs by Defendant David Sambol; (c)

18   Plaintiffs' Verified Answers and Objections to Defendant Eric Sieracki's First Set

19   of Interrogatories to Plaintiffs; (d) Lead Plaintiff New York City Pension Funds'

20   Verified Supplemental Answers and Objections to Defendant Carlos Garcia's

21   Second Set of Interrogatories; (e) Second Supplemental Answers and Objections

22   to the Second Set of Interrogatories to Plaintiffs Barry Brahn and Shelley B.

23   Katzeff by Defendant Carlos Garcia; (f) Supplemental Answers and Objections to

24   Defendant Andrew Gissinger III's First Set of Interrogatories to Plaintiffs Barry

25   Brahn and Shelley B. Katzeff; and (g) Plaintiffs' Verified Answers and

26   Objections to Defendant Banc of America Securities, LLC's First Set of

27   Interrogatories.

28

PLAINTIFFS' SUPP. ANS. & OBJ. TO DEF. RUSSELL'S INTERROGS. NO. 2-4 & 6-15
LEAD CASE NO. CV 07-05295 MRP (MANx)

**Exhibit A
0091**

1   Dated:  March 1, 2010                    LABATON SUCHAROW LLP

2                                  By:     */s/ Joel H. Bernstein*
                                           JOEL H. BERNSTEIN
3                                          JONATHAN M. PLASSE
                                           IRA A. SCHOCHET
4                                          DAVID J. GOLDSMITH
                                           MICHAEL H. ROGERS
5                                          JOSHUA L. CROWELL

6                                          *Lead Counsel for Lead*
                                           *Plaintiffs New York Funds*
7
                                           KREINDLER & KREINDLER LLP
8                                          GRETCHEN M. NELSON
                                           MARK LABATON
9
                                           *Liaison Counsel for Lead*
10                                         *Plaintiffs New York Funds*

11                                         KAPLAN FOX & KILSHEIMER LLP
                                           JOEL B. STRAUSS
12                                         *jstrauss@kaplanfox.com*
                                           JEFFREY P. CAMPISI
13                                         *jcampisi@kaplanfox.com*
                                           850 Third Avenue
14                                         New York, New York 10022
                                           Telephone: (212) 687-1980
15                                         Facsimile: (212) 687-7714

16                                         *Attorneys for Plaintiff*
                                           *Barry Brahn*
17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

Joel H. Bernstein declares as follows:

I am a member of the law firm of Labaton Sucharow LLP, Court-appointed Lead Counsel for Lead Plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund, and the New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York.

I have reviewed Plaintiffs' Verified Supplemental Answers and Objections to Interrogatories No. 2-4 and 6-15 Propounded by Defendant Keith P. Russell to Lead Plaintiffs and Plaintiffs, and state that the responses therein are true and correct to the best of my knowledge, information and belief, subject to the objections set forth therein.

Executed this 1st day of March, 2010.

*/s/ Joel H. Bernstein*
Joel H. Bernstein