LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
*jbernstein@labaton.com*
JONATHAN M. PLASSE
*jplasse@labaton.com*
IRA A. SCHOCHET
*ischochet@labaton.com*
DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
MICHAEL H. ROGERS
*mrogers@labaton.com*
JOSHUA L. CROWELL
*jcrowell@labaton.com*
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead
Plaintiffs New York Funds*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions | Lead Case No.<br>CV 07-05295 MRP (MANx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND PLAN OF ALLOCATION OF NET SETTLEMENT FUND**<br><br>Date:   November 15, 2010<br>Time:  1:00 p.m.<br>Courtroom:  12<br>Judge:  Hon. Mariana R. Pfaelzer |

1

## **TABLE OF CONTENTS**

Table of Authorities ............................................................................... iii

Preliminary Statement ...............................................................................1

The Court's Preliminary Approval
Order and the Pre-Hearing Notice Program ..............................................3

ARGUMENT ..............................................................................................5

I.   STANDARDS FOR FINAL APPROVAL
     OF CLASS ACTION SETTLEMENTS ...............................................5

II.  THE PROPOSED $624 MILLION SETTLEMENT
     IS FUNDAMENTALLY FAIR, ADEQUATE, AND
     REASONABLE AND SHOULD BE APPROVED..................................7

     A.   The Settlement Amount is Fair in View
          of the Best Possible Recovery at Trial and
          the Myriad Risks of Continued Litigation .................................7

     B.   Plaintiffs Face Substantial Risks in Establishing
          Loss Causation, Damages and Liability...................................13

          1.   Risks Concerning
               Loss Causation and Damages......................................13

          2.   Risks Concerning Liability.............................................18

               a.   Claims Against Countrywide ...............................19

                    i.    Risks Concerning the
                          Truth-on-the-Market Defense .......................19

                    ii.   Risks Concerning Alleged
                          Qualitative Misstatements..........................22

                    iii.  Risks Concerning Alleged
                          Quantitative Misstatements.........................25

               b.   Claims Against Mozilo .......................................27

               c.   Claims Against Sambol .......................................30

               d.   Claims Against Sieracki .....................................32

               e.   Claims Against KPMG .......................................34

               f.   Claims Against the
                    Underwriter Defendants .....................................36

               g.   Claims Against the Outside
                    Director Defendants and Kurland........................38

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.   The Settlement Is the Result of Lengthy Arm's-Length Negotiations Facilitated By a Sitting U.S. District Judge and a Respected Private Mediator ....................................40

D.   Having Essentially Completed Fact Discovery and Exchanged Multiple Expert Reports on Liability, Loss Causation and Damages Issues, Plaintiffs Entered Into the Settlement on a Fully Informed Basis ....................................47

E.   Continued Litigation Would Be Complex and Consume Substantial Judicial and Private Resources ..........................49

F.   The Experience and Views of Counsel ....................................51

III.   THE PLAN OF ALLOCATION OF THE NET SETTLEMENT FUND IS FAIR, ADEQUATE AND REASONABLE AND SHOULD BE APPROVED ....................................52

A.   Standards ....................................52

B.   Basis of Methodology ....................................53

C.   Eligible Securities ....................................54

D.   Trading Loss Requirement ....................................55

E.   Calculation of Recognized Loss ....................................56

F.   Application of Factor to Recognized Loss to Determine Recognized Claim ....................................61

G.   *De Minimus* Threshold ....................................63

IV.   THE PROPOSED DISMISSALS OF DEFENDANTS GARCIA AND GISSINGER AND THE SECURITIES ACT CLAIMS AGAINST DEFENDANT SAMBOL ARE FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED ....................................64

Conclusion ....................................64

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Aetna, Inc. Securities Litigation,*
No. MDL 1219, 2001 WL 20928
(E.D. Pa. Jan. 4, 2001) ....................................................................55

*In re American Business Financial
Services, Inc. Noteholders Litigation,*
No. 05-232, 2008 WL 4974782
(E.D. Pa. Nov. 21, 2008) ...............................................15, 23, 25-26

*In re AOL Time Warner, Inc.
Securities & "ERISA" Litigation,*
No. MDL 1500, 2006 WL 903236
(S.D.N.Y. Apr. 6, 2006) ..................................................................58

*Basic, Inc. v. Levinson,*
485 U.S. 224 (1988) ........................................................................56

*In re Cardinal Health Inc. Securities Litigation,*
528 F. Supp. 2d 752 (S.D. Ohio 2007)............................................41

*In re Cardinal Health Inc. Securities Litigation,*
426 F. Supp. 2d 688 (S.D. Ohio 2006)............................................95

*In re Cardizem CD Antitrust Litigation,*
218 F.R.D. 508 (E.D. Mich. 2003)........................................41, 44, 45

*In re Cendant Corp. Litigation,*
264 F.3d 201 (3d Cir. 2001) ....................................................10, 254

*In re Cendant Corp. Litigation,*
109 F. Supp. 2d 235 (D.N.J. 2000),
*aff'd,* 264 F.3d 201 (3d Cir. 2001) ..........................................*passim*

*In re Chambers Development Securities Litigation,*
912 F. Supp. 822 (W.D. Pa. 1995) ..................................................47

*Churchill Village L.L.C. v. General Electric,*
361 F.3d 566 (9th Cir. 2004) .............................................................5

*City Partnership Co. v. Atlantic
Acquisition Ltd. Partnership,*
100 F.3d 1041 (1st Cir. 1996) .........................................................40

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992).......................................................5, 7

*In re Cylink Securities Litigation,*
274 F. Supp. 2d 1109 (N.D. Cal. 2003).............................................12

*Denney v. Jenkens & Gilchrist,*
230 F.R.D. 317 (S.D.N.Y. 2005)..................................................42, 50

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ........................................................................ 13

*In re Enron Corp. Securities, Derivative*
*& "ERISA" Litigation,*
No. MDL-1446, 2008 WL 4178151
(S.D. Tex. Sept. 8, 2008) .................................................56, 57, 61, 62

*Footbridge Limited Trust v. Countrywide*
*Home Loans, Inc.,*
No. 09 Civ. 4050 (PKC),
2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ................................... 29

*In re Gilat Satellite Networks, Ltd.,*
No. CV 02-1510 (CPS),
2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ................................... 13

*In re Gilat Satellite Networks, Ltd.,*
No. CV 02-1510, 2007 WL 1191048
(E.D.N.Y. Apr. 19, 2007) .................................................................. 63

*In re Global Crossing Securities*
*& ERISA Litigation,*
225 F.R.D. 436 (S.D.N.Y. 2004)...........................................14, 52, 63

*Harding University v. Consulting Services Group, L.P.,*
48 F. Supp. 2d 765 (N.D. Ill. 1999)................................................... 23

*In re Heritage Bond Litigation,*
546 F.3d 667 (9th Cir. 2008) ............................................................... 5

*Hicks v. Morgan Stanley & Co.,*
No. 01 Civ. 10071 (RJH),
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .................................... 13

*Huberman v. Tag-It Pacific, Inc.,*
314 F. App'x 59 (9th Cir. 2009)........................................................ 13

*In re Ikon Office Solutions, Inc. Securities Litigation,*
277 F.3d 658 (3d Cir. 2002) .........................................................35, 36

*In re Ikon Office Solutions, Inc. Securities Litigation,*
194 F.R.D. 166 (E.D. Pa. 2000) ........................................................ 62

*In re Immune Response Securities Litigation,*
497 F. Supp. 2d 1166 (S.D. Cal. 2007) ...............................44, 49, 50

*In re Initial Public Offering Securities Litigation,*
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...........................................10, 57

*In re Initial Public Offering Securities Litigation,*
243 F.R.D. 79 (S.D.N.Y. 2007)......................................................... 13

*In re Initial Public Offering Securities Litigation,*
  226 F.R.D. 186 (S.D.N.Y. 2005) ........................................................44

*International Union, United Automobile,*
  *Aerospace & Agricultural Implement*
  *Workers of America v. Chrysler LLC,*
  No. 07-CV-14310, 2008 WL 2980046
  (E.D. Mich. July 31, 2008) ................................................................47

*In re JDS Uniphase Corp. Securities Litigation,*
  No. C 02-1486 CW, 2008 WL 753758
  (N.D. Cal. Mar. 19, 2008) ................................................................23

*In re LDK Solar Securities Litigation,*
  No. C 07-5182 WHA,
  2010 WL 3001384 (N.D. Cal. July 29, 2010) ...................................58

*Linney v. Cellular Alaska Partnership,*
  151 F.3d 1234 (9th Cir. 1998) .......................................................6, 7

*Linney v. Cellular Alaska Partnership,*
  No. C 96-3008 DLJ, 1997 WL 450064
  (N.D. Cal. July 18, 1997), *aff'd,*
  151 F.3d 1234 (9th Cir. 1998) ..........................................................40

*In re Lucent Technologies, Inc. Securities Litigation,*
  307 F. Supp. 2d 633 (D.N.J. 2004) ...................................................10

*In re Lupron Marketing & Sales Practices Litigation,*
  No. 01-CV-10861 RGS, 2005 WL 2006833
  (D. Mass. Aug. 17, 2005) .................................................................18

*In re Lupron Marketing & Sales Practices Litigation,*
  228 F.R.D. 75 (D. Mass. 2005) ........................................................18

*Mars Steel Corp. v. Continental Illinois*
  *National Bank & Trust Co. of Chicago,*
  834 F.2d 677 (7th Cir. 1987) ............................................................46

*Marshall v. Holiday Magic, Inc.,*
  550 F.2d 1173 (9th Cir. 1977) ............................................................6

*McPhail v. First Command Financial Planning, Inc.,*
  No. 05cv179-IEG-JMA, 2009 WL 839841
  (S.D. Cal. Mar. 30, 2009) .................................................................48

*In re Mercury Interactive Corp. Securities Litigation,*
  No. 08-17372, 2010 WL 3239460
  (9th Cir. Aug. 18, 2010) .....................................................................6

*In re Mego Financial Corp. Securities Litigation,*
  213 F.3d 454 (9th Cir. 2000) ...........................................6, 33, 48, 50

*In re Merrill Lynch & Co. Research*
  *Reports Securities Litigation,*
  No. 02 MDL 1484 (JFK), 2007 WL 4526593
  (S.D.N.Y. Dec. 20, 2007) ........................................................................ 63

*In re Merrill Lynch & Co. Research*
  *Reports Securities Litigation,*
  246 F.R.D. 156 (S.D.N.Y. 2007) .............................................. 10, 13, 55, 58

*In re Merrill Lynch Tyco Research Securities Litigation,*
  249 F.R.D. 124 (S.D.N.Y. 2008) ............................................................... 13

*In re MetLife Demutualization Litigation,*
  689 F. Supp. 2d 297 (E.D.N.Y. 2010) ....................................................... 54

*In re Metropolitan Securities Litigation,*
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) .................................................. 36

*Metzler Investment GMBH v. Corinthian Colleges, Inc.,*
  540 F.3d 1049 (9th Cir. 2008) ................................................................... 32

*In re MicroStrategy, Inc. Securities Litigation,*
  150 F. Supp. 2d 896 (E.D. Va. 2001) ........................................................ 35

*In re MicroStrategy, Inc. Securities Litigation,*
  148 F. Supp. 2d 654 (E.D. Va. 2001) .............................................. 17, 26, 42

*In re The Mills Corp. Securities Litigation,*
  265 F.R.D. 246 (E.D. Va. 2009) ........................................................ *passim*

*National Rural Telecommunications*
  *Cooperative v. DIRECTV, Inc.,*
  221 F.R.D. 523 (C.D. Cal. 2004) ........................................... 7, 50, 51

*In re Nortel Networks Corp. Securities Litigation,*
  No. 01 Civ. 1855 (RMB), 2006 WL 3802198
  (S.D.N.Y. Dec. 26, 2006) .......................................................................... 10

*Officers for Justice v. Civil Service Commission*
  *of City & County of San Francisco,*
  688 F.2d 615 (9th Cir. 1982) ...................................................................... 6

*In re Omnivision Technologies, Inc.*
  *Securities Litigation,*
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................................. *passim*

*In re Pacific Enterprises Securities Litigation,*
  47 F.3d 373 (9th Cir. 1995) ....................................................................... 51

*Plumbers & Steamfitters Local 773 Pension Fund*
  *v. Canadian Imperial Bank of Commerce,*
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................. 24, 32

*In re PNC Financial Services*
   *Group, Inc. Securities Litigation*,
   440 F. Supp. 2d 421 (W.D. Pa. 2006) ............................................... 26

*In re Portal Software, Inc. Securities Litigation*,
   No. C-03-5138 VRW, 2007 WL 4171201
   (N.D. Cal. Nov. 26, 2007) ......................................................*passim*

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...................................................... 35

*Raab v. General Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ......................................................... 19

*In re Relafen Antitrust Litigation*,
   231 F.R.D. 52 (D. Mass. 2005) .................................................... 48

*Satchell v. Federal Express Corp.*,
   No. C 03-2659 SI, 2007 WL 1114010
   (N.D. Cal. Apr. 13, 2007) .......................................................... 44

*SEC v. Mozilo*,
   No. CV 09-3994 JFW (MANx),
   2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ..........................*passim*

*Shalala v. Guernsey Memorial Hospital*,
   514 U.S. 87 (1995) ...................................................................... 25

*In re Shoretel, Inc. Securities Litigation*,
   No. C 08-00271 CRB,
   2009 WL 2588881 (N.D. Cal. Aug. 19, 2009) ............................... 9

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ..................................................... 19

*Smith v. Dominion Bridge Corp.*,
   No. 96-7580, 2007 WL 1101272
   (E.D. Pa. Apr. 11, 2007) ............................................................. 30

*SRM Global Fund Limited Partnership*
   *v. Countrywide Financial Corp.*,
   No. 09 Civ. 5064 (RMB), 2010 WL 2473595
   (S.D.N.Y. June 17, 2010) .................................................21, 28, 29

*In re Telik, Inc. Securities Litigation*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ......................................... 21

*In re Tyco International, Ltd. Multidistrict Litigation*,
   535 F. Supp. 2d 249 (D.N.H. 2007) .......................................*passim*

*In re Veeco Instruments, Inc. Securities Litigation*,
   No. 05 MDL 0165 (CM),
   2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ............................*passim*

*In re Veritas Software Corp. Securities Litigation*,
 No. C 03-0283 MMC, 2005 WL 3096079
 (N.D. Cal. Nov. 15, 2005), *aff'd in part and
 vacated in part on other grounds*,
 496 F.3d 962 (9th Cir. 2007) ................................................................. *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
 396 F.3d 96 (2d Cir. 2005) ...................................................... 7-8, 41

*Watkins v. Miller*,
 92 F. Supp. 2d 824 (S.D. Ind. 2000) ................................................. 24

*White v. National Football League*,
 822 F. Supp. 1389 (D. Minn. 1993),
 *aff'd*, 41 F.3d 402 (8th Cir. 1994) .................................................. 60

*In re Williams Securities Litigation*,
 496 F. Supp. 2d 1195 (N.D. Okla. 2007) ...................................... 36

*In re WorldCom, Inc. Securities Litigation*,
 388 F. Supp. 2d 319 (S.D.N.Y. 2005) ..................................... *passim*

*In re WorldCom, Inc. Securities Litigation*,
 No. 02 Civ. 3288 (DLC),
 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ............................... 39

*In re WorldCom, Inc. Securities Litigation*,
 346 F. Supp. 2d 628 (S.D.N.Y. 2004) .......................................... 37

*In re Worlds of Wonder Securities Litigation*,
 35 F.3d 1407 (9th Cir. 1994) ........................................... 32, 33, 36

*Wu Group v. Synopsys, Inc.*,
 No. C 04-3580 MJJ,
 2005 WL 1926626 (N.D. Cal. Aug. 10, 2005) .............................. 23

**STATUTES & RULES**

15 U.S.C. § 77k(b)(3)(A) & (C) ....................................... 37, 38-39

15 U.S.C. § 77k(e) .............................................................. 9, 38

15 U.S.C. § 78u-4(f)(2) .................................................... 17, 40

Fed. R. Civ. P. 6(a)(1)(C) .......................................................... 3

Fed. R. Civ. P. 23(e) ................................................................ 64

Fed. R. Civ. P. 23(e)(2) ..................................................... 5, 64

**OTHER AUTHORITIES**

Ellen M. Ryan & Laura E. Simmons,
 *Securities Class Action Settlements:
 2009 Review and Analysis* (Cornerstone Research 2010) ............10-11

**Preliminary Statement**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's August 2, 2010 Order Granting Preliminary Approval to Settlement and Directing Dissemination of Notice to the Class (the "Preliminary Approval Order"), Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund ("NYSCRF"); Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds" and, together with NYSCRF, "Lead Plaintiffs" or the "New York Funds"); and Plaintiff Barry Brahn, on behalf of the certified Class (collectively with Lead Plaintiffs, "Plaintiffs"), respectfully submit this memorandum of points and authorities in support of final approval of the proposed Settlement of this class action and the Plan of Allocation of the Net Settlement Fund.

The Settlement provides for the gross payment of $600 million in cash by Defendant Countrywide Financial Corporation ("Countrywide" or the "Company") and certain insurers on behalf of all Defendants other than KPMG LLP ("KPMG"), and $24 million in cash by KPMG. If approved by the Court, the $624 million Settlement will be the 13th largest securities class action settlement since the enactment of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and the second largest in a case within the Ninth Circuit.[1]

---

[1] *See* Securities Class Action Services "Top 100 Settlements Quarterly Report," Ex. D, at 2. Citations to "Ex. __" herein refer to exhibits to the accompanying Declaration of Joel H. Bernstein in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation of Net Settlement Fund and Lead Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Expenses ("Bernstein Decl.").

1    The Settlement represents an extraordinary benefit for the Class that falls well
2    within a range of reasonableness in light of the myriad risks of continued
3    litigation—in particular, the significant risks inherent in proving the required
4    elements of causation and damages as well as scienter, falsity and materiality.
5        The merits of the claims, which center on complex and arguably subjective
6    questions concerning, among other things, the underwriting guidelines for a wide
7    and diversified line of home loan products, the changing risk of the Company's
8    loan portfolios, the state of mind of senior executives in connection with the
9    Company's lending practices and public disclosures, the proper application of
10   generally accepted accounting principles ("GAAP"), and the adequacy of
11   KPMG's audits of the Company's financial statements pursuant to generally
12   accepted auditing standards ("GAAS"), are sharply disputed.  The value of the
13   claims, which center on equally complex and expert-dependent questions of the
14   meaning and impact of Company news and whether the prices of Countrywide
15   securities fell because of the revelation of undisclosed facts that contradicted
16   earlier statements, rather than solely because of the collapse of the overall
17   housing market, also are sharply disputed.  Plaintiffs' expert has opined for
18   purposes of the Settlement that the Class suffered approximately $2.8 billion in
19   damages, while Countrywide's expert would testify that damages are zero.
20       While Lead Plaintiffs, which are among the nation's largest public pension
21   funds, are confident in the merits of the claims, Defendants have mounted
22   vigorous defenses—previewed in a raft of summary judgment motions—that add
23   substantial risk to Plaintiffs' ability to prove liability and damages at trial.
24   Nonetheless, Lead Plaintiffs have secured a Settlement that represents a large
25   percentage of the potential recovery at trial and provides cash relief to Class
26   members now, and in accordance with a fair and coherent Plan of Allocation.
27
28

An agreement to settle this action was reached only after informed arm's-length negotiations facilitated by a sitting Judge of this Court and a respected private mediator, and after fact discovery was virtually complete and the parties exchanged the reports of 17 testifying liability and damages experts.  The final, three-day mediation session was the culmination of a series of other discussions beginning in May 2009 that were constructive in airing the issues and obstacles to settlement but failed to result in anything close to an accord.  The formal terms and conditions of the Settlement were painstakingly negotiated and reflect a fully informed and carefully crafted compromise.  The Settlement and Plan of Allocation should be approved.

### The Court's Preliminary Approval Order and the Pre-Hearing Notice Program

On June 29, 2010, following this Court's June 16, 2010 Order re: Preliminary Approval of Settlement (Dkt. No. 839), Plaintiffs filed a renewed unopposed motion for preliminary approval of the Settlement.  On August 2, 2010, after a hearing, the Court issued the Preliminary Approval Order (Dkt. No. 976).[2]  *See* Bernstein Decl. ¶¶ 5-7.[3]

Pursuant to and in compliance with the Preliminary Approval Order, beginning on August 13, 2010, the Claims Administrator caused the Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing (the "Notice") and Proof of Claim form to be mailed to all Class members who could

---

[2] For ease of reference, the Preliminary Approval Order, as corrected, is annexed as Exhibit A to the Bernstein Declaration.

[3] The Preliminary Approval Order provides, among other things, that Proofs of Claim must be postmarked or otherwise received by the Claims Administrator no later than 90 days after the Fairness Hearing, or such other date as may be set by the Court.  *See* Ex. A, at ¶ 8.  Ninety days after November 15, 2010 is February 13, 2011, a Sunday.  Because postal services are generally unavailable on Sundays, the claims submission deadline given in the Notice and Proof of Claim is February 14, 2011 (Monday).  *See also id.* (authorizing Lead Counsel to process late claims so long as distribution is not materially delayed); Fed. R. Civ. P. 6(a)(1)(C) (if last day of time period specified in court order is Saturday, Sunday or legal holiday, period continues to run until next business day).

be identified by reasonable effort.  *See* accompanying Declaration of Thomas R. Glenn of Rust Consulting, Inc. Regarding Notice to the Class ("Glenn Decl."), at ¶¶ 8, 10-11 & 13 and Ex. 1 thereto.  A total of 657,699 Notice packets have been mailed as of October 7, 2010.  *Id.* ¶ 4.  On August 13, 2010, the Notice and Proof of Claim were also posted on both the case-dedicated website established by the Claims Administrator for purposes of this Settlement, *id.* ¶ 15, and the website of Plaintiffs' Lead Counsel.  Bernstein Decl. ¶ 9.  Accordingly, the Notice and Proof of Claim were made publicly available 66 days before the deadline for Class members to object or opt-out of the action, and a full 94 days before the Fairness Hearing.

The Notice provides means by which Class members or other interested persons can call, e-mail, or write to the Claims Administrator or Lead Counsel with inquiries.  As of October 7, 2010, the toll-free telephone "hotline" manned by the Claims Administrator has received more than 2,000 calls from potential Class members and other interested persons, and the Claims Administrator has received 266 e-mails sent to the case-specific e-mail address established for purposes of this Settlement.  Glenn Decl. ¶¶ 16-17.

During the week of August 23, 2010, the Summary Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing (the "Summary Notice") was published on the *PR Newswire,* a national business-oriented wire service, and in the *Wall Street Journal*, *USA Today*, and the *Los Angeles Times. Id.* ¶ 14 and Exs. 2-5 thereto.

As of October 7, 2010, the Claims Administrator has received more than 12,000 Proof of Claim forms from potential Class members.  *Id.* ¶ 21.  Given that Class members have until at least February 2011 to submit claims, it appears that far more Class members will participate in the Settlement than opt-out or object.

# ARGUMENT

## I. STANDARDS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

Rule 23(e) of the Federal Rules of Civil Procedure provides that the claims of a certified class may be settled only with the approval of the Court, and only on a finding, after reasonable notice to the class and a hearing, that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see In re Heritage Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008) ("A district court may approve a proposed settlement in a class action only if the compromise is fundamentally fair, adequate, and reasonable.") (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (same).

In making this determination, courts in this Circuit consider and balance a number of factors, including:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial;[4] (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant;[5] and (8) the reaction of class members to the proposed settlement.[6]

---

[4] Although class certification was unusually complex and hard-fought here, resulting in an 80-page opinion (Dkt. No. 661; *see* Bernstein Decl. ¶¶ 25, 27, 34-44), the potential risks of decertification were not particularly important to Lead Plaintiffs' decision to settle.  Accordingly, "this factor favors neither approval nor disapproval of the settlement."  *In re Veritas Software Corp. Sec. Litig.*, No. C-03-0283 MMC, 2005 WL 3096079, at *5 (N.D. Cal. Nov. 15, 2005), *aff'd in part and vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007).

[5] This factor, similarly, neither favors nor disfavors approval of the Settlement because no nonparty government entity participated in the prosecution or settlement of this action.  *See Veritas*, 2005 WL 3096079, at *6; *cf. Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (SEC participated in and approved of class action settlement).

[6] With respect to factor (8), Class members have until October 18, 2010 to request exclusion from the Class or object to the matters to be considered during the Fairness Hearing.  Plaintiffs will file a brief responding to any objections and addressing opt-outs no later than November 8, 2010.  *See* Preliminary Approval Order, Ex. A, at ¶¶ 9-10; *In re Mercury Interactive Corp. Sec. Litig.*, No. 08-17372, 2010 WL 3239460, at *6 (9th Cir. Aug. 18, 2010) (fee petition must be

1    *E.g.*, *Churchill Village L.L.C. v. General Elec.*, 361 F.3d 566, 575-76 (9th Cir.

2    2004) (citing *Hanlon*, 150 F.3d at 1026); *Officers for Justice v. Civil Serv.*

3    *Comm'n of City & County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)

4    (same).  Courts have also considered "(9) the procedure by which the settlement

5    was arrived at, and (10) the role taken by the lead plaintiff in that process, a factor

6    somewhat unique to the PSLRA."  *In re Portal Software, Inc. Sec. Litig.*, No. C-

7    03-5138 VRW, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) (internal

8    citation omitted); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458

9    (9th Cir. 2000) ("In addition, the settlement may not be the product of collusion

10   among the negotiating parties.") (citing *Class Plaintiffs*, 955 F.2d at 1290).

11          The determination of whether a settlement is fair, adequate and reasonable

12   is committed to the Court's sound discretion.  *See Mego*, 213 F.3d at 458

13   ("Review of the district court's decision to approve a class action settlement is

14   extremely limited.") (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234,

15   1238 (9th Cir. 1998)).  Nonetheless, in applying the pertinent factors the Court

16   should not prejudge the merits of the case, in part because the Court will be called

17   upon to decide the merits if the action proceeds.  *See Officers for Justice*, 688

18   F.2d at 625 ("[T]he settlement or fairness hearing is not to be turned into a trial or

19   rehearsal for trial on the merits. . . .  [I]t is the very uncertainty of outcome in

20   litigation and avoidance of wasteful and expensive litigation that induce

21   consensual settlements.").

22          The Court's discretion in assessing the fairness of the settlement is also

23   circumscribed by "the strong judicial policy that favors settlements, particularly

24   where complex class action litigation is concerned."  *Linney v. Cellular Alaska*

25   *P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) (quoting *Officers for Justice*, 688

26

27

28   filed sufficiently in advance of objection deadline to give class members adequate
     opportunity to review).

F.2d at 626); *see Class Plaintiffs*, 955 F.2d at 1276 (same); *see also In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007) ("[P]ublic policy generally favors settlement—particularly in class actions as massive as the case at bar.").

## II.   THE PROPOSED $624 MILLION SETTLEMENT IS FUNDAMENTALLY FAIR, ADEQUATE, AND REASONABLE AND SHOULD BE APPROVED

### A.   The Settlement Amount is Fair in View of the Best Possible Recovery at Trial and the Myriad Risks of Continued Litigation

In evaluating the fairness of a settlement, the fundamental question is how the value of the settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay and expense.  In this regard, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Mego*, 213 F.3d at 459 (quoting *Officers for Justice*, 688 F.2d at 628); *see also National Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("It is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.") (quoting *Officers for Justice*, 688 F.2d at 628).  Indeed, "[t]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 119 (2d Cir. 2005).  Reality dictates that some discount needs to be offered to defendants in a settlement, who otherwise would have no incentive to pay anything short of a litigated judgment. *See, e.g., Linney*, 151 F.3d at 1242 ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (quoting *Officers for Justice*, 688 F.2d at 624) (internal quotation marks omitted).

The $624 million Settlement—which, if approved by the Court, will be among the largest settlements in a PSLRA case—is well with a range of reasonableness in light of the best possible recovery at trial and the risks of continued litigation. As set forth in the accompanying supporting Declaration of Frank C. Torchio for Settlement Purposes ("Torchio Decl."),[7] with the assumptions discussed below as to Defendants' proof of negative causation at trial, the maximum aggregate damages Plaintiffs could have obtained at trial is estimated to be $2,831,648,041. Torchio Decl. ¶ 32 and Ex. B thereto; *see also id.* ¶¶ 26-31. The proposed $624 million Settlement represents 22 percent of this amount.

Initially, Plaintiffs estimate that maximum aggregate damages on their claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") is $2.578 billion (see Torchio Decl. Ex. B) and maximum aggregate statutory damages on their claims under Section 11 of the Securities Act of 1933 (the "Securities Act") is $1.778 billion.[8] Total maximum potential damages, before any showing of negative causation by Defendants on the Section 11 claims, are therefore estimated at $4.22 billion.[9] Plaintiffs then calculate the

---

[7] The Torchio Declaration, with its exhibits and appendix, was previously filed with the Court as part of Plaintiffs' June 29, 2010 submissions in support of preliminary approval of the Settlement (Dkt. Nos. 845 to 845-5). For the Court's convenience, and to ensure a complete record for purposes of the Fairness Hearing, the Torchio Declaration is again filed herewith.

[8] *See* Torchio Decl. ¶ 32 n.21. The statutory measure of damages under Section 11, in contrast to accepted methods of calculating damages under Section 10(b), assumes loss causation and puts upon defendants the burden to prove what portion of the decline in the security was caused by factors other than the alleged misstatements. This affirmative defense is often called "negative causation." *See* 15 U.S.C. § 77k(e); *In re Shoretel, Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009 WL 2588881, at *2 (N.D. Cal. Aug. 19, 2009).

[9] This $4.22 billion maximum damages estimate necessarily excludes approximately $135 million in damages to avoid double-counting with respect to the three securities (7% Capital Securities, 6.25% Subordinated Notes, and Series B Medium-Term Note with CUSIP 22238HGQ7) that have both Section 10(b) and Section 11 claims. *See* Torchio Decl. ¶ 32 n.21.

1    least amount by which Plaintiffs believe this estimate is likely to be reduced by

2    Defendants' showing on their affirmative defense of negative causation.

3         In completing this second step, Plaintiffs calculate approximate Section 11

4    damages with respect to the Series A and Series B Medium-Term Notes other

5    than CUSIP 22238HGQ7 at $254 million; the 7% Capital Securities at $36

6    million; the 6.25% Subordinated Notes Due May 15, 2016 at $62.5 million; and

7    the Series B Medium-Term Note with CUSIP 22238HGQ7 at $36.8 million.  *See*

8    Torchio Decl. Ex. B.  Each of these Section 11 damages estimates assumes that

9    Defendants, at trial, will meet their burden of proving negative causation to the

10   same extent that Plaintiffs' expert discounts Section 10(b) damages by finding

11   that a portion of such damages was caused by macroeconomic and other factors

12   unrelated to alleged misstatements.  Because Plaintiffs, at trial, will proffer

13   evidence of damages for the common stock, options, 7% Capital Securities, and

14   five bonds for which Plaintiffs have certified Section 10(b) claims that necessarily

15   takes loss causation into account, it is reasonable and appropriate to assume that a

16   rational jury will apply such evidence of causation reciprocally to the

17   Countrywide Securities for which Plaintiffs also have Section 11 claims.  Based

18   on all of these assumptions, including the amount of negative causation

19   Defendants would be able to establish as part of their affirmative defense, the

20   proposed $624 million Settlement represents 22 percent of Plaintiffs' estimated

21   damages amount.

22        This percentage, particularly in view of the risks and uncertainties

23   discussed above, falls well within the range of possible approval and is in fact an

24   extraordinary result.  As noted in Plaintiffs' brief for preliminary approval of the

25   Settlement, courts have generally approved other large settlements in PSLRA

26   cases that recover a comparable or far smaller percentage of maximum damages.

27   *See, e.g., Tyco*, 535 F. Supp. 2d at 261 (approving $3.2 billion settlement for

28

"approximately 27% of the alleged damages" as "an outstanding recovery for the class"); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2006 WL 3802198, at *6 (S.D.N.Y. Dec. 26, 2006) (approving $1.14 billion "[s]ettlement represent[ing] about 10% of Lead Plaintiff's original [] estimate of the maximum possible damages"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving $586 million settlement "represent[ing] two percent of the aggregate expected recovery") ("*IPO*"); *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 648 (D.N.J. 2004) (approving settlement of "approximately $517 million" at time of preliminary approval "[a]lthough the Class allegedly suffered billions of dollars in damages"); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving $125 million settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions").

An updated statistical study published this year by Cornerstone Research found that between 2002 and 2008, court-approved securities class action settlements (730 settlements) recovered a median of 2.9 percent of estimated "plaintiff-style" damages.[10]  *See* Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements: 2009 Review and Analysis*, at 1, 5 (Cornerstone Research 2010) (Ex. E).  Similarly, all settlements during 2009 (103 settlements) recovered a median of 2.3 percent of such damages.  *Id.* at 1, 5.  Cornerstone also found that where, as here, estimated damages are between $1 billion and $5

---

[10] Cornerstone's method of determining "plaintiff-style" damages, while perhaps more liberal than the method used by Lead Plaintiffs' experts, is not explained so as to enable Lead Plaintiffs' experts to replicate it with any degree of reliability.  *See* Ex. E, at 4 & 18 n.6.  But if Cornerstone means to imply that "plaintiff-style" damages represents an approach to damages that a securities class action plaintiff might present in good faith to a court and jury today, then that is what Lead Plaintiffs' experts have estimated here for settlement purposes. As discussed herein, several courts have cited earlier versions of the Cornerstone study in considering the fairness of securities class action settlements.

1   billion, settlements during 2002-2008 and 2009 recovered a median of only 0.9

2   percent and 1.5 percent of such damages, respectively.  *Id.* at 5.

3       Further, Cornerstone found that settlements between 1996 and 2009 in

4   cases that named the company's auditor as a defendant (192 settlements)

5   recovered a median 4.5 percent of "plaintiff-style" damages.  *Id.* at 8.  Settlements

6   during 1996-2009 in cases where an underwriter was named as a defendant (147

7   settlements) recovered a median 5.4 percent of such damages, and settlements

8   during this period in which the plaintiff asserted Securities Act claims (248

9   settlements) recovered a median 4.2 percent of such damages.  *Id.* at 9.  Lastly,

10   settlements during this period in which the SEC brought related litigation (261

11   settlements) recovered a median 4.1 percent of such damages.  *Id.* at 12.

12       Viewed as percentage of the potential recovery at trial, therefore, this

13   Settlement provides the Class with a recovery roughly 24 times greater than

14   settlements in 2002-2008 with comparable "plaintiff-style" damages; 14 times

15   greater than settlements in 2009 with comparable "plaintiff-style" damages; seven

16   times greater than all settlements in 2002-2008; nine times greater than all

17   settlements in 2009; five times greater than settlements where Securities Act

18   claims were asserted or the SEC pursued a parallel action; and four times greater

19   than all settlements where the auditor or an underwriter was sued.

20       Plaintiffs submit that a settlement of such magnitude clearly is within a

21   range of reasonableness in light of the best possible recovery and the risks of

22   continued litigation.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 242 n.22 (3d

23   Cir. 2001) (observing that approved settlement recoveries in securities class

24   actions typically range from 1.6% to 14% of claimed damages); *In re Omnivision*

25   *Techs., Inc. Sec. Litig.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (settlement

26   yielding 6% of potential damages after deducting fees and costs was "higher than

27   the median percentage of investor losses recovered in recent shareholder class

28

1    action settlements") (citing *In re Heritage Bond Litig.*, No. 02-ML-1475 DT

2    (RCx), 2005 WL 1594389, at *8-9 (C.D. Cal. June 10, 2005)).[11]

3          Several courts have relied upon earlier versions of the Cornerstone

4    Research study in approving securities class action settlements.  In *Portal*

5    *Software*, Judge Vaughn Walker cited Cornerstone's *2006 Review and Analysis* in

6    approving a settlement representing 25 percent of plaintiffs' maximum recovery

7    at trial, stating that "[t]he settlement . . . exceeds median percentages for all

8    securities class actions in 2005 and 2006, which were approximately 3.1% and

9    2.4% respectively."  2007 WL 4171201, at *3.  Judge Walker also referenced the

10   Cornerstone study in *In re Cylink Securities Litigation*, 274 F. Supp. 2d 1109

11   (N.D. Cal. 2003), noting that its value "lies in the standard [it] afford[s] by which

12   to make comparisons of settlements across cases."  *Id.* at 1115 (citing 2002

13   version of study).

14         Further, in *In re Veeco Instruments, Inc. Securities Litigation*, No. 05 MDL

15   0165 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007), the court favorably

16   cited Cornerstone's *2006 Review and Analysis* in noting that "[t]he 23.2%

17   possible recovery of estimated damages exceeds the median percentage reported

18   by Cornerstone Research for settlements overall, which was 3.6% through year-

19   end 2005 and 2.4% for 2006[.]"  *Id.* at *12 & n.2.  And in *Hicks v. Morgan*

20   *Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24,

21   2005), the court approved a $10 million settlement, stating that "24.4% of

22

23   ───────────────

24         [11] Cornerstone also examined securities class action settlements by judicial
     circuit.  There were 248 such settlements approved by courts within the Ninth

25   Circuit through 2008, far more than any other Circuit, and 28 during 2009 (also
     more than any other Circuit).  *See* Ex. E, at 15.  The median settlement amount

26   among the group of 248 settlements was $6.5 million, which was 3.2 percent of
     estimated "plaintiff-style" damages.  The median settlement amount among the

27   group of 28 settlements was $7.5 million, which was 2.2 percent of "plaintiff-
     style" damages.  This Settlement, both in sheer size and measured against

28   potential recovery at trial, dwarfs the median settlements approved by courts
     within this Circuit.

Defendants' [damages] estimate and 3.8% of Plaintiffs' estimate . . . is within the range of reasonableness for post-PSLRA securities class action settlements." *Id.* at *7 (citing 2004 Cornerstone study).[12]  This factor weighs strongly in favor of final approval of the Settlement.

### B. Plaintiffs Face Substantial Risks in Establishing Loss Causation, Damages and Liability

#### 1. Risks Concerning Loss Causation and Damages

Loss causation requires proof of "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Huberman v. Tag-It Pac., Inc.*, 314 F. App'x 59, 61-62 (9th Cir. 2009).  Once causation is established, damage estimation remains "a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (citation and internal quotation marks omitted).

During the hearing on preliminary approval of the Settlement, the Court remarked that "I certainly appreciate the difficulty here from the standpoint of the

---

[12] *See also In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) (approving $4.9 million settlement, noting that "the estimated recovery of three percent of the total damages estimated by the plaintiffs, does not meaningfully diverge from the range of reasonableness for settlements of similarly sized securities class actions," drawing observation from the 2008 Cornerstone study that "report[ed] that, in 2007, the median settlement as a percentage of estimated damages was 3.5% in securities class actions where estimated damages ranged between $126 and $500 million."); *Merrill Lynch*, 246 F.R.D. at 167 ("A recovery of between approximately 3% and 7% of estimated damages is within the range of reasonableness for recovery in the settlement of large securities class actions.") (citing Cornerstone *2006 Review and Analysis*); *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 94 n.120 (S.D.N.Y. 2007) (A "review of securities class action settlements indicates that the median settlement recovery in 2005 was approximately three percent of plaintiffs' estimated damages."); *In re Gilat Satellite Networks, Ltd.*, No. CV 02-1510 (CPS), 2007 WL 2743675, at *12 (E.D.N.Y. Sept. 18, 2007) (approving settlement representing 10.6% of maximum recovery at trial, which compared favorably to "a median settlement amount as a percentage of estimated damages of 3.1% in 2005") (citing Cornerstone *2005 Review and Analysis*).

1   Defendants and from the standpoint of the Plaintiffs as it relates to los[s]

2   causation and damages."  Aug. 2, 2010 Hearing Transcript, Ex. F, at 24:25-25:3.

3   The Court went on to state that "I think the principal uncertainty here in front of a

4   jury would be los[s] causation and damages.  I agree with Mr. Bernstein about

5   that. . . .  You can come to virtually any conclusion that you want to about what a

6   jury would find."  *Id.* at 25:8-12.

7        Consistent with these observations, Plaintiffs faced significant risks with

8   respect to proving loss causation and damages at trial.  Countrywide argued in its

9   summary judgment motion, and would contend at trial, that the corrective

10  disclosures identified by Plaintiffs told the market nothing new, and that

11  Countrywide disclosed prior to July 2007 that it had expanded underwriting

12  guidelines, made numerous exceptions to its guidelines, and originated substantial

13  volumes of riskier loan products like pay option adjustable rate mortgages ("pay

14  option ARMs") and home equity lines of credit ("HELOCs") as well as other

15  low-documentation loans.  Plaintiffs contend that these disclosures were

16  incomplete and inconsistent with other public assurances by Countrywide, but the

17  issue whether the decline in Countrywide's security prices was caused by the

18  corrective disclosures ultimately would be decided by a jury.

19       The risks associated with loss causation are also reflected in the sharply

20  divergent opinions of Plaintiffs' and Defendants' testifying expert witnesses on

21  these issues.  In his Rule 26(a)(2) report ("Jarrell Report"), Plaintiffs' expert

22  Gregg A. Jarrell, Ph.D., among other opinions and analyses, quantified the

23  maximum amount of artificial inflation in Countrywide's common stock price

24  and estimated per-share damages for the stock and certain other securities in the

25  Class by determining that seven disclosure dates during the Class Period—July

26  24, 2007 and August 14, 15, 16, 17, 20 and 21, 2007—were partially or fully

27

28

1    "corrective" in nature.[13]  Professor Jarrell concluded that each of these disclosure

2    dates had "economic correspondence" to the alleged fraud and, taken together,

3    corrected the market price of Countrywide for the foreseeable economic effects of

4    that fraud.[14]  *See* Jarrell Report (App'x to Torchio Decl.) at 39-67.  Professor

5    Jarrell went on to opine that Countrywide common stock was artificially inflated

6    by $8.60 per share or certain lesser amounts between January 31, 2006 and

7    August 15, 2007, with artificial inflation being zero before and after this segment

8    of the Class Period.[15]  *See id.* at 72-73.

9         In contrast, Countrywide's expert R. Glenn Hubbard, Ph.D. opined in his

10   report ("Hubbard Report") that none of the corrective disclosure dates alleged in

11   the Complaint—including the seven dates critical to Professor Jarrell's results—

12   were "corrective" because the news on those days were realizations of previously

13   disclosed risks (such as the susceptibility of Countrywide's business to declines in

14   economic and real estate market conditions and to constraints on Countrywide's

15   funding liquidity) or were not associated with statistically significant share price

16   declines.[16]  Professor Hubbard concluded that all of the declines in Countrywide

---

[13] *See* Jarrell Report at 72.  The Jarrell Report is filed herewith the appendix to the accompanying Torchio Declaration.

[14] Economic correspondence "means that the economic content and substance of the information disclosed accords with the foreseeable economic effects of the alleged misrepresentations and misconduct."  Jarrell Report at 12.

[15] This artificial inflation period is comparable to the relevant period in the SEC's enforcement action against Defendants Angelo R. Mozilo, David Sambol and Eric P. Sieracki (the "SEC Action").  The SEC alleges material misstatements starting in late April 2005 and ending with Countrywide's Form 10-K for 2007.  *See* Complaint in *SEC v. Mozilo*, No. CV 09-3994 JFW (MANx) (C.D. Cal. June 4, 2009), at ¶¶ 14, 20, 28, 92 (Ex. G).  Judge Walter recently denied Defendants' motions for summary judgment nearly in their entirely, and trial is set to begin on October 19, 2010.  *See SEC v. Mozilo*, No. CV 09-3994 JFW (MANx), 2010 WL 3656068, at *21-22 (C.D. Cal. Sept. 16, 2010) (Ex. H).

[16] *See* Hubbard Report at 7.  The Hubbard Report was previously filed with the Court as part of Plaintiffs' June 29, 2009 preliminary approval submissions (Dkt. No. 844-1).  For the Court's convenience, and to ensure a complete record for purposes of the Fairness Hearing, the Hubbard Report is again filed herewith as Exhibit I to the Bernstein Declaration.

1   securities beginning in July 2007 were a consequence of general market

2   conditions and realizations of previously disclosed risks, and accordingly opined

3   that recoverable damages are zero.  *See* Hubbard Report, Ex. I, at 7; *In re*

4   *American Bus. Fin. Servs., Inc. Noteholders Litig.*, No. 05-232, 2008 WL

5   4974782, at *8 (E.D. Pa. Nov. 21, 2008) (noting, in approving settlement of class

6   action against subprime home equity lender, defendants' "argu[ment] that other

7   factors like the subprime crisis, not their alleged misrepresentations and

8   omissions, caused the classes' harm").

9        Consistent with Professor Hubbard's opinions, KPMG's expert William H.

10  Beaver, Ph.D. stated in his report that the news on the disclosure dates alleged in

11  the Complaint did not restate or correct Countrywide's audited financial

12  statements, and rather concerned contemporaneous and forward-looking

13  economic events related to Countrywide and conditions in the mortgage sector.

14  KPMG would thus contend at trial that none of the losses sustained by Class

15  members was caused by KPMG's audits of Countrywide's financial statements

16  and issuance of unqualified audit opinions, particularly where no financial

17  statements have been restated.  *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp.

18  2d 319, 338 (S.D.N.Y. 2005) (approving settlement where "with respect to both

19  Securities Act and Exchange Act claims, the defendants contested the extent to

20  which the decline in the prices of WorldCom securities was due to the WorldCom

21  accounting fraud as opposed to other market forces").[17]

22

23

24

25   [17] *See also Omnivision*, 559 F. Supp. 2d at 1041-42 ("The amount Plaintiffs
     might recover if they prevailed at trial is uncertain.  A number of factors,
26   including general market conditions . . . may have affected the portion of the
     damages attributable to Defendants' purportedly misleading statements.");
27   *Veritas*, 2005 WL 3096079, at *4 ("As plaintiffs note, defendants' experts likely
     would contend that much or all of the loss experienced by plaintiffs was due to
28   factors unrelated to any wrongful conduct of defendants and, in particular, would
     likely rely on [wide industry fluctuations] as the principal factor . . . .").

1    This competing opinion testimony would inevitably reduce the trial of

2 these issues to a risky "battle of the experts."  Juries, particularly those tasked

3 with weighing complex financial and statistical evidence, are unpredictable.

4 Although Plaintiffs believe that Professor Jarrell's damage estimates and

5 underlying analyses are well-supported, a jury potentially could reject or

6 minimize his opinions and credit those of Professors Hubbard and Beaver.[18]

7 Even assuming a jury finding of complete liability (which of course is not

8 guaranteed), Plaintiffs have no assurance that the jury would award more than

9 $624 million and that the award would be upheld on appeal.[19]  *See Tyco*, 535 F.

10 Supp. 2d at 260-61 ("Proving loss causation would be complex and difficult.

11 Moreover, even if the jury agreed to impose liability, the trial would likely

12 involve a confusing 'battle of the experts' over damages.  If, faced with

13 conflicting expert testimony, the jury chose to embrace the most conservative

14 estimate of damages, then the ultimate award might turn out to be less than the

15 proposed settlement."); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654,

16

17

18

19    [18] Plaintiffs also adduced fact evidence from which a jury could conclude that Countrywide's senior management believed that the lending practices and loose underwriting guidelines were a substantial cause of the Company's liquidity crisis, and indeed had predicted in writing that reckless underwriting practices would cause such a crisis.  Even so, Countrywide and KPMG both retained additional experts who would testify essentially that the Company was a victim rather than a cause of the global credit crisis that started in August 2007.

23    [19] In September 2009, a consultant retained by Lead Plaintiffs administered a jury focus exercise in the Los Angeles area intended to test likely jurors' reactions to various case themes, evidence and damage theories developed up to that point. *See* Bernstein Decl. ¶ 66.  The jury exercise yielded several deliberative "verdicts" based on identical presentations and evidence.  Although one verdict awarded full damages, another awarded 20 percent of damages, and other verdicts fell in-between.  An actual jury award of 20 percent of damages would yield $566.3 million in the aggregate—about 10% less than this Settlement.  In any event, the results of the jury exercise show, consistent with this Court's remarks during the preliminary approval hearing, that the amount of damages an actual jury might award is unpredictable.

666-67 (E.D. Va. 2001) ("[T]he damages issue would have become a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury.").[20]

Moreover, owing to the proportionate liability provisions of the PSLRA, a divided verdict on liability on Plaintiffs' Section 10(b) claims potentially could result in a recovery far lower than $624 million. *See* 15 U.S.C. § 78u-4(f)(2) (absent finding of knowing violation of Exchange Act, liability extends only to defendant's percentage of responsibility).  And Plaintiffs cannot entirely discount the possibility that a jury would find some or all Defendants liable, but award token damages or none at all.  *See In re Lupron Mktg. & Sales Practices Litig.*, No. 01-CV-10861 RGS, 2005 WL 2006833, at *4 (D. Mass. Aug. 17, 2005) ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages.") (citing instances). These risks strongly support final approval of the Settlement.

### 2.      Risks Concerning Liability

"As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication," *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005).  Moreover, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 256 (E.D. Va. 2009) (quoting *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971)).  Plaintiffs are confident in the merits of the claims and their prospects of success before a jury.  Nonetheless, the voluminous discovery record, the confidential record developed for mediation purposes, and

---

[20] Of further note, were this action to be tried to verdict, the jury would not award $624 million or any other aggregate sum because Professor Jarrell opined only as to per-share damage amounts.  *See* Jarrell Report at 72-75, 77.  Aggregate recovery by the Class after a litigated judgment would depend upon the participation of individual Class members in response to a notice and proof of claim form.

1  Defendants' summary judgment motions indicate that Defendants have liability

2  defenses that potentially could prevail at or prior to trial, or on appeal.

### a.     Claims Against Countrywide

#### i.     Risks Concerning the Truth-on-the-Market Defense

5        Among Lead Plaintiffs' principal contentions is that Countrywide

6  consistently hid the complete truth from the public with regard to the nature and

7  expansion of its loan underwriting guidelines, the amount of lending that occurred

8  nonetheless as "exceptions" to those guidelines, and, accordingly, the true extent

9  of the risks associated with the loans the Company sold onto the secondary

10 mortgage market or held in its investment portfolio.

11       Countrywide's primary defense set forth in its summary judgment brief,

12 and raised during the mediation process, is its contention that all of the material

13 facts allegedly concealed during the Class Period were in fact disclosed in certain

14 SEC filings, including prospectuses for the public offering of Countrywide

15 mortgage-backed securities ("MBS"); at Company-sponsored investor forums for

16 fixed-income and equity investors, which were attended by securities analysts and

17 institutional investors; at quarterly investor conference calls; and in various other

18 media including analyst reports and the financial press. *See Raab v. General*

19 *Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("[T]he presumption that the

20 market price has internalized all publicly available information cuts both ways.").

21       More specifically, Countrywide would contend at trial that the market

22 knew lending guidelines had expanded across the entire mortgage industry, that

23 the market was aware of Countrywide's own underwriting practices (including

24 expansions of guidelines and no-documentation loans) and the credit quality of its

25 loans, that the MBS prospectuses disclosed detailed characteristics of its loans,

26 and that Countrywide accurately disclosed that it originated loans of a quality

27 sufficient to make them saleable to secondary market participants.  And in

1  asserting this "truth-on-the-market" defense, Countrywide maintains not only that

2  there were no material misstatements because complete information was

3  disclosed, but also that the Company and its senior management did not act with

4  scienter because the volume and density of its periodic disclosures were

5  inconsistent with an intent to defraud.[21]

6         With respect to the disclosures in MBS prospectuses, Plaintiffs would

7  respond that, as Judge Walter stated recently in the SEC Action, "a reasonable

8  investor is not required to pore through hundreds of prospectus supplements,

9  consisting of thousands of pages, . . . to determine that the underwriting

10  guidelines touted in [Countrywide's] Forms 10-K were routinely ignored in

11  making loans," and that "even if an investor were able to synthesize all of the

12  information in the prospectus supplements, the investor would not be able to

13  determine the extent to which Countrywide was ignoring its underwriting

14  guidelines." *SEC v. Mozilo*, No. CV 09-3994 JFW (MANx), 2010 WL 3656068,

15  at *11 (C.D. Cal. Sept. 16, 2010) (denying defendants' summary judgment

16  motions) (Ex. H).[22]  With respect to Countrywide's disclosures that its strategy

17  was to offer the "broadest" menu of loan products in the mortgage industry,

18  Plaintiffs would contend with supporting evidence that "Countrywide never

19  disclosed that it employed the strategy in such a way to make its underwriting

20  guidelines a composite of the most aggressive guidelines in the industry." *Id.*

21

22      [21] *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir.
2009) (scienter requires a showing of intentional misconduct or deliberate

23  recklessness, with recklessness defined as "a highly unreasonable omission,
involving not merely simple, or even inexcusable negligence, but an extreme

24  departure from the standards of ordinary care, and which presents a danger of
misleading buyers or sellers that is either known to the defendant or is so obvious

25  that the actor must have been aware of it") (quoting *In re Silicon Graphics Inc.
Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)).

26      [22] *See also* Dec. 9, 2009 Class Certification Opinion (Dkt. No. 661) at 25 n.26

27  ("If taken individually, each MBS may contain a small sample of loans originated
or purchased by Countrywide and therefore may not be material to investors in
the proposed class.  Many MBS prospectus disclosures may be immaterial *to*

28  *investors in Countrywide* unless the data in them is aggregated.").

1    Regarding Countrywide's disclosure that its underwriting guidelines were

2   designed to produce loans "saleable" in the secondary market, Plaintiffs would

3   respond with supporting evidence that Countrywide nonetheless concealed "that

4   the underwriting guidelines it designed, presumably to ensure prudent

5   underwriting, were routinely ignored, and that the *only* criterion Countrywide

6   used in approving a *particular* loan was whether it could be sold in the secondary

7   mortgage market." *Id.*  And with respect to Countrywide's presentations and

8   other disclosures at analyst and investor conferences, Plaintiffs would respond

9   with evidentiary support that certain analysts were unaware, for example, that

10   large proportions of "exception" loans were based on exceptions none of

11   Countrywide's competitors were offering, and that certain analysts were surprised

12   by the Company's corrective disclosures on and after July 24, 2007 and the stock

13   price reacted accordingly.[23]  *See also id.* at *9 ("[A] reasonable investor is not

14   required to pore through all prior transcripts of earnings calls . . . .").

15    Although Lead Plaintiffs believe the Court would deny summary judgment

16   on this issue, a jury potentially could be persuaded and find no misstatements, no

17   scienter, or both.  The jury would have to compare voluminous (and potentially

18   overwhelming) disclosures and other public statements with internal Company

19   documents, and make delicate assessments of whether Countrywide disclosed the

20   "complete" or "enough" truth regarding its loans and lending practices, and the

21   impact of such "truth" on the allegedly false statements.  The size, complexity

22   and subtlety of such an undertaking, and the unpredictability of its outcome,

23   support approval of the Settlement.  *See id.* at *19 (Countrywide's extensive

24   disclosures "may undermine the inference of scienter"); *In re Telik, Inc. Sec.*

25

26    [23] This Court's Order Governing the Treatment of Confidential Information
     (Dkt. No. 506) precludes a detailed description of evidence in the discovery
27   record that has not otherwise been publicly discussed.  This brief will reference
     evidence discussed in Judge Walter's recent opinion in the SEC Action and which
28   is also part of the discovery record here.

*Litig.*, 576 F. Supp. 2d 570, 579 (S.D.N.Y. 2008) (risks on truth-on-the-market defense supported settlement; some analysts perceived company's improper conduct at the time while others did not).[24]

### ii.   Risks Concerning Alleged Qualitative Misstatements

Countrywide contends in its motion for summary judgment, and would contend at trial, that the alleged false assurances and other generalized statements concerning the quality of the Company's loans and underwriting regimen were true because, contrary to Plaintiffs' allegations, the Company expanded its underwriting guidelines carefully and following detailed analysis; it maintained the best exception loan controls in the industry and carefully managed the granting of exceptions; and it had extensive risk controls that ensured adherence to guidelines, prevention of fraud, and loan quality.

Although Plaintiffs have substantial responses to these contentions,[25] the issues of whether Countrywide's qualitative statements were materially misleading and made with scienter are complex, dependent in part upon

---

[24] *See also SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, No. 09 Civ. 5064 (RMB), 2010 WL 2473595, at *8-9 (S.D.N.Y. June 17, 2010) (dismissing with prejudice complaint by large hedge fund; omissions concerning credit performance and lack of historical experience with pay option ARMs were immaterial where Company disclosed risks of pay option ARMs in SEC reports and earnings calls) (Ex. J).

[25] Plaintiffs have evidence from which a rational jury could conclude, among other things, that Countrywide's execution of its "matching" strategy entailed the adoption of the most aggressive aspects of its competitors' guidelines (including those of marginal subprime competitors) without adopting companion mitigating requirements that would offset risk. A jury could also conclude that exception loans functionally became the "rule" at Countrywide such that a significant portion of the loans recommended for rejection by the Company's automated underwriting systems were ultimately approved, a significant portion of the exceptions issued by the subprime production division were exceptions that no competitor offered, and exceptions were concentrated in intrinsically high-risk products like pay option ARMs, HELOCs and no-documentation loans, and with high-risk attributes like low-FICO and high loan-to-value, resulting in a dangerous compounding of risk. A jury could further conclude from the record evidence that pay option ARMs, contrary to the Company's assurances of "quality," were poorly underwritten, such that they were issued with a high level of exceptions under low-doc programs to relatively low-FICO borrowers.

---

1   circumstantial and opinion evidence, and sharply disputed.  Even assuming that

2   the Court would deny summary judgment, Plaintiffs have no assurance that the

3   jury would find in their favor and that the verdict would be upheld on appeal.

4           It is uncertain, for example, how the jury would resolve issues about the

5   risks inherent in the pay option ARMs and HELOCs held in the Company's loan

6   portfolio, how those risks rose over time, and whether such risks were sufficiently

7   disclosed in one form or another.  The evidence pertinent to these issues will

8   include internal and public documents and testimony from both fact and expert

9   witnesses.  While Plaintiffs' expert on mortgage lending, Richard K. Green, Ph.D.

10  of the University of Southern California, would testify that the portfolio became

11  increasingly risky during the Class Period while underwriting standards were

12  being lowered, and that internal concerns about risk contradicted public

13  statements about risk, Kerry D. Vandell, Ph.D., a Professor of Finance and

14  Director of the Center for Real Estate at the University of California-Irvine,

15  would testify on Countrywide's behalf that the risk in the portfolio was carefully

16  managed and consistent with industry norms, and that unprecedented market

17  dislocations in the housing market caused the Company's demise.  *See American*

18  *Bus.*, 2008 WL 4974782, at *8 (approving settlement with subprime lender where

19  lead counsel "also acknowledge[s] that conflicting expert opinions likely will be

20  presented which creates a significant risk in a jury trial").  The same uncertainty

21  exists with regard to the competing evidence the parties would present regarding

22  exception lending and the Company's internal risk controls.[26]

23  _____

24  [26] In its summary judgment brief, Countrywide attempts to discredit the
    factual averments of about a dozen confidential witnesses ("CWs") in the
25  Complaint by identifying purported discrepancies between their averments and
    their subsequent deposition testimony, or by arguing that certain CWs recanted.
26  KPMG makes similar charges in its summary judgment motion.  This brief is not
    the appropriate forum for detailed responses to Defendants' specific contentions
27  regarding the CWs and their testimony, beyond noting that the allegations
    attributed to each CW were faithful to what that CW told Lead Plaintiffs'
28  investigators when that CW was interviewed, and that there was other testimony

1    With regard to scienter, the jury will have to confront an overarching and

2    critical issue of business judgment versus deliberate recklessness.  Plaintiffs

3    would present evidence at trial showing that the Company's Chief Risk Officer

4    and other seasoned risk management personnel repeatedly rang the alarm

5    internally regarding the dangers posed by the Company's aggressive lending

6    practices, but were sidelined or ignored by senior management in favor of

7    evermore aggressive loan production.  Countrywide and other Defendants will

8    characterize these discussions as no more than the usual "give and take" that

9    occurs as part of the decision-making process at large companies, and particularly

10   ones whose business is based on deciding how much risk to take.  They will

11   contend that the decisions following such internal deliberations, even if they

12   ended badly for the Company and its shareholders, were taken in good faith and

13   thus are not actionable under the federal securities laws.  *See* Dec. 1, 2008

14   Omnibus Order on Defendants' Motions to Dismiss (Dkt. No. 296) at 5 ("The

15   federal securities laws do not create liability for poor business judgment or failed

16   operations.") (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977));

17   *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*

18   *Commerce*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("*CIBC*") ("[F]undamental

19   disagreements with Defendants' business judgments in a tumultuous economic

20   downturn . . . are not actionable under Section 10(b) and Rule 10(b)-5.").  The

21

22   by CWs that supported Plaintiffs' allegations.  Defendants have, however, raised
     questions of credibility as to certain CWs for the jury to determine, and these
23   questions constitute an additional litigation risk.  *See In re JDS Uniphase Corp.*
     *Sec. Litig.*, No. C 02-1486 CW, 2008 WL 753758, at *3 (N.D. Cal. Mar. 19,
24   2008) (when confidential witness averments are corroborated by investigator
     notes, question of whether statements were made to plaintiffs "is essentially a
25   credibility question"); *Wu Group v. Synopsys, Inc.*, No. C 04-3580 MJJ, 2005 WL
     1926626, at *13 (N.D. Cal. Aug. 10, 2005) (same); *Harding Univ. v. Consulting*
26   *Servs. Group, L.P.*, 48 F. Supp. 2d 765, 769-70 (N.D. Ill. 1999) (witness
     allegations in complaint had factual basis after reasonable investigation
27   notwithstanding post-complaint contradictory testimony); *see also Watkins v.*
     *Miller*, 92 F. Supp. 2d 824, 854 (S.D. Ind. 2000) ("Cases in which prosecution
28   witnesses later recant for a host of possible reasons are not uncommon.").

1  uncertainty of how the jury will resolve this important issue supports final

2  approval of the Settlement.

### iii.  Risks Concerning Alleged Quantitative Misstatements

Plaintiffs also claimed that Countrywide presented annual and quarterly financial statements in violation of GAAP with respect to the setting of loan loss reserves on loans held for investment ("ALL"), loss reserves concerning representations and warranties made on securitized loans ("R&W"), valuation of retained interests ("RIs") in securitized loans, and valuation of mortgage servicing rights ("MSRs").  Although Plaintiffs believe the Court would deny summary judgment on their accounting claims at least with respect to 2006 and the first two quarters of 2007,[27] success at trial is not assured.  Countrywide contends that it consistently considered increasing credit risk and delinquency trends in its financial accounting, and specifically that it calculated ALL based on specific credit risk characteristics in its portfolio, established R&W reserves based on empirically verifiable data and assumptions derived from historical data, and properly valued RIs and MSRs based on rigorous modeling techniques.

The Supreme Court has stated that GAAP is not a talismanic rulebook, but rather is complex, changing "and, even at any one point, is often indeterminate." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  The relevant GAAP

---

[27] Plaintiffs would introduce evidence at trial from which a rational jury could conclude, among other things, that Countrywide materially understated R&W reserves for 2006 and the first two quarters of 2007, primarily due to recklessly computing those reserves based solely on average historical default rates for loans from its 2001 through 2005 vintages, but not including the 2006 vintage that Countrywide knew was defaulting at a much greater rate.  Trial evidence would also show that Company materially overstated the value of its RIs for 2006 and the first two quarters of 2007, largely by (a) ignoring the rising rate of delinquencies in its HELOC residuals, (b) applying static interest rates in an environment where those rates were climbing; and (c) failing to incorporate negative home price appreciation in certain real estate markets into its valuation models.  Trial evidence would further show that Countrywide materially understated ALL in 2006, mostly because it relied only on historical defaults and consequent losses to set the reserve.

1   provisions and accounting methods here are complex, require the application of

2   reasonable judgment, and arguably are subjective in critical respects.  *See*

3   *American Bus.*, 2008 WL 4974782, at *8 (approving settlement with subprime

4   lender where lead counsel "acknowledge[d] the risk of presenting the complex

5   accounting issues involved to a jury").  At trial, Countrywide would point out that

6   it did not restate any of the financial statements at issue, that KPMG issued

7   unqualified audit opinions on the Company's year-end financials and did not

8   identify any material errors, and that the SEC, after a comprehensive formal

9   investigation culminating in litigation, did not charge any GAAP violations.

10          Particularly against this background, Plaintiffs have no assurance that a

11  jury would conclude that Countrywide's annual or quarterly financial statements

12  violated GAAP, let alone find that the Company's accounting judgments—that

13  generally were based on KPMG's advice—were made recklessly or in bad faith.

14  *See In re PNC Fin. Servs. Group, Inc. Sec. Litig.*, 440 F. Supp. 2d 421, 434 (W.D.

15  Pa. 2006) ("[D]efendants have contended that the alleged GAAP violations are

16  insufficient to sustain a finding of scienter, particularly where the accounting

17  issues are complex and outside accountants purportedly gave independent

18  approval to the challenged statements."); *cf. Veeco*, 2007 WL 4115809, at *8

19  ("Defendants would continue to assert that even if Veeco's financial statements

20  were restated . . . , Plaintiffs would be unable to prove that the statements were

21  materially false and misleading, and that even if they could prove the falsity of

22  any statements, Plaintiffs would be unable to prove that any of the Defendants

23  acted with scienter.").  These risks are magnified here because resolution of these

24  issues would depend heavily upon the conflicting testimony of multiple

25  accounting experts.  *See id.* at *9 ("Plaintiffs likely would need to rely heavily on

26  the testimony of their accounting . . . experts, who would be challenged by

27  Defendants.  Thus, a very lengthy and complex battle of the parties' experts likely

28

1  would have ensued at trial, with unpredictable results."); *MicroStrategy*, 148 F.

2  Supp. 2d at 667 (additional litigation would "requir[e] extensive expert testimony

3  concerning the company's accounting practices and the significance of the

4  Individual Defendants' decisions in relation to GAAP").

### b.   Claims Against Mozilo

6      Plaintiffs asserted claims under Sections 10(b), 20(a) and 20A of the

7  Exchange Act and Sections 11 and 15 of the Securities Act against Angelo R.

8  Mozilo, Countrywide's founder, Chairman of the Board and CEO, for alleged

9  misstatements in SEC reports and Registration Statements concerning loan

10  origination and underwriting standards, the Company's financial condition, the

11  risks of pay option ARMs, and loans categorized as "prime" versus "nonprime";

12  for alleged oral misstatements concerning, among other subjects, the Company's

13  subprime lending business and the riskiness of the loans in its portfolio; and for

14  selling Countrywide stock, contemporaneously with purchases by the Lead

15  Plaintiffs, while in possession of material nonpublic information.

16      Mozilo argues in his summary judgment motion, and would contend at

17  trial, that he never tried to deceive Countrywide investors or hide information

18  from the public, and instead was a business leader who "spoke his mind" directly

19  and candidly in public as well as internally within the Company.  He contends

20  that when his public statements are viewed in full and in the context of the

21  Company's other disclosures, the finder of fact will conclude that there were no

22  secrets about the types of loans Countrywide originated or the risks the Company

23  faced, including the risks surrounding pay option ARMs.

24      With regard to scienter, Mozilo contends that his decision in 2006 to

25  postpone his planned retirement from the Company, and certain negative

26  statements about the mortgage market he made publicly during the Class Period,

27  are inconsistent with the assertion that he foresaw the macroeconomic upheaval

28

1   that began in 2007 or that he had an intent to pump up the stock price.  Mozilo

2   also contends that the facts concerning his stock sales made pursuant to Rule

3   10b5-1 trading plans actually show good faith and an absence of scienter.

4   According to Mozilo, he sold Countrywide stock on the advice of financial

5   advisors and friends in order to diversify his holdings as he approached

6   retirement, and, rather than dump all his stock at once, he sold over a 12-month

7   period, using Company-sanctioned trading plans and while retaining significant

8   investment risk as a major stockholder.

9   　　　　Although Plaintiffs have responses to these contentions and believe

10   Mozilo's summary judgment motion would be denied,[28] Plaintiffs cannot reliably

11   predict how a jury will react to the array of evidence that would be presented at

12   trial.  One piece of evidence is Mozilo's September 26, 2006 e-mail to Sambol

13   and Sieracki in which he stated that "[w]e have no way, with any reasonable

14   certainty, to assess the real risk of holding [pay-option] loans on our balance

15   sheet" and that "[t]he bottom line is that we are flying blind on how these loans

16   will perform in a stressed environment of higher unemployment, reduced values

17   and slowing home sales."  Although a jury could find that this e-mail contradicted

18   Mozilo's public assurances around that time regarding the risks inherent in pay-

19   option ARMs, the jury also potentially could conclude that Countrywide fully

20   disclosed those risks, including its lack of significant historical experience with

21   such loans.  *Compare Mozilo*, 2010 WL 3656068, at *13 (quoting "flying blind"

22   e-mail in denying Mozilo's summary judgment motion) *with SRM Global Fund*

23   *Ltd. P'ship v. Countrywide Fin. Corp.*, No. 09 Civ. 5064 (RMB), 2010 WL

24

25   　　　[28] Judge Walter recently denied Mozilo's motion for summary judgment based on evidence discussed in this subsection as well as more record evidence

26   that Plaintiffs would use to show that Mozilo intentionally or recklessly made false and misleading statements regarding the quality of Countrywide's

27   underwriting guidelines and loan production, pay-option ARMs, and the categorization of loans as "prime" versus "nonprime."  *See Mozilo*, 2010 WL

28   3656068, at *12-15, 16-20.

2473595, at *8-9 (S.D.N.Y. June 17, 2010) (dismissing action that quoted "flying blind" e-mail as a centerpiece of the complaint) (Ex. J).[29]

Another e-mail sent by Mozilo to Sambol, Sieracki and others, dated March 26, 2006, described 100% financing subprime loans as "toxic" and "the most dangerous product in existence."  Mozilo followed up on April 13, 2006 with an e-mail to Sambol and Sieracki stating that he "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loans," and referring to second-lien subprime loans as "poison."  The jury could conclude that this e-mail shows Mozilo's knowledge that the Company routinely ignored its underwriting guidelines and understood the associated risks, and his awareness of specific breakdowns in underwriting procedures.  *See Mozilo*, 2010 WL 3656068, at *17.  The jury also potentially could find, however, that the risks of such credit-blemished, no-money-down loans were sufficiently disclosed and that despite Mozilo's colorful language, "defendants were under no duty to employ the adjectorial characterization that the plaintiffs believe is more accurate."  *SRM*, 2010 WL 2473595, at *8 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994)) (internal quotation marks omitted); *see also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 379810, at *21 (S.D.N.Y. Sept.

---

[29] Judge Walter distinguished *SRM* on the grounds that SRM, unlike the SEC, was relying on the fraud-on-the-market presumption, and that SRM did not purchase Countrywide securities until after the Company filed its 2006 Form 10-K, which stated that the Company lacked significant historical experience with the credit performance of pay-option ARMs.  *See Mozilo*, 2010 WL 3656068, at *14 n.6.  Lead Plaintiffs, like SRM, would rely on the fraud-on-the-market presumption.  Judge Walter also held, unlike the court in *SRM,* that whether Defendants' adverse disclosures were sufficient to render the misrepresentations immaterial was a jury question.  *See id.* at *13 ("Whether the disclosed information adequately conveyed the risks of Pay-Option ARM loans or was readily available to a reasonable investor are questions of fact for the jury.").  Plaintiffs cannot be certain which of these two inconsistent rulings this Court would favor or, if the issue were to go to the jury, what the jury would find.

1   28, 2010) (concluding, in dismissing action by purchasers of Countrywide MBS,

2   that Mozilo's "serious lack of compliance" e-mail did not show scienter).

3   It is equally uncertain how a jury will resolve the factual issues concerning

4   Mozilo's stock sales and multiple and amended Rule 10b5-1 trading plans.

5   Plaintiffs would contend at trial that Mozilo possessed material nonpublic

6   information at the time he adopted or amended these trading plans, that he made

7   false statements with scienter at the same time he was adopting these plans and

8   selling stock, and that his trading plans were significantly out-of-line with his

9   prior trading plans and practices.  Judge Walter denied Mozilo's summary

10  judgment motion on this basis.  *See Mozilo*, 2010 WL 3656068, at *20.  The jury,

11  however, potentially could credit Mozilo's explanations, among others, that he

12  insisted upon a "floor" price below which no shares could be sold; that in

13  February 2007 he transferred $1 million in stock to a trust for his children which

14  provides tax benefits only if the assets appreciate; and that he made many

15  negative public statements in and around the time trades were made under the

16  various plans.  Plaintiffs expect to have only circumstantial evidence to meet

17  Mozilo's direct testimony on this issue.  *See Smith v. Dominion Bridge Corp.*, No.

18  96-7580, 2007 WL 1101272, at *5 (E.D. Pa. Apr. 11, 2007) ("Since stockholders

19  normally have little more than circumstantial and accretive evidence to establish

20  the requisite scienter, proving scienter is an uncertain and difficult necessity for

21  plaintiffs.") (internal quotations omitted); *Veeco*, 2007 WL 4115809, at *9 ("[I]t

22  is difficult to predict whether a jury would find . . . circumstantial evidence

23  convincing to prove scienter.").

24  ### c.    Claims Against Sambol

25  Lead Plaintiffs asserted Exchange Act claims against David Sambol,

26  Countrywide's head of loan production and later president and COO, for alleged

27  misstatements in SEC reports concerning loan quality, financial statements, the

28

1  reporting of loans as "prime" versus "nonprime," and liquidity, and alleged oral

2  misstatements concerning loan origination standards, risk mitigation, and the

3  Company's subprime business.[30]

4       Sambol contends in his summary judgment motion, and would contend at

5  trial, that even assuming he made a material misstatement of fact, he believed his

6  statements to be true at the time he made them, there is no evidence of intentional

7  or reckless misconduct because he disclosed the allegedly omitted facts to the

8  public, he (as his separately retained expert would testify) consistently followed

9  "best practices" in terms of Countrywide's corporate governance and internal

10  disclosure processes, and his stock trading history shows a lack of intent to

11  defraud.  Sambol contends that Plaintiffs' claims, rather than suggesting fraud,

12  reflect mere disagreement with business judgments following robust debate

13  within the Company.

14       Although Plaintiffs have responses to these contentions and believe

15  Sambol's summary judgment motion would be denied,[31] success before a jury

16  remains uncertain.  A jury potentially could find that the fact Sambol sold

17  Countrywide shares pursuant to Rule 10b5-1 trading plans, and ultimately lost

18

19      [30] Plaintiffs previously agreed to dismiss the Securities Act claims asserted

20  against Sambol.  The fairness of this proposed dismissal was fully discussed in Plaintiffs' preliminary approval brief and is referenced in Part IV below.

21      [31] Sambol told investors in September 2006, for example, that Countrywide

22  was "on the sidelines" of the subprime lending sector.  Plaintiffs contend that this statement was false because Sambol knew that the Company was originating

23  increasing volumes of poor quality subprime loans that did not adhere to the Company's already loose underwriting guidelines.  Plaintiffs have substantial

24  evidence that Sambol was well-aware that Countrywide's "matching strategy" resulted in the Company's guidelines being the most aggressive in the industry.

25  Moreover, in an April 2006 e-mail, Mozilo discussed a conversation with Sambol in which Sambol referred to 100% financing second-lien subprime loans as the

26  "milk" of Countrywide's business.  Further, in June 2006, Sambol was informed that 23% of Countrywide's first-lien subprime loans originated during the first

27  quarter were done as "exceptions" to the existing underwriting guidelines.  The SEC also alleges that Sambol's "on the sidelines" statement was deceptive, and

28  Judge Walter recently denied his motion for summary judgment on this and other evidence.  *See Mozilo*, 2010 WL 3656068, at *4, 17.

millions as his remaining holdings fell precipitously in value, evidenced good faith and a belief in the future success of the Company.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (preexisting trading plan can rebut inference of scienter); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-25 (9th Cir. 1994) (granting summary judgment where insiders held onto most of their stock and lost money).  If the jury found that the allegedly omitted facts actually were disclosed to the public, such finding could militate against Plaintiffs as well.  *See Mozilo*, 2010 WL 3656068, at *19.  And the jury potentially could conclude that Countrywide's collapse was caused by overly aggressive or even negligent business decisions during an economic boom, and not deception of investors.  *See* Dec. 1, 2008 Omnibus Order at 5; *CIBC*, 694 F. Supp. 2d at 303.

### d.    Claims Against Sieracki

Plaintiffs asserted Exchange Act and Securities Act claims against Eric P. Sieracki, Countrywide's CFO, for alleged misstatements in SEC filings concerning lending standards, pay option ARMs, and the Company's financial condition, and oral misstatements concerning liquidity and loan quality issues.

Sieracki contends in his summary judgment motion, and would contend at trial, that all of his alleged misstatements in SEC filings were true when taken in context, and that none of his oral statements were false or misleading.  Sieracki further contends that no evidence supports the claim that he knew any statement was false or recklessly ignored adverse facts, emphasizing that he (unlike Mozilo and Sambol) did not sell any Countrywide stock and in fact purchased stock throughout his time as CFO.  This buy-and-hold activity, according to Sieracki, is entirely inconsistent with Plaintiffs' theory that he was aware of material adverse information and shows instead, particularly when combined with the "fulsomeness" of Countrywide's disclosures generally, that he believed in good

1   faith that any adverse facts has been disclosed to the market and reflected in the

2   stock price.  Sieracki also contends that he was not reckless of the truth or falsity

3   of Countrywide's various qualitative and quantitative statements because the

4   Company followed, and he reasonably relied upon, a rigorous internal

5   certification process designed to achieve accuracy in disclosure.

6        Although Plaintiffs believe that triable issues of fact exist and that

7   Sieracki's summary judgment motion would be denied,[32] the prospects of success

8   before a jury are uncertain.  A jury potentially could find that Sieracki did not act

9   knowingly or recklessly given his regular periodic stock purchases and the losses

10   he ultimately sustained on those holdings.  *See Mego*, 213 F.3d at 458-59

11   (affirming approval of settlement where district court noted lack of insider selling

12   as significant litigation risk); *Worlds of Wonder*, 35 F.3d at 1424-25 (granting

13   summary judgment where insiders held onto stock); *Mozilo*, 2010 WL 3656068,

14   at *19 (Sieracki's evidence of stock purchases and reliance on in-house counsel

15   "tends to negate scienter").  And even assuming that Sieracki fails to persuade the

16   jury on this practical point, substantial risk remains as to how the jury will sort

17

18       [32] Plaintiffs have evidence from which a rational jury could conclude, for

19   example, that Sieracki was aware that Countrywide routinely ignored its underwriting guidelines and that he understood the associated risks.  This

20   evidence includes Sieracki's attendance at meetings of the Corporate Credit Risk Committee in June 2005 in which he was informed that one-third of the loans that

21   were referred from the CLUES automated underwriting system violated "major" underwriting guidelines and one-third violated "minor" guidelines."  Sieracki also

22   learned that Countrywide was originating non-owner occupied loans with 95% combined loan-to-value ratios, which were exceptions to the Company's

23   underwriting guidelines.  Sieracki also learned in June 2006, as did Sambol, that 23% of the first-lien subprime loans originated during the first quarter were

24   exception loans.  Judge Walter denied Sieracki's motion for summary judgment on this and other evidence.  *See Mozilo*, 2010 WL 3656068, at *16-17.

25   Additionally, as reported recently by the *Los Angeles Times* in connection with the SEC Action, Sieracki wrote e-mails to his father in the Spring of 2006, which

26   Plaintiffs also obtained in discovery, with such statements as: "I can lose my net worth or go to jail for things I don't even know," and that "[i]t's tempting to think

27   about bailing based on the stock price, but I think I need to persevere and stick it out as long as I can.  They're finally forced to pay me good money and I will try

28   to ride that train as long as I can."  Sieracki would contend that these statements were "inside jokes" and "black humor."

1   out the far more complex factual issues of what financial and loan-related

2   information Sieracki had and when, and whether such information was at

3   variance with his specific public statements when taken in context.

4                **e.**      **Claims Against KPMG**

5        Plaintiffs asserted Section 10(b) and Section 11 claims against KPMG in

6   connection with its audits of certain of Countrywide's year-end financial

7   statements and audit opinions issued on those financial statements.  KPMG has

8   separately paid $24 million to settle these claims.

9        KPMG contends in its summary judgment motion, and would contend at

10   trial, that it continually considered increased credit risk and higher probability of

11   future loan defaults in setting Countrywide's ALL and valuing its mortgage-

12   related assets.  KPMG also contends that Plaintiffs cannot proceed to trial on the

13   theory that Countrywide should have increased ALL as risky loans seasoned and

14   the probability of default grew, because ALL can be recorded only when it is

15   probable that a loss already has been incurred as of the date of the financial

16   statement.  Indeed, KPMG maintains that to increase ALL based on probable

17   future trends would itself violate GAAP.  KPMG further contends that the fact

18   that industry-wide events in 2007 required Countrywide to lower its 2007

19   valuation of its mortgage assets and increase ALL does not show that

20   Countrywide's accounting for those assets in earlier years was incorrect.  Finally,

21   KPMG contends that no evidence supports the allegation that KPMG was

22   deliberately reckless in conducting its audits and opining on the presentation of

23   the Company's annual financial statements.

24        While Plaintiffs have responses to these contentions and believe summary

25   judgment would be denied,[33] KPMG's summary judgment motion constitutes a

26

27        [33] Plaintiffs have adduced fact and opinion evidence from which a rational
jury could conclude, among other things, that KPMG was well-aware of the audit

28   risks involved in auditing a large mortgage lender but nonetheless ignored

litigation risk and considerable doubt remains in any event as to what a jury would decide.[34]  This Court has observed that "an auditor's job requires complex and subjective professional judgments that courts are not ideally positioned to second guess."  Dec. 1, 2008 Omnibus Order at 97.  Particularly where Countrywide did not restate the financial statements at issue, and the accounting and valuation methods at issue involve the application of professional judgment, a jury potentially could find that KPMG's unqualified audit opinions were not materially misleading.  *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 673 (3d Cir. 2002) ("[I]n issuing an opinion, the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment."); *see also id.* ("[E]ven an audit conducted in strict accordance with professional standards countenances some degree of calibration for tolerable error which, on occasion, may result in a failure to detect a material omission or misstatement.").

With regard to scienter, courts have stated that "[t]he meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (citation omitted).[35]  Even if the jury were to find that

---

multiple "red flags" of severely declining loan quality in conducting its audits; that KPMG repeatedly failed to find a material weakness concerning model performance, development, and validation despite continuing, unremediated deficiencies in internal controls; that KPMG knew Countrywide had understated its reserves for losses on securitized loans; that KPMG found but failed to report flaws in Countrywide's valuation of retained interests; and that KPMG knew the Company was not applying qualitative internal and external factors, like changes in economic environment, to its calculations of loan loss reserves.

[34] *See In re MicroStrategy, Inc. Sec. Litig.*, 150 F. Supp. 2d 896, 904 (E.D. Va. 2001) (noting, in approving settlement with auditor, that "[a]s an initial matter, plaintiffs, by not compromising their claims pursuant to a fair and reasonable settlement, risked an adverse ruling on PwC's motion for summary judgment"); *cf. In re Ikon Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 677 (3d Cir. 2002) (affirming summary judgment in auditor's favor following $110 million settlement with company).

[35] *See also* Dec. 1, 2008 Omnibus Order at 97 n.79 ("An outside auditor's lack of information relative to management, and the subjective professional judgments that auditors must make, *do* weigh in outside auditors' favor under a *Tellabs* analysis; outside auditors' economic incentives weigh, if at all, somewhat

---

1   Countrywide's financial statements for a certain year or years violated GAAP

2   (which is a precondition to finding a GAAS violation),[36] Plaintiffs have no

3   assurance that a jury would conclude that KPMG negligently failed to follow

4   GAAS in conducting those audits, let alone that KPMG's "accounting practices

5   were so deficient that the audit amounted to no audit at all, or an egregious refusal

6   to see the obvious, or to investigate the doubtful, or that the accounting judgments

7   which were made were such that no reasonable accountant would have made the

8   same decisions if confronted with the same facts." *Worlds of Wonder*, 35 F.3d at

9   1426; *see also Ikon*, 277 F.3d at 673 (plaintiffs "must show that Ernst's

10  judgment—at the moment exercised—was sufficiently egregious such that a

11  reasonable accountant reviewing the facts and figures should have concluded that

12  IKON's financial statements were misstated and that as a result the public was

13  likely to be misled.") (citation omitted).  And, as with Plaintiffs' accounting

14  claims against Countrywide, resolution of the GAAP and GAAS issues would be

15  reduced to the proverbial battle of the experts.  *See Veeco*, 2007 WL 4115809, at

16  *9; *see also In re Cendant Corp. Litig.*, 109 F. Supp. 2d 235, 260 (D.N.J. 2000)

17  (approving settlement with auditor because of scienter required under section

18  10(b) and defenses to section 11 claims), *aff'd*, 264 F.3d 201 (3d Cir. 2001).

### f.    Claims Against the Underwriter Defendants

20      Plaintiffs asserted claims against the Underwriter Defendants under

21  Sections 11 and 12(a)(2) of the Securities Act in connection with Countrywide's

---

24  against auditors."); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688,

25  763 (S.D. Ohio 2006) ("Recklessness on the part of an independent auditor entails a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company.") (internal quotation marks omitted).

26  [36] *See In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1294 (E.D. Wash. 2007) (false certification of GAAS compliance is material only if the financial statements are inaccurate); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1286 (N.D. Okla. 2007) (auditor's GAAS statement not material where financial statements did not violate GAAP).

1   Class Period offerings of certain debt and preferred securities.  Plaintiffs alleged

2   that the Registration Statements and Prospectuses for these offerings were

3   materially misleading by having incorporated by reference various Countrywide

4   Form 10-K, 10-Q, and 8-K reports that contained false statements or omitted

5   material facts.

6        To defeat these claims—which assumes in the first instance that the jury

7   would find the offering documents were materially misleading—the Underwriter

8   Defendants must establish that they conducted adequate due diligence into the

9   veracity of the statements at issue prior to each offering and, with respect to

10  Countrywide's audited financial statements, that no "red flags" put them on

11  notice of wrongdoing such that they could not properly rely on KPMG's audit

12  opinions.  *See* 15 U.S.C. § 77k(b)(3)(A) & (C); *see generally In re WorldCom,*

13  *Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) (authoritative opinion on

14  liability standards for section 11 claims against underwriters).

15       The Underwriter Defendants contend in their summary judgment motion,

16  and would contend at trial, that they conducted "regular, real-time" diligence of

17  Countrywide, both at the time of each specific offering and on an ongoing basis,

18  and that they were entitled to rely on KPMG's audits in accepting Countrywide's

19  financial statements as compliant with GAAP.  The Underwriter Defendants also

20  assert that they had their own money "on the line" in reliance on this diligence

21  because they provided lines of credit to Countrywide totaling tens of billions of

22  dollars, and thus have an alignment of interests with investors that tends to show

23  their good faith.

24       Although Plaintiffs believe the evidence raises triable issues of fact on

25  these claims,[37] Plaintiffs would face risks in submitting these factual disputes to a

26

27       [37] Plaintiffs have adduced evidence from which a rational jury could
28  conclude, among other things, that the Underwriter Defendants did not conduct
     extensive due diligence of the offerings at issue; that due diligence calls were

1   jury.  A jury potentially could find that some or all of the Underwriter

2   Defendants, which include most of the major Wall Street investment banks as

3   well as smaller securities firms, acted reasonably and prudently in the ordinary

4   course of their business.  *See WorldCom*, 388 F. Supp. 2d at 338 (noting, in

5   approving settlement, that underwriters "had asserted due diligence defenses and

6   might have been successful at establishing the adequacy of their efforts at trial"

7   and "might have been able to establish that no 'red flags' put them on notice of

8   wrongdoing and that they were thus entitled to rely on WorldCom's audited

9   financial statements").  Moreover, Section 11 claims do not impose joint and

10  several liability upon underwriter syndicates; a divided verdict on liability could

11  significantly reduce potential damages.  *See* 15 U.S.C. § 77k(e) (underwriter's

12  liability extends only to specific securities it underwrote and distributed).

### g.   Claims Against the Outside Director Defendants and Kurland

15         Finally, Plaintiffs asserted claims under Section 11 of the Securities Act

16  against the 11 Outside Director Defendants and Defendant Stanford L. Kurland,

17  Countrywide's former president, for having signed allegedly misleading

18  Registration Statements.[38]  These Defendants, like the Underwriter Defendants,

19  have an affirmative due diligence defense and could defeat liability by

20  establishing that, after a reasonable investigation, they had reasonable grounds to

---

abbreviated and often occurred on the eve of the offering; that the Underwriters
slavishly relied on management's assurances; that the Underwriters loaned money
to Countrywide only because doing so was a prerequisite to receiving
Countrywide's investment banking business and their interests as creditors
conflicted with the interests of Class members; and that the "opinion" and
"comfort" letters the Underwriters solicited from outside counsel and KPMG
cannot support a due diligence defense.  Plaintiffs also adduced evidence from
which a rational jury could conclude that Defendant Countrywide Securities
Corporation conducted little or no due diligence.

[38]  The claims asserted against Defendants Carlos Garcia and Andrew
Gissinger III also fall into this category.  Plaintiffs previously agreed to dismiss
these claims.  The fairness of these proposed dismissals was fully discussed in
Plaintiffs' preliminary approval brief and is referenced in Part IV below.

1  believe that the statements in the Registration Statements were not materially

2  misleading, and that they had no reason to doubt that the Company's audited

3  financial statements were presented in conformity with GAAP.  *See* 15 U.S.C. §

4  77k(b)(3)(A) & (C); *see generally In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ.

5  3288 (DLC), 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) (authoritative opinion

6  on liability standards for section 11 claims against directors).

7      The Outside Director Defendants generally contend on summary judgment,

8  and would contend at trial, that they participated and relied on rigorous and

9  thorough processes to oversee Countrywide's business, and they reasonably

10  believed that the alleged qualitative and quantitative misstatements were true.

11  Their contentions are supported by a separately retained testifying expert.

12  Defendant Kurland, supported by his own expert, would contend similarly that his

13  continuing involvement with risk issues gave him a strong basis for evaluating the

14  alleged misstatements, that he reasonably relied on Countrywide's "robust"

15  internal control and governance structure and disclosure processes, and he

16  reasonably relied on KPMG's unqualified audit opinions.

17      Although Plaintiffs believe issues of triable fact exist on these claims,[39] a

18  jury potentially could find that the Outside Director Defendants and Kurland were

19  diligent in their actions and reasonably believed that the alleged misstatements

20  were true.  *See WorldCom*, 388 F. Supp. 2d at 338 (noting that outside director

21  defendants could have successfully established due diligence defense and that

22

23      [39] Plaintiffs have adduced evidence from which a rational jury could
conclude, among other things, that the Outside Director Defendants and Kurland
24  received a wealth of information from senior management about deteriorating
lending standard and loan quality that was materially inconsistent with the
25  representations in Registration Statements.  Additionally, Defendant Henry G.
Cisneros, one of the outside directors and a former U.S. Secretary of Housing and
26  Urban Development, acknowledged in an October 2008 article in the *New York
Times* that "[t]he irresistible temptation to engage in subprime was Countrywide's
27  fatal error.  I fault myself for not having seen it and, since it was not something I
could change, having left."  He also stated that "I've been waiting for someone to
28  put all the blame at my doorstep."

1   there were no red flags as to audited financial statements); *Cendant*, 109 F. Supp.

2   2d at 261 (plaintiffs faced liability risks where 18 outside directors had due

3   diligence defense).  Further, those of the Outside Director Defendants who left

4   the Company early in the Class Period, when artificial inflation was zero

5   according to Professor Jarrell, would no doubt emphasize that fact.  Kurland

6   would similarly observe that he left in September 2006.

7       Moreover, because outside directors cannot be jointly and severally liable

8   on a Section 11 claim, a divided verdict on liability against the Outside Directors

9   could reduce maximum damages.  *See* 15 U.S.C. § 77k(f)(2) (liability of outside

10   director is determined under proportional liability provisions of PSLRA); *see also*

11   *WorldCom*, 388 F. Supp. 2d at 338 (outside directors "argued that their

12   proportionate share of responsibility was minimal compared to the WorldCom

13   insiders who perpetrated the fraud"); *Cendant*, 109 F. Supp. 2d at 261.

14       Viewed separately or together, the myriad risks concerning liability, loss

15   causation and damages strongly support final approval of the Settlement.

16   **C.    The Settlement Is the Result of Lengthy**
        **Arm's-Length Negotiations Facilitated By a Sitting**

17       **U.S. District Judge and a Respected Private Mediator**

18       "The involvement of experienced class action counsel and the fact that the

19   settlement agreement was reached in arm's length negotiations, after relevant

20   discovery had taken place create a presumption that the agreement is fair."

21   *Linney v. Cellular Alaska P'ship*, No. C 96-3008 DLJ, 1997 WL 450064, at *5

22   (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998); *see also City*

23   *P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir.

24   1996) ("When sufficient discovery has been provided and the parties have

25   bargained at arms-length, there is a presumption in favor of the settlement.").

26   The parties entered into the proposed $624 million Settlement in good faith, at

27   arm's-length, and without a trace of collusion.  The Settlement is the product of

28

1  extensive and informed arm's-length negotiations culminating in a three-day

2  mediation session before the Honorable A. Howard Matz, a sitting Judge of this

3  Court, and Professor Eric D. Green of Boston University School of Law, a

4  nationally recognized private mediator.[40]

5        Counsel for Countrywide first contacted Lead Plaintiffs concerning

6  potential settlement after this Court's April 6, 2009 Omnibus Order resolving

7  Defendants' second round of motions to dismiss (Dkt. No. 412).  Following an

8  abortive attempt to arrange a joint mediation among the parties in the *Argent*,

9  *Luther* (as that case was then known) and ERISA matters as well as this action,

10 counsel for Lead Plaintiffs, Countrywide and Bank of America Corporation met

11 on May 21, 2009 with Professor Green to have preliminary discussions about

12 their basic positions and to set ground rules for potential future negotiation

13 sessions.  Bernstein Decl. ¶ 97.

14       On September 24, 2009, shortly after the hearing on Plaintiffs' motion for

15 class certification, all parties and their counsel participated in a mediation session

16 that focused on loss causation and damages issues.  Lead Plaintiffs and

17 Countrywide, assisted by consulting experts, made detailed presentations heard

18 by all parties and Professor Green.  These discussions were useful principally in

19 opening a dialogue between Lead Plaintiffs and Countrywide concerning the

20 complex causation and damages issues here.  *Id.* ¶ 98.

21

22

23

24

25

26

27

28

---

[40] *See, e.g., Wal-Mart*, 396 F.3d at 117 (crediting affidavit from Eric D. Green, settlement mediator, attesting to procedural integrity of $3 billion antitrust settlement); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 756 (S.D. Ohio 2007) (noting final approval of $600 million settlement following negotiations that "involved a nationally recognized mediator, Professor Eric Green"); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) ("[The] negotiations and the ultimate Settlement Agreement were closely monitored by Professor Eric D. Green, an experienced and respected mediator appointed by the Court.").  Professor Eric Green is not related to Professor Richard Green, one of Plaintiffs' testifying expert witnesses as noted above.

Prior to this meeting, the parties had agreed to participate in a more comprehensive mediation, and on October 13, 2009, all parties and their counsel again met before Professor Green to address both liability and damages issues. At this point, the parties had not yet taken any merits depositions, Defendants' document productions were voluminous but still incomplete, and Plaintiffs' motion for class certification was *sub judice*.  Nonetheless, Lead Plaintiffs and Countrywide exchanged lengthy mediation statements, totaling 136 pages, based on the record developed to date.  Lead Plaintiffs and Countrywide made detailed presentations during the session.  Although progress was made in airing the obstacles to settlement and clarifying the strengths and weaknesses of the claims and defenses, this mediation session did not result in an agreement.  *Id.* ¶ 99.  The failure to reach an agreement at various stages of mediated settlement discussions, and the extended nature of those discussions, support a finding of procedural fairness.  *See Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 336-37 (S.D.N.Y. 2005) ("There is no indication of collusion between [the parties]; indeed, on more than one occasion, it appeared that negotiations would break down."); *MicroStrategy*, 148 F. Supp. 2d at 665 ("Counsel for both sides of this lawsuit participated in numerous meetings and extensive and intensive discussions extending over a period of months, with plaintiffs' lead counsel pressing their belief in the strength of their case on the merits.").[41]  The parties then returned in earnest to an adversarial litigation posture.

The prospect of settlement resurfaced in February 2010, after fact discovery was essentially complete.  Professor Green suggested to the parties

---

[41] On January 7, 2010, Lead Plaintiffs and the Outside Director Defendants participated in a mediation facilitated by Professor Green to discuss a partial settlement.  This effort was then broadened to include certain of the Individual Defendants whose interests aligned with the Outside Directors, and a further mediation was held on February 13.  The discussions did not result in an accord. Bernstein Decl. ¶ 100.

1  (who agreed) that owing to the size and complexity of this matter, the

2  involvement of a sitting judge would be helpful to the mediation process.  At this

3  Court's behest, Judge Matz ultimately agreed to serve as a settlement judge.[42]

4  Thereafter, the parties agreed to convene before Professor Green on March 4,

5  2010 to further discuss and debate loss causation and damages issues, and to

6  participate in a three-day, omnibus mediation before Judge Matz and Professor

7  Green on March 31 and April 1 and 2.  Bernstein Decl. ¶¶ 101-102.

8       The March 4 session, which most parties attended, included damages

9  presentations by Lead Plaintiffs' and Countrywide's consulting experts and open

10 dialogue among these experts and Professor Green.  The day was useful in

11 framing the issues and focusing on the areas of dispute.  *Id.* ¶ 103.

12      Iterative negotiations were reserved for the March 31-April 2 sessions,

13 which took place in and around Judge Matz's courtroom.  These negotiations

14 were well-informed not only by the extensive discovery record and prior damages

15 and causation analyses, but also Plaintiffs' 144-page comprehensive mediation

16 statement.  For its mediation statement, Countrywide submitted its motion for

17 summary judgment, which had been filed under seal a few days earlier.

18 Additionally, Lead Plaintiffs gave Judge Matz and Professor Green the reports of

19 certain testifying experts that were submitted in and around the time of the

20 mediation sessions.  *Id.* ¶ 104.

21      During the mediation, Lead Plaintiffs and Countrywide each made

22 substantial presentations on liability and damages issues.  The sessions were

23 highly contentious, and were marked by Judge Matz's and Professor Green's

24 persistent efforts in challenging the parties' positions and orthodoxies and urging

25 them to reconsider or revise their stances.  Lead Plaintiffs, Countrywide and

26

27

28

---

[42] This Court formally appointed Judge Matz to act as a mediator in a March 26, 2010 Minute Order (Dkt. No. 800).  *See* Bernstein Decl. ¶ 101.

1   KPMG, in particular, were compelled to carefully weigh the strengths and

2   weaknesses of the claims and defenses.  Owing in considerable part to the

3   mediators' skill in facilitating the discussions, Lead Plaintiffs reached an

4   agreement-in-principle with KPMG and subsequently with Countrywide, on

5   behalf of all other Defendants, late the afternoon of the third day.  Judge Matz had

6   Lead Plaintiffs and KPMG, and then Lead Plaintiffs and Countrywide, recite the

7   basic terms of their agreement on the record.[43]  *Id.* ¶ 105.

8        The direct and sustained involvement of Judge Matz and Professor Green

9   in the settlement negotiations leaves no doubt that they were conducted at arm's-

10  length and without collusion.  *See, e.g., WorldCom*, 388 F. Supp. 2d at 332, 337

11  ("not a modicum of doubt" as to procedural fairness of settlement achieved after

12  negotiations before sitting federal district judge and magistrate judge); *In re*

13  *Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007)

14  (former judge's involvement as mediator was "highly indicative of fairness").[44]

15       Plaintiffs submit that all parties, as well as Defendants' insurance carriers,

16  were represented throughout the settlement negotiations by able counsel

17  experienced in securities class litigation.  Lead Plaintiffs were represented at the

18  three-day mediation not only by Court-appointed Lead Counsel, but also by the

19  Los Angeles firm of Hennigan, Bennett & Dorman LLP, which was retained to

20

21       [43] Negotiation of the Settlement Agreement and associated documentation
22  was no less contentious and protracted.  At one point, Lead Plaintiffs and
    Countrywide had a teleconference with Judge Matz and Professor Green in an
23  attempt to break an impasse regarding several major issues.  Bernstein Decl. ¶
    107; *see Cardizem*, 218 F.R.D. at 530 (noting, as additional evidence of arm's-
24  length nature of settlement process, that Professor Green "was often called upon"
    to mediate disputes when parties reached impasse in negotiating specific terms of
25  settlement).
         [44] *See also In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 194 & n.42
26  (S.D.N.Y. 2005) (settlement was "clearly the result of arm's length bargaining"
    where negotiations facilitated by former judge); *Satchell v. Federal Express*
27  *Corp.*, No. C 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007)
    ("The assistance of an experienced mediator in the settlement process confirms
28  that the settlement is non-collusive.").

bolster Plaintiffs' trial team.  Lead Plaintiffs also attended the mediation, with six in-house attorneys present including the General Counsel to the New York State Comptroller, one Associate Counsel, and one Assistant Counsel, the New York City Deputy Controller for Legal Affairs, and the Deputy Chief and Senior Counsel of the Pensions Division of the New York City Law Department.[45] NYSCRF and New York City Pension Fund representatives also attended all of the prior negotiation sessions except the May 2009 preliminary meeting.[46] Bernstein Decl. ¶¶ 106, 118; Bierman Decl., Ex. B, at ¶¶ 3, 13 (NYSCRF oversight of and direct participation in settlement negotiations); Seemen Decl., Ex. C, at ¶¶ 22, 27-28 (same for New York City Pension Funds).  Courts generally give weight to the judgment and experience of capable counsel and plaintiffs in evaluating the process of the Settlement as well as its substantive fairness.  *See Portal Software*, 2007 WL 4171201, at *5 ("[F]actor (10), the role taken by the lead plaintiff in the settlement process, supports settlement because lead plaintiff was intimately involved in the settlement negotiations.").[47]

---

[45] Promptly after the agreement-in-principle was reached, Lead Counsel made presentations to the Boards of Trustees of each of the five New York City Pension Funds to secure formal ratification from the Lead Plaintiffs themselves. All five Boards independently ratified the Settlement, as did Comptroller DiNapoli in his capacity as sole trustee of NYSCRF.  Bernstein Decl. ¶¶ 119-120.

[46] The New York Funds have served as court-appointed lead plaintiffs in other major cases, with remarkable results.  NYSCRF has served as lead plaintiff in the *WorldCom* ($6.133 billion settlement), *Cendant* ($3.18 billion), *McKesson HBOC* ($1.04 billion), *Raytheon* ($460 million), and *Bayer* ($18.5 million) securities class actions.  *See* Declaration of Luke Bierman on behalf of NYSCRF, Ex. B, at ¶ 5.  The New York City Pension Funds have served as lead plaintiffs in the *Cendant* ($3.18 billion settlement), *Juniper Networks* ($169.5 million), and *Orbital Sciences* ($22.5 million) securities class actions.  *See* Declaration of Karen Seemen on behalf of New York City Pension Funds, Ex. C, at ¶¶ 11-12.

[47] *See also Tyco*, 535 F. Supp. 2d at 261 ("This settlement was the product of arms-length negotiations by highly skilled and diligent counsel on both sides, and Lead Plaintiffs ably discharged their responsibilities to monitor Co-Lead Counsel and ensure that Co-Lead Counsel acted in the best interests of the class."); *Cardizem*, 218 F.R.D. at 530 (noting that "in-house counsel for the Class Representatives oversaw negotiations and approved the Settlement").

During the preliminary approval hearing, the Court remarked that "the Plaintiffs settled this before they had to answer [Defendants'] motions for summary judgment" and, referring to Countrywide's own motion, that "as a lawyer, one has to appreciate how well put your points were."  Aug. 2, 2010 Hearing Transcript, Ex. F, at 25:14-17.  Neither the Court nor any Class member should have the misimpression that Lead Plaintiffs felt pressured to settle, or settled cheaply, because Defendants had moved for summary judgment shortly before the final mediation.  On May 12, 2009, early in the discovery period and before any settlement discussions occurred, the Court issued an Order adopting the parties' joint proposal to set various pretrial deadlines including March 26, 2010 as the deadline to move for summary judgment.  *See* Dkt. Nos. 442 (Joint Proposed Schedules) & 443 (Order).  On or about February 22, 2010, the parties, in consultation with Professor Green, agreed upon March 4 and April 1-2 as further mediation dates.  (March 31 was added later.)  This was more than a month in advance of the March 26 motion deadline.  Accordingly, all parties knew when they committed to April 1 and 2 as mediation dates that Defendants would be moving for summary judgment shortly before then.[48]

The pendency of the summary judgment motions constituted a litigation risk that Lead Plaintiffs carefully considered during the March 31-April 2 negotiation sessions.  But the fact that Countrywide and KPMG agreed to pay a combined $624 million one week after moving for summary judgment also confirms, in Plaintiffs' view, that Defendants recognized genuine risks as to their chances of success on those motions and that damages potentially were very high.  Put simply, $624 million is a lot of money.  The proof is in the pudding.  *See*

---

[48] Notably, the Court's Order appointing Judge Matz as a mediator stated that "the existing case schedule, including all submission deadlines and hearing dates, shall remain in effect unless otherwise ordered by this Court."  Mar. 26, 2010 Order, Dkt. No. 800.

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987) ("Rather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation, which was more favorable to the class than any class member could reasonably have expected.  The proof of the pudding was indeed in the eating."); *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 836 (W.D. Pa. 1995) (using this adage in focusing on settlement amount in evaluating substantive fairness); *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Chrysler LLC*, No. 07-CV-14310, 2008 WL 2980046, at *28 (E.D. Mich. July 31, 2008) (same as to procedural fairness).[49]  This factor weighs strongly in favor of final approval of the Settlement.

### D. Having Essentially Completed Fact Discovery and Exchanged Multiple Expert Reports on Liability, Loss Causation and Damages Issues, Plaintiffs Entered Into the Settlement on a Fully Informed Basis

Lead Plaintiffs negotiated the Settlement on a fully informed basis and with a thorough understanding of the merits and value of the parties' claims and defenses.  This litigation was hard-fought by any standard, and discovery and mediation preparation demanded painstaking, non-routine efforts on swiftly moving (and strictly enforced) case schedules.  When the parties reached a settlement agreement-in-principle on April 2, 2010, Plaintiffs had successfully litigated two rounds of motions to dismiss, obtained class certification after extensive fact and expert discovery on market efficiency and other Rule 23 issues; consulted with various experts throughout the litigation, and essentially completed merits discovery.  Bernstein Decl. ¶¶ 14-28, 34-44.  Merits discovery

---

[49] Moreover, although the parties agreed to the Settlement before Plaintiffs were to respond to Defendants' summary judgment motions, Plaintiffs' responses were in many respects encapsulated in their brief and exhibits submitted confidentially to Judge Matz and Professor Green.  These voluminous submissions formed the basis for Lead Plaintiffs' contentions during the mediation that resulted in agreement on the $624 million Settlement amount.

1   was comprehensive and involved, among other efforts, the review of

2   approximately 25 million pages of documents, 71 depositions (there were 81

3   depositions in total), and hundreds of pages of detailed answers to contention

4   interrogatories served by most Defendants.  *Id.* ¶¶ 45-84.

5        The negotiations during the three-day mediation sessions were further

6   informed by Plaintiffs' 144-page confidential mediation brief and exhibits,

7   Plaintiffs' causation and damages analyses prepared for settlement purposes, and

8   Countrywide's summary judgment brief, as well as the parties' prior mediation

9   discussions and associated submissions as discussed above.  Additionally, near

10   the start of the mediation, the parties had exchanged the reports of 17 testifying

11   expert witnesses on a panoply of liability and damages issues.  Plaintiffs supplied

12   certain of their expert reports to Judge Matz and Professor Green at their request.

13   Defendants' summary judgment briefs and expert reports previewed all of the

14   evidence and arguments they would likely advance at trial.

15        In short, Plaintiffs had an essentially complete understanding of the

16   likelihood of success and the potential recovery at trial at the time the Settlement

17   was agreed to.  *See Portal Software*, 2007 WL 4171201, at *4 ("The settlement

18   reflects three and a half years of completed work including pre-filing

19   investigation, locating and interviewing over twenty-one witnesses, . . . and

20   plaintiff's analysis of defendant's motion for summary judgment . . . .  As a

21   result, the true value of the class's claims was well-known.") (citation omitted).[50]

22   This factor strongly supports final approval of the Settlement.

23

24   _____

     [50] *See also Mego*, 213 F.3d at 459 (noting that "Class Counsel had worked
25   with damages and accounting experts throughout the litigation"); *McPhail v. First
     Command Fin. Planning, Inc.*, No. 05cv179-IEG-JMA, 2009 WL 839841, at *5
26   (S.D. Cal. Mar. 30, 2009) (noting that "[a]t the time of settlement, the parties
     were finishing expert discovery and Class Counsel was preparing for trial");
27   *Mills*, 265 F.R.D. at 254 ("This case proceeded through all of class discovery and
     nearly reached the conclusion of all fact discovery, which required a review of
28   millions of pages of documents, . . . and 25 fact witness depositions."); *In re
     Relafen Antitrust Litig.*, 231 F.R.D. 52, 73 (D. Mass. 2005) ("This is not a case

### E.   Continued Litigation Would Be Complex and Consume Substantial Judicial and Private Resources

Without a settlement, the anticipated complexity, cost, and duration of continued litigation would be considerable.  This action is undoubtedly complex.  Plaintiffs assert claims against many corporate and individual Defendants under multiple provisions of the Securities Act and Exchange Act on a wide and diverse array of facts.  These facts generally concern Countrywide's underwriting practices for billions of dollars' worth of differentiated home loans, the gradually increasing risk inherent in the loans held in the Company's portfolio, the Company's accounting for its securitized and held-for-investment loans and presentation of its financial statements, the audits conducted by KPMG, the oversight exercised by the independent members of the Board of Directors, and the due diligence performed by the Underwriter Defendants, all during a four-year period which involved turnover in the Company's management and Board as well as rapid internal growth and change.  *See Cendant*, 109 F. Supp. 2d at 256 (complexity of litigation favored settlement where, among other things, "Lead Counsel would also have to prosecute its claims against all 28 individual defendants and prove their level of involvement in the wrongdoing.").

These facts involve vigorously disputed and complex issues concerning, among other things, the state of mind of Defendants Mozilo, Sambol, and Sieracki in connection with the Company's lending practices and accounting; Mozilo's state of mind in connection with his sales of personally held Countrywide stock; the interpretation and application of GAAP rules governing loan loss reserves and other aspects of the Company's financial statements; and the reasonableness of the Board's and management's reliance on KPMG's

---

where the bulk of the attorneys' time was spent on negotiations.  Class counsel has consistently and vigorously been preparing for trial, which, were this Court to reject the Settlement, would commence in the near future.").

1   opinions and advice.  The damages issues are the subject of equal dispute and

2   center on complex questions of loss causation that have been the subject of

3   renewed debate since the Supreme Court's decision in *Dura*.  Loss causation has

4   become more difficult to prove and demands greater judicial scrutiny.  *See*

5   *Immune Response*, 497 F. Supp. 2d at 1172 ("recogniz[ing]," in approving

6   settlement, "that the issues of scienter and causation are complex and difficult to

7   establish at trial").  And, as noted above, resolution of the causation and damage

8   issues will depend upon conflicting expert testimony.  Such complexities will be

9   magnified if the action is tried.  *See Denney*, 230 F.R.D. at 337 ("If this case were

10  to be tried, both sides would be heavily dependent on . . . experts, further

11  compounding the expense and complexity of this case.  The burden on the parties

12  would be significant.").

13          The Ninth Circuit has stated that the expense and "likely duration of further

14  litigation" should be considered in evaluating the fairness of a settlement.  *E.g.,*

15  *Mego*, 213 F.3d at 458.  Here, the expense and duration of continued summary

16  judgment practice, trial preparation, the trial itself, post-trial motions, and any

17  appeals would be significant and could match the substantial time and money

18  already spent.  *See DIRECTV*, 221 F.R.D. at 526-27 ("Given the length,

19  complexity, and number of issues involved, it is very possible that a jury may not

20  have reached a unanimous verdict on all issues.  Furthermore, even if it did reach

21  unanimous verdicts, it is likely that an appeal would have followed.  Avoiding

22  such a trial and the subsequent appeals in this complex case strongly militates in

23  favor of settlement rather than further protracted and uncertain litigation.").[51]

24

25  _____

26  [51] *See also Immune Response*, 497 F. Supp. 2d at 1172 ("The trial would have lasted several weeks, and the nonprevailing party would likely have appealed the judgment. . . .  Both Parties would thus have to expend a significant amount of resources if this litigation were to proceed."); *Omnivision*, 559 F. Supp. 2d at

27  1042 ("Litigation is also time-consuming; if Defendants were to appeal a jury

28  verdict in favor of Plaintiffs, it could be years before Plaintiffs see a dollar.").

Additionally, ongoing attorney's fees and expenses incurred by certain Defendants' counsel could further diminish the available directors' and officers' liability insurance coverage which, even before any draw-down for defense costs, was hundreds of millions of dollars below Plaintiffs' damages estimates. Although only a portion of the Countrywide settlement amount was funded by insurers, the continued erosion of insurance coverage nonetheless puts any future recovery at increased risk. While denying liability, Defendants considered their risks and costs and agreed to settle now, thereby avoiding further litigation.

Given the uncertain prospects of success, settlement at this time is highly beneficial to the Class. While Plaintiffs are prepared to resume litigation full-tilt if the Court declines to approve the Settlement, Plaintiffs have no assurance that a settlement reached on the eve of trial would be materially greater than this Settlement. Indeed, if the Court declines to approve the Settlement and then grants summary judgment in part, a future settlement could be far less. And if the case goes to trial and Defendants obtain a favorable verdict, the Class will be left with no recovery, and only after lengthy and costly additional proceedings. The $624 million Settlement, however, provides sizable, tangible and certain relief to the Class now, without subjecting Class members to the risks, duration and expense of continuing litigation. This factor weighs strongly in favor of final approval of the Settlement.

## F.     The Experience and Views of Counsel

The Ninth Circuit has stated that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *see also DIRECTV*, 221 F.R.D. at 528 ("'Great weight' is accorded to the recommendation of counsel, who are most

1  closely acquainted with the facts of the underlying litigation.") (quoting *In re*
2  *PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997)).

3        Lead Counsel and all other Plaintiffs' Counsel (and Lead Plaintiffs and
4  Plaintiff Brahn) firmly believe the Settlement is fundamentally fair, adequate and
5  reasonable, and particularly so in view of the risks, burdens and expense of
6  continued litigation.  Bernstein Decl. ¶¶ 108, 121; *see also* Bierman Decl., Ex. B,
7  ¶¶ 15, 20; Seemen Decl., Ex. C, ¶¶ 30, 34 (Lead Plaintiffs endorsing settlement).
8  Further, it is respectfully submitted that Lead Counsel and all Plaintiffs' Counsel
9  are experienced and able lawyers in this area of practice, and "[t]here is nothing
10 to counter the presumption that Lead Counsel's recommendation is reasonable."
11 *Omnivision*, 559 F. Supp. 2d at 1043.

12       Accordingly, this factor, like the others discussed above, strongly favors
13 approval of the Settlement.  Plaintiffs respectfully submit that the Settlement is
14 fundamentally fair, adequate, and reasonable and should be approved.

15 **III.   THE PLAN OF ALLOCATION OF THE NET**
   **SETTLEMENT FUND IS FAIR, ADEQUATE**
16 **AND REASONABLE AND SHOULD BE APPROVED**

17       **A.   Standards**

18       Approval of a plan of allocation of settlement proceeds is governed by the
19 same overarching standard of fairness applied to the settlement.  *See Portal*
20 *Software*, 2007 WL 4171201, at *5 ("The court turns next to the proposed plan of
21 allocation, which must be fair, reasonable and adequate.") (citing *Class Plaintiffs*,
22 955 F.2d at 1284); *Tyco*, 535 F. Supp. 2d at 262 ("Like the settlement itself, the
23 plan of allocation must be fair, reasonable, and adequate.").

24       "When formulated by competent and experienced counsel," a plan of
25 allocation "need have only a reasonable, rational basis."  *Global Crossing*, 225
26 F.R.D. at 462 (internal quotation marks and citation omitted).  A reasonable plan
27 may consider the relative strengths of different claims and differing positions of

28

1   class members.  *See Portal Software*, 2007 WL 4171201, at *6 ("Courts endorse

2   distributing settlement proceeds according to the relative strengths and

3   weaknesses of the various claims.") (citing cases).

4   **B.     Basis of Methodology**

5        The Net Settlement Fund will be distributed to Authorized Claimants, *i.e.,*

6   members of the Class who submit timely and valid Proofs of Claim, in

7   accordance with the Plan of Allocation set forth in the Notice.  The Plan of

8   Allocation treats all Class members in a similar manner: everyone who submits a

9   valid and timely Proof of Claim, and who has not excluded himself or herself

10  from the Class, receives a *pro rata* share of the Net Settlement Fund in the

11  proportion that his or her Recognized Claim bears to the total of all Recognized

12  Claims submitted.  The Recognized Claim, as used in the Plan, is not market loss.

13  Rather, it is a weighted loss amount used to calculate an Authorized Claimant's

14  *pro rata* participation in the Net Settlement Fund.

15       The Plan of Allocation was developed by Lead Counsel together with

16  Forensic Economics, Inc., Plaintiffs' consulting damages expert, and in

17  consultation with Lead Plaintiffs and counsel for Plaintiff Brahn.  The Plan

18  reflects Plaintiffs' general allegation that the prices of Countrywide securities

19  were artificially inflated during the Class Period because of Defendants' material

20  misstatements.  The Plan is modeled in particular on the Jarrell Report, and as

21  such recognizes claims based on the dollar amounts of artificial inflation in

22  Countrywide securities during the Class Period, most notably during the January

23  31, 2006-August 15, 2007 subperiod.  Professor Jarrell was assisted by Forensic

24  Economics in preparing his report.  *See Cendant*, 109 F. Supp. 2d at 264-73

25  (approving $3.18 billion settlement and plan of allocation developed by Forensic

26  Economics over class member objections).

27

28

## C.   Eligible Securities

The Plan of Allocation begins by defining the Countrywide securities for which an Authorized Claimant may be entitled to receive a distribution from the Net Settlement Fund.[52]  The list of "Eligible Securities" excludes from the Plan four discrete categories of securities that are in the Class: *(i)* exchange-traded put and call options that expired before July 24, 2007; *(ii)* the seven Series A Notes that matured before July 24, 2007; *(iii)* the 13 Series B Notes that matured before July 24, 2007; and *(iv)* exchange-traded put and call options that were first listed after August 16, 2007.

The securities in the first three categories are excluded from the Settlement because July 24, 2007, as found by Professor Jarrell and alleged in the Complaint, was the first date on which Countrywide made a partial corrective disclosure to the market.  The prices of the Company's securities could not have been affected by disclosure of the Countrywide fraud before that date.  *See WorldCom*, 388 F. Supp. 2d at 345 (noting that "[i]t would be entirely reasonable" to allocate settlement money only to those class members who sold or held securities on or after the first corrective disclosure date).

The option securities in the fourth category are excluded from the Settlement because they were first issued during a subperiod of the Class Period when, according to Professor Jarrell, Countrywide common stock (of which the options are derivative) was no longer artificially inflated.  For this reason, Lead Plaintiffs determined that there was no rational, non-speculative basis to assign a modest quantum of artificial inflation in order to permit some recovery.

---

[52] The eight Types of Eligible Securities are *(i)* common stock; *(ii)* eligible exchange-traded put and call options; *(iii)* Countrywide Capital V 7% Capital Securities; *(iv)* eligible Series A Medium-Term Notes ("Notes"); *(v)* eligible Series B Notes; *(vi)* Series L Notes (CUSIP Nos. 22237LNR9 and 22237LPA4 only); *(vii)* Series M Notes (CUSIP No. 22237LPM8 only); and *(viii)* 6.25% Subordinated Notes Due May 15, 2016.

### D.      Trading Loss Requirement

The Plan of Allocation then looks to the Class member's trading history to determine whether he or she has an overall dollar loss, or Trading Loss, in his or her purchases and sales of Eligible Securities during the Class Period, using certain "Holding Prices" to account for securities held through the end of the Class Period.  This ensures, consistent with Section 10(b)'s out-of-pocket damages measure, that only those Class members who lost money are eligible to receive a settlement payment.  *See Cendant*, 264 F.3d at 242 n.24 ("Shareholder's damages are $5 because that is the difference between what she paid for the stock and what she sold it for after the fraud was revealed ($20-$15); these are her 'out-of-pocket' damages."); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 337 (E.D.N.Y. 2010) ("For the plaintiffs' Rule 10b-5 claim . . . the measure of damages is out-of-pocket loss.").

Similarly, Class members who "made money" overall have no recoverable damages and are reasonably excluded from the Net Settlement Fund.  *See Merrill Lynch*, 246 F.R.D. at 169 (overruling objection to plan that excludes those who incurred no out-of-pocket loss: "[I]t is not inequitable for a plan of allocation to provide for distribution of the proceeds of a settlement fund only to claimants who suffered out-of-pocket losses as a result of the defendants' alleged fraudulent conduct."); *In re Aetna, Inc. Sec. Litig.*, No. MDL 1219, 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001) ("[I]t is fair that claimants who reaped a profit on their sales of Aetna stock during the Class Period receive no share of the settlement since they suffered no loss from any alleged misrepresentations.").

Further, the Plan guards against potential windfalls by using the lesser of Trading Loss and Recognized Loss to calculate the Recognized Claim.  The court in *Mills*, 265 F.R.D. at 258, approved this methodology:

> Paramount in assigning recovery in a case of fraud like this is the notion that not every investor who lost money in a transaction involving Mills stock is necessarily eligible for recovery.  The

> proposed allocation accounts for this by estimating the losses of the Class actually attributable to Defendants' supposed misstatements, and then restricts the amount of each Class Member's claim by the lesser of: (1) their actual amount of loss in purchasing and selling Mills stock, and (2) the difference between the amount by which the price per share was inflated when they purchased the stock versus the amount the price per share was inflated when they sold the stock.

Given that the Plan, like the plan in *Mills*, is premised on inflationary loss rather than pure market loss, Plaintiffs believe that a Class member's Recognized Loss will nearly always be less than his or her Trading Loss in any event.

### E.    Calculation of Recognized Loss

The Jarrell Report set forth per-share damages estimates based on Professor Jarrell's findings regarding the amount of artificial inflation in the prices of Countrywide securities during various subperiods of the Class Period.  Consistent with this approach, the Plan of Allocation, as noted, calculates Recognized Loss using a inflationary loss approach rather than a market loss approach.  The basic formulas are straightforward.  For Eligible Securities held through the end of the Class Period, Recognized Loss is the dollar amount of artificial inflation per unit on the date of purchase, multiplied by the number of units purchased.[53]  For Eligible Securities sold before the end of the Class Period, the Recognized Loss is the dollar amount of artificial inflation per unit multiplied by the number of units purchased, minus the dollar amount of artificial inflation per unit multiplied by the number of units sold.[54]  This approach is logical:

---

[53] For Countrywide common stock and 7% Capital Securities, a "unit" is one share of common stock and one share of the 7% Capital Securities, respectively. For options, a unit is an option with one share of common stock as the underlying security.  For bonds, each $1,000 of face value is a unit.

[54] The Plan sets forth separate inflation tables for *(i)* common stock; *(ii)* the Series L Note with CUSIP 22237LNR9; *(iii)* the Series L Note with CUSIP 22237LPA4; *(iv)* the Series M Note; *(v)* 7% Capital Securities; *(vi)* 6.25% Subordinated Notes; and *(vii)* the Series B Note with CUSIP 22238HGQ7.  For all Series A Notes and Series B Notes other than 22238HGQ7, totaling 156 bonds, the Plan applies the dollar inflation amounts for the Series L Note with CUSIP 22237LNR9.  This methodology is reasonable because this Series L Note traded robustly throughout the Class Period, whereas the Series A and B Notes were offered and traded at varying times and with varying levels of robustness.

1
2
3
4
5
6
7
8
9
10

> A clearer picture of the logic of the proposed allocation emerges in analyzing the objection of John McAvoy, a Class Member who purchased Mills Series B preferred stock on August 23, 2004. McAvoy bought the stock for $27.30 per share and sold it on February 1, 2006, at $25.10 per share, indicating a loss of $2.20 per share over the period of time he owned Mills stock.  Under the plan of allocation, however, McAvoy will receive no payment, which might seem unjust at first blush.
>
> Upon closer inspection, however, the result is a logical one.  When McAvoy purchased the stock on August 23, 2004, Lead Plaintiff's damages expert . . . calculates that the inflation per share to be $2.40. When he sold the stock, the inflation was actually estimated to be greater, at $2.93 per share.  Thus, when the focus is placed on losses attributable to the actionable conduct of the Defendants—the fraud—the inflated value of McAvoy's shares actually increased by $.53 per share.  Were the allocation structured to account only for out-of-pocket losses, the Class' recovery would be predicated, at least in part, on factors outside those serving as a basis for this suit.

11   *Mills*, 265 F.R.D. at 259-60.

12   The court-approved plans of allocation in *IPO*, *Enron*, and *WorldCom*,

13   three of the largest PSLRA settlements,[55] also employed this general

14   methodology.  *See IPO*, 671 F. Supp. 2d at 497 ("Where Subject Securities are

15   purchased *and sold* during the class period, an Authorized Claimant's

16   'Recognized Claim' is calculated as the lesser of either the difference between the

17   alleged inflation of the shares at the time of purchase and the alleged inflation at

18   the time of sale or the difference between the purchase price paid and the sales

19   proceeds received."); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, No.

20

21   This is also consistent with the Court's finding that this Series L Note, but no
22   Series A Note and no Series B Note other than 22238HGQ7, qualified for the presumption of classwide reliance under the fraud-on-the-market theory.  *See* Dec. 9, 2009 Class Certification Opinion at 70; *Basic, Inc. v. Levinson*, 485 U.S.
23   224, 242 (1988).  Further, using the Series L Note inflation amounts uniformly for similarly positioned Notes will simplify the administration of this Settlement.
24   *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *3 (S.D. Tex. Sept. 8, 2008) ("A substantial difficulty, unusual if
25   not unique, in drafting a plan of allocation that was fair, reasonable, and adequate to all class members in the [Enron] litigation was the wide variety of securities
26   involved; the settlements covered approximately 195 different Enron or Enron-related securities.").  This Settlement, comparably, covers 165 distinct Eligible
27   Securities, where call and put options are counted as only two Eligible Securities and the 20 Series A and B Notes that matured before July 24, 2007 are excluded.

28   [55] *See* SCAC "Top 100 Settlements" Report, Ex. D, at 2.

1   MDL-1446, 2008 WL 4178151, at *12 (S.D. Tex. Sept. 8, 2008) (approving plan

2   where "Recognized Loss" is dollar amount of inflation at date of purchase times

3   number of units purchased, minus dollar amount of inflation at date of sale if sold

4   before end of class period, times number of units sold); *WorldCom*, 388 F. Supp.

5   2d at 334 ("The tables accompanying the Supplemental Plan lay out the dollar

6   amount of artificial inflation inhering in the market price of each type of

7   WorldCom security for each day of the Class Period, as estimated by the Lead

8   Plaintiff."); *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No.

9   MDL 1500, 2006 WL 903236, at *17 (S.D.N.Y. Apr. 6, 2006) (plan of allocation

10  in $2.65 billion settlement calculated claims using percentage of artificial

11  inflation at purchase and sale: "Plans of allocation similarly calculating claims

12  according to inflationary loss have recently been approved as a reasonable

13  approach to the calculation of damages.") (citing cases).[56]

14      Application of the dollar inflation tables means that a Class member must

15  hold his or her securities over at least one corrective disclosure and, for securities

16  that are sold, must sell them when the inflation amount is less than the inflation

17  amount at purchase.  Thus, recovery is reasonably limited to those Class members

18  who incur a loss "caused by" the alleged fraud.  *See In re LDK Solar Sec. Litig.*,

19  No. C 07-5182 WHA, 2010 WL 3001384, at *3 (N.D. Cal. July 29, 2010)

20

21

---

22      [56] The Plan's use of artificial inflation amounts to determine Recognized Loss
23  for all Eligible Securities, including those that are the subject of Securities Act
    claims only, is reasonable.  As noted in Plaintiffs' brief for preliminary approval
24  of the Settlement, Plaintiffs' estimate of aggregate Section 11 damages assumes
    that Defendants, at trial, would meet their burden of proving negative causation to
25  the same extent that Forensic Economics discounts Section 10(b) damages by
    finding that a portion of such damages was caused by macroeconomic and other
26  factors unrelated to alleged misstatements.  Because Plaintiffs, at trial, would
    proffer evidence of damages for common stock, options, 7% Capital Securities,
27  and five bonds for which Plaintiffs have certified Section 10(b) claims that
    necessarily takes loss causation into account, it is reasonable to assume that a
28  rational jury would apply such causation evidence reciprocally to the securities
    for which Plaintiffs have Section 11 claims.

1  (overruling objection to plan that excluded in-and-out traders who purchased and

2  sold during 5-day period between corrective disclosures).[57]

3       The dollar inflation tables depart from the Jarrell Report in an important,

4  and reasonable, respect.  As discussed in Plaintiffs' brief for preliminary approval

5  of the Settlement, the Plan of Allocation is generally consistent with, but does not

6  precisely track, the evidence of damages Plaintiffs would introduce at trial.

7  Certain Class members who lack recoverable damages according to the Jarrell

8  Report may have a Recognized Claim under the Plan.  Professor Jarrell concluded

9  that the prices of Countrywide securities were artificially inflated only between

10  January 31, 2006 and August 15, 2007 (the "Jarrell Inflation Period").  The Plan

11  assigns a modest quantum of artificial inflation ("peppercorns") to Countrywide

12  securities (other than options) that Class members purchased before and after the

13  Jarrell Inflation Period.  More specifically, for the pre-January 2006 subperiod,

14  the Plan assigns ten percent (10%) of the smallest amount of artificial inflation

15  attributed to the security during the January 2006 to August 2007 subperiod.  For

16  the post-August 2007 subperiod, the Plan assigns five percent (5%) of that

17  smallest amount of artificial inflation.  *See* Torchio Decl. ¶¶ 33-34.  This

18  distinction between what is provided to those Class members who purchased

19  before the Jarrell Inflation Period and what is provided to those who purchased

20  after that period reflects Lead Plaintiffs' determination that the latter group of

21  Class members has weaker claims than those who purchased before any alleged

22  misconduct became known to the public.

23

24

25  [57] *See also Omnivision*, 559 F. Supp. 2d at 1043 (overruling objection to plan that excludes in-and-out traders: "Simply put, there is no basis for the [objectors] to recover damages."); *Merrill Lynch*, 246 F.R.D. at 169-70 (overruling

26  objections to plan that excludes those who purchased and sold before any corrective disclosures; such objectors "would be unable to prove loss causation");

27  *Mills*, 265 F.R.D. at 259-60 (overruling objection to plan that excluded class member who purchased stock at $2.40 inflation per share and sold at $2.93

28  inflation per share, despite actual dollar loss).

The Plan's use of artificial inflation "peppercorns" is reasonable because (a) the Class has been certified, and all Class members, regardless of whether they were damaged, will give a broad release of claims as part of the Settlement; (b) there has been no determination by the Court in this context that any Class member cannot recover damages at trial;[58] (c) in the absence of such a ruling, Lead Plaintiffs want as many Class members as possible, subject to the relative strength of their particular claims, to be eligible to participate in the Settlement; (d) the total estimated recovery allocated to Class members who purchased outside the Jarrell Inflation Period does not materially reduce the total recovery allocated to those who purchased during that period;[59] and (e) because a Plan of Allocation is applied in the settlement context, the Plan need not precisely match the damage calculations Plaintiffs would offer at trial so long as the Plan has a reasonable and rational basis.  *See, e.g., In re Veritas Software Corp. Sec. Litig.*, No. C 03-0283 MMC, 2005 WL 3096079, at *7 (N.D. Cal. Nov. 15, 2005) ("Other courts have held, and this Court sees no reason to disagree, that damages need not be calculated with precision in determining a plan of allocation for settlement proceeds; the only requirement is that the allocation be fair and

---

[58] The Court has stated that Countrywide debt securities held to maturity are not damaged.  *See* Dec. 1, 2008 Omnibus Order at 29.  As noted above, bonds that matured before July 24, 2007 are specifically excluded from the Eligible Securities for which a Class Member may have a Recognized Claim.  Bonds that mature after July 24, 2007 may have a Recognized Claim if sold at a loss prior to maturity, and the Plan addresses such trades.  Bonds held to maturity between July 24, 2007 and the end of the Class Period will have no Recognized Claim because they were effectively sold at no loss.  Unmatured bonds held at the end of the Class Period may have a Recognized Claim depending on the bond's "Holding Price" under the Plan.

[59] The peppercorns of artificial inflation assigned to common stock purchased outside the Jarrell Inflation Period (*i.e.*, before January 31, 2006 and after August 15, 2007) account for only an estimated $2 million of the $488 million in total settlement money allocated to common stock under the Plan, or 0.41 percent.  *See* Torchio Decl. ¶ 41 & nn.28-29.  Similarly, the peppercorns assigned to the 7% Capital Securities purchased after the Jarrell Inflation Period account for only an estimated $100,000 of the $7.3 million in total settlement money allocated to the 7% Capital Securities under the Plan, or 1.37 percent.  *See id.* ¶ 43 & nn.31-32.

reasonable.") (citing cases), *aff'd in part and vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007); *White v. National Football League*, 822 F. Supp. 1389, 1422 (D. Minn. 1993) (allocating reduced recovery to set of class members who "arguably suffered no damages"), *aff'd*, 41 F.3d 402 (8th Cir. 1994).[60]

### F.   Application of Factor to Recognized Loss to Determine Recognized Claim

For claimants with an overall Recognized Loss on all of his or her trades in Eligible Securities, the Plan determines the Recognized Claim for each Type of Eligible Security.[61]   For each Eligible Security, the Recognized Claim is the Recognized Loss (or Trading Loss, if less than the Recognized Loss) multiplied by the applicable "factor," reflecting Lead Plaintiffs' determination as to the relative strength of those claims.   For Eligible Securities that are subject to claims under the Securities Act—7% Capital Securities, 6.25% Subordinated Notes, and Series A and B Notes—the applicable factor is 1.25.   For the other Eligible Securities—common stock, options, and Series L and M Notes—which are subject to claims under the Exchange Act only, the "factor" is simply 1.00.   *See Enron*, 2008 WL 4178151, at *5 n.13 (approving plan where "Recognized Claim" is amount of claim after application of multiplier or, if no multiplier applied, remains equal to "Recognized Loss").

---

[60] *See also Cendant*, 109 F. Supp. 2d at 272 ("To repeat, a Plan of Allocation need not be, and cannot be, perfect.  The Court will not invalidate the Plan of Allocation where certain shareholders, seeking advantageous treatment, fail to demonstrate that on the whole the plan is unreasonable."); *Mills*, 265 F.R.D. at 258 ("The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis.").

[61] The Plan aggregates, or nets, a Class member's Recognized Gains against his or her Recognized Losses within each Type of Eligible Security, and then nets these Recognized Gains and Losses across each Type of Eligible Security to arrive at a single, overall Recognized Loss (or Gain) for all Eligible Securities together.  If the Class member has an overall Recognized Loss, the applicable factor is applied to each Type of Eligible Security to determine his or her Recognized Claim as discussed herein.  If the Class member has an overall Recognized Gain, he or she apparently profited from the alleged fraud and is ineligible to receive a settlement payment.

Thus, the Plan enhances the Recognized Claims of Class members with Securities Act claims by 25 percent over those with Exchange Act claims. The multiplier recognizes the fact that Section 11 claims do not require proof of scienter at trial, while not unduly reducing the total recovery to Class members with Section 10(b) claims. The multiplier also provides for straightforward claims administration while avoiding the risk of a windfall to Class members with Section 11 claims if a relatively small number of proofs of claim were submitted against a separate Section 11 allocation pool. *See id.* at *8 ("[A] single pool of funds with use of differential multipliers eliminates the possibility of windfall for some of the § 11 claims that would arise if there were separate pools and a low claims rate for one of the pools."); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("[T]he recognized claims of those who acquired Ikon securities in exchange for the sale of a business to Ikon . . . are multiplied by 1.5. These individuals, unlike those who sold their business before the date of the Registration Statement, would have a much stronger section 11 claim for which they would not have to prove scienter.").[62]

After the Recognized Claim is determined for each Type of Eligible Security purchased by the Class member, his or her final Recognized Claim is determined by adding together the individual, security-specific Recognized Claims. This method enables the Plan to treat Exchange Act and Securities Act claims separately for Class members who have both claims. The final, aggregate

---

[62] Although the Plan uses the single-pool method such that the Net Settlement Fund is not pre-allocated to pay claims submitted by, for example, stock purchasers versus bond purchasers, the Plan provides that the total amount payable to options traders will not exceed 5% of the Net Settlement Fund. This limitation reflects the fact that options, unlike all other Eligible Securities, are derivative securities and were not issued by Countrywide, and guards against the possibility that the losses of options traders could swamp the losses of common stock purchasers. *See Veritas*, 2005 WL 3096079, at *9 (overruling objection to cap on payout to options traders of 2% of net settlement fund, and citing cases approving similar options caps).

1   Recognized Claim is the basis for which the Authorized Claimant's *pro rata*

2   distribution from the Net Settlement Fund is calculated, subject to the *de minimus*

3   limitation discussed below.

4   ### G.   *De Minimus* Threshold

5   Finally, the Plan of Allocation sets a *de minimus* threshold for payable

6   claims of $10.00.  This protects the Net Settlement Fund from depletion by

7   administrative costs associated with claims that are unlikely to exceed those costs,

8   and limits the number of smaller checks that may go uncashed.  Experience

9   suggests that a $10.00 threshold is reasonable such that the cost of processing and

10  paying such claims will not exceed that amount and that most Class members will

11  deposit a check of $10.00 or more, while not unduly depriving smaller claims of

12  settlement benefits.  The use of such a *de minimus* threshold is standard and

13  benefits the Class as a whole.  *See In re Gilat Satellite Networks, Ltd.*, No. CV

14  02-1510, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007) ("[D]e minimus

15  thresholds for payable claims are beneficial to the class as a whole . . . and courts

16  have frequently approved such thresholds, often at $10.").[63]

17  In sum, the Plan of Allocation ensures an equitable *pro rata* distribution of

18  the Net Settlement Fund among Authorized Claimants based solely on if and

19  when they purchased and sold Eligible Securities, taking into account the relative

20  amounts of artificial inflation therein during the Class Period and the critical

21  distinction in proof between the Exchange Act and Securities Act claims, and

22

23

24  [63] *See also Global Crossing*, 225 F.R.D. at 463 (stating that "counsel are entitled to use their discretion to conclude that, at some point, the need to avoid excessive expense to the class as a whole outweighs the minimal loss to the claimants who are not receiving their de minimis amounts of relief" and concluding that "Securities Lead Counsel acted reasonably in including a $10 de minimis threshold in the allocation plan"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *12 (S.D.N.Y. Dec. 20, 2007) (overruling objection to $50 *de minimus* threshold: "[C]ourts have approved minimum payouts in class action settlements in order to foster the efficient administration of the settlement.").

25

26

27

28

with a reasonable *de minimus* threshold to ensure that carrying out the distribution will be cost-effective.  Plaintiffs submit that the Plan, which was fully disclosed in the Notice, is fair, reasonable, and adequate and should be approved.

## IV.   THE PROPOSED DISMISSALS OF DEFENDANTS GARCIA AND GISSINGER AND THE SECURITIES ACT CLAIMS AGAINST DEFENDANT SAMBOL ARE FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

Although Rule 23(e) is usually invoked in the context of settlement, the rule also requires court approval for "voluntary dismiss[al]" of the claims of a certified class.  Fed. R. Civ. P. 23(e).  The court may approve the proposed voluntarily dismissal after notice and a hearing, and "on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

On March 25, 2010, shortly before parties reached the settlement agreement-in-principle, Plaintiffs, Garcia, and Gissinger filed a stipulation voluntarily dismissing these Defendants from the action with prejudice (Dkt. No. 755-1).  On April 1, 2010, Plaintiffs and Sambol filed a stipulation dismissing the Securities Act claims asserted against him with prejudice (Dkt. No. 855).

Plaintiffs' brief in support of preliminary approval of the Settlement fully discussed the terms of and bases for these proposed dismissals, and why they are fair to the Class.  In compliance with the Preliminary Approval Order, the Notice made reference to the proposed dismissals and indicated that they would be further considered by the Court during the Fairness Hearing.  Plaintiffs respectfully submit that dismissing Garcia and Gissinger from the action, and dismissing the Securities Act claims against Sambol, particularly in the context of the overall Settlement, are fair, reasonable, and adequate and should be approved.

## Conclusion

For the foregoing reasons, Lead Plaintiffs New York Funds and Plaintiff Barry Brahn, on behalf of the Class, respectfully request that this Court grant final approval to the proposed Settlement, approve the Plan of Allocation of the Net

1    Settlement Fund, and enter the proposed Final Judgment and Order of Dismissal

2    With Prejudice submitted herewith.

3    Dated:  October 11, 2010                    Respectfully submitted,

4                                                LABATON SUCHAROW LLP

5                                     By:    */s/ Joel H. Bernstein*
                                            JOEL H. BERNSTEIN
6                                           JONATHAN M. PLASSE
                                            IRA A. SCHOCHET
7                                           DAVID J. GOLDSMITH
                                            MICHAEL H. ROGERS
8                                           JOSHUA L. CROWELL

9                                           *Lead Counsel for Lead*
                                            *Plaintiffs New York Funds*

10
                                            KREINDLER & KREINDLER LLP
11                                          GRETCHEN M. NELSON (#112566)
                                            *gnelson@kreindler.com*
12                                          707 Wilshire Boulevard, Suite 4100
                                            Los Angeles, California  90017
13                                          Telephone:  (213) 622-6469
                                            Facsimile:  (213) 622-6019
14
                                            HENNIGAN, BENNETT
15                                            & DORMAN LLP
                                            J. MICHAEL HENNIGAN (#59591)
16                                          *hennigan@hbdlawyers.com*
                                            KIRK D. DILLMAN (#110486)
17                                          *dillmank@hbdlawyers.com*
                                            MICHAEL SWARTZ (#163590)
18                                          *swartzm@hbdlawyers.com*
                                            865 South Figueroa Street, Suite 2900
19                                          Los Angeles, California  90017
                                            Telephone:  (213) 694-1200
20                                          Facsimile:  (213) 694-1234

21                                          *Liaison Counsel for Lead*
                                            *Plaintiffs New York Funds*
22
                                            KAPLAN FOX & KILSHEIMER LLP
23                                          JOEL B. STRAUSS
                                            *jstrauss@kaplanfox.com*
24                                          JEFFREY P. CAMPISI
                                            *jcampisi@kaplanfox.com*
25                                          850 Third Avenue
                                            New York, New York  10022
26                                          Telephone:  (212) 687-1980
                                            Facsimile:  (212) 687-7714

27
                                            *Attorneys for Plaintiff Barry Brahn*
28