1 LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
2 *jbernstein@labaton.com*
JONATHAN M. PLASSE
3 *jplasse@labaton.com*
IRA A. SCHOCHET
4 *ischochet@labaton.com*
DAVID J. GOLDSMITH
5 *dgoldsmith@labaton.com*
MICHAEL H. ROGERS
6 *mrogers@labaton.com*
JOSHUA L. CROWELL
7 *jcrowell@labaton.com*
140 Broadway
8 New York, New York 10005
Telephone: (212) 907-0700
9 Facsimile: (212) 818-0477

10 *Lead Counsel for Lead*
*Plaintiffs New York Funds*
11

12                 UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14                        WESTERN DIVISION

15 IN RE COUNTRYWIDE FINANCIAL         Lead Case No.
   CORPORATION SECURITIES             CV 07-05295 MRP (MANx)
16 LITIGATION
                                      **DECLARATION OF JOEL H.**
17 This Document Applies to: All Actions   **BERNSTEIN IN SUPPORT**
                                      **OF PLAINTIFFS' MOTION**
18                                    **FOR FINAL APPROVAL OF**
                                      **SETTLEMENT AND PLAN**
19                                    **OF ALLOCATION OF NET**
                                      **SETTLEMENT FUND AND LEAD**
20                                    **COUNSEL'S PETITION FOR**
                                      **AN AWARD OF ATTORNEY'S**
21                                    **FEES AND REIMBURSEMENT**
                                      **OF EXPENSES**
22
                                      Date: November 15, 2010
23                                    Time: 1:00 p.m.
                                      Courtroom: 12
24                                    Judge: Hon. Mariana R. Pfaelzer
25

26

27

28

JOEL H. BERNSTEIN declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a member of the New York law firm of Labaton Sucharow LLP ("Lead Counsel" or "Labaton Sucharow"), Court-appointed Lead Counsel for Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund ("NYSCRF"), Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds" and, together with NYSCRF, "Lead Plaintiffs" or the "New York Funds"), and the certified Class (collectively with Lead Plaintiffs, "Plaintiffs") in the above-titled action.  I am admitted to practice before this Court *pro hac vice.*

2.      I respectfully submit this declaration in support of Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the Settlement of this action and the Plan of Allocation of the Net Settlement Fund (the "Plan of Allocation" or "Plan"), and also in support of Lead Counsel's petition, pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, for an award of attorney's fees and reimbursement of expenses incurred in this action.  I have personal knowledge of the matters referred to herein except where I specifically aver upon information and belief.

**A.      Benefits of the Settlement**

3.      The Amended Stipulation and Agreement of Settlement (the "Settlement Agreement"), filed with the Court on June 29, 2010 (Dkt. No. 841) and to which the Court granted preliminary approval on August 2, 2010, provides for the gross payment of Six Hundred Million Dollars ($600,000,000.00) in cash by Defendant Countrywide Financial Corporation ("Countrywide" or the "Company") and certain insurers on behalf of all Defendants other than Defendant

KPMG LLP ("KPMG"), and Twenty-Four Million Dollars ($24,000,000.00) in cash by KPMG.

4.     The $624 million Settlement amount has been fully funded and earning interest for the benefit of the Class since September 15, 2010.  After the deduction of attorney's fees and expenses and notice and administration costs awarded or approved by the Court, together with any taxes and tax expenses payable by the Settlement Fund, the Net Settlement Fund will be distributed among Authorized Claimants, *i.e.,* Class members who submit timely and valid Proof of Claim forms, in accordance with the Plan of Allocation.

**B.     The Court's Preliminary Approval Order and Lead Plaintiffs' Dissemination of Pre-Hearing Notices**

5.     On June 29, 2010, following this Court's June 16, 2010 Order re Preliminary Approval of Settlement (Dkt. No. 839), Lead Plaintiffs filed a renewed unopposed motion for preliminary approval of the Settlement (Dkt. No. 843) together with the amended Settlement Agreement.

6.     On August 2, 2010, the Court held a hearing to consider preliminary approval of the Settlement, and issued an Order Granting Preliminary Approval to Settlement and Directing Dissemination of Notice to the Class (Dkt. No. 976) (the "Preliminary Approval Order").  For ease of reference, a true and correct copy of the Preliminary Approval Order, as corrected, is annexed hereto as Exhibit A.

7.     In the Preliminary Approval Order, the Court, among other things:

a.     made a preliminary finding that the proposed Settlement should be approved as *(i)* the result of serious, extensive arm's-length and non-collusive negotiations, *(ii)* falling within a range of reasonableness warranting final approval, *(iii)* having no obvious deficiencies, *(iv)* not improperly granting preferential treatment to the Lead Plaintiffs, additional named Plaintiffs, or segments of the Class, and *(v)* warranting notice of the proposed Settlement to Class

Members and further consideration of the Settlement at a full fairness hearing;

b.      scheduled a hearing (the "Fairness Hearing") for November 15, 2010 at 1:00 p.m. to determine, among other things, *(i)* whether the proposed Settlement of the action on the terms and conditions provided in the Settlement Agreement is fair, reasonable and adequate and should be approved by the Court, *(ii)* whether the proposed Plan of Allocation of the Net Settlement Fund is fair and reasonable and should be approved by the Court, *(iii)* whether a Final Judgment and Order of Dismissal with Prejudice should be entered in this action, and *(iv)* to consider Lead Counsel's application for an award of attorney's fees and reimbursement of expenses;

c.      approved the form, substance, and requirements of the Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing (the "Notice"), the Summary Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing (the "Summary Notice"), and the Proof of Claim form;

d.      authorized Lead Counsel to retain Rust Consulting, Inc. (the "Claims Administrator") to supervise and administer the notice procedure and the processing of claims under Lead Counsel's supervision;

e.      directed that the Notice and Proof of Claim form, on or before August 20, 2010, be mailed by first class mail to all Class members who can be identified with reasonable effort;

f.      directed that the Summary Notice be published on at least one occasion in the *Wall Street Journal*, *USA Today*, and the *Los Angeles Times*, and on *PR Newswire*, a national business-oriented wire service, within fourteen (14) days after the mailing of the Notice;

1        g.      directed banks, brokerage firms, institutions, and other

2    persons who are nominees that purchased Countrywide securities for

3    the beneficial interest of other persons during the Class Period, within

4    ten (10) days of receiving the Notice and Proof of Claim, to provide

5    names and last-known addresses of beneficial owners to the Claims

6    Administrator or request additional copies of the Notice and Proof of

7    Claim form to mail directly to such beneficial owners;

8        h.      found that the procedures established for publication,

9    mailing and distribution of the Notices and Proof of Claim

10   substantially in the above manner and form: *(i)* constitute the best

11   notice to Class members practicable under the circumstances, *(ii)* are

12   reasonably calculated, under the circumstances, to describe the terms

13   and effect of the Settlement Agreement and of the Settlement and to

14   apprise Class Members of their right to object to the proposed

15   Settlement or to exclude themselves from the Class, *(iii)* are

16   reasonable and constitute due, adequate, and sufficient notice to all

17   persons entitled to receive such notice, and *(iv)* satisfy all applicable

18   requirements of the Federal Rules of Civil Procedure (including Rules

19   23(c) and (d)), the United States Constitution (including the Due

20   Process Clause), the Private Securities Litigation Reform Act of 1995

21   (the "PSLRA"), the Rules of this Court, and any other applicable law;

22       i.      directed Countrywide, on behalf of all Defendants, to

23   provide the notice of the proposed Settlement to appropriate Federal

24   and State officials required by the Class Action Fairness Act of 2005,

25   28 U.S.C. § 1715, not later than ten (10) days after the Settlement

26   Agreement was filed with the Court;

27       j.      established detailed procedures and deadlines for Class

28   members to submit Proof of Claim forms;

1    k.    established detailed procedures and deadlines for Class
2    members to request exclusion from the Class;

3    l.    established detailed procedures and deadlines for Class
4    members to object to the fairness, reasonableness, or adequacy of the
5    Settlement, the Plan of Allocation, any term of the Settlement
6    Agreement, or the award of attorneys' fees and reimbursement of
7    expenses requested by Lead Counsel;

8    m.    established detailed procedures and deadlines for
9    objecting Class members or their counsel to appear at the Fairness
10   Hearing;

11   n.    made a preliminary finding that the stipulation of
12   dismissal as to Defendants Carlos Garcia and Andrew Gissinger III,
13   filed with the Court on March 25, 2010, should be approved, and
14   noted that a determination as to whether such dismissal should be
15   finally approved as fair, reasonable and adequate will be made at the
16   Fairness Hearing;

17   o.    stayed all proceedings in this action until further order of
18   the Court except as may be necessary to implement the Settlement or
19   comply with the terms of the Settlement Agreement and the
20   Preliminary Approval Order; and

21   p.    expressly reserved the right to continue or adjourn the
22   Fairness Hearing from time to time without further notice to the Class.

23   8.    Contemporaneously herewith, Lead Plaintiffs have filed the
24   Declaration of Thomas R. Glenn of Rust Consulting, Inc. Regarding Notice to the
25   Class, dated October 8, 2010.  Mr. Glenn's declaration attests in detail to, among
26   other things, the mailing of the Notice and Proof of Claim and the publication of
27   the Summary Notice in compliance with the Preliminary Approval Order.  *See id.*
28   ¶¶ 13-14.  Mr. Glenn's declaration also provides information with respect to

content and traffic on the case-dedicated Internet website established on August 13, 2010 (which consent includes the Notice and Proof of Claim form) and calls made to the case-dedicated toll-free telephone "hotline." *See id.* ¶¶ 15-17.

9.     On August 13, 2010, I caused the Preliminary Approval Order, the Notice, and the Proof of Claim form to be posted on the *In re Countrywide Securities Litigation* case page of Lead Counsel's website, www.labaton.com. These documents have been available on my firm's website continuously since that date.

## C.     Procedural History of the Action

10.     This action was commenced on August 14, 2007, when George Pappas filed a class action complaint against Countrywide, Angelo R. Mozilo, and Eric P. Sieracki alleging violations of the federal securities laws (No. CV 07-5295). Between August 31, 2007 and January 25, 2008, additional securities class action complaints against Countrywide and various other defendants were filed by the Norfolk County Retirement System (No. CV 07-5727), Jack McBride (No. CV 07-6083), Saratoga Advantage Trust (No. CV 07-6635), Barry Brahn (No. CV 07-7259), Marsha Steele (No. CV 07-7548), and the New York Funds and Barry Brahn (No. CV 08-0492). These complaints were subsequently consolidated into this action.

11.     On October 15, 2007, NYSCRF and the New York City Pension Funds filed a motion for consolidation, appointment as lead plaintiffs, and approval of their selection of lead counsel (Dkt. No. 28). Four additional plaintiffs filed motions to be appointed lead plaintiff or co-lead plaintiff, though two of them subsequently filed notices of non-opposition to the appointment of the New York Funds.

12.     On November 28, 2007, the Court issued an Order Consolidating Cases and Appointing Lead Plaintiff and Lead Counsel (Dkt. No. 67). First, the Court consolidated the *Norfolk County Retirement System*, *McBride*, *Saratoga*

*Advantage Trust*, and *Brahn* complaints into this Action. Second, the Court appointed NYSCRF and the New York City Pension Funds as Lead Plaintiffs in this action to "bring all claims involving publicly traded securities, whether they arise under the 1933 Act or 1934 Act, and whether they concern common or preferred stock." Order at 11. Third, the Court approved the New York Funds' selection of Labaton Sucharow LLP to serve as Lead Counsel.

13.     Lead Plaintiffs filed a motion on February 27, 2008 requesting further consolidation of securities class action cases against Countrywide (Dkt. No. 124). On March 28, 2008, the Court issued an order granting the motion and consolidating the *Steele* complaint as well as the complaint filed by the New York Funds and Brahn into this Action (Dkt. No. 178).

14.     On April 11, 2008, following a confidential investigation that included telephonic and in-person interviews of approximately 92 former Countrywide employees and an analysis of thousands of pages of nonpublic Countrywide documents that Lead Counsel's investigators obtained through their investigation, Plaintiffs filed a 416-page Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "CAC"), naming Barry Brahn and Shelley B. Katzeff as additional plaintiffs (Dkt. No. 186).

15.     The CAC asserted claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Countrywide and two of its subsidiaries, Countrywide Capital V ("CCV") and Countrywide Securities Corporation ("CSC") (collectively, the "Countrywide Defendants"); Mozilo, Sieracki, David Sambol, and Stanford L. Kurland (the "Officer Defendants"); former executives Carlos M. Garcia, Andrew Gissinger III, and Thomas K. McLaughlin, along with 13 non-management members of the

Board of Directors (the "Outside Director Defendants");[1] 25 Underwriter Defendants; and two auditor defendants, KPMG LLP ("KPMG") and Grant Thornton LLP ("Grant Thornton").

16.     On June 10, 2008, all Defendants moved to dismiss the CAC.  Six separate motions were filed by: *(i)* Countrywide, CCV, CSC, and 18 of the 20 Individual Defendants; *(ii)* the remaining two Individual Defendants, Michael E. Dougherty and Kathleen Brown; *(iii)* the Underwriter Defendants; *(iv)* KPMG, its first motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and its second motion pursuant to Rules 8, 12(e), and 41(b); and *(v)* Grant Thornton. Lead Plaintiffs filed opposition submissions on August 11, 2008, including one consolidated memorandum in opposition to the five motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 243), and one memorandum in opposition to KPMG's motion to dismiss pursuant to Rules 8, 12(e), and 41(b) (Dkt. No. 247).  Defendants filed six reply briefs on September 30, 2008.  The Court held a four-hour hearing on October 20, 2008.

17.     On December 1, 2008, the Court issued a 112-page Omnibus Order on Defendants' Motions to Dismiss the Consolidated Amended Complaint and All Pending Requests for Judicial Notice (Dkt. No. 296), which denied Defendants' motions to dismiss the CAC in substantial part, dismissed certain allegations and claims with leave to amend, and dismissed a limited set of allegations and claims with prejudice.

> a.     The Court dismissed with prejudice all claims against Grant Thornton, and theories of liability based on fiscal year 2003 accounting-related statements and on language such as

---

[1] The Officer Defendants and the Outside Director Defendants are referred to together as the "Individual Defendants."

"solid quarter" (and other language describing present financial performance) from Forms 8-K.

b.     The Court granted Lead Plaintiffs leave to amend with respect to the following five areas:

- violations of generally accepted accounting principles ("GAAP") in Countrywide's 2004 and 2005 financial statements on all accounting theories, and in Countrywide's financial statements for 2006 and the first three quarters of 2007 as to the alleged overvaluation of retained interests in securitized loans, with further leave to allege accounting-related theories not alleged in the CAC;

- scienter as to KPMG with respect to its audits and audit reports certifying Countrywide's 2004, 2005, and 2006 financial statements;

- the reasonableness as a matter of law of the Underwriter Defendants' reliance on Countrywide's 2004 and 2005 financial statements, as audited by KPMG, in acting as underwriters for offerings of Countrywide securities;

- loss causation with respect to the claims asserted against Kurland under Sections 10(b) and 20(a) of the Exchange Act; and

- the pleading of claims under Section 12(a)(2) of the Securities Act to allege that

Plaintiffs purchased securities directly from or traceable to specific underwriter defendants.

c.     Thus, the Court's decision largely upheld the claims under Sections 11 and 15 of the Securities Act with respect to four Countrywide bonds—the Series A and Series B Medium-Term Notes, the 6.25% Subordinated Notes Due May 15, 2016, and the 7% Capital Securities; and the claims under Sections 10(b), 20(a), and 20A of the Exchange Act with respect to Countrywide common stock and other publicly traded securities.

18.     On January 6, 2009, Plaintiffs filed a 415-page Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").  In addressing the five areas in which the Court granted leave to amend, the Complaint alleged new, particularized facts that set forth:

a.     the rapid increases in credit risk from Countrywide's deteriorating lending practices and accelerating production of high-risk loans, resulting in far more impaired loans in 2004 and 2005—a development that was not reflected in various line items reported in the Company's financial statements;

b.     the audit "risk factors" that KPMG failed to heed, the audit and testing procedures that KPMG failed to conduct, the red flags that KPMG ignored, and the steps KPMG should have taken once the red flags came to its attention;

c.     an array of specific red flags that should have alerted the Underwriter Defendants of the possibility that Countrywide's financial statements certified by KPMG were materially misleading, thereby overcoming the Underwriter Defendants'

"due diligence defense" that the Court found existed on the face

of the CAC;

d. the causal connection between Kurland's misstatements

and the corrective disclosures, given that he had left

Countrywide months before the first corrective disclosure; and

e. facts showing that certain Plaintiffs purchased securities

directly from specific Underwriter Defendants.[2]

19. On February 6, 2009, all Defendants named in the Complaint moved to dismiss or filed notices of joinder. Eight separate motions were filed by: *(i)* the Countrywide Defendants; *(ii)* KPMG; *(iii)* the 20 remaining Underwriter Defendants;[3] *(iv)* Sambol; *(v)* Kurland; *(vi)* Sieracki; *(vii)* McLaughlin; and the 11 Outside Director Defendants other than Dougherty and Brown. Mozilo, Garcia, Gissinger, and Dougherty and Brown filed joinders. Plaintiffs filed an omnibus opposition submission on March 9, 2009 (Dkt. No. 380), and Defendants filed reply briefs on March 26, 2009. In an Order dated April 1, 2009, the Court stated that it would not hear oral argument on the motions to dismiss (Dkt. No. 411).

---

[2] The Court had dismissed CAC's Securities Act claims with respect to the Floating Rate Subordinated Notes Due April 1, 2011 without prejudice. Plaintiffs did not replead these claims in the Complaint. Although the Court had upheld the CAC's Exchange Act claims with respect to the Series A and Series B Floating Rate Convertible Senior Debentures Due 2037, Plaintiffs did not assert these claims in the Complaint because of certain intervening events.

[3] In the Complaint, Plaintiffs dropped four firms as Underwriter Defendants, after entering into tolling agreements with them, because all of the securities for which they acted as underwriters had matured: Dresdner Kleinwort Wasserstein Securities Inc., RBC Capital Markets Corp., SG Americas Securities LLC, and Wachovia Securities, Inc. Additionally, Lehman Brothers Inc. was not named in the Complaint because it went bankrupt. On December 14, 2009, Plaintiffs entered into a second tolling agreement with the Underwriter Defendants with respect to four additional Underwriters, BNY Capital Markets, LLC, RBC Dominion Securities Inc., Scotia Capital Inc., and TD Securities Inc., for the same reason applicable to the first tolling agreement.

20.     On April 6, 2009, the Court issued an Omnibus Order on Motions Related to the Second Amended Complaint and the Unopposed Motion to Correct the Order of December 1, 2008 (Dkt. No. 412).  The Court dismissed with prejudice only certain claims against four of the Individual Defendants—the Exchange Act claims against Kurland, the Section 20A claims against Sambol and Sieracki, the Section 20A claim against Mozilo in part, and the Securities Act claims against McLaughlin in significant part.  The Court otherwise denied the motions to dismiss.

21.     Thus, in the Complaint Plaintiffs had successfully repleaded: *(i)* the violations of GAAP in Countrywide's financial statements in 2004, 2005, 2006, and the first three quarters of 2007; *(ii)* the claim under Section 10(b) of the Exchange Act against KPMG with respect to its audits of Countrywide's 2004, 2005, and 2006 financial statements; and *(iii)* the claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants.[4]

22.     On April 29, 2009, Defendants filed 12 separate Answers denying the substantive allegations.

23.     On June 19, 2009, as class certification discovery proceeded, Countrywide filed a motion for judgment on the pleadings as to certain "unidentified securities" (Dkt. No. 462), which was joined by Mozilo, Sambol, and KPMG.  Lead Plaintiffs opposed the motion (Dkt. No. 479).  The Court took the submissions under advisement (Dkt. No. 483, July 10, 2009), and later issued an order denying the motion (Dkt. No. 662, December 9, 2009).

---

[4] Lead Counsel's investigators generally continued their investigation from this point throughout the pendency of the case, finding crucial evidence obtained from additional witnesses.  Lead Counsel obtained declarations from some of these later-discovered witnesses.  These were produced to Defendants in discovery and would have been used in opposition to Countrywide's and other Defendants' motions for summary judgment had the case not settled.

24.     Following the Court's April 6, 2009 Omnibus Order on the motions to dismiss the Complaint, the only claim pending against McLaughlin was a claim for controlling-person liability under Section 15 of the Securities Act relating to the issuance of Series A Medium-Term Notes, and any potential liability was limited to the period before April 5, 2005.  Plaintiffs agreed to dismiss the lone remaining claim against him.  On August 17, 2009, Plaintiffs and McLaughlin filed a stipulation of dismissal with prejudice (Dkt. No. 494).  The Court issued an order dismissing McLaughlin from the case (Dkt. No. 499, August 18, 2009).

25.     On August 26, 2009, after the completion of extensive fact and expert discovery on class certification (*see infra* ¶¶ 34-44 for a discussion of the scope and extent of this discovery), Plaintiffs filed a motion to certify the Class (Dkt. No. 520).  On September 9, 2009, all Defendants named in the Complaint filed oppositions to Plaintiffs' motion or joined other Defendants' oppositions.  Four memoranda were filed by Countrywide, KPMG, Gissinger, and Kurland.  Plaintiffs filed reply submissions on September 14, 2009 (Dkt. No. 588).  The Court heard oral argument on the motion on September 22, 2009.

26.     In August 2009, Kurland met-and-conferred with Plaintiffs concerning the Section 11 claim pending against him in connection with the 7% Capital Securities.  Countrywide issued the 7% Capital Securities pursuant to an October 27, 2006 Post-Effective Amendment to a Form S-3 dated February 9, 2006.  Although Kurland signed the Form S-3 (*see* Compl. ¶ 947), he did not sign the Post-Effective Amendment because he left the Company before it was filed with the SEC.  Kurland contended that the Post-Effective Amendment vitiated his Section 11 liability—an argument he could have made in two successive motions to dismiss but did not.  Based on this new information, and after further investigation of the facts and the law, Plaintiffs agreed to dismiss the Section 11 claim with respect to the 7% Capital Securities as against Kurland.  On September 2, 2009, Plaintiffs and Kurland filed a stipulation of dismissal with prejudice (Dkt.

No. 525).  The Court issued an order dismissing the claim against Kurland (Dkt. No. 528, September 4, 2009).

27.    On December 9, 2009, the Court issued an 80-page Memorandum of Decision Resolving All Class Certification Issues and Related Objections, granting in part and denying in part Plaintiffs' motion for class certification and appointing Labaton Sucharow as Class Counsel (Dkt. No. 661).  The Court certified the following Class:

> All persons and entities that, between March 12, 2004 and March 7, 2008 (inclusive), either in the open market or pursuant or traceable to 11 a registration statement:
>
> a.    purchased or otherwise acquired Countrywide Financial Corporation publicly traded common stock or call options ("the common stock subclass"); or
>
> b.    sold Countrywide Financial Corporation publicly traded put options (included as part of the common stock subclass); or
>
> c.    purchased or otherwise acquired Countrywide Capital V 7% Securities ("the Capital Securities subclass"); or
>
> d.    purchased or otherwise acquired Countrywide Financial Corporation Series A Medium-Term Notes, Series B Medium-Term Notes, 6.25% Subordinated Notes Due May 15,2016, Series L Medium-Term Notes (limited to CUSIP nos. 22237LNR9 and 22237LPA4), and Series M Medium-Term Notes (limited to CUSIP no. 22237LPM8) ("the debt securities subclass").
>
> Excluded from the Class are:
>
> • Defendants;
>
> • Members of the Individual Defendants' immediate families;

- Defendants' subsidiaries and affiliates;
- Any person who was an officer, director, partner or controlling person of Countrywide (including any of its subsidiaries or affiliates) or any other Defendant during the class period;
- Any entity in which any Defendant has a controlling interest; and
- The legal representatives, heirs, successors and assigns of any such excluded person or entity.

28. On January 21, 2010, further to the Court's December 9, 2009 Memorandum of Decision, the Court issued an Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification and Directing Dissemination of Notice to the Class (Dkt. No. 704), appointing NYSCRF as class representative for the Common Stock Subclass, appointing the New York City Pension Funds as class representative for the Debt Securities Subclass, and appointing Plaintiff Brahn as class representative for the Capital Securities Subclass, all as defined above.

29. On December 23, 2009, Countrywide filed a Rule 23(f) petition with the United States Court of Appeals for the Ninth Circuit seeking permission to appeal the Court's order granting class certification in part. Plaintiffs filed an answer to the petition, and the Ninth Circuit denied the petition on April 19, 2010.

30. On March 18, 2010, all of the parties, except for Mozilo, filed a Joint Application to Modify Schedule for Exchange of Expert Reports and Expert Discovery; Summary Judgment Briefing and Hearing; and Trial (Dkt. No. 734), which, among other things, sought to push the deadline for summary judgment motions and the trial date back one week. The parties agreed that such a modification was warranted to accommodate: *(i)* the fact that an explosion and fire occurred in Labaton Sucharow's office building on March 13, 2010, causing the

1   entire building to close for approximately two weeks; and *(ii)* the three-day

2   omnibus mediation session before Judge A. Howard Matz and Professor Eric

3   Green, scheduled to occur in the middle of summary judgment briefing.  The

4   Court denied the joint application on March 23, 2010 (Dkt. No. 738).

5       31.    On March 26, 2010, after fact discovery was essentially completed

6   (*see infra* ¶¶ 45-84 for a discussion of the scope and extent of this discovery),

7   Defendants filed 11 separate motions for summary judgment.  Shortly after these

8   motions were filed, and before Plaintiffs were required to file their opposition

9   papers, the omnibus mediation session before Judge Matz and Professor Eric

10  Green took place, resulting in a global settlement agreement on April 2, 2010.[5]

11      32.    On June 29, 2010, following this Court's June 16, 2010 Order re:

12  Preliminary Approval of Settlement (Dkt. No. 839), Plaintiffs filed the Settlement

13  Agreement (Dkt. No. 841) and their renewed unopposed motion for preliminary

14  approval of the Settlement and related submissions (Dkt. Nos. 842-846).

15      33.    On August 2, 2010, after a hearing held the same day, this Court

16  issued an Order Granting Preliminary Approval of Settlement and Directing

17  Dissemination of Notice to the Class (Dkt. No. 976, as corrected).

18  **D.    Class Certification Discovery**

19      34.    Pursuant to the Court's First Order Setting Class Certification

20  Schedule, dated May 1, 2009 (Dkt. No. 438), subsequently modified by the

21  Court's Order re: Stipulation re: Class Discovery Deadline, dated July 29, 2009

22  (Dkt. No. 486), the deadline for class discovery was July 15, 2009, and the

23

24

25      [5] Although the parties agreed to settle before Plaintiffs were to respond to

26  these summary judgment motions, Lead Counsel started to prepare their
    opposition submissions when the mediation was underway.  Had the mediation

27  been unsuccessful, Lead Counsel would have filed their opposition submissions as
    required by the briefing schedule.

28

deadline for Lead Plaintiffs to file their class certification motion was August 26, 2009.

35.     In May 2009, Countrywide commenced extensive class certification discovery by serving on all Plaintiffs two sets of requests for production and two sets of interrogatories, comprising a total of 88 document requests and 21 interrogatories.  These discovery requests were quite broad, particularly given the size and complexity of Lead Plaintiffs' respective numerous and varied investment portfolios.  For example, Countrywide sought documents concerning not just Plaintiffs' purchases and sales of Countrywide securities, but all of Plaintiffs' transactions in all securities during the Class Period.  Countrywide also sought all documents concerning Plaintiffs' investment policies, strategies, and practices, and all documents that Plaintiffs relied upon in making investment decisions, including any news articles, reports, financial information, and internal guidelines.  On July 15, 2009, Countrywide served on the New York City Pension Funds a second set of interrogatories and a set of requests for admission.

36.     In response, between May and August 2009, Lead Counsel produced more than 245,000 pages of documents plus 8.98 gigabytes of securities trading data in native format.  After working closely with the New York Funds to identify potentially responsive documents, Lead Counsel reviewed 4.48 million pages and 12.57 gigabytes of data over a span of less than four months so that Defendants could use this discovery in opposition to the motion for class certification.

37.     Lead Plaintiffs also propounded class certification discovery in connection with establishing that publicly traded Countrywide bonds traded in efficient markets.  Most bond trades during the Class Period occurred over the counter with broker/dealers, rather than on a centralized exchange as with equities, but with many trades reported to the TRACE system of the Financial Industry Regulatory Authority ("FINRA").  In May 2009, Lead Plaintiffs issued 21 subpoenas to CSC, various private firms (including certain Underwriter

Defendants), and FINRA seeking nonpublic transaction data for specified Countrywide bonds.

38.   On June 22, 2009, the parties exchanged detailed expert reports opining on issues relating to the efficiency of the markets for Countrywide common stock, preferred securities, options, and bonds.  Lead Plaintiffs submitted one expert report from Gregg A. Jarrell, Ph.D., while Countrywide submitted two expert reports from Sanjiv R. Das, Ph.D. and Andrew S. Carron, Ph.D.  KPMG submitted one expert report from Allan W. Kleidon, Ph.D., who opined on both issues of market efficiency and the manageability of a class action.  The parties quickly analyzed the opposing reports and exchanged rebuttal expert reports on June 29, 2009.

39.   Pursuant to the Court's Order Concerning Expert Discovery Protocols (Dkt. No. 461, June 15, 2009), Lead Plaintiffs produced the materials that Professor Jarrell relied upon in forming his opinions set forth in his initial and rebuttal expert reports.  Countrywide and KPMG produced materials that Drs. Das, Carron, and Kleidon relied upon in forming their opinions.

40.   Two representatives of NYSCRF—William M. Barrett, Assistant Comptroller for the Division of Pension Investments and Cash Management, and Maurice K. Peaslee, Associate Counsel in the Division of Legal Services—and two representatives of the New York City Pension Funds—David Jeter, Assistant Comptroller for Asset Management, and Karen J. Seemen, Assistant Corporation Counsel in the Pensions Division of the New York City Law Department—gave deposition testimony on a wide range of issues identified by Countrywide.  Mr. Barrett sat for two days of testimony, on June 30 and September 1, 2009, while the other three depositions occurred during the first two weeks of July 2009.

41.   During July 2009, Lead Counsel, in addition to defending the depositions of Lead Plaintiffs' representatives, took the depositions of Defendants' three market efficiency experts.  With the assistance of Professor

Jarrell and the staff of Forensic Economics, an economic litigation consulting firm that was retained by Lead Counsel, Lead Counsel reviewed and analyzed Countrywide's and KPMG's six expert reports and the materials their experts relied upon in an expedited fashion. Lead Counsel deposed Dr. Das, Dr. Carron, and Dr. Kleidon during a five-day period from July 9-13, 2009. Lead Counsel defended Professor Jarrell's deposition on July 15, 2009.

42. Plaintiffs Brahn and Katzeff also gave deposition testimony, bringing the total number of class certification depositions to ten.

43. On July 31, 2009, Countrywide served a supplemental expert affidavit from Dr. Das attempting to rebut Lead Plaintiffs' rebuttal expert report. On August 5, 2009, Lead Plaintiffs filed a motion to strike Dr. Das's "sur-rebuttal" expert report (Dkt. No. 488), which the Court granted on August 12, 2009 (Dkt. No. 493).

44. As noted above, the Court heard oral argument on Plaintiffs' motion for class certification on September 22, 2009, and granted the motion in significant part on December 9, 2009.

**E. Merits Discovery**

45. In its Second Scheduling Order Setting Trial Date dated May 4, 2009 (Dkt. No. 439), the Court ordered that trial would begin on August 10, 2010, and that the trial date would not be extended absent a showing of "extraordinary circumstances." Thus, the parties had 16 months from the Court's April 6, 2009 Omnibus Order for class certification discovery and briefing, fact and expert discovery on the merits, motions for summary judgment, and other pre-trial motions in this large and complex case.

46. Pursuant to a Minute Order dated May 12, 2009 (Dkt. No. 443), the Court ordered the schedule as set forth in the parties' Joint Proposed Schedules for Fact Discovery, Expert Reports, and Summary Judgment Motions, dated May 11, 2009 (Dkt. No. 442), which provided that the fact discovery deadline for all

Countrywide-related witnesses was January 31, 2010, and the deadline for KPMG and the Underwriter Defendants was March 15, 2010.

47.     The parties had protracted negotiations over the terms of a protective order that would govern the treatment of confidential information produced in the Action. For example, there was strong disagreement regarding the parties' rights and obligations arising from possible requests for public disclosure submitted to the New York Funds pursuant to the New York State Freedom of Information Law. Such disagreements took months to resolve, and the parties did not file a proposed stipulated order to the Court until August 25, 2009, which was entered by the Court the same day (Dkt. No. 506).

### a.     Plaintiffs' Discovery Requests and Subpoenas

48.     On April 15, 2009, shortly after the Court's April 6, 2009 Omnibus Order denying the second round of motion to dismiss, Lead Plaintiffs served their first set of requests for production propounded to Countrywide, seeking all documents that Countrywide had previously produced to the U.S. Securities and Exchange Commission (the "SEC"), the U.S. Department of Justice, the Federal Bureau of Investigation, the U.S. Congress, and various state attorneys general, and all communications with those governmental entities, relating to the matters raised in the Complaint.

49.     On May 4, 2009, Lead Plaintiffs issued a request of production to all Defendants seeking all transcripts of testimony provided to the SEC relating to the matters raised in the Complaint. Over the ensuing months, Lead Plaintiffs issued several additional sets of more particularized discovery requests.

50.     Lead Plaintiffs issued a total of 23 sets of requests for production, comprising hundreds of separate document requests. More specifically, Lead Plaintiffs served two sets of requests for production on all Defendants; four sets on Countrywide; three sets on the Underwriter Defendants; two sets on KPMG; two sets on CSC; one set on all Individual Defendants; one set on the Outside

Director Defendants; one set on each of the four Officer Defendants; and one set on each of Defendants Garcia, Gissinger, and McLaughlin. Lead Plaintiffs issued these discovery requests promptly, serving eight sets in May 2009 and 12 sets in June 2009.

51. One of the key document requests, which was critical to the analysis conducted by Lead Plaintiffs' mortgage banking expert, Professor Richard K. Green of the University of Southern California, was a request for Countrywide's mortgage loan databases and loan files comprising information on tens of millions of mortgage loans made during the Class Period. A major claim in this case was that Defendants made false statements concerning the risks of the loans Countrywide issued and its underwriting processes. To have valid evidence upon which to base an opinion on that subject, Professor Green needed detailed information concerning the loans that were alleged to be high-risk. Countrywide contended that the document requests would be extremely burdensome and, further, would invade the privacy of Countrywide's mortgage customers. After months of negotiation, the parties agreed to produce a statistically significant sample of loans[6] from the loan databases (100,000 loans) and loan files (1,000 loan files),[7] all of which required review.

52. Also in May and June 2009, Lead Plaintiffs served 16 sets of interrogatories, including two sets each on Countrywide, KPMG, and the Underwriter Defendants; one set on CSC; one set on the Outside Director Directors; one set on each of the four Officer Defendants; and one set on each of

---

[6] Defendants did not agree that the sample obtained was statistically significant or even representative. Had litigation gone forward, the parties likely would have introduced conflicting expert testimony on that subject.

[7] Although Countrywide agreed to produce the loan files for a sample of 1,000 loans selected by Lead Counsel, the Company was able to locate the files for only about 700 of those loans.

Defendants Garcia, Gissinger, and McLaughlin. These discovery requests included contention interrogatories seeking the identification of all facts concerning Defendants' allegations set forth in certain affirmative defenses asserted in Defendants' answers.

53. Lead Plaintiffs issued subpoenas *duces tecum* to 57 current or former employees of Countrywide and KPMG. In addition, Lead Plaintiffs issued 13 subpoenas *duces tecum* to third parties who were not current or former employees of Countrywide or KPMG, including four securities analysts who covered Countrywide, the three major credit ratings agencies, Bank of America Corporation, the SEC, a firm that conducted loan review and due diligence on Countrywide loans, and a personal financial advisor who provided services to Mozilo and Sambol. Defendants issued a smaller number of subpoenas *deuces tecum* as well.

54. Defendants and third parties collectively produced approximately 25 million pages of documents in response to Lead Plaintiffs' document requests and subpoenas.

55. Lead Plaintiffs also sought relevant documents from the two federal bank regulatory agencies that had examined Countrywide Bank's operations and financial position, the Federal Reserve Bank ("FRB") and the Office of the Comptroller of the Currency ("OCC"). In accordance with applicable federal regulations, Lead Plaintiffs submitted a request for documents to the FRB on December 17, 2009, and a request to the OCC on January 7, 2010. Lead Plaintiffs were still in the process of obtaining the requested documents when the parties reached a settlement.

### b. Plaintiffs' Review and Analysis of Documents Produced in Discovery

56. Plaintiffs reviewed and analyzed the 25 million pages of documents produced by Defendants and third parties between May 2009 and March 2010.

57.     To process this vast amount of information in a relatively short period, Lead Counsel deployed substantial resources and technology.  All of the documents were placed in an electronic database that was created by and maintained at Merrill Corporation, an external technology and litigation support vendor.  The database, called Lextranet, allowed counsel to search for documents through boolean-type searches (as in the Westlaw and Lexis-Nexis databases), as well as by multiple other categories, such as by author and/or recipients, type of document (*i.e.*, emails, spreadsheets, memoranda, accounting documents), date, producing party, and so on.

58.     Lead Counsel used Lextranet in conjunction with Cognition, a linguistic and semantic search tool that connected the jargon and unfamiliar vocabulary in Defendants' documents to more common words, thereby facilitating faster and more effective searches.  These technologies enabled Lead Counsel to conduct targeted searches for relevant information and to efficiently prepare the best evidence for depositions and trial.

59.     Lead Counsel hired a team of 119 short-term attorneys ("STAs"), all admitted to practice in New York, to review and analyze the documents under the supervision of Labaton Sucharow partners and associates.  STA billing rates were capped at $325 per hour, below my firm's comparable associate billing rates.  This number of STAs was necessary principally because the document review was subject to a relatively short timetable.  The first documents were not produced by Defendants until May 29, 2009, and the fact discovery deadline for all Countrywide-related witnesses was January 31, 2010, with fact depositions expected to commence in October 2009.  All documents had to be analyzed in advance of meaningful deposition preparation.  Based on prior experience and estimating the volume of work a typical STA could complete per hour, Lead Counsel estimated the number of STAs who be need to complete document review and analysis in time to prepare for depositions.  STAs were also needed to

conduct a privilege and responsiveness review of the 4.48 million pages of Lead Plaintiffs' documents that were identified as potentially responsive to Defendants' discovery requests.

60. By August 2009, the STAs had reviewed the first wave of 14 million pages of documents. Lead Counsel then reduced the number of STAs attorneys to 58 for the purposes of reviewing further document productions, preparing for depositions, and other discovery projects. This smaller group of STAs reviewed the millions of additional pages of documents that certain Defendants produced in December 2009 and January 2010, just before the discovery deadline. Although Lead Counsel's goal was to complete document review and analysis prior to preparing for depositions, Defendants continued to produce documents through the end of discovery.

61. All aspects of the document review were carefully supervised by Lead Counsel to ensure that it was as thorough and efficient as possible. This supervision began with in-person training sessions conducted by partners and senior associates, who gave the STAs a detailed written and oral introduction to the facts, relevant law, and theories of the case. Further, Lead Counsel selected five associates as "Team Leaders" who monitored, managed, and supervised the STAs. All partners and associates, including Team Leaders, and paralegals, investigators, and others met at least weekly to discuss important documents and findings and to review and refine strategy and factual and legal theories when needed. This process led to the identification of valuable evidence supporting Lead Plaintiffs' allegations.

62. To increase the effectiveness and efficiency of the review, most STAs were assigned to initially review the documents and determine their relative importance. Later, partners, associates, and some of the STAs conducted further analyses to determine which documents supported Plaintiffs' claims, which supported various defenses, which to use at depositions, which to raise with expert

witnesses, and other analyses.  Later yet, partners, associates, and some STAs conducted further analysis to cull the documents into a much smaller group judged to be highly important in supporting either claims or defenses, which helped to frame areas of inquiry at deposition.

63.     Based on the many hundreds of important documents that were unearthed during this process, the STAs prepared a significant number of useful memoranda, outlines, and other materials in preparation for depositions.  These attorneys also helped to compile and prioritize deposition exhibits.  In addition, the Team Leaders and STAs reviewed the dozens of transcripts and exhibits from depositions taken in connection with this case and the SEC investigation, then prepared memoranda summarizing the testimony.

64.     As a result of this process, Lead Plaintiffs were prepared to answer the nine sets of broad contention interrogatories served by Mozilo, Sambol, Sieracki, Garcia, Gissinger, Kurland, KPMG, the Outside Directors, and Banc of America Securities LLC.  Faced with the obligation to identify facts in the record supporting the substantive allegations in the Complaint, Lead Plaintiffs responded with detailed narratives that cited approximately 250 separate documents that Lead Counsel unearthed during discovery.  Lead Counsel then used these contention interrogatory responses to prepare a 144-page mediation brief encompassing virtually the entirety of the factual case developed through discovery.  Had the March 31-April 2 mediation been unsuccessful, Lead Counsel would have further refined and supplemented its mediation brief to prepare a strong opposition to Defendants' raft of motions for summary judgment.

65.     Lead Counsel made a thorough and cost-effective effort to understand the intricate facts and circumstances surrounding the allegations in this case.  Lead Counsel was able to parse through millions of pages of documents concerning the details of mortgage lending and securitization.  At the end, Lead Counsel had constructed an accurate picture of, among other things,

Countrywide's loan underwriting guidelines, underwriting exception practices, internal controls, risk management, and the Individual Defendants' involvement throughout the relevant period. The prodigious document review effort was fruitful and allowed Lead Plaintiffs to negotiate from a position of strength during the mediation.

66. In September 2009, Lead Plaintiffs tested the strength of their case based on the evidence gathered and synthesized up to that point. A consultant retained by Lead Plaintiffs administered a jury focus exercise in the Los Angeles area intended to test likely jurors' reactions to various case themes, evidence, and damage theories developed up to that point. The jury exercise yielded several, and different, deliberative "verdicts" based on identical presentations and evidence.

### c. Depositions of Fact Witnesses

67. Fact depositions commenced on October 29, 2009, and the last one took place on March 15, 2010. During this period of less than five months, the parties deposed a total of 71 witnesses. Plaintiffs took 55 of these depositions, comprising 18 witnesses who were named as Individual Defendants in the Complaint; 20 non-party witnesses who were former employees of Countrywide; nine current or former partners or employees of KPMG; six current or former employees of the Underwriter Defendants and CSC; and two securities analysts who had covered Countrywide. Defendants took 16 depositions, including two that were cross-noticed by Plaintiffs.

68. Plaintiffs took the depositions of 20 non-party former Countrywide employees. These witnesses included: *(i)* five persons who were involved in risk management, including the Chief Risk Officer of Countrywide, the Chief Risk Officer of Countrywide Bank, and the head of Enterprise Risk Assessment; *(ii)* five persons whose roles were relevant to loan product management, including underwriting guidelines and pricing; *(iii)* four persons who were involved in

accounting and financial reporting, including the Chief Accounting Officer and Deputy Chief Financial Officer; *(iv)* three persons who were involved with creating and using quantitative models to calculate, among other things, loan loss reserves; *(v)* two persons who had held the title of Chief Investment Officer at different times during the Class Period; *(vi)* two persons who were involved in investor relations and corporate development; and *(vii)* one person who had been the head of Internal Audit.

69. The number of depositions that Lead Plaintiffs noticed was necessary given the scope and complexity of Lead Plaintiffs' allegations, which encompassed all aspects of Countrywide's operations, including its underwriting guidelines and practices, credit risk management, mortgage securitization, and financial reporting; the size and breadth of the Company; and the number of Defendants in the case. Nevertheless, in determining the number and identity of deponents, Lead Plaintiffs sought to be thorough but efficient. The condensed timeframe for fact discovery required Lead Counsel to be selective. Lead Counsel continually reevaluated its deponent list to determine whether, in light of depositions just completed, certain depositions were still necessary. Lead Counsel ultimately withdrew deposition notices for approximately 20 Countrywide witnesses.

70. In an effort to expedite discovery in this case, on several occasions Lead Plaintiffs proposed that the parties stipulate to the admissibility of transcripts of depositions taken during the SEC investigation of Countrywide. Doing so would have obviated the need to cover the same ground that the SEC had already covered. In turn, Lead Plaintiffs offered to substantially reduce the number and length of depositions. Defendants would not agree to this.

71. Lead Counsel did, however, successfully negotiate stipulations with the Underwriter Defendants that eliminated a substantial number of otherwise necessary depositions. On February 23, 2010, Plaintiffs and the Underwriter

Defendants executed a stipulation in which Plaintiffs agreed not to conduct any deposition discovery of the Non-Lead Underwriters, and, in turn, the Non-Lead Underwriters would be deemed to have conducted the same due diligence shown to have been conducted by the Lead Underwriters on the securities offerings at issue in this case. This stipulation eliminated deposition discovery of eight of the 16 Underwriter Defendants. In addition, in March 2010, Plaintiffs and the Lead Underwriters executed a stipulation in which Plaintiffs agreed to take the deposition of just one person from each Lead Underwriter, and, in turn, the Lead Underwriters would not proffer any form of testimony on due diligence activities from persons other than the one deposition witness designated by each Lead Underwriter.

72. Between October 29, 2009 and March 15, 2010, Plaintiffs' counsel participated in the following depositions of fact witnesses:

| Deponent | Deposition Date(s) | Location | Transcript Length (pages) |
|---|---|---|---|
| Chris Brendler | 10/29/2009 | Baltimore, MD | 356 |
| Van Hesser | 11/04/2009 | New York, NY | 328 |
| Brian Kuelbs | 11/10/2009 | Los Angeles, CA | 235 |
| Wei Wang | 11/11/2009 | Los Angeles, CA | 199 |
| Greg Hendry | 11/12/2009 | Los Angeles, CA | 189 |
| Stephen Lange | 11/17/2009 | Los Angeles, CA | 290 |
| Kevin Bartlett | 11/19/2009 | San Francisco, CA | 223 |
| Thomas Scrivener | 11/20/2009 | Los Angeles, CA | 235 |
| Mark Elbaum | 12/02/2009 | Los Angeles, CA | 186 |
| Barry Pyle | 12/03/2009 | Los Angeles, CA | 81 |
| Schyler Thiessen | 12/03/2009 | San Francisco, CA | 329 |

| Deponent | Deposition Date(s) | Location | Transcript Length (pages) |
|---|---|---|---|
| Greg Lumsden | 12/09/2009 | Los Angeles, CA | 246 |
| Jens Christian Ingerslev | 12/15/2009 | Los Angeles, CA | 253 |
| Don White | 12/16/2009 | New York, NY | 343 |
| Josephine Chen | 12/16/2009 | Los Angeles, CA | 136 |
| Michael McCarthy | 12/17/2009 | Los Angeles, CA | 136 |
| Lisa Riordan | 12/17/2009 | Los Angeles, CA | 101 |
| Frank Aguilera | 12/22/2009 | Los Angeles, CA | 267 |
| Jack Schakett | 12/22/2009 | Los Angeles, CA | 256 |
| Dianne Lucius | 01/06/2010 | Carson City, NV | 297 |
| Cynthia Lau | 01/08/2010 | Los Angeles, CA | 317 |
| Walter Smiechewicz | 01/11/2010-01/12/2010 | Los Angeles, CA | 354 |
| John McMurray | 01/12/2010-01/14/2010 | Seattle, WA | 770 |
| Philip MacPhail | 01/13/2010 | Los Angeles, CA | 315 |
| Keith Russell | 01/15/2010 | Los Angeles, CA | 270 |
| Margaret Voskanian | 01/15/2010 | Los Angeles, CA | 296 |
| Richard Cabanes | 01/19/2010 | Los Angeles, CA | 168 |
| Martin Melone | 01/21/2010 | Los Angeles, CA | 264 |
| Jason Crone | 01/21/2010 | Los Angeles, CA | 135 |
| Mark Zachary | 01/21/2010 | Houston, TX | 257 |
| Eric Sieracki | 01/22/2010 | Los Angeles, CA | 334 |
| Michael Dougherty | 01/22/2010 | Minneapolis, MN | 291 |

| Deponent | Deposition Date(s) | Location | Transcript Length (pages) |
|---|---|---|---|
| Oscar Robertson | 01/22/2010 | Cincinnati, OH | 81 |
| Harley Snyder | 01/22/2010 | Chicago, IL | 217 |
| Nicholas Krsnich | 01/25/2010 | Los Angeles, CA | 314 |
| Charles Tashiro | 01/25/2010 | Rochester, NY | 97 |
| Angelo Mozilo | 01/26/2010-01/28/2010 | Westlake Village, CA | 297 |
| Jeffrey Cunningham | 01/26/2010 | Phoenix, AZ | 140 |
| Alan Hevesi | 01/26/2010 | New York, NY | 79 |
| Anne McCallion | 01/26/2010 | Los Angeles, CA | 368 |
| Laurie Milleman | 01/26/2010 | Los Angeles, CA | 142 |
| Ron Sion | 01/27/2010 | New York, NY | 302 |
| Clifford Rossi | 01/27/2010 | Washington, DC | 346 |
| David Sambol | 01/282010-01/29/2010 | Los Angeles, CA | 483 |
| Kathleen Brown | 01/29/2010 | Los Angeles, CA | 232 |
| Henry Cisneros | 01/29/2010 | Los Angeles, CA | 158 |
| Carlos Garcia | 01/29/2010 | Los Angeles, CA | 301 |
| Andrew Gissinger | 01/29/2010 | Los Angeles, CA | 320 |
| Peter Harper | 01/29/2010 | Phoenix, AZ | 309 |
| Gwendolyn King | 01/29/2010 | Washington, DC | 196 |
| Melody Rollins | 01/29/2010 | Newport Beach, CA | 178 |
| Julie Scammahorn | 01/29/2010 | New York, NY | 206 |
| Stanford Kurland | 01/31/2010 | Los Angeles, CA | 230 |
| Robert Parry | 01/31/2010 | Los Angeles, CA | 184 |

| Deponent | Deposition Date(s) | Location | Transcript Length (pages) |
|---|---|---|---|
| Mindy Levine | 02/03/2010 | Woodland Hills, CA | 219 |
| Ben Enis | 02/04/2010 | Las Vegas, NV | 211 |
| Tamara Wright | 02/08/2010 | Dallas, TX | 308 |
| Scott Carnahan | 02/09/2010-02/10/2010 | Santa Monica, CA | 132 |
| Edwin Heller | 02/12/2010 | Boca Raton, FL | 280 |
| Raz Bolkorjian | 02/17/2010 | Santa Monica, CA | 267 |
| Patrick Calahan | 02/19/2010 | Santa Monica, CA | 351 |
| David Lloyd | 02/23/2010 | Santa Monica, CA | 174 |
| Stanley Shipley | 02/24/2010 | New York, NY | 311 |
| Anita Agarwal | 02/26/2010 | Santa Monica, CA | 182 |
| John Klinge | 03/02/2010 | Chicago, IL | 273 |
| Chandru Harjani | 03/04/2010 | New York, NY | 322 |
| John Taylor | 03/05/2010 | Santa Monica, CA | 303 |
| Jeffrey Bower | 03/07/2010 | Santa Monica, CA | 332 |
| Michael Tae | 03/09/2010 | New York, NY | 196 |
| Patrick Kinsella | 03/11/2010 | Santa Monica, CA | 215 |
| John Bolger | 03/15/2010 | New York, NY | 160 |

73.     As indicated above, these depositions proceeded in 20 cities around the nation.  The parties conducted seven depositions in November, 11 depositions in December, 35 depositions in January, 10 depositions in February, and seven depositions in March.  Indeed, during the last seven days of January alone, the parties deposed 20 witnesses.  These 71 depositions resulted in 17,873 pages of testimony.

74.     Also as indicated above, the parties frequently had to participate in multiple depositions on the same day—this occurred 13 times.  Five depositions took place on January 26, 2010, and nine depositions took place on January 29, 2010.  Two depositions occurred on January 31, 2010, which was a Sunday. During the 19-week period from October 29, 2009 through March 15, 2010 (which included the holiday season, during which the parties agreed for the convenience of the witnesses not to take depositions), the parties took three or more depositions in 11 of those weeks.

75.     Lead Counsel enlisted the assistance of four other firms to take or defend depositions—Kaplan Fox & Kilsheimer LLP (counsel for Plaintiff Brahn), Kreindler & Kreindler LLP (liaison counsel for Lead Plaintiffs), Lockridge Grindal Nauen P.L.L.P. (additional counsel for Plaintiff Brahn), and Klafter Olsen & Lesser LLP.

76.     Lead Counsel made every effort to conduct depositions in a cost-effective manner.  Of the 51 depositions that Lead Counsel took, defended or otherwise participated in, 20 were staffed by just one attorney, 29 were staffed by two attorneys, and two were staffed by three attorneys.  I was the "third" attorney at both of those depositions.  I attended principally as a means of observing the performance of the associate of my firm who was taking the deposition.

### d.     Defendants' Discovery Requests

77.     In addition to conducting its own document and deposition discovery, Plaintiffs' counsel responded to Defendants' copious requests for fact discovery. Collectively, Defendants served on the New York Funds (either NYSCRF, the New York City Pension Funds, or both) 12 sets of interrogatories, eight sets of requests for production, and six sets of requests for admission.  (These numbers do not include the requests that Countrywide issued in connection with class certification discovery.)  In particular, Mozilo issued two sets of interrogatories and two sets of requests for production to each of the Lead Plaintiffs.

78.     Plaintiffs responded to numerous and comprehensive contention interrogatories served by Mozilo, Sambol, Sieracki, Garcia, Gissinger, Kurland, KPMG, the Outside Director Defendants, and Banc of America Securities LLC. In aggregate, these responses comprised more than 500 pages and cited approximately 250 separate documents found during discovery.

### e.     Motion Practice Related to Fact Discovery

79.     The parties engaged in numerous meet-and-confer discussions pursuant to the Court's Local Rules and in a good-faith effort to resolve a large number of discovery disputes and avoid unnecessary motion practice. This effort was mostly successful, as Lead Plaintiffs filed only three motions to compel, prevailing on two of them.

80.     During the Summer and Fall of 2009, Lead Counsel held several meet-and-confer discussions with counsel for Countrywide and KPMG, separately, regarding the scope of their respective document productions—*e.g.*, search terms, custodians, the relevant time period, the format in which electronically stored information ("ESI") would be produced, and the metadata that would be included in the production of ESI. Following these time-intensive discussions, the parties were able to resolve the vast majority of their disputes without the intervention of the Court. Substantial differences remained, however, between Lead Plaintiffs and KPMG regarding the production of certain documents created after the Class Period and documents previously produced to the SEC. Consequently, on September 17, 2009, Lead Plaintiffs filed a motion to compel KPMG to produce these materials (Dkt. No. 611). The Court granted the motion in part (Dkt. No. 620, September 23, 2009).

81.     In the Fall of 2009, Lead Counsel discovered that Countrywide had been withholding certain documents concerning many of the Company-wide problems directly relevant to the allegations in the Complaint. Countrywide asserted that the documents were protected from disclosure by the work-product

doctrine and the "self-critical analysis privilege." On October 6, 2009, Lead Plaintiffs moved to compel (Dkt. No. 643). The Court granted the motion in part (Dkt. No. 648, October 20, 2009), and the disputed documents ultimately became a focus of Lead Plaintiffs' case.

82. During his deposition, one former Countrywide employee refused to answer any questions regarding two sets of documents that Countrywide claimed were inadvertently produced and that were prepared by the FRB and the OCC. Countrywide's counsel claimed that the documents were protected by the bank examination privilege. On December 16, 2009, Lead Plaintiffs filed a motion to compel further deposition testimony regarding these documents (Dkt. No. 669). The Court denied the motion on the ground that Lead Plaintiffs had not yet exhausted administrative procedures for requesting the documents from the regulatory agencies (Dkt. No. 673, December 28, 2009). Subsequently, Lead Counsel submitted formal requests to the FRB and OCC and successfully negotiated the production of certain documents, though the parties reached settlement before actual production (*see supra* ¶ 55).

83. Lead Plaintiffs received one motion to compel. On January 29, 2010, the Outside Director Defendants moved to compel further responses to their contention interrogatories. Lead Plaintiffs opposed the motion (Dkt. No. 713). The Court heard oral argument, but the parties agreed to the Settlement before the Court ruled.

84. Between December 11 and 18, 2009, Countrywide produced more than three million pages of documents to Lead Plaintiffs. Given the volume of this production and intervening holidays, this was close to the January 31, 2010 deadline for discovery of Countrywide-related witnesses. Lead Counsel made several attempts to achieve a consensus among all the parties on a modification of the pretrial schedule. Although most of the Defendants appeared to agree that a modification was warranted, the parties were unable to reach agreement on the

specifics.  Because of the urgency posed by the approaching discovery deadline, on January 5, 2010, Lead Plaintiffs filed an *ex parte* application to modify the pretrial schedule, which proposed a new schedule constituting a good-faith attempt to accommodate Defendants' expressed views (Dkt. No. 677). Defendants opposed the application, and the Court denied it (Dkt. No. 687, January 6, 2010).  In response, Lead Plaintiffs accelerated what had already been a full-tilt litigation effort, and three months later Defendants agreed to pay $624 million in Settlement.

**F.      Expert Reports on Liability and Damages Issues**

85.    The parties exchanged a flurry of lengthy, detailed reports from no fewer than 17 expert witnesses designated to testify on a range of issues related to liability, loss causation and damages.

### a.      Expert Reports Served on March 24, 2010

86.    Lead Plaintiffs served the report of Richard K. Green, Ph.D., a Professor in the School of Policy, Planning and Development and the Marshall School of Business at the University of Southern California, and Director of the Lusk Center for Real Estate, on mortgage banking and loan underwriting issues. Lead Plaintiffs also served the report of D. Paul Regan, CPA, of the accounting and consulting firm of Hemming Morse, Inc., concerning Countrywide's lack of compliance with generally accepted accounting principles ("GAAP") in presenting certain of its periodic and year-end financial statements.[8]

87.    The Countrywide Defendants served the report of Kerry D. Vandell, Ph.D., a Professor of Finance and Director of the Center for Real Estate at the

---

[8] Pursuant to the Court's June 15, 2009 Order Concerning Expert Discovery Protocols (Dkt. No. 461), Lead Plaintiffs subsequently produced the documents and data Professor Green and Mr. Regan relied upon in forming their respective opinions, together with other categories of information set forth in Fed. R. Civ. P. 26(a)(2)(B).

Paul Merage School of Business, University of California-Irvine, concerning, among other things, the macroeconomic factors causing the decline in house prices and the impact of the decline on the mortgage industry in general and on Countrywide in particular. The Countrywide Defendants also served the report of Christopher L. Culp, Ph.D., a Senior Advisor with the consulting firm of Compass Lexicon, concerning the causes of the disruptions and illiquidity in global credit markets in the Summer of 2007 and how those events affected Countrywide through August 2007.

88.     Defendant Sambol served the report of Allen Ferrell, a Professor of Securities Law at Harvard Law School, concerning Countrywide's corporate governance and disclosure processes.

89.     Defendant Kurland served the report of Charles J. Lundelius, a senior managing director in the forensic and litigation practice FTI Consulting, Inc., concerning Countrywide's internal control and governance structures and the appropriateness of Kurland's reliance thereon in signing registration statements.

90.     The Outside Director Defendants served the report of Robert J. Haft, a Professor at Georgetown University Law Center, concerning issues of due diligence relating to these defendants.

91.     Defendants Garcia and Gissinger served the report of Stephen J. Choi, J.D., Ph.D., a Professor at New York University School of Law, concerning due diligence and reasonable reliance issues.

**b.     Expert Reports Served on March 31, 2010**

92.     Lead Plaintiffs served the report of Gregg A. Jarrell, Ph.D., a Professor of Finance at the William E. Simon Graduate School of Business Administration of the University of Rochester, concerning microeconomic loss causation and damages issues. Lead Plaintiffs also served a second report from D. Paul Regan, CPA, concerning KPMG's lack of compliance with generally

accepted auditing standards ("GAAS") in conducting its audits of certain of Countrywide's year-end financial statements.

93. The Countrywide Defendants served the report of Stephen G. Ryan, a Professor of Accounting at the New York University Stern School of Business concerning the conformity of certain of Countrywide's year-end financial statements with GAAP. The Countrywide Defendants also served the report of R. Glenn Hubbard, Ph.D., Dean of Columbia University Graduate School of Business, concerning microeconomic loss causation and damages issues. The Countrywide Defendants also served the report of Guy F. Erb, a managing director in the forensic and litigation services practice of FTI Consulting, Inc., concerning issues of reasonable and customary due diligence with respect to Defendant Countrywide Securities Corporation.

94. Defendant KPMG served the report of Sandra K. Johnigan, a former partner of Ernst & Young LLP, concerning KPMG's compliance with GAAS in conducting its audits of certain of Countrywide's year-end financial statements. KPMG also served the report of Joseph C. Schubert, a former partner of Ernst & Young LLP, concerning KPMG's compliance with professional standards in issuing opinions on Countrywide's internal controls over financial reporting. KPMG also served the report of John J. McConnell, a Professor of Finance at the Krannert Graduate School of Management at Purdue University, concerning, among other things, the economic events of 2007-2008 and their impact on Countrywide as an ongoing entity and the residential mortgage lending industry generally. KPMG also served the report of William H. Beaver, Ph.D., a Professor of Accounting emeritus at the Stanford University Graduate School of Business, concerning the relation between publicly available information about Countrywide and the prices of Countrywide securities.

95. Finally, Defendants Garcia and Gissinger served the report of Robert A. Sherwin, a managing principal and vice president at Analysis Group, Inc.,

concerning damages issues relating to the guarantee of certain Countrywide debt securities by its wholly owned subsidiary, Countrywide Home Loans, Inc.[9]

## G. Mediated Settlement Discussions

96.     The Settlement is the product of extensive and informed arm's-length negotiations culminating in a three-day mediation session before the Honorable A. Howard Matz, a sitting Judge of this Court, and Professor Eric D. Green of Boston University School of Law, a nationally recognized private mediator.[10]

97.     Counsel for Countrywide first contacted Lead Plaintiffs concerning potential settlement after this Court's April 6, 2009 Omnibus Order resolving Defendants' second round of motions to dismiss (Dkt. No. 412).  Following an abortive attempt to arrange a joint mediation among the parties in the *Argent*,[11] *Luther* (as that case was then known),[12] and ERISA matters[13] as well as this action, counsel for Lead Plaintiffs, Countrywide and Bank of America

---

[9] Lead Plaintiff also consulted with certain experts they considered using as rebuttal testifying experts if the need arose.  These experts were retained early in the litigation, and Lead Plaintiffs considered whether to have them submit reports rebutting reports submitted by certain of Countrywide's and KPMG's experts.  Linda Allen, Ph.D. and Anthony Saunders, Ph.D., were potential experts on macroeconomic causation issues, and Leonard Blum of Westwood Capital LLC was a potential expert on securities underwriting and due diligence.  Additionally, Lucian A. Bebchuk, Ph.D., head of the corporate governance center at Harvard Law School, was a potential expert on corporate governance issues.  These experts and their qualifications are further discussed in paragraphs 169, 172 and 176 below and in their individual declarations within the accompanying Compendium of Individual Declarations Submitted in Support of Lead Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Expenses ("Compendium").

[10] Professor Eric Green is not related to Professor Richard Green, one of Plaintiffs' testifying expert witnesses.

[11] *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, No. CV 07-07097 MRP (MANx) (C.D. Cal.).  This was a class action brought on behalf of purchasers of certain Countrywide convertible debentures sold in a private placement.

[12] *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. CV 10-0302 MRP (MANx) (C.D. Cal.).  This is a class action brought on behalf of purchasers of certain Countrywide mortgage-backed and asset-backed securities.

[13] *Alvidres v. Countrywide Fin. Corp.*, No. CV 07-05810 JFW (CTx) (C.D. Cal.).  This was a class action brought on behalf of employees who purchased Countrywide securities in the Company's employee stock ownership plan.

Corporation met on May 21, 2009 with Professor Green to have preliminary discussions about their basic positions and to set ground rules for potential future negotiation sessions.

98.     On September 24, 2009, shortly after the hearing on Plaintiffs' motion for class certification, all parties and their counsel participated in a mediation session that focused on loss causation and damages issues. Lead Plaintiffs and Countrywide, assisted by consulting experts, made detailed presentations heard by all parties and Professor Green. These discussions were useful principally in opening a dialogue between Lead Plaintiffs and Countrywide concerning the complex causation and damages issues here.

99.     Prior to this meeting, the parties had agreed to participate in a more comprehensive mediation, and on October 13, 2009, all parties and their counsel again met before Professor Green to address both liability and damages issues. At this point, the parties had not yet taken any merits depositions, Defendants' document productions were voluminous but still incomplete, and Plaintiffs' motion for class certification was sub judice. Nonetheless, Lead Plaintiffs and Countrywide exchanged lengthy mediation statements, totaling 136 pages, based on the record developed to date. Lead Plaintiffs and Countrywide made detailed presentations during the session. Although progress was made in airing the obstacles to settlement and clarifying the strengths and weaknesses of the claims and defenses, this mediation session did not result in an agreement. The parties then returned in earnest to an adversarial litigation posture.

100.    On January 7, 2010, Lead Plaintiffs and the Outside Director Defendants participated in a mediation facilitated by Professor Green to discuss a partial settlement. A further mediation was held on February 13. The discussions did not result in an accord.

101.    The prospect of settlement resurfaced in February 2010, after fact discovery was essentially complete. Professor Green suggested to the parties

(who agreed) that owing to the size and complexity of this matter, the involvement of a sitting judge would be helpful to the mediation process. At this Court's behest, Judge Matz ultimately agreed to serve as a settlement judge, and the Court formally appointed Judge Matz to act as a mediator in a March 26, 2010 Minute Order (Dkt. No. 800).

102. Thereafter, the parties agreed to convene before Professor Green on March 4, 2010 to further discuss and debate loss causation and damages issues, and to participate in a three-day, omnibus mediation before Judge Matz and Professor Green on March 31 and April 1 and 2. The March 4 and April 1-2 mediation dates were agreed upon among the parties and Professor Green by February 22, 2010. The March 31 date was added later.

103. The March 4, 2010 mediation session, which most parties attended, included damages presentations by Lead Plaintiffs' and Countrywide's consulting experts and open dialogue among these experts and Professor Green. The day was useful in framing the issues and focusing on the areas of dispute.

104. Iterative negotiations were reserved for the March 31-April 2 sessions, which took place in and around Judge Matz's courtroom. These negotiations were well-informed not only by the extensive discovery record and prior damages and causation analyses, but also Plaintiffs' 144-page comprehensive mediation statement. For its mediation statement, Countrywide submitted its motion for summary judgment, which had been filed under seal a few days earlier. Additionally, Lead Plaintiffs gave Judge Matz and Professor Green the reports of certain testifying experts that were submitted in and around the time of the mediation sessions.

105. During the mediation, Lead Plaintiffs and Countrywide each made substantial presentations on liability and damages issues. The sessions were highly contentious, and were marked by Judge Matz's and Professor Green's persistent efforts in challenging the parties' respective positions and urging them

to reconsider or revise their stances. Lead Plaintiffs, Countrywide and KPMG, in particular, were compelled to carefully weigh the strengths and weaknesses of the claims and defenses. Owing in considerable part to the mediators' skill in facilitating the discussions, Lead Plaintiffs reached an agreement-in-principle with KPMG and subsequently with Countrywide, on behalf of all other Defendants, late the afternoon of the third day. Judge Matz had Lead Plaintiffs and KPMG, and then Lead Plaintiffs and Countrywide, recite the basic terms of their agreement on the record.

106. Plaintiffs submit that all parties, as well as Defendants' insurance carriers, were represented throughout the settlement negotiations by able counsel experienced in securities class litigation. Lead Plaintiffs were represented at the three-day mediation not only by Court-appointed Lead Counsel, but also by the Los Angeles firm of Hennigan, Bennett & Dorman LLP, which was retained to bolster Plaintiffs' trial team. Six in-house attorneys from Lead Plaintiffs also attended the mediation, including the General Counsel to the New York State Comptroller, one Associate Counsel, and one Assistant Counsel; the New York City Deputy Controller for Legal Affairs; and the Deputy Chief and Senior Counsel of the Pensions Division of the New York City Law Department. NYSCRF and New York City Pension Fund representatives also attended all of the prior negotiation sessions except the May 2009 preliminary meeting.

107. Negotiation of the Settlement Agreement and associated documentation occurred between late April and June 29, 2010 and was no less contentious and protracted. At one point, Lead Plaintiffs and Countrywide had a teleconference with Judge Matz and Professor Green in an attempt to break an impasse regarding several major issues.

108. Lead Counsel firmly believes, and respectfully submits, that the Settlement is fundamentally fair, adequate and reasonable in light of the myriad risks, burdens, and expense of continued litigation. These factors are discussed in

detail in Lead Plaintiffs' memorandum of points and authorities in support of final approval of the Settlement and the Plan of Allocation of the Net Settlement Fund, filed concurrently herewith.

**H.    The Lead Plaintiffs and Their Oversight
         and Monitoring of Lead Counsel**

109.    As established by Article 9 of the New York Retirement and Social Security Law, NYSCRF holds and invests the assets of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System, and provides pension, death and disability benefits for state and local government employees and employees of certain other participating employers.  NYSCRF is the third-largest public pension fund in the nation, with assets under management of $132.5 billion as of March 31, 2010, and serves more than one million active and retired members and their beneficiaries. The Comptroller of the State of New York has sole investment and fiduciary responsibility for managing NYSCRF's assets.  *See* Declaration of Luke Bierman, Esq., General Counsel to the State Comptroller DiNapoli, Ex. B hereto ("Bierman Decl."), at ¶ 1.

110.    NYSCRF has served as the court-appointed lead plaintiff in other major securities class actions, with remarkable results.  NYSCRF has served as lead plaintiff in the *WorldCom* ($6.133 billion settlement), *Cendant* ($3.18 billion), *McKesson HBOC* ($1.04 billion), *Raytheon* ($460 million), and *Bayer* ($18.5 million) cases.  *See id.* ¶ 5.

111.    The New York City Pension Funds provide pension benefits to employees of the City of New York, including full-time uniformed employees of the New York City Police and Fire Departments and the pedagogical staff and non-pedagogical employees of the Board of Education.  The New York City Employees' Retirement System provides benefits to all New York City employees who are not eligible to participate in the separate Police Department, Fire

Department, Board of Education or Teachers pension funds. Pursuant to Title 13 of the Administrative Code of the City of New York, the Boards of Trustees of the New York City Pension Funds have delegated to the Comptroller of the City of New York investment responsibility for management of the pension funds' assets. Collectively, the New York City Pension Funds have assets under management of $97.8 billion, and serve more than 370,000 active members and 262,000 retirees and beneficiaries. *See* Declaration of Karen L. Seemen, Esq., Senior Counsel with the New York City Law Department, Ex. C hereto ("Seemen Decl."), at ¶¶ 3-8.

112. The New York City Pension Funds have served as court-appointed lead plaintiffs in multiple securities class actions, and secured significant settlements in the *Cendant* ($3.18 billion settlement), *Juniper Networks* ($169.5 million), and *Orbital Sciences* ($22.5 million) cases. *See id.* ¶¶ 11-12.

113. The New York Funds closely supervised, monitored, and participated in all aspects of this litigation. As noted in Mr. Bierman's and Ms. Seemen's declarations, NYSCRF and the New York City Pension Funds (among other things) had frequent discussions with Lead Counsel regarding strategy; reviewed and commented on substantial discovery responses and submissions to the Court in advance of service or filing; reviewed discovery responses and Court submissions by Countrywide, KPMG and other Defendants; attending hearings in this Court; and participated fully in document and deposition discovery on class certification issues. *See* Bierman Decl. ¶¶ 3-4; Seemen Decl. ¶¶ 22-24, 29.

114. Lead Counsel took care to keep the New York Funds fully informed of all material developments in the action as well as general status matters. Lead Counsel and the New York Funds convened formal quarterly meetings to discuss all aspects of the case (with NYSCRF or the New York City Pension Funds meeting in person together with Lead Counsel), and had regular conference calls and e-mail communications promptly as matters arose. Conference calls were frequently held once per week, and, depending on the stage of the case, e-mails

were exchanged several times a week and often many times a day. E-mail was a particularly efficient method of communicating with the New York Funds; early on in the case, Lead Counsel established a "client group" e-mail server that was used liberally to send messages and documents to all NYSCRF and New York City Pension Funds representatives simultaneously.

115. Lead Counsel's consultations with the New York Funds regularly included discussions on specific strategic and discovery matters, and were especially detailed regarding all matters related to settlement. Further, on several occasions, representatives of NYSCRF and the New York City Pension Funds had conference calls concerning this action to discuss strategy without Lead Counsel present, and later gave instructions to Lead Counsel.

116. With regard to case documents, Lead Counsel ensured that the New York Funds reviewed virtually all Plaintiff briefs, pleadings, discovery requests and responses, and expert reports before they were served or filed. Lead Counsel forwarded virtually all Defendant briefs, pleadings, discovery responses, and expert reports, promptly after they were served or filed.

117. Representatives of the New York Funds personally attended three major hearings held in this Court: the November 19, 2007 oral argument on competing motions for appointment as lead plaintiff and approval of selection of lead counsel, the October 20, 2008 oral argument on Defendants' motion to dismiss the CAC, and the September 22, 2009 oral argument on Plaintiffs' motion for class certification. Representatives of the New York Funds expect to attend the Fairness Hearing scheduled for November 15, 2010.

118. A representative of NYSCRF also personally attended the jury focus exercise (*see supra* ¶ 66) that took place on September 9 and 10, 2009. And, as noted above, representatives of NYSCRF and the New York City Pension Funds personally attended all of the various settlement negotiations and mediations following the May 21, 2009 preliminary meeting, and six representatives of the

New York Funds attended the March 31-April 2, 2010 mediation.  *See supra* ¶ 106.

119.    Between April 14 and 27, 2010, Lead Counsel made substantially identical presentations to the full Boards of Trustees of each of the five New York City Pension Funds to seek formal ratification.  All five Boards of Trustees subsequently ratified the Settlement.

120.    Comptroller DiNapoli, in his capacity as sole trustee of NYSCRF, also ratified the Settlement shortly after the parties reached the settlement agreement-in-principle.

121.    Both NYSCRF and the New York City Pension Funds endorse the Settlement and believe it to be a fair recovery to the Class in view of the several factors described in the Notice.  *See* Bierman Decl. ¶ 15; Seemen Decl. ¶ 30; *see also supra* ¶ 108.

**I.    Additional Exhibits Concerning the Fairness of the Settlement and Plan of Allocation**

122.    Annexed hereto as Exhibit D is a true and correct copy of Securities Class Action Services' "Top 100 Settlements Quarterly Report" for the fourth quarter of 2009, published in 2010 by RiskMetrics Group.

123.    Annexed hereto as Exhibit E is a true and correct copy of a study by Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements: 2009 Review and Analysis*, published in 2010 by Cornerstone Research.

124.    Annexed hereto as Exhibit F is a true and correct copy of cited excerpts of the transcript of the August 2, 2010 hearing in this action concerning Plaintiffs' renewed unopposed motion for preliminary approval of the Settlement.

125.    Annexed hereto as Exhibit G is a true and correct copy of the Complaint in *SEC v. Mozilo*, No. CV 09-3994 JFW (MANx) (C.D. Cal.), filed on June 4, 2009.

126.    Annexed hereto as Exhibit H is a true and correct copy of Judge

Walter's recent opinion deciding Defendants' motions for summary judgment in

*SEC v. Mozilo*, No. CV 09-3994 JFW (MANx), 2010 WL 3656068 (C.D. Cal.

Sept. 16, 2010).

127.    Annexed hereto as Exhibit I is a true and correct copy of the Report

of R. Glenn Hubbard, Ph.D., dated March 31, 2010.  Dr. Hubbard was designated

by the Countrywide Defendants as their testifying expert witness on loss causation

and damages issues.

128.    Annexed hereto as Exhibit J is a true and correct copy of the recent

decision dismissing the complaint in *SRM Global Fund Limited Partnership v.*

*Countrywide Financial Corp.*, No. 09 Civ. 5064 (RMB), 2010 WL 2473595

(S.D.N.Y. June 17, 2010).

**J.    Proposed Dismissal of Claims Asserted Against**
        **Defendants Garcia and Gissinger and Securities**
        **Act Claims Asserted Against Defendant Sambol**

129.    As noted above, the parties reached the settlement agreement-in-

principle on April 2, 2010.  Shortly before then, on March 25, 2010, Plaintiffs and

Defendants Garcia and Gissinger filed a stipulation voluntarily dismissing these

Defendants from the action with prejudice (Dkt. No. 755-1).  Similarly, on April

1, 2010, Plaintiffs and Defendant Sambol filed a stipulation dismissing the

Securities Act claims asserted against him with prejudice (Dkt. No. 855).

130.    The proposed dismissals all arise from the same potentially

dispositive issue.  The SAC asserts claims under Section 11 of the Securities Act

against Garcia in connection with Countrywide's offerings of Series A Medium-

Term Notes, Series B Medium-Term Notes, 6.25% Subordinated Notes Due May

15, 2016, and Countrywide Capital V 7% Capital Securities (Counts I, IV and

VII).  The SAC asserts Section 11 claims against Gissinger in connection with the

7% Capital Securities offering (Count VII).  The SAC asserts claims against

Sambol under Sections 11 and 15 in connection with the offerings of Series B

Medium-Term Notes, 6.25% Subordinated Notes, and 7% Capital Securities (Counts IV, VI, VII and IX).

131.   In March 2010, pursuant to Local Rule 7-3, Lead Counsel had telephonic meet-and-confer discussions with counsel for Garcia, Gissinger and Sambol concerning their summary judgment motions to be filed on March 26, 2010.  During these meet-and-confer discussions, Garcia, Gissinger, and Sambol stated for the first time that they would content that Plaintiffs' Securities Act claims should be dismissed with prejudice because (a) these defendants signed the relevant Registration Statements in their capacities as officers of Countrywide Home Loans, Inc. ("CHL"), not Defendant Countrywide Financial Corporation ("CFC"); (b) as CHL signatories, these defendants did not incorporate by reference the CFC Form 10-Ks, 10-Qs or 8-Ks that were alleged to be false and misleading; (c) CHL guaranteed, but did not issue, the Series A or Series B Medium-Term Notes, and no damages resulted from such guarantees; (d) CHL's guarantees were separate and distinct securities from the CFC securities that were being guaranteed; and (e) CHL did not issue or guarantee the 6.25% Subordinated Notes or 7% Capital Securities, and thus no damages resulted from any action by CHL with respect to those securities.

132.   Plaintiffs investigated these contentions carefully and conducted relevant legal research.  They noted, among other things, (a) that CHL is a subsidiary issuer or guarantor that is exempt from Exchange Act reporting requirements, and accordingly did not incorporate by reference the allegedly false SEC reports; (b) that CHL's guarantees of the Series A and B Medium-Term Notes are securities that were separately registered with the SEC but are not "publicly traded" securities falling within the Class definition; (c) that there were no losses associated with the guarantees; and (d) that none of the Plaintiffs purchased them.

133. Plaintiffs determined that there was a significant risk that the Court would grant summary judgment as to those claims, that litigating this peripheral set of issues would waste the Court's and the parties' time and resources, and that agreeing to dismiss Garcia and Gissinger and the Securities Act claims against Sambol would appropriately narrow the myriad issues before the Court on summary judgment.

134. No payments were made, and nothing of value was given, to any of the Plaintiffs or their counsel in exchange for the proposed dismissals.

135. Equally important, Plaintiffs determined that voluntarily dismissing Garcia and Gissinger and the Securities Act claims against Sambol would almost certainly have no material effect on the Class's potential recovery at trial. The claims against Garcia and Gissinger overlapped with the Securities Act claims asserted against many other defendants including Countrywide, Mozilo, Sieracki, KPMG, and the Underwriter Defendants; removing Garcia and Gissinger from the action did not impact Professor Jarrell's damages analyses. With regard to Sambol, Plaintiffs would continue to pursue the Exchange Act claims asserted against him, and the damages associated with those claims were greater than those associated with the Securities Act claims.

136. Plaintiffs' agreement to dismiss these defendants and claims had no impact on the negotiation or amount of the $624 million Settlement. During all of the mediation sessions, Countrywide negotiated a settlement with Lead Plaintiffs that would result in a dismissal with prejudice and discharge of all claims against all Defendants other than KPMG, with only KPMG negotiating separately. The negotiations were conducted in this fashion because Garcia, Gissinger, Sambol, and all other Defendants besides KPMG have indemnification agreements with Countrywide. As noted above, the same Securities Act claims against Garcia, Gissinger and Sambol had been asserted against many other defendants and so, with or without such claims against those three defendants, Countrywide faced the

same degree and amount of risk on those claims during the settlement negotiations. Had Plaintiffs determined not to voluntarily dismiss Garcia and Gissinger (or the Securities Act claims against Sambol), the claims against them (and the Securities Act claims against Sambol) would have been made part of the Settlement dismissing this action in its entirety, and the $600 million Countrywide agreed to pay in settlement would have been the same.

**K.     Petition for an Award of Attorney's Fees**

137.   Lead Counsel respectfully seeks an award of attorney's fees in the amount of $47,372,000.00, or approximately 7.59% of the Settlement Fund, plus accrued interest at the same net rates earned by the Settlement Fund.

138.   This fee is sought with the express consent of Lead Plaintiffs pursuant to certain *ex ante* agreements between Lead Counsel and NYSCRF and between Lead Counsel and the New York City Pension Funds.

139.   The Implementation Contract entered into between Lead Counsel and NYSCRF, dated May 6, 2004 and extended by later amendment, sets forth explicit terms for the fee structure to be utilized as the basis for any fee and expense application to be submitted by Lead Counsel. The fee grid in the Implementation Contract was superseded by a revised fee proposal agreed-to by Lead Counsel and the New York City Pension Funds, and adopted by NYSCRF in October 2007. The revised fee proposal, for 7.59% of the Settlement Fund, is less than the fee that would be authorized by the fee grid contained in NYSCRF's Implementation Contract. *See* Bierman Decl. ¶ 7; Seemen Decl. ¶¶ 19-21 and attachment thereto.

140.   Lead Counsel and the law firms of Hennigan, Bennett & Dorman LLP, Kaplan Kilsheimer & Fox LLP ("Kaplan Fox"), Klafter Olsen & Lesser LLP, Kreindler & Kreindler LLP ("Kreindler"), and Lockridge Grindal Nauen P.L.L.P. (collectively, "Plaintiffs' Counsel"), have at all times assumed the responsibility of litigating this action on a contingent-fee basis, such that any attorney's fee would be paid only upon securing a valuable recovery for the

1  benefit of the New York Funds, Plaintiff Barry Brahn, and the Class by settlement

2  or judgment.  It is Lead Counsel's understanding that all Defendants' counsel, in

3  contrast, were paid on an ongoing basis by or on behalf of their respective clients

4  during the pendency of this action.

5      141.   Collectively, Plaintiffs' Counsel spent 182,710.65 hours litigating

6  this action and securing the settlement, resulting in a cumulative lodestar of

7  $69,190,643.25.  The cumulative lodestar excludes time spent preparing this

8  petition for attorney's fees and expenses.  For the Court's convenience, a master

9  chart of the cumulative lodestar and expenses for which reimbursement is sought

10  is annexed hereto as Exhibit K.

11      142.   Each of Plaintiffs' Counsel, including my firm, has prepared a

12  detailed firm-specific declaration that sets forth the time spent, total lodestar, and

13  work performed in this action.  These six declarations are respectfully submitted

14  as Tabs 1-6 of the accompanying Compendium of Individual Declarations

15  Submitted in Support of Lead Counsel's Petition for an Award of Attorney's Fees

16  and Reimbursement of Expenses ("Compendium").

17      143.   NYSCRF has found the number of attorneys that Lead Counsel used

18  to staff this litigation to be reasonable.  Bierman Decl. ¶ 12.  Further, NYSCRF

19  representatives have reviewed the daily time records of the attorneys and

20  paraprofessionals who worked on this case, and are satisfied that the hours and

21  resources that Plaintiffs' Counsel devoted to this action were a benefit to the

22  Class.  *See id.*

23      144.   NYSCRF has stated that after reviewing the periodic time reports, the

24  daily time records, and the hourly rates for the attorneys and paraprofessionals

25  who devoted time to this action, it is assured that the fee request is in accordance

26  with the Implementation Contract and the revised fee proposal.  *See id.* ¶ 16.

27  Accordingly, NYSCRF has given its approval and endorsement of Lead Counsel's

28  fee application.  *Id.*

145. NYSCRF has stated that it believes that Lead Counsel's fee request comports with the Implementation Contract and the revised fee proposal and that it is fair and reasonable compensation for Plaintiffs' Counsel's efforts in obtaining the Settlement recovery for the Class. *Id. ¶* 20.

146. In accordance with the Master Agreement, Lead Counsel periodically forwarded to the New York City Pension Funds summary reports of its hours, lodestar, expenses, daily time records, and back-up documentation of its expenses, as well as the same for other Plaintiffs' Counsel. *See* Seemen Decl. ¶ 26.

147. The New York City Pension Funds, having reviewed and monitored Lead Counsel's and its co-counsel's hours, as well as approving the hiring and retention of STAs, have concluded that the hours worked were reasonable and necessary. *Id.* ¶ 32.

148. The New York City Pension Funds believe that Lead Counsel's fee request comports with the Master Agreement and that it is fair and reasonable compensation for the efforts of Lead Counsel and its co-counsel in obtaining the Settlement recovery for the Class. *Id.* ¶ 34.

149. In further support of the reasonableness of the requested fee, Lead Counsel respectfully submits the accompanying Declaration of Michael H. Diamond in Support of Lead Counsel's Request for Attorneys' Fees and Expenses ("Diamond Decl."). Mr. Diamond, an attorney with nearly 40 years of litigation experience, is the former Managing Partner and head of litigation in the Los Angeles office of Skadden, Arps, Slate, Meagher & Flom LLP, and former head of the litigation group in the Los Angeles office of Milbank, Tweed, Hadley & McCloy LLP. *See* Diamond Decl. ¶¶ 3-4.

150. Mr. Diamond has reviewed the extensive history of this action and the agreements and information pertinent to the reasonableness of the requested fee. Mr. Diamond opines that the requested fee is reasonable, observing among other things that Lead Counsel made a concerted effort to use a relatively limited

number of attorneys, conducted an efficient review of more than 29 million pages of documents, worked a reasonable number of hours under the circumstances, that the hours worked by Lead Counsel and its STAs closely tracked the ebb and flow of the litigation, and that Lead Counsel's billing rates are reasonable. *Id.* ¶¶ 10-20.

151.   The table below, drawn from information in Lead Counsel's contemporaneous time records, demonstrates that Lead Counsel devoted more than two-thirds of all of its hours in this case to the review and analysis of the nearly 30 million pages of documents produced, and on work preparing for and taking, defending, or otherwise participating in the 81 depositions that proceeded in this action:

| | Category | Hours | Percent |
|---|---|---|---|
| 1 | Investigations, Factual Research | 8,365 | 5.20% |
| 2 | Legal Research | 4,092 | 2.54% |
| 3 | Written Discovery – Propound | 1,200 | 0.75% |
| 4 | Written Discovery – Respond | 5,938 | 3.69% |
| 5 | Discovery – Depositions | 38,568 | 23.96% |
| 6 | Discovery - Document Review | 69,078 | 42.91% |
| 7 | Pleadings | 5,448 | 3.38% |
| 8 | Briefs & Motions | 6,762 | 4.20% |
| 9 | Court Appearances & Preparation | 1,717 | 1.07% |
| 10 | Settlement/Mediation | 7,370 | 4.58% |
| 11 | Class Certification | 1,562 | 0.97% |
| 12 | Experts | 2,502 | 1.55% |
| 13 | Attorney Meeting/Strategy | 3,204 | 1.99% |

| | | | |
|---|---|---|---|
| 14 | Case Management | 5,184 | 3.22% |

152.   Additionally, as shown in the graph below, Lead Counsel logged a large percentage of these hours (a) between May 29, 2009 and August 3, 2009, when Lead Counsel reviewed nearly half of all documents produced in the case, with the goal of completing as much of the review and analysis as possible before the beginning of fact depositions; and (b) between October 29, 2009 and March 15, 2010, when Lead Counsel itself took or otherwise participated in 43 depositions, in order to meet the January 31, 2010 deadline for Countrywide-related discovery and the March 15, 2010 deadline for auditor and underwriter-related depositions:



153.   In requesting a fee of 7.59% of the Settlement Fund, Lead Counsel seeks an award that is lower than that awarded in other comparable cases.  The table below, prepared by Lead Counsel based on publicly available information,

compares the percentage fee requested in this case to the percentage fees awarded in the 14 other PSLRA settlements between $400 million and $800 million, with Settlement close to the midpoint (*see* SCAS Report, Ex. D):

| Case | Court | Docket No. | Fee Award | Total Settlement Amount (millions) |
|---|---|---|---|---|
| *In re Initial Public Offering Sec. Litig.* | S.D.N.Y. | 21-MC-0092 | **29.02%** | $586.0 |
| *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.* | S.D.N.Y. | 03-MD-1529 | **21.40%** | $460.0 |
| *Ohio Pub. Employees Ret. Sys. v. Freddie Mac* | S.D.N.Y. | 03-CV-4261 | **20.00%** | $410.0 |
| *In re Cardinal Health, Inc. Sec. Litig.* | S.D. Ohio | 04-CV-0575 | **18.00%** | $600.0 |
| *In re BankAmerica Corp. Sec. Litig.* | E.D. Mo. | 99-MD-1264 | **18.00%** | $490.0 |
| *In re Lucent Techs., Inc. Sec. Litig.* | D.N.J. | 00-CV-0621 | **17.00%** | $667.0 |
| *In re Global Crossing, Ltd. Sec. Litig.* | S.D.N.Y. | 02-CV-0910 | **16.18%** | $447.8 |
| *Carlson v. Xerox Corp.* | D. Conn. | 00-CV-1621 | **16.00%** | $750.0 |
| *In re Qwest Commc'ns Int'l Sec. Litig.* | D. Colo. | 01-CV-1451 | **15.00%** | $445.0 |
| *In re Marsh & McLennan Sec. Litig.* | S.D.N.Y. | 04-CV-8144 | **13.50%** | $400.0 |
| *In re Raytheon Co. Sec. Litig.* | D. Mass. | 99-CV-12142 | **9.00%** | $460.0 |
| *In re Dynegy Inc. Sec. Litig.* | S.D. Tex. | 02-CV-1571 | **8.73%** | $474.1 |
| *In re Waste Mgmt., Inc. Sec. Litig.* | S.D. Tex. | 99-CV-2183 | **7.93%** | $457.0 |
| *In re Merrill Lynch & Co. Sec., Deriv. & ERISA Litig.* | S.D.N.Y. | 07-CV-9633 | **7.82%** | $475.0 |
| ***In re Countrywide Financial Corp. Securities Litigation*** | ***C.D. Cal.*** | ***CV 07-05295*** | ***7.59%*** | ***$624.0*** |

154.   The fees in these cases average 15.54%, and range from 7.82% (out of a $475 million settlement fund) to 29.02% (out of a $586 million settlement fund).  If awarded, the 7.59% fee requested here would be the lowest percentage

fee awarded in any PSLRA settlement in the $400-$800 million range, and less than half of the average in percentage terms.

155. Annexed hereto as Exhibit L is a true and correct copy of Theodore Eisenberg and Geoffrey P. Miller, *Attorneys Fees and Expenses in Class Action Settlements: 1993-2008,* 7 J. EMPIRICAL LEGAL STUD. 248 (2010).

156. Given Lead Counsel's representation agreements with the New York Funds, the complexity and magnitude of this action, the difficulties of proof on liability, loss causation and damages, the experience of counsel for Plaintiffs and Defendants, the extraordinary results obtained, the views of Mr. Diamond expressed in the accompanying declaration, and the other factors discussed in Lead Counsel's accompanying memorandum of points and authorities in support of an award of attorney's fees and reimbursement of expenses, Lead Counsel respectfully submits that the requested fee is reasonable.

**L.     Petition for Reimbursement of Expenses**

157. Lead Counsel, on behalf of all Plaintiffs' Counsel, also respectfully seeks reimbursement of $8,080,517.87 in litigation expenses incurred in this action, with interest on the amount of expenses actually paid as of September 15, 2010.  Plaintiffs' Counsel, and Lead Counsel in particular, were required to lay out substantial funds and incur substantial obligations for, among other items, consulting and testifying expert fees and costs; document hosting, electronic discovery, and other litigation support services; jury consultant services; court reporting services; photocopying; and travel, lodging, and meals.

158. The firm-specific declarations submitted by Lead Counsel and each of Plaintiffs' Counsel, Tabs 1-6 of the Compendium, itemizes the expenses for which reimbursement is being sought.  The separate declaration submitted by me on behalf of my firm, Compendium Tab 1, also contains a report of the expenses incurred by the case-specific Litigation Fund established and administered by my firm and to which my firm and the Kaplan Fox and Kreindler firms periodically

contributed during the pendency of this action. My separate declaration discusses in greater detail the sources of the expenses for which reimbursement is sought and how the total is calculated.

159.  The Implementation Contract between Lead Counsel and NYSCRF contains strict expense reimbursement provisions limiting the amount for which Lead Counsel can seek reimbursement in this action. These limits included, among other things, maximum daily hotel and meal charges and requiring all air travel to be done on the basis of economy class fares—the same limits placed on government employees in travel status. NYSCRF (and the New York City Pension Funds) continued to insist upon these provisions in this application for expense reimbursement. *See* Bierman Decl. ¶ 9.

160.  Accordingly, the expenses itemized by Plaintiffs' Counsel in their respective declarations, as well as expenses incurred by consulting and testifying experts and other service providers, all adhere to the limitations imposed by the New York Funds.

161.  Lead Counsel also provided both NYSCRF and the New York City Pension Funds with periodic reports and back-up documentation detailing the expenses incurred by Plaintiffs' Counsel and their experts and consultants. NYSCRF's audits of Lead Counsel's expenses resulted in the elimination of more than $150,000 in charges for local taxi transportation and local meals incurred during late night and weekend work. *See id.* ¶¶ 10-11. Lead Counsel similarly advised other Plaintiffs' Counsel to exclude such expenses from their expense submissions and reviewed their declarations to ensure compliance with these restrictions.

162.  NYSCRF has stated that after reviewing the periodic expense reports and the back-up documentation provided by Lead Counsel, it concluded that the litigation expenses requested for reimbursement are reasonable, as they represent the necessary costs and expenses for the prosecution of this securities fraud case,

but are capped at the rates set in the Implementation Contract. NYSCRF accordingly has approved the request for reimbursement of expenses Lead Counsel seeks here. *Id.* ¶ 19.

163. The New York City Pension Funds, after reviewing Lead Counsel's and co-counsel's expenses, have concluded similarly that the requested expenses are reasonable for reimbursement. The New York City Pension Funds have approved Lead Counsel's request for reimbursement of expenses. Seemen Decl. ¶¶ 33-34.

164. Mr. Diamond has opined, after carefully reviewing the expenses for which reimbursement is sought here, that the expenses were reasonably and necessarily incurred. Diamond Decl. ¶ 21. Mr. Diamond's own fees are being borne by Lead Counsel and are not included in this petition for fees and expenses.

165. The accompanying Compendium contains, in addition to the six fee and expense declarations of Plaintiffs' Counsel, 12 declarations submitted by Lead Plaintiffs' consulting experts, testifying expert witnesses, and major litigation support vendors to attest to the services rendered and the fees and costs charged for which Lead Counsel seeks reimbursement. These 12 declarations, Tabs 7-18 of the Compendium (in descending order of expense amount), are respectfully submitted by the following:

166. Forensic Economics, Inc. provided consulting services with respect to the efficiency of the market, loss causation, materiality, and damages for Countrywide common stock, preferred securities, bonds and options. Forensic Economics performed extensive research and analyses to assist and support the work of Professor Jarrell in this action. Forensic Economics also conducted extensive analyses for settlement purposes relating to causation, damages, estimated settlement recoveries, and the Plan of Allocation, and submitted the declaration of Frank C. Torchio, president of Forensic Economics. Mr. Torchio's declaration, setting forth his qualifications and services rendered and supporting

Forensic Economics' professional fees and expenses, is submitted as Tab 7 of the Compendium.

167. Merrill Communications, LLC provided a range of litigation support services concerning data acquisition and forensics; electronically stored information and hard copy collection; imaging, managing and receiving data (paper or electronic format); document hosting and database management, and court reporting and other deposition-related services. The declaration of Richard G. Vestuto, setting forth Merrill's services rendered and supporting its fees and expenses, is submitted as Tab 8 of the Compendium.

168. D. Paul Regan, CPA, is Chairman of Hemming Morse, Inc., CPAs, Litigation and Forensic Consultants. Mr. Regan was Lead Plaintiffs' testifying expert witness on accounting and auditing issues and compliance with GAAP and GAAS, and submitted two reports. Mr. Regan's declaration, setting forth his qualifications and services rendered and supporting his professional fees and expenses, is submitted as Tab 9 of the Compendium.

169. Westwood Capital Advisors, LLC is an investment banking firm that provided consulting services to Plaintiffs on issues relating to securities underwriting and the sufficiency of the due diligence purportedly undertaken by the Underwriter Defendants. The declaration of Leonard Blum, setting forth his qualifications and services rendered and supporting his professional fees and expenses, is submitted as Tab 10 of the Compendium.

170. Richard K. Green, Ph.D. is a Professor in the School of Policy, Planning and Development and the Marshall School of Business at the University of Southern California, and Director of the Lusk Center for Real Estate. Professor Green was Lead Plaintiffs' testifying expert witness on mortgage banking and loan underwriting issues, and submitted a report. Professor Green's declaration, setting forth his qualifications and services rendered and supporting his

professional fees and expenses, together with the fees and expenses charged by FI Consulting, Inc., is submitted as Tab 11 of the Compendium.

171. Gregg A. Jarrell, Ph.D. is a Professor of Economics and Finance at the University of Rochester's William E. Simon Graduate School of Business. Professor Jarrell was Lead Plaintiffs' testifying expert witness on issues of market efficiency, microeconomic loss causation, and per-share damages. Professor Jarrell submitted multiple reports and affidavits, and gave deposition testimony. Professor Jarrell's declaration, setting forth his qualifications and services rendered and supporting his professional fees and expenses, is submitted as Tab 12 of the Compendium.

172. Professor Linda Allen is the Presidential Professor of Finance at Zicklin School of Business, Baruch College, City University of New York. Professor Anthony Saunders is the John M. Schiff Professor of Finance at Stern School of Business, New York University. Professors Allen and Saunders provided consulting expert services to Lead Plaintiffs concerning issues of macroeconomic loss causation and the causes of the collapse of the housing market and were prepared to submit a rebuttal report on the issue if Lead Counsel had deemed it necessary. Their joint declaration, setting forth their qualifications and services rendered and supporting their professional fees and expenses, is submitted as Tab 13 of the Compendium.

173. Cognition Technologies, Inc. provided consulting services with respect to linguistic and semantic searching in 10 million discovery documents and customization of Cognition's semantic map to handle new vocabulary in the documents. The declaration of Kathleen Dahlgren, Ph.D., setting forth Cognition's services rendered and supporting its fees and expenses, is submitted as Tab 14 of the Compendium.

174. Marks Paneth & Shron LLP is a New York accounting and consulting firm that provided consulting services to Lead Plaintiffs with respect to

accounting and auditing issues, principally related to Lead Plaintiffs' preparation of the April 11, 2008 Consolidated Amended Complaint. The declaration of Sharon Sabba Fierstein, CPA, setting forth her qualifications and services rendered and supporting Marks Paneth & Shron's professional fees and expenses, is submitted as Tab 15 of the Compendium.

175. Axia Advisors, LLC is a litigation consulting and advisory firm that also provided consulting services to Lead Plaintiffs with respect to accounting and auditing issues, principally related to Lead Plaintiffs' research and drafting of the April 11, 2008 Consolidated Amended Complaint. Axia preceded Marks Paneth & Shron in this consulting role. The declaration of Jorge Amador, CPA, Managing Director of Axia, setting forth his qualifications and services rendered and supporting his professional fees and expenses, is submitted as Tab 16 of the Compendium.

176. Lucian A. Bebchuk, Ph.D. is the William J. Friedman & Alicia Townsend Friedman Professor of Law, Economics, and Finance, and Director of the Program on Corporate Governance at Harvard Law School. Professor Bebchuk was retained in order to review and potentially rebut the report of Professor Allen Ferrell submitted by Defendant Sambol. Professor Bebchuk provided consulting services with respect to issues concerning the nature and implementation of Countrywide Financial Corporation's corporate governance policies and procedures, including, as pertinent to the allegations of insider trading by Defendant Angelo R. Mozilo, the adequacy of any corporate governance procedures designed to prevent insider trading. Professor Bebchuk's declaration, setting forth his qualifications and services rendered and supporting his professional fees and expenses, is submitted as Tab 17 of the Compendium.

177. H. Nejat Seyhun, Ph.D. is a Professor of Finance and the Jerome B. and Eilene M. York Professor of Business Administration and the Ross School of Business of the University of Michigan. Professor Seyhun conducted the forensic

1   and statistical analyses, set forth in Lead Plaintiffs' April 11, 2008 Complaint,

2   analyzing the extent and profitability of insider trading at Countrywide.  Professor

3   Seyhun's declaration, setting forth his qualifications and services rendered and

4   supporting his professional fees and expenses, is submitted as Tab 18 of the

5   Compendium.

6       178.   Based on the foregoing and the circumstances discussed in Lead

7   Counsel's memorandum of points and authorities in support of an award of

8   attorney's fees and reimbursement of expenses, Lead Counsel respectfully submits

9   that the total expenses for which reimbursement is sought were reasonably and

10  necessarily incurred in the prosecution and settlement of this action.

11

12      I declare under penalty of perjury that the foregoing is true and correct.

13  Executed this 11th day of October, 2010.

14

15              _/s/ Joel H. Bernstein_
                 JOEL H. BERNSTEIN