LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
*jbernstein@labaton.com*
JONATHAN M. PLASSE
*jplasse@labaton.com*
IRA A. SCHOCHET
*ischochet@labaton.com*
DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
MICHAEL H. ROGERS
*mrogers@labaton.com*
JOSHUA L. CROWELL
*jcrowell@labaton.com*
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead
Plaintiffs New York Funds*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions | Lead Case No.<br>CV 07-05295 MRP (MANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD COUNSEL'S PETITION FOR AN AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF EXPENSES**<br><br>Date:  November 15, 2010<br>Time:  1:00 p.m.<br>Courtroom:  12<br>Judge:  Hon. Mariana R. Pfaelzer |

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ................................................................................................ iii

ARGUMENT ........................................................................................................... 4

I.    THE REQUESTED ATTORNEY'S FEE IS REASONABLE AND SHOULD BE AWARDED FROM THE GROSS SETTLEMENT FUND ............................................... 4

    A.    The Common Fund Doctrine and the PSLRA ...................................... 4

    B.    The Ninth Circuit Has Indicated a Preference for the Percentage-of-Fund Method in Awarding Attorney's Fees in Common Fund Cases ..................... 5

    C.    Lead Plaintiffs' Active Role in Obtaining a Competitive Percentage Fee Agreement at the Commencement of the Litigation Supports the Reasonableness of the Fee Requested ............................ 6

        1.    The Legislative History and Purpose of the PSLRA Support the Presumptive Reasonableness of the Percentage Fee Negotiated By Lead Plaintiffs ........................... 6

        2.    The New York Funds' Selection of Counsel and Negotiation of the Fee Before Appointment as Lead Plaintiffs Demonstrate That the Fee Is Presumptively Reasonable ..................................... 8

    D.    Additional Pertinent Factors Demonstrate That the Requested Fee is Reasonable ............................. 11

        1.    Lead Counsel Has Achieved an Extraordinary Result for the Class ........................... 11

        2.    Lead Counsel's Efforts Were Effective and Efficient and Produced an Extraordinary Result ......................... 13

            a.    Lead Counsel Filed a Detailed Complaint and Then Defeated Two Rounds of Motions to Dismiss ............................... 17

            b.    In Ten Months, Lead Counsel Conducted Extensive Class and Merits Discovery, and Obtained Class Certification Over Vigorous Opposition ..................... 18

            c.    Lead Counsel Hired Short-Term Attorneys to Analyze the Enormous

Volume of Documents Produced and
to Assist With Deposition Preparation ......................... 19

d.   Courts Have Awarded Fees in
Cases Where Plaintiffs' Counsel
Hired Short-Term Attorneys ......................................... 20

e.   Lead Counsel Engaged in a Series
of Mediation Sessions and Ultimately
Settled the Case for $624 Million ................................ 21

3.   This Action Presented Obstacles
to Prevailing on the Merits ..................................... 23

a.   Loss Causation and Damages ........................................ 24

b.   Truth-on-the-Market Defense ....................................... 24

4.   The Contingent Nature of the
Fee and the Financial Burden
Carried By Lead Counsel ......................................... 25

5.   A 7.59% Fee Is at the
Lowest End of the Range of Fees
Awarded in Other Complex Actions ..................................... 26

E.   The Lodestar Cross-Check Confirms
That the Requested Fee Is Reasonable ............................... 28

II.   THE EXPENSES FOR WHICH LEAD COUNSEL
SEEKS REIMBURSEMENT WERE REASONABLY AND
NECESSARILY INCURRED BY PLAINTIFFS' COUNSEL .................. 30

Conclusion ......................................................... 35

1

## **Table of Authorities**

2

CASES

3

*In re Activision Securities Litigation,*
723 F. Supp. 1373 (N.D. Cal. 1989)................................................................5

*In re Apple Computer Securities Litigation,*
No. C-84-20148(A)-JW,
1991 WL 238298 (N.D. Cal. Sept. 6, 1991)..................................................26

*Boeing Co. v. Van Gemert,*
444 U.S. 472 (1980) ........................................................................................4

*Carlson v. Xerox Corp.,*
596 F. Supp. 2d 400 (D. Conn. 2009) ..........................................................21

*Carter v. Anderson Merchandisers, LP,*
No. EDCV 08-0025-VAP (OPx),
2010 WL 1946757 (C.D. Cal. May 11, 2010)...............................................29

*In re Cavanaugh,*
306 F.3d 726 (9th Cir. 2002) ..........................................................................7

*Craft v. County of San Bernardino,*
624 F. Supp. 2d 1113 (C.D. Cal. 2008) .......................................................11

*In re Cylink Securities Litigation,*
274 F. Supp. 2d 1109 (N.D. Cal. 2003)........................................................12

*In re Daou Systems Inc. Securities Litigation,*
No. 98-CV-1537-L (AJB),
2008 WL 2899726 (S.D. Cal. July 24, 2008)..................................................6

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ......................................................................................24

*In re Educational Testing Service Praxis Principles*
*of Learning & Teaching: Grades 7-12 Litigation,*
447 F. Supp. 2d 612 (E.D. La. 2006) ...........................................................28

*In re Enron Corp. Securities,*
*Derivative & ERISA Litigation,*
586 F. Supp. 2d 732 (S.D. Tex. 2008).....................................................20-21

*In re Fidelity/Micron Securities Litigation,*
167 F.3d 735 (1st Cir. 1999) .........................................................................30

*Fischel v. Equitable Life Assurance Society,*
307 F.3d 997 (9th Cir. 2002) ........................................................................25

*In re Global Crossing Securities & ERISA Litigation,*
225 F.R.D. 436 (S.D.N.Y. 2004)....................................................................7

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Harris v. Marhoefer,*
   24 F.3d 16 (9th Cir. 1994) ..................................................... 30

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) .............................................................. 11

*In re Heritage Bond Litigation,*
   No. 02 ML 1475 DT, 2005 WL 1594403
   (C.D. Cal. June 10, 2005) ................................................. 6, 11

*Hicks v. Morgan Stanley & Co.,*
   No. 01 Civ. 10071 (RJH),
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .......................... 28

*In re HPL Technologies, Inc. Securities Litigation,*
   366 F. Supp. 2d 912 (N.D. Cal. 2005) ............................... 7, 10

*In re Immune Response Securities Litigation,*
   497 F. Supp. 2d 1166 (S.D. Cal. 2007) ............................ 31-32

*In re Mego Financial Corp. Securities Litigation,*
   213 F.3d 454 (9th Cir. 2000) .................................................. 6

*In re Omnivision Technology, Inc. Securities Litigation,*
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................. 6, 23

*In re Oracle Securities Litigation,*
   131 F.R.D. 688 (N.D. Cal. 1990) ............................................ 5

*In re Portal Software, Inc. Securities Litigation,*
   No. C-03-5138 VRW,
   2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ......................... 12

*Powers v. Eichen,*
   229 F.3d 1249 (9th Cir. 2000) ................................................ 5

*In re Quintus Securities Litigation,*
   No. C-00-4263 VRW,
   2006 WL 3507936 (N.D. Cal. Dec. 5, 2006) .......................... 29

*Rodriguez v. West Publishing Corp.,*
   563 F.3d 948 (9th Cir. 2009) .................................................. 4

*Sandoval v. Tharaldson Employee Management, Inc.,*
   No. EDCV 08-482-VAP (OPx),
   2010 WL 2486346 (C.D. Cal. June 15, 2010) .......................... 4

*Six (6) Mexican Workers v. Arizona Citrus Growers,*
   904 F.2d 1301 (9th Cir. 1990) ................................................ 5

*In re Tyco International, Ltd. Securities Litigation,*
   535 F. Supp. 2d 249 (D.N.H. 2007) ..................................... 21

*Vizcaino v. Microsoft Corp.,*
   290 F.3d 1043 (9th Cir. 2002) ........................................ *passim*

*In re Washington Public Power Supply*
   *System Securities Litigation,*
   19 F.3d 1291 (9th Cir. 1994)................................................................4, 5, 25

*In re WorldCom, Inc. Securities Litigation,*
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ........................................................7, 10

*In re WorldCom, Inc. Securities Litigation,*
   No. 02 Civ. 3288 (DLC),
   2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ...................................................20

*Young v. Polo Retail, LLC,*
   No. C 02-4546 VRW,
   2007 WL 951821 (N.D. Cal. Mar. 28, 2007) .............................................29-30

**STATUTES**

15 U.S.C. § 78u-4(a)(3)(B)(iii)................................................................7

15 U.S.C. § 78u-4(a)(4) .......................................................................32

15 U.S.C. § 78u-4(a)(6) .......................................................................4

**OTHER AUTHORITIES**

S. Rep. No. 104-98 (1995),
   *reprinted in* 1995 U.S.C.C.A.N. 679 ........................................................7

Theodore Eisenberg & Geoffrey P. Miller,
   *Attorney Fees and Expenses in Class Action Settlements: 1993-2008,*
   7 J. EMPIRICAL STUD. 248 (2010) ..............................................................28

Third Circuit Task Force Report,
   *Selection of Class Counsel,*
   208 F.R.D. 340 (2002)........................................................................8

**Preliminary Statement**

Labaton Sucharow LLP ("Labaton Sucharow"), Court-appointed Lead Counsel for Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund ("NYSCRF") and Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds" and, together with NYSCRF, "Lead Plaintiffs" or the "New York Funds"), on behalf of all Plaintiffs' Counsel, respectfully submits this memorandum of points and authorities in support of its petition for an award of attorney's fees in the amount of $47,372,000.00, or approximately 7.59% of the $624 million Settlement Amount, plus interest, and for reimbursement of expenses in the total amount of $8,080,517.87, plus interest on the amount of expenses actually paid by Plaintiffs' Counsel as of September 15, 2010.

This was a highly contested litigation. Lead Counsel secured the $624 million Settlement only after, among other things, successfully opposing two rounds of motions to dismiss by multiple Defendants, obtaining class certification over Defendants' vigorous opposition, reviewing and analyzing nearly 30 million pages of documents, and preparing for and participating in 81 depositions. The New York Funds, sophisticated public pension funds that have led cases resulting in some of the largest securities class action settlements on record, actively participated in all aspects of the litigation, including major motion practice and all settlement discussions, and closely monitored and supervised the work of Lead Counsel and other Plaintiffs' Counsel.[1]

---

[1] The law firms of Hennigan, Bennett & Dorman LLP; Kreindler & Kreindler LLP; Kaplan Fox & Kilsheimer LLP; Lockridge Grindal Nauen P.L.L.P.; and

The New York Funds took an active role from the outset.  Before seeking lead plaintiff appointment in November 2007, the New York Funds demanded, and Lead Counsel agreed to, a contingent fee agreement that, by its terms and under the circumstances of the Settlement, limited Lead Counsel's fee to 7.59% of any recovery.  This 7.59% fee is low compared to percentage fee awards in other comparable securities class action settlements, and is far lower than the 25% "benchmark" fee applied by courts in this Circuit.  The requested fee is further supported by other relevant circumstances identified by the Ninth Circuit, including an extraordinary result achieved in a case that carried substantial risks; and the fact that Plaintiffs' Counsel zealously prosecuted this case on a contingent-fee basis, logging more than 182,000 hours and incurring more than $8 million in expenses with no guarantee of a recovery.

Lead Counsel's successful prosecution of this action, subject to the competitive fee agreement enforced by Lead Plaintiffs, is precisely the result intended by the PSLRA's mandate to put institutional investors in charge of securities class actions and to insure that attorneys' fees are "reasonable."  The Lead Plaintiffs support this petition for fees and expenses, and have stated that the time spent and expenses incurred by Plaintiffs' Counsel were reasonable and necessary to obtain this excellent result.  *See* Declaration of Luke Bierman on behalf of NYSCRF ("Bierman Decl."), Ex. B,[2] at ¶¶ 12, 19; Declaration of Karen

---

Klafter Olsen & Lesser LLP served as additional Plaintiffs' Counsel with the consent of Lead Plaintiffs and were actively involved in the prosecution of this case.  The work, time spent, and expenses incurred by Lead Counsel and each of these firms is detailed in their respective declarations in support of this fee and expense petition.  *See* Tabs 1-6 of the accompanying Compendium of Individual Declarations Submitted in Support of Lead Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Expenses.

[2] Citations to "Ex. ___" herein refer to exhibits to the accompanying Declaration of Joel H. Bernstein in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation of Net Settlement Fund and Lead Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Expenses ("Bernstein Decl.").

J. Seemen on behalf of New York City Pension Funds ("Seemen Decl."), Ex. C, at ¶¶ 32-34.

In further support of the reasonableness of the requested fee, Lead Counsel also respectfully submits the accompanying Declaration of Michael H. Diamond in Support of Lead Counsel's Request for Attorneys' Fees and Expenses ("Diamond Decl.").  Mr. Diamond has nearly 40 years of litigation experience in this and other courts, including defending many large securities class actions.  He is the former Managing Partner and Head of Litigation of the Los Angeles office of Skadden, Arps, Slate, Meagher & Flom LLP, and former head of the litigation group at the Los Angeles office of Milbank, Tweed, Hadley & McCloy LLP.  During his last two years at Skadden, Mr. Diamond was in charge of the entire firm's litigation-related disciplines.  *Id.* ¶¶ 3-4.

Based upon his review of the extensive history of this litigation, and agreements and information pertinent to the reasonableness of the requested fees, Mr. Diamond has opined that this was a "well run, exceptionally lawyered case that achieved an excellent result for the class"; that Plaintiffs' Counsel worked efficiently; that the amount of hours worked was fair; and that the fee requested is "eminently reasonable." *Id.* ¶¶ 10-20, 22.

Lead Counsel is mindful of the comments expressed by the Court during the preliminary approval hearing regarding "the number of hours" counsel included in its lodestar report, and the "the number of associates and contract lawyers," suggesting that the Court has concerns regarding the requested fee. Aug. 2, 2010 Hearing Transcript, Ex. F, at 26:11-14.  Lead Counsel directly addresses those concerns herein.  In doing so, Lead Counsel respectfully submits that the relevant factors and criteria discussed in this brief and accompanying submissions, including the Bierman, Seemen, and Diamond Declarations, as well as the facts set forth in the Bernstein Declaration, support a conclusion that this

1  complex action was efficiently and effectively litigated and that the requested fee

2  is reasonable.

3  **ARGUMENT**

4  **I.  THE REQUESTED ATTORNEY'S FEE IS**
   **REASONABLE AND SHOULD BE AWARDED**
5  **FROM THE GROSS SETTLEMENT FUND**

6  **A.  The Common Fund Doctrine and the PSLRA**

7  Having created a $624 million common fund for the benefit of the Class,

8  Lead Counsel seeks a fee amounting to a reasonable percentage of the recovery.

9  It has long been recognized that "a lawyer who recovers a common fund for the

10  benefit of persons other than himself or his client is entitled to a reasonable

11  attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S.

12  472, 478 (1980).  Indeed, the Ninth Circuit has stated that "those who benefit from

13  the creation of the fund should share the wealth with the lawyers whose skill and

14  effort helped create it." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19

15  F.3d 1291, 1300 (9th Cir. 1994) *("WPPSS")*.

16  Further, the Private Securities Litigation Reform Act of 1995 (the

17  "PSLRA") requires that the percentage awarded be "reasonable," stating in

18  relevant part:

19  > Total attorneys' fees and expenses awarded by the court
   > to counsel for the plaintiff class shall not exceed a
20  > reasonable percentage of the amount of any damages and
   > prejudgment interest actually paid to the class.

21
22  15 U.S.C. § 78u-4(a)(6).  Courts in the Ninth Circuit and elsewhere generally

23  apply this provision by requiring that awards of attorney's fees should be

24  "reasonable in the circumstances." *Rodriguez v. West Publ'g Corp.*, 563 F.3d

25  948, 967 (9th Cir. 2009) (citing *WPPSS*, 19 F.3d at 1294 n.2); *see also Sandoval*

26  *v. Tharaldson Employee Mgmt., Inc.*, No. EDCV 08-482-VAP (OPx), 2010 WL

27  2486346, at *8 (C.D. Cal. June 15, 2010) (fee should "be reasonable under the

28

circumstances").  As discussed below, Lead Counsel submits that a 7.59% fee is eminently reasonable under all of the circumstances of this complex case.

### B. The Ninth Circuit Has Indicated a Preference for the Percentage-of-Fund Method in Awarding Attorney's Fees in Common Fund Cases

Although district courts retain discretion to award attorney's fees in common fund cases based upon either the percentage-of-fund or lodestar method, *see WPPSS*, 19 F.3d at 1296, the Ninth Circuit has implicitly endorsed use of the percentage-of-fund method in most cases by having established a "benchmark" fee award of 25% of the common fund.  *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-48 (9th Cir. 2002) (applying analysis of benchmark percentage); *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (same); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (same).

Use of the percentage approach is consistent with the practice in the private marketplace, where attorneys working on a contingent basis are customarily compensated by a percentage of the recovery.  It also more closely aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum possible recovery in the shortest amount of time.  Additionally, use of the percentage method decreases the burden imposed on the court by eliminating the need for a time-consuming analysis of the time spent by each firm litigating the action.[3]

---

[3] *See, e.g.*, *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1375-76 (N.D. Cal. 1989) (looking with approval to "a number of salutary effects . . . achieved by [the percentage method], including removing the inducement to unnecessarily increase hours, prompting early settlement, reducing burdensome paperwork for counsel and the court and providing a degree of predictability to fee awards"); *In re Oracle Sec. Litig.*, 131 F.R.D. 688, 689 (N.D. Cal. 1990) (opining on the superiority of the percentage method by noting that the lodestar method "is now thoroughly discredited by experience . . . [and] requires judges to assess, after the litigation is over, strategic and other decisions made by plaintiffs' lawyers in the midst of litigation").

Courts in this Circuit have used the percentage method with increasing frequency since the enactment of the PSLRA. *See*, *e.g.*, *Vizcaino*, 290 F.3d at 1047; *Powers*, 229 F.3d at 1256; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000); *In re Omnivision Techs., Inc. Sec. Litig.*, 559 F. Supp. 2d 1036, 1047-48 (N.D. Cal. 2008); *In re Daou Sys. Inc. Sec. Litig.*, No. 98-CV-1537-L (AJB), 2008 WL 2899726, at *1-2 (S.D. Cal. July 24, 2008); *In re Heritage Bond Litig.*, No. 02 ML 1475 DT, 2005 WL 1594403, at *18 (C.D. Cal. June 10, 2005); *see also* Diamond Decl. ¶ 11 (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL STUD. 248, 281 (2010), for observation that "th[e] percentage] method is by far the one most used by Courts considering attorney fee awards in class actions . . . since 1995 the percentage method has been the one overwhelmingly used in securities class actions").

Further, in employing the percentage method, courts generally apply a lodestar "cross-check" to confirm the reasonableness of the requested fee. *See Vizcaino*, 290 F.3d at 1047 (affirming use of percentage method and applying the lodestar method as a cross-check).

## C. Lead Plaintiffs' Active Role in Obtaining a Competitive Percentage Fee Agreement at the Commencement of the Litigation Supports the Reasonableness of the Fee Requested

### 1. The Legislative History and Purpose of the PSLRA Support the Presumptive Reasonableness of the Percentage Fee Negotiated By Lead Plaintiffs

Evidence of "the percentage fee to which some plaintiffs agreed *ex ante* . . . may be probative of the fee award's reasonableness." *Vizcaino*, 290 F.3d at 1050. This proposition is greatly strengthened in a PSLRA case, where sophisticated institutional plaintiffs act in their own and the Class' interests and demand and negotiate a competitive fee agreement with counsel at the outset of the litigation.

1    Under the PSLRA, the presumptive lead plaintiff is the person with "the

2    largest financial interest in the relief sought by the class . . . ."  15 U.S.C. § 78u-

3    4(a)(3)(B)(iii); *see also In re Cavanaugh*, 306 F.3d 726, 729-30 (9th Cir. 2002).

4    A primary purpose of this provision is "to empower investors so that they—not

5    their lawyers—exercise primary control over private securities litigation."  S. Rep.

6    No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683.

7    Courts generally view fee agreements negotiated *ex ante* with institutional

8    investors as highly probative of reasonableness.  Thus, in *In re WorldCom, Inc.*

9    *Securities Litigation*, 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005), in which

10   NYSCRF was the lead plaintiff, Judge Cote observed that one of the "important

11   innovation[s] of the PSLRA" was the "establishment of criteria for the

12   appointment of a lead plaintiff capable of exercising a significant supervisory role

13   in the litigation, including management of the fees and costs . . . ."  Therefore,

14   "[w]hen class counsel in a securities lawsuit have negotiated an arm's-length

15   agreement with a sophisticated lead plaintiff possessing a large stake in the

16   litigation, and when that lead plaintiff endorses the application following close

17   supervision of the litigation, the court should give the terms of that agreement

18   great weight."  *Id.* (citation omitted); s*ee also In re HPL Techs., Inc. Sec. Litig.*,

19   366 F. Supp. 2d 912, 916 (N.D. Cal. 2005) ("the earlier a fee arrangement is

20   concluded between lead plaintiff and lead counsel, the more deference the court

21   should pay to that fee agreement," because *ex ante* agreements are likely the

22   product of "competition among counsel proposing to represent the class"); *In re*

23   *Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("In

24   class action cases under the PSLRA, courts presume fee requests submitted

25   pursuant to a retainer agreement negotiated at arm's length between lead plaintiff

26   and lead counsel are reasonable.").[4]

27   

28       [4] Similarly, the Third Circuit Task Force has opined that because "[t]he
     PSLRA establishes a model of client control that extends not only to appointment

1    Mr. Diamond notes this as well, observing that "[t]he fee percentage sought

2    here was set by agreement with the Lead Plaintiffs, sophisticated plaintiffs who

3    were cognizant of their fiduciary obligations to the class they represent . . . .  This

4    is not a case where the Plaintiffs' attorney set his own fee—it was set by prior

5    agreement with sophisticated clients.  Given the importance of the Lead Plaintiff

6    in the statutory scheme adopted in 1995, this is a significant fact."  Diamond Decl.

7    ¶ 11.D.

8              **2.    The New York Funds' Selection of
                       Counsel and Negotiation of the Fee Before
9                      Appointment as Lead Plaintiffs Demonstrate
                       That the Fee is Presumptively Reasonable**

10   This action, in which Lead Plaintiffs are two of the nation's largest public

11   pension funds, is paradigmatic of the PSLRA's purpose of appointing institutions

12   with the power to control the litigation.  Throughout this litigation, the New York

13   Funds attended very seriously to their fiduciary obligations to the class.  This

14   included the manner in which they chose their counsel and negotiated their fees,

15   thereby obtaining at the commencement of this litigation a very competitive fee

16   agreement on behalf of the Class, while still selecting counsel that they thought

17   would best represent the Class' interests.

18   In August 2007, NYSCRF became aware that certain securities class action

19   complaints had been filed against Countrywide.  NYSCRF thereafter decided to

20   seek appointment as Lead Plaintiff, and sought written proposals from the 14

21   firms in its litigation pool containing analyses of potential claims against

22   Countrywide and other Defendants.  The firms in the pool, including Labaton

23   Sucharow, had each agreed to a preexisting Implementation Contract with

24   NYSCRF, which included a fee agreement setting forth the percentage fee

25

26   ─────────────────────────────────────────

27   of counsel but also to monitoring of counsel and negotiation of the fee. . . .
     [S]trict scrutiny of the fee agreement is inconsistent with the client-driven
28   litigation model established in the PSLRA."  Third Circuit Task Force Report,
     *Selection of Class Counsel*, 208 F.R.D. 340, 425 (Jan. 15, 2002).

amounts lead counsel would be permitted to apply for following a settlement or judgment in securities class action cases.  Bierman Decl., Ex. B, at ¶ 7.  Under the circumstances of this Settlement, the requested award, pursuant to the NYSCRF Implementation Contract, ordinarily would have been 8.64%.  Of the eleven proposals received, NYSCRF found Labaton Sucharow's proposal the best overall and decided to retain the firm.

The New York City Pension Funds also became aware of securities litigation against Countrywide in August 2007.  At that time, and pursuant to certain Master Agreements, it had a pool of nine law firms, including Labaton Sucharow, which it considered for securities class action cases.  *See* Seemen Decl., Ex. C, at ¶ 17.[5]  The New York City Pension Funds invited its pool members to submit case analyses and proposed fee arrangements.[6]  *Id*.  Labaton Sucharow's detailed analysis was accompanied by a fee proposal which, under the circumstances of this Settlement would have permitted a request for an award of 8.57%.  This was slightly lower than the fee reflected in the NYSCRF Implementation Contract fee grid.

New York City determined that Labaton Sucharow's analysis reflected significant insights regarding the Countrywide action and was inclined to retain the firm as Lead Counsel.  *Id*. ¶ 18.  Nonetheless, in an effort to maximize the potential recovery for the Class, New York City required Labaton Sucharow to submit a revised fee proposal with fees lower than initially proposed.  *Id*.  Labaton Sucharow then submitted a revised proposal providing that it could apply for a fee that, under the terms of this Settlement, would authorize a request of 7.59% of the

---

[5] Those firms had been selected through a formal procurement process in 2004 and 2005, and had already signed Master Agreements with the New York City Law Department.

[6] Unlike NYSCRF's Implementation Contract, the New York City Law Department's Master Agreement with Labaton Sucharow did not contain a specified fee agreement for particular cases.

1  amount recovered.  *Id.* ¶ 19.  New York City then agreed to retain Labaton

2  Sucharow based upon this revised proposal.[7]  *Id.*

3      New York City's Master Agreement also required that all expenses

4  advanced by Plaintiffs' Counsel (for which they would seek reimbursement), plus

5  all notice and administration fees and costs (anticipated here to be approximately

6  $6.6 million), be netted out from the total settlement fund before calculating

7  attorney's fees based on the agreed upon percentage.  *Id.* ¶ 21.  Here, this netting-

8  out clause saves the Class $588,000.[8]

9      After each learning that the other would seek lead plaintiff status, the New

10  York City Pension Funds and NYSCRF decided to do so jointly, with Labaton

11  Sucharow as proposed lead counsel.  NYSCRF, learning that New York City had

12  required a lower fee, decided that the lower fee should apply to its retention as

13  well.  *See id.* ¶ 20.  Thus, by virtue of an agreement with Lead Counsel that

14  predated their motion for lead plaintiff appointment, as set forth in the

15  Implementation Contract, as well as additional fee negotiations, the New York

16  Funds obtained an unusually competitive fee agreement on behalf of the Class.

17  Based on these circumstances, as well as the language and purpose of the PSLRA

18  and applicable case law, it is respectfully submitted that Lead Plaintiffs' fee

19  agreement with Lead Counsel is entitled to a presumption of reasonableness.  *See*

20  *WorldCom*, 388 F. Supp. 2d at 356; *HPL*, 366 F. Supp. 2d at 916; *see also*

21  Diamond Decl. ¶ 11.D (noting that "the percentage fee set in the State

22  _____

23  [7] As was true with respect to all of the above proposals, the applicable fee grid provides for different fees depending on the stage of the action and the amount of recovery, with fee percentages declining with greater recoveries.  The operative

24  fee grid provides that for settlements between $500 million and $1 billion, Lead Counsel may apply for a fee of $43 million plus 4% of the settlement amount in

25  excess of $500 million (*i.e,* $124 million), after netting out approved expenses and estimated notice and administration costs.  *See* Seemen Decl, Ex. C, at ¶ 19 and

26  attachment thereto.  The math is as follows: $43,000,000 + 0.04($124,000,000 - $8,080,517.87 - $6,600,000) = $47,372,779.29.  For clarity and ease of

27  administration, the requested fee is rounded down to $47,372,000.00.

      [8] $43,000,000 + 0.04(124,000,000) = $47,960,000.  $47,960,000 -

28  $47,372,000 = $588,000.

Implementation Agreement was reduced when the New York City Pension Funds joined as co-lead plaintiff" as a fact militating in favor of the reasonableness of the requested fee).

### D. Additional Pertinent Factors Demonstrate That the Requested Fee is Reasonable

The Ninth Circuit has articulated a series of factors that district courts may use to determine whether to depart upward or downward from the 25% benchmark fee. Among these factors are (1) the risk of litigation; (2) the financial burden of contingent representation carried by counsel; (3) the result achieved; and (4) customary fees for similar cases. *See Vizcaino*, 290 F.3d at 1048-50. Courts in this district have also looked to additional factors, including "the effort expended by counsel." *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1116 (C.D. Cal. 2008); *see Heritage Bond*, 2005 WL 1594403, at *6. The Ninth Circuit has stated that courts should not use these factors as a rigid checklist to weigh individually, but rather, should evaluate the totality of the circumstances. *Vizcaino*, 290 F.3d at 1048-50.

Lead Counsel submits that all of the pertinent discretionary factors strongly support the requested fee as discussed below.

### 1. Lead Counsel Has Achieved an Extraordinary Result for the Class

Courts have consistently recognized that the result achieved is an important factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *Vizcaino*, 290 F.3d at 1048, 1050 (finding district court properly considered the results obtained by counsel in awarding fee).

The $624 million Settlement has been fully funded and earning interest since September 15, 2010. If approved by the Court, the Settlement will be the 13th largest in a PSLRA case, and the second largest in a case within the Ninth

Circuit.  *See* Securities Class Action Services "Top 100 Settlements Quarterly Report," Ex. D.

Moreover, the $624 million Settlement amount constitutes a significant percentage of Plaintiffs' estimated recovery at trial:[9]

- According to Plaintiffs' damages consultant, the proposed $624 million Settlement represents 22% of the maximum $2.83 billion in damages Plaintiffs potentially could have obtained if completely successful at trial.

- A 22% recovery fits comfortably within, and is at the upper end of, the range of other large court-approved settlements.

- In a survey of 833 PSLRA class action settlements between 2002 and 2009, Cornerstone Research determined that the median recovery as a percentage of "plaintiff-style" damages was less than 3%.  *See* Ex. E at 5.

- For cases where estimated "plaintiff-style" damages were between $1 billion and $5 billion, Cornerstone also observed that the percentage recovery was in the range of 0.9% and 1.5%.  *Id.*

- Courts in this and other Circuits have cited Cornerstone's research in approving PSLRA settlements.  *See, e.g., In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007); *In re Cylink Sec. Litig.*, 274 F. Supp. 2d 1109, 1115 (N.D. Cal. 2003).

---

[9] For a more detailed discussion of the fairness of the Settlement as a function of the maximum potential recovery at trial, see Part II.A of Lead Plaintiffs' accompanying Memorandum of Points and Authorities in Support of Final Approval of Proposed Settlement and Plan of Allocation of Net Settlement Fund.

## 2. Lead Counsel's Efforts Were Effective and Efficient and Produced an Extraordinary Result

As noted above, the Court appeared to express concern during the August 2, 2010 hearing regarding the hours expended by Lead Counsel.  Aug. 2, 2010 Hearing Transcript, Ex. F, at 26:11-14.  Lead Counsel respectfully submits that it worked efficiently and effectively to secure an excellent result for the Class, particularly given the nature of the claims asserted, the defenses raised by the Defendants, and the scope of and time limitations on discovery.  Lead Counsel further refers the Court to Mr. Diamond, who notes the following in his declaration:

- ● *Lead Counsel Made a Concerted Effort to Use a Relatively Limited Number of Attorneys.*  Mr. Diamond acknowledges that clients often are concerned about "an excessive number of attorneys employed on their cases," but concludes that Lead Counsel's time records here show a "remarkable concentration of work" in that 11 attorneys accumulated a full "3/4 of Labaton's lodestar amount" allocable to those attorneys not hired for document review.  Diamond Decl. ¶ 14.  Mr. Diamond explains that this "shows that there was a concerted effort to make efficient use of the attorneys on the case." *Id.*

- ● *Lead Counsel Conducted an Efficient Review of More Than 29 Million Pages of Documents Produced.*  Mr. Diamond notes that Lead Counsel employed specific attorneys to review this large volume of documents, and that it "was not only a reasonable way to accomplish the necessary document review, but it enabled the review to be accomplished by relatively low priced lawyers, thus keeping the cost to the class as low as possible."  Diamond Decl. ¶ 15.  He further calculated that the blended billing rate for the more

than 170 attorneys hired by Lead Counsel to analyze documents produced and conduct deposition preparation was $313 per hour, "which in my experience is a low rate for attorneys working in New York City or Los Angeles, and lower than Lead Counsel associates who would otherwise have conducted the document review." *Id.*

- **The Amount of Hours Worked by Lead Counsel Was Reasonable.**  Based on his comparison of monthly hours billed to the work conducted in those months, Mr. Diamond states that "the hours spent do not seem excessive at all," noting that based on *(i)* a case that lasted 32 months before settling, and *(ii)* 57,600 hours of work by non-document review attorneys during those months, Plaintiffs' Counsel worked, on average, less than 1,800 hours per month.  Diamond Decl. ¶ 16.  Mr. Diamond declares that based on his experience, that average is "surprisingly low." *Id.*

- **The Hours Worked By Lead Counsel and its Short-Term Attorneys Closely Tracked the Ebbs and Flows of the Litigation.**  Mr. Diamond reviewed the rise and fall of hours spent by Lead Counsel on a monthly basis in order "to insure that the amount of work being done reflected the demands of the case and not some attempt to create hours wastefully."  Diamond Decl. ¶ 17.  He concludes that "[t]here was no evidence that hours were created to do unnecessary work." *Id.*

The table below supports this finding, demonstrating that Lead Counsel devoted more than two-thirds of all of its hours to the review and analysis of the

nearly 30 million pages of documents produced, and on work preparing for and taking, defending, or otherwise participating in the 81 depositions:[10]

| | Category | Hours | Percent |
|---|---|---|---|
| 1 | Investigations, Factual Research | 8,365 | 5.20% |
| 2 | Legal Research | 4,092 | 2.54% |
| 3 | Written Discovery – Propound | 1,200 | 0.75% |
| 4 | Written Discovery – Respond | 5,938 | 3.69% |
| 5 | Discovery – Depositions | 38,568 | 23.96% |
| 6 | Discovery - Document Review | 69,078 | 42.91% |
| 7 | Pleadings | 5,448 | 3.38% |
| 8 | Briefs & Motions | 6,762 | 4.20% |
| 9 | Court Appearances & Preparation | 1,717 | 1.07% |
| 10 | Settlement/Mediation | 7,370 | 4.58% |
| 11 | Class Certification | 1,562 | 0.97% |
| 12 | Experts | 2,502 | 1.55% |
| 13 | Attorney Meeting/Strategy | 3,204 | 1.99% |
| 14 | Case Management | 5,184 | 3.22% |

Bernstein Decl. ¶ 151.

Additionally, as shown in the graph below, Lead Counsel logged a large percentage of these hours (a) between May 29, 2009 and August 3, 2009, when Lead Counsel reviewed nearly half of all documents produced in the case, with the goal of completing as much of the review and analysis as possible before the beginning of fact depositions; and (b) between October 29, 2009 and March 15, 2010, when Lead Counsel itself took or otherwise participated in 43 depositions,

---

[10] The total hours logged by Lead Counsel (161,000.9) accounts for 88% of all of the hours logged by all Plaintiffs' Counsel collectively (182,710.65). *See* Master Chart of Lodestar and Expenses, Ex. L; Ex. 1 to each of Compendium Tabs 1-6 (firm fee/expense declarations).

in order to meet the January 31, 2010 deadline for Countrywide-related discovery and the March 15, 2010 deadline for auditor and underwriter-related depositions:



Bernstein Decl. ¶ 152.

The above table, reflecting the allocation of attorney time in concert with the extensive document reviews and depositions, and the above graph, showing the rise and fall of hours as these discovery demands changed, support a conclusion that Lead Counsel spent its time and deployed its resources efficiently throughout the course of this complex litigation.

- ***Lead Counsel's Billing Rates Are Reasonable.*** Mr. Diamond observes that Lead Counsel's partner billing rates ranged from $550 to $865, with an average of $734, which he declared "seem on the low side to me" in light of his knowledge that billing rates for top partners at New York and Los Angeles firms approach,

and sometimes exceed, $1,000 per hour.  Diamond Decl. ¶ 18.  He

further notes that associate and paralegal rates similarly seem to

be "on the low side" of what would be considered the going rate.

*Id.*  Finally, Mr. Diamond observes that the blended rates for all

Plaintiffs' Counsel attorneys is $403, "an extremely reasonable

rate for a New York or Los Angeles firm handling cases at this

level." *Id*.

With this summary information in mind, Lead Counsel explains in greater

detail the services and value it provided in this litigation on behalf of Lead

Plaintiffs and the Class.

**a.      Lead Counsel Filed a Detailed
Complaint and Then Defeated
Two Rounds of Motions to Dismiss**

Lead Counsel conducted a broad and detailed investigation before filing the

Consolidated Amended Complaint ("CAC").  *See* Bernstein Decl. ¶¶ 14-15.

Defendants filed six motions to dismiss the CAC, to which Lead Counsel

responded with a 149-page omnibus opposition brief and related submissions

(Dkt. No. 243).  A relatively limited number of attorneys researched and drafted

this brief.  In its December 1, 2008 Omnibus Order (Dkt. No. 296), the Court

sustained most of the allegations while dismissing others, granting leave to

replead on many of the claims it dismissed.  After Lead Plaintiffs filed their

Second Amended Complaint ("Complaint") in January 2009, Defendants

responded with eight motions to dismiss.  Lead Counsel filed a 140-page omnibus

brief.  In its April 6, 2009 Omnibus Order, the Court allowed many of the

previously dismissed claims to proceed, lifted the PSLRA stay of discovery, and

ordered the parties to propose a discovery schedule.  *See* Bernstein Decl. ¶¶ 16-21.

In full, Lead Counsel spent approximately 24,000 hours, or 15% of its total time,

before the Court issued its April 6, 2009 Omnibus Order.

### b.  In Ten Months, Lead Counsel Conducted Extensive Class and Merits Discovery, and Obtained Class Certification Over Vigorous Opposition

After the Court sustained most of the claims alleged in the SAC and lifted the stay of discovery, the successful prosecution of this Action on the merits required Lead Counsel to conduct a significant amount of discovery within ten months.  Lead Counsel reviewed and analyzed approximately 25 million pages of documents produced by Defendants and third parties between May 2009 and March 2010, and took or otherwise participated in 71 merits depositions between October 2009 and March 2010.  In addition, between May and August 2009, Lead Counsel produced over 245,000 pages of documents, plus 8.98 gigabytes of data in native format, in response to Defendants' requests for production, and took and defended four depositions of experts in connection with class certification issues. Bernstein Decl. ¶¶ 36, 41, 54, 72.  It is through experience and skill that Lead Counsel was able to successfully and efficiently handle these discovery demands with—as Mr. Diamond noted—only eleven attorneys (exclusive of short-term attorneys) handling most of the substantive work.  *See* Diamond Decl. ¶ 14.

The continuing pressures of prosecuting this action—including completing all fact discovery by March 15, 2010, discovery-related meet-and-confers and motion practice,[11] and responding to nine sets of contention interrogatories[12]—

---

[11] In order to avoid Court intervention in the numerous discovery disputes that arose throughout this litigation, Lead Counsel sought, and was successful on many occasions, to negotiate resolutions of those disputes with Defendants. Nevertheless, on occasion, Lead Plaintiffs required the assistance of the Court, and they filed successful motions to compel in which the Court ordered *(i)* Countrywide to produce allegedly privileged documents relating to a post-Class Period investigation of many of the Company-wide problems that underlie the allegations in the Complaint (Dkt. No. 648, October 20, 2009); and *(ii)* KPMG to produce post-Class Period e-mails and documents previously produced to the SEC (Dkt. No. 620, September 23, 2009).  Bernstein Decl. ¶¶ 80-81.

[12] Plaintiffs responded to contention interrogatories served by Defendants Angelo Mozilo, David Sambol, Eric Sieracki, Carlos Garcia, Drew Gissinger, Stanford Kurland, KPMG LLP, the Outside Director Defendants, and Banc of America Securities LLC.  These responses totaled over 500 pages.  Bernstein Decl. ¶ 78.

---

were demanding.  Therefore, Lead Counsel, with the consent of Lead Plaintiffs, associated with attorneys from five other firms, all of whom have extensive experience in securities class action litigation.

### c. Lead Counsel Hired Short-Term Attorneys to Analyze the Enormous Volume of Documents Produced and to Assist With Deposition Preparation

Another way that Lead Counsel efficiently handled the enormous class and merits discovery was to hire a team of short-term attorneys ("STAs").  Lead Counsel hired 119 STAs to begin the process of reviewing, analyzing and organizing the documents that were arriving by the tens-of-thousands every few days during the early summer of 2009.  Lead Plaintiffs specifically approved the hiring of STAs, subject to certain conditions with which Lead Counsel complied.[13]  All STAs received a detailed introduction to the facts, relevant law, and theories of the case, as presented by senior attorneys.[14]  Among the various tasks conducted by STAs were the analysis of documents produced by Defendants and third parties; deposition preparation, including identifying and prioritizing deposition exhibit materials; privilege and responsiveness review of Lead Plaintiff documents requested by Defendants;[15] and the review of documents and

---

[13] In accordance with the directives of Lead Plaintiffs, all STAs were admitted to practice in New York, worked under the supervision of senior Labaton Sucharow attorneys, and were billed at rates capped at $325 per hour.  These rates were well below Labaton Sucharow's comparable associate billing rates.  Bernstein Decl. ¶ 59.

[14] In addition to supervision by full-time attorneys, five "Team Leaders" were assigned to monitor, manage, and supervise the short term attorneys.  These five individuals were chosen based on leadership and legal abilities demonstrated during prior engagements with Labaton Sucharow on other complex cases.  Bernstein Decl. ¶ 61.

[15] Lead Counsel promptly produced more than 245,000 pages of Lead Plaintiffs' documents, plus 8.98 gigabytes of data, between May and August 2009.  In order to produce such a large volume of documents in a timely fashion so that Defendants could use this discovery in opposition to Lead Plaintiffs' motion for class certification, Lead Counsel had to review an even larger volume of documents and data for responsiveness and privilege.  Bernstein Decl. ¶¶ 36, 59.

deposition transcripts in connection with Lead Plaintiffs' responses to contention interrogatories that Defendants had served.  Bernstein Decl. ¶¶ 59-62.

Starting in late May 2009, as Lead Counsel received tens of millions of pages of documents to review, the number of STAs rose to 119.  In August 2009, however, after review of the first wave of 14 million pages (well in advance of the first fact depositions, anticipated to begin in October), the number of STAs fell to 58.  In order to adequately prepare for 71 depositions in only five months, Lead Counsel continued to retain approximately 50 STAs through the remainder of 2009 and into early 2010.  The use of STAs to match the ebb and flow of work supports the conclusion that Lead Counsel made efficient use of its attorneys.  *See* Bernstein Decl. ¶ 60; Diamond Decl. ¶ 17 ("I also reviewed the rise and fall of hours spent on the case by Lead counsel attorneys on a monthly basis to insure that the amount of work being done reflected the demands of the case and not some attempt to create hours wastefully. . . .  There was no evidence that hours were created to do unnecessary work"); *see also* Bierman Decl., Ex. B, at ¶ 12 ("[W]e are satisfied that the hours and resources that Lead Counsel devoted to this action were a benefit to the Class.").

### d.   Courts Have Awarded Fees in Cases Where Plaintiffs' Counsel Hired Short-Term Attorneys

Courts have approved the use of short-term attorneys in cases that, like this one, involve heavy document review and production and deposition discovery.  In *In re WorldCom, Inc. Securities Litigation*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004), the court overruled objections to the fee, stating that "[t]he extensive use of contract attorneys was justified by the need to review over ten million pages of documents and was a far more efficient way of proceeding than giving the task to more highly compensated counsel."  *Id.* at *21 n.48; *see also In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 586 F. Supp. 2d

732, 781 n.62 (S.D. Tex. 2008) (also concluding that use of short-term attorneys, and inclusion of their time in lodestar, was appropriate).

The court in *In re Tyco International, Ltd. Securities Litigation*, 535 F. Supp. 2d 249 (D.N.H. 2007) also overruled objections to that fee based on lead counsel's inclusion of STA time:

> An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney. It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar.

*Id.* at 272. Similarly, in *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400 (D. Conn. 2009), the court overruled objectors who argued that "the lodestar is inflated because contract attorneys should have been billed as an expense instead of contract attorney work being billed at the rate of $300 per hour." *Id.* at 409. Indeed, the court cited *Tyco* with approval, stating that "[c]o-Lead Counsel explained at the fairness hearing the process followed in hiring contract attorneys and the supervision given their work. This objection was rejected by the court in *Enron*, and was also rejected by the court in *Tyco*. This court finds the objection unpersuasive for substantially the same reasons." *Id.* (citations omitted).

### e.    Lead Counsel Engaged in a Series of Mediation Sessions and Ultimately Settled the Case for $624 Million

The first full mediation occurred on October 13, 2009, following an exchange of confidential mediation briefs. At this point, neither side had taken any fact depositions, and, in fact, the class certification briefing and hearing had taken place only few weeks earlier. Over the course of two weeks in late September and early October 2009, Lead Counsel *(i)* categorized and prioritized the strongest documents for the Plaintiffs' case; *(ii)* worked closely with their consulting experts to understand the accounting and mortgage lending issues most germane to the case; *(iii)* discussed strategies and theories to best present these

documents and analysis; and *(iv)* drafted a 63-page mediation brief, including 145

exhibits culled almost entirely from the documents produced by Defendants and

third parties.  These mediation sessions did not result in an accord.  *See* Bernstein

Decl. ¶ 99.

Months later, after fact discovery was virtually complete, the parties once

again agreed to mediate, this time before the Hon. A. Howard Matz, a sitting

judge of this Court, and Professor Eric D. Green, a respected private mediator.  In

the process of submitting a 144-page mediation brief encompassing the entirety of

the factual case developed through discovery,[16] Lead Counsel worked for weeks

to assess, analyze, and categorize the best documents out of the 25 million pages

produced by Defendants and third-parties.  Additionally, Lead Counsel reviewed

and analyzed thousands of pages from the transcripts of the 81 depositions taken

in the action.  Through this process, Lead Counsel identified the approximately

300 documents that ultimately made up the exhibits to the mediation brief.  At the

same time, Lead Counsel also worked with experts, conferring with them

regarding certain positions relating to accounting, mortgage lending, loss

causation, and damages, and the expert reports submitted by Defendants.[17]  In all,

Lead Counsel spent 7,370 hours, or approximately 4.58% of its total time, in

connection with mediation and negotiation sessions.  *See* Bernstein Decl. ¶¶ 104-

105, 151.

In sum, the amount of time that Plaintiffs' Counsel worked, the projects on

which it committed this time, and the efficiency with which they managed that

---

[16] In many respects, Plaintiffs' mediation brief would have formed the core of their opposition to Defendants' summary judgment briefs had the case not settled.
[17] This process was made challenging by a fire that broke out on March 13, 2010, in the basement of Lead Counsel's office building.  For two weeks, extending up to the days before the mediation session took place, all the work that went into the final mediation brief was done via remotely located servers, accessed through dedicated computer networks.  Lead Counsel worked out of two rented locations or at home during those two weeks.  *See* Bernstein Decl. ¶ 30.

time to secure an excellent result for the Class, supports the reasonableness of the hours expended.

### 3. This Action Presented Obstacles to Prevailing on the Merits

The Ninth Circuit observes that "[r]isk is a relevant circumstance," and it is therefore appropriate to apply a lodestar multiplier in cases "fraught with risk and [when] recovery was far from certain." *Vizcaino*, 290 F.3d at 1048-49 (quoting *WPPSS*, 19 F.3d at 1302). District courts within this circuit have long observed that "[t]he risk that further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees." *Omnivision*, 559 F. Supp. 2d at 1046-47.

Indeed, the same court noted that "Plaintiffs did not face an easy path if they continued to trial, *id*. at 1047, and, in a recitation of circumstances similar to those Lead Plaintiffs faced at the time they agreed to settle, explained further:

> Defendants were likely to move for summary judgment on the issues of loss causation and scienter. The parties' estimates of possible damages varied dramatically, such that if Plaintiffs prevailed on liability but Defendants prevailed on damages, the reward could have been even smaller. Even if they proceeded to trial before a jury, the outcome remained uncertain.

*Id*. Finally, the court justified the fees awarded to counsel by concluding that if the case had gone to a jury, "[t]he risk that Plaintiffs would have recovered less, if anything, also supports granting the requested fee." *Id.*; *see also* Diamond Decl. ¶ 11.C ("In my experience, courts have recognized in awarding fees that the risks taken by counsel in pursuing a complex case to a successful conclusion are a significant factor in awarding fees.").

As summarized below, Lead Plaintiffs faced notable risk with respect to loss causation and damages and Countrywide's "truth-on-the-market" defense.[18]

---

[18] A detailed discussion of litigation risk associated with the claims against all Defendants is set forth in Part II.B of Lead Plaintiffs' concurrently filed brief in support of final approval of the Settlement.

### a.   Loss Causation and Damages

Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), a plaintiff must demonstrate "a causal connection between the material misrepresentation and loss."  This Court, during the preliminary approval hearing, stated that it "certainly appreciate[s] the difficulty here from the standpoint of the Defendants and from the standpoint of the Plaintiffs as it relates to los[s] causation and damages. . . .  I think the principal uncertainty here in front of a jury would be los[s] causation and damages . . . .  You can come to virtually any conclusion that you want to about what a jury would find."  Aug. 2, 2010 Hearing Transcript, Ex. F, at 24:25-25:12.

Those risks are most clearly reflected in the divergent opinions of the parties' respective experts, which would reduce a trial to the highly unpredictable scenario where a lay jury would be tasked with weighing all manner of complex financial and statistical evidence.  Even assuming a jury found Defendants liable (an uncertain outcome), there is no guarantee it would award damages per share resulting in an aggregate $624 million recovery.

### b.   Truth-on-the-Market Defense

Lead Plaintiffs' allegations hinged largely on Countrywide's failure to reveal the complete truth concerning the nature and expansion of its loan underwriting guidelines, including runaway "exceptions" to those guidelines, and the extent of risk associated with the Company's loans sold into the secondary market or held for investment.  Among Countrywide's primary defenses was the assertion that it disclosed all material facts in its SEC filings, including mortgage-backed securities ("MBS") prospectuses; at Countrywide-sponsored investor forums that securities analysts and investors attended; at quarterly investor conference calls; and in public media, including the financial press.

Lead Plaintiffs believe they would have prevailed on this issue at summary judgment, based on presentation of evidence demonstrating the lack of completeness in Countrywide's alleged public disclosure of these risks. Nonetheless there remained a significant risk, based upon the sheer number of public statements Defendants made as to the risks Countrywide faced, that a jury would find that Countrywide sufficiently disclosed enough of the truth regarding its loans and lending practices, and therefore made no material misstatements. These risks support the reasonableness of the requested fee.

### 4. The Contingent Nature of the Fee and the Financial Burden Carried By Lead Counsel

Determination of a reasonable fee should also include consideration of the contingent nature of counsel's compensation.  As the Ninth Circuit noted in *WPPSS*:

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases.  Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

19 F.3d at 1299 (citations omitted).  Rewarding counsel in this manner also "provides the 'necessary incentive' for attorneys to bring actions to protect individual rights and to enforce public policies."  *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1008 (9th Cir. 2002) (citing *Vizcaino*, 290 F.3d at 1051; *WPPSS*, 19 F.3d at 1299).

Thus, courts have consistently recognized that the contingent-fee risk of receiving little or no recovery is a major factor in considering an award of attorney's fees.  This risk of non-recovery is neither theoretical nor academic; it is quite real.  Recently, in fact, in *In re JDS Uniphase Corp. Securities Litigation*, No. C-02-1486 CW (N.D. Cal.), after years of contingent representation, including

overcoming defendants' summary judgment motions, a jury returned a defendants' verdict, with the result that Lead Counsel here received no compensation for years of work and the expenditure of millions of dollars of unreimbursed expenses and attorney time.  *See also In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 WL 238298, at *1 (N.D. Cal. Sept. 6, 1991) (overturning plaintiff's jury verdict and entering judgment notwithstanding the verdict because "no reasonable jury could have found defendants . . . liable for directly violating Rule 10b-5" based on lack of "substantial evidence that . . . defendants made false or misleading statements knowing that the statements were false and misleading or with reckless disregard that the statements were false or misleading").

Plaintiffs' Counsel have devoted more than 182,000 hours to litigating and settling this action, representing more than $69 million in combined lodestar, and have incurred more than $8 million in expenses in the course of securing this result for the Class, knowing that no fee would be paid if their efforts were unsuccessful.  *See* Master Lodestar and Expenses Chart, Bernstein Decl. Ex. K. This further supports the reasonableness of the requested fee.

### 5.    A 7.59% Fee Is at the Lowest End of the Range of Fees Awarded in Other Complex Actions

In requesting a fee of 7.59% of the Settlement Fund, Lead Counsel seeks a fee award lower than those awarded in comparable cases.  The table below, prepared by Lead Counsel based on publicly available information, compares the percentage fee requested in this case to the percentage fees awarded in the 14 other PSLRA settlements between $400 million and $800 million, with this Settlement near the midpoint (*see* SCAS Report, Ex. D):

| Case | Court | Docket No. | Fee Award | Total Settlement Amount (millions) |
|---|---|---|---|---|
| *In re Initial Public Offering Sec. Litig.* | S.D.N.Y. | 21-MC-0092 | **29.02%** | $586.0 |
| *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.* | S.D.N.Y. | 03-MD-1529 | **21.40%** | $460.0 |
| *Ohio Pub. Employees Ret. Sys. v. Freddie Mac* | S.D.N.Y. | 03-CV-4261 | **20.00%** | $410.0 |
| *In re Cardinal Health, Inc. Sec. Litig.* | S.D. Ohio | 04-CV-0575 | **18.00%** | $600.0 |
| *In re BankAmerica Corp. Sec. Litig.* | E.D. Mo. | 99-MD-1264 | **18.00%** | $490.0 |
| *In re Lucent Techs., Inc. Sec. Litig.* | D.N.J. | 00-CV-0621 | **17.00%** | $667.0 |
| *In re Global Crossing, Ltd. Sec. Litig.* | S.D.N.Y. | 02-CV-0910 | **16.18%** | $447.8 |
| *Carlson v. Xerox Corp.* | D. Conn. | 00-CV-1621 | **16.00%** | $750.0 |
| *In re Qwest Commc'ns Int'l Sec. Litig.* | D. Colo. | 01-CV-1451 | **15.00%** | $445.0 |
| *In re Marsh & McLennan Sec. Litig.* | S.D.N.Y. | 04-CV-8144 | **13.50%** | $400.0 |
| *In re Raytheon Co. Sec. Litig.* | D. Mass. | 99-CV-12142 | **9.00%** | $460.0 |
| *In re Dynegy Inc. Sec. Litig.* | S.D. Tex. | 02-CV-1571 | **8.73%** | $474.1 |
| *In re Waste Mgmt., Inc. Sec. Litig.* | S.D. Tex. | 99-CV-2183 | **7.93%** | $457.0 |
| *In re Merrill Lynch & Co. Sec., Deriv. & ERISA Litig.* | S.D.N.Y. | 07-CV-9633 | **7.82%** | $475.0 |
| ***In re Countrywide Financial Corp. Securities Litigation*** | ***C.D. Cal.*** | ***CV 07-05295*** | ***7.59%*** | ***$624.0*** |

The fees in these cases average 15.54%, and range from 7.82% (out of a $475 million settlement fund) to 29.02% (out of a $586 million settlement fund). If awarded, the 7.59% fee requested here would be the lowest percentage fee awarded in any PSLRA settlement in the $400-$800 million range, and less than half of the average in percentage terms. Bernstein Decl. ¶¶ 153-154.

Empirical studies of attorney's fees as a percentage of the common fund also demonstrate the reasonableness of the requested fee. Theodore Eisenberg and

Geoffrey P. Miller published a report that, among other things, compiled and analyzed fee percentages organized into groupings based on the size of the recovery.  *See* Eisenberg & Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008,* 7 J. EMPIRICAL LEGAL STUD. 248 (2010) (Ex. L).  As noted by Eisenberg and Miller, for class action settlements of over $175 million, the average percentage fee was 12.0%, with a median of 10.2%.  *Id.* at 265.  The percentage fee requested here is well below those numbers.[19]  Mr. Diamond also cites this study in opining that a "[c]omparison of the percentage fee sought here to the fees awarded in other class action cases supports the position that the percentage sought here is reasonable."  Diamond Decl. ¶ 11.F (citing Eisenberg & Miller); *see also id.* (observing that 7.59% fee is significantly lower than cases observed in study of settlements between $500 million and $1 billion, which awarded average fee of 12.9%) (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, Vanderbilt Law School Law & Economics Paper 10-06 (July 2010 draft)).

### E.    The Lodestar Cross-Check Confirms That the Requested Fee Is Reasonable

The Ninth Circuit approves but does not mandate the consideration of counsel's lodestar as a cross-check against the reasonableness of a proposed fee. *See Vizcaino*, 290 F.3d at 1050 ("The lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award.").  Courts in this Circuit frequently award attorneys in common fund cases a multiple of their lodestar, rewarding them "for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning

---

[19] Courts have looked with approval to the Eisenberg and Miller studies.  *See*, *e.g.*, *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (noting mean percentage fee for settlements within given range); *In re Educational Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 630 (E.D. La. 2006) (relying on Eisenberg and Miller to compute a "benchmark" percentage).

contingency cases." *Id.* at 1051 (also affirming a fee that yielded a multiple of 3.65, holding that district court correctly considered the range of multiples of 1-4 normally applied in common fund cases); *see also Carter v. Anderson Merchandisers, LP*, No. EDCV 08-0025-VAP (OPx), 2010 WL 1946757, at *2 (C.D. Cal. May 11, 2010) (lodestar multiplier of 1.14 was on low end for common fund cases and confirmed reasonableness of requested fee).

Here, the combined lodestar of all Plaintiffs' Counsel, submitted in the six firm declarations in the accompanying Compendium and summarized in the Master Chart annexed to the Bernstein Declaration as Exhibit K, is $69,190,643.25, representing 182,710.65 hours logged by attorneys, paralegals and other professional and paraprofessional staff.  Lead Plaintiffs, after reviewing Plaintiffs' Counsel's periodic time records, have stated that the number of attorneys used to staff this action were reasonable and that the hours and resources Plaintiffs' Counsel devoted to this action were reasonable and necessary, and benefited the Class.  *See* Bierman Decl., Ex. B, at ¶ 12; Seemen Decl., Ex. C, at ¶ 32.  Mr. Diamond, after reviewing the same records, has also expressed the view that the hours expended by counsel were reasonable and necessary for the effective prosecution of this action.  *See* Diamond Decl. ¶ 17.

When cross-checked against the $47,372,000 fee requested, the lodestar yields a negative "multiplier" of 0.68.  Put another way, awarding the requested fee will give the Class a significant discount of 32% off Plaintiffs' Counsel's usual billing rates.  *See also* Bierman Decl., Ex. B, at ¶ 8 (noting that "Lead Counsel is seeking a fee that is substantially less than its lodestar").  The cross-check thus confirms that the requested 7.59% fee is reasonable.  *See In re Quintus Sec. Litig.*, No. C 00-4263 VRW, 2006 WL 3507936, at *4 (N.D. Cal. Dec. 5, 2006) (0.414 multiplier supported reasonableness of fee because "class members obtained a significant discount on market attorney rates"); *Young v. Polo Retail,*

*LLC*, No. C 02-4546 VRW, 2007 WL 951821, at *8 (N.D. Cal. Mar. 28, 2007) (multiplier of 0.56 "suggest[ed] that, despite exceeding the 25% benchmark used by some courts, the fees sought [were] reasonable based on the time and effort expended by plaintiffs' counsel").  Lead Counsel respectfully submits that the requested fee should be awarded.

## II.  THE EXPENSES FOR WHICH LEAD COUNSEL SEEKS REIMBURSEMENT WERE REASONABLY AND NECESSARILY INCURRED BY PLAINTIFFS' COUNSEL

Lead Counsel also respectfully seeks reimbursement of $8,080,517.87 in expenses paid and incurred by Plaintiffs' Counsel to date in connection with the prosecution and settlement of this action.  In determining whether counsel's expenses are compensable in a common fund case, courts look to whether the particular costs are of the type typically billed by attorneys to paying clients in the marketplace.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994); *see also In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) ("[L]aw firms are not eleemosynary institutions, and lawyers whose efforts succeed in creating a common fund are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax.").  Here, the expenses sought by Plaintiffs' Counsel are of—and, owing to Lead Plaintiffs' close oversight, limited to—the type the are routinely charged to hourly paying clients, and therefore should be reimbursed out of the common fund.

The declarations of Lead Counsel and each of Plaintiffs' Counsel, Tabs 1-6 in the Compendium, include itemized schedules of the expenses incurred.  The individual Declaration of Joel H. Bernstein, Tab 1, also includes a report of the expenses paid and incurred by the case-specific Litigation Fund maintained and administered by Lead Counsel (as well as Labaton Sucharow's "internal" disbursements), together with a detailed explanation of the sources and accounting

for the $8.08 million total expense request.  *See id.* ¶¶ 9-11, 17-18.  A Master Chart of the total expenses for each of Plaintiffs' Counsel is Exhibit K to the omnibus Bernstein Declaration.

The New York Funds carefully audited Plaintiffs' Counsel's expenses during the pendency of this action, and with particular scrutiny as this fee and expense petition was being prepared.  Having reviewed the summary reports and back-up documentation, they have stated that the expenses for which Lead Counsel seeks reimbursement are reasonable and were necessarily incurred in connection with the action.  *See* Bierman Decl., Ex. B, at ¶ 19 ("After reviewing the periodic expense reports and the back-up documentation provided by Counsel, we concluded that the litigation expenses requested for reimbursement are reasonable, as they represent the necessary costs and expenses for the prosecution of this securities fraud case, but are capped at the rates set in the Implementation Contract."); Seemen Decl., Ex. C, at ¶ 33 ("Lead Counsel's and its co-counsel's requested expenses are reasonable for reimbursement.").  Mr. Diamond has expressed the same view.  *See* Diamond Decl. ¶ 21 ("[T]he expense amount is clearly reasonable in my opinion.").

The New York Funds did not simply sign-off on all of counsel's expenses in conducting their audits.  Lead Counsel's Implementation Contract with NYSCRF, among other provisions, limited expenses for hotels and out-of-town meals to the rates applicable to government employees in travel status, and limited reimbursement for all airfare to the cost of a coach-class ticket.  *See* Bierman Decl., Ex. B, at ¶ 9.  Plaintiffs' Counsel's travel-related expenses, which are not insubstantial given the amount of transcontinental travel that was necessary here, are compliant with these restrictions.  *See also In Immune Response Sec. Litig.*,

497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) ("reimbursement for travel expenses . . . is within the broad discretion of the Court") (citation omitted).[20]

Moreover, in auditing Lead Counsel's expenses, NYSCRF disallowed $108,837.80 in local taxi transportation (which was incurred at night and on weekends, or to and from local airports); $48,311.73 for local meals (which was also incurred at night and on weekends, and had been limited to amounts chargeable by government employees); and $1,540.55 for reference books and seminars. *See* Bierman Decl., Ex. B, at ¶ 11; *see also* Bernstein Firm Fee/Expense Decl., Compendium Tab 1, at ¶¶ 14-15.  Other Plaintiffs' Counsel were accordingly barred from seeking reimbursement for these expense categories.

As reflected in the individual Declaration of Joel H. Bernstein, Compendium Tab 1, the vast majority (82%) of the expenses requested pertain to consulting and testifying experts ($4,939,243.07) and electronic document hosting and management ($1,687,065.81).  Aside from these significant amounts, in fact, the expenses for which Lead Counsel seeks reimbursement total $1,454,208.99, which is 3% of the requested fee.  Mr. Diamond views this, based on his experience, as a "very low ratio."  Diamond Decl. ¶ 21.

Lead Plaintiffs pre-approved each consulting and testifying expert, including his or her rates, that Lead Counsel engaged in this action.  *See* Bierman Decl., Ex. B, at ¶¶ 3, 6; Seemen Decl., Ex. C, at ¶ 22.  These experts include Richard K. Green, Ph.D. of the University of Southern California, Plaintiffs'

---

[20] The PSLRA authorizes an "award of reasonable costs and expenses . . . directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. § 78u 4(a)(4).  Rather than present a separate application by Lead Plaintiffs, Lead Counsel's expense request includes $15,900.16 incurred by NYSCRF and the New York City Pension Funds in connection with their attendance at three hearings in this Court, the jury focus exercise in September 2009, and the March 31-April 2 mediation.  Lead Counsel's expense request also includes $11,439.93 relating to attorney's fees and expenses paid by NYSCRF to outside counsel who represented former members of its advisory boards whom Defendant Mozilo served with document and deposition subpoenas.  *See* Bernstein Firm Fee/Expense Decl., Compendium Tab 1, at ¶¶ 13-14, 27.  Lead Counsel has reimbursed the New York Funds for these costs.

1 testifying expert witness on mortgage banking and lending practices issues

2 (supported by FI Consulting, Inc.); D. Paul Regan, CPA of Hemming Morse, Inc.,

3 Plaintiffs' testifying expert witness on accounting and auditing issues; Gregg A.

4 Jarrell, Ph.D. of the University of Rochester, Plaintiffs' testifying expert witness

5 on market efficiency, loss causation and damages issues (supported by Forensic

6 Economics, Inc.); H. Nejat Seyhun, Ph.D. of the University of Michigan, who

7 conducted insider trading analyses for the CAC; Anthony Saunders, Ph.D. and

8 Linda Allen, Ph.D. of New York University, who consulted on issues of

9 macroeconomic loss causation; Lucian A. Bebchuk, Ph.D. of Harvard Law

10 School, who provided consulting services on issues of corporate governance and

11 insider trading; Westwood Capital Advisors, LLC, which provided consulting

12 services with respect to securities underwriting and due diligence issues; and two

13 forensic accountants who consulted with Lead Plaintiffs with respect to the

14 accounting allegations in the CAC.

15      The professional fees and costs charged by these experts, and the work

16 performed, are supported by the declarations found at Tabs 7, 9-13 and 15-18 in

17 the Compendium.  A brief discussion of each expert and his, her or its role in the

18 litigation is also found in paragraphs 166, 168-172 and 174-177 of the omnibus

19 Bernstein Declaration.  Lead Counsel submits that the multiple reports and

20 affidavits submitted by the testifying experts, the deposition testimony given by

21 Professor Jarrell, and the substantial advice and analysis of the consulting experts,

22 were crucial at various times during the course of the litigation and contributed

23 substantially to Lead Plaintiffs' obtaining the $624 million Settlement.

24      Further, Lead Counsel respectfully seeks reimbursement of the

25 $1,687,065.81 charged by Merrill Communications LLC in connection with

26 electronic document hosting.  With Lead Plaintiffs' approval, Lead Counsel

27 contracted with Merrill Corporation to host Lextranet, a remote-access platform

28

that allowed users to view every document produced in this litigation on their own computers.  These users could also categorize, label, and search the documents with relative ease.  With nearly 30 million pages of documents produced, it would not have been possible to adequately analyze and categorize them within the time allotted for discovery without using such a service.  In an effort to hold down costs, Lead Counsel aggressively negotiated with Merrill with respect to the costs of these and other critical litigation support services, most importantly court reporting services.  Merrill agreed to waive the fees it would otherwise have charged Lead Counsel for the stenographic recording of depositions (a considerable sum given the 58 depositions Plaintiffs took in this case), and provided free use of Merrill facilities in Los Angeles and elsewhere for depositions and other off-site meetings.  *See* Bernstein Decl. ¶¶ 57, 167; Declaration of Richard Vestuto of Merrill, Compendium Tab 8.

Finally, Lead Counsel respectfully seeks reimbursement of the $225,756.63 charged by Cognition Technologies, Inc.  Cognition provided a linguistic and semantic search tool that connected the jargon and unfamiliar vocabulary in Defendants' documents to more common words, thereby facilitating faster and more effective searches.  These technologies enabled Lead Counsel to conduct targeted searches for relevant information and to efficiently prepare the best evidence for depositions and trial.  *See* Bernstein Decl. ¶¶ 58, 173; Declaration of Kathleen Dahlgren of Cognition, Compendium Tab 14.

In sum, Lead Counsel respectfully submits that the $8.08 million in expenses for which Plaintiffs' Counsel seeks reimbursement are reasonable under the circumstances and typical of the types and amounts of costs incurred in large and complex securities cases.  Lead Counsel respectfully requests that the Court grant reimbursement of these expenses.

## <u>Conclusion</u>

For the foregoing reasons, Lead Counsel respectfully requests an award of attorney's fees in the amount of $47,372,000.00, or approximately 7.59% of the $624 million Settlement Amount, with interest; and reimbursement of expenses in the amount of $8,080,517.87, with interest on the amount of expenses actually paid by Plaintiffs' Counsel as of September 15, 2010.

A proposed Order is submitted herewith.


Dated:  October 11, 2010                  Respectfully submitted,

                                          LABATON SUCHAROW LLP

                          By:   */s/ Joel H. Bernstein*
                                JOEL H. BERNSTEIN
                                JONATHAN M. PLASSE
                                IRA A. SCHOCHET
                                DAVID J. GOLDSMITH
                                MICHAEL H. ROGERS
                                JOSHUA L. CROWELL

                                *Lead Counsel for Lead*
                                *Plaintiffs New York Funds*

                                KREINDLER & KREINDLER LLP
                                GRETCHEN M. NELSON (#112566)
                                *gnelson@kreindler.com*
                                707 Wilshire Boulevard, Suite 4100
                                Los Angeles, California  90017
                                Telephone:  (213) 622-6469
                                Facsimile:  (213) 622-6019

                                HENNIGAN, BENNETT
                                 & DORMAN LLP
                                J. MICHAEL HENNIGAN (#59591)
                                *hennigan@hbdlawyers.com*
                                KIRK D. DILLMAN (#110486)
                                *dillmank@hbdlawyers.com*
                                MICHAEL SWARTZ (#163590)
                                *swartzm@hbdlawyers.com*
                                865 South Figueroa Street, Suite 2900
                                Los Angeles, California  90017
                                Telephone: (213) 694-1200
                                Facsimile:  (213) 694-1234

                                *Liaison Counsel for Lead*
                                *Plaintiffs New York Funds*

1
2
3
4
5

KAPLAN FOX & KILSHEIMER LLP
JOEL B. STRAUSS
*jstrauss@kaplanfox.com*
JEFFREY P. CAMPISI
*jcampisi@kaplanfox.com*
850 Third Avenue
New York, New York  10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

6

*Attorneys for Plaintiff Barry Brahn*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28