LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
*jbernstein@labaton.com*
JONATHAN M. PLASSE
*jplasse@labaton.com*
IRA A. SCHOCHET
*ischochet@labaton.com*
DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
MICHAEL H. ROGERS
*mrogers@labaton.com*
JOSHUA L. CROWELL
*jcrowell@labaton.com*
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead Plaintiffs New York Funds*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions | Lead Case No.<br>CV 07-05295 MRP (MANx)<br><br>**DECLARATION OF MICHAEL H. DIAMOND IN SUPPORT OF LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES**<br><br>Date: November 15, 2010<br>Time: 1:00 a.m.<br>Courtroom:  12<br>Judge:  Hon. Mariana R. Pfaelzer |

I, MICHAEL H. DIAMOND, hereby declare as follows:

1. I am an attorney admitted to the practice of law in the State of California and before this Court. I submit this declaration in support of the application by Labaton Sucharow LLP ("Lead Counsel"), Lead Plaintiffs' Counsel in the above entitled matter, for an award of attorneys' fees. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I have been retained by Lead Counsel to present my opinion as to the reasonableness of the fees sought in its application. For the reasons set forth in the discussion below, it is my opinion that the fees and expenses sought clearly meet the standard for reasonable fees and expenses.

## Qualifications

3. A copy of my resume is attached as Exhibit A. I was admitted to the New York Bar in 1971, the California Bar in 1984 and practiced law continuously until my retirement in November 2007. During that time, I specialized in securities litigation. I defended multiple corporations and their officers and directors in both major shareholder class action cases and derivative actions involving issues of disclosure and breach of fiduciary duty. Over the course of my career, I have litigated against many of the leading class action attorneys nationwide and, as a result, I negotiated multiple settlements, which included negotiating reasonable attorneys' fees.

4. From 1984 to 1994, I was the Managing Partner and Head of Litigation for the Los Angeles office of the law firm of Skadden, Arps, Slate, Meagher and Flom, LLP ("Skadden"). From 1992 to 1994, when I left Skadden, I was in charge of the entire firm's litigation related disciplines, an area that included more than 500 lawyers. From 2000 to 2007, I served as the head of the Los Angeles litigation group for the law firm of Milbank, Tweed, Hadley & McCloy, LLP ("Milbank"). As a result of these management responsibilities, in

addition to my own practice history, I have extensive experience in attorney staffing and billing practices in large complex cases.

5. I also served from 1994 to 1997 as Executive Vice President and General Counsel for New World Communications, Inc., a publicly traded company, where I worked closely with outside counsel in major business cases and transactions. This experience adds to my ability to evaluate counsel's conduct from a client's point of view.

6. My experience as a securities class action litigator at Skadden and Milbank, as a manager of litigators at both of those firms and as General Counsel at New World Communications qualifies me as an expert in evaluating attorney fees and the conduct of lawyers in large complex cases. Therefore, I feel qualified to opine on the reasonableness of Lead Counsel's attorneys' fees and expenses in its representation of Lead Plaintiffs in this matter. I am being compensated for my services in this matter as a rate of $750 per hour.

**Materials Relied Upon**

7. In the course of my research as part of my engagement, I have reviewed the following documents.

    A. The May 6, 2004 Implementation Contract and Amendments between the Comptroller of the State of New York in his capacity as sole trustee of the Common Retirement Fund and Administrative Head of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System and Lead Counsel (the 'State Implementation Agreement");

    B. The June 16, 2006 Master Agreement between the City of New York Law Department, acting on behalf of the New York City Pension Funds and Retirement Systems and Lead Counsel (the "City Agreement");

C. Correspondence from Lead Counsel to the City of New York Law department in October, 2007 relating to legal fees;

D. Time and expense reports supplied by Lead Counsel to Lead Plaintiffs from September 2007 to (i) August 2010 (regarding time reports) and (ii) September 2010 (expense reports);

E. Narrative reports supplied by Lead Counsel to the Lead Plaintiffs describing the work performed on a monthly basis;

F. Agendas of meetings between Lead Counsel and representatives of the Lead Plaintiffs;

G. A memorandum dated May 18, 2009 from Lead Counsel to the Lead Plaintiffs discussing billing for attorneys involved in document review;

H. The July 1, 2009 deposition transcript of Maurice Peaslee, associate counsel in charge of securities litigation for the office of the New York State Comptroller;

I. The July 2, 2009 deposition transcript of Karen J. Seemen , assistant corporation counsel in the Pensions Divisions of the City of New York Law Department;

J. Correspondence relating to expenses;

K. The Second Consolidated Amended Complaint in this action;

L. The Pleadings submitted to the Court is support of the Settlement of this action;

M. The Court docket in this action; and

N. The pleadings and documents submitted in support of the fee application.

8. In addition to reviewing the documents discussed in Paragraph 7, supra, I had numerous discussions with attorneys at Lead Counsel regarding the

issues in the case and the extent of the work undertaken in connection with this matter.

9. I also reviewed certain statistical reports surveying class action settlements and legal fee awards:

A. Brian T. Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," Vanderbilt Law School Law & Economics Paper 10-06 (July 2010 draft) (the 'Vanderbilt Study"), a copy of which is attached hereto as Exhibit B.

B. Eisenberg & Miller, "Attorney Fees and Expenses in Class Action Settlements: 1993-2008," 7 Journal of Empirical Studies, Issues 2, 248-281 (June 2010) ("Eisenberg & Miller"), a copy of which is attached hereto as Exhibit C.

C. Logan, *et al.*, "Attorney Fee Awards in Common Fund Class Actions", 24 Class Action Reports 167 -234 (2003) ("Logan"), a copy of which is attached hereto as Exhibit D.

## **The Fee Application**

10. The Fee application seeks an award of $47.372 million. This is 7.59% of the $624 million settlement amount. It also represents less than 80% of the total time charges (the lodestar) recorded by Lead counsel alone. I have not been requested as part of my engagement to opine as to the fairness of the settlement amount, but I would note that the amount was reached following years of exhaustive litigation and mediation by the Honorable A. Howard Matz, an experienced Federal Judge appointed by this Court. In addition, the amount has been preliminarily found to be fair by the Court after submission of voluminous papers in support, and no fees will be awarded until a final finding of fairness is made. Therefore, assuming the settlement achieved through the efforts of Lead Counsel and its associated counsel is found to be fair, the fee sought, while obviously a significant sum, seems clearly reasonable viewed either as a

percentage of the settlement achieved or as a reflection of the work performed on the case.

## The Percentage Method

11. The most commonly used method to determine legal fees in class action cases is to base the award on a percentage of the settlement achieved. As has been reported by numerous commentators, including those who authored the studies listed in paragraph 9, supra, this method is by far the one most uses by Courts considering attorney fee awards in class actions. The Eisenberg and Miller study points out that since 1995 the percentage method has been the one overwhelmingly used in securities class actions. The percentage sought here, 7.59%, is in my view a low percentage in this kind of case and is clearly reasonable. This is supported by several factors:

    A.    The accepted "standard" according to many cases in the Ninth Circuit is 25% of the settlement amount. While obviously this standard is subject to and has been departed from in many decisions, the fact remains that the percentage sought here is less than 1/3 of that amount.

    B.    In my experience, it is unusual for a Lead Counsel in a securities class action to seek a fee below 15% of the settlement achieved, yet here the fee sought is barely ½ of that percentage.

    C.    Lead Counsel in this case did significant work on the possible claim against Countrywide and the various defendants prior to being retained by the Lead Plaintiffs. This work consisted of interviewing numerous witnesses, reviewing documents and even drafting and filing a preliminary complaint, all without any assurance that it would be retained as counsel by the Lead Plaintiffs. There was also a risk that Lead Counsel's clients would not be chosen lead plaintiff, and indeed others tried to claim that designation in hard

fought motion practice.  Finally, it was not at all clear that the case would lead to a successful result – the defendants raised significant defenses that could have upset any recovery. (*See* discussion of risk in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Final Approval of Proposed Settlement and Plan of Allocation of Net Settlement Fund, at II.B.)  In my experience, courts have recognized in awarding fees that the risks taken by counsel in pursuing a complex case to a successful conclusion are a significant factor in awarding fees.  Indeed, Eisenberg and Miller (page 251) noted a "significant association between fee level . . . and risk."

   D. The fee percentage sought here was set by agreement with the Lead Plaintiffs, sophisticated plaintiffs who were cognizant of their fiduciary obligations to the class they represent.  Indeed, the percentage fee set in the State Implementation Agreement was reduced when the New York City Pension funds joined as co-lead plaintiff.  This is not a case where the Plaintiffs' attorney set his own fee – it was set by prior agreement with sophisticated clients.  Given the importance of the Lead Plaintiff in the statutory scheme adopted in 1995, this is a significant fact.

   E. This is clearly not a case where a strike suit lawyer seeks a windfall fee after forcing a settlement without doing real substantive work. From the beginning groundwork mentioned in C above, and through 3 years of intense legal work, as described in more detail in the papers filed in support of this application, Lead Counsel and its associated firms took exactly the opposite approach, putting in extraordinary work on the case and consulting on a regular basis with their clients.  This businesslike conduct of the litigation stands in

sharp contrast to the abusive behavior which led to the calls for class action reform.

  F. Comparison of the percentage fee sought here to the fees awarded in other class action cases supports the position that the percentage sought here is reasonable. Using figures from the Vanderbilt Study, which purports to analyze all Federal Class action settlements in 2006 and 2007, the mean percentage fee awarded in 2006-7 in 233 securities class action settlements was 24.7%, and the median was 25%, three times the percentage sought here. The mean and median percentage awards for all class action settlements (not just securities cases) in the Ninth Circuit (111 cases) were 23.9% and 25%. The author of the Vanderbilt Study points out that as settlements get larger, the percentages go down, but the percentage sough here compares favorably even at the highest level. Thus the 2 cases he found in the $500 million to $1 billion range awarded a fee averaging 12.9%, more than 50% higher than the fee sought here. Indeed it is instructive that in the largest settlement, the Enron cases, where the settlement amount was 10 times what it is in this case, the legal fees awarded equaled 9.5% of the $7 billion settlement. The other studies I reviewed presented similar results. Thus Logan found that from 1993 to 2003 the mean percentage fee recovery in 277 securities cases was 18.9%. Eisenberg and Miller report that from 1993 to 2008 in cases where the settlement exceeded $175.5 million, the mean percentage fee recovery was 12%.

  G. The amount arrived at by using the percentage method is often tested for reasonableness by using what is called a "lodestar crosscheck", that is by checking that the fee awarded does not unreasonably exceed the amount that the lawyers would have earned

had they been compensated for their work on a time basis.  In securities cases it is normal for the percentage fee awarded to result in a multiple of the lodestar amount.  In the Vanderbilt Study the average multiple for all types of class actions, including types such as consumer and debt collection cases which do not require the same sophistication and intensive discovery and legal work of a case such as this, was still 0.98.  Eisenberg found the mean multiple in securities cases to be 1.75, and Logan found the average multiple for 877 securities cases from 1973 to 2003 was 4.29.  Indeed, in this case Lead counsel agreed with the Law Department of New York City that its fee in the case would be limited to 3 times its lodestar amount, demonstrating the view of a sophisticated client that a multiple of 3 was a normal cap.  Yet in fact, the fee sought here is a multiple of less than 0.8 of the Labaton Firm's lodestar alone, and less than 0.7 of the total lodestar of all counsel who worked on the Plaintiffs' side.  Yet, as discussed below, 100% of the lodestar would be a reasonable reflection of what time charges should be in a case of this magnitude litigated as energetically as it was by all parties.  In the Enron settlement mentioned above, the fee awarded to the Plaintiffs' attorneys was 5.2 times the lodestar.  For Counsel to receive less than 70% of the total lodestar under the percentage method is a certain indication that the fee arrived at is reasonable.

In sum, the percentage method yields a more than reasonable fee based on a number of factors intrinsic to this case as well as in comparison to other class action fees.

### The Lodestar

12. This was a large, complex case. As described in greater detail in the papers submitted in support of this application it required a vast amount of legal work:

    a. The case involved 44 defendants.

    b. There were five motions to dismiss the First Amended Complaint.

    c. The Second Amended Complaint relied on statements from 14 witnesses to support its claims.

    d. There were eight motions to dismiss the Second Amended Complaint.

    e. There was a bitterly fought battle over class certification.

    f. More than 29 million documents were produced, reviewed, and analyzed during discovery.

    g. There were more than 80 depositions, many of which resulted in formal discovery disputes requiring court intervention.

    h. There were myriad court hearings.

    i. The case involved the selection, retention and utilization of three testifying and six consulting experts.

    j. There were five settlement mediation sessions.

13. There are several ways clients analyze legal fees to determine whether they are reasonable. Indeed, it is important to note here that in fact there were 2 active and sophisticated clients (*see, e.g.*, Bierman declaration submitted in support of this application, Par. 5) who were overseeing the work being done. As Mr. Bierman points out (Par. 3), their activities included "frequent discussions with Lead Counsel regarding overall strategies for the case; reviewing, commenting on and *approving* the filing of pleadings, briefs and other submissions; testifying at

depositions; reviewing briefs and other submissions by defendants; overseeing and approving, under terms and conditions NYSCRF believed to be appropriate, the retention of certain experts and consultants; and having representatives of NYSCRF appear in Court when such appearances would be appropriate and beneficial to the class." This was not a case where the lawyers had the uncontrolled opportunity to create unnecessary work.

14. In my experience on large cases such as this, clients often look at the staffing to see if there has been use of an excessive number of attorneys employed on their cases. Obviously, in a case such as this where deadlines were short and the motions and discovery required extensive work, it would be necessary to pull in many attorneys to meet deadlines. Yet the Lead Counsel time records show a remarkable concentration of work – 3/4 of Labaton's lodestar amount attributable to attorneys who were not specially hired and utilized for document review was accumulated by only 11 attorneys. This shows that there was a concerted effort to make efficient use of the attorneys on the case. The client agrees: "NYSCRF found the number of attorneys that Lead Counsel used to staff this litigation to be reasonable." (Bierman declaration, Par. 12).

15. In getting to the bottom of the practices attacked in the Second Amended Complaint, Lead Counsel sought extensive document discovery. Document discovery in a case such as this, where over 29 million documents were produced, is a huge undertaking. A conscientious attorney must be sure all those documents are reviewed by attorneys who will understand and be able to cull out of that huge universe of materials the documents that will help prove the claims made. I have overseen document review in cases with a fraction of the documents produced here, and I still found myself directing an army of lawyers working with database specialist and other professionals who specialize in document review. Lead Counsel thus chose, after consultation with Lead Plaintiffs, to employ specific lawyers to accomplish this task. These attorneys were not per diem

attorneys or attorneys sent from a temp agency. They were hired as staff and trained to do the document review thoroughly and properly. Lead Counsel also consulted an expert on ethics to ascertain what was the proper way to charge for this work, and was advised that the work should be charged as lawyer time and made part of the lodestar. Over ½ of the Lead Counsel lodestar amount arises from time charges by these attorneys. This was not only a reasonable way to accomplish the necessary document review, but it enabled the review to be accomplished by relatively low priced lawyers, thus keeping the cost to the class as low as possible. In the end, Lead Counsel employed over 170 such attorneys, and their blended billing rate was $313/hour, which in my experience is a low rate for attorneys working in New York City or Los Angeles, and lower than Lead Counsel associates who would otherwise have conducted the document review.

16. I have also examined the billing rates and hours expended by the other Plaintiffs' counsel working on this case. Looking at the monthly time reports and comparing them to the work done in the corresponding months, the hours spent do not seem excessive at all. The case went on for 32 months before it was settled in April, and the non-document review attorneys at all of the firms on the Plaintiffs' side worked 57,600 hours in those months – an average of approximately 1,800 hours per month. Considering the huge amount of work done as described in the submissions in support of the fee application, this time is, in my experience, surprisingly low.

17. I also reviewed the rise and fall of hours spent on the case by Lead Counsel attorneys on a monthly basis to insure that the amount of work being done reflected the demands of the case and not some attempt to create hours wastefully. I used the narrative work descriptions provided by Lead Counsel to its clients as well as the docket sheet in the case to see if the variability in hours matched the variability in work load, and my found that it did so. This conclusion is supported by a graph prepared by Lead Counsel (*See* Lead Plaintiffs' Memorandum of Law in

Support of Application for Award of Attorney's Fees and Reimbursement of Expenses, p. 16) which tracks the rise and fall of monthly hours, as well as hours spent on document review and depositions, over the course of the case.  The chart graphically demonstrates how the rise and fall of hours was dictated by the work demands of the case.  There was no evidence that hours were created to do unnecessary work.  As the client put it (Bierman declaration, Par. 12), . . ."we are satisfied that the hours and resources that Plaintiffs' Counsel devoted to this action was a benefit to the Class."

18.   The billing rates used to arrive at the lodestar amount were reasonable in my view.  The partner rates ranged from $550 to $865 per hour, rates that seem on the low side to me.  While data on billing rates is not easy to find, I have awareness of billing rates from my practice experience and from interactions with lawyers at large firms such as the ones opposite Lead Counsel in this case.  I know that the top partners at those firms charge much more than the top rate of $865 charged by Lead Counsel – indeed billing rates of top partners at the large New York firms approach and sometimes exceed $1000/hour, with Los Angeles large firms at or near the same level.  The average partner rate charged by the Labaton attorneys, $734, would be considered a bargain for a law firm in New York or Los Angeles capable of handling a case of this magnitude and complexity.  The associate and paralegal rates seem similarly to be on the low side of what would be considered the "going rate".  Indeed, the blended rate for all attorneys who worked on the Plaintiff's side of the case is $403, an extremely reasonable rate for a New York or Los Angeles firm handling cases at this level.  What is even more startling is the blended rate for attorneys that would be implied if the fee application is approved.  Since the lodestar multiplier sought is less than 0.7, if we were to take 70% of the charges for all the other timekeepers and subtract it from the total amount sought in fees, the result of 43.354 million would be the amount sought for attorneys' work.  This would yield an effective blended rate sought by the fee

application here for all the attorneys who worked on this case of $276, an extremely low number in today's market by any measure. It is interesting to compare this $276 blended rate sought here to the hourly rate of $1,370 in 2003 dollars that the Logan study found was the average received in fees awarded in 277 securities cases settled from 1973 to 2003, and which would surely be higher today.

19.   In comparing the billing rates giving rise to the lodestar amount to prevailing rates for lawyers handling comparable cases, it also should be noted that non-contingent firm rates are set in a context where payment is anticipated on a relatively current basis.  Here, the Lead Counsel rates might not have been collected at all, as noted in the discussion of risk above, but even when they are collected, it is hardly current. Assuming this settlement is approved in November, the average collection time for a dollar in fees charged by Lead counsel will exceed sixteen months.  Given the risk of non-collection and the time delay in collection,  for comparative purposes the Lead Counsel rates are actually lower by comparison than the raw numbers would indicate.

20.   For all the above reasons, it is my opinion that the full lodestar amount presented by Lead Counsel could form a reasonable basis for a fee award. *A fortiori*, the fee sought in the application, which is less than 70% of that amount, is reasonable.

### Expenses

21.   I have also reviewed the expenses sought in the application of $8,080,517.87.  When one subtracts out the expert fees of $4,939,243.07, the resulting amount of $3,141,274.80 is about 6.6% of the fees sought, a reasonable number.  Indeed, if one also subtracts out the $1,687,065.81 for electronic document hosting, the remaining $1,454,208.99 of normal litigation expenses is about 3% of the fees sought ($47,372,000) and only 2.1% of the fees charged ($69,190,643.25).  In my experience, this is a very low ratio.  Indeed, even

including expert and document hosting fees the total expenses amount to less than 1.3% of the recovery, well below the mean of 2.8% or the median of 1.7% found in the Eisenberg and Miller study, at 274. It also is important to note that expenses were closely monitored by the clients, who received back-up for all expense charged and actually disallowed certain charges which are not included in the expenses sought. For all these reasons, the expense amount is clearly reasonable in my opinion.

### Summary

22. The fee application here reflects a well run, exceptionally lawyered case that achieved an excellent result for the class. The intimate involvement of the client and the voluminous substantive work undertaken by the law firm makes this case a prime example of how securities class actions were intended to be carried out under the changes adopted in 1995 in the PSLRA. The fee requested is anything but overreaching, not even seeking the full lodestar amount. Under all the circumstances, the fee requested is in my opinion eminently reasonable.

Executed this 11th day of October, 2010.

_____
MICHAEL H. DIAMOND