LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
*jbernstein@labaton.com*
JONATHAN M. PLASSE
*jplasse@labaton.com*
IRA A. SCHOCHET
*ischochet@labaton.com*
DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
MICHAEL H. ROGERS
*mrogers@labaton.com*
JOSHUA L. CROWELL
*jcrowell@labaton.com*
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead
Plaintiffs New York Funds*

[Additional counsel listed on signature pages]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Relates to: All Actions | Lead Case No.<br>CV 07-05295 MRP (MANx)<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND PLAN OF ALLOCATION OF NET SETTLEMENT FUND**<br><br>Date:   February 25, 2011<br>Time:   1:00 p.m.<br>Courtroom:  12<br>Judge:  Hon. Mariana R. Pfaelzer |

1

# <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................ ii

Preliminary Statement ............................................................................. 1

The Court's Second Preliminary Approval
Order and the Supplemental Notice to the Class ........................................ 4

ARGUMENT ........................................................................................... 5

I.     THE PROPOSED SETTLEMENT AS MODIFIED BY
       THE AMENDMENT REMAINS FUNDAMENTALLY FAIR,
       ADEQUATE AND REASONABLE BECAUSE THE CLASS
       WILL BE NO WORSE OFF, AND POTENTIALLY WILL
       BE BETTER-OFF, UNDER THE MODIFIED SETTLEMENT ............. 5

II.    THE PLAN OF ALLOCATION OF THE NET SETTLEMENT
       FUND AS MODIFIED REMAINS FAIR, ADEQUATE AND
       REASONABLE AND SHOULD BE APPROVED ............................. 8

       A.    The Additional Term of the Plan of Allocation
             Appropriately Prevents "Double-Dipping" By
             Opt-Outs Who Might Seek to Rejoin the Class ................... 8

       B.    The New and Repeated Objections to the Plan of
             Allocation Are Without Merit and Should Be Overruled ....... 11

             1.    Vembar K. Ranganathan .................................... 11

             2.    David B. Orser ................................................ 13

III.   ISSUES CONCERNING CERTAIN REQUESTS
       FOR EXCLUSION FROM THE CLASS .................................... 14

       A.    SRM Global Fund Limited Partnership ........................... 14

       B.    Objection of Byron B. Mathews, Jr. .............................. 15

       C.    Virginia B. Carré ..................................................... 17

       D.    Evelyn L. Steele ...................................................... 17

       E.    Audley Kong ........................................................... 18

       F.    Angelo V. Cavallaro .................................................. 18

       G.    Jack L. Haynie and Mary E. Haynie ............................... 18

Conclusion .......................................................................................... 19

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## Cases

*In re AOL Time Warner, Inc.*
  *Securities & "ERISA" Litigation,*
  No. MDL 1500, 2006 WL 903236
  (S.D.N.Y. Apr. 6, 2006) ...................................................................14

*In re Cement & Concrete Antitrust Litigation,*
  817 F.2d 1435 (9th Cir. 1987),
  *rev'd on other grounds*, 490 U.S. 93 (1989) ....................................10

*In re Enron Corp. Securities,*
  *Derivative & "ERISA" Litigation,*
  No. MDL-1446, 2008 WL 4178151
  (S.D. Tex. Sept. 8, 2008) ................................................................14

*In re Equity Funding Corp. of America*
  *Securities Litigation,*
  603 F.2d 1353 (9th Cir. 1979) .........................................................10

*Gortat v. Capala Bros., Inc.,*
  No. 07-CV-3629 (ILG), 2010 WL 1423018
  (E.D.N.Y. Apr. 9, 2010) ............................................................16, 18

*In re Initial Public Offering Securities Litigation,*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................14

*In re The Mills Corp. Securities Litigation,*
  265 F.R.D. 249 (E.D. Va. 2009) ......................................................13

*In re Portal Software, Inc. Securities Litigation,*
  No. C-03-5138 VRW, 2007 WL 4171201
  (N.D. Cal. Nov. 26, 2007) ...............................................................13

*SEC v. Capital Consultants, LLC,*
  397 F.3d 733 (9th Cir. 2005) ...........................................................10

*In re WorldCom, Inc. Securities Litigation,*
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................14

*In re WorldCom, Inc. Securities Litigation,*
  No. 02 Civ. 3288 (DLC), 2005 WL 1048073
  (S.D.N.Y. May 5, 2005) ............................................................16, 18

## Rules

Fed. R. Civ. P. 23(c)(2)(B)(vi) .........................................................16, 18

**Preliminary Statement**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's January 7, 2011 Order Granting Preliminary Approval to First Amendment to Settlement Agreement and Directing Dissemination of Supplemental Notice to the Class (the "Second Preliminary Approval Order"), Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund ("NYSCRF"); Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, and Teachers' Retirement System of the City of New York (collectively, the "New York City Pension Funds," and together with NYSCRF, the "New York Funds" or "Lead Plaintiffs"); and Plaintiff Barry Brahn, on behalf of the Class (collectively with Lead Plaintiffs, "Plaintiffs"), respectfully submit this supplemental memorandum of points and authorities in support of final approval of the proposed Settlement of this class action and Plan of Allocation of the Net Settlement Fund, both as modified.

The original $624 million Settlement, which this Court preliminarily approved on August 2, 2010, was fair, reasonable, and adequate in light of the maximum potential recovery at trial and the myriad risks of continued litigation.[1] Indeed, in response to the hundreds of thousands of Court-approved Notices that were mailed and numerous media reports concerning the Settlement, only ***three*** Class members have objected (one very recently), and even then only to discrete

---

[1] *See* Plaintiffs' Mem. of P&A in Supp. of Mot. for Final Approval of Proposed Settlement and Plan of Allocation of Net Settlement Fund, dated Oct. 11, 2010 (Dkt. No. 984) (the "Principal Settlement Brief"). Plaintiffs incorporate the Principal Settlement Brief herein by reference.

1  aspects of the Plan of Allocation of the Net Settlement Fund (the "Plan of

2  Allocation" or "Plan").

3       Approximately two dozen institutional investors (most of which are

4  represented by one of two law firms), together with a handful of individual

5  investors, submitted timely and valid requests for exclusion from the Class.  The

6  total losses suffered by such investors ("Opt-Outs"), as measured pursuant to a

7  Supplemental Agreement previously entered into among Plaintiffs, the

8  Countrywide Defendants ("Countrywide"), and Defendant KPMG LLP

9  ("KPMG"), were high enough to allow Countrywide and KPMG to terminate the

10  Settlement.  In response, and in keeping with their fiduciary duties to the Class as

11  a whole, the New York Funds and their counsel expended considerable effort to

12  preserve this valuable, hard-earned Settlement while also ensuring that continuing

13  Class members' rights are protected and their recoveries are not diminished.

14       The parties have entered into a First Amendment to the Amended

15  Stipulation and Agreement of Settlement (the "Amendment") that sets aside up to

16  $22.5 million from the $624 million Settlement Amount for Countrywide's use in

17  settling litigation brought or threatened to be brought by Opt-Outs.  As discussed

18  below, the operation of this "Set-Aside" ensures that the benefits accruing to

19  individual Class members will be no worse—and may well be better—under the

20  Settlement as modified than what they could reasonably expect between the time

21  they received the original Notice and the objection deadline.  If approved by the

22  Court, the minimum $601.5 million Settlement will be the 14th largest securities

23  class action settlement since the enactment of the Private Securities Litigation

24

25

26

27

28

1   Reform Act of 1995 (the "PSLRA"), and the second-largest in a case within the

2   Ninth Circuit.[2]

3          Separate and apart from the Amendment, the recovery to certain Class

4   members will also be enhanced by the $48.15 million in new cash obtained by the

5   SEC in the October 2010 settlement of its enforcement action against former

6   Countrywide executives.  The SEC recovery was publicly disclosed after

7   dissemination of the original Notice to the Class, and ensures that Class members

8   will receive more than they reasonably expected based on the original Notice.

9          Plaintiffs also have added a new term to the proposed Plan of Allocation to

10  prevent the possible scenario where Opt-Outs, in satisfaction of actual or potential

11  opt-out litigation, seek to opt back into the Class and receive a payment from the

12  Net Settlement Fund while also receiving additional settlement money from

13  Countrywide or any other Released Parties directly.  As discussed below, such

14  "double-dipping" is unfair to the many thousands of Class members who have

15  accepted the Settlement by not excluding themselves.

16         Finally, this brief addresses remaining issues concerning certain requests

17  for exclusion from the Class, including the request for exclusion submitted by

18  SRM Global Fund Limited Partnership ("SRM").  Plaintiffs also respond below to

19  an objection submitted by an individual investor to Plaintiffs' determination that

20

21         [2] *See* Securities Class Action Services "Top 100 Settlements Quarterly Report"
    for fourth quarter 2010, Ex. B, at 3.  Citations to "Ex. ___" herein refer to exhibits

22  annexed to the accompanying Supplemental Declaration of Joel H. Bernstein in
    Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of

23  Allocation of Net Settlement Fund and Lead Counsel's Modified Petition for an
    Award of Attorneys' Fees and Reimbursement of Expenses ("Bernstein Suppl.

24  Decl.").

25         The Principal Settlement Brief described the original $624 million Settlement
    as the 13th largest securities class action settlement since the enactment of the

26  PSLRA (Dkt. No. 984, at 1).  A further partial settlement in the *HealthSouth* action
    approved in July 2010 brought the total recovery there to $804.5 million, bumping

27  this Settlement (whether valued at $624 million or $601.5 million) to 14th place.
    This Settlement remains the second-largest within this Circuit.  *See* Ex. B, at 3.

28

his request for exclusion is invalid under the terms of the initial Preliminary Approval Order.  Further, Plaintiffs disclose five additional requests for exclusion received after Plaintiffs' November 29, 2010 brief concerning objections and opt-outs was filed with the Court.

For the reasons given below and in the Principal Settlement Brief, the Settlement and the Plan of Allocation, both as modified, should be approved.

### The Court's Second Preliminary Approval Order and the Supplemental Notice to the Class

On January 4, 2011, pursuant to Paragraph 35 of the Amended Stipulation and Agreement of Settlement dated as of June 29, 2010 (the "Settlement Agreement") and the Court's directives during a telephonic status conference held on December 16, 2010, Plaintiffs filed the Amendment together with an unopposed motion for preliminary approval of the Amendment (Dkt. Nos. 1015-1017).  On January 7, 2011, the Court issued the Second Preliminary Approval Order (Dkt. No. 1021).

Pursuant to and in compliance with the Second Preliminary Approval Order, beginning on January 14, 2011, Rust Consulting, Inc., the Claims Administrator ("Rust"), caused the Supplemental Notice of Proposed Modified Settlement of Class Action and Fairness Hearing (the "Supplemental Notice") to be mailed to all Class members who could be identified by reasonable effort and all Opt-Outs.  *See* accompanying Second Supplemental Declaration of Thomas R. Glenn of Rust Consulting, Inc. Regarding Notice to the Class ("Glenn 2d Suppl. Decl."), at ¶¶ 3-4 and Ex. 1 thereto.  More than 920,000 Supplemental Notices have been mailed as of February 2, 2011.  *Id.*  On January 14, 2011, the Supplemental Notice was also posted on both the case-dedicated website established by Rust for purposes of this Settlement, *id.* ¶ 6, and the website of Plaintiffs' Lead Counsel.  Bernstein Suppl. Decl. ¶ 27.

Like the prior Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing (the "Notice"), the Supplemental Notice provides means by which Class members or other interested persons can call, e-mail, or write to Rust or Plaintiffs' Lead Counsel with inquiries.  Ex. 1 to Glenn 2d Suppl. Decl.  As of February 2, 2011, the toll-free telephone "hotline" manned by Rust has received nearly 8,500 calls from potential Class members and other interested persons, and Rust has received more than 1,100 e-mails at the e-mail account established for purposes of this Settlement.  Glenn 2d Suppl. Decl. ¶¶ 7-8.

Pursuant to the Second Preliminary Approval Order, Class members have until at least April 26, 2011 to submit proofs of claim against the Net Settlement Fund.  As of February 2, 2011, Rust has received more than 60,500 proofs of claim from potential Class members.  *Id.* ¶ 12.

## **ARGUMENT**

**I.    THE PROPOSED SETTLEMENT AS MODIFIED BY THE AMENDMENT REMAINS FUNDAMENTALLY FAIR, ADEQUATE AND REASONABLE BECAUSE THE CLASS WILL BE NO WORSE OFF, AND POTENTIALLY WILL BE BETTER-OFF, UNDER THE MODIFIED SETTLEMENT**

The $601.5 million Settlement, as modified, is and remains well within a range of reasonableness in light of the best possible recovery at trial and the risks of continued litigation.  In exchange for Countrywide and KPMG's agreement to waive their right to terminate the Settlement under the Supplemental Agreement, Plaintiffs agreed under the Amendment to set aside up to $22.5 million of the $624 million Settlement Amount for a period of two (2) years from the date the Court issues the Final Judgment approving the Settlement (the "Set-Aside").  The Set-Aside may be used by Countrywide to settle litigation brought, or threatened to be brought, by Opt-Outs but may not be used for defense costs.  Any portion of

1   the Set-Aside not used after this two-year period will revert to the Settlement

2   Fund.

3          The Set-Aside has a provision that may result in its reduction.  If the "Opt-

4   Out Payout"—the amount the Opt-Outs would actually have received in the

5   Settlement as their pro rata share of the Net Settlement Fund if they had stayed in

6   the Class (as if they had never opted out in the first place) and submitted valid

7   proofs of claim—is less than $22.5 million, the Set-Aside will be reduced to that

8   lesser amount.  The Opt-Out Payout will be determined when the proof of claim

9   review and audit process is essentially complete.  *See* Bernstein Suppl. Decl. ¶¶

10  21-22.

11         Although up to $22.5 million will be set aside from the Countrywide

12  Settlement Fund to settle opt-out litigation, the Class is now smaller because the

13  Opt-Outs have removed themselves from the action and relinquished their rights

14  to submit a claim against the Net Settlement Fund.

15         Estimating the Opt-Out Payout (the estimated amount the Opt-Outs would

16  have received from the Net Settlement Fund had they stayed in the Class and

17  submitted proofs of claim) is an inexact process and depends on the final

18  calculation of the proofs of claim that Class members ultimately submit.

19  Nonetheless, both Lead Plaintiffs and Countrywide are reasonably confident,

20  based upon independent analyses, that the Opt-Out Payout—even assuming 100%

21  participation by Class members in the Settlement—would have materially

22  exceeded the $22.5 million Set-Aside.  Countrywide estimated that the Opt-Out

23  Payout, assuming 100% participation, could have been as high as $45.7 million.

24  With less than 100% participation by the Class, which is virtually certain, the

25  theoretical Opt-Out Payout likely would be even greater.  Nonetheless, because

26  the Set-Aside will equal the ***lesser*** of $22.5 million or the Opt-Out Payout, the

27

28

Class is protected from any instance in which the Set-Aside might exceed the Opt-Out Payout.

Accordingly, the amount of "additional" settlement money now available to current Class members because the Opt-Outs excluded themselves from the Class (which amount otherwise would have been allocated to the Opt-Outs had they stayed in the Class) likely will be *greater* than the amount being set aside from the Settlement to pay the Opt-Outs.  Individual Class members will recover no less (and potentially more) in the modified Settlement than they would have recovered in the original Settlement if the Opt-Outs had not excluded themselves in the first place.  While Class members were made aware of the possibility of exclusions upon receipt of the prior Notice, they did not know that a substantial number of institutional investors would opt out, leaving a larger share of the Net Settlement Fund for remaining Class members.  This is an unexpected benefit that the Amendment is intended to preserve.  Indeed, as disclosed in the Supplemental Notice, the average per-share settlement recoveries estimated in the original Notice assumed that there would be no opt-outs.  Because the Set-Aside cannot be greater than the Opt-Out Payout, and will most likely be less than the Opt-Out Payout, the average per-share recoveries in the original Notice will not be less under the modified Settlement.

Moreover, Class members who elected to remain in the Class and the Settlement took the risk that there would be no opt-outs at all, thus reducing the amount available to the Class members who elected to stay in the Class.  Because the maximum amount of the Set-Aside is less than the estimated Opt-Out Payout assuming full participation, and is some fraction of the estimated Opt-Out Payout assuming less than full participation, remaining Class members will, in all likelihood, receive more than they expected to receive based on the assumption in the Notice that no one would opt out.

1      Additionally, as discussed in Plaintiffs' brief filed on November 29, 2010

2  (Dkt. No. 1005), the settlements in *SEC v. Mozilo*, No. CV 09-3994 JFW (MANx)

3  (C.D. Cal.) (the "SEC Action"), have yielded $48.15 million in new cash that has

4  been or shortly will be paid by Defendants Angelo R. Mozilo, David Sambol and

5  Eric P. Sieracki.  Consistent with the final judgments issued by Judge Walter,

6  these additional funds will be jointly administered with this Settlement for the

7  benefit of certain Class members and will be distributed consistent with the Plan

8  of Allocation.  The addition of the SEC Action settlement money means that the

9  total amount available to Class members today is greater than the total amount

10  available to Class members at the time the Settlement was originally reached and

11  when the original Notice was initially mailed.[3]

12      For these reasons, as well as those discussed at length in the Principal

13  Settlement Brief, Plaintiffs respectfully submit that the Settlement as modified is

14  and remains fundamentally fair, adequate and reasonable and should be approved

15  by the Court.

## II. THE PLAN OF ALLOCATION OF THE NET SETTLEMENT FUND AS MODIFIED REMAINS FAIR, ADEQUATE AND REASONABLE AND SHOULD BE APPROVED

### A. The Additional Term of the Plan of Allocation Appropriately Prevents "Double-Dipping" By Opt-Outs Who Might Seek to Rejoin the Class

21      As set forth in the Supplemental Notice, Plaintiffs have slightly modified

22  the Plan of Allocation by adding the following proposed language to Part G of the

---

[3] In declarations filed concurrently herewith, the New York Funds have endorsed the Settlement has modified by the Amendment and expressed their view that it provides a fair, reasonable, and adequate recovery to the Class in light of the factors set forth in the original Notice and Supplemental Notice.  *See* Declaration of Diane D. Foody on behalf of NYSCRF, ¶ 5; Supplemental Declaration of Karen J. Seemen on behalf of New York City Pension Funds, ¶ 10.

Plan, titled "Distributions from the Net Settlement Fund": "A Claimant's Distribution Amount will be reduced dollar-for-dollar by any amount separately paid or required to be paid to the Claimant by any of the Released Parties to resolve a Settled Claim." Ex. 1 to Glenn 2d Suppl. Decl., at 3.

The purpose of this term of the Plan is to guard against double-dipping by Opt-Outs who may successfully opt back into the Class and submit a Proof of Claim against the Net Settlement Fund and, separately, enter into a "side settlement" with Countrywide or other Released Parties to resolve their opt-out claims. This term provides that in the event that Opt-Outs and Countrywide or any other Released Party enter into a settlement agreement pursuant to which the Opt-Outs (1) opt back into the Class (with leave of Court) and thus receive a Distribution Amount from the Net Settlement Fund, and (2) receive a separate, additional payment directly from Countrywide or any other Released Party for Settled Claims, the Distribution Amount will be reduced by that separate settlement payment. It would be grossly unfair to the current, smaller Class for Opt-Outs—having already excluded themselves from and destabilized a fair, reasonable, and adequate Settlement—to share in the Net Settlement Fund now *and* get additional money on the side as a reward for having opted-out. No Class member should receive money directly from any Released Party over and above the valuable recovery provided in the Settlement in satisfaction of its Settled Claims. Thus, this term of the Plan ensures that Opt-Outs either (a) stay outside the Class and commence whatever individual litigation they see fit to commence, or (b) rejoin the Class (assuming leave of Court) but recover nothing in the Settlement that would cause their total recovery to exceed their *pro rata* share of the Net Settlement Fund, identical to the type of recovery to be received by the

1  tens of thousands of Class members who accepted the Settlement and never

2  sought to exclude themselves in the first place.[4]

3          The Ninth Circuit has approved offset provisions in allocation plans

4  supported by similar equitable considerations.  *See SEC v. Capital Consultants,*

5  *LLC*, 397 F.3d 733, 738-41 (9th Cir. 2005) (approving allocation plan whereby

6  each dollar obtained from third-party actions against company in receivership

7  reduced distribution from the receiver by 50 cents); *In re Cement & Concrete*

8  *Antitrust Litig.*, 817 F.2d 1435, 1438-39 (9th Cir. 1987) (approving, to prevent

9  double recovery, allocation plan in partial settlement that offset payment by

10  amounts recovered from non-settling defendants), *rev'd on other grounds*, 490

11  U.S. 93 (1989); *In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d 1353,

12  1363-67 (9th Cir. 1979) (approving, based in part on double-recovery concerns,

13  offset in plan of allocation that reduced class member's settlement payment by

14  amount received in related bankruptcy reorganization).[5]

15

16      [4] With respect to potential "Opt-Ins," the Amendment provides that if a
sufficient number of Opt-Outs are not excluded from the Class as set forth in the

17  Final Judgment such that the Termination Threshold is no longer reached, the
parties will revert to the original $624 million Settlement with no Set-Aside and no

18  termination rights under the Supplemental Agreement.

19      [5] Independent Fiduciary Services, Inc. ("IFS"), as fiduciary to the successor to
the Countrywide Financial Corporation 401(k) Savings and Investment Plan (the

20  "401(k) Plan"), filed an objection on October 21, 2010 seeking various assurances
with respect to how the 401(k) Plan would be treated under the Plan of Allocation.

21  *See* Dkt. No. 994.  In responding to this objection in their November 28, 2010
brief, Lead Plaintiffs provided certain of these assurances based upon IFS's

22  representation, among others, that IFS does not seek double recovery on unitized
interests for which 401(k) Plan participants recovered in the settlement of the

23  Countrywide ERISA Action before Judge Walter.  *See* Dkt. No. 1005, at 5.  Lead
Plaintiffs indicated that the Claims Administrator, before honoring the 401(k)

24  Plan's proof of claim, would need to be reasonably assured that no participant
would receive an improper double recovery.  *Id.*  To ensure clarity on this issue

25  during the claims process, Lead Plaintiffs and IFS have entered into a letter
agreement setting forth the calculation of an offset to the 401(k) Plan's payment in

26  this Settlement in respect of the payment the 401(k) Plan received in the settlement
of the ERISA Action.  Ex. C.  Every dollar of offset will inure to the benefit of

27  other Class members who file proofs of claim.  Lead Plaintiffs respectfully request
that the Court approve this letter agreement.

28

1    Plaintiffs respectfully submit that this term of the Plan of Allocation is fair

2  and reasonable and should be approved together with the complete Plan.

3    **B.**    **The New and Repeated Objections
                 to the Plan of Allocation Are Without
                 Merit and Should Be Overruled**

4

5         **1.**    **Vembar K. Ranganathan**

6    Plaintiffs received an objection letter from Vembar K. Ranganathan on

7  January 5, 2011, months after the October 18, 2010 objection deadline set forth in

8  the Preliminary Approval Order and the day after the Amendment was filed with

9  the Court.  Ex. D.  Rust mailed the original Notice to Mr. Ranganathan on August

10  27, 2010 using an address supplied by his broker.  Glenn 2d Suppl. Decl. ¶ 14.

11    Mr. Ranganathan purchased 300 shares of Countrywide common stock

12  between August and October 2007, and still holds 200 shares.  He contends, first,

13  that "[t]he [P]lan denies any settlement fees for long term investors like me who

14  have continued to hold CFC past March 7, 2008, the artificial cutoff date set by

15  the litigating team."  Ex. D.  There is nothing artificial about March 7, 2008, the

16  last day of the Class Period, and Mr. Ranganathan erroneously views this date as a

17  deadline to have *sold* Countrywide stock rather than a deadline to have purchased

18  stock.  In calculating Recognized Loss, shares held past March 7, 2008 are

19  assigned the full dollar amount of inflation as of the date of purchase.  A Class

20  member's trading history after July 1, 2008, when Countrywide was acquired by

21  Bank of America and all Countrywide securities were retired, is irrelevant to the

22  calculation of Recognized Claim or, for that matter, damages at trial.[6]  In any

23

24

25  _____

26      [6] Under the Plan of Allocation, a Trading Loss is a prerequisite to and a
     limitation on Recognized Loss.  The computation of Trading Loss looks to
27  Countrywide securities still held as of the close of trading on June 30, 2008, as
     well as securities sold between March 8 and June 30, 2008.

28

1  event, Mr. Ranganathan does have a Recognized Claim, albeit a small one ($6.00)

2  given his modest 300-share investment.[7]

3         Mr. Ranganathan asserts that the artificial inflation tables in the Plan are

4  "spurious and designed to benefit a handful of speculators, and deny any benefit to

5  long term CFC investors."  Ex. D.  This statement is unsupported and wrong.

6  Class members who hold their securities through the end of the Class Period

7  generally will have greater Recognized Claims than those who sell during the

8  Class Period.  As discussed in the Principal Settlement Brief, the tables are

9  derived from the careful, sophisticated analyses of Plaintiffs' experts and, with the

10 exception of the "peppercorns"—which, ironically, account for Mr.

11 Ranganathan's Recognized Claim here—are consistent with the causation and

12 damages evidence Plaintiffs would have presented at trial.  *See* Dkt. No. 984, at

13 59-61.  Mr. Ranganathan's reference to unspecified "speculators" ignores the fact

14 that he purchased all of his shares between August and October 2007, after

15 Countrywide had begun its long, slow slide leading to the Bank of America deal,

16 and that his sale of 100 shares at $19.86 occurred only two days after he had

17 purchased those shares at $19.37.

18        Finally, Mr. Ranganathan's suggestion that all Class members should

19 receive a "flat fee" (Ex. D) ignores the fact that different Class members, based on

20 the number of securities purchased and whether and when they were sold, have

21 widely varying losses.  Assigning a "flat fee" to each share would provide some

22 Class members with a windfall while depriving others of a fair recovery.  For this

23 reason, "[c]ourts endorse distributing settlement proceeds according to the relative

24

25        [7] Mr. Ranganathan nonetheless will not receive a payment from the Net
26 Settlement Fund because his Recognized Claim falls below the $10.00 *de minimus*
   threshold for payable claims.  This threshold is reasonable and appropriate for the
27 reasons given in the Principal Settlement Brief (Dkt. No. 984, at 63-64), and no
   one, including Mr. Ranganathan, has objected to this term of the Plan.

28

1   strengths and weaknesses of the various claims." *In re Portal Software, Inc. Sec.*
2   *Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *6 (N.D. Cal. Nov. 26, 2007)
3   (citing cases). Tellingly, Mr. Ranganathan makes no effort to proffer a "flat fee"
4   that would be appropriate here, nor does he consider the dozens of securities in the
5   Class other than common stock, many of which traded only during certain
6   segments of the Class Period. Mr. Ranganathan's objection should be overruled.[8]

7              **2.    David B. Orser**

8        Plaintiffs' November 29, 2010 brief concerning objections, requests for
9   exclusion, and the SEC Action settlements included Plaintiffs' response to an
10  objection to the Plan of Allocation submitted by David B. Orser. *See* Dkt. No.
11  1005, at 12-13. On or about December 4, 2010, Mr. Orser sent a second letter
12  replying to Plaintiffs' argument and renewing his objection. Ex. E.

13       Mr. Orser's objection continues to be without merit. After asserting
14  mistakenly that common stock purchased during and held through the end of the
15  Class Period will have no Recognized Loss under the Plan of Allocation, Mr.
16  Orser now asserts that "[a]llowing a [Recognized] [C]laim of $240 when an actual
17  loss of $55,133 was incurred seems very unfair." Ex. E. Mr. Orser fails to
18  consider the critically important difference between trading losses and recoverable
19  damages under the federal securities laws. As discussed in the Principal
20  Settlement Brief, the Plan's inflationary loss approach to calculating Recognized
21  Loss is reasonable, far from "arbitrary" as Mr. Orser contends (Ex. E), and
22  entirely appropriate under the circumstances of this action. *See* Dkt. No. 984, at
23  56-61; *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 249, 259-60 (E.D. Va. 2009)

24

25       [8] Although Mr. Ranganathan "appeal[s] to the Court to reject the settlement
26  outright" and seeks "to stop the proposed settlement" (Ex. D), his concern plainly
    is limited to the Plan of Allocation as it affects his own investment. Mr.
27  Ranganathan does not mention the amount of the Settlement, let alone present any
    substantive challenge thereto.

28

1  (approving allocation plan that provided no recovery to class member with trading

2  loss of $2.20 per share because the amount of inflation per share increased by

3  $0.53 between the dates of purchase and sale).[9]

4        The size of Mr. Orser's Recognized Claim relative to his pure trading loss

5  is unsurprising given that he purchased all of his shares beginning in October

6  2007, months after Countrywide's first partially corrective disclosure on July 24.

7  Indeed, had this case gone to trial, Mr. Orser would have recovered nothing

8  because he purchased his stock outside of the subperiod during which the stock

9  was artificially inflated according to Plaintiffs' damages and loss causation expert.

10  Mr. Orser's objection should be overruled.

11

12  **III.    ISSUES CONCERNING CERTAIN REQUESTS FOR EXCLUSION FROM THE CLASS**

13      **A.    SRM Global Fund Limited Partnership**

14        SRM originally submitted a request for exclusion from the Class on

15  October 14, 2010.  *See* Dkt. No. 1006-25.  Plaintiffs stated in their November 29,

16  2010 brief that SRM's request for exclusion should be deemed invalid because it

17  did not disclose the prices at which SRM purchased and sold Countrywide

18  common stock as required by the Preliminary Approval Order.  *See* Dkt. No.

19

20

21

22      [9] *See also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497

23  (S.D.N.Y. 2009) ("Where Subject Securities are purchased and sold during the class period, an Authorized Claimant's 'Recognized Claim' is calculated as the

24  lesser of either the difference between the alleged inflation of the shares at the time of purchase and the alleged inflation at the time of sale or the difference between

25  the purchase price paid and the sales proceeds received."); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *12 (S.D. Tex. Sept. 8, 2008); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 334

26  (S.D.N.Y. 2005); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 2006 WL 903236, at *17 (S.D.N.Y. Apr. 6, 2006) (all *cited in* Dkt. No.

27  1005, at 56-61).

28

1005, at 17.  This brief was served upon counsel for SRM as well as all other invalid opt-outs listed therein.  *See* Dkt. No. 1009.

SRM recently cured the deficiency in its request for exclusion by submitting the missing prices to the Claims Administrator.  Ex. F.  It is the New York Funds' present understanding that SRM will file an application with the Court for a ruling deeming its exclusion request to be timely and valid.

### B.    Objection of Byron B. Mathews, Jr.

In their November 29, 2010 brief, Plaintiffs stated that the request for exclusion submitted by Byron B. Mathews, Jr. should be deemed invalid because it was postmarked past the October 18, 2010 deadline set forth in the Preliminary Approval Order, and failed to list his Class Period trades in Countrywide securities as the Preliminary Approval Order requires.  *See* Dkt. No. 1005, at 17. This brief was served upon Mr. Mathews.  *See* Dkt. No. 1009.

Mr. Mathews has filed an objection, contending that he did not receive the original Notice until after the October 18 deadline and that the disclosure requirement in the Preliminary Approval Order "deprive[s]" him of his due process right to opt out.  *See* Mathews Objection, Dkt. No. 1019, at 1-3.  Mr. Mathews has sent two subsequent communications to Lead Counsel that essentially reiterate his position.  *See* Jan. 21, 2011 Letter from B. Mathews to Lead Counsel, Ex. G; Renewed Request for Exclusion of B. Mathews received on Jan. 22, 2011, Ex. H.

Mr. Mathews had good cause to submit his request for exclusion after the deadline in the Preliminary Approval Order.  Despite the diligent steps taken by Rust in and after August 2010, Mr. Mathews' broker inexplicably did not provide Mr. Mathews' name and address to Rust until November 1, 2010.  Rust mailed the original Notice to Mr. Mathews three days later.  Glenn 2d Suppl. Decl. ¶¶ 15-18.

1    Mr. Mathews' opt-out is invalid nonetheless because it fails to list his Class

2 Period trades in Countrywide securities. The Court's Preliminary Approval Order

3 governs the validity of requests for exclusion in this action (*see* Dkt. No. 976, ¶ 9),

4 and the parties needed such trading information in order to determine whether the

5 Termination Threshold set forth in the Supplemental Agreement was exceeded.

6 This trading information also enabled the parties to estimate Defendants' potential

7 additional exposure from opt-out litigation, which in turn was critical in enabling

8 the parties to reach agreement on the material terms of the Amendment. Mr.

9 Mathews has not asserted that disclosing his trades would be unduly burdensome.

10 Indeed, defendants will be entitled to discovery of his trades if he files an

11 individual lawsuit.[10]

12    Regardless, this Court has broad discretion with respect to defining "the

13 time and manner for requesting exclusion." Fed. R. Civ. P. 23(c)(2)(B)(vi); *see*

14 *also Gortat v. Capala Bros., Inc.*, No. 07-CV-3629 (ILG), 2010 WL 1423018, at

15 *3 (E.D.N.Y. Apr. 9, 2010) (provision "implicitly authoriz[es]" court to define

16 time and manner for opting out); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ.

17 3288 (DLC), 2005 WL 1048073, at *4 (S.D.N.Y. May 5, 2005) ("Rule 23 gives a

18 court the power to prescribe the procedures a class member must follow to opt out

19 of a class action."). The Preliminary Approval Order itself makes this clear. *See*

20

21    [10] Mr. Mathews is mistaken when he states in his renewed request for exclusion

22 that "the Notice did not require that [he] provide any information other than a
statement that [he] wished to be excluded from the class." Ex. H at 2. Consistent
with the Preliminary Approval Order, the Notice stated clearly that persons

23 wishing to opt-out had to disclose their trades. *See* Dkt. No. 986-1, at 9 (Notice).

24    Mr. Mathews is also mistaken when he suggests that his Claimant ID number
"should have been all the information needed by Plaintiff and/or Rust Consulting

25 to identify Mr. Mathews' potential claim." Dkt. No. 1019, at 2-3. The Claimant
ID number is assigned by Rust to each potential Class member name and address

26 received from brokers and other sources. The Claimant ID number does not
include or provide a link to the potential Class member's actual transactions in

27 Countrywide securities. Rust receives such information only to the extent it is
supplied in proofs of claim or requests for exclusion. Glenn 2d Suppl. Decl. ¶ 20.

28

1  Dkt. No. 976, ¶ 9 ("A request for exclusion shall not be effective unless it

2  provides the required information set forth herein and in the Notice and is made

3  within the time stated herein, ***or the request for exclusion is otherwise accepted***

4  ***by the Court.")*** (emphasis added).

5  ### C.   Virginia B. Carré

6  On November 30, 2010, the day after Plaintiffs filed their brief concerning

7  objections and requests for exclusion (Dkt. No. 1005), the Claims Administrator

8  received a request for exclusion from Virginia B. Carré, dated November 23,

9  2010.  Ex. I.  This request for exclusion is untimely under the Preliminary

10  Approval Order.  Moreover, to the extent Ms. Carré purchased Countrywide stock

11  during the Class Period, she fails to provide that information as required by the

12  Preliminary Approval Order.  The sole purchase she discloses occurred in 1994,

13  years before the start of the Class Period.

14  ### D.   Evelyn L. Steele

15  On January 18, 2011, the Claims Administrator received a request for

16  exclusion from Evelyn L. Steele, dated January 11, 2011.  Ex. J.  This request for

17  exclusion is untimely under the Preliminary Approval Order.  Moreover, to the

18  extent Ms. Steele purchased Countrywide stock during the Class Period, she fails

19  to provide that information as required by the Preliminary Approval Order.  Ms.

20  Steele discloses only that she ***held*** Countrywide stock as of the start of the Class

21  Period, and sold those shares a few months later.[11]

22

23  ───────────

[11] Ms. Steele comments in her exclusion request that "the business model that
24  Countrywide was using was fairly evident to the alert and stemmed from the ease
with which they could assign lightly documented mortgages to willing government
25  entities (Fannie Mae and Freddie Mac)."  Ex. J.  This view highlights the risks
Plaintiffs faced with respect to Countrywide's truth-on-the-market defense, and
26  accordingly ***supports*** the fairness of the Settlement.  *See* Principal Settlement Brief
(Dkt. No. 984), at 19-22.  Ms. Steele's other comments tend to reflect mere
27  disagreement with well-settled class action law and procedure, and are
insubstantial.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E.   Audley Kong

The Claims Administrator received a request for exclusion from Audley Kong on January 28, 2011.  Ex. K.  This request for exclusion is untimely under the Preliminary Approval Order and fails to disclose Mr. Kong's trades in Countrywide securities as required by the Order.

### F.   Angelo V. Cavallaro

On February 2, 2011, the Claims Administrator received a request for exclusion from counsel for Angelo V. Cavallaro, dated January 24, 2011.  Ex. L. This request for exclusion is untimely under the Preliminary Approval Order and fails to disclose complete information concerning Mr. Cavallaro's trades in Countrywide securities as required by the Order.

### G.   Jack L. Haynie and Mary E. Haynie

On February 2, 2011, the Claims Administrator received a request for exclusion from Jack L. Haynie and Mary E. Haynie, dated January 22, 2011.  Ex. M.  This request for exclusion is untimely under the Preliminary Approval Order and fails to disclose Mr. and Mrs. Haynie's trades in Countrywide securities as required by the Order.

As noted above, however, this Court ultimately has broad discretion to determine when and under what circumstances persons—including SRM, Mr. Mathews, Ms. Carré, Ms. Steele, Mr. Kong, Mr. Cavallaro, and Mr. & Mrs. Haynie—may opt out of the Class.  *See* Fed. R. Civ. P. 23(c)(2)(B)(vi); *Gortat*, 2010 WL 1423018, at *3; *WorldCom*, 2005 WL 1048073, at *4; Preliminary Approval Order ¶ 9 (Dkt. No. 976).

## Conclusion

For the foregoing reasons, Lead Plaintiffs New York Funds and Plaintiff Barry Brahn, on behalf of the Class, respectfully request that this Court (i) grant final approval to the proposed Settlement as modified by the Amendment; (ii) approve the Plan of Allocation of the Net Settlement Fund as modified in the Supplemental Notice; (iii) approve the letter agreement between Lead Plaintiffs and IFS concerning the offset calculation applicable to the 401(k) Plan's proof of claim; and (iv) overrule the objections submitted by Independent Fiduciary Services, Inc., David B. Orser, and Vembar K. Ranganathan in their entirety.

A proposed Final Judgment and Order of Dismissal With Prejudice and proposed Order Approving Plan of Allocation of Net Settlement Fund as Modified are submitted herewith.


Dated:  February 4, 2011                Respectfully submitted,

                                        LABATON SUCHAROW LLP

                             By:    */s/ Joel H. Bernstein*
                                        JOEL H. BERNSTEIN
                                        JONATHAN M. PLASSE
                                        IRA A. SCHOCHET
                                        DAVID J. GOLDSMITH
                                        MICHAEL H. ROGERS
                                        JOSHUA L. CROWELL

                                        *Lead Counsel for Lead*
                                        *Plaintiffs New York Funds*

                                        KREINDLER & KREINDLER LLP
                                        GRETCHEN M. NELSON (#112566)
                                        *gnelson@kreindler.com*
                                        707 Wilshire Boulevard, Suite 4100
                                        Los Angeles, California  90017
                                        Telephone:  (213) 622-6469
                                        Facsimile:  (213) 622-6019

HENNIGAN, BENNETT
 & DORMAN LLP
J. MICHAEL HENNIGAN (#59591)
*hennigan@hbdlawyers.com*
KIRK D. DILLMAN (#110486)
*dillmank@hbdlawyers.com*
MICHAEL SWARTZ (#163590)
*swartzm@hbdlawyers.com*
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

*Liaison Counsel for Lead*
*Plaintiffs New York Funds*

KAPLAN FOX & KILSHEIMER LLP
JOEL B. STRAUSS
*jstrauss@kaplanfox.com*
JEFFREY P. CAMPISI
*jcampisi@kaplanfox.com*
850 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Attorneys for Plaintiff*
*Barry Brahn*