# Exhibit A

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
jbernstein@labaton.com
JONATHAN M. PLASSE
jplasse@labaton.com
IRA A. SCHOCHET
ischochet@labaton.com
DAVID J. GOLDSMITH
dgoldsmith@labaton.com
MICHAEL H. ROGERS
mrogers@labaton.com
JOSHUA L. CROWELL
jcrowell@labaton.com
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead Plaintiffs New York Funds*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions | Lead Case No.<br>CV 07-05295 MRP (MANx)<br><br>**DECLARATION OF KAREN J. SEEMEN, ESQ. IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, LEAD PLAINTIFF'S PROPOSED PLAN OF ALLOCATION, AND AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**<br><br>Date:  November 15, 2010<br>Time: 1:00 p.m.<br>Courtroom:  12<br>Judge:  Hon. Mariana R. Pfaelzer |

KAREN J. SEEMEN hereby declares, pursuant to 28 U.S.C. § 1746:

1. I am a Senior Counsel in the Office of the Corporation Counsel of the City of New York ("Law Department").

2. I submit this Declaration on behalf of Court-appointed Lead Plaintiffs in this Action, certain New York City Pension Funds described below (collectively, the "NYC Pension Funds"), in support of final approval of (i) the Settlement; (ii) the proposed Plan of Allocation ("Plan of Allocation"); and (iii) Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses. The statements in this declaration are based on my personal knowledge.

3. The NYC Pension Funds consist of the actuarial pension systems of the New York City Employees' Retirement System ("NYCERS"), the New York City Police Department Pension Fund ("Police"), the New York City Fire Department Pension Fund ("Fire"), the New York City Teachers' Retirement System ("Teachers"), and the New York City Board of Education Retirement System ("BERS").

4. NYCERS, established under Section 13-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who join the Pension Plan and are not eligible to participate in separate Fire Department, Police Department, Teachers, or Board of Education pension funds. NYCERS holds over $34.6 billion in assets with over 200,000 active members and approximately 120,000 retirees and beneficiaries.

5. The New York City Police Pension Fund, created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department. Police holds over $19.8 billion in assets with more than 36,000 active members and 37,000 retired members.

6. The New York City Fire Department Pension Fund, established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department. Fire holds approximately $6.4 billion in assets, and has approximately 12,000 active members and 18,000 retired members.

7. The New York City Teachers' Retirement System maintains two separate retirement programs: the Qualified Pension Plan ("QPP"), established pursuant to Section 13-502 of the Administrative Code of the City of New York, which provides pension benefits to those with regular appointments to the pedagogical staff of the Board of Education; and the Tax-Deferred Annuity ("TDA"), established pursuant to Internal Revenue Code Section 403(b), which provides a means of deferring income tax payments on voluntary tax-deferred contributions. Teachers QPP has approximately $34.7 billion in assets and approximately 75,000 retirees and over 100,000 active members. The TDA is comprised of a Diversified Equity Fund known as the Variable A Annuity Program, with approximately $9 billion dollars in assets, and a stable value fund known as the Variable B Annuity Program, an International Equity Fund, an Inflation Protection Fund, and a Socially Responsive Equity Fund.

8. The New York City Board of Education Retirement System provides pension benefits to, among others, non-pedagogical employees of the Board of Education. BERS has approximately $2.3 billion in assets and approximately 12,000 retirees and 22,000 active members.

9. The Law Department is the legal arm of the City of New York, employing more than 650 attorneys. Pursuant to the powers and duties granted to it under Section 394 of the New York City Charter, the Law Department represents all City agencies and the NYC Pension Funds, as well as the offices of elected officials such as the Comptroller and the Public Advocate. In the matters in which outside counsel is retained to represent New York City, its agencies and its pension

1 funds, the Law Department has the sole authority and responsibility to select which
2 firms to retain and to negotiate the terms of retention.

3     10.    The Law Department serves as counsel to the NYC Pension Funds,
4 has over 650 attorneys with experience in all areas of litigation, including class
5 action and securities litigation, and is thus able to provide direction and monitoring
6 of this litigation on behalf of the NYC Pension Funds.

7     11.    The Law Department was counsel for the NYC Pension Funds in
8 federal securities class actions in which it served as Court-appointed Lead Plaintiff.
9 Among these cases are *In re Cendant Corp. Litig.*, 264 F.3d 201 (3rd Cir. 2001), *In*
10 *re Orbital Sciences Corporation Securities Litigation*, 188 F.R.D. 237 (E.D. Va.
11 1999), *Wachovia*, 08-cv-06171 (S.D.N.Y.), *In re Take-Two Securities Litigation*,
12 Civil Action No. 1:06-cv-00803-SWK (S.D.N.Y.), *In re Juniper Networks, Inc.*
13 *Sec. Litig.*, Civil Action No. 3:06-cv-4327-MJJ (N.D. Cal.), and *Vogel v. Jobs*,
14 Civil Action No. C-06-05208-JF (N.D. Cal.).

15     12.    Among these cases is one of the largest settlements in the history of
16 federal securities class actions: *Cendant*, at $3.318 billion, was the largest
17 settlement of its kind when approved, and today is still the third largest.

18     13.    Carolyn Wolpert, Deputy Chief of the Pension Division, and I directly
19 oversee many of the Law Department's securities class actions, including this
20 Action. Ms. Wolpert and I personally participated in all major aspects of this case
21 including settlement negotiations.

**The NYC Pension Funds Seek to Maximize Classes' Recoveries by Obtaining Competitive Fees from Class Counsel**

24     14.    The Master Agreement entered into between the Law Department and
25 Labaton, in June 2006, relating to Labaton serving as Securities
26 Litigation/Evaluation Counsel (the "Master Agreement"), does not contain
27 provisions for specific fee agreements or grids. Instead, generally at the outset of
28

1 litigation, the Law Department will negotiate a fee agreement for that specific case.
2 The Law Department undertakes to obtain competitive fees in these circumstances.

3     15.    In addition, the NYC Pension Funds have in the past objected to what
4 they perceive as excessive fees, and have successfully reduced awards through
5 these procedures. *See*, *e.g.*, *Cendant*, 264 F.3d 201 (3rd Cir. 2001).

6     16.    I am familiar with the Master Agreement entered into between the
7 New York Funds and Lead Counsel in this Action. The Master Agreement sets the
8 processes for retaining counsel, monitoring litigation, and setting the guidelines for
9 any application to the Court for fees and expenses submitted by Lead Counsel.

10     17.    After learning of the potential of a class action securities case against
11 Countrywide in August 2007, the Law Department sought bids, including proposed
12 attorney's fees, from the Labaton and the other firms in its pool The Law
13 Department received 8 bids, including Labaton's, by October 11, 2007.

14     18.    Based upon Labaton's well-developed investigation and knowledge of
15 the facts underlying potential claims in the Action, the Law Department expressed
16 interest in possibly retaining Labaton as counsel. Although Labaton's fee proposal
17 was based on a grid that would have called for an award in the single-digit
18 percentages under the circumstances of this settlement, the Law Department
19 nonetheless requested a revised, lower fee proposal in order to ensure a greater
20 recovery for the class members.

21     19.    Thereafter, on October 12, 2007, Labaton submitted a revised fee
22 proposal, which was lower than the original fee proposal—such that under the
23 circumstances of this settlement, Labaton would receive the same 7.59% it is
24 actually requesting. Upon receipt of the revised fee proposal, the Law Department
25 decided to retain Labaton as counsel for the NYC Pension Funds based upon the
26 revised fee proposal. A copy of the fee grid relevant to the revised proposal, which
27 limits Labaton's fee application in this Action, is annexed. Labaton also agreed at
28

that point that it would not apply for a fee that exceeded three times its lodestar amount.

20. At about the same time that the NYC Pension Funds were deciding to retain Labaton and move for Lead Plaintiff, the Law Department learned that the New York State Common Retirement Fund ("NYSCRF") was also intending to move for Lead Plaintiff and that they were strongly considering hiring Labaton as Lead Counsel. After the two institutions decided to move together as a group, NYSCRF required that Labaton agree to the lower fee agreement that NYC Pension Funds negotiated.

21. Additionally, in order to maximize recovery for the Class, the Master Agreement also provides that any fee of a contingent nature, as the requested fee is, will be calculated as a percentage against the net recovery ***after deduction of permissible costs and out-of-pocket expenses*** advanced by Lead Counsel. Included in those costs and expenses to be deducted from the settlement fund for fee calculation purposes are administration costs associated with providing notice to the Class, and distributing the fund to Class members.

**The Law Department Closely Monitored, Supervised, and/or Approved All Aspects of this Action**

22. The Law Department participated in, supervised, and monitored all phases of this Action, including: attending regularly scheduled conferences with Lead Counsel concerning case strategy; reviewing, commenting on, editing, and approving all pleadings, motions, memoranda of law, and other submissions to the Court; reviewing, commenting on, editing, and approving mediation briefs; testifying at depositions; reviewing and analyzing Defendants' briefs, pleadings and submissions; attending Court hearings where appropriate; approving the retention of experts and other consultants; and personally participating in mediation and settlement negotiations.

23. Ms. Wolpert and I communicated regularly with Lead Counsel and co-Lead Plaintiff the New York State Common Retirement Fund, concerning this case, speaking with Lead Counsel several times a month and often weekly and even daily during stages of the case involving dispositive briefing, class certification depositions, Lead Plaintiff document production, and mediation.

24. The Law Department specifically approved Lead Counsel's use of short-term contract attorneys, hired to analyze and review the millions of pages produced in this case. The Law Department approved the hiring and use of these contract attorneys on a number of conditions, including a $325/hr cap on their billing rates.

25. The Law Department specifically approved the decisions to retain experts, other consultants including an entity that conducts mock trials and jury focus groups, and other entities that have assisted in the prosecution and administration of this case, based on considerations of cost, effectiveness, and importance towards achieving a successful result. Similarly, the Law Department reviewed the credentials and competitive proposals of the various candidates for Claims Administrator. The Law Department therefore authorized retaining Rust Consulting, Inc. for that position.

26. In accordance with the Master Agreement, Lead Counsel periodically forwarded to the Law Department summary reports of its hours, lodestar, expenses, daily time records, and back-up documentation of expenses, as well as the same for its co-counsel. This office reviewed those materials.

27. I attended and participated in mediations and negotiations, including the mediation that ultimately resulted in the settlement before the Court for approval. Lead Counsel kept us apprised of all settlement offers and responses and the Law Department participated in numerous conferences with Lead Counsel regarding possible settlements.

28. During and after the mediation that resulted in the proposed settlement, and in connection with ongoing discussions with Lead Counsel, the Law Department reviewed and approved the Stipulation of Settlement and all other exhibits filed with the Court in connection with motion for preliminary approval, including the Notices to the Class.

29. The Law Department also reviewed and commented on the draft briefs and other documents submitted in support of preliminary approval of the Settlement, and final approval of the Settlement, including approval of the proposed Plan of Allocation, and the approval of the Application for an Award of Attorney's Fees and Reimbursement of Expenses.

**The NYC Pension Funds Support the Settlement in this Action**

30. We endorse the settlement in this Action and believe it to be a fair recovery for the Class due to all of the factors identified in the Notice sent to potential Class Members concerning the Settlement, as further detailed in the Declaration of Joel H. Bernstein In Support of Lead Plaintiff's Motion for Final Approval of the Proposed Settlement and the Plan of Allocation of the Net Settlement Fund and Lead Counsel's Application for an Award of Attorney's Fees and Reimbursement of Expenses.

**The NYC Pension Funds Support Awarding the Fee Requested in this Action**

31. The Master Agreement provides that the Law Department has the right to review the reasonableness of any requests for attorney's fees and compensation of expenses. After having monitored this Action from inception through settlement, the Law Department believes the fee request accords with the Master Agreement and is reasonable, and therefore give its approval and endorsement of Lead Counsel's application for an award of fees as well as Lead Counsel's request for reimbursement of expenses.

32. Furthermore, having reviewed and monitored Lead Counsel's and its co-counsel's hours, as well as approving the hiring and retention of short term

1  attorneys, the Law Department concludes those hours worked were reasonable and
2  necessary.
3     33.   The Law Department also concludes that Lead Counsel's and its
4  co-counsel's requested expenses are reasonable for reimbursement. As a result, the
5  Law Department approves the request for reimbursement of expenses submitted by
6  Lead Counsel and its co-counsel.
7     34.   The Law Department therefore believes that the recovery obtained is a
8  fair settlement for the Class and that the Plan of Allocation is a fair method for
9  distributing the settlement proceeds among Settlement Class Members. The Law
10 Department further believes the requested fee request comports with the Master
11 Agreement and that it is fair and reasonable compensation for the efforts of Lead
12 Counsel and its co-counsel in obtaining this recovery for the Class. We further
13 believe that the amounts requested by Lead Counsel and its co-counsel for expense
14 reimbursement are reasonable.
15    35.   I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that
16 the foregoing is true and correct.

Executed this 7th day of October, 2010, at New York, New York.

Karen J. Seemen

## SCHEDULE OF LABATON FEE AGREEMENT

| Total Recovery | Appointment as Lead Plaintiff through Resolution of all Motions to Dismiss | From Resolution of Motions to Dismiss through Adjudication of Summary Judgment Motions | From Adjudication of Summary Judgment Motions to end of case (including appeals) |
|---|---|---|---|
| Tier I: $0 - $100 million | 7% of recovery | 11% of recovery | 13% of recovery |
| Tier II: $100 - $250 million | $7,000,000 plus 6% of any amount in this range | $11,000,000 plus 10% of any amount in this range | $13,000,000 plus 12% of any amount in this range |
| Tier III: $250 - $500 million | $16,000,000 plus 4% of any amount in this range | $26,000,000 plus 7% of any amount in this range | $31,000,000 plus 8% of any amount in this range |
| Tier IV: $500 - $1 billion | $26,000,000 plus 1% of any amount in this range | $43,000,000 plus 4% of any amount in this range | $51,000,000 plus 4% of any amount in this range |
| Tier V: Over $1 billion | $31,000,000 plus 1% of any amount in excess of $1,000,000,000 | $63,000,000 plus 2% of any amount in excess of $1,000,000,000 | $71,000,000 plus 2% of any amount excess of $1,000,000,000 |