# Exhibit A

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
*jbernstein@labaton.com*
JONATHAN M. PLASSE
*jplasse@labaton.com*
IRA A. SCHOCHET
*ischochet@labaton.com*
DAVID J. GOLDSMITH
*dgoldsmith@labaton.com*
MICHAEL H. ROGERS
*mrogers@labaton.com*
JOSHUA L. CROWELL
*jcrowell@labaton.com*
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead*
*Plaintiffs New York Funds*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| IN RE COUNTRYWIDE FINANCIAL CORPORATION SECURITIES LITIGATION<br><br>This Document Applies to:  All Actions | Lead Case No.<br>CV 07-05295 MRP (MANx)<br><br>**DECLARATION OF MICHAEL H. DIAMOND IN SUPPORT OF LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES**<br><br>Date:  November 15, 2010<br>Time: 1:00 a.m.<br>Courtroom:  12<br>Judge:  Hon. Mariana R. Pfaelzer |

I, MICHAEL H. DIAMOND, hereby declare as follows:

1.      I am an attorney admitted to the practice of law in the State of California and before this Court.  I submit this declaration in support of the application by Labaton Sucharow LLP ("Lead Counsel"), Lead Plaintiffs' Counsel in the above entitled matter, for an award of attorneys' fees.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I have been retained by Lead Counsel to present my opinion as to the reasonableness of the fees sought in its application.  For the reasons set forth in the discussion below, it is my opinion that the fees and expenses sought clearly meet the standard for reasonable fees and expenses.

### Qualifications

3.      A copy of my resume is attached as Exhibit A.  I was admitted to the New York Bar in 1971, the California Bar in 1984 and practiced law continuously until my retirement in November 2007.  During that time, I specialized in securities litigation.  I defended multiple corporations and their officers and directors in both major shareholder class action cases and derivative actions involving issues of disclosure and breach of fiduciary duty.  Over the course of my career, I have litigated against many of the leading class action attorneys nationwide and, as a result, I negotiated multiple settlements, which included negotiating reasonable attorneys' fees.

4.      From 1984 to 1994, I was the Managing Partner and Head of Litigation for the Los Angeles office of the law firm of Skadden, Arps, Slate, Meagher and Flom, LLP ("Skadden").  From 1992 to 1994, when I left Skadden, I was in charge of the entire firm's litigation related disciplines, an area that included more than 500 lawyers.  From 2000 to 2007, I served as the head of the Los Angeles litigation group for the law firm of Milbank, Tweed, Hadley & McCloy, LLP ("Milbank").  As a result of these management responsibilities, in

addition to my own practice history, I have extensive experience in attorney staffing and billing practices in large complex cases.

5.     I also served from 1994 to 1997 as Executive Vice President and General Counsel for New World Communications, Inc., a publicly traded company, where I worked closely with outside counsel in major business cases and transactions.  This experience adds to my ability to evaluate counsel's conduct from a client's point of view.

6.     My experience as a securities class action litigator at Skadden and Milbank, as a manager of litigators at both of those firms and as General Counsel at New World Communications qualifies me as an expert in evaluating attorney fees and the conduct of lawyers in large complex cases.  Therefore, I feel qualified to opine on the reasonableness of Lead Counsel's attorneys' fees and expenses in its representation of Lead Plaintiffs in this matter.  I am being compensated for my services in this matter as a rate of $750 per hour.

## Materials Relied Upon

7.     In the course of my research as part of my engagement, I have reviewed the following documents.

A.     The May 6, 2004 Implementation Contract and Amendments between the Comptroller of the State of New York in his capacity as sole trustee of the Common Retirement Fund and Administrative Head of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System and Lead Counsel (the 'State Implementation Agreement");

B.     The June 16, 2006 Master Agreement between the City of New York Law Department, acting on behalf of the New York City Pension Funds and Retirement Systems and Lead Counsel (the "City Agreement");

C.     Correspondence from Lead Counsel to the City of New York Law department in October, 2007 relating to legal fees;

D.     Time and expense reports supplied by Lead Counsel to Lead Plaintiffs from  September 2007 to (i) August 2010 (regarding time reports) and (ii) September 2010 (expense reports);

E.     Narrative reports supplied by Lead Counsel to the Lead Plaintiffs describing the work performed on a monthly basis;

F.     Agendas of meetings between Lead Counsel and representatives of the Lead Plaintiffs;

G.     A memorandum dated May 18, 2009 from Lead Counsel to the Lead Plaintiffs discussing billing for attorneys involved in document review;

H.     The July 1, 2009 deposition transcript of Maurice Peaslee, associate counsel in charge of securities litigation for the office of the New York State Comptroller;

I.     The July 2, 2009 deposition transcript of Karen J. Seemen , assistant corporation counsel in the Pensions Divisions of the City of New York Law Department;

J.     Correspondence relating to expenses;

K.     The Second Consolidated Amended Complaint in this action;

L.     The Pleadings submitted to the Court is support of the Settlement of this action;

M.     The Court docket in this action; and

N.     The pleadings and documents submitted in support of the fee application.

8.     In addition to reviewing the documents discussed in Paragraph 7, supra, I had numerous discussions with attorneys at Lead Counsel regarding the

issues in the case and the extent of the work undertaken in connection with this matter.

9.      I also reviewed certain statistical reports surveying class action settlements and legal fee awards:

A.      Brian T. Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," Vanderbilt Law School Law & Economics Paper 10-06 (July 2010 draft) (the 'Vanderbilt Study"), a copy of which is attached hereto as Exhibit B.

B.      Eisenberg & Miller, "Attorney Fees and Expenses in Class Action Settlements: 1993-2008," 7 Journal of Empirical Studies, Issues 2, 248-281 (June 2010) ("Eisenberg & Miller"), a copy of which is attached hereto as Exhibit C.

C.      Logan, *et al.*, "Attorney Fee Awards in Common Fund Class Actions", 24 Class Action Reports 167 -234 (2003) ("Logan"), a copy of which is attached hereto as Exhibit D.

## The Fee Application

10.     The Fee application seeks an award of $47.372 million.  This is 7.59% of the $624 million settlement amount.  It also represents less than 80% of the total time charges (the lodestar) recorded by Lead counsel alone.  I have not been requested as part of my engagement to opine as to the fairness of the settlement amount, but I would note that the amount was reached following years of exhaustive litigation and mediation by the Honorable A. Howard Matz, an experienced Federal Judge appointed by this Court.  In addition, the amount has been preliminarily found to be fair by the Court after submission of voluminous papers in support, and no fees will be awarded until a final finding of fairness is made.  Therefore, assuming the settlement achieved through the efforts of Lead Counsel and its associated counsel is found to be fair, the fee sought, while obviously a significant sum, seems clearly reasonable viewed either as a

percentage of the settlement achieved or as a reflection of the work performed on the case.

## The Percentage Method

11.    The most commonly used method to determine legal fees in class action cases is to base the award on a percentage of the settlement achieved.  As has been reported by numerous commentators, including those who authored the studies listed in paragraph 9, supra, this method is by far the one most uses by Courts considering attorney fee awards in class actions.  The Eisenberg and Miller study points out that since 1995 the percentage method has been the one overwhelmingly used in securities class actions.  The percentage sought here, 7.59%, is in my view a low percentage in this kind of case and is clearly reasonable.  This is supported by several factors:

A.    The accepted "standard" according to many cases in the Ninth Circuit is 25% of the settlement amount.  While obviously this standard is subject to and has been departed from in many decisions, the fact remains that the percentage sought here is less than 1/3 of that amount.

B.    In my experience, it is unusual for a Lead Counsel in a securities class action to seek a fee below 15% of the settlement achieved, yet here the fee sought is barely ½ of that percentage.

C.    Lead Counsel in this case did significant work on the possible claim against Countrywide and the various defendants prior to being retained by the Lead Plaintiffs.  This work consisted of interviewing numerous witnesses, reviewing documents and even drafting and filing a preliminary complaint, all without any assurance that it would be retained as counsel by the Lead Plaintiffs.  There was also a risk that Lead Counsel's clients would not be chosen lead plaintiff, and indeed others tried to claim that designation in hard

fought motion practice.  Finally, it was not at all clear that the case would lead to a successful result – the defendants raised significant defenses that could have upset any recovery. (*See* discussion of risk in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Final Approval of Proposed Settlement and Plan of Allocation of Net Settlement Fund, at II.B.)  In my experience, courts have recognized in awarding fees that the risks taken by counsel in pursuing a complex case to a successful conclusion are a significant factor in awarding fees.  Indeed, Eisenberg and Miller (page 251) noted a "significant association between fee level . . . and risk."

D.    The fee percentage sought here was set by agreement with the Lead Plaintiffs, sophisticated plaintiffs who were cognizant of their fiduciary obligations to the class they represent.  Indeed, the percentage fee set in the State Implementation Agreement was reduced when the New York City Pension funds joined as co-lead plaintiff.  This is not a case where the Plaintiffs' attorney set his own fee – it was set by prior agreement with sophisticated clients.  Given the importance of the Lead Plaintiff in the statutory scheme adopted in 1995, this is a significant fact.

E.    This is clearly not a case where a strike suit lawyer seeks a windfall fee after forcing a settlement without doing real substantive work. From the beginning groundwork mentioned in C above, and through 3 years of intense legal work, as described in more detail in the papers filed in support of this application, Lead Counsel and its associated firms took exactly the opposite approach, putting in extraordinary work on the case and consulting on a regular basis with their clients.  This businesslike conduct of the litigation stands in

sharp contrast to the abusive behavior which led to the calls for class
action reform.

F.    Comparison of the percentage fee sought here to the fees
awarded in other class action cases supports the position that the
percentage sought here is reasonable.  Using figures from the
Vanderbilt Study, which purports to analyze all Federal Class action
settlements in 2006 and 2007, the mean percentage fee awarded in
2006-7 in 233 securities class action settlements was 24.7%, and the
median was 25%, three times the percentage sought here.  The mean
and median percentage awards for all class action settlements (not just
securities cases) in the Ninth Circuit (111 cases) were 23.9% and
25%.  The author of the Vanderbilt Study points out that as
settlements get larger, the percentages go down, but the percentage
sough here compares favorably even at the highest level.  Thus the 2
cases he found in the $500 million to $1 billion range awarded a fee
averaging 12.9%, more than 50% higher than the fee sought here.
Indeed it is instructive that in the largest settlement, the Enron cases,
where the settlement amount was 10 times what it is in this case, the
legal fees awarded equaled 9.5% of the $7 billion settlement.  The
other studies I reviewed presented similar results.  Thus Logan found
that from 1993 to 2003 the mean percentage fee recovery in 277
securities cases was 18.9%.  Eisenberg and Miller report that from
1993 to 2008 in cases where the settlement exceeded $175.5 million,
the mean percentage fee recovery was 12%.

G.    The amount arrived at by using the percentage method is
often tested for reasonableness by using what is called a "lodestar
crosscheck", that is by checking that the fee awarded does not
unreasonably exceed the amount that the lawyers would have earned

had they been compensated for their work on a time basis. In securities cases it is normal for the percentage fee awarded to result in a multiple of the lodestar amount. In the Vanderbilt Study the average multiple for all types of class actions, including types such as consumer and debt collection cases which do not require the same sophistication and intensive discovery and legal work of a case such as this, was still 0.98. Eisenberg found the mean multiple in securities cases to be 1.75, and Logan found the average multiple for 877 securities cases from 1973 to 2003 was 4.29. Indeed, in this case Lead counsel agreed with the Law Department of New York City that its fee in the case would be limited to 3 times its lodestar amount, demonstrating the view of a sophisticated client that a multiple of 3 was a normal cap. Yet in fact, the fee sought here is a multiple of less than 0.8 of the Labaton Firm's lodestar alone, and less than 0.7 of the total lodestar of all counsel who worked on the Plaintiffs' side. Yet, as discussed below, 100% of the lodestar would be a reasonable reflection of what time charges should be in a case of this magnitude litigated as energetically as it was by all parties. In the Enron settlement mentioned above, the fee awarded to the Plaintiffs' attorneys was 5.2 times the lodestar. For Counsel to receive less than 70% of the total lodestar under the percentage method is a certain indication that the fee arrived at is reasonable.

In sum, the percentage method yields a more than reasonable fee based on a number of factors intrinsic to this case as well as in comparison to other class action fees.

## The Lodestar

12.     This was a large, complex case.  As described in greater detail in the papers submitted in support of this application it required a vast amount of legal work:

      a.     The case involved 44 defendants.

      b.     There were five motions to dismiss the First Amended Complaint.

      c.     The Second Amended Complaint relied on statements from 14 witnesses to support its claims.

      d.     There were eight motions to dismiss the Second Amended Complaint.

      e.     There was a bitterly fought battle over class certification.

      f.     More than 29 million documents were produced, reviewed, and analyzed during discovery.

      g.     There were more than 80 depositions, many of which resulted in formal discovery disputes requiring court intervention.

      h.     There were myriad court hearings.

      i.     The case involved the selection, retention and utilization of three testifying and six consulting experts.

      j.     There were five settlement mediation sessions.

13.     There are several ways clients analyze legal fees to determine whether they are reasonable.  Indeed, it is important to note here that in fact there were 2 active and sophisticated clients (*see, e.g.*, Bierman declaration submitted in support of this application, Par. 5) who were overseeing the work being done.  As Mr. Bierman points out (Par. 3), their activities included "frequent discussions with Lead Counsel regarding overall strategies for the case; reviewing, commenting on and *approving* the filing of pleadings, briefs and other submissions; testifying at

depositions; reviewing briefs and other submissions by defendants; overseeing and approving, under terms and conditions NYSCRF believed to be appropriate, the retention of certain experts and consultants; and having representatives of NYSCRF appear in Court when such appearances would be appropriate and beneficial to the class."  This was not a case where the lawyers had the uncontrolled opportunity to create unnecessary work.

14.     In my experience on large cases such as this, clients often look at the staffing to see if there has been use of an excessive number of attorneys employed on their cases.  Obviously, in a case such as this where deadlines were short and the motions and discovery required extensive work, it would be necessary to pull in many attorneys to meet deadlines.  Yet the Lead Counsel time records show a remarkable concentration of work – 3/4 of Labaton's lodestar amount attributable to attorneys who were not specially hired and utilized for document review was accumulated by only 11 attorneys.  This shows that there was a concerted effort to make efficient use of the attorneys on the case.  The client agrees: "NYSCRF found the number of attorneys that Lead Counsel used to staff this litigation to be reasonable."  (Bierman declaration, Par. 12).

15.     In getting to the bottom of the practices attacked in the Second Amended Complaint, Lead Counsel sought extensive document discovery.  Document discovery in a case such as this, where over 29 million documents were produced, is a huge undertaking.  A conscientious attorney must be sure all those documents are reviewed by attorneys who will understand and be able to cull out of that huge universe of materials the documents that will help prove the claims made.  I have overseen document review in cases with a fraction of the documents produced here, and I still found myself directing an army of lawyers working with database specialist and other professionals who specialize in document review.  Lead Counsel thus chose, after consultation with Lead Plaintiffs, to employ specific lawyers to accomplish this task.  These attorneys were not per diem

attorneys or attorneys sent from a temp agency.  They were hired as staff and trained to do the document review thoroughly and properly.  Lead Counsel also consulted an expert on ethics to ascertain what was the proper way to charge for this work, and was advised that the work should be charged as lawyer time and made part of the lodestar.  Over ½ of the Lead Counsel lodestar amount arises from time charges by these attorneys.  This was not only a reasonable way to accomplish the necessary document review, but it enabled the review to be accomplished by relatively low priced lawyers, thus keeping the cost to the class as low as possible.  In the end, Lead Counsel employed over 170 such attorneys, and their blended billing rate was $313/hour, which in my experience is a low rate for attorneys working in New York City or Los Angeles, and lower than Lead Counsel associates who would otherwise have conducted the document review.

16.     I have also examined the billing rates and hours expended by the other Plaintiffs' counsel working on this case.  Looking at the monthly time reports and comparing them to the work done in the corresponding months, the hours spent do not seem excessive at all.  The case went on for 32 months before it was settled in April, and the non-document review attorneys at all of the firms on the Plaintiffs' side worked 57,600 hours in those months – an average of approximately 1,800 hours per month.  Considering the huge amount of work done as described in the submissions in support of the fee application, this time is, in my experience, surprisingly low.

17.     I also reviewed the rise and fall of hours spent on the case by Lead Counsel attorneys on a monthly basis to insure that the amount of work being done reflected the demands of the case and not some attempt to create hours wastefully. I used the narrative work descriptions provided by Lead Counsel to its clients as well as the docket sheet in the case to see if the variability in hours matched the variability in work load, and I found that it did so.  This conclusion is supported by a graph prepared by Lead Counsel (*See* Lead Plaintiffs' Memorandum of Law in

Support of Application for Award of Attorney's Fees and Reimbursement of Expenses, p. 16) which tracks the rise and fall of monthly hours, as well as hours spent on document review and depositions, over the course of the case. The chart graphically demonstrates how the rise and fall of hours was dictated by the work demands of the case. There was no evidence that hours were created to do unnecessary work. As the client put it (Bierman declaration, Par. 12), . . ."we are satisfied that the hours and resources that Plaintiffs' Counsel devoted to this action was a benefit to the Class."

18.     The billing rates used to arrive at the lodestar amount were reasonable in my view. The partner rates ranged from $550 to $865 per hour, rates that seem on the low side to me. While data on billing rates is not easy to find, I have awareness of billing rates from my practice experience and from interactions with lawyers at large firms such as the ones opposite Lead Counsel in this case. I know that the top partners at those firms charge much more than the top rate of $865 charged by Lead Counsel – indeed billing rates of top partners at the large New York firms approach and sometimes exceed $1000/hour, with Los Angeles large firms at or near the same level. The average partner rate charged by the Labaton attorneys, $734, would be considered a bargain for a law firm in New York or Los Angeles capable of handling a case of this magnitude and complexity. The associate and paralegal rates seem similarly to be on the low side of what would be considered the "going rate". Indeed, the blended rate for all attorneys who worked on the Plaintiff's side of the case is $403, an extremely reasonable rate for a New York or Los Angeles firm handling cases at this level. What is even more startling is the blended rate for attorneys that would be implied if the fee application is approved. Since the lodestar multiplier sought is less than 0.7, if we were to take 70% of the charges for all the other timekeepers and subtract it from the total amount sought in fees, the result of 43.354 million would be the amount sought for attorneys' work. This would yield an effective blended rate sought by the fee

application here for all the attorneys who worked on this case of $276, an extremely low number in today's market by any measure.  It is interesting to compare this $276 blended rate sought here to the hourly rate of $1,370 in 2003 dollars that the Logan study found was the average received in fees awarded in 277 securities cases settled from 1973 to 2003, and which would surely be higher today.

19.     In comparing the billing rates giving rise to the lodestar amount to prevailing rates for lawyers handling comparable cases, it also should be noted that non-contingent firm rates are set in a context where payment is anticipated on a relatively current basis.  Here, the Lead Counsel rates might not have been collected at all, as noted in the discussion of risk above, but even when they are collected, it is hardly current.  Assuming this settlement is approved in November, the average collection time for a dollar in fees charged by Lead counsel will exceed sixteen months.  Given the risk of non-collection and the time delay in collection,  for comparative purposes the Lead Counsel rates are actually lower by comparison than the raw numbers would indicate.

20.     For all the above reasons, it is my opinion that the full lodestar amount presented by Lead Counsel could form a reasonable basis for a fee award. *A fortiori*, the fee sought in the application, which is less than 70% of that amount, is reasonable.

## Expenses

21.     I have also reviewed the expenses sought in the application of $8,080,517.87.  When one subtracts out the expert fees of $4,939,243.07, the resulting amount of $3,141,274.80 is about 6.6% of the fees sought, a reasonable number.  Indeed, if one also subtracts out the $1,687,065.81 for electronic document hosting, the remaining $1,454,208.99 of normal litigation expenses is about 3% of the fees sought ($47,372,000) and only 2.1% of the fees charged ($69,190,643.25).  In my experience, this is a very low ratio.  Indeed, even

including expert and document hosting fees the total expenses amount to less than 1.3% of the recovery, well below the mean of 2.8% or the median of 1.7% found in the Eisenberg and Miller study, at 274. It also is important to note that expenses were closely monitored by the clients, who received back-up for all expense charged and actually disallowed certain charges which are not included in the expenses sought. For all these reasons, the expense amount is clearly reasonable in my opinion.

### Summary

22.     The fee application here reflects a well run, exceptionally lawyered case that achieved an excellent result for the class. The intimate involvement of the client and the voluminous substantive work undertaken by the law firm makes this case a prime example of how securities class actions were intended to be carried out under the changes adopted in 1995 in the PSLRA. The fee requested is anything but overreaching, not even seeking the full lodestar amount. Under all the circumstances, the fee requested is in my opinion eminently reasonable.


Executed this 11th day of October, 2010.




MICHAEL H. DIAMOND

# Exhibit A

# MICHAEL H. DIAMOND

250 N. Canon Dr., Penthouse
Beverly Hills, CA 90210
310 550 8015
mdiamond@mhdmediation.com

## Areas of Expertise

1  Corporate governance, fiduciary duties and disclosure obligations of corporate officers,  directors and controlling shareholders generally and in acquisition transactions

2  Litigation, analysis and resolution of complex business and financial disputes

3  All aspects of law firm and litigation management, including fee and billing issues.

4  Legal aspects of television broadcast and production

## Professional Experience

**FOUNDER AND MEMBER, MHD MEDIATION,LLC**

Beverly Hills, CA              October   2007 to present

1  Practice includes mediation, consulting and expert witness services

2  Serve as director of and consultant to large family business on wide range of governance and business issues

3  Testified as expert witness on disclosure and fiduciary duty issues

4  Served as consultant on fiduciary duty issues

**LITIGATION PARTNER, HEAD OF LOS ANGELES LITIGATION DEPARTMENT**
**MILBANK, TWEED, HADLEY & MCCLOY**

Los Angeles, CA              June 2000 to October 2007

1  Practice focused on Corporate Governance, Fiduciary Duty and Securities

2  Represented former CEO in jury trial of securities class action involving alleged misleading financial statements and disclosures

3  Represented former officers and directors in Breach of Fiduciary Duty jury trial involving alleged interested financial transactions and fraudulent payments

4  Represented Corporate Directors  in cases alleging breach of fiduciary duty arising from alleged misleading  financial disclosures in acquisition transactions

5  Represented bank in dispute over repurchase of mortgages

6 Represented Creditors' Committee of Pacific Gas & Electric in reorganization case where primary issue was interpretation of financial forecasts

7 Advised corporate directors on fiduciary and disclosure obligations

8 Represented Television Network in dispute with affiliate

9 Represented Investment Advisor in Breach of Fiduciary Duty suit by Investor

10 Represented CEO of Family owned business in an attempt to invalidate a family trust as part of a divorce action

11 Managed, Expanded and Upgraded Los Angeles Litigation Group

**FOUNDING PARTNER**
**DIAMOND & OSTROW LLP**

Los Angeles, CA                     September 1997 to June 2000

1 Practice focused on Corporate Governance, Securities and business cases

2 Represented Broker/dealer sued by Orange County in matter arising from derivative investments leading to Orange County bankruptcy

3 Represented securities underwriter in case alleging misleading financial forecasts under Rule 144A

4 Advised special Board committee in Management Buyout transaction

**EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL, HEAD OF CORPORATE COMMUNICATIONS**
**NEW WORLD COMMUNICATIONS GROUP**

Los Angeles, CA and New York, NY            May 1994 to September 1997

1 Served as General Counsel of Publicly Traded Broadcast, Production and Distribution Company.

2 Advised Directors on Governance, Fiduciary Obligations and Disclosure issues.

3 Negotiated Groundbreaking Network Affiliation Agreements and Station and Corporate Acquisitions

4 Assisted in preparation of SEC filings and disclosure documents and was in charge of Annual Report Preparation

5 Generally supervised Legal Functions of the Company

**LITIGATION PARTNER, MANAGING PARTNER OF LOS ANGELES OFFICE, PARTNER IN CHARGE OF WORLDWIDE LITIGATION**
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM**

New York, NY and Los Angeles, CA            August 1971 to May 1994

1 Practice focused on representation of and advice to Corporate Officers and Directors in acquisition transactions where key issue was breach of fiduciary duty and in financial disclosure and securities cases

2 Represented and advised directors of numerous companies including Walt Disney, Carter Hawley Hale, Lockheed, Conoco, Mesa Petroleum, Hunt

Oil, Humana, Hartford National Bank, Multibank, Woolworth on governance and financial issues arising in acquisitions

3   Represented family members in disputes over governance of family owned businesses

4   Advised law firm members on separation issues

5   Management functions included serving on firm's policy committee, compensation committee and part of office of executive partner

6   Involved in all aspects of firm management including strategic planning, compensation and expansion as firm grew from fewer than 100 to over 1000 lawyers

7   Managing partner of Los Angeles Office from inception as it grew to over 100 lawyers

## Education

1   **Brown University**          Providence, R.I.     A.B. Mathematics 1964

2   **Columbia University Law School**   New York, NY   J.D. (Magna cum Laude)   1969

3   **Harvard University Law School**    Cambridge, MA

Mediation Workshop in the Program of Instruction for Lawyers at the Program on Negotiation   2007

# Exhibit B

# An Empirical Study of Class Action Settlements and Their Fee Awards

## Brian T. Fitzpatrick[*]

This article is a comprehensive empirical study of class action settlements in federal court. Although there have been prior empirical studies of federal class action settlements, these studies have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). By contrast, in this article, I attempt to study every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first attempt to collect a complete set of federal class action settlements for any given year. I find that district court judges approved 688 class action settlements over this two-year period, involving nearly $33 billion. Of this $33 billion, roughly $5 billion was awarded to class action lawyers, or about 15% of the total. Most judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and the fees awarded according to this method varied over a broad range, with a mean and median around 25%. Fee percentages were strongly and inversely associated with the size of the settlement. The age of the case at settlement was positively associated with fee percentages. There was some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located, with lower percentages in securities cases and in settlements from the Second and Ninth Circuits. There was no evidence that fee percentages were associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.

## I.        Introduction

Class actions have been the source of great controversy in the United States. Corporations fear them.[1] Policymakers have tried to corral them.[2]

[*] Associate Professor of Law, Vanderbilt University Law School. J.D., 2000, Harvard Law School. Address: Vanderbilt Law School, 131 21st Ave South, Nashville, TN 37203; email: brian.fitzpatrick@vanderbilt.edu. Research for this article was supported by Vanderbilt's Cecil D. Branstetter Litigation & Dispute Resolution Program and Law & Business Program. I am grateful for comments I received from Dale Collins, Robin Effron, Ted Eisenberg, Deborah Hensler, Richard Nagareda, Randall Thomas, an anonymous referee for this journal, and participants at workshops at Vanderbilt Law School, the University of Minnesota Law School, the 2009 Meeting of the Midwestern Law and Economics Association, and the 2009 Conference on Empirical Legal Studies. I am also grateful for the research assistance of Drew Dorner, David Dunn, James Gottry, Chris Lantz, Gary Peeples, Keith Randall, Andrew Yi, and, especially, Jessica Pan.

[1] See, e.g., Robert W. Wood, Defining Employees and Independent Contractors, BUS. L. TODAY, May-June 2008, at 45, 48.

Commentators and scholars have suggested countless ways to reform them.[3] Despite all of the attention showered on class actions, and despite the excellent empirical work on class actions to date, the data that currently exists on how the class action system operates in the United States is limited. We do not know, for example, how much money changes hands in class action litigation every year. We do not know how much of this money goes to class action lawyers rather than class members. Indeed, we do not even know how many class action cases are resolved on an annual basis. In order to intelligently assess our class action system as well as whether and how it should be reformed, answers to all of these questions are important. Answers to these questions are equally important to policymakers in other countries who are currently thinking about adopting American-style class action devices.[4]

This article tries to answer these and other questions by reporting the results of an empirical study that attempted to gather all class action settlements approved by federal judges over a recent two-year period, 2006 and 2007. I use class action settlements as the basis of the study because, even more so than individual litigation, virtually all cases certified as class actions and not dismissed before trial end in settlement.[5] I use federal settlements as the basis of the study for practical reasons: it was easier to identify and collect settlements approved by federal judges than those approved by state judges. Systematic study of class action settlements in state courts must await further study;[6] these future studies are important

---

[2] *See* Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); Class Action Fairness Act of 2005, 28 U.S.C. §§ 1453, 1711-1715 (2006).

[3] *See, e.g.,* Robert G. Bone, *Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness*, 83 B.U. L. REV. 485, 490-94 (2003); Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 VAND. L. REV. 995, 1080-81 (2005).

[4] *See, e.g.,* Samuel Issacharoff & Geoffrey Miller, *Will Aggregate Litigation Come to Europe?*, 62 VAND. L. REV. 179 (2009).

[5] *See, e.g.,* Emery Lee & Thomas E. Willing, *Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions* 11 (Federal Judicial Center 2008); Tom Baker & Sean J. Griffith, *How the Merits Matter: D&O Insurance and Securities Settlements*, 157 U. PA. L. REV. 755 (2009).

[6] Empirical scholars have begun to study state court class actions in certain subject areas and in certain states. *See, e.g.,* Robert B. Thompson & Randall S. Thomas, *The Public and Private Faces of Derivative Suits*, 57 VAND. L. REV. 1747 (2004); Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions*, 57 VAND. L. REV. 133 (2004); *Findings of the Study of California Class Action Litigation* (Administrative Office of the Courts) (First Interim Report, 2009).

because there may be more class action settlements in state courts than there
are in federal court.[7]

This article attempts to make three contributions to the existing empirical
literature on class action settlements.  First, virtually all of the prior empirical
studies of federal class action settlements have either been confined to
securities cases or have been based on samples of cases that were not
intended to be representative of the whole (such as those settlements
approved in published opinions).  In this article, by contrast, I attempt to
collect every federal class action settlement from the years 2006 and 2007.
As far as I am aware, this study is the first to attempt to collect a complete set
of federal class action settlements for any given year.[8]  As such, this article
allows us to see for the first time a complete picture of the cases that are
settled in federal court.  This includes aggregate annual statistics, such as
how many class actions are settled every year, how much money is approved
every year in these settlements, and how much of that money class action
lawyers reap every year.   It also includes how these settlements are
distributed geographically as well as by litigation area, what sort of relief was
provided in the settlements, how long the class actions took to reach
settlement, and an analysis of what factors were associated with the fees
awarded to class counsel by district court judges.

Second, because this article analyzes settlements that were approved in
both published and unpublished opinions, it allows us to assess how well the
few prior studies that looked beyond securities cases but relied only on
published opinions capture the complete picture of class action settlements.
To the extent these prior studies adequately capture the complete picture, it
may be less imperative for courts, policymakers, and empirical scholars to
spend the considerable resources needed to collect unpublished opinions in
order to make sound decisions about how to design our class action system.

Third, this article studies factors that may influence district court judges
when they award fees to class counsel that have not been studied before.  For
example, in light of the discretion district court judges have been delegated
over fees under Rule 23, as well as the salience the issue of class action
litigation has assumed in national politics, Realist theories of judicial
behavior would predict that Republican judges would award smaller fee
percentages than Democratic judges.  I study whether the political beliefs of
district court judges are associated with the fees they award, and, in doing so,
contribute to the literature that attempts to assess the extent to which these
beliefs influence the decisions of not just appellate judges, but trial judges as

---

[7] *See* DEBORAH R. HENSLER, ET AL., CLASS ACTION DILEMMAS: PURSUING PUBLIC GOALS FOR
PRIVATE GAIN 56 (2000).

[8] Of course, I cannot be certain that I found every one of the class actions that settled in
federal court over this period.  Nonetheless, I am confident that, if I did not find some, the
number I did not find is small and would not contribute meaningfully to the data reported in
this article.

well.  Moreover, it contributes to the small but growing literature examining whether the ideological influences found in published judicial decisions persist when unpublished decisions are examined as well.

In Part II of this article, I briefly survey the existing empirical studies of class action settlements.  In Part III, I describe the methodology I used to collect the 2006-2007 federal class action settlements and I report my findings regarding these settlements.  District court judges approved 688 class action settlements over this two-year period, involving over $33 billion. I report a number of descriptive statistics for these settlements, including the number of plaintiff versus defendant classes, the distribution of settlements by subject matter, the age of the case at settlement, the geographic distribution of settlements, the number of settlement classes, the distribution of relief across settlements, and various statistics on the amount of money involved in the settlements.  It should be noted that, despite the fact that the few prior studies that looked beyond securities settlements appeared to oversample larger settlements, much of the analysis set forth in this article is consistent with these prior studies.  This suggests that scholars may not need to sample unpublished as well as published opinions in order to paint an adequate picture of class action settlements.

In Part IV, I perform an analysis of the fees judges awarded to class action lawyers in the 2006-2007 settlements.  All told, judges awarded nearly $5 billion over this two-year period in fees and expenses to class action lawyers, or about 15% of the total amount of the settlements.  Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and, unsurprisingly, the fees awarded according to this method varied over a broad range, with a mean and median around 25%. Using regression analysis, I confirm prior studies and find that fee percentages are strongly and inversely associated with the size of the settlement.  Further, I find that the age of the case is positively associated with fee percentages but that the percentages were not associated with whether the class action was certified as a settlement class.  There also appeared to be some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located.  Fee percentages in securities cases were lower than the percentages in some but not all other areas, and district courts in some circuits—the Ninth and the Second (in securities cases)—awarded lower fee percentages than courts in many other circuits.  Finally, the regression analysis did not confirm the Realist hypothesis: there was no association between fee percentage and the political beliefs of the judge in any regression.

## II.       Prior Empirical Studies of Class Action Settlements

There are many existing empirical studies of federal securities class action settlements.[9]   Studies of securities settlements have been plentiful because for-profit organizations maintain lists of all federal securities class action settlements for the benefit of institutional investors that are entitled to file claims in these settlements.[10]   Using this data, studies have shown that since 2005, for example, there have been roughly 100 securities class action settlements in federal court each year, and these settlements have involved between $7 billion and $17 billion per year.[11]   Scholars have used this data to analyze many different aspects of these settlements, including the factors that are associated with the percentage of the settlements that courts have awarded to class action lawyers.[12]   These studies have found that the mean and median fees awarded by district court judges are between 20% and 30% of the settlement amount.[13]   These studies have also found that a number of factors are associated with the percentage of the settlement awarded as fees, including (inversely) the size of the settlement, the age of the case, whether a public pension fund was the lead plaintiff, and whether certain law firms were class counsel.[14]   None of these studies has examined whether the political affiliation of the federal district court judge awarding the fees was associated with the size of awards.

---

[9] *See, e.g.*, James D. Cox & Randall S. Thomas, *Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions*, 106 COLUM. L. REV. 1587 (2006); James D. Cox, Randall S. Thomas & Lynn Bai, *There are Plaintiffs and . . . there are Plaintiffs: An Empirical Analysis of Securities Class Action Settlements*, 61 VAND. L. REV. 355 (2008); Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, *A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after* Goldberger v. Integrated Resources, Inc., 29 WASH. U. J.L. & POL'Y 5 (2009); Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions* (St. John's Legal Studies, Research Paper No. 06-0034, 2006), *available at* http://ssrn.com/abstract=870577 [hereinafter Perino, *Markets and Monitors*]; Michael A. Perino, *The Milberg Weiss Prosecution: No Harm, No Foul?* (St. John's Legal Studies, Research Paper No. 08-0135, 2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133995 [hereinafter Perino, *Milberg Weiss*].

[10] *See, e.g.*, RiskMetrics Group, *available at* http://www.riskmetrics.com/scas.

[11] *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2007 REVIEW AND ANALYSIS 1 (2008), *available at* http://securities.stanford.edu/Settlements/REVIEW_1995-2007/Settlements_Through_12_2007.pdf.

[12] *See, e.g.*, Eisenberg, Miller & Perino, *supra* note 9, at 17-24, 28-36; Perino, *Markets and Monitors*, *supra* note 9, at 12-28, 39-44; Perino, *Milberg Weiss*, *supra* note 9, at 32-33, 39-60.

[13] *See, e.g.*, Eisenberg, Miller & Perino, *supra* note 9, at 17-18, 22, 28, 33; Perino, *Markets and Monitors*, *supra* note 9, at 20-21, 40; Perino, *Milberg Weiss*, *supra* note 9, at 32-33, 51-53.

[14] *See, e.g.*, Eisenberg, Miller & Perino, *supra* note 9, at 14-24, 29-30, 33-34; Perino, *Markets and Monitors*, *supra* note 9, at 20-28, 41; Perino, *Milberg Weiss*, *supra* note 9, at 39-58.

There are no comparable organizations that maintain lists of non-securities class action settlements.  As such, studies of class action settlements beyond the securities area are much rarer, and, when they have been done, rely on samples of settlements that were not intended to be representative of the whole.  The two largest studies of class action settlements not limited to securities class actions are a 2004 study by Ted Eisenberg and Geoff Miller,[15] which was recently updated to include data through 2008,[16] and a 2003 study by Class Action Reports.[17]  The Eisenberg-Miller studies collected data from class action settlements in both state and federal courts found from court opinions published in the Westlaw and Lexis databases and checked against lists maintained by the CCH Federal Securities and Trade Regulation Reporters.  Through 2008, their studies have now identified 689 settlements over a sixteen-year period, or less than 45 settlements per year.[18]  Over this sixteen-year period, their studies found that the mean and median settlement amounts were, respectively, $116 million and $12.5 million (in 2008 dollars), and that the mean and median fees awarded by district courts were 23% and 24% of the settlement, respectively.[19]  Their studies also performed an analysis of fee percentages and fee awards.  For the data through 2002, they found that the percentage of the settlement awarded as fees was associated with the size of the settlement (inversely), the age of the case, and whether the district court went out of its way to comment on the level of risk that class counsel had assumed in pursuing the case.[20]  For the data through 2008, they regressed only fee awards and found that the awards were inversely associated with the size of the settlement, that state courts gave lower awards than federal courts, and that the level of risk was still associated with larger awards.[21]  Their studies have not examined whether the political affiliations of the federal district court judges awarding fees were associated with the size of the awards.

The Class Action Reports study collected data on 1120 state and federal settlements over a 30 year period, or less than 40 settlements per year.[22]

---

[15] *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27 (2004).

[16] *See* Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) [hereinafter Eisenberg & Miller II].

[17] *See* Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports 169 (Mar.-Apr. 2003).

[18] *See* Eisenberg & Miller II, *supra* note 16, at 251.

[19] *See id.* at 258-59.

[20] *See* Eisenberg & Miller, *supra* note 15, at 61-62.

[21] *See* Eisenberg & Miller II, *supra* note 16, at 278.

[22] *See* Eisenberg & Miller, *supra* note 15, at 34.

Over the same ten-year period analyzed by the Eisenberg-Miller study, the Class Action Reports data found mean and median settlements of $35.4 and $7.6 million (in 2002 dollars), as well as mean and median fee percentages between 25% and 30%.[23]  Professors Eisenberg and Miller performed an analysis of the fee awards in the Class Action Reports study and found the percentage of the settlement awarded as fees was likewise associated with the size of the settlement (inversely) and the age of the case.[24]

### III.    Federal Class Action Settlements 2006 & 2007

As far as I am aware, there has never been an empirical study of all federal class action settlements in a particular year.  In this Article, I attempt to make such a study for two recent years: 2006 and 2007.  In order to compile a list of all federal class settlements in 2006 and 2007, I started with one of the aforementioned lists of securities settlements, the one maintained by RiskMetrics, and I supplemented this list with settlements that could be found through three other sources: 1) broad searches of district court opinions in the Westlaw and Lexis databases,[25] 2) four reporters of class action settlements—*BNA Class Action Litigation Report*, *Mealey's Jury Verdicts and Settlements*, *Mealey's Litigation Report*, and the *Class Action World* website[26]—and 3) a list from the Administrative Office of Courts of all district court cases coded as class actions that terminated by settlement between 2005 and 2008.[27]  I then removed any duplicate cases and examined the docket sheets and court orders of each of the remaining cases to determine whether the cases were in fact certified as class actions under either Rule 23, Rule 23.1, or Rule 23.2.[28]  For each of the cases verified as such, I gathered the district court's order approving the settlement, the district court's order awarding attorneys' fees, and, in many cases, the settlement agreements and class counsel's motions for fees, from electronic databases

---

[23] *See id.* at 47, 51.

[24] *See id.* at 61-62.

[25] The searches consisted of the following terms: ("class action" & (settle! /s approv! /s (2006 2007))); (((counsel attorney) /s fee /s award!) & (settle! /s (2006 2007)) & "class action"); ("class action" /s settle! & da(aft 12/31/2005 & bef 1/1/2008)); ("class action" /s (fair reasonable adequate) & da(aft 12/31/2005 & bef 1/1/2008)).

[26] *See* http://classactionworld.com/

[27] I examined the AO lists in the year before and after the two-year period under investigation because the termination date recorded by the AO was not necessarily the same date the district court approved the settlement.

[28] *See* Fed. R. Civ. P. 23, 23.1 & 23.2.  I excluded from this analysis opt-in collective actions, such as those brought pursuant to the provisions of the Fair Labor Standards Act, *see* 29 U.S.C. § 216(b), if such actions did not also include claims certified under the opt-out mechanism in Rule 23.

7

(such as Westlaw or PACER), and, when necessary, from the clerk's offices of the various federal district courts. In this Part, I report the characteristics of the settlements themselves, and, in the next Part, I report the characteristics of the attorneys' fees awarded to class counsel by the district courts that approved the settlements.

### A.   Number of settlements

I found 688 settlements approved by federal district courts during 2006 and 2007 using the methodology described above. This is almost the exact same number the Eisenberg-Miller study found over a *sixteen*-year period in both federal *and* state court. Indeed, the number of annual settlements identified in this study is *several times* the number of annual settlements that have been identified in any prior empirical study of class action settlements. Of the 688 settlements I found, 304 of these settlements were approved in 2006 and 384 were approved in 2007.[29]

### B.   Defendant versus plaintiff classes

Although Rule 23 permits federal judges to certify either a class of plaintiffs or a class of defendants, it is widely assumed that it is extremely rare for courts to certify defendant classes.[30] My findings confirm this widely held assumption. Of the 688 class action settlements approved in 2006 and 2007, 685 involved plaintiff classes and only three involved defendant classes. All three of these defendant-class settlements were in employment benefits cases, where companies sued classes of current or former employees.[31]

### C.   Settlement subject areas

---

[29] A settlement was assigned to a particular year if the district court judge's order approving the settlement was dated between January 1 and December 31 of that year. Cases involving multiple defendants sometimes settled over time because defendants would settle separately with the plaintiff class. All such partial settlements approved by the district court on the same date were treated as one settlement. Partial settlements approved by the district court on different dates were treated as different settlements.

[30] *See, e.g.,* Robert H. Klonoff, Edward K.M. Bilich & Suzette M. Malveaux, Class Actions and Other Multi-Party Litigation: Cases and Materials 1061 (2d ed. 2006).

[31] *See* Halliburton Company v. Graves, No. 04-00280 (S.D. Tex., Sep. 28, 2007); Rexam, Inc. v. United Steel Workers of America, No. 03-2998 (D. Minn. Aug. 29, 2007); Rexam, Inc. v. United Steel Workers of America, No. 03-2998 (D. Minn. Sept. 17, 2007).

Although courts are free to certify Rule 23 classes in almost any subject area, it is widely assumed that securities settlements dominate the federal class action docket.[32]  At least in terms of the number of settlements, my findings reject this conventional wisdom.  As Table 1 shows, although securities settlements comprised a large percentage of the 2006 and 2007 settlements, they did not comprise a majority of those settlements.  As one would have expected in light of Supreme Court precedent over the last two decades,[33] there were almost no mass tort class actions (included in the "Other" category) settled over the two-year period.

Although the Eisenberg-Miller study through 2008 is not directly comparable on the distribution of settlements across litigation subject areas— because its state and federal court data cannot be separated (more than 10% of the settlements were from state court[34]) and because it excludes settlements in fee-shifting cases—their study through 2008 is the best existing point of comparison.  Interestingly, despite the fact that state courts were included in their data, their study through 2008 found about the same percentage of securities cases (39%) as my 2006-2007 dataset shows.[35]  But their study found many more consumer (18%) and antitrust (10%) cases while finding many fewer labor and employment (8%), employee benefits (6%), and civil rights (3%) cases.[36]  This is not unexpected given their reliance on published opinions and their exclusion of fee-shifting cases.

---

[32] *See, e.g.*, John C. Coffee, Jr., *Reforming the Security Class Action: An Essay on Deterrence and its Implementation*, 106 COLUM. L. REV. 1534, 1539-40 (2006) (describing securities class actions as "the 800-pound gorilla that dominates and overshadows other forms of class actions").

[33] *See, e.g.*, Samuel Issacharoff, *Private Claims, Aggregate Rights*, 2008 SUP. CT. REV. 183, 208.

[34] *See* Eisenberg & Miller II, *supra* note 16, at 257.

[35] *See id.* at 262.

[36] *See id.*

**Table 1: The number of class action settlements approved by federal judges in 2006 and 2007 in each subject area**

| *Subject matter* | *Number of settlements* | |
|---|---|---|
| | **2006** | **2007** |
| Securities | 122 (40%) | 135 (35%) |
| Labor and Employment | 41 (14%) | 53 (14%) |
| Consumer | 40 (13%) | 47 (12%) |
| Employee Benefits | 23 (8%) | 38 (10%) |
| Civil Rights | 24 (8%) | 37 (10%) |
| Debt Collection | 19 (6%) | 23 (6%) |
| Antitrust | 13 (4%) | 17 (4%) |
| Commercial | 4 (1%) | 9 (2%) |
| Other | 18 (6%) | 25 (6%) |
| **Total** | **304** | **384** |

Note: Securities: cases brought under federal and state securities laws.   Labor and Employment: workplace claims brought under either federal or state law, with the exception of ERISA cases.   Consumer: cases brought under the Fair Credit Reporting Act as well as cases for consumer fraud, etc.   Employee Benefits: ERISA cases.   Civil Rights: cases brought under 42 U.S.C. § 1983 or cases brought under the Americans with Disability Act seeking non-workplace accommodations.   Debt Collection: cases brought under the Fair Debt Collection Practices Act.   Antitrust: cases brought under federal or state antitrust laws. Commercial: cases between businesses, excluding antitrust cases.   Other: includes, among other things, derivative actions against corporate managers and directors, environmental suits, insurance suits, Medicare and Medicaid suits, product liability suits, and mass tort suits.
Sources: Westlaw, PACER, district court clerks' offices.

*D.   Settlement classes*

The Federal Rules of Civil Procedure permit parties to seek certification of a suit as a class action for settlement purposes only.[37]   When the district court certifies a class in such circumstances, the court need not consider whether it would be manageable to try the litigation as a class.[38]   So-called "settlement classes" have always been more controversial than classes certified for litigation because they raise the prospect that, at least where there are competing class actions filed against the same defendant, the defendant could play class counsel off one another to find the one willing to settle the case for the least amount of money.[39]   Prior to the Supreme Court's 1997 opinion in *Amchem Products, Inc. v. Windsor*,[40] it was uncertain

---

[37] *See* Martin H. Redish, *Settlement Class Actions, The Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process*, 73 U. Chi. L. Rev. 545, 553 (2006).

[38] *See* Amchem Products, Inc v Windsor, 521 US 591, 620 (1997).

[39] *See* Redish, *supra* note 37, at 557-59.

[40] 521 US 591 (1997).

whether the Federal Rules even permitted settlement classes. It may therefore be a bit surprising to learn that 68% of the federal settlements in 2006 and 2007 were settlement classes. This percentage is higher than the percentage found in the Eisenberg-Miller studies, which found that only 57% of class action settlements in state and federal court between 2003 and 2008 were settlement classes.[41] It should be noted that the distribution of litigation subject areas among the settlement classes in my 2006-2007 federal data set did not differ much from the distribution among non-settlement classes, with two exceptions. One exception was consumer cases, which were nearly three times as prevalent among settlement classes (15.9%) as non-settlement classes (5.9%); the other was civil rights cases, which were four times as prevalent among non-settlement classes (18.0%) as settlements classes (4.5%). In light of the skepticism with which the courts had long treated settlement classes, one might have suspected that courts would award lower fee percentages in such settlements. Nonetheless, as I report in Part III, whether a case was certified as a settlement class was not associated with the fee percentages awarded by federal district court judges.

### E. The age at settlement

One interesting question is how long class actions were litigated before they reached settlement. Unsurprisingly, cases reached settlement over a wide range of ages.[42] As shown in Table 2, the average time to settlement was a bit more than 3 years (1196 days) and the median time was a bit under 3 years (1068 days). The average and median ages here are similar to those found in Eisenberg-Miller study through 2002, which found averages of 3.35 years in fee-shifting cases and 2.86 years in non-fee-shifting cases, and medians of 4.01 years in fee-shifting cases and 3.0 years in non-fee-shifting cases.[43] Their study through 2008 did not report case ages.

The shortest time to settlement was 105 days in a labor and employment case.[44] The longest time to settlement was nearly 15 years (5443 days) in a commercial case.[45] The average and median time to settlement varied

---

[41] *See* Eisenberg & Miller II, *supra* note 16, at 266.

[42] The age of the case was calculated by subtracting the date the relevant complaint was filed from the date the settlement was approved by the district court judge. The dates were taken from PACER. For consolidated cases, I used the date of the earliest complaint. If the case had been transferred, consolidated, or removed, the date the complaint was filed was not always available from PACER. In such cases, I used the date the case was transferred, consolidated, or removed as the start date.

[43] *See* Eisenberg & Miller, *supra* note 15, at 59-60.

[44] *See* Clemmons v. Rent-A-Center West, Inc., No. 05-6307 (D. Or. Jan. 20, 2006).

[45] *See* Allapattah Services Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006).

significantly by litigation subject matter, with securities cases generally taking the longest time and debt collection cases taking the shortest time. Labor and employment cases and consumer cases also settled relatively early.

**Table 2: The number of days 2006-2007 federal class action cases took to reach settlement in each subject area**

| Subject matter | Average | Median | Minimum | Maximum |
|---|---|---|---|---|
| | | | | |
| Securities | 1438 | 1327 | 392 | 3802 |
| Labor and Employment | 928 | 786 | 105 | 2497 |
| Consumer | 963 | 720 | 127 | 4961 |
| Employee Benefits | 1162 | 1161 | 164 | 3157 |
| Civil Rights | 1373 | 1360 | 181 | 3354 |
| Debt Collection | 738 | 673 | 223 | 1973 |
| Antitrust | 1140 | 1167 | 237 | 2480 |
| Commercial | 1267 | 760 | 163 | 5443 |
| Other | 1065 | 962 | 185 | 3620 |
| | | | | |
| **All** | **1196** | **1068** | **105** | **5443** |
| Source: PACER. | | | | |

### F.  The location of settlements

The 2006-2007 federal class action settlements were not distributed across the country in the same way federal civil litigation is in general.  As Figure 1 shows, some of the geographic circuits attracted much more class action attention than we would expect based on their docket size, and others attracted much less.  In particular, district courts in the First, Second, Seventh, and Ninth Circuits approved a much larger share of class action settlements than the share of all civil litigation they resolved, with the First, Second, and Seventh Circuits approving nearly double the share and the Ninth Circuit approving one-and-one half times the share.  By contrast, the shares of class action settlements approved by district courts in the Fifth and Eighth Circuits were less than one half of their share of all civil litigation, with the Third, Fourth, and Eleventh Circuits also exhibiting significant underrepresentation.

With respect to a comparison with the Eisenberg-Miller studies, their federal court data through 2008 can be separated from their state court data on the question of the geographic distribution of settlements, and there are some significant differences between their federal data and the numbers reflected in Figure 1.  Their study reported considerably higher proportions of settlements than I found from the Second (23.8%), Third (19.7%), Eighth

(4.8%), and D.C. (3.3%) Circuits, and considerably lower proportions from
the Fourth (1.3%), Seventh (6.8%), and Ninth (16.6%) Circuits.[46]

**Figure 1: The percentage of 2006-2007 district court civil terminations
and class action settlements in each federal circuit**



Sources: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (*available at*
http://www.uscourts.gov/stats/index.html).

Figure 2 separates the class action settlement data in Figure 1 into
securities and non-securities cases.   Figure 2 suggests that the over-
representation of settlements in the First and Second Circuits is largely
attributable to securities cases, whereas the over-representation in the
Seventh Circuit is attributable to non-securities cases, and the over-
representation in the Ninth is attributable to both securities and non-securities
cases.

---

[46] *See* Eisenberg & Miller II, *supra* note 16, at 260.

Figure 2: The percentage of 2006-2007 district court civil terminations and class action settlements in each federal circuit



Sources: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (*available at* http://www.uscourts.gov/stats/index.html).

It is interesting to ask why some circuits received more class action attention than others. One hypothesis is that class actions are filed in circuits where class action lawyers believe they can find favorable law or favorable judges. Federal class actions often involve class members spread across multiple states, and, as such, class action lawyers may have a great deal of discretion over which district they file suit in.[47] One way in which law or judges may be favorable to class action attorneys is with regard to attorneys' fees. In Part III, I attempt to test whether district court judges in the circuits with the most over- and under-subscribed class action dockets award attorneys' fees that would attract or discourage filings there; I find no evidence that they do.

Another hypothesis is that class action suits are settled in jurisdictions where defendants are located. This might be the case because, although class action lawyers may have discretion over where to file, venue restrictions might ultimately restrict cases to jurisdictions in which defendants have their corporate headquarters or other operations.[48] This might explain why the

---

[47] *See* Samuel Issacharoff & Richard Nagareda, *Class Settlements Under Attack*, 156 U. PA. L. REV. 1649, 1662 (2008).

[48] *See* 28 U.S.C. §§ 1391, 1404, 1406, 1407. *See also* Foster v. Nationwide Mutual Ins. Co., No. 07-04928, 2007 U.S. Dist. LEXIS 95240 at *2-17 (N.D. Cal. Dec. 14, 2007) (transferring

Second Circuit, with the financial industry in New York, sees so many securities suits, and why other circuits with cities with a large corporate presence, such as the First (Boston), Seventh (Chicago), and Ninth (Los Angeles and San Francisco), see more settlements than one would expect based on the size of their civil dockets.

Another hypothesis might be that class action lawyers file cases wherever it is most convenient for them to litigate the cases—*i.e.*, in the cities in which their offices are located. This, too, might explain the Second Circuit's overrepresentation in securities settlements, with prominent securities firms located in New York, as well as the over-representation of other settlements in some of the circuits in which major metropolitan areas with prominent plaintiffs' firms are found.

### G.  Type of relief

Under Rule 23, district court judges can certify class actions for injunctive or declaratory relief, for money damages, or for a combination of the two.[49]  In addition, settlements can provide money damages both in the form of cash as well as in the form of in-kind relief, such as coupons to purchase the defendant's products.[50]

As shown in Table 3, the vast majority of class actions settled in 2006 and 2007 provided cash relief to the class (89%), but a substantial number also provided in-kind relief (6%) or injunctive or declaratory relief (23%). As would be expected in light of the focus on consumer cases in the debate over the anti-coupon provision in the Class Action Fairness Act of 2005,[51] consumer cases had the greatest percentage of settlements providing for in-kind relief (30%).  Civil rights cases had the greatest percentage of settlements providing for injunctive or declaratory relief (75%), though almost half of civil rights cases also provided some cash relief (49%).  The securities settlements were quite distinctive from the settlements in other

---

venue to jurisdiction where the defendant's corporate headquarters were located).  One prior empirical study of securities class action settlements found that 85% of such cases are filed in the home circuit of the defendant corporation.  *See* James D. Cox, Randall S. Thomas & Lynn Bai, *Do Differences in Pleading Standards Cause Forum Shopping in Securities Class Actions?: Doctrinal and Empirical Analyses*, 2009 WIS. L. REV. 421, 429, 440, 450-51 (2009).

[49] *See* FED. R. CIV. P. 23(b).

[50] These coupon settlements have become very controversial in recent years, and Congress discouraged them in the Class Action Fairness Act of 2005 by tying attorneys' fees to the value of coupons that were ultimately redeemed by class members as opposed to the value of coupons offered class members.  *See* 28 U.S.C. § 1712.

[51] *See, e.g.,* 151 CONG. REC. H723 (2005) (statement of Rep. Sensenbrenner) (arguing that consumers are "seeing all of their gains go to attorneys and them just getting coupon settlements from the people who have allegedly done them wrong.").

areas in their singular focus on cash relief: every single securities settlement provided cash to the class and almost none of them provided in-kind, injunctive, or declaratory relief.  This is but one example of how the focus on securities settlements in the prior empirical scholarship can lead to a distorted picture of class action litigation.

**Table 3: The percentage of 2006 and 2007 class action settlements providing each type of relief in each subject area**

| Subject matter | Cash | In-kind relief | Injunctive or declaratory relief |
|---|---|---|---|
| | | | |
| Securities (n=257) | 100% | 0% | 2% |
| Labor and Employment (n=94) | 95% | 6% | 29% |
| Consumer (n=87) | 74% | 30% | 37% |
| Employee Benefits (n=61) | 90% | 0% | 34% |
| Civil Rights (n=61) | 49% | 2% | 75% |
| Debt Collection (n=42) | 98% | 0% | 12% |
| Antitrust (n=30) | 97% | 13% | 7% |
| Commercial (n=13) | 92% | 0% | 62% |
| Other (n=43) | 77% | 7% | 33% |
| **All (n=688)** | **89%** | **6%** | **23%** |

Note: Cash: cash, securities, refunds, charitable contributions, contributions to employee benefit plans, forgiven debt, relinquishment of liens or claims, and liquidated repairs to property.  In-kind relief: vouchers, coupons, gift cards, warranty extensions, merchandise, services, and extended insurance policies.  Injunctive or declaratory relief: modification of terms of employee benefit plans, modification of compensation practices, changes in business practices, capital improvements, research, and unliquidated repairs to property.
Sources: Westlaw, PACER, district court clerks' offices.

H.  *Settlement money*

Although securities settlements did not comprise the majority of federal class action settlements in 2006 and 2007, they did comprise the majority of the money—indeed, the *vast majority* of the money—involved in class action

settlements. In Table 4, I report the total amount of ascertainable value involved in the 2006 and 2007 settlements. This amount includes all determinate[52] payments in cash or cash equivalents (such as marketable securities), including attorneys' fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.[53] I did not attempt to assign a value to any relief that was not valued by the district court (even if it may have been valued by class counsel). It should be noted that district courts did not often value in-kind or injunctive relief—they did so only 18% of the time—and very little of the amounts set forth in Table 4—only $1.3 billion, or 4%—are based on these valuations. It should also be noted that the amounts in Table 4 reflect only what defendants *agreed to pay*; they do not reflect the amounts that defendants *actually paid* out after the claims administration process concluded. Prior empirical research has found that, depending on how settlements are structured (e.g., whether they awarded a fixed amount of money to each class member who eventually files a valid claim or a pro rata amount of a fixed settlement to each class member), defendants can end up paying much less than they agreed.[54]

---

[52] For example, I excluded awards of a fixed amount of money to each class member who eventually filed a valid claim (as opposed to settlements that awarded a pro rata amount of a fixed settlement to each class member) if the total amount of money set aside to pay the claims was not set forth in the settlement documents.

[53] In some cases, the district court valued the relief in the settlement over a range. In these cases, I used the middle point in the range.

[54] *See* HENSLER, ET AL., *supra* note 7, at 427-430.

17

**Table 4: The total amount of money involved in federal class action settlements in 2006 and 2007**

| Subject matter | Total ascertainable monetary value in settlements (and percentage of overall annual total) | | | |
|---|---|---|---|---|
| | **2006** (n=304) | | **2007** (n=384) | |
| Securities | $16,728 | 76% | $8,038 | 73% |
| Labor and Employment | $266.5 | 1% | $547.7 | 5% |
| Consumer | $517.3 | 2% | $732.8 | 7% |
| Employee Benefits | $443.8 | 2% | $280.8 | 3% |
| Civil Rights | $265.4 | 1% | $81.7 | 1% |
| Debt Collection | $8.9 | <1% | $5.7 | <1% |
| Antitrust | $1,079 | 5% | $660.5 | 6% |
| Commercial | $1,217 | 6% | $124.0 | 1% |
| Other | $1,568 | 7% | $592.5 | 5% |
| | | | | |
| **Total** | **$22,093** | **100%** | **$11,063** | **100%** |

Note: Dollar amounts are in millions.  Includes all determinate  payments in cash or cash equivalents (such as marketable securities), including attorneys' fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court. Sources: Westlaw, PACER, district court clerks' offices.

Table 4 shows that, in both years, around three-quarters of all the money involved in federal class action settlements came from securities cases.  Thus, in this sense, the conventional wisdom about the dominance of securities cases in class action litigation is correct.   Figure 3 is a graphical representation of the contribution each litigation area makes to the total number and total amount of money involved in the 2006-2007 settlements.

**Figure 3: The percentage of 2006-2007 federal class action settlements and settlement money from each subject area**



Sources: Westlaw, PACER, district court clerks' offices.

Table 4 also shows that, in total, over $33 billion was approved in the 2006-2007 settlements. Over $22 billion was approved in 2006 and over $11 billion in 2007. It should be emphasized again that the totals in Table 4 understate the amount of money defendants agreed to pay in class action settlements in 2006 and 2007 because they exclude the unascertainable value of those settlements. This understatement disproportionately affects litigation areas, such as civil rights, where much of the relief is injunctive because, as I noted, very little of such relief was valued by district courts. Nonetheless, these numbers are, as far as I am aware, the first attempt to calculate how much money is involved in federal class action settlements in a given year.

The significant discrepancy between the two years is largely attributable to the 2006 securities settlement related to the collapse of Enron, which totaled $6.6 billion, as well as to the fact that seven of the eight 2006-2007 settlements for more than $1 billion were approved in 2006.[55] Indeed, it is

---

[55] *See* In re Enron Corporation Securities Litigation, MDL 1446 (S.D. Tex. May 24, 2006) ($6,600,000,000); In re Tyco International Ltd. Multidistrict Litigation, MDL 02-1335 (D.N.H. Dec. 19, 2007) ($3,200,000,000); In re AOL Time Warner, Inc. Securities and "ERISA" Litigation, MDL 1500 (S.D.N.Y. Apr. 6, 2006) ($2,500,000,000); In re: Diet Drugs

worth noting that the eight settlements for more than $1 billion accounted for almost $18 billion of the $33 billion that changed hands over the two year period. That is, a mere 1% of the settlements comprised over 50% of the wealth involved in federal class action settlements in 2006 and 2007. In order to give some sense of the distribution of settlement size in the 2006-2007 dataset, Table 5 sets forth the number of settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards (605 out of the 688 settlements). Nearly two-thirds of all settlements fell below $10 million.

**Table 5: The distribution by size of 2006-2007 federal class action settlements with ascertainable value**

| Settlement Size (in millions) | Number of Settlements |
|---|---|
| [$0 to $1] | 131 (21.7%) |
| ($1 to $10] | 261 (43.1%) |
| ($10 to $50] | 139 (23.0%) |
| ($50 to $100] | 33 (5.45%) |
| ($100 to $500] | 31 (5.12%) |
| ($500 to $6600] | 10 (1.65%) |
| **Total** | 605 |

Note: includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
Sources: Westlaw, PACER, district court clerks' offices.

Given the disproportionate influence exerted by securities settlements on the total amount of money involved in class actions, it is unsurprising that the average securities settlement involved more money than the average settlement in most of the other subject areas. These numbers are provided in Table 6, which includes, again, only the settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards. The average settlement over the entire two-year period for all types of cases was almost $55 million, but the median was only $5.1 million. (With the $6.6 billion Enron settlement excluded, the average settlement for all ascertainable

Products Liability Litigation, MDL 1203 (E.D. Pa. May 24, 2006) ($1,275,000,000); In re Nortel Networks Corp. Securities Litigation (Nortel I), No.01-1855 (S.D.N.Y. Dec. 26, 2006) ($1,142,780,000); In re Royal Ahold N.V. Securities and ERISA Litigation, 03-1539 (D. Md. Jun. 16, 2006) ($1,100,000,000); Allapattah Services Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) ($1,075,000,000); In re Nortel Networks Corp. Securities Litigation (Nortel II), No. 05-1659 (S.D.N.Y. Dec. 26, 2006) ($1,074,270,000).

cases dropped to $43.8 million, and, for securities cases, dropped to $71.0 million.)  The average settlements varied widely by litigation area, with securities and commercial settlements at the high end of around $100 million, but the median settlements for nearly every area were bunched around a few million dollars.  It should be noted that the high average for commercial cases is largely due to one settlement above $1 billion;[56] when that settlement is removed, the average for commercial cases was only $24.2 million.

**Table 6: The average and median settlement amounts in the 2006-2007 federal class action settlements with ascertainable value to the class**

| Subject matter | Average | Median |
|---|---|---|
|  |  |  |
| Securities (n=257) | $96.4 | $8.0 |
| Labor and Employment (n=88) | $9.2 | $1.8 |
| Consumer (n=65) | $18.8 | $2.9 |
| Employee Benefits (n=52) | $13.9 | $5.3 |
| Civil Rights (n=34) | $9.7 | $2.5 |
| Debt Collection (n=40) | $0.37 | $0.088 |
| Antitrust (n=29) | $60.0 | $22.0 |
| Commercial (n=12) | $111.7 | $7.1 |
| Other (n=28) | $76.6 | $6.2 |
|  |  |  |
| **All (n=605)** | **$54.7** | **$5.1** |

Note: Dollar amounts are in millions.  Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
Sources: Westlaw, PACER, district court clerks' offices.

Table 6 permits comparison with the two prior empirical studies of class action settlements that sought to include non-securities as well as securities cases in their purview.  The Eisenberg-Miller study through 2002, which included both common-fund and fee-shifting cases, found that the mean class action settlement was $112 million and the median was $12.9 million, both in 2006 dollars,[57] more than double the average and median I found for all settlements in 2006 and 2007.  The Eisenberg-Miller update through 2008 included only common-fund cases and found mean and median settlements in federal court of $115 million and $11.7 million (both again in 2006 dollars),[58] respectively; this is still more than double the average and median I found. This suggests that the methodology used by the Eisenberg-Miller studies—

---

[56] *See* Allapattah Services Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) (approving $1,075,000,000 settlement).

[57] *See* Eisenberg & Miller, *supra* note 15, at 47.

[58] *See* Eisenberg & Miller II, *supra* note 16, at 262.

looking at district court opinions that were published in Westlaw or Lexis—oversampled larger class actions (because opinions approving larger class actions are, presumably, more likely to be published than opinions approving smaller ones). It is also possible that the exclusion of fee-shifting cases from their data through 2008 contributed to this skew, although, given that their data through 2002 included fee-shifting cases and found an almost identical mean and median as their data through 2008, the primary explanation for the much larger mean and median in their study through 2008 is probably their reliance on published opinions. Over the same years examined by Professors Eisenberg and Miller, the Class Action Reports study found a smaller average settlement than I did ($39.5 million in 2006 dollars), but a larger median ($8.48 million in 2006 dollars). It is possible that the Class Action Reports methodology also oversampled larger class actions, explaining its larger median, but that there are more "mega" class actions today than there were before 2003, explaining its smaller mean.[59]

It is interesting to ask how significant the $16 billion that was involved annually in these 350 or so federal class action settlements is in the grand scheme of American litigation. Unfortunately, we do not know how much money is transferred every year in American litigation. The only studies of which I am aware that attempt even a partial answer to this question are the estimates of how much money is transferred in the American "tort" system every year by a financial services consulting firm, Tillinghast-Towers Perrin.[60] These studies are not directly comparable to the class action settlement numbers because, again, the number of tort class action settlements in 2006 and 2007 was very small. Nonetheless, as the tort system no doubt constitutes a large percentage of the money transferred in all litigation, these studies provide something of a point of reference to assess the significance of class action settlements. In 2006 and 2007, Tillinghast-Towers Perrin estimated that the American tort system transferred $160 billion and $164 billion, respectively, to claimants and their lawyers.[61] The total amount of money involved in the 2006 and 2007 federal class action settlements reported in Table 4 was, therefore, roughly 10% of the

---

[59] There were eight class action settlements during 2006 and 2007 of more than $1 billion. *See* note 55 *supra.*

[60] Some commentators have been critical of Tillinghast's reports, typically on the ground that the reports overestimate the cost of the tort system. *See* M. Martin Boyer, *Three Insights from the Canadian D&O Insurance Market: Inertia, Information and Insiders*, 14 CONN. INS. L.J. 75, 84 (2007); John Fabian Witt, *Form and Substance in the Law of Counterinsurgency Damages*, 41 LOY. L.A. L. REV. 1455, 1475 n.135 (2008). If these criticisms are valid, then class action settlements would appear even more significant as compared to the tort system.

[61] *See* TILLINGHAST-TOWERS PERRIN, U.S. TORT COSTS: 2008 UPDATE 5 (2008). The report calculates $252 billion in total tort "costs" in 2007 and $246.9 billion in 2006, *see id.*, but only 65% of those costs represent payments made to claimants and their lawyers (the remainder represents insurance administration costs and legal costs to defendants). *See* TILLINGHAST-TOWERS PERRIN, U.S. TORT COSTS: 2003 UPDATE 17 (2003).

Tillinghast-Towers Perrin estimate.  This suggests that, in merely 350 cases every year, federal class action settlements involve the same amount of wealth as 10% of the entire American tort system.  It would seem that this is a significant amount of money for so few cases.

## IV.   Attorneys' Fees in Federal Class Action Settlements 2006 & 2007

### A.  Total Amount of Fees and Expenses

As I demonstrated in Part III, federal class action settlements involved a great deal of money in 2006 and 2007, some $16 billion a year.  A perennial concern with class action litigation is whether class action lawyers are reaping an outsized portion of this money.[62]  The 2006-2007 federal class action data suggest that these concerns may be exaggerated.  As shown in Table 7, only 13% of the settlement amount in 2006 and 20% of the amount in 2007 went to class action lawyers as fee and expense awards.[63]  The 2006 percentage is lower than the 2007 percentage in large part because the class action lawyers in the Enron securities settlement received less than 10% of the $6.6 billion corpus.  In any event, the percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33%.[64]  Lawyers received less than 33% of settlements in fees and expenses in virtually every subject area in both years.

---

[62] *See, e.g.*, John C. Coffee, Jr., Commentary, *Conflicts, Consent, and Allocation After Amchem Products—Or, Why Attorneys Still Need Consent to Give Away Their Clients' Money*, 84 VA. L. REV. 1541, 1544 (1998); Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. REV. 991, 995 (2002).

[63] In some of the partial settlements, *see* note 29 *supra*, the district court awarded expenses for all the settlements at once and it was unclear what portion of the expenses was attributable to which settlement.  In these instances, I assigned each settlement a pro rata portion of expenses.  To the extent possible, all of the fee and expense numbers in this article exclude any interest known to be awarded by the courts.

[64] *See, e.g.*, Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267, 284-86 (1998) (reporting results of a survey of Wisconsin lawyers).

**Table 7: The total amount of fees and expenses awarded to class action lawyers in federal class action settlements in 2006 and 2007**

| Subject matter | Total fees and expenses awarded in settlements (and as percentage of total settlement amounts) in each subject area | |
|---|---|---|
| | **2006** (n=292) | **2007** (n=363) |
| Securities | $1,899 (11%) | $1,467 (20%) |
| Labor and Employment | $75.1 (28%) | $144.5 (26%) |
| Consumer | $126.4 (24%) | $65.3 (9%) |
| Employee Benefits | $57.1 (13%) | $71.9 (26%) |
| Civil Rights | $31.0 (12%) | $32.2 (39%) |
| Debt Collection | $2.5 (28%) | $1.1 (19%) |
| Antitrust | $274.6 (26%) | $157.3 (24%) |
| Commercial | $347.3 (29%) | $18.2 (15%) |
| Other | $119.3 (8%) | $103.3 (17%) |
| | | |
| **Total** | **$2,932 (13%)** | **$2,063 (20%)** |

Note: Dollar amounts are in millions. Excludes settlements in which fees were not (or at least not yet) sought (22 settlements), settlements in which fees have not yet been awarded (2 settlements), and settlements in which fees could not be ascertained due to indefinite award amounts, missing documents, or non-public side agreements (9 settlements).
Sources: Westlaw, PACER, district court clerks' offices.

It should be noted that, in some respect, the percentages in Table 7 overstate the portion of settlements that were awarded to class action attorneys because, again, many of these settlements involved indefinite cash relief or non-cash relief that could not be valued.[65] If the value of all of this relief could have been included, then the percentages in Table 7 would have been even lower. On the other hand, as noted above, not all of the money defendants agree to pay in class action settlements is ultimately collected by the class.[66] To the extent leftover money is returned to the defendant, the percentages in Table 7 understate the portion class action lawyers received relative to their clients.

*B. Method of Awarding Fees*

---

[65] Indeed, the large year-to-year variation in the percentages in labor, consumer, and employee benefits cases arose because district courts made particularly large valuations of the equitable relief in a few settlements and used the lodestar method to calculate the fees in these settlements (and thereby did not consider their large valuations in calculating the fees).

[66] *See* HENSLER, ET AL., *supra* note 7, at 427-430.

District court judges have a great deal of discretion in how they set fee awards in class action cases. Under Rule 23, federal judges are told only that the fees they award to class counsel must be "reasonable."[67] Courts often exercise this discretion by choosing between two approaches: the lodestar approach or the percentage-of-the-settlement approach.[68] The lodestar approach works much the way it does in individual litigation: the court calculates the fee based on the number of hours class counsel actually worked on the case multiplied by a reasonable hourly rate and a discretionary multiplier.[69] The percentage-of-the-settlement approach bases the fee on the size of the settlement rather than the hours class counsel actually worked: the district court picks a percentage of the settlement that it thinks is reasonable based on a number of factors, one of which is often the fee lodestar (sometimes referred to as a "lodestar cross check").[70] My 2006-2007 dataset shows that the percentage-of-the-settlement approach has become much more common than the lodestar approach. In 69% of the settlements reported in Table 7, district court judges employed the percentage-of-the-settlement method with or without the lodestar cross check. They employed the lodestar method in only 12% of settlements. In the other 20% of settlements, the court did not state the method it used or it used another method altogether.[71] The pure lodestar method was used most often in consumer (29%) and debt collection (45%) cases. These numbers are fairly consistent with the Eisenberg-Miller data from 2003 to 2008. They found that the lodestar method was used in only 9.6% of settlements.[72] Their number is no doubt lower than the 12% number found in the 2006-2007 dataset because they excluded fee-shifting cases from their study.

---

[67] FED. R. CIV. P. 23(h).

[68] The discretion to pick between these methods is most pronounced in settlements where the underlying claim was not found in a statute that would shift attorney's fees to the defendant, *see, e.g., In re* Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st. Cir. 1995) (permitting either percentage or lodestar method in common fund cases); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (same); Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993) (same). By contrast, courts typically used the lodestar approach in settlements arising from fee-shifting cases.

[69] *See* Eisenberg & Miller, *supra* note 15, at 31.

[70] *See id.* at 31-32.

[71] These numbers are based on the fee method described in the district court's order awarding fees, unless the order was silent, in which case the method, if any, described in class counsel's motion for fees (if it could be obtained) was used. If the court explicitly justified the fee award by reference to its percentage of the settlement, I counted it as the percentage method. If the court explicitly justified the award by reference to a lodestar calculation, I counted it as the lodestar method. If the court explicitly justified the award by reference to both, I counted it as the percentage method with a lodestar cross check. If the court calculated neither a percentage nor the fee lodestar in its order, then I counted it as an "other" method.

[72] *See* Eisenberg & Miller II, *supra* note 16, at 267.

ॉัੀਾਂੌ

court's order or counsel's motion for fees and expenses (which was 96% of the time).  The awards ranged from 3% of the settlement to 47% of the settlement.  The average award was 25.4% and the median was 25%.  Most fee awards were between 25% and 35%, with almost no awards more than 35%.  The Eisenberg-Miller study through 2008 found a slightly lower mean (24%) but the same median (25%) among its federal court settlements.[79]

**Figure 4: The distribution of 2006-2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar crosscheck**



Sources: Westlaw, PACER, district court clerks' offices.

It should be noted that in 218 of these 444 settlements (49%), district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded.  In 204 of these settlements, the lodestar multiplier resulting from the fee award could be ascertained.  The lodestar multiplier in these cases ranged from .07 to 10.3, with a mean of 1.65 and a median of 1.34.  Although there is always the possibility that class counsel are optimistic with their time sheets when they submit them for lodestar consideration, these lodestar numbers—only one multiplier above 6.0, with the bulk of the range not much above 1.0—strike me as fairly parsimonious for the risk that goes into any piece of litigation

---

[79] *See* Eisenberg & Miller II, *supra* note 16, at 259.

and cast doubt on the notion that the percentage-of-the-settlement method results in windfalls to class counsel.[80]

Table 8 shows the mean and median fee percentages awarded in each litigation subject area. The fee percentages did not appear to vary greatly across litigation subject areas, with most mean and median awards between 25% and 30%. As I report later in this Part, however, after controlling for other variables, there were statistically significant differences in the fee percentages awarded in some subject areas compared to others. The mean and median percentages for securities cases were 24.7% and 25.0%, respectively; for all non-securities cases, the mean and median were 26.1% and 26.0%, respectively. The Eisenberg-Miller study through 2008 found mean awards ranging from 21-27% and medians from 19-25%,[81] a bit lower than the ranges in my 2006-2007 dataset, which again, may be because they oversampled larger settlements (as I show below, district courts awarded smaller fee percentages in larger cases).

---

[80] It should be emphasized, of course, that these 204 settlements may not be representative of the settlements where the percentage-of-the-settlement method was used without the lodestar crosscheck.

[81] *See* Eisenberg & Miller II, supra *note* 16, at 262.

**Table 8: Fee awards in 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Subject matter | Percentage of settlement awarded as fees | |
|---|---|---|
| | Mean | Median |
| Securities (n=233) | 24.7% | 25.0% |
| Labor and Employment (n=61) | 28.0% | 29.0% |
| Consumer (n=39) | 23.5% | 24.6% |
| Employee Benefits (n=37) | 26.0% | 28.0% |
| Civil Rights (n=20) | 29.0% | 30.3% |
| Debt Collection (n=5) | 24.2% | 25.0% |
| Antitrust (n=23) | 25.4% | 25.0% |
| Commercial (n=7) | 23.3% | 25.0% |
| Other (n=19) | 24.9% | 26.0% |
| **All (n=444)** | **25.7%** | **25.0%** |
| Sources: Westlaw, PACER, district court clerks' offices. | | |

In light of the fact that, as I noted above, the distribution of class action settlements among the geographic circuits does not track their civil litigation dockets generally, it is interesting to ask whether one reason for the pattern in class action cases is that circuits oversubscribed with class actions award higher fee percentages. Although this question will be taken up with more sophistication in the regression analysis below, it is worth describing here the mean and median fee percentages in each of the circuits. Those data are presented in Table 9. Contrary to the hypothesis set forth in Part III, two of the circuits most oversubscribed with class actions, the Second and the Ninth, were the only circuits in which the mean fee awards were *under* 25%. As I explain below, these differences are statistically significant and remain so after controlling for other variables.

**Table 9: Fee awards in 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| *Circuit* | *Percentage of settlement awarded as fees* | |
|---|---|---|
| | Mean | Median |
| First (n=27) | 27.0% | 25.0% |
| Second (n=72) | 23.8% | 24.5% |
| Third (n=50) | 25.4% | 29.3% |
| Fourth (n=19) | 25.2% | 28.0% |
| Fifth (n=27) | 26.4% | 29.0% |
| Sixth (n=25) | 26.1% | 28.0% |
| Seventh (n=39) | 27.4% | 29.0% |
| Eighth (n=15) | 26.1% | 30.0% |
| Ninth (n=111) | 23.9% | 25.0% |
| Tenth (n=18) | 25.3% | 25.5% |
| Eleventh (n=35) | 28.1% | 30.0% |
| DC (n=6) | 26.9% | 26.0% |
| Sources: Westlaw, PACER, district court clerks' offices. | | |

The lodestar method likewise permits district courts to exercise a great deal of leeway through the application of the discretionary multiplier. Figure 5 shows the distribution of lodestar multipliers in the 71 settlements in which district courts used the lodestar method and the multiplier could be ascertained. The average multiplier was .98 and the median was .92, which suggests that courts were not terribly prone to exercise their discretion to deviate from the amount of money encompassed in the lodestar calculation. These 71 settlements were heavily concentrated within the consumer (median multiplier 1.13) and debt collection (.66) subject areas. If cases in which district courts used the percentage-of-the-settlement method with a lodestar cross check are combined with the lodestar cases, the average and median multipliers (in the 263 cases where the multipliers were ascertainable) were 1.45 and 1.19, respectively. Again—putting to one side the possibility that

class counsel are optimistic with their time sheets—these multipliers appear fairly modest in light of the risk involved in any piece of litigation.

**Figure 5: The distribution of lodestar multipliers in 2006-2007 federal class action fee awards using the lodestar method**



Sources: Westlaw, PACER, district court clerks' offices.

### D. Factors Influencing Percentage Awards

Whether district courts are exercising their discretion over fee awards wisely is an important public policy question given the amount of money at stake in class action settlements.  As shown above, district court judges awarded class action lawyers nearly $5 billion in fees and expenses in 2006-2007.  Based on the comparison to the tort system set forth in Part III, it is not difficult to surmise that, in the 350 or so settlements every year, district court judges are awarding a significant portion of all of the annual compensation received by contingency-fee lawyers in the United States. Contingency fees are arguably the engine that drives much of the non-criminal regulation in America; unlike many other nations, we regulate largely through the *ex post*, decentralized device of litigation.[82]  To the extent district courts could have exercised their discretion to award billions more or

---

[82] *See, e.g.*, Samuel Issacharoff, *Regulating after the Fact*, 56 DePaul L. Rev. 375, 377 (2007).

billions less to class action lawyers, district courts have been delegated a great deal of leeway over a big chunk of our regulatory horsepower. It is therefore worth examining how district courts exercise their discretion over fees. This examination is particularly important in cases where district courts use the percentage-of-the-settlement method to award fees: not only do such cases comprise the vast majority of settlements, but they comprise the vast majority of the money awarded as fees. As such, the analysis that follows will be confined to the 444 settlements where the district courts used the percentage-of-the-settlement method.

As I noted, prior empirical studies have shown that fee percentages are strongly and inversely related to the size of the settlement both in securities fraud and other cases. As shown in Figure 6, the 2006-2007 data are consistent with prior studies. Regression analysis, set forth in more detail below, confirms that, after controlling for other variables, fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all non-securities cases.

**Figure 6: Fee awards as a function of settlement size in 2006-2007 class action cases using the percentage-of-the-settlement method with or without lodestar crosscheck**



Sources: Westlaw, PACER, district court clerks' offices.

As noted above, courts often look to fee percentages in other cases as one factor they consider in deciding what percentage to award in a settlement at hand. In light of this practice, and, in light of the fact that the size of the

settlement has such a strong relationship to fee percentages, scholars have tried to help guide the practice by reporting the distribution of fee percentages across different settlement sizes.[83] In Table 10, I follow the Eisenberg-Miller studies and attempt to contribute to this guidance by setting forth the mean and median fee percentages, as well as the standard deviation, for each decile of the 2006-2007 settlements in which courts used the percentage-of-the-settlement method to award fees. The mean percentages ranged from over 28% in the first decile to less than 19% in the last decile.

**Table 10: Mean, median, and standard deviation of fee awards by settlement size in 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Settlement Size (in millions) | Mean | Median | Standard Deviation |
|---|---|---|---|
| [$0 to $0.75] (n = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (n=44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (n = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (n = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (n = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (n = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (n = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (n = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (n = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6600] (n = 45) | 18.4% | 19.0% | 7.9% |
| Sources: Westlaw, PACER, district court clerks' offices. | | | |

It should be noted that the last decile in Table 10 covers an especially wide range of settlements, those from $72.5 million to the Enron settlement of $6.6 billion. In order to give more meaningful data to courts that must award fees in the largest settlements, Table 11 shows the last decile broken into additional cut points. When both Tables 10 and 11 are examined together, it appears that fee percentages tended to drift lower at a fairly slow

---

[83] *See* Eisenberg & Miller II, *supra* note 16, at 265.

pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20%, and by the time $500 million was reached, they plunged well below 15%, with most awards at that level under even 10%.

**Table 11: Mean, median, and standard deviation of fee awards of the largest 2006-2007 federal class action settlements using the percentage-of-the settlement method with or without lodestar crosscheck**

| Settlement Size (in millions) | Mean | Median | Standard Deviation |
|---|---|---|---|
| ($72.5 to $100] (n = 12) | 23.7% | 24.3% | 5.3% |
| ($100 to $250] (n=14) | 17.9% | 16.9% | 5.2% |
| ($250 to $500] (n = 8) | 17.8% | 19.5% | 7.9% |
| ($500 to $1000] (n = 2) | 12.9% | 12.9% | 7.2% |
| ($1000 to $6600] (n = 9) | 13.7% | 9.5% | 11% |
| Sources: Westlaw, PACER, district court clerks' offices. | | | |

Prior empirical studies have not examined whether fee awards are associated with the political affiliation of the district court judges making the awards. This is surprising because Realist theories of judicial behavior would predict that political affiliation would influence fee decisions.[84]  It is true that, as a general matter, political affiliation may influence district court judges to a lesser degree than it does appellate judges (who have been the focus of most of the prior empirical studies of Realist theories): district court judges decide more routine cases and are subject to greater oversight on appeal than appellate judges.  On the other hand, class action settlements are a bit different in these regards than many other decisions made by district court judges.  To begin with, class action settlements are almost never appealed, and when they are, the appeals are usually settled before the appellate court hears the case.[85]  Thus, district courts have much less reason to worry about the constraint of appellate review in fashioning fee awards.  Moreover, one would think the potential for political affiliation to influence

---

[84] *See generally* C. K. ROWLAND & ROBERT A. CARP, POLITICS AND JUDGMENT IN FEDERAL DISTRICT COURTS (1996).  *See also* Max M. Schanzenbach & Emerson H. Tiller, *Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence, and Reform*, 75 U. Chi. L. Rev. 715, 724-25 (2008).

[85] *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1640, 1634-38 (2009) (finding that less than 10% of class action settlements approved by federal courts in 2006 were appealed by class members).

judicial decisionmaking is greatest when legal sources lead to indeterminate outcomes and when judicial decisions touch upon matters that are salient in national politics. (The more salient a matter is, the more likely Presidents will select judges with views on the matter and the more likely those views will diverge between Republicans and Democrats.) Fee award decisions would seem to satisfy both of these criteria. The law of fee awards, as explained above, is highly discretionary, and fee award decisions are wrapped up in highly salient political issues such as tort reform and the relative power of plaintiffs' lawyers and corporations. I would expect to find that judges appointed by Democratic presidents awarded higher fees in the 2006-2007 settlements than did judges appointed by Republican presidents.

The data, however, do not appear to bear this out. Of the 444 fee awards using the percentage-of-the-settlement approach, 52% were approved by Republican appointees, 45% were approved by Democratic appointees, and 4% were approved by non-Article III judges (usually magistrate judges). The mean fee percentage approved by Republican appointees (25.6%) was slightly *greater* than the mean approved by Democratic appointees (24.9%). The medians (25%) were the same.

In order to examine whether the Realist hypothesis fared better after controlling for other variables, I performed regression analysis of the fee percentage data for the 427 settlements approved by Article III judges. I used ordinary least squares regression with the dependent variable the percentage of the settlement that was awarded in fees.[86] The independent variables were the natural log of the amount of the settlement, the natural log of the age of the case (in days), indicator variables for whether the class was certified as a settlement class, for litigation subject areas, and for circuits, as well as indicator variables for whether the judge was appointed by a Republican or Democratic President and for the judge's race and gender.[87]

The results for five regressions are in Table 12. In the first regression (column 1), only the settlement amount, case age, and judge's political affiliation, gender, and race were included as independent variables. In the second regression (column 2), all of the independent variables were included.

---

[86] Professors Eisenberg and Miller used a square root transformation of the fee percentages in some of their regressions. I ran all of the regressions using this transformation as well and it did not appreciably change the results. I also ran the regressions using a natural log transformation of fee percentage and with the dependent variable natural log of the fee amount (as opposed to the fee percentage). None of these models changed the results appreciably. The regressions were also run with and without the 2006 Enron settlement because it was such an outlier ($6.6 billion); the case did not change the regression results appreciably. For every regression, the data and residuals were inspected to confirm the standard assumptions of linearity, homoscedasticity, and the normal distribution of errors.

[87] Prior studies of judicial behavior have found that the race and sex of the judge can be associated with their decisions. *See, e.g.*, Adam B. Cox & Thomas J. Miles, *Judging the Voting Rights Act*, 108 COLUM. L. REV. 1 (2008) Donald R. Songer et al., *A Reappraisal of Diversification in the Federal Courts: Gender Effects in the Courts of Appeals*, 56 J. POL. 425 (1994).

In the third regression (column 3), only securities cases were analyzed, and, in the fourth regression (column 4), only non-securities cases were analyzed.

In none of these regressions was the political affiliation of the district court judge associated with fee percentage in a statistically significant manner.[88]  One possible explanation for the lack of evidence for the Realist hypothesis is that district court judges elevate other preferences above their political and ideological ones.  For example, district courts of both political stripes may succumb to docket-clearing pressures and largely rubber stamp whatever fee is requested by class counsel; after all, these requests are rarely challenged by defendants.  Moreover, if judges award class counsel whatever they request, class counsel will not appeal, and, given that, as noted above, class members rarely appeal settlements (and when they do, often settle them before the appeal is heard),[89] judges can thereby virtually guarantee there will be no appellate review of their settlement decisions.  Indeed, scholars have found that, in the vast majority of cases, the fees ultimately awarded by federal judges are little different than those sought by class counsel.[90]

Another explanation for the lack of evidence for the Realist hypothesis is that my dataset includes both unpublished as well as published decisions.  It is thought that Realist theories of judicial behavior lose force in unpublished judicial decisions.  This is the case because the kinds of questions for which Realist theories would predict that judges have the most room to let their ideologies run are questions for which the law is ambiguous; it is thought that these kinds of questions are more often answered in published opinions.[91]  Indeed, most of the studies finding an association between ideological beliefs and case outcomes were based on datasets that included only published opinions.[92]  On the other hand, there are a small but growing number of studies that have examined unpublished opinions as well, and some of these studies have shown that ideological effects persisted.[93]  Nonetheless, in light

---

[88] Although these coefficients are not reported in Table 8, the gender of the district court judge was never statistically significant.  The race of the judge was only occasionally significant.

[89] *See* Fitzpatrick, *supra* note 85, at 1640.

[90] *See* Eisenberg & Miller II, *supra* note 16, at 270 (finding that state and federal judges awarded the fees requested by class counsel in 72.5% of settlements); Eisenberg, Miller & Perino, *supra* note 9, at 22 ("[J]udges take a light touch when it comes to reviewing fee requests.").

[91] *See, e.g.*, Ahmed E. Taha, *Data and Selection Bias: A Case Study*, 75 UMKC L. Rev. 171, 179 (2006).

[92] *See id.* at 178-79.

[93] *See, e.g.*, David S. Law, *Strategic Judicial Lawmaking: Ideology, Publication, and Asylum Law in the Ninth Circuit*, 73 U. Cin. L. Rev. 817, 843 (2005); Deborah Jones Merritt & James J. Brudney, *Stalking Secret Law: What Predicts Publication in the United States Courts of Appeals*, 54 Vand. L. Rev. 71, 109 (2001); Donald R. Songer, *Criteria for Publication of Opinions in the U.S. Courts of Appeals: Formal Rules Versus Empirical Reality*, 73 Judicature 307, 312 (1990).  At the trial court level, however, the studies of civil cases have

of the discretion that judges exercise with respect to fee-award decisions, it
hard to characterize *any* decision in this area as "unambiguous." Thus, even
when unpublished, I would have expected the fee award decisions to exhibit
an association with ideological beliefs. Thus, I am more persuaded by the
explanation suggesting that judges are more concerned with clearing their
dockets or insulating their decisions from appeal in these cases than with
furthering their ideological beliefs.

In all of the regressions, the size of the settlement was strongly and
inversely associated with fee percentages. Whether the case was certified as
a settlement class was not associated with fee percentages in any of the
regressions. The age of the case at settlement was associated with fee
percentages in the first two regressions, and when the settlement class
variable was removed in regressions three and four, the age variable became
positively associated with fee percentages in non-securities cases but
remained insignificant in securities cases. Professors Eisenberg and Miller
likewise found that the age of the case at settlement was positively associated
with fee percentages in their 1993-2002 dataset,[94] and that settlement classes
were not associated with fee percentages in their 2003-2008 dataset.[95]

Although the structure of these regressions did not permit extensive
comparisons of fee awards across different litigation subject areas, fee
percentages appeared to vary somewhat depending on the type of case that
settled. Securities cases were used as the baseline litigation subject area in
the second and fifth regressions, permitting a comparison of fee awards in
each non-securities area with the awards in securities cases. These
regressions show that awards in a few areas, including labor/employment and
antitrust, were more lucrative than those in securities cases. In the fourth
regression, which included only non-securities cases, labor and employment
cases were used as the baseline litigation subject area, permitting comparison
between fee percentages in that area and the other non-securities areas. This
regression shows that fee percentages in several areas, including consumer
and employee benefits cases, were lower than the percentages in labor and
employment cases.

In the fifth regression (column 5), I attempted to discern whether the
circuits identified in Part III as those with the most overrepresented (the First,

---

found no ideological effects. *See* Laura Beth Nielsen, Robert L. Nelson, & Ryon Lancaster,
*Individual Justice or Collective Legal Mobilization? Employment Discrimination Litigation in
the Post Civil Rights United States*, 7 J. EMPIRICAL L. STUD. 175, 192-93 (2010); Denise M.
Keele et al., *An Analysis of Ideological Effects in Published versus Unpublished Judicial
Opinions*, 6 J. EMPIRICAL L. STUDIES 213, 230 (2009); Orley Ashenfelter, Theodore Eisenberg,
& Stewart J. Schwab, *Politics and the Judiciary: The Influence of Judicial Background on
Case Outcomes*, 24 J. LEGAL STUD. 257, 276-77 (1995). With respect to criminal cases, there
is at least one study at the trial court level that has found ideological effects. *See*
Schanzenbach & Tiller, *supra* note 84, at 734.

[94] *See* Eisenberg & Miller, *supra* note 15, at 61.

[95] *See* Eisenberg & Miller II, *supra* note 16, at 266.

Second, Seventh, and Ninth) and underrepresented (the Fifth and Eighth) class action dockets awarded attorneys' fees differently than the other circuits. That is, perhaps district court judges in the First, Second, Seventh, and Ninth Circuits award greater percentages of class action settlements as fees than do the other circuits, whereas district court judges in the Fifth and Eighth Circuits award smaller percentages. In order to test this hypothesis, in the fifth regression, I included indicator variables only for the six circuits with unusual dockets to measure their fee awards against the other six circuits combined. The regression showed statistically significant association with fee percentages for only two of the six unusual circuits: the Second and Ninth Circuits. In both cases, however, the direction of the association (i.e., the Second and Ninth Circuits awarded *smaller* fees than the baseline circuits) was opposite the hypothesized direction.[96]

The lack of the expected association with the unusual circuits might be explained by the fact that class action lawyers forum shop along dimensions other than their potential fee awards; they might, for example, put more emphasis on favorable class-certification law because there can be no fee award if the class is not certified. As noted above, it might also be the case that class action lawyers are unable to engage in forum shopping at all because defendants are able to transfer venue to the district in which they are headquartered or another district with a significant connection to the litigation.

It is unclear why the Second and Ninth Circuits were associated with lower fee awards despite their heavy class action dockets. Indeed, it should be noted that the Ninth Circuit was the baseline circuit in the second, third, and fourth regressions, and, in all of these regressions, district courts in the Ninth Circuit awarded smaller fees than courts in many of the other circuits. The lower fees in the Ninth Circuit may be attributable to the fact that it has adopted a presumption that the proper fee to be awarded in a class action settlement is 25% of the settlement.[97] This presumption may make it more difficult for district court judges to award larger fee percentages. The lower awards in the Second Circuit are more difficult to explain, but it should be noted that the difference between the Second Circuit and the baseline circuits went away when the fifth regression was re-run with only non-securities

---

[96] This relationship persisted when the regressions were re-run among the securities and non-securities cases separately. I do not report these results, but, even though the First, Second, and Ninth Circuits were oversubscribed with securities class action settlements and the Fifth, Sixth, and Eighth were undersubscribed, there was no association between fee percentages and any of these unusual circuits except, again, the inverse association with the Second and Ninth Circuits. In non-securities cases, even though the Seventh and Ninth Circuits were oversubscribed and the Fifth and the Eighth undersubscribed, there was no association between fee percentages and any of these unusual circuits except again for the inverse association with the Ninth Circuit.

[97] *See* note 75 *supra*. It should be noted that none of the results from the previous regressions were affected when the Ninth Circuit settlements were excluded from the data.

cases.[98]  This suggests that the awards in the Second Circuit may be lower *only* in securities cases.  In any event, it should be noted that the lower fee awards from the Second and Ninth Circuits contrast with the findings in the Eisenberg-Miller studies which found no inter-circuit differences in fee awards in common-fund cases in their data through 2008.[99]

---

[98] The Ninth Circuit's differences persisted.

[99] *See* Eisenberg & Miller II, supra *note* 16, at 260.

**Table 12: Regression of fee percentages in 2006-2007 settlements using
percentage-of-the-settlement method with or without lodestar crosscheck**

| Independent variable | Regression coefficients (and robust t-statistics) | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| **Settlement amount** (natural log) | -1.77 (-5.43)** | -1.76 (-8.52)** | -1.76 (-7.16)** | -1.41 (-4.00)** | -1.78 (-8.67)** |
| **Age of case** (natural log days) | 1.66 (2.31)** | 1.99 (2.71)** | 1.13 (1.21) | 1.72 (1.47) | 2.00 (2.69)** |
| **Judge's political affiliation** (1 = Democrat) | -0.630 (-0.83) | -0.345 (-0.49) | 0.657 (0.76) | -1.43 (-1.20) | -0.232 (-0.34) |
| **Settlement class** | | .150 (0.19) | .873 (0.84) | -1.62 (-1.00) | .124 (0.15) |
| **1st Circuit** | | 3.30 (2.74)** | 4.41 (3.32)** | 0.031 (0.01) | 0.579 (0.51) |
| **2d Circuit** | | 0.513 (0.44) | -0.813 (-0.61) | 2.93 (1.14) | -2.23 (-1.98)** |
| **3d Circuit** | | 2.25 (1.99)** | 4.00 (3.85)** | -1.11 (-0.50) | -- |
| **4th Circuit** | | 2.34 (1.22) | 0.544 (0.19) | 3.81 (1.35) | -- |
| **5th Circuit** | | 2.98 (1.90)* | 1.09 (0.65) | 6.11 (1.97)** | 0.230 (0.15) |
| **6th Circuit** | | 2.91 (2.28)** | 0.838 (0.57) | 4.41 (2.15)** | -- |
| **7th Circuit** | | 2.55 (2.23)** | 3.22 (2.36)** | 2.90 (1.46) | -0.227 (-0.20) |
| **8th Circuit** | | 2.12 (0.97) | -0.759 (-0.24) | 3.73 (1.19) | -0.586 (-0.28) |
| **9th Circuit** | | -- | -- | -- | -2.73 (-3.44)** |
| **10th Circuit** | | 1.45 (0.94) | -0.254 (-0.13) | 3.16 (1.29) | -- |
| **11th Circuit** | | 4.05 (3.44)** | 3.85 (3.07)** | 4.14 (1.88)* | -- |
| **DC Circuit** | | 2.76 (1.10) | 2.60 (0.80) | 2.41 (0.64) | -- |
| **Securities case** | | -- | | | -- |
| **Labor and employment case** | | 2.93 (3.00)** | | -- | 2.85 (2.94)** |
| **Consumer case** | | -1.65 (-0.88) | | -4.39 (-2.20)** | -1.62 (-0.88) |
| **Employee benefits case** | | -0.306 (-0.23) | | -4.23 (-2.55)** | -0.325 (-0.26) |
| **Civil rights case** | | 1.85 (0.99) | | -2.05 (-0.97) | 1.76 (0.95) |
| **Debt collection case** | | -4.93 (-1.71)* | | -7.93 (-2.49)** | -5.04 (-1.75)* |
| **Antitrust case** | | 3.06 (2.11)** | | 0.937 (0.47) | 2.78 (1.98)** |
| **Commercial case** | | -0.028 (-0.01) | | -2.65 (-0.73) | 0.178 (0.05) |
| **Other case** | | -0.340 (-0.17) | | -3.73 (-1.65) | -0.221 (-0.11) |
| **Constant** | 42.1 (7.29)** | 37.2 (6.08)** | 43.0 (6.72)** | 38.2 (4.14)** | 40.1 (7.62)** |
| **N** | 427 | 427 | 232 | 195 | 427 |
| **R²** | .20 | .26 | .37 | .26 | .26 |
| **Root MSE** | 6.59 | 6.50 | 5.63 | 7.24 | 6.48 |

Note: ** significant at the 5% level; * significant at the 10% level. Standard errors in column 1 were
clustered by circuit. Indicator variables for race and gender were included in each regression but not

| reported. |
|---|
| Sources: Westlaw, PACER, district court clerks' offices, Federal Judicial Center. |

## V.      Conclusion

This article has attempted to fill some of the gaps in our knowledge about class action litigation by reporting the results of an empirical study that attempted to collect all class action settlements approved by federal judges in 2006 and 2007.  District court judges approved 688 class action settlements over this two-year period, involving more than $33 billion.  Of this $33 billion, nearly $5 billion was awarded to class action lawyers, or about 15% of the total.   District courts typically awarded fees using the highly discretionary percentage-of-the-settlement method, and fee awards varied over a wide range under this method, with a mean and median around 25%. Fee awards using this method were strongly and inversely associated with the size of the settlement.  Fee percentages were positively associated with the age of the case at settlement.  Fee percentages were not associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.  Finally, there appeared to be some variation in fee percentages depending on subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all of the other litigation areas, and district courts in the Ninth Circuit and in the Second Circuit (in securities cases) awarded lower fee percentages than district courts in several other circuits.  The lower awards in the Ninth Circuit may be attributable to the fact that it is the only circuit that has adopted a presumptive fee percentage of 25%.

41

# Exhibit C

*Journal of Empirical Legal Studies*
Volume 7, Issue 2, 248–281, June 2010

# Attorney Fees and Expenses in Class Action Settlements: 1993–2008

*Theodore Eisenberg and Geoffrey P. Miller\**

We report on a comprehensive database of 18 years of available opinions (1993–2008, inclusive) on settlements in class action and shareholder derivative cases in state and federal courts. An earlier study, covering 1993–2002, revealed a remarkable relationship between attorney fees and class recovery size: regardless of the methodology for calculating fees ostensibly employed by the courts, the class recovery size was the overwhelmingly important determinant of the fee. The present study, which nearly doubles the number of cases in the database, confirms that relationship. Fees display the same relationship to class recoveries in both data sets and neither fees nor recoveries materially increased over time. Although the size of the class recovery dwarfs other influences, significant associations exist between the fee amount and both the fee method used and the riskiness of the case. We found no robust evidence of significant differences between federal and state courts. The strong association between fee and class recovery persists in cases with recoveries of \$100 million or more, as do the significant associations between fee level and fee method and risk. Fees were not significantly affected by the existence of a settlement class, the presence of objectors, or opt outs from the class. Courts granted the requested fee in over 70 percent of the cases, with the Second Circuit granting the requested amount least often. In cases denying the requested fee, the mean fee was 68 percent of the requested amount. Fees and costs exhibit scale effects with the percent of each decreasing as the class recovery amount increased. Costs are strongly associated with hours expended on the case.

## I. Introduction and Background

Class actions and their close cousins, shareholder derivative lawsuits, are vital mechanisms by which the legal system copes with mass harms—similar injuries to a large number of people. Long a feature of the U.S. landscape, class actions have recently begun to spread across the world.[1]

———

*Address correspondence to Theodore Eisenberg, Cornell Law School, Myron Taylor Hall, Ithaca, NY 14853; email ted-eisenberg@lawschool.cornell.edu. Eisenberg is Henry Allen Mark Professor of Law & Adjunct Professor of Statistical Sciences, Cornell Law School; Miller is Stuyvesant P. Comfort Professor of Law, New York University Law School.

We have from time to time acted as expert witnesses or consultants on the issue of attorney fees in class action cases. We thank participants at the International Conference on Empirical Legal Studies, Tel Aviv University and Kevin Clermont for comments, and Thomas P. Eisenberg, Nicholas Germain, and Erica Miller for excellent research assistance.

[1]See, e.g., Samuel Issacharoff & Geoffrey Miller, Will Aggregate Litigation Come to Europe? 62 Vanderbilt L. Rev. 179 (2009).

*Attorney Fees and Expenses in Class Action Settlements     249*

A crucial issue for all class and derivative litigation is the matter of compensating counsel. Unless class counsel are adequately compensated, class and derivative litigation will be undersupplied in the legal market. On the other hand, if class action attorneys are overcompensated they may bring too many of these lawsuits and receive an excessive share of the settlement value in cases that are brought.

In normal litigation the attorney compensation can be set by private agreement between lawyer and client, but private agreement does not work in the case of class action and derivative litigation: in these contexts there is no client capable of negotiating with the attorney. In class actions, the clients are disorganized and, prior to notice of certification, usually do not even know that a lawsuit has been filed on their behalf. Except perhaps in the case of private securities litigation, the representative plaintiff cannot effectively negotiate with the attorneys over fees and costs: he or she has only a minority stake in the matter (in consumer cases, often a miniscule one), is often unsophisticated, and may be strongly influenced by the attorney's advice. In derivative cases, the ostensible client—the corporation—is usually managed by defendants in the lawsuits and therefore is unwilling to pay any fee to incentivize an attorney to bring the lawsuit. In both settings, therefore, the court must independently determine the appropriate attorney fee award.

Where can the court look for information on this question? No private stakeholder is a reliable source of information. The class attorneys' suggested fee is not impartial since, at the time of the settlement, their interest is to seek the largest possible award. Nor can the court rely on the defendant's recommendations. Settlement agreements often contain "clear-sailing" clauses under which defendants agree not to object to a fee request up to a certain amount. However, clear-sailing agreements are of little value when the defendant is not paying the fee—indeed, it is not clear that the defendant has any "skin in the game" when the fee will be paid out of the class recovery. Even when the defendant does pay the fee—as in the typical consumer class action—the clear-sailing agreement has limited probative value unless the parties have deferred fee negotiations until after achieving a definite agreement on the merits. Otherwise, there is reason for concern that the defendant may have agreed to pay class counsel a premium in exchange for reductions in the amount going to the class. The reaction of the class to the settlement and proposed fee is also not a reliable guide. Empirical research suggests that the vast majority of class members are rationally indifferent to class action settlements; their failure to opt out of a settlement does not indicate approval of the proposed fee.[2] Nor can the court rely on objectors to the settlement. Few objectors appear at class action fairness hearings,[3] and those who show up may not object to the fee. Even if objectors do complain about the fee, they have only a small amount at stake and thus lack the incentive to thoroughly research the fee question.

Lacking reliable guidance from class counsel, the defendant, class members, or objectors, the judge has no alternative but to make an independent investigation. Where, however, should the judge look for information pertinent to the task of setting fees? Among

_____

[2]See Theodore Eisenberg & Geoffrey Miller, The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt L. Rev. 1529 (2004).

[3]Id.

the factors that judges typically examine in setting fees, the most important is probably that of "awards in similar cases."[4] Precedents of fees awarded by other courts should, in theory, be relatively reliable guides because the prior courts were presumably exercising the requisite rigorous scrutiny and judicial independence when they set the fees, and because class counsel will have presumably considered the relevant case law in calculating whether to take on the litigation in the case at bar. But even this approach is not problem-free. In the typical class action settlement, the fee is taken from the common fund generated on behalf of the class. No party, in this case, has the right incentives to vigorously research the precedents running contrary to counsel's fee request. Unless the judge does his or her own research, he or she may not have access to unbiased information about fees in similar cases.

The present empirical study is intended to assist courts in the task of fee setting—and counsel in the task of identifying appropriate fees to request—by supplying an account of compensation practices in courts across the country, studied over an extended period of time, and conducted in an academic setting outside the fires of litigation. The information provided in this article is the best data on "awards in similar cases" from cases with available opinions. If used effectively, our study may be of material assistance in further rationalizing the compensation of class counsel.

We find, regardless of the methodology for calculating fees ostensibly employed by the courts, that the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class. Fees display the same relationship to class recoveries in data sets spanning both 1993 to 2002 and 2003 to 2008. Neither fees nor recoveries materially increased over time. Although the size of the class recovery dwarfs other influences, significant associations exist between the fee amount and both the fee method used and the riskiness of the case. We found no robust evidence of significant differences between federal and state courts. The strong association between fee and class recovery persists in cases with recoveries of $100 million or more, as do the significant associations between fee level and fee method and risk.

Courts granted the requested fee in over 70 percent of the cases, with courts in the Second Circuit granting the requested amount least often. In cases in which the requested fee was not awarded, the mean fee was 68 percent of the requested amount. Costs are modest, with both means and median costs comprising less than 3 percent of the class recovery. Fees and costs both exhibit scale effects, with the percent of each decreasing as the class recovery amount increased. Costs are strongly associated with hours expended on the case. Fees were not significantly affected by the existence of a settlement class, the presence of objectors, or opt outs from the class.

Section II of this article describes the data gathering and coding. Section III presents the relation between fee amount and class recovery and fee percent and class recovery over time, and by locale (including state and federal courts), and by case category. It also explores the relation between the fee and risk, settlement class, and the presence of opt outs and objectors. Section IV assesses the relation between the fee and the method used to compute

––––––

[4]See, e.g., Thompson v. Connick, 553 F.3d 836 (5th Cir. 2008); Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000); Spell v. McDaniel, 824 F.2d 1380, 1402 n.18 (4th Cir. 1987).

the fee, as well as the pattern of multipliers used in connection with lodestar fees. Section V reports on the pattern of costs and expenses. Section VI presents multivariate results that confirm our core findings. Section VII discusses the results and Section VIII concludes.

## II. Methodology

The results reported here were gathered in two segments. The first segment covered cases reported from 1993 to 2002 and its results are reported in previous work.[5] That study also described the motivation for the variables used in this study. The basis for believing that the variables studied might relate to fee awards is reasonably self-evident and need not be repeated here.

As previously reported, we searched in the WESTLAW™ "AllCases" database using the search "settlement & 'class action' & attorney! w/2 fee! & date(=[1993–2002])". This search's results were checked against a search of the LEXIS™ "Mega" database using equivalent search terms. We also compiled lists of citations in the cases found by these search requests and included any additional cases meeting the basic search criteria. We further checked the list against the CCH™ Federal Securities and Trade Regulation Reporters. Once cases had been identified by this method, we sometimes gathered additional information about case characteristics from other sources—for example, information on the Internet or docket entries in the U.S. Courts PACER system. The second segment covered the period 2003 to 2008, inclusive. We replicated the WESTLAW search (expanded to include the term "derivative" to make doubly sure we picked up all derivative settlements) and checked the results, in many cases, against information available on the Internet or in PACER.

The present study focuses solely on common fund cases and does not assess cases in which a court applied a statutory fee-shifting statute to assess fees. Our searches and exclusion criteria yielded recovery and fee information for a total sample of 689 common fund cases. Relatively more cases come from the later period (301 cases for six years from 2003 to 2008 compared with 388 cases for the preceding 10 years). This was principally due to the significantly expanded coverage of the PACER system in the later period, and also to our inclusion of cases in which fee-shifting statutes could have been applied but the fee was not determined by formally applying the fee-shifting statute.

We used the following conventions for coding in both searches. If the court stated a range of value (e.g., for the amount of class recovery), we used the midpoint. If there was no better estimate available but a maximum recovery value could be ascertained, we used the maximum possible recovery. If the court estimated the relief at "over" or "more than" a sum, the sum that was the minimum was used. Where the settlement amount included post- or prejudgment interest, we included that in the amount of the settlement. We collected only the number of attorney hours, thus excluding, where possible, the (usually minor) hours reported for paralegals or law clerks.

————

[5]For our prior empirical study of class action attorney fees, see Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004).

To code the court's fee calculation method, we tracked whether the court engaged in a lodestar calculation and, if so, the purity of the lodestar approach. This generated the following fee method categories: (1) percentage method cases in which no lodestar calculation exists, (2) cases in which both the lodestar calculation and the percentage approach were used (usually with the lodestar being employed as a "cross-check" on the percentage fee), and (3) pure lodestar cases in which the lodestar method was the exclusive method used. If the lodestar amount was not specified, but could be estimated with reasonable accuracy, we included it. We used plaintiffs' own estimates of their lodestar only when these estimates were not contested by the court. In some cases, the court simply reported a fee without explaining its methodology; these we recorded as missing or as "negotiated" if the approved fee was the one negotiated by the parties.

The coding of variables related to fee shifting was somewhat subtle. Many class action cases are brought under numerous claims for relief, some of which authorize the court to award fees to the prevailing plaintiff or prevailing party. When these cases settle, the courts often set fees without reference to the fee-shifting statute. Even when fee-shifting statutes are potentially available, the fee is often awarded out of the class recovery. Our "fee-shifting" variable codes whether the fee *could* have been calculated under a fee-shifting statute had the case progressed to a litigated judgment, regardless of whether the court actually invoked the fee-shifting statute as a basis for awarding the fee. For the later cases (2003–2008), we kept track of whether the court had actually used the fee-shifting statute as a basis for awarding the fee. In that period, a fee-shifting statute was available in 177 cases but was used as the basis for awarding the fee in only 21 cases, 11.9 percent. We included as common fund cases the 156 cases in which fee-shifting statutes were available but were not used. Preliminary regression models indicated no significant difference in fee awards between these cases and "purer" common fund cases.

For many other variables, coding was reasonably straightforward. In employment discrimination and civil rights cases, two prominent categories of fee-shifting statute cases, the amount of the relief to the class, as expected, often was difficult to quantify because an important element of relief in such cases was often injunctive. For civil rights cases involving only injunctive relief, the cost to the defendant was used as a measure of the value of the relief for the class when this was available. In some fee-shifting cases, the court awarded attorney fees but it was impossible to estimate the amount of class damages. These fee and recovery coding conventions led to usable values for the fee amount and the client recovery, two of our core variables, in the 689 cases studied here.

We also coded cases for risk. Where the court addressed the question of risk, we coded according to our best estimate of the court's evaluation. In many cases, however, the court did not explicitly address the risk of the litigation. Coding therefore depended on assuming that risk was not prominent in cases in which courts did not mention it. We divided the cases into three risk categories. If nothing was said about risk or if the court's discussion suggested a normal degree of risk, the case was coded as being medium risk. If the court affirmatively indicated the existence of substantial risk, or if exceptional risk was evident from the facts or procedural history of the case, we coded the case as having high risk. If the court indicated or the facts otherwise suggested that the case was very likely to generate a substantial recovery for the class at the time it was brought (e.g., if the case grew

out of a prior government prosecution that had resulted in fines or convictions), we coded the case as low risk.

As in our earlier work, two caveats about using published opinions are in order. First, our data include only opinions that were published in some readily available form. Obviously, therefore, we have not included the full universe of cases in our data set. Although published opinions are not necessarily representative of the universe of all cases, they can lead to important insights. For judges seeking to inform their fee decisions with knowledge of other cases, published opinions are the prime source of data. Further, the present study expands on the published opinion data by delving into unpublished materials available on PACER when these could supply information missing from the published case reports.

A second caveat about the published opinion data is that this methodology over-weights federal cases. Opinions of state trial court judges are published less frequently than opinions of federal district courts; and since fee awards are typically reported in the court of first instance, we found many more federal than state opinions responsive to our search request. Further, the PACER system allowed us to "dig" for more information in the case of federal opinions. There is no state analog to PACER, and therefore we could only rarely discover information about fees and related issues when a state opinion on a class action or derivative case failed to report the necessary data.

# III. Bivariate Results: Fee Amount and Fee Percent

We first examine bivariate results—that is, the relation between either the fee amount or the fee percent and one of the other variables coded in our data. We outline the persistent regular relationship between fees and recovery in both data sets (1993–2002 and 2003–2008). We then examine the pattern of fees across other dimensions such as time, locale, case category, risk, settlement class status, and the presence of opt outs and objectors. All amounts are in 2008 inflation-adjusted dollars.

## A. The Persistent Relation Between Fee and Recovery

The relation between fee amount and class recovery has remained consistent over time. Figure 1 shows scatterplots of the fee amount and class recovery for each of the two time periods (Figures 1a and 1b), for the time periods combined (Figure 1c), and for cases with recoveries greater than or equal to $100 million (Figure 1d). The scales have been transformed into log10 units to address the bunching of cases at the lower end of the recovery scale that would occur in a linear dollar scale. Units of log10 can easily be interpreted because the log10 scale is simply based on powers of 10 (e.g., a value of 9 on a log10 scale is equal to $1 billion, or one followed by nine zeros).

Figures 1a and 1b show that the pattern is virtually unchanged over time. The associations between fee and recovery are striking and large. The linear correlation between fee and recovery exceeds 0.94 for each time period and the slope of the relation-ships appears constant for the two time periods. In a regression model with a dummy

*Figure 1:*   Fees as a function of recovery.



variable for time period and an interaction term consisting of the product of the time period dummy variable and the class recovery size, one cannot reject the hypothesis that the dummy variable and the interaction term coefficients are jointly zero, thus confirming the consistency of the pattern. The relation between fees and class recoveries is also observed when the data are combined, as shown in Figure 1c. In both the separate and combined data sets, the size of the class recovery swamps all other influences on the size of the fee, as shown in regression models in Section VI of this article.[6] Figure 1d, which is limited to large cases, also shows a strong linear relation between fee and recovery. For these 109 cases, the linear correlation coefficient is 0.77 ($p < 0.0001$). The decreased slope for the high end of case recoveries is consistent with the scaling effect discussed in Section III.B.4 of this article.

Figure 2 further supports the primacy of the recovery as the explanation for the fee award. For ease of comparison, Figure 2a reproduces the combined time period data from Figure 1c. Figures 2b and 2c show that neither the hours claimed nor the age of a case are as strongly associated with the fee amount as is the class recovery amount.

With six additional years of data, we can extend our prior analysis of the pattern of fees and class recoveries over time. One notable earlier finding was the absence of

———

[6]Figure 1b shows the later time period with more low-recovery cases (less than $100,000). This is likely attributable to our inclusion in the non-fee-shifting sample cases in which a fee-shifting statute existed but was not used, as well as to the information about smaller cases now available on PACER See Section II.

*Figure 2:*   Fee as a function of recovery, hours, and age, 2003–2008.



increases in class recoveries or fees over time,[7] a finding that heartened opponents of attempts to reform the class action system via the Class Action Fairness Act of 2005 (CAFA)[8] and prompted a response from a noted Yale Law School professor.[9] The newer data reveal that the level of both class recoveries and attorney fees has not varied substantially over time. As Figure 3 shows, these amounts have shown no distinct time trend for most of 16 years. Inflation-adjusted recoveries and fees through 2007 were at levels not significantly different from levels in 1993 and in fact are lower in inflation-adjusted dollars. In 2008, a noticeable drop in mean and median recoveries and fees occurred. The difference in class recovery medians between 2008 and all earlier years combined is statistically significant at $p = 0.002$, and the difference in fees between 2008 and earlier years is significant at $p = 0.0003$. The difference in the median ratio of fee to recovery (ratio of the logs) did not significantly differ between 2008 and earlier years

---

[7]Eisenberg & Miller, supra note 5.

[8]Class Action Fairness Act, Pub. L. No. 109-2, 119 Stat. 4 (2005). See 149 Cong. Rec. S1299902 (Oct. 22, 2003) (remarks of Senator Feingold); 151 Cong. Rec. S1086-02 (Feb. 8, 2005) (remarks of Senator Feingold).

[9]George L. Priest, What We Know and What We Don't Know About Modern Class Actions: A Review of the Eisenberg-Miller Study (Feb. 2005, Manhattan Inst.).

256    *Eisenberg and Miller*

*Figure 3:*   Class recovery and attorney fee over time, mean and median.



Sources: Westlaw, LexisNexis, PACER.

($p = 0.517$).[10] We therefore do not view the changes in 2008 as necessarily indicating anything significant about longer-term fee patterns.

### B.  Locales, Case Categories, and Other Factors

Table 1 shows the distribution of cases by locale. It combines all 25 federal appellate opinions into one category, "Appeal," and all 75 state cases into one category, "State." Federal district court cases dominate the sample, accounting for approximately 85 percent of the cases. The federal class action cases cluster by districts. The Southern District of New York accounted for 103 of 589 federal district court cases, and the Eastern District of Pennsylvania accounted for 70 such cases. They are the only two districts to account for 10 percent or more of the federal trial court portion of the sample and together accounted for 25 percent of all cases in the sample. Two other districts accounted for more than 5 percent of the federal court portion of the sample: the Northern District of California had 47 cases

---

[10]This pattern of average and median fees in more recent years may be partly due to the increase in smaller cases that we were able to code by accessing the PACER database and to inclusion in the later period of cases in which fee-shifting statutes were theoretically available but not used to set the fee. We investigated whether a changing mix of cases explained the pattern by separately assessing, for the two time periods, cases with recoveries greater than or equal to $5 million and recoveries less than $5 million. For both recovery size groups, the difference in recovery across the two time periods was not statistically significantly different. The difference over time in medians for cases with recoveries greater than or equal to $5 million was significant at $p = 0.590$; for cases with recoveries less than $5 million, the difference in medians was significant at $p = 0.749$. But the smaller cases were more prevalent in the later period. Cases with recoveries of less than $5 million comprised 33 percent of the later period cases compared to 24 percent of the earlier period cases, a difference statistically significant at $p = 0.022$. Thus the decreasing recovery amount over time is attributable to a different mix of cases in our sample, and not to differences in treatment of similar cases over time. Thus, throughout more than a decade of civil litigation reform efforts based on claims of increasing awards and fees, the pattern in available opinions, which tend to include the largest cases, has not significantly changed.

Table 1:   Frequency of Class Action Fee Opinions, by
Court, 1993–2008

| Locale | N | % of Cases |
|---|---|---|
| Other | 161 | 23.37 |
| SDNY | 103 | 14.95 |
| State | 75 | 10.89 |
| EDPA | 70 | 10.16 |
| NDCA | 47 | 6.82 |
| DNJ | 35 | 5.08 |
| NDIL | 29 | 4.21 |
| EDNY | 26 | 3.77 |
| APPEAL | 25 | 3.63 |
| DDC | 18 | 2.61 |
| EDMI | 17 | 2.47 |
| DMN | 16 | 2.32 |
| EDLA | 13 | 1.89 |
| MDFL | 12 | 1.74 |
| EDCA | 12 | 1.74 |
| CDCA | 10 | 1.45 |
| DMA | 10 | 1.45 |
| SDCA | 10 | 1.45 |
| Total | 689 | 100.00 |

SOURCES:  Westlaw, LexisNexis, PACER.

and the District of New Jersey 35 cases. The Northern District of Illinois had just under 5 percent of the federal district cases. Together, these five districts accounted for over 50 percent of the federal district court opinions.

These results suggest that class action litigation in the federal system is heavily concentrated in a few jurisdictions. Of the 94 federal district courts, nearly half of all class actions in our data set occurred in five courts. Even adjusting for population (the popular class action districts also tend to be ones with large populations), the concentration ratio remains striking. We take this as evidence that certain jurisdictions offer advantages for class action litigation, either in the form of experienced judges who can handle these cases in a fair and expeditious manner, faster dockets, a sense on the part of plaintiffs' attorneys that the courts in these districts are reasonably well-inclined toward class action litigation, or a concentration of class action attorneys specializing in the practice.

We also investigated whether different federal courts appear to specialize in different types of cases. Table 2 shows the breakdown of the four largest case types, plus the residual case type, "Other," in the federal district courts with the largest number of class action settlements in our data (those listed in Table 1). For each case category, one column shows the percent of cases in each district and a second column shows the number of cases. For example, the Southern District of New York accounted for 70 of 253 securities cases, 28 percent of that category. Thus, the Southern District of New York tends to dominate securities class actions, whereas the Eastern District of Pennsylvania is the leader in antitrust

*Eisenberg and Miller*

Table 2:   Class Action Case Categories by Locale, 1993–2008

| | Antitrust | | Consumer | | Employment | | Securities | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| District | % | N | % | N | % | N | % | N | % | N | % | N |
| Other | 16 | 10 | 35 | 34 | 30 | 15 | 21 | 52 | 38 | 49 | 27 | 160 |
| SDNY | 7 | 4 | 1 | 1 | 10 | 5 | 28 | 70 | 18 | 23 | 18 | 103 |
| EDPA | 20 | 12 | 14 | 13 | 2 | 1 | 14 | 36 | 6 | 8 | 12 | 70 |
| NDCA | 7 | 4 | 7 | 7 | 14 | 7 | 8 | 19 | 8 | 10 | 8 | 47 |
| DNJ | 8 | 5 | 7 | 7 | 2 | 1 | 6 | 15 | 5 | 7 | 6 | 35 |
| NDIL | 10 | 6 | 7 | 7 | 4 | 2 | 5 | 12 | 2 | 2 | 5 | 29 |
| EDNY | 5 | 3 | 7 | 7 | 2 | 1 | 6 | 14 | 1 | 1 | 4 | 26 |
| DDC | 16 | 10 | 1 | 1 | 0 | 0 | 1 | 2 | 4 | 5 | 3 | 18 |
| EDMI | 3 | 2 | 0 | 0 | 0 | 0 | 2 | 6 | 7 | 9 | 3 | 17 |
| DMN | 5 | 3 | 3 | 3 | 4 | 2 | 2 | 6 | 2 | 2 | 3 | 16 |
| EDLA | 0 | 0 | 3 | 3 | 4 | 2 | 2 | 4 | 3 | 4 | 2 | 13 |
| EDCA | 0 | 0 | 2 | 2 | 16 | 8 | 0 | 0 | 2 | 2 | 2 | 12 |
| MDFL | 2 | 1 | 2 | 2 | 2 | 1 | 3 | 7 | 1 | 1 | 2 | 12 |
| CDCA | 0 | 0 | 2 | 2 | 6 | 3 | 1 | 3 | 2 | 2 | 2 | 10 |
| DMA | 2 | 1 | 5 | 5 | 0 | 0 | 1 | 2 | 2 | 2 | 2 | 10 |
| SDCA | 0 | 0 | 2 | 2 | 4 | 2 | 2 | 5 | 1 | 1 | 2 | 10 |
| Total | 100 | 61 | 100 | 96 | 100 | 50 | 100 | 253 | 100 | 128 | 100 | 588 |

NOTE: Table includes only federal district court cases.
SOURCES: Westlaw, LexisNexis, PACER.

and consumer cases. The Northern and Eastern Districts of California are the leaders in employment cases. Table 2 shows that the SDNY's dominance is almost completely attributable to its large role in securities cases.

### 1. Fees Across Locales

Table 3 shows summary statistics about fees and recoveries by locale. The mean fee to recovery ratio was 0.23, or 23 percent of the class award, but this percent varies by recovery size, as shown in Figure 5 and Table 7. The mean fee was $12.8 million and the median was $2.3 million. The mean class recovery was $116.0 million and the median was $12.5 million.

Some bankruptcy case fee studies[11] and other studies of case outcomes show notable interdistrict variation. Like these studies, we find significant variation across federal districts. For the 16 federal districts with at least 10 cases with necessary information in the

───────

[11]See Lynn M. LoPucki & Joseph W. Doherty, The Determinants of Professional Fees in Large Bankruptcy Reorganization Cases, 1 J. Empirical Legal Stud. 111, 114, 136 (2004) (showing significant fee request reduction variation across Delaware and the Southern District of New York); Stephen J. Lubben, Corporate Reorganization and Professional Fees, 82 Am. Bankr. L.J. 82 (2008) (showing some significant Delaware and Southern District of New York effects). But see Lynn M. LoPucki & Joseph W. Doherty, Professional Overcharging in Large Bankruptcy Reorganization Cases, 5 J. Empirical Legal Stud. 983, 1010 (2008) (tbl. 5, showing insignificant Delaware and Southern District of New York effects).

Table 3:   Fee and Class Recoveries, by Locale, 1993–2008

| | Mean Ratio | Median Ratio | Mean Fee | Median Fee | Mean Gross Recovery | Median Gross Recovery | Number of Cases |
|---|---|---|---|---|---|---|---|
| APPEAL | 0.19 | 0.20 | 5.89 | 2.15 | 57.86 | 13.37 | 25 |
| CDCA | 0.25 | 0.25 | 3.93 | 2.75 | 16.30 | 19.90 | 10 |
| DDC | 0.22 | 0.22 | 16.69 | 2.14 | 134.79 | 13.00 | 18 |
| DMA | 0.16 | 0.15 | 11.50 | 7.00 | 118.55 | 81.00 | 10 |
| DMN | 0.25 | 0.27 | 8.77 | 4.75 | 40.99 | 14.25 | 16 |
| DNJ | 0.21 | 0.22 | 32.26 | 7.80 | 503.42 | 36.88 | 35 |
| EDCA | 0.26 | 0.25 | 0.40 | 0.12 | 3.26 | 0.54 | 12 |
| EDLA | 0.26 | 0.23 | 7.79 | 1.77 | 43.53 | 8.61 | 13 |
| EDMI | 0.22 | 0.20 | 6.56 | 1.34 | 34.80 | 11.75 | 17 |
| EDNY | 0.32 | 0.25 | 11.33 | 2.38 | 142.42 | 9.03 | 26 |
| EDPA | 0.28 | 0.29 | 12.66 | 1.51 | 75.79 | 6.88 | 70 |
| MDFL | 0.21 | 0.21 | 3.64 | 2.66 | 18.23 | 14.87 | 12 |
| NDCA | 0.26 | 0.25 | 4.44 | 2.00 | 24.06 | 9.25 | 47 |
| NDIL | 0.24 | 0.24 | 12.14 | 2.75 | 51.45 | 12.50 | 29 |
| Other | 0.24 | 0.25 | 20.47 | 3.25 | 154.98 | 16.38 | 161 |
| SDCA | 0.26 | 0.25 | 4.66 | 1.14 | 63.12 | 4.90 | 10 |
| SDNY | 0.22 | 0.22 | 11.54 | 2.13 | 127.97 | 12.85 | 103 |
| State | 0.20 | 0.20 | 5.94 | 2.00 | 61.61 | 12.32 | 75 |
| Total | 0.23 | 0.24 | 12.84 | 2.33 | 116.01 | 12.50 | 689 |

NOTE: Dollar amounts are in millions of 2008 dollars.
SOURCES: Westlaw, LexisNexis, PACER.

sample (including "Other" as a district), a test of the hypothesis that the median ratio of fee to class recovery does not differ significantly can be rejected, with a Mann-Whitney test yielding a significance level of $p = 0.014$. Given the strong association between fee and class recovery, we explored these initial interdistrict differences by accounting for recovery level and case category in regression models. The district dummy variables were collectively statistically significant ($p = 0.035$), indicating that when the size of class recoveries and case categories are accounted for, one can reject the hypothesis of no statistically significant interdistrict differences. Table 3's first two numerical columns suggest that interdistrict differences can be nontrivial but are not dramatic. With one exception, the District of Massachusetts, the median ratio always ranges from 0.20 to 0.29.

In federal courts, attorney fee doctrine is dictated at the circuit court level if the appeals court has issued an opinion on point (the Supreme Court has never offered definitive guidance on this issue). The Ninth Circuit has a 25 percent benchmark fee in common fund cases but allows departures based on individual case factors,[12] and the Eleventh Circuit has indicated that its district courts view 25 percent as a benchmark.[13]

———

[12]E.g., Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

[13]Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 775 (11th Cir. 1991).

260    *Eisenberg and Miller*

Table 4:   Fee and Class Recoveries, by Federal Circuit, 1993–2008

| Circuit | Mean Ratio | Median Ratio | Mean Fee | Median Fee | Mean Gross Recovery | Median Gross Recovery | Number of Cases |
|---|---|---|---|---|---|---|---|
| 1st | 0.20 | 0.20 | 31.83 | 3.50 | 227.41 | 19.32 | 21 |
| 2nd | 0.23 | 0.24 | 10.58 | 2.13 | 119.06 | 11.63 | 145 |
| 3rd | 0.26 | 0.26 | 17.38 | 3.00 | 193.50 | 13.38 | 120 |
| 4th | 0.20 | 0.21 | 29.27 | 1.89 | 320.07 | 13.55 | 8 |
| 5th | 0.24 | 0.23 | 42.39 | 2.63 | 368.34 | 15.65 | 26 |
| 6th | 0.23 | 0.23 | 10.42 | 3.33 | 94.65 | 15.50 | 42 |
| 7th | 0.26 | 0.24 | 8.79 | 2.15 | 38.37 | 10.07 | 42 |
| 8th | 0.25 | 0.30 | 11.21 | 4.18 | 68.35 | 14.70 | 29 |
| 9th | 0.25 | 0.25 | 4.53 | 1.80 | 32.97 | 9.50 | 101 |
| 10th | 0.22 | 0.23 | 12.46 | 7.42 | 63.96 | 32.00 | 22 |
| 11th | 0.21 | 0.22 | 17.35 | 4.22 | 87.09 | 26.85 | 34 |
| DC | 0.21 | 0.22 | 15.17 | 1.94 | 122.04 | 11.00 | 20 |
| Total | 0.24 | 0.25 | 13.74 | 2.40 | 123.12 | 12.50 | 610 |

NOTE:  Three Federal Circuit cases and all state court cases are omitted. Dollar amounts are in millions of 2008 dollars.
SOURCES:  Westlaw, LexisNexis, PACER.

The Eleventh and D.C. Circuits mandate the percentage methodexclusively, while other circuits allow percentage or lodestar methods.[14] The Second Circuit's *Goldberger* decision rejected the use of benchmarks and mandated a fact-specific inquiry.[15]

Table 4 explores intercircuit variation, showing summary statistics about fees and recoveries by circuit, and excludes state court cases. The median and mean fee to recovery ratios were 0.24 and 0.25, respectively. In regression models of the ratio, circuit dummy variables were not collectively statistically significant ($p = 0.124$), indicating that when the size of class recoveries and case categories are accounted for, one cannot reject the hypothesis of no statistically significant intercircuit differences. We also explored differences between particular circuits and all other circuits based on announced benchmarks and methods. In regression models using dummy variables for individual circuits, and controlling for case category and recovery size, none of the individual circuit effects were statistically significant. Nor were differences within the Second Circuit significantly different pre- and post-*Goldberger*.[16]

––––––

[14]Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993); Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991).

[15]Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).

[16]Nor was the variance in fee percent significantly different between the Ninth or Eleventh Circuits and other circuits. For a more in-depth exploration of the effect (or lack of effect) of the *Goldberger* decision, see Theodore Eisenberg, Geoffrey Miller & Michael Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After *Goldberger v. Integrated Resources, Inc.*, 29 Wash. U. J. Law & Policy 5 (2009).

2. State-Federal Differences

We hypothesized that the fee percent would tend to be higher in class actions in state court than in federal court.[17] Beliefs in differences in how federal and state courts process class actions were cited as reasons for enactment of CAFA.[18] The Congress that enacted CAFA intended to route interstate class actions to federal court, "with the expressed intent of defeating the plaintiffs' bar's manipulation of state courts."[19] President George W. Bush declared that it "marks a critical step toward ending the lawsuit culture in our country."[20] Empirical support for CAFA was almost entirely lacking, however, with both Federal Judicial Center (FJC) research[21] and our own prior work[22] suggesting little in the way of significant state-federal defferences.

 Table 3 shows that the mean fee to class recovery ratio for state court cases was 0.20, lower than the overall mean ratio of 0.24. Regression models of the fee (log 10) or the ratio (of logs) as a function of the case category and the class recovery size indicate that the federal-state difference was sometimes statistically significant in the direction suggested by Table 3—namely, that state courts award lower percentage fees.[23] The direction of the effect is surprising if one believes federal courts are less receptive to class actions than are state courts. A lower fee to recovery ratio suggests somewhat less encouragement of class action activity by state courts compared to federal courts.

3. Case Categories

Table 5 summarizes fees, recoveries, and their ratios by case categories. Mean fees ranged from 11 percent of the class recovery in tax cases to 27 percent in employment cases. In the

———

[17]Eisenberg & Miller, supra note 5.

[18]Pub. L. No. 109-2, 119 Stat. 4 (2005) (codified in scattered sections of 28 U.S.C.). See generally Kevin M. Clermont & Theodore Eisenberg, CAFA Judicata: A Tale of Waste and Politics, 156 U. Pa. L. Rev. 1553 (2008); Georgene M. Vairo, Class Action Fairness Act of 2005 (2005).

[19]Clermont & Eisenberg, supra note 18, at 1554–55.

[20]Remarks on Signing the Class Action Fairness Act of 2005, 41 Weekly Comp. Pres. Doc. 265, 265 (Feb. 18, 2005); see also Edward A. Purcell, Jr., The Class Action Fairness Act in Perspective: The Old and the New in Federal Jurisdictional Reform, 156 U. Pa. L. Rev. 1823 (2008) (stressing partisan support for CAFA).

[21]Thomas E. Willging & Shannon R. Wheatman, Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make? 81 Notre Dame L. Rev. 591, 645, 652–54 (2006) (finding insignificant differences in state court and federal court treatment of class actions, and observing that "[a]ttorney perceptions of judicial predispositions toward their clients' interests show little or no relationship to the judicial rulings in the surveyed [state and federal class action] cases"). See also Section VII.

[22]Eisenberg & Miller, supra note 5.

[23]The state court effect was significant in multilevel models with a random intercept for case category. The effect was insignificant in models with dummy variables for case category.

262    *Eisenberg and Miller*

Table 5:   Fee and Class Recoveries, by Case Category, 1993–2008

| | *Mean Ratio* | *Median Ratio* | *Mean Fee* | *Median Fee* | *Mean Gross Recovery* | *Median Gross Recovery* | *Number of Cases* |
|---|---|---|---|---|---|---|---|
| Antitrust | 0.22 | 0.23 | 21.02 | 9.15 | 163.48 | 39.36 | 71 |
| Civil rights | 0.24 | 0.23 | 4.10 | 1.52 | 16.53 | 7.48 | 18 |
| Consumer | 0.25 | 0.20 | 10.04 | 1.70 | 128.42 | 9.33 | 125 |
| Corporate | 0.21 | 0.19 | 3.35 | 1.12 | 16.51 | 9.86 | 30 |
| Employment | 0.27 | 0.25 | 2.43 | 0.75 | 12.28 | 3.00 | 55 |
| ERISA | 0.23 | 0.25 | 6.61 | 3.46 | 29.54 | 14.00 | 43 |
| Securities | 0.23 | 0.25 | 14.78 | 2.52 | 141.96 | 12.50 | 268 |
| Tax refund/tax | 0.11 | 0.06 | 12.96 | 5.50 | 188.01 | 60.07 | 8 |
| Tort | 0.21 | 0.20 | 30.15 | 6.33 | 254.60 | 25.86 | 29 |
| Other | 0.23 | 0.25 | 13.59 | 2.00 | 61.86 | 10.75 | 42 |
| Total | 0.23 | 0.24 | 12.84 | 2.33 | 116.01 | 12.50 | 689 |

NOTE: Dollar amounts are in millions of 2008 dollars.
SOURCES: Westlaw, LexisNexis, PACER.

Table 6:   Frequency of Case Categories, by Time Period

| | *Non-Fee-Shifting Cases* | | | |
|---|---|---|---|---|
| | *1993–2002* | | *2003–2008* | |
| | N | *% of Cases in Period* | N | *% of Cases in Period* |
| Antitrust | 36 | 11.9 | 35 | 9.1 |
| Civil rights | 2 | 0.7 | 16 | 4.2 |
| Consumer | 52 | 17.2 | 73 | 18.9 |
| Corporate | 15 | 5.0 | 15 | 3.9 |
| Employment | 7 | 2.3 | 48 | 12.4 |
| ERISA | 7 | 2.3 | 36 | 9.3 |
| Securities | 142 | 46.9 | 126 | 32.6 |
| Tax refund/tax | 6 | 2.0 | 2 | 0.5 |
| Tort | 17 | 5.6 | 12 | 3.1 |
| Other | 19 | 6.3 | 23 | 6.0 |
| Total | 303 | 100 | 386 | 100 |

SOURCES: Westlaw, LexisNexis, PACER.

larger case categories, fees ranged from 21 percent to 27 percent of recoveries. A test of the hypothesis that the median ratio of fees to recoveries is the same across case categories can be rejected at $p < 0.022$, if one includes the small civil rights and tax categories. But the effect becomes statistically insignificant if one excludes the two smallest categories ($p = 0.222$).

The case category makeup of the samples varied over time. Table 6 shows the case category breakdown for the time period of our prior study and the years 2003 to 2008, added for purposes of this study. In each time period, securities cases were the dominant case category, but they declined as a proportion of the sample in the later time period. This

*Figure 4:*   Fee and recovery by case category, 1993–2008.



Sources:  Westlaw, LexisNexis, PACER.

is due to the increase in the proportion of civil rights, employment, and ERISA cases, which
likely increased because of the change in coding, discussed above, to allow inclusion with
common fund cases, cases subject to a fee-shifting statute but in which the fee was not
determined pursuant to the statute, as well as to increased availability of information
through the PACER database.

Figure 4 explores whether the core relation between fee amount and class recovery
varies by case category. It shows that relation through separate scatterplots for 10 case
categories. The consistency of the pattern across category is striking. Every category shows
the same basic relation between fee and recovery.

4.  Scaling Effect

The existence of a scaling effect—the fee percent decreases as class recovery increases—is
central to justifying aggregate litigation such as class actions. Plaintiffs' ability to aggregate
into classes that reduce the percentage of recovery devoted to fees should be a hallmark of
a well-functioning class action system.[24] As Figure 5 shows, a substantial scaling effect existed

———

[24]Eisenberg & Miller, supra note 5.

264     *Eisenberg and Miller*

*Figure 5:*   Fee as a percent of recovery for two time periods.



Sources:  Westlaw, LexisNexis, PACER.

in the 2003–2008 period, as well as in the earlier 1993–2002 period. The linear correlation coefficient for 2003–2008 was −0.57 and for 1993–2002 was −0.50, both statistically significant at $p < 0.0001$. The lines in the figure show the best-fitting regression line for each data subset.

Table 7 presents additional information about the scale effect. For purposes of this table, we divided the range of class recoveries into deciles of about 69 cases each. Table 7's first column shows the bounds on the deciles, starting with the lowest decile of class recoveries. Thus the table's first numerical row includes cases with class recoveries in the first decile, those recoveries less than or equal to $1.1 million. The table's last row includes cases in the highest decile, those with recoveries greater than $175.5 million. The table's columns show, within each decile range, the mean, median, and standard deviation of the fee percent for the row decile. Thus, for the 69 cases with class recoveries of less than $1.1 million, the mean fee percent award was 37.9 percent in 69 cases, the median fee percent award was 32.3 percent, and the standard deviation was 19.6 percent. Although there is some fluctuation in the scale effect trend across the middle deciles, the overall trend is clear, with the highest decile having less than one-third of the median and mean percentage fee of the lowest decile.

Table 7:   Mean, Median, and Standard Deviation of
Fee Percent, Controlling for Class Recovery Amount,
1993–2008

| *Range of Class Recovery (Millions) Decile* | *Mean* | *Median* | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery > 1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery > 2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery > 5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery > 8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery > 14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery > 22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery > 38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery > 69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery > 175.5 | 12.0 | 10.2 | 7.9 | 68 |

SOURCES: Westlaw, LexisNexis, PACER.

Table 8:   Fee Percent, by Risk Level

| | *High Risk* | | *Low/Medium Risk* | |
|---|---|---|---|---|
| | N | *Fee %* | N | *Fee %* |
| Antitrust | 9 | 20.1 | 62 | 22.2 |
| Civil rights | 4 | 29.3 | 13 | 23.2 |
| Consumer | 14 | 31.3 | 110 | 24.7 |
| Corporate | 4 | 23.4 | 26 | 20.8 |
| Employment | 4 | 35.1 | 51 | 26.2 |
| ERISA | 5 | 24.6 | 38 | 23.2 |
| Securities | 45 | 26.4 | 217 | 22.7 |
| Tax refund/tax | — | — | 8 | 10.8 |
| Tort | 8 | 25.1 | 21 | 19.0 |
| Other | 13 | 22.1 | 29 | 23.9 |
| Total | 106 | 26.1 | 575 | 23.1 |

SOURCES: Westlaw, LexisNexis, PACER.

## 5. Risk

Standards applied to attorney fees uniformly indicate that greater risk warrants an increased fee.[25] Table 8 reports, by case category, the mean fee percent separately for high risk and other cases. It confirms that courts systematically reward risk. For every case category except antitrust and "other," mean fee percents were higher in high-risk cases than in other cases. The difference within a case category between high-risk cases and other cases

──────

[25]E.g., Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000).

266   *Eisenberg and Miller*

Table 9:  Fee Percent and Settlement Classes, Opt Outs, Objectors

|  | *Period*<br>*2003–2008* | |
|---|---|---|
|  | N | *Fee %* |
| A.  Settlement Class Status |  |  |
|   Settlement class | 208 | 24.4% |
|   Not a settlement class | 160 | 25.4% |
| B.  Presence of Objectors |  |  |
|   Any objector | 142 | 23.4% |
|   No objector | 123 | 28.6% |
| C.  Number of Opt Outs |  |  |
|   No opt outs | 28 | 34.6% |
|   One opt out | 20 | 37.2% |
|   >One opt out | 116 | 23.6% |

Sources:  Westlaw, LexisNexis, PACER.

was statistically significant only for the large securities category (*t* test significance level, $p = 0.006$).

6.  Settlement Classes, Opt Outs, and Objectors

Table 9 reports the relation between the fee percent and three class action case character-istics: settlement class status (Panel A),[26] whether any objection was filed (Panel B), and the number of class members opting out of the class (Panel C). We collected useful data on these issues only for the later time period (2003–2008). No significant difference in fee percent for settlement class cases compared to nonsettlement class cases emerged. There were significant differences in the fee percent for cases with and without objectors. Cases with objectors tended to have lower fee percents than cases without objectors. Cases with more than one opting-out class member tended to have lower fee percents than cases with zero or one opting-out class member. But, in regression models that supplement those reported in Table 17, the objector and opt-out variables were found not to be significant once one controlled for recovery size.

# IV. Bivariate Results: Fee Methods and Multipliers

The dominant method used to calculate fees in class actions has evolved from considering multiple factors[27] to the dominance of two other methods, the lodestar and percentage

———

[26]A settlement class is a case in which a class was certified for settlement purposes only.

[27]The factors include the time and labor required, the customary fee, whether the fee is fixed or contingent, the amount involved and the results obtained, the experience, reputation, and ability of the attorneys, awards in similar

Table 10:    Frequency of Method Used, by Time Period

|  | 1993–2002 | | 2003–2008 | |
|---|---|---|---|---|
|  | N | % of Cases in Period | N | % of Cases in Period |
| Lodestar | 38 | 13.6 | 37 | 9.6 |
| Percent | 158 | 56.4 | 146 | 37.8 |
| Both (usually % with LS check) | 68 | 24.3 | 165 | 42.8 |
| Other | 16 | 5.7 | 38 | 9.8 |
| Total | 280 | 100 | 386 | 100 |

NOTE: LS = lodestar method.
SOURCES: Westlaw, LexisNexis, PACER.

methods. Under the lodestar method, courts multiply the reasonable number of hours expended by counsel by a reasonable hourly rate and then adjust the product for various factors.[28] Under the percentage method, the court multiplies the amount recovered on behalf of the class by a percentage factor. Some courts adopt a blended approach that checks the percentage method for reasonableness against a lodestar calculation.[29] We explore here the rates at which courts use the fee calculation methods, the relation between those methods and fees, the rates at which courts granted requested fees, and the use of multipliers in cases using the lodestar method.

*A. Lodestar*

1. Frequency of Use of Lodestar Versus Percent

Table 10 reports the rate of use of competing methods of computing a fee award. One result is the decline in the use of the lodestar method. From 1993 to 2002, 13.6 percent of cases used a pure lodestar method. From 2003 to 2008, only 9.6 percent of cases used the lodestar method, a notable but not statistically significant reduction ($p = 0.136$). This is likely due to the relatively few cases using the lodestar method exclusively.

Table 10 also suggests a reduction in use of the pure percent method, from 56.4 percent to 37.8 percent, but this understates the dominance of the percent method. For the 1993 to 2002 period, we coded which method was primary and which was used as a check. In non-fee-shifting cases in this period, 61 cases used the percent method with a lodestar

------

cases, the nature and length of the professional relationship with the client, the time limitations imposed by the client or the circumstances, the preclusion of other employment by the attorney due to acceptance of the case, the novelty and difficulty of the questions, the skill needed to perform the legal services, and the "undesirability" of the case. The leading precedent outlining this multifactor approach is Johnson v. Georgia Highway Express, 488 F.2d 714, 717–19 (5th Cir. 1974).

[28]E.g., Gisbrecht v. Barnhart, 535 U.S. 789 (2002). See Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Tex. L. Rev. 865 (1992); Charles Silver, Due Process and the Lodestar Method: You Can't Get There from Here, 74 Tulane L. Rev. 1809 (2000).

[29]See notes 12–15 supra for circuit level case law addressing the fee method to be used.

268    *Eisenberg and Miller*

*Figure 6:*   Pure lodestar use over time.



check compared with three cases that used the lodestar method with the percent method as a check. The 68 cases shown as using "both" methods in the earlier period included an additional four cases that used both methods without indicating which was dominant. So cases coded as using "both" methods were almost always percent method cases with a lodestar check. We used less detailed coding of the method in the second period. If a case used both methods, we simply coded it as "both." Nevertheless, it is reasonable to assume that the "both" cases in the second period are similar to those in the earlier period and are dominated by the percent method with the lodestar as a check. So our best estimate is that the percent method is the overwhelmingly dominant method of computing fees, either as the sole method or as the primary method with the lodestar as a check. Figure 6 shows the rate of pure lodestar use over time, with a separate line for the large subset of securities class actions. Figure 1's strong linear correlation between fee and recovery supports this assessment as a lodestar-dominated system would likely show a less strong association between fee and class recovery.

   Table 11 limits the sample to federal cases and shows the fee method used broken down by circuit. As suggested by Table 10, the use of the percent method, combined with the use of the percent method with a lodestar check, dominates. Table 11 shows that this is the pattern in every circuit, regardless of formal fee method doctrine. The lodestar method peaks at 21 percent of cases in the Sixth Circuit and only the Second Circuit combines nontrivial lodestar use with a substantial number of cases. The table slightly overstates the more recent federal rate of lodestar use, which totaled only 9 percent in cases from 2003 to 2008.

*Attorney Fees and Expenses in Class Action Settlements*     *269*

Table 11:   Fee Method by Circuit, Federal Cases, 1993–2008

| Circuit | Lodestar | | Percent | | Both | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | N | % | N | % | N | % | N | % | N |
| 1st | 5 | 1 | 60 | 12 | 35 | 7 | 0 | 0 | 100 | 20 |
| 2nd | 19 | 26 | 37 | 51 | 40 | 55 | 5 | 7 | 100 | 139 |
| 3rd | 5 | 6 | 37 | 43 | 56 | 65 | 3 | 3 | 100 | 117 |
| 4th | 13 | 1 | 50 | 4 | 38 | 3 | 0 | 0 | 100 | 8 |
| 5th | 20 | 5 | 40 | 10 | 36 | 9 | 4 | 1 | 100 | 25 |
| 6th | 21 | 8 | 62 | 24 | 13 | 5 | 5 | 2 | 100 | 39 |
| 7th | 10 | 4 | 61 | 25 | 17 | 7 | 12 | 5 | 100 | 41 |
| 8th | 0 | 0 | 59 | 17 | 34 | 10 | 7 | 2 | 100 | 29 |
| 9th | 9 | 9 | 48 | 48 | 30 | 30 | 13 | 13 | 100 | 100 |
| 10th | 9 | 2 | 41 | 9 | 45 | 10 | 5 | 1 | 100 | 22 |
| 11th | 3 | 1 | 52 | 17 | 36 | 12 | 9 | 3 | 100 | 33 |
| D.C. | 0 | 0 | 50 | 10 | 35 | 7 | 15 | 3 | 100 | 20 |
| Federal Circuit | 0 | 0 | 100 | 3 | 0 | 0 | 0 | 0 | 100 | 3 |
| Total | 11 | 63 | 46 | 273 | 37 | 220 | 7 | 40 | 100 | 596 |

SOURCES: Westlaw, LexisNexis, PACER.

Table 12:   Fee Percent by Method Used, by Time Period

| | 1993–2002 | | 2003–2008 | |
|---|---|---|---|---|
| | N | Mean Fee % of Recovery | N | Mean Fee % of Recovery |
| Lodestar | 38 | 17.2 | 37 | 31.6 |
| Percent | 158 | 23.4 | 146 | 25.3 |
| Both (usually % with LS check) | 68 | 22.9 | 165 | 21.9 |
| Other | 16 | 11.4 | 38 | 28.7 |
| Total | 280 | 21.7 | 386 | 24.8 |

NOTE: LS = lodestar method.
SOURCES: Westlaw, LexisNexis, PACER.

## 2. Is Use of the Lodestar Method Associated with Lower Fee Awards?

Table 12 explores the relation between fee method and fee percent. Although the table's first row suggests a substantial increase in fee percents in lodestar cases over time, the higher fee percents in recent lodestar cases are an artifact of case category. Consumer cases comprise 37 percent of the lodestar category and the difference between percent and lodestar methods vanishes if one excludes consumer cases. The consumer case category percent of cases changed for the two periods in our sample. Consumer cases were 59.5 percent of the lodestar cases in the later period compared to 15.8 percent of the lodestar cases in the earlier period. The lodestar method was used at a higher rate, 23.0 percent, in consumer cases than in any case category other than the small tax category. These high-percent consumer cases (see Table 8) are the source of the change in mean lodestar fee percents over time. The increased prominence of consumer cases in the later period

sample is likely attributable to our including as common fund cases those in which a
fee-shifting statute was theoretically available but was not in fact used. In regression models,
reported below (see Table 18), the percent and "both" fee methods have positive and
statistically significant coefficients compared to the lodestar method once case category is
controlled for.

For the period 2003 to 2008, we coded the hours worked by attorneys in cases with
opinions reporting that information. The lower lodestar awards appear to be a conse-
quence of fewer hours worked, or at least fewer hours claimed in court filings. Fewer hours
were worked, on average, in lodestar method cases than in other cases and fewer hours were
worked in consumer cases than in any other case category. As in regressions of the fee
amount, regression of hours worked that controlled for fee method, case category, and
circuit yielded coefficients for the percent and "both" method dummy variables that are
statistically significant and positive compared to lodestar cases.

### B. Fee Grant Rates

Fee requests were generally granted in the amount requested, with 72.5 percent of requests
granted in full, as shown in Table 13's last row (Panel A). Our data for the rate of grants is
limited to the 2003 to 2008 period because requested amounts were not recorded for the
earlier time period. Table 13 shows that strong intercircuit differences ($p = 0.012$, exclud-
ing the two Federal Circuit cases) in the grant rate existed, with the Second Circuit granting
the requested amount statistically significantly less often than the Third Circuit or the Ninth
Circuit. These intercircuit differences remain significant in logistic regression models that
control for case category and recovery amount, and in models that exclude securities cases.
The table also shows that state courts tended to grant award requests at a lower rate than
federal courts. The difference between federal and state grant rates was only statistically
significant at $p = 0.148$.

Fee requests were not granted in full in 100 of 363 cases. In those cases, the mean fee
grant was 68 percent of the request and the median was 74 percent. The mean grant of 61
percent in state court cases was lower than the 69 percent in federal court cases and the
median of 66 percent in state court cases was also lower than the median of 75 percent in
federal court cases. However, only nine of the 100 cases with less than full grants were state
court cases.

Table 13, Panel B, shows the rate at which requested fees were granted in relation
to the range of class of recovery, using the same decile ranges as Table 7. It shows a
declining grant rate as the class recovery increases. The grant rate for the lowest recovery
decile was 83 percent compared to 56 percent for the highest recovery decile. We inter-
pret this as indicating that judges tend to scrutinize fee requests in large cases more
closely than they do for smaller cases. Panel C shows the grant rate in relation to the
percent of class recovery requested as fees. Instead of using class recovery deciles, it uses
deciles of the percent of recovery requested, which range from the lowest decile of
requests up to 11.8 percent of the recovery to the highest decile of requests over 35.7
percent. It shows a trend of decreasing grant rates as the percent of the recovery
requested increased. Attorneys requesting the lowest percents received requested amounts

Table 13:   Rates at Which Requested Fees Were Given, 2003–2008

*A. By Locale*

| Locale | Proportion of Fee Requests Granted in the Amount Requested | N |
|---|---|---|
| 1st | 0.70 | 10 |
| 2nd | 0.54 | 74 |
| 3rd | 0.83 | 64 |
| 4th | 0.60 | 5 |
| 5th | 0.69 | 13 |
| 6th | 0.79 | 24 |
| 7th | 0.79 | 14 |
| 8th | 0.83 | 18 |
| 9th | 0.83 | 72 |
| 10th | 0.77 | 13 |
| 11th | 0.64 | 22 |
| D.C. | 0.80 | 10 |
| Federal Circuit | 0.50 | 2 |
| State court | 0.59 | 22 |
| Total | 0.72 | 363 |

*B. By Range of Class Recovery (Millions)*

| Range of Class Recovery (Millions) Decile | Rate Granted | N |
|---|---|---|
| Recovery <= 1.1 | 0.83 | 52 |
| Recovery > 1.1 <= 2.8 | 0.75 | 36 |
| Recovery > 2.8 <= 5.3 | 0.82 | 38 |
| Recovery > 5.3 <= 8.7 | 0.67 | 33 |
| Recovery > 8.7 <= 14.3 | 0.77 | 35 |
| Recovery > 14.3 <= 22.8 | 0.68 | 34 |
| Recovery > 22.8 <= 38.3 | 0.76 | 33 |
| Recovery > 38.3 <= 69.6 | 0.68 | 34 |
| Recovery > 69.6 <= 175.5 | 0.67 | 36 |
| Recovery > 175.5 | 0.56 | 32 |

*C. By Range of Class Recovery Percent Requested Decile*

| | Rate Granted | N |
|---|---|---|
| Percent of recovery requested <= 11.8% | 0.81 | 36 |
| Percent of recovery requested > 11.8% <= 17.8% | 0.86 | 36 |
| Percent of recovery requested > 17.8% <= 21.9% | 0.62 | 37 |
| Percent of recovery requested > 21.9% <= 25% | 0.76 | 75 |
| Percent of recovery requested > 25.0% <= 30.0% | 0.72 | 72 |
| Percent of recovery requested > 30.0% <= 33.3% | 0.71 | 35 |
| Percent of recovery requested > 33.3% <= 35.7% | 0.67 | 36 |
| Percent of recovery requested > 35.7% | 0.61 | 36 |

NOTE:  In Panel C, the number of observations in the fourth and fifth rows reflects the bunching of fee requests at 25 percent and 30 percent. They each occupy approximately two deciles of fee requests.
SOURCES:  Westlaw, LexisNexis, PACER.

272     *Eisenberg and Miller*

Table 14:   Mean Multiplier by Circuit and
Case Category

|  | *Mean Multiplier* | N |
|---|---|---|
| A.  Circuit | | |
| 1st | 2.10 | 15 |
| 2nd | 1.58 | 97 |
| 3rd | 2.01 | 87 |
| 4th | 2.43 | 7 |
| 5th | 2.07 | 15 |
| 6th | 1.97 | 22 |
| 7th | 1.85 | 16 |
| 8th | 2.30 | 14 |
| 9th | 1.54 | 50 |
| 10th | 1.91 | 14 |
| 11th | 1.19 | 19 |
| D.C. | 2.23 | 11 |
| Federal | 1.54 | 1 |
| Total | 1.81 | 368 |
| B.  Case Category | | |
| Antitrust | 2.24 | 38 |
| Civil rights | 1.99 | 11 |
| Consumer | 1.82 | 60 |
| Corporate | 1.94 | 7 |
| Employment | 1.24 | 21 |
| ERISA | 1.58 | 29 |
| Securities | 1.75 | 177 |
| Tort | 1.83 | 11 |
| Other | 2.35 | 14 |
| Total | 1.81 | 368 |

SOURCES:  Westlaw, LexisNexis, PACER.

in 81 percent of cases compared to 61 percent for attorneys requesting the highest percents. This result suggests that attorneys who make more modest fee requests have a greater chance of having their requests granted.

We explored the effects of the class recovery amount, percent of recovery requested, circuit, and type of case in logistic regression models in which whether the requested fee was granted was a dichotomous dependent variable. The class recovery amount and the percent of recovery requested were highly statistically significant (each $p < 0.001$), the circuit dummy variables were jointly significant at $p = 0.005$, and the case type dummy variables were not statistically significant ($p = 0.262$).

*C. Multipliers*

Courts often check the percentage-based attorney fee against the lodestar award. If the percentage fee grossly exceeds the lodestar amount, the fee may be deemed excessive, and the courts can adjust the fee downward to a more reasonable range. Table 14 reports, for

*Figure 7:*  Relation between multipliers and fee percent, recovery, and hours, 2003–2008.



Sources:  Westlaw, LexisNexis, PACER.

federal cases, the mean multiplier applied by circuit and by case category. The sample is limited to those cases that reported a multiplier that was not equal to 1.

The mean multiplier ranged from 1.19 in the Eleventh Circuit to 2.43 in the Fourth Circuit. Across case categories, the mean multiplier ranged from 2.35 in "other" to 1.24 in employment cases. But, in regression models of the multiplier (log) as a function of circuits and case categories, neither the dummy variables for circuits nor for case categories were collectively significant. We therefore cannot reject the hypotheses that multipliers are similar across circuits and case categories.

We do, however, find significantly different multipliers used in cases in which fee-shifting statutes were available and cases in which they were not. With no statute in the background, multipliers averaged 1.96 in 161 cases with necessary data. If a fee-shifting statute was available, multipliers averaged 1.38 in 66 cases. The difference in medians was significant at $p = 0.021$.

Figure 7 shows the relation between the fee outcomes, class recovery amount, and multipliers (Figures 7a and 7b), and between multiplier and hours reported (Figure 7c).

Since a suspected fee windfall is most likely to occur when the percentage method would yield what is perceived to be too high a fee, we expect the multiplier to tend to bring high percentage fee cases into a more moderate range. We therefore predicted and found, in our prior study, a strong negative correlation between the lodestar multiplier (fee award

274     *Eisenberg and Miller*

Table 15:   Mean, Median, and Standard Deviation of
Multiplier, Controlling for Class Recovery Amount,
1993–2008

| *Range of Class Recovery (Millions) Decile* | *Mean* | *Median* | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 0.88 | 0.74 | 0.45 | 33 |
| Recovery > 1.1 <= 2.8 | 0.95 | 0.77 | 0.67 | 40 |
| Recovery > 2.8 <= 5.3 | 1.44 | 1.25 | 0.74 | 32 |
| Recovery > 5.3 <= 8.7 | 1.59 | 1.25 | 1.32 | 34 |
| Recovery > 8.7 <= 14.3 | 1.49 | 1.45 | 0.87 | 37 |
| Recovery > 14.3 <= 22.8 | 1.68 | 1.51 | 0.85 | 38 |
| Recovery > 22.8 <= 38.3 | 1.83 | 1.44 | 1.44 | 33 |
| Recovery > 38.3 <= 69.6 | 1.98 | 1.75 | 1.00 | 38 |
| Recovery > 69.6 <= 175.5 | 2.70 | 2.09 | 2.43 | 43 |
| Recovery > 175.5 | 3.18 | 2.60 | 1.99 | 40 |

Sources:  Westlaw, LexisNexis, PACER.

divided by the lodestar) and the percentage fee awarded.[30] A similar relation exists for
2003–2008, as shown in Figure 7a.

Higher multipliers should, in general, lead to higher recoveries, a result shown in
Figure 7b. Increased multipliers do not appear to be being used a reward for hours worked.
Figure 7c shows no clear positive association between mutlipliers and hours.

Table 15 presents more detailed information about the relation between class recov-
ery and multipliers. It uses the recovery deciles reported in Table 7, but Table 15 includes
fewer observations because the sample is limited to cases with multipliers not equal to 1.
The table reports the mean, median, and standard deviation for each recovery decile.
The pattern for the mean and median multiplier confirms that suggested by Figure 7b. As
the recovery decile increases, the multiplier also tends to increase, with the multiplier in the
highest recovery decile more than triple that of the multiplier in the lowest recovery decile.

# V.  COSTS AND EXPENSES

Costs and expenses (collectively "costs") tended to be a small percentage of the class
recovery and have remained a fairly constant percentage over time. For the 232 cases from
1993 to 2002 for which cost data were available, mean costs were 2.8 percent of the recovery
and median costs were 1.7 percent. For the 304 cases with necessary data from 2003 to 2008,
mean costs were 2.7 percent of the recovery and median costs remained at 1.7 percent. As
before, we found no evidence that the cost percent increased over time.[31]

———

[30]Eisenberg & Miller, supra note 5.

[31]Id.

*Figure 8:*  Costs as a function of recovery, fees, hours, and age, non-fee-shifting cases, 2003–2008.



NOTE: Cases with age greater than 10 years old are coded as 10 years old.
SOURCES: Westlaw, LexisNexis, PACER.

We further explored costs as a function of four variables: (1) the class recovery, (2) the fee, (3) the hours reported in the court's opinion, and (4) the age of the case in years. We only coded hours billed and case age beginning with the 2003 to 2008 data. Figure 8 shows the relation between costs and the four factors and limits the sample to cases in which hours were reported in opinions and costs were at least $100. All four factors are positively associated with costs. The figure also suggests that the strongest association is between costs and hours.

Table 16 shows the correlation coefficients between costs and the four factors in Figure 8. The first four numerical columns cover the period 2003–2008, for which hours data were recorded. The last two numerical columns show the correlation between costs and fee and recovery for the period 1993–2002. The correlations between costs and recovery and fee for either period do not reach the strength of association of hours and costs in the later period. The weaker correlation between costs and age may be in part a function of age being coded only in whole years and therefore providing a less continuous measure of that factor.

A regression model, not reported here, of costs as a percent of recovery controls for case category and other factors. It shows that costs, like fees, have a scale effect: their percent of recovery significantly declines as the size of the recovery increases. The cost

276    *Eisenberg and Miller*

Table 16:   Correlations Between Costs and Four Factors

|  | Fee (Log10) | Recovery (Log10) | Hours (Log) | Age in Years | Fee (Log10) | Recovery (Log10) |
|---|---|---|---|---|---|---|
|  | | | Period = 2003–2008 | | Period = 1993–2002 | |
| Correlation Coeff. | 0.86 | 0.85 | 0.91 | 0.34 | 0.77 | 0.71 |
| Significance | <0.0001 | <0.0001 | <0.0001 | <0.0001 | <0.0001 | <0.0001 |
| N | 167 | 167 | 167 | 167 | 232 | 232 |

Sources: Westlaw, LexisNexis, PACER.

percent significantly increases with hours. In a model with both case age and hours as explanatory variables, only hours were statistically significant.

## VI. Multivariate Results

Some of the above results are so strong and robust that no further analysis is needed to support their credibility. The strong correlation between fees and class recovery and the scale effect survive any reasonable analysis, are reasonably represented by Figures 1 and 5, and are confirmed in regression models reported below. Other key results consist of factors associated with the level of the fee award. These include:

1.  The tendency of state courts to award a lower percent of recovery as a fee,
2.  The relation between case category and fee percent,
3.  The tendency of high-risk cases to receive a higher percent of the class recovery as a fee, and
4.  The tendency of lodestar awards in non-fee-shifting cases to be lower than percent-method awards.

This section first explores the robustness of these results to simultaneous control for recovery level and then reports regression models.

### A. The Relation Between the Fee Award and State Court Status, Risk, and the Lodestar Method

As Figure 1 and our earlier work suggest, for most explanatory variables, the size of the class recovery is the most important potential confounding factor in assessing the relation between other covariates and the fee award. From Figures 1 and 5, we know that: (1) the fee award increased with class recovery, and (2) the fee award was a declining percent of the class recovery as the class recovery increased. Regression models assessing nonrecovery covariates thus require both a dummy variable for the covariate, and an interaction term between the covariate and the class recovery. That is, the covariate may influence both the intercept and the slope of the line representing the relation between the covariate and the fee award. The use of class recovery, a dummy covariate, and an interaction term raises problems of multicollinearity in the regression model, which preliminary analysis confirmed. The problems arose even when a single covariate and interaction term were

*Attorney Fees and Expenses in Class Action Settlements*    277

Table 17:   Influence of Locale, Risk, and Lodestar Method on Percent Fee Award, Controlling for Class Recovery Amount, 1993–2008

| Range of Class Recovery (Millions) Decile | Federal-State | | Risk | | Lodestar | |
|---|---|---|---|---|---|---|
| | Federal Case | State Case | Low-/Medium-Risk Case | High-Risk Case | Other Methods | Pure Lodestar |
| Recovery <= 1.1 | 38.7 | 27.2 | 37.1 | 48.4 | 32.3 | 58.0 |
| N | 64 | 5 | 64 | 5 | 53 | 15 |
| Recovery > 1.1 <= 2.8 | 26.8 | 30.4 | 26.7 | 29.5 | 26.6 | 33.4 |
| N | 63 | 6 | 60 | 9 | 64 | 5 |
| Recovery > 2.8 <= 5.3 | 27.0 | 23.2 | 26.0 | 29.3 | 26.8 | 17.9 |
| N | 58 | 11 | 61 | 8 | 65 | 2 |
| Recovery > 5.3 <= 8.7 | 22.7 | 23.2 | 21.8 | 26.8 | 23.3 | 20.5 |
| N | 61 | 8 | 55 | 14 | 54 | 9 |
| Recovery > 8.7 <= 14.3 | 24.1 | 21.4 | 23.3 | 26.8 | 24.8 | 19.0 |
| N | 61 | 8 | 58 | 11 | 56 | 11 |
| Recovery > 14.3 <= 22.8 | 23.3 | 15.6 | 22.7 | 23.0 | 23.3 | 16.3 |
| N | 62 | 6 | 63 | 6 | 61 | 6 |
| Recovery > 22.8 <= 38.3 | 22.3 | 20.8 | 20.9 | 29.2 | 24.0 | 11.7 |
| N | 58 | 10 | 58 | 10 | 53 | 11 |
| Recovery > 38.3 <= 69.6 | 21.2 | 15.7 | 19.9 | 24.6 | 21.6 | 9.8 |
| N | 61 | 9 | 62 | 8 | 61 | 7 |
| Recovery > 69.6 <= 175.5 | 19.6 | 16.0 | 17.3 | 24.7 | 20.0 | 10.0 |
| N | 64 | 5 | 50 | 19 | 62 | 4 |
| Recovery > 175.5 | 12.6 | 6.5 | 10.6 | 16.5 | 12.7 | 4.3 |
| N | 61 | 7 | 52 | 16 | 62 | 5 |

Sources:  Westlaw, LexisNexis, PACER.

included in regression models, and were magnified when multiple covariates and interaction terms were used. Rather than simply report possibly questionable regression models, we first used a simpler technique to explore the possible influence of certain covariates on the fee award while simultaneously accounting for the class recovery.

Table 17 expands on Section III's tables by reporting in more detail, for non-fee-shifting cases, the relation between the fee awarded and three key covariates—state court status, risk, and use of the lodestar method—while controlling for the size of the class recovery. As was done for Tables 7, 13, and 15, we divided the range of class recoveries into deciles. Table 17's first column shows the bounds on the deciles, starting with the lowest decile of class recoveries. Each decile's statistics are reported in two rows; the first shows the fee percent and the second row shows the number of cases included in the fee percent calculation. Thus the table's first two numerical rows include cases with class recoveries in the first decile, those recoveries less than or equal to $1.1 million. The table's last two rows include cases in the highest decile, those with recoveries greater than $175.5 million. The table's second and third columns show, within each decile range, the mean fee percent award and the number of cases, divided by federal court versus state court status. Thus, for the 69 cases with class recoveries of less than $1.1 million, the mean federal case fee percent award was 38.7 percent in 64 cases and the mean state case fee percent award was 27.2

percent in five cases. The table's fourth and fifth columns show the same information, but now divided by high-risk case status versus low-/medium-risk case status. The table's sixth and seventh columns show the same information divided by use of the pure lodestar method versus use of all other methods.

With respect to federal versus state court status, the mean state case fee percent is lower than the mean federal percent for every recovery decile except the second and fourth. Thus, after controlling for class recovery size, state courts tend to award lower fees than federal courts but not overwhelmingly so. The pattern is even more consistent with respect to risk. For every recovery decile, the fee percent is higher in high-risk cases than in low-/medium-risk cases. The lodestar effect follows the same trend, with every class recovery decile except the lowest two showing a lower fee percent in pure lodestar cases than in other cases. In the low recovery deciles, of course, the lodestar method can compensate attorneys for substantial efforts that a percent fee award may not fully reflect. Section III's results for these three covariates therefore survive analysis that controls for the key potential confounder, the class recovery size.

## B. Regression Models

Table 18 reports ordinary least squares regression models that confirm our core results. Model 1 shows that over 90 percent of the variance in the fee is explained by the size of the

Table 18:  Regression Models of Fees

|  | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
|  | *Dependent Variable = Fee (Log10)* | | | | |
| Gross recovery (log10) | 0.850 | 0.850 | 0.846 | 0.833 | 0.827 |
|  | (74.37)** | (73.79)** | (73.32)** | (62.21)** | (61.35)** |
| State court case |  | −0.088 | −0.083 | −0.040 | 0.003 |
|  |  | (8.25)** | (8.15)** | (3.13)** | (0.15) |
| High-risk case |  |  | 0.111 | 0.102 | 0.098 |
|  |  |  | (7.16)** | (6.06)** | (5.06)** |
| Lodestar = reference category |  |  |  |  |  |
| Percent method |  |  |  | 0.188 | 0.169 |
|  |  |  |  | (4.76)** | (4.22)** |
| Both methods |  |  |  | 0.181 | 0.158 |
|  |  |  |  | (4.82)** | (4.15)** |
| Other methods |  |  |  | 0.032 | 0.028 |
|  |  |  |  | (0.62) | (0.51) |
| Constant | 0.374 | 0.382 | 0.395 | 0.331 | 0.440 |
|  | (4.91)** | (4.69)** | (4.92)** | (3.28)** | (3.64)** |
| Case category dummies | No | No | No | No | Yes |
| Observations | 689 | 688 | 681 | 663 | 663 |
| $R^2$ | 0.92 | 0.92 | 0.92 | 0.93 | 0.93 |

Notes: Robust *t* statistics in parentheses; *significant at 5 percent; **significant at 1 percent; standard errors are clustered by locale.

Sources: Westlaw, LexisNexis, PACER.

recovery. None of the other models add materially to the explanatory power of this simple model. Nevertheless, it is noteworthy that the model with the largest set of explanatory variables, Model 5, shows no statistically significant difference between state and federal courts. The models also consistently confirm that fee methods other than the pure lodestar method tend to have higher fees. The models confirm the association between greater risk and increased fees.[32] In Model 5, a test of the hypothesis that the case category dummy variables are jointly equal to zero can be rejected at $p = 0.0003$. Their significance persists if one omits the two small cases categories, civil rights and tax, but the significance level increases to $p = 0.012$. The significance of the results in Table 18 persists if one limits the sample to the 106 cases with recoveries of $100 million or more but the sizes of the coefficients do change. The percent of variance explained then ranges from 72 percent to 77 percent, depending on the model.

We also tested whether the use of a lodestar "cross-check" generated a different pattern of fees than when fees were calculated according to the percentage method alone. A regression analysis not reported here does not find any statistically significant difference between fees calculated by the percentage method alone and those calculated by the percentage method with the lodestar cross-check. This result may raise questions about the utility of the lodestar cross-check, which can involve a time-consuming analysis of the reasonableness of the attorneys' hours and hourly rates.

## VII. Discussion

The data support several major conclusions.

*Strength of Relation and Dominance of Method.*  The percentage fee method is overwhelmingly the method used by courts in awarding fees in class actions. It is so widely used and so consistently employed that other information about cases adds little explanatory power to study of the fee award. The amount of the class recovery dwarfs all other effects. Even in circuits that eschew the percentage method, it appears to be the dominant de facto method used and best explains the pattern of awards. The consistent pattern may help attorneys to calibrate their fee requests and lead to courts usually approving the requested fee amount.

*Scale Effect and Aggregate Litigation.*  The pattern of class action awards continues to exhibit a strong scale effect. Attorneys receive a smaller proportion of the recovery as the size of the recovery increases. Aggregation of claims thus appears to have produced the kind of efficiency hoped for. This characteristic of aggregate litigation should be considered when evaluating devices designed to preclude or discourage aggregate litigation or arbitration, such as prohibitions on class arbitration.[33]

––––––

[32]Multilevel models, using random intercepts for locale and case category, do not yield materially different results.

[33]For a study suggesting possible efforts to discourage aggregate litigation, see Theodore Eisenberg, Geoffrey P. Miller & Emily Sherwin, Mandatory Arbitration for Customers But Not for Peers: A Study of Arbitration Clauses in Consumer

*280   Eisenberg and Miller*

*The Scope and Nature of Our Sample.*  Some perspective on the scope of our sample relative to the universe of class action cases comes from a study of class actions against insurers from 1993 through 2002. The RAND Institute for Civil Justice surveyed 269 property and casualty insurers and 207 life and health insurers, received responses from 205 companies, and obtained usable information from 199 insurers.[34] Of 564 attempted class actions, 12 percent led to a class settlement.[35] In 32 cases, the respondents provided information about the aggregate pool of funds offered to settle the case and its associated expenses. The amounts ranged from $360,000 to $150 million, with a mean fund size of $12.8 million and a median size of $2.6 million. Almost two-thirds of the cases, 62.5 percent, resulted in a common fund of less than $5 million.[36] In 48 cases, the respondents supplied information about the award to class counsel for fees and expenses. Fees and expenses ranged from $50,000 to $50,000,000, with a mean of $3.4 million and a median of $554,000.[37] The overall median fee and expense ratio from the pooled data was thus about 21 percent ($554,000 divided by $2.6 million). This compares to a pooled median fee of $2.33 million and median gross recovery of $12.5 million in our sample, as shown in Table 3, which yields a pooled ratio of 19 percent. The scaling effect, combined with our higher median gross recovery, probably helps explain the lower ratio in our sample of cases.

Aside from the RAND study's similar findings about fee levels, the study shows the small fraction of class action filings that lead to information about fees, even in the absence of being limited to available opinions. In the RAND data, 564 purported class actions led to 78 certified classes and 32 cases with available fee information. Thus, less than 15 percent of purported class actions were certified and about 6 percent led to usable fee information. If the same proportions are assumed to apply more broadly, then our 689 fee cases can be thought of as representing over 12,000 purported class action filings.

*Federal-State Differences.*  Despite claims that CAFA was needed to redress differences in state and federal court processing of class actions, our data provide little evidence of federal-state differences. The fee per amount recovered did not systematically differ between federal and state courts, as shown in Table 17. Table 13 shows that state courts were, if anything, less likely than federal courts to grant the requested fee amount.

------

and Non-Consumer Contracts, 92 Judicature 118 (Nov.–Dec. 2008); Theodore Eisenberg, Geoffrey P. Miller & Emily Sherwin, Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Nonconsumer Contracts, U. Mich J.L. Reform 871 (2008), reprinted in 4 ICFAI U.J. of Alternative Disp. Resol. 51 (2008).

[34]Nicholas M. Pace, Stephen J. Carroll, Ingo Vogelsang & Laura Zakaras, Insurance Class Actions in the United States 9–10 (2007).

[35]Id. at 47 (tbl. 3.16).

[36]Id. at 54.

[37]Id. at 55.

The absence of pro-class bias in state courts is consistent with sources cited above[38] and with additional research. In the RAND insurance study, of 564 attempted class actions, 12 percent led to a class settlement, with 12 percent of the 465 state court cases and 15 percent of the 98 federal court cases settling.[39] The modal outcome of a pretrial ruling for the defense did not significantly differ between federal and state courts.[40] The settlement rate for the cases with certified classes did not statistically significantly differ between federal and state courts.[41]

Thus, available evidence about comparative state-federal judicial performance in class actions consistently suggests no strong differences.

## VIII. Conclusion

Over the course of 16 years, attorney fees in class action cases have displayed a strikingly strong linear relation to class recoveries. Significant associations also exist between the fee amount and both the fee method and the riskiness of the case. Despite CAFA's premise of differences between federal and state court treatment of class actions, our findings add to a growing body of evidence that little hard data support claims of significant state-federal differences. Core results persisted in mega-cases, those with recoveries of $100 million or more, in cases with settlement classes, and in cases with and without objectors and opt outs. Fees and costs decline as a percent of the recovery as the recovery amount increases, suggesting the efficiency of this form of aggregate litigation. In this data set that likely includes the most significant class action decisions, those that lead to an available opinion, neither fees nor recoveries materially increased over time.

We hope that the information contained in this study can be of use to courts charged with the important and sometimes daunting task of setting counsel fees in class action and derivative cases.

---

[38]Text accompanying notes 18–22 supra.

[39]Pace et al., supra note 34, at 47 (tbl. 3.16).

[40]Id.

[41]Id. at 48 (tbl. 3.17). The study did not distinguish between orders certifying the case for a class trial, those certifying for settlement purposes only, and those certifying on a provisional basis only. Id. at 17. Neil Marchand reports that plaintiffs' preferences for state or federal court in Michigan class actions vary depending on the governing substantive law, with preference for state courts in cases governed by state substantive law and preference for federal courts in cases governed by federal substantive law. Neil J. Marchand, Class Action Activity in Michigan's State and Federal Courts, available at <http://ssrn.com/abstract=1334923>.